1  Julie A. Pace (#014585)
2  **BALLARD SPAHR ANDREWS & INGERSOLL, LLP**
3  3300 North Central Avenue, Suite 1800
   Phoenix, Arizona 85012-2518
   Telephone: 602-798-5477
4  Fax: 602-998-3251
5  Email: seldend@ballardspahr.com
        pacej@ballardspahr.com
6
7  Attorneys for Plaintiffs

8        **IN THE UNITED STATES DISTRICT COURT**
9          **FOR THE DISTRICT OF ARIZONA**

10  MANUEL de JESUS ORTEGA              )   Case No.
    MELENDRES, on behalf of himself and )
11  all others similarly situated,       )
                                         )
12          Plaintiffs,                  )   **COMPLAINT  (Class Action)**
                                         )
13  v.                                   )   **1. Violation of Equal Protection under the**
                                         )   **U.S. Constitution**
14  JOSEPH M. ARPAIO, in his individual  )   **2. Violation of Unreasonable Search and**
    and official capacity as Sheriff of  )   **Seizure under U.S. Constitution**
15  Maricopa County, Arizona, JOHN       )   **3. Violation of Due Process under U.S.**
    DOES 1-10 in their individual and    )   **Constitution**
16  official capacities as sheriff's     )   **4. Violation of Right to Travel under U.S.**
    deputies for the County of Maricopa, and )   **Constitution**
17  MARICOPA COUNTY, ARIZONA,            )   **5. Violation of Due Process under Arizona**
                                         )   **Constitution**
18          Defendants.                  )   **6. Violation of Right to Privacy under**
                                         )   **Arizona Constitution**
19                                       )   **7. Violation of Race Discrimination in**
                                         )   **Federally Funded Programs**
20                                       )
21  ───────────────────────────────────
22
23          Plaintiff, Manuel de Jesus Ortega Melendres ("Plaintiff" or "Mr.
24  Ortega"), on behalf of himself and all others similarly situated, by and through his
25  attorneys, Ballard Spahr Andrews & Ingersoll, LLP, alleges upon information and
26  belief, except as to his own actions, the investigation of his counsel, and the facts that
27  are a matter of public record, as follows:
28

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

## NATURE OF THE CASE

1.    In this civil rights case, Plaintiff seeks to remedy and stop illegal, discriminatory and unauthorized enforcement of federal immigration laws against Hispanic persons in Maricopa County, Arizona.  Plaintiff also seeks damages for his unlawful arrest and detention.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  This Court has authority to grant declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 1343, 2201, and 2202, and to award attorneys' fees under 28 U.S.C. §§ 1988 and 2412.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.    Plaintiff Manuel de Jesus Ortega Melendres, a Hispanic male, is a citizen and resident of Sonora, Mexico.  At the time of the events that are the subject of this lawsuit, Mr. Ortega possessed a valid Visa issued by the United States Department of State and a valid Permit issued by the United States Department of Homeland Security.  Mr. Ortega is a retired school teacher.

5.    Defendant Maricopa County, Arizona, is a political subdivision of the State of Arizona that can sue and be sued in its own name.  Upon information and belief, Maricopa County receives federal funds.

6.    Defendant Joseph M. Arpaio ("Arpaio") was at all relevant times the Sheriff of Maricopa County, Arizona, acting within the scope of his employment as Sheriff.  He is responsible for, among other things, the implementation of the policies and/or practices of Maricopa County, including but not limited to, the control, supervision, operation and administration of the Maricopa County Sheriff's Office.

7.    Defendants John Does 1-10 were at all times relevant to this complaint, employed, duly appointed, and acting as sworn officers of the Maricopa County

2

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

Sheriff's Office, and were at all times acting under color of law and pursuant to the policies and/or usages of the County of Maricopa and the State of Arizona. Said Defendants are sued individually and in their official capacities as sheriff's deputies. Defendants are hereinafter referred to collectively as "Defendants."

## FACTS

### The Unlawful Stop and Detention of Manuel de Jesus Ortega

8.     On September 6, 2007, Mr. Ortega legally entered the United States at the border station in Nogales, Arizona.

9.     Mr. Ortega possesses a United States Visa that is valid through August 23, 2016, and possessed a Permit issued by the United States Department of Homeland Security that was valid through November 1, 2007.

10.     On or about September 26, 2007, at 6:15 a.m., Mr. Ortega was a passenger in a vehicle in Cave Creek, Arizona, that was stopped by officers from the Maricopa County Sheriff's Office. The vehicle was being driven by a Caucasian male, but the passengers, including Mr. Ortega, were Hispanic men.

11.     The officers told the driver that he was being stopped for speeding, but they did not give him a citation or take him into custody.

12.     The officers looked at Mr. Ortega sitting in the vehicle and asked him to produce identification.

13.     Mr. Ortega showed them the following documents that he had in his wallet: (a) his United States Visa, which has his photograph and fingerprint on it; (b) his Mexican Federal Voter Registration card, which also has his photograph and fingerprint on it; and (c) a copy of the Permit he was given by the United States Department of Homeland Security with a stamp that shows his admission to the United States was valid through November 1, 2007.

14.     Although Mr. Ortega produced identification establishing his legal status in the United States, the officers told him to exit the vehicle, which he did.

3

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

15.    After exiting the vehicle, the officers pushed Mr. Ortega against a Sheriff's Department vehicle and patted him down over his entire body in a rough manner.

16.    The Sheriff's officers then took everything out of Mr. Ortega' pockets, including his wallet and a small bottle of lotion that Mr. Ortega occasionally applies to his face so that his skin does not become dry.

17.    The Sheriff's officers, upon removal of the small bottle of lotion from Mr. Ortega's pocket, asked Mr. Ortega in a confrontational manner "How many times a week to you jack off?"

18.    Mr. Ortega was then handcuffed with his arms behind his back.  Mr. Ortega had a broken wrist years ago that did not heal correctly.  His wrist has a visible deformity and causes him pain.  Mr. Ortega asked the Sheriff's officers to please be careful in handcuffing him, but they handled him roughly.  The officers kept Mr. Ortega' hands handcuffed behind his back for approximately 40 minutes.

19.    The officers then put Mr. Ortega in the back of a Sheriff's vehicle and took him to the Sheriff's office in Cave Creek.

20.    At the Sheriff's office they placed Mr. Ortega in a holding cell where they left him for four hours.

21.    Throughout the time that Mr. Ortega was seized from the vehicle, patted down, handcuffed, transported to the Sheriff's office, placed in the holding cell and left to remain in the holding cell, no one from the Sheriff's office explained anything to him, and no one offered to get a Spanish speaking officer or translator to assist in communicating with him.

22.    The officers did not advise Mr. Ortega of his *Miranda* rights.

23.    The officers did not tell Mr. Ortega that he had the right to speak to an attorney.

24.    The officers did not tell Mr. Ortega anything about whether he could or should make any statements to them.

4

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

25. The officers did not give Mr. Ortega any opportunity to make a phone call.

26. The officers did not tell Mr. Ortega what crime he allegedly committed, or if he was being charged with any crime.

27. The officers did not say anything about what might happen to Mr. Ortega.

28. The officers did not give Mr. Ortega any documents regarding his arrest or their putting him in jail.

29. After the Sheriff's officers left Mr. Ortega in the jail in Cave Creek for four hours, they placed him in handcuffs again, with his arms behind his back and took him to a Hummer vehicle. A driver and a driver's companion then drove him to downtown Phoenix. The driver of that vehicle spoke Spanish. Mr. Ortega explained that his wrist was quite painful and asked if he could be handcuffed with his hands in front of him rather than with his hands pulled behind his back. The driver said that he could not do that.

30. The officers drove Mr. Ortega to the U.S. Immigration and Customs Enforcement ("ICE") office on Central Avenue in downtown Phoenix. They took him inside and removed the handcuffs. Mr. Ortega' hands were swollen, and he was in pain.

31. At the ICE office Mr. Ortega was placed in a holding cell and left unattended for more than one hour.

32. After waiting in the cell, Mr. Ortega was taken to an ICE official. He did not identify himself or give Mr. Ortega any identification. The Sheriff's officers who arrested Mr. Ortega were also present.

33. The ICE officer asked Mr. Ortega how he entered the United States. Mr. Ortega told him that he came through legally at the port of entry at Nogales, Arizona. The ICE officer asked for Mr. Ortega's documents.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

34. The Sheriff's officers gave Mr. Ortega's Visa and other documents to the ICE official. The ICE official took look a quick look at the documents and said, "These documents are good."

