STEPTOE & JOHNSON LLP
Collier Center
201 East Washington Street
Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile:  (602) 257-5299

David J. Bodney (06065)
dbodney@steptoe.com
Peter S. Kozinets (019856)
pkozinets@steptoe.com
Karen J. Hartman-Tellez (021121)
khartman@steptoe.com
Isaac P. Hernandez (025537)
ihernandez@steptoe.com

Attorneys for Plaintiffs
(Additional Attorneys for
Plaintiffs listed on next page)

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL DE JESUS ORTEGA MELENDRES, JESSICA QUITUGUA RODRIGUEZ, DAVID RODRIGUEZ, VELIA MERAZ, MANUEL NIETO, JR., on behalf of themselves and all others similarly situated, and SOMOS AMERICA, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona, MARICOPA COUNTY SHERIFF'S OFFICE, and MARICOPA COUNTY, ARIZONA, <br><br> Defendants. | No. CV 07-02513-PHX-MHM <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(Class Action)** <br><br> [Assigned to the Hon. Mary H. Murguia] |

Additional Attorneys:

ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

Daniel Pochoda (021979)
dpochoda@acluaz.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

Robin Goldfaden*
rgoldfaden@aclu.org
Mónica M. Ramírez*
mramirez@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Kristina M. Campbell (023139)
kcampbell@maldef.org
Nancy Ramirez*
nramirez@maldef.org

*Pro Hac Vice Application to be filed

Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., on behalf of themselves and all others similarly situated, and Somos America (collectively, "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1.     This is a class action to enforce the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964; and Article II, § 8 of the Arizona Constitution.  Plaintiffs seek declaratory and injunctive relief against Defendants Sheriff Joe Arpaio ("Arpaio"), the Maricopa County Sheriff's Office ("MCSO") and Maricopa County, Arizona (collectively, "Defendants").

2.     As described below, Defendants have engaged in a widespread pattern and practice of racial profiling and other racially and ethnically discriminatory treatment in an illegal, improper and unauthorized attempt to "enforce" federal immigration laws against large numbers of Latino persons in Maricopa County without regard for actual citizenship or valid immigration status.

3.     Claiming authority under a limited agreement with U.S. Immigration and Customs Enforcement (ICE) that actually prohibits the practices challenged here, Defendants have launched a series of massive so-called "crime suppression sweeps" that show a law enforcement agency operating well beyond the bounds of the law.  During these sweeps, which have shown no signs of abating since Defendants began them in September 2007, large numbers of MCSO officers and volunteer "posse" members under Defendants' direction and control have targeted Latino persons for investigation of immigration status, using pretextual and unfounded stops, racially motivated questioning, searches and other mistreatment, and often baseless arrests.  Defendants' pattern and practice of racial profiling goes beyond these sweeps to include widespread, day-to-day targeting and mistreatment of persons who appear to be Latino.

4.     To curtail Defendants' illegal conduct, Plaintiffs bring this action as representatives of a class of Latino persons who, as a result of racial profiling, have been or will be stopped, detained, interrogated or searched by Arpaio and his agents in

1    moving or parked vehicles in Maricopa County.  The moment Plaintiffs and those they

2    represent were stopped by Defendants, they became the victims of "an all too familiar

3    set of circumstances – an intrusive law enforcement stop and seizure of innocent persons

4    on the basis of suspicions rooted principally in the race of the 'suspects.'"  *Washington*

5    *v. Lambert*, 98 F.3d 1181, 1182 (9th Cir. 1996).  Plaintiffs seek judicial relief to enjoin

6    Defendants' unlawful racial profiling and the attendant racially motivated mistreatment

7    and constitutional injuries that Plaintiffs and the class will otherwise continue to endure.

8                    **JURISDICTION AND VENUE**

9        5.    This Court has subject matter jurisdiction over this action pursuant to 28

10   U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the state law claims pursuant

11   to 28 U.S.C. § 1367.  This Court has authority to grant declaratory and injunctive relief

12   pursuant to 28 U.S.C. §§ 1343, 2201 and 2202, and to award attorneys' fees under 42

13   U.S.C. § 1988(b).

14        6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

15                          **PARTIES**

16        7.    Plaintiff Manuel de Jesus Ortega Melendres ("Mr. Ortega") is a citizen

17   and resident of Mexico.  At the time of the events underlying this lawsuit, he was

18   lawfully present in the United States.  He is of Latino descent and, by physical

19   appearance, is a person of color.  He is a retired school teacher.

20        8.    Plaintiffs David and Jessica Rodriguez, husband and wife, are U.S.

21   citizens and residents of Maricopa County.  The Rodriguezes are of Latino descent and,

22   by physical appearance, are persons of color.

23        9.    Plaintiffs Velia Meraz and Manuel Nieto, Jr., siblings, are U.S. citizens

24   and residents of Maricopa County.  They are of Latino descent and, by physical

25   appearance, are persons of color.  They work for their family-owned business in

26   Phoenix.

27       10.    Plaintiff Somos America/We Are America is a community-based non-

28   profit membership organization, comprised of grassroots organizations, community and

religious leaders, labor unions, students and others, established in March 2006 to mobilize for equal rights for immigrant communities in Arizona and for comprehensive immigration reform. Somos America's organizational mission includes seeking to combat racial discrimination directed at Latinos.   Plaintiff Somos America and its members have been injured by the pattern and practice of Defendants alleged in this Complaint.

11.   Upon information and belief, because of their race, color and/or ethnicity, Somos America members have been unlawfully targeted, stopped, questioned and/or detained by Defendants, and those they direct and control, as a result of Defendants' policy and practice of profiling and targeting persons whom they believe to be of Latino descent to determine their immigration status.   As a result of Defendants' policy and practice and failure to provide adequate training and supervision, Defendants' agents have pretextually, with racial motivation and without adequate cause stopped vehicles driven or ridden in by Somos America members and have subjected occupants to discriminatory, unreasonable and burdensome questioning and other differential treatment without individualized suspicion or any evidence of criminal activity.   Several individual members have reported to Somos that they have been stopped while driving in Maricopa County by MCSO officers without good cause and subjected to the mistreatment described herein.

