**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Manuel de Jesus Ortega Melendres, ) | No. CV-07-2513-PHX-MHM |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Joseph M. Arpaio, et al., ) | |
| ) | |
| Defendant. ) | |
| ) | |

Currently pending before the Court are Defendants Joseph M. Arpaio, Maricopa County, and the Maricopa County Sheriff's Office's Motion to Dismiss (Dkt.#39.), and Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., and Somos America's Motion for an Expedited Rule 16 Conference. (Dkt.#49.)  After reviewing the record and holding oral argument, the Court issues the following Order.

**I.   Standard**

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1990).  The Ninth Circuit has stated that "[t]he issue is not whether a plaintiff's success on the merits is likely

1 but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. Id.

Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Section 1356 (1990). The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997). Therefore, a district court does not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also U.S. v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).

**II.     Background**

This case concerns allegations that deputies from the Maricopa County Sheriff's Office ("MCSO") have been profiling, targeting and ultimately stopping and detaining persons based on their race in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act, and Article II, § 8 of the Arizona Constitution. Defendants have responded to these claims by filing a motion to dismiss the case for lack of jurisdiction and for failure to state a claim upon which relief could be granted. Specifically, Defendants have asserted that the organization Somos America lacks Article III standing and cannot proceed as a Plaintiff in the instant lawsuit, and that the claims of the remaining individual Plaintiffs Ortega Melendres, J. Rodriguez, D. Rodriguez, Meraz, and Nieto all fail as a matter of law. Defendants have also argued that as a 42 U.S.C. § 1983 municipal defendant Maricopa County cannot under be held liable for the alleged violation of Plaintiffs' constitutional rights. Lastly, Defendants contend that the MCSO is

a non-jural entity, and as such, is not capable of suing or being sued in its own name.[1] Because all well-plead allegations in Plaintiffs' First Amended Complaint must be taken as true for the purpose of ruling on a motion to dismiss, the Court will briefly discuss the factual allegations made by each named Plaintiff. See Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996).

### A. Manuel de Jesus Ortega Melendres

According to Plaintiffs' Complaint, Ortega Melendres is a Mexican national who possesses a valid U.S. Visa and a permit issued by the United States Department of Homeland Security ("DHS"). On September 26, 2007, around 6:15 a.m., Ortega Melendres was one of several passengers in a car that was being driven around Cave Creek, Arizona. The driver of the vehicle was a Caucasian man, but the passengers, including Ortega Melendres, were by physical appearance all Latino men. The car was pulled over by MCSO deputies, at which time the driver was told that he was being stopped for speeding– although no citation was ultimately issued. The deputies then asked Ortega Melendres to produce identification. Ortega Melendres provided all of the identification that he was carrying in his wallet, which included a valid U.S. Visa with his fingerprint and photograph—valid through August 23, 2016, his Mexican Federal Voter Registration card, which also included his fingerprint and photograph, and a copy of the DHS permit with a stamp showing its validity through November 1, 2007.

After producing these three forms of identification, the deputies asked Ortega Melendres to exit the vehicle, where he was subject to a pat down search. The deputies then reached into Ortega Melendres' pockets and removed various items, including a small bottle of skin lotion. Ortega Melendres was then handcuffed and placed in the back of a MSCO

---

[1] While Defendants have also argued that Sheriff Arpaio and the MCSO are entitled to qualified immunity, under Ninth Circuit case law, "qualified immunity is only an immunity from a suit for damages, and does not provide immunity from suit for declaratory or injunctive relief." Hydrick v. Hunter, 500 F.3d 978, 988 (9th Cir. 2007). After Plaintiffs amended their complaint to request only prospective injunctive relief, qualified immunity was no longer available to Defendants.

- 3 -

1 vehicle. Ortega Melendres was transported to a MCSO facility in Cave Creek and placed in a holding cell. While Ortega Melendres was confined to the holding cell, which lasted for approximately four hours, he alleges that he was neither advised of the crime that he had allegedly committed, nor provided with any processing documentation.

