1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Manuel de Jesus Ortega Melendres, et al.,)    No. CV-07-2513-PHX-MHM
                                              )
10            Plaintiff,                        )    **ORDER**
                                              )
11   vs.                                       )
                                              )
12                                             )
     Joseph M. Arpaio, et al.,                 )
13                                             )
             Defendant.                        )
14                                             )
                                              )
15   _____)

16

17

18          Currently pending before the Court is Defendants Sheriff Joseph M. Arpaio, Maricopa

19   County, and the Maricopa County Sheriff's Office's Motion for Recusal. (Dkt.#63.)  After

     reviewing the relevant documents and determining oral argument unnecessary, the Court
20
     issues the following Order.
21
     **I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND**
22
            Having already issued two substantive Orders in this case (Dkt.##25, 60.), the Court
23
     is intimately familiar with the underlying facts and sees no reason to go through them now
24
     in great detail.  On December 12, 2007, Plaintiffs Manuel de Jesus Ortega Melendres, Jessica
25
     Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., and Somos America
26

27

28

1   filed suit—on behalf of themselves and all others similarly situated[1]—against Defendants
2   pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, Title
3   VI of the Civil Rights Act, and Article II, § 8 of the Arizona Constitution alleging racial
4   profiling and unlawful detention of persons of Hispanic appearance and/or descent during
5   Defendants' attempt to enforce federal immigration laws.  On January 3, 2008, Defendants
6   moved to dismiss the Complaint; Plaintiffs subsequently sought leave to amend.
7   (Dkt.##12,17.)  On September 5, 2008, the Court granted leave to amend and denied as moot
8   Defendants' motion to dismiss.  (Dkt.#25.)   Thereafter, Defendants renewed their dismissal
9   motion.  On February 10, 2009, after holding oral argument, the Court denied Defendants'
10  renewed motion to dismiss on the merits.  See Melendres v. Arpaio, 598 F. Supp. 2d 1025
11  (D. Ariz. 2009); (Dkt.#60.)  On February 23, 2009, thirteen days after the Court's Order was
12  entered, Defendants moved to recuse the Court under both 28 U.S.C. § 144 and 28 U.S.C.
13  § 455.

14        In support of their Motion for Recusal, Defendants submitted the affidavit of Mr.
15  David Hendershott, Chief of the Maricopa County Sheriff's Office ("MCSO"), as well as
16  supporting exhibits.  Plaintiffs responded in opposition with a declaration from Mr. Aaron
17  Lockwood, an attorney with the law firm of Steptoe and Johnson, along with supporting
18  exhibits. The factual background, as reflected in the filings made by the affiant and declarant,
19  is as follows.

20        The Court has an identical twin sister, Janet Murguia.  Janet Murguia is currently
21  President and CEO of the National Council of La Raza ("NCLR").  NCLR is the largest
22  national Latino civil rights organization in the United States.  Janet Murguia previously
23  served as Deputy Director of Legislative Affairs to President William J. Clinton, and as
24  Executive Vice Chancellor for University Relations of the University of Kansas.
25  Furthermore, one of the Court's older brothers, Ramon Murguia, an attorney in private

26

27        [1]Plaintiffs have filed a "Motion to Certify the Class," and that Motion is currently
28  pending with the Court.  (See Dkt.#93.)

1   practice in Kansas City, Kansas, has also been affiliated with NCLR, having served on the

2   organization's Board of Directors, including a term as its Chairman.

3       Defendants contend that it was not until February 11, 2009—the day after the Court

4   ruled against them in its first potentially dispositive Order—that they became aware of the

5   Court's relationship with her sister and her sister's connection to NCLR.  According to

6   Defendants, on February 11, 2009 the *Phoenix Business Journal* published an article entitled,

7   "Federal Court sides with ACLU against Arpaio in round 1 of profiling case."  Among other

8   things, this article mentioned that Janet Murguia is "president and CEO of the National

9   Council of La Raza, a leading Hispanic advocacy group."  (Dkt.#63, Exhibit 1.)  That same

10  day, an online version of the *Phoenix New Times* published an article commenting on the

11  Court's Order. Among other things, the *New Times* article noted that the Court is the "[f]irst

12  Latina judge appointed to the U.S. District Court in Phoenix." (Id. at Exhibit 2.)  Similarly,

13  on February 12, 2009, *The Arizona Republic* ran a story in its local section concerning the

14  instant case, in which it discussed the Court's personal background, along with that of her

15  sister. (Id.)

16      Through their affiant, Defendants contend that after these and other media sources

17  publicized the Court's personal background, including her sister's work at NCLR,

18  Defendants were contacted by members of the public—who were apparently looking to

19  express their disappointment with the Court's ruling in the instant case.  According to

20  Defendants, it was through these public comments that they were first alerted to the Court's

21  personal history.  Defendants also claim public reaction to the Court's February 10, 2009

22  Order was alarming, since, according to Defendants, the public appeared to be more focused

23  on the relationship between the Court and her sister than on the underlying merits of the

24  action.  To this end, Defendants have submitted five 'reader comments' that were posted on

25  websites belonging to the *The Arizona Republic* and the *Phoenix Business Journal*. These

26  reader comments were posted alongside online versions of the newspapers' aforementioned

27  February 11, 2009 articles.  Defendants contend that these five reader comments typify the

28  sentiments communicated to them by members of the public, and that these selected reader

1    comments underscore what Defendants perceive to be the public's reaction to Court's
2    continued role in this case. Defendants' proffered reader comments include the following:

3        •    "Of course this Judge will let the lawsuit stand. Her sister is the President of
4             La Raza. Can you say CONFLICT OF INTEREST!"

5        •    "They [*The Arizona Republic*] seem to have left out that Judge Murguia is the
6             sister of the head of La Raza. Kind of important fact to leave out, don't you
7             think?"

8        •    "Judge Murguia … is only making her sister's job easier."

9        •    "Wrong is just WRONG…. I would have made the same ruling and MY sister
10            is not connected to La Raza."

11       •    "[Judge] Murguia is the twin sister of Janet Murguia, president and CEO of the
12            National Council of La Raza, a leading Hispanic advocacy group. This judge
13            should be impeached for not recusing herself. Peter Kozinets should be fired
14            by the plaintiffs for tainting their lawsuit by getting a judge with such an
15            obvious conflict of interest to the case. If they ever had a shred of legitimate
16            claim, this blows it away."

17       Defendants additionally claim that while researching the Court's background they
18   came upon a 2004 newspaper article published in the *Kansas City Star*. This article noted
19   that the Court and Janet Murguia are the youngest of six children, and that the Court and her
20   siblings constitute "one big chain," and "[i]f not for one, the chain would be broken." (See
21   Dkt.#63, ¶ 11.) The article also describes the relationship between the Court and her
22   identical twin sister as "close," reporting that they "talk constantly," and speak "to each other
23   several times a week." (Id.)

