# Exhibit A

**Exhibit A**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Manuel de Jesus Ortega          )
Melendres, et al.,              )
                                )
        Plaintiffs,             )
                                )No. CV 07-2513-PHX-GMS
vs.                             )
                                )
Joseph M. Arpaio, et al.,       )
                                )
        Defendants.             )
                                )


VIDEOTAPED DEPOSITION OF MANUEL JOSEPH MADRID


Phoenix, Arizona
October 27, 2009
9:09 a.m.


CERTIFIED COPY


Reported by:

CARRIE SMALANSKAS

Registered Professional Reporter

Certified Realtime Reporter

Certified LiveNote Reporter

Arizona CR No. 50355

1    the district you are working.

2         Q.   Make traffic stops?

3         A.   Sure, sure.

4         Q.   And how long were you a patrol officer at the

5    District II substation for?

6         A.   I believe from 2001 until 2005.

7         Q.   What did you do next?

8         A.   I went to our lake patrol division.

9         Q.   What were your responsibilities there?

10        A.   Enforce watercraft laws.

11        Q.   Anything else?

12        A.   Coordinate search and rescues, recover drowned

13   -- drowning victims.

14        Q.   Anything else?

15        A.   That kind of sums it up.

16        Q.   Did you make traffic stops in the lake area?

17        A.   Sure.

18        Q.   What was your next assignment?

19        A.   I promoted out of lake patrol and I have been

20   assigned to the human smuggling unit since I believe June

21   of 2007, my current position.

22        Q.   What is the human smuggling unit?

23        A.   It is a unit within the Maricopa County

24   Sheriff's Office that conducts interdiction patrol on our

25   highways and within Maricopa County interdicting human

Electronically signed by Carrie  Smalanskas (001-370-696-0410)                                                              e830d28e-965e-4176-b742-1cb5a3fec39f

1    smuggling loads, also investigates drop houses within

2    Maricopa County.

3         Q.   What else does the human smuggling unit do?

4         A.   We assist in several things.  We assist --

5    obviously one of the big things we are here, we assist in

6    crime suppressions.  For the most part, that's what we do.

7         Q.   Do you also engage in patrols?

8         A.   That would be the saturation patrols, yes.

9         Q.   Tell me everything you can about how you heard

10   about the human smuggling unit.

11        A.   I came in shortly as -- after it had been

12   created, so I have been there for pretty much since the

13   start, so there is not much that I heard about it prior

14   to.

15        Q.   So you were a founding member?

16        A.   Correct, correct.

17        Q.   How did you come to learn about it being

18   established?

19        A.   How did I come to learn about it?

20        Q.   Yes.

21        A.   I helped create it.

22        Q.   Were you asked to help create it?

23        A.   It was my position that I had transferred into

24   so part of my responsibilities as a supervisor within that

25   unit was to help create -- create the units and our

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

1     Q.    So when you joined the unit at that time, was it

2     just you and Sergeant Baranyos and Lieutenant Siemens?

3     A.    Correct.

4     Q.    And then additional deputies joined?

5     A.    Correct.  There was already a few deputies

6     assigned to the unit as well.

7     Q.    And what specifically are your responsibilities

8     in the unit?

9     A.    Now or then?

10    Q.    Well, then.  That's a good question.

11    A.    The same.  We -- between me and Sergeant Palmer

12    we co-supervise each other's units.  We supervise

13    interdiction patrol.  We work with our liaisons between

14    ICE.  That is, for the most part, my responsibilities.

15    Q.    Who is your liaison -- or who was your liaison?

16    A.    Well -- what's that?

17    Q.    Who is your liaison?

18    A.    Jim Barrett.

19    Q.    How do you spell his last name?

20    A.    I don't know.

21    Q.    And was he the same liaison that you had the

22    whole time you were at the human smuggling unit?

23    A.    No.

24    Q.    Who else were your liaisons?

25    A.    Cathy David, Martinez -- I forget what his first

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

1      Q.   Apart from those DUI investigations, have you

2   ever been involved in any similar large-scale sweeps?

3      A.   Prior to what?

4      Q.   Prior to the formation of immigration

5   enforcement.

6      A.   Just the DUI investigation -- or the DUI task

7   force.

8      Q.   There have been several sweeps since the

9   immigration hotline was opened.  Do you recall which

10  sweeps you have been involved in since that time?

11     A.   I believe all -- maybe most of them.  I am not

12  sure.  There might have been one or two that I missed.

13     Q.   Approximately how many of them do you recall

14  being a part of?

15     A.   I don't know.  I don't know.  10, 15.  I don't

16  know.

17     Q.   Were you involved in the sweep that occurred on

18  October 16th and 17th in Surprise?

19     A.   Of this month?  Yes.

20     Q.   You were involved in that sweep?

21     A.   Yes.

22     Q.   What typically are your duties during the

23  sweeps?

24     A.   Typically, I run the -- I'm one of the command

25  post supervisors.  I ensure that everything is running

Page 82

1   smoothly there, as well as compile stats at the end of the

2   night from each deputy and compile the stats and then put

3   them out to our chain of command -- or to my chain of

4   command.

5        Q.   Do you conduct any traffic stops yourself?

6        A.   I am at the command post.  No.

7        Q.   Well, for instance, in the sweep at Cave Creek

8   in September 2007 you were able to visit the site of one

9   of the stops.  Have you done similar visits during the

10  other sweeps?

11       A.   Possible, yeah.  There is -- at some point

12  there, Sergeant Palmer will come in and do my job at the

13  command post and I will go out on the road.  But,

14  typically, I would say 80, 85 percent of the time I am at

15  the command post.

16       Q.   And Sergeant Palmer is --

17       A.   Is on the road.

18       Q.   Is on the road.

19            You mentioned you would draft summaries of the

20  operations after they occurred, correct?

21       A.   Correct.

22       Q.   And these would be the e-mails similar to the

23  one we were looking at for the Cave Creek operation?

24       A.   Correct.

25       Q.   And how would you get the statistics that you

1    would include in those summaries?

2         A.   Every individual deputy was handed a stat sheet,

3    and a stat sheet would be turned in by them at the end of

4    the night.  All of their numbers and what them all

5    combined would be totaled on the one stat sheet, and that

6    is what I would provide.

7         Q.   And did you keep the stat sheets?

8         A.   No.

9         Q.   Were they just, you know, thrown out or --

10        A.   Yeah.  I don't -- throw them in the garbage,

11   whatnot.  I add the totals.  I didn't need 40, 50 stat

12   sheets.

13        Q.   And after you were done reviewing them, you

14   would throw them out?

15        A.   Correct.

16        Q.   At a certain point, were you advised to start

17   keeping the stat sheets?

18        A.   No.

19        Q.   Were you ever asked to produce copies of the

20   stat sheets?

21        A.   The individual stat sheets?

22             MR. CASEY:  I am going to object to the form and

23   instruct him not to answer to the extent you are asking

24   him for communications with counsel.

25        Q.   BY MR. KOZINETS:  And without revealing any kind

1    of communication with counsel, have you ever been asked

2    since December of 2007 to keep the stat sheets?

3        A.   No.

4        Q.   All right.  The stat sheets would typically

5    contain what kind of information?

6        A.   Criminal arrests, they -- contacts that they

7    encountered, DUI arrests, drug arrests, total traffic

8    stops made, hours that they worked.  There were several

9    different items.

10       Q.   Would it include explanations about the

11   circumstances of individual traffic stops?

12       A.   No.  They might have wrote notes on it, but

13   there is nothing that they are required to turn in, no.

14       Q.   So you would see notes about the circumstances

15   of individual stops?

16       A.   No.  I didn't say that.  I said they could have

17   wrote notes on it.  I don't know that I saw.  I don't pay

18   attention.  They are compiling the numbers.

19            (Deposition Exhibit No. 3 was marked for

20   identification by the reporter.)

21       Q.   BY MR. KOZINETS:  Sergeant Madrid, have you ever

22   had a chance to review what has been marked as Exhibit 3

23   to your deposition?

24       A.   Yes.

25       Q.   And do you recognize it as an e-mail that you

Electronically signed by Carrie Smalanskas (001-370-696-0410)          e830d28e-965e-4176-b742-1cb5a3fec39f

1    made during the course of this particular saturation

2    patrol?

3        A.   Correct.

4        Q.   And all 12 of the persons arrested were in the

5    country unlawfully --

6        A.   Correct.

7        Q.   -- according to your summary?

8        A.   Correct.

9        Q.   And there were no persons who were arrested for

10   committing any state criminal violations during this

11   sweep?

12       A.   Yes, there was one.  It indicates here one for

13   driving on a suspended license.

14       Q.   And that person was also in the country

15   unlawfully?

16       A.   Correct.

17       Q.   Apart from driving on a suspended license, there

18   were no arrests made for committing any other types of

19   crimes?

20       A.   Correct.

21       Q.   What is your practice with respect to how long

22   you generally keep your e-mails?

23       A.   Generally, I keep them until I get a little

24   message that pops up that I get an e-mail that says my box

25   is overloaded, so then I start deleting a bunch of stuff.

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

1      Q.    Without revealing any kind of attorney/client

2  communication, were you ever asked to suspend your

3  practice regarding deletion of e-mails?

4      A.    No.

5      Q.    Do you keep copies of your e-mails?

6      A.    No.

7      Q.    You don't save some of them to, like, a special

8  folder?

9      A.    Not of my e-mail.  I do have all my shift

10  summaries saved.

11      Q.    And when you say you have all of your shift

12  summaries saved, do you mean that you electronically save

13  them?

14      A.    Yes.

15      Q.    And you save them into a particular kind of

16  folder?

17      A.    Just a folder on my desktop.

18      Q.    Do you also print out shift summaries and keep

19  them in hard copy?

20      A.    No.

21      Q.    Do you save other documents electronically that

22  are related to these crime suppression operations?

23      A.    When Sergeant Palmer or Cesar Brockman will

24  write something, yeah, I just leave it in my e-mail, yeah.

25      Q.    So if Sergeant Palmer sends you an e-mail about

Page 109

```
 1   an operation, you'll save it?
 2        A.    I just leave it there.  I open it and just leave
 3   it there.  That's why my box goes overloaded, and I have
 4   to start deleting.
 5        Q.    And then when your box is overloaded, then you
 6   start --
 7        A.    I just start deleting what I use to -- what I
 8   previously deleted and then my "Sent" ones.
 9        Q.    And that would include e-mails from Sergeant
10   Palmer --
11        A.    Correct.
12        Q.    -- or others --
13        A.    Correct.
14        Q.    -- regarding crime suppression operations?
15        A.    Correct.
16        Q.    Apart from the shift summaries, are there any
17   other crime suppression operation documents that you have
18   saved?
19        A.    Stat sheets.  What we had touched on earlier.
20   The stats that I compile at the end of -- I will save the
21   total sheet that I compile and then I will save -- because
22   I also send that out as an attachment with my shift
23   summary.
24        Q.    So you will save the compiled total document --
25   let me put that more artfully.
```

Page 110

1      A.    Yes.

2      Q.    You will save the document that has all of the

3  totals that you compiled --

4      A.    Correct.

5      Q.    -- of statistics for a given sweep?

6      A.    Correct.

7      Q.    But the underlying stat sheets themselves you

8  will throw them away?

9      A.    For the most part, yeah.

10      Q.    Do you know if your e-mails are archived or

11  backed up in any way?

12      A.    I would assume so, yeah.  I don't know.  I am

13  not computer savvy.

14            (Deposition Exhibit No. 7 was marked for

15  identification by the reporter.)

16      Q.    BY MR. KOZINETS:  Sergeant Madrid, have you had

17  a chance to look at Exhibit No. 7?

18      A.    Yes, I have.

19      Q.    And is that a shift summary that you wrote?

20      A.    Yes, it is.

21      Q.    And it relates to an operation conducted on

22  November 29th, 2007, at about 6:30 a.m., correct?

23      A.    Correct.

24      Q.    And would you have written this summary that

25  day?

                CARRIE REPORTING, LLC - Certified Reporters
                           (480) 429-7573

Page 158

1    Q.    About how many deputies do you remember being

2    involved in the Guadalupe sweep?

3    A.    Again, the same number.  Roughly 100 to 200, I

4    guess.

5    Q.    100 to 200 deputies?

6    A.    Yes.  Excuse me, over the course of two days.

7    Q.    And about how many posse members?

8    A.    That would include posse members.

9    Q.    And about how many vehicles?

10   A.    Roughly the same as we discussed before.

11   Q.    And the area of operation here says, "Town

12   limits of Guadalupe."

13         Do you see that?

14   A.    Yes.

15   Q.    And do you understand that the town limits of

16   Guadalupe cover approximately one square mile?

17   A.    Correct.

18   Q.    Why was there a need to have so many deputies

19   from the SWAT team and other units converge on the one

20   square mile Town of Guadalupe to conduct this saturation

21   patrol?

22   A.    The same units listed here are the same units

23   that participate in all of the saturation patrols.

24   Q.    The SWAT team participates in all the saturation

25   patrols?

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

1   County Sheriff's Office will continue to enforce federal

2   and state immigration law through human smuggling,

3   employer sanctions, and crime suppression operations --

4       A.   Yes.

5       Q.   -- and that crime suppression operations are

6   part of the Maricopa County Sheriff's Office's enforcement

7   of federal and state immigration laws?

8       A.   Yes.

9       Q.   After the sweep from about two weeks ago, were

10  you given stat sheets by the individual officers who

11  participated?

12      A.   Yes.

13      Q.   And do you still have them?

14      A.   No.

15      Q.   What did you do with them?

16      A.   I believe I shredded those.

17      Q.   And you would have shredded those shortly after

18  the sweep concluded?

19      A.   I would have shredded them after I compiled them

20  and added them all up and made the total -- total sheet.

21      Q.   And that would have been a day or two after the

22  sweep?

23      A.   It would have been the night of --

24      Q.   Probably October 17th.

25      A.   The 7th -- what day did we do this?

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

1       Q.   October 16th through 17th, I believe.

2       A.   It would have been the night -- after each day

3  is over with, I compile them and then I compile the next

4  day's after that day is over.  And then I also do a --

5  totals for the entire operation.

6       Q.   Right.  So you would have -- after you did the

7  first day's totals, you would have shredded the stat

8  sheets for that day?

9       A.   Yeah.

10      Q.   So on October 17th you would have done the

11 totals for the prior day?

12      A.   After each, like -- as soon as the event was

13 over for that day, it typically is into the next

14 morning -- 2:00, 3:00 in the morning that I would compile

15 those, put out the e-mail of what that day's stats were as

16 well as the totals with everything.  And then the same

17 would be for the next day as well.  I would do for that

18 day, and then I would combine the two days into a new stat

19 sheet as well.

