1   Timothy J. Casey (#013492)
    Drew Metcalf (#016993)
2   SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
    1221 East Osborn Road, Suite 105
3   Phoenix, AZ 85014-5540
    Telephone: (602) 277-7000
4   Facsimile:  (602) 277-8663
    timcasey@azbarristers.com
5   Counsel for Defendants Joseph M. Arpaio and
    the Maricopa County Sheriff's Office
6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                       **FOR THE DISTRICT OF ARIZONA**

10

11  Manuel de Jesus Ortega Melendres, et al.      No. CV 07-02513-PHX-GMS

12                           Plaintiffs,

    vs.
13                                                **DEFENDANTS' RESPONSE IN**
    Joseph M. Arpaio, et al.                      **OPPOSITION TO PLAINTIFFS'**
14                           Defendants.          **MOTION FOR SANCTIONS**

15
                                                  (Oral Argument Requested)
16

17

18          Defendants respectfully submit this Response in Opposition to Plaintiffs' Motion for

19  Sanctions.

20          This Response is supported by the following Memorandum of Points and Authorities,

21  the Court's entire file in this case, and any oral argument the Court may wish to hear.

22                   **MEMORANDUM OF POINTS AND AUTHORITIES**

23  **I.      INTRODUCTION AND SUMMARY.**

24          Plaintiffs seek a variety of sanctions against Defendants Joseph M. Arpaio and the

25  Maricopa County Sheriff's Office ("MCSO") because the MCSO: (a) failed to preserve

26  individual deputies' stat sheets generated during its saturation patrols; and (b) for purportedly

27  not having produced emails from Sgt. Manuel Madrid or others in the MCSO's Human

28  Smuggling Unit ("HSU").  Distilling the Motion to its essence, there are three fundamental

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1 questions raised by the Motion:

2       Question No. 1.       Why did the MCSO not preserve the stat sheets created at

3 saturation patrols, and what was its intent in discarding the sheets?

4       Question No. 2.       Has the MCSO lost or otherwise allowed discoverable electronic

5 data, such as emails, regarding its saturation patrols to be discarded without production to the

6 Plaintiffs; and

7       Question No. 3.       What is the appropriate sanction, if any, that is appropriate for

8 the MCSO not preserving the stat sheets?

9                       **Short Answer to Question No. 1.**

10      The MCSO made an honest and unintentional mistake in not properly handling the

11 Plaintiffs' July 21, 2008 document preservation letter and, therefore, continued to discard in

12 good-faith and without malice saturation patrol stat sheets pursuant to its standard practice.

13      Throughout the history of its special law enforcement operations, such as crime

14 saturation patrols, the MCSO has not kept individual deputies' notes that have been

15 incorporated into final reports.  This practice stems from both Arizona law and local law

16 enforcement practice.  The original complaint filed in December 2007 by the former counsel

17 for a single plaintiff did not place the MCSO on reasonable notice that its past and future

18 saturation patrols were at issue, or that its standard treatment of stat sheets should be altered.

19 On July 16, 2008, however, when new counsel lodged a proposed amended complaint adding

20 new party plaintiffs and new factual allegations, and on July 21, 2008 when Plaintiffs' new

21 counsel issued a broad document hold/preservation letter ("the Hold Letter") while

22 concurrently propounding on the MCSO an Arizona Public Records Request seeking the

23 same records as the Hold Letter, the MCSO was clearly placed on notice that all documents

24 regarding its saturation patrols were subject to preservation for this litigation.

25      Through an unintentional and inadvertent mistake, an MCSO chief did not forward

26 the Hold Letter to others within the MCSO that had the responsibility for implementing the

27 document hold.  As a consequence, after July 21, 2008, the HSU continued to treat saturation

28 patrol stat sheets in its historical manner.  In short, the HSU recorded and compiled the

quantitative data from the stat sheets onto the master data sheet for the particular saturation

1    patrol, kept the master data sheet, and discarded the stat sheets.

2          All MCSO personnel acted in good-faith at all times.  HSU command staff, which is

3    responsible for the planning, execution, and summarizing of the results of MCSO saturation

4    patrols, was never advised to keep stat sheets for purposes of this lawsuit.  No MCSO

5    employee ever intended to deprive the Plaintiffs of any saturation patrol-related documents.

6    Moreover, no MCSO employee ever intended to create an environment where discoverable

7    documents would not be preserved.

8                    **Short Answer to Question No. 2.**

9          No.  The HSU preserved its saturation patrol related emails and produced those to

10   Plaintiffs.  Plaintiffs have not been deprived of emails regarding the patrols and there is no

11   basis in fact for Plaintiffs to seek sanctions on any issue relating to such emails.

12                   **Short Answer to Question No. 3.**

13          The Court should not issue sanctions, and certainly not the type of sanctions

14   requested by the Plaintiffs.  Plaintiffs' desired sanctions are either disproportionate to the

15   nature and substance of the information contained on the discarded stat sheets, or unfair and

16   unwarranted under the circumstances.  MCSO stat sheets do not contain information that

17   would make it more probable that the MCSO racially profiled Latinos during saturation

18   patrol-related traffic stops.  Plaintiffs have not shown, and cannot show, the type of unfair

19   prejudice from the discarding of the stat sheets that would justify the type of sanctions they

20   seek.

