```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3

 4    Manuel de Jesus Ortega          )
      Melendres, et al.,              )
 5                                    )
                    Plaintiffs,       )
 6                                    )   CV 07-2513-PHX-GMS
                    vs.               )   Phoenix, Arizona
 7                                    )
      Joseph M. Arpaio, et al.,       )
 8                                    )   February 4, 2010
                    Defendants.       )   11:06 a.m.
 9    _____ )

10

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE G. MURRAY SNOW
                         (Motion Hearing)
12    Appearances:

13    For the Plaintiffs:        David J. Bodney, Esq.
                                 Peter S. Kozinets, Esq.
14                               Aaron J. Lockwood, Esq.
                                 STEPTOE & JOHNSON, L.L.P.
15                               Collier Center
                                 201 E. Washington Street
16                               Suite 1600
                                 Phoenix, Arizona  85004-2382
17                               (602) 257-5200

18    For the Defendants:        Timothy J. Casey, Esq.
                                 SCHMITT, SCHNECK, SMYTH
19                               & HERROD, P.C.
                                 1221 E. Osborn Road
20                               Suite 105
                                 Phoenix, Arizona  85014-5540
21                               (602) 277-7000

22    Court Reporter:            Gary Moll
                                 401 W. Washington Street, SPC #38
23                               Phoenix, Arizona  85003
                                 (602) 322-7263

24
      Proceedings taken by stenographic court reporter
25    Transcript prepared by computer-aided transcription
```

1                    P R O C E E D I N G S

2

3          THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

4    on for motion hearing.

5          Counsel, please announce your appearance.                11:06:27

6          MR. KOZINETS:  Peter Kozinets from Steptoe & Johnson,

7    counsel for the plaintiffs.  With me, Your Honor, is David

8    Bodney from Steptoe & Johnson, Dan Pochoda from the ACLU, Anne

9    Lai from the ACLU, and Aaron Lockwood from Steptoe.

10          THE COURT:  Thank you.                                   11:06:43

11          MR. CASEY:  And, Your Honor, Tim Casey representing

12    defendants Joseph M. Arpaio and the MCSO, Maricopa County

13    Sheriff's Office.

14          THE COURT:  All right.

15          As I indicated in -- in the notice of oral argument, I   11:06:56

16    have some questions for both parties.  Before I start, though,

17    I'm going to give you sort of how I view this thing, and I hope

18    it will be helpful to you.

19          I'm going to give you 20 minutes each, and that

20    includes the time to answer my questions, and you can have     11:07:11

21    whatever other time you want to present whatever you want.  But

22    I would suggest that you focus more on my questions.

23          I have read pretty carefully the exhibits that have

24    been submitted by both sides, with the exception of I have not

25    yet taken a look at anything that was filed yesterday.         11:07:26

1          It does seem to me, though, that there is no dispute

2    that the individual stat sheets were destroyed, and the

3    question then, of course, is -- which received most of the

4    briefing related to the statutes, and that is whether or not

5    the legal standards required to impose sanctions have been met,          11:07:47

6    and I'm going to have some questions about assuming that they

7    have been met, what the nature of -- how particular I can get

8    on the inferences that I allow.  I will probably have some

9    questions for both parties on that.

10          The e-mails, it seems to me, it is very clear that          11:08:06

11   some e-mails were deleted after the time that the letter was --

12   the litigation hold was sent in July.  It is less clear to me

13   that those e-mails have been recovered.  I realize that efforts

14   have been made, I read all the deposition testimony, but I'm

15   going to have, Mr. Casey, some questions for you about that.          11:08:29

16          It is also less clear to me -- I've read Lieutenant

17   Culhane's affidavit.  I've read Deputy Chief MacIntyre's

18   affidavit.  I've also read the deposition excerpts of

19   Lieutenant Sousa and the affidavits of Lieutenant Sousa,

20   Sergeant Palmer, and Sergeant Madrid.          11:08:50

21          It seems clear to me that, at the very best, if any

22   instructions pertaining to retaining e-mails or stat sheets

23   were communicated -- and that appears to be doubtful to me --

24   but it appears at the very best that even if they were

25   communicated, they weren't understood, and I would be          11:09:08

```
1    interested in any evidence that you might have, Mr. Casey, to

2    the contrary to that.

3         That leaves me, as I look at it, considering -- it is

4    clear that stat sheets have been destroyed.  It is clear that

5    e-mails have been deleted.  It is clear to me also, and I don't     11:09:25

6    think it's contested, that the stat sheets are not recoverable.

7    I'm not yet sure whether the e-mails are recoverable.  It might

8    depend on whether or not they can be found or all of that is on

9    some backup file.  I'll have some questions about that.

10        Assuming that -- then I have some questions about          11:09:44

11   appropriate inferences if e-mails can't be destroyed, but I

12   also have some questions about some of the more general things

13   that were only hinted at -- well, I shouldn't say "hinted at,"

14   put were not raised with a whole lot of specificity in the

15   motion about what we do about other materials that may or may     11:10:02

16   not be responsive to -- that may or may not be responsive to

17   the original litigation hold, the original public information

18   request, and whether or not they were subsequently asked for in

19   any kind of discovery.  That is sort of my basic -- those are

20   my basic concerns as I'm going to try to respond to the motion.   11:10:26

21        I also do not want this -- I mean, I want to give you

22   a pretty definitive answer, but I'm going to need some more

23   information than you provided to give you a definitive answer.

24   And it seems to me that you've not asked that I -- the

25   plaintiffs have not asked that I make any determination about      11:10:43
```

```
 1   an inference at this point if I determine that sanctions -- or

 2   a particular inference at this point if I determine that

 3   sanctions are appropriate in light of some of the destruction

 4   of documents, and that makes it difficult to give you a very

 5   definitive ruling, too.                                          11:10:58

 6          All right.  You've got my stream of consciousness

 7   thoughts.  I'm going to have particular questions, I'm going to

 8   give you both 20 minutes, and I'll probably ask you my

 9   questions right off the bat both -- in both instances.

10          Mr. Kozinets.                                             11:11:12

11          Let me tell you, Mr. Kozinets, before you start, that

12   I'm interested in the arguments that you make about an

13   obligation to preserve documents prior to your transmission of

14   the July 21st letters.

15          I've read the Zubulake cases pretty carefully.           11:11:34

16          Do you have anything other than by Judge Scheindlin

17   that suggests such a detailed obligation to -- to preserve

18   documents as soon as a complaint is filed?

19          MR. KOZINETS:  Yes, Your Honor.

20          THE COURT:  What are those cases?                        11:11:56

21          MR. KOZINETS:  Those cases would be the Napster case,

22   which was decided in -- within --

23          THE COURT:  I read Napster.

24          MR. KOZINETS:  -- federal court in California, Your

25   Honor.  It cites to Zubalake with approval.                     11:12:09
```

```
 1              THE COURT:  Okay.

 2              MR. KOZINETS:  And the Zubalake cases have been widely

 3    cited, cited throughout the country, as essentially setting the

 4    standard regarding the duties of counsel and parties to comply

 5    with document preservation obligations.                          11:12:26

 6              THE COURT:  Okay, let me weave something for you with

 7    that.

 8              MR. KOZINETS:  Sure.

 9              THE COURT:  Assuming that I accept Zubalake, or

10    however you correctly pronounce it --                            11:12:36

11              MR. KOZINETS:  Zubalake.

12              THE COURT:  Okay.  Assuming that I accept that, does

13    it impose a different obligation in terms of preserving and

14    retaining documents than it might pose, for example -- than the

15    question poses of whether -- whether I can impose a sanction     11:12:54

16    for that failure?

17              In other words, the sanction requirements require not

18    only that they have destroyed documents they had an obligation

19    to preserve, but that I find fault in connection with that

20    failure.                                                         11:13:08

21              So, for example, in this case would that apply

22    differently where we have destroyed individual stat sheets and

23    deleted e-mails?  Is there a greater obligation, or is it less

24    likely that destruction of the individual stat sheets is

25    negligent than destruction of the e-mails, in light of the      11:13:33
```

```
 1   complaint?

 2         Do you understand my question?

 3         MR. KOZINETS:  I think so, Your Honor.

 4         You're asking in light of the original complaint that

 5   was filed in December?                                    11:13:40

 6         THE COURT:  Yes, um-hum.

 7         MR. KOZINETS:  I do, Your Honor.  I don't think

 8   there -- there is any distinction at all, and I think that

 9   sanctions ought to be imposed for both failings dating back

10   from December of 2007 --                                  11:13:51

11         THE COURT:  And what I'm really asking about now is

12   the negligence prong in terms of sanctions.  I'm not asking

13   about -- I'm assuming that Zubalake applies, and now I'm

14   saying:  Is there a different factual pattern which would

15   suggest that it might not have been negligent to destroy the   11:14:05

16   stat sheets, whereas it would be negligent to destroy the

17   e-mails?

18         MR. KOZINETS:  Your Honor, I think in -- in this case

19   the fact pattern that we have here clearly shows that it wasn't

20   just negligent, but it was either willful or grossly negligent   11:14:21

21   to allow the stat sheets to be destroyed and to allow the

22   e-mails to be purged.

23         And there are several reasons for this.  First has to

24   do with the scope of the original complaint itself.  Well, the

25   defendants have --                                        11:14:38
```

1          THE COURT:  I've read the original complaint.

2          MR. KOZINETS:  Okay.  And as the complaint shows,

3     the Human Smuggling Unit, which was then called the Triple I

4     Unit, but which the testimony shows is one and the same with

5     the Human Smuggling Unit, was directly at the center of that          11:14:53

6     first complaint.

