1  COVINGTON & BURLING LLP
   333 Twin Dolphin Drive
2  Suite 700
   Redwood Shores, CA 94065-1418
3  Telephone: (650) 632-4700
   Facsimile:  (650) 632-4800
4
   Stanley Young (*Pro Hac Vice*)
5  syoung@cov.com
   Andrew C. Byrnes (*Pro Hac Vice*)
6  abyrnes@cov.com
7  *Attorneys for Plaintiffs (Additional attorneys*
   *for Plaintiffs listed on next page)*
8

9              **UNITED STATES DISTRICT COURT**

10            **FOR THE DISTRICT OF ARIZONA**

11 | Manuel de Jesus Ortega Melendres,    ) No. CV 07-2513-PHX-GMS
12 | et al.,                              )
   |                                      )
13 |            Plaintiffs,               )
   |                                      ) **PLAINTIFFS' RENEWED MOTION**
14 |      vs.                             ) **FOR CLASS CERTIFICATION**
   |                                      )
15 | Joseph M. Arpaio, et al.,            ) **ORAL ARGUMENT REQUESTED**
   |                                      )
16 |            Defendants.               ) The Honorable Judge G. Murray Snow
   |                                      )
17 |_____|

18

19

20

21

22

23

24

25

26

27

28

*Additional Attorneys for Plaintiffs:*

COVINGTON & BURLING LLP
1 Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
Tammy Albarran (*Pro Hac Vice*)
talbarran@cov.com
Kevin Hickey (*Pro Hac Vice*)
khickey@cov.com
Matthew Steilen (*Pro Hac Vice*)
msteilen@cov.com
Lesli Gallagher (*Pro Hac Vice*)
lgallagher@cov.com

ACLU FOUNDATION OF ARIZONA
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376
Daniel Pochoda (021979)
dpochoda@acluaz.org
Anne Lai (330036*)
alai@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0775
Facsimile:  (415) 395-0950
Cecillia Wang (*Pro Hac Vice*)
cwang@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512
Facsimile:  (213) 629-0266
Nancy Ramirez (*Pro Hac Vice*)
nramirez@maldef.org

Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr. and Somos America/We are America ("Somos") (together "Plaintiffs") respectfully renew their Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2).  Specifically, Plaintiffs seek to certify a class of "All Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona."[1]  [First Amended Complaint ("FAC") ¶ 121.]

As a preliminary matter, Plaintiffs have standing to pursue the equitable remedies and other remedies for which they demand relief.  Plaintiffs can show a pattern and practice of racial discrimination by Defendants Joseph M. Arpaio and Maricopa County Sheriff's Office ("MCSO") (hereinafter "Defendants") sufficient to permit the Court to conclude that Plaintiffs are subject to the likelihood of future harm.

Additionally, this case satisfies the requirements of Fed. R. Civ. P.23(a) for class certification as: (1) the proposed class consists of thousands of Hispanics and therefore is so numerous that determining relief on an individual basis is impractical; (2) the question of whether the MCSO engages in discriminatory practices in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution is common to all class members; (3) the claims of the individual class representatives are typical of other members of the class; and (4) the named Plaintiffs are fully capable of adequately protecting the interests of the class, and they are represented by able and experienced counsel.

Class-wide declaratory and injunctive relief based upon the Defendants' unlawful discriminatory conduct is therefore appropriate under Fed. R. Civ. P. 23(b)(2).

## I.   BACKGROUND

On August 24, 2009, this Court deferred determination on Plaintiffs' Motion for

---

[1] Plaintiffs intend the terms "Hispanic" and "Latino" to be synonymous.

1   Class Certification, stating that "it would be premature for the Court to certify a class

2   while this essential question [of standing to seek equitable relief] remains open to

3   dispute."  [Order, Aug. 24, 2009, at 12 [hereinafter "Order"] [D.I. 155].]   The Court

4   stated that standing "is an important question that cannot be ultimately resolved in the

5   absence of an evidentiary record."  [*Id.*]

6       A  detailed  recitation  of  relevant  aspects  of  the  evidentiary  record  showing

7   Defendants' pattern and practice of racial discrimination can be found in Plaintiffs'

8   concurrently filed Motion for Partial Summary Judgment and Statement of Facts   in

9   support of the Motion ("SOF") which Plaintiffs incorporate by reference here.

