1
2
3
4

COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile:  (650) 632-4800

5
6
7

Stanley Young (*Pro Hac Vice*)
syoung@cov.com
Andrew C. Byrnes (*Pro Hac Vice*)
abyrnes@cov.com

8

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

9
10

**IN THE UNITED STATES DISTRICT COURT**

11

**FOR THE DISTRICT OF ARIZONA**

12
13
14
15
16
17
18

| Manuel de Jesus Ortega Melendres, et al., | ) | No. CV 07-2513-PHX-GMS |
|---|---|---|
| Plaintiffs, | ) ) ) | **SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) ) | |
| Joseph M. Arpaio, et al., | ) ) | |
| Defendants. | ) ) ) | (The Honorable Judge G. Murray Snow) |

19
20
21
22
23
24
25
26
27
28

*Additional Attorneys for Plaintiffs:*

COVINGTON & BURLING LLP
1 Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
Kevin Hickey (*Pro Hac Vice*)
khickey@cov.com
Matthew Steilen (*Pro Hac Vice*)
msteilen@cov.com
Lesli Gallagher (*Pro Hac Vice*)
lgallagher@cov.com

ACLU FOUNDATION OF ARIZONA
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376
Daniel Pochoda (021979)
dpochoda@acluaz.org
Anne Lai (330036*)
alai@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0775
Facsimile:  (415) 395-0950
Cecillia Wang (*Pro Hac Vice*)
cwang@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512
Facsimile:  (213) 629-0266
Nancy Ramirez (*Pro Hac Vice*)
nramirez@maldef.org

**SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

| No. | Statement of Fact | Supporting Evidence |
|-----|-------------------|---------------------|
| 1. | In 2006, Maricopa County Sheriff Joseph Arpaio announced a new focus for his agency—to find and lock up illegal immigrants. | ORT 78-80, Ex. 5 to Arpaio Dep. I (introduced at Arpaio Dep. I at 34:19-35:5) [Hickey Dec.[1] Ex. 7]; ORT 84-85, Ex. 6 to Arpaio Dep. I (introduced at Arpaio Dep. I at 45:14-46:19) (quoting Arpaio stating that "ours is an operation where we want to go after the illegals . . . and lock them up.") [Hickey Dec. Ex. 8]; Arpaio Dep. I at 38:9-19 (statements reflect new get-tough policy on illegal immigration in Maricopa County initiated around that time) [Hickey Dec. Ex. 4]. |
| 2. | At the time, Sheriff Arpaio made public statements equating illegal immigrants with people from Mexico and suggesting that his new enforcement priority would focus on persons from Mexico.  He stated, for example, that as far as he was concerned, "the only sanctuary for illegal immigrants is in Mexico." | ORT 78-80, Ex. 5 to Arpaio Dep. I (introduced at Arpaio Dep. I at 34:19-35:5) ("If you get caught by immigration, you get a free ride back to Mexico…Not in my county….") [Hickey Dec. Ex. 7]; ORT 104, Ex. 10 to Arpaio Dep. I (introduced at Arpaio Dep. I at 149:6-21) [Hickey Dec. Ex. 10] |
| 3. | As part of a "crackdown" against illegal immigration, the Maricopa County Sheriff's Office ("MCSO") sought, and secured, an agreement with U.S. Immigration and Customs Enforcement to cross-certify its field personnel to enforce the federal immigration laws under the Immigration and Nationality Act § 287(g), 8 U.S.C. §1357(g). | Arpaio Dep. I at 143:10-24 [Hickey Dec. Ex. 4]; ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) (discussing 160 "trained and anxious" employees in "crackdown" on illegal immigration) [Hickey Dec. Ex. 9]; Sands Dep. I at 37:2-5 (testifying that MCSO did not previously have 287(g) authority) [Hickey Dec. Ex. 76]. |

---

[1] Declaration of Kevin Hickey In Support Of Plaintiffs' Motion For Partial Summary Judgment filed concurrently herewith.

| | | |
|---|---|---|
| 4. | As part of its campaign against illegal immigration, the MCSO created a specialized unit to enforce human smuggling law.  This unit was initially called the "Triple I Unit" and eventually became the "Human Smuggling Unit" ("HSU"). | Arpaio Dep. I at 38:20-39:22 [Hickey Dec. Ex. 4]; Sands Dep. I at 22:4-16, 60:2-23 [Hickey Dec. Ex. 76]; Rangel Dep. I at 12:18-13:16 [Hickey Dec. Ex. 67]. |
| 5. | MCSO expanded the HSU from 2 in April 2006 to 15 sworn officers by September 2007. | Melendres MCSO 14930, Ex. 9 to Click Dep. (introduced at Click Dep. at 144:20-146:1) [Hickey Dec. Ex.42]; Rangel Dep. I at 13:17-23 [Hickey Dec. Ex. 67]. |
| 6. | As part of its campaign against illegal immigration, the MCSO further created and publicized a hotline for citizens to call with complaints about suspected illegal immigrants. | ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) (discussing launch of hotline for citizens to report suspected illegal immigrants in "crackdown") [Hickey Dec. Ex. 9]. |
| 7. | As part of its campaign against illegal immigration, MCSO began sending deputies, posse and "the full resources of the Sheriff's Office" to "saturate valley cities" and other locations. These operations became known as "saturation patrols" or "crime suppression operations." | ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) [Hickey Dec. Ex. 9]. |
| 8. | In a statement about MCSO's new focus, Sheriff Arpaio distinguished his program from other law enforcement agencies' immigration enforcement efforts:  Rather than targeting illegal immigrants who were also criminal offenders, he stated that MCSO's program was designed to "go after illegals, not the crime first.  It's a pure program." | ORT 84-85, Ex. 6 to Arpaio Dep. I (introduced at 45:14-46:19) [Hickey Dec. Ex. 8]; multimedia file, Ex. 20 to Arpaio Dep. I (introduced at Arpaio Dep. I at 47:22-49:8) (footage of Feb. 26, 2007 MCSO news conference)[2]. |
| 9. | Describing his plans for the City of Mesa, Sheriff Arpaio stated that he would simply send some deputies "right down there to the main street…and arrest some illegals." | ORT 76-77, Ex. 17 to Arpaio Dep. I (introduced at 248:18-249:3) [Hickey Dec. Ex.13]; Arpaio Dep. I at 249:11-23 [Hickey Dec. Ex. 4]. |

---

[2] Ex. 20 to Arpaio Dep. I includes two audio/video recordings.  Plaintiffs intend to file these multimedia records with the Clerk should the Court grant Plaintiffs' Motion for Leave to File Audio/Video Recordings in Non-Electronic Form.

| 10. | On October 16, 2009, MCSO's 287(g) agreement with ICE was modified so that deputies no longer had authority to enforce federal immigration laws outside of the jail context. Sheriff Arpaio stated that this would not change any of his policies on illegal immigration and has continued to conduct large-scale saturation patrols after that date. | ORT 613-14 (MCSO News Release stating that "nothing changes" after loss of 287(g) authority) [Hickey Dec. Ex. 207]; ORT 1239 [Hickey Dec. Ex.209]; ORT 1246 (announcing large scale saturation patrols for 2010) [Hickey Dec. Ex.210]. |
|---|---|---|
| 11. | Sheriff Arpaio stated that his deputies could still "take care of the situation" and enforce the federal immigration laws against people based on their "speech, what they look like, if they look like they came from another country." | Multimedia file, Ex. 20 to Arpaio Dep. I (introduced at Arpaio Dep. I at 273:7-276:8) (Oct. 9, 2009 FOX News interview by Glenn Beck). |
| 12. | In Sheriff Arpaio's experience, he "rarely run[s] across people other than Hispanics crossing the border illegally." | Melendres MCSO 78151-55, Ex. 27 to Arpaio Dep. II (introduced at Arpaio Dep. II at 169:6-17) at Melendres MCSO 78153 [Hickey Dec. Ex. 32]; Arpaio Dep. II at 169:6-170:18 [Hickey Dec. Ex. 15]. |
| 13. | Sheriff Arpaio believes that the Hispanic illegal immigrants who come to Arizona "by and large" have "certain appearances," including "brown…skin color." | Arpaio Dep. I at 11:1-9 [Hickey Dec. Ex. 4]. |
| 14. | Discussing allegations that his agency was engaged in racial profiling during immigration enforcement operations, Sheriff Arpaio stated, "I have to tell you something. It's not politically correct to say this. Where do you think 99 percent of the people come from?" | ORT 1235[3] (footage from Oct. 22, 2009 MCSO news conference). |
| 15. | It is unusual for a law enforcement agency to look for illegal immigrants who have not committed any other offense. | Stewart Decl.[4] at ¶ 6. |

---

[3] ORT 1235 is an audio/video recording. Plaintiffs intend to file this multimedia record with the Clerk should the Court grant Plaintiffs' Motion for Leave to File Audio/Video Recordings in Non-Electronic Form.

[4] Declaration of Robert L. Stewart in Support of Plaintiffs' Motion for Partial Summary Judgment filed concurrently herewith.

| | | | |
|---|---|---|---|
| 16. | In 2008, Sheriff Arpaio published a book with co-author Len Sherman titled, *Joe's Law: America's Toughest Sheriff Takes on Illegal Immigration, Drugs, and Everything Else that Threatens America*. The book discusses illegal immigration at length, and suggests that Mexican and Hispanic immigrants are different than all other immigrant groups in U.S. history because they "maintain identities, from language to customs to beliefs, separate from the American mainstream" and seek to "reconque[r]" American land for Mexico. The book then distinguishes Arpaio's his own parents, writing "My parents did not regard any inch of American soil as somehow belonging to Italy, so their arrival here never constituted a 'reconquest' of that land." | | Arpaio Dep. I at 11:10-18 [Hickey Dec. Ex. 4]; Ex. 1 to Arpaio Dep. I (introduced at Arpaio Dep. I at 14:12-16) [Hickey Dec. Ex. 5]. |
| 17. | Arpaio promotes his book, *Joe's Law*, during book signings and interviews and admits that the line between what's in his book and his official business is not very firm. | | Arp. Dep. II 232:8-239:18 [Hickey Dec. Ex. 15]; OSLS000171, 174-75, 178-79, 189-90 (pages from redacted version of Ex. 35, withdrawn because it was not originally redacted, to Arpaio Dep. II, introduced at 220:2-7) [Hickey Dec. Ex. 186]. |
| 18. | Sheriff Arpaio has stated that illegal immigration from Mexico is "impacting on our culture because we are seeing their failure to assimilate." | | Melendres MCSO 78143-50, Ex. 28 to Arpaio Dep. II (introduced at Arpaio Dep. II at 172:22-173:5) at Melendres MCSO 78147-48 [Hickey Dec. Ex. 33]. |
| 19. | Sheriff Arpaio has described the illegal immigration problem as an "epidemic" and has also portrayed immigrants coming over the Mexican border as "dirty." | | Melendres MCSO 68373-74 (MCSO news release referring to the "illegal immigration epidemic") [Hickey Dec. Ex. 174]; ORT 528-535, Ex. 2 to Arpaio Dep. I (introduced at 20:13-21:1) at ORT 533 ("There's no control, no health checks or anything. They check fruits and vegetables, how come they don't check people? No one talks about that! They're all dirty.") [Hickey Dec. Ex. 6]. |
| 20. | When the swine flu broke out, he sent out a news release announcing that his deputies would be wearing face masks and gloves in the field to protect them from illegal immigrants coming from Mexico. | | ORT 637-39 ("Today's reality is this. There is a new and critical byproduct of the 287G program and that is protecting the health of the American public.") [Hickey Dec. Ex. 208] |

| 21. | The launch of saturation patrols and creation of the HSU cost MCSO significant resources. | Click Dep. at 190:15-18, 330:4-333:5 [Hickey Dec. Ex. 40]; Ex. 25 to Click Dep. [Hickey Dec. Ex. 43]; Palmer Dep. II at 109:8-110:5 (discussing HSU's propensity for overtime) [Hickey Dec. Ex. 61]. |
| --- | --- | --- |
| 22. | With the commencement of the saturation patrols and other policy changes, the MCSO declared itself a "full-fledged anti illegal immigration agency."  In making this transformation, Sheriff Arpaio stated that his officers had "heard the people speak" and were taking action to respond to their "frustration" with the illegal immigration issue. | ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) [Hickey Dec. Ex. 9]. |
| 23. | Sheriff Arpaio has a practice of keeping letters from his constituents and press clippings in a file devoted to the issue of immigration for his own reflection and interest. | Arpaio Dep. II at 11:10-12:18, 74:16-23 [Hickey Dec. Ex. 15]. |
| 24. | Sheriff Arpaio decides, personally, what goes into the immigration file. | Arpaio Dep. II at 17:22-18:1 [Hickey Dec. Ex. 15]. |

| | | |
|---|---|---|
| 25. | Sheriff Arpaio received and saved letters and news clippings explicitly advocating racial profiling in his immigration file. | Melendres MCSO 075852, Ex. 11 to Arpaio Dep. II, (introduced at Arpaio Dep. II at 74:16-23) ("Call it 'racial profiling' but if there are 12 million illegals that fit the profile, then it is what it is.") [Hickey Dec. Ex. 18]; Melendres MCSO 075859, Ex. 12 to Arpaio Dep. II (introduced at Arpaio Dep. II at 80:20-81:5) ("Sheriff Joe is doing what he was elected to do . . . . Racial profiling? Hello . . . The majority of illegal immigrants are Latino.") [Hickey Dec. Ex. 19]; OSLS002976-89 ("These Latino communities secrete and conceal these newly arrived illegals . . . . "[I]f we wish to locate illegals in the SW, shouldn't we be profiling those who appear to be Latino in complexion and facial genes, and speaking Spanish?") [Hickey Dec. Ex. 192]; OSLS0004172 ("I have been mistaken for being Hispanic, which I am not . . . . I do not understand the problem about Hispanics being stopped and checked out to make sure they are legal. . . . . They are Hispanic and how are we to tell if they are in this country legally unless we check.") [Hickey Dec. Ex. 198]. |
| 26. | Sheriff Arpaio had his assistant, Helen Gonzalez, send "thank you" letters to many of the individuals who wrote to him advocating racial profiling.  He would also circulate the letters to Chief Sands and others within the MCSO leadership. | Arpaio Dep. II at 21:12-22:13 (establishing meaning of notations), 91:22-92:1 [Hickey Dec. Ex. 15]; OSLS002976-89 (letter advocating racial  profiling for which Arpaio requests a thank you letter and forwards the letter to Brian Sands and Lisa Allen) [Hickey Dec. Ex. 192];  OSLS0004172 (letter advocating that Hispanics be "checked" for which Arpaio requests a thank you letter) [Hickey Dec. Ex. 198]. |
| 27. | One of the letters in Arpaio's file states, in part, "Their claim about your profiling in doing your job is ridiculous Where else would you look for illegal aliens except in neighborhoods where they would reside[?]" | OSLS 02990 [Hickey Dec. Ex. 193] |
| 28. | Arpaio requested that a copy of the letter be sent to Brian Sands, Lisa Allen and Paul Chagolla. | OSLS002990 [Hickey Dec. Ex. 193] |

