**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., ) | No. CV-07-2513-PHX-GMS |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Joseph M. Arpaio, in his individual ) capacity as Sheriff of Maricopa County, ) Arizona, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

Pending before the Court are Defendants' Motion for Summary Judgment (Doc. 413), Plaintiffs' Renewed Motion for Sanctions, (Doc. 416), Plaintiffs' Renewed Motion for Class Certification (Doc. 420), Plaintiffs' Motion for Partial Summary Judgment (Doc. 421), and Defendants' Motion for Leave to File Sur-Reply. (Doc. 469). A hearing on these motions is scheduled for Thursday, December 22, at 10:00 a.m.

The parties have been informed that the Court would request supplemental briefing on identified issues prior to oral argument. This Order identifies the topics on which the Court desires supplemental briefing and is issued pursuant to Federal Rules of Civil Procedure 56(f). In April of this year the Ninth Circuit Court of Appeals issued *United States v. Arizona,* 641 F.3d 339 (9th Cir. 2011). Neither party discussed this opinion in detail in its briefing, nor did either party address it in the context of Plaintiffs asserted Fourth Amendment claims. In fact, Plaintiffs have not moved for summary judgment on these

claims. Yet, as the Court reads *Unites States v. Arizona,* it is possibly dispositive of those claims and also bears upon the issues presented by the class certification motion with respect to the search and seizure claims. Prior to taking any action pursuant to Fed. R. Civ. P. 56(f), however, the Court desires to have the parties address the law set forth in *United States v. Arizona* as it relates to the developed facts pertaining to the stop of Plaintiff Ortega-Melendrez and to otherwise respond to the following questions.

In *United States v. Arizona,* 641 F.3d 339, 362 (9th Cir. 2011) the Court held that (1) there is no "federal criminal statute making unlawful presence in the United States, alone, a federal crime." *Id.* (citing *Martinez-Medina v. Holder,* ____F.3d ____, ____ (9th Cir. 2011)). Such violations, as well as other immigration "status" offenses according to the case, constitute civil violations of federal immigration law. The *Arizona* case also makes clear two additional points: (1) "states do not have the inherent authority to enforce the civil provisions of federal immigration law," and, (2) that "an alien's admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry." *id., quoting Gonzales v. City of Peoria,* 722 F.2d 468, 476-77 (9th Cir. 1983). In light of these and the other holding of *United States v. Arizona*, and in light of the revocation of MCSO's 287(g) status for conducting field enforcement operations as of October 16, 2009:

1. What good faith legal basis is there, if any, for MCSO to assert that it has the authority going forward to enforce civil violations of the federal immigration law?

2. What good faith basis is there, if any, for MCSO to assert that it presently has the authority pursuant to any enforceable state or federal law to detain any person based upon a reasonable belief, without more, that the person is not legally present in the United States?

3. What good faith legal basis is there, if any, for the proposition that *Whren v. U.S.*, 517 U.S. 806 (1996), justifies pretextual stops for the ancillary purpose of investigating civil immigration violations when the officer conducting the stop does not have the authority to enforce civil immigration violations?

4. What good faith legal basis is there, if any, for asserting that prior to the revocation of MCSO's field enforcement authority, an officer who was not 287(g) certified had

authority to detain someone for any period on the reasonable belief that the person was not in compliance with the civil immigration laws of the United States?

5. On what basis, if any, did Office DiPietro form a belief that Ortega-Melendrez was committing a criminal violation when he was sitting in the vehicle which Officer DiPietro stopped?

6. Does the MCSO continue to assert that it presently has the authority pursuant to any enforceable law to detain any person based upon a reasonable suspicion, without more, that the person is not legally present in the United States? Please identify the basis for that authority in light of *United States v. Arizona.*

7. What other good faith arguments are there that the Court either lacks the authority or otherwise should not enjoin the MCSO from seeking to enforce federal civil immigration law, or otherwise conduct stops of persons based only upon a reasonable suspicion, without more, that the person is not legally present within the United States?

