**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER** |
| vs. | |
| Joseph M. Arpaio, in his individual capacity as Sheriff of Maricopa County, Arizona, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Renewed Motion for Sanctions. (Doc. 416). Oral arguments were held on December 22, 2011. For the reasons stated below, Plaintiffs' motion is granted and the Court will permit the finder of fact at trial to draw adverse inferences based on the destruction of documents by the Defendants.

As further explained below, Plaintiffs seek only injunctive relief and have not requested a jury trial. At oral argument, both parties agreed that the Court will likely be the finder of fact at trial. In light of the discretion with which it should use inherent power, the Court reserves the right to alter the inferences or issue further permissive inferences as the need arises during the course of this litigation.

**BACKGROUND**

This putative class action civil rights suit alleges that the Maricopa County Sheriff's Office ("MCSO") engages in a policy or practice of racial profiling. (Doc. 26 ¶ 2). The background facts relevant to the sanctions motion, in which numerous emails and "stat sheets"[1] responsive to Plaintiffs' discovery requests were destroyed by Defendants, can be found in the Court's earlier order granting sanctions. (Doc. 261). Since that order was issued, the Maricopa County Office of Enterprise Technology ("OET") announced that it had in its possession a database of MCSO emails dating back to August, 2008 which it had archived pursuant to a litigation hold in an unrelated case. (Doc. 283, Ex. 1(C)). Defendants agreed to provide Plaintiffs with a "carve-out" of the data recovered by OET, which contained all of the archived MCSO emails except those containing the names of attorneys representing MCSO in various matters. (Doc. 330). The carve-out contained numerous emails which would have been responsive to the discovery requests but which had not been provided by MCSO, ninety-two of which Plaintiffs include as exhibits to their motion for partial summary judgment. (Doc. 450 at 1).

**DISUCSSION**

**1. Legal Standard**

A party engages in spoliation when it destroys documents even though it "had some notice that the documents were potentially relevant to the litigation before they were destroyed." *U.S. v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotations omitted). Once it determines that a party has destroyed evidence, the Court has an inherent power to issue sanctions, including to order the finder of fact "that it may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party."

---

[1] "Stat sheets" are forms on which deputies of the MCSO record their patrol activities. Deputies record the total number of stops, contacts, and arrests made during a tour. Stat sheets may also allow deputies to document the type of arrest made, such as a drug arrest, a DUI arrest, a warrant arrest, or an arrest of a suspected illegal alien. (*See* Doc. 235, Ex. 9(A)–11).

1 *Medical Lab. Mgmt. Consultants v. Am. Broad. Co.*, 306 F. 3d 806, 824 (9th Cir. 2002). In fashioning an adverse inference instruction, a court should consider whether the party seeking an instruction has shown "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1078 (N. D. Cal 2006) (internal quotations omitted).

An organization is put on notice that evidence must be preserved, for the purposes of the *Napster* test, "[a]s soon as a potential claim is identified." 462 F. Supp. 2d at 1067. When an organization is put on notice, notice is imputed to its employees, in order to prevent "an agency, corporate officer, or legal department [from shielding] itself from discovery obligations by keeping its employees ignorant." *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987); *cf. New Times v. Arpaio*, 217 Ariz. 533, 541, 177 P.3d 275, 283 (App. 2008) ("If public entities could be excused from providing public records merely by being inattentive to requests, then access to the records would be easily frustrated."). If, however, documents are not available "because of the inadvertent loss of the evidence" before a party had notice of a lawsuit, an adverse inference instruction is not merited. *Medical Lab*, 306 F.3d at 825; *see also Marceau v. Int'l Bhd. of Elec. Workers*, 618 F. Supp. 2d 1127, 1174 (D. Ariz. 2009) (destruction of duplicate copies of documents pursuant to company policy a year before a lawsuit was filed may constitute "an innocent reason" for loss).

Once a court has determined that documents were destroyed after a party was put on notice that they should be preserved, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *Napster*, 462 F. Supp. 2d at 1066–67. "[A] finding of 'bad faith' is not a prerequisite" to a district court's imposition of an adverse inference. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (citing *Unigard v. Lakewood*, 982 F.2d 363, 368–70 n.2 (9th Cir. 1993)). When a party on notice

1 intentionally destroys, rather than accidentally loses, that evidence, it is a "willful" spoliator 2 even if it did not intend to deprive an opposing party of relevant evidence. *Leon v. IDX* 3 *Systems Corp.,* 464 F.3d 951, 959 (9th Cir. 2006) (destruction was willful when a party 4 "knew he was under a duty to preserve [evidence], but intentionally deleted many files and 5 then wrote a program to write over the deleted documents").

