1  **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9  Manuel de Jesus Ortega-Melendres, et al.,)    No. CV-07-2513-PHX-GMS
                                           )
10              Plaintiffs,                )    **ORDER**
                                           )
11  vs.                                    )
                                           )
12                                         )
    Joseph M. Arpaio, in his individual)
13  capacity as Sheriff of Maricopa County,)
    Arizona, et al.,                       )
14                                         )
                Defendants.                )
15                                         )
                                           )
16  _____)

17

18         Pending before the Court are Defendants' Motion for Summary Judgment (Doc. 413),

19  Plaintiffs' Renewed Motion for Class Certification (Doc. 420), Plaintiffs' Motion for Partial

20  Summary Judgment (Doc. 421), and Defendants' Motion for Leave to File Sur-Reply. (Doc.

21  469). At oral arguments on December 22, 2011, Plaintiffs moved for summary judgment on

22  Ortega-Melendres's Fourth Amendment claims. (Doc. 490). For the reasons stated below,

23  Defendants' motion for summary judgment is granted in part and denied in part, Plaintiffs'

24  motion for partial summary judgment on the Equal Protection claims is denied, Plaintiffs'

25  motion for summary judgment on the Fourth Amendment claims is granted in part and denied

26  in part, Plaintiffs' motion for class certification is granted, and Defendants' motion for leave

27

28

1 to file a sur-reply is dismissed as moot.[1]

2                                    **BACKGROUND**

3 **1. Factual Background**

4          This putative class action civil rights suit alleges that the Maricopa County Sheriff's

5 Office ("MCSO") engages in a policy or practice of racial profiling, and a policy stopping

6 persons without reasonable suspicion that criminal activity is afoot, in violation of Plaintiffs'

7 rights under the Fourteenth and Fourth Amendments. (Doc. 26 ¶ 2). Under an agreement with

8 the Department of Immigration and Customs Enforcement ("ICE"), certain MCSO deputies

9 had been certified to enforce federal civil immigration law. (Doc 413, Ex. 5). The agreement

10 between MCSO and ICE operated pursuant to section 287(g) of the Immigration and

11 Nationality Act ("INA"), and the participating officers were therefore said to be 287(g)

12 certified. 8 U.S.C. § 1357(g) (2006). On October 16, 2009, the agreement between MCSO and

13 ICE was modified so that MCSO officers no longer had authority to enforce federal civil

14 immigration violations in the field, but could continue to do so in the jails. (Doc. 422 ¶ 10).

15 Plaintiffs allege that under the guise of enforcing immigration law, MCSO officers are in fact

16 engaged in a policy of racially profiling Latinos. (Doc. 26 ¶ 3).

17          The five named Plaintiffs were stopped by MCSO officers during three incidents, on

18 September 27, 2007, December 7, 2007, and March 28, 2008. (*Id.* ¶¶ 53–119). In addition,

19 Somos America ("Somos"), a non-profit membership organization, claims that it and its

20 members have been harmed by the alleged policy. (*Id.* ¶ 10). In Count One, Plaintiffs claim

21 that MCSO has violated and is violating the Equal Protection Clause of the Fourteenth

22 Amendment. (*Id.* ¶¶ 128–37). In Count Two, they allege that MCSO's stops of the named

23 Plaintiffs violated the Fourth Amendment, as applied to MCSO through the Fourteenth

24 Amendment. (*Id.* ¶¶ 138–43). In Count Three, they allege that those same stops also violated

25 _____

26          [1] Plaintiffs' motion for sanctions (Doc. 416) was granted in an order issued earlier
today. (Doc. 493). A discussion of the history of discovery issues in this case is contained
27 in that order.

28                                        - 2 -

the search and seizure protections of Article II, Section 8 of the Arizona State Constitution. (*Id.* ¶¶ 144–47). In Count Four, they argue that MCSO's policy violates Title VI of the Civil Rights Act of 1964, which forbids race discrimination in federally funded programs. (*Id.* ¶¶ 148–54). Plaintiffs seek certification of a class consisting of "All Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." (Doc. 420 at 1). Plaintiffs seek only equitable relief, in the form of a declaratory judgment, an injunction against Defendant, attorneys' fees, and "such other relief as the Court deems just and proper." (Doc. 26 at 28–29).

Defendants now move for summary judgment on all counts. First, they argue that the Plaintiffs are not likely to suffer future injury, and that they therefore lack standing to obtain equitable relief under the test established in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). (Doc. 413 at 14–17). Next, they argue that the vehicle traffic stops of the named Plaintiffs were supported by probable cause, and that the Fourth Amendment and Arizona Constitutional claims therefore fail under *Whren v. U.S.*, 517 U.S. 806 (1996). (Doc. 413 at 18–22). Finally, they claim that the record shows that MCSO does not engage in intentional discrimination, and that the Fourteenth Amendment and Title VI claims therefore fail. (Doc. 413 at 23–31). Plaintiffs seek summary judgment on Claim One and Claim Four, and certification of their proposed class. (Docs. 416, 420, 421).

**2. Legal Background**

In 1952, Congress passed the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, which set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization." *De Canas v. Bica*, 424 U.S. 351, 353 (1976). The INA contains both criminal and civil provisions regarding those who either enter the United States without legal authority or enter with legal authority but remain after that authority expires. *See*, *e.g.*, 8 U.S.C. §§ 1302, 1306, 1325 (2006) (criminal provisions); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)–(C) (2006) (civil provisions regarding admissibility and

1   deportation). The Supreme Court, referencing specific criminal provisions of the INA, has

2   written that "entering or remaining unlawfully in this country is itself a crime." *I.N.S. v.*

3   *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). The criminal provisions cited in *Lopez-*

4   *Mendoza* set forth with particularity what actions constitute "entering or remaining

5   unlawfully." For example, entering or attempting to enter the United States other than at a

6   legal border crossing is a federal crime. 8 U.S.C. § 1325. A non-citizen who remains within

7   the United States and willfully fails to register or be fingerprinted after thirty days, or who

8   knowingly files a fraudulent application, has also committed a federal offense. 8 U.S.C.

9   §§1302, 1306. All aliens over the age of 18, moreover, must carry their registration papers

10  at all times, under penalty of a criminal misdemeanor. 8 U.S.C. § 1304(e). There is no

11  provision in the INA or any other federal law, however, that specifically criminalizes mere

12  presence in the United States without authority to remain.[2] The Supreme Court has

13  acknowledged that "[a] deportation proceeding is a purely civil action to determine eligibility

14  to remain in this country." *Lopez-Mendoza*, 468 U.S. 1032.

15       Being present in the country without authorization to remain "is only a civil

16  violation." *Gonzales v. City of Peoria*, 722 F.2d 468, 476 (9th Cir. 1983) *overruled on other*

17  *grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). Nothing in *Lopez-*

18  *Mendoza* alters this law. In a recent decision, the Ninth Circuit found that a state trooper did

19  not commit an "egregious violation" of the Fourth Amendment sufficient to trigger the

20  exclusionary rule in a civil proceeding because the language of *Lopez-Mendoza* was such that

21  "a reasonable officer could have interpreted that statement to mean an alien's unlawful

22  presence in this country is itself a crime." *Martinez-Medina v. Holder*, 616 F.3d 1011, 1017

23  (9th Cir. 2010). In amending and superceding that opinion, the court clarified that

24  _____

25       [2] It is also a crime for a person who has previously been denied admission, excluded,
26  deported or removed to be present in the United States unless the Attorney General expressly
    consents to the person's reapplication for admission or the alien establishes that he was not
27  required to obtain such advance consent. 8 U.S.C. § 1326(a).

28                                          - 4 -

1   "[a]lthough a reasonable officer could have been confused by these statements in *Lopez-*
2   *Mendoza* and *Martinez* . . . a close reading of those cases demonstrates that neither meant to
3   suggest that an alien's mere unauthorized presence is itself a crime." *Martinez-Medina*, ___
4   F.3d ___, 2011 WL 855791, at *6 (9th. Cir. Mar. 11, 2011). The panel went on to emphasize
5   that "*Gonzales*'s observation that 'an alien who is illegally present in the United States . . .
6   [commits] only a civil violation,' . . . remain[s] the law of the circuit, binding on law
7   enforcement officers." *Id.* (quoting *Gonzales*, 722 F.2d at 476–77). An alien who "overstays
8   a valid visa or otherwise remains in the country after the expiration of a period authorized
9   by the Department of Homeland Security," therefore, although he may be subject to
10  deportation, has violated no criminal statute. *Martinez-Medina*, ___ F.3d at ___, 2011 WL
11  855791, at *5 n.4.

12        Officers enforcing the immigration laws must comply with the Fourth Amendment,
13  which protects the right of the people to be free from "unreasonable searches and seizures."
14  U.S. CONST. amend IV. Probable cause to arrest a person will flow when "the facts and
15  circumstances within the knowledge of the arresting officers and of which they had
16  reasonably trustworthy information were sufficient to warrant a prudent man in believing that
17  [the person arrested] had committed or was committing an offense." *United States v. Jensen*,
18  425 F.3d 698, 704 (9th Cir. 2005). Absent probable cause, when circumstances require
19  "necessarily swift action predicated upon the on-the-spot observations of the officer on the
20  beat," officers may make brief investigatory seizures based only on reasonable suspicion that
21  "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 20, 30 (1968). An investigatory
22  stop is lawful if an officer "reasonably suspects that the person apprehended is committing
23  or has committed a criminal offense." *Arizona v. Lemon Montrea Johnson*, 555 U.S. 323, 326
24  (2009). Stopping a vehicle is usually "analogous to a so-called '*Terry* stop'"; officers
25  ordinarily may stop a vehicle based on reasonable suspicion of criminal activity. *Berkemer*
26  *v. McCarty*, 468 U.S. 420, 439 (1984).

27        Federal ICE officers have the power to investigate and enforce both criminal and civil
28                                              - 5 -

immigration law, including the power to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Authorized officers may stop vehicles pursuant to this authority so long as "they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Reasonable suspicion for a federal officer to stop a car to investigate the immigration status of the occupants depends upon the "totality of the circumstances." *U.S. v. Arvizu*, 534 U.S. 266, 277 (2002) (border patrol agent had reasonable suspicion to stop a minivan when (1) it had turned onto a dirt road frequently used by smugglers to avoid a checkpoint, (2) it had slowed when the driver saw the officer, (3) the children sitting in the back began to wave mechanically, and (4) the children had their knees propped up, as though there was cargo beneath them).

In considering the totality of the circumstances, however, "an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population." *U.S. v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). Hispanic appearance, for example, is "of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Moreover, while an inability to speak English is probative of immigration status, it does not supply reasonable suspicion unless "other factors suggest that the individuals are present in this country illegally." *Manzo-Jurado*, 457 F.3d at 937. The Ninth Circuit has also held that "individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior," taken together, do not provide a federal immigration officer reasonable suspicion to conduct a stop. *Id.* at 932.

Local law enforcement officers who have been certified under section 287(g) may "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). They are therefore

1   permitted to enforce civil violations of federal immigration law. Officers certified under the
2   287(g) program may make traffic stops based upon a reasonable suspicion, considering the
3   totality of the circumstances, that people in the vehicle are not authorized to be in the United
4   States. *Brignoni-Ponce*, 422 U.S. at 884.

5      Local law enforcement officers, however, do not have the "inherent authority" to
6   investigate civil immigration violations, including status violations. *U.S. v. Arizona*, 641 F.3d
7   339, 362 (9th Cir. 2011).[3] Since the MCSO lost its 287(g) field authority after October 16,
8   2009, the only immigration laws its officers can investigate are federal criminal laws or state
9   laws that have not been enjoined. *Gonzales*, 722 F.2d at 476–77.

10     Local law enforcement officers, even those not certified under 287(g), are generally
11  not prohibited from investigating and enforcing federal criminal law. *Ker v. California*, 374
12  U.S. 23, 37 (1963). The Ninth Circuit has held that local law enforcement officers, therefore,
13  may investigate and enforce "the criminal provisions of the [INA]." *Gonzales*, 722 F.2d at
14  477.[4] Non-287(g) officers may detain those whom they have reasonable suspicion to believe
15  have illegally crossed a border in violation of § 1325, fraudulently filed an immigration
16  application under § 1306, failed to carry documentation of their immigration status under
17  § 1304(e), or committed other criminal immigration violations.

18     Moreover, actual knowledge, let alone suspicion, that an alien is illegally present is
19  not sufficient to form a reasonable belief he has violated federal criminal immigration law.

20  _____

21    [3] The Supreme Court has granted a writ of certiorari to review the Ninth Circuit's
22  decision. *U.S. v. Arizona*, 641 F.3d 339, 362 (9th Cir. 2011), *cert. granted* 60 U.S.L.W. 3090
     (U.S. Dec. 12, 2011) (No. 11-182). The question presented in that case is whether federal
23  laws impliedly preempt four provisions of SB 1070 on their face. *Id.* The Supreme Court has
     not been asked to decide whether states have an *inherent* authority to enforce civil provisions
24  of the immigration law. At oral argument, Defendants conceded that they had no authority
25  to enforce federal civil immigration law.

26    [4] Plaintiffs stated at oral argument that local law enforcement officers do not have the
     inherent authority to enforce federal criminal immigration law. They cited no authority for
27  this proposition, which is in conflict with *Gonzales*, upon which they otherwise rely.

28

1    The Ninth Circuit recently affirmed that "an alien's 'admission of illegal presence . . . does

2    not, without more, provide probable cause of the criminal violation of illegal entry,'"

3    precisely because the criminal sections of the INA contain additional elements, such as

4    crossing a border without authorization, willfully refusing to register, or filing a fraudulent

5    application. *Martinez-Medina*, ___ F.3d ___, 2011 WL 855791, at *6 (quoting *Gonzales*, 722

6    F.2d at 476–77).[5] MCSO officers, none of whom are now 287(g) certified, therefore have no

7    power to detain or investigate violations such as those "regulating authorized entry, length

8    of stay, residence status, and deportation." *U.S. v. Arizona*, 641 F.3d at 362. Seizing a civilian

9    pursuant to such a violation, absent reasonable suspicion of criminal activity, violates the

10   Fourth Amendment.

11          Local law enforcement officers can investigate violations of state law, including

12   validly enforceable state laws that involve immigration matters. The State of Arizona, in

13   response to "rampant illegal immigration, escalating drug and human trafficking crimes, and

14   serious public safety concerns," along with a perceived failure by the federal government to

15   enforce federal immigration law, has passed a number of state laws involving immigration

16   issues. *U.S. v. Arizona*, 703 F. Supp. 2d 980, 985 (D. Ariz. 2010). Some of the provisions of

17   Senate Bill ("SB") 1070, one of the laws in question, have been enjoined, but some portions

18   of the law remain valid.

19          Portions of SB 1070 that have not been enjoined allow local law enforcement officials

20   to turn over those who have been convicted of a state crime to federal authorities to

21   determine their immigration status. Ariz. Rev. Stat. ("A.R.S.") § 11-1051(C)–(F); *See U.S.

22   v. Arizona*, 703 F. Supp. 2d at 985 (D. Ariz. 2010) (upholding the provisions). Additionally,

23

24   ─────────────────────

25          [5] The Tenth Circuit has found that officers have probable cause to believe people have
     crossed a border without authorization when their car was stopped legally, the driver of the
26   vehicle failed to provide a valid driver's license, the driver and his passenger admitted they
     were not legally present in the country, and the driver and passenger "indicated they were
27   coming from Mexico." *U.S. v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001).

28

1    a person who is "in violation of a criminal offense" commits a further offence if he transports

2    or moves an unauthorized alien "if the person recklessly disregards" that person's unlawful

3    status. A.R.S. § 13-2929(A)(1) (2010). However, no one may determine the transported

4    alien's status except for a federal officer or a "law enforcement officer who is authorized by

5    the federal government to verify or ascertain an alien's immigration status." A.R.S § 13-

6    2929(D)(1)–(2). Officers without such authorization cannot therefore collect evidence to

7    satisfy a key element of the crime.[6]

8         In addition, some Arizona state immigration laws predate SB 1070. The Legal

9    Arizona Workers Act of 2007 allows state courts to suspend or revoke the license to do

10   business of any employer who knowingly or intentionally employs an alien who is not

11   authorized to work. A.R.S. §§ 23-211, 212, 212.01 (2007). It has been held to be

12   constitutional by the Supreme Court. *See Chamber of Commerce of U.S. v. Whiting*, 131

13   S.Ct. 1968, 1977 (2011) (upholding the measure). However, the law explicitly provides an

14   enforcement process by which individuals file written complaints to the Attorney General,

15

16        [6] SB 1070 also includes provisions prohibiting stopping a vehicle "to hire or pick up

17   passengers for work at a different location if the motor vehicle blocks or impedes the normal
     movement of traffic," or for someone to enter a vehicle for such a purpose while the vehicle

18   blocks or impedes traffic. A.R.S. § 13-2928(A)–(B). These provisions have not been

19   enjoined, but their status remains uncertain. In upholding them, the district court found that
     "the June 9, 2010, decision of the Ninth Circuit Court of Appeals in a case contesting a

20   virtually identical local ordinance in Redondo Beach, California forecloses a challenge." *U.S.

21   v. Arizona*, 703 F. Supp. 2d at 1000 (citing *Comite de Jornaleros de Redondo Beach v. City
     of Redondo Beach*, 607 F.3d 1178, 1184–93 (9th Cir. 2010)). An *en banc* decision of the

22   Ninth Circuit has since overturned that panel decision and found that the Redondo Beach
     ordinance, Redondo Beach Mun. Code § 3–7.1601(a), is "a facially unconstitutional

23   restriction on speech," since soliciting work as a day laborer is protected First Amendment

24   activity. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936,
     940 (9th Cir. 2011) (en banc). It is therefore not clear whether local law enforcement officers,

25   including MCSO officers, can enforce A.R.S. § 13–2928(A) or § 13–2928(B). In an
     unrelated lawsuit, a preliminary injunction is currently being sought against A.R.S.

26   § 13–2928(A) and § 13–2928(B) based on the *en banc* ruling in *Redondo Beach*. *See

27   Friendly House, et al. v. Whiting, et al.,* CV-10-01061-SRB.

28                                        - 9 -

1   who in turn conducts an investigation before a license is revoked. A.R.S. § 23-212. It has no

2   provisions through which enforcement actions can be taken against employees, and

3   specifically exempts independent contractors from its definition of "employee," suggesting

4   that it cannot be enforced against those who hire day laborers as independent contractors.

5   A.R.S. § 23-211(3)(b).

6       Since 2005, human smuggling has been an Arizona state crime. A.R.S. § 13-2319

7   (2010). The human smuggling statute reads: "It is unlawful for a person to intentionally

8   engage in the smuggling of human beings for profit or commercial purpose." A.R.S. § 13-

9   2319(A). The statute defines "smuggling of human beings" as "the transportation,

10  procurement of transportation or use of property or real property by a person or an entity that

11  knows or has reason to know that the person or persons transported or to be transported are

12  not United States citizens, permanent resident aliens or persons otherwise lawfully in this

13  state or have attempted to enter, entered or remained in the United States in violation of law."

14  A.R.S. § 13-2319(F)(3). In order for the elements of the crime to be satisfied, therefore, a

15  person must 1) transport, procure transportation for, or harbor a person, 2) know or have

16  reason to know that the person is not legally in the country, and 3) do so for profit or

17  commercial purpose.[7] If a driver does not know or have reason to know that his passengers

18  are not legally in the country, no one has violated the statute. If the transportation is not being

19  conducted for profit or a commercial purpose, no one has violated the statute. People who

20  cross the international border at an unauthorized location have violated 8 U.S.C. § 1325, but

21  have not violated or conspired to violate the human smuggling statute unless the other

22

23      [7] A current lawsuit in the District Court of Arizona challenges a policy in which "non-

24  smuggler migrants" are "arrest[ed], detain[ed], and punish[ed] . . .for conspiring to transport
    themselves." *We are America/Somos America, Coalition of Arizona v. Maricopa Cty. Bd. of*

25  *Supervisors*, ___ F. Supp. 2d. ___, 2011 WL 3629352 (D. Ariz. Aug. 18, 2011, CV-06-

26  02816-RCB). For the purposes of this order, the Court assumes, without deciding, that those
    who are smuggled may be prosecuted for conspiring to smuggle themselves, so long as all

27  elements of the statute are satisfied.

28                                        - 10 -

1    elements of A.R.S. § 13-2319 are met.

2          A law enforcement officer must have a reasonable suspicion that the smuggling is

3    "afoot" to conduct a brief investigatory stop to enforce the human smuggling law. *Terry*, 392

4    U.S. at 20. Therefore, an officer must have reasonable suspicion that 1) a person is being

5    transported or harbored, 2) by a person who knows or has reason to know that the person

6    being transported or harbored is not legally present in Arizona or the United States, and 3)

7    that the person is currently being transported or harbored "for profit or commercial purpose."

8    A.R.S. § 13-2319(A)–(F). The fact that a law enforcement officer suspects, or even knows,

9    that a vehicle passenger is not legally present in the country does not in and of itself provide

10   reasonable suspicion that the passenger was or is being "smuggled." Moreover, a passenger's

11   lack of legal status, standing alone, is in no way probative as to whether the driver is

12   transporting the passenger for profit or commercial purpose. Since "an alien's 'admission of

13   illegal presence . . . does not, without more, provide probable cause of the criminal violation

14   of illegal entry,'" knowledge of illegal presence, standing alone, can likewise not provide

15   reasonable suspicion or probable cause that the human smuggling statute has been violated

16   sufficient to justify a *Terry* stop. *Martinez-Medina*, 2011 WL 855791, at *6.

17         A minor traffic infraction provides officers sufficient probable cause to stop a motor

18   vehicle. *Whren v. U.S.*, 517 U.S. 806, 810 (1996). When officers stop a car for probable

19   cause, the fact that they actually intend to investigate another crime for which they lack

20   probable cause is irrelevant—the "ulterior motive" does not "serve to strip the agents of their

21   legal justification" to conduct the initial stop. *Id.* at 813. While an ulterior motive does not

22   remove objective probable cause for a car stop, neither it nor the initial probable cause

23   provides limitless authority to detain passengers for unrelated crimes or civil violations. This

24   is because while "[t]here is probable cause to believe that the driver has committed a minor

25   vehicular offense, . . . there is no such reason to stop or detain the passengers." *Maryland v.*

26   *Wilson*, 519 U.S. 408, 413 (1997).

27         For any detention to be valid under the Fourth Amendment, "[t]he scope of the

28                                          - 11 -

1   detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460

2   U.S. 491, 500 (1983). Applied to the car stop context, this principle means that officers may

3   question a driver who has been lawfully stopped if the questioning does "not unreasonably

4   prolong the duration of the stop." *U.S. v. Turvin*, 517 F.3d 1097, 1099, 1104 (9th Cir. 2008)

5   (when officer recognized driver as previously arrested drug dealer, asking for driver's

6   consent to search a box in the vehicle that "look[ed] very odd" did not prolong the stop).

7   During this questioning, however, "unless the detainee's answers provide the officer with

8   probable cause to arrest him, he must then be released." *Berkemer*, 468 U.S. at 439–440.[8]

9        Vehicle passengers are legally "seized" based on the reasonable suspicion that

10   provided justification for the stop—an officer "need not have, in addition, cause to believe

11   any occupant of the vehicle is involved in criminal activity." *Lemon Montrea Johnson*, 555

12   U.S. at 327. To question or search a passenger beyond the scope of investigating the cause

13   for the original stop, however, an officer needs suspicion particular to that passenger—for

14   example, in order to frisk a passenger, an officer needs reasonable suspicion independent of

15   the reason for the stop that "the person subjected to the frisk is armed and dangerous." *Id.*[9]

16        Local law enforcement officers may therefore not detain vehicle passengers based

17   upon probable cause, or even actual knowledge, without more, that those passengers are not

18   _____

19        [8] Defendants' reliance on *Muehler v. Mena*, 544 U.S. 93 (2005) for the proposition
     that "[a] traffic violation provides probable cause to stop the vehicle and to reasonably detain
20   a driver and other occupants of the vehicle," is unavailing. (Doc. 413 at 5). In *Muehler*, there
     was no traffic stop; rather, Mena was handcuffed and asked about her immigration status
21   while her house was searched for weapons pursuant to a valid warrant. *Mueler*, 544 U.S. at
     96. The Supreme Court held that the detention was reasonable in light of the nature of the
22   search, and that an interrogation that did not prolong the search did not constitute an
     independent Fourth Amendment seizure. The officers who asked about Mena's immigration
23   status were federal immigration officers. *Id.*

24

25        [9] The Fourth Circuit has held that, without extending the duration of the stop, officers
     may direct very limited requests to passengers, writing that a "request for identification from
26   passengers falls within the purview of a lawful traffic stop and does not constitute a separate
     Fourth Amendment event." *U.S. v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007).

27

28                                          - 12 -

1    lawfully in the United States, since such knowledge does not provide officers with reasonable

2    suspicion that the passengers are violating any law that local law enforcement officers can

3    enforce. *Martinez-Medina*, 2011 WL 855791, at *6. This prohibition holds true even when

4    the car has been reasonably stopped for other cause, such as a traffic violation, because such

5    cause provides "no such reason to stop or detain the passengers." *Wilson*, 519 U.S. at 413.

6        Defendants, citing *Terry* and its progeny, claim that if an officer has reasonable

7    suspicion that a person has satisfied one significant element of a criminal statute, the officer

8    may stop that person to develop reasonable suspicion that the person has violated the other

9    elements. A line of Ninth Circuit cases has emphasized that since probable cause is an

10   objective standard relying upon the totality of the circumstances, an officer may have

11   probable cause to arrest or search when he does not have "probable cause for every element

12   of the offense." *U.S. v. McCarty*, 648 F.3d 820, 839 (9th Cir. 2011) (When airport traveler

13   opened his bag and photographs of nude children fell out, TSA did not need probable cause

14   that the photographs met the precise definition of child pornography in order to have

15   probable cause to search bags further). Nevertheless, officers still need an "objectively

16   reasonable belief that [a person] has committed a crime" before they have probable cause to

17   proceed further. *Id.*  Although "[p]robable cause does not require the same type of specific

18   evidence of each element of the offense as would be needed to support a conviction," *Adams*

19   *v. Williams*, 407 U.S. 143, 149 (1972), officers must have some reliable information that a

20   person has committed a crime, usually including violating its key elements. *See*, *e.g.*, *Gasho*

21   *v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (finding that while "an officer need not

22   have probable cause for every element of the offense . . . when specific intent is a required

23   element, the arresting officer must have probable cause for that element in order to

24   reasonably believe that a crime has occurred."). Regardless of whether some crimes contain

25   some elements for which an officer need not have probable cause in order to have probable

26   cause that the crime has been committed, in the immigration context, "an alien's 'admission

27   of illegal presence . . . does not, without more, provide probable cause of the criminal

28                                            - 13 -

1   violation of illegal entry.'" *Martinez-Medina*, 2011 WL 855791, at *6.

2          To justify a *Terry* stop, an officer must have *reasonable* suspicion that a crime is

3   about to be committed, and a person has not committed a crime if the necessary elements

4   have not been satisfied. *Cf. In re Winship*, 397 U.S. 358, 361 (1970) (To convict a person of

5   a crime, a prosecutor must "convince the trier of all the essential elements of guilt.") (internal

6   quotation omitted). If the totality of the circumstances do not provide reasonable suspicion

7   that a person is about to commit or is committing a crime, then the officer cannot stop the

8   person. Moreover, an officer cannot conduct a *Terry* stop in order to acquire the reasonable

9   suspicion necessary to justify the stop itself; the "demand for specificity in the information

10  upon which police action is predicated is the central teaching of [the Supreme Court's]

11  Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 22 n.18 (collecting cases).

12         Defendants also cite *U.S. v. Cortez*, 449 U.S. 411 (1981), *Scarbrough v. Myles*, 245

13  F.3d 1299 (11th Cir. 2001), and a number of cases in which officers frisked individuals for

14  weapons during a legally justified stop, including *U.S. v. Orman*, 486 F.3d 1170 (9th Cir.

15  2007), *Lemon Monrea Johnson*, and *Terry* itself. *Cortez* involved federal immigration

16  officers stopping a vehicle after an extended field investigation and overnight surveillance;

17  since federal immigration officers may stop vehicles based on reasonable suspicion that

18  passengers have violated federal civil immigration law, there were no criminal elements that

19  needed to be satisfied. *U.S. v. Cortez*, 449 U.S. at 421–22. *Scarbrough* was a qualified

20  immunity case. In that case, the court held that Officer Myles had "arguable probable cause"

21  that defendants had committed of a crime, and therefore met the lower standard necessary

22  to be afforded qualified immunity. *Scarbrough*, 245 F.3d at 1303. It in no way suggests that

23  a *Terry* stop is justified without reasonable suspicion that a crime has been committed, or that

24  essential elements can remain unsatisfied.[10]

25

26         [10] Cases detailing the standards for conducting a frisk are not relevant to this

27  complaint, and need not be discussed in detail.

28                                          - 14 -

As a matter of law, belief without more that a person is not legally authorized to be in the country cannot constitute reasonable suspicion to believe that he or she has violated the state human smuggling law. The Ninth Circuit has held that actual knowledge that a person is not lawfully in the country does not provide probable cause that the person has, additionally, crossed the border at an unauthorized place. *Martinez-Medina*, 2011 WL 855791, at *6. If an officer does not have reasonable suspicion that criminal activity is afoot, he does not have reason to detain someone under *Terry*.

**DISCUSSION**

**I. Legal Standard**

Summary judgment is appropriate if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (9th Cir. 1986). In considering such evidence, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

The party moving for summary judgment bears the initial burden to identify the portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *F.T.C. v. Stefanchick*, 559 F.3d 924, 927 (9th Cir. 2009) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). Should the moving party meet this burden, the non-moving party then must "set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Horphang Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (internal quotations omitted). District courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

Affidavits must be made "on personal knowledge, not information and belief" in order

1   to be considered at summary judgment. *Taylor v. List*, 880 F.2d 1040, 1046 n.3 (9th Cir.

2   1989). Expert testimony may be considered unless it consists of a "legal conclusion." *U.S.

3   v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999). The Ninth Circuit "has refused to find a genuine

4   issue where the only evidence presented is uncorroborated and self-serving testimony."

5   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal quotations

6   omitted).

7   **II. Analysis**

8       **A. Search and Seizure Claims**

9       A plaintiff does not have standing to seek injunctive relief, even if he has suffered

10  harm, unless that harm is accompanied by "continuing, present adverse effects." *O'Shea v.

11  Littleton*, 414 U.S 488, 496 (1974). Continuing, present adverse effects may be found when

12  a plaintiff demonstrates that there is "a sufficient likelihood that he will again be wronged

13  in a similar way." *Lyons*, 461 U.S. at 111. Standing for injunctive relief will not flow,

14  however, if an injury is "contingent upon [plaintiffs'] violating the law." *Spencer v. Kemna*,

15  523 U.S. 1, 15 (1998). Plaintiffs have no standing to enjoin police conduct, therefore, if by

16  "conduct[ing] their activities within the law" they will avoid "exposure to the challenged

17  course of conduct." *Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 497). To have

18  standing to seek an injunction on their Fourth Amendment claims, Plaintiffs must present a

19  genuine question as to whether they are likely to be seized again in violation of the Fourth

20  Amendment, not merely that the traffic stops are conducted in a discriminatory fashion or are

21  pretextual efforts to enforce other law. *See Whren v. U.S.*, 517 U.S. at 810.

22      In the unique circumstances of this case, Defendants' assertions about the scope of

23  their authority to stop persons to investigate potential violations of the state smuggling statute

24  establish that plaintiffs are sufficiently likely to be seized in violation of the Fourth

25  Amendment to provide them with standing to seek injunctive relief. MCSO has conceded

26  that it has no authority, inherent or otherwise, to enforce federal civil immigration law, but

27  now claims the authority to detain persons it believes are not authorized to be in the country

28

based on its ability to enforce Arizona's human smuggling statute. A.R.S. § 13-2319. Defendants claim, therefore, that their authority to stop people to investigate violations of the state human smuggling statute is the same as a federal immigration officer's authority to enforce federal civil immigration law. In supplemental briefing and at oral argument, Defendants asserted that MCSO officers could briefly detain people "based only upon a reasonable suspicion, without more, that the person is not legally present within the United States." (Doc. 488 at 17).

The fact that a person is unlawfully present, without more, does not provide officers with reasonable suspicion that the person is currently being smuggled for profit, nor does it provide probable cause that the person was at some point in the past smuggled for profit. *Cf. Martinez-Medina*, 2011 WL 855791, at *6. To the extent that Defendants claim that the human smuggling statute, or any Arizona or federal criminal law, authorizes them to detain people based solely on the knowledge, let alone the reasonable suspicion, that those people are not authorized to be in the country, they are incorrect as a matter of law.

The likelihood that any particular named Plaintiff will again be stopped in the same way may not be high. However, if MCSO detains people, as they claim a right to do, without reasonable suspicion that they have violated essential elements of a criminal law—either state or federal—exposure to that policy is both itself an ongoing harm and evidence that there is "sufficient likelihood" that Plaintiffs' rights will be violated again. *Lyons*, 461 U.S. at 111. Although some MCSO officers were certified under 287(g) to enforce civil provisions of the federal immigration law during the incidents that gave rise to the complaint, since that authority has been revoked they may no longer do so. In *Lyons* itself, the court wrote that a victim of police misconduct could seek an injunction if he could show that department officials "ordered *or authorized* police officers to act in such manner." *Id.* at 106 (emphasis added). MCSO affirmatively alleges that its officers are authorized to stop individuals based only on reasonable suspicion or probable cause that a person is not authorized to be in the United States. This assertion establishes the standing of all named Plaintiffs to seek

injunctive relief. Further, because this assertion is wrong as a matter of law, named Plaintiffs (and all members of the putative class) are entitled to partial summary judgment on their Fourth Amendment claims, to the extent that Defendants are detaining persons without reasonable suspicion that the state human smuggling statute has been violated. Defendants need not be enjoined from enforcing federal civil immigration law because they concede that they have no authority to enforce such law.

To be granted injunctive relief, a plaintiff must establish four elements. A plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat't Res. Def. Council*, 555 U.S. 7, 20 (2008); *see* FED. R. CIV. P. 65. The loss of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The balance of equities and public interest both favor enforcing class members' Fourth Amendment rights. Injunctive relief is appropriate.

To the extent that named Plaintiffs claim a right to additional injunctive relief on summary judgment based on the facts of their individual detentions, those detentions are discussed below.

### 1. Ortega-Melendres

On September 19, and September 22, 2007, undercover MCSO deputies went to a church in Cave Creek posing as day laborers. (Doc. 433, Ex. 139). The officers discovered that the church maintained a sign-in sheet for those looking for work "in order to fairly distribute the jobs among the day laborers." (*Id.*). An email to Lieutenant Joseph Sousa of MCSO's Human Smuggling Unit ("HSU") detailing the officers' undercover operation concluded that "[o]n both days, there was no information discovered pertaining to forced labor, human smuggling or possible 'drop houses.'" (*Id.*). On September 27, MCSO conducted an operation "related exclusively to stopping for probable cause following traffic violations only those vehicles that were observed to have picked up people congregating at

1   the church property and that had left the property." (Doc. 453 ¶ 172).

2        Plaintiff Manuel de Jesus Ortega-Melendres, a Mexican national who was legally in

3   the United States at the time, along with two other men, entered a vehicle from the parking

4   lot. (Doc. 413, Ex. 1 ¶ 14). Deputy DiPietro was participating in the operation, which he

5   understood to be focused on "a church parking lot that had day laborers working from it or

6   being picked up by people." (Doc. 413, Ex. 4 at 46, ln 22–25). Officers of the HSU who were

7   monitoring the church contacted Deputy DiPietro and told him to follow the vehicle Ortega-

8   Melendres had entered and attempt to develop probable cause to stop it. (Doc. 413, Ex. 1 ¶

9   15). DiPietro followed the truck for a mile and a half, and then pulled it over for traveling

10  above the speed limit. (Doc. 422 ¶ 177). DiPietro spoke to the driver of the vehicle and to the

11  passengers, and formed, in his own words, "reasonable suspicion from that they were day

12  laborers and here illegally." (Doc. 413, Ex. 4 at 49, ln 18–20). When asked whether he

13  believed that the passengers had committed any state crime, he stated, "I'm not sure what the

14  employer sanction laws and when they came into effect or not. But I had reason to believe

15  that they were here illegally." (Doc. 413, Ex. 4 at 49–50).[11] When asked specifically if he was

16  concerned about human smuggling, he stated, "There was a concern of—when I found out

17  that this church was doing this, you know, allowing day laborers to be worked out, there's

18  a *possibility* that it *could have been* some type of human smuggling type of—some type of

19  criminal activity *could have been* going on out of that parking lot." (Doc. 413, Ex. 4 at 120,

20  ln 6–11) (emphasis added). DiPietro decided not to give the driver of the vehicle a traffic

21  ticket, and summoned Deputy Rangel, who was 287(g) certified and spoke Spanish, to

22  investigate the immigration status of the passengers of the truck, including Ortega-

23  Melendres. (Doc. 413, Ex. 1 ¶¶ 20–22). Defendants and Plaintiffs agree that Melendres

25  [11] As discussed above, Arizona's employer sanctions law contains no provision for
26  penalties of any sort levied on employees, rather than employers, and specifically exempts
    independent contractors from its definition of "employee." *See* A.R.S §§ 23-211, 212,
27  212.01.

28                                        - 19 -

provided Rangel with his tourist visa, but disagree as to whether he also provided his I-94 form. (Doc. 456 ¶ 26). The driver was allowed to leave with a warning.[12] (Doc. 422 ¶ 178). After between fifteen and twenty-one minutes of questioning, Ortega-Melendres and the other passengers were taken to an MCSO substation, where they were detained for roughly two hours, and then transported to an ICE Detention and Removal Office, where Ortega-Melendres was held for six more hours. (Doc. 453 ¶ 185). After he was seen by an ICE agent, Ortega-Melendres was released. (Doc. 453 ¶ 184).

It is not clear from the record that the HSU officers who first radioed Deputy DiPietro were themselves certified under the 287(g) program to enforce federal immigration law. Assuming that they were, they would only have had reasonable suspicion to stop the vehicle if the facts and reasonable inferences drawn from those facts could "reasonably warrant suspicion that the vehicles contain[ed] aliens who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. They did not stop the vehicle themselves, and instead requested that Deputy DiPietro do so.

Defendants assert that in training 287(g) officers, ICE informs them that race or apparent ancestry may be used as one factor in evaluating whether officers have reasonable suspicion to stop an individual, although it cannot be considered the sole factor. (Doc. 452 at 15; Doc. 453, Ex. 9 at 19, ln 10–21). Whether or not such information is provided by ICE to local law enforcement officers during their 287(g) training, the law in the Ninth Circuit is clear: "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens." *Montero-Camargo*, 208 F.3d at 1134. Defendants cite *Montero-Camargo* for the proposition that the courts do not "preclude the use of racial or ethnic appearance as one factor relevant to reasonable suspicion or probable cause," but

---

[12] To the extent that Defendants now assert that Deputy DiPietro detained Orgeta Melendres pursuant to his authority to enforce Arizona's human smuggling statute, they offer no explanation why he did not also detain the driver for violating that same statute.

1   fail to quote the sentence in its entirety, which limits this use to "when a *particular suspect*

2   has been identified as having a *specific racial or ethnic appearance*." *Id.* at 1134 n.21

3   (emphasis added). Defendants at no time claim that Ortega-Melendres matched a particular

4   description of a suspect of any specific crime before his vehicle was stopped. Assuming that

5   Ortega-Melendres was dressed as a member of a work crew, his appearance would be

6   inadequate to justify a stop. *Manzo-Jurado*, 457 F.3d at 932.

7        In addition to his dress and his appearance, Ortega-Melendres gathered at an area

8   where day laborers were known to congregate and entered a vehicle with others from the

9   same location. The Ninth Circuit has yet to consider whether this type of behavior provides

10  officers with reasonable suspicion to investigate immigration status, and it is not necessary

11  to consider that question in this Order. The HSU officers who observed Ortega-Melendres

12  enter the vehicle did not stop the vehicle themselves to determine his immigration status;

13  rather they requested that Deputy DiPietro follow the vehicle and develop probable cause to

14  stop it.

15       Deputy DiPietro stopped the vehicle for traveling 34 miles per hour in a 25 mile per

16  hour zone, but Plaintiffs' claim does not rest on whether he had probable cause to effect the

17  initial traffic stop. DiPietro himself acknowledges that he dismissed the driver but called

18  Deputy Rangel to investigate the immigration status of the vehicle's passengers because "I

19  had reasonable suspicion . . . that they were day laborers and here illegally." (Doc. 453, Ex.

20  13 at 49, ln 18–21). In their original briefing on the pending motion, Defendants conceded

21  that "Deputy DiPietro had no reason to believe that any passengers of the truck had

22  committed any violation of criminal law." (Doc. 453 ¶ 176). In their supplemental briefing,

23  however, in which the Court asked them to respond to specific questions concerning

24  Plaintiffs' Fourth Amendment claims, they now assert that DiPietro had formed a reasonable

25  suspicion that Ortega-Melendres had violated the human smuggling statute and was

26

27

28

conspiring to smuggle himself.[13] Even assuming that Ortega-Melendres's behavior or DiPietro's conversation with the driver provided reasonable suspicion that Ortega-Melendres was in the United States without authorization, no evidence has been offered suggesting that DiPietro had reasonable suspicion that any other elements of a federal or state crime had been satisfied. *See Martinez-Medina*, ___ F.3d ___, 2011 WL 855791, at *6 (2011). Previous undercover work by MCSO had revealed no evidence of human smuggling or drop houses, and there is no evidence to suggest probable cause that Ortega-Melendres had previously been transported for profit or commercial purpose. (Doc. 433, Ex. 139). DiPietro's statement, based on no evidence in the record, that the church might possibly have been engaged in human smuggling or other undefined criminal activity, constitutes merely a "inchoate and unparticularized suspicion or 'hunch'" and did not objectively provide him reasonable suspicion that Ortega-Melendres in particular was committing, or conspiring to commit, any crime. *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).

Further, that the stop itself may have been justified did not provide reasonable suspicion to detain Ortega-Melendres. Officer DiPietro was justified under *Whren* in stopping the car, and was permitted to question the driver without reasonable suspicion so long as he did "not unreasonably prolong the duration of the stop." *Turvin*, 517 F.3d at 1099. During that questioning, however, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer*, 468 U.S. at 439–440.

Defendants argue that "it was completely proper for MCSO deputies to make traffic stops of motorists under Arizona law and then call for a 287(g) certified deputy to determine

---

[13] To the extent that they also claim, relying on *Martinez-Medina*, that Deputy DiPietro could have reasonably concluded that unauthorized presence in the United States is a crime, DiPietro's reasonable but wrong belief would be relevant only in determining whether to afford him qualified immunity in a suit for damages. Whether he in fact violated the Fourth Amendment is a purely objective question. *See Whren*, 517 U.S. 806, 813 (discussing cases that "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").

1    if someone in the stopped vehicle might be unlawfully in the country." (Doc. 452 at 11). For

2    this proposition, they cite to the deposition of Alonzo Pena, the Special Agent in Charge for

3    ICE Phoenix. In his deposition, however, Special Agent Pena states that a local officer may

4    call a federal or 287(g) officer to check a detainee's immigration status, but "that he has to

5    have the legal basis to detain that person on his own state charges." (Doc. 453, Ex. 1 at 98,

6    ln 8–9). Of course, state officers may summon federal officers to investigate the immigration

7    status of those who have been convicted of state crimes. A.R.S. § 11-1051(C)–(F). However,

8    MCSO had no legal basis under state criminal law on which to detain Ortega-Melendres or

9    the other passengers while Deputy DiPietro called Deputy Rangel, nor to detain Ortega-

10   Melendres once MCSO allowed the driver to leave. Passengers in a vehicle are technically

11   seized when the vehicle is stopped, and thus may challenge a stop under the Fourth

12   Amendment. *Brendlin v. California*, 551 U.S. 249, 259 (2007). Any argument, however, that

13   the probable cause used to stop the vehicle provided DiPietro with reasonable suspicion to

14   detain and investigate the passengers in that vehicle is pure bootstrapping. *Id.* at 413 ("There

15   is probable cause to believe that the driver has committed a minor vehicular offense, but

16   there is no such reason to stop or detain the passengers."). DiPietro had no reasonable

17   suspicion that Ortega-Melendres and the other passengers were committing, or probable

18   cause that they had committed, any state or federal crime.

19        DiPietro's stated reason for detaining the passengers was that he suspected that they

20   were in the country without authorization. As a 287(g) certified officer, he had the authority

21   to detain them if this suspicion was reasonable. 8 U.S.C. § 1357(g). Certain material facts

22   that would resolve this question are currently still in dispute. For example, the parties dispute

23   whether the driver provided DiPietro with information adequate to support reasonable

24   suspicion that Ortega-Melendres was not in the country legally, and they dispute whether

25   Ortega-Melendres produced documentation verifying his status to Deptuy Rangel. (Doc. 413,

26   Ex. 1 ¶ 18; Doc. 456 ¶ 26). Therefore, summary judgment in favor of Ortega-Melendres is

27   appropriate to the extent that it enjoins MCSO from detaining persons for further

28                                            - 23 -

1   investigation without reasonable suspicion that a crime has been or is being committed. On

2   Ortega-Melendres's underlying claims, however, granting either party summary judgment

3   would be inappropriate at this juncture.

4                 **2. Plaintiffs Jessika and David Rodriguez–Claims Two and Three**

5           On December 7, 2007, David and Jessika Rodriguez were driving on Bartlett Dam

6   Road when they were stopped by Deputy Matthew Ratcliffe of the MCSO. (Doc. 422 ¶

7   186–87). The road had been closed by the Maricopa County Department of Transportation

8   and a "Road Closed" sign had been posted on it. (Doc. 413, Ex. 1 ¶ 40; Doc 413, Ex. 9). Mr.

9   and Mrs. Rodriguez claim that they approached in a manner that would not have allowed

10  them to see the sign. (Doc. 453 ¶ 189). Deputy Ratcliffe pulled over the vehicle. (Doc. 422

11  ¶ 187). Although the parties disagree as to whether Deputy Ratcliffe asked Mr. Rodriguez

12  for his social security card, it is undisputed that he issued Mr. Rodriguez a citation. (Doc. 453

13  ¶ 193). Deputy Ratcliffe had stopped other vehicles that day; he states that he turned the

14  drivers over to the Tonto National Forest Rangers, while Mr. and Mrs. Rodriguez state the

15  other drivers were only given warnings, not citations. (Doc. 453 ¶¶ 197–98).

16          Since the Rodriguezes were driving on a road that had been closed by the Department

17  of Transportation, Deputy Ratcliffe had probable cause to stop them, whether or not they had

18  seen the sign. *See Wren*, 517 U.S. at 810. For the purposes of Defendants' motion for

19  summary judgment, it must be assumed that Deputy Ratcliffe asked the Rodriguezes for a

20  social security card, not merely for a social security number as Defendants allege. (Doc. 456

21  ¶ 52). Furthermore, for the purposes of this motion, Plaintiffs' claim that requesting a social

22  security card or number is not standard practice within MCSO when issuing traffic citations

23  may be presumed. (Doc. 422 ¶ 195). Nevertheless, when a traffic stop is supported by

24  probable cause, "whether the officer's conduct deviated materially from usual police

25  practices" is immaterial for the purposes of Fourth Amendment analysis. *Wren*, 517 U.S.

26  at 814. The MCSO's *Arizona Traffic Ticket and Complaint* form has a space in which to

27  enter a suspect's social security number, and a social security card is a commonly understood

28                                              - 24 -

document for verifying that number. (Doc. 413, Ex. 7). Plaintiffs offer no evidence suggesting that the Rodriguez stop took any longer than it would have had Deputy Ratcliffe not requested the card. Their claim that Deputy Ratcliffe enforced the traffic laws selectively in choosing their vehicle to stop and ticket does not bear on the Fourth Amendment analysis. *Whren*, 517 U.S. at 813. Moreover, their claim that Deputy Ratcliffe followed their vehicle after issuing a summons does not state a Fourth Amendment claim, since people "traveling in an automobile on public thoroughfares ha[ve] no reasonable expectation of privacy in [their] movements from one place to another." *U.S. v. Knotts*, 460 U.S. 276, 281 (1983).

Therefore, partial summary judgment in favor of the Rodriguezes is appropriate to the extent that in enjoins MCSO from detaining persons for further investigation without reasonable suspicion that a crime has been or is being committed. On their remaining underlying claims, however, the Court grants summary judgment to Defendants.

### 3. Plaintiffs Manuel Nieto and Velia Meraz–Claims Two and Three

On March 28, 2008, MCSO officers were conducting special operations in North Phoenix. (Doc. 453 ¶ 200). On that date, Manuel Nieto and Velia Meraz drove into a convenience store where MCSO Deputy Charley Armendariz was standing by another vehicle that he had stopped. (Doc. 422 ¶ 201). Plaintiffs and Defendants disagree about the details of the encounter between Armendariz, Nieto, and Meraz, but agree that Deputy Armendariz ordered Nieto and Meraz to leave and that he radioed for backup. (Doc. 453 ¶ 202). By the time backup officers arrived, Nieto and Meraz had in fact left the vicinity of the convenience store. (Doc. 453 ¶ 203). The backup officers pursued Nieto and Meraz's vehicle, which pulled into the parking lot of a nearby auto repair shop owned by Nieto's father. (Doc. 456 ¶ 87). Plaintiffs and Defendants dispute much of what Nieto, Meraz, and the officers did during the course of this second encounter, but agree that Deputy Michael Kikes forcibly removed Mr. Nieto from the vehicle and handcuffed him while checking his identification. (Doc. 453 ¶ 212). Mr. Nieto was released from custody without being charged. (Doc. 453 ¶ 213).

1    Summary judgment on Nieto and Meraz's claim would be improper because many

2    material facts are in dispute. (Doc. 456 ¶¶ 70–72, 74–83, 87, 92). Defendants and Plaintiffs

3    disagree about Nieto and Meraz's behavior when they first pulled into the convenience store

4    near Deputy Armandariz. (Doc. 456 ¶¶ 70–72). They disagree about whether Nieto and

5    Meraz immediately obeyed Deputy Armandariz's order to leave the area. (Doc. 456 ¶¶

6    74–76). They disagree about the nature of the later stop by Deputy Kikes and about Nieto's

7    behavior before he was forcibly removed from the vehicle. (Doc. 456 ¶¶ 87, 92). The parties

8    offer drastically different versions of the stop, each supported by deposition testimony. The

9    disputed facts are material to the question of whether the MCSO officers had probable cause

10   for the initial stop, whether they had probable cause to remove Nieto from the car, and

11   whether they had probable cause to handcuff him.

12   Therefore, partial summary judgment in favor of Nieto and Meraz is appropriate to

13   the extent that in enjoins MCSO from detaining persons for further investigation without

14   reasonable suspicion that a crime has been or is being committed. On their underlying claims,

15   however, granting either party summary judgment would be inappropriate at this juncture.

16   **B. Discrimination Claims–Counts One and Four**

17   Just as Plaintiffs needed to demonstrate standing to seek injunctive relief on their

18   Fourth Amendment Claims, so too must they demonstrate a "sufficient likelihood" that their

19   Equal Protection rights will be violated again in order to seek equitable relief on Claim One

20   and Claim Four. *Lyons*, 461 U.S. at 111. Courts have consistently held that a racially

21   discriminatory law enforcement policy constitutes ongoing harm, and thereby supports

22   standing to seek an injunction. *See LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985);

23   *Thomas v. Cty of L.A.*, 978 F.2d 504, 508 (9th Cir. 1992); *Rodriguez v. California Highway*

24   *Patrol*, 89 F. Supp. 2d 1131 (N.D. Cal. 2000); *Committee for Immigrant Rights of Sonoma*

25   *v. Cty. of Sonoma*, 644 F. Supp. 2d 1177 (N.D. Cal. 2009). Plaintiffs demonstrate a sufficient

26   likelihood that they will again be wronged when they "do not have to induce a police

27   encounter before the possibility of injury can occur" because stops are the result of an

28

1    "unconstitutional pattern of conduct." *LaDuke*, 762 F.2d at 1326. Injunctive relief is

2    appropriate when plaintiffs show that police misconduct "is purposefully aimed at minorities

3    and that such misconduct was condoned and tacitly authorised by department policy makers."

4    *Thomas*, 978 F.2d at 508. A plaintiff challenging law enforcement policies on Equal

5    Protection grounds must show "both that the . . . system had a discriminatory effect and that

6    it was motivated by a discriminatory purpose." *Wayte v. U.S.*, 470 U.S. 598, 608 (1985); *see*

7    *also Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65

8    (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a

9    racially disproportionate impact."). Likewise, Title VI authorizes a private right of action

10   only in cases involving intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280

11   (2001). Consideration of race need not be the "dominant or primary" purpose of a policy for

12   it to be discriminatory. *Arlington Heights*, 429 U.S. at 265. Instead, a finder of fact must

13   determine whether a discriminatory purpose was "a motivating factor" in the policy. *Id.* at

14   266. Plaintiffs may demonstrate that a policy was intentionally discriminatory if they can

15   show that it "was based in part on reports that referred to explicit racial characteristics."

16   *Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (Kennedy, J.). Frequent stops of

17   minorities can serve as evidence of a discriminatory policy, but the Ninth Circuit has held

18   that a single stop, even if discriminatory, does not alone provide sufficient evidence of a

19   discriminatory policy to support standing to seek an injunction. *Hodgers-Durgin v. de la*

20   *Vina*, 199 F. 3d 1037, 1044 (9th Cir. 1999).

21       Plaintiffs here provide evidence from which a finder of fact could conclude that

22   MCSO racially profiles Latinos. Sheriff Arpaio has made public statements that a fact finder

23   could interpret as endorsing racial profiling, such as stating that, even lacking 287(g)

24   authority, his officers can detain people based upon "their speech, what they look like, if they

25   look like they came from another country." (Doc. 426, Ex. 4 at 274). Moreover, he

26   acknowledges that MCSO provides no training to reduce the risk of racial profiling, stating

27   "if we do not racial profile, why would I do a training program?" (Doc. 426, Ex. 4 at 41).

28
                                        - 27 -

1         In addition, Sheriff Arpaio keeps a file containing letters and news clippings that a

2    reasonable fact finder could determine advocate or support racial profiling. Sample

3    sentiments include, "Stopping Mexicans to make sure they are legal is not racist," "If you

4    have dark skin, then you have dark skin! Unfortunately, that is the look of the Mexican

5    illegal," and a person who stated that her mother, who had been profiled during World War

6    II, believed that profiling was "the right thing to do." (Doc. 427, Exs. 22, 23, 36). Arpaio

7    wrote personal thank-you letters to a number of the authors. (Doc. 435, Exs. 184–85 ). In

8    addition, the file contains clippings of letters to the editors of local papers advocating racial

9    profiling that included the following statements: "Call it 'racial profiling' but if there are 12

10   million illegals that fit a 'profile' then it is what it is," "I'd say they should be looking for

11   Mexicans," and "Hooray for profiling." (Doc 427, Ex. 18; Doc. 428, Ex. 37). Arpaio also

12   underlined key phrases in an email regarding this case which referred to the Honorable Mary

13   Murguia, the original judge in this matter, as "the 'token' Hispanic female judge that sits in

14   your so-call [*sic*] 'federal' court in Sand Land," and suggested that she had made rulings in

15   this case in exchange for "Dinero? Favors? Human smuggling money?" He ordered three

16   copies of the email made for himself, and had it forwarded to four other staff members. (Doc.

17   427, Ex. 16).

18        The available documentary evidence could further lead a reasonable finder of fact to

19   conclude that MCSO's special operations were conducted in response to citizen requests that

20   it engage in law enforcement operations based on race. The department received a number

21   of citizen communications asking MCSO to conduct special operations in places where the

22   writers described Latinos congregating, but did not provide evidence of a crime. (Doc. 428,

23   Exs. 25–26, 28). The letters were forwarded, sometimes by Sheriff Arpaio, to people who

24   planned the special operations, among them Chief Brian Sands, with annotations that

25   included phrases such as "for our operations," and "I will be going to Mesa." (*Id.*). MCSO

26   subsequently conducted special operations in the areas described by the letter writers and the

27   Sheriff's annotations. (Doc. 453 ¶¶ 65–68). Chief Sands stated in a deposition that if Sheriff

28

Arpaio instructed him to conduct special operations in a particular location, he would do so. (Doc. 453, Ex. 14 at 75, ln 17). In addition, MCSO officers, including officers associated with the special operations, circulated emails that compared Mexicans to dogs, ridiculed stereotypical Mexican accents, and portrayed Mexicans as drunks. ( Doc. 431, Exs. 96, 103, 105). From the totality of this evidence, along with the adverse inferences that the finder of fact will be permitted to make at trial, it would be possible for a fact finder to conclude that the MCSO engaged in an intentional policy of racial discrimination.

A finder of fact here could determine that MCSO engaged in a policy that had both a discriminatory effect and a discriminatory intent. Defendants challenge Plaintiffs' expert report supporting discriminatory effect, but fail to show that no reasonable fact finder could credit it. (Doc. 424; Doc. 453 ¶ 233). If a fact finder determines that MCSO had a policy of conducting special operations solely in response to citizen complaints that referred to racial characteristics rather than reports of crime, as it could based on this evidence, MCSO engaged in intentional discrimination. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *see also U.S. v. City of Yonkers*, 96 F.3d 600, 612 (2nd Cir. 1996) ("Even assuming . . . that the actions of the municipal officials are only responsive . . . the Equal Protection Clause does not permit such actions where racial animus is a significant fact or in the community position to which the city is responding."). *Cf. Watkins v. U.S. Army*, 875 F.2d 699, 730 (9th Cir. 1989) ("[E]qual protection doctrine does not permit notions of majoritarian morality to serve as compelling justification for laws that discriminate against suspect classes.").

Further, if a fact finder determines the MCSO operations were conducted based upon the citizen emails and as described publicly by Sheriff Arpaio even after MCSO lost its 287(g) authority, Plaintiffs would not be able to prevent being stopped by "conduct[ing] their activities within the law." *Lyons*, 461 U.S. at 103. They could invite investigation by speaking Spanish in restaurants, by dressing like "day laborers," or by looking like "they

came from another country." (Doc. 428, Exs. 25–26, 28; Doc. 426, Ex. 4 at 274, ln 23). Moreover, the fact that the individual Plaintiffs have not been stopped again during the course of this litigation does not preclude standing to seek injunctive relief. In *Hodgers-Durgin*, the plaintiffs drove "every day" through a region in which INS officers were patrolling "all over the place." 199 F.3d at 1044. They lacked standing not because they had only been stopped once in ten years, but more precisely because a single stop provided no evidence that INS had a policy of racial profiling. *Id.* They had produced no additional evidence that INS racially profiled anyone, and the single stop, even if improper, did not demonstrate that a policy existed. As discussed above, Plaintiffs here have presented sufficient evidence aside from the stops themselves.

If such a policy exists, it presents a "sufficient likelihood" that the named Plaintiffs will suffer ongoing harm. Continued, ongoing harm results from "a pattern or practice of constitutional violations or policies promoting constitutional violations, including racial profiling."*Committee for Immigrant Rights*, 644 F. Supp. 2d at 1195 (N.D. Cal 2009); *see also Thomas*, 978 F.2d at 508. The named Plaintiffs have standing to seek injunctive relief for their Equal Protection claims.

Given the fact that the Plaintiffs involved in the stops have standing, it is not necessary to determine whether Somos America has standing as well. "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.*" Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008) (quoting *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993)).

The fact that Plaintiffs have demonstrated that there is a genuine issue of material fact as to whether MCSO has a racial profiling policy not only grants them standing, but precludes a finding in favor of Defendants' summary judgment motion with regards to Claim One and Claim Four. However, it would be equally improper to find for Plaintiffs at this stage. Defendants allege that they do not consider race when making traffic stops or deciding

1   where to conduct special operations. Both Chief Sands and Lieutenant Sousa state that the
2   operations are conducted based upon multiple criteria, including crime data, rather than
3   solely on citizen complaints. (Doc. 453, Ex. 14 at 79, ln 14–22; Doc. 453, Ex. 5 at 88, ln
4   17–22). While the deposition statements by MCSO deputies that they had alternate reasons
5   for conducting operations cannot form the sole basis for granting summary judgment in their
6   favor, *Villiarimo*, 281 F.3d at 1061 (no genuine issue exists when "the only evidence
7   presented is uncorroborated and self-serving testimony") (internal quotations omitted), intent
8   to discriminate is required to establish an equal protection violation, and the states of mind
9   of MCSO officers is therefore relevant to Claims One and Four. The officers' statements
10  about their intent raise sufficient issues of material fact to defeat Plaintiffs' motion for
11  summary judgment. Lieutenant Sousa, for example, claims that complaints of people
12  stepping into the street and littering, while not mentioned in the MCSO's undercover
13  investigation of the Cave Creek church, were relevant factors in deciding to conduct special
14  operations there on September 27, 2007. (Doc. 453, Ex. 5 at 100, ln 8–13). Determining
15  whether MCSO was relying in some degree upon the citizen complaints that contained no
16  description of criminal activity, and therefore had a policy of racial discrimination, "demands
17  a sensitive inquiry into such circumstantial and direct evidence of intent as may be
18  available." *Arlington Heights*, 429 U.S. at 266. Such an inquiry is best conducted by a finder
19  of fact at trial, not by the court at summary judg2ment. *See Sluimer v. Verity, Inc.*, 606 F. 3d
20  584, 587 (9th Cir. 2010) ("Credibility determination, the weighing of the evidence, and the
21  drawing of legitimate inferences from the facts are . . . not those of a judge . . . ruling on a
22  motion for summary judgment.") (quoting *Anderson*, 477 U.S. at 255).

23          **C. Class Certification**

24          Plaintiffs move for class certification on all of their claims. A class may not be certified
25  unless it meets each of the four requirements of Rule 23(a), ordinarily referred to as
26  numerosity, commonality, typicality, and adequacy of representation. FED. R. CIV. P. 23(a).
27  In addition, a class action must satisfy at least one of the three requirements of Rule 23(b), one

28                                            - 31 -

1  of which is that "the party opposing the class has acted or refused to act on grounds that apply
2  generally to the class, so that final injunctive relief or corresponding declaratory relief is
3  appropriate regarding the class as a whole." FED. R. CIV. P. 23(b)(2). The party seeking
4  certification bears the burden of demonstrating that it has met all of these requirements, and
5  "the trial court must conduct a 'rigorous analysis'" to determine whether it has met that
6  burden. *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (quoting
7  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996)). Defendants claim that
8  class certification is not appropriate because Plaintiffs lack standing to seek injunctive relief
9  and because their claims fail as a matter of law. (Doc. 444 at 6–7). As discussed above, the
10 named Plaintiffs have established that they have standing to seek injunctive relief on their
11 Search and Seizure claims because MCSO has publicly stated that it may stop persons based
12 solely on a belief that they are not legally present in the country, and on their Equal Protection
13 claims because they have brought forth evidence suggesting that MCSO engages in a policy
14 or practice of racial profiling. *LaDuke*, 762 F.2d at 1326. Should it be determined after trial
15 that Plaintiffs lack standing to seek injunctive relief on any claim, the class may then be de-
16 certified or partially de-certified. FED. R. CIV. P. 23(c)(1)(C).

17      Defendants do not dispute that Plaintiffs' proposed class is sufficiently numerous, but
18 claim that Plaintiffs have not demonstrated commonality, typicality, or adequacy of
19 representation. (Doc. 444 at 7–13). They further claim that Plaintiffs have not demonstrated
20 that the class satisfies the requirements of Rule 23(b)(3). (Doc. 444 at 13–14). Finally,
21 Defendants claim that the proposed class is overbroad. (Doc. 444 at 14–16).

22      To satisfy the commonality prong, class members need not allege that they "have all
23 suffered a violation of the same provision of law," but their claims "must depend upon a
24 common contention—for example, the assertion of discriminatory bias on the part of the
25 same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Although
26 the factual circumstances of the individual stops involving the named Plaintiffs differ, they
27 claim generally that MCSO has a policy of racial profiling, in violation of the Fourteenth
28

Amendment, which leads officers to detain individuals without reasonable suspicion that they committed a crime, in violation of the Fourth Amendment. (Doc. 26 ¶ 2–4). In a civil rights suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (citing *LaDuke*, 762 F.2d at 1332). As other courts have noted, commonality in cases alleging racial profiling is satisfied when "the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members." *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001).

Likewise, differences in the subjective motivations between MCSO officers conducting stops does not defeat typicality of claims alleging a departmental policy of violating constitutional rights, whether under the Fourth or the Fourteenth Amendments. "In assessing typicality, the court considers 'the nature of the claim or defense of the class representative, and not . . . the specific facts from which it arose or the relief sought.'" *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 241 (D. Ariz. 2001) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Defendants further argue that the individual claims are subject to unique defenses because some officers were acting pursuant to their authority under 287(g) of the INA. (Doc. 444 at 12). It is true that state officers acting pursuant to 287(g) "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law," but acting under color of federal law does not provide them an adequate defense to alleged Constitutional violations. 8 U.S.C. § 1357(g)(8) (2006); *see generally Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). At any rate, no MCSO officer has had 287(g) authority since October of 2009, and none could assert this defense going forward; since Plaintiffs seek only prospective relief, these potential defenses are irrelevant. Moreover, MCSO concedes that it believes it has legal

authority to detain persons, if only briefly, to investigate possible criminal violations based only on a reasonable suspicion that they may be in the country without authorization. Plaintiffs' claims that they were and continue to be subject to an unconstitutional practice or policy by MCSO are typical of class members' claims.

Representation is adequate when named plaintiffs will pursue the action vigorously on behalf of the class and when they have no conflicts of interest with other class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Defendants claim that Plaintiffs have a conflict of interest because "the named Plaintiffs lack standing; they lack a valid Fourth Amendment claim under the facts presented; and they lack a valid intentional discrimination claim." (Doc. 444 at 13). These substantive arguments are addressed elsewhere in this order, and they lack merit. The failure of the Rodriguezes' underlying Fourth Amendment claim does not create a conflict of interest with putative class members, especially when they, like other named representatives, argue that MCSO does not have authority to stop people to the extent that MCSO asserts. Defendants do not challenge Plaintiffs' contention that they will prosecute the case vigorously and on behalf of the class. Plaintiffs have met the requirements of Rule 23(a).

Plaintiffs may seek certification under Rule 23(b)(2) "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S.Ct. at 2557. The rule does not require, as does Rule 23(b)(3), that common issues of law and fact "predominate," but only that class members "complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v, Reno*, 145 F.3d 1032, 1047 (9th Cir. 1988). Moreover, "[e]ven if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Id.* Plaintiffs have alleged a prototypical Rule 23(b)(2) suit, one in which a single injunction or declaratory judgment would provide all class members relief from MCSO's allegedly unconstitutional policy. *Wal-Mart*, 131 S.Ct at 2257. Defendants do not challenge Plaintiffs' argument that class certification is proper under Rule 23(b)(2), but instead claim that Plaintiffs have not met the

1   predominance requirement of Rule 23(b)(3). This rule, however, is not applicable to the

2   nature of the class sought to be certified. *Walters*, 145 F.3d at 1047 ("Although common

3   issues must predominate for class certification under Rule 23(b)(3), no such requirement

4   exists under 23(b)(2)."). Plaintiffs have demonstrated that their proposed class meets the

5   requirements for certification.

6        Finally, Defendants challenge the class as overbroad. (Doc. 444 at 14–16). The rule

7   that class definitions not be overbroad is "designed to protect absentees." *Amchem Prods.,*

8   *Inc. v. Windsor*, 521 U.S. 591, 620 (1997). When a class is certified under Rule 23(b)(2),

9   notice need not be given to individual class members, and members do not have the

10  opportunity to "opt-out" of the litigation. FED. R. CIV. P. 23(c)(2). There remains a risk after

11  a Rule 23(b)(2) certification, therefore, that "individuals who may never learn of the

12  pendency of [the] case might encounter difficulty in pursuing meritorious individual

13  litigation in the future, on the basis of *lis pendens*, *res judicata*, or collateral estoppel." *Rice*

14  *v. City of Philadelphia*, 66 F.R.D. 17, 21 (E.D. Pa. 1974). Regarding the equitable relief

15  sought by Plaintiffs in Count One and Count Four, such concerns are mitigated and "it is

16  usually unnecessary to define with precision" the members of a 23(b)(2) class. *Id.* at 19; *see*

17  *also Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994) ("In a Rule 23(b)(2) class

18  action for equitable relief, the due process rights of absent class members generally are

19  satisfied by adequate representation alone.").

20       The Fourth Amendment class, however, presents an overbreadth issue that the Equal

21  Protection class does not. In considering the preclusive effect of class actions, "the general

22  rule is that a class action suit seeking only declaratory and injunctive relief does not bar

23  subsequent individual damage claims by class members, even if based on the same events."

24  *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996). Here, however, Ortega-Melendres was

25  originally seeking damages in addition to injunctive relief, and only dropped his damages

26  claims in the amended complaint. (Doc. 1 at 20; Doc. 26 at 29–30). Since class members may

27  not opt-out of a 23(b)(2) class, individuals who may have legitimate damages claims against

28                                        - 35 -

MCSO for violating the Fourth Amendment could potentially face difficulty pursuing their claims because courts could find that the class members' initial damages claims may be *res judicata* to their suit. No class member other than Ortega-Melendres ever sought damages in this action. Further, the Ninth Circuit has found that class notice, rather than the original complaint, determines whether class actions certified under Rule 23(b)(2) are *res judicata* to subsequent damages claims. *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("[N]otice in [the earlier suit] was not sufficient under Rule 23 to preclude monetary claims in later suits, for the class in [the earlier suit] was certified and given notice as a Rule 23(b)(2) 'injunction' class action."). In other circuits, class actions that have been certified under Rule 23(b)(2), even when they contain ancillary damages claims that are ruled on in litigation, have been found not to bar subsequent damages claims by class members who were "not notified that participation in the class action would preclude a subsequent individual damage action." *Wright v. Collins*, 766 F.2d 841, 848 (4th Cir. 1985). The class in this case is being certified pursuant to Rule 23(b)(2), and at this point in the litigation no damages claims are being sought. No class is certified as to any damages claim and this litigation does not preclude future damages claims against MCSO or its officers.

In a case seeking injunctive relief, "[t]he fact that the class includes future members does not render the class definition so vague as to preclude certification." *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). Moreover, the class definition is not overbroad in a case alleging racial discrimination when the Plaintiffs, as here, "define the class by the activities of defendants." *Int'l. Molders and Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457, 464 (N.D. Cal 1983)."[14]

---

[14] The class certified in *International Molders* consisted of "all persons of Hispanic or other Latin American ancestry, residing or working within the jurisdiction of the San Francisco District Office of the United States Immigration and Naturalization Service (INS) and/or the Livermore Border Patrol Sector, who have in the past, are now, or may in the future be subjected to the policies, practices and conduct of INS and/or the Border Patrol during the course of INS area control operations directed at places of employment." 102

1    The Plaintiffs' proposed class is therefore certified as "All Latino persons who, since

2    January 2007, have been or will be in the future, stopped, detained, questioned or searched

3    by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area

4    in Maricopa County, Arizona." As in all class actions, the Court has the right to tailor or

5    amend the class definitions should future events suggest that it is appropriate to do so. FED.

6    R. CIV. P. 23(c)(1)(C).

7    **D. Motion for Sur-Reply**

8    Defendants have filed a motion for leave to file a sur-reply, claiming that Plaintiffs

9    presented new evidence in their reply supporting their partial summary judgment motion.

10   (Doc. 469). Since Plaintiffs' partial summary judgment motion has been denied, Defendants'

11   motion is dismissed as moot.

12   **E. Relief**

13   Any justification the MCSO had in detaining Ortega-Melendres relied solely on

14   DiPietro's status as a 287(g)-certified officer, a status that no MCSO officer currently has.

15   Regardless of whether federal law pre-empts specific provisions of SB 1070, "states do not

16   have the inherent authority to enforce the civil provisions of federal immigration law." *U.S.*

17   *v. Arizona*, 641 F.3d at 362. Even knowledge, let alone reasonable suspicion, that a person

18   is not legally in the country does not provide probable cause that the person has violated

19   federal criminal immigration law or state criminal law. *Martinez-Medina*, ___ F.3d at ___,

20   2011 WL 855791, at *6; A.R.S. § 13-2319(A).

21   Therefore, for the reasons previously stated, the certified class is presently entitled to

22   partial injunctive relief enjoining Defendants from detaining any person based solely on

23   knowledge, without more, that the person is in the country without lawful authority. To be

24   clear, the Court is not enjoining MCSO from enforcing valid state laws, or detaining

25   individuals when officers have reasonable suspicion that individuals are violating a state

26   _____

27   F.R.D. at 460.

28

1    criminal law. Instead, it is enjoining MCSO from violating federal rights protected by the

2    United States Constitution in the process of enforcing valid state law based on an incorrect

3    understanding of the law.

4         A policy of detaining people pursuant to laws that MCSO has no authority to enforce,

5    or detaining them without reasonable suspicion that they are violating laws it can enforce

6    constitutes "continuing, present adverse effects" and therefore merits injunctive relief.

7    *O'Shea*, 414 U.S at 496. MCSO and its officers need not be enjoined from detaining

8    individuals in order to investigate civil violations of federal immigration law, because they

9    concede that they have such authority. MCSO and all of its officers are, however, enjoined

10   from detaining any person based on knowledge, without more, that the person is unlawfully

11   present within the United States. It follows of course that MCSO may not stop any person

12   based on reasonable suspicion or probable cause, without more, that the person is unlawfully

13   present within the United States. Nor may they seek to develop reasonable suspicion that a

14   person is violating state law by detaining them to ask questions in the absence of reasonable

15   suspicion that they are committing a crime.

16        While MCSO officers can, of course, continue to investigate federal and state criminal

17   law, including immigration-related criminal law, to stop people pursuant to such law, officers

18   must have reasonable suspicion that the person is violating that law, or probable cause that

19   the person has violated that law. MCSO does not have reasonable suspicion that a person is

20   violating or conspiring to violate the state human smuggling law or any other state or federal

21   criminal law because it has knowledge, without more, that the person is in the country

22   without legal authorization.

23                                  **CONCLUSION**

24        Plaintiffs are granted partial summary judgment on their Fourth Amendment claims

25   to the extent that they claim MCSO's stated position that it has the authority to detain persons

26   based on reasonable suspicion, without more, that they are not legally present in the country

27   will cause them future harm. Material questions of fact exist as to whether the underlying

28                                      - 38 -

1    stops of Ortega-Melendres and Nieto and Meraz were justified under the authority MCSO

2    had at the time, so summary judgment on those claims is inappropriate. The stop of the

3    Rodriguezes was objectively supported by probable cause, and was not prolonged even if

4    Deputy Radcliffe requested their social security cards, so partial summary judgment is

5    granted to Defendants on the Rodriguezes' underlying search and seizure claims.

6         Plaintiffs have demonstrated that there is a genuine issue of fact as to whether MCSO

7    engages in a policy or practice of considering race during its operations. They therefore have

8    standing to seek equitable relief for their equal protection claims, which therefore cannot be

9    dismissed at the summary judgment phase. Because the question of whether MCSO engaged

10   in a policy of intentional discrimination requires credibility determinations best suited to a

11   trial, however, Plaintiffs will also not be granted summary judgment on their equal protection

12   claims.

13        Plaintiffs have met their burden for class certification under Rule 23. The litigation

14   is certified as a class action, with the following certified class: "All Latino persons who,

15   since January, 2007, have been or will be in the future, stopped, detained, questioned or

16   searched by MCSO agents while driving or sitting in a vehicle on a public roadway or

17   parking area in Maricopa County, Arizona."

18        Since Plaintiffs' Motion for Summary Judgment is denied even considering the record

19   presented, there is no need to consider Defendants' Motion to File a Sur-Reply, which is

20   dismissed as moot.

21        MCSO acknowledges that enforcing immigration law is one of the purposes of the

22   special operations. Local law enforcement agencies, such as the MCSO, may not enforce

23   civil federal immigration law. Defendants are therefore enjoined from detaining individuals

24   in order to investigate civil violations of federal immigration law, including those "regulating

25   authorized entry, length of stay, residence status, and deportation." *U.S. v. Arizona*, 641 F.3d

26   at 362. They are further enjoined from detaining any person based on actual knowledge,

27   without more, that the person is not a legal resident of the United States.

28

1

**IT IS THEREFORE ORDERED:**

2      1) Defendants' Motion for Summary Judgment (Doc. 413) is **granted in part** and
3  **denied in part**. Summary judgment is **granted** with regards to Plaintiffs Jessika and David
4  Rodriguez's underlying claims under Claim Two and Claim Three, which are hereby
5  **dismissed**. Summary judgment is **denied** with regards to the underlying claims of Plaintiffs
6  Melendres, Nieto, and Meraz under Claim Two and Claim Three. Defendants' motion for
7  summary judgment is **denied** with regards to Claim One and Claim Four.

8      2) Plaintiffs' Motion for Class Certification (Doc. 420) is **granted**. The litigation is
9  certified as a class action, with the following defined class for the purposes of the equal
10 protection claim: "All Latino persons who, since January, 2007, have been or will be in the
11 future, stopped, detained, questioned or searched by MCSO agents while driving or sitting
12 in a vehicle on a public roadway or parking area in Maricopa County, Arizona."

13      3) Plaintiffs' Motion for Partial Summary Judgment on Claim One and Claim Four
14 (Doc. 421) is **denied**.

15      4) Plaintiffs' Motion for Summary Judgment on Claim Two and Claim Three (Doc.
16 490) is **denied in part** as it relates to the underlying claims, and **granted in part** as it relates
17 to future enforcement actions of the MCSO.

18      4) Defendants' Motion for Leave to File Sur-Reply (Doc. 469) is **dismissed as moot**.

19      5) MCSO and all of its officers are hereby **enjoined** from detaining any person based
20 only on knowledge or reasonable belief, without more, that the person is unlawfully present
21 within the United States, because as a matter of law such knowledge does not amount to a
22 reasonable belief that the person either violated or conspired to violate the Arizona human
23 smuggling statute, or any other state or federal criminal law.

24

25 Dated this 23rd day of December, 2011

26 _A. Murray Snow_____

27                                    G. Murray Snow
                                  United States District Judge

28