Timothy J. Casey (#013492)
James L. Williams (#026402)
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile:  (602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Civil Services Division
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | No. CV 07-02513-PHX-GMS |
| Plaintiffs, | |
| vs. | **DEFENDANTS' POST-TRIAL BRIEF RE LEGAL ISSUES REQUESTED BY THE COURT AND CLOSING ARGUMENT** |
| Joseph M. Arpaio, et al., | |
| Defendants. | |

Defendants Joseph M. Arpaio ("Arpaio") and the Maricopa County Sheriffs Office

("MCSO") (or collectively referred to herein as "Defendants") submit the following post-

trial brief and closing argument.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    PLAINTIFFS' FOURTEENTH AMENDMENT RACIAL PROFILING CLAIM
FAILS BECAUSE THEY HAVE NOT PROVEN THAT DEFENDANTS HAD,
OR HAVE, A POLICY, PATTERN, OR PRACTICE THAT WAS
MOTIVATED BY AN INTENTIONALLY DISCRIMINATORY PURPOSE.**

   **A.    Evidence of Discriminatory Intent, Motive, Purpose, or Animus is
          Required.**

A plaintiff asserting a Fourteenth Amendment equal protection claim or a Title VI

racial discrimination claim must demonstrate that the challenged law enforcement policy, pattern, or practice "had a discriminatory effect" and "that it was ***motivated* by a discriminatory purpose**." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (emphasis added); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-74 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of **official conduct discriminating on the basis of race.**" *Washington v. Davis*, 426 U.S. 229, 239 (1976). "[T]he invidious quality of a law claimed to be racially discriminatory **must ultimately be traced to a racially discriminatory purpose.**" *Id.* at 241 (emphasis added); *see also Alexander v. Louisiana*, 405 U.S. 625, 628-29 (1972) (the state may "**not deliberately and systemically"** use race**)** (emphasis added); *Wright v. Rockefeller*, 376 U.S. 52 (1964) (challengers failed to prove that legislature "was either motivated by racial considerations or in fact drew the [congressional] districts on racial lines"; the plaintiffs had not shown that the statute "was the product of **a state contrivance** to segregate on the basis of race or place of origin.") (emphasis added). As a consequence, "a long line of Supreme Court cases make clear that the Equal Protection Clause **requires proof of discriminatory intent or motive."** *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (emphasis added); *see also Wilkins v. City of Tempe*, 2010 U.S. District LEXIS 843 (D. Ariz. Jan. 5, 2010) (same).

"[A] violation of Title VI, like a violation of the Equal Protection Clause, requires a showing of **intentional discrimination**." *Alexander v Sandoval*, 523 U.S. 275, 280 (2001) (emphasis added). "It is beyond dispute… that [Title VI] prohibits only intentional discrimination… [and] proscribes those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Id.* (emphasis added); *see also Rodriquez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1138-39 (N.D. Cal. 2000) (holding that civil rights plaintiffs alleging a Title VI violation must prove intent to discriminate at trial); *De La Cruz v. Tormey*, 582 F.2d 45, 51 (9th Cir. 1978) (plaintiffs "are required to prove two essential elements before they can be entitled to relief under the Fourteenth Amendment: discriminatory effect and invidious discriminatory intent or purpose.") (emphasis added);

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

*Benally v. Kaye*, 2005 U.S. Dist. LEXIS 39751 at *19-20 (D. Ariz. 2005). Thus, "in the absence of proof of **discriminatory animus**," a plaintiff cannot be awarded declaratory or injunctive relief. *Gebray v. Portland Int'l Airport*, 2001 U.S. Dist LEXIS 22747 at *11 (D. Oreg. 2001) (emphasis added); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2000) ("defendants' acts or omissions [must be] motivated by **discriminatory animus** toward the [persons] as a protected class.") (emphasis added); *Meyers v. San Juan Sch. Dist*, 905 F. Supp. 1544, 1573 (D. Utah 1995) (same).[1]

To prevail on their Fourteenth Amendment claim, the Plaintiffs at trial "must [have] produce[d] evidence sufficient to permit the Court to find by a preponderance of the evidence **that [the] decision… was racially motivated**." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (emphasis added); *see also Bingham v. City of Manhattan* Beach, 341 F.3d 939, 948-49 (9th Cir. 2003) (same); *FDIC v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991) (same); *Cornwell v. Electra Cen. Credit Union*, 439 F.3d 1018, 1028-29 n.6 (9th Cir. 2006) (same). The equal protection discriminatory intent standard has been described by one commentator as "a legislative state of mind akin to malice." R. Seigel, *Why Equal Protection No Longer Protects: The Evolving Forms of Status-Enforcing State Action*, 49 Stan. L. Rev. 1111, 135 (1997).

Plaintiffs, therefore, must prove that the "decision makers in [their] case acted with discriminatory purpose." *McClesky v. Kemp*, 481 U.S. 279, 292 (1987). "'Discriminatory purpose **… implies more than intent as volition or intent as awareness of consequences**. It implies that the **decision maker… selected or reaffirmed a particular course of action at least in part because of… its adverse effects upon an identifiable group**.'" *Id.* at 298 (emphasis added) (quoting *Feeney*, 442 U.S. at 279).[2]

---

[1] The term "animus" is Latin, meaning "ill will; animosity." *Black's Law Dictionary*, (8th Ed.), B. Garner at p. 97 (Thomson West, 2004).

[2] The law makes clear that the requisite intent is necessary to find a violation of the Equal Protection Clause. On the other hand, a violation of the Fourth Amendment requires no showing or proof of intent. Therefore, there can be circumstances where particular conduct might violates the Fourth Amendment but does not, or cannot, violate the Fourteenth Amendment's Equal protection Clause. The Court also inquired about the intent standards of 'deliberate indifference" and "deliberate ignorance." Trial Transcript ("TT") at 1925:13 to 1925:7. An intent standard of "deliberate indifference" by a decision maker is insufficient, as a matter of law, to support an equal protection claim. *Lee*, 250 F.3d at 687. Likewise, research indicates that an intent standard of "deliberate ignorance" or "willful blindness" has not been applied, let alone approved, by any federal court in a Fourteenth Amendment civil rights case to

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

Based on the foregoing, Plaintiffs must prove the Defendants, and their deputies, in each of the specific stops involving the named Plaintiffs acted with racially discriminatory purpose or animus. *McClesky*, 481 U.S. at 292; *Wayte*, 470 U.S. at 608; *see also United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("in order to prevail under the Equal Protection Clause, [the claimant] must prove the decision makers in **his** case acted with discriminatory purpose.") (emphasis in original).   Proof of the allegedly discriminatory motivation of other state actors is irrelevant to an Equal Protection claim. *Avery*, 137 F.3d at 355.  Finally, Plaintiffs also must prove that the Defendants had a policy, pattern, or practice that was motivated, at least in part, by a racially discriminatory purpose or animus. *McClesky*, 481 U.S. at 292; *Wayte*, 470 U.S. at 608.

The trial evidence, however, amply demonstrates that Plaintiff have failed to meet their burden of proof that Defendants, or any MCSO deputy, acted with discriminatory intent, motive or animus in any manner, or that Defendants had a policy, pattern, or practice that was motivated by a discriminatory purpose.

**B.**      **There is No Evidence of Discriminatory Intent, Motive, or Animus as to the Melendres Incident.**

**1.**      **Deputy DiPietro**

It is undisputed that on September 28, 2007, Deputy Louis DiPietro stopped the truck in which Plaintiff Melendres was a passenger.  At trial, Plaintiffs presented no evidence that suggested, let alone established by a preponderance of the evidence, that Deputy DiPietro had a racially discriminatory intent, motive, animus, or purpose in deciding to stop, or in actually stopping, the Melendres vehicle, or in detaining or questioning the truck's passengers.  *See* Trial Transcript ("TT") at 242:7 to 243:7; 244:11.

Deputy DiPietro was taught and trained by the MCSO not to use race or ethnicity in making law enforcement decisions.  TT at 316:3-9.  He was later taught by ICE officials

---

satisfy the intent element for a decision maker.  An intent standard of "deliberate ignorance" or "willful blindness" is applied in the rare criminal case where a criminal defendant "purposely contrived to avoid learning all the facts in order to have a defense in the event he was arrested and charged."  *United States v. Beckett*, 724 F.2d 855, 856 (9th Cir. 1984); *see also United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1988) (same).

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
Professional
Corporation

when he underwent 287(g) certification training not to use race or ethnicity to make law enforcement decisions.  TT at 316:10-24.  The MCSO Human Smuggling Unit ("HSU") briefed Deputy DiPietro before special operations that he was not to use race in any manner in making his law enforcement decisions.  TT at 312:5-24.

Deputy DiPietro stopped the Melendres truck based solely on probable cause that it was speeding.  TT at 245:2-12; 261:21-23; *see also See* Dkt#530 at § C(1), ¶ 102-03 (stipulation).  The purpose of saturation patrols, according to Deputy DiPietro, was to make "a lot of contacts."  TT at 302:13 to 303:14.  If he could not develop probable cause to stop the truck, he was to let it go.  TT at 292:7-10.  Moreover, before Deputy DiPietro found probable cause to stop the truck, **he did *not* know or see** the race of the truck's driver or the race of the passengers in the truck.  TT at 245:13-15; 261:24 to 262:6; *see United States v. Montero-Camargo*, 208 F.3d 1122, 1139-40 (9th Cir. 2000) (no constitutional violation occurs when officer did not know the race of the driver or vehicle occupants before actually stopping the vehicle.); *Longmire v. Starr*, 2005 U.S. Dist. LEXIS 18388 *7 (N.D. Tex. 2005) (in light of the facts showing the traffic stop of the plaintiff was based on race-neutral probable cause, "Plaintiff cannot establish that the allegedly discriminatory purpose was a motivating factor in the officer's decision to stop his vehicle."); *United States v. Hernandez-Bustos*, 2005 U.S. LEXIS 16311, *4 ¶ 3 (D. Kan. 2005) (no racial profiling when the officer made the traffic stop without knowing or seeing the driver's race or ethnicity); *United States v. Eliseo-Gonzalez*, 2009 U.S. LEXIS 91831 *4 (M.D. Fla. 2009) ("[N]o racial profiling took place in this case.  The officer testified that he could not see inside the vehicle when it passed his position and could not observe race or gender because of the dark tint.").

Deputy DiPietro did **not** detain or question the passengers in the Melendres truck because of their race, ethnicity, or "the color of their skin."  TT at 267:19-21.  Although Deputy DiPietro could not remember the specific facts that led to his conclusion, he concluded after he made the traffic stop that he had reasonable suspicion that the truck's passengers may have been in the country unlawfully and may have been engaged in the state crime of human smuggling.  TT at 265:7 to 266:25.[3]; *Graham v. Connor,* 490 U.S. 386, 387

---

[3]   Another MCSO deputy, Ramon Charley Armendariz, testified that, in his experience, human smugglees or "pollos" will work day-laborer type of jobs in order to pay off the debt they owe to the smuggler or "coyote." TT at 1494:11-19.

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
Professional Corporation

1  (1989) (the reasonableness of a detention is evaluated "from the perspective of a reasonable

2  officer on the scene."); *Michigan v. Summers*, 452 U.S. 692, 703, fn. 14 (1981) ("[T]he

3  reasonableness of a detention may be determined in part by whether the police are diligently

4  pursuing a means of investigation which is likely to resolve the matter one way or another

5  very soon….") (internal citation and quotations omitted).

6      Deputy DiPietro did **not** use the passengers' skin color or racial and/or ethnic

7  appearance as factors in forming his reasonable suspicion.  TT at 271:1-4.  He may ask for

8  identification from vehicle passengers *regardless of the passengers' race* when he has

9  reasonable suspicion that a violation of law may be occurring.  TT at 306:8 to 307:23.

10  Additionally, Deputy DiPietro <u>kept the driver present at the traffic stop while another MCSO

11  deputy (i.e. Carlos Rangel) interviewed the passengers</u> to determine if the crime of human

    smuggling was occurring.  TT at 246:7 to 247:5; 267:5-18; 313:11-22.[4]

12      In summary, there was no evidence presented at trial that would allow a reasonable

13  fact finder to conclude that Deputy DiPietro's decision to make a traffic stop, or to detain the

14  driver or passengers of the truck or to question the same, was motivated or influenced by a

15  discriminatory intent, discriminatory purpose, or racial animus.  There is no Fourteenth

16  Amendment violation by Deputy DiPietro or any MCSO policy, pattern, or practice that

17  violates the Fourteenth Amendment.[5]

18  _____

19  [4]  After September 2007, Deputy DiPietro received training from the MCSO regarding Arizona's human smuggling
    statute. TT at 291:1-23.

20

21  [5]  Based on the trial testimony of Deputy DiPietro, his demeanor, countenance, and "salt of the earth" credibility, and his
    un-rebutted testimony that the detention of the truck's driver was not completed and the driver not released until after the
    questioning of the passengers under suspicion (TT at 246:7 to 247:5; 267:5-18; 313:11-22), Defendants respectfully urge
22  the Court to reconsider its December 23, 2011 ruling on the <u>Fourth Amendment detention</u> of Mr. Melendres by Deputy
    DiPietro based on its factual conclusion inherent in the ruling. Dkt#494 at 23, lns. 8-10 ("MCSO had no legal basis under
23  state criminal law on which to detain Ortega-Melendres or other passengers while Deputy DiPietro called Deputy
    Rangel, nor to detain Ortega-Melendres **once MCSO allowed the driver to leave**.") (emphasis added).   The trial
24  evidence shows the driver remained at the scene while the passengers were questioned. TT at 246:7 to 247:5; 267:5-18;
    313:11-22. While Deputy DiPietro was, admittedly, unable to articulate at deposition or trial all the facts that led to his
25  conclusion that he had reasonable suspicion that the crime of human smuggling may be occurring, or that the passengers
    may have been in the country unlawfully, the facts that were articulated by Deputy DiPietro show that he had a good
26  faith factual basis for his conclusion.  *See* Dkt#488 at 7-14; *see also cf.  United States v. Twilley*, 222 F.3d 1092, 1096
    (9th Cir. 2000) ("A factual belief that is mistaken, but held reasonably and in good faith, can provide reasonable
27  suspicion for a traffic stop.").  In addition, Deputy DiPietro had a good-faith reasonable belief under the law that Mr.
    Ortega-Melendres and the other passengers in the truck may have violated what was reasonably believed, in September
28  2007, to be the federal crime of unlawful presence in the United States.  *See Martinez-Medina v. Holder*, 673 F.3d 1029,
    1035 (9th Cir. 2011) ("Based on these passages from *Martinez* and *Lopez-Mendoza*, a reasonable officer could have

## 2.   Deputy Rangel

Plaintiffs presented no evidence at trial that established that the other MCSO deputy actively involved with Mr. Melendres, Deputy Carolos Rangel, had racially discriminatory intent, motive, animus, or purpose in deciding to question or detain Mr. Melendres or any of the truck's passengers.  Deputy Rangel was called to the traffic stop by MCSO dispatch because he was fluent in the Spanish language.  TT at 950:24 to 951:16.  It is undisputed that he arrived at the traffic stop within one (1) minute of being called.  *See* Dkt#530 at § C(1), ¶ 107 (stipulation).

Deputy Rangel was, at the time, 287(g) certified to enforce federal immigration law and had the authority to detain persons and investigate their alienage when he had reasonable suspicion of unlawful presence.  TT at 956:11-22; *see also* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.*; Dkt#530 at § C (3), ¶¶ (d)-(j).  Deputy Rangel, as a 287(g) deputy, looked for ICE approved racially neutral indicators of unlawful presence in the United States such as the questioned person providing him with a foreign identification card, not having identification documents issued from anywhere in the United States, and the inability to speak the English language.  *See* Dkt#530 at §C (1), ¶ 112 (stipulation). [6]  During the course of the questioning of the passengers, Deputy Rangel learned from Mr. Melendres that he was going to work for compensation and did not have his I-94 document on him.  TT at 910:19 to 911:2; 937:14 to 938:9.  This testimony from Deputy Rangel is undisputed.  According to ICE witness Jason Kidd, these facts rendered Mr. Melendres out-of-status under federal law.  TT at 1408:18 to 1410:8.  Mr. Melendres did not, for whatever reason, appear live or via deposition at trial to rebut the testimony of Mr. Kidd or Deputy Rangel.

Pursuant to federal law, during Mr. Melendres' visit to Maricopa County he was required to keep with him at all times his B-1/B-2 tourist visa and an I-94 Form that allowed him to travel more than 25 miles north of the U.S. border with Mexico.  *See* Dkt413-1 at ¶ 8;

---

concluded that an alien's illegal presence in the United States is a crime."); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("entering or remaining unlawfully in this country is itself a crime."); *Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987) (admission of being an alien without a green card provides probable cause for arrest).

[6]  It is, again, important to note, that the truck's driver remained present at the traffic stop *while* Deputy Rangel concurrently questioned the truck's passengers.  TT at 952:4-15.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

[7]*see also* Dkt#530 at § C (3), ¶ (d). If a visiting foreign national, such as Mr. Melendres, does not keep his tourist visa and/or I-94 Form with him (i.e., on his person) that person is legally "out-of-status," and a 287(g) deputy may lawfully question and detain such a person without a warrant in order to determine his entry status, and/or in order to deliver him to ICE for its determination of the person's lawful presence in the United States.[8] *Id*. at ¶ 9; *see also* Dkt#530 at § C (3). In addition, a person visiting the United States with a tourist visa is not lawfully permitted to work for compensation or otherwise have employment. *Id*. at ¶ 10; *see also* TT at 1408:18 to 1410:8 and Dkt#530 at § C (3)(g). If a foreign national visiting the United States on a tourist visa tells a 287(g) deputy that he is working while visiting as a tourist, that foreign national is considered "out of status" and may be detained without warrant and transported to ICE. *Id*. at ¶ 11; *see also* TT at 1408:18 to 1410:8 and Dkt#530 at § C (3)(g).

Based on the foregoing, there simply was no evidence presented at trial that would allow a reasonable fact finder to conclude that Deputy Rangel's questioning or detention of Mr. Melendres, or the truck's other passengers, was motivated or influenced by a discriminatory intent, motive, purpose, or racial animus. There is no Fourteenth Amendment violation by Deputy Rangel or any MCSO policy, pattern, or practice that violates the Fourteenth Amendment.

## C. There is No Evidence of Discriminatory Intent, Motive, or Animus as to the Rodriguez Incident.

It is undisputed that Deputy Matthew Ratcliffe made the traffic stop of the Rodriguez Plaintiffs on Bartlett Dam Road on Sunday, December 2, 2007. It is also undisputed, indeed

---

[7]  The parties stipulated the Court could consider the parties' summary judgment motions and supporting statements of facts in reaching its judgment. TT at 1922:12-25. In fact, the Court stated at the close of the trial that "I'm not aware of any significant difference between deposition transcripts and trial transcripts in terms of anything that would give me pause…." *Id*. at 1922:12-15. Defendants urge the Court, however, to disregard the deposition testimony of Plaintiffs Melendres and Jessika Rodriquez because there was no showing of unavailability at trial and there was no fair opportunity to cross-examine them before the Court for it to evaluate their credibility.

[8]  Local law enforcement personnel that are trained and certified pursuant to ICE's 287(g) program are expressly authorized to investigate and enforce federal immigration law. More specifically, the MCSO personnel certified with 287(g) authority by the federal government under the February 2007 ICE-MCSO Memorandum of Agreement are expressly allowed to stop and interrogate any person "*believed*" by a MCSO 287(g) certified officer to be an alien as to his/her right to be or remain in the United States. *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.* They are also permitted to make warrantless arrests. *Id*.; *see also* MOA at Admitted Exhibit ("EX") 1075.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

stipulated by the parties, that the MCSO did not conduct a saturation patrol anywhere in the county on that date.  *See* Dkt#530 at §C (1), ¶¶ 63-81 (stipulation of saturation patrol dates) and 127 ("Neither Deputy Ratcliffe nor anyone from the MCSO conducted a saturation patrol on that date.").

On December 2, 2007, the Maricopa County Department of Transportation ("MCDOT") had closed the Bartlett Dam Road in order to protect the public's safety because storm damage with heavy flooding had washed away parts of the road and left debris on the road.  *Id*. at ¶ 124.  There was a "Road Closed" sign posted by the MCDOT indicating that the road ahead was closed.  *Id*. at ¶ 125.  Deputy Ratcliffe was on regular patrol that day in a marked MCSO SUV when he saw a dark colored truck drive on the closed road.  *Id*. at ¶¶ 126 and 128.  Deputy Ratcliffe decided to stop the truck for driving on a closed road.  *Id*. at ¶ 129.

Before deciding to conduct the traffic stop, Deputy Ratcliffe **did not see or know the race or ethnicity** of the truck's drivers or of any of the truck's occupants.  *Id*. at ¶ 130; TT at 1359:21 to 1360:1.  David Rodriguez was driving the truck, his wife, Jessika, was sitting in the front right passenger seat, and the Rodriguez' children were seated in the truck's back row.  *See* Dkt#530 at §C (1), ¶ 130.   Deputy Ratcliffe asked Mr. Rodriguez for his license, vehicle registration, proof of insurance, and Social Security number.  *Id*. at ¶ 131.  He asked for Mr. Rodriguez' Social Security number so he could complete the MCSO citation form, which includes a space for recording such information.  *Id*. at ¶ 132.  These requests were reasonable.  *Graham,* 490 U.S. at 387; *Summers*, 452 U.S. at 703, fn. 14.

Mr. Rodriguez asked Deputy Ratcliffe why he asked for his Social Security number, and the deputy explained that the number was for identification purposes only and to fill in the blank on the citation form.  Dkt#530 at §C (1), ¶¶ 136 and 138.  Deputy Ratcliffe then issued a citation to Mr. Rodriguez for failure to obey a traffic control device (i.e., the "Road Closed" sign).  *Id*. at ¶139.  Mr. Rodriquez asked the deputy what effect such a citation would have on his commercial driver's license, and Mr. or Mrs. Rodriguez then stated that he/she did not see any other drivers on the road receiving citations.  *Id*. at ¶ 140; TT at 229:12-16.  Deputy Ratcliffe responded that he was only dealing with them and not dealing

with others at the time.  Dkt#530 at §C (1), ¶ 141.  At that time, Mrs. Rodriguez angrily told Deputy Ratcliffe that she felt that he was engaging in "selective enforcement" in issuing a traffic citation to her husband.  *Id.* at ¶ 142; *see also* TT at 1361:21 to 1362:10.  Mr. Rodriguez admitted that his wife meant by the comment that Deputy Ratcliffe was racially profiling him by issuing a citation solely because he was Hispanic.  TT at 230:5-17.  Deputy Ratcliffe later followed the Rodriguez vehicle on Bartlett Dam road to take pictures of the closed road sign given Mrs. Rodriguez' racial profiling comments.  TT at 1362:24 to 1363:18.  Mr. Rodriguez later pled responsible for the citation.  Dkt#530 at §C (1), ¶ 145.

The evidence shows that the race or ethnicity of Mr. Rodriguez **played no role** in Deputy Ratcliffe's decision to issue a citation to him.  TT at 1360:2-6.  Additionally, the race or ethnicity of the Rodriguez family **was not** a motivation for Deputy Ratcliffe to follow them on Bartlett Dam Road or to take photographs of the "Closed Road" sign.  TT at 1364:24 to 1365:6.[9]

As a consequence, there was no evidence presented at trial that would allow a reasonable fact finder to conclude that Deputy Ratcliffe's traffic stop, questioning or citation of Mr. Rodriguez or others in his truck was in any way motivated or influenced by discriminatory intent, discriminatory purpose, or racial animus.  There is no Fourteenth Amendment violation by Deputy Ratcliffe or any MCSO policy, pattern, or practice.[10]

Finally, it is important to note that, while the Rodriguez Plaintiffs claim they have been subject to a policy, pattern or practice of racial profiling by the MCSO since early 2007

---

[9]   The other drivers that Deputy Ratcliffe had stopped on that date (December 2, 2007) were turned over to the Tonto National Forest Ranger, and the ranger issued citations to those persons. TT 1365:10 to 1366:14.  Deputy Ratcliffe did not remember the race or ethnicity of those other drivers, nor did he care what race or ethnicity they were. TT at 1366:15-20.  Mr. Rodriguez never personally observed Deputy Ratcliffe stop any other vehicles. TT at 231:18 to 232:4.  Mr. Rodriguez was never informed by the other drivers why they were not cited. TT at 232:17-20; 232:25 to 233:12.  He merely speculated that the other unknown drivers were not cited because "they're Caucasian." TT at 232:21-24.  Interestingly, named plaintiff Jessika Rodriguez, although in court when her husband testified, did not testify live or via deposition at trial.  Perhaps one reason she did not testify is that the evidence showed her racial profiling claim to be actually a politically motivated dispute between her then-employer and Arpaio over MCSO law enforcement priorities, and not an actual grievance on actual operational practice by Deputy Ratcliffe or the MCSO.  *See* TT at 222:2-22 (Mrs. Rodriguez was a political appointee of, and assistant to, former City of Phoenix Mayor Phil Gordon who had political disputes with Arpaio over illegal immigration, and who used the Rodriguez incident in communications with federal officials complaining about Arpaio).

[10]   The Court ruled on December 23, 2011 that there was no Fourth Amendment violation by Deputy Ratcliffe in regards to the Rodriguez traffic stop, detention, or questioning.  Dkt# 25:9-11.

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
Professional
Corporation

(i.e., allegedly "stopping Latinos because of their skin color" (TT at 234:8-12)), in the nearly five (5) years since the Rodriquez traffic stop, neither Mr. nor Mrs. Rodriquez have been stopped again by the MCSO despite each driving 20,000 miles annually within Maricopa County.  TT at 233:15 to 234:7.  Mr. Rodriquez truthfully testified as to why he has not been stopped again by the MCSO despite the racial profiling allegations he has alleged for years in his lawsuit:

> Q.    Do you have any explanation for the Court as to why you have driven anywhere from sixty to eighty thousand miles in the county in four years and seven months and you have never again been stopped because of supposedly your skin color?
>
> A.    **Because I obey the law**.
>
> Q.    So what you're telling me is that if you are a driver and you obey the law, you have nothing to worry about from the MCSO, correct?
>
> A.    **True.**
>
> Q.    If you are a law abider, you are not going to be pulled over, are you?  True?
>
> A.    **True.**

TT at 234:13-24 (emphasis added).

Neither Mr. nor Mrs. Rodriquez have standing to remain party-plaintiffs or class representatives for Fourteenth Amendment purposes and decertification or partial decertification is required.  A plaintiff seeking *equitable relief* must demonstrate a "credible" and "genuine" threat of suffering the same harm or injury again in the future.  *Ellis v. Dyson*, 421 U.S. 426, 434-435 (1975); *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 and 502 (1974) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief;" to obtain equitable relief, the plaintiff must establish "the likelihood of substantial and immediate irreparable injury."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (in the context of a party seeking injunctive relief, the plaintiff must prove that he is "likely to suffer future injury.").[11]

---

[11] The Court previously stated: "Should it be determined after trial that Plaintiffs lack standing to seek injunctive relief on any claim, the class may then be decertified or partially decertified."  Dkt# 494 at p. 32:14-16.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

1

2

**D.    There is No Evidence of Discriminatory Intent, Motive, or Animus as to the Meraz and Nieto Incident.**

3

### 1.    Deputy Armendariz

4

5

6

7

8

9

10

11

12

13

14

15

On March 28, 2008, the MCSO was conducting a saturation patrol in north Phoenix. Deputy Ramon Charley Armendariz worked the saturation patrol in the capacity of a patrol officer, and his role was to conduct traffic stops and write citations.   TT at 1517:15-22.[12] Around 2:00 p.m., Deputy Armendariz made a traffic stop of a car on North Cave Creek Road for no brake lights, and that car was stopped at a convenience mart/gas station located at the southwest corner of North Cave Creek Road and East Nisbit Road.  TT at 1517:23 to 1518:10.  Deputy Armendariz parked his patrol car behind the stopped car.  The stopped car contained two men, and Deputy Armendariz conducted a radio check on them. *Id*.  The driver was eventually taken into custody for failure to provide identification.  TT at 1518: 3-10.  The driver also was driving on a suspended license.  *Id*.  Importantly, Deputy Armendariz does **not** consider or use race or ethnicity to detain or question drivers or passengers.  TT at 1507:15-20.  Deputy Armendariz only detains persons based on reasonable suspicion.  TT at 1519:21 to 1526:3.

16

17

18

19

20

21

22

23

Deputy Armendariz placed the car's driver in handcuffs, and sat him inside his MCSO patrol car.   For security reasons because he was the only officer at the scene, Deputy Armendariz placed handcuffs on the car's passenger, and had the passenger sit down on the front bumper of the MCSO patrol car.  Dkt#413-1 at ¶ 67.  At that moment a dark colored vehicle pulled into the convenience mart/gas station and parked directly ("a couple of feet") behind Deputy Armendariz' patrol car.  TT at 1528:12-25.  Deputy Armendariz was standing in front of his patrol car handling the detained passenger of the car he stopped.  Dkt#413-1 at ¶ 68.

24

25

26

The dark colored vehicle was playing load music, the passenger side windows were down, and Deputy Armendariz could see a female passenger (later known to be Ms. Meraz) and a male driver (later known to be Mr. Nieto).   TT at 1528:12-25; *see also* Dkt#413-1 at ¶

27

28

---

[12] Deputy Ramon Armendariz is a member of the MCSO HSU and is 287(g) certified.  Dkt#413-1 at ¶ 61.  Deputy Armendariz' first language is Spanish and he is fluent in speaking that language.  *Id*. at ¶ 62.

69.   The female passenger started **yelling and screaming repeatedly** in Spanish out her window at Deputy Armendariz' detainee sitting on the bumper of the patrol car, "no diga nada,' … which means don't say anything,'; 'pida un abogado,' which means ….'ask for a lawyer,'" TT at 1531:4 to 1533:8, 1563:15-21; *see also* Dkt#413-1 at ¶ 70.[13]

At first, Deputy Armendariz tried to ignore the yelling, but the female passenger in the dark colored vehicle kept yelling and he began to fear for his safety. TT at 1531:4 to 15132: 5; *see also* Dkt#413-1 at ¶ 71.  Deputy Armendariz, therefore, ordered the driver of the vehicle that "they needed to leave." TT at 1532:18-23.  In response to Deputy Armendariz' command, the female passenger kept yelling. TT at 1533:6-8.  The female passenger **yelled** several times that 'we're not going anywhere!' Dkt#413-1 at ¶ 72.  Deputy Armendariz again ordered that they leave. Dkt#413-1 at ¶ 73.  The dark vehicle, however, would not leave. TT at 1533:6-8.

Deputy Armendariz was worried about his safety and the safety of the two men he had in custody. TT at 1532:18 to 1533:16; 1535:17 to 1536:13; *see also* Dkt#413-1 at ¶ 75.  Because the vehicle with the yelling passenger would not leave, Deputy Armendariz called on his radio for back-up. TT at 1533:23 to 1534:3; *see also* Dkt#413-1 at ¶ 76.[14]

Despite Deputy Armendariz' repeated commands for them to leave, the male in the dark colored vehicle then opened his door and started to get out. TT at 1534:6-14, 1536:18 to 1537:3, 1560:19 to 1561:2; *see also* Dkt#413-1 at ¶ 78.  Deputy Armendariz believed that the male was going to get out of the car to "try to kick my ass." *Id.*  The vehicle occupants appeared very "angry" and were acting "very threatening." Dkt#413-1 at ¶ at 79.  "[T]heir actions towards [Deputy Armendariz] were as if it was personal towards [him]." *Id.*  Deputy Armendariz' state of mind at this time was fear. TT at 1536:11 to 1537:3, 1562:4-17; *see*

---

[13]   Ms. Meraz testified that she did not "recall" if she said anything to the detainees in handcuffs at this point in time. TT at 657:9-14.

[14]   MCSO Deputy Douglas Beeks heard Deputy Armendariz' radio call for back-up and described Deputy Armendariz' voice as sounding "excited" and "agitated". TT at 1437:10 to 1439:14; *see also* Dkt#413-1 at ¶ 77.  Deputy Beeks also recalls hearing words used by Deputy Armendariz that led Deputy Beeks to believe in good faith that "a vehicle had tried to run over or hit Deputy Armendariz as it left the area" and that a crime may have been committed. TT at 1439:18 to 1440:2; *see also* Dkt#413-1 at ¶773.  Accordingly, Deputy Beeks was concerned for the safety of Deputy Armendariz. *Id.*  MCSO Deputy Michael Kikes also heard Deputy Armendariz' radio call for assistance and believed, based on the pitch of Deputy Armendariz' voice, that something was wrong at the time of Deputy Armendariz' call.  TT a 567:14 to 569:13.

*also* Dkt#413-1 at ¶ 80.[15]  At no time did he leave his detainees and approach the two people in the dark colored vehicle.  TT at 1533:10-16.

Finally, the vehicle's occupants left the scene while yelling profanities at him, "fucking Sheriff Joe, fucking Nazi," and "you guys don't have a right to do this."  TT at 1534: 21 to 1535:14; *see also* Dkt#413-1 at ¶ 74.  Ms. Meraz admits to yelling while leaving the convenience mart, but denies she said the foregoing words.  TT at 657:15 to 658:8.  As the Meraz-Nieto vehicle was leaving the convenience mart, Deputy Michael Kikes arrived on scene on his motorcycle in response to the radio call for assistance and actually saw the vehicle quickly leave.  TT at 570:20-25 ("I saw a vehicle pulling out of the driveway at the south end of the parking lot in a rather quick hurry…."); *see also* TT at 571:23 to 572:1 (describing Kikes' characterization of the hurried departure of the SUV driver).

Deputy Armendariz identified the vehicle to Deputy Kikes and pointed him toward the departing vehicle.  TT at  570:20 to 571:2, 1537:14-25.  Deputy Armendariz intended the deputy to investigate the departing vehicle's occupants for disorderly conduct.  TT at 1538:1-8.  Deputy Beeks, in a patrol car, followed Deputy Kikes.  TT at 1538:18-21.  Deputy Armendariz returned to the work of safely handling his arrestees.  TT at 1538:9-11.[16]

Based on the foregoing, there was no evidence at trial from which a reasonable fact finder could fairly conclude that anything Deputy Armendariz did, or did not do, was motivated by a discriminatory intent, purpose, or racial animus.  There is no Fourteenth Amendment violation by Deputy Armendariz, nor was there any MCSO policy, pattern, or practice that violates the Fourteenth Amendment.

---

[15]  Deputy Armendariz's caution about Mr. Nieto's anger and behavior was sound.  Although unknown to Deputy Armendariz at the time, Plaintiff Manuel Nieto is a three-time convicted felon who spent 3.5 years in prison for domestic violence and was released from prison only one month earlier in February 2008. Dkt#413-1 at ¶ 81.

[16]   The testimony from Mr. Nieto and Mrs. Meraz as to what occurred between them and Deputy Armendariz is not credible.  Each of them testified, more or less, that they simply pulled into the parking lot at the convenience mart minding their own business when Deputy Armendariz left two detainees to approach their vehicle and, without any justification whatsoever, yell at them and ordered them to leave the premises.  TT at 658:9-22 (Meraz); TT at 638:5 to 642:18; 643:23 to 644:13 (Nieto).  They essentially denied saying or screaming anything toward Deputy Armendariz or the detainees except "ask for a lawyer."  *Id.*  Finally, Ms. Meraz' prior felony conviction for a crime of dishonesty should weigh on her credibility, as does Mr. Nieto's admission that he has, at least historically, had problems controlling his anger and rage.  TT at 655:20 to 656:12 (Meraz); TT at 642:19 to 643:22 (Nieto).  The Court must decide for itself what likely occurred at the convenience mart between these Plaintiffs and Deputy Armendariz and whose versions of events is more likely right than wrong.

### 2.   Deputies Kikes and Beeks

Deputy Kikes believed in good faith that he had probable cause or reasonable suspicion to stop the dark colored vehicle because he believed there was "some crime" or that some emergency situation of some type had occurred involving Deputy Armendariz.  TT at 573:6-25; *see also* Dkt#413-1 at ¶ 85.   As such, he tried to stop the Meraz-Neito vehicle but the driver (Mr. Nieto) saw Deputy Kikes and refused to obey his signals and oral commands to pull over and stop.  TT at 572:5-18 (i.e., lights and siren); 573:3-5 (speaker system commands).  The driver did not brake or yield to the right.  TT at 575:1-3.  Mr. Nieto admitted that he saw Deputy Kikes' lights and sirens, and heard his command over the speaker system to stop driving, but still did not stop.  TT at 644:14 to 645:2.

The driver's non-compliance with Deputy Kikes' signals and directions was a significant safety concern to Deputy Kikes.  TT at 575:4-14.  Indeed, the driver's failure to heed the stop signals and commands was, in itself, a violation of Arizona's motor vehicle code.  TT at 575:12-14.

At no point in time before Deputy Kikes made the traffic stop could he see or determine the race or ethnicity of the driver or any occupants of the pursued vehicle.  TT at 574:20-25, 576:18 to 577:1.  In other words, race and ethnicity **had "absolutely" no role or influence** on his decision to make the traffic stop.  *Id.*

Eventually, the driver turned left "quickly" and "bounced" into the private driveway of a commercial building on the left side of the road.  TT at 575:15 to 576:2.  Deputy Kikes now considered this traffic stop to be a "high risk stop."  TT at 577:4-20.  He parked his motorcycle behind the dark colored vehicle so it could not back-up and leave.  TT at 577:4-14.  The driver did not turn off his engine, and would not get out of the vehicle despite commands to exit.  TT at 578:4-9; 579:1-6; 1444:23-25.[17]  Deputy Kikes cautiously approached the vehicle from the rear and driver's side; he never drew his weapon. TT at 578:10-25.

Deputy Kikes repeatedly asked the driver to get out of his vehicle, but the driver did not comply.  TT at 579:1-6.  Deputy Beeks arrived at the scene and described the driver as

---

[17]   Mr. Nieto could "not recall" whether he turned his engine ignition off when he stopped at the business.  TT at 645:11-13.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

"**noncompliant**, **combative**, **belligerent**, and **arguing** with" Deputy Kikes.  TT at 1444:13-22.  In fact, Deputy Beeks had the impression that the driver was "attempting, if possible to drive off from the traffic stop."  TT at 1444:15-22.

At this same time, two men came out of the commercial building and began to yell and curse at Deputy Kikes.  TT at 579:7 to 580:8.  The men were the Plaintiffs' father and brother.  Ms. Meraz described her father and other brother coming out of the family business and being upset.  TT 652:25 to 653:7.  Deputy Beeks believed the "situation was out of control and getting out of control more – more rapidly and needed to be stopped at that point."  TT at 1445: 3-20.  Deputy Beeks was so concerned for his safety and that of Deputy Kikes that he drew his weapon.  TT at 1445:21-24.

With a non-compliant, combative and belligerent driver, and two other men cursing and yelling at him, Deputy Kikes was now concerned that this already "high risk stop" was becoming even more dangerous.  TT at 580:12-23.  As such, he got to the driver's side door, opened the door, and told the driver to step out of the vehicle. TT at 580:23 to 581:6.  Deputy Kikes brought the driver (i.e., Mr. Nieto) to the back of the vehicle and cuffed him, away from the hostile yelling and cursing men.  TT at 581:7 to 582:16.  Deputy Kikes needed to gain control of the dynamic situation in order to protect his safety and that of others at the scene so he could determine what had occurred moments earlier with Deputy Armendariz. *Id*.

Deputy Kikes did not yank or pull the driver out of his vehicle.  TT at 582:18-19; 1446:8-14 (Beeks testimony).[18]  He did not slam, hit, throw the driver, or kick out the driver's feet.  TT at 582:20 to 583:4.  The situation was then cleared based on radio communication with Deputy Armendariz.  TT at 583:16 to 584:15.  Based on that communication, Deputy Kikes did not cite or arrest the driver for disorderly conduct. *Id.*

Finally, the evidence shows that the race or ethnicity of the driver **played no role** in Deputy Kikes' decision to remove the driver from his vehicle.  TT at 585:1-4.  Race or ethnicity **played no role** in the decision to move the driver to the back of his vehicle.  TT at

---

[18]  Mr. Beeks' testimony is objective and particularly credible.  He is no longer employed by the MCSO.  He now lives in Cedar Rapids, Iowa and works for Rockwell Collins Aviation as a senior systems engineer.  TT at 1434:6-17.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

585:5-8.  Race or ethnicity also **played no role** in Deputy Kikes' decision to use handcuffs on the driver to safely stabilize the situation.  TT at 585:9-11.  Similarly, Deputy Beeks' decision to pull his weapon (and possibly point it in the direction of the driver) was **purely a safety-related decision that was unrelated to the race or ethnicity** of the driver or of any other person at the scene.  TT at 1449:3-23.

There was no evidence presented at trial from which a reasonable fact finder could fairly conclude that anything Deputies Kikes and Beeks did, or did not do, was somehow motivated by a discriminatory intent, purpose, or racial animus.  There was no Fourteenth Amendment violation by Deputies Kikes and Beeks nor was there any MCSO policy, pattern, or practice that violates the Fourteenth Amendment.[19]

Despite the alleged existence of a MCSO policy, pattern or practice of intentionally discriminating against Latinos since early 2007, Ms. Meraz testified that in the nearly five years since her encounter with the MCSO she has never again been stopped or questioned by the MCSO.  TT at 660:3-8.  Mr. Nieto, in the same time period, also has not again been stopped by the MCSO.  TT at 647:19 to 648:3.  Accordingly, neither Ms. Meraz nor Mr. Nieto have standing to remain party-plaintiffs or class representatives for Fourteenth Amendment purposes, and decertification or partial decertification is required.  *Ellis*, 421 U.S. at 434-435; *see also O'Shea*, 414 U.S. at 495-96 and 502; *Lyons*, 461 U.S. at 105 (same).[20]

### E.   The Trial Testimony of Class Members Was and Is Irrelevant to Obtain the Relief Requested by the Plaintiffs.

The evidence at trial shows that the named Plaintiffs were not stopped in their

---

[19]   As for the Plaintiffs' Fourth Amendment claim regarding Mr. Nieto and Ms. Meraz, the evidence shows that there was no Fourth Amendment violation.  The reasonableness of a detention is evaluated "from the perspective of a reasonable officer on the scene."  *Graham*, 490 U.S. at 387; *see also Summers*, 452 U.S. at 703, fn. 14.  Additionally, according to the undisputed police practices expert testimony at trial Deputy Kikes acted reasonably and appropriately in stopping the vehicle based on reasonable suspicion that a crime may have been committed, and properly removed and detained Mr. Nieto in order to safely conduct an investigation as to what had actually occurred at the convenience mart moments earlier with Deputy Armendariz.  *See* Report of Bennie Click at admitted exhibit ("EX") No. 1070 at 35-37.  The sole police practices expert testimony further shows that Deputy Beeks "acted reasonably when he drew his weapon in order to secure his safety, the safety of the other deputies, the safety of Mr. Nieto and Ms. Meraz, and the safety of bystanders."  *Id*. at 36.

[20]   "Should it be determined after trial that Plaintiffs lack standing to seek injunctive relief on any claim, the class may then be decertified or partially decertified."  Dkt# 494 at p. 32, lns. 14-16.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

vehicles because of their race or ethnicity, or due to any MCSO policy, pattern, or practice motivated by a discriminatory purpose, intent, or racial animus.  Plaintiffs similarly presented no evidence at trial that *they* were detained or questioned by any specific MCSO deputies who had racially discriminatory purpose, intent, motive, or animus in regards to the Plaintiffs, or as a result of any MCSO policy, pattern, or practice motivated by a discriminatory purpose or racial animus.  As such, and in apparent recognition of the foregoing fatal omissions as to the *named* Plaintiffs, they called as witnesses at trial four class members in an attempt to bolster their case.[21]  The testimony of those four witnesses, however, is irrelevant to the issues in this case.[22]

There is no Fourteenth Amendment violation under a policy, pattern, or practice claim that seeks equitable relief **unless** such policy, pattern, or practice resulted in a constitutional injury to the **named** Plaintiffs.  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Missouri v. Jenkins*, 515 U.S. 70, 88-89 (1995).  The Supreme Court's decisions in *Lewis* and *Jenkins* make clear that, in an action seeking injunctive relief, the only constitutional violations (i.e., injuries) that are relevant are those suffered by the *named* plaintiffs – that is, those are the only "inadequacies which the suit empower[s] the court to remedy" and are the only injuries "relevant to the question of whether the *named* plaintiffs are entitled to the injunctive relief they seek."  *Lewis*, 518 U.S. at 357 (emphasis added).  "System-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).  As such, there was no legal reason on the merits to present such testimony in open court.

To the extent there is arguable minimal legal relevance to the class members' testimony to somehow try to support a policy, pattern or practice claim, the actual nature of that testimony, as offered at trial, is factually insufficient to establish that any MCSO policy, pattern, or practice was motivated by a racially discriminatory intent, purpose, or animus.  For example, the testimony of Daniel Magos shows that he was stopped for race neutral

---

[21]   These witnesses were David Vasquez, Daniel Magos, Diona Solis, and Lorena Escamilla.

[22]   At the hearing on March 23, 2012, the Court stated that such witness testimony was "only minimally relevant" (Dkt# 532 at p. 10:25), and "in my view, only minimally relevant in terms of establishing the existence of a policy."  (*Id*. at p.11:23-24).

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
Professional
Corporation

probable cause for not having a license plate on a trailer he was towing.  TT at 554:19-34; 563:8-13.  He was questioned about having a concealed weapon on the floor of his car (without a concealed weapons permit).  TT at 552:18-24; 554:8-14; 558:23-25.  Although the experience was purportedly one of the worst of his life, he did not personally contact, or try to contact, the MCSO, the FBI, or the Department of Justice to complain about the traffic stop or his alleged treatment by the MCSO deputy, "B. Russell."  TT at 561:2-12; 55:18-24; *see also cf. Cornwell*, 439 F.3d at 1028-29 n.6 (cannot "rely solely on the plaintiff's subjective belief that the challenged action was [wrong].").

The testimony of Lorena S. Escamilla, was, in a word, incredible.  *See* TT at 1595-1618 (addressing Deputy Franciso Gamboa's testimony about what occurred).  Deputy Gamboa testified that he made a traffic stop of Ms. Escamilla for the race-neutral probable cause of her vehicle having no rear license plate light.  TT at 1597:22 to 1598:22.  Before making the decision to stop the vehicle driven by Ms. Escamilla, Deputy Gamboa **did not know** the race or ethnicity of the driver.  TT at 1604:1-3.  Ms. Escamilla refused to stop her vehicle and comply with Deputy Gamboa's commands.  *Id.*  She received a citation, and her bizarre conduct made the stop so unusual that the deputy wrote an incident report.  TT at 1598:23 to 1599:5.  In addition, it inexplicably took Ms. Escamilla three (3) years to make a complaint against Deputy Gamboa.  TT at 982:4-11.  Somehow, however, she made it to Plaintiffs' witness list.

David Vasquez testified to his subjective view that, on June 26, 2008, he was stopped in his car for driving with a "cracked windshield" because "I believe I was pulled over for driving while brown."  TT at 200:24 to 201:4; 202:8-11; *see also cf. Cornwell*, 439 F.3d at 1028-29 n.6.  Despite this "upsetting" experience, Mr. Vasquez did not complain to the MCSO, the local Mesa Police Department, the FBI, the Department of Justice, or the ACLU.  TT at 203:2 to 204:16.  Indeed, the incident did not surface until the ACLU solicited Mr. Vasquez for this case. TT at 204:17-24.

Diona Solis's testimony was rather unremarkable in light of the Plaintiffs' claims in this lawsuit.  She testified that she was pulled over in March 2009 while driving with her family and friends on U.S. 60-Grand Avenue after returning from a Boy Scout trip to the

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

Grand Canyon.  TT at 960:9 to 964:18.  Ms. Solis did not identify the deputy, could not recall the reasons she was stopped in her vehicle, and only made subjective and generalized complaints about the deputy being "rude" and allegedly questioning the citizenship of her passengers.  *Id.*

In short, the testimony of these four witnesses is irrelevant, and does not support Plaintiffs' claim that there is a Fourteenth Amendment violation under an MCSO policy, pattern, or practice.

> **F.      There is No Evidence of Discriminatory Intent, Motive, or Animus as to the MCSO's Law Enforcement Priorities, its Selection of Saturation Patrol Sites, or its Policies and Practices.**

Given the complete absence of evidence supporting their Fourteenth Amendment claims as to the named Plaintiffs (or even the class members that testified), the Plaintiffs next allege that the MCSO is a racially prejudiced law enforcement agency motivated to conduct saturation patrols, and traffic stops during those patrols and at other times, because of a racially discriminatory intent, purpose, motive, or animus against Latinos:

> The [MCSO] has engaged in a pattern and practice of racial discrimination.  We intend to show that the MCSO's policies, in particular its use of saturation patrols to apprehend illegal immigrants, has resulted in disparate treatment of Hispanics.  We also intend to show that this disparate treatment results from an intent to treat people differently based on their race or ethnicity.  If proven, these facts warrant injunctive relief, including appointment of a monitor by the Court that will prevent future discrimination….
>
> This case is about racial discrimination in law enforcement.
>
> *   *   *
>
> It is our view that the problem here [at the MCSO] starts at the top.

TT at 38:11-22; 41:1-2 (Plaintiffs' Opening Statement).

> **1.    Arpaio Statements and the Evidence**

Because it is undisputed that Arpaio is the top policy maker for the MCSO, Plaintiffs charge that Arpaio's public and media comments on illegal immigration prove a discriminatory intent, purpose, motive or animus against Hispanics in general, and as a

result, those comments: (a) set MCSO operational policy; (b) control or influence the deputies' law enforcement operations in the field; and (c) dictate where, when, and how saturation patrols will be conducted and/or when and how traffic stops will be made by deputies.  However, the truth, *indeed the evidence throughout trial*, does not support Plaintiffs' charges.

First, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when he publicly announced in 2007 an MCSO "crackdown" on illegal immigration.  That suggestion is wrong.  The race-neutral reality is that Arizona is a border state and that Maricopa County is a well-recognized major human smuggling corridor.  TT at 505:10-25; *see also* Dkt#453 at p. 151, ¶ 35.  The undisputed evidence shows that the drug cartels from south of the border are involved in the smuggling of human beings into Maricopa County.  TT at 504:8 to 505:17 (Arpaio), 97:15 to 918:1 (Rangel), and 1491:12-21 (Armendariz).  Most of the illegal immigrants in the county, given the countries they are originally from, are, by definition Latinos.  *Id*. at pp. 150, ¶¶ 28-30.  Most day-laborers in this county, in the experience of many MCSO deputies, are illegal immigrants.  *Id*. at ¶ 36.  As mentioned above, at least one deputy testified that, in his experience, human smugglees or "pollos" will work day-laborer types of jobs in order to pay off the extortionate debt they owe to the smuggler or "coyote." TT at 1494:11-19.

Arpaio, or any reasonable person, can oppose "rampant" illegal immigration without having racial or ethnic animus toward the illegal immigrants specifically, or Latinos in general.  *United States v. Brewer*, 703 F.Supp.2d 980, 985 (D. Ariz. 2010) (describing the illegal immigration situation in Arizona as "rampant").  A reasonable trier of fact, under the evidence presented in this case, could not fairly interpret Arpaio's public comments about illegal immigration as anything other than an expression of his opposition to, and desire to remediate, the undisputed problem of illegal immigration.  Arpaio's comments certainly are not evidence of racial or ethnic animus toward Latinos.

Second, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when he made illegal immigration an MCSO enforcement priority in 2007, and classified his office as a "full-fledged anti-illegal

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

immigration agency" and a program that focused on illegal immigrants regardless of whether they had committed a state crime.  That suggestion is wrong.  The truth is the ICE-MCSO MOA, which bestowed 287(g) authority on certified and trained MCSO deputies, *expressly allowed* the MCSO to focus on curbing illegal immigration and making it a law enforcement priority regardless of whether a state crime had been committed by an illegal immigrant.  TT 331:1-13; 333:20 to 334:1; *see also* EX 1075.  The MCSO 287(g) program was, according to ICE Assistant Special Agent in Charge Jason Kidd, a **"pure program"** where 28(g) certified deputies served as federal immigration officers.  TT at 1796:10 to 1798;11; *see also* TT at 332:19-25; 333:20 to 334:1; Dkt#453 at p. 150-51, ¶ 31.  Under 287(g), and by July 2007, a portion of the MCSO, namely the HSU, was, in fact, becoming a "full-fledged anti-illegal immigration agency."  TT at 336:7-22; *see also* Dkt#453 at p. 151, ¶¶ 32-33.  According to police practices expert Mr. Click, Arpaio's decision in 2007 that public safety in Maricopa County would be promoted by the MCSO's enforcement of federal immigration laws under the 287(g) program **was a reasonable race-neutral policy decision** for him to make.  *See* EX 1070 at 46-49; *see also* Dkt#453 at p. 151, ¶ 27.

Third, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when he warned in early 2009 that illegal immigrants could transmit swine flu and thus had disease, and supposedly said that all Mexican nationals were "dirty."  That suggestion is wrong.  Arpaio's comment on the flu was race neutral and related to his concern about the possibility that inmates in the county jail may have been exposed to the swine flu because some of the inmates originated from an area near Mexico City, Mexico that had a swine flu epidemic that caused roughly 150 deaths.  TT 346:2 to 347:6; *see also* Dkt#453 at p. 153, ¶ 43.  His purported comment about illegal immigrants being "dirty" was, if not taken completely out of context, referring to them having hiked through the desert for several days, being overheated, being physically grimy or dirty from the desert hiking, disheveled, and un-groomed.  TT at 347:7-12; 497:20 to 498:21.

Fourth, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos because he wrote in one of his books the opinion that illegal immigrants from Mexico are failing to assimilate into U.S. culture.  That suggestion is

wrong.  Arpaio does not hold such a view.  TT at 348:17 to 352:13.

Fifth, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when during an interview with television personality Lou Dobbs he supposedly considered it to be a personal compliment to be compared to the Ku Klux Klan.  That suggestion is absurd.  Arpaio does not believe being called KKK is an honor.  TT at 357:1:9.  In fact, and in fair context, Arpaio only said to Mr. Dobbs that the fact that he was being ridiculed by people and being called "nasty names" meant to him that he must be "doing something" in enforcing the law.  TT at 357:18 to 358:10.

Sixth, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when he publicly stated that most illegal immigrants in the county are from Mexico, have certain "appearances, and that 99 percent of the illegal immigrants come from south of the US-Mexico border.  That suggestion is wrong.  Arpaio does not believe that illegal immigrants have "certain appearances" or appearances that are "readily observable."  TT at 360:11-23.  What he said about "appearance" was in the context of illegal immigrants having hiked through the desert for several days, being overheated, being physically grimy or dirty from the desert hiking, disheveled, and un-groomed.  TT at 347:7-12; 497:20 to 498:21.  Moreover, it is a matter of personal opinion (Dkt#453 at p. 150, ¶ 29) and objective empirical fact that most illegal immigrants in Arizona are from Mexico: "It is well established that illegal immigrants in Arizona and in the United States as a whole are overwhelmingly Hispanic.  The Pew Hispanic Center has estimated that **94 percent of illegal immigrants in Arizona *are from Mexico alone***, not including the rest of Latin America."  *See* EX 402 at p. 14; *see also* Dkt#453 at p. 150, ¶ 30.

Seventh, Plaintiffs suggest that Arpaio had racially discriminatory intent, motive, purpose, or animus against Latinos when he described in interviews with television personalities John Sanchez and Glenn Beck that he thought law enforcement could use what people "look like" to make traffic stops.  That suggestion is wrong.  Arpaio was **not** talking about using appearance or what people "look like" to make traffic stops.  TT at 498:22 to 500:5.  What he was attempting to convey in the television interviews -- and it is unknown whether the clips played by Plaintiffs were edited by the original broadcaster -- were the

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

factors taught by ICE that indicated a person's possible unlawful presence in the country **after** a lawful traffic stop was already made.  *Id.*; *see also* Dkt#453 at p. 152, ¶ 38.[23]   **It is undisputed that the MCSO does not use race as an indicator or factor to make vehicle stops under Arizona law**.   TT at 273:10-17 (DiPietro), TT at 1171:10-18, 1204:2-17 (Madrid), TT at 715:17-19; 749:22 to 750:2 (Palmer), TT at 927:9 to 928:1, 931:11-13 (Rangel), TT at 1436:1-15 (Beeks), TT at 1485:4-9 (Armendariz).   Traffic stops are made only on probable cause or reasonable suspicion that the motor vehicle code or equipment code was violated.  *Id.*  Finally, Arpaio does not personally patrol the street or make arrests. TT at 344:21 to 345:3.

Eighth, Plaintiffs are just wrong in their suggestion that Arpaio's public statements somehow controlled or influenced the manner in which the MCSO deputies conducted their law enforcement operations in the field.  The evidence shows that there was a professional law enforcement buffer between Arpaio's public comments and MCSO field operations, and that his media statements had no bearing whatsoever on the operations conducted in the field/street by the MCSO deputies.  *See, e.g.*, TT at 854:17 to 856:7 and 891:1 to 894:3 (Sands), TT at 1071:14 to 1072:21 (Sousa).  Undisputed evidence established that there was a "disconnect" between what was actually occurring in the field in the deputies' operations and what Arpaio was publicly stating was occurring in those operations.  TT at 891:6-9; *see also* TT 893:25 to 894:3.[24]

Ninth, Plaintiffs are wrong that Arpaio's public statements to the media set MCSO operational policy.  TT at 529:15-19.  Arpaio's statements to the media are not MCSO policy.  *Id.*  To the contrary, there is a very specific, formal, and professional procedure in place at the MCSO where Arpaio, along with his chiefs and top assistants, carefully decide upon and set law enforcement policy for the agency.  TT at 528:6 to 529:7.

Finally, Plaintiffs are wrong when they suggest that Arpaio determined or dictated

---

[23]   Arpaio was not trained or certified as a 287(g) officer.  TT at 500:10-11.  Accordingly, Arpaio testified that the MCSO deputies that were 287(g) trained are better sources for learning the unlawful presence indicators taught by ICE than him.  TT at 501:19-22.

[24]   Such a "disconnect" is neither surprising nor alarming.  Reasonable and responsible management involves the delegation of detail to subordinates.  By rough analogy, a CEO of an automobile company would not be expected to fully understand, or be able to articulate, the precise engineering principles in airbag deployment for a particular vehicle.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

where, when, and how saturation patrols will be conducted and/or when and how traffic stops will be made by deputies.  As shown below, Chief Sands makes the _exclusive_ decision of where, when, and how saturation patrols will be conducted.  *See, eg*., TT at 519:10 ("I let my people make the decisions.").  Arpaio has never told Sands where to conduct a saturation patrol or tried to influence him to go to a particular area for a particular reason.  TT at 512:5-12, 518:17-24, 519:2-12, 523:18-21, 526:20-24.  At most, Arpaio has only suggested general areas for Chief Sands to consider for saturation patrols after independently assessing the relevant considerations.  TT at 840:24 to 841:3; 872:9 to 873:24.[25]

## 2.   Citizen Letters and the Evidence

Plaintiffs suggest that Arpaio, and Deputy Chief Brian Sands, had racially discriminatory intent, motive, purpose, or animus against Latinos when they allegedly planned and initiated saturation patrols in certain areas as a result of citizen letters that expressed racially or ethnically offensive or insensitive remarks about Latinos and/or called for the MCSO to target Latinos based solely on their race or ethnicity.  The evidence, however, does not support Plaintiffs' suggestion.

The evidence showed that Arpaio receives numerous letters from citizens throughout the county, Arizona and the United States about law enforcement issues, including illegal immigration.  TT at 479:19-22.  Arpaio saves the letters he receives.  TT at 482:25 to 483:18.  When a person takes the time to write to him, Arpaio will write a "thank you note." TT at 479:23 to 480:25.  Arpaio's expression of gratitude for the letter does **not** mean he agrees with the content of the letter or the opinions expressed by the letter's author.  TT at 484:19 to 485:2; *see also* Dkt#453 at p. 153-54, ¶¶ 44-48.  Regardless of how foolish, wrong, or misguided a letter writer might be in his or her opinions or letter, Arpaio does not make it a practice in his "thank-you" letters to correct the author's opinions or beliefs.  TT at 480:13-25, 486:12-14.

Arpaio will forward the letter to the appropriate person at the MCSO who is responsible for a particular subject that is mentioned in the letter.  TT at 481:1 to 482:24.  In

---

[25] If Chief Sands disagrees with Arpaio on a suggested area for a saturation patrol, he will express that opposition.  TT at 841:6-14.  He has the independence and employment security to disagree with Arpaio.  TT at TT at 842:4 to 843:3; *see also* TT at 893:16 to 894:3.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

forwarding such letters, Arpaio places no law enforcement value on the letter.  TT at 481:1-5.  If a letter arguably deals with the subject of illegal immigration, Arpaio forwards the letter to Chief Sands.

Not a single citizen letter received by Arpaio ever influenced or affected his law enforcement decisions.  TT at 511:9-11, 511:23-25 (rejecting EX 202).  Not a single citizen letter received by Arpaio ever resulted in the planning or initiation of a saturation patrol.  TT at 512:5-12 (rejecting EX 202), 516:22-24 (rejecting EX 244), 517:16-18 and 518:6-9 (rejecting EX 228), 521:6-12 (rejecting EX 237), 523:12-14 and 523:18-21 (rejecting EX 235), and 526:12-24 (rejecting EX 187).  At no time from January 1, 2007 to July 24, 2012 has Arpaio ever considered race or ethnicity in any of his decision making.  TT at 529:20-23.  Indeed, Arpaio testified that racial profiling **is morally wrong** and his deputies will **not** engage in such conduct.  Dkt#453 at p. 154, ¶ 49.[26]

Chief Sands is the sole decision maker as to whether, where, when, and how to do a saturation patrol.  TT at 839:16 to 840:2; Dkt#453 at p. 157, ¶ 63.  He has been in law enforcement for over 28 years.  TT at 841:15-21.  He has been through *four different sheriffs* elected to the office, and he is a permanent member of the professional, non-political staff at the MCSO.   TT at 841:15 to 842:10.  He considers himself "separate from the political process" and, therefore, a "type of insulation against political pressure."  TT at 842:4 to 843:3.  Arpaio does not make the decisions on where, when, and how to do a saturation patrol.  TT at 839:25 to 840:6.  In fact, Arpaio has never ordered, or pressured, Chief Sands to go to a particular area to conduct a saturation patrol.  TT at 840:17-23.

Not a single citizen letter forwarded from Arpaio and received by Chief Sands ever resulted in Chief Sands planning or initiating a saturation patrol in the citizen's requested area or in a nearby area.  TT at 853:14 to 854:25, 856:14 to 857:2 (rejecting EX 228), 857:6-22; 860:2-6 (rejecting EX 187), 862:8 to 864:19 (rejecting EX 235), and 864:23 to 868:25 (rejecting EX 236).  **In fact, Chief Sands rejected, and did not consider, every citizen letter that Plaintiffs showed him at trial.  In other words, not a single citizen letter cited by Plaintiffs at trial ever led to Chief Sands taking law enforcement action.**

---

[26]   The following MCSO personnel also testified that racial profiling is immoral, illegal, and impermissible at the MCSO:  Sands, Sousa, Madrid, Palmer, DiPietro, Ratcliffe, Kikes, and Beeks.  *See, e.g.*, Dkt#453 at p. 154-55, ¶¶ 50-56.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

There are a multitude of different race neutral law enforcement factors that Chief Sands used to determine whether to conduct a saturation patrol and where it is conducted. TT at 871:11 to 872:7.   The race or ethnicity of people played **no role** in Chief Sands' selection of saturation patrol locations.  Dkt#453 at p. 157, ¶ 64.  The ethnic constituency in a neighborhood played **no role** in selecting locations for saturation patrols.  Dkt#453 at p. 157, ¶ 65.  Even with an additional MCSO emphasis on enforcing laws related to illegal immigration, **the MCSO still did not focus or target areas believed to contain a high percentage of illegal immigrants**.  Dkt#453 at p. 157, ¶ 66.   Similarly, HSU Lt. Joe Sousa testified that the areas for saturation patrols were *not* selected because they may have a high concentration of suspected illegal aliens.  *Id*. at ¶ 67.  Moreover, Chief Sands testified that "the [illegal] immigration problems that we have are so widespread throughout Maricopa County there [are] very few places you can go [on a saturation patrol] where you are not going to encounter an illegal alien."  *Id*. (emphasis added); *see also* TT at 843:8 to 844:4 (discussing similar facts related to the results of conducting saturation patrols in Maricopa County in response to the Court's questioning).

Chief Sands selected the sites for saturation patrols based on a *combination* of the following types of factors: (1) the area's crime history and statistics.  TT at 871:11 to 872:7; Dkt#453 at p. 158, ¶ 68(A); (2) intelligence and data regarding possible criminal activity at the possible site.  Dkt#453 at p. 158, ¶ 68(B); (3) requests for assistance in a particular area from Arizona legislators and information offered in the request about criminal behavior.  TT at 871:11 to 872:7; Dkt#453 at p. 158, ¶ 68(C); (4) requests for assistance from city officials for a particular area.  TT at 871:11 to 872:7; Dkt#453 at p. 158, ¶ 68(D); (5) information provided by local police officers from other law enforcement agencies.  Dkt#453 at p. 158, ¶ 68(E); and (6) requests for assistance from private citizens in the community providing information about possible criminal activity; but such information provided by private citizens is independently evaluated and confirmed by the MCSO.  Dkt#453 at p. 158, ¶ 67(8).  He also was involved in the strategy related to their planning.  TT at 884:5-25. Furthermore, police practices expert Mr. Click opined that the "method by which the MCSO chooses areas for saturation patrols is reasonable and consistent with standard law

enforcement practices."  EX 1070 at p. 47.

When evaluating private citizen complaints, the MCSO under Chief Sands' general supervision conducted an independent investigation of the complaint to determine its legitimacy and whether there was any criminal activity.  TT at 872:9 to 873:24; *see also* Dkt#453 at p. 159, ¶ 69.  The MCSO **automatically rejected and dismissed** citizen complaints that contained only racial or ethnic information.  Dkt#453 at p. 159, ¶ 70, p. 161, ¶¶72-73.

Plaintiffs' suggestion at trial that the MCSO conducted small scale saturation patrols because a location was frequented by day-laborers is misleading.  When the MCSO received citizen or business complaints about day laborers, the MCSO independently investigated the complaints and only took action when it determined that criminal activity associated with the day laborers justified such action.  Dkt#453 at p. 172, ¶ 107.  Chief Sands did **not** select locations for saturation patrols because of the sole factor that there are day-laborers at a particular location.  *Id.*  While some saturation patrols involved sites where day laborers were located, every saturation patrol in an area with day laborers was conducted because there **were race and ethnicity-neutral factors related to criminal activity occurring at the site** that controlled Chief Sands' decision to conduct a particular saturation patrol at the particular location.  *Id.* at ¶ 108.[27]

Based on the foregoing, Plaintiffs have failed to prove that Chief Sands had a racially discriminatory intent, motive, purpose, or animus against Latinos in the selection of saturation patrol sites or their planning.

### 3.  Sgts. Palmer and Madrid

It is undisputed that MCSO deputies did not, and do not, use race or ethnicity to make

---

[27]  For example, the September 2007 Cave Creek operation also involved day laborers violating Title 28 by interfering with traffic; the October 2007 Queen Creek operation involved day laborers sexually harassing school girls at a nearby bus stop (TT at 1847:18 to 1848:5); the 2007-08 Fountain Hills operations involved each time days laborers interfering with traffic and criminal trespass and vandalism; the so-called "Pruitt's operations" in late 2007 and early 2008 near 36th Street and Indian School in Phoenix involved day laborers urinating and defecating on private property, interfering with traffic, and criminal nuisance by harassing the customers of the local businesses (TT at 875:18 to 876:25).  A mere citizen or business complaint about day laborers congregating in an area was insufficient to conduct a saturation patrol. (TT at 883:14 to 884:1); *compare Doe v. Vill. of Mamaroneck*, 462 F.Supp.2d 520, 531 ¶ 89 (S.D.N.Y 2006) ("To the extent Village officials did receive complaints from residents concerning the behavior of the day laborers, *the Village took no step to investigate and determine whether those complaints were genuine* and/or whether they were motivated consciously or unconsciously, by racial animus towards the day laborers.") (emphasis added).

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
Professional
Corporation

traffic stops.[28]  Plaintiffs, however, may argue that HSU Sgts. Brett Palmer and Manuel Madrid improperly used Hispanic race or ethnicity on occasion when determining a person's unlawful presence in the United States either in the context of: (1) exercising 287(g) authority when questioning passengers from suspected human smuggling load vehicles (i.e. Palmer); or (2) exercising 287(g) authority when determining unlawful presence (i.e., Madrid).  *United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000).  Such testimony, however, does **not** rise to the level of racially discriminatory intent, motive, purpose, or animus against Latinos to support a violation of the Equal Protection Clause.

First, such incidents **do not** constitute a policy, pervasive pattern, or deliberate plan. *Meehan v. Los Angeles County*, 856 F.2d 102, 107 (9th Cir. 1988) (two incidents not sufficient to establish custom); *see also Wilkins*, 2010 U.S. District LEXIS 843, 13-14 (same).  "Plaintiffs eventual burden in obtaining a permanent injunction against a state law enforcement agency is to establish more than repeated incidents of misconduct." *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992) *citing to Rizzo v. Goode*, 423 U.S. 362, 375 (1976) (violations must be a "a pervasive pattern… flowing from a deliberate plan by the named defendants" directed toward Plaintiffs or the class to which Plaintiffs belong); *see also Hodgers-Durgin*, 199 F.3d at 1044 (a single stop, even if discriminatory, does not alone provide sufficient evidence or a discriminatory policy to support an injunction).

Second, the testimony at trial shows that neither Sgt. Palmer nor Sgt. Madrid had the requisite racially discriminatory intent, motive, purpose, or animus against Latinos.  While it is MCSO policy never to use race for any purpose, it is undisputed that Sgts. Palmer and Madrid were specifically trained by ICE that, as 287(g) officers enforcing federal immigration law, they could use race or ethnicity as one of many factors in determining unlawful presence.  TT at 1831:13 to 1832:19.  ICE SAC Alonzo Pena testified to this fact.

---

[28]  TT at 1204:14-17 (Madrid - no use of race prior to putting on 287(g) hat);  TT at 715:17 to 717:4 (Palmer - no use of race in stopping vehicle);  TT at 753:7-16 (Palmer - no use of race as a factor in conducting traffic stops or making contacts); TT at 1015:7-11 (Sousa – race not used to make a law enforcement contact); TT at 1073:16-20 (Sousa - race played no role in any of his decisions as Lieutenant of HSU);  TT at 927:22 to 928:1 (Rangel – "race has nothing to do with" traffic stops); TT at 1359:21 to 1360:1-6 and 1364:24 to 1365:6 (Ratcliffe - race/ethnicity played no role in Rodriguez traffic stop); TT at 1436:1-15 (Beeks - race/ethnicity are not criteria for traffic stops, arrests, detentions, or any law enforcement decisions);  TT at 1485:4-9, 1487:4-8, and 1507:11-20 (Armendariz - race/ethnicity is never used or taught as a basis for a traffic stop, including during saturation patrols).

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

*Id*.  **They, therefore, could not and did not form the requisite discriminatory intent required for a violation of the 14th Amendment**.  *United States v. Lopez-Moreno*, 420 F.3d 420 (5th Cir. 2005) (racial profiling claim under Equal Protection Clause against police officer rejected despite officer's use of race during questioning of passengers of car in order to determine lawful presence because the use of race was not "driven by a discriminatory purpose."); *see also cf.  Charfauros v. Board of Elections*, 2001 U.S. App. LEXIS 15083 * 36 n. 11 (9th Cir. May 10, 2001) (advice of counsel is a defense to a § 1983 claim of violating the Equal Protection Clause because it negates the discriminatory intent element); *Jock v.  Ransom*, 2007 U.S. Dist. LEXIS 47027 *26-27 (N.D.N.Y. June 28, 2007) *citing to United States v. Beech-Nut Nutrition Corp*., 871 F.2d 1181 (2d Cir. 1989) (noting that, the "thrust" of the "advice of counsel defense" is "that the defendant, on the basis of counsel's advice believed his conduct to be lawful and thus could not be found to have had unlawful intent….").  Indeed, an "error or mistake in the application of the law [does not by itself] give rise to an equal protection claim."  *Ciechon v. City of Chicago*, 686 F.2d 511, 522 (7th Cir. 1982).[29]

### G.   Plaintiffs' Saturation Patrol Statistics Do Not Establish an Equal Protection Violation.

Nineteenth century American author and commentator Samuel Clemens, aka Mark Twain, once remarked that there are three kinds of lies; "Lies, damned lies, and statistics." [30] Not surprisingly, therefore, Plaintiffs rely heavily on Dr. Ralph Taylor's statistical opinions about saturation patrols in an effort to try to prove that an MCSO policy, pattern or practice had a discriminatory effect on Latinos and that Defendants had a racially discriminatory intent, purpose, motive, or animus toward Latinos.  That reliance is misplaced.

---

[29]   At page 25 of the Joint Pretrial Statement, Dkt#530, Defendants did <u>not</u> stipulate, and do not concede, that the consideration of race as one of many factors necessarily constitutes a *de facto* or *de jure* violation of the <u>Fourth Amendment</u> and warrants injunctive relief.  Rather, as the Ninth Circuit did in *Montero-Camargo*, this improper factor should be disregarded in the Court's assessment of reasonable suspicion, and the Court should determine whether the actions taken were justified based upon other factors constituting the totality of the circumstances.  To hold otherwise, would be contrary to the holding in *Montero-Camargo* and amount to a manifest injustice.  *Id*. at 1135 ("We decide no broad constitutional questions here.") and 1139-40 (rejecting race as a factor but considering other race neutral factors to decide whether reasonable suspicion existed to justify the traffic stop).

[30]   http://en.wikipedia.org/wiki/lies_damned_lies_and-statistics.  Twain attributed the quote to British Prime Minister Benjamin Disraeli (1804-1881).

First, assuming, *arguendo*, that Taylor's opinions are reliable, his conclusions remain non-dispositive.  An official policy, pattern, or practice is **not** unconstitutional solely because it has a racially disproportionate impact.  *Castaneda v. Partida*, 430 U.S. 482, 493 (1971).  The Supreme Court held long ago that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact."  *Vill. Of Arlington Heights*, 429 U.S. at 264-65.  An equal protection cause of action can only be based upon disparate treatment.  *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of invidious racial discrimination…..").  Moreover, only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation."  *McClesky*, 481 U.S. at 293 n.12.

Second, Taylor's findings are not reliable.  His methodology in reaching his conclusions was admittedly "quasi-experimental" in nature.  Dkt#453 at p. 170, ¶ 101.  As defense expert Dr. Stephen Camarota discussed in detail in his report (EX 402) as well as during his trial testimony, Taylor's proffered findings must be rejected because he relied on a defective, incomplete data set, made assumptions that introduced selection bias, and failed to control for relevant non-discriminatory factors.[31]

For his analysis, Taylor used MCSO CAD data, which is real-time radio dispatch data not subject to quality control.  TT at 69:2–9, 99:4-10, 116:16 to 117:15, 1265:18 to 1266:1, 1869:10–23.  Taylor acknowledged that his data set did <u>not</u> include traffic stops for which there was no radio call and that he did not know how many such stops occurred from 2007 through 2009.  TT at 117:9–15, 117:17–25.  Taylor testified that he did <u>not</u> control for the presence/absence of a driver's license, which could explain why a driver's name would not be checked over the radio.  TT at 117:9-15, 142:22-23, 189:8-16.  Taylor used this data even though it was not collected for the purpose of tracking names, the race or ethnicity of persons stopped by MCSO, and did not include records of race or ethnicity of persons stopped by MCSO.  TT at 81:21–24.

Taylor decided to utilize this data even though he knew that it did <u>not</u> contain any

---

[31] EX 402 at pp. 4-6, 23-35; TT at 1236:4 to 1238:5, 1240:1-11, 1252:9 to 1254:3, 1258:18 to 1262:7, 1262:17 to 1263:5, 1265:14 to  1272:17, 1274:11 to 1275:11, 1276:6 to 1277:7, 1278:12 to 1282:25, 1285:21 to 1286:17, and 1294:17 to 1298:23.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

information concerning relevant socio-economic factors, such as income, language, education, violating behavior, or driving behavior, and without making any effort to control for such potentially confounding variables.  TT at 165:19 to 167:15, 167:20 to 168:6, 175:14 to 180:10.  Taylor admitted his lack of understanding about numerous characteristics of the CAD data, and he admitted he never contacted MCSO CAD Coordinator Scott Jeffries to better understand the data before completing his study.  TT at 124:13 to 125:5, 132:7 to 138:19.

Third, Taylor failed to use all the CAD data available to him.  He limited his study to 2007-2009, thereby excluding 2005 and 2006.  TT at 58:15–18, 64:4-9.  He also limited his study to MCSO traffic incidents that had at least one name check, thereby **excluding thousands** of incidents not containing a name check.  TT at 75:11–19, 78:3–9, 141:18 to 143:10, 145:13 to 146:23, 1240:1–11.  Camarota testified that at least 30% of the CAD incidents do not have a name check associated with it.  TT at 1240:1–11; 1236:4 to 1238:4.  Taylor does not know whether the incidents not containing a name check involved a random distribution of persons with Hispanic and non-Hispanic surnames.  TT at 144:15–23, 147:2–22.  Therefore, he does not know with reasonable certainty whether the data's exclusion significantly impacted his analysis.  TT at 1252:9 to 1254:1.  He limited his study of name-check incidents to those with the final disposition of a traffic stop or traffic citation and then **omitted approximately 16,000 of those incidents**.  TT at 69:2–9, 75:11–19, 1270:10–24, 1272:10 to 1273:5.  In establishing his data universe of name check incidents with final disposition of a traffic stop or traffic citation, he excluded other types of name-check incidents initiated as traffic stops such as DUI and drug crimes that met his criteria.  TT at 114:1–16, 126:9–11, 129:4–7, 130:4–16, 139:9–21.  Taylor excluded incidents comprising approximately 20% of the available data and ***that he does not know the implications of the excluded data on his analysis***.  TT at 78:13–15, 111:13-18, 1898:1–7.

Fourth, Taylor limited his study of "Saturation Patrol Days" to 11 large operations, excluding numerous other operations involving HSU and smuggling interdiction components.  TT at 65:11-19; 67:4–18; 76:16 to 78:2, 159:14–21.  He did not test whether inclusion of these other operations/patrols would have changed his findings.  He limited his

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

study of "Saturation Patrol Day Active Officers" to MCSO deputies whose names were listed on a sign-in list or arrest list for a Saturation Patrol, but did not control for deputies who participated in a patrol but did not sign-in or make a listed arrest.  TT at 67:19 to 69:1, 1059:13–25.

Taylor's study of name checks made by "Saturation Patrol Day Active Officers" on "Saturation Patrol Days" constituted only 1.3% of name checks made by MCSO officers during his study period.  TT at 181:13 to 182:19.  The impact of confounding data and variables would be greatly magnified within the extremely small fraction of name checks identified by Taylor as having been made by these officers on these days.  TT at 180:12 to 182:14.  Taylor's focus on a mere 1.3% of names checked is extremely problematic given the much greater fraction of CAD data he excluded.  **Thirty-seven percent of available CAD data was excluded from Taylor's universe.**  TT at 1268:18 to 1273:5.  The fraction of missing data is so large in comparison to Taylor's focal point that ***the potential for selection bias is enormous*** and means that no fact finder could reasonably rely on Taylor's findings to infer disparate impact or disparate impact caused by racial animus.  TT at 1281:6 to 1282:3.  Indeed, seventy percent of the 1.3% involved deputies from two units:  HSU, which on regular assignment focuses on human smuggling crimes, and Lake Patrol, which on regular assignment focuses on boating and recreational area incidents.  TT at 183:24 to 185:12, 662:1-10, 989:14 to 990:8, 1355:21 to 1356:3, 1494:11 to 1497:4.  Lake Patrol's Non-Saturation Patrol baseline covers name checks in a district with significantly fewer Hispanics than more urban areas of Maricopa County.  EX 402, pp. 31-32; TT at 1278:24 to 1281:5.

Taylor did not test, and does not know, whether his saturation patrol findings would be the same if he excluded those two units from his data universe attributed to "Saturation Patrol Day" stops by "Saturation Patrol Day Active Officers" or if he controlled for objective non-racial variables (such as invalid license plate, heavily weighted vehicles, numerous occupants, darkly tinted windows, etc.) used by HSU officers in patrolling for, and interdicting, human smuggling load vehicles.  TT at 186:1–20, 924:10 to 928:23, 1199:6-15, 1886:7-9.  Taylor's explanation for not testing: he did not want to "run up more billable

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

hours." TT at 186:23 to 187:25, 1902:21 to 1905:25.  Taylor, therefore, never provided a "goodness of fit" statistic to the Court.  *Id.*

Fifth, Taylor's findings cannot support a reasonable inference of racially discriminatory purpose, intent, motive or animus.  In offering his findings, Taylor is comparing "Non Saturation Patrol Day" name-checks to "Saturation Patrol Day" name checks derived from his limited data universe.  TT at 60:1-10, 91:17–20.  In other words, "Non-Saturation Patrol Day" name-checks are the non-violative baseline/benchmark.  To the extent that a reasonable fact finder credits Taylor's data universe and findings to support an inference that there was a discriminatory effect on "*Saturation Patrol Days*," the fact finder also must adopt an equal and opposite inference that there was not a discriminatory effect on "*Non-Saturation Patrol Days,*" which **constitute approximately** ***96% of all name-check incidents* studied by Taylor.**  TT at 183:15 – 183:21.  **Accordingly, it would not be reasonable to infer an** ***agency-wide*** **policy, pattern and practice of racial discrimination based on only 4% of the incidents considered by Taylor.**

Further, Taylor's own findings show a mere four (4) percent difference between the Hispanic share of name checks on "Non-Saturation Patrol Days" (21.82%) and "Saturation Patrol Days" (25.80%).  TT at 161:3–25, 1880:6-19.  Such a small difference does not reasonably lead to the inference that there was intentional deputy racial animus on "Saturation Patrol Days."  Given the substantial margin of error intrinsic in any study of ethnicity gleaned from CAD data of names checked over the radio, the four percent difference reasonably could be explained by objective, non-racial variables that Taylor admitted he ignored such as poverty's effect, poor vehicle maintenance, language barriers to understanding traffic laws, etc.  The lack of probity of Taylor's findings is further exemplified by the fact that the number of names checked over the radio by Saturation Patrol Active Officers on a Saturation Patrol Day is only 1.3% of the total names checked by MCSO.  TT at 181:23 to 183:7.  A fact finder could not confidently draw reasonable conclusions regarding the policies and practices of MCSO based on this very small fraction of the name-check universe.  TT at 1281:6 to 1282:3.

Finally, even assuming, *arguendo*, that Taylor's analysis evidenced a longer duration

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

of traffic stops involving a name check of at least one Hispanic name, Plaintiffs have not established that the alleged 2.5 minute difference resulted from racial animus.  Although Taylor testified that it was important for the statistical validity of his analysis to control for other variables "so you can isolate the impact on the variable that's of key interest, which is at least one surname that was Hispanic" (TT at 105:5–9), he failed to control for common traffic stop variables such as the lack of a driver's license, the lack of Title 28 required identification, the radio checking of multiple sur-names, communication difficulties when a stop involves officer-citizen language barriers, or an MCSO deputy translating documents from English into Spanish as a matter of good community policing.  TT at 102:24 to 104:1, 697:16 to 698:11, 753:14 to 755:6, 173:9 to 176:14, 1515:7 to 1517:14 (Armendariz: no required license or ID takes greater time to authenticate person's identity), 1527:13-18 (Armendariz: translating documents into Spanish takes greater time).  Any combination of these objective, race-neutral factors can account for a 2.5 minute longer stop involving a Hispanic name check.

In summary, the testimony of Camarota and Taylor shows that Taylor's statistical data proves neither discriminatory effect on Latinos nor allows any reasonable inference that Defendants had a racially discriminatory intent, purpose, motive, or animus toward Latinos.

## II.   **CONCLUSION**

Based on the foregoing documentary and testimonial evidence presented at trial, the Defendants have not violated the Fourth and Fourteenth Amendment Rights of the named Plaintiffs or any class member.  The Court, therefore, should return a verdict in favor of Defendants and against the Plaintiffs and the class on their claims for relief.  The Court should also dismiss Mr. Melendres, Mr. Rodriguez, and Mrs. Rodriguez as named Plaintiffs and decertify or partially decertify the current class.

DATED this 9th day of August, 2012.

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

*/s/Timothy J. Casey*
Timothy J. Casey
James L. Williams
1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

1

Telephone: (602) 277-7000
Facsimile:(602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and the
Maricopa County Sheriff's Office

2

3

4

## CERTIFICATE OF SERVICE

5

6

        I hereby certify that on August 9, 2012, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
Notice of Electronic Filing to the following CM/ECF registrants:

7

8

9

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

10

11

12

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

13

14

15

16

Daniel Pochoda, Esq.
Annie Lai, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

17

18

19

Cecillia Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

20

21

22

23

Andre Segura, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Counsel for Plaintiffs

24

25

26

Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

27

28

Thomas P. Liddy
Deputy County Attorneys, Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

36

1  Phoenix, Arizona 85004
   Co-counsel for Defendants Joseph M. Arpaio and
2  the Maricopa County Sheriff's Office

3
     _/s/Eileen Henry_____
4  Eileen Henry, Paralegal
   SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation