Timothy J. Casey (#013492)
James L. Williams (#026402)
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile: (602) 277-8663
timcasey@azbarristers.com

Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Civil Services Division
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | No. CV 07-02513-PHX-GMS |
| Plaintiffs, | |
| vs. | **DEFENDANTS' RESPONSE IN REBUTTAL TO PLAINTIFFS' POST TRIAL BRIEF** |
| Joseph M. Arpaio, et al., | |
| Defendants. | |

Defendants submit the following Response in Rebuttal to Plaintiffs' Post Trial Brief. For the Court's convenience, the same abbreviations used in Defendants' Post Trial Brief (Dkt#562) are used in this Response.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION.

Plaintiffs' Brief argues that Defendants employ a policy, pattern, and practice of targeting Hispanics/Latinos and using race in forming reasonable suspicion during traffic stops, that Defendants initiate saturation patrols based on race-based requests from the public, and that Defendants improperly detain persons suspected of being illegally present in the United States. The trial evidence disproves Plaintiffs' arguments. Plaintiffs' now also attempt to avoid their burden of proving that Defendants acted with the required

1  discriminatory intent, purpose, motive, or animus in violation of the Fourteenth Amendment.
2  That attempt is legally and factually unsupportable.  Accordingly, the Court should return a
3  verdict in favor of Defendants and against Plaintiffs.

4  **II.    THE MCSO HAS NO POLICY, PATTERN, OR PRACTICE THAT
         VIOLATES THE FOURTEENTH AMENDMENT.**

5

6        **A.    The Statistical Evidence Establishes That No Discriminatory Policy,
              Pattern, or Practice of Targeting Latinos Occurred.**

7

8        Plaintiffs argue that Defendants' "crackdown" on illegal immigration, which was
9  announced in July 2007, resulted in the unlawful targeting of Latinos by conducting
10 saturation patrols beginning in September, 2007.  Dkt#564 at 1, 6, 8, 22.  However, despite
11 Plaintiffs' heavy reliance upon statistical evidence, Plaintiffs gloss over one undeniable truth
   from that evidence: there was **no increase in the Hispanic share of MCSO stops/name**
12 **checks from 2005 to 2009** as a result of Defendants' alleged 2007 "crackdown" or
13 otherwise.  EX 402 at 9, 36-37; TT at 1254:15 to 1255:19; 1257:14 to 1258:14.
14       This evidence is fatal to Plaintiffs' case.  *Chavez v. Ill. State Police*, 251 F.3d 612,
15 638 (7th Cir. 2001) ("parties may not prove discrimination merely by providing the court
16 with statistical analyses.  The statistics proffered must address the crucial question of
17 whether one class is being treated differently from another class that is otherwise similarly
18 situated").  This evidence does not rely upon external benchmarking,[1] which Plaintiffs'
19 expert Taylor repeatedly criticized.  TT 1330:18 to 1340:7; 1341:13 to 1342:13.  In fact,
20 Taylor was unable to rebut this evidence except to simply claim that it constituted "internal
21 comparisons" rather than "internal benchmarking."  TT 1879:7-18.
22       Taylor attempted to discount the use of *external* benchmarking,[2] which further

23

24 [1] Courts have used statistical benchmarking to establish a point of comparison in equal protection cases.  *See Chavez*,
   251 F.3d at 643- 645 (discussing use of benchmarks); *Cf., Georgia v. Ashcroft*, 539 U.S. 461, 469 (2003) (using
25 benchmarking for re-districting case); *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023, 1042-1045
   (Fed. Cir. 2008) (discussing benchmarking for small disadvantaged business case); *Navajo Nation v. Arizona Re-
26 Districting Commission*, 230 F.Supp2d 998, 1009 (D. Ariz. 2002) (discussing benchmarking in re-districting case).

27 [2] In light of Plaintiffs' response to the Court's inquiry about using non-saturation patrol days as a baseline (*see* Dkt#564
   at 24; TT 1931:25 to 1932:6), it appears that, with regard to non-saturation patrol days, Plaintiffs ask the Court to simply
28 accept Taylor's conclusions **without comparing them to a baseline or benchmark of any kind**– that is, to *assume*
   discriminatory effect on non-saturation patrol days and disregard relevant contrary evidence (i.e. Camarota's external

revealed that the share of Hispanic name checks during 2005-2009 did **not significantly and consistently exceed** the percentage of Hispanics in Maricopa County or Arizona.  EX 402 at 9 and 36; TT 1254:15 to 1256:25.  In fact, although the percentage of Hispanics in Maricopa County and Arizona *increased dramatically over this time period*, the percentage of Hispanic names checked by MCSO actually *did **not** increase* at all.  *Id.*

By employing percent-over-percent analyses (TT 161:3-25; 1880:6-19) and excluding entire years and categories of data that did not support Plaintiffs' Fourteenth Amendment case theory (*see* Dkt#562 at 31-34), Taylor attempted to convince the Court that MCSO traffic stop statistics proved the targeting of Latinos.  To the contrary, the reliable and pertinent statistics conclusively rebut Plaintiffs' theory that the MCSO's alleged "crackdown" in 2007 constituted the targeting of Latinos (i.e. <u>discriminatory intent/purpose</u>), **and** conclusively establish that no <u>discriminatory effect</u> has resulted from any policy, pattern or practice allegedly employed by Defendants during the relevant time period.  Additional flaws in Taylor's conclusions are detailed in Defendants' Brief.  Dkt#562 at 30-35.

In an effort to avoid proving that Defendants acted with the required discriminatory intent, purpose, motive or animus, Plaintiffs insinuate that Taylor's statistical analysis was "unrebutted" at trial.  Dkt#564 at 22.  Plaintiffs' subtlety in their insinuation is unsurprising given Defense expert Camarota's numerous criticisms of Taylor's analysis, and Taylor's admitted failure to account for multiple confounding factors and thousands of stop/name check incidences.[3]  Dkt#562 at 30-35.

**B.**    <u>**Plaintiffs' Brief Unfairly and Wrongly Skews the Trial Testimony.**</u>

    **1.**    <u>**Defendants Do Not Have a Policy, Pattern, or Practice of Using Race In Forming Reasonable Suspicion During Traffic Stops.**</u>

Plaintiffs argue that Defendants have a policy, pattern, or practice of using race in forming reasonable suspicion during traffic stops and, thereby, seek to be relieved of their

---

benchmarks).  Plaintiffs, again, are trying to dodge their burden of proving discriminatory effect.

[3] Camarota opined that Taylor's findings were derived from a data set that was incomplete and lacked quality control, that Taylor introduced selection bias, and that Taylor failed to control for numerous confounding variables.  Dkt#562 at 31-34.  Camarota thus opined that the Court should lack confidence in Taylor's findings and the inferences he desires the Court to draw.  *Id.*

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

burden of proving that Defendants acted with a discriminatory intent, purpose, motive or animus.  Dkt#564 at 2-3, 5.  Plaintiffs' legal argument is addressed in Section II. C., *infra*; however, the trial evidence establishes that Defendants have no such policy, pattern, or practice.

Plaintiffs first try to support their argument that the MCSO explicitly relies upon apparent Hispanic descent as an indicator *in immigration investigations* notwithstanding the October 2009 loss of its 287(g) certification with an isolated quote from the testimony of Lt. Sousa that MSCO officers who received 287(g) training cannot forget or "turn off" that ICE training.[4]  TT 1007:6-11; Dkt#564 at p.4, n.3.  To the contrary, Sousa's testimony directly rebuts Plaintiffs' contention.  When presented with Plaintiffs' sound bite regarding "turn[ing] off" ICE training, Sousa responded that "I had that conversation when I first came into the unit, whether we were using that part of the training that ICE gave us, and I was pretty sure we weren't" using race/ethnicity as one factor among others to determine alienage and stated that after his 2009 deposition he "spoke to my sergeants and my deputies and I questioned them, [a]re we using this part of the 287(g) training? And they said they weren't using that part of that training."  TT 1017:5-19.  Sousa further testified that "we were not using that part of the 287(g) training" and "[t]hat we don't use that indicator" and "we were not using that part of the training and that particular indicator," and that MCSO "sergeants and deputies had never used that indicator," even when they were acting pursuant to their 287(g) authority.  TT 1017:20 to 1018:8; 1018:23 to 1021:16.  Sousa further testified more generally that, following the revocation of 287(g) authority, the HSU "talked to the county attorney about how to proceed" and "**changed how we do business in the field 'cause we didn't have the 287(g) authority**."  TT 1006:23 to 1007:5.

Plaintiffs then cite portions of Sgt. Madrid's testimony to support the propositions that "MCSO relies on the ICE indicators to determine whom to hold pending contact with ICE" and that the MCSO "continues immigration investigations in the same way as before" its 287(g) authority was revoked.  Dkt#564 at p.4, n.3.  Once again, Madrid's testimony was

---

[4] Plaintiffs also cite paragraph 51 from section (C)(1) of the Final Pretrial Order which merely concerns the termination of the MCSO's 287(g) agreement.  It contains no statement regarding the use thereafter of ICE training regarding use of race or ethnicity.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

directly the opposite – that race is <u>not</u> used before a MCSO deputy invokes his 287(g) authority ("put[s] on his 287(g) hat") and that after MCSO's 287(g) authority was revoked deputies would <u>stop</u> at "the point where we would put that [287(g)] hat on."  TT 1204:14-17; 1205:10-21.  Madrid testified that MCSO deputies, in the absence of 287(g) authority, do **not** "look at the race or ethnicity of the driver or the passengers in the vehicle."  TT 1204:14 to 1205:25.  He further testified that race is **not** used by the MCSO to support reasonable suspicion or probable cause for Title 28 traffic violations or suspected human smuggling loads or for any other purpose.  TT 1198:23 to 1205:25.[5]

Next Plaintiffs cite a portion of Deputy Rangel's testimony to support the same proposition that "MCSO relies on the ICE indicators to determine whom to hold pending contact with ICE."  Dkt#564 at p.4, n.3.  There is **nothing**, however, in the cited testimony (TT 958:23 to 959:14) that supports the proposition.  Rangel's testimony is directly contrary to Plaintiffs' proposition.  TT 926:8 to 928:1 ("Race has nothing to do with this"); TT 931:2-13 (race and nationality play no role in determining whether to ask passengers for identification).  The testimony of other deputies is in accord.

Deputy Armendariz testified that he did not at any time during his career at MCSO use race/ethnicity of either a driver or passenger as part of his decision to stop a vehicle, including during saturation patrols, and that he did not at any time while he was a 287(g) officer use race or ethnicity as a factor, even among others, to determine whether someone was unlawfully present in the United States.  TT 1487:4-17.  Armendariz further testified that he has never considered the race/ethnicity of a passenger or driver in deciding whether to stop a vehicle, detain a person, or initiate questioning of a person during a saturation patrol.  TT 1507:11-20.

Deputy Beeks testified that race and ethnicity are not "criteria… for any criminal

---

[5]  The evidence shows that the MCSO does **not** use race/ethnicity as an indicator or factor to make vehicle stops under Arizona law.  *See, e.g.*, TT at 273:10-17 (DiPietro), TT at 1171:10-18, 1204:2-17 (Madrid), TT at 715:17-19; 749:22 to 750:2 (Palmer), TT at 927:9 to 928:1, 931:11-13 (Rangel), TT at 1436:1-15 (Beeks), TT at 1485:4-9 (Armendariz).  Traffic stops are made only on probable cause or reasonable suspicion that the motor vehicle code or equipment code was violated.  *Id*.  Indeed, the evidence shows that as to the named Plaintiffs and one of the testifying class members, the involved MCSO deputies could not even see the race/ethnicity of the drivers or passengers before making the traffic stops.  TT 1604:1-3 (Gamboa); TT at 574:20-25, 576:18 to 577:1 (Kikes); TT at 1359:21 to 1360:1 (Ratcliffe); TT at 245:13-15; 261:24 to 262:6 (DiPietro).  As such, Defendants submit that Maricopa County residents are entitled to learn whether the MCSO conducts traffic stops of Latinos for "driving while brown" as argued by Plaintiffs.

decisions that are made," including charging a person with a crime, making a traffic stop, detaining a person, arresting someone, or "for any decision." TT 1436:1-15. He also testified that he was instructed during saturation patrols that "there would be no stops based upon… race or ethnicity" and that "race, ethnicity, would not be a factor in making that decision" as to which vehicles to stop. TT 1472:7 to 1473:3.

Sgt. Palmer testified that, although ICE taught MCSO deputies "that race could be a factor, among others, but standing alone and by itself was not a factor for contact," MCSO adopted a different policy of not using race/ethnicity in determining whether to make a contact or initiate an investigation. TT 676:4–15; EX 68, 69. Palmer testified that he and Madrid regularly, on saturation patrols and in general, instructed deputies not to use race/ethnicity and that this instruction was given before every saturation patrol, in addition to the admonition being included in the operations plan. TT 776:6-21.

Plaintiffs inexplicably argue that "[t]he **only factor** deputies have to guide their discretion" when **identifying profile vehicles** and conducting immigration enforcement pursuant to their 287(g) authority "is **race**." Dkt#564 at p. 14-15 (emphasis added). In light of the overwhelming testimony to the contrary, including the testimony cited above, it is not surprising that **Plaintiffs offer no citation to the record to support this outrageous argument**.[6] Deputies described numerous other indicia of profile vehicles and, as discussed above, repeatedly stated that race/ethnicity played no part in that analysis. TT 925:3 to 928:1 (Rangel described race-neutral human smuggling indicators and stated "Race has nothing to do with this"); TT 1199:6 to 1204:13 (Madrid described race-neutral human smuggling indicators and that stated race was not a part of that analysis).[7] The trial evidence, therefore, simply does not establish a policy, pattern, or practice of Defendants' relying upon race when making law enforcement decisions, including in forming reasonable suspicion of immigration or human smuggling violations.

---

[6] Plaintiffs cite EX 328, which does not even remotely support the use of race as a factor in identifying profile vehicles, let alone, "the only factor" as Plaintiffs argue.

[7] Plaintiffs also assert that MCSO's statement that it "look[ed] for suspected illegal immigrants… would be tantamount to an admission of racial profiling." Dkt#564 at 14. Plaintiffs, once again, provide **no citation or authority** to support their argument that a law enforcement agency cannot look for suspected illegals aliens without racially profiling and *a fortiori* that ICE racially profiles (as do all other law enforcement agencies formerly 287(g) certified and trained by ICE).

To the extent Plaintiffs argue that the actions of one or two MCSO deputies constitute a policy, pattern or practice, Plaintiffs are incorrect as a matter of law. *Meehan v. Los Angeles County*, 856 F.2d 102 (9th Cir. 1988) (two incidents not sufficient to establish a custom); *Davis v. Ellensburg*, 869 F.2d 1230 (9th Cir. 1989) (manner of one arrest insufficient to establish policy); *Wilkins v. City of Tempe*, 2010 U.S. Dist. LEXIS 843, 13-14 (D. Ariz. Jan. 5, 2010) (citing *Meehan* and *Davis* for the foregoing propositions in assessing discriminatory purpose); *Chavez*, 251 F.3d at 646 (testimony by officer who "had nothing to do with the stops of" the plaintiff that "sometimes race is an indicator to keep in mind" does not "demonstrate discriminatory intent"); *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992) (citing *Rizzo v. Goode*, 423 U.S. 362, 367-69, 375 (1976)) (as many as nineteen constitutional violations in one year by only a small percentage of the officers does not warrant injunctive relief absent showing that the misconduct flowed from a policy, plan, or a pervasive pattern of misconduct reflecting a departmental policy that was causally linked to such officers). Not surprisingly, "**[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee.**" *Davis*, 869 F.2d at 1233-34 (emphasis added) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)); *see also Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 878-880 (1984) (*quoting NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 934 (1982) ("statistical evidence, buttressed by expert testimony and anecdotal evidence by three individual employees… was not sufficient to support the finding of a pattern of bank-wide discrimination… a 'court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees.'… Conversely, a piece of fruit may well be bruised without being rotten to the core.").

## 2.   Defendants Do Not Initiate Saturation Patrols Based On Race-Based Requests From the Public.

Plaintiffs next argue that Defendants initiate saturation patrols based on race-based requests from members of the public. Dkt#564 at 6-11. First, they argue that a November 20, 2005 letter (a/k/a EX 385) received by Arpaio **almost two years before** the MCSO even

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

began saturation patrols motivated Arpaio to announce a "crackdown on illegal immigration" in July 2007.  Dkt#564 at 6; EX 385(the 11/20/05 letter), EX 328 (an MCSO press release). There is, however, no evidence: (a) that this 2005 letter was a motivating factor for the initiation of saturation patrols in 2007; or (b) that EX 328, when it mentions "hear[ing] the people speak," is referring to the 2005 letter (EX 385) or to any letter/communication from the public that is based on race and provides no evidence of possible criminal activity. Indeed, the evidence proves the contrary.  Dkt#562 at 26 ("Not a single citizen letter received by Arpaio ever resulted in the planning or initiation of a saturation patrol."); *see also* TT 481:1 to 484:15 (Arpaio places no law enforcement value on letters before circulating them to the appropriate staff to assess the information and decide how to respond); TT 529:20-23 (Arpaio has not used race or ethnicity in any aspect of his decision making from 2007 to the present).

Plaintiffs similarly attempt to convince the Court that the "requests by members of the public" mentioned in MCSO press releases must have been the few arguably "racially-motivated requests" that described no criminal conduct and that were actually the letters selected by Plaintiffs.  Dkt#564 at 6.  Once again, the overwhelming evidence establishes that Defendants do **not** act in response to such communications.  TT 390:16 to 392:20 (Arpaio testified that MCSO does **not** act upon race-based reports that describe no criminal activity and that MCSO investigates reports of crime to determine whether they are valid); TT 427:11-18 (same); TT 430:10–22 (same); TT 446:25 to 447:4 (same); TT 525:21 to 526:24 (same); TT 535:4–10 (same); TT 395:21-397:6 (Arpaio testified that MCSO did **not** conduct saturation patrols in response to citizen letters about day labors but instead in response to independently confirmed reports finding "criminal activity"); TT 428:20-22 (same); TT 407:25 to 408:14 (Arpaio testified that MCSO does **not** act on public information provided via MCSO's hotline that does not refer to criminal activity); TT 481:15 to 482:20 (same); TT 420:20 to 421:1 (Arpaio testified that MCSO conducts saturation patrols "when we have evidence of crimes being" committed); TT 789:23 to 790:2 (Sands testified that saturation patrols are launched in response to crime, not in response to day laborers); TT 791:16-22 (Sands testified that he "look[s] into the validity of information" received from

citizens regarding possible crimes); TT 794:6-12 (Sands testified that MCSO did **not** conduct saturation patrols due to citizen complaints that did not describe a potential violation of the law); TT 863:18 to 864:19 (same); TT 813:9-14 (Sands: "People just don't get crime suppression operations just because they request one"); TT 814:16 to 815:1 (Sands has **never** decided the location of a saturation patrol "based on anything other than crime-related activities"); TT 1038:15 to 1039:3 (Sousa testified that citizen tips that describe merely racial characteristics do **not** prompt law enforcement action); TT 1081:4 to 1082:4 (same).

The testimony also made clear that large-scale saturation patrols take 30 to 60 days to plan, but Plaintiffs still claim that citizen letters received by anywhere from zero (0) to nine (9) days earlier somehow prompted the MCSO to plan, prepare, and conduct a large-scale saturation patrol in record time.  TT 867:18 to 869:7; 393:1-14.  Plaintiffs also argue that an isolated citizen letter prompted saturation patrols that actually occurred between nine (9) months to nearly two (2) years later.  TT 409:23 to 411:5; Dkt#564 at 6; EX 385, EX 328. Plaintiffs' claim defies both the record evidence and logistical common sense.

### 3.    Plaintiffs Misstate Additional Testimony and Exhibits.

First, Plaintiffs attempt to discount as "purported" the fact that ICE trained MCSO deputies who were 287(g) certified that race could be used as one factor among others in immigration enforcement.  Dkt#564 at 4.  The fact that ICE did so, however, is not a "purported" fact.  It is, instead, an undisputed and indisputable fact.  TT 1831:13 to 1832:19; EX 69.[8]

Second, Plaintiffs attempt to rebut the defense testimony that the racial/ethnic composition of MCSO saturation patrol arrest lists was not a concern given the nature of the criminal charge by labeling the testimony "nonsensical" and creating a "straw man" type of argument.  Dkt#564 at 18.  This attempt misses the point of the cited testimony.  The point of the cited testimony is not that the criminal statute was race-neutral **but that the deputy's determination of <u>whether a law had been violated</u> was undoubtedly race neutral**.  TT

---

[8]  The Court noted in pertinent part: "I will tell you Agent Pena's testimony today I think we hear clearly ICE say, or an ICE officer say, that race could be considered as a factor among other factors in certain contexts…." TT at 1927:20-23. The ICE training, whether right or wrong under Ninth Circuit law, goes directly to whether Plaintiffs can prove the discriminatory intent, purpose, motive, or animus element of their Fourteenth Amendment claim.  *See* Dkt#562 at 29:18 to 30:14.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

741:8 to 743:2 (Palmer: arrest for outstanding warrant is race-neutral because pre-existence of warrant is independent of person's race/ethnicity); TT 1184:8-22 (Madrid: driving on a suspended license is race-neutral because a pre-existing suspension of a license is independent of the person's race/ethnicity).  As former Dallas Police Chief Click attempted to explain to Plaintiffs' counsel at trial, "the crime would apply regardless.  If you stop somebody for drunk driving, it doesn't make any difference what race or ethnicity they are."  TT 1763:10-13.

Third, Plaintiffs take unwarranted liberties with the facts concerning the stops of the named Plaintiffs.  In regards to the Melendres stop, Plaintiffs state that "[w]hile not issuing a citation to the Caucasian driver, [DiPietro] detained the Latino passengers… for further investigation into their immigration status."  Dkt#564 at p. 26.  It is undisputed, however, that DiPietro **did not release the driver <u>until</u>** he was notified by Rangel that MCSO no longer suspected the passengers of being involved in human smuggling.  TT 267:9 to 269:10.

Regarding the Rodriguez stop, Plaintiffs inexplicably state "it is clear that Deputy Ratcliffe was aware of Mr. Rodriguez's race <u>and nothing more</u> when he made the decision to give Mr. Rodriguez a citation.  Dkt#564 at p. 26 (emphasis added).   In fact, Ratcliffe testified that Mr. Rodriguez' race played no role in his citation issuance decision.  TT at 1360:2-6.  Plaintiffs' argument that Ratcliffe "was aware of… nothing more" at that time simply defies logic and ignores the entirety of his testimony concerning the stop.  It is undisputed that Ratcliffe was aware that Mr. Rodriguez violated the law by driving on a closed road and that he had done so with his children in the car and had thereby endangered them.  TT 1356:12 to 1357:3; 1359:9-14.

Finally, regarding the Meraz/Nieto stop, Plaintiffs argue that Nieto and Meraz were "pursued by multiple MCSO units… at gunpoint so that officers could check Mr. Nieto's identification" although "Mr. Nieto and Ms. Meraz had committed 'no crime.'"  Dkt#564 at 27.  There are at least three key problems with this argument.  First, there is **no trial testimony** whatsoever that the stop of the Meraz/Nieto vehicle was conducted so that deputies could check Nieto's identification.  Second, the standard for conducting such a stop is not whether the detainee has committed a crime but whether there is **reasonable suspicion**

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

that a crime has been or is being committed.  Dkt#562 at 15-17.  Third, as detailed by the testimony of Armendariz, Beeks, and Kikes, the aggressive and belligerent actions of Meraz and Nieto during Armendariz' separate traffic stop, the urgency of Armendariz' request for backup in response to their actions, Nieto's hasty departure from the gas station, and Nieto's repeated non-compliance with lawful commands more than justified the traffic stop.

### C.      Plaintiffs Must Prove That Defendants Acted With Discriminatory Intent.

Plaintiffs stipulated they must prove discriminatory intent to prevail on their racial profiling claim.  TT 1924:24 to 1925:7.  The Court also determined in a prior Order that, in order to obtain injunctive relief, Plaintiffs must show that Defendants' "misconduct 'is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorized by department policy makers.'"  Dkt#494 at 27.  Unable to meet this burden, Plaintiffs now seek to avoid it.  Plaintiffs argue that Defendants employ a policy, pattern, or practice of "rel[ying] explicitly on racial classifications in law enforcement decisions" -- which Defendants do not -- and that this relieves Plaintiffs from proving Defendants were motivated by a discriminatory intent, purpose, motive, or animus.  Dkt#564 at 2-4.

Plaintiffs' argument is mistaken for a number of reasons.  First, this case does not involve the sort of expressly race-based "classification" (i.e., a statute expressly treating persons differently based solely upon their race) that would trigger the cases cited by Plaintiffs.  As set forth in Section II.B., *supra*, Defendants **do not** employ a policy, pattern, or practice of stopping, detaining, or arresting persons solely because they are Hispanic.  "In the rare case, where the effect of government action is a pattern 'unexplainable on grounds other than race,' … *it was the presumed **racial purpose of state action**… that was the constitutional violation."  Miller v. Johnson*, 515 U.S. 900, 913 (1995) (emphasis added). "Patterns of discrimination as conspicuous as these are rare…. *Id*. at 913-14.

Second, in support of their argument Plaintiffs rely on a portion of a footnote in *Wayte v. United States*, 470 U.S. 598, 609 n.10 (1985) that is expressly dicta.  After discussing the plaintiff's burden of establishing discriminatory purpose and effect, for example, the Court actually held in footnote 10 that no "**overtly discriminatory classification**… **is presented here, for petitioner cannot argue that the passive policy discriminated on its face.**"

11

*Wayte* at 610 (emphasis added) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)).

Third, the *Wayte* Court's citing to *Strauder* evinces the Court's intent in referring to "overtly discriminatory classification." *Id. Strauder* concerned a West Virginia statute that expressly provided that only "white male persons" could serve on juries. *Strauder*, 100 U.S. at 305. Strauder, an African-American man charged with murder, alleged the statute violated the Equal Protection Clause. *Id.* at 304. The Court agreed, holding that the statute *expressly* and *necessarily* discriminated against *all* African-Americans *as a class* and, therefore, violated the Fourteenth Amendment. *Id.* at 308-10.

Fourth, Plaintiffs' argument that the Ninth Circuit's ruling in *United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) "relied on equal protection principles" is mistaken. Dkt#564 at 3. Plaintiffs admit that "*Montero-Camargo* was a Fourth Amendment case." *Id.* The Ninth Circuit simply quoted from two Supreme Court cases and immediately followed its brief discussion of those cases with its clear limitation that "[w]e decide no broad constitutional questions here." 208 F.3d at 1135. The Ninth Circuit then proceeded to uphold the traffic stop at issue despite the officer admittedly having made the traffic stop in *express* reliance upon race/ethnicity because other race neutral factors justified the stop. *Id.* at 1139-40.

Both of the Supreme Court cases cited in *Montero-Camargo*, like *Strauder*, concerned a law that provided that a person's race *expressly* and *necessarily* determined a certain outcome. The first of these cases, *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 270-71 (1986), concerned a remedial/reverse discrimination quota involving public school teacher layoffs to maintain an express racial quota. The second case, *Fullilove v. Klutznick*, 448 U.S. 448, 453 (1980), was another remedial/reverse discrimination decision concerning a facial challenge to a law requiring that "10% of the federal funds granted for local public works projects must be used… to procure services or supplies from businesses owned and controlled by members of statutorily identified minority groups."

Not only is the remedial/reverse discrimination rationale of *Wygant* and *Fullilove* inapplicable to this litigation, this Court is not faced with evidence of anything remotely approaching the fact patterns set forth in *Strauder*, *Wygant*, or *Fullilove* where a law

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

1
2
3
4
5
6

*expressly* provided that person's race *necessarily* determines a certain outcome.  *See, e.g.,*
*Miller*, 515 U.S. at 904 (citing *Wygant* for the proposition that "[l]aws classifying citizens on
the basis of race cannot be upheld unless they are narrowly tailored to achieving a
compelling state interest") (emphasis added).  Finally, Plaintiffs' reliance upon *Hirabayashi*
*v. United States*, 320 U.S. 81 (1943) is likewise unavailing.   That case similarly concerned
federal legislation imposing a curfew only upon persons of Japanese ancestry.  *Id*. at 100.

7
8
9
10

      Plaintiffs' argument is not on solid factual or legal footing.  Indeed, they essentially
ask this Court to expand existing law, and create new law, to support their Fourteenth
Amendment racial profiling claim.  As a consequence, the Court should not relieve Plaintiffs
of their burden of proving that Defendants acted with discriminatory intent, purpose, motive,
or animus.

11
12
13

**III.    THE MCSO HAS NO POLICY, PATTERN, OR PRACTICE THAT**
**VIOLATES THE FOURTH AMENDMENT OR THE COURT'S**
**INJUNCTION.**

14
15

      **A.    Defendants' Race-Neutral Requests For Identification Do Not Violate the**
           **Fourth Amendment or the Court's Injunction.**

16
17
18
19
20
21
22
23
24
25
26
27

      As a matter of officer safety, some MCSO deputies testified that they ask all
passengers, regardless of race/ethnicity, to voluntarily provide identification.  TT 931:2 to
931:13,  944:9 to 946:15 (Rangel testified he always asks passengers for identification
because, as a matter of officer safety, he wants to know who he is dealing with on a traffic
stop, he has cleared arrest warrants doing so,  he does not consider the race/ethnicity of the
passenger in deciding to ask for identification, and he releases the person if no record of the
person's identity can be found); TT 1518:14 to 1521:8, 1521:25 to 1526:3 (Armendariz
testified he asks all passengers, regardless of race/ethnicity, for voluntary identification, it is
"typical" for law enforcement officers to do this, and the passenger may refuse to provide
identification but that a person who voluntarily provides an identity that cannot be verified
through a broad database search is temporarily detained upon reasonable suspicion of
providing false identification to the officer); TT 1586:10 to 1587:24 (recounting Caucasian
passenger providing false name to avoid being apprehended).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs argue that a request for voluntary identification necessarily constitutes "an unreasonable seizure without any reasonable suspicion of criminal activity."  Dkt#564 at 32. Plaintiffs are wrong.  "[B]ecause passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well."  *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (*citing Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997); *United States v. Jenson*, 462 F.3d 399, 403-04 (5th Cir. 2006); *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989).

"Asking questions is an essential part of police investigations.  **In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment**."  *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004) (emphasis added).  "Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."  *Id*. (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984) ("our recent decision in *Royer*, *supra*, plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.")); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("mere police questioning [regarding identification] does not constitute a seizure unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop"); *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (*Muehler* applies equally to traffic stops); *Florida. v. Bostick*, 501 U.S. 429, 438 (U.S. 1991) ("bus passenger's decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant only if the cooperation is voluntary.").

**A police officer may lawfully conduct a check on the passenger using the identification provided by the passenger**.  *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1153 (9th Cir. 2007) ("there is no constitutional basis for complaint when the police properly obtain information located in a driver's license or state ID card, and then use it to access additional… information about the document's owner."); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500-501 (4th Cir. 2007) ("request for identification from passengers

14

falls within purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event.").

**Plaintiffs presented no evidence at trial that an identity request and check prolonged any traffic stop**.  On the other hand, Armendariz testified that, absent probable cause or reasonable suspicion to detain a passenger, passengers are <u>released once the citation of the driver is completed</u>.  TT 1513:21to 1515:5; 1521:13 to 1522:8.  Once a deputy reasonably believes that the passenger has provided false information to the officer in violation of Arizona law,[9] a reasonable detention of the individual is justified independent of the initial traffic stop.  *Rice*, 483 F.3d at 1081 (where result of identity search revealed no records associated with the name provided, the officer "considered this information unusual because '[u]sually somebody has a record of some sort'" and officer's "inference that the passenger's desire to conceal her identity was somehow related to the activities of the car's three occupants was justified, and our case law supports such an inference."); *see also United States v. Berber-Tinoco*, 510 F.3d 1083, 1088 (9th Cir. 2007) (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (when the evidence "seems equally capable of supporting an innocent explanation as a reasonable suspicion... the Supreme Court directs us to give due weight to the factual inferences drawn by law enforcement officers").

Plaintiffs also incorrectly state -- and without a supporting citation -- that this voluntary identification procedure "springs out of MCSO's focus on immigration enforcement," presumably relating to Plaintiffs' Fourteenth Amendment argument.  Dkt#564 at 32.  To the contrary, for example, Armendariz testified that this was his general practice, whether on regular patrol or a saturation patrol, and that this practice pre-dated his assignment to the HSU.  TT 1546:3-20.  The decisional law cited above by Defendants confirms Armendariz' experience that this practice is "typical" among law enforcement officers.  TT 1516:20; 1520:14.

### B.  Defendants Do Not Prolong Stops to Investigate Illegal Presence.

Plaintiffs argue that Defendants presently extend traffic stops solely on suspicion of a

---

[9] A.R.S. §§ 28-1595 and 28-3169 make it unlawful to fail or refuse to provide to an officer a driver's license that contains certain information about the driver.  A.R.S.  28-1595; TT 1506:6-16.  A.R.S. § 13-2907.01 makes it unlawful for a person to knowingly make a false statement to an officer, and A.R.S. §§ 13-2510, 2511 and 2512 make it unlawful to knowingly conceal the identity of another person with the intent to hinder apprehension or prosecution of such person.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

person's unlawful presence.  Dkt#564 at 28-31.  The evidence does **not** support this argument.  **No MCSO deputy** testified that he presently detains persons based on the knowledge or reasonable belief, without more, that the person is unlawfully present in the United States, or that he has done so since the October 2009 revocation of MCSO's 287(g) authority, or since the Court's December 23, 2011 injunction.

The deputies testified that they "no longer conduct investigations regarding alienage" and, upon developing knowledge or reasonable suspicion of unlawful presence and absent any reasonable suspicion of a violation of state law, they would contact ICE **for ICE to advise MCSO whether or not ICE desires for the person to be detained**.  TT 1205:22 to 1208:13 (Madrid); 1225:17 to 1226:23 (Madrid); 701:18 to 702:2 (Palmer).  All four portions of the testimony cited by Plaintiffs in support of their argument state that the MCSO simply **contacts ICE**.  TT 502:12-24 (Arpaio: "We call ICE."); 698:8-11 (Palmer: "contact… an ICE agent."); 1161:18-19 (Madrid: "we would make a call to ICE and let them make that determination."); 1226:8-11 (Madrid: "they have to call ICE.").

What Plaintiffs appear to argue is that Defendants _may not ever contact ICE_ about a person reasonably suspected to be unlawfully present in the country.  That argument is rejected by Plaintiffs in their own Opening Statement ("This case is … not about immigration policy.  Our goal here is not to impede enforcement of the immigration laws.").  TT at 38:21-23.  The argument also is contrary to _Arizona v. United States_, 132 S. Ct. 2492, 2507 (2012).  "The **accepted way** to perform these status checks is to **contact ICE**, which maintains a database of immigration records."  (emphasis added).  "Congress has done nothing to suggest it is inappropriate to **communicate with ICE** in these situations, however.  Indeed, it has encouraged the **sharing of information about possible immigration violations**."  _Id_. (citing 8 U. S. C. § 1357(g) (10)(A)) (emphasis added).  "The federal scheme thus leaves room for a policy requiring state officials to **contact ICE** as a routine matter."  _Id_. (emphasis added).  "The first sentence of § 2(B) instructs officers to make a 'reasonable' **attempt to verify his immigration status with ICE** if there is reasonable suspicion that his presence in the United States is unlawful."  _Id_. (emphasis

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

added).[10]

There is no evidence that the MCSO has initiated, or is initiating, traffic stops based solely on reasonable suspicion or knowledge of unlawful presence. There likewise is no evidence that the MCSO is prolonging lawfully made traffic stops on those occasions when a deputy contacts ICE. There is no evidence that the MCSO is "holding aliens in custody for possible unlawful presence **without federal direction and supervision**." *Id.* at 2509. Indeed, MCSO's first action upon developing knowledge or reasonable suspicion of unlawful presence is to contact ICE for it to advise MCSO whether or not it desires for the person to be detained. TT 1205:22 to 1208:13; 1225:17 to 1226:23; 701:18 to 702:2. Accordingly, the MCSO immediately contacting ICE about a person reasonably believed to be illegally present in the United States does not constitute a violation of the Fourth Amendment or the Court's injunction.[11]

## IV.   CONCLUSION

The evidence shows that Defendants have not violated Plaintiffs' Fourth or Fourteenth Amendment rights, and the Court should return a verdict in favor of Defendants.

DATED this 16th day of August, 2012.

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

*/s/Timothy J. Casey*
Timothy J. Casey
James L. Williams
1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014

---

[10]  As mentioned already, Plaintiffs presented no evidence at trial that an identity request/check prolonged any traffic stop. Importantly, Plaintiffs further failed to offer any evidence that MCSO contacting ICE about any persons believed to be unlawfully present after October 2009 (i.e., after the termination of the MCSO's field 287(g) authority) resulted in any prolonged detention of any person. This failure is not surprising. "ICE's Law Enforcement Support Center operates '24 hours a day, seven days a week, 365 days a year' and provides, among other things, 'immigration status, identity information and real-time assistance to local, state and federal law enforcement agencies.'" *Arizona*, 132 S. Ct. at 2508 (citations omitted).

[11]  For the reasons discussed in Section II., *supra*, concerning Plaintiffs' Fourteenth Amendment claims, Plaintiffs cannot prevail on their Title VI claim. Title VI authorizes a private right of action only in cases involving intentional discrimination and extends no further than the Fourteenth Amendment. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *United States v. Fordice*, 505 U.S. 717, 732 n.7 (1992). Plaintiffs' new "heritage" theory based on the testimony of one deputy again relies upon a myopic and self-serving understanding of that deputy's testimony. Dkt#564 at 35. Deputy Ratcliffe's testimony expressly concerned the former 287(g) program (TT 1374:19), and it is undisputed that the MCSO no longer conducts investigations regarding alienage because it lacks such authority. TT 1205:22-25. Plaintiffs' Title VI claim fails as does their Fourteenth Amendment claim.

Telephone: (602) 277-7000
Facsimile:(602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and the
Maricopa County Sheriff's Office

Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Civil Services Division
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

Daniel Pochoda, Esq.
Annie Lai, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

Cecillia Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

Andre Segura, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Counsel for Plaintiffs

Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

Thomas P. Liddy
Deputy County Attorneys, Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100
Phoenix, Arizona 85004
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office


*/s/Eileen Henry*
Eileen Henry, Paralegal
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation