1    COVINGTON & BURLING LLP
     333 Twin Dolphin Drive
2    Suite 700
     Redwood Shores, CA 94065-1418
3    Telephone: (650) 632-4700
     Facsimile: (650) 632-4800
4
     Stanley Young (*Pro Hac Vice*)
5    syoung@cov.com
     Andrew Byrnes (*Pro Hac Vice*)
6    abyrnes@cov.com

7    *Attorneys for Plaintiffs (Additional attorneys
     for Plaintiffs listed on next pages)*
8

9                    UNITED STATES DISTRICT COURT

10                        DISTRICT OF ARIZONA

11

12   Manuel de Jesus Ortega Melendres, et.          No. CV 07-2513-PHX-GMS
     al.,
13
             Plaintiffs,                            **RESPONSE TO DEFENDANTS'
14                                                  POST-TRIAL BRIEF**
             v.
15
     Joseph M. Arpaio, et al.,
16
             Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

1

*Additional Attorneys for Plaintiffs:*

2

COVINGTON & BURLING LLP

3

One Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000

4

Facsimile: (415) 591-6091

5

Tammy Albarrán (*Pro Hac Vice*)
talbarran@cov.com

6

Lesli Gallagher (*Pro Hac Vice*)
lgallagher@cov.com

7

David Hults (*Pro Hac Vice*)
dhults@cov.com

8

ACLU FOUNDATION OF ARIZONA

9

3707 N. 7th St., Ste. 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854

10

Facsimile: (602) 650-1376

11

Daniel Pochoda (021979)
dpochoda@acluaz.org

12

James Lyall
jlyall@acluaz.org

13

14

Anne Lai (*Pro Hac Vice*)
annie.lai@yale.edu

15

16 Lyon St. Fl. 2
New Haven, CT 06511
Telephone: (203) 432-3928

16

Facsimile: (203) 432-1426

17

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

18

39 Drumm Street

19

San Francisco, California 94111
Telephone: (415) 343-0775

20

Facsimile: (415) 395-0950

21

Cecillia D. Wang (*Pro Hac Vice*)
cwang@aclu.org

22

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

23

IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 17th Floor

24

New York, NY 10004
Telephone: (212) 549-2676

25

Facsimile: (212) 549-2654

26

Andre Segura (*Pro Hac Vice*)
asegura@aclu.org

27

28

RESPONSE TO DEFENDANTS' POST-TRIAL BRIEF
No. CV 07-2513-PHX-GMS

1    MEXICAN AMERICAN LEGAL DEFENSE
     AND EDUCATIONAL FUND
2    634 South Spring Street, 11th Floor
     Los Angeles, California 90014
3    Telephone: (213) 629-2512 x121
     Facsimile: (213) 629-0266
4
     Nancy Ramirez (*Pro Hac Vice*)
5    nramirez@maldef.org

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................... 1

II.    DEFENDANTS DO NOT DISPUTE THAT THEY RELY ON RACE
       WHEN FORMING REASONABLE SUSPICION DURING
       IMMIGRATION INVESTIGATIONS. ................................................... 1

III.   DEFENDANTS MISCHARACTERIZE THE REQUIREMENT OF
       DISCRIMINATORY INTENT .............................................................. 3

IV.    MCSO DECISION-MAKERS ACT WITH DISCRIMINATORY
       INTENT. ................................................................................................ 4

V.     THE RECORD ESTABLISHES THAT THE MCSO COMMITTED
       CONSTITUTIONAL VIOLATIONS DURING THE INDIVIDUAL
       STOPS. .................................................................................................. 9

       a.     Stop of Manuel de Jesus Ortega Melendres ................................. 9

       b.     Stop of David and Jessika Rodriguez ........................................ 11

       c.     Stop of Manuel Nieto and Velia Meraz ..................................... 12

       d.     Stops of Additional Class Members ........................................... 15

VI.    PLAINTIFFS HAVE CONCLUSIVE EVIDENCE OF
       DISCRIMINATORY EFFECT, AND DEFENDANTS' EFFORTS TO
       REBUT THAT EVIDENCE ARE UNPERSUASIVE. ......................... 16

VII.   CONCLUSION .................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ali v. Hickman*,
  584 F.3d 1174 (9th Cir. 2009) ...................................................................... 4

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) .................................................................... 1, 9

*Charfauros v. Bd. of Elections*,
  249 F.3d 941 (9th Cir. 2001) ...................................................................... 3

*Ciechon v. City of Chicago*,
  686 F.2d 511 (7th Cir. 1982) ...................................................................... 3

*De La Cruz v. Tormey*,
  582 F.2d 45 (9th Cir. 1978) ........................................................................ 4

*Doe v. Vill. of Mamaroneck*,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) .................................................... 6, 8

*Garza v. County of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) ...................................................................... 4

*Gebray v. Portland Int'l Airport*,
  No. CV-01-755-ST, 2001 U.S. Dist. LEXIS 22747 (D. Or. Dec. 21, 2001) ................ 3

*Guardians Ass'n. v. Civil Serv. Comm'n of New York City*,
  463 U.S. 582 (1983) .................................................................................... 3

*Hodgers-Durgin v. De La Vina*,
  199 F.3d 1037 (9th Cir. 1999) (en banc) .................................................. 15

*Jock v. Ransom*,
  No. 7:05-cv-1108, 2007 WL 1879717 (N.D.N.Y. June 28, 2007) ................ 3

*Johnson v. California*,
  542 U.S. 499 (2005) .................................................................................... 1

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .................................................................. 3-4

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................................. 15

*Md. State Conference of NAACP Branches v. Md. Dept. of State Police*,
    72 F. Supp. 2d 560 (D. Md. 1999) ................................................................ 12

*Meehan v. County of Los Angeles*,
    856 F.2d 102 (9th Cir. 1988) ....................................................................... 2

*Members of Bridgeport Hous. Auth. Police Force v. City of Bridgeport*,
    85 F.R.D. 624 (D. Conn. 1980) ................................................................... 2

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005) ..................................................................... 1

*Meyers v. Bd. of Educ. of San Juan Sch. Dist.*,
    905 F. Supp. 1544 (D. Utah 1995) ............................................................... 4

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) ..................................................................................... 15

*Moeller v. Taco Bell Corp.*,
    816 F. Supp. 2d 831 (N.D. Cal. 2011) ....................................................... 15

*Ortega-Melendres v. Arpaio*,
    836 F. Supp. 2d 959 (D. Ariz. 2011) ..................................................... 5, 15

*Pierce v. County of Orange*,
    526 F.3d 1190 (9th Cir. 2008) ................................................................... 15

*Thomas v. County of Los Angeles*,
    978 F.2d 504 (9th Cir. 1993) ....................................................................... 2

*United States v. Del Vizo*,
    918 F.2d 821 (9th Cir. 1990) ..................................................................... 15

*United States v. Lopez-Moreno*,
    420 F.3d 420 (5th Cir. 2005) ....................................................................... 3

*United States v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) ............................................................... 2, 10

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d. Cir. 1987) ..................................................................... 5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................................... 4

*Washington v. Davis*,
    426 U.S. 229 (1976) ..................................................................................... 4

*Wayte v. United States*,
    470 U.S. 598, 608 (1985)............................................................................................ 2

*Whren v. United States*,
    517 U.S. 806, 813 (1996 ............................................................................................ 3

*Zeigler v. Town of Kent*,
    258 F. Supp. 2d 49 (D. Conn. 2003)........................................................................ 9

**OTHER AUTHORITIES**

*Black's Law Dictionary* (8th ed. 2004) .......................................................................... 3

## I.     INTRODUCTION

In its zeal to apprehend illegal immigrants, the Maricopa County Sheriff's Office (MCSO) improperly makes Hispanic ethnicity a criterion for decision-making throughout its ranks. Defendants have failed to show that their saturation patrols are based on any meaningful criminal analysis; instead, the record demonstrates that Sheriff Arpaio and the MCSO take action in response to constituent complaints that are based on race. Defendants have also been unable to justify their more general practice of relying on race in immigration investigations and on traffic stops conducted by MCSO officers. As set forth in greater detail in Plaintiffs' Post-Trial Brief, MCSO leadership refuses to implement basic measures to detect and put an end to racial profiling in the agency. Injunctive relief is necessary to prevent further harm to the class.

## II.     DEFENDANTS DO NOT DISPUTE THAT THEY RELY ON RACE WHEN FORMING REASONABLE SUSPICION DURING IMMIGRATION INVESTIGATIONS.

Defendants do not contest that: (1) the MCSO expressly considers apparent Hispanic descent in determining whether reasonable suspicion exists to initiate an immigration investigation; (2) as shown through their in-court admissions and public statements, MCSO supervisors and command staff, including Sheriff Arpaio, approve of this practice; and (3) this practice continues in the MCSO to this day. *Compare* Pls.' Post-Trial Br. ("Pls.' Br.") at 2-4 *with* Defs.' Post-Trial Br. ("Defs.' Br.") at 28-30.

Defendants claim the testimony of Human Smuggling Unit ("HSU") supervisors about deputies' reliance on race does not suffice to establish a policy warranting injunctive relief. *See* Defs.' Br. at 29. However, uncontested evidence shows the MCSO maintains an officially-sanctioned practice of using race as a factor in immigration-related investigations. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) ("'standard operating procedure' of the local government entity" can establish a policy or custom) (internal citation omitted); *see generally Armstrong v. Davis*, 275 F.3d 849, 861(9th Cir. 2001), *abrogated in part on other grounds by Johnson v. California*, 542 U.S. 499, 504-05 (2005).

First, Plaintiffs have established that this widespread practice was approved by officers up the chain of command. The two HSU supervising sergeants, Sergeants Palmer and Madrid, testified that race or ethnicity could be used by their deputies. *See* Pls.' Br. at 3; *see also, e.g.*, Trial Transcript ("Tr.") 716:20-717:4 (Palmer) ("MCSO policy" permitted officers to "initiate an investigation during a stop based on race or ethnicity, among other factors"); Tr. 725:8-726:21 (affirming testimony from *October 23, 2009* that race may be used as a factor). Their testimony establishes that they approve the use of race and ethnicity by officers and have never criticized anyone for relying on apparent Hispanic descent to develop reasonable suspicion of an immigration violation. *See* Pls.' Br. at 3. The use of an individual's ethnic appearance in immigration investigations has also been endorsed by Sheriff Arpaio—the MCSO's final policymaker. *Id*. at 3-4.[1]

Defendants claim that this discriminatory practice is part of their ICE training and is not attributable to the discriminatory intent of MCSO personnel. Defs.' Br. at 29-30. But "a showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification." *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985). This is because "[d]e jure discrimination . . . is by nature intentional . . . ." *Members of Bridgeport Hous. Auth. Police Force v. City of Bridgeport*, 85 F.R.D. 624, 644 (D. Conn. 1980).[2] Further, reliance—in good faith or not—on a

---

[1] Defendants cite *Meehan v. County of Los Angeles*, 856 F.2d 102 (9th Cir. 1988), which held that isolated incidents were insufficient to demonstrate a policy and practice, but in that case, there was no proof that the policy-maker approved of the practice. *Id.* at 107. They also rely on *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1993), but that case found that evidence did not support the district court's conclusion that there was "a direct link between departmental policy makers, who tacitly authorize deputies' unconstitutional behavior and the injuries suffered . . . ." *Id.* at 509. Here, individuals in supervisory and policy-making positions have *stated* that the MCSO relies on Mexican appearance in investigations. *See* Pls.' Br. at 2-4.

[2] The Ninth Circuit has held that Hispanic appearance is of such limited value that it may not be considered at all in immigration investigations. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1132, 1135 (9th Cir. 2000) (en banc). Defendants attempt to backtrack from their stipulation on this point, Defs.' Br. at 30 n.29, but Ninth Circuit caselaw is clear: the use of race, even as one of several factors, in making a stop or detention, is offensive to equal protection principles. *See* Pls.' Br. at 2-3. The use of race (continued…)

mistaken understanding of the law is no defense in a suit for injunctive relief. *See* Pls.'

Br. at 4. The cases cited by Defendants, *see* Defs.' Br. at 30, are inapposite.[3]

Defendants' witnesses confirmed the MCSO's explicitly race-based practices in

this regard are continuing. *See* Pls.' Br. at 4 n.3. The Court should enjoin these practices.

## III.   DEFENDANTS MISCHARACTERIZE THE REQUIREMENT OF DISCRIMINATORY INTENT.

As to other, purportedly race-neutral practices, to prove a Fourteenth Amendment

violation, Plaintiffs need only prove that Defendants purposefully intend to treat persons

differently based on their race. Pls.' Br. at 5. Cases cited by Defendants that use the

words "animus" or "invidious"[4] merely refer to an intent to make distinctions based on

race, and not some notion of racial hatred or malice. *See Gebray v. Portland Int'l*

*Airport*, No. CV-01-755-ST, 2001 U.S. Dist. LEXIS 22747, at *11 (D. Or. Dec. 21,

2001) (citing to *Guardians Ass'n. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582,

584 (1983), which used discriminatory "animus" and "intent" interchangeably in the

context of evaluating a Title VI claim); *Lee v. City of Los Angeles*, 250 F.3d 668, 687

---

among other factors does not necessarily implicate the Fourth Amendment, so long as
there is an otherwise valid basis for the seizure, *see Whren v. United States*, 517 U.S.
806, 813 (1996), but Plaintiffs do not dispute that point.

[3] *See, e.g.*, *Charfauros v. Bd. of Elections*, 249 F.3d 941, 954 (9th Cir. 2001) (monetary
damages case considering, but rejecting, qualified immunity; finding that even if counsel
was consulted, "a reasonable Board nevertheless would have known that the
discriminatory . . . process employed would violate the Equal Protection Clause[]"); *see
also Jock v. Ransom*, No. 7:05-cv-1108, 2007 WL 1879717 (N.D.N.Y. June 28, 2007)
(evaluating a defense based on advice of counsel). Here, Defendants have not alleged
any reliance on advice of counsel, and even assuming such were the case, a reasonable
officer would know that use of a racial classification in making detentions is
unconstitutional. *United States v. Lopez-Moreno*, 420 F.3d 420 (5th Cir. 2005) and
*Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982) are also inapplicable because
they did not involve any explicit use of a racial classification in law enforcement.

[4] Black's Law Dictionary defines animus as meaning "ill will" *or* "*intention*," the latter
definition having been omitted by Defendants. *See Black's Law Dictionary* 97 (8th ed.
2004). *Cf.* Defs.' Br. at 3 n.1. The entry for "invidious discrimination" in Black's Law
Dictionary also does not state that hatred or ill will is required. *See Black's Law
Dictionary* 500, 846 (8th ed. 2004).

(9th Cir. 2001) (using "animus" interchangeably with discriminatory intent or purpose, i.e., more than a foreseeably disproportionate impact); *Meyers v. Bd. of Educ. of San Juan Sch. Dist.,* 905 F. Supp. 1544, 1572-73 (D. Utah 1995) (not mentioning animus at all); *De La Cruz v. Tormey*, 582 F.2d 45, 51 (9th Cir. 1978) (relying on *Washington v. Davis*, 426 U.S. 229 (1976), and *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), for intent standard).

Courts regularly hold that the government acted with discriminatory intent without a finding of racial hatred or governmental ill will. *See, e.g., Ali v. Hickman*, 584 F.3d 1174, 1182 (9th Cir. 2009) (finding that a prosecutor had a discriminatory purpose in striking a potential juror but not finding that the prosecutor held ill will towards the potential juror because of her race). The MCSO's policy and practice of taking action in response to expressions of private prejudice, for example, is sufficient to demonstrate discriminatory intent. Pls.' Br. at 6-7; *see also Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (upholding district court's finding that the County engaged in intentional discrimination because although "the Supervisors appear to have acted primarily on the political instinct of self-preservation . . . they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this . . . .") (internal quotation omitted). As discussed below, Plaintiffs have amply shown that Sheriff Arpaio and the MCSO act with discriminatory intent.

## IV.   MCSO DECISION-MAKERS ACT WITH DISCRIMINATORY INTENT.

Defendants argue that the planning of saturation patrols and Sheriff Arpaio's public statements do not evince discriminatory intent against Latinos. *Cf.* Defs.' Br. at 20-28. These arguments lack merit. First, with respect to saturation patrol planning, Defendants admit the MCSO has launched saturation patrols in response to constituent requests. Tr. 809:13-15 (Sands). They acknowledge that some saturation patrols result from complaints about Latino day laborers. *See* Pls.' Br. at 7-11; *see also, e.g.*, Exs. 126, 129, 202, 235, 307, 308, 310, 311, 455; Tr. 398:6-17, 434:20-435:4, 435:16-18 (Arpaio);

Tr. 795:11-25 (Sands); Tr. 1217:14-18, 1219:8-22 (Madrid). Further, Chief Sands and Sheriff Arpaio review racially-inspired constituent requests, including requests about day laborers, in planning for saturation patrols. *See* Pls.' Br. at 7-11; *see also, e.g.*, Exs. 223, 237, 244; Tr. 411:9-16, 412:1-3, 416:12-417:11, 428:12-14, 430:2-5 (Arpaio).[5] This evidence and the additional adverse inferences on which the Court may rely, *see* Final Pretrial Order, Mar. 26, 2012, Dkt. No. 530 ("PTO") (C.)(2.)(c.)-(e.), establish that MCSO decision-makers plan saturation patrols by relying on constituent requests that are explicitly or implicitly based on race and do not describe criminal activity. Such reliance shows a discriminatory purpose. *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224-26 (2d. Cir. 1987); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 987-88 (D. Ariz. 2011).[6]

Defendants do not address all of the numerous examples of Sheriff Arpaio forwarding racially charged constituent complaints to command staff and indicating his desire that his staff do something about such complaints, including by using them in planning operations. Nor do Defendants dispute the Sheriff's contemporaneous statements declaring that operations are conducted in response to such complaints. Pls.' Br. at 8-11. Defendants argue instead that Chief Sands, not Sheriff Arpaio, selects the locations for the patrols. Defs.' Br. at 26. However, Chief Sands acknowledges that he

---

[5] Incredibly, Defendants assert that not a single citizen letter influenced the Sheriff's law enforcement decisions. Defs.' Br. at 26. The evidence shows otherwise. The Sheriff admitted that he wrote, for example, "[w]e should have a meeting internally and decide how to respond" and "[f]or our operation" on constituent requests and that he forwarded those requests to his staff. *See* Ex. 385; Tr. 327:14-329:11; Ex. 237; Tr. 428:14-430:22. Chief Sands admitted that Sheriff Arpaio made saturation patrol suggestions, that the suggestions may have been in response to the public, and that the suggestions were followed. Tr. 809:9-810:9, 893:8-24. The MCSO's press releases confirm that saturation patrols resulted from constituent complaints, including those about Hispanic day laborers. *See, e.g.*, Exs. 307, 308, 310, 311.

[6] Defendants' counsel suggests that the "rampant" problems at the border offer a "race-neutral" rationale for the MCSO's decisions. Defs.' Br. at 21. But the question is not whether a reasonable law enforcement agency *could* have opposed illegal immigration for race-neutral reasons. It is whether *this* agency took action based on race. Defendants' contemporaneous statements and records show that the MCSO did act based at least in part on racial motivations. Pls.' Br. at 5-7. Counsel's statements to this effect are therefore not relevant.

does what he can to respond to constituent complaints that the Sheriff forwards to him, Tr. 810:24-811:3, and that he takes his direction from the Sheriff. Tr. 809:20-810:9, 893:8-894:3. The record thus belies Defendants' assertion that not a single one of the constituent requests "ever resulted in [the MCSO] planning or initiating a saturation patrol . . . ." *Cf.* Defs.' Br. at 26.

Defendant's assertion that Chief Sands selects saturation patrol sites based on factors *other than* baseless constituent complaints is unsupported by the record. *Cf.* Defs.' Br. at 27. When asked what types of information would prompt the MCSO to conduct a patrol at trial, Chief Sands did not mention crime history and statistics. *See* Tr. 871:11-20; *cf.* Defs.' Br. at 27.[7] Chief Sands claimed that the operations may be conducted in response to local officials, but he did not provide any specific example of the MCSO corroborating that local officials were reporting actual crimes and not the mere presence of Hispanic day laborers. *See* Tr. 871:11-16.[8] Moreover, the record shows that some operations, such as the Queen Creek patrol, were based on constituent requests forwarded by Town officials about the mere presence of Hispanic day laborers. *See* Pls.' Br. at 8-9. Chief Sands acknowledged relying on constituent complaints but did not identify a specific instance in which the MCSO attempted to corroborate that a constituent complaint involved a crime. *Cf.* Tr. 872:9-873:24, 876:3-10; *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 531, 554 (S.D.N.Y. 2006). Descriptions of alleged crimes in complaints that Defendants mention, Defs.' Br. at 28 n.27, do not hold up to

_____

[7] Defendants cite Chief Sands' deposition testimony, Defs.' Br. at 28, but the evidence at trial does not support their argument. Chief Sands confirmed at trial that he typically does not do a comparative crime analysis across different geographical areas and that he might not use crime data to launch a patrol at all. Tr. 787:24-789:22. If any crime statistics are pulled, they would be attached to the operations plans. Tr. 789:10-13 (Sands). Chief Sands' testimony that there was a drop house problem that left "[n]o city [] unaffected," Tr. 871:21-872:7, does not explain why the MCSO decided to do a patrol in any particular area.

[8] Sheriff Arpaio claimed that a legislator request for an operation in Mesa was investigated, Tr. 534:11-535:10, but he failed to provide any specifics. The operations plan for that patrol makes no mention of an investigation, and contained no comparative crime analysis. Ex. 91; *see also* Pls.' Br. at 10-11.

1    scrutiny, and the MCSO's operations (like those in Queen Creek) routinely resulted in

2    arrests for civil immigration violations, rather than for the supposed crimes. *See* Pls.' Br.

3    at 8-11; Tr. 843:8-844:5 (Sands).[9] Defendants have failed to come forward with any

4    other constituent complaints to which they were supposedly responding that actually

5    contain useful criminal intelligence. Chief Sands' self-serving statements should thus not

6    be given weight.[10]

7         Defendants claim that the Sheriff is "disconnected" from MCSO operations,

8    Defs.' Br. at 24-25, but the evidence refutes that claim. Sheriff Arpaio sets policy for the

9    MCSO, Tr. 414:19-22 (Arpaio), and has been directly involved in implementing that

10   policy. *See, e.g.*, Tr. 806:16-23 (Sands); Tr. 1133:6-12, 1133:25-1135:3 (Madrid); Tr.

11   663:3-15 (Palmer). MCSO command staff testified that they understand what the Sheriff

12   wants them to do. *See, e.g.*, Tr. 893:15-24 (Sands); Tr. 992:8-993:5 (Sousa). The

13   Sheriff's statements to the public and the directives to his office are closely aligned. *See*,

14   *e.g.*, Tr. 529:8-14 (Arpaio). MCSO staff are well aware of the Sheriff's public comments

15   and attend his press briefings. *See, e.g.*, Tr. 1133:16-20 (Madrid); Tr. 663:11-12

16   (Palmer); Tr. 891:10-892:3 (Sands).

17        Defendants attempt to explain away or dismiss some of Sheriff Arpaio's

18   statements, specifically: that undocumented persons have "certain appearances";[11] that

19   _____

20   [9] *See also, e.g.*, Tr. 388:6-393:3 (Sheriff Arpaio unable to say whether complaint
     regarding day laborers in Queen Creek describes any crime); Tr. 792:11-793:5 (Chief
21   Sands admitting there were no individuals in the Cave Creek saturation patrol charged
     with loitering or obstructing traffic); Tr. 794:3-5, 796:1-20 (Chief Sands admitting there
22   were no individuals arrested for urinating and not being able to say whether anyone was
     cited for any of the other activities that allegedly led to the complaints that prompted the
     36th and Thomas saturation patrol).
23
     [10] Chief Sands testified that the MCSO did "knock and talks" at apartments near the
24   church in the Cave Creek operation because of reports about warrants, Tr. 877:1-16, but
     Deputy Rangel, who was actually part of the operation, confirmed that HSU was
25   investigating day laborers who lived there. Tr. 908:12-909:11 (Rangel). Chief Sands also
     claimed that saturation patrols are not directed at illegal immigration, even though they
26   plainly are. *See* Pls.' Br. at 12-14. His credibility is therefore in question.

27   [11] Sheriff Arpaio's testimony at trial, that "certain appearances" was in reference to
     individuals hiking through the desert, Defs' Br. at 23, directly contradicts his deposition
28   testimony, Tr. 360:24-361:11 (referring to skin color), and should not be given weight.

1  undocumented persons could be investigated based on what they "look like";[12] and that

2  it was an honor to be called "KKK."[13] These attempts are unpersuasive. In fact, the

3  Sheriff's statements clearly demonstrate discriminatory intent. Sheriff Arpaio holds

4  media interviews and issues press releases in which he uses camouflaged racial

5  expressions and conflates Mexican or Hispanic ancestry with illegal immigration status.

6  *See, e.g.*, Exs. 410B, 410C, 184, 308, 310.[14] The Sheriff also stated in his deposition that

7  it would not bother him if he were racially profiled. Tr. 469:6-18.

8       Perhaps most absurd is Defendants' suggestion that excerpts from Sheriff

9  Arpaio's book, *Joe's Law,* discussing Mexican-Americans do not suggest discriminatory

10  intent. *Cf.* Defs.' Br. at 22-23; *see* Ex. 396; Tr. 348:17-352:11. The Sheriff did extensive

11  book signings and approved the book's publication, *see* Tr. 348:17-356:5, and several

12  passages describe the Sheriff's own family, not his co-author's. *See* Tr. 348:23-349:9.

13  The book concerns the Sheriff's actions in his official capacity, and he admits that

14  readers attribute the views in his book to him. Tr. 352:12-14, 355:14-356:24.[15]  In sum,

15  the evidence amply demonstrates that the MCSO decision-makers possess the requisite

16  discriminatory intent.

17

18

_____

19  [12] The Sheriff said that his office could determine whether someone was in the country
illegally if they "look like they just came from another country," Tr. 361:12-366:5—a
20  practice that is unconstitutional for the reasons discussed in Section II, *supra.* The
Sheriff admitted to implementing that practice during questioning by his own lawyer.
21  *See* Tr. 501:23-502:24.

22  [13] Regardless of whether Sheriff Arpaio genuinely believes it is an honor to be called
KKK, *see* Tr. 357:4-358:21, the most important point is that it is reasonable to infer the
23  Sheriff's public statements on national television affect the culture of the MCSO in a
way that makes differential treatment based on race seem permissible.

24  [14] *See also Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006)
(concluding that hostility displayed by town officials towards day laborers is evidence of
25  racism in discriminatory purpose analysis). Further, Sheriff Arpaio kept numerous
constituent letters containing explicit and camouflaged racial sentiments, some of them
26  calling specifically for the Sheriff's Office to racially profile, and circulated them to his
command staff. Pls.' Br. at 7 n.5.

27  [15] The Sheriff's testimony on this point at trial is in contradiction with his deposition
testimony and lacks credibility. *Cf.* Tr. 355:14-356:24.

28

**V.    THE RECORD ESTABLISHES THAT THE MCSO COMMITTED CONSTITUTIONAL VIOLATIONS DURING THE INDIVIDUAL STOPS.**

Plaintiffs have proven that the MCSO has an agency-wide policy, pattern, and practice of (1) relying on race as an indicator of unlawful status during immigration investigations, Pls.' Br. at 2-4; (2) initiating saturation patrols, large and small, in response to racially-charged constituent requests that describe no criminal activity, Pls.' Br. at 5-11; and (3) instituting a policy of targeting Hispanics on traffic stops, Pls.' Br. at 11-22. Plaintiffs are entitled to an injunction on those bases, since members of the class, including named Plaintiffs, face a realistic threat of future harm as a result of these on-going policies. *See Armstrong*, 275 F.3d at 861. The record *also* contains evidence that shows that the deputies who were involved in the stops of the named Plaintiffs and testifying class members acted with discriminatory intent and violated the Fourteenth and Fourth Amendment rights of those stopped. The self-serving statements from the officers that they did not racially profile have little probative value. *See, e.g.*, *Zeigler v. Town of Kent*, 258 F. Supp. 2d 49, 56 (D. Conn. 2003) (giving little weight to affidavits denying racial motivation).

    *a.    Stop of Manuel de Jesus Ortega Melendres*

It is undisputed that Mr. Ortega Melendres was stopped and investigated on September 27, 2007 because he appeared to be a Hispanic day laborer. *See* Tr. 250:3-13 (DiPietro). Defendants claim that Mr. Ortega Melendres could not have been a victim of racial profiling because Deputy DiPietro did not know the race of the passengers before he stopped the vehicle for speeding. Defs.' Br. at 5. This misses the point. The only reason Deputy DiPietro made the stop in the first place is that he was directed to do so after a surveillance unit had spotted Latino men getting into the vehicle. Tr. 240:20-242:16 (DiPietro). Permitting Defendants to escape liability for this clear case of racial profiling simply because the officer who made the stop was ordered to do so by others would provide agencies carte blanche to profile so long as they simply divide tasks among officers. This cannot be the rule.

Once Deputy DiPietro had the vehicle stopped, he then *detained* the passengers so that an HSU officer could come and conduct an immigration check. Tr. 256:9-18 (DiPietro). He did this without reasonable suspicion of any violation of the law, in violation of the Fourth Amendment. Pls.' Br. at 30-31.[16] Instead, Deputy DiPietro detained the passengers because they fit his profile of an "illegal" immigrant. Tr. 295:11-18 (Dipietro).[17] Meanwhile, the white driver of the vehicle was not cited for speeding, and he was permitted to leave.[18]

After Deputy DiPietro detained Mr. Ortega Melendres, Deputy Rangel arrested him for allegedly being "out of status." Tr. 913:18-915:19, 937:18-938:4 (Rangel). However, contrary to Defendants' contention, Defs.' Br. at 7, Mr. Melendres was not out of status because, as ICE determined, he had a valid I-94 on his person and there was no evidence he was going to work. Ex. 1093.

Moreover, discriminatory intent infused the operation that resulted in Mr. Ortega Melendres's arrest. The goal of the operation that day was to rid the area of Hispanic day laborers by effectuating immigration arrests. Tr. 908:3-11 (Rangel). An undercover operation had revealed no information about human smuggling in the area. *See* Ex. 122.

---

[16] That Deputy DiPietro was "unable to articulate at deposition or trial all the facts that led to his conclusion that he had reasonable suspicion," Defs.' Br. at 5 & 6 n.5, does not excuse Defendants from having to justify Mr. Ortega Melendres' detention based on specific and articulable facts. *See, e.g., Montero-Camargo*, 208 F.3d at 1129. By this statement, Defendants effectively concede that DiPietro had no reasonable suspicion.

[17] It is not normally Deputy DiPietro's practice to request passengers' identification on a traffic stop absent reasonable suspicion of a violation of the law. Tr. 306:8-25 (DiPietro).

[18] During trial, Deputy DiPietro testified that he only released the driver once the HSU deputy gave him authority to do so. Tr. 246:7-247:5 (DiPietro). Defendants claim that the driver was held until he could be cleared of suspicion of human smuggling. Defs.' Br. at 6 n.5. But Deputy DiPietro testified at his deposition that, after receiving a warning from Deputy DiPietro, the driver was "free to leave the traffic stop at that time." Tr. 320:17-322:3 (DiPietro). Deputy DiPietro's trial testimony therefore should be discredited. Deputy Rangel admitted that no one from HSU even talked to the driver. Tr. 910:8-18 (Rangel).  In short, the white driver was not investigated for smuggling at all and was released after a mere warning for the speeding violation that served as a pretext for the detention and investigation of the Hispanic passengers.

1    It was not suspicion of smuggling, but the Hispanic ethnicity of the passengers, that led

2    the HSU to direct Deputy DiPietro to find a pretext to stop the car.

3          *b.    Stop of David and Jessika Rodriguez*

4          The Rodriguez stop also shows differential treatment based on race. On

5    December 7, 2007, David Rodriguez, who is Hispanic, Tr. 210:22-23 (Rodriguez), was

6    stopped by Deputy Ratcliffe, asked for his Social Security card, Tr. 213:17-214:1,

7    225:17-23 (Rodriguez), asked for his Social Security number, Tr. 214:17-19

8    (Rodriguez); Tr. 1371:23-1372:4 (Ratcliffe), and given a citation, Tr. 216:5-8

9    (Rodriguez). Other drivers, who were white, were not issued citations despite being

10   stopped for driving on the exact same stretch of road at the same time as Mr. Rodriguez.

11   Tr. 217:21-218:1 (Rodriguez); Ex. 51 (CAD record showing other individuals were not

12   cited). Although there was no saturation patrol in progress that day, Deputy Ratcliffe had

13   participated in saturation patrols on other days, Tr. 1368:1-3, and was aware of the

14   MCSO's goal of making a large number of immigration-related arrests by targeting

15   Latino drivers.[19]

16         Deputy Ratcliffe's assertion that he did not see or know Mr. Rodriguez's race or

17   ethnicity before stopping his vehicle, Tr. 1359:21-23, is not credible. Deputy Ratcliffe

18   admitted that the driver drove towards him (permitting him to see the driver) before

19   making a U-turn and heading back up the road. Tr. 1371:14-17. Also, Deputy Ratcliffe

20   testified that he had decided, before he walked up to the vehicle, to give Mr. Rodriguez a

21   ticket for driving on the closed road, Tr. 1370:22-1371:3, and that he decided to issue the

22   citation because he believed Mr. Rodriguez was putting his children in harm's way by

23   _____

24   [19] Notably, the same Deputy Ratcliffe stopped class member and witness David Vasquez
     during the June 26, 2008 saturation patrol in Mesa, purportedly for a crack in his

25   windshield. Tr. 198:18-22, 201:1-6 (Vasquez). The first question Deputy Ratcliffe asked
     Mr. Vasquez after stopping him was whether Vasquez spoke English. Tr. 200:15-19

26   (Vasquez). When it became clear that Mr. Vasquez spoke perfect English, and after
     Deputy Ratcliffe checked out his documentation, Vasquez was released without any

27   citation. Tr. 200:20-201:6 (Vasquez). Despite the fact that Deputy Ratcliffe appeared at
     trial, he did not contest Mr. Vasquez's description of that stop.

28

driving down to the lake. Tr. 1359:9-14. But this is a fabrication, as Deputy Ratcliffe could not see the children in the vehicle before he approached it. *See* Tr. 1371:4-13 (Ratcliffe).[20]

Deputy Ratcliffe's other purported justifications are also not credible. Defendants claim that Deputy Ratcliffe asked for Social Security information because the citation form includes a space for it. Defs.' Br. at 9. But military status is also a blank on the form and Deputy Ratcliffe did not ask Mr. Rodriguez about that. Ex. 1006 (citation showing box for military status left blank); Tr. 1371:23-1372:7.

Defendants attempt to argue that Mr. Rodriguez no longer has standing to sue for injunctive relief because he has not been stopped since the incident in 2007 and believes that he can avoid being stopped by driving extremely carefully when he notices a police vehicle in the area. Defs.' Br. at 11. But whether Mr. Rodriguez subjectively believes he can avoid a future stop does not remove the threat of future harm where the evidence indicates that the MCSO has a policy, pattern or practice of targeting Latino drivers, including Mr. Rodriguez, for traffic stops using the pretext of minor equipment violations. *See* Pls.' Br. at 34-35; *Md. State Conference of NAACP Branches v. Md. Dept. of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999).

   c.   *Stop of Manuel Nieto and Velia Meraz*

On March 28, 2008, during one of the MCSO's large-scale saturation patrols, siblings and Plaintiffs Manuel Nieto and Velia Meraz were stopped on the way back to their family's auto repair shop after they had left a gas station just a few hundred feet down the road. Tr. 628:14-629:7, 631:21-632:23 (Nieto); Tr. 1459:15-17 (Beeks). They had been ordered to leave the gas station by Deputy Armendariz, who was at the time

---

[20] Defendants also state that Mrs. Rodriguez told Deputy Ratcliffe that he was engaging in "selective enforcement" by issuing her husband a traffic citation when non-Hispanic drivers were not cited, but Deputy Ratcliffe had no recollection of that conversation at trial, admitting that his memory of the events that day was not very accurate. Tr. 1372:15-1373:3.

conducting a traffic stop of two other individuals. Tr. 1518:3-19, 1527:19-24, 1537:17-21 (Armendariz).

Defendants failed to provide a single justification for stopping or using force against Mr. Nieto and Ms. Meraz. Indeed, the accounts of the MCSO officers involved directly contradict each other on critical points. Deputy Armendariz insists that he sent backup units after Plaintiffs in order to investigate them for being "disorderly" and "aggressive," even though they had already left the station and could not have posed a danger to himself or his detainees. Tr. 1537:22-1538:8 (Armendariz). There was no reason to follow, stop, or detain Mr. Nieto and Ms. Meraz, much less subject them to the use of force, as demonstrated by the fact that deputies who stopped them asked them no questions pertaining to any criminal investigation and left the scene without further action once they knew that Mr. Nieto and Ms. Meraz were citizens. Tr. 635:1-11 (Nieto); 653:18-25 (Meraz). In fact, Deputy Armendariz communicated that there was "no crime" and that "charges would not be pursued." Tr. 584:5-15, 600:19-601:3 (Kikes); Tr. 1468:14-22 (Beeks).[21] The Court may infer the deputies actually stopped Plaintiffs' vehicle to check the driver's identification and see if he might be an illegal immigrant.[22]

Defendants' post hoc rationalizations of the stop of Mr. Nieto and Ms. Meraz are internally inconsistent and illogical. For example, Defendants claim that when Deputy Armendariz saw Mr. Nieto try to exit the vehicle at the gas station, he ordered Plaintiffs to stay in the vehicle because he thought Mr. Nieto was going to "kick [his] ass." Defs.'

---

[21] Deputy Kikes testified that he observed no crime before deciding to pull Mr. Nieto and Ms. Meraz over. Tr. 587:23-588:11 (Kikes). There was no probable cause for the offense of disorderly conduct.  *See* Pls.' Opp. to Defs.' Motion for Summary Judgment ("MSJ"), Dkt. No. 455, at 3, 19-22; Pls.' Br. at 34 & n. 28.

[22] Plaintiffs had initially attracted Deputy Armendariz's attention by pulling in with Spanish music audibly playing. They again attracted his attention on the way out by speaking Spanish to the detainees, informing them that they had the right to remain silent and ask for a lawyer. (Defendants' mischaracterize the trial record, Defs.' Br. at 13 n.13, as Ms. Meraz specifically testified that the only time she spoke with the detainees was on the way out of the station, Tr. 657:9-19.)  All three MCSO officers were participating in a large-scale saturation patrol, whose purpose was to make contacts in an effort to find and arrest potential illegal immigrants. *See* Pls.' Br. at 11-14.

Br. at 13. Yet when Defendants' counsel tried to "refresh" Deputy Armendariz's memory with this statement, Deputy Armendariz did not characterize it this way. *See* Tr. 1536:18-1537:3. Deputy Armendariz also testified that he thought Plaintiffs might have been armed because he assumes the majority of people carry weapons with them. Tr. 1572:19-1573:5 (Armendariz).

Similarly, Deputy Kikes claimed that Mr. Nieto did not yield to his instructions to pull over, Tr. 575:1-11 (Kikes), even though he conceded that Mr. Nieto probably pulled over to the left just seconds after being directed to do so, Tr. 593:21-24 (Kikes); Tr. 1459:15-17 (Beeks), and Deputy Kikes testified that a driver pulling over to the left was not unusual. Tr. 594:8-21 (Kikes). Deputy Beeks fabricated a claim that Deputy Armendariz had reported over the radio that Mr. Nieto had tried to run him over, Tr. 1442:10-24, 1454:18-1458:12 (Beeks), though no other deputy so testified. Deputy Beeks also claimed that Mr. Nieto was being "combative" and had his hands on the steering wheel, indicating that he was about to "drive off from the traffic stop." Tr. 1444:16-22 (Beeks). Rather than agreeing that Mr. Nieto was attempting to drive off, however, Deputy Kikes instead confirmed that, when Plaintiffs were initially stopped, Mr. Nieto (and not Ms. Meraz, as Deputy Beeks claimed) was speaking on the phone. *Compare* Tr. 594:25-595:1 (Kikes) *with* Tr. 1463:6-1464:2 (Beeks).[23]

Defendants' inconsistent accounts of the incident, and the absence of any other explanation for Plaintiffs' treatment during the North Phoenix saturation patrol, are circumstantial evidence that the officers' extreme tactics resulted from their reaction to Mr. Nieto's and Ms. Meraz's race.[24] Deputy Kikes' implausible claim that he could not

---

[23] In fact, while Deputy Beeks approached Mr. Nieto at gunpoint, Tr. 1467:16-1468:8 (Beeks), Deputy Kikes did not see a need to draw his weapon at any point during the stop, Tr. 596:13-15 (Kikes). Deputy Kikes also apparently determined that the situation was stable enough that he could wait until the driver got off the phone before removing him from the vehicle. Tr. 597:1-12 (Kikes).

[24] The tactics deployed by the MCSO—i.e., surrounding Plaintiffs at gunpoint and ordering them out of the vehicle—are not part of a routine traffic stop and constitute a use of force (or arrest) that was itself unjustified under governing Fourth Amendment (continued…)

observe their race, Tr. 594:25-596:6 (Kikes), indicates further that race is exactly what triggered the stop and those tactics.

>    d.    *Stops of Additional Class Members*

The testimony of other class members is further evidence of the MCSO's policy, pattern and practice of racial discrimination with respect to traffic stops.[25] Class members not named in a complaint are regularly relied on to supply such evidence. *See*, *e.g.*, *Pierce v. County of Orange*, 526 F.3d 1190, 1210-11, 1225-26 (9th Cir. 2008); *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 839-41, 859 (N.D. Cal. 2011).[26]

Whether or not the additional class members, such as Daniel Magos and David Vazquez, attempted to file complaints with agencies such as the FBI and Department of Justice has no bearing on the veracity of their accounts, particularly where, as here, their testimony remained undisputed at trial. *See* Pls.' Br. at 27-28 (setting forth additional detail regarding these stops).[27]

---

law. *See United States v. Del Vizo*, 918 F.2d 821, 824-25 (9th Cir. 1990). Yet, no officer on this stop appears to have been required to write a use of force or other report.

[25] This includes the testimony of Lydia Guzman, as representative of named Plaintiff Somos America. Notably, Defendants do not dispute Somos America's standing. *See* Pls.' Opp. to Defs.' MSJ, Dkt. No. 455 at 10-11.

[26] The cases that Defendants rely on do not address the appropriate scope of evidence at trial in a class action, and instead deal primarily with standing. *See, e.g., Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044-45 (9th Cir. 1999) (en banc); *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *Missouri v. Jenkins*, 515 U.S. 70, 88-89 (1995).This Court has already held that Plaintiffs have standing because they "have presented sufficient evidence [of a policy] aside from the stops [of named Plaintiffs] themselves." *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d at 987 (distinguishing *Hodgers-Durgin*, 199 F.3d at 1044-45). The testimony of other class members is relevant as it provides additional evidence of the policy or practice. Because named Plaintiffs here were injured by the same pattern and practice that harmed other class members, this case is further distinguishable from *Lewis*. *See* 518 U.S. at 358 (scope of injunction too broad if it covers harm beyond that affecting named Plaintiffs).

[27] The only stop of a class member that Defendants make any attempt to dispute is that of Lorena Escamilla. However, he claimed that he stopped Ms. Escamilla because her license plate light was out, but he never cited her for such a violation. Tr. 1625:9-1626:20. Deputy Gamboa further testified that Ms. Escamilla refused to provide identification. *See* Tr. 1597:24-1598:12. But the CAD printout shows that Deputy Gamboa ran her name and birth date within mere minutes of the initial stop and thus presumably had her identification at that time. Tr. 1620:15-1621:12 (Gamboa); Ex. 63 (CAD report). In light of these inconsistencies, Deputy Gamboa's testimony that he could not see Ms. Escamilla's race is also not credible.

1

2

**VI.     PLAINTIFFS HAVE CONCLUSIVE EVIDENCE OF DISCRIMINATORY EFFECT, AND DEFENDANTS' EFFORTS TO REBUT THAT EVIDENCE ARE UNPERSUASIVE.**

3

4

5

6

7

8

9

         Contrary to Defendants' suggestion, Defs.' Br. at 30-31, Dr. Taylor's findings that the MCSO's policies and practices have negatively impacted Hispanics—on both saturation patrol and non-saturation patrol days—are additional and powerful evidence of discriminatory effect. *See* Pls.' Br. at 22-28. His findings, including those based on the same data set that Mr. Jefferys provided to Dr. Camarota, and including the incidents that Defendants criticized Dr. Taylor for excluding from his initial analysis,[28] are all highly statistically significant. Pls.' Br. at 23; Tr. 1898:13-1902:10.

10

11

12

13

14

15

16

17

18

19

20

21

         Defendants' efforts to cast doubt on Dr. Taylor's qualifications and methodology are unavailing.[29] It may be true that the CAD data was not free of error, Defs.' Br. at 31, that the MCSO failed to record race or ethnicity of those stopped, *see id*. at 31-32, and that the MCSO does not ensure that it keeps records of all officers participating in saturation patrols, *id*. at 32-33. Tr. 1866:19-1867:13, 1869:19-23, 1876:22-1877:21 (Taylor); Tr. 1318:9-21, 1323:9-1324:4 (Camarota). But Dr. Taylor still had enough information to conduct a reliable study. It was therefore proper under scholarly standards for him to rely on the data and outcome variables that were available, i.e., name checked and length of stop. Tr. 1866:19-1867:13, 1869:19-23 (Taylor). It was also proper for Dr. Taylor to consider 11 of 13 major saturation patrols because the MCSO provided insufficient information about the other two to conduct a meaningful analysis. Tr. 1875:25-1876:21.[30] There is no information that excluding those patrols was biasing.

22

23

[28] These incidents include those with call type descriptions DWI, driving on a suspended license, and drug/alcohol offenses. *See* Tr. 1898:13-1902:10 (Taylor).

24

25

[29] Dr. Taylor is a fellow of the American Society of Criminology, has an extensive background in criminology and statistics, and has written a textbook on the topic. Tr. 55:17-56:24. In contrast, Defendants' expert Dr. Camarota has comparatively little formal statistics training. Tr. 1229:23-1230:9.

26

27

[30] In addition, Dr. Taylor's consideration of stops beginning in January 2007 is appropriate to set a baseline, one year before the first major saturation patrol. Tr. 58:15-25. Defendants fail to show why considering stops in 2005-06 would have made any difference to Dr. Taylor's analysis. *See* Defs.' Br. at 32.

28

Defendants' other criticisms of Dr. Taylor have no statistical or scientific basis. Dr. Taylor followed the internal benchmarking approach of other statisticians who have studied racial profiling in policing. Tr. 1878:20-1879:18. Internal benchmarking controls for the unit to which an officer is assigned. Tr. 1886:14-1887:1. However, internal benchmarking does not mean that, during the comparison days or traffic stops, the MCSO acted properly. *See* Defs.' Br. at 34 (citing only Dr. Taylor's testimony that the likelihood of Hispanic name checking is higher on patrol days); Pls.' Br. at 24. Dr. Taylor also followed accepted practice by not expressly considering socioeconomic data. Tr. 167:12-19, 1888:1-8.

Some of Defendants' arguments simply rest on a basic misunderstanding of statistics. Defendants' criticism of the absence of the words "goodness of fit" in Dr. Taylor's reports, Defs.' Br. at 34, is no substitute for a competing, scientifically valid analysis. Dr. Taylor testified that not only did he measure goodness of fit using the generally accepted Wald chi-squared method, his findings also satisfied numerous other tests of robustness. Tr. 1874:16-1875:24. Also, the term "quasi-experimental" describes a *type* of study; it does not mean that the study is less valid than an "experimental" one. *See* Tr. 176:17-22 (Taylor). Finally, Dr. Taylor's analysis is not undermined by the fact that 1.3% of the MCSO's name checks were made by saturation patrol active officers, Defs.' Br. at 33, or by the four-percentage-point difference in the Hispanic share of name checks on saturation patrol days as compared with non-saturation patrol days using a 90% probability threshold, *id.* at 34. *See* Tr. 182:9-183:3, 1879:25-1883:3 (Taylor).

## VII.   CONCLUSION

The Court should find Defendants liable on all counts.

RESPECTFULLY SUBMITTED this 16th day of August, 2012.

By  /s/ Stanley Young
Stanley Young (*Pro Hac Vice*)
Andrew C. Byrnes (*Pro Hac Vice*)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418

Tammy Albarran (*Pro Hac Vice*)
talbarran@cov.vom
David Hults (*Pro Hac Vice*)
dhults@cov.com
Covington & Burling LLP
1 Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091

Lesli Gallagher (*Pro Hac Vice*)
lgallagher@cov.com
Covington & Burling LLP
9191 Towne Centre Drive, 6th Floor
San Diego CA 92107
Telephone: (858) 678-1800
Facsimile:  (858) 678-1600

Dan Pochoda
dpochoda@acluaz.org
James Lyall
jlyall@acluaz.org
ACLU Foundation of Arizona
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

Cecillia Wang (*Pro Hac Vice*)
cwang@aclu.org
American Civil Liberties Union
Foundation Immigrants' Right Project
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0775
Facsimile: (415) 395-0950

Andre I. Segura (*Pro Hac Vice*)
asegura@aclu.org
American Civil Liberties Union
Foundation Immigrants' Right Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone:  (212) 549-2676
Facsimile:  (212) 549-2654
asegura@aclu.org

Nancy Ramirez (*Pro Hac Vice*)
nramirez@maldef.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512
Facsimile:  (213) 629-0266

Anne Lai (*Pro Hac Vice*)
annie.lai@yale.edu
15 Lyon St. Fl. 2
New Haven, CT 06511
Telephone: (203) 432-3928
Facsimile: (203) 432-1426

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, 2012 I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and caused the attached document to be e-mailed to:

Thomas P. Liddy
liddyt@mcao.maricopa.gov

Ann Uglietta
uglietta@mcao.maricopa.gov

Timothy J. Casey
timcasey@azbarristers.com

*Attorneys for Defendant Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office*

*s/Precilla Mandujano*
Paralegal