1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                     Plaintiffs,     )   CV 07-2513-PHX-GMS
6                                    )
                     vs.             )   Phoenix, Arizona
7                                    )   July 19, 2012
     Joseph M. Arpaio, et al.,       )   8:37 a.m.
8                                    )
                     Defendants.     )
9    _____)

10

11

12

13

14

15                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  BEFORE THE HONORABLE G. MURRAY SNOW

17                  (BENCH TRIAL DAY 1 - Pages 1 - 277)

18

19

20

21

22   Court Reporter:             Gary Moll
                                 401 W. Washington Street, SPC #38
23                               Phoenix, Arizona  85003
                                 (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                        A P P E A R A N C E S

2

For the Plaintiffs:          Stanley Young, Esq.
3                                Andrew C. Byrnes, Esq.
                                 COVINGTON & BURLING, L.L.P.
4                                333 Twin Dolphin Drive
                                 Suite 700
5                                Redwood Shores, California  94065
                                 (650) 632-4704
6
                                 David Hults, Esq.
7                                COVINGTON & BURLING, L.L.P.
                                 1 Front Street
8                                35th Floor
                                 San Francisco, California  94111
9                                (415) 591-7066

10                               Lesli Rawles Gallagher, Esq.
                                 9191 Towne Centre Drive
11                               6th Floor
                                 San Diego, California  92122-1225
12                               (858) 678-1807

13                               Nancy Anne Ramirez, Esq.
                                 MEXICAN AMERICAN LEGAL DEFENSE
14                               AND EDUCATIONAL FUND
                                 Regional Counsel
15                               634 S. Spring Street
                                 11th Floor
16                               Los Angeles, California  90014
                                 (213) 629-2512, Ext. 121
17
                                 Annie Lai, Esq.
18                               Daniel J. Pochoda, Esq.
                                 AMERICAN CIVIL LIBERTIES
19                               FOUNDATION OF ARIZONA
                                 77 E. Columbus Avenue
20                               Suite 205
                                 Phoenix, Arizona  85012
21                               (602) 650-1854

22

23

24

25

1                    A P P E A R A N C E S

2

3                              Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Director
5                              Immigrants' Rights Project
                               39 Drumm Street
6                              San Francisco, California  94111
                               (415) 343-0775
7
                               Andre Segura, Esq.
8                              AMERICAN CIVIL LIBERTIES UNION
                               125 Broad Street, 18th Floor
9                              New York, New York  10004
                               (212) 549-2676
10
      For the Defendants:      Timothy J. Casey, Esq.
11                             James L. Williams, Esq.
                               SCHMITT, SCHNECK, SMYTH,
12                             CASEY & EVEN, P.C.
                               1221 E. Osborn Road
13                             Suite 105
                               Phoenix, Arizona  85014-5540
14                             (602) 277-7000

15                             Thomas P. Liddy
                               Deputy County Attorney
16                             MARICOPA COUNTY ATTORNEY'S OFFICE
                               Practice Group Leader, Litigation
17                             Ann T. Uglietta
                               Deputy County Attorney
18                             Civil Services Division
                               222 N. Central Avenue
19                             Suite 1100
                               Phoenix, Arizona 85004
20                             (602) 372-2098

21

22

23

24

25

I N D E X

Witness:                                                              Page

RALPH BRECKEN TAYLOR

Direct Examination by Mr. Byrnes                                       54
Cross-Examination by Mr. Liddy                                        110
Redirect Examination by Mr. Byrnes                                    187

VICTOR DAVID VASQUEZ

Direct Examination by Ms. Ramirez                                     197
Cross-Examination by Mr. Liddy                                        202

DAVID RODRIGUEZ

Direct Examination by Ms. Gallagher                                   210
Cross-Examination by Mr. Casey                                        219
Redirect Examination by Ms. Gallagher                                 235

LOUIS DiPIETRO

Direct Examination by Mr. Segura                                      238
Cross-Examination by Mr. Casey                                        259




Opening Statements

By Mr. Young                                                           37

By Mr. Casey                                                          41

<pre>
1                        E X H I B I T S

2    No.      Description                          Admitted

3    1        Email chain last dated March 11, 2009 re      35
              "Three Presidents" (Exhibit 7 to the
4             Deposition of Joseph Sousa, taken on October
              22, 2010)
5
     2        Email chain, last dated June 13, 2009 re "FW:  35
6             Thought you'd find this interesting" containing
              status purported to be from the L.A. Times
7             (Exhibit 5 to the deposition of Brett Palmer,
              taken on November 9, 2010)
8
     5        Email dated May 29, 2008 re "3511 stuff" and   35
9             attaching a copy of a "Mexifornia" Driver's
              License, email dated 6/3/2008 forwarding "3511
10            Stuff" (Exhibit 34 to the deposition of Joseph
              Arpaio, taken on November 16, 2010)
11
     7        Email last dated May 1, 2008 re "FW: MORE:     35
12            Mexican Words of the Day" (Exhibit 22 to the
              Deposition of Brian L. Sands, taken on
13            November 15, 2010)

14   11       MCSO News Release dated October 21, 2009,      35
              "Arpaio: 'We Will Still Use Indicators in the
15            Enforcement of Illegal Immigration Laws'" (ORT
              000616-617 / Exhibit 3 to the deposition of
16            Brett Palmer, taken on October 23, 2009)

17   12       Excerpt from "Workbook: Statutory Authority,   35
              ICE Academy" dated Fall 2005 (ORT 000618 /
18            Exhibit 4 to the deposition of Brett Palmer,
              taken on October 23, 2009)
19
     13       Oct. 30, 2009 email from Palmer to Madrid,     35
20            Armendariz, Rangel, Sousa (Carveout MCSO
              0000431)
21
     16       Email chain last dated July 2, 2008 re "FW:    35
22            Some we haven't seen yet, just scroll down"
              attaching image of "No Illegals - No Burritos"
23            (Carveout MCSO 0003188-97, 3205)

24

25
</pre>

1                           E X H I B I T S

2    No.        Description                                    Admitted

3    17         Email chain last dated July 1, 2008 re "RE:      35
                FUNNY MEXICAN WORDS" (Carveout MCSO 0004961-62)
4
     18         Email chain last dated July 2, 2008 re "A RARE    35
5               PHOTO OF A MEXICAN NAVY SEAL" (Carveout MCSO
                0005586-88)
6
     19         Email chain last dated November 12, 2005 re      35
7               "FW: Guadalupe Handgun revision" and attaching
                image of "Hispanic Shooting Range" (Carveout
8               MCSO 0006209-10)

9    20         Dec. 16, 2008 email from Sousa to Rangel,        35
                Palmer, Madrid, Armendariz; Jerez reply
10              (Carveout MCSO 0023530-31)

11   29         Email chain last dated June 25, 2008 re "Indian  35
                Yoga vs. Mexican yoga"
12              (Carveout MCSO 0038846-49)

13   30         Email dated September 2, 2008 re "Fw: Mexican    35
                Jews" (Carveout MCSO 0103100)
14
     31         Email chain dated December 15, 2008 re "FW:      35
15              Learn the Mexican Words of the Day"
                (Carveout MCSO 0132232)
16
     32         Email dated July 10, 2008 re "FW: Word of the    35
17              Day" attaching Mexican word of the day.doc
                (Carveout MCSO 0162905-06)
18
     35         Attachment to July 30, 2008 email from           35
19              Gonzales to Barron-Irby; titled "Brian
                Sands/Dave Trombi" (Carveout MCSO 0227729-30)
20   43         Mar. 11, 2009 email from Siemens to Rios,        35
                Sousa (Carveout MCSO 0350979)
21
     44         Email chain, last dated September 29, 2009 re    35
22              "Mexican Engineering at It's Best!!"
                (Carveout MCSO 0426255-70)

23

24

25

```
 1                          E X H I B I T S

 2     No.      Description                                Admitted

 3     45       Email chain, dated February 24, 2009 re "FW:    35
                Mexican words of the day"
 4              (Carveout MCSO 0496147-48)

 5     46       Email dated July 22, 2009 re "MEXICAN TEST"     35
                (Carveout MCSO 0497277-80)
 6
       47       Email chain dated November 3, 2009 re "FW:      35
 7              Mexican Recliners" (Carveout MCSO 0501203-05)

 8     50       MCSO CAD Incident History, Incident #           35
                MA07222192 (MCSO CAD Database)
 9
       51       MCSO CAD Incident History, Incident #          218
10              MA07222209 (MCSO CAD Database)

11     54       MCSO CAD Incident History, Incident #           74
                MA08115843 (MCSO CAD Database)
12
       65       MCSO Memorandum re "Complaint on Deputy Matt    35
13              Ratcliffe" and other complaints against the
                MCSO with various dates
14              (Melendres MCSO 000001-30)

15     66       MCSO Arizona Ticket and Complaint Form          35
                (Melendres MCSO 000004 / Exhibit 6 to the
16              deposition of Matthew Lucas Ratcliffe, taken
                on October 15, 2009)
17
       67       DHS officer training manual: PowerPoint         35
18              presentation discussing delegation of authority
                under 287(g) (Melendres MCSO 000081-104)
19
       68       Civil Rights file with 287(g) Officer Training  35
20              Participant Workbook (Melendres MCSO 000179-198
                / Exhibit 1 to the deposition of Brett Palmer,
21              taken on October 23, 2009)

22     69       DHS officer training manual: Lesson plan re use 35
                of race by federal law enforcement
23              (Melendres MCSO 000222-37)

24

25
```

1                          E X H I B I T S

2   No.        Description                                    Admitted

3   70    MCSO CAD Incident History 9/27/2007 Incident          35
          #MA07181873 (Melendres MCSO 001785-87 /
4         Exhibit 1 to the deposition of Carlos Rangel,
          taken on October 20, 2009)
5
    71    CAD Incident History (MA08054641 MA08054636           35
6         MA08054640) and Incident Report (MA08054636)
          (Melendres MCSO 001811-20 / Melendres MCSO
7         001811 - Exhibit 9 to Kikes Deposition /
          Melendres MCSO 001812-14 - Exhibit 12 to
8         Armendariz November 24, 2009 Deposition /
          Melendres MCSO 001816 - Exhibit 7 to Beeks
9         Deposition / Melendres MCSO 001817-20 -
          Exhibit 7 to Kikes Deposition)
10
    73    CAD Incident History MA08054636 (Melendres           35
11        MCSO 001817-20)

12  74    Enforcement Support Unit organizational chart        35
          (Melendres MCSO 001821)
13
    75    Saturation Patrol Documents 32nd Street and          35
14        Thomas, January 18-19, 2008
          (Melendres MCSO 001822-24)
15
    76    MCSO Human Smuggling Unit, Shift Summary for         35
16        Saturation Patrol 12/14/07 at Aguila and
          surrounding area (Melendres MCSO 014905-07)
17
    77    Saturation Patrol Stats, January 18th, 2008          35
18        from 1500 to 2300 (Melendres MCSO 001825)

19  78    MCSO Crime Suppression / Saturation Patrol           35
          Totals (Melendres MCSO 001826)
20
    79    Saturation Patrol Documents 32nd Street and          35
21        Thomas, March 21-22, 2008; Operation Summary,
          stat sheet for saturation patrol, arrest list /
22        handwritten Notes dated 3/21/2008 of arrests
          (Melendres MCSO 001834-40)
23

24

25

```
1                          E X H I B I T S

2    No.      Description                                    Admitted

3    80       MCSO Human Smuggling Unit Shift Summary, for      35
              11/29/2007 in the Area of Broadway and Stapley,
4             Mesa (Melendres MCSO 014898)

5    81       MCSO Human Smuggling Unit Shift Summary, for      35
              12/5/07 in the Area of Broadway and Stapley,
6             Mesa (Melendres MCSO 014900)

7    82       Saturation Patrol Documents, Cave Creek and       35
              Bell, March 27-28, 2008 / Incident action plan,
8             Patrol statistics, personnel sign-in rosters,
              Arrest lists, Mar. 27-28, 2008 at Cave Creek
9             and Bell Rds. In Phoenix (Melendres MCSO
              001844-52; Melendres MCSO 014547-48;
10            MCSO 14644-45)

11   83       Stat Sheet for Saturation Patrol 03/28/08         35
              (Melendres MCSO 001848)
12
     84       MCSO Personnel Sign-In for Cave Creek & Bell,     35
13            3/28 (Melendres MCSO 001849-50)

14   85       Handwritten arrest logs (Melendres MCSO           35
              001851-52 / Exhibit 6 to the deposition of
15            Douglas W. Beeks, taken on October 22, 2009)

16   86       Saturation Patrol Documents, Guadalupe,           35
              April 3-4, 2008 (Melendres MCSO 001853-59)
17
     87       Incident action plan, patrol statistics,         35
18            personnel sign-in roster, arrest lists,
              email correspondence to Phoenix, Tempe and
19            Ahwatukee PDs, Apr. 3-4, 2008 in Guadalupe
              (Melendres MCSO 001853-77)
20
     88       Email dated April 4, 2008 re "Guadalupe          35
21            Saturation patrol 04/04/08 and stat totals"
              (Melendres MCSO 001864-65)
22
     89       Saturation Patrol Sign-in Roster for Guadalupe   35
23            Saturation Patrol 4/3-4/2008
              (Melendres MCSO 001866-73)
24

25
```

E X H I B I T S

| No. | Description | Admitted |
|-----|-------------|----------|
| 90 | Saturation Patrol Documents, incident action Plan, III Strike Team protocol, officer safety bulletin, aerial photographs and maps of Mesa, supplemental operations plan, stats for last four sweeps, arrest lists, personnel sign-in roster, copy of East Valley Tribune article: "Arpaio plans to sweep Mesa on Thursday," patrol Statistics, June 26-27, 2008 in Mesa (Melendres MCSO 001878-925; Melendres MCSO 014578-79) | 35 |
| 91 | Saturation Patrol Documents, Mesa, June 26-27, 2008 (Melendres MCSO 001878-98) | 35 |
| 92 | Illegal Immigration Enforcement Protocols (April 25, Oct. 8, and Oct. 21, 2008) (Melendres MCSO 001887-88; Melendres MCSO 014951-53; Melendres MCSO 014966-67) | 35 |
| 93 | Email dated June 28, 2008 re "Mesa Saturation Patrol 08/27/08 and stat totals for operation" (Melendres MCSO 001899-1900) | 35 |
| 94 | MCSO Crime Suppression / Saturation Patrol Arrest List, Mesa Op / 06-26-27, 2008 (Melendres MCSO 001904-20) | 35 |
| 95 | MCSO Crime Suppression / Saturation Patrol Arrest List for Mesa Op; (Melendres MCSO 001904-06; 1911-14) | 35 |
| 96 | Form for MCSO Crime Suppression / Saturation Patrol Totals (Melendres MCSO 058706) | 35 |
| 97 | Saturation Patrol Documents, Mesa, July 14, 2008 / Incident action plan, III Strike Team protocol, officer safety bulletin, aerial photographs and maps of Mesa, July 14, 2008 in Town of Mesa (Melendres MCSO 001926-47) | 35 |
| 98 | Email dated July 15, 2008 re "Mesa Saturation Patrol 07/14/08" (Melendres MCSO 001941) | 35 |
| 99 | Sign-in Roster, dated 07/14/08 for Operation: Mesa-OP (Melendres MCSO 001942-46) | 35 |

E X H I B I T S

| No. | Description | Admitted |
|-----|-------------|----------|
| 100 | Saturation Patrol Documents, Food Vendor Detail, Maryvale, July 31, 2008 (Melendres MCSO 001948-54) | 35 |
| 101 | Saturation Patrol Documents, Sun City / Sun City West / US 60 / I-17, August 13-14, 2008 (Melendres MCSO 001970-73) | 35 |
| 102 | Saturation Patrol Documents, Operation plan, maps of Sun City and Sun City West, patrol statistics, email correspondence, shift summaries, arrest lists, personnel sign-in roster, Aug. 13-14, 2008 in Sun City/Sun City West (Melendres MCSO 001970-98) | 35 |
| 103 | Email dated August 15, 2008 re "Sun City Detail 08/13 and 08/14" (Melendres MCSO 001974) | 35 |
| 104 | MCSO Crime Suppression / Saturation Patrol Arrest List and Sign-in Roster for Sun City (Melendres MCSO 001978-95) | 35 |
| 107 | Aug. 5, 2008 internal MCSO email re named plaintiffs in lawsuit (Melendres MCSO 008968) | 35 |
| 108 | Emails dated May 6 & 7, 2008 attaching Shift Summaries of saturation patrols in Fountain Hills (Melendres MCSO 014432-36 / Exhibit 8 to the deposition of Brian L. Sands, taken on December 14, 2009) | 35 |
| 109 | Email correspondence, patrol statistics, Aug. 19, 2008 in Cave Creek (Melendres MCSO 014458-59) | 35 |
| 110 | Email originally dated January 11, 2009 re "Interdiction & Crime Suppression Detail 01-10-2009_Two Day Totals" (Melendres MCSO 014484-85) | 35 |

```
1                        E X H I B I T S

2    No.     Description                              Admitted

3    111     Operations plan, maps of southwest valley,    35
             illegal immigration activity and crime
4            statistics for 2008, officer safety bulletin,
             email correspondence, patrol statistics,
5            personnel sign-in roster, arrest lists,
             Jan. 9-10, 2009 in Buckeye
6            (Melendres MCSO 014484-87; MCSO 014632-4;
             Melendres MCSO 15553-77; Melendres MCSO 56976-98)
7
     112     Email correspondence, patrol statistics,      35
8            arrest list, Sept. 4, 2008 in Cave Creek
             (Melendres MCSO 014496-99)
9
     113     Shift summary Jan. 4, 2008 at 24th and Bell   35
10           Rds. in Phoenix (Melendres MCSO 014512)

11   114     Shift summaries and email correspondence re:   35
             Patrol statistics, Oct. 2007-Mar. 2008 smaller
12           operations near 32nd/36th St. & Thomas Rd.
             in Phoenix (Melendres MCSO 014512, 014519,
13           014525, 014533, 014537, 014659, 014663-67,
             014672-73, 014678, 014693, 014876-77, 014893,
14           & 014909-10)

15   115     Email dated March 17, 2008 from M. Madrid      35
             regarding "36th Street and Thomas stats"
16           (Melendres MCSO 014537 / Exhibit 9 to the
             Deposition of Joseph Sousa taken on December 10,
17           2009)

18   116     Email originally dated 3/22/2008 re "Saturation 35
             patrol on 3/22/08" (Melendres MCSO 014541)
19
     117     Email correspondence; patrol statistics,       35
20           July 8, 2008 in Cave Creek
             (Melendres MCSO 014586-87)
21
     118     Email originally dated March 28, 2008 re       35
22           "Saturation patrol stat form 3/28/08-Cave
             Creek & Bell & totals for the two day operation"
23           (Melendres MCSO 014644-45)

24

25
```

1                         E X H I B I T S

2    No.      Description                              Admitted

3    119      Shift summary for February 29, 2007 in Avondale  35
              (Melendres MCSO 014651-52)
4
     120      Email originally dated November 15, 2007 re      35
5             "Saturation patrol, 11/15/07" for area of
              Stapley & Main in Mesa (Melendres MCSO 014670)
6
     121      Email re Nov. 14, 2007 in Cave Creek             35
7             (Melendres MCSO 014671)

8    122      Email originally dated September 24, 2007 re     35
              "Good Sheppard of the Hills (Cave Creek
9             Church)" (Melendres MCSO 014686)

10   123      Email originally dated October 22, 2007 re       35
              "Fountain Hills Detail"
11            (Melendres MCSO 014691-92)

12   124      Email from 25th St. And Bell Rd. Supporter       35
              (Melendres MCSO 014707)
13
     125      Email originally dated Oct. 11, 2008 re stats    35
14            of "Saturation Patrol 7th Street and
              Thunderbird" (Melendres MCSO 014715)
15
     126      Email chain, originally dated September 27,      35
16            2007 re "Cave Creek day labors and tip line"
              (Melendres MCSO 014861 / Exhibit 2 to the
17            deposition of Carlos Rangel, taken on October
              20, 2009)
18
     127      MCSO Enforcement Support Division Operations     35
19            Plan, Southeast Valley, Human Smuggling
              Interdiction / Crime Suppression Patrol, for
20            July 23-25, 2009 (Melendres MCSO 056999-57001)

21   128      MCSO Crime Suppression / Saturation Patrol       35
              Arrest List, July 23-24, 2009
22            (Melendres MCSO 057029)

23

24

25

```
1                          E X H I B I T S

2    No.      Description                            Admitted

3    129      Email, originally dated 10/4/2007 re "Queen    35
              Creek Detail" from Manuel Madrid (Melendres
4             MCSO 014865-66 / Exhibit 5 to the deposition of
              Joseph Sousa, taken on December 10, 2009)

5
     130      INTENTIONALLY LEFT BLANK
6
     131      Email dated October 15, 2007, re HSU detail    35
7             near 36th and Thomas (Melendres MCSO
              014876-877 (dup) MCSO 071618 / Exhibit 4 to the
8             October 20, 2009 deposition of Rangel)

9    132      MCSO Policy & Procedure document, Subject of    35
              Traffic Law Enforcement Guidelines, effective
10            12-29-05 (Melendres MCSO 014913-16 / Exhibit 4
              to the deposition of Matthew Lucas Ratcliffe,
11            taken on October 15, 2009)

12   133      MCSO Policy and Procedure on Subject Search     35
              and Seizure, dated 9-16-06
13            (Melendres MCSO 014917-25)

14   134      MCSO Policy and Procedure on Subject Traffic    35
              Violator Contacts and Citation Issuance, dated
15            10-03-06 (Melendres MCSO 014926-28)

16   135      Human Smuggling Unit growth time line, April of 35
              2006 - 2007 (Melendres MCSO 014930 / Exhibit 9
17            to the deposition of Bennie R. Click, taken on
              March 18, 2011)
18
     136      MCSO's The Briefing Board, Number 08-52,        35
19            October 21, 2008, re Illegal Immigration
              Enforcement Protocol (Melendres MCSO 014951-53)
20
     137      MCSO Operation Manual re Human Smuggling Unit   35
21            Standard Operating Procedures, revised 10-30-08
              (Melendres MCSO 014956)
22
     138      MCSO Memorandum re "Enforcement Support         35
23            Protocol for Response to Human Smuggling
              Cases" dated April 20, 2006
24            (Melendres MCSO 014961-65)

25
```

E X H I B I T S

| No. | Description | Admitted |
|-----|-------------|----------|
| 139 | MCSO Policy and Procedure on Subject Arrest Procedures, dated 11-03-00 (Melendres MCSO 014968-76) | 35 |
| 140 | MCSO CAD/RMS codes (Melendres MCSO 015012-14) | 35 |
| 141 | Model Lesson Plan: Laws of Arrest (Melendres MCSO 015055-87) | 35 |
| 142 | Arizona Peace Officer Standards and Training Board, 585-Hour Basic Curriculum, Model Lesson Plan, Lesson Title: Search and Seizure 2.3, dated July 2006 (Melendres MCSO 015088-112 / Exhibit 6 to the Deposition of Bennie R. Click, taken on March 18,2011) | 35 |
| 143 | Arizona Peace Officer Standards and Training Board, Model Lesson Plan: Cultural Awareness (Melendres MCSO 015258-306) | 35 |
| 144 | Arizona Peace Officer Standards and Training Board, 585-Hour Basic Curriculum, Model Lesson Plan, Lesson Title: Traffic Citations 4.2, Revised March 2008 (Melendres MCSO 015180-15201) | 35 |
| 145 | MCSO Operation Clean House, Date of Operation 2/11/09 (Melendres MCSO 015468-84) | 35 |
| 146 | Enforcement Support Division, Operations Plan, Southwest Valley, Human Smuggling Interdiction / Crime Suppression Patrol January 9-10, 2009 (Melendres MCSO 015553-59 / Exhibit 6 to the Initial Expert Report of Ralph B. Taylor) | 35 |
| 147 | Email dated January 11, 2009 re "Interdiction & Crime Suppression Detail 01-10-2009_Two Day Totals" for area of Southwest Valley, and attaching stats for January 9-10 (Melendres MCSO 015560-65) | 35 |

1                          E X H I B I T S

2    No.        Description                            Admitted

3    148        January 9-10, 2009 Sign-in Roster for       35
                Operation: Southwest Valley and MCSO
4               Interdiction Patrol for  Human Smuggling /
                Crime suppression Totals
5               (Melendres MCSO 015566-77 / Exhibit 7 to the
                Initial Expert Report of Ralph B. Taylor (MCSO
6               15566 - 15569) / Exhibit 8 to the Initial Expert
                Report of Ralph B. Taylor (MCSO 015576-15577)
7
     149        MCSO III Strike Team statistics             35
8               (Melendres MCSO 016218)

9    150        MCSO Operational Manual, Human Smuggling Unit    35
                Standard Operating Procedures, Revised on
10              10-30-08 (Melendres MCSO 016219-20)

11   152        MCSO Policy & Procedure document, Subject of    35
                Code of Conduct, dated 08-20-99
12              (Melendres MCSO 016296-309)

13   153        MCSO Arizona Ticket and Complaint Form         35
                (Melendres MCSO 016857, 16918)
14
     156        287(g) Personnel Assignments                 35
15              (Melendres MCSO 021382-84)

16   164        Enforcement Support Division, Operations Plan,    35
                Southwest Valley, Human Smuggling Interdiction /
17              Crime Suppression Patrol April 23-24, 2009
                (Melendres MCSO 056976-82)
18
     165        Email dated April 25, 2009 re "Interdiction      35
19              & Crime Suppression Detail 04-23 & 04-24
                2009_Two Day Totals" (Melendres MCSO 056983)
20
     166        MCSO Crime Suppression / Saturation Patrol      35
21              Arrest List, April 23-24, 2009
                (Melendres MCSO 056988-90)
22
     167        Sign-in Roster, dated 04-23 and 04-24-2009 for   35
23              Operation: West Valley (Melendres MCSO 056991-98)

24

25

```
 1                        E X H I B I T S

 2     No.      Description                            Admitted

 3     168      Enforcement Support Division Operation Intel,   35
                Southeast Valley, Human Smuggling Interdiction /
 4              Crime Suppression Patrol, July 2009; Arrest Lists;
                Email dated July 25, 2009 re summary of Crime
 5              Suppression Patrol (Melendres MCSO 057002-57028)

 6     169      Enforcement Support Division Operations Plan,    35
                Durango/35th Avenue Corridor, Human Smuggling
 7              Interdiction / Crime Suppression Patrol,
                September 5-6, 2009 (Melendres MCSO 057030-34)
 8
       170      Sign-in Roster and Arrest Lists, dated          35
 9              September 5-6, 2009 (Melendres MCSO 057035-45)

10     171      Email dated September 7, 2008, re "Crime         35
                Suppression Shift Summary Totals"
11              (Melendres MCSO 057046-47)

12     172      MCSO Internal Investigations Policy & Procedure  35
                (Melendres MCSO 057566-70)
13
       173      Email dated October 15, 2009 subject "Effective 35
14              Immediately" re deputies who are 287g certified
                to cease actions (Melendres MCSO 058704-705)
15
       174      Enforcement Support Division Operations Plan,    35
16              Northwest Valley, Human Smuggling Interdiction /
                Crime Suppression Patrol, October 16-17, 2009.
17              Arrest Lists, Sign-in Rosters, email with
                totals (Melendres MCSO 058708-30)
18
       175      Email originally dated May 29, 2009 re           35
19              "Saturation patrol 05/29/09" in District II
                (Melendres MCSO 059523-24)
20
       176      Enforcement Support Division Operations Plan,    35
21              Maricopa County, Human Smuggling Interdiction /
                Crime Suppression Patrol, November 16-18, 2009
22              (Melendres MCSO 059649-54)

23     177      Sign-in Roster, November 16, 2009               35
                (Melendres MCSO 059656-59)
24

25
```

```
 1                        E X H I B I T S

 2     No.      Description                            Admitted

 3     178      MCSO Arrest List (Melendres MCSO 059660-62)    35

 4     179      Sign-in Roster, November 17, 2009             35
                (Melendres MCSO 059664-65)
 5
       180      MCSO Arrest List (Melendres MCSO 059666-67)    35
 6
       181      MCSO Interdiction patrol for human smuggling   35
 7              / Crime suppression Totals, November 16-17,
                2009 (Melendres MCSO 059668, 59689)
 8
       182      MCSO Interdiction patrol for human smuggling   35
 9              / Crime suppression Totals, November 16, 2009
                (Melendres MCSO 059668-59688)
10
       183      MCSO News Brief, dated April 5, 2008 re        35
11              "Guadalupe Crime Suppression Operation Complete"
                (Melendres MCSO 068349)
12
       184      MCSO News Release, dated March 29, 2007        35
13              "Arpaio Deploys First of 160 Deputies & Officers
                in Comprehensive Fight Against Illegal Immigration"
14              (Melendres MCSO 068373-74)

15     186      MCSO News Release dated July 8, 2008           35
                "Sheriff's Deputies Saturate Cave Creek in Crime
16              Suppression Operation" (Melendres MCSO 068331)

17     190      Complete file re IA investigation into Mayor   35
                Phil Gordon's letter, IA #2008-083
18              (Melendres MCSO 069274-359)

19     191      Email chain, last dated September 4, 2007      35
                re "FW: Ak" containing attachment of The
20              Mexican 300 video (Melendres MCSO 069381-82 /
                Exhibit 5 to the deposition of Carlos Rangel,
21              taken on November 8, 2010)

22     192      Email dated November 20, 2007 from Manuel      35
                Madrid, "Saturation Patrol 36th Street and
23              Thomas 11/21/07" (Melendres MCSO 069550 /
                Exhibit 5 to the deposition of Manuel Joseph
24              Madrid, taken on October 20, 2010)

25
```

| | | |
|---|---|---|
| 1 | | E X H I B I T S |
| 2 | No. | Description | Admitted |

| No. | Description | Admitted |
|---|---|---|
| 193 | License, Registration, Warrant Checks conducted by MCSO (Disc) (Melendres MCSO 069841) | 81 |
| 194 | Oct. 3, 2008 email to Hendershott, Sands; Forwarded to Palmer, Rangel, Madrid, Armendariz (Melendres MCSO 070577) | 35 |
| 196 | March 14, 2008 email from Sousa to various (Melendres MCSO 070839-40) | 35 |
| 199 | Jan. 8, 2008 email from Sousa to various RE "Stats" and attaching HSU status as of 01-08-08 (Melendres  MCSO 071352-53) | 35 |
| 200 | May 6, 2008 email from Sousa to Plata RE "New Protocol put in place for ICE" (Melendres MCSO 071789-90) | 35 |
| 201 | Aug. 14, 2007 letter from SAC Pena to State Rep. Miranda; Arpaio forwards to Sands, Hendershott, and others (Melendres MCSO 071805-07) | 35 |
| 210 | Listing of comments made by Arpaio to May's Statements, 4/16/2008 (Melendres MCSO 072766-68) | 35 |
| 213 | MOA between MCSO and ICE (Melendres MCSO 073327-42) | 35 |
| 215 | Email dated January 21, 2009 to The Class West re "Requested response by Sheriff from Paula", thanking them for support (Melendres MCSO 074146) | 35 |
| 219 | Email chain, last dated 10/4/2007 "FW: Corner of Queen Creek & Ellsworth" re day laborers (Melendres MCSO 075244-47 / Exhibit 30 to the Deposition of Joseph Arpaio, taken on November 16, 2010) | 35 |
| 221 | Letter dated June 27, 2008 from Richard H to Chief Gascon (Melendres MCSO 075284 / Exhibit 14 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 35 |

1                         E X H I B I T S

2    No.        Description                              Admitted

3    224    July 25, 2009 Arpaio notes on conversation      35
            with Matt Allen (Melendres MCSO 075444-45)
4
     240    July 25, 2008 letter from Arpaio to Sharon M    35
5           (Melendres MCSO 076133)

6    250    Letter dated June 24, 2008 to Chief George      35
            Gascon from Sheriff Arpaio (Melendres MCSO 076995)
7    265    Operations Plan for Nov. 16-18, 2009, attached  35
            to Nov. 10, 2009 email from Sousa to Palmer,
8           Sands (Melendres MCSO 078443-50)

9    266    Sept. 22, 2009 Shift Summary by Madrid          35
            (Melendres MCSO 078551)
10
     267    Operations Plan attached to Oct. 14, 2009       35
11          email from Palmer to Sousa
            (Melendres MCSO 078678-85)
12
     268    Feb. 13, 2009 email from Palmer to Mr. Pacheco  35
13          (Melendres MCSO 078945-46)

14   269    July 17, 2009 email from Palmer to Sousa        35
            (Melendres MCSO 079204-05)
15
     270    Oct. 19, 2007 email from Ross to Sousa et al.   35
16          (Melendres MCSO 080278-81)

17   271    Sept. 12, 2007 email from Siemens to McCall     35
            (Melendres MCSO 080382-86)
18
     272    June 18, 2007 email from Baranyos to Stevens    35
19          (Melendres MCSO 080471)

20   273    Jan. 3, 2008 email from Baranyos to Sousa and   35
            various (Melendres MCSO 080669)
21
     274    Sept. 19, 2008 email from Sousa to Palmer       35
22          (Melendres MCSO 080707-08)

23   275    Apr. 8, 2008 email from Trombi to Sousa         35
            (Melendres MCSO 080768)
24

25

E X H I B I T S

| No. | Description | Admitted |
|---|---|---|
| 276 | Jan. 2, 2008 email from Baranyos to Madrid, Sousa (Melendres MCSO 080811) | 35 |
| 277 | Mar. 13, 2008 email from Baranyos to Madrid, Sousa  (Melendres MCSO 080819) | 35 |
| 278 | June 25, 2008 email from Palmer to Armendariz (Melendres MCSO 081359-61) | 35 |
| 279 | Email chain last dated April 15, 2008 re "Enforce EVENT numbers" and prior chain re "287g Deputies" (Melendres MCSO 081362-66 / Exhibit 3 to the deposition of Joseph Sousa, taken on October 22, 2010) | 35 |
| 280 | Email chain dated October 13, 2009 re "Tuesday in Anthem???" (Melendres MCSO 081403) | 35 |
| 281 | MCSO Crime Analysis Services Brochure (Melendres MCSO 081425-26) | 35 |
| 282 | Dec. 17, 2008 email from Palmer to Collins/Sousa (Melendres MCSO 081512-14) | 35 |
| 283 | Operations plan attached to July 5, 2007 email from Siemens to Sands, Madrid (Melendres MCSO 081548-51) | 35 |
| 284 | July 27, 2008 Shift Summary (Melendres MCSO 095907) | 35 |
| 285 | MCSO Operation Manual re Human Smuggling Unit Standard Operating Procedures, revised 05-22-08 (Melendres MCSO 095926-29) | 35 |
| 286 | Email correspondence, patrol statistics, Jan. 23, 2009 at 7th St & Thunderbird (Melendres MCSO 14494-95) | 35 |

1                           E X H I B I T S

2     No.      Description                                      Admitted

3     287      Email chain originally dated December 1, 2007      35
               re "detail, 12/1" / Shift Summary for 12/5/07 /
4              Email originally dated 12/8/2007 re "detail,
               12/08/07 / Shift Summary 12/14/07 / Aguila
5              Saturation Patrol Totals 12-14-07 to 12-15-07 /
               Email originally dated December 19, 2007 re
6              "detail, 12/19/07" / Shift Summary 12/22/07
               (Melendres MCSO 14665-66; MCSO 14900; MCSO
7              14663-64; MCSO 14905-07; MCSO 14659; MCSO 14909)

8     288      B1/B2 Visa, Nov. 13, 2007 I-94, Jan. 9, 2009       35
               I-94 and Federal Mexican Voter ID (ORT 000001)
9
      289      April 29, 2008 letter Andrew Thomas to Sheriff     35
10             Arpaio (ORT 000002-11)

11    290      Memorandum of Agreement (ORT 000014-29)            35

12    291      Fact Sheet: Delegation of Immigration             35
               Authority (ORT 000030-36)
13
      307      MCSO News Brief, dated September 27, 2007          35
14             "Sheriff's Office Not Waiting for Loitering and
               Soliciting Ordinance to Take Effect" (ORT 000103)
15
      308      MCSO News Release, dated October 4, 2007,          35
16             "Sheriff Arpaio Goes After Day Laborers"
               (ORT 000104 / Exhibit 10 to the deposition of
17             Joseph Arpaio, taken on December 16, 2009)

18    309      MCSO News Release dated December 5, 2007           35
               "Arpaio Intensifies Presence at Pro-Illegal
19             Immigration Protest at Pruitt's" (ORT 000105-06)

20    310      MCSO News Release, dated January 18, 2008,         35
               "Sheriff Mobilizes Posse in Central Phoenix"
21             (ORT 000107-108 / Exhibit 11 to the deposition
               of Joseph Arpaio, taken on December 16, 2009)
22
      311      MCSO News Release dated March 27, 2008             35
23             "Arpaio's Crime Suppression Operation Migrates
               North to Bell Road" (ORT 000109-110)
24

25

1                               E X H I B I T S

2    No.        Description                                  Admitted

3    312        MCSO News Brief dated March 28, 2008 "News        35
                from the Sheriff's Office" (ORT 000111)
4
     313        MCSO News Release dated April 3, 2008            35
5               "Sheriff's Crime Suppression Operation Moves to
                Guadalupe" (ORT 000112-113)
6
     314        MCSO News Release dated April 4, 2008            35
7               "Sheriff's Operation in Guadalupe Returns"
                (ORT 000114)
8
     315        MCSO Press Release, "Sheriff's Deputies Arrest   35
9               Thirteen Illegal Aliens in the City of Mesa"
                (May 8, 2008) (ORT 000115)
10
     316        MCSO News Release dated June 26, 2008            35
11              "Sheriff's Crime Suppression/Illegal Immigration
                Operation Moves Into Mesa" (ORT 000116 / Exhibit
12              1 to the deposition of Louis DiPietro, taken on
                October 21,2009)
13
     317        MCSO News Release, dated February 3, 2009,       35
14              "Arpaio Orders Move of Hundreds of Illegal
                Aliens to Their Own Tent City" (ORT 000117-118 /
15              Exhibit 21 to the deposition of Joseph Arpaio,
                taken on December 16, 2009)
16
     320        Jeffrey S. Passel and David L. Word,             35
17              "Constructing the List of Spanish Surnames for
                the 1980 Census:  An Application of Bayes'
18              Theorem," U.S. Bureau of the Census (1980)
                (ORT 000245-350)
19
     326        MCSO public records request for personnel file  35
20              (ORT000383-406)

21   327        Documents received pursuant to FOIA             35
                (ORT 000410-20)
22

23

24

25

1                      E X H I B I T S

2   No.      Description                                  Admitted

3   328   MCSO News Release, dated July 20, 2007,           35
          "Sheriff's Crackdown on Illegal Immigration
4         Heats Up, Hundreds of deputies/volunteer posse
          targeting profile vehicles, Arpaio Opens Hotline
5         for Citizens to Report Illegal Aliens"
          (ORT 000421-422 / Exhibit 7 to the deposition of
6         Joseph Arpaio, taken on December 16, 2009 /
          Exhibit 4 to the Initial Expert Report of
7         Ralph B. Taylor)

8   329   MCSO News Release dated August 8, 2007            35
          "Sheriff's Anti-Human Smuggling Unit Arrests
9         8 More Illegals" (ORT 000423-24)

10  330   MCSO News Brief dated July 15, 2008 "Mesa         35
          Crime Deterrence Operation" (ORT 000424)
11
    331   MCSO News Release dated August 13, 2008           35
12        "Sheriff Intensifies Search for Human Smugglers"
          (ORT 000425-26)
13
    332   MCSO News Brief dated September 4, 2008           35
14        "Sheriff's Crime Suppressions Arrest Eleven More
          Illegal Aliens in Cave Creek" (ORT 000427)
15
    333   MCSO News Release dated January 8, 2009           35
16        "Sheriff's Crime Suppression and Human Smuggling
          Operation Comes to Buckeye Area" (ORT 000428-429)
17
    334   MCSO News Release dated April 23, 2009            35
18        "Sheriff Plans Two Day Crime Suppression
          Crackdown" (ORT 000430-31)
19
    342   MCSO News Release dated July 23, 2009 "Sheriff    35
20        Joe Arpaio Says It Is Business As Usual"
          (ORT 000499-500)
21
    343   MCSO News Release dated October 6, 2009           35
22        "Department of Homeland Security Decides to Strip
          Arpaio's Office of Its Federal Immigration Status
23        Arpaio Outraged…." (ORT 000522-525)

24  345   May 2, 2007 I-94 (ORT 000550-51)                  35

25

1                                 E X H I B I T S

2    No.        Description                                        Admitted

3    349        MCSO News Release dated October 16, 2009              35
                "Sheriff Arpaio: 'Nothing Changes'"
4               (ORT 000613-14)

5    350        MCSO News Release dated October 19, 2009              35
                "Weekend Crime Suppression Operation Concludes"
6               (ORT 000615)

7    351        MCSO News Release dated November 16, 2009             35
                "Sheriff Arpaio Launches County-Wide Crime
8               Suppression / Illegal Immigration Operation"
                (ORT 000623-24)
9
     353        MCSO News Release dated April 28, 2009               35
10              "Arpaio Says Swine Flu Underscores Need for
                Illegal Immigration Enforcement" (ORT 000637-39)
11
     358        MCSO News Release dated March 1, 2010               35
12              "Sheriff's Patrol Deputies Ramping Up
                Enforcement of Human Smuggling Laws" (ORT 001237)
13
     359        MCSO News Release dated March 18, 2010              35
14              "Arpaio Announces 14th Crime Suppression
                Operation as Human Smuggling Arrests Have
15              Dramatically Increased This Year…" (ORT 001239-40)

16   360        MCSO News Release dated March 19, 2010 "Sheriff     35
                Joe Arpaio Announces an Upcoming 15th Crime
17              Suppression Operation"
                (ORT 001241-242)
18
     361        MCSO News Release dated April 6, 2010 "Sheriff      35
19              Arpaio Will Conduct 15th Suppression Operation
                in High Crime Neighborhood in Phoenix"
20              (ORT 001244-245)

21   362        MCSO News Release dated April 29, 2010 "Sheriff     35
                Arpaio Kicks off 15th Crime Suppression /
22              Illegal Immigration Operation" (ORT 001249-250)

23   363        MCSO News Release dated April 30, 2010 "15th        35
                Crime Suppression / Illegal Immigration
24              Operation Has Successful First Day" (ORT 001251)

25

E X H I B I T S

| No. | Description | Admitted |
|-----|-------------|----------|
| 364 | MCSO News Release dated June 29, 2010 "Sheriff Arpaio to Citizens of Arizona 'Do Not Worry About Federal Government's Threat to Sue State – It's An Intimidation Tactic'" (ORT 001257-58) | 35 |
| 368 | Ortega Melendres Visa and Mexican ID (ORT 12-13) | 35 |
| 369 | Thank you letter from Arpaio to Mr. Se, dated February 24, 2009 (OSLS 000028) | 35 |
| 370 | Thank you letter from Arpaio to Ms. B, dated July 26, 2007 (OSLS 000121) | 35 |
| 387 | CAD Database (Disc) | 72 |
| 392 | Defendant Maricopa County Sheriff's Office Answers to Plaintiffs' First Set of Interrogatories dated March 27, 2009 | 35 |
| 393 | Defendant Maricopa County Sheriff's Office Response to Plaintiffs' First Set of Request for Production of Documents and Things | 35 |
| 394 | Defendant Maricopa County Sheriff's Office Response to Plaintiffs' Second Set of Requests for Admission and Requests for Production and Third Set of Interrogatories (Exhibit 5 to the Initial Expert Report of Ralph B. Taylor) | 35 |
| 395 | Email chain, last dated June 13, 2009 from Brett Palmer re "FW: Thought you'd find this interesting…." (Exhibit 6 to the deposition of Ramon Charley Armendariz, taken on November 8, 2010) | 35 |
| 396 | Excerpts from the book "Joe's Law" by Sheriff Joe Arpaio and Len Sherman (Exhibit 1 to the deposition of Joseph Arpaio, taken on December 16, 2009) | 35 |
| 397 | Hand drawing of intersection (Exhibit 13 to the November 24, 2009 Deposition of Armendariz) | 35 |

1                          E X H I B I T S

2    No.        Description                                    Admitted

3    402        Report of Steven Camarota, Ph.D., Hispanic       35
                Surname Analysis of Maricopa County Sheriff's
4               Office Patrol Activity 2005 to 2009 dated
                January 20, 2011
5
     406        MCSO CAD Incident Report, Incident               35
6               #MA08054585 / (Exhibit 9 to the November 24,
                2009 Deposition of Armendariz / Exhibit 3 to
7               the Initial Expert Report of Ralph B. Taylor)

8    411        Photos (Exhibit 24 to the November 24, 2009      35
                Deposition of Armendariz)
9
     1005       Memorandum from Deputy M. Ratcliffe, #1553       35
10              to Sgt. Wes Ellison, #752 re Complaint/Rodriguez
                (Melendres MCSO 056862)
11
     1006       MCSO Traffic Ticket and Complaint #684751 re     35
12              David Rodriguez with charge of Failure to Obey
                A Traffic Control Device (Melendres MCSO 056863)
13
     1018       Audio CD re 911 call from Manuel's Repair        35
14              Shop (Melendres MCSO 000031)

15   1045       Book about illegal immigration authored by       35
                Diana E. (Melendres MCSO 074447-74738)
16
     1070       Expert Report of Bennie Click dated January      35
17              21, 2011

18   1106       Operations Manual, Human Smuggling Unit          35
                Standard Operating Procedures
19              (Melendres MCSO 014954-60)

20   1114       MCSO Policy EB1 re Traffic Law Enforcement       35
                Guidelines (Melendres MCSO 014935-38)
21
     1115       MCSO Policy EB-2 re Traffic Violator Contacts    35
22              and Citation Issuance (Melendres MCSO 014939-41)

23   1116       MCSO Policy GJ-3 Policy re Search and Seizure    35
                (Melendres MCSO 014942-50)
24
     1117       MCSO Policy EA-11 re Arrest Procedures           35
25              (Melendres MCSO 014968-93)

```
 1                          E X H I B I T S

 2    No.       Description                              Admitted

 3    1118      MCSO Policy EA-3 re Field Interviews         35
              (Melendres MCSO 014911-12)
 4
      1119      Human Smuggling Unit growth time line        35
 5            (Melendres MCSO 014910)

 6    1120      HSU Triple I Stats as of 11/10/09            35
              (Melendres MCSO 059586)
 7
      1140      09/27/07 Cave Creek Saturation Patrol        35
 8            Documents (Melendres MCSO 014079)

 9    1141      10/04/07 Queen Creek Saturation Patrol       35
              Documents (Melendres MCSO 014036-14037;
10            014865-14866; 015466-15467)

11    1142      10/09/07 Queen Creek Saturation Patrol       35
              Documents (Melendres MCSO 014870-14871)
12
      1149      11/19/07 Wickenburg Saturation Patrol        35
13            Documents (Melendres MCSO 014669)

14    1160      01/18-01/19/08 32nd Street and Thomas Road   35
              Saturation Patrol Documents (Melendres MCSO
15            001825-1833; 014041-14049; 014704; 015767-15775)

16    1163      02/20/08 Wickenburg Saturation Patrol        35
              Documents (Melendres MCSO 014653-14654)
17
      1165      03/17/08 Wickenburg Saturation Patrol        35
18            Documents (Melendres MCSO 014712)

19    1166      03/21/-03/22/08 32nd Street and Thomas Roads 35
              Saturation Patrol Documents (Melendres MCSO
20            001837-1842; 014071-14074; 014099-14101;
              014541-14543; 014696-14697)
21
      1167      03/27-03/28/08 Cave Creek and Bell Road      35
22            MCSO Documents (Melendres MCSO 001847-1852;
              014093-14098; 014547-14548; 014644-14646;
23            015750-15764)

24    1168      04/03-04/04/08 Guadalupe MCSO Documents      35
              (Melendres MCSO 001861-1877; 014109-14121;
25            014549-14554; 015638-15651)
```

1                          E X H I B I T S

2     No.      Description                                    Admitted

3     1169     05/06-05/07/08 Fountain Hills MCSO Documents      35
               (Melendres MCSO 014038; 014433-14434, 14436)
4
5     1170     06/26-06/27/08 Mesa MCSO Documents               35
               (Melendres MCSO 001899-1925; 014218-14251;
6              014576-14582; 015597-15630)

7     1171     07/05/08 Mesa MCSO Documents (Melendres          35
               MCSO 014191-14198; 014583-14585; 015798-15805)

8     1172     07/08/08 Cave Creek MCSO Documents               35
               (Melendres MCSO 014586-14587; 015464-15465;
9              014700)

10    1173     07/14/08 Mesa MCSO Documents (Melendres MCSO      35
               001941-1947; 014588-14590; 015518-15525)
11
12    1174     07/31/08 Food Vendor Detail, Maryvale MCSO        35
               Documents (Melendres MCSO 001957-1969;
13             014261-14294; 014607; 015713-15716)

14    1175     08/13-08/14/08 Sun City/Sun City West/US          35
               60/I-17 MCSO Documents (Melendres MCSO
15             001974-1998; 014178-14190; 014608-14609;
               15529-15552; 001970-1973; 014175-14177;
16             015526-15528)

17    1176     08/13/08 I-17 & Mile Post 234 (north of Anthem)   35
               MCSO Documents (Melendres MCSO 014080-14090;
18             014612)

19    1180     01/09-01/10/09 Town of Buckeye MCSO Documents     35
               (Melendres MCSO 014484-14487; 014632-14634;
20             015460-15463; 015560-15577; 015553-15559;
               015497-15499)

21    1185     04/23-04/24/09 West Valley – Buckeye, Avondale,   35
               Goodyear, Tolleson, Gila Bend, Tonopah MCSO
22             Documents (Melendres MCSO 056983-56998;
               056976-56982)
23
24    1186     07/23-07/25/09 Southeast Valley – Chandler,       35
               Tempe, Gilbert, Queen Creek MCSO Documents
               (Melendres MCSO 057005-57029; 056999-57004)
25

<pre>
 1                          E X H I B I T S

 2   No.       Description                               Admitted

 3   1187      09/05-09/06/09 Durango and 35th Avenue        35
              Corridor MCSO Documents
 4            (Melendres MCSO 057040-57052; 057030-57039)

 5   1189      11/16-11/18/09 Maricopa County MCSO Documents  35
              (Melendres MCSO 059602-59648; 059655-59707;
 6            59649-59654)

 7   1190      Department of Homeland Security Officer        35
              Training Manual (Melendres MCSO 000038-1784)
 8
     1194      U.S. DOJ article, "Guidance Regarding the Use  35
 9            of Race by Federal Law Enforcement Agencies"
              (ORT 000037-46)
10
     1195      Arizona Peace Officer Standards and Training   35
11            Board 585-Hour Basic Curriculum Model Lesson
              Plan re Law Enforcement Services 1.3
12            (Melendres MCSO 015015-40)

13   1196      Arizona Peace Officer Standards and Training   35
              Board 585-Hour Basic Curriculum Model Lesson
14            Plan re Ethics and Professionalism
              (Melendres MCSO 015041-54)
15
     1199      Arizona Peace Officer Standards and Training   35
16            Board 585-Hour Basic Curriculum Model Lesson
              Plan re Patrol and Observation
17            (Melendres MCSO 015127-69)

18   1201      Arizona Peace Officer Standards and Training   35
              Board 585-Hour Basic Curriculum Model Lesson
19            Plan re Title 28 – Traffic Law 4.6
              (Melendres MCSO 015202-57)
20
     1203      Arizona Peace Officer Standards and Training   35
21            Board 585-Hour Basic Curriculum Model Lesson
              Plan re Police and the Community 6.5
22            (Melendres MCSO 015307-29)

23   1204      Arizona Peace Officer Standards and Training   35
              Board 585-Hour Basic Curriculum Model Lesson
24            Plan re High Risk Vehicle Stops Instructor 8.4
              Section I: Introduction to Course
25            (Melendres MCSO 015330-34)
</pre>

1                        E X H I B I T S

2    No.          Description                              Admitted

3    1205         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
4                 Plan re High-Risk Vehicle Stops Instructor 8.4
                  Section II: Pre-Stop Procedures
5                 (Melendres MCSO 015335-39)

6    1206         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
7                 Plan re High Risk Vehicle Stops Instructor 8.4
                  Section III: Vehicle Positioning
8                 (Melendres MCSO 015340-44)

9    1207         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
10                Plan re High-Risk Vehicle Stops Instructor 8.4
                  Section IV: Removal of Subject(s) from the
11                Vehicle (Melendres MCSO 015345-49)

12   1208         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
13                Plan re High-Risk Vehicle Stops Instructor 8.4
                  Section V: Clearing the Suspect Vehicle
14                (Melendres MCSO 015350-54)

15   1209         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
16                Plan re High Risk Vehicle Stops Instructor 8.4
                  Section VI: Clearing Unconventional Vehicles
17                (Melendres MCSO 015355-58)

18   1211         Lesson Plan, Vehicle Position                   35
                  (Melendres MCSO 015411-22)
19
     1212         Lesson Plan, High Risk Vehicle Stops Instructor 35
20                (Melendres MCSO 015423-34)

21   1213         Arizona Peace Officer Standards and Training    35
                  Board 585-Hour Basic Curriculum Model Lesson
22                Plan re Search and Seizure 2.3
                  (Melendres MCSO 015435-59)
23

24

25

P R O C E E D I N G S

1

2

3      THE COURT:  Please be seated.  Good morning, Counsel.

4      I just have a few matters that I think will be

5 time-saving before we begin.  The parties in the joint pretrial      08:37:18

6 statement stipulated to the admission of a number of exhibits.

7      Has there been any subsequent objection to the

8 admission of those exhibits?

9      MR. YOUNG:  Your Honor, we have had a discussion about

10 the expert reports in the issue, and this relates in particular      08:37:35

11 to the reports of the defendants' experts.  We would be fine

12 with having all of the expert reports admitted.  We think the

13 Court has -- we know the Court has seen them earlier in

14 connection with the summary judgment proceedings and we think

15 it would be efficient.      08:37:53

16      We actually did stipulate to the admission of the

17 defendants' expert's reports.  There's been an objection raised

18 to the plaintiffs' expert's report's admission.  We think that

19 they should all be treated the same, and to the extent we need,

20 would request a revision of the pretrial order pursuant to      08:38:11

21 Rule 16(e) we would ask the Court to consider that at this

22 time.

23      THE COURT:  Mr. Casey.

24      MR. CASEY:  Your Honor, I don't care to play gotcha,

25 but they stipulated to ours, we objected on hearsay and      08:38:22

1    duplication, and obviously you can't cross-examine a report.

2            I will throw this suggestion out.  If the Court is

3    inclined to allow some sort of parity or equity, none of the

4    reports should come in.

5            THE COURT:  Well, what I'm going to do -- I take joint      08:38:41

6    pretrial statements seriously.  I'm going to admit the exhibits

7    that have been stipulated to in the joint pretrial statement.

8    You can make your objection when the expert reports come up

9    that you've preserved in the joint pretrial statement.  I'll

10   make a ruling at that time.                                          08:38:57

11           If you anticipate that you're going to have such an

12   objection, we can take it up at a break.  If you feel like we

13   need further discussion, Mr. Young, we can discuss it then

14   during the break before we take up matters.

15           But I propose what you do now is get out your lists,        08:39:09

16   'cause I'm going to read into -- into the record the exhibits

17   that I'm admitting into evidence.

18           MR. CASEY:  Yes, Your Honor.

19           THE COURT:  And they will then be admitted.

20           If I've got -- if I make some sort of mistake, please       08:39:21

21   correct me, but I am reading from your joint pretrial -- from

22   the final pretrial order.

23           So the Court is exhibiting -- is admitting Exhibits 1,

24   2, 5, 7, 11, 12, 13, 16, 17, 18, 19, 20, 29, 30, 31, 32, 35,

25   43, 44, 45, 46, 47, 50, 65, 66, 67, 68, 69, 70, 71, 73, 74, 75,     08:39:49

1  76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91,

2  92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107,

3  108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119,

4  120, 121, 122, 123, 124, 125 -- yes, 124.  125, 126, 127, 128,

5  129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140,      08:40:59

6  141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 152, 153,

7  156, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174,

8  175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 186, 190,

9  191, 192, 194, 196, 199, 200.  201.

10        You have stipulated to the admission of an exhibit         08:41:59

11  number that is intentionally left blank, that's 207.

12        210, 213, 215, 219, 221, 224, 240, 244, 250, 265, 266,

13  267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278,

14  279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290,

15  291, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317,      08:42:44

16  320, 326, 327, 328, 329, 330, 331, 332, 333, 334.

17        So I've got you 328.  I'll start again.  329, 330,

18  331, 332, 333, 334, 342, 343, 345, 349, 350, 351, 353, 358,

19  359, 360, 361, 362, 363, 364, 368, 369, 370, 392, 393, 394,

20  395, 396, 397, 402, 406, 411, 1005, 1006, 1017, 1018, 1020,      08:43:52

21  1043, 1045, 1070, 1106, 1114, 1115, 1116, 1117, 1118, 1119,

22  1120, 1140, 1141, 1142, 1149, 1152, 1160, 1163, 1165, 1166,

23  1167, 1168, 1169, 1170, 1171, 1172, 1173, 1174, 1175, 1176,

24  1180, 1185, 1186, 1187, 1189, 1190, 1194, 1195, 1196, 1199,

25  1201, 1203, 1204, 1205, 1206, 1207, 1208, 1209, 1211, 1212, and  08:45:14

1    1213.

2              Those are the exhibits that in the final pretrial

3    order all parties stipulated to.

4              Do you have any corrections?

5              MR. YOUNG:  Your Honor, I believe you may have missed    08:45:36

6    No. 277.

7              THE COURT:  Nope, I didn't.

8              MR. YOUNG:  Thank you.

9              THE COURT:  Any other corrections, Mr. Casey?

10             Then those exhibits --    08:45:52

11             MR. CASEY:  No, Your Honor.  I just wanted to point

12   out, pursuant to Ms. Zoratti's direction, there are some

13   defense exhibits that have been stipulated in evidence but are

14   duplicative of plaintiffs'.  We're going to be using the

15   plaintiffs', but everything is correct as you've read.    08:46:08

16             THE COURT:  All right.  Then I'm going to admit the

17   exhibits that I have just read.

18             (Exhibits admitted into evidence.)

19             The reason why I've gone through that exercise is I've

20   given you both strict time limits.  I intend to keep to those    08:46:17

21   time limits.  To the extent that there is material in the

22   exhibits that you want me to refer to, you can simply say that

23   or have the witness say that, and I will look at the exhibits.

24   You don't have to spend time drag -- with the witness dragging

25   me through the exhibit.    08:46:34

1          Couple of other points.  I realize that discovery in

2     this matter for the most part closed some time ago, and that it

3     remained open only for the documents that were subsequently

4     produced by Maricopa County, and as a result, because there

5     have been some intervening actions by the executive branch of          08:46:56

6     the United States Government and other sources that may or may

7     not have an effect on this action, there may be a little bit of

8     disconnect between discovery and the trial testimony.

9          I'm going to ask and I'm going to remind the parties

10    that I'm going to make the decision in this case based on the          08:47:19

11    evidence presented here and based on the request for injunctive

12    relief and based on the facts as they now stand, not as they

13    may have stood two years ago.

14          I realize that facts that existed two years ago may,

15    nevertheless, be relevant to the request for injunctive relief,        08:47:35

16    but I'm going to ask you to keep in mind that I'm going to make

17    the decision for -- any decision pertaining to injunctive

18    relief based on the facts as I understand them today.

19          To that end, there may -- and because there may be

20    some disconnect, and because this is not a jury trial but a            08:47:53

21    trial to the bench, I'm going to be a little bit less hesitant

22    to ask questions than I normally am.  That doesn't mean that

23    I'm not going to let you present your cases; I hope that I

24    will, for the most part, allow you to present your cases.  But

25    if I have some points of clarification, I'm not going to               08:48:12

```
 1    hesitate to ask questions.

 2          If I do that, I will try to ask the questions at the

 3    end of cross-examination so that I've allowed you to direct

 4    your witness, to cross the witness, and then if I have

 5    remaining questions, I will ask them then and then allow the          08:48:26

 6    attorney who is on cross to ask any follow-up questions and

 7    then the other side will get redirect, so both sides will be

 8    able to question after my questions, if there are any points of

 9    clarification.

10          Is there any misunderstanding as to that?                       08:48:43

11          MR. YOUNG:  No, Your Honor.

12          MR. CASEY:  None from the defendants, Your Honor.

13          THE COURT:  All right.  Is there anything else that

14    needs to be taken up before we begin?

15          MR. YOUNG:  Your Honor, I do have a very brief                   08:48:52

16    statement to make in the nature of introducing the people who

17    will be involved in the case, and with your permission I would

18    like to approach the podium to do that.

19          THE COURT:  One moment, please.

20          (Pause in proceedings.)                                         08:49:23

21          THE COURT:  All right.  I am reminded that I never had

22    the case called.  I assume we all know why we're here, but I

23    will have the case called.

24          THE CLERK:  This is CV-07-2513, Melendres v. Arpaio,

25    on for bench trial.                                                   08:49:35
```

```
 1            THE COURT:  All right.  Mr. Young, you may proceed.

 2            MR. YOUNG:  Thank you, Your Honor.  The fundamental

 3   values of our nation --

 4            THE COURT:  Can I ask you to hold?  We apparently have

 5   a snafu; the court reporter can't hear you.                      08:50:07

 6            MR. YOUNG:  Your Honor, Stanley Young for the

 7   plaintiffs.

 8            A fundamental value for our nation is equal protection

 9   of the laws, regardless of race or ethnicity.  Plaintiffs have

10   brought this case in order to protect that value.                08:50:19

11            The Maricopa County Sheriff's Office has engaged in a

12   pattern and practice of racial discrimination.  We intend to

13   show that the MCSO's policies, in particular its use of

14   saturation patrols to apprehend illegal immigrants, has

15   resulted in disparate treatment of Hispanics.  We also intend    08:50:38

16   to show that this disparate treatment results from an intent to

17   treat people differently based on their race or ethnicity.  If

18   proven, these facts warrant injunctive relief, including

19   appointment of a monitor by the Court that will prevent future

20   discrimination.                                                  08:50:57

21            This case is about racial discrimination in law

22   enforcement.  It is not about immigration policy.  Our goal

23   here is not to impede enforcement of the immigration laws.

24   Rather, our goal is to ensure that the actions of the MCSO

25   comply with the requirements of the Constitution.                08:51:15
```

1    During the course of this trial, Your Honor, you will

2    see a number of co-counsel presenting witnesses, and I would

3    like to introduce them now.  Starting from the far right we

4    have Andre Segura from the ACLU Immigrant Rights Project; Dan

5    Pochoda from the ACLU of Arizona; Cecilia Wang from the ACLU        08:51:36

6    Human Rights Project; Nancy Ramirez from the Mexican American

7    Legal Defense and Education Fund; Lesli Gallagher from

8    Covington & Burling; Annie Lai, cooperating attorney with the

9    ACLU of Arizona; and Andrew Byrnes, also with Covington &

10   Burling.  Our associate, David Hults, sitting on the bench        08:51:59

11   there, is also going to assist during the course of trial.

12   We anticipate the following witnesses.  Today you will

13   hear from Dr. Ralph Taylor, who is our statistical expert, who

14   will testify about stop rates for Hispanics on saturation

15   patrols and the lengths of stops involving Hispanics.             08:52:20

16   We will also be calling a number of named plaintiffs

17   and members of the class.  Your Honor will hear from David

18   Vasquez, who was stopped during the Mesa sweep in June 2008,

19   supposedly for a cracked windshield, but with no citation

20   resulting.                                                        08:52:40

21   You will hear from named plaintiff David Rodriguez,

22   who was treated disparately while on a lake outing with his

23   family.

24   You will hear from Velia Meraz and Manny Nieto who,

25   during a saturation patrol, had guns drawn on them, not having    08:52:55

1    committed any crime.

2          Diona Solis will also testify about the stop involving

3    her with a car full of Boy Scouts when all were asked for

4    identification.

5          Lydia Guzman, who is with the named organizational          08:53:10

6    plaintiff, SOMOS America, will also testify about the effects

7    of the sheriff's policies on her group.

8          Lorena Escamilla will also testify.  She was treated

9    roughly by MCSO officers while pregnant, in a stop that

10   featured shifting explanations for why she was stopped.          08:53:34

11         We will not, unfortunately, have Mr. Ortega Melendres,

12   who is one of the named plaintiffs in the case.  We understand

13   that he has some medical issues that prevent him from traveling

14   to be with us for this trial.

15         We also intend to submit the testimony of a number of     08:53:50

16   MCSO officers and officials.  They will show, we believe, that

17   the tone and the culture of the MCSO is characterized by a

18   denigration of Hispanics, by a lack of training, lack of

19   supervision to prevent racial profiling, and by the use of race

20   as a basis for suspicion as to illegal immigration status.       08:54:15

21         We believe that the evidence will show that the MCSO

22   in this regard falls below generally accepted law enforcement

23   agency standards and fosters racial profiling and illegal

24   seizures.

25               You will hear, Your Honor, from Sheriff Arpaio and    08:54:36

1    Chief Sands.  It is our view that the problem here starts from

2    the top.  This testimony will show the influence of race on the

3    MCSO's highest level decision making and operations.

4         Finally, you will hear from our police practices

5    expert, Robert Stewart, who will show how the MCSO has, in          08:54:56

6    fact, departed from generally accepted police practices.

7         We hope the Court will compel the MCSO to honor the

8    Constitution and put in place the standard practices that other

9    law enforcement agencies around the country have used to

10   prevent racial discrimination and comply with the equal           08:55:17

11   protection laws.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Mr. Casey.

15        MR. CASEY:  Thank you, Your Honor.                            08:55:27

16        If I may have a minute to set up.

17        THE CLERK:  Counsel, do you intend to display that?

18        MR. CASEY:  Pardon me?

19        THE CLERK:  Do you intend to display something?

20        MR. CASEY:  Yes, I do.                                        08:56:08

21        Your Honor, very briefly, my name, as you know, is Tim

22   Casey, been on the case for a long period of time.  With me at

23   counsel table is Tom Liddy of the Maricopa County Attorney's

24   Office.  Next to him is James Williams of my office.  Next to

25   James is Ann Uglietta, who's also with the Maricopa County         08:56:26

1    Attorney's Office, and we represent the defendants in this

2    case, Maricopa County Sheriff Joe Arpaio and the Maricopa

3    County Sheriff's Office which, as you know throughout the

4    course, we abbreviate MCSO.

5         We're here today because the plaintiffs, as you've    08:56:43

6    just heard, allege that they've been the victims of racial

7    discrimination by MCSO deputies during traffic stops, and

8    particularly what their lawyers focus on is the traffic stops

9    that occurred during saturation patrols.

10        At essence what they claim, throughout this    08:57:00

11   litigation, is that Joe Arpaio in 2007 started, initiated a

12   policy, pattern, or practice, of initiating saturation patrols

13   pursuant to citizen requests that are, at best, racially

14   insensitive, at worst racist, and that that sort of thing

15   trickles down into law enforcement operations.  It permeates    08:57:24

16   the entire operation, and therefore there's a discriminatory

17   effect on Latinos during saturation patrols, and there is

18   racial animus, discriminatory purpose.

19        Your Honor, there are two sides, as you're aware, to

20   every story.  If the truth was anything like what the    08:57:44

21   plaintiffs' lawyers are suggesting, it would be a very

22   disturbing picture.  But I'm here to tell you, Your Honor, that

23   the evidence is going to show something very different.  And

24   what I'd like to do is just very briefly go through two themes

25   about the evidence that you're going to hear.    08:58:02

1              At the end of this trial, whether it finishes on

2      August 1st or August 2nd, when you've heard evidence that the

3      plaintiffs have put together and you've heard the evidence that

4      the defendants put together, then you need to decide how to

5      resolve the matter.                                          08:58:19

6              Now, my client, Sheriff Arpaio and the MCSO, believe

7      the charges of plaintiffs and their lawyers are unfair.  But we

8      understand that that is the decision that you, as the trier of

9      fact in this case, have to make.  And to help you understand

10     how the evidence is going to come in, I want to go over very   08:58:34

11     briefly two points.

12             The first is we have five plaintiffs on three stops.

13     The evidence is going to show race and ethnicity had nothing to

14     do with the traffic stops of those individuals, the detention

15     of those individuals, or whether citations were issued.        08:58:52

16             The next point of the evidence, Your Honor, is their

17     Fourteenth Amendment racial profiling claim fails because race

18     and ethnicity had nothing to do with the initiation, planning,

19     or execution of these things.

20             Now again, I'm going to go through this quickly         08:59:10

21     because we have -- the Court is familiar with it.  Deputy

22     DiPietro handled the stop of Mr. Melendres.  He's going to be

23     called today.  Race had nothing to do with this.  He did not

24     see the race of the truck's driver.  He did not see the race of

25     the truck's passengers.  It played no role, race or ethnicity  08:59:28

1   played no role in his decision to find probable cause to stop

2   the truck for speeding.  The probable cause was race neutral,

3   speeding.

4          Plaintiffs' racial profiling expert, Mr. Stewart, who

5   was mentioned during opening, can't testify that Deputy            08:59:47

6   DiPietro acted with any racial animus.  And Mr. Stewart

7   basically says if you're targeting possible criminal activity

8   at a location, you must be targeting Latinos.

9          Even Mr. Melendres, and I'm sorry to hear that he

10  would choose to file his lawsuit, is not here in this courtroom     09:00:10

11  to testify that he had no opinion on whether he was racially

12  profiled.

13         The next set of plaintiffs are Mr. and Mrs. Rodriguez,

14  who were traveling on Bartlett Dam Road.  The deputy who

15  stopped him was Deputy Ratcliffe.  He could not see the race of    09:00:27

16  the driver or the occupants.  He stopped them on race neutral

17  grounds.  The Court has already determined that he had probable

18  cause to stop them for driving on a closed road.

19         His decision, which I believe is still an issue here,

20  and that you're going to hear Mr. Rodriguez testify to about        09:00:43

21  the issuance of a citation, was based solely on the fact that

22  he was driving on an unsafe, closed road.  Mr. Rodriguez

23  admitted in traffic court responsibility for the violation, and

24  again, Mr. Stewart has no opinion as their expert on whether

25  Deputy Ratcliffe had any discriminatory intent or purpose.          09:01:03

```
 1              Now I'm going to go through this, quite frankly, one
 2    of other things you're going to hear from David Rodriguez is
 3    that he believed that he was given a citation and Caucasian
 4    drivers were not.  And the fact of the matter is that many of
 5    the drivers, you're going to hear from Deputy Ratcliffe, he        09:01:24
 6    pulled over, turned over to the jurisdiction that had primary
 7    responsibility, the Tonto National Forest, and they actually
 8    issued citations regarding those.  Another deputy was the one
 9    that allowed certain people ingress and egress to the lake to
10    deal with property damage.                                         09:01:43
11              I have put these things up very quickly.  The final
12    set of plaintiffs are a brother and sister.
13              THE COURT:  Let me ask you before we move off of
14    Ratcliffe, I assume that the -- was there any allegation that
15    Ratcliffe was stopped during a saturation patrol?                 09:01:58
16              MR. CASEY:  Ratcliffe was a deputy on --
17              THE COURT:  I'm sorry, I meant Rodriguez.
18              MR. CASEY:  It is not.  That's significant here,
19    because if you look at the plaintiff Melendres, it was a small
20    HSU operation, not a typical --                                   09:02:13
21              THE COURT:  But it was an HSU operation.
22              MR. CASEY:  It was an HSU special operation, so
23    technically it's classified.  Then you go to Rodriguez, there
24    was no saturation patrol.  We've already stipulated into
25    evidence what days those occurred, no saturation patrols there.   09:02:28
```

1              Then you go to Manuel Nieto and Velia Meraz, the

2       brother and sister.  There was a saturation patrol that day,

3       but the facts are going to show that their stop, the

4       interaction, really had nothing to do with the saturation

5       patrol.  Deputy Kikes was a motorcycle cop who did not know or      09:02:44

6       see the race of the occupants.

7              Mr. Stewart is going to testify as plaintiffs' expert.

8       He has no evidence, he can offer no opinion that Kikes offered

9       any racial discriminatory intent.  Mr. Stewart again, I guess

10      some of this is duplicate.                                          09:03:05

11             The bottom line as to the five plaintiffs on the three

12      stops, there's absolutely no evidence that race or ethnicity

13      played any factor in any aspect.  That's why they go to the

14      citizen complaints that Arpaio -- that said rotten from the

15      head down.  The evidence is going to show, Your Honor, that         09:03:30

16      Sheriff Arpaio's statements don't show racial animus.  And I'm

17      going to go through these quickly because I want to be

18      commensurate with the plaintiffs' time.

19             MCSO operations focus on crime and only crime.  They

20      enforce all the laws whether they're popular or not.  And           09:03:49

21      you're going to hear evidence, and you talked about this on

22      December 22nd at our hearing last year, there are press

23      statements and there are actual field operations.  We're going

24      to talk about what is actually going on in the field with the

25      law enforcement professionals versus some of the things that        09:04:07

 1   the plaintiffs are going to show you about -- or show you

 2   during the trial.

 3         The next thing, too, is when you're going to hear

 4   Sheriff Arpaio and plaintiffs' theme is he gets letters from

 5   citizens saying, Please come to location A to do a saturation          09:04:24

 6   patrol, and that somehow he goes out, he does it.  He sends

 7   thank you letters because he's an elected official; he thinks

 8   that's prudent.  If they take the time to write him, he will

 9   write them back.

10         He makes no law enforcement decision or value               09:04:40

11   assessment about the letters.  If they come in and they mention

12   animal abuse in Wickenburg in the county, he'll send it off to

13   Animal Control.  If he thinks it mentions drugs, he sends it to

14   drugs.  If it has anything to do remotely with an issue he

15   believes is dealing with immigration, he sends it off to Brian        09:04:59

16   Sands.  He makes no value assessment.  He expects his staff to

17   determine what value, if any, to put on that.

18         He does not select, "he" being Sheriff Arpaio, does

19   not select the sites for the saturation patrols.  He has never

20   suggested a site based on a citizen letter.                       09:05:19

21         The other thing that's important for the Court to

22   remember, when the plaintiffs argue that this letter came in on

23   day 1, Arpaio sees it on day 10, and on day 14 a saturation

24   patrol was conducted, the evidence is going to show it takes 30

25   to 60 days to plan a large-scale saturation patrol.  If it is         09:05:40

1    just HSU members -- and there are 15 of those, the evidence

2    will show -- it takes two to three weeks to plan those.

3          THE COURT:  Let me ask you, Mr. Casey:  Is there any

4    dispute about whether HSU members are all 287(g) certified?

5          MR. CASEY:  There is not.  Lieutenant Sousa was not      09:05:58

6    287(g) certified.  The two deputies underneath him, Brett

7    Palmer, Manuel Madrid -- you'll see Sergeant Madrid today --

8    were 287(g).  Under each one is a squad.  There are five 287(g)

9    certified before that was revoked in October of '09, and then

10   each one had a 287(g) detention officer.                       09:06:19

11         THE COURT:  And then all of those are 287(g)

12   certified?

13         MR. CASEY:  All are 287(g) certified, Your Honor.

14         THE COURT:  Now, when we're talking saturation

15   patrols, saturation patrols involve more personnel than HSU    09:06:32

16   personnel.

17         MR. CASEY:  There are HSU saturation patrols and there

18   are large scale.  For example, Sun City --

19         THE COURT:  I understand that.  In the larger scale --

20         MR. CASEY:  Yes.                                         09:06:44

21         THE COURT:  -- are all the participants 287(g)

22   certified?

23         MR. CASEY:  No.

24         Here are the criteria that you're going to hear for

25   the selection of the sites, Your Honor, combination of factors. 09:06:53

| 1 | Sands makes the decision of where, when, and how to do a |
|---|---|
| 2 | saturation patrol.  He does it based on the area's crime |
| 3 | history and data.  Intelligence and data about criminal |
| 4 | activity.  The ethnic constituency of a neighborhood plays no |
| 5 | role.  Information about areas involving crime that come in |
| 6 | from other police officers.  There's no focus or targeting of |
| 7 | areas believed to contain a high percentage of illegal aliens, |
| 8 | illegal immigrants, undocumented workers, whatever we may wish |
| 9 | to characterize them as.  The race or ethnicity of people play |
| 10 | no role in Sands' decision. |
| 11 | Again, you may get requests for assistance in a |
| 12 | particular area from legislatures -- legislators, and |
| 13 | information offered in the requests only if it's related to |
| 14 | criminal activity.  You may get a request from city officials. |
| 15 | Chief Sands will testify, consistent with his deposition |
| 16 | testimony, he never has made a decision for a saturation patrol |
| 17 | based on a citizen letter that did not set forth details about |
| 18 | criminal activity and was not independently confirmed by the |
| 19 | MCSO investigation. |
| 20 | THE COURT:  Let me ask another question, Mr. Casey. |
| 21 | MR. CASEY:  Yes, Your Honor. |
| 22 | THE COURT:  Does a saturation patrol involve officers |
| 23 | in vehicles as well as officers on foot, motorcycle officers, |
| 24 | whatever else? |
| 25 | MR. CASEY:  Mostly officers in marked vehicles, |

09:07:11

09:07:35

09:07:54

09:08:12

09:08:23

1    unmarked vehicles, and on motorcycles.

2          THE COURT:  All right.  That is the balance of a

3    saturation patrol?

4          MR. CASEY:  That is the vast majority of it.

5          THE COURT:  And I don't know, maybe we'll have to          09:08:33

6    develop this through testimony, but is -- is it MCSO's

7    contention that saturation patrols, whether they be smaller

8    scale HSU saturation patrols or the larger scale saturation

9    patrols, are run according to a zero tolerance policy?

10         MR. CASEY:  At one point it became zero tolerance, and   09:08:54

11   you're going to hear the testimony of when it became.  It

12   wasn't always.  In 2007, 2008, you're going to have to hear

13   about when it was.  But there were times that they did not have

14   a zero tolerance.

15         And you're going to hear testimony that zero tolerance   09:09:09

16   was in two fashions.  One, if you're on a saturation patrol and

17   you pull over Stan Young and he has a warrant for his arrest,

18   there are actually some people would have the discretion

19   whether to execute that based on if he had his family there, if

20   he had an emergency.  But on a zero tolerance, if he has an      09:09:26

21   arrest warrant he is arrested.

22         Zero tolerance also played a role in, if I'm a regular

23   deputy on patrol and I see office -- I see a violator going 75,

24   I have discretion whether or not I can pull them over.  If I

25   see a speeder during a saturation patrol under zero tolerance,  09:09:48

1    I am to pull them over, I am to give a citation.

2          I'd like to end with this.  The law enforcement

3    experts on both sides agree that the method chosen by the MCSO

4    for saturation patrols is reasonable and consistent with

5    standard law enforcement.  Plaintiffs' expert, contrary to what    09:10:08

6    we've heard, is going to testify that he did not draw the

7    conclusion based on his analysis that any saturation patrol was

8    unjustified or unwarranted.

9          And finally, what you're going to hear from Bennie

10   Click, our police practices expert, former chief police of the    09:10:23

11   City of Dallas, is that everything that was going on was

12   properly planned, properly executed, properly supervised,

13   properly debriefed, met reasonable and appropriate standards of

14   care for law enforcement nationally, exceeded those standards,

15   and, quite frankly, he will also testify that these deputies      09:10:43

16   were properly trained on the prohibition to ever use race in

17   any aspect.  That's why at the end of this trial I'm going to

18   ask you, Your Honor, to award the defendant -- the defendants a

19   defense verdict to deny the plaintiffs the requested relief.

20   Thank you very much.                                              09:11:08

21          THE COURT:  Thank you.

22          Mr. Young, first witness.

23          MR. YOUNG:  Yes, Your Honor.  Mr. Byrnes will present

24   our first witness.

25          MR. BYRNES:  Your Honor, plaintiff calls as our first      09:11:33

```
 1    witness, Dr. Ralph Taylor.

 2            Your Honor, I've prepared a binder of the exhibits I

 3    intend to use with Dr. Taylor.  May I approach?

 4            MR. CASEY:  I'm sorry, what --

 5            THE COURT:  What is the range of the exhibits?        09:11:50

 6            MR. BYRNES:  In numerical?

 7            THE COURT:  Yeah.

 8            MR. BYRNES:  They range from 54 to 399.

 9            THE COURT:  All right.  Bring your -- bring your --

10    you may approach.                                            09:12:01

11            Dr. Taylor, will you please come forward to be sworn

12    by the clerk.

13            THE CLERK:  Please step forward, sir.

14            Can you please state and spell your full name.

15            THE WITNESS:  Ralph, R-a-l-p-h; Brecken,             09:12:29

16    B-r-e-c-k-e-n; Taylor, T-a-y-l-o-r.

17            THE CLERK:  Please raise your right hand.

18            (Ralph Brecken Taylor was duly sworn as a witness.)

19            THE CLERK:  Thank you.  Please take our witness stand.

20    Go to the right, sir.                                        09:12:49

21            MR. LIDDY:  Your Honor, before we begin, may I inquire

22    as to what it is that the plaintiff provided the Court?

23            THE COURT:  Yes.  Sorry.

24            Do you not have a copy for defendants?

25            MR. BYRNES:  We provided the defendants with copies of 09:13:04
```

1  the demonstrative exhibits, which had not -- which are portions

2  of other exhibits that have been disclosed.  We did not provide

3  witnesses -- I'm sorry, strike that -- opposing counsel with

4  the exhibits that they already have.

5          THE COURT:  All right.  Let me ask you, have you given  09:13:20

6  me anything in this notebook that hasn't already been admitted

7  into evidence?

8          MR. BYRNES:  Yes, we have.

9          THE COURT:  And what specifically have you given me

10  that's not been admitted into evidence?                       09:13:29

11          MR. BYRNES:  The exhibits that you have that have not

12  yet been admitted into evidence that are exhibits are 398 and

13  399, expert reports of Dr. Taylor.

14          They are Exhibit 54, and the other -- there are a

15  series of demonstrative exhibits which are designated with    09:14:01

16  suffixes off of the Exhibits 398 and 399, which are the expert

17  reports, and those demonstrative exhibits are portions of those

18  reports.  And that's what my colleague just handed opposing

19  counsel.

20          THE COURT:  I'll tell you what.  Why don't you give    09:14:23

21  them this.  They can follow from that, and I will just use the

22  exhibits as you call them out.  I have them behind me.

23          MR. LIDDY:  Thank you, Your Honor.

24          MR. BYRNES:  May I proceed, Your Honor?

25          THE COURT:  Please.                                    09:14:42

1                    RALPH BRECKEN TAYLOR,

2    called as a witness herein, having been duly sworn, was

3    examined and testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. BYRNES:                                          09:14:43

6    Q.  Dr. Taylor, what is your current position?

7    A.  I'm currently a professor of criminal justice at Tempe

8    University, and I also hold a courtesy appointment in geography

9    and urban studies.

10   Q.  Dr. Taylor, can you please describe your educational      09:15:02

11   background.

12   A.  I received a Ph.D. in social psychology from Johns Hopkins

13   University in 1977.

14   Q.  What is the focus of your work?

15   A.  I have done work on a range of topics related to the causes  09:15:15

16   of crime, impact of crime, and a variety of criminal justice

17   topics.

18   Q.  Dr. Taylor, have you authored or coauthored any

19   publications in scientific journals?

20   A.  Yes.  I've authored or coauthored over 60 publications that  09:15:33

21   appeared in journal articles.

22   Q.  Do you serve on the board of any journal?

23   A.  Yes.  I currently serve on the editorial boards for the

24   Journal of Quantitative Criminology, Environment and Behavior,

25   and the Journal of Criminal Justice.  I have previously served  09:15:50

on other editorial boards.

Q.  Have you received any special recognition for your work?

A.  Last fall I was elected a fellow of the American Society of Criminology.

Q.  Dr. Taylor, do you review scientific papers prior to their publication?

A.  Yes, I do.  I do that as part of my work on the various editorial boards, and then other journal editors will also ask me to review articles.

Q.  Dr. Taylor, do you review grant proposals as well?

A.  Yes, I do.

Q.  For which organizations do you review them?

A.  I am regularly asked to review grant proposals for the National Institute of Justice, and I've also previously reviewed proposals for the National Science Foundation and the National Institute of Mental Health.

Q.  Have you taught statistics?

A.  Yes, I have.  I've taught undergraduate statistics and graduate statistics.

Q.  Have you taught courses in research methods?

A.  Yes, I have.  I have taught courses in undergraduate research methods and in graduate research methods, and I authored a research methods textbook in criminal justice published by McGraw-Hill in 1994.

Q.  Have you done any work on race and criminal justice?

1    A.  Yes, I have.

2    Q.  What work is that?

3    A.  Well, race is a factor in many different studies that I've

4    completed.  Specifically with regard to criminal justice, I

5    completed a study in the early 2000s at the request of the          09:17:39

6    Pennsylvania Supreme Court working group and examined the

7    impact of the racial composition of the neighborhood in which a

8    summoned juror lived, on the likelihood that the summoned juror

9    would show up for jury duty.

10   Q.  Have any of your research publications addressed police        09:17:59

11   operations?

12   A.  Yes, they have.

13   Q.  Which of your publications have addressed police

14   operations?

15   A.  There was a publication that appeared in 2005 in the           09:18:09

16   journal Justice Quarterly, which I was a coauthor with two

17   others who were then graduate students at that time.  We

18   investigated the impact of Philadelphia Police Department's

19   Operation Safe Streets, which was an attempt to reduce drug

20   activity on specific corners in the City of Philadelphia.          09:18:30

21   Q.  Have you worked with police data?

22   A.  Yes, I have.

23   Q.  In what context?

24   A.  In a range of different -- different studies since 1978.

25   Q.  Dr. Taylor, have you previously served as an expert            09:18:44

1    witness?

2    A.  Yes, I have.

3    Q.  In what case or cases?

4    A.  There was a -- one case in the early 1980s, Greater

5    Baltimore Board of Realtors v. Harry Hughes, who was then      09:18:57

6    governor of Maryland.  And the case questioned whether or not a

7    ban on real estate signs should be maintained in specific real

8    estate conservation areas.

9    Q.  Have you ever served as an expert witness in a case against

10   the Maricopa County Sheriff's Office?                          09:19:17

11   A.  No, I have not.

12   Q.  Have you ever served as an expert witness in any case

13   against any law enforcement agency?

14   A.  No.

15   Q.  Dr. Taylor, you've been retained by plaintiffs' counsel in  09:19:26

16   this case?

17   A.  Yes.

18   Q.  And what is your fee?

19   A.  $150 per hour.

20   Q.  Is that in any way contingent upon the result of this case?  09:19:36

21   A.  No.

22          MR. BYRNES:  Your Honor, plaintiffs tender Dr. Ralph

23   Taylor as an expert witness in the field of criminal justice.

24          THE COURT:  I don't make it my habit to certify people

25   as experts.  I do allow them to offer opinions, and I will      09:19:48

```
 1   allow Dr. Taylor to offer -- well, I will listen to the opinion
 2   he's going to offer, subject to any objections by plaintiff
 3   based on the qualifications -- or by defendant based on the
 4   qualifications you've just set forth.
 5              MR. BYRNES:  Thank you, Your Honor.                    09:20:07
 6   BY MR. BYRNES:
 7   Q.  Dr. Taylor, what question were you asked to investigate in
 8   this case?
 9   A.  I was asked to investigate the impact of major saturation
10   patrol operations carried out by the MCSO.                       09:20:18
11   Q.  On what in particular -- what impact in particular were you
12   asked to investigate?
13   A.  I was asked to investigate the possibility of ethnic
14   disproportionality.
15   Q.  During what time period did you analyze the activities of    09:20:35
16   the Maricopa County Sheriff's Office?
17   A.  I analyzed data that were provided from January 1, 2007,
18   through October 31st, 2009.
19   Q.  Why did you choose that time period?
20   A.  I chose that time period because the first major saturation  09:20:54
21   patrol operation for which I received documentation took place
22   in January 2008.  And if that was the program of interest, the
23   purpose was to come up with a baseline period, if you will,
24   that would be of sufficient length, and therefore 2007 serves
25   as the comparison period.                                        09:21:23
```

1    Q.  And why did you choose October 31st, 2009, as an end date?

2    A.  That was the last date for which there were data from one

3    of the data sources.

4    Q.  You've mentioned several times saturation patrols.  At

5    least in your analysis, what is a saturation patrol?                      09:21:39

6    A.  A saturation patrol is an operation for which the MCSO

7    prepares operation plans and announces a date and location of

8    the operation.

9    Q.  In reaching your conclusion, what were the underlying facts

10   that you investigated?                                                     09:21:56

11   A.  I looked at two -- two outcomes of interest.  If a -- a

12   name was checked by an MCSO officer, what was the likelihood

13   that that name checked was a Hispanic versus non-Hispanic name?

14   And then I also looked at if a stop, a traffic stop or traffic

15   violation occurred, what was the length of the stop?                      09:22:21

16   Q.  And what did you conclude?

17   A.  What I concluded were three -- three points.  It appeared

18   that if -- if an incident took place during a day on which a

19   major saturation patrol operation was in effect, there was a

20   much higher likelihood that the name checked by the                       09:22:46

21   officer would be Hispanic rather than non-Hispanic.

22          Second, focusing just on saturation patrol days

23   themselves, if a name was checked by an officer who was active

24   in a saturation patrol that day, it was much more likely that

25   the name would be Hispanic rather than non-Hispanic.                      09:23:07

1      THE COURT:  Can I get you to repeat those two things

2  you just said, please.

3      THE WITNESS:  Yes, sir.  The first finding was that if

4  saturation patrol days are compared to comparison days when

5  there's no saturation patrol taking place, the names checked          09:23:24

6  were much more likely to be Hispanic rather than non-Hispanic.

7      THE COURT:  And that includes a database that includes

8  the operations of all Maricopa County sheriff's officers,

9  whether or not they're involved in the saturation patrol?

10      THE WITNESS:  Correct.                                           09:23:44

11      And then the second point that I was making was that

12  if we focused just on saturation patrol days when there's a

13  major operation taking place, in contrast, the names of the

14  officers who are active in that operation, the names submitted

15  by those officers are much more likely to be Hispanic than are       09:24:05

16  the names submitted on the same day by officers not active in

17  that operation.

18      THE COURT:  All right.  So let me see if I can state

19  that.  On the day that a saturation patrol takes place there is

20  a higher likelihood that any officer is going to stop -- any         09:24:21

21  officer involved in any operation is going to stop a Hispanic

22  than is normally the case for the MCSO.  And if the officer is

23  in fact active in the saturation patrol, there is a higher

24  likelihood than the normal officer that he will stop someone

25  who has a Hispanic surname.                                          09:24:44

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  All right.  Thank you.

3              THE WITNESS:  And the third, the third point was that

4    if -- if you look at -- if you look at the incidents, or if, if

5    you will, the stops that take place, the incidents are more                09:25:03

6    likely -- and this is for the entire -- the entire series --

7    the incidents are more like -- are going to last about

8    22 percent longer, or about two minutes longer, if during that

9    incident the officer checks at least one Hispanic name, and

10   that's controlling for several other factors that could be                 09:25:27

11   varying across the stops.

12             THE COURT:  Let me break that down.

13             Did you do any study -- was this related to the

14   operations of all MCSO operations on that day, or was it

15   related only to those officers who checked -- who stopped                  09:25:42

16   persons with Hispanic surnames that were involved in a

17   saturation patrol?

18             THE WITNESS:  This is all -- all incidents that I

19   analyzed which were traffic stops and traffic violations,

20   regardless of the day on which they occurred.                             09:25:58

21             THE COURT:  Oh.  So forget saturation patrols.  All

22   traffic stops of persons that have somebody with a Hispanic

23   surname in the car are two minutes longer than other traffic

24   stops?

25             THE WITNESS:  Yes, sir.  All incidents, if -- if the            09:26:13

```
 1    officer -- all the incidents where names are checked, or at

 2    least one name is checked, because if -- where at least one

 3    name is checked, if one of those names is Hispanic, then the

 4    stop, controlling for other factors, the stop will last about

 5    two minutes longer.                                        09:26:36

 6              THE COURT:  Thank you.

 7              MR. BYRNES:  Your Honor, I'm handing to Dr. Taylor

 8    Exhibit 398 and 399.  May I approach the witness?

 9              THE COURT:  You may.

10    BY MR. BYRNES:                                             09:27:03

11    Q.  Dr. Taylor, focusing first on Exhibit 398.

12              Your Honor, may we put that exhibit on the screen?

13              THE COURT:  Any objection?

14              MR. LIDDY:  I object, Your Honor.  I object to this

15    exhibit which has not yet been moved into evidence being     09:27:28

16    published to the fact-finder.

17              THE COURT:  Okay, I'm going to sustain the objection

18    until the exhibit -- until and if the exhibit is admitted into

19    evidence.

20    BY MR. BYRNES:                                             09:27:41

21    Q.  Dr. Taylor, do you recognize Exhibit 398?

22    A.  Yes, I do.

23    Q.  And what is Exhibit 398?

24    A.  This is the initial report that I prepared analyzing the

25    data.                                                      09:27:54
```

1    Q.  Does this report set forth your conclusion as well?

2    A.  Yes, it does.

3          MR. BYRNES:  Your Honor, plaintiffs move Exhibit 398

4    into evidence for the purpose of showing the basis of

5    Dr. Taylor's conclusions.                                  09:28:07

6          MR. LIDDY:  Objection, Your Honor, on the basis of

7    that it's hearsay, it's cumulative, and it's duplicative.

8          THE COURT:  That's fine.  It is hearsay, it seems to

9    me.  So unless you're offering -- it seems to me like you're

10   offering it for the truth of the matter asserted, is that   09:28:21

11   correct?

12         MR. BYRNES:  No, that's not correct, Your Honor.

13   We're offering it to show the basis of Dr. Taylor's conclusion.

14         I'll cite Your Honor to the Paddock case, 745 F.2d

15   1254 from the Ninth Circuit (1984), where a compliant audit   09:28:33

16   report, while rejected on the basis of hearsay, the circuit

17   court reversed with instructions to the district court to allow

18   into evidence that report --

19         THE COURT:  Why don't you just have the doctor tell me

20   what the basis of his -- basis of his test was?  He's here; he   09:28:59

21   can testify to it.

22   BY MR. BYRNES:

23   Q.  Dr. Taylor, can you please look at Exhibit 399.

24         Dr. Taylor, what is Exhibit 399?

25   A.  Exhibit 399 is the rebuttal expert report that I prepared.   09:29:24

1    Q.  And this report reflects your analysis and conclusions and

2    rebuttal to Dr. Camarota's report?

3    A.  Indeed, yes.

4    Q.  Dr. Taylor, what data sources did you consider in

5    performing your analysis?                                    09:29:44

6    A.  Initially I was provided with two data files from the

7    Maricopa County that were provided by Covington & Burling.  I

8    was provided an MCSO CAD database, which went from January 1,

9    2005, through 2009, and this was -- and then in addition I was

10   also provided a separate -- separate database in PDF form that  09:30:05

11   was from the mobile, the mobile database from the terminals

12   that officers had in their car.

13          Subsequently, additional information that I was

14   provided included the list of the saturation patrol dates and I

15   was also provided with sign-in rosters for saturation patrols  09:30:27

16   and arrests, arrest lists for saturation patrols.

17   Q.  Did you review any other materials in performing your

18   analysis?

19   A.  Yes, I reviewed the original -- the original complaint and

20   also several -- several depositions.                          09:30:46

21   Q.  And whose depositions did you review?

22   A.  I don't recall specifically, but there were several

23   depositions of MCSO officers.

24          MR. BYRNES:  Your Honor, I would like to show

25   Dr. Taylor a demonstrative exhibit, exhibit marked 398A.      09:31:05

```
1              THE COURT:  It should be on your screen, Doctor.

2    BY MR. BYRNES:

3    Q.  Dr. Taylor, do you see the exhibit?

4    A.  Yes, I do.

5              MR. BYRNES:  Your Honor, may we publish this exhibit      09:31:34

6    on the courtroom screen?

7              THE COURT:  No.

8              MR. BYRNES:  Sorry, Your Honor?

9              THE COURT:  No.

10   BY MR. BYRNES:                                                      09:31:40

11   Q.  Dr. Taylor, is this Exhibit 398 a list of the saturation

12   patrols you studied?

13   A.  Yes.

14   Q.  Does this exhibit also reflect the operations plans that

15   you considered?                                                    09:31:54

16   A.  Yes.

17   Q.  And how many saturation patrols were that?

18   A.  There were 13 patrols listed here.  The first one is

19   January 2008 and the last one is November of 2009.

20             MR. BYRNES:  Your Honor, I'm handing to Dr. Taylor       09:32:19

21   Exhibit 87, which has been admitted into evidence.

22             May I approach the witness?

23             THE COURT:  You may.

24   BY MR. BYRNES:

25   Q.  Dr. Taylor --                                                  09:32:37
```

1     MR. BYRNES:  Your Honor, may we publish the exhibit on

2  the courtroom screen?

3     THE COURT:  You may.

4  BY MR. BYRNES:

5  Q.  Dr. Taylor, do you recognize Exhibit 87?                    09:32:46

6  A.  Yes, this appears to be an operation -- an operation plan

7  for a -- for a saturation patrol in Guadalupe, and that

8  operation took place the 3rd and 4th of April, 2008.

9  Q.  Dr. Taylor, I'd like to direct your attention first to page

10  1854 of the exhibit.  You'll notice the pages are numbered in   09:33:12

11  the bottom right-hand corner.

12     What is -- and it appears -- actually, let me ask you,

13  Dr. Taylor, does this document, is this a collection of mul --

14  is this exhibit a collection of multiple documents?

15  A.  Well, we have various information about the -- the          09:33:34

16  saturation -- the saturation patrol.  And then there's

17  additional information about the -- about the patrol.

18     And then we've also got a -- it looks like a

19  sign-in -- a sign-in roster for the 3rd of April.  It goes on

20  for three pages.  It lists officers and -- and posse members    09:34:01

21  that signed in.  And then there's also a sign-in roster for the

22  4th of April.  And there appears to be an arrest list for the

23  3rd of April and the 4th of April, and there are other things

24  in here as well.

25  Q.  Okay.  I'd like to direct your attention first to the       09:34:29

1    initial material about which you spoke, which begins on page

2    1854.  Earlier you testified you had reviewed operations plans

3    in conjunction with your analysis.

4         Is this portion of Exhibit 87 -- and I'm now referring

5    to pages 1854 through 1859 -- is that an operations plan?        09:34:51

6    A.  Well, it -- yes, it appears to be.  It provides guidelines

7    and talks about when it will happen and where it's happening,

8    and what officers were being called and what arrangements are

9    being made, yes.

10   Q.  Did you use this -- this operations plan in arriving at     09:35:12

11   your conclusions?

12   A.  Yes, because the -- the question was to identify the dates

13   on which there are major saturation patrols taking place.  So

14   the definition used was if the MCSO published an operation

15   guideline or saturation patrol document, then the decision was,  09:35:36

16   okay, those days on which there are major saturation patrols

17   for which there is an operations manual will then be classified

18   as saturation patrol days.

19   Q.  If you'd please turn to the page that begins 1866.  The

20   number may be cut off slightly at the bottom.                   09:36:00

21        You referred in your earlier testimony to sign-in

22   rosters.  Is the -- I'm looking now at the page that -- page

23   1866 through 1871.  Are these the sign-in rosters on which you

24   relied with respect to this Guadalupe saturation patrol?

25   A.  Yes, because in addition to identifying the saturation      09:36:27

1    patrol day, I also sought if there was an incident, an

2    officer linked with an incident, I sought to identify on

3    saturation patrol day:  Is the officer linked with the incident

4    I'm investigating active in that saturation patrol on that day?

5          So to determine that I used two pieces of information,    09:36:50

6    one of which was the sign-in roster.  So you can see here that

7    there are various officers giving their -- their badge numbers,

8    Joe Sousa, Manuel Madrid, Ernest Quintero, and so on, so these

9    are officers signing in for the saturation patrol operation.

10   Q.  Dr. Taylor, I'd like to now direct your attention to the    09:37:16

11   portion of Exhibit 87 that begins at page 1872.  And in

12   particular, that page and then the next page, 1873.

13         What -- what type of documents are these pages?

14   A.  This appears to be a list of individuals arrested on a

15   saturation patrol, the first, and so we've got the individual    09:37:44

16   charged, probable cause, and then the arresting -- the

17   arresting deputy.

18   Q.  Did you rely on these arrest lists in arriving at your

19   conclusions with respect to the Guadalupe saturation patrol?

20   A.  Yes, I did, because it was my understanding that not all    09:38:03

21   officers active in saturation patrol operations would sign the

22   sign-in roster.  So in order to -- in order to pick up

23   additional officers that might be active but hadn't signed in,

24   if an officer made an arrest associated with the saturation

25   patrol, that officer was classified as saturation patrol active    09:38:29

1    on that day.

2    Q.  Dr. Taylor, move -- moving aside from this exhibit, what is

3    the CAD database that you referred to earlier?

4    A.  The CAD database is a -- an MS -- a Microsoft Access

5    relational database that the MCSO uses, and it provides detail          09:38:49

6    about incidents and comments about -- specific comments about

7    things that took place during incidents.  And I was provided

8    with records, all of which were initial all type T, which meant

9    traffic.

10   Q.  Okay.  Dr. Taylor, I'm handing you Exhibit 387, which is a          09:39:16

11   disk.

12              MR. BYRNES:  Your Honor, may I approach the witness?

13              THE COURT:  You may.

14              Is Exhibit 387 already in evidence?

15              MR. BYRNES:  It is not, Your Honor.                          09:39:37

16              I'd like my colleague to put on the witness's screen

17   the main menu that appears.

18              MR. LIDDY:  Your Honor, I would object to proceeding

19   in this manner unless defense tables are able to see the

20   exhibit while the witness is being examined from that exhibit.         09:39:59

21              THE COURT:  Well, you can show -- you can bring it up

22   on defense table, Kathleen.  You can bring it up on parties'

23   tables as well as witnesses'.

24              (Off-the-record discussion between the Court and the

25   clerk.)                                                                09:40:18

 1          THE COURT:  All right.  You can do that, it will come

 2    up on the whole gallery, but we'll -- that way you can see it,

 3    Mr. Liddy, unless you have any objection.

 4          MR. LIDDY:  No objection to that, Your Honor, so long

 5    as the fact-finder will not be able to view it until such time          09:40:28

 6    it's admitted in evidence.

 7          THE COURT:  That's fine.

 8          You want to lay the groundwork to introduce it if you

 9    intend to introduce it, and then we'll see if we have any

10    objection?                                                             09:40:51

11          MR. BYRNES:  Sure.

12    BY MR. BYRNES:

13    Q.  Dr. Taylor, you testified earlier about the CAD database.

14    Did you receive a copy of that database on a disk?

15    A.  Yes, I did.                                                        09:40:59

16    Q.  And when you placed that disk in -- did you place the disk

17    in the disk drive --

18    A.  Yes.

19    Q.  -- and review it?  When you did that did a menu appear?

20    A.  Yes.  If you put the disk in and then start Microsoft            09:41:10

21    Access, which is a relational database, a menu comes up of

22    different tables that you can view.

23    Q.  And were those tables that come up when you put the disk in

24    the disk drive, were they the tables that you reviewed in

25    performing your analysis of this case?                                09:41:32

A.  Yes, they were.  I converted it to a different program and
then I viewed them, yes.

Q.  Did you review the data on the disk and this database
yourself?

A.  Yes, I did.                                                    09:41:47

Q.  How are the data in the CAD database organized?

A.  Data in the CAD database are a relational database.  And
what that means is that there's one table which lists the
different incidents, and then there's an identifying number,
and then that identifying number links to details or comment   09:42:08
lines about each incident, so you've got overall features of
the incident linked to specifics associated with the incident.

         MR. BYRNES:  Your Honor?

         THE COURT:  Yes.

         MR. BYRNES:  I have in front of me the main menu       09:42:28
screen from that disk.  May I inquire of opposing counsel if
they can see the same?

         THE COURT:  Do you have it up?

         MR. LIDDY:  Your Honor, I have something up.  Yes,
Your Honor, it's the same.  It's got no title on it, so I can't 09:42:42
tell.

         THE COURT:  All right.  Please proceed.

BY MR. BYRNES:

Q.  Dr. Taylor, can you see in front of you on the screen a
menu titled Main Switchboard?                                   09:42:55

1    A.  Yes, I do.

2    Q.  Is this the main menu that you saw when you put the disk

3    provided to you by plaintiffs' counsel into your computer to

4    access the information in performing your analysis?

5    A.  Yes, it is.                                          09:43:09

6            MR. BYRNES:  Your Honor, plaintiffs move into evidence

7    Exhibit 387.

8            MR. LIDDY:  Your Honor, I object, unless the Exhibit

9    7 [sic] is merely the index you're referring to that's

10   currently on the screen.                                 09:43:24

11           THE COURT:  I'm going to overrule the objection.

12   We'll move on.  The exhibit is admitted.

13           MR. BYRNES:  Thank you, Your Honor.

14           (Exhibit No. 387 is admitted into evidence.)

15   BY MR. BYRNES:                                           09:43:32

16   Q.  Dr. Taylor, you had testified to the organization of the

17   CAD database.  What information -- and I believe you testified

18   about incident histories, is that correct?

19   A.  Yes.

20   Q.  What information can be determined from the incident     09:43:47

21   histories in the CAD database?

22   A.  Well, at the incident level there is an identifying number,

23   there is a date that the incident took place, there's a time.

24   There's an initial call type designation, which is T here for

25   all of these.  There's also a final call type designation.    09:44:04

1    There is also an indication of the primary officer.

2            MR. BYRNES:  Your Honor, I'm handing Dr. Taylor

3    Exhibit 54.  Exhibit 54 is not yet in evidence, Your Honor.

4            May I approach the witness?

5            THE COURT:  You may approach.                        09:44:27

6    BY MR. BYRNES:

7    Q.  Dr. Taylor, does the data from the CAD database on which

8    you rely include the information on Exhibit 54?

9    A.  Yes, it does.

10   Q.  Does Exhibit 54 show that an MCSO deputy checked a name?   09:44:53

11   A.  Yes, it does.

12   Q.  And where on Exhibit 54 does it reflect that?

13   A.  About five -- five lines from the bottom, there was a

14   remote inquiry made by the unit requesting information in --

15           Can I say the name?                                 09:45:20

16   Q.  Yes.

17   A.  Vasquez dot Victor dot D, and that's followed by a date of

18   birth, 10-28-1964.

19   Q.  Dr. Taylor, in the upper right-hand corner of the

20   Exhibit 54 there is a -- an area titled Disposition.          09:45:41

21           Do you see that?

22   A.  Yes, I do.

23   Q.  Did you use disposition information in conducting your

24   analysis?

25   A.  Yes, I did.                                             09:45:52

1   Q.  For what purpose did you use disposition information?

2   A.  In the incident level analysis of time length, it was

3   necessary to control for whether or not somebody had been

4   arrested or cited.  And in addition, I repeated the analysis of

5   stop length focusing on -- just on incidents where there had          09:46:16

6   been a citation.

7           MR. BYRNES:  Your Honor, plaintiffs move into evidence

8   Exhibit 54.

9           MR. LIDDY:  Without objection.

10          THE COURT:  Exhibit 54 is admitted.                           09:46:30

11          (Exhibit No. 54 is admitted into evidence.)

12          MR. BYRNES:  Your Honor, I'm handing the witness

13  Exhibit 140, which has been admitted into evidence.

14          May I approach the witness?

15          THE COURT:  You may.                                          09:46:41

16          MR. BYRNES:  Your Honor, may we publish the exhibit on

17  the courtroom --

18          THE COURT:  You may.

19  BY MR. BYRNES:

20  Q.  Dr. Taylor, you recognize this document?                         09:46:59

21  A.  Yes, I do.

22  Q.  What does this document show?

23  A.  This document lists, for particular fields in the CAD

24  database, codes used by the MCSO.

25  Q.  Did you rely on the codes in Exhibit 140 to determine what        09:47:16

 1   the codes in the CAD database meant?

 2   A.  Yes, I did.

 3   Q.  If you could please turn to the final page of

 4   Exhibit 170 -- strike that, 140.  At the -- the upper

 5   right-hand corner of the material there's a section called          09:47:47

 6   Disposition Codes.  Do you see that?

 7   A.  Yes, I do.

 8   Q.  Did you rely on this portion of Exhibit 140 to determine

 9   the meaning of the disposition codes in the attached database?

10   A.  Yes.          09:48:01

11   Q.  Dr. Taylor, which incident did you include in your analysis

12   of the effect of the saturation patrol operations on the

13   ethnicity of drivers and passengers whose names were checked?

14   A.  My analysis included all incidents from January 1, 2007,

15   through October 31st, 2009, that had a final disposition code          09:48:20

16   of either traffic stop or traffic violation.

17   Q.  Were there any other characteristics shared by the

18   incidents you included?

19   A.  They all had at least one name that was checked.

20   Q.  Did you --          09:48:41

21          THE COURT:  Hold it.  Hold it.  One name that was

22   checked meaning one name that was a Hispanic surname?

23          THE WITNESS:  They -- they all had at least -- the

24   officer had submitted a request to check at least one name --

25          THE COURT:  All right.          09:48:53

```
 1              THE WITNESS:  -- Hispanic or non-Hispanic.
 2              THE COURT:  Okay.  So you looked at everything that
 3      had one name checked that was either a traffic stop or a
 4      traffic violation.
 5              THE WITNESS:  Yes, Your Honor.                          09:49:02
 6              THE COURT:  Okay.  Thank you.
 7      BY MR. BYRNES:
 8      Q.  Dr. Taylor, I would like you to look back at Exhibit 398A.
 9              MR. BYRNES:  Please don't publish that on the screen.
10      Thank you.                                                     09:49:46
11              Can we publish that to the witness but not to the rest
12      of the courtroom?  Thank you.
13      BY MR. BYRNES:
14      Q.  Do you see it now, Dr. Taylor?
15      A.  Yes.                                                       09:49:56
16      Q.  Dr. Taylor, I asked you a number of questions about this
17      document earlier.  I just want to -- about these particular
18      saturation patrols.  Are these 13 saturation patrols listed in
19      this document beginning with saturation patrol on January 18th
20      and 19th of 2008 and finishing with the saturation patrol on   09:50:20
21      November 16th and 17th of 2009 listed here as county wide, are
22      these the saturation patrols that you reviewed for purposes of
23      your analysis?
24      A.  For purposes of the analysis I was only -- I only had
25      complete information for 11 of the 13.  That is, from the March 09:50:39
```

1    21-22nd saturation patrol through October 16-17, 2009.  I did

2    not have complete data sources for either the first one or the

3    last one.

4    Q.  For clarity in the record, Dr. Taylor, perhaps you can

5    start with the first and last saturation patrol you mentioned.    09:51:07

6          Can you please identify by date and location the names

7    of the saturation patrols that you reviewed for purposes of

8    your analysis.

9    A.  Right.  So the saturation patrols that I classified as

10   saturation patrols began March 21-22nd, 2008.    09:51:22

11          And you want me to list each one?

12   Q.  Well, I would -- I asked you, Can you please identify by

13   date and --

14   A.  Right.

15   Q.  -- the 13 saturation patrols that you analyzed.    09:51:38

16   A.  Okay.  So there are 13 -- 13 listed.  I had complete

17   information for 11 of them, so March 21st-22nd, 2008,

18   32nd Street and Thomas Road in Phoenix.  March 27th-28th, 2008,

19   Cave Creek and Bell Roads in Phoenix.  April 3rd and 4th, 2008,

20   Town of Guadalupe, June 26th-27th, 2008, Town of Mesa.  July    09:52:06

21   14, 2008, Town of Mesa.  August 13-14, 2008, Town of Sun City

22   and Sun City West.  January 9 and 10, 2009, MCSO District 2,

23   southwest valley.  April 23-24, 2009, Town of Avondale,

24   southwest valley.  July 23-24, 2009, Town of Chandler,

25   southeast valley.  September 5 and 6, 2009, 35th Avenue and    09:52:41

1  Lower Buckeye Road in Phoenix.  October 16-17, 2009, Town of

2  Surprise, a/k/a northwest valley.

3  Q.  Dr. Taylor, returning to your analysis of certain incidents

4  in the CAD data, did you exclude any incidents in the CAD data

5  that you received from your analysis?                              09:53:06

6  A.  Yes, I did.

7  Q.  And which incidents do you exclude?

8  A.  I excluded incidents if they were not classified as traffic

9  stop or traffic violation.

10  Q.  And why did you exclude those?                                09:53:18

11  A.  Because those incidents had less potential for

12  officer discretion.

13  Q.  What percentage of the incidents that you reviewed were

14  described as traffic stops or traffic violations?

15  A.  A little over 80 percent each year.                          09:53:32

16  Q.  In evaluating the data, how did you determine what names

17  were checked during the incident?

18  A.  I wrote programs in a statistical software package that

19  allowed me to extract from the comment fields particular names.

20  Q.  Did you find any incidents where Maricopa County sheriff's   09:53:58

21  officers ran the same person through the CAD database multiple

22  times?

23  A.  Yes.

24  Q.  How did you address that circumstance in your analysis?

25  A.  I wrote additional programs and organized the data in such   09:54:11

1  a way that I could de-duplicate names within incidents.

2  Q.  And how did you de-duplicate the names?

3  A.  You arrange the records with an incident so that similar

4  names are near one another, and then you de-duplicate if a

5  preceding or a following name appears to be duplication, or if     09:54:34

6  there's a reversal; there are five or six rules about how to do

7  this that are in the -- in the report.

8  Q.  And what are the particular methodologies that you use?

9  A.  I wrote programs in a statistical package called Stata.

10  Q.  In addition, did you do anything else to address the          09:55:01

11  potential duplication of names in the data?

12  A.  Subsequent to Dr. Camarota's criticism about he had been

13  informed that folks would submit aliases, and therefore you

14  would also want to also de-duplicate by date of birth, and so I

15  wrote additional programs that also de-duplicated by date of      09:55:26

16  birth.

17  Q.  Did the result of your analysis change after you

18  de-duplicate -- de-duplicated data by date of birth?

19  A.  No, all patterns of significance remained the same.

20  Q.  Dr. Taylor, you testified earlier concerning a mobile         09:55:45

21  computer terminal data file?

22  A.  Yes.

23  Q.  What is that file?

24  A.  It's a -- I received a 4,096-page PDF file.  And I

25  understood that officers could submit separate inquiries          09:56:01

1  through their mobile terminals, and I converted this into a

2  data file.

3  Q.  What information is included in the mobile file?

4  A.  The mobile file includes much of the information in the CAD

5  file, but not all of it.                                          09:56:21

6  Q.  What information does it not include in the CAD file?

7  A.  There were some specific features about incidents that the

8  CAD does not have -- that the mobile file, excuse me, does not

9  have.

10         MR. BYRNES:  Your Honor, handing Dr. Taylor            09:56:35

11  Exhibit 193, which is a disk.  May I approach the witness?

12         THE COURT:  You may.

13         MR. BYRNES:  Your Honor, may I show on Dr. Taylor's

14  screen and counsels' screen what appears when you put this disk

15  into a disk drive?                                              09:57:07

16         THE COURT:  You may.

17  BY MR. BYRNES:

18  Q.  Dr. Taylor, while that is being done, did you receive --

19  you mentioned receiving a 4,096-page PDF file.  Did you receive

20  it on the disk?                                                 09:57:29

21  A.  Yes, I did.

22  Q.  Can you please look at your -- could we have page 1 of --

23  of page 2.

24         Dr. Taylor, on your screen is the result of my

25  colleague putting this disk in a computer and what comes up,    09:57:56

1    what came up when a PDF file on that disk was opened.

2           Is this PDF file from which you constructed a mobile

3    only database?

4    A.  Yes.

5           MR. BYRNES:  Your Honor, plaintiffs move into evidence    09:58:16

6    Exhibit 193.

7           THE COURT:  Any objection?

8           MR. LIDDY:  No objection, Your Honor.

9           THE COURT:  Exhibit 193 is admitted.

10          (Exhibit No. 193 is admitted into evidence.)    09:58:22

11          THE COURT:  You may publish if you wish.

12          MR. BYRNES:  I have no further questions that will

13   pertain to publishing.

14          THE COURT:  All right.

15   BY MR. BYRNES:    09:58:35

16   Q.  Dr. Taylor, doesn't the Maricopa County Sheriff's Office

17   maintain records of the racial ethnicity of the people stopped

18   during traffic stops?

19   A.  Not that I'm aware of.

20   Q.  Did the case -- strike that.    09:58:45

21          Did the CAD data that you reviewed include records of

22   the race or ethnicity of the people stopped during traffic

23   stops?

24   A.  No.

25   Q.  Did the mobile file data contain that information?    09:58:57

1    A.   No.

2    Q.   Did you attempt to determine the likely race or ethnicity

3    of the people stopped?

4    A.   Yes.

5    Q.   How did you make that determination?                          09:59:05

6    A.   I used information from the census about the probabilities

7    that various surnames would be Hispanic, and I linked those

8    probabilities to the names checked.

9    Q.   How does the census determine the probability that a name

10   is Hispanic?                                                       09:59:26

11   A.   The census has used different methodologies over the years,

12   but for the 2000 list, which I used, they basically had a large

13   set of 270 million census records.  They analyzed the names,

14   the people listed on the census records, and then they look to

15   see how that name links with another item on the census, which    09:59:47

16   is asking people whether or not they self-identify as Hispanic.

17   Q.   Is there -- how did the census bureau characterize, if at

18   all, particular surnames with regard to the likelihood that

19   some surnames are Hispanic?

20   A.   It provides specific percentages or probabilities for each    10:00:12

21   of over a hundred thousand common surnames in terms of the

22   likelihood that each name is -- the likelihood that a person

23   will self-identify as Hispanic.

24   Q.   Can you provide an example of a name where over 90 percent

25   of the people, for example, with that surname, identified as       10:00:33

1  Hispanic?

2  A.  Sure.  Probably Rodriguez or Garcia would be names that are

3  in the United States where 90 percent of the people with that

4  name self-identify as Hispanic.

5  Q.  In your analysis did you -- how did you characterize the          10:00:48

6  probability that someone with a surname is Hispanic?

7  A.  What I did was I -- because there's no consensus in the

8  field about what percentage of people need to -- who use this

9  name need to self-identify as Hispanic for us to call this

10 Hispanic, I used different thresholds, if you will.                    10:01:10

11         So I used -- so, for example, in the research people

12 had said a name that's Hispanic, if 60 percent or more people

13 with this name self-identified -- self-identify as Hispanic,

14 and they have gone all the way up to this name is Hispanic if

15 90 percent of people with that surname self-identify as               10:01:36

16 Hispanic.  And in those probabilities you create variables

17 based on those thresholds.

18 Q.  Has this technique been used in other analyses related to

19 criminal justice?

20 A.  Yes, it has.                                                       10:01:54

21 Q.  In which other analyses has it been used?

22 A.  There have been analyses on drug arrests in criminal

23 justice journals.

24 Q.  Are you aware of techniques that are more commonly used

25 than the census bureau technique to determine ethnicity?              10:02:11

```
 1    A.  No.  In situations like this, without direct information

 2    about self-identification on ethnicity, this appears to be

 3    widely used in several different disciplines in social science.

 4    Q.  Dr. Taylor, using this census technique did you determine

 5    how many of those people whose names the MCSO checked were        10:02:32

 6    Hispanic?

 7    A.  Yes, I did.

 8          MR. BYRNES:  Your Honor, may I show on Dr. Taylor's

 9    and counsels' screen Demonstrative Exhibit 399H?

10          THE COURT:  399H?                                           10:02:48

11          MR. BYRNES:  Yes.

12          THE COURT:  Yes.

13    BY MR. BYRNES:

14    Q.  Dr. Taylor, did you prepare the table in Exhibit 399H?

15    A.  Yes.                                                          10:03:04

16    Q.  What does this table show?

17    A.  This table shows that anywhere from -- it shows that with

18    the reprocessed data there were 123,831 names checked, and the

19    percentage Hispanic for those names ranged anywhere from 30 --

20    a little over 33 percent to 22 percent, depending on the         10:03:33

21    particular threshold used to define a surname as Hispanic.

22    Q.  You referred to the reprocessed data.  What do you mean by

23    that?

24    A.  These were the data that were reprocessed subsequent to

25    criticisms that Dr. Camarota offered in his rebuttal report.     10:03:53
```

1    So I responded by making an additional de-duplication by date

2    of birth and removing the mobile records.

3    Q.  What was the result of the use of reprocessed data instead

4    of the original data you used?

5    A.  As shown by this table, the percent Hispanic names checked        10:04:16

6    remained virtually the same.  For example, if we use the

7    80 percent threshold with the reprocessed data, the percent

8    Hispanic surnames is 30.2; with the original data it's 31.2.

9    So all of the rates are within 1 percent of what we have the

10   data designated.                                                      10:04:47

11   Q.  And how many total names were checked using the reprocessed

12   data and the original data?

13   A.  With the original data we have 160,974, and with the

14   original data we have 123,831.

15   Q.  Dr. Taylor, in that last response you concluded by saying         10:05:03

16   that in your original data there were 123,831 names checked.

17   A.  I'm sorry, in the reprocessed data.  Thank you.

18           THE COURT:  I'm sorry, I want to ask what the category

19   Proportion Hispanic means.  Does that mean the proportion

20   stopped?  Proportion checked?                                         10:05:28

21           THE WITNESS:  Yes, Your Honor.  Of the names that were

22   checked, what proportion of those names checked were Hispanic,

23   and using different minimum probability thresholds to define a

24   name as Hispanic.  So if --

25           THE COURT:  I understand the probability thresholds.          10:05:48

```
 1   I just want to know what the category Proportion Hispanic
 2   means.
 3            THE WITNESS:  Of all names that were checked during
 4   traffic stops or traffic violation incidents.
 5            THE COURT:  Okay.  Thank you.                          10:05:59
 6            MR. BYRNES:  Your Honor, plaintiff moves this exhibit
 7   into evidence as a demonstrative exhibit.
 8            MR. LIDDY:  Your Honor, I would object.  It's been
 9   tendered as a demonstrative and it would be duplicative.  The
10   witness has testified about it, so I would object.            10:06:14
11            THE COURT:  I think it can be -- I don't know that it
12   needs to be admitted into evidence as a demonstrative.
13   Demonstrative, it seems to me, means it's not admitted into
14   evidence, but it can be -- it can be shown, if that's what you
15   want to do.                                                    10:06:31
16            MR. BYRNES:  Shown into the --
17            THE COURT:  It can be published.
18            MR. BYRNES:  Published.
19            Let's move on to another exhibit.  Thank you, Your
20   Honor.                                                         10:06:47
21            Your Honor, I'd like to show to Dr. Taylor
22   Demonstrative Exhibit 399I.  May I put that on the screen?
23            THE COURT:  You may.
24   BY MR. BYRNES:
25   Q.  Dr. Taylor, is that exhibit on your screen?               10:06:59
```

1    A.  Yes.

2    Q.  Dr. Taylor, did you prepare this table?

3    A.  Yes, I did.

4    Q.  And does this table reflect your analysis and certain

5    conclusions at which you arrive?                                10:07:14

6    A.  Yes.

7          MR. BYRNES:  Your Honor, plaintiffs move this

8    exhibit -- Your Honor, may we publish this exhibit?

9          MR. LIDDY:  Your Honor, it's been tendered as a

10   demonstrative.  He has yet to lay the foundation for it.  So    10:07:31

11   until he does so...  I'm fine with publishing it to the witness

12   but not publishing it to the Court.

13         THE COURT:  Well, I don't think there's really any

14   distinction here.  I'm not admitting it into evidence, but he

15   can show it to the witness and it can be published.             10:07:44

16   BY MR. BYRNES:

17   Q.  Dr. Taylor, what does this table show concerning name

18   checking patterns by the MCSO?

19   A.  What this table shows is the relationship between whether

20   or not a name checked on an official saturation patrol day and  10:08:09

21   whether or not the name checked was Hispanic.  And we see that

22   on the days we know is an official saturation patrol there were

23   1,312 names that were checked that were Hispanic using a

24   90 percent probability threshold, and there were 1,998 names

25   checked on the official saturation patrol day if we use the     10:08:37

1   60 percent threshold.

2   Q.  With regard to total stops, whether or not on saturation

3   patrol days, what did you find concerning the total number of

4   Hispanic stops?

5   A.  If you look at the far right-hand column and look at                10:08:58

6   Hispanic names checked, for the 90 percent threshold you will

7   see that 27,217 Hispanic names were checked, and if you use

8   the -- come down to the 60 percent, 60 percent threshold, you

9   will see that 41,560 Hispanic names were checked.

10  Q.  And what percentage of the total stops is that?                     10:09:32

11  A.  Of the names checked, the Hispanic percentage is anywhere

12  from 21.98 percent, if we use the 90 percent probability

13  minimum, and if we use the 60 percent probability minimum, then

14  the number is 33.56 percent of the names checked.

15  Q.  Dr. Taylor, how did you conduct your analysis to determine          10:10:01

16  the likelihood that a Hispanic surname would be checked in the

17  context of the Maricopa County sheriff's operations?

18  A.  Whether or not the name is Hispanic becomes an outcome

19  variable.  And then you try to predict that with various

20  factors that are of interest, like was the name checked on the         10:10:28

21  saturation patrol date or not.

22  Q.  To determine whether there are differences in the rate that

23  Hispanic names are checked versus not Hispanic, why not just

24  compare the proportion of total names checked with the

25  proportion of the population of Maricopa County that's                 10:10:50

1    Hispanic?

2    A.   That approach, according to scholars who study police stops

3    and racial profiling, is not the best scientific approach.

4    Q.   And why is it not the best approach, in your view?

5    A.   Because the scholars in the field point out that in studies          10:11:12

6    of this type there are three -- three factors in play, and a

7    study should seek to separate out the influence of those three

8    factors, those three factors being, of course, what are the

9    police officers doing?  The second issue are potential

10   differences by race or ethnicity in violating behavior, people          10:11:34

11   driving while violating laws.  And the third issue is exposure,

12   that is, are there differential exposures between the two

13   groups of interest to police -- to police officers?

14   Q.   Is it possible, in your view, that the proportion of

15   Hispanics who were stopped -- strike that.                              10:12:00

16        Is it possible that the proportion of Hispanics in the

17   population could match the proportion of Hispanic stops and yet

18   racial profiling could still occur?

19   A.   Yes.

20   Q.   And how could that be?                                             10:12:17

21   A.   It could be because the other two factors that are in play

22   here could be different.  The rate at which Hispanics versus

23   non-Hispanics in vehicles are exposed to officers could vary or

24   their violating rates could vary.

25   Q.   Dr. Taylor, I'd like to turn your attention to the                 10:12:35

demonstrative exhibit on your monitor there.  How many names

were checked on saturation patrol days?

A.  On saturation patrol days, if we use the 90 percent

probability threshold in the top half of the table, we see that

there were 5,086 names checked on official saturation patrol                10:12:56

days, as I define them, and if we use the 60 percent -- okay.

I'm sorry.  Yes.  Those are -- right.  Those are the names that

were checked on the official saturation patrol days is the

same, yes.

Q.  And how many Hispanic names were checked on saturation                   10:13:19

patrol days?

A.  On saturation patrol days, if at the top we use the 90

percent probability threshold, we see 1,312 Hispanic names

checked during a saturation patrol day.  And if we use the

60 percent probability threshold we'll see that 1,988 Hispanic                10:13:46

names were checked on saturation patrol days.

Q.  Dr. Taylor, did you determine whether a Maricopa County

sheriff's officer was more likely to check a Hispanic name on a

saturation patrol day?

A.  Yes, I did.                                                               10:14:06

Q.  And what did you conclude?

A.  What I concluded was that if we confined our attention just

to names checked on major saturation patrol days, the

likelihood of the name checked being Hispanic was significantly

higher if the name was checked by an officer active in that                  10:14:24

```
 1    operation that day.
 2              MR. BYRNES:  Your Honor, may I show the Demonstrative
 3    Exhibit 399B to Dr. Taylor?
 4              THE COURT:  Yes.
 5    BY MR. BYRNES:                                            10:14:42
 6    Q.  Dr. Taylor, did you prepare this table?
 7    A.  Yes.
 8    Q.  And is this a table that reflects your analysis and
 9    conclusion concerning, at least in part, concerning the
10    likelihood of Hispanic surname checking on saturation patrol  10:14:53
11    days?
12    A.  Yes.
13              MR. BYRNES:  Your Honor, may we publish this
14    demonstrative?
15              THE COURT:  You may.                            10:14:59
16    BY MR. BYRNES:
17    Q.  Dr. Taylor, what does this table show?
18    A.  If saturation patrol days are compared with different
19    comparison days, there is a significantly higher likelihood
20    that the surname checked will be Hispanic.               10:15:17
21    Q.  What is the increase in likelihood?
22    A.  Depending upon the particular comparison days that are
23    chosen, it's anywhere from 26 to a little over 39 percent more
24    likely that a name checked on a saturation patrol day would be
25    Hispanic rather than non-Hispanic.                       10:15:39
```

1    Q.  How did you select which control or comparison dates to

2    use?

3    A.  First of all, we did it -- I did it three different ways.

4    First of all, simply said, let's look at all non-saturation

5    patrol days.  Second, I said let's -- let's find comparison          10:15:59

6    days that are closely comparable to the saturation patrol days,

7    so I would take days from a week before or a week after.  And

8    then finally, I said, Let's take the same day but a year

9    earlier and -- yes.

10   Q.  Did you use any other control besides these control dates?       10:16:24

11   A.  There -- excuse me.  There are additional factors that I

12   had in the model to control for other variations.

13   Q.  And which others?

14   A.  I control for whether the name was checked on a weekend day

15   or a weekday.  I also have, because the data extends over time,      10:16:43

16   I also have variables that control for temporal trends.  And I

17   also controlled for the fact of multiple names might be checked

18   within the same incident.

19   Q.  You earlier testified about reprocessed data versus

20   original data you used.  Was this the conclusion at which --         10:17:06

21   which is shown in Exhibit 399B, are those reflective of your

22   analysis of reprocessed data?

23   A.  Yes.

24        MR. BYRNES:  Your Honor, I'd like to show

25   Demonstrative Exhibit 399A to Dr. Taylor.  May I do so?             10:17:22

```
 1              THE COURT:  Yes.
 2   BY MR. BYRNES:
 3   Q.  Dr. Taylor, did you prepare this table?
 4   A.  Yes.
 5   Q.  And does this table reflect your analysis, in part, of      10:17:41
 6   predicting the likelihood that a Hispanic name is checked?
 7   A.  Yes.
 8              MR. BYRNES:  Your Honor, may we publish this to the
 9   gallery?
10              THE COURT:  You may.                                  10:18:00
11   BY MR. BYRNES:
12   Q.  Looking at the proportion of the demonstrative that's
13   showing on your screen, Dr. Taylor, what does this -- what does
14   this table show?
15   A.  The most important finding is under the column that's       10:18:18
16   called Percent.  And what that does is that looks at how much
17   higher were the odds that the name checked was Hispanic
18   compared to -- compared to different -- different control
19   groups.  I'm sorry, different comparison days.
20              And if you look at the middle section under that      10:18:42
21   column you will see where the comparison group is a week
22   earlier or a week later.  You will see that the odds of the
23   name checked is Hispanic versus not Hispanic were anywhere from
24   28.8 to 34.8 percent higher on the saturation patrol days
25   compared to the comparison days a week earlier or a week later. 10:19:08
```

1          Just one other feature to point out.  Just to the left

2  of that we have the significance of these differences.  These

3  are all highly statistically significant, which means these

4  results are extremely unlikely to be due to chance patterns in

5  this data.                                                    10:19:25

6  Q.  There's some testimony with regard to the statistical

7  significance of the data.  Would you -- looking at the column

8  with the P --

9  A.  P less than .001.  What that .001 means is that the chances

10 of getting a result like this just due to chance, noise, maybe  10:19:44

11 variation, this would happen less than one in a thousand times.

12 Q.  Dr. Taylor, did you consider whether on a saturation patrol

13 day an MCSO officer active in a saturation patrol was more

14 likely to check a Hispanic name than officers not active in a

15 saturation patrol that day?                                   10:20:13

16 A.  Yes.

17 Q.  And what did you conclude?

18 A.  I concluded that if the name was checked by an

19 officer active in a saturation patrol, it was much more likely

20 that that name would be Hispanic as compared to non-Hispanic.  10:20:25

21          MR. BYRNES:  Your Honor, may I show Demonstrative

22 Exhibit 399C to Dr. Taylor?

23          THE COURT:  Yes.

24 BY MR. BYRNES:

25 Q.  Dr. Taylor, did you prepare this table?                   10:20:42

1    A.  Yes.

2    Q.  Does this table reflect your analysis and conclusion in

3    part concerning the likelihood that a Hispanic name is checked

4    on saturation patrol days?

5    A.  Yes.                                                        10:20:57

6          MR. BYRNES:  Your Honor, may we publish this exhibit?

7          THE COURT:  Yes.

8    BY MR. BYRNES:

9    Q.  Dr. Taylor, what does this table show?

10   A.  If we look at the column Percent Change, this shows the    10:21:06

11   effect of a name checked -- a name check being done by an

12   officer active in a saturation patrol day on the odds that the

13   name checked is Hispanic versus non-Hispanic.

14         And so, for example, if we look at the number using an

15   80 percent minimum threshold for a name, this is -- this       10:21:32

16   number 53.7 is saying that the odds that a name check on a

17   saturation patrol day would be Hispanic rather than

18   non-Hispanic is 53.7 percent higher if that name was checked by

19   an officer active in the operation rather than an officer on

20   that same day not active in the operation.                     10:21:58

21         The column just to the left of that tells us with the

22   P less than, that this result is highly statistically

23   significant and unlikely to occur by chance more than one in a

24   thousand times.

25   Q.  There are also on this table other columns, one of which   10:22:19

1    has B as a heading, one of which has Z.  What significance, if

2    any, do those have in your analysis and conclusions?

3    A.  The B is a B weight, which indicates the size or the impact

4    of this.  The Z is a statistic next to it that compares the

5    size of that impact relative to the noise in the data.  And        10:22:46

6    that Z number is then associated with a particular probability

7    which you see right next to the Z.

8    Q.  What percentage change was there with regard to the

9    likelihood a Hispanic name was checked by an officer actively

10   involved in the saturation patrol compared with one who was not    10:23:11

11   so involved?

12   A.  Well, the numbers that we see here suggest that the

13   likelihood of a Hispanic versus non-Hispanic name being checked

14   are anywhere from 46 to 53.7 percent higher, depending on the

15   threshold, minimum threshold used.                                 10:23:33

16   Q.  And make sure I understand.  Who are you comparing?

17   A.  This is comparing -- this is focusing on saturation patrol

18   days only.  It's comparing the names checked by officers active

19   on that operation that day to all the other officers checking

20   names on those same days.                                          10:23:57

21   Q.  Dr. Taylor, did you compare the likelihood of checking a

22   Hispanic name between an MCSO officer active in a saturation

23   patrol on the one hand and an officer who has never been active

24   on any saturation patrol on a non-saturation patrol day?

25   A.  Yes.                                                           10:24:16

1    Q.  And what did you conclude?

2    A.  What I concluded was that the first situation you

3    described, a saturation patrol officer active on a saturation

4    patrol day compared to an officer on a non-saturation patrol

5    day and an officer that is -- and an officer who had never been          10:24:32

6    involved in a saturation patrol operation, the first type --

7    the first type of situation results in a much higher likelihood

8    that a Hispanic name will be chosen.

9         MR. BYRNES:  Your Honor, may I display to Dr. Taylor

10   Demonstrative Exhibit 399E?                                             10:24:50

11        THE COURT:  Yes.

12   BY MR. BYRNES:

13   Q.  Dr. Taylor, did you prepare this table?

14   A.  Yes.

15   Q.  This table reflects in part your analysis and conclusions           10:25:00

16   concerning the likelihood of Hispanic surname checking?

17   A.  Yes.

18        MR. BYRNES:  Your Honor, may we publish?

19        THE COURT:  Yes.

20   BY MR. BYRNES:                                                          10:25:13

21   Q.  Dr. Taylor, what does this table show?

22   A.  This shows that if we look at the name checking patterns of

23   saturation patrol active officers working on saturation patrol

24   days and we compare their name checking to officers never

25   involved in a saturation patrol working on non-saturation               10:25:34

```
 1   patrol days, the odds of a name check being Hispanic is going

 2   to be anywhere from 34 to 40 percent higher, depending on the

 3   name threshold we used, 34 to 40 percent higher for that first

 4   group, the saturation patrol active officers working on

 5   saturation patrol days.                                          10:26:03

 6          MR. BYRNES:  Your Honor, may I display to Dr. Taylor

 7   Demonstrative Exhibit 399J?

 8          THE COURT:  Do you know what I'm going to do?  I'm

 9   going to take a break here.  And I'm going to ask you to be

10   back in -- at 20 minutes to 11:00.                               10:26:15

11          MR. BYRNES:  Thank you, Your Honor.

12          THE COURT:  And I'll remember you were getting ready

13   to put on 399J.

14          (Recess taken.)

15          THE COURT:  Please be seated.                             10:45:03

16          Mr. Byrnes, you can resume, please.

17          MR. BYRNES:  Your Honor, may I display to Dr. Taylor

18   Exhibit 399J?

19          THE COURT:  You may.

20   BY MR. BYRNES:                                                   10:45:16

21   Q.  Dr. Taylor, you see a table on your screen?

22   A.  Yes.

23   Q.  Did you prepare this table?

24   A.  Yes.

25   Q.  Does this table reflect your analysis and conclusions        10:45:23
```

1    concerning predicting the likelihood that a Hispanic name is

2    checked using reprocessed data?

3    A.  Yes.

4    Q.  Dr. Taylor, how are names checked, as you refer to name

5    checking?                                                        10:45:42

6    A.  The officers submit an inquiry about a name and that then

7    appears in the CAD database records.

8    Q.  How is the inquiry submitted?

9    A.  The officers call in to dispatch and request a check on a

10   name.                                                            10:45:58

11           MR. BYRNES:  Your Honor, may we publish the exhibit?

12           THE COURT:  Yes.

13   BY MR. BYRNES:

14   Q.  Dr. Taylor, what did you find concerning the likelihood

15   that a Hispanic name is checked using reprocessed data?          10:46:12

16   A.  What I found was that the likelihood that a Hispanic name

17   would be checked is significantly higher under several

18   conditions if a name's checked by a saturation patrol

19   officer active on a saturation patrol day.

20           And you see here under the 80 percent, under the         10:46:36

21   column OR, for Odds Ratio, and for the 80 percent block for an

22   SP officer on an SP day we see a number 39.1.  That tells us

23   that the odds that a Hispanic name versus a non-Hispanic name

24   would be checked is that much higher if the name is checked by

25   a saturation patrol officer on a saturation patrol day compared  10:47:04

1    to a name checked by a non-saturation patrol

2    officer involved -- never involved saturation patrol officer on

3    a non-saturation patrol day.

4    Q.  How much greater is the likelihood that a Hispanic name is

5    checked by a saturation patrol officer on a saturation patrol      10:47:22

6    day?

7    A.  Using the 80 percent threshold, it is 39 percent more

8    likely to be Hispanic than non -- compared to non-Hispanic.

9    Q.  Does that percentage increase likelihood change depending

10   on the outcome -- depending on the probability threshold that      10:47:42

11   the name is a Hispanic name?

12   A.  No, it does not.  This result is consistent across

13   different minimum probability thresholds used to define a name

14   Hispanic, so it goes anywhere from 34.1 percent more likely up

15   to 40 percent more likely, depending upon the minimum             10:48:05

16   probability threshold for the name.

17   Q.  What did you find concerning the name checking of officers

18   that had been involved in saturation patrols at some point, but

19   were not at the time they checked the name?

20   A.  Yes.  In each -- each block here, each block of three, the     10:48:23

21   last row in each block informs us about that.  So sticking with

22   the 80 percent block, there's a row there that says SP officer,

23   that last row, and over here we have 15 percent under the odds

24   ratio.

25            That means that if an officer had been involved in        10:48:43

1    saturation patrol but was checking a name not on a saturation

2    patrol day, he or she was 15 percent more likely to check a

3    name that was Hispanic compared to non-Hispanic, and he or she

4    is 15 percent more likely than an officer who's never been

5    involved in a saturation patrol checking a name on a                    10:49:08

6    non-saturation patrol day.  That result also remained

7    consistently strong across the different thresholds, and all

8    these results are highly unlikely to be due to chance.

9    Q.  What is the probability that the result could be the result

10   of chance?                                                             10:49:26

11   A.  The result that we're just talking about here, the

12   15 percent more likely, the P less than column is .001.  That

13   means that the chances that we could get this result just due

14   to chance, that would happen less than one time in a thousand.

15   Q.  How, if at all, does that probability of finding the result    10:49:46

16   by chance differ with regard to the other analyses that you

17   performed concerning Spanish name checks?

18   A.  Well, almost all these results here that we're talking

19   about, almost all of them were highly significant, with P less

20   than .01, then less than one time in a thousand would be due to    10:50:07

21   chance.  We see that for the SP officer on SP day, and we also

22   see that for the last point we were just discussing, which is

23   SP officer involved.

24   Q.  What is the significance of the row labeled SP Day?

25   A.  That's looking at the odds that a name check would be          10:50:37

1  Hispanic versus not, comparing a saturation patrol day, a name

2  checked by an officer not active that day, a name checked by an

3  officer who's also never been involved, so un -- it's a non --

4  it's a saturation patrol day, but an officer's checking the

5  name who's never been involved in one of those operations, and

6  his or her likelihood of name checking is being compared to

7  another officer who's never been involved on checking a name on

8  a non-saturation patrol day.  So holding the officer type

9  constant and we're just comparing a typical saturation patrol

10 day name check versus the typical non-saturation patrol day

11 name check.

12 Q.  And what did you find concerning that comparison?

13 A.  Well, there is -- sticking with the 80 percent threshold

14 under Odds Ratio, we have a number 10.7, which means that the

15 name checked was 10 per -- the odds that the name would be

16 Hispanic versus non-Hispanic are 10 percent -- 10.7 percent

17 higher if that name was checked on a saturation patrol day by

18 an officer who'd never been involved in a saturation patrol,

19 compared to that same officer on a non-saturation patrol day.

20 Q.  Did you have different results depending upon the

21 probability threshold that a name was Hispanic?

22 A.  These results are consistent using all four minimum

23 probability thresholds.  They're all statistically significant.

24 Q.  Dr. Taylor, did you conduct an analysis to determine

25 whether incidents involving Hispanic people were longer than

1    other incidents?

2    A.  Yes.

3    Q.  How did you conduct that analysis?

4    A.  What I did was I looked at -- excuse me -- I looked at how

5    long the stop lasted from -- there's several fields in the CAD          10:52:44

6    database that tell us when calls began and when calls ended,

7    looked at it different ways, so we basically have stop length

8    in minutes, so that's not the outcome, and now we've switched

9    so our computer analysis now is the incident, not the name.

10          And so what we find, what I find in -- in my analyses          10:53:07

11   is that if one or more Hispanic names were checked during --

12   during an incident, the incident lasted significantly longer,

13   and its impact persisted using different probability

14   thresholds, and after controlling for other factors.

15   Q.  You mentioned earlier that the unit for -- a unit of          10:53:33

16   analysis for this particular analysis was the incident not the

17   names --

18   A.  Yes.

19   Q.  -- being checked.  What do you mean by that?

20   A.  Well, each incident only has one stop length.  It has the          10:53:46

21   time it began and the time it ended.  So that's the level at

22   which I have my outcome information.

23   Q.  You referred to controls in your analysis.  What were they?

24   A.  I controlled for -- excuse me.  I controlled for how many

25   names were checked, whether or not someone was arrested, and          10:54:07

```
 1   whether or not someone was cited.
 2   Q.  Did your analysis of the length of stops include incidents
 3   that had not occurred during saturation patrols?
 4   A.  Yes, this is with respect to all -- all incidents of type
 5   traffic stop or traffic violation.                              10:54:31
 6            MR. BYRNES:  Your Honor, may I display to Dr. Taylor
 7   Exhibit 398B?
 8            THE COURT:  Yes.
 9   BY MR. BYRNES:
10   Q.  Dr. Taylor, did you create this table, Exhibit 398B?        10:54:46
11   A.  Yes.
12   Q.  Does this table reflect your analysis concerning the
13   variables used with regard to the duration of a stop?
14   A.  Yes.
15            MR. BYRNES:  Your Honor, may we publish this to the     10:55:04
16   gallery?
17            THE COURT:  You may.
18   BY MR. BYRNES:
19   Q.  Dr. Taylor, did you create variables to perform your
20   analysis?                                                       10:55:17
21   A.  Yes.
22   Q.  And are -- does this table reflect the variables that you
23   created?
24   A.  Yes.
25   Q.  Why did you create these variables to your analysis?        10:55:22
```

1  A.  In order to determine in a statistical manner the

2  association between the key variable of interest here was one

3  or more Hispanic names checked with the outcome, the length of

4  the stop.

5  Q.  In what ways did the variables achieve that goal?          10:55:40

6  A.  They achieved that by -- by you have several factors at

7  play, and this is an attempt to put these factors in so you can

8  isolate the impact on the variable that's of key interest,

9  which is at least one surname being checked that was Hispanic.

10  Q.  How many incidents did you review to determine the stop     10:56:06

11  length?

12  A.  It appears that we have stop length for 108,018 incidents.

13  Q.  What is the significance of the column Mean at the standard

14  deviation, minimum value and maximum value?

15  A.  This is just the descriptive information about -- about      10:56:34

16  these variables.  The first -- so we can see the whole --the

17  average, what was the variation?  What was the minimum?  What

18  was the -- what was the maximum?

19  Q.  How many names were checked during these stops that you

20  analyzed for purposes of determining their duration?            10:57:00

21  A.  It appears there were 126,349.

22  Q.  And what does the 1.27 under the Mean column signify next

23  to N of Names Checked During Stop?

24  A.  That would indicate for the incidents that I analyzed on

25  average there were 1.27 names checked per incident.             10:57:23

```
1           MR. BYRNES:  Your Honor, may I display to Dr. Taylor

2    Exhibit 399F?

3           THE COURT:  Yes.

4    BY MR. BYRNES:

5    Q.  Dr. Taylor, did you prepare this table?                      10:57:40

6    A.  Yes.

7    Q.  Does this table reflect your analysis and conclusion with

8    regard to the impact of checking one or more Hispanic names on

9    the length of the stop?

10   A.  Yes.                                                         10:57:56

11          MR. BYRNES:  Your Honor, may we publish this to the

12   gallery?

13          THE COURT:  You may.

14   BY MR. BYRNES:

15   Q.  Dr. Taylor, what did you find concerning the impact of      10:58:02

16   checking Hispanic names on the length of the stop?

17   A.  What I found about the impact of Hispanic name checking on

18   stop length, if we look at the 80 percent section of the table

19   here, and then within that section concentrate on this little

20   block of things where it says mean(min.mm).  You will see there 10:58:30

21   that there are two -- two stop lengths.  In other words, if --

22   once you put all the predictor factors in whether or not a name

23   was checked and the other factors, you can come up with a

24   predicted stop length.

25          So if no Hispanic names were checked, the predicted      10:58:51
```

1    stop length was 11.54 minutes using the 80 percent minimum

2    threshold for declaring the name's Hispanic.  If one or more

3    Hispanic names were checked, then the average stop length is

4    now 14.11 minutes.  So we have a 2.57-minute difference between

5    these two classes of incidents, and that means that if one or          10:59:20

6    more Hispanic names was checked, the stops on average lasted

7    22 percent longer.

8    Q.  Did your finding concerning the length of stop with regard

9    to different probability thresholds for a Hispanic name, were

10   your findings different based on those thresholds?                      10:59:44

11   A.  No.  Regardless of which minimum threshold was used, the

12   results were always statistically significant and the size of

13   difference was about the same.

14   Q.  What is the probability that these results could be

15   obtained at random?                                                     11:00:00

16   A.  As shown just above the highlighted section is a little

17   column with P less than and a number .01.  That's telling us

18   that the chance that this result could just happen randomly,

19   that would occur less than one time in a thousand.

20   Q.  Dr. Taylor, on the right-hand side there's a column                 11:00:17

21   Citation Issued During Incident.  How did the issuance of a

22   citation affect, if at all, your conclusion concerning the

23   length of stops?

24   A.  Well, I -- what I found if I concentrated just on incidents

25   where a citation was issued, you still have -- of course, the          11:00:36

1  stops become longer, but the key issue is that under that

2  mean(min.mm), we still have a difference in the average

3  predicted stop length.

4      So if no Hispanic names were checked and a citation

5  was issued, the average stop lasted 16.67 minutes if no          11:01:00

6  Hispanic names were checked, but if at least one Hispanic name

7  was checked, then that stop lasted 18.95 minutes, for about a

8  2.2-minute difference.  Or stated differently, if one Hispanic

9  name was checked, the stop lasted about 14 percent longer.

10 Q.  Did you find the same result with regard to other          11:01:26

11 probability thresholds for Hispanic names besides the

12 80 percent on which you --

13 A.  Yes.  The difference was about the same regardless of --

14 the time difference was about the same regardless of the

15 threshold used.                                                 11:02:04

16 Q.  Other than ethnicity and whether a citation was issued,

17 were there other factors that predicted a longer stop, in your

18 analysis?

19 A.  Yes, if more names were checked and if an arrest was made.

20 Q.  Did you account for those factors?                          11:02:18

21 A.  Yes, I did.

22      MR. BYRNES:  Your Honor, may I display to Dr. Taylor

23 Exhibit 399G?

24      THE COURT:  Yes.

25 BY MR. BYRNES:                                                  11:02:34

1    Q.  Dr. Taylor, did you prepare this table?

2    A.  Yes.

3    Q.  Does this table reflect your analysis and conclusions

4    concerning the duration of traffic stops where one or more

5    Hispanic surnames are checked?                                    11:02:48

6    A.  Yes.

7            MR. BYRNES:  Your Honor, may we publish to the

8    gallery?

9            THE COURT:  You may.

10   BY MR. BYRNES:                                                     11:02:56

11   Q.  Dr. Taylor, what were your findings concerning the duration

12   of traffic stops where one or more Hispanic surnames are

13   checked?

14   A.  My finding was that those stops lasted longer.  If we're

15   looking at all stops, they lasted anywhere from 21 to            11:03:08

16   25 percent longer, or 2.5 minutes to 2.9 minutes longer.  And

17   if we looked at just citations, incidents where a citation was

18   issued, there was still a difference.  The stops were longer if

19   at least one Hispanic name was checked, and these differences

20   are consistent regardless of which minimum threshold is used to  11:03:29

21   label a name, surname Hispanic.

22   Q.  And what is the likelihood that the areas you identified

23   would occur by chance?

24   A.  Less than one in a thousand.

25           MR. BYRNES:  Your Honor, pursuant to Federal Rule of      11:03:48

1    Evidence 1006, plaintiffs move into evidence Exhibit 398A,

2    398B, 399A, 399B, 399C, 399E, 399F, 399G, 399H, 399I, and 399J

3    as a summary of the CAD database and mobile database evidence

4    presented earlier.

5            THE COURT:  Objection?                              11:04:18

6            MR. LIDDY:  Objection, Your Honor.  They're

7    demonstratives and they're duplicative to the testimony of the

8    witness.

9            THE COURT:  I'm going to take that under advisement.

10   I'll issue my ruling after the noon hour.                   11:04:25

11           MR. BYRNES:  Thank you, Your Honor.

12           I have no further questions on direct examination.

13           THE COURT:  All right.

14           Cross-examination.

15                       CROSS-EXAMINATION                       11:05:00

16   BY MR. LIDDY:

17   Q.  Good morning, Dr. Taylor.

18   A.  Good morning, Mr. Liddy.

19   Q.  Good to see you again.

20   A.  Wish I could say the same.                              11:05:07

21   Q.  Is it my hair?

22   A.  No, hair's great.

23   Q.  I apologize beforehand, I'm a -- not a numbers guy.  I went

24   to law school, I didn't do the engineering thing or the math

25   thing, so I'm going to have a couple questions for you based   11:05:24

1  upon your testimony this morning, and ask you to clarify a

2  couple things about the numbers.  Is that okay?

3  A.  Yeah.

4  Q.  You testified that there's a -- that you found an

5  association between the likelihood of a driver in Maricopa                11:05:58

6  County being stopped and whether or not the sheriff's deputy

7  making that stop was working during a saturation patrol, is

8  that correct?

9  A.  Are you referring to my testimony today?

10  Q.  I am.                                                                11:06:21

11  A.  I was testifying about names checked and about stop

12  lengths.

13  Q.  Okay.  So if I understand the importance of your

14  distinction, you're not talking about actual stops, you're

15  talking about examination of data that was provided to you.              11:06:35

16  A.  Data about stops.

17  Q.  Data about some stops, is that correct, but not all stops?

18  A.  Data about more than 80 percent of the stops.

19  Q.  Let's talk about that.

20        Where did you get the figure 80 percent?                          11:06:49

21  A.  The percent of cases per year that were traffic violations

22  or traffic stops I recall as being, for 2007-2008-2009, being

23  about or slightly more than 80 percent.

24  Q.  But my question's about all stops in Maricopa County.  I

25  thought I heard you hedging there a little bit, qualifications           11:07:18

1    and narrowing the field of the actual stops that you studied,

2    is that correct?

3    A.  The data that I received were initial call type T, which

4    MCSO calls traffic stops.  And within that I focused on final

5    call type traffic stop or traffic violation, and I'm speaking          11:07:36

6    to those traffic stops or traffic violations being about

7    80 percent per year of all the incidents that I received.

8    Q.  Of all the incidents that you received, but not of all the

9    incidents of traffic stops by Maricopa County deputies during

10   the years that cover the data that you received, is that              11:07:59

11   correct?

12   A.  I'm not sure I understand the question.

13   Q.  Okay.  The question is:  Of the data you received, is that

14   reflective of all the stops made by Maricopa County sheriff's

15   deputies in the years covered by the data, or just of all stops       11:08:15

16   that were reflected in the data that were presented to you by

17   plaintiff?

18   A.  It's reflective of the data presented to me, which were

19   stops of call type -- initial call type T.

20   Q.  What is an initial call type T?                                   11:08:29

21   A.  Traffic.

22   Q.  So you're telling me that every single traffic stop that

23   was made in Maricopa County from the years 2007 to 2009 are

24   call type T in the CAD data and you looked at all those?

25   A.  No.                                                               11:08:45

1    Q.  Well, what are you telling me?

2    A.  I'm telling you that I received data that were classified

3    by MCSO as initial call type T, and I understood these to be

4    the category generally traffic stops.  And then within that

5    there were two categories, traffic stop and traffic violation,          11:09:03

6    that represented over 80 percent of the cases per year.

7    Q.  The initial call type T --

8    A.  Um-hum.

9    Q.  -- but not all call types T, is that correct?  Is that your

10   testimony?                                                               11:09:21

11   A.  They were initial call type T, yes, that's my testimony.

12   Q.  And what if at the end of the dispatch it was recoded to

13   something other than call type T?  Is that inclusive of your

14   universe that you studied, or exclusive?

15   A.  My understanding is that initial call type T include --             11:09:42

16   what happened is that there was a final call type designation

17   which has many different categories in it.  Nobody had told me

18   that the final call type designation then supersedes that

19   initial call classification.

20   Q.  Did you make an inquiry as to whether an initial call type          11:10:17

21   T in any of the calls for data you received might, under the

22   normal practice of the Maricopa County Sheriff's Office, be

23   later reported in the CAD data as something other than T?

24   A.  I did not make that inquiry, because at the time that I was

25   retained, I understood that the discovery was closed.                   11:10:36

1  Q.  Okay.  So for the benefit of those of us here, it's

2  possible that there are a significant number of traffic stops

3  made by Maricopa County deputies between the years 2007-2009,

4  data for which you have not reviewed?

5  A.  Yes.                                                    11:10:56

6  Q.  So explain to me your 80 percent figure again; I don't

7  understand that.

8  A.  Of the incidents that I received, they all had an initial

9  call type T, which I understood to be traffic stop.  Within

10  that set of records there was also a final call type         11:11:17

11  designation, and several different categories were in those

12  different -- were in those final call type designations.  And I

13  selected incidents that were -- also had a final call type

14  designation traffic stop or traffic violation, because those

15  represented type -- really represented types of incidents where 11:11:50

16  there is potential for officer discretion.

17  Q.  Okay.  So let's say that a deputy rolls up behind a vehicle

18  that he sees has made a lane change in a reckless manner

19  without a signal, lights them up, pulls them over, goes to the

20  window -- before he goes anywhere, he gets on the computer and  11:12:12

21  he runs the license plate, and the name pops up and the

22  registration of the vehicle.

23        And he walks up to the individual and he asks:  May I

24  see your driver's license, your proof of insurance, and

25  registration for the vehicle?  And it's presented to him, he   11:12:28

1    goes back, he looks that up, everything checks out, goes back

2    to the driver and says:  From here on out, you need to signal

3    when you make a lane change.  You're creating a hazard on these

4    roads.  Have a nice day.

5           Does that stop reflect the universe that you studied?    11:12:48

6    A.  Yes, if he ran a name, which I think you implied he did

7    when you examined the driver's license.

8    Q.  No, Doctor, I did not.  He ran a plate.  Then he got the

9    driver's license and he ran the number, the identification

10   number on the driver's license.                                 11:13:10

11          Now, the name came up.  The plate's registered to a

12   specific name.  And the name came up that goes with the

13   driver's license number that he ran, and they matched, so he

14   never went on dispatch and called in and checked the name.

15          So would that not be a situation where there's a        11:13:28

16   traffic stop in Maricopa County for which you did not include

17   in your universe?

18   A.  That would depend on whether the specific comment lines

19   also included what came back from dispatch in this situation.

20          MR. LIDDY:  Your Honor, I would like to place upon the   11:14:03

21   courtroom document camera Plaintiffs' Trial Exhibit PX 050 and

22   publish it to the witness.

23          THE COURT:  You may do so.

24   BY MR. LIDDY:

25   Q.  Dr. Taylor, can you see this exhibit?                       11:14:21

1    A.  It's a little bit fuzzy, but okay.

2    Q.  Let me see if I can do anything about that.  I doubt I can.

3    As I have said, I'm not a techie.

4         That help?

5    A.  Sure.  Thank you.                                    11:14:37

6         MR. LIDDY:  Counsel, can you see that?

7         MR. BYRNES:  Yes.

8    BY MR. LIDDY:

9    Q.  You just referred to MCSO CAD incident history reports, did

10   you not?                                                 11:15:07

11   A.  Yes.

12   Q.  Now, the document that I just displayed there, would you

13   describe that document for me.

14   A.  This appears to be a report based on one incident, with

15   several -- an incident and then with detail, detail lines.   11:15:21

16   Q.  And would you agree with me that that's a document that

17   reflects information reported from MCSO CAD data?

18   A.  Yes.

19   Q.  And would you agree with me that that CAD data is records

20   that are kept and recorded during radio traffic in traffic   11:15:41

21   stops?

22   A.  Yes, they are.

23   Q.  So if there was a traffic stop that did not involve the use

24   of the radio, such a report would not be generated, is that

25   your understanding?                                      11:15:56

1  A.  If you're asking about the difference between the mobile

2  data and the central dispatch data, I believe that's the point

3  that's in question right now, so is this from a mobile terminal

4  inquiry or radio inquiry?  Or do we know?

5  Q.  Well, I know.                                                11:16:16

6  A.  Oh, okay.

7  Q.  It says MCSO CAD incident history.

8  A.  Okay.  This is radio.

9  Q.  That's right, so this is radio.  So my question posed,

10 Dr. Taylor, if a deputy had pulled somebody over and run the    11:16:30

11 license plate without using the radio, looked at the driver's

12 license identification number, and never ran a name check on

13 the radio, no such CAD data report would be reflected, is that

14 correct?

15 A.  In my analysis, no, it would not.                           11:16:47

16 Q.  Thank you.

17      Do you have any idea how many traffic stops were made

18 by deputies of the MCSO between the years 2007-2009 in which

19 they did not use a radio?

20 A.  No, I do not, but that issue is not necessarily relevant.   11:17:04

21 Q.  To whom?

22 A.  To my findings.

23 Q.  Is it relevant to those of us that reside here in Maricopa

24 County?

25 A.  Could be.                                                   11:17:22

1    Q.  Is it relevant to anyone who wants to determine how much

2    weight to give to your testimony?

3    A.  Not necessarily.

4    Q.  Now, are there two different sections to this document?

5    A.  Yes.                                                        11:17:46

6    Q.  And is one of them the upper third of the document and the

7    remainder on the bottom third?

8    A.  Yes.

9    Q.  And how would you categorize, or what nomenclature would

10   you use to describe the top third?                             11:17:56

11   A.  The top third describes the incident itself, and the bottom

12   third recalling the comment portion or the details.

13   Q.  Okay.  So would it be fair to refer to the comment portion

14   as the C portion, C for "comment"?

15   A.  Are you asking me if there's a designation here on --      11:18:20

16   Q.  No, I'm asking you what nomenclature you use when you

17   describe --

18   A.  I call them detail, detail lines.

19   Q.  So the detail lines are in the comment section?

20   A.  Yes.                                                        11:18:34

21   Q.  And how do you refer to the section up above?

22   A.  I refer to that as the incident -- incident features.

23   Q.  Incident features.  Okay.  Now, there's a number in the

24   uppermost left portion of the incident feature that reads Mike

25   Alpha 07222192.  You see that?                                 11:18:54

1   A.   Yes.

2   Q.   What is that?

3   A.   That is the identifying number for the incident.

4   Q.   Okay.  And it's an alphanumeric identification number?

5   A.   Yes.                                                          11:19:08

6   Q.   And the Alpha portion, Mike Alpha, what does that stand

7   for?

8   A.   I'm not sure.

9   Q.   And how about the numbers in the alphanumeric feature, what

10  do they stand for?  What do they tell us about this report?       11:19:22

11  A.   The 07 tells us that this occurred during 2007.

12  Q.   Okay.  And the remaining numbers?

13  A.   I'm not sure.

14  Q.   If you'll follow along to the uppermost right, you see

15  where it says Disposition 7?                                       11:19:46

16  A.   Yes.

17  Q.   What does that number 7 stand for?

18  A.   According to the codes that I received, that stands for

19  citation written slash warning issued.

20  Q.   What does that mean?                                          11:20:06

21  A.   That would suggest the officer either issued a citation or

22  a warning.

23  Q.   And how does that affect your use of a document such as

24  this in your study?

25  A.   I'm not sure I understand the question.                       11:20:21

1    Q.  Well, when you looked at the CAD data, were there any

2    pieces of data with Disposition 7, and if so, did that mean

3    anything to you in how you treated that piece of data?

4    A.  Yes, it would, depending on my analysis.

5    Q.  Okay.  Would you describe that for me, please.          11:20:48

6    A.  Yes.  For example, if we're talking about the analysis of

7    names checked, and this is the only page for this incident,

8    then I would not have used this for the analysis of names

9    checked.  But I would have used it for the analysis of -- I

10   wouldn't -- I couldn't have used it for the analysis of stop   11:21:11

11   length because also there were no names checked.

12   Q.  Okay.  So anything that's coded Disposition 7 you're saying

13   would have no names checked?

14   A.  No, that's not what I'm saying.

15   Q.  Okay.  Well, then, explain it to me again, 'cause I didn't  11:21:26

16   get it.

17   A.  What I'm saying -- what I'm saying is that because in the

18   comment portion there was no name that was checked --

19   Q.  Okay.

20   A.  -- I then do not have my outcome variable for my analysis   11:21:37

21   that looks at the probability of a name check being Hispanic or

22   non-Hispanic.

23   Q.  How would you know whether there's a name checked or inside

24   the comment portion by just looking at Disposition 7?

25   A.  These are two separate issues.                             11:21:56

121

1    Q.  Okay.  Well, I'm only asking about one issue, and that's

2    whether or not the code 7 disposition field has any bearing on

3    how you treat this piece of data in your study.

4    A.  This particular incident would not be included.

5    Q.  Okay.  But I'm not asking you about this particular

6    incident, and I apologize, I can understand how you'd see that.

7    I'm only asking you for MCSO CAD incident history data with

8    Disposition 7.

9    A.  Yes.  I would take that into account in my stop length

10   analysis.

11   Q.  Okay.  And when you're doing the stop length analysis, I

12   would assume, and would I be correct, if you look at time call

13   received and time closed, also in the uppermost portion of this

14   document, is that correct?

15   A.  Yes.

16   Q.  Okay.  And when you look at time call received, you see

17   that?  Says 53.47 p.m.?

18   A.  Yes.

19   Q.  It appears to me that there is a digit that is missing.

20          Do you see, does it appear that way to you?

21   A.  I'm not sure.

22   Q.  Okay.

23   A.  I'm not sure.  Again, the key -- the key issue with the --

24   the key distinction to make here is that I do understand that

25   my analysis was not based on the fields that are displayed in

11:22:17
11:22:37
11:22:58
11:23:20
11:23:35

1    a -- in a PDF like this; my analysis is based on fields as

2    they're coded in the data file --

3    Q.  Okay.  So --

4    A.  -- which might not correspond to what gets displayed.

5    Q.  So that if in fact there's a digit missing in that, it          11:23:53

6    would not necessarily be missing in the data field that you

7    were observing when you were doing your study, is that correct?

8    A.  Yes.

9    Q.  All right.

10        THE COURT:  I want to go back just a second, make sure          11:24:06

11   I understand something.

12        When Mr. Liddy was talking to you about disposition

13   code 7 --

14        THE WITNESS:  Yes.

15        THE COURT:  -- you indicated that would not be in your          11:24:15

16   study because you don't have a Hispanic name on this incident

17   history?

18        THE WITNESS:  That is correct.

19        THE COURT:  Would it be on -- would it have made its

20   way in your analysis of stop length for non-Hispanic names?          11:24:30

21        THE WITNESS:  It wouldn't have been used to create a

22   model about predicting stop differences.  But once that

23   model --

24        THE COURT:  Well, hold it.  Does the model about

25   predicting stop -- stop differences have anything to do with         11:24:46

```
 1    the testimony you've offered today?

 2              THE WITNESS:  I was describing that earlier.

 3              THE COURT:  Well, I understood the results of your

 4    analysis and conclusion, and I want to know if you can answer

 5    the question and I realize that maybe you can't.              11:24:59

 6              If I understand correctly, this incident would not

 7    calculate into any calculation of how long it took for anybody

 8    who was stopped who had a Hispanic name, there is no Hispanic

 9    name here.

10              THE WITNESS:  Correct.                              11:25:16

11              THE COURT:  I want to know if this incident would

12    calculate into the comparison figure, which is stops for

13    non-Hispanic names.

14              THE WITNESS:  No, it would not.

15              THE COURT:  Okay.  Thank you.                       11:25:26

16              MR. LIDDY:  Thank you, Your Honor.

17    BY MR. LIDDY:

18    Q.  Let's drop down below the bolded line.

19              You see where it says caller name --

20    A.  Yes.                                                      11:25:39

21    Q.  -- on the left?  Right below there it says Initial Call

22    Type capital T.  You see that?

23    A.  Yes.

24    Q.  What does that mean?

25    A.  That would suggest that this was a traffic stop.          11:25:53
```

1    Q.   Okay.  What's a traffic stop?

2    A.   The events that they code initial call type T.

3    Q.   That sounds like a professor's answer to me.

4         If a cop was driving down the street and he sees

5    somebody that was either acting suspicious or has a piece of                    11:26:12

6    equipment that's outside the -- the code, the state law, or is

7    speeding, turns on the lights, pulls him over, is that a

8    traffic stop?

9    A.   It sounds like it as you're representing it, yeah.

10   Q.   That's what I was getting at.  Would all such stops be                     11:26:31

11   initially coded as a call type T?

12   A.   I would presume so, given my understanding.

13   Q.   So it's possible that the conduct of the Maricopa County

14   Sheriff's Office would be such that they would conduct a

15   traffic stop that would not have an initial call type T?                       11:26:51

16   A.   It's possible, because it appeared from Dr. Camarota's

17   testimony in reporting on conversations with Mr. Jefferys that

18   there were some issues about the designation of initial call

19   type T.

20   Q.   Okay.  Well, I don't want to question you about something                  11:27:10

21   that Mr. Camarota or Mr. Jefferys might have said.  We can

22   bring them in and I'm sure the Court would be happy to hear

23   from Mr. Jefferys or Mr. Camarota.  But I specifically want to

24   question you about your knowledge, and specifically knowledge

25   that you had while you were conducting your study.                             11:27:29

1          So while you were conducting the study, were you aware

2     of any Maricopa County Sheriff's Office deputy traffic stops

3     that would be coded as something other than a T in the MCSO CAD

4     incident history, if such a history was created?

5     A.  I'm not aware, because I was not provided with those data.        11:27:49

6     Q.  Fair enough, Doctor.

7          Let's let our eyes scan over slightly to the right,

8     where it says Final Call Type.  You see that?

9          Is it on your screen?

10    A.  Yes, sir.                                                         11:28:10

11    Q.  And you see that?

12    A.  Yes, I do.

13    Q.  And would you read for me the numeric code to the right of

14    Final Call Type?

15    A.  910.                                                              11:28:18

16    Q.  What does 910 designate?

17    A.  According to the documentation that I received, it stands

18    for traffic violation.

19    Q.  Okay.  And you're referring to a document that's previously

20    been provided to you?                                                 11:28:32

21    A.  Yes.

22    Q.  And has been admitted into evidence?

23    A.  Yes, the CAD codes.

24    Q.  You see the exhibit number on that?  If you don't, that's

25    okay.  Might be on --                                                 11:28:42

1   A.  140.

2   Q.  140?  Okay.  So by looking at that, you can see what 910

3   stands for?

4   A.  Yes.

5   Q.  And would it be your testimony that you had that, I'll call    11:28:51

6   it a cheat sheet, available for you when you were doing the

7   study?

8   A.  It was provided to me.

9   Q.  Okay.  Now, what does the designation 910 mean for the

10  purposes of inclusion or exclusion in your study?    11:29:09

11  A.  It means that the incidents would be included.

12  Q.  Included, okay.

13          And what numeric designations might you find there

14  that would mean excluded?

15  A.  I'm not sure I understand the question.    11:29:28

16  Q.  Well, I think if I understand your testimony, your

17  testimony is that if the final call type is designated as a

18  910, you're going to include it in your study.

19  A.  My testimony is that if the final call type description is

20  either traffic violation or traffic stop, I will include it in    11:29:45

21  my study.

22  Q.  Okay, but I didn't ask you about that; I asked you about

23  910.  Is it your testimony that a final call type 910 would be

24  included in your study.  You already testified that, yes, it

25  would be, is that correct?    11:30:01

1   A.  I'm not sure.  I mean, the --

2   Q.  I don't want to put words in your mouth.  If you're not

3   sure, you're not sure, that's fine.

4           THE COURT:  Mr. Liddy?

5           MR. LIDDY:  Yes, Your Honor.                    11:30:16

6           THE COURT:  Can I keep you close to the microphones,

7   please?

8           MR. LIDDY:  Yes, Your Honor.

9           THE COURT:  Thank you.

10          MR. LIDDY:  Going to be a challenge.  One I am      11:30:26

11  confident we can meet.

12  BY MR. LIDDY:

13  Q.  My question to you is:  What other final -- final call type

14  numeric designations have you found in the course of your study

15  that caused you to exclude data from your study?          11:30:46

16  A.  To exclude, I didn't rely on the final call type, I relied

17  on call type description.

18  Q.  Which would be the field directly to the right?

19  A.  Yes, sir.

20  Q.  So it's your testimony that throughout your study of this  11:31:08

21  CAD data you never used final call type descriptors to

22  determine whether you were going to include or exclude the data

23  in your study?

24  A.  My testimony is that I select -- I analyzed incidents that

25  had call type description traffic violation or traffic stop.   11:31:34

```
 1   Q.  That wasn't the question.  The question was:  Is it your

 2   testimony that there's not a single incident during your study

 3   of the CAD data that you used final call type numeric

 4   designations to either include or exclude the data in your

 5   study?                                                              11:31:58

 6              MR. BYRNES:  Objection, compound.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  Could I have the question read back?

 9              THE COURT:  Go ahead, Gary.

10              (The record was read as requested.)                     11:32:53

11              THE WITNESS:  I did not rely on the numeric code.

12   BY MR. LIDDY:

13   Q.  In the Final Call Type field.

14   A.  Correct.

15   Q.  Thank you.                                                     11:33:08

16              But you did rely on Initial Call Type field, is that

17   correct?

18   A.  Yes.

19   Q.  And I think you previously testified that you also relied

20   on a call type description, traffic violation or -- is that        11:33:13

21   correct?

22   A.  Yes.

23   Q.  And would there be other call type descriptions other than

24   traffic violation that you would include?

25   A.  I only -- no, I only included final call type description      11:33:25
```

1    traffic violation or traffic stop.

2    Q.  Or traffic stop.

3    A.  Yes.

4    Q.  So if there was any other call type description other than

5    traffic violation or traffic stop, you automatically excluded          11:33:39

6    it?

7    A.  Yes.

8    Q.  Why?

9    A.  Because the class of incidents in which I was most

10   interested and which offer potential for officer discretion are        11:33:51

11   the kind of incidents that we would call traffic stops or

12   traffic violations.

13   Q.  Potential for officer discretion, did I hear that

14   correctly?

15   A.  Yes, you did.                                                       11:34:06

16   Q.  So it's your -- it's your understanding that there's no

17   potential for officer discretion in any traffic stop except

18   those that would be designated in this CAD incident history

19   under call type description field as traffic violation?

20   A.  No.                                                                 11:34:28

21   Q.  Well, then, what is your testimony?

22   A.  My testimony is that the potential for discretion, when we

23   consider classes of incidents, is going to be greater if we're

24   focusing on incidents, final call type description traffic

25   violation or traffic stop.                                             11:34:45

1  Q.  Greater than what?

2  A.  Greater than as a class of incidents, the other types of

3  designations that appeared.

4  Q.  Well, what class of incident would it be if an MCSO deputy

5  spotted somebody speeding down Interstate 10, pulled up behind

6  them, lit them up, pulled them over, called in his license

7  plate, approached the vehicle, asked for driver's license,

8  proof of insurance and registration, and then saw about a pound

9  of marijuana in the back seat?  What would the call type

10  description for that be?

11  A.  The final call type description probably would not be

12  traffic violation or traffic stop.

13  Q.  Fair enough.

14       Would you include that and therefore you would exclude

15  it in your study.

16  A.  Correct.

17  Q.  Why?

18  A.  Because when we consider classes of incidents, so let's say

19  it's not clear that for a particular class of incident that

20  ends up in, let's say, you didn't give me the exact final call

21  type designation in your instance, but let's presume it was --

22  Q.  Something other than traffic violation or traffic stop.

23  A.  Like drug arrest or something.

24  Q.  Sure.

25  A.  That those as a class of incidents have less potential for

11:35:01

11:35:39

11:35:54

11:36:07

11:36:22

1  officer discretion than do the ones that end up final call type

2  description traffic violation or traffic stop.

3  Q.  Okay, I understand -- were you finished with your answer?

4  A.  Yes.

5  Q.  I understand that part.  The question was:  Why?          11:36:37

6  A.  Because as a class of incidents, those are less relevant.

7  Q.  And they're less relevant because there is no potential for

8  a police officer to use discretion in determining whether to

9  pull that person over or not?

10  A.  I didn't say that there was no discretion.                11:36:58

11  Q.  Okay.

12  A.  I said that if you consider it as a class of incidents, the

13  potential for discretion is less in that entire group than it

14  would be in the group that in the final call type description

15  traffic violation and traffic stop, and in making this         11:37:14

16  limitation, this also happens to be in line with scholarship in

17  the field.

18  Q.  So you're telling me that every time a cop identifies a

19  speeder, pulls them over, and his license plate checks out, his

20  registration checks out, he's got a valid driver's license, but  11:37:31

21  he's got pot in the back seat, that those cases go into a

22  separate group of police officers that have less potential to

23  use discretion as to whether they pull the guy over or not?

24  A.  I'm not clear how many incidents of that type there are.

25  Q.  But that wasn't the question.  I'm not asking you how many  11:37:48

1  there are.  If there's only one, does that cop have discretion

2  as to whether to pull over that car that's speeding or not?

3  A.  Officers have discretion, yes, in that situation.

4  Q.  Then why don't you include it in your study?

5  A.  Because we don't know what's in the entire class of

6  incidents.

7  Q.  Oh.  All right.  Let me ask you to continue gazing upon the

8  exhibit we have here on the camera, and let's go down to the

9  bottom two-thirds, which is descriptive and contains comments.

10      Is that a fair description?

11  A.  Yes.

12  Q.  Okay.  Let's look at the very first piece of data in the

13  field there.

14      I only get three shots at this then I'm out, right?

15  No, it's not going to work.

16      I can see the first one listed in that descriptive

17  field 12/2/2000.  That appears to me to be a date, would you

18  agree?

19  A.  Yes, it's just missing a digit at the end.

20  Q.  Okay.  So in theory it could be 2001, 2002, is that --

21  A.  We know from information on top that it's 2007.

22  Q.  Okay.  So we've got a digit missing and so we go to another

23  field and we can fill in the information for that digit, is

24  that correct?

25  A.  Yes.

11:38:07

11:38:34

11:39:02

11:39:18

11:39:36

1    Q.  Okay.  And you move over to the right one column, 53:47.

2    What does that mean to you?

3    A.  It would suggest that the first transaction took place at

4    1:53.

5    Q.  Okay.  And by transaction you mean what?                    11:39:55

6    A.  I mean communication between the officer and dispatch.

7    Q.  Via the radio?

8    A.  You have indicated before that this was via radio, I

9    believe.

10   Q.  I'm asking you your understanding at the time you did the   11:40:09

11   study.

12   A.  This is CAD incident history, so yes, it would be on the

13   radio.

14   Q.  Okay.  And slide over, if you would, to the right, and you

15   see DP14, David Papa 14.  You see that?                         11:40:19

16   A.  Yes.

17   Q.  What does that mean?

18   A.  I don't know.

19   Q.  Slide over one more to the right, Bravo 0735.

20            Can you tell me what that means?                       11:40:33

21   A.  No.

22   Q.  And we slide over more, OUTONS, all caps, under the field

23   designated Type.

24            Can you tell me what that means?

25   A.  No.                                                         11:40:45

1   Q.  If we move over a little bit more we will see Unit, Tango

2   533.  Would you agree with me that's what it says?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  I don't know.                                          11:41:01

6   Q.  Moving further to the right, comments, ampersand, what is

7   that?  390 November Delta Romeo.

8           You see that?

9   A.  Yes.

10  Q.  What is that?                                          11:41:14

11  A.  I'm not sure.  And following after that we have the

12  officer's badge number and the officer's name.

13  Q.  Okay.  That's where I was going if I could work out the

14  technology.  And you're talking about pound sign 01553?

15  A.  Yes.                                                   11:41:35

16  Q.  What do you understand that to be?

17  A.  That is the officer's badge number.

18  Q.  And just to the right of that, Ratcliffe, do you believe

19  that to be his surname?

20  A.  Yes.                                                   11:41:47

21  Q.  Matthew L., first name and middle initial?

22  A.  Yes.

23  Q.  Is there any more information there?

24  A.  It says no more information.

25  Q.  That's a trick question.  You passed.                 11:41:55

```
 1              Okay.  Let's move down to the third column.  See that?
 2  A.  The third row, yes.
 3  Q.  All right, third row.  And let's move all the way down to
 4  Unit.  Foxtrot Delta 110.
 5              What does that mean to you?                        11:42:18
 6  A.  I'm not sure.
 7  Q.  Okay.  Let's move one to the left, Type:  Alpha Sierra
 8  Sierra Tango Oscar Sierra.  What does that mean?
 9  A.  I'm not sure, but it looks like there's an existing
10  officer.                                                      11:42:35
11  Q.  Okay.  Did it look like that to you when you did the study?
12  A.  I wasn't looking at this little -- this column that you're
13  pointing out here right now.
14  Q.  Okay.  So for purposes of examining your model, your study,
15  the fact that you understand what that means now is not        11:42:55
16  relevant, is that correct?
17  A.  No.
18  Q.  Okay.  Let's go a little bit further to the right:  [Bravo
19  Tango Lima DAM #EOF Cave Creek Wash].
20              What does that mean?                               11:43:15
21  A.  I'm not sure, but it looks like some kind of address.
22  Q.  Could be Bartlett Dam?
23  A.  Could be.
24  Q.  You know what area of Maricopa County Bartlett Dam's in?
25  A.  No, I don't.                                               11:43:28
```

1    Q.  Do you know which Maricopa County Sheriff's Office unit

2    regularly patrols the Bartlett Dam area?

3    A.  It's been represented to me that that's the Lake Patrol.

4    Q.  Okay.  Let's go down to the fifth line there.  See where

5    I've designated that, the green mark?                      11:43:56

6    A.  Yes.

7    Q.  And we scroll all the way over to where it says Dispatch.

8            You see that?

9    A.  Yes.

10   Q.  And it says Alpha 8549.  You see that?                 11:44:07

11   A.  Yes.

12   Q.  What does that mean?

13   A.  Don't know.

14   Q.  I want our eyes to travel up to the beginning of the

15   Comments section under this it says Bravo 0735.  You see that?  11:44:18

16   A.  Yes.

17   Q.  You previously testified you don't know what that means.

18   A.  Correct.

19   Q.  But you recognize there's been a change there?

20   A.  Yes, this -- this number here, this alphanumeric string  11:44:29

21   under Dispatch is different from the alphanumeric string that

22   appeared in the first line under Dispatch.

23   Q.  So under Dispatch the code designating dispatch is no

24   longer Bravo 0735, it's now Alpha 8549, is that correct?

25   A.  Yes.                                                    11:44:49

```
 1  Q.  Do you know why that change would occur?

 2  A.  No.

 3  Q.  Do you know -- okay.  Never mind.

 4       Let's slide over a little bit more to the right under

 5  comment.  All caps, Tango Yankee Papa colon T, capital T.      11:44:59

 6       Do you know what that means?

 7  A.  It looks to me like what's happening here is the T stands

 8  for the initial -- looks to me like this is an initial call

 9  type, and then with that little arrow they're saying it then

10  becomes a 910.                                                 11:45:23

11  Q.  And were you able to figure that out by looking at the data

12  up front we looked at earlier, that the initial call type was

13  capital T and the final call type was 910, and it coincides

14  with that?

15  A.  Well, in this instance, yes, it does.                      11:45:36

16  Q.  Okay.  Thank you.

17       And then farther to the right, RSP:P, an arrow,

18  another P, and DSP:7.

19  A.  Well, DSP:7 corresponds to Disposition 7 at the very top

20  right of the record.                                           11:46:02

21  Q.  Right.

22  A.  And Disposition 7 stands for citation written slash warning

23  issued.

24  Q.  Okay.  Thank you.

25       I'm going to go all the way down to the end of this       11:46:14
```

1  document.  So I'm moving this up.  You see that?

2  A.  Yes.

3  Q.  I'm going to bring on the zoom here, see if this works out.

4        You see that?

5  A.  Yes, I do.                                                    11:46:38

6  Q.  Okay.  Would you read that last sentence for me.

7  A.  "If there are any questions or comments regarding the

8  information presented, please contact the CAD Coordinator at

9  602-876-1033."

10  Q.  I think you've got a future in radio.  Thank you.          11:47:10

11        Was that number available to you when you did your

12  study?

13  A.  This was on a file that I received, but I did not look at

14  this section of the PDF reports because these were not data.

15  These in fact were footers that were a huge problem that had to  11:47:28

16  be removed.

17  Q.  Okay.  So would it be fair for me to ascertain from that

18  response that you never called that phone number, 602-876-1033?

19  A.  Absolutely correct.

20  Q.  Thank you.                                                  11:47:43

21        I want to direct your attention back up to the top of

22  this document.  And we discussed this area before about the

23  call type, initial call type and final call type.  Do you

24  recall that?

25  A.  Yes.                                                        11:48:25

1   Q.  And you testified that you never used the final call type

2   numeric designation to determine whether to include or exclude?

3   Do you recall that testimony?

4   A.  Right, I -- what I said was when I selected -- when I

5   decided which incidents to examine, I relied on final call type        11:48:42

6   description traffic violation or traffic stop.  At some point I

7   learned that that also corresponded with the numeric codes that

8   you've been discussing.

9   Q.  Okay.  And you have your exhibit in front of you that tells

10  us what some of those numeric codes are, is that correct?             11:48:58

11  A.  Yes.

12  Q.  And had you ever encountered the numeric code for final

13  call type as 692?

14  A.  692 is indicated as DWI.

15  Q.  Yes, that's correct.                                              11:49:18

16  A.  And these were included in the initial file that I

17  received.

18  Q.  So you do recall seeing some of those?

19  A.  I do recall seeing final call type description DWI, yes.

20  Q.  Okay.  And did you include or exclude those in your study?        11:49:28

21  A.  They were excluded.

22  Q.  Why?

23  A.  Because as a class of incidents, the potential for

24  discretion is less than in the class of incidents traffic stops

25  or traffic violations.                                                11:49:44

1   Q.  Does that mean that when a deputy pulls behind somebody and

2   pulls them over and then smells alcohol on his breath that

3   somehow he should be put in a group where he has less

4   discretion to determine whether to pull that person over or

5   not?                                                            11:50:02

6   A.  No, it does not mean that.

7   Q.  What does it mean?

8   A.  What it means is that if we're looking at DWI as a class of

9   incidents, that on average in those incidents there will be

10  less potential for discretion than -- by the officer, than     11:50:16

11  there will be in the class of incidents traffic stop or traffic

12  violation.

13  Q.  Well, how is the cop going to know that when he determines

14  to pull him over?

15  A.  You're switching back to -- I can't answer that question.   11:50:31

16  My answer was about a category, so --

17  Q.  Well, my question's not about a category.  My question's

18  about the amount of discretion that a cop has when he decides

19  to pull somebody over and later in time smells beer.  Explain

20  to me why that police officer has less discretion at the time   11:50:54

21  he decides to turn on the lights and pull the guy over than he

22  would if later in time he did not smell beer?

23  A.  I could answer that if you could also indicate to me how

24  the vehicle was being operated prior to being pulled over.

25  Q.  Show me on the CAD data how you can determine that.         11:51:15

1   A.  It does not appear that you can.

2   Q.  Well, then why would you need that information to make a

3   determination whether you're going to include it or exclude it

4   in your study of the CAD data?

5   A.  Because as a group of incidents, the group of incidents                11:51:30

6   DWI, there are probably -- in fact, it's probably quite likely

7   that there was a significant fraction of them where they were

8   significantly impaired driver behavior.

9   Q.  So you just drop them out of the study?

10  A.  If I could finish.                                                       11:51:55

11  Q.  Oh, I'm sorry.  I thought you were finished.

12  A.  In the class of DWI there were probably a significant

13  fraction of cases where there is minimal officer discretion

14  because the vehicle is being operated in a markedly impaired

15  fashion.  So as a class of incidents, the potential for                     11:52:14

16  discretion is less in the class DWI than the potential in the

17  class of incidents traffic stop or traffic violation.

18  Q.  Doctor, let's say that you come across some CAD data in

19  which it meets the criteria in the incident history traffic

20  violation, initial call type T, but there's no name anywhere in             11:52:54

21  the comment section.

22          You include that or exclude that in your universe of

23  study?

24  A.  That's excluded, because that incident provided no

25  information on the outcome of incident.                                     11:53:11

1  Q.  What was the outcome?

2  A.  Whether or not the name check was Hispanic, and then also

3  stop length.

4  Q.  Well, what if the driver of the car did have a surname that

5  was Hispanic, but the name just wasn't put in the CAD data?    11:53:28

6  How do you account for that?

7  A.  I'm not -- don't need to account for it, unless it's the

8  case that all of the incidents of the type in which I'm

9  interested that include no name have a significantly different

10  fraction of Hispanic -- Hispanic persons.                      11:53:49

11  Q.  Did they?

12  A.  Don't know, and it's not been proved to me that those

13  fractions are different.

14  Q.  So you just excluded them.

15  A.  Because there was no information to analyze.               11:54:02

16  Q.  Don't you have to make certain assumptions about the data

17  that you're going to exclude?

18  A.  No, because it's a different class of data.  The focus here

19  is defining the content area that's of interest, and the

20  content area of interest in alignment with studies in this area  11:54:21

21  are traffic stops and traffic violations, because of the

22  potential for officer discretion in those type of incidents.

23  Q.  Okay.  Well, let's say that it's 2008, and a young woman in

24  her twenties, Blanca Esparza, is driving her car, and she's

25  speeding and she's pulled over.  A sheriff's deputy pulls her   11:54:45

143

1    over, looks at her license plate, checks it through his

2    on-board computer, approaches the car, asks her for her

3    driver's license, gets it, the driver's license number checks

4    out with the same number as the registration to the car, and so

5    there's no radio stop at all, he tickets her for speeding and          11:55:01

6    then moves on his way, but never does the name check?

7          Let's say he does use his radio, but never does a name

8    check on the radio.  You get a CAD data, no name, you're going

9    to exclude that, is that correct?

10    A.  That is correct.                                                   11:55:20

11    Q.  And because you are not interested in that piece of data,

12    is that your testimony?

13    A.  My testimony is that I'm not interested in incidents that

14    do not generate a name to be checked.

15    Q.  But if we're looking for whether or not the sheriff's            11:55:35

16    deputies are using their discretion to pull over Hispanics,

17    wouldn't that piece of information be valuable?

18    A.  Not necessarily.

19    Q.  To whom?

20    A.  To anybody.                                                       11:55:50

21    Q.  To me?

22    A.  Yes.

23    Q.  Who resides here in Maricopa County?

24    A.  Yes.

25    Q.  Who has an elected sheriff?  Whose police powers are vested       11:55:57

```
 1    in the local government, not the federal government?
 2              MR. BYRNES:  Objection, Your Honor, argumentative.
 3    BY MR. LIDDY:
 4    Q.  He would not be interested in me?
 5              THE COURT:  When there's an objection, please wait        11:56:09
 6    till I rule.
 7              MR. LIDDY:  I apologize, Your Honor.
 8              THE COURT:  I'm going to ask you to rephrase your
 9    question.
10    BY MR. LIDDY:                                                       11:56:20
11    Q.  Could that piece of information be relevant to anyone,
12    Doctor?
13    A.  Yes, it could.
14    Q.  Thank you.
15              Is it true that you dropped data without names in the     11:56:40
16    CAD data file, despite not knowing whether they're randomly
17    distributed across the data or not.
18    A.  I dropped a different class of incidents because of how I
19    define my content domain.
20    Q.  But my question was about your knowledge of random             11:56:59
21    distribution.
22    A.  The issue is not about random distribution.
23    Q.  It is to me.  That's the question.
24    A.  May I explain?
25    Q.  Sure, please.                                                  11:57:10
```

1    A.  When we're discussing the concept, there will be areas

2    where we agree that yes, this is of central relevance.  Given

3    the questions at interest in this case, the questions of

4    central relevance are where officers have discretion in traffic

5    stop situations.  So there might be -- so that's our core --    11:57:29

6    our core issue of interest.  And there are other classes of

7    incidents that are potentially different.

8              So this is not a matter of dropping out cases randomly

9    or non-randomly from one class of incident; this is a matter of

10   defining what is a -- the range of the topic of interest that    11:57:50

11   aligns with the scholarship in the field and aligns with the

12   idea of officer discretion.

13   Q.  Okay.  The total number of T incidents provides and the

14   gross universe provides was 198,194 incidents, is that correct?

15   A.  I do not recall the specific number.                        11:58:11

16   Q.  Do you recall that you examined only 139,696?

17   A.  In the original or the reprocessed?

18   Q.  In the original.

19   A.  That sounds about right, yes.

20   Q.  Would you agree with me that the number that you include in    11:58:26

21   your study is a smaller number than the number that you -- that

22   was the gross?

23   A.  If we're talking about the years 2007 to 2009, I included

24   the majority.

25   Q.  The majority.  But the majority is, as you recall, less      11:58:43

1    than the total.

2    A.  Yes, it's about 80 percent.

3          And it's important to also understand, if I may, that

4    even though 18 percent or so incidents might be dropped per

5    year, the number of names checked that are dropped might be          11:59:00

6    much, much, much, much smaller.

7    Q.  But might not that be because there were no names in the

8    CAD data file?

9    A.  There are records with no names, yes.

10   Q.  That were dropped?                                               11:59:18

11   A.  There are records with no names that were dropped.  Let's

12   be clear about two separate issues.  There were incidents of

13   final call type designation traffic stop or traffic violation

14   with no name in the Comments field.  Those were dropped.

15         There are also incidents with a different final call          11:59:35

16   type designation, name or not.  Those were dropped because

17   that's a different class of incident.

18   Q.  But my question is just about those that do not have names

19   in the CAD data file.

20   A.  A final call type traffic stop or traffic violation?           11:59:50

21   Q.  No, in the total universe.  You told me, your testimony you

22   dropped some that had no names.

23   A.  I dropped all the ones that had no names.

24   Q.  But the driver of those vehicles and the passengers of

25   those vehicles had names, is that correct?                          12:00:04

1  A.  Yes.

2  Q.  Okay.  So they were stopped by an officer using discretion,

3  and they had names, but you excluded them in your study,

4  correct?

5  A.  Correct, because there were no data and --                    12:00:18

6  Q.  Okay.

7  A.  -- and it's not necessarily the case that if we had some

8  magical way of getting those names, that it would in any way

9  alter the pattern of findings that I found.

10  Q.  Well, what if we had a magical way of determining whether    12:00:33

11  the incidents of Hispanic surnames or non-Hispanic surnames was

12  randomly distributed across the field of the 18 percent of the

13  gross universe you excluded; would that be helpful?

14  A.  If they were randomly distributed, then that would suggest

15  that my excluding them was completely appropriate.             12:00:53

16  Q.  So wouldn't it be valuable for those of us trying to

17  determine how much weight to give to your study to know whether

18  or not there was random distribution of that universe that you

19  excluded?

20  A.  No.  Because my study is very clear that the outcome of     12:01:06

21  interest is name checking patterns, and stop length when we

22  have names.

23          THE COURT:  Mr. Liddy?

24          MR. LIDDY:  Yes, Your Honor.

25          THE COURT:  I'm looking for a good time to break for    12:01:27

```
 1    lunch.  I don't want to -- I don't want to interrupt you if

 2    you're close to the end, but if you're not, why don't we break

 3    for lunch?

 4            MR. LIDDY:  Looks like a good time to break for lunch,

 5    Your Honor.                                                          12:01:37

 6            THE COURT:  All right.  We will see you back here at

 7    1:15.

 8            (Lunch recess taken.)

 9            THE COURT:  Please be seated.

10            Okay.  The motion that was made to admit various          13:19:21

11    exhibits into evidence pursuant to Federal Rule of Evidence

12    1006 is denied.  Those documents are not summaries, and all of

13    the items they contained were not testified to.  Nevertheless,

14    the testimony that was introduced will stand.  I think it

15    fairly describes the -- the gist of the expert's testimony.      13:19:43

16            Further, as I discussed with the parties at the end

17    of -- or at the beginning of the lunch break, we will convene

18    court in this courtroom on Tuesday, but then on Wednesday we're

19    going to return back up to my original courtroom.

20            Any question about that?                                  13:20:02

21            MR. CASEY:  Not from the defense, Your Honor.

22            MR. BYRNES:  None from the plaintiffs, Your Honor.

23            THE COURT:  Mr. Liddy, are you ready to resume

24    cross-examination?

25            MR. LIDDY:  I am, Your Honor.                             13:20:12
```

1          THE COURT:  Please do so.

2     BY MR. LIDDY:

3     Q.  Doctor, earlier this morning you gave testimony pertaining

4     to document 3991I.

5          Do you recall that?                                    13:21:17

6     A.  Yes.

7     Q.  Is the document that's on the courtroom document camera

8     familiar to you?

9     A.  Yes.

10    Q.  Can you tell me, for the relevant period of time, what was    13:21:23

11    the Hispanic population of Maricopa County?

12    A.  I don't have that number.

13    Q.  You don't have that number on a document or you don't have

14    that number at all?

15    A.  I don't have that -- I don't know that number.            13:21:49

16    Q.  How about the Hispanic population for the state of Arizona?

17    A.  I do not have that number.

18    Q.  When you conducted your examination of these materials, did

19    you have United States Census data available to you from the

20    2000 census?                                                 13:22:10

21    A.  Yes.

22    Q.  And did that data indicate -- was it sufficient to draw

23    a -- to draw an evaluation on your part whether the population

24    of the state of Arizona was Hispanic?

25    A.  Yes, if I wanted to do that.                             13:22:31

1   Q.  And did you do that as part of your study?

2   A.  No, I did not, because that's a type of study that's called

3   external benchmarking, which is not the preferred type of

4   study.

5   Q.  Well, explain to me, please, what external benchmarking is.    13:22:45

6   A.  This has to do with what's called a denominator problem in

7   studies on police stops or police traffic studies, and the

8   question is:  What should the appropriate denominator be

9   against which officer actions are benchmarked?  And as

10  explained in my testimony earlier today, the use of an external    13:23:09

11  benchmarking approach relying on -- relying on census

12  population data to compare that to police activity is not the

13  preferred approach.

14  Q.  Is it a -- an approach that would have any value?

15  A.  It might have some value but for the fact that it would not    13:23:28

16  have as much value as a study based on internal benchmarking,

17  which was the type of study that I conducted.

18  Q.  Would you expect traffic stops in a known community to

19  correlate to the percentage of population of a subgroup of that

20  community by ethnicity?    13:23:53

21  A.  I might expect that, but that would not be relevant to the

22  issues under discussion here today.

23  Q.  Why might you expect that?

24  A.  I might expect it; I might not.

25  Q.  So let's say the population of the state of Arizona was a    13:24:14

1    third Hispanic, 33 percent.  Would you expect the law

2    enforcement traffic stops to be -- to come in around 33 percent

3    in Spanish surnames?

4    A.  They might; they might not.

5    Q.  And that would be based upon what?                    13:24:31

6    A.  The traffic stop percent Hispanic represents a result

7    that's obtained after three different factors are taken into

8    account.

9         One factor would be the relevant population, one

10   factor would be -- I'm sorry.  The first factor would be police  13:24:55

11   officer behavior.

12        The second factor would be if there's a differential

13   rate at which Hispanics, compared to non-Hispanics, violate

14   rules.

15        And the third question would be the exposure question,  13:25:12

16   which is to what extent are Hispanics versus non-Hispanics

17   differentially exposed to law enforcement officers engaged in

18   these types of activities.

19   Q.  What do you mean when we say the factor of whether or not

20   the subcommunity of Hispanics violates rules?            13:25:30

21   A.  It would -- it's possible that there is a difference, there

22   might be or might not be, in extent to which Hispanics driving

23   vehicles versus non-Hispanics driving vehicles violate

24   particular laws.

25   Q.  And might one of those laws be obeying traffic laws that  13:25:57

 1  are taught in traffic school when one obtains a state driver's

 2  license?

 3  A.  That would be one.

 4  Q.  Might another be equipment, the laws pertaining to the

 5  status of equipment on a vehicle?                           13:26:24

 6  A.  That might be relevant, but in my study it appears not to

 7  be.

 8  Q.  How about this factor?  In your opinion, might it be a

 9  factor of whether one did or did not observe vehicle code

10  requirements based upon not ethnicity, but poverty?        13:26:45

11  A.  That's possible.

12  Q.  Would it make sense for one to theorize that an individual

13  who is living at the poverty level, let's say one-and-a-half

14  times poverty level, might have less disposable income than

15  individuals living in the same area at three, four, or five   13:27:10

16  times the poverty level for annual income?

17  A.  In general that's true, but given the way I designed my

18  study, that's not relevant.

19  Q.  But I'm not asking you about your study right now; I'm

20  asking about the population of Maricopa County.             13:27:25

21        Would it be reasonable for one to theorize that

22  individuals living at the poverty level have less ability to

23  use disposable income to make repairs to vehicles such that

24  they meet the code in the state of Arizona?

25  A.  Yes.  However, it would also be plausible that they would   13:27:52

1   have less money for gas and, therefore, would be less able to

2   drive as frequently.

3   Q.  Do you have any data that you've observed that would shed

4   any light on whether Hispanics in Maricopa County are more or

5   less likely to drive to and from work each day than individuals          13:28:12

6   with non-Hispanic surnames?

7   A.  The question you just asked me is specific to commuting

8   patterns, and Dr. Camarota in his report did provide

9   information about Hispanic and non-Hispanic commuting matters.

10  Q.  Was that information from the American community survey?          13:28:38

11  A.  I believe that's where he said he got it, yes.

12  Q.  And do you recall what that data was?

13  A.  Not specifically, no.

14  Q.  Would it surprise you to learn that according to that

15  survey, Hispanics self-report that they commute in an          13:28:53

16  automobile, a truck, or a van at rates higher than

17  non-Hispanics in Maricopa County?

18  A.  That would not surprise me.

19  Q.  And if that fact were true, would it not affect results of

20  the study of Hispanic drivers' traffic patterns versus          13:29:11

21  non-Hispanic in Maricopa County?

22  A.  Not necessarily.

23  Q.  And why is that?

24  A.  Because you've spoken to commuting patterns between

25  Hispanics and non-Hispanics.  You haven't spoken to total          13:29:27

1    vehicle miles traveled; you haven't spoken to non-commuter

2    travel; you haven't spoken to the other two issues that I also

3    mentioned about differential violating rates and differential

4    exposure to officers involved in these enforcement activities.

5    Q.  So if I understand your response correctly, you're saying          13:29:44

6    it's not enough to know whether Hispanics drive -- commute to

7    and from work in Maricopa County more than non-Hispanics, what

8    one would need to know how long they're on the roads?

9    A.  To determine total exposure, you would want vehicle --

10   total vehicle miles, and you also want to know about the times          13:30:03

11   that they're traveling.

12   Q.  Can I direct your attention to 399I, please.  I see it's --

13   it's titled Relevant Numbers: Name Checking Patterns By Key

14   Variables With Reprocessed Data.

15        What is reprocessed data?                                          13:30:25

16   A.  The original data on which I based my analysis was

17   criticized by Dr. Camarota in his report as having overloaded

18   for two factors: the submission of multiple names with

19   different aliases but same dates of birth, which I took care of

20   in the reprocessed data; and also he indicated in his report          13:30:44

21   that the mobile data completely overlaps with the canned

22   [phonetic] data file, and therefore that I should have removed

23   it, so that was the second change that I made.  And when I did

24   the analysis with the reprocessed data responding to those

25   criticisms, the pattern of results was essentially identical.          13:31:05

1    Q.  I see the top half of this table here says the all day

2    saturation patrol day versus others.   (Numbers and Columns

3    Percentages).   Using 90 Percent Probability Threshold For

4    Hispanic Name.

5         Did I read that correctly?                                    13:31:27

6    A.  Yes, sir.

7    Q.  And when you use the term "90 percent probability

8    threshold," are you referring to the surname analysis of the

9    2000 U.S. Census data?

10   A.  Yes, I am.                                                     13:31:37

11   Q.  Tell me what that 90 percent number represents.

12   A.  What that represents is that a name was classified as

13   Hispanic if based on that 2000 census data research and

14   analysis and resulting tables in the U.S. at least 90 percent

15   of people with that surname also in the census self-identified  13:31:59

16   as Hispanic.

17   Q.  So would that give me any confidence in, say, predicted

18   value, if I were looking at one of the names at the 90 percent

19   threshold, that I could determine, with 90 percent confidence,

20   that that person might self-identify him- or herself as         13:32:21

21   Hispanic?

22   A.  If I may, the answer is no, because you've switched from a

23   class of individuals to an individual instance.  So the point

24   is if we're looking at a large group of people, then in general

25   folks with a surname, there are small                            13:32:39

```
 1   undercounting/overcounting issues which are discussed in my

 2   report, but in general with a large sample of people, if

 3   they're named -- if they have a surname that the U.S. Census

 4   data indicates 90 percent or more people self-identify as

 5   Hispanic, there's a good chance that in a large sample,          13:32:59

 6   90 percent of the people with those names will self-identify.

 7   Q.  So you're saying it's not useful in determining whether an

 8   individual named Rodriguez is likely to -- to self-identify

 9   herself as Hispanic, but it is only useful when looking at

10   groups, large groups of people with the surname Rodriguez?       13:33:20

11   A.  Well, Mr. Rodriguez or Mrs. Rodriguez is a -- is a

12   member --

13   Q.  Or Ms.

14   A.  -- or Ms. Rodriguez is a member of a group, and if we have

15   lots of Rodriguezes, yes, it could be useful.                    13:33:35

16   Q.  But it's not useful to Ms. Rodriguez herself personal.

17   A.  If you're asking me -- be sure I understand the question --

18   if you're asking me can you, with certainty, that is, can you

19   guess that nine times out of 10 am I -- do I have a 90 percent

20   chance or better of being right if I walk up to Mr., Ms., or     13:33:55

21   Miss Rodriguez, and knowing their surname, estimating that they

22   are Hispanic, the answer is -- in one particular one instance

23   the answer is no.  But if you were to go up to a thousand

24   persons with the surname Rodriguez and guess that they are

25   going to self-identify as Hispanic, you in general, doing        13:34:17
```

1   random sampling, would be right 90 percent of the time.

2   Q.  Were you asked to prepare a report based upon your

3   examination of the CAD data?

4   A.  Yes, I was.

5   Q.  And you've prepared two reports, is that correct: an                13:34:38

6   initial report, and one in response to Mr. Camarota's

7   criticism?

8   A.  Yes.

9   Q.  In your initial report did you provide any information as

10  to an estimate of the Hispanic population in Maricopa County?          13:34:52

11  A.  I don't recall specifically that I did.

12          If that's a page of my report, apparent -- what's this

13  page from?  This is -- this is a page from my report.

14  Q.  Do you recognize it?

15  A.  Yeah, it looks like it, because there's -- there are the           13:35:29

16  variables I was using.

17  Q.  I'm going to zoom in just for a little bit here.  Would you

18  read for me the line that I have underlined in red ink?

19  A.  Should I start at the beginning of the paragraph?

20  Q.  Sure.                                                              13:35:46

21  A.  Looking at all the names checked in the combined mobile and

22  CAD incident file for the entire period 1/1/2007 through

23  10/31/2009, 35 percent of names appeared as Hispanic using the

24  lower threshold of 60 percent, whereas 22.7 percent of surnames

25  were treated as Hispanic using the highest threshold of               13:36:11

1   90 percent.  By way of comparison, approximately 31.8 percent

2   of the population of Maricopa County identifies as Hispanic,

3   according to the most reason data from the United States

4   Census.

5   Q.  And do you recall when you wrote this report?                    13:36:28

6   A.  This would have been in early -- late 2010; very, very

7   early 2011.

8   Q.  Do you recall whether you used the 2000 United States

9   Census report data or the 2010?

10  A.  I don't recall specifically.                                     13:36:56

11  Q.  But do these refresh your recollection at the time that you

12  conducted this study and wrote this report you had available to

13  you United States Census data enough to estimate that

14  approximately 31.8 percent of the population of Maricopa County

15  self-identified as Hispanic?                                         13:37:13

16  A.  Indeed.

17  Q.  Back to 399I.  The upper half of this table here you have

18  over on the left a column that says Name.  Do you see that?

19  A.  Yes.

20  Q.  Okay.  And then if we drop down it says Not Hispanic.  See      13:37:38

21  that?

22  A.  Yes.

23  Q.  Soon as I get my -- my marker, I'll be able to see it even

24  better, right?

25          Now, let's look at the bold writing on the column,          13:37:55

1  second column to the right.  "No."  You see that?

2  A.  Yes.

3  Q.  And what does that indicate, "no"?  What's that mean?

4  A.  This is, if I may just provide a -- just a brief bit of

5  background --                                                    13:38:14

6  Q.  Sure.

7  A.  -- this is a -- these are two cross tabulation tables that

8  describe the relationship between two variables.  The column

9  variable is whether or not the name was checked on an official

10 saturation patrol day, "no" versus "yes"; the row variable is    13:38:27

11 whether or not the name checked was Hispanic, not Hispanic or

12 Hispanic.  And the percent in each column indicates the percent

13 in that group that belong in that row.

14 Q.  Okay.  So the "no," what does that mean?

15 A.  That means that the name was checked on a day when there     13:38:45

16 was no official saturation patrol as I defined it, which meant

17 11 out of the 13 saturation patrols.

18 Q.  But zero out of the dozen or so saturation patrols that

19 were conducted prior to the 13 that you looked at, is that

20 correct?                                                         13:39:04

21 A.  Yeah, that is correct.

22 Q.  And why didn't you look at any of those saturation patrols?

23 A.  First of all, let me -- if I can respond with two points.

24 Q.  Sure.

25 A.  The first point is that they thought it was best to allow    13:39:20

1   the MCSO to define official major saturation patrol days.  And

2   the fact as you're suggesting with your question, if I

3   understand it properly, that there were also days when -- that

4   I said here, no, for official saturation patrol meaning no, you

5   know, none -- no major operations that I had actual data for,          13:39:47

6   you're suggesting there were saturation patrols of a more minor

7   nature operating in that minor -- in that no column.

8          And if I can just make one more point --

9   Q.  Please do.

10  A.  -- if I could, what this means is that any contrast that I          13:40:03

11  find between the days of interest, which are in the yes column

12  official saturation patrol days, and the no column, that is the

13  comparison group, any comparison that I find would have been --

14  any differences I find, for example, in the Hispanic, if you

15  look at the Hispanic row and you look at official saturation          13:40:24

16  patrol day, no versus yes, we have a higher percentage on

17  official saturation patrol days, 25.8 percent versus 21.8, and

18  if I had from these no days separated out the days which you're

19  discussing with these minor saturation patrols, my contrast

20  would have been even stronger.          13:40:52

21  Q.  Okay.  And when you -- and I apologize.  My question did

22  not imply that the many saturation patrols conducted prior to

23  the date of those that you chose to study were not official

24  major saturation patrol, I never heard that term before, I

25  don't know anything about it, official major saturation patrol          13:41:14

1    is the focal point of your study, is that correct?

2    A.  Yes, sir.

3    Q.  Okay.  And you just mentioned the percentages here, I'll

4    see if I can draw up here, you mentioned 28.2 percent and

5    25.8 percent, is that correct?                                    13:41:37

6    A.  That is correct.

7    Q.  And one falls under the no column, the other falls under

8    the yes column.

9    A.  That is correct.

10   Q.  And I apologize for my math.  I told you I wasn't a math    13:41:45

11   major type of guy, but to me that looks like a difference of a

12   little less than 4 percent.  You can see how a layman such as

13   me would see it that way?

14   A.  Yes, I can, but if I could make two mentions.

15         First of all, if we have a broader threshold            13:42:04

16   categorization for Hispanics looking at the 60 percent table,

17   we've got a difference of 6 percent, and it's 6 percent

18   compared to 33, so that's about a 1/6th different.  And these

19   data are before controlling for other factors operating in the

20   data whose impact needs to be isolated out so we can discover  13:42:27

21   the net impact of a major -- of an official saturation patrol

22   day on the name checking pattern.

23   Q.  Okay.  But you would agree with me the difference between

24   25.8 and 21.82 is less than 4 percent.

25   A.  Yes, it's 3.98 percent.                                    13:42:45

1   Q.  Thank you.  And would you also agree with me that

2   21.82 percent is less than 31.8 percent?

3   A.  Yes, I would, but I would also add that's not informative.

4   Q.  To whom?

5   A.  To an analyst trying to interpret these data patterns.          13:43:10

6   Q.  Okay.  And what about 25.8 percent, you would agree with me

7   that that also is less than 31.8 percent, which is the figure

8   that you found in the United States Census data for the

9   Hispanic population of Maricopa County.

10  A.  Yes, but I'd again add that's not informative.                  13:43:32

11  Q.  To who?

12  A.  To the analyst trying to understand these data patterns.

13  Q.  Well, would you agree with me it might be informative to

14  someone else?

15  A.  Yes, sir.                                                       13:43:47

16  Q.  Thank you.  Now, let's travel over to the right here where

17  it says Total, you see that?

18  A.  Yes.

19  Q.  21.98 percent, what does that represent?

20  A.  What you see over on the right-hand side adds up the total      13:44:13

21  numbers going across for Hispanics, so if you add up 25,905 and

22  1312, that comes out to 27,217.  And of the total in this

23  table, 123,831, those 27,217 make up 21.98.

24          Using the extremely stringent definition of a Hispanic

25  surname and if we used a number that's closer to what's used in    13:44:44

1    the research down on the bottom right, you will see that the

2    same corresponding number is 33.56 percent.

3    Q.  33.56 percent?

4    A.  Yes.

5    Q.  So as our confidence in whether or not the names                13:45:00

6    self-reported as Hispanic drops from 90 percent to 60 percent,

7    this ratio climbs up from 21.98 percent to 33.56 percent, am I

8    correct?

9    A.  Not exactly.  You've mischaracterized a little bit the

10   distinction between the 90 percent and the 60 percent --           13:45:31

11   Q.  Well, am I -- am I incorrect that we would have less

12   confidence in the 60 percent surname figure than we would in

13   the 90 percent surname figure to self-identify as Hispanic?

14   A.  One would have equal confidence in both numbers, depending

15   on one's purposes.                                                  13:45:49

16   Q.  What if my purpose is to know whether or not the individual

17   who actually has the name is going to self-identify as

18   Hispanic?

19   A.  The issue is not so much whether the individual

20   self-identifies Hispanic; the question is what correlates with     13:46:02

21   surnames that are Hispanic or not and examining that, using

22   different thresholds for saying a name must meet this minimum

23   probability to be classified as Hispanic.

24   Q.  So we can be just as confident that an individual who's

25   pulled over by a deputy in Maricopa County who has the name        13:46:20

```
 1   Rodriguez --

 2            Which is a 90 percent name, you testified earlier

 3   today, is that correct?

 4   A.  Yes, sir.

 5   Q.  Is -- self-identifies as Hispanic, as a person who had a        13:46:31

 6   name that, according to U.S. Census data analysis, is only

 7   60 percent.  Exact same amount of confidence?

 8   A.  It's not a question of confidence.

 9   Q.  But that's -- but that's the question.  So it is a question

10   of confidence for the purpose of responding to this question.       13:46:53

11   A.  I could have equal confidence in both results.

12   Q.  Could you understand why someone else might have less

13   confidence in the 60 percent figure, than the 90 percent

14   figure?

15   A.  Yes, I could.                                                    13:47:10

16   Q.  Thank you.

17            You mentioned in an early response of this data that

18   there were certain controls that you looked at.

19   A.  Yes, I did.

20   Q.  And what were those controls?                                    13:47:34

21   A.  Could you specify which analysis is under discussion?

22   Q.  Well, the analysis of whether or not -- or the likelihood

23   of an individual who's Hispanic to be pulled over in Maricopa

24   County by a deputy sheriff in a traffic stop, or as you define

25   traffic stop.                                                        13:47:59
```

1    A.  I have -- I have two outcomes I investigate in my report:

2    whether or not a name check, the odds of being Hispanic or not,

3    and stop length.

4    Q.  All right.  I'm not referring to stop length in this

5    question, whether or not the person stopped is likely to be --      13:48:13

6    the name check would be Hispanic.

7    A.  Okay.  And the control variables that I applied in that

8    situation included the following:  First of all, there were

9    multiple names within an incident, so the analysis controls for

10   that.                                                                13:48:32

11          Secondly, because these data are collected over a

12   significant period of time, one wants to control for the

13   natural variation in the data because things might be naturally

14   changing from one month to the next, so you control for those

15   long-term temporal trends in three different ways.                  13:48:46

16          And in addition, control for whether the name was

17   checked on a weekday or a weekend, and then an additional

18   control is built in by selecting specific comparison days.

19   Q.  What about a control for socioeconomic factors, did you

20   have any of those controls?                                         13:49:10

21   A.  Those data were not available.

22   Q.  Were they obtainable?

23   A.  If you're asking me -- if I may be sure I understand the

24   question?  If you're asking me, Could I have obtained

25   socioeconomic data based on the location of the stop?  Is that      13:49:29

1    the question?

2    Q.   No.

3    A.   Okay, I'm sorry.  I don't understand.

4    Q.   When you said the data was not available, do you mean it

5    was not available in the CAD data universe that you were          13:49:41

6    provided?

7    A.   That's correct.

8    Q.   But with that data available outside the CAD data universe

9    provided, such as the U.S. Census data that you obtained, could

10   you not have obtained information about socioeconomic factors     13:49:54

11   that might have been a factor in determining the likelihood of

12   a name searched by a Maricopa County sheriff being Hispanic or

13   non-Hispanic?

14   A.   If you could tell me -- I'm sorry, I just want to be sure

15   I'm clear on this.  Are you -- so this socioeconomic data would   13:50:15

16   be describing what particular feature?

17   Q.   On the likelihood of one being pulled over on the roads of

18   Maricopa County by a Maricopa County sheriff's deputy.

19   A.   I'm sorry, I still don't understand the question, because I

20   have a name, I don't have any socioeconomic data associated       13:50:35

21   with that.

22   Q.   That's correct, but the question is:  Can you go and get

23   socioeconomic data?

24         You looked at a study of individuals who were pulled

25   over in Maricopa County by a deputy, some of whom have surnames   13:50:47

1    that are self-identified as Hispanic and some self-identified

2    as not Hispanic, is that correct?

3    A.  Yes.

4    Q.  Is there socioeconomic data available for individuals who

5    live in the state of Arizona, Maricopa County, that are either          13:51:07

6    Hispanic or non-Hispanic in surname?

7    A.  Not for these particular individuals whose names were

8    checked.

9    Q.  Well, we're not looking at the individuals whose names are

10   checked; we're looking at the surnames, correct?                        13:51:23

11   A.  Yes.

12   Q.  Okay.  Did you use any socioeconomic data to search for the

13   reasons why the disparity that you identify in your study

14   occurred?

15   A.  No, I did not.                                                      13:51:56

16   Q.  Why?

17   A.  Because given the type of internal benchmarking study I

18   conducted, that would not be relevant to changing the pattern

19   of results.  And if I may give one example.

20   Q.  Well, before you give an example, let me ask this question:         13:52:11

21   If a deputy on the Beeline Highway sees an automobile that's in

22   such a state of disrepair that it falls beneath the code

23   required by law in Arizona, might one factor be the disposable

24   income available to the person responsible for the maintenance

25   of that vehicle?                                                        13:52:41

1    A.  Yes, that's possible.

2    Q.  So did you look at any socioeconomic data to determine

3    whether there was a higher incidence of poverty among Hispanics

4    in Maricopa County versus people with non-Hispanic names?

5    A.  No, I did not.  And again, if I can explain, that would not

6    be specifically relevant.

7    Q.  If an individual's being pulled over because his

8    automobile's in disrepair and it's going to cost X dollars to

9    repair it, and X dollars is in excess of the disposable income

10   of the individual who's driving the car or is otherwise

11   responsible for the car, how could that be not relevant to our

12   inquiry as to whether or not there's racial profiling by the

13   Maricopa County Sheriff's Office by pulling over people for

14   having broken taillights and broken windshields?

15   A.  Because your comment assumes an identity between the

16   Hispanic population of Maricopa County and those individuals

17   pulled over by the Maricopa County Sheriff's Office.

18   Q.  If the name, according to your analysis, is a 90 percent

19   likelihood of self-identification as Hispanic.

20   A.  The average for the county doesn't necessarily describe the

21   individual -- the specific individuals who were stopped.  And,

22   if I could just add one amplification here --

23   Q.  Okay.

24   A.  -- in the reprocessed report with the reprocessed data

25   where your analys -- where your comment is the question of

1  poverty would seem to suggest that if an officer checked a name

2  for a vehicle and a name check was Hispanic, the poverty

3  argument would suggest that the officer should be more likely

4  to issue a citation because the vehicle is in violation of

5  current vehicular codes.                                    13:54:44

6        The analysis that I conducted suggested exactly the

7  opposite was true; that is, if the officers did pull over -- do

8  pull over a Hispanic and check a Hispanic rather than

9  non-Hispanic name, they were less likely to issue a citation,

10  which would suggest that poverty and linking through poverty to   13:55:02

11  vehicle maintenance was not an issue here.

12  Q.  Why would it suggest it's not an issue?

13  A.  Because they were less likely to issue -- issue a citation

14  if name checked was Hispanic.

15  Q.  How is the variable, whether or not a citation is issued or   13:55:18

16  not, relevant to determining why an individual who was pulled

17  over was operating a vehicle that was out of compliance with

18  the code?

19  A.  It would seem, given the purpose of the saturation patrols,

20  that the purpose is to -- one of the purposes is to cite folks   13:55:34

21  whose vehicles are in violation.

22  Q.  And who made that determination?  Did you make that

23  determination?

24  A.  I'm saying when I -- when I read the saturation patrol

25  documents and read the background on what the purpose was of     13:55:48

1  those operations, and you read some of the depositions of the

2  officers, that appeared to be part of what the major saturation

3  patrols were about.

4  Q.  Based on your interpretation?

5  A.  Based on the documents that I read.                    13:56:02

6  Q.  After you read them did you interpret them?

7        Sounds to me like you're introducing bias into the

8  study.  Can you understand why it looks that way to me?

9  A.  No.

10 Q.  You have just testified that you used as a factor whether   13:56:19

11 or not an officer used his discretion to write a citation or to

12 give someone a warning.  And you've determined that poverty is

13 not a factor, because you've got in the head of that deputy and

14 you've decided that deputy doesn't care about whether that

15 individual's automobile is out of compliance, because you think  13:56:41

16 that deputy only cares about what?  You know, it's not a code

17 violation.

18        MR. BYRNES:  Objection, Your Honor, argumentative.

19        THE COURT:  I'm going to sustain the objection.  I

20 don't even understand.  I think you lost me on the question.   13:56:57

21 BY MR. LIDDY:

22 Q.  Why did you determine that after reading the document that

23 the variable as to whether or not the deputy used his

24 discretion to write a citation or not write a citation was such

25 that you would not make inquiries as to socioeconomic variables  13:57:17

1  that would affect the outcome of whether or not the driver of

2  the car was Hispanic or not?

3  A.  That's not what I did.  The argument about the

4  socioeconomic variables was raised in Dr. Camarota's report.

5  And the argument in his report clearly suggested that one of          13:57:36

6  the reasons that MCSO officers might be stopping vehicles more

7  often if they are -- if they are driven by Hispanics or have

8  Hispanics passengers is because these are lower socioeconomic

9  population; therefore, the vehicles are more likely to be out

10  of compliance.                                                        13:58:00

11          And then by implication from his reasoning, by

12  implication from his reasoning, then officers give citations

13  for many reasons, but one might be because the vehicle is not

14  in compliance.  So that's why I then tested that relationship.

15  Q.  By implication from his reasoning?                                13:58:16

16  A.  Um-hum.

17  Q.  So because Dr. Camarota told you to, you determined that

18  the discretion as to whether or not a driver issued a citation

19  or a warning was a relevant factor in determining that you were

20  not going to look at socioeconomic factors?                          13:58:35

21  A.  I'm not looking at socioeconomic factors, but the earlier

22  fact -- the earlier point that I discussed about separating

23  external benchmarking studies versus internal benchmarking

24  studies, but what I was doing was taking an implication of his

25  line of argument and testing it.                                     13:58:53

1    Q.   Okay.  Let me direct your attention to 399, Table 3 on 399.

2         You see that?

3    A.   Yes, sir.

4    Q.   Increased duration of traffic stops where one or more

5    Hispanic surnames are checked.                                13:59:09

6         So this table is an effort to illustrate your findings

7    on the second issue which you were inquiring about, is that

8    correct?

9    A.   Yes.

10   Q.   And that issue was the length of stop and whether there's  13:59:19

11   an association with an Hispanic surname or not?

12   A.   Yes.

13   Q.   Okay.  So percentage cutoff for Hispanic surname

14   determination, first column, top left.  And we drop down there,

15   we see the 90 percent, 80 percent, 70 and 60 percent threshold, 13:59:36

16   all of which refers to the surname analysis of the U.S. Census

17   data, self-reported, correct?

18   A.   Yes.

19   Q.   Okay.  Look at the 90 percent threshold and slide over to

20   right there, and you see percentage increased in length of     13:59:48

21   stops where a Hispanic surname was checked, 25 percent.  That's

22   2.9 minutes longer, is that correct?

23   A.   Yes.

24   Q.   Does that mean that there's an association into the length

25   of the stop as to whether or not a person's surname was        14:00:05

1  90 percent likely to be Hispanic, according to the analysis?

2  A.  More specifically, if I may.

3  Q.  Okay.

4  A.  It refers to if we have an incident, and one or more of the

5  names checked during that incident was a Hispanic surname,    14:00:20

6  using the 90 percent threshold minimum probability, that stop

7  lasted about 2.9 minutes longer after controlling for several

8  factors, and that was about 25 percent longer.

9  Q.  And did you study other variables that may potentially have

10  impacted the length of the -- the differential between the 2 --    14:00:46

11  the 2.9 minutes longer?

12  A.  This analysis controls for other factors such as the

13  number of names that were checked --

14  Q.  Okay.

15  A.  -- whether or not somebody was arrested, and I'm not sure    14:01:00

16  right now what other variables were in there.

17  Q.  Did you check for the length of time based on a hyphenated

18  name, say Jose Maria Olazabal, one of my favorite golfers.

19  With a hyphenated name would the duration of the stop be

20  longer?    14:01:23

21  A.  I'm not sure I understand the question.  I'm sorry.

22  Q.  Well, let's say that Jose Maria Olazabal in Scottsdale teed

23  it up breaking some records, but he's so happy about the 62

24  he's driving down, let's say the 101, and he's going 90 miles

25  an hour and he gets lit up by a sheriff's deputy, and they pull    14:01:40

him over and they ask him for his driver's license and ID, and

he gives them one, they say Jose Maria Olazabal, but he's from

Spain so he doesn't have an Arizona driver's license or another

driver's license from the state here, so they do the name check

on him.  They're going to check Jose Maria Olazabal, they're    14:01:58

going to check Jose Olazabal, and they're going to check Jose

Maria, correct?

A.  Yes, that -- that is correct, but because I -- I

de-duplicated within the analysis, that helps control for that.

Q.  So the fact that that stop would take longer, you've        14:02:15

already accounted for.

A.  The three variations you just gave me on that name would

count as just one name check.

Q.  But it would till take longer.

A.  I guess depending on the deputy's typing skills or radio    14:02:32

skills.

Q.  Well, it would be on the radio.  He'd be calling each name

in under separate databases, maybe two or three national

databases for each name.  Would it make sense for that to take

longer than if there was only one name?                         14:02:46

A.  In that particular instance, yes.

Q.  Okay.  What if the individual who were pulled over had no

driver's license and no ID?  Would that stop take longer?

A.  It could.

Q.  Did you account for that?                                    14:03:07

1   A.  I don't think so.

2   Q.  What if the individual driving the vehicle was a

3   non-English speaker, was a Spanish-speaker, let's say, and the

4   deputy, who's a native English speaker but speaks Spanish had

5   to translate, speak Spanish.  Would that stop take longer?          14:03:41

6   A.  I'm sorry, could we go back to the previous question?

7   Q.  Let's stay on this one.

8   A.  If I could have the question again, please.

9   Q.  Would a traffic stop be longer if the driver of the vehicle

10  stopped spoke Spanish and not English, and the deputy spoke         14:03:58

11  Spanish, but not as a native speaker, and had to translate from

12  English to Spanish while communicating with the driver of the

13  vehicle stopped?

14  A.  And we're comparing that to a stop where...

15  Q.  Where the driver was a native English speaker stopped by an     14:04:17

16  officer who was a native English speaker.

17  A.  Yes, the first could take longer.

18  Q.  Did you account for that?

19  A.  No, I did not.

20  Q.  Let's say that a Spanish speaking deputy pulled over a          14:04:31

21  Spanish speaking driver and had -- had -- gave him a citation,

22  and with the citation gave him a court document, and the court

23  document was in English.  And the Spanish speaking deputy was

24  employing policing techniques and translating the document and

25  explaining what it meant in Spanish.  Would that take longer?       14:05:01

1  A.  It could, but let me -- let me add, if I may, one -- one

2  additional point here.  We know nothing about, in all these

3  scenarios that you've given me, we know nothing about the

4  English speaking capabilities of other people in the vehicle.

5  Maybe the stops included multiple names being checked, and                    14:05:19

6  therefore multiple names in the vehicle.

7  Q.  But you controlled for multiple names?

8  A.  Yes, I did.

9  Q.  But I didn't ask you about controlling for multiple names,

10  I asked you about controlling for the additional time it would    14:05:32

11  take for a Spanish speaking officer to translate an English

12  court document that he's required by law to hand to the driver

13  when given a citation.  Did you control for that?

14  A.  No, nor did I control for the fact he might have given it

15  to somebody sitting in the passenger seat, and the other person   14:05:50

16  said:  I'll translate it.  You can go now, officer.

17  Q.  Okay.  Thank you.

18        What is quasi-experimental methodology?

19  A.  It refers to a type of evaluation study.

20  Q.  And what type might that be?                                   14:06:23

21  A.  It's a type where you have a program, and you seek to

22  compare it to situations outside the program.  And -- stop

23  there.

24  Q.  Earlier in your testimony I heard you testify that there

25  was a 000.1 percent chance that the variation you identified in    14:06:51

1    some of your tables was caused by chance or noise.

2         Do you recall that?

3    A.  I spoke to the association.

4    Q.  Would you explain to me what that means.

5    A.  What it means is that the size of the impact that's          14:07:11

6    observed is of such strength that -- on the various

7    assumptions, that result would not occur by chance any more

8    than about one time out of a thousand.

9    Q.  So that means it didn't occur by chance.

10   A.  That's the way we usually discuss it, yes, sir.             14:07:34

11   Q.  And when you referred to statistical noise, you meant by

12   chance, or perhaps something else that was not relevant to the

13   inquiry?

14   A.  What I meant was that the impact of a particular factor is

15   compared to an error, it's compared to other features of the    14:07:50

16   factor, and you test to see the size of the effect compared to

17   the background noise for that specific effect.

18   Q.  So if the variation and association wasn't caused by chance

19   or statistical noise, what was it caused by?

20   A.  I'm sorry, I don't --                                        14:08:16

21   Q.  If the statistical variation in the association you

22   identified in your study, your table, was not caused by

23   statistical noise or by chance, do you have an opinion as to

24   what was the cause?

25   A.  I'm confused, because there are two words in your question,  14:08:32

```
 1   variation and association, and those are two -- two different
 2   things.
 3            I'm looking at the association of a particular factor
 4   like the name being checked on saturation patrol day and now
 5   that associates with another variable, the outcome, the          14:08:46
 6   likelihood that the name checked as being Hispanic or
 7   non-Hispanic, so I've got an association.
 8   Q.  Okay.  And you said that the differential --
 9   A.  Um-hum.
10   Q.  -- was not caused by chance.                                 14:09:02
11   A.  Correct.
12   Q.  Or highly unlikely to be caused by chance.
13   A.  Correct.
14   Q.  Do you have an opinion as to what the cause was?
15   A.  Well, the cause would appear to be the behaviors of the      14:09:10
16   officers involved.
17   Q.  The behavior of the officers?
18   A.  Um-hum.
19   Q.  Not the conduct of the drivers?
20   A.  That's certainly also possible.  But again, the issue about  14:09:22
21   as soon as -- it could be the officers, and -- but again, we're
22   back to the key question here.  The key question here is any
23   other factor that gets mentioned, such as the conduct of --
24   I'll stop.  Go ahead.
25   Q.  Did you finish your response?                                14:09:47
```

1    A.  Yes.

2           THE COURT:  Well, do you want to repeat it for me?

3    Because I'm not sure I got the gist of it.

4           THE WITNESS:  What I'm saying is that if we have

5    variation in the name checking patterns, those name checks are     14:10:04

6    submitted by officers in terms of Hispanic versus non-Hispanic.

7    So one plausible explanation would be that the officers are

8    doing something different on these days versus other days.

9           Are there certain -- are there other possible factors

10   that could be happening?  Certainly they could.  But any other     14:10:24

11   possible factors, one would also have to make the case that

12   that -- those other factors applied -- play out differently if

13   Hispanic names are checked versus non-Hispanic names are

14   checked.

15          In other words, any other factors could be randomly     14:10:39

16   distributed but for us, Hispanic versus non-Hispanic names

17   checked.  And I don't have those other factors, and those --

18   I'm being asked to consider those other factors.

19          THE COURT:  All right.  Thank you.

20   BY MR. LIDDY:     14:10:58

21   Q.  One of those factors could be poverty?

22   A.  Could be.

23   Q.  Could be a hypenated name?

24   A.  Could be.

25   Q.  Could be non-native Spanish speaking officer translating to     14:11:04

1    a Spanish speaking driver?

2    A.  Could be.

3    Q.  Could be community policing, translating a court document

4    from English to Spanish to ensure that the driver comprehends

5    it?                                                                    14:11:24

6    A.  Interesting idea, um-hum.

7    Q.  But could be?

8    A.  Yeah.

9    Q.  You didn't control for that?

10   A.  I had no data on that.                                             14:11:30

11   Q.  I understand.

12        I direct your attention to another document here.

13   This is a table from page 38 of the original report.  Does it

14   look familiar to you?

15   A.  Yes.                                                               14:11:49

16   Q.  Can you tell us what that is.

17   A.  This is a table of descriptive statistics, variables that

18   got used in my model to -- to predict whether or not the name

19   check was Hispanic.

20   Q.  Okay.  And if you look at the left-most column under          14:12:32

21   variable, and if you read along with me, capital S, capital P,

22   SP day.  That's saturation patrol day?

23   A.  Yes.

24   Q.  Those days are defined by you as large saturation patrols,

25   that's the term of art you used?                                       14:12:49

1  A.  The term was these are the saturation patrols for which the

2  MCSO generated operation documents.

3  Q.  Okay.

4  A.  And I would have had 11 of those 13 that were in the time

5  period I examined.                                                    14:13:03

6  Q.  I recall that testimony.

7        Right below that column, SP officer, saturation patrol

8  officer?

9  A.  Yes.

10  Q.  And below that, saturation patrol officer on a saturation      14:13:09

11  patrol day.

12  A.  Yes.

13  Q.  So how do you define a saturation patrol officer?

14  A.  A saturation patrol officer has been involved in one or

15  more saturation patrols during the period I examined for the        14:13:25

16  patrols I defined.

17  Q.  And then for the date of this column that -- one of those

18  officers is actually working on a saturation patrol day?

19  A.  Correct, that's SP officer on SP day.

20  Q.  Thank you.                                                      14:13:40

21        And if you scroll over one to the right variable, you

22  have SP underscore OFDAY, and what is that?

23  A.  That means you have a saturation patrol officer on a

24  saturation patrol day.  There's the variable I used.

25  Q.  Okay.  And below that's column N, capital N, the number         14:13:56

1    of -- the number of units studied, and it says 160,974, and

2    I've underscored that in red.  Do you see that?

3    A.    Yes.

4    Q.    And what does that number represent?

5    A.    As is explained in a note at the bottom of the table, this          14:14:10

6    unit of analysis here are individual names checks, and since

7    this is from the original report this was before the data were

8    reprocessed.

9    Q.    Okay.  And the next column over mean(average value) 0.013.

10   And what does that represent?                                            14:14:37

11   A.    What that represents is that of all the names checked that

12   are -- that are listed there, the 160,974, that 1.3 percent of

13   them were checked by saturation patrol officers on a saturation

14   patrol day, as I've defined it.

15   Q.    1.3 percent of the 160,974?                                        14:15:02

16   A.    Um-hum.

17   Q.    That looks like a pretty small share of the total universe.

18   Would you agree with me on that?

19   A.    It's certainly smaller than 1.4.  But bigger than 1.2.

20   Q.    But when we're looking for associations in data, we'd like        14:15:25

21   to slice that salami a little thicker, wouldn't we?

22   A.    The issue is not the number of cases; the issue is the

23   patterning across the outcome.

24   Q.    Well, how much confidence can we have in a sample size that

25   is 0.013, or 1.3 percent of the total universe?                         14:15:41

1   A.   A lot.  And that's --

2   Q.   Okay.  Go ahead.

3   A.   That's what the tests of statistical significance are for.

4   Q.   How many is that?  160,974, 1.3 percent of that?  How many

5   are we actually talking about here?                                    14:16:07

6   A.   Well, if we've got 1 percent of 160,000, then that's going

7   to be about 1,600.  And this was bigger than that, so...

8   Q.   You're telling us that the number of sat -- the number of

9   incidents you're examining that occur when a saturation patrol

10  officer is working on a saturation patrol day that shows this          14:16:31

11  larger association, shows this association, is a very, very

12  small fraction of the total number of the data that you had

13  available to you, that you chose to study, when in reality you

14  had more than 160,000, is that correct?

15  A.   Yes, what's correct, is that of these 160,974 names              14:16:58

16  checked, 1.3 percent of them were checked by officers who were

17  active on a saturation patrol day, but I also examined the

18  impacts of saturation patrol day itself, which accounted for

19  4.3 percent of the names, and that was, I believe -- I think

20  that's more than the share of day -- the share of days that           14:17:26

21  were saturation patrol days, and the variable SP officer for

22  officers who are ever involved in a saturation patrol day,

23  27 percent of the names were checked by them.

24  Q.   What percentage of those stops were by Lake Patrol?

25  A.   Again, the unit of analysis here is name checks.  I do not       14:17:53

1  know the specific number of names checked by Lake Patrol.

2  Q.  Do you know the normal area of operation of Lake Patrol?

3  A.  I believe that it was indicated earlier today that part of

4  it might be Bartlett Lake.

5  Q.  And do you know what the United States Census estimate of

6  Hispanic population inside of the operational area of Lake

7  Patrol is?

8  A.  No.

9  Q.  Would it be useful for you to know that if you're going to

10  compare their non-saturation patrol stops with their saturation

11  patrol stops?

12  A.  Not necessarily.

13  Q.  So on a daily basis they're working in an area where

14  there's a lower percentage of Hispanic population, and on a

15  saturation patrol area, say they're moved to Mesa where there's

16  a 32, 33 percent, you don't think that information is relevant

17  to an increase to whether or not it is the conduct of the

18  officer that's causing the higher increase in Hispanic

19  pullovers?

20  A.  Can I have the question again?

21  Q.  You don't think it's relevant for the purpose of this

22  inquiry to know what the Hispanic population is of the normal

23  area of the Lake Patrol's area of operations versus the

24  Hispanic population in the area where a particular saturation

25  patrol has been cited?

14:18:10

14:18:30

14:18:44

14:19:06

14:19:26

```
 1   A.  It would be relevant if I had that information for all the
 2   officers assigned to saturation patrol, and I could contrast
 3   their normal non-saturation patrol beats with their saturation
 4   patrol beats, so I could see how the officers were moved in
 5   from areas where -- from areas where their usual duties give          14:19:44
 6   them a less heavily Spanish community.  Some officers might
 7   have been moved in from areas that had a more heavily Hispanic
 8   community.
 9          And again, the key issue here is not so much the
10   residential makeup of the community, but we've got the two           14:20:01
11   intervening variables that are important in studies of this
12   nature.
13   Q.  We have more than just those two intervening variables;
14   that's the point I'm asking you about.  There are other
15   intervening variables that you chose not to examine.  I'm           14:20:12
16   asking you why you chose -- you -- you told me it's not
17   relevant to know what the Hispanic population is, the normal
18   operation area of the sat -- of the Lake Patrol on a
19   non-saturation patrol day versus it is.  Who's to say it's not
20   relevant?  You say it's not relevant, but why?  Why is it not       14:20:32
21   relevant to know that information?
22          MR. BYRNES:  Objection, Your Honor, argumentative.
23   BY MR. LIDDY:
24   Q.  Why is it not relevant?
25          I'll withdraw the question.                                  14:20:56
```

1          Why did you only choose to examine -- to discern that

2    two variables were relevant and all the other ones that's been

3    exposed to you today are not relevant?

4    A.   I had no information on the regular assignments of officers

5    who became active in saturation patrols which would have          14:21:07

6    allowed me to contrast them with a regular beat.

7          And even more importantly, I had no information about

8    the driving population to which they were exposed in their

9    regular beat as compared to the driving population to which

10   they were exposed on saturation patrol days.  And so we're back   14:21:26

11   to the denominator problem, and studies of racial profiling

12   have considered this very carefully.

13   Q.   So you've just told me that the other variables were not

14   available to you.  You did not tell me why they're not relevant

15   to this inquiry.                                                   14:21:43

16   A.   The models that I have tested show associations; they show

17   good fit; they show significant impacts.  Is it possible there

18   could be other factors?  Yes.  But those other factors, unless

19   they're distributed in such a way that they create problems for

20   my analysis, which I can't know --                                14:22:09

21   Q.   That they show a good fit?

22   A.   Yes.

23   Q.   What is your statistics to show goodness of fit in your

24   report?

25   A.   It's not in the report.                                      14:22:20

```
1              MR. LIDDY:  I have no further questions, Your Honor.

2              THE COURT:  Redirect?

3                          REDIRECT EXAMINATION

4   BY MR. BYRNES:

5   Q.  Dr. Taylor, can you please return to Exhibit 50.          14:22:50

6              MR. BYRNES:  Could we please publish that exhibit?

7              THE COURT:  You may.

8              MR. BYRNES:  Thank you.

9              THE WITNESS:  Okay.

10  BY MR. BYRNES:                                                 14:23:11

11  Q.  Mr. Liddy asked you a number of questions concerning the

12  call type fields of this exhibit.  Do you recall that?

13  A.  Yes.

14  Q.  And some of them related to final call type and call type

15  description.  Do you recall that?                             14:23:27

16  A.  Yes.

17  Q.  And the records that you reviewed in the CAD database, did

18  you ever see a final call type of key?

19  A.  No.

20  Q.  What final call types, in addition to 910 which is in     14:23:37

21  Exhibit 50, do you recall?

22  A.  Other call types were things like welfare check, abandoned

23  vehicle, there were a range of -- a range of -- a range of

24  codes.

25  Q.  Now, I want to be sure I understand.  Are the welfare check  14:24:01
```

1    and abandoned vehicle that you just mentioned, did those

2    incident records also have an initial call type of T?

3    A.  Yes.

4    Q.  And would those words you just mentioned, welfare check and

5    abandoned vehicle, where -- in what field did those -- that                    14:24:19

6    information was -- was it located?

7    A.  That would be located right here where you see traffic

8    violations.  It would be under the -- right after call type

9    description.

10   Q.  Did you exclude incidents with a call type description of      14:24:33

11   welfare check from your analysis?

12   A.  Yes.

13   Q.  Why did you do that?

14   A.  Because that did not represent the type of situation with

15   potential for officer discretion.                                              14:24:49

16   Q.  Did you exclude incidents with a call type description of

17   abandoned vehicle from your analysis?

18   A.  Yes.

19   Q.  And why did you do that?

20   A.  Because there was no way to have a name generated for a        14:25:00

21   name check if the officer's just accounting -- encountering an

22   abandoned vehicle.

23   Q.  Do you recall any other call type descriptions

24   corresponding to incidents for which you excluded from your

25   analysis?                                                                      14:25:18

1    A.  I don't have the complete list, but it included some animal

2    control issues, might have been a boating issue, welfare check,

3    checking on a vacation home, a variety of things.

4    Q.  And just to be clear, did you exclude those from your --

5    A.  Those were all excluded, yes.  The only -- the only ones          14:25:39

6    that I included in my analysis had final call type description

7    traffic violation or traffic stop.

8    Q.  Mr. Liddy asked you about how you would handle an incident

9    where there was no driver's license and no identification

10   checked, and you had asked if you could go back to your answer        14:26:01

11   and he did not offer you that opportunity.

12        Why did you not include in your analysis incidents

13   where there was no driver's license and no identification

14   checks?

15   A.  If it did not include a name, then I don't have any               14:26:22

16   information on the outcome of interest.

17   Q.  Do you have any way to obtain names of the individuals

18   stopped if the names were not in the CAD database or the mobile

19   file you were provided?

20   A.  Not that I was aware of.                                          14:26:40

21   Q.  Other than through the name in the census analysis you

22   testified about earlier, did you have any other way to

23   determine the race or ethnicity of the individuals stopped by

24   the MCSO?

25   A.  No.                                                               14:26:55

```
 1   Q.  Are you aware of another expert in this case who similarly
 2   did not consider incidents with no names in the data?
 3   A.  Yes.
 4   Q.  Who is that?
 5   A.  Dr. Camarota.                                              14:27:08
 6   Q.  Why did you not include the incident whose incident history
 7   is at Exhibit 50 in your analysis?
 8   A.  Because there's no -- no name in the comment section.
 9   Q.  Does the notation that the disposition is 7 have any
10   bearing on whether you included -- decided to include the      14:27:30
11   incident in your analysis or not?
12   A.  No.
13   Q.  Dr. Taylor, do you have an understanding of from where the
14   plaintiffs obtained the CAD data?
15   A.  Yes, I understood it was provided by the Maricopa County   14:27:49
16   Sheriff's Office.
17   Q.  Do you have any understanding regarding whether you
18   received from plaintiffs' attorneys all of the data that the
19   plaintiff itself had received from the Sheriff's Office?
20   A.  I'm sorry, I don't get the question.                       14:28:07
21   Q.  I'll rephrase it.  Do you have any understanding of whether
22   you received everything that the plaintiffs had been provided
23   by defendants?
24   A.  Yes, my -- my understanding is that the data that I
25   received was the data that counsel for plaintiffs had received. 14:28:22
```

1    Q.  I'd like to ask you to turn to Exhibit 399.  Actually,

2    before you -- before you turn there, let me ask a question.

3           I believe you testified under cross-examination about

4    analyses concerning the likelihood that Hispanics would be

5    cited after having been stopped in a traffic stop or traffic          14:28:56

6    violation, is that correct?

7    A.  Yes.

8    Q.  What analysis did you conduct to make that determination?

9    A.  I conducted a correlation analysis for linking those two

10   variables, and then assessed the statistical -- the direction        14:29:14

11   and statistical significance of that correlation.

12   Q.  Do you recall specifically how -- how the mag -- strike

13   that.  Do you recall how large the differential was in terms of

14   probability receiving a citation for a Hispanic -- an incident

15   where a Hispanic name was checked versus one where it hadn't?         14:29:42

16   A.  I don't recall that specifically.

17   Q.  You were asked about the impact of the socioeconomic status

18   with regard to your analysis.

19           Are you aware of any empirical basis for the

20   proposition that because Hispanics are, on average, of lower          14:30:03

21   socioeconomic status, they're more likely to drive vehicles

22   that are out of compliance with vehicle codes?

23   A.  I am not aware of any data supporting that.

24   Q.  In your testimony concerning the probability threshold that

25   a surname is Hispanic, you identify a number of probability          14:30:27

1  thresholds.  Why did you determine that looking at data as a

2  90 percent probability threshold was sufficient?

3  A.  Well, generally when one's doing research, one wants to

4  sort of check the robustness of one's results and be sure that

5  one's results are not due to just one particular way of coding    14:30:56

6  the outcome.  So you explore alternate approaches, and in the

7  research in this area the threshold mentioned ranged from

8  60 percent to 90 percent.  So that's why I used thresholds in

9  that range.

10       THE COURT:  Can I stop you?    14:31:18

11       Gary, would you read back Mr. Byrnes' question again,

12  please.

13       THE COURT:  All right.  I don't think you answered the

14  question.  You provided me why you looked at a range.  But I

15  understood Mr. Byrnes to be asking specifically about the    14:31:56

16  90 percent threshold.

17       THE WITNESS:  Right.  The 90 percent threshold was

18  specifically mentioned by census researchers as an example of

19  the heavily Hispanic threshold.

20  BY MR. BYRNES:    14:32:15

21  Q.  Now the question I intended to ask next:  Why did you stop

22  there?  Why didn't you look at other probability thresholds

23  besides the 90 percent?

24  A.  To be sure that -- the field has also used cutoffs.  You

25  have to have a minimum probability of 60 percent or 70 or 75.    14:32:34

```
1    Most of the research appears to use minimum thresholds between

2    about 70 to 80 percent.  So I chose 90 because it's

3    specifically mentioned by census researchers as an example of

4    heavily Hispanic, I go down to 80 and 70 percent because that's

5    what's widely used in the research, and then I did also              14:32:53

6    probably mention a 60 percent threshold, so I included that.

7    It's a type of robustness analysis.

8    Q.  Could using a 90 percent probability threshold mean that

9    the name of someone who has self-identified as Hispanic would

10   in fact be counted as non-Hispanic?                                  14:33:09

11        THE COURT:  Would you restate that question?  I'm not

12   sure I followed it.

13        MR. BYRNES:  Sure.

14   BY MR. BYRNES:

15   Q.  In the context where you're using the 90 percent threshold,      14:33:18

16   is it possible that someone who self-identifies as Hispanic

17   would be counted as non-Hispanic?

18   A.  So somebody is self-identifying as Hispanic in the census,

19   and then -- because there are -- you know, if it's a 90 percent

20   threshold it means that 10 percent of the people don't, you          14:33:46

21   know, aren't -- aren't Hispanic in the U.S. population with

22   that surname.

23   Q.  I believe I'm talking about the converse.  So could using

24   that threshold mean that someone who self-identifies as

25   Hispanic would be counted as non-Hispanic in your analysis           14:34:11
```

1   under the 90 percent probability threshold?

2   A.  So they've got a name that the census data tells us

3   90 percent or more of the people with this name self-identify

4   as Hispanic, and so we know somebody self-identifies as

5   Hispanic, and you're saying --                                14:34:30

6   Q.  Are there circumstances -- let me rephrase it.

7            Are there circumstances under which someone who

8   identifies as Hispanic would be counted as non-Hispanic, in

9   your analysis?

10  A.  Yes, it's possible.                                       14:34:45

11  Q.  And under what circumstances would that be?

12  A.  Well, there are issues of undercounting and over counting

13  with this methodology.  So somebody, for example, might

14  self-identify -- might not self-identify as Hispanic, but has

15  that name because, for example, they might have married someone  14:35:04

16  and taken their -- taken their surname.

17           THE COURT:  Well, let me -- let me follow up on this

18  because I want to make sure I understand it.

19           You identified, I think, Rodriguez as a name in the

20  90 percent threshold.                                         14:35:17

21           THE WITNESS:  Yes.

22           THE COURT:  Is that correct?

23           THE WITNESS:  Yes.

24           THE COURT:  In your study, all of the Rodriguezes are

25  going to appear in the category that you've designated as the  14:35:23

```
 1   90 percent threshold, right?

 2          THE WITNESS:  Yes.

 3          THE COURT:  They're not going to be not counted as

 4   Hispanics because they're going to be in the 90 percent

 5   threshold, isn't that correct?                              14:35:34

 6          THE WITNESS:  Yes.

 7          THE COURT:  So I think the answer to question that

 8   Mr. Byrnes just asked you is, they're going to appear in the

 9   90 percent threshold.  That is not going to either count them

10   as Hispanic or non-Hispanic, but it is going to include them in  14:35:48

11   the 90 percent threshold which presumes that there is a high

12   Hispanic correlation, does it not?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  So have I under -- have I

15   stated correctly your testimony?                            14:36:00

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  All right.  Thank you.

18          THE WITNESS:  Thank you.

19   BY MR. BYRNES:

20   Q.  Dr. Taylor, I'd like to have you turn your attention to  14:36:06

21   page 36 of Exhibit 398.  That's your initial report.  And

22   Mr. Liddy directed your attention -- if you could.

23          Mr. Liddy directed your attention to a sentence that

24   reads, by way of comparison, approximately 31.8 percent of the

25   population of Maricopa County identifies as Hispanic according  14:36:37
```

1   to the most reason data from the United States Census.

2           Do you recall that --

3   A.  Yes.

4   Q.  -- discussion?

5           And you read the preceding sentence -- preceding                14:36:48

6   sentence, the first of the two sentences in that -- in that

7   paragraph.  Why did you state in your initial report by way

8   of -- why did you include the percentage of the population of

9   Maricopa County that identified itself as Hispanic in your

10  report?                                                                  14:37:19

11  A.  Just to provide a little bit of descriptive context.

12  Q.  Is there information in your report besides the sentence

13  that you read earlier that would be required to fully

14  understand the extent, if any, of your reliance on the

15  statement concerning the percentage of Hispanics in the                 14:37:38

16  Maricopa County population?

17  A.  No.

18  Q.  Did you rely in any way on the percentage of the population

19  in Maricopa County that identifies itself as Hispanic?

20  A.  No.                                                                  14:37:55

21          MR. BYRNES:  I have no further questions.

22          THE COURT:  All right.  Next witness.

23          You can step down, Dr. Taylor.  Thank you.

24          THE WITNESS:  Thank you, Your Honor.

25          (Pause in proceedings.)                                         14:38:42

```
 1              THE COURT:  Do you want to tell us who the next

 2    witness is?

 3              MS. RAMIREZ:  Your Honor, the plaintiff calls David

 4    Vasquez as its next witness.

 5              THE COURT:  Thank you.                              14:38:51

 6              THE CLERK:  Can you please state and spell your full

 7    name.

 8              MR. VASQUEZ:  Victor, V-i-c-t-o-r; David, D-a-v-i-d;

 9    Vasquez, V a-s-q-u-e-z.

10              THE CLERK:  Thank you.  Please raise your right hand.  14:39:05

11              (David Victor Vasquez was duly sworn as a witness.)

12              THE CLERK:  Thank you.  Can you please take our

13    witness stand.

14                        VICTOR DAVID VASQUEZ,

15    called as a witness herein, having been duly sworn, was         14:39:17

16    examined and testified as follows:

17                         DIRECT EXAMINATION

18    BY MS. RAMIREZ:

19    Q.  Good afternoon, Mr. Vasquez.

20    A.  Good afternoon.                                            14:39:40

21    Q.  Would you tell us where you live.

22    A.  I live in Mesa, Arizona.

23    Q.  How long have you lived there?

24    A.  Seven years.

25    Q.  How old are you?                                           14:39:46
```

1    A.   I'm 47 years old.

2    Q.   What is your occupation?

3    A.   I'm an information technology specialist.

4    Q.   And who is your employer?

5    A.   Medicis Pharmaceuticals.                              14:39:55

6    Q.   What is your educational background?

7    A.   I have about two years of college, two years more to go

8    before I get my bachelor's.

9    Q.   Are you married?

10   A.   Yes, I am.                                            14:40:05

11   Q.   For how long?

12   A.   Seven years.

13   Q.   Any children?

14   A.   Yes, we have two.

15   Q.   I'd like to turn now -- oh, one more question:  What is   14:40:11

16   your ethnicity?

17   A.   I am Mexican American.

18   Q.   I'd like to turn now to the events of June 26th, 2008?

19   A.   All right.

20   Q.   Were you stopped by the Maricopa County Sheriff's Office on   14:40:23

21   June 26th, 2008?

22   A.   Yes, I was.

23   Q.   Where did your trip begin?

24   A.   From our apartment in Mesa.

25   Q.   Were you alone?                                       14:40:34

1   A.  No, I was with my wife at the time.

2   Q.  And what race or ethnicity is your wife?

3   A.  She is Native American and Spanish.

4   Q.  What kind of car were you driving?

5   A.  I was driving a Mitsubishi Lancer, the year is 2003.   14:40:44

6   Q.  Where were you heading?

7   A.  We were going to dinner at a local restaurant.

8   Q.  Approximately what time was it?

9   A.  Probably say maybe seven, seven-thirtyish.

10  Q.  Was it dark?   14:41:02

11  A.  No, it was still light outside.

12  Q.  Were you driving with your windows up or down?

13  A.  They were down at the time.

14  Q.  Were you aware that the Sheriff's Office was conducting

15  immigration patrols in the area that day?   14:41:13

16  A.  Yes, I was.  I read about it in the newspaper.

17  Q.  When did you first notice the MCSO's patrol car?

18  A.  We were traveling, I believe southbound on Gilbert towards

19  Broadway, and we were turning left to go west -- east on

20  Broadway, sorry.  And they were in the inner left-hand turn   14:41:33

21  lane and I was in the outer left-hand turn lane.

22  Q.  And where was the patrol car in relation to where you were?

23  A.  I'd probably say about half a car length in back of me.

24  Q.  And was it in the lane next to you?

25  A.  Yes.   14:41:53

```
1   Q.  What kind of car was the sheriff's car?

2   A.  An SUV type vehicle.

3   Q.  Was it marked?

4   A.  Yes.

5   Q.  Did you notice anything else about it?            14:42:02

6   A.  It had very dark-tinted windows.

7   Q.  How far did you travel from the intersection before you

8   were stopped?

9   A.  When we turned left, I'd probably say we were going east on

10  Broadway, probably say maybe a mile.                  14:42:17

11  Q.  Had you been driving the speed limit?

12  A.  Yes.

13  Q.  Had you obeyed all the traffic signals?

14  A.  Yes.

15  Q.  What happened after you were pulled over?         14:42:24

16  A.  Two deputies approached my car, one from the driver's side

17  and one from the passenger side, and the deputy that approached

18  my side asked, the first question that he asked was:  Do I

19  speak English?

20  Q.  And what happened after that?                     14:42:42

21  A.  They then asked -- I replied yes, and he asked for my

22  driver's license, registration, and proof of insurance.

23  Q.  Did you provide that?

24  A.  Yes, I did.

25  Q.  What happened next?                               14:42:53
```

1    A.  They went back to their vehicle, and I'd say maybe five or

2    ten minutes later he came back and handed me my paperwork and

3    stated the reason he pulled me over was a crack in my

4    windshield.

5    Q.  Were you cited?                                         14:43:11

6    A.  No.

7    Q.  I have what's been entered into evidence as Exhibit 54.

8         MS. RAMIREZ:  Your Honor, may I approach the witness?

9         THE COURT:  You may.

10   BY MS. RAMIREZ:                                             14:43:34

11   Q.  This is the CAD incident history for MA 08115843.  This is

12   a document generated by MCSO's computer dispatch system.

13        Do you see the second line in the comment section

14   about halfway down the page where it says @217VPC?

15   A.  Yes, I do.                                              14:43:57

16   Q.  Is that the license plate number of the vehicle you were

17   driving the evening you were stopped?

18   A.  Yes, it is.

19   Q.  And then a couple of lines down from that it says Vasquez

20   dot Victor dot V.  Is that your name?                       14:44:10

21   A.  Yes, it is.

22   Q.  Next to that it says 10281964.  Is that your date of birth?

23   A.  Yes, it is.

24   Q.  I'd like you to go back to the line that contains your

25   vehicle license number.  What is the name that appears next to  14:44:23

1    it?

2    A.   Ratcliffe, Matthew L.

3    Q.   Aside from the deputy asking you if you spoke English, was

4    there anything unusual about the stop?

5    A.   I just found it kind of funny that he asked me that          14:44:36

6    question, 'cause I felt like I was being singled out.  I've

7    never had that question asked me before in any traffic stop.

8    Q.   What did you do after the deputy let you go?

9    A.   We proceeded to go to dinner.  And as we were driving to

10   dinner I proceeded to tell my wife:  I believe I was pulled      14:45:10

11   over for driving while brown.

12   Q.   And what did the deputy do to make you believe that?

13   A.   It's not so much what he did; it's he said he pulled me

14   over for a cracked windshield, when the crack in the windshield

15   doesn't impair my visibility.  And I -- I just found it -- at    14:45:27

16   the angle that the car he was in and the angle we were at the

17   traffic stop, how did he see it?

18           MS. RAMIREZ:  Thank you very much.

19           THE WITNESS:  You're welcome.

20           THE COURT:  Cross-examination.                            14:45:49

21                   CROSS-EXAMINATION

22   BY MR. LIDDY:

23   Q.   Good afternoon, sir.

24   A.   Good afternoon.

25   Q.   Thank you for joining us this afternoon.                     14:46:02

1    A.  You're welcome.

2    Q.  Was this experience on June 26, 2008, an upsetting

3    experience for you?

4    A.  I would say so, upsetting as just being like profiled.

5    Q.  Did you feel at the time that you realized you were being    14:46:23

6    pulled over that you were being profiled, or did that thought

7    occur to you later on in the day?

8    A.  It occurred to me as we were leaving the traffic stop.

9    Q.  And was -- was it more upsetting after it occurred to you

10   that you may have been racially profiled than it was to be    14:46:41

11   initially stopped?

12   A.  Yes.

13   Q.  And did you discuss the idea that you thought you were

14   racially profiled with your wife?

15   A.  Yes, I did.    14:46:54

16   Q.  Did you write a letter to the Maricopa County Sheriff's

17   Office complaining because you felt that you were racially

18   profiled?

19   A.  No, I did not.

20   Q.  This incident occurred in Gilbert, Arizona?    14:47:12

21   A.  No, it occurred in Mesa, Arizona.

22   Q.  Did you write the Mesa Police Department complaining about

23   the way you were treated?

24   A.  No, I did not.

25   Q.  Did you write the FBI complaining about racial profiling?    14:47:23

1    A.  No, I did not.

2    Q.  Did you write to the Department of Justice?

3    A.  No.

4    Q.  Are you aware that the Department of Justice has -- has a

5    Civil Rights Division?                                              14:47:39

6    A.  No, I did not know that.

7    Q.  You did not know that at the time, or you do not know that

8    now?

9    A.  I did not know that now.

10   Q.  Have you had any contact since June 26, 2008, and your       14:47:50

11   appearance today with the Department of Justice, Civil Rights

12   Division?

13   A.  No.

14   Q.  Did you write a letter to the American Civil Liberties

15   Union?                                                             14:48:05

16   A.  No, I did not.

17   Q.  How did the ACLU learn that you believed you were racially

18   profiled?

19   A.  I believe they filmed the traffic stop.

20   Q.  And then they contacted you?                                  14:48:16

21   A.  Yes.

22   Q.  How long after the traffic stop were you contacted by the

23   ACLU?

24   A.  My best guesstimate was probably two to three months.

25   Q.  How did you learn that the Maricopa County Sheriff's Office   14:48:32

1  was conducting a crime saturation patrol in Mesa on June 26th,

2  2008?

3  A.  I read about it in the newspaper.

4  Q.  How long after you were pulled over did you read it in the

5  newspaper?                                                        14:48:53

6  A.  As a matter of fact, it was that week.

7  Q.  Did you file a notice of claim with Maricopa County

8  complaining about --

9  A.  I'm sorry, can you repeat?  What kind of claim?

10  Q.  Yeah.                                                        14:49:12

11  A.  Okay.

12  Q.  Did you file a notice of claim to Maricopa County to warn

13  them that you might file a suit against Maricopa County because

14  you believed you were racially profiled?

15  A.  No, I did not.                                               14:49:25

16  Q.  Did you ask the name of the officer during the traffic

17  stop?

18  A.  No.

19  Q.  Did you ask for the officer's badge number?

20  A.  No.                                                         14:49:41

21  Q.  Do you recall now whether the officer was a man or a woman?

22  A.  It was a male.

23  Q.  And there were two deputies during that stop: one on your

24  side and one on the other side.  Did I remember that correctly?

25  A.  Yes.                                                        14:50:02

1    Q.  Were they both males?

2    A.  Yes.

3    Q.  Do you recall approximately how tall that male who was on

4    your side was?

5    A.  No.                                                          14:50:11

6    Q.  Would you feel confident to estimate his weight?

7    A.  I'd probably say average weight, 150, 160.

8    Q.  How many other times have you been pulled over by Maricopa

9    County Sheriff's Office deputies --

10   A.  None.                                                        14:50:34

11   Q.  -- since June 26th, 2008?

12   A.  Never.

13   Q.  How long did the traffic stop take?

14   A.  My es -- my estimate is about 10 minutes.

15   Q.  Counsel just asked you --                                    14:50:50

16          MR. LIDDY:  Excuse me, Your Honor?

17          THE COURT:  Would you restate the name of this

18   exhibit, please, just for the record?

19          MR. LIDDY:  Exhibit --

20          MS. RAMIREZ:  It's Plaintiffs' Exhibit 54.               14:51:18

21          MR. LIDDY:  Plaintiffs' Exhibit 54, Your Honor.

22   BY MR. LIDDY:

23   Q.  Sir, can you see this exhibit on your monitor?

24   A.  No, I can't.

25          MR. LIDDY:  Your Honor, may I ask it be published to      14:51:33

```
 1    the witness?
 2            THE COURT:  Yes.
 3    BY MR. LIDDY:
 4    Q.  May I ask you to look on the left-hand side about halfway
 5    down below the bold line.  I'm going to go ahead and mark it          14:51:54
 6    here.  Right here.  Do you see that line?
 7    A.  Yes.
 8    Q.  And above that line would you read with me, it says
 9    6/26/200.  Do you see that?
10    A.  Yes, I do.                                                        14:52:12
11    Q.  And to the right of that it says 6:40:17.
12            Do you see that?
13    A.  Yes.
14    Q.  Do you recall the time of the day that you were pulled
15    over?                                                                 14:52:23
16    A.  I believe I stated it was around 7:00 or 7:30.
17    Q.  Definitely late in the afternoon or early evening?
18    A.  Yes.
19    Q.  Could it have been at 6:40 in the afternoon?
20    A.  That's more evening, but yes.                                     14:52:39
21    Q.  Okay.  And if you would, excuse me, go all the way down to
22    the bottom of the exhibit, right here.  Do you see that?
23    A.  Yes.
24    Q.  Appears to be a time stamp there, a time entry, and that
25    second field, 6:44 and 31 seconds?                                   14:53:00
```

1    A.  Yes.

2    Q.  Would you agree with me that that's approximately four

3    minutes and 20 seconds?

4    A.  Yes.

5    Q.  It would be your recollection that the traffic stop took a          14:53:14

6    little bit longer than that?

7    A.  My best guesstimate was 10 minutes.

8              MR. LIDDY:  I have no further questions, Your Honor.

9              THE COURT:  Thank you.

10             Redirect?                                                      14:53:28

11             MS. RAMIREZ:  I have nothing further, Your Honor.

12             THE COURT:  All right.  Next witness.

13             Thank you, Mr. Vasquez, you can step down.

14             MR. BYRNES:  Your Honor, we are locating our witness,

15   who was waiting outside the courtroom.                                   14:54:12

16             THE COURT:  Okay.  Do you want to take an afternoon

17   break now?

18             MR. BYRNES:  Sure, Your Honor.  Thank you very much.

19             THE COURT:  All right.  We'll take the afternoon

20   break.  We will resume at 10 minutes after 3:00.                        14:54:20

21             (Recess taken.)

22             THE COURT:  Thank you.  Please be seated.

23             I promised the parties that I would keep them apprised

24   of my time allocations, and I'm sure you've got somebody else

25   tracking this to check me.  Defendants have taken two hours and         15:11:46

```
 1   23 minutes of their time.  Plaintiffs have taken one hour and

 2   56 minutes.  If you've got any major gripes with that, think

 3   I've made a substantial error, let me know.

 4           Call your next witness, please.

 5           MS. GALLAGHER:  Plaintiffs call David Rodriguez.        15:12:10

 6           THE COURT:  Mr. Rodriguez, please come forward to be

 7   sworn in.

 8           MR. CASEY:  Your Honor, we've invoked Rule 615,

 9   exclusion of witnesses.  If I remember correctly, I recognize

10   his wife is still in the courtroom, who is a witness.          15:12:23

11           THE COURT:  Ms. Rodriguez and any other witnesses who

12   may be called to testify in this matter must leave the

13   courtroom.

14           MS. GALLAGHER:  Your Honor, Ms. Rodriguez is a named

15   plaintiff in the case as well, and I believe named parties --   15:12:34

16           MR. CASEY:  I apologize.

17           MS. GALLAGHER:  -- are an exception to the rule.

18           THE COURT:  That's correct.

19           Ms. Rodriguez, you may stay.

20           MR. CASEY:  I apologize.                                15:12:45

21           THE COURT:  That's all right.

22           THE CLERK:  Can you please state and spell your full

23   name.

24           THE WITNESS:  David Rodriguez.  D-a-v-d-i-d;

25   R-o-d-r-i-g-u-e-z.                                             09:12:28
```

```
 1              THE CLERK:  Please raise your right hand.

 2              (David Rodriquez was duly sworn as a witness.)

 3              THE CLERK:  Thank you.  Please take our witness stand

 4    stand.

 5              THE COURT:  Please.                                    15:13:30

 6                        DAVID RODRIGUEZ,

 7    called as a witness herein, having been duly sworn, was

 8    examined and testified as follows:

 9                        DIRECT EXAMINATION

10    BY MS. GALLAGHER:

11    Q.  Good afternoon, David.  Where do you live?

12    A.  In west Phoenix.

13    Q.  And how long have you lived in west Phoenix?

14    A.  I've been here since 1994.

15    Q.  And who do you live with?                                   15:13:47

16    A.  My wife and my two kids.

17    Q.  And what is your occupation?

18    A.  I'm a heavy equipment mechanic.

19    Q.  Do you currently have any plans to leave Maricopa County or

20    west Phoenix?                                                   15:13:59

21    A.  No.

22    Q.  And David, what is your ethnicity?

23    A.  Hispanic.

24    Q.  I want to talk about December 2nd, 2007.  Did you have an

25    encounter with Maricopa County Sheriff's Office deputies on     15:14:10
```

1    December 2nd, 2007?

2    A.  Yes, I did.

3    Q.  Can you tell me what you were doing that day?

4    A.  We went out four-wheel driving on my truck.

5    Q.  When you say "we," can you tell me who you're referring to?    15:14:22

6    A.  My wife and my two kids.

7    Q.  And where was it that you were four-wheel driving?

8    A.  Towards Bartlett Lake.

9    Q.  And you mentioned you were in a truck.  What kind of

10   vehicle was that?    15:14:35

11   A.  A Chevy crew cab, four-wheel drive.

12   Q.  Can you tell me what route you had taken into the area that

13   day?

14   A.  When we first got up there, that road you have to take, it

15   T's off and you go down towards the lake.  And as soon as I got    15:14:51

16   on that road you can take off through the desert, and I

17   started -- I took off, I started driving through the desert.

18        We were going down the trail for a few -- it was

19   probably about good maybe quarter mile down the trail, and we

20   came across a Yamaha expo that had some demonstrations with    15:15:13

21   some Rhinos that they were -- had some people riding.  We

22   stayed there for a bit, watched that, and we got back in my

23   truck and started going down the trail.  And we ended up on the

24   road.

25   Q.  When you say that road, do you know what road that was?  Do    15:15:32

1    you recall the name of it?

2    A.  It's Bartlett, Bartlett Lake, Bartlett Lake Road, something

3    like that.

4    Q.  The road that leads into Bartlett Lake?

5    A.  Yes.                                                        15:15:45

6    Q.  Were there any other vehicles with you?

7    A.  Not -- not -- there was vehicles everywhere out there;

8    there was a lot of them.

9    Q.  Was there a point in time when you reentered the road that

10   you had entered the area on?                                   15:15:59

11   A.  Yes, I did.

12   Q.  And can you explain to me the circumstances of that?

13   A.  Once I got onto the road I just saw -- started going down

14   towards the lake, and just went the -- went down the road for a

15   while, and I came across a -- a Road Damaged sign that was on   15:16:13

16   the right-hand side of the road, and maybe about a quarter mile

17   after that there was a long wash.

18            And when I -- when we hit the wash there was debris on

19   the road, and at the other end of the wash I noticed there was

20   a -- a sheriff -- a sheriff truck.  There was two vehicles, one 15:16:33

21   was marked and the other one wasn't marked.

22   Q.  Let me step back and ask you a couple questions about when

23   you entered the road.  Do you recall where that was that you

24   reentered the road in relation to where you had exited the road

25   earlier that day?                                              15:16:48

1    A.  It's -- it was further down the road.

2    Q.  And when you reentered the road, what was the condition of

3    the road?

4    A.  It was fine at that time.

5    Q.  So at some point you entered a wash area, and what happened    15:16:58

6    at that point?

7    A.  That's when I seen -- seen the MCSO, and I went ahead and

8    started turning around.  And that's when I also noticed there

9    was a motorcycle behind me, and he also turned around.  When

10   we -- I turned around and started getting out, that's when we    15:17:19

11   got stopped.

12   Q.  When you say we got stopped you're referring to --

13   A.  I -- both I and the motorcycle got stopped.

14   Q.  And were you stopped by the same vehicle?

15   A.  No, two different vehicles.    15:17:32

16   Q.  And what happened after you were stopped?

17   A.  Once we were stopped, the officer came to me and he asked

18   me if I seen the Road Closed sign, and I replied to him no, I

19   didn't.  I seen the Road Damaged sign that was up on the road a

20   bit.    15:17:51

21        And then he asked me for my -- my -- my driver's

22   license, registration, proof of insurance, and my Social

23   Security card.  And I gave him what I had, which was my

24   driver's license, registration, Social Security card, which --

25   not my Social Security card, my proof of insurance.  I told him    15:18:07

1    I don't carry my Social Security card with me.

2    Q.  Do you recall the name of the officer that stopped you that

3    day?

4    A.  His name is Ratcliffe.

5    Q.  And so once he collected the items you mentioned, your          15:18:20

6    license, registration and insurance from you, what happened

7    after that?

8    A.  He went back to his -- to his truck.  And just sitting in

9    there watching, and seen the other officer in front of us with

10   the motorcycle, they were exchanging words.  And at that time      15:18:40

11   four more other vehicles came down the road, and the

12   officer also flagged them down, stopped them, flagged them

13   down, so they pulled over to the side.

14   Q.  The officer that had stopped you or the officer that had

15   stopped the motorcycle?                                            15:18:57

16   A.  That stopped the motorcycle.

17        And then at that time the other -- the other

18   officer that I was talking to, he came back to my truck and he

19   asked me for my Social Security number, and I -- I replied

20   back, What do you need it for?  I have my -- all my              15:19:16

21   information's on my driver's license.  That should be more than

22   enough.  You have all my info on my driver's license.

23   Q.  And did he respond to your question?

24   A.  After that he did, he said he needed it, and I told him you

25   have all my information off my driver's license, that should be    15:19:35

1    more than enough.  He said you need a Social Security number to

2    get a driver's license here.

3         And I had also asked him if I could get a warning,

4    'cause I had already seen the motorcycle leave.  And at that

5    time he kind of -- he replied to me, he replied to me if -- if    15:19:55

6    he -- let me take a step back.

7         When he -- when I asked him to take -- if I can get

8    a -- a warning like the other one, he -- he said, Why?  I don't

9    know what the other officer's doing.  You know, that's not my

10   concern.  You're my concern.    15:20:24

11        And I said, Well, how do I know if I -- if they're not

12   going to be cited.  I said, well, I can see in front of me the

13   other officer doesn't have a citation book.  So then he went

14   about -- at that time, too, the red car had already gone by.

15   Q.  When you say the red car, can you explain to me what --    15:20:47

16   what vehicle that was and what occurred?

17   A.  The other four vehicles that were stopped, the first one

18   was a red one.  It drove off.  And I had also told him, Look,

19   the other vehicle left.  I said, Can I get a warning?  And

20   he -- he pretty much -- he, you know, told me, Do you think the    15:21:05

21   law doesn't pertain to you?  Do you think you're above the law?

22   I said:  No.  I would like to see if I could get a warning like

23   these other people.

24        And at that time my wife had mentioned seems like

25   selective enforcement, and he looked around -- he looked at her    15:21:28

```
1    and said, What did you say, ma'am?  And she repeated again what

2    she said.  And at that time my daughter that was sitting in the

3    back, she even said, dad, what's going on?  What's going to

4    happen?

5            And I -- I myself just made a decision.  I gave him my

6    Social Security number and I asked him if I could sign the

7    citation for I can leave, because I knew I wasn't gonna get out

8    of it, and after that I signed it and he said we can go.

9    Q.  Okay.  And after he said you could go, did you immediately

10   leave the area?

11   A.  No, we -- I stayed there for a bit and I kind of soaked

12   everything that had just happened, and he got on his loud -- on

13   his loudspeaker and told us to leave the area, to go ahead and

14   go, so --

15   Q.  Did you leave at that point?

16   A.  Yes.  We started going, I started going and driving out.

17   And he followed me pretty much really close to my truck all the

18   way out, which was about two and a half miles to three miles

19   out.  And on the way back, that's when I came across the -- the

20   Road Closed sign.  Once I passed that I pulled over to the --

21   to the right and I waited there for a minute, and he passed me

22   up and stopped.

23   Q.  Had you seen that Road Closed sign that you stopped at

24   prior to that point in the day?

25   A.  No, I did not.
```

15:21:46

15:22:06

15:22:23

15:22:44

15:22:59

1  Q.  And why did you stop after he pulled around the Road Closed

2  sign?

3  A.  I wanted to see if I could get ahold of the other people,

4  see if they were cited, too.

5  Q.  And when you're referring to the other people, who are you          15:23:11

6  referring to?

7  A.  The other vehicles that were -- that were stopped.

8  Q.  So just so we're clear on the record, at the time that you

9  were being stopped, you also saw a motorcycle being stopped and

10  four other vehicles stopped, correct?          15:23:26

11  A.  Yes.

12  Q.  And at the time that you left after receiving your

13  citation, were any of those vehicles still in the area?

14  A.  Yeah, there were cars that were -- that the other

15  officer had.          15:23:40

16  Q.  So you stopped at the outside to see if you could speak

17  with them?

18  A.  Yes.

19  Q.  And were you able to speak with those other drivers?

20  A.  Yes, we were.          15:23:48

21  Q.  Are you aware if any of the other drivers were cited?

22  A.  Yes.  None of them were cited.  I was the only one that was

23  cited.

24  Q.  And are you aware if any of other drivers or any of the

25  other individuals were Hispanic?          15:24:02

```
 1   A.  No, they were all Caucasian.

 2           MS. GALLAGHER:  Hand the witness what has been marked

 3   as Plaintiffs' Exhibit 51.

 4   BY MS. GALLAGHER:

 5   Q.  David, are you aware of the names of any of the              15:24:27

 6   individuals, the other individuals that were stopped that day?

 7   A.  I recognize Blaine, I talked to him.  The last name.

 8   Q.  When you say you recognize Blaine, you're referring to

 9   Exhibit 51 that I handed you?

10   A.  Yes.                                                         15:24:48

11   Q.  So the name Blaine Woodruff that appears on that exhibit is

12   one of the individuals you spoke with that day?

13   A.  Yes.

14   Q.  Do you recognize the other names?

15   A.  Yes.  Well, my wife had talked -- talked with those two     15:24:58

16   other people.

17           MS. GALLAGHER:  Your Honor, at this time plaintiff

18   moves to enter Exhibit 51 into evidence.

19           MR. CASEY:  No objection, Your Honor.

20           THE COURT:  Exhibit 51's admitted.                      15:25:10

21           (Exhibit No. 51 is admitted into evidence.)

22   BY MS. GALLAGHER:

23   Q.  David, do you believe you were treated different than the

24   other individuals that you saw stopped on December 2nd, 2007?

25   A.  Yes, I do.                                                   15:25:28
```

1    Q.  And why is that?

2    A.  Because I'm Hispanic.

3            MS. GALLAGHER:  No further questions, Your Honor.

4            THE COURT:  Cross-examination?

5            MR. CASEY:  Yes, Your Honor.  Thank you.                15:25:35

6                        CROSS-EXAMINATION

7    BY MR. CASEY:

8    Q.  Good afternoon, Mr. Rodriguez.  How are you?

9    A.  Good.

10   Q.  I don't know if you will remember me, but you and I met   15:25:41

11   almost three years ago when I took your deposition in October

12   of 2009.  Do you happen to remember that by any chance?

13   A.  Yes.

14   Q.  All right.

15   A.  It has been some time.                                    15:25:55

16   Q.  It has been.  So sorry to meet you here under these

17   circumstances.  I have a few questions I want to talk to you

18   about.  They're going to be very similar to what your lawyer

19   has asked you about, but perhaps I need to cover some areas a

20   little differently, so if you would bear with me, be patient, I  15:26:10

21   would appreciate it.  Okay?

22   A.  Okay.

23   Q.  Just like at your deposition, you see we have a court

24   reporter here.  See that?

25   A.  Yes.                                                       15:26:20

1    Q.  Okay.  And every now and then if I say, Was that a yes or

2    was that a no? I want you to understand I'm not doing that to

3    badger you or be difficult, I'm -- or to harass you; it's so we

4    have a clear oral verbal word response.  Okay?

5    A.  Okay.                                                                    15:26:33

6    Q.  All right.  At your deposition there was also a court

7    reporter.  You remember that that person took down your

8    testimony, question, answer, question, answer; do you remember

9    that?

10   A.  Yes.                                                                     15:26:45

11   Q.  And before you started to testify, you swore to tell the

12   truth, and you did tell the truth, didn't you?

13   A.  Yes.

14   Q.  Okay.

15           MR. CASEY:  Your Honor, I have the original that your                15:26:54

16   clerk has provided me.  I'd like permission to provide the

17   transcript to the witness, please.

18           THE COURT:  Yes.

19           MR. CASEY:  Thank you.

20   BY MR. CASEY:                                                               15:27:14

21   Q.  Mr. Rodriguez, what I've put in front of you is your

22   deposition.  Have you seen that before today, that transcript?

23   A.  Yes.

24   Q.  Okay.  And you have actually, after your deposition, had

25   time to review it and make sure that it was taken down                      15:27:25

1   accurately, did you not?

2   A.  Yes.

3   Q.  And that you conveyed the information that you wanted to

4   convey, right?

5   A.  Yes.                                                    15:27:35

6   Q.  Now, I'd like to now talk to you about the event.  This

7   event you've already told us occurred on a Sunday, didn't it?

8   A.  Yes.

9   Q.  It occurred on December 2nd, 2007, true?

10  A.  Yes.                                                    15:27:45

11  Q.  And you were driving a Chevy Tahoe, correct?

12  A.  Truck.

13  Q.  Excuse me, I misspoke.  You drove a Chevy truck, right?

14  A.  Yes.

15  Q.  That Chevy truck was a crew cab, wasn't it?            15:27:54

16  A.  Yes.

17  Q.  It was a four-by-four?

18  A.  Yes.

19  Q.  And it had factory windows tinted, didn't it?

20  A.  Yes.                                                    15:28:06

21  Q.  Your windows were up because it was cold that morning,

22  wasn't it?

23  A.  Yes, it was.

24  Q.  And sitting shotgun, or passenger right front seat, was

25  your wife, wasn't she?                                      15:28:13

```
1    A.  Yes.

2    Q.  And by the way, at the time your wife was a political

3    assistant, an assistant for Phoenix Mayor Phil Gordon, wasn't

4    she?

5    A.  Yes.                                                          15:28:25

6    Q.  And you understand working with your wife, being married to

7    her, that over the course of years, two elected officials,

8    Sheriff Joe Arpaio and Mayor Gordon, have had conflicts,

9    haven't they?

10   A.  That I don't know.                                            15:28:38

11   Q.  You're aware of it from talking to your wife they've had

12   disagreements, haven't they?

13   A.  No.

14   Q.  You're not aware of that at all.

15   A.  Now I am, after this -- what's been going on.                 15:28:44

16   Q.  Okay.

17   A.  But back then it didn't really matter to me.

18   Q.  And you're aware that her boss actually wrote federal

19   representatives using you and your wife as examples of what

20   supposedly is wrong with Sheriff Arpaio and his practices,       15:28:58

21   right?

22   A.  Yes.

23   Q.  Okay.  Now, let's go back to the setting.  You have a crew

24   cab.

25   A.  Yes.                                                          15:29:07
```

1    Q.  And you have two children in the back, right?

2    A.  Yes.

3    Q.  And you decided that you were going to go four-wheeling

4    that day?

5    A.  Yes.                                                      15:29:14

6    Q.  And you actually pulled up into a street on Bartlett Dam

7    Road, and you saw a sign that said "road damaged," didn't you?

8    A.  No, it was when I was driving down the road is when I seen

9    the Road Damaged sign.

10   Q.  Okay.  And thank you for correcting me.  You saw the Road   15:29:25

11   Damaged sign?

12   A.  Yes, I did.

13   Q.  And you chose -- and you drove around it, did you not?

14   A.  I did not drive around it; it was on the side of the road.

15   Q.  Your intention to go was off-roading, wasn't it?          15:29:36

16   A.  Yes, which we did.

17   Q.  And you just kept driving, true?

18   A.  Yes.

19   Q.  Later in the day, you've already told the judge, the

20   honorable court up there, that later in the day when you were   15:29:48

21   going out, you saw a Road Closed sign, didn't you?

22   A.  Yes.

23   Q.  All right.  Now, I'd like to focus you on something a

24   little bit different with the background that we've just gone

25   over, and that's the stop.  You ended up being pulled over by   15:29:59

1  an MCSO deputy, did you not?

2  A.  Yes.

3  Q.  And that deputy was someone that you described as Matthew

4  Ratcliffe, true?

5  A.  Yes.                                                          15:30:10

6  Q.  At the time of your deposition did you remember the name of

7  the deputy that pulled you over?

8  A.  Yes, it's on the citation.

9  Q.  Okay.  Then you know that -- let me ask you this:  Did you

10  know that he was assigned to the MCSO's Lake Patrol Division?     15:30:22

11  A.  No.

12  Q.  Are you aware that your lawyers and I have stipulated that

13  on that day, December 2nd, 2007, there was no MCSO saturation

14  patrol, large or small, conducted anywhere in Maricopa County

15  that day?                                                        15:30:42

16  A.  No, I don't know that.

17  Q.  I'm sorry?

18  A.  I don't know that.

19  Q.  Okay.  Thank you.

20        When you were pulled over you were asked for your         15:30:50

21  driver's license, right?

22  A.  Yes.

23  Q.  You had no problem with that?

24  A.  Yeah.

25  Q.  You were asked -- also asked for your vehicle registration   15:30:56

 1  and you had no problem with that?

 2  A.  Yes.

 3  Q.  You were also asked for your proof of insurance, and you

 4  had no problem with that, true?

 5  A.  Yes.                                              15:31:07

 6  Q.  And what you told the court here today is that

 7  Deputy Ratcliffe asked you for your Social Security card.  Is

 8  that what your testimony is?

 9  A.  Yes.

10  Q.  Are you certain he asked you for your Social Security card    15:31:18

11  versus Social Security number?

12  A.  Pretty sure it was card.

13  Q.  Now, I don't know if it's me as a lawyer or me as a human

14  being, but when I hear someone saying "pretty sure," that tells

15  me there might be a chance that you're mistaken.         15:31:35

16          Am I reading that correctly?

17  A.  I remember Social Security card.

18  Q.  You remember Social Security card.  Is it possible that

19  Matthew Ratcliffe, Deputy Ratcliffe, simply asked you for your

20  Social Security number?  Is that possible, sir?        15:31:57

21  A.  No, 'cause when -- when -- when he stopped, I even asked my

22  wife when he went back, What did he want my card for?  I never

23  carried it.

24  Q.  Sir, would you turn to page 13 of your transcript, and let

25  me know when you get there.                            15:32:29

1         Are you there, sir?

2    A.  Yes.

3    Q.  Okay.  I'm going to look down at the bottom.  I'm going to

4    begin reading at line 18, and there was a -- there was a

5    question earlier, and I want to read this.  This is your answer    15:32:42

6    beginning at line 18:

7         "And so after that, he -- he just got kind of a little

8    bit going back and forth of conversation, you know, because he

9    wanted, you know -- he had asked me again, because I guess on

10   the form there's a place where you have to put in the Social    15:33:01

11   Security number, and he -- he asked me again for the Social

12   Security number..."

13        Did I read that correctly so far?

14   A.  Yeah.

15   Q.  And those were your words, were they not?    15:33:16

16   A.  Yeah.

17   Q.  Now I'm going to continue where you say:  "... and I had

18   told him, I said, 'Well, my driver's license should be more

19   than enough,' because you need a Social Security to get a

20   driver's license."  Did I read that correctly?    15:33:33

21   A.  Yes.

22   Q.  Okay.  All right.  Now, Deputy Ratcliffe in fact told you

23   at the time, in the presence of your wife, that the Social

24   Security number that he wanted was for the use with a citation,

25   wasn't it?    15:33:50

1  A.  After -- after he kept asking me for it, and I told him all

2  my -- my driver's license has all the information.

3  Q.  Sir, he -- and I appreciate it, and I'm probably not being

4  precise enough.  You knew from Deputy Ratcliffe that he wanted

5  your Social Security number in order to fill out the citation          15:34:12

6  form, true?

7  A.  At the time I didn't know.

8  Q.  You did not know.

9  A.  No.

10  Q.  All right.  Would you turn to -- again, this is the same          15:34:22

11  part that we were reading here, and then I'm going to show

12  another page.  Okay?

13        Page 13.  And again, just we look at lines 20 through

14  23:  "... he had asked me again, because I guess on the form

15  there's a place where you have to put in the Social Security          15:34:42

16  number, and he -- he asked me again for the Social Security

17  number, and I told him ..."  It goes on.

18        I've read that correctly, right?

19  A.  Yes.

20  Q.  Now, let's go to page 27 real quick.                             15:34:53

21        And I'm sorry, sir, I didn't write down the specific

22  line, so I'm going to move on here.

23        Sir, what I'm going to show you is Plaintiffs'

24  Exhibit 65, a particular page out of it.

25        MR. CASEY:  And if I could ask Madam Clerk, please, if        15:35:33

1    I can use the ELMO.

2    BY MR. CASEY:

3    Q.  You've seen this form before, this type of form, have you

4    not?

5    A.  That's the citation.                                              15:35:52

6    Q.  Yes.  In fact, that's how you remembered Deputy Ratcliffe's

7    name because the -- his name was on this type form, wasn't it?

8    A.  Yes.

9    Q.  And you see here where it says Complaint?

10   A.  Yes.                                                              15:36:07

11   Q.  And then do you see where it says License Number?

12   A.  Yes.

13   Q.  And then you see here where it says SSN?  You see that?

14   A.  Yes.

15   Q.  What do you understand SSN to mean?                              15:36:16

16   A.  Social Security number.

17   Q.  Okay.  And I want to come back to see if that's refreshed

18   your recollection.

19          Isn't it true, sir, that Deputy Ratcliffe told you

20   that the only reason he wanted your Social Security number was      15:36:29

21   for a form of identification to put in the citation?  Is that

22   true or false?

23   A.  No.  It wasn't until the end when I told him, What do you

24   need it for, and he -- he showed the clipboard and I seen it,

25   so that's when I gave it to him.                                     15:36:47

1    Q.  Okay.  And I appreciate, I hear what you're saying.

2    Eventually, you learned that's what it was for, wasn't it?

3    A.  Yes.

4    Q.  Okay.  Sir -- excuse me.  That was -- that was a false

5    start.                                                              15:37:08

6            You asked Deputy Ratcliffe if you could get -- when

7    he -- when you learned -- let me strike that.

8            When you learned he was going to issue you a citation,

9    you asked Deputy Ratcliffe if you could, instead of getting a

10   citation, simply get a warning, did you not?                        15:37:26

11   A.  Yes.

12   Q.  And one of the reasons why you asked him if you could have

13   a warning was you were very concerned that there might be some

14   possible effect of that -- that citation on your commercial

15   driver's license, your CDL, right?                                  15:37:41

16   A.  Yes.

17   Q.  And that's when you talked to and asked questions of

18   Deputy Ratcliffe about that, didn't you?

19   A.  No.

20   Q.  You -- you didn't ask him anything about the effect of a       15:37:50

21   citation on your CDL?

22   A.  No, I don't remember having a conversation with him about

23   that.

24   Q.  All right.  Now, again as a lawyer, as a human being, which

25   one I'm not sure, let me ask you, I hear someone say, "I don't      15:38:02

1   remember," is it possible that you asked him questions about

2   the CDL?

3   A.   No.

4   Q.   Okay.  All right.  Thank you, sir.

5        Now, at about the time you were asking him for a -- a          15:38:14

6   warning instead of a citation, your wife, who is sitting

7   shotgun next to you, yelled, did she not, at dep -- at the

8   deputy?

9   A.   She didn't yell.

10  Q.   She did accuse him of racial profiling, didn't she?          15:38:29

11  A.   She said, It -- it sounds to me like you're doing selective

12  enforcement.

13  Q.   And you know what that meant from your wife, did you not?

14  A.   Yes, I know what it means.

15  Q.   That that meant, You are doing this because we are           15:38:47

16  Hispanic.  Isn't that what she meant?

17  A.   Yes.

18  Q.   Okay.  And that's exactly what you understood the deputy

19  took your wife's comment to mean, true?

20  A.   I can't speak for him.                                       15:39:00

21  Q.   No, I understand that.  I'm not asking you to speak for

22  anybody but yourself.

23        Your impression, I mean, you heard your wife say that

24  to the deputy and you saw his reaction, and he said, Excuse me,

25  ma'am?  You knew message received by him, wasn't it?             15:39:13

1    A.   No.

2    Q.   No.   Nothing?   Okay.

3         Now, you agree with me that you believe the citation

4    was wrong.

5    A.   Yes.                                                    15:39:29

6    Q.   You believe you were cited only because you were a Latino.

7    A.   Yes.

8    Q.   You believe you were cited, even though you were driving on

9    a closed road.

10   A.   Yes.                                                    15:39:39

11   Q.   You believe you were cited even though Maricopa County

12   Department of Transportation had posted publicly closed road

13   signs, true?

14   A.   True.

15   Q.   You believe the traffic stop itself was done because you   15:39:50

16   were Latino.

17   A.   True.

18   Q.   Okay.   So not only are you complaining about getting a

19   citation instead of a warning, you're complaining about the

20   stop itself, right?                                          15:40:10

21   A.   What I'm complaining about is out of six vehicles, I was

22   the only one being cited.   I was the only one cited.

23   Q.   And you do not know, sir -- strike that.

24        Did Deputy Ratcliffe in your presence stop any of

25   those other vehicles that you claim to have spoken to?       15:40:29

```
 1   A.  No.

 2   Q.  Did you ever ask him what he was doing with other vehicles

 3   he was stopping?

 4   A.  No.

 5   Q.  And you understand, and I -- and I'm going to put words in        15:40:40

 6   your mouth, and you tell me if I'm wrong, or I'm sure your

 7   lawyer will object, but my understanding is there was a

 8   motorcycle that was near you at the time of the stop, and when

 9   you folks did a U-turn, Deputy Ratcliffe was the one that

10   stopped you, and another MCSO deputy stopped the motorcycle,        15:41:00

11   right?

12   A.  True.

13   Q.  And that motorcyclist is one of the drivers that you

14   tell -- you're telling the judge you talked to, right?

15   A.  Not the motorcycle.  He already left before any -- before       15:41:13

16   they let me go.

17   Q.  Do you -- did you -- and I'm going to -- I'm going to take

18   your word for it.  You talked to other people and they all said

19   they weren't cited.  Did they tell you why they weren't cited?

20   A.  No.                                                              15:41:31

21   Q.  Do you have any idea why they weren't cited?

22   A.  Because they're Caucasian.

23   Q.  'Cause they're white?

24   A.  Most likely.

25   Q.  Now, did they tell you that that was their -- that's what       15:41:37
```

1    they believed?

2    A.  No, they didn't tell me.

3    Q.  Did they tell you whether or not they had property at the

4    lake that had been damaged in the storm?

5    A.  No.                                                                    15:41:50

6    Q.  Did they tell you whether or not they had boats or anything

7    like that that had been damage in the storm?

8    A.  No.

9    Q.  Do you know whether they were allowed ingress to go in and

10   egress to go out by the sheriff's deputies in order to attend          15:42:01

11   to recently damaged property?

12   A.  No.

13   Q.  All right.  One final area, then I'm going to let you --

14   let you go, sir.  I appreciate your patience on this.

15           Since December 2nd, 2007, have you been pulled over            15:42:22

16   again by the Maricopa County Sheriff's Office?

17   A.  No.

18   Q.  And let me know if you don't know the answer to this, but

19   since that date has your wife, Jessika, been pulled over by the

20   MCSO?                                                                     15:42:38

21   A.  No.

22   Q.  Now, you told me when we talked in your deposition on

23   October 2nd, 2009, that you personally drive probably between

24   fifteen to twenty thousand miles a year just within Maricopa

25   County alone.                                                            15:42:55

1      Do you remember telling me that?

2  A.  Yes.

3  Q.  Okay.  And over the period of the four years and seven

4  months, if my math is right, you've driven between 60,000 to

5  80,000 miles in Maricopa County, and have never again been          15:43:07

6  stopped by the MCSO for a traffic violation, right?

7  A.  Yes.

8  Q.  And you understand that on your behalf these lawyers are

9  claiming that Sheriff Arpaio has a policy or a pattern or a

10 practice of stopping Latinos because of their skin color.           15:43:27

11      You're aware of it, are you not?

12 A.  Yes.

13 Q.  Do you have any explanation for the Court as to why you

14 have driven anywhere from sixty to eighty thousand miles in the

15 county in four years and seven months and you have never again      15:43:40

16 been stopped because of supposedly your skin color?

17 A.  Because I obey the law.

18 Q.  So what you're telling me is that if you are a driver and

19 you obey the law, you have nothing to worry about from the

20 MCSO, correct?                                                       15:43:59

21 A.  True.

22 Q.  All right.  If you are a law abider, you are not going to

23 be pulled over, are you?  True?

24 A.  True.

25 Q.  And you're not going to be pulled over just because of your      15:44:10

1   skin color, right?

2   A.  That, I don't know.

3   Q.  Okay.  And I'll take that as just what it is: you don't

4   know one way or the other, do you?

5   A.  I can't speak for nobody else.                    15:44:22

6   Q.  For almost five years and no problems on your part, right?

7   A.  No problems on our part.

8           MR. CASEY:  Thank you for your time and patience.  I

9   very much appreciate it.

10          THE COURT:  Redirect?                          15:44:32

11          MS. GALLAGHER:  Yes, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MS. GALLAGHER:

14  Q.  Just a few questions, David, to clarify a few things that

15  Mr. Casey told you about.                              15:44:50

16          The first thing, you still have the deposition

17  transcript that you read from in front of you?

18  A.  Yes.

19  Q.  Can you please turn to page 11 of that transcript.

20          Okay.  For completeness, I'm going to start reading at  15:45:08

21  the end of page 11, starting at about line 20.  And if you

22  could just follow along, and then I'll ask you if I've read it

23  correctly.

24          "And when we got stopped, he came -- the officer came

25  up and asked us -- he asked us if -- if -- what we were doing,  15:45:22

1    and then I -- I told him that we were out four-wheeling and we

2    were -- you know, we had brought out the kids to, you know, be

3    out there to enjoy the time for the day, and he had -- then he

4    asked me for my driver's license, my proof of insurance, my

5    registration, and my Social Security card.  Well, I gave him --    15:45:39

6    I don't have -- I didn't have my Social Security card.  I gave

7    him my registration, my driver's license, and he went back."

8         Did I read that correctly?

9    A.  Yes.

10   Q.  And is that a correct account of how you recall the events    15:45:55

11   of that day?

12   A.  Yes.

13   Q.  And is it true that later he asked you for your Social

14   Security number?

15   A.  Yes.                                                          15:46:02

16   Q.  Okay.  At what point did you -- so you testified earlier

17   that you had seen a Road Damaged sign.  At what point did you

18   see that sign?

19   A.  When I was driving down -- down the road, after I had gone

20   back on the road from being off off-roading.                      15:46:16

21   Q.  You also testified that there were other vehicles that you

22   saw that were stopped at the -- around the same time that you

23   were.  Did you happen to notice which direction those vehicles

24   were traveling when they were pulled over?

25   A.  Towards the lake.                                             15:46:35

1    Q.  And how long after you had left the area did you wait

2    before they came back out and you were able to speak to them?

3    A.  I would say maybe about 10 to 15 minutes afterwards they

4    drove by.

5    Q.  After this incident happened, has it affected your -- your          15:46:51

6    driving, particularly when you see a police vehicle, in any

7    way?

8    A.  Yes.

9    Q.  And how is that?

10   A.  Just gotta obey the law and stay -- and stay the way you're         15:47:02

11   supposed to be, just obey the law.

12   Q.  Have you been particularly careful about your driving when

13   you notice a vehicle now?

14   A.  Yes.

15   Q.  Police vehicle?                                                     15:47:17

16   A.  Yes.

17          MS. GALLAGHER:  Thank you.  No further questions.

18          THE COURT:  Next witness.

19          MR. SEGURA:  Thank you, Your Honor.  Plaintiff calls

20   Deputy Louis DiPietro.                                                 15:47:54

21          THE COURT:  Please come forward, sir, and be sworn in.

22          THE CLERK:  Come right up here, sir.

23          Hi.

24          MR. DiPIETRO:  Hi.

25          THE CLERK:  Can you please state and spell your full            15:48:35

```
 1   name.
 2           MR. DiPIETRO:  Louis DiPietro.  L-o-u-i-s,
 3   D-i, capital P-i-e-t-r-o.
 4           THE CLERK:  Thank you.  Please raise your right hand.
 5           (Louis DiPietro was duly sworn as a witness.)            15:48:49
 6           THE CLERK:  Thank you.  Please take our witness stand.
 7           MR. SEGURA:  May I proceed, Your Honor?
 8           THE COURT:  You may.
 9                        LOUIS DiPIETRO
10   called as a witness herein, having been duly sworn, was        15:49:23
11   examined and testified as follows:
12                      DIRECT EXAMINATION
13   BY MR. SEGURA:
14   Q.  Good afternoon, Deputy DiPietro.  My name is Andre Segura.
15   I'm an attorney for the plaintiff in this case.               15:49:29
16   A.  Good afternoon.
17   Q.  Thank you for your patience today.  It looks like we'll
18   probably be able to get you out of here and not have you come
19   back on Tuesday.  Thank you.
20   A.  Okay.                                                      15:49:37
21   Q.  Deputy, you joined the Sheriff's Office in 1988, is that
22   right?
23   A.  Correct.
24   Q.  And you were -- you started as a detention officer?
25   A.  Correct.                                                   15:49:46
```

1   Q.  And then in around 2001 you became a deputy sheriff?

2   A.  Yes.

3   Q.  And at some point after that you were transferred to the

4   K-9 unit, correct?

5   A.  Yes.                                                    15:49:59

6   Q.  And are you still a deputy with the K-9 unit?

7   A.  No longer in K-9.

8   Q.  And what is your position now?

9   A.  I'm a patrol deputy.

10  Q.  You're familiar with the 287(g) program?              15:50:07

11  A.  Yes.

12  Q.  And you were once certified as a 287(g) officer, is that

13  correct?

14  A.  Can you repeat the question?

15  Q.  You were once certified as a 287(g)?                   15:50:21

16  A.  Yes.

17  Q.  And you participated in the past in saturation patrols with

18  the Sheriff's Office?

19  A.  Yes.

20  Q.  And you participated in one in September of 2007, is that   15:50:32

21  right?

22  A.  That wasn't a saturation patrol.

23  Q.  What was that operation?

24  A.  That was an investigation by the Human Smuggling Unit.

25  Q.  Okay.  And this was in Cave Creek?                     15:51:02

1   A.  That's the one you're referring to, right?

2   Q.  Yes.

3   A.  Correct.

4   Q.  And this operation involved individuals who were

5   congregating in a church parking lot, is that right?                15:51:17

6   A.  Yes.

7   Q.  And it appeared that day laborers had been congregating

8   there to seek work, is that right?

9   A.  That was part of it, yes.

10  Q.  And you were assisting with other deputies that day?            15:51:37

11  A.  I was assisting the Human Smuggling Unit on an

12  investigation of activity stemming from that parking lot, along

13  with another K-9 deputy.

14  Q.  And so at -- at that time you were still with the K-9 unit,

15  right?                                                              15:51:57

16  A.  Yes.

17  Q.  And as part of your duties with the K-9 unit, you would

18  lend assistance to patrol officers?

19  A.  Yes.

20  Q.  Okay.  And prior to this operation you were -- you were       15:52:02

21  given instructions, right?

22  A.  They had a debriefing of some sort.

23  Q.  Okay.  And during the debriefing you were told that there

24  was going to be an undercover officer surveilling the property,

25  is that right?                                                     15:52:21

1    A.   There were going to be -- I believe there was going to be

2    several undercover officers surveilling -- doing surveillance.

3    Q.   And these officers were surveilling in -- in vehicles, is

4    that correct?

5    A.   I don't -- I don't recall.                                    15:52:43

6    Q.   Would you assume they were in unmarked vehicles?

7            MR. CASEY:   Objection, calls -- excuse me, Your Honor.

8    There's no foundation, speculation.

9            THE COURT:   Sustained.

10   BY MR. SEGURA:                                                     15:52:56

11   Q.   And so these -- these officers who were -- and you were

12   told during debriefing that the undercover officers were

13   observed in the parking lot for individuals who were picked up

14   by vehicles, is that right?

15   A.   Correct.                                                      15:53:12

16   Q.   And so this -- these undercover officers would see men who

17   appeared to be day laborers get into vehicles, correct?

18   A.   I'm not sure of their gender, but they would see people get

19   into the vehicles and -- and -- yes.

20   Q.   And so they would -- they would visually observe these       15:53:35

21   individuals getting into cars from the parking lot, right?

22   A.   Yes.

23   Q.   And if -- if a vehicle would pick up individuals at the

24   parking lot, was the undercover officer to radio a description

25   of that vehicle to the officers like yourself who were on        15:53:56

1   patrol?

2   A.   To the two K-9 officers that were assisting the Human

3   Smuggling Unit, yes.

4   Q.   And you said you were -- you were driving a patrol vehicle,

5   is that right?                                                      15:54:08

6   A.   A fully marked K-9 patrol vehicle, yes.

7   Q.   And so after the description of the vehicle went out on the

8   radio, your job was to follow the vehicle, right?

9   A.   Yes.

10  Q.   And it was to -- to follow it and see if you could develop   15:54:27

11  probable cause to make a stop, is that right?

12  A.   Correct.

13  Q.   Okay.  And so on each of these occasions you were given a

14  description of the vehicle first so you knew which vehicle to

15  follow, right?                                                      15:54:44

16  A.   Correct.

17  Q.   And then after making the stop, you would call someone with

18  the Human Smuggling Unit to come and conduct an immigration

19  check, is that right?

20  A.   You know, I don't know if they actually were just            15:55:00

21  monitoring those radios and knew that we were on the stop or

22  the -- I was instructed to call in.  I know it wasn't like call

23  in on a cellphone or anything.

24  Q.   Okay.  But were you to communicate to the Human Smuggling

25  Unit that you had made a stop so they could come and conduct an   15:55:18

1   immigration check?

2   A.  Like I said, I'm not sure if it was -- I'm sure that we

3   were all on the same frequency for radio traffic, so if they

4   heard me, my call sign on a traffic stop, after they heard --

5   after they called out a vehicle description, they probably knew     15:55:41

6   I was on a traffic stop with a vehicle they wanted me to

7   follow.

8          MR. SEGURA:  Your Honor, may I hand the witness a

9   document to attempt to refresh his recollection?

10         THE COURT:  You may.                                         15:55:53

11  BY MR. SEGURA:

12  Q.  Deputy, could you take a look at page 65 of the document

13  that I handed you.

14         Do you have that page in front of you?

15  A.  Yes, I do.                                                      15:56:26

16  Q.  And could you just read to yourself starting at line -- at

17  line 19, and continue on until the next page, line 6.

18  A.  Line 6?

19  Q.  Yes, on the next page.

20  A.  Okay.                                                           15:57:20

21  Q.  Do you recall now if Sergeant Madrid was involved in this

22  operation?

23  A.  Yes, I knew that prior to the question.

24  Q.  Sorry, I should have asked that before.  And he's part of

25  the Human Smuggling Unit, right?                                    15:57:36

1    A.  Yes, he is.

2    Q.  And so you -- you were instructed to call the Human

3    Smuggling Unit after making a stop in order for them to conduct

4    an immigration check, is that right?

5    A.  At the time of this deposition, that was my understanding.    15:57:57

6    They were to be notified.

7    Q.  Okay.

8    A.  I don't know if it was a physical phone call, a radio, a

9    transmission, or if they were just listening to radio traffic

10   to know that I was out on a traffic stop with the vehicle.    15:58:14

11   Q.  Do you recall stopping a vehicle in which an individual by

12   the name of Manuel Ortega Melendres was in the car?

13   A.  I stopped a white pickup truck that the Human Smuggling

14   Unit had called out for me to find probable cause to stop.

15   Q.  Okay.  And it was your understanding that the driver of    15:58:42

16   this vehicle had picked up individuals from this church parking

17   lot?

18   A.  Yes.

19   Q.  Okay.  And you received this information over dispatch,

20   right?    15:58:54

21   A.  Yes.

22   Q.  Given a description of the vehicle?

23   A.  Yes.

24   Q.  And so you followed this vehicle until developing probable

25   cause to make a stop, is that right?    15:59:06

```
1   A.  Correct.

2   Q.  And you stopped -- you -- you've stated that you stopped

3   the vehicle for speeding, is that right?

4   A.  Yes.

5   Q.  And you followed the vehicle for a while before making the    15:59:17

6   stop, right?

7   A.  Yes, I did.

8   Q.  For about a mile and a half, you say?

9   A.  I believe I said two to three miles, then I remember

10  reading somewhere else I said a mile and a half.               15:59:36

11  Q.  Good amount of time, correct?

12  A.  Yes.

13  Q.  Did you see the race of the passengers in the vehicle

14  before you made the stop?

15  A.  No, I didn't.                                               15:59:44

16  Q.  But you saw what they looked like once you made the stop,

17  right?

18  A.  Yes.

19  Q.  Okay.  So you did make an evaluation of their appearance

20  and of their race once you made the stop?                      15:59:58

21  A.  Yes.

22  Q.  Did you in this situation give the driver a citation for

23  speeding?

24  A.  No, I didn't.

25  Q.  You didn't give him a speeding ticket?                     16:00:11
```

1    A.   I didn't.

2    Q.   Did you give the driver a warning?

3    A.   A verbal warning.

4    Q.   But not a written warning, right?

5    A.   Correct.                                                    16:00:20

6    Q.   And did you let the driver go?

7    A.   After the investigation was over, the driver was allowed to

8    leave, yes.

9    Q.   After checking the driver's license and registration and

10   giving him a verbal warning, he was free to leave, correct?      16:00:38

11   A.   No.  Actually, after the investigation at the point that

12   the Human Smuggling Unit had also arrived and did their

13   investigation, and they told me they -- they gave me the

14   information that they didn't have any charges on the driver, it

15   was up to me whether I wanted to cite him or not, and that's     16:01:02

16   when I gave him the warning on the speeding.

17   Q.   So you had the driver wait until the Human Smuggling Unit

18   arrived?

19   A.   Yes, I did.

20   Q.   And did the Human Smuggling Unit -- or the officers from     16:01:20

21   the Human Smuggling Unit, did they question the driver?

22   A.   I didn't see -- I don't recall them -- they were -- there

23   was -- I think there was four passengers and the driver.  I was

24   back at my truck running the driver, trying to run a plate and

25   that sort of thing.                                              16:01:47

1          I'm not sure what that they told me at the conclusion

2    of their investigation, that was done on the side of the road

3    during the time of the traffic stop that they had no charges on

4    the driver, it was up to me if I wanted to give him a citation

5    or a warning.                                                        16:02:08

6    Q.  Okay.  You were -- you were deposed with respect to this

7    case, right?

8    A.  Yes.

9    Q.  Okay.  And that was on October 21st, 2009?

10   A.  I don't remember.                                                16:02:24

11   Q.  Okay.  But you were -- you swore to tell the truth that

12   day, is that right?

13   A.  Yes.

14   Q.  Okay.  And could you turn to page 59 of your deposition

15   testimony?                                                           16:03:04

16   A.  59?

17   Q.  Yes.  Okay.  And do you see on line 14 you were asked the

18   question:  "Tell me as best as you can what happened after you

19   called in for Sergeant Madrid."  You see that?

20   A.  Yes, I do.                                                       16:03:36

21   Q.  And you answered:  "Unmarked vehicle arrives.  Sergeant

22   Madrid and another deputy was in the vehicle.  Came out and

23   they dealt with the four passengers.  I -- as I remember, I

24   dealt with the driver.  Gave him his verbal warning, his

25   driver's license, registration and insurance back.  And told      16:03:48

1  him to slow down.  And I'm not sure at what point he drove off,

2  but he was free to leave the traffic stop at that time.  I

3  believe the occupants of the vehicle were out of the vehicle at

4  that time.  And shortly after that, I left the scene myself."

5        Do you see that?                                        16:04:02

6  A.  Yes, I do.

7  Q.  So did that refresh your recollection as to whether

8  Sergeant Madrid or any other agency officer questioned the

9  driver?

10 A.  No.                                                       16:04:16

11 Q.  So it's still your testimony that you waited until the HSU

12 officer told you that the driver was free to leave?

13 A.  No, they told me they didn't have any charges, there's no

14 charges on him, and whether -- it was up to me whether to give

15 him a -- a citation or not.                                   16:04:39

16 Q.  And you called -- who -- was there another officer there

17 with Sergeant Madrid?

18 A.  Yes, there was.

19 Q.  And who was that?

20 A.  You know, at the time I didn't know who all by name was     16:05:01

21 there, but I've, you know, from who all's listed as -- listed,

22 it was Carlos Rangel.

23 Q.  Okay.  And you called officers from the Human Smuggling

24 Unit in order to question the passengers about their

25 immigration status?                                          16:05:31

A.  Yes, but there's more to that.  And from what I remember

from the -- the briefing prior to this was it was their, Human

Smuggling Unit's investigation, and they were going to come and

take over that portion of the investigation.

Q.  Okay.  Turn to page 55 of your deposition, please.                16:06:09

You see on line 4, it starts mid answer, but the

beginning it's just you describing the stop, it says:  "And I

also asked him for his driver's license, registration and

insurance, and when all that came back -- well, I went back to

my truck and got on the radio and talked to our dispatchers,              16:06:38

gave them the information.  Everything came back good on him.

They do a records check.  And I went back up to him and --

well, I had already made a call for Sergeant Madrid to come and

check the status of these workers."  You see that?

A.  Yes.                                                                16:06:55

Q.  So you called Sergeant Madrid to come and check the

immigration status of these workers, correct?

A.  That's still -- that's still unclear to me.  Keep in mind

that this was almost five years ago, and at the time of the

deposition it was, like, 25 months after the fact.  But from --         16:07:10

they were notified either by listening to the radio or by me

giving them a call via radio that I was on the traffic stop.

Q.  Okay.  By the time you made -- at the time of this

deposition you were -- you were certain that the reason you

called was because Sergeant Madrid and the officers called to            16:07:38

1   check their status, correct?

2   A.  They were going to take over the investigation from there.

3   Q.  Okay.  Can you turn to page 49 of your deposition, please.

4           On line 21 -- starting on line 21, you were asked,

5   question:  Did you have -- excuse me.                              16:08:08

6           Starting on line 17 you were asked:  "Why did you call

7   Sergeant Madrid?"

8           And your answer during your deposition was:  "The

9   driver told me that he had picked them up to work.  And I had

10  reasonable suspicion from that that they were day laborers and   16:08:20

11  here illegally."

12          Did you testify to that during your deposition?

13  A.  Yes, I did.

14  Q.  You mentioned earlier something about officers possibly

15  investigating human smuggling, is that right?                    16:08:37

16  A.  It was the Human Smuggling Unit.

17  Q.  But you had no reason to believe that the trucks or the

18  individuals in the car were involved in human smuggling, right?

19  A.  I had reasonable suspicion could have been, yes.

20  Q.  You had reasonable suspicion that they were involved in      16:09:05

21  human smuggling?

22  A.  Yes.

23  Q.  Did you ask the driver any questions relating to human

24  smuggling during the stop?

25  A.  I just asked him if he -- if he knew who the pass -- who      16:09:19

```
1   are the passengers in the vehicle.

2   Q.  You didn't ask any questions relating to human smuggling

3   specifically, right?

4   A.  No, they were going to take over the investigation after

5   the traffic stop.                                           16:09:35

6   Q.  Okay.

7   A.  "They" being the Human Smuggling Unit.

8   Q.  And can I have you turn to page 127 of your deposition

9   transcript, please.

10          On line 16 of page 127, the question you were asked:  16:10:05

11  "You didn't have specific information that it was involved in

12  human smuggling?"

13          And your answer was:  "No, I had specific information

14  that it was speeding in a 25-mile-an-hour zone."

15          Does that refresh your recollection as to whether you  16:10:20

16  had any reason to believe that the truck or any passengers were

17  involved in human smuggling?

18          MR. CASEY:  Excuse me, Your Honor.  For completeness

19  purposes, the actual questions begin at line 2.  It's taken out

20  of context with this witness.                               16:10:35

21          THE COURT:  Do you want to show me your transcript?

22          MR. CASEY:  Yes, Your Honor.

23          MR. SEGURA:  I have an extra copy, Your Honor, if

24  you'd like.

25          THE COURT:  I want to see it.  You say line 2?       16:10:46
```

```
 1            MR. CASEY:  I believe it should start at line 2, Your

 2    Honor.

 3            THE COURT:  All right.  I am going to ask you to start

 4    at line 2, please.

 5            MR. SEGURA:  Sure, Your Honor.                        16:11:13

 6    BY MR. SEGURA:

 7    Q.  Starting at page 127, line 2, you were asked:  "You didn't

 8    have specific reason to believe that that truck was involved in

 9    human smuggling?"

10            And you answered:  "At the time that I made the stop?   16:11:22

11            "Question:  Correct."

12            You answered:  "At the time I was making the stop, I

13    was looking for probable cause.  Now, whether that truck could

14    have been involved in human smuggling, it very well could have

15    been."                                                        16:11:36

16            And then you were asked:  "Did you have specific

17    reason to believe that that truck was involved in human

18    smuggling when you pulled it over?"

19            You answered:  "I pulled the truck over for speeding."

20            "Question:  So you did not pull it over for human     16:11:45

21    smuggling?

22            "Answer:  No, I didn't.

23            "Question:  You didn't have specific information that

24    it was involved in human smuggling?

25            "Answer:  No, I had specific information that it was   16:11:54
```

```
1    speeding in a 25-mile-an-hour zone."
2           And then:  "Question:  Now, when you spoke with the
3    driver of the truck, you didn't ask the driver if he was
4    involved in human smuggling; correct?
5           "Answer:  No, I didn't.
6           "Question:  You didn't conduct a human smuggling
7    investigation into the driver; correct?
8           "Answer:  No, I didn't."
9           So going back to the stop that we were just talking
10   about, you said that you had reasonable suspicion to believe
11   that they were undocumented, is that right?
12          MR. CASEY:  Objection to form, Your Honor.  I think
13   we're going to need to it clear up.  There's a lot of
14   phraseology here, Your Honor, whether it's illegal immigrant,
15   illegal alien, undocumented migrant.  I just want to make sure
16   that the witness is answering the question.
17          THE COURT:  Well, let's go back and take it from the
18   deposition.  I've got it as page 49, deposition line 17.  Why
19   don't we use the exact language he used in the deposition, if
20   you would, please.  I may have that wrong, but that's the
21   citation I've written down.
22          MR. SEGURA:  That's fine.
23   BY MR. SEGURA:
24   Q.  So previously we had read the portion of your deposition
25   transcript where you answered that the driver told you that he
```

16:12:13

16:12:37

16:13:08

16:13:23

16:13:35

254

```
 1    had picked up these individuals, and that you had reasonable

 2    suspicion from that that they were day laborers and were here

 3    illegally, right?

 4    A.  Can you repeat that question?

 5    Q.  Sure.  Previously we had looked at your deposition          16:13:55

 6    transcript where you were asked, "Why did you call Sergeant

 7    Madrid?" and you answered:  The driver told me that he had

 8    picked them up to work, and I had reasonable suspicion from

 9    that that they were day laborers in here illegally.

10         You see that?                                              16:14:14

11    A.  Yes, I do.

12    Q.  And you believe most day laborers are undocumented, right?

13         From -- from your experience, you believe that most

14    day laborers are undocumented?

15    A.  Can you repeat the question?                                16:14:33

16    Q.  Sure.  From -- in your experience, you -- through your

17    experience, you believe that most day laborers are

18    undocumented, right?

19    A.  Yes.

20    Q.  And so being a day laborer would give you reasonable        16:15:10

21    suspicion that the person is undocumented, right?

22    A.  I think it's more the totality of the -- of the

23    circumstances.  And I'm --

24    Q.  During your -- on -- if you could turn to page 50 of your

25    deposition transcript.  On line 21 you were asked:  "In other   16:15:40
```

```
 1   words, they are -- you think that most people who seek these

 2   day laborer jobs are undocumented individuals?"

 3           And you answered:  "I would have reason to, reasonable

 4   suspicion to think so, yes."

 5           That was your answer, right?                          16:15:59

 6   A.  Correct.

 7           THE COURT:  Can I get that transcript and page number,

 8   please?

 9           MR. SEGURA:  Sorry, Your Honor.  That's page 50,

10   starting at line 21 going to line 25.                         16:16:08

11           THE COURT:  Thank you.

12   BY MR. SEGURA:

13   Q.  And you believe most day laborers are from Mexico or

14   Central or South America, right?

15   A.  Talking about here locally?                               16:16:22

16   Q.  Sure.  In Maricopa County.

17   A.  The ones I've seen, yes.

18   Q.  Okay.  So the ones that you've seen, most of them appear to

19   be Latino or Hispanic, right?

20   A.  Yes.                                                      16:16:40

21   Q.  Going back to this stop we were just talking about, you

22   didn't have any probable cause to believe that the passengers

23   had engaged in any state crime, did you?

24   A.  Can you repeat the question?

25   Q.  Sure.  During the stop, you didn't have any probable cause 16:17:05
```

1    to believe that the passengers had engaged in any state crimes?

2         MR. CASEY:  We object, Your Honor, as to vague, as to

3    what point in the time of the stop, Your Honor.

4         THE COURT:  I'm going to overrule the objection, allow

5    him to answer.                                          16:17:22

6         THE WITNESS:  Can you repeat it again, then?

7         MR. SEGURA:  Sure.  Sure.

8    BY MR. SEGURA:

9    Q.  You didn't have any probable cause to believe that the

10   passengers had engaged in any state crimes, did you?     16:17:30

11   A.  No, I didn't.

12   Q.  Okay.  But you held them until officers from the HSU could

13   arrive, right?

14   A.  Yes, I believe that was like one minute from the time I

15   stopped -- stopped -- stopped the truck.                 16:17:50

16   Q.  Okay.  So they weren't free to leave until HSU arrived,

17   right?

18   A.  Until they finished their investigation.

19   Q.  Okay.  So at the time you called HSU, or communicated the

20   information that you had made the stop, the only information   16:18:10

21   that you had about the passengers were that they were day

22   laborers who had just been picked up, is that right?

23   A.  Can you repeat -- repeat the question?

24   Q.  Sure.  At the time you called Sergeant Madrid and HSU, the

25   only information you had about these passengers was that they  16:18:32

1    appeared to be day laborers who had just been picked up in the

2    church parking lot?

3    A.  No.

4    Q.  What other information did you have?

5    A.  The driver didn't know who they were.                    16:18:42

6    Q.  Okay.  The driver during the stop was a white male, right?

7    A.  Yes.

8    Q.  You stopped another car that same day?

9    A.  Yes, I did.

10   Q.  Okay.  And just like the first time, you were given a      16:19:04

11   description of the vehicle and then followed it to develop

12   probable cause?

13   A.  Yes.

14   Q.  Okay.  And you stopped the vehicle for a broken taillight,

15   right?                                                        16:19:15

16   A.  Yes.

17   Q.  Okay.  And as with the first stop, you didn't give the

18   driver a citation for this broken taillight, right?

19   A.  Correct.

20   Q.  And with the first stop you just gave the driver a verbal  16:19:24

21   warning, right?

22   A.  Yes.

23   Q.  Okay.  So you let the driver go after giving this warning,

24   right?

25   A.  After the investigation from the Human Smuggling Unit was   16:19:56

1    conducted.

2    Q.   So the Human Smuggling Unit investigated the driver?

3    A.   They investigated -- I guess you'd have to ask them what

4    all they investigated.

5    Q.   But you called Sergeant Madrid to question the passengers    16:20:17

6    of this vehicle, right?

7    A.   Excuse me.  I'm not sure if I specifically asked Sergeant

8    Madrid to interview the passengers of the vehicle.

9    Q.   And -- but you communicated that you had made a stop to

10   HSU, officers from HSU arrived and then questioned the    16:20:57

11   passengers, right?

12   A.   Correct.

13   Q.   And the driver in this stop was also a white male, is that

14   right?

15   A.   You're talking about the first stop?    16:21:09

16   Q.   The second stop.

17   A.   The second stop?  Yes.

18   Q.   Okay.  And all the passengers were Latino or appeared to be

19   Latino?

20   A.   Appeared to be.    16:21:22

21           MR. SEGURA:  That's all the questions I have.

22           THE COURT:  Cross-examination.

23           MR. CASEY:  Thank you, Your Honor.

24           Your Honor, are we going till 5:00 or 4:45, so I can

25   try to plan my time accordingly?    16:21:55

```
 1              THE COURT:  Well, I may have questions for
 2   Mr. DiPietro, so...
 3              MR. CASEY:  I thought you may, Your Honor.
 4              THE COURT:  I'm not sure that in light of the
 5   questions -- I mean, I can't really judge how many questions      16:22:07
 6   I'll have until I hear your cross.
 7              MR. CASEY:  Sure.
 8              THE COURT:  You may cover it.  But I had intended to
 9   go till 4:45.
10              MR. CASEY:  Okay.                                       16:22:16
11              THE COURT:  Officer DiPietro, that may mean that you
12   need to return on Tuesday, I'm sorry.
13              THE WITNESS:  That's fine.
14                          CROSS-EXAMINATION
15   BY MR. CASEY:                                                     16:22:23
16   Q.  I make no promises to you, sir, about how long we're going
17   to go on this.
18              I want to take this in the following order.  I want to
19   stop -- start with talking to you about what I call the
20   Melendres stop.  That was one of the passengers in the vehicle    16:22:38
21   the lawyer was asking about.  Okay?
22   A.  Okay.
23   Q.  And then I want to then talk to you a little about your
24   background, and in that I'm going to talk to you about some
25   things that -- about training.  So I want to first focus you on   16:22:52
```

1    the Melendres vehicle.

2         I'd like to use your words.  I'm allowed to lead you

3    at this point, but I want to hear a little bit -- I want to

4    hear from you.  On the date --

5         MR. SEGURA:  Objection, Your Honor, as to leading          16:23:10

6    questions.

7         THE COURT:  Well, if and when we have a leading

8    question I can determine whether I'm going to allow Mr. Casey

9    to lead or not.  And, in fact, whatever statements he says

10   about what the law permits or will not permit, he doesn't get   16:23:20

11   to decide, I do.  So we'll just wait until the question is

12   presented.

13   BY MR. CASEY:

14   Q.  Your Honor -- sir, at the time, September 27, 2007, you

15   were obviously an MCSO deputy, were you not?                    16:23:40

16   A.  Yes.

17   Q.  Had you gone through, at that time, ICE training?

18   A.  Yes, I did.

19   Q.  At that time were you certified by the federal government

20   to be a local immigration law enforcement officer?             16:23:56

21   A.  Yes, I was.

22   Q.  Where did you undergo that training?

23   A.  The training was at our training academy off of roughly

24   35th Avenue and Lower Buckeye.

25   Q.  And who taught that ICE training?                           16:24:15

1  A.  ICE agents.

2  Q.  How long was the academy?

3  A.  I don't remember.

4  Q.  Let's now focus on the stop.  You told us that you were

5  told that people had gotten into a car, into a truck, and then          16:24:35

6  began driving, and that you were to look for probable cause.

7  A.  Yes.

8  Q.  You told us that you paced the car or the truck for some

9  distance, and determined that in your judgment it was violating

10  Title 28, speeding?          16:24:53

11  A.  Correct.

12          THE COURT:  I'm sorry, Mr. Casey, I do apologize.  I

13  didn't get to hear the tail end of your question, and that's

14  because you're standing a little far away from the microphone

15  and the acoustics in here are terrible.          16:25:06

16          MR. CASEY:  I'm sorry.

17          THE COURT:  Can I get you to hold that mike, and can I

18  get you to repeat the end of your question again.

19          MR. CASEY:  Yes, Your Honor.

20  BY MR. CASEY:          16:25:14

21  Q.  You made the traffic stop, did you not, sir, because you

22  determined they were in violation of Title 28 and speeding?

23  A.  Yes, I did.

24  Q.  Did you at any time before you made the determination that

25  they were speeding ever see the race of anyone in that vehicle?          16:25:29

```
 1   A.  No, I didn't.
 2   Q.  Were you able to make any determination of the ethnicity of
 3   anyone in that vehicle?
 4   A.  No.
 5   Q.  Did you know the race or ethnicity of the driver?          16:25:40
 6   A.  No.
 7   Q.  Once you pulled over the vehicle, you told the plaintiffs'
 8   lawyer that you began questioning the driver.  And I realize
 9   you said it's been nearly five years.  And we have your
10   deposition.  If you'd tell me to the best of your recollection, 16:25:58
11   what is it that you remember asking him and learning from the
12   driver?
13   A.  Well, I -- I went up to his vehicle and said something to
14   the effect that I'm a deputy sheriff, and can I see your
15   driver's license, registration, and insurance?  He provided    16:26:19
16   that.
17          I said:  Who do you have in your vehicle with you?
18   And he says -- something to the effect of:  Who's in the
19   vehicle with you?
20          And he said:  I just picked these guys up for work.     16:26:33
21   Q.  Now, did you try to speak with the passengers at any time,
22   at that time?
23   A.  I really don't remember if I did, it's been so long ago.
24   But normally on a -- normally on a routine traffic stop I would
25   try, yes.                                                       16:27:00
```

1    Q.  Let's -- and I recognize your memory's not accurate, but

2    assuming you were unable to communicate in the English language

3    with a passenger who you tried to speak to, what is your custom

4    and practice, or at least back in December of 2007 what was

5    your custom and practice if you thought you needed to            16:27:23

6    communicate with passengers?

7    A.  I'd call for backup, a Spanish-speaker.

8    Q.  At some -- you testified that -- to the plaintiffs' counsel

9    that at some point you called for backup.  Do you remember

10   that?                                                            16:27:40

11   A.  Yes.

12   Q.  Do you remember whether you called for a particular person

13   or whether you called for a generic Spanish-speaker?

14   A.  I don't recall.

15   Q.  Fair enough, sir.                                            16:27:49

16         Between the point -- I'm trying to understand this.

17   From the point you talked to the driver and maybe tried to talk

18   to the passengers, did you go back to your car and run a

19   license plate check?  I'm trying to get a feel for when you

20   called for backup.                                              16:28:08

21   A.  Normally on a traffic stop you -- you would call out the

22   license plate and your location.  Then you contact the driver,

23   and they're getting you the information on the license plate.

24   A lot of times you're doing that maybe as you're approaching or

25   before you even get out of your vehicle.  But yeah, go back to  16:28:34

 1   my truck, pretty standard practice, and get on the radio there

 2   to run the driver and/or occupants.

 3   Q.  Now, you've told the plaintiffs' lawyer in answer to his

 4   question that you believe, based on whatever your interaction

 5   was with the driver, maybe the passengers, you said you had --    16:28:56

 6   you had reasonable suspicion that they were day laborers and in

 7   the country unlawfully, or something to that effect.

 8            What was -- what were the facts that you had as a law

 9   enforcement officer that allowed you to come to that

10   conclusion?                                                       16:29:18

11   A.  Can you repeat the question?

12   Q.  Sure.  You -- you told a conclusion to the plaintiffs'

13   lawyers and said:  I had reasonable suspicion that these folks

14   were day laborers and were here unlawfully or here illegally or

15   something to that effect.                                         16:29:41

16            Do you remember that?

17   A.  Yes, I do.

18   Q.  Okay.  And what I'm asking you is if you could tell the

19   Court, what information did you have that allowed you to form

20   that conclusion that you had reasonable suspicion?  What was     16:29:53

21   the information you had?

22   A.  Well, if I could just back up for a moment.

23   Q.  Please.

24   A.  Because two K-9 units were there to assist the Human

25   Smuggling Unit, and they investigate crimes regarding human       16:30:12

1  smuggling.  So that was in my mind prior to making the stop.

2        And then once I made the stop and I contacted the

3  driver, and he didn't know -- you know, I asked him who's in --

4  who do you have in the vehicle?  Oh, just some workers I picked

5  up.  That kind of -- in my mind he doesn't know them by name,                16:30:44

6  it gives me reasonable suspicion that something was going on.

7  Q.  Now, you mentioned two things in your direct examination

8  with the plaintiffs' lawyer.  You thought these people in the

9  back may have been in the country unlawfully.  Do you remember

10 saying that?                                                                  16:31:07

11 A.  Yes.

12 Q.  And then you also told us that you had some suspicion that

13 maybe the crime, the state crime of human smuggling was

14 involved.  Did I understand that correctly?

15 A.  Is that in my deposition?  Can you --                                     16:31:26

16 Q.  I'm -- I'm asking you.  Did you believe that human

17 smuggling, the crime of human smuggling, did you believe that

18 may exist?

19 A.  Yes, I did.

20 Q.  And what was the factual basis that you had to believe that               16:31:38

21 that crime may exist?

22 A.  Well, the driver was in a means of transportation, he

23 didn't know the occupants, and they were coming from a parking

24 lot the Human Smuggling Unit was investigating for some type of

25 crime, or possible crimes.                                                    16:32:04

1   Q.  Now, you mentioned earlier in answers that the driver told

2   you he had just picked up the passengers for work.

3          You remember that?

4   A.  Yes.

5   Q.  Did that information play any role in forming your          16:32:15

6   reasonable -- what you described as reasonable suspicion?

7   A.  It could have, yes.

8   Q.  Okay.  Do you remember as you sit here today whether or not

9   it did?

10  A.  Can you just back up --                                     16:32:42

11  Q.  Sure.  Sure.  And I understand.  And I'm probably not being

12  very clear.

13         You told us that you thought the people in the

14  passenger -- the passengers were here illegally.  You thought

15  there might have been a human smuggling involved.  And you just  16:32:57

16  told me, as I understand it, that the driver told you he's

17  transporting someone, and he was transporting him for work, and

18  that they didn't -- and that they didn't know each other.

19         And my question was:  What, if any, significance did

20  you give to the information the driver gave you that he was      16:33:19

21  taking these guys to work?  Was that of any significance?

22         And if it's not, if you don't remember, please just

23  tell us.  We're not asking you to speculate or guess.  If you

24  don't remember you don't --

25  A.  I really don't recall.                                      16:33:38

1  Q.  Now, I'd like to clear something up that came up in your --

2  in this testimony, and that is:  Did you release the driver of

3  the truck -- and I'm going to -- let me back up for a minute.

4  I apologize to the court reporter and Your Honor.

5       The evidence is going to show the Spanish speaking                16:34:03

6  287(g) deputy named Carlos Rangel arrived.  Are you generally

7  aware of that?

8  A.  Yes.

9  Q.  Now, assuming that that proves true, the question I have

10  for you is:  Did you release the driver of the truck before       16:34:17

11  Deputy Carlos Rangel finished his questioning of the occupants?

12  A.  No.

13  Q.  Okay.  Did you release the driver and then call Rangel?

14  A.  No.

15  Q.  Did you release the driver and detain the passengers while    16:34:40

16  waiting for Carlos Rangel or another 287(g) officer who spoke

17  Spanish to arrive?

18  A.  No.

19  Q.  Did you detain those passengers in the car because of the

20  color of their skin?                                               16:35:03

21  A.  No.

22  Q.  Why did you detain them?

23  A.  I detained them because the Human Smuggling Unit was doing

24  an investigation and there was a possibility that it could be

25  involved in some -- some type of crime.                            16:35:22

1    Q.  Now, let's go back for a minute.

2         Why did you not -- one of the questions that I

3    looked -- there is -- if -- if you were investigating or

4    expecting Carlos Rangel, through his Spanish skills, to

5    investigate whether human smuggling was going on, how did you                16:35:50

6    ever make a decision to let go of the driver, to let him go

7    with no citation or anything, if you really thought human

8    smuggling was involved?

9    A.  Can you repeat that?

10   Q.  Sure.  At some point you said that you thought these people                16:36:11

11   were here unlawfully, right?

12   A.  Yes.

13   Q.  That you thought that they may have -- there may be some

14   sort of human smuggling involved and you had reasonable

15   suspicion, right?                16:36:27

16   A.  Yes.

17   Q.  Okay.  And then what you told us is that -- you told,

18   actually, the plaintiff, the plaintiffs' counsel that while a

19   Spanish speaking person was talking to the passengers, you were

20   talking to the driver.  Do I understand that correctly?                16:36:41

21   A.  I was dealing with the driver primarily, as I recall,

22   reference the traffic violation.

23   Q.  Now, my question is on this, I'm sorry if I haven't made it

24   very clear, is if you really thought human smuggling was

25   involved, why did you let the driver go?  Even without a                16:37:08

| | |
|---|---|
| 1 | citation for speeding. |
| 2 | A.  At the point that I let him go with no citation? |
| 3 | Q.  Yes, sir. |
| 4 | A.  There was no probable cause, or there -- I was told by the |
| 5 | Human Smuggling Unit they didn't have anything on the driver. |
| 6 | Q.  So that's what you meant when you were answering the |
| 7 | question to the plaintiffs' counsel and you said we don't have |
| 8 | anything on him, you could decide whether to cite him for |
| 9 | speeding or not, is that correct? |
| 10 | A.  That's correct. |
| 11 | Q.  All right.  All right.  Please forgive me because I did not |
| 12 | understand.  All right. |
| 13 | So an investigation with the passengers was going on |
| 14 | to also try to clear the driver of whether he was transporting |
| 15 | people for money. |
| 16 | A.  Correct. |
| 17 | Q.  Okay.  All right.  Now, let's -- you testified at the |
| 18 | beginning of your deposition that this particular event was not |
| 19 | a saturation patrol.  Did I understand that correctly? |
| 20 | A.  That's correct. |
| 21 | Q.  Do you need some water? |
| 22 | A.  No, I'm fine, thank you. |
| 23 | Q.  This was some type of special HSU-only operation? |
| 24 | A.  Along with the two K-9s. |
| 25 | Q.  Now, when you were there and trying to identify what was |

16:37:31

16:37:50

16:38:04

16:38:43

16:39:03

```
1    going on with these passengers, when you said you had

2    reasonable suspicion that these folks may have been in the

3    country unlawfully, did you rely in any form on any of your

4    training from ICE to become a 287(g) certified officer in

5    making that decision?                                        16:39:30

6          That's a bad question.  Let me start over.

7          You told us that you had reasonable suspicion that

8    they may have been in the country unlawfully, there may have

9    been human smuggling.  My question for you is:  In making that

10   decision -- and I know you don't remember the detail, the fact   16:39:48

11   that led you to that conclusion, but do you remember whether

12   you relied on the ICE factors, the indicators, what you were

13   taught how to determine whether someone is here unlawfully or

14   not?

15   A.  Yes, I use -- I used some of the indicators.  Without being   16:40:05

16   able to communicate, not speaking Spanish, I wasn't able to

17   investigate it much more than that.

18   Q.  Now, there was a -- excuse me, Your Honor.  I want to make

19   sure it's clear, because sometimes on the record it's not, but

20   you've mentioned something about noticing after you made the     16:40:26

21   traffic stop when you went up to the vehicle and noticed the

22   driver was Caucasian and you noticed the skin color, the

23   appearance of the occupants, did you at all rely on skin color

24   in making a decision to detain anyone?

25   A.  No.                                                          16:40:52
```

1    Q.  Did you use skin color, that these people looked Hispanic,

2    darker, lighter, in coming to a reasonable suspicion that these

3    people may be in the country unlawfully?

4    A.  No.

5    Q.  Now, have you undergone -- strike that.                    16:41:20

6         When you went through your ICE training was there any

7    information that you remember about racial sensitivity,

8    cultural sensitivity, and prohibition on racial profiling?

9    A.  Yes.

10   Q.  And do you remember specifically what -- generally what you  16:41:47

11   were taught by ICE about whether or not racial profiling was

12   permitted in the law enforcement community?

13   A.  We're not allowed -- we don't racial -- racially profile.

14   Q.  Had you known that before you had gone to ICE training for

15   287(g)?                                                        16:42:07

16   A.  Yes.

17   Q.  Had you -- did you go through -- when you first started as

18   a detention officer, did you transition over to the deputy side

19   later?

20   A.  Yes, I could -- yes, I did.                                16:42:17

21   Q.  Did you have to go through the academy then?

22   A.  Yes.

23   Q.  Did you have a component at the academy about the

24   prohibition on the use of race in making law enforcement

25   decisions?                                                     16:42:31

1    A.  Yes.

2    Q.  Were you taught during the course of your career at

3    Maricopa County that -- whether or not using race or ethnicity

4    in any shape or form is permissible outside something called a

5    BOLO, specific be on the lookout for this person with this                16:42:50

6    description with this race who just robbed a bank?

7    A.  Yes.

8            MR. SEGURA:  Objection, Your Honor, leading.

9            THE COURT:  Sustained.

10           MR. CASEY:  I think, Your Honor, I will -- I don't          16:43:11

11   need to lead, but I did just want to make a record that this is

12   cross-examination, I think --

13           THE COURT:  It is cross-examination.

14           MR. CASEY:  Yes.

15           THE COURT:  This is a member of the Maricopa County          16:43:20

16   Sheriff's Office, and you represent the Maricopa County

17   Sheriff's Office.  And I think the Federal Rules of Evidence

18   give me plenty of leeway to tell you that even though it's

19   cross-examination, you cannot lead your own client.

20           MR. CASEY:  All right.  Thank you very much, Your          16:43:35

21   Honor.

22   BY MR. CASEY:

23   Q.  Sir, at -- and let me break down that.

24           MR. CASEY:  Can I have Mr. Moll start reading that

25   last question again to refresh my memory?                          16:43:48

```
 1              (The record was read as requested.)
 2    BY MR. CASEY:
 3    Q.  Were you taught during the course of your academy training
 4    about the prohibition on racial profiling?
 5    A.  Yes.                                                          16:44:18
 6    Q.  You have been involved, you told the plaintiffs' counsel,
 7    in some large-scale saturation patrols with the MCSO through
 8    the years?
 9    A.  Yes.
10    Q.  Was there ever any notice given to you folks about whether   16:44:27
11    or not you could use race and ethnicity in any aspect of your
12    patrol duties?
13    A.  Sorry, can you repeat it?
14    Q.  Was any warning, instruction, anything ever given about the
15    use of race?                                                     16:44:46
16    A.  Yes, kind of.  The instruction was that we don't racially
17    profile.
18    Q.  Now, sir, one final area, and then I'm done, sir.
19              In October, around mid-October of 2009, the federal
20    authorities revoked, suspended, removed the field authority of   16:45:10
21    287(g) officers in Maricopa County.  After that -- just with
22    that as a frame of reference, are you aware of any new training
23    that MCSO adopted after that date for its patrol deputies about
24    the use of race in law enforcement?
25    A.  Yes, we had some online training on that.                    16:45:33
```

1  Q.  Do you know who prepared, created that online training?

2  A.  I believe it was Arizona POST.

3  Q.  Final question, or at least final area.  Since December

4  23rd, 2011, have you personally participated in any saturation

5  patrol conducted by MCSO, whether large or small scale?                16:46:07

6        THE COURT:  Could you repeat that date?  I want to

7  make sure I got it straight.

8        MR. CASEY:  I may have misspoken, Your Honor.  Let me

9  rephrase.

10 BY MR. CASEY:                                                          16:46:18

11 Q.  Since December 23rd, 2011, have you personally participated

12 in a saturation patrol of any size in Maricopa County?

13 A.  No.

14 Q.  Are you -- and again, if you don't know, you tell me,

15 because I know you're, you know, patrol.  But are you aware at     16:46:47

16 any time the MCSO, since December 23rd, 2011, there being a

17 saturation patrol, large scale, small scale?  Are you aware of

18 that having happened since that date?

19        If you don't know, just tell the Court you don't know.

20 A.  Well, there -- no.                                                 16:47:21

21        MR. CASEY:  Okay.  Those are the questions I have for

22 you, sir.  Thank you very much for your time and patience.

23        THE COURT:  Again, Deputy DiPietro, I'm going to ask

24 you to come back on Tuesday.  We're going to end for today.

25 But I have -- I'm going to decide whether I'm going to ask any     16:47:42

```
1   follow-up questions, and then the plaintiff has the right to

2   ask any follow-up questions, so we'll ask you to come back on

3   Tuesday.

4           We are going to recess for the evening.  We will

5   resume trial on Tuesday.  We will have trial in here on          16:47:55

6   Tuesday, and then we will move up to my regular courtroom on

7   Wednesday.

8           Is there anything else that either party has that they

9   wish to raise at this time?

10          You can step down, Deputy.  Thank you.                    16:48:05

11          THE WITNESS:  Thank you.

12          MR. SEGURA:  No, Your Honor.

13          MR. CASEY:  Your Honor, sorry, I was just looking at

14  Rule 611.

15          THE COURT:  Yeah.                                         16:48:15

16          MR. CASEY:  Refreshing my memory on that.  I don't

17  have anything in addition, Your Honor.  Thank you.

18          THE COURT:  All right.  Have I convinced you that

19  Rule 611 gives me authority to do what I just did?

20          MR. CASEY:  Your Honor, you certainly do.  I will        16:48:25

21  add -- I will admit I see it says ordinary leading questions

22  should be permitted on cross-examination, but you're absolutely

23  right, you have discretion.

24          THE COURT:  All right.

25          MR. CASEY:  Thank you, Your Honor.                        16:48:40
```

1          THE COURT:  I'll see you all Tuesday morning at 8:30.

2          (Proceedings recessed at 4:48 p.m.)

1

2                    C E R T I F I C A T E

3

4

5

6

7         I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17        DATED at Phoenix, Arizona, this 20th day of July,

18   2012.

19

20

21                            s/Gary Moll

22

23

24

25