1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                   )
               Plaintiffs,          )   CV 07-2513-PHX-GMS
6                                   )
               vs.                  )   Phoenix, Arizona
7                                   )   July 24, 2012
    Joseph M. Arpaio, et al.,       )   8:31 a.m.
8                                   )
               Defendants.          )
9   _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17              (BENCH TRIAL DAY 2 - Pages 278-537)

18

19

20

21

22  Court Reporter:            Gary Moll
                               401 W. Washington Street, SPC #38
23                             Phoenix, Arizona  85003
                               (602) 322-7263
24

    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3   For the Plaintiffs:         Stanley Young, Esq.
                                Andrew C. Byrnes, Esq.
4                               COVINGTON & BURLING, L.L.P.
                                333 Twin Dolphin Drive
5                               Suite 700
                                Redwood Shores, California  94065
6                               (650) 632-4704

7                               David Hults, Esq.
                                COVINGTON & BURLING, L.L.P.
8                               1 Front Street
                                35th Floor
9                               San Francisco, California  94111
                                (415) 591-7066

10
                                Lesli Rawles Gallagher, Esq.
11                              9191 Towne Centre Drive
                                6th Floor
12                              San Diego, California  92122-1225
                                (858) 678-1807

13
                                Nancy Anne Ramirez, Esq.
14                              MEXICAN AMERICAN LEGAL DEFENSE
                                AND EDUCATIONAL FUND
15                              Regional Counsel
                                634 S. Spring Street
16                              11th Floor
                                Los Angeles, California  90014
17                              (213) 629-2512, Ext. 121

18                              Annie Lai, Esq.
                                Daniel J. Pochoda, Esq.
19                              AMERICAN CIVIL LIBERTIES
                                FOUNDATION OF ARIZONA
20                              77 E. Columbus Avenue
                                Suite 205
21                              Phoenix, Arizona  85012
                                (602) 650-1854

22
                                Andre Segura, Esq.
23                              AMERICAN CIVIL LIBERTIES UNION
                                125 Broad Street, 18th Floor
24                              New York, New York  10004
                                (212) 549-2676

25

1                    A P P E A R A N C E S

2

3                              Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Director
5                              Immigrants' Rights Project
                               39 Drumm Street
6                              San Francisco, California  94111
                               (415) 343-0775

7

   For the Defendants:        Timothy J. Casey, Esq.
8                              James L. Williams, Esq.
                               SCHMITT, SCHNECK, SMYTH,
9                              CASEY & EVEN, P.C.
                               1221 E. Osborn Road
10                             Suite 105
                               Phoenix, Arizona  85014-5540
11                             (602) 277-7000

12                             Thomas P. Liddy
                               Deputy County Attorney
13                             MARICOPA COUNTY ATTORNEY'S OFFICE
                               Practice Group Leader, Litigation
14                             Ann T. Uglietta, Esq.
                               Deputy County Attorney
15                             Civil Services Division
                               222 N. Central Avenue
16                             Suite 1100
                               Phoenix, Arizona 85004
17                             (602) 372-2098

18

19

20

21

22

23

24

25

```
 1                              I N D E X

 2    Witness:                                              Page

 3    LOUIS DiPIETRO

 4    Examination by the Court                              286
      Cross-Examination Continued by Mr. Casey              310
 5    Redirect Examination by Mr. Segura                    319

 6    JOSEPH M. ARPAIO

 7    Direct Examination by Mr. Young                       324
      Cross-Examination by Mr. Casey                        479
 8    Redirect Examination by Mr. Young                     531

 9

10

11

12                            E X H I B I T S

13    No.        Description                            Admitted

14
      185        Letter dated July 26, 2007 from Carole V. B.   376
15               to Joe (Melendres MCSO 068791-92 / Exhibit 42
                 to the deposition of Joseph Arpaio, taken on
16               November 16, 2010)

17    187        Letter dated June 19, 2008 from Gina M to      442
                 Sheriff Joe (Melendres MCSO 069086-88 / Exhibit
18               18 to the deposition of Joseph Arpaio, taken on
                 November 16, 2010)
19
      202        Email chain dated November 19, 2007 re         395
20               "Pictures from Sat. Protests"
                 (Melendres MCSO 071945)
21

22

23

24

25
```

E X H I B I T S

| No. | Description | Admitted |
|---|---|---|
| 206 | Email dated October 27, 2009 re "Why Sheriff Arpaio, Secretary Napolitano?" (Melendres MCSO 072425 / Exhibit 13 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 368 |
| 216 | Letter dated May 26, 2009 from Stella to Sheriff Arpaio re Mexicans Loitering at 36th Street" (Melendres MCSO 074346 / Exhibit 19 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 444 |
| 223 | Letter dated May 8, 2008 from Mike S to Sheriff Arpaio (Melendres MCSO 075403-04 / Exhibit 23 to the deposition of Joseph Arpaio, taken on November 16, 2010 / Exhibit 15 to the deposition of Brian L. Sands, taken on November 15, 2010) | 411 |
| 228 | Comments/Support Log for July 16, 2008 (Melendres MCSO 075622-24 / Exhibit 25 to the Deposition of Joseph Arpaio, taken on November 16,2010) | 423 |
| 230 | West Valley View article, dated September 30, 2008, "Family ties make a difference" (Melendres MCSO 075852 / Exhibit 11 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 459 |
| 235 | Letter dated August 8, 2008 from Bob & Lynnette W to Sheriff Arpaio (Melendres MCSO 076087-88 / Exhibit 21 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 434 |
| 237 | Letter dated August 1, 2008 from Gail V to Sheriff Joe re "Want to check out Sun City?" (Melendres MCSO 076091 / Exhibit 20 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 428 |

E X H I B I T S

| No. | Description | Admitted |
|-----|-------------|----------|
| 241 | Letter dated July 14, 2008 re illegal immigration and cc'ing Arpaio (Melendres MCSO 076155) | 382 |
| 249 | "Illegal Alien 'Contributions' to the U.S." (Melendres MCSO 076783 / Exhibit 10 to the deposition of Joseph Arpaio, taken on November 16, 2010 ) | 454 |
| 256 | Letter dated February 14, 2009 from John B to Congressman Conyers re Illegal Immigration (Melendres MCSO 077958 / Exhibit 3 to the Deposition of Brian L. Sands, taken on November 15, 2010) | 456 |
| 262 | Letter dated June 30, 2009 from Sarah M to Sheriff Joe (Melendres MCSO 078209 / Exhibit 17 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 383 |
| 264 | Article from Daily News-Sun dated April 7, 2009 "Profiling is sheriff's best tool" (Melendres MCSO 078287 / Exhibit 43 to the deposition of Joseph Arpaio, taken on November 16, 2010) | 460 |
| 357 | Footage from the October 22, 2009 MCSO News Conference (Disc) (ORT 001235) | 360 |
| 375 | Comments/Support Log dated September 20, 2007 (OSLS 001245-46) | 406 |
| 381 | Letter dated February 1, 2008 to Sheriff Joe from Garry and Kay R. (OSLS 003259-60) | 437 |
| 385 | Letter dated November 20, 2005 to Sheriff Joe from Stacey O re "Minuteman Project / Illegal Immigration Maricopa Co." (OSLS 005516-18) | 327 |

<u>E X H I B I T S</u>

| No. | Description | Admitted |
|-----|-------------|----------|
| 410 | Multimedia files - News Conferences and interviews (Exhibit 20 to the December 16, 2009 Deposition of Sheriff Arpaio (Disc)) | 477 |
| 410A | Multimedia files - News Conferences and interviews (Exhibit 20 to the December 16, 2009 Deposition of Sheriff Arpaio (Disc)) | 363 |
| 410B | Multimedia files - News Conferences and interviews (Exhibit 20 to the December 16, 2009 Deposition of Sheriff Arpaio (Disc)) | 365 |
| 410C | Multimedia files - News Conferences and interviews (Exhibit 20 to the December 16, 2009 Deposition of Sheriff Arpaio (Disc)) | 366 |
| 410D | Multimedia files - News Conferences and interviews (Exhibit 20 to the December 16, 2009 Deposition of Sheriff Arpaio (Disc)) | 333 |
| 451 | Impeachment exhibit | |

<pre>
 1                        P R O C E E D I N G S

 2

 3            THE COURT:  Thank you.  Please be seated.

 4            THE CLERK:  This is 07-2513, Melendres v. Arpaio, on

 5   for continuation of bench trial.                                  08:32:06

 6            THE COURT:  Good morning, Counsel.

 7            COUNSEL IN UNISON:  Good morning, Your Honor.

 8            THE COURT:  By my count, plaintiffs have used two

 9   hours and 47 minutes of their time, defendants have used three

10   hours and nine minutes.                                           08:32:20

11            Are there matters that the parties wish to address

12   this morning?

13            MR. YOUNG:  No, Your Honor.

14            MR. CASEY:  Not from the defense, Your Honor.

15            THE COURT:  All right.  Is Deputy DiPietro still here?   08:32:29

16            MR. CASEY:  Yes, Your Honor, he is.

17            THE COURT:  Would you have him retake the stand?

18            Deputy, please retake the stand.

19            (Pause in proceedings.)

20            THE COURT:  Deputy, I do want to remind you that         08:33:01

21   you're still under oath.  Even though you took that oath last

22   Thursday, it's still effective today.

23            As I indicated to the parties, I might ask a few

24   questions of the witnesses, and if I was going to ask them, I

25   was going to ask them now, then return to Mr. Casey the          08:33:12
</pre>

```
 1    opportunity to answer -- or ask any follow-up that come from my

 2    questions, and then I'll allow normal redirect.

 3              Any questions about that procedure?

 4              MR. SEGURA:  No, Your Honor.

 5              MR. CASEY:  Not from the defense, Your Honor.  Thank     08:33:26

 6    you.

 7              THE COURT:  All right.

 8                          LOUIS DiPIETRO,

 9    recalled as a witness herein, having been previously duly

10    sworn, was examined and testified further as follows:

11                          EXAMINATION

12    BY THE COURT:

13    Q.  Deputy DiPietro, I just have -- I have a few questions,

14    several questions about your testimony that I just want to ask

15    to make sure that I can clarify my understanding of your best   08:33:38

16    recollection of events that you've testified to.  Okay?

17    A.  Okay.

18    Q.  You said you started as a Sheriff's Office employee as a

19    corrections officer in 1988?

20    A.  Detention officer, yes.                                      08:33:57

21    Q.  A detention officer, I'm sorry.

22              And how long were you a detention officer?

23    A.  I'm sorry, what was the question?

24    Q.  How long were you a detention officer with the Sheriff's

25    Office?                                                          08:34:11
```

1    A.  Approximately 12 years.

2    Q.  Okay.  Until about 2000, then?

3    A.  Correct.

4    Q.  And what did you become in 2000?  What happened to you in

5    2000 that you were no longer a detention --                      08:34:24

6    A.  I went to the academy to become a deputy sheriff.

7    Q.  Okay.  And what was your assignment as a deputy sheriff?

8    A.  I was assigned to District 2 patrol after I got out of the

9    academy, and then I went to the K-9 unit.

10   Q.  When did you go to the K-9 unit?                              08:34:45

11   A.  I think it was in August.

12   Q.  Of?

13   A.  Of -- it's -- 2001, I believe.

14   Q.  So pretty quickly you became a K-9 officer?

15   A.  Correct.                                                      08:35:13

16   Q.  I think that you testified that you did help out the Human

17   Smuggling Unit in some of its operations, and you also

18   participated in saturation patrols.

19   A.  Yes.

20   Q.  How many times did you help -- and when you were helping     08:35:27

21   out the Human Smuggling Unit, were you still a K-9 officer?

22   A.  Yes.

23   Q.  How many times did you help out the Human Smuggling Unit?

24   A.  I don't recall.

25   Q.  Did you do it often?                                         08:35:52

1   A.  Sometimes -- sometimes we assisted them in, like, a drop

2   house situation; sometimes I assisted them with -- with my K-9,

3   searching for subjects that fled from vehicles; and then the

4   one -- the one time that we're -- I'm here for today.

5   Q.  What I'll call the Ortega Melendres stop.                          08:36:19

6         Do you understand what I'm saying when I say the

7   Ortega Melendres stop?

8   A.  I do now.  At -- at the time, I didn't even know he was a

9   passenger of the vehicle.

10  Q.  Sure.  I just want to ask a question in a way so that        08:36:32

11  you -- we're communicating and you understand what I'm asking.

12  A.  Okay.

13  Q.  Did you ever do any other operations like the

14  Ortega Melendres operation with Human Smuggling?

15  A.  No.                                                          08:36:47

16  Q.  That was the only one?

17  A.  Yes.

18  Q.  And did you meet with Human Smuggling that day prior to

19  conducting the operation?

20  A.  Yes.                                                         08:36:55

21  Q.  And did you have sort of an operational plan?

22  A.  There was a short briefing prior to doing it.

23  Q.  And what -- what did they tell you in that briefing?

24  A.  I don't remember exactly what all was said there, but I

25  remember that it was -- that there was some type of              08:37:11

1    investigation that they were doing reference to possible day

2    laborers working out of the church parking lot, and they

3    wanted -- there was two K-9 units there to assist them, and

4    they wanted -- they were going to have eyes on the parking lot.

5    The HSU, the Human Smuggling Unit detectives were going to be          08:37:38

6    watching the parking lot.  And they wanted -- they would call

7    out a vehicle as it left, after it picked up subjects, and they

8    wanted the -- the K-9 units to follow the vehicle, and if they

9    could establish probable cause, to pull it over then to stop

10   it.                                                                    08:38:05

11   Q.  And the probable cause that you were to establish would be

12   traffic violation?

13   A.  Correct.

14   Q.  At the time that you helped out the Human Smuggling -- I

15   think it was in September of 2007; does that sound correct to         08:38:17

16   you?

17   A.  Yes.

18   Q.  In September of 2007, were you at that time 287(g)

19   certified?

20   A.  Yes, I was.                                                        08:38:32

21   Q.  Do you remember when it was that you received your 287(g)

22   certification?

23   A.  It was sometime that -- that summer.

24   Q.  And this may sound like a stupid question, but I'm going to

25   ask it as well as I can:  Do you remember who your teacher was?       08:38:47

1    A.  No, we had multiple instructors.

2    Q.  Were you aware of whether they were instructors from the

3    MCSO or from ICE, or do you know who your instructors were

4    employed by?

5    A.  I don't believe any of the instructors were from MCSO.    08:39:06

6    They were all from ICE or -- I believe ICE.

7    Q.  How many were in your class?

8    A.  I don't know exactly, but I guess maybe 25 or 30.

9    Q.  How was it, if you know, that you were asked to assist HSU

10   in this operation?                                            08:39:41

11   A.  I'm sorry, what was the question?

12   Q.  Well, HSU was going to conduct this operation in September

13   2007.  Do you know how it was that you became selected to

14   assist in that operation?

15   A.  My K-9 sergeant at the time, Shawn Braaten, he -- he       08:39:56

16   informed myself and the -- the other K-9 officer prior to doing

17   it.

18   Q.  All right.  He just said, This is your assignment for

19   today?

20   A.  Correct.                                                   08:40:14

21   Q.  Had you ever, prior to participating in that operation,

22   received any training in Arizona law pertaining to human

23   smuggling?

24   A.  I don't recall, unless it was during the ICE -- I don't

25   recall.                                                       08:40:50

Q.   Okay.  So you don't remember receiving any training

pertaining to the Arizona human smuggling statute.

A.   Prior to that -- to that operation?

Q.   Correct.

A.   I don't recall at this time.                                08:41:05

Q.   Have you ever received any training in the Arizona human

smuggling statute?

A.   Yes.

Q.   When did you receive that training?

A.   There was some online training within the last year, I     08:41:22

believe.

Q.   So the training that you received was online?

A.   Yes.

Q.   And was it specific to the Arizona human smuggling statute?

A.   Yes.                                                        08:41:40

Q.   And who offered that training?

A.   It was through the Maricopa County Sheriff's Office

training division, but I believe POST helped come up with it.

Q.   What do you remember about that training?

A.   I remember that racial profiling is -- is not to be a       08:41:59

factor, and there's indicators in human smuggling.  And I

believe at the time that that came out was that we were to call

ICE, because we didn't have our 287(g) any longer.

Q.   All right.  Let me go back, take you back now to September

of 2007.  I don't -- if in my summary of your testimony I       08:42:43

1  misstate anything, please feel free to correct me, but I think

2  you said you had a briefing, you were told that ICE would have

3  eyes -- not ICE, but the HSU would have eyes on the parking

4  lot, and they would call out -- identify cars that they wanted

5  you to follow, and it was your job to find probable cause to          08:43:05

6  stop those cars for a traffic violation.

7  A.  Yes, but if there was no probable cause, to let it go.

8  Q.  Okay.  So if you couldn't develop probable cause, you

9  couldn't make a stop?

10 A.  Correct.                                                          08:43:23

11 Q.  All right.  Do you remember how many cars they called out

12 to you that day?

13 A.  Two.

14 Q.  So were you able to develop probable cause as to both of

15 those cars?                                                           08:43:35

16 A.  Yes, I was.

17 Q.  Did you cite either of those drivers for traffic

18 violations?

19 A.  No, I didn't.

20 Q.  Now, do you remember whether the car in which                     08:43:42

21 Mr. Ortega Melendres was a passenger was the first car you

22 stopped or the second?

23 A.  It was the first.

24 Q.  Where were you positioned?

25 A.  Somewhere -- in a parking lot somewhere east of -- of the         08:43:55

1    church off of Cave Creek Road.

2    Q.  All right.  And I think -- and again, I don't want to put

3    words in your mouth, but I think you testified earlier you

4    couldn't see the people in the parking lot.

5    A.  Correct, I didn't.                                    08:44:13

6    Q.  You just got the call, you followed, you developed probable

7    cause, you pulled over the car in which Mr. Ortega Melendres

8    was a passenger after developing probable cause that it was

9    speeding, I think was your testimony.

10   A.  Yes.                                                  08:44:26

11   Q.  What did you do next?

12   A.  I contacted the driver.

13   Q.  Okay.  I want to take this -- I want to take it in order.

14         So you would have pulled over the car, and when you

15   pulled over the car you would have radioed in that you stopped 08:44:40

16   the car, is that correct?

17   A.  Yes.

18   Q.  And you would have given the license plate or whatever you

19   did?

20   A.  Yes.                                                  08:44:51

21   Q.  Do you recall whether you radioed at that time other off --

22   HSU officers that were on the scene?

23   A.  I don't recall.

24   Q.  If you would have placed a radio call to them at any time,

25   would it have been right after you stopped the car?          08:45:11

1    A.   Yes.

2    Q.   Then what did you do next?

3    A.   After I pulled the car over?

4    Q.   Yes.

5    A.   Then I -- it was -- it was a truck.  I approached the          08:45:24

6    truck, contacted the driver, asked him for his driver's

7    license, registration, and insurance, identified myself as a

8    deputy sheriff, and I told him why I was -- why I stopped him.

9    Q.   Which was?

10   A.   He was going nine miles over the speed limit.                  08:45:49

11   Q.   And what did you do next?

12   A.   I asked him who was in the vehicle, and he said he just

13   picked these guys up to work.

14   Q.   And what did you do next?  I'm trying to get a very

15   specific chronology, to the extent you can remember.              08:46:08

16   A.   I don't remember if I had talked to the passengers at all,

17   I don't -- I don't speak Spanish, so...  There was four

18   passengers in the vehicle.  It was a four-door truck.  Three

19   were in the back seat; one was in the front passenger seat.

20   And I went -- after I got his information that I asked from the   08:46:32

21   driver, I went back to my truck and I got on the radio and

22   ran -- ran his information.

23   Q.   All right.  So again I'm going to try and summarize, and

24   please correct me if I say anything that's not correct.  You

25   approached the driver, you asked the driver for his driver's     08:46:56

1    license, registration, and insurance.

2    A.  Yes.

3    Q.  You asked him if he knew his passengers.

4    A.  Yes.

5    Q.  You don't recall whether you spoke with the passengers?    08:47:05

6    A.  No, not at -- I would have -- no, I don't.

7    Q.  You don't recall whether or not you made any particular

8    observations as to the passengers -- well, except for where

9    they were seated.

10   A.  Any other observations?    08:47:31

11   Q.  Well, did you make any other observations as to the

12   passengers?

13   A.  Well, they were Hispanic males, and they were dressed like

14   they were possibly -- the guy's truck had a wheelbarrow and

15   possibly some masonry tools in the back.  Looked like they were    08:47:49

16   going -- they looked like they were dressed to work.

17   Q.  Did you make any other observations?

18   A.  I don't remember.

19   Q.  Okay.  And then if I understand the chronology, you went

20   back to your vehicle and you provided the information over the    08:48:11

21   radio concerning the driver.

22   A.  Yes, to our dispatchers.

23   Q.  What did you do next?

24   A.  If my memory serves me correct, I think an HSU officer,

25   detective arrived.    08:48:33

1   Q.  All right.  And did you have -- did you speak with the HSU

2   officer?

3   A.  I imagine I did.

4   Q.  Okay.  Do you have any recollection as to what you would

5   have told him?                                                      08:48:42

6   A.  Driver -- I don't -- I don't recall, but --

7   Q.  If you don't recall, that's fine, just say so.  I'm just

8   asking 'cause -- 'cause I need to be clear about what your best

9   recollection and testimony of the events were.

10  A.  Okay.                                                           08:48:58

11  Q.  Okay.  So do you recall whether or not you spoke to any of

12  the HSU officers when they arrived?

13  A.  I had to have spoke to them, yes.

14  Q.  Do you recall what you -- what your conversation was with

15  them?                                                               08:49:18

16  A.  No.

17  Q.  What happened next?

18  A.  They investigated the alienage of the passengers, I

19  imagine.

20  Q.  Okay.  What did you do while they were investigating the        08:49:28

21  alienage of the passengers?

22  A.  I stood by.

23  Q.  You just stood back from the scene.

24  A.  Or -- yeah, by the truck, or maybe in my truck.

25  Q.  Okay.  So you think you may have even been in your truck?       08:49:42

1    A.   Possibly.   Probably not, though.   For officer safety, I

2    think I'd probably be out.

3    Q.   What, if anything, did you observe while the HSU officers

4    were talking to -- or determining the alienage of the

5    passengers in the vehicle?                                    08:50:01

6    A.   I don't -- I don't recall, but I would imagine they were

7    looking for some type of ID.

8    Q.   From the passengers?

9    A.   From the passengers, yeah.

10   Q.   What next do you recall?   What happened next?   That you   08:50:25

11   were able to observe.

12   A.   At some point I remember they -- they said they were going

13   to take the four passengers, and they were patting them down,

14   searching them prior to putting them in the vehicle, and they

15   said something to the effect, Oh, we don't have anything on the  08:51:08

16   driver.   It's up to you whether you want to give him a citation

17   or -- or not.

18   Q.   And how long a period did that take?

19   A.   I think -- I don't recall.   There's probably some record of

20   it somewhere.   You know, I would imagine the course of a        08:51:35

21   routine traffic stop, 20 -- 20 -- 20 minutes, possibly more, I

22   don't know.

23   Q.   And after you spoke to the driver and returned to your

24   vehicle the first time, how long did that take?

25   A.   I would imagine just a few minutes.                        08:51:56

1    Q.  What happened next?

2    A.  I gave the driver a verbal warning.  They were getting

3    ready to transport the four passengers.  Driver was released

4    with a verbal warning, he drove off, and I left also.

5    Q.  What was your understanding of the purpose of this          08:52:29

6    operation by HSU?

7    A.  Some type of investigation regarding possible illegal

8    aliens.

9    Q.  And what did you consider your role to be in that

10   operation?                                                     08:52:54

11   A.  My role was just to find probable cause, stop the vehicle,

12   and they were going to take over the investigation from there.

13   Q.  Okay.  It wasn't your role, necessarily, to cite or to not

14   cite anyone?

15   A.  No.  That's the -- it's officer's discretion.              08:53:10

16   Q.  So you had the discretion to cite them or not to cite them?

17   A.  Yes.

18   Q.  At what point had you determined whether or not you were

19   going to cite the officer for a traffic -- the driver --

20   A.  The driver?                                                08:53:27

21   Q.  -- for a traffic violation?

22   A.  I'm not -- I'm not really sure, but generally I don't cite

23   for under 10 miles under the speed limit.

24   Q.  All right.  Thank you.

25   A.  Or over the speed limit.                                   08:53:58

```
 1   Q.  All right.  I have two other areas I just want to talk to

 2   you about now.  And again, I want to be careful not to put

 3   words in your mouth, but I don't to prolong this, so I'm going

 4   to try to summarize what I understood your testimony to be on

 5   Thursday.  And if I misstate that in any way, please correct        08:54:14

 6   me, because I do not want to try to dictate to you what you're

 7   saying.

 8   A.  Okay.

 9   Q.  I think you said something on Thursday about having an

10   opinion about day laborers, and whether or not day laborers         08:54:27

11   were authorized to be in this country.

12           Do you have such an opinion?

13   A.  On whether they're authorized to be in this country?

14   Q.  Yes, on whether day laborers on the whole are authorized to

15   be in this country.                                                 08:54:54

16   A.  My opinion was based on just slightly over 50 per -- I

17   believe the question was whether I thought they -- day laborers

18   were, a majority of the day -- or most day laborers are here

19   illegally.

20   Q.  Do you have an opinion as to that?                              08:55:20

21   A.  I do.

22   Q.  What is your opinion?

23   A.  I believe that there's probably reasonable suspicion to

24   think that they might be, and I -- and whether 50 percent of

25   them or just slightly over 50 percent of them that are working     08:55:42
```

1    as day laborers are, I said most of the -- yes, and most of the

2    ones that I come across.

3    Q.  How many times have you been involved in operations

4    relating to day laborers?

5    A.  That was the only one.                                    08:56:06

6    Q.  So if I ask you what -- can I ask you:  What is the basis

7    for your opinion that most day laborers are illegal?

8    A.  It was most that I've come across, and I was basing it on

9    that day.

10   Q.  All right.  So during the course of that day, you formed an   08:56:30

11   opinion that day labor -- most day laborers are illegal.

12   A.  That did have -- that did have some bearing on my -- my

13   opinion, yes.

14   Q.  What other bases for that opinion do you have, and did you

15   have on that day?                                             08:57:06

16   A.  I don't -- that I had on that day?  I don't -- don't

17   recall.

18   Q.  Is there any other bases other -- basis other than that day

19   on which you have now formed that opinion?

20   A.  Yes.                                                      08:57:31

21   Q.  And what are they?

22   A.  The fact that that type of work doesn't require any type

23   of -- you don't have to show an ID.  It would be easier, that

24   type of work would be easier for a person in this country

25   illegally to -- to get, because they wouldn't have the proper    08:57:57

1    paperwork for other types of employment.

2    Q.  Any other bases?

3    A.  That's all I can think of now.

4    Q.  I just want to ask about one other area.

5            In addition to assisting HSU in its operations, and I    08:58:16

6    think you said this was the only operation of its type, but you

7    have helped, for example, track folks with your K-9 unit,

8    you've done other things for HSU over the course of your time

9    as a deputy?

10   A.  Yes.                                                        08:58:33

11   Q.  But this was the only operation of its kind?

12   A.  Yes.

13   Q.  Have you -- well, let me ask now, I think you indicated

14   you've also participated in saturation patrols.

15   A.  Yes.                                                        08:58:46

16   Q.  How many saturation patrols have you participated in?

17   A.  I don't -- I don't recall.  Probably five or so.

18   Q.  Do you recall the locations of the saturation patrols in

19   which you participated?

20   A.  I believe -- I'm not sure exactly which -- because some of  08:59:06

21   the saturation patrols were broken to like east side and west

22   side, and sometimes they encompassed different -- different

23   cities.  But I think several on the east side and at least one

24   on the -- on the west side.

25   Q.  What was the one on the west side that you participated in  08:59:53

1  that you can recall?

2  A.  I think it was Surprise -- it was around the Surprise area.

3  They have -- they had real -- some of them have pretty broad

4  boundaries.

5  Q.  What were the ones on the east side that you participated    09:00:08

6  in that you can recall?

7  A.  Like Mesa, I believe, was -- I know I was in, like, the

8  Chandler area one time.  I don't -- I don't remember -- I don't

9  remember specifically any -- any others.

10  Q.  All right.  So you have a specific --    09:00:40

11  A.  There -- there could have been multiple ones like in the

12  Mesa and Gilbert-Chandler area.

13  Q.  Do you have -- did you have an understanding at the time as

14  to what the purpose of saturation patrols was?

15  A.  Yes.    09:00:56

16  Q.  And what was the purpose of saturation patrols?

17  A.  Just go out there, make a lot of contacts.

18  Q.  When you say "make a lot of contacts," what do you mean?

19  A.  You would just, if you saw something that looked

20  suspicious, you'd go either talk with the person, or if you saw    09:01:13

21  traffic violations you'd stop the vehicle.  And as you're -- as

22  you're doing that you're -- you're running their information.

23  Q.  But there wasn't any particular purpose or motivation or

24  goal in running the saturation patrols other than making --

25  making law enforcement contacts?    09:01:35

1    A.  I don't -- I don't recall.

2    Q.  How was it that you were selected, if you know, to be

3    involved in saturation patrols?

4    A.  I think the K-9 unit, they assist patrol, and -- and we did

5    quite a few special details.                                    09:02:02

6    Q.  It was -- you were just assigned to be part of a saturation

7    patrol?  In other words, you didn't volunteer; you were just

8    told, You're going to be on saturation patrol?

9    A.  Yeah.  Yes.

10   Q.  What particularly did you do in these saturation patrols?   09:02:14

11   A.  I primarily would look for traffic violations, stop

12   vehicles, talk to people, run their information, and I assisted

13   the other units by doing narcotics sniffs on vehicles, narcotic

14   K-9 sniffs.

15   Q.  As in dog sniffs, I think, is that correct?                 09:02:46

16   A.  Yes.

17   Q.  All right.  So you were in a motor vehicle doing traffic

18   stops and also doing dog sniffs with your dog?

19   A.  Yes.

20   Q.  During the time that you were participating in saturation   09:02:58

21   patrols was there ever any instruction given you about who to

22   pull over or who not to pull over?

23   A.  No.

24   Q.  That was again completely within your discretion?

25   A.  Yes.                                                        09:03:12

1    Q.  How would you make that decision?

2    A.  On whether to pull a vehicle over or not?

3    Q.  Yes.

4    A.  You'd look for a traffic violation and -- and stop it.

5    Q.  And if you stopped the vehicle and you pulled it over, what          09:03:27

6    would you do next?

7    A.  You'd contact the driver, ask him for driver's license,

8    registration, insurance.  You'd be looking to see if there's

9    any indicators in the car of anything else going on.  Then

10   you'd go back, run their information.  Sometimes, you know,          09:03:51

11   they have warrants, or driving on suspended license, or things

12   such like that -- like that.

13   Q.  What would be some of the other things that you would be

14   looking for, as you say, indicators of other things going on?

15   Would among them be immigration violations, or violations of          09:04:14

16   the human smuggling -- or the Arizona human smuggling statute?

17   A.  Yes, if -- if you thought you had a vehicle that had -- had

18   indicators that led you to believe to that, yes.

19   Q.  Did you ever make any follow-up inquiries with respect to a

20   violation of the immigration laws or the Arizona human          09:04:51

21   smuggling statute during a saturation patrol?

22           You didn't understand my question?

23   A.  No, I didn't.

24   Q.  All right.  You participated in saturation patrols,

25   correct?          09:05:03

1    A.  Yes.

2    Q.  You made stops during those patrols?

3    A.  Yes.

4    Q.  During the course of any stop on any saturation patrol in

5    which you participated that you recall, did you ever, after          09:05:12

6    having stopped somebody, form -- or decide that you needed to

7    determine whether or not there was a violation of immigration

8    laws or the Arizona human smuggling statute?

9    A.  I believe so, yes.

10   Q.  And on what basis did you make that determination?               09:05:41

11   A.  It didn't really pertain to human smuggling, but whether a

12   driver was here legally in the United States.

13   Q.  Okay.  And how would you make a determination that a driver

14   may not be here legally in the United States?

15   A.  Well, I'd ask him for his driver's license, registration,        09:06:13

16   and insurance, and there's been times where they didn't have a

17   driver's license.  I'm not a Spanish-speaker.  There's times

18   I've had to call for Spanish-speakers, but sometimes I can just

19   work my way through it, and sometimes the driver would just

20   say, I'm not a citizen of the United States.  Can't get one.        09:06:42

21   Q.  Did you ever make a similar determination with respect to

22   passengers in a vehicle that you stopped?

23   A.  Yes.

24   Q.  And on what would you make that determination?

25   A.  As far as whether they were citizens of the United States,       09:06:59

1   or why would I ask them?

2   Q.   Whether there was reasonable suspicion that they might not

3   be citizens of the United States.

4   A.   Sometimes I -- sometimes the passenger would not have an ID

5   card or anything, and there's been occasions that they'd tell          09:07:28

6   me or later learn that they weren't here legally either.  They

7   weren't citizens of the United States.

8   Q.   So would you ask passengers for their ID card when you

9   stopped a driver?

10  A.   Generally, if -- if they weren't wearing a seat belt or          09:07:50

11  something I would, yes.

12  Q.   And if -- and would you ask them for an ID card regardless

13  of what their race was?

14  A.   Yes.

15  Q.   So is it your habit to just ask passengers, all passengers,      09:08:02

16  for ID cards when you make a traffic stop?

17  A.   No.

18  Q.   Is it ever your habit to ask passengers for ID cards when

19  you make a traffic stop?

20  A.   Is it ever?                                                       09:08:22

21  Q.   Yeah.  I mean, is there ever a course of events, when you

22  make just a regular traffic stop, that you're going to ask

23  passengers in the car to give you their ID card?

24  A.   Yes, sometimes there's reasonable suspicion and I -- and I

25  have asked them, yes.                                                  09:08:41

1   Q.  Okay.  And in the case of, now, the saturation patrols,

2   when you would ask for -- a passenger for an ID card, what

3   would be the basis on which you asked for that ID card?

4   A.  I don't recall doing that on a -- on a saturation patrol.

5   Q.  Okay.  You don't think you ever asked a passenger for their      09:09:04

6   ID card on a saturation patrol?

7   A.  I probably have, but I don't -- I don't recall.

8   Q.  Okay.  And if you don't recall, you don't recall why you

9   would have asked them for an ID card?

10         If you don't understand my question, please tell me.      09:09:24

11  I don't mean to --

12  A.  Well, no, if they -- if they weren't wearing a seat belt,

13  which is a traffic violation, I would -- I could ask them.  But

14  if I was suspicious of -- if I had reasonable suspicion of

15  other occupants in the vehicle, or if I came across -- if      09:09:40

16  there's something in plain view in the vehicle, drugs or a gun

17  or something, I might ask -- go and investigate a little deeper

18  and ask them for their IDs.

19  Q.  You don't have any specific recollection of asking any

20  passenger for their ID during a saturation patrol?      09:10:07

21  A.  No, I don't.

22  Q.  You believe you may have done that?

23  A.  Possibly, yes.

24  Q.  Do you have any recollection of any arrests that you made

25  during a saturation patrol that were related either to the      09:10:21

1    Arizona human smuggling statute or to immigration charges?

2    A.  None.

3    Q.  Did you ever receive any training on how to run -- how to

4    operate during a saturation patrol from the MCSO?  Any

5    directions?  That were specifically related to saturation          09:10:45

6    patrols.

7    A.  Well, they -- they usually had a -- a briefing prior to

8    the -- prior to the saturation patrol, and they would give you,

9    generally, like a map of the boundaries.  They'd give you

10   specifics on, you know, a transport vehicle that would pick        09:11:14

11   up -- excuse me -- any arrests that you had.

12   Q.  Where would the briefing --

13            I'm sorry.  Go ahead.

14   A.  And they would -- they would just generally give you the

15   guidelines of -- of the detail.                                    09:11:39

16            And I remember specifically that -- instances where --

17   different details where they were -- they would say, you know,

18   Racial profiling, we don't do it, and go out there and just

19   make stops.

20   Q.  All right.  Where would these briefings occur?                 09:12:00

21   A.  I remember one at -- on the west side at the District 3

22   substation.  I remember one at the -- out in Mesa by District 1

23   by the -- it's off of the 60, and I believe it's Mesa Drive.

24   Q.  Who would give these briefings?

25   A.  The operations commander, I believe.                           09:12:40

1  Q.  Do you have any recollection of any specific operations

2  commander that gave one of these briefings?

3  A.  I remember Lieutenant Sousa.

4  Q.  Lieutenant Sousa gave a briefing before a saturation

5  patrol?                                                          09:13:17

6  A.  Yes.

7  Q.  And it's a specific saturation patrol that you recall?

8  A.  Which one specifically did he give, or --

9  Q.  Yes.

10  A.  I don't recall.  I think he -- he gave several of them.    09:13:29

11  Q.  Do you have a specific recollection that he gave several?

12  A.  Yes.

13  Q.  Which ones?

14  A.  Well, as I was just thinking of that answer, there was

15  another operation that we did that we were out of, like,        09:13:47

16  35th Avenue and Durango area was where the command post was.

17  Q.  Okay.  And was that one that Lieutenant Sousa gave?

18  A.  Yes.

19  Q.  Do you have any recollection of anyone else other than

20  Lieutenant Sousa giving these briefings?                        09:14:11

21  A.  It's possible.  I don't -- I don't recall.  And there's

22  been times where -- where the sheriff was there, but I'm not

23  sure if he gave the briefing.

24  Q.  And would the briefing differ from operation to operation?

25  A.  Yes.                                                        09:14:45

```
 1  Q.  After any of the saturation patrols in which you

 2  participated did your supervisors or anyone else from MCSO ever

 3  debrief you about the stops you conducted?

 4  A.  No.

 5          THE COURT:  Thank you.  Those are all my questions.      09:15:14

 6          Mr. Casey, I wasn't running anybody's time, but I'm

 7  going to start running yours now, okay?

 8          MR. CASEY:  Thank you, Your Honor.

 9          Your Honor, with permission --

10          THE COURT:  Mr. Casey?                                    09:15:55

11          MR. CASEY:  Yes.

12          THE COURT:  I'm sorry, I can barely hear you.

13          Could you make sure you're close to a microphone?

14          MR. CASEY:  Yes, Your Honor.

15          THE COURT:  Thank you.                                    09:16:02

16          MR. CASEY:  With permission, I'd like to publish on

17  all screens Exhibit 102, which is admitted into evidence.

18          THE COURT:  All right.

19                     CROSS-EXAMINATION CONTINUED

20  BY MR. CASEY:                                                     09:16:12

21  Q.  Deputy, what I'd like to do is go back real quick.  The

22  judge just asked you a question about briefings beforehand, and

23  you indicated that you recall Lieutenant Joe Sousa giving

24  briefings.  Do you remember that?

25  A.  Yes.                                                          09:16:26
```

1  Q.  Okay.  I pulled up Exhibit 102, which the parties have

2  stipulated into evidence is an operations plan before an

3  operation in Sun City.

4       Just looking through that document briefly, although

5  you don't remember ever -- you didn't testify going to

6  Sun City, do you remember seeing operations plans like this

7  during briefings?

8  A.  Yes.

9  Q.  Okay.  Now, what I'd like to do is deal -- turn to the next

10 page, and I'm going to blow this up so it's clear, or hopefully

11 clear.  Do you remember reading any instructions such as we see

12 here conducting traffic stops on saturation patrols?

13      Do you see where it says:  At no time will MCSO

14 personnel stop a vehicle based on the race of the subjects in

15 the vehicle?

16      And it's -- I didn't do a very good job blowing it up.

17      You see where it says race is prohibited?

18 A.  Yes.

19 Q.  Race -- okay.  Now, do you remember --

20      MR. SEGURA:  Excuse me, Your Honor, objection.

21 There's no foundation that the deputy was actually on this --

22      THE COURT:  Overruled.

23      MR. SEGURA:  -- saturation patrol.

24 BY MR. CASEY:

25 Q.  In addition, is this the type of written warning you recall

09:16:44

09:17:00

09:17:34

09:17:44

09:17:52

1    receiving in a presaturation patrol briefing?

2    A.  Can you ask that question again?

3    Q.  We see this from the Sun City.

4    A.  Yes.

5    Q.  Is that the type of written warning you recall receiving in    09:18:14

6    the saturation patrols that you participated on?

7    A.  Yes.

8    Q.  In addition to the written warning, did Lieutenant Sousa,

9    to your recollection, also orally tell everyone that was

10   participating that racial profiling was prohibited?    09:18:39

11   A.  Yes.

12   Q.  Okay.  Now, do you see there where it also talks about

13   conducting interviews?  Do you remember reading that type of

14   information where deputies that were not 287(g) were only to

15   call 287(g) deputies based on certain indicators other than    09:18:59

16   race?  You see at the end there?

17        Let me rephrase the question.  Do you see at the last

18   sentence it says:  At no time will a deputy call for a 287(g)

19   deputy based just on race?

20        Do you see that?    09:19:25

21   A.  Yes.

22   Q.  Was that the type of information that you recall reading

23   about before you participated in a saturation patrol?

24   A.  Yes.

25   Q.  Was that the type of information that you recall in the    09:19:36

1  saturation patrols you participated in that Lieutenant Sousa or

2  others would orally tell anyone participating?

3         MR. SEGURA:  Objection, Your Honor, compound question.

4         THE COURT:  Overruled.

5  BY MR. CASEY:                                                    09:19:54

6  Q.  You may answer, sir.

7  A.  Yes.

8  Q.  Okay.  Now, I'd like to turn to something different, and --

9         Thank you.  I no longer need the screen.  Thank you,

10 ma'am.                                                           09:20:05

11        You testified in answer to one of the judge's

12 questions, the Court's question, and I'm going back to

13 September of 2007, what we call the Ortega Melendres stop, you

14 told the judge that the other officers said, We don't have

15 anything on the driver.                                          09:20:27

16        Do you remember telling the Court that?

17 A.  Yes.

18 Q.  What did you understand those other officers to mean when

19 they told you, after they got done talking to the passengers,

20 We don't have anything on the driver?                            09:20:40

21 A.  I thought that meant they didn't have any probable cause

22 for arrest on him for any type of criminal charges.

23 Q.  Was one of the criminal charges that you -- and -- you --

24 and I'm going to -- with that framework, Your Honor, with that

25 foundation, you mentioned earlier that you understood that you  09:21:09

```
1    were there looking for day laborers and illegal aliens.
2              My question to you is:  Was there any other discussion
3    about any criminal activity that was being looked at at that
4    day, either that area or that church?
5    A.  During the briefing --                                    09:21:30
6    Q.  Yes, sir.
7    A.  I don't recall.
8    Q.  Now, the question I have for you a little bit more
9    specifically is:  Do you know, as part of the investigation,
10   whether there was looking for any human smuggling?             09:21:44
11             MR. SEGURA:  Objection, Your Honor, leading.
12             THE COURT:  Overruled.
13             THE WITNESS:  I don't recall.
14   BY MR. CASEY:
15   Q.  Okay.  Do you know whether there was any mention that there  09:22:00
16   was any investigation about human drop houses?
17   A.  I don't -- I don't recall.
18   Q.  All right.  And thank you, sir.  All we're asking for is
19   your best memory.  I realize it's been nearly five years.
20             Next question:  Do you remember whether there was any  09:22:25
21   information given that there was any information about traffic
22   hazards posed by people congregating an area and jumping into
23   traffic?  Title 28 violations.
24   A.  I don't remember.
25   Q.  You would defer to the people that planned, initiated this  09:22:54
```

```
 1   operation, wouldn't you?
 2           MR. SEGURA:  Objection, leading, Your Honor.
 3           MR. CASEY:  It's a preliminary matter, Your Honor.
 4           THE COURT:  Even if it's leading, it's not so bad that
 5   I'm going to sustain the objection.                              09:23:08
 6           You may answer the question.
 7           MR. CASEY:  I'm going to withdraw the question.
 8   BY MR. CASEY:
 9   Q.  Did you plan the operation?
10   A.  No, I didn't.                                                09:23:17
11   Q.  Did you -- did you do anything about the investigation that
12   led to this operation?
13   A.  Not that I recall.
14   Q.  All right.  The people that might be in a better position
15   to answer these questions, or the judge's, would be those who   09:23:32
16   planned and initiated the operation; do you agree with that?
17   A.  Yes, I do.
18           MR. SEGURA:  Objection, Your Honor, as to which
19   questions he's referring to.
20           THE COURT:  I'm going to overrule the objection.        09:23:45
21           MR. CASEY:  All right.  Would the court reporter,
22   Mr. Moll, read my question back to the witness, please, after
23   the interruption?
24           (The record was read by the court reporter.)
25           THE WITNESS:  Yes, I do.                                09:24:13
```

1    BY MR. CASEY:

2    Q.   Okay.  Let me turn -- and I only have a few more areas.

3         When you got out of the detention side at MCSO and you

4    went to the academy, at the academy did you receive any

5    training about the prohibition on the use of race or ethnicity        09:24:28

6    to make law enforcement decisions?

7    A.   Yes, I did.

8    Q.   Was that something that you were trained on at the MCSO?

9    A.   Yes.

10   Q.   Now, when you became -- later, when you went to the 287(g)        09:24:43

11   academy, your testimony, as I understand it, was that you

12   believed that the instructors there, although you don't

13   remember their name, were federal officials, ICE officials.

14   A.   Yes.

15   Q.   Did they conduct training with you about the use of race or        09:25:03

16   ethnicity in making law enforcement decisions?

17   A.   Yes.

18   Q.   Okay.  What did ICE tell you about whether or not you could

19   use race?

20   A.   It's prohibited.        09:25:28

21   Q.   Did they -- do you remember why they told you it was

22   prohibited?

23   A.   That there's different nationalities that are coming into

24   the United States illegally, there's not just one.

25   Q.   Now, let me turn to a -- another factor.  I want to go back        09:25:51

1    to 2007, September.  And this is sort of a hypothetical because

2    of your -- your memory.

3           If you had spoken to the passengers in that vehicle

4    you had stopped and they had only spoken Spanish, could you

5    tell us what your custom and practice would have been under          09:26:21

6    those circumstances?

7    A.  I would probably call for somebody who speaks -- excuse

8    me -- for a deputy that spoke Spanish for translation.

9    Q.  All right.  Now, the final area is the judge asked you

10   about your opinion about day laborers, and where they may be         09:26:47

11   from, and the testimony last week you were asked a question by

12   Mr. Segura about your experience.

13          Based on this traffic stop that you made in September

14   of 2007, that was your experience, that people that were

15   working as day laborers were also here in the country               09:27:08

16   unlawfully?  Is that what your testimony was?

17   A.  Can you repeat the question?

18   Q.  Sure.  I'm trying to follow up with the judge's question,

19   find out what was your experience that led you to the

20   conclusion that 51 percent or more of day laborers were in the      09:27:32

21   country unlawfully?

22          MR. SEGURA:  Objection, Your Honor.  I don't believe

23   that was the witness's testimony.

24          THE COURT:  I'm going to overrule it on the basis that

25   the objection stated.                                               09:27:49

1    BY MR. CASEY:

2    Q.  Would you answer my question, please?  Do you need it read

3    back after the interruption?

4    A.  Yes, I do.

5         MR. CASEY:  All right.  Mr. Moll, would you please --    09:28:00

6    please read that back.

7         (The record was read by the court reporter.)

8         THE WITNESS:  What was my experience prior to that?

9    BY MR. CASEY:

10   Q.  I'm just trying to figure out -- I heard you say to the    09:28:38

11   judge that it was based on that day.  I'm trying to figure out

12   if there was any other experience that you had other than that

13   day that led you to base -- to form that opinion based on your

14   experience.

15   A.  Not in law enforcement, no.    09:28:54

16   Q.  Okay.  Now, that opinion is based on your experience within

17   Maricopa County, is --

18   A.  Yes.

19        MR. CASEY:  Okay.  Those are all the questions I have

20   for the witness, Your Honor.  Thank you.    09:29:10

21        THE COURT:  All right.

22        Redirect?

23        MR. SEGURA:  Good morning, Your Honor.

24        THE COURT:  Good morning.

25                                                          09:29:29

REDIRECT EXAMINATION

BY MR. SEGURA:

Q.  Good morning, Deputy.  I just have a few questions.

    You testified on -- on Thursday, I believe, when asked
by Mr. Casey, that you remember receiving racial profiling     09:29:39
training at some point after MCSO lost its 287(g)
certification?

A.  Yes.

Q.  Do you remember that?  And when did you receive that
training?                                                      09:29:50

A.  I don't recall.  It was after we lost the 287(g) status.

Q.  Do you remember the year?

A.  No.

Q.  Was it in the past year?

A.  I did have some online training.                          09:30:15

Q.  And when was that training?

A.  Within the last year or so, year and -- maybe year, year
and a half.

Q.  Do you remember what -- what month that was in?

A.  No.                                                       09:30:32

Q.  You said that was online training?

A.  Yes.

Q.  So you weren't able to ask any questions during that
training, were you?

A.  No.                                                       09:30:43

1  Q.  Okay.  It was conducted over the Internet, right?

2  A.  Correct.

3  Q.  And how was the term "racial profiling" defined in that

4  training?

5  A.  I don't recall.                                           09:30:53

6  Q.  And so we've been discussing this operation that occurred

7  in September of 2007, right?

8  A.  Yes.

9  Q.  And that operation was consistent with what you learned in

10 this most recent online training?                             09:31:10

11 A.  Can you repeat that?

12 Q.  That operation of September 2007, that was consistent with

13 what you learned in this most recent training?

14 A.  As far as racial profiling?

15 Q.  Yes.                                                       09:31:30

16 A.  Yes.

17 Q.  You testified on Thursday, and I believe in response to the

18 judge's question, that you -- you didn't let the driver go

19 until HSU -- the HSU deputies had completed their investigation

20 and told you it was up to you whether to give him a citation?   09:31:52

21 A.  Correct.

22 Q.  And that's -- that's still your testimony today?

23 A.  Yes.

24 Q.  Okay.  I'm going to hand you -- you were looking at your

25 deposition transcript last Thursday.  I'm going to hand you it  09:32:05

```
 1    again.
 2              MR. SEGURA:  Your Honor, may I approach?
 3              THE COURT:  You may.
 4    BY MR. SEGURA:
 5    Q.  Can you turn to page 59 of your deposition transcript and        09:32:20
 6    look at line 10.
 7              Are you there?
 8              You were asked on line 10 -- starting on line 10:
 9    "Approximately how long after you stopped the truck was the
10    driver there on the scene?"                                         09:32:47
11              And you answered on line 12:  I don't -- excuse me.
12    "I don't -- I don't remember."
13              Then you were asked on line 14:  "Tell me as best as
14    you can what happened after you called in for Sergeant Madrid."
15              And you answered:  "Unmarked vehicle arrives.             09:33:02
16    Sergeant Madrid and another deputy was in the vehicle.  Came
17    out and they dealt with the four passengers.
18              "I -- as I remember, I dealt with the driver.  Gave
19    him his verbal warning, his driver's license, registration and
20    insurance back.  And told him to slow down.  And I'm not sure       09:33:17
21    at what point he drove off, but he was free to leave the
22    traffic stop at that time.  I believe the occupants of the
23    vehicle were out of the vehicle at that time.  And shortly
24    after that, I left the scene."
25              Do you see that?                                          09:33:31
```

```
1   A.   Yes.

2   Q.   And that was your deposition testimony, right?

3   A.   Yes.

4   Q.   And you swore to tell the truth --

5   A.   Yes.                                                  09:33:41

6   Q.   -- during your deposition?

7            I just have --

8   A.   Can I elaborate on that?

9   Q.   We can move on to another area.

10           The purpose of saturation patrols is to make contacts   09:34:00

11  with vehicles, right?

12  A.   No.  With vehicles?

13  Q.   Yes.

14  A.   No, with persons.

15  Q.   Okay.  And that includes passengers?            09:34:14

16  A.   Yes.

17           MR. SEGURA:  I have no further questions, Your Honor.

18           THE COURT:  Deputy DiPietro, thank you for your

19  testimony.  You may step down.

20           THE WITNESS:  Thank you.                    09:34:31

21           MR. YOUNG:  Your Honor -- Your Honor, plaintiffs call

22  Sheriff Joe Arpaio.

23           THE COURT:  All right.  If you'll gather him and have

24  him come forward in order to be sworn.

25           (Pause in proceedings.)                     09:35:19
```

```
 1              THE COURT:  Sheriff Arpaio, if you'll please come

 2    right here and be sworn by our deputy.

 3              THE CLERK:  Can you please state and spell your full

 4    name.

 5              THE WITNESS:  Joseph M. Arpaio, A-r-p-a-i-o, Sheriff.   09:35:32

 6              THE CLERK:  Thank you.  Please raise your right hand.

 7              (Joseph M. Arpaio was duly sworn as a witness.)

 8              THE CLERK:  Thank you.  Please take our witness stand.

 9              (Pause in proceedings.)

10              MR. YOUNG:  Your Honor, we have a couple of binders   09:36:05

11    for you and for counsel, and I'll have our assistant,

12    Ms. Mandujano, distribute those.  One of those is a witness

13    binder that contains numerous exhibits that I plan to ask the

14    sheriff about.  The other contains four deposition transcripts

15    that we may also look at.                                       09:36:26

16          So I think we'll supply them to the sheriff as well as

17    to the Court, as well as to counsel.

18              THE COURT:  All right.  Are they all identical?

19              MR. YOUNG:  Yes.

20              THE COURT:  Do they contain exhibits that have not yet  09:36:41

21    been admitted?

22              MR. YOUNG:  They do, and I'll note that because I'll

23    seek admission of some of them.

24              THE COURT:  All right.

25              MR. YOUNG:  But we'll need to ask the sheriff about    09:36:46
```

```
 1    them first.
 2              THE COURT:  I understand.
 3              (Pause in proceedings.)
 4                      JOSEPH M. ARPAIO,
 5    called as a witness herein, having been duly sworn, was        09:37:02
 6    examined and testified as follows:
 7                      DIRECT EXAMINATION
 8    BY MR. YOUNG:
 9    Q.  Good morning, Sheriff.
10    A.  Good morning.                                              09:37:15
11    Q.  How are you?
12    A.  A little flu, but I'm okay.
13    Q.  Sorry to hear that.  Are you able to testify today?
14    A.  Yes.
15    Q.  You have not always viewed illegal immigration as a serious 09:37:24
16    crime, correct?
17    A.  One of the serious crimes, yes.
18    Q.  Okay.  But you didn't always look at illegal immigration as
19    a serious crime, is that right?
20    A.  That's right.                                              09:37:37
21    Q.  Before 2005 you did not view illegal immigration as a top
22    issue, correct?
23    A.  Correct.
24    Q.  In fact, in 1996 you wrote a whole book that did not even
25    mention illegal immigration, correct?                         09:37:49
```

1    A.  Possibly.

2    Q.  I'll ask you to take a look at your deposition testimony

3    from September 7, 2010, in the Mora case, page 229.  This will

4    give you a chance to look at that big binder there.  And you'll

5    see that there are four deposition transcripts there.  Two of        09:38:15

6    them in this case, which are Ortega, and then one in the Mora

7    case and one in the Lopez Valenzuela case.

8            If you look at the one from September 7, 2010, in the

9    Mora case, at page 229, you'll see at line 20 -- actually, line

10   22 you say:  "Things have changed since 1996.  We didn't have       09:38:39

11   a -- at least outwardly, a controversial illegal immigration.

12   I don't think I even mentioned that in the first book."

13           Do you see that?

14   A.  229?

15   Q.  Correct.                                                         09:38:58

16           MR. CASEY:  Your Honor, for completeness purposes, can

17   we have the line 20 actually read regarding the date?

18           MR. YOUNG:  Sure.  Line 20 is:

19           "ANSWER:  Well, the first book was in 1996.

20           "QUESTION:  Okay."                                           09:39:12

21           And then what I read earlier follows.

22           THE WITNESS:  That's correct.

23   BY MR. YOUNG:

24   Q.  Okay.  So your first book didn't mention illegal

25   immigration at all, correct?                                        09:39:23

1    A.  If that's what I said, yes.

2    Q.  Now, I'd like you to take a look at the other binder, which

3    is witness binder.  It has a lot of number tabs, and hopefully

4    those tabs will help you find various exhibits that we're going

5    to talk about and look at today.                          09:39:42

6            I'd ask you to look at PX 385.

7            Now, there's a cover page on each exhibit, and then

8    actually I think you're looking at the wrong one.

9            Do you have 385 there?

10   A.  Trying to get the page here.  385.                   09:40:19

11   Q.  Well, look at -- go look at the tabs.  Look at the tabs

12   first, and then you can find the document.

13           Ms. Mandujano is handing you a copy separately of

14   Exhibit 385 in case that will help.

15           THE COURT:  All right.  I'm going to ask before anyone  09:40:37

16   approaches the witness, you ask first.

17           MR. YOUNG:  My apologies, Your Honor.

18   BY MR. YOUNG:

19   Q.  So Sheriff, you've been handed a copy of Exhibit 385, which

20   is a November 20, 2005 letter to you.                     09:40:52

21           Do you see that?

22   A.  Yes, sir.

23   Q.  Is that your handwriting on the upper part of the first

24   page?

25   A.  Yes, it is.                                           09:41:01

1  Q.  And you forwarded this to Dave Hendershott, your chief

2  deputy at the time?

3  A.  I made cop -- I indicated that that should go to him, yes.

4  Q.  All right.

5         MR. YOUNG:  Your Honor, we move to admit Exhibit          09:41:15

6  PX 385.

7         MR. CASEY:  Your Honor, no foundation has been

8  offered, other than he made marginalia on it, for the

9  underlying hearsay in the letter.

10        THE COURT:  Are you offering the underlying content of   09:41:27

11 the letter for the truth of the matter asserted in it,

12 Mr. Young?

13        MR. YOUNG:  No, Your Honor.

14        THE COURT:  Okay.  The objection is overruled.  The

15 exhibit is admitted.                                             09:41:40

16        (Exhibit No. 385 is admitted into evidence.)

17        MR. YOUNG:  We can publish Exhibit 385.

18        THE COURT:  You may do so.

19 BY MR. YOUNG:

20 Q.  This is a letter to you from someone saying he or she is    09:41:47

21 from the Minuteman Project, correct?

22 A.  Yes.

23 Q.  And it talks about in the first page, in the paragraph at

24 the bottom, about rallies that that group had held at Bell Road

25 and Cave Creek, and then again at Thomas and 36th Streets.       09:42:05

1        Do you see that?

2    A.  Yes.

3    Q.  Those are places where you later did saturation patrols,

4    correct?

5    A.  Yes.                                                          09:42:15

6    Q.  And on the second page in the second-to-last paragraph in

7    the middle of the page, it says:  Is it unreasonable to ask our

8    police to question day laborers about their immigration status?

9        You see that sentence?

10   A.  What -- what paragraph on page --                             09:42:40

11   Q.  On the second page, it's 517, second paragraph from the

12   bottom.  In the middle of that paragraph there's a sentence

13   that says:  Is it unreasonable to ask our police to question

14   day laborers about their immigration status?

15       Do you see that sentence?                                     09:42:58

16   A.  Yes.

17   Q.  Now, there's a little mark in pen on the right side of that

18   letter.  Is that yours?

19   A.  It may be.

20   Q.  You marked that paragraph to bring it to the attention of    09:43:09

21   Chief Hendershott, correct?

22   A.  I believe I did.

23   Q.  Then in the next paragraph down at the bottom there's a

24   sentence that says:  MMP -- which is Minuteman Project -- wants

25   to work with an organization that is willing to investigate and  09:43:38

1    deport illegal immigrants when they are spotted in our cities.

2             Do you see that sentence?

3    A.  Yes.

4    Q.  You also put a mark next to that paragraph to direct Chief

5    Hendershott's attention to that, correct?                          09:43:52

6    A.  Yes.

7    Q.  In your note to Chief Hendershott on the first page of

8    page -- PX 385 you told him:  We should have a meeting

9    internally and decide how to respond.  And then your initials

10   under that dated November 25, 2005, correct?                       09:44:11

11   A.  Yes.

12   Q.  And then you made a cc to yourself so that you would get a

13   copy of this letter, is that right?

14   A.  Yes.

15   Q.  You started to become more concerned about illegal          09:44:21

16   immigration sometime around 2006, correct?

17   A.  Yes.

18   Q.  And it became one of your top priorities?

19   A.  One of, yes.

20   Q.  Around that time you started to adopt your office's         09:44:37

21   policies and procedures to address the illegal immigration

22   issue, is that right?

23   A.  Yes.

24   Q.  You entered into a 287(g) agreement with the federal

25   government to enforce the illegal immigration laws.            09:44:51

A.  In conjunction with two state laws that were passed.

Q.  You also created the Triple I Unit, which later became the Human Smuggling Unit?

A.  Yes.

Q.  You set up a hotline so that people could call in with information about illegal immigrants that they thought they'd found?

09:45:07

A.  Yes.

Q.  And you started doing saturation patrols in order to apprehend illegal aliens, correct?

09:45:18

A.  We started to do employer sanction and human smuggling enforcement.

Q.  And part of that was using saturation patrols.

A.  On occasion, yes.

Q.  Well, up until December 2009 you'd done about 13 of these saturation patrols, correct?

09:45:37

A.  Crime suppression, yes.

Q.  Do you use, or does your department use saturation patrol and crime suppression patrols interchangeably?

A.  Yes.

09:45:57

Q.  You've done more of them since then, correct?

A.  More --

Q.  More saturation patrols since December 2009, is that correct?

A.  Yes.

09:46:05

1    Q.  Your program or your policy is to go after illegal

2    immigrants, but not the crime first, is that right?

3    A.  That's not right.  That is not correct.

4    Q.  You had a press conference in 2007 to announce your illegal

5    immigration efforts, correct?                                    09:46:29

6    A.  I may have.

7    Q.  And you said at that time that your program was a pure

8    program to go after the illegals and not the crime first,

9    correct?

10   A.  The context of that was that we had the 287(g) agreement    09:46:45

11   along with our enforcement of state crimes, and we had the

12   authority under the federal policy to arrest those that are in

13   this country illegally.

14          MR. YOUNG:  Your Honor, I would request that we play

15   Exhibit 410D, which is a portion of the sheriff's statements     09:47:08

16   during that press conference.

17          THE COURT:  Any objection?

18          MR. CASEY:  Your Honor, my understanding -- yes, I --

19   I object that there has not -- it's improper impeachment.  As I

20   understand what he's using it for, the witness has just          09:47:29

21   answered his question.

22          THE COURT:  Well, I'm going to overrule the objection.

23   I'm not sure whether it's entered for impeachment only.  It

24   seems to me that it's not hearsay.  So I'm going to allow it to

25   be played.                                                       09:47:38

```
 1              MR. CASEY:  Thank you, Your Honor.

 2              (Exhibit 410D played as follows.)

 3              "SHERIFF ARPAIO:  Actually, when you look at this

 4    whole situation, the Phoenix Police situation, ours --"

 5              MR. CASEY:  Your Honor, this has not been identified        09:47:53

 6    as an exhibit yet.  It's not been identified whether it's in

 7    evidence, I don't believe, and whether it's --

 8              THE COURT:  So your objection is?

 9              MR. CASEY:  Objection, it's not in evidence.

10              THE COURT:  Is this exhibit in evidence?                   09:48:06

11              MR. YOUNG:  It's been marked.  I'm going to ask him

12    whether this is him, and then I'm going to move it into

13    evidence, Your Honor.

14              THE COURT:  All right.  Then why don't -- all right.

15    Play it.                                                            09:48:14

16              MR. YOUNG:  Could we start from the beginning and

17    maybe the sound level can come down a little bit.

18              (Exhibit 410D played as follows.)

19              "SHERIFF ARPAIO:  Actually, when you look at this

20    whole situation, the Phoenix Police situation, ours is a --        09:48:30

21    a -- a operation, whether it's the state law or the federal, to

22    go after illegals, not the crime first, that they happen to be

23    illegals.  My program, my philosophy is a pure program.  You go

24    after illegals.  I'm not afraid to say that.  And you go after

25    them and you lock them up."                                         09:48:55
```

1  BY MR. YOUNG:

2  Q.  Sheriff, that's you, isn't it?

3  A.  Next to the agent in charge of ICE.

4  Q.  Well, you're the one who's talking in that video, correct?

5  A.  With the agent in charge of ICE.  I don't have the whole          09:49:08

6  video.

7  Q.  Okay.  Well, in what we just saw, you're the only person

8  talking, correct?

9  A.  Yes.

10 Q.  This press conference took place in February 2007 and you         09:49:20

11 made those statements there?

12 A.  According to the video.

13         MR. YOUNG:  Your Honor, I move for admission of

14 Exhibit 410D.

15         THE COURT:  Objection?                                        09:49:31

16         MR. CASEY:  No objection, Your Honor.

17         THE COURT:  Exhibit 410D is admitted.

18         (Exhibit No. 410D is admitted into evidence.)

19 BY MR. YOUNG:

20 Q.  And you have no problems having a pure program where you go       09:49:38

21 after the illegals and not the crime first, correct?

22 A.  I'm going to state again, under the 287(g) agreement when

23 we enforce the laws and stop someone for violating the laws,

24 we -- under that agreement we have the authority to enforce the

25 federal immigration laws, even though they were not connected       09:50:04

1    with any state crime.

2    Q.  Your practice for press releases for major investigations

3    is for them, the press releases, to be passed by you before

4    they are sent out, is that right?

5    A.  I have a public relations director that usually writes the          09:50:33

6    press releases, and on occasion I will review the basics of

7    that press release.

8    Q.  Well, back at your deposition on September 7, 2010, in the

9    Mora case, at page 131, you were asked this question and you

10   gave these an -- this answer, at line 6 of page 131:                    09:51:02

11       "And I wanted to get at your protocol in your

12   department.  Is it routine and customary for any press release

13   to be passed by you before it's sent out?

14       "ANSWER:  It -- if it's a major investigation, the

15   answer is yes, normally.                                                09:51:23

16       "QUESTION:  And then when it's given to you, you may

17   edit it, but ultimately you have to approve what's sent out.

18   Is that fair to say?

19       "ANSWER:  I look at it."

20   A.  Yeah, I do look at certain press releases.                          09:51:38

21   Q.  Please, let's look at PX 328.  Sheriff, can you find that

22   in your binder?

23       MR. CASEY:  I'm sorry, what was the exhibit,

24   Mr. Young?

25       MR. YOUNG:  PX 328.                                                 09:51:55

1          MR. CASEY:  Thank you, sir.

2    BY MR. YOUNG:

3    Q.  Each tab has a number on the side starting with PX.  And

4    then there's a cover sheet with a little number on it and then

5    you can flip to the next page.                                     09:52:24

6          Are you looking at your office's July 20, 2007, press

7    release, sheriff?

8    A.  You're talking about 328?

9    Q.  Yes.

10   A.  That's the July 20.                                            09:52:40

11   Q.  Correct.  It's the one that has the headline:  Sheriff's

12   Crackdown on Illegal Immigration Heats Up.

13         Do you see that?

14   A.  Yes.

15   Q.  And underneath that it says:  Hundreds of                      09:52:53

16   deputies/volunteer posse targeting profile vehicles.  You see

17   that?

18   A.  Yes.

19   Q.  The purpose of that press release was to let the public and

20   your constituents know your position and actions relating to      09:53:06

21   the issue of illegal immigration, correct?

22   A.  Yes.

23   Q.  The quoted statements reflect your views, is that right?

24   A.  There are some quotes and some that are not quoted, and as

25   I said before, I have public information officers that prepare     09:53:35

1    press releases.

2    Q.  On the second page, the third bullet point, it says you

3    announced a dedicated hotline for citizens to call in with

4    information or evidence about illegal aliens.  You did that at

5    that time, right?                                              09:53:55

6    A.  Yes.

7    Q.  Then at the bottom it says, and this is in quotations

8    attributed to you, quote:  "We are quickly becoming a

9    full-fledged anti-illegal immigration agency," end quote.

10         Those are your words?                                    09:54:12

11   A.  Yes, as re -- as reference to two state laws, and the

12   authority from the federal government to enforce illegal

13   immigrant laws, so we did have a unit to perform those duties.

14   It wasn't the whole agency working on immigration.

15   Q.  Is that statement still true, that is, is your office still  09:54:40

16   a full-fledged anti-illegal immigration agency?

17   A.  We are not a full-fledged agency.  We have units to perform

18   those duties along with homicide and many other duties.

19   Q.  But you had the tools, and by July 2007 you developed the

20   tools, the money, and the training to concentrate on the       09:55:04

21   specific problem of illegal immigration, is that right?

22   A.  Yes.  Yes.

23   Q.  And in discussing -- in discussing all those changes that

24   we've been talking about in the 2006-2007 time frame, you said

25   the following at the bottom of the press release on the second  09:55:22

1    page:  We have heard the people speak, we understand their

2    frustration, and will continue to do all that we can do to

3    reduce the number of illegal aliens making their way into the

4    United States and Maricopa County.

5            Was that your feeling at the time?                      09:55:40

6    A.  Yes.

7    Q.  Is it still your feeling today?

8    A.  Yes.

9    Q.  Were you here in the courtroom -- were you here in the

10   courtroom on Thursday, when David Vasquez testified about what    09:55:57

11   he thought was being stopped for driving while brown in Mesa

12   during one of your operations there?

13   A.  Was I in this courtroom?  No.

14   Q.  That's my question.  Did you hear about his testimony?

15   A.  No.                                                          09:56:14

16   Q.  So you don't have any basis to comment on his testimony one

17   way or the other?

18   A.  That's correct.

19   Q.  Even assuming that the officer sees the cracked windshield,

20   a violation for one is a highly discretionary decision by your    09:56:27

21   officers, correct?

22   A.  That's up to the individual officer.

23           MR. YOUNG:  Let's put PX 183.  Before you can find

24   that, it's been admitted into evidence so we can publish it.

25           THE COURT:  Would you repeat that exhibit again,         09:56:46

1    please?

2              MR. YOUNG:  183, PX 183.

3              THE COURT:  Thank you.

4              Has that been admitted into evidence?  I'm sorry.

5              MR. YOUNG:  Yes, it has, Your Honor.                    09:56:59

6    BY MR. YOUNG:

7    Q.  PX 183 is another press release from your office dated

8    April 5, 2008.  Do you see that?

9    A.  Yes.

10   Q.  And it announces a Guadalupe crime suppression operation   09:57:11

11   being complete?

12   A.  Yes.

13   Q.  And you say in that press release that Mayor Gordon -- and

14   I refer you to the fourth paragraph about in the middle of the

15   page -- Mayor Gordon says that you arrest brown-skinned people  09:57:27

16   for driving with cracked windshields.

17             Do you see that?

18   A.  Yes.

19   Q.  Now, you disagreed with that statement at the time, right?

20   A.  Yes.                                                        09:57:42

21   Q.  And your statement at the time, if you go toward the

22   bottom, third paragraph from the bottom, was that Gordon's --

23   and you also mention Mayor Jimenez's -- pro-illegal alien

24   comments and actions to prevent this sheriff from enforcing

25   state and immigration laws within their cities will not deter   09:58:04

1    me from enforcing the law.

2            Was that your feeling at the time?

3    A.  Yes.

4    Q.  Is that your feeling today?

5            Notice, I know they're --                                   09:58:16

6    A.  They're no longer there, so I can't answer that.

7    Q.  All right.  But you feel today that their comments then

8    were pro-illegal alien comments, is that right?

9    A.  It's a matter of conjecture.

10   Q.  Well, you made this statement, or at least your office put   09:58:34

11   this statement out that's attributed to you.  You said that

12   Mayors Gordon and Jimenez were making pro-illegal alien

13   comments, is that correct?

14   A.  Yes.

15   Q.  Now, when Mayor Gordon accused you of going after            09:58:49

16   brown-skinned people for driving with cracked windshields, you

17   thought he was talking about illegal immigrants, is that right?

18   A.  I'm not sure what he was talking about.  He's made many,

19   many comments that were not accurate.

20           However, you will see that we arrested 50 people for    09:59:15

21   warrants and no connections, many of those with illegal

22   immigration.  So this was a crime suppression operation in

23   Guadalupe that I'm responsible for as the law enforcement

24   agency in that area.

25   Q.  I'm looking at what your press release describes Mayor       09:59:37

```
 1   Gordon as saying, and what your press release says in that
 2   fourth paragraph is:  Mayor Gordon and other critics have
 3   accused the sheriff's volunteer posse and deputies of arresting
 4   brown-skinned people for driving with cracked windshields.
 5          Do you see that sentence?                              09:59:56
 6   A.  That's his allegations.
 7   Q.  There's nothing in here about illegal aliens, correct?
 8   A.  This is what the former mayor is saying.
 9   Q.  Okay.  The former mayor is saying that you should not
10   arrest brown-skinned people for driving with cracked           10:00:15
11   windshields, right?  That's what your press release --
12   A.  That's what he is saying.
13   Q.  Okay.  And your press release is reporting what he was
14   saying, right?
15   A.  Yes.                                                       10:00:27
16   Q.  And then your reaction was that that's a pro-illegal alien
17   comment.
18          MR. CASEY:  Your Honor, for completeness purposes I
19   request that the witness be shown paragraph number 4, where
20   there's a reference to --                                      10:00:37
21          THE COURT:  You know what?
22          MR. YOUNG:  Your Honor --
23          MR. CASEY:  Your Honor --
24          THE COURT:  I'm going to overrule your objection.  I
25   will look at paragraph 4.                                      10:00:43
```

```
 1              MR. CASEY:  Thank you, Your Honor.

 2              The second sentence of paragraph 4, Your Honor.

 3              THE COURT:  I think that you can ask him that on

 4    cross-examination --

 5              MR. CASEY:  Thank you, Your Honor.                    10:00:53

 6              THE COURT:  -- if you wish to do so.

 7              MR. YOUNG:  And I think that would be the proper way

 8    to do it, Your Honor.

 9              MR. CASEY:  And I move to strike counsel's comment

10    about --                                                       10:00:58

11              THE COURT:  All right.  We're not going to enter into

12    this kind of bickering back and forth.  Please, if you have

13    objections and comments about objections, you make them in one

14    or two words and I'll make the ruling.

15              MR. YOUNG:  Thank you, Your Honor.                    10:01:09

16    BY MR. YOUNG:

17    Q.  Sheriff, you have the whole press release in front of you.

18    You're free to read whatever you want to in it.

19              My question is:  Your response to Mayor Gordon's

20    criticism that you were arresting brown-skinned people for     10:01:25

21    driving with cracked windshields was that that was a

22    pro-illegal alien comment, correct?

23    A.  If you look at my quotes, I'm stating that we enforce all

24    the laws, including illegal immigration, and many arrests were

25    made of criminals with outstanding warrants.                   10:01:49
```

1    Q.  And a lot of them with brown skin, correct?

2    A.  I don't really know what color their skin was.

3    Q.  Okay.  Well, for purposes of this press release, you were

4    treating brown-skinned people to be the same as illegal aliens.

5         Do you agree with that?                                    10:02:11

6    A.  No, I don't.

7    Q.  Did you deny in your press release, anywhere in your press

8    release did you deny Mayor Gordon's accusation that you and

9    your department were arresting brown-skinned people for driving

10   with cracked windshields?                                       10:02:31

11   A.  I'm not sure if I denied it in this press release.  It

12   could have been denied in other media venues.

13   Q.  I took your deposition on November 16, 2010, Sheriff, and

14   I'm going to read to you a part of it from page 248, lines 10

15   through 20.                                                     10:02:56

16        "QUESTION:  Well, your press release says that it's

17   clear he doesn't like --"

18        That's referring to Mayor Gordon.

19        "-- doesn't like what he says is your 'arresting

20   brown-skinned people for driving with cracked windshields.'  Do  10:03:10

21   you disagree with him about that?"

22        And you answered:  "Of course I do.  That's a very

23   strong, slanderous-type remark.

24        "QUESTION:  Is there anything in this press release

25   where you deny the accusation that your volunteer posse and      10:03:22

1    deputies arrest brown-skinned people for driving with cracked

2    windshields?

3              "ANSWER:  No."

4              Then there's an objection, and then you go on:

5              "This is just a press release regarding an operation,    10:03:38

6    and it was prepared by my public relations staff.  And I looked

7    at it."

8    A.  I'm trying to -- was that 248?

9    Q.  I was reading from your November 16, 2010, deposition,

10   which is in the other binder if you want to look at it.    10:03:55

11             Sheriff, I actually don't have any further questions

12   on this issue.  We can move on unless --

13   A.  Okay.

14   Q.  -- you want to look at it.

15             You thought that because Mayor Gordon was advocating    10:04:24

16   the rights of brown-skinned people that he was being

17   pro-illegal alien, is that right?

18   A.  Could you repeat that question, please?

19   Q.  Let me break it up.

20             Your understanding as reflected in this press release    10:04:40

21   was that Mayor Gordon was advocating the rights of

22   brown-skinned people, right?

23   A.  No.

24   Q.  You didn't think that he was advocating the rights of

25   brown-skinned people?    10:04:52

1    A.  You know, I can't read his mind what he was advocating, and

2    once again, I didn't prepare this complete press release.

3    Q.  All right.  But you -- you agreed with the press release

4    and probably read it and approved it at the time it went out,

5    correct?                                                          10:05:16

6    A.  Sometimes I read every line; sometimes I just breeze over

7    it.

8    Q.  Well, you said in your press release that Mayor Gordon was

9    accusing you of arresting brown-skinned people for driving with

10   cracked windshields.  That's right.                              10:05:31

11   A.  Yes.

12   Q.  And you thought that because of that criticism, he was

13   making pro-illegal alien comments, is that right?

14   A.  At the time that could be possible.

15   Q.  Let's go to Exhibit PX 353.                                  10:05:53

16          Actually, before we go there -- before we go there,

17   you thought that Mayor Gordon, in making the statements that he

18   was making, was encouraging civil unrest against the sheriff

19   and his deputies, is that right?

20   A.  That was possible.                                           10:06:16

21   Q.  Okay.  Isn't that what you thought at the time, that his

22   saying that you should not be arresting brown-skinned people

23   for driving with cracked windshields would encourage civil

24   unrest against your department?

25   A.  You know, I don't arrest people on these operations; my      10:06:29

1   deputies and my staff that runs the operations.  I don't get

2   involved in these operations.  I'm not there on the street

3   patrolling and making arrests.

4   Q.  All right.  I'm -- I'm going to ask you to take a look at

5   your November 16, 2010, deposition in this case, and why don't        10:06:52

6   we put this on the screen.  It's page 247, line 8, and going

7   down to line 20.

8            Sheriff, you were asked at that time:

9            "QUESTION:  So you think that when Mayor Gordon

10  criticizes you for arresting brown-skinned people for driving        10:07:18

11  with cracked windshields, that he's making a pro-illegal alien

12  comment?"

13           Actually, we went over that already.

14           Page 251.

15           Question at line 5, page 251:  "Do you think that when      10:07:36

16  Mayor Gordon and other critics accuse your department of

17  arresting brown-skinned people for driving with cracked

18  windshields, that they are, as you say in your press release,

19  'encouraging civil unrest against the sheriff and his

20  deputies'?                                                            10:07:53

21           "ANSWER:  Yes."

22           That was your feeling at the time, correct?

23  A.  Yes, because we do not arrest people because of the color

24  of their skin.  And he's making those allegations, the way I

25  read it.                                                              10:08:09

1    Q.  Now, let's go to PX 353, which has been admitted.

2        Exhibit 353 is another press release from your office,

3    Sheriff, about the issue of swine flu.

4        You see that on your screen?

5    A.  Yes.                                                          10:08:30

6    Q.  And the first sentence of that press release is a statement

7    attributed to you that says that:  It is estimated that over

8    90 percent of all illegal aliens arrested by the anti-human

9    smuggling unit come from areas south of Mexico City where the

10   swine flu has already killed nearly 150 people.                  10:08:50

11       You see that?

12   A.  Yes.

13   Q.  You authorized your office to issue that statement?

14   A.  Yes.  Yes.

15   Q.  Do you have any proof of that claim?                         10:09:03

16   A.  Well, we were concerned with the people incarcerated in our

17   jails because of this epidemic in Mexico, and I believe we show

18   that a high percentage of the people that are in our jails came

19   from south of Mexico City.

20   Q.  You have no proof for the statement that's made in your      10:09:34

21   press release, is that correct?

22   A.  Yes, we'd talked to all the inmates from Mexico that were

23   incarcerated, and the majority said they did come from south of

24   Mexico City.

25   Q.  Did any of them have swine flu?                              10:09:54

1    A.  Not that I know of, but we were concerned.

2    Q.  You were trying to associate people from Mexico with

3    disease.  Isn't that what you were doing?

4    A.  No, I was just being concerned about illegal immigrants

5    coming across the border that may be carrying the swine flu,

6    since they're not going through the checkpoints.

7    Q.  You've called illegal immigrants dirty in the past, is that

8    right?

9    A.  I think on the context that I said that was when you cross

10    the border illegally and cross the desert, sometimes for days,

11    that you are heated, you could be dirty after four days in the

12    desert, and that was the context how I used that word.

13    Q.  Let's go to PX 396.  That's been admitted, so we can

14    publish it.

15        Sheriff, in 2008 you published this book, Joe's Law,

16    America's Toughest Sheriff Takes on Illegal Immigration, Drugs,

17    and Everything Else That Threatens America?

18    A.  That was with my co-editor.

19    Q.  You dictated it into a tape-recorder, is that right?

20    A.  Much of it.

21    Q.  And then your co-author gave you background and you

22    repeated it, is that right?

23    A.  He may have made some of his own comments.

24    Q.  Well, you wrote the book, correct?

25    A.  In conjunction with the co-author.

10:10:14

10:10:32

10:11:05

10:11:28

10:11:45

1    Q.  In your deposition in the Mora case on September 7, 2010,

2    at page 232, lines 15 to 21, you testified as follows, starting

3    at line 15:

4         "It is to ask now, have you read it?

5         "ANSWER:  No.  I dictated the subject matter working          10:12:20

6    with my co-author.  So I already knew about the book.  Why do I

7    have to read it again?  I mean, I wrote the book.  So I don't

8    have to read it again.  So when I say I didn't read the book, I

9    don't have to read the book."

10        Was that testimony truthful at that time?                     10:12:41

11   A.  Which is very confusing.  I don't understand your question.

12   But are you saying that I didn't read the book again?

13   Q.  No, I'm saying that you wrote the book, so at the time you

14   said you didn't have to read it again, that's what you

15   testified to in September 2010, is that right?                     10:12:59

16   A.  Yes.

17   Q.  And now let's look at the book.  On page 48 -- and again,

18   we're looking at PX 396 -- you wrote, quote:  All other

19   immigrants, exclusive of those from Mexico, hold to certain

20   hopes and truths.                                                  10:13:27

21        Do you see that?

22   A.  What paragraph are you referring to?

23   Q.  Yeah, let me apologize here.  It's the -- the third

24   paragraph from the top, and it's the paragraph that begins:

25   There were other differences as well.                             10:13:46

1          You see that sentence?

2   A.  Yes.

3   Q.  And you're referring to your parents there, right?

4   A.  Yes.

5   Q.  And you said that they, like all other immigrants exclusive

6   of those from Mexico, held to certain hopes and truths, is that

7   right?

8   A.  Once again I will say that my co-author wrote much of the

9   items you're reading.

10  Q.  Now, you're saying in that paragraph -- or your book,

11  anyway, is saying in that paragraph -- that immigrants from all

12  over the world, except those from Mexico, hold to the hopes and

13  truths that your own parents came to this country with.

14          Is that a fair reading of what that paragraph says?

15  A.  What paragraph are you talking about?

16  Q.  The paragraph that's on your screen that says, quote, My

17  parents, like all other immigrants exclusive of those from

18  Mexico, held to certain hopes and truths.

19          A fair reading of that is that immigrants from

20  everywhere else in the world -- Italy, China, anywhere else

21  other than Mexico -- hold to the same hopes and truths that

22  your parents held when they came here.

23          Is that a fair reading of that paragraph?

24  A.  I believe that the co-author was talking about the

25  proximity of Mexico and the United States, where many that came

10:14:00

10:14:22

10:14:43

10:15:04

10:15:26

1    over went back to Mexico versus Italy, where my parents came

2    from.

3    Q.  Sheriff, can you give me a yes or no answer to that

4    question?

5    A.  I'm trying to explain it.                          10:15:41

6    Q.  Well, do you have a yes or no answer to my question?

7    A.  Can you repeat the question again?

8    Q.  My question is:  Is it a fair reading of that sentence in

9    your book that says, My parents, like all other immigrants

10   exclusive of those from Mexico, held to certain hopes and     10:15:54

11   truths, that it's saying that immigrants from other places in

12   the world have the same hopes and truths that your parents had,

13   but the people who came here from Mexico do not?

14   A.  Well, that's not fair.  The people from Mexico had the same

15   hopes and enthusiasm for coming into the United States.        10:16:17

16   Q.  You think that people who come here from Mexico, and who

17   have come here from Mexico, come here in search of the same

18   freedoms and opportunities in America that other people have

19   come to America for during its long history?

20   A.  Yes, I do.                                          10:16:41

21   Q.  Would you agree with me that the American dream is for

22   everyone?

23   A.  Yes.

24   Q.  But on that same page -- again, looking down in the

25   paragraph that starts number 2 -- you say in your book that    10:16:59

1    there's a growing -- quote, growing movement among not only

2    Mexican nationals but also some Mexican Americans -- and I'm

3    paraphrasing here a little bit -- who contend that the United

4    States stole the territory that is now California, Arizona, and

5    Texas, for a start, and that massive immigration over the          10:17:21

6    border will speed and guaranty the reconquista of those lands

7    returning them to Mexico.

8           Do you see that?

9    A.  Yes.

10   Q.  You put that into your book, right?                            10:17:35

11   A.  Once again, my co-author wrote them.

12   Q.  Okay.  Is that your view?

13   A.  No, it isn't.

14   Q.  Then on the next page, page 49 of your book, the paragraph

15   at the top, you talk about how second and third generations of    10:17:54

16   Mexican immigrants have maintained identities from language to

17   customs to beliefs separate from the American mainstream.

18          Do you see that language?

19   A.  Yes.

20   Q.  That's -- that's in your book, right?                         10:18:16

21   A.  Yes.

22   Q.  You think that those whose ancestors came from Mexico,

23   second- and third-generation Mexican Americans, are not part of

24   the American mainstream?

25   A.  No.  They are.  I think we're referring to Italian            10:18:40

1   neighborhoods, Irish neighborhoods seem to congregate sometimes

2   in one area.  That may be what my co-author was talking about.

3   Q.  Well, do you believe that people who lived in Italian

4   neighborhoods of certain cities in the United States are not

5   part of the American mainstream?                                    10:19:01

6   A.  No, they are part of -- of our country.

7   Q.  You say that second and third generations of Mexican

8   immigrants, with respect to language and customs and beliefs,

9   are, quote, separate from the American mainstream, end quote.

10          Is that a fair reading of this section of your book?       10:19:21

11  A.  Once again, I didn't write this; my co-author wrote it.

12  Q.  In this book you talk about a lot of things that you do in

13  your official capacity as sheriff, correct?

14  A.  Yes.

15  Q.  And in fact, there isn't really a very firm line between      10:19:36

16  what's in your book and what you do in your official capacity,

17  is that right?

18  A.  I don't understand the question.

19  Q.  Well, there are things --

20          THE COURT:  Do you know what, Mr. Young?  It's about      10:19:53

21  time for morning break.  For some reason your microphone's not

22  working.  I'm going to get our -- I'm going to take a morning

23  break and get our --

24          MR. YOUNG:  Oh, okay.  I think I've been pressing the

25  button here, but I'll try not to do that in the future.           10:20:03

1              THE COURT:  All right.  Well, if that's the problem

2      that's a relief, but it's about time for morning break, anyway.

3              Mr. Casey, did you have a matter?

4              MR. CASEY:  I was just going to say that's the problem

5      I've had, is pressing the button inadvertently.                    10:20:14

6              THE COURT:  All right.  Well, thanks for pointing that

7      out.

8              We are, nonetheless, going to take the morning break.

9      I'm going to ask everybody to be back in the courtroom ready to

10     proceed at 25 minutes to 11:00.  We're now in recess.             10:20:24

11             (Recess taken.)

12             THE COURT:  Thank you.  Please be seated.

13             Mr. Young, you ready to resume?

14             MR. YOUNG:  Yes, Your Honor.

15             THE COURT:  Please do so.                                  10:37:18

16     BY MR. YOUNG:

17     Q.  Sheriff, before the publication of your book you briefly

18     looked at the whole manuscript, correct?

19     A.  I don't know if it was the whole manuscript, but I did look

20     at some of it.                                                    10:37:34

21     Q.  Well, in your deposition on December 4, 2009, in the Lopez

22     Valenzuela case, at page 34, line 24, you were asked this

23     question:  "Did you review the whole manuscript before the book

24     was published?"

25             And on page 35 at line 1 you answered:  "I briefly        10:37:55

1    looked at it, yes."

2          Is that right?

3    A.  It may not have been every line of the manuscript, but in

4    general terms I looked at it.

5    Q.  You signed off on the publication of the book, correct?          10:38:20

6    A.  Yes.

7    Q.  And you have no interest in changing the book in, say, a

8    second edition, to edit any of the things that are in it that

9    we just looked at, is that right?

10   A.  I'm not looking towards another book.                           10:38:34

11   Q.  When you looked at those sections in 2009 and since that

12   time, you haven't changed anything in that book, is that right?

13   A.  That's correct.

14   Q.  You've done book signings for your book?

15   A.  I believe when it first came out I did some book signings.      10:38:49

16   Q.  You did one at Barnes & Noble in Happy Valley on May 20,

17   2008?

18   A.  I may have.

19   Q.  And another one at Barnes & Noble in Palm Valley on May 31,

20   2008?                                                               10:39:04

21   A.  I don't know the exact time, but I may have.

22   Q.  Then another one at -- in Arrowhead at another Barnes &

23   Noble on June 18, 2008?

24   A.  May have.

25   Q.  Then at Borders on July 26, 2008?                               10:39:14

1    A.  May have.

2    Q.  And you've done four or five national media interviews

3    about your book, Joe's Law, correct?

4    A.  Yes, when it first came out.

5    Q.  You went on night talk with Mike Schneider, New York          10:39:29

6    Bloomberg TV, and Neil Cavuto on Fox TV, is that right?

7    A.  The best of my recollection.

8    Q.  And you did a book interview on June 4, 2008, with Fox

9    News, on June 4, 2008, is that right?

10   A.  I may have.                                                    10:39:48

11   Q.  You did one with Mike Savage on his radio show on June 13,

12   2008?

13   A.  May have.

14   Q.  At any of those book signings or interviews you've never

15   told anyone that the opinions in your book were not your          10:40:03

16   opinions, is that right?

17   A.  I don't think I said it either way.  They didn't -- write

18   on our front cover that I had a co-author.

19   Q.  Right, but at the signings and at the interviews you never

20   told the people that you were talking to that there were          10:40:22

21   opinions in the book that were not yours, is that right?

22   A.  I don't recall.

23   Q.  Your November 16, 2010, deposition, at page 240 you were

24   asked this question.  And we can pull that up on the screen,

25   page 240, line 25:                                                10:40:46

1              "At any of your interviews or at book signings, did

2       you ever tell any of the people you talked to about your book

3       that there are opinions in the book that are not yours?

4              " ANSWER:  I don't recall saying that to any groups

5       that I talked to, unless they asked."                           10:41:07

6              Now, it would be fair to assume, Sheriff, that the

7       people who buy and read your book believe that the opinions in

8       it about illegal immigration are your opinions, is that right?

9       A.  No, that's up to -- that's their -- would be their opinion.

10      Once again, it's in front page, back page, about my co-author.   10:41:29

11             MR. YOUNG:  All right.  We're going to play something

12      from your deposition.  It's at November 16, 2010, page 243,

13      lines 4 through 12.

14             Can we play JA4.

15             (Video clip played as follows:)                           10:41:45

16             "QUESTION:  I'm asking what you think, Sheriff.  Do

17      you think that the people who bought and read your book believe

18      that the opinions in it on illegal immigration are your

19      opinions?

20             "ANSWER:  I have no idea, but I would surmise that        10:42:08

21      they do as I'm very outspoken on the subject, book or no book.

22      I average two speeches a day for 18 years.  I don't prepare

23      speeches.  So I think everybody knows where I stand, book or no

24      book."

25      BY MR. YOUNG:                                                    10:42:29

1   Q.  Sheriff, some people have compared you to the Klu Klux

2   Klan, is that right?

3   A.  I guess among other nasty claims, too.

4   Q.  The Klu Klux Klan, or the KKK, is a racist organization

5   that's lynched people who belong to minority groups, is that          10:42:47

6   right?

7   A.  Yes.

8   Q.  You think it's an honor to be called KK, don't you?

9   A.  No, I do not.

10  Q.  Let's run an interview that you did with Lou Dobbs.  It's         10:43:00

11  impeachment Exhibit PX 451.  And I'm going to ask you to look

12  at this video, Sheriff, and tell me whether that's you saying

13  what's on it.

14          MR. CASEY:  I'm sorry, Your Honor, what was the

15  exhibit?                                                             10:43:21

16          THE COURT:  Impeachment Exhibit 451.

17          (Video clip played as follows:)

18          "LOU DOBBS:  The idea that you're criticized in some

19  quarter -- in some quarters for enforcing the law, I mean,

20  what -- how do you react to that?                                    10:43:33

21          "SHERIFF ARPAIO:  Well, you know, they call you KKK,

22  they did me.  I think it's a honor, right?

23          "LOU DOBBS:  Right (unintelligible).

24          "SHERIFF ARPAIO:  Means we're doing something."

25  BY MR. YOUNG:                                                        10:43:44

Q.  That's you talking to Lou Dobbs, Sheriff, is that right?

A.  Just before that live interview I was asked about the KKK, and I was very adamant that I have no use for the KKK.  And then they did the live.  And the only thing I was saying to Lou Dobbs, that he's taken a lot of heat, and that they're using the KKK, and I was referring to the fact, well, with all the heat you're taking, Lou, look what they're doing to you.

So prior to that I had a taped interview in front of the jail denouncing the KKK but they never showed that; they just showed this part.

MR. YOUNG:  Your Honor, I'm going to move to strike that answer as nonresponsive.

BY MR. YOUNG:

Q.  My question, Sheriff, was:  Is that you in the video?

MR. YOUNG:  Your Honor, may I --

THE COURT:  You've made your motion.  I'm going to take a look.  Just a second.

(Pause in proceedings.)

THE COURT:  Okay.  I'm going to strike the response and ask the witness to answer the question.

THE WITNESS:  That is me.

MR. YOUNG:  Your Honor, I move to admit PX 451.

THE COURT:  Objection?

MR. CASEY:  No objection, Your Honor.

THE COURT:  PX 451 is admitted.

1              (Exhibit No. PX 451 is admitted into evidence.)

2    BY MR. YOUNG:

3    Q.  Now, you told Lou Dobbs that being called KKK means you're

4    doing something.  What you were referring to includes your

5    saturation patrol activities, correct?                                    10:45:16

6    A.  No.

7    Q.  Includes your creation of the HSU?

8    A.  No.

9    Q.  Your call-in line?

10   A.  No.                                                                    10:45:22

11   Q.  You think it's proper to consider the fact, in devising

12   your policies, that illegal immigrants in the overwhelming

13   majority in Maricopa County come from Mexico, is that right?

14   A.  Yes.

15   Q.  You think that 99 percent of them come from Mexico, is that    10:45:44

16   right?

17   A.  I don't have the statistics.

18         MR. YOUNG:  Let's play another video, PX 357, from

19   October 22, 2009, an NBC 12 story about you.

20         (Video clip played as follows:)                                     10:45:58

21         "SHERIFF ARPAIO:  It's not politically correct to say

22   this.  Where do you think 99 percent of the people come from?

23   We happen to be next to the border.  I mean, I would love -- we

24   did catch four Chinese people."

25   BY MR. YOUNG:                                                             10:46:22

```
 1   Q.  Sheriff, that's you talking at a press conference, correct?

 2   A.  Yes.  I don't know if it was a press conference, but that's

 3   me talking.

 4   Q.  That's you talking.

 5   A.  Yes.                                                           10:46:31

 6           MR. YOUNG:  Judge, can we admit PX 357?

 7           MR. CASEY:  No objection, Your Honor.

 8           THE COURT:  PX 357's admitted.

 9           (Exhibit No. PX 357 is admitted into evidence.)

10   BY MR. YOUNG:                                                      10:46:44

11   Q.  You believe that the illegal immigrants coming into

12   Maricopa County have certain appearances, is that right?

13   A.  Certain appearances?

14   Q.  That was my question.

15   A.  No.                                                           10:46:55

16   Q.  You don't believe they have certain appearances?

17   A.  No.

18   Q.  Do you believe that the appearances of the illegal

19   immigrants coming into Maricopa County are readily observable?

20   A.  No.                                                           10:47:07

21   Q.  Do you believe that the appearances of illegal immigrants

22   coming into Maricopa County include brown skin color?

23   A.  No.

24           MR. YOUNG:  You were deposed on December 6 -- November

25   16 -- no, December 16, 2009, on page 11, lines 1 through 9, and   10:47:23
```

1    I'm going to ask that that video be played, JA2.

2            (Video clip played as follows:)

3            "QUESTION:  In your experience, by and large, do the

4    Mexicans, the illegal immigrants who come into Arizona have

5    brown skin?                                                          10:47:50

6            "ANSWER:  Well, if you are talking about the

7    Hispanics, as a rule how they get here, yes, they do have

8    certain appearances.

9            "QUESTION:  And those appearances are readily

10   observable, skin color?                                              10:48:04

11           "ANSWER:  Yeah."

12   BY MR. YOUNG:

13   Q.  In fact, your office believes that you can figure out who

14   an illegal immigrant is by their speech and the clothes they

15   wear, is that right?                                                 10:48:20

16   A.  There's other criteria.  If you're talking about the people

17   being smuggled into the -- Maricopa County from Mexico, they're

18   illegally crossing the border.

19   Q.  But you can tell, at least in part, from their appearance,

20   their speech, and the clothes they wear, that they're illegal       10:48:43

21   immigrants, in your view, is that right?

22   A.  These are criteria that the ICE, federal government, has.

23   Q.  You were interviewed by John Sanchez on CNN back in 2009,

24   is that right?

25   A.  Yes.                                                            10:49:04

```
 1                 MR. YOUNG:  I'm going to play PX 410A for you.  Please
 2       take a look.
 3                 (Video clip played as follows:)
 4                 "JOHN SANCHEZ:  But you just said you detain people
 5       who haven't committed a crime.  How do you prove that they're     10:49:18
 6       not illegal?
 7                 "SHERIFF ARPAIO:  It has to do with their conduct,
 8       what type of clothes they're wearing, their speech.  They admit
 9       it.  They -- they have phony ID's.  A lot of variables
10       involved.                                                         10:49:33
11                 "JOHN SANCHEZ:  You judge people and arrest them based
12       on their speech and the clothes that they're wearing, sir?
13                 "SHERIFF ARPAIO:  Well, when they're in a vehicle with
14       someone that has committed a crime, we have the right to talk
15       to those people.  When they admit they are here illegally, we     10:49:43
16       take action.
17                 "JOHN SANCHEZ:  But you just told me -- let's go back
18       here.  You just told me that you arrest a people and turn them
19       over to the feds even if they haven't committed a crime.
20                 "SHERIFF ARPAIO:  The federal -- no, they did commit a   10:49:58
21       crime.  They are here illegally.
22                 "JOHN SANCHEZ:  But how did you know they were here
23       illegally?  And then you went on to tell me it's because of the
24       clothes they wore.
25                 "SHERIFF ARPAIO:  Well, you look at the federal law.     10:50:07
```

1   The federal law specifies it's the speech, the clothes, the

2   environment, the erratic behavior.  It's right in the law."

3   BY MR. YOUNG:

4   Q.  That's you talking --

5   A.  Yes.                                                          10:50:19

6   Q.  -- in that video, correct?

7   A.  Yes.

8          MR. YOUNG:  Your Honor, I move the admission of

9   PX 410A.

10         MR. CASEY:  No objection, Your Honor.                     10:50:28

11         THE COURT:  Exhibit 410A is admitted.

12         (Exhibit No. PX 410A is admitted into evidence.)

13  BY MR. YOUNG:

14  Q.  Sheriff, you also believe that you can tell who an illegal

15  immigrants is by the way they look if they look like they came  10:50:37

16  from another country, is that right?

17  A.  That's not right.

18  Q.  You did another interview in 2009 with Glenn Beck on Fox

19  News, correct?

20  A.  May have.                                                    10:50:52

21         MR. YOUNG:  Let's play PX 410B.

22         (Video clip played as follows:)

23         "GLENN BECK:  I'm trying to understand this.  They

24  said that you can't enforce the federal law, so how are you

25  going to enforce it and still be a man of your word?             10:51:06

1          "SHERIFF ARPAIO:  Because I'm going to enforce the

2     state laws, and there is a federal law that they don't seem to

3     understand is there --

4          "GLENN BECK:  Which is?

5          "SHERIFF ARPAIO:  -- that I will enforce also.          10:51:19

6          "GLENN BECK:  Which is what?

7          "SHERIFF ARPAIO:  Which is if local law enforcement

8     comes across some people that have a erratic or scared or

9     whatever --

10         "GLENN BECK:  Demeanor?                                 10:51:32

11         "SHERIFF ARPAIO:  They're worried --

12         "GLENN BECK:  Yeah.

13         "SHERIFF ARPAIO:  -- and that they have their speech,

14    what they look like, if they just look like they came from

15    another country, we can take care of that situation.  But I    10:51:40

16    don't need that anyway, Glenn.

17         "GLENN BECK:  Wait.  Wait.  Wait.  Hang on.  Hang on.

18         "SHERIFF ARPAIO:  I can still do the job.

19         "GLENN BECK:  When was that -- when was that law

20    written?  Because all I hear about is that sounds like         10:51:54

21    profiling, and the government is saying --

22         "SHERIFF ARPAIO:  Well --

23         "GLENN BECK:  -- you can't profile anybody.

24         "SHERIFF ARPAIO:  Well, that law in 1996, part of

25    the -- the comprehensive law that was passed, it's in there."  10:52:04

```
 1   BY MR. YOUNG:

 2   Q.  That's you, Sheriff --

 3   A.  Yes.

 4   Q.  -- correct?

 5   A.  Yes.                                              10:52:12

 6   Q.  You don't have any reason to believe that your words in

 7   that interview were altered, is that right?

 8   A.  I don't know.

 9           MR. YOUNG:  Your Honor, I move to admit 410B.

10           MR. CASEY:  No objection, Your Honor.         10:52:27

11           THE COURT:  410B is admitted.

12           (Exhibit No. 410B is admitted into evidence.)

13   BY MR. YOUNG:

14   Q.  You think that someone without identification who looks

15   like they just came from Mexico is an illegal alien, is that  10:52:35

16   right, Sheriff?

17   A.  No.

18           MR. YOUNG:  Let's play PX 410C, which is a KPHO News

19   item.

20           (Video clip played as follows:)             10:52:48

21           "SHERIFF ARPAIO:  And certain criteria, there's no

22   identification, look like just came from Mexico, and they admit

23   it, so that's enough."

24   BY MR. YOUNG:

25   Q.  Sheriff, that's also you, correct?               10:53:00
```

```
 1    A.  Yes.

 2              MR. YOUNG:  Your Honor, I move the admission of

 3    PX 410C.

 4              MR. CASEY:  No objection, Your Honor.

 5              THE COURT:  410C is admitted.                    10:53:09

 6              (Exhibit No. 410C is admitted into evidence.)

 7    BY MR. YOUNG:

 8    Q.  If someone tells one of your officers that he or she is

 9    a U.S. citizen, they tell one of your officers, "I'm a

10    citizen," in your view, that's not enough to avoid the need for  10:53:25

11    your officer to do more to investigate the citizenship of that

12    person, is that right?

13    A.  You know, I delegate these operations to my staff and my

14    officers.  I don't get involved in their activities.  They make

15    the decision on how to pursue and enforce these and other laws.  10:53:48

16    Q.  Well, your view is that even if someone says they're a

17    citizen, your officer should check them out, right, that you

18    think that's good law enforcement?

19    A.  That's not my view.  Once again, I said that I delegate

20    these operations to my well-trained, professional staff and    10:54:11

21    deputies, and they make the decision.

22    Q.  All right.  Well, let's take a look at your deposition from

23    the Mora case on September 7, 2010, page 184.  And I'm going to

24    read this section, and you can follow along on the screen if

25    you'd like.                                                    10:54:34
```

1              "I'm asking you to please assume that we already know

2    they're not suspects.  Assume that's true.  Also assume we know

3    that the person is a U.S. citizen or legally in the country.

4              "As to those people, if you assume you've got a group

5    of people like that, do you have any concern with your deputies        10:54:53

6    running records checks and completing FI cards on those

7    people?"

8              FI card's a field investigation card, is that right?

9    A.   Yes.

10   Q.   Now, you gave this answer starting on line 21:                     10:55:10

11             "Well, I don't know how they can prove that fact

12   because we are dealing with illegal identification.  So even if

13   someone says they're a U.S. citizen, I would imagine that you

14   would check them out.  That's just good law enforcement."

15             You gave that testimony in September 2010?                    10:55:33

16   A.   Yes.

17   Q.   Now, let's look at -- and again, we won't publish this,

18   since it's not yet admitted -- PX 206.

19             Your Honor, may --

20             Sheriff, actually, Exhibit 206, if you want to look at        10:56:01

21   the whole thing, is in your binder, or if you would prefer, we

22   can have Ms. Mandujano give you a copy of it.

23             THE COURT:  We can just put it up on the sheriff's

24   screen, if you want.

25             MR. YOUNG:  Okay.  Let's put up 206.                          10:56:13

BY MR. YOUNG:

Q.  That's your handwriting in the upper right-hand corner, correct?

A.  Yes.

Q.  And those are your initials there?                                    10:56:20

A.  Yes.

Q.  You wrote cc Brian S?

A.  Yes.

Q.  Now we're going to see a lot of those today.

        When you cc Brian S, that's a note to your assistant       10:56:33

to send a copy of that document to Chief Brian Sands, who runs

your enforcement activities, correct?

A.  That's right.

Q.  So this particular document, you did send a copy of it to

Chief Sands, is that right?                                               10:56:52

A.  I'm sure.  I hope he receives it, but it was cc'd to him.

        MR. YOUNG:  Your Honor, I move the admission of

PX 206.

        MR. CASEY:  No objection, Your Honor.

        THE COURT:  Exhibit 206 is admitted.                             10:57:07

        (Exhibit No. 206 is admitted into evidence.)

BY MR. YOUNG:

Q.  Okay.  Now, you'll see that we've blacked certain things

out on this, and we've done that with various letters that

people have sent to you.  You understand the reason we've done          10:57:18

1    that, correct?

2    A.  Yes.

3    Q.  Okay.  But there are versions that your office has given to

4    us it has which do have the names there, so if at any time it

5    would help you to look at that original version, just let us        10:57:32

6    know.

7            But the version that we're looking at on the screens

8    in the courtroom, we'll publish this at this point, we can --

9            THE COURT:  That's okay.

10           MR. YOUNG:  -- we'll have the redacted versions.             10:57:43

11   BY MR. YOUNG:

12   Q.  Now, this letter is in your immigration file because it has

13   to do with illegal immigration, is that right?

14   A.  Yes.

15   Q.  And you thought that this letter would be relevant to           10:57:54

16   Chief Sands' activities relating to illegal immigration, that's

17   why you sent it to him, right?

18   A.  Yes.

19   Q.  The first paragraph mentions Secretary Napolitano taking

20   away your 287(g) authority.                                         10:58:10

21           Do you see that?

22   A.  Yes.

23   Q.  You put a checkmark over Secretary Napolitano's name, is

24   that right?

25   A.  Yes.                                                            10:58:22

1   Q.  The federal government did take away your 287(g) field

2   authority in late 2009, is that right?

3   A.  Yes.

4   Q.  In the second paragraph of this e-mail that you forwarded

5   to your chief -- to Chief Sands, there's some language about        10:58:34

6   her reasons for taking away that authority.  And it says in the

7   second line there that her reasons include making our Latino

8   population fear to go out in public.

9        Do you see that?

10  A.  Yes.                                                            10:58:55

11  Q.  Now, you wanted to send this e-mail to Chief Sands so he

12  could see that information, among other things?

13  A.  The reason I marked out Secretary Napolitano's, you missed

14  the first where both Senators McCain and Kyle have requested

15  that Secretary Napolitano explain why she took away my 287(g).      10:59:17

16  So I thought that was important to pinpoint her name that you

17  got two senators talking about it.

18        When I send this -- these letters, doesn't mean that I

19  agree with them or have anybody take action.  I just send this

20  information to my subordinates so they can look at it.  So I        10:59:38

21  don't agree with every letter that I receive.

22  Q.  Let's look at the sixth paragraph, the one that starts,

23  What our open border crowd.  And what it says is:  What our

24  open border crowd calls racial profiling is what I call

25  reasonable suspicion and probable cause, both of which are         11:00:02

```
 1   legal grounds for further action.  If it looks like a duck --
 2   no, I'm sorry, if it walks like a duck and quacks like a duck.
 3           Do you see that?
 4   A.  Yes.
 5   Q.  Now, that's saying if someone looks like an illegal          11:00:15
 6   immigrant, he must be an illegal immigrant, correct?
 7   A.  Once again, I don't know where this fellow was getting his
 8   information.  I just took this letter, like I do all the
 9   letters that I receive, whether it's animal cruelty, any
10   subject matter, and I give it to the appropriate chiefs that     11:00:36
11   run those divisions.
12   Q.  You can't tell me that you disagree with the sentiments
13   expressed in that paragraph, is that correct?
14   A.  This is just his opinion.
15   Q.  Well, but you can't tell me that you disagree with it, is    11:01:00
16   that correct?
17   A.  Can you repeat what I'm allegedly disagreeing with?
18   Q.  Yeah, it's the paragraph that says, quote:  What our open
19   border crowd calls racial profiling is what I call reasonable
20   suspicion and probable cause, both of which are legal grounds    11:01:16
21   for further action.  If it walks like a duck and quacks like a
22   duck.
23   A.  I don't know about the duck comment, I don't agree with
24   that.  But I presume he's saying when you have probable cause
25   and you make an arrest, you can develop that to see if the       11:01:31
```

1  person is here illegally.

2  Q.  And you can do that through what the open border crowd

3  calls racial profiling, in your view?  Is that your view?

4  A.  That's not my view.

5          MR. YOUNG:  Okay.  I'm going to play a portion of your    11:01:50

6  deposition from November 16, 2010.  It's JA5.  It's line --

7  page 85, line 24.

8          (Video clip played as follows:)

9          "'What our open border crowd calls racial profiling is

10  what I call reasonable suspicion and probable cause, both of    11:02:10

11  which are legal grounds for further reaction.  If it walks like

12  a duck and quacks like a duck,' and then he's got three dots

13  after that.

14          "ANSWER:  Yes.

15          "QUESTION:  You see that?    11:02:22

16          "ANSWER:  Yes.

17          "QUESTION:  Do you agree with that statement?

18          "ANSWER:  Once again, that's his statement, and I

19  don't know what context he's talking about, about ducks or

20  whatever he's mentioning.    11:02:34

21          "QUESTION:  Do you think he's talking about ducks?

22          "ANSWER:  Well, he says 'if it walks like a duck and

23  quacks like a duck,' he must be talking about ducks.

24          "QUESTION:  Do you seriously think he's talking about

25  ducks?    11:02:50

1        "ANSWER:  I'm just saying what he's reporting in his

2  report.

3        "QUESTION:  You don't think he's talking about illegal

4  immigration?

5        "ANSWER:  He may, but once again, I can't read his    11:03:03

6  mind.  This is his opinion, not mine.

7        "QUESTION:  Okay, well, you passed this on to

8  Mr. Sands.  I'm asking about your understanding.  As you

9  understand that statement, do you agree with it or disagree

10  with it?    11:03:16

11        "ANSWER:  I -- once again, I don't know where he's

12  going with this.

13        "QUESTION:  So you don't -- you can't tell me one way

14  or the other whether you agree or disagree?

15        "ANSWER:  No.  I don't know what he means by his    11:03:25

16  comments.

17        "QUESTION:  Is that a --

18        "ANSWER:  I can't read his mind.  This is his -- his

19  statements, not mine.

20        "QUESTION:  Since you can't read his mind, are you    11:03:35

21  telling me you can't tell me one way or another whether you

22  agree or disagree with his statement?

23        "ANSWER:  I have no comment on the statement.

24        "QUESTION:  Okay.  Well, I'm entitled to know whether

25  you agree or disagree with it.  You can tell me you can't    11:03:50

1   answer the question.

2          "ANSWER:  Okay, then I'm going to tell you I can't

3   answer.  I can't read his mind."

4   BY MR. YOUNG:

5   Q.  Sheriff, you receive letters of support from members of the   11:04:00

6   public who praise your illegal immigration policies, correct?

7   A.  Yes.

8   Q.  You keep a file with those items, is that right?

9   A.  I keep a file on items pertaining to immigration.

10  Q.  In addition to letters of support, that file also includes   11:04:20

11  press articles?

12  A.  I may keep some press articles.  I'm not saying I keep all

13  of them.

14  Q.  And this is done for your own interests so at any time you

15  can go back and look at things to refresh your memory?   11:04:35

16  A.  Yes.

17  Q.  You decide what goes into that immigration file, correct?

18  A.  Yes.

19  Q.  Nobody else decides what goes into that immigration file,

20  is that right?   11:04:44

21  A.  Yes, that's correct.

22  Q.  So if it's in your file, you're the person who put it

23  there.

24  A.  Yes.

25  Q.  Now, PX 185 is something that has not yet been admitted,   11:04:56

1    but I want you to take a look at it.  Let's put it up on the

2    witness stand screen.  It's a letter dated July 26, 2007, from

3    Carole V.B. to yourself, is that right?

4         Actually, we need the sheriff to take a look at the

5    whole letter, so if we can just put the whole letter on the          11:05:25

6    screen.

7         Are you able to read that, Sheriff?

8    A.  Yes.

9    Q.  This letter was faxed to you on July 26, 2007, at

10   10:33 a.m., is that right?                                           11:06:04

11   A.  I'm not sure.  I don't see any initials on this letter.

12   Q.  Well, you put this document, this letter, in your

13   immigration file, is that right?

14   A.  I may have.

15        MR. YOUNG:  Your Honor, I move for the admission of            11:06:25

16   PX 185.

17        MR. CASEY:  Your Honor, I have no objection to this

18   document's admissibility.  However, in the documents the

19   plaintiffs gave me there is a second letter of identical date

20   that is different in substance.                                      11:06:39

21        THE COURT:  Is it also identified as Exhibit 185?

22        MR. CASEY:  It is in the file folder that the

23   plaintiffs gave me.

24        MR. YOUNG:  Yes, I think that's correct, and that is

25   an error.  The Exhibit 185 should include only the first letter     11:06:51

```
 1    from that person.  It's from the same person, but they are

 2    different letters.

 3             THE COURT:  All right.  Well, the copy you have in the

 4    notebook in front of you is not the exhibit.  I'm going to

 5    admit Exhibit 185, which is the letter that is now on the        11:07:03

 6    screen --

 7             MR. YOUNG:  Yes.

 8             THE COURT:  -- and I'm not going to admit any other

 9    sheet other than that.

10             (Exhibit No. 185 is admitted into evidence.)           11:07:14

11             MR. CASEY:  Thank you, Your Honor.  No objection.

12             MR. YOUNG:  Thank you, Your Honor.

13    BY MR. YOUNG:

14    Q.  Now, you've spoken to the author of this letter, whose name

15    is Carole, is that right?                                       11:07:22

16    A.  I believe in the past, yes.

17    Q.  So you actually know her.

18    A.  Yes.

19    Q.  Now, let's look at the first paragraph of her letter to you

20    of July 26, 2007, and she tells you:  As to this statement:     11:07:31

21    "What right does he have to investigate people based on the

22    color of their skin, or the accent or the way they look," said

23    Phoenix attorney Antonio Bustamante.

24             You see that?

25    A.  Yes.                                                        11:07:55
```

```
 1   Q.  Then in the second paragraph Carole tells you:  The right
 2   you have as an elected law enforcement official, elected by
 3   legal residents of the county and state that you represent.
 4   That is, that she's saying that you have that right to
 5   investigate people based on the color of their skin or their     11:08:11
 6   accent or the way they look because you're an elected law
 7   enforcement official.
 8        Do you see that?
 9   A.  Yes.
10   Q.  Then later on in the big paragraph, about in the middle      11:08:20
11   there's some language that she writes to you, quote:
12   Profiling?  Give me a break.  During World War II my little
13   Italian mother was en route to Tucson by train to marry my
14   father.  There was rumor about an Italian Mata Hari on the
15   train.  Mommy, Vye Del Duca, was pulled off the train and       11:08:43
16   interrogated along with all the other Italian women on board.
17   While she said it was frightening, she believed it was the
18   right thing to do.
19        Do you see that language?
20   A.  Yes.                                                        11:08:59
21        MR. YOUNG:  Okay.  Actually, we should publish
22   Exhibit 185.
23        THE COURT:  You may do so.
24        MR. YOUNG:  Thank you, Your Honor.
25   BY MR. YOUNG:                                                   11:09:22
```

1  Q.  You read this letter before putting it into your file,

2  correct?

3  A.  I believe I did.

4  Q.  You also wrote Carole a thank you letter, correct?

5  A.  I answer all the letters I get whether I agree with them or    11:09:31

6  not.

7        MR. YOUNG:  Let's look at PX 370, which has been

8  admitted, so please publish it.

9        THE COURT:  You may publish it.

10  BY MR. YOUNG:                                              11:09:46

11  Q.  Let's zero in on the date and the body of the letter.

12        Now, this letter was dated July 26, 2007.  This is

13  your response to her, is that right?

14  A.  Yes.

15  Q.  You actually dated this letter the same day as the letter    11:10:05

16  that came in to you by fax, correct?  July 26, 2007.

17  A.  The letter you're talking about came in by fax?

18  Q.  That's -- that's true.  Why don't we go back to 185.  Let's

19  put them both side by side, actually.

20        And you see the letter that I read to you earlier?  It    11:10:31

21  has a fax line dated July 26, 2007, at 10:33 a.m., you see

22  that?

23  A.  Yes.

24  Q.  So you got this -- her letter by fax, and then you

25  responded with a letter the same day, is that right?    11:10:45

1    A.  Could be.  If the dates are correct, I guess I did.

2    Q.  That's your handwriting where you struck out her name and

3    you wrote -- her last name and you wrote "Carole," is that

4    right?

5    A.  I believe it is.                                          11:11:08

6    Q.  So let's look at what you told Carole in response to

7    your -- to her letter.  Let's go back to the Exhibit 370.  You

8    told her that you received her letter regarding your illegal

9    immigration policies?

10   A.  Yes.                                                      11:11:29

11   Q.  And then you told her that you appreciated that you had her

12   support, is that right?

13   A.  Yes.

14   Q.  And then you said, quote, I especially enjoyed reading the

15   story about your Italian grandmother and her experiences after  11:11:40

16   coming into the country legally, end quote.

17            You wrote that to her, right?

18   A.  Yes.

19   Q.  This is a letter specifically tailored to respond to

20   Carole B's letter to you, is that right?                      11:11:57

21   A.  Most of the responses are the same, but I did talk about

22   the Italian grandmother.

23   Q.  Okay.  Who had been ethnically profiled, is that right,

24   according to Carole's letter?

25   A.  That's her opinion.                                       11:12:14

1  Q.  You don't have an opinion one way or is the other on

2  whether that are ethnic profiling was correct or right or

3  proper or not, is that right?

4  A.  The only opinion I have is we should never racial profile.

5  That's immoral, illegal.  So whatever people write to me, even        11:12:30

6  though I don't agree fully, I do respond and write back.

7  That's my philosophy of management.  So I do answer letters

8  regardless whether I agree with the people or not.

9  Q.  You answered her letter by telling her you enjoyed her

10  story?        11:12:51

11  A.  I was talking about the Italian -- her grandmother.

12  Q.  I think your letter said grandmother, but her letter says

13  mother, so may believe you got a little bit confused, right?

14  A.  Probably.

15  Q.  Okay.  So on page 278 of your deposition of November 16,        11:13:04

16  2010, at line 20, you're asked:

17       "You have no opinion today as to whether, if that

18  happened today, that would be proper or improper?  "

19       And then your answer is:  "Once again, I have no

20  opinion.  This is her statement, her opinion."        11:13:30

21       So as far as that what she calls, what Carole calls

22  ethnic profiling, you don't have an opinion as to whether that

23  would be proper or not today, is that right?

24  A.  I'm going to say again that I'm against anyone racial

25  profiling.  That's today, that's been my whole 50 years in law        11:13:51

1  enforcement.

2  Q.  Well, I appreciate your saying that in court today, but you

3  gave that testimony that I just read, is that right?

4  A.  I don't think I said I agree with -- that I condone racial

5  profiling.                                                        11:14:11

6  Q.  No, you said you had no opinion on whether that profiling

7  was proper or not.

8  A.  I'm not -- I don't have the opinion on what she is saying,

9  that this is her opinion.  I don't have all the facts.

10 Q.  Let's take a look, again, now, at PX 241.  This has not      11:14:25

11 been admitted yet, but I'd ask you to look at it.

12         Sheriff, it's a July 14, 2008, letter.

13         You see that letter?

14 A.  Yes.

15 Q.  And it's actually a letter to the East Valley Tribune by     11:14:46

16 someone named Nicholas.

17         Do you see that?

18 A.  Yes.

19 Q.  That's your handwriting at the top, right?

20 A.  Yes.                                                         11:14:58

21 Q.  Those are your initials?

22 A.  Yes.

23 Q.  And you say, Write a thank you letter, is that right?

24 A.  Yes.

25 Q.  And in fact you did send him a thank you letter, correct?    11:15:07

```
 1   A.  I'm not sure whether I did.  I presume I may have.

 2   Q.  Well, you did keep this letter in your file, correct?

 3   A.  Yes.

 4   Q.  Well, when you put a note like this in your handwriting on

 5   a letter like this, your intention is to tell your assistant to    11:15:27

 6   send a thank you letter to the author, is that right?

 7   A.  Yes.

 8   Q.  Let's look at the first par --

 9           MR. YOUNG:  Oh, actually, I'd move the admission of

10   PX 241.                                                            11:15:45

11           MR. CASEY:  No objection, Your Honor.

12           THE COURT:  Exhibit 241 is admitted.

13           (Exhibit No. 241 is admitted into evidence.)

14   BY MR. YOUNG:

15   Q.  The first paragraph of that letter, 241, says, quote:  The    11:15:51

16   United States federal government has totally failed the

17   American people by not controlling the southern borders for 50

18   years.  All Anglo-Americans are in danger of losing our entire

19   way of life, end quote.

20           Do you see that?                                          11:16:07

21   A.  Yes.

22   Q.  And you sent the author of that letter a thank you note,

23   correct?

24   A.  Yes.

25   Q.  Let's go to PX 26 --                                          11:16:16
```

```
 1    A.  Doesn't mean I agree with the contents.
 2    Q.  Let's go to PX 262.  Again, this has not yet been admitted,
 3    so let's just -- Sheriff, you take a look at it.  It's a June
 4    30, 2009, letter from Sarah N and Erika S to you.  That's your
 5    handwriting in the corner, correct?                              11:16:38
 6    A.  Yes.
 7    Q.  And again, you have a -- a note there to send a thank you
 8    note to them?
 9    A.  Yes.
10          MR. YOUNG:  Your Honor, I move the admission of this     11:16:46
11    exhibit.
12          MR. CASEY:  Your Honor, my file folder's missing
13    Exhibit 262.  I was wondering if I could get a copy other than
14    the one on the screen and look at it briefly.
15          MR. YOUNG:  Sure.  I'll ask Ms. Mandujano to give you    11:16:57
16    a copy.
17          THE COURT:  Any objection, Mr. Casey?
18          MR. CASEY:  Allow me real quick, Your Honor, just to
19    look.
20          (Pause in proceedings.)                                  11:17:11
21          MR. CASEY:  No objection, Your Honor.
22          THE COURT:  All right.  Exhibit 262 is admitted.
23          (Exhibit No. 262 is admitted in evidence.)
24    BY MR. YOUNG:
25    Q.  There you can see in the second paragraph at the          11:17:20
```

```
 1   beginning --

 2           Oh, we can publish this?

 3           THE COURT:  You may.

 4   BY MR. YOUNG:

 5   Q.  The second paragraph says, as for being a racist against    11:17:30

 6   Mexicans, this is the most ridiculous thing we have heard.

 7   Stopping Mexicans to make sure they are legal is not racist,

 8   because our state is a border state to Mexico.

 9           You see that?

10   A.  Yes.                                                         11:17:44

11   Q.  You read this before you wrote the note in the upper

12   right-hand corner instructing your assistant to prepare a thank

13   you letter to these authors, is that right?

14   A.  I may have breezed through it.  I don't read every line.

15   Q.  Then let's take a look at your handwritten note.  You say    11:17:58

16   cc sheriff, and then you put a 3 with a circle around it,

17   right?

18   A.  Yes.

19   Q.  That means that you wanted your assistant to make three

20   copies of it for yourself, is that right?                       11:18:14

21   A.  Yes.

22   Q.  And these copies you sometimes take them home and read

23   them, is that right?

24   A.  Yes, I do.

25   Q.  And you take copies of letters like this where you've        11:18:23
```

1    indicated you want copies made, and you put them in files so

2    that you can keep them for later on, is that right?

3    A.  Yes.

4    Q.  Now, we discussed Chief Sands, who runs your enforcement

5    activities, and who also oversees your saturation patrols and          11:18:47

6    other illegal immigration operations, is that right?

7    A.  Yes.

8    Q.  You have discussed with Chief Sands letters of support that

9    you have received from the public on the issue of illegal

10   immigration, is that right?                                            11:19:05

11   A.  I don't know if I discuss the letters.  I just make sure he

12   got a copy for his information.

13   Q.  Is it safe to say that you at least may have discussed

14   letters of support with Chief Sands on the issue of illegal

15   immigration?                                                           11:19:23

16   A.  No.  No, I haven't discussed the letters with him, nor

17   my -- I do not do that.

18   Q.  Your November 16, 2010 deposition, at page 47, line 22 to

19   25, Sheriff, you were asked at that time:

20          "Do you recall ever discussing with Mr. Sands any             11:19:47

21   letter of support you've received from the public on the issue

22   of illegal immigration?

23          "ANSWER:  I may have, but I don't recall which ones."

24          Was that testimony accurate at the time you gave it?

25   A.  Just what I said now.  I don't discuss every letter, but          11:20:03

1    there's a possibility on occasion a letter may be discussed.

2    Q.  Thank you.

3           You had an operation in Queen Creek on October 4,

4    2007, correct?

5           I'll tell you that the pretrial order at paragraph 64,    11:20:28

6    your attorneys and plaintiffs have stipulated that you did have

7    an operation in Queen Creek on October 4, 2007.

8    A.  Yes.

9    Q.  Do you remember that operation in Queen Creek?

10   A.  I remember that we may have had an operation at that time.    11:20:44

11   Q.  The MCSO is the police force for Queen Creek, is that

12   correct?

13   A.  Yes.

14   Q.  So they don't have any other law enforcement other than

15   your office, is that right?                                      11:20:57

16   A.  That's correct.

17   Q.  Let's look at PX 308, which has been admitted.  It's a

18   press release from your office dated October 4, 2007, entitled

19   Sheriff Arpaio Goes After Day Laborers.

20          Now, you talk about this day laborer issue.  Simply      11:21:21

21   being a day laborer is not a crime, correct?

22   A.  That's correct.

23   Q.  Now, in the paragraph, the second -- the third paragraph

24   where you talk about the Queen Creek operation, you say it

25   follows on or comes on the heels of some other operations,       11:21:47

1    including in Cave Creek and in Wickenburg.  Do you see that?

2    A.  Yes.

3    Q.  So at this time in the fall of 2007 you were doing a number

4    of these operations against day laborers, is that right?

5    A.  I don't have all the dates, what the time element was          11:22:03

6    between these operations, but if that's what you have, then

7    it's correct.

8    Q.  The second-to-last paragraph, the last sentence, is a

9    quotation attributed to you, and you said, quote:  As far as

10   I'm concerned, the only sanctuary for illegal aliens is in        11:22:28

11   Mexico, end quote.

12        You were talking about the day laborer activity or

13   operations that you had undertaken in Queen Creek, Cave Creek,

14   and Wickenburg, is that right?

15   A.  I'm not sure if it was just Queen Creek that I was talking     11:22:48

16   about.

17   Q.  Queen Creek and others, you were talking about that when

18   you said as far as you're concerned, the only sanctuary for

19   illegal aliens is in Mexico, is that right?

20   A.  Yes.                                                           11:23:04

21   Q.  Do you stand by that statement today?

22   A.  What I was saying is when the people that come into this

23   country illegally and then are deported, they should stay in

24   that country and not keep coming back into our country.  So

25   it's somewhat of a sanctuary area when they keep coming back.      11:23:31

1    Q.  Does that apply to all the day laborers that your officers

2    encountered in Queen Creek, Wickenburg, and Cave Creek as

3    described in this press --

4    A.  I'm talking about those that have been arrested and

5    deported.                                                          11:23:49

6    Q.  Let's look at PX 219, which has been -- actually, which has

7    been admitted, and let's publish.

8              MR. YOUNG:  Your Honor, with permission, can we

9    publish PX 2 -- 129?  No, I'm sorry, 291.

10             THE COURT:  Exhibit 291 may be published.             11:24:08

11             MR. YOUNG:  I'm sorry, it's 219.

12             THE COURT:  Well, let's wait a minute, be sure that is

13   the exhibit.

14             MR. YOUNG:  Okay.

15   BY MR. YOUNG:                                                    11:24:26

16   Q.  We looked at this e-mail chain in your deposition, Sheriff,

17   correct?  Do you recall that?

18   A.  This e-mail?

19   Q.  Right.

20   A.  From Sousa to Chagolla, is that who you're talking about?   11:24:35

21   Q.  Right.  Well, let's look a little further down in the chain

22   and go to the second page.

23             Can we go do the second page?

24             Now, you see Art Sanders' name there in the middle?

25   A.  Yes.                                                        11:25:00

1    Q.  He was the mayor of Queen Creek, right?

2    A.  Yes.

3    Q.  And then he sent an e-mail to John Kross, who was the town

4    manager of Queen Creek, is that right?  You see that on the

5    first -- second page and then going back to the first page?          11:25:11

6    A.  Yes.

7    Q.  And then if you go back to the first page, you see that the

8    e-mail ended up with Joseph Sousa and Paul Chagolla and John

9    D'Amico of your department, correct?

10   A.  Yes.                                                               11:25:28

11   Q.  Now, in this e-mail chain there's someone who writes in to

12   the mayor and council members of Queen Creek who talks about an

13   issue that she's concerned about about Hispanic men standing on

14   a street corner.

15          Do you see that?                                               11:25:51

16   A.  Yes.

17   Q.  And she says that as she was waiting for a light to turn

18   green, a Hispanic man was standing on the southwest corner with

19   other Hispanic men, and he came up to my passenger side window

20   and jeered at me.  I'm paraphrasing a little bit, but that's          11:26:12

21   what she says.

22          Do you see that language?

23   A.  Yes.

24   Q.  And then he ran back to another Hispanic man and exchanged

25   high fives and they both laughed.  You see that?                      11:26:22

A.  Yes.

Q.  On the following page, at the top she describes yet another

Hispanic man giving her what she described as a very

intimidating look.

        You see that?                                          11:26:38

        Go to the third page of the exhibit.

        Okay.  Do you see the language there about the

jeering -- the intimidating look, rather -- top of the page?

A.  Yes.

Q.  And then there's a paragraph about taking pictures of kids,   11:27:07

and whistling, and making noises at kids, or young girls.  And

then she says:  A lot of people feel uncomfortable with the

situation that exists on the corners of Ellsworth and Ocotillo.

        Do you see that?

A.  Yes.                                                       11:27:28

Q.  There's no crime that is described in this e-mail chain, is

that right?

A.  Let me just say that I believe that this is passed on to

our officials and deputies, and I don't know what they did with

it, whether they looked into it or not, especially about kids   11:27:55

alleged to -- their pictures taken of the teenage kids.

Q.  Okay.  My question is about your opinion, Sheriff.

        In your view, you can't tell whether there's a crime

described in this paragraph, is that right?

A.  I can't tell till someone decides to investigate the       11:28:16

1  situation.

2  Q.  And you think that the facts that are set forth in this

3  e-mail warrant an investigation?

4  A.  I had no idea.  That's why I pass it on to the deputies

5  that are responsible for that area.                        11:28:35

6  Q.  Well, actually, let's look at your deposition of November

7  16, 2010, page 194, lines 11 to 21.  And you were asked:

8       "You think the e-mail by this person describes a

9  situation that warranted your department's looking into

10  further?"                                                 11:29:07

11       And you answered:  "I believe so, yes."

12       And you say:  "And I'm sure that this is passed on to

13  our people, as evidenced by the lieutenant that had some

14  correspondence with a lieutenant that covers that area.  And

15  you have to understand, this letter, I believe, was sent to the  11:29:22

16  mayor and to the city manager.  And we would be remiss in our

17  duties not to respond, since they pay us to service their

18  community."

19       You gave that testimony?

20  A.  Yes.  As I just said, I pass it on to my deputies, and I  11:29:34

21  really don't know what action they took, if any.

22  Q.  Sheriff, if you go back to the exhibit, if you go back to

23  the exhibit, and the paragraph that says that the author is

24  thinking that a lot of people feel uncomfortable with the

25  situation, that's on page 3.  The third and fourth lines say  11:30:12

1    that the service of those men, those Hispanic men, are offering

2    is illegal if the men are illegal immigrants.

3              Do you see that?

4    A.  Yes.

5    Q.  And then the next paragraph says:  These men are highly    11:30:36

6    suspected of being illegal immigrants, but the town turns a

7    blind eye to the situation.

8              See that?

9    A.  Yes.

10   Q.  Okay.  So your view is it warrants an immigration    11:30:56

11   investigation if someone sees a bunch of Hispanic men on a

12   street corner, even if they're only suspected but not known to

13   be illegal immigrants, is that your view?

14   A.  No, my view is that we don't go grabbing people on street

15   corners unless we have a crime committed.    11:31:18

16   Q.  Okay.  Well, you couldn't tell whether there's a crime

17   described in this e-mail, and you did go and grab a bunch of

18   Hispanic people in Queen Creek as described in your press

19   release, correct?

20   A.  That were committing state crimes.    11:31:36

21   Q.  But you didn't know that at the time that you did the

22   operation before you did the operation.  All you had was

23   e-mails that said there are Hispanic men who are acting in a

24   way that makes other people uncomfortable in Queen Creek, is

25   that right?    11:31:48

1    A.  I don't know if we went into that area because of this

2    complaint.

3    Q.  Oh, really?

4    A.  We just don't go into an area overnight; you have to plan

5    the operations.                                              11:32:02

6    Q.  Okay.  So there -- there may be other -- this e-mail

7    actually is dated October 4, 2007, which is the same day as

8    that operation.  It's possible there are other e-mails from

9    other people in Queen Creek or officials in Queen Creek

10   reporting on similar situation or the same situation, is that  11:32:21

11   right?

12   A.  Once again, I don't know.  You can't go in to do an

13   operation overnight.  These operations are planned.  They take

14   three, four weeks to plan the operation.

15   Q.  Let's look at PX 129, which has been admitted, so we can    11:32:38

16   publish it.  This is a shift summary for the Queen Creek

17   saturation patrol.  Actually, the Queen Creek operation; I

18   don't think you called it a saturation patrol.

19          So if you focus on the middle page -- of the page,

20   let's include the "from" and "to" information, and then that    11:33:06

21   first paragraph.  You see that?

22   A.  Yes.

23   Q.  Okay.  So it reports on October 4, 2007, HSU conducted a

24   detail in the town of Queen Creek based on e-mails from the

25   town council in reference to the day laborers in their city.    11:33:22

| | |
|---|---|
| 1 | That's what we were just talking about, correct? |
| 2 | A.  Yes. |
| 3 | Q.  Now, we don't have those other e-mails.  I mean, you're |
| 4 | aware that your office failed to preserve and, in fact, |
| 5 | destroyed certain e-mails that were supposed to be handed over |
| 6 | in this lawsuit, correct? |
| 7 | A.  That's something handled by my attorneys. |
| 8 | Q.  Well, you've heard about that? |
| 9 | A.  Yes, I heard. |
| 10 | Q.  Okay.  So we have this October 4, 2007, e-mail, and that's |
| 11 | what we have to go on. |
| 12 | Based on that, you can see, will you agree with me, |
| 13 | that your office just went after day laborers in Queen Creek |
| 14 | who were Hispanic because there were people there who were made |
| 15 | uncomfortable by their presence, is that right? |
| 16 | A.  That's not my opinion. |
| 17 | Q.  Is that a reasonable reading of these e-mails and |
| 18 | documents? |
| 19 | A.  You're going to have to talk to the people running the |
| 20 | operation. |
| 21 | Q.  Let's go on to PX 202, which relates to 36th Street and |
| 22 | Thomas, and that's not yet been admitted, so let's, Sheriff, |
| 23 | just the two of us look at it for the moment.  Let's focus on |
| 24 | the e-mail text.  It's a November 19, 2007, e-mail.  Let's just |
| 25 | keep the whole -- keep the whole thing there. |

11:33:38

11:33:47

11:34:08

11:34:16

11:34:54

```
 1            Is that your handwriting?

 2            Yes, do the whole thing.

 3            That's your handwriting, correct, Sheriff?

 4   A.  Yes.

 5   Q.  And you cc'd Brian Sands, your chief of enforcement, on it?    11:35:05

 6   A.  Yes.

 7   Q.  Okay.  So this was in your file, correct?

 8   A.  It may have been, I'm not sure, but --

 9   Q.  Well, that -- that is your handwriting and you sent it to

10   Chief Sands?                                                       11:35:21

11   A.  Doesn't mean I kept a copy, but normally I do.

12            MR. YOUNG:  All right.  Your Honor, I'd move the

13   admission of PX 202.

14            MR. CASEY:  No objection, Your Honor.

15            THE COURT:  Exhibit 202 is admitted.                      11:35:34

16            (Exhibit No. 202 is admitted into evidence.)

17            THE COURT:  You may publish.

18            MR. YOUNG:  And we thus publish it.  Thank you, Your

19   Honor.

20   BY MR. YOUNG:                                                      11:35:45

21   Q.  Now, there's an e-mail that is there which is part of what

22   you forwarded to Chief Sands from Dr. J.  It says:  Hi Captain,

23   here are some pics from the latest protest, 11-17-07, across

24   the street from Pruitt's.

25            You recall there being some issues about day laborers    11:36:04
```

1   congregating near Pruitt's furniture store.

2   A.  About criminal activity, yes.

3   Q.  Well, there were day laborers there, correct?

4   A.  The information we received, yes.

5   Q.  And the second sentence of the e-mail says:  Note the --          11:36:23

6   and referring to the pictures -- note the unpermit mariachi

7   band that no one would tell to move or leave, even though they

8   did not have a permit.

9           And then it says:  These illegal activists are putting

10  on a freak show and getting away with it.                           11:36:43

11          THE COURT:  Mr. Young, you're depressing your button,

12  so I can't hear you.

13          MR. YOUNG:  Oh, sorry.

14          Is that better?

15          THE COURT:  It is much better.                              11:36:55

16          MR. YOUNG:  Thank you, Your Honor.  I'm sorry.  It's a

17  crowded lectern and I have a lot of paper, some of which is

18  falling off occasionally, but I'm going to try not to push

19  these buttons.

20  BY MR. YOUNG:                                                       11:37:05

21  Q.  So you see the language about the freak show there,

22  Sheriff?

23  A.  Yes.

24  Q.  Now, you subsequently did some major crime suppression and

25  saturation patrol operations in the area that's discussed in       11:37:20

```
 1   this e-mail?

 2   A.  Yes.

 3   Q.  Let's --

 4           MR. YOUNG:  Actually, did we admit Exhibit 202?

 5           THE WITNESS:  Excuse me.  You said in this meet -- not    11:37:32

 6   because of this e-mail.

 7   BY MR. YOUNG:

 8   Q.  Well, I'm just referring to the area, and the area around

 9   Pruitt's furniture store, in that general vicinity, you did do

10   a number of major operations, correct?                            11:37:44

11   A.  Yes.

12           MR. YOUNG:  Did we admit Exhibit 202?  Okay.

13           Let's go on to Exhibit 310, which has been admitted.

14   BY MR. YOUNG:

15   Q.  This is a press release dated January 18, 2008, about a       11:37:59

16   crime suppression operation in Central Phoenix.  And it focuses

17   on the area between 16th and 40th Streets and Indian School and

18   McDowell Roads.  This relates to the same issue that existed

19   near Pruitt's furniture store, correct?

20   A.  Yes.                                                          11:38:26

21   Q.  And the action that's described in this press release was

22   in response to a letter from business owners in the area,

23   correct?

24   A.  That may be true.  I don't recall.

25   Q.  That letter that you received from business owners in the     11:38:42
```

1    area, you gave it to Chief Sands and you asked him to take care

2    of it, is that right?

3    A.  Are you talking about that one letter that we just read

4    from the doctor, that her name was not blacked out, where you

5    blacked out everybody else's name?                                11:38:57

6    Q.  No, I'm actually referring now to Exhibit 310, and

7    actually, I'll guide you to it here.  It's on the screen now,

8    which says that the operation comes as a result of a letter to

9    the sheriff from business owners in the area.

10             You see that?                                           11:39:14

11   A.  Yes.

12   Q.  You gave that letter to Chief Sands and asked him to take

13   care of it?

14   A.  I may have.  I'm sure if I did distribute it, it went to

15   him.                                                              11:39:25

16   Q.  And he did take care of it, right?

17   A.  I believe he did.

18   Q.  Now, at the top of the second page of Exhibit 310 --

19   A.  Are you missing the last paragraph?  Can I repeat, before

20   you get to the second page?                                       11:39:45

21   Q.  I think your attorney will be able to ask you questions.  I

22   want to focus on the last page at this point.

23             Actually, let's -- actually, good idea.  Let's look at

24   that paragraph, the bottom of page 1, and then go over to the

25   top of page 2.                                                    11:40:00

1  A.  The reason I mention that is sometimes it's taken out of

2  context.

3  Q.  Well, let's -- let's not do that.  Let's look at what's

4  written there.  And that last sentence says:  The posse

5  volunteers and deputy sheriffs will not racially profile anyone      11:40:13

6  in this operation.

7          And then the quote from you continues:  Still, I

8  anticipate that many illegal immigrants will be arrested as

9  this Central Phoenix neighborhood remains a popular spot for

10  day laborers.                                                        11:40:33

11          You see that?

12  A.  Yes.

13  Q.  You're aware that Chief Sands cannot think of an instance

14  where the MCSO arrested a day labor who was not Hispanic?

15          And I'll -- I'll tell you in fairness that your          11:40:54

16  attorneys and ours have stipulated to that fact in the pretrial

17  order, paragraph 84.

18          Are you aware of that fact, that Chief Sands cannot

19  think of an instance where the MCSO has arrested a day laborer

20  who was not Hispanic?                                                11:41:09

21  A.  No.

22  Q.  Were you aware that Deputy DiPietro, Deputy Rangel, and

23  Chief Sands and Lieutenant Sousa all believe that most day

24  laborers in Maricopa County are Hispanic?  And that's, again,

25  paragraph 82 of the pretrial order.  Were you aware of that?        11:41:28

1   A.  I can't speak for them.

2   Q.  You did this operation in Central Phoenix because, as your

3   press release says, you thought that there were many illegal

4   immigrants who would be arrested there because it remains a

5   popular spot for day laborers.                                    11:41:48

6        You see that?

7   A.  No, I think what I said was pursuant to our arrests,

8   violators of the state laws, if we come across any illegal

9   immigrants, pursuant to our authority to conduct federal

10  detainment and arrests under that 287(g), we would take action.   11:42:15

11  Q.  What you knew when you launched this operation was that

12  there were day laborers there, correct?

13  A.  Yes.

14  Q.  At the time that you launched the operation, you did not

15  know whether any one of those day laborers was an illegal        11:42:30

16  immigrant --

17  A.  That's correct.

18  Q.  -- is that right?

19       That's correct?

20  A.  That we did not know they were here illegally.               11:42:37

21  Q.  That's correct, right?

22  A.  Yes.

23  Q.  Now, you did another sweep in this same area later in the

24  spring on March 21 to 22, 2008?

25       I think this is also known as 36th Street and Thomas.      11:42:55

1          Do you recall that?

2    A.  Yes.

3    Q.  Now, a week after that you did another sweep at Cave Creek

4    and Bell Roads, is that right, on March 27 to 28, 2008?

5    A.  I don't have the dates in front of me, but if you say it's          11:43:12

6    so, I'll take that.

7    Q.  All right.  Well, let's look at Exhibit PX 311, which

8    should be published, because it was --

9          MR. YOUNG:  And, Your Honor, I'd ask that it be

10   published.  It's been admitted.          11:43:26

11         THE COURT:  If you confirm that it's admitted,

12   Kathleen, you can publish it.

13   BY MR. YOUNG:

14   Q.  You see Exhibit PX 311 there, which is your press release

15   of March 27, 2008?          11:43:43

16   A.  Yes.

17   Q.  And this operation at Cave Creek and Bell Roads was also a

18   response to a petition that you received from a group of

19   business people, correct?

20   A.  I believe that some people were concerned and made a          11:43:56

21   request.

22   Q.  Now, you -- you gave a press conference before doing the

23   Bell Road operation, is that right?

24   A.  I may have.

25   Q.  The night before doing that press conference announcing the          11:44:17

1    Bell Road operation, you spoke to a group at the Sunnyslope

2    Veterans of Foreign Wars headquarters, is that right?

3    A.  Possibly did, yes.

4    Q.  Well, I'll tell you --

5    A.  I don't know about the time, but I did speak before that          11:44:39

6    important organization, the VFW.

7    Q.  You've heard of the group United for a Sovereign America?

8    A.  I'm not too familiar with that group.

9    Q.  But you've heard of it, correct?

10   A.  I believe recently.                                               11:45:00

11   Q.  You're briefly familiar with United for a Sovereign America

12   as a group that's against illegal immigration, correct?

13   A.  I'm not sure what their whole programs or philosophy is,

14   but I did learn that they wanted to do something about illegal

15   immigration.                                                          11:45:29

16   Q.  Now, there were some people from United for a Sovereign

17   America at the Sunnyslope VFW where you spoke the night before

18   you publicly announced your Bell Road operation, is that right?

19   A.  I don't know who was in the audience.  I don't check

20   everybody out when I give a speech, or ask for their                 11:45:47

21   identification.

22   Q.  At that meeting, before you made the public announcement of

23   the Bell Road operation, you mentioned to that group the night

24   before at the VFW that you were going to do an operation on

25   Bell Road, is that right?                                            11:46:08

A.  Well, according to this press release.  But this isn't

unusual, because I do announce when I'm going into an area.

Q.  My question is, though, not your public announcement in the

press release, or your press conference.  My question is about

the group that you addressed the night before your press

conference at the VFW.

        You told that group that you were going to do an

operation on Bell Road, is that right?

A.  It just -- is this on the press release?  It just went

black.

        MR. YOUNG:  Your Honor, the screen -- okay.

        THE WITNESS:  Okay.

        I may have.

BY MR. YOUNG:

Q.  And you told that group at the VFW that, quote, I

appreciate your support, end quote, and quote, you're on the

right track.  You're doing what you should be doing, is that

right?

A.  What paragraph of that?

Q.  Well, I'm not -- I'm not asking you about the press release

now; I'm asking you about your appearance at this group at the

VFW before you publicly announced the Bell Road operation.

        You told that group that you appreciated their support

and that they were on the right track and doing what they

should be doing, is that right?

```
 1    A.  I may have.  I don't recall everything I said during that

 2    speech.

 3    Q.  Well, you also told the people at that gathering that the

 4    good news is that all these people are leaving, and they're

 5    going to other states or back to Mexico.                         11:47:54

 6         Did you say that --

 7    A.  I may have.

 8    Q.  -- that evening?

 9         You may have?

10    A.  Yes.                                                          11:48:02

11    Q.  At your press conference on March 21, the leader of United

12    for a Sovereign America was there with you, is that right?

13    A.  What press conference?

14    Q.  On March 21, 2008, about the Bell Road operation.

15    A.  Was that at the VFW?                                          11:48:25

16    Q.  No, this is the next day.  You were at the VFW, and then --

17    that evening, and then the next day you gave a press

18    conference.

19         Do you recall someone from United for a Sovereign

20    America being with you at the press conference?                  11:48:41

21    A.  No.

22    Q.  Do you recall being asked at the press conference whether

23    it bothered you that a group that was present at the press

24    conference accepted neo-Nazis?

25    A.  In who -- can you repeat that?                               11:48:55
```

1   Q.  Do you recall being asked at that press conference whether

2   it bothered you that someone from a group that accepted

3   neo-Nazis was present with you at that press conference?

4   A.  I don't recall anyone asking me that, or who may have asked

5   me.  If you're talking about the media, I have no recollection,    11:49:18

6   if that did occur, who did ask that question.

7   Q.  Well, I'll tell you there was a news story written by

8   Stephen Lemons, who wrote that you were asked that question at

9   that time, and that you said you had no problem because you

10  talk to everybody.                                                 11:49:39

11          Does that refresh your memory?

12  A.  I may have said --

13          You talking about Lemons of the New Times?

14  Q.  Yes.

15  A.  I did -- I may have said I do talk to everybody.  That's my    11:49:47

16  philosophy.

17  Q.  Now, Mr. Lemons did a news story where he said that at the

18  meeting at the VFW, there were people there from the group

19  United for a Sovereign America.

20          Does that refresh your memory?  Do you deny what he        11:50:03

21  says?

22  A.  No, I don't know who was at that VFW.  I mean, I'm speaking

23  before the VFW.  I said before, I don't ask everybody who they

24  are, where they're from.  I speak to everybody.

25  Q.  Okay, that -- that's good.  I'm sure that people appreciate    11:50:19

1  that.

2       At that meeting at the VFW did you say that you were

3  going to need an army probably, and did you ask how many

4  people, the group that you were speaking to, would like to have

5  out there?                                                    11:50:37

6  A.  I don't recall that.

7  Q.  Now, you did some sweeps in -- in Mesa, too, correct?

8  A.  Suppression operations.

9  Q.  Let's look at 375, which is not an exhibit, but I'd like

10  the sheriff to look at it.                                    11:50:57

11       You have people in your office taking notes on phone

12  calls that come in, is that right?

13  A.  The front desk, sometimes when they get calls they make

14  notes.

15  Q.  Is this one of those sets of notes that your front desk    11:51:10

16  generated recording messages that your office receives?

17  A.  Yes.

18  Q.  That's your handwriting in the upper right-hand corner?

19  A.  Yes.

20       MR. YOUNG:  Your Honor, I move the admission of          11:51:24

21  PX 375.

22       MR. CASEY:  No objection, Your Honor.

23       THE COURT:  Exhibit 375 is admitted.

24       (Exhibit No. 375 is admitted into evidence.)

25  BY MR. YOUNG:                                                 11:51:33

1  Q.  You have your front desk make records of what people say

2  when they call in so that you can know what people are saying

3  about your policies?

4  A.  Briefly, yes.

5  Q.  Near the bottom of the first page there's a note that          11:51:44

6  says -- it's the one second from the last, second from the

7  bottom.  And it says:  We have called the non-emergency and

8  illegal hotline numerous times, and nobody gets all the

9  Mexicans hanging out on Mesa Drive between Southern and

10 Broadway.  Why isn't anything being done?                          11:52:12

11        You put a bracket next to that comment, correct?

12 A.  Yes.

13 Q.  And then you made a note at the top of the document in the

14 upper-right-hand corner of the first page, where you directed a

15 copy of the document to Dave Hendershott and Brian Sands and to  11:52:30

16 yourself with two copies, is that right?

17 A.  Yes.

18 Q.  You did that on September 24, 2007?

19 A.  Yes.

20 Q.  There's nothing in the particular note on Mexicans hanging    11:52:44

21 out on Mesa Drive that indicates anyone being discussed there

22 is illegally present in the country, correct?

23 A.  Can you repeat that?

24 Q.  Okay.  Let me reword it.

25        The note says:  Nobody gets all the Mexicans hanging        11:53:04

1    out on Mesa Drive between Southern and Broadway.

2             There's no indication that any of those people

3    referred to there are illegal immigrants, correct?

4    A.  Yes.

5    Q.  And there's no indication that a crime is being committed,    11:53:18

6    correct?

7    A.  Yes.

8    Q.  But you put a bracket next to this note and sent it to your

9    chief deputy, your chief of enforcement, and two copies to

10   yourself so that they could see this information, is that    11:53:30

11   right?

12   A.  We're talking about the hotline that I initiated several

13   years ago.  And much information comes across that hotline, but

14   we don't act on this type of information over a hotline.

15   Q.  Well, you did send it to Chief Hendershott and Chief Sands,    11:53:51

16   right?

17   A.  I sent -- any information I get on illegal immigration I

18   sent to people that have an interest in it that work for me.

19   Q.  Well, you picked out this particular note to put a bracket

20   next to it, the one about nobody getting all the Mexicans    11:54:08

21   hanging out on Mesa Drive, is that right?

22   A.  Because it was talking about the hotline.  She mentioned

23   the no one responds to her calls.

24   Q.  And you think that you should have someone look into having

25   someone respond to a call about Mexicans hanging out on Mesa    11:54:29

```
 1   Drive?
 2   A.  That's up to the people that run the hotline.  I'm sure
 3   they don't respond to every call that comes in to the hotline
 4   unless there's good evidence.
 5   Q.  Well, it's up to you to decide to put a mark next to this          11:54:43
 6   note and then send it to two of your top lieutenants, correct?
 7   A.  Yes.
 8   Q.  You made that decision?
 9   A.  Yes.
10   Q.  Sometime after September 20, 2007, which is the date of           11:54:52
11   this document, you started planning a major operation in Mesa,
12   correct?
13   A.  I think we'd done two or three, so I'm not sure what time
14   you're --
15   Q.  Actually --                                                       11:55:15
16   A.  -- referring to.
17           MR. YOUNG:  Can we publish this exhibit, Your Honor?
18           THE COURT:  You may.
19           MR. YOUNG:  Thank you.
20   BY MR. YOUNG:                                                         11:55:25
21   Q.  Well, you see at the top it's dated September 20, 2007?
22   A.  Yes.
23   Q.  Now, I'll tell you that your attorneys and we have agreed
24   that you did major operations in Mesa on June 26 and 27 and
25   July 14, 2008.  So my question is:  Sometime between September        11:55:40
```

1    20, 2007, and June and July 2008, you started planning major

2    operations in Mesa, is that correct?

3    A.  Can you repeat the date?  You're saying September 20.

4    Q.  Yes.  The date in this document which is on the screen.

5    A.  We did an operation six days later?                    11:56:03

6    Q.  No.

7    A.  September 26?

8    Q.  I'll do it again, and I apologize if I've been unclear.

9          There's this comment that you put a mark next to that

10   says:  Nobody gets all the Mexicans hanging out on Mesa Drive.   11:56:14

11   And that's from a call that came in on September 20, 2007.

12          Do you see that?

13   A.  Yes.

14   Q.  Now, in June and July 2008 you did some major operations in

15   Mesa, correct?                                              11:56:31

16   A.  About nine months later, you're talking about?

17   Q.  I haven't counted.

18   A.  Well, you saying September till June of next year?

19   Q.  You're -- as I said, you did some major operations on June

20   26-27 and July 14, 2008.  My question to you is:  Between the   11:56:49

21   time that you marked this note about nobody getting all the

22   Mexicans hanging out on Mesa Drive in September 2007, and the

23   time that you did those operations many months later in June

24   and July 2008, you started to plan, your office started to plan

25   major operations in Mesa, is that correct?                 11:57:17

1  A.  Had nothing to do with this comment.

2  Q.  Sheriff, I'm asking whether in that time period you started

3  to plan major operations in Mesa.

4  A.  We'd been planning all along, and I'm not sure we started

5  right after September 20.                                    11:57:37

6  Q.  My question was:  Sometime in that nine-month time period

7  did you start to plan major operations in Mesa?

8  A.  Yes.

9  Q.  Let's look at PX 223.  Again, this has not yet been

10  admitted, but Sheriff, I'm going to ask you to take a look at  11:57:57

11  it.  This is a May 8, 2008, letter from Mike S to you.

12       That's your handwriting on the top, right?

13  A.  Yes.

14  Q.  And you asked your assistant to send a thank you letter to

15  the author of this letter?                                   11:58:15

16  A.  Yes.

17       MR. YOUNG:  Your Honor, I move the admission of

18  PX 223.

19       MR. CASEY:  No objection, Your Honor.

20       THE COURT:  Exhibit 223 is admitted.                  11:58:23

21       (Exhibit No. 223 is admitted into evidence.)

22       MR. YOUNG:  May we publish the exhibit?

23       THE COURT:  You may.

24       MR. YOUNG:  Thank you.

25  BY MR. YOUNG:                                               11:58:31

412

1    Q.  You forwarded a copy of this letter to Chief Sands,

2    correct?

3    A.  Yes.

4    Q.  Now, let's take a look at the -- the letter.  Down at the

5    bottom of the first page it starts, Living in Mesa.  And it          11:58:46

6    says:  Living in Mesa, I can drive down any of the streets

7    where day laborers, most of whom I would believe to be here

8    illegally, gather and wait for work.

9            You see that?

10   A.  Yes.                                                             11:59:07

11   Q.  And then he complains that the Mesa Police Department is

12   not doing anything about the day laborers waiting for work.

13           Do you see that?

14   A.  Yes.

15   Q.  You put a mark next to that paragraph.  That's your mark         11:59:18

16   right there on the right-hand side, is that right?

17   A.  Yes.

18   Q.  And you did that so that Chief Sands would have this

19   information about day laborers in Mesa as backup and

20   intelligence for his operations, is that right?                     11:59:38

21   A.  Once again, any information I get I transmit to the

22   appropriate officials.

23   Q.  And Chief Sands, being the person who oversees your

24   saturation patrols, was the appropriate person to get the

25   information in this letter?                                         11:59:53

1    A.  Yes.

2    Q.  You think that simply getting information about day

3    laborers where someone tells you that they believe them to be

4    there illegally is something that warrants your sending to

5    Chief Sands for his enforcement operations?                    12:00:11

6    A.  Everything I receive I give to him.  However, I believe

7    there's another sentence about the Mesa police chief in the

8    same paragraph.

9    Q.  Now, let's talk about Chief Sands a bit here.

10                THE COURT:  Is now a good time to break for lunch?    12:00:32

11                MR. YOUNG:  Actually, it would be, Your Honor.

12                THE COURT:  All right.  We will break for lunch.

13   We'll resume at 1:15.

14                THE COURT:  Thank you.  Please be seated.

15                You ready to resume cross-exam -- or examination,    13:15:27

16   Mr. Young?

17                MR. YOUNG:  Yes, Your Honor.

18                THE COURT:  Before you do that, I just want to make

19   sure, there was an irregularity, particularly with the

20   impeachment exhibit.  I understand that the parties have        13:15:38

21   stipulated to its numbering as used by you in examination this

22   morning, is that correct?

23                MR. YOUNG:  I think that we submitted an impeachment

24   exhibit which we had identified as 451.  And my understanding,

25   and Ms. Gallagher should correct me if I'm wrong, is that your  13:15:55

```
 1   clerk has now marked that as Exhibit 451 in this proceeding,

 2   and that future impeachment exhibits should be marked by the

 3   clerk in numerical order following that.

 4            THE COURT:  451.

 5            Do you agree with that, Mr. Casey?                      13:16:10

 6            MR. CASEY:  That's -- that's acceptable, Your Honor.

 7            THE COURT:  All right.  Then please proceed with your

 8   examination.

 9            MR. YOUNG:  Thank you, Your Honor.

10   BY MR. YOUNG:                                                    13:16:19

11   Q.  Hello, Sheriff.

12            You're the final decision maker at the MCSO, correct?

13   A.  Yes.

14   Q.  If you issue your instructions, those instructions are the

15   final word at MCSO on whatever it is that you've instructed on,  13:16:32

16   is that right?

17   A.  I delegate to my staff.  They carry out my mission, usually

18   on an independent basis.

19   Q.  But if you issue instructions, those instructions are the

20   final word at MCSO, is that right?                               13:17:02

21   A.  I establish the policy, and it's up to my staff, employees,

22   to carry it out.

23   Q.  Sheriff, you gave your deposition on December 16, 2009, in

24   this case.  At page 66 you testified as follows, starting at

25   line 2:  "In other words, as the final decision-maker if you     13:17:23
```

1    issued instructions, your instructions would be the final word

2    at MCSO?

3            "ANSWER:  Yes."

4            That's accurate, correct?

5    A.  Yes.                                                          13:17:37

6    Q.  Now, sometimes you discuss with Chief Sands the letters of

7    public support that you receive and pass on to him that relate

8    to the subject of illegal immigration.  We've seen that, is

9    that correct?

10   A.  I think I said I very seldom discuss it.  There may be       13:17:55

11   occasions where I do.

12   Q.  You also work together or discuss with Chief Sands the

13   issue of where to do crime suppression or saturation patrol

14   operations, is that correct?

15   A.  He makes the decision on where to go after good research,    13:18:10

16   and then he tells me what he plans on doing.

17   Q.  But you talk to him about that decision making process

18   about where to do crime suppression patrols, is that right?

19   A.  He makes a decision after obtaining information,

20   intelligence, and what have you, and then he advises me as to    13:18:39

21   where he's going.

22   Q.  You make suggestions to him as to where to do the

23   saturation patrol/crime suppression operations?

24   A.  Very seldom do I suggest.  I give him the information and

25   he makes a decision on where to conduct the operation.           13:18:56

1    Q.  Well, you do make suggestions and you have the final say if

2    you want to exercise your power as sheriff, correct?

3    A.  That's correct.

4    Q.  You are the sheriff, and if you tell Chief Sands to do

5    something, he will do it, correct?                              13:19:22

6    A.  I expect him to, yes.

7    Q.  And he does, is that right?

8    A.  I don't micromanage, but I presume he gets it done.

9    Q.  And he definitely does not go into an area with a

10   saturation patrol without your knowing about it, is that right? 13:19:39

11   A.  That's correct.

12   Q.  Let's take a look at PX 244, which has been admitted, so it

13   can be published.

14          THE COURT:  Yes, it can be published.

15          MR. YOUNG:  I'm sorry, Your Honor.  Thank you.          13:19:59

16   BY MR. YOUNG:

17   Q.  Let's look at the first page, which is on the left-hand

18   side of this document.  That's your handwriting on the top,

19   correct?

20   A.  Yes.  Yes.                                                  13:20:15

21   Q.  And what it says there, there's a redaction there, but it

22   says:  Thanks for your support, right?  Says that?

23   A.  Yes.

24   Q.  And then under that it says something illegal immigration.

25          Do you see that?                                        13:20:38

1    A.  Yes.

2    Q.  And then it says:  I will be going into Mesa.

3         Do you see that?

4    A.  Yes.

5    Q.  Now, on the right-hand side there's a -- another note that          13:20:45

6    says:  Chain gangs are all over.

7         Do you see that?

8    A.  Yes.

9    Q.  Now, you also wrote a note on the top to cc this to

10   Chief Sands, is that right, where it says "cc Brian"?          13:21:05

11   A.  Yes.

12   Q.  George Gascón was the Mesa police chief, correct?

13   A.  What time period?

14   Q.  In 2008.

15   A.  I believe he was.          13:21:23

16   Q.  He's Hispanic, correct?

17   A.  I don't know.

18   Q.  He was publicly critical of your illegal immigration

19   efforts, is that right?

20   A.  Yes.          13:21:37

21   Q.  Now, on this page, further down toward the bottom where it

22   says do the Mesa, Arizona sweep, can we focus on that?

23         And this letter, by the way, was written by someone

24   named Jack to you on May 24, 2008, and he says:  Yes, the Mesa,

25   Arizona police chief drags his feet and stalls enforcing that          13:22:03

1   which the majority vote and some of the politicians put into

2   state and federal law.  Add the fact that the head of Mesa's

3   police union is a Hispanic.  That's what you get from Mesa.

4          You see that?

5   A.  Yes.                                                    13:22:21

6   Q.  You drew a line, a bracket, to emphasize that paragraph

7   which you sent on to Chief Sands, is that right?

8   A.  Yes.

9   Q.  And then toward the bottom, the next paragraph of that same

10  page says that the author spoke to one of your MCSO officers   13:22:41

11  and asked why he did not arrest the 30 plus or minus illegals

12  that were on all four corners.

13         Do you see that?

14  A.  Yes.

15  Q.  And then the letter-writer to you says:  I can't just      13:23:04

16  because they're standing there.  And then Jack says that he's

17  going to write to you, Sheriff Arpaio, and complain about his

18  lack of action.

19         Do you see that?

20  A.  Yes.                                                      13:23:22

21  Q.  Now, go to the next page where the paragraph continues at

22  the top.  And let's -- okay.

23         And then Jack writes that the officer that he's

24  complaining about is of Hispanic origin, and that Jack was

25  close enough to see his name badge.                           13:23:44

```
1              Do you see that?

2    A.  Yes.

3    Q.  This is Jack here in this letter complaining to you about

4    one of your own Hispanic officers, correct?

5    A.  Yes.                                                          13:23:58

6    Q.  And the complaint was about the officer not arresting a

7    bunch of people who were standing in Mesa on a street corner,

8    is that right?

9    A.  Yes.

10   Q.  And you sent this complaint about one of your Hispanic      13:24:08

11   officers to Chief Sands, correct?

12   A.  Yes.

13   Q.  Now, on page 2, Jack asks you to -- where it says

14   Sheriff Joe in all capitals, it says, Sweep a whole bunch of

15   places, Mesa, Chandler, southeast Chandler, Guadalupe, Cave     13:24:34

16   Creek, sweep everywhere.

17             Do you see that?

18   A.  Yes.

19   Q.  You in fact had saturation patrol operations in those

20   areas, didn't you?                                              13:24:47

21   A.  I don't think we went into Chandler.

22   Q.  Okay.  But as to the others you think you did go?

23   A.  Guadalupe and Cave Creek, yes, and Mesa.

24   Q.  Now, you sent Jack here a thank you letter in which you

25   said that you shared his concern about issues relating to       13:25:13
```

1    illegal immigration, is that correct?

2    A.  I say that -- that's a basic letter that I write to

3    everybody.

4    Q.  Well, in your note on this letter, though, you say that you

5    will be going into Mesa.                                    13:25:32

6    A.  That's my note.

7    Q.  And in fact, you did go into Mesa, didn't you?

8    A.  I think we'd been there before 2008, and I'm sure we'd been

9    there three, four times.

10   Q.  Well, as we discussed -- well, first of all this letter's   13:25:47

11   dated May 24, 2008.  You went into Mesa about a month later in

12   late June, and then you did another operation in July 2008.

13            Do you remember that?

14   A.  If those are the dates.

15   Q.  I'll tell you those are the dates.                        13:26:02

16            You personally attended one or more of those

17   operations in Mesa, correct?

18   A.  I wasn't involved in the operation, but I was there, I

19   believe.

20   Q.  You believed that your operations in Mesa were in keeping   13:26:18

21   with your promise to the public, correct?

22   A.  I don't know the promises that you're referring to to the

23   public.

24   Q.  All right.

25   A.  We go in there when we have evidence of crimes being        13:26:38

```
 1   committed.
 2   Q.  Let's look at PX 316.
 3           MR. YOUNG:  PX 316 has been admitted, Judge.  May we
 4   publish it?
 5           THE COURT:  Yes.                                      13:26:52
 6   BY MR. YOUNG:
 7   Q.  PX 316 is your press release about one of your Mesa
 8   operations in June, correct?
 9   A.  Yes.
10   Q.  And the first sentence there says:  In keeping with his  13:27:00
11   promise to the public and East Valley state legislators,
12   Maricopa County Sheriff Joe Arpaio today directed his deputies
13   and posse volunteers into the city of Mesa.
14           You see that?
15   A.  Yes.                                                     13:27:16
16   Q.  So would you agree with me that your going into Mesa was in
17   keeping with your promise to the public?
18   A.  I think the heading says All Violations of the Law to be
19   Enforced.  That's why we went into Mesa.
20   Q.  Sheriff, my question was:  Did you think going into Mesa  13:27:35
21   was in keeping with your promise to the public?
22   A.  We went into Mesa to enforce all the laws.
23           MR. YOUNG:  Judge, could I get an instruction to the
24   witness to answer the question?
25           THE COURT:  Sheriff, listen carefully to the question, 13:27:49
```

1    and if you can, try to answer the question --

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  -- you're asked.

4    BY MR. YOUNG:

5    Q.  Sheriff, your going into Mesa, in your view, was in keeping    13:27:57

6    with your promises to the public, is that correct?

7    A.  I'm not sure when you say "promises to the public."  We

8    don't go into areas because of promises, normally, to the

9    public.

10   Q.  So is it your testimony that your press release dated June    13:28:16

11   26 was wrong when it said in keeping with his promise to the

12   public you went into Mesa?

13   A.  I think I was referring to legislators.

14   Q.  You do -- you're right, you refer to legislators, but you

15   also refer to your promise to the public, correct?    13:28:35

16   A.  Well, not on that operation.  In general terms I told the

17   public that I will enforce all the illegal immigration laws,

18   but not for that specific Mesa operation.

19   Q.  Well, this paragraph is about the specific Mesa operation.

20            Do you see that?    13:28:56

21   A.  In keeping with his promise to the public.  That's a

22   generic term that goes back, not just for that instance.

23   Q.  Okay.  Well, in a generic sense, then, your going into Mesa

24   was in keeping with your promise to the public.  Is that a

25   correct statement?    13:29:16

1    A.  But not only for that operation is what I'm trying to get

2    across to you.

3    Q.  You make promises to the public generally, and your other

4    operations besides the ones in Mesa are also in keeping with

5    your promise to the public?                                          13:29:30

6    A.  That's correct.

7    Q.  Let's go to PX 228, which is not yet admitted.  It's

8    another list of comments from your front desk call-ins.

9           Do you see that?

10   A.  Yes.                                                             13:29:55

11   Q.  And you have some handwriting copying this to Chief Sands

12   and to Lisa Allen, who's your public information officer,

13   correct?

14   A.  Yes.

15          MR. YOUNG:  Your Honor, I move for the admission of         13:30:10

16   Exhibit 228.

17          MR. CASEY:  No objection, Your Honor.

18          THE COURT:  228 is exhibit -- is admitted.

19          (Exhibit No. 228 is admitted into evidence.)

20          MR. YOUNG:  And I would ask that it may be published.       13:30:19

21          THE COURT:  May be published.

22          MR. YOUNG:  Thank you.

23   BY MR. YOUNG:

24   Q.  You read this list of call-in comments and you sent it to

25   Chief Sands because you wanted him to see what people were          13:30:29

1    saying, is that right?

2    A.  Yes.

3    Q.  And you also wanted to see what people were saying, is that

4    right?

5    A.  I don't solicit the phone calls.  When they do come in, I          13:30:40

6    receive the messages.

7    Q.  And you want to see what messages people are leaving for

8    you, is that right?

9    A.  Yes.

10   Q.  You also wanted your public information officer, Lisa           13:30:50

11   Allen, to see what in this case people had said, is that right?

12   A.  Yes.

13   Q.  On the first page under Terril K there's a note -- I'll

14   also say this is July 16, 2008, so you'd done some activities

15   in Mesa already.                                                     13:31:13

16           That person left a message:  Please continue coming to

17   Mesa.  You have my personal invitation.  You put a mark next to

18   that for Chief Sands?

19   A.  Yes.

20   Q.  And then on the third page of the exhibit there's another       13:31:28

21   comment in the middle from Suzanne B.  Let's get that on the

22   board.  It's -- no, the next page here.

23           There's another note from Suzanne B, you see that,

24   also thanking you for coming to Mesa.

25           See that?                                                    13:31:55

1    A.  Yes.

2    Q.  And that person asks you to do a sweep on Mesa Drive at

3    Sixth Avenue and Main Street, correct?

4    A.  Yes.

5    Q.  And says that illegals are hanging around early in the          13:32:09

6    morning.

7    A.  Yes.

8    Q.  You put a mark next to that --

9    A.  Yes.

10   Q.  -- request as well, and then you sent it to Chief Sands.        13:32:16

11   A.  Yes.

12   Q.  Now, there's more of this on page -- the second page,

13   right?  If you would go to the second page of the exhibit

14   there's a note from Joyce F, and it says, among other things,

15   immigration sweeps, she's on your side.  Immigrants hanging out     13:32:47

16   on Cave Creek Road on corner daily.

17            You see that?

18   A.  Yes.

19   Q.  And you put a mark next to that note, too --

20   A.  Yes.                                                            13:32:58

21   Q.  -- and sent it to Chief Sands?

22   A.  Yes.

23   Q.  There's nothing in any of these notes that we've looked at

24   that talks about any of these -- well, let's -- let's focus on

25   this one, this Joyce F note.  It says:  Immigrants hanging out       13:33:08

1    on Cave Creek Road on corner daily.

2          There's nothing there that indicates that those are

3    illegal immigrants, is that right?

4    A.  That's correct.

5    Q.  And further down at the bottom of the page says Kerrie R.    13:33:21

6    It says:  Please make another immigrant sweep at Cave Creek and

7    Bell Road.  You see that?

8    A.  Yes.

9    Q.  And you put a mark next to that note, too.

10   A.  Yes.    13:33:36

11   Q.  In fact, what you did as you look at these pages -- and

12   maybe we can put the first two pages on this -- is that

13   wherever someone asked for you to do an immigrant sweep -- I'm

14   using Kerrie R's words there -- you put a mark next to that

15   note and you sent it to Chief Sands, is that right?    13:33:55

16   A.  I send the whole document to him, especially when it

17   pertains to illegal immigration he gets everything, regardless

18   of what the subject matter is pertaining to illegal

19   immigration.

20   Q.  Well, that's -- that's not quite true, right?  Because just    13:34:22

21   going back to the first page there's an item from Robert H.

22   That item refers to illegal immigration, but it doesn't ask for

23   a sweep or a suppression patrol.

24          Do you see that?

25   A.  Yes.    13:34:46

```
1    Q.  Okay.  So you did not put a mark next to that item that
2    relates to immigration --
3    A.  No, I did not.
4    Q.  -- correct?
5    A.  Yes.                                                         13:34:57
6    Q.  But you did put a mark next to these other items which
7    specifically call for you and your office to do crime
8    suppression patrols in particular locations.
9            Is that what you did?  You did that, correct?
10   A.  Yes.                                                         13:35:15
11   Q.  You think it's good management for you to send items like
12   this exhibit to Chief Sands, since he runs your illegal
13   immigration enforcement efforts, is that right?
14   A.  As I said previously, I sent -- it's my management policy,
15   50 years, I send anything pertaining to a subject matter to who  13:35:40
16   is responsible to them.  I think that's good management.  They
17   can do what they want with it.  If they want to throw it in the
18   wastebasket, that's their discretion.
19   Q.  Let's take a look next at PX 237.  That's not yet been
20   admitted.  This is a letter that someone sent to you from        13:36:08
21   Sun City, is that right?
22   A.  Yes.
23   Q.  And we'll call her Gail, dated August 1, 2008.
24           Is that your handwriting on the upper right?
25   A.  Yes.                                                         13:36:28
```

```
 1   Q.  And then you sent it to Brian Sands, correct?

 2   A.  Yes.

 3          MR. YOUNG:  Your Honor, I move for the admission of

 4   PX 227.

 5          MR. CASEY:  No objection, Your Honor.              13:36:37

 6          MR. YOUNG:  Your Honor, may we publish it?

 7          THE COURT:  Let me ask, was that 227 or 237?

 8          MR. CASEY:  237.

 9          MR. YOUNG:  I'm sorry, I meant -- oh, it's 237, yes.

10   Thank you.  Sorry.                                        13:36:50

11          May we publish Exhibit 237?

12          THE COURT:  Well, yeah, I'll admit 237, and you may

13   publish it.

14          (Exhibit No. 237 is admitted into evidence.)

15          MR. YOUNG:  Thank you.                             13:37:03

16   BY MR. YOUNG:

17   Q.  Now, Sun City is another place where your office is the

18   only law enforcement agency, is that right?

19   A.  Yes.

20   Q.  And you take action there where -- when people there    13:37:10

21   express concern about crimes, right?

22   A.  Yes.

23   Q.  Now, this letter is -- has a subject line, Want to check

24   out Sun City, is that right?

25   A.  Yes.                                                  13:37:29
```

1    Q.  You did do a major operation in Sun City, correct?

2    A.  I think we were planning that three, four weeks before this

3    letter came in.

4    Q.  Okay.  But you did do an operation in Sun City, right?

5    A.  In an area, yes.                                          13:37:46

6    Q.  Now, her letter -- this is Gail -- says in the second

7    paragraph that she was in a McDonald's at Bell Road and Boswell

8    next to the Chase Bank and, quote, there was not an employee in

9    sight or within hearing who spoke English as a first language,

10   to my dismay.                                                 13:38:14

11        You see that?

12   A.  Yes.

13   Q.  Now, it's not a crime for someone to speak English as a

14   second language, is it?

15   A.  No, it's not a crime.                                     13:38:21

16   Q.  And then she says:  From the staff at the registers to the

17   back -- to the staff back in the kitchen area, all I heard was

18   Spanish except when they haltingly spoke to a customer.

19        You see that?

20   A.  Yes.                                                      13:38:38

21   Q.  Speaking Spanish is not a crime, either, right?

22   A.  No, it is not.

23   Q.  So if you speak English as a second language, or if you

24   speak Spanish, there's not even a potential criminal violation.

25        Would you agree with me on that?                         13:38:53

1    A.  Yes.

2    Q.  You forwarded this letter to Chief Sands and you wrote a

3    note in your handwriting that says, For our operation, is that

4    right?

5    A.  Yes.                                                    13:39:11

6    Q.  The operation that you were referring to was the Sun City

7    crime suppression operation that you were going to launch, is

8    that right?

9    A.  Yes.

10   Q.  You sent Chief Sands this information about people speaking    13:39:21

11   Spanish at a McDonald's so he would know about it for purposes

12   of the operation that you and he were planning at that time, is

13   that right?

14   A.  I'm not sure.  Once again, I sent that letter to him for

15   whatever he wants to do with it.  Now, whether he wants to talk    13:39:42

16   to that person, see if that person has information about crime,

17   I don't know.

18   Q.  Well, you wanted Chief Sands to know about this letter and

19   about people speaking Spanish at that McDonald's for purposes

20   of his operation.                                          13:40:03

21   A.  Anything that comes in regarding illegal immigration I give

22   to him, and he decides what to do with it.

23   Q.  Gail was a constituent, correct, from Sun City?

24   A.  I don't -- I don't even know who she is.

25   Q.  Okay.  Well, you put a note that says, We'll look into it,    13:40:26

1    is that right?

2    A.   For him to do what he wants to do with that complaint.   Not

3    actually the complaint, but the person that may have

4    information.

5    Q.   I'm going to read to you from your deposition on November    13:40:44

6    16, 2010, at line 136 -- page 136, starting at line 1, and

7    don't put this on the screen:  Well, what was it, then, that

8    you were looking into about what Gail told you in her letter?

9          And I'm substituting the first name for the last name.

10          "ANSWER:  Well, once again, this is two years ago.  I    13:41:07

11    don't have all the details on our operation in Sun City.  But

12    she is a constituent from Sun City, and I'm not sure as to who,

13    if anybody, contacted her or whether I -- in my letter, I said

14    that we appreciate your information, knowing that probably in

15    the near future we were going to do a crime suppression    13:41:27

16    operation where she lived."

17          That testimony that you gave was accurate, right?

18    A.   If I said that back then, yes.

19    Q.   You did.

20    A.   To the best of my knowledge.    13:41:44

21          I presume everybody in the -- is a constituent in that

22    regard.  It was in Maricopa County.

23    Q.   You believed that this information in Gail's letter was

24    intelligence regarding the operations that you were going to

25    have in Sun City regarding crime, is that right?    13:42:11

1   A.  I call it information that I just passed on to the person

2   responsible for the illegal immigration programs.

3   Q.  Well, actually, you think of it as intelligence, correct?

4   A.  I would call it more information.

5   Q.  And we look at page 134 of your November, 2010,                13:42:32

6   deposition -- and we can put this on the board, or on the

7   screen -- starting at line 5, going to line 12, and what you

8   said in your deposition in response to this question:

9           "What did you mean when you told Brian Sands,

10  forwarding him this information -- forwarding him this letter,   13:42:53

11  'for our operation'?"

12          Your answer was:  "Well, once again, we're talking

13  about a situation that's, what, over two years old?  I'm not

14  sure, but it could be some intelligence regarding some

15  operations we had in Sun City or in that area regarding crime."  13:43:08

16  A.  It's a matter of semantics, information/intelligence.  I

17  like using the word "information."  I may have used the word

18  "intelligence" at that time.

19  Q.  Okay.  You did not tell Gail that speaking Spanish is not a

20  crime, is that right?                                            13:43:35

21  A.  I never talked to her.

22  Q.  Well, you wrote her a thank you letter, right?

23  A.  I don't know.  I didn't see it.

24  Q.  Well, I haven't seen it, either, actually --

25  A.  Then I guess I didn't write it.                              13:43:47

1   Q.  But your note says that you're going to have your staff

2   write her a thank you letter?

3   A.  No, I said look into this.

4   Q.  Well, the top doesn't it say letter --

5   A.  Yeah, that's right, thank you for information.          13:43:59

6   Q.  So you wrote her a thank you letter?

7   A.  Which I do with everybody.

8   Q.  And you did it with Gail, right?

9   A.  I'm not sure if that was carried out.  I don't remember the

10  letter.                                                      13:44:10

11  Q.  Okay.

12  A.  But I did say to my secretary, Write a thank you note --

13  letter.

14  Q.  Do you think you would have told your secretary to include

15  in that thank you letter some information back to Gail that   13:44:20

16  simply speaking Spanish is not a crime?

17  A.  No.

18  Q.  Did it even occur to you that you might say that to her?

19  A.  No.

20  Q.  Let's go to PX 235.  And 235 -- I'm sorry, it's          13:44:31

21  Exhibit 235.  When I say PX I'm thinking -- I'm putting an

22  extra letter on there.

23          Exhibit 235, that's a letter from someone named Bob

24  and Lynnette to you dated August 2, 2008.  You have some

25  handwriting in the upper right-hand corner, right?           13:45:01

1    A.   Yes.

2    Q.   And you instructed Helen, your assistant, to write a thank

3    you letter back to them?

4    A.   Yes.

5    Q.   Could we --                                          13:45:07

6         MR. YOUNG:   I request admission of Exhibit 235, Your

7    Honor.

8         MR. CASEY:   Your Honor, I have no objection to that

9    admission.   I would just want to point out in my notebook I've

10   got a second page again that appears to be another letter from  13:45:20

11   the same people.

12        MR. YOUNG:   Yeah, and I'm only seeking admission of

13   the first page, which is the letter that's on the screen now.

14        MR. CASEY:   No objection.

15        MR. YOUNG:   And we can use the exhibit later on, with   13:45:34

16   agreement of defendants.

17        THE COURT:   All right.   Only the first page of

18   Exhibit 235 is admitted.   If there's been more than one page

19   submitted, then only the first page is admitted.

20        (Exhibit No. 235 is admitted into evidence.)           13:45:52

21        MR. YOUNG:   Thank you, Your Honor.

22        May we publish Exhibit 235?

23        THE COURT:   You may.

24   BY MR. YOUNG:

25   Q.   Now, you also sent this letter to Chief Sands to help him  13:46:00

```
 1   with his operations, correct?
 2   A.  Is that the August 8th that's on my screen?
 3   Q.  Yes.
 4   A.  Yes.
 5   Q.  You did have an operation in Surprise, is that right?        13:46:08
 6   A.  I don't recall the time frame.
 7   Q.  But do you recall having an operation in Surprise?
 8   A.  In the Surprise area, yes.
 9   Q.  In the second paragraph the authors write:  I would love to
10   see an immigrant sweep conducted in Surprise, especially -- or    13:46:29
11   specifically at the intersection of Grand and Greenway.  The
12   area contains dozens of day workers attempting to flag down
13   motorists seven days a week.
14            You see that?
15   A.  Yes.                                                          13:46:45
16   Q.  You put a line next to that paragraph to draw the attention
17   of Chief Sands to it?
18   A.  Yes.
19   Q.  This is also information or intelligence that you wanted
20   him to have for your operations?                                  13:46:56
21   A.  I'm not sure that was a time they were conducting a
22   Sun City/Surprise operation.
23   Q.  Well, I'll tell you for your information, Sheriff, that
24   your attorneys and we have agreed that on October 16 and 17,
25   2009, in Surprise and in the northwest valley, your office held   13:47:13
```

1   a major operation.  That was paragraph 78 of the pretrial

2   order.

3           My question is:  Did you put a line next to this

4   paragraph so that Chief Sands could have this intelligence or

5   information for purposes of your office's operations?                13:47:35

6   A.  Well, you know, let me say in that time period we were

7   authorized by the government to conduct 287(g) operations.  And

8   we had a close relationship with ICE, so that was another

9   reason I would give the information to the chief, in case he

10  would speak with the ICE officials, since we were under their    13:48:05

11  umbrella.

12  Q.  So the answer is, yes, this information about day workers

13  in Surprise you sent to Chief Sands so he could have it for his

14  operations, including whatever discussions with ICE he was

15  having, is that right?                                            13:48:26

16  A.  Anything to do with immigration I would send to him.

17  Q.  Let's look at P -- at Exhibit 381.  This is a February 1,

18  2008, letter to you from Gary and Kay.

19          You have that in front of you?

20  A.  Yes.                                                          13:48:52

21  Q.  Now, you have another handwritten note on the top of this

22  exhibit, right?

23  A.  Yes.

24          MR. YOUNG:  Your Honor, may we admit Exhibit 381?

25          MR. CASEY:  No objection, Your Honor.                     13:49:10

1        THE COURT:  Exhibit 381's admitted.

2            (Exhibit No. 381 is admitted into evidence.)

3        THE COURT:  You may publish.

4        MR. YOUNG:  Thank you, Your Honor.

5   BY MR. YOUNG:                                            13:49:21

6   Q.  The fourth paragraph of this letter, starting in the middle

7   of the page, asks you:  Lastly, we would like to know why the

8   Mexicans are allowed to park on the corner of 99th and Broadway

9   peddling their old corn, peanuts, et cetera.  I know they do

10  not have a permit.  It is not fair we have to see them every    13:49:43

11  day driving into our complex.

12        You see that?

13  A.  Yes.

14  Q.  Now, you sent the authors of this letter a thank you note,

15  correct?                                                 13:49:59

16  A.  I don't see it, but I presume I asked for it to be sent.

17  Q.  Okay.  Well, just going back to the note at the top of the

18  page you say:  Helen, thank you letter.

19        That's your way of telling your assistant to prepare a

20  thank you letter that will go out on your behalf, is that   13:50:16

21  right?

22  A.  Yes.

23  Q.  And then you write at the top of the letter:  Will give

24  information to my illegal immigration officers to look into.

25        Is that right?                                     13:50:33

1   A.   Yes.

2   Q.   Now, this letter does talk about Mexicans, right?

3   A.   Yes.

4   Q.   But there's nothing in this letter, at least the paragraph

5   that we've looked at, indicating that they're illegal            13:50:46

6   immigrants, correct?

7   A.   I think we were talking about not having a permit, which is

8   a violation of the law regardless who they are.  She was

9   complaining about corn vendors with no permit to operate.

10  Q.   And you think that selling something without a permit is     13:51:11

11  something that your illegal immigration officers would be

12  pursuing?

13  A.   Whatever they wanted to do with it.  We do have drop houses

14  where food is stored, people are selling goods without a

15  permit, which is a health problem.                               13:51:31

16  Q.   Well, I'm asking about what you intended, though.

17       Do you think that you sent this letter, or this

18  information to your illegal immigration officers because

19  someone was selling something without a permit?

20  A.   That, and also we're dealing with possible immigration       13:51:45

21  violations.

22  Q.   And the possible immigration violation springs out of the

23  fact, as described in this letter, that the people being

24  described are Mexican, is that right?

25  A.   There's always the possibility.  I'm not accusing them of    13:52:01

1    being here illegally; I'm giving it to the section of my

2    organization as knowledge about illegal immigration.

3    Q.  It's possible in your view every time there's a Mexican

4    that there may be an immigration violation.  Is that your view?

5    A.  I'm not saying that.                                          13:52:22

6    Q.  Well, isn't that -- is that not what you just said?

7          And why did you send this information to your illegal

8    immigration officers?

9    A.  Because we've had intelligence and made many arrests where

10   illegal immigrants were selling goods on the streets, a          13:52:34

11   violation of the law.

12   Q.  Well, you -- you've stopped and arrested many people who

13   were and looked Mexican, is that right?

14   A.  Pardon?

15   Q.  You've stopped many people and arrested many people who are  13:52:48

16   or looked Mexican?

17   A.  No, we only stop -- investigate people when they commit a

18   state crime.

19   Q.  You have another area of your office that deals with people

20   who are selling things without a permit, correct?               13:53:06

21   A.  I don't know where that falls under.

22   Q.  Your illegal immigration officers go after people who are

23   selling things without a permit?

24   A.  When we have information, as I said before, we've arrested

25   many people selling goods on the street without permits, but    13:53:33

1   has nothing to do with whether they're Irish, Mexican, or what

2   have you.

3   Q.  So if someone is Irish and is selling something without a

4   permit, do you send your illegal immigration officers that

5   information so they can look into it?                    13:53:51

6   A.  It depends on the circumstances.

7   Q.  All right.  Well, let's just say someone is Caucasian and

8   is selling something without a permit.  Do you send your

9   illegal immigration officers after that person?

10  A.  If the Caucasian -- if there is a history that -- that a    13:54:07

11  certain group of people were involved in this type of activity

12  and many of them were in this country illegally, it only makes

13  common sense to send it to the person who's handling the

14  illegal immigration problem.

15  Q.  And in this case you sent it to your illegal immigration    13:54:27

16  officers because the people selling things without a permit

17  were Mexicans, is that right?

18  A.  Not necessarily.

19  Q.  Well, there's no other information that you have other than

20  that they're selling without a permit and they're Mexican, is   13:54:39

21  that right?  And that's enough for you to send it to your

22  illegal immigration officers?

23          MR. CASEY:  Excuse me, Your Honor.  For completeness

24  purposes, he's only -- I request that he show the witness the

25  second page of the document for --                       13:54:53

1          THE COURT:  You can do that on cross-examination.

2          MR. CASEY:  Thank you, Your Honor.

3     BY MR. YOUNG:

4     Q.  Sheriff?

5     A.  The answer is that I sent it to my illegal immigration          13:55:00

6     group of people that handles illegal immigration.

7     Q.  Because they're Mexicans selling corn without a permit, is

8     that right?

9     A.  We had information about people, Mexican ancestry or

10    whatever, that were involved in selling goods on the street          13:55:24

11    without permits, and I just gave it to the immigration group to

12    look into it.  Not accusing them of any violation of the law.

13    Q.  Okay, but you're starting an investigation based on the

14    fact that they're Mexicans selling something without a permit,

15    is that right?          13:55:45

16    A.  I'm just responding to someone who wrote the information

17    and decided to give it to the immigration group.

18    Q.  Have you ever sent to your illegal immigration officers the

19    case of a Caucasian person who was selling things without a

20    permit?          13:56:02

21    A.  I don't recall ever coming up with that instance.

22    Q.  Because you don't think of Caucasians as being possible

23    illegal immigrants, right?

24    A.  They could be.

25    Q.  Well, in the context of people selling things without a          13:56:15

1   permit, that's not something that would occur to you, is that

2   right?

3   A.   That's correct.

4   Q.   Let's go to PX 187.  Sheriff, this is a June 19, 2008,

5   letter with your handwriting on it in the upper right-hand          13:56:41

6   corner, correct?

7   A.   Yes.

8   Q.   And you sent this on to Chief Sands, correct?

9   A.   Yes.

10          MR. YOUNG:  Your Honor, may we admit PX 187?                 13:56:52

11          THE COURT:  Any objection?

12          MR. CASEY:  No, Your Honor.  No objection.

13          THE COURT:  Exhibit 187 is admitted.

14          (Exhibit No. 187 is admitted into evidence.)

15          MR. YOUNG:  May we publish it?                              13:57:04

16          THE COURT:  You may.

17   BY MR. YOUNG:

18   Q.   Now, this letter is one that you put in your immigration

19   file, is that right?

20   A.   I may have.                                                   13:57:19

21   Q.   You have a note there that says cc sheriff, so you wanted

22   two copies of this for yourself, is that right?

23   A.   Yes.

24   Q.   Now, on the bottom of the first page and then running over

25   to the top of the second there is this statement by the author    13:57:33

443

```
 1   of this letter, Exhibit 187:  Then they have the nerve to say

 2   we are racial profiling.  Please.  It is what it is.  If you

 3   have dark skin then you have dark skin.  Unfortunately, that is

 4   the look of the Mexican illegal who are here illegally.

 5           You see that?                                    13:58:02

 6   A.  Yes.

 7   Q.  Then it talks about, further down in that same paragraph,

 8   unclean, disrespectful, integrity-less law-breaking selves.  It

 9   talks about their firing gunshots into the area and playing

10   their loud obnoxious noise they call music which disrupts the  13:58:21

11   law-abiding citizens.

12           Do you see that?

13   A.  Yes.

14   Q.  Then in the paragraph below that it talks about how it was

15   a beautiful city to live in 20 years ago.  And then in the     13:58:33

16   third line she says, and this is Gina:  I am begging you to

17   come over to the 29th Street/Greenway Parkway area and round

18   them all up.

19           You see that?

20   A.  Yes.                                                  13:58:50

21   Q.  Now, there's a mark in the right-hand corner of this

22   document next to that paragraph begging you to come over to

23   that place and round them all up.  That's your mark, right?

24   A.  Yes.

25   Q.  You put that mark there so that Chief Sands could see it   13:59:00
```

444

```
 1   for purposes of his operations, correct?
 2   A.  Yes.
 3   Q.  And in fact, in the first -- on the first page in the upper
 4   right-hand corner you said to Chief Sands, Have someone handle
 5   this, is that right?                                              13:59:17
 6   A.  Yes.
 7   Q.  Sheriff, you're confident that if you send Chief Sands
 8   something like this and ask him to handle it, he'll take care
 9   of it, is that right?
10   A.  In a professional way, yes.  I believe --                     13:59:38
11   Q.  This letter also men -- this letter mentions gunshots.
12            To your knowledge, did anyone, in response to your
13   sending this letter to Chief Sands, do any searching for
14   anybody who was firing guns?
15   A.  I don't know.                                                 13:59:57
16   Q.  Let's go to Exhibit 216.  This is a May 26, 2009, letter
17   from Stella to you.  That's your handwriting on the upper
18   right, is it?
19   A.  Yes.
20   Q.  And you sent this to Chief Trombi, correct?                   14:00:20
21   A.  Yes.
22            MR. YOUNG:  Your Honor, I move to admit Exhibit 216.
23            MR. CASEY:  No objection, Your Honor.
24            THE COURT:  216's admitted.
25            (Exhibit No. 216 is admitted into evidence.)            14:00:34
```

1          MR. YOUNG:  May we publish it?

2          THE COURT:  You may.

3    BY MR. YOUNG:

4    Q.  Now, this is a little hard to read so we'll need to look at

5    a little closer at it, but let's -- let's go to the first          14:00:41

6    paragraph of the letter.  And it talks about how Stella entered

7    a parking lot off of Thomas Road and west of Wal-Mart nearest

8    to Home Depot where she always sees numerous Mexicans standing

9    around in that area.

10         You see that language?          14:01:07

11   A.  Yes.

12   Q.  Then in the second paragraph she talks about a particular

13   day where she says:  All of a sudden a large amount of these

14   Mexicans swarmed around my car, and I was so scared and alarmed

15   and the only alternative I had was to manually direct them away          14:01:27

16   from my car.  And then she discusses how frightened she was.

17         You see that?

18   A.  Yes.

19   Q.  Nothing that is described by Stella in this letter is a

20   crime, correct?          14:01:43

21   A.  Not that I know of.

22   Q.  So Stella here is writing to you and complaining about

23   having a large number of Mexicans around her.  You think that

24   her complaint relates to day laborers, is that right?

25   A.  I don't see anything about day laborers here.          14:02:06

1    Q.  Well, you're right; it just talks about Mexicans.  But you

2    think that her complaint, as set forth in this letter, relates

3    to day laborers, is that right?

4    A.  I didn't say that.  I'm looking at the safety of that area.

5    This lady had some complaints, regardless of what background       14:02:29

6    they were.

7    Q.  Well, I'm not going to put this on the screen, but I'll

8    read to you from your November 16, 2010, deposition, at page

9    123, and I'll start at line 9, referring to this letter:

10           "In fact, she gives an address, which is 3721 East       14:02:50

11   Thomas Road.  It's underlined in the copy that I have.  Did you

12   underline that address?

13           "ANSWER:  I may have.

14           "QUESTION:  And what was your purpose in doing that?

15           "ANSWER:  I believe we've had a lot of complaints in       14:03:03

16   that area.  And I just wanted this letter to be another

17   information-gathering document to assist my people in case they

18   had to do some law enforcement activity.

19           "QUESTION:  The complaints that you're referring to

20   relate to day laborers?                                           14:03:21

21           "ANSWER:  I'm not sure if that's the only complaint in

22   this letter.  That may be one of her complaints."

23           You gave that testimony in November 2010?

24   A.  You say so, yes.

25   Q.  You thought that this information in Stella's letter          14:03:42

1    warranted further investigation, including a call to her?

2    A.  I did not.  Once again, I gave it to the people who run the

3    immigration operations under the federal jurisdiction and state

4    jurisdiction.  It's up to them what they want to do with it.

5    Q.  Well, Sheriff, look at your handwritten note again and                14:04:11

6    let's pull that up on the screen.

7           You wrote to Chief Trombi, Dave Trombi:  Keep file on

8    these complaints and also have one contact Stella.  You wrote

9    that, correct?

10   A.  Yes.                                                                   14:04:29

11   Q.  So you thought that the information about all the Mexicans

12   in this location warranted having someone contact Stella and

13   you -- you instructed Chief Trombi to have someone do that, is

14   that right?

15   A.  Once again, that would be up to him.  This is a suggestion,           14:04:43

16   they keep a file on all the complaints we receive, and for him

17   to -- if he saw fit, to contact the complainant and see what

18   her problem is.

19   Q.  Really, when -- when you said have one contact Stella, that

20   was just a -- that wasn't an instruction, that was simply a              14:05:06

21   suggestion?

22   A.  Yes.

23   Q.  You forwarded this letter to Chief Trombi so that he and

24   others could have information that would help them do some law

25   enforcement activity, is that right?                                      14:05:22

A.  Yes.

Q.  And you thought that talking to Stella about her experience
with the Mexicans might help your department gather information
regarding the illegal immigration problem, is that right?

A.  That -- once again, we're talking about crime.  I believe
she was talking about possible criminal complaints.  And it's
only good law enforcement to try to get to a complainant and
see what she has.

Q.  You just told me that there's nothing in this letter that
indicates a crime or a potential crime.

A.  I didn't read it.  It's very difficult to read.  I didn't
read the whole letter here.

Q.  So the facts that we did talk about, though, you agree with
me that those do not indicate a crime or potential crime,
correct?

A.  The way she wrote the letter, that's possible.  But you
never know until you can get to talk to the complainant.

Q.  So you think that you should investigate for a possible
crime whenever anyone is concerned that they're surrounded by a
bunch of Mexicans.  Is that what you're saying?

A.  Well, I think that it doesn't matter whether they're
Mexicans or not, but if you have some concerns about people
surrounding your car, it might be a violation of the law.
Especially if you're afraid.

Q.  You think that fear alone, fear of someone of a different

14:05:37

14:05:51

14:06:10

14:06:25

14:06:43

```
 1   ethnicity than yourself, justifies investigation into criminal

 2   activity?

 3   A.  No, I don't -- I don't believe the race of any person

 4   enters into it.  Whether it's 10 people, Caucasian, whatever,

 5   to come and surround your car when you have a little fear, I         14:07:04

 6   think someone should look into it.

 7   Q.  The only thing you know about the people mentioned in the

 8   letter is that they're Mexican, according to Stella, correct?

 9   A.  Doesn't matter if they're Italian or Mexican, it doesn't

10   matter.                                                             14:07:20

11   Q.  You did not have Chief Trombi tell Stella that being

12   Mexican is not a crime, did you?

13   A.  I did not tell Trombi anything other than he may want to

14   look into it.

15   Q.  Would you agree with me that one of the things that makes        14:07:34

16   our country great is that our Constitution and our laws

17   prohibit treating people differently, at least by the

18   government, based on their race?

19   A.  I fully agree with that.

20   Q.  You've received letters from people -- and we've seen some       14:07:49

21   of them -- asking you to take action against other people based

22   on their race or their ethnicity or their language.  And you've

23   written back thank you letters to all of them, correct?

24   A.  I answer all the letters, whether they're negative,

25   positive, that's my policy to thank them, at least for writing      14:08:10
```

1    to my office, regardless of whether I agree with the contents

2    of that letter.

3    Q.  And you thank them for supporting your policies on illegal

4    immigration, right?

5    A.  I thank them on supporting policies on immigration and our    14:08:26

6    fight against crime.

7    Q.  And you pass those letters on to Chief Sands or Chief

8    Trombi so that your officers, your chiefs, can use that

9    information for purposes of their activities, correct?

10   A.  If they want to.    14:08:45

11   Q.  You have not personally written back -- in all of these

12   thank you letters, in response to all of these letters you've

13   received, you've not personally written back to any of them to

14   tell them that you will not go after other people based on

15   their race, ethnicity, or language, is that right?    14:09:04

16   A.  I'm just thanking them for their input, whether it's right

17   or wrong, at least they took the time to write a letter to the

18   elected sheriff, and I am responding to that letter.

19   Q.  Okay.  My --

20   A.  I said again, I don't agree with everything I receive.    14:09:21

21   Q.  I appreciate that, Sheriff.

22        My question is this.  In all of these cases where

23   people have written in to you asking for you to do something

24   because of somebody else's race or ethnicity or language, have

25   you ever, in all of your thank you letters, written back to    14:09:36

```
 1   them and said:  I'm not going to do that because what you've

 2   described is not a crime.  It's not a crime to speak Spanish.

 3   It's not a crime to be Mexican.

 4        Have you ever said anything like that in any of the

 5   thank you letters that you've sent back to people who write in       14:09:53

 6   to you?

 7   A.  I think I said most times I will get it to my appropriate

 8   staff to look into it.

 9   Q.  Sheriff, you still haven't answered my question.

10        You've sent back thank you letters.  We saw one that          14:10:08

11   you wrote to Carole earlier today about the Italian mother or

12   grandmother, right?  I'm talking about thank you letters like

13   that.

14        In any of those letters have you ever told the person

15   who wrote to you, No, I'm not going to do that.  We don't go        14:10:21

16   after people based on their race, language, or ethnicity?

17   A.  I may have, but I don't recall how many or how far back it

18   was.

19   Q.  Do you think it would be part of your -- well, as sheriff,

20   you have responsibilities for the public good.                     14:10:46

21        Would you agree with me on that?

22   A.  Yes.

23   Q.  Would you agree with me that it would promote the public

24   good for you to tell all these people that you don't go after

25   people based on race?  Wouldn't it be good for you to tell them     14:10:58
```

452

1   that in your thank you letter?

2   A.  Well, I'm usually responding to their request for some type

3   of action.  I'm not going to give them a history lesson; I'm

4   just thanking them for their concern and input.

5   Q.  And that -- you don't think it would -- actually, you          14:11:20

6   didn't answer my question.  Do you think it would be in keeping

7   with your public responsibilities and your obligation to

8   protect the public good for you to send back as part of your

9   thank you letter something that says, You know, being Mexican

10  is not a crime.  Speaking Spanish is not a crime.  This is not    14:11:44

11  something that I'm going to respond to?

12          Have you ever done that -- do you think it would be

13  good to do that?

14  A.  There's a good possibility, but I like to think that the

15  public understands what we do on illegal immigration by our       14:12:00

16  activities without writing the message to each person.

17  Q.  Based on the letters that you're getting from members of

18  the public that we've looked at today, they think that you're

19  going after people who are Mexican or who speak Spanish.

20          Is that what you want to leave them the impression         14:12:23

21  that you do when you send them a thank you letter without

22  telling them that you're not going to do what they're asking?

23  A.  You know, I write a lot of letters.  I don't see all the

24  letters here.  So I'm not sure how many times I may have

25  written back to people and advised them on certain situations.    14:12:40

```
 1    Q.  Right, but I --

 2    A.  I write hundreds -- hundreds of letters around the world,

 3    around the country, and locally.  I can't remember every letter

 4    that I have written.

 5    Q.  Well, that's right.  And if your office had kept any of          14:12:55

 6    those letters or provided them in this litigation, we'd be able

 7    to look at them, but what we have is what we have.

 8          But you'd agree with me, just to make sure we capture

 9    this point, you think that -- and you agree with me that it

10    would be helpful to the public good, since you're sending thank      14:13:12

11    you letters back to these people, for you to tell them if you

12    don't go after people based on their race or language?

13    A.  That may be helpful, but I like to get the message out in

14    other media ways that we don't go around arresting people

15    because of what they look like.  I say that constantly.             14:13:36

16    Q.  You're saying that here in court today, correct?

17    A.  That's right.

18    Q.  But you've never said that in any of your thank you

19    letters, is that right?

20    A.  I don't recall.                                                 14:13:47

21    Q.  Let's go to Exhibit 249.  This is a set of statistics.

22          Is that your handwriting on the top?

23    A.  Yes.

24    Q.  You forwarded these statistics to Chief Sands, Brian Sands,

25    and also to Scott Freeman, correct?                                 14:14:12
```

1    A.  Yes.

2           MR. YOUNG:  Your Honor, we move for admission of

3    Exhibit 249.

4           MR. CASEY:  No objection, Your Honor.

5           THE COURT:  Exhibit 249's admitted.                    14:14:21

6           (Exhibit No. 249 is admitted into evidence.)

7           MR. YOUNG:  May we publish it?

8           THE COURT:  You may.

9    BY MR. YOUNG:

10   Q.  Now, you thought that this document was also relevant to    14:14:29

11   Chief Sands' duties, correct?

12   A.  Yes.

13   Q.  And you gave it to him without regard to whether it was

14   correct or not, is that right?

15   A.  It says FBI/INS.  I presume it may have been correct.     14:14:38

16   Q.  Before you send it to Chief Sands with Mr. Freeman --

17           What's Scott Freeman's title?

18   A.  Pardon?

19   Q.  What's Scott Freeman's title?

20   A.  I believe at the time he may have been in charge of the    14:14:54

21   detective bureau.

22   Q.  Okay.  Is he chief?  What's his --

23   A.  He's chief now.

24   Q.  Okay.  Before you sent this set of statistics to

25   Chief Sands and Chief Freeman, you didn't do anything to verify    14:15:08

1    whether any of this information was correct, is that right?

2    A.  I did not.

3    Q.  Now, down at the bottom -- actually, in the -- in the

4    middle under TV and radio stations, there's a section that

5    talks about Spanish-only TV and radio stations.  You see that?    14:15:25

6    A.  Yes.

7    Q.  And then under schools, the heading, it talks about the

8    number of people in Los Angeles County who speak English and

9    the number who speak Spanish, is that right?

10   A.  Yes.    14:15:41

11   Q.  And you thought this information was relevant to the duties

12   that Chief Sands was carrying out?

13   A.  It's talking about illegal immigration, put out, evidently,

14   by the FBI, and this is good information for them to have, even

15   though most of it is in California.    14:15:58

16   Q.  You think that information about the number of Spanish-only

17   TV and radio stations is about illegal immigration?

18   A.  I don't know, I didn't prepare this report.  I'm just

19   giving the statistical report, as I do always to keep my people

20   informed as to what the statistics are.    14:16:15

21   Q.  Let's go to Exhibit 256.  Exhibit 256 is a February 14,

22   2009, letter to a congressman from someone named John, it

23   appears.  That's your handwriting on the top right, correct?

24   A.  Yes.

25   Q.  And you sent this to Chief Sands?    14:16:46

1    A.  Yes.

2              MR. YOUNG:  May we admit Exhibit 256, Your Honor?

3              MR. CASEY:  No objection.

4              THE COURT:  Exhibit 256 is admitted.

5              (Exhibit No. 256 is admitted into evidence.)          14:17:01

6              MR. YOUNG:  May we publish it?

7              THE COURT:  You may.

8    BY MR. YOUNG:

9    Q.  So -- by the way, that note at the top where you have

10   sheriff 3, you wanted three copies of that for yourself?          14:17:11

11   A.  Yes.

12   Q.  And you also sent it to Lisa Allen, your public information

13   officer?

14   A.  Yes.

15   Q.  Look at the fourth paragraph of the letter.  The bottom          14:17:20

16   part of that fourth paragraph talks about a sad statement on

17   the dysfunction of Hispanic countries and their governments,

18   and the fact that their governments allow their citizens to run

19   amuck like wild feral animals in all that land area.

20              That paragraph concludes:  Also, do not open travel to          14:17:50

21   Cuba because they will come -- just come here illegally also,

22   and we have too many dysfunctional Hispanics already here.

23              Now, you read those statements before passing them on

24   to Chief Sands and Ms. Allen, correct?

25   A.  I may have skirted the letter.  I'm not saying I read every          14:18:12

1    word.

2    Q.  You thought Chief Sands should know about this letter

3    because he runs your illegal immigration program?

4    A.  I thought that since it's written to Congressman Conyers,

5    who was head of the judiciary committee, with copies to the          14:18:37

6    President and Attorney General Holder, that he might be

7    interested in someone writing to these government officials,

8    regardless of what the content was.

9    Q.  Now, in your deposition I'll tell you at page 45, from

10   November 16, 2011, you say that you presume you did read the          14:18:59

11   letter before you passed it on to Mr. Sands and Ms. Allen.

12   A.  I may have, and I just said today I may not have read every

13   word.  I don't recall the letter, but now reading it, I guess

14   it refreshes my memory.

15   Q.  The three copies that you had made of this letter, you took      14:19:23

16   at least one of those home, correct?

17   A.  I may have.

18   Q.  Let's go to Exhibit 230.

19        MR. YOUNG:  Oh, by the way, did we -- we admitted this

20   letter?                                                              14:19:37

21        Okay.  Thank you.

22   BY MR. YOUNG:

23   Q.  Exhibit 230 is a letter to the editor on a -- in a

24   newspaper which has been clipped out.  It's from the West

25   Valley View.  This article is in your immigration file because      14:19:59

1    it mentions you, correct?

2    A.  Yes.

3    Q.  And you're the one that decided to put the letter in your

4    file?

5    A.  I may have.  I don't see any initials on this press --          14:20:19

6    press article.

7            MR. YOUNG:  Your Honor, we'd move for the admission of

8    Exhibit 230.

9            MR. CASEY:  Objection, hearsay, Your Honor -- Your

10   Honor, no foundation.                                               14:20:30

11           MR. YOUNG:  Your Honor, I'm not moving for the

12   admission of this exhibit for the truth of the matter stated.

13   I'm moving for its admission to show communications that go on

14   within the Sheriff's Office.  And I can make an offer of proof

15   on that, if you would like, before you decide whether to admit    14:20:50

16   it.

17           THE COURT:  Just a second.

18           (Pause in proceedings.)

19           THE COURT:  Go ahead and make your offer of proof.

20   BY MR. YOUNG:                                                      14:21:08

21   Q.  So, Sheriff, you have someone in your reception office clip

22   things out of newspapers, and then you take those clippings and

23   put them in your immigration file, is that right?

24   A.  Some.  I don't read every clipping.

25   Q.  When those things are clipped -- well, let's talk about        14:21:21

```
 1    this exhibit.  This exhibit, 230, was distributed within your

 2    office to the public information office and to your top staff,

 3    including your deputy chief, your chief deputy, and yourself,

 4    is that right?

 5    A.  I presume so.                                                14:21:39

 6             MR. YOUNG:  Your Honor, based on that --

 7             THE COURT:  I'll admit the exhibit.

 8             (Exhibit No. 230 is admitted into evidence.)

 9             THE COURT:  I'll admit the exhibit.

10             MR. YOUNG:  Thank you, Your Honor.  May we publish it?  14:22:00

11             THE COURT:  You may.

12             THE CLERK:  Counsel, what number is that exhibit?

13             THE COURT:  I'm sorry, I'll state it.  It's

14    Exhibit 230.

15    BY MR. YOUNG:                                                    14:22:09

16    Q.  In the second column there's a sentence that says:  Call it

17    racial profiling, but if there are 12 million illegals that fit

18    a profile, then it is what it is.

19             Do you see that?

20    A.  Yes.                                                         14:22:19

21    Q.  Do you think it's a good idea to send items like this to

22    all of your top staff and your public information office?

23    A.  Well, they get all the articles that come in automatically,

24    not just this; everything that comes in they get a copy of.

25    Q.  And you have your front desk clip out articles on illegal   14:22:37
```

```
1    immigration issues, correct?
2    A.  On everything.
3    Q.  But there's some items that refer to illegal immigration
4    issues, and those are the ones you put in your immigration
5    file, correct?                                                    14:22:50
6    A.  If I decide to take it from the master article file.
7    Q.  All right.  Let's look at 264, Exhibit 264.  It's not yet
8    admitted, but it's a letter to the editor from the Daily
9    News-Sun dated April 7, 2009.
10         Now, let's -- yeah.  Let's look at the Arrowhead Media   14:23:14
11   stamp on the top there.  Arrowhead Media's an organization that
12   your office hires in order to send you clippings from
13   newspapers on matters like this, correct?
14   A.  Yes.
15   Q.  And you put this clipping into your immigration file, is   14:23:32
16   that right?
17   A.  I may have.
18         MR. YOUNG:  Your Honor, I move for the admission of
19   Exhibit 264.
20         MR. CASEY:  No objection.                                14:23:47
21         THE COURT:  Exhibit 264 is admitted.
22         (Exhibit No. 264 is admitted into evidence.)
23         THE COURT:  You may publish.
24         MR. YOUNG:  Thank you, Your Honor.
25   BY MR. YOUNG:                                                  14:23:58
```

1   Q.  Now, Exhibit 264 has some language at the -- in the column

2   on the left.  It says:  I'd say they should be looking for

3   Mexicans.  They most assuredly should be looking for what

4   95 percent of the illegal traffic consists of, which is

5   Mexican.                                                    14:24:25

6           And then it goes on:  Profiling is a natural process

7   to be used when looking for anything or anyone illegal.  It is

8   a valuable tool for law enforcement, and a police department

9   that doesn't use it should be charged with malfeasance.

10          This article was also circulated to your chief deputy,   14:24:43

11  your deputy chiefs, your public information office, and in

12  fact, anyone who would want to read it, is that right?

13  A.  Once again, all the articles are put in the folder and

14  circulated to all my chiefs, deputy chiefs, regardless of what

15  the subject matter is.  So I presume they got this article,   14:25:06

16  too.

17  Q.  Do you have any regrets about this particular item being

18  circulated in your office?

19  A.  I don't pick and choose what's good and what's bad.  What's

20  in the newspaper, we circulate.  Let me say it's not always   14:25:29

21  good, but we still circulate it.

22  Q.  This item, the only reason we have this item is it's in

23  your immigration file.  You picked this item to put in your

24  file, correct?

25  A.  I presume so, yes.  Doesn't mean I agree with it.         14:25:45

Q.  Let's go to Exhibit 5, which has been admitted, so it can

be published.  Let's look at the e-mail on the first page.

          THE COURT:  You can publish it, Kathleen.

          MR. YOUNG:  Oh, sorry, Your Honor.  I apologize.

BY MR. YOUNG:                                                    14:26:07

Q.  On the first page there's an e-mail from Walter Duncanson

to Greg Nottingham.  Do you know any of those people?

A.  I don't recall.

Q.  Let's look at the second page.  Let's blow that up.

          You've seen this Mexifornia driver's license before,   14:26:38

have you, Sheriff?

A.  Recently, yes.

Q.  Do you think it's a joke?

A.  No, I think it's in poor taste.

Q.  Do you think people in your office have a right to allow    14:26:52

them -- that allows them to circulate this kind of material in

your office?

A.  No.

Q.  Do you have any policy against this kind of material being

circulated?                                                     14:27:07

A.  I believe we do.

          MR. YOUNG:  I'm going to ask that a video of your

deposition from November 16, 2010, be played.  Starts at page

216, line 12.  It's JA11.

          (Video clip played as follows:)                       14:27:17

1          "QUESTION:  Do you think this Mexifornia driver's

2     license is a joke?

3          "ANSWER:  I don't know.

4          "QUESTION:  You can't tell --

5          "ANSWER:  I don't think it's an official driver's      14:27:33

6     license.  I'm pretty certain of that.

7          "QUESTION:  Can you tell whether or not it's meant to

8     be a joke?

9          "ANSWER:  I don't know.  Doesn't look legitimate to

10    me.                                                          14:27:44

11         "QUESTION:  Do you think it's funny?

12         "ANSWER:  No, I don't think it's funny.

13         "QUESTION:  Why not?

14         "ANSWER:  It doesn't look like a -- a -- how should I

15    say?  You said it looks funny, or did I say it looks funny?  14:28:05

16         "QUESTION:  My question was --

17         "ANSWER:  I don't think it's in good taste.

18         "QUESTION:  And why is it not in good taste?

19         "ANSWER:  They're making fun of, it looks like, I

20    don't know if they're Mexicans or illegal aliens, but the   14:28:20

21    connotation, when you look at that, when it says 'illegal

22    alien,' as far as the class is concerned.  It's not an official

23    document.  And I'm not going to get into freedom of speech.

24    People have a right to say what they want.  But I don't think

25    this is in good taste.                                       14:28:41

1        "QUESTION:  Do you have a policy in your office

2   against employees circulating things that are not in good

3   taste?

4        "ANSWER:  I don't know if I have a specific policy

5   that says what good taste is and whatnot.  But this is my          14:28:52

6   opinion.

7        "QUESTION:  Well, just sitting here having looked at

8   it and discussed it for a couple of minutes, are you still

9   unable to tell me whether the circulation of this Mexifornia

10  driver's license violates any policy in your office?              14:29:09

11       "ANSWER:  I have no idea about this.  First time I

12  have seen this correspondence is right now.  So I'm saying,

13  again, that we'll look into it and see if there is any

14  violation.

15       "QUESTION:  But as of now --                                 14:29:24

16       "ANSWER:  I can't answer any of your questions because

17  I don't know."

18  BY MR. YOUNG:

19  Q.  Sheriff, we looked at that Mexifornia license in November

20  2010.  Do you recall that?                                        14:29:38

21  A.  Yes.

22  Q.  Between now and today, are you aware of any investigation

23  or discipline relating to this Mexifornia license?

24  A.  If you recall, I said this wasn't in good taste then, and I

25  say it now.  After that we looked into the policies and I         14:30:02

```
1    believed my people gave out certain discipline.

2    Q.  Is it correct that you cannot think of a single Caucasian

3    person from Canada, the United States -- or the United Kingdom,

4    rather, Italy, Germany, et cetera, being arrested for illegal

5    immigration violations in your crime suppression operations      14:30:32

6    from their onset through December 2009?

7    A.  I -- you say other -- could you repeat that question,

8    please?

9    Q.  Yeah.  Between the start of your crime suppression

10   operations and December 2009, can you think of a single          14:30:50

11   Caucasian person being arrested for illegal immigration

12   violations in connection with those operations?

13   A.  You talking up to 2009?

14   Q.  December 2009, correct.

15   A.  Up to or after?                                               14:31:08

16   Q.  Up to.

17   A.  I can't recall.

18   Q.  You're not aware of a written policy in your office about

19   racial profiling, is that right?

20   A.  I don't know if we have one specifically for racial          14:31:21

21   profiling.  We sure have plenty of training.  Probably we're

22   the most trained law enforcement agency in the country with the

23   five weeks of training from the government, academy training,

24   in-house training.

25   Q.  You've not seen any written materials or videos on racial    14:31:43
```

1   profiling within your department, have you?

2   A.  I haven't seen it myself.

3   Q.  You have never created or approved a specific racial

4   profiling training program within the MCSO, is that right?

5   A.  I think my personnel staff has done that.                14:32:00

6   Q.  But you never have, is that right?

7   A.  Did I prepare it?

8   Q.  No.

9   A.  No, I delegate that --

10  Q.  Approve.                                                 14:32:11

11  A.  -- to the people that are in charge of personnel.

12  Q.  You don't think you need a racial profiling program within

13  the MCSO, is that right?

14  A.  Well, we sure have a lot of training, as I just mentioned.

15  That's very important.                                       14:32:30

16  Q.  Well, you said in one of your depositions that since you

17  don't think you racially profile, you don't need a training

18  program.  Do you recall saying that?

19  A.  I may have at that time.

20  Q.  Do you think Latinos are subject to a lot of prejudice in   14:32:46

21  Maricopa County?

22  A.  I haven't found that.  And let me say I spent four years as

23  a director in Mexico City, South America, Texas, Turkey, you

24  name it, and I think I would know if there's prejudice here in

25  Maricopa County, but I haven't seen it.                      14:33:11

1  Q.  You've never seen any prejudice against Latinos in Maricopa

2  County; is that what you're saying?

3  A.  Not that I know of.

4  Q.  Do you think that calling someone a spic would indicate

5  racial profiling?                                          14:33:27

6  A.  I can't answer that.

7        MR. YOUNG:  All right.  Well, let's refer to your

8  December 16, 2009, deposition, at page 116, starting on line

9  15.  This is a video again, Sheriff JA12.

10        (Video clip played as follows:)                     14:33:43

11        "QUESTION:  Do you think there is a lot of prejudice

12  against Hispanics in our community?

13        "ANSWER:  I don't believe so.  I don't -- I haven't

14  really come across that.

15        "QUESTION:  You are not aware of the use of racial     14:34:08

16  epithets toward Hispanics in our community?

17        "ANSWER:  No.  I -- in fact, after all those years

18  living in Mexico and so on, I don't think I know a -- what you

19  just said, believe it or not.

20        "QUESTION:  A Latino?                                 14:34:28

21        "ANSWER:  I don't know if that is wrong, Latino.  I

22  don't know.  I don't know what is politically correct on some

23  of these ethnic comments that people make.  So I don't know the

24  bad names that you are talking about.

25        "QUESTION:  Well --                                   14:34:45

1          "ANSWER:  I don't know if Latino is a bad name.

2          "QUESTION:  No, but if -- if someone used a pejorative

3     term directed toward an Hispanic, one of your officers, would

4     that be evidence of racial profiling?

5          "ANSWER:  I don't know.                              14:35:02

6          "QUESTION:  Could it be?

7          "ANSWER:  Could be.

8          "QUESTION:  So if one of your officers called one of

9     my clients in the context of a detention a spic, would that be

10    racial profiling?                                         14:35:15

11         "ANSWER:  I don't know.

12         "QUESTION:  But it could be?

13         "ANSWER:  It could be.

14         "QUESTION:  It could be.

15         "ANSWER:  But I doubt it."                           14:35:21

16    BY MR. YOUNG:

17    Q.  Sheriff, you think it is not a problem when someone who has

18    not committed a crime is stopped on the road as a result of

19    being racially profiled, is that right?

20    A.  Can you repeat that?                                  14:35:46

21    Q.  Okay, let me take it a piece at the time.  Let's say that

22    you've not committed a crime, and let's say that you've been

23    stopped on the road as a result of being racially profiled.

24    Someone just says, You're of a certain race; I'm going to stop

25    you.                                                      14:36:07

```
 1            You don't think that's a problem, is that right?
 2    A.  I think it's a problem.  That would be racial profiling.
 3    If there's no reason to stop someone other than his race or
 4    what he looks like, I -- you said I said that's no problem, I'm
 5    saying it is a problem.                                        14:36:24
 6            MR. YOUNG:  Let's go to your December -- November 16,
 7    2010, deposition, page 284, line 25.  This is video JA1.
 8            (Video clip played as follows:)
 9            "QUESTION:  Well, how about you as an individual?  If
10    you're stopped on the road because you've been racially        14:36:46
11    profiled, but you actually haven't committed a crime, would you
12    think that you've been harmed?
13            "ANSWER:  Me, personally?
14            "QUESTION:  Yes.
15            "ANSWER:  It would not bother me.                       14:36:58
16            "QUESTION:  Why would it not bother you?
17            "ANSWER:  If I did not commit a crime and someone came
18    up to me and I had nothing to hide, why would I be concerned?"
19    BY MR. YOUNG:
20    Q.  Sheriff, your relationship with ICE changed in 2009,       14:37:18
21    correct?
22    A.  Yes.
23    Q.  They took away your field authority under section 287(g)?
24    A.  Yes.
25    Q.  That change did not affect how your department does its    14:37:32
```

1   immigration related operations, is that right?

2   A.  Not really.

3   Q.  You did large-scale saturation patrols after the 287(g)

4   authority was removed?

5   A.  Yes.                                                          14:37:46

6   Q.  As you look back on what your office has done on the issue

7   of illegal immigration in Maricopa County, do you think that

8   there have been any excesses that you would try to avoid in the

9   future if you could do it all over again?

10  A.  Well, you say "excesses," we did investigate, on the        14:38:06

11  streets and in our jail system, over 51,000 illegal aliens.

12  We've done a great job, been commended by the government.  So I

13  don't know when you say "excess."  We're here to enforce all

14  the laws, and that's what we do.

15  Q.  Well, let me put it another way:  Do you have any regrets   14:38:35

16  about things that you have done in the area of illegal

17  immigration such that if you could start over again you would

18  do things differently the second time?

19  A.  Well, you -- no one is ever perfect, but in general terms

20  we've done a good job, been well trained, and I stand by that.  14:38:54

21  Q.  So you don't know of anything that you would do differently

22  if you had the chance to do that, is that right?

23  A.  Not right now.

24  Q.  People have criticized your policies, correct?

25  A.  Some people have criticized me and my policies constantly   14:39:14

```
 1    every day for four years.

 2    Q.  You don't recall any instance where as a result of that

 3    criticism you re-examined any of your policies or practices, is

 4    that right?

 5    A.  We may have tinkered with some situations, but in general       14:39:33

 6    terms we're continuing to do what we've been doing for six

 7    years.

 8    Q.  There have been stories in the news media containing

 9    criticisms about your office's activities, correct?

10    A.  You mean me or my office?                                       14:39:57

11    Q.  Well, your office, and I'm focusing on illegal immigration.

12    A.  Okay.

13    Q.  There have been news media criticisms of what your office

14    has done on those issues --

15    A.  Yes.                                                            14:40:09

16    Q.  -- correct?

17            As a result of those, you have not reevaluated or

18    asked any questions about whether those criticized activities

19    are proper, is that right?

20    A.  Oh, I don't -- I don't think that I make decisions on what      14:40:20

21    newspapers say.

22    Q.  And you don't do investigations about the propriety of your

23    office's actions based on what the newspapers say, either, is

24    that right?

25    A.  Well, I don't know in every case.  Maybe sometimes you may      14:40:36
```

```
 1   look at it and sometimes the news media does have good

 2   information.

 3   Q.  In your December 16, 2009, deposition, at page 157, lines

 4   10 through 18 -- well, let's -- let's strike that.

 5             You're aware of certain articles in The Arizona          14:41:17

 6   Republic and the East Valley Tribune on racial profiling in

 7   your department, or alleged racial profiling in your

 8   department, is that right?

 9   A.  They may have written reports.

10   Q.  But you've never questioned your chief of enforcement,         14:41:31

11   Chief Sands, about what you've read in those papers relating to

12   those allegations of abuse, is that right?

13   A.  I'm sure he got copies of the articles.

14   Q.  But you've never questioned him about those articles, is

15   that right?                                                        14:41:49

16   A.  I may have.  I don't recall any specific instance.

17   Q.  You recall the East Valley Tribune series won a Pulitzer

18   prize?

19   A.  Yes.

20   Q.  At page 177 of your December 16, 2009, deposition, page        14:42:03

21   177, line 2, you were asked this question, referring to the

22   East Valley Tribune series:

23             "After this series came out, did you ever question

24   Chief Sands about these statements, for example, that deputies

25   either don't justify the operation or say it is in response to    14:42:33
```

1    business owners' complaints?

2          "ANSWER:  No."

3          Now, the Justice Department of the United States has

4    sued you, correct?

5          And let me make the question more specific.  The                14:42:51

6    Justice Department has sued you for some of the same issues on

7    racial profiling that are the subject of this lawsuit plus some

8    other things related to your jail, is that right?

9    A.  Yes.

10   Q.  As a result of that lawsuit, you have not done anything to       14:43:04

11   change what you're doing, is that right?

12         MR. CASEY:  Objection, Your Honor, relevance.

13         MR. YOUNG:  Your Honor, it relates to what the

14   department is doing right now.

15         THE COURT:  You mean the MCSO?                                  14:43:22

16         MR. YOUNG:  The MCSO, yes.

17         THE COURT:  All right.  I'll overrule the objection.

18   BY MR. YOUNG:

19   Q.  So, Sheriff, as a result of the Department of Justice's

20   lawsuit involving racial profiling against your office, your          14:43:31

21   office has not done anything to change what it is doing, is

22   that right?

23   A.  We've continued to enforce the immigration laws, human

24   smuggling, employer sanction.  We continue to do so.

25   Q.  And you're doing it the same way that you were before that        14:43:51

1  lawsuit, is that right?

2  A.  Yes.

3  Q.  As a result of either this lawsuit or the Department of

4  Justice lawsuit, have you concluded that anything that you were

5  doing before was illegal and should therefore no longer be          14:44:10

6  done?

7  A.  No.

8  Q.  Now, I was reading an article in Arizona Public Media dated

9  June 6, 2012, a little over a month ago, and it noted that the

10 Sheriff's Office had completed its last sweep in southwest           14:44:29

11 Phoenix in October 2011.

12        Does that sound right to you?

13 A.  Yes.

14 Q.  So then it said that your office had gone eight months

15 without doing a sweep, and then the article says, quote:            14:44:45

16 Critics of the self-proclaimed toughest sheriff say legal

17 pressures have led Arpaio to suspend his immigration sweeps,

18 end quote.

19        Do you agree with that statement?

20 A.  No.  We're still doing crime suppression concentrating on        14:45:06

21 the drug traffic, seized over seven tons recently.  Everyone

22 arrested was in this country illegally.  So we continue to

23 enforce the illegal immigration laws, the employer sanction,

24 human smuggling, and the drug traffic.

25 Q.  You haven't stopped doing anything, correct?                     14:45:34

1   A.  We continue to enforce the laws, and we do it good.

2   Q.  And you're not going to back down even if people take you

3   to court, is that right?

4   A.  I have confidence in the courts, and what happens, we'll

5   have to abide by the decision.                           14:45:55

6   Q.  You gave a speech in Houston in September 2009 to a group

7   called Texans for Immigration Reform and U.S. Border Watch, is

8   that right?

9   A.  I give so many speeches, but I guess that's correct if --

10          What year was it?                                14:46:13

11  Q.  2009 in September.

12  A.  Yes.

13  Q.  And the crowd that you spoke to that occasion was a large

14  crowd of about 200 people?

15  A.  I believe so.                                        14:46:26

16  Q.  Now, you've become famous in part for making prisoners in

17  your jail wear pink underwear, is that right?

18  A.  I don't know about "famous," but they do wear pink

19  underwear.

20  Q.  And you've gotten some attention for that, is that right?  14:46:42

21  A.  Yes.

22          MR. YOUNG:  All right.  I'm going to -- I'm going to

23  play a section of PX 410, without a letter suffix, starting in

24  about 33 minutes in, and it's the longer section about the pink

25  underwear.                                               14:47:05

1     MR. CASEY:  I have no objection if it's the section

2  that was used at his deposition in December of 2009.

3     MR. YOUNG:  It is, Your Honor.

4     THE COURT:  All right.  We'll play the section.

5     Yeah, you can publish it.                    14:47:19

6     Let me -- if we haven't begun, let me ask, how long --

7  you said this is a long section.  How long is it?

8     MR. YOUNG:  Probably about 30 seconds or 45 seconds,

9  and I'm almost -- very nearly done, actually.

10     THE COURT:  All right.                        14:47:37

11     (Video clip played as follows:)

12     "SHERIFF ARPAIO:  People wonder about pink underwear.

13  Well, I had a reason for that.  They were stealing the white

14  underwear.  When they checked out of jail you looked under

15  their belt and it's white.  Well, you give them three pairs of   14:47:50

16  white underwear, they smuggle it out and sell it.  So I had an

17  idea, let's make it pink, because nobody wears pink underwear.

18  So if they're coming out, that's our underwear.  That's the

19  official reason.

20     I always -- I always have an official reason so I can   14:48:11

21  win the lawsuits, and then I have my reasons.  So my reason is

22  they hate pink."

23  BY MR. YOUNG:

24  Q.  Sheriff, that's your voice, correct?

25  A.  Didn't know I was going to be recorded, but I stand by it.   14:48:24

1   Q.  You stand by that.  That is you?

2   A.  Yes.

3          MR. YOUNG:  Your Honor, I move the admission of

4   Exhibit 410.

5          MR. CASEY:  No objection, Your Honor.                    14:48:36

6          THE COURT:  Exhibit 410 is admitted.

7          (Exhibit No. 410 is admitted into evidence.)

8   BY MR. YOUNG:

9   Q.  So to that audience, you told them that you have things

10  that you tell the courts in order to win the lawsuits, but     14:48:45

11  those aren't your real reasons for doing things, is that right?

12  A.  No, I think I said that -- that -- and this is in humor,

13  that I make sure that we do things properly in case I get sued.

14          As far as the personal opinion, I was joking at that.

15  This is not -- Houston, Texas, is not Maricopa County, so      14:49:09

16  there's no connection with Texas and Maricopa County.  So I was

17  giving a speech, I don't prepare, and I throw humor in my

18  speeches to keep everybody awake.

19  Q.  Sheriff, which is the truth, what you say here in court or

20  what you say to audiences who want to hear you talk?            14:49:33

21  A.  What I say in court under oath, that's the truth.

22  Q.  And what you said to the audience in Houston, that was not

23  the truth, is that --

24  A.  No, I -- I joke.  I wasn't under oath in Houston, Texas.

25  Q.  Which is the truth, Sheriff: what you're saying here in     14:49:50

1  court or what you said in your book?

2  A.   The truth is what I say in court, to the best of my

3  recollection.

4  Q.   Which is the truth, Sheriff, what you say here in court

5  today or what you tell interviewers like Lou Dobbs and Glenn      14:50:05

6  Beck on national television?

7  A.   Sometimes when you're talking to national television it's

8  much different than testifying, where you're going back and

9  forth very quickly, and sometimes, as you know, the media edits

10 or twists things around.                                          14:50:24

11 Q.   I don't think you answered my question.

12      Is what you're saying here in court true or is what

13 you told Lou Dobbs and Glenn Beck true?

14 A.   To the best of my recollection, I'm testifying to what I

15 remember here in court.                                           14:50:43

16      MR. YOUNG:   Thank you, Sheriff.

17      THE WITNESS:   Thank you.

18      THE COURT:   I think we're going to -- is that the end

19 of direct?

20      MR. YOUNG:   Yes, I have no further questions at this        14:50:54

21 time.

22      THE COURT:   All right.

23      I'm going to take the afternoon break.  I'll ask the

24 parties to be back at five minutes after 3:00.

25      THE COURT:   Please be seated.                               15:07:17

1      I do want to remind the parties before we begin

2   cross-examination that there is another matter scheduled for

3   this courtroom tomorrow, and we will be resuming for the rest

4   of the trial, this trial, in my regular courtroom, which is

5   room 602 upstairs.                                          15:07:33

6           You ready to begin cross-examination, Mr. Casey?

7           MR. CASEY:  Yes, Your Honor.

8           THE COURT:  Please do so.

9           MR. CASEY:  Thank you very much, Your Honor.

10                      CROSS-EXAMINATION                       15:07:41

11  BY MR. CASEY:

12  Q.  Good afternoon, Sheriff.

13  A.  Good afternoon.

14  Q.  I'm going to ask you some questions.  Hopefully, they're

15  not going to be too repetitive, but there are some areas that  15:07:51

16  the plaintiffs' lawyer has gone over with you that I'd like to

17  address with you and get additional information or information

18  that they did not talk to you about.

19          But first of all, tell -- tell the Court, where --

20  where do you get mail from, letters?                        15:08:12

21  A.  Actually, from all over the world: United States, Arizona,

22  just about everywhere.

23  Q.  What is your policy if someone takes the time to write a

24  letter to you, or an e-mail to your former secretary, Helen

25  Gonzalez, what is your policy about how you handle that?     15:08:35

A.  My policy is to respond; if they take the time to write, I

can take the time to respond.

Q.  What happens if they write in and they call you names?  Do

you write response letters to that?

A.  That's very seldom, but I probably do respond.                    15:08:52

Q.  What happens if you have someone living in the Dark Ages,

for example, that says, We ought to do A, B, and C, and it's

stupid and it's illegal?  Do you write thank you letters to

them if they write you?

A.  Well, I think it depends.  If he said he killed five          15:09:13

people, I don't think that right.  So it all depends on a

letter.

Q.  The point I guess I'm asking you is, you were asked a

series of questions by plaintiffs' lawyer about this person

wrote in and -- wrote in to you and said Mexicans, Mexicans,      15:09:30

Mexicans.  You remember that series of questions?

A.  Yes.

Q.  Why not write back to them and say:  You know, being

Mexican, however you mean it, author, is not illegal.  Standing

on a street corner is not illegal.                                15:09:49

        Why don't you correct people when they write in to

you?

A.  Well, you know, I get so many letters and I just have sort

of a format to say thank you and -- and write back to them

without getting into all the details.                             15:10:01

1    Q.  If you get a letter that says -- from someone, any piece of

2    information, do you put any law enforcement value on that

3    letter before you decide how to circulate it?

4    A.  Not really.  I usually give it to the people responsible,

5    let them decide.                                                    15:10:22

6    Q.  Now, let's say you get a letter in from someone out near

7    Wickenburg who talks about horses being underfed, underwatered.

8           Do you read that?

9    A.  Any letter that comes to me I read, but once again, I would

10   give that to my animal cruelty unit, so they'll make a decision   15:10:42

11   what to do about it.

12   Q.  Again, do you make any law enforcement assessment on the

13   information that's in there?

14   A.  I do not.

15   Q.  Okay.  I'm in the East Valley and I write in that I live       15:10:53

16   across the street from a park and I see black men,

17   African-Americans, and at night they come out and there's cars

18   driving by exchanging -- they put their hands in the windows

19   and there seems to be some sort of exchange going on, then they

20   drive away, they drive away; they come back, more hand            15:11:15

21   exchanges.  Sometimes I see women walking and a car will slow

22   down, and sometimes the women get in the car and go away,

23   sometimes they don't.

24          If you got a letter hypothetically like that that

25   mentions a specific racial ethnic characteristic and also has     15:11:34

1   that other information, what do you do with it?

2           MR. YOUNG:  Objection, calls for speculation, Your

3   Honor.

4           THE COURT:  I'm going to allow it.

5           THE WITNESS:  Once again, I will give it to the          15:11:45

6   appropriate supervisors that handle that type of crime.

7   BY MR. CASEY:

8   Q.  Okay.  If --

9   A.  Alleged crime.

10  Q.  Okay.  And the alleged crime might be drug transactions,    15:11:57

11  could it not?

12  A.  Yes.

13  Q.  Might be prostitution, could it not?

14  A.  Yes.

15  Q.  Did the fact that in my hypothetical, would the fact that   15:12:05

16  an author mentions there are a bunch of black guys there, he

17  mentions race, is that any -- does that play any role

18  whatsoever in your decisions to forward on information to your

19  staff or not?

20  A.  No.                                                         15:12:23

21  Q.  Now, let's go back for a minute.

22          When -- if you get information that might indicate

23  narcotics, who do you send those letters to?

24  A.  To my narcotics bureau.

25  Q.  Okay.  Now, we -- we have a number of these letters because 15:12:39

1  you kept them in an immigration file.  Tell us why you keep an

2  immigration file for your own personal use.

3  A.  I not only keep immigration, I keep many other files on

4  policies in the jail, operations, so I can get to it right away

5  if I have to without waiting for the organization to try to          15:13:15

6  track it down.

7  Q.  Okay.  Explain for the Court if you would, what other types

8  of files do you keep?  We've been talking about your

9  immigration file, and here are all of your immigration file,

10  all of your letters and documents that have been produced in     15:13:32

11  the case, these three binders.  What other types of files

12  have -- do you keep?

13  A.  Many of them.

14  Q.  For example, what?

15  A.  Whether it's the Tent City, chain gangs, prostitution       15:13:44

16  raids, mall patrol, DUI operation, these are all operations

17  that we do.  I keep a separate file in case I have to refer to

18  it immediately, I can get to it.

19  Q.  Okay.  Now, for example, and I don't have the exhibit

20  number in front of me, but one of the exhibits was from a woman  15:14:09

21  in Sun City on August 1st, 2008, where she described nothing

22  more than going to a McDonald's and having the Spanish language

23  spoken around her.

24          Do you remember that?

25  A.  Yes.                                                        15:14:22

1  Q.  Why do you keep something like that in your immigration

2  file?

3  A.  Well, I believe that we were going to do a crime

4  suppression operation, and I wanted my people to know any

5  information that they could have.  Not saying that there is          15:14:38

6  something to this, but let him get it, let him dissect it, and

7  as I say, he can throw it in the wastebasket.

8  Q.  Is it fair to say that you pass along, once you

9  characterize it as drug or animal abuse or illegal immigration,

10  you pass it along without determining if there's crime or no       15:14:59

11  crime mentioned?

12  A.  Yes.  Let me just say this.  We get much correspondence

13  every day.  I don't see all the correspondence.  The only

14  correspondence that I see where it's directed in my name, and

15  then it comes to me when someone writes to me personally.          15:15:17

16  Q.  When you -- let's turn now to thank you notes.  You said if

17  they take the time to write in to the sheriff, they'll get a

18  thank you note.

19          When you write a thank you note, does that mean you

20  agree with everything the author has said to you in his or her     15:15:32

21  letter?

22  A.  No, it does not.

23  Q.  Are you intending to convey that message to them, that you

24  agree with whatever he or she -- he or she says by writing a

25  thank you note?                                                    15:15:47

1    A.  No, I'm just thanking them for writing a letter to the

2    sheriff.

3    Q.  Now, you are, as the sheriff of Maricopa County, under the

4    constitution of our state you are an elected official?

5    A.  Yes.                                                        15:15:59

6    Q.  Do you write thank you notes -- I'm trying to figure out,

7    is it a matter of the public relations side, or is it a matter

8    of common courtesy, or a combination of these things, why you

9    write thank you notes to everyone?

10   A.  I think it's a combination.  Once again, I am the chief law   15:16:15

11   enforcement officer, but I'm also elected.  And if someone's

12   going to take the time to write to me, they deserve a response.

13   That's just my policy I've had in 40 years of managing offices.

14   Q.  Sheriff, other than perhaps letter exchanges with other

15   elected officials or government officials of some type, if you   15:16:40

16   get a letter from a citizen that advocates or appears to

17   advocate the use of something illegal, such as racial

18   profiling, why not write a letter as to them correcting them,

19   educating them, informing them, as Mr. Young has suggested?

20   A.  Well, if you're saying there's a potential crime that the    15:17:07

21   person may have committed writing to me, I'm sure not going to

22   write a letter back to them.  I will give it to the appropriate

23   authorities.

24   Q.  Well, let's say that some of these letters say to you, Hey,

25   call it what it is, it's racial profiling.  Most illegal aliens  15:17:23

```
 1   are from south of the border, they're Mexican nationals, and by

 2   definition they're Latino, so go after them.

 3         Why not write them and correct them as Mr. Young has

 4   suggested?  Why not do that?

 5   A.  Because it's my policy just mainly to answer the letter,        15:17:39

 6   let them know I got the letter and respond to that.

 7   Q.  Can you think as you sit here today, separate and apart

 8   from this litigation, can you think of any times that you've

 9   actually written a letter to a citizen and corrected their

10   opinions, corrected their thoughts?                                 15:17:57

11   A.  I may have, but I don't recall.

12   Q.  Is that something that you customarily do, correct people

13   of their opinions?

14   A.  No.

15   Q.  Now, I'm going to show you right in front of you, it's in       15:18:06

16   the manila color folder right there, Exhibit 1040.  That is not

17   in evidence yet, sir.  This is a summary of the contents of

18   your immigration file.  And as I said here, these are three

19   binders of this.

20         MR. YOUNG:  Your Honor, could I get a copy of that?           15:18:32

21         THE COURT:  Does he not have a copy of 1040,

22   Mr. Casey?

23         MR. CASEY:  (Handing).

24         MR. YOUNG:  Thank you.

25         MR. CASEY:  I apologize, Your Honor.  I thought we all        15:18:43
```

1  had each other's exhibits.  My mistake.

2  BY MR. CASEY:

3  Q.  Would you look at the last page of Exhibit 1040, please,

4  which is, again, a summary of your illegal immigration file.

5  A.  It's 48.                                                      15:19:02

6  Q.  Okay.  Should be the very last page.

7       Tell me how many different citizen letters, news

8  clippings and documents are listed in there.

9  A.  592.

10 Q.  Okay.  Do you have an estimate as you sit here today of how   15:19:13

11 many citizen letters the plaintiffs have used with you during

12 the course of your three or four hours up here?

13      MR. YOUNG:  Your Honor, I'll object and move to strike

14 the last answer.  We do have an objection to this exhibit, and

15 having the witness simply repeat the hearsay we believe is        15:19:34

16 improper.

17      MR. CASEY:  I will move at this time also for the

18 admission of Exhibit 1040 under Rule 1006 as a summary of his

19 entire file.

20      And Your Honor, from an evidentiary standpoint we have        15:19:52

21 produced and made available to counsel the underlying

22 documents.  They're also here.  That is nothing more than a

23 Rule 1006 Federal Rule of Evidence summary of what's in that

24 file.

25      MR. YOUNG:  Your Honor, not all of the underlying             15:20:10

1    documents are admitted.  And in fact, we believe that many of

2    the underlying documents are not going to be admissible, and

3    therefore, their descriptions and the summary that's alleged to

4    be contained in this document should not be admissible, either.

5              In addition, we believe that the descriptions that are        15:20:30

6    set forth in the exhibit do not, in our view, reflect the

7    contents of the matters that they are alleged to summarize.

8              Also, the exhibit lacks foundation.  Neither the

9    exhibit nor the information provided in the exhibit has been

10   authenticated, and there are characterizations of facts in         15:20:53

11   there that are not, and therefore the exhibit should not be

12   admitted.

13             THE COURT:  All right.  It seems to that we're taking

14   two different objections.  One is your objection to the

15   question and one is the objection to the exhibit.         15:21:08

16             I am not going to admit the exhibit.  The reason I'm

17   not going to admit the exhibit is it doesn't sound to me like

18   all the requirements of the rule have been -- have been met;

19   that is, the originals are duplicates.  Well, I take that back.

20   Originals and duplicates I assume have been made available         15:21:29

21   because they've been produced.  And I have no interest in

22   producing them in court.

23             So I will say this.  I'm not going to admit the

24   exhibit, because I don't have the time to go through and assess

25   the accuracy of the description of the exhibit, although I         15:21:43

1    don't question, Mr. Casey, that it's been made in good faith.

2              That being said, my not admitting the exhibit does not

3    mean that I think it's inappropriate for Mr. Casey to ask the

4    sheriff about how many documents were in that file and take

5    account of that.                                                    15:22:04

6              So to the extent that your objection to Mr. Casey's

7    question went to how many documents were in that file, I'm

8    going to overrule that objection.

9              Is everybody clear on how I've ruled?

10             MR. YOUNG:  Thank you, Your Honor, yes.                    15:22:13

11             MR. CASEY:  The defense is, yes.  Thank you very much,

12   Your Honor.

13   BY MR. CASEY:

14   Q.  Sheriff Arpaio, let me rephrase the question based on the

15   Court's rulings.                                                    15:22:21

16             Out of the 592 documents that were in your immigration

17   file, how many of those citizen letters in there did they show

18   you during your direct exam?

19   A.  I haven't counted them, but I would guess maybe 10.

20   Q.  Okay.  Thank you very much.                                     15:22:42

21             Now let's talk about some of those letters.  And if

22   you would turn to the documents that are in the binder that the

23   plaintiffs gave you, specifically what I'd like you to do is

24   turn to Exhibit 410.

25             Now, excuse me, that's not in there.  Let me strike      15:23:02

1   that.

2        Exhibit 410D is a clip of a press conference you

3   conducted that you were shown by plaintiffs' counsel from

4   February of 2007, and it was talking about pure immigration

5   enforcement.  And you began to say something about another man          15:23:23

6   who was present during that press conference, and you were not

7   allowed to finish explaining who else was there.

8        You've mentioned it was an SAC --

9   A.  That was the head of the ICE/Immigration/Customs under the

10  Homeland Security, and we had a joint press conference.                   15:23:48

11  Q.  And what was that -- what's SAC stand for?

12  A.  Special agent in charge.

13  Q.  What is the name of the ICE special agent in charge who had

14  the joint press conference with you that the plaintiff showed

15  in Exhibit 410D?                                                          15:24:02

16  A.  I think it was Al Peña, P-e-n-a.

17  Q.  When you say Al Peña, is also his full name Alonzo Peña?

18  A.  Alonzo, yes.

19  Q.  All right.  And explain what was the purpose of you having

20  a joint press conference with Special Agent in Charge Alonzo              15:24:18

21  Peña present, why?

22  A.  What date was that, Counselor?

23  Q.  It was February of 2007.

24  A.  That was the date that -- right after that that I signed an

25  agreement with ICE to be able to enforce the federal                     15:24:38

```
 1    immigration laws, if you're talking about 2007.
 2    Q.  Yes.  So that was after the announcement of you folks
 3    having 287(g) authority granted by the federal government?
 4    A.  Yes.
 5    Q.  Okay.  At any time during that press conference, after the        15:24:59
 6    press conference, did Mr. Peña ever tell you that any of your
 7    comments about 287(g) authority or your authority were
 8    inappropriate?
 9              MR. YOUNG:  Objection, Your Honor, hearsay.
10              THE COURT:  I'm going to sustain that objection.        15:25:18
11              MR. CASEY:  Thank you, Your Honor.
12    BY MR. CASEY:
13    Q.  Let's turn now to Exhibit 1 -- 183, if we could, please.
14              Let me know when they're there, sir.
15              You remember a series of questions by plaintiffs'        15:25:50
16    counsel asking you about this particular document?
17              THE COURT:  You know what?  You know what I'm going to
18    do?
19              MR. CASEY:  Yes, sir.
20              THE COURT:  Mr. Young, you have these loaded on your        15:26:00
21    computer, correct?
22              MR. YOUNG:  Yes, we do.
23              THE COURT:  Would it be more convenient for you,
24    Mr. Casey, if I asked Mr. Young, if you're going to refer to an
25    exhibit, that he brings it up so that the witness can see it on        15:26:10
```

```
 1   the monitor?
 2            MR. CASEY:  That would be wonderful, Your Honor.
 3            THE COURT:  Do you have any objection to doing that,
 4   Mr. Young?
 5            MR. YOUNG:  No, not at all, Your Honor.              15:26:17
 6            THE COURT:  All right.  Please do so.
 7            (Pause in proceedings.)
 8            MR. CASEY:  My clock is not ticking, right?
 9            THE COURT:  I'll let you off the clock for 30 seconds
10   here.                                                         15:26:38
11            MR. CASEY:  Thank you, Your Honor.  All right.
12            (Off-the-record discussion between the Court and the
13   clerk.)
14            MR. CASEY:  I may ask Mr. Braun to highlight some
15   things, Your Honor.                                           15:27:00
16   BY MR. CASEY:
17   Q.  First of all, let's focus, if I could, on the second full
18   paragraph ending with the sentence "nearly 30 warrants."
19            And if I could have that highlighted under the
20   TrialDirector program.  Thank you, Mr. Braun.                 15:27:16
21            Do you see there the last sentence where it says:
22   Nearly 30 warrants belonging to several valley law enforcement
23   agencies were cleared?
24   A.  Yes.
25   Q.  Now, the plaintiffs' lawyer was questioning you about     15:27:27
```

1    illegal aliens, about various things, and about race.  My

2    question for you is a little bit different.  Explain -- I

3    know -- excuse me, Your Honor.  I know the Court understands

4    this, but tell the Court what is an arrest warrant when it's

5    been cleared.                                              15:27:50

6    A.  It's the people that have outstanding warrants did not

7    appear for court.  That's one situation.  And when you arrest

8    that person you're clearing warrants.  You could clear two or

9    three warrants, depending upon how many charges.

10   Q.  Do I understand it correctly that if you clear a warrant,  15:28:10

11   that means before a traffic stop was ever made, some court

12   somewhere has issued a warrant for that person's arrest?

13   A.  That's correct.

14   Q.  If a person is arrested for DUI, does that have anything to

15   do with the race or ethnicity of the arrestee?            15:28:27

16   A.  No.

17   Q.  If a person is arrested for driving on a suspended license,

18   does that have anything to do with the race or ethnicity of a

19   person?

20   A.  No.                                                   15:28:40

21   Q.  If a person has a fail -- is arrested for failure to

22   produce ID under Title 28 of Arizona's motor vehicle code, does

23   that have anything to do with race or ethnicity?

24   A.  No.

25   Q.  Now, the other question is, because you were asked about   15:28:54

1    the arrest of people in the country illegally, whether you call

2    them illegal aliens, undocumented migrants, illegal migrants,

3    unlawfully present, whatever we -- name we give to them, if

4    someone is arrested under 287(g) authority and taken to ICE,

5    does that have anything to do with the race or ethnicity of the    15:29:16

6    person?

7    A.  No.

8    Q.  The only basis is because they're in the country

9    unlawfully.

10   A.  Crossing the border.                                           15:29:26

11   Q.  Okay.  Now, you were also asked -- if I could go down and

12   have Mr. Braun very capably go to the fourth paragraph

13   beginning with Mr. -- Mayor Gordon, excuse me.

14          Would you read that second sentence, please.

15   A.  Mayor Gordon and other critics have accused the sheriffs       15:29:50

16   volunteer posse and deputies of arresting brown-skinned people

17   for driving with cracked windshields.  Also, the mayor stated

18   that the sheriff should be apprehending criminals with

19   outstanding warrants instead of going after illegal aliens.

20   Q.  All right.  Now, you were asked a series of questions by       15:30:10

21   Mr. Young, plaintiffs' counsel, that because there were people

22   brown-skinned, you associated Gordon and Mayor Jimenez as being

23   pro-illegal alien.

24          Do you remember that exchange?

25   A.  Yes.                                                           15:30:27

1    Q.  All right.  But you notice right here that there's actually

2    a comment about whether or not you should go after illegal

3    aliens based on whether they're criminals or not, you see that?

4            That was a poor question here.

5            Do you see that a policy --                                          15:30:45

6            Let me ask you -- does it appear that there's a policy

7    dispute between Mayor Jimenez and Mayor Gordon and you as to

8    what your office's law enforcement priority should be?

9    A.  Yes.

10   Q.  And based on that second sentence that's blown up, it          15:31:02

11   appears that Mayor Gordon and the others are saying, Go after

12   criminals with warrants, don't go after illegal aliens, right?

13   A.  Yes.

14   Q.  What was your policy at this time?

15   A.  Are you talking about Guadalupe?                                15:31:21

16   Q.  In general about --

17   A.  Then my policy is to enforce all the laws, the state laws,

18   and then if we come across, during the pursuing of those

19   arrests, come across illegal aliens, then we take action.

20   Q.  Right.  Let me turn now to Exhibit 396.  And if Mr. Braun      15:31:40

21   would be so kind to pull that up, please.  And specifically

22   what I'd like to have Mr. Braun do for the Court is take it to

23   the next page, please.

24           And do you remember that there was -- if I could have

25   this paragraph where it says there were other differences as      15:32:11

1    well.  My parents, like all other immigrants.

2          Do you remember being questioned about that, about how

3    exclusive of those people from Mexico you had -- there were

4    certain hopes and dreams, you remember that questioning?

5    A.  Yes.                                                    15:32:29

6    Q.  Okay.  In the context of what is written in Joe's Law, in

7    your book, was this -- were you talking about --

8          If I could also have this expanded, Mr. Braun, down a

9    few lines.

10          Was this about legal immigrants from Mexico or was      15:32:54

11    this about something else?

12   A.  Well, once again, my co-author, as I mentioned before,

13   wrote much of this, but I presume that we're talking about

14   legal immigrants.

15   Q.  Illegal or legal?                                        15:33:12

16   A.  Legal, coming across into the United States.

17   Q.  Now, you see where I've highlighted right here paragraph

18   number 1 where it says:  My parents left Italy and basically

19   never expected to return, unlike the illegal Mexican

20   immigrants.                                                  15:33:29

21          Do you see that?

22   A.  Yes.

23   Q.  Does that refresh your recollection as to whether or not

24   you were discussing the differences from your parents as legal

25   immigrants versus illegal immigrants --                     15:33:36

1    A.   Yes.

2    Q.   -- from Mexico?

3         What do you understand this to be discussing?

4    A.   Well, I believe what my co-author was saying, that since

5    we're close to the United States and Mexico, sometimes the                    15:33:51

6    Mexican people come into the United States to work, what have

7    you, and then they go back to their country, where it's very

8    difficult for the Italians, they have to cross an ocean and

9    don't have that luxury to go back and forth.

10   Q.   Thank you.                                                               15:34:18

11        Mr. Braun, thank you.  That's it for that.

12        I'd like to turn to a different exhibit.  This was one

13   of the video clips that was made.  It's Exhibit 451.  For the

14   record, this was a Lou Dobbs interview.  The sheriff in that

15   image appeared to have darker hair; Mr. Dobbs, darker hair and               15:34:32

16   a little thinner.

17        Do you know what year that interview took place, sir?

18   A.   Probably 20 years ago, I don't -- no, I don't -- I don't

19   remember how many years ago it was.

20   Q.   All right.  Now, you were asked a series of questions about             15:34:45

21   appearance and you started to explain, but you were not

22   permitted to explain.  What did you mean when you were talking

23   on that show about appearance?  Were you talking about skin

24   color?

25   A.   No.                                                                     15:35:03

1    Q.  What were you talking about, sir?

2    A.  Well, we -- I think we were talking about when you cross

3    the border and you -- spends three, four days to cross the

4    desert and then you are stopped, sometimes you are heated; your

5    clothes are disheveled, dirty, and that type of thing.  I think          15:35:24

6    that's what I was talking about, appearance when you're coming

7    into our country crossing that desert.

8    Q.  You were asked earlier about, from plaintiffs' lawyer,

9    Don't you think all Mexican illegals are dirty?  You remember

10   that?                                                                     15:35:41

11   A.  Yes.  Of course, I don't.

12   Q.  Okay.

13   A.  Is that the question?

14   Q.  Yeah, that was -- that was the question.

15   A.  No, I --                                                              15:35:48

16   Q.  Are you talking about -- explain what you were talking

17   about there.

18   A.  I think I was talking about what I just said: that when

19   they are coming into our country and spending days coming in,

20   sometimes they do have the appearance of dirty clothes,                   15:36:04

21   disheveled, heat, and I can go on and on.

22   Q.  Now, I'd like to refer you to, for the record, Exhibit 410A

23   as in alpha.  That was a John Sanchez interview at CNN where he

24   was discussing to you very similar factors.  Do you remember

25   that exchange, watching it on your screen?                               15:36:29

1  A.  Yes.

2  Q.  Were you also discussing appearance as you just described

3  here today to me?

4  A.  Yes, and also pursuant to an arrest, not just stopping

5  someone because --                                           15:36:40

6  Q.  All right.  And that -- that was going to be my next

7  question, because in the context of Mr. Sanchez's interview, it

8  makes it sound like you're stopping people because of skin

9  color appearance in order to make an actual vehicle stop.

10        Is that anywhere allowed in Maricopa County in your    15:36:58

11  office?

12  A.  No.

13  Q.  What are your folks -- what is the legal basis that your

14  deputies are trained to stop automobiles for?

15  A.  Well, they're enforcing the -- the laws, the traffic laws.  15:37:11

16  Q.  Probable cause?

17  A.  Yes.

18  Q.  Reasonable suspicion of --

19  A.  Yes.

20  Q.  -- violation?                                            15:37:20

21  A.  On those type of crimes.

22  Q.  So when you -- and again, so I'm understanding your

23  testimony correctly, when Mr. Sanchez was asking you those

24  questions, you weren't talking about a traffic stop; you're

25  talking about after one has been lawfully made, what are some  15:37:32

1    sort of factors to indicate unlawful presence?

2    A.  Yes, that's correct.

3    Q.  Were you trying, Sheriff, to describe for CNN ICE

4    indicators of unlawful presence?

5    A.  Yes.                                                   15:37:49

6    Q.  Okay.  Are you --

7    A.  I believe -- I believe that was -- I'm not sure if that was

8    the time that that program was taken away, we were talking

9    about it.

10   Q.  Now when -- have you ever been 287(g) certified?         15:38:02

11   A.  No.

12   Q.  You're in management, obviously, as the sheriff.

13   A.  Yes.

14   Q.  When's the last time you've been actually -- when's the

15   last time you effectuated an arrest?                        15:38:17

16   A.  As the sheriff?

17   Q.  As a law enforcement patrol officer.

18   A.  As a patrol officer or with federal drug enforcement --

19   well, let me say this.  As sheriff I effected one arrest that

20   was very necessary.                                         15:38:38

21   Q.  Before that, when's the last time you've done some sort of

22   patrol where you've arrested someone?  Do you remember?

23   A.  Oh, 50 years I've done many arrests around the world, but I

24   can't remember when the last one was.

25   Q.  And you never went to ICE 287(g) training, did you?      15:38:54

```
 1   A.  No.

 2   Q.  Would you defer to the men and women in your office who

 3   actually were trained by the federal officials about what the

 4   indicators are?

 5            MR. YOUNG:  Objection, leading.                          15:39:11

 6            THE COURT:  I'm going to sustain the objection.

 7   BY MR. CASEY:

 8   Q.  Sir, who knows better about what the actual ICE indicators

 9   are for unlawful presence: you or someone that's 287(g) or was

10   287(g) trained and certified?                                     15:39:27

11   A.  Most of my deputies have been trained and are out there

12   operational, enforcing the law.

13   Q.  If instead of listening to you about what 287(g) indicators

14   are, is it better for us to listen to what 287(g) witnesses

15   say?                                                              15:39:45

16            MR. YOUNG:  Objection, leading.

17            THE COURT:  Sustained.

18   BY MR. CASEY:

19   Q.  Sir, if we want to know really what's going on with how you

20   use indicators in the field, who do we need to listen to?        15:39:56

21   A.  I think you should listen to those that have been trained

22   and are enforcing those laws.

23   Q.  Now, let me turn to one related thing before I move on,

24   Sheriff, and that was Exhibit 410B as in bravo.  That was the

25   Glenn Beck interview.                                             15:40:15
```

1          Again, you mentioned in there that you had the

2    ability -- and that's not in there.  That was a video clip that

3    was played after the federal government, under the current

4    administration, revoked 287(g) field authority in October of

5    2009.                                                          15:40:34

6          With that frame of reference, you were asked by Glenn

7    Beck how you could continue to do certain things, and you told

8    him, We can stop them or take action based on what they look

9    like, like they just came from another country.

10         What were you trying to accomplish with that statement  15:40:52

11   to Mr. Beck?

12   A.  No, I was -- are you talking about after 287(g)?

13   Q.  Yes.

14   A.  Well, we still had the authority, pursuant to a legitimate

15   arrest, to determine that person was here illegally.  And then 15:41:05

16   if there was no state charge to book that person into the jail,

17   we would turn that person over to ICE.

18   Q.  And you have that authority today.  In any of your law

19   enforcement actions can you, if you come across someone

20   unlawful, detain them?                                         15:41:27

21   A.  Yes.

22   Q.  And what do you do with them?

23   A.  We call ICE, and they can pick them up or we deliver the

24   person to their office.

25   Q.  At any -- is ICE currently accepting -- when MCSO happens, 15:41:41

1    in law enforcement operations, to come across people in the

2    country unlawfully, is ICE accepting people that you turn over?

3    A.  I think probably in the last two weeks we've made over 40

4    arrests of illegal aliens coming into our county, and a few we

5    did not have the state charge, including some young children,    15:42:10

6    and ICE did accept those people.

7    Q.  Now, when you said the state charge, explain for the Court:

8    What state charge are you talking about?

9    A.  We talked about the human smuggling laws, which are Class 4

10   felonies, and we haven't had any problem yet turning those that    15:42:29

11   we cannot charge in state court over to ICE.

12   Q.  Now, this is a related subject but a little bit different.

13   During the end of Mr. Young's questioning he asked you about

14   whether or not you've been doing saturation patrols, and you

15   talked about the focus being on narcotics or drugs.  Tell me    15:42:48

16   about that focus and why you have that focus now.

17   A.  Well, we still have a big drug problem coming in from

18   Mexico, and we're cracking down on that activity and have

19   seized about 50 pounds of methamphetamine and six, seven tons

20   of marijuana recently.    15:43:15

21          And actually, every arrest that we made were illegally

22   here.  I'm not saying every drug trafficker is here illegally,

23   but all those cases we had the smugglers in this country -- in

24   this country coming in from Mexico illegally.

25   Q.  And when you make the drug arrests, are there state charges    15:43:39

504

```
1    for some sort of drug -- drug charges?
2    A.  Yes, we -- these are state violations, and we have them
3    prosecuted in state court.
4    Q.  How does that work when they're also in the country
5    unlawfully?  Are they taken over to ICE, or they go through the    15:44:00
6    criminal justice system first?
7    A.  Those that we don't have state charges we turn over to ICE.
8    Q.  Okay.  Based on your experience as the sheriff in this
9    county for the last, let's just -- I know it's been close to 20
10   years, but who is generally in charge or in control of the    15:44:20
11   illegal narcotics, the drugs coming into Maricopa County?
12   A.  Who is in charge of --
13   Q.  Who does it?  Who are the bad guys that do that?
14   A.  It's usually the drug traffickers in Mexico.
15   Q.  Is that the drug cartels?    15:44:41
16   A.  Yes.  I was the regional director in Mexico City for four
17   years, and South America and Texas and Arizona, so I think I
18   know something about the U.S.-Mexican border, but it is a big
19   problem.  The drug traffic's still coming into our country, and
20   also the illegal immigration problem.    15:45:04
21   Q.  That was my next question, is based on your experience over
22   the last, you know, 20 years, really the last 10, who's in
23   charge, who's really handling the human smuggling of human
24   beings from south of the border into the United States, at
25   least in Maricopa County?    15:45:23
```

1   A.  Well, there's many, many organizations in Mexico, Central

2   America's, not just Mexico, involved in the illegal immigration

3   and also the drug traffic, and much violence occurring right

4   now in Mexico because of the drug traffic.

5   Q.  Is the same organized cartel running the drugs, are they          15:45:42

6   also involved running human beings?

7   A.  Some of them are, as evidenced by the fact, as I mentioned,

8   our last 14, 18 arrests on huge amounts of drugs were illegal

9   aliens bringing the drugs into our county.

10  Q.  Do you have any opinion, based on your law enforcement            15:46:04

11  experience, as to whether Maricopa County itself is a major

12  smuggling corridor for humans and narcotics?

13  A.  It is a major corridor for drugs and illegal immigration,

14  as evidenced by the fact that just recently, as I mentioned, we

15  arrested over 30 smugglers, and the majority were heading to          15:46:27

16  the East Coast and other areas of the country, so it is a

17  transit area, too.

18  Q.  Do you have any information, based on your experience --

19  let me back up.

20          Do you have any opinion as to whether or not Maricopa         15:46:47

21  County is a distribution center, Phoenix particularly is a

22  distribution for narcotics and human smuggling?

23  A.  Yes, it is, as evidenced by drop houses for the illegal

24  immigrants, which is very serious because of the violence that

25  occurs in the drop houses, and also the drug traffic.                 15:47:08

1    Q.  The human smuggling, when you say there's violence, could

2    you describe for me what you mean in human violence.  What are

3    you talking about here?

4    A.  Well, we're concerned more about the drop houses where they

5    are almost kidnapped, if you will, in these houses, till            15:47:29

6    they're shipped out to other areas of the country.

7    Q.  Let's turn now -- thank you very much.  Let's turn to

8    Exhibit 185.  If I could have Mr. Braun pull Exhibit 185, which

9    is in evidence.  I'm going to keep Mr. Braun busy, I think,

10   from here on out.                                                   15:48:02

11          If you could just pull up the last half of the letter,

12   please, Mr. Braun.  Thank you.

13          Do you remember Exhibit 185?  This is the letter

14   written from Carole where she talked about her little mom on a

15   train being racially profiled.  Do you remember that?            15:48:20

16   A.  Yes.

17   Q.  Now, do you have any information one way or the other as to

18   whether or not Carole's recitation of the facts is true or not

19   true?

20   A.  No, I do not.                                                  15:48:35

21   Q.  Do you know whether her mom was racially profiled as the

22   plaintiffs allege racial profiling is occurring here or not?

23   A.  I do not.

24   Q.  That's it.  Nothing else for 185, sir.  If you could turn

25   to Exhibit 308.                                                    15:48:53

1          And Mr. Braun, if I could have 308 up, please, for the

2    Court.

3          All right.  All right.  308.

4          Do you remember going over Exhibit 308, this press

5    release?                                                    15:49:18

6    A.  Yes.

7    Q.  Do the men and women in Human Smuggling, HSU, do they help

8    you write the press releases?

9    A.  No.

10   Q.  Do they review the press releases to make sure they're    15:49:29

11   accurate for what's actually going on in the operations side?

12   A.  No.

13   Q.  Who's Lisa Allen?  You mentioned her earlier.

14   A.  She's the director of our public relations.

15   Q.  Is she a sworn peace officer?                             15:49:43

16   A.  No.

17   Q.  Is she a member of your posse?

18   A.  No.

19   Q.  Has she ever gone to 287(g) training?

20   A.  No.                                                       15:49:50

21   Q.  Do you know if she ever clears anything she writes for you

22   in press releases with Human Smuggling Unit to make sure it's

23   factually accurate?

24   A.  She may talk to Chief Sands, but I don't believe she talks

25   to the deputies enforcing those laws.                        15:50:03

1  Q.  Okay.  Sir, do you know whether or not your deputies in HSU

2  on that Queen Creek operation, on that Cave Creek operation,

3  were going after day laborers?

4  A.  No.

5  Q.  Look at that.  If I could have, Mr. Braun, the second        15:50:37

6  paragraph enlarged.  Thank you.

7          Looking and showing this, this is about citizens

8  complaining that day laborers are shouting at the children and

9  photographing them at the bus stop.

10          What is it that's a concern about that to you as a law   15:50:55

11  enforcement chief executive officer?

12  A.  Well, it's not the day laborers; it would be anyone

13  that's -- may be taking pictures of young children.

14  Q.  Well, why is -- plaintiffs were asking you about day

15  laborers.  It was all focused on day laborers.                   15:51:16

16          Is there a possibility that this is either criminal or

17  could lead to criminal activity is what I'm asking you.

18  A.  If you're talking about taking pictures of young children,

19  yes.

20  Q.  What's the problem with that, sir?                           15:51:28

21  A.  Well, there's a lot -- a lot of problems with that.  Why

22  would they be taking pictures of young kids?  For kidnapping,

23  assaults; it could be a lot of reasons.

24  Q.  Let's turn now -- that's the end of that exhibit.  Sheriff

25  Arpaio, let's turn now to Exhibit 219.  And let me know -- if    15:51:46

1    we could -- just refresh your recollection, sir.  This is an

2    e-mail from Joe Sousa to Paul Chagolla forwarding on various

3    things.  If Mr. Braun could take me to the next page.  And it

4    appears to be a letter from a citizen forwarded by Art Sanders.

5    Who was Art Sanderson?  Sanders.                          15:52:21

6    A.  At the time he was the mayor --

7    Q.  And --

8    A.  -- may still be of Queen Creek.

9    Q.  Okay.  So it appears that a citizen of Queen Creek wrote in

10   to the mayor of Queen Creek, right?                       15:52:31

11   A.  Yes.

12   Q.  And then the mayor sent it to John Kross, the town manager

13   for Queen Creek.

14   A.  Yes.

15   Q.  And then it went to Joe Sousa.                        15:52:41

16   A.  Yes.

17   Q.  All right.  Now, if we look at that, the plaintiffs were

18   focusing on Hispanic men standing on a corner.

19           Do you remember that focus?

20   A.  Yes.                                                  15:53:00

21   Q.  Okay.  Was there anything else that was not discussed by

22   you --

23           Let's turn to the next page, if we could, Mr. Braun,

24   and let's highlight the second paragraph, kids passing this

25   area.                                                     15:53:17

510

```
 1            Okay.  Tell me, is -- is this a concern that you had

 2    when you saw this letter?

 3    A.  Yes.

 4    Q.  Okay.  In fact, let me back up for a minute.

 5            Was this in your -- do you know if this was in your          15:53:35

 6    immigration file?

 7    A.  I don't know.

 8    Q.  Do you know if you ever actually saw this letter?

 9    A.  I don't see my initials on it.

10    Q.  All right.  Do you know --                                        15:53:46

11    A.  It wasn't addressed to me.  I don't -- I don't believe it

12    was addressed to me personally.

13    Q.  Now, this letter from this Deborah is dated, you see

14    that -- if Mr. Braun could go back to the page before -- that

15    was dated September 17th, was it not?                                 15:54:05

16    A.  Yes.

17    Q.  Okay.  So she's complaining about things that are occurring

18    on that day, is she not?

19    A.  Yes.

20    Q.  All right.  And the Queen Creek detail was a small HSU           15:54:15

21    operation.  Do you know -- were you aware that occurred on

22    October 4, 2007?

23    A.  I may have.

24    Q.  Did you plan that operation out in Queen Creek?

25    A.  No.                                                               15:54:35
```

1    Q.  Did you tell anyone -- Sands, Sousa, anyone in HSU -- you

2    will go out to -- you will go out to Queen Creek because of

3    this exhibit, 219?

4    A.  No.

5    Q.  Did you ever suggest to them that, You will go to Queen        15:54:49

6    Creek.  I want you to go to Queen Creek because of this

7    exhibit?

8    A.  No.

9    Q.  Did this exhibit, 219, in any way influence or affect any

10   of your law enforcement decisions?                                 15:55:03

11   A.  No.  I'm not even sure I saw it.

12   Q.  All right.  Let's turn, let's go to the next exhibit,

13   Exhibit 202.

14        Mr. Braun, please.  And thank you very much,

15   Mr. Braun, for your help.                                          15:55:16

16        Exhibit 202, do you remember talking about this?

17        Do you remember talking about that, sir?

18   A.  You mean today?

19   Q.  With Mr. Young, yes.  Thank you.

20   A.  I believe I -- I have -- I do remember.                        15:55:43

21   Q.  Do you remember, is this part of your file?

22   A.  Probably was.  Could be.

23   Q.  Did this letter, this e-mail, have any influence on any of

24   your law enforcement decisions?

25   A.  No.                                                            15:56:05

1   Q.  Did you initiate the decision to go and do a saturation

2   patrol near the Pruitt's at 36th Street and Thomas Road?

3   A.  Not me.  I'm saying again I gave this information to my

4   immigration unit.

5   Q.  Okay.  Did you ever tell anyone in your immigration unit,                    15:56:24

6   because I received this thing from Dr. J, Jafari, or whoever it

7   is, go there and do some sort of saturation patrol?

8   A.  No.

9   Q.  Did you ever suggest -- and as a lawyer I'm going to use

10  these other words -- suggest, intimate, anything to let them                    15:56:41

11  know:  I'm the boss.  I want this.  Get out there?

12  A.  No.

13  Q.  Those are all the questions on Exhibit 202 I have for you,

14  sir.

15          Exhibit 310, Mr. Braun.  Thank you.                                     15:56:56

16          Sheriff, we'll pull up Exhibit 310 here.  You have 310

17  in front of you, do you not?

18  A.  Yes.

19  Q.  Do you see, sir, in the third paragraph -- excuse me, the

20  fourth paragraph.  I misspoke.  Do you see anything mentioning                  15:57:31

21  property crimes?

22  A.  Yes.

23  Q.  Okay.  What is the significance of that phrase, to the

24  extent you -- you know, of in this press release?

25          Let me rephrase the question.  First of all, the crime                 15:57:52

1    suppression operation, who conducted that, do you know?

2    A.  You mean in our office?

3    Q.  Yes, sir.

4    A.  It would be Sands' unit.

5    Q.  Okay.  Did, sir, any criminal aspects, to your knowledge,          15:58:08

6    play any role -- well, let me strike that.

7         Did you have any role, sir, in making that decision to

8    go out there?

9    A.  Once again, I gave it to my experts and they -- they made a

10   decision, I guess.                                                      15:58:27

11   Q.  Now, you were -- you talked about day laborers and illegal

12   immigration arrests being -- going on.  What is -- why include

13   in the press release something about ongoing property crimes

14   occurring there?  Do you know?

15   A.  Well, when we do go into these areas it is to enforce all          15:58:49

16   the laws, including property crimes, or burglaries.

17   Q.  Now, why in here say deputy sheriffs will not racially

18   profile anyone in this operation?

19   A.  Because I would -- I think that's important, to let the

20   people know we're not out there to racial profile, although          15:59:13

21   there's been allegations of such.

22   Q.  You testified during Mr. Young's questioning that there may

23   not be a specific policy saying thou shall not racially

24   profile.  You remember that?

25   A.  Yes.                                                               15:59:36

```
 1   Q.  Is it an MCSO policy, whether a separate policy or not, not
 2   to use race or ethnicity in making law enforcement decisions?
 3   A.  I'm not sure what the -- if it's in the policy.  I do know
 4   that we've had tremendous training on that issue.
 5   Q.  What is that training, sir?
 6   A.  Well, we've had it in our academy, and the 287(g), five
 7   weeks of intensive training that includes the racial profiling
 8   issue.  Whenever our units go out I'm sure that the supervisors
 9   bring that up again, and we've had more training through the --
10   our personnel in the training division, especially in the last
11   two years because of the 1070 law.
12   Q.  Okay.  What is the -- we heard some testimony about online
13   training from Officer DiPietro.  Is there -- is there any other
14   training that you're aware of other than that additional online
15   training?
16   A.  Not that I can -- I don't believe so.  There may be.  But I
17   do know that when they do go out on operations that the
18   supervisors, as I said, bring this up.
19   Q.  Okay.  Let's turn now -- thank you, sir.  Let's turn now to
20   Exhibit 375.
21         Mr. Braun, if I could get 375.  Thank you, sir.
22         Do you remember being shown this document during the
23   course of your questioning by plaintiffs' counsel?
24   A.  Yes.
25   Q.  And specifically, sir, you were asked about your comments,
```

15:59:50

16:00:18

16:00:37

16:00:58

16:01:16

```
 1    your markings on that.
 2           Do you remember that?
 3    A.  Yes.
 4    Q.  Okay.  And let's look at the one that says down there on
 5    September 20th from Wayne L.                                    16:01:28
 6           Does it appear from that caller -- strike that.
 7           What do you conclude from that caller about whether or
 8    not your office is being responsive to people only mentioning
 9    race?
10    A.  I mentioned before it had the -- was talking about the     16:01:47
11    hotline.  We do have a successful hotline, and we listen to it.
12    And we don't take the word of someone that just says there's
13    some Mexicans hanging out or cutting grass or whatever.  We
14    don't look at it.  But if we get some concrete information,
15    we'll pursue it.                                                16:02:12
16    Q.  Does this support your statement that you just said that we
17    don't consider race, we disregard it, and here seems to be
18    someone actually complaining about that?
19    A.  Yes.
20           MR. YOUNG:  Objection, leading.                          16:02:28
21           THE COURT:  Sustained.
22    BY MR. CASEY:
23    Q.  Do you know who handles the hotline tip line?
24    A.  I believe it's the people running the illegal immigration
25    programs.                                                       16:02:50
```

1    Q.  Is that the Human Smuggling Unit people?

2    A.  Or the employer sanction; I'm not sure which unit.

3    Q.  And you -- do you know first-hand how they screen calls and

4    determine whether or not they're -- they warrant follow-up?

5    A.  I don't know firsthand.                                      16:03:13

6    Q.  Okay.  Thank you very much.

7          You were then asked a question, sir, you see, first of

8    all --

9          MR. CASEY:  Bear with me, Your Honor.  Excuse me.

10   BY MR. CASEY:                                                    16:03:36

11   Q.  All right.  Let's turn to Exhibit 244, if we could, please.

12         Do you remember being asked questions about this?

13   A.  Yes.

14   Q.  And up on your -- up on your notes it said:  I will be

15   going to Mesa.  Do you remember that?                            16:04:04

16   A.  Yes.

17   Q.  Okay.  What does that indicate to you as to whether or not

18   there was a saturation patrol in -- planned, in existence, or

19   being planned, anything like that?

20   A.  I think we'd gone in there two, three times, and just        16:04:18

21   wanted the -- our units to have this information.

22   Q.  Okay.  Did you make any law enforcement -- or place any law

23   enforcement value whatsoever on this document?

24   A.  I did not.

25   Q.  Did this document, was it intended by you to influence or    16:04:37

1   direct Chief Sands to go into Mesa in the summer of -- June or

2   July of 2008?

3   A.  No.

4   Q.  That's it for Exhibit 244.

5           Okay.  Let's now turn to Exhibit 228, please,                16:04:59

6   Mr. Braun.

7           Here's another call.  What I'd like to do is blow up

8   Terry K, first of all.

9           Sheriff, do you see at the top of this letter it's

10  dated July 16, 2008?                                                  16:05:28

11  A.  Yes.

12  Q.  And the stipulations in evidence that Mr. Young was telling

13  you about is the parties have stipulated that there was a June

14  26 and a July 8 -- excuse me, a June 26 and a July 5 saturation

15  patrol in Mesa, and then again on July 14th.                         16:05:48

16          Assuming those things, did Terry K's comment on July

17  16th have any role whatsoever in those saturation patrols?

18  A.  No.

19  Q.  They were all after the fact, were they not?  Her comments

20  were --                                                              16:06:08

21  A.  Yes.

22  Q.  -- after the saturation patrol.

23  A.  Yes.

24  Q.  If I could please turn, have Mr. Braun turn to the next

25  page, Joyce F, please.  If I could have that highlighted.           16:06:16

1              Thank you, Mr. Braun.

2              Did that description from Joyce F have any role or

3    influence on, to your knowledge, any law enforcement decision

4    in MCSO?

5    A.  Not to my knowledge.                                        16:06:39

6    Q.  Now, there was some sort of investigation going on at some

7    point over the years over in Cave Creek.  Did this have

8    anything to do with it, to the best of your knowledge?

9    A.  Not that I know of.

10   Q.  Now, if I could turn to the next page, the last page,      16:06:54

11   please, and have Mr. Braun highlight Susan -- or Suzanne B.

12             Okay.  Again, this is dated July 16, 2008, and the

13   stipulated evidence shows the Mesa saturation patrol's already

14   taken place.  Would Suzanne B's comments in here have

15   influenced you in any way to make any law enforcement decision? 16:07:29

16   A.  Not me, no.

17   Q.  Did you at any time tell Brian Sands, Joe Sousa,

18   Brett Palmer, Manny Madrid, anyone in HSU, these people are

19   writing in and I want to go there?  Let's find a way.

20   A.  No.                                                         16:07:50

21   Q.  Did you ever at any time, from January 1st, 2007, until

22   this very date, have you ever told anyone in your office:  I

23   want to go there.  Find me a way?

24   A.  No.

25   Q.  Anything like that?                                         16:08:03

```
1    A.  No.

2    Q.  What happens if you get very excited?  You're an elected

3    official.  There's a lot of things going on.  You get people

4    that come up to you and plead with you for something or

5    another.                                                          16:08:20

6          Do you ever get overwhelmed by the idea that, Boy, we

7    gotta do something and we gotta do something now to help

8    people?  You ever get overwhelmed like that where you go make a

9    decision?

10   A.  You know what?  I let my people make the decisions.  They    16:08:29

11   enforce the laws.  I have confidence in my people that they'll

12   make the right decisions.  I leave it up to them.

13   Q.  Tell Judge Snow, if that's the case, why are you marking

14   these up and sending them to Brian S?  'Cause you're not

15   marking everything; you're only marking some.                    16:08:49

16         Why are you sending it to Brian Sands?  If you expect

17   no action.

18   A.  He may have an interest.  Once again, I've said constantly

19   I believe in circulating anything, whether it's negative or

20   positive, to my people so they can evaluate it.  I don't know    16:09:06

21   if this may have some interest to them, or at least some

22   intelligence purposes.  That's why I do it.

23   Q.  Thank you very much, sir.

24         Let's now turn to Exhibit 237.  If I could have

25   Mr. Braun's capable assistance.  And if I could just have the    16:09:30
```

1    whole letter highlighted, please.

2            First of all, sir, the parties have stipulated,

3    Sheriff, into evidence that on August 13 and 14, 2008, there

4    was what's called a large-scale saturation patrol that was

5    conducted Sun City, Sun City West, and U.S. 60 and I-17.                    16:10:00

6    That's just the frame of reference for this question, sir.

7            You mentioned that it takes some period of time to

8    prepare saturation patrols.  How long do you understand it

9    takes a large-scale saturation patrol to be planned?

10   A.  Well, you know, they're very thorough.  It could be three              16:10:21

11   weeks, four weeks.  It's not done immediately; takes a lot of

12   planning.

13   Q.  If Joe Sousa were to testify to this Court that it takes 30

14   to 60 days, if he testifies to that would that surprise you it

15   takes that long?                                                           16:10:41

16   A.  No.

17   Q.  Now, this letter, would you tell us, what is the date on

18   this letter?

19   A.  August 1, 2008.

20   Q.  Your marginalia is to the right, correct?                              16:10:47

21   A.  Yes.

22   Q.  And what is the date that you put on your marginalia?

23   A.  It's August 5th.

24   Q.  Based on those dates and how long you understand it takes

25   to conduct, to plan a saturation patrol, could this letter in             16:11:00

```
 1   any way have influenced anyone's decision to conduct a

 2   saturation patrol?

 3              MR. YOUNG:  Objection, leading, and argumentative.

 4              THE COURT:  Sustained.

 5   BY MR. CASEY:                                              16:11:15

 6   Q.  Sir, this -- is there any way that you believe that this

 7   letter could have influenced anyone's decision to conduct a

 8   satur --

 9   A.  No.

10   Q.  Explain why.                                           16:11:26

11   A.  The timing, number one.  As I mentioned, it takes weeks to

12   prepare this -- these type of operations.

13   Q.  Let me understand this.  I asked you this before, but it

14   still -- it beats on me.

15              This lady mentions nothing other than there are people 16:11:42

16   speaking Spanish, and I'm trying to understand why you keep

17   that in your own personal immigration file for possible use.

18              What possible use could there be for something like

19   this?  If you could tell us why you keep that.

20   A.  Well, I -- I think she's talking about public servants,   16:12:02

21   self-serving, illegal organizations, and that type of thing.  I

22   think that I kept it for that reason, not about the language

23   situation.

24   Q.  One final question:  Did you expect, in forwarding this to

25   Chief Sands, that he would do anything specific during the     16:12:33
```

1    Sun City operation because of this letter?

2    A.  No.

3    Q.  Did you expect him to call this woman?

4    A.  Well, if he wanted to.  You know, when people write in or

5    call, sometimes it's good to call back, regardless of what the

6    situation is.  She took time to write a letter, so I think

7    someone ought to take time to contact her, if -- if it ever

8    happened.

9    Q.  You see in there the first sentence where it's talking

10    about an area of illegal immigrants?  In the first sentence?

11    A.  Yes.

12    Q.  Help me understand, is that something that triggered this

13    to be put in your immigration file?

14    A.  No, I think the public servants and self-serving

15    pro-illegal organizations that are against you triggered it.  I

16    do have many organizations that don't like my programs.

17    Q.  Let's turn now to a different document, your -- Sheriff

18    Arpaio, and that is Exhibit 235.  That's in evidence.

19          Yeah, if we could just blow that up.  Thank you,

20    Mr. Braun.

21          What's the date on this letter?

22    A.  August 8, 2008.

23    Q.  And there was some testimony -- actually, the established

24    facts that Mr. Braun brought out that stipulated that 16 months

25    later there was a saturation patrol on October 16, 2009, in the

16:12:48

16:13:10

16:13:34

16:14:02

16:14:16

1    Surprise area.

2          With that frame of reference, sir, did this letter

3    have any influence over your decision making on law enforcement

4    actions?

5    A.  We're talking about nine months later, is that --          16:14:31

6    Q.  Well, there was a -- this letter's dated August 8th, is it

7    not?

8    A.  Yes.

9    Q.  Okay.  And the stipulated facts are that we did something

10   on October 16, 2009, a saturation patrol in Surprise.          16:14:44

11   A.  Yes.

12   Q.  My question for you is:  Did this letter have any influence

13   over any decisions that you made as a law enforcement officer?

14   A.  No.

15   Q.  Okay.  Did you make the decision to go to Surprise?          16:14:55

16   A.  I believe Chief Sands made that decision.  Of course, he

17   ran it by me and I agreed to it.

18   Q.  Did you ever intend, by forwarding this letter over to him,

19   that you were going to influence Chief Sands to go to a

20   particular geographic area?          16:15:18

21   A.  Just gave it to him for information.

22   Q.  All right.  Let's turn now to Exhibit 381, please,

23   Mr. Braun.  Thank you.

24          All right.  This -- you were asked a series of

25   questions on this and I want to make sure that it's clear.          16:15:44

1          Why did you decide to give this letter, Exhibit 381,

2    to your illegal immigration officers to look into?

3    A.  I think there's some concern about speeding by this person.

4    I don't know who wrote it; there's no name to it.

5    Q.  And also, if Mr. Braun could turn to the second page.                16:16:11

6          Is there any other information in the second page that

7    also served as a prompt, I guess, if you will, to forward it on

8    to your immigration officers?

9    A.  I think the main thing was the speeding.  We get quite a

10   few complaints in that area on the traffic violations.                    16:16:30

11   Q.  I'm looking at the second paragraph in here where somebody

12   says:  I fear they are afraid of these illegals, whatever that

13   may mean.  Did that have any role in your decision to send

14   something over to your officers?

15   A.  Once again, I just sent it to them for their information.            16:16:51

16   Q.  All right.  The working without a permit, you mentioned

17   drop houses earlier and human smuggling, people being held

18   against their will.  Do you have any -- could you tell us, what

19   is your experience of people paying off their drug smuggling

20   fees?                                                                     16:17:30

21          Let me rephrase the question.  You talked earlier

22   about people being held against their will in drop houses.  Do

23   you have any personal knowledge, based on your years as a

24   sheriff, as to how people in our community who are being held

25   by those people pay off their fees for smuggling?  Do you know?         16:17:45

1   A.  Don't understand the question.

2   Q.  All right.  I'm going to withdraw the question and move on.

3           Do you know whether any investigation was ever

4   conducted by any 287(g) officers in response to this exhibit,

5   381?                                                                    16:18:11

6   A.  I lost it.

7   Q.  You lost my --

8   A.  It's gone, it's blank.  Is that the one I was just reading?

9   Q.  Just looking at, right.

10  A.  And the question, again?                                            16:18:21

11  Q.  Do you know if any investigation -- you said here Info to

12  my illegal immigration officers to look into.  Do you know

13  whether or not they ever looked into it?

14  A.  No, I do not.

15  Q.  Do you know whether they did anything, if -- anything at             16:18:32

16  all?

17  A.  I do not.

18  Q.  If they did anything, do you know if they took any action

19  other than merely investigating it?

20  A.  I do not.                                                            16:18:42

21  Q.  Let's turn now to Exhibit 187, please.

22          Thank you, Mr. Braun.

23          Explain for me why you would write something to Brian

24  Sands and say:  Have someone handle?  What does that mean, sir?

25  A.  I'm trying to read the letter.                                      16:19:15

Q.  Let's see if I -- Mr. Braun, if you could pull out the

call-out so he could read the two pages, please.

        Thank you, sir.

A.  I think that the person writing the letter was concerned

with her neighborhood, the crime in her neighborhood, and I          16:19:50

thought that maybe he should get in touch with this person and

get more information.

Q.  All right.  Now, do you see the second page where it says,

second paragraph from the bottom:  I'm begging you to come over

to the 29th Street/Greenway Parkway area and round them all up?     16:20:11

        You see that?

A.  Yes.

Q.  Did you mean by saying, "Have someone handle this," that

there was going to be police action taken in response to that

request?                                                             16:20:26

A.  No, she was -- whoever it was was also talking about

gunshots in the area, which is very dangerous, so I just gave

it to Sands.  If he wanted to send someone to talk to her,

okay.

Q.  Finally, sir, if we could just ask you on this:  Did you at     16:20:42

any time try to influence Chief Sands to go to anywhere near

29th Street and Greenway Parkway in response to this letter,

Exhibit 187?

A.  No.

Q.  Okay.  One other exhibit, 216, please.                           16:21:07

1       Okay.  If I could have, Mr. Braun, it would be the

2   fourth paragraph from the bottom.  It says, With all the

3   controversy, and having that blow up.  You see that's very,

4   very difficult to read.

5       Sir, do you see the part that reads -- it's in          16:21:40

6   evidence:  Although the Mexicans at this location may be within

7   their legal right to be there, I feel they do not have the

8   right to harass motorists driving through the above-mentioned

9   area.

10      Explain for me what you understood that to mean when      16:21:57

11  you received that letter.

12  A.  Well, if anybody is being harassed, I think someone should

13  look into it.  That's why I gave it to him, if he wanted to

14  look into it and get more information.

15  Q.  Did Dave Trombi have anything to do with initiating        16:22:17

16  saturation patrols?

17  A.  I believe he did.

18  Q.  Okay.  Do you know if he was ever a decision maker in where

19  to conduct a saturation patrol?

20  A.  I'm not sure whether he, in conjunction with Chief Sands,   16:22:30

21  worked together on making those decisions.

22  Q.  Other than saying, Contact Stella, the author, what did

23  you -- what else -- what did you expect to be done with this

24  letter?

25  A.  I don't know.  As I say, I gave it to them, and sometimes   16:22:49

```
 1   good police work is talk to the people who complain about

 2   issues.  She was complaining about being harassed.

 3            MR. CASEY:  One final area, Your Honor, before we sit

 4   down and conclude this.

 5   BY MR. CASEY:                                                    16:23:10

 6   Q.  Sheriff Arpaio, would you explain to the Court how you set

 7   policy in your office, whether it is a written policy or

 8   whether you decide to emphasize a particular crime and make it

 9   a priority.  How do you make policy in your office?

10   A.  Well, I -- of course, we have our normal duties in law     16:23:27

11   enforcement, but sometimes I think that something is important

12   and we'll establish a policy to concentrate on certain issues.

13            For example, we have gone after prostitution many

14   times, DUIs, warrants, animal cruelty, how to operate the

15   jails.  So I listen to my staff and get their input, and then   16:23:59

16   when I establish the policy I expect them to carry it out,

17   which they do in a very professional manner.

18   Q.  Do you ever -- do you ever establish policy just by what I

19   call fiat, edict, by order:  This is what it's going to be.

20   Make it happen.  Accomplish it, please.                         16:24:23

21            Do you ever do anything like that?

22   A.  No, I establish the policy and -- and it's not a -- it's

23   not a policy in a way as we talk about personnel matters, but I

24   establish priorities and policies and my people carry it out.

25   They do a little research and educate themselves on the         16:24:46
```

1    policies that I may want to conduct.  We don't just take it out

2    of the sky.  So I use my staff to study the situation and then

3    we go forward.

4    Q.  Do you get feedback from your deputy chiefs about ideas for

5    policy, whether it's good or bad, things like that?          16:25:08

6    A.  On occasion they may come up with some ideas, and then I

7    make the final decision.

8    Q.  Do you set forth MCSO policy in press releases?

9    A.  Sometimes -- you mean policies --

10   Q.  Yeah.                                                      16:25:30

11   A.  Sometimes we do publicize what we are going to do.  I don't

12   run a CIA secret organization; I have an open-door policy.  I

13   want everybody to know what the sheriff does.  So sometimes we

14   use the vehicle of the media to get the word out.

15   Q.  And other than getting the word out, it is -- do you -- do   16:25:48

16   you set policy when you speak to Glenn Beck?  When you speak to

17   Lou Dobbs?  When you speak to John Sanchez?

18   A.  No, I don't establish policy.  I may talk about the

19   policies, but I don't establish policy through the news media.

20   Q.  Do you, in any of your decisions from 2007, January 1st, to   16:26:08

21   today, do you consider race or ethnicity in any aspect of the

22   decision making you make?

23   A.  No.

24   Q.  You were asked about truths and lies.  Remember that was --

25            THE COURT:  Mr. Casey?                                16:26:26

1        MR. CASEY:  I'm sorry.

2        THE COURT:  I'm having a hard time hearing you.

3        MR. CASEY:  I apologize, Your Honor.  Please forgive

4  me.

5  BY MR. CASEY:                                          16:26:32

6  Q.  You were asked about truth, lies, and it was in the context

7  of the pink underwear.

8        Do you remember those questions?

9  A.  Yes.

10 Q.  Okay.  Explain for me just briefly why that con -- that   16:26:39

11 comment in Houston you said was humorous.

12 A.  Why I use humor?

13 Q.  Yeah, why do you use humor?

14 A.  That's what I do.  I don't read speeches.  I don't prepare

15 speeches.  I talk off the cuff.  Sometimes I throw some humor   16:26:59

16 into it.

17 Q.  Were you telling that audience in Houston that there's the

18 truth, and on the other hand there's the reasons to win

19 lawsuits?

20 A.  No.                                                  16:27:12

21       MR. CASEY:  All right.  Those are all the questions I

22 have for you, Sheriff Arpaio.  Thank you --

23       THE WITNESS:  Thank you.

24       MR. CASEY:  -- very much for your patience.

25       THE COURT:  Redirect?                              16:27:25

1          MR. YOUNG:  I do have some, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. YOUNG:

4    Q.  Sheriff, you were asked some questions about the number of

5    items in your immigration file.                                    16:27:38

6              Did you count those items to come up with that number?

7    A.  I don't know who counted them; I just saw it in this form

8    here.

9    Q.  So you actually have no idea whether the number that you

10   testified to is correct or not, is that right?                     16:27:53

11   A.  I'm going by this form.

12   Q.  Do you know who made this form, this piece of paper that

13   you were shown?

14   A.  No.

15   Q.  Other than looking at that piece of paper, you don't really    16:28:06

16   have any idea how many items are in your immigration file, is

17   that right?

18   A.  I didn't count them, no, personally.

19   Q.  You've been in law enforcement for over 50 years, is that

20   right?                                                             16:28:17

21   A.  Yes.

22   Q.  And as a result of that experience, you know how to assess

23   whether a situation has the potential for a criminal violation

24   or not, is that right?

25   A.  Well, right now I'm the head of an agency, as I said           16:28:37

```
 1   before, that I delegate to my people and they make decisions.

 2   They can assess.  I don't make individual decisions on law

 3   enforcement.

 4   Q.  You're the head of a law enforcement agency?

 5   A.  That's correct.                                        16:28:57

 6   Q.  And as the head of a law enforcement agency and with 50

 7   years' experience in law enforcement, you do have the ability

 8   to look at a situation and assess whether there is the

 9   potential for a criminal violation, correct?

10   A.  If it comes to my attention, yeah.                     16:29:08

11   Q.  You were asked some questions by Mr. Casey about drug

12   trafficking.

13   A.  Yes.

14   Q.  Is it your view that Mexicans are potentially drug

15   traffickers?                                               16:29:36

16   A.  All Mexicans?  Is that your question?  The answer is no.

17   Q.  Some Mexicans?

18   A.  Some are.

19   Q.  And some Mexicans are suspects for kidnapping and other

20   crimes relating to children?                              16:29:55

21   A.  Yes.

22   Q.  In the discussion about Queen Creek, you were asked some

23   questions by Mr. Casey about people taking pictures, is that

24   right?

25   A.  Yes.                                                   16:30:13
```

1    Q.  And he referred you back to the e-mail where someone in

2    Queen Creek said a bunch of Hispanics are taking pictures of

3    children.

4    A.  Yes.

5    Q.  In your review of that e-mail did you see any particular          16:30:24

6    reference to a specific person taking pictures, or was it just

7    a group of Hispanic men taking pictures?

8    A.  I believe there was no individual mentioned, but there were

9    a group of people taking pictures.

10   Q.  It was just a group of Hispanic men, correct?                     16:30:48

11   A.  Whoever it was, the focus was taking pictures of young

12   kids.

13   Q.  So there wasn't any particular person that was identified

14   as taking pictures; it was just a group of Hispanic men.

15   A.  Yes.                                                              16:31:06

16   Q.  In your view, did that justify thinking that that group of

17   Hispanic men might be kidnappers or other criminals who ought

18   to be looked into?

19   A.  No, doesn't matter what background of the group is.

20   Q.  Please go to Exhibit 219, which is that Queen Creek e-mail        16:31:27

21   that we looked at earlier.  And can we go to the last page of

22   that exhibit.

23          All right.  Well, take that exhibit down.

24          There have been occasions when you have directed your

25   office to perform a saturation patrol or other enforcement           16:32:06

1    action in a particular location, is that correct?

2    A.  Once again, I say I delegate that to the experts, and they

3    make the decision on where to go, when, and so on.

4    Q.  But remember the press release we looked at about the Mesa

5    operations that said that you were fulfilling a promise to both    16:32:36

6    the public and to certain legislators?

7    A.  Yes.

8    Q.  You were requested by certain legislators to do an

9    operation in Mesa.

10   A.  Yes.    16:32:55

11   Q.  And based on that request to you from the legislators, you

12   had your office do a Mesa operation, correct?

13   A.  We told them to get -- to look into it to see if it

14   justified an operation.

15   Q.  Have you ever said that legislators who provide your office    16:33:14

16   with additional funds to do immigration enforcement should be

17   listened to when they make requests to you about where to do

18   immigration related enforcement activities?

19   A.  Well, I think when Congress makes an issue and wants

20   something done by law enforcement, they pretty well jump.  And    16:33:41

21   when you have legislators that have an interest in their area,

22   Mesa, I think we ought to look into that, because you had

23   legislators, about seven of them, that have a concern, know who

24   the constituents are, have good information what's occurring in

25   their area on crime, so I'd look at that as a pretty good    16:34:06

1    source to at least look into it to see if we're going to pursue

2    their concerns.  Not meaning that we have to do it, but I think

3    it's good management to do that.

4    Q.  And in that case of Mesa in response to those legislators'

5    concerns, you did go into Mesa, correct?                          16:34:28

6    A.  Only after my people studied the area to see if there was a

7    crime issue and it was worth going into that area.

8    Q.  Your people studied that issue because you instructed them

9    to, correct?

10   A.  I asked them to look into it and they did.                    16:34:44

11           MR. YOUNG:  Thank you very much, Sheriff.

12           THE WITNESS:  Thank you.

13           MR. YOUNG:  Thank you, Your Honor.

14           THE COURT:  Thank you.

15           Have you had enough for the day, or do you want to        16:35:02

16   call your next witness?

17           Sheriff Arpaio, you may step down.  Thank you.

18           THE WITNESS:  Thank you.

19           MR. YOUNG:  I think we could get the next witness done

20   in 20 or so minutes, Your Honor.                                  16:35:11

21           THE COURT:  Do you know what?  I am going to -- with

22   all due respect, I'm going to end for the day because we have

23   to move our materials up to my courtroom.  So I think we're

24   going to end for the day so we give the -- my staff a little

25   time to move things up.                                           16:35:25

1          We will begin promptly at 8:30 tomorrow morning in my

2     courtroom.   Thank you.

3               (Proceedings recessed at 4:35 p.m.)

1

2                C E R T I F I C A T E

3

4

5

6

7           I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 24th day of July,

18   2012.

19

20

21                         s/Gary Moll

22

23

24

25