1                UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega        )
    Melendres, et al.,            )
5                                 )
               Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                 )
               vs.                )   Phoenix, Arizona
7                                 )   July 25, 2012
    Joseph M. Arpaio, et al.,     )   8:43 a.m.
8                                 )
               Defendants.        )
9   _____)

10

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            BEFORE THE HONORABLE G. MURRAY SNOW

17            (BENCH TRIAL DAY 3 - Pages 538-816)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
    Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

A P P E A R A N C E S

For the Plaintiffs:                   Stanley Young, Esq.
                                      Andrew C. Byrnes, Esq.
                                      COVINGTON & BURLING, L.L.P.
                                      333 Twin Dolphin Drive
                                      Suite 700
                                      Redwood Shores, California  94065
                                      (650) 632-4704

                                      David Hults, Esq.
                                      COVINGTON & BURLING, L.L.P.
                                      1 Front Street
                                      35th Floor
                                      San Francisco, California  94111
                                      (415) 591-7066

                                      Lesli Rawles Gallagher, Esq.
                                      9191 Towne Centre Drive
                                      6th Floor
                                      San Diego, California  92122-1225
                                      (858) 678-1807

                                      Nancy Anne Ramirez, Esq.
                                      MEXICAN AMERICAN LEGAL DEFENSE
                                      AND EDUCATIONAL FUND
                                      Regional Counsel
                                      634 S. Spring Street
                                      11th Floor
                                      Los Angeles, California  90014
                                      (213) 629-2512, Ext. 121

                                      Annie Lai, Esq.
                                      Daniel J. Pochoda, Esq.
                                      AMERICAN CIVIL LIBERTIES
                                      FOUNDATION OF ARIZONA
                                      77 E. Columbus Avenue
                                      Suite 205
                                      Phoenix, Arizona  85012
                                      (602) 650-1854

                                      Andre Segura, Esq.
                                      AMERICAN CIVIL LIBERTIES UNION
                                      125 Broad Street, 18th Floor
                                      New York, New York  10004
                                      (212) 549-2676

1                          A P P E A R A N C E S

2

3                                    Cecillia D. Wang, Esq.
                                     AMERICAN CIVIL LIBERTIES UNION
4                                    FOUNDATION
                                     Director
5                                    Immigrants' Rights Project
                                     39 Drumm Street
6                                    San Francisco, California  94111
                                     (415) 343-0775
7

   For the Defendants:              Timothy J. Casey, Esq.
8                                    James L. Williams, Esq.
                                     SCHMITT, SCHNECK, SMYTH,
9                                    CASEY & EVEN, P.C.
                                     1221 E. Osborn Road
10                                   Suite 105
                                     Phoenix, Arizona  85014-5540
11                                   (602) 277-7000

12                                   Thomas P. Liddy
                                     Deputy County Attorney
13                                   MARICOPA COUNTY ATTORNEY'S OFFICE
                                     Practice Group Leader, Litigation
14                                   Ann T. Uglietta, Esq.
                                     Deputy County Attorney
15                                   Civil Services Division
                                     222 N. Central Avenue
16                                   Suite 1100
                                     Phoenix, Arizona 85004
17                                   (602) 372-2098 2098

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2   Witness:                                    Page

 3   DANIEL MAGOS

 4   Direct Examination by Mr. Hults             546
     Cross-Examination by Mr. Liddy              556
 5   Redirect Examination by Mr. Hults           563

 6   MICHAEL KIKES

 7   Direct Examination by Mr. Casey             565
     Cross-Examination by Ms. Lai                585
 8   Examination by The Court                    608
     Redirect Examination by Mr. Casey           623
 9
     MANUEL NIETO, JR.
10
     Direct Examination by Ms. Lai              626
11   Cross-Examination by Mr. Casey             636

12   VELIA MERAZ

13   Direct Examination by Ms. Lai              648
     Cross-Examination by Mr. Casey             655
14
     BRETT PALMER
15
     Direct Examination by Ms. Wang             661
16   Cross-Examination by Mr. Casey             738
     Redirect Examination by Ms. Wang           777
17
     BRIAN L. SANDS
18
     Direct Examination by Mr. Young            785
19


20                         E X H I B I T S

21   No.      Description                    Admitted

22   452      Previously marked as Exhibit No. 467    711

23


24


25
```

```
 1                        P R O C E E D I N G S

 2

 3            THE COURT:  Thank you.  Please be seated.

 4            THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

 5   on for continuation of bench trial.                            08:43:14

 6            THE COURT:  Kathleen.

 7            (Off-the-record discussion between the Court and the

 8   clerk.)

 9            THE COURT:  The Court is informed the attorneys have

10   some matters to raise prior to next witness.                   08:43:52

11            MR. YOUNG:  Yes, Your Honor.  Good morning.

12            Both parties, both sides have adopt -- have invoked

13   the exclusionary rule for witnesses, and I wanted to let the

14   Court know, we've talked about this beforehand, we've agreed

15   that that does not apply to expert witnesses, but it does apply  08:44:10

16   to fact witnesses.  So I just wanted to make sure the Court

17   understood that.  Actually, I think on both sides we've had

18   expert witnesses who have had access to testimony that has gone

19   on so far in the trial.

20            THE COURT:  All right.                                 08:44:27

21            MR. YOUNG:  The second issue relates to the videos

22   that we showed yesterday.  I've also conferred with Mr. Casey

23   on this.  The videos that were played in court yesterday have

24   been admitted.  The exhibits that were lodged with the Court --

25   namely, 357, 410, 410A through D, and 451 -- are actually the   08:44:45
```

```
 1   entireties of the news broadcasts or whatever out of which the
 2   sections that were played in court and admitted were excerpted.
 3        And what Mr. Casey and I have discussed is that we
 4   would provide the clerk with substitutes for those exhibits
 5   that would comprise only the clips that were shown in court
 6   yesterday and were admitted, and I'd ask the Court's permission
 7   to do that.
 8        THE COURT:  All right.  Let me get the names of those
 9   exhibits again.
10        MR. YOUNG:  Yes.  357, 410, 410A, 410B, 410C, 410D,
11   and 451.
12        THE COURT:  All right.
13        You agree with that, Mr. Casey?
14        MR. CASEY:  Yes, I do.  Only those that were admitted
15   yesterday ought to be in the Court's record, yes.
16        THE COURT:  All right.  I'll allow that, then.
17        MR. YOUNG:  Thank you, Your Honor.
18        THE COURT:  Anything else?
19        MR. CASEY:  Just one other thing.  Plaintiffs have
20   graciously agreed that they're going to be calling a witness
21   this morning, and immediately after that we're going to take an
22   MCSO deputy named Michael Kikes regarding the -- regarding the
23   Nieto-Meraz stop out of order, and he will be the second
24   witness because of a personal matter that he has that he's not
25   going to be available the rest of the trial.
```

08:45:11
08:45:24
08:45:50
08:45:59
08:46:22

1        So I wanted to alert the Court to that and thank on

2    the record the plaintiffs for their courtesy.

3        THE COURT:  All right.  I do want to commend both

4    parties.  It seems to me this is a very highly contended case,

5    but I think that the attorneys have behaved professionally and    08:46:36

6    with courtesy to expedite it and make the matters

7    comprehensible.

8        I do want to let the plaintiffs know that you have, by

9    my count -- and my count is not appealable unless you can

10   convince me I've made an error -- you have taken six hours and    08:46:54

11   43 minutes, and the defendants have taken four hours and 43

12   minutes.

13       You ready to call your next witness, Mr. Young?

14       MR. YOUNG:  Yes, Your Honor.  Thank you.

15       Mr. Hults will be presenting our first witness today.    08:47:11

16       THE COURT:  All right.  Mr. Hults.

17       MR. HULTS:  Plaintiffs call Daniel Magos.

18       MR. LIDDY:  Excuse me, Your Honor.  The defense

19   objects to this on the basis of relevance.  The plaintiffs

20   propose to have this witness testify about events on December    08:47:45

21   4th, 2009, and the parties have stipulated that December 4th,

22   2009, was not a saturation patrol day.

23       THE COURT:  And so is it your position that only

24   saturation patrol days are relevant?

25       MR. LIDDY:  Your Honor, the -- the plaintiffs are    08:48:04

```
1   trying to make the case that there is racial profiling during

2   saturation patrols, and so there are more Hispanics on

3   saturation patrol days by saturation patrol officers and that

4   the stops take longer.  And this witness has no experience, no

5   firsthand experience about any issues that --                      08:48:22

6            THE COURT:  I appreciate it and understand the basis

7   for your objection.  I'm going to overrule it, because as I

8   understand it there are not only saturation patrol claims, but

9   there are claims relating to the operations of HSU that may or

10  may not be characterized as saturation patrols.  There are       08:48:37

11  Fourth Amendment and Fourteenth Amendment claims, and I can't

12  determine beforehand whether this witness has any relevant

13  knowledge pertaining to something that may still be left in

14  this case.

15           So I'm overruling your objection without prejudice to    08:48:50

16  your renewing the objection, the moving to strike, to the

17  extent that you're going to take the position that anything he

18  testifies to isn't relevant to the remaining claims.

19           MR. LIDDY:  Thank you, Your Honor.

20           THE COURT:  Sir, would you please come forward to be      08:49:02

21  sworn.

22           THE CLERK:  Right up here, sir.  Actually, right over

23  here.

24           Please state and spell your first name.

25           MR. MAGOS:  Daniel Magos.                                 08:49:21
```

```
 1                THE CLERK:  Did you say "Daniel"?

 2                MR. MAGOS:  Yes.

 3                THE CLERK:  Okay.

 4                MR. MAGOS:  Magos, M-a-g-o-s.

 5                THE CLERK:  Please raise your right hand.        08:49:33

 6                (Daniel Magos was duly sworn as a witness.)

 7                THE CLERK:  Thank you.  Please take our witness stand.

 8                THE COURT:  Mr. Hults, would you, please.

 9                          DANIEL MAGOS,

10      called as a witness herein, having been duly sworn, was

11      examined and testified as follows:

12                          DIRECT EXAMINATION

13      BY MR. HULTS:

14      Q.  Good morning.

15      A.  Good morning.                                          08:50:11

16      Q.  Please state your name.

17      A.  Daniel Magos.

18      Q.  How old are you?

19      A.  I'm 67 years old.

20      Q.  What is your date of birth?                            08:50:19

21      A.  July 3, 1945.

22      Q.  Where do you live?

23      A.  I live in Phoenix, Arizona.

24      Q.  And how long have you lived in Phoenix?

25      A.  Over 50 years.                                         08:50:34
```

1    Q.   What is your level of education?

2    A.   One and a half years of college.

3    Q.   What is your current occupation?

4    A.   I work in the maintenance department to one of the school

5    districts.                                                          08:50:53

6    Q.   What is your ethnicity?

7    A.   Mexican American.

8    Q.   Are you married?

9    A.   Yes.

10   Q.   For how long have you been married?                           08:50:59

11   A.   Forty-five years.

12   Q.   What is your wife's ethnicity?

13   A.   Mexican American.

14   Q.   Do you have any children?

15   A.   Yes, two.                                                      08:51:11

16   Q.   Do you have any grandchildren?

17   A.   Granddaughter and a grandson.

18   Q.   Where were you born?

19   A.   I was born in Chihuahua, Mexico.

20   Q.   What is your current citizenship status?                      08:51:24

21   A.   I'm an American citizen.

22   Q.   And how long have you been a U.S. citizen?

23   A.   For over 45 years.

24   Q.   Is your wife a U.S. citizen?

25   A.   Yes, she was born in Phoenix.                                 08:51:37

1    Q.  Did you encounter a deputy from the Maricopa County

2    Sheriff's Office, or MCSO, on December 4th, 2009?

3    A.  Yes, I did.

4    Q.  What were you doing at the time?

5    A.  I was on my way to a job site.                                  08:51:56

6    Q.  What was your job at the time?

7    A.  At the time I was doing maintenance and remodeling.

8    Q.  Approximately what time of day was it?

9    A.  It was approximately 10 o'clock in the morning.

10   Q.  Were you alone?                                                 08:52:19

11   A.  No, my wife was in the truck with me.

12   Q.  Why was your wife with you?

13   A.  Occasionally she would go to some of the jobs with me, you

14   know, assist me with tools or whatever and...

15   Q.  What kind of truck were you driving?                           08:52:36

16   A.  It's a '93 Ford pickup truck, ST series, or F-150.

17   Q.  Was there anything in the bed of your truck?

18   A.  Yes, I was carrying my tools.

19   Q.  What type of tools?

20   A.  There was some landscaping tools, hoes, shovels, rakes, a      08:52:59

21   wheelbarrow.

22   Q.  And how were those tools situated in the bed of your truck?

23   A.  I had them standing up, and I had devised a, you know, some

24   kind of a brace to keep them upright so they didn't get all

25   mixed up in the back of my truck.                                  08:53:28

1    Q.  Was there anything behind your truck?

2    A.  Yes.  I was towing a flatbed trailer, a small trailer.

3    Q.  Was there anything in the trailer?

4    A.  No, nothing.  It was empty.

5    Q.  Were you driving with your windows down at the time?    08:53:43

6    A.  They were up until I came to the stop.  There was a traffic

7    light, and I was about to make a left turn from northbound 27th

8    onto westbound Durango.  And when I come to an intersection, I

9    usually lower my driver's side window about halfway for better

10   visibility.  The tinting on the window is slightly blurry on    08:54:17

11   the driver's side.

12   Q.  Was the deputy that you saw in a vehicle?

13   A.  Yes.

14   Q.  What kind of vehicle was the deputy in?

15   A.  It was a marked patrol car, you know, the -- brown with the    08:54:40

16   gold insignia on the side.

17   Q.  Where was the deputy in relation to you when you first saw

18   him?

19   A.  He was to my left, and he was getting ready to make a

20   right-hand turn into southbound 27th Avenue.    08:55:02

21   Q.  Could you see the deputy's face at the time?

22   A.  Yes.

23   Q.  What happened when you saw the MCSO deputy?

24   A.  He was making his right-hand turn at a very slow rate of

25   speed.  And he stared at my wife, and then he stared at me as    08:55:28

1   he was coming parallel to my truck.

2   Q.  Did you say anything after you noticed him staring at you?

3   A.  I asked my wife why he was staring at us that way.

4   Q.  And what happened after he began to turn slowly by you?

5   A.  He accelerated.  I could hear the -- his engine roaring at          08:55:55

6   a high RPM.  He went south about 200 feet and then made a

7   sudden U-turn.

8   Q.  And then what happened after he made the sudden U-turn?

9   A.  The traffic light changed and I made my left turn, and then

10  he came behind me and followed me for about couple a hundred          08:56:23

11  feet, three hundred, and then he turned his emergency lights

12  on.

13  Q.  Did you pull over?

14  A.  Yes, I pulled over on the next northbound street.  There

15  wasn't too much room on Durango to pull over.                          08:56:46

16  Q.  And what happened after you pulled over?

17  A.  The deputy remained in his car.  He did not make any move.

18  So my wife and I proceeded to get off the truck to go check

19  with the deputy, see why he had stopped us.

20  Q.  And how long was it between the time you stopped and when          08:57:09

21  you exited the truck?

22  A.  Probably about a minute.

23  Q.  And then what happened after you exited the truck?

24  A.  The deputy got off his car and he started yelling at us to

25  get back in the truck, so we got back in.                             08:57:30

1    Q.   What happened after you got back in the truck?

2    A.   The deputy went back in his car for couple of minutes, and

3    then finally he decided to come over to my -- to the driver's

4    side window of the truck and asked me for my license, and asked

5    my wife for ID, and then he specified that he wanted her                08:57:57

6    driver's license.

7    Q.   What was the deputy wearing?

8    A.   He was wearing the regular Maricopa County sheriff's

9    uniform.

10   Q.   What do you mean by regular Maricopa County sheriff's             08:58:16

11   uniform?

12   A.   Brown pants, lighter brown shirt.

13   Q.   And did you -- what did you say when he asked for your and

14   your wife's driver's licenses?

15   A.   I asked him why he had stopped us, and he just asked me for      08:58:32

16   the other documents, my registration and proof of insurance.

17   Q.   Did you provide your and your wife's licenses to the

18   deputy?

19   A.   Yes, we did.

20   Q.   Did you provide your insurance card to the deputy?                08:59:02

21   A.   Yes.  I looked for the insurance card, and I also looked

22   for the registration.  I was unable to find the registration to

23   the truck, so I just gave him the insurance -- proof of

24   insurance.  Told him I couldn't find the registration.  He

25   said, Don't worry.  It's not important.                                08:59:29

```
 1   Q.  Did you ask why the deputy requested your wife's license?

 2   A.  Yes, I did at one time when he was -- when he asked for the

 3   license, I told him she was not the driver.  He insisted we

 4   provide with my wife's license, driver's license.

 5   Q.  And what was his tone of voice?                              08:59:57

 6   A.  All during the stop he was yelling at us.  He never

 7   addressed us in a civil manner or a normal conversation tone of

 8   voice, always yelling.

 9   Q.  Did you find out at this time why you were stopped?

10   A.  Yes.  He told me my license plate on my truck was not        09:00:21

11   visible.

12   Q.  Did your truck have a license plate on it?

13   A.  Yes.

14   Q.  And where was the trailer relative to the license plate on

15   your truck?                                                      09:00:45

16   A.  The trailer sits at a lower height than the license plate.

17   From a car you can plainly see it.

18   Q.  And what happened after you provided your licenses and your

19   insurance card to the deputy?

20   A.  The deputy asked me if I was carrying any drugs, any         09:01:10

21   weapons, or any bazookas in my truck.  I told him I was not

22   carrying any bazookas or drugs, but -- but I was carrying a

23   handgun.  He told me to step out of the truck so that he could

24   gain access to my handgun.

25   Q.  Did you legally own the handgun?                             09:01:42
```

1    A.   Yes, it was perfectly legal under Arizona law.

2    Q.   And was it legally in your car?

3    A.   Yes.

4    Q.   And did you provide the handgun to the deputy?

5    A.   Yes.  He got it himself and put it on his waist under his    09:01:55

6    belt.

7    Q.   And what happened after you gave the handgun to the deputy?

8    A.   He told me to put my hands against the truck, and to take a

9    step or two back and open my legs, spread my legs open, so that

10   he could search me.    09:02:31

11   Q.   Did you say anything in response to the deputy's statement

12   that you would be searched?

13   A.   Yes.  I asked him why I was being searched, and he said

14   that I was being searched for weapons and drugs.  I told him

15   that I had already stated that I didn't have any drugs, and    09:02:55

16   that my only weapon was my handgun.

17   Q.   Did you comply with being searched?

18   A.   Under protest.  I told the deputy that if he searched me,

19   it was against my consent.  He just said, you know, Do as I say

20   and I'm going to frisk you.    09:03:21

21   Q.   And you did --

22   A.   Yes.

23   Q.   -- do as he said?

24   A.   Yes.

25   Q.   Please describe the search.    09:03:27

1    A.  He searched my underarms, the sides, my groin area.  And he

2    searched my pockets, one of my pants pockets.  The shirt pocket

3    he picked out the contents.  Usually, I carry notes and my pen.

4    And he got the contents out of the pocket and got his other

5    hand into it and found nothing, so he put the -- my notes.        09:04:12

6    Q.  How did the search make you feel?

7    A.  Humiliated.  Worthless.  Defenseless.

8    Q.  What happened after you were searched?

9    A.  The deputy went back to his car with our ID and my gun and

10   told me to wait in the truck, so I got in the truck and waited.   09:04:52

11   You know, he took several minutes, probably up to 10, up to

12   about 10 minutes.  And then one of my clients called me on the

13   phone and I answered the phone call; I was late to meet with

14   him.

15        Then the deputy came, came out of his car and came to      09:05:22

16   my window, and again yelling that I hang up the phone.  And,

17   you know, I was still talking to my client then he yelled

18   again, so I hung up the call.

19   Q.  And what happened after you hung up the phone?

20   A.  The deputy told me that the plate on the trailer was         09:05:50

21   missing.  I asked him if I could go and see for myself, and

22   there was no plate on the trailer.  Then he told me I was free

23   to go, and apologized for yelling and screaming and scaring us

24   during the stop with his behavior.

25   Q.  Do you know why there was no license on -- license plate on  09:06:25

1   the trailer?

2   A.  No, absolutely not.  I usually check it, and I had checked

3   it the night before and it was there.

4   Q.  And were you cited for not having a plate on the trailer?

5   A.  No, I was not cited for not having a plate or not being                09:06:46

6   able to provide a registration on the truck.

7   Q.  And what happened after he said that you were free to go?

8   A.  He proceeded to make a U-turn and went westbound on

9   Durango.  I made a U-turn and went by the job site and went and

10  met with my client.                                                        09:07:15

11  Q.  Just to be clear, were you issued any citation that day?

12  A.  No, no citation whatsoever.

13  Q.  Did you say anything to him after he said you were free to

14  go?

15  A.  No, but after his apology he told me that that stop had              09:07:40

16  nothing to do with racial profiling.  I told him that was

17  exactly what it was.

18  Q.  Did you take down his name and badge?

19  A.  Yes.  I had a pad and a pen.  I took the name off his

20  uniform, wrote it down, and then I asked him for his badge,               09:08:21

21  'cause he was not wearing one.  So he showed me his badge and I

22  took the number down.

23  Q.  And what was his name?

24  A.  I believe the initial was B. Russell.

25  Q.  Did this incident change your view of the MCSO?                       09:08:41

1  A.  Yes, completely.  I lost respect for the MCSO's deputies

2  and sheriff.

3  Q.  Do you feel you were treated differently because of your

4  ethnicity?

5  A.  Yes.                                                    09:09:06

6  Q.  Did you do anything to complain about the incident?

7  A.  Yes.  My daughter's boyfriend, who was at the time working

8  for a law firm, wrote up a letter, and he tried to call the --

9  he called the deputy's office or the Sheriff's Office to make a

10 verbal complaint, and he made a -- several attempts.  He talked  09:09:33

11 to the secretary and talked into the recorder and left

12 messages.  They never responded.  They never answered the call.

13         MR. HULTS:  No further questions.

14         THE COURT:  Cross-examination, Mr. Liddy.

15                     CROSS-EXAMINATION                        09:09:59

16 BY MR. LIDDY:

17 Q.  Good morning, sir.

18 A.  Good morning.

19 Q.  You've previously testified that you had dark window

20 tinting on the driver's side window of your truck, is that     09:10:14

21 correct?

22 A.  Correct.

23 Q.  Did you have any tinting on any of the other glass in the

24 cabin of your truck?

25 A.  Yes, they all have a tint.                               09:10:23

1  Q.  Would that include the rear window of the truck?

2  A.  Yes.

3  Q.  And is that tinting the same darkness as the tinting that

4  you described on the driver's side window?

5  A.  Yes.                                                              09:10:39

6  Q.  Now, you previously testified that the deputy continued to

7  proceed south for about 200 feet and then executed a U-turn.

8        Am I remembering your testimony correctly?

9  A.  Yes.

10  Q.  How do you know that he proceeded south for 200 feet and    09:10:59

11  executed a U-turn?

12  A.  That was an approximation.

13  Q.  Did you -- were you able to see that yourself?

14  A.  I was looking through the side mirror.

15  Q.  So you could see his vehicle?                                    09:11:15

16  A.  Yes.

17  Q.  You testified that he asked you a question about potential

18  contents in your vehicle, including bazookas.

19        Do you recall that testimony?

20  A.  Yes.                                                             09:11:37

21  Q.  Did you observe anything in his mannerism that would lead

22  you to believe that his reference to bazookas was an attempt to

23  decrease the tension in the situation?

24  A.  I did not notice, 'cause most of the time he was yelling.

25  He was not talking in a normal tone of voice.                       09:11:56

1  Q.  Was he yelling when he asked whether you had any bazookas

2  inside your truck?

3  A.  Particular the time the word "bazooka" came up, I don't

4  remember if he was, you know, changing the facial expressions

5  or...                                                              09:12:15

6  Q.  You mentioned that you had a weapon with you in the truck

7  at the time of this stop, is that correct?

8  A.  Yes.

9  Q.  And would you describe that weapon for the Court, please.

10  A.  Yes.  That's a .25 caliber pistol.                            09:12:27

11  Q.  Is that a semiautomatic pistol?

12  A.  Yes.

13  Q.  Do you recall the manufacturer of that?

14  A.  No, I don't.

15  Q.  How long have you owned this semiautomatic pistol?            09:12:38

16  A.  About eight years.

17  Q.  Did you regularly carry this semiautomatic pistol with you?

18  A.  Yes.

19  Q.  Did you keep it on your person?

20  A.  No, not on my person.                                         09:13:01

21  Q.  Did you keep it in the truck?

22  A.  Yes.

23  Q.  And where, precisely, did you keep it inside the truck?

24  A.  At times it was on my seat; other times it was on the

25  floor.                                                            09:13:18

1    Q.   Did you have it holstered?

2    A.   No, it doesn't.

3    Q.   When you made turns with your truck would the centrifugal

4    force move the semiautomatic pistol to the left and the right,

5    depending on your turn?                                            09:13:33

6    A.   No.

7    Q.   Was it in a fixed position?

8    A.   Fixed position.

9    Q.   And did you have an apparatus inside your truck in order to

10   keep it in a fixed position?                                       09:13:41

11   A.   No, but there's rubber matting on the floor of the truck

12   and it was sitting on that.

13   Q.   So there were no straps of any sort?

14   A.   No.

15   Q.   And at the time of this traffic stop, precisely where was    09:13:51

16   that .25 caliber semiautomatic pistol?

17   A.   It was on the floor of the truck.

18   Q.   In proximity to the driver's seat?

19   A.   Yes, right behind my right foot.

20   Q.   Excuse me, right behind your what?                            09:14:10

21   A.   Right foot.

22   Q.   Right foot.  Thank you.

23        And did you keep a weapon in your truck on a regular

24   basis for your personal protection?

25   A.   Yes.                                                          09:14:25

Q.  Did you have a conceal carry permit at the time of this

stop in 2009?

A.  No.

Q.  You previously testified that when you were initially

pulled over, that the deputy did not immediately approach your

truck.

            Do you recall that testimony?

A.  Yes.

Q.  Were you observing the deputy in your rearview mirror?

A.  Yes.

Q.  You were able to see through the rearview mirror -- through

the rear window through the tinting --

A.  Yes.

Q.  -- observe the deputy?

A.  Yes.

Q.  Do you recall whether you were able to see whether the

deputy had an onboard computer inside his --

A.  No.

Q.  -- vehicle?

A.  No, I couldn't see.

Q.  Did you see him talking on the radio?

A.  No.

Q.  I think it's clear from your testimony, but I want to make

the record clear that this was a very upsetting experience for

you, was it not?

```
 1   A.   Yes, it was.
 2   Q.   Was it one of the worst experiences of your life?
 3   A.   Yes, especially with my wife present.
 4   Q.   Did you write to the Maricopa County Sheriff's Office to
 5   complain of your treatment on that day?                          09:15:53
 6   A.   No, I didn't.
 7   Q.   Did you write to the FBI to complain about your treatment
 8   by the Maricopa County Sheriff's deputy as you perceived it?
 9   A.   No, I didn't.
10   Q.   Did you write to the Civil Rights Division of the           09:16:09
11   Department of Justice?
12   A.   No, not at the moment.
13   Q.   Was it your testimony that you did not write to them at
14   that moment?
15   A.   No, not -- not at the moment, not at that time.             09:16:21
16   Q.   Have you subsequently written to the Department of Justice
17   to complain about your treatment?
18   A.   I have not written, but I have talked to some of the
19   investigators.
20   Q.   Approximately how long after the stop, December 4th, 2009,  09:16:39
21   did you discuss this incident with the Department of Justice?
22   A.   It probably took month and a half.
23   Q.   So you would estimate that it would be, perhaps, in January
24   or February of 2010?
25   A.   Yes.                                                        09:17:03
```

1    Q.  Did you write a letter to the American Civil Liberties

2    Union?

3    A.  Yes, I did.

4    Q.  Can you tell me the approximate time that you wrote to the

5    ACLU about this stop by the Maricopa County Sheriff's          09:17:21

6    Department?

7    A.  It was mid to later part of December.

8    Q.  Did you bring a copy of that letter with you here to court

9    today?

10   A.  No, I don't have.  It's -- it's not a letter; it's a form    09:17:39

11   that the ACLU supplies.  They sent me one in the mail and I

12   filled it out and sent it in.

13   Q.  Would I be correct if I inferred from your testimony that

14   the ACLU contacted you and not that you contacted the ACLU?

15   A.  No, I contacted the ACLU.                                  09:18:02

16   Q.  And then subsequently they sent you a form?

17   A.  Yes.

18   Q.  Did you contact them by writing them?

19   A.  No, I contacted them by phone.

20   Q.  Have you filed a notice of claim with Maricopa County?     09:18:16

21   A.  No, not that I know.

22   Q.  Now, after December 4th, 2009, how many more times have you

23   been stopped by the Maricopa County Sheriff's Office deputies

24   while driving in Maricopa County?

25   A.  None.                                                      09:18:39

```
 1              MR. LIDDY:  Sir, I appreciate you coming this morning.

 2         I have no further questions, Your Honor.

 3         THE WITNESS:  Thank you.

 4         THE COURT:  Redirect?

 5         MR. HULTS:  Just have a few additional questions.          09:19:02

 6                      REDIRECT EXAMINATION

 7    BY MR. HULTS:

 8    Q.  Do you believe the deputy could have seen the missing

 9    license plate on your trailer at the time he accelerated and

10    made a U-turn?                                                 09:19:23

11    A.  No, 'cause he was still parallel to my truck when he

12    accelerated.  That was immediately after the staring in to my

13    wife and I.

14    Q.  Did you need to have a concealed weapons permit to carry

15    the gun legally in your car?                                   09:19:45

16         MR. LIDDY:  Objection.  This question calls for a

17    legal conclusion, Your Honor.

18         THE COURT:  Objection sustained.

19    BY MR. HULTS:

20    Q.  Did you believe you were carrying the gun legally in your  09:20:01

21    car?

22    A.  Yes.

23         If I can elaborate on that, it had never been an issue

24    with any other police department: Phoenix, DPS, immigration

25    department.  I was stopped by the Border Patrol once, middle of 09:20:22
```

1    the night.  We were coming from El Paso, Texas, from donating

2    blood for my brother.  And I told the Border Patrol that I was

3    carrying a weapon and they said they had no problem.

4    Q.  And were you cited that day for violating any gun laws?

5    A.  No, none whatsoever.                                          09:20:52

6    Q.  How many times did your son-in-law attempt to lodge a

7    complaint with Maricopa County Sheriff's Office?

8    A.  It was at least four.

9    Q.  Do you feel you're at risk of being stopped again by the

10   Maricopa County Sheriff's Office because of your ethnicity?        09:21:16

11          MR. LIDDY:  Objection, Your Honor.  Calls for

12   speculation.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes, I do, because the deputy had no

15   grounds that day to stop me, had no reason.                        09:21:31

16          MR. HULTS:  No further questions.

17          THE COURT:  Mr. Magos, thank you for your testimony.

18   You may step down, sir.

19          THE WITNESS:  Thank you.

20          THE COURT:  Next witness.                                   09:21:43

21          MR. CASEY:  Yes, Your Honor.  Again, so it's clear for

22   the record, defendants will be taking out of order, with

23   agreement and concurrence of plaintiffs' counsel, Deputy

24   Michael Kikes, K-i-k-e-s.

25          THE CLERK:  Come right here, sir.  Can you please           09:22:34

565

```
 1    state and spell your full name.
 2              MR. KIKES:  Michael Kikes, K-i-k-e-s.
 3              THE CLERK:  Hang on a second.  Michael, okay.
 4              MR. KIKES:  Kikes, K-i-k-e-s.
 5              THE CLERK:  Thank you.  Please raise your right hand.    09:22:50
 6              (Michael Kikes was duly sworn as a witness.)
 7              THE CLERK:  Thank you.  Please take our witness stand.
 8                        MICHAEL KIKES,
 9    called as a witness herein, having been duly sworn, was
10    examined and testified as follows:                                09:22:59
11                      DIRECT EXAMINATION
12    BY MR. CASEY:
13    Q.  Good morning.  Would you please tell the Court your full
14    name.
15    A.  Michael Dean Kikes.                                           09:23:23
16    Q.  And who are you employed by, sir?
17    A.  Maricopa County Sheriff's Office.
18    Q.  And what do you do for the Maricopa County Sheriff's
19    Office?
20    A.  I currently work in the security detail for the sheriff in    09:23:30
21    threats unit.
22    Q.  And how long have you been doing that?
23    A.  Approximately two years.
24    Q.  Before you became part of that security unit, would you
25    tell the Court what you did for Maricopa County in the            09:23:42
```

```
 1   preceding three years.
 2   A.  I worked as a motor officer for the Sheriff's Office.
 3   Q.  On the dates of March 27th and March 28th of 2008, would
 4   you tell the Court what you did as an MCSO deputy?
 5   A.  I was working as a motor unit and working a crime                    09:24:03
 6   suppression detail.
 7   Q.  All right.  Now, Deputy Kikes --
 8          Am I saying your last name correctly.
 9   A.  Yes, sir.
10   Q.  -- the parties have stipulated that the MCSO conducted a            09:24:11
11   large-scale saturation patrol, or crime suppression operation,
12   on March 27 and 28, 2008, near Cave Creek Road and Bell Road.
13          Did you participate in that saturation patrol?
14   A.  Yes.
15   Q.  In what role did you participate?                                   09:24:31
16   A.  Just as another unit, motor unit in that area, patrolling
17   it.
18   Q.  What type of -- lawyers always say "vehicle" instead of
19   "car" or "truck."  What were you driving as a patrol -- as a
20   patrol deputy that day?                                                 09:24:48
21   A.  I was driving a Harley-Davidson motorcycle.
22   Q.  You were what I'd call a motorcycle cop.
23   A.  Motor unit, yes, sir.
24   Q.  Okay.  What was your role as a motorcycle deputy on March
25   28, 2008, during that saturation patrol?                               09:25:03
```

1    A.   We were looking for violations of the law.

2    Q.   When you say "looking for violations of the law," explain

3    for me what you mean.

4    A.   Any motor vehicle violations, any movement, any equipment

5    failures, anything of that nature.                          09:25:19

6    Q.   Were you ever trained by ICE, or anyone, to be a 287 --

7    what's called a 287(g) certified officer?

8    A.   No, sir.

9    Q.   All right.  Thank you.

10        How was it that you, as a motorcycle officer, were       09:25:31

11   somehow involved in this saturation patrol, if you know?

12   A.   It was just chosen, various units were chosen to do the

13   operation.

14   Q.   Focusing on March 28, 2008, at some time during that day

15   did you hear a radio transmission, a radio call from Deputy   09:25:56

16   Ramon Charley Armendariz?

17   A.   Yes, I did.

18   Q.   Do you know Deputy Armendariz?

19   A.   Yes, I do.

20   Q.   And how long have you known Deputy Armendariz?           09:26:06

21   A.   Approximately four years.

22   Q.   As of that date you had known him for four years?

23   A.   Yes, sir.

24   Q.   Had you worked with him before?

25   A.   On various types of details.                            09:26:16

568

1   Q.  Are you familiar with what his voice sounds like during

2   normal conversation?

3   A.  Absolutely.

4   Q.  Are you familiar with what his voice sounds like when it

5   comes across a radio transmission in what I guess we could call     09:26:26

6   a normal transmission?

7   A.  Yes, sir.

8   Q.  During that call that you heard, that transmission from

9   Deputy Armendariz, what did you hear on that call?

10  A.  It wasn't a normal response.  It was a higher pitch, a more     09:26:42

11  type of a hurried response from him, an anxious type of radio

12  transmission.

13  Q.  And what was he asking for, if anything?

14  A.  He was asking for assistance and a backup unit to his

15  location.                                                           09:27:02

16  Q.  What was it about what you heard from Deputy Armendariz

17  that made you think it was, I don't want to put words in your

18  mouth, but a higher urgency or higher stress, whatever the word

19  that you use there, what was it that led you to that

20  conclusion?                                                         09:27:17

21  A.  The anxiety in his voice, the higher pitch; the faster

22  transmission of his voice of a normal call.

23  Q.  Okay.  What do -- what did you interpret that call for

24  backup to mean in light of how you interpreted his voice?

25  A.  That something out of the norm was going on, something of      09:27:33

1    an emergency type was -- had begun or is beginning or in the

2    process of.

3    Q.  Now, when you say some type of emergency may have taken

4    place or had occurred, what do you mean by that?

5    A.  Something where -- whether it was an officer safety issue          09:27:47

6    or some kind of crime had been committed, that he was the sole

7    officer on that call and he needed help immediately.

8    Q.  What is -- in MCSO language, MCSO parlance, what is a

9    station 45 code on radio traffic?

10   A.  That means all radio traffic has to cease, and only the           09:28:09

11   people that are on the call at that situation, that time, that

12   have logged into that call can transmit, so that they can get a

13   clear understanding of what's going on at that time.

14   Q.  When, in your experience as an MCSO patrol deputy, when are

15   station 45s used?                                                     09:28:28

16   A.  Basically in extreme emergencies, in situations where

17   there's an officer safety issue, or danger, or something has

18   occurred.

19   Q.  Was there, to your knowledge, a station 45, or a stat 45,

20   in place following Deputy Armendariz's call for backup?              09:28:45

21   A.  I believe there was.

22   Q.  Okay.  Now, let's turn to a different subject.

23            After you heard the call for backup, what did you do?

24   A.  I immediately left where I was sitting on Cave Creek Road

25   and proceeded to his location, where he advised where he was         09:29:04

```
 1   at.
 2   Q.  Do you remember the -- roughly the cross streets of where
 3   he was at?
 4   A.  I want to say Cave Creek Road and Nisbet Road or Nisbet
 5   Drive.                                                          09:29:17
 6   Q.  Can you describe the -- what was the location where Charley
 7   Armendariz, Ramon, was?
 8   A.  He was in a gas station type mini mart location.
 9   Q.  Okay.  What route did you take to Deputy Armendariz's
10   position at Cave Creek and Nisbet Road?                        09:29:31
11   A.  I came southbound on Cave Creek Road.
12   Q.  Did you do anything -- did you -- well, let me back up.
13   Excuse me.
14         Did you drive there normally?  Did you use any of your
15   equipment?  How would you describe your trip to Armendariz's   09:29:50
16   location.
17   A.  No, I actually drove with lights and sirens because of the
18   extent of his voice and him calling for backup at that point.
19   Q.  Okay.  Tell me what you saw or did -- back up.
20         Tell me what you saw when you arrived.                    09:30:10
21   A.  As I arrived, I saw the officer -- or the deputy's patrol
22   car pulled behind another vehicle, and Deputy Armendariz was
23   off to the left of the patrol vehicle by the front.  And I saw
24   a vehicle pulling out of the driveway at the south end of the
25   parking lot in a rather quick hurry, and Charley at that point  09:30:32
```

1  signaled to me and said:  Go get the black SUV.  He waved his

2  arms in a frantic mode to go get the black SUV.

3  Q.  Okay.  Now, do I understand that you pulled into the

4  convenience mart, gas station where Deputy Armendariz was?

5  A.  Correct, I came in at the north end of it and I didn't         09:30:56

6  stop.  I swept through there as he was pointing to me, and I

7  directly never lost sight of the vehicle he was pointing to and

8  quickly got behind it.

9  Q.  So I understand what you're saying, as you're pulling in,

10  you're seeing a black SUV leaving?                                09:31:10

11  A.  Correct.

12  Q.  All right.  Now, you described that this black SUV was

13  leaving quickly, hurried.  What's the basis for your conclusion

14  that it appeared to be leaving quickly or hurried?

15  A.  The way the vehicle left the driveway, not using its turn     09:31:25

16  signal to let people know that it was moving to the left, the

17  back end of the vehicle was down, and it was -- you could tell

18  that it was moving quickly.  It jetted across both northbound

19  lanes and then into the southbound lane, the number 1 lane.

20  Q.  What is the significance, to those of us who may not be       09:31:46

21  familiar with it, with when you say the back of the vehicle

22  going down as it accelerates, what did that indicate?

23  A.  That accelerates horsepower, horsepower being driven to the

24  rear of the vehicle drivetrain, causing the vehicle, lower end

25  of the vehicle to dip in its -- because it's trying to catch up   09:32:01

1    to the front end as it's picking up speed.

2    Q.  And Deputy Armendariz pointed the vehicle out and said:

3    Get the black SUV?

4    A.  Correct.

5    Q.  Okay.  What did you do after that?                        09:32:15

6    A.  I pulled directly behind the SUV, came slightly out to the

7    left side, looking into the driver's side rearview mirror.  Had

8    my lights on.  At that point I went ahead and told him to pull

9    over with the PA system that we have in the motor unit, to pull

10   to the right.  He failed to pull to the right.  He kept going.   09:32:37

11   We did make eye contact back and forth, and he kept driving

12   further down the road.

13   Q.  You said you had your lights on?

14   A.  Correct, my lights on.

15   Q.  Was your siren on?                                        09:32:48

16   A.  Not when I was voicing my telling him to come to the right.

17   After that and he failed to, then I -- then I went ahead and

18   activated my siren.

19   Q.  Okay.  Explain for me, it sounds like there's some audio

20   speaker system on the motorcycle.  Is that a fair statement?    09:33:03

21   A.  Yes, there is.  There's a PA system on there.

22   Q.  And how do you operate that while you're also driving a

23   motorcycle?

24   A.  Everything is done by thumbs and fingers up by the controls

25   of the motorcycle, the front of the motorcycle.  You don't have   09:33:16

1   to leave your hands off the handlebars at all.

2   Q.  What did you say when you used that signal -- excuse me.

3           What did you say as you were using that system when

4   you were behind the black SUV?

5   A.  I was telling him to pull over to the right.                     09:33:32

6   Q.  Now, would you tell the Court, please, what was the

7   probable cause or reasonable suspicion, if any, that you had

8   for making that traffic stop that you intended to make on that

9   black SUV?

10  A.  Well, at this point I thought there was exigent              09:33:54

11  circumstances at this point, and that was my reason for

12  stopping him, that something had occurred in the gas station

13  with Charley at that time.  He couldn't leave his people that

14  he had detained and handcuffed and chase after another vehicle.

15          So as he was waving to me in a frantic mode that, to    09:34:11

16  me, something had occurred, some crime or something had

17  occurred, and at that point my PC was to go after the vehicle

18  and then pull it over.

19  Q.  All right.  Now, you just mentioned that some crime may

20  have occurred.  Did you believe that the driver of this black    09:34:24

21  SUV may have been fleeing a crime scene?

22  A.  Yeah, by the -- by the speed of him leaving the driveway,

23  by the franticness of the deputy, by everything that curtailed

24  in those short time that I heard on the radio from the time I

25  saw the vehicle leaving to the time I was after the vehicle.     09:34:42

1    Q.  Did the -- did the driver -- strike that.

2         You mentioned earlier that when you were following the

3    vehicle you got into a position, as I understand your

4    testimony, that you lined up your bike with the side rearview

5    mirror.  Is that a correct summary?                          09:35:04

6    A.  Correct, yes.  We --

7    Q.  Why did you do that?

8    A.  We do that because on a motor unit it's kind of tough to

9    see behind you when you're driving a regular vehicle if he's

10   placed right behind you, so we come out to the side so he can  09:35:12

11   not only see our lights, but he can see that it is an actual

12   police officer or deputy, and you can see and focus on the

13   driver's movements, on his eyes, what he's doing if he, in

14   fact, has acknowledged that he sees you.

15   Q.  Were you ever able to determine one way or the other if the  09:35:28

16   driver was able to see you from the rearview mirror, or

17   anything like that?

18   A.  Yeah, we had eye contact several times and he leaned

19   forward, looked to see who I was, and then he kept going.

20   Q.  Were you able from that distance to determine anything   09:35:43

21   about the driver's race or ethnicity?

22   A.  No.  I just concentrated on his eyes and where he was

23   watching, where he was focusing, where I was going, my distance

24   between him and I, and to make sure that he didn't slam on his

25   brakes or something occurred.                                09:35:59

1  Q.  Did that driver of the black SUV ever pull over or yield,

2  pursuant to your directions?

3  A.  No, he never hit his brakes and/or pulled to the right.

4  Q.  Did that cause you, as a motorcycle officer involved in

5  patrol, any type of concern issue?                              09:36:16

6  A.  Absolutely.  It raises the -- it raises the awareness of

7  you twofold, because now you have a vehicle that has left a

8  place, has accelerated away from a scene, and now he's not

9  pulling over and he's not listening to your direction, and he

10 acknowledges that you're there.  So the awareness and the       09:36:34

11 officer safety issue becomes twofold now.

12 Q.  Is the -- based on your experience, is the failure to yield

13 or stop a violation of Title 28 of the motor vehicle code?

14 A.  Yes.

15 Q.  All right.  Describe for us what happened since this         09:36:48

16 vehicle, this black SUV, is not stopping, what did it do next?

17 A.  The next thing the vehicle did was proceed farther

18 southbound on Cave Creek Road.  Then he made a left into a

19 mechanic's yard or driveway and come to a stop at that point,

20 where I pulled behind him and had got off my motorcycle.        09:37:12

21 Q.  As the driver pulled left, could you describe for us how it

22 pulled left in terms of speed and anything like that.

23 A.  He pulled in quickly to the -- the driveway.  I -- the

24 vehicle bounced somewhat, not of a normal slow like you would

25 enter a driveway and be cautious.  He bounced -- the front end   09:37:36

1    bounced, the back end bounced, and he pulled in and came to a

2    stop.

3    Q.  All right.  Now, it stopped in a business?

4    A.  Correct, a mechanic shop, I believe it was.

5    Q.  Now, before we go on I want to ask you, before this black        09:37:51

6    SUV came to a stop, could you see the number of people in the

7    vehicle?

8    A.  All I could see was heads.  I couldn't tell you whether it

9    was two, three, four, and at this point I could -- I was

10   focusing just strictly on the driver.                                09:38:07

11   Q.  Before this black SUV came to a stop could you determine

12   the gender, the sex, of anybody in the vehicle?

13   A.  Just the -- just the driver.  It looked -- appeared to be

14   to be a male driver, and that was all.

15   Q.  Before this SUV came to a stop, could you determine the          09:38:23

16   race or ethnicity of the driver?

17   A.  No, not from the back of the head, no.

18   Q.  Before the black SUV came to a stop, Deputy Kikes, could

19   you determine the race or ethnicity of any occupants in that

20   S -- that vehicle?                                                   09:38:39

21   A.  No, 'cause the windows were -- were basically blacked out

22   from the passenger side -- or from the rear seats all the way

23   back.

24   Q.  Did you use race or ethnicity in any way to make that

25   decision to stop that vehicle?                                       09:38:53

1    A.   No, absolutely not.

2    Q.   Okay.  Now, let's go back to where -- before I started

3    asking these questions about what you could see or determine.

4           After this vehicle had stopped, what did you -- first

5    of all tell us, what did the driver of that vehicle do after it    09:39:08

6    stopped?

7    A.   The driver was on his cellphone when he got into the

8    parking lot, or into the driveway at a complete stop.  I

9    positioned my motorcycle in a cross position across the back so

10   in case he did back out he would obviously would have had to    09:39:26

11   run over the motorcycle to stop.  And then I got onto the left

12   back pillar of the vehicle looking in to see if anybody was

13   looking out at me and if anything odd was coming up at this

14   point, because it was now becoming almost a high-risk stop.

15   Q.   What made it a high-risk stop?    09:39:44

16   A.   The fact that the vehicle didn't yield to the lights and

17   siren; didn't pull to the right, kept driving.  The fact that

18   he acknowledged to me that he saw me, he knew I was there; and

19   the fact that the frantic voice of Deputy Armendariz was waving

20   his hands to go get the vehicle, that something was wrong.    09:40:06

21   Q.   You mentioned that you parked your motorcycle behind the

22   SUV.  Did I understand that correctly?

23   A.   Correct.

24   Q.   Why?

25   A.   Well, that's -- that's in case for some protection for    09:40:16

1    officer safety reason, and in case he backed out he would have

2    had to have gone over the top of the bike.  That's what we

3    practice.

4    Q.  Well, didn't he, when he stopped, turn off his engine?

5    A.  No, his -- his vehicle was still running.  He was on the          09:40:27

6    phone, and which as another height awareness for us for

7    officer safety-wise.  We had a fear of him either possibly

8    leaving the situation or backing out over us or something at

9    that point.

10   Q.  Was the driver's side window, as you began to do your             09:40:40

11   approach, was it up or down?

12   A.  No, it was up.  All windows were up in the vehicle.

13   Q.  How was it that you were able to determine that the driver

14   was on a cellphone?

15   A.  As I slowly went -- started moving towards the front of the       09:40:52

16   vehicle, clearing the vehicle, being able to look into the

17   back, I had a close view, make sure there was no other

18   occupants other than now the person up front in the driver's

19   seat and the passenger side.  I was able to get up and I could

20   see him more clearly at that point, being on the phone through       09:41:08

21   the rearview mirror of a side.

22   Q.  At any time did you ever remove your sidearm, your weapon,

23   your gun, from its holster?

24   A.  No, I had my hand -- I had the hood released on my sidearm

25   and I had my hand on my weapon, as I do every stop.                  09:41:24

1    Q.    Okay.  Now, let's pick up where you're saying you're

2    starting -- you're moving ahead, you're trying to determine

3    what's in the vehicle.  What happened next?

4    A.    I kept asking the driver to step out of the vehicle.  He

5    would look at me and he'd keep talking on the phone and not        09:41:37

6    acknowledge my commands at all to come out.

7    Q.    And what else was happening after that?

8    A.    I started to see two gentlemen come out of the mechanic

9    shop, began to yell and curse at me and tell me to get off

10   their property, as I was still trying to talk to the driver of    09:41:56

11   the vehicle.

12   Q.    Now, the vehicle has pulled into this commercial property;

13   you're trying to work on finding out what's going on.  Is that

14   correct so far?

15   A.    Yes, sir.                                                    09:42:10

16   Q.    All right.  And then where did these two people come from

17   that you now are -- are seeing approach you?

18   A.    They're now -- they came out of the garage of the

19   mechanic's shop and started walking towards the driveway where

20   we were, where we had the vehicle pulled over at.                 09:42:24

21   Q.    And you said two gentlemen, so two men?

22   A.    Two men.

23   Q.    And I understand we're in a courtroom and perhaps we don't

24   need specific details unless the Court wants it, but what do

25   you mean they were cursing at you or yelling at you?              09:42:37

1  A.  Well, basically every other word was the F word and telling

2  me to get off their property, I had no business being there,

3  what was I doing there, and get the F off their property.

4  Q.  And would you tell me, what was your thought process, to

5  the extent you remember it, about how this situation was                09:42:52

6  developing with the vehicle that was engine on, the driver not

7  getting out, and now two other people coming out cursing at

8  you?

9        MS. LAI:  Objection, compound.

10        MR. CASEY:  All right.  I could break it up if you'd          09:43:05

11  like, Your Honor.  All right.

12  BY MR. CASEY:

13  Q.  All right.  Let's just take it -- tell me, what was your

14  thought process, your thought process when this was all going

15  on.                                                                     09:43:14

16  A.  Well, now my officer safety awareness is now even gotten

17  worse, because now I've got to be able to control a scene that

18  has people coming at me, people are swearing at me, I've got a

19  driver that's failing to obey to the commands, and I don't know

20  who's around me, I've never been in that area before, so I              09:43:28

21  don't know where else or what else is adjacent to that, and I'm

22  trying to get control of the situation at that point.

23  Q.  Okay.  Tell me what happened next, if you would, please.

24  A.  At that point I finally got to the driver's door, opened

25  the driver's door, and told the driver to step out of the               09:43:42

1    vehicle.

2    Q.   Would he do that voluntarily?

3    A.   He -- he motioned that he was coming out.  He -- and I told

4    him to get off the phone, put the cellphone down, and he

5    finally came out of the vehicle.  I held the door open to the          09:43:53

6    vehicle.

7    Q.   And what did you do with him once he got out of the

8    vehicle?

9    A.   Once I got him out of the vehicle I brought him to the back

10   of the vehicle, explained to him at that point, I said, Look,         09:44:01

11   you're not under arrest.  I'm just trying to find out what's

12   going on here.  At this point we're going to go ahead and

13   handcuff you and detain you because of the situation.  I said

14   until we get further information from the other officer who

15   made the initial, it's his, the primary officer, then this is        09:44:16

16   where we're going to be for now and I need to get him out of

17   the front of that vehicle.

18   Q.   Explain for us, what was it in your mind that gave you the

19   cause or the basis for you to remove this driver and put cuffs

20   on him and detain him?                                                09:44:35

21   A.   Well, the entire action from the moment I saw the vehicle

22   to the moment I stopped, he -- he never obeyed or wanted to

23   respond to us in any way, shape or, form, and from the initial

24   call from Deputy Armendariz is the reason why he was brought to

25   the back.                                                            09:44:52

1    Q.  What role did your safety, the safety of anyone else at the

2    scene, play in that decision?

3    A.  A huge role, because we -- we now had people that were very

4    upset in the parking lot coming at us.  We now had the person

5    that failed to yield, that failed to obey a direct order, and          09:45:09

6    everything now is becoming height awareness and officer safety

7    by twofold again.

8    Q.  How did the -- how was your judgment affected by the two

9    other men coming out, yelling the F word at you, telling you to

10   leave?  How did that affect your judgment on controlling the          09:45:28

11   situation?

12   A.  Immensely, because now I had to worry about whether they

13   were going to come past the gates, whether I was going to have

14   a situation with them.  I had a person that I had to detain and

15   keep in control, as well as now there was three or four other         09:45:40

16   things going on.

17   Q.  Okay.  What happened -- well, let me back up.

18        Did you forcibly remove this driver from the vehicle?

19   A.  No.

20   Q.  Did you ever somehow kick out his feet?                           09:45:54

21   A.  No.  I walked him to the back of the vehicle, and that's

22   where he was handcuffed was in the back of the vehicle.

23   Q.  Did you ever in any way somehow cause him to drop to one or

24   both of his knees?

25   A.  No.  He sat on the rear bumper of the vehicle.                    09:46:12

1   Q.  Okay.  Did you at any time in any way push him, slam him,

2   or anywhere force him and his face against any part of the

3   black SUV?

4   A.  No, I don't recall that at all.

5   Q.  When you say you don't recall it, did it happen?          09:46:26

6   A.  No, it didn't happen.

7   Q.  Okay.  Now, what happened after, Deputy, you placed Mr. --

8   excuse me, we haven't established that name yet -- the driver

9   of the SUV, the black SUV, you put him in cuffs.  You've

10  detained him.  What happened next?                           09:46:43

11  A.  At that point a -- they were still yelling out of the front

12  at us to the rear.  Another deputy showed up behind me in a

13  vehicle, car, fully-marked patrol unit.

14  Q.  Do you know who that deputy was?

15  A.  That was Deputy Beeks.                                    09:46:59

16  Q.  Okay.

17  A.  And at that point we -- basically, I just stayed with the

18  occupant, the driver, and Deputy Beeks made a phone call and

19  was on the phone with Deputy Armendariz to find out the whole

20  situation and what exactly occurred.                         09:47:13

21  Q.  And what happened then?

22  A.  After we've got the information from Deputy Armendariz, we

23  went ahead and released the driver.  I went ahead and took his

24  handcuffs off and kind of just talked to him for a couple

25  minutes, told him that, you know, this was just all done out of  09:47:29

1    officer safety.  I didn't know, and we weren't aware of exactly

2    what happened until we talked to the primary officer, and at

3    that point he was released.

4    Q.  Do you have any information as to why -- well, strike that.

5            Was any citation issued to the man?                    09:47:44

6    A.  No, there was not.

7    Q.  Do you know why a citation was not issued?

8    A.  I believe that came from Deputy Armendariz, and that he

9    felt at that point there had been not enough of a crime or not

10   enough of a situation to warrant and issue a citation for any   09:47:58

11   reason.

12   Q.  Same thing as to an arrest.  Do you have any information as

13   to why no arrest was made of this person?

14   A.  No crime had been committed as far as I understood, and

15   that's why he was not arrested.                                09:48:10

16   Q.  Okay.  Now, sir, the evidence is going to show that there

17   was another occupant in the vehicle.  Do you know anything

18   about what was occurring to her at this time?

19   A.  No.  On traffic stops like that type of situation, we try

20   to have them stay in the vehicle so that's one less person to   09:48:24

21   have to handle at the scene.  That was enough going on with the

22   people in front, the driver, and the situation, to have

23   somebody else step out.

24   Q.  I think I only have three more questions for you, then

25   we're going to sit down.                                       09:48:39

1          Did the race or ethnicity of this driver of the black

2    SUV play any role in your decision to remove him or ask him to

3    be removed from the black SUV?

4    A.  No.

5    Q.  Did the race or ethnicity of the driver of the black color          09:48:50

6    SUV play any role in your decision to move him back to the back

7    of the vehicle?

8    A.  No.

9    Q.  Did the race or ethnicity of the driver of the black SUV

10   play any role in your decision to detain him with handcuffs?          09:49:07

11   A.  No.

12          MR. CASEY:  Okay.  Thank you, sir.  No other

13   questions.

14          I pass the witness, Your Honor.

15          THE COURT:  Hold on one second.          09:49:17

16          Cross-examination.

17                    CROSS-EXAMINATION

18   BY MS. LAI:

19   Q.  Good morning, Deputy.

20   A.  Good morning, ma'am.          09:49:35

21   Q.  As your lawyer asked you, on March 28th, 2008, you were

22   working the saturation patrol in North Phoenix?

23   A.  Yes, ma'am.

24   Q.  And since you were working the saturation patrol, it's true

25   that any stop or arrest you made on that saturation patrol          09:49:49

1  would be counted in the statistics for that patrol, correct?

2  A.  I believe so.  I wasn't with the statistic.  I didn't -- I

3  didn't handle the statistics area of it.

4  Q.  If you made an arrest on the patrol it would be counted

5  towards the total arrests for that patrol?                    09:50:04

6  A.  I believe so.

7  Q.  Okay.  And if you made a stop on that patrol, it would be

8  considered part of the patrol?

9  A.  I would believe so.

10  Q.  And on that day you responded to a radio communication from  09:50:14

11  Deputy Armendariz, you testified?

12  A.  I'm sorry, I didn't know that was -- is that a question?

13  Q.  You just testified on that day you -- the reason you

14  responded to the scene was because there was a radio

15  communication from Deputy Armendariz, correct?              09:50:32

16  A.  Yes, ma'am.

17  Q.  When you arrived at Deputy Armendariz's location, the

18  vehicle that you eventually stopped had already left the gas

19  station, correct?

20  A.  Correct, it was pulling out as I was pulling in.          09:50:43

21  Q.  It was driving south on Cave Creek Road, correct?

22  A.  Yes, ma'am.

23  Q.  Cave Creek Road runs north-south?

24  A.  Yes, ma'am.

25  Q.  And the gas station is on the corner with Nisbet Road?     09:50:53

1    A.   I believe so.

2    Q.   Nisbet Road runs east-west, correct?

3    A.   Yes, ma'am.

4    Q.   You didn't encounter that vehicle until another 50 feet or

5    further south on that road, correct?                              09:51:06

6    A.   Correct, on Cave Creek Road.

7    Q.   And that would have been approximately 75 feet from the

8    intersection with Nisbet Road?

9    A.   I'm not sure the feet from the intersection at all.

10   Q.   It was 50 feet further down from your location, you recall    09:51:25

11   that?

12   A.   Okay.

13   Q.   When you arrived, Deputy Armendariz gestured towards the

14   vehicle?

15   A.   Yes, ma'am.                                                    09:51:37

16   Q.   You understood from that gesture he wanted you to follow

17   the vehicle and stop it?

18   A.   Along with his voice.

19   Q.   You didn't observe the vehicle commit any crime, did you?

20   A.   No, I was going off of Deputy Armendariz's.                   09:51:51

21   Q.   Did you observe the vehicle commit a traffic violation?

22   A.   After I pulled -- after I pulled behind him or before that?

23   Q.   Before you decided to stop the vehicle you didn't observe

24   the vehicle commit any traffic violation, correct?

25   A.   No.                                                           09:52:07

1    Q.  The information you had about this vehicle was that it was

2    headed southbound and Deputy Armendariz wanted you to stop it,

3    correct?

4    A.  That's correct.  He pointed to it and he voiced, Go after

5    the black SUV.                                                    09:52:18

6    Q.  No other -- no other information, correct?

7    A.  Correct.

8    Q.  And Deputy Armendariz hadn't said over the radio that the

9    vehicle or the vehicle occupants had committed any crime,

10   correct?                                                          09:52:31

11   A.  No, he did not.

12   Q.  Now, you say that Deputy Armendariz used the words, Go get

13   the black SUV?

14   A.  Correct.

15   Q.  And he said that to you verbally, not over the radio?        09:52:39

16   A.  He was yelling that from his location.

17   Q.  He yelled that from the gas station?

18   A.  Right, as I pulled in.

19   Q.  He didn't say that over the radio?

20   A.  Not that I'm aware of.                                        09:52:51

21   Q.  Are you sure of that?

22   A.  I'm not sure of that.  I didn't look at the radio call.

23   Q.  Is it possible he could have said it over the radio?

24   A.  It's possible.

25   Q.  You gave a deposition in this case in 2010.  Do you recall   09:53:03

```
 1   that?
 2   A.  February 15th, yes.
 3   Q.  And at that deposition you took an oath to tell the truth?
 4   A.  Yes.
 5          MS. LAI:  Okay.  Your Honor, may I approach the            09:53:19
 6   witness with a copy of the deposition?
 7          THE COURT:  You may.
 8   BY MS. LAI:
 9   Q.  Deputy, just bear with me a moment while I find the page.
10          If you could turn to page 73 of your deposition          09:53:45
11   transcript.  If I could direct your attention to lines 1
12   through 12 of page 73.
13   A.  Okay.
14   Q.  Do you see where it starts:
15          "Okay.  And when he said the black SUV that just left,   09:54:08
16   he said that to you --"
17   A.  Correct.
18   Q.  And you answered:  "Headed southbound."
19          "QUESTION:  Headed southbound.
20          He said that to you in person, not over the radio?       09:54:18
21          "ANSWER:  In the radio.
22          "QUESTION:  In the radio?
23          "ANSWER:  Yeah, I heard it in the radio."
24   A.  Okay.
25   Q.  Okay.  So you didn't have a conversation with Deputy        09:54:27
```

1  Armendariz in person?

2  A.  No, I never stopped.

3  Q.  Okay.  And that, the testimony you gave in your deposition

4  is the testimony you stand by today?

5  A.  I believe so, yes.                                    09:54:38

6  Q.  So if we listen to the radio transmission, we would hear

7  Deputy Armendariz describing the back -- black SUV headed

8  southbound on the radio?

9  A.  I believe so.  At that point in time everything was

10  frantic, so I'm pretty sure he either said it over the radio or    09:54:52

11  loud enough where I could hear it.

12  Q.  Now, are you aware that Deputy Armendariz told the vehicle

13  occupants to leave the gas station?

14  A.  No, I was not aware what their conversation was before I

15  got there.                                               09:55:04

16  Q.  If you're not aware today, certainly at the time of the

17  stop you couldn't have been aware of that, correct?

18  A.  Correct.

19  Q.  And did you know that deputy -- did you know for sure that

20  Deputy Armendariz was patrolling alone that day?             09:55:15

21  A.  No, I don't know enough about each and every unit that was

22  out there at all.

23  Q.  So when you heard the transmission over the radio, you

24  didn't know whether he was alone, correct?

25  A.  Correct.                                             09:55:28

1    Q.  All right.  And Deputy Armendariz, you testified, was

2    speaking in a faster, you said a faster transmission over the

3    radio?

4    A.  That would be correct.

5    Q.  Would it be possible that he was speaking with the vehicle          09:55:38

6    occupants?

7    A.  No.

8    Q.  It's not possible that he spoke to the vehicle occupants at

9    the gas station?

10   A.  Not when he was on the radio at the same time.                      09:55:48

11   Q.  Well, if he was -- if he needed to put -- to say something

12   over the radio while he was speaking to them, wouldn't that

13   explain why he had to put in a faster transmission?

14   A.  I would only be speculating on what he does when he's on

15   the radio when he had the occupants in front of him.  I don't          09:56:02

16   know what was going on at that time, I wasn't there.

17   Q.  Now, going back to Cave Creek Road, when you first spotted

18   the vehicle that Mr. Nieto and Ms. Meraz, who were the vehicle

19   occupants, you eventually learned, when you first spotted that

20   vehicle it was traveling in the number 1 lane, correct?               09:56:24

21   A.  That would be correct.

22   Q.  That's the lane that's on the left closest to the center

23   divider?

24   A.  That's correct.

25   Q.  In other words, the left turn lane?                               09:56:31

1    A.  No, the left travel lane.  There wasn't a turn lane there.

2    Q.  If an individual wanted to turn left at some point on the

3    road, he would certainly want to be in that lane, correct?

4    A.  Using his turn signal, yes.

5    Q.  Okay.  As soon as you felt you were close enough to where          09:56:46

6    he could see you were a law enforcement officer, that's when

7    you signaled to pull him over?

8    A.  Yes, ma'am.

9    Q.  Okay.  And so you didn't signal to pull him over

10   immediately; you needed to get close enough to pull him over,         09:56:56

11   correct?

12   A.  Oh, I could make eye contact with him so he'd know who I

13   was with the lights and the siren.

14   Q.  And if that -- that vehicle did pull over about 300 feet

15   further down the road, correct?                                       09:57:08

16   A.  Correct.

17   Q.  Can you estimate how fast the vehicle was traveling?

18   A.  No, not at that time.  I was watching the vehicle.

19   Q.  All right.  And you've been a deputy for quite some time

20   now?                                                                  09:57:20

21   A.  Yes, ma'am.

22   Q.  Okay.  For the years that you were on your motor unit, you

23   didn't have a speedometer on that motor unit?

24   A.  Absolutely.

25   Q.  Correct?                                                          09:57:26

A.  Yes, you do.

Q.  Okay.  You do have a speedometer?

A.  Yes, you do have a speedometer --

Q.  So you do have a way --

A.  -- and a tachometer.                                    09:57:33

Q.  You do have a way to measure the speed of the -- how fast a

vehicle is driving?

A.  In the short distance you're not measuring the speed,

you're keeping an eye on the vehicle, 'cause your

officer safety at this point has been endangered because the    09:57:45

vehicle's not yielding to the right-of-way of when you're

trying to pull the vehicle over.

Q.  I'm not asking on that situation, but in regular patrol if

you have a speedometer, you have a way to measure the speed

that a vehicle's traveling, correct?                       09:57:56

A.  If you pace a vehicle approximately a quarter of a mile,

yes.

Q.  In all your years as a deputy, you would be able to judge

how fast a vehicle was driving, correct?

A.  In a longer distance, yes.                             09:58:07

Q.  Now, if the vehicle was driving approximately 20 miles per

hour, traveling 300 feet, that would take about 10 seconds to

travel that distance?

A.  Approximately.

Q.  Okay.  If a vehicle has a signal light on, that means it's    09:58:19

1   about to pull over, correct?

2   A.  Correct.

3   Q.  It understands you're there if you're trying to pull it

4   over?

5   A.  If it has a signal, it understands I'm there?          09:58:29

6   Q.  Correct.

7   A.  Yes.

8   Q.  Now, you mentioned that the vehicle pulled over to the left

9   and not to the right?

10  A.  That's correct.                                        09:58:43

11  Q.  That's not unusual, though, in your experience, is it?

12  A.  It's not unusual for them to stop in the middle of the

13  road, either, but the norm for the law states that you need to

14  yield to the right-of-way, come to a complete stop.

15  Q.  In your experience, cars do pull over to the left when     09:58:57

16  you're trying to pull them over?

17  A.  They pull over to the left, but not into some driveway and

18  keep the car running.

19  Q.  In your experience, cars pull over to the left when you're

20  trying to pull them over?                                  09:59:08

21  A.  Sometimes.

22  Q.  When you had the vehicle pulled over, you approached from

23  the driver's side?

24  A.  The rear of the driver's side.

25  Q.  You said you could see the driver talking on his cellphone?  09:59:16

1    A.  Yes, ma'am.

2    Q.  You could see his eyes?

3    A.  Yes, he was looking at me.

4    Q.  You could also observe there was a passenger?

5    A.  Not from the driver's side mirror.                    09:59:24

6    Q.  Okay.  Focusing on the driver, if you could see his eyes,

7    presumably you could see his face?

8    A.  Pretty much, yes.

9    Q.  You could see his race?

10   A.  You could see somebody in the vehicle, yes.           09:59:39

11   Q.  You could see his skin color, you could observe it,

12   correct?

13   A.  No, 'cause it was slightly tinted.

14   Q.  Okay.  So you couldn't see his facial features?

15   A.  I couldn't see the color of his skin, if that's what you're  09:59:48

16   looking for.

17   Q.  You couldn't tell that the driver was Hispanic?

18   A.  Not till I was completely up on the vehicle and had the

19   driver's door open.

20   Q.  Okay.  So before you opened the driver door you're telling  09:59:58

21   me you couldn't see through the window and see the driver's

22   race?

23   A.  All I could see was his eyes at that point, 'cause he kept

24   leaning over looking at me going back and forth and bobbing.

25   Q.  Can you please answer the question.  You're telling me you  10:00:10

```
 1   couldn't see the driver's race while you were looking through

 2   the window at his face and his eyes?

 3   A.  From behind the vehicle, no.

 4   Q.  You couldn't see -- you could see his face, but you could

 5   not see his race.  Is that your testimony?                         10:00:22

 6   A.  Yes.

 7   Q.  Okay.  And if the driver was talking on the cellphone he

 8   had one phone on his -- he had one hand on the phone, correct?

 9   A.  That would be, yes.

10   Q.  Okay.  Now, your testimony is that you were concerned for     10:00:34

11   officer safety?

12   A.  Yes.

13   Q.  And you didn't draw your weapon at any time during the

14   stop?

15   A.  No, I did not.                                                 10:00:47

16   Q.  Okay.  Now, you removed the driver out of the vehicle,

17   correct?

18   A.  I assisted the driver out of the vehicle.

19   Q.  Okay.  You put your hands on him --

20   A.  On his arm.                                                    10:01:00

21   Q.  -- as he -- as he was coming out of the vehicle, correct?

22   A.  Yes, I did.

23   Q.  But did you do that immediately?

24   A.  Not until he was out of the vehicle completely, and then I

25   put my hand on his arm to control him.                            10:01:09
```

1   Q.  Okay.  You opened the door to take him out of the vehicle,

2   correct?

3   A.  Correct.

4   Q.  Did you do that immediately as you approached?

5   A.  No.                                                        10:01:17

6   Q.  You waited?

7   A.  Yes.

8   Q.  Okay.  You waited until he got off the phone, correct?

9   A.  Correct, I had asked him to get off the phone.

10  Q.  Okay.  And you waited until after he finished the phone     10:01:28

11  call to open the door and take him out of the vehicle, correct?

12  A.  That would be correct.

13  Q.  At that point you put your arm on him and you removed him

14  from the vehicle, correct?

15  A.  No.                                                        10:01:39

16  Q.  You didn't remove him from the vehicle?

17  A.  I didn't put my arm on him.  I put my hand on his arm and

18  assisted him out of the vehicle to have control of him.

19  Q.  Okay.  You took his arm and, as you say, assisted him out

20  of the vehicle.                                                10:01:53

21  A.  That would be correct.

22  Q.  Okay.  You handcuffed him?

23  A.  Not till we got to the back of the vehicle.

24  Q.  You remember that clearly, that you didn't handcuff him

25  until he was at the back of the vehicle?                      10:02:05

```
 1   A.  That's correct.
 2   Q.  He was not handcuffed on the ground or when he was placed
 3   against the vehicle?
 4   A.  He was never placed on the ground or placed against the
 5   vehicle.
 6   Q.  You never placed him against the vehicle?
 7   A.  No, ma'am.
 8   Q.  Okay.  Are you sure of that?
 9   A.  Yes, ma'am.
10   Q.  Okay.  Please turn to page 81 of your deposition.
11           At the bottom there, line 24, do you see that?
12   A.  Yes.
13   Q.  Going to the top of page 82.  Do you see where it says:
14           "QUESTION:  Was Mr. Nieto -- did you place Mr. Nieto
15   against the car when you removed him from the vehicle?"
16           On the next page:
17           "ANSWER:  I believe so."
18   A.  Yes, I see that.
19   Q.  Did you place him against the car?
20   A.  It might have been in the back of the vehicle where he sat
21   down against the bumper he was placed, but if you read farther
22   up you'll see that we walked him to the back of the vehicle
23   first.
24   Q.  You placed him against the vehicle, though.
25   A.  As he sat down, yes.
```

10:02:15

10:02:23

10:02:58

10:03:09

10:03:20

1  Q.  You placed Mr. Nieto against the car when you removed him

2  from the vehicle, correct?

3  A.  Once he was in the back of the vehicle, as I stated

4  earlier.

5  Q.  Now, you testified about some individuals coming out of the          10:03:36

6  shop?

7  A.  Yes, ma'am.

8  Q.  They were approaching you?

9  A.  They were.

10  Q.  They were trying to speak to you?          10:03:47

11  A.  I don't recollect they were speaking to me.  They were

12  yelling at me; they weren't speaking to me.

13  Q.  They were trying to tell you about their family members

14  that you had stopped, correct?

15  A.  They said nothing about a family member.          10:03:59

16  Q.  You thought they were threatening?

17  A.  Yes, I did.

18  Q.  They weren't carrying any weapons, though, however?

19  A.  I don't know if they were or weren't.  I was looking at

20  their facial expressions and trying to control my situation          10:04:07

21  where I was at with my occupant of the drivers.

22  Q.  You were looking at their facial expressions?

23  A.  Yes.

24  Q.  You weren't looking at their hands?

25  A.  I was looking everywhere at that time.          10:04:15

```
 1    Q.  You didn't look at their hands to see if they had any

 2    weapons?

 3    A.  Again, I was looking everywhere at that time.

 4    Q.  But you just testified your attention was to their face?

 5    A.  Their face and their motions and their direction.          10:04:27

 6    Q.  Okay.  And they were wearing mechanic's uniforms?

 7    A.  Yeah, looks like they were wearing blue shirts with names

 8    on it.

 9    Q.  So you could observe that they were wearing blue shirts

10    with names on them in the commotion that was occurring?        10:04:38

11    A.  Yes.

12    Q.  Okay.  And you looked at their face?

13    A.  Yes, and their direction of travel.

14    Q.  And you could see that they were Hispanic, correct?

15    A.  I didn't make a decision whether they were Hispanic or not, 10:04:50

16    but yes, they were Hispanic.

17    Q.  You could observe their facial appearance?

18    A.  Yes.

19    Q.  Now, you eventually released Mr. Nieto?

20    A.  That's correct.                                            10:04:58

21    Q.  You released him without charges?

22    A.  That's correct.

23    Q.  Without any charges, without any citation?

24    A.  Yes.

25    Q.  And you say somebody spoke with Deputy Armendariz and said  10:05:06
```

```
 1   that there was -- they learned from Deputy Armendariz no crime
 2   had been committed?
 3   A.  That's correct.
 4   Q.  Was that person Deputy Beeks?
 5   A.  I believe so.                                              10:05:20
 6   Q.  Okay.  You say Deputy Beeks didn't arrive at the scene
 7   until after Mr. Nieto had been handcuffed and moved to the back
 8   of the vehicle?
 9   A.  I believe he was there just at -- just as I was bringing
10   him to the back.                                               10:05:32
11   Q.  Okay.
12   A.  I believe so.
13   Q.  Deputy Beeks didn't arrive when the -- when the driver was
14   still in the vehicle, correct?
15   A.  Not that I know of.  I don't remember who was actually     10:05:36
16   behind me or exactly when he showed up.
17   Q.  But you saw that he arrived later, that was your testimony,
18   correct?
19   A.  Correct.
20   Q.  Okay.  Now, earlier you -- well, you're familiar with the  10:05:45
21   term "zero tolerance"?
22   A.  Correct.
23   Q.  Okay.  That was a policy that was adopted on some Sheriff's
24   Office sweeps?
25   A.  Correct.                                                   10:06:01
```

1  Q.  And according to you, that includes if somebody commits a

2  traffic violation, it's mandatory to issue a citation, correct?

3  A.  That's correct.

4  Q.  And if somebody commits a crime, it's mandatory to make an

5  arrest, correct?                                                    10:06:15

6  A.  Correct.

7  Q.  If there's any probable cause to believe that somebody has

8  committed any kind of crime, you would arrest that person

9  because it's a zero tolerance policy, correct?

10 A.  That's correct.                                                 10:06:24

11 Q.  And there was a zero tolerance policy, according to you, in

12 effect during that saturation patrol?

13 A.  That's correct.

14 Q.  That was the first sweep, in fact, that you participated in

15 where this instruction was given?                                   10:06:35

16 A.  Yes, ma'am.

17 Q.  That policy requires that no person will be excused if any

18 law has been broken, correct?

19 A.  That's correct.

20 Q.  So if the driver or the passenger of that vehicle had          10:06:45

21 committed any violation of the law, they would have been cited

22 or arrested, correct?

23 A.  Correct.

24 Q.  They would not have been excused under the zero tolerance

25 policy, correct?                                                    10:06:59

1    A.   That's correct.

2    Q.   Now, you're aware MCSO never conducted an internal

3    investigation into this incident?

4    A.   I believe so.  I have no idea what they did with the

5    situation.                                                          10:07:08

6    Q.   To your knowledge, no one was required to file a use of

7    force report?

8    A.   I don't know what the other officers, if they were talked

9    to or not.  There was no use of force done at that point.

10   Q.   Okay.  Guns being drawn, that's not a use of force?         10:07:20

11   A.   I didn't have anything drawn, so I would not be involved in

12   that if there was any type of investigation made on that.

13   Q.   To your knowledge, none of the other officers filed use of

14   force reports?

15   A.   As far as I'm aware of, I do not have any knowledge of them   10:07:34

16   filing a report.

17   Q.   You were never questioned by anyone at MCSO about this

18   incident, correct?

19   A.   No, ma'am.

20   Q.   Now, at the March 2008 patrol there was a preoperation       10:07:43

21   briefing?

22   A.   Yes.

23   Q.   Am I correct that you weren't provided with any information

24   about specific criminal activity to look out for at this

25   briefing?                                                         10:07:56

```
 1    A.   Right.
 2    Q.   And this was the same on the other saturation patrols that
 3    you've participated in, as far as you can remember?
 4    A.   Yes, ma'am.
 5    Q.   You did learn at the preoperation briefing, however, that       10:08:04
 6    the operation was conducted in response to complaints, correct?
 7    A.   As far as I know, that's what the initial reason why we'd
 8    be in the areas that we were in, because of complaints from
 9    citizens.
10    Q.   Okay, complaints from citizens.  You heard that at the          10:08:20
11    operation briefing, correct?
12    A.   Correct.
13    Q.   And when you participate on an operation you sign in on the
14    sign-in roster?
15    A.   Yes, ma'am.                                                     10:08:32
16    Q.   You don't know of any patrols where you participated but
17    didn't sign in, correct?
18    A.   No, ma'am.
19    Q.   Now, does the zero tolerance policy also apply to traffic
20    stops, the decision to stop a vehicle?                              10:08:43
21    A.   On the crime suppressions?
22    Q.   Correct.
23    A.   I believe so.
24    Q.   And so if you see any vehicle committing any kind of moving
25    or equipment violation, you would have to stop -- it would be       10:08:54
```

1   mandatory to stop that vehicle?

2   A.  Yes, ma'am.

3   Q.  Okay.  But you can't stop every vehicle on the road with a

4   traffic or equipment violation, correct?

5   A.  Not enough.  Not enough vehicles to stop everybody for          10:09:05

6   traffic violations that are on the road today.

7   Q.  As an officer, it would be physically impossible to stop

8   every vehicle on the road that's violating the law, correct?

9   A.  That's correct.

10  Q.  Officers have to exercise some discretion?                      10:09:19

11  A.  Yes.

12  Q.  And some types of violations are considered less serious

13  from a public safety perspective than others?

14  A.  Correct.

15  Q.  For example, a small crack in the windshield would be           10:09:27

16  considered less serious from a public safety perspective than

17  others?

18  A.  Depending on the location of where the crack is at.

19  Q.  Okay.  And if the crack is, in your judgment, not a serious

20  crack, or there's nothing impairing the driver's vision, you        10:09:41

21  might not cite that -- that driver, correct?

22  A.  Provided that's the only violation on the vehicle.

23  Q.  Okay.  And you might not stop that driver, correct, on

24  regular patrol?

25  A.  That's correct.                                                 10:09:53

1  Q.  A turn signal being -- lights being out, that's an example

2  of a violation that's considered less serious?

3  A.  No, that's considered serious.

4  Q.  A turn signal light being out?

5  A.  Not indicating which direction you're going, you just make          10:10:07

6  the movement into another lane causing an accident is serious.

7  Q.  You didn't testify at your deposition that a turn signal

8  light being out is considered a less serious violation than

9  others?

10  A.  We also didn't talk about whether it caused an incident or          10:10:25

11  whether there was a violation in great cause.

12  Q.  Okay.  Would you please turn to page 20 of your deposition.

13  A.  Okay.

14  Q.  Can you start on line -- just direct your attention to line

15  21, and I'm going to the top of page 21.                               10:11:00

16          Do you see where it says:

17          "QUESTION:  Are there other equipment or moving

18  violations that you consider typically less serious and

19  presenting less of a danger to the public, and, therefore, you

20  might not stop that vehicle if you observed a violation?           10:11:15

21          "ANSWER:  Yes.

22          "QUESTION:  And can you give me some examples of

23  those?

24          "ANSWER:  Maybe a turn signal light out.

25          "QUESTION:  Any others?                                     10:11:24

1              "ANSWER:  Nothing off the top of my head."

2    A.  Okay.

3    Q.  Was that your testimony?

4    A.  Yes, it was.

5    Q.  Do you stand by it today?                              10:11:30

6    A.  Yes, I do.

7    Q.  Okay.  Failing to signal a lane change, that's a moving

8    violation that might considered less serious than others?

9    A.  Yes.

10   Q.  Now, you're familiar with the CAD database, correct?   10:11:40

11   A.  CAD database?

12   Q.  The Computer Automated Dispatch database?

13   A.  Yes.

14   Q.  Do you use that yourself?

15   A.  Yes, I have.                                            10:11:56

16   Q.  You're familiar with what the final disposition codes are?

17   A.  Yes, I am.

18   Q.  In the CAD, a disposition code of 7 means a citation was

19   issued?

20   A.  That would be correct.                                 10:12:07

21   Q.  And 5 means that no violation occurred or that no citation

22   was issued, correct?

23   A.  The call was clear.

24   Q.  No violation occurred or no citation was issued, correct?

25   A.  The call was just cleared.  It doesn't mean that a citation  10:12:16

```
 1   won't be issued later.
 2   Q.  It doesn't mean that no citation was issued on the stop?
 3   A.  Correct.
 4   Q.  Does it mean that or does it not?
 5   A.  Nothing was given at that time.                        10:12:26
 6        MS. LAI:  Okay.  Thank you very much.  I have no
 7   further questions.
 8        THE COURT:  Actually, I have a few, Ms. Lai.  And so
 9   consistent with my practice, I will allow you to ask follow-up
10   before we return to Mr. Casey for redirect.                10:12:42
11                           EXAMINATION
12   BY THE COURT:
13   Q.  Did you participate in other saturation patrols besides the
14   saturation patrol on March 27 and 28 in -- that you've been
15   discussing?                                                10:13:17
16   A.  Yes, sir.
17   Q.  How many other saturation patrols did you --
18   A.  I believe there was either two or three other saturation
19   patrols.
20   Q.  Do you remember the locations that you participated in?  10:13:22
21   A.  I can -- one was in the city of Guadalupe, and I believe
22   the other one was in Buckeye.
23   Q.  And I believe in this saturation patrol did you participate
24   in both days of that saturation patrol?
25   A.  I don't recall whether I was both or just single.      10:13:42
```

```
1    Q.  Do you recall whether you participated for the full length
2    of the day when you participated?
3    A.  Yes, I did.
4    Q.  And if you participated on both days, would you have
5    participated the full length of the operation on both days?        10:13:59
6    A.  I believe so.  You would have been required to.
7    Q.  That would have been a requirement?
8    A.  Yeah, to put in your hours.
9    Q.  All right.  Now, was there a briefing -- I think you
10   indicated in testimony to Ms. Lai that there was a briefing on      10:14:10
11   the date of the 28th.
12   A.  Right, there's usually a briefing at the beginning of each
13   one.
14   Q.  I'm sorry?
15   A.  There's usually a briefing at the beginning on each one of      10:14:20
16   them.
17   Q.  Okay.  On the beginning of each operation --
18   A.  Yes.
19   Q.  -- or the beginning of each day?
20   A.  Each day.                                                        10:14:26
21   Q.  All right.  And did you attend the briefing at the
22   beginning of all of the days in which you participated in a
23   patrol?
24   A.  Yes, I did.
25   Q.  Okay.  Now, do you recall where the briefing was --             10:14:33
```

 1    briefing took place?

 2    A.  It's usually at the center of the command post, and that

 3    varies from place to place to place, where we set up the

 4    command post where the people would be brought in to be booked.

 5    Q.  All right.  So it would be like a vacant lot in which the    10:14:49

 6    sheriff had set up operations with various mobile facilities?

 7    A.  Yes, sir.

 8    Q.  Do you recall who gave the briefing?

 9    A.  I do not recall who, exactly.  It could have been a

10    lieutenant, could have been a sergeant, one of those two.    10:15:05

11    Q.  You don't recall?

12    A.  Not exactly who the name was.

13    Q.  You don't recall who gave the briefings in this case?

14    A.  No, I do not.

15    Q.  Do you recall who gave the briefings in any other instance?    10:15:13

16    A.  They varied every time.

17    Q.  So you never had the same officer give you -- or you don't

18    recall having the same officer give you the briefings more than

19    once in any of the saturation patrols in which you

20    participated?    10:15:29

21    A.  I believe Lieutenant Sousa did twice on our briefings, but

22    I'm not a hundred percent sure, and then a sergeant would also

23    tail onto that and make sure he'd say what he had to say.

24    Q.  All right.  How long did these briefings take?

25    A.  They'd take probably, speculating, 20 minutes or so.    10:15:46

```
 1   Q.  All right.  And they were held in this vacant lot or where

 2   you'd set up operations?

 3   A.  Correct, everybody would attend.

 4   Q.  And everybody was required to attend?

 5   A.  Absolutely mandatory.                                       10:16:01

 6   Q.  Would you sign up -- would you sign up and sign in to

 7   reflect your attendance?

 8   A.  Yes, sir.

 9   Q.  And would that be the sign-in sheet?

10   A.  Yes, sir.                                                   10:16:07

11   Q.  All right.  What was your patrol assignment on March 27th

12   and 28th?

13   A.  I was a motor unit, 624 David.

14   Q.  And were you assigned a particular division?

15   A.  At that point I was assigned to the motors unit.  We only   10:16:27

16   had four motor units at that point in the sheriff's department,

17   and it wasn't like a specialty unit other than just motors,

18   strictly motors, which we did moving violations, accidents, and

19   those things, DUI task force, things of those natures.

20   Q.  All right.  Were you given any materials that you recall at  10:16:47

21   either -- at any of the briefings?

22   A.  The only thing we were given was the initial sheet of the

23   date, the time, and remarks to make sure that there was

24   absolutely no racial profiling.  In bold letters I remember

25   that exclusively at the bottom of it, the sheet.  Make sure     10:17:13
```

```
 1    there was absolutely no racial profiling of any kind, and that
 2    was it.  Just the location and the areas that had the heavy
 3    problems in, and they wouldn't state exactly what the problems
 4    were, whether it was traffic, speeding, accidents, DUIs, but
 5    just the areas to be aware of the location.                          10:17:30
 6    Q.  All right.  And so there would be a statement at the bottom
 7    of the sheet "no racial profiling"?
 8    A.  Absolutely.
 9    Q.  Now, what did that mean to you?
10    A.  To me there was no profiling.  You don't just pick on         10:17:39
11    the -- the Chinese, the Americans, the whites, the blacks, the
12    browns, the greens.  Anybody and everybody who had a violation
13    was to be stopped; was to be cited; was to be pulled over.
14    Q.  Something about -- and I'm a little confused, because I
15    think you said that -- that you didn't have discretion; if you    10:17:57
16    saw a violation, you had to pull him over and stop him.
17    A.  Correct.
18    Q.  And you had to give him a citation?
19    A.  They were to be cited.
20    Q.  Or arrested if --                                             10:18:05
21    A.  Correct, if it was criminal.
22    Q.  -- if it merited an arrest?
23    A.  Yes, sir.
24    Q.  But then I think you said to Ms. Lai -- and I'm sorry if
25    I'm mispronouncing your name, Ms. Lai -- that you couldn't       10:18:12
```

```
 1   possibly stop everybody you see so you had to exercise some

 2   discretion.  Have I misunderstood?

 3   A.  Correct, you -- it would be literally impossible to stop

 4   every single person there was that made a violation with the

 5   amount of cars that go by, whether they were -- a taillight was        10:18:30

 6   out, something of that nature.

 7   Q.  Is it fair to say that on most cars you could develop a

 8   reason to stop them if you followed them for very long?

 9   A.  If you followed them, sure.

10          THE COURT:  Kathleen, could you please hand the                  10:18:48

11   witness Exhibit No. 82.

12          THE CLERK:  (Handing).

13          THE WITNESS:  Thank you.

14          THE CLERK:  You're welcome.

15   BY THE COURT:                                                          10:18:58

16   Q.  That's a multiple-page document.  I want to ask you about

17   several pages of it.

18          The first two pages look like they're an incident

19   action plan.  Have you -- and it looks like, it's -- and I will

20   tell you this exhibit has been admitted into evidence.  It             10:19:12

21   looks like it's an incident action plan for March 27 and March

22   28, 2008.  Have you ever seen that before?

23   A.  I believe that was what we had that day.

24   Q.  Okay.  So that was the document that was distributed to you

25   that told you you shouldn't racially profile?                          10:19:30
```

```
 1    A.   Correct.

 2    Q.   Can you show me anywhere on that document where it says

 3    you're not to racially profile?

 4    A.   That was voiced by them at the actual command.

 5    Q.   Okay.  So you remember somebody saying, Don't racially          10:19:41

 6    profile?

 7    A.   Correct.

 8    Q.   All right.  So you were actually given a copy of this

 9    document?

10    A.   I believe so.                                                   10:19:48

11    Q.   Now, it says that the command post was at the northwest

12    corner of Cave Creek and Bell, but then it says "tentative."

13         Is that where you remember -- does that refresh your

14    recollection about where the command post was for this

15    operation?                                                          10:20:01

16    A.   Yes, it was on the northwest corner of Bell and Cave Creek.

17    Q.   And then it says briefing time 1500 at command post?

18    A.   Yes, sir.

19    Q.   And so you would -- you believe you would have been there

20    at about 3 o'clock at the command post?                             10:20:12

21    A.   Yes, sir.

22    Q.   And then it says patrol operations, HSU, ES Ops, SAU --

23         Do you see where I'm talking at the --

24    A.   Yes, sir.

25    Q.   -- bottoms of the document?                                    10:20:21
```

```
 1                -- TOI, K-9, Lake Patrol, and Mountain Division
 2      personnel --
 3      A.   Um-hum.
 4      Q.   -- as available.
 5                Which one of those were you?                          10:20:28
 6      A.   None.  Motors.
 7      Q.   You were motors.  So you were from a division that's not
 8      listed on this document?
 9      A.   That's correct.
10      Q.   Now, I do see where it says that all criminal violations   10:20:41
11      encountered will be dealt with appropriately.  And so do you
12      believe you read that?
13      A.   Yes, I did.
14      Q.   If you would, would you please turn, then, to the third
15      sheet in that exhibit.  And that talks about a stats sheet for  10:21:07
16      saturation patrol, and it looks like -- it looks to me like
17      it's a summary sheet for March 27, 2008.
18      A.   Okay.
19      Q.   Have you ever seen a summary like this before?
20      A.   No, I do not.                                              10:21:25
21      Q.   Did you keep records of all the stops -- did you have a
22      stat sheet in which you kept records of all the stops that you
23      made?
24      A.   Yes, we turn those in.
25      Q.   Do you know who you turn them in to?                       10:21:34
```

```
 1    A.   To whichever deputy or person was at the desk when you came

 2    back at the end of the night.

 3    Q.   All right.   And so if you would have participated on March

 4    27th, you would have done that, and if you would have

 5    participated on March 28th, you would have done that as well.      10:21:50

 6    A.   Yes, sir.

 7    Q.   All right.   If you'll turn now to -- five pages back into

 8    the document, it looks like a personnel sign-in for Cave Creek

 9    and Bell on 3-28.

10         Do you see that in the top right-hand corner?              10:22:04

11    A.   Yes, sir.

12    Q.   And it looks like it goes on for two pages.

13         I don't see your name there.   Have I missed it?

14         (Pause in proceedings.)

15         THE WITNESS:   No, I don't see it as well.                 10:22:44

16    BY THE COURT:

17    Q.   All right.   Thank you.

18         Now, if you'll turn back several more pages, there's

19    another handwritten form, and it has on the top -- it's divided

20    up.   It has names -- it has several columns.   It has what looks   10:23:00

21    like name and date of birth.   It has a column entitled Charge.

22    It has another column that looks to me like 287(g).   Another

23    one that looks like PC.   And another one that looks like

24    Arresting Deputy.

25         Do you see that form?                                      10:23:16
```

1    A.  On which page, Your Honor?  I'm sorry.

2    Q.  If we start -- thank you.  If we start with the exhibit --

3    A.  Okay.

4    Q.  Well, you see down in the lower right-hand corner where it

5    has MCSO and it has Melendres, then MCSO and a number?          10:23:30

6    A.  Yes, sir.

7    Q.  You see down in the bottom right-hand corner where there's

8    Melendres MCSO 001851?

9    A.  Correct.

10   Q.  That's the document, that's the page I'm looking at right   10:23:40

11   now.

12   A.  Okay.

13   Q.  And do you see those various columns?

14   A.  Correct.

15   Q.  And do you see up on the -- in the top left there's a       10:23:46

16   notation that say this is for 5-28-08?

17   A.  Correct.

18   Q.  Do you have any idea whose handwriting that is?

19   A.  No, I do not.

20   Q.  If we look down the Arresting Deputy column, we find your   10:23:58

21   name on 28 and 29.  It looks like you arrested somebody

22   named -- well, I don't -- I don't know, but it looks like

23   Kikes.

24           Do you see that?

25   A.  Yes, there's two in a row.                                  10:24:14

1   Q.  There's two in a row, and it looks like they are -- whoever

2   wrote this is recording stops that was made by an arresting

3   deputy, Kikes.

4   A.  Correct.

5   Q.  Are you aware of any other Kikeses --                    10:24:27

6   A.  No.

7   Q.  -- that operated on this saturation patrol?

8   A.  Just one, Your Honor.

9   Q.  All right.  And so do you have any recollection on March --

10  or I think it was March 28th, I think that says 3-28-08, is   10:24:37

11  that your recollection?

12  A.  Yes, sir.

13  Q.  Do you have any recollection on March 28, '08, of arresting

14  somebody for -- well, looks like you were -- well, I'm not

15  going to say anything.                                       10:24:53

16        Do you have any recollection, does that help refresh

17  your recollection as to whether or not you arrested anybody on

18  March 28th, 2008?

19  A.  No, that doesn't help me.

20  Q.  All right.  Do you see the name that is -- that is listed  10:25:04

21  as being arrested by the officer -- Deputy Kikes was Freddy

22  Apolinar Hernandez?

23  A.  Correct.

24  Q.  With a date of birth, looks like January 8th of '90?

25  A.  Correct.                                                  10:25:17

1    Q.  And then if we look in the charge document -- the Charge

2    column, it says, looks to me like "failed to provide"?

3    A.  Correct.

4    Q.  And if we look in the 287(g) column it says "yes"?

5    A.  Correct.                                                    10:25:27

6    Q.  And then if we look in the PC column it says "failure to

7    maintain lane"?

8    A.  Correct.

9    Q.  What does that -- does that mean anything to you, a failure

10   to maintain a lane?                                             10:25:37

11   A.  Yeah, it's -- that means he wasn't driving in the lane he

12   was supposedly supposed to be driving in.  He went over the

13   lane, went over the lines, came back, came back into another

14   lane, weaving.

15   Q.  All right.  And then it says Arresting Deputy, Kikes?       10:25:48

16   A.  Yes, sir.

17   Q.  Now, on the next entry -- that was line 28.  You see line

18   29, looks like Marcos Martinez Lopez, with a date of birth

19   November 24th, 1982?

20   A.  Yes, sir.                                                   10:26:06

21   Q.  And the charge, it looks like 287(g)?

22   A.  Correct.

23   Q.  And then the 287(g) column is obviously marked yes.  And

24   then in the PC column we have it looks like PASS number 28,

25   which I interpret to mean "passenger" for number 28, is that   10:26:23

1    correct?  Or do you have any recollection of that one way or

2    another?

3    A.  I believe that was probably the passenger in the vehicle

4    for number 28, yes.

5    Q.  Do you have any idea what the column PC means?                    10:26:35

6    A.  As far as passenger, number 28?

7    Q.  Well, you see the top of the column it says PC?

8    A.  Correct.

9    Q.  And then we have various things here like cracked

10   windshield, window tint, passenger number 3, lane change             10:26:48

11   violation.  Do you have any idea what PC would mean?

12   A.  "Probable cause."

13   Q.  Okay.  So any recollection of arresting somebody based on

14   probable cause because they were a passenger in a car that you

15   cited for failure to maintain a lane?                                10:27:06

16   A.  It looks -- it looks like that I had the 287(g) come out to

17   my location and to speak to this gentleman, and that the

18   reason, being that he was arrested at the beginning, was

19   probably for failure to provide ID of any kind.

20   Q.  You're talking about number 29 now, entry number --              10:27:25

21   A.  Right.

22   Q.  -- 29?

23   A.  Correct.

24   Q.  Okay.  You, of course, were not 287(g) certified at the

25   time?                                                                10:27:36

1    A.    No, sir, I was not.

2    Q.    I think that's what you said?

3    A.    Correct.

4    Q.    So you said if this would be you, you would have had a

5    287(g) come out?                                                        10:27:42

6    A.    For translation.

7    Q.    And what -- what basis would you have determined that you

8    were going to bring a 287(g) officer out?

9    A.    There was many 287(g) officers working the suppression, and

10   it was the luck of the draw that it was a 287(g) that came to          10:27:58

11   my location that would have spoke Spanish and be able to

12   understand so he'll be able to translate for me, and at that

13   point he would have decided that the arrest would have been

14   made.

15   Q.    There's no other arrests on this sheet that are indicated         10:28:11

16   the arresting deputy is Officer Kikes?

17   A.    On that sheet or the next sheet?

18   Q.    Well, it looks to me, and tell me if you interpret it

19   differently, like the next sheet, I was going to ask you about

20   this, is for March 27, so that would be for the day before?           10:28:29

21   A.    Correct.

22   Q.    And that does indicate that there was one arrest made by

23   Officer Kikes.

24   A.    Right, line 17.

25   Q.    And that is of a Francisco Raciel Garcia Soto?                    10:28:37

```
 1   A.  I can't read the writing.

 2   Q.  It looks to me --

 3   A.  Better than me.

 4   Q.  Okay.  But it's something like that?

 5   A.  Correct.                                        10:28:49

 6   Q.  And the date of birth, 12-20-87?

 7   A.  Okay.

 8   Q.  Well, yeah.  That may or may not be; that's my attempted

 9   interpretation.  And the charge was failure to provide ID?

10   A.  Correct.                                        10:29:02

11   Q.  And 287(g) is yes.

12   A.  Yes, sir.

13   Q.  And then PC was?

14   A.  Speeding.

15   Q.  And then you're listed as the arresting deputy?   10:29:13

16   A.  Correct.

17   Q.  Would this lead you -- does this refresh your recollection

18   as to whether you participated on both the 27th and the 28th?

19   A.  I believe so, Your Honor, I did.

20   Q.  And do you have any recollection of making any other    10:29:24

21   arrests of any other persons or any other citations for any

22   other persons other than those that are listed on these sheets?

23   A.  These look like they're just basically more -- more of

24   the -- all the arrests that were made.

25   Q.  Sort of a summary sheet?                          10:29:40
```

1  A.  A summary, and not all the citations that were actually

2  given out.

3  Q.  Okay.  But how do -- the parole [sic], or the operations

4  look like they took place from 4 o'clock in the afternoon to

5  11 o'clock in the evening on both days, is that correct?        10:30:02

6  A.  Yes, Your Honor.

7           THE COURT:  Okay.  I don't think I have any other

8  questions.

9           Ms. Lai?

10           MS. LAI:  No further questions, Your Honor.          10:30:12

11           THE COURT:  Mr. Casey?

12           MR. CASEY:  Briefly, Your Honor.  Thank you.

13                     REDIRECT EXAMINATION

14  BY MR. CASEY:

15  Q.  Deputy, you were asked a question, or a series of questions  10:30:19

16  by plaintiffs' counsel about saturation patrols and a zero

17  tolerance.  Do you remember those series of questions?

18  A.  Yes, sir.

19  Q.  You were also asked by the Court some questions about

20  discretions during traffic stops or the issuing citations.      10:30:34

21           Do you remember that?

22  A.  Yes.

23  Q.  Okay.  Was the traffic stop you made of the black Suburban,

24  was that part of the saturation patrol?

25  A.  No, it was not.                                             10:30:48

1    Q.   What was it a part of?

2    A.   That was no part of anything.  That was just a violation

3    that had occurred in the parking lot at that time and something

4    had happened.  So that was not part of the actual patrol that

5    day of what happened.                                          10:31:02

6    Q.   Okay.  And you testified earlier that that traffic stop and

7    everything was initiated by all the communications, the

8    experience that you had hearing -- let me rephrase the

9    question.

10           You made the traffic stop essentially in response to   10:31:15

11   information you gathered in response to a call for backup?

12   A.   Correct.

13   Q.   Does the saturation in that context -- if there was a zero

14   tolerance in place during saturation patrols at that time, did

15   that policy apply to this particular vehicle?                  10:31:32

16   A.   No, it did not.

17   Q.   Did it apply to these particular people?

18   A.   No.

19   Q.   Okay.  Now, let's turn now to the other thing that the

20   Court was asking you about, discretion during traffic stops.   10:31:39

21           If you are an officer, would you describe for us if

22   you -- if you see five cars driving by, all in excess of the

23   speed limit during a saturation patrol, how do you determine

24   which car you're going to pull over?

25   A.   You -- you really can't.  You have to -- at that point it's  10:32:04

1    just your best guess of who's either traveling the fastest or

2    who's endangering the public the most.

3    Q.   Okay.  If a single car goes by at an excessive rate of

4    speed and there's a zero tolerance in effect, what are you to

5    do then?                                                          10:32:24

6    A.   I will proceed to go after the vehicle.

7    Q.   And let's go back where there's a multiple scenario where

8    you're on -- you're on Bell Road and you got five cars speeding

9    by, all of them would implicate the zero tolerance to pull

10   over.  Do you personally ever try to determine anything about    10:32:39

11   the race, ethnicity, the demographics, anything about the

12   occupants of those vehicles in order to determine which one

13   you're going to stop out of the five?

14   A.   No.

15         MR. CASEY:  That's all the questions I have.  Thank         10:32:58

16   you, Your Honor.

17         THE COURT:  Thank you.

18         MS. LAI:  Your Honor, if I may ask a couple of

19   questions of the witness.

20         THE COURT:  I'm sorry, you may not.  You had the            10:33:04

21   opportunity and you've surrendered it.

22         And I don't mean to be too harsh, but I am going to

23   hold strictly to the rules that I follow in the courtroom, and

24   that's what I'm going to do here.

25         Officer Kikes, we appreciate your testimony.  You're       10:33:17

```
 1   excused.
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Thank you.  We're going to take the
 4   morning break.  Please be back -- I'm going to have you be back
 5   at five minutes to 11:00.                              10:33:31
 6              (Recess taken.)
 7              THE COURT:  Please be seated.  Thank you.
 8              Next witness.
 9              MS. LAI:  Plaintiffs call Manuel Nieto.
10              THE COURT:  Mr. Nieto, please come right here to be   10:55:29
11   sworn.
12              THE CLERK:  Right here.  Can you please state and
13   spell your full name.
14              MR. NIETO:  Manuel Nieto, Jr.  M-a-n-u-e-l, N-i-e-t-o,
15   Jr.                                                    10:55:49
16              THE CLERK:  Thank you.  Please raise your right hand.
17              (Manuel Nieto, Jr., was duly sworn as a witness.)
18              THE CLERK:  Thank you.  Please take our witness stand.
19              THE COURT:  Please.
20                       MANUEL NIETO, JR.,
21   called as a witness herein, having been duly sworn, was
22   examined and testified as follows:
23                       DIRECT EXAMINATION
24   BY MS. LAI:
25   Q.  Good morning, Mr. Nieto.                           10:56:27
```

627

```
 1   A.   Good morning.

 2   Q.   How old are you?

 3   A.   I'm 37 years old.

 4   Q.   Where do you live?

 5   A.   Arizona.   Phoenix, Arizona.                           10:56:32

 6   Q.   How long have you lived in Phoenix?

 7   A.   Twenty-one, twenty-two years.

 8   Q.   What do you do for work?

 9   A.   I'm an auto mechanic.

10   Q.   Where do you work?                                     10:56:46

11   A.   I work at Angel's Auto Repair.

12   Q.   And who is the owner of Angel's Auto Repair?

13   A.   My brother is.

14   Q.   Did the shop at some time have a different name?

15   A.   Yes, it did.                                           10:56:56

16   Q.   What was that name?

17   A.   Manuel's Auto Repair.

18   Q.   And who was Manuel's Auto Repair named after?

19   A.   My father.

20   Q.   This is a family business?                            10:57:05

21   A.   Yes, it is, that's correct.

22   Q.   Are you married, Mr. Nieto?

23   A.   I am married.   I have five kids and I have a beautiful

24   family, yes.

25   Q.   Where were you born?                                   10:57:16
```

1    A.  I was born in Chicago, Illinois.

2    Q.  What is your citizenship status?

3    A.  U.S. citizen.

4    Q.  Do you have any felony convictions for the last 10 years?

5    A.  Yes, I do.  I have one.                                    10:57:28

6    Q.  What was that for?

7    A.  It was for burglary.  I signed a plea bargain for burglary,

8    but it was a domestic dispute.

9    Q.  Have you had any problems with the law since then?

10   A.  No, I have not.                                            10:57:44

11   Q.  Do you have an older sister?

12   A.  I do have an older sister.  Her name is Velia Meraz, and

13   she's right back there.

14   Q.  Okay.  Were you aware that on March 28th, 2008, that the

15   Maricopa County Sheriff's Office was conducting an operation in   10:58:03

16   the North Phoenix area?

17   A.  Yes, I was, I was aware.

18   Q.  How did you learn that?

19   A.  Through the media, on the radio, word of mouth, customers

20   coming in and out of our shop.  It was -- it was just out      10:58:19

21   there, patrol deputies just going up and down the street, so

22   yeah, I did have knowledge of it.

23   Q.  Were you yourself stopped that day?

24   A.  I was.  I was stopped that day.

25   Q.  About what time of day were you stopped?                   10:58:34

1    A.  It was about -- between 2:00 and 3:00, because that's when

2    we take our lunch break, so it was between 2:00 and 3:00.

3    Q.  Where did you go on your lunch break?

4    A.  We went to the gas station, which is right down the street

5    from our shop.  We went to a buy some Gatorades and some                10:58:53

6    cigarettes, and that's where we first made contact with one of

7    the deputies.

8    Q.  What did you see when you arrived at the gas station?

9    A.  As I was driving to the gas station, I seen what appeared

10   to be a sheriff's deputy with two detainees sitting on the gas         10:59:14

11   pumps, and I just pulled into the parking spot.

12   Q.  Whose car were you driving?

13   A.  I was driving my sister's SUV.

14   Q.  When you arrived at the gas station did you park in a

15   designated parking spot?                                               10:59:33

16   A.  Yes, I did.  Yes, I did.  At that time when I pulled in, I

17   saw the deputy that I saw as I was pulling in walking towards

18   our vehicle.

19   Q.  Were the windows rolled down?

20   A.  Yes, they were rolled down.                                        10:59:48

21   Q.  What happened after you -- after the deputy started walking

22   towards the vehicle?

23   A.  The deputy walked towards the passenger side of the

24   vehicle, and my sister was sitting in the passenger side.  He,

25   in an angry manner, I want to say yelling, said:  You need to          11:00:08

1    leave now.  My sister asked why, and he just repeated himself:

2    You need to leave now.

3    Q.  You said earlier that the deputy had some people detained?

4    A.  Yes, I did say that, he did.

5    Q.  Did the deputy leave the detainees in order to speak to          11:00:36

6    you?

7    A.  Yes.  He walked from where he was at from the gas pump, the

8    detainees were sitting on the floor, and he walked from where

9    he was to our vehicle, yes, he did.

10   Q.  Did your sister say anything else to the deputy?              11:00:49

11   A.  He -- like I said, she asked him why.  He said:  You need

12   to leave now.  You gotta get out of here.  I'm gonna arrest

13   you.  That's when I said:  What did we do wrong?  He said:  You

14   two, you need to leave now or I'm gonna arrest you for

15   disorderly conduct.                                              11:01:14

16          At that point my sister asked him for his name and his

17   badge number.  He gave her that information, very angry, very

18   upset, and at that point we just -- I started reversing.

19   Q.  Now, when you pulled in did you have the radio on?

20   A.  No, it was -- well, we pulled in.  As soon as we got there   11:01:29

21   I turned the radio down or shut the vehicle off, one of the

22   two, but there was no music playing as we were conversating

23   with the -- with the deputy.

24   Q.  All right.  Did you ever get out of the car before you left

25   the gas station?                                                 11:01:44

1    A.  We were not given a chance to.

2    Q.  Did you ever open the car door?

3    A.  No, I did not.

4    Q.  And you said you obeyed the deputy's order to leave the gas

5    station?                                                              11:01:58

6    A.  Yes.  Yes.  Yes, I did.

7    Q.  When you were leaving the gas station, did you back out

8    onto Nisbet Road or Cave Creek Road?

9    A.  I backed up into Nisbet Road the same way I came in.

10   Q.  Where were you headed?                                            11:02:12

11   A.  We were going back to our business.  After the

12   officer said, You guys need to leave now, You need to leave now

13   or I'm gonna arrest you, arrest you for disorderly conduct,

14   those words were exchanged, I reversed into Nisbet, proceeded

15   to Cave Creek Road, put my signal light, turned left.  Right        11:02:31

16   before I knew we were at our business, 'cause it's like right

17   down the street.

18   Q.  Okay.  What lane did you get in when you turned onto Cave

19   Creek Road?

20   A.  I'm sorry.  Repeat that?                                         11:02:44

21   Q.  What lane did you get in when you turned onto Cave Creek

22   Road?

23   A.  I turned -- I turned left, so I had to turn on the very

24   first lane going south.  And within matter of seconds I have to

25   merge to the yellow lane because our shop is, like, right next      11:02:59

1  to the -- almost next to the gas market.

2  Q.  Okay.  What happened next?

3  A.  I pulled -- I pulled up to the -- I pulled up to the front

4  of the shop.  I hear sirens.  I hear -- I see a motorcycle

5  officer in back of us.  It was -- it was chaos.  I pulled up.        11:03:22

6  I see more SUVs coming in back of our vehicle.  They draw guns

7  on the vehicle.  They pull my sister out, tell her to get out

8  of the vehicle.

9       At that time I'm on the phone with 911 trying to

10 explain my situation as to what's happening.  The motorcycle       11:03:45

11 officer tells me to get out of the vehicle.  I explained to him

12 I was on the phone with 911 and he said, I don't care who

13 you're on the phone with.  Get out of the vehicle.

14      So the door was unlocked, he opened the door, pulled

15 me out, threw me to the ground, and within seconds I had two,       11:04:12

16 three other officers or posse members on top of me while they

17 were cuffing me.

18 Q.  Do you remember the motorcycle deputy on Cave Creek Road

19 trying to pull you over?

20 A.  Yes.                                                            11:04:31

21 Q.  Did you pull over?

22 A.  I did pull over.  Yeah, I did pull over.  The only way I

23 could pull over was already me turning into our business.

24 Q.  How is it that he indicated to you he wanted you to pull

25 over?                                                               11:04:50

1   A.  He was -- I heard on his mike and the sirens:  Pull over.

2   Pull over.  So as he's saying that on the mike, I'm already

3   with my signal light ready to turn into our business, 'cause,

4   like I said, it's -- it's feet.  It's, like, right there.

5   Q.  Why were you on the phone with 911?                         11:05:10

6   A.  Because I -- I was being harassed.  I was -- I feared for

7   my -- for my life.  I was first asked to leave from a

8   convenience store for no reason.  When I see all -- when the

9   situation takes place at the shop with the guns drawn, all the

10  commotion going on, Get out of the car, I'm -- I'm -- I'm on    11:05:38

11  the phone with 911.  I'm scared.

12  Q.  When you were handcuffed, taken out of the vehicle,

13  handcuffed, and put against the vehicle, what was going through

14  your mind at the time?

15  A.  It -- it's kind of hard to explain my feelings now that so  11:05:55

16  much time has passed by, but what I can tell you is that as I

17  told you when you first questioned me that if I have a prior

18  conviction, I do.  I went to prison for three years.  I got

19  released from prison February 28th, 2008.  This incident

20  happened four weeks after, March 28th.                          11:06:25

21        Me, as paying my debt to society, working for my

22  family, doing good, enjoying my family now that I'm out, for me

23  to be in handcuffs again for no reason, thinking my family's

24  going to be taken away from me, it -- it's -- it's horrible.

25  And -- and, again, that question you asked me, that's what was  11:06:52

1    running through my mind.

2    Q.  Did they try to verify your license or identity, the

3    deputies?

4    A.  They did.  They asked me for -- if I had a driver's

5    license.  I was handcuffed.  I was able to pull my wallet out        11:07:05

6    of my back pocket.  As soon as I pulled my wallet out, the

7    deputy got my wallet out of my hands and he took my driver's

8    license out and -- and verified myself, he verified my

9    information.

10   Q.  Did your family see what was happening to you?                   11:07:25

11   A.  They did.  My father and my brother seen all the commotion.

12   They were scared.  They -- I looked and I could see them, like,

13   lost:  What's going on?  Why is my -- my son, why is my brother

14   on the floor?  What did he do wrong?  I could just see it in

15   their face.  And whatever deputies or posse members were there     11:07:56

16   were keeping them away, like, Stand back.  Stand back.

17   Q.  Um-hum.

18   A.  But it was a terrifying moment.

19   Q.  Did anyone else there at the shop see what happened?

20   A.  I was, like I said, cuffed.  And after they took me to the      11:08:12

21   back I could see people at the shop, what customers that we had

22   there.  There was my family there.  And what I know after that

23   happened, that vendors were complaining 'cause they couldn't

24   get in and out of the shop.  So yeah, there was -- there was

25   quite a few people there.                                           11:08:44

1   Q.  Did the deputies ever tell you why they stopped you?

2   A.  They -- when they verified my information, the deputy with

3   the motor -- with the motorcycle, he's the one that ver -- that

4   called in, I remember that clearly, ran my name, everything

5   came back good.  He uncuffed me.  They huddled up on the side         11:09:07

6   of the shop, they were just talking for a few minutes, and

7   everybody just got on their vehicle and just left.

8   Q.  Did they issue --

9   A.  I was never -- I was never said why I was stopped.  They

10  never gave me a citation.  They didn't arrest me.  They just          11:09:25

11  left it at that.

12  Q.  Did they ever apologize to you?

13  A.  No, not at all.

14  Q.  After the deputies left, did you try to go back to work?

15  A.  I was at work.  I didn't work.  What I did, I -- first            11:09:39

16  thing I did, I wanted to file a complaint so I called 911 again

17  to let them know the situation.  Through all that chaos they

18  had me jumping back and forth from the sheriff's department to

19  the Phoenix PD wondering what jurisdiction it was.  And that I

20  recall, the last thing they told me, that a detective was going      11:10:12

21  to contact me back.  To this date I have not got that phone

22  call from that -- that detective.

23  Q.  And that was a detective with the Maricopa County Sheriff's

24  Office?

25  A.  You know what?  They had me jumping back and forth that I'm      11:10:24

```
 1    not even sure if it was Maricopa or if it was the Phoenix PD.
 2    Q.  Mr. Nieto, do you believe you could be stopped again?
 3    A.  Yes, I actually do.  I have not been stopped ever since the
 4    incident, but I do believe I will be able -- they'll probably
 5    stop me again.  And if all this racial profiling does not stop,      11:10:50
 6    that's my opinion, I think that my kids in the future will be
 7    looking forward to the same thing and I'll be fearing for their
 8    lives, yes.
 9            MS. LAI:  Thank you very much.
10            THE WITNESS:  You're welcome.                                11:11:08
11            THE COURT:  If you can give me just a second --
12            MR. CASEY:  Yes, Your Honor.
13            THE COURT:  -- Mr. Casey.
14            Please proceed.
15            MR. CASEY:  Thank you, Your Honor.                           11:11:28
16                       CROSS-EXAMINATION
17    BY MR. CASEY:
18    Q.  Good morning, Mr. Nieto.  How are you?
19    A.  Good morning.  I'm doing fine.
20    Q.  I don't know if you'll remember me, but I met you at your        11:11:35
21    deposition some time ago.
22    A.  Okay.
23    Q.  Do you remember me?
24    A.  You look familiar.
25    Q.  Well, I lost a little weight.  I got off the pizza and the       11:11:45
```

1    doughnuts, so I...

2    A.  Okay.

3    Q.  Mr. Nieto, I want to make sure that I'm understanding your

4    testimony clearly.  You remember March 28, 2008, was on a

5    Friday, wasn't it?                                              11:12:05

6    A.  I don't remember if it was on a Friday, but I know the

7    incident did happen March 28.

8    Q.  You and your sister were going to decide to take your lunch

9    break, which was a late lunch break around 2 o'clock or so?

10   A.  We always take a lunch break at 2 o'clock.                  11:12:20

11   Q.  So the answer to my question is yes, around 2 o'clock?

12   A.  Yes, between 2:00 and 3:00, yes.

13   Q.  And what you decided you folks were going to do was drive

14   down to the near QuikStop, a convenience mart nearby, to pick

15   up some cigarettes and Gatorades or drinks, right?             11:12:33

16   A.  That's correct.

17   Q.  And you actually were the driver in your sister's black,

18   what, Suburban?

19   A.  It's a Suburban, yes.

20   Q.  It's a black color?                                         11:12:46

21   A.  Yes.

22   Q.  It has window tinting, doesn't it?

23   A.  Yes, it does.

24   Q.  And your sister was riding in the right-front passenger

25   seat, also known as riding shotgun?                            11:12:54

1    A.  If you want to call it that, yes.  Yes.

2    Q.  All right.  We're riding in the right-front passenger seat.

3        You're comfortable with that, right?

4    A.  Yes.

5    Q.  And so you folks drive in there and as you drove in there,    11:13:03

6    what you've told the Court is you see an MCSO deputy there with

7    other -- two other people, do you not?

8    A.  Yes.  Yes.

9    Q.  And what you described for the Court is you saw what

10   appeared to be two people in detention or under arrest, but you    11:13:20

11   don't know whether they were cuffed or not.

12   A.  There were two gentlemen on the gas pumps sitting down with

13   their hands behind their back and a deputy standing by them,

14   yes.

15   Q.  All right.  And what you said is you folks parked your car,    11:13:36

16   right?

17   A.  Pulled up into the parking spot.

18   Q.  Okay.  You parked in the parking spot, and next thing you

19   know the deputy comes up to you, just he walks up to you,

20   doesn't he?    11:13:50

21   A.  He left the -- left where he was at and walked towards our

22   vehicle, yes.

23   Q.  And he left the two people that you saw sitting down with

24   their hands behind their back, didn't he?

25   A.  Yes, he did, sir.    11:14:01

1  Q.  And he came up to you and said, Get out, Leave right now,

2  something to that effect?

3  A.  Came up to my sister's window and told her first, yes.

4  Q.  Okay.  And you -- and you hadn't said anything to him is

5  what you're telling us, true?                                    11:14:14

6  A.  Not when he first walked up to the vehicle, no.

7  Q.  All right.  Before he ordered you to leave, you are telling

8  this Court under oath --

9  A.  Um-hum.

10  Q.  -- that you said nothing to him.                            11:14:25

11  A.  When he was speaking to my sister.

12  Q.  Okay.  No, I'm going to -- I'm going to rephrase this

13  question.  I want --

14  A.  Okay.

15  Q.  -- you to focus just on my question.                       11:14:35

16  A.  Yes, sir.

17  Q.  Before he says anything to you when he's walking up, you

18  had said nothing to the deputy, true?

19  A.  True.

20  Q.  Your sister had said nothing to the deputy, true?          11:14:46

21  A.  True.

22  Q.  Okay.  The deputy leaves the two men you see sitting by the

23  gas pumps with their hands behind their backs and walks up to

24  your car, true?

25  A.  Yes, sir.                                                   11:15:01

1    Q.   And he yells at you, doesn't he?

2    A.   Not at me.  At my sister first.

3    Q.   He yells at your sister?

4    A.   Yes.

5    Q.   And he says:  You gotta leave now or I'm going to arrest    11:15:07

6    you for disorderly conduct?

7    A.   "You need to leave now."

8    Q.   Okay.

9    A.   My sister asked why.

10   Q.   Okay.  And what did he say in response?    11:15:16

11   A.   "You better leave now.  I'm going to arrest you for

12   disorderly conduct."

13   Q.   And your sister, did she yell anything out of the car to

14   anybody?

15   A.   She -- she said something to the effect after we were --    11:15:28

16            Can I clear that up so we won't have --

17   Q.   Not yet, sir.  Your lawyer will be able to ask you --

18   A.   Ask me the question again, please.  I'm sorry.

19   Q.   At any time, from the point you pulled in until this

20   officer ends his conversation with your sister about leaving --    11:15:42

21   A.   Um-hum.

22   Q.   -- okay?  And she asks why, and he says, Leave or I'm going

23   to disorderly conduct, did she yell anything at anyone before

24   that time?

25   A.   She yelled -- she yelled out the window, Don't sign    11:15:57

1  anything.  Just give him your name.  After the fact she got his

2  badge number and his name, and we were pulling out.

3  Q.  All right.  So there's a little bit more to the story than

4  what you told us earlier, isn't there?

5  A.  Can you be more specific?                                    11:16:15

6  Q.  Sure.  Your sister yelled something out the window, is what

7  I understand you're telling us, when you folks were driving

8  out, didn't she?

9  A.  After we were leaving, yes.

10  Q.  Okay.  And would you tell the judge:  What did she yell      11:16:29

11  out?

12  A.  She, after -- when we were leaving she told the detainees

13  not -- you have the right not to sign nothing.  Just tell him

14  your name.

15  Q.  And did she do that in the English language or the Spanish  11:16:42

16  language?

17  A.  I believe it was Spanish.

18  Q.  Okay.

19  A.  I believe it was Spanish.

20  Q.  Did she yell at them, Don't speak till you get a lawyer?    11:16:49

21  A.  I do not recall exactly.

22  Q.  But she told them in Spanish, Don't sign anything, didn't

23  she?

24  A.  After the officer told us to leave that we were leave -- we

25  were already backing up leaving.                               11:17:03

1    Q.  All right.  Did your sister, as you're driving out, yell

2    any profanities at the officer?

3    A.  No, sir.  No, sir.

4    Q.  Did she yell any profanities or vulgarities about

5    Sheriff Joe being an f'ing Nazi?                                    11:17:16

6    A.  No.  No, sir, not at all.

7    Q.  Did you yell anything out the window?

8    A.  No, I did not.

9    Q.  Okay.  All right.  So in summary, you were asked to leave,

10   told to leave --                                                    11:17:27

11   A.  Which I did.

12   Q.  Okay.  And you basically had done nothing.

13   A.  Absolutely nothing.

14   Q.  Okay.  And the only -- the only thing that your sister had

15   done before she was told, Leave or you're going to be arrested      11:17:39

16   for disorderly conduct, was ask, Why do we have to leave?

17   That's all that happened, right?

18   A.  Yes.

19   Q.  Okay.  Now, sir, you mentioned this earlier, but you do

20   agree with me, you have problems controlling your anger, do you     11:17:56

21   not?

22          MS. LAI:  Objection.  Are you referring to a

23   conviction?

24          THE COURT:  I'm not going to allow speaking

25   objections.  What's the basis of your objection?                    11:18:07

```
1          MS. LAI:  If Mr. Casey's about to go into the details
2     of the conviction --
3          THE COURT:  I'm going to overrule the objection,
4     'cause I don't think that the question anticipates that.
5          MS. LAI:  Okay.                                       11:18:19
6     BY MR. CASEY:
7     Q.  Sir, you have trouble controlling your anger, do you not?
8     A.  Now that -- as we speak, or in my past?
9     Q.  At the time of July -- excuse me, of March 28, 2008 --
10    A.  No, I did not.                                         11:18:33
11    Q.  Okay.
12    A.  No.
13    Q.  You have trouble controlling your rage, do you not?
14    A.  At the time?  I ask again, at the time or in the past?
15    Q.  Well, let's just -- we'll do it in the past.  In the past  11:18:44
16    you --
17    A.  In the past I have, yes.
18    Q.  Okay.  You've had trouble controlling your emotions,
19    haven't you?
20    A.  In the past, yes.                                      11:18:50
21    Q.  And that has gotten you in trouble, hasn't it?
22    A.  Yes, it has.
23    Q.  Okay.  Now, even though you've had trouble controlling your
24    anger and your emotions, sir, you're telling me that at no time
25    did you ever act aggressively towards that deputy that      11:19:03
```

```
 1    approached you, true?
 2    A.  That's true.
 3    Q.  You're telling us that at no time did you ever refuse to
 4    leave that quick stop.
 5    A.  Absolutely, you're right.                              11:19:14
 6    Q.  You're telling us that at no time did you ever have any
 7    threatening conduct whatsoever towards that deputy or his
 8    detainees?
 9    A.  I did not.
10    Q.  Okay.  What you're telling us is that you obeyed his    11:19:24
11    instruction to leave as soon as it was given, true?
12    A.  Yes, that's true, 'cause I didn't get cited or arrested,
13    yes.
14    Q.  Okay.  And, sir, when you were driving away from the scene,
15    you testified that you saw a motorcycle cop behind you, didn't  11:19:40
16    you?
17    A.  Yes.
18    Q.  And you saw lights on, right?
19    A.  Yes.
20    Q.  You saw sirens on, or heard sirens on?                  11:19:47
21    A.  I heard sirens, yes.
22    Q.  And you also heard him speaking over a loudspeaker to pull
23    over, didn't you?
24    A.  And I did, yes.
25    Q.  You didn't pull over to the right; you pulled into your  11:19:57
```

```
 1    family business?

 2    A.  No, I -- as he got in back of me I was already pulling --

 3    turning left into the family business.

 4    Q.  Okay.  And when you pulled up into the family business, you

 5    pulled up to a gate that was closed, didn't you, in the family      11:20:07

 6    business?

 7    A.  No, you're wrong, sir.  It was not closed.

 8    Q.  Okay.

 9    A.  It's an open gated so vehicles could go in and out, so the

10    shop was open at the time.                                          11:20:16

11    Q.  Did you have your -- did you turn your engine off or did

12    you leave it on when you stopped?

13    A.  I do not recall.

14    Q.  Did the officer tell you to get out of the vehicle at any

15    time?                                                               11:20:27

16    A.  He did tell me to get out of the vehicle.

17    Q.  Did you, as just like you said, when he told you to leave

18    the QuikStop and you did it right away --

19    A.  That's right.

20    Q.  -- when he asked you to leave the -- get out of your car,       11:20:37

21    did you get out right away?

22    A.  I told him I was on the phone with 911.  He said, I don't

23    care who you're on the phone with.  At that time he opened the

24    door, pulled me out, the phone fell, and next thing you know

25    I'm on the floor and I have two, three other deputies on my         11:20:50
```

```
 1    back getting handcuffed.
 2    Q.  Now, Mr. Nieto, I appreciate and thank you for sharing
 3    that, but my question was a little bit different.
 4    A.  Um-hum.
 5    Q.  Just like you obeyed quickly at the QuikStop, my question      11:21:02
 6    is not whether you're on the phone, not whether you explain.
 7    My question was:  When the officer approached you, asked you to
 8    get out of your car, did you immediately comply with that
 9    demand?
10    A.  I would have to say so, yes, immediately.  All I have --       11:21:18
11    all I did say is, I'm on the phone with 911, and after that the
12    door was open and I was thrown out.
13    Q.  And your testimony is that you had multiple guns pointed at
14    you.
15    A.  Yes.                                                           11:21:33
16    Q.  And you were thrown to the ground and you had multiple
17    people topple you or dog pile you, as I used to call it when I
18    was growing up?
19    A.  Those aren't the words I used, so, no, I wouldn't say
20    dog pile.  Like I said, I had -- I was thrown to the ground and   11:21:44
21    I had either posse members or deputies on my back getting
22    handcuffed.
23    Q.  Let's -- one other thing before we go, sir.  You understand
24    that your lawyers, on your behalf, are alleging that that
25    deputy and other deputies are acting pursuant to a policy,        11:22:06
```

1    pattern, or practice set by Sheriff Arpaio to racially

2    discriminate against Latino citizens in our communities.

3              You understand that, don't you?

4    A.  If that's what you're saying, okay, those are your words of

5    putting it, okay, I understand.                                    11:22:24

6    Q.  Okay.  Well, you believe that you were stopped and treated

7    the way you were because of the color of your skin, is that

8    correct?

9    A.  May I answer that question?

10   Q.  Please, I asked that.                                          11:22:35

11   A.  I do believe so.  And the reason why I say that is because

12   you, as being a smart person, if somebody does something wrong,

13   either gets arrested or gets a citation for not following the

14   traffic -- or get during a traffic violation.  As you're well

15   aware of, I didn't get a citation or either was arrested.  So I   11:22:58

16   do believe I was racially profiled.

17   Q.  Okay.  Thank you, sir.

18   A.  Um-hum.

19   Q.  And since, since, despite that policy or pattern or

20   practice that supposedly exists in this county, since March       11:23:10

21   28th, 2008, you have never again been stopped by the MCSO, have

22   you?

23   A.  I have not.  But I do fear.

24   Q.  I understand your fear, but the reality is you have not

25   been stopped again, have you?                                     11:23:27

1    A.  No, I have not.

2    Q.  My statement's correct?

3    A.  Yes.  Yes.  I have not been stopped.

4            MR. CASEY:  All right.  Thank you very much, sir.

5            THE COURT:  You may step down.                    11:23:36

6            THE WITNESS:  Thank you, sir.

7            THE COURT:  Well, hold it.  Hold it.  One moment.

8            Do you have any redirect?  I apologize.

9            MS. LAI:  No, I do not.  Thank you, Your Honor.

10            Plaintiffs call Velia Meraz.                     11:23:53

11            THE CLERK:  Right over here, ma'am.

12            Can you please state and spell your full name.

13            MS. MERAZ:  Yes.  My name is Velia Meraz.  V-e-l-i-a,

14   M-e-r-a-z.

15            THE CLERK:  Thank you.  Please raise your right hand.   11:24:20

16            (Velia Meraz was duly sworn as a witness.)

17            THE CLERK:  Thank you.  Please take our witness stand.

18            THE COURT:  Please.

19                        VELIA MERAZ,

20   called as a witness herein, having been duly sworn, was

21   examined and testified as follows:

22                      DIRECT EXAMINATION

23   BY MS. LAI:

24   Q.  Ms. Meraz, good morning.

25   A.  Good morning.                                        11:25:03

1  Q.  Are you the sister of Manuel Nieto?

2  A.  Yes, I am.

3  Q.  How old are you?

4  A.  I'm 39.

5  Q.  Do you work with your brother?                              11:25:11

6  A.  Yes, I do.

7  Q.  Are you a mother also?

8  A.  A mother to three little angels.

9  Q.  What is your citizenship status?

10  A.  I am a U.S. citizen.                                         11:25:22

11  Q.  On the day that you and your brother were stopped in March

12  2008, do you remember parking at the convenience store at the

13  gas station?

14  A.  Yes.

15  Q.  Which side of the convenience store did you park on?        11:25:33

16  A.  It was on the north side of the convenience store.

17  Q.  When you were pulling up was the radio on?

18  A.  Yeah, we had the radio on.

19  Q.  What was playing?

20  A.  Some Spanish music.                                         11:25:46

21  Q.  What kind of music?

22  A.  It was a cumbia, because I was getting into it and kind of

23  dancing around in my seat.

24  Q.  Were you singing along to the music?

25  A.  Yes, I was.                                                 11:25:57

```
1    Q.  Was the music loud?

2    A.  I don't know if it was loud or not, but I was listening and

3    singing along.

4    Q.  Now, you heard your brother testify that the deputy came

5    over to you?                                                          11:26:14

6    A.  Yes.

7    Q.  Do you recall that as well?

8    A.  Yes, I do.

9    Q.  What specifically did the deputy say?

10   A.  He marched up to my side, passenger side, and kind of           11:26:22

11   harshly said:  You need to get out of here now.

12            And I said:  Why?

13            He said:  You need to get out of here now before I

14   arrest you for disorderly conduct.

15            And then after that my brother proceeded to ask:  Why?      11:26:41

16   What did we do wrong?

17            And he says:  And you, too, you need to get out of

18   here before you get arrested for disorderly conduct.

19            And I then said, Sir, I says, I don't know why you're

20   doing this, I says, but it's not right, and I says, Can I           11:26:55

21   please have your number and your badge -- your badge number and

22   your full name?

23   Q.  Did he provide his badge number?

24   A.  Yes, he did.  A little upset about it, seemed, but yes.

25   Q.  Did you buy what you went to the gas station to purchase?       11:27:11
```

1    A.  No, we did not.

2    Q.  Did you ask the deputy if you could go inside and buy those

3    things?

4    A.  I do remember asking, Can we at least get what we came for

5    and leave, sir?  And he says, Nope, get outta here now.                 11:27:27

6    Q.  Did you ever speak to the detainees who were by the gas

7    pumps?

8    A.  As we were pulling out to leave like we were told, I did

9    kind of yell out, Don't sign anything you don't understand, and

10   provide your names only.                                                11:27:47

11   Q.  Did you say that in English or Spanish?

12   A.  In Spanish.

13   Q.  What happened after you left the gas station?

14   A.  We backed out onto Nisbet, stopped right there on Cave

15   Creek, put our signal on to go left.  And we made a turn and          11:28:02

16   got on the far left lane, and then just about quickly right in

17   the middle lane to make the left to the shop.  It's fairly

18   close.

19   Q.  Did you at some point observe sheriff's deputies following

20   you on Cave Creek Road?                                                 11:28:22

21   A.  First I heard the sirens, and then I kind of turned around

22   in my seat and looked in the mirror and saw a motorcycle cop as

23   well as other deputies and vehicles.

24   Q.  And your brother pulled into the shop, is that right?

25   A.  Yes, he did.                                                        11:28:37

```
 1   Q.  What happened on your side of the vehicle after your

 2   brother pulled into the shop?

 3   A.  Once he pulled into the shop, there was a motorcycle cop

 4   and other deputy vehicles as well, and they had drawn their

 5   weapons, and one of them was on their speaker thingy saying:        11:28:56

 6   Get out of the vehicle now.  Get out with your hands up.

 7           And I proceeded to get out.  And when I got out I

 8   noticed that there were a couple of deputies pointing their

 9   guns.  And so I slowly walked around the vehicle towards, like,

10   the front.                                                         11:29:22

11   Q.  Did you know what you had done wrong at that point?

12   A.  No.

13   Q.  Did you see your brother get pulled out of the vehicle?

14   A.  Yes, I did.

15   Q.  What did you see?                                              11:29:36

16   A.  I saw that he was sitting inside on the phone.  He was only

17   told, I believe, about one time to get out, and then the deputy

18   went to the door, opened it, pulled him out.  He hit the floor,

19   and then a couple of them kind of like put their knee on him,

20   like to put the handcuffs on him.                                  11:30:01

21   Q.  Where were you standing when you saw this happen?

22   A.  I was standing right in front of the shop.

23   Q.  Is that in the front of the vehicle?

24   A.  Correct.

25   Q.  Do you remember your father coming out of the shop?           11:30:16
```

```
 1   A.  Yes.

 2   Q.  Did anybody else come out of the shop?

 3   A.  It was him and a brother of mine.  Several people.

 4   Q.  Was your father and brother wearing mechanic's uniforms?

 5   A.  Yes.                                                        11:30:41

 6   Q.  Did your father appear worried?

 7   A.  Very much so.

 8   Q.  Why was your father worried?

 9   A.  Well, he just --

10          MR. CASEY:  Objection, Your Honor.                       11:30:50

11          THE COURT:  Sustained.

12          MR. CASEY:  Yeah.

13   BY MS. LAI:

14   Q.  What did your father say when he came out of the shop?

15   A.  What's going on?  What's wrong?  Why you guys doing that to  11:30:58

16   him?  What's going on?

17          And I just said, We didn't do anything.

18          And he goes:  Let my children go.  Those are my

19   children.  Those are my children.  They're U.S. citizens.  What

20   did they do wrong?                                              11:31:16

21   Q.  What happened after the father told the deputy you

22   were U.S. citizens?

23   A.  They backed off.

24   Q.  Did they let your brother go?

25   A.  Shortly thereafter.                                         11:31:30
```

1  Q.  Did the deputies provide you or your brother with an

2  apology?

3  A.  No.

4  Q.  Did the deputies cite you or press any charges against you?

5  A.  No.                                                          11:31:45

6  Q.  Ms. Meraz, do you have any convictions from the past 10

7  years?

8  A.  Yes, I do.

9  Q.  What was that --

10  A.  One.                                                        11:31:53

11  Q.  -- for?

12  A.  One for fraudulent schemes and artifices.

13  Q.  Have you completed all the requirements in connection with

14  that conviction?

15  A.  Yes, I did, and early.                                      11:32:00

16  Q.  Now going back to the incident, did you ever file a written

17  complaint with the Sheriff's Office?

18  A.  No, I did not, but my brother tried to that day.

19  Q.  Why did you not file a written complaint with the Sheriff's

20  Office?                                                         11:32:17

21  A.  I was there with him when he was making the phone call.

22  Q.  Do you believe the deputies in this incident treated you

23  unfairly?

24  A.  Yes, I do.

25  Q.  Why is that?                                                11:32:30

1    A.  I still don't understand why it is that we went through

2    this, had guns drawn, and for what?  We weren't issued a

3    warning, a citation, a ticket.  I believe that if we had done

4    something wrong, that would have been the case.

5    Q.  Do you believe you could be pulled over again by the          11:32:51

6    Sheriff's Office?

7    A.  Yes, I do.

8    Q.  Why?

9    A.  He -- Sheriff Arpaio keeps saying it on national TV that

10   he's going to continue what he's doing, and that means that      11:33:06

11   includes these sweeps and these stops.  So I do believe it

12   could happen again.

13          MS. LAI:  Thank you very much.

14          THE COURT:  Cross-examination?

15          MR. CASEY:  Yes, Your Honor.  Thank you.                   11:33:22

16                    CROSS-EXAMINATION

17   BY MR. CASEY:

18   Q.  Ms. Meraz, good morning to you.

19   A.  Good morning.

20   Q.  I will not be long.  Your lawyer asked you about your         11:33:28

21   conviction.  In fact, was it around the year 2005 that you were

22   convicted for a felony involving dishonesty?

23   A.  It was -- I don't remember exactly when it was, but it was

24   for fraudulent schemes and artifices.

25   Q.  And that's for dishonesty, isn't it?                          11:33:48

1    A.  That's not what the charge says, sir.

2    Q.  I understand.  But you were convicted, as you said, of

3    fraudulent schemes and artifices, true?

4    A.  Correct.

5    Q.  Because when you worked for Catholic Social Services you                11:33:58

6    were an immigration caseworker there --

7    A.  Um-hum.

8    Q.  -- were you not?

9            MS. LAI:  Objection, Your Honor, as to the details of

10   the criminal case.                                                          11:34:08

11           THE COURT:  I'm going to take into account the

12   criminal conviction; I don't think you need to go any further,

13   Mr. Casey.

14           MR. CASEY:  All right.  Thank you very much.

15   BY MR. CASEY:                                                               11:34:14

16   Q.  And what you're telling the Court is when -- you were --

17   first of all, you were present when I questioned your brother,

18   right?

19   A.  Yes, I was.

20   Q.  And what you're -- what you're telling the Court is when                11:34:20

21   you and your brother pulled in, you had said nothing to the

22   officer at any time before he ordered you to leave, true?

23   A.  I don't recall being asked that, sir.

24   Q.  Let me -- let me ask you.  Did you say anything to the

25   deputy before you were asked to leave?                                      11:34:39

1    A.  Before I was asked to leave?

2    Q.  Yes, ma'am.

3    A.  I asked -- I asked him why he was asking us to leave.

4    Q.  Okay.  Before he asked you to leave did you say anything to

5    him?                                                        11:34:54

6    A.  No.

7    Q.  Did you yell anything to him?

8    A.  No, I did not.

9    Q.  Did you say anything to the detainees that you saw in

10   handcuffs at the station?                                   11:35:04

11   A.  As we were on our way leaving I did.

12   Q.  Before you were asked to leave by the deputy, did you say

13   anything to those people that were being detained?

14   A.  Not that I can recall.

15   Q.  Did you yell anything at those two people?              11:35:20

16   A.  On our way out of there, yes.

17   Q.  Okay.  So the only time you yelled anything was on the way

18   out?

19   A.  Yes, sir.

20   Q.  And what did you yell?                                  11:35:30

21   A.  If you don't understand -- or don't -- don't sign anything

22   you don't understand.

23   Q.  In what language did you yell it?

24   A.  In Spanish.

25   Q.  Okay.  Did you yell it repeatedly or just a single time? 11:35:46

1    A.  Just a single time.

2    Q.  Okay.  And as you were leaving, your brother driving out,

3    did you yell any profanities either at the officer or towards

4    the officer?

5    A.  Never.                                                        11:36:04

6    Q.  Did you yell anything about vulgarities towards the

7    officer?

8    A.  No, sir.

9    Q.  Okay.  Can you explain to the Court, to the judge, who's

10   the finder-of-fact in this case, if you have any reason, any    11:36:23

11   opinion, any explanation for why you would simply pull up in a

12   car and all of a sudden an officer with some -- with two people

13   detained would walk away from them and tell you folks to leave?

14        Do you have any explanation that you can offer us

15   about how that happened?                                          11:36:43

16        MS. LAI:  Objection, compound.

17        THE COURT:  Overruled.

18        THE WITNESS:  Do I have to answer that question?

19        THE COURT:  You do have to answer the question.

20        THE WITNESS:  Sorry about that.                              11:36:58

21        I don't know, sir.  We pulled in with Spanish music; I

22   was singing along to it.  That was it.

23   BY MR. CASEY:

24   Q.  Nothing happened to -- is what you're telling us that would

25   ever justify any reasonable human being or officer to actually   11:37:12

```
 1   have you leave.  Is that a fair statement?
 2            MS. LAI:  Objection, argumentative.
 3            THE COURT:  Want to rephrase that one?
 4            MR. CASEY:  Yeah.
 5   BY MR. CASEY:                                          11:37:26
 6   Q.  In your judgment, ma'am, did anything happen that would
 7   ever allow any officer to request you to leave?
 8   A.  Not to my knowledge, sir.
 9   Q.  At some point you learned the name of the deputy, did you
10   not?                                                   11:37:38
11   A.  Yes, I did.
12   Q.  And what was the deputy's name?
13   A.  Mr. Armendariz.
14   Q.  Okay.  Did you ever determine what race Mr. Armendariz was,
15   Deputy Armendariz?                                     11:37:46
16   A.  He looks Latino.
17   Q.  Do you believe that Deputy Armendariz was treating you
18   differently because you yourself were Latino?
19   A.  I don't know what was running through his mind, sir.
20   Q.  And I understand that, and I never asked you about what was   11:38:02
21   running through his mind.  I'm asking for what's running
22   through your mind --
23   A.  Um-hum.
24   Q.  -- your belief.
25            Do you believe that he was treating you differently   11:38:11
```

1    because you were Latino?

2    A.  I believe so.

3    Q.  Okay.  Now, since that day on March 28, 2008, have you ever

4    again been stopped by any MCSO deputy?

5    A.  No, sir.                                                        11:38:30

6    Q.  Have you at any time since that date been questioned by any

7    MCSO deputy?

8    A.  No, sir.

9         MR. CASEY:  Thank you very much for your time, ma'am.

10        THE COURT:  Redirect?                                         11:38:40

11        MS. LAI:  No further questions.  Thank you.

12        THE COURT:  Okay.

13        Thank you, Ms. Meraz.  You can step down.

14        Next witness.

15        MS. WANG:  Good morning, Your Honor.  Cecillia Wang           11:38:56

16   for the plaintiffs.  Plaintiffs call Brett Palmer.

17        (Pause in proceedings.)

18        THE CLERK:  Right up here, sir.

19        Can you please state and spell your full name.

20        MR. PALMER:  Brett Palmer.  B-r-e-t-t, P-a-l-m-e-r.           11:39:57

21        THE CLERK:  Thank you.  Please raise your right hand.

22        (Brett Palmer was duly sworn as a witness.)

23        THE CLERK:  Thank you.  Please take our witness stand.

24

25

```
 1                         BRETT PALMER,

 2    called as a witness herein, having been duly sworn, was

 3    examined and testified as follows:

 4                      DIRECT EXAMINATION

 5    BY MS. WANG:                                                11:40:41

 6    Q.  Good morning, sir.

 7    A.  Good morning.

 8    Q.  You are a sergeant with the Maricopa County Sheriff's

 9    Office, correct?

10    A.  Yes, ma'am.                                             11:40:47

11    Q.  And you started working at the MCSO in about 2000?

12    A.  Correct.

13    Q.  You're currently one of two sergeants supervising the Human

14    Smuggling Unit, correct?

15    A.  I was one of two sergeants.  In the last two months I've  11:41:00

16    been transferred to a different division.

17    Q.  I see.  But up until recently -- or let me ask this:  When

18    were you transferred?

19    A.  Approximately mid-May, last week of May.

20    Q.  So until May of this year, 2012, you were one of the     11:41:12

21    supervising sergeants of the Human Smuggling Unit?

22    A.  Yes.

23    Q.  The other supervising sergeant is Manuel Madrid, correct?

24    A.  Yes, Sergeant Madrid and I did serve together for a few

25    years.                                                       11:41:27
```

1   Q.  And, sir, is it true that the Human Smuggling Unit actually

2   consists of three subunits, two Human Smuggling Units and an

3   employment sanctions unit, correct?

4   A.  Yes, not three separate units.  There's an interdiction

5   street team that has two squads that me and Sergeant Madrid          11:41:41

6   ran, and the other unit you're speaking of would be the

7   employer sanctions unit.

8   Q.  And so there's two sections, basically: human smuggling

9   section and an employer sanction section within HSU, correct?

10  A.  Yes, ma'am.                                                       11:41:56

11  Q.  And Lieutenant Joe Sousa commands the entire HSU?

12  A.  Yes, ma'am.

13  Q.  Thank you.

14        Now, you began as a supervisor of the Human Smuggling

15  Unit in about April of 2008, is that correct?                        11:42:05

16  A.  Yes.

17  Q.  And you did not submit an application for that position,

18  correct?

19  A.  That's correct.

20  Q.  You were tapped for that position by a higher-up person          11:42:15

21  within MCSO, correct?

22  A.  Yes.

23  Q.  That was Lieutenant Sousa?

24  A.  Yes.

25  Q.  And you considered that a positive career step for you,          11:42:25

```
 1   right?

 2   A.  Yes.

 3   Q.  HSU's mission is one of the sheriff's top priorities for

 4   the entire MCSO, correct?

 5   A.  Yes.                                                      11:42:35

 6   Q.  And the sheriff has been involved personally in HSU

 7   operations?

 8   A.  Yes.

 9   Q.  He's been present at some of those operations?

10   A.  Yes.                                                      11:42:44

11   Q.  And he's given press conferences about HSU operations?

12   A.  Yes.

13   Q.  And you've personally spoken to the sheriff about HSU work,

14   correct?

15   A.  Yes.                                                      11:42:53

16   Q.  And HSU is a desirable assignment within the MCSO, correct?

17   A.  Yes.

18   Q.  Now, sir, you command about seven -- you used to command

19   about seven deputies within HSU?

20   A.  Approximately, yes, ma'am.                                11:43:07

21   Q.  And Sergeant Madrid commanded about another seven deputies?

22   A.  Yes.

23   Q.  But you and Sergeant Madrid would co-supervise each other's

24   deputies on occasion, correct?

25   A.  Yes.                                                      11:43:19
```

1  Q.  Now, the sergeant position is very important within MCSO,

2  right?

3  A.  Yes.

4  Q.  You're supervising directly deputies under your command,

5  correct?                                                              11:43:28

6  A.  Yes.

7  Q.  And they need to follow your lead?

8  A.  Yes.

9  Q.  Sergeant, you're familiar with the term "saturation

10  patrol"?                                                             11:43:38

11  A.  Yes.

12  Q.  Is that synonymous with "crime suppression patrol" or

13  "sweep"?

14  A.  Yes, it is.

15  Q.  And HSU has done saturation patrols, right?                      11:43:45

16  A.  Yes, ma'am.

17  Q.  I'd like to talk about a particular saturation patrol.

18  This was in Fountain Hills on May 6th and 7th of 2008.

19          Do you recall that patrol?

20  A.  I do.                                                            11:43:58

21  Q.  Okay.  You were present at that patrol in Fountain Hills?

22  A.  Yes.

23  Q.  Now, you were told what the objective of that saturation

24  patrol was, correct?

25  A.  Yes.                                                             11:44:15

1   Q.  You did not decide what the objective of that patrol was,

2   correct?

3   A.  That's correct.

4   Q.  And the objective you were told was to go to the specified

5   area and interdict on crime in the area and enforce the civil          11:44:24

6   traffic code for the state of Arizona, is that correct?

7   A.  Yes.

8   Q.  There's a -- in general, is there a briefing for MCSO

9   personnel before these kinds of saturation patrols?

10  A.  Yes.                                                                11:44:46

11  Q.  Did you attend the briefing for this particular one?

12  A.  Yes, I conducted it.

13  Q.  Now, before the patrol you were not told of particular

14  persons that were being targeted, is that right?

15  A.  No, ma'am, not any particular persons, no.                         11:45:03

16  Q.  And you were not told of a specific crime that was under

17  investigation, isn't that right?

18  A.  A specific crime, no.  There were reports of criminal acts

19  in the area, and some shopkeepers had some issues with some

20  people they had trespassing their property, but as far as              11:45:20

21  specific crime you could say trespassing, disorderly conduct,

22  criminal damage, those would be specific.

23  Q.  So fair to say that you were told in general there was

24  crime going on in the Fountain Hills area?

25  A.  Yes, ma'am.                                                        11:45:34

1    Q.  And but for purposes of this saturation patrol you were not

2    told of particular crimes that were under investigation,

3    correct?

4    A.  We were not there to investigate particular criminal acts,

5    correct.                                                        11:45:46

6    Q.  As you said before.

7    A.  Correct.

8    Q.  Now, you did not choose the location for this operation,

9    correct?

10   A.  That's correct, I did not.                                  11:45:54

11   Q.  And you do not know who selected the location, correct?

12   A.  No, I do not know.

13   Q.  You did not know why the location was chosen?

14   A.  No, I don't know.

15   Q.  And all of that is generally true of saturation patrols,    11:46:06

16   correct?

17   A.  From my position, yes.

18   Q.  So in general you did not know why the locations were

19   chosen for saturation patrols?

20   A.  That's correct.                                             11:46:21

21   Q.  Or even who chose the locations.

22   A.  I imagine it was someone above my pay grade, but I don't

23   know who that was.

24   Q.  Thank you.

25        Now, after the Fountain Hills operation you had a          11:46:30

```
1    debriefing of sorts, right?
2    A.  Yes.
3    Q.  That was informal, you'd say?
4    A.  Yes.
5    Q.  You didn't announce ahead of time, Everybody who           11:46:39
6    participated in the saturation patrol should gather and we're
7    going to talk it over"?
8    A.  I announced it to the people that were participating under
9    my command that day to gather up at the Fountain Hills
10   substation, and I conducted what I would deem to be an informal  11:46:53
11   debriefing with them about the operation.
12   Q.  And that informal debriefing was with whoever was still
13   around the substation in Fountain Hills after the operation?
14   A.  Correct.  Nobody would have left.  It would have
15   encompassed everyone involved in the operation.  But I say       11:47:07
16   informal 'cause we were in the parking lot, I think is where I
17   debriefed.
18   Q.  Sir, you've been deposed for this case twice, correct?
19   A.  Yes.
20   Q.  Let me, if the judge will permit, hand you the deposition    11:47:17
21   transcript from your first deposition on October 23rd, 2009.
22            MS. WANG:  May I, Your Honor?
23            THE COURT:  You may.
24            MS. WANG:  Thank you.
25            THE WITNESS:  Thank you.                                11:47:35
```

```
 1              THE COURT:  You have a copy of the transcript,
 2   Mr. Casey?
 3              MR. CASEY:  Your Honor, I do have it.
 4              THE COURT:  All right.
 5              MS. WANG:  Do you need one, Your Honor?              11:47:45
 6              THE COURT:  I'd appreciate one unless I already have
 7   it somewhere.  And I don't see it.  Thank you.
 8   BY MS. WANG:
 9   Q.  Sir, I'm going to have you turn to page 79 and call your
10   attention to line 10.  You were asked:                        11:48:04
11              "Was there a specific meeting where that occurred
12   where they said:  Let's address what went on in this particular
13   saturation patrol to see what was good, what was bad."
14              And you answered:  "Informally, yes."
15              Correct?                                            11:48:26
16   A.  Yes, ma'am.
17   Q.  You see that?  And that -- that was true, right?
18   A.  Yes.
19   Q.  Okay.  And the very next line you were asked:
20              "Informally?  And who was involved informally.      11:48:39
21              "Answer:  Well, I believe I conducted that at the
22   Fountain Hills substation prior to departing."
23              That was your testimony?
24   A.  Yes.
25   Q.  And the question was:  "With whoever was left?              11:48:51
```

```
 1              "Answer:  Correct."

 2              Is that right?

 3   A.  Yes.

 4   Q.  And your testimony now is that everybody was left?

 5   A.  Yes.                                                    11:49:01

 6   Q.  So it's your testimony now that everybody who participated

 7   in that patrol was still in the substation at the time of this

 8   postoperation briefing?

 9   A.  It was a few years ago, but I'm not aware of anybody having

10   left.                                                       11:49:17

11   Q.  You didn't have a sign-in sheet for that postoperation

12   informal briefing, did you?

13   A.  I don't recall, but I don't imagine we would have had one

14   for that particular one, no.

15   Q.  Sir, I'm going to hand you an exhibit.  We may show some    11:49:28

16   portions of it on the screen, but for now I'll hand you the

17   whole thing.  It's already in evidence, Plaintiffs'

18   Exhibit 108.

19              MS. WANG:  With the judge's permission.

20              THE COURT:  You may do so.                       11:49:46

21              MS. WANG:  Thank you.

22              THE WITNESS:  Thank you.

23   BY MS. WANG:

24   Q.  Sir, as I said, Exhibit 108 is already in evidence.  Why

25   don't you take a quick look at it.  It is a few pages.          11:50:08
```

1          Sir, does this reflect some documents relating to the

2    Fountain Hills saturation patrol that we're discussing?

3    A.  Yes, I believe it does.

4    Q.  And again, this patrol covered two days, isn't that right?

5    A.  Yes, I believe it did.                                    11:50:29

6    Q.  May 6th and 7th, 2008?

7    A.  Yes, ma'am.

8    Q.  And let's turn to the page that's marked MCSO 014433 and

9    continues on to 34.  It's titled Human Smuggling Unit Shift

10   Summary.                                                       11:50:49

11          Do you see that?

12   A.  Yes.

13   Q.  Sir, this is a shift summary that you wrote about the

14   Fountain Hills patrol, correct?

15   A.  Yes.                                                       11:50:55

16   Q.  And on the first day, May 6th, 2008, this -- this is what

17   the shift summary covers, correct?

18   A.  Yes.

19   Q.  Now, you note on this document that during that first day,

20   May 6th, 2008, HSU and ES --                                  11:51:11

21          That's "Employer Sanctions," correct?

22   A.  Yes, ma'am.

23   Q.  -- detectives conducted a total of seven traffic stops for

24   civil infractions.

25          Do you see that?                                       11:51:24

1    A.  Yes, ma'am.

2    Q.  So that day during the saturation patrol there were seven

3    traffic stops conducted, correct?

4    A.  Yes.

5    Q.  And then the next sentence reads:  11 total civil citations    11:51:34

6    were written to drivers, ranging from suspended vehicle

7    registration and insurance violations to turning violations and

8    improper window tinting, is that correct?

9    A.  Yes, ma'am.

10   Q.  And then you note, In total, seven individuals were    11:51:49

11   arrested for 287(g), correct?

12   A.  Yes.

13   Q.  287(g) refers to the agreement that MCSO had at that time

14   with the United States Department of Homeland Security?

15   A.  Yes.    11:52:10

16   Q.  So this sentence here, In total, seven individuals were

17   arrested for 287(g), that refers to people who were turned over

18   to ICE for administrative processing, correct?

19   A.  Yes.

20   Q.  They were not arrested on any Arizona state criminal    11:52:22

21   charge, correct?

22          I beg your pardon.  Let me withdraw that.

23          The next sentence says six were processed

24   administratively through ICE, correct?

25   A.  Yes.    11:52:41

1   Q.  So that means six of the seven people who were arrested for

2   287(g) were processed administratively through ICE, correct?

3   A.  Yes.

4   Q.  None of those six were charged with any crime under Arizona

5   law, correct?                                                    11:52:56

6   A.  No.

7   Q.  And then the next sentence reads:  One was booked into the

8   Fourth Avenue Jail for an outstanding felony warrant for drug

9   possession and originally arising out of a Phoenix PD report.

10        Do you see that?                                           11:53:10

11  A.  Yes, ma'am.

12  Q.  And that individual, just to be clear, I want to make sure

13  I understand this, he was arrested because of a prior warrant

14  on an old matter, correct?

15  A.  Yes, that appears to be what I've written there.            11:53:22

16  Q.  Okay.  So there wasn't -- it wasn't a situation where

17  deputies during the saturation patrol developed new evidence

18  about a drug possession charge, is that right?  Based on what

19  you wrote here?

20  A.  Correct.  He had a warrant for his arrest from a previous   11:53:37

21  charge.

22  Q.  And then you noted in the next sentence that that

23  individual, the one who was picked up on the outstanding

24  warrant, was in the United States illegally and, therefore, had

25  an ICE detainer placed on him at the jail, correct?             11:53:48

```
 1   A.  Yes, ma'am.

 2   Q.  Now, of the seven people who were arrested for 287(g), to

 3   be clear, none of them was arrested for an Arizona state crime

 4   arising out of events that day, May 6th, 2008, isn't that

 5   right?                                                            11:54:05

 6   A.  Yes, that would appear to be so from the shift summary.

 7   Q.  Nobody that day was charged with human smuggling, is that

 8   right?

 9   A.  Correct.

10   Q.  I'll have you turn to the next page, MCSO 01443 -- sorry,   11:54:18

11   014434.  Now, you've got a list here --

12        Again, this is a report you wrote, correct?

13   A.  Yes, ma'am.

14   Q.  You have a list here of the individuals who were processed

15   administratively through ICE, is that right?                    11:54:37

16   A.  Yes.

17   Q.  And there are one, two, three, four, five, six, seven,

18   eight names, right?

19   A.  Yes.

20   Q.  They all appear to you to be Hispanic names, is that right? 11:54:48

21   A.  Yes.

22   Q.  And in the next paragraph you indicated the person who was

23   booked into the jail with the felony warrant, the old warrant

24   from the Phoenix Police Department, is that right?

25   A.  Yes.                                                         11:55:07
```

1   Q.  He also had a Hispanic last name, correct?

2   A.  Yes.

3   Q.  And then finally, the last paragraph indicates there was a

4   person arrested for a techno-cop warrant, felony warrant,

5   et cetera, et cetera.  Do you see that?                        11:55:21

6   A.  Yes.

7   Q.  That name is not a Hispanic name, right?

8   A.  No, it is not.

9   Q.  So it looks like there were 10 people in all who were

10  arrested during the saturation patrol on May 6, 2008, is that  11:55:30

11  right?

12  A.  Yes.

13  Q.  And nine of them, nine of the ten had Hispanic names,

14  correct?

15  A.  Yes.                                                       11:55:44

16  Q.  I'm going to have you turn a couple of pages to MCSO

17  014436.  And this one is the shift summary you wrote for the

18  next day, May 7th, correct?

19  A.  Yes, it appears so.

20  Q.  And it's -- it's similar in format to the one we just      11:56:02

21  looked at, correct?

22  A.  Yes, ma'am.

23  Q.  And on May 7th, again 10 people were arrested, is that

24  right?

25  A.  Yes, ma'am, it appears so.                                 11:56:20

```
 1   Q.  And seven were turned over to ICE for administrative
 2   processing, is that right?
 3   A.  Yes, it appears so.  I've listed that seven were 287(g).
 4   Q.  Could we highlight the paragraph beginning "Narrative,"
 5   please.                                                         11:56:52
 6        So why don't we break this down.  You wrote, During
 7   patrol, 10 suspects were taken into custody, right?
 8   A.  Yes.
 9   Q.  Seven were 287(g) only in U.S. illegally, right?
10        MR. CASEY:  Your Honor?  I'm sorry to do this.  For        11:57:07
11   whatever reasons, it's not popping up on our screen.  I see
12   it's at other -- everywhere else, but not here.
13        THE COURT:  Yeah.  Well --
14        MR. CASEY:  I'm following along on my computer, but I
15   don't see the highlighting that they're emphasizing.           11:57:20
16        THE COURT:  Let me ask you, if you can follow along on
17   a hard copy, we will get our tech person up here during lunch
18   and make sure you --
19        MR. CASEY:  No, I just wanted to alert the Court for
20   this afternoon.                                                 11:57:32
21        THE COURT:  Yeah, I appreciate it.  We're going to
22   break in just a minute.  We'll get our tech person up here and
23   make sure that your monitor is functioning appropriately.
24        MR. CASEY:  Thank you, Your Honor.
25        THE COURT:  Unless you're telling me you're having any     11:57:39
```

```
 1    problem following now.
 2             MR. CASEY:  No, I'm not having any trouble at all
 3    following, Your Honor.  I just wanted to make sure that there
 4    is highlighting, that I have to look one way or the other to
 5    see what they're emphasizing.                                   11:57:48
 6             THE COURT:  All right.  If you have any issue --
 7             MR. CASEY:  Okay.  It's working now.
 8             THE COURT:  Okay.  Thank you.
 9             MR. CASEY:  Thank you, Your Honor.
10             THE COURT:  Thank you, Kathleen.                        11:57:55
11             MS. WANG:  I'm sorry, Mr. Moll, can you tell me if
12    there was a pending question?
13             (The record was read by the court reporter.)
14    BY MS. WANG:
15    Q.  Is that right, sir?                                         11:58:17
16    A.  Yes.
17    Q.  And three were United States citizens booked on state
18    charges, right?
19    A.  Yes.
20    Q.  None of the seven people who were 287(g) only were arrested 11:58:22
21    on any Arizona state charge, is that right?
22    A.  It appears that way, yes.
23    Q.  And if you -- let's go back up to the listing at the --
24    under Suspects at the top of the page, the first three names.
25             There are three names listed there.  Those were the   11:58:49
```

1    three United States citizens who were arrested that day on a --

2    on a criminal charge, right?

3    A.  Yes, ma'am.

4    Q.  It says 910S.  Do you see that?

5    A.  Yes, ma'am.                                          11:59:03

6    Q.  That means driving on a suspended license, is that right?

7    A.  Yes, ma'am.

8    Q.  And if we look at the day's total arrests of all the 10

9    people, you had three people arrested on driving with a

10   suspended license, and seven people arrested only on          11:59:18

11   immigration administrative -- excuse me, let me rephrase that.

12          You had three people arrested on driving for -- with a

13   suspended license, and seven people who were arrested merely

14   for administrative immigration matters, is that right?

15   A.  Yes, ma'am.                                          11:59:39

16   Q.  Nobody that day -- May 7, 2008 -- was arrested for human

17   smuggling, correct?

18   A.  No, ma'am.

19   Q.  And looking again at this list of names up at the top, 10

20   names in all, fair to say that eight of those ten names are    11:59:52

21   Hispanic names?

22   A.  Yes, ma'am.

23   Q.  So over the course of the two-day saturation patrol you had

24   17 out of 20 people arrested with Hispanic last names, is that

25   correct?                                                12:00:14

```
1    A.  Yes, ma'am.

2    Q.  That did not raise a concern for you about possible racial

3    profiling?

4    A.  No, ma'am, it did not.

5    Q.  You did not follow up to see if there was a problem with        12:00:24

6    racial profiling during that saturation patrol?

7    A.  No, ma'am, I did not.

8    Q.  Let's set aside Fountain Hills for now and talk more

9    generally about saturation patrols.

10            THE COURT:  Well --                                         12:00:39

11            MS. WANG:  Or take a lunch break?

12            THE COURT:  Let's take a lunch break right now.

13            MS. WANG:  Okay.

14            THE COURT:  And we'll be back at 1:15.

15            (Lunch recess taken.)                                       13:18:07

16            THE COURT:  Thank you.  Please be seated.

17            We ready to resume?

18            MS. WANG:  Thank you.  Good afternoon, Your Honor.

19            THE COURT:  Good afternoon.

20   BY MS. WANG:                                                        13:18:20

21   Q.  Good afternoon, Sergeant.

22   A.  Good afternoon.

23   Q.  Sergeant, did you talk to anyone about your testimony

24   during the lunch break?

25   A.  I conferred with my attorney.                                    13:18:26
```

1  Q.  Okay.  Sir, MCSO has used posse members during these HSU

2  saturation patrols, correct?

3  A.  Yes.

4  Q.  And on at least one occasion a posse member named Jim

5  Van Allen e-mailed you about some HSU activity, is that right?    13:18:43

6  A.  Yes.

7          MS. WANG:  I'm going to ask that Exhibit 280 be put up

8  on the screens.  This is already in evidence.

9  BY MS. WANG:

10  Q.  And can you take a look at Exhibit 280.    13:18:58

11          Is this one such e-mail from -- e-mail address says

12  jvacarefreeaz.  Is that Mr. Van Allen?

13  A.  Yes.

14  Q.  And he wrote to you in the first e-mail at the bottom:

15  Sergeant and the J.J., please give me a call if we are going    13:19:14

16  fishing today in Anthem.  Thanks, Jim.

17          You see that?

18  A.  Yes.

19  Q.  And then you responded on the same day, is that right?

20  A.  Yes.    13:19:24

21  Q.  Now, Mr. Van Allen is a member of the posse for MCSO,

22  correct?

23  A.  Yes.

24  Q.  In fact, he has frequently participated in HSU operations,

25  correct?    13:19:38

```
 1   A.  Yes.

 2   Q.  And he had already at the time that he sent this e-mail?

 3   A.  Yes.

 4   Q.  Were you aware, sir, that on March 10th of 2009,

 5   Mr. Van Allen had sent an e-mail to Lieutenant Sousa talking        13:19:46

 6   about operation wetback?

 7   A.  I'm aware of it, yes.

 8   Q.  Were you aware of it at the time of this e-mail exchange?

 9   A.  I'm aware of it after it was sent to Lieutenant Sousa.

10   Q.  And was that before October 13th, 2009?                         13:20:07

11   A.  I don't recall the date, ma'am.

12   Q.  Okay.  Would it refresh your recollection to take a look at

13   the e-mail that he sent Lieutenant Sousa?

14   A.  Yes.

15   Q.  Actually, I'll come back to that later.                         13:20:18

16       Sir, a couple of days after October 13th, 2009,

17   Mr. Van Allen wrote to you again by e-mail, is that right?

18   A.  He may have.

19       MS. WANG:  Your Honor, I have a deposition exhibit

20   from Sergeant Palmer's deposition that may refresh his              13:20:48

21   recollection.  It has not previously been marked for

22   identification.

23       May I show it to him?

24       THE COURT:  Is it just a page from his -- pages from

25   his deposition?                                                     13:21:00
```

```
 1              MS. WANG:  It's actually the exhibit to the

 2    deposition.

 3              THE COURT:  Yeah.  And you're showing it to him for

 4    purposes of refreshing his recollection?

 5              MS. WANG:  Correct, Your Honor.  I don't plan do          13:21:08

 6    introduce it into evidence.

 7              THE COURT:  All right.  You may do so.

 8              MS. WANG:  Thank you.

 9              MR. CASEY:  May I get the exhibit number, please?

10              MS. WANG:  I have a copy.                                 13:21:14

11              MR. CASEY:  That's all right.  I have the exhibits

12    here.

13              MS. WANG:  It was Exhibit 3 to the deposition of

14    Brett Palmer on November 9th, 2010, the second deposition.

15              MR. CASEY:  Thank you, Counsel.                          13:21:28

16              THE WITNESS:  Thank you, ma'am.

17    BY MS. WANG:

18    Q.  Sergeant, does that refresh your recollection that

19    Mr. Van Allen wrote to you again on October 17th, 2009?

20    A.  Yes, it does.                                                  13:21:42

21    Q.  And again he asked, I will assume we will do the same

22    fishing up in the Anthem area this afternoon unless you advise

23    to the contrary, correct?

24    A.  Yes.

25    Q.  And you responded the same day, is that right?                13:21:51
```

1    A.  Yes.

2    Q.  And you wrote, The guys will be at the Anthem substation at

3    1300 hours, correct?

4    A.  Yes.

5    Q.  And by "the guys" you meant HSU deputies?                    13:22:01

6    A.  Yes.

7    Q.  Now, by "fishing" did you take Mr. Van Allen to mean that

8    members of HSU would go out on patrol in the Anthem area?

9    A.  Yes.

10   Q.  And look for immigration law violations?                     13:22:19

11   A.  No.

12   Q.  Look for crime?

13   A.  Yes.

14   Q.  Okay.  That was not a saturation patrol, as you understand

15   the term, correct?                                              13:22:31

16   A.  Correct.

17   Q.  You didn't plan it for many weeks beforehand?

18   A.  No, that was the normal business of HSU.

19   Q.  Okay.  And that's something that HSU does often, this kind

20   of fishing?                                                     13:22:43

21   A.  We patrol known smuggling routes often, yes, for human

22   smuggling loads.

23   Q.  And what Mr. Van Allen referred to as fishing, which you

24   responded to, that's something HSU does often?

25   A.  Yes.                                                        13:22:57

1    Q.  So I want to turn now to talk about saturation patrols more

2    generally.  Sometimes HSU saturation patrols involve

3    significant MCSO resources, correct?

4    A.  Yes.

5    Q.  Lots of deputies, right?                                    13:23:11

6    A.  Yes.

7    Q.  Sometimes more than a hundred?

8    A.  I'm not privileged to the exact numbers, but it's -- could

9    be.

10   Q.  Would it surprise you if it was more than a hundred         13:23:25

11   deputies at some of these saturation patrols?

12   A.  I don't know if the number's ever been to a hundred sworn

13   deputy sheriffs, but probably close to a hundred personnel

14   between deputies and posse personnel, yes.

15   Q.  Okay.  There might be also MCSO detention officers during   13:23:37

16   these saturation patrols?

17   A.  Yes.

18   Q.  And a during these saturation patrols we're talking about,

19   is it fair to say that virtually all of HSU would be present

20   and participating?                                              13:23:50

21   A.  Yes.

22   Q.  By the way, HSU has a high propensity for overtime pay

23   among MCSO units, is that right?

24   A.  Yes.

25   Q.  Now, it wouldn't just be HSU personnel involved in these    13:24:02

1    saturation patrols, right?

2    A.   Correct.

3    Q.   There are far fewer than a hundred personnel in HSU, right?

4    A.   Yes.

5    Q.   So you'd bring in other MCSO sworn deputies?                    13:24:16

6    A.   Yes.

7    Q.   Including the tactical operations unit?

8    A.   Yes.

9    Q.   That's MCSO's SWAT team?

10   A.   Yes.                                                            13:24:27

11   Q.   They would come dressed in their SWAT uniforms?

12   A.   Yes.

13   Q.   And there would be deputies at the saturation patrols

14   sometimes wearing balaclavas?

15   A.   Yes.                                                            13:24:36

16   Q.   And there would be many, many MCSO vehicles involved in the

17   saturation patrols, correct?

18   A.   Yes.

19   Q.   The sheriff himself was often present?

20   A.   Yes.                                                            13:24:44

21   Q.   And these saturation patrols would sometimes span two or

22   three days?

23   A.   Yes.

24   Q.   Now, we talked earlier about how you learned about

25   saturation patrols.  You were told when a saturation patrol        13:24:55

1    would take place, correct?

2    A.   Yes.

3    Q.   Generally by Lieutenant Sousa?

4    A.   Yes.

5    Q.   Would anyone else above you in the chain of command tell          13:25:04

6    you about saturation patrols coming up?

7    A.   I might have had a passing conversation with Chief Sands at

8    some point, but it was a meeting in the hallway, it wasn't a

9    formal meeting.  It would be like if I just saw him going up to

10   his office for some other matter, we might talk about when the        13:25:23

11   next saturation patrol might be, but that was maybe once or

12   twice.

13   Q.   Okay.  So on occasion you learned from Chief Sands of a

14   saturation patrol?

15   A.   Correct.                                                          13:25:33

16   Q.   Let's talk about preoperation briefings.  I think we

17   previously talked about postoperation briefings.

18        There would be a preoperation briefing before every

19   saturation patrol is that right?

20   A.   Yes, ma'am.                                                       13:25:50

21   Q.   And you would be present?

22   A.   Very often, yes.

23   Q.   Sometimes you would present information?

24   A.   Yes.

25   Q.   Lieutenant Sousa also would present information?                  13:25:55

1    A.   Yes.

2    Q.   And you would tell the deputies who would participate in

3    the patrol that -- what their objective was, is that right?

4    A.   Yes.

5    Q.   And that, again, was to basically do traffic stops and look    13:26:06

6    for crime, is that right?

7    A.   Yes.

8    Q.   You did not tell deputies why the location was selected for

9    the saturation patrol, is that correct?

10   A.   I don't recall specifically disseminating that information    13:26:20

11   in a briefing, no.

12   Q.   Okay.  Well, going back to the Fountain Hills patrol that

13   we discussed earlier, you did not even know why the location

14   was chosen, is that correct?

15   A.   That's correct.    13:26:34

16   Q.   So you could not have conveyed that information to deputies

17   during the preoperation briefing?

18   A.   Correct.

19   Q.   We talked before about a postoperation briefing after the

20   Fountain Hills operation, correct?    13:26:46

21   A.   Yes.

22   Q.   And you said that you conducted that briefing with whoever

23   was left in the Fountain Hills substation after the brief --

24   after the operation?

25   A.   Yes.    13:26:54

1  Q.  You called that an informal postoperation briefing, right?

2  A.  Yes.

3  Q.  There was no formal assessment of whether that Fountain

4  Hills operation was successful, is that right?

5  A.  How I would define formal, no, I don't believe there was a    13:27:08

6  formal assessment, no.

7  Q.  So you didn't look to see whether the saturation patrol had

8  any impact on the crime rates in that area, correct?

9  A.  I would not have been the person to assess that data, no.

10  I did not do that.    13:27:25

11  Q.  Do you know whether anyone assessed any data afterwards?

12  A.  I'm not privileged to information -- if someone had or had

13  not, I don't know if anyone did.

14  Q.  So you do not know whether any postoperation assessment

15  based on crime rates was done?    13:27:38

16  A.  That's correct, I do not.

17  Q.  Sergeant, your own view, though, is that even a single

18  arrest during a saturation patrol would make it a success, is

19  that right?

20  A.  Yes.    13:27:52

21  Q.  Sergeant, during the postoperation briefing for Fountain

22  Hills did you discuss the fact with deputies who were there

23  that you had made no human smuggling arrests during that

24  operation?

25  A.  No, I did not.    13:28:07

1    Q.  And talking more generally, setting aside Fountain Hills in

2    particular, it was not the regular practice of HSU to do a

3    formal postoperation briefing after saturation patrols, is that

4    right?

5    A.  I'm sorry, specifically with my HSU personnel?                13:28:23

6    Q.  Or in general, it was not the practice of MCSO to do a

7    formal postoperation briefing after these saturation patrols?

8    A.  Correct.

9    Q.  Sergeant, you generally expected a large number of illegal

10   immigrants to be arrested during saturation patrols, isn't that  13:28:45

11   right?

12   A.  Based on previous patrols, yes.

13   Q.  And in fact, prior to one saturation patrol you wrote an

14   e-mail to someone named Virginia Collins to advise her:  We

15   expect many arrests, to include many 287(g) arrests, is that     13:29:03

16   right?

17   A.  Yes.

18   Q.  Virginia Collins is a lieutenant with MCSO, is that

19   correct?

20   A.  A lieutenant detention officer, yes, ma'am.                   13:29:12

21   Q.  She's on the detention side of MCSO, right?

22   A.  Yes.

23   Q.  And she is in charge of the 287(g) -- well, withdrawn.

24        She was in charge of the 287(g) certified MCSO

25   detention officers, correct?                                     13:29:25

```
1   A.  Yes, ma'am.

2   Q.  At the time you wrote that e-mail to her?

3   A.  Yes.

4   Q.  And at the time you wrote Ms. Collins -- or, excuse me,

5   Lieutenant Collins, you previously had already had high numbers      13:29:36

6   of 287(g) arrests during your HSU saturation patrols, right?

7   A.  Yes.

8   Q.  One of the measures of whether your saturation patrols are

9   successful is the number of illegal immigrants arrested, isn't

10  that right?                                                          13:29:50

11  A.  No, ma'am, I would not say that.

12  Q.  Sir, you wrote reports after these operations, right?

13  A.  I wrote shift summaries, yes.

14  Q.  Sorry, shift summaries.

15  A.  Yes.                                                             13:30:09

16  Q.  And you reported important information in those shift

17  summaries?

18  A.  Yes.

19  Q.  You sent them up the chain of command, right?

20          Is that a yes?                                               13:30:15

21  A.  Yes.

22  Q.  And you wanted to include what was important in reporting

23  to your commanding officers about the saturation patrols,

24  right?

25  A.  I reported what was asked of me to report, yes.                  13:30:26
```

1          MS. WANG:  Can we please show Exhibit 108, which is

2     already in evidence?

3          THE COURT:  You may.

4          MS. WANG:  I want to go to the second page, which

5     we've seen already.                                              13:30:45

6          Let's highlight the first sen -- paragraph.

7     BY MS. WANG:

8     Q.  Sergeant, you report in this first paragraph how many

9     people you arrested for 287(g), correct?

10    A.  Yes.                                                         13:31:02

11    Q.  You also noted that the one person who was arrested on an

12    outstanding felony warrant was in the United States illegally,

13    right?

14    A.  Yes.

15    Q.  And as you go on to the next paragraph and outline the     13:31:11

16    individual traffic stops, again, you note everywhere you had an

17    illegal immigrant, isn't that right?

18    A.  Yes.

19    Q.  And that was true with the last page of this exhibit where

20    you did a shift summary for the second day of the patrol, isn't  13:31:31

21    that right?

22    A.  Yes.

23    Q.  So isn't it fair to say that you prominently noted the

24    number of illegal immigrants arrested during a saturation

25    patrol in your shift summary?                                   13:31:43

1    A.   Yes.

2    Q.   And you reported that to your chain of command?

3    A.   Yes.

4           MS. WANG:  I'd like also now, Your Honor, to show

5    Exhibit 168, which is also already in evidence.                    13:31:56

6           THE COURT:  You may.

7           MS. WANG:  And let's turn to -- let's turn to page

8    MCSO 057010, please.

9    BY MS. WANG:

10   Q.   And let's take a look at this page.  This is an e-mail that   13:32:20

11   you sent, correct?

12   A.   Yes, the highlighted box, yes, ma'am.

13   Q.   And this was your shift summary for a crime suppression

14   patrol on July 23rd and July 24th of 2009, is that correct?

15   A.   Yes, ma'am.                                                    13:32:39

16   Q.   This was a saturation patrol in the southeast valley,

17   right?

18   A.   Yes, ma'am.

19   Q.   And down below where it says Friday's patrol you list the

20   salient facts about this saturation patrol, correct?               13:32:49

21   A.   Yes, ma'am.

22   Q.   The first thing you say is that there were a total of 27

23   suspects taken into custody, correct?

24   A.   Yes.

25   Q.   And the next thing you list is of the 27 suspects, six were   13:32:58

692

```
 1   illegally in the country, 287(g), correct?

 2   A.  Yes.

 3   Q.  Let's turn to the next page.  This looks like the -- the

 4   exhibit got cut off a little bit between page 057010 and

 5   057011, but the first sentence -- or the first line on the        13:33:25

 6   second page we have up here has a sentence fragment that says:

 7   Suspects arrested with warrants, none were illegal alien.

 8            Do you see that?

 9   A.  Yes, ma'am.

10   Q.  And so is it fair to say that here, though we don't see the   13:33:38

11   beginning of the sentence, you're reporting how many suspects

12   who were arrested on outstanding warrants were illegal aliens,

13   is that correct?

14   A.  Yes.

15   Q.  So, sir, in your shift summaries you, as you testified a      13:33:52

16   moment ago, highlighted very prominently how many illegal

17   immigrants were arrested during the saturation patrol, correct?

18   A.  Yes.

19   Q.  That's true for this southeast valley operation, right?

20   A.  Yes.                                                          13:34:09

21   Q.  Was true in the Fountain Hills operation as well, right?

22   A.  Yes.

23   Q.  And that was consistent with all of the shift summaries

24   that you wrote for these operations, correct?

25   A.  Yes.                                                          13:34:17
```

1    Q.  Is it still your testimony -- let me ask you again, is it

2    still your testimony that the number of illegal immigrants

3    arrested was not a measure of success for these HSU operations?

4    A.  It was not a measure of success to me.

5    Q.  Okay.  But to someone else it might have been?                    13:34:31

6    A.  I don't know who that was, ma'am.  I was instructed what to

7    put in my shift summaries, what numbers were relevant.

8    Q.  By your chain of command?

9    A.  Correct.

10   Q.  And so it was important to your chain of command the          13:34:43

11   number of illegal immigrants arrested?

12   A.  I can assume so.

13   Q.  Sir, in fact, HSU did arrest large numbers of people who

14   were undocumented immigrants during saturation patrols, is that

15   right?                                                                13:34:54

16   A.  Yes.

17   Q.  Sergeant, at some point in time HSU adopted something

18   called a zero tolerance policy for saturation patrols, is that

19   right?

20   A.  Yes.                                                              13:35:11

21   Q.  It was about mid-2008, correct?

22   A.  I don't recall the exact date, but it was shortly after I

23   arrived in the unit, so that's probably true, yes.

24   Q.  Okay.  That was before the Fountain Hills saturation patrol

25   we were discussing?                                                   13:35:23

1    A.  Yes.

2    Q.  And after this zero tolerance policy was implemented, it

3    meant that if a deputy observed any violation of law during a

4    saturation patrol they were required to make a stop, is that

5    right?                                                          13:35:35

6    A.  Yes.

7    Q.  They didn't have their ordinary discretion to let someone

8    go if they felt it was a minor violation, correct?

9    A.  Yes.

10   Q.  So even a very minor traffic violation would trigger a stop  13:35:48

11   under the zero tolerance policy, correct?

12   A.  Yes.

13   Q.  Sir, the zero tolerance policy was adopted for HSU

14   saturation patrols to avoid having the race card played, isn't

15   that right?                                                     13:36:06

16   A.  That would be a fair assessment, yes.

17   Q.  Meaning there were lots of public criticisms that MCSO was

18   engaging in racial profiling at that time it was instituted,

19   right?

20   A.  Yes.                                                        13:36:18

21   Q.  And MCSO wanted to avoid those criticisms?

22   A.  Yes.

23   Q.  And according to you, when the zero tolerance policy is in

24   place, you know that your deputies are not racially profiling

25   during saturation patrols?                                     13:36:35

1    A.  Yes.

2    Q.  Because of the zero tolerance policy?

3    A.  In part, yes.

4    Q.  And the other part is that you trust your deputies?

5    A.  In part, yes.                                            13:36:47

6    Q.  And that you tell people that racial profiling is

7    prohibited?

8    A.  In part, yes.

9    Q.  Sergeant, deputies are permitted to pull a suspected

10   smuggling vehicle over if they have probable cause to believe a   13:37:01

11   traffic violation has been committed, right?

12   A.  Yes.

13   Q.  And that's true even if they just have a hunch that this is

14   a smuggling load, right?

15   A.  A hunch absent indicators, no, but a hunch with indicators,   13:37:17

16   yes.

17   Q.  Sorry, the -- the premise of my question was that they have

18   the probable cause that a traffic violation has been committed.

19   A.  Yes.

20   Q.  Once you have probable cause that there's a traffic        13:37:30

21   violation, you could pull a vehicle over, right?

22   A.  Yes.  Actually, you only need reasonable suspicion for a

23   traffic infraction for civil violations, but yes.

24   Q.  I apologize, you're right.

25              So when a deputy has reasonable suspicion of a traffic   13:37:53

1   violation, he can go ahead and pull that vehicle over, right?

2   A.  Yes.

3   Q.  He might have a hunch that it might be a human smuggling

4   load, but he doesn't need that.  He already has the probable

5   cause or reasonable suspicion on the traffic violation, right?          13:38:09

6   A.  Yes.

7   Q.  If a deputy has a hunch that he's got a human smuggling

8   vehicle but he doesn't have articulable suspicion that it is a

9   human smuggling vehicle, he can follow that car until he

10  develops probable cause of a traffic violation, right?                  13:38:27

11  A.  Until he develops reasonable suspicion for the violation,

12  yes, ma'am, that's correct.

13  Q.  Of the traffic violation, right?

14  A.  Yes.

15  Q.  Now, you've been on patrol, right, as an MCSO sworn deputy?         13:38:38

16  A.  Yes, ma'am.

17  Q.  And in your experience, if you follow any vehicle on the

18  roads of this county for even a short amount of time, you will

19  be able to pull that person over for some kind of violation,

20  isn't that right?                                                        13:38:51

21  A.  My opinion is yes.

22  Q.  And once you see that traffic violation you can stop the

23  vehicle?

24  A.  Yes.

25  Q.  And if you had a hunch all along that it was a smuggling            13:39:02

1    load, you can investigate that hunch during the traffic stop?

2    A.  Yes.

3    Q.  And during that stop you might develop reasonable suspicion

4    that a person in the car is an undocumented immigrant, isn't

5    that right?                                                          13:39:17

6    A.  Yes.

7    Q.  Even if it's not a smuggling load?

8    A.  Yes.

9    Q.  Sir, you're familiar with the 287(g) agreement that MCSO

10   once had?                                                            13:39:35

11   A.  Yes.

12   Q.  That's the task force agreement, to be clear.

13   A.  Yes.

14   Q.  That was terminated by DHS in about October of 2009?

15   A.  Yes.                                                             13:39:46

16   Q.  Now, I want to ask you a question about when that 287(g)

17   task force agreement was still in place.  Okay?

18   A.  Okay.

19   Q.  When it was in place, if a non-287(g) deputy pulled over a

20   car and suspected that someone might be an undocumented              13:40:00

21   immigrant in it, he would have to call a 287(g) certified

22   deputy over to check that out, isn't that right?

23   A.  Yes.

24   Q.  The non-287(g) deputy could not do that investigation him-

25   or herself, correct?                                                 13:40:18

A.  Correct.

Q.  He'd have to wait for the 287(g) certified deputy to arrive

on the scene?

A.  Correct.

Q.  Now, after the 287(g) agreement was terminated by DHS there    13:40:23

was no 287(g) deputy to call upon, correct?

A.  Correct.

Q.  So since the termination of that agreement, any MCSO deputy

who finds himself with a person who might be an undocumented

immigrant now has to wait for an ICE agent to come, correct?    13:40:45

A.  Has to wait for contact with an ICE agent, correct.

Q.  Okay.  Sergeant Palmer, you're knowledgeable about the laws

pertaining to immigration in this country, correct?

A.  I have a fairly working -- good working knowledge, I would

think so, yes.    13:41:03

Q.  You keep up with developments in the case law in

immigration?

A.  Yes, I try to.

Q.  Do you still do that since your transfer out of HSU?

A.  Yes, I do.    13:41:12

Q.  Can I ask you what -- where are you now within MCSO?

A.  Civil process division.

Q.  Okay.  Sir, during your second deposition in this case in

2010 you testified about the impact of the termination of the

287(g) agreement.    13:41:28

1           Do you remember that?

2    A.  Yes.

3    Q.  And your view was that MCSO deputies still had inherent

4    authority with respect to immigration enforcement, despite the

5    termination of the 287(g) agreement, is that right?                    13:41:41

6    A.  In accordance with the training from Kris Kobach that was

7    received by the office, yes, ma'am, that's correct.

8    Q.  So at the time of your second deposition in this case you

9    believed that even without 287(g) authority, an MCSO deputy

10   would have the inherent authority to make reasonable detentions    13:42:00

11   of individuals for whom he has reasonable suspicion to believe

12   is in fact an illegal alien in the United States, is that

13   correct?

14   A.  Yes.

15   Q.  And at the time of your second deposition that was an          13:42:12

16   accurate statement of MCSO policy, is that right?

17   A.  Yes.

18   Q.  Sir, is that still the law today?

19   A.  No.

20   Q.  Okay.  And is that because of this Court's order in            13:42:23

21   December of last year?

22   A.  Yes, in part, and also I believe that there was a ruling at

23   some level that what Kris Kobach was teaching was actually a

24   civil violation, not a criminal violation.

25   Q.  Okay.  So you're talking about this training that someone      13:42:39

```
 1    named Kris Kobach put together for MCSO, is that -- is that
 2    right?
 3    A.  Yes, ma'am.
 4    Q.  Mr. Kobach's training reflected the inherent authority
 5    principle that we were just discussing, is that right?          13:42:58
 6    A.  Yes.
 7    Q.  The same principle that you testified to in your deposition
 8    in 2010?
 9    A.  Yes.
10    Q.  And his training reflected that same principle, is that     13:43:04
11    right?
12    A.  Yes.
13    Q.  And that training was given to all MCSO deputies?
14    A.  Yes.
15    Q.  And that was a video that deputies would access on MCSO's   13:43:12
16    website-based training system?
17    A.  Yes.
18    Q.  Sir, at the time prior to this change in the law that we're
19    talking about, when an MCSO deputy pulled someone over, he
20    could develop reasonable suspicion that someone in the car was  13:43:32
21    an undocumented immigrant under this inherent authority
22    doctrine, is that right?
23    A.  Yes.
24    Q.  And you testified that being in the United States illegally
25    is a federal crime?                                             13:43:46
```

1    A.  I may have then, yes.

2    Q.  You know that's not true any more?

3    A.  That's true, that's correct.

4    Q.  But at the time you told people in your chain of command

5    that being in the United States illegally was a federal crime?        13:43:57

6    A.  Yes.

7    Q.  And you told deputies under your supervision that being in

8    the United States illegally is a federal crime?

9    A.  For the two weeks before I was corrected on it by my chain

10   of command, yes.        13:44:13

11   Q.  Okay.  That was sometime in 2009?

12   A.  Yes.

13   Q.  And you previously testified that overstaying a visa also

14   is a federal crime, correct?

15   A.  That was my understanding, yes.        13:44:25

16   Q.  And you now know that was incorrect?

17   A.  That's correct.

18   Q.  Sir, at the time that MCSO's task force 287(g) agreement

19   was terminated, there was a period in which MCSO deputies were

20   told to call you or Sergeant Madrid if they encountered someone        13:44:46

21   suspected of being an illegal immigrant, is that right?

22   A.  Yes, ma'am.

23   Q.  After the termination of the 287(g) agreement, that deputy

24   would have to call ICE, is that right?

25   A.  Yes, ma'am.        13:45:01

1    Q.  That's still the case today, right?

2    A.  Yes.

3    Q.  Sir, Chief Sands asked you to do some research on

4    immigration law, is that correct?

5    A.  Yes.                                                    13:45:18

6    Q.  And you sent him some of your legal research on inherent

7    authority, as we just discussed?

8    A.  Yes.

9           MS. WANG:  I'd like to show Exhibit 269, which is

10   already in evidence.  Your Honor, is that okay?            13:45:33

11          THE COURT:  Yes.

12          MS. WANG:  And let's highlight the first e-mail on

13   this page.

14          Sorry, I meant the -- the lower one.

15   BY MS. WANG:                                                13:45:50

16   Q.  So this is an e-mail you sent to Chief Sands on July 15,

17   2009, correct?

18   A.  Yes.

19   Q.  And you said:  Hey chief, here is the info you're looking

20   for.  That's because he had asked you to do some research --  13:46:06

21   A.  Yes.

22   Q.  -- on the authority of local officers to enforce

23   immigration law?

24   A.  Yes.

25   Q.  And you have a citation here to Section 8,               13:46:12

1    U.S.C. 1324(a)(1)(A)(iv)(b)(iii).

2            See that?

3    A.  Yes.

4    Q.  And let's highlight in the second paragraph about halfway

5    down there's a sentence that starts, Immigration officers and    13:46:35

6    local law enforcement officers.

7            Do you see that?

8    A.  Yes.

9    Q.  You wrote -- well, actually, did you write this or did you

10   just pull this off of the Internet?    13:46:49

11   A.  My recollection is that I cut and paste.

12   Q.  Okay.  So you cut and pasted this language from a website

13   and conveyed it to Chief Sands?

14   A.  Yes.

15   Q.  Okay.  And this said:  Immigration officers and local law    13:46:59

16   enforcement officers may detain an individual for a brief

17   warrantless interrogation where circumstances create a

18   reasonable suspicion that the individual is illegally present

19   in the U.S.  Specific facts constituting a reasonable suspicion

20   include evasive, nervous, or erratic behavior, dress or speech    13:47:17

21   indicating foreign citizenship, and presence in an area known

22   to contain a concentration of illegal aliens, correct?

23   A.  Yes.

24   Q.  And you conveyed this to Chief Sands?

25   A.  Yes.    13:47:31

1    Q.  Sir, the date on this e-mail is July 15, 2009.

2            You see that?

3    A.  Yes.

4    Q.  That was about a week before HSU did a saturation patrol in

5    Chandler and southeast valley, isn't that right?                13:47:45

6    A.  Looking back at the dates there, you know, but yes, I

7    believe so.

8    Q.  Okay.  You don't need to see a document to --

9    A.  No, I believe you're right.

10   Q.  Okay.  Now, I want to call your attention -- let's take the   13:48:04

11   highlighting off that middle sentence.  The next sentence says:

12   Hispanic appearance -- oops.

13           The next sentence said:  Hispanic appearance alone is

14   not sufficient.

15           You see that?                                             13:48:26

16   A.  Yes, ma'am.

17   Q.  But it was your understanding that Hispanic appearance, if

18   combined with other factors, could be sufficient to establish

19   reasonable suspicion of illegal presence in the United States,

20   isn't that right?                                                 13:48:36

21   A.  My understanding --

22   Q.  That's right.

23   A.  -- Hispanic appearance?  No.

24   Q.  Your understanding was not that Hispanic appearance

25   combined with other factors could be sufficient under the law?   13:48:49

```
 1   A.  No.

 2   Q.  Okay.  We'll come back to that later.

 3          Now, you later found out -- let's take this

 4   highlighting down.

 5          You later found out that there is no such federal      13:49:01

 6   statute as 8 U.S.C. 1324(a)(1)(A)(iv)(b)(iii), is that right?

 7   A.  Yes.

 8   Q.  You pulled the information from some website and gave it to

 9   Chief Sands, right?

10   A.  Yes.                                                      13:49:16

11   Q.  You did not check Title 8 of the United States Code to

12   verify the information before sending it on to Chief Sands?

13   A.  I assumed that they would have our attorneys do that.

14   Q.  So you gave the information to Joe -- Chief Sands?

15   A.  Yes.                                                      13:49:31

16   Q.  Also to Joe Sousa, correct?

17   A.  Yes.

18   Q.  And in fact, at some point after that the sheriff actually

19   mentioned this supposed statute in public, isn't that right?

20   A.  Yes.                                                      13:49:43

21          MS. WANG:  I'm going to now ask that we show

22   Exhibit 467.  This evidence is not in evidence yet.

23          THE COURT:  You may show it to the witness.

24          MS. WANG:  Okay.  Why don't we highlight, but -- oh,

25   sorry.  I thought I would have it, too.  Let me get there.     13:50:15
```

```
 1              THE COURT:  You can have it.  I can have it.  The
 2    witness can have it.
 3              MR. CASEY:  What?  I'm sorry --
 4              THE COURT:  Everybody else can have it.
 5              MR. CASEY:  -- what was the exhibit number?        13:50:24
 6              MS. WANG:  467.
 7              THE COURT:  Kathleen, I can see it.  The witness can
 8    see it.  You can show counsel table.
 9              MR. CASEY:  It's not showing up on defense counsel's
10    table.                                                       13:50:33
11              THE COURT:  Is it not electronically loaded?
12              THE WITNESS:  It's not on here.
13              MS. WANG:  I have copies.  Not to worry.
14              THE COURT:  Okay.  Well, I'm not going to allow you to
15    publish it.                                                  13:50:43
16              MR. CASEY:  It's up now.
17              MS. WANG:  Okay.
18              THE COURT:  You're going to need to wait a minute
19    because we can control who gets it.
20              MR. CASEY:  Excuse me, Your Honor.  Just may I make an  13:50:57
21    inquiry whether this is an impeachment exhibit?  It's not
22    pulling up on my list of exhibits for the plaintiffs.
23              THE COURT:  Is this an impeachment exhibit?
24              MS. WANG:  It was identified to the Court previously
25    as an impeachment exhibit, yes.                              13:51:09
```

```
 1              THE COURT:  All right.

 2              (Off-the-record discussion between the Court and the

 3    clerk.)

 4              THE COURT:  Okay.  This is -- this is, then, an

 5    unnumbered impeachment exhibit, 'cause we're going to give it      13:51:20

 6    the next consecutive number, assuming that it's admitted, but

 7    as -- as it stands right now, you can refer to it however you

 8    want to designate it in the record, but I'm -- we're not

 9    assigning it a number yet.

10              MS. WANG:  Thank you, Your Honor.  This was previously    13:51:34

11    marked for identification by plaintiffs as PX 467.

12    BY MS. WANG:

13    Q.  Sergeant Palmer, do you see -- let's highlight the top up

14    until the -- where it says section 1324.

15              Sergeant Palmer, is this an e-mail that you sent to       13:51:53

16    Lieutenant Sousa and others on October 14th, 2009?

17    A.  Yes.

18    Q.  And again, this -- this e-mail has some material that you

19    pulled from websites, is that right?

20    A.  Yes.                                                           13:52:10

21    Q.  But it also has information that you wrote yourself,

22    correct?

23    A.  Yes.

24    Q.  Where it says Palmer and then a colon, those were your

25    annotations on the material from websites, is that right?          13:52:22
```

1   A.  Yes.

2   Q.  And on the first part you wrote:  My interpretation is that

3   state and local LEO --

4         That stands for "law enforcement officer," correct?

5   A.  Yes.                                                    13:52:39

6   Q.  -- fall under "other officers," is that correct?

7   A.  Yes.

8   Q.  And other officers is in quotations.  Is that because you

9   found that language appearing in this supposed federal statute?

10  A.  I don't recall, but likely, yes.                        13:52:51

11  Q.  Okay.  And then you continue on:  A person we as local

12  officers lawfully encounter in the course of duty who gives off

13  indicators, as stated in U.S.C. and the INA, that lead us to

14  reasonably believe the person is an illegal alien then and must

15  lead to the reasonable suspicion that the person may be guilty   13:53:08

16  of a federal crime because all violations of the INA are

17  federal criminal violations.

18         Do you see that?

19  A.  Yes.

20  Q.  And again, that was incorrect?                          13:53:21

21  A.  Yes.

22  Q.  So this e-mail was sent in October of 2009, correct?

23  A.  Yes.

24  Q.  And the previous one was sent in July of 2009, isn't that

25  right?                                                       13:53:45

```
 1    A.  Yes.
 2            MS. WANG:  Can you show the last exhibit, please.  I
 3    believe that was -- there we go.  No.  That was 169.
 4            THE COURT:  I believe it was 269.
 5            MS. WANG:  Oh, sorry, Your Honor.  269.          13:54:08
 6    BY MS. WANG:
 7    Q.  So to be clear, you sent the first e-mail about this
 8    purported federal statute to Chief Sands and Lieutenant Sousa
 9    July 17, 2009, is that correct?
10    A.  Yes.                                                13:54:29
11    Q.  And then the second one in October of 2009, right?
12    A.  Yes.
13    Q.  I think you testified a few minutes ago that you had this
14    mistaken understanding of the federal law for only a couple of
15    weeks?                                                  13:54:42
16    A.  In reference to the specific long string that you
17    identified, yes, of the U.S. code.
18    Q.  Okay.  But you -- by October of 2009 you still believed --
19            MS. WANG:  And can we highlight the -- the top of this
20    exhibit again?                                          13:54:59
21    BY MS. WANG:
22    Q.  By October of 2009 you still believed that a local
23    officer who had reasonable belief that a person is an illegal
24    alien is guilty of a federal crime?
25    A.  I apologize, ma'am.  Yes, I do believe -- at that time I  13:55:15
```

1    believed they were guilty of a federal crime.

2            What I -- I misspoke earlier.  The long string that

3    you identified in the U.S. code, I know that's an inaccurate

4    string, doesn't exist.  That part of the U.S. code does not

5    exist.                                                    13:55:33

6    Q.  Okay.  And so by October of 2009, to be clear, you still

7    believed that MCSO officers, as local law enforcement officers,

8    could arrest people based on reasonable -- sorry, could detain

9    people based on reasonable suspicion that they were illegal

10   aliens?                                                   13:55:49

11   A.  Yes.

12           MS. WANG:  Your Honor, I would move this exhibit, what

13   we marked for identification as Plaintiffs' Exhibit 467, into

14   evidence.

15           (Off-the-record discussion between the clerk and the   13:56:02

16   Court.)

17           THE COURT:  If we admit it, that's what it will be.

18           Any objection?

19           MR. CASEY:  Yes, Your Honor.  It's impeachment.  It's

20   not been marked as a formal exhibit or disclosed for those   13:56:13

21   purpose.  It's been used for impeachment.  It doesn't come in

22   substantively, Your Honor.

23           THE COURT:  Well, I -- I agree that it -- it is only

24   going to come in for impeachment, but I am going to admit it

25   for purposes of impeachment only.                          13:56:29

```
 1              And the exhibit number, just so we're all clear, is

 2     going to be Exhibit No. 452.

 3              (Exhibit No. 452 is admitted into evidence.)

 4              MS. WANG:  Thank you, Your Honor.

 5     BY MS. WANG:                                                    13:56:58

 6     Q.  Sergeant Palmer, deputies in HSU who were under your

 7     supervision also learned of your mistaken interpretations of

 8     federal law as expressed in these e-mails, correct?

 9     A.  Yes.

10     Q.  In fact, at least one deputy forwarded on the information  13:57:12

11     in what's now been marked Exhibit 452 to others, is that

12     correct?

13     A.  I don't know.  I don't see that, ma'am.

14     Q.  Okay.

15     A.  If you could show me where you're looking.                 13:57:23

16     Q.  Sure.  What I'd like to show you is actually a different

17     exhibit.

18              MS. WANG:  Again, this is to refresh recollection

19     with permission, Your Honor.  This has previously been marked

20     for identification as Plaintiffs' Exhibit 469.  I have a copy  13:57:34

21     for Mr. Casey.

22              THE COURT:  You can give Mr. Casey a copy.

23              Mr. Casey?

24              MR. CASEY:  Yes, sir?

25              THE COURT:  You can also approach the witness with it. 13:57:50
```

1            MS. WANG:  Thank you, Your Honor.

2            MR. CASEY:  Thank you, ma'am.

3            THE COURT:  But right now it's not being introduced.

4            (Pause in proceedings.)

5            MS. WANG:  Your Honor, may I inquire of the witness?          13:58:45

6            THE COURT:  You may.

7            Have you had a chance to review the document?

8            THE WITNESS:  May I take a few more minutes, Your

9   Honor?

10           THE COURT:  You may.                                          13:58:52

11           THE WITNESS:  Thank you.

12           MR. CASEY:  Your Honor?  So we can expedite this

13  matter, so I don't interrupt Ms. Wang's tes -- her questions,

14  she hasn't offered it yet, but we will object to the

15  admissibility.                                                        13:59:09

16           THE COURT:  Well, I understand it's not been offered.

17  It's only been -- it's only been shown to him to refresh his

18  recollection.

19           MR. CASEY:  Okay.  I was just going to make a record

20  while we had a pause.  Excuse me for jumping the gun.                 13:59:19

21           THE COURT:  Your record is you object for?

22           MR. CASEY:  My record is we object on that it's being

23  offered for recollection, presumably for impeachment.  It's an

24  improper exhibit --

25           THE COURT:  Well, until it's offered for impeachment,        13:59:30

```
 1    we won't worry about it.
 2            MR. CASEY:  All right.  Thank you, Your Honor.
 3            MS. WANG:  Your Honor, I could have shortcutted that
 4    and said that I don't plan to move this into evidence.
 5            THE COURT:  All right.
 6            MS. WANG:  I merely want to refresh the witness's
 7    recollection.
 8            Also, for the record, just to identify this document,
 9    what was marked for identification as Plaintiffs' Exhibit 469
10    spans MCSO 078815 through 18 of the documents produced by MCSO
11    in this case.
12            THE COURT:  All right.  Well, just -- just so that we
13    can be clear, as long as we're talking about the record, what
14    you have identified it doesn't mean it's been marked for
15    identification that way.
16            MS. WANG:  Correct, Your Honor.  I want it just so
17    that we know what it was, since I don't I don't plan to move it
18    into evidence.
19            THE COURT:  Do you plan to mark it for identification?
20            MS. WANG:  Yes, I would like to do that.
21            THE COURT:  All right.  And so if you're going to mark
22    it for identification, it's going to be marked for
23    identification as Exhibit 453.
24            MS. WANG:  Thank you, Your Honor.
25    BY MS. WANG:
```

13:59:39

14:00:07

14:00:25

14:00:36

14:00:47

1    Q.   Sergeant, have you had a chance to review what's been

2    marked for identification as Exhibit 453?

3    A.   Yes, ma'am.

4    Q.   Does that refresh your recollection that at least one HSU

5    deputy forwarded on the information in Exhibit 452 to others?          14:00:58

6    A.   He forwarded it to the Maricopa County Attorney for review,

7    yes, ma'am.

8    Q.   Thank you, sir.

9          Sergeant, you were at one time certified under the

10   287(g) program, correct?                                              14:01:20

11   A.   Yes, I was.

12   Q.   And you went through ICE training in order to become

13   certified?

14   A.   Yes.

15   Q.   Now, a few minutes ago you testified that your                   14:01:27

16   understanding of the law is that Hispanic appearance alone

17   cannot be one factor among others in deciding whom to stop

18   based on suspicion of illegal presence in the United States.

19          Was that your testimony?

20   A.   That's my personal opinion, yes.                                 14:01:46

21   Q.   I'm sorry, I didn't ask you for your personal opinion; I

22   asked you was that your understanding of the law.

23          That was your testimony a few minutes ago?

24   A.   Yes.

25   Q.   You went through ICE training for the 287(g) program,            14:01:54

1    correct?

2    A.  Yes.

3    Q.  Wasn't it your understanding, based on that ICE training,

4    that race could be one factor among others in determining whom

5    to stop based on suspicion of illegal presence in the United        14:02:08

6    States?

7    A.  Based on training received from Immigration and Customs

8    Enforcement, yes.  Not Hispanic appearance, race.

9    Q.  So your understanding based on the ICE training was that

10   Mexican ancestry can be one, among other factors, to justify       14:02:25

11   stopping an individual based on suspicion of illegal presence

12   in the United States, correct?

13   A.  Per ICE training, yes.

14   Q.  And that was not your understanding of MCSO's practice,

15   correct?                                                            14:02:44

16   A.  Correct.

17   Q.  According to you, it is not HSU's practice to use race or

18   ethnicity in deciding whether to stop a vehicle, is that right?

19   A.  Correct.

20   Q.  But once a vehicle is already stopped based on probable         14:02:56

21   cause of a traffic violation, it is MCSO policy that race or

22   ethnicity can be one factor among others in initiating an

23   investigation into immigration status, isn't that right?

24   A.  No.

25   Q.  Was that true at the time of your first deposition in this      14:03:17

1    case?

2    A.  I believe so, yes.

3    Q.  So at the time you first were deposed in this case in 2009,

4    skin color or ethnicity could be a factor in deciding when to

5    begin an investigation into immigration status, correct?    14:03:34

6    A.  I'm sorry, ma'am.  We've never used race to start or stop

7    an investigation.

8    Q.  Sir, I'd like to show you the transcript from your first

9    deposition at page 20.  Let's highlight lines 17 through 24.

10             You were asked:  "Can skin color or ethnicity be a    14:04:01

11   factor in whether you begin an investigation?

12             "ANSWER:  To begin an investigation?

13             "QUESTION:  Yes.

14             "ANSWER:  Yes.

15             "QUESTION:  And you're differentiating that it cannot    14:04:12

16   be a factor in your decision to stop?

17             "ANSWER:  Correct."

18             That was your sworn deposition testimony, correct?

19   A.  Yes, that's correct.

20   Q.  So MCSO policy made a distinction about the use of race in    14:04:26

21   deciding whether to initiate a stop versus deciding whether to

22   initiate an immigration investigation, correct?

23   A.  Yes.

24   Q.  You can't stop someone based on race as one factor among

25   many, correct?    14:04:46

1    A.   Correct.

2    Q.   But you could decide to initiate an investigation during a

3    stop based on race or ethnicity, among other factors, correct?

4    A.   Among several factors, yes, ma'am.

5    Q.   Sir, in the course of your duties as a sergeant commanding        14:04:57

6    the Human Smuggling Unit you reviewed field reports by

7    deputies, correct?

8    A.   Yes.

9    Q.   And you've reviewed reports in which MCSO deputies reported

10   that they did consider race or ethnicity as one factor among         14:05:13

11   others in forming reasonable suspicion that they were dealing

12   with a human smuggling load, correct?

13   A.   Yes.

14   Q.   Sir, have you ever told a deputy that it's not proper to

15   consider Hispanic descent as one factor among others in              14:05:29

16   deciding whether to initiate an investigation into human

17   smuggling?

18   A.   No, I haven't.

19   Q.   Sir, I want to show you what's been marked as Exhibit 162.

20        MS. WANG:  This is not in evidence and there is a               14:05:56

21   pending objection to it.  And let's just highlight the top so

22   that the sergeant can see it.

23   BY MS. WANG:

24   Q.   Sir, is this an incident report on an MCSO form?

25   A.   Yes.                                                            14:06:13

1    Q.  And the reporting officer is listed as E.A. Quintero, is

2    that right?

3    A.  Yes.

4    Q.  Deputy Quintero is in the Human Smuggling Unit, right?

5    A.  Yes.                                                          14:06:24

6    Q.  You know him?

7    A.  Yes.

8    Q.  And he is assigned to the Human Smuggling Unit?

9    A.  Yes.

10   Q.  You were present at this particular incident, isn't that     14:06:30

11   right?

12   A.  I believe I testified in my deposition that I was, yes.

13   Q.  Okay.  Let's turn -- okay.  That's fine.

14          And let's turn to page 38089.

15          So on this page it's titled Narrative.  This is like a    14:06:59

16   narrative supplement to the incident report, correct?

17   A.  Yes.

18   Q.  And up at the top it shows that you were on the scene,

19   correct?

20   A.  Yes, it does.                                                 14:07:11

21   Q.  And this referred to a stop at -- on U.S. 93 at milepost

22   198 on April 15, 2008, is that right?

23   A.  Yes.

24   Q.  Okay.  Now, let's highlight the second paragraph on this

25   page.  Here Deputy Quintero is describing how he made this       14:07:33

1    traffic stop, right?

2    A.  Yes.

3    Q.  And he's basically describing that at this particular point

4    on the highway there are two lanes that merge into one,

5    correct?                                                          14:07:52

6    A.  Yes.

7    Q.  And he pulled over this vehicle because the driver failed

8    to turn on the turn blinker in merging from one lane into the

9    next, correct?

10   A.  Yes.                                                          14:08:03

11   Q.  That's a forced lane change, right, because the road's

12   merging?

13   A.  Yes.

14   Q.  And going on to the next paragraph, the next one, he calls

15   this an unsafe lane change?                                       14:08:27

16   A.  Yes.

17   Q.  That was his probable cause to make the stop?

18   A.  Yes, it appears so.

19   Q.  Okay.  Let's turn to the next page.  In the first

20   paragraph, Deputy Quintero notes that he contacted the driver    14:08:47

21   of the vehicle, is that right?

22   A.  Yes, ma'am.

23   Q.  And the driver spoke only Spanish?

24   A.  Yes.

25   Q.  And then looking at the next paragraph, basically Deputy     14:08:54

1    Quintero explains why he thought this was a human smuggling

2    load, right?

3    A.   Yes.

4    Q.   There were a lot of people in that vehicle, right?

5    A.   Yes.                                                          14:09:11

6    Q.   And people were lying down on the floorboard, et cetera?

7    A.   Yes.

8    Q.   Those are pretty good signs it's a human smuggling load,

9    right?

10   A.   Among others, yes.                                           14:09:21

11   Q.   Okay.  Let's go to the next paragraph.

12        Let's focus on the last sentence.  Deputy Quintero

13   writes:  The Hispanic descent of the occupants within the

14   vehicle, their inability to speak the English language, the

15   pungent body odor, and lack of luggage for traveling also        14:09:40

16   raised my suspicions.

17        See that?

18   A.   Yes.

19   Q.   He's saying that Hispanic descent was one of the factors

20   among others that led him to think this was a human smuggling    14:09:50

21   load?

22   A.   Yes.

23   Q.   As well as the inability to speak English, is that right?

24   A.   Yes.

25   Q.   According to you, that's perfectly legitimate?              14:09:57

A.  Among the other indicators listed there I don't see an
issue with that, no.

Q.  Sir, when a deputy provides a field report that states that
he took some action inconsistent with MCSO policy, a
supervising sergeant should take corrective action, isn't that
right?

14:10:22

A.  Yes.

Q.  If a deputy reports that he took some action that's
contrary to law, a supervising sergeant should take corrective
action?

14:10:33

A.  Yes.

Q.  So according to this document -- withdrawn.

        An MCSO deputy may form reasonable suspicion that a
person is in the United States illegally, based in part on race
or ethnicity, in addition to other factors?

14:10:53

A.  In the United States illegally, no.

Q.  But that it's a human smuggling load?

A.  Yes.

Q.  Sir, an MCSO deputy can develop reasonable suspicion based
on the fact that -- withdrawn.

14:11:12

        An MCSO deputy may form reasonable suspicion that a
person is an undocumented immigrant if the person's manner of
dress indicates that he has recently arrived from Mexico?

A.  Yes.

Q.  Speaking Spanish only, not being able to speak English, is

14:11:29

```
 1    also a factor that can lead an MCSO deputy to trigger an

 2    investigation of human smuggling?

 3    A.  Among others, yes.

 4    Q.  Speaking little or no English is one of those factors?

 5    A.  Among others, yes, ma'am.                              14:11:51

 6    Q.  Speaking broken English can give rise to reasonable

 7    suspicion that someone is in the country illegally?

 8    A.  Yes, ma'am.

 9    Q.  And appearing to have recently arrived from Mexico is

10    another one of the factors that can trigger an investigation  14:12:04

11    into immigration violations?

12    A.  Yes.

13          MS. WANG:  Okay.  Let's take that down.

14    BY MS. WANG:

15    Q.  Sir, as a sergeant in the Human Smuggling Unit, one of your  14:12:17

16    responsibilities was to supervise deputies under your command,

17    right?

18    A.  Yes.

19    Q.  You need to make sure that deputies are acting in

20    compliance with MCSO policy?                               14:12:28

21    A.  Yes.

22    Q.  You need to make sure they're complying with the law?

23    A.  Yes.

24    Q.  Now, deputies in HSU, when you were a sergeant there, were

25    not required to submit documentation to you on the race of  14:12:40
```

1  people they stopped, isn't that right?

2  A.  Required to submit it to me, no.

3  Q.  They weren't required to write it down, were they?

4  A.  If they wrote a report or a citation, yes, both of those

5  require ethnicity delineation.                          14:12:59

6  Q.  If they didn't write a traffic citation or make an arrest,

7  you wouldn't know what the race of anyone they contacted was?

8  A.  Not necessarily, no, ma'am.

9  Q.  So if a deputy conducted a traffic stop and then let the

10  person go with a warning, you wouldn't know anything about the  14:13:13

11  race of the person they stopped?

12  A.  Not unless I had specific conversation with that deputy and

13  it came up, no.

14  Q.  The general practice is unless you write the citation or

15  write an incident report, you don't report the race of the    14:13:25

16  person stopped, true?

17  A.  Correct.

18  Q.  And as a sergeant in the HSU, you did not keep statistics

19  so you could monitor for deputies who might have, say, an

20  unusual number of arrests of Latinos, isn't that right?        14:13:41

21  A.  That's right.

22  Q.  To your knowledge, nobody at MCSO monitors such statistics,

23  is that right?

24  A.  Correct.

25  Q.  Sir, MCSO deputies are not required to submit daily logs of  14:14:00

```
 1    their activity to their supervising sergeants, isn't that

 2    right?

 3    A.  Yes, ma'am.

 4    Q.  They do have to?

 5    A.  No, no, they do not, you're right.                        14:14:11

 6    Q.  Deputies do not have to submit daily logs to their

 7    supervisors?

 8    A.  Do not, correct.

 9    Q.  And they do not have to submit shift summaries to their

10    supervisors?                                                  14:14:22

11    A.  Do not, correct.

12    Q.  Now, sometimes you would get documentation from deputies

13    about their traffic stops, correct?

14    A.  Yes.

15    Q.  You might get something like the incident report we just  14:14:37

16    went over?

17    A.  Yes.

18    Q.  And those documents sometimes would explain what the

19    reasonable suspicion was that justified the traffic stop, is

20    that right?                                                   14:14:48

21    A.  Yes.

22    Q.  And if you looked at that, once you saw that a deputy had

23    reasonable suspicion to justify the stop, you would know they

24    didn't engage in racial profiling during that stop, is that

25    your opinion?                                                 14:15:03
```

1    A.   Yes.

2    Q.   Sir, according to you, deputies do not stop people because

3    they're Hispanic, is that right?

4    A.   That's right.

5    Q.   How do you know that?  Is that because you trust your          14:15:20

6    brothers and know that they abide by the law?

7    A.   In part, yes.

8    Q.   Sir, I want to go back to one thing we covered a few

9    minutes ago.  I asked you whether Hispanic descent could be one

10   factor among others in determining whether -- in developing        14:15:37

11   reasonable suspicion that someone is unlawfully in the United

12   States.

13        Do you remember that?

14   A.   Yes.

15   Q.   You testified no just now?                                     14:15:46

16   A.   Yes, I think that's correct.

17   Q.   Okay.  I'd like to go to --

18        MS. WANG:  Sorry, Your Honor.  Just a moment.

19   BY MS. WANG:

20   Q.   I'd like to go to your first deposition from 2009 to          14:16:10

21   page 28, lines 18 through 24.  Sorry, 23.

22        Sir, you were asked during your deposition:

23        "And in addition to these criteria, at least for

24   further investigation, you would add, or it would be proper to

25   use Hispanic descent as a factor; is that correct?               14:16:33

1        "ANSWER:  In determining on whether to carry on an

2   investigation for a human smuggling load?  Yes."

3            And then let's continue on.

4        "QUESTION:  Not for the stop or the detention, but as

5   part of an investigation to see if the person, if there's          14:16:57

6   reasonable suspicion -- let's put it that way -- that the

7   person is here illegally?

8            "ANSWER:  Yes."

9            Do you see that?

10  A.  Yes, ma'am.                                                     14:17:07

11  Q.  That was your sworn testimony then?

12  A.  Yes.

13  Q.  Are you going to stand by that, or are you going to stand

14  by what you said a minute ago?

15  A.  I'll stand by my sworn testimony.                              14:17:14

16           MR. CASEY:  Excuse me.  Objection, Your Honor,

17  argumentative.

18  BY MS. WANG:

19  Q.  Sir, do you stand by your testimony from your deposition

20  when you were sworn to tell the truth?                            14:17:23

21  A.  Yes.

22  Q.  Thank you.  Sergeant, you know someone named John Little?

23  A.  I do.

24  Q.  He's an MCSO deputy, right?

25  A.  Correct.                                                       14:17:44

```
 1              MS. WANG:  I'd like to show what's been marked

 2    Exhibit 2 and is already in evidence.

 3    BY MS. WANG:

 4    Q.  Sir, is this an e-mail exchange between you and John Little

 5    from June 12th and 13th, 2009?                              14:18:10

 6    A.  Yes, ma'am.

 7    Q.  And Deputy Little sent you an e-mail on -- on June 12th,

 8    2009, correct?

 9    A.  Yes.

10    Q.  From his MCSO e-mail account?                           14:18:22

11    A.  Yes.

12    Q.  To your MCSO e-mail account?

13    A.  Yes.

14    Q.  And you forwarded this e-mail on to deputies in HSU and

15    Enforcement Support, correct?                              14:18:32

16    A.  Yes.

17              MS. WANG:  Let's highlight the numbered lines in the

18    middle of that first e-mail at the bottom.

19    BY MS. WANG:

20    Q.  The e-mail that Deputy Little sent you starts out:  I found  14:18:47

21    this an interesting set of facts:

22              From the L.A. Times.  Number 1.  40 percent of all

23    workers in L.A. County -- L.A. County has 10.2 million

24    people -- are working for cash and not paying taxes.  This is

25    because they are predominantly illegal immigrants working   14:19:03
```

```
 1    without a green card.
 2              Do you see that?
 3    A.  Yes, I do.
 4    Q.  And at the time you forwarded this e-mail you did not know
 5    whether that was true or not, correct?                          14:19:13
 6    A.  That's correct.
 7    Q.  And then if you look at number 4 it says:  Over two-thirds
 8    of all births in Los Angeles County are to illegal alien
 9    Mexicans on Medi-Cal, whose births were paid for by taxpayers.
10              You see that?                                         14:19:29
11    A.  Yes, ma'am.
12    Q.  At the time you forwarded this e-mail you did not know
13    whether that was true, correct?
14    A.  Correct.
15    Q.  And if you look a little bit down it says:  Over 300,000    14:19:34
16    illegal aliens in Los Angeles County are living in garages.
17              You see that?
18    A.  Yes, ma'am.
19    Q.  You didn't know where that -- whether that was true,
20    either, do you -- did you?                                      14:19:55
21    A.  No, ma'am, I did not.
22    Q.  Number 9 says:  21 radio stations in L.A. are Spanish
23    speaking.  You see that?
24    A.  Yes.
25    Q.  That has nothing to do with crime, does it?                 14:20:03
```

1    A.   No, ma'am, it does not.

2    Q.   And you did not know whether that was true when you

3    forwarded this e-mail on, correct?

4    A.   Correct.

5    Q.   Number 10 says:  In L.A. County 5.1 million people speak          14:20:09

6    English, 3.9 million speak Spanish.

7              And that, again, does not involve any kind of crime,

8    does it?

9    A.   No.

10   Q.   And let's go down to the bottom of the e-mail where it          14:20:23

11   says:  We are a bunch of fools for letting this continue.

12             Next page, please.

13             You see that?  We are a bunch of fools for letting

14   this continue.  How can you help?

15   A.   Yes.                                                             14:20:44

16   Q.   And it's basically a chain letter.  It says, Send this

17   letter on to others, correct?

18   A.   Yes.

19   Q.   And that's what you did.

20   A.   Yes.                                                             14:20:52

21   Q.   You sent the e-mail on to deputies under your command in

22   HSU without verifying the information, correct?

23   A.   Yes.

24   Q.   You later found that this information was not correct,

25   didn't you?                                                          14:21:02

1    A.  Yes.

2    Q.  You found that out during your second deposition in this

3    case?

4    A.  I believe so, yes.

5    Q.  During a break in the deposition, someone looked on the          14:21:09

6    Internet and found out all these statistics had been debunked

7    as a hoax?

8    A.  Yes.

9    Q.  And you saw that during the deposition break on the

10   Internet for yourself, right?                                        14:21:20

11   A.  Yes.

12   Q.  One of the websites you looked at was Snopes.com?

13   A.  Yes, I believe so.

14   Q.  That was a common and familiar website to you?

15   A.  Yes.                                                             14:21:30

16   Q.  And you looked at some other Internet sites reviewed

17   during -- you looked at other Internet sites during the break

18   in the deposition?

19   A.  Yeah.  I don't think I looked personally at them, I was

20   conferring with my attorney, but yes.                               14:21:42

21   Q.  Okay.  During that second deposition your attorney,

22   Mr. Liddy, introduced as an exhibit a printout from the

23   L.A. Times website showing that the statistics were false,

24   correct?

25   A.  Yes.                                                            14:21:54

```
 1   Q.  And that the L.A. Times had never published any such

 2   statistics, is that right?

 3   A.  Yes.

 4   Q.  What was the date of that L.A. Times article?

 5   A.  I don't see it on the --                                  14:22:07

 6   Q.  I'm sorry, the one that Mr. Liddy introduced at your

 7   deposition from the actual L.A. Times website.

 8   A.  I don't know, ma'am.

 9        MS. WANG:  Can we show PX 10?  This is not in

10   evidence.  I'm using this just to refresh recollection.       14:22:18

11        THE COURT:  Then just show it to the witness.  Do not

12   put it up on the screen.

13        If you'll put it up we can show it to the witness.  We

14   can control screens that it goes on.

15        MS. WANG:  Okay.  Let's highlight where it says May      14:22:39

16   Day myth-busting with the date underneath.

17   BY MS. WANG:

18   Q.  So this L.A. Times article debunking the statistics you

19   sent was dated April 30th, 2007, isn't that right?

20   A.  Yes, ma'am.                                               14:22:50

21   Q.  So by the time you forwarded the false statistics on June

22   13, 2009, the L.A. Times had already debunked that, correct?

23   A.  Yes.

24   Q.  And the information was readily available on the Internet,

25   isn't that right?                                             14:23:05
```

1    A.  Yes.

2    Q.  When you forwarded Deputy Little's e-mail, you intended it

3    as factual information for your deputies, right?

4    A.  Yes.

5    Q.  You sent it for training purposes?                    14:23:14

6    A.  Yes.

7    Q.  You should not have sent that e-mail, should you?

8    A.  No, ma'am, I should not have.

9    Q.  But you did not rescind it?

10   A.  Rescind it?                                           14:23:23

11   Q.  You didn't send an e-mail later to say, Disregard the

12   e-mail that I sent?

13   A.  I don't recall if I did or not.

14   Q.  Sir, I'd like to show you a document that is not yet in

15   evidence.  That's Exhibit 3.  There is a pending objection to   14:23:39

16   this.

17          Sir, Wade Voeltz is an MCSO deputy, right?

18   A.  Yes, ma'am.

19   Q.  He sent you this e-mail on August 3rd, 2009?

20   A.  Yes.                                                  14:23:58

21   Q.  And the e-mail is a document titled:  No one has asked what

22   does Raza studies teach and why we want to shut it down.

23          Do you see that?

24   A.  Yes.

25   Q.  By someone named Laura, right?                        14:24:11

1    A.  Yes.

2    Q.  And the first page contains a statement in the second

3    paragraph:  Here I found an attitude problem, but only Mexicans

4    seemed to have it who told me their government informed them

5    that this is their land, they're taking it back.                    14:24:37

6            You see that?

7    A.  Yes, ma'am.

8    Q.  And it also contains the statement:  Even many

9    Mexican Americans appeared to have this attitude problem and

10   told me they were Mexicans first.                                    14:24:51

11           See that?

12   A.  Yes, ma'am.

13   Q.  Deputy Voeltz sent this to you from his MCSO e-mail

14   account, correct?

15   A.  Yes.                                                             14:24:57

16   Q.  To your MCSO e-mail account?

17   A.  Yes.

18   Q.  You never told him, Don't send me something like this?

19   A.  No.

20   Q.  Sir, I'd like to also put on the screen now Exhibit 18,          14:25:09

21   which is in evidence.

22           MS. WANG:  And I'd ask, Your Honor, that it be

23   published.

24           MR. CASEY:  I'm sorry.  What was the exhibit,

25   Ms. Wang?                                                            14:25:23

```
 1              MS. WANG:  18.

 2              MR. CASEY:  Thank you.

 3              MS. WANG:  And let's blow this up so that the

 4    sergeant can read it.  The whole chain, please.

 5    BY MS. WANG:                                             14:25:37

 6    Q.  This is an e-mail chain between -- well, looks like someone

 7    named Jerome Hepp is forwarding you an e-mail.

 8              See that?

 9    A.  Yes, ma'am.

10    Q.  Jerome Hepp is an MCSO deputy, correct?             14:25:47

11    A.  He is, yes.

12    Q.  Again, he sent this from his MCSO e-mail account to your

13    MCSO e-mail account, correct?

14    A.  Yes.

15    Q.  And the subject line says:  Forward.  A rare photo of   14:25:59

16    Mexican navy SEAL.  Do you see that?

17    A.  Yes, ma'am.

18    Q.  Let's turn to the last page of this exhibit.  This is the

19    attachment to the e-mail.

20    A.  Yes, ma'am.                                         14:26:14

21    Q.  That's the rare photo of a Mexican navy SEAL?

22    A.  Yes.

23    Q.  A dog in a scuba diving outfit?

24    A.  Yes.

25    Q.  Let's go back to the first page.  Let's highlight the   14:26:22
```

1    e-mail again.

2            You forwarded this e-mail on to numerous MCSO staff,

3    isn't that right?

4    A.  Yes, ma'am.

5    Q.  Including HSU deputies under your supervision, correct?          14:26:41

6    A.  Correct.

7    Q.  And then it looks like Deputy Quintero sent it on to

8    another deputy, is that right?

9    A.  Yes.

10   Q.  Sergeant, do you consider this a joke?                          14:26:52

11   A.  At the time I considered it a joke e-mail, yes, ma'am.

12   Q.  A joke worth sending to deputies under your supervision?

13   A.  At the time, yes.

14           MS. WANG:  I'd like to put up on the screen, Your

15   Honor, Exhibit 29, which is already in evidence.  I'd like to       14:27:15

16   publish that, if I may.

17           THE COURT:  You may.

18           MS. WANG:  Let's highlight the top of this so we can

19   read the -- the e-mail information.

20           MR. CASEY:  Your Honor, I apologize.  I just needed         14:27:30

21   the exhibit number.  Excuse me.

22           MS. WANG:  29, Tim.

23           MR. CASEY:  Thank you very much.

24           MS. WANG:  You're welcome.

25           Let's scroll down so we can see all of the e-mail           14:27:39

 1    string from about halfway.  Thank you.

 2    BY MS. WANG:

 3    Q.  Sir, again, this was an e-mail that Jerome Hepp, Deputy

 4    Hepp, sent on to you and others, correct?

 5    A.  Yes.                                                          14:27:54

 6    Q.  And again, this was through the MCSO e-mail system?

 7    A.  Yes, it was.

 8    Q.  And again this was something that you forwarded on to many

 9    others on MCSO e-mail, correct?

10    A.  Yes, ma'am.                                                   14:28:07

11    Q.  Including HSU deputies under your supervision?

12    A.  Yes.

13    Q.  And again, it looks like a Deputy Ruiz sent that on to

14    others, is that right?

15    A.  Yes.                                                          14:28:20

16    Q.  And the subject line of this was:  Indian yoga versus

17    Mexican yoga, is that right?

18    A.  Yes, ma'am.

19    Q.  Let's turn to the second-to-last page, MCSO 38848.

20            This, in the original version, was labeled Indian       14:28:36

21    yoga, isn't that right?

22    A.  Yes, ma'am.

23    Q.  That was a photo of a man doing a yoga pose, correct?

24    A.  Yes.

25    Q.  Let's turn to the last page.                                 14:28:45

1               This photo was captioned Mexican yoga, correct?

2   A.  Yes, ma'am.

3   Q.  That's a photograph of two men with a bottle of tequila on

4   the table?

5   A.  Yes.                                                              14:29:08

6   Q.  And one of them appears to be passed out drunk?

7   A.  Yes.

8   Q.  Sergeant, you were never disciplined for sending any of

9   these e-mails on to deputies under your supervision, were you?

10  A.  Actually, yes, I was.                                            14:29:19

11  Q.  You were?

12  A.  Yes.

13  Q.  When was that?

14  A.  I don't recall the date, ma'am, but I was disciplined.

15  Q.  After this lawsuit started?                                      14:29:26

16  A.  No, I believe it was before.

17  Q.  But you stayed a sergeant at HSU?

18  A.  Yes.

19          MS. WANG:  Thank you.  I have nothing further for this

20  witness, for now.                                                   14:29:40

21          THE COURT:  Cross-examination?

22          MR. CASEY:  Yes, Your Honor.  Thank you.

23          May I have a brief moment to set up my laptop?

24          THE COURT:  You surely may.

25          MR. CASEY:  Thank you.                                       14:30:09

```
 1              (Pause in proceedings.)

 2                   CROSS-EXAMINATION

 3    BY MR. CASEY:

 4    Q.  Sir, the Indian yoga, the Mexican navy SEAL e-mail, the

 5    L.A. Times statistics, were those mistakes?            14:30:44

 6    A.  Yes, they were.

 7    Q.  You testified that as to Exhibit 18, which I believe was

 8    the Mexican navy SEAL, and the Indian yoga, Exhibit 29, that

 9    you had, as I understand it, intended it to be humorous?

10    A.  Yes.                                                14:31:05

11    Q.  Do you understand -- well, let me tell you, do you

12    understand now whether it was humorous or not?

13    A.  I do understand, yes.

14    Q.  It appears that you sent it to a number of people within

15    HSU.  Did you also send it to people outside HSU?        14:31:15

16    A.  I don't recall.  I may have, sir.

17    Q.  Okay.  Did you ever receive any feedback from any -- anyone

18    indicating to you this indicates to them that you have a

19    problem, somehow you're racist; somehow you have some issue?

20    A.  No, sir, I did not.                                 14:31:40

21    Q.  Now, the discipline, you're certain that you were

22    disciplined when these things surfaced?

23    A.  I'm uncertain of the time of the discipline, but I am

24    certain that I was disciplined.

25    Q.  All right.  Thank you, sir.                         14:32:02
```

```
 1              Now, what I'd like to do is I am going to go over some
 2    of the things that we -- that were asked of you during the
 3    course of your testimony, and specifically what I'd like to do
 4    is I'm going to pull up some exhibits that were used.  The
 5    first one will be the Exhibit 108.  And I'm going to refer to        14:32:23
 6    the last page.
 7              Is that being shown up on your screen?
 8    A.  Yes.
 9    Q.  It's in evidence.
10              And specifically what I'm going to do is enlarge this      14:32:39
11    a bit so you can see it.  Okay.
12              Now, you were asked -- and this is the last page of
13    Exhibit 108.  And you were asked a specific question by the
14    plaintiffs' lawyer about:  Does the fact that 17 out of the 20
15    arrestees in -- and I believe this was Fountain Hills --            14:33:03
16    whether it caused you any problem or concern because those 17
17    out of 20 arrestees had Hispanic surnames.
18              Do you remember being asked that question?
19    A.  Yes, I do.
20    Q.  You said it did not.  Did I understand your answer            14:33:19
21    correctly?
22    A.  Yes, sir.
23    Q.  All right.  But you were never asked to explain why it did
24    not, so my question is:  Why was it not a concern to you that
25    17 out of the 20 people that were arrested appear to have         14:33:33
```

1  Hispanic surnames?

2  A.  Several reasons, sir.  One, we're a border state with the

3  country of Mexico.  I don't have U.S. census -- census data,

4  but I would wager by common sense that we would probably have a

5  lot of Hispanic Americans living in Arizona, being a border        14:33:56

6  state, as with Texas, New Mexico, and California.

7          I would also add that -- I was asked the question

8  based on surnames, and as surnames are listed here it doesn't

9  cause me concern at all, because as an example, if I may --

10  Q.  Please.                                                        14:34:13

11  A.  -- Sergeant Manny Madrid, his wife is Tiana Madrid, same

12  last name, but she's white haired, white skin, blue-eyed.  Her

13  name appearing on this, Tiana Madrid, could also give a false

14  impression that she's Hispanic, which she is not.

15          And so that's -- I've seen plenty of U.S. citizens and    14:34:29

16  other individuals that have Hispanic surnames that are not

17  necessarily Hispanic.

18  Q.  Is there anything when you look at this exhibit,

19  Exhibit 108, at page 3, is there anything about the nature of

20  why they were arrested that alleviates any potential concern?     14:34:48

21  A.  No, there's nothing listed about why they were arrested.

22  Q.  Well, for example, let me -- let me point out, for example,

23  there was a -- if you're looking at the screen, it appears that

24  one woman that, at least in my judgment, sir, a Nicole Chapman,

25  that does not appear to me to be a Hispanic surname.              14:35:11

1            Do you see that there?

2    A.  Yes, I do.

3    Q.  Do you see what the reason that you wrote for Nicole

4    Chapman's arrest was?

5    A.  Felony warrant.                                      14:35:23

6    Q.  Does it indicate anything else next to felony warrant?

7    A.  For dangerous drugs.

8    Q.  Now, my question for you is:  If someone has a felony

9    warrant for dangerous drugs, does that have anything to do with

10   race or ethnicity of the person?                         14:35:42

11   A.  No, sir, it's race neutral.

12   Q.  Is that something, a factor that you look at or rely on

13   when you're evaluating arrest sheets?

14   A.  No, sir, I don't -- it's not a factor -- it's a factor in

15   the sense that the reasonable suspicion for the traffic stop or  14:35:55

16   the probable cause for the arrest would be race neutral

17   elements.

18   Q.  Okay.  Is having an outstanding warrant out a race-neutral

19   factor?

20            You understand my question?                      14:36:12

21   A.  No, sir.

22   Q.  Okay.  When someone -- if someone is pulled over and they

23   run -- officers, do they run a search on the -- on the person's

24   license, identification?

25   A.  Generally, yes, sir.  A license check and a records check  14:36:24

1    for warrants.

2    Q.  And how does -- and a warrant comes back and says it exists

3    or it doesn't exist?

4    A.  Yes.

5    Q.  Okay.  And so that means what to you as an officer?          14:36:33

6    A.  If a warrant does not exist they don't have any outstanding

7    warrants for their arrest, and the opposite, consequently.

8    Q.  Now, the fact that this person had a warrant out for

9    dangerous drugs or narcotics, that's independent of whether

10   they're Caucasian, whether African-American, or Hispanic, is     14:36:52

11   that a fair statement?

12   A.  Yes.

13   Q.  Now, if you look at the next one that -- there's a Santiago

14   Martinez-Gonzalez.  That name is listed under a description

15   that they were booked in jail for felony warrant, and it says    14:37:07

16   felony warrant with an ICE detainer.  Tell me, what does that

17   indicate?

18   A.  The warrant is not specifically identified, but it is

19   indicated they had a felony warrant for their arrest.  That's

20   why they were taken into custody and booked into the jail.  And  14:37:21

21   subsequent to a 287(g) screening process they received an ICE

22   detainer.

23   Q.  Is the -- does the existence of a warrant, when you run a

24   check on an identification, does that have any bearing or

25   dependency on the race or ethnicity of the person you're         14:37:39

1    checking?

2    A.  No, it does not.

3    Q.  Now, let's just go before we move on, on the top of the

4    screen here there are one, two, three, four, five, six, seven,

5    eight individuals there that you have under the heading          14:37:54

6    Processed Administratively Through ICE.

7            What does that mean, processed administratively

8    through ICE?

9    A.  Processed administratively through ICE means that they were

10   turned over to the custody of ICE personnel.                    14:38:09

11   Q.  Why is that?

12   A.  Subsequent to a 287(g) screening process they were

13   determined to be illegal aliens within the United States

14   borders and turned over to ICE personnel.

15   Q.  Does the fact that -- even though we're a border state, in  14:38:24

16   and of itself, does the fact that someone is here unlawfully in

17   the United States mean that they're necessarily Hispanic or

18   Latino?

19   A.  No.

20   Q.  Now, I'd like to turn to a different subject, and that is   14:38:40

21   posse members.  You were asked questions about posse members.

22           Do you remember that?

23   A.  Yes.

24   Q.  What tasks -- please explain what tasks posse members do or

25   perform during saturation patrols.                              14:38:59

1   A.  During saturation patrols, as with any other operation or

2   patrol time, they perform a support role.  Posse members are

3   not sworn police officers in the state of Arizona.  They carry

4   no arrest power.  They cannot stop cars.  They cannot take law

5   enforcement action unless duly commanded by a law enforcement          14:39:19

6   officer, a deputy sheriff, to take such action.

7           But that would be the case with any citizen, too, that

8   an officer would need to invoke the assistance of.  They would

9   provide vehicles, caged units for us to secure prisoners into,

10  traffic control, security.                                             14:39:39

11  Q.  Sir, explain for me, and I think you already mentioned

12  this, whether posse members can do any particular stops on

13  saturation patrols.  Can they make traffic stops?

14  A.  Independently, no.

15          MR. CASEY:  Your Honor, I'm having a little bit of a           14:40:14

16  computer difficulty pulling up images on this.  I maybe would

17  ask for a break at maybe 10, 15 minutes.

18          THE COURT:  Sure.  It's about time for a break,

19  anyway.  Why don't we -- why don't we give you 20 minutes and

20  we'll be back at 3 o'clock.                                            14:40:32

21          MR. CASEY:  Thank you, Your Honor.

22          (Recess taken.)

23          THE COURT:  Thank you.  Please be seated.

24          Did you get the glitch fixed, Mr. Casey?

25          MR. CASEY:  Thank you, Your Honor, for breaking at             15:01:51

1    that time, accommodating me, and also the plaintiffs' counsel.

2    BY MR. CASEY:

3    Q.  Sergeant Palmer, I'd like to return to some of the

4    questions, and I'm going to be going around here and changing

5    subjects.  You were asked a question about a posse member named        15:02:02

6    Jim Van Allen, an e-mail where he asked about fishing.

7            Do you remember that?

8    A.  Yes, sir.

9    Q.  What was your understanding of what posse member Jim

10   Van Allen was referring to?                                            15:02:16

11   A.  Referring to human smuggling, going out and performing our

12   assigned task looking for human smuggling load vehicles in the

13   Anthem area.

14   Q.  Did you understand that in any way to be some sort of

15   pejorative, some sort of mean-streaked comment about people            15:02:28

16   that were in the country unlawfully?

17   A.  No, sir, not at all, and I've heard other officers from

18   multiple agencies.  I myself have, when I was a deputy back in

19   2001-2002, would comment to my sergeant at that time that I was

20   going to fishing in the state trust land, but it wasn't for           15:02:48

21   illegal aliens; it was for people having sex in vehicles and

22   committing acts of drug -- drug use and other crimes.

23   Q.  All right.  Thank you very much.

24           Let me move on to Exhibit 168, where I was going

25   before my computer gave me fits.                                       15:03:03

1          I'm going to show you -- this was what the plaintiffs'

2     lawyer was asking about.  It was a shift summary, and it was

3     saturation patrols.

4          Do you remember being asked a series of questions

5     about your emphasis and your highlighting of certain data?          15:03:19

6     A.  Yes.

7     Q.  All right.  Now, you were specifically asked about your

8     emphasis about the arresting of illegal immigrants.

9          Do you remember that?

10    A.  Yes.                                                            15:03:34

11    Q.  Would you go over here on Friday's -- under the heading

12    Friday's patrol.  And I know the Court has a copy of this in

13    front of you, but what types of information were you actually

14    highlighting?

15    A.  The total number of arrests made; how many out of those     15:03:43

16    arrested were identified through 287(g) screening to be illegal

17    aliens inside the U.S. borders.  And then the delineation

18    between number of arrests and some various other crimes that I

19    was asked to place in there, such as how many were arrested for

20    failing to provide identification, which is a criminal          15:04:11

21    violation in the state of Arizona, and other such stuff like

22    that, how many and warrants, stuff like that.

23    Q.  All right.  And out of this 27 total suspects taken into

24    custody, looking at the last bullet point, would you read that

25    into the record?  What does it indicate there?                  15:04:29

1    A.  The last bullet point, sir?

2    Q.  Yes, sir.

3    A.  21 U.S. citizens were booked on the state charges ranging

4    from DUI, driving suspended, drug possession, to misdemeanor

5    felony warrants.                                                    15:04:41

6    Q.  Thank you, sir.

7         And my question for you is:  In your mind's eye as a

8    sergeant in HSU, you were -- were you trying to emphasize any

9    particular data on these types of shift summaries when you

10   authored them?                                                      15:04:58

11   A.  No.

12   Q.  All right.  Thank you, sir.

13        Now, one other different area they asked you about --

14   asked some questions about after the DHS, ICE, revoked 287(g)

15   authority in October of 2009.                                       15:05:17

16        You remember generally those types of questions?

17   A.  Yes, sir.

18   Q.  They also asked you about inherent authority.  At one point

19   you testified that you believed that there was an inherent

20   authority?                                                          15:05:30

21   A.  Based on training from Kris Kobach, yes, sir.

22   Q.  That's Professor Kris Kobach from the University of

23   Missouri?

24   A.  Yes, sir.

25   Q.  And at some point also you testified to one of the              15:05:37

1    exhibits, it's actually Exhibit 452, also identified in the

2    record as 467, that was an e-mail of a legal opinion, some sort

3    of analysis that you did.

4            You remember that?

5    A.  Yes, sir.                                                          15:05:53

6    Q.  Are you a -- are you on attorney?

7    A.  No, sir, I'm not.

8    Q.  Do you have any training in analyzing law at all?

9    A.  No, sir, I do not.

10   Q.  Tell us what your interest is in following law as a law          15:06:01

11   enforcement.

12   A.  Ensuring that we do uphold the rights of citizens and the

13   rights of everybody in this country, and ensuring that legal

14   requirements are met for all things, not just human smuggling,

15   immigration related matters, but also for search and seizure         15:06:19

16   type laws and procedures, search warrant laws and procedures,

17   proper procedure when following a DUI investigation, and others

18   of the like.

19   Q.  Do you believe that is a responsible thing for a

20   sergeant to do to keep abreast of changes in the law?               15:06:36

21   A.  I do.

22   Q.  Okay.  Now, you also indicated that at one point you were

23   under the belief that the mere presence of a person in the

24   United States was a crime under the federal law.

25           Did I understand that correctly?                            15:06:52

1    A.  Yes, sir.

2    Q.  At some point that changed, regardless of when it was?

3    A.  Yes.

4    Q.  Okay.  When you learned of corrections or changes based on

5    the law, what did you do at MCSO when you learned those                    15:07:04

6    changes?

7    A.  I changed my procedures in how me and my crew conducted

8    ourselves in the field.

9    Q.  When you learned that law had either clarified or changed,

10   depending on, I guess, the reader, that mere unlawful presence            15:07:19

11   was not a crime under federal law, did you teach that to the

12   people you supervise?

13   A.  Yes, it was to -- communicated, yes.

14   Q.  And when you learned that inherent authority did not exist

15   under any federal or state law for you folks to enforce                    15:07:40

16   immigration law, did you teach that to your subordinate

17   officers or deputies?

18   A.  Yes, sir, I did.

19   Q.  All right.  There's another area that I think is important

20   because I -- I'm just going to ask you about it.                           15:07:53

21            Ms. Wang testified -- testified, excuse me.

22            Ms. Wang questioned you about whether the Human

23   Smuggling Unit uses race to stop vehicles.

24            Do you remember that?

25   A.  Yes, sir.                                                              15:08:09

1    Q.   And what was your answer to that?

2    A.   No, we do not use race to stop vehicles.

3    Q.   All right.  Then she went to another area where she asked

4    you whether HSU uses race to -- and the record will speak for

5    itself, but my note's to initiate investigations.          15:08:23

6            Do you remember that?

7    A.   Yes, sir.

8    Q.   Okay.  And you answered yes.

9            Do you remember that?

10   A.   Yes.                                                   15:08:31

11   Q.   Would you explain for me what you were talking about when

12   you said yes.

13   A.   I was the human smuggling sergeant.  My job revolved around

14   human smuggling crimes.  I was answering to that effect.  We --

15   we searched for a very specific crime.  We would not use race   15:08:48

16   in a report or for an investigation into a DUI driver, into a

17   drug crime, into a suspended license status, into any other

18   crime, but with human smuggling we would use race because

19   Arizona is a nexus for human smuggling through the Mexican

20   border.                                                     15:09:10

21   Q.   Thank you very much.

22           Now, what -- I'm going to give you a different

23   scenario.  What about a saturation patrol, hypothetically in

24   Sun City, where there are two people driving their car and

25   they're pulled over for speeding.  And let's assume that the   15:09:23

1   stopping deputy has reasonable suspicion that one of the

2   persons is there in the country unlawfully.

3           Is that MCSO policy for that officer to use race as an

4   indicator of unlawful presence?

5   A.  No.                                                        15:09:45

6           MS. WANG:  Objection, Your Honor.  The question was

7   compound and confusing.

8   BY MR. CASEY:

9   Q.  Did you understand my question?

10          THE COURT:  I'll rule on the objection.              15:09:57

11  BY MR. CASEY:

12  Q.  Did you understand my question, sir?

13  A.  I do.

14  Q.  Okay.

15          THE COURT:  I'll rule on the objection, Mr. Casey.   15:10:05

16          MR. CASEY:  Oh, I'm sorry.  I thought you said

17  "overruled."  I apologize.

18          THE COURT:  No, I said I'll rule on the objection.

19          MR. CASEY:  Oh, I'm so sorry, Your Honor.

20          THE COURT:  I'm going to sustain the objection.      15:10:26

21          MR. CASEY:  Okay.

22          MS. WANG:  Your Honor, I'd move to strike the

23  testimony, in that case, please.

24          THE COURT:  I am going to strike the testimony.

25          MS. WANG:  Thank you, Your Honor.                    15:10:33

1   BY MR. CASEY:

2   Q.  Sir, do you have your deposition in front of you?

3   A.  The one dated October 23rd, 2009, yes, sir.

4   Q.  Yes.  Would you turn to page 28.  Let me know when you're

5   there, sir.                                                    15:11:01

6   A.  I'm there.

7   Q.  And would you -- I'm going to refer you to line 18.  I'm

8   going to read the question to you.

9        "QUESTION:  And in addition to these criteria, at

10  least for further investigation, you would add, or it would be  15:11:19

11  proper to use Hispanic descent as a factor; is that correct?"

12       And the answer beginning at line 22 in your words is

13  what?  Would you please read that for me?

14  A.  My answer was beginning:  "In determining on whether to

15  carry on an investigation for a human smuggling load?  Yes."    15:11:37

16  Q.  And that's what you were explaining about for a human

17  smuggling load?

18  A.  Yes.

19  Q.  Were you talking about a specific saturation patrol traffic

20  stop not involving a suspected human smuggling load?            15:11:50

21  A.  No.

22  Q.  All right.  Thank you very much, sir.

23       Now, when did you join the MCSO, Deputy?

24  A.  Began the academy around June-July OF 2000; graduated

25  November 2000.                                                  15:12:18

1   Q.  And where did you attend your academy training?

2   A.  MCSO academy.

3   Q.  During that academy training was there any training that

4   you underwent regarding racial issues, the prohibition on

5   racial profiling, things like that?                                    15:12:30

6   A.  Yes, I believe there was.

7   Q.  What is your understanding on whether or not the MCSO

8   accepts, tolerates, or otherwise allows the use of race or

9   ethnicity in making law enforcement decisions?

10  A.  In making law enforcement decisions?                               15:12:47

11  Q.  Yes, sir.

12  A.  We don't use race as a factor, specifically, in conducting

13  traffic stops or making contacts.

14  Q.  In the time period of 2007 and 2009 you were a sergeant in

15  HSU?                                                                   15:13:04

16  A.  Yes.

17  Q.  Describe the general breakup.  Who was the overall

18  commander of HSU?

19  A.  Lieutenant Joe Sousa was the commander.  He reported

20  directly to Chief Dave Trombi, who reported directly to              15:13:17

21  Chief Brian Sands, and on to the chief deputy and the sheriff

22  at that point.

23  Q.  Who was under Lieutenant Sand -- excuse me,

24  Lieutenant Sousa?

25  A.  Lieutenant Sousa supervised three supervisors, two of which      15:13:33

1   were myself, Sergeant Palmer, and my partner at the time,

2   Sergeant Madrid.  Later Sergeant Trowbridge was other agency

3   sergeant who replaced Sergeant Madrid.

4          And then there's a third supervisor who is Deputy

5   Cesar Brockman, and he hands the -- he heads the employer          15:13:53

6   sanctions unit, criminal employment squad.

7   Q.  And employer sanction squad is inclusive of the Human

8   Smuggling Unit?

9   A.  Yes.

10  Q.  At any given time, if you could state between the years       15:14:06

11  2007 and the end of 2009 how many deputies were you sort of

12  assigned to in a squad or group?

13  A.  It ranged between four to five, up to six or seven

14  individuals.  Usually it was staffed for six deputies and one

15  detention officer on each squad, for seven total bodies.         15:14:29

16  Q.  All right.  Now, in -- let me back up for a minute.

17         Describe for me generally how do you supervise those

18  deputies?

19  A.  How do I supervise them?

20  Q.  Yes.                                                          15:14:46

21  A.  Very directly.  We spend 95 percent of our time in field on

22  the roadway hunting for human smuggling load vehicles, human

23  drop houses, and other crimes related to human smuggling.  I'm

24  with my squad, as well as Sergeant Madrid was out there with

25  his squad, working together side by side.                        15:15:06

1       I've personally conducted numerous traffic stops and

2   made personal apprehensions of human smuggling load vehicles.

3   So has Sergeant Madrid.  We regularly stop with our guys

4   whenever they have a human smuggling load to oversee the

5   investigation and take a hands-on approach to those                15:15:26

6   investigations.

7   Q.  You were asked a question by plaintiffs' counsel about how

8   you know or believe that your deputies are not using race in

9   making law enforcement decisions, traffic stops, detainments.

10      Do you remember that?                                          15:15:47

11  A.  Yes.

12  Q.  And she asked you about, You know your brothers.

13      Do you remember that?

14  A.  Yes.

15  Q.  Would you explain for us, what are some of the things that    15:15:52

16  you do as a supervisor, when you were at HSU, to try to

17  determine whether or not your officers were complying with

18  policy and the law?

19  A.  I'm not a hands-off sergeant.  I supervise very closely

20  with my guys.  I eat lunch with my guys.  I regularly brief      15:16:09

21  with my guys.  I'm regularly on all their traffic stops.  Not

22  every one, obviously, but regularly on their traffic stops,

23  overseeing their investigations.

24      We do talk regularly outside of work as well.  We do

25  associate, both with the camaraderie on an individual level, as  15:16:29

1    well as on a team level for the MCSO.  And I feel I have a good

2    understanding of all of them, their personalities, their lives,

3    their families.

4    Q.  How is it that attending traffic stops helps you supervise

5    them for following MCSO policy and following the law?          15:16:50

6    A.  Being on the traffic stop I'm seeing exactly why they

7    pulled the vehicle over.  The individual that is there can --

8    has an opportunity to make a complaint about the traffic stop,

9    even those that were not human smuggling load vehicles that

10   ended up being as -- where no report was written and no          15:17:13

11   citation was written, I've been on those stops as well.

12            And I've seen the -- heard what the reasonable

13   suspicion was for the stop, seen what other probable cause

14   factors might -- might have for charging or leading to an

15   arrest, and being on a hands-on approach with the deputies       15:17:30

16   under my supervision.

17   Q.  Now --

18            THE COURT:  You know, Sergeant Palmer, I'm going to

19   ask you to slow down just a little bit.  You speak pretty

20   quickly, and I want to make sure I catch everything you say.     15:17:39

21            THE WITNESS:  Yes, sir, I apologize.

22            THE COURT:  No problem.  Thank you.

23   BY MR. CASEY:

24   Q.  And I apologize, I may not have picked this up, but on

25   average, between the years '07 to the end of '09, three-year     15:17:48

1  time period, how many people were you directly responsible for

2  supervising in HSU?

3  A.  I apologize, sir.  Just to clarify, in '07 I don't think I

4  was in human smuggling.  It was April of '08 --

5  Q.  Okay.                                                          15:18:01

6  A.  -- and then after.  So I apologize.  I just want to make

7  sure I'm clear on that.  But as far as one more time, sir, how

8  many people did I supervise?

9  Q.  Yes.  On average during that time period, I'm trying to get

10 a gauge of that, of how many people you had to supervise.         15:18:14

11 A.  Roughly, on average, five to six.  There were times when an

12 individual would be transferred, perhaps, and we wouldn't get a

13 replacement body for a month or two, but on an average, five.

14 Again, we were staffed at one point up to seven, six deputies

15 and one detention officer on each squad.                          15:18:37

16 Q.  Did you review arrest reports of your deputies after any

17 particular -- whether it's large-scale or small-scale

18 saturation patrols?

19 A.  Yes.

20 Q.  What was the purpose for your reviewing those?                 15:18:49

21 A.  To assure -- what I review reports for is to assure that

22 the who, what, when, where, why and how are all met for the

23 charging of the -- of the case, and that the reason for the

24 stop is clearly articulated, the subjects are clearly

25 identified, the crime is clearly identified, the probable cause   15:19:08

```
 1    has been met for the crime with all the evidence, and -- and

 2    that proper procedure and policy were followed.

 3    Q.  Does that help you in your judgment to determine whether or

 4    not MCSO policy, and generally law, is being complied with?

 5    A.  Yes, I believe it does.                                          15:19:27

 6    Q.  Okay.  And I -- it may be repetitive, but explain, how does

 7    it help you determine that?

 8    A.  I'm reviewing their reports constantly, consistently.  For

 9    the record, I've seen probably just as many arrest reports, I

10    don't have statistics in front of me, but just as many arrest    15:19:44

11    reports on white Caucasian males out of my human smuggling

12    stats as I've seen out of black males or Hispanic males or

13    Asiatic.

14          I've read the arrest reports.  If anything seemed

15    suspicious to me, over the four years I was in the unit, I        15:20:03

16    would have flagged that and pulled an individual in for a

17    conversation on it.  But with my in-field supervision, the

18    closeness that I feel I had with my squad, and having reviewed

19    those reports, I don't feel there ever was an issue.

20    Q.  Now, let's go to a hypothetical situation where there is a    15:20:18

21    saturation patrol out at location A.  Was there a common

22    practice of you and the other sergeant --

23          First of all, where would Lieutenant Sousa usually be,

24    based on your knowledge?

25    A.  Lieutenant Sousa would generally remain at the command        15:20:36
```

1  post.

2  Q.  Okay.  And of the two sergeants most of the time, you and

3  Manny Madrid, what would you both do?

4  A.  One of us would be designated the in-field supervisor and

5  one of us would be designated as the command post supervisor.      15:20:52

6  Lieutenant Sousa would remain as the commander of the operation

7  in most cases, and then one of us would remain at the command

8  post as his support aide in logistical things that may come up

9  and other -- other stuff, decisions that may need to get made

10  or be disseminated by a sergeant.      15:21:14

11  Q.  What do you do as an in-field supervisor --

12  A.  The same thing --

13  Q.  -- during a saturation patrol?

14  A.  The same thing that I would do during human smuggling on --

15  investigations with my human smuggling squad.  I would be in      15:21:24

16  the field making traffic stops, responding to the traffic stops

17  of other deputies.  That would include other deputies outside

18  the human smuggling.  I would respond to stops of Lake Patrol

19  deputies, of the enforcement support deputies, of any deputy

20  who was working the operation.      15:21:44

21       I would also respond to citizen complaints.

22  Oftentimes, there were complaints with media cameras

23  encroaching and what the deputy felt was violating their

24  investigative procedure for the traffic stops, so I would

25  respond and try to handle that administratively.      15:22:00

1    Q.  You already actually brought up, I guess, my next question.

2    That was, we've had testimony, the Court's heard testimony that

3    in large operations, people other than deputies from other than

4    HSU participated in.  Is that your understanding?

5    A.  Yes.                                                          15:22:21

6    Q.  Okay.  So my question is:  Do you also join traffic stops

7    of, say, a K-9 unit member, or a SWAT member, TOU, and

8    supervise there?

9    A.  Yes.

10   Q.  There was a word used, and I'm going to butcher it,         15:22:37

11   balaclava.  Balaclava.  It's like a face covering?

12   A.  Yes.

13   Q.  Do you know how to say that?

14   A.  Top of my head, no.

15   Q.  Okay.                                                        15:22:47

16   A.  Balaclava.

17   Q.  Okay.  I'm going to -- I'm going to leave that alone.

18        During any saturation patrols that you ever

19   participated did you ever see any deputies interact with the

20   public with one of those on?                                     15:22:59

21   A.  Yes.

22   Q.  And what were the circumstances of that, please?

23   A.  The deputies who wore the balaclavas were from human

24   smuggling operations, and they were at times from special

25   investigations.  And special investigations deals almost        15:23:16

1    exclusively with narcotic, drug-related crimes.  Both of us

2    operate in undercover capacities at varying levels.

3          With specific regard to human smuggling, we have had

4    HSU detectives, select two or three that we would designate to

5    meet with coyotes, the suspects, for a human exchange, much          15:23:39

6    like a buy/bust for dope or cocaine, we would do a buy/bust for

7    humans.  It would be an extortion human smuggling related case,

8    and we would have a HSU detective pose as a family member for

9    the extorted family to participate in the exchange of money for

10   the -- for the body.  And eventually resulted in the                 15:24:08

11   apprehension of all suspects and the safe return of the victim.

12   Q.  What about going out to a certain part of Mesa and doing a

13   saturation patrol?  Are those things used in a context like

14   that?

15   A.  Yes.  Yes, they are.  And the reason they wear the               15:24:24

16   balaclavas is simply because we're trying to protect that

17   individual's identity.  Because we do have media cameras all

18   over those saturations, and we don't necessarily want unduly to

19   be just plastering the deputies' faces all over the news and

20   all over the media.                                                  15:24:42

21   Q.  Do they go out and make traffic stops with those masks on?

22   A.  They don't make them with them on.  They were instructed to

23   place them on upon the -- what they -- at their -- at their

24   call.  They would make that decision.  If a -- people showed up

25   taking pictures or cameras, or if the media showed up, that         15:25:00

1    would be their decision on whether or not to use that.

2    Q.  All right.  Thank you, sir.  Let's turn to a different

3    subject, and that's ICE.  Were you ever -- what year were you

4    trained as a 287(g) officer?

5    A.  I don't recall specifically, but I think it was in '08.  I    15:25:17

6    think it was almost immediately after my arrival.

7    Q.  So that would have been first half of 2008?

8    A.  In the summer, yeah.  Maybe around May or June.

9    Q.  Do you remember how long that training was?

10   A.  Five weeks.    15:25:30

11   Q.  Where was your -- where was your training?

12   A.  ICE personnel conducted the training at the MCSO training

13   center.

14   Q.  And where's the MCSO training center?

15   A.  It's located on the corner of 35th Avenue and Lower Buckeye    15:25:41

16   in Phoenix.

17   Q.  Was there any discussion during your training by the ICE

18   officials about the use of race in law enforcement activities?

19   A.  Yes.

20   Q.  Were you taught about the prohibition of using race and    15:26:00

21   solely race to make any law enforcement decisions?

22   A.  Were we taught that by ICE?

23   Q.  Yes, sir.

24   A.  No, I don't believe so specifically.

25   Q.  All right.  And, sir, what I'm going to do is show you    15:26:14

1    what's been marked and admitted in evidence, it's Exhibit 67 on

2    the screen, and represent to you this -- well, first of all, do

3    you recognize this -- this document?

4    A.  It looks like a handout we would have received at the ICE

5    academy.                                                          15:26:33

6    Q.  All right.  And I'm going to -- and it appears to be

7    printouts of some sort of presentation, a PowerPoint slide?

8    A.  Yes, sir.

9    Q.  And I'm going to point out the third point on this.

10          If you look at item number 7 on this slide, can you       15:26:43

11   tell me what that says?

12   A.  DOJ guidance regarding the use of race.

13   Q.  All right.  Is that something that you were taught by ICE

14   during your 287(g) certified training?

15   A.  Yes.                                                          15:27:00

16   Q.  Okay.  Now I'm going to turn to a different document, which

17   is Exhibit 68 in evidence, and it should be at the next page

18   when I pull it up on the screen here.

19          Do you recognize where this page is taken from, sir?

20   A.  It appears to be out of a page from the workbook that ICE    15:27:28

21   would have handed us.

22   Q.  Do you remember receiving a workbook when you went through

23   287(g) training?

24   A.  Yes, I did.

25   Q.  And I'll just have you -- I'll just have you assume for the  15:27:43

```
 1   sake of my questions this is part of that workbook, and what
 2   I'd like to do is have you look at the items that I'm going to
 3   enlarge for your use.
 4           This says interim training objections -- training
 5   performance objectives.  Does this fairly and accurately          15:28:05
 6   describe the types of training that was provided about how to
 7   comply with the law?
 8   A.  Yes.
 9   Q.  Was that a part of the actual instruction given to you by
10   the federal officials?                                            15:28:26
11   A.  Yes.
12   Q.  All right.  Thank you, sir.
13           I'm now going to turn to same Exhibit 68 in evidence,
14   and it's going to be actually page 19 of that exhibit.
15           THE COURT:  I'm sorry, it's page 19 of which exhibit?     15:28:43
16           MR. CASEY:  It's Exhibit 68, Your Honor.
17           THE COURT:  Okay.  Thank you.
18           MR. CASEY:  You're most welcome.
19   BY MR. CASEY:
20   Q.  And I'm going to blow up this section out of the workbook.    15:28:52
21           Is this particular section out of the ICE workbook, is
22   that also something that you were trained on?
23   A.  Yes, sir.
24   Q.  Now, I'm going to go to the next page of Exhibit 68.
25           Would you tell us what section C reads, sir.              15:29:25
```

1    A.  Section C, just the bolded?

2    Q.  Yes, sir.

3    A.  Consequences of the failure of a LEA officer to honor the

4    Fourteenth Amendment.

5    Q.  What is a LEA officer?                                    15:29:39

6    A.  L-E-A, LEA.  Law enforcement agency.

7    Q.  All right.  Describe for me generally, if you'd just take a

8    moment to look at this, what is this intending to convey to the

9    students, the trainees undergoing the instruction?

10   A.  It's intended to con --                                   15:30:00

11        MS. WANG:  Objection as to what the intent of the

12   author was.

13        THE COURT:  Sustained.

14   BY MR. CASEY:

15   Q.  Okay, I'm going to ask you, what do you understand was     15:30:09

16   being taught with this section by the ICE officials?

17   A.  What could result if you violate the Fourteenth Amendment.

18   Q.  And would you tell us what you were taught by the ICE

19   officials.

20   A.  Just as it's listed here, sir: that you could undergo      15:30:23

21   suppression of evidence in the case, suppression of statements

22   made during the traffic stop or after arrest, and possibly

23   criminal prosecution.

24   Q.  There's another section, civil liability, isn't there?

25   A.  Yes, sir, there is.                                        15:30:38

1    Q.  And it mentions a particular statute 42 U.S.C. 1983?

2    A.  Yes, sir.

3    Q.  Okay.  Based on what you learn -- well, first of all, what

4    do you believe about racial profiling?

5    A.  I believe racial profiling is wrong and unethical and          15:30:54

6    should not be done.

7    Q.  Okay.  Why shouldn't it be done?

8    A.  'Cause it violates people's rights and it's -- it's an

9    unethical treatment of individuals.

10   Q.  Looking at the risks of civil exposure and looking at          15:31:07

11   criminal, potential criminal prosecution, based on your

12   experience in HSU and as an MCSO deputy, does it make, in your

13   mind's eye, your judgment, any sense to run the risk of ever

14   using race?

15   A.  No, sir.                                                        15:31:27

16   Q.  For the very types of factors that we see here in this

17   exhibit, 68?

18   A.  Correct, in terms of using race for racial profiling,

19   correct, yes.

20   Q.  All right.  Now, let me turn to the next exhibit.  This is     15:31:36

21   Exhibit 69 that's already in evidence, and this a particular --

22   particular page, and I'm going to blow this up.

23           Sir, what do you understand -- your understanding of

24   what this course was about, based on this manual, this portion?

25           Do you need me to rephrase the question?                   15:32:24

1    A.  No, sir.  I was just reviewing the document.

2        My understanding of what was being taught with

3    particular respect to this document?

4    Q.  Yes, sir.  What were you taught by ICE?

5    A.  ICE -- ICE in the 287(g) academy taught us that race could    15:32:37

6    be a factor, among others, but standing alone and by itself was

7    not a factor for contact.

8    Q.  Did MCSO, other than the human smuggling load vehicles, did

9    the MCSO ever adopt a different policy?

10   A.  Yes.    15:32:54

11   Q.  And what was that policy?

12   A.  That we would not be racially profiling, would not use that

13   race -- we would not use race in determining whether or not to

14   make a contact or to initiate an investigation, absent any

15   other -- any other probable cause to that effect.    15:33:12

16   Q.  All right.  Let's turn to a different thing.

17       Did you plan -- strike that.

18       Did you determine where to go for saturation patrols?

19   A.  No, I did not.

20   Q.  Okay.  When an MCSO saturation patrol was to occur, I'd    15:33:24

21   like to talk to you about the briefings.  What type of

22   information was given to others participating in the operation

23   before it started?

24   A.  The details of the operation, the scope of it; boundaries;

25   what was expected of them; that it was a zero tolerance patrol;    15:33:47

1    how to undergo the report-writing process, the booking process,

2    as well as the fact that we do not racially profile, and that

3    was stressed heavily at these briefings.

4    Q.  Who would give these briefings?

5    A.  Lieutenant Sousa administered many of them.  I myself                    15:34:04

6    administered several of them.  Sergeant Madrid administered

7    several of them.  And there was also a document, operations

8    plan, that they were told they needed to read verbatim from

9    front page to back page.  And that also covered the fact that

10   we do not racially profile.                                                  15:34:26

11   Q.  In addition to operations plan, orally you told them --

12   A.  Yes.

13   Q.  -- about racial profiling?

14   A.  That we do not do it; it will not be tolerated; that no

15   deputy is to pull over a vehicle or initiate contact with an                 15:34:38

16   individual based upon the color of their skin, suspicion of

17   their religion, or an understanding of what their race was.

18   Q.  Now, let's look at what I have on the screen right here,

19   which is Exhibit 102 already admitted into evidence.  This is

20   page 1 of that document.                                                     15:34:57

21        Do you recognize that document just generally, sir?

22   A.  Honestly, no, but I can -- seems to reference the Sun City

23   operation.

24   Q.  All right.  Let me turn to the next page, which is Exhibit

25   102, page 2 of that exhibit.                                                 15:35:12

```
 1          Do you recognize that document in general?
 2   A.  Yes.
 3   Q.  What is it?
 4   A.  It's an operations plan for a saturation patrol.
 5   Q.  Okay.  And who prepares operations plans?                    15:35:22
 6   A.  Many times that was my assigned task in human smuggling.
 7   Q.  Okay.  And what was the purpose of an operation patrol?
 8   A.  Purpose of an operation plan or patrol?
 9   Q.  I'm sorry, I misspoke.  What was the purpose of an
10   operations plan?                                                 15:35:43
11   A.  The purpose of an operations plan was to clearly outline
12   what the objectives were, who the command structure was, the
13   dates and times of the operation, scope of the operation, and
14   any other pertinent information, which would have included the
15   fact that we do not racially profile and that it's not          15:36:00
16   tolerated.
17   Q.  All right.  Now, I'm going to call out this particular
18   section and move this up.
19          Primary objective.  What does that indicate to the
20   reader?  What did you intend when you wrote those sort of        15:36:11
21   things, what did you intend to convey?
22   A.  That's what is expected of all the deputies patrolling on
23   the operation, is that that's the primary objective, that they
24   are expected to make traffic stops with a zero tolerance
25   mindset, and that as stated there, that if you have a criminal   15:36:27
```

1  violation, be it misdemeanor, if that's the case, would not be

2  cited and released; that person would be booked for the

3  misdemeanor crime.

4  Q.  All right.  Now, let's turn to I believe it's the next page

5  on this.  I'm going to -- do you see the section entitled                15:36:43

6  Conducting Traffic Stops on Saturation Patrol?

7  A.  Yes, sir.

8  Q.  What is that section about or for?

9  A.  That's basically instructing individuals specifically --

10  it's redundant, because everybody should know this, but it's           15:37:07

11  instructing them on how the traffic stops will be conducted;

12  that they'll do it in accordance with MCSO policy and in

13  accordance with training that they've received at the basic

14  academy level.

15  Q.  You see the part that I've highlighted there?                      15:37:18

16  A.  Yes, I do.

17  Q.  Was that a standard -- when an operations plan was prepared

18  by HSU, was that a standard written instruction included in

19  there?

20  A.  Yes.                                                               15:37:32

21  Q.  Was that type of instruction orally given to deputies?

22  A.  Yes.

23  Q.  Why give them both ways?

24  A.  Again, redundancy, to hammer home the idea that it's not

25  tolerated, and we will not perform that action.                       15:37:45

1   Q.  All right.  Now, I'm going to highlight or pull out this

2   next section, if I can get this right.

3           Can you tell me what that particular section's in

4   reference to, sir?

5   A.  It's instructing the deputies on the patrol, on the          15:38:09

6   saturation patrol, on how to conduct themselves when they

7   believe they have reasonable suspicion that an occupant in the

8   vehicle that they -- or a person they'd be contacting is

9   unlawfully present within the United States.

10  Q.  Now, I'm going to highlight this last, at least part of the  15:38:38

11  last sentence.  Why did you include that phrase in there, at no

12  time will a deputy call for a 287(g) certified deputy based

13  just on race?

14  A.  I included that, again, for redundancy.  And it was

15  approved by Lieutenant Sousa that it needed to be in there to    15:38:55

16  hammer home the idea that we do not racial profile, and that it

17  will not be tolerated.

18  Q.  All right.  Now, let's turn to a different subject, sir,

19  and that is, there was a hotline or a tip line that the MCSO

20  had?                                                             15:39:11

21  A.  Yes.

22  Q.  Did you ever operate or man that?

23  A.  I personally did not.

24  Q.  Okay.  Did you ever take calls?

25  A.  I have taken calls, yes, from people reporting illegal       15:39:20

```
 1   immigration violations to --
 2   Q.  Do you know how, generally, calls and information were
 3   handled or received?
 4   A.  If it was an insistent individual, I would probably jump on
 5   the phone right away with them.  Otherwise, they would leave a        15:39:38
 6   message into a recording box.  That box would be checked by an
 7   administrative assistant of the unit, of the human smuggling
 8   unit, and when they pulled that information down they would put
 9   it onto a sheet of paper, handwritten out, and place it in
10   either Sergeant Madrid's box or my box for follow-up.                 15:39:55
11   Q.  And did you make a decision whether there was any --
12   anything to be done about those tips after you received them?
13   A.  Yes.
14   Q.  What would you do, generally, if you received information
15   that just said, There's a group of these people standing on the      15:40:10
16   corner and I don't like it, and there's a mention of race.
17        How would you generally handle those?
18   A.  As a matter of professional courtesy, if there -- and
19   customer service, if there was a phone number present I would
20   call that individual in every case and attempt to have a             15:40:28
21   conversation or a dialog with them, and ascertain if there was
22   any criminal matter that they have not stated in the -- in the
23   tip.
24        Oftentimes there was not criminal matter, and if there
25   wasn't any criminal matter present at the location they're           15:40:45
```

1    describing I had no problem telling individuals that what they

2    were providing to me amounted to racial profiling.  I told

3    individuals multiple times that they were providing me with

4    racial profiling information, and that we would not be doing

5    anything in regards to their tip information.                          15:41:00

6    Q.  Were there times that you actually said that?

7    A.  Yes, plenty of times.

8    Q.  And how did they react in hearing that they were advocating

9    something that was, in your words, wrong and illegal?

10   A.  In those instances, they fell into two categories.  You had   15:41:16

11   the one category where they would be completely compliant and

12   understanding, it's like, you know what?  I didn't think about

13   that.  Okay, I understand.  And other ones would yell, scream,

14   and swear at me.

15   Q.  Part of the job?                                                  15:41:31

16   A.  Yes.

17   Q.  What about calls that mentioned race?  For example, we

18   heard some testimony yesterday about someone saying there are

19   Mexicans hanging out on the corner.

20         What about someone who says something about that and       15:41:44

21   then mentions something that may indicate crime?  What do you

22   do when you have a mixture of those two?

23   A.  I disregard anything that has to do with racial profiling.

24   If they can articulate to me the reasonable likelihood that a

25   crime may be occurring at that location, if I can place an           15:42:01

```
1    example, they may call in and ask, tell me that they have a

2    bunch of people that appear to be of Hispanic descent that

3    speak Spanish only living in a house at a certain location in

4    Phoenix.

5             On the surface, that sounds like racial profiling to      15:42:19

6    me and nothing that I would move my team on.  However, upon

7    contact -- and this happened a few times -- eliciting

8    information from them, they would provide details that would

9    lead me to believe that reasonably a crime of human smuggling

10   may be occurring at that residence.                              15:42:39

11            And those extra details would oftentimes be the fact

12   that one individual is constantly outside looking around.  That

13   would -- that would constitute a guard.  That vehicles are

14   constantly pulling around the back of the property.  That would

15   be an in -- an indicator.  That the vehicles were not small Geo   15:42:53

16   Metros, but large-capacity SUVs and vans.  That would be an

17   indicator.  Overgrown yards.  Trash not being taken out.  And

18   the fact that people being moved at odd hours of the day or

19   night.

20   Q.  Thank you, sir.  Let's turn to a different subject.          15:43:11

21            At the MCSO what is something called the briefing

22   board?

23   A.  The briefing board is a means by which MCSO disseminates

24   new policies, new procedures, and information that they feel is

25   critical for dissemination to the whole Sheriff's Office.        15:43:28
```

1   Q.  Does it also include reminders about policy?

2   A.  Yes, it does.

3   Q.  Okay.  I'm going to show you what's been marked into

4   evidence as Exhibit 92, and specifically I'm going to show you

5   page 5 of that exhibit.  Do you recognize generally that on                    15:43:42

6   your screen?

7           Let me rephrase the question.  It's too -- too poor.

8           Does it appear to be a page out of a briefing board?

9   A.  Yes, it does.

10  Q.  Okay.  Now, specifically I'm going to show you, and                         15:44:01

11  hopefully successfully do a call-out on this, would you read

12  that into the record, please, what it says on the call-out.

13  A.  Conducting traffic stops on saturation patrol/interdiction

14  patrol.  Sworn personnel will conduct traffic stops as

15  specified in office policy and procedures, as well as in                       15:44:22

16  accordance with the training received at the basic training

17  academy.  At no time will sworn personnel stop a vehicle based

18  on the race of any subject in a vehicle.  Racial profiling is

19  prohibited and will not be tolerated, the last part having been

20  bolded and underlined.                                                         15:44:41

21  Q.  All right.  And let me click that, and would you please

22  read into the record the date of this particular briefing

23  board.

24  A.  October 21st, 2008.

25  Q.  Would you just give me an overview of the frequency that an                15:44:53

1    HSU detective and people participating in human -- excuse me,

2    participating in saturation patrols would receive warnings

3    about not using race.

4    A.  I'm sorry sir.  One more time.

5    Q.  I should get an objection sustained.                          15:45:14

6         How often would MCSO deputies get warned not to use

7    race?

8    A.  On saturation patrols, or in general?

9    Q.  In general.

10   A.  In general, I can't speak for the sergeants of other          15:45:30

11   districts, but me and Sergeant Madrid would perform that task

12   regularly in the course of our regular duties.

13   Q.  What about HSU and members participating in saturation

14   patrols?  How frequently were they told, No racial profiling?

15   A.  Every day of the operation.  If the operation was a           15:45:49

16   three-day operation, each of the three days there would be a

17   briefing and they would be required, each of the three days, to

18   read that operations plan, which denotes that there's no racial

19   profiling, and they would receive the same instruction again

20   from whoever was providing the briefing, Lieutenant Sousa,        15:46:02

21   myself, or Sergeant Madrid.

22        MR. CASEY:  Okay.  Those are the questions I have for

23   you.  Thank you, sir.

24        THE COURT:  Ms. Wang?

25        MS. WANG:  Thank you, Your Honor.  I have a brief            15:46:16

```
 1    redirect.
 2              THE COURT:  I'm sorry, we need just a moment.
 3              MS. WANG:  Oh, I'm sorry.  You have questions.
 4              THE COURT:  We're going to take a break for a few
 5    minutes while we correct a problem.                              15:47:58
 6              MS. WANG:  Yes, Your Honor.
 7              (Recess taken.)
 8              THE COURT:  Ms. Wang, redirect?
 9              MS. WANG:  Thank you, Your Honor.
10                     REDIRECT EXAMINATION                            15:56:22
11    BY MS. WANG:
12    Q.  Good afternoon again, Sergeant.
13    A.  Good afternoon, ma'am.
14    Q.  Mr. Casey was asking you questions about your supervision
15    of deputies in the Human Smuggling Unit.                        15:56:32
16              You remember that?
17    A.  Yes.
18    Q.  And you testified, I believe, that you read as many arrest
19    reports for black, Asiatic, white males as for Hispanic males.
20              Is that your testimony today?                         15:56:46
21    A.  I don't have statistics, but I would venture to say that,
22    yes, I believe I do.
23    Q.  You must be talking about your overall experience at MCSO,
24    not limited to the Human Smuggling Unit, isn't that right?
25    A.  No, because the deputies working in human smuggling also    15:56:59
```

1  work at off-duty jobs and they make arrests at off-duty jobs,

2  and they make arrests to and from coming into work on traffic

3  stops.  Those arrests range from DUI to criminal speeding to

4  drug possession.

5  Q.  Sir, isn't it fair to say that in your capacity as a        15:57:19

6  supervisor at HSU, the majority of arrest reports you read were

7  for Hispanic males?

8  A.  In HSU?

9  Q.  Yes.

10 A.  Correct, in connection with human smuggling crimes.         15:57:29

11 Q.  Okay.  In connection with HSU arrests, right?

12 A.  In connection with human smuggling crimes.  An HSU arrest

13 may not necessarily be a human smuggling crime.

14 Q.  But in work that HSU deputies did, the majority of arrests

15 would be for Hispanic males, is that right?                     15:57:43

16 A.  Yes.

17 Q.  Sergeant, you tes -- Mr. Casey asked you about your

18 interactions with deputies under your supervision at HSU.

19         You remember that?

20 A.  Yes.                                                        15:57:59

21 Q.  And you talked about how well you know them, is that right?

22 A.  Yes.

23 Q.  Some of them you socialize with after-hours?

24 A.  Yes.

25 Q.  And based on knowing them socially and knowing them as well  15:58:06

1  as you do, you feel you understand whether they engage in

2  racial profiling?  That's your testimony?

3  A.  Yes.

4  Q.  And you were asked, sir, about some deposition testimony

5  you gave about that, is that right?                              15:58:22

6  A.  Yes.

7  Q.  Let me just reread that, so that we can make sure we

8  understand the testimony.  This is in deposition 1, starting at

9  line -- page 77, line 22.

10         You were asked:  You're not aware that there are in      15:58:40

11 any -- let me start over.

12         "QUESTION:  You're not aware that there are any in the

13 MCSO who ever uses racial animus as one of their motivations?

14         "ANSWER:  I'm not aware of it, and I do not believe it

15 occurs.                                                          15:58:59

16         "QUESTION:  And how do you know it doesn't occur?

17         "ANSWER:  Quite frankly, sir, I know my brothers, and

18 we abide by the law."

19         That was your testimony in your deposition, correct?

20 A.  Yes.                                                         15:59:09

21 Q.  And that was based on how well you know your deputies

22 through social interactions, as well as on-the-job

23 interactions?

24 A.  Yes.

25 Q.  And then you continued on in your testimony:                 15:59:17

1        "QUESTION:  And how can the department or you as a

2  supervisor check whether it occurs or not?"

3        I take that to mean "it" meaning racial profiling, is

4  that how you read that?

5  A.  Yes, that's my interpretation.            15:59:30

6  Q.  Okay.  So the question was:  How can the department or you

7  as a supervisor check whether it occurs or not?  What if one

8  particular person in fact always finds a reason in terms of

9  some infraction, some traffic infraction, but is actually

10  stopping only people of color?  How would you find that out?  15:59:45

11        "ANSWER:  I'm not aware of -- I'm not aware of how I

12  would find out, sir.  I don't believe it occurs."

13        That was your testimony?

14  A.  Yes.

15  Q.  And again, your -- the point you were making is that you  15:59:56

16  know your deputies and you trust them not to racially profile,

17  correct?

18  A.  Yes.

19  Q.  And you don't check to see whether they're doing it.

20  A.  There's -- I don't have a system in place for me to check  16:00:07

21  through statistical, not that that's necessarily reliable,

22  anyhow.

23  Q.  Thank you, Sergeant.

24        Sir, Mr. Casey showed you Exhibit 102, which is in

25  evidence, and this was concerning a saturation patrol in  16:00:27

1  Sun City and Sun City West, correct?

2  A.  I'm sorry, ma'am.  Which exhibit are you referring to?

3  Q.  It's on your screen.  It's Exhibit 102, I believe.

4  A.  Actually, it's not on my screen.

5         MS. WANG:  Oh, I'm sorry.                                    16:00:44

6         Can we show that to the witness as well?

7         THE COURT:  He has it.

8         MS. WANG:  Okay.

9  BY MS. WANG:

10  Q.  So you were asked during -- by your lawyer about this          16:00:49

11  saturation patrol document collection for Sun City and Sun City

12  West, correct --

13  A.  Yes.

14  Q.  -- August 13th and 14th, 2008?

15  A.  Yes.                                                           16:01:02

16  Q.  This saturation patrol occurred after this lawsuit was

17  filed, correct?

18  A.  I don't know when the date of the lawsuit was.

19  Q.  Fair enough.

20         Let's turn to page MCSO 001972.  I believe Mr. Casey        16:01:15

21  asked you some questions about this page.

22         Can we enlarge the paragraph that starts Conducting

23  traffic stops.

24         Mr. Casey asked you about the second sentence that

25  says:  Note:  At no time will MCSO personnel stop a vehicle        16:01:45

1    based on the race of the subjects in the vehicle.  Racial

2    profiling is prohibited.

3            Do you see that?

4    A.  Yes, ma'am.

5    Q.  It instructs that there shall be no stops based on race,        16:01:58

6    correct?

7    A.  Yes.

8    Q.  This document does not tell deputies they cannot use race

9    in deciding when to initiate an immigration investigation once

10   a stop is already underway, isn't that right?                      16:02:10

11   A.  Yes.

12   Q.  It's correct, right?

13   A.  Yes.

14   Q.  The document does not contain such a statement or

15   prohibition?                                                       16:02:22

16   A.  That's correct.

17   Q.  And let's highlight, I believe, the next paragraph after

18   that.  Mr. Casey asked you about the last sentence, which

19   reads:  Example.  The violator does not have valid

20   identification and does not speak English.  At no time will a      16:02:38

21   deputy call for a 287(g) certified deputy based just on race.

22           Do you see that?

23   A.  Yes.

24   Q.  Says "based just on race," correct?

25   A.  Yes.                                                           16:02:49

1   Q.  This sentence does not exclude the possibility that a

2   deputy could call based on race plus other factors?

3   A.  That would be a correct assessment.

4   Q.  Okay.  Let's turn now to Exhibit 92, which is in evidence.

5   Mr. Casey asked you about this, too.  This was the briefing          16:03:05

6   board from October 28, 2008.

7        You see that?  Let's turn to --

8   A.  Ma'am, I'm sorry.  You said the briefing board?  I have a

9   shift summary on my screen.

10  Q.  Oh, sorry.  Which -- maybe Mr. Casey can help me out.            16:03:22

11       Oh, it's on page 3 of this exhibit.  There we go.

12       So this -- within Exhibit 92 is an MCSO briefing

13  board, correct?

14  A.  Yes.

15  Q.  And Mr. Casey was asking you about this particular briefing      16:03:36

16  board dated October 21, 2008?

17  A.  Yes.

18  Q.  Let's turn to, I believe the next page.

19       Sorry.  Bear with me.  I don't have a paper copy of

20  this.  I'm not sure where Mr. Casey was reading from.               16:04:06

21       MR. CASEY:  To the extent it helps the Court and

22  counsel, I began at page 5 of Exhibit 92.

23       MS. WANG:  Thank you, Mr. Casey.

24       MR. CASEY:  You're most welcome.

25       MS. WANG:  Can we go to that page, please?  Page 5.          16:04:18

1              MR. CASEY:  Bates label 14953.

2              MS. WANG:  Two pages from here.  Sorry.

3              Okay.  That's correct.

4              Highlight the second paragraph, please, that starts,

5    Conducting traffic stops on saturation patrol.                    16:04:42

6    BY MS. WANG:

7    Q.  Mr. Casey asked you about the second-to-last sentence:  At

8    no time will sworn personnel stop a vehicle based on the race

9    of any subject in a vehicle.

10             You see that?                                           16:04:54

11   A.  Yes.

12   Q.  And then it says racial profiling is prohibited and will

13   not be tolerated, correct?

14   A.  Yes.

15   Q.  Once again, this document tells deputies they cannot stop a   16:05:00

16   vehicle based on the race of any subject, is that right?

17   A.  Yes.

18   Q.  This document does not say that deputies may not initiate

19   an immigration investigation based on the race of any subject

20   in a vehicle, isn't that right?                                   16:05:15

21   A.  Correct.

22             MS. WANG:  Thank you.  I have no further questions.

23             THE COURT:  You may step down.  Thank you, Sergeant.

24             THE WITNESS:  Thank you.

25             MR. YOUNG:  Your Honor, plaintiffs call Chief Brian     16:05:37

1    Sands.

2              (Pause in proceedings.)

3              THE CLERK:  Right up here, sir.

4              Could you please state and spell your full name for

5    the record.                                                    16:06:25

6              MR. SANDS:  Brian L. Sands.  That's B-r-i-a-n, L as in

7    Lincoln, S-a-n-d-s.

8              THE CLERK:  Thank you.  Please raise your right hand.

9              (Brian L. Sands was duly sworn as a witness.)

10             THE COURT:  Mr. Young.                                16:07:11

11             MR. YOUNG:  Thank you, Your Honor.

12                          BRIAN L. SANDS,

13   called as a witness herein, having been duly sworn, was

14   examined and testified as follows:

15                      DIRECT EXAMINATION                           16:07:14

16   BY MR. YOUNG:

17   Q.  Good afternoon, Chief Sands.

18   A.  Good afternoon.

19   Q.  You're chief of enforcement within the Maricopa County

20   Sheriff's Office?                                              16:07:18

21   A.  Correct.

22   Q.  Your responsibilities include illegal immigration

23   enforcement efforts, true?

24   A.  That's one of them, yes.

25   Q.  That includes saturation patrols, is that correct?        16:07:25

```
 1    A.  Correct.

 2    Q.  That also includes overseeing the Human Smuggling Unit,

 3    right?

 4    A.  Correct.

 5    Q.  Your responsibilities include carrying out Sheriff Arpaio's     16:07:36

 6    policies with respect to saturation patrols, is that right?

 7    A.  I do carry out those duties, yes.

 8    Q.  One of the goals of saturation patrols is to impact illegal

 9    immigration, correct?

10    A.  Not necessarily.                                                16:07:59

11    Q.  You remember we had a deposition on November 15, 2010?  And

12    I'm going to read to you from page 203, starting at line 20.

13             Every saturation --

14             "QUESTION:  Every saturation patrol that you do has an

15    effect with respect to illegal immigration; is that right?        16:08:25

16             "ANSWER:  I would hope so.

17             "QUESTION:  Okay.  That's their purpose, correct?

18             "ANSWER:  That's one of their purposes, yeah."

19             By the way, I have a binder with your deposition

20    transcripts if you'd like to see it, but -- which I would         16:08:43

21    request that the Court allow me to bring to the witness.

22             THE COURT:  You may do so.

23             MR. YOUNG:  And actually, we have another binder for

24    Your Honor and also for Mr. Casey.  So with Your Honor's

25    permission, I'll give one to your clerk for Your Honor as well.    16:09:00
```

787

```
1              THE COURT:  That would be fine.

2              MR. YOUNG:  Thank you.

3              MR. CASEY:  Thank you very much.

4    BY MR. YOUNG:

5    Q.  So, Chief Sands, is it correct that one of the purposes of     16:09:28

6    the saturation patrols is to impact illegal immigration?

7    A.  Like I said before, that's one of the purposes, yes, but

8    not necessarily the sole purpose.

9    Q.  In July 2007 the sheriff announced a crackdown on illegal

10   immigration, is that right?                                        16:09:48

11   A.  I believe you're correct.

12   Q.  And that crackdown included the use of saturation patrols,

13   is that right?

14   A.  I believe that might be correct, yes.

15   Q.  In deciding where to do saturation patrols --                  16:10:05

16          And, actually, you're responsible for deciding where

17   to do saturation patrols, is that right?

18   A.  Correct.

19   Q.  In making those decisions, you typically do not do a

20   comparative analysis of crime across different areas, is that      16:10:26

21   correct?

22   A.  Not typically, but we do a comparison of different

23   statistics from different perspectives.

24   Q.  Okay.  Please answer my question, which was:  In deciding

25   where to do saturation patrols, you typically do not do a          16:10:47
```

```
1    comparative analysis of crime across different areas, is that
2    correct?
3    A.  That's correct, yeah.
4    Q.  Thank you.
5         An increase in crime is not necessarily used for
6    determining whether and where to have a saturation patrol, is
7    that right?
8    A.  Not necessarily.
9    Q.  Chief Sands, you did another deposition on December 14,
10   2009, and at page 106 of that deposition, starting at line 12,
11   you testified as follows:
12        "Did you conduct some sort of analysis of crime data
13   that led you to believe that there had been some sort of
14   increase in crime in that area?
15        "ANSWER:  I wouldn't necessarily use an increase in
16   crime to always critique whether or not to have a suppression."
17        Was that answer correct at the time that you gave it?
18   A.  I believe my an -- last one was in line with that statement
19   you just made.
20   Q.  Okay.  So you -- you stand by your deposition testimony
21   that I just read to you?
22   A.  Can you -- can you ask me that question again, please?
23   Q.  Well, here -- here's what -- I'll tell you, my question is:
24   Do you stand by your earlier testimony, and the testimony is
25   this, from your earlier deposition on December 14, 2009, page
```

16:11:04

16:11:21

16:11:44

16:12:03

16:12:25

1    106, starting at line 8:

2            "Did you conduct some sort of analysis of crime data

3    that led you to believe that there had been some sort of

4    increase in crime in that area?

5            "ANSWER:  I wouldn't necessarily use an increase in      16:12:38

6    crime to always critique whether or not to have a suppression."

7    A.  That sounds familiar, yes.

8    Q.  Do you stand by that testimony?

9    A.  Yes.

10   Q.  Any crime analysis that you do use in saturation patrol      16:12:55

11   planning would be attached to the saturation patrol operation

12   plan, is that correct?

13   A.  Normally, yes.

14   Q.  A spike in crime -- strike that.

15           You don't recall whether a spike in crime is a           16:13:20

16   criterion for having a saturation patrol, correct?

17   A.  Are you talking about a certain area, or any -- any time

18   we're about to use --

19   Q.  In a particular area.  You don't really recall spikes in

20   crime in particular areas as being a criterion for having a      16:13:46

21   saturation patrol, is that right?

22   A.  That's correct, yes.

23   Q.  You have launched saturation patrols based on complaints

24   from citizens, including businesses, about day laborers, is

25   that right?                                                      16:14:08

A.  About crimes related to people that perhaps were acting as

day laborers.

Q.  Well, we can talk about crimes, but let's sort that -- or

set that aside for the moment.

You have launched saturation patrols based on                    16:14:32

complaints from citizens about day laborers, is that right?

A.  I believe it was -- it's more involved than that.  We've

had several instances where we've had small saturation patrols

when it came to issues involving what might have been day

laborers.                                                        16:15:01

Q.  At page 200 of your February [sic] 14, 2009, deposition,

you were asked these questions and you gave these answers:

Question, starting line 2 of page 200:  "Do you view

day laborers as the source of a nuisance to local businesses?

"ANSWER:  Those are the complaints that we get              16:15:27

frequently from citizens.

"QUESTION:  And you have launched several of the

sweeps we discussed today based on complaints from citizens

about day laborers?

"ANSWER:  Some of those cases, yes."                        16:15:45

Do you stand by that testimony today?

A.  I'm sorry, that was page 200?

Q.  It was page 200 of your -- and there are three depositions

in that binder, so you'll need to look at the one for December

14, 2009, at page 200, and the question is:                      16:16:01

1          "Do you view day laborers as the source of a nuisance

2    to local businesses?"

3          Do you see that?  It's actually on your screen now,

4    Chief.  You can look at it there.

5          Now, please let's look on the screen from line 2 down          16:16:22

6    to line 10.  Do you stand by that testimony?

7    A.  Those -- that those are the complaints that we received?  I

8    believe we have received those complaints, yes.

9    Q.  My question is:  Do you stand by your earlier testimony?

10         It's a simple question, Chief.          16:16:52

11   A.  Yes.

12         MR. CASEY:  Excuse me, Judge.  Move to strike the last

13   comment as argumentative.

14         MR. YOUNG:  I'll withdraw it.  And my apologies.

15   BY MR. YOUNG:          16:17:04

16   Q.  Now, Chief Sands, if you get a citizen complaint that is

17   racially motivated, and the racial motivation is clear on the

18   face of the complaint, but you think that that citizen

19   complaint also involves or could involve a possible crime, you

20   would go ahead and act on that complaint, is that right?          16:17:32

21   A.  If there was a crime involved, yes, I would at least look

22   into the validity of the information.

23   Q.  Let's take a look at several of the operations, starting

24   with Queen Creek.  Let's look at Exhibit 126, which has been

25   admitted.          16:18:07

1          And do you see there the subject line is Cave Creek

2    day laborer and tip line?

3    A.  Yes, I see that.

4    Q.  This was an illegal immigrant operation that the Human

5    Smuggling Unit conducted in response to complaints about day          16:18:26

6    laborers, is that correct?

7    A.  Yes, it appears that way.

8    Q.  The operation was in response, at least in part, to citizen

9    hotline complaints about day laborers, is that right?

10   A.  It says Cave Creek day labors and tip line.                       16:18:53

11   Q.  Now, there were no criminal charges for the day laborers

12   who were investigated in this instant.  There were no criminal

13   charges relating to loitering, is that correct?

14   A.  I don't remember any.

15   Q.  Well, in fact, according to your earlier deposition -- and        16:19:38

16   again, it's December 14, 2009 -- page 100.  Let's bring up that

17   page.  100, starting at line 13.

18          "QUESTION:  So none of the day laborers who were

19   investigated in this operation were charged with loitering,

20   correct?                                                              16:20:08

21          "ANSWER:  Correct.

22          "QUESTION:  Or with any other infractions having to do

23   with disrupting traffic in Cave Creek, correct?

24          "ANSWER:  Correct.

25          "QUESTION:  Instead, they were asserted for suspicion          16:20:21

1   of being in the country unlawfully, correct?

2           "ANSWER:  I believe there were some arrests made for

3   that, yes."

4           Do you stand by that testimony today?

5   A.  Yes.                                                          16:20:35

6   Q.  Now let's move to 32nd and 36th Streets at Thomas, P --

7   Exhibit 202, which has been admitted.  That's an e-mail chain

8   dated November 19, 2007.  It's from a Dr. J.  You see that in

9   the subject line?  Or "from" line, rather, of the bottom

10  e-mail.                                                           16:21:10

11  A.  I do see -- I do see it, yes.

12  Q.  Okay.  And you see the note that the sheriff wrote to you

13  forwarding a copy on paper of this e-mail?

14  A.  I see it.

15  Q.  You know the author of the bottom e-mail, correct?          16:21:23

16  A.  I'm not sure I do, sir.

17  Q.  Well, are you sure you haven't met her?

18          What if --

19  A.  Oh, okay.  Yes.  All right.  As I read down further in the

20  context of the e-mail I see her last name.                        16:21:52

21  Q.  Okay.  So you've met her and you do know who she is, right?

22  A.  I do know who she is, yes.

23  Q.  Her complaint -- well, just look at the -- the e-mail.  She

24  talks about an unpermit mariachi band, and how illegal

25  activists are putting on a freak show.                            16:22:15

1    Do you see that?

2    A.  I see it.

3    Q.  You did, or your department, did a sweep at 36th and Thomas

4    based in part on her complaints, is that correct?

5    A.  I remember her making some complaints, yes.                16:22:38

6    Q.  And based on her complaints, including the e-mail that

7    you're looking at, Exhibit 202, you decided to do a sweep, a

8    saturation patrol, a crime suppression operation, at 36th and

9    Thomas, is that correct?

10   A.  No, there's no -- there's no violation of law that I see    16:22:59

11   there, unless it's a -- some kind of city code violation that

12   we wouldn't entertain, normally.

13   Q.  Well, let's look at your deposition from November 15, 2010,

14   at line 149.  Page 149, rather, at line 10.

15        "QUESTION:  Well, you did do crime suppression              16:23:34

16   operations at that location.  Is it fair to say that the

17   requests from business people in that area had something to do

18   with causing the sheriff's office to do those operations?

19        "ANSWER:  I remember that, yes."

20        Then let's go down a little bit further.                    16:23:52

21        "QUESTION:  And you did those operations because of

22   demands from business owners in that area, correct?

23        "ANSWER:  Correct, yeah."

24        Now, I'm not going to say the name of the person here,

25   but --                                                           16:24:07

1        "And Dr. J is one of those people?

2        "ANSWER:  I believe she is one of those people, yes."

3        You stand by that testimony?

4   A.  I can't really answer that yes or no.

5   Q.  Do you think that your testimony that you gave back in          16:24:27

6   December -- rather, November -- no, December -- November 2010

7   was accurate at the time you gave it?

8   A.  Oh, I do.  And it was accurate in the statement right above

9   that on the -- what you're talking about mariachi bands and

10  that type activity.                                                 16:24:51

11  Q.  So it's accurate that Dr. J's complaints, including what we

12  see in Exhibit 202, was a reason that you decided to do a sweep

13  at 36th Street and Thomas, is that right?

14  A.  Not the -- excuse me, sir, but not the one you asked me

15  about.                                                              16:25:08

16  Q.  Were there other complaints that -- from Dr. J that were

17  the cause?

18  A.  I believe there were, but ones about mariachi bands playing

19  in the street would not be a reason for us to act.  And at that

20  time I testified with the same response, if you look above what   16:25:30

21  you zeroed in on the -- on my deposition.

22  Q.  The operation at that location was prompted by members of

23  the business community who complained about day laborers, is

24  that right?

25  A.  I believe you're correct.  It started with that, yes.          16:25:48

1  Q.  And there were various complaints about the day laborers,

2  including that they were urinating and et cetera, is that

3  right?

4  A.  That sounds familiar, yes.

5  Q.  But in fact, when you did the operation at that location          16:26:05

6  you didn't arrest any of those people for urinating or doing

7  those other things, is that right?

8  A.  I don't recall any day laborers being arrested that I know

9  of.

10 Q.  My question is:  Did you arrest any of them for urinating?       16:26:22

11        And I think your answer is that you don't know of

12 anyone during that operation who was arrested for urinating in

13 public, is that right?

14 A.  I believe so, yes.  I believe that's a correct statement,

15 yes.                                                                   16:26:40

16 Q.  And you don't know of any day laborers who were cited for

17 engaging in any other of the activities that led to the

18 complaints from the business owners in that area, is that

19 right?

20 A.  I believe you're correct in that statement, yes.                 16:26:51

21 Q.  Now, about a week later you did another operation a little

22 bit north at Cave Creek and Bell Road.

23        Do you recall that?  Late March, 2008?

24 A.  Quite a ways north, yes.

25 Q.  I'm sorry?                                                        16:27:09

1    A.  That's quite a ways north.

2    Q.  It is quite a ways north?  And you have to forgive me

3    because I don't know Phoenix geography as well as you do, but

4    it is -- I've got it right, it is north, correct?

5    A.  Correct.                                                16:27:21

6    Q.  All right.  And in late March -- let's put up Exhibit 311,

7    which has been admitted.  And it states that Arpaio's crime

8    suppression operation migrates north to Bell Road.  And it

9    talks about the request of certain business owners for this

10   operation.  The sheriff suggested doing this operation based on  16:27:45

11   a written request by 10 business owners, is that right?

12   A.  I'm sorry, I didn't see that in there.

13   Q.  All right.  Well, my question is a factual question.  I put

14   the press release up just to give a reference point.

15        But my question is, as a matter of your memory of what  16:28:34

16   happened:  Is it true that the sheriff suggested this operation

17   at Cave Creek and Bell Road based on a written request by 10

18   business owners?

19   A.  I recall something like that.  I don't remember exactly how

20   many business people.                                       16:28:57

21   Q.  But it was a written request from some business people,

22   correct?

23   A.  I believe you're correct, yes, sir.

24   Q.  Based on that request, the sheriff suggested that you do an

25   operation at Cave Creek and Bell Road, is that right?        16:29:06

```
 1    A.  I believe you're correct, yeah.

 2    Q.  You're not sure that any effort was made to verify the

 3    basis for that request, is that right?

 4    A.  I'm not sure.  I don't even recall what the complaints were

 5    at this time.                                                    16:29:29

 6    Q.  You did not interview any of those business owners

 7    yourself, correct?

 8    A.  No, I don't remember doing that, no.

 9    Q.  And you don't know that anybody else from your office did

10    either, is that right?                                           16:29:44

11    A.  I'm not sure that they did, no.

12    Q.  You're not sure if any effort was made to check out the

13    source of that letter that prompted that operation, is that

14    correct?

15    A.  That's -- I don't recall doing it, no.                       16:29:55

16    Q.  Okay.  Now let's move to Fountain Hills, and let's pull up

17    Exhibit 108.  That operation occurred May 6th and 7, 2008.  And

18    actually, you have not been here, I believe, but we looked at

19    this earlier.  Let's turn to the -- the third page of that

20    exhibit, and you'll see a number of names there and you'll see   16:30:23

21    that nine out of ten of them appear to be Hispanic.

22            You see that?

23    A.  Yes.

24    Q.  And let's go to the fifth page of the exhibit.

25            By the way, the third page is a summary of the first     16:30:43
```

```
 1   day of the operation.  The second day is summarized in the

 2   fifth page.

 3           Let's blow that up a little bit so the chief can read

 4   it.

 5           You see that list of names?                                16:30:55

 6   A.  Yes, I do.

 7   Q.  Eight of the ten of those names appear to be Hispanic,

 8   correct?

 9   A.  They appear to be, yes.

10   Q.  Fountain Hills is not a Hispanic neighborhood, correct?        16:31:09

11   A.  The city of Fountain Hills is a city of about 30,000

12   people.  I'm not sure of the demographic breakdown.

13   Q.  You would agree with me that Fountain Hills has a high

14   population of non-blacks and non-Hispanics, correct?

15   A.  I would agree with that statement, yes.                        16:31:41

16   Q.  Notwithstanding that fact, the numbers that we see in this

17   exhibit do not cause any concern for you with respect to the

18   issue of racial profiling, is that right?

19   A.  No.

20   Q.  It's not right, you do have a concern?                         16:32:05

21   A.  I'm -- I'm saying I don't.

22   Q.  You do not have a concern.  You don't have -- the numbers

23   that we looked at, the eight of 10, the nine of 10, they don't

24   cause you any concern about possible racial profiling, is that

25   correct?                                                           16:32:18
```

1   A.  No, not on the face of what you just described, a list of

2   names.  I'd have to look into what the traffic stops were and

3   what led to it.

4   Q.  Do you see a concern with those numbers?

5   A.  What I'm looking at right now is saturation patrol.                16:32:37

6   There's three subjects with suspended license charges,

7   indicating they were stopped and found to have suspended

8   licenses.  That would indicate to me that someone stopped them

9   and it was determined that their licenses were suspended and

10  they shouldn't have been driving.                                      16:32:59

11  Q.  Chief, let's move on to Mesa.  You did some operations in

12  Mesa, correct?

13  A.  Correct.

14  Q.  Let's -- and you did those in June and July 2008.

15  Actually, the parties have stipulated to that, so I'm just            16:33:18

16  telling you that to give you a reminder.

17          Let's pull up Exhibit 223, which has been admitted.

18          Now, the sheriff has testified, I'll tell you, that he

19  sent this to you with a little mark on the bottom of the first

20  paragraph.  You believe that this letter was relevant to your        16:33:41

21  job in connection with saturation patrols, is that right?

22  A.  By topic, I haven't read the letter.  I mean, I'm sure I've

23  read it in the past, but you're --

24  Q.  Well, we read it in your deposition, and you -- do you

25  receive things when the sheriff sends them to you with little        16:34:11

```
 1   handwritten notes like this?
 2   A.  Yes.
 3   Q.  Okay.  Do you believe that this letter is relevant to your
 4   job in connection with saturation patrols?
 5   A.  I'd have to read it, if you don't mind.                      16:34:24
 6   Q.  Well, I'll tell you you did read it in your deposition at
 7   November 15, 2010 --
 8           MR. CASEY:  Excuse me, Your Honor.
 9           May the witness be allowed to refresh his memory?
10           THE COURT:  I'll allow the witness to read the letter.  16:34:41
11           THE WITNESS:  Thank you, Your Honor.
12           MR. YOUNG:  And I apologize.  I didn't mean to say
13   that he could not read the letter.  It is there on the screen
14   and he's free to read it if he wants to to answer the question.
15           (Pause in proceedings.)                                 16:34:56
16           MR. YOUNG:  Let us know when you want to go to the
17   next page, Chief.
18           THE WITNESS:  Okay.  I'm ready for the second page.
19           Please, can you ask me that question again now that
20   I've read it?                                                   16:35:59
21   BY MR. YOUNG:
22   Q.  You believe that this letter which the sheriff sent you is
23   relevant to your job in connection with saturation patrols,
24   correct?
25   A.  It's -- it's relative to an immigration issue that's        16:36:07
```

```
 1   actually what appears to be largely political.
 2   Q.  Let's pull up Exhibit 243, which has also been admitted.
 3           This is another letter about Mesa that the sheriff
 4   sent to you, correct?
 5   A.  Yes.                                                           16:36:29
 6   Q.  Now, in the paragraph -- and I'll just tell you the sheriff
 7   has told us that he marked the paragraph on the left side of
 8   the page that refers to the head of Mesa's police union being a
 9   Hispanic.
10           Do you see that language?                                 16:36:55
11   A.  Yes.
12   Q.  You believe that that's a reference to George Gascón, who
13   was chief of the Mesa Police Department at that time, correct?
14   A.  No, I don't.
15   Q.  Well, let's look at your November 15, 2010, deposition at     16:37:11
16   page 128, line 1 -- starting at line 1.
17           No, I'm sorry.  Page 131, starting at line 15 and
18   let's go to the 132 at line 7.
19           There you testified that you thought that the letter
20   was referring to Chief Gascón, correct?                           16:37:59
21   A.  Actually, yeah, at that time the question was submitted to
22   me differently than you just submitted to me, and you were
23   speaking in reference to the leader of the Mesa police union.
24   It was not George Gascón.
25   Q.  Okay.  Well, with respect to to the letter, taking into       16:38:19
```

1   account that the author of the letter may have confused the

2   police union with the police department, you said, and I'll

3   just start reading to you from line 20:

4           "Chief Gascón, right?

5           "ANSWER:  Right.                                    16:38:43

6           "QUESTION:  That's the person you think is being

7   referred to in this letter?

8           "ANSWER:  I'm sure of that, yeah, from the time period

9   we're talking about.  There is another Hispanic police chief

10  over there, though, but I imagine he's talking about Gascón."   16:38:56

11          You stand by that testimony today?

12  A.  Yes.

13  Q.  You believe that the author of this letter, Exhibit 223,

14  thinks that dark-complected people are illegal aliens, is that

15  right?                                                        16:39:21

16  A.  I believe he's talking about Hispanic people and he's using

17  the same language referring to the union president and the

18  police chief as being such, so I -- I'm assuming that he's

19  talking about Hispanics, yes.

20  Q.  And you're assuming that he's talking about dark-complected   16:40:11

21  Hispanic people, correct?

22  A.  He -- he may be.

23  Q.  And the reason you think he may be referring to

24  dark-complected Hispanic people is that he's visually seeing

25  them and likely has not talked to them, but, nonetheless,     16:40:33

1    believes that they're illegal aliens, is that correct?

2    A.  I believe he doesn't have a basis for his -- his complaint.

3    Q.  And for that reason you think that he is making a

4    conclusion based on the color of their skin, is that right?

5    A.  I would believe it's implied in his message.                    16:40:56

6    Q.  Other than actually talking to them, in your view, there

7    wouldn't be any other way to really know that they're illegal

8    aliens other than by the fact that they're dark-skinned

9    Hispanic people, correct?

10   A.  I wouldn't draw that conclusion myself.                         16:41:28

11   Q.  Well, let's take a look -- and actually, we'll listen to

12   your testimony on November 15, 2010.  It's clip number 2.  Page

13   142, from line 18.

14         No, actually 142 -- yes.  Okay.  142, line 18.  Go

15   ahead.                                                              16:41:58

16         Well, maybe I'll read it here.

17         "QUESTION:  Well, I actually didn't make an assumption

18   about his perceiving --"

19         This is my question.

20         "-- I didn't make an assumption about his perceiving          16:42:15

21   dark-skinned people as illegals.  I think that's your

22   assumption about what he's saying.

23         "My question to you is, where do you get that

24   assumption about what he is saying?

25         "ANSWER:  Because he is talking about illegal aliens          16:42:29

1    and viewing them and visually seeing them.  So it would be a

2    safe bet to say he's drawn some kind of conclusion, unless he's

3    gone up there and individually talked to every one of these

4    people that he's talking about and verified the fact that they

5    were they're illegally.                                          16:42:49

6          "What else am I supposed to think is that the guy is

7    just guessing that they're illegals?"

8          You did an operation in Sun City as well, correct?

9    A.  Yes, we have.

10   Q.  Let's pull up Exhibit 236, which has previously been marked  16:43:12

11   and admitted, and let's blow up the text of the letter.

12         See the letter there about people speaking Spanish at

13   McDonald's?

14   A.  Yeah, I do see a statement like that.

15   Q.  You think that the author of this letter is alleging that    16:43:43

16   there are illegal aliens working at that McDonald's, correct?

17   A.  That's what I assume her perception probably was.

18   Q.  And that's based on the fact that she says there are people

19   who don't speak English as a first language and who are

20   speaking Spanish at the McDonald's, your conclusion is that      16:44:22

21   she's alleging that there are illegal aliens at that

22   McDonald's, correct?

23   A.  If you read it in context with the first paragraph where

24   she's -- seems to be concerned about pro-illegals

25   organizations, I believe she's talking about her own perception  16:44:48

1    of illegal immigration.

2    Q.  You also believe the sheriff may have forwarded this letter

3    to you for your employer sanction people, is that right?

4    A.  I'm not sure.

5    Q.  I'll tell you, at page 107 of your deposition, lines 12 and    16:45:09

6    13, that's what you told me.

7         Do you stand by that?

8    A.  I said that at -- he sent that to me because of that?

9    Q.  You said at line 12 of page 107, quote:

10        "He may have been conveying this off to me for our    16:45:30

11   employer sanction people.  I don't know.  Those are operations,

12   too, that we have."

13        Do you stand by that testimony?

14   A.  That he may have been sending something to me with that

15   thought?  Okay.    16:45:44

16   Q.  The sheriff may have told you that you should do a Sun City

17   operation, correct?

18   A.  He may have said that, yes.

19   Q.  The sheriff was involved in the Sun City operation, is that

20   right?    16:46:06

21   A.  Yes, he was.

22   Q.  You briefed him on what you were going to do operationally?

23   A.  I usually do, yes.

24   Q.  Now, you see the note at the top on the right-hand side?

25   Let's pull it back up again.    16:46:24

```
 1              You see where in parentheses the sheriff writes to you
 2   that it's, quote, for our operation?
 3   A.  Yes, I see that.
 4   Q.  You think he may have been responding to perceptions about
 5   illegal immigrants in the community, is that correct?          16:46:47
 6   A.  I'm not exactly sure what he was thinking when he sent it
 7   to me, but I can tell you what I would do.
 8   Q.  What would you do?
 9   A.  Nothing.
10   Q.  Well, in fact, you did do a saturation patrol less than two  16:47:08
11   weeks after the date of this letter in Sun City, is that right?
12   A.  I can't remember exactly the date of.  However --
13   Q.  August 13 and 14, 2008.
14   A.  Okay.
15   Q.  And I'll tell you that that's what the parties have agreed.  16:47:26
16              Let's pull up Exhibit 235.  This is an August 8
17   letter.  And you'll see there that -- and I'll tell you again
18   it's the sheriff that did that mark.
19              The author says that they would love to see an
20   immigrant sweep conducted in Surprise.  And I'll tell you the  16:47:52
21   parties have agreed that on October 16 and 17, 2009, the MCSO
22   conducted a large-scale saturation patrol in Surprise and the
23   northwest valley.
24   A.  I'm sorry.  Could you give me that date again?
25   Q.  Yes.  October 16-17, 2009.                                  16:48:14
```

1    A.  Okay.  Okay.

2    Q.  Do you recall that operation in Surprise in the northwest

3    valley?

4    A.  Yes, I do.

5    Q.  Now, between August 8, 2008, which is the date of this          16:48:27

6    letter, and October 2009, is sufficient time for your

7    department to plan a large-scale saturation patrol, correct?

8    A.  It could be.

9    Q.  The sheriff wrote a note on this saying that his staff

10   should send a thank you note.  You think it's appropriate for      16:48:56

11   the sheriff to do so, correct?

12   A.  I believe the sheriff can respond to his constituents how

13   he feels he should.

14   Q.  The sheriff is a political person.  You agree with that?

15   A.  Very true.                                                      16:49:15

16   Q.  The sheriff gets elected to office, is that right?

17   A.  I'm sorry -- okay.  I thought you were making a statement.

18   Yes, he does get elected to office, yes.

19   Q.  I'm not from Phoenix so I really do need to ask you these

20   questions.                                                          16:49:33

21   A.  No problem.

22   Q.  The sheriff has to be responsive to his constituents, is

23   that right?

24   A.  Yes.

25   Q.  And that responsiveness includes responding to letters from     16:49:43

1   constituents asking for him to perform operations in particular

2   areas, is that right?

3   A.  The way he responds to his constituents isn't necessarily

4   the way I deal with it.  I don't normally have to deal with a

5   lot of that, so it's not fair for me to put words into his          16:50:11

6   mouth.

7   Q.  All right.  Well, you don't see a problem with him

8   responding to this particular letter, is that correct?

9   A.  No, if he wants to respond to it, he's the officeholder.

10  Q.  The sheriff receives a lot of public support for his            16:50:42

11  illegal immigration policies.  Do you agree with that?

12  A.  I believe you're correct.

13  Q.  The crime suppression patrols that you oversee are part of

14  his response to citizen complaints, is that right?

15  A.  Historically speaking, that's true.                             16:50:58

16  Q.  In fact, the public expects a response from the Sheriff's

17  Office, including in the form of crime suppression patrols,

18  correct?

19  A.  I believe that's one of their expectations, yes.

20  Q.  The sheriff suggests saturation patrol sites to you,            16:51:18

21  correct?

22  A.  We have discussions about them, yes.

23  Q.  And the sheriff's recommendations or discussions with you

24  about locations for saturation patrols is in response to at

25  least some types of calls from members of the public, correct?     16:51:42

1    A.  It could be, yes.

2    Q.  And you follow his suggestions, correct?

3    A.  Yes.

4    Q.  More generally, Sheriff Arpaio is the final decision maker

5    in your office.  Do you agree with that?                         16:52:05

6    A.  Yes, he is obviously the official in charge as the sheriff.

7    Q.  You follow his directives, correct?

8    A.  Yes, but he gives me great latitude in performance of my

9    duties.

10   Q.  He, the sheriff, expects you to be responsive to the         16:52:26

11   citizen complaints that he sends to you, correct?

12   A.  If there's some validity to it.  We don't have great

13   discussion about those complaints.

14   Q.  Let's play clip 3, which is from your November 15, 2010,

15   deposition, line -- page 115, line 122.                          16:52:54

16          All right.  I will read it aloud.

17          MR. CASEY:  Sorry.  Could you repeat the page number,

18   please?

19          MR. YOUNG:  Yes.  Page 115 at line 22.

20          MR. CASEY:  Thank you, sir.                                16:53:22

21   BY MR. YOUNG:

22          "QUESTION:  So what is Sheriff Arpaio telling you when

23   he says, 'Brian, for our operations'?

24          "ANSWER:  I don't know.  I don't know.  He is passing

25   me off information about a citizen's complaint.  He expects me    16:53:33

```
 1    to do whatever I can about a citizen's complaint."

 2            You stand by that testimony?

 3    A.  Emphasis on the "can," yes, I do.

 4    Q.  You often get notes from the sheriff about complaints, or

 5    containing complaints from citizens where he annotates              16:53:58

 6    something and sends it to you, is that right?

 7            Let me clarify the question.  You often get notes from

 8    the sheriff in which he has annotated something that he has

 9    received from someone else and sent to you, is that right?

10    A.  That's correct.                                                 16:54:21

11    Q.  I'm sorry?  Did you --

12    A.  I said that's correct, yes.

13    Q.  The sheriff sometimes sends you opinions of people that he

14    receives, correct?

15    A.  Yes.                                                            16:54:31

16    Q.  And the sheriff has sent you things that you believe he

17    agrees with, is that right?

18    A.  I'm sure of that, yes.

19    Q.  You're sure that the sheriff has sent you things that he

20    has received from other people, and that are about illegal          16:54:50

21    immigration, and that you know he agrees with, is that right?

22    A.  I believe he agrees with some of it, yes.

23    Q.  The sheriff has forwarded to you statements and e-mails and

24    articles from what you call closed border activists, is that

25    right?                                                              16:55:14
```

1    A.  I believe he has, yeah.

2    Q.  But you cannot think of anything that the sheriff has ever

3    sent you that you know that he disagrees with, is that correct?

4    A.  Everything he sends to me I don't have a discussion with

5    him, so I'm not quite certain how to answer that question, sir.    16:55:36

6    Q.  Well, the question is pretty simple.  You can't think of

7    anything that the sheriff has ever sent you that you know that

8    he disagrees with, is that right?

9    A.  Well, he sends me so -- so much that I'd be speculating on

10   what his thoughts were about what the content of the subject    16:56:01

11   matter was.

12   Q.  Okay.  Well, you gave a slightly different answer on

13   November 15, 2010, and I'm going to read that to you.

14            Page 218, starting at line 18.

15            "QUESTION:  Has the sheriff ever, to your memory,    16:56:19

16   forwarded to you, for your information, any statements that you

17   know the sheriff disagrees with?

18            "ANSWER:  I can't think of any right offhand."

19   A.  Yeah, okay, I can't think of any, no, I --

20   Q.  You stand by that testimony?    16:56:40

21   A.  Well, and I think that was my testimony now.  I don't have

22   discussion with him about these matters on every incident that

23   he sends to me, so I can't, no.

24   Q.  So your earlier testimony was correct?

25   A.  Yeah, yes.    16:56:57

1    Q.  When you do get copies of documents from the sheriff, you

2    read them and you may distribute them for action, or you may

3    draw a line through it and dispose of it, is that right?

4    A.  That's correct.

5    Q.  If there is a letter that you get from a citizen that has          16:57:16

6    some information in it that you deem warrants some kind of

7    action, you will forward it to a subordinate, is that correct?

8    A.  Yes.

9    Q.  If there were a letter from a citizen suggesting that you

10   need to do a crime suppression operation in a particular area,        16:57:33

11   you could pass that letter along to a subordinate for action,

12   is that right?

13   A.  Depending on what the content was.  People just don't get

14   crime suppression operations just because they request one.

15   Q.  Well, there are some where you do pass them along for             16:57:53

16   action, though, right?

17   A.  There's some involving reports of crimes that I pass along,

18   or I'll get to the appropriate agency.

19   Q.  If the citizen letter related to a crime suppression

20   operation, one of the subordinates that you could send the           16:58:13

21   letter to would be Joe Sousa, is that right?

22   A.  That's correct in the past, yes.

23   Q.  He was the head of the Human Smuggling Unit?

24   A.  Correct.

25   Q.  Is he still the head of the Human Smuggling Unit?                 16:58:27

```
 1   A.  No, sir.

 2   Q.  In making decisions about where to do crime --

 3           THE COURT:  Mr. Young, I'm looking for a good place to

 4   break for the day.  We're getting very close to the end of the

 5   day.                                                              16:58:44

 6           MR. YOUNG:  How about two more questions?

 7           THE COURT:  All right.

 8   BY MR. YOUNG:

 9   Q.  Chief Sands, in making your decisions about where to do

10   crime suppression patrols, you have considered citizen and       16:58:52

11   public comments that the sheriff has forwarded to you, correct?

12   A.  I have looked at them, yes, I have, yeah.

13   Q.  Not only have you looked at them, but you've considered

14   them, is that right?

15   A.  Dependent on what their content was.                         16:59:06

16   Q.  And you are sure that you have decided the locations of at

17   least some saturation patrols based on correspondence that the

18   sheriff has received from a member of the public and has

19   forwarded to you, is that correct?

20   A.  Not in every case, no.                                       16:59:33

21   Q.  I didn't ask in every case.  My question was:  You're sure

22   that you have decided the locations of at least some saturation

23   patrols based on correspondence that the sheriff has received

24   from members of the public and forwarded to you, is that right?

25   A.  Yes, but it wouldn't have been solely based on anything       17:00:01
```

```
 1    other than crime-related activities.

 2            MR. YOUNG:  Thank you very much, Chief.

 3            Your Honor, we'll need to continue with Chief Sands

 4    tomorrow.  But I'm at a breaking point now.

 5            THE COURT:  All right.  Thank you.                    17:00:15

 6            You may step down for the day.  We'll see you back

 7    tomorrow.

 8            THE COURT:  Is there anything that the parties want to

 9    raise at this time?

10            MR. YOUNG:  Plaintiffs have nothing at this time, Your  17:00:33

11    Honor.

12            MR. CASEY:  Defendants have nothing, Your Honor.

13            THE COURT:  All right.  We'll see you tomorrow.

14            (Proceedings recessed at 5:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4

5

6

7        I, GARY MOLL, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17        DATED at Phoenix, Arizona, this 25th day of July,

18  2012.

19

20

21                        s/Gary Moll

22

23

24

25