35. The ICE official told Mr. Ortega he was free to leave.

36. Mr. Ortega was in custody from 6:15 a.m. until about 3:00 p.m.

37. During the approximately nine hours that he was in custody, Mr. Ortega was never: (a) given any water, (b) given any food, (c) told his rights, or (d) given the name of any of the officers involved.

38. Mr. Ortega also was never given any paperwork, other than a case number, with any information about his: (a) being stopped, (b) being taken into custody by the Sheriff's officers, (c) being held in jail by the Sheriff's officers, (d) being transferred to the ICE office, (e) being held in jail at the ICE office, or (f) his being released from custody.

39. After being released in downtown Phoenix, Mr. Ortega had to make his own way from downtown Phoenix to Cave Creek.

40. Because of Mr. Ortega' experience with the Maricopa County Sheriff's officers he is now afraid.

41. Mr. Ortega is frightened to walk on the street or be seen in public in Maricopa County because he fears that the Sheriff's officers will come and arrest him again because he is Hispanic and does not speak English.

42. Mr. Ortega is afraid that the Sheriff's officers will hurt him physically if they pick him up again.

43. Mr. Ortega is afraid that he will be thrown in jail without any explanation, without any rights, and without any opportunity to get help even though the federal government of the United States has issued a Visa to him that gives him permission to be here.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

**Defendants' Limited Authority to Perform Immigration Enforcement Functions**

44.     Pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. §1357(g), the Secretary of the U.S. Department of Homeland Security is authorized to enter into agreements with state and local law enforcement agencies to train and permit designated officers to perform certain immigration enforcement functions.  Under such a Memorandum of Agreement ("MOA"), the state and local officers are given training and supervised by appropriate ICE officers.

45.     According to ICE, "[t]he 287(g) program is designed to enable state and local law enforcement personnel, **incidental to a lawful arrest and during the course of their normal duties**, to question and detain individuals for potential removal from the United States, **if these individuals are identified as undocumented illegal aliens and they are suspected of committing a state crime**." *Fact Sheet, Section 287(g) of the Immigration and Nationality Act* (September 24, 2007)*, available at* http://www.ice.gov/pi/news/factsheets/factsheet287gprogover.htm (emphasis added)( a true copy of the *Fact Sheet* is attached hereto as Exhibit A).

46.     ICE also has made it clear that, "[t]he 287(g) program is not designed to allow state and local agencies to perform random street operations."  The 287(g) program also, "is not designed to impact issues such as excessive occupancy and day laborer activities."  Indeed, "ICE representatives repeatedly emphasized that it is designed to identify individuals for potential removal, **who pose a threat to public safety, as a result of an arrest and/or conviction for state crimes**." *Id.* (emphasis added).

47.     ICE guidelines specifically direct that, "**Police can only use 287(g) authority when people are taken into custody as a result of violating state or local criminal law.  Police cannot randomly ask for a person's immigration status or conduct immigration raids**," and officers may only, "use their authority when dealing with someone who is suspected of a state crime that is more than a traffic offense." *Id.* (emphasis added).

7

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

48.     In or around January 2007, Defendants Maricopa County and Arpaio entered into an MOA with ICE which authorized up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office to perform certain immigration enforcement functions. A true copy of the MOA is attached hereto as Exhibit B.

49.     Part I of the MOA provides that, "the exercise of the immigration enforcement authority granted under this MOA to participating LEA [Law Enforcement Agency] personnel shall occur only as provided in this MOA." Part V of the MOA specifically provides that the immigration enforcement authority granted to Defendants is, "subject to the limitations contained in this MOA."

50.     Part XV of the MOA provides as follows:

> Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

> Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

51.     The U.S. Department of Justice Guidance Regarding the Use of Race By Federal Law Enforcement ("DOJ Guidance") to which Defendants are bound specifically states that, "'[r]acial profiling' at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures," and that, "[r]acial profiling in law enforcement is not merely wrong, but also ineffective." A true copy of the DOJ Guidance is attached hereto as Exhibit C.

52.     The DOJ Guidance directs that, "[i]n making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement

officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description."

53.     Defendants' authority to enforce federal immigration law is constrained and limited by the U.S. Constitution, federal law and the MOA.

54.     Notwithstanding those profound limits on Defendants' authority, Defendants, acting under and pursuant to Arpaio's policies, practices, philosophies and directives, have grossly exceeded the limits of their lawful authority and in so doing they have egregiously trampled the constitutional and civil rights of Ortega and countless other Hispanic and Latino members of the Maricopa County community.

55.     By their actions described above and as set forth in more detail below, Defendants have devised and implemented an invidious and unconstitutional custom, policy and practice of racial profiling toward Hispanic and Latino persons in Maricopa County.

## Defendants' Racial Profiling and Abuse of Authority

56.     In or about July, 2007, Arpaio established a dedicated hotline for people to call the Maricopa County Sheriff's Office with information about alleged unauthorized aliens. Arpaio and Maricopa County do not have legal authority under federal law or the MOA to establish and operate that hotline.

57.     Arpaio established and implemented a "Triple I" Unit (Illegal Immigration and Interdiction) to investigate tips received on his illegal immigration hotline. Arpaio and Maricopa County do not have legal authority under federal law or the MOA to operate the Triple I Unit.

58.     On September 27, 2007, Arpaio ordered his Triple I Unit to go to Cave Creek, Arizona, to investigate and arrest illegal immigrants. Acting under color of law and Arpaio's orders, several Maricopa County Sheriff's officers detained, questioned and arrested at least nine Hispanic individuals allegedly because they were illegal immigrants. Upon information and belief, those officers did not have probable cause to believe that any of those detained, questioned or arrested had committed a

9

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

violation of Arizona state law. Those arrested were transported directly to jail, not to an ICE facility.

59.     On October 4, 2007, Arpaio ordered his Triple I Unit to go to Queen Creek, Arizona, for an operation similar to that conducted in Cave Creek. Again, at least 16 Hispanic individuals were detained, questioned and arrested on suspicion of being illegal immigrants. Upon information and belief, the arresting officers did not have probable cause to believe that any of those detained, questioned or arrested had committed a violation of Arizona state law. Those arrested were transported directly to jail, not to an ICE facility.

60.     Recently, Arpaio entered into an agreement with the Maricopa County Attorney's Office to jointly investigate possible violations of Arizona's new employer sanctions law, A.R.S. Section 23-212. According to Arpaio, his Triple I Unit will be used to enforce that law. Maricopa County Attorney Andrew Thomas sought the agreement with Arpaio because he has, "a proven track record of enforcing immigration laws and not caving in to political correctness." The constitutionality and validity of Arizona's new employer sanctions law is the subject of other cases pending in this court.

61.     At a recent press conference, Arpaio clearly and emphatically outlined his overzealous, illegal and unconstitutional policies and philosophies. He described his operation as a "pure program." One designed, "to go after illegals, not the crime first." His practice is to "go after illegals... go after 'em and lock 'em up." Arpaio and Maricopa County do not have legal authority under federal law or the MOA to engage in that conduct.

62.     On December 8, 2007, Sheriff's officers followed, questioned and detained a Hispanic male in Cave Creek. He was merely walking on the sidewalk. He was followed by officers in a patrol car. The officers stopped the car, approached the man and detained him for questioning without probable cause or other lawful basis.. The officers asked him for identification and his social security card. They

10

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

questioned him at length about his citizenship status and his residence.  He is a U.S. citizen.

63.     For the past several weeks, Arpaio and his officers have detained, questioned and arrested Hispanic protesters demonstrating in the vicinity of Pruitt's Home Furnishings in east Phoenix.   Upon information and belief, the arresting officers did not have probable cause to believe that any of those detained, questioned or arrested had committed a violation of Arizona state law.

64.     In a blatant affront to the Pruitt store protesters First Amendment rights, Arpaio has announced that he will continue to harass and arrest those protesters until and unless they stop their protests.

65.     Defendants' conduct violates the Constitution and laws of the United States, the MOA and the DOJ Guidance.  As such, it must be stopped.

## CLASS ALLEGATIONS

66.     This is a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) on behalf of Plaintiff and all other similarly situated individuals.

67.     The class which Plaintiff seeks to represent consists of, "all individuals of Hispanic descent who reside, are employed, attend school and travel within the borders of Maricopa County, Arizona."  This class is so numerous that joinder of all members is impracticable.

68.     There are questions of law and fact common to all members of the class and all class members have been directly affected by the challenged actions of Defendants.  Each putative class member has been subjected to arbitrary, racially-discriminatory stops, detention, arrests and/or searches conducted by Defendants.  Each putative class member has been subjected to stops, detentions, interrogations and/or searches without any reasonable articulable suspicion or probable cause that such class member had committed a crime or was engaged in criminal activity.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

69.     The claims and defenses of the representative plaintiff are typical of the claims and defenses of the class.

70.     The representative plaintiff will fairly and adequately protect the interests of the class.

71.     Defendants in this case have taken actions in violation of the class members' constitutional rights and/or refused to act in accordance with those rights, which are grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

72.     Plaintiff's counsel is competent and experienced in class action litigation of this type.

### FIRST CLAIM FOR RELIEF:
### EQUAL PROTECTION
### (Fourteenth Amendment)

73.     Plaintiff hereby incorporates by this reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

74.     As an Hispanic and a citizen of a foreign country, Mr. Ortega is a member of a protected class.

75.     As Hispanics and citizens of a foreign country, those individuals detained, questioned and arrested by Defendants' Triple I Unit on September 27 and October 4, are members of a protected class.

76.     Defendants, acting under color of law and in concert with one another, engaged in profiling of Mr. Ortega and other Hispanic individuals based on their race.

77.     Defendants, acting under color of law and in concert with one another, engaged in profiling of Mr. Ortega and other Hispanic individuals based on their national origin.

78.     Defendants did not have reasonable suspicion or probable cause to stop and/or detain Mr. Ortega or any of the other Hispanic individuals referred to above.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

79.     By purposefully stopping and detaining Mr. Ortega because of his race and/or national origin, Defendants deprived Mr. Ortega of the equal protection of the law within the meaning of the Fourteenth Amendment to the United States Constitution.  These actions violated Mr. Ortega' Fourteenth Amendment rights and 42 U.S.C. § 1983.

80.     By their conduct described above, Defendants in general, and Arpaio in particular, have devised and implemented a policy, custom and practice of illegally detaining and questioning Hispanic individuals solely because of their race and national origin.

81.     Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

82.     As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

**SECOND CLAIM FOR RELIEF:**
**UNREASONABLE SEARCH AND SEIZURE**
**(Fourth and Fourteenth Amendments)**

83.     Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

84.     Pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, state and local governments are prohibited from conducting unreasonable searches and seizures.

85.     Defendants, acting under color of law and in concert with one another, stopped, seized, searched and arrested Mr. Ortega without probable cause or reasonable suspicion that he had committed any crime.  Such conduct violated the

DMEAST #9915788 v1

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

1  Fourth Amendment guarantee against unreasonable searches and seizures, the

2  Fourteenth Amendment, and 28 U.S.C § 1983.

3       86.    Upon information and belief, Arpaio and the other Defendants, acting

4  under color of law and in concert with one another, have engaged in a custom,

5  practice and policy of stopping, seizing, searching and arresting Hispanic individuals

6  in Maricopa County without probable cause or reasonable suspicion that they had

7  committed any crimes under Arizona law.

8       87.    Defendants' actions have caused and will continue to cause Mr. Ortega

9  and other similarly situated individuals to suffer tremendous harm and public

10  humiliation and be subjected to unlawful discrimination unless these actions are

11  stopped.

12       88.    As a direct, proximate result of Defendants' wrongful conduct, Mr.

13  Ortega has suffered and will continue to suffer significant and substantial emotional

14  and physical injuries.

**THIRD CLAIM FOR RELIEF:**
**DUE PROCESS**
**(Fourteenth Amendment)**

17       89.    Plaintiff hereby incorporates by reference all allegations of the

18  preceding paragraphs of this Complaint, as if fully set forth herein.

19       90.    Defendants, acting under color of law and in concert with one another,

20  stopped, seized, searched and arrested Mr. Ortega without probable cause or

21  reasonable suspicion that he had committed any crime.

22       91.    Defendants, acting under color of law and in concert with one another,

23  unlawfully detained Mr. Ortega without probable cause or reasonable suspicion that

24  he had committed any crime.

25       92.    Defendants, acting under color of law and in concert with one another,

26  failed to implement and/or follow proper procedures to determine Mr. Ortega's legal

27  immigrant status prior to detaining, searching and arresting him.

28

DMEAST #9915788 v1

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

93.     Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under federal law through the MOA, the DOJ Guidance and the Section 287(g) program.

94.     Defendants' wrongful conduct violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983 in that they denied Mr. Ortega and other similarly situated individuals liberty and freedom without due process of law.

95.     As members of a suspect class, Mr. Ortega and other similarly situated Hispanic individuals are entitled to be treated fairly, equally and free from discrimination.  Defendants' wrongful conduct deprived Mr. Ortega and other similarly situated individuals of substantive due process in violation of the Due Process Clause of the Fourteenth Amendment in that those Defendants discriminated against Mr. Ortega and other similarly situated individuals on the basis of their race and national origin.

96.     Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

97.     As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

**FOURTH CLAIM FOR RELIEF**
**RIGHT TO TRAVEL**
**(Commerce Clause, Article IV and Fourteenth Amendment)**

98.     Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

99.     Defendants, acting under color of law and in concert with one another, have caused Mr. Ortega and other similarly situated individuals to be penalized and

15

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

deterred in the exercise of their fundamental right to interstate travel and migration on account of their race and/or national origin. These actions violated those individuals' right to travel, in violation of the Commerce Clause, the Privileges and Immunities Clause of Article IV, the Fourteenth Amendment and 28 U.S.C. § 1983.

100. Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

101. As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

**FIFTH CLAIM FOR RELIEF:**
**VIOLATION OF ARTICLE II, § 4 OF THE ARIZONA CONSTITUTION**

102. Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

103. Article II, § 4 of the Arizona Constitution provides: "No person shall be deprived of life, liberty, or property without due process of law."

104. By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated rights guaranteed to Mr. Ortega and other similarly situated individuals under Article II, § 4 of the Arizona Constitution.

105. Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

DMEAST #9915788 v1

106. As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

## SIXTH CLAIM FOR RELIEF:
## VIOLATION OF ARTICLE II, § 8 OF THE ARIZONA CONSTITUTION

107. Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

108. Article II, § 8 of the Arizona Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

109. By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated rights guaranteed to Mr. Ortega and other similarly situated individuals under Article II, § 8 of the Arizona Constitution.

110. Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

111. As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

## SEVENTH CLAIM FOR RELIEF:
## RACE DISCRIMINATION IN FEDERALLY FUNDED PROGRAMS
### (Defendant County of Maricopa)

112. Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

113. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

> [N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

discrimination under any program or activity receiving federal financial assistance.

114. Defendant County of Maricopa is a political subdivision of the State of Arizona and, as a recipient of federal funds, is required to conduct its activities in a racially non-discriminatory manner, pursuant to Title VI of the Civil Rights Act of 1964.

115. Federal regulations implementing Title VI further provide that no program receiving financial assistance through the U.S. Department of Justice shall utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin. 28 C.F.R. § 42.104(b)(2).

116. The methods employed by Arpaio and Maricopa County discriminate against individuals based on their race, color, and national origin, as described herein.

117. Defendant Maricopa County's violation of 42 U.S.C. § 2000d and its implementing regulations has caused and will continue to cause Mr. Ortega and other similarly situated individuals tremendous harm and public humiliation in that they will continue to be subjected to unlawful discrimination unless it is stopped.

118. As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

# DEMAND FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of a class of all those similarly situated, respectfully demands judgment against Defendants awarding the following:

A.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race and national origin and denied Mr. Ortega and the class due process of law and the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983;

B.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' detention, search and arrest of Mr. Ortega and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they had committed a crime, violated the Fourth Amendment's guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 28 U.S.C. § 1983;

C.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' conduct violated Mr. Ortega's rights to procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983;

D.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' conduct violated Mr. Ortega's right to travel interstate, in violation of the Commerce Clause, the Privileges and Immunities Clause of Article IV, the Fourteenth Amendment, and 28 U.S.C. § 1983;

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

E.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violated the procedural and substantive due process guarantees of Article II, § 4 of the Arizona Constitution;

F.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violated Mr. Ortega's privacy rights provided by Article II, § 8 of the Arizona Constitution;

G.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendants engaged in race discrimination in violation of Title VI of the Civil Rights Act of 1964 and 42 C.F.R. § 101 et seq.;

H.  A preliminary and permanent injunction prohibiting Defendants from continuing to engage in such race and national origin based discrimination as described herein and to put into place safeguards sufficient to ensure that such discrimination does not continue in the future;

I.  A preliminary and permanent injunction prohibiting Defendants from exceeding the limits of their authority under federal immigration law, the MOA and the DOJ Guidance;

J.  A preliminary and permanent injunction prohibiting Defendants from operating their so-called illegal alien hotline;

K.  A preliminary and permanent injunction directing Defendants to disband and dissolve their so-called Triple I Unit;

L.  An award of compensatory and consequential damages to Mr. Ortega in an amount to be determined at trial;

M.  An award of punitive damages against the individual Defendants for their wanton, willful and malicious violations of Mr. Ortega' constitutional and civil rights, in an amount to be determined at trial;

20

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

N.      An award of attorneys' fees and costs of suit, plus interest, pursuant to

42 U.S.C. §§ 1988 and 2412; and

O.      Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 12th day of December, 2007.

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP

By: /s/ Julie A. Pace
   Julie A. Pace
   3300 N. Central Avenue, Suite 1800
   Phoenix, Arizona 85012
   Attorneys for Plaintiffs

Louis R. Moffa, Jr.
Plaza 1000 Main Street
Suite 500
Voorhees, New Jersey 08043
Phone:  856-761-3493
Fax:     856-873-9050
Email:  moffal@ballardspahr.com

I hereby certify that on the 12th_ day of December, 2007, I caused the foregoing document:

COMPLAINT

To be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to the following ECF participants:

And to be delivered as a courtesy hard copy To:

/s/ Kathleen Reynolds

DMEAST #9915788 v1


EXHIBIT A

 

U.S. Immigration
and Customs
Enforcement

- Skip Navigation
- Home
- Site Map
- Español

Search                          Go

Home
About Us
Partners
International Students
Public Information
Careers
Español

- Public Information
- Topics of Interest
- Annual Report
- News Releases
- Fact Sheets
- Speeches & Testimonies
- Email Sign Up
- Newsletters
- FOIA
- FAQs

Protecting National Security and Upholding Public Safety

# Fact Sheets

September 24, 2007

### Delegation of Immigration Authority Section 287(g)
### Immigration and Nationality Act

# Section 287(g) of the Immigration and Nationality Act

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), effective September 30, 1996, added Section 287(g), performance of immigration officer functions by state officers and employees, to the Immigration and Nationality Act (INA). This authorizes the secretary of the U.S. Department of Homeland Security (DHS) to enter into agreements with state and local law enforcement

agencies, permitting designated officers to perform immigration law enforcement functions, pursuant to a Memorandum of Agreement (MOA), provided that the local law enforcement officers receive appropriate training and function under the supervision of sworn U.S. Immigration and Customs Enforcement (ICE) officers.

The cross-designation between ICE and state and local patrol officers, detectives, investigators and correctional officers working in conjunction with ICE allows these local and state officers: necessary resources and latitude to pursue investigations relating to violent crimes, human smuggling, gang/organized crime activity, sexual-related offenses, narcotics smuggling and money laundering; and increased resources and support in more remote geographical locations.

## Memorandum of Agreement

The MOA defines the scope and limitations of the authority to be designated. It also establishes the supervisory structure for the officers working under the cross-designation and prescribes the agreed upon complaint process governing officer conduct during the life of the MOA. Under the statute, ICE will supervise all cross-designated officers when they exercise their immigration authorities. Once the scope of limitations of the MOA has been reached, the assistant secretary of ICE, and the governor, a senior political entity, or the head of the local agency may sign the MOA, requesting the cross-designation.

## Officer Selection Requirement

- U.S. citizen;
- Current background investigation completed;
- Minimum two years experience in current position; and
- No disciplinary actions pending.

## Training Requirements

ICE offers two training programs including a five-week program for field level law enforcement officers and a four-week program for correctional personnel. The U.S. Immigration and Customs Enforcement Academy sets standards and testing. Certified instructors conduct the training.

## 287(g) Signed MOAs as of 9-19-07 : 28

- AL Alabama State Police
- AZ Department of Corrections
- AZ AZ Department of Public Safety
- AZ Maricopa County Sheriff's Office
- CA Los Angeles County Sheriff's Department
- CA Orange County Sheriff's Office
- CA Riverside County Sheriff's Office
- CA San Bernardino County Sheriff's Office
- CO CO Dept. of Public Safety
- CO El Paso County Sheriff's Office
- FL Collier County Sheriff's Office
- FL Florida Department of Law Enforcement

- GA Department of Public Safety
- GA Cobb County Sheriff's Office
- MA Department of Corrections
- MA Framingham Police Department
- MA Barnstable County Sheriff's Office
- NC Alamance County Sheriff's Office
- NC Cabarrus County Sheriff's Office
- NC Gaston County Sheriff's Office
- NC Mecklenburg County Sheriff's Office
- NH Hudson City Police Department
- OK Tulsa County Sherrif's Office
- TN Davidson County Sheriff's Office
- VA Herndon Police Department
- VA Prince William-Manassas Adult Detention Center
- VA Rockingham County Sheriff's Office
- VA Shenandoah County Sheriff's Office

- Number of Task Force MOAs in Field: 10
- Number of Jail MOAs in Field: 14
- Number of Joint MOAs in Field: 4
- Number of Officers Trained to date: 485
- Number of Arrests: More than 25,000

# Criminal Alien Program (CAP)

Under current MOAs, 287(g) participants in Arizona , California , and North Carolina currently ensure that criminal aliens incarcerated within federal, state and local facilities are not released into the community upon completion of their sentences. ICE is working to expand 287(g) authority to local and county correctional facilities that are not operational within normal ICE jurisdictions. The expansion of the 287(g) program into smaller county and local correctional facilities will act as a force multiplier for CAP and have a positive impact on this important program.

# A Law Enforcement Partnership

Terrorism and criminal activity are most effectively combated through a multi-agency/multi-authority approach that encompasses federal, state and local resources, skills and expertise. State and local law enforcement play a critical role in protecting our homeland security because they are often the first responders on the scene when there is an incident or attack against the United States . During the course of daily duties, they will often encounter foreign-born criminals and immigration violators who pose a threat to national security or public safety.

# Frequently Asked Questions

# What is the program designed to do?

The 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and

they are suspected of committing a state crime.

## What is the program not designed to do?

The 287(g) program is not designed to allow state and local agencies to perform random street operations. It is not designed to impact issues such as excessive occupancy and day laborer activities. In outlining the program, ICE representatives have repeatedly emphasized that it is designed to identify individuals for potential removal, who pose a threat to public safety, as a result of an arrest and /or conviction for state crimes.

## How do I participate in the 287(g) Delegation of Authority program?

The interested agency must send a letter addressed to the U.S. Immigration and Customs Enforcement (ICE), attention Assistant Secretary, requesting participation in the 287(g) Delegation of Authority program. A sample letter can be obtained from the local 287(g) SAC point of contact.

## A law enforcement agency has requested to participate in the 287 (g) Delegation of Authority program, what's next?

ICE with assistance from the requesting law enforcement agency (LEA) conducts a field survey. This must be completed to determine the infrastructure required to support the request. If the local ICE office demonstrates they have the capability to fully support the request, it will then go to our ICE headquarters for further review. The final approval must come from the Assistant Secretary. An approved request requires the LEA enter into a Memorandum of Agreement (MOA) with ICE. The MOA defines the scope and limitations of the authority to be designated to the LEA. Once the MOA is signed and the parameters of the agreement are defined, ICE will train the LEA officers.

## What type of training is involved for participating agencies?

ICE offers two training programs including a five-week program for field-level law enforcement officers, and a four-week program for correctional/detention personnel. ICE sets standards and provides certified instructors to conduct the training. Training topics include such areas as immigration and criminal law, document examinations, cross-cultural communications and intercultural relations, alien status, ICE operations, statutory authority, removal charges, ICE Use of Force policy and avoidance of racial profiling. Upon successful completion of the training, officers receive official certification from ICE entitled "287(g) Authority." Re-certification is also required. After certification, ICE continues to provide supervision and support. By requirement, all grants of 287(g) authority must be supervised ICE to help state/local officers determine the appropriate response once they determine a suspect to be an immigration violator.

## Who Will Pay for Training?

ICE will pay for expenses associated with the training of officers under the 287(g) Delegation of Authority program.

# Who will pay for the salary of state/local officers while they attend training?

The LEA is required to pay its officers' salary.

# Who Will Pay for the Information Technology (Computer and Network Systems) Needed to Access the ICE Databases?

ICE will fund the costs associated with the Information Technology needed to access the ICE databases.

# What Are the Requirements for an Officer to Be Selected?

The officer must be a U.S. citizen, must have a background investigation completed by ICE, must have a minimum of two years experience in their current position, and have no disciplinary actions pending.

# What Role Does ICE Perform with 287(g) Trained State and Local Officers?

ICE will supervise the 287(g) trained officers while conducting immigration enforcement activities. ICE will also provide annual training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions.

# Can 287(g) Trained Officers Determine Alienage of any Person Suspected of Being an Illegal Alien?

The 287(g) trained officers are focused on identifying and processing criminal aliens for removal and on investigating criminal immigration violations.

# Does a person need to be convicted of a state crime for officers to use the 287(g) authority?

Officers trained and certified in the 287(g) program may use their authority when dealing with someone suspected of a state crime that is more than a traffic offense. If the person's identity is in question, the officer will be able to make an inquiry to the ICE system for help in making a positive identification. Officers can only use their 287(g) authority when dealing with persons suspected of committing state crimes and whose identity is in question or are suspected of being an illegal alien. While enforcing immigration law is primarily a federal responsibility, the 287(g) program provides a mechanism for enlisting the help of state and local law enforcement in this effort with a minimal impact on their normal duties.

# Will the police conduct raids looking for illegal aliens?

Police can only use 287(g) authority when people are taken into custody as a result of violating state or local criminal law. Police cannot randomly ask for a person's immigration status or conduct immigration

raids.

# Do LEAs receive special grants from ICE to fund their participation in the 287(g) program?

There are currently no ICE grants or payments made to LEAs for participation in the 287(g) program.

# Will participation in the 287(g) program allow LEAs to arrest any undocumented alien?

Incidental to an arrest for a state violation, 287(g) trained officers identify and process criminal aliens for removal from the U. S.

# Will LEA participation in the 287(g) program resolve all undocumented alien problems?

By providing training and assistance to LEAs across the country, 287(g) acts as a force multiplier for both the LEA and ICE to enforce the provisions of the INA. The requesting LEA should work closely with the local OI and DRO offices to identify the right mix of ICE services, which may or may not include 287(g) training, to address the local LEA concerns.

# What successes have 287(g) Delegation of Authority officers had?

ICE has established 22 Memorandum of Agreement's and has trained 349 law enforcement officers under the 287(g) program. These trained officers have arrested approximately 20,000 individuals under the 287(g) Delegation of Authority program. From January 19, 2007, thru March 18, 2007, Orange County, California, detention officers trained in 287(g) conducted approximately 1,508 interviews that resulted in 1,004 immigration detainers, Approximately 659 were for felony charges and approximately 345 were for misdemeanors. 71 of those detentions were affiliated with street gangs. In November 2005, the Arizona Department of Corrections (ADC) began processing alien inmates at their Intake Center as part of the 287(g) program. ADC estimates Arizona taxpayers have saved $9 million by accelerating ICE's removal of eligible state inmates.

# Contact Information

For more information on Section 287(g) of the Immigration and Nationality Act, you may request an information packet via the Section 287g form.

U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad

responsibilities for a number of key
homeland security priorities.

Last Modified: Tuesday, October 16, 2007

- About Us
- Partners
- International Students
- Public Information
- Careers
- Home
- Site Map
- DHS
- USA.gov
- FOIA
- Privacy & Usuage Policy
- Español
- Get Plugins

U.S. Immigration and Customs Enforcement (ICE)

EXHIBIT B

# MEMORANDUM OF AGREEMENT
## C-50-07-058-2-00

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and Maricopa County, a political subdivision of the State of Arizona, pursuant to which ICE authorizes up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office (hereinafter interchangeably referred to as MCSO or the "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The MCSO represents Maricopa County in the implementation and administration of this MOA. It is the intent of the parties that these delegated authorities will enable the LEA to identify and process immigration violators in Maricopa County consistent with the terms of this MOA. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

## I. PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter perform certain functions of an immigration officer within the LEA. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken by participating LEA personnel pursuant to this agreement.

## II. AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), also codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of the Department of Homeland Security, acting through the Assistant Secretary of ICE, to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

## III. POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating MCSO personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating MCSO personnel are subject to ICE supervision while performing immigration-related duties pursuant to this MOA. For the purposes of this MOA, ICE officers will provide supervision for participating MCSO personnel only as to immigration enforcement functions. MCSO retains supervision of all other aspects of the employment and performance of duties of participating MCSO personnel.

## IV. ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory 5 week (4 week for LEA personnel functioning solely in a correctional facility or ICE detention facility) training in the enforcement of federal immigration laws and policies as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. Only participating LEA personnel who are selected, trained, authorized, and supervised, as set out herein, have authority pursuant to this MOA to conduct the immigration officer functions enumerated in this MOA.

Participating LEA personnel performing immigration-related duties pursuant to this MOA will be LEA officers assigned to the Violent Fugitive Apprehension Squad (VFAS), Criminal Investigations Section (CIS), Anti-Gang Unit, Drug Enforcement Unit and Community Action Teams (CAT). Participating LEA personnel will be exercising their immigration-related authorities during the course of criminal investigations involving aliens encountered within Maricopa County. Any combination of these officers or others may be assigned and/or co-located as task force officers to assist ICE agents with criminal investigations.

The mission of these various LEA assignments are summarized as follows:

Violent Fugitive Apprehension Squad (VFAS): The LEA personnel assigned to the VFAS unit are charged with the responsibility of identifying high-risk felons who are wanted for crimes or offenses that represent a significant threat to public safety.

Criminal Investigation Section (CIS): The LEA personnel assigned to CIS by statute are charged with the responsibility of identifying criminal enterprises and other forms of organized criminal activities.

Anti-Gang Unit: The LEA personnel assigned to the anti-gang unit engage in law enforcement actions that are targeted against gang activity.

Drug Enforcement Unit: The LEA personnel assigned to these various drug enforcement units are involved with illegal trafficking in narcotics investigations, quite often they encounter individuals who may be in the country illegally.

Community Action Teams (CAT): The LEA personnel assigned to the Community Action Teams are officers who have been assigned to these special units and charged with the responsibility of assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity occurring in hot spots within their communities.

## V.    DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel will be authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1)) and to process for immigration violations those individuals who are convicted of State or Federal felony offenses;

- The power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. 287.5(c)(1).

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens. INA § 287(a)(4) and 8 C.F.R. § 287(c)(2).

- The power to serve warrants of arrest for immigration violations under 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required criminal alien processing, to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

- The power and authority to prepare charging documents (INA Section 239, 8 C.F.R. 239.1; INA Section 238, 8 C.F.R 238.1; INA Section 241(a)(5), 8 C.F.R 241.8; INA Section 235(b)(1), 8 C.F.R. 235.3) including the preparation of the Notice to Appear (NTA) application or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors;

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors; and

- The power and authority to detain and transport (8 C.F.R. § 287.5(c)(6)) arrested aliens to ICE-approved detention facilities.

## VI.   DETENTION ISSUES

The LEA is expected to pursue to completion prosecution of the state or local charges that caused the individual to be taken into custody.  ICE will assume custody of individuals who have been convicted of a State or local offense only after such individuals have concluded service of any sentence of incarceration.  ICE will also assume custody of aliens with prior criminal convictions and when immigration detention is required by statute.  The ICE Detention and Removal Field Office Director or designee will assess on a case-by-case basis the appropriate removal vehicle to be employed and/or whether to assume custody of individuals that do not meet the above criteria based on special interests or other extenuating circumstances after processing by the LEA.  The immigration laws provide ICE Detention and Removal Operations (DRO) with the discretion to manage limited DHS detention resources, and ICE Field Office Directors may exercise this discretion by declining to detain aliens whose detention is not mandated by federal statute.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which, the LEA will provide, for a reimbursable fee, detention of incarcerated aliens in LEA facilities, upon the completion of their sentences.  The LEA facility will be expected to meet the ICE detention standards for either a less than 72-hour or over 72-hour facility as determined by ICE, and consistent with the anticipated detention period.

The parties understand that the LEA will not continue to detain an alien after that alien is eligible for release from the LEA's custody in accordance with applicable law and LEA policy, except for a period of up to 48-hours, excluding Saturday, Sunday, and any holiday, pursuant to an ICE detainer issued in accordance with 8 C.F.R. § 287.7, absent an IGSA in place as described above.

Upon completion of processing and release from MCSO detention facilities of an individual who participating MSCO personnel have determined to be a removable alien, the alien will be transported by MCSO on the same day to the ICE detention office located at 2035 N. Central Ave., Phoenix, Arizona 85004 or another ICE designated office or facility, after notification to and coordination with the ICE supervisory officer, so that no further detention costs will be incurred by ICE.

## VII.   NOMINATION OF PERSONNEL

The Sheriff of Maricopa County will nominate candidates for initial training and certification under this MOA.  For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA.  All candidates must be United States citizens.  All candidates must have at least two years of LEA work experience.  All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any future expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties, but will be subject to all the requirements of this MOA.

## VIII. TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory 4 and 5 week training tailored to the immigration functions to be performed. Training will take place at a mutually designated site in Maricopa County, utilizing ICE-designed curriculum and competency testing.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) Civil Rights laws; (vi) the U.S. Department of Justice "Guidance Regarding the Use Of Race By Federal Law Enforcement Agencies" dated June 2003; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law and the Vienna Convention on Consular Relations to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XX below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX. CERTIFICATION AND AUTHORIZATION

The ICE Training Division will certify in writing to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of Training Division certification, the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of one year from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time by ICE or the LEA. Such revocation will require immediate notification to the other party to this MOA. The Maricopa County Sheriff and the ICE Special Agent in Charge and ICE Field Office Director in Phoenix will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XX below, shall constitute revocation of all immigration enforcement authorizations delegated hereunder.

## X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material.

ICE will provide the instructors and training materials. The LEA is responsible for the salaries and benefits, including overtime, for all of its personnel being trained or performing duties under this MOA, and for those personnel performing the regular functions of the participating LEA personnel while they are receiving training. LEA will cover the costs of all LEA candidates' travel, housing, and per diem affiliated with the training required for participation in this agreement. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which the LEA will provide, for a reimbursable fee, transportation for all incarcerated aliens in the LEA's facilities, upon the completion of their sentences, or upon completion of processing in those circumstances in which state or local prosecution is not available, to a facility or location designated by ICE. If ICE determines that it is necessary, the LEA will provide ICE, at not cost, with an office within each participating LEA facility for ICE supervisory employees to work.

ICE agrees to be responsible for the purchase, installation, and maintenance of technology (computer/IAFIS/Photo and similar hardware/software) necessary to support the investigative functions of participating LEA personnel at each LEA facility with an active 287(g) program. The use of this equipment is to be limited to the performance of responsibilities authorized by this MOA under section 287(g) of the INA by participating LEA personnel. ICE also agrees to provide the necessary technological support and software updates for use by participating LEA personnel to accomplish the delegated functions. Such hardware, software, and other technology purchased or provided by ICE, shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, or when deemed necessary by the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by the participating LEA personnel will be supervised and directed by ICE supervisory officers or the designated team leader in Phoenix. Participating LEA personnel are not authorized to perform immigration officer functions, except when working under the supervision of an ICE officer. Participating LEA personnel shall give timely notice to the ICE supervisory officer within 24 hours or any detainer issued under the authorities set forth in this MOA.

In the correction setting, participating MCSO personnel shall give notice to the ICE supervisory officer as soon as practicable after, and in all cases within 24 hours of, any detainer issued under the authorities set forth in this MOA. In the field setting, participating MCSO deputies will contact an ICE duty officer at the time of exercising the authority in this MOA for guidance. The actions of participating MCSO personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to the ICE Special Agent in Charge and ICE Field Office Director in Phoenix, or designees, and the Sheriff of Maricopa County, or designee, when circumstances safely allow the concern to be raised. The Special Agent in Charge, the ICE Field Office Director in Phoenix, and the Sheriff of Maricopa County shall attempt to resolve the conflict.

Whenever possible, MCSO will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Office of Investigations (OI) or ICE's Office of Detention and Removal (DRO) prior to taking any enforcement action. This deconfliction will, at a minimum, include wants/warrants, criminal history, and a person, address, and vehicle check through TECS II.

MCSO participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE agents with criminal investigations.

## XII.   REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII. LIABILITY AND RESPONSIBILITY

If any participating LEA personnel are the subjects of a complaint of any sort that may result in that individual receiving employer discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by state law, immediately notify ICE of the existence and nature of the complaint. The resolution of the complaint shall also be promptly reported to ICE. Complaints regarding the exercise of immigration enforcement authority by participating LEA personnel shall be handled as described below.

Except as otherwise noted in this MOA or allowed by federal law, the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personnel expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will only be treated as federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function as authorized by this MOA. 8 U.S.C. § 1357(g)(7). It is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities available to ICE officers from personal liability arising from tort lawsuits based on actions conducted in compliance with this MOA. 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. Such requests must be made in writing directed to the Attorney General of the United States, and will be handled in coordination with the ICE Special Agent in Charge and/or the ICE Field Office Director in Phoenix. Requests for representation must be presented to the ICE Office of the Chief Counsel at 2035 N. Central Avenue, Phoenix, AZ 85004. Any request for representation and related correspondence must be clearly marked "Subject to Attorney-Client Privilege." The Office of the Chief Counsel will forward the individual's request, together with a memorandum outlining the factual basis underlying the event(s) at issue in the lawsuit, to the ICE Office of the Principal Legal Advisor, which will forward the request, the factual memorandum, and an advisory statement opining whether such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Torts Staff, Civil Division, Department of Justice. ICE will not be liable for defending or indemnifying acts of intentional misconduct on the part of participating LEA personnel.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with Garrity v. New Jersey, 385 U.S. 493 (1967).

As the activities of participating LEA personnel under this MOA are undertaken under federal authority, the participating LEA personnel will comply with federal standards and guidelines relating to the Supreme Court's decision in Giglio v. United States, 405 U.S. 150 (1972), and its progeny, which relates to the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

## XIV. COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, with regard to activities undertaken under the authority of this MOA, is included at Appendix B.

## XV. CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

## XVI. STEERING COMMITTEE

The ICE Special Agent in Charge, the ICE Field Office Director, and the Sheriff of Maricopa County shall establish a steering committee that will meet periodically to review and assess the immigration enforcement activities conducted by the participating LEA personnel and to ensure compliance with the terms of this MOA. The steering committee will meet periodically in Maricopa County at locations to be agreed upon by the parties, or via teleconference. Steering committee participants will be supplied with specific information on case reviews, individual participants' evaluations, complaints filed, media coverage, and, to the extent practicable, statistical information on increased immigration enforcement activity in Maricopa County. An initial review meeting will be held no later than nine months after certification of the initial class of participating LEA personnel under Section IX, above.

## XVII. COMMUNITY OUTREACH

The LEA may, at its discretion, engage in community outreach with individuals and organizations expressing an interest in this MOA. ICE may participate in such outreach upon the LEA's request.

## XVIII. RELATIONS WITH THE NEWS MEDIA

LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. This MOA also describes the complaint procedures available to members of the public regarding actions taken by participating LEA personnel pursuant to this agreement.

The LEA hereby agrees to coordinate with ICE before releasing information to the media regarding actions taken under this MOA. The points of contact for ICE and MCSO for this purpose are identified in Appendix C.

## XIX. MODIFICATION OF THIS MOA

Modifications to this MOA must be proposed in writing and approved by the signatories.

## XX. DURATION AND TERMINATION OF THIS MOA

This MOA will be in effect from the date of signing until it is terminated by either party. Either party, upon written notice to the other party, may terminate the MOA at any time. A termination notice shall be delivered personally or by certified or registered mail and termination shall take effect immediately upon receipt of such notice.

Either party, upon written or oral notice to the other party, may temporarily suspend activities under this MOA when resource constraints or competing priorities necessitate. Notice of termination or suspension by ICE shall be given to the Sheriff of Maricopa County. Notice of termination or suspension by MCSO shall be given to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

Except for the provisions contained in Section XIII, this MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create, any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, and accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

Date: 2/24/07

Julie Myers
Assistant Secretary
Immigration and Customs Enforcement
Office of Homeland Security

Date: _____

(See attached page 10A)

Maricopa County
Board of Supervisors

Date: JAN 19, 2007

Joe Arpaio
Sheriff
Maricopa County

**Maricopa County Board of Supervisors**

_____ 2-7-07
~~ACTING~~ Chairman of the Board          Date

ATTEST:

_____ 2-7-07
Clerk of the Board          Date

APPROVED AS TO FORM AND WITHIN THE POWERS AND AUTHORITY
GANTED UNDER THE LAWS OF THE STATE OF ARIZONA TO MARICOPA
COUNTY

_____ 1-25-67
Deputy County Attorney

This signature page is added and made part of
The Memorandum of Agreement (MOA) between
United States Immigration and Customs Enforcement (ICE)
and Maricopa County

(10A)

# APPENDIX A

## POINTS OF CONTACT

The ICE and MCSO points of contact for purposes of implementation of this MOA are:

For MCSO:         David A. Hendershott
Chief Deputy, Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ 85003
(602) 876-1824

For ICE DRO:      Jon Gurule
Assistant Field Office Director
Detention and Removal Operations
2035 N. Central Avenue
Phoenix, AZ 85004    (602)379-6696

For ICE OI:        Troy Henley
Deputy Special Agent in Charge
400 N. 5th Street, 11th Floor
Phoenix, AZ 85004
(602) 514-7392

# APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between DHS/ICE and the Maricopa County Sheriff's Office, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under Federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

The MOA sets forth the process for designation, training, and certification of certain LEA personnel to perform certain immigration enforcement functions specified herein. Complaints filed against those personnel in the course of their non-immigration duties will remain the domain of the LEA and be handled in accordance with the LEA Manual of Policy and Procedures. The LEA will also handle complaints filed against personnel who may exercise immigration authority, but who are not designated and certified under this MOA. The number and type of the latter complaints will be monitored by the Steering Committee established under Section XVI of the MOA.

In order to simplify the process for the public, complaints against participating LEA personnel relating to their immigration enforcement can be reported in a number of ways. The ICE Headquarters Office of Professional Responsibility (OPR) and the LEA's Internal Affairs Division will coordinate complaint receipt and investigation.

The ICE OPR will forward complaints to the Department of Homeland Security's Office of Inspector General (DHS OIG) as appropriate for review, and ensure notification as necessary to the U.S. Department of Justice Civil Rights Division (DOJ CRD). The ICE OPR will coordinate complaints related to participating personnel with the LEA Internal Affairs Division as detailed below. Should circumstances warrant investigation of a complaint by the DHS OIG or the DOJ CRD, this will not preclude the DHS OIG, DOJ CRD, or ICE OPR from conducting the investigation in coordination with the LEA's Internal Affairs Division, when appropriate.

The ICE OPR will adhere to established procedures relating to reporting and resolving allegations of employee misconduct, and the LEA's Internal Affairs Division will follow applicable LEA policies and procedures, personnel rules, Arizona statutes, and collective bargaining agreement requirements.

1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures.

Complaints will be accepted from any source (e.g.: ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints can be reported to federal authorities as follows:

A.  Telephonically to the ICE OPR at the Joint Intake Center (JIC) in Washington, D.C. at the toll-free number 1-877-246-8253; or

B.  Telephonically to the Resident Agent in Charge of the ICE OPR office in Tucson, AZ at (520) 407-2200; or

C.  Via mail as follows:

>  U.S. Department of Homeland Security
>  U.S. Immigration and Customs Enforcement
>  Office of Professional Responsibility
>  425 I Street, NW
>  Room 3260
>  Washington, D.C. 20536

Complaints can also be referred to and accepted by any of the following LEA entities:

A.  The LEA Internal Affairs Division; or

B.  The supervisor of any participating LEA personnel; or

C.  The LEA Internal Affairs Division as follows:
>  Commander
>  Internal Affairs Division.
>  Maricopa County Sheriff's Office
>  100 W. Washington Street, Suite 1900
>  Phoenix, AZ 85003

2. Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

3. Complaint Resolution Procedures

Upon receipt of any complaint, the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above, the ICE OPR will adhere to existing ICE reporting requirements as they relate to the DHS OIG and/or the DOJ CRD. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the Maricopa County Sheriff's Office shall be honored. If appropriate, an individual may be removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

**APPENDIX C**

**PUBLIC INFORMATION POINTS OF CONTACT**

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

For MCSO:

Lt. Paul Chagoya
Public Information Office
Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ 85003
(602) 525-6239

For ICE:

Virginia Kice
Western Regional Communications Director/Spokesperson
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Western Region Public Affairs
24000 Avila Road
Laguna Niguel, CA 92677
(949) 360-3096

EXHIBIT C

**U.S. Department of Justice**
**Civil Rights Division**

## GUIDANCE REGARDING THE

## USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES

### June 2003

## INTRODUCTION AND EXECUTIVE SUMMARY

In his February 27, 2001, Address to a Joint Session of Congress, President George W. Bush declared that racial profiling is "wrong and we will end it in America." He directed the Attorney General to review the use by Federal law enforcement authorities of race as a factor in conducting stops, searches and other law enforcement investigative procedures. The Attorney General, in turn, instructed the Civil Rights Division to develop guidance for Federal officials to ensure an end to racial profiling in law enforcement.

"Racial profiling" at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.

Racial profiling in law enforcement is not merely wrong, but also ineffective. Race-based assumptions in law enforcement perpetuate negative racial stereotypes that are harmful to our rich and diverse democracy, and materially impair our efforts to maintain a fair and just society. [1]

The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation, whose goal of "liberty and justice for all" recedes with every act of such discrimination. For this reason, this guidance in many cases imposes more restrictions on the consideration of race and ethnicity in Federal law enforcement than the Constitution requires. [2] This guidance prohibits racial profiling in law enforcement practices without hindering the important work of our Nation's public safety officials, particularly the intensified anti-terrorism efforts precipitated by the events of September 11, 2001.

**I. Traditional Law Enforcement Activities.** Two standards in combination should guide use by Federal law enforcement authorities of race or ethnicity in law enforcement activities:

- **In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**
- **In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that**

links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

**II. National Security and Border Integrity.** The above standards do not affect current Federal policy with respect to law enforcement activities and other efforts to defend and safeguard against threats to national security or the integrity of the Nation's borders, [3] to which the following applies:

- **In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Any questions arising under these standards should be directed to the Department of Justice.

## THE CONSTITUTIONAL FRAMEWORK

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, for example, the decision of federal prosecutors "whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" [4] *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The same is true of Federal law enforcement officers. Federal courts repeatedly have held that any general policy of "utiliz[ing] impermissible racial classifications in determining whom to stop, detain, and search" would violate the Equal Protection Clause. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). As the Sixth Circuit has explained, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based soleiyupon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). "A person cannot become the target of a police investigation solely on the basis of skin color. Such selective law enforcement is forbidden." *Id.* at 354.

As the Supreme Court has held, this constitutional prohibition against selective enforcement of the law based on race "draw[s] on 'ordinary equal protection standards.'"*Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, impermissible selective enforcement based on race occurs when the challenged policy has "'a discriminatory effect and . . . was motivated by a discriminatory purpose.'"*Id.* (quoting *Wayte*, 470 U.S. at 608). [5] Put simply, "to the extent that race is used as a proxy" for criminality, "a racial stereotype requiring strict scrutiny is in operation." *Cf. Bush v. Vera*, 517 U.S. at 968 (plurality).

## I. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES

### A. Routine or Spontaneous Activities in Domestic Law Enforcement

In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers

**may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**

Federal law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to the national security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race or ethnicity.

- **Example**: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use race or ethnicity as a factor in deciding which motorists to pull over. Likewise, the officer may not use race or ethnicity in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among racial groups could justify using race as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. The President has made clear his concern that racial profiling is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain racial and ethnic groups without regard to the specific circumstances of a particular investigation or crime, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this guidance for Federal law enforcement officers to act on the belief that race or ethnicity signals a higher risk of criminality. This is the core of "racial profiling" and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by race or ethnicity. In such circumstances, the officer is not acting based on a generalized assumption about persons of different races; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- **Example**: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the look-out for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The Officer

may use this description, including the race of the particular suspect, in deciding which speeding motorists to pull over.

## B. Law Enforcement Activities Related to Specific Investigations

**In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.**

As noted above, there are circumstances in which law enforcement activities relating to particular identified criminal incidents, schemes or enterprises may involve consideration of personal identifying characteristics of potential suspects, including age, sex, ethnicity or race. Common sense dictates that when a victim describes the assailant as being of a particular race, authorities may properly limit their search for suspects to persons of that race. Similarly, in conducting an ongoing investigation into a specific criminal organization whose membership has been identified as being overwhelmingly of one ethnicity, law enforcement should not be expected to disregard such facts in pursuing investigative leads into the organization's activities.

Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an *identified* criminal activity. The rationale underlying this concept carefully limits its reach. In order to qualify as a legitimate investigative lead, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity;
- The information must be trustworthy;
- The information concerning identifying characteristics must be tied to a particular criminal incident, a particular criminal scheme, or a particular criminal organization.

The following policy statements more fully explain these principles.

### 1. *Authorities May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Race- or Ethnicity-Based Information*

This standard categorically bars the use of generalized assumptions based on race.

  ○ ***Example:*** In the course of investigating an auto theft in a federal park, law enforcement authorities could not properly choose to target individuals of a particular race as suspects, based on a

generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of race-neutral pretexts as an excuse to target minorities. Federal law enforcement may not use such pretexts. This prohibition extends to the use of other, facially race-neutral factors as a proxy for overtly targeting persons of a certain race or ethnicity. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly race-based efforts, if properly supported by reliable, empirical data, are in fact race-neutral.

○ *Example*: In connection with a new initiative to increase drug arrests, local authorities begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

○ *Example:* Authorities seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, authorities can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where authorities are investigating a crime and have received *specific information* that the suspect is of a certain race (*e.g.*, direct observations by the victim or other witnesses), authorities may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the racial classification, and federal authorities may use reliable incident-specific identifying information to apprehend criminal suspects. Agencies and departments, however, must use caution in the rare instance in which a suspect's race is the only available information. Although the use of that information may not be unconstitutional, broad

targeting of discrete racial or ethnic groups always raises serious fairness concerns.

o **_Example_**: The victim of an assault at a local university describes her assailant as a young male of a particular race with a cut on his right hand. The investigation focuses on whether any students at the university fit the victim's description. Here investigators are properly relying on a description given by the victim, part of which included the assailant's race. Although the ensuing investigation affects students of a particular race, that investigation is not undertaken with a discriminatory purpose. Thus use of race as a factor in the investigation, in this instance, is permissible.

## 2. The Information Must be Relevant to the Locality or Time Frame

Any information concerning the race of persons who may be involved in specific criminal activities must be locally or temporally relevant.

o **_Example_**: DEA issues an intelligence report that indicates that a drug ring whose members are known to be predominantly of a particular race or ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular race or ethnicity that is predominant in the Charleston drug ring.

## 3. The Information Must be Trustworthy

Where the information concerning potential criminal activity is unreliable or is too generalized and unspecific, use of racial descriptions is prohibited.

o **_Example_**: ATF special agents receive an uncorroborated anonymous tip that a male of a particular race will purchase an illegal firearm at a Greyhound bus terminal in a racially diverse North Philadelphia neighborhood. Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that race in the bus terminal. *Cf. Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect"). The information is neither sufficiently reliable nor sufficiently specific.

## 4. Race- or Ethnicity-Based Information Must Always be Specific to Particular Suspects or Incidents, or Ongoing Criminal Activities, Schemes, or Enterprises

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information. As noted above, where a crime has occurred and authorities have eyewitness accounts including the race, ethnicity, or other distinguishing characteristics of the perpetrator, that information may be used. Federal authorities may also use reliable, locally relevant information linking persons of a certain race or ethnicity to a particular incident, unlawful scheme, or ongoing criminal enterprise--even absent a description of any particular individual suspect. In certain cases, the circumstances surrounding an incident or ongoing criminal activity will point strongly to a perpetrator of a certain race, even though authorities lack an eyewitness account

  o **Example**: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang. The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity. This information, however, is not suspect-specific because there is no description of the particular assailant. But because authorities have reliable, locally relevant information linking a rival group with a distinctive ethnic character to the murder, Federal law enforcement officers could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation. Agents could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

It is critical, however, that there be reliable information that ties persons of a particular description to a specific criminal incident, ongoing criminal activity, or particular criminal organization. Otherwise, any use of race runs the risk of descending into reliance upon prohibited generalized stereotypes.

  o **Example**: While investigating a car theft ring that dismantles cars and ships the parts for sale in other states, the FBI is informed by local authorities that it is common knowledge locally that most car thefts in that area are committed by individuals of a particular race. In this example, although the source (local police) is trustworthy, and the information potentially verifiable with reference to arrest statistics, there is no particular incident- or scheme- specific information linking individuals of that race to the particular interstate ring the FBI is investigating. Thus, without more, agents could not use ethnicity as a factor in making law enforcement decisions in this investigation.

Note that these standards allow the use of reliable identifying information about planned future crimes. Where federal authorities receive a credible tip from a reliable informant regarding a planned crime that has not yet occurred, authorities may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law

enforcement efforts by essentially compelling authorities to wait for crimes to occur, instead of taking pro-active measures to prevent crimes from happening.

- o ***Example***: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older couples of a particular race to act as the couriers. DEA agents may properly target older couples of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

## II. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES INVOLVING THREATS TO NATIONAL SECURITY OR THE INTEGRITY OF THE NATION'S BORDERS

**In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Since the terrorist attacks on September 11, 2001, the President has emphasized that federal law enforcement personnel must use every legitimate tool to prevent future attacks, protect our Nation's borders, and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The Constitution prohibits consideration of race or ethnicity in law enforcement decisions in all but the most exceptional instances. Given the incalculably high stakes involved in such investigations, however, Federal law enforcement officers who are protecting national security or preventing catastrophic events (as well as airport security screeners) may consider race, ethnicity, and other relevant factors to the extent permitted by our laws and the Constitution. Similarly, because enforcement of the laws protecting the Nation's borders may necessarily involve a consideration of a person's alienage in certain circumstances, the use of race or ethnicity in such circumstances is properly governed by existing statutory and constitutional standards. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975). [6] This policy will honor the rule of law and promote vigorous protection of our national security.

As the Supreme Court has stated, all racial classifications by a governmental actor are subject to the "strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224-25 (1995). The application of strict scrutiny is of necessity a fact-intensive process. *Id.*

at 236. Thus, the legality of particular, race-sensitive actions taken by Federal law enforcement officials in the context of national security and border integrity will depend to a large extent on the circumstances at hand. In absolutely no event, however, may Federal officials assert a national security or border integrity rationale as a mere pretext for invidious discrimination. Indeed, the very purpose of the strict scrutiny test is to "smoke out" illegitimate use of race, *Adarand*, 515 U.S. at 226 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)), and law enforcement strategies not actually premised on *bona fide* national security or border integrity interests therefore will not stand.

In sum, constitutional provisions limiting government action on the basis of race are wide-ranging and provide substantial protections at every step of the investigative and judicial process. Accordingly, and as illustrated below, when addressing matters of national security, border integrity, or the possible catastrophic loss of life, existing legal and constitutional standards are an appropriate guide for Federal law enforcement officers.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Federal law enforcement may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might conceivably be involved in planning some such attack during the state visit.
- *Example*: U.S. intelligence sources report that terrorists from a particular ethnic group are planning to use commercial jetliners as weapons by hijacking them at an airport in California during the next week. Before allowing men of that ethnic group to board commercial airplanes in California airports during the next week, Transportation Security Administration personnel, and other federal and state authorities, may subject them to heightened scrutiny.

Because terrorist organizations might aim to engage in unexpected acts of catastrophic violence in any available part of the country (indeed, in multiple places simultaneously, if possible), there can be no expectation that the information must be specific to a particular locale or even to a particular identified scheme.

Of course, as in the example below, reliance solely upon generalized stereotypes is forbidden.

- *Example*: At the security entrance to a Federal courthouse, a man who appears to be of a particular ethnicity properly submits his briefcase for x-ray screening and passes through the metal detector. The inspection of the briefcase reveals nothing amiss, the man does not activate the metal detector, and there is nothing suspicious about his activities or appearance. In the absence of any threat warning, the federal security screener may not order the man to undergo a further inspection solely because he appears to be of a particular ethnicity.

## FOOTNOTES

1. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone.").

2. This guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial or any other proceeding.

3. This guidance document does not apply to U.S. military, intelligence, protective or diplomatic activities conducted consistent with the Constitution and applicable Federal law.

4. These same principles do not necessarily apply to classifications based on alienage. For example, Congress, in the exercise of its broad powers over immigration, has enacted a number of provisions that apply only to aliens, and enforcement of such provisions properly entails consideration of a person's alien status.

5. Invidious discrimination is not necessarily present whenever there is a "disproportion" between the racial composition of the pool of persons prosecuted and the general public at large; rather, the focus must be the pool of "*similarly situated* individuals of a different race [who] were not prosecuted."*Armstrong*, 517 U.S. at 465 (emphasis added). "[R]acial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime."*Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality).

6. Moreover, as in the traditional law enforcement context described in the second standard, *supra,* officials involved in homeland security may take into account specific, credible information about the descriptive characteristics of persons who are affiliated with identified organizations that are actively engaged in threatening the national security.