12.   Because of Defendants' policies and pattern and practice of racially profiling persons in Maricopa County whom they believe to be of Latino descent, Somos America has experienced an increase in various requests for assistance from persons who have been negatively impacted by Defendants' actions.   In response, Somos America and its members have participated in monitoring Defendants' pattern and practice and assisting persons who have been unlawfully racially profiled by Defendants. Somos America is concerned that it will not be able to meet adequately this increased demand for assistance.  Already its limited sources have been, and continue to

1   be, diverted and drained as a result of Defendants' policies and practices and the harm
2   they cause.

3       13.    Defendant Joseph M. Arpaio is the Sheriff of Maricopa County, Arizona,
4   and is sued in his official capacity.  He is the final decisionmaker for Maricopa County
5   in the area of law enforcement, and is responsible for setting and implementing the
6   policies and practices of the MCSO, including but not limited to creating and regulating
7   department policies regarding the stops and arrests and related treatment of individuals
8   in motor vehicles in Maricopa County.

9       14.    Defendant Arpaio, on behalf of the MCSO and with the Maricopa County
10  Board of Supervisors, is responsible for entering into a Memorandum of Agreement
11  (MOA) with U.S. Immigrations and Customs Enforcement (ICE) that purports to
12  authorize enforcement of federal immigration laws by specially nominated and cross-
13  trained MCSO Sheriff's deputies.  Defendant Arpaio, in his role as Sheriff, is
14  responsible for implementation and administration of the MOA.  He is also responsible
15  for directing MCSO immigration enforcement activity that is legally unauthorized and
16  conducted pursuant to his policy and practice of racial profiling.

17      15.    Upon information and belief, Arpaio participated in the authorization,
18  planning and supervision of the actions of the MCSO employees involved in the events
19  described in this Complaint.  Upon information and belief, Arpaio is also responsible for
20  recruiting, training, supervising and managing members of the MCSO's volunteer
21  "posse" that have carried out Defendants' policies and practices and have participated in
22  the events described herein without adequate selection processes, proper authority, or
23  adequate training and supervision.

24      16.    Upon information and belief, Arpaio is also responsible for the institution
25  of a telephonic "hotline" used to generate and pursue "tips" about suspected
26  immigration violations notwithstanding the complexity of immigration law, the general
27  lack of training, knowledge, and experience among the public in immigration law, and
28  the unfortunate reality that such a hotline invites individuals to equate race with

immigration status and allows some to pursue personal grievances by way of a hotline complaint. Arpaio established and has overseen an "Illegal Immigration and Interdiction" unit, known as the "Triple I Unit," to pursue hotline tips and other immigration enforcement activities carried out in the manner described herein.

17. Upon information and belief, Arpaio failed to train MCSO personnel and volunteers adequately and to promulgate appropriate policies to prevent the unlawful stops of Plaintiffs and class members based on impermissible racial profiling and arbitrary and unreasonable stops and seizures. Arpaio has also failed to develop criteria to avoid the abuse of the unchecked discretion he has afforded MCSO personnel, and has established, implemented and enforced illegal and unconstitutional policies and practices that have caused the unlawful treatment of Plaintiffs and class members by MCSO Deputies and other personnel and "posse" members.

18. Defendant MCSO is a law enforcement agency in Maricopa County. Upon information and belief, MCSO programs and activities receive financial assistance through federal grants and other contributions from the U.S. Department of Justice ("DOJ") and other federal agencies. As a recipient of federal financial assistance, MCSO is legally required to provide and conduct its programs and activities in a racially and ethnically non-discriminatory manner.

19. Defendant Maricopa County, Arizona, is a political subdivision of the State of Arizona that can sue and be sued in its own name. Upon information and belief, Maricopa County programs and activities receive federal financial assistance. The County is therefore legally required to conduct its programs and activities in a racially and ethnically non-discriminatory manner. By both its action and inaction, Defendant Maricopa County has agreed with, accepted, acquiesced in, and sanctioned Defendant Arpaio's focus on supposed enforcement of federal civil immigration laws at the expense of pursuit of criminal conduct and has done the same with regard to Defendants' policy and practice of employing illegal and improper racial profiling and other discriminatory treatment of Plaintiffs and other Latino persons in Maricopa

County.  In fact, the Chair of the Maricopa County Board of Supervisors has praised as good law enforcement these policies and practices of Defendant Arpaio in the face of large-scale criticism that they specifically target Latinos.

## GENERAL ALLEGATIONS

### Limits on Defendants' Authority to Perform Immigration Functions

20.    In or around January 2007, Defendants Maricopa County and Arpaio entered into an MOA with ICE that provided for a maximum of 160 nominated, trained and certified personnel of the MCSO to perform certain immigration enforcement functions in limited circumstances.  (A true copy of the MOA is attached hereto as Exhibit A.)

21.    Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) authorizes the Secretary of the U.S. Department of Homeland Security, of which ICE is a part, to enter into MOAs with state and local law enforcement agencies to train and permit designated officers to perform certain immigration enforcement functions. Under such agreements, the designated state and local officers are to be trained and supervised by appropriate ICE officers.

22.    According to ICE, "[t]he 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and they are suspected of committing a state crime." *Fact Sheet, Section 287(g) of the Immigration and Nationality Act* (September 24, 2007), *at* http://www.ice.gov/pi/news/factsheets/factsheet287gprogover.htm.  (A true copy of the Fact Sheet is attached hereto as Exhibit B.)

23.    ICE has made clear that "[t]he 287(g) program is not designed to allow state and local agencies to perform random street operations," and "is not designed to impact issues such as excessive occupancy and day laborer activities." *Id.*  ICE guidelines state, "Police can only use 287(g) authority when people are taken into

1  custody as a result of violating state or local criminal law.  Police cannot randomly ask

2  for a person's immigration status or conduct immigration raids," and "[**officers may**

3  **only] use their authority when dealing with someone who is suspected of a state**

4  **crime that is <u>more than a traffic offense</u>**."  *Id.*  (emphases added).

5      24.    Part I of the MOA provides that "the exercise of the immigration

6  enforcement authority granted under this MOA to participating LEA [Law Enforcement

7  Agency] personnel shall occur only as provided in this MOA."  Part V provides that the

8  immigration enforcement authority granted to Defendants is "subject to the limitations

9  contained in this MOA."  (Ex. A.)

10     25.    Part XV of the MOA provides in part that "[p]articipating LEA personnel

11  who perform certain federal immigration enforcement functions are bound by all federal

12  civil rights statutes and regulations, including the U.S. Department of Justice 'Guidance

13  Regarding The Use Of Race By Federal Law Enforcement Agencies' dated June 2003."

14  (Ex. A.)

15     26.    The DOJ Guidance states:  "'Racial profiling' at its core concerns the

16  invidious use of race or ethnicity as a criterion in conducting stops, searches and other

17  law enforcement investigative procedures."   It notes that "[r]acial profiling in law

18  enforcement is not merely wrong, but also ineffective."   (A true copy of the DOJ

19  Guidance is attached hereto as Exhibit C.)

20     27.    The DOJ Guidance directs that "[**i]n making routine or spontaneous law**

21  **enforcement decisions, <u>such as ordinary traffic stops</u>, Federal law enforcement**

22  **officers may not use race or ethnicity to any degree**, except that officers may rely on

23  race and ethnicity in a specific suspect description."  (Ex. C (emphases added).)

24     28.    Arpaio has utilized deputies trained under the MOA – and, on information

25  and belief has also used other MCSO deputies and other personnel and volunteers who

26  are not specially nominated and cross-trained to perform immigration duties – on and/or

27  in support of his "Triple I Unit."   In doing so (and in other ways), he has violated the

28  applicable ICE guidelines as to what a 287(g) agreement may allow.

29.     In short, Defendants' authority to enforce federal immigration law is constrained and limited by the U.S. and Arizona Constitutions, federal and state law, and the MOA.   Defendants have grossly exceeded these limits by devising and implementing an invidious and unconstitutional custom, policy and practice of racial profiling toward Latino persons in Maricopa County and an unconstitutional policy and practice of stopping Latino drivers and passengers, pretextually and without individualized suspicion or cause, and of subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped.   Consequently, Defendants have violated the constitutional and civil rights of Plaintiffs and countless other Latino members of the Maricopa County community.

### Defendants' Racial Profiling and Immigration "Sweeps"

30.     Specifically, Defendants have adopted an unlawful, racially-biased policy of stopping, detaining, questioning and/or searching persons in vehicles in Maricopa County who are or appear to be Latino to interrogate them about their perceived immigration status based on nothing more than their race, color and/or ethnicity. Defendants have implemented this policy in Maricopa County in part through a series of so-called "crime suppression sweeps" that target persons who appear to be Latino for stops, questioning, arrests and other differential treatment that is not based on a constitutionally acceptable level of cause or suspicion and that is in any event racially motivated.

31.     However, as exemplified by the stops of several Plaintiffs described below, this racially-motivated and biased policy of targeting persons who appear to be Latino for immigration enforcement through pretextual and unfounded stops, interrogation, and arrests also applies and is followed as a general matter by MCSO personnel and is not limited to when "sweeps" are being conducted.   Persons who appear to be Latino, when driving or riding in a car, are at risk of being stopped and subjected to burdensome, time-consuming, harassing and stigmatizing interrogation, searches and other mistreatment that may culminate in an arrest and further detention.

1   These stops and interrogations are frequently unsupported by reasonable suspicion or

2   probable cause, and in any event, are pretextual and racially motivated.

3        32.    Indeed, upon information and belief, Caucasian drivers and passengers

4   involved in the same or similar acts or alleged violations are treated differently and their

5   vehicles stopped at much lower rates than similarly situated Latino drivers and

6   passengers pursuant to MCSO policy and practice.   Further, Caucasian drivers and

7   passengers are treated differently and less intrusively and detained for shorter periods of

8   time after their vehicles are stopped by MCSO personnel than Latino drivers and

9   passengers after being stopped.   Latino occupants are also treated differently and more

10  intrusively by MCSO than Caucasian occupants of the same vehicle.

11       33.    Defendants' pattern and practice of racial profiling is evidenced by

12  numerous statements of Arpaio.   For example, Arpaio has claimed that physical

13  appearance alone is sufficient to question an individual regarding their immigration

14  status.   *See* Howard Witt, "Does Crackdown Cross Line? Arizona Efforts Stir Racial

15  Profiling Claims," *Chicago Tribune*, May 26, 2008.

16       34.    At a press conference last year, he described his operations as a "pure

17  program" designed "to go after illegals, not the crime first."   *See* Richard Ruelas,

18  "Arpaio Stays Silent on Real ICE Plan," *The Arizona Republic*, March 2, 2007, at B10.

19  Arpaio's practice is to "go after illegals . . . . You go after them, and you lock them up."

20  *Id.*   Arpaio and Maricopa County do not have legal authority under federal or state law

21  or the MOA to engage in such conduct, let alone to do so in a discriminatory manner.

22       35.    Defendants have targeted specific areas of Maricopa County that have

23  high Latino populations or large numbers of Latino day laborers for pretextual "crime

24  suppression operations."   On information and belief, large numbers of MCSO deputies

25  and hundreds of volunteer "posse" members, assisted by members of motorcycle clubs

26  such as the "American Freedom Riders," have been concentrated in such areas during

27  these "sweeps."   *See, e.g.*, Press Release, Maricopa County Sheriff's Office, "Sheriff's

28

1    Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's Request to Leave
2    Town" (April 4, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

3          36.    Defendants' sweeps were launched in September 2007, have continued
4    through the present time, and show no signs of abating.

5          37.    On or about September 27, 2007,  Arpaio and MCSO initiated a "crime
6    suppression operation" in Cave Creek, Arizona, to investigate and arrest persons
7    deemed by them to be "illegal" immigrants and to disrupt a "day labor" center in the
8    parking lot of a local church where persons who are predominantly Latino gather.
9    Acting under color of law and Arpaio's orders, several MCSO officers detained,
10   questioned and arrested at least nine Latino individuals because they allegedly were
11   undocumented immigrants.  In the case of at least one vehicle that MCSO officers
12   stopped after it left the church parking lot, MCSO officers let the Caucasian driver leave
13   and did not issue a citation to him, but they questioned, detained and arrested the Latino
14   passengers in the Caucasian driver's vehicle.  *See* Press Release, Maricopa County
15   Sheriff's Office, "Sheriff's Office Not Waiting for Loitering and Soliciting Ordinance to
16   Take Effect" (September 27, 2007), *at* http://www.mcso.org/include/pr_pdf/CC.pdf.
17   Upon information and belief, the officers did not have reasonable suspicion or probable
18   cause to believe that any driver stopped or passenger questioned had committed a
19   violation of Arizona or federal law, and in any event, used a traffic violation to
20   investigate the immigration status of all Latino occupants.

21         38.    On October 4, 2007, Arpaio and MCSO initiated another "crime
22   suppression operation" in Queen Creek, Arizona.  Again, at least 16 Latino individuals
23   were detained, questioned and arrested on suspicion of being undocumented immigrants.
24   *See* Press Release, Maricopa County Sheriff's Office, "Sheriff Arpaio Goes After Day
25   Laborers" (October 4, 2007), *at* http://www.mcso.org/include/pr_pdf/Queen%20Creek
26   %20Day%20Laborers.pdf.   Upon information and belief, the officers did not have
27   reasonable suspicion or probable cause to believe that any driver stopped or passenger
28   questioned had committed a violation of Arizona or federal law, and in any event, used a

1   traffic violation to investigate the immigration status of all Latino occupants.   Upon

2   information and belief, there were other persons who appeared to be Latino beyond the

3   number arrested who were also subject to pretextual, racially motivated stops and

4   questioning aimed at investigating them for immigration enforcement.

5       39.   For several months beginning in October 2007, Defendants Arpaio and

6   MCSO targeted the intersection of 34th Street and Thomas Road in central Phoenix

7   because of the presence of day laborers near Pruitt's Furniture Store.   *See, e.g.*, Press

8   Release, Maricopa County Sheriff's Office, "Arpaio Intensifies Presence at Pro-Illegal

9   Immigration   Protests   at   Pruitt's"   (December   5,   2007),   *at*

10  http://www.mcso.org/include/pr_pdf/Arrests%20120507.pdf.   Upon information and

11  belief, MCSO did not engage in these activities at the invitation or request of the City of

12  Phoenix Police Department, which has jurisdiction over this area.   Upon information

13  and belief, MCSO officers engaged in racial profiling and targeted Latino individuals

14  during this operation.   These officers stopped and questioned Latino drivers and

15  passengers prior to having adequate cause or suspicion that they were involved in

16  criminal acts, and in any event, for racially motivated reasons, singled them out for

17  investigation and enforcement and subjected them to different treatment.

18      40.   On December 5, 2007, Defendant Arpaio announced that he was

19  increasing the number of MCSO deputies patrolling the Pruitt's parking area.   *Id.*

20  Arpaio announced that he was acting in response to protests by members of the Latino

21  community about the policies of the MCSO and the Pruitt's owner.   During the

22  operation at Pruitt's, Arpaio and his officers stopped, detained, questioned and arrested

23  Latino persons in the vicinity of the store.   Upon information and belief, the officers did

24  not have reasonable suspicion or probable cause to believe that those stopped had

25  committed a violation of Arizona or federal law prior to making the stop, and in any

26  event, for racially motivated reasons, singled them out for investigation and enforcement

27  and subjected them to different treatment.   In an apparent effort to suppress the Pruitt

28

1   store protesters' exercise of their First Amendment rights, Arpaio announced that he
2   would continue to patrol the area until the protests ended.  *Id.*

3          41.    On or about January 18, 2008, Arpaio and MCSO conducted a "crime
4   suppression operation" between 16th and 40th Streets and McDowell and Indian School
5   Roads in Phoenix.  *See* Press Release, Maricopa County Sheriff's Office, "Sheriff
6   Mobilizes     Posse     in     Central     Phoenix"     (January     18,     2008),     *at*
7   http://www.mcso.org/include/pr_pdf/Sheriff%20Mobilizes%20Posse%20in%20Central
8   %20Phoenix.pdf.  Upon information and belief, MCSO did not engage in these activities
9   at the invitation or request of the Phoenix Police Department, which has jurisdiction
10   over this area.  Upon information and belief, MCSO officers engaged in racial profiling
11   and targeted Latino individuals during this operation.   To justify the massive use of
12   MCSO resources in the area bounded by 16th and 40th Streets and Indian School and
13   McDowell Roads in Phoenix, Defendant Arpaio stated:  "I anticipate that many illegal
14   immigrants will be arrested as the central Phoenix neighborhood remains a popular spot
15   for day laborers."  *Id.*  Such day laborers are predominantly Latino, but are by no means
16   exclusively noncitizens, let alone all undocumented.

17          42.    In late March 2008, Arpaio and MCSO conducted a "crime suppression
18   operation" at Cave Creek and Bell Roads in Phoenix because of the existence of the
19   Macheuli Day Labor Center, which is run by one of the leaders of the Pruitt's protests,
20   Salvador Reza.  *See* Press Release, Maricopa County Sheriff's Office, "Bell Road Crime
21   Suppression     Patrols"     (March     28,     2008),     *at*
22   http://www.mcso.org/include/pr_pdf/Bell%20Operations%2032808.pdf.     Upon
23   information and belief, MCSO did not engage in these activities at the invitation or
24   request of the Phoenix Police Department, which has jurisdiction over this area.  Upon
25   information and belief, MCSO officers engaged in racial profiling and targeted Latino
26   individuals during this operation.  Defendant Arpaio praised as "patriotic" the private
27   groups, including the American Freedom Riders, that on information and belief, had
28   been harassing all Latino persons entering and leaving this legal center.   Upon

1    information and belief, Arpaio was aware of the anti-immigrant reputation of the

2    American Freedom Riders and the public use of racial epithets by their members.

3        43.     Between April 3 and April 6, 2008, Arpaio and MCSO conducted a "crime

4    suppression operation" in the Town of Guadalupe, Arizona. *See* Press Release,

5    Maricopa County Sheriff's Office, "Sheriff's Crime Suppression Operation Moves to

6    Guadalupe" (April 3, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe

7    %20Operation.pdf.   Upon information and belief, MCSO officers engaged in racial

8    profiling, targeting individuals who appeared to them to be Latino during this operation.

9        44.     As MCSO is the law enforcement agency for the Town of Guadalupe,

10   Arpaio was aware that nearly all of the residents of Guadalupe are of Latino and/or

11   Native American descent. In response to the criticism of his tactics and allegations of

12   racial profiling by the Mayor of Guadalupe, Rebecca Jimenez, Arpaio publicly labeled

13   her "a supporter of illegal immigration." *See* Press Release, Maricopa County Sheriff's

14   Office, "Sheriff's Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's

15   Request to Leave Town" (April 4, 2008), *at*

16   http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

17        45.     On April 4, 2008, after the commencement of the MCSO sweep in the

18   Town of Guadalupe, Phoenix Mayor Phil Gordon formally requested that U.S. Attorney

19   General Michael Mukasey launch a Justice Department investigation into the

20   "discriminatory harassment, improper stops, searches and arrests" of Latino persons in

21   Maricopa County by the MCSO. (A copy of Mayor Gordon's letter is attached as

22   Exhibit D.)

23        46.     On or about May 7, 2008, Arpaio and MCSO conducted a "crime

24   suppression operation" in Fountain Hills, Arizona. *See* Press Release, Maricopa County

25   Sheriff's Office, "Mesa Drop House" (May 8, 2008) *at*

26   http://www.mcso.org/include/pr_pdf/mesa%20drop%20house%2050808.pdf.     Upon

27   information and belief, MCSO officers engaged in racial profiling and targeted Latino

28   individuals during this operation as described above for other sweeps.

47.     On or about June 26, 2008, Arpaio and MCSO conducted a "crime suppression operation" in Mesa, Arizona, using nearly 200 deputies and posse members. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Crime Suppression/Illegal Immigration Operation Moves Into Mesa" (June 26, 2008) *at* http://www.mcso.org/include/pr_pdf/Mesa%20Crime%20Suppression.pdf.          Upon information and belief, MCSO did not engage in these activities at the invitation or request of the City of Mesa Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation as described above for other sweeps.

48.     On information and belief, the MCSO personnel involved in these "crime suppression sweeps" and in the vehicle stops of Plaintiffs and other Latinos in Maricopa County have targeted, stopped, interrogated, detained or arrested Latino persons based on their race, color and/or ethnicity, pretextually and not because of probable cause or reasonable suspicion that they had committed any crime.

### Additional Indicia of Racial Bias

49.     In early 2008, Arpaio established a telephone hotline to facilitate MCSO's unlawful, racially-biased immigration enforcement tactics and its racial profiling of Latinos in Maricopa County.  Arpaio was aware that his policy of acting on anonymous citizen "tips" about alleged undocumented immigrants and his invitation for untrained members of the public to participate in his enforcement campaign would result in false, inaccurate, and racially motivated reports about Latino residents.  As opposed to law enforcement use of tips from the public which are based on suspected criminal activity and behaviors, a citizen report that an individual is "here illegally" will often be based solely on an individual's race, color and/or ethnicity.  On information and belief, this hotline has been used to further the policies and practices complained of herein and has increased their racially discriminatory impact.

50.     Racial profiling in law enforcement operations has been recognized as a serious and recurrent problem by elected officials and associations representing chiefs of

police and other law enforcement professionals across the nation and beyond. Professional safeguards have been developed for law enforcement agencies to monitor and deter racially motivated practices when stopping and questioning the drivers of vehicles and any passengers. These safeguards include: collecting data for every vehicle stop, including data regarding the race of the persons affected, the identity of the officers involved, the reason for the stop and the actions taken; regularly analyzing this data for the agency and for particular units and officers; intervening if the resulting data indicate a problem of racial profiling or racial animus; requiring ongoing training of all personnel in the area of racial bias and sensitivity; disciplining personnel upon documented findings of racially improper actions; video and audio taping of all vehicle stops from start to finish; and making available to the public the results of the agency's monitoring efforts and its internal reviews of racial profiling or race discrimination complaints.

51. On information and belief, Defendants have not adequately implemented, or even begun to implement, the foregoing safeguards. Rather, Arpaio and other Defendants have remained steadfast in their resolve to continue their course. As a result, Plaintiffs and those they seek to represent continue to be at risk for being subjected to pretextual stops, detention, questioning, searches and other mistreatment, without adequate cause or suspicion and because of the color of their skin.

## CLASS REPRESENTATIVES

52. Defendants' behavior toward the following Plaintiffs starkly illustrates the unlawful policies, practices and conduct described above.

### The Unlawful Stop and Detention of Manuel de Jesus Ortega Melendres

53. On September 6, 2007, Mr. Ortega legally entered the United States at the border station in Nogales, Arizona.

54. Mr. Ortega possesses a U.S. Visa that is valid through August 23, 2016, and possessed a Permit issued by the U.S. Department of Homeland Security that was valid through November 1, 2007.

55.    On or about September 26, 2007, at 6:15 a.m., Mr. Ortega was a passenger in a vehicle in Cave Creek, Arizona that was stopped by officers from the Maricopa County Sheriff's Office. The vehicle was being driven by a Caucasian male, but the passengers, including Mr. Ortega, were Latino men.

56.    The officers told the driver that he was being stopped for speeding, but they did not give him a citation or take him into custody.

57.    The officers looked at Mr. Ortega sitting in the vehicle and asked him to produce identification.

58.    Mr. Ortega showed them the following documents that he had in his wallet: (a) his United States Visa, which has his photograph and fingerprint on it; (b) his Mexican Federal Voter Registration card, which also has his photograph and fingerprint on it; and (c) a copy of the Permit he was given by the U.S. Department of Homeland Security with a stamp showing its validity through November 1, 2007.

59.    Although Mr. Ortega produced identification establishing his legal status, the officers told him to exit the vehicle.

60.    After exiting the vehicle, the officers pushed Mr. Ortega against a police vehicle and roughly patted him down over his entire body.

61.    The Sheriff's officers then took everything out of Mr. Ortega's pockets, including his wallet and a small bottle of lotion that Mr. Ortega occasionally applies to his face so that his skin does not become dry.

62.    The Sheriff's officers, upon removal of the small bottle of lotion from Mr. Ortega's pocket, asked Mr. Ortega in a confrontational manner, "How many times a week do you jack off?"

63.    Mr. Ortega was then handcuffed with his arms behind his back. Mr. Ortega had a broken wrist years ago that did not heal correctly. His wrist has a visible deformity and causes him pain. Mr. Ortega asked the Sheriff's officers to please be careful in handcuffing him, but they handled him roughly. The officers kept Mr. Ortega's hands handcuffed behind his back for approximately 40 minutes.

64.    The officers then put Mr. Ortega in the back of a Sheriff's vehicle and took him to the Sheriff's office in Cave Creek where he was placed in a holding cell for four hours.

65.    Throughout the time that Mr. Ortega was seized from the vehicle, patted down, handcuffed, transported to the Sheriff's office, placed in the holding cell and left to remain in the holding cell, no one from the Sheriff's office explained anything to him, and no one offered to get a Spanish speaking officer or translator to assist in communicating with him.

66.    The officers did not advise Mr. Ortega of his Miranda rights.

67.    The officers did not give Mr. Ortega any opportunity to make a phone call.

68.    The officers did not tell Mr. Ortega what crime he allegedly committed, or if he was being charged with any crime.

69.    The officers did not say anything about what might happen to Mr. Ortega.

70.    The officers did not give Mr. Ortega any documents regarding his arrest or their putting him in jail.

71.    After the Sheriff's officers left Mr. Ortega in the jail for four hours, they placed him in handcuffs again and drove him to downtown Phoenix.  The driver of that vehicle spoke Spanish.  Mr. Ortega explained that his wrist was quite painful and asked if he could be handcuffed with his hands in front of him rather than behind him.  The driver said that he could not do that.

72.    The officers drove Mr. Ortega to the local ICE office.  They took him inside and removed the handcuffs.  Mr. Ortega's hands were swollen, and he was in pain.

73.    At the ICE office, Mr. Ortega was placed in a holding cell again and left unattended for more than an hour.

74.    Mr. Ortega was then taken to an ICE official who did not identify himself. The Sheriff's officers who arrested Mr. Ortega were also present.

75.     The ICE official asked for Mr. Ortega's documents.  He took a quick look at the documents and said, "These documents are good."   The ICE official told Mr. Ortega he was free to leave.

76.     Mr. Ortega had been in custody for about nine hours.  During that time, Mr. Ortega was never: (a) given any water, (b) given any food, (c) told his rights, or (d) given the name of any of the officers involved.

77.     Mr. Ortega also was never given any paperwork, other than a case number, with any information about his: (a) being stopped, (b) being taken into custody by the Sheriff's officers, (c) being held in jail by the Sheriffs officers, (d) being transferred to the ICE office, (e) being held in jail at the ICE office, or (f) his being released from custody.

78.     After being released, Mr. Ortega had to make his own way from downtown Phoenix to Cave Creek.

79.     Because of Mr. Ortega' experience with the Maricopa County Sheriff's officers he is now afraid.  He is frightened to walk on the street or be seen in public in Maricopa County because he fears that the Sheriff's officers will come and arrest him again because he is Latino and does not speak English.

80.     Mr. Ortega is afraid that the Sheriff's officers will hurt him physically if they pick him up again.

81.     Mr. Ortega is afraid that he will be thrown in jail without any explanation, without any rights, and without any opportunity to get help even though the federal government of the United States has issued a Visa to him that gives him permission to be here.

### The Unlawful Stop and Detention of David and Jessica Rodriguez

82.     On or about December 2, 2007, Mr. and Mrs. Rodriguez, along with their two young children, visited Lake Bartlett.

83.     As they were leaving the preserve, while driving on a paved road, they saw a sign that read, "Road Damaged."   They could then see that the road ahead was

1    washed out by recent rains.  Two Sheriff's vehicles were parked on the opposite side of

2    the wash-out.

3        84.    Like the motorcycle rider behind him, Mr. Rodriguez decided to turn

4    around and head the other way.

5        85.    The two Sheriff's vehicles followed.  The deputies stopped Mr. Rodriguez,

6    the motorcycle (now in front of them) and another sedan.

7        86.    The deputies let the motorcycle and sedan go in short order, without

8    visibly exchanging any documentation.

9        87.    When Deputy Matthew Ratcliffe approached Mr. Rodriguez, however,

10   Deputy Ratcliffe asked for a social security card, driver's license, vehicle registration

11   and proof of insurance.

12       88.    Mrs. Rodriguez asked Deputy Ratcliffe why he needed to see a social

13   security card, to which he responded, "standard procedure."

14       89.    Deputy Ratcliffe then asked Mr. Rodriguez whether he had seen the "Road

15   Closed" sign.  Mr. Rodriguez explained that he had seen only a "Road Damaged" sign.

16   The Rodriguezes later discovered that there was a "Road Closed" sign, but on a part of

17   the paved road that they had not traveled.

18       90.    Deputy Ratcliffe took down Mr. Rodriguez's information and returned to

19   his vehicle.

20       91.    While they waited, the Rodriguezes watched another deputy pull over

21   several other vehicles, and from all appearances, the other drivers were being given only

22   warnings.

23       92.    When Deputy Ratcliffe returned, Mrs. Rodriguez asked if they could be

24   given a warning like everyone else.  He said no.

25       93.    Mrs. Rodriguez told Deputy Ratcliffe that this was selective enforcement.

26   She said that this looked like racial profiling.

27       94.    Deputy Ratcliffe became visibly angry and gave them a citation for failure

28   to obey a traffic control device.

95.    Deputy Ratcliffe returned to his vehicle, turned on his siren and yelled over the loud speaker "you're free to go."

96.    As Mr. Rodriguez drove to the exit of the preserve, he finally saw the "Road Closed" sign.  He pulled over and waited on the side of the road.  Mr. Rodriguez was able to stop and speak with several drivers he had seen pulled over by Sheriff's deputies.  Not one of them had been asked for a social security card, and not one of them had been given a citation.  The other drivers were all Caucasian.

97.    The next day, Mrs. Rodriguez filed a formal complaint with the MCSO.  To date, she has not received a formal response.

**The Unlawful Stop and Detention of Velia Meraz and Manuel Nieto, Jr.**

98.    On or about March 28, 2008, a little before 3:00 p.m., Ms. Meraz and Mr. Nieto drove down the block from their family business, Manuel's Auto Repair, to the Quick Stop at the corner of N. Cave Creek and E. Nisbet Roads.

99.    They had the windows down, and Ms. Meraz was singing along to Spanish music.

100.    Pulling into the Quick Stop, they noticed a Sheriff's vehicle behind one of the vehicles at the pumps.  The officer, Deputy Alberto Armendariz, was speaking with two Latino-looking men in handcuffs.

101.    As soon as Mr. Nieto parked the car, Deputy Armendariz yelled over to them that they should leave.  Ms. Meraz asked why.

102.    Leaving the two handcuffed gentlemen, Deputy Armendariz approached Ms. Meraz and accused them of disturbing the peace.  Ms. Meraz explained that she was just singing to her music.

103.    Deputy Armendariz repeated that they had better leave before he arrested them for disorderly conduct.  Ms. Meraz said that they would leave, but asked the deputy for his badge number.

104.    The Deputy then starting speaking into his radio, evidently calling for additional officers.

105. As Mr. Nieto and Ms. Meraz pulled out of the Quick Stop, they noticed a motorcycle officer coming down Cave Creek Road.

106. Deputy Armendariz waved at the motorcycle officer, directing him to follow Mr. Nieto and Ms. Meraz.

107. Mr. Nieto then saw the motorcycle officer and three other Sheriff's vehicles behind them. The motorcycle officer told Mr. Nieto to pull over and get out of the car.

108. Mr. Nieto quickly dialed 9-1-1 and reported that he was being harassed by Sheriff's officers for no apparent reason.

109. Mr. Nieto's family business was no more than 50 yards away, so he pulled into the parking lot there.

110. The four police vehicles descended on them, blocking off the street and their business. The officers jumped out of their vehicles and raised their weapons.

111. Among the officers were Deputies Douglas Beeks and Cesar Brockman.

112. An officer grabbed Mr. Nieto and pulled him out of the car. He was pressed face first against his car. His arms were twisted behind his back and he was handcuffed.

113. An officer then asked Mr. Nieto if he had a driver's license. He responded that he did.

114. The sound of the commotion drew other people from the repair shop. The officers told them to stay back. The customers were told that they needed to leave or be arrested.

115. Mr. Nieto was petrified that he was going to be arrested in front of his family, neighbors and customers, though he had done nothing wrong.

116. Mr. Nieto's father, who had come out of the shop, called out to the officers that the repair shop was his business, that Mr. Nieto and Ms. Meraz were his children and that they all were U.S. citizens.

117.   The officers immediately backed down and lowered their weapons.  Mr. Nieto was let out of the handcuffs.  The officers asked for his identification and ran it through their computer system.  They did not give him any citation.

118.   Mr. Nieto asked why the officers had subjected him and his sister to such treatment.  He was not given any explanation, nor any apology.

119.   Upon information and belief, Mr. Nieto and Ms. Meraz were targeted because they look Latino.  Upon information and belief, what happened to them was part of the sweep going on at that time on Cave Creek Road.

**CLASS ALLEGATIONS**

120.   This is a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) on behalf of Plaintiffs and all other similarly situated individuals.

121.   The class that Plaintiffs seek to represent consists of all Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona.  This class is so numerous that joinder of all members is impracticable.

122.   There are questions of law and fact common to all members of the class and all class members have been directly affected by the challenged actions of Defendants.  Each putative class member has been or will be subjected to arbitrary, racially-motivated, discriminatory stops, questioning, detentions, arrests and/or searches conducted by Defendants.  Each putative class member has been or will be subjected to stops, detentions, interrogations and/or searches, pretextually, without consent, without any reasonable, articulable suspicion or probable cause that such class member had committed a crime or was engaged in criminal or other unlawful activity, and in a manner to which Caucasian drivers and passengers in vehicles in Maricopa County are generally not subjected.

123.    The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the class.

124.    The representative Plaintiffs will fairly and adequately protect the interests of the class.

125.    Defendants in this case have taken actions in violation of the class members' constitutional rights and/or refused to act in accordance with those rights, which are grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

126.    Plaintiffs' counsel is competent and experienced in class action litigation of the type brought here.

**REQUISITES FOR RELIEF**

127.    As a result of the conduct of Defendants described above, Plaintiffs have been denied their constitutional and civil rights. Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their constitutional and civil rights.   Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.   Plaintiffs therefore seek injunctive relief restraining Defendants from continuing to engage in and enforce the unlawful and unconstitutional policies, practices, conduct and acts described herein.

**FIRST CLAIM FOR RELIEF:  EQUAL PROTECTION**
**(Fourteenth Amendment)**

128.    Plaintiffs hereby incorporate by this reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

129.    As Latino persons, Plaintiffs are members of a protected class.

130.    As Latino persons, those individuals stopped, detained, questioned or searched by MCSO agents during the class period are members of a protected class.

131.   Defendants, acting under color of law and in concert with one another, engaged, and continued to engage, in profiling and discriminatory treatment of Plaintiffs and other Latino individuals based on their race, color and/or ethnicity.

132.   Defendants have acted pretextually, with racial motivation and without reasonable suspicion or probable cause to stop, detain, question, search and/or arrest Plaintiffs or any of the other Latino individuals referred to above.

133.   By purposefully stopping, detaining, questioning, searching and/or arresting Plaintiffs and subjecting them to different, burdensome and injurious treatment because of their race, color and/or ethnicity, Defendants deprived Plaintiffs and members of the plaintiff class of the equal protection of the law within the meaning of the Fourteenth Amendment to the U.S. Constitution.  These actions violated Plaintiffs' and class members' Fourteenth Amendment rights and 42 U.S.C. § 1983.

134.   Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

135.   By their conduct described above, Defendants in general, and Arpaio in particular, have devised and implemented a policy, custom and practice of illegally stopping, detaining, questioning or searching Latino individuals because of their race, color and/or ethnicity.

136.   Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

137.   As a direct, proximate result of Defendants' wrongful conduct, Plaintiffs and class members have suffered and will continue to suffer significant and substantial emotional harm and additional injuries.

**SECOND CLAIM FOR RELIEF:  UNREASONABLE SEARCH AND SEIZURE**
**(Fourth and Fourteenth Amendments)**

138.   Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

139.   Pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution, state and local governments are prohibited from conducting unreasonable searches and seizures.

140.   Defendants, acting under color of law and in concert with one another, stopped, seized, searched, arrested and/or impermissibly extended stops of Plaintiffs, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had violated the law.  Such conduct violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983.

141.   Upon information and belief, Arpaio and the other Defendants, acting under color of law and in concert with one another, have engaged in a custom, practice and policy of stopping, seizing, searching and arresting Latino individuals in Maricopa County, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had committed any crime.

142.   Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

143.   Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

### THIRD CLAIM FOR RELIEF:  VIOLATION OF ARIZONA CONSTITUTION ARTICLE II, § 8

144.   Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

145.   Article II, § 8 of the Arizona Constitution provides:  "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

146.   By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated the rights guaranteed to

1   Plaintiffs and other similarly situated individuals under Article II, § 8 of the Arizona

2   Constitution.

3          147.    Defendants' actions have caused and will continue to cause Plaintiffs and

4   other similarly situated individuals to suffer public humiliation and additional harms,

5   and be subjected to unlawful discrimination unless these actions are stopped.

6                    **FOURTH CLAIM FOR RELIEF:  RACE DISCRIMINATION**
                         **IN FEDERALLY FUNDED PROGRAMS**
7                        **(Defendants MCSO and Maricopa County)**

8          148.    Plaintiffs hereby incorporate by reference all allegations of the preceding

9   paragraphs of this Complaint as if fully set forth herein.

10         149.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

11              i.   [N]o person in the United States shall, on the ground of race, color,
                     or national origin, be excluded from participation in, be denied
                     benefits of, or be subjected to discrimination under any program or
12                   activity receiving federal financial assistance.

13         150.    Defendant MCSO is the law enforcement agency for Maricopa County,

14  Arizona, and receives federal funding and other financial assistance from the

15  Department of Justice and other federal agencies.  As a recipient of federal financial

16  assistance, MCSO is required to conduct its activities in a racially non-discriminatory

17  manner pursuant to Title VI of the Civil Rights Act of 1964.

18         151.    Defendant County of Maricopa is a political subdivision of the State of

19  Arizona and, as a recipient of federal funds, is required to conduct its activities in a

20  racially non-discriminatory manner pursuant to Title VI of the Civil Rights Act of 1964.

21         152.    Federal regulations implementing Title VI further provide that no program

22  receiving financial assistance through the DOJ shall utilize criteria or methods of

23  administration which have the effect of subjecting individuals to discrimination because

24  of their race, color and/or ethnicity, or have the effect of defeating or substantially

25  impairing accomplishment of the objectives of the program as respects individuals of a

26  particular race, color and/or ethnicity.

27

28

153.   The methods employed by Arpaio, MCSO and Maricopa County discriminate against individuals based on their race, color and/or ethnicity as described herein.

154.   Defendants MCSO's and Maricopa County's violations of 42 U.S.C. § 2000d and its implementing regulations have caused and will continue to cause Plaintiffs and other similarly situated individuals public humiliation and additional harms in that they will continue to be subjected to unlawful discrimination unless it is stopped.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of a class of all those similarly situated, respectfully demand judgment against Defendants awarding the following:

A.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race, color and/or ethnicity and denied Plaintiffs and plaintiff class equal protection of the laws in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983;

B.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' stops, interrogations, detentions, searches and/or arrests of Plaintiffs and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they had committed a crime violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983;

C.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violate the rights of Plaintiffs and other similarly situated individuals provided by Article II, § 8 of the Arizona Constitution;

1        D.     A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202

2    that Defendants engaged in race discrimination in violation of Title VI of the Civil

3    Rights Act of 1964 and 42 C.F.R. § 101 *et seq.*;

4        E.     A preliminary and permanent injunction prohibiting Defendants

5    from continuing to engage in such race, color and/or ethnicity-based discrimination as

6    described herein and to put into place safeguards sufficient to ensure that such

7    discrimination does not continue in the future;

8        F.     A preliminary and permanent injunction prohibiting Defendants

9    from exceeding the limits of their authority under the MOA and state and federal law;

10       G.     An award of attorneys' fees and costs of suit, plus interest, pursuant

11    to 42 U.S.C. § 1988; and

12        H.     Such other relief as the Court deems just and proper.

13        DATED this 16th day of July 2008.

14

15                     STEPTOE & JOHNSON LLP

16

17                     By  /s/ David J. Bodney

18                        David J. Bodney
                         Peter S. Kozinets

19                         Karen J. Hartman-Tellez
                         Isaac P. Hernandez

20                         Collier Center
                         201 East Washington Street

21                         Suite 1600
                         Phoenix, Arizona 85004-2382

22

23                     ACLU FOUNDATION OF ARIZONA
                     Daniel Pochoda

24                     P.O. Box 17148

25                     Phoenix, Arizona 85011-0148
                     Telephone:  (602) 650-1854

26                     Facsimile:  (602) 650-1376

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
Robin Goldfaden
Mónica M. Ramírez
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
Kristina M. Campbell
Nancy Ramirez
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Attorneys for Plaintiffs

561437