After the four hour detention, the arresting officers placed Ortega Melendres back into handcuffs and transported him to downtown Phoenix, where he was handed over to officials from the United States Immigration and Custom Enforcement ("ICE"). At the ICE building, Ortega Melendres was again placed in a holding cell, this time for one hour. With Sheriff's deputies present, ICE officials asked Ortega Melendres to produce valid documents regarding his presence in the U.S. After briefly glancing over the documents that Ortega Melendres had given MCSO deputies earlier in the day, the ICE official told Ortega Melendres that he was free to leave. Upon release, Ortega Melendres was not given any information relating to his nearly nine hour detention, other than a case number.

### B.     David and Jessica Rodriguez

On December 2, 2007, David and Jessica Rodriguez, who are husband and wife, were leaving Lake Bartlett, Arizona with their two children. While driving, the Rodriguez' passed a sign that they thought read "Road Damaged." At the same time, the Rodriguez' could see that road ahead had been washed out by recent rains. They also noticed two MCSO vehicles located on the opposite side of the road. After the Rodriguez' along with two other vehicles—a motorcycle and a sedan—had driven past the road sign, the deputies pulled over all three vehicles.

According to the Complaint, the driver of the motorcycle and sedan were let go in short order without a visible exchange of any documentation. When a MSCO deputy approached the Rodriguez' vehicle, they were asked to produce a valid driver's license, vehicle registration, proof of insurance, and a social security card. After Mrs. Rodriguez asked the deputy why it was necessary to present a social security card during a routine traffic stop, the deputy answered that it was "standard procedure." The deputy then asked Mr. Rodriguez whether he had seen a sign marked "Road Closed." Mr. Rodriguez answered

- 4 -

1 that he had only seen a "Road Damaged" sign. According to the Complaint, the Rodriguez'
2 later discovered that there was indeed a "Road Closed" sign, but it was located on a portion
3 of the road that they had not yet traveled upon.

4 The deputy took Mr. Rodriguez' information and returned to his vehicle. While
5 waiting for the deputy to return, the Rodriguez' noticed that additional drivers continued to
6 be pulled over, and from what they could see, these drivers were being given oral warnings.
7 When the deputy returned, Mrs. Rodriguez asked if they, like the other drivers, could receive
8 a warning. The deputy declined. When Mrs. Rodriguez told the deputy that it appeared as
9 though they were being targeted because of their race, the Rodriguez' were given a citation
10 for failure to obey a traffic control devise. After being advised that they were free to leave,
11 and driving to the exist of the Lake Bartlett preserve, the Rodriguez' finally saw the "Road
12 Closed" sign. The Rodriguez' pulled to the side of the road where Mr. Rodriguez was able
13 to speak with several drivers of other vehicle that had been pulled over in the same location
14 by MCSO deputies. According to the Complaint, none of those drivers were asked to produce
15 a social security card, nor had any of them received a citation. The Rodriguez' also allege
16 that all of these other drivers were Caucasian.

17 **C.     Velia Meraz and Manuel Nieto, Jr.**

18 Around March 28, 2008, Meraz and Nieto drove a vehicle from their family's auto
19 repair business to a nearby gas station/convenience store. The windows of the car were down
20 and Meraz was singing along to Spanish language music playing in the car. As they pulled
21 into the parking lot, Meraz and Nieto noticed that there was a MCSO vehicle parked behind
22 another vehicle located at one of the gas pumps. They also noticed that a MCSO deputy was
23 speaking with two men who were in handcuffs. The deputy then yelled over to Meraz and
24 Nieto to leave. Meraz asked why. At that point, the deputy walked over and accused Meraz
25 and Nieto of disturbing the peace—to which Meraz remarked that she was only singing along
26 to music. The deputy repeated the request to leave, while warning Meraz and Nieto that they
27 could be arrested for disorderly conduct. Meraz agreed the two of them would leave, but
28

- 5 -

1 before doing so she asked for the deputy's badge number. The deputy then spoke into his
2 radio, apparently signaling other officers in the area to the scene.

3       As Meraz and Nieto pulled out of the parking lot, they noticed a motorcycle officer
4 coming down the road. The deputy, still located next to the gas pump, signaled to the officer
5 on the motorcycle to follow their vehicle. Nieto, who was apparently driving, noticed that
6 the motorcycle officer along with three other MSCO vehicles were now behind him. The
7 motorcycle officer signaled for Nieto to pull over and get out of the car. In response, Neito
8 dialed 911 to report that he was being harassed by the MCSO for no apparent reason. Since
9 Nieto's family business was no more than 50 yards away, he pulled over into the auto store's
10 parking lot. At that time, the four MCSO vehicles descended on them, blocking off the
11 street. After MCSO deputies came out of their vehicles with weapons raised, an officer
12 grabbed Nieto and pulled him out of the car, pressing him face first against his car, placing
13 his arms behind his back and putting him into handcuffs. A deputy asked Nieto whether he
14 possessed a driver's license, to which he replied that he did.

15       The commotion attracted people from inside Nieto's family's auto repair shop. Mr.
16 Nieto's father then came from out of the shop and told the officers that the shop was his and
17 that Nieto and Meraz were his children, and that they were both U.S. citizens— at which time
18 the MCSO deputies backed down and withdrew their weapons. Once Nieto's identification
19 was processed, he and Meraz were released without receiving a citation. Nieto and Meraz
20 believe that they were targeted because they are Latino and that the incident was part of a
21 larger immigration sweep being conducted by the MCSO in the Cave Creek, Arizona area
22 at the time.

23       **III.**    **Plaintiffs' Claims Under the Fourth Amendment**

24       The Fourth Amendment protects individuals against unreasonable searches and
25 seizures. Terry v. Ohio, 392 U.S. 1, 9 (1968). "Whenever a police officer accosts an
26 individual and restrains his or her freedom to walk away" that person has been seized within
27 the meaning of the Fourth Amendment. Murillo v. Musegades, 809 F. Supp. 487, 498 (W.D.
28 Tex. 1992). The length and scope of detention must be justified by the circumstances

1 authorizing its initiation. See Terry, 392 U.S. at 16. Consistent with the Fourth
2 Amendment, law enforcement officer may conduct a brief investigatory stop or seizure when
3 an officer has reasonable suspicion "supported by articulable facts that criminal activity may
4 be afoot." United States v. Sololow, 490 U.S. 1, 7 (1989). An investigatory seizure based
5 on reasonable suspicion must be brief and must last no longer than necessary for the officer
6 to investigate the situation with the aim of either confirming or dispelling his or her
7 suspicion. See United States v. Urrieta, 520 F.3d 569, 578-79 (6th Cir. 2008); United States
8 v. Valdez, 267 F.3d 395, 397 (5th Cir. 2001). In addition, an officer may frisk or pat down
9 an individual during an investigatory stop only where there are specific and articulable facts
10 that the individual is armed. See Terry, 392 U.S. at 21, 27.

11 A full custodial arrest, on the other hand, must be based on probable cause. See
12 generally, McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984). "Probable cause exists
13 where the facts and circumstances within the officers' knowledge and of which they had
14 reasonably trustworthy information are sufficient in themselves to warrant a man of
15 reasonable caution in the belief that an offense has been or is being committed by the person
16 to be arrested." Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979).

17 There is no bright line rule to determine when an officer has reasonable suspicion or
18 probable cause. Instead, both are measured by analyzing the totality of the circumstances
19 surrounding the encounter. See Cortez, 449 U.S. at 418. The Supreme Court has
20 determined that under a totality of the circumstances analysis lower courts are prohibited
21 from adopting a "divide and conquer" approach, whereby each individual factor cited by the
22 officer to support his assessment is viewed in isolation, and accorded no weight if susceptible
23 to an innocent explanation. Id. at 274. Along similar lines, the Supreme Court has noted that
24 law enforcement officers in assessing the likelihood of criminal or suspicious activity often
25 rely upon specialized training and experience to "make inferences from and deductions about
26 the cumulative information available to them that might well elude an untrained person."
27 United States v. Arvizu, 534 U.S. 266, 273 (2002). "[T]he Court has emphasized that even
28 when factors considered in isolation from each other are susceptible to an innocent

explanation, they may [to the discerning eye] collectively amount to [probable cause or] reasonable suspicion." United States v. Berber-Tinoco, 510 F.3d 1083,1087 (9th Cir. 2007).

With respect to reasonable suspicion, it is a less demanding standard than probable cause, but still requires an objective justification for the detention. See United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). The officer in question needs to be able to "articulate more than an inchoate . . . suspicion or [a] hunch of criminal activity." Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 145 (2000)). Instead, "reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for **particularized** suspicion." Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981) (emphasis in original)). The Ninth Circuit has repeatedly "rejected profiles that are likely to sweep many ordinary citizens into a generality of suspicious appearance." Montero-Camargo, 208 F.3d at 1129-30 (citing United States v. Rodriguez, 976 F.2d 592, 595-96 (9th Cir. 1992)).

Within the immigration context, it unquestioned that ICE agents and, if applicable, local law enforcement agencies, have the right to investigate and if necessary arrest individuals who are illegally present within the United States; their actions are however always circumscribed by the Fourth Amendment. See United States v. Brignoni-Ponce, 422 U.S. 873, 885-87 (1975) (holding that under the Fourth Amendment law enforcement officers may, when based upon reasonable suspicion, "question [an individual] about their citizenship and immigration status, and [] may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."). Reasonable suspicion in the immigration enforcement setting must therefore also be individualized and focused on the particular person being stopped. United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991). "Where . . . the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis." Montero-Camargo, 208 F.3d at 1131. Courts cannot "approve the wholesale seizure of miscellaneous persons . . . in the absence of well-founded suspicion based on particular, individualized and objectively observable factors

- 8 -

1  which indicate" that the person is indeed an illegal alien. Id. at 1132 (quoting United States
2  v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir. 1994)).

3  With respect to the role played by race in this process, the Ninth Circuit has found that
4  an individual's race, standing alone, is not an appropriate factor for assessing reasonable
5  suspicion under the totality of the circumstances. In the immigration enforcement setting,
6  the Ninth Circuit has been even more specific, holding that "Hispanic appearance is of little
7  or no use in determining which particular individuals among the vast Hispanic populace
8  should be stopped by law enforcement officials on the lookout for illegal aliens." Id. at 1134.
9  In this vein, the Ninth Circuit has held:

> The likelihood that in an area in which the majority—or even a substantial part—of the population is Hispanic, any given person of Hispanic ancestry is in fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a relevant factor in the reasonable suspicion calculus. As we have previously held, factors that have such a low probative value that no reasonable officer would have relied on them to make an investigative stop, must be disregarded as a matter of law.

Id. at 1132. Rather than relying upon racial generalizations, immigration enforcement officials must make what the Ninth Circuit has referred to as "permissible deductions;" meaning, logical inferences about apparent criminal activity that are predicated upon objectively verifiable evidence. See Berber-Tinoco, 510 F.3d at 1088 (quoting Cortez, 449 U.S. at 419-20). With this background in mind, the Court will now turn to analyze the factual events which constitute Plaintiffs' well-plead Complaint.

With respect to Plaintiff Ortega Melendres, Defendants argue in their Motion to Dismiss that because the MCSO deputy had probable cause to pull over the car in which Ortega Melendres was a passenger for speeding, MCSO deputies were thereby entitled to arrest Ortega Melendres and detain him for approximately nine hours. This argument is baseless, ignoring requirements that criminal suspicion be individualized. Contrary to Defendants' assertion, the Complaint plainly sets forth several cognizable violations of Mr. Ortega Melendres' rights under the Fourth Amendment.

First, assuming all facts alleged by Ortega Melendres are true, MCSO deputies had no more than reasonable suspicion to temporarily detain the driver of the car to conduct

- 9 -

a brief investigatory stop regarding an apparent traffic violation. Once MCSO deputies began to question Ortega Melendres in an apparent attempt to inquire into his immigration status, that encounter needed to be supported by additional indices of criminal suspicion. See Brendlin v. California, 551 U.S. 249 (2007) ( "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment. The same is true of a passenger.").[2] From the face of the Complaint, it does not appear that there were "specific and articulable facts" to suggest that Ortega Melendres was engaged in any type of criminal activity when deputies initially engaged him. There are certainly no facts present in the Complaint that would permit the Court to make a reasonable inference that Ortega Melendres should have been under suspicion of being an illegal alien when the officers first approached the car. At best, the deputies had reasonable suspicion to believe that someone other than Ortega Melendres had committed the offense of speeding. This falls far short of justifying an immigration based investigatory stop of Ortega Melendres.

The Complaint states an additional Fourth Amendment violation that occurred when Ortega Melendres was placed into full custodial arrest without probable cause. As mentioned above, by questioning Ortega Melendres while he was a passenger in a car that had been stopped for a traffic violation, MCSO deputies seized Ortega Melendres without specific and articulable facts that criminal activity was afoot. Notwithstanding that Fourth Amendment violation, once Ortega Melendres provided MCSO deputies with sufficient immigration documents—including a U.S. Visa containing a fingerprint and

---

[2] Ortega Melendres was seized with the meaning of the Fourth Amendment because a reasonable person in Ortega Melendres' position would not have felt free to leave the car and disengage with the deputies. See United States v. Washington, 490 F.3d 765, 769 (9th Cir. 2007) ("A person is seized if taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal quotations omitted)). See United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("[A] reasonable person would have believed that he was not free to leave.").

- 10 -

1 picture, a DHS permit, and a Mexican Federal Voter Registration Card with picture and
2 fingerprint—MCSO deputies were not justified in placing Ortega Melendres in full
3 custodial arrest for violating U.S. immigration laws. If, as Defendants argue, this Court
4 were to sanction the action alleged in the Complaint as a matter of law, then state law
5 enforcement officials would be capable of arresting any lawful non-citizen of Hispanic
6 heritage who presented a U.S. Visa and other seemingly valid immigration
7 documents—irrespective of any additional indices of suspicion.[3]

8       The Court will next turn to the Fourth Amendment claims of Plaintiffs D. and J.
9 Rodriguez. With respect to their contentions, even though the initial encounter between
10 the Rodriguez family and the MCSO was based on reasonable suspicion that the car had
11 violated Arizona State law by driving on a road closure, the Complaint sufficiently
12 alleges that the scope and duration of the investigatory stop was exceeded when deputies
13 requested Mr. Rodriguez' social security card in an apparent attempt to inquire into the
14 Rodriguez family's immigration status.  On its face, the Complaint adequately states that
15 such a request was not "standard procedure" for all routine traffic stops conducted by the
16 MCSO, since none of the other drivers on the same road closure were asked to produce
17 a social security card.  And nothing in the Complaint suggests that a reasonable officer
18 could have concluded that the Rodriguez' were illegal aliens, based solely on the fact that
19 they drove past a sign marked "Road Closed" or "Road Damaged."  As previously noted,
20 Hispanic physical appearance by itself never gives rise to reasonable suspicion that the
21 person seized is violating U.S. immigration law. Again, given the procedural posture of
22 this case, any external analysis regarding the surrounding circumstances of the stop would
23 be inappropriate for the Court to consider.

---

[3] It is important to keep in mind that at this stage of the proceedings the Court is only resolving a Motion to Dismiss, where all factual allegations made in Plaintiff Ortega Melendres' Complaint are treated as true.  It would be inappropriate at this stage of the proceedings for the Court to consider evidence external to the Complaint, such as the training, experience and observations of the arresting officers.

- 11 -

With respect to Plaintiffs Meraz and Nieto, the Court will similarly permit their Fourth Amendment claims to proceed beyond this initial stage. The Court cannot resolve as a matter of law the legality of Meraz and Nieto's seizure without first resolving many fact intensive questions. Such questions include whether Meraz and Nieto complied with the deputies instructions to leave the scene, whether such instructions were reasonable, whether Nieto immediately pulled over after being signaled to do so by a MCSO motorcycle, and whether deputies were justified in drawing their weapons on Meraz and Nieto. The Court will therefore take up this issue again on summary judgment, after discovery has closed, and the Parties have been given the opportunity to bring forth additional information.

It is worth noting, however, that unlike Plaintiffs Ortega Melendres and D. and J. Rodriguez, there is no evidence in the Complaint to suggest that the investigatory stop of Meraz and Nieto was initiated or extended in order to inquire into the immigration status of the two Plaintiffs. Furthermore, Plaintiffs' claim that Meraz and Nieto were released after their father identified them as U.S. Citizens has no bearing on the Fourth Amendment inquiry. The only question under the Fourth Amendment is whether MCSO deputies had an <u>objective</u> basis to briefly detain Meraz and Nieto; an officer's subjective beliefs—including alleged biases relating to a suspect's race or national origin—play no role in the Fourth Amendment analysis. <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (noting that an inquiry under the Fourth Amendment is wholly objective, and that claims related to an officer's subjective intentions are only cognizable under the Equal Protection clause of the Fourteenth Amendment).

In Sum, Defendants' Motion to Dismiss for failure to state a claim under the Fourth Amendment is denied.

**IV.  Plaintiffs' Claims Under the Equal Protection Clause**

"The Constitution prohibits selective enforcement of the law based on considerations such as race." <u>Whren</u>, 517 U.S. at 813. Under the Equal Protection Clause of the Fourteenth Amendment, a law enforcement officer's discriminatory

motivations can give rise to a constitutional violation even where the unequal treatment occurred during an otherwise lawful criminal detention. Farm Labor Org. Comm. V. Ohio State Highway Patrol, 308 F.3d 523, 533 (6th Cir. 2002).

The Parties do not agree as to what is required to successfully state a § 1983 claim for selective enforcement of criminal laws in violation of the Equal Protection Clause. Plaintiffs contend that they only need to demonstrate that Defendants' conduct had both a discriminatory purpose and a discriminatory effect. Rodriguez v. Cal. Highway Patrol, 89 F. Supp. 2d 1131, 1140-41 (N.D. Cal. 2000). On the other hand, Defendants argue that "[t]o establish a discriminatory effect" in a selective enforcement case, Plaintiffs must also show that similarly situated individuals were treated differently. Rosenbaum v. City & County of San Francisco, 484 F.3d 1142, 1152-53 (9th Cir. 2007) (quoting United States v. Armstrong, 517 U.S. 456, 465 (1996)). Defendants note that this is the same legal standard that is required for selective prosecution cases brought under the Equal Protection clause.[4] At this stage of the litigation, the Court will not resolve the question of whether Plaintiffs must prove that similarly situated individuals of a non-minority group were treated differently than the named Plaintiffs, who are all Hispanic. This is because Plaintiffs' selective enforcement claims withstand Defendants' Motion to Dismiss under either construction of law.

With respect to whether Plaintiffs have sufficiently plead a discriminatory purpose, the Complaint is replete with references to acts of intentional discrimination by

---

[4] Plaintiffs respond by arguing that where a discriminatory purpose is manifest, a claimant does not need to also show that similarly situated members of non-minority groups were treated differently. See Pyke v. Cuomo, 258 F.3d 107, 108-09 (2d Cir. 2001) (holding that plaintiffs could plead a "theory of discriminatory motivation underlying a facially neutral policy . . . [without] show[ing] the disparate treatment of other similarly situated individuals."). Plaintiffs also claim that the Court should not conflate selective enforcement cases with selective prosecution cases, since a selective prosecution claim implicates concerns related to prosecutorial discretion, and absent clear evidence to the contrary, courts presume that prosecutors have properly discharged their duties. Armstrong, 517 U.S. at 464. "Law enforcement officers, in contrast, never have been afforded the same presumption of regularity." Rodriguez, 89 F. Supp. 2d at 1141.

- 13 -

Defendants against Plaintiffs on the basis of race. Examples of such intentional discrimination include allegations that Defendant Arpaio made a public statement that physical appearance alone is sufficient to question an individual about their immigration status, that MCSO's crime suppression sweeps have been allegedly targeted at areas having a high concentration of Hispanics, and that the MCSO has used volunteers to assist in these crime sweeps who have known animosity towards Hispanics and immigrants.

With respect to whether Plaintiffs have sufficiently plead a discriminatory effect, "a government program that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006). In addition, the Complaint also contains claims that Defendants' policies and practices have treated similarly situated persons differently. First, the Complaint makes a general allegation–which the Court takes as true for the purpose of ruling on the instant Motion—that Caucasian drivers and passengers have been treated differently by the MCSO and other Defendants, since Caucasian drivers have been stopped at much lower rates than similarly situated Hispanic drivers and passengers. (¶32) Allegations of disparate treatment are also present in the claims of the named Plaintiffs. For example, Ortega Melendres alleges that the Caucasian driver of the car in which he was a passenger was not questioned in a similar manner or with a similar purpose. Likewise, the Rodriguez' Plaintiffs allege that they were able to speak with the other drivers who drove past the road closure near Lake Bartlett, Arizona, all of whom were Caucasian, and none of them had been asked by MCSO deputies to present their social security card. Furthermore, none of the Caucasian drivers allegedly received a citation for driving on a closed road. With respect to Meraz and Nieto, the Complaint alleges that once their father identified them as U.S. Citizens, the MCSO deputies released Nieto from custody and left the scene. These facts are more than sufficient to show a discriminatory purpose and effect on the part of Defendants at this preliminary stage of the litigation.

1  Defendants' Motion to Dismiss for failure to state a claim under the Equal
2  Protection Clause of the Fourteenth Amendment will therefore be denied as to all
3  Plaintiffs.

### V. Plaintiffs' § 1983 Municipal Liability Claim

Under Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 691-94 (1978), municipal liability attaches where a plaintiff's alleged constitutional deprivation was the product of a policy or custom of the local government. See Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008). "For purposes of liability under Monell, a policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. (quoting Fairley v. Luman, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (internal quotations omitted)). Whether a state official is a final policy maker for purposes of municipal liability is a question of state law that is to be determined by the district court. See Streit v. County of Los Angeles, 236 F.3d 552, 560 (9th Cir. 2001). When determining whether an individual has final policymaking authority, courts ask whether the individual at issue has authority "in a particular area, or on a particular issue." McMillian v. Monroe County, 520 U.S. 781, 785 (1997).

In the absence of an express local policy, a plaintiff may demonstrate that there is a well settled custom or practice by the municipality which produced the alleged constitutional violation. See Navarro v. Block, 72 F.3d 712, 714-15 (9th Cir. 1996). Allegations of random acts are generally insufficient to establish a local custom. Id. at 714. If a plaintiff can sufficiently prove the existence of a local custom, they need not also show that final policy makers were aware of or sanctioned the custom in question. Id. at 714-15.

Here, Defendants argue that Defendant Sheriff Arpaio is not a final policy maker for the County of Maricopa with respect to law enforcement issues. Without citation to relevant case law, Defendants contend that Arizona statutes, specifically, A.R.S. §11-251(30)-(31), vest sole final decision making power on all matter relating to

Maricopa County with the Maricopa County Board of Supervisors. Defendants claim that if Arpaio possesses any final policy making authority, it is only with respect to the MCSO, not Maricopa County. Plaintiffs counter by citing to Flanders v. Maricopa County, 203 Ariz. 368 (Ct. App. 2002) and Guillory v. Greenlee County, 2006 U.S. Dist. LEXIS 71926 (D. Ariz. Sept. 28, 2006), both of which held that Arizona Counties could be held liable for the discretionary acts of its Sheriff in the context of jail management and law enforcement policy. With respect to whether Sheriffs are final policy makers for Arizona Counties in the context of criminal law enforcement, Guillory went on to specifically hold:

> The Sheriff is an enumerated officer of the Defendant County. 11-401(A)(1). As a matter of law, the County is liable for policies made by the Sheriff, pursuant to his designated powers and duties as provided for by statute: A.R.S. § 11-441. See e.g., Flanders, 54 P.3d at 847 (holding county liable because the sheriff is a county officer whose duties regarding jail operations are fixed by law, A.R.S. § 11-441(5)).
>
> Section 11-441(A)(2) provides that the Sheriff shall arrest and take before a magistrate for examination all persons who attempt to commit or who have committed a public offense. The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest. Cf Arizona v. Monaco, 207 Ariz. 75, 83 P.3d 553, 558-59 (Ariz. App. 2004) (explaining the statute does not create a constitutional right to be arrested upon first discovery of criminal activity because sheriff must be permitted to exercise discretion to conduct investigation until enough evidence is obtained for a conviction). This makes the Sheriff the final policymaker regarding criminal investigations.
>
> Under A.R.S. § 11-444, actual and necessary expenses of the Sheriff must be allowed and paid by the County. The Court finds that this fiscal independence further demonstrates that the Sheriff is the designated and final policymaker for the County regarding the needs of its officers for the prompt and orderly administration of criminal justice . . . .

Guillory, 2006 U.S. Dist. LEXIS 71926 at *11-13. In the absence of precedent to the contrary, the Court is inclined to follow this line reasoning—particularly when the Arizona statute cited by Defendants to support their point is inapposite.[5] The County of

---

[5] A.R.S. § 11-251 (30)-(31) describes the power of the Board of Supervisors in broad terms, and the statute does not speak to the precise issue in this case. In fact, the statute is completely silent as to the respective power and responsibilities of a Sheriff under Arizona state law.

- 16 -

1  Maricopa will therefore remain in the instant lawsuit as a municipal defendant pursuant
2  to § 1983.

3  **VI.    Maricopa Country Sheriff's Office as a Non-Jural Entity**

4  Defendants also contend that the MCSO is a non-jural entity, incapable of suing
5  or being sued in its own name. The Court is aware that this issue is very much unsettled
6  within the District of Arizona, and that Arizona State Courts have declined to address the
7  same issue. See Williams v. City of Tempe, 2006 U.S. Dist. LEXIS 14518, *8 (D. Ariz.
8  March 27, 2006) ("There is no per se rule that police departments are not jural entities.
9  In fact, there is no consensus within the District of Arizona as to whether the Maricopa
10 County Sheriff's Office is a jural entity."); see also  Flanders, 203 Ariz. at 379. On the
11 one hand, a sister court within the District of Arizona, in a lengthy and well reasoned
12 opinion, determined that the MCSO was in fact a non-jural entity, since it does not posses
13 a legal identity separate and apart from that of Maricopa County. Wilson v. Maricopa
14 County, 2005 U.S. Dist. LEXIS 28021 (D. Ariz.  November 15, 2005). On the other
15 hand, Plaintiffs have cited to several cases where the MCSO has been amenable to suit,
16 as both plaintiff and defendant. See Maricopa County Sheriff's Office v. Maricopa
17 County Employee Merit Sys. Comm'n, 211 Ariz 219 (2005); W. Valley View, Inc. v.
18 Maricopa County Sheriff's Office, 216 Ariz. 225 (Ct. App. 2007); Patterson v. Maricopa
19 County Sheriff's Office, 117 Ariz. 153 (Ct. App. 1993). Plaintiffs additionally argue that
20 because the MCSO constitutes a "program or activity," which receives federal funds
21 under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-4a-(1)(A), it must be
22 subject to suit under the statute to enjoin any unlawful use of those funds. Because the
23 Title VI issue was not addressed by Defendants—who chose not to file a Reply brief in
24 this case—and because the MCSO has acted as a plaintiff as recently as 2005, the Court
25 will not dismiss the MCSO as a non-jural entity.

26 **VII.   Somos America's Article III Standing**

27 Lastly, Defendants challenge the Article III standing of the organizational Plaintiff
28 Somos America, arguing that it failed to sufficiently allege an injury-in-fact to one of its

1  members, and that the interests it seeks to protect are not relevant to its core purpose.
2  Under Ninth Circuit case law, however, the Court need not reach this issue. "The
3  general rule applicable to federal court suits with multiple plaintiffs is that once the court
4  determines that one of the plaintiffs has standing, it need not decide the standing of the
5  others." Preminger v. Peake, 536 F.3d 1000, 1006 (9th Cir. 2008) (quoting Leonard v.
6  Clark, 12 F.3d 885, 888 (9th Cir. 1993)). In the instant case, it is undisputed that
7  Plaintiffs Ortega Melendres, D. Rodriguez, J. Rodriguez, Meraz and Nieto have Article
8  III standing. Because their claims have not been dismissed and are instead proceeding
9  forward in this lawsuit, the Court need not inquire into the standing of Somos America
10 either.

**Accordingly,**

**IT IS HEREBY ORDERED** denying Defendants' Motion to Dismiss. (Dkt.#39.)

**IT IS FURTHER ORDERED** denying as moot Plaintiffs' Motion for an Expedited Rule 16 Conference. (Dkt.#49.)

DATED this 10th day of February, 2009.

_____
Mary H. Murguia
United States District Judge