24       Questioning Defendants' factual representations, Plaintiffs responded with their own
25   submission. Specifically, Plaintiffs point out that on December 11, 2007, the day before the
26   instant case was filed, *The Arizona Republic*—which is the State of Arizona's largest daily
27   circulation newspaper—published a front page story detailing the Court's sibling relationship
28   with Janet Murguia. Because this article contains quotes from Sheriff Arpaio as well as the

1   Maricopa County Attorney, and because the article focused on another high profile federal

2   lawsuit involving many of the same Defendants, Plaintiffs argue that the article contradicts

3   Defendants' stated position that they were unaware of the Court's background until February

4   11, 2009.  (Dkt.#70, Exhibit A.)  Plaintiffs further note that this story was picked up and

5   reported nationally by the Associated Press.  (Id. at Exhibit B.)

6       With respect to Janet Murguia's work with NCLR, Defendants allege that NCLR has

7   continually offered public comments about the facts of this case, including published articles

8   and speeches by Janet Murguia herself.  For example, according to Defendants, NCLR is on

9   record as "strongly oppos[ing] efforts to make state and local police responsible for the

10  enforcement of federal immigration laws." (See id. at Exhibit 7.) Similarly, according to

11  Defendants, NCLR has issued statements claiming that the local enforcement of federal

12  immigrations laws is "having a serious negative impact on Latino communities," and that

13  "delegation of immigration authority is likely to result in racial profiling, police misconduct,

14  and civil rights violations." (Id. at ¶ 15.)

15      Defendants have also submitted evidence that NCLR has a Phoenix office, and

16  therefore has a direct presence in Maricopa County.  (Id. at ¶ 19.)  Defendants also note that

17  NCLR's website directs individuals who believe that their rights have been violated to

18  contact one of NCLR's affiliate organizations.  Among the organizations listed as affiliates

19  are the American Civil Liberties Union ("ACLU") and the Mexican American Legal Defense

20  and Education Fund ("MALDEF").  Both the ACLU and MALDEF, while not parties to this

21  case, are providing legal representation to the named Plaintiffs.

22      Among the litany of reasons Defendants submit to support their recusal motion, one

23  concerns a recent public awareness campaign launched by NCLR, "We Can Stop the Hate."

24  (See www.wecanstopthehate.org.)   The We Can Stop the Hate campaign contains a

25  prominent picture of Janet Murguia, and links to several of her public speeches.  Specifically,

26  Defendants point to a February 4, 2009 article available on the website. This article addresses

27  actions taken by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO").

28  Although the actions of Sheriff Arpaio and Maricopa County addressed in the article appear

1  to be unrelated to the instant lawsuit,[2] Defendants point out that disparaging statements

2  directed towards Sheriff Arpaio and MCSO are included in the online publication.  Examples

3  of such statements include the following: "[i]n true Arpaio form, his office sent a press

4  release to the media inviting them to this event, proving that he's more interested in drawing

5  attention to himself than actually doing his job." (Dkt.#63, at ¶ 17; Exhibit 9.)  Among an

6  assortment of epithets, Sheriff Arpaio is called "a relentlessly self-promoting caricature of

7  a sheriff (ever closer to 'I'm not a real Sheriff, I just play one on TV' territory), not an actual

8  law enforcement official. The march is yet another stunt to distract people from his

9  incompetent, lawsuit-riddled folly of a department." (Id.)  The article further refers to

10  members of the MCSO as "Arpaio and his thugs." (Id.)

11      The Court notes that after independently reviewing the We Can Stop the Hate

12  campaign's website, it encountered numerous other articles relating to Sheriff Arpaio and the

13  MCSO.  For reasons that are altogether unclear, these articles were not made part of

14  Defendants' factual submission.   Interestingly, two such articles directly address the

15  underlying facts of the instant case.  Given the nature of the assertions that Defendants have

16  raised against the Court in their recusal motion, the absence of these highly relevant articles

17  from Defendants' factual submission is somewhat puzzling.  The first article encountered by

18  the Court is dated January 20, 2009 and entitled "Join a Call for an Investigation of Sheriff

19  Arpaio." In this article, NCLR asks members of the public to support a public call for an

20  immediate investigation by the federal government into the legality of the agreement between

21  U.S. Immigration and Customs Enforcement and MCSO, which permits MCSO to work with

22  federal law agencies to aid in the enforcement of federal immigration laws.  This agreement

23

24  ───────────────

25      [2]Although the article refers to a "parade" of "hundreds of detained immigrants in
   shackles through the streets of Phoenix," which seemingly implicates and casts aspersions
26  on Defendants immigration enforcement policy, the thrust of the article is concerned with
   Sheriff Arpaio's general treatment of detained prisoners, rather than the legality of an
27  immigration detention and whether such detentions were predicated upon constitutional
28  violations. (Id.)

is referred to as the "§ 287(g)" agreement.[3]  In the instant lawsuit, Plaintiffs' claim Defendants have violated their civil rights in the course of carrying out their activities under the § 287(g) agreement, and Plaintiffs seek to enjoin Defendants from enforcing federal immigration laws pursuant to the 287(g) agreement.

The second article independently encountered by the Court is dated October 22, 2008 and is entitled "Sheriff Joe Strikes Again."[4]  In this article, NCLR refers to Sheriff Arpaio as "a man who has made a career of humiliating prisoners, harassing Latinos of every variety, wasting taxpayer dollars with dubious results, and having a less than stellar respect for civil rights and due process." (Id.)  The article goes on to characterize Sheriff Arpaio as "unrepentant, arrogant, and monumentally disingenuous." (Id.)  It also addresses the precise legal and factual issues of the instant lawsuit.  Specifically, this article alleges that Sheriff Arpaio and MCSO deputies have engaged in acts of racial profiling. The article states that "Arpaio claims he does not know what racial profiling is since he can't possibly define something he's never engaged in.  Here's a hint, Joe: the stuff you're doing to Latinos in Arizona—the ACLU noted in July that 'Arpaio has made no secret that he believes physical appearance alone is sufficient reason to stop and question individuals regarding their immigration status'—that's racial profiling."  (Id.)

Another item in Defendants' factual submission concerns an April 16, 2008 speech by Janet Murguia entitled "Conventional Wisdom." This speech is also available on the We Can Stop the Hate website. (Id. at ¶ 18; Exhibit 10.)  While Janet Murguia's speech refers

---

[3]

See We Can Stop the Hate, http://www.wecanstopthehate.org/site/latest/join_the_call_for_an_investigation_of_sheriff_arpaio (last visited June 1, 2009.)

[4]

See We Can Stop the Hate, http://www.wecanstopthehate.org/site/latest/sheriff_joe_strikes_again (last visited June 1, 2009.)

to "hate groups and extremists pulling the levers and turning the wheels," these comments were not directed towards any of the Defendants, and no reasonable person could infer that the speech was in any sense about them.  In fact, the "Conventional Wisdom" speech, for all practical purposes, appears to be completely unrelated to the instant case, other than the fact that it highlights Janet Murguia and NCLR's involvement in Latino civil rights issues. (Id.)

Lastly, Defendants point to Plaintiff Somos America's website, which lists the organization's political and social interests.  (See Dkt.#63, ¶ 21.) Defendants argue that Somos America's website demonstrates that it shares a common ideology with NCLR, and presumably with the Court's sister.  Defendants lastly state that Somos America's website contains a link to Janet Murguia's "Conventional Wisdom" speech.  (Id.) .

## II.   LEGAL STANDARD

Two statutes govern the recusal of district judges:  28 U.S.C. § 144 and 28 U.S.C. § 455(a)-(b) . Section 144 applies when a party to a proceeding believes that the district judge "has a personal bias or prejudice either against him or in favor of any adverse party[.]" 28 U.S.C. § 144.  "Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit."  United States v. Sibla, 624 F.2d 864, 867 (9th Cir. 1980) (citations omitted).  Specifically, the statute provides:

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case.  It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144.  When a party files a timely and legally sufficient affidavit pursuant to § 144 that plainly sets forth a compelling case for recusal, the district judge "shall proceed no further therein, but another judge shall be assigned to hear such proceeding." Id.; Sibla, 624 F.2d at 867.  However, "if the motion and affidavit required by [§] 144 [are] not presented to the judge, no relief under [§] 144 is available."  Sibla, 624 F.2d at 868.

Section 455 has two recusal provisions.  The first provision, subsection (a), states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself [or herself]

in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Subsection (b) provides that any justice, judge, or magistrate shall also disqualify themselves under the following situations:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
>         *   *   *
>
> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
>
>         *   *   *
>
> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
>
>         *   *   *
>
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

28 U.S.C. § 455.

Unlike section 144, section 455 "sets forth no procedural requirements." Sibla, 624 F.2d at 867-68. Instead, that section is directed towards the judge, rather than the parties, and is self-enforcing on the part of the judge. Id. Moreover, "section 455 modifies section 144 in requiring the judge to go beyond [a] section 144 affidavit and consider the merits of the [recusal] motion pursuant to section 455[]." Id. at 868. The recusal standards under § 144 and § 455 are identical, and decisions interpreting one section are controlling in the interpretation of the other. Id.

**IV.   DISCUSSION**

Because Defendants have moved to recuse the Court under both § 144 and multiple sub-sections of § 455, the Court will address each of these claims in turn. Before turning to

1   the merits of Defendants' individual contentions, the Court will first address whether

2   Defendant's recusal motion has been timely filed.

3          **A.      Whether Defendants' Motion is Untimely**

4          Recusal motions brought under either § 144 and § 455 must be filed in a timely

5   manner.  <u>See</u> 28 U.S.C. § 144(a) (motions "must be made in a timely fashion"); <u>Davies v.

6   Commissioner</u>, 68 F.3d 1129, 1131 (9th Cir. 1995) ( motions under § 455 must also "be made

7   in a timely fashion").  The recusal statute "is not intended to give litigants a veto power over

8   sitting judges, or a vehicle for obtaining a judge of their choice."  <u>United States v. Cooley</u>,

9   1 F.3d 985, 993 (10th Cir. 1993).   Moreover, "where the facts are known before a legal

10  proceeding is held, waiting to file . . . a motion until the court has ruled against a party is

11  untimely." <u>Summers v. Singletary</u>, 119 F.3d 917, 921 (11th Cir. 1997).

12         Plaintiffs contend that the instant motion to recuse is untimely and has been brought

13  in bad faith, since this case was first assigned to the Court in December 2007 and Defendants

14  waited for over a year before moving for recusal.  Plaintiffs cite to examples where other

15  courts have rejected recusal motions when the delays at issue involved appreciably shorter

16  time periods than here.  <u>See e.g.</u>, <u>United States v. Simmons</u>, 1997 U.S. Dist. LEXIS 22658,

17  *17 (E.D. Cal. July 28, 1997) ("foreclos[ing] relief" for a 10-month delay); <u>Singer v.

18  Waldman</u>, 745 F.2d 606, 608 (10th Cir. 1984) (denying a recusal motion filed over one-year

19  after the complaint).

20         Plaintiffs also take issue with Defendants' assertion of prior ignorance regarding the

21  Court's family background. Plaintiffs argue that Defendants' contentions strain all credulity

22  and should be rejected.  According to Plaintiffs, the Court's background, including her

23  sister's position with NCLR, was a matter of public record as far back as 2001, when the

24  *Washington Post* printed an article discussing the Court's relationship with her twin sister.

25  Furthermore, Plaintiffs have submitted a December 2007 front page article from *The Arizona

26  Republic*, which details the Court's family history, including Janet Murguia's work at NCLR.

27  Notably, Plaintiffs also point to the fact that this article quoted both Sheriff Arpaio and the

28  Maricopa County Attorney at length.  Plaintiffs contend that because the article was focused

1   on MCSO's implementation of a controversial and well-known statewide law sanctioning
2   Arizona employers who hire illegal workers, Defendants must have read the article and been
3   aware of its contents. Plaintiffs argue that from the surrounding circumstances one could
4   reasonably infer that Defendants have intentionally held on to this information, and are now
5   seeking to recuse the Court after having lost the first round of substantive briefing. In other
6   words, Plaintiffs have accused Defendants of knowing about the Court's sister and NCLR,
7   and attempting to use this information as a proverbial ace in the hole, to be pulled out and
8   played when it made convenient trial strategy to do so.

9        Plaintiffs also contend that if the Court is unwilling to make a determination that
10   Defendants possessed actual knowledge regarding the Court's background around the time
11   the lawsuit was filed, then Defendants should at least be charged with 'constructive
12   knowledge' of all facts that were readily available and commonly known during that same
13   period of time.  See Drake v. Birmingham Bd. of Edu., 476 F. Supp. 2d 1341, 1347 (N.D.
14   Ala. 2007) (rejecting a recusal motion on timeliness ground where a party could have
15   discovered through reasonable diligence that the judge was a deacon in the same church as
16   plaintiff and her husband). This would, of course, include knowledge that the Court has a
17   twin sister who serves as President and CEO of NCLR.

18        In their reply brief, Defendants adamantly deny that they intentionally waited to file
19   their recusal motion until after the Court had ruled against them on their renewed motion to
20   dismiss. Instead, Defendants claim that they were genuinely unaware of the Court's
21   background during the early stages of the litigation. According to Defendants, the Court's
22   February 10, 2009 ruling is relevant to the timing of their recusal motion only insofar as the
23   Order was the catalyst for local and national media reporting, after which members of the
24   public allegedly began to contact Defendants' offices. Defendants claim that, in actuality,
25   their recusal motion was brought within days of discovering the Court's relationship with her
26   sister.  According to Defendants, the Court's Order played little role in the timing of their
27   motion because they were not expecting to win the motion anyway. As Defendants note,
28   there is nothing particularly unusual about a district court denying a motion to dismiss

1    brought under Fed. R. Civ. P. 12(b)(6), particularly when the facts are heavily disputed, as

2    they are here.  Defendants invoke the Ninth Circuit holding that  "[i]t is axiomatic that the

3    motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."

4    See Gilligan v. Jamco Dev. Corp., 108 F.3d 246 (9th Cir. 1997).

5        The Court finds that serious questions exist as to the veracity of the representations

6    made by Defendants, their affiant, and defense counsel as to whether Defendants were aware

7    of the Court's relationship with her twin sister prior to the February 10, 2009 Order.  The

8    Court agrees with Plaintiffs that the timing of Defendants' motion was bound to raise

9    significant questions as to whether the filing constitutes a bad faith litigation tactic,

10    particularly in light of the December 2007 front page article in *The Arizona Republic*, which

11    discussed the Court's personal history and includes quotes from a key Defendant and

12    counsel.  The Court further agrees that under the circumstances it seems implausible that

13    Defendants were unaware of the Court's sister's role at NCLR, and were not at least on

14    notice that there might be a familial relationship between Janet Murguia and the Court.

15    Indeed, Defendants' own arguments themselves undermine their claim to reasonable

16    ignorance.  Noting that the standard for recusal under 28 U.S.C. § 455(a) is applied by

17    considering "a reasonable person with knowledge of all the facts," Taylor v. Regents of

18    Univ. of Cal., 993 F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994),

19    Defendants argue that such a reasonable person would know about Janet Murguia and the

20    activities and interests of NCLR and would question the Court's impartiality based upon that

21    knowledge.  At the same time, Defendants assert that they themselves were not aware that

22    the Court had a twin sister who is the President and CEO of NCLR until some 15 months into

23    the litigation.  Effectively, then, Defendants ask this Court to find that they were less aware

24    of the relevant facts than a "reasonable person" would have been.  This strains credulity,

25    especially in light of the public record described earlier and the Defendants' participation in

26    the public debate surrounding the issues that underlie this case. Nevertheless, there is no

27    direct evidence conclusively demonstrating that Defendants or their counsel have made a

28

1  factual misrepresentation to the Court— notwithstanding the improbability of Defendants'

2  claims.

3        Overall, the law supports the denial of Defendants' recusal motion as untimely.

4  However, because the Court must abide by an unwavering commitment to the perception of

5  fairness in the judicial process, it will not deny the petition on the basis of timeliness and will

6  instead address the substantive questions raised by the request for recusal.

7        **B.**     **Whether The Court Is Actually Biased Against Defendants Under §**
          **455(b)(1)**

8

9        Defendants' first substantive argument is that, pursuant to § 455(b)(1), the Court is

10  actually and personally biased against Defendants.  The moving party carries a "substantial

11  burden" of overcoming the presumption that a district court is free from bias.  <u>United States</u>

12  <u>v. Denton</u>, 434 F.3d 1104, 1111 (8th Cir. 2006).  Under § 455(b)(1), actual bias is defined

13  as "a personal animus or malice that the judge harbors against [a party] of a kind that a fair-

14  minded person could not entirely set aside when judging certain persons or causes."  <u>Hook</u>

15  <u>v. McDade</u>, 89 F.3d 350, 355 (7th Cir. 1996).  Recusal for actual bias is required only if the

16  moving party can prove by "compelling evidence" that "a reasonable person would be

17  convinced the judge was biased."  <u>Id.</u>

18        Defendants set forth their bias argument by asserting, without reference to any

19  evidence whatsoever, that the Court "has a natural, personal bias in favor of Plaintiffs, as well

20  as [a] corresponding, natural prejudice against Defendants."  (Dkt.#63, at p. 14.)  This bare

21  bones assertion, even in combination with similar statements peppered throughout

22  Defendants' motion, falls well short of the "compelling evidence" standard promulgated by

23  the Seventh Circuit in <u>Hook</u>.  <u>See</u> <u>Hook</u>, 89 F.3d at 355.  As Plaintiffs argue in their

24  opposition brief, Defendants can point to nothing the Court has ever done to suggest that it

25  holds an opinion of any party that is wrongful or inappropriate.

26        Moreover, Defendants, in particular Maricopa County and Sheriff Arpaio, are frequent

27  litigants before this Court on a wide variety of civil matters.  It is not an overstatement to say

28  that the Court has presided over a countless number of cases involving these Parties, and it

1    has ruled in Defendants' favor on scores of their dispositive motions.  The Court can think of
2    no other case involving either Maricopa County or Sheriff Arpaio where it has been accused
3    of harboring  a "personal animus or malice" towards either one of them.  See Hook, 89 F.3d
4    at 355.  In fact, as recently as September 2008, the Court presided over a bench trial where
5    Sheriff Arpaio was the only named Defendant.  See Mitchell v. Arpaio, CV-06-1963-PHX-
6    MHM; 2008 U.S. Dist. LEXIS 80179 (D. Ariz. Sept. 19, 2008).   After reviewing all
7    admissible evidence in that case, which included live in-court testimony given personally by
8    Sheriff Arpaio, the Court ruled in the Sheriff's favor, holding that "Defendant [was] entitled
9    to judgment dismissing the . . . Complaint with prejudice."  Id. at * 16.  Certainly, Sheriff
10   Arpaio's  victory  in  the  September  2008  Mitchell  bench  trial,  along  with  many  other
11   successfully defended civil actions before this Court, undercuts any claim of actual bias
12   towards him or any of the other Defendants.  See Alexander v. Primerica Holdings, 10 F.3d
13   155, 163-64 (3d Cir. 1993) (noting that there is heightened concern regarding judicial recusal
14   in a bench trial where the court is "deciding each and every substantive issue at trial").

15   In light of the record before the Court, Defendants' "natural bias" contention could
16   easily be interpreted as an argument that this Court's alleged bias somehow flows from her
17   racial heritage.  Obviously, such an argument would be unwarranted and baseless.  Beyond
18   that, the idea that an Hispanic judge should never preside over a controversial case concerning
19   alleged acts of racial profiling purportedly committed against Hispanics is repugnant to the
20   notion that all parties are equal before the law, regardless of race. See Plessy v. Ferguson, 163
21   U.S. 537, 559 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind, and neither
22   knows nor tolerates classes among citizens.").[5]  Given the absence of any factual foundation

23

24        [5]In their reply brief, Defendants proclaim that the Court's race played no role in their
25   recusal motion, and that they are not contesting whether a Hispanic judge should ever sit on
     a case concerning Hispanic civil rights, only that this Court should not sit on this case given
26   the nature of her sister's work and the public positions advocated by her employer. (Dkt#.73
     at p. 2.)  However, Defendants main brief does not appear to be quite as measured as their
27   reply.  For example, Defendants, for reasons that are both unstated and unknown, quoted in
28   bold the following passage from an article found in the *Phoenix New Times*: "Hmm - we

1   supporting Defendants' claim of bias, and given the Court's extensive history of presiding

2   over disputes involving Sheriff Arpaio, MCSO and Maricopa County in a neutral and

3   impartial manner, the Court does not see how any reasonable attorney could set forth an

4   accusation of actual bias.  As the Second Circuit stated, in upholding the imposition of

5   sanctions under Rule 11 of the Federal Rules of Civil Procedure against an attorney, the

6   "suggestion that a judge cannot administer the law fairly because of the judge's racial and

7   ethnic heritage is extremely serious and should not be made without a factual foundation

8   going well beyond the judge's membership in a particular racial or ethnic group." See

9   MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,138 F.3d 33, 37 (2d Cir. 1998).

10      The Court therefore rejects the unsupported assertion that it is actually biased against

11   Maricopa County, Sheriff Arpaio or MCSO, in this or any other case.  Further, the Court

12   admonishes counsel for Defendants that in all future pleadings he should adhere scrupulously

13   to the requirements of Fed. R. Civ. P. 11(b) or be prepared to face sanctions for failing to do

14   so.

15      **C.   Whether The Court Has An Interest That Could Be Substantially Affected By The Outcome Of These Proceedings Under § 455(b)(4)**

16

17      Under § 455(b)(4), a judge must recuse herself if "individually or as a fiduciary . . .

18   [the court has] a financial interest in the subject matter in controversy or is a party to the

19   proceeding, or any other interest that could be substantially affected by the outcome of the

20   proceeding."  28 U.S.C. § 455(b)(4).

21      Defendants contend that the Court's interest in the well being of her sister constitutes

22   an "other interest" within the meaning of § 455(b)(4), since a victory on the merits for

23   Plaintiffs would, according to Defendants, help to advance NCLR's stated social and political

24   goals, and, in turn, advance Janet Murguia's career.  Plaintiffs respond by arguing that courts

25   have narrowly defined "other interests" to include only financial or pecuniary interests of

26

27   can't but wonder what the first Latina judge appointed to the U.S. District Court in Phoenix
     thinks of the idea that 'physical appearance alone' should merit a police investigation." (See

28   Dkt.#63 at p. 4.)

1    some variety, see e.g., In re Virginia Elec. & Power Co., 539 F.2d 357, 367-68 (4th Cir.

2    1976), and that a purported interest in the career advancement of one's sibling does not square

3    with any accepted interpretation of the statute. See Guardian Pipeline, L.L.C. v. 950.80 Acres

4    of Land, 525 F.3d 554, 557 (7th Cir. 2008);   In re New Mexico Natural Gas Antitrust Litig.,

5    620 F.2d 794, 796 (10th Cir. 1980).  Defendants, in reply, cite to In re Virginia Elec. & Power

6    Co., arguing that Plaintiffs' reliance upon that case is misplaced, since in that case the Fourth

7    Circuit specifically stated:

8        Unlike [the term] 'financial interest' [found in § 455(b)(4)], the term 'any other
         interest' [also found in § 455(b)(4)] is not defined in terms of ownership or in
9        any other manner. It is not easy to conclude what the term means. But it must
         have been the congressional intent to make an interest of lesser degree than
10       ownership disqualify. That would seem to be so for otherwise there would be
         no purpose in defining financial interest in terms of ownership and failing to
11       apply such a limitation on any other interest.

12   In re Virginia Elec. & Power Co., 539 F.2d at 367 (emphasis added).

13       With respect to Defendants novel interpretation of § 455(b)(4), the Court does not

14   accept that a sibling relationship can constitute an 'interest' within the meaning of the recusal

15   statute. Notwithstanding Defendants' argument, the language of Virginia Elec. discusses 'any

16   other interest' in terms of the degree of ownership over something that is financial or

17   proprietary in nature.  See also E. & J. Gallo Winery v. Encana Energy Serv., Inc., 2004 U.S.

18   Dist. LEXIS 29380, *13-15   (E.D. Cal. Feb. 20, 2004) (citing to Virginia Elec. and

19   characterizing an 'other interest' as decidedly financial, albeit one that is indirect or remote

20   in nature).  Moreover, the Court is not aware of any case law that would tend to support

21   Defendants' proffered reading. The Court will not endorse an untethered expansion of the

22   recusal statute to the point where a litigant can engage in a broad based fishing expedition to

23   dig up potentially disqualifying 'interests' that a judge may be accused of having in a

24   particular case.  The Court therefore agrees with Plaintiffs that the term 'any other interests'

25   should be interpreted as being limited to financial or pecuniary interests, whether by

26   ownership or some other means.

27       Defendants go on to claim that even if the Court were to apply the more restricted

28   interpretation of § 455( b)(4) advocated by Plaintiffs—that the Court's interest must involve

- 16 -

1   "an investment or other asset whose value depends on the outcome, or some other concrete

2   financial effect"—recusal would still be warranted.  (See Dkt.#70 at p. 10.)  This, according

3   to Defendants, is because an adverse ruling here would likely cause an appreciable drop in the

4   amount of "public donations" to NCLR, since "the positions, causes and relationships it

5   advances and develops [may not be bearing] fruit in society's executive, legislative, or judicial

6   branches of government." (See Dkt.#72 at p. 8.)

7          There is nothing in the record, however, to support Defendants' speculation that the

8   Court's sister's career or her organization would be materially affected by the outcome of the

9   proceedings.  Similarly, there is nothing in the record to suggest that the Court has an interest

10  in her sister's well being that would somehow be inconsistent with the fair resolution of this

11  case, or that the Court has a personal stake in the advancement of her sister's career that

12  would create an untenable conflict of interest. Furthermore, even if a victory for Plaintiffs here

13  would somehow help to advance Janet Murguia's interests, nothing in the record suggests that

14  the Court itself would derive any type of financial, proprietary or otherwise tangible benefit

15  from her sister's potential career advancement.  Defendants' theory that NCLR might stand

16  to lose "public donations" depending on the outcome of this case is not actionable under the

17  relevant sub-section of the recusal statute, since § 455(b)(4) is directed towards interests held

18  by the Court, not its siblings or its siblings' employer.[6]

19  _____

20      [6]There is one final issue under § 455(b)(4) which, in an abundance of caution, the
    Court must raise, even though it was not addressed by either of the Parties.  This issue is
21  whether the Court is a potential member of Plaintiffs' proposed class, and if so, whether
    recusal is required.  In their First Amended Complaint, Plaintiffs redefined their proposed
22  class to include the following individuals: "all Latino persons who, since January 2007, have
    been or will be in the future, stopped, detained, questioned or searched by MCSO agents
23  while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County,
    Arizona." (See Dkt.#18 at p. 24.)  Although the Court can be fairly characterized as a "Latino
24  person," it has not, admittedly, been "stopped, detained, questioned or searched by MCSO
    agents" since January 2007.  Moreover, the Court does not foresee being stopped,
25  questioned, detained or searched in the near future, but must concede that it always remains
    a theoretical possibility, even if remote.  While the Court is mindful of the Ninth Circuit's
26  admonition that "no man can be the judge in his own case [or] try cases where he has an
27  interest in the outcome," Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994), the

28

1   Thus, the Court has no conceivable interest in this case that would serve as a grounds

2   for recusal under § 455(b)(4).

3       **D.    Whether The Court's Sister Has An Interest That Could Be Substantially Affected By The Outcome Of This Lawsuit Under § 455(b)(5)(iii)**

4       Under § 455(b)(5)(iii), recusal is mandated where "a person within the third degree of

5   relationship . . . [i]s known by the judge to have an interest that could be substantially affected

6   by the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii).  The phrase "third degree of

7   relationship" has been to interpreted to include a judge's siblings.  <u>See generally</u> <u>Harris v.</u>

8   <u>Champion</u>, 15 F.3d 1538, 1571 (10th Cir. 1994) (finding that § 455(b)(5)(iii) should apply to

9   the district court's uncle).

10      Pursuant to this sub-section, Defendants broadly assert that the Court's sister has

11  "ideological, political, social and activist interests" in this lawsuit that are contrary to

12  Defendants' interests.  (<u>See</u> Dkt.#63 at p. 5.)  In response, Plaintiffs point to the Seventh

13  Circuit case of <u>SCA Serv. v. Morgan</u>, 557 F.2d 110, 116 (7th Cir. 1977), which held that a

14  partner's interest in the reputation and goodwill of his law firm fell within § 455(b)(5)(iii).

15  <u>Id.</u>  Plaintiffs argue that the connection between a business's reputation and goodwill and the

16  interests of one of its owners are obviously financial in nature, whereas "ideological, political,

17  social and activist interests" are obviously not.  As such, Plaintiffs argue that the definition

18  of 'interests' under § 455(b)(5)(iii) should be co-extensive with the meaning of 'interests'

19  under § 455(b)(4).  Plaintiffs note that Defendants have cited no examples where courts have

20  defined the term interests differently under § 455(b)(4) and § 455(b)(5)(iii).  <u>See e.g.</u>,

21  <u>Guardian Pipeline, L.L.C.</u>, 525 F.3d at 557.

22

23  _____

24  Court is not presently a member of Plaintiffs' proposed class and cannot state with any degree of certainty whether it will become a member in the future.  In any event, even under

25  the unlikely scenario that the Court becomes an unnamed class member, its interest in the outcome of the case would likely be de minimis and too insubstantial to necessitate recusal.

26  <u>See</u> <u>In re New Mexico Natural Gas Antitrust Litig.</u>, 620 F.2d 794, 796 (10th Cir. 1980)

27  (holding that the district court's recusal under § 455(b)(4) was unwarranted where the judge, like all other consumers in New Mexico, may have benefitted from a lower gas and electric

28  bill in a class action lawsuit brought against a statewide utility company).

1   The Court agrees with Plaintiffs.  It is not at all clear how the word interests could be

2   given two different meanings in the same statute, when used in a nearly identical context. See

3   Ratzlaf v. United States, 510 U.S. 135,143 (1994) ("A term appearing in several places in a

4   statutory text is generally read the same way each time it appears.").  Thus, if the term

5   interests is to be given a consistent meaning throughout § 455, then Defendants have failed

6   to show how the Court's sister has an interest in the instant lawsuit that can be reasonably

7   characterized as financial or proprietary in nature. And as previously stated, "ideological,

8   political, social and activist" interests are not generally recognized as actionable.

9       Additionally, Defendants have not even suggested, much less explained, how any

10  interest, even under the rejected "social, political, or ideological" standard, might be

11  "substantially" affected by the outcome of this case, particularly when the degree of any

12  potential impact on the interests of the Court's sister or NCLR seems indirect at best.  Neither

13  the Court's sister, nor her employer, are parties in this case, employed by a party in this case,

14  or have a direct affiliation with a party in this case or with their counsel. It is far too

15  speculative to suggest that because Janet Murguia and NCLR might arguably share common

16  values or pursue the same political or social goals as Plaintiffs and their counsel, that they

17  might be substantially affected by the outcome of this case.  See ESPN, 767 F. Supp. at 1080.

18      The Court therefore rejects § 455(b)(5)(iii) as a basis for recusal in this case.

19

20

21  **E.      Whether The Court's Impartiality Might Reasonably Be Questioned under §455(a)**

22      The more difficult question presented by this motion is whether the Court's impartiality

23  might reasonably be questioned under 28 U.S.C. §455(a).  The standard for recusal under

24  §455(a) is "whether a reasonable person with knowledge of all the facts would conclude the

25  judge's impartiality might reasonably be questioned." Taylor v. Regents of Univ. of Cal., 993

26  F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994).

27      The Court is acutely aware that it owes an independent duty to uphold the integrity of

28  the judicial system, see Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 860 (1988)

1   (recognizing that the purpose of § 455(a) is "to promote public confidence in the integrity of

2   the judicial process by avoiding even the appearance of impropriety whenever possible"),

3   even when a party's pleadings are bombastic and its position relies upon inflammatory and

4   meritless forms of argumentation.  This Court will not dodge the critical question of whether

5   its continued role in this case is appropriate under the circumstances, even though it would

6   have been entirely justified in denying Defendants' recusal motion on timeliness grounds

7   alone.

8        Two competing concerns govern the Court's decision on the merits of this question.

9   First, of course, "[t]he test for recusal under [§ 455(a)] asks "whether a reasonable person with

10  knowledge of all the facts would conclude the judge's impartiality might reasonably be

11  questioned." Taylor, 993 F.2d at 712.  Critically, "the judge's actual state of mind, purity of

12  heart, incorruptibility, or lack of partiality are not the issue." Nichols v. Alley, 71 F.3d 347,

13  351 (10th Cir. 1995) (internal quotations and citations omitted).  The test is purely an

14  objective one, which focuses on "whether a reasonable person perceives a significant risk that

15  the judge will resolve the case on [any] basis other than the merits." In re Mason, 916 F.2d

16  384, 385 (7th Cir. 1990); Preston v. United States, 923 F.2d 731, 734 (9th Cir. 1991) ("The

17  inquiry is whether a reasonable person would have a reasonable basis for questioning the

18  judge's impartiality, not whether the judge is in fact impartial.").

19       It must be noted that in the recusal context, a reasonable person means a

20  "well-informed, thoughtful observer," as opposed to a "hypersensitive or unduly suspicious

21  person." In re Mason, 916 F.2d at 386.  Thus, to the extent that the selected reader comments

22  left on the *Phoenix Business Journal* and *The Arizona Republic* websites have been offered

23  by Defendants to exemplify the public's reaction to the Court's continued involvement in this

24  case,[7] that position is rejected.  Judges must decide whether to recuse themselves "not by

25

26       [7]Of course, not all of the comments cited by the Defendants supported their contention
    that the public's reaction to the Court's February 10, 2009 Order was one of suspicion and
27  mistrust. See e.g. these comments: "Wrong is just WRONG . . . I would have made the same
    ruling and MY sister is not connected to La Raza"; and "[t]his judge, like any judge in her
28

- 20 -

considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2d Cir. 1988). "Articles and features in the media suggesting impropriety cannot act as a barometer" of the reasonable person. TV Commc'ns Network, Inc. V. ESPN, Inc., 767 F. Supp. 1077, 1080 (D. Colo. 1991). Obviously, no Court should permit anonymous bloggers to wield a veto power over its participation in any case.

Second, courts have "a strong duty to sit" when there is no legitimate reason to recuse. Clemens v. U.S. Dist. Ct. For the Cent. Dist. of Cal., 428 F.3d 1175, 1179 (9th Cir. 2005). A judge should not recuse him or herself based "on unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges." In re United States, 666 F.2d 690, 694 (1st Cir. 1981).

As the Parties acknowledge in their filings, this is a high profile case, one that is not likely to be free from controversy, regardless of who is presiding over it. The issue of whether Maricopa County, Sheriff Arpaio and MCSO ought to be enforcing federal immigration laws elicits strong feelings, both within the local Phoenix community as well as across the nation. Further, allegations of violations of Constitutional rights often arouse strong public passions. These passions are no doubt shared by both those who allege the violations and those who dispute them. The Court also recognizes the controversial and sensitive nature of the immigration issue generally within the country. Nothing in this set of circumstances would, by itself, warrant recusal under the appropriate standard.[8]

---

position, simply upheld the legal standard for a motion to dismiss. There were enough facts alleged to let the case go to the next step."

[8]In the Court's view this case is not about whether sound public policy—which is set by the political branches and not by the courts—favors having a local Sheriff and his deputies enforce federal immigration laws. If it were, this case would never have withstood

1    Nonetheless, the Court recognizes its somewhat unique position, in that the Court's

2    twin sister plays a prominent public role in advocating policy positions that diametrically

3    oppose those taken by Defendants.  At the same time, the statute does not require the Court

4    to recuse itself from a matter merely because a case concerns Hispanic civil rights, our

5    nation's immigration policy, or some related matter.  Section 455(a) does not require such a

6    cautious approach on the part of a judge, and the Court must be careful to avoid allowing her

7    sister's public profile to serve as a proxy for a race-based recusal challenge.  Also providing

8    context to this inquiry is the rather unremarkable yet often overlooked proposition that "[a]

9    district judge is not a sterile creature who dons judicial robes without any prior contacts in the

10   community but rather is very likely to be a man or woman with a broad exposure to all kinds

11   of citizens of all shades of persuasion and background." United States v. Suren, 1992 U.S.

12   App. LEXIS 38216, *16 (9th Cir. Aug. 18 1992) (Memorandum Opinion) (quoting In re

13   Searches Conducted on March 5, 1980, 497 F. Supp. 1283, 1290 (E.D. Wis. 1980) (internal

14   citations omitted)).

15   Both Parties devote a great deal of space in their briefs to arguing over the proper

16   interpretation of two leading U.S. Supreme Court cases dealing with recusal motions brought

17   under § 455(a): Microsoft v. United States, 530 U.S. 1301 (2000) and Cheney v. United States

18   Dist. Ct., 541 U.S. 913 (2004).  Microsoft concerned whether Chief Justice Rehnquist should

19   have recused himself from a case where his son, a lawyer who represented Microsoft in

20   potentially related anti-trust matters, might have stood to gain from a favorable ruling towards

21   the company.  Id. at 1301-02.  After rejecting the possibility that his son might have an

22   interest that could be substantially affected by the outcome of the case, the Chief Justice

23   addressed whether his continued involvement created the appearance of impropriety.  Id.

24

25   ────────────────

26   even the flimsiest motion to dismiss. Instead, this lawsuit concerns only whether Defendants
     have violated Plaintiffs' rights under the Fourth Amendment, Fourteenth Amendment, and

27   the Arizona State Constitution, while carrying out their otherwise lawful duties to enforce
     federal immigration laws. The Court has not been asked to pass judgment on the wisdom of

28   the § 287(g) authorization, nor would it do so if asked.

1    Ultimately, Chief Justice Rehnquist decided against recusal.  In so doing, he noted that a

2    "decision by this Court as to Microsoft's antitrust liability could have a significant effect on

3    Microsoft's exposure to antitrust suits in other courts . . . [but] [e]ven our most unremarkable

4    decision interpreting an obscure federal regulation might have a significant impact on the

5    clients of our children who practice law." Id. at 1303.  The Chief Justice went on to comment

6    on the Supreme Court's unique  institutional role, stating:

7            [I]t is important to note the negative impact that the unnecessary
             disqualification of even one Justice may have upon our Court.  Here—unlike
8            the situation in a District Court or a Court of Appeals—there is no way to
             replace a recused Justice.  Not only is the Court deprived of the participation
9            of one of its nine members, but the even number of those remaining creates a
             risk of affirmance of a lower court decision by an equally divided court.

10   Id.

11          Cheney involved an attempt to force the recusal of Justice Scalia from a case

12   concerning whether the executive branch was required to disclose the identity of persons who

13   had served on the Vice President's energy task force.  See Cheney, 541 U.S. at 914-16.  The

14   substance of the recusal motion focused on a hunting trip that Justice Scalia had taken with

15   Vice President Cheney and others.  At issue, among other things, was that the host of the trip

16   had ties to the energy industry and that members of the hunting party, including Justice Scalia,

17   had traveled to their final destination on the Vice President's government-issued airplane.  Id.

18   In deciding against recusal, Justice Scalia stated that media commentary constituting "a blast

19   of largely inaccurate and uninformed opinion cannot determine the recusal question." Id. at

20   924.  Justice Scalia further commented that recusal might be advisable,  "if I were sitting on

21   a Court of Appeals," where the recused judge's place on the panel "would be taken by another

22   judge and the case would proceed normally."  Id. at 915.  Echoing the sentiments of Chief

23   Justice Rehnquist, Justice Scalia opined that the Supreme Court operated quite differently,

24   since, "[t]he Court proceeds with eight Justices, raising the possibility that, by reason of a tie

25   vote, it will find itself unable to resolve the significant legal issue presented by the case." Id.

26          The helpfulness of the Microsoft and Cheney opinions is debatable in this case.  Chief

27   Justice Rehnquist's Memorandum, although quite informative in its analysis of when a close

28   family member's potential interest in a case might cast aspersions on a judge's apparent

1   neutrality, is the writing of only one Justice. It is not the opinion of the Court. As such,

2   Microsoft is not binding precedent. Similarly, Justice Scalia's Memorandum in Cheney

3   discussing his personal friendship with Vice President Cheney and the media's coverage of

4   their hunting trip, is non-precedential.

5        More importantly, those cases do not deal with the recusal of a trial court judge. When

6   a federal district court judge recuses herself from a case, another judge can easily step into her

7   place. Because every district court judge has taken the same oath to faithfully apply the law,

8   which includes applying binding precedent from the U.S. Supreme Court as well as the law

9   of the relevant circuit, very little prejudice results from a district court judge's recusal.  On

10  the other hand, as Chief Justice Rehnquist and Justice Scalia have observed, the U.S. Supreme

11  Court is sui generis, or one of a kind.  There are only nine members, and when one recuses,

12  only eight will sit. As was noted, the votes of at least five Justices are required to overturn a

13  lower court opinion. Therefore, when that body is short one or more of its members, there is

14  a substantial risk that an important legal issue will go completely unresolved, without a

15  majority opinion. No other case, certainly not one from the federal district court, presents an

16  analogous situation.

17       One of the focal points of the Parties' arguments in this case is the notion that a judge

18  might be seen as unwilling to take a position inconsistent with her sibling's ideological,

19  political or social interests.  Defendants argue that a reasonable observer, one who is apprised

20  of all the facts, might assume that siblings, like the Court and her sister, share common

21  pursuits, points of view or even political ideology. Defendants further claim that siblings who

22  are personally close are likely to influence each other's thinking, even indirectly.  When the

23  siblings are twins, no less identical twins, according to Defendants, the likelihood of

24  confusion is even greater.  Plaintiffs respond by arguing that people frequently disagree with

25  their siblings, even with their identical twin, on a wide variety of issues and that no reasonable

26  person would question this Court's ability to do so here. Additionally, the Plaintiffs argue, the

27  mere fact that Janet Murguia is President and CEO of an organization that advocates for the

28  rights of Latinos would not cause a reasonable person to question the Court's impartiality.

In weighing the Parties' competing views, there is little, if any, guidance from case law.  The Parties have not cited to—and the Court is not aware of—a similar case, where nothing more than a sibling's political or social affiliations could arguably create the appearance of impropriety for a judge under § 455(a).  Cognizant that a "reasonable person" is well-informed and thoughtful, the Court agrees with Plaintiffs that no reasonable person would automatically ascribe the views of one sibling to another.  It is certainly part of the common experience that brothers and sisters often disagree about all sorts of issues, regardless of how personally close they are or how often they speak on the telephone.  There is no reason to believe that this reality would change when the siblings are identical twins.  A reasonable and impartial observer apprised of all the facts would not conclude that identical twins are more likely to share a common view point or interests than other siblings, much less that a twin who is a judge would be incapable of impartiality.  The Court is not aware of any evidence that would tend to show that it has been unduly influenced by her sister's political or social views.  Moreover, there is no proof that the Court, in light of her sister's stated positions, would be hesitant to rule against Plaintiffs, if the law so required.  That the Court's identical twin is on record as opposing the enforcement of federal immigration laws by Sheriff Arpaio and MCSO does not by itself mandate the Court's recusal under § 455(a).  If the only grounds for recusal were Janet Murguia's role as President and CEO of NCLR and the public comments that she has made pursuant to that role, the Court's inquiry would stop there.  However, this is not the case, as the Court must also address the issue of the We Can Stop the Hate website, which was launched by NCLR while the Court's sister was serving as President and CEO as a campaign to address acts of discrimination against Latino communities throughout the United States.

Whether the Court's impartiality might reasonably be questioned based on the content of these internet-based articles is a difficult issue.  Obviously, the Court has no connection to the We Can Stop the Hate campaign.  There is also nothing in the record to suggest that the Court's sister is the author of the offending articles or that she had any personal involvement

1   in their publication. Yet, the Court is mindful that it must be vigilant to avoid even the

2   slightest appearance of impropriety.

3        Without question, these articles greatly disparage MCSO deputies and personally

4   attack Sheriff Arpaio.  As has been previously pointed out, these articles refer to Sheriff

5   Arpaio as a "relentlessly self-promoting caricature," who has "less than stellar respect for civil

6   rights and due process," and who is "unrepentant, arrogant, and monumentally disingenuous."

7   With respect to the MCSO, its deputies are referred to as "thugs," while the department is

8   generally characterized as a "lawsuit-riddled folly" of an agency, among other things.  In the

9   context of a motion for recusal, when comments like these originate from a website that is

10  associated with the Court's sister or the organization that she leads, they cannot be taken

11  lightly.

12       Besides being insulting, the We Can Stop the Hate online articles speak directly to

13  MCSO's decision to enforce federal immigration laws pursuant to its § 287(g) authority.  In

14  fact, these articles specifically assert that MCSO has failed to adequately safeguard basic

15  constitutional rights through its departmental procedures, and that MCSO deputies have

16  engaged in wide-spread acts of racial profiling and have blatantly violated the Fourth

17  Amendment rights of detained immigration suspects by predicating stops on "physical

18  appearance alone."  The instant litigation sets out to determine these exact questions, i.e.,

19  whether the Fourth and Fourteenth Amendment rights of Latino persons in Maricopa County

20  have been violated.[9]

21       In applying the objective standard of § 455(a), the Court believes that whether a

22  reasonable person apprised of all relevant facts would question its impartiality based on

23  circumstances surrounding the publication of the We Can Stop the Hate website is a close call.

24  _____

25       [9]The Court must also note that a prominent picture of Janet Murguia sits immediately
    adjacent to each We Can Stop the Hate online article. Even though the picture is correctly
26  labeled as belonging to Janet Murguia and not the Court, the Court seeks to avoid the risk of
    confusing the Court's picture with that of her sibling. The Court must consider the possibility
27  that a reasonably well-informed and impartial observer might mistake the Court for her
28  identical twin sister.

1   On the one hand, the views of the Court's sister and her organization cannot be fairly imputed
2   to the Court, and there is nothing in the record to support an inference that the Court would
3   be unwilling to issue a ruling contrary to her sister's publicly-held positions. On the other
4   hand, much of the commentary contained in the articles is highly disparaging of specific
5   Defendants in this case, and the website takes a strong stand on disputed factual matters lying
6   at the heart of the litigation.

7          The United States Court of Appeals for the Ninth Circuit has instructed that when a
8   case is close, the balance should tip in favor of recusal. United States v. Holland, 519 F.3d
9   909, 911 (9th Cir. 2008) (quoting United States v. Dandy, 998 F.2d 1344, 1349 (6th Cir.
10  1993)).  No Court should tolerate even the slightest chance that its continued participation in
11  a high profile lawsuit could taint the public's perception of the fairness of the outcome.
12  Certainly, this Court is unwilling to take such a risk.  Thus, because at the district court level
13  all doubts should be resolved in favor of recusal when the issue is close, strictly on the sole
14  issue remaining—whether the Court's impartiality might reasonably be questioned under
15  Section 455 (a)—the Court, in an abundance of caution, will recuse itself from this matter.
16  **Accordingly,**

17          **IT IS HEREBY ORDERED** granting Defendants' Motion for Recusal. (Dkt.#63.)
18          **IT IS FURTHER ORDERED** directing that the Clerk reassign this case to another
19  judge in the District of Arizona by random lot.

20          DATED this 15th day of July, 2009.

Mary H. Murguia
United States District Judge

- 27 -