20      Q.   And so after you did the e-mail for the first

21 day's work, is that when you would shred the stat sheets

22 for that day?

23      A.   I would, yeah, either throw them in my garbage

24 -- I believe I threw them in my garbage, I believe.

25      Q.   So after you compiled the statistics for the

Electronically signed by Carrie Smalankas (001-370-696-0410)                                    e830d28e-965e-4176-b742-1cb5a3fec39f

1       A.    No.

2       Q.    So in order to conclude that no racial profiling

3   is done by your deputies, do you essentially rely on -- or

4   strike that.

5            Do you have any means of verifying whether your

6   deputies are engaging in racial profiling other than

7   relying on their representations?

8       A.    No.  I put my trust in them.  They have been

9   trained correctly.  They have gone through several

10  academies, such as the basic training academy, the ICE

11  academy.  I trust them with my life as well as they do

12  theirs with mine.

13      Q.    Do you believe that if there is probable cause

14  to make a traffic stop, that stop is entirely lawful?

15      A.    Say that again.

16      Q.    Do you believe that a traffic stop is lawful so

17  long as there is probable cause to make the traffic stop?

18      A.    Yes.

19      Q.    Are you aware that racial profiling can occur

20  even if there is probable cause for a traffic stop?

21      A.    Yes.

22      Q.    Do you record traffic stops through any sort of

23  audio or video means?

24      A.    Do I?  No.

25      Q.    Do your deputies?

# Exhibit B

**Exhibit B**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

MANUEL de JESUS ORTEGA     )
MELENDRES, et al.,         )
                           )
                           )
        Plaintiffs,        )
                           )
                           )
           vs.             )  No. CV 07-2513-PHX-GMS
                           )
                           )
JOSEPH M. ARPAIO, et al.,  )
                           )
                           )
        Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF BRETT PALMER

Phoenix, Arizona
October 23, 2009
1:17 p.m.

Prepared by:

MICHAELA H. DAVIS, RPR, CRR

Certified Reporter

Certificate #50574

(COPY)

1      Q.    From you.

2            And what instructions did you give to that group

3      that was assembled on May 6, 2008?

4      A.    That it was a zero-tolerance saturation of the

5      area, and we were enforcing traffic code.

6      Q.    Now, when you say "zero tolerance," it is true --

7      or let me ask you if it's true, in your experience, that

8      there are many times, leaving aside this operation, when

9      you will observe a traffic violation or motor vehicle

10     problem -- a taillight or a crack in the window -- where

11     you will use officer discretion and not stop the car; is

12     that correct?

13     A.    In the course of my nine-year career, you're

14     asking me have there been times?

15     Q.    Yes.

16     A.    Yes.

17     Q.    I mean, isn't that true generally; that there are

18     low-priority vehicle and traffic infractions that will

19     often not result in a stop for an officer, of an officer's

20     time?

21     A.    I don't feel comfortable calling them "low

22     priority."

23     Q.    There are certainly more serious and less serious

24     vehicle and traffic violations; is that correct?

25     A.    I would consider a moving violation more serious

1    than an equipment violation.

2        Q.    And you would consider if someone was speeding at

3    95 miles per hour on Central Avenue than 5 miles over the

4    speed limit more serious, the first example.

5        A.    I would.

6        Q.    And it's possible you would, in terms of use of

7    your discretion and resources, not stop someone who was

8    going 5 miles over the 35-mile limit versus 40 miles over

9    the limit?

10       A.    In my nine-year career, I have used my

11   discretion, yes.

12       Q.    And are you saying then that that would be a

13   different policy in Fountain Hills; that no matter what

14   the nature of the infraction was, whether it was a

15   taillight out, as you put it, people had no discretion?

16   Had to stop everybody with a taillight out?

17       A.    Correct.

18       Q.    And why was that adopted as the policy in these

19   particular stops when at other times in terms of use of

20   departmental resources it was considered good policy to

21   not always have to stop?

22       A.    Quite simply, to avoid the race card being

23   played.

24       Q.    And it was adopted as a defensive measure; is

25   that fair to say?

Page 58

```
 1      A.    Defensive measure, no.

 2      Q.    Well, when you say "being played," being played

 3   by whom?

 4      A.    Well, sir, if we were to use discretion and we

 5   had these same numbers, would somebody not claim we were

 6   racially profiling every one of the vehicles we stopped?

 7   If we have zero tolerance and we stop every vehicle and

 8   write tickets to everybody, that's exactly why that policy

 9   was adopted on these operations.

10      Q.    And where did that policy come from?  Do you know

11   who --

12      A.    I don't know.

13      Q.    -- instituted that policy?

14            But you were told that that was the policy by

15   someone higher than you at the MCSO?

16      A.    Yes.

17      Q.    Before we get back to the present exhibit, let me

18   show you ...

19            (Exhibit No. 7 was marked for

20            identification.)

21   BY MR. POCHODA:

22      Q.    Sergeant, you've been shown Plaintiffs'

23   Exhibit 7, Bates 13983 and 13984, and that is headed

24   Location History, Traffic Stops in Fountain Hills.

25            Would that reflect the stops that were made
```

1     Q.   And how do you know it doesn't occur?

2     A.   Quite frankly, sir, I know my brothers, and we

3  abide by the law.

4     Q.   And how can the department or you as a supervisor

5  check whether it occurs or not?  What if one particular

6  person, in fact, always finds a reason in terms of some

7  infraction, some traffic infraction, but is actually

8  stopping only people of color.  How would you find that

9  out?

10    A.   I'm not aware of -- I'm not aware of how I would

11 find out, sir.  I don't believe it occurs.

12    Q.   And there's no mechanism, there's no statistical

13 gathering of evidence, for example, about whether Deputy A

14 has a much higher percentage of stops of only Latinos

15 versus other deputies?  That's not kept at the department,

16 is it?

17    A.   I'm not aware of what's kept and not kept.

18    Q.   You don't keep it as a supervisor?

19    A.   I do not.

20    Q.   So as long as in any particular stop you are able

21 to see that there was a legal reason, that ends your

22 inquiry as to whether there was also racial profiling; is

23 that correct?

24    A.   Yes.

25    Q.   Did you speak to -- after this -- going back to

# Exhibit C

**Exhibit C**

1  STEPTOE & JOHNSON LLP
   Collier Center
2  201 East Washington Street
   Suite 1600
3  Phoenix, Arizona 85004-2382
   Telephone: (602) 257-5200
4  Facsimile:  (602) 257-5299

5  David J. Bodney (06065)
   dbodney@steptoe.com
6  Peter S. Kozinets (019856)
   pkozinets@steptoe.com
7  Karen J. Hartman-Tellez (021121)
   khartman@steptoe.com
8  Isaac P. Hernandez (025537)
   ihernandez@steptoe.com
9
   Attorneys for Plaintiffs
10 (Additional attorneys for
   Plaintiffs listed on next page)
11
12              UNITED STATES DISTRICT COURT

13                  DISTRICT OF ARIZONA

14 Manuel de Jesus Ortega Melendres,        )
   et al.,                                  )
15                                          )   No. CV 07-2513-PHX-MHM
                                            )
16               Plaintiffs,                )   **PLAINTIFFS' FIRST SET OF**
                                            )   **REQUESTS FOR PRODUCTION**
                                            )   **OF DOCUMENTS AND THINGS**
17        vs.                               )   **TO DEFENDANT MARICOPA**
                                            )   **COUNTY SHERIFF'S OFFICE**
18 Joseph M. Arpaio, et al.,                )
                                            )
19               Defendants.                )
                                            )
20
21
22
23
24
25
26
27
28

Additional Attorneys:

ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

Daniel Pochoda (021979)
dpochoda@acluaz.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

Mónica M. Ramírez (*Pro Hac Vice*)
mramirez@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Kristina M. Campbell (023139)
kcampbell@maldef.org
Nancy Ramirez (*Pro Hac Vice*)
nramirez@maldef.org

TO:   Maricopa County Sheriff's Office
c/o Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105
Phoenix, Arizona 85014-5540

Pursuant to Federal Rules of Civil Procedure 26 and 34, you are hereby requested to produce for inspection and copying the documents described below at Steptoe & Johnson LLP, 201 East Washington Street, Suite 1600, Phoenix, Arizona, 85004, within thirty (30) days of the date of service of these Requests.

## Definitions and Instructions

1.     In producing the documents designated below, you are requested to furnish all documents known or available to you regardless of whether a document is currently in your possession, custody or control, or that of your attorneys, employees, agents, deputies, investigators or other representatives (including persons or entities under your supervision or acting at your direction), or is otherwise available to you.

2.     "You," "your" and/or "MCSO" means the Maricopa County Sheriff's Office, and includes any person or entity acting or purporting to act on its behalf, at its direction or under its supervision.

3.     "Plaintiffs" means, individually or collectively, Manuel de Jesus Ortega Melendres, David Rodriguez, Jessica Quitugua Rodriguez, Velia Meraz, Manuel Nieto, Jr. and Somos America/We Are America.

4.     "ICE" means the United States Immigration and Customs Enforcement, an agency of the United States Department of Homeland Security.

5.     "MOA" means the Memorandum of Agreement between ICE and Maricopa County, fully executed on or about February 24, 2007, pursuant to which ICE authorized certain MCSO personnel to perform certain immigration enforcement functions.

6.     "Crime Suppression Operations" means the law-enforcement activities of the MCSO that have also been referred to as "saturation patrols" or "sweeps" conducted:

A.   On or about September 27, 2007 in the Town of Cave Creek;

B.   On or about October 24, 2007 in the Town of Queen Creek;

C.   From October 2007 to March 2008, near Pruitt's furniture store near 34th Street and Thomas Road in Phoenix;

D.   On or about January 18-19, 2008, between 16th and 40th Streets and McDowell and Indian School Roads in Phoenix;

E.   On or about March 21-22, 2008 near 32nd Street and Thomas Road in Phoenix;

F.   On or about March 27-28, 2008 near Cave Creek and Bell Roads in Phoenix;

G.   On or about April 3-4, 2008 in the Town of Guadalupe;

H.   On or about May 6-7, 2008 in the Town of Fountain Hills;

I.   On or about June 26-27, 2008 in the Town of Mesa;

J.   On or about July 5, 2008 in the Town of Mesa;

K.   On or about July 8, 2008 in the Town of Cave Creek;

L.   On or about July 14, 2008 in the Town of Mesa;

M.   On or about August 13-14, 2008 in and around the Towns of Sun City and Sun City West; and

N.   On or about January 9, 2009 in the Town of Buckeye.

"Crime Suppression Operations" includes all similar law-enforcement activities of the MCSO not specifically identified above, performed on or after January 1, 2007.

7.   "Routine Traffic Stop" means a stop or detention, of any duration, of a motor vehicle by MCSO to investigate a suspected violation of the traffic code, Title 28 of Arizona Revised Statutes, regardless of whether the stop results in a warning, citation or arrest.

8.   "Person" means, inclusively, any natural person, proprietorship, partnership, joint venture, trust, group, agency, department, association, corporation or any other entity or organization, and any agent or employee of any of those individual entities.

9.   "Relate" or "relating to" means evidencing, memorializing, referring, concerning, constituting, containing, discussing, describing, embodying, reflecting, identifying, mentioning, stating, responding or otherwise alluding to or

relating to in any way, in whole or in part, the subject matter referred to in the request for production.

10.     "Correspondence" or "communication" means any oral or written contact, regardless of method, between two or more persons, organizations, companies or other business entities, regardless of form, and shall include, without limitation, notes, letters, memoranda, e-mail, facsimile, reports, briefings, telegrams, telex or, by any document, oral contact by such means as face to face meetings and/or telephone conversations, or any form of transmittal of information in the form of facts, ideas, inquiries or otherwise.

11.     "Document" or "documents" means all matters, instruments or other tangible things, including any electronically stored information ("ESI") contained on computer diskette or other media, within the scope of Federal Rules of Civil Procedure 26 and 34, including, without limitation:   any and all correspondence, memoranda, complaints, grievances, citations, booking papers, arrestee statements, arrest reports, incident reports, field reports, departmental reports, disciplinary reports or "write-ups," draft reports, preliminary reports, final reports and underlying materials, witness statements, witness interview summaries, field interrogation cards, meeting minutes, meeting agendas, notes of meetings, bulletins, written briefings, intra- and interoffice communications, including CAD and MDT reports, policies, manuals, training materials, books of account, worksheets, desk diaries, appointment books, daily logs, end-of-shift logs, expense accounts, and records of every type and description, all written, recorded and graphic matter of every type and description, electronic mail, electronic databases, radio logs, recordings, transcriptions of recordings, notes of conversations, telegraphic communications, pamphlets, schedules, studies, books, computer printouts, photographs and photographic records, maps, charts, tapes (including video tapes), transcriptions of tapes, and any other device or medium on or through which information of any type is transmitted, recorded, or preserved. The term "document" also means every copy of a document where such copy is not an identical

- 3 -

duplicate of the original. Any comment or notation appearing on any document, and not a part of the original text, is to be considered a separate "document." Any draft or other preliminary form of any document is also to be considered a separate "document."

12.    The singular form of any word shall include the plural, the masculine form of any word shall include the feminine, and the words "and" and "or" shall be construed both conjunctively and disjunctively to make the request more inclusive.

13.    The word "all" shall include "any," and vice versa.  The word "including" means "including without limitation."

14.    If for any reason you are unable to produce in full any document requested:

    A.    Produce each such document to the fullest extent possible;

    B.    Specify the reasons for your inability to produce the remainder; and

    C.    State in detail whatever information, knowledge or belief you have concerning the whereabouts and substance of each document not produced in full.

15.    If any document requested was at one time in existence, but is no longer in existence, please state for each document as to which that is the case.

    A.    The type of document;

    B.    The types of information contained therein;

    C.    The date on which it ceased to exist;

    D.    The circumstances under which it ceased to exist;

    E.    The identity of all persons having knowledge of the circumstances under which it ceased to exist; and

    F.    The identity of all persons having knowledge or who had knowledge he contents thereof.

16.    For each document requested which you are unable to produce and which was at any time within your possession, custody or control, or to which you had access at any time, specify in detail:

    A.    The nature of the document (e.g., letter, memorandum, etc.);

    B.    The author of the document;

C.   All recipients of the document and any copy thereof;

D.   A summary of the information contained in the document;

E.   The date on which you lost, relinquished, or otherwise ceased to have possession, custody or control of, or access to the document;

F.   Identify all persons having knowledge of the circumstances whereby you lost, relinquished, or otherwise ceased to have possession, custody or control of, or access to the document; and

G.   Identify all persons who have or have had knowledge of the contents of the document in full or in part.

17.   In the event you seek to withhold or do withhold any document, in whole or in part, on the basis that it is privileged or is otherwise not subject to discovery, produce a list of all such documents, and as to each document, state:

A.   The name of each author, writer, sender or initiator of each such document;

B.   The name of each recipient, addressee or party to whom such document was sent or intended to be sent;

C.   The name of each and every person who received a copy of the document;

D.   The date of the document or, if no date appears on the document, the date the document was prepared;

E.   The title of the document, or if it has no title, then such other description of the document and its subject matter as shall be sufficient to identify the document;

F.   The name and business address of the person in custody or charge or possession of each such document; and

G.   The grounds claimed for withholding the document from discovery (e.g., attorney-client privilege, work product or any other grounds), and the factual basis for such claim.

18.   In accordance with Fed. R. Civ. P. 34, you are requested to designate the paragraph and sub-paragraph of this request to which each document produced is responsive.

19.   Please produce the requested documents in the same order as you maintain them in the ordinary course of business.

20.   Documents are to be produced with all hand-written notations, marginalia, and interlineations.

21.    ESI should be produced in a reasonably usable, searchable and intelligible format, or together with a description of the system from which it was derived sufficient to permit rendering the material reasonably usable, searchable and intelligible.

22.    Pursuant to Fed. R. Civ. P. 26(e), this request is a continuing one, and requires that you produce all responsive documents and things whenever you obtain or become aware of them, even if they are not in your possession or available to you on the date you first respond to this Request.

23.    Unless otherwise specified, the time period covered by these requests is January 1, 2007 through the present.

## Document Requests

1.    All documents identified in, referenced by or relied upon for your responses to Plaintiffs' First Set of Interrogatories to Defendant Maricopa County Sheriff's Office.

2.    All documents relating to your stop, detention, questioning, citation, arrest or investigation of Plaintiffs, including all documents relating to:

> A.    The stop, detention, questioning, citation, arrest or investigation of Manuel de Jesus Ortega Melendres on or about September 26, 2007;
>
> B.    The stop, detention, questioning, citation, arrest or investigation of Jessica or David Rodriguez on or about December 2, 2007: and
>
> C.    The stop, detention, questioning, citation, arrest or investigation of Velia Meraz or Manuel Nieto, Jr. on or about March 28, 2008.

3.    All documents relating to your Crime Suppression Operations, including all documents relating to:

> A.    MCSO's decision to conduct Crime Suppression Operations in any particular area of Maricopa County, including studies of crime or traffic patterns in the selected areas, requests from area residents, business or public officials for MCSO action, and reports, meeting minutes, meeting notes, emails or analyses relating to areas selected for such Operations and the timing of such Operations;

- 6 -

B. Instructions, directives, training, supervision or planning documents applicable to MCSO supervisors, officers, posse members and volunteers in connection with Crime Suppression Operations;

C. Identifying information for MCSO supervisors, officers, posse members and volunteers, and any ICE officers participating in any Crime Suppression Operation; and

D. Debriefing, after-action or other reports, lists or logs associated with each Crime Suppression Operation; and

E. Debriefing, after-action or other reports, lists or logs by the officers who stopped, detained, questioned, cited or arrested Plaintiffs for the shift in question, if not during a Crime Suppression Operation.

4.    All documents relating to all traffic stops performed by every MCSO supervisor, officer, posse member or volunteer for years 2005 to present that may include one or more of the following:

A. The location, time and duration of the stop;

B. The specific reason(s) or justification(s) for the stop;

C. Any and all details about the vehicle, such as plate number, make, model and year;

D. The names of driver(s) and passenger(s);

E. The age, gender and race or ethnicity of the driver(s) and passenger(s);

F. Whether any driver or passenger was questioned, warned, cited, searched, arrested, detained or investigated and the reason(s) therefor;

G. The specific questions asked of driver(s) and passenger(s);

H. Any database checks run on the driver(s), passenger(s) or vehicle;

I. Whether a search was conducted and the basis therefor;

J. If searched, whether any contraband was found; and

K. Whether any driver or passenger was referred to, held for, or subsequently transferred to the custody of ICE and the reason(s) therefor.

5.    All documents relating to MCSO's policies, practices, instructions or training pertaining to traffic stops of any type, including all documents relating to:

A. Questioning of drivers or passengers;

B. Requesting a driver's license or proof of registration or insurance from drivers;

C. Requesting any other documentation from drivers or requesting documentation of any type from passengers;

D. Searching vehicles, drivers or passengers incident to a traffic stop;

E. Extending the duration of traffic stops beyond the time needed to issue a citation or warning, including any guidelines or limitations on MCSO's ability to investigate the citizenship or immigration status of drivers or passengers; and

F. Detaining or arresting drivers or passengers for suspected violations of state or federal immigration law.

6. All documents relating to the release without charge of any person that MCSO arrested where the original contact with the person was made incident to a traffic stop.

7. All documents relating to complaints, claims, investigations or allegations, whether formal or informal, of racial profiling or the improper use of race, ethnicity, national origin, language ability or name by MCSO.

8. All documents relating to MCSO's policies, practices, instructions or training pertaining to the receipt of, or response to, any "tip," anonymous or otherwise, about suspected immigration violations or unlawful activity by illegal aliens, including all documents relating to MCSO's illegal immigration hotline.

9. All documents relating to MCSO's policies, practices, instructions or training regarding the use or consideration of race, ethnicity, national origin, language ability or names in carrying out law-enforcement activities, including traffic stops, Crime Suppression Operations, and MCSO's enforcement of state and federal immigration law.

10. All documents relating to MCSO's implementation and administration of the MOA, including:

A. The initial application for Maricopa County's MOA with ICE and any related correspondence;

B. Any addenda or subsequent modifications to the MOA;

C. The training and certification of MCSO officers pursuant to the MOA, including the names and badge numbers of officers who have been certified;

- 8 -

D.     All data, statistical information and reports submitted to, or requested by, ICE pursuant to § XII of the MOA;

E.     All documents relating to the Steering Committee identified in § XVI of the MOA, including any documents relating to its members, meetings and performance of its duties;

F.     All MCSO information reports for administrative arrests or transfers of suspects subsequently released by ICE;

G.     All 287(g) Stat/Summary forms completed after administrative arrests or transfers; and

H.     All ICE 213 reports.

11.     All documents relating to or reflecting, for each month since January 2005 to the present, the number of persons MCSO identified and processed for suspected violations of state or federal immigration law, pursuant to the MOA or otherwise, following Routine Traffic Stops.

12.     All documents relating to requests for records submitted to MCSO by any person, regardless of whether the records sought were deemed public, that concern racial profiling or the administration of the MOA by MCSO, including copies of any such requests and the responses thereto.

13.     All documents relating to any internal or external audits of MCSO, including any audits, evaluations or assessments performed by ICE, the Department of Justice or any other state or federal agency, relating to the activities, management, outcomes or efficacy of MCSO, including any documents reviewed, received or created during the audit process.

14.     All documents relating to MCSO's Human Smuggling Unit, Illegal Immigration and Interdiction Unit, Violent Fugitive Apprehension Squad, Criminal Investigation Section, Anti-Gang Unit, Drug Enforcement Unit, Community Action Teams or volunteer posses as they pertain to:

A.     The MOA and MCSO's enforcement of federal immigration law;

B.     MCSO's enforcement of state immigration and anti-smuggling law;

C.     Crime Suppression Operations; and

D.     The performance of Routine Traffic Stops.

- 9 -

15.     All documents relating to MCSO's budget for years 2005 to present that may indicate sources or allocation of funding for the 287(g) program, Crime Suppression Operations, the Human Smuggling Unit, the Illegal Immigration and Interdiction Unit, Community Action Teams or volunteer posses.

16.     All documents relating to MCSO's receipt or use of federal financial assistance, including any grant or loan of federal funds, donated or leased federal property or interest in federal property (including personnel, equipment or facilities) without consideration or at nominal consideration, or any other similar assistance from any federal agency including any subdivision of the Department of Homeland Security or the Department of Justice.

17.     All documents compiled or created by MCSO for years 2005 to present relating to Maricopa County crime statistics or reports, including the number and type of crimes and whether arrests were made, and all documents reflecting precinct or other geographic breakdowns of such statistics or reports.

18.     All documents relating to the law-enforcement activities of Detective Jesus J. Cosme for any shift in or around June or July 2008 during which a civilian "ride along" occurred, and during which Sergeant Ryan Baranyos assisted in the stops, arrests or processing of suspected illegal immigrants, including all reports, notes, memos, call logs, video recordings taken during the ride along, transcripts of such videos, and any other document evidencing the stops, arrests and related events occurring during the shift.

19.     All media reports (including print, broadcast and electronic/internet articles, stories, blogs, editorials and columns, and all MCSO press releases) kept by MCSO relating to Defendants' Crime Suppression Operations or Defendants' enforcement of state or federal immigration laws, and all communications between or among MCSO employees regarding such media reports.

///

- 10 -

DATED this 25th day of February, 2009.

STEPTOE & JOHNSON LLP

By _____
   David J. Bodney
   Peter S. Kozinets
   Karen J. Hartman-Tellez
   Isaac P. Hernandez
   Collier Center
   201 East Washington Street
   Suite 1600
   Phoenix, Arizona 85004-2382

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
Mónica M. Ramírez
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
Kristina M. Campbell
Nancy Ramirez
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Attorneys for Plaintiffs

- 11 -

1

## CERTIFICATE OF SERVICE

2

3
I hereby certify that on the 25th day of February, 2009, I caused the

4
foregoing document to be hand-delivered to:

5
Timothy J. Casey

6
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105

7
Phoenix, Arizona 85014-5540
timcasey@azbarristers.com

8

9

10
Legal Secretary

11

12
570433

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D

**Exhibit D**

1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                    )
              Plaintiffs,            )
6                                    )   CV 07-2513-PHX-GMS
              vs.                    )   Phoenix, Arizona
7                                    )
    Joseph M. Arpaio, et al.,        )
8                                    )   October 21, 2009
              Defendants.            )   9:22 a.m.
9   _____)

10

11                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE G. MURRAY SNOW
12                       (Scheduling Conference)

    Appearances:
13

    For the Plaintiffs:          David J. Bodney, Esq.
14                               Peter S. Kozinets, Esq.
                                 STEPTOE & JOHNSON, L.L.P.
15                               Collier Center
                                 201 E. Washington Street
16                               Suite 1600
                                 Phoenix, Arizona  85004-2382
17                               (602) 257-5200

18  For the Defendants:          Timothy J. Casey, Esq.
                                 SCHMITT, SCHNECK, SMYTH
19                               & HERROD, P.C.
                                 1221 E. Osborn Road
20                               Suite 105
                                 Phoenix, Arizona  85014-5540
21                               (602) 277-7000

22  Court Reporter:              Gary Moll
                                 401 W. Washington Street, SPC #38
23                               Phoenix, Arizona  85003
                                 (602) 322-7263
24

    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

 1          THE COURT:  Okay.  Well, before we start addressing

 2  discovery schedule, then, I want to know if there are any other

 3  discovery disputes that the parties anticipate.  Not

 4  necessarily that I'm going to be able to resolve them today

 5  but, clearly, we're going to have the Touhy issue hanging out          09:32:55

 6  there.  Or I shouldn't say "clearly," we don't know yet, but

 7  that there -- I recognize the potential for that.

 8          Are there any other matters that are going to be

 9  matters of disputed discovery?

10          MR. BODNEY:  Your Honor, if I may, from plaintiffs'          09:33:10

11  perspective I hope not, but it is possible, and permit me,

12  please, to alert the Court to what that could be.

13          We have requested documents from these defendants

14  going back to last February and have written a series of four

15  letters, the most recent being one yesterday.          09:33:32

16          With respect to full compliance with document

17  requests, Mr. Casey has not had an opportunity to respond to my

18  October 20th letter, and I am hopeful that we will have a

19  chance to meet and confer and do our best to work those issues

20  out before coming to the Court with any kind of dispute.  But          09:33:56

21  the issues involve the following, and I'll be very brief.

22          We've yet to receive any documents reflecting internal

23  communications from Sheriff Joe Arpaio, Chief David

24  Hendershott, Deputy Chief Brian Sands, or other top MCSO

25  officers.          09:34:21

1        There's a -- what one would expect to be a fairly wide

2  universe of documentary information from those individuals

3  relating to key issues in this case that we've not seen.

4        It may be that Mr. Casey is prepared to vow for his --

5  avow for his client that they don't exist and they've never     09:34:42

6  existed and we can search for all time and we won't find them

7  but, candidly, we find that hard to believe.  That's one issue.

8        A second is the Sheriff's Office has declined to

9  provide in electronic format the CAD crime statistics disclosed

10  in defendant Arpaio's and MCSO's ninth supplemental disclosure     09:35:04

11  statement.

12        I'll be brief through the remaining items.

13        Third, we've not received the names of the individual

14  drivers and passengers investigated during the traffic stops

15  identified by the defendants as occurring during the dates and     09:35:24

16  in the locations of various so-called crime suppression sweeps.

17  We would expect to receive those documents.

18        Fourth, we've not received any additional officer stat

19  sheets for MCSO's crime suppression operations.

20        Fifth, MCSO has failed to produce records reflecting     09:35:45

21  certain public records requests and responses received by the

22  office.  We've just not received any response to that request

23  going back some time now.

24        And finally, despite prior requests, we've not

25  received a privilege log from the defendants.     09:36:06

1    So we do have these depositions scheduled, and to make

2    the most of those discovery opportunities we would expect to

3    have as much as possible of these documents produced so that we

4    can ask these officers about them.

5    As I say, I'm hopeful that the issue can be resolved        09:36:27

6    by the end of this week or the beginning of next.  If not, it

7    may be that we'll have a motion to compel production of

8    documents.

9    THE COURT:  All right.  Thank you.

10   Do you have anything you want to say in that respect,        09:36:43

11   Mr. Casey?

12   MR. CASEY:  Yes, Your Honor.  With the Court's

13   indulgence, just -- just to address these, the privilege log,

14   no privilege log has been provided, because we have found no

15   documents that constitute any privilege.  So, therefore,      09:36:53

16   there's no privilege log.

17   We're dealing with a public entity, and we've not, in

18   all the documents searched for and gathered, and in this case

19   we have produced, I'm not going to -- I should have checked, I

20   meant to check yesterday, but we've produced tens of thousands  09:37:12

21   of pages of documents.  We've tried to be overinclusive.  Not

22   one of them has any privilege, so therefore there's no

23   privilege log.

24   On the stat sheets there's a misunderstanding.  I'll

25   be glad to explain this.  But also on the record I think the   09:37:26

1    testimony they will find from the witnesses is that over the

2    course of years '07, '08, to now, there's an evolution on what

3    kinds of information the officers, during the crime saturation

4    patrols, kept.  One of them were stat sheets.

5            Every stat sheet that we have been able to locate --     09:37:45

6    when I say "we," my client -- has been produced.  If we found

7    it, it's been given.  It's been produced.

8            If -- there's -- there's nothing else out there that

9    my clients have -- are aware of that hasn't been given to me

10   and produced.                                                    09:37:59

11           As to the traffic stops, I'm not sure I quite

12   understand what they -- what their complaint is.  We have given

13   them electronically two-and-a-half years of every single

14   traffic stop that has occurred in Maricopa County.  So they can

15   run their own searches.                                          09:38:20

16           Every document that we have been able to locate on the

17   traffic stops for the individualized plaintiffs and for the

18   arrests that were made during saturation patrols have been

19   turned over.

20           THE COURT:  Are you -- do you have statistics that       09:38:35

21   indicate the stops that were made during the crime saturation

22   patrols?

23           MR. CASEY:  Every type of statistical data, records,

24   everything that was kept that were generated out of those

25   saturation patrols have been produced to the plaintiffs.        09:38:47

1          THE COURT:   That wasn't my question, though.

2          My question was:   Have you maintained records that

3    indicate which -- the identification of persons stopped during

4    the crime saturation patrols?

5          MR. CASEY:   Well, the Sheriff's Office only keeps                    09:39:04

6    track of records where there's a citation issued or there's an

7    arrest made.   They don't keep track, and the testimony's been

8    so far, if they pull over me, for example, and there's just a

9    warning given, they don't document that.

10         So the only documents we have are on citations of --           09:39:19

11   given during stops or arrests, and all of those records have

12   been produced.

13         The electronic format, I don't remember what the

14   reason why is we told them we couldn't do it, so I'm not

15   prepared to tell you, Your Honor, what are reasons for that.          09:39:37

16         And as for the e-mails, I will tell you --

17         THE COURT:   When you say e-mails, do you mean the

18   internal communications?

19         MR. CASEY:   Yes.   Yes, sir.

20         Essentially, what I understand the concern is is that          09:39:49

21   they see, you know, the management hierarchy -- namely, Sheriff

22   Arpaio; the Chief Deputy David Hendershott; Chief Brian Sands,

23   who's sort of the head of the units that actually do the

24   saturation patrol.   And what the plaintiffs have come to me, as

25   I understand informally, have -- have said is, you know, we          09:40:08

# Exhibit E

**Exhibit E**

STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

David J. Bodney
Tel 602.257.5212
Fax 602.452.0910
dbodney@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

July 21, 2008

VIA FACSIMILE
AND U.S. MAIL

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014-5540

Re:   Manuel de Jesus Ortega Melendres v. Arpaio, No. 2:07-cv-02513-MHM
      (D. Ariz.) (Document Preservation Request)

Dear Tim:

As you know, this firm represents Manuel de Jesus Ortega Melendres, Jessica Rodriguez, David Rodriguez, Velia Meraz and Manuel Nieto, Jr. On their behalf, I write to demand that Defendants Joseph M. Arpaio, the Maricopa County Sheriff's Office and Maricopa County (collectively, "Defendants") take all reasonable steps to preserve all documents, including but not limited to all electronically stored information ("ESI"), that are relevant to the allegations in the pleadings in this action or that are reasonably likely to lead to the discovery of admissible evidence.

We fully expect – and by this notice demand – that Defendants will take steps to preserve and retain all pertinent documents and ESI within their possession regarding the allegations in the Complaint in the above matter. These include, without limitation, the following stops, detentions, interrogations, citations and/or arrests conducted by the Maricopa County Sheriff's Office ("MCSO"):

- of Manuel de Jesus Ortega Melendres on or about September 26, 2007;
- of Jessica and David Rodriguez on or about December 2, 2007; and
- of Velia Meraz and Manuel Nieto, Jr. on or about March 28, 2008.

STEPTOE & JOHNSON LLP

Timothy J. Casey
July 21, 2008
Page 2

Pertinent records also relate to the "crime suppression operations" and any other enforcement activities conducted by the MCSO at the following dates and locations:

- on or about September 27 in Cave Creek;
- on or about October 4, 2007 in Queen Creek;
- from October 2007 to March 2008 near Pruitt's furniture store near 34th Street and Thomas Road in Phoenix;
- on or about January 18, 2008 between 16th and 40th Streets and McDowell and Indian School Roads in Phoenix;
- in or about mid-March through late March 2008 at Cave Creek and Bell Roads in Phoenix;
- on or about April 3-6, 2008 in the Town of Guadalupe;
- on or about May 7, 2008 in Fountain Hills;
- on or about June 26, 2008 in Mesa; and
- any subsequent "crime suppression operation," including but not limited to such an operation in July 2008 in or around Cave Creek that may relate to any of the allegations in the recently lodged Complaint.

Please preserve all documents relevant to these events and any allegations in the Complaint, including but not limited to all: (1) Departmental Reports; (2) booking papers; (3) communication records, including CAD and MDT reports; (4) incident numbers; (5) field interrogation cards; (6) written briefings; (7) any communications from MCSO command center vehicles or MCSO patrol cars, officers or volunteers; (8) emails, memoranda and other communications pertaining to planning, execution and results for any of the listed "crime suppression operations"; (9) reports or analyses of these operations; (10) communications with local governments and officials, including but not limited to police departments, about these operations; (11) complaints about any of these operations from any source; (12) documents pertaining to any immigration enforcement activity by the MCSO; and (13) communications with ICE or any agencies or officials of the United States Government about these operations.

With respect to electronic records, we expect that Defendants have already imposed a litigation hold to preserve and retain all potentially pertinent ESI within their possession, custody or control, consistent with their obligations under the Federal Rules of Civil Procedure. For purposes of this notice, ESI shall include, without limitation, all electronic mail ("email") files and attachments, backup email files (including backup media, such as Microsoft Exchange server backup tapes), text files (including word processing documents), data files, program files, spreadsheets, graphical image files (including .JPG, .GIF, .BMP, .TIFF and .PDF files), databases, voicemail messages and files, calendar and scheduling information, computer system activity logs, and backup tapes. It shall also include all file fragments, residual and hidden data, deleted files and other electronically recorded information to the extent that the preservation of such data is reasonably calculated to lead to the retrieval of any relevant deleted information.

STEPTOE & JOHNSON LLP

Timothy J. Casey
July 21, 2008
Page 3

We reserve the right to supplement this demand as investigation and discovery proceed. Of course, if you have any questions regarding any of the foregoing, please contact me directly.

Very truly yours,

David J. Bodney

# Exhibit F

Exhibit F

## STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

David J. Bodney
Tel 602.257.5212
Fax 602.452.0910
dbodney@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

July 21, 2008

VIA FACSIMILE
AND U.S. MAIL

Capt. Paul Chagolla
Public Information Officer
Maricopa County Sheriff's Office
100 W. Washington St., Suite 1900
Phoenix, Arizona 85003

Re:   Manuel de Jesus Ortega Melendres / Maricopa County Sheriff's Office (Arizona
Public Records Law Request)

Dear Captain Chagolla:

This firm represents Manuel de Jesus Ortega Melendres, Jessica Rodriguez, David
Rodriguez, Velia Meraz and Manuel Nieto, Jr., plaintiffs in a pending lawsuit against the Maricopa
County Sheriff's Office. In that capacity, I respectfully request that you make available the following
public records (as defined below) for inspection and photocopying pursuant to A.R.S. § 39-121, *et seq.*
(the "Arizona Public Records Law").

- All records relating to the "crime suppression operations" or activities of the
  Maricopa County Sheriff's Office ("MCSO") that occurred:

    1. on or about September 27, 2007 in Cave Creek;
    2. on or about October 4, 2007, in Queen Creek;
    3. from October 2007 to March 2008, near Pruitt's furniture store near 34th Street
       and Thomas Road in Phoenix;
    4. on or about January 18, 2008, between 16th and 40th Streets and McDowell and
       Indian School Roads in Phoenix;
    5. in or about mid-March through late March 2008 at Cave Creek and Bell Roads in
       Phoenix;
    6. on or about April 3-6, 2008, in the Town of Guadalupe;
    7. on or about May 7, 2008, in Fountain Hills;

STEPTOE & JOHNSON LLP

Capt. Paul Chagolla
July 21, 2008
Page 2

      8.    on or about June 26, 2008 in Mesa; and

      9.    any subsequent "crime suppression operation," including but not limited to such an operation in July 2008 in or around Cave Creek.

- All records relating to the following stops, detentions, interrogations, citations and/or arrests conducted by the MCSO:

      1.    of Manuel de Jesus Ortega Melendres on or about September 26, 2007;

      2.    of Jessica and David Rodriguez on or about December 2, 2007; and

      3.    of Velia Meraz and Manuel Nieto, Jr. on or about March 28, 2008.

      For purposes of this request, the term "records" includes, without limitation, all (1) departmental reports; (2) booking papers; (3) communication records, including CAD and MDT reports; (4) incident numbers; (5) field interrogation cards; (6) written briefings; (7) any communications from MCSO command center vehicles or MCSO patrol cars, officers or volunteers; (8) emails, memoranda and other communications pertaining to planning, execution and results for any of the listed "crime suppression" operations; (9) reports or analyses of these operations; (10) communications with local governments and officials, including but not limited to police departments, about these operations; (11) complaints about any of these operations from any source; (12) documents pertaining to any immigration enforcement activity by the MCSO; and (13) communications with ICE or any agencies or officials of the United States Government about these operations.

      This request is for a non-commercial purpose, and we are willing to pay reasonable copying expenses. We seek access to inspect these records as promptly as possible, but no later than 5 p.m. on Monday, August 4, 2008.

      I look forward to hearing from you or your counsel, and to MCSO's anticipated cooperation with this request.

Very truly yours,

David J. Bodney

Copy to:

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 E. Osborn Rd., Suite 105
Phoenix, Arizona  85014-5540

# Exhibit G

**Exhibit G**

# STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

Peter S. Kozinets
602.257.5250
pkozinets@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

September 10, 2009

VIA EMAIL
AND U.S. MAIL

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105
Phoenix, Arizona 85014

> Re:  *Melendres, et al. v. Arpaio, et al.*, No. CV07-02513-PHX-GMS (D. Ariz.);
> Outstanding Discovery; Case Management Conference

Dear Tim:

I write regarding several discovery matters and other issues, described below.

1.    Defendants' Failure to Produce Documents Reflecting Communications Between or Among Sheriff Arpaio, Chief Deputy Hendershott, Chief Brian Sands and/or Other Senior MCSO Staff Regarding MCSO's Crime Suppression Operations or Implementation of the 287(g) Agreement.

We have reviewed the entirety of Defendants' document productions to date and have found that the productions lack basic documents that we expected to receive.  In particular, *Defendants' productions are devoid of any internal emails, memoranda or other written communications between or among senior MCSO officers, including Arpaio, Hendershott and Sands,* regarding the massive crime suppression operations or "sweeps" that Defendants have publicly touted and executed over the last two years.  This stands in stark contrast to MCSO's press releases and Sheriff Arpaio's public statements, which repeatedly emphasize Sheriff Arpaio's direct knowledge and approval of these operations.   It also contrasts starkly with MCSO's Answers to Plaintiffs' Interrogatories, which repeatedly identify Chief Sands as one of the MCSO officials most knowledgeable about the sweeps and related topics, including the Memorandum of Agreement ("MOA" or "287(g) Agreement") between MCSO and U.S. Immigration and Customs Enforcement ("ICE") that MCSO has repeatedly invoked in connection with its sweeps.  [*See, e.g.,* MCSO's Answers to Plaintiff's Interrogatories, Response Nos. 3,

STEPTOE & JOHNSON ᴸᴸᴾ

Timothy J. Casey
September 10, 2009
Page 2

9, 10, 11, 12, 13, 14, 15, 16]  While MCSO has produced shift or patrol summaries that were copied to Sands, MCSO's production is devoid of any emails from Sands and any other internal communications to or from Sands regarding the subject matter of the foregoing Interrogatories.

In addition, the dearth of documents sent to or from Hendershott is particularly surprising because he is listed as the MCSO's point of contact "for purposes of implementation of this MOA" in Appendix A of the MOA.  [Melendres MCSO 021375]

The missing emails and other written communications are responsive to the above-cited Interrogatories, and to the following Requests for Production of Documents to MCSO: Request No. 1 (all documents "identified in, referenced by or relied upon for your responses to" Plaintiffs' Interrogatories); Request No. 3 (all documents "relating to your Crime Suppression Operations"); Request No. 7 (all documents "relating to complaints, claims, investigations or allegations, whether formal or informal, of racial profiling or the improper use of ethnicity, national origin, language ability or name by MCSO"); Request No. 8 (all documents relating to MCSO's policies, practices, instructions or training pertaining to any tips about suspected immigration violations); Request No. 10 (all documents "relating to MCSO's implementation and administration of the MOA"); Request No. 13 (all documents "relating to any internal or external audits of MCSO, including any audits, evaluations or assessments performed by ICE, the Department of Justice or any other state or federal agency, relating to the activities, management, outcomes or efficacy of MCSO"); Request No. 14 (all documents relating to MCSO's Human Smuggling Unit, Illegal Immigration and Interdiction Unit, Violent Fugitive Apprehension Squad, Criminal Investigation Section, Anti-Gang Unit, Community Action Teams or volunteer posse that pertain to" the MOA and MCSO's enforcement of federal immigration law, MCSO's enforcement of state immigration and anti-smuggling law, Crime Suppression Operations and the performance of routine traffic stops); Request No. 15 (all documents relating to MCSO's budget for years 2005 to the present that may indicate sources of allocation of funding for the 287(g) program, Crime Suppression Operations, the Human Smuggling Unit, the Illegal Immigration and Interdiction Unit, Community Action team or volunteer posse); Request No. 16 (all documents "relating to MCSO's receipt or use of federal financial assistance"); and Request No. 17 (all documents from 2005 to the present "relating to Maricopa County crime statistics or reports").

It is difficult to believe that no such documents existed at the time that this lawsuit was filed in December 2007, or that none have come into existence since that time.  Especially in light of the upcoming depositions and the age of this case, Plaintiffs demand that Defendants supplement their prior productions with these clearly responsive documents as soon as possible, and in any event by no later than **September 24, 2009.**

2.     Defendants' Failure to Produce Documents Reflecting Communications Between or Among Sheriff Arpaio, Chief Deputy Hendershott, Chief Brian Sands and/or Other Senior MCSO and Officials from the U.S. Department of Homeland Security ("DHS") or ICE Regarding MCSO's Crime Suppression Operations or Implementation of the 287(g) Agreement.

STEPTOE & JOHNSON LLP

Timothy J. Casey
September 10, 2009
Page 3

These documents are responsive to the same Interrogatories and Requests for Production of Documents identified above. Again, given the fact that Defendants have purportedly been carrying out federal immigration enforcement duties when conducting so-called "crime suppression operations," it strains credulity to believe that none of these documents existed when this suit was filed nearly two years ago, or that none have come into existence since that time.

Moreover, on August 18, 2009, I wrote to you to ask that MCSO supplement its prior productions with additional communications between MCSO and ICE, including those identified in Robert Driscoll's letter to DHS (which was posted on MCSO's website). [See my Aug. 18, 2009 letter at 1] MCSO has seen fit to release portions of these communications to the press, but has not produced the underlying communications to Plaintiffs – despite its unambiguous obligation to do so under Federal Rules of Civil Procedure 26, 33 and 34.

3.    Defendants' Failure to Produce *Any* Documents Relating to the Selection, Training, Duties and Supervision of Volunteer "Posse."

Plaintiffs' Interrogatory No. 13 and Request for Production No. 1 seek these documents. Please produce them by September 24.

4.    Defendants Have Not Produced All "Individual Stat Sheets" for the Sweeps.

For crime suppression operations in early 2008, MCSO produced Individual Stat Sheets for some participating officers. [*E.g.*, Melendres MCSO 001826–33] For subsequent sweeps, however, MCSO produced only statistical totals for the entire operation. [*E.g.*, Melendres MCSO 001837] We understand that MCSO continued to use some form of Individual Stat Sheet to create these operation totals. These individual stat forms are responsive to Request for Production Nos. 3 and 4, and should be disclosed pursuant to Rule 26(e).

5.    Defendants Have Not Produced the Names of Individuals Stopped But Not Arrested During the Sweeps.

While MCSO has produced arrest lists for most sweeps [*E.g.*, Melendres MCSO 001850–51], MCSO has not provided the names of those individuals who were stopped and subjected to minimal investigation, but not arrested. In your December 17, 2008 letter, you identified all traffic stops within the vicinity and timeframe of sweeps using the CAD system. [Melendres MCSO 013981–14027] Please provide all names within the CAD database associated with the stops identified in your December 17 letter, and please provide all names and all other details of traffic stops that MCSO can identify as falling within the vicinity and time frame of all subsequent sweeps.

6.    Defendants Have Not Produced Public Records Requests and All Responses.

In Request for Production No. 12, Plaintiffs requested copies of all public records requests to, and the responses of, MCSO related to allegations of racial profiling or the administration of

STEPTOE & JOHNSON LLP

Timothy J. Casey
September 10, 2009
Page 4


MCSO's Memorandum of Agreement with ICE. I understand that you have disclosed documents to us that were provided to members of the media in response to some public records requests, but the requests themselves or MCSO's responses have not been produced.

       7.     <u>Defendants Have Not Supplemented Their Production of Documents Relating to Racial-Profiling Complaints.</u>

      In connection with Request for Production No. 7 regarding complaints of racial profiling, we have documents reflecting an informal inquiry to the various MCSO divisions conducted in or about August 2008. [Melendres MCSO 008968–93] That inquiry occurred more than a year ago, however, and we understand that MCSO may have received additional, relevant complaints since that time. Please supplement MCSO's Response.

       8.     <u>Defendants Have Not Produced Any of the Materials Requested in My August 18, 2009 Letter.</u>

      In addition to the topics addressed above, MCSO has not produced basic public records relating to the most recent sweeps, including those conducted in Avondale on April 23-24, 2009, in Chandler on July 23-24, 2009, and – most recently – near 35th Ave and Lower Buckeye in Phoenix on September 4-6, 2009. The unproduced documents include arrest records, operational planning and site-selection documents, after-action reports and briefings, the names of persons stopped but not arrested, and all internal and external communications (including, but not limited to, emails) between and among MCSO personnel and/or others relating in any way to these operations. *See, e.g.,* Plaintiffs' Request for Production No. 6 (seeking "All documents relating to your Crime Suppression Operations....").

      Moreover, as requested in my August 18 letter, please (1) confirm whether you ever served a Second Supplemental Response to Plaintiffs' Requests for Production of Documents to MCSO, and (2) let us know if MCSO can produce – in *electronic* format – the "CAD reports" that we reviewed at your office on June 19, 2009, and that are disclosed in Defendant Arpaio and MCSO's Ninth Supplemental Disclosure Statement. On August 19, we spoke with you about these requests by telephone, and you agreed to check with your clients and produce what you could. To date, we have not received any additional information regarding these requests.

       9.     <u>Defendants Have Not Produced a Privilege Log.</u>

      If you contend that any of the documents that MCSO has withheld are privileged or otherwise protected from disclosure, please provide a log.

      Please respond to all of the above requests by **September 24, 2009**, so that we can determine whether these requests can be resolved informally, or whether we will need to involve the Court.

STEPTOE & JOHNSON LLP

Timothy J. Casey
September 10, 2009
Page 5

Finally, pursuant to the Court's September 2, 2009 Order Setting Rule 16 Case Management Conference, we shall amend the Joint Case Management Report that we filed on February 26, 2009, with the intention of providing you a draft for review by the end of September. At this time, we do not believe that a second meeting pursuant to Rule 26(f) is necessary. If you feel otherwise, please let us know.

We are in receipt of your recent correspondence regarding deposition dates, and shall respond under separate cover shortly.

If you have any questions, please call.

Very truly yours,

Peter S. Kozinets

# Exhibit H

**Exhibit H**

# STEPTOE & JOHNSON LLP

### ATTORNEYS AT LAW

Peter S. Kozinets
602.257.5250
pkozinets@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

September 30, 2009

VIA EMAIL
AND U.S. MAIL

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105
Phoenix, Arizona 85014

Re:     *Melendres, et al. v. Arpaio, et al.*, No. CV07-02513-PHX-GMS (D. Ariz.);
        Outstanding Discovery Issues

Dear Tim:

I write regarding several outstanding discovery matters.

First, MCSO has ignored Plaintiffs' September 10, 2009 letter, which identifies several serious deficiencies in MCSO's production of documents – including MCSO's failure to produce *any* internal communications between and among Sheriff Arpaio and other senior MCSO officers relating to MCSO's "crime suppression operations" and other subjects at issue. The letter requested a response by Thursday, September 24. Early last week, you mentioned in an email that you anticipated responding by last Wednesday or Thursday. The September 10 letter raises several issues that must be resolved to ensure that Plaintiffs' depositions of MCSO's witnesses – which are fast-approaching – proceed efficiently and productively.

Second, MCSO has not provided any alternative dates for Sheriff Arpaio's deposition, despite our request (in my September 14, 2009 letter) for two or three alternative dates before November 11, for a deposition to be held at Steptoe & Johnson LLP. We are currently available to take the Sheriff's deposition on November 2 or 4, or December 1, 2, 9 or 10; please let us know at your earliest convenience if these dates work.

It should be in the interests of all parties to resolve the foregoing issues well in advance of the October 21, 2009 case management conference.

STEPTOE & JOHNSON LLP

Timothy J. Casey
September 30, 2009
Page 2

Third, enclosed for your review and comment is a draft Amended Joint Proposed Case Management Report, which must be filed by October 9. Please let us know if you have any changes or comments regarding the draft. (Also enclosed is a redline that compares this draft to the Joint Case Management Report filed on February 26, 2009.)

Fourth, last week we received ICE's initial response to Plaintiff's subpoena duces tecum. Enclosed is a copy of the response, along with a copy of a CD that ICE produced. [*See* September 21, 2009 letter from Christopher Buchanan; September 23, 2009 letter from Mike Johns]

Fifth, in response to your September 25, 2009 correspondence regarding the depositions of Alonzo Pena and Bill Reid, we are available to participate in their depositions on both of the date ranges you mentioned (November 23-24 or December 3-4), but we prefer the earlier dates. We anticipate appearing telephonically if the depositions proceed out of state.

If you have any questions or would like to discuss, please call.

Very truly yours,

Peter S. Kozinets

Enclosures

Copy (with enclosures) to:

Michael Moberly (counsel for Maricopa County)

588986

# Exhibit I

**Exhibit I**

# STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

Peter S. Kozinets
602.257.5250
pkozinets@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

October 20, 2009

VIA EMAIL
AND U.S. MAIL

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105
Phoenix, Arizona  85014

Re:    *Ortega Melendres, et al. v. Arpaio, et al.*, No. CV07-02513-PHX-GMS (D. Ariz.)
       Follow-up request for outstanding discovery items

Dear Tim:

We have reviewed the documents produced with defendants' October 8, 2009 supplemental response to plaintiffs' requests for production. While this disclosure finally addressed some of the concerns raised in my August 18, September 10 and September 30, 2009 letters, there are still several outstanding discovery items to which defendants have failed to respond. Without defendants' full compliance with their obligations under the Rules, we cannot prepare fully for the upcoming depositions, and despite our commitment to expedite this case, we may be forced to postpone some depositions until we have received all responsive documents.

First and foremost, we have yet to receive *any* documents reflecting internal communications by Sheriff Joseph Arpaio, Chief David Hendershott, Deputy Chief Brian Sands or other top MCSO officers. We are hard-pressed to believe that these individuals communicate only orally amongst themselves about crime suppression operations, immigration enforcement, the federal 287(g) program, volunteer posse, allegations of racial profiling or any other matter within the scope of plaintiffs' requests. As I have noted previously, we do have copies of broadcast email reporting on crime suppression operations that include Deputy Chief Sands as one of many recipients. We lack, however, any internal communications *from* any of these officers. Similarly, we have not received any internal communications from MCSO's top officers to deputies regarding MCSO's policy positions. We find it inconceivable that the Sheriff's policies, particularly on state and federal immigration law, are not

Doc. #590089

Timothy J. Casey
October 20, 2009
Page 2

communicated directly to deputies, but that deputies must rely on MCSO's press releases and the media to learn MCSO's law-enforcement agenda.

Second, MCSO has wrongfully declined to provide in electronic format the CAD crime statistics disclosed in Defendants Arpaio and MCSO's Ninth Supplemental Disclosure Statement. While you have offered to produce hardcopy printouts from the database [Melendres MCSO 044458-56846], plaintiffs are entitled to obtain this information electronically. The Rules makes clear that "a party must produce [electronically stored information] in a form or forms in which it is ordinarily maintained or in a reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E)(ii). Moreover, the 2006 amendment to the Rules was intended to "permit[] the requesting party to designate the form or forms in which it wants electronically stored information produced." *See* Advisory Committee Notes on the 2006 amendments to Rule 34(b). Accordingly, plaintiffs have a right to the CAD crime statistics in electronic format so that they can search and manipulate the data the same way that defendants can. Indeed, we see no valid reason why MCSO declined this request when it already provided the CAD traffic stop data to plaintiffs in electronic format.

Third, we have not received the names of the individual drivers and passengers investigated during the traffic stops identified in your December 17, 2008 letter as occurring during the dates and in the locations of various crime suppression operations. Although you have provided Location History Reports for these stops [Melendres MCSO 013981-14027], we understand that the CAD traffic stop database also contains the names of those individuals whose license and registration were checked during these stops. Please make this information available or explain why MCSO cannot do so.

Fourth, we have not received any additional individual officer "stat sheets" for MCSO's crime suppression operations. MCSO has made these available for one such operation, but not for the others. [Melendres MCSO 001826-33] As emphasized in my prior letters, these stat sheets are responsive to plaintiffs' requests, and they all should be disclosed.

Fifth, MCSO has failed to produce the public records requests and responses specifically identified in Request for Production No. 12 of Plaintiffs' First Set of Requests for Production of Documents. We have asked for the requests and responses themselves, not the public records produced to the requester, if any.

Sixth, despite my prior requests for one, we have yet to receive a privilege log. In MCSO's most recent production of documents, we found several, completely bank, Bates numbered pages. [*E.g.*, Melendres MCSO 057277-79, Melendres MCSO 057286-88, Melendres MCSO 057290, Melendres MCSO 057292, Melendres MCSO 057296 and Melendres MCSO 057831-35] Without a privilege log, we have no means of determining the basis of these redactions or the validity of any claim to privilege or confidentiality.

I trust that we can get these issues resolved promptly and avoid any impact to our current deposition schedule. As such, please let me know if you foresee any delay in responding to any of the

STEPTOE & JOHNSON LLP

Timothy J. Casey
October 20, 2009
Page 3


items listed above by Friday, October 23, 2009.  Of course, if you care to discuss this matter in person, please call.

Very truly yours,

*Aaron Lockwood* for

Peter S. Kozinets

# Exhibit J

**Exhibit J**

# STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

Peter S. Kozinets
602.257.5250
pkozinets@steptoe.com

Collier Center
201 East Washington Street
Suite 1600
Phoenix, AZ 85004-2382
Tel 602.257.5200
Fax 602.257.5299
steptoe.com

November 2, 2009

VIA EMAIL
AND U.S. MAIL

Timothy J. Casey
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 East Osborn Road, Suite 105
Phoenix, Arizona 85014

> Re: *Ortega Melendres, et al. v. Arpaio, et al.*, No. CV07-02513-PHX-GMS (D. Ariz.)
> Defendants' failure to produce discovery and spoliation of evidence

Dear Tim:

I write regarding several discovery issues, new and old.

Document Destruction

We were troubled to learn at the October 27, 2009 deposition of Sgt. Manuel Madrid that he has been shredding documents that Plaintiffs have been seeking for months. Your clients should have placed a "litigation hold" on those documents at the outset of this litigation. In any event, Plaintiffs requested that your clients preserve potentially relevant documents and electronically stored information nearly 15 months ago. [*See* July 21, 2008 letter from David Bodney to you, at 1 ("I write to demand that Defendants . . . take all reasonable steps to preserve all documents, including but not limited to all electronically stored information ('ESI'), that are relevant to the allegations in the pleadings in this action or that are reasonably likely to lead to the discovery of admissible evidence.")] In that letter, we expressly put Defendants on notice of the need to preserve all "[p]ertinent records . . . relat[ing] to the 'crime suppression operations'" conducted by MCSO from 2007 to the present. [*Id.* at 2]

Yet Sgt. Madrid testified last Tuesday that he had *never* been instructed to retain documents, and that he has been shredding individual officer "stat sheets" throughout the pendency of this litigation – even as recently as October 16-17, 2009, after MCSO's sweep in Surprise. We were startled by this revelation because we have been seeking these precise documents from Defendants for

STEPTOE & JOHNSON ᴸᴸᴾ

Timothy J. Casey
November 2, 2009
Page 2

months. In my September 10, 2009 letter, I pointed out that MCSO had produced some stat sheets for an operation in January 2008, but not for other sweeps. [Sept. 10, 2009 letter at 3] In my September 30 and October 20 letters, I renewed Plaintiffs' requests for these documents. Indeed, MCSO's failure to produce them was also discussed with Judge Snow at the October 21 Rule 16 Conference.

The stat sheets are an important source of discoverable, relevant information. All officers who participated in the sweeps were required to complete them at the end of each of their shifts. The sheets contain officer notes about the circumstances of stops made during sweeps, and may provide additional, pertinent information about the officers' conduct. While we received a handful of stat sheets for one operation, if every officer who participated in every sweep completed a stat sheet, we should have received more than 1,000 of them. Further, our review of the CAD traffic stop database reveals that the stat sheets likely contained information not available in the CAD system. For example, many of the stat sheets reflect far more contacts than there are incidents recorded in the CAD database for that officer on that day. [Melendres MCSO 001826-33] In addition, the stat sheets have space for a "Brief Summary of Arrest" and "any notable incidents," where officers can provide handwritten notes. [*E.g.*, Melendres MCSO 001826] Comparable information was *not* captured in the CAD database.

Sgt. Madrid's testimony makes clear that Plaintiffs have ample grounds to seek appropriate judicial relief, including an immediate order directing MCSO to stop shredding documents and preserve all pertinent documents and ESI. Moreover, a district court may sanction a party for spoliation of evidence under its "inherent power" to "levy sanctions in response to abusive litigation practices" and/or the Federal Rules. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Sanctions may include striking the despoiling parties' pleadings, adverse inference instructions and/or a default judgment. *Id. See also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 424 (S.D.N.Y. 2004) (imposing adverse inference sanctions where employees failed to follow litigation hold directives, counsel failed to monitor compliance adequately and UBS lost relevant documents).

Before we address this issue to the Court, we want to confirm that the documents discussed during the deposition of Sgt. Madrid in fact no longer exist. Please confirm that "stat sheets" for all of the "crime suppression operations," "crime saturation patrols" or "sweeps" conducted by MCSO from 2007 to the present cannot be found from any source.

Moreover, in response to Sgt. Madrid's testimony that he regularly and systematically deletes his email when his inbox becomes "full," and that he had not been asked to preserve any email, please let us know whether anyone else searched his email for relevant and responsive documents before deletion. Also, please advise if MCSO has back-up tapes or some other means of retrieving this lost evidence. In the same vein, please let us know if Sgt. Madrid has now been instructed to stop shredding stat sheets, and to preserve and produce emails regarding the planning of any future sweeps.

STEPTOE & JOHNSON LLP

Timothy J. Casey
November 2, 2009
Page 3

<u>Outstanding Discovery Matters</u>

As you know, we have other open discovery disputes. First, you had indicated after the Rule 16 conference that your clients would provide a statement under penalty of perjury that MCSO does not have any documents reflecting internal communications by or among Sheriff Arpaio, Chief Hendershott, Deputy Chief Sands or other top MCSO officers that are responsive to plaintiffs' discovery requests. We are still waiting for this affirmation. In light of Sgt. Madrid's testimony, we are concerned that the non-existence of these communications is the result of routine destruction – rather than lack of creation. Of course, if you have since learned of the existence (or past existence) of relevant emails from these key players, we trust that you will update us accordingly, as we have been seeking this information for months. [*See* Sept. 10, 2009 letter at 1; Sept. 30, 2009 letter at 1; and Oct. 20, 2009 letter at 1] If you contend that no responsive records exist, please let us know what steps you have taken to ensure your clients' cooperation with this discovery request.

Second, we are still seeking the names of the drivers and passengers investigated for license, registration and warrant checks pursuant to traffic stops during the sweeps. We requested this information in two prior letters. [Sept. 10, 2009 letter at 3; Oct. 20, 2009 letter at 2] As explained in those letters, the "Location History" reports provided with your December 17, 2008 letter (Melendres MCSO 013981-14027) suggest that MCSO has the ability to isolate within the CAD database the traffic stops that took place during sweeps. The reports appear to list the traffic stops that occurred on a certain date in a specific location. On Melendres MCSO 013983-84, for example, the report lists "Traffic Stops in Fountain Hills" for the "Period covered: May 7, 2008." It then identifies 17 incidents.

Please produce an update to Melendres MCSO 013981-14027 that provides "Location History" reports for all sweeps from 2007 to the present. Also, please provide an updated version of MCSO's CAD traffic stop database. The electronic copy provided earlier this year has no data from 2009. The 2009 data should be produced.

To the extent the names of persons subjected to license, registration and warrant checks during sweeps are *not* within the CAD database, please confirm whether your clients can and will provide this information. If you believe that this information *is* contained within the CAD database, please explain in detail how that information can be extracted efficiently from the database. If necessary, we are willing to meet and confer with you and a representative of the MCSO Information Technology department to discuss where this information is and how it can be accessed. If we cannot resolve this issue cooperatively, we reserve the right to address the issue to the Court and/or notice an appropriate Rule 30(b)(6) deposition.

Third, MCSO has received numerous requests for public records pursuant to the Arizona Public Records Law on subject matters relevant to this litigation. MCSO continues to withhold, however, copies of those requests and MCSO's responses to them. Plaintiffs' Request for Production No. 12, therefore, remains wholly unanswered. [Sept. 10, 2009 letter at 3; Oct. 20, 2009 letter at 2]

STEPTOE & JOHNSON LLP

Timothy J. Casey
November 2, 2009
Page 4

Fourth, you have contended that a privilege log is unnecessary and that no privileged communications have been withheld, even though MCSO has produced several blank or apparently redacted documents in discovery. [*E.g.*, Melendres MCSO 057277-79, 057286-88, 057290, 057292, 057296 and 057831-35] You have represented that these pages were blank when they were provided to you by Defendants. Please explain why these pages were blank so we may better evaluate whether information has been wrongfully redacted.

In view of the seriousness of these issues, please respond by November 6, 2009. As always, I am available to discuss this matter in person.

Very truly yours,

Peter S. Kozinets

590851

# Exhibit K

**Exhibit K**

# SCHMITT, SCHNECK, SMYTH & HERROD, P.C.

ATTORNEYS AT LAW

**Timothy J. Casey**
e-mail: timcasey@azbarristers.com

November 4, 2009

## VIA E-MAIL AND REGULAR MAIL

Peter Kozinets, Esq.
STEPTOE & JOHNSON, LLP
Collier Center
201 East Washington St., Suite 1600
Phoenix, Arizona 85004

> *Re:    Melendres v. Arpaio et al, United States District Court for the District of*
> *Arizona, CV 07-02513-PHX-GMS*

Dear Peter:

I am in receipt of your letter dated November 2, 2009 and thank you for the same.

Stat Sheets

Your charge of evidence destruction by Sgt. Manuel Madrid or the MCSO is hyperbole. Whether the MCSO kept individual stat sheets from July 21, 2008 to the current date is immaterial to the successful prosecution of Plaintiffs' case or to the defense of the same. You already know from the sworn testimony from the MCSO witnesses, and will further learn in the future when you question others from the MCSO, that the stat sheets contain only quantitative information regarding the particular deputy's activity during a crime suppression/saturation patrol (i.e., the number of contacts made by a deputy; the number of arrests made by a deputy; the number of citations issued by the deputy; etc.) which are then used to create the patrol's master data sheet of statistics summarizing all the data for the operation. The master data sheet that you have for each patrol contains the sum of all the individual stat sheets for that patrol. If Plaintiffs have the master data sheet, which they do, then Plaintiffs have the underlying data from the stat sheets. Moreover, there is no recording of the race or ethnicity of persons on the stat sheets. There are no notes on the stat sheets "about the circumstances of the stops" as you imagine. There is no "additional pertinent information about the officers' conduct" on the stat sheets as you believe.

You need not take my word for it. Attached is an Affidavit from Lt. Joseph Sousa for your review and file. You will note that Lt. Sousa has also directed the HSU to keep, solely for purposes of this litigation, any stat sheets generated at future crime suppression/saturation patrols.

As for Sgt. Manuel Madrid's e-mails, it is my memory that he testified on October 27, 2009 that he recently deleted e-mails when his electronic mail box became too full to receive

new e-mails. You have turned innocuous testimony into an allegation of a nefarious act. The charge is unfair. Plaintiffs already have numerous e-mails from Sgt. Madrid, many of which they did not even use at his deposition. Plaintiffs received these e-mails because the MCSO did, in fact, search for responsive e-mails from its employees, including Sgt. Madrid. With that said, and to allay your concerns, I have requested from the MCSO that it promptly secure from the County's IT Department all deleted and undeleted e-mails for the entire HSU. I have asked that they provide the same to me in electronic format as soon as possible. We will see if this can be done. If so, following my prompt review of the e-mails, I will produce the same to you. You can then independently determine at your own expense whether further responsive e-mails for Sgt. Madrid or for any member of the HSU exist.

### MCSO Leadership E-Mails

In your letter, and in prior correspondence dated October 20, 2009, your profess disbelief that there either are no e-mails to and from or between Sheriff Arpaio, Chief Hendershott, and Chief Sands. You have concluded in the past, despite my explanations to you, that e-mail documents must exist and therefore the MCSO is hiding them from you or otherwise has destroyed them. That belief is unfounded. Affidavits of Chief Sands and Chief Hendershott are attached for your review and file.

### Names of Drivers and Passengers During Traffic Stops

You have asked my clients to provide you with all of the names of every driver and passenger investigated for license, registration and warrant check pursuant to traffic stops during the crime suppression/saturation patrols from 2007-09. I was advised much earlier in this litigation, however, that my clients do not have such information in a single format or that is somehow kept in the regular course and scope of its ordinary operations. As such, my clients have already given you all the documents and database information from which Plaintiffs can, themselves, glean such specific information.

My clients produced to Plaintiffs on February 19, 2009 four DVD-R's containing all of the MCSO's traffic stops from years 2005-08 from the MCSO CAD traffic stop database. The electronic database is searchable as you requested. The MCSO CAD traffic stop database provides Plaintiffs with the information they need to answer their questions for the stops they want, such as incident numbers, date, location of incident, and license plate information. If owner information from a license plate number is not independently obtainable by you, then please identify in a formal document request what specific license plate numbers you wish to have run for ownership and I will ask my client to run the same and provide a response. In addition, if you are sincere in meeting and conferring with an MCSO IT person to learn how to better use the database provided to you last February, please know that I am willing to arrange the same.

For the various traffic stops made during the crime suppression/saturation patrols, Plaintiffs already have in their possession the arrest lists for each patrol. These arrest lists

contain the name of the arrested person, his/her date of birth, the charge, a description of the probable cause for the stop, the name of the arresting deputy, and the report number. You also have the Incident/DR numbers for each stop for each patrol. Plaintiffs can review the documents and obtain their desired information. If it is specific citations or reports that Plaintiffs want then identify the same in a formal document request and my client will produce the citations or reports.

As for your request for 2009 traffic stop data from the MCSO CAD traffic stop database, I believe that data arguably may already called for in one of your 2008 document requests. Accordingly, a new document request will not be necessary. Please note that yesterday I requested from my clients the immediate duplication of all MCSO traffic stops for year 2009 (from January 1, 2009 to October 31, 2009). I am advised I should receive the same on Monday, November 9, 2009 and I will produce it to Plaintiffs so they can do their own work.

### Public Records Request

Plaintiffs' letter claims that the MCSO has not responded fully or properly to Plaintiff's public records request pursuant to Arizona law. They are, however, short on specifics. Please identify what categories of documents you believe the MCSO has not produced and I will immediately run it to ground and find out an answer from my clients.

### Privilege Log

My clients have not submitted a privilege log because they have not withheld any documents on privilege. The documents that you believe were redacted (Melendres MCSO 057277-79, 057286-88, 057290, 057292, 057296 and 057831-35) have not been redacted. I have conferred with my clients and they simply produced to me stacks of documents that appeared potentially responsive to Plaintiffs' discovery requests (and my demands for more information) and some of the documents within the stack contained blank pages. As I have explained to you in person, I do not remove documents from client-provided documents that may be responsive to an opponent's discovery requests, even if the pages are blank. My office Bates labeled the entire set as provided to me from my client. As you can see, even blank pages are Bates labeled. In short, nothing is being withheld from Plaintiffs based on privilege.

The only documents my office has redacted are Melendres MCSO 57124-57276. I specifically told you about the same during a personal meeting following a recent deposition at your office. The redacted information from these pages contains the telephone numbers and addresses for members of the Sheriff's posse. This information is redacted not due to privilege but due to concern that the documents could be disseminated outside of the litigation and end up in the hands of an anti-Arpaio extremist. That extremist might decide for himself/herself to harass or annoy the posse members solely because of their volunteerism. This concern is legitimate. I am sure you will remember what occurred to Plaintiff Jessika Rodriquez when the MCSO inadvertently posted a report on- line that contained her telephone number. Should you want the posse members' home addresses and telephone numbers, perhaps you could explain

3

why and then we could enter into a protective agreement/order limiting distribution of the same to only the persons that have a legitimate business reasons for possessing such information.

Sincerely,

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.

Timothy J. Casey, Esq.

TJC/eh

Encls.

4

# Exhibit L

Exhibit L

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, | NO.: CV-07-2513-PHX-GMS |
| Plaintiff, | |
| vs. | **AFFIDAVIT OF JOSEPH SOUSA** |
| Joseph M. Arpaio, et al. | |
| Defendant. | |

STATE OF ARIZONA      )
                             )
COUNTY OF MARICOPA   )

Affiant, Joseph Sousa, under oath, declares and testifies as follows:

1.     My name is Joseph Sousa.  I am an employee of the Maricopa County Sheriff's Office ("MCSO") and currently serve as the Lieutenant for the MCSO Human Smuggling Unit ("HSU").  In such capacity, I work closely with the men and women in the HSU, including the sergeants under my supervision, Sgts. Brett Palmer and Manny Madrid.

2.     I am over eighteen (18) year of age, competent to testify, and make this Affidavit based upon my personal knowledge and based on information provided to me by other employees within the MCSO which I am advised is true.

3.     I joined the HSU sometime in the fall of 2007, and began in that time period to serve as its commanding Lieutenant.  Before my arrival at the HSU, Lt. Chuck Siemens was responsible for Enforcement Support and HSU.  Because of the workload required of Lt. Siemens, upon my arrival, I was assigned supervisory responsibility for the HSU.  Lt. Siemens maintained supervisory responsibility for Enforcement Support until roughly March 2009.

4.     I have received and read the November 2, 2009 letter from Plaintiffs' lawyer

complaining about the absence of individual MCSO deputy "stat sheets" from MCSO crime suppression/saturation patrols. Plaintiffs' lawyer mistakenly believes that certain types of non-quantitative data are contained on the stat sheets prepared by individual deputies during crime suppression/saturation patrols from April 2008 to October 15, 2009. I, therefore, submit this affidavit to correct the lawyer's misunderstanding about the use of stat sheets in saturation patrols, and the data they actually contain from April 2008 to October 15, 2009.

5.      "Stat sheets" have been used historically by individual MCSO Enforcement Support deputies to collect generalized quantitative types of data regarding a special operation. These special operations have included crime suppression/saturation patrols, Mall Patrols, warrant round-ups, under-age drinking details, and under-age tobacco details. The stat sheets used during these special operations have varied in style and substance over the years depending on the specific operation at issue and the specific MCSO sergeants commanding or involved in the operation. Stat sheets have taken many different forms, including pre-prepared forms, any available piece of scrap paper, post-it notes, index cards, or other pieces of paper where a deputy would record his specific quantitative data during his/her shift at the operation.

6.      In general, the stat sheets, regardless of form, contained the following general types of information: the number of times the deputy assisted another law enforcement agency; the number of contacts the deputy made with third persons during the assignment; the number of criminal arrests for adults made by that deputy; the number of warrant arrests made by that deputy; the number of criminal citations-adult only issued by that deputy; the number of arrests-juveniles made by that deputy; the number of criminal traffic citations issued by that deputy; the number of civil citations issued by that deputy; the number of field information cards prepared by that deputy; the number of weapons recovered by that deputy; the number of stolen pieces of property recovered by that deputy; and the number of compensated hours for the individual deputy. It is not common practice

for the MCSO deputies to record the race or ethnicity of any contact, person, suspect, or arrestee.

7.      When the deputy's shift concludes, then the deputy's data would be provided to the operation's command staff either orally or by turning over to command staff the piece of paper containing the deputy's data.   The operation's command staff then would compile the individual deputies' data and record it within a master sheet of statistics/data for the particular operation.  This master data sheet would contain a compilation of the total statistics/data for the operation based on the information provided by the deputies.  For example, if three deputies reported, either orally or via stat sheets, to command staff during a special operation that they had 4, 7, and 5 contacts, respectively, and 1, 2, and 4 arrests, respectively, then the command staff's master data sheet for the operation would add those items and memorialize in a list format that there was a total of sixteen total contacts for the operation and a total of seven arrests for the operation.   Arrests would also be tracked by separate documents memorializing all the pertinent information regarding each arrest.  Barring exigent circumstances where a motor vehicle's license place is not run during a traffic stop, information about each traffic stop made during a special operation also would be contained within the MCSO CAD traffic stop database.

8.      For the January 18-19, 2008 crime suppression/saturation patrol conducted by the MCSO at 32nd Street and Thomas, Lt. Siemens had deputies involved in the patrol use the form of stat sheet that was produced in this lawsuit as Melendres MCSO 001826-33.  A copy is attached as Exhibit "A." As shown Melendres MCSO 001826-33, the deputies did not record the race or ethnicity of any contact, person, suspect, or arrestee.

9.      Lt. Siemens and the MCSO's HSU or Enforcement Support did not ordinarily keep or maintain stat sheets, such as Melendres MCSO 001826-33, in the usual course of MCSO's operations or activities.  The information on the stat sheets was always transferred by the operation's command staff to the master data sheet for the operation (i.e., Melendres MCSO 001825), and the stat sheets were discarded.  The stat sheets were considered

CHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

duplicative and added no value to MCSO law enforcement operations. The stat sheets for the January 18-19, 2008 crime suppression/saturation patrol, Melendres MCSO 001826-33, were produced because they existed.

10.     The MCSO HSU and Enforcement Support stopped using the form in Exhibit A for saturation patrols by <u>April 2008</u> when I made changes to the form. By early April 2008, I had created a stat sheet for use by individual deputies during crime suppression/saturation patrols in the form reflected in MCSO Melendres 058706. This form is attached as Exhibit "B."

11.     Exhibit B is the general format of stat sheet used by individual deputies during crime suppression/saturation patrols from April 3, 2008 until October 15, 2009. Exhibit B does <u>not</u> contain a space for a "brief summary of arrest/incident" or "any notable incidents" as did the form in Exhibit A. Exhibit B does <u>not</u> contain any question intended to elicit from the deputy a description of the probable cause that led to the traffic stop, or the event, circumstances, and/or reasonable suspicion that led to a contact with a particular person. Exhibit B also does <u>not</u> contain any question intended to have the deputy document the race or ethnicity of a contact and/or suspect. As mentioned already, it is not common practice for the MCSO deputies to record the race or ethnicity of any contact, person, suspect, or arrestee.

12.     During a crime suppression/saturation patrol from April 3, 2008 to October 15, 2009, either I or Sgts. Palmer or Madrid, would receive each individual deputy's statistics/data for the particular patrol at the end of each deputy's shift. We would receive the data either via individual conversations with the deputies in person, or via radio or telephone communication, or by reviewing their completed Exhibit B stat sheet turned into the command post at the conclusion of the particular deputy's shift. Not every deputy on every saturation patrol submitted a stat sheet at the conclusion of their shift at a crime suppression/saturation patrol.

13.     Either I or my sergeants would transfer the statistical/data information

reported to us by the deputies to a master data sheet for the operation. This master data sheet would summarize all of the patrol's total statistics/data. The master data sheet is often called "Crime Suppression/Saturation Patrol Totals." Again, this is a compilation of the individual quantitative data from the deputies and merely adds the deputies "numbers" together to memorialize the number of events that occurred during the patrol in quantitative terms.

14.     Since April 2008, the stat sheet used during crime suppression/saturation patrols (Exhibit B) seeks the recording of the individual deputy's number of certain events. The stat sheets do <u>not</u> contain information about the race or ethnicity of any contact, person, suspect, or arrestee. The stat sheets do <u>not</u> contain "officer notes about the circumstances of stops made during the sweeps" as alleged by Plaintiffs' lawyer. The stat sheets do <u>not</u> contain any information about any arrests or "notable incidents" as alleged by Plaintiffs' lawyer. Similarly, since April 2008, the stat sheets do <u>not</u> contain "additional, pertinent information about the officers' conduct" as alleged by Plaintiffs' lawyer. In fact, since April of 2008, I have not received or reviewed a single stat sheet from any deputy for a crime suppression/saturation patrol that contained more information than the type sought in Exhibit B.

15.     Because all of the statistical/data information reported by the individual deputies is already recorded by command staff as part of the patrol's master data sheet, and given that all arrest-related information is separately documented on an independent arrest sheet, all traffic citations are separately document by the citation form, and that each traffic stop/license plate run made on a motor vehicle by a deputy is recorded on the MCSO CAD traffic stop data base system, neither I nor my sergeants have kept the duplicative stat sheets collected from individual deputies during saturation patrols in the usual course of MCSO's activities from April 2008 to present.

16.     Based on my involvement in the crime suppression/saturation patrols and close work and communications with Sgts. Palmer and Madrid, I can state with reasonable

certainty that, since April 2008, there was no information on the individual deputies' stat sheets that is not contained within the data compilation in the respective crime suppression/saturation patrol's master data sheet.

17.     I have personally reviewed the saturation patrol files of the HSU. Each and every stat sheet that is in existence, regardless of the form of the stat sheet, has been provided to the MCSO's lawyer in this case. The HSU has produced each crime suppression/saturation patrol's master data sheet to the MCSO's lawyer in this case. In addition, it is my belief that a complete set of all the MCSO HSU and Enforcement Support crime suppression/saturation patrol documents in this case that are ordinarily kept or maintained during the usual course of the MCSO's activities have been provided to the MCSO's lawyer in this case.

18.     Via electronic mail dated November 3, 2009, and effectively immediately, I have instructed HSU members and command staff to keep and preserve, solely for purposes of this lawsuit, any stat sheets received from individual deputies involved in any future MCSO crime suppression/saturation patrols.


_____                    November 4, 2009
Joseph Sousa



STATE OF ARIZONA              )
                              )       ss.
COUNTY OF MARICOPA            )

On this 4th day of November, 2009, before me personally appeared Joseph Sousa, to me personally known, being duly sworn, executed the foregoing affidavit.


Witness my hand and official seal.

SCHMITT, SCHNECK, SMITH & HERROD, P.C.
Professional Corporation



Notary Public

My Commission Expires:

_____

OFFICIAL SEAL
**EILEEN HENRY**
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 14, 2012

# <u>EXHIBIT A TO:</u>

Manuel de Jesus Ortega Melendres,

        Plaintiff,

vs.

Joseph M. Arpaio, et al.

        Defendant.

NO.:  CV-07-2513-PHX-GMS

**AFFIDAVIT OF JOSEPH SOUSA**



# Maricopa County Sheriff's Office
### Joseph M. Arpaio
**Sheriff**

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: O11 9 03   Sworn/Posse#: E. QUINTERO #13 Call Sign: 503K

10-8 Time: 1330   10-7 Time: 1900

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | Ø | Recovered Stolen Property | Ø |
| Contact | 4 | Value of recovered stolen property | Ø |
| Ⓑ Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | 1 | Number of Deputies | 1 |
| Warrant Arrests Summary needed below | Ø | Number of compensated hours | |
| Ⓑ Criminal Citations Adult Only Summary needed below | 1 | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | 2Ø | Number of Posse Members | |
| Ⓐ Criminal Traffic Citations Summary needed below | 1 | Number of Posse Hours | |
| Civil Citations Issued | Ø | Number of 351J Tows Conducted | |
| FI Cards | 4 | Triple I Holds | |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | 1 | | |

**Brief Summary of Arrest/Incident: DR #, and any notable incidents below:**

ON TODAY'S DATE AT 1555 HOURS, SUSPECT (A) WAS STOPPED AT 24ST STREET & ROOSEVELT AFTER THE OCCUPANTS OF HIS VEHICLE WERE OBSERVED CONFRONTING UNKNOWN SUBJECTS AT A BUS STOP LOCATED AT 32ND STREET & ROOSEVELT. SP (A) FINALLY STOPPED AT 24ST STREET & ROOSEVELT WHERE HE WAS ARRESTED FOR NOT PROVIDING IDENTIFICATION. SUSPECT (B) THE FRONT PASSENGER WAS ARRESTED AFTER A 380. CAL SEMI-AUTO WAS FOUND UNDERNEATH THE FRONT PASSENGER SEAT FOR CCW IN VEHICLE W/IN HIS IMMEDIATE CONTROL

Melendres
MCSO 001826



# Maricopa County Sheriff's Office
## Joseph M. Arpaio
**Sheriff**

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: _11/19/07_    Sworn/Posse#: _Alin Avila_    Call Sign: _Sick_

10-8 Time: _1500_    10-7 Time: _____

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | 1 | Recovered Stolen Property | |
| Contact | 10 | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | 5 | Number of Deputies | 2 |
| Warrant Arrests Summary needed below | | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | 1 | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | | Number of Posse Hours | |
| Civil Citations Issued | 1 | Number of 351.1 Tows Conducted | |
| FI Cards | | Triple-I Holds | 3 |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

**Brief Summary of Arrest/Incident: DR #, and any notable incidents below:**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |



# Maricopa County Sheriff's Office
## Joseph M. Arpaio
### Sheriff

Individual Stat Sheet

*Must be turned into to Supervisor at the end of shift*

Date: 01/19/08     Sworn/Posse#: _Ross 1654_     Call Sign: _521K_

10-8 Time: _1500_     10-7 Time: _1745_

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | | Recovered Stolen Property | |
| Contact | 8 | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | | Number of Deputies | |
| Warrant Arrests Summary needed below | | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | | Number of Posse Hours | |
| Civil Citations Issued | 2 | Number of 3511 Tows Conducted | 1 |
| FI Cards | | Triple I Holds | 2 |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

**Brief Summary of Arrest/Incident: DR #, and any notable incidents below:**

Melendres
MCSO 001828



# Maricopa County Sheriff's Office
## Joseph M. Arpaio
### Sheriff

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: 01/19/08    Sworn/Posse#: S 1513    Call Sign: S 30 K

10-8 Time: 1700    10-7 Time: _____

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | | Recovered Stolen Property | |
| Contact | II | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | | Number of Deputies | |
| Warrant Arrests Summary needed below | I | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | I | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | | Number of Posse Hours | |
| Civil Citations Issued | I | Number of 351J Tows Conducted | |
| FI Cards | | Triple I Holds | |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

Brief Summary of Arrest/Incident: DR #, and any notable incidents below:

DR # 08-011138 - Subject was stopped for Equip Violation. Records check
revealed he had susp. Lic. and 10-52.



# Maricopa County Sheriff's Office
## Joseph M. Arpaio
**Sheriff**

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: _1-19-08_  Sworn/Posse#: _MILLETT REVE_   Call Sign: _51_

10-8 Time: _1500_   10-7 Time: _2200_

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | | Recovered Stolen Property | |
| Contact _IHIIHIIII_ | 13 | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | | Number of Deputies | |
| Warrant Arrests Summary needed below | | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | | Number of Reserve Deputy Hours | 7 |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | | Number of Posse Hours | |
| Civil Citations Issued _IHI_ | 5 | Number of 3511 Tows Conducted | |
| FI Cards | | Triple I Holds | |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

Brief Summary of Arrest/Incident: DR #, and any notable incidents below:

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

Melendres
MCSO 001830



*C. Bradshaw*

# Maricopa County Sheriff's Office

## Joseph M. Arpaio
### Sheriff

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: _1/19/08_    Sworn/Posse#: _S 1512_    Call Sign: _T512_

10-8 Time: _16:00_    10-7 Time: _22:30_

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | 1 | Recovered Stolen Property | |
| Contact | 11111111 | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | | Number of Deputies | |
| Warrant Arrests Summary needed below | | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | 111 | Number of Posse Hours | |
| Civil Citations Issued | 1111 | Number of 3511 Tows Conducted | 1 |
| FI Cards | | Triple I Holds | |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

Brief Summary of Arrest/Incident: DR #, and any notable incidents below:

9105 For DUI - Traffic stop no turn signal
692 - stopped for Poor Driving



# Maricopa County Sheriff's Office
### Joseph M. Arpaio
### Sheriff

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: 1-19-08    Sworn/Posse#: 5 1616    Call Sign: T523

10-8 Time: 1600    10-7 Time: 2300

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | | Recovered Stolen Property | |
| Contact | THL THL | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | THL | Number of Deputies | |
| Warrant Arrests Summary needed below | II | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | III8 | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | |
| Criminal Traffic Citations Summary needed below | II | Number of Posse Hours | |
| Civil Citations Issued | THL IIII THL THL | Number of 3511 Tows Conducted | III |
| FI Cards | | Triple I Holds | II |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

Brief Summary of Arrest/Incident: DR #, and any notable incidents below:

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

Melendres
MCSO 001832



# Maricopa County Sheriff's Office

Joseph M. Arpaio
**Sheriff**

Individual Stat Sheet

*Must be turned into Supervisor at the end of shift*

Date: _01/19/0__   Sworn/Posse#: _P/0459A_   Call Sign: _K 396_
_P/0918_

10-8 Time: _1530_   10-7 Time: _2140_

| Type of Stat | Total | Type of Stat | Total |
|---|---|---|---|
| Assist Other Agencies | | Recovered Stolen Property | |
| Contact | | Value of recovered stolen property | |
| Criminal Arrest Adults (In Custody) Summary needed below-Warrants Below | | Number of Deputies | |
| Warrant Arrests Summary needed below | | Number of compensated hours | |
| Criminal Citations Adult Only Summary needed below | | Number of Reserve Deputy Hours | |
| Criminal Arrest Juveniles Summary needed below | | Number of Posse Members | 2 |
| Criminal Traffic Citations Summary needed below | | Number of Posse Hours | 16 |
| Civil Citations Issued | | Number of 3511 Tows Conducted | 1 |
| FI Cards | | Triple I Holds | |
| Number of Weapons Recovered Guns, Knives, Batons, Etc. | | | |

**Brief Summary of Arrest/Incident: DR #, and any notable incidents below:**

_ASSISTED/ BACKUP ON 8 STOPS._

# EXHIBIT B TO:

Manuel de Jesus Ortega Melendres,

        Plaintiff,

vs.

Joseph M. Arpaio, et al.

        Defendant.

NO.:  CV-07-2513-PHX-GMS

**AFFIDAVIT OF JOSEPH SOUSA**

 

# Maricopa County Sheriff's Office
## Joseph M. Arpaio
## Sheriff

### Crime Suppression/Saturation Patrol
### Totals

| Type of stat | Total | Type of stat | Total |
|---|---|---|---|
| Criminal Arrest (Adult in custody) | | All Contacts | |
| Criminal Arrest (juvenile) | | Assist to other agencies | |
| Drug Arrest | | FI cards completed | |
| 287g arrest with No state charges (Processed through ICE only) | | Total DR's | |
| 287g arrest with state charges (Detainer) | | Total Posse hours | |
| Warrant arrest | | Total Reserve hours | |
| Number of warrants cleared | | Total Compensated sworn hours | |
| DUI arrests | | Transports by Jail Wagons | |
| Criminal Citations (Adult) | | 287g arrest who had a warrant | |
| Criminal Citations (Juvenile) | | Total Traffic Stops made | |
| Traffic Citations | | Misc: | |

Melendres
MCSO   058706

# Exhibit M

**Exhibit M**

# Maricopa County Sheriff's Office



Sheriff Joseph M. Arpaio, Sheriff

## Human Smuggling Unit
## Shift Summary



| | |
|---|---|
| Incident: | Saturation Patrol |
| DR: | N/A |
| Time/Date: | 05-06-2008 / 0600 to 1200 Hours |
| Location: | Town of Fountain Hills |
| Narrative: | |

On 05-06-2008 between the hours of 0600 & 1200 the Sheriff's Office Human Smuggling Unit (HSU) assisted by the Enforcement Support (ES) Unit conducted a saturation/crime suppression patrol of Fountain Hills. During this time frame HSU & ES Detectives conducted a total of seven (7) traffic stops for civil infractions. Eleven (11) total civil citations were written to drivers ranging from suspended vehicle registration & insurance violations to turning violations & improper window tinting. In total seven (7) individuals were arrested for 287G. Six (6) were processed administratively through ICE. One (1) was booked into the Fourth Avenue Jail for an outstanding felony warrant for drug possession & originally arising out of a Phoenix PD report. This individual was in the country illegally & therefore had an ICE detainer placed on him at the jail.

The following is a break down of the traffic stops that produced arrests:

➢ Traffic stop made by Detective Armendariz. PC was unlawful tint & a cracked windshield. Detective Armendariz could not see into the vehicle. Driver was arrested for 287G & processed administratively through ICE. Driver was cited for the civil infractions. Location of stop was Shea Blvd. & Fountain Hills Blvd.

➢ Traffic stop made by Detective Armendariz. PC was unlawful tint. Detective Armendariz could not see into the vehicle. The driver was cited for the civil infraction. The passenger was arrested for 287G. Location of stop was Shea Blvd. & Palisades Blvd.

➢ Traffic stop made by Detective Cosme. PC was an improper left turn. The driver was arrested for an outstanding felony warrant. The driver was also detained for 287G. The driver was booked into the Fourth Avenue Jail for the felony warrant & an ICE detainer was put in place. The location of the stop Saguaro Blvd. & Ledford Street.

➢ Traffic stop made by Detective Armendariz. PC was for improper tint. The driver & three (3) occupants were arrested for 287G. The driver was cited for the civil infraction.

Three traffic stops were conducted where no arrest or detainment was made, but the driver of each vehicle was cited for the civil infraction.

In addition to the traffic stops HSU & ES Detectives conducted a welfare check at an address in Fountain Hills. This was done in part because Detectives had been supplied with information from the District that this address may possibly be involved in Drop House activity & also in part because a juvenile reported to be living at the address had not been to school in the last ten (10) days. When Detectives conducted the welfare check they found the juvenile girl at the house & confirmed that she in fact had not been to school in the last two weeks. This juvenile female & her adult uncle (also in the house) were found to be in the country illegally & as such were processed administratively through ICE.

Reported By Sgt. Brett Palmer

DR Number N/A

# Maricopa County Sheriff's Office

Sheriff Joseph M. Arpaio, Sheriff

## Human Smuggling Unit
## Shift Summary




The following individuals were processed administratively through ICE:

- Fernando Diaz-Villalvazo _ DOB 04-04-1976
- Paola Alejandro Cassillas-Cruz _ DOB 04-02-1992
- Cruz Elena Ortega-Enriquez _ DOB 05-30-1968
- Ana Salvida _ DOB 12-09-1988
- Oscar Javier Medina-Rivas _ DOB 08-07-1983
- Julio Cesar Enciso _ DOB 05-22-1983
- Euserbio Izaguirre-Berrelleza _ DOB 07-09-1982
- Joel Rivas-Gonzalez _ DOB 08-03-1986

The following person was booked into jail for the felony warrant with an ICE detainer:

- Santiago Martinez-Gonzalez _ DOB 07-25-1979

The following person was arrested for a Techno-Cop Warrant (Felony Warrant x2 for dangerous drugs/narcotics):

- Nicole Chapman _ DOB 09-10-1975

Sgt. Brett Palmer
Human Smuggling Unit

Reported By Sgt. Brett Palmer                                    DR Number N/A

# Exhibit N

Exhibit N

Timothy J. Casey (#013492)
Drew Metcalf (#016993)
SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile:  (602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, JESSICA QUITUGUA RODRIQUEZ, DAVID RODRIQUEZ, VELIA MERAZ, MANUEL NIETO, JR. on behalf of themselves and all others similarly situation, and SOMOS AMERICA, | No. CV 07-02513-PHX-MHM |
| Plaintiffs, | |
| vs. | **DEFENDANTS' INITIAL RULE 26 (a)(1) DISCLOSURE STATEMENT** |
| JOSEPH M. ARPAIO, in his individual and official capacity as Sheriff of Maricopa County, Arizona; MARICOPA COUNTY, ARIZONA SHERIFF'S OFFICE, and MARICOPA COUNTY, ARIZONA | |
| Defendants. | |

Pursuant to Rule 26(a)(1), Federal Rules of Civil Procedure, Defendants Joseph M. Arpaio, Maricopa County and Maricopa County Sheriff's Office ("Defendants"), by and through undersigned counsel, provides their Initial Disclosures as follows:

I. **THE NAME AND, IF KNOWN, THE ADDRESS AND TELEPHONE NUMBER OF EACH INDIVIDUAL LIKELY TO HAVE DISCOVERABLE INFORMATION THAT THE DISCLOSING PARTY MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES, UNLESS SOLELY FOR IMPEACHMENT, IDENTIFYING THE SUBJECTS OF THE INFORMATION**

1. Manuel de Jesus Ortega Melendres, c/o Plaintiff counsel.

Mr. Melendres is expected to testify regarding the circumstances and events

Maricopa County 287(g) program, the MCSO's polices and practices and issues related to human smuggling and saturation patrols.

14.    Sgt. Manny Madrid, #1376, MCSO, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person is an officer in Enforcement Support and has knowledge and may be asked to testify regarding the incident involving plaintiff Mr. Ortega-Melendres and related issues.

15.    Sgt. Brett Palmer, MCSO, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person has knowledge and may be asked to testify regarding the ICE-Maricopa County 287(g) program, the MCSO's polices and practices and issues related to human smuggling and saturation patrols.

16.    Deputy Louis Depietro, #1432, MCSO Swat Division, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person is an officer in the SWAT Division and has knowledge and may be asked to testify regarding the traffic stop related to plaintiff Mr. Ortega Melendres, and 287(g) certified officer involvement following the stop.

17.    Deputy Terry Heimgartner, #1452, MCSO Swat Division, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person is an officer in the SWAT Division and has knowledge and may be asked to testify regarding the incident involving plaintiff Mr. Ortega-Melendres and related issues.

18.    Deputy Carlos Rangel, #1528, MCSO Enforcement Support, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person is an officer in Enforcement Support and has knowledge and may be asked to testify regarding the incident involving plaintiff Mr. Ortega-Melendres and related issues.

19.    Deputy Herbert Rowe, #1179, MCSO District IV, c/o Schmitt, Schneck, Smyth & Herrod P.C.

This person is an officer in District IV and has knowledge and may be asked to

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

**IV.  FOR INSPECTION AND COPYING AS UNDER RULE 34 ANY INSURANCE AGREEMENT UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY PART OR ALL OF A JUDGMENT WHICH MAY BE ENTERED IN THE ACTION OR TO INDEMNIFY OR REIMBURSE FOR PAYMENTS MADE TO SATISFY THE JUDGMENT**

The County Defendants understand that Plaintiffs are not seeking an award of compensatory damaged. Instead, they understand that Plaintiffs are simply seeking declaratory and injunctive relief. Accordingly, this are of disclosure does appear relevant or reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the foregoing objection, the County Defendants state that in this litigation they are self-insured pursuant to A.R.S. § 11-981. Various policies of insurance are also procured to cover portions of some of the exposures typically seen in litigation seeking compensatory damages or as authorized by statute.

DATED this 11th day of March, 2009.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.

Timothy J. Casey
Drew Metcalf
Schmitt, Schneck, Smyth & Herrod, P.C.
1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014
Telephone: (602) 277-7000
Facsimile:(602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants

**ORIGINAL** of this document e-mailed and regular mailed
this 11th day of March, 2009, to:

David J. Bodney, Esq.
Peter Kozinets, Esq.
Karen J. Hartman-Tellez
Isaac P. Hernandez
STEPTOE & JOHNSON LLP
Collier Center
201 East Washington St., Suite 1600
Phoenix, Arizona 85004-2382
Counsel for plaintiffs

SCHMITT SCHNECK SMYTH&
HERROD, P.C
Professional
Corporation

# Exhibit O

**Exhibit O**

Page 21

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

MANUEL de JESUS ORTEGA      )
MELENDRES, et al.,          )
                            )
                            )
            Plaintiffs,     )
                            )
                            )
                 vs.        ) No. CV 07-2513-PHX-GMS
                            )
                            )
JOSEPH M. ARPAIO, et al.,   )
                            )
                            )
            Defendants.     )
_____   )

VIDEOTAPED DEPOSITION OF LOUIS DIPIETRO
VOLUME II OF II

Phoenix, Arizona
October 21, 2009
1:12 p.m.

Prepared by:
MICHAELA H. DAVIS, RPR, CRR

Certified Reporter

Certificate #50574

(COPY)

1    A.    Yes.

2    Q.    And did you provide it to someone?

3    A.    I turned it in at the end of the shift.

4    Q.    To whom?

5    A.    To -- I'm not sure who it was.  Whoever was

6  collecting them.

7    Q.    Do you know who was collecting them?

8    A.    I don't know who it was.  It was a female.

9  Sergeant Madrid was sitting next to her.  It -- her last

10  name might be Porta(phonetic) or something.  I'm not sure.

11  Porta.

12    Q.    Do you know if --

13    A.    Or no, I'm sorry.  Perla.

14    Q.    Perla.  Do you know --

15    A.    I think it was Perla.

16    Q.    Perla?

17    A.    But I don't know who she is.

18    Q.    So she collected the stat sheets?

19          Correct?

20    A.    That's who I turned it in to.

21    Q.    Okay.  For the Chandler sweep that you were

22  involved in, did you prepare stat sheets as well?

23    A.    Yes.

24    Q.    And who did you turn those in to?

25    A.    I'm not sure who it was at the table there near

1     the command post.

2          Q.    How about during the Mesa operation last summer?

3     Did you prepare those stat sheets as well?

4          A.    I'm sure I did.

5          Q.    Do you remember who you turned them in to?

6          A.    No.

7          Q.    All right.  When you participated in the sweep in

8     Mesa, do you remember if there was anybody from the U.S.

9     Immigration and Customs Enforcement Agency who was there

10    at the sweep?

11         A.    Repeat the question.

12         Q.    Well, you're familiar with ICE.

13               Yes?

14         A.    Yes.

15         Q.    That's the Federal Immigration and Customs

16    Enforcement Agency, the successor to the INS --

17         A.    Uh-huh.  Correct.

18         Q.    -- correct?

19               Do you know whether there was anybody from ICE

20    who came to the sweep that you participated in in Mesa?

21         A.    No.

22         Q.    Do you know if ICE supervised the sweep in any

23    way?

24         A.    No.

25         Q.    Was anybody from ICE present at the sweep in