## II.   THE LAW GOVERNING SANCTIONS.

21          Plaintiffs' Motion requests that the Court sanction the Defendants pursuant to Rule

22   37, F.R.C.P. (Motion at p. 1, ln. 2).  This request is inappropriate.  "A sanction under Rule

23   37(b) is only appropriate when a party fails to obey a Court order."  *Kinnally v. Rogers

24   Corp.*, 2008 U.S. Dist. LEXIS 963659 at *8 (D. Ariz. Nov. 7, 2008) *citing Unigard Sec. Ins.

25   Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).  "Rule 37(b)(2)'s

26   requirement that there be some form of court order that has been disobeyed has not been read

27   out of existence.  Rule 37(b)(2) has never been read to authorize sanctions for more general

28   discovery abuse."  *Unigard*, 982 F.2d at 368.  As a consequence, the Court must deny

Plaintiffs' request for sanctions pursuant to Rule 37.

Plaintiffs' Motion also requests sanctions pursuant to the Court's power under Rule 26, F.R.C.P. (Motion at p. 1, ln. 2). The Court unquestionably has the inherent discretionary power to issue sanctions and make evidentiary rulings in response to the destruction or failure to preserve relevant evidence. *Medical Laboratory Mgt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 824 (9th Cir. 2002). However, "[s]anctions under [the Court's] 'inherent powers must be exercised with restraint' and should be appropriate to the conduct that triggered the sanction." *Kinnally*, at 7-8 *quoting Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991).

The party seeking sanctions for spoliation of evidence has the burden of proving that the documents that were not preserved were relevant. *Hous. Rights Ctr. v. Sterling*, 2005 U.S. Dist. LEXIS 44769 at *24 (C.D. Ca. Mar. 2, 2005). A "party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*, 462 F.Supp.2d 1060, 1066-67 (N.D. Cal. 2006). **Courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim."** *Id*. at 1066 (emphasis added). As set forth by the District of Arizona:

> In order for the Court to impose sanctions, including spoliation, under its inherent authority, the three part test in *Napster* must be satisfied – that is, the alleging party must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a **culpable state of mind**; and (3) that **the destroyed evidence** was relevant to the party's claim or defense such that a reasonable trier of fact could find that it **would support that claim** or defense.

*Kinnally*, at * 13 (emphasis added), *quoting In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d at 1078. **"All elements of the *Napster* test presume that relevant evidence has indeed been destroyed."** *Kinnally* at * 13 (emphasis added).

Here, Plaintiffs' Motion fails to satisfy the first prong of the *Napster* test **only** as to the MCSO saturation patrol stat sheets generated between December 12, 2007 and July 16, 2008. Defendants agree and stipulate that Plaintiffs have satisfied the first prong of *Napster*

4

1    as to those stat sheets generated between July 16, 2008 and November 1, 2009.

2           As to the second prong of the *Napster* test, Plaintiffs' Motion fails.  The MCSO did

3    not intentionally, deliberately, or maliciously destroy stat sheets at any time.  Its failure to

4    preserve the stat sheets resulted from inadvertence, innocent oversight, or good-faith

5    ignorance of the need to preserve the same for purposes of this litigation.

6           As to the third prong of the *Napster* test, Plaintiffs' Motion fails because they are not

7    unfairly prejudiced by the loss of the stat sheets given the documents' limited content, the

8    existence of the master data sheets, and that a reasonable trier of fact could not find that the

9    stat sheets would support their claim that MCSO deputies racially profile Latinos during

10   saturation patrols.

11   **III.    THE ALLEGATIONS IN MR. MELENDRES' DECEMBER 12, 2007
            COMPLAINT DID NOT PLACE DEFENDANTS ON REASONABLE NOTICE
12          THAT ALL PAST AND FUTURE SATURATION PATROLS WERE AT
            ISSUE THEREBY CREATING AN OBLIGATION UNDER *NAPSTER* TO
13          PRESERVE STAT SHEETS.**

14          Plaintiffs contend that Plaintiff Manuel Melendres' original complaint filed by his

15   former counsel on December 12, 2007 (Dkt#1) "expressly put Defendants on notice that their

16   crime suppression sweeps were the subject of pending litigation."  (Motion at p. 3, lns. 20-

17   21).  That contention is mistaken.

18          First, Plaintiffs' contention unfairly relies on a 20/20 clarity that only hindsight gained

19   from two-years of litigation experience in this case can now arguably provide to client and

20   counsel.  Second, Plaintiffs' contention disregards their July 16, 2008 Motion to Amend

21   wherein their new -- and current -- counsel represented that the lodged amended complaint

22   actually "clarifies the allegations by more closely focusing on Defendants' alleged unlawful

23   conduct, and by illustrating that conduct with the experiences of four additional individual

24   representative plaintiffs and a membership organization." (Dkt#17 at p. 2, ln. 28 to p. 3, ln.

25   3).  They also disregard the fact that the lodged amended complaint, for the first time,

26   challenged the MCSO law enforcement activities *during saturation patrols*, and for the first

27   time, used the terms "sweeps" and "crime suppression sweeps." (*Id*. at lodged amended

28   complaint at ¶ 3).

Finally, Plaintiffs' contention does not consider the variety and confusing nature of Mr. Melendres' original allegations prepared by his previous counsel.  The original complaint sought "to remedy and stop illegal, discriminatory and unauthorized enforcement of federal immigration laws against Hispanic persons in Maricopa County, Arizona.  Plaintiff also seeks damages for his unlawful arrest and detention." (Dkt# 1 at ¶ 1).  Many of the factual allegations dealt solely with Mr. Melendres' incident.  (*Id*. at ¶¶ 8-43).  Other factual allegations centered on a generalized "limited ability" of the MCSO to perform federal immigration functions under a federal 287(g) program.  (*Id*. at ¶¶ 44-55).  In the context of, and following, factual allegations about Mr. Melendres and the Defendants' 287(g) authority, Mr. Melendres merely concluded by alleging that the MCSO had a policy of racially profiling Latinos "in Maricopa County." (*Id*. at ¶ 55).  The factual allegations did not reference or use terms such as "sweeps," "crime sweeps," "crime suppression operations," "saturation patrols," or the like.

Mr. Melendres' complaint continued by asserting factual allegations regarding seemingly disparate subjects: an MCSO telephone "hotline" for citizens to call about suspected illegal aliens; the MCSO's use of the hotline information for investigations; the lack of federal authority to allow the MCSO to investigate suspected illegal aliens; the MCSO detaining illegal aliens in Cave Creek on a specific date; questioning an unspecified Hispanic man walking on a sidewalk in Cave Creek on another date; and arresting Latino "protesters" outside of Pruitt's Home Furnishing store in east Phoenix. (*Id*. at ¶¶ 56-65).  The putative class also included every Latino in Maricopa County that had been stopped, detained, arrested and/or searched by Defendants.  (*Id*. at ¶¶ 66 and 68).  Similarly, Mr. Melendres' multiple legal causes of action shed no particular light other than his position that he was damaged by the MCSO and that others like him must also have been damaged.

Based on the foregoing, Defendants did not understand, appreciate, or know in good-faith, that Mr. Melendres' original complaint was intended to place in dispute all past and future MCSO saturation patrols.  The Defendants, therefore, could not have had a fair obligation to preserve stat sheets generated during the MCSO saturation patrols that occurred between December 12, 2007 and July 21, 2008.  Accordingly, Plaintiffs' Motion does not

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

satisfy the first prong of the *Napster* test as to the stat sheets discarded in that eight-month time period.

**IV. UNDER *NAPSTER*, THE MCSO HAD AN OBLIGATION FROM JULY 16, 2008 TO NOVEMBER 1, 2009 TO KEEP AND PRESERVE STAT SHEETS GENERATED DURING SATURATION PATROLS CONDUCTED IN THAT TIME PERIOD.**

As set forth above, Defendants agree and stipulate that Plaintiffs have satisfied the first prong of *Napster* as to those stat sheets generated by the MCSO between July 16, 2008 and November 1, 2009.

**V. PLAINTIFFS CANNOT SATISFY THE SECOND PRONG OF *NAPSTER* FOR THE STAT SHEETS DISCARDED BETWEEN JULY 16, 2008 TO NOVEMBER 1, 2009 BECAUSE MCSO PERSONNEL DID NOT ACT WITH THE REQUIRED CULPABLE STATE OF MIND.**

**A.     The Receipt of the Hold Letter.**

By July 16, 2008, Mr. Melendres had retained new counsel (the current set of attorneys for Plaintiffs), filed a Motion to Amend, and lodged a proposed amended complaint.  Less than a week later, July 21, 2008, defense counsel received the Hold Letter. (*See* Exhibit 1).  On the same date at 5:33 p.m., defense counsel provided the Hold Letter to his MCSO client contact for this litigation, Chief John MacIntyre.

The transmittal email's subject line stated the case name and, in capital letters, advised that the communication involved a document preservation request from Plaintiffs' counsel.  The transmittal email, with the attached Hold Letter, was also sent for information purposes to Ms. Jean Bowman, the County Claims Adjuster for this litigation and to Mr. Christopher Keller, Esq., Maricopa County Attorney's Office Civil Division Chief.  The transmittal email set the importance of the correspondence as "High."

Without waiving, or intending to waive, the attorney-client privilege, the transmittal email states in pertinent part the directive that Chief MacIntyre was to "make certain that the appropriate person at the MCSO knows to KEEP AND PRESERVE" the types or

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

categories of documents requested by Plaintiffs. (*See* Exhibit 2) (emphasis in original).[1]

The Hold Letter specifically demanded that the MCSO preserve all documents responsive to its categories of specific information desired, and "any allegations in the Complaint." (Exhibit 1). The Hold Letter's reference to "the Complaint" did **not** refer to Mr. Melendres' original lawsuit filed in December 2007, but instead referred to the "recently lodged Complaint." (*Id*.). The letter also sought the preservation of all "emails, memoranda and other communications pertaining to [the] planning, execution, and results for any of the listed crime saturation operations." (*Id.*) The letter, therefore, placed Defendants on notice that the MCSO was to keep and preserve all documents relating to MCSO saturation patrols, including what would eventually be learned were stat sheets.

## B. MCSO Chief McIntyre Inadvertently and Innocently Did Not Forward the Hold Letter to others in the MCSO and the Stat Sheets were Not Kept.

Chief MacIntyre received the Hold Letter. (MacIntyre Affidavit, Exhibit 3 at ¶ 4). He does not remember how he handled the receipt of the letter, but generally recalls subsequently speaking with defense counsel about the need to preserve MCSO saturation patrol-related documents. (*Id*. at ¶ 5). Chief MacIntyre's usual practice upon receipt of such a letter is to forward such requests for handling to the MCSO Legal Liaison Division, and the MCSO personnel that may have documents potentially responsive to the particular request. (*Id*. at ¶ 6). This, however, unfortunately did not occur.

> [I]t appears likely that I did not forward [the Hold Letter] to the MCSO Legal Liaison Division or other MCSO personnel pursuant to my standard practice. I am uncertain how this happened, but believe that I must have simply, albeit regrettably, forgot to forward [it] to others at the MCSO in the press of attending to other matters, including my other law enforcement duties and professional activities.

(*Id*. at ¶ 8).

[1] The attorney-client privilege ordinarily attaches to a confidential litigation hold communication from lawyer to client. *See In re eBay Seller Antitrust Litigation*, 2007 WL 2852364, at *2 (N.D.Cal. Oct. 2, 2007); *Gibson v. Ford Motor Co.*, 510 F.Supp.2d 1116, 1123 (N.D.Ga.2007); *Muro v. Target Corp.*, 250 F.R.D. 350, 360 (N.D.Ill.2007); *Turner v. Resort Condos. Int'l*, 2006 WL 1990379, at *7-8 (S.D.Ind. July 13, 2006). Without waiving the privilege, the transmittal email is provided to allow the Motion's resolution on the merits. A portion of the transmittal email is redacted because it contains legal advice provided by counsel to client and, therefore, subject to the attorney client privilege. Defendants will submit to the Court for an *in camera* review the entire un-redacted document should it desire to review the same.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional Corporation

Within the MCSO, it is the responsibility of the Legal Liaison Section Commander to search for, gather, preserve, and produce MCSO documents for litigation purposes. (Culhane Affidavit, Exhibit 4 at ¶ 4).  That commander also is responsible for implementing or effectuating within the MCSO any "litigation holds" received by the MCSO in litigation. (*Id.*).  However, Lt. Dot Culhane, the Legal Liaison Commander, did not receive the Hold Letter from Chief MacIntyre.  Lt. Culhane thus could not effectuate the Hold Letter.

The three commanding officers in the HSU that plan, execute, and summarize the results of MCSO saturation patrols,  Lt. Joe Sousa, Sgt. Manuel Madrid, and Sgt. Brett Palmer, also did not receive the Hold Letter.  They did not know that they should keep stat sheets for purposes of this litigation. (Sousa 11/09/09 Affidavit, Exhibit 5 at ¶ 10; Madrid Affidavit, Exhibit 6 at ¶ 6; Palmer Affidavit, Exhibit 7 at ¶¶ 9-10).  Except for a few stat sheets from a January 2008 saturation patrol that were mistakenly not discarded pursuant to standard practice, stat sheets from saturation patrols conducted between July 21, 2008 and November 1, 2009 were not maintained for this litigation.

At no time did Lt. Sousa, Sgt. Madrid or Sgt. Palmer at HSU discard stat sheets knowing or believing they needed to be preserved. (Sousa 12/09/09 Affidavit, Exhibit 9 at ¶¶ 9-10; Palmer Affidavit, Exhibit 7 at ¶¶ 10-11; Madrid Affidavit, Exhibit 6 at ¶¶ 6-7).  These HSU officers did **not** discard the sheets to harm the Plaintiffs. (*Id.*).  Their treatment of the stat sheets was done in good-faith and in compliance with the standard MCSO practice. (*Id.*).

Likewise, Chief MacIntyre did **not** intend to harm or prejudice Plaintiffs.  He did not intend to deprive them of discoverable information.  He just made a mistake in not forwarding the Hold Letter to others within the MCSO organizational structure.  Chief MacIntyre explains:

> I take very seriously, and act in good-faith in regards to, all requests for the production of MCSO documents in litigation and requests in litigation for the MCSO to preserve its documents.  My apparent mistake in not forwarding [the Hold Letter] to others within the MCSO was not deliberate, intentional, or in any way calculated to gain some strategic or tactical advantage at Plaintiffs' expense, or to prejudice the Plaintiffs.  **At no time did I ever contemplate or intend to** deprive Plaintiffs of any MCSO documents, or to **create an environment within the MCSO where potentially discoverable documents would not to be maintained for purposes of this litigation.**  Instead, my apparent mistake was inadvertent, accidental, and an

9

1   innocent oversight on my part.

2

3   (MacIntyre Affidavit, Exhibit 3 at ¶ 10) (emphasis added).

4           To further understand the MCSO's lack of culpable or malicious intent that is

5   required under *Napster* for the imposition of the type of sanctions requested by Plaintiffs, it

6   is helpful to learn about the MCSO's use of stat sheets, the contents of those sheets, and why

    the sheets are not kept as part of routine local law enforcement practice.

7           C.      **What Stat Sheets Are And Why The MCSO Does Not Keep Them.**

8           Saturation patrols are special operations intended to address concerns about criminal

9   activity or possible problems in the community.  (Siemens Affidavit, Exhibit 8 at ¶ 4).  They

10  are infrequent events, and do not occur on a daily or weekly basis.  (*Id*.)  Over the years,

11  these special operations have included crime suppression or saturation patrols, mall patrols,

12  warrant round-ups, under-age drinking details, and under-age tobacco details.  (*Id*.; *see also*

13  Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 5).

14          After its creation in early 2006, the HSU was responsible for the planning, execution,

15  and summarizing of the results of MCSO saturation patrols.  (Siemens Affidavit, Exhibit 8 at

16  ¶ 4).  Lt. Charles Siemens commanded the HSU from its opening until around September

17  2007. (*Id*. at ¶ 3).  Lt. Sousa joined the HSU in roughly September 2007, and took over the

    commanding duties for the division. (*Id*. at ¶ 3; *see also* Sousa 11/04/09 Affidavit, Exhibit 9

18  at ¶ 3).

19          Stat sheets are not prepared by MCSO deputies on regular or routine law enforcement

20  activities.  Stat sheets, instead, are prepared only by those deputies involved in special

21  operations, and the HSU is the division that conducts the special operations referred to as

22  saturation patrols.  Lt. Sousa explains the history of MCSO stat sheets:

23          "Stat sheets" have been used historically by individual MCSO Enforcement Support
24          deputies to collect generalized quantitative types of data regarding a special
            operation…. The stat sheets used during these special operations have varied in style
25          and substance over the years depending on the specific operation at issue and the
            specific MCSO sergeants commanding or involved in the operation.  Stat sheets have
26          taken many different forms, including pre-prepared forms, any available piece of
            scrap paper, post-it notes, index cards, or other pieces of paper where a deputy would
27          record his specific quantitative data during his/her shift at the operation.

28

(Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 5).

As mentioned above, MCSO stat sheets used during special operations contain only **quantitative types of data** recorded by each deputy.  This data reflects each deputy's **number** of criminal arrests, criminal citations issued, civil citations issued, and similar matters.  (*Id.* at ¶ 6; *see also* Siemens Affidavit, Exhibit 8 at ¶ 5; MacIntyre Affidavit, Exhibit 3 at ¶ 12).  When the individual deputy concludes his shift, that deputy reports his individual quantitative data orally or via the stat sheet to the command staff for the special operation.  (*Id.* at ¶ 7; *see also* Siemens Affidavit, Exhibit 8 at ¶ 7; MacIntyre Affidavit, Exhibit 3 at ¶ 13).  Not every deputy turns in a stat sheet.  (*Id.*).  The command staff then compiles the individual deputies' data into a master data sheet to record the <u>total</u> statistics for the special operation.

> This master data sheet would contain a compilation of the total statistics/data for the operation based on the information provided by the deputies.  For example, if three deputies reported, either orally or via stat sheets, to command staff during a special operation that they had 4, 7, and 5 contacts, respectively, and 1, 2, and 4 arrests, respectively, then the command staff's master data sheet for the operation would add those items and memorialize in a list format that there was a total of sixteen total contacts for the operation and a total of seven arrests for the operation.

*Id.* at ¶ 7; *see also* Siemens Affidavit, Exhibit 8 at ¶ 7; MacIntyre Affidavit, Exhibit 3 at ¶ 13).[2]

The resulting master data sheet can be titled a "Shift Summary," "Overall Operations Summary," a "Totals" document, or a "Stats Sheet for Saturation Patrol." (Palmer Affidavit, Exhibit 7 at ¶ 5).  The "master data sheets, regardless of what they were officially titled, were always kept."[3]  (Siemens Affidavit, Exhibit 8 at ¶ 8; Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 9).  After the data from the stat sheets were compiled into the master data sheet, it was the standard good-faith practice for HSU command staff to discard them.

Stat sheets are discarded at the MCSO as standard practice because they have no law

---

[2]  Information about the arrests made during a saturation patrol is memorialized on a separate list.  (Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 7).  These lists have been produced to Plaintiffs.  Information about each traffic stop made during a special operation is contained within the MCSO CAD traffic stop database.  (*Id.*).  This traffic stop data base for 2005 to 10/09 has been produced to Plaintiffs.

[3]  Master data lists for each saturation patrol have been produced to Plaintiffs.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

enforcement value and are considered duplicative of the master data sheets. (Siemens Affidavit, Exhibit 8 at ¶ 8; Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 9; MacIntyre Affidavit, Exhibit 3 at ¶ 14).  This practice is not unique to the MCSO.  It is "not a common practice for local law enforcement agencies in Arizona, including the MCSO, to keep individual law enforcement officers' notes that have been incorporated into a final report." (Siemens Affidavit, Exhibit 8 at ¶ 8; Palmer Affidavit, Exhibit 7 at ¶ 9; MacIntyre Affidavit, Exhibit 3 at ¶ 14).

This common practice among local law enforcement personnel is not surprising.  The stat sheets lack legal value in Arizona's criminal justice system.  Rule 15.4(a)(2), Arizona Rule of Criminal Procedure, governs "superseded notes."  **The rule provides that local law enforcement officers' handwritten notes incorporated into another document or report are not considered a statement and, therefore, are not discoverable in Arizona's criminal justice system.**  (MacIntyre Affidavit, Exhibit 3 at ¶ 14).

> The exception for superseded notes in Rule 15.4(a)(2) is added as a protection for the … law enforcement officer to alleviate the bookkeeping problem of retaining every scrap of notes taken in a case, and to prevent cross examination on "jottings" contained in a notebook.

Comment to Rule 15.4.  In addition, neither ICE nor the ICE-MCSO 287(g) Memorandum of Agreement (which allowed MCSO deputies who were 287(g) trained and certified to enforce federal immigration law in the field until October 15, 2009) required the MCSO to keep, or provide the federal government with, the stat sheets generated during the various MCSO saturation patrols.  (Palmer Affidavit, Exhibit 7 at ¶ 9).

Based on the foregoing, the MCSO did not act, or fail to act, with the required culpable state of mind.  The Defendants submit that Plaintiffs' Motion fails to satisfy the second prong of the *Napster* test.

**VI.  PLAINTIFFS CANNOT SATISFY THE THIRD PRONG OF *NAPSTER* BECAUSE THEY ARE NOT UNFAIRLY PREJUDICED BY THE DESTROYED STAT SHEETS AND A REASONABLE TRIER OF FACT WOULD NOT FIND THE SHEETS SUPPORTIVE OF THEIR CLAIM OF RACIAL PROFILING DURING SATURATION PATROL TRAFFIC STOPS.**

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

12

Plaintiffs argue that the discarded stat sheets "would help Plaintiffs establish that defendants used discretionary traffic stops to target Latinos."  (Motion at p. 12, lns. 20-21). In support of this argument, they offer further argument that in a saturation patrol involving zero tolerance:

> [s]tat sheet showing that an officer was on duty for an 8-hour shift but made only two traffic stops during that time, **would strongly suggest** that the officer did not stop everyone for whom he observed some type of traffic or vehicle violation, but rather exercised discretion and was more selective when deciding whom to stop.  Combining these sheets with records showing that the same officer's stops led to the arrests of predominately Latino suspect would provide further proof of Plaintiffs' claims.

(Motion at p. 13, lns. 5-11) (emphasis added).  These multiple layers of argument are unsound for several reasons.

First, while individual stat sheets would disclose individual deputies' names and per-officer data given a specified period of time, Plaintiffs do not explain beyond offering speculation as to how a low number of traffic stops by any particular deputy during a given period of time would "strongly suggest that the officer did not stop everyone" or was actually exercising discretion or selectivity.  The lack of explanation is understandable.  A low number of traffic stops by a deputy during a saturation patrol necessarily would be influenced or affected by such race-neutral factors as: (a) the precise nature of the deputy's duties/assignment during the patrol, such as whether he was on regular roving motor vehicle traffic patrol or on a smuggling vehicle interdiction assignment looking only for so-called smuggling "load" vehicles; (b)  the deputy's professional work ethic and habits; (c) the geographic area of the deputy's patrol and the volume of motor vehicle traffic in that area; (d) the time of day the deputies' patrol took place; (e) the deputy's level of law enforcement experience and training which would allow him to recognize and enforce violations of state law; and (f) whether he was a member of a two-person patrol car with the other occupant recording exclusive credit for the activity or event.

Second, even if the stat sheets existed and allowed the Plaintiffs to compare them with the deputy's arrests for the same saturation patrol, Plaintiffs do explain how such information would show a deputy's purported racial animus and a causal nexus to allegedly targeting

Latinos.  Plaintiffs' speculation to the contrary, the fact is that race is not a factor when a person is arrested by an MCSO deputy for DUI, driving on a suspended driver's license, for having an outstanding arrest warrant directed to the person, for violating Arizona law, or by violating federal law by being or remaining in the United States unlawfully.  An individual deputy cannot "make up" these facts to arrest a person merely because he/she is Latino.  The probable cause for an arrest either exists or it does not.

Third, the stat sheets do **not** contain information about the race or ethnicity of the driver, passengers, contacts, suspects, or any other person encountered by the deputy for any reason. (Sousa 11/04/09 Affidavit, Exhibit 9 at ¶¶ 6 and 11; Palmer Affidavit, Exhibit 7 at ¶ 5; Madrid Affidavit, Exhibit 6 at ¶ 4; Siemens Affidavit, Exhibit 8 at ¶ 7).

Fourth, the idea that the stat sheets could provide non-quantitative, narrative, or "smoking gun" types of incriminating information is wrong.  The form of stat sheet turned into the HSU **after April 2008** did not contain a space for a "brief summary of arrest/incident" or "any notable incidents. (Sousa 11/04/09 Affidavit, Exhibit 9 at ¶ 14).  The stat sheet form used for this time period did not contain any question intended to elicit from the deputy a description of the probable cause that led to the traffic stop, or the event, circumstances, and/or reasonable suspicion that led to a contact with a particular person.  (*Id.*)  The stat sheet for this time also does not contain any question intended to have the deputy document the race or ethnicity of a contact and/or suspect.  (*Id.*).  **Since April 2008, Lt. Sousa has not "received or reviewed a single stat sheet from any deputy for a crime suppression/saturation patrol that contained more information than the type sought in [the form].**" (*Id.*) (emphasis added).  Also, according to Sgt. Palmer:

> To the best of my memory, during my time at the HSU I have never received or reviewed a Stat Sheet from a deputy that contained any information on it other than merely the raw *number* of times a certain event occurred.  To the best of my memory, I also have never seen during my tenure a Stat Sheet that contains handwriting or a narrative description on the bottom of the page with additional information about the deputies' work, or additional comments at the "Misc." section.  Quite frankly, it is my experience that most deputies do not like using or filling out the Stat Sheet.

(Palmer Affidavit, Exhibit 7 at ¶ 7; *see also* Siemens Affidavit, Exhibit 8 at ¶ 6 ("[I]t was my experience that most deputies did not like completing the Stat Sheets in the first place….")).

The type of information actually recorded on the stat sheets is found on the sheets created during the saturation patrol on November 16-17, 2009. (Exhibit 10-11).

As for Plaintiffs' reliance on the form of stat sheet used by the HSU before April 2008, that reliance is misplaced. The form of stat sheet used before April 2008 seeks the same type of "numbers" data as listed above. (Siemens Affidavit, Exhibit 8 at ¶¶ 5-6).  While the pre-April 2008 form of stat sheet used by the HSU contained a section entitled *"Brief Summary of Arrest/Incident: DR #, and any notable incidents below",* that section was merely intended to allow the deputy to capture any "extraordinary information."  (*Id*. at ¶ 6). Lt. Siemens, however, testifies "it was **uncommon** and **rare** for a deputy to write information under this section.  [W]hen a deputy did write information in the section on the **unusual occasion**, it was generally **limited** to a description of the probable cause for the stop or an arrest." (*Id*.) (emphasis added).  There is no evidence that any of the discarded stat sheets might contain, let alone do contain, information that is adverse or incriminating to the MCSO, or that somehow coupled with other documents, would lead to incriminating conclusions.

Finally, "[a]n employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case."  *Marceau v. IBEW, Local 1269*, 2009 U.S. Dist. LEXIS 28703 at *115 (D. Ariz. Mar. 31, 2009), *quoting Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002).  The evidence, therefore, shows that Plaintiffs have suffered -- and can suffer -- no unfair prejudice from the MCSO's mistake in discarding the stat sheets.  The master data sheets containing the compilation of all the stat sheets for each saturation patrol exist, and have been produced.  *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553 (7th Cir. 2001) (retaining and producing final ranking sheet although defendant intentionally destroyed individual notes complied with particular federal law).

## VII.   THERE IS NO EVIDENCE OF MISSING SATURATION PATROL EMAILS AND THE EVIDENCE SHOWS THAT SUCH EMAILS HAVE BEEN PRESERVED AND PRODUCED.

Plaintiffs argue that the MCSO "**may** have permanently deleted relevant emails."

(Motion at p. 1, lns. 15-16) (emphasis added).  In support of this argument, Plaintiffs have turned the testimony of a single HSU command staff officer, Sgt. Madrid, about innocently freeing hard-drive space on his desktop computer in order to receive or send email into a speculative argument that there may have been a wholesale loss of HSU saturation patrol related emails.  They are mistaken.

### A.    The Testimony of HSU Command Officers.

There is no evidence that any HSU saturation patrol emails have been lost or destroyed and the evidence demonstrates that such emails have, in fact, been preserved and produced.  During Sgt. Madrid's deposition he was asked questions about maintaining his emails and deleting emails about saturation patrols from his computer system when it became full.  He was not, however, asked about either the volume of emails about saturation patrols, the reasons or context for his email deletions, or his previous searches for emails and documents and providing the same to others. (Madrid Affidavit, Exhibit 6 at ¶ 8).  Because saturation patrols are special operations and infrequent events, Sgt. Madrid conservatively estimates that "probably well less than 5% of all of my email traffic" relate to saturation patrols.  (*Id*. at ¶ 9).  Most of the items that Sgt. Madrid deleted were "unrelated to the law enforcement activities of the HSU." (*Id*. at ¶ 10).

Arguably more important, at various times in 2008 and 2009, at either the request of Sgt. Madrid's commanding officer, the MCSO Legal Liaison Office, lawyers representing the MCSO in a United States Department of Justice investigation, or defense counsel in this litigation, Sgt. Madrid has personally searched his paper and electronic files for any documents and emails (regardless of date, author, or recipient) relating to MCSO saturation patrols or the activities of the HSU.  (*Id*. at ¶ 11).  This includes but is not limited to how saturation patrols were planned, scheduled, briefed, executed, and summarized.  (*Id*.).  Each time Sgt. Madrid conducted a search he printed out saturation patrol documents and turned them over to the person requesting them.  (*Id*.).  According to Sgt. Madrid "every paper or electronic document, including emails, that I have about MCSO saturation patrols from the date I joined the HSU to the present have been turned over" and produced to Plaintiffs.  (*Id*. at ¶ 12).  The extent of the preservation and disclosure of Sgt. Madrid's emails is further

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

reflected by the fact that even his emails from the fall of 2007 have been produced in this litigation. (*See e.g.*, Exhibit 12).

The testimony of the remaining HSU command staff is in accord.  Lt. Siemens explains that in August 2008, at the request of defense counsel and the MCSO Legal Liaison, he began a search for documents, hard copy and emails, relating to all saturation patrols that had been conducted from 2007 to that date.  (Siemens Affidavit, Exhibit 8 at ¶ 10).  Either he, or members of his staff, turned over the documents to Legal Liaison and in turn, those documents were produced to Plaintiffs.  (*Id.*).  Lt. Sousa conducted multiple document searches over the past two years and "every paper or electronic document, including emails, that [he] or the HSU have about MCSO saturation patrols from the date I joined the HSU in April 2008 to the present have been turned over…" (Sousa 12/09/09 Affidavit, Exhibit 5 at ¶¶ 5-6).  Sgt. Palmer has done the same type of search and all saturation patrol related documents, including emails, have been preserved and produced.  (Palmer Affidavit, Exhibit 7 at ¶¶ 12-14).

Plaintiffs, therefore, have not been deprived of emails regarding the MCSO saturation patrols.  There is no basis in fact for Plaintiffs to seek sanctions on any issues relating to MCSO saturation patrol emails.

### B.    MCSO Document Search and Preservation Efforts.

The MCSO search for, and preservation of, all saturation patrol-related documents, including emails, is the result of a deliberate, comprehensive, and continuous effort**.** Although Chief MacIntyre mistakenly did not forward the Hold Letter to others within the MCSO, the MCSO received from Plaintiffs on July 21, 2009 an Arizona Public Records Request or Public Information Request ("PIR").  (Culhane Affidavit, Exhibit 4 at ¶¶ 5-6; MacIntyre Affidavit, Exhibit 3 at ¶ 9).  The PIR sought the production of "all [MCSO] records" relating to certain specifically identified MCSO saturation patrols and essentially mirrored the Hold Letter.  (*Id.*; *see also* MacIntyre Affidavit, Exhibit 3 at ¶ 9(b)).  It also sought the <u>future</u> production of "all [MCSO] records" relating to "any subsequent 'crime suppression operation.'"  (Culhane Affidavit, Exhibit 4 at ¶ 7).  **The PIR was considered and treated by Legal Liaison as a "litigation hold" request.**  (Culhane Affidavit, Exhibit 4

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

eXP

at ¶ 7).[4]

Based on the PIR, Legal Liaison staff worked to search for, preserve, and produce to Plaintiffs the MCSO saturation patrol-related documents, whether electronic or hard copy, including emails, responsive to the PIR.  (Culhane Affidavit, Exhibit 4 at ¶ 6).  **"These document searches were continuous over an eight month time period, seemed always on-going, and were complete, thorough, and exhaustive in nature**."  (*Id*. at ¶¶ 9-11).

The MCSO, therefore, has acted responsibly in fulfilling its discovery obligations in this case.  Despite the accidental failure to communicate the Hold Letter to HSU and the unique nature of deputy stat sheets, the MCSO has produced a tremendous amount of responsive documents to Plaintiffs.  Accordingly, they have not been deprived of emails regarding the MCSO saturation patrols.

Finally, and perhaps in an over-abundance of caution, the MCSO recently secured six (6) gigabytes (the equivalent of 400,000 document pages) of deleted and un-deleted emails from the entire HSU *regardless* of content or subject matter.  Defense counsel will review the same to determine if there are any other HSU saturation patrol related emails that somehow were not previously produced by the MCSO, and if so, produce them.  **If** there are new emails produced which are objectively material to the issues in this case, Defendants will agree to re-tender for deposition the pertinent MCSO witnesses to testify about their emails, and pay the costs for the additional deposition.

## VIII.  <u>CONCLUSION.</u>

Based on the foregoing, the Defendants respectfully request that the Court deny Plaintiffs' Motion.

DATED this 11th of December, 2009.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.

*s/Timothy J. Casey*

---

[4]   Because stat sheets are exclusive to special operations, and such operations are infrequent events in the activities of the MCSO, MCSO Legal Liaison Commander Lt. Culhane was not knowledgeable about, or familiar with, saturation patrol stat sheets and therefore do not know what they are or what they comprise. (Culhane Affidavit, Exhibit 4 at ¶ 8). In implementing its own litigation hold, MCSO Legal Liaison's "instruction to MCSO units, including the HSU, to keep and preserve documents relating to future saturation patrols would have been a general instruction and would not have specifically referred to, or mentioned, "stat sheets." (*Id.*)

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

| | |
|---|---|
| 1 | Timothy J. Casey |
| | Drew Metcalf |
| 2 | Schmitt, Schneck, Smyth & Herrod, P.C. |
| | 1221 E. Osborn Rd., Suite 105 |
| 3 | Phoenix, Arizona 85014 |
| | Telephone: (602) 277-7000 |
| 4 | Facsimile:(602) 277-8663 |
| | timcasey@azbarristers.com |
| 5 | Counsel for Defendants Joseph M. Arpaio and the |
| | Maricopa County Sheriff's Office |

6

7   **ORIGINAL** of this document electronically
filed with the Clerk's Office using the
CM/ECF System this 11th day of December, 2009.

8

9   **COPY** of this document electronically and regular mailed
this 11th day of December, 2009, to the following:

10   The Honorable G. Murray Snow
United States District Court

11   401 West Washington Street,
Phoenix, Arizona 85003-2158

12

13   **COPY** of this document electronically and regular mailed
11th day December, 2009, to the following counsel:

14   David J. Bodney, Esq.
Peter Kozinets, Esq.

15   STEPTOE & JOHNSON LLP
Collier Center

16   201 East Washington St., Suite 1600
Phoenix, Arizona 85004-2382

17   Counsel for Plaintiffs

18   Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA

19   P.O. Box 17148
Phoenix, Arizona 85011-0148

20

21   Cecillia Wang, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

22   39 Drumm Street
San Francisco, California 94111

23

24   Gladys Limon, Esq.
Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE

25   AND EDUCATION FUND
634 S. Spring Street, 11th Floor

26   Los Angeles, California 90014

27   *s/Eileen Henry*
Eileen Henry, Paralegal

28   SCHMITT, SCHNECK, SMYTH & HERROD, P.C