7          The complaint sought, on behalf of the plaintiff in a

8     proposed class, to enjoin the functions of that entire unit,

9     which was involved, even at that time, in sweeps in Cave Creek,

10    Queen Creek, and East Phoenix that came to be known as the          11:15:11

11    crime suppression operations at issue.

12          And the contemporaneous media coverage at the time,

13    which we've attached to our reply brief, which includes

14    statements by the sheriff and his PIO, makes clear that they --

15    they understood that the original complaint really was directed          11:15:26

16    to the activities of that unit.

17          Now, that unit's activities, because they were at

18    issue, and because potential racial profiling relating to its

19    activities were at issue beginning in December of 2007,

20    defendants and their counsel had an obligation to at that time,          11:15:45

21    as soon as they got that federal court complaint in December of

22    2007, to take the steps outlined in Zubalake to issue a

23    litigation hold, to talk to all of the key players and

24    communicate to them directly the obligation to preserve

25    relevant evidence, and to suspend any routine destruction          11:16:05

```
 1    practices regarding e-mail, stat sheets, or other relevant
 2    documents.
 3              THE COURT:  Let me ask you about something that I
 4    think was raised obliquely by the defendant.
 5              Is it your position that you have formally asked for      11:16:24
 6    in discovery all of the information that you requested a
 7    litigation hold on in the July 21st letter?
 8              Do you understand that question?
 9              MR. KOZINETS:  I do, Your Honor, and our Rule 34
10    document requests are very broad, and they certainly encompass    11:16:41
11    everything that was mentioned in the litigation hold letter.
12              THE COURT:  Did you ever receive a response to your
13    public information requests that was separate from responses to
14    discovery in this lawsuit?
15              MR. KOZINETS:  We did receive some documents in         11:16:59
16    response to the public records request.
17              THE COURT:  All right.  When was the last time you
18    received any documents in response to the public information
19    request?
20              MR. KOZINETS:  Your Honor, once formal discovery began  11:17:12
21    in this case, the defendants really, instead of responding to
22    the public records aspect of the request, just produced
23    everything in the context of discovery --
24              THE COURT:  So when was that, approximately?
25              MR. KOZINETS:  When was the last time we received --    11:17:31
```

1    well, Tuesday, Your Honor, Tuesday of this week.

2             THE COURT:  Let me ask another question.

3             You talk about the private e-mail accounts, or

4    personal -- maybe not private, personal e-mail accounts of

5    Chief Hendershott.  Did you ever have -- and I haven't          11:17:49

6    reviewed -- and I don't know that I have copies of all your

7    discovery requests, but did you ever subpoena or otherwise

8    request from Chief Hendershott information contained on his --

9    on his personal accounts that may be related to immigration

10   suppression operations?                                          11:18:09

11            MR. KOZINETS:  We've not sent a separate subpoena to

12   Mr. Hendershott.  However, our Rule 34 document requests call

13   upon the defendants to produce all documents relating to the

14   crime suppression operations at issue --

15            THE COURT:  I understand that.  Chief Hendershott,      11:18:24

16   though, isn't a defendant, is he?  Or is he personally named?

17            MR. KOZINETS:  He's not personally named, but he is

18   the chief deputy for the named defendant Maricopa County

19   Sheriff's Office.  He essentially has day-to-day administrative

20   and management responsibility for the entire agency.  So he     11:18:39

21   certainly would be a key player in the Zubalake sense.  He was

22   disclosed as a witness in the plaintiffs' disclosure statements

23   as somebody who may have knowledge about the activities at

24   issue.  And so we sought all e-mail from all pertinent

25   witnesses regarding these operations in the enforcement of --    11:19:04

```
 1            THE COURT:  All right.

 2            MR. KOZINETS:  -- immigration law.

 3            THE COURT:  I've got it.  Set this aside for a second.

 4   I'm going to ask you another question.

 5            I understand that you're asking for sanctions with      11:19:13

 6   respect to the destruction of stat sheets.

 7            MR. KOZINETS:  Correct.

 8            THE COURT:  They're lost, they're irretrievably lost,

 9   and apparently the MCSO does not contest that.

10            The MCSO, though, does say that the e-mails are not      11:19:26

11   necessarily irretrievably lost, depending upon whether or not

12   they may exist on the master server.

13            What do you want with respect to the retrieval of

14   those e-mails, or do you just want a sanction?

15            I could not understand from your motion whether you      11:19:42

16   were asking for a sanction for the deletion of the e-mails or

17   whether you were asking for some sort of a motion to compel a

18   review by the MCSO of its computer backup files or its -- I

19   mean, you've made a rather broad discovery request to reopen

20   discovery.  Whatever I'm going to grant in that respect, if I    11:20:05

21   grant anything, will be tailored to what I do on this motion,

22   so I want to know what you're asking in that respect.

23            Do you understand my question?

24            MR. KOZINETS:  I do understand, Your Honor, and the

25   reason why the request may not have been entirely clear is        11:20:20
```

1   because we still did not know from the defendants exactly what

2   the state of their e-mails were.  And what has occurred over

3   time is that -- well, let me take one step back.

4          Before we raised these issues with the Court at the

5   discovery teleconference that led to the filing of this motion,   11:20:41

6   I had a meet and confer conversation with opposing counsel

7   during which I learned that there had been no search for any

8   responsive relevant e-mail that had taken place within the six

9   months prior to November 2009.  And it was only upon my

10  inquiring into these issues, because of the spoliation   11:21:01

11  testimony that we had received, that we had essentially backed

12  into in deposition, that we were able to prompt the defendants

13  to conduct another search.  At that time, it wasn't clear

14  whether they even had the ability to recover any of the

15  so-called purged e-mail.   11:21:20

16         We have since received representation that a new

17  search has been conducted that covers both deleted and

18  undeleted e-mail.  But we haven't seen anything under oath or

19  by way of testimony showing that the agency has the ability to

20  go back and recover all of the deleted e-mails and showing the   11:21:41

21  steps they took to do so, or showing what searches they

22  undertook thereafter.

23         And this goes back to the Hendershott point that you

24  made earlier, Your Honor, which is that once we learned that

25  Mr. Hendershott had been using a personal e-mail account to   11:21:59

```
 1    conduct public business, we wrote to the other side and we

 2    said:  Your e-mail searches need to encompass all of those

 3    personal accounts as well, because they may involve evidence

 4    relating to this case.

 5              THE COURT:  All right.  I understand all that.              11:22:18

 6              What do you want?

 7              MR. KOZINETS:  Here's what we would like, Your Honor.

 8    We would like the defendants to -- to be ordered to conduct a

 9    forensic analysis of their computer systems, their servers and

10    hard drives, in order to determine whether all of the purged    11:22:41

11    e-mails have been restored.  We would then want them to search

12    the restored e-mail --

13              And, Your Honor, I will tell you that they have

14    undertaken some form of a new search, but we don't know for

15    certain whether that encompasses all of these previously         11:23:03

16    deleted e-mails.

17              So we would want them to search whatever is recovered,

18    and we would want the opportunity, Your Honor, to reopen

19    depositions of witnesses for whom -- to whom these e-mails

20    relate, for the limited purpose of asking them about those       11:23:23

21    e-mails.

22              And in that process, we would ask that the Court order

23    the defendants to pay for the reporters' -- the court

24    reporters' costs for those depositions, and to pay a reasonable

25    hourly attorneys' fees rate for one plaintiffs' attorney to      11:23:41
```

1    prepare for and take those depositions.

2         I'll tell you, Your Honor, that with respect to this

3    e-mail process, we have started to receive new batches of

4    e-mail that are resulting from some form of the new search, but

5    we're only getting the --                                11:24:00

6         THE COURT:  From Mr. Casey?

7         MR. KOZINETS:  What's that?

8         THE COURT:  Mr. Casey's sending you --

9         MR. KOZINETS:  Yes, so --

10        THE COURT:  -- new documents --                     11:24:06

11        MR. KOZINETS:  -- so starting the week, frankly, on I

12   think it was Monday, we got about three or four hundred pages

13   of e-mails from the Human Smuggling Unit.  We were told that

14   there were hundreds, if not thousands, more that may or may not

15   be discoverable and that we were invited to review.  We got    11:24:21

16   another hundred pages of e-mails on I believe Tuesday this

17   week, and we've been told that there's possibly much more that

18   will be forthcoming.

19        Now, keep in mind, Your Honor, that these all relate

20   to the documents that we've been asking for since we filed     11:24:37

21   our --

22        THE COURT:  I've got it.  I'm --

23        MR. KOZINETS:  Okay.

24        THE COURT:  -- going to ask you another question.

25        Let's talk for a second now about the stat sheets.   11:24:47

```
 1   Assuming that I find a sanction is appropriate, and that that
 2   sanction is an adverse inference, isn't it appropriate to limit
 3   the adverse inference to information that might reasonably be
 4   obtained from the statutes?
 5          In other words, it's not fair to -- to order an            11:25:05
 6   inference on an inference, is it?
 7          MR. KOZINETS:  Well, we --
 8          THE COURT:  Let me give you an example of what I'm
 9   talking about.
10          It might be an appropriate inference to say something     11:25:20
11   like:  You can infer that the destroyed stat -- to the finder
12   of fact, whoever that turns out being -- you can infer that the
13   destroyed stat sheets would reflect a low number of contacts
14   and a high relation between the contacts and immigration
15   arrests, for whatever inference you might want the finder of     11:25:39
16   fact to draw from that.  But it is not appropriate, is it, to
17   instruct the finder of fact that they should re -- that they
18   should arrive at the ultimate inference?
19          Do you understand what my question is now better?
20          MR. KOZINETS:  I think so, Your Honor.                    11:25:56
21          The stat sheets are documents that --
22          THE COURT:  Okay.
23          MR. KOZINETS:  -- if we had them, we would use them
24   to --
25          THE COURT:  I know what the stat sheets are.              11:26:10
```

```
 1              MR. KOZINETS:  Okay.

 2              THE COURT:  I've looked at them all pretty carefully,

 3    and I realize that there are categories of information on each.

 4              But shouldn't the inferences be limited to what you

 5    might have been able to glean by comparing and contrasting          11:26:20

 6    those categories of information?

 7              MR. KOZINETS:  I think so, Your Honor, and I think

 8    what we would have been able to glean is that there were high

 9    levels of disparity between --

10              THE COURT:  Perhaps so, but -- but that is an argument    11:26:35

11    you're making off an inference, isn't it?

12              In other words, you could say:  Look, there's very

13    few -- this is in a team that made very few contacts.  But of

14    the contacts they made, there was a huge number of comparative

15    immigration arrests.  How could they be operating on a             11:26:52

16    zero-tolerance policy if they made three contacts and had three

17    immigration arrests in the course of 12 hours on a patrol?

18              You can make that argument, but that's the inference

19    that you're drawing from the -- from the facts, and it's only

20    the facts that I can in -- that I can instruct the inference       11:27:12

21    on.

22              Do you understand now my question?

23              MR. KOZINETS:  I think so, Your Honor.  I think the

24    difficulty, of course, is that we don't know what --

25              THE COURT:  Yeah, and that's precisely why I can't        11:27:22
```

1    really determine at this point what an appropriate inference

2    might be based on those stat sheets, because I don't know what

3    may prove to be relevant from those stat sheets after all

4    discovery is in.

5           MR. KOZINETS:  What we did supply with our reply brief    11:27:35

6    were excerpts from Lieutenant Sousa's deposition where I walked

7    through with him some of the stat sheets that showed wide

8    disparities.

9           THE COURT:  Yeah, well, it seems to me, too, that that

10   was related to a separate point, which is that the master stat    11:27:50

11   sheets, or the shift summaries, may not accurately reflect an

12   accurate compilation from all of the individual stat sheets.

13   That may be the basis for another inference, but it's something

14   that I don't know yet and we haven't heard from Mr. Casey on,

15   either.                                                            11:28:08

16          MR. KOZINETS:  Another purpose of that exchange,

17   though, was to demonstrate how, by reviewing the stat sheets, a

18   third party could observe wide disparities among different

19   officers during the same shifts --

20          THE COURT:  Yes.                                           11:28:24

21          MR. KOZINETS:  -- in terms of the number of law

22   enforcement contacts and stops and arrests that they made, so

23   that you could have one officer who made 24 stops in 10 hours

24   and one that made two.

25          THE COURT:  But shouldn't Mr. Casey then be allowed to    11:28:36

```
1    to argue, as it seems to me Lieutenant Sousa did in that
2    deposition, that there are just different ways in which
3    different officers operate.  Their different skills, they
4    observe things differently, whatever.  He can make that
5    argument can't he, in response?                              11:28:54
6          I mean, why in the world, even if I'm going to give an
7    adverse inference, should I preclude Mr. Casey from making
8    opposite arguments that are also inferable from whatever
9    information I might say could be inferred from the stat sheets?
10         MR. KOZINETS:  Well, I think that once the adverse      11:29:05
11   inference is there, of course, the other side can make whatever
12   arguments they're going to make about the inference.
13         THE COURT:  I am -- you have now answered my
14   questions.  Thank you.  But you only have very few minutes to
15   summarize whatever you want, and so I'm going to let you do    11:29:19
16   that.
17         MR. KOZINETS:  Thank you very much, Your Honor.
18         I think that the key point here is that severe
19   sanctions are warranted, because this case represents an
20   egregious series of violations of basic discovery duties.     11:29:32
21         Those violations began at the beginning of this case
22   when there was no litigation hold, written hold issued, no
23   attempt to communicate with the key players about preservation,
24   and no suspension of routine destruction of documents.
25         The case that we brought to the Court's attention       11:29:48
```

1  yesterday, Your Honor, is Judge Scheindlin's most recent

2  decision following up on the Zubalake cases, and in that case

3  she recognizes that it's -- it's gross negligence per se to

4  fail to comply with any one of those standards.

5          The standard in the Ninth Circuit, Your Honor, is even    11:30:04

6  more stringent with respect to fault, more stringent --

7          THE COURT:  You are talking Napster now?

8          MR. KOZINETS:  No, I'm -- not specifically.  I'm

9  referring more to the -- the Unigard case --

10         THE COURT:  Unigard.    11:30:19

11         MR. KOZINETS:  -- footnote 2; the Glover versus BIC

12  case, and the Leon case.  Those three Ninth Circuit Court of

13  Appeals decisions all recognize that you don't need bad faith.

14         THE COURT:  You need negligence.

15         MR. KOZINETS:  What's that?    11:30:34

16         THE COURT:  You need negligence.

17         MR. KOZINETS:  You need negligence.

18         But moreover, Your Honor, you can find willfulness so

19  long as the destroying party had knowledge that the documents

20  may have some potential relevance to the litigation but    11:30:44

21  destroyed them anyhow.

22         THE COURT:  I might find willfulness, but is

23  willfulness even necessary here, because the documents pretty

24  clearly have relevance, don't they?

25         MR. KOZINETS:  They do.  They do, Your Honor.    11:30:57

1           So the other part of the story here is that all of

2    this has been coming to light after we took 17 depositions and

3    spent an enormous amount of time and money on the litigation.

4           And one thing we found out is that the named

5    defendant, Sheriff Arpaio himself, was never asked to preserve          11:31:19

6    or produce his own files relating to these issues, so that more

7    than two years after the case was filed, no one had had a

8    discussion with the sheriff asking for these basic files.

9           So as a result, we took his deposition in December

10   last year.  Within the last week or so, on January 21st, we            11:31:40

11   finally got the sheriff's immigration file: 820 pages of press

12   releases that he apparently edited; of correspondence; of other

13   documents relating to all of these issues.  We also got 200

14   pages or more of Internal Affairs investigations into claims of

15   racial profiling.  These were documents that we asked for in          11:32:04

16   July of 2008 and again in February of 2009 in our Rule 34

17   requests.

18          We've also been getting more than a hundred pages of

19   documents relating to --

20          THE COURT:  You need to wrap it up.                             11:32:21

21          MR. KOZINETS:  -- relating to the planning and

22   execution of these sweeps, which were topics we inquired about

23   in the depositions.

24          So for more than two years to have gone by and for us

25   to be getting this now is simply intolerable, Your Honor, and         11:32:34

```
1    we submit that this case is appropriate for sanctions.

2            THE COURT:  Thank you.

3            Mr. Casey, I'm going to start off with questions for

4    you, if you don't mind.

5            MR. CASEY:  Yes.                                      11:33:00

6            THE COURT:  I did read, and I can't remember who it

7    was at this point, some deposition testimony describing a

8    zero-tolerance policy as it related to the saturation patrols,

9    or crime suppression sweeps, or whatever you want to call them.

10   I'm going to call them special operations from here on out.    11:33:15

11           Is a zero-tolerance policy in effect during those

12   patrols?

13           MR. CASEY:  We have two different versions of whether

14   or not it is.

15           THE COURT:  Have your witnesses indicated that they    11:33:26

16   received instruction pertaining to a zero-tolerance policy?

17           MR. CASEY:  Yes, they do have on some, but my -- and

18   I'm going off of my memory, Your Honor.  On some of the larger

19   saturation patrols there is a zero tolerance, as it's been

20   testified to, where they make no exception.  If they see in    11:33:43

21   fact a violation of civil traffic law, they -- or a mechanical

22   problem or a moving violation, they will pull them over.

23           THE COURT:  Doesn't that make the information that

24   might be contained on those stat sheets relevant?

25           MR. CASEY:  It does.  It is relevant.  I don't dispute  11:33:59
```

```
1    that.
2              THE COURT:  Okay.  And, again, I realize that we're
3    talking about things that may be sensitive to you, sensitive to
4    your communications with your clients --
5              MR. CASEY:  Yes, Your Honor.                              11:34:08
6              THE COURT:  -- I appreciate your forthrightness, but
7    doesn't that mean that if I find that there's negligence, that
8    a sanction -- that the legal requirement for sanctions has been
9    met?
10             MR. CASEY:  Yes.                                          11:34:19
11             THE COURT:  Okay.  Thank you.
12             MR. CASEY:  Yes.
13             THE COURT:  Let me move on.
14             And I want to be careful here, because I realize that
15   this is -- may be attorney-client information.  I don't want      11:34:30
16   you to give me any attorney-client information.  But I read
17   pretty carefully the affidavits of Lieutenant Culhane and Chief
18   MacIntyre, and I did not see any -- either of them describe any
19   steps they took prior to July 21st, 2008, to make sure that
20   documents pertaining to the sheriff's immigration enforcement    11:34:51
21   operations were maintained or preserved, not destroyed.
22             Have you submitted anything to me, either your own
23   personal avowals or by way of affidavit or deposition
24   testimony, that suggests that any steps were taken to preserve
25   documents after the original complaint was filed in December of  11:35:11
```

1  2007?

2          MR. CASEY:  We filed nothing, Your Honor, but I can

3  represent and avow to you, without waiving any attorney-client

4  privilege, that after the complaint was filed, and once -- at

5  that time how cases were assigned to outside counsel, which are      11:35:28

6  decisions that were made by other people in Maricopa County,

7  once I got that matter, I will tell you that without waiving

8  the attorney-client privilege, I did work with my client

9  contact at that time, which was Chief John MacIntyre.  Clearly,

10  the complaint indicated to me, upon a cursory review and even a      11:35:43

11  detailed review, that we're dealing with a man named Melendres,

12  and the request was to capture all documents, anything related

13  to those.

14          And also, because there's sort of what I think of as a

15  smorgasbord of activity -- in hindsight, it's very clear what      11:35:57

16  it relates to; at the time, I don't think it was that clear --

17  but also a request to make sure you search for all documents

18  related to these incidents that are identified in that

19  complaint.

20          Those items were searched for and, quite frankly,      11:36:12

21  became part and parcel over the production that was made

22  pursuant to the public records request that was submitted back

23  in July of 2008.

24          And let me just also throw in here that I think -- I

25  need to put this in right perspective.  We're dealing with,      11:36:28

```
1   yes, a universe of documents called stat sheets.  We're also

2   dealing with some e-mails.  The fact of the matter is is

3   Maricopa County -- and you've seen it in the affidavits --

4   regardless of the mistakes that the sheriff's office made on

5   those two items, stat sheets and the e-mails, has produced        11:36:45

6   70,000 documents, over that, and it's continuing to go.  Yes,

7   there are issues of timing.

8           And if I just may finish on this on the e-mail issue,

9   they continually reviewed e-mails, and, yes, there was purging

10  of e-mails, but when you look at the testimony, when those        11:37:05

11  things were deleted, the testimony was, as I recall, chitchat

12  e-mails from a deputy to a sergeant or a lieutenant about

13  staffing issues.  Those were the things that were described,

14  for example, by Lieutenant Sousa in his deposition as being

15  deleted.  All key, what they considered key, things about the     11:37:22

16  planning, preparation and execution in the post-briefings, have

17  been produced, according to the affidavits they provided.

18          THE COURT:  To the best of their estimation, right?

19          MR. CASEY:  To the -- yes, absolutely.

20          THE COURT:  And my point is this:  Why should            11:37:36

21  plaintiffs take a post hoc belief from Lieutenant Sousa from

22  Sergeant Madrid -- and, again, I don't question your good faith

23  in attempting to produce the documents once you became aware of

24  the need to produce them, but wouldn't it be the tendency of

25  anybody after the fact to say, Well, they got anything -- they    11:37:57
```

1    got everything, anyway.  Why should plaintiffs take that

2    assurance?

3              MR. CASEY:  They shouldn't, and that's why they filed

4    the motion.  If I was in their position I would do the same

5    thing.  But --                                           11:38:11

6              THE COURT:  And so let me ask you a --

7              MR. CASEY:  Sure.

8              THE COURT:  -- follow-up question.

9         You heard me ask plaintiffs what they want.

10             MR. CASEY:  Yes.                                11:38:17

11             THE COURT:  They want a description of the forensic

12   steps that the sheriff's department has taken under oath --

13             MR. CASEY:  Yeah.

14             THE COURT:  -- to determine that those e-mails, those

15   purged e-mails have been recovered, were capable of being     11:38:24

16   recovered, and have been provided.

17             MR. CASEY:  Yes, I'm prepared to address that, and

18   also, we can provide whatever needs to be under oath, but let

19   me share with you and put on the record the following.

20        When these things matters -- when these matters            11:38:38

21   surfaced last fall, the individual who attended most of the

22   depositions, if not all, with me was Chief Brian Sands of the

23   Enforcement Support Division.  Chief Sands is overall

24   responsible for that.  We discussed -- again, without waiving

25   any privilege -- what needed to be recovered.                  11:38:58

1          On November 19th, 2009, I was provided a disk of six

2     gigabytes of material.  I understand that to be roughly 400,000

3     pages.  Let me represent to you what I have been told that that

4     disk contains.

5          THE COURT:  Okay.  Hold it a second.  I'm going to                11:39:14

6     catch up with you to make sure I don't lose anything --

7          MR. CASEY:  Yes, sir.

8          (Pause in proceedings.)

9          THE COURT:  All right.  Go ahead.

10          MR. CASEY:  Every e-mail, and any e-mail that contains          11:39:30

11     an attachment for any HSU -- Human Smuggling Unit -- employee

12     in an employee's Outlook box, in their sent file, in their in

13     box, in their deleted trash bin files, for only the 28 days --

14     that period is between basically October 31st, 2009, to

15     November 19th, 2009 -- have been saved.  Anything that was          11:39:57

16     deleted by the HSU before October 31st, 2009, is unrecoverable.

17     It is gone.  So when we talk about saving deleted files, I am

18     now advised that it is only for that 28 days before November

19     19th, 2009.

20          Now, any e-mails in the six gigabytes, any e-mails            11:40:22

21     with attachments that may have been saved, Your Honor, by an

22     HSU employee and placed in an Outlook folder, would have been

23     saved regardless of year, author or recipient.  I don't know if

24     the Court has Outlook, but you can drag in incoming mail and

25     put it in a folder and it won't be deleted, pursuant to what I      11:40:45

```
 1    understand is the county, or at least the sheriff's office's

 2    28-day natural purging of deleted e-mails from the empty file.

 3            Let me share with you what we did is we waited until

 4    we got on, January 7th of this year from Mr. Kozinets, a letter

 5    from him, because we said:  Look, we have these issues.  You

 6    don't trust us.  You tell me, Mr. Kozinets, what are the key

 7    words that you want us to search these six gigabytes for?

 8            He provided that to us on January 7th, we hired an

 9    outside contractor that's involved in forensic discovery

10    issues, and let me tell you what we have so far.

11            Through the key word search -- well, first of all,

12    bear with me, Your Honor, the six point gigabytes [sic] was --

13    when they looked at it, the third-party forensic examiner, when

14    they expanded them with attachments it came out to over 12

15    gigabytes.

16            We then took, through the third -- using the third

17    party, Mr. Kozinets' key words --

18            THE COURT:  You know what?  I have an idea we're going

19    to have to get to this in a --

20            MR. CASEY:  Yeah.

21            THE COURT:  -- more detailed discussion --

22            MR. CASEY:  Sure.

23            THE COURT:  -- that's probably under oath.

24            Can you --

25            MR. CASEY:  Yeah.
```

11:41:04

11:41:27

11:41:49

11:41:55

11:41:58

1          THE COURT:  -- just sort of net it out?

2          MR. CASEY:  Yeah, let me net it out.

3          The bottom line is, Your Honor, 3,851 pages of e-mails

4    from 2007 cover everything.  I've reviewed those and determined

5    456 were clearly discoverable.  Some are duplicative of what's          11:42:12

6    already been produced.  A lot are already duplications.  Some

7    are new.  That's based on my observation.

8          I am now currently reviewing 2008 documents.  Those

9    are almost 9800, and I don't know how many are going to end up

10   being produced.  So that is where we stand on the e-mails.          11:42:33

11         I will also tell you that the sheriff's office

12   recognizes that they have a problem in this case because of the

13   apparent lack of searching on a methodical detailed method --

14   methodology for identifying e-mails and preserving them.

15         We do have, as you saw in Culhane's affidavit, in see          11:42:52

16   man's affidavit, and in HSU personnel -- Sousa, Madrid and

17   Palmer -- that at various times, not only at my request when I

18   bypassed the chain of command --

19         THE COURT:  Yes.  Yes.  I've got all that.

20         MR. CASEY:  Okay.          11:43:06

21         THE COURT:  Let me -- let me --

22         MR. CASEY:  Please.

23         THE COURT:  -- go back to a --

24         MR. CASE:  Yes.

25         THE COURT:  -- a deeper concern, which really goes to          11:43:09

```
 1    the -- really goes to the Culhane affidavit.

 2              MR. CASEY:  Yes.

 3              THE COURT:  Deputy Chief MacIntyre, I think, didn't

 4    try and make any excuses.  He just said:  I should have done

 5    it, and I did not do it.                                        11:43:21

 6              MR. CASEY:  Yes.

 7              THE COURT:  And I'm not trying to suggest that

 8    Lieutenant Culhane made any excuses, but what she said in her

 9    affidavit was, it seemed to me, speculation.  She said:  I

10    believe that we would have followed standard policy in treating  11:43:34

11    requests for future documents as a litigation hold.  She never

12    states, as I read it, that she can actually say that happened.

13              MR. CASEY:  Yeah.  And, Your Honor, that's probably my

14    mistake in not getting an additional document, because Dot

15    Culhane, Lieutenant Culhane, transferred out of the MCSO legal   11:43:50

16    liaison office, which is the task force --

17              THE COURT:  Yeah.

18              MR. CASEY:  -- you know, you understand that.  She

19    transferred out in March and someone else took over for her.

20              THE COURT:  Okay.  But even assuming that I don't have  11:44:00

21    anything that says that they communicated it, what we do have

22    is apparently what you don't contest.  We have Sheriff Arpaio

23    in his deposition saying he never remembers receiving any

24    instruction to preserve documents.

25              MR. CASEY:  Yes.  Yes.                                 11:44:16
```

```
 1            THE COURT:  We have Lieutenant Sousa saying he never

 2    received any instruction to preserve anything.  And we've got

 3    Sergeant Madrid saying the same thing.

 4            MR. CASEY:  Yes.

 5            THE COURT:  Doesn't that suggest rather strongly that      11:44:24

 6    nobody communicated to anybody that they were supposed to save

 7    anything?

 8            MR. CASEY:  Certainly as to -- certainly as to

 9    e-mails.  I have to break it down that way.  Certainly as to

10    e-mails.                                                           11:44:37

11            THE COURT:  All right.  And that's fair.  But let's

12    talk about e-mails now for a second.

13            MR. CASEY:  Yes.

14            THE COURT:  And I appreciate all the efforts that

15    you're -- that you're going through to recover what you can,       11:44:44

16    but it doesn't sound to me -- and I don't -- you know, I

17    don't -- I don't pretend that I have any information technology

18    expertise, but it doesn't sound to me like, based on what you

19    said, you can provide any assurance that all the e-mails have

20    in fact been preserved prior to October 31st, 2009.  You're       11:45:02

21    doing your very best to recover everything that is on the

22    system, but you've indicated that you can't provide any

23    guarantee that that will happen.

24            MR. CASEY:  Yes, and without waiving any privilege, we

25    cannot, on behalf of my client, we cannot guarantee that          11:45:16
```

1    everything has been saved.

2          THE COURT:  Okay.  And so wouldn't e-mails relating to

3    the immigration suppression operation, saturation patrols,

4    whatever you want to call them, wouldn't they be relevant?

5          MR. CASEY:  Absolutely, yes.                              11:45:32

6          THE COURT:  Okay.  And you've acknowledged, then, that

7    if I find negligence, that a sanction's appropriate on stat

8    sheets.  Is a sanction appropriate on the e-mails as well?

9          MR. CASEY:  Your Honor, under Unigard, Leon, and the

10   Glover decision, you don't have to get to willfulness.          11:45:55

11          I believe, quite frankly, what we do have here is an

12   incident of a very large organization that's involved in a lot

13   of litigation, for whatever reason, missing issues on an e-mail

14   and then the stat sheets.

15          I think there's another issue, Judge, that's important  11:46:11

16   about the stat sheets.

17          THE COURT:  Well, and I want to hear you, but --

18          MR. CASEY:  Yes, sir.

19          THE COURT:  -- I want to -- I want to bifurcate

20   things.                                                         11:46:20

21          MR. CASEY:  Yes.

22          THE COURT:  It seems to me that much of your argument

23   pertaining to the stat sheets pertains not so much to whether

24   or not the legal requirements for sanction have been met, but

25   that pertain to tailoring what that sanction might be in way of 11:46:32

```
 1    an adverse inference.

 2              MR. CASEY:  I think that's right, Your Honor.

 3              THE COURT:  Okay.  I want to hear your argument as it

 4    pertains to e-mails.  With stat sheets, we at least have

 5    defined categories of information, and I could limit any                11:46:46

 6    adverse inference to:  All right, I'm going to allow an adverse

 7    in -- any adverse inference that can be drawn that can be based

 8    on the content of what would be in these stat sheets.  But as

 9    it pertains to e-mails, what limiting factors are there?

10              MR. CASEY:  Your Honor, I think the deposition              11:47:05

11    testimony that we have so far that I think, with all due

12    respect, has been there are e-mails that look like they're

13    gone.

14              The fact of the matter is is they're routine chitchat,

15    and --                                                                   11:47:21

16              THE COURT:  Well, again --

17              MR. CASEY:  Yeah, I -- and I understand that, but all

18    I have to go off of, and all the plaintiffs can go off of, and

19    frankly, the Court, for determining an inference, is what the

20    testimony is.                                                           11:47:31

21              The issue is, for example, the planning of all these

22    things produced, all the reports from it produced, the arrests

23    produced, everything produced, except, for example, Joe going

24    to Sam saying, Hey, are you -- what time are you showing up

25    there?                                                                  11:47:45
```

```
 1            THE COURT:  And so your basic argument, I don't mean
 2   to --
 3            MR. CASEY:  Yes, Your Honor.
 4            THE COURT:  -- restate it, is:  We're going to have to
 5   wait and see what you can recover to determine what the likely      11:47:52
 6   lacuna is?
 7            MR. CASEY:  I think so.  But I will tell -- I promise
 8   you that no matter what we do and what my client does, they --
 9   the plaintiffs will criticize it, and sometimes it's deserved,
10   but no matter what it is, it will be criticized as inadequate,      11:48:04
11   because ultimately what they want this Court to do is they want
12   an adverse jury instruction that says:  If it's not here, guess
13   what it would have shown?  Racial animus; racial bias;
14   intentional biasing of Latinos.
15            THE COURT:  Well, it seems to me that --                   11:48:22
16            MR. CASEY:  That's really what they want.
17            THE COURT:  Well, and I understand that that is not --
18   would not be an unreasonable position that I -- for me to
19   expect plaintiffs to take.
20            But it also seems to me that I can't -- I cannot gauge     11:48:32
21   what an appropriate adverse inference would be for the lost
22   e-mails until I can see what you can produce.
23            MR. CASEY:  Well, here's also the other thing, Judge.
24   The reason it's so difficult is we've got a reality that's not
25   here, but the other thing is is other than the testimony that      11:48:49
```

1   it's chitchat, okay, they don't have to buy it and the Court

2   doesn't have to believe it, but how does the Court, how do we

3   solve this problem, if that's what we're interested in doing --

4           THE COURT:  I don't know, but that's certainly where

5   we may end up.                                                  11:49:03

6           MR. CASEY:  Well, I think we have -- I think we --

7   quite frankly, I think it is a problem that has to be addressed

8   by the MCSO so it's not repeated, and then as a -- as a legal

9   matter in this case, I don't know, no matter what you order,

10  how there can be an inference on an instruction when the only   11:49:15

11  evidence we have is, even though it's subjective in an

12  adversarial process by my people is that it's chitchat, when

13  everything else about -- on the substance of the saturation

14  patrols has been -- has been provided.

15          For example, when you mentioned earlier to              11:49:33

16  Mr. Kozinets about the, you know, the inference, for example,

17  on the stat sheets, limited it to the information that they

18  arguably could have gleaned, well, we have some idea because of

19  the nature of the -- of those boxes, we don't even have these

20  e-mails to be able to see:  Are they chitchat or are they       11:49:51

21  substantive?

22          THE COURT:  That's the problem.

23          MR. CASEY:  So I guess what I'm saying to you is that,

24  yes, we need to wait, but I'm not sure, even at the end of the

25  day, that we're going to have a better answer.                  11:50:02

1          THE COURT:  Well, that may be true, but we're going to

2   have to await that when it comes.

3          MR. CASEY:  Yes.

4          THE COURT:  Let me ask you this:  What about

5   plaintiffs' position regarding who needs to pay for -- well,          11:50:11

6   let's take it one point at a time.

7          Is there any -- do you have any argument that once

8   these materials are provided, plaintiffs shouldn't be allowed

9   the right to redepose witnesses that these -- either authored

10  these e-mails or that they were sent to?                             11:50:30

11         MR. CASEY:  Your Honor, I think it is the fair

12  position, and I've consulted with my client -- again, without

13  waiving the privilege -- it is appropriate for them if they so

14  choose, if they act in good faith about meaningful discovery on

15  new documents produced, to have them, if they want to talk to       11:50:44

16  Joe Sousa about a new e-mail that is new, absolutely, I think

17  it is appropriate for them to do that, and that the dep -- but

18  the deposition be limited to that only.

19         I do not agree, I do not agree -- and I think it would

20  probably be appropriate for the court reporting fee to be paid      11:51:02

21  by the defense.  But it is not appropriate, I respectfully

22  submit, for us to fund their litigation efforts.

23         THE COURT:  But in this case, why?  What would be your

24  argument?

25         MR. CASEY:  Well, the argument, Judge, is typically          11:51:14

1  going back that it's an adversarial process, and although this

2  is a sanction, paying -- allowing for a reopening of fact

3  discovery, tendering these witnesses again on these documents,

4  and paying for a court reporter's fee is one thing.  But

5  funding, funding their litigation efforts is contrary, as I                11:51:33

6  understand it, I believe it to be contrary to our system.

7         And personally I am concerned that we have legions of

8  lawyers on the team over here that we are going to have

9  something that is already going to be price prohibitive, and

10  already the county is in financial difficulty.  It's not              11:51:48

11  appropriate.

12         THE COURT:  I understand your argument, and I may give

13  you another chance --

14         MR. CASEY:  Yes, sir.

15         THE COURT:  -- to brief it.                                       11:51:55

16         Let me ask you something else:  How long is it going

17  to take you to go through the process of recovering what you

18  now have?

19         MR. CASEY:  I have sitting in my office right now two

20  more Bankers Boxes of 2008 documents.  I have to review those.        11:52:09

21  My hope is to get them Bates labeled on Monday morning, and

22  then hand-delivered, as soon as they're Bates labeled and

23  copied, to Mr. Bodney and Mr. Kozinets.

24         I am then going to put in -- I have a request in to

25  XACT, which is the organization that's a third party, to do          11:52:29

1    2009.  And then I will go back and see if there's anything

2    earlier than 2007, 2006 documents.

3              I'm looking at two weeks, Your Honor.  I have two

4    other lawyers with me working on this and a paralegal, but my

5    eyes have to look at those documents before they go out.          11:52:48

6              So I'm looking at two weeks, certainly until Monday,

7    to get the -- to get 2008 out, and I think fairly 2009, but I'm

8    looking at two -- two, three weeks for the whole thing.

9              THE COURT:  And at this point you don't have any

10   estimate of how many new documents may be turned over to the      11:53:12

11   plaintiffs?

12             MR. CASEY:  I could just tell you, based on my

13   familiarity with this case after being on it for two years,

14   that it is my view that there are new documents.  The

15   plaintiffs will be correct in saying there are new documents.     11:53:25

16             It is also my view that the vast majority are

17   discoverable but have nothing to do with anything in this case,

18   and that many of them have been produced earlier in this

19   litigation, which, Your Honor, does tell me that the MCSO,

20   despite not having, apparently, the good enough program on        11:53:42

21   searching for e-mails, did find them, including -- they make it

22   sound like we produced two -- two e-mails from 2007 regarding

23   Manuel Madrid, but there are many things that have been

24   produced, and some of them are duplicative in this new set.

25             I requested this, by the way, with my client to make    11:54:01

1  sure that we try to avoid any issue of this e-mail, and

2  obviously the ability to recapture deleted documents from years

3  past is not possible.

4       THE COURT:  All right.

5       I'll give you two minutes to summarize anything else,      11:54:30

6  if you have anything else you want to say.

7       MR. CASEY:  Yes.  Your Honor, it isn't -- you

8  obviously have read the materials.  The important thing to

9  remember is that whether sanctions are appropriate because of

10 negligence, oversight, or gross negligence -- because          11:54:43

11 willfulness is not an issue in here -- my clients all acted in

12 good faith.

13      The final point I need to point out on the stat

14 sheets, so you know, is there is a miscommunication, a

15 misunderstanding, because the stat sheets are only used for    11:54:56

16 special ops.  So it's not commonly known throughout the MCSO,

17 and when requests were made for the stat sheets, I think there

18 was an understanding, and it's just my impression, Your Honor,

19 there was a misunderstanding about individual stat sheets

20 versus what they call them, stat sheets, the master data       11:55:15

21 sheets.

22      So when we said, We need to produce all the stat

23 sheets, they kept coming back and saying, You've got all of

24 them.  We produced them all to you.  We've got those.  And we

25 go back and say, We need the individual stat sheets, I think   11:55:27

1   there's still the misunderstanding.  So there's no willfulness

2   here.

3           THE COURT:  Well, let's just set that aside, and

4   I'm --

5           MR. CASEY:  Sure.                                    11:55:35

6           THE COURT:  -- I don't know that I have to decide

7   that, as you say.  But I've looked carefully at the July 21st,

8   2008 description of what kind of documents they wanted.

9           MR. CASEY:  Right.

10          THE COURT:  You're not arguing that those stat sheets   11:55:45

11  aren't described in that description, are you?

12          MR. CASEY:  Oh, no.  But what I'm saying is that over

13  at the special operations, HSU, there are two types of stat

14  sheets:  You've got your individuals and then the master data

15  sheets.  And I think that's one of the reasons.              11:55:57

16          The other thing is any sanction has to be

17  commensurate, obviously, with the damage -- the damage that's

18  been done.  Obviously, there are documents that can't be

19  produced, and the plaintiffs argue that we never know the

20  extent of the damage.  But the fact of the matter is on the --  11:56:12

21  at least on the stat sheets --

22          THE COURT:  Well, let me ask you --

23          MR. CASEY:  Sure.

24          THE COURT:  -- on that point, because it seems to me

25  that the only issue right now that is ripe for me to decide the  11:56:23

```
1   sanctions and what they might be pertain to the statutes.  The
2   e-mails are going to require a little bit more work and
3   thought.  But I don't read plaintiffs' motion to be asking for
4   any particular inference at this point.
5              MR. CASEY:  No, I -- I agree with you.                    11:56:35
6              THE COURT:  And so why -- and you're arguing that the
7   inference of the sanction has to be commensurate to the
8   violation.
9              MR. CASEY:  To the prejudice.
10             THE COURT:  Okay --                                       11:56:48
11             MR. CASEY:  It has to be --
12             THE COURT:  -- to the prejudice.
13             MR. CASEY:  Yes, sir.
14             THE COURT:  Fine.  What about engaging in a procedure
15  where I allow plaintiff, after discovery is closed, to set      11:56:54
16  forth the adverse inferences they think are necessary to their
17  case that could have been derived from the stat sheets and I'll
18  allow you to respond?
19             MR. CASEY:  I think that's fair.  I think creative
20  lawyers --                                                          11:57:08
21             THE COURT:  Mr. Kozinets, what's your view on that?
22             MR. KOZINETS:  That's fair, Your Honor.
23             THE COURT:  All right.  Well, that -- that, at least
24  for the moment, takes care of that one.
25             Assuming that I find sanctions are appropriate, that's   11:57:18
```

```
 1    how we'll proceed.  I'll look at that and issue my ruling
 2    shortly.
 3            As it pertains to e-mails, I think you've -- I don't
 4    know that you've offered, but you've suggested that you have
 5    the capability of putting under oath the procedure that you've          11:57:32
 6    gone to to recover e-mails, what you're capable of recovering,
 7    what you're not capable of recovering, and summarizing, in
 8    essence, what you will provide to the plaintiffs, and that you
 9    can do that in three or four weeks.
10            MR. CASEY:  Yes, Your Honor.  And I -- I will tell you          11:57:48
11    that at first blush my reaction is it would be an affidavit
12    from me almost avowing to this, because I have tried, and with
13    permission of my client, to bypass them to -- to go with a
14    third party to make sure that we get everything accurate.
15            So it may just be --                                           11:58:06
16            THE COURT:  Your own affidavit.
17            MR. CASEY:  It may be.  And I'm -- obviously, I don't
18    want to be a witness --
19            THE COURT:  As, perhaps, supplemented by a third
20    party?                                                                 11:58:13
21            MR. CASEY:   Yeah, I would probably have XACT tell us
22    exactly what they --
23            THE COURT:  Okay.
24            MR. CASEY:  -- what they did.
25            THE COURT:  Mr. Kozinets, are you going to assert, if          11:58:17
```

1    Mr. Casey provides the affidavit, that he's disqualified

2    himself as a witness in this case?

3           I realize that there are ethical prohibitions, but

4    there's pretty broad exceptions.

5           MR. KOZINETS:  Your Honor, no, we wouldn't assert          11:58:38

6    that, assuming he produces the kind of affidavit that has been

7    described.

8           THE COURT:  Are you -- well, I guess before we go down

9    this road, are you going to challenge his credibility?  That's

10   where it seems to me that it might become an issue.             11:58:51

11          MR. KOZINETS:  I don't think so, Your Honor.  I mean,

12   obviously it would depend on the -- the affidavit itself, but

13   what we would ultimately be challenging is not his credibility,

14   but his clients' credibility.

15          THE COURT:  All right.  What I'm going to do,            11:59:08

16   Mr. Casey, unless you have an objection that I want to hear you

17   on first, is I'm going to authorize you to do the affidavit, if

18   you're the appropriate person.  But I do think you need to

19   identify your sources of information with clarity in the

20   affidavit --                                                    11:59:21

21          MR. CASEY:  Yes, sir.

22          THE COURT:  -- so that if -- so that if questions

23   about the accuracy of your sources of information come up, then

24   we can address those.

25          MR. CASEY:  You want the foundation for what I say.      11:59:32

```
 1              THE COURT:  That's correct.

 2              MR. CASEY:  Yes, sir.

 3              THE COURT:  All right.  I'll let you speak,

 4    Mr. Kozinets, after I'm through.

 5              It seems to me that after we receive that affidavit, I    11:59:39

 6    need to give plaintiffs a fair amount of time to evaluate that

 7    information.  Then we need to have another conference that's

 8    going to reset deadlines, because this is obviously going to

 9    affect deadlines, and to determine what additional discovery

10    I'm going to permit, based on the new -- newly provided          11:59:56

11    information, and what the basis -- what, if any, limits I'm

12    going to put on that discovery.  But it seems to me that we

13    need to address it after I've given both sides the opportunity

14    to look at what you disclose.

15              Now, Mr. Kozinets, what's your point?                   12:00:16

16              MR. KOZINETS:  Thank you, Your Honor.  I just wanted

17    to make one or two observations.

18              The first relates to e-mails.  It's complete news to

19    us that no e-mails could be recovered from prior to October of

20    last year.  That really, frankly, is quite stunning.  It means   12:00:31

21    that for about two years of this litigation, there's simply no

22    backed up e-mails whatsoever.

23              In light of that, I would argue that that takes this

24    case out of the fact pattern that we had coming in here today

25    and puts it into a much -- an even more serious category of      12:00:48
```

 1  cases where e-mails have been essentially wiped and you've lost

 2  an entire category of documents.

 3          THE COURT:  Well --

 4          MR. KOZINETS:  -- so it becomes more like the Leon --

 5          THE COURT:  You know, I understand that that may well   12:01:04

 6  be your position, but I'm going to wait and look and see what

 7  has been provided, what will be provided in the totality of the

 8  information that we get before I determine what, if anything,

 9  I'm going to do by way of a sanction.  All right?

10          MR. KOZINETS:  All right.  And just one other point,   12:01:20

11  briefly, Your Honor.

12          In addition to the other sanctions we've outlined

13  today, we're also seeking an award of our attorneys' fees and

14  costs incurred in connection with the making of the motion

15  that --   12:01:30

16          THE COURT:  I understood that.  Thank you.

17          MR. KOZINETS:  Thank you.

18          MR. CASEY:  Your Honor, two things, if I may argue.

19          Do you want any response to the things that were kind

20  of thrown in their reply memorandum about the Hendershott   12:01:40

21  e-mails, or anything like that?

22          THE COURT:  Well --

23          MR. CASEY:  Because if it's going to be the subject of

24  anything, I'd like to address it.  But if it -- I mean, the

25  first time they raised some of those things was --   12:01:51

1          THE COURT:  Was in the reply.

2          MR. CASEY:  -- was in the reply, and then there was

3     something that was filed late last night.

4          THE COURT:  I'm not concerned so much about the

5     Hendershott materials.  It seems to me if you want to assert          12:01:59

6     those, you can do it separately, Mr. Kozinets.  You can do that

7     in the four-week period that -- well, first let me check out.

8          I'll give you four weeks to provide that information

9     to Mr. Kozinets.

10         Mr. Kozinets, how much time are you going to want to          12:02:13

11    review that before I set a status conference so we determine

12    how we're going to go forward?

13         MR. KOZINETS:  Your Honor, I think I -- I would start

14    off with two weeks, but if the volume is enormous --

15         THE COURT:  Well, I'll be amenable to any sort of an          12:02:28

16    extension based on volume, if in fact it's enormous.

17         Kathleen, can you give me a date six weeks out?

18         MR. CASEY:  Do I understand it correctly that in four

19    weeks, all the -- of the six gigabyte data stuff, the documents

20    I'm to get -- to produce to the plaintiffs in four weeks.          12:02:45

21         THE COURT:  Well, if you need more, tell me now.

22         MR. CASEY:  No.  No, I can -- I'm confident I can do

23    it in four weeks.

24         THE COURT:  All right.

25         MR. CASEY:  And I will check with XACT, but I don't --          12:02:54

1   I can't imagine that's going to be a problem.

2             THE COURT:  All right.  I want that in four weeks,

3   together with your affidavit --

4             MR. CASEY:  Okay.

5             THE COURT:  -- and/or the affidavits of anybody else          12:03:02

6   that you deem appropriate.

7             Then, Mr. Kozinets, I give you the two weeks, and I'm

8   going to set a date right now.  We're going to have another

9   status conference to determine how we're going to go forward.

10            March 19 at 9:30.                                             12:03:15

11            During that time, Mr. Kozinets, what I'm going to

12   address in my ruling is going to be the stat sheets and the

13   e-mails.  I realize that you've raised other things in your

14   reply relating to whether or not Sheriff Arpaio fully

15   responded, but it does seem to me that because they were raised      12:03:35

16   in reply, Mr. Casey hasn't been given a fair opportunity to

17   respond to that argument.

18            So any arguments about Sheriff Arpaio, any arguments

19   about Deputy Hendershott, or any other arguments about the

20   inadequacy of discovery that has been provided in light of what      12:03:52

21   you are now finding, you need to raise in a separate motion.

22            If we need to, if we can, we'll address them in the

23   six-week conference.  If there hasn't been enough time for

24   briefing, I'll address them as quickly as I can.  But I would

25   appreciate it if these things be done with some expedition.          12:04:10

1              MR. CASEY:  If the Court -- I am prepared to address

2      those subjects if the Court wants to.  I just -- I haven't been

3      able --

4              THE COURT:  All right.

5              MR. CASEY:  -- to brief them.                          12:04:19

6              THE COURT:  I just don't want to -- I do not want to

7      have you argue that you didn't have a fair opportunity to

8      respond.  Because I did read the reply --

9              MR. CASEY:  Yeah.

10             THE COURT:  -- I am familiar with both the excerpts     12:04:28

11     from Sheriff Arpaio's deposition and the allegations made in

12     the reply.  Those are the ones I'd be most interested in, if

13     you --

14             MR. CASEY:  Yes.

15             THE COURT:  -- want to address them.                   12:04:37

16             MR. CASEY:  Yes, Your Honor.  And I think it's

17     probably a good and fulsome thing to do this in one fell swoop.

18             The Arpaio documents that were produced should have

19     been produced a long time ago.  I don't have an explanation,

20     but we have them, we produced them.  They were subject both to  12:04:52

21     the public information request, and they were subject to a fair

22     reading of the February '09 RFP submitted by plaintiffs.

23             The Hendershott e-mail, I have, if my memory's

24     correct, researched that; checked with Chief Hendershott;

25     provided a letter, it's not sworn, a letter to plaintiffs'      12:05:16

1  counsel advising that according to Chief Hendershott, he has

2  searched for his AOL account.

3          It is his home account.  It's a family account.  On

4  occasion he has used it for business, but he's not used it on

5  the Melendres case, and he certainly has nothing related to        12:05:30

6  saturation patrols or any of the issues that I identified for

7  him that are pertinent in this case.

8          The deposition of Hendershott currently has been

9  postponed but is set to February 12, I believe.  I've invited

10 plaintiffs they can get all the testimony they wish under oath      12:05:48

11 on that issue from Chief Hendershott, but I am told there are

12 no personal account e-mails that have anything to do with this

13 case remotely.

14         Those are the -- those are the two pieces of, I guess,

15 evidence, if you will, or averments that I have for you, Your       12:06:06

16 Honor, in response.

17         THE COURT:  All right.  I appreciate it.  And you

18 don't need to file any motions with respect to those two

19 matters.  I will presume if you're going to, with --

20         MR. CASEY:  May I sit down?                                 12:06:17

21         THE COURT:  Yes, you may.  Thanks.

22         If you're going to, with respect to Chief Hendershott,

23 you'll do it after his deposition, I presume.

24         MR. KOZINETS:  That's correct, Your Honor.

25         Just with respect to Sheriff Arpaio, the relief that       12:06:28

```
1    we would seek would be an order allowing us to reopen his

2    deposition so we could ask him about the newly produced files.

3              THE COURT:  Yeah, and it doesn't sound to me like

4    there's going to be much of an objection to that motion, and

5    it's --                                                          12:06:42

6              MR. KOZINETS:  And -- and --

7              THE COURT:  -- going to be granted.

8              MR. KOZINETS:  Pardon me, Your Honor.

9              And we would ask that it be done entirely at their

10   expense, both for the reporters' costs and for the reasonable    12:06:48

11   attorneys' fees of one plaintiffs' lawyer to get ready and --

12             THE COURT:  I understand.

13             MR. KOZINETS:  Thank you, Your Honor.

14             The other thing, Your Honor, is that this -- all of

15   this is an example of an enormous amount of delay and expense    12:07:00

16   that we are contending with in this case.  It's not our

17   interest at all in order -- to move out the discovery deadlines

18   or delay the resolution of this case by one day.  But

19   unfortunately, due to the conduct we've discussed today, that

20   seems to be where we're headed.                                  12:07:16

21             THE COURT:  All right.

22             We're going to reset it March 19th.  At that point I'm

23   going to expect plaintiffs' counsel and defense counsel to be

24   ready to discuss what additional depositions will be

25   authorized, whether there will be briefings on -- additional     12:07:33
```

```
 1   briefings on motions to sanction, and whether or not those need
 2   to await any additional depositions as it pertains to the
 3   e-mails.
 4            I am going to take under advisement whether -- and I
 5   will issue an order on sanctions with respect to the stat       12:07:58
 6   sheets.  But I -- as I've indicated, it doesn't seem to me that
 7   the motion requests that I determine at this point, if I'm
 8   going to authorize any adverse inference, the scope of that
 9   inference, and that I'm going to await ruling on that, in any
10   case, until the close of discovery, for the reasons that I've   12:08:21
11   set forth.
12            Any additional questions by either party, or concerns?
13            Mr. Kozinets?
14            MR. KOZINETS:  No, Your Honor.  Thank you.
15            THE COURT:  Mr. Casey?                                 12:08:30
16            MR. CASEY:  Not on this matter, but if I can just
17   raise one other issue that's somewhat related.
18            THE COURT:  Sure.
19            MR. CASEY:  Ten seconds.
20            THE COURT:  Um-hum.                                    12:08:39
21            MR. CASEY:  We recently filed the Touhy motion
22   asking -- asking you to order that DHS tender two documents and
23   five witnesses.  Because of, obviously, the problems related to
24   timing on that, I wanted to alert you to that, because we are
25   asking and did ask for the Court to extend the discovery cutoff 12:08:53
```

1    date solely to get the documents and tender the five people,

2    should you order that to occur.

3         THE COURT:  All right.  I have been informed -- I have

4    not yet had a chance to read your Touhy motion, but I have been

5    informed that it has been filed.                              12:09:08

6         What I hope to do in this conference is to authorize

7    limited discovery on all additional points, but it will be

8    specific -- to the extent that deadlines are extended, they

9    will be extended for specific purposes.  And so if you have

10   matters that -- that you come across before then, you need to  12:09:25

11   get something in writing to me indicating why, and then we'll

12   set that schedule.

13        MR. KOZINETS:  Your Honor, just to be clear, we are

14   intending to file an opposition to the Touhy motion.

15        THE COURT:  Yeah, and I would expect that you would      12:09:41

16   have plenty of time to do that before the six-week period is

17   up.  I wasn't presuming one way or the other I was going to

18   rule, but I did hear that it had been filed and was aware of

19   it, but I haven't read it yet.  I'll wait till I get your

20   opposition and the reply, and then we'll deal with it.        12:09:56

21        MR. KOZINETS:  Thank you, Judge.

22        THE COURT:  Any additional matters?

23        Thank you.

24        MR. CASEY:  Thank you, Your Honor.

25        (Proceedings concluded at 12:10 p.m.)

```
 1
 2                    C E R T I F I C A T E
 3
 4
 5
 6
 7          I, GARY MOLL, do hereby certify that I am duly
 8   appointed and qualified to act as Official Court Reporter for
 9   the United States District Court for the District of Arizona.
10          I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15
16
17          DATED at Phoenix, Arizona, this 5th day of February,
18   2010.
19
20
21                         s/Gary Moll
22
23
24
25
```