10   **II.    ARGUMENT**

11       **A.    Plaintiffs Have Article III Standing To Seek Equitable Relief.**

12       This Court previously noted that "[w]hether Plaintiffs can establish standing in

13   this case depends on whether they can show a policy, pattern, or practice of racial

14   discrimination  sufficient  to  permit  the  Court  to  make  findings  that  Plaintiffs  are

15   personally subject to the likelihood of future harm." [Order 12.]   Plaintiffs here can

16   establish that Defendants have a pattern and practice of race-based discrimination

17   against Hispanics in conducting traffic stops and so have standing to seek equitable

18   relief.  In general, a party has standing to seek injunctive relief if it can show that it is

19   "realistically threatened by a repetition of the violation." *Armstrong v. Davis*, 275 F.3d

20   849, 860-861 (9th Cir. 2001) (internal quotation omitted).  A realistic threat of repetition

21   of injury may be established by showing that the "harm is part of a pattern of officially

22   sanctioned , . . behavior, violative of the plaintiffs' [federal] rights." *Mayfield v. United*

23   *States*, 599 F.3d 964, 971 (9th Cir. 2010) (quotation omitted).

24       As discussed more fully below, Defendants are engaged in a pattern and practice

25   of discriminatory conduct against Hispanics that has led to violations of the Fourth and

26   Fourteenth Amendments.  Because Plaintiffs are Hispanics who for the most part live

27   and/or work and therefore travel in Maricopa County, it "is not 'conjectural' or

28   'hypothetical'" that they are likely targets for future harm. *Multi-Ethnic Immigrant*

*Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621, 628 (C. D. Cal. 2007) ("Plaintiffs need not establish that future harm is certain, or even probable.").  For all these reasons, Plaintiffs have standing to seek equitable relief.

> **1.    Defendants' Pattern And Practice Of Racial Discrimination Establish That Plaintiffs' Injury Is Likely To Be Repeated.**

Plaintiffs' Motion for Partial Summary Judgment and accompanying 256 paragraph SOF set forth in comprehensive detail how Defendants are engaged in a pattern and practice of discrimination against Hispanics in traffic stops.  For the Court's convenience, Plaintiffs summarize below several points that are particularly salient to the question of standing.

> **a.    Defendants Endorse, Plan And Act On Materials Explicitly Calling For Racial Profiling.**

Defendants have acted upon constituent letters explicitly calling for racial profiling.  Specifically, Sheriff Arpaio has endorsed such letters and passed them on to his subordinates for use in the planning and implementation of enforcement operations, including saturation patrols.  [Pls.' Mot. for Partial Summ. J. at 6-8, 20-24.]

Both Sheriff Arpaio and MCSO officers have distributed offensive materials about Hispanics within the MCSO indicating that negative stereotypes about Hispanics are deeply and widely felt within the agency.  [Pls.' Mot. for Partial Summ. J. at 8, 16-20, 30-31.]  Indeed, Sheriff Arpaio has made public statements expressing his own views about Hispanics, stigmatizing them and emphasizing their "difference" from other immigrant groups and threat to the American way of life.  [*Id.* at 4, 18.]

Importantly, Defendants equate Hispanics with illegal immigrants.  Sheriff Arpaio has repeatedly stated that his enforcement operations are intended to "go after illegals," and that they can be spotted based on "what they look like"  [*Id.* at 5, 20.]

These statements and actions indicate that Defendants employ an improper practice of permitting and using racially charged materials to plan, strategize and execute their enforcement of immigration laws.

1

2

### b.   Defendants Discriminate Against Hispanics Through Pretextual Traffic Stops, Unreasonably Extended Stops And Stops Made Without Probable Cause.

3   Defendants have created, through pretextual traffic stops, unreasonably extended

4   stops and stops made without probable cause, a systemic pattern and practice that

5   encourages race-based discrimination against Hispanics.   MCSO deputies routinely

6   initiate pretextual traffic stops—stops for alleged vehicle or traffic code violation—in

7   order to question Hispanic drivers and passengers about their citizenship or immigration

8   status.   [Pls.' Mot. for Partial Summ. J. at 26-27; *see also* SOF 114-15, 117.]   Both

9   MCSO witnesses and the parties' experts have testified to the MCSO's tactic of using

10   pretextual traffic stops to launch immigration investigations.   [SOF 114-15, 117.]   For

11   example, Jorge Urteaga was stopped during a saturation patrol and asked to "prove" his

12   citizenship even though he had produced a valid drivers license.   [SOF 215.]   Jerry

13   Cosio was arrested during a saturation patrol and overhead an officer saying he "doesn't

14   count" because "he's [an] American."   [SOF 219.]   Plaintiffs David Rodriguez, some

15   members of Somos and class member Lino Garcia were even asked to produce their

16   Social Security numbers.   [SOF 188, 217; Transcript of Deposition of Lydia Guzman

17   ("Guzman Dep.") at 37:7-38:5, attached as Exhibit 46 to Declaration of Kevin Hickey in

18   Support of Plaintiffs' Motion for Partial Summary Judgment ("Hickey Decl.")]

19   Indeed, Defendants have instituted saturation patrol operations that are

20   specifically designed to afford deputies wide discretion to make such pretextual traffic

21   stops.   [Pls.' Mot. for Partial Summ. J. at 5-6, 24-28; *see also* SOF 114-15, 117.]

22   Officers are encouraged to stop vehicles committing any violation, no matter how

23   trivial, something that MCSO witnesses testified is easy to do in almost every case.

24   [SOF 116, 118.]   They are also instructed to contact all passengers on stops and ask for

25   identification documents, even from passengers who have not committed any violation

26   of the law.   [SOF 126-28.]   This is highly unusual in law enforcement and creates a

27   substantial risk of overly intrusive stops.   [Declaration of Robert L. Stewart in Support

28   of Plaintiffs' Motion for Partial Summary Judgment ("Stewart Decl.") at ¶¶ 22-28.]

1    The experience of Plaintiff Manuel de Jesus Ortega Melendres exemplifies this

2    risk of impermissible stops.   Mr. Ortega Melendres was riding as a passenger in a

3    vehicle in an area where a saturation patrol operation was in progress when he was

4    stopped.   Even though the Caucasian driver was not cited and the deputy had no

5    information to believe that Mr. Ortega Melendres had broken any law, Mr. Ortega

6    Melendres was detained for further investigation into his "status." [SOF 171, 176-79,

7    183-85.]   Likewise, numerous other similarly situated Hispanics have been asked for

8    identification.   [SOF 216-18, 222.]   These facts document the MCSO's pattern and

9    practice of using pretextual traffic stops to target Hispanics for immigration

10   investigation.

11       As a result of such investigations, traffic stops involving Hispanics are

12   unreasonably prolonged.   Plaintiff Ortega Menderes was ultimately detained for 7 to 8

13   hours.   [SOF 185.]   Jorge Urteaga's and Ms. Escamilla's traffic stops lasted 45 minutes

14   and close to two hours, respectively.   [SOF 215, 220.]   These examples illustrate

15   Defendants' practice of unlawfully extending traffic stops to conduct immigration

16   investigations of Hispanics.

17       MCSO deputies have also initiated traffic stops of Hispanics where no reasonable

18   suspicion or probable cause exists.   For example, named Plaintiffs Manuel Nieto and

19   Velia Meraz were stopped at gunpoint without cause during a saturation patrol after a

20   deputy heard them listening to Spanish music; they were released without charge.   [SOF

21   200-06, 213.]   Daniel Magos was stopped for a purported issue with his rear license

22   plate, even though the deputy would not have been able to see this when he made a U-

23   turn to stop Mr. Magos; Mr. Magos was never cited.   [SOF 216.]   Lino Garcia was

24   pulled over several times, allegedly for issues with his license plate light, and once

25   simply because he "looked suspicious, but was never cited.   [SOF 217.]   Mr. Urteaga,

26   who was apparently stopped for vehicle registration issue, had his citation thrown out by

27   a judge.   [SOF 215.]   And Lorena Escamilla stood near her car while officers debated

28   what traffic violation she could be cited for, only to have her charge crossed out by the

time she got to court. [SOF 220.] Finally, earlier this week, a U.S. District of Arizona Court found that two other class members, Julian and Julio Mora, were stopped and arrested by the MCSO without cause. *Mora v. Arpaio*, No. CV-09-1719-PHX-DGC, 2100 WL 1562443 at *2-*5 (D. Ariz. April 25, 2011). Notably, the Court found substantial evidence that the violation of the Moras' Fourth Amendment rights was the result of the MCSO's "policies, practices and customs." *Id.* at *7. [*see also* SOF 223.] In sum, Defendants have employed the tactics of pretextual stops, prolonged traffic stops and traffic stops without probable cause to discriminate against Hispanics based on race.

            **c.**      **The MCSO's Lack of Safeguards Against Racial Profiling Facilitates A Practice And Pattern Of Widespread And Ongoing Discriminatory Conduct.**

      As further elaborated in Plaintiffs' Motion for Summary Judgment, the MCSO does not have any agency-wide written policy on racial profiling, does not adequately train or supervise its deputies to avoid racial profiling. [*See* Pls.' Mot. for Partial Summ. J. at 28-31.] The absence of any meaningful policy or training on racial profiling and serious failures in supervision and oversight not only exacerbate Defendants' practice and pattern of discriminatory conduct, they also serve as evidence that racial profiling is likely to be repeated in the future, absent court intervention. *See Armstrong*, 275 F.3d at 863-64 (noting employees untrained in issues of disability as a factor in meeting the "realistic repetition" requirement).

            **d.**      **Statistical Analysis Of The MCSO's Traffic Stops Show That Defendants Racially Profile Hispanics.**

      Statistical analysis of the MCSO's traffic stops shows that Defendants racially profile Hispanics. The results are stark. Hispanics were approximately 26% to 29.9% more likely to be stopped on saturation patrol days. [Pls.' Mot. for Partial Summ. J. at 10-12.] On saturation patrol days, Hispanics are 46% to 53.7% more likely to be stopped by officers working on saturation patrols than by other officers. [*Id.*] And stops of vehicles with at least one Hispanic occupant also lasted, on average, 21% to 25%

1    longer than stops of other vehicles, controlling for stop disposition and the number of

2    occupants.  [*Id.*]  Defendants' expert does not contradict these specific findings.

3                        **e.    Plaintiffs' Injury Is Likely To Be Repeated.**

4            Defendants' pattern and practice of targeting Hispanics based on racially charged

5    material in order to investigate immigration status without instituting significant

6    safeguards against racial profiling has resulted in Hispanics being disproportionately

7    stopped and stopped longer by the MCSO.  Defendants have given no indication that

8    they intend to change their practice or pattern of behavior.  In fact, Sheriff Arpaio has

9    reiterated his emphasis on immigration even though MCSO is no longer certified to

10   assist in immigration investigation.[2]  [SOF 10]  As such, plaintiffs are realistically

11   threatened with continued improper targeting.  *See Armstrong*, 275 F.3d at 861 ("where

12   the defendants have repeatedly engaged in the injurious acts in the past, there is a

13   sufficient possibility that they will engage in them in the near future to satisfy the

14   'realistic repetition' requirement.").

15          Indeed Plaintiffs can do nothing to avoid a repeat of the injury.  *See Hodgers-*

16   *Durgin v. De La Vina*, 199 F.3d 1037, 1041-42 (9th Cir. 1999) (en banc) ("[I]n this case

17   there is no string of contingencies necessary to produce an injury. . . another stop of the

18   sort alleged by plaintiffs would itself constitute further injury.").  As in *Hodgers-*

19   *Durgin*, the MCSO can pull over Plaintiffs even when Plaintiffs do nothing illegal to

20   prompt the stop.  *See supra* 4-6.  Under such circumstances, the threat of repetition of

21   injury to Plaintiffs is realistic and sufficient to confer standing.  Indeed, a Maryland

22   Court found standing under similar circumstances.  That court's analysis is instructive:

23

24

25  _____

26   [2] To the extent that MCSO officers are continuing to detain individuals for the
     purpose of inquiring into their citizenship or immigration status after the termination of
     their Section 287(g) field authority, such enforcement separately violates the Fourth
27   Amendment.  The Ninth Circuit has held that state and local law enforcement officers do
     not have the inherent authority to enforce federal civil immigration law.  *See, e.g. United*
28   *States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *17 (9th Cir. Apr. 11, 2011).

Here, the plaintiffs' likelihood of injury depends only on their status as a member of a minority group and their need to travel on I-95.  Any "illegal" action on their part associated with the future stop need be no more than a minor, perhaps unintentional, traffic infraction; indeed, according to their allegations, they may be stopped even if no traffic violation has been committed.  The plaintiffs also have reason to expect they will continue to travel on I-95.  This combination of alleged past injury, an earlier pattern and practice finding, and the plaintiffs' likely future travel is sufficient to confer standing.

*Md. State Conference of NAACP Branches v. Md. Dept. of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999).

### 2. Defendants' Pattern And Practice Of Racial Discrimination Have Injured Somos' Members And Establish Standing.

Somos has standing to sue on behalf of its members who, like the named individual Plaintiffs, have also been subjected to Defendants' pattern and practice of discriminatory conduct.  An organization has standing as representative of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1135-36 (N.D. Cal. 2000) (finding that NAACP and LULAC have representational standing to challenge racial profiling).

Here, Somos meets all three requirements.  Somos' members include individuals and organizational members.  [Guzman Dep., Ex. 46 to Hickey Decl., at 21:22-27:25.] A number of its members have already been subjected to Defendants' discriminatory conduct.  For example, the MCSO stopped member Melissa LaPlaine of Cop Watch during a saturation patrol because the light on her license plate was loose.  [*Id.* at 36:10-37:6.]  Defendants stopped member Andrew Sanchez of Citizens Camera Crew during the Guadalupe saturation patrol for honking.  [*Id.* at 46:15-48:6.]  Other Somos members who have been stopped by Defendants include Alfredo Gutierrez, Michael of LULAC

(who was stopped twice), Adolfo Maldonado of Cop Watch and his passenger Lydia Navarro (who were asked to produce their Social Security numbers), day laborer members of Tonatierra, members of the AFL-CIO, and a staff of an Association of Immigration Lawyers member.  [Guzman Dep., Ex. 46 to Hickey Decl., at 29:22-33:13, 37:7-43:18.]   In sum, several members of Somos have been subject to Defendants' unlawful conduct and are likely to continue to be subjected to such conduct in light of Defendants' practice and pattern of racially targeting Hispanics, as discussed above.

Somos also meets the second requirement for representational standing in that the interests Somos seeks to vindicate are germane to Somos' purpose.   Somos' organizational mission includes "seeking to combat racial discrimination directed at Latinos."   [FAC ¶ 10]  Clearly, preventing race-based discrimination of Latinos in traffic stops is germane to Somos' organizational purpose.

Somos also meets the third requirement for representational standing.  Neither Plaintiffs' claims nor the injunctive and declaratory relief sought require the participation of Somos' members.  Indeed, representational standing is particularly appropriate "where the relief sought is some form of prospective remedy, such as declaratory judgment, which will inure to the benefit of the organization's membership." *Rodriguez*, 89 F. Supp. 2d at 1135.

Because Hispanics, including Somos members, will continue to be subject to Defendants' violative conduct, Somos (like the individual named plaintiffs) also has standing to seek equitable relief from this Court.[3]

## III.    CLASS CERTIFICATION IS APPROPRIATE IN THIS ACTION.

Plaintiffs renew their motion to seek class certification now that the record is sufficient to show that Plaintiffs have standing to seek equitable remedies.  Civil

---

[3] Somos also has standing as an organization that has been directly injured by Defendants' conduct.  Somos can demonstrate that Defendants' constitutional violations have resulted in frustration of its organizational mission and diversion of its resources. [*See* Guzman Dep., Ex. 46 to Hickey Decl., at 18-21; 73-77; 81-87.]

1  rights actions typically are certified as class actions.  *See* Fed. R. Civ. P. 23(b)(2)

2  advisory committee's note (1966).  Class certification "is especially appropriate" where

3  as here Plaintiffs seek "injunctive relief against discriminatory practices by a

4  defendant."  *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001).

5  Indeed, another district court in this Circuit has granted class certification based on

6  similar allegations of a pattern and practice of traffic stops premised on race.  *See* Order

7  Granting Motion for Class Certification, *Rodriguez v. California Highway Patrol*, C 99

8  20895 JF (N.D. Cal. May 10, 2001) (Attach. 1 to Pls.' Mot. for Class Certification [D.I.

9  93-94]).

10          To proceed as a class, Plaintiffs and the proposed class must meet the

11  elements of Rule 23(a) and those of at least one subsection of Rule 23(b) of the Federal

12  Rules of Civil Procedure.  *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998).  In

13  considering class certification, "the court generally is bound to take the substantive

14  allegations of the complaint as true."  *Multi-Ethnic Immigrant Workers Organizing*

15  *Network*, 246 F.R.D. at 626 (citing *In re Coordinated Pretrial Proceedings in Petroleum*

16  *Products Antitrust Litig.,* 691 F.2d 1335, 1342 (9th Cir. 1982)).  Nevertheless,

17  "sometimes it may be necessary for the court to probe behind the pleadings before

18  coming to rest on the certification question."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S.

19  147, 160 (1982).  "Although some inquiry into the substance of a case may be necessary

20  to ascertain satisfaction of the [] requirements of Rule 23(a), it is improper to advance a

21  decision on the merits to the certification stage."  *Moore v. Hughes Helicopters, Inc.*,

22  708 F.2d 475, 480 (9th Cir. 1983).  Indeed, nothing in "either the language or history of

23  Rule 23 [] gives a court any authority to conduct a preliminary inquiry into the merits of

24  a suit in order to determine whether it may be maintained as a class action."  *Eisen v.*

25  *Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

26      **A.    The Proposed Class Meets Each Of The Four Requirements Of Rule
             23(a).**

27          The  four  elements  for  Rule  23(a)  certification  are  commonly  known  as

28

numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).

### 1.   The Proposed Class Is So Numerous That Joinder Is Impracticable.

Plaintiffs meet the "numerosity" requirement because the  proposed class "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A class presumptively meets the numerosity requirement if it is likely to exceed 40 members.  *McMillon v. Hawaii*, 261 F.R.D. 536, 542 (D. Haw. 2009) (citing Newberg on Class Actions §3:6 (4th ed. 2002)).  Here, the proposed class of all Latino motorists and passengers in Maricopa County who have been or will be subjected to Defendants' discriminatory practices clearly exceeds 40.  In addition to the five named plaintiffs and several members of Somos, at least twenty other class members have been subjected to Defendants' discriminatory conduct.    [SOF  215-223  (including  passengers).] Importantly, Plaintiffs' expert Dr. Taylor's analysis reveals that the MCSO has stopped at least 1312 Hispanics during saturation patrols, the vast majority of whom were legally present in the United States.  [Rebuttal Expert Report of Ralph B. Taylor ("Taylor Rebuttal Report"), attached as Ex. C to Declaration of Ralph B. Taylor in Support of Plaintiffs' Motion for Partial Summary Judgment ("Taylor Decl."), at 44-45.]  MCSO officers will no doubt continue to stop large numbers of Hispanics pursuant to their race-based pattern of traffic stops at issue in this case.  Since those stopped will be future, unnamed class members, joinder is impracticable.  *See Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319-20 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982) (evaluating numerosity requirement and finding inherently impracticable joinder of unknown future claimants a factor in favor of certification).  For all these reasons, the proposed class satisfies the numerosity requirement.

### 2.   Plaintiffs Present Questions Of Law Or Fact Common To The Class.

Defendants' unconstitutional pattern or practice of racial profiling by targeting cars with Latinos for investigation is common to all class members and sufficient to

meet the "commonality" requirement of Fed. R. Civ. P. 23(a)(2). The "requirement that there be questions of law or fact common to the class is met by the alleged existence of common discriminatory practices." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994) (internal quotation omitted); *Walters*, 145 F.3d at 1047 ("It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole.")

Here, there are several questions of law and fact common to all class members including a) whether Defendants are engaging in a pattern or practice of stopping and investigating Hispanics based on race in traffic stops in violation of Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment; b) whether Defendants are initiating certain traffic stops of Hispanics without any reasonable suspicion or probable cause in violation of the Fourth Amendment; and c) whether Defendants are unreasonably prolonging traffic stops of Hispanics in order to investigate immigration status in violation of the Fourth Amendment.

As described previously, and further elaborated in Plaintiffs' Motion for Summary Judgment, Defendants have a pattern and practice of improperly using race to plan, strategize and execute their enforcement of immigration laws with no significant safeguards to prevent racial profiling of Hispanics. Further, statistical analysis of the MCSO's traffic stops and anecdotal evidence demonstrates that Hispanics are being disproportionately stopped by the MCSO during saturation patrols. Together, these facts give rise to the *common question* of whether Defendants violate the Equal Protection clause of the Fourteenth Amendment.

The record also reveals that MCSO officers initiated traffic stops without any reasonable suspicion or probable cause of any violation of the law, in contravention of the Fourth Amendment. *Cf. Delaware v. Prouse*, 440 U.S. 648, 661 (1979). As described above, Defendants have stopped named Plaintiffs Manuel Nieto and Velia Meraz as well as several class members without probable cause in violation of Plaintiffs' Fourth Amendment rights. *See United States v. Montero-Camargo*, 208 F.3d,

1122, 1132 & n.22 (9th Cir. 2000); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air."). These facts establish support for the *question* whether Defendants are initiating certain traffic stops without any reasonable suspicion or probable cause in violation of the Fourth Amendment.

Further, as discussed above, the record contains evidence that Defendants are making pretextual traffic stops of Hispanics in order to investigate immigration status and measurably extending traffic stops in order to carry out that investigation. Statistical evidence shows that Hispanics are stopped for 21% to 25% longer during traffic stops. [Pls.' Mot. for Partial Summ. J. at 10-12.] This is consistent with the experience of Plaintiff Ortega Melendres and other class members. "[W]here an officer's inquiries into matters unrelated to the justification for the traffic stop measurably extend the duration of the stop, the officer must have an independent reasonable suspicion to inquire into those unrelated matters." *United States v. Mitchell*, 2:10-cr-00146 KJN, 2010 WL 2838614, at *3-4 (E.D. Cal. July 19, 2010); *United States v. Sharpe*, 470 U.S. 675, 68688 (1985). Defendants have no reasonable suspicion to inquire into immigration related matters; they use race as the reason for immigration inquiry. These facts establish the presence of a common Fourth Amendment *question*.

Defendants' practice and pattern of discrimination against Hispanic drivers and passengers is the type of "common" question of law or fact that courts have found sufficient to meet the "commonality" requirement. *See, e.g.*, *Rodriguez*, Order Granting Class Certification at 15 (finding allegations of "systemic and uniform practice of racial profiling by" California Highway Patrol sufficient to meet the "commonality" requirement); *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1071-72 (7th Cir. 1976) (affirming certification of class of Mexican Americans subjected to race-based stops and interrogations); *Daniels*, 198 F.R.D. at 411-22 (certifying a class of African American and Latino men who were allegedly stopped and frisked by police street

1   crimes unit based on their race and without reasonable suspicion).

2        Where, as here, Plaintiffs' claim results from Defendants' unconstitutional

3   pattern of conduct, the case for commonality is particularly strong; any incidental

4   factual differences in the details of a given stop are immaterial to the question of

5   commonality. *See, e.g., Walters*, 145 F.3d at 1047 (factual differences in underlying

6   claims do not defeat certification where common allegations of constitutional violations

7   arise from government policies and procedures); *Rodriguez v. California Highway*

8   *Patrol*, 591 F.3d 1105, 1122 (9th Cir. 2010) ("[T]he existence of shared legal issues

9   with divergent factual predicates is sufficient, as is a common core of salient facts

10   coupled with disparate legal remedies within the class.") (quotation omitted).

11        Finally, a finding of commonality is especially appropriate where the relief

12   sought, injunctive relief in this case, by its "very nature often present[s] common

13   questions satisfying Rule 23(a)(2)." *Baby Neal for ex rel. Kanter v. Casey*, 43 F.3d 48,

14   57 (3d Cir. 1987) (internal citation omitted).  Plaintiffs and class members thus meet the

15   commonality requirement of Rule 23(a)(2).

16          **3.**    **Named Plaintiffs' Claims Are Typical Of Those Of The Class.**

17        Claims of the named Plaintiffs must be typical of those of the class as a whole to

18   satisfy Fed. R. Civ. P. 23(a)(3).  Such claims are typical if they arise from the same

19   challenged pattern and practice, *Armstrong*, 275 F.3d at 868-69; *Marisol A. ex rel.*

20   *Frobes v. Guiliani,* 929 F. Supp. 662, 691, (S.D.N.Y. 1996), or were "injured by the

21   same course of conduct." *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168,

22   1175 (9th Cir. 2010).  Here, Defendants subjected named Plaintiffs and class members

23   to the same discriminatory pattern and practice—stopping, questioning or detaining

24   them based on race.  And each plaintiff and class member has been harmed or will be

25   harmed by Defendants' unconstitutional conduct.  Plaintiffs have therefore met the

26   "typicality" requirement of Rule 23(a).

27        As with commonality, varying fact patterns do not defeat a finding of typicality.

28   *Wolin*, 617 F.3d at 1175 (noting "typicality can be satisfied despite different factual

circumstances"); *Armstrong*, 275 F.3d at 869 ("we do not insist that the named plaintiffs' injuries be identical with those of the other class members . . . .").

Plaintiffs also satisfy the typicality requirement because the injunctive relief that they seek would inure to the benefit of all members of the proposed class. For all these reasons, Plaintiffs have met the typicality requirement of Rule 23(a).

### 4.   Named Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class.

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This has been interpreted to require that Plaintiffs and their counsel (1) not "have any conflicts of interest with other class members", and (2) "will prosecute the action vigorously on behalf of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Plaintiffs here meet both requirements. No conflict of interest exists between the named Plaintiffs and the class. The class representatives have experienced the same unlawful conduct as class members as a whole and they seek the same relief.

The named Plaintiffs are represented by qualified and competent counsel who will prosecute the action vigorously on behalf of the class. Plaintiffs' counsel Stanley Young, Andrew Byrnes and Tammy Albarrán of Covington & Burling LLP have years of combined litigation experience, including with class actions or civil rights disputes. Co-counsel Daniel Pochoda is the Legal Director of the ACLU Foundation of Arizona and has litigated numerous class action and constitutional cases, including arguing a civil rights case before the U.S. Supreme Court. He also served as an attorney in the Civil Rights Division of the U.S. Department of Justice. Co-counsel Cecillia Wang is the managing attorney for the California office of the ACLU Immigrants' Rights Project and has served as lead counsel in several matters including a federal class action challenging an unconstitutional state bail law. Co-counsel Nancy Ramirez serves as the Western Regional Counsel for the Mexican American Legal Defense and Educational Fund (MALDEF), a national civil rights organization whose principal objective is to

1   promote the civil rights of Hispanics in the U.S., and has litigated several class action

2   cases in federal court.  In light of the above, both the named Plaintiffs and their counsels

3   meet the requirements of Rule 23(a)(4).

4         **B.**     **The Proposed Class Satisfies The Requirements Of Rule 23(b)(2).**

5   In addition to meeting the requirements of Rule 23(a), the proposed class also

6   meets the requirement of Rule 23(b)(2), which is satisfied if "the party opposing the

7   class has acted or refused to act on grounds that apply generally to the class, so that final

8   injunctive relief or corresponding declaratory relief is appropriate respecting the class as

9   a whole."  Fed. R. Civ. P. 23(b)(2).

10  *First*, certification is appropriate under Rule 23(b)(2) where defendants' injurious

11  pattern and practices apply to the entire class.  *Rodriguez*, 591 F.3d at 1125.  As noted

12  previously, Defendants are engaged in a pattern of discriminatory conduct against

13  Hispanic drivers and passengers.  Rule 23(b)(2) was intended to target precisely such

14  civil rights violations.  *See* Fed. R. Civ. P. 23(b)(2) advisory committee's note; Newberg

15  on Class Actions §4.11 (4th ed. 2002) (noting the rule is "designed specifically for civil

16  rights cases seeking broad declaratory or injunctive relief for a numerous and often

17  unascertainable or amorphous class of persons").

18  *Second*, Rule 23(b)(2) is "almost automatically satisfied in actions primarily

19  seeking injunctive relief."  *Baby Neal*, 43 F.3d at 58.  Unlike cases "brought under one

20  of the other 23(b) prongs, questions of manageability and judicial economy are . . .

21  irrelevant to 23(b)(2) class actions."  *Rodriguez*, 591 F.3d at 1125 (internal citation

22  omitted).

23  *Finally*, class action treatment here would ensure that those other than the named

24  Plaintiffs are able to enforce a judgment against Defendants.  In the absence of a class

25  action, there is no reason to believe that Defendants would willingly apply such an order

26  to non-parties.  *Nehmer v. U.S. Veterans' Admin.*, 118 F.R.D. 113, 119 (N.D. Cal. 1987)

27  ("Class actions enable unidentified class members to enforce court orders with contempt

28  proceedings, rather than relying on the res judicata in a subsequent lawsuit.").

1

2

**C.     The Proposed Class Is Sufficiently Definite To Be Certified Under Rule 23(b)(2).**

3

4

Plaintiffs' proposed class is sufficiently definite to be certified under Rule 23(b)(2).  The class is defined in terms of, and limited by, Defendants' challenged behaviors.  Furthermore, the class is defined by objective criteria, including location in a vehicle within the geographical limits of Maricopa County.  *Cf. Guadiana v. State Farm Fire and Cas. Co.*, No. 07-326 TUC FRZ, 2010 WL 5071069, at *5 (D. Ariz. Dec. 7, 2010); *see also Rice v. City of Philadelphia*, 66 F.R.D. 17, 19 (E.D. Pa. 1974).  Thus, the proposed class is ascertainable and sufficiently defined for purposes of Rule 23(b)(2) certification.

5

6

7

8

9

10

11

**IV.     CONCLUSION**

12

For all the reasons stated herein, Plaintiffs respectfully request that the court certify a class of "All Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona."

13

14

15

16

17

RESPECTFULLY SUBMITTED this 29th day of April, 2011.

18

19

By  */s/ Stanley Young*
Stanley Young (*Pro Hac Vice*)
Andrew C. Byrnes (*Pro Hac Vice*)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418

20

21

22

23

Tammy Albarran (*Pro Hac Vice*)
Lesli Gallagher (*Pro Hac Vice*)
Kevin J. Hickey (*Pro Hac Vice*)
Matthew Steilen (*Pro Hac Vice*)
1 Front Street
San Francisco, CA 94111-5356

24

25

26

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
Anne Lai
3707 N. 7th St., Ste. 235

27

28

1  Phoenix, Arizona 85014
   Telephone:  (602) 650-1854
2  Facsimile:  (602) 650-1376

3  ACLU FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
4  Cecillia Wang
   39 Drumm Street
5  San Francisco, California 94111
   Telephone:  (415) 343-0775
6  Facsimile:  (415) 395-0950

7  MEXICAN AMERICAN LEGAL
   DEFENSE & EDUCATIONAL FUND
8  Nancy Ramirez
   634 South Spring Street, 11th Floor
9  Los Angeles, California 90014
   Telephone:  (213) 629-2512 x136
10 Facsimile:  (213) 629-0266

11 *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

   I hereby certify that on the 29th day of April, 2011 I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants:

        Thomas P. Liddy
        tliddy@mail.maricopa.gov
        Maria R. Brandon
        brandonm@mail.maricopa.gov

        Timothy P. Casey
        timcasey@azbarristers.com'

        *Attorneys for Defendant Sheriff Joseph Arpaio and the*
        *Maricopa County Sherriff's Office*


       */s/ Stanley Young*
        Stanley Young