| 29. | One of the letters in Arpaio's file states, in part, "What your officers are doing is actually 'statistically validating.' In the real world we all rely on 'stereotyping' every day.  It's simply a natural reaction.  . . . . If it looks like a duck & quacks like a duck . . . . !" | OSLS003221 [Hickey Dec. Ex. 195] |
|---|---|---|
| 30. | Arpaio requested that a thank you letter be sent and that a copy be sent to Brian Sands. | OSLS003221 [Hickey Dec. Ex. 195] |
| 31. | In one of the letters in Arpaio's immigration files, the author complains about motorists speeding, raising an actual concern for the safety of those in the area, but then goes on to complain about "Mexicans…on the corner…peddling their old corn, peanuts, etc," and to express frustration "at how the police officers ignore these Mexicans when they are speeding right by them." | OSLS003259-60 [Hickey Dec. Ex. 197] |
| 32. | Although nothing in the letter indicates that the author has any knowledge about the immigration status of the Mexican individuals the author complains about, Arpaio wrote a note indicating that he would "give the info to *my illegal immigration OFFICERS* to look into." | OSLS003259-60 (emphasis added) [Hickey Dec. Ex. 197] |
| 33. | In one of the letters in Arpaio's immigration files, the author stated that "Joe, those terrorist bear a close resemblance to those Hispanics, they are dark skinned, dark eyed, and have black hair . . . . 'Hispanic' criminal immigrants must include some actual Muslim terrorists . . . they are here because Bush, in his insane determination to give this country to Mexico, has made that possible." Arpaio requested that a thank you letter be sent and that copies be sent to Brian Sands and Paul Chagolla. | OSLS0003243-44 [Hickey Dec. Ex. 196] |

| 34. | On October 27, 2009, Richard H. forwarded an email he had sent to the *Arizona Republic* to Helen Gonzalez of the Sheriff's office.  In the email, Richard H. writes, "the only Hispanics that fear to report crimes are the ones here illegally," and continues "[w]hat our open border crowd calls racial profiling is what I call reasonable suspicion and probable cause, both of which are legal grounds for further reaction . . . . If it walks like a duck and quacks like a duck . . . ." | Melendres MCSO 072425, Ex. 13 to Arpaio Dep. II (introduced at Arpaio Dep. II at 82:19-83:22) and Ex. 9 to Sands Dep. II (introduced at Sand Dep. II at 85:9-86:4) [Hickey Dec. Exs. 20, 80]. |
| 35. | Richard H. writes actively on illegal immigration issues, and Sheriff Arpaio has talked to him personally in the past. | Arpaio Dep. II at 85:1-17 [Hickey Dec. Ex. 15]. |
| 36. | Sheriff Arpaio forwarded Richard H.'s October 27 email to Chief Sands. | Melendres MCSO 072425, Ex. 13 to Arpaio Dep. II (introduced at Arpaio Dep. II at 82:19-83:22) and Arpaio Dep. II at 82:19-83:25 (confirming he sent the email to Brian Sands with two copies to himself) [Hickey Dec. Ex. 20]; Ex. 9 to Sands Dep. II (introduced at Sand Dep. II at 85:9-86:4) and Sands Dep. II at 86:5-7 (confirming that he received the email from Arpaio) [Hickey Dec. Exs. 78, 80]. |

| | | |
|---|---|---|
| 37. | Richard H. has sent other correspondence advocating racial profiling.  Sheriff Arpaio has retained copies and circulated these materials. | Melendres MCSO 075284; Ex. 14 to Arpaio Dep. II (introduced at Arpaio Dep. II at 88:22-89:2) (copy of letter Mr. H. sent to Mesa Police Chief Gascon dated June 27, 2008 stating "It is a fact that at least 90 percent of the illegals in Mesa are Hispanic, and you need to fit that fact into your concept and fear of racial profiling.") [Hickey Dec. Ex. 21]; Arpaio Dep. II at 89:3-89:15 (Arpaio's initials on the copy indicate that he reviewed and distributed it), Arpaio Dep. II at 89:16-25 (failing to disclaim Mr. H.'s statement) [Hickey Dec. Ex. 15]; OSLS0004525 (letter from Mr. H. stating, "I suppose we should assume that it is [Sheriff Arpaio's] fault that the vast majority of individuals residing illegally in Maricopa County are Hispanics and that they live in Hispanic communities," to which Arpaio requests a thank you letter and copies Brian Sands) [Hickey Dec. Ex. 199]; OSLS0005154 (letter from Richard H. stating "Of course the Sheriff is having his deputies concentrate on the Hispanic communities; that's where most of the illegals are," to which Sheriff Arpaio copies Brian Sands) [Hickey Dec. Ex. 200]. |
| 38. | In two of the many emails Richard H. sent to Sheriff Arpaio, and which Arpaio kept, Richard H. specifically equates racial profiling to "establishing probable cause". | Carveout MCSO 209953-54 ("What some refer to as racism I see as establishing probable cause.") [Hickey Dec. Ex. 109]; Carveout MCSO 297781 ("Profiling . . . is an important part of establishing probable cause.") [Hickey Dec. Ex. 112]. |

| 39. | In 2005, the Minutemen Project wrote to Sheriff Arpaio asking him to "investigate and deport illegal immigrants when they are spotted in our cities," and further stating, "How is it that hundreds, if not thousand, of day laborers stand on our cities street corners every day of the year without fear of being questioned? . . . If you are serious on working the illegal immigration issue, we are serious about working with you."  Sheriff Arpaio sent this letter on to Chief Hendershott and told him "We should have a meeting (internally) and decide how to respond." | OSLS0005516 [Hickey Dec. Ex. 201]. |
| 40. | In July 2007, Carole B. sent a letter to Sheriff Arpaio relaying that her Italian mother had been profiled based on ethnicity during World War II, and that she thought it was "the right thing to do."   Sheriff Arpaio wrote her a thank you letter in response, stating "I especially enjoyed reading the story of your Italian grandmother and her experiences after coming into the country *legally*." | MCSO 068791-92, Ex. 42 to Arpaio Dep. II (introduced at Arpaio Dep. II at 274:16-21) ("Profiling? Give me a break!  During World War II my little Italian mother was en route to Tucson by train to marry my father.  There was a rumor about an Italian Mata Hari on the train. Mommy…was pulled off the train and interrogated along with all the other Italian women on board…it was the right thing to do.") [Hickey Dec. Ex. 36]; OSLS000121 (thank you letter from Arpaio) [Hickey Dec. Ex. 185]. |
| 41. | In a letter to Sheriff Arpaio, CT S. writes that illegal Hispanic immigrants are trying to take over and change the culture of the United States.  She describes the immigration of Hispanics as a "monstrous onslought"   and refers to a Cinco de Mayo program at an elementary school as "openly seditious."  Arpaio  requested that his staff send a thank you letter stating that he will "continue to fight the problem facing our county." | OSLS-000591-95 [Hickey Dec. Ex. 187]. |

- 12 -

| | | | |
|---|---|---|---|
| 42. | A 200-page immigration "book" authored by Diana E. and sent to Sheriff Arpaio contains a chapter on "racial profiling," purporting to capture the view of the community. The chapter states, "Of course the Latinos are being targeted; who else is coming over from Mexico - The Swedes?" Sheriff Arpaio forwarded the book to Chief Sands and Captain Chagolla. | | Melendres MCSO 74447-74738 (racial profiling chapter, Melendres MCSO 74589-98) [Hickey Dec. Ex. 178]. |
| 43. | In a letter to "Sheriff Joe," Sarah M. and Erika S. write that "Stopping Mexicans to be sure they are legal is not racist. Because our state is a border state to Mexico, so of course, there will be more Mexican illegals here than any other ethnic group." Sheriff Arpaio requested that a thank you letter be sent, forwarded the letter to Chief Sands and asked for three copies for himself. | | Melendres MCSO 078209, Ex. 17 to Arpaio Dep. II at 106:4-8) [Hickey Dec. Ex. 22]; Melendres MCSO 076783, Ex. 10 to Arpaio Dep. II (introduced at Arpaio Dep. II at 71:2-7) [Hickey Dec. Ex. 17]; Arpaio Dep. II at 71:8-10) (confirming that he sent the letter to Brian Sands); Arpaio Dep. II at 106:9-14 [Hickey Dec. Ex. 15]. |

| 44. | Sheriff Arpaio received and retained letters and emails from constituents containing racially charged and stigmatizing towards Hispanics. | Melendres MCSO 76123, Ex. 24 to Arpaio Dep. II (introduced at Arpaio Dep. II at 160:8-12) ("Because of their demeanor, it is obvious to pick out the illegals from the American citizens.") [Hickey Dec. Ex. 29]; Melendres MCSO 76155 ("[I]f the Sheriff did not pursue his enforcement policy - we the residents of AZ would now also be facing a 70% population of Hispanics and Spanish language domination.  This would destroy our historical 'American way of life.'") [Hickey Dec. Ex. 179]; Melendres MCSO 76267 (Those "in the 'Hispanic community' are not practicing American values.") [Hickey Dec. Ex. 180]; Melendres MCSO 75403-04, Ex. 23 to Arpaio Dep. II (introduced at Arpaio Dep. II at 155:9-160:5) ("[T]hey wave around the Mexican flag while demanding U.S. citizenship") [Hickey Dec. Ex. 28]; Melendres MCSO 71945 (complaining about "unpermit[ted] Mariachi band" and "freak show" from "illegal activists") [Hickey Dec. Ex. 175]; OSLS 001235 ("There are a bunch of Mexicans that play soccer once or twice a week…If they are illegals, we don't want them here.") [Hickey Dec. Ex. 190]; OSLS0001057, OSLS 001058-60 (complaining about, for example: "Many obvious illegal immigrants thriving in this city," "a suspicious person with luggage waiting outside [a] particular gas station," "Mexican woman driving old pickup tricks and cars with children jumping around the front seat," and stating about a local phonebook: "These materials are offensive and they are designed mostly for the Mexican Population…Everything is in Spanish!") [Hickey Dec. Exs. 188, 189] |

| | | |
|---|---|---|
| 45. | Sheriff Arpaio had thank you notes sent to these individuals or circulated the materials to MCSO leadership, including Chief Sands. | MCSO 76123, Ex. 24 to Arpaio Dep. II (introduced at Arpaio Dep. II at 160:8-12) and Arpaio Dep. II at 160:8-161:16 (Arpaio likely sent a thank you note); Melendres MCSO 76155 (Thank you letter); Melendres MCSO 76267 (forwarded to Chief Sands); Melendres MCSO 77958, Ex. 3 to Sands Dep. II (forwarded to Chief Sands); OSLS 001235 (Arpaio forwarded letter complaining about Mexicans playing soccer to Chief Sands) [Hickey Dec. Ex. 190]; OSLS-0001057, OSLS-0001058-60 (Arpaio requested a thank you letter and forwarded note to Chief Sands) [Hickey Dec. Exs. 188, 189]. |
| 46. | Sheriff Arpaio did not express disagreement with the materials containing racially charged language when he passed them on to his colleagues.  Chief Sands does not recall the Sheriff ever forwarding any statements that the Sheriff did not agree with. | Arpaio Dep. II at 28:16-22 (discussing MCSO 074133, Ex. 2B to Arpaio Dep. II) [Hickey Dec. Exs. 15, 16]; Sands Dep. II at 218:14-24 [Hickey Dec. Ex. 78]. |
| 47. | Sheriff Arpaio sent Chief Sands a letter stating that Hispanics countries allow their citizens to "run amuck like wild feral animals" and that "we have too many dysfunctional Hispanics [in the U.S.] already". | Melendres MCSO 77958, Ex. 3 to Sands Dep. II (introduced at 33:6-17) [Hickey Dec. Ex. 79]. |
| 48. | Arpaio forwarded an email referring to Judge Murguia a "token Hispanic female judge" to Chief Hendershott, Lisa Allen, Chief Sands, and Chief Macintyre | MCSO 074133, Ex. 2B to Arpaio Dep. II (introduced at Arpaio Dep. II at 25:15-21) (referring to Judge Murguia a "token Hispanic female judge" and stating "Quite uncool of Murguia to sit, or shit, on this case") [Hickey Dec. Ex. 16]; Arpaio Dep. II at 25:22-26:16) (confirming that Arpaio forwarded the "token Hispanic female judge" email to Chief Hendershott, Lisa Allen, Chief Sands, and Chief Macintyre) [Hickey Dec. Ex. 15]; |

| 49. | Sheriff Arpaio circulated a set of "statistics," which had been discredited by the *Los Angeles Times*, to Chief Sands because, according to Arpaio, they relate to Sands' law enforcement activities. Under "illegal alien contributions," this document lists the number of Spanish radio stations in Phoenix and the number of Spanish speakers in Los Angeles County.  It claims that 83% of warrants for murder in Phoenix are for illegal aliens—a number that Arpaio later acknowledged "does not sound right." Arpaio admitted that he never checked the veracity of these statistics before circulating them to his officers. Deputy Palmer circulated the same statistics to other members of MCSO. | Melendres MCSO 076783, Ex. 10 to Arpaio Dep. II (introduced at 71:2-7) and Arpaio Dep. II at 71:8-10 (confirming that he passed them on to Brian Sands and Scott Freeman), 72:23-74:9 [Hickey Dec. Exs. 15, 17]; Ex. 5 to Palmer Dep. II (introduced at Palmer Dep. II at 50:1-21) [Hickey Dec. Ex. 62]; Palmer Dep. II at 118:8-119:8 [Hickey Dec. Ex. 61]. |
|---|---|---|
| 50. | It is not generally accepted practice for the head of a law enforcement agency to circulate materials that advocate racial profiling or are racially charged within his office. | Stewart Decl. at ¶ 11. |
| 51. | Circulation of such material sends a message to subordinates that the sentiments expressed should be considered as communicating the Sheriff's desires for the agency's operations. | Stewart Decl. at ¶ 12. |
| 52. | Defendants' police practices expert Bennie Click testified that he was not sure whether circulating such materials would be "appropriate" and that law enforcement needs to be "very careful taking any action" based on them.  Mr. Click stated that if he had received such correspondence as a police chief, he "would [not] even respond to it." | Click Dep. at 163:25-164:8, 166:9-15 [Hickey Dec. Ex. 40]. |

| 53. | In its news releases, MCSO has described the goal of the saturation patrols as arresting significant numbers of illegal immigrants. | ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) (describing "more than 200" armed personnel who would saturate valley cities) [Hickey Dec. Ex. 9]; ORT 103 (MCSO News Release announcing Sept. 27, 2007 operation in Cave Creek where deputies were "cracking down on illegal immigration") [Hickey Dec. Ex. 45]; DiPietro Dep. at 39:19-40:22 [Hickey Dec. Ex. 44]; ORT 104, Ex. 10 to Arpaio Dep. I (introduced at Arpaio Dep. I at 149:6-21) (MCSO News Release describing Oct. 4, 2007 Queen Creek operation that went after day laborers who were illegal immigrants) [Hickey Dec. Ex. 10]; ORT 105-06 (MCSO News Release describing patrols for illegal immigrants near 36th Street and Thomas Road in December 2007) [Hickey Dec. Ex. 203]; ORT 107-08, Ex. 11 to Arpaio Dep. I (MCSO News Release announcing Jan. 18, 2008 crime suppression operation in central Phoenix and anticipating "many" illegal immigration arrests); ORT 109-110 (MCSO News Release announcing March 27-28, 2008 crime suppression operation targeting day laborer centers that are "magnets for [] illegal aliens") [Hickey Dec. Ex. 204]. |
| --- | --- | --- |
| 54. | Sheriff Arpaio has touted the high numbers of illegal immigrants arrested on saturation patrols.  After saturation patrols, MCSO provides the media with the total number of illegal immigrants arrested. | ORT 1239-40 (MCSO news release touting the 530 arrests of illegal aliens during saturation patrol) [Hickey Dec. Ex. 209]; Sousa Dep. I 128:2-130:15 [Hickey Dec. Ex. 88]. |
| 55. | Sheriff Arpaio has referred to the operations as "crime suppression/illegal immigration details." | Melendres MCSO 76995 (letter to Mesa Police Chief Gascon) [Hickey Dec. Ex. 181]. |
| 56. | An MCSO officer has referred to saturation patrols as "roundups on illegal immigrants."  Lieutenant Sousa, however, stated that such "roundups" would be "illegal." | Melendres MCSO 81362-66, Ex. 3 to Sousa Dep. II (introduced at Sousa Dep. II 25:19-26:1) [Hickey Dec. Ex. 91]; Sousa Dep. II. at 27:24-30:17 (acknowledging that roundups of illegal immigrants would, in his view, constitute racial profiling) [Hickey Dec. Ex. 90]. |

| 57. | In Sheriff Arpaio's calendar, days on which saturation patrols took place are marked as "sweeps," yet he has stated that the word "sweeps" has a negative connotation and denied that MCSO "goes around sweeping people on the streets." | Arpaio Dep. II at 219:9-21; 222:14-223:14 [Hickey Dec. Ex. 15]; OSLS000303 (page from redacted version of Ex. 35, withdrawn because it was not originally redacted, to Arpaio Dep. II, introduced at 220:2-7) [Hickey Dec. Ex. 186]. |
|---|---|---|
| 58. | In advance of large saturation patrols, HSU prepares and distributes a planning document titled, "Operations Plan," "Overall Operations Summary," or "Incident Action Plan." | Sousa Dep. I at 96:13-24, 130:21-133:4,143:3-9 [Hickey Dec. Ex. 88]; Madrid Dep. I at 146:6-13 [Hickey Dec. Ex. 50]. |
| 59. | Even though officers from different divisions would participate in the larger saturation patrols, HSU gives the briefing and collects the officer stat sheets at the end of the operation. | Sousa Dep. I at 16:20-17:1 (Lt. Sousa is commander of HSU), 25:17-26:6; 169:21-170:10 [Hickey Dec. Ex. 88]. |
| 60. | MCSO has conducted at least 13 large saturation patrols consisting of multiple divisions.  It has also conducted some smaller saturation patrols consisting primarily of HSU units. | Sousa Dep. I at 142:22-143:9 [Hickey Dec. Ex. 88]. |
| 61. | MCSO conducted a large-scale saturation patrol on January 18-19, 2008, covering 16th to 40th Streets / Indian School to McDowell Roads in Phoenix. | Melendres MCSO 1822–24 (Overall Operations Summary) [Hickey Dec. Ex. 119]; ORT 107-08 (Press Release), Ex. 11 to Arpaio Dep. I (introduced at 161:9-162:18). [Hickey Dec. Ex. 11] |
| 62. | MCSO conducted a large-scale saturation patrol on March 21-22, 2008, covering 16th to 40th Streets / Indian School to McDowell Roads in Phoenix.  39 of the 56 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 1834–36 (Overall Operations Summary) [Hickey Dec. Ex. 120]; Melendres MCSO 1838-40 (Arrest List) [Hickey Dec. Ex. 121]; Sousa Dep. I at 131:18-25 [Hickey Dec. Ex. 88]; Melendres MCSO 14541 (email with totals) [Hickey Dec. Ex. 137]. |
| 63. | MCSO conducted a large-scale saturation patrol on March 27-28, 2008, in the area around Cave Creek and Bell Roads in Phoenix.  27 of the 53 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 1844–46 (Incident Action Plan) [Hickey Dec. Ex. 122]; Melendres MCSO 1872–73 (Arrest List) [Hickey Dec. Ex. 126]; Melendres MCSO 1849–50 (Sign-in Roster) [Hickey Dec. Ex. 123]; ORT 109 (Press Release) [Hickey Dec. Ex. 204]; Sands Dep. I at 114:17-115:16 [Hickey Dec. Ex. 76]; Melendres MCSO 14644-45 (email with totals) [Hickey Dec. Ex. 138]. |

| | | |
|---|---|---|
| 64. | MCSO conducted a large-scale saturation patrol on April 3-4, 2008 in the Guadalupe, Arizona.  9 of the 45 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 1853–59 ("Operation Guadalupe") [Hickey Dec. Ex. 124]; Melendres MCSO 1872–73 (Arrest List) [Hickey Dec. Ex. 126]; Melendres MCSO 1866-71 (Sign-in Roster) [Hickey Dec. Ex. 126]; Sands Dep. I at 124:19-125:9 [Hickey Dec. Ex. 76]; Melendres MCSO 1864 (email with totals) [Hickey Dec. Ex. 125]. |
| 65. | MCSO conducted a large-scale saturation patrol on June 26-27, 2008, in Mesa, Arizona.  19 of the 63 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 1878–98 (Incident Action Plan) [Hickey Dec. Ex. 127]; Melendres MCSO 1904-06 [Hickey Dec. Ex.129]; Melendres MCSO 1911-14 (Arrest Lists) [Hickey Dec. Ex.129]; Melendres MCSO 1907-10 [Hickey Dec. Ex.129]; Melendres MCSO 1915-20 (Sign-in Rosters) [Hickey Dec. Ex.129]; Sands Dep. II at 127:9-128:6 [Hickey Dec. Ex.78]; Melendres MCSO 1899-1900 (email with totals) [Hickey Dec. Ex.128]. |
| 66. | MCSO conducted a large-scale saturation patrol on July 14, 2008, in Mesa, Arizona.  26 of the 40 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 1926–39 (Incident Action Plan) [Hickey Dec. Ex.130]; Melendres MCSO 1844-46 (Arrest List) [Hickey Dec. Ex.122]; Melendres MCSO 1942-4 (Sign-in Roster) [Hickey Dec. Ex.132]; Melendres MCSO 1941 (email with totals) [Hickey Dec. Ex.131]. |
| 67. | MCSO conducted a large-scale saturation patrol on August 13–14, 2008, in Sun City and Sun City West.  79 of the 109 persons arrested were suspected of being illegal immigrants.  23 of these were arrested under the state human smuggling law. | Melendres MCSO 1971–72 (Operations Plan) [Hickey Dec. Ex.133]; Melendres MCSO 001978-86 (Arrest List) [Hickey Dec. Ex.135]; Melendres MCSO 001987-95 (Sign-in Roster) [Hickey Dec. Ex.135]; ORT 000425-26 (Press Release) [Hickey Dec. Ex. 206]; Madrid Dep. I at 168:3-6 [Hickey Dec. Ex. 50]; Melendres MCSO 1974 (email with totals) [Hickey Dec. Ex. 134]. |

| 68. | MCSO conducted a large-scale saturation patrol on January 9–10, 2009, in the Southwest Valley. 14 of the 52 persons arrested were suspected of being illegal immigrants. None were arrested under the state human smuggling law. | Melendres MCSO 15553–59 (Operations Plan) [Hickey Dec. Ex. 150]; Melendres MCSO 15570-71 [Hickey Dec. Ex. 151]; Melendres MCSO 15576-77 (Arrest Lists) [Hickey Dec. Ex. 151]; Melendres MCSO 15566-69 [Hickey Dec. Ex. 151]; Melendres MCSO 15572-75 (Sign-in Rosters) [Hickey Dec. Ex. 151]; Sousa Dep. I at 12-17 [Hickey Dec. Ex. 88]; Melendres MCSO 14484-85 (email with totals) [Hickey Dec. Ex.136]. |
| --- | --- | --- |
| 69. | MCSO conducted a large-scale saturation patrol on April 23-24, 2009, in Avondale and the Southwest Valley. 20 of the 40 persons arrested were suspected of being illegal immigrants. None were arrested under the state human smuggling law. | Melendres MCSO 56976–82 (Operations Plan) [Hickey Dec. Ex. 158]; Melendres MCSO 56988-90 (Arrest List) [Hickey Dec. Ex. 160]; Melendres MCSO 56991-98 (Sign-in Roster) [Hickey Dec. Ex.161]; Armendariz Dep. I at 177:24-178:15 [Hickey Dec. Ex. 1]; Melendres MCSO 56983 (email with totals) [Hickey Dec. Ex.159]. |
| 70. | MCSO conducted a large-scale saturation patrol on July 23-24, 2009, Chandler and the Southeast Valley. 15 of the 74 persons arrested were suspected of being illegal immigrants. None were arrested under the state human smuggling law. | Melendres MCSO 56999–57004 (Operations Plan) [Hickey Dec. Ex. 162]; Melendres MCSO 057005-09 [Hickey Dec. Ex. 162]; Melendres MCSO 57029 (Arrest Lists) [Hickey Dec. Ex. 162]; Melendres MCSO 057012 [Hickey Dec. Ex. 162]; Melendres MCSO 57020-28 (Sign-in Rosters) [Hickey Dec. Ex. 162]; Palmer Dep. I at 124:10-23 [Hickey Dec. Ex. 56]; Melendres MCSO 57010-11 (email with totals) [Hickey Dec. Ex. 162]. |
| 71. | MCSO conducted a large-scale saturation patrol on September 5-6, 2009, in the area around 35th Avenue and Lower Buckeye Road in Phoenix. 30 of the 61 persons arrested were suspected of being illegal immigrants. None were arrested under the state human smuggling law. | Melendres MCSO 57030–34 (Operations Plan) [Hickey Dec. Ex. 163]; Melendres MCSO 057040-43 [Hickey Dec. Ex. 164]; Melendres MCSO 57045 (Arrest Lists) [Hickey Dec. Ex. 164]; Melendres MCSO 57035-39 [Hickey Dec. Ex. 164]; Melendres MCSO 57044 (Sign-in Rosters) [Hickey Dec. Ex. 164]; Sousa Dep. I at 167:6-169:5 [Hickey Dec. Ex. 88]; Melendres MCSO 57046-47 (email with totals) [Hickey Dec. Ex. 165]. |

| 72. | MCSO conducted a large-scale saturation patrol on October 16-17, 2009, in Surprise and the Northwest Valley. 21 of the 32 persons arrested were suspected of being illegal immigrants.  None were arrested under the state human smuggling law. | Melendres MCSO 58708–14 (Operations Plan) [Hickey Dec. Ex. 166]; Melendres MCSO 058717-19 [Hickey Dec. Ex. 166]; Melendres MCSO 58725-27 (Arrest Lists) [Hickey Dec. Ex. 166]; Melendres MCSO 58720-24 [Hickey Dec. Ex. 166]; Melendres MCSO 58728-30 (Sign-in Rosters) [Hickey Dec. Ex. 166]; Sands Dep. I at 143:24-144:4 [Hickey Dec. Ex. 76]; Melendres MCSO 58715 (email with totals) [Hickey Dec. Ex. 166]. |
| 73. | MCSO conducted a county-wide large-scale saturation patrol on November 16-17, 2009. 33 of the 51 persons arrested were suspected of being illegal immigrants. | Melendres MCSO 059649–54 (Operations Plan) [Hickey Dec. Ex. 167]; Melendres MCSO 059660-62 [Hickey Dec. Ex. 169]; Melendres MCSO 059666-67 (Arrest Lists) [Hickey Dec. Ex. 171]; Melendres MCSO 059656-59 [Hickey Dec. Ex. 168]; Melendres MCSO 059664-65 (Sign-in Rosters) [Hickey Dec. Ex. 170]; Armendariz Dep. I at 186:5-187:11 [Hickey Dec. Ex. 1]; Melendres MCSO 59668, 59689 (stat sheets with totals) [Hickey Dec. Ex. 172]. |
| 74. | Chief Sands is responsible for planning saturation patrol operations, including site-selection. | Sands Dep. I at 71:9-72:1 [Hickey Dec. Ex. 76]; Sousa Dep. I at 93:13-21. [Hickey Dec. Ex. 88] |
| 75. | Lieutenant Sousa and Chief Sands acknowledge that saturation patrols are regularly initiated based on citizen complaints. | Sousa Dep. I at 85:2-10 [Hickey Dec. Ex. 88]; Sands Dep. I at 75:2-12 (stating that he followed Sheriff Arpaio's suggestions about locations for sweeps based on calls from the public and citizen complaints) [Hickey Dec. Ex.76], 199:24-200:9 (testifying that MCSO has launched sweeps on the basis of citizen complaints about day laborers as a "nuisance") [Hickey Dec. Ex. 76]. |

| 76. | MCSO regularly received requests for sweeps or immigration enforcement activity by phone. | Melendres MCSO 75622-24, Ex. 25 to Arpaio Dep. II (introduced at Arpaio Dep. II at 161:19-163:13) and Arpaio Dep. II at 163:22-167:14 (acknowledging that he flagged three requests for sweeps containing no description of criminal activity but of immigrants "hanging out . . . on corner" for Brian Sands "since he's been in charge of the crime suppression operations.") [Hickey Dec. Ex. 30]; Melendres MCSO 75620, Ex. 26 to Arpaio Dep. II (introduced at Arpaio Dep. II at 167:15-22) and Arpaio Dep. II at 167:23-168:11 (testifying that he highlighted two requests for sweeps for Brian Sands) [Hickey Dec. Ex. 31]; OSLS001245 (call from Wayne L. of Mesa on Sept. 20, 2007 stating that he had "called the non-emergency and illegal hot line . . . but nobody gets all the Mexicans hanging out on Mesa Dr. between Southern and Broadway" that Arpaio highlighted and sent it to Brian Sands). [Hickey Dec. Ex. 191]. |
| --- | --- | --- |
| 77. | Sheriff Arpaio passed on such requests to Chief Sands even though they contained no information about criminal activity. | Arpaio Dep. II at 163:22-167:14, 167:23-168:11 [Hickey Dec. Ex. 15]; OSLS001245 [Hickey Dec. Ex. 191]. |
| 78. | On or about June 24, 2008, Sheriff Arpaio received a letter from Gina M., in which she stated, "They have the nerve to say we are racially profiling. Please, it is what it is.  If you have dark skin, then you have dark skin. Unfortunately, that is the look of the Mexican illegals who are here illegally."  The letter goes on to say, "I'm begging you to come over to 29th Street/Greenway Parkway area and round them all up." | Melendres MCSO 69086-88; Ex. 18 to Arpaio Dep. II (introduced in Arpaio Dep. II at 115:8-21) [Hickey Dec. Ex. 23]. |
| 79. | Sheriff Arpaio forwarded Gina M's letter onto Chief Sands with a note that said, "Have someone handle this," because, according to him, he was "building up intelligence on crime areas in the city."  Sheriff Arpaio and Chief Sands stated that MCSO did saturation patrols in the area near 29th Street and Greenway. | Melendres MCSO 69086-88; Ex. 18 to Arpaio Dep. II (introduced in Arpaio Dep. II at 115:8-21) [Hickey Dec. Ex. 23]; Arpaio Dep. II at 115:19-116:18 [Hickey Dec. Ex. 15]; Sands Dep. II at 99:8-19 [Hickey Dec. Ex. 78]. |

| 80. | On or about May 26, 2009, Sheriff Arpaio received a letter from a Stella C., stating, in part, "On this particular day, all of a sudden a large amount of these Mexicans swarmed around my car, and I was so scared and alarmed, and the only alternative I had was to manually direct them away from my car." | Melendres MCSO 074346; Ex. 19 to Arp. Dep. II (introduced at 120:22-121:1) [Hickey Dec. Ex. 24]. |
|---|---|---|
| 81. | Arpaio forwarded the May 26, 2009 letter on to Chief Deputy Trombi with a note for him to keep file on these complaints, and also to have someone contact the author.  Although Sheriff Arpaio first stated that he passed the letter on because she talks about a crime, he admitted that no crime was actually described in the letter. | Arp. Dep. II at 120:22-122:24; 124:3-126:53. [Hickey Dec. Ex. 15]. |
| 82. | On or about August 8, 2008, Sheriff Arpaio received a letter from Bob and Lynnette W. requesting an immigrant sweep in Surprise, "specifically at the intersection of Grand and Greenway." The basis for their request was that "[t]he area contains dozens of day workers attempting to flag down motorists."  Sheriff Arpaio forwarded the letter to Chief Sands. | Melendres MCSO 76087; Ex. 21 to Arpaio Dep. II (introduced at 145:6-9) [Hickey Dec. Ex. 26]; Arpaio Dep. II at 145:6-146:2 [Hickey Dec. Ex. 15]. |
| 83. | On August 1, 2008 Arpaio received a letter from Gail V. complaining about people speaking Spanish at McDonald's in her area and telling Arpaio that he should "check out Sun City." | MCSO Melendres 076091, Ex. 11 to Sands Dep. II (introduced at Arpaio Dep. II at 106:2-10) [Hickey Dec. Ex. 81] and Ex. 20 to Arpaio Dep. II (introduced at 133:7-9) [Hickey Dec. Ex. 25]. |
| 84. | Sheriff Arpaio acknowledged that Gail v's letter did not describe any criminal activity.  Nevertheless, Sheriff Arpaio wrote a note on the letter stating "Letter, thank you for the info. Will look into it." | Arpaio Dep. II at 133:10-18, 135:23-25, 141:10-15 (stating that he did not tell Gail v. that speaking Spanish is not a crime) [Hickey Dec. Ex. 15]. |

| 85. | Sheriff Arpaio then passed her letter on to Chief Sands with a handwritten notation "for our operation." Chief Sands testified that he understands that he is expected "to do whatever [he] can about a citizen's complaint." | Arpaio Dep. II at 133:7-135:12, 138:15-139:1 (explaining that he forwarded MCSO Melendres 076091 to Chief Sands because "we're responding to our constituent's information"), 141:25-145:3 (explaining that he passed it on to Brian Sands in connection with a crime suppression operation in the area) [Hickey Dec. Ex. 15]; Sands Dep. II at 115:22-116:3, 118:25-119:19 [Hickey Dec. Ex. 78]. |
|---|---|---|
| 86. | On or about August 13 & 14, 2008, the MCSO conducted a saturation patrol in Sun City. | MCSO 1970-73 (Operations Plan) [Hickey Dec. Ex. 133]. |
| 87. | On May 8, 2008, a Mike Sa. wrote a letter to Sheriff Arpaio calling his attention to the situation in Mesa, stating that "ha[d] yet to see the police stop in order to determine whether these day laborers are here under legitimate circumstances," commenting that he "believes" that they are here illegally. | MCSO Melendres 75403-04, Ex. 23 to Arpaio Dep. II (introduced at 155:9-14) [Hickey Dec. Ex. 28], Ex. 15 to Sands Dep. II (introduced at Sands Dep. II at 153:25-154:5) [Hickey Dec. Ex. 83]. |
| 88. | Sheriff Arpaio and Chief Sands both acknowledge that being day laborer is not a crime. | Arpaio Dep. II at 157:18-158:11 (referring to MCSO Melendres 75403-04) [Hickey Dec. Ex. 15]; Sands Dep. II at 138:15-20 [Hickey Dec. Ex. 78]. |
| 89. | Chief Sands cannot think of an instance in which the MCSO arrested a day laborer who is not Hispanic. | Sands Dep. II 140:3-10 [Hickey Dec. Ex. 78]. |
| 90. | Sheriff Arpaio sent Mike Sa.'s letter to Chief Sands with a notation next to the portion asking for police action against the day laborers as "intelligence." | MCSO Melendres 075403-04, Ex. 23 to Arpaio Dep. II (introduced at 155:9-14) [Hickey Dec. Ex. 28]; Arpaio Dep. II at 155:24-157:3 [Hickey Dec. Ex. 15]. |
| 91. | On May 24, 2008, Sheriff Arpaio received a letter from Jack Se., whom Arpaio had corresponded with before, stating that Mesa needs a "sweep . . . terribly." He noted that the head of Mesa's police union is Hispanic, and commented, "This is what you get from Mesa." He criticized a Hispanic officer for refusing to arrest "30+ illegals" because they were just "standing there." | Melendres MCSO 76195, Ex. 22 to Arpaio Dep. II (introduced at Arpaio Dep. II at 147:15-18) [Hickey Dec. Ex. 27]; Ex. 13 to Sands Dep. II (introduced at 126:21-127:1) [Hickey Dec. Ex. 82]. |

| 92. | Chief Sands testified that Jack Se. likely believed the individuals were "illegals" because they were "dark-complected people." | Melendres MCSO 076195, Ex. 13 to Sands Dep. II (introduced at 126:21-127:1) [Hickey Dec. Ex. 82]; Sands Dep. II at 140:3-143:18 [Hickey Dec. Ex. 78]. |
|---|---|---|
| 93. | In response to Jack Se.'s letter, Arpaio wrote, "I will be going into Mesa" and sent a copy of the letter to Chief Sands, with the intention of drawing Sands' attention to Mr. Se.'s concerns. | Melendres MCSO 076195, Ex. 22 to Arpaio Dep. II (introduced at Arpaio Dep. II at 147:15-18) [Hickey Dec. Ex. 27]; Arpaio Dep. II at 146:18-160:5 . [Hickey Dec. Ex. 15] |
| 94. | Arpaio also wrote Jack Se. a letter stating in part, "Please know that I share your concern regarding the impact [illegal immigration] is having on our country and Maricopa County." | OSLS000028 [Hickey Dec. Ex. 184]. |
| 95. | On June 26-27, 2008 and July 14, 2008, MCSO conducted large-scale saturation patrols in Mesa.  An MCSO news release announcing the first Mesa operation said that Sheriff Arpaio was sending his officers there "[i]n keeping with his promise to the public and to east valley state legislators." | Melendres MCSO 1878–98 (June 26-27, 2008 Operations Plan) [Hickey Dec. Ex. 127]; Melendres MCSO 1926–39 (July 14, 2008 Operations Plan) [Hickey Dec. Ex. 130]; ORT 116 (June 26, 2008 News Release) [Hickey Dec. Ex. 205]. |
| 96. | On or about October 3, 2007, MCSO received an email from Debora B., which had been forwarded by John Kross, the Town Manager of Queen Creek.  Debora B. complained that "kids passing [] the area . . . have seen Hispanic man take out cell phones and look like they were taking a picture of the kids."  She described Hispanic men being "silly" and complained that they "see our cars and children pass everyday."  She stated that these Hispanic men "are highly suspected of being illegal immigrants" and that "the situation" was making a lot of people feel uncomfortable. | Melendres MCSO 75244-47, Ex. 30 to Arpaio Dep. II (introduced at Arpaio Dep. II at 180:21-181:1) . [Hickey Dec. Ex. 34]. |
| 97. | Sheriff Arpaio he could not tell if any crime had been committed based on Deborah B.'s email.  However, he said that the message was passed on to his people to "look into further" and that MCSO "would be remiss in our duties not to respond." | Melendres MCSO 75244-47, Ex. 30 to Arpaio Dep. II (introduced at Arpaio Dep. II at 180:21-181:1) [Hickey Dec. Ex. 34]; Arpaio Dep. II at 188:10-191:17, 194:11-195:1 [Hickey Dec. Ex. 15]. |

| 98. | On October 4, 2007, MCSO conducted a saturation patrol in Queen Creek based on—according to the Operations Plan—"e-mails from the town council in reference to the day laborers in their city." | MCSO 1465, Ex. 5 to Sousa Dep. I (introduced at Sousa Dep. I at 108:22-109:4) [Hickey Dec. Ex. 89]; Sousa Dep. I at 108:22-109:17 . [Hickey Dec. Ex. 88]. |
|---|---|---|
| 99. | Arpaio sends operation requests to Chief Sands because they "may assist him in the future on any operation he has." | Arpaio Dep. II at 145:24-146:2 [Hickey Dec. Ex. 15]. |
| 100. | Chief Sands indicated that MCSO has responded to constituents by conducting saturation patrols.  He stated "We respond to citizen's complaints on a lot of things. Sometimes we have crime suppressions, sometimes they're handled in a different way." | Sands Dep. II at 121:11-123:14 [Hickey Dec. Ex. 78]. |
| 101. | It is not generally accepted practice for the head of a law enforcement agency to pass on racially charged materials and that do not describe criminal activity to officers tasked with designing enforcement operations. | Stewart Decl. at ¶ 18. |
| 102. | In this litigation, some MCSO officers have taken the position that the saturation patrols are designed to address crime generally.  Officers were instructed to simply "enforce the laws" or "enforce the traffic laws." | Sousa Dep. I at 69:13-22 [Hickey Dec. Ex. 88]; Madrid Dep. I at 74:3-17 [Hickey Dec. Ex. 50]; Sands Dep. I at 105:19-107:5 [Hickey Dec. Ex. 76]. |
| 103. | Prior to 2006, when MCSO deployed significant resources for a large patrol, officers were given information on particular criminal activity. | Sousa Dep. I at 153:3-154:25 [Hickey Dec. Ex. 88]; Madrid Dep. I at 74:8-75:1 [Hickey Dec. Ex. 50]; Palmer Dep. I at 42:16-43:22 [Hickey Dec. Ex. 56]; Sands Dep. I at 42:20-45:1 [Hickey Dec. Ex. 76]. |

| 104. | It would be consistent with generally accepted practice for saturation patrols to focus on a specific type of criminal activity.  Saturation patrols are typically used by law enforcement to impact an increase in a specific crime or a rise in violent crime in a limited geographical area, such as that which would arise from a gang-related turf war.  The targeted locations are typically developed through objective crime analysis. | Stewart Decl. at ¶¶ 13-16. |
| 105. | In the experience of Defendants' expert, Bennie Click, saturation patrols usually focus on DUIs or gang activity.  In such cases, officers would focus on a specific area where the problem was known to take place and  would be given instructions on how to target those individuals.  Mr. Click explained that "If it's drunk drivers, I don't want somebody down buying drugs at the park.  I want them out looking for drunk drivers." | Click Dep. at 290:95-292:25 [Hickey Dec. Ex. 40]. |
| 106. | In the saturation patrols conducted by MCSO since 2007, officers have not been given instructions to look for any patterns of criminal conduct or specific criminal suspects. | Sousa Dep. I at 156:4-16 [Hickey Dec. Ex. 88]; Madrid Dep. I at 74:10-16 [Hickey Dec. Ex. 50]; DiPietro Dep. at 79:4-80:21 [Hickey Dec. Ex. 44]; Armendariz Dep. I at 100:10-101:20 [Hickey Dec. Ex. 1]; Beeks Dep. I at 126:18-127:7 [Hickey Dec. Ex. 38]. |
| 107. | Nor has MCSO relied on comparative analyses of crime or traffic hazards to justify a saturation patrol or selection of a site for a patrol. | Sands Dep. I at 106:3-20, 142:17-25 (not aware of any "spike in crime"), 145:1-146:3 (MCSO "[t]ypically . . . [doesn't] do a comparative analysis" and it is enough justification for a sweep "[i]f there is [any] crime there…and the public expects the sheriff's office to do something about it") [Hickey Dec. Ex. 76]; Sousa Dep. I at 89:20-92:23 (no comparative crime data), 95:23-96:10 (no spike in traffic offenses observed) [Hickey Dec. Ex. 88]. |
| 108. | Defendants' expert, Bennie Click, acknowledged that none of the saturation patrols appeared to have been implemented due to a concern about DUI or traffic accidents. | Click Dep. at 288:3-11 [Hickey Dec. Ex. 40]. |

| | | |
|---|---|---|
| 109. | Lieutenant Sousa testified that a spike in traffic problems did not trigger any saturation patrols. | Sousa Dep. I at 95:23-96:1 [Hickey Dec. Ex. 88]. |
| 110. | Officers understood that the focus of saturation patrols was on illegal immigration. | Madrid Dep. I at 120:1-13 (Immigration enforcement a "purpose" of saturation patrols and most arrests were immigration-related) [Hickey Dec. Ex. 50]; DiPietro Dep. at 47:21-48:14 (describing the briefing he recalled receiving for the September 27, 2007 Cave Creek operation as "pretty much about suspected illegal aliens") [Hickey Dec. Ex. 44]; Sands Dep. II at 20:20-204:7 (illegal immigration is "one of the purposes" of saturation patrols) [Hickey Dec. Ex. 78]. |
| 111. | Defendants' expert, Bennie Click, acknowledged that "the general information to officers . . . was that this is a—an illegal immigration enforcement effort." | Click Dep. at 295:8-296:3 [Hickey Dec. Ex. 40]. |
| 112. | Several saturation patrol operations were explicitly focused on day laborers. | Madrid Dep. I at 58:7-59:4 [Hickey Dec. Ex. 50]; Sousa Dep. I at 111 [Hickey Dec. Ex. 88].ORT 103 [Hickey Dec. Ex. 45]; Madrid Dep. I at 86:17-87:11 [Hickey Dec. Ex. 50]; Melendres MCSO 75244-47 [Hickey Dec. Ex. 34]; ORT 104 [Hickey Dec. Ex. 10]; ORT 109-110 [Hickey Dec. Ex. 204]. |
| 113. | MCSO officers believe that most day laborers in Maricopa County are Latino or Hispanic. | DiPietro Dep. at 51:2-6 [Hickey Dec. Ex. 44]; Rangel Dep. I at 93:22-94:1 [Hickey Dec. Ex. 67]; Sousa Dep. I at 104:18-21 [Hickey Dec. Ex. 88]; Sands Dep. II at 140:3-10 [Hickey Dec. Ex. 90]. |
| 114. | The method by which MCSO looks for illegal immigrants on saturation patrols is to conduct pretextual traffic stops for minor violations and then investigate the driver and/or passengers for possible immigration violations. | ORT 421-22, Ex. 7 to Arpaio Dep. I (introduced at 57:23-58:17) (describing hundreds of deputies and posse as "targeting profile vehicles") [Hickey Dec. Ex. 9]; Madrid Dep. I at 66:24-67:3 [Hickey Dec. Ex. 50]; ORT 96-102 (Transcript from ABC Nightline program Nov. 6, 2007 discussed at Madrid Dep. I at 131:9-132:5) [Hickey Dec. Ex. 202]. |

| | | |
|---|---|---|
| 115. | MCSO's primary tactic on saturation patrols was the use of pretextual traffic stops. | Click Dep. at 287:15-288:2 ("[I]t's fair to say that primarily the stops [on saturation patrols] were to investigate other criminal activity.") [Hickey Dec. Ex. 40]; Stewart Decl. at ¶¶ 25-29. |
| 116. | Officers can easily find probable cause to stop a vehicle for a traffic violation. Deputy Rangel testified that it was possible to develop probable cause to stop just about any vehicle after following it for about two minutes. | Palmer Dep. II at 75:10-24 ("it is not difficult to follow any vehicle on the street for a short amount of time and obtain some type of violation….me and my team [], it's very easy for us to obtain that probable cause") [Hickey Dec. Ex. 61]; Armendariz I Dep. at 29:21-30:10 (hard to go down the street anywhere in County without seeing a violation) [Hickey Dec. Ex. 1] ; Rangel Dep. at 68:7-69 [Hickey Dec. Ex. 67]. |
| 117. | On numerous operations targeting day laborers, MCSO would have undercover units identify vehicles that appeared to be carrying illegal immigrants and then develop probable cause to stop them for a traffic violation. | Melendres MCSO 14861 (describing Sept. 27, 2007 operation in Cave Creek) [Hickey Dec. Ex. 141]; DiPietro Dep. at 46:21-49:15 (same) [Hickey Dec. Ex. 44]; Madrid Dep. I at 57:22-59:4 (same) [Hickey Dec. Ex. 50]; Melendres MCSO 14865-66 (describing similar methodology for Oct. 4, 2007 Queen Creek operation) [Hickey Dec. Ex. 142]; Melendres MCSO 14876-77 (describing similar methodology for Oct. 15, 2007 operation near 36th St. and Thomas) [Hickey Dec. Ex. 143]; Melendres MCSO 14691-92 (describing similar methodology for Oct. 22, 2007 Fountain Hills operation) [Hickey Dec. Ex.140]; Melendres MCSO 69660, Ex. 5 to Madrid Dep. II (introduced at Madrid Dep. II at 95:8-96:7) [Hickey Dec. Ex. 52]; Madrid Dep. II at 96:8-15 (HSU had used similar method on other operations) [Hickey Dec. Ex. 51]. |
| 118. | During saturation patrols, MCSO officers were encouraged to make traffic stops for any minor traffic or equipment violation, and to cite and book all violators pursuant to a "zero-tolerance" policy. | Madrid Dep. I at 221:16-23 (traffic stops) [Hickey Dec. Ex. 50]; Palmer Dep. I at 57:12-58:16 (traffic stops and citations) [Hickey Dec. Ex. 56]; Kikes Dep. at 47:4-49:15 (traffic stops, citations and arrests) [Hickey Dec. Ex. 49]; Sousa Dep. I at 147:11-16 (arrests only) [Hickey Dec. Ex. 88]. |

| 119. | The "zero tolerance policy" was adopted as a defensive tactic by MCSO to rebut allegations of racial profiling. | Sousa Dep. I at 134:5-15 (operations didn't start as zero tolerance), 148:5-25 (policy adopted to defend against perception that deputies were deciding who to arrest based on race) [Hickey Dec. Ex. 88]; Palmer Dep. I at 57:18-58:16 (policy adopted to "avoid the race card being played" given the numbers) [Hickey Dec. Ex. 56]. |
|---|---|---|
| 120. | However, Lieutenant Sousa and Chief Sands both testified that the zero tolerance policy did not apply to stops. MCSO witnesses acknowledged that officers could not stop every single vehicle violating the traffic code and exercise discretion in deciding whom to stop. | Sousa Dep. I at 147:17-148:4 (testifying that zero tolerance policy emphasized arrests and did not require deputies to stop every vehicle) [Hickey Dec. Ex. 88]; Sands I Dep. at 123:9-17 (testifying that would be difficult to extend so-called zero tolerance policy to traffic stop) [Hickey Dec. Ex. 76]; Armendariz I Dep. at 29:21-30:10 (hard to go down the street anywhere in County without seeing a violation and can't pull over two vehicles at once—deputies *have to* exercise discretion) [Hickey Dec. Ex. 1]; Kikes Dep. at 18:15-20 [Hickey Dec. Ex. 49]. |
| 121. | "Zero tolerance" does not eliminate officer discretion in traffic stops and would not prevent racial profiling. | Stewart Declaration at ¶ 35. |
| 122. | A "zero tolerance" policy combined with a lack of any follow-up to determine whether officers are in fact applying the policy would not prevent racial profiling.  It would actually make it harder for supervisors to detect it  because more officers would be making traffic stops for minor violations.  As a general matter, officers exercise greater discretion in making traffic stops for minor violations.  Officers exercising their discretion in a racially biased way would not draw attention unless supervisors examine the race or ethnicity of the persons stopped. | Stewart Declaration at ¶¶ 31-35. |
| 123. | MCSO did not conduct monitoring or data analysis to ensure that the zero tolerance policy was being applied equally, or at all. | Sands Dep. I at 122:13-123:8 [Hickey Dec. Ex. 76]; Sousa Dep. I at 204:6-205:18 [Hickey Dec. Ex. 88]. |

| 124. | The practice of stopping vehicles for minor violations is departure from MCSO's normal practice of prioritizing more serious violations. | Melendres MCSO 14913-16, Ex. 4 to Ratcliff Dep (MCSO Policy & Procedure EB-1: Traffic Enforcement Guidelines) at 14913, ("In all situations, officer discretion should be used.") [Hickey Dec. Ex. 72]; Palmer Dep. I at 56:6-57:17 [Hickey Dec. Ex. 56]. |
|---|---|---|
| 125. | The claim that MCSO's objective in saturation patrols was general crime suppression operations is not supported by the record. MCSO's objective was clearly to interdict illegal immigrants. | Stewart Decl. at ¶¶ 19-22. |
| 126. | MCSO's regular practice is to only investigate passengers where there is reasonable suspicion of criminal activity. This is consistent with generally accepted police procedure. | MCSO's Answers to Pls.' First Set of Interrogs. No. 2 ("MCSO officers typically do not request documents from a passenger in motor vehicles pulled over for violating Arizona's traffic code unless there are indicators and reasonable suspicion….") [Hickey Dec. Ex. 213]; Stewart Decl. at ¶¶ 26-27, 29-30. |
| 127. | However, as Defendants' expert, Bennie Click observed, on saturation patrols, officers were briefed to contact passengers and ask for identification. | Click Dep. at 228:3-22 [Hickey Dec. Ex. 40]; Madrid Dep. I at 43:5-45:10 (explaining that there is no protocol within MCSO about when to make contacts with passengers on routine traffic stops, but that officers in the HSU are trained to contact passengers) [Hickey Dec. Ex. 50]. |
| 128. | MCSO officers have wide discretion to question passengers on immigration investigations. | Sousa Dep. I at 74:25-76:4, 149:24-151:18 [Hickey Dec. Ex. 88]. |
| 129. | MCSO witnesses could not identify any agency-wide written policy prohibiting racial profiling. | Arpaio Dep. I at 210:1-15 [Hickey Dec. Ex. 4]; Click Dep. at 95:20-24, 97:1-23 [Hickey Dec. Ex. 40]. |
| 130. | MCSO's Code of Conduct does not include any prohibition on racial profiling. Nor do MCSO's policies and procedures on Search and Seizure, Traffic Law Enforcement Guidelines, Traffic Violator Contacts, or Citation Issuance or Arrest Procedures include any prohibition on racial profiling. | Click Dep. at 97:1-23 [Hickey Dec. Ex. 40]; Melendres MCSO 16296-309 [Hickey Dec. Ex. 152]; Melendres MCSO 14917-25 [Hickey Dec. Ex.144]; Melendres MCSO 14913-16, Ex. 4 to Ratcliff Dep [Hickey Dec. Ex. 72]; Melendres MCSO 14926-28 [Hickey Dec. Ex. 145]; Melendres MCSO 14968-76 [Hickey Dec. Ex. 148]. |

| | | |
|---|---|---|
| 131. | To the extent that some of MCSO's policies and procedures pertaining to HSU contain a statement that "Racial profiling is prohibited," those policies do not include any definition of racial profiling or detail as to how it should be avoided. Officers could not recall ever seeing a definition of racial profiling in an MCSO document. | Click Dep. at 95:25-96:3, 97:24-99:6 [Hickey Dec. Ex. 40]; Melendres MCSO 95926 (HSU Policy) [Hickey Dec. Ex. 183]; Melendres MCSO 14956 (HSU Standard Operating Procedures) [Hickey Dec. Ex. 147]; Melendres MCSO 14951 (Immigration Enforcement Protocol) [Hickey Dec. Ex. 146]; Kikes Dep. at 120:4-6 [Hickey Dec. Ex. 49]. |
| 132. | Some of MCSO's later Operations Plans for saturation patrols contain a prohibition on racial profiling. However, this generic prohibition is confusing and not all officers receive a copy of the Operations Plans. | Melendres MCSO 1971–72 (Operations Plan noting that "[a]t no time with MCSO officers stop a vehicle based on the race of the subjects in the vehicle (racial profiling is prohibited)" but allowing a deputy to call for a 287(g) officer unless the reason for suspecting that the person is an illegal immigrant is *solely* based on race) [Hickey Dec. Ex. 133]; Melendres MCSO 1822–24 (Operations Plan containing no prohibition on racial profiling) [Hickey Dec. Ex. 119]; Melendres MCSO 001834–36 (Operations Plan containing no prohibition on racial profiling) [Hickey Dec. Ex. 120]; Sousa Dep. I at 97:19-24 [Hickey Dec. Ex. 88]. |
| 133. | The AZPOST Model Lesson Plan on Search and Seizure provided by Defendants prohibits only "profiling based solely on race." | Melendres MCSO 15088-112, Ex. 6 to Click Dep. (introduced at Click Dep. 138:7-10) at Melendres MCSO 15101 [Hickey Dec. Ex. 41]. |
| 134. | According to the Department of Homeland Security, the 287(g) certification program includes only "a brief training block on civil rights law." | ORT 1292. [Hickey Dec. Ex.211] |
| 135. | Sergeant Palmer, a supervisor in the HSU, believes that race or ethnicity can be one of several factors considered in deciding whether or not to initiate an investigation once a vehicle is stopped.  Sergeant Madrid also believes that race and ethnicity may be considered in an immigration screening. | Palmer Dep. I at 28:11-29:6 [Hickey Dec. Ex.56]; Madrid Dep. I at 195:18-196:21 [Hickey Dec. Ex. 50]. |

| 136. | MCSO officers have in fact explicitly relied on apparent Hispanic descent in immigration investigations. | Melendres MCSO 38084-38094, Ex. 2 to Palmer Dep. I (introduced at Palmer Dep. I at 21:3-17) (listing "Hispanic descent of the occupants within their vehicle, the inability to speak the English language" as factors that raised the deputy's suspicions) [Hickey Dec. Ex. 58]; Melendres MCSO 024665-24671 [Hickey Dec. Ex.155]; Melendres MCSO 19474-19486 [Hickey Dec. Ex.154]. |
|---|---|---|
| 137. | Sergeant Palmer testified that additional bases for investigation include "the person speaks only Spanish," "appear[ing] that the person just came from Mexico," and presence in an illegal alien locale. | ORT 616-618, Exs. 3 & 4 to Palmer I Dep. (introduced at Palmer Dep. I at 26:11-28:10) [Hickey Dec. Exs. 59, 60]; Palmer Dep. I at 28:5-30:1 [Hickey Dec. Ex. 56]. |
| 138. | Sergeant Madrid, a supervisor in the HSU, recalled racial profiling training in the academy over ten years ago, but was unable to remember what it covered.  The only additional racial profiling training he received was as part of the 287(g) program. | Madrid Dep. I. at 9:17-10:13, 194:24-195:8 [Hickey Dec. Ex. 50]; Madrid Dep. II at 10:1-10:15 [Hickey Dec. Ex.51]. |
| 139. | Deputy Ratcliffe only received racial profiling training at the academy in 2003 and through the 287(g) program. | Ratcliffe Dep. at 80:10-24 [Hickey Dec. Ex. 71]. |
| 140. | The only racial profiling training Deputy Armendariz has received was the "short and sweet" program at the academy in 2005 or 2006.  Even though he is 287(g)-certified, he did not recall any other training. | Armendariz Dep. I at 198:1-199:7 [Hickey Dec. Ex. 1]. |
| 141. | Deputy Kikes "believe[d]" he had received racial profiling training as a part of annual training by AZPOST, but had attended no other training during his career. | Kikes Dep. at 120:18-121:317 [Hickey Dec. Ex. 49]. |
| 142. | MCSO officers do not receive any ongoing training on racial profiling or sensitivity. | Rangel Dep. I at 108:16-19 [Hickey Dec. Ex.67]. |
| 143. | MCSO's failure to have a clear, agency-wide prohibition against racial profiling that includes a definition of racial profiling does not comply with generally accepted police practices. | Stewart Decl. at ¶¶ 40-41. |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4 | 144. | The training that MCSO officers received was inadequate and did not prepare them for the complexities of immigration enforcement through traffic stops away from the border, and does not comply with generally accepted police practices. | Stewart Decl. at ¶¶ 43-47. |
| 5<br>6<br>7<br>8<br>9<br>10<br>11 | 145. | One MCSO officer used his county email account to circulate a photo of a mock driver's license for a state called "Mexifornia," which included a photograph depicting stereotypical "Mexican" features.  Sheriff Arpaio and Chief Sands acknowledged that this email could be offensive and was not "in good taste." | Ex. 34 to Arpaio Dep. II (introduced at Arpaio Dep. II at 212:13-17) and Ex. 25 to Sands Dep. II (introduced at Sands Dep. II at 231:18-23) (email sent from Sergeant Walter Duncanson to another MCSO sergeant) [Hickey Dec. Exs. 35, 87]; Arpaio Dep. II at 216:18-217:13 (testifying that he does not think email was "in good taste.") [Hickey Dec. Ex. 15]; Sands Dep. II at 231:18-233:1 (testifying that this email may be offensive to people) [Hickey Dec. Ex. 90]. |
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 | 146. | HSU officers and others distributed "Mexican Word of the Day" emails making fun of Mexican accents on an ongoing basis.  Chief Sands acknowledged that these emails are offensive. | Carveout MCSO 35727-28, 35735-36, 35743-44 (emails from HSU Deputy Juan Silva), Exs. 22, 23, and 24 to Sands Dep. II (introduced at Sands Dep. II at 226:4-9, 226:24-227:3; 227:7-11) [Hickey Dec. Exs. 84, 85, 86]; Sands Dep. II at 226:4-229:17 (testifying that these emails are offensive) [Hickey Dec. Ex. 78]; Carveout MCSO 162905-06 ("Mexican Word of the Day) [Hickey Dec. Ex. 108]; Carveout MCSO 132232 ("Learn the Mexican Words of the Day" email sent to HSU Sergeant Baranyos) [Hickey Dec. Ex.107]; Carveout MCSO 496147 ("Mexican words of the day" email sent to Sergeant Baranyos) [Hickey Dec. Ex.115]. |

21<br>22<br>23<br>24<br>25<br>26<br>27<br>28

| | | | |
|---|---|---|---|
| 147. | HSU officers and others regularly circulated other emails containing jokes, exaggerated statistics or characterizations about Mexicans, Hispanics and Mexican culture using their county email accounts. | Carveout MCSO 5586 ("Rare Photo of a Mexican Navy Seal" sent by Sergeant Palmer) [Hickey Dec. Ex. 96]; Carveout-MCSO 3188-97, 3205 ("No Illegals → No Burritos - Damn. They got smart" attachment forwarded by HSU acting Sergeant Cesar Brockman) [Hickey Dec. Ex. 94]; Carveout-MCSO 426255-70 ("Mexican Engineering" attachment showing crude devices received by HSU Deputy Alfredo Navarrette) [Hickey Dec. Ex. 114]; Carveout MCSO 501203-05 ("Mexican recliners" attachment showing men sitting in wheelbarrows, forwarded by HSU detention officer Victor Navarrette) [Hickey Dec. Ex. 117]; Carveout-MCSO 4961 ("Funny Mexican Words" email circulated among MCSO personnel) [Hickey Dec. Ex. 95]; Carveout MCSO 103100 ("Mexican Jews" email playing on Mexican accent) [Hickey Dec. Ex.106]; Carveout MCSO 497277, 497278, 297280 ("Mexican test" email forwarded by HSU Deputy Sean Ross) [Hickey Dec. Ex. 116]; Carveout MCSO 6209-10 (email containing video of "Hispanic Shooting Range" forwarded by Chris Fultz and Hector Martinez) [Hickey Dec. Ex. 97]; Carveout MCSO 2520, Ex. 6 to Armendariz Dep. II (introduced at Armendariz Dep. II at 85:3-8) (email from Palmer to several MCSO deputies containing exaggerated statistics about Mexicans, including that "[o]ver two-thirds of all births in Los Angeles County are to illegal alien Mexicans on Medi-Cal") [Hickey Dec. Ex. 3]; Melendres MCSO 69381, Ex. 5 to Rangel Dep. II (introduced at Rangel Dep. II at 45:1-19) (email from Deputy Rangel to several members of the MCSO containing a video entitled "the Mexican 300") [Hickey Dec. Ex. 70]; Carveout MCSO 0173580-85, Ex. 6 and 7 to Palmer Dep. II (introduced at Palmer Dep. II at 61:12-18, 62:23-63:3) (email from Deputy Wade Voeltz to Sergeant Brett Palmer containing language about a conspiracy among Mexican-Americans and illegal aliens to re-conquer the Southwest United States) [Hickey Dec. Exs. 63, 64]; Carveout MCSO 282787-90 (email arguing that America would be destroyed if it became "bilingual . . . and bi-cultural") [Hickey Dec. Ex. 110]. |

| 148. | In one such example, HSU Sergeant Palmer sent an email with an attachment entitled, "Indian yoga versus Mexican yoga" depicting a man in a yoga pose with the subtitles "Indian Yoga" "Requires years of practice to achieve," and a man who appears to be passed out from intoxication with the subtitle "Mexican Yoga" "Requires about 3-4 hours to achieve." | Carveout MCSO 38846-49 [Hickey Dec. Ex. 105] |
|---|---|---|
| 149. | MCSO deputies involved in the events at issue in this litigation distributed some of the emails, both to other officers and to individuals outside of the MCSO. | Carveout MCSO 497277, 497278, 297280 (Ross) [Hickey Dec. Ex. 116]; Melendres MCSO 69381, Ex. 5 to Rangel Dep. II, Carveout MCSO 173580-85 (Voeltz) Ex. 6 to Palmer Dep. II, Palmer Dep. II at 61:12-62:8 (Deputy Voeltz participates in saturation patrols) [Hickey Dec. Exs. 70, 63, 61] |
| 150. | HSU supervisors, who are responsible for the performance and behavior of their deputies, also received or sent some of the emails. | Carveout MCSO 38846-49, 5586 (Palmer) [Hickey Dec. Exs. 105, 96]; Carveout MCSO 3188-97, 3205 (Brockman) [Hickey Dec. Ex. 94]; Carveout MCSO 132232, 496147 (Baranyos) [Hickey Dec. Exs. 107, 115]; MCSO Carveout-2520, Ex. 6 to Armendariz Dep. II (introduced at Armendariz Dep. II at 85:3-8) and Armendariz Dep. II at 85:3-88:18 (confirming that Palmer forwarded email containing fabricated statistics about Mexicans to several MCSO and HSU deputies) [Hickey Dec. Exs. 2, 3]. |

| | | |
|---|---|---|
| 151. | MCSO posse members, volunteers that worked alongside the MCSO during saturation patrols, also sent emails containing dehumanizing characterizations of illegal immigrants and praising a program from the 1950s known as "Operation Wetback." | Melendres MCSO 81403, Carveout-MCSO 0173580-85, Exs. 6 and 7 to Palmer Dep. II (introduced at Palmer Dep. II at 61:12-18, 62:23-63:3) and Palmer Dep. II at 16:7-17:9 (posse member Jim Van Allen writes in reference to a saturation patrol, "Please give me a call if we are going fishing, today, in Anthem.") [Hickey Dec. Exs. 61, 63, 64]; Carveout MCSO 0348209, Ex. 7 to Sousa Dep. II (introduced at 84:19-22) and Sousa Dep. II at 86:21-24 (posse member Jim Van Allen sent email stating, "[a]nd then again in 1954, President Dwight Eisenhower deported 13 million Mexican nationals. The program was called 'Operation Wetback' so that American World War II and Korean veterans had better -- had a better chance at jobs.") [Hickey Dec. Exs. 92, 90]; Carveout-MCSO 295020 (email with same title sent from outside) [Hickey Dec. Ex. 111]. |
| 152. | Sheriff Arpaio could not state whether circulation of the Mexifornia license email violated a policy of his department. | Ex. 34 to Arpaio Dep. II (introduced at Arpaio Dep. II at 212:13-17) [Hickey Dec. Ex. 35]; Arpaio Dep. II at 217:20-218:6 [Hickey Dec. Ex. 15]. |
| 153. | Such emails are racially derogatory and should "absolutely" be dealt with by a law enforcement agency "as soon as it surface[s]." | Click Dep. 335:22-337:2 (referring to Mexican Word of the Day, Mexifornia license and Mexican 300 emails) [Hickey Dec. Ex. 40]. |
| 154. | MCSO's failure to immediately put an end to the circulation of such materials created an impression that such stereotyping was appropriate and fell below generally accepted police practices. | Stewart Decl. at ¶¶ 60-64. |
| 155. | MCSO does not have any system by which supervisors can analyze the race and ethnicity of persons stopped or contacted by its officers in order to detect whether racial profiling is occurring, including on saturation patrols. | Madrid Dep. I at 197:19-198:12 [Hickey Dec. Ex. 50]; Palmer Dep. 78:4-19 [Hickey Dec. Ex. 56]; Sands Dep. I at 149:2-25 [Hickey Dec. Ex. 76]; Sousa Dep. I at 236:17-237:24 [Hickey Dec. Ex. 88]. |

| 156. | MCSO deputies do not record all encounters with citizens or, to the extent they do record them, they do so on pads of paper that they destroy at the ends of their tours of duty. | Armendariz Dep. I at 46:1-51:7 [Hickey Dec. Ex.1]. |
| 157. | HSU supervisors testified they would not inquire further into the lawfulness of a stop so long as there was probable cause for a traffic violation. Sergeant Palmer specifically testified that as long as there was a legal reason for the traffic stop, that "end[ed] the inquiry" for him about racial profiling. Sergeant Palmer testified that he "knew" his officers did not profile because, "Quite frankly . . . I know my brothers." | Palmer Dep. I at 75:4-78:24 [Hickey Dec. Ex. 56]; Madrid Dep. I at 198:13-18 [Hickey Dec. Ex.50]. |
| 158. | Sergeant Madrid testified that he is typically at the command post during saturation patrol operations and is not present at traffic stops. Despite having no "means of verifying whether [his deputies are engaging in racial profiling," he simply "trust[s]" that his deputies do not profile. | Madrid Dep. I at 130:4-17, 197:14-198:12 [Hickey Dec. Ex. 50]. |
| 159. | MCSO saturation patrol "operations plans" do not describe any specific role for supervisors working in the operation. | MCSO 001822-24 [Hickey Dec. Ex. 119]; MCSO 001834-36 [Hickey Dec. Ex. 120]; MCSO 001844-46 [Hickey Dec. Ex. 122]; MCSO 001853–59 [Hickey Dec. Ex. 124]; MCSO 001878-98 [Hickey Dec. Ex. 127]; MCSO 001926-39 [Hickey Dec. Ex.130]; MCSO 1970-73 [Hickey Dec. Ex. 133]; MCSO 015553-59 [Hickey Dec. Ex. 150]; MCSO 056976-82 [Hickey Dec. Ex. 158]; MCSO 056999-7004 [Hickey Dec. Ex. 162]; MCSO 057030-34 [Hickey Dec. Ex. 163]; MCSO 058708-14 [Hickey Dec. Ex. 166]; MCSO 059649-54 (MCSO Operations Plans) [Hickey Dec. Ex. 167] |
| 160. | Sergeant Madrid acknowledged that all but one of the names on a sample set of saturation patrol arrest lists appeared to be Hispanic. However, neither he nor Lieutenant Sousa saw any issue with this or felt the need to investigate further. | Madrid Dep. I at 139:2-141:12 (all but one of the persons arrested during a March 2008 operation in Phoenix had Hispanic surnames), 141:20-143:11 ("[I]t means nothing) [Hickey Dec. Ex. 50]; Sousa Dep. I at 134:16-136:21 ("It's a nonissue. It's not a concern for me.") [Hickey Dec. Ex.88]. |

| | | |
|---|---|---|
| 161. | Chief Sands acknowledged that 90 percent of arrestees on one of the smaller saturation patrols in Fountain Hills appeared to be Hispanic, even though that area is predominantly "non-Hispanic." | Sands Dep. I at 130:10-133:6 [Hickey Dec. Ex. 76]; Melendres MCSO 14434-36, Ex. 8 to Sands Dep. I (introduced at Sands Dep. I at 131:7-132:11) [Hickey Dec. Ex.77]. |
| 162. | During saturation patrols, only total tallies and arrest data are reported to supervisors.  MCSO routinely destroyed information about the number of contacts individual deputies made until they were required to preserve them in this litigation. | Sousa Dep. I at 193:3-14, 195:24-198:4 (confirming that one could tell from an individual officer's stat sheet how many traffic stops and contacts that officer made, among other information, and that data was not available from other sources) [Hickey Dec. Ex. 88]; Madrid Dep. I at 186:9-187:24 [Hickey Dec. Ex.50]; Sousa Dep. I at 198:7-25 (identifying stat sheets from November 16, 2009 operation which MCSO had, by then, started to preserve) [Hickey Dec. Ex.88]. |
| 163. | Other than the tallying of immigration arrests, MCSO conducts no after-action de-briefing after a saturation patrol. | Madrid Dep. I at 129:15-17 [Hickey Dec. Ex. 50]; Beeks Dep. at 121:22-123:9 [Hickey Dec. Ex. 38]. |
| 164. | Lieutenant Sousa, the head of HSU, testified that, despite doing nothing to review patterns of stops or arrests by his officers, he felt that racial profiling was a "not a concern" because he "trusts" his officers. | Sousa Dep. I at 56:20-59:14, 135:24-138:12 [Hickey Dec. Ex.88]. |
| 165. | Sheriff Arpaio testified that there was no need for racial profiling training because he "had confidence" in his officers. | Arpaio Dep. I at 41:12-25 [Hickey Dec. Ex. 4]. |
| 166. | Sheriff Arpaio testified that he himself would not be "bothered" if he was a victim of racial profiling.  Chief Sands, Chief Deputy Hendershott and Lieutenant Sousa each testified that they were not aware of MCSO ever having disciplined an officer for racial profiling. | Arpaio Dep. II at 284:18-285:6 [Hickey Dec. Ex. 15]; Sands Dep. I at 152:16-21 [Hickey Dec. Ex. 76]; Hendershott Dep. I at 44:12-15 [Hickey Dec. Ex. 47]; Sousa Dep. II at 61:7-9 [Hickey Dec. Ex. 90]. |
| 167. | MCSO's minimal documentation about traffic stops and failure to review the documentation that was available for patterns that would reveal racial profiling falls below generally accepted police practices. | Stewart Decl. at ¶¶ 48-59. |

| | | |
|---|---|---|
| 168. | Given the deputies considerable discretion, MCSO's failure to actively monitor officers' activities during saturation patrols falls below generally accepted police practices. | Stewart Decl. at ¶¶ 55-59. |
| 169. | The attitude of Sergeant Palmer and other MCSO supervisors with respect to supervision did not meet generally acceptable standards. | Click Dep. 126:3-130:23 (testifying if that if Palmer in fact approached the issue of racial profiling as his testimony reflected, he would not "find that to be generally acceptable") [Hickey Dec. Ex. 40]. |
| 170. | ICE officials confirmed that they had no basis to opine on whether or not MCSO was engaged in racial profiling on saturation patrols or otherwise. They did not attend most operations and were not present at any traffic stops.  They did not examine MCSO activities for evidence of racial profiling because, in their view, traffic stops were being conducted pursuant to state law. | Pena Dep. at 168:24-169:7 (no way of evaluating traffic stops because not on scene), 170:3-174:8 (ICE did not oversee enforcement of state laws, including routine traffic laws), 215:22-217:11 (reduced supervision and monitoring on crime sweep operations), 184:4-186:14 (cannot determine whether any traffic stop could be attributable to racial profiling) [Hickey Dec. Ex. 66]; Kidd Dep. at 28:23-29:1 (only present at the command center at two saturation patrols); 153:4-154:1 (it was "not ICE's job or function to look into whether there were racial motivations" on traffic stops and could not determine if it was happening) [Hickey Dec. Ex.48]. |
| 171. | During MCSO's saturation patrol in Cave Creek on September 27, 2007, Manuel de Jesus Ortega Melendres was riding as a passenger in a vehicle pulled over by Deputy Louis DiPietro. | Ortega Melendres Dep. at 14 [Hickey Dec. Ex. 53]; DiPietro Dep. at 46:10-20 [Hickey Dec. Ex. 44]. |
| 172. | The purpose of the saturation patrol was to apprehend illegal immigrants that were suspected to be looking for work at the Good Shepherd of the Hills Church. | ORT 103, Ex. 1 to DiPietro Dep. (introduced at DiPietro Dep. at 72:11-73:4) (stating that officers were in the area to address complaints "received on [the Sheriff's] newly implemented illegal immigration hotline" regarding illegal immigrants near the church) [Hickey Dec. Ex. 45]; DiPietro Dep. at 47:21-48:1 (describing briefing he received) [Hickey Dec. Ex. 44]. |

| | | |
|---|---|---|
| 173. | Prior to the operation, MCSO had sent undercover officers to the church. The officers learned only that Hispanic day laborers were obtaining work from employers visiting the day laborer center there. There was no information discovered pertaining to human smuggling, drop houses, or even illegal immigration. | Melendres MCSO 014686 [Hickey Dec. Ex.139]. |
| 174. | Like other operations conducted by MCSO, in this operation, undercover units identified vehicles that appeared to have picked up day laborers at the church parking lot. The units would call out a vehicle description to marked units. The marked units would then follow the vehicles and develop probable cause of a traffic violation to stop them so that an immigration investigation could be conducted. | ORT 14861, Ex. 2 to Rangel Dep. I (introduced at Rangel Dep. at 56:4-21) [Hickey Dec. Ex. 68]; Rangel Dep. I at 59:25-60:20, 63:2-64:24 [Hickey Dec. Ex. 67]; DiPietro Dep. 48:4-49:15, 65:15-66:6 [Hickey Dec. Ex. 44]. |
| 175. | Though some MCSO witnesses claim that there were complaints of day laborers creating traffic hazards, the pickup location was in a parking lot away from the road and operation did not address any traffic issues created by day laborers. | Madrid Dep. I at 48:6-14 [[Hickey Dec. Ex. 50]; Rangel Dep. I at 57:14-16 [Hickey Dec. Ex. 67]; DiPietro Dep. at 46:21-25, 51:24-52:2 [Hickey Dec. Ex. 44]; ORT 14861, Ex. 2 to Rangel Dep. (introduced at Rangel Dep. at 56:4-21) [Hickey Dec. Ex. 68]; Stewart Declaration at ¶¶ 29-30. |
| 176. | Before Deputy DiPietro pulled over any of the vehicles carrying day laborers, he had no reason to believe that the passengers had committed any violation of the law. | DiPietro Dep. at 69:6-14 [Hickey Dec. Ex. 44]. |
| 177. | Deputy DiPietro followed the vehicle that Mr. Ortega Melendres was riding in for about one-and-a-half miles before pulling it over for speeding. | DiPietro Dep. at 52:7-54:10 [Hickey Dec. Ex. 44]. |
| 178. | Deputy DiPietro did not cite the Caucasian driver for speeding or question him further but gave him a verbal warning. Deputy DiPietro took notes of the stop but destroyed them. He did not create any other record of the stop. | DiPietro Dep. at 56:5-58:6, 59:19-23 [Hickey Dec. Ex. 44]. |
| 179. | Deputy DiPietro then called for additional officers to come "check the status" of the Latino passengers. | DiPietro Dep. at 55:4-25 [Hickey Dec. Ex. 44]; Ortega Melendres Dep. at 24:17-19 [Hickey Dec. Ex.53]. |

| | | |
|---|---|---|
| 180. | Deputy DiPietro made another stop on the same operation where he stopped a vehicle for a broken taillight, gave the white driver a warning and turned over the Latino passengers to Sergeant Madrid for further investigation. | DiPietro Dep. at 68:11-69:14 [Hickey Dec. Ex. 44]. |
| 181. | Although there was no need to extend the stop any longer, after finishing with the driver, the passengers were detained until Deputy Rangel could contact them and check their identification documents. | DiPietro Dep. at 59:1-60:1 [Hickey Dec. Ex. 44]; Rangel Dep. I at 34:1-8 [Hickey Dec. Ex. 67]. |
| 182. | MCSO considers the lack of identification documents by a person (even a passenger) to be grounds for investigating the person's immigration status. | Rangel Dep. I at 21:20-22:5 [Hickey Dec. Ex. 67]; DiPietro Dep. at 108:13-21 [Hickey Dec. Ex. 44]. |
| 183. | After conducting an investigation, Deputy Rangel placed Mr. Ortega Melendres under arrest and transported him to ICE. | Rangel Dep. I at 36:21-23, 41:5-42:22, 44:24-45:8 [Hickey Dec. Ex. 67]. |
| 184. | Deputy Rangel claimed that he detained Mr. Ortega Melendres because he had said he was working and because he did not produce an I-94 form.  However, Mr. Ortega Melendres told Deputy Rangel that he had permission to be in the country.  When Mr. Ortega Melendres was transferred to ICE, ICE agreed with him and released him, even offering him a ride home. | Rangel Dep. I at 34:20-36:24, 46:17-47:16, 120:2-9, 125:3-126:6 [Hickey Dec. Ex. 67]; Ortega Melendres Dep. at 26:4-27:14 [Hickey Dec. Ex. 53]. |
| 185. | Mr. Ortega Melendres was in custody for a total of 7 to 8 hours. | Ortega Melendres Dep. at 25:23-26:2 [Hickey Dec. Ex. 53]. |
| 186. | On December 7, 2007, David and Jessika Rodriguez were driving on Bartlett Dam Road towards the Bartlett Lake Marina with their children in the vehicle when they encountered two MCSO vehicles on the other side of a long wash (it had recently rained).  Upon seeing this, they and another motorcycle behind them made a U-turn and started heading back up Bartlett Dam Road. | David Rodriguez Dep. at 10:10-11:15 [Hickey Dec. Ex. 74]. |

| 187. | While they were turning around, MCSO deputy Matthew Ratcliffe stopped them for driving on a closed road. | Ratcliffe Dep. at 20:16-22:20 [Hickey Dec. Ex. 71]. |
|------|------|------|
| 188. | Deputy Ratcliffe testified that he asked Mr. Rodriguez for his license, registration, insurance, and Social Security number.  The Rodriguezes recall that Deputy Ratcliff asked Mr. Rodriguez for his Social Security card. | Ratcliffe Dep. at 24:21-25:6 [Hickey Dec. Ex. 71]; David Rodriguez Dep. at 11:25-12:3 [Hickey Dec. Ex. 74]; Jessica Rodriguez Dep. at 14:5-10 [Hickey Dec. Ex. 75]. |
| 189. | Mr. Rodriguez told Deputy Ratcliffe that they had been off-roading and did not see the "Road Closed" sign. | David Rodriguez Dep. at 11:20-25, 13:13-17 [Hickey Dec. Ex. 74]. |
| 190. | Officers are trained that a citation is not in the best interest of the public when a person was "not aware of the violation" and educating the person by giving him a warning will have the same effect as a citation." | Melendres MCSO 15180-15201 (AZPOST Model Lesson Plan: Traffic Citations 4.2) at 15197 [Hickey Dec. Ex. 149]. |
| 191. | MCSO policy provides that the enforcement of traffic laws "shall be consistent" and "uniform." | Melendres MCSO 14913-16, Ex. 4 to Ratcliff Dep. (introduced at Ratcliffe Dep. at 51:17-52:16) at 14913 [Hickey Dec. Ex. 72]. |
| 192. | The Rodriguezes pointed out to Deputy Ratcliffe that the other vehicles driven by non-Hispanic persons stopped by Deputy Ratcliffe's partner, including the motorcycle driver, were not receiving citations.  At least one vehicle was allowed to drive through to the marina because the driver had to attend to a boat there. | David Rodriguez Dep. at 12:8-13:33, 25:5-26:8 [Hickey Dec. Ex. 74]; Jessica Rodriguez Dep. at 14:24-15:11, 34:5-35:8 [Hickey Dec. Ex. 75]; Ratcliffe Dep. at 28:9-30:24, 33:13-25 [Hickey Dec. Ex. 71]. |
| 193. | Deputy Ratcliffe proceeded to issue Mr. Rodriguez a citation.  Deputy Ratcliffe testified that he does not badger drivers for a Social Security number, but even after the Rodriguezes asked why he needed it, he continued to insist that Mr. Rodriguez provide it.  Mr. Rodriguez finally provided his Social Security number so that he could leave.  Deputy Ratcliffe followed the Rodriguezes back out to the main road. | Ratcliff Dep. at 25:18-26:9, 35:15-17, 98:7-15,  99:5-8 [Hickey Dec. Ex. 71]; David Rodriguez Dep. 14:18-20 [Hickey Dec. Ex. 74]. |

| 194. | By the time Deputy Ratcliffe issued Mr. Rodriguez a traffic citation, he already had Mr. Rodriguez's identification. | Ratcliffe Dep. at 27:16-20, 96:4-24 [Hickey Dec. Ex. 71]. |
|---|---|---|
| 195. | MCSO's policy only provides that additional forms of identification should be requested "if the violator does not have a driver's license." Officers regularly leave this block blank. | Melendres MCSO 14926-28 (MCSO Policy & Procedure EB-2: Traffic Violator Contacts and Citation Issuance) at Melendres MCSO 14927 [Hickey Dec. Ex. 145]. |
| 196. | The traffic citation form also has a block called "Military Status" but Deputy Ratcliffe did not insist on this information.  Other officers *do* complete this information. | Melendres MCSO 16857, 16918, 37088, 30625 [Hickey Dec. Exs. 153, 157]; Melendres MCSO 4, Ex. 6 to Ratcliffe Dep. (introduced at Ratcliffe Dep. at 97:1-13) [Hickey Dec. Ex. 73]; Melendres MCSO 26936, 27001, 26904, 36541, 30629 [Hickey Dec. Ex. 156]. |
| 197. | Deputy Ratcliffe testified that he stopped four other vehicles for driving on Bartlett Dam Road that day.  He did not cite the drivers of these vehicles, none of whom were Hispanic, and instead turned them over to a Tonto National Forest officer. | Ratcliff Dep. at 39:4-25 [Hickey Dec. Ex. 71]. |
| 198. | On their way out of the area, the Rodriguezes stopped to inquire whether the other drivers had received citations.  They spoke to several drivers and none of them had received citations. | David Rodriguez Dep. at 15:3-7, 19:7-13, 25:23-25 [Hickey Dec. Ex. 74]; Jessica Rodriguez Dep. at 15:23-16:3 [Hickey Dec. Ex. 75]; Ratcliff Dep. at 38:1-10 [Hickey Dec. Ex. 71]. |
| 199. | MCSO conducted an internal investigation into the incident.  MCSO supervisors reviewed what happened and had no issue with the way that Deputy Ratcliffe exercised his discretion. | Melendres MCSO 000001-03 [Hickey Dec. Ex. 118]. |
| 200. | On March 28, 2008, MCSO was conducting a saturation patrol in North Phoenix when Manuel Nieto and Velia Meraz encountered Deputy Charley Armendariz at a gas station near the auto shop where they work. | ORT 109-110 (MCSO News Release announcing crime suppression operation to arrest "illegal aliens") [Hickey Dec. Ex. 204]; Meraz Dep. at 7:4-10, 10:9-15 [Hickey Dec. Ex. 54]; Nieto Dep. at 6:11-12, 12:4-12 [Hickey Dec. Ex. 55]. |

| | | |
|---|---|---|
| 201. | Deputy Armendariz was in the course of conducting a traffic stop and had two Hispanic individuals detained at the gas station. | Nieto Dep. at 7-12 [Hickey Dec. Ex. 55]; Armendariz Dep. I 133:2-21 [Hickey Dec. Ex. 1]. |
| 202. | As Mr. Nieto and Ms. Meraz drove into the gas station and pulled into a parking spot, they were playing Spanish music with their windows rolled down.  At this time, Deputy Armendariz ordered Mr. Nieto and Ms. Meraz to leave or he would arrest them for disorderly conduct.  Deputy Armendariz testified that Ms. Meraz was speaking in Spanish to the detainees, telling them to remain silent and ask for a lawyer. | Meraz Dep. at 10:16-23 [Hickey Dec. Ex. 54]; Nieto Dep. at  12:12-16 [Hickey Dec. Ex. 55]; Armendariz Dep. I at 139:2-25, 141:3-16 [Hickey Dec. Ex. 1]. |
| 203. | Deputy Armendariz also called for backup.  By the time additional officers arrived, Mr. Nieto and Ms. Meraz had complied with Deputy Armendariz's ordered and left the gas station. | Armendariz Dep. I at 147:1-10, 149:2-19 [Hickey Dec. Ex. 1]; Nieto Dep. 12:25-13:5 [Hickey Dec. Ex. 55]; Meraz Dep. 11:3-7 [Hickey Dec. Ex. 54]. |
| 204. | When Deputy Kikes arrived, Deputy Armendariz says he gave Deputy Kikes a description of the vehicle and its occupants.  Deputy Kikes remembers only seeing Deputy Armendariz waving in the direction of the vehicle driven by Mr. Nieto. | Armendariz Dep. I at 149:19-23, 153:20-155:7 [Hickey Dec. Ex. 1]; Kikes Dep. at 71:15-73:14 [Hickey Dec. Ex. 49]. |
| 205. | As Deputy Beeks arrived, he could see that Deputy Armendariz was unharmed.  Deputy Armendariz signaled to Deputy Beeks where the vehicle had gone. | Beeks Dep. at 120:3-12 [Hickey Dec. Ex. 38]; Armendariz Dep. I at 149:24-25, 153:8-16 [Hickey Dec. Ex. 1]. |

| 206. | Deputy Armendariz later relayed to Deputy Beeks that Mr. Nieto and Ms. Meraz had committed "no crime" and that there was "no probable cause" to arrest." | Kikes Dep. at 86:6-24 [Hickey Dec. Ex. 49]. |
|---|---|---|
| 207. | Deputy Kikes signaled to Mr. Nieto to pull over.  At the time he pulled Mr. Nieto over, he had no information other than that Deputy Armendariz had requested backup.  Mr. Nieto's pulled in to the family auto shop because it was just south of their location. | Kikes Dep. at 76:1-77:2 [Hickey Dec. Ex. 49]; Nieto Dep. at 13:1-14:1 [Hickey Dec. Ex. 55]. |
| 208. | Mr. Nieto and Ms. Meraz also called 911 at this time because they believe they were being harassed. | Nieto Dep. 14:4-9 [Hickey Dec. Ex. 55]; Meraz Dep. 11:15-17 [Hickey Dec. Ex. 54]. |
| 209. | As Deputy Beeks and other officers approached the vehicle, they had their guns drawn.  Mr. Nieto and Ms. Meraz recall that guns were pointed at them. | Beeks Dep. at 103:21-104:23 [Hickey Dec. Ex. 38]; Nieto Dep. at 36:6-22 [Hickey Dec. Ex. 55]; Meraz Dep. at 11:10-11 [Hickey Dec. Ex. 54]. |
| 210. | When Mr. Nieto did not initially exit the vehicle because he was on the phone with 911, Deputy Kikes opened the driver's side door and pulled Mr. Nieto out.  Mr. Nieto recalls being lifted off the ground by officers and thrown against the vehicle. | Nieto Dep. at 14:10-19 [Hickey Dec. Ex. 55]; Kikes Dep. at 79:6-18, 80:23-82:1 [Hickey Dec. Ex. 49]. |
| 211. | As this was occurring, Mr. Nieto and Ms. Meraz's family members came out of the auto shop and informed the deputies that they were U.S. citizens. | Nieto Dep. at 14:20-25 [Hickey Dec. Ex. 55]; Meraz Dep. at 11:22-12:10 [Hickey Dec. Ex. 54]; Kikes Dep. 79:11-15 [Hickey Dec. Ex. 49]. |
| 212. | Deputy Kikes handcuffed Mr. Nieto and ran his identification.  They found no problems. | Kikes Dep. at 82:2-3, 83:10-84:15 [Hickey Dec. Ex. 49]; Nieto Dep. at 15:11-22 [Hickey Dec. Ex. 55]. |
| 213. | Officers then released Mr. Nieto and Ms. Meraz without any citation or charge.  They did not provide Mr. Nieto or Ms. Meraz with an explanation of what happened or an apology. | Kikes Dep. at 84:16-22 [Hickey Dec. Ex. 49]; Nieto Dep. at 16:1-3, 29:22-30:2 [Hickey Dec. Ex. 55]. |
| 214. | Mr. Nieto attempted to lodge a complaint with the MCSO but never received a call back from anyone to take the complaint. | Nieto Dep. at 30:4-18 [Hickey Dec. Ex. 55]. |

| | | |
|---|---|---|
| 215. | Jorge Urteaga is a Hispanic male who was stopped by MCSO during a saturation patrol operation in Buckeye on January 9, 2009. After Mr. Urteaga provided the officer with his driver's license, the officer asked him where he was from and whether he could "prove" he was a U.S. citizen. The citation he received for an apparent vehicle registration issue was dismissed. His traffic stop lasted 45 minutes. | Declaration of Jorge Urteaga at ¶¶ 3-7, 9-10. |
| 216. | Daniel Magos is an older Hispanic male was stopped on December 4, 2009 by the MCSO. The officer pulled him over for a rear license plate issue but he would not have been able to see the back of Mr. Magos' vehicle when he made a U-turn to pull them over. He then asked for a "drivers license" from both Mr. Magos and his wife, who is also Hispanic. He was told, however, that his registration "wasn't important." The officer then frisked Mr. Magos even though he presented no danger. The officer did not cite Mr. Magos. When Mr. Magos asked him for his badge number, the MCSO officer told Mr. Magos "don't go thinking this is racial profiling." When Mr. Magos attempted to file a complaint against the officer, he never received a call back. | Declaration of Daniel Magos at ¶¶ 2-5, 7, 11, 13-15. |
| 217. | Lino Garcia is a Hispanic male who was pulled over four times in or near his neighborhood of Avondale, Arizona by the MCSO. Each time, both he and his girlfriend, who is also Hispanic, were asked for identification. On one occasion, he was stopped because his license plate light was too dark. The next time, he was told the plate was too bright. On another occasion, Mr. Garcia was stopped simply because the deputy thought he "looked 'suspicious'". He was not issued a citation on any stop. Once, Mr. Garcia was asked for his Social Security number even though he wasn't cited. | Declaration of Lino Garcia at ¶¶ 2-6, 8. |

| | | |
|---|---|---|
| 218. | Sergio Martinez Villaman is a Hispanic male and H2B visa holder who was stopped during a saturation patrol operation in Mesa on June 27, 2008 for an apparent failure to signal a lane change.  The officer made a U-turn to pull him over.  The officer questioned Mr. Martinez Villaman's passenger about whether he had ID or spoke English.  The officer later arrested Mr. Martinez Villaman for failure to provide ID even though he provided his Arizona's driver's license.  He spent 13 days in jail before a justice court judge ordered him released because the criminal citation was never filed by the officer. | Declaration of Sergio Martinez Villaman at ¶¶ 2-6, 9-10, 12-16. |
| 219. | Jerry Cosio is a young Hispanic male who was detained during a saturation patrol operation in Mesa on July 23, 2009.  He was arrested with his uncle.  When he was taken to an MCSO substation, he overhead another officer congratulating the deputy who arrested him, saying he got "two birds with one stone."  Another officer said he "doesn't count" because "he's American." | Declaration of Jerry Alfonso Cosio at ¶¶ 2, 6, 9-10 . |
| 220. | Lorena Escamilla is a Hispanic female who was stopped outside of her home on September 2, 2009.  He officer made a U-turn to follow her home.  She stood near her car while officer debated what traffic infraction she could be cited for.  After she refused to sit down on the hood of her car, the deputy grabbed her and pushed her into her car, belly first.  Ms. Escamilla was five months pregnant at the time.  Though she was told she was pulled over for a license plate light being out, Ms. Escamilla was cited for failure to show ID (she did show ID, *several times*).  When she went to court, the clerk told her the officer had crossed out the charge on her citation.  Ms. Escamilla's traffic stop lasted approximately two hours, from 10pm to midnight.  She tried several times to file a complaint but was unsuccessful. | Declaration of Lorena Escamilla at ¶¶ 2-4, 12, 14. |

| | | |
|---|---|---|
| 221. | Garrett Smith is a Caucasian male who was stopped by MCSO with his Hispanic family during a saturation patrol operation in north Phoenix on October 16, 2009.  The deputy told Mr. Smith he was being stopped for going 5 mph over the speed limit, even though there were other vehicles on the road passing them on their left.  He told Mr. Smith that he was part of a "special enforcement operation" and that he had noticed the vehicle because his 14-year old son was sitting in the back seat with his knees up, and it looked like someone might be trying to "hide from" the deputy.  Mr. Smith was not issued a citation. | Declaration of Garrett Smith at ¶¶ 2-6, 8. |
| 222. | Jaime Sanchez and Diona Solis were stopped by the MCSO on March 8, 2009.  They were returning from a Boy Scout camping trip with four young boys aged 9-13.  Upon hearing Jaime's accent, the deputy asked Jaime if he was a U.S. citizen.  Jaime responded that he was a legal resident and provided the deputy with his identification.  The deputy then asked me for my ID and ID from all of the boys in the vehicle.  I did not have IDs for them because they are minors.  In the end, the deputy cited Jaime for speeding. | Declaration of Diona Solis at ¶¶ 2-6, 10. |
| 223. | Julio Mora and his father were stopped by MCSO on February 11, 2009 while driving down a public roadway without any indication that they had broken the law.  They were ordered out of their vehicle, zip-tied, and taken to the site of a nearby worksite raid.  They were released several hours later after deputies confirmed they were in the country legally.  The Moras did not receive any traffic citation. | Declaration of Julio Mora at ¶¶ 2-6, 11-12. |
| 224. | Somos America is a membership organization that includes individual and organizational members.  Some members of Somos America have been stopped by MCSO.  The organization has also had to divert resources in response to MCSO's actions. | Guzman Dep. at 21:22-27:25, 29:22-49:6, 73:3-88:6 [Hickey Dec. Ex. 46]. |

| 225. | After Plaintiffs filed their initial Complaint on December 12, 2007, Captain Paul Chagolla received an email summarizing its allegations. Sheriff Arpaio's immigration file contains this email and his notes on the Complaint. | Melendres MCSO 73088-89 [Hickey Dec. Ex. 177]. |
|---|---|---|
| 226. | On July 16, 2008, Lieutenant Charles Siemens forwarded an email to Lieutenant Sousa and Captain Raymond Jones containing an ACLU press release describing the claims in Plaintiffs' First Amended Complaint. He also forwarded the press release to MCSO supervisors Glen Powe, George Acritelli, David Letourneau, and Detective Jimmy Clapper.  He sent the release to Sergeant Madrid, writing "Manny, Can you check the arrest logs or CAD and find a report for the listed guy I highlighted below?" | Carveout MCSO 33792 [Hickey Dec. Ex. 101]; Carveout MCSO 31088-89 [Hickey Dec. Ex. 98]; Carveout MCSO 31142-43 [Hickey Dec. Ex. 99]; Carveout MCSO 31188-89 [Hickey Dec. Ex. 100]. |
| 227. | MCSO's Computer Aided Dispatch (CAD) database records information from calls by MCSO officers to central dispatch made during MCSO traffic stops. | Rangel Dep. I at 47:18-51:23 [Hickey Dec. Ex. 67]; Armendariz Dep. I at 114:15-121:7 [Hickey Dec. Ex. 1]. |
| 228. | The "Incident History" for each traffic stop in the CAD database contains information about the traffic stop, including the date, time, duration, location, disposition, and primary officer conducting the traffic stop. | Rangel Dep. I at 48:6-50:4 [Hickey Dec. Ex. 67]; Armendariz Dep. I at 114:16-126:10 [Hickey Dec. Ex. 1]. |
| 229. | The CAD database contains information on MCSO officers' checks of names, licenses, registrations and warrants that are called into dispatch during the traffic stop. | Rangel Dep. I at 48:6-50:4 [Hickey Dec. Ex. 67]; Armendariz Dep. I at 114:16-126:10 [Hickey Dec. Ex. 1]. |
| 230. | MCSO officers have indicated it is "standard practice" to call traffic stops they initiate into dispatch.  Defendants' statistical expert assumes that the names checked in the CAD database correspond to "persons stopped" by the MCSO. | Armendariz Dep. I at 35:17-36:8, 39:21-40:15, 167:4-6 [Hickey Dec. Ex. 1]; Camarota Report at 9-10 [Hickey Dec. Ex.212]. |
| 231. | MCSO "Sign-in Rosters" contain a list of officers who participated on each day of the saturation patrol. | Kikes Dep. at 101:7-102:20 [Hickey Dec. Ex. 49]; Sousa Dep. I at 197:11-14 [Hickey Dec. Ex.88]. |

| | | |
|---|---|---|
| 232. | MCSO saturation patrol "Arrest Lists" contain information about each of the arrests made on a saturation patrol, including the arresting deputy. | Palmer Dep. I at 105:22-107:1 [Hickey Dec. Ex.56]. |
| 233. | Plaintiffs statistical expert, Dr. Ralph B. Taylor, conducted an analysis of MCSO's CAD database for racial and ethnic patterns and differences, with a focus on the impact of MCSO's saturation patrol operations on Hispanic individuals. | Taylor Initial Report at 12, 28-29 [Taylor Dec. Ex. B]. |
| 234. | MCSO's CAD database does not contain a record of the race or ethnicity of persons stopped during traffic stops. To determine whether an individual stopped was Hispanic, Dr. Taylor relied upon data from the U.S. Census on surnames strongly associated with Hispanic ethnicity.  This method is commonly accepted in social sciences, including criminology, political science, and public health.  Although it is possible that an individual with a "Hispanic" name might not be Hispanic, and vice versa, these effects cancel each out to produce an accurate estimate in the aggregate; if anything, the method slightly undercounts Hispanics. | Taylor Initial Report at 21-28 (explaining Hispanic surname methodology) [Taylor Dec. Ex. B]. |
| 235. | To ensure the robustness of his results, Dr. Taylor used a range of percentile thresholds for determining whether a surname is considered "Hispanic," consistent with the accepted research in the field. | Taylor Initial Report at 22-23; 35-36 [Taylor Dec. Ex. B]. |
| 236. | Dr. Taylor analyzed all stops in the CAD database from January 1, 2007 through October 31, 2009 that are described as in the CAD data as "traffic stops" or "traffic violations" in which at least one name was called into dispatch.  There were 106,802 such incidents in the CAD file, and 123,831 names checked. | Taylor Initial Report at 95; Taylor Rebuttal Report at 17, 50-51 [Taylor Dec. Exs. B, C]. |

| 237. | To determine whether a large-scale saturation patrol occurred on a given day, Dr. Taylor relied on the dates in Operations Plans created by MCSO in advance of major saturation patrol operations.  These days are termed "saturation patrol days." | Taylor Initial Report at 16-18 & Appendix 2 [Taylor Dec. Ex. B]. |
|---|---|---|
| 238. | To determine whether an MCSO officer had participated in a given saturation patrol, Dr. Taylor relied upon the officers names listed on the "Sign-in Rosters" and "Arrest Lists" maintained by MCSO. | Taylor Initial Report at 18-20 & Appendix 2 [Taylor Dec. Ex. B]. |
| 239. | MCSO officers were 28.8% to 34.8% more likely to check Hispanics surnames on saturation patrol days, as compared to non-saturation patrol control days one week before and after a saturation patrol day. | Taylor Rebuttal Report at 29-30 & Appendix 1 tbl. 1. [Taylor Dec. Ex. C] |
| 240. | MCSO officers were 36.2% to 39.5% more likely to check Hispanic names as compared to non-Hispanic names on saturation patrol days, as compared to non-saturation patrol control days one year earlier. | Taylor Rebuttal Report at 19-20 & Appendix 1 tbl. 1. [Taylor Dec. Ex. C] |
| 241. | MCSO officers were 26% to 29.9% more likely to check Hispanic names as compared to non-Hispanic names on saturation patrol days, as compared to all non-saturation patrol days. | Taylor Rebuttal Report at 19-20 & Appendix 1 tbl. 1. [Taylor Dec. Ex. C] |
| 242. | The increased Hispanic surname checks on saturation patrols days versus non-saturation patrol days shown in Dr. Taylor's analysis was found regardless of the type of control dates used, and regardless of the probability threshold used for labeling a surname Hispanic. | Taylor Rebuttal Report at 29-31. [Taylor Dec. Ex. C] |
| 243. | The increased Hispanic surname checks on saturation patrols days versus non-saturation patrol days shown in Dr. Taylor's analysis were all highly statistically significant, meaning that the chances of obtaining these results by chance were less than one in a thousand. | Taylor Rebuttal Report at 29-31 & Appendix 1 tbl. 1. [Taylor Dec. Ex. C] |

| 244. | MCSO officers actively working in a saturation patrol operation were 34.1% to 40% more likely to check Hispanic surnames as compared to officers never involved in saturation patrol operations on non-saturation patrol days. | Taylor Rebuttal Report at 26 & Appendix 1 tbl. 2. [Taylor Dec. Ex. C] |
|---|---|---|
| 245. | On saturation patrol days, MCSO officers actively working a saturation patrol operation were 46% to 53.7% more likely to check Hispanic surnames compared to other officers also working on those same days but not involved in the major saturation patrol. | Taylor Rebuttal Report at 27 & Appendix 1 tbl. 3. [Taylor Dec. Ex. C] |
| 246. | The increased rates of Hispanic surname checking by officers who were actively working in saturation patrols appeared regardless of the probability threshold used for labeling a surname Hispanic. | Taylor Rebuttal Report at Appendix 1 tbl. 2 & 3. [Taylor Dec. Ex. C] |
| 247. | The increased rates of Hispanic surname checking on by officers who were actively working in saturation patrols were all highly statistically significant, meaning that the chances of obtaining these results by chance were less than one in a thousand. | Taylor Rebuttal Report at Appendix 1 tbl. 2 & 3. [Taylor Dec. Ex. C] |
| 248. | MCSO officers took about 21% to 25% longer to complete a traffic stop when at least one Hispanic name was checked.  This result is highly statistically significant and controls for stop disposition (whether someone was arrested) and the number of names checked during a stop. | Taylor Rebuttal Report at 28-29 & Appendix 1 tbl. 4. [Taylor Dec. Ex. C] |
| 249. | The 21% to 25% increase in traffic stop duration when a Hispanic surname was checked corresponds to, on average, a predicted length difference of about two and a half to three minutes. | Taylor Rebuttal Report at 28-29 & Appendix 1 tbl. 4. [Taylor Dec. Ex. C] |
| 250. | Dr. Taylor's study uses internal benchmarking, in which the comparison group is based upon MCSO's own traffic stop activity. | Taylor Initial Report at 28-29; Taylor Rebuttal Report at 38-40. [Taylor Dec. Ex. B] |

| 251. | Defendants' statistical expert, Dr. Steven Camarota is a researcher for the Center for Immigration Studies, a think tank that advocates for greater restrictions on immigration. | Camarota Dep. at 87:22-88:9, 89:11-24, 92:15-16 [Hickey Dec. Ex. 39]. |
|---|---|---|
| 252. | Defendants' statistical expert, Dr. Steven Camarota, acknowledged that one can "gain insight into what is happening" by examining the CAD database, and that he also relies on data from the U.S. Census on surnames strongly associated with Hispanic ethnicity to infer the ethnicity of persons stopped and to detect patterns in those stops. | Camarota Dep. at 8:25-9:17, 10:16-11:5; 315:14-23 [Hickey Dec. Ex. 39]. |
| 253. | Defendants' statistical expert, Dr. Steven Camarota, conceded that the CAD database revealed a disparity in the stop rate for Hispanics between saturation patrol and non-saturation patrol days. | Camarota Report at 31 ("days on which a [saturation patrol] operation was underway do show a Hispanic share that is 4.8 percentage points higher") [Hickey Dec. Ex. 212]. |
| 254. | Dr. Camarota admitted that higher stop rates for Hispanics can indicate that Hispanics are being targeted. | Camarota Report at 1 ("[I]f Hispanics are being targeted, we would expect them to compromise a much larger share of those stopped.") [Hickey Dec. Ex. 212]; Camarota Dep. at 116:1-6 [Hickey Dec. Ex. 39]. |
| 255. | Dr. Camarota did not deny that the disparity in MCSO's stop lengths, i.e., that stops involving Hispanics last longer than other stops, existed. | Camarota Dep. at 140-41 [Hickey Dec. Ex. 39]. |
| 256. | Dr. Camarota did not try to replicate Dr. Taylor's analysis of the effect of saturation patrols on Hispanic stop rates | Camarota Dep. at 26:18-21 [Hickey Dec. Ex. 39]. |

RESPECTFULLY SUBMITTED this 29th day of April, 2011.

By /s/ Stanley Young

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of April, 2011 I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants:

Timothy J. Casey
timcasey@azbarristers.com

Thomas P. Liddy
tliddy@mail.maricopa.gov

Maria R. Brandon
brandonm@mail.maricopa.gov

*Attorneys for Defendant Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office*

*/s/ Stanley Young*

- 55 -