The parties will simultaneously file supplemental briefs to address the above questions not to exceed twenty pages in length on or before December 16. The Court will not grant an extension to this deadline absent extraordinary circumstances.

At oral argument the Court would like to address the following additional questions with the parties:

1. With respect to the renewed motions for class certification Defendants have argued that the class should not be certified because: (a) there would be separate defenses to class members' claims depending upon whether the officer(s) who stopped class members were 287(g) certified, and (b) the proposed class is overbroad, and might presumably destroy the right of some individual class members to seek damages or otherwise protect their rights.

A. To what extent does the destruction of the stat sheets impair the ability of potential parties to determine whether they were stopped by MCSO officers who were 287(g) certified? To the extent that Defendants have complicated the ability to distinguish between stops made by 287(g) officers and stops not made by such officers, would provisional class certification be an appropriate sanction among possible permissive inferences for destruction

1 of the stat sheets?

2     B. To what extent does *Martinez-Medina v. Holder,* \_\_\_\_F.3d \_\_\_\_, \_\_\_\_ (9th Cir. 2011) suggest that Defendants would receive qualified immunity for any damages claims prior to the issuance of that decision? If Defendants would be able to invoke qualified immunity for claims related to immigration enforcement prior to *Martinez-Medina* would overbreadth continue to be a basis on which to deny class certification?

7     2. Outside the scope of MCSO's saturation patrols, what facts have Plaintiffs offered that the practices or policies of the MCSO have a discriminatory effect on putative class members? If any class is certified, should the class be limited to those class members detained in pursuit of immigration enforcement by the MCSO?

11     3. Were the Court to rule, or the MCSO to acknowledge, that it has no authority under existing law to detain someone based on a reasonable belief, without more, that such person is not legally present in the United States, and that it would instruct its officers on the appropriate law, what additional evidence is there that suggests that the Plaintiffs and/or putative class members would be likely to suffer harm in the future sufficient to find standing to seek injunctive relief on the discrimination claims?

17     The emails produced by the OET carveout suggest that relevant emails were destroyed. Nevertheless, courts should "impose the 'least onerous sanction' given the extent of the offending party's fault and the prejudice to the opposing party," *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1078 (N. D. Cal 2006) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994), and sanctions should not "not interfere with that party's right to produce other relevant evidence." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). In light of the substantive evidence recovered by the OET carveout and the caution to use inherent powers with restraint, parties should be prepared to discuss the appropriateness of the following adverse inferences:

26     1) The finder of fact may infer that the stat sheets would have suggested that officers involved in special operations did not follow a "zero tolerance" policy requiring them to stop all traffic offenders.

- 4 -

2) The finder of fact may infer that the stat sheets for special operations would have included a significantly higher number of arrests in the categories "Illegal Alien turned over to ICE/LEAR" and/or "Suspected Illegal Alien arrested on state charges" than records documenting ordinary patrol activity.

3) The finder of fact may infer that the stat sheets would have shown that MCSO officers not certified under 287(g) to enforce immigration law nevertheless detained or arrested suspected illegal aliens.

4) The finder of fact may infer that MCSO maintained a file of citizen complaints making requests for special operations.

5) The finder of fact may infer that MCSO received and circulated citizen complaints prior to August 31, 2008 requesting that MCSO officers conduct special operations to enforce federal immigration law in areas where MCSO later conducted such operations.

6) The finder of fact may infer that some of the citizen communications described above complained about "Mexicans," "day laborers," or "illegal immigrants" but did not provide a description of any criminal activity.

Should parties wish to discuss other issues, they are free to do so. However, the oral argument is scheduled to last only two hours. Each party will receive one hour total for argument, and the above-mentioned issues are of principal interest to the Court.

Dated this 30th day of November, 2011

*A. Murray Snow*
G. Murray Snow
United States District Judge