6 "Because of their very potency, inherent powers must be exercised with restraint and 7 discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). While a court may take the 8 degree of culpability into account when fashioning an adverse inference, it nevertheless must 9 "impose the 'least onerous sanction' given the extent of the offending party's fault and the 10 prejudice to the opposing party." *Napster*, 462 F. Supp. 2d at 1078 (quoting *Schmid v.* 11 *Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). In particular, an adverse 12 inference should "not interfere with that party's right to produce other relevant evidence." 13 *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

14 **2. Analysis**

15 Plaintiffs issued two separate and adequate requests that Defendants preserve 16 documents relevant to this litigation, and Defendants nevertheless destroyed responsive 17 documents. On July 21, 2008, counsel for Plaintiffs wrote a letter to counsel for Defendants 18 in this matter demanding preservation of MCSO records regarding MCSO special operations. 19 (Doc. 227, Ex. E). On the same day that they wrote to counsel for the Defendants, Plaintiffs' 20 counsel made a virtually identical request for information directly to the MCSO's Public 21 Information Officer pursuant to the Arizona Public Records Act. A.R.S. § 39-121 (2008). 22 (Doc. 235, Ex. 3(B)) ("PIR request"). Neither letter resulted in a litigation hold. MCSO 23 Deputy Chief Jack MacIntyre acknowledged that he took no action regarding the first letter, 24 and MCSO Lieutenant Doris "Dot" Culhane stated that if she took any action at all in 25 response to the second, it was only to issue a "general instruction." (Doc. 235, Exs. 3, 4). 26 Moreover, emails deleted by MCSO officers and recovered by OET demonstrate that officers 27 in fact had actual notice of the suit. Lieutenant Sousa received and forwarded a press release 28 announcing this litigation, in an email to other officers requesting documentation of a named

- 4 -

1  Plaintiff's arrest. (Doc. 417, Ex. 2–3). As of July 16, 2008, MCSO had notice that documents
2  relating to special operations were "potentially relevant to the litigation." *Kitsap*, 314 F.3d
3  at 1001.

4        Defendants intentionally destroyed the documents. They state that they "inadvertently
5  and innocently discarded the stat sheets," but do not contest that the sheets were shredded,
6  rather than lost. (Doc. 445). Moreover, Defendants do not contest that MCSO officers
7  intentionally deleted emails, as stated in deposition testimony. (Doc. 227, Ex. A). Because
8  Defendants had notice that the emails and stat sheets were relevant to the litigation, and
9  subsequently destroyed them, permissive adverse inferences are justified even if Defendants
10 did not intend to deprive Plaintiffs of relevant evidence. *Leon*, 464 F.3d at 959; *see also*
11 *Glover*, 6 F.3d at 1329.

12       This court has already found that adverse inferences will be issued regarding the stat
13 sheets because they were destroyed with a culpable state of mind and because "[t]he
14 information contained in the individual stat sheets would have been relevant to the claims of
15 Plaintiffs and/or defenses of Defendants." (Doc. 261 at 10). Regarding emails, in an order
16 issued before the OET database was recovered, this Court wrote that the decision to issue
17 inferences and to define their scope would be made based upon the efforts made by
18 Defendants to recover lost documents, the sources from which documents were recovered,
19 and the content of recovered documents. (Doc. 261 at 11–12). Since the emails that were
20 provided by the OET carveout in large measure obviated the necessity to search for more lost
21 documents, the inferences will instead be crafted based upon the content of the recovered
22 email.

23     **A. Stat Sheets**

24       The MCSO stat sheets allow individual officers to capture data regarding the number
25 of contacts and types of arrests that they make during a particular tour. (Doc. 235, Exs.
26 9–11). Some of the sheets also allow deputies to mark the number of arrests made of
27 suspected illegal aliens. (*Id.*). The stat sheets identify officers, but do not offer a means by
28 which an officer can note the race or ethnicity of the people stopped during a patrol. (*Id.*).

- 5 -

1       Chief Brian Sands has stated that documentation of officer activity is the best evidence
2 that an officer in fact engaged in a "zero tolerance" policy, stating that "the end results at the
3 end of the day speak for themselves, how many arrests were made, how many contacts were
4 made, that type of thing." (Doc. 453, Ex. 14 at 122, ln 15–17). MCSO has destroyed
5 numerous stat sheets that could have shown whether officers in fact engaged in a zero
6 tolerance a policy. Indeed, the few stat sheets that were not shredded show significant
7 variations between the number of stops and arrests conducted by individual officers during
8 special operations, including some sheets showing officers conducted very few stops during
9 a long shift while allegedly enforcing a "zero tolerance" policy. (Doc. 419, Ex. 27). One
10 MCSO officer, when presented with a stat sheet detailing an officer's activity during a
11 special operation, confirmed that it documented fewer stops than a "zero tolerance" policy
12 would suggest. (Doc. 419, Ex. 29). Plaintiffs are therefore granted the following permissive
13 adverse inferences:

14       1) The finder of fact may infer that the stat sheets would have suggested that officers
15       involved in special operations did not follow a "zero tolerance" policy requiring them
16       to stop all traffic offenders.

17       2) The finder of fact may infer that the stat sheets for special operations would have
18       included a significantly higher number of arrests in the categories "Illegal Alien
19       turned over to ICE/LEAR" and/or "Suspected Illegal Alien arrested on state charges"
20       than records documenting ordinary patrol activity.

21 **B. MCSO Emails**

22       After OET provided its recovered Database to Defendants, Defendants gave Plaintiffs
23 a "carveout" containing MCSO emails except for those that include the names of attorneys
24 representing MCSO. (Doc. 330). Many of the emails deleted by MCSO were present in the
25 OET carveout, which preserved emails on OET's backup tapes as of "some date in August,
26 2008." (Doc. 283, Ex. 1(C)). Although Plaintiffs have used numerous emails from the
27 carveout to argue the merits of their case, additional material is unrecoverable, and adverse
28 inferences will be issued regarding this lost material. Some of the material from Sheriff

- 6 -

Arpaio's immigration file, which was provided in its entirety and therefore will not be subject to adverse inferences, also sheds light on the nature of the deleted emails.

MCSO officers received and circulated requests that the department conduct special operations based upon criteria other than criminal activity. Some of these communications were found in Sheriff Arpaio's file, while others were found in the OET carveout. Sample communications from the public include requests that MCSO conduct special operations in Sun City because the writer heard employees of a restaurant speaking Spanish, that MCSO operate in Surprise because the writer observed "dozens of day workers" there, and that it send officers to Mesa because the writer observed day laborers, "most of whom, I would believe to be here illegally." (Doc. 428, Exs. 25–26, 28). Subsequently, MCSO conducted special operations in the locations specified in the communications. (Doc. 453 ¶ 65–68). At least two emails refer to a file or collection of citizen requests, although no such file was provided during discovery. (Doc. 417, Ex. 14; Doc. 451, Ex. 38). Some communications obtained in discovery reference previous emails that were never produced. (Doc. 418, Ex. 21). In addition, the carveout included racially derogatory emails circulated among MCSO officers and volunteer posse members. (Doc. 431, Exs. 94–115).

Defendants were on actual notice of this lawsuit by July 16, 2008, and the carveout captured emails present on the OET system as of some day in August 2008. Although Plaintiffs offer no good reason to suppose that the complete nature and type of the possibly missing documents are not of the same nature as those in the carveout, they have demonstrated that documents remain missing. Moreover, the content of the recovered emails could constitute circumstantial evidence of discriminatory intent by MCSO. Therefore, at trial, the following inferences will be allowed:

    1) The finder of fact may infer that MCSO maintained a file of citizen complaints making requests for special operations.

    2) The finder of fact may infer that MCSO received and circulated citizen complaints prior to August 31, 2008 requesting that MCSO officers conduct special operations to enforce immigration-related law in areas where MCSO later conducted such

1 operations.

2 3) The finder of fact may infer that at least some of the citizen communications
3 described above complained about "Mexicans," "day laborers," or "illegal
4 immigrants" but did not provide a description of any criminal activity.

## CONCLUSION

Plaintiffs made two separate and sufficient requests to MCSO that it retain documents, and MCSO nevertheless destroyed responsive stat sheets and emails. Plaintiffs will be granted permissive adverse inferences regarding both the stat sheets and the emails. The Court reserves the right to issue further permissive inferences at or before trial as necessary.

**IT IS THEREFORE ORDERED:**

Defendants' Renewed Motion for Sanctions (Doc. 416) is **granted in part**, and Plaintiffs will be entitled to the following adverse inferences at trial:

a) The finder of fact may infer that the stat sheets would have suggested that officers involved in special operations did not follow a "zero tolerance" policy requiring them to stop all traffic offenders.

b) The finder of fact may infer that the stat sheets for special operations would have included a significantly higher number of arrests in the categories "Illegal Alien turned over to ICE/LEAR" and/or "Suspected Illegal Alien arrested on state charges" than records documenting ordinary patrol activity.

c) The finder of fact may infer that MCSO maintained a file of citizen complaints making requests for special operations.

d) The finder of fact may infer that MCSO received citizen complaints prior to August 31, 2008 requesting that MCSO officers conduct special operations to enforce immigration-related law in areas where MCSO later conducted such operations.

e) The finder of fact may infer that some of the citizen communications described above complained about "Mexicans," "day laborers," or "illegal immigrants" but did not provide a description of any criminal activity.

The Court reserves the right to issue further permissive inferences at or before trial

as necessary.

Dated this 23rd Day of December, 2011

*A. Murray Snow*
G. Murray Snow
United States District Judge