1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega            )
     Melendres, et al.,                )
5                                      )
                     Plaintiffs,       )   CV 07-2513-PHX-GMS
6                                      )
                     vs.               )   Phoenix, Arizona
7                                      )   July 26, 2012
     Joseph M. Arpaio, et al.,         )   8:33 a.m.
8                                      )
                     Defendants.       )
9    _____  )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17              (BENCH TRIAL DAY 4 - Pages 817-1093)

18

19

20

21

22   Court Reporter:           Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                        A P P E A R A N C E S

2

3   For the Plaintiffs:           Stanley Young, Esq.
                                   Andrew C. Byrnes, Esq.
4                                  COVINGTON & BURLING, L.L.P.
                                   333 Twin Dolphin Drive
5                                  Suite 700
                                   Redwood Shores, California  94065
6                                  (650) 632-4704

7                                  David Hults, Esq.
                                   COVINGTON & BURLING, L.L.P.
8                                  1 Front Street
                                   35th Floor
9                                  San Francisco, California  94111
                                   (415) 591-7066

10

                                   Lesli Rawles Gallagher, Esq.
11                                 9191 Towne Centre Drive
                                   6th Floor
12                                 San Diego, California  92122-1225
                                   (858) 678-1807

13

                                   Nancy Anne Ramirez, Esq.
14                                 MEXICAN AMERICAN LEGAL DEFENSE
                                   AND EDUCATIONAL FUND
15                                 Regional Counsel
                                   634 S. Spring Street
16                                 11th Floor
                                   Los Angeles, California  90014
17                                 (213) 629-2512, Ext. 121

18                                 Annie Lai, Esq.
                                   Daniel J. Pochoda, Esq.
19                                 AMERICAN CIVIL LIBERTIES
                                   FOUNDATION OF ARIZONA
20                                 77 E. Columbus Avenue
                                   Suite 205
21                                 Phoenix, Arizona  85012
                                   (602) 650-1854

22

                                   Andre Segura, Esq.
23                                 AMERICAN CIVIL LIBERTIES UNION
                                   125 Broad Street, 18th Floor
24                                 New York, New York  10004
                                   (212) 549-2676

25

1                        A P P E A R A N C E S

2

3                                Cecillia D. Wang, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
4                                FOUNDATION
                                 Director
5                                Immigrants' Rights Project
                                 39 Drumm Street
6                                San Francisco, California  94111
                                 (415) 343-0775
7

   For the Defendants:          Timothy J. Casey, Esq.
8                                James L. Williams, Esq.
                                 SCHMITT, SCHNECK, SMYTH,
9                                CASEY & EVEN, P.C.
                                 1221 E. Osborn Road
10                               Suite 105
                                 Phoenix, Arizona  85014-5540
11                               (602) 277-7000

12                               Thomas P. Liddy
                                 Deputy County Attorney
13                               MARICOPA COUNTY ATTORNEY'S OFFICE
                                 Practice Group Leader, Litigation
14                               Ann T. Uglietta, Esq.
                                 Deputy County Attorney
15                               Civil Services Division
                                 222 N. Central Avenue
16                               Suite 1100
                                 Phoenix, Arizona 85004
17                               (602) 372-2098

18

19

20

21

22

23

24

25

1                          I N D E X

2    Witness:                                        Page

3    BRIAN L. SANDS

4    Direct Examination Continued by Mr. Young        823
     Cross-Examination by Mr. Casey                   837
5    Examination by The Court                         879
     Redirect Examination by Mr. Young               890

6    CARLOS RANGEL

7
     Direct Examination by Ms. Gallagher             897
8    Cross-Examination by Mr. Liddy                   916
     Examination by The Court                         942
9    Cross-Examination Continued by Mr. Liddy         954
     Redirect Examination by Ms. Gallagher            956

10   DIONA SOLIS

11
     Direct Examination by Mr. Segura                 960

12   LORENA S. ESCAMILLA

13
     Direct Examination by Ms. Ramirez               965
14   Cross-Examination by Mr. Liddy                   981

15   JOSEPH SOUSA

16   Direct Examination by Mr. Byrnes                 988
     Cross-Examination by Mr. Casey                  1026
17   Redirect Examination by Mr. Byrnes              1074

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2    No.        Description                              Admitted

3    14         Report attached to June 11, 2009 email from    907
                Joya to Rangel (Carveout MCSO 0002221-22)
4
     63         MCSO CAD Incident History, Incident #          978
5               MA09163575 (MCSO CAD Database)

6    454        Impeachment exhibit                           1083

7    1093       Draft copy of a response to the U.S. House     914
                Inquiry dated 02/12/09 (ICE BS 10760-66,
8               Ex. 40 to J. Kidd Depo)

9    1122A      Bates No. Melendres MCSO 016040               1041
                (Page 8 of Exhibit 1122)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  Thank you.  Please be seated.  The parties

4    have anything to raise?

5          MR. YOUNG:  Yes, Your Honor.                          08:33:08

6          THE COURT:  All right.  What do you need?

7          MR. YO UNG:  Thank you.

8          Your Honor, may I approach the witness and hand him an

9    exhibit?

10         THE COURT:  Are we going to start with testimony?     08:33:17

11         MR. YOUNG:  Yes.

12         THE COURT:  Okay.

13         Is there anything that you need to raise, Mr. Casey?

14         MR. CASEY:  There is not, Your Honor.  Thank you.

15         THE COURT:  All right.  I'm just going to give you my  08:33:24

16    calculation, as I promised to do at the beginning of every day.

17         Plaintiffs have used 10 hours and 35 minutes.

18    Defendants have used six hours and 25 minutes.

19         Mr. Young, if you're ready to proceed, you may do so.

20         MR. YOUNG:  Thank you, Your Honor.                    08:33:40

21         Your Honor, I'd like to hand the witness Exhibit 158

22    for identification.  May I?

23         THE COURT:  You may.

24

25

```
 1                      BRIAN L. SANDS,

 2  recalled as a witness herein, having been previously duly

 3  sworn, was examined and testified further as follows:

 4                  DIRECT EXAMINATION CONTINUED

 5  BY MR. YOUNG:                                              08:34:08

 6  Q.  Chief Sands, good morning.

 7  A.  Good morning.

 8  Q.  I've handed you Exhibit 158.  Before I have you look at

 9  that, the MCSO receives federal funding, correct?

10          MR. CASEY:  Objection, Your Honor.  It's irrelevant.  08:34:21

11  We've stipulated already to federal funding being received by

12  the MCSO.

13          MR. YOUNG:  Then I'll withdraw the question.

14          THE COURT:  All right.

15  BY MR. YOUNG:                                              08:34:29

16  Q.  Do you recognize Exhibit 158 as a list of federal grants to

17  the Maricopa County Sheriff's Office?

18  A.  It appears to be.

19          MR. YOUNG:  Your Honor, I move for the admission of

20  Exhibit 158.                                               08:34:53

21          MR. CASEY:  Your Honor, I'd like to note on the

22  objection that it's irrelevant because of the stipulation the

23  parties have reached into -- reached already in the pretrial

24  statement.

25          THE COURT:  Mr. Young?                             08:35:06
```

```
 1              MR. YOUNG:  Well, I was going to ask some questions

 2   about specific use of the funding.  And actually, if Mr. Casey

 3   would be so kind as to remind me of the paragraph, I would take

 4   a look at that.

 5              MR. CASEY:  I'm sorry, we have a 300-page pretrial and    08:35:19

 6   I don't remember.  I do know that we've stipulated to that.

 7              THE COURT:  All right.  If you stipulated to federal

 8   funding, I guess I'm going to ask, Mr. Young, what is the

 9   relevance of asking about individual programs?

10              MR. YOUNG:  Well, if counsel will stipulate that that    08:35:34

11   satisfies the requirements of our Title VI cause of action,

12   then I'll move on.

13              MR. CASEY:  I stipulate.

14              THE COURT:  All right.

15              MR. YOUNG:  Okay.  Thank you.                            08:35:42

16   BY MR. YOUNG:

17   Q.  Let's pull up Exhibit 187, and I want to focus,

18   Chief Sands, on a note that Sheriff Arpaio wrote to you in the

19   upper right-hand corner of the first page of that exhibit.

20              Can we focus on that?                                    08:36:04

21              You see there the sheriff has written to you a note

22   that says:  Have someone handle?

23   A.  Yes.

24   Q.  Now, when you get a note like that from Sheriff Arpaio, you

25   understand that you're either supposed to do something, or the     08:36:25
```

1  sheriff wants you to do something to resolve the problem that

2  the member of the public who has written the letter on which

3  the sheriff has attached this note has presented, is that

4  correct?

5  A.  In a broad sense, yes, but it's -- the determination of how          08:36:43

6  it's handled is left up to me.

7  Q.  You said in a broad sense, yes, that's correct, is that

8  right?

9  A.  Well, apparently he's giving me some kind of information,

10  which I'm not sure what is contained there, and asking me to          08:37:06

11  look into it or handle it.  That -- that's a very broad term,

12  and he leaves it up to me how to do that.

13  Q.  When you get a request like that from the sheriff, Have

14  someone handle that, you act in accordance with that request

15  from the sheriff, correct?          08:37:32

16  A.  I review it.

17  Q.  I'm going to read to you from your deposition of November

18  15, 2010, at line 2 on page 100.

19        "QUESTION:  Well, when Sheriff Arpaio sends you

20  something and tells you, 'Have someone handle that,' is it your          08:37:56

21  understanding that you're supposed to do something or that he

22  wants you to do something to resolve the problem that the

23  member of the public has presented?

24        "ANSWER:  I should hope so.

25        "QUESTION:  And do you act in accordance with that          08:38:14

```
 1   request from the sheriff?
 2           "ANSWER:  Yes."
 3           Was that testimony accurate when you gave it?
 4   A.  I'm trying to follow you, sir.  I got caught in --
 5   Q.  Sure.  It's at page 100, starting at line 2.  Do you have    08:38:37
 6   that page in front of you?
 7   A.  Yes.
 8   Q.  Please take your time to read it if you'd like to do that.
 9           (Pause in proceedings.)
10           THE WITNESS:  I'm having trouble finding it here in    08:39:32
11   the notebook.  Could you maybe expand it on the screen so I can
12   see it?
13           MR. YOUNG:  Oh, sure.
14           Mr. Braun?
15   BY MR. YOUNG:    08:39:42
16   Q.  Do you want the whole page 100?
17   A.  Yes, please.
18           All right, that -- those -- that questioning was
19   relative to a particular situation that was going on at
20   29th Street and Greenway, and there may have been something of    08:40:19
21   substance there that I may have passed on at the time, I'm not
22   quite sure what it was.  It seems like it was a -- something
23   about shooting in public.
24   Q.  Actually, my question, Chief Sands, was whether the
25   testimony that you gave on page 100 of your November 15, 2010,    08:40:43
```

 1  deposition, from lines 2 to 13, which I just read to you, was

 2  correct.

 3  A.  Yes.  If there was some criminal activity there, yes, I

 4  would -- I would submit it for -- for someone to either look

 5  into, or perhaps I would communicate it to -- to another agency      08:41:05

 6  if that was necessary.

 7  Q.  You don't recall anyone from your office doing anything to

 8  deal with possible gunshots at 29th Street and Greenway

 9  Parkway, correct?

10  A.  I don't recall it, no.                                           08:41:28

11  Q.  Let's go to Exhibit 206.

12        This is an e-mail on paper the sheriff forwarded to

13  you, and I'd like you to focus, actually, on the sixth

14  paragraph that begins -- well, I'll just read it to you.

15        Says:  What our open border crowd calls racial               08:41:57

16  profiling is what I call reasonable suspicion and probable

17  cause, both of which are legal grounds for further action.  If

18  it walks like a duck and quacks like a duck.

19        You see that language?

20  A.  Yes.                                                             08:42:15

21  Q.  It walks like a duck and quacks like a duck is an old-time

22  police term, correct?

23  A.  I've heard that term before, yes.

24  Q.  Okay.  It's the sort of term you hear when you're dealing

25  with gang members.  If they look like gang members, they must       08:42:32

```
 1    be gang members, correct?
 2    A.  I've heard it in that context, yes.
 3    Q.  Let's go to Exhibit 228.
 4         MR. CASEY:  Sorry, 228?
 5         MR. YOUNG:  Yes.                              08:42:52
 6         MR. CASEY:  Thank you, sir.
 7    BY MR. YOUNG:
 8    Q.  This is a log of calls to the front desk that the sheriff
 9    forwarded to you, correct?
10    A.  It appears that way, yes.                      08:43:07
11    Q.  Let's go to the second page.  I want to focus on the entry
12    from Joyce F.
13         Actually, let's go to the third page.
14         I'm sorry, the second page, the bottom item, Kerrie R.
15         You see there, Chief Sands, where it says:  Please  08:43:36
16    make another immigrant sweep at Cave Creek and Bell Road?
17    A.  Yes, I see that.
18    Q.  When you get something like that from the sheriff, you
19    understand that he's telling you things that he wants you to
20    know, is that correct?                             08:43:53
21    A.  Yes, he's giving me that information, yes.
22    Q.  So as you look at that language, the sheriff is telling you
23    to please make another immigrant sweep at Cave Creek and Bell
24    Road, is that right?
25    A.  I don't see that written in there anywhere, no, sir.  08:44:18
```

1    Q.  Please go to page 197 of your November 10 deposition, if

2    you'd like to read along.  I'll read it to you.

3              It's page 197, starting at line 13.

4              "So he's telling you via this document, among other

5    things, that someone says, Please make another immigrant sweep    08:44:40

6    at Cave Creek and Bell Road.

7              "Would you agree with me on that?

8              "ANSWER:  It's written down there, yes."

9    A.  I haven't read this in its total context, but I believe I'm

10   talking about the person that called in and gave the message,    08:44:59

11   not the sheriff.

12   Q.  You're familiar with the MCSO zero tolerance policy, is

13   that correct?

14   A.  I am aware of -- of that terminology being used, yes.

15   Q.  When you hear that term, you believe that it means that you    08:45:16

16   arrest everybody that you have warrants for or that you have

17   probable cause that they committed a chargeable offense, is

18   that right?

19   A.  Of course we're going to arrest everybody that has a

20   warrant, and typically that's implied to arrest people that    08:45:31

21   we're taking into custody for charging with a crime, yes.

22   Q.  Your understanding is that it also means that you arrest

23   everyone that you have probable cause for that they committed a

24   chargeable offense, correct?

25   A.  That's the normal practice in a saturation patrol, yes.    08:45:52

1   Q.  You don't do any analysis to determine whether a zero

2   tolerance policy is actually followed during saturation

3   patrols, is that correct?

4   A.  Typically I don't, no.

5   Q.  The zero tolerance policy does not apply to traffic stops    08:46:12

6   or traffic tickets, correct?

7   A.  I'm -- I'm not quite clear on your question.

8          Are people stopped with zero tolerance in mind, or are

9   they -- please clarify that for me a little.

10  Q.  You would agree with me that your officers cannot stop    08:46:38

11  every single driver that they observe exceeding the speed

12  limit.

13          Do you agree with that?

14  A.  Usually it's not feasible.

15  Q.  So, therefore, you do not send officers out to write    08:46:51

16  tickets for every traffic violation that they encounter, is

17  that right?

18  A.  I've never emphasized that.

19  Q.  There is no hard and fast rule during saturation patrols

20  that officers stop every traffic violator that they see, is    08:47:23

21  that right?

22  A.  Correct.

23  Q.  The zero tolerance concept, as used in the context of

24  anti-illegal immigration saturation patrols, is rhetoric used

25  by Lieutenant Sousa, is that correct?    08:47:47

1    A.  It is a phrase and rhetoric used by Lieutenant Sousa.

2    However, that is the common practice during all saturation

3    patrols, regardless of what the goals and objectives or the

4    outcome of it are.

5    Q.  But it's not true as to traffic violations and traffic                08:48:08

6    tickets, correct?

7    A.  I've never emphasized writing everyone a traffic ticket or

8    stopping everybody for a traffic violation.

9    Q.  You told a New York Times reporter in September 2008 that

10   most of your deputies, quote, Can make a quick recognition on            08:48:34

11   somebody's accent, how they're dressed, end quote, correct?

12   A.  I made a statement relative to that.  I'm not sure of the

13   accuracy of the reporter's reporting on it.  He even got my

14   name wrong, so I'm not sure how accurate he was.

15   Q.  Well, he called you Bruce, but in fact, you're pretty sure           08:49:01

16   that it was you, Brian Sands, that he was talking to, correct?

17   A.  Yes, I just question his reporting.

18   Q.  Whatever you said to him is similar to what he quoted and

19   which I just read, correct?

20   A.  Yeah, there was conversation along that line.  Yes, I do             08:49:21

21   remember something like that.

22   Q.  And you said something similar to what I just read to you,

23   is that right?

24   A.  There was a conversation about language and that type of

25   thing, yes.                                                               08:49:35

1   Q.  And you said something like what I just read, is that

2   right?

3   A.  I'm not exactly sure what I said at the time.

4   Q.  In your deposition from December 14, 2009, page 89, start

5   at line 17, you were asked this question with respect to that          08:49:59

6   article.

7          "And it says most sheriff's deputies, quote, can make

8   a quick recognition on somebody's accent, how they're dressed,

9   end quote.  Do you see that?

10         "ANSWER:  Yes?                                                   08:50:19

11         "QUESTION:  Do you agree with that statement?

12         "ANSWER:  I think it is taken -- obviously it is out

13  of context, but it may have been something similar to what I

14  said, yes."

15         Was that testimony accurate when you gave it?                    08:50:32

16  A.  It's as accurate as I just gave you now.

17  Q.  Your office does not collect data to see whether or not

18  racial profiling is occurring, correct?

19  A.  No.

20  Q.  Well, let's go back to your December 14, 2009, deposition          08:50:59

21  at page 149.

22         THE COURT:  Let me interrupt.  When you said "no,"

23  Chief Sands, did you mean no, you don't collect data, or no,

24  Mr. Young's statement that you don't collect data was

25  incorrect?  Which of those two did you mean?                           08:51:21

1            THE WITNESS:  We collect -- I'm sorry, Your Honor.

2            We collect data relative to a person's race at the

3     time of booking, and there's several other forms that we

4     collect it on, but it's basically for the purpose of suspect --

5     suspect description.                                            08:51:43

6            THE COURT:  All right.  So you don't collect data for

7     purposes of determining whether racial profiling has occurred?

8            THE WITNESS:  No, sir.

9            THE COURT:  Thank you.

10           MR. YOUNG:  Thank you.                                   08:51:56

11    BY MR. YOUNG:

12    Q.  After saturation patrols take place, you typically do not

13    collect statistics on the effects of that saturation patrol, is

14    that right?

15    A.  We collect the arrest statistics and the statistics        08:52:13

16    relative to the number of contacts, that type of thing.

17    Q.  How about crime statistics, though?  Do you typically

18    collect crime statistics for the area of the saturation patrol

19    after the saturation patrol has taken place to determine

20    whether the saturation patrol had any effects?                 08:52:38

21    A.  I normally don't analyze that, but there may be -- it may

22    be done in follow-up when we go back or review it.

23    Q.  You usually do not conduct such an analysis, though,

24    correct?

25    A.  Personally, I don't, no.                                   08:53:00

1    Q.  In your twenty year -- six years, your 26 years of

2    experience from 1983 to 2009, your office never disciplined

3    anyone for racial profiling, correct?

4    A.  Not that I can recall.

5    Q.  Your office has no interest in adopting further safeguards    08:53:19

6    to protect against racial profiling, is that correct?

7    A.  I wouldn't go so far as to make a comment like that, no,

8    sir.

9    Q.  You believe that your office does not have an issue with

10   racial profiling, right?    08:54:02

11   A.  I believe our office does not have that culture, nor is

12   there anything within the system that would reward someone or

13   promote that kind of activity.

14   Q.  Do you think that your office needs to do anything further

15   to safeguard against the possibility of racial profiling?    08:54:29

16   A.  I'm never opposed to any kind of training that might

17   enhance issues out there -- or not enhance issues, but correct

18   a problem.

19   Q.  That wasn't my question, Chief Sands.

20        Do you believe that your office should adopt any    08:54:46

21   further safeguards to protect against the possibility of racial

22   profiling?

23   A.  I really don't believe that we have that culture or problem

24   out there.  However, I would look at those types of training

25   and safeguards.    08:55:08

1    Q.  So do you think that your office does need to adopt further

2    safeguards to protect -- to protect against the possibility of

3    racial profiling?

4    A.  No, I don't believe that -- that we have a problem, sir.

5    Q.  So you do not believe that you need to adopt any further          08:55:22

6    safeguards or procedures, is that right?

7    A.  I'd have to -- I'd have to review exactly what you're

8    talking about, sir.

9    Q.  Well, I'm talking about any further safeguards or

10   procedures, any changes.  Do you think you need to do anything        08:55:35

11   more in your office to protect against the possibility of

12   racial profiling?

13   A.  That's very ambiguous, sir.  I really have to review what

14   you're talking about.

15   Q.  Well, I'm really talking about any changes at all.               08:55:49

16          Are you able to answer the question of whether you

17   think you need to make any changes at all to protect -- to

18   protect against the possibility of racial profiling in your

19   office?

20   A.  I don't think we have a problem, again, like I'm saying,        08:56:02

21   and anything that we do for training to prevent problems, I'm

22   not opposed to it.

23          You're putting out something very broad-based and not

24   giving me anything to -- to really analyze.

25   Q.  So you're saying you're not opposed to any additional or        08:56:23

1    new safeguards or protections that might be put in place in the

2    future to protect against racial profiling.  Is that what

3    you're saying?

4    A.  I'm not opposed to anything that prevents problems, whether

5    it's -- it's vehicle safety use, or gun use, or dealing with          08:56:41

6    the public in general, I'm not opposed to anything that -- that

7    might better the office.

8    Q.  That would include changes in the future that could happen

9    that would increase the protections against racial profiling,

10   is that right?                                                        08:57:01

11   A.  And there again, if there's a benefit to the community and

12   a benefit to the office, I would be interested in looking at

13   it, yes, sir.

14   Q.  After the federal government revoked its 287(g) authority

15   in 2009, nothing in your office changed with respect to its          08:57:24

16   illegal immigration enforcement policies, is that correct?

17   A.  I really can't answer that with yes or no.  We continue to

18   enforce state laws, and some of those laws are relative to

19   human smuggling, and indirectly workplace issues.

20   Q.  At page 169 of your December 14, 2009, deposition, line 2,       08:57:57

21   you were asked these questions and gave these answers:

22          "QUESTION:  We talked a little bit earlier today about

23   the sheriff stating that nothing would change even though the

24   287(g) task force agreement was no longer in effect.  Do you

25   recall that?                                                         08:58:19

1    "ANSWER:  Yes.

2        "QUESTION:  Is it your understanding that the Maricopa

3    County Sheriff's Office will continue its crackdown against

4    illegal immigration as described in this press release of July

5    2007?                                                          08:58:30

6        "ANSWER:  We are going to continue enforcement of

7    immigration issues, yes."

8        Is that testimony accurate?

9    A.  Yes, and relative to the answer that I just gave you that

10   we still have laws to enforce.                                 08:58:44

11   Q.  And that's true today?

12   A.  Yes.

13   Q.  And you're going to continue to use traffic stops as a

14   means of finding illegal immigrants, is that correct?

15   A.  If a traffic stop is used and there's an ability to detain 08:59:02

16   somebody and it's -- it's relevant to whatever broad issue you

17   just submitted out there, yes.

18       MR. YOUNG:  Thank you, Chief Sands.

19       Your Honor, no further questions at this time.

20       MR. CASEY:  Your Honor, may I have a minute to           08:59:24

21   assemble my computer up there?

22       THE COURT:  You may.

23       MR. CASEY:  Thank you.

24                         CROSS-EXAMINATION

25   BY MR. CASEY:                                                  09:00:24

1    Q.   Good morning, Chief.  How are you?

2    A.   Good morning.  Fine, thank you.

3    Q.   I think what I may do is go in reverse order Mr. Young had

4    asked you about.

5         You were asked whether or not MCSO was going to                    09:00:32

6    continue to use traffic stops to identify illegal aliens.  Has

7    the MCSO ever used traffic stops to specifically identify

8    illegal aliens?

9    A.   No.

10   Q.   Tell me how it is that people that are unlawfully present          09:00:49

11   in the United States are discovered.

12   A.   Well, it will be a number of ways.  If you're talking

13   relative to a traffic enforcement issue or a traffic stop,

14   generally speaking, it revolves -- or involves a driver that

15   can't identify himself.                                                 09:01:14

16   Q.   In the time period particularly 2007, 2008, 2009, could you

17   tell the Court, if traffic stops are conducted by the MCSO

18   anywhere in the boundaries of Maricopa County, what is your

19   experience about whether or not people that happen to be

20   unlawfully in the country are discovered during those stops?           09:01:39

21   A.   I'm sorry, I didn't --

22   Q.   Okay.  I apologize.  It was -- it was too long.

23        Maricopa County Sheriff's Office do traffic stops

24   throughout the county.  Is that a --

25   A.   Yes.                                                               09:01:55

1   Q.  All right.  What is your experience if you do enough

2   traffic stops in the county, anywhere in the county, whether

3   your deputies are going to discover or learn that there are

4   people in that vehicle that are unlawfully present in the

5   United States?                                              09:02:09

6   A.  That exists, yes.

7   Q.  S that just a simple factor -- well, explain for me why

8   that exists.

9   A.  Well, it would be like any criminal violation.  When a

10  traffic stop occurs, you can oftentimes catch violators      09:02:26

11  involved with either warrants or -- or serious traffic

12  violations, perhaps drug smuggling, human smuggling.  Any time

13  a criminal activity is afoot it can be discovered along the

14  roadway.

15  Q.  You, as -- let me back up.                               09:02:49

16        Who makes the decision to go to a particular area for

17  a saturation patrol?

18  A.  I usually do.

19  Q.  Okay.  When you say you usually do, what do you mean?

20  A.  It would depend on the amount of resources being used.  My  09:03:05

21  primary job is making sure resources are -- are being used

22  properly, and that there's coordination between commanders to

23  ensure that things are put in place, both logistically and

24  organizationally, to have a positive outcome.

25  Q.  Does Sheriff Arpaio make the decision of where a saturation  09:03:30

```
 1   patrol is going to be conducted?
 2   A.  No, I usually establish that, or one of my subordinates do.
 3   Q.  Okay.  When you say "usually," I want to make sure it's
 4   clear for this Court.  You're talking about either you or one
 5   of your subordinates, not Joe Arpaio?                          09:03:51
 6   A.  Correct.
 7   Q.  Now, you were asked a series of questions about Joe Arpaio
 8   being the elected sheriff and the chief policymaker.
 9         Do you remember that?
10   A.  Yes, sir.                                                   09:04:06
11   Q.  And you were asked questions about him needing to respond
12   to citizen complaints.
13         Do you remember that?
14   A.  Correct.
15   Q.  Are you under, in your judgment --                          09:04:12
16         Well, first of all, how -- back up.
17         Have you ever, since 2007, ever received any type of
18   pressure from Joe Arpaio to go to a particular area to do a
19   saturation patrol?
20   A.  No.                                                         09:04:28
21   Q.  Have you ever been ordered by Sheriff Arpaio:  Go to
22   location A?
23   A.  No.
24   Q.  At most, what you testified, do I understand correctly, is
25   he may have suggested locations to you?                         09:04:43
```

```
 1   A.   Yes.

 2   Q.   Do you ever remember him suggesting locations to you?

 3   A.   Not specifics, but I -- I know he has.

 4   Q.   Okay.  So in general he's suggested locations to you?

 5   A.   Correct.                                                09:04:56

 6   Q.   All right.  Now, my question for you is this:  Even though

 7   he is the elected official and sets policy, what if you

 8   disagree with him and you don't believe that there can be or

 9   should be a patrol in that area?  What is your response?

10   A.   I would say that it's not -- there's no value to it.    09:05:14

11   Q.   And what do you base that decision on, that no value to it?

12   A.   That you probably wouldn't have any arrests, or it would

13   just -- it would not be worthy of -- of utilization of the

14   resources, I'm sorry.

15   Q.   Do you view yourself -- first of all, do I understand it  09:05:36

16   correctly you've been in law enforcement for how long, 26

17   years?

18   A.   Longer than that now.  That was on record several years

19   ago, so it would be over 28 years now, sir.

20   Q.   And was that all with the MCSO?                         09:05:52

21   A.   Yes.

22   Q.   So you have been at the MCSO, regardless of who the elected

23   sheriff is?

24   A.   Correct.

25   Q.   So your part of permanent professional staff?          09:06:01
```

1    A.  Yes, through four sheriffs now.

2    Q.  All right.  You've been through four different sheriffs?

3    A.  Correct.

4    Q.  And I'm going to ask you this question and see if you can

5    help me understand.  The sheriff is an elected official.  Do          09:06:13

6    you stay?  Do you go?  Come with the political winds of who's

7    in office?

8            Do you understand my question?

9    A.  Yes, I'm -- I'm not what you would say at will.  I have a

10   permanent rank that could be reverted back to at any time.          09:06:30

11   Q.  Do you view that permanent rank and being separate from the

12   political process as any type of insulation against political

13   pressure?

14   A.  Yes, yeah.

15   Q.  You believe that that insulation allows you in any way to        09:06:51

16   serve the MCSO better?

17   A.  Possibly.  I haven't given it much thought, but yes.

18   Q.  Well, let me give you a hypothetical.

19           Let's say that the sheriff becomes excited about

20   something and is very, very desirous of taking a particular law      09:07:10

21   enforcement action.  How do you respond to that hypothetical if

22   you, as the professional law enforcement officer, say there's

23   no value to it from a law enforcement perspective?

24   A.  I have no concern about saying something like that.

25   Q.  Have you done that sort of thing before, in general?            09:07:33

1    A.  We have had conversations in the past and I have -- I can't

2    really remember what the issue was, but I have suggested other

3    alternatives of enforcement.

4    Q.  The plaintiffs' lawyer asked you about something called

5    illegal immigration saturation patrols.                         09:07:59

6          Do you remember that?

7    A.  Yes.

8    Q.  Are there such things as illegal immigration saturation

9    patrols in your office?

10   A.  No.  We practice crime suppression through our saturation   09:08:12

11   patrols, and it's not geared at any one person or -- or a

12   person of a certain color.  Those are typically the end results

13   of saturation patrols.

14   Q.  Explain for us --

15          THE COURT:  Wait a minute.                               09:08:34

16          MR. CASEY:  Excuse me.

17          THE COURT:  When you say those are the typical results

18   of saturation patrols, what do you mean by that?

19          THE WITNESS:  What I mean, sir, is that we don't go

20   out intentionally on a saturation patrol to stop any certain    09:08:48

21   groups of people.  If people are arrested, and subsequently

22   they're in the country illegally, that's the -- that's the end

23   result of stopping a certain amount of people, arresting them,

24   and determining they may not be in the country legally.

25          THE COURT:  So a typical result of a saturation patrol   09:09:16

1    would be to arrest illegal immigrants?

2              THE WITNESS:  It's not a goal in the objective that's

3    put out there, but that is one of the results that occur, yes,

4    sir.

5              THE COURT:  Okay.  Thank you.                          09:09:29

6    BY MR. CASEY:

7    Q.  And in follow-up to the Court's question, under what

8    authority, when there was -- before October of 2009, would

9    people in the country unlawfully be detained administratively

10   or arrested?                                                     09:09:43

11   A.  You're talking about 287(g)?

12   Q.  Yes, sir.

13   A.  Yes, sir.

14   Q.  Is that the authority?

15   A.  It was at the time, yes.                                     09:09:50

16   Q.  What about say right now, we're July 26, 2012, and your

17   deputies pull over a vehicle and -- and let's assume they have

18   reasonable suspicion to believe that one or more occupants is

19   in the country unlawfully.

20             On what grounds are those people held in order to be   09:10:12

21   turned over to ICE?

22   A.  It's normally a result of a human smuggling investigation,

23   and it may be someone that can't be charged with a state crime

24   of human smuggling.

25   Q.  And a different question, and I'm going to be jumping        09:10:31

```
 1   around here, so please let me know if I'm not being clear or
 2   you need me to give you some more background, or what we call
 3   foundation, so bear with me, please.
 4          THE COURT:  Before you ask a question I'm going to ask
 5   a few follow-ups to that one.                                    09:10:48
 6          MR. CASEY:  Yes, sir.
 7          THE COURT:  Chief Sands, when you talk about now you
 8   use the state human smuggling statute to detain persons and
 9   then you hand them over to ICE, is that correct?
10          THE WITNESS:  That -- that does happen once in a          09:11:02
11   while, yes, sir.
12          THE COURT:  And when you do that, do you do it based
13   on the theory that they are conspiring to violate that law?
14          THE WITNESS:  No, then they would be charged with a --
15   with a state crime.  It's the ones that you possibly can't       09:11:17
16   determine there's enough evidence to charge them with the state
17   law, and then you would turn them over to ICE.
18          THE COURT:  All right.  So if you don't have probable
19   cause to charge them with a state law violation, then you turn
20   them over to ICE if you believe that they're in the country     09:11:38
21   illegally?
22          THE WITNESS:  Or at least contact ICE.
23          THE COURT:  Thank you.
24          I'm sorry for interrupting.
25          MR. CASEY:  No, sir.  Please interrupt all you want.      09:11:46
```

1    BY MR. CASEY:

2    Q.  Let me skip to something else.

3          You were asked about what was supposedly a quote of

4    Barry Sands in the New York Times.  Do you remember about that?

5    A.  I think it was Bruce Sands.                                    09:12:10

6    Q.  Okay, Barry, Bruce Sands.  Do you have your deposition in

7    front of you in which that was addressed?

8    A.  Yeah, if you can locate it for me again.

9    Q.  All right.  I -- I believe it was your first deposition

10   from the year 2009.  I believe also it was page 89.               09:12:27

11          You were asked basically this question by Mr. Young.

12   And if you would let me know when you're at page 89.

13          MR. YOUNG:  Actually, Your Honor, may I correct

14   counsel?  It was actually Mr. Kozinets who asked that question.

15   And I'd love to take credit for it, but I really can't.          09:12:51

16          THE COURT:  Thank you for the correct attribution.

17          MR. CASEY:  All fault or credit goes to Mr. Kozinets.

18   BY MR. CASEY:

19   Q.  My question really was to you, I was talking about

20   Mr. Young here today, regardless of who was the original        09:13:06

21   questioner --

22          MR. YOUNG:  Apologies, then.

23          MR. CASEY:  Nothing like that is necessary.

24   BY MR. CASEY:

25   Q.  Mr. Sands, Chief Sands, would you look at page 89 of your    09:13:17

```
 1    December 14, 2009, deposition.
 2             All right.  You there?
 3    A.  Yes, I'm there, yes.
 4    Q.  Okay.  Beginning at line 25, at the very bottom, this was
 5    the question asked at the deposition, it was very similar to        09:13:44
 6    the question asked today, and it continues to page 90, line 2.
 7             "QUESTION:  You agree that most deputies can, in fact,
 8    make a quick recognition of potential immigration violations by
 9    considering someone's accent and how they are dressed?"  End of
10    question?                                                           09:14:06
11             Do you see that?
12    A.  Yes, I do.
13    Q.  You were not permitted or whatever reason allowed to
14    provide an explanation.  Would you please tell us, read in your
15    answer at page 90, line 3 through 10.                               09:14:15
16    A.  My answer:  "Most deputies that have been trained by ICE --
17    and there is more, I believe, that I said on this than that
18    what has obviously been taken out of context and under the
19    quotes, but if you look below there it also says 'where
20    deputies have received training from Immigration and Customs        09:14:37
21    Enforcement.'  I think that there is a lot been left out of
22    this statement, so -- for me to respond to it in that context
23    yes or no."
24    Q.  And that's how you answered at the time when you were asked
25    that question about The New York Times quote allegedly from         09:14:57
```

```
 1   you?

 2   A.  Yes.

 3   Q.  All right.  Now, sir, I'm going to turn to a different

 4   subject, and that is I'm going to pull up on the screen

 5   Exhibit 375 that is in evidence already.  And I'm going to          09:15:13

 6   represent to you that this is a document that was forwarded to

 7   you from Joe Arpaio dated September 20th, 2007.

 8            You see that?

 9   A.  It hasn't come up yet, sir.

10   Q.  I'm showing it on my screen.  I'm showing it on this            09:15:40

11   screen --

12            THE COURT:  I'm sorry.  You know --

13            MR. CASEY:  I'm sorry.

14            THE COURT:  Ms. Zoratti has temporarily left the

15   courtroom, and she's the one that commands that kind of stuff.      09:15:50

16            MR. CASEY:  Okay.  Let me see if I can get a hard copy

17   real quick, Your Honor, to show the witness so we don't delay.

18            May I approach the witness?

19            THE COURT:  You may.

20            MR. CASEY:  Thank you, Your Honor.                         09:16:11

21   BY MR. CASEY:

22   Q.  Do you recognize the handwriting in the upper right corner?

23   A.  Yes.

24   Q.  Whose handwriting do you believe that is?

25   A.  It appears to be notes from Sheriff Arpaio.                     09:16:31
```

1    Q.   Okay.  And are you familiar with his handwriting?

2    A.   Fairly, yes.

3    Q.   Okay.  I'd like to refer you down to the September 20th,

4    2007 caller under Wayne L, and I'd like you to read that for a

5    moment, please.                                          09:16:54

6            MR. CASEY:  May I inquire of the Court whether it's on

7    the Court's screen?

8            THE COURT:  Yes.

9            MR. CASEY:  All right.  Thank you, sir.

10           THE COURT:  Although I will say that the one that's on  09:17:05

11   my screen and the one that we're likely to publish when

12   Ms. Zoratti gets back is not redacted, the name is not

13   redacted.

14           MR. CASEY:  Yes, Your Honor, I see -- I notice that.

15   The actual --                                            09:17:18

16           THE COURT:  Do we have a redacted version?

17           MR. CASEY:  My understanding is the plaintiffs'

18   version is redacted, but this is right out of the --

19           THE COURT:  Database?

20           MR. CASEY:  Yes.  So I will not --                09:17:26

21           THE COURT:  Yes.

22           MR. YOUNG:  I think we could have -- I think we could

23   have Mr. Braun put it on the screen.  I'm looking at a redacted

24   version, and I think --

25           THE COURT:  Do you have a redacted version, Mr. Braun?  09:17:37

1              MR. BRAUN:  I do.

2              THE COURT:  All right.  Let's put that one up.

3              MR. CASEY:  Okay.

4    BY MR. CASEY:

5    Q.  All right.  Sir, have you had a chance now to read Wayne          09:17:47

6    L's comment of September 20th, 2007?

7              THE COURT:  You can publish it, Kathleen.

8              THE WITNESS:  Yes, I have.

9    BY MR. CASEY:

10   Q.  All right.  Would you tell me --                                  09:17:57

11             First of all, do you remember receiving this?

12   A.  No, not really, no.

13   Q.  Do you remember reading it?

14   A.  Vaguely, I re -- I see these, so a lot of them sound

15   similar.                                                             09:18:16

16   Q.  Well, it was almost, what, eight, nine, ten, 11, 12, almost

17   five years ago.

18   A.  Correct.

19   Q.  All right.  As you read it now, what do you understand this

20   Wayne L to be trying to communicate in this -- this particular       09:18:29

21   comment?

22   A.  He -- that we're not responding to his complaints.

23   Q.  And what's he complaining about based on that?

24   A.  Quote, Mexicans hanging out on Mesa Drive, unquote.

25   Q.  Is there any -- in your professional judgment, is Wayne L        09:18:51

1   identifying any criminal activity?

2   A.  No.

3   Q.  And based on him complaining that he's called the

4   non-emergency and illegal hotlines numerous times and is

5   getting no one to do anything about it, what does that mean to    09:19:10

6   you?

7   A.  That --

8          MR. YOUNG:  Objection, Your Honor, lack of foundation.

9   He doesn't recall getting this document or reading this note,

10  so I don't think he can testify about this document or what it    09:19:20

11  meant to him at the time.

12         THE COURT:  Well, I'm going to allow him to answer.

13         MR. CASEY:  And if I -- may I put on something on the

14  record?

15         THE COURT:  You may.    09:19:33

16         MR. CASEY:  It's asking for his present sense

17  impression on his reading of it right now and what he

18  interprets it now.

19         THE COURT:  Well, I don't think you're going to get

20  present sense impression on that.  It doesn't matter.  I'm    09:19:43

21  going to allow him to answer.

22         MR. CASEY:  Okay.  Thank you, Your Honor.

23         Could I have Mr. Moll read back my question?  I don't

24  remember it.

25         (The record was read by the court reporter.)    09:20:14

1            THE WITNESS:  It means that his complaint is not any

2    of our business, and that we're not responding to his being

3    upset about Mexican people, as he quotes it.

4    BY MR. CASEY:

5    Q.  Is that something, the handling, assuming that the people     09:20:33

6    in HSU looking at the illegal hotline, if that's the way

7    they're handling this, is that consistent with your

8    expectations as their supervisor?

9            MR. YOUNG:  Objection, leading; foundation.

10           THE COURT:  I'm going to sustain it on foundational     09:20:49

11   grounds.

12   BY MR. CASEY:

13   Q.  Sir, do you train your deputies -- strike that.

14           Do you supervise deputies in the HSU as the chief of

15   enforcement?                                                    09:21:00

16   A.  The word "supervision's" a little close, but yeah, they're

17   under my responsibility, yes.

18   Q.  Are you familiar with the policies, the protocols, of how

19   HSU members handling illegal hotline tips are to handle those?

20   A.  Yes, I do.                                                  09:21:21

21   Q.  And how are they to handle those?

22   A.  They're not to respond to -- to anything that's racially

23   motivated.

24   Q.  With that -- is this complaint consistent with your

25   expectation of how the hotline handlers should handle race-only   09:21:36

1    complaints?

2    A.  I've had this conversation a number of times with

3    Lieutenant Sousa, because oftentimes people will call in at a

4    lower level like the hotline, or perhaps the public line down

5    in radio, and they'll have complaints that nobody's responding          09:21:57

6    to them.  That complaint will get to me, and it's usually

7    always of this nature, where somebody's not getting what they

8    feel is a proper response to what we believe is what might be

9    racially motivated as a complaint.

10   Q.  All right.  Thank you, sir.                                          09:22:21

11           I'd like to turn to a new document.  If I could --

12   these are redacted.  If I could have my computer back hooked up

13   and published, please.

14           Again, this is Exhibit 228 that is in evidence.  And

15   what I'd like to do, do you see the top there that -- do you            09:22:37

16   recognize Sheriff Arpaio's handwriting?

17   A.  Yes.

18   Q.  Are you -- are you written -- is your name written anywhere

19   in there?

20   A.  It appears to be Brian S, yes.                                      09:22:50

21   Q.  And what is the date of this particular note?

22   A.  The comment/support date at the top is July 16th, 2008.

23   Q.  All right.  Now, on Exhibit 228 in evidence, I'm going to

24   turn to the second page.  And what I'm going to do, if I can do

25   it successfully, is do a call-out on caller -- or commenter             09:23:09

1    Joyce F.

2            You see that, sir?

3    A.  Yes, I do.

4    Q.  Okay.  Now, my question for you, sir, is:  Is this the type

5    of information that would cause you to initiate a saturation          09:23:37

6    patrol?

7    A.  No.

8    Q.  Do you know one way or the other -- well, let me ask you:

9    Do you know if you ever relied on this to do a saturation

10   patrol near Cave Creek Road or anywhere?                             09:23:54

11           MR. YOUNG:  Objection, foundation.

12           THE COURT:  Overruled.

13           THE WITNESS:  There's no indication of criminal

14   activity here.  There's no value to it from a police standpoint

15   to -- to entertain a decision.                                       09:24:08

16   BY MR. CASEY:

17   Q.  Well, wait just a second.  We've heard testimony that Joe

18   Arpaio has made illegal immigration enforcement a top priority.

19   Joyce F says there are immigrants hanging out on Cave Creek

20   Road on the corner daily.  Why is that not important, then?          09:24:24

21   A.  When I make police or law enforcement decisions, it's not

22   based on any type of rhetoric that -- that the sheriff might be

23   addressing to the public.  I have to deal with it in a

24   perspective of what can and should be done from a -- from a

25   police officer standpoint.                                           09:24:51

```
 1   Q.  Now, before I go on to this document, we had some testimony

 2   about Arpaio's statements in the media.

 3           Do you -- are you involved on a regular basis in

 4   writing press releases that Sheriff Arpaio sends out?

 5   A.  No.                                                           09:25:10

 6   Q.  Have there been some times that press releases on

 7   saturation patrols have gone out after the fact that you've

 8   looked at and wished they were written differently?

 9   A.  Yes, there's been times.  And I'll be in the field and

10   something will go out, and I'll have a -- I'll have a           09:25:26

11   difference of opinion on it.

12   Q.  Now, I understand this may -- is a difficult question,

13   because of your -- you know, because the sheriff is the -- the

14   head of the office.  But in your opinion, are there times that

15   some public statements of the sheriff are a bit of a disconnect  09:25:41

16   from what's occurring on the operations side?

17   A.  Yes, in a sense that -- that the sheriff doesn't typically

18   perceive what -- the individual duties and the training that an

19   individual officer.  He'll speak very broadly about situations

20   that -- that don't necessarily get down to the brass tacks of    09:26:18

21   what the police officers may be doing.

22   Q.  Have you had occasions after you've observed him, say, on a

23   television program where he's articulated something, have you

24   had occasion where you've talked to him and said, That's not

25   right, boss, and explain to him what was not right?             09:26:41
```

A.  We have had conversations about issues, and obviously

there's been a lot of discussion about -- in the past on the

indicators that our deputies were intentionally trained on

287(g).  And some of that may have been miscommunicated to the

sheriff through not really any fault of his, but he lacks                    09:27:03

the -- the basic broad training that's very vigorous that

the -- that the deputies have been put through.

Q.  And who provided that ICE training to your deputies that

were 287(g) certified?

A.  It was the basic academy of the Department of Homeland                   09:27:24

Security through ICE.

Q.  Federal officials?

A.  Yes.

Q.  Okay.  Now let's get back to 228, which is in evidence,

Exhibit 228.  And I'm now going to refer you to another comment              09:27:40

of a Kerri R.  And let me move this up a bit for you.  Sir,

just take a moment and read that.

        Did you ever initiate a saturation patrol at or near

Cave Creek and Bell Road based on anything like Kerri R's

comments?                                                                    09:28:11

A.  No.

Q.  Would you do it based on comments like this?

A.  No.

Q.  Okay.  Why?

A.  There's not enough information there, nor there -- is there              09:28:16

```
 1   any criminal indicators there that would even require a look

 2   into the comment.

 3   Q.  Thank you, sir.

 4        I'm going to turn to another exhibit, and I -- I

 5   appreciate your patience, Chief Sands.                          09:28:38

 6        Do you remember being shown Plaintiffs' Exhibit 187

 7   that's in evidence?

 8        And I'm going to -- first of all, do you recognize the

 9   writing in the upper right?

10   A.  Yes, I do, yeah.                                            09:28:57

11   Q.  That's Sheriff Arpaio's?

12   A.  It appears.

13   Q.  Okay.  It says Brian S?

14   A.  Yes.

15   Q.  What's written underneath that?                             09:29:05

16   A.  "Have someone handle."

17   Q.  Okay.  Now, I'm going to turn to the second page so you can

18   see the second page of Exhibit 187.  And just to refresh your

19   recollection on that.

20        Sir, did you ever initiate a saturation patrol near        09:29:32

21   29th Street and Greenway in response to Exhibit 187?

22   A.  No, I don't believe so, no.

23   Q.  Now, yesterday you were asked, I'm going to -- this relates

24   to this.  You were asked a question by plaintiffs' counsel

25   about -- and I'm paraphrasing, sir -- Sir, isn't it true that   09:29:52
```

1    you take action in response to citizen complaints?

2         Do you remember that question?

3    A.  Yes.

4    Q.  Do you remember whether or not, when you were asked the

5    question, whether any definition was being provided about          09:30:09

6    action, what that meant?

7    A.  No.

8    Q.  Okay.  When you said "yes" to that question, what types of

9    action would you take in response to citizen complaints?

10   A.  Well, obviously it would depend on what the -- what the        09:30:33

11   information was contained in it.

12        I vaguely remember this, going over it at the

13   deposition.  This is something I typically would pass off to

14   the assistant police chief over at Phoenix or any other

15   jurisdiction.                                                       09:30:54

16   Q.  And you're talking about Exhibit 187?

17   A.  Yes.

18   Q.  And my question, let me make it broader because I think

19   it's important.  What are the types -- generally; not just in

20   this letter.  But if you get a letter, a citizen letter that      09:31:12

21   you take action on, what are the types of things that you take

22   action on?  What are the things you do?

23   A.  Normally, it's to look into it and see -- see if there's

24   more information needed on it; if there's a personal contact

25   that needs to be made of the person that sent it.  There's --     09:31:33

 1    there's a -- a reason why I would give this situation over to

 2    Phoenix PD rather than call out a saturation patrol.

 3    Saturation patrols have -- have different impact on this kind

 4    of a crime.

 5           Although this -- this person that sent the letter in      09:31:56

 6    makes some comments about people that in general I don't agree

 7    with, but she talks about shooting guns off in a neighborhood,

 8    and we all know the dangers that are involved in that.  If

 9    you've lived here for a long enough time you realize that

10    that's been a problem.  And that can be best addressed by the    09:32:19

11    local patrol officers that are working that beat, and that

12    would be Phoenix PD.

13           And so those are the kinds of things that -- that I

14    will typically immediately network off to local agencies.

15    Q.  Here's a little bit different but related question:  Can     09:32:39

16    action that you take, in addition to what you mentioned about

17    following up with a person or talking to local officers, would

18    that also include knock-and-talks, surveillance, things like

19    that, if you deemed it appropriate?

20    A.  It could, yes.                                               09:33:01

21    Q.  Now, what -- well, let me just finish up on this.

22           Is it -- is it your testimony that Exhibit 187 had no

23    influence on any law enforcement decision you made?

24           MR. YOUNG:  Objection, leading.

25           MR. CASEY:  Okay.  Let me rephrase the question.          09:33:18

BY MR. CASEY:

Q.  Did Exhibit 187 have any influence on anything you did?

A.  No, only that I can't remember exactly what I did take

on -- the shooting report stands out in my mind, but no, I

don't -- I didn't take any action to follow up investigation,                    09:33:40

nor would I have, as I explained before.

Q.  Now, let me turn to a different subject.

        Yesterday you were asked a question out of your

deposition, and if you would turn to your second deposition.

That was the one that was taken November 15, 2010.  If you                        09:34:02

would just turn to that, please.

        MR. YOUNG:  Your Honor, could we have a page number?

        MR. CASEY:  I apologize.  218.

BY MR. CASEY:

Q.  All right.  You were asked this question:                                     09:34:37

        "Has the sheriff ever, to your memory, forwarded to

you, for your information, any statements that you know the

sheriff disagrees with."

        And then you were asked and shown, actually, this

answer you gave:  "I can't think of any right offhand."                           09:34:51

        Do you remember that yesterday?

A.  Yes.

Q.  Would you tell us what you meant by that answer.

A.  I just couldn't remember any specifics, and had not given

it really a whole lot of thought about what he may agree or                       09:35:13

```
 1   disagree with, particularly information coming in from the
 2   public.
 3   Q.  Are you telling the Court that everything that Joe Arpaio
 4   sends to you that's from a citizen, he agrees with?
 5   A.  No, I -- I wouldn't -- I wouldn't make that broad-based    09:35:27
 6   statement and believe it.  I get articles out of the New Times
 7   that I'm sure he doesn't agree with.
 8   Q.  Okay.  Have you ever seen letters from citizens, to the
 9   best of your recollection, that were critical of anything that
10   Arpaio, Joe Arpaio, had done that had been circulated to you?   09:35:49
11   A.  I've seen -- I've seen some things, yes, come in, yes.
12   Q.  All right.  That's the end of that area of inquiry, sir.
13        You also were shown from your deposition -- and we
14   don't need to go to it, but it was something about he, Arpaio,
15   expects me to do whatever I can about a citizen complaint.      09:36:14
16        Do you remember that series of questions and answers
17   yesterday?
18   A.  Yes.
19   Q.  Again, the court record will stand as it is, but my notes,
20   to the extent they're accurate, says something that you said,   09:36:26
21   the emphasis that you answered was the emphasis is on the word
22   "can."
23        You remember that?
24   A.  Yes.
25   Q.  What did you mean by the emphasis is on the word any --      09:36:37
```

```
 1   whatever I can do about a citizen complaint?

 2   A.   Whatever is reasonable.  Oftentimes, the complaints are

 3   totally unreasonable, and I'm not going to even respond to such

 4   inquiries or admonitions that may come in unless there's

 5   some -- some actual complaint.  And that's where the word I        09:37:04

 6   meant "can" should be.

 7   Q.   Thank you, sir.

 8        I'm now going to turn to Exhibit 235, which is in

 9   evidence.

10        Do you remember seeing this document yesterday?            09:37:25

11        Sir, do you remember seeing that yesterday or this

12   morning, perhaps, and being questioned on it?

13   A.   I remember seeing it before, yes.

14   Q.   What's the date of the letter?

15   A.   August 8th, 2008.                                           09:38:03

16   Q.   Okay.  Is there anything in Exhibit 235 that would cause

17   you to initiate a saturation patrol at -- in Surprise, Arizona?

18   A.   No.

19   Q.   Did you initiate or otherwise begin a process of doing a --

20   of planning a saturation patrol in Surprise, Arizona, in any     09:38:34

21   way based on this letter, Exhibit 235?

22   A.   No, I can't say that I would activate anything --

23   Q.   Now --

24   A.   -- as a saturation patrol.

25   Q.   Excuse me.  I'm sorry, Chief.                               09:38:49
```

```
1          The evidence that the parties have stipulated to is
2   there was a saturation patrol in Surprise, Arizona, that
3   general area, on October 16 and 17 of the year 2009.
4          How long, generally, does it take to prepare for a
5   large saturation patrol?
6   A.  I usually prefer to put together those type of resources if
7   I have a month or -- or two months to plan on it.
8   Q.  What about just an HSU operation, since there are about 15,
9   17 members?  How much time is needed to initiate, plan, and
10  execute?
11  A.  A lot of times it depends on what their -- their current
12  operations that they're working, what their commitments might
13  be.  But any time you have a -- a division or smaller, they're
14  more responsive.  Or if it's a -- truly an exigent type
15  situation, like a lost person or something, obviously I'm going
16  to pull whatever resources I can out immediately and start
17  minutes after the reports are in.
18  Q.  Is -- assuming the parties were correct -- well, it's a
19  fact.  It's stipulated that there was an October, mid-October
20  2009 saturation patrol near Surprise.  Is there, in your
21  judgment, any connection between this letter dated August 8th,
22  2008, and that Surprise, Arizona, patrol?
23  A.  No, there's no -- there's no crime stipulated in this
24  complaint, other than this person's perception of some people
25  that are -- that are trying to flag down motorists that in
```

09:39:11

09:39:33

09:39:55

09:40:13

09:40:36

```
 1    their perception are day workers.
 2    Q.  Is there anything in your judgment that is unlawful by the
 3    mere fact of being a day laborer?
 4    A.  No.
 5    Q.  If someone reports to you "there are day laborers here,"      09:41:00
 6    does that cause you any concern whatsoever?
 7    A.  No.
 8    Q.  Now, what happens if you get a different scenario where
 9    someone says there are day laborers here and they're jumping
10    out in traffic, they're doing this?  Does that cause any         09:41:23
11    concern?
12    A.  It could, because we're talking about traffic safety issues
13    now, and these are the -- these complaints throughout the
14    valley, ever since I've been with the Sheriff's Office, are
15    common about day laborers.  And oftentimes over the -- over the  09:41:43
16    years as they're looked into, just by simple observation, it
17    may or may not be so that the traffic is being impeded or
18    people's safety's at stake, and that's the normal response to
19    something like that, not a saturation patrol.
20    Q.  Thank you, sir.                                              09:42:07
21          Only a few more areas, and then we're going to have
22    you -- I'll be done.
23          I'd like to now turn to Exhibit 236, which is admitted
24    into evidence.  And you were shown this letter either yesterday
25    or today.  Do you remember that letter?                         09:42:30
```

```
1   A.  Yes.

2   Q.  Okay.  This is the one where someone's complaining about

3   people only speaking the Spanish language at a McDonald's?

4   A.  Yes.

5   Q.  First of all, is that Joe Arpaio's handwriting on the upper      09:42:46

6   right?

7   A.  Yes.

8   Q.  Does it say here:  For info.  Will look into it"?

9   A.  Yes.

10  Q.  Do you have -- what is your understanding of what that           09:43:07

11  means to you, if anything?

12  A.  It means it appears that -- it's --

13          MR. YOUNG:  Your Honor, I'll -- I'll object on

14  foundation.  I'm not sure that's the right reading of that

15  handwritten note.                                                    09:43:25

16          MR. CASEY:  I just asked him -- I'm sorry.

17          MR. YOUNG:  And I can be more specific about my

18  objection if you would like.

19          THE COURT:  Did you want to read exactly what it said,

20  Mr. Casey?                                                           09:43:47

21          MR. CASEY:  I'll read exactly, and let me -- let me

22  start over.  I withdraw the question.

23  BY MR. CASEY:

24  Q.  Sir, actually, I'd like you to read in the handwriting in

25  full as you can -- as you can read it.                               09:43:57
```

```
 1   A.  Starting from the top, it's letters.  Thank you.  For info.

 2   Will look into it.  Cc Brian, parentheses, for our operation,

 3   cc sheriff.  8-5-08.

 4   Q.  What did you understand -- well, first of all, do you

 5   remember receiving this letter?                                09:44:32

 6   A.  No, not really.

 7   Q.  Based on your review of it today, what is your

 8   understanding of what you're to do with it?

 9           MR. YOUNG:  Objection, foundation.

10           THE COURT:  Overruled.                                 09:44:50

11           THE WITNESS:  I've had letters such as this that came

12   through the sheriff's administrative assistant, and obviously

13   it -- it even says cc to me.  I wouldn't do anything with this.

14   It appears he wants to send the person acknowledgment that he

15   received it.                                                   09:45:20

16   BY MR. CASEY:

17   Q.  Separate and apart from anything that Sheriff Arpaio is

18   doing on his end, like a personal acknowledgment, can you tell

19   us whether or not you did anything in response to this copy

20   sent to you by the sheriff?                                    09:45:34

21           MR. YOUNG:  Objection, foundation.

22           THE COURT:  Overruled.

23           THE WITNESS:  Personally, he probably wouldn't want me

24   to call that person up and talk to him.  It probably wouldn't

25   be positive.  I -- I don't entertain those kinds of thoughts   09:45:51
```

1    that this person shares.

2         And like I say, there's -- there's -- no police need

3    to respond to something like that.

4    BY MR. CASEY:

5    Q.  Now, the part that says cc Brian and then parenthetical,    09:46:07

6    for our operation, do you have an understanding as you sit here

7    today what that meant?

8    A.  Well, I can't tell you exactly what was going on in his --

9    his brain at the time, but it might be just the -- the

10   shuttling of paperwork or transference of what he's doing by    09:46:29

11   subject.

12   Q.  As you sit here today -- and I'm not really interested so

13   much in what he meant.  I'm trying to understand what -- as you

14   read it today, if you have any understanding of what, if

15   anything, you were to do.    09:46:47

16   A.  Oh, I wouldn't -- I would not respond to this person at

17   all.

18   Q.  Now let's go to a different area.

19         The date of this letter is what, sir?

20   A.  It's August 1, 2008.    09:46:59

21   Q.  And the date that the sheriff has dated his handwritten

22   portion is what?

23   A.  Looks like August 5th.

24   Q.  Okay.  And the parties have stipulated that there was a

25   saturation patrol conducted in the Sun City area on August 14,    09:47:16

1    2008.  Assuming that, sir, and based on what you told us

2    about -- well, let me ask you this.  Strike the question.

3    Excuse me, Mr. Moll.

4            Assuming the stipulation is accurate -- and that is

5    the evidence that we have, sir -- can you tell us whether the          09:47:34

6    saturation patrol conducted in Sun City was what you would

7    consider a large operation or a smaller one?

8    A.  I believe it was a large operation.

9    Q.  That's just going off your memory?

10   A.  Yes.                                                               09:47:55

11   Q.  If in fact it was a large one, would that mean it was

12   including deputies outside of the HSU?

13   A.  Yes.

14   Q.  And you told us it takes, -- you would like to have 30 to

15   60 days to plan a large operation?                                     09:48:11

16   A.  Yes, because I have other issues.

17   Q.  Based on that, sir, in your judgment, is there any way that

18   this letter had any role or influence on conducting a

19   saturation patrol in Sun City on August 14, 2008?

20           MR. YOUNG:  Objection, leading.                                09:48:31

21           THE COURT:  Sustained.

22   BY MR. CASEY:

23   Q.  Sir, did this letter have any role or influence in

24   conducting a saturation patrol on August 14, 2008?

25   A.  No.                                                                09:48:43

1    Q.  Why?

2    A.  Well, for one thing, back to the -- there's no basis for

3    criminal activity there to substantiate the need for increased

4    patrols, and -- and there is a timing element there.

5           And there again, we're not going to -- to go out and            09:49:02

6    commit those kind of resources because of one person sending a

7    pat-on-the-back-type letter to the sheriff.

8    Q.  Now, yesterday the plaintiffs' lawyer asked you that -- a

9    question if Sheriff Arpaio was involved in the Sun City

10   operation.                                                             09:49:25

11          Do you remember that?

12   A.  Yes.

13   Q.  And again, there wasn't really a definition about

14   involvement.

15          How was Sheriff Arpaio involved in the Sun City                 09:49:32

16   operation?

17   A.  His involvement would have been coming around to the

18   command post and checking on activity.

19   Q.  Was his involvement in selecting the site?

20   A.  No.                                                                09:49:51

21   Q.  Was his involvement in the planning of the patrol?

22   A.  No.

23   Q.  Was his involvement in the actual effectuation or execution

24   of the patrol?

25   A.  No.                                                                09:50:04

```
1   Q.  I'm going to now turn to Exhibit 243, which is in evidence.

2   And if you would just refresh your recollection by looking at

3   that, sir.

4   A.  Yes.

5   Q.  Okay.  Now, you were asked a question -- you were asked a    09:50:41

6   question about you coming up to the conclusion about

7   dark-skinned people as illegals.

8        Do you remember that?

9   A.  Yes.

10  Q.  All right.  Now, if you would turn to your second            09:50:57

11  deposition that was dated November 15, 2010, and go to page

12  142, please.

13  A.  I'm at 142.

14  Q.  Okay.  Specifically, I'm going to read the question at

15  lines 18 through 23, and then your answer begins at page 143     09:51:23

16  and goes from lines 1 through 10.

17       "QUESTION:  Well, I actually didn't make an assumption

18  about his perceiving dark-skinned people as illegals.  I think

19  that's your assumption about what he's saying.

20       "My question to you is, where do you get that              09:51:48

21  assumption about what he is saying?"

22       Then the answer begins the next page, lines 1 through

23  10.  Would you please read your answer for completeness

24  purposes.

25  A.  "Because he is talking about illegal aliens and viewing      09:52:00
```

1    them and visually seeing them.  So it would be a safe bet to

2    say that he's drawn some kind of conclusion, unless he's gone

3    up there and individually talked to every one of these people

4    that he's talking about and verified the fact that they were

5    here illegally.                                                    09:52:21

6         "What else am I supposed to -- to think -- is that the

7    guy is just guessing that they're illegals?"

8    Q.  Thank you, sir.

9         Let me go to another section and then we'll finish up

10   here.                                                              09:52:39

11        What are the factors, the criteria that you consider

12   when determining where to go for a saturation patrol?

13   A.  The type of crime that's relative to what -- either the

14   discovery of it.  It might be complaints.  It might be a

15   request from city agencies, local agencies.  We have to         09:53:07

16   determine that there's a need to do a saturation patrol.

17        Then again, the number of people to commit to -- to a

18   saturation patrol -- patrol is based on a geographic area that

19   we can cover.  Oftentimes, a decision to do these -- these

20   broad-based ones that we were doing several years ago --         09:53:36

21   Q.  You mean large scale?

22   A.  Large scale, yes, I'm sorry, geographically covering large

23   areas is -- we had a serious drop house problem throughout

24   Maricopa County, particularly in the urban areas of Phoenix,

25   Mesa, Glendale, Surprise.  No city was unaffected by this.       09:53:57

1        And in order to have the drop house activity, you had

2    to have movement of smugglers coming from the south

3    transporting people in and out of drop houses.  So the

4    opportunity to affect that -- that movement, in my mind, was --

5    was something that needed to be done, when you're talking about    09:54:27

6    in the case of a couple of years having over 300 drop houses in

7    Maricopa County.

8    Q.  Thank you, sir.

9        If you get a letter from someone, a business, a group

10   of businessmen, or citizens that mention crime, what do you do    09:54:47

11   in response -- and then they want some sort of saturation

12   patrol, what do you do when you receive that?

13   A.  I'll check and see or have my staff look into the facts

14   around it.  Is there crime in that general area?  Oftentimes,

15   people won't -- won't complain directly about crime; they'll    09:55:11

16   complain about quality of life issues affected by crime.  The

17   old -- age-old situation of finding used condoms and needles in

18   your front yard.  In itself, that's not a crime, but it's the

19   quality of life issue that's affected by crime in the area,

20   and...                                                           09:55:48

21       So sometimes if you go out and saturate those

22   particular kind of areas, the public sees a response and

23   they'll have confidence in -- in their law enforcement that

24   they're doing something.  When you have that type of response,

25   you generally have an impact on all the crime in the -- in the    09:56:02

1    neighborhood or community.

2    Q.   And in the process you happen to come across people with

3    outstanding warrants?

4    A.   Yes.   Those are typically the folks that we want to go

5    after the most.                                              09:56:23

6    Q.   And in the process, do you happen to also come across

7    people that are in the country unlawfully?

8    A.   Yes, we have.

9    Q.   Okay.   Now, I'm going to -- well, let me ask you, there's

10   been some testimony about legislators who wrote in and        09:56:38

11   mentioned crime and wanted a saturation patrol.

12        Why not just trust self-reports of crime?

13   A.   Well, in some -- in some extreme cases that is necessary,

14   particularly if you have a series of very serious types of

15   crimes, like murder, homicide, rape, burglaries, that you --  09:57:05

16   you should respond to those kind of reports.

17        But not if they're vague and ambiguous.

18   Q.   Does the MCSO, for saturation patrol purposes,

19   independently determine whether there's a criminal basis to

20   conduct a saturation patrol before it does such a patrol?     09:57:34

21   A.   I'll have the staff look at all aspects of whether there is

22   crime in the area, quality of life issues in the area, that

23   type of thing.

24   Q.   Now, in the -- you know that there are certain things

25   called operations plans?                                      09:57:49

1    A.  Yes, sir.

2    Q.  You were asked a series of questions about Mr. Young

3    before -- by Mr. Young, before he stepped down, about what your

4    willingness is to do certain things.

5         Is there additional types of information, for example,    09:58:02

6    through your experience now, that you would include in

7    saturation patrols that you did not historically include in

8    there?

9    A.  Yeah, and I think we've evolved over -- over time on being

10   more specific, and -- and I must say, over my time period with    09:58:26

11   the Sheriff's Office of way, way back when I first started,

12   these operations plans weren't even written up or developed.

13   Oftentimes, they were just conducted.  And I think we've

14   evolved over the years and -- and I think more specifics could

15   be included in operations plans.                                  09:58:51

16   Q.  Such as including information about the actual criminal

17   data leading to the patrol?

18   A.  Yes.

19   Q.  Okay.  Now, I apologize, I may have asked this of you.  But

20   since last December, December 23rd, 2011, have there been any    09:59:10

21   saturation patrols conducted?

22   A.  Not other than DUI enforcement, those type of traffic

23   issues.  I -- no, we haven't done anything.

24   Q.  Any sort of things you would consider saturation patrols

25   related to narcotics, drugs?                                      09:59:39

1    A.  Yes, we've done a number of those operations, particularly

2    south of the I-8 corridor.

3    Q.  Now, I'm going to turn to Exhibit 311, which is in

4    evidence.  And do you remember being asked questions about this

5    particular exhibit?                                              09:59:58

6         Would you like me to enlarge it?

7    A.  No, that's fine.

8         I do recall it, yes.

9    Q.  All right.  Now, Exhibit 311, sir, is discuss -- mentioned

10   some business owners requesting some action.                     10:00:19

11        Did you ever initiate any saturation patrol at the

12   request of business owners without doing any independent

13   evaluation on crime?

14   A.  As I remember, we had our staff look into contacting

15   Phoenix PD and looking at some of their -- their issues that     10:00:41

16   they were having in the -- in the community at the time.

17   Q.  All right.  Thank you, sir.

18        Next exhibit is Exhibit 202, which is in evidence.

19   And I will blow this up, sir.

20        You remember this was about something occurring near        10:01:11

21   36th Street and Thomas out near Pruitt's Furniture?

22   A.  Yes, I remember.

23   Q.  Could you tell the Court why there was an HSU operation in

24   that location?

25   A.  Yes.  It was relative to complaints in the neighborhood       10:01:34

1    about crime, and some of the business people were complaining

2    about those quality of life impact issues on their businesses.

3    Q.  Did you independently have your staff at HSU determine

4    whether or not the complaints of crime by the business people

5    were legitimate?                                                    10:02:01

6    A.  As I remember, they -- they looked at the issues that

7    Phoenix PD was having in the -- in the community at the time.

8    Q.  Okay.  Do you remember if they independently also looked at

9    the specific complaints of the crime mentioned by the business?

10   A.  I -- I can't remember.                                          10:02:21

11   Q.  Is that something that would have been customary and

12   standard to do?

13   A.  Yes.

14   Q.  What were the types, if you recall -- and if you don't,

15   please tell the Court -- what were the types of criminal         10:02:35

16   behavior or crimes that were looked at relative to Exhibit 202?

17   A.  As I remember, it had nothing to do with what's written in

18   this e-mail.  It was about defecating in -- on people's

19   property, that type of situation.

20   Q.  Did it also involve, sir, issues relating to the -- any      10:02:59

21   traffic obstructions under Title 28?

22   A.  Yeah, I vaguely remember something like that, yeah.

23   Q.  What about criminal loitering or harassment of customers?

24   A.  Yeah.  And there again, sometimes that stuff's hard to

25   verify.                                                            10:03:18

1  Q.  All right.  This is the last one.  Exhibit 126, sir.  I'm

2  going to blow this up so we can...

3       You were asked about Exhibit 126, which is in

4  evidence.  You were asked about the tip line, and again, you

5  were asked by the plaintiffs' counsel that this led to action.          10:03:48

6       Do you remember that?

7  A.  Yes.

8  Q.  Okay.  What action was -- did it lead to?

9  A.  One of the key things on this -- and you have to

10  understand, one of our programs we have on the Internet is a          10:04:07

11  listing of warrants where people can -- citizens can go online

12  and they can identify subjects who have warrants and report to

13  us where they're living so we can go pick them up, and this was

14  a result of that, those knock-and-talks in the Village

15  apartments came in from tips on the hotline relative to the          10:04:40

16  number of warrants that existed at that address.

17  Q.  Now, look at the last line here.  Let me see if I can

18  adjust this accurately and do a call-out.  Bear with me, Chief.

19       All right.  Let me move this up a bit here.

20       Can you read that, sir?  Out loud.  Call out.          10:05:12

21  A.  "After all the above was complete, HSU detectives conducted

22  knock-and-talks in the Village apartments based tips from the

23  hot line.  The tips from the hotline produced negative

24  results."

25  Q.  Explain for me what that means to us who are not law          10:05:33

1    enforcement.

2    A.  Means typically that they -- they got no arrests.

3    Q.  And help me -- help me understand this.  Does it mean there

4    was information about crime coming in, and action was taken in

5    the form of knock-and-talks?                              10:05:53

6    A.  Yes.

7    Q.  And then what was the result of the knocks-and-talks as a

8    result of the tips?

9    A.  The suspects weren't there.

10   Q.  All right.  Thank you.                                10:06:03

11         Sir, moving away from this exhibit, you said that it

12   was a typical result -- and I think it was in answer to the

13   judge's question, or perhaps a follow-up -- that illegal

14   immigrants would be arrested during a saturation patrol.

15         My question is:  Were there -- was it typical for    10:06:18

16   other people other than unlawfully present persons to also be

17   arrested during saturation patrols?

18   A.  Oh, yes.

19   Q.  What about U.S. citizens?

20   A.  Yes.                                                  10:06:32

21   Q.  What about businessmen?

22   A.  Yes.

23   Q.  What about people that had suspended drive -- driving on

24   suspended license?

25   A.  Most assuredly, yes.                                  10:06:42

1    Q.   Okay.  What about people that were under the influence of

2    alcohol, DUI?

3    A.   Yes.

4    Q.   Okay.  And arrest warrants?

5    A.   Correct.                                                    10:06:51

6         MR. CASEY:  Those are all the questions I have for

7    you, sir.  Thank you for your time.

8         THE COURT:  Chief Sands, I'm going to have just a few

9    questions for you before I'm going to allow Mr. Casey to

10   resume, in case he has any questions in light of mine.  I'm    10:07:21

11   sorry, because some of these you may have testified to and I've

12   tried to keep good notes, but I may have just missed it.

13                           EXAMINATION

14   BY THE COURT:

15   Q.   Did you ever receive 287(g) training?                     10:07:34

16   A.   No, sir, I didn't.

17   Q.   Did you ever review the materials given to your officers in

18   287(g) training?

19   A.   I did a little, sir.  I relied for most of my information

20   on a program meeting with the command staff or the management   10:07:48

21   staff over at ICE that I worked really close with during

22   opening days of our relationship with the 287(g) program.

23   Q.   You talked about, I think, December 23, 2011, being the

24   last saturation patrol in which the MCSO has engaged.

25        Did I understand you correctly?                           10:08:20

1    A.  Yes, sir.

2    Q.  Then I think you said, Well, it was the last saturation

3    patrol except for we've done a D -- we've done DUI sat patrols,

4    we've done narcotic saturation patrols, is that correct?

5    A.  Correct.  And forgive me, Your Honor, because I get a lot                10:08:35

6    of these saturation patrols mixed up, and there's a number of

7    reasons we do saturation patrols, and --

8    Q.  All right.  So you have saturation patrols that you do for

9    different reasons?

10   A.  Correct.                                                                 10:08:51

11   Q.  And in any saturation patrol, like a DUI saturation patrol,

12   you'll find somebody with outstanding warrants?

13   A.  Correct.

14   Q.  And you'll find somebody with outstanding warrants in a

15   narcotics --                                                                 10:09:03

16   A.  Correct.

17   Q.  -- saturation patrol?

18          And presumably you'll arrest them?

19   A.  Correct.

20   Q.  What was the reason you were doing these saturation patrols    10:09:07

21   that we've been discussing during your testimony?

22   A.  Well, there's a number of reasons as far as what the

23   community demand might be.  That was a reason that the sheriff

24   might have to respond to the public.

25   Q.  Well, let -- let me just ask.  When you say "community           10:09:23

```
1    demand," is that -- and I don't mean to -- was it a community

2    demand to be doing illegal immigration saturation patrols?

3    A.  I think that --

4    Q.  Your perception?

5    A.  I think the perception from my perspective is we did have       10:09:39

6    issues with immigration and the lack of enforcement throughout

7    our community.  And my whole perspective of the enforcement to

8    try to -- to correct or change some of that was purely going

9    after drop houses or delaying the operation of drop houses, and

10   at the same time attacking any corridors that smugglers might      10:10:09

11   be operating out of.

12   Q.  All right.  That would have been effective law enforcement.

13   A.  And that's, from my perspective, is what I was attempting

14   to do out there.

15   Q.  All right.  But it had a -- the saturation patrols had a       10:10:26

16   wider swath than just that, didn't they?

17   A.  Yes, sometimes intentionally so, and -- and as has been

18   pointed out with the press releases, there's some inaccuracies

19   that went out.  There were things that I did that I wouldn't

20   inform the public relations people that we might be doing so       10:10:51

21   that it doesn't get out to the -- to the media.

22   Q.  Do you think your officers are aware of your press

23   releases?

24   A.  They -- they might be now.  I don't think they were at the

25   time, no.                                                          10:11:09
```

1  Q.  Okay.  Do you have any knowledge one way or another whether

2  they were aware?

3  A.  No.

4  Q.  Do you have any recollection whether sometimes prior to a

5  saturation patrol, for example, the sheriff or somebody else          10:11:18

6  would go on TV and say, We're going to do a saturation patrol

7  in this location at this time?

8  A.  I've heard that, yes.

9  Q.  Was that something that you were in favor of?

10  A.  No, I'd rather -- I'd rather do things without any              10:11:30

11  observation, and I think a lot of police are that way.  They'd

12  rather not have a lot of attention drawn to -- to their

13  operations.  So my -- my druthers, or what I'd really like to

14  have sometimes, is not have the media there.

15  Q.  Okay.  Was it standard practice before you did a saturation    10:11:55

16  patrol to have a press release and inform the media that you

17  were going to do a saturation patrol?

18  A.  And there again, going back as far as I can remember, even

19  before this debate on immigration, yes, those -- those press

20  releases were going out about saturation patrols.                   10:12:20

21  Q.  And you still feel like you can conduct saturation patrols;

22  you still have that ability, and you're not here today to tell

23  me you're not going to conduct saturation patrols related to or

24  that may involve concerns about illegal immigration?

25  A.  That -- that's true, Your Honor.                                10:12:38

1    Q.  Let me ask a couple of other things, because as you've gone

2    through the letters, first with Mr. Young, and then with

3    Mr. Casey, the various materials that were forwarded to you

4    from Sheriff Arpaio, you've identified ones that -- and I think

5    that you would have acted on and that you wouldn't have acted          10:12:57

6    on, and you've identified reasons why you wouldn't have acted

7    on them.  Is that a -- have I understood your testimony

8    correctly?

9    A.  Yes, sir.

10   Q.  All right.  I want to present for you the hypothetical that         10:13:07

11   you get -- and I -- I'm not sure how hypothetical it is in some

12   instances, but I just want to make sure I understand what I

13   think the gist of your testimony to be.

14          You get a complaint from a citizen that day laborers

15   of Hispanic ancestry appear to be congregating on a particular         10:13:30

16   corner.  Is that a basis on which you could or would conduct a

17   saturation patrol?

18   A.  No.

19   Q.  Would that provide reasonable suspicion to investigate

20   anyone there for committing a crime, whether 287(g) or                 10:13:48

21   otherwise?

22   A.  No.

23   Q.  Would it provide probable cause for believing that a crime

24   had been committed, either pursuant to 287(g) authority or

25   state law?                                                             10:14:03

1   A.   No.

2   Q.   I just want to understand, because I don't want to lose the

3   ability to ask any other questions that might be important to

4   me before I let you go.

5        What is your role in the planning of any particular          10:14:22

6   saturation patrol?

7        I understand that you've -- if I understand you

8   correctly, and you can correct me if I'm wrong, you've

9   identified yourself as the person, together with your -- with

10  the supervising officers that you -- that report to you, you    10:14:40

11  are the person who selects the locations.

12       Do you have any other role in the operation or

13  planning of a particular saturation patrol?

14  A.   The strategies that go along with it, I'm involved in.  And

15  there's been a lot of conversation here about what I wouldn't    10:15:04

16  want to have in the media, what I do want to have in the media.

17  And oftentimes I'll start operations that end up as a

18  saturation patrol that may be initiated by our narcotics unit

19  and our warrants unit, where they'll go out without any

20  attention and go out and effect arrests, perhaps in a certain    10:15:28

21  area, or after a certain goal or objective, like -- and I'll

22  point out the Vekol Valley area which is south of the I-8

23  corridor.  And there's been a lot of attention given that in

24  the last year or so down there because of the smuggling issues

25  that go on.                                                      10:15:48

1    Q.   Right.   And is part of that in Maricopa County?

2    A.   Most of it is, sir.

3              The issue for us is we go down there surreptitiously

4    in an undercover capacity trying to head off whatever we can,

5    because as soon as they're alerted -- as soon as the smugglers

6    are alerted that we're in the area, they cease operations and

7    wait us out.   And so we don't want any fanfare about that.

8              Then we'll come out with a uniform presence, heavy

9    uniform patrol presence in the whole general area to stop

10   whatever we can, to catch what might be pushed through.

11   Q.   That will be not an HSU operation; that would be a

12   saturation patrol.

13   A.   That's a saturation patrol.   However, I have used HSU as a

14   resource, more vehicles out, more deputies' eyes out there.

15   Q.   In the what I'm going to call -- and I don't mean to cut

16   off.   Was I cutting you off?

17   A.   No, sir.

18   Q.   What I'll call the more urban saturation patrols that for

19   the most part we've been discussing here, were you involved in

20   the planning of those?

21   A.   Yes, sir.

22   Q.   Did you have any regular recurring role in the planning of

23   those other than picking out the locations?

24   A.   There again, the strategy that was used behind them,

25   because I wouldn't say that we're cookie-cutter, but we have

10:16:08

10:16:27

10:16:49

10:17:02

10:17:15

1    plans and operations that we traditionally use, and strategies

2    that we traditionally use, and so I would be involved in that.

3            And a lot of it is coordination.  We are a

4    bureaucracy, and I have commanders that work for me that don't

5    often -- they get along, but it's the bureaucracy effect of the    10:17:37

6    way we do business.  And it's my job to make sure the narcotics

7    people are working with the HSU people and, you know,

8    throughout the office, the warrants people.

9    Q.  What is a typical strategy for the urban saturation

10   patrols?  I understand you've told me it's not cookie-cutter,    10:18:01

11   but there are similar strategies, if I understand.

12   A.  Correct.  If we're going to do a saturation patrol in an

13   urban area --

14   Q.  Yes.

15   A.  -- depending -- if we have a specific area where we might    10:18:12

16   have high frequency of drop house operation, it would be

17   approached primarily with heavy surveillance, undercover type

18   of officers in there, nonuniform, and lead up to the location

19   of -- of a drop house.

20           It might be the stopping of a -- a vehicle that's    10:18:38

21   loaded with people that have just recently been smuggled,

22   enough to get us to that location to do a search warrant.

23   Q.  All right.  Let me tell you that it's been my impression

24   that the saturation patrols that we have discussed in this

25   lawsuit, and I understand that there are all kinds of    10:18:56

saturation patrols from what you're telling me, but the
saturation patrols that we have discussed in this lawsuit are
not ones that involved targeting a drop house.

     Are there any here that targeted a drop house?

A.  There were -- and forgive me for -- for being a little
redundant here, because during most of this time period
discussed, one of the biggest problems that we were facing was
large human smuggling loads being transport --

Q.  I'm quite aware of that.

A.  All right.  And so drop houses were always at the forefront
of my mind.  If we had -- we had some operations where we
specifically were looking for drop house locations based on
their frequency.

Q.  Well, I understand that --

A.  And some of them may have been in these operations, Your
Honor.

Q.  You just don't recall?

A.  I don't recall.  I can't tell you specifically which ones.

Q.  And if we were to go through and say was there a drop house
operation in this one, this one, this one, you still don't
think you'd be able to recall?

A.  If I sat down with my lieutenant I could probably sort it
out, yes, sir.

Q.  All right.  Let me ask you, though, I mean, you indicated
that for the most part the sheriff would do a public relations

1   announcement prior to the saturation patrols.  Presumably, he's

2   not going to do a public relations announcement before a

3   saturation patrol that involves a drop house.

4   A.  Not in any specifics.

5   Q.  Yeah.  Okay.  That helps me.  Thank you.                    10:20:34

6   A.  Because I would be discussing that with him.

7   Q.  Let me ask you, there's been some testimony involving

8   MCSO's position about its ability to enforce federal

9   immigration law after 287(g) authority was revoked.

10          Do you -- were you involved in any communications with  10:21:07

11  anyone after, or prior to, once you became aware that you were

12  going to lose 287(g) authority, other than attorneys, about

13  whether or not MCSO would have authority, inherent or

14  otherwise, to continue to enforce federal immigration law?

15  A.  I've had discussion with ICE officials on that topic,       10:21:33

16  particularly around that time.  Obviously, there was a lot of

17  politics going on at the same time.  They have been good

18  partners with this agency, and they have worked with us when

19  we've had issues primarily enforcing the state laws and taking

20  people from us that appeared to be here illegally.             10:22:04

21  Q.  Right.  So you can refer people to them for prosecution,

22  but you don't prosecute them.

23  A.  That's true.  I think the question is detention, and how

24  long you can detain people, and not actually the authority to

25  do that, but --                                                 10:22:27

```
 1   Q.  Okay.  Yeah.  And you're honing in on what my real question

 2   is.

 3           I understand that you would have had discussions with

 4   ICE after your 287(g) authority was revoked about coordinating

 5   the transfer of people that you no longer had the authority to        10:22:41

 6   prosecute or to arrest to ICE.  I presume you would have had

 7   such discussions.

 8   A.  I have, yes.

 9   Q.  But I'm not really talking about those discussions.  I'm

10   talking about discussions about whether or not you had inherent        10:22:54

11   authority, despite the revocation of 287(g), to enforce federal

12   immigration law.

13           Did you ever have any such discussions with anyone,

14   other than an attorney?

15   A.  I don't remember specifically having that discussion with          10:23:11

16   anybody other than attorneys.  It may have come up in passing

17   conversation with ICE officials.

18   Q.  Okay.  Did you ever have any discussion with Sergeant

19   Palmer about whether or not MCSO had inherent authority to

20   enforce federal immigration law?                                       10:23:34

21   A.  I don't recall having any.

22   Q.  Do you ever remember having any discussion regarding the

23   views of someone named Kris Kobach?

24   A.  Yes.

25   Q.  And did you have those discussions with anyone other than         10:23:46
```

1    an attorney?

2    A.  No.  And Kris Kobach is an attorney, I believe.

3    Q.  Well, I'm not asking about --

4    A.  Oh, I'm sorry.

5    Q.  -- any communications you may have had with Mr. Kobach.    10:24:00

6    I'm just asking about any communications you had with anybody,

7    and you don't recall any.

8    A.  I don't recall any, no.

9          THE COURT:  All right.  Thank you, sir.  I think those

10   are all my questions.                                         10:24:13

11          Mr. Casey.

12          MR. CASEY:  Your Honor, I don't have any questions,

13   but if the Court would like, I do have a list of all saturation

14   patrols just by date, geographic area, if the Court was

15   interested in it.  It's both large and small scale from 2007 to  10:24:32

16   the end of '09.

17          THE COURT:  I do appreciate that, but I don't -- if

18   Mr. Young's interested in pursuing it I'm going to let him do

19   that on his time and not on the Court's time.

20          MR. CASEY:  No, no questions, Your Honor.              10:24:46

21          THE COURT:  All right.

22          Mr. Young?

23          MR. YOUNG:  Yes, I have a few questions, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. YOUNG:                                                 10:24:48

1  Q.  Chief Sands, Mr. Casey asked you some questions about

2  Sheriff Arpaio's public statements in the form of press

3  conferences and television interviews.  Do you recall those

4  questions?

5  A.  I recall questions like that, yes.                    10:25:14

6  Q.  And I think you said, in answering his questions, that

7  there was a disconnect between the sheriff and your operations.

8        Did I hear that correctly?

9  A.  Yeah.  Yes.

10  Q.  Is it true that some of your lieutenants and sergeants and  10:25:34

11  deputies attend some of the press conferences where Sheriff

12  Arpaio makes those statements?

13  A.  There's some, yes.

14  Q.  Do some of your lieutenants and sergeants and deputies ever

15  see the sheriff talking on television about your office's      10:26:00

16  immigration operations?

17        MR. CASEY:  Objection, foundation, Your Honor.

18        THE COURT:  Sustained.

19  BY MR. YOUNG:

20  Q.  Chief Sands, have you ever seen the sheriff on television   10:26:14

21  talking about your office's immigration policies?

22  A.  I have.

23  Q.  Have you ever talked to anyone else in your office who has

24  told you that they have seen the sheriff talking on television

25  about your office's immigration policies?                      10:26:32

A.  I've had discussions.  I can't remember if it was specific

to what you just addressed as immigration, but I have had those

discussions with staff, yeah.

Q.  You've had discussions about staff who have seen the

sheriff talking on television interviews, correct?                    10:26:53

A.  With -- with some of my staff members, yeah.  Yes.

Q.  Are some of those staff members the people who are active

in your office's immigration-related activities?

A.  No.

        Oh, correction on that, sir.  There's some of them       10:27:16

that may be in the chain of command of some of those people,

but there's others that -- that are not.  That are -- and I'm

not talking about rank and file staff; I'm talking about

command staff.

Q.  Who are the chain of command people that you just had in       10:27:31

mind as you answered my last question?

A.  The people I typically meet with, we have conversations

quite a bit as far as press releases, and what -- or not press

releases, but press conferences, and watching the press

conference, and what was reported by a certain channel.  Those   10:27:53

conversations come up.

Q.  Is Lieutenant Sousa one of those people?

A.  I usually don't have the opportunity to have those

discussions with him.

Q.  How about Sergeant Palmer?                                    10:28:03

```
 1    A.   Usually never talk to Sergeant Palmer.
 2    Q.   Has there ever been an internal communication within your
 3    office that's gone out to the people who implement your
 4    immigration-related policies saying that Sheriff Arpaio's
 5    public statements are wrong and do not represent the policy of      10:28:26
 6    your office?
 7    A.   I've never seen anything like that.
 8    Q.   If the sheriff were -- well, let's go back.
 9         Mr. Casey asked you some questions about your actions
10    when you or if you disagree with something that the sheriff has      10:28:54
11    suggested, and you responded to him that you've said certain
12    things and you've discussed certain things.
13         Do you recall that --
14    A.   Yes.
15    Q.   -- series of questions and answers?                             10:29:05
16         If the sheriff disagrees with what you tell him and he
17    tells you to do something -- for example, to conduct an
18    operation or not conduct an operation -- would you be permitted
19    to disobey his instruction?
20    A.   It's never come to that level.  I do work for him, but like     10:29:27
21    I say, our -- our relationship is such that he takes feed --
22    feedback from me.  And we're what I'd call a professional
23    organization, and, you know, certainly he could fire me.
24    There's no doubt about that.
25         But when I say a disconnect, oftentimes he doesn't              10:30:02
```

1    understand what the rank and file deputies are doing out there,

2    and it becomes right back to this same long story that -- that

3    we had about the indicators, and how the information is used.

4    Q.  Let's go back to Exhibit 228.  Mr. Casey asked you some

5    questions about that, and I just have one or two more questions          10:30:30

6    about that.

7            There are some comments in this document, and we can

8    flip through, maybe go to the second page.

9            There's some comments in here about activities in

10   Mesa.  Do you see those?                                                 10:30:57

11   A.  You'll have to point them out to me, sir.  I don't have

12   enough mag --

13   Q.  Okay.  Well, let's take the middle of the second page where

14   it says Ron M.  And that says:  Happy with your sweeps in Mesa.

15   Keep up the good work.                                                   10:31:15

16           Do you see that?

17   A.  Yes.

18   Q.  That's something that you appreciate hearing, that is, that

19   you are getting support from the public, for your -- at least

20   some members of the public, some members of the public, for             10:31:34

21   your activities, is that right?

22   A.  Well, any time we get a positive it's better than a

23   negative.  However, I'm also a person that's been a police

24   officer for a long time, and I know when my sensitivities have

25   to end and when my job has to begin.                                     10:31:58

```
 1              And I also know that this is similar to a poll that's
 2    conducted by our office staff, and that's -- that's all it is.
 3    There's relatively no information about criminal activities.
 4    This is just information that rolls in on a daily basis from
 5    the public, and...  It's no different than reading a poll that      10:32:25
 6    Channel 10 puts out on what our standings are.  I'm positively
 7    reinforced by that, but it doesn't give me the motivation to go
 8    out and do my job as a police officer.
 9    Q.  Sheriff, I'm going to read to you from your November 15,
10    2010, deposition at page 198.  No need to display this on the      10:32:58
11    screen.  But I'm going to start at line 21.
12              MR. CASEY:  I'm sorry, what page, sir?
13              MR. YOUNG:  Page 198 of the November 15, 2010,
14    deposition, starting at line 21.
15    BY MR. YOUNG:                                                      10:33:13
16    Q.  And you can read along with me, Chief.
17    A.  Okay.  We're talking about November 15th?
18    Q.  Yes.
19    A.  Let me catch up.  Go ahead, sir.
20    Q.  Question -- this is line 21:                                   10:33:25
21              "QUESTION:  You do believe that the sheriff wants you
22    to know about what this barometer is saying, correct?"
23              And it's referring to this exhibit that we've been
24    talking about, 228.
25              "ANSWER:  Oh, certainly.  Yes.  Yes.  There's one       10:33:39
```

1  above there that you're not even mentioning about Mesa and

2  'Keep up the good work.'

3      "QUESTION:  Is that the one from Ron M that says,

4  'Happy with your sweeps in Mesa.  Keep up the good work,' end

5  quote?                                                          10:34:02

6      "ANSWER:  Yes.

7      "QUESTION:  Is that something that you appreciated

8  finding out that someone felt that way?

9      "ANSWER:  When we can get support from the public,

10  yes."                                                          10:34:15

11      Do you stand by that testimony?

12  A.  Yes, and it's similar to the testimony I just gave you.

13      MR. YOUNG:  Thank you very much for your time,

14  Chief Sands.

15      THE WITNESS:  Thank you.                                  10:34:27

16      THE COURT:  Chief, we thank you for your testimony.

17  You can step down.

18      THE WITNESS:  Thank you, sir.

19      THE COURT:  We're going to take the morning break.  I

20  think I've run my court reporter into the ground.  We'll be    10:34:35

21  back at 11 o'clock.

22      MR. CASEY:  Did the Court say 11:00?

23      THE COURT:  11:00.

24      MR. CASEY:  Thank you, sir.

25      (Recess taken.)                                           10:34:44

```
 1              THE COURT:  Thank you.  Please be seated.

 2         Next?

 3              MS. GALLAGHER:  Plaintiffs call Deputy Carlos Rangel.

 4              THE CLERK:  Right over here, sir.

 5         Can you please state and spell your full name.        11:03:05

 6              MR. RANGEL:  My name is Carlos Rangel.

 7              THE COURT:  Can you spell it?

 8              MR. RANGEL:  R-a-n-g-e-l.

 9              THE CLERK:  Please raise your right hand.

10         (Carlos Rangel was duly sworn as a witness.)          11:03:29

11              THE CLERK:  Thank you.  Please take our witness stand.

12              THE COURT:  Go ahead.  Please proceed.

13                          CARLOS RANGEL,

14    called as a witness herein, having been duly sworn, was

15    examined and testified as follows:                         11:04:08

16                       DIRECT EXAMINATION

17    BY MS. GALLAGHER:

18    Q.  Good morning, Deputy Rangel.

19    A.  Good morning.

20    Q.  You went to the police academy in approximately 2000, is   11:04:14

21    that correct?

22    A.  Correct.

23    Q.  And you've been working for the Sheriff's Office here in

24    Maricopa County ever since?

25    A.  Yes.                                                    11:04:23
```

Q.  So that's about 13 years?

A.  Yes.

Q.  And you're a member of the HSU, or Human Smuggling Unit?

A.  Yes, I am.

Q.  You joined the HSU right as it was being formed in 2006,

correct?

A.  That's correct.

Q.  And in approximately 2007 you became 287(g) certified?

A.  Yes, I was.

Q.  Deputy Rangel, you're bilingual, is that correct?

A.  Yes, I am.

Q.  English and Spanish?

A.  Yes.

Q.  And you spent part of your childhood growing up in Mexico,

is that correct?

A.  Yes.

Q.  So you consider yourself Latino?

A.  Yes.

Q.  And you would agree with me that it's possible for some

Latinos to have prejudices against other Latinos, is that

correct?

A.  As to what?  I don't understand the question.

Q.  It's possible that a Latino individual could have

prejudices against other Latino individuals?

A.  Yes.

1    Q.  You learned about racial profiling in the academy back in

2    2000, is that correct?

3    A.  Yes.

4    Q.  In the academy you were taught not to racially profile as

5    part of a course on criminal law, is that correct?                11:05:30

6    A.  Correct.

7    Q.  And that was about it, as far as you remember, in terms of

8    your training at the academy in terms of racial profiling,

9    isn't that correct?

10   A.  Yes.                                                           11:05:42

11   Q.  And after the academy you did not receive any ongoing

12   training from the MCSO regarding racial bias or sensitivity, is

13   that correct?

14   A.  Correct.

15   Q.  Now, at some point in approximately October of 2009 the       11:05:51

16   MCSO lost its authority under 287(g), is that correct?

17   A.  Yes.

18   Q.  And you were not immediately given any training or

19   direction as to how that impacted what you did on patrol, were

20   you?                                                              11:06:07

21   A.  Correct.

22   Q.  And when you joined the HSU back in 2006, you did not

23   receive any formal training on the detection and apprehension

24   of criminal aliens, is that correct?

25   A.  Correct.                                                      11:06:23

1    Q.  In fact, you never received any formal training with

2    respect to the detection and apprehension of criminal aliens,

3    correct?

4    A.  Correct.

5    Q.  In fact, you never received any training at all after                11:06:30

6    becoming an HSU officer that was specific to your role as an

7    HSU deputy, isn't that correct?

8    A.  What was that, again?

9    Q.  You never received any training after becoming an HSU

10   officer that was specific to your role as an HSU officer, is       11:06:47

11   that correct?

12   A.  As to training for -- for what?

13   Q.  That was specific to your role as an HSU deputy as opposed

14   to any -- any aspects of your job that would be similar,

15   whether or not you were HSU.                                       11:07:05

16   A.  Correct.

17   Q.  You've been involved in a number of saturation patrols,

18   that's correct?

19   A.  Yes.

20   Q.  And prior to going out on saturation patrols there's          11:07:16

21   generally a briefing about the saturation patrol?

22   A.  Yes.

23   Q.  And sometimes Sheriff Arpaio himself gives a speech to the

24   media before saturation patrols?

25   A.  I believe so.                                                  11:07:31

```
1    Q.  And you've been present at some of those speeches prior to

2    saturation patrols?

3    A.  Yes.

4    Q.  Now, as part of the briefing -- and I'm talking now about

5    the briefing you received as officers, and not necessarily the      11:07:44

6    media speech -- as part of that briefing you received prior to

7    saturation patrols you received information about the reasons

8    for the patrol?

9    A.  Yes.

10   Q.  But you were not made aware of any spikes in crime              11:07:55

11   occurring in the sweep areas, were you?

12   A.  Correct.

13   Q.  And you were never made aware of a spike in traffic or

14   vehicular violations in a targeted area?

15   A.  Correct.                                                        11:08:10

16   Q.  You were never told that the local police departments were

17   asking for help in the area?

18   A.  That's correct.

19   Q.  But you did get information about citizen complaints

20   regarding that area, is that correct?                              11:08:27

21   A.  Sometimes.

22   Q.  Such as day laborers in the area?

23   A.  Yes.

24   Q.  And businesses complaining about day laborers scaring away

25   their customers?                                                   11:08:39
```

1    A.  Yes.

2    Q.  In particular, with respect to an operation that was

3    conducted in Queen Creek, you were informed that it was in

4    response to a citizen complaint mentioning day laborers

5    harassing children nearby?                                    11:08:52

6    A.  I believe so.

7    Q.  And you believe that the majority of undocumented

8    immigrants in Maricopa County are Latino, is that correct?

9    A.  Yes.

10   Q.  And you believe the majority of undocumented immigrants in   11:09:02

11   Maricopa County are from Central or South America?

12   A.  Yes.

13   Q.  And you believe that most day laborers are here illegally,

14   is that correct?

15   A.  Not all of them.                                         11:09:17

16   Q.  Most of them?

17   A.  Yes, most of them.

18   Q.  Now, on saturation patrols you're familiar with the

19   practice of following a vehicle to -- to develop probable cause

20   to stop the vehicle for a traffic violation?                 11:09:30

21   A.  Yes.

22   Q.  And sometimes that's done for purposes of investigating a

23   different violation than the probable cause that you developed

24   was for?

25   A.  For myself, I'm speaking on my behalf?                   11:09:40

1   Q.  Yes.

2   A.  If I'm following a vehicle to develop probable cause it's

3   because of a Title 28 violation: cracked windshield, any

4   equipment violation.

5   Q.  But sometimes the reason you're attempting to develop            11:10:01

6   probable cause is because you want to investigate the driver or

7   occupants of the vehicle for another reason, is that correct?

8   A.  Like what other reason?  I don't understand.

9   Q.  So you may try to develop probable cause in order to make

10  contact with the individuals --                                     11:10:18

11  A.  Yes.

12  Q.  -- in the car for a reason other than the probable cause

13  that you developed?

14  A.  No, I'll make -- I'll make contact with the vehicle to

15  investigate why they have equipment violation.                      11:10:31

16  Q.  You've been involved in operations where you've

17  contacted -- been contacted by another officer, told that there

18  is a vehicle of interest, and then developed probable cause to

19  stop that vehicle, is that correct?

20  A.  Say that again.                                                  11:10:52

21  Q.  You've been involved in -- excuse me.  You've been involved

22  in operations where you've been contacted by another officer,

23  told that there was a vehicle of interest to that officer, and

24  then have developed probable cause to stop that vehicle, the

25  vehicle of interest to the other officer?                           11:11:10

1    A.  I quite don't understand your question.

2    Q.  Has there ever been an instance on a saturation patrol or

3    other operation where you've got a call-out from a ra -- on the

4    radio from another officer informing you of a vehicle that they

5    want to have stopped, and you've then followed the vehicle in          11:11:33

6    order to find probable cause to stop that vehicle?

7    A.  Yes.

8            MS. GALLAGHER:  Your Honor, permission to approach the

9    witness with Exhibit 14?

10           THE COURT:  Yes.                                               11:12:02

11           MS. GALLAGHER:  Can also put 14 on the screen for

12   counsel and the witness.

13           MR. LIDDY:  Excuse me, Your Honor.

14           MS. GALLAGHER:  Should be on your screen as well.

15           MR. LIDDY:  Your Honor, I'd like to inquire as to           11:12:22

16   whether this exhibit's been admitted.

17           MS. GALLAGHER:  No, this has not been admitted, so

18   just on the screens for counsel.

19           MR. LIDDY:  Yeah, but not for the Court.

20           THE COURT:  I get it on my screen always.                   11:12:34

21           MR. LIDDY:  Okay.

22   BY MS. GALLAGHER:

23   Q.  Deputy Rangel, have you had a moment to look at that

24   document?

25   A.  No, not yet.                                                    11:12:53

```
1    Q.  Excuse me?

2    A.  No, I haven't yet.

3    Q.  Okay.  Let me know when you've had a moment.

4            (Pause in proceedings.)

5            THE WITNESS:  Okay.                              11:13:48

6    BY MS. GALLAGHER:

7    Q.  Thank you.

8            You've seen this report before?

9    A.  I'm not sure if I've seen it before.

10   Q.  On the beginning of paragraph 2, while on patrol, Detective   11:14:05

11   Rangel, number 1528, is that yourself?

12   A.  Yes, it is.

13   Q.  So this is about a stop that you conducted?

14   A.  Yes.

15   Q.  Okay.  And this is a report that is commonly completed   11:14:18

16   after a load vehicle is apprehended, is that correct?

17   A.  Correct.

18   Q.  And part of this report is created from a template that you

19   would use to help fill out the narrative, is that correct?

20   A.  Yes.                                                  11:14:35

21   Q.  HSU deputies, including yourself, regularly use this

22   template for convenience purposes, is that correct?

23   A.  Correct.

24   Q.  And in fact, you've used this form, for the most part,

25   every time that you filled out a report regarding a load   11:14:49
```

1    vehicle, is that correct?

2    A.  Yes, I believe so.

3    Q.  You still use this form today?

4    A.  Yes.

5    Q.  And if we go towards the very bottom, the last paragraph of    11:14:57

6    this document, you see there's some gray boxes, the first one

7    having Subject Name, do you see that?

8    A.  Yes.

9    Q.  And so here you would use a pre-prepared narrative and fill

10   in these gray boxes with the details of the specific stop being    11:15:15

11   reported on?

12   A.  Correct.

13   Q.  If we can go to the next page.

14          The second paragraph, you see it says Subject, who is

15   originally from Mexican Hometown?    11:15:35

16   A.  Yes.

17   Q.  And then Mexican Hometown is a square that you would fill

18   in?

19   A.  Yes.

20   Q.  With the town in Mexico where you believe the individual    11:15:40

21   was from?

22   A.  Yes.

23   Q.  And if we can go now to the next paragraph.  At the top it

24   says Subject said He/She met an unknown Hispanic male.

25          Do you see that?    11:16:07

1   A.   Yes.

2   Q.   So Hispanic male is part of the form, is that correct?

3   A.   Correct.

4   Q.   And that's not a box that you would typically change?

5   A.   For the most part, no.                                    11:16:15

6   Q.   In fact, you've never changed the language when filling out

7   that form, have you?

8   A.   Correct.

9        MS. GALLAGHER:   Your Honor, at this time I move to

10  admit Exhibit 14 into evidence.                                11:16:27

11       MR. LIDDY:   Without objection, Your Honor.

12       THE COURT:   Exhibit 14's admitted.

13       (Exhibit No. 14 is admitted into evidence.)

14  BY MS. GALLAGHER:

15  Q.   Deputy Rangel, I'd like to shift your attention now to a   11:16:39

16  saturation patrol or an operation that you were involved in in

17  Cave Creek in September of 2007.

18       Do you remember that patrol?

19  A.   Yes.

20  Q.   And the operation was based on citizen complaints about day  11:16:52

21  laborers hanging around a church, is that correct?

22  A.   Yes, and I believe also a drop house nearby.

23  Q.   The church was Good Shepherd of the Hills church, is that

24  correct?

25  A.   Yes.                                                       11:17:07

1    Q.  And you had conducted the -- had been part of the

2    operation -- excuse me.  Strike that.

3         The goal of the operation that was conducted on

4    September 27th, 2007, was to rid the area of day laborers, is

5    that correct?                                                    11:17:17

6    A.  I'm not sure about getting rid of the day laborers.  It was

7    to enforce the -- the laws within the town.

8    Q.  The goal was to make sure that the businesses were not

9    having day laborers hanging around in front of their

10   businesses, is that correct?                                     11:17:45

11   A.  Correct.

12   Q.  And a few days before that operation, on September 24th,

13   you did an undercover operation at that same church, Good

14   Shepherd of the Hills?

15   A.  I personally did not.                                        11:17:57

16   Q.  You were not involved in that operation --

17   A.  No, I -- I was involved, but not undercover.

18   Q.  You were not undercover, but you were involved in the

19   undercover operation?

20   A.  Yes.                                                         11:18:09

21   Q.  And as part of that investigation you determined that most

22   of the day laborers in that area were living in apartments

23   nearby?

24   A.  Correct.

25   Q.  Just south of the church there?                              11:18:20

1    A.  Either south or east, I'm not sure.

2    Q.  And then on September 27, three days later, you did an

3    operation in that area?

4    A.  Yes.

5    Q.  And as part of that operation, MCSO officers did some          11:18:32

6    knock-and-talks?

7    A.  Yes.

8    Q.  And that was at the same apartments that you had determined

9    on the 24th were where a number of the day laborers had been

10   living?                                                          11:18:47

11   A.  Correct.

12   Q.  Now, as part of that operation you responded to a call by

13   Deputy DiPietro for a 287(g) officer, is that correct?

14   A.  That is correct.

15   Q.  And you were the first officer to arrive on the scene         11:19:00

16   besides Deputy DiPietro, is that correct?

17   A.  Yes.

18   Q.  Deputy DiPietro informed you that the passengers spoke

19   Spanish and no English?

20   A.  Correct.                                                      11:19:13

21   Q.  And that he had pulled the vehicle over for speeding?

22   A.  Yes.

23   Q.  He then asked you to speak to the passengers?

24   A.  Yes.

25   Q.  And at that point he had not told you anything else about     11:19:20

1    the traffic stop or the passengers, is that correct?

2    A.  Correct.

3    Q.  And you had no reason to believe that the passengers had

4    violated any state law, is that correct?

5    A.  Correct.                                              11:19:32

6    Q.  So then you proceeded to speak with the passengers?

7    A.  Yes.

8    Q.  But you did not speak with the driver of the vehicle, is

9    that correct?

10   A.  That is correct.                                      11:19:41

11   Q.  In fact, you made no contact with the driver whatsoever?

12   A.  Yes.

13   Q.  And you didn't consider it to be HSU's job to clear the

14   driver?

15   A.  I didn't make the stop.                               11:19:53

16   Q.  So you did not consider it HSU's job to clear the driver,

17   is that correct?

18   A.  Correct.

19   Q.  You asked for identification from the passengers?

20   A.  Yes.                                                  11:20:08

21   Q.  And Mr. Melendres provided you with a B-1/B-2 visa, is that

22   correct?

23   A.  That's correct.

24   Q.  And he also provided you with his I-94?

25   A.  No, he did not.                                       11:20:18

1   Q.  He stated that he had it in his wallet, correct?

2   A.  No, he did not.

3         MS. GALLAGHER:  Your Honor, permission to approach the

4   witness with a copy of Exhibit 1093.

5         THE COURT:  You may have it.                          11:20:39

6         MS. GALLAGHER:  And for the record, I believe this is

7   an exhibit that was ex -- excuse me, that was submitted by

8   defendants.  The clerk should have a copy.  However, we have

9   learned that this exhibit is under protective order.  We have

10  contacted the government and gotten permission to use a       11:20:54

11  slightly more redacted version of the document.  So if it is

12  admitted into evidence at a later point, I have an extra copy

13  for the clerk with the extra redaction that I'm going to be

14  giving to the witness.

15        THE COURT:  All right.                               11:21:11

16        Have you given a copy to defense counsel?

17        MS. GALLAGHER:  I have one for them.

18        MR. LIDDY:  Thank you.

19  BY MS. GALLAGHER:

20  Q.  Deputy Rangel, I'd like you to turn to the third page of  11:21:34

21  this document.  On the top it has an indication, a Bates label

22  that says ICE BS 10762.

23  A.  Okay.

24  Q.  And we're going to focus on the last paragraph of -- excuse

25  me, of 1093 on page 10762.  I'm going to read this out loud, if  11:21:59

```
 1    you can read along?
 2            MR. LIDDY:  Objection, Your Honor, foundation and
 3    hearsay.
 4            MS. GALLAGHER:  Your Honor, this exhibit was submitted
 5    by defendants, so --                                          11:22:13
 6            THE COURT:  That doesn't solve anything.
 7            MS. GALLAGHER:  So they would have no objection in the
 8    pretrial order to the -- to the exhibit itself as they
 9    submitted it.  And as I understand, the pretrial order governs
10    objections.                                                   11:22:31
11            THE COURT:  Any objection to 1093?
12            MS. GALLAGHER:  I believe we did, Your Honor.
13            THE COURT:  And you're waiving that?
14            MS. GALLAGHER:  Yes, Your Honor.
15            THE COURT:  Mr. Liddy, did you preserve any objection  11:22:36
16    to 1093?
17            MR. CASEY:  Your Honor, I can speak to that.  We did
18    not state an objection to it.  We listed it.  It's not been
19    stipulated into evidence, and I still believe, Your Honor, that
20    we have the ability to pre -- if we list it, we didn't list an 11:22:53
21    objection, but I think we can still at this point make those
22    objections here.
23            I know what the Court's order says --
24            THE COURT:  And the Court's order says you're going to
25    have to convince me that there's a manifest injustice to       11:23:07
```

```
 1    preserve a late objection not in the pretrial order.  So I'll

 2    give you your shot.  What's the manifest injustice?

 3              MR. CASEY:  Your Honor, the manifest injustice in this

 4    is you have -- she's not shown him the first page here.  We

 5    don't know who the author is.  We don't know who it was sent       11:23:26

 6    to.  It appears to be an ICE inquiry in answering allegations

 7    that congressional members of the House Judiciary Committee had

 8    about this particular stop, and it appears to articulate

 9    conclusions that some unknown person set forth.  And it is

10    improper cross now --                                              11:23:46

11              THE COURT:  Now I've given you the opportunity --

12              MR. CASEY:  Sorry.

13              THE COURT:  I've given you the opportunity to set the

14    context for the document as the defense sees it.  You still

15    haven't established, I don't think, manifest injustice, so I'm     11:23:55

16    going to allow you to proceed.

17    BY MS. GALLAGHER:

18    Q.  So I'll direct your attention to the last paragraph of the

19    page labeled 10762.  It says there:  The DRO acting supervisory

20    immigration enforcement agent, or SIEA, on duty at the ICE        11:24:15

21    detention facility remembers the MCSO deputy bringing in

22    Ortega Melendres and showing him the BCC.  The MCSO deputy

23    stated he arrested Ortega Melendres for working and violating

24    his B-2 visa.  Ortega Melendres did have his I-94 in his

25    wallet -- and I'm going to skip the rest of that sentence         11:24:37
```

1    because it's highly redacted.  It has to do with a query into a

2    database.

3         The record showed Ortega Melendres was admitted

4    through 2008 for six months.  The SIEA asked Ortega Melendres

5    if he was working, and Ortega Melendres stated that he was not.    11:24:49

6         Did you read that paragraph?

7    A.  Yes.

8    Q.  Does that refresh your recollection as to whether

9    Mr. Melendres had the I-94 in his wallet --

10   A.  No.                                                            11:25:04

11   Q.  -- when you stopped him that day?

12   A.  No.

13        MS. GALLAGHER:  Your Honor, plaintiffs at this time

14   move 1093 into evidence.

15        MR. LIDDY:  No objection, Your Honor.                         11:25:11

16        THE COURT:  The exhibit's admitted.

17        (Exhibit No. 1093 is admitted into evidence.)

18   BY MS. GALLAGHER:

19   Q.  And yet you detained Mr. Melendres on September 27th, 2007,

20   is that correct?                                                   11:25:21

21   A.  Yes.

22   Q.  You placed him in handcuffed -- in handcuffs?

23   A.  He was arrested.

24   Q.  He was placed in handcuffs?

25   A.  Yes, I believe so.                                             11:25:32

```
 1    Q.  He was searched?

 2    A.  Yes.

 3    Q.  He was taken to an ICE facility?

 4    A.  Yes.

 5    Q.  In fact, all -- excuse me.  In fact, all four passengers      11:25:39

 6    were handcuffed, searched, and taken to ICE, correct?

 7    A.  I believe so.

 8    Q.  And all four passengers were Hispanic, is that correct?

 9    A.  Yes.

10    Q.  The driver on the stop was not searched?                      11:25:50

11    A.  I don't know.

12    Q.  While you were at the stop the driver was not searched?

13    A.  I don't know.

14    Q.  You didn't see the driver being searched?

15    A.  No, I did not.                                                11:26:06

16    Q.  You didn't see the driver being handcuffed?

17    A.  No.

18    Q.  And the driver was Caucasian, is that correct?

19    A.  Yes.

20            MS. GALLAGHER:  Thank you, Deputy Rangel.                 11:26:24

21            Your Honor, plaintiffs have no further questions at

22    this time.

23            THE COURT:  Cross-examination.

24            MS. GALLAGHER:  Your Honor, with permission, I would

25    like to give the clerk a copy of 1093 with the additional        11:26:36
```

1    redaction.

2              THE COURT:  Yes.

3              MS. GALLAGHER:  Thank you.

4              THE COURT:  Mr. Liddy, please proceed.

5              MR. LIDDY:  Thank you, Your Honor.                    11:26:58

6                        CROSS-EXAMINATION

7    BY MR. LIDDY:

8    Q.  Good morning, Deputy Rangel.

9    A.  Good morning.

10   Q.  Are you 287(g) trained?                                    11:27:08

11   A.  Yes.

12   Q.  So you operated for a time as 287(g) qualified officer?

13   A.  That is correct.

14   Q.  Would you tell the Court what the difference was between

15   using your 287(g) authority in your operations versus when you  11:27:25

16   did not use your 287(g) authority.

17   A.  Well, basically 287 -- 287(g) authority gave authority to

18   determine alienage on a person that you suspected of being in

19   the country illegally.

20   Q.  For what purpose would you need to determine alienage of    11:27:48

21   someone who was encountered in your operation?

22   A.  To determine?

23   Q.  Yeah.  For what purpose would you want to determine

24   alienage while using your 287(g) authority?

25   A.  If the -- if they were involved in human smuggling.        11:28:04

1    Q.  What is human smuggling?

2    A.  It's the practice that they bring people from another

3    country into the United States illegally.

4    Q.  Is that a common crime that occurs in Maricopa County?

5    A.  Yes.                                                    11:28:26

6    Q.  Are there smuggling organizations that commit that crime on

7    a fairly regular basis?

8    A.  Yes.

9    Q.  Do they use roads and highways in Maricopa County as

10   corridors for the smuggling operations?                     11:28:39

11   A.  Yes, they do.

12   Q.  Are those the same corridors that, on your experience, that

13   drug smugglers use in their operations?

14   A.  Correct.

15   Q.  In your experience, are the criminal syndicates that         11:28:51

16   smuggle human beings often the same syndicates that smuggle

17   drugs?

18   A.  Yes.

19   Q.  In your experience, are those individuals that commit those

20   crimes dangerous?                                           11:29:03

21   A.  Oh, yes.

22   Q.  Do they -- in your experience, do they frequently carry

23   weapons?

24   A.  Yes.

25   Q.  Do they commit violent acts?                            11:29:12

```
 1   A.   Yes, they do.

 2   Q.   In your experience, who are most often the victims of the

 3   violence perpetrated by human smugglers?

 4   A.   The smugglees.

 5   Q.   And by smugglees you mean whom, precisely?          11:29:25

 6   A.   The persons that's being smuggled into the country.

 7   Q.   And those persons, by definition, would not be United

 8   States citizens?

 9   A.   Correct.

10   Q.   In your experience, are they more often Hispanic than not   11:29:34

11   Hispanic?

12   A.   Yes.

13   Q.   Would it be fair to characterize your job as, in part,

14   protecting Hispanics that are not from the United States?

15   A.   Correct.                                             11:29:48

16   Q.   Have you ever risked your life to protect the life of a

17   Hispanic in this country without legal documents?

18   A.   Yes.

19   Q.   Would you tell us about that incident.

20   A.   I believe it was back in 2008.  ICE requested our    11:30:04

21   assistance on a kidnapping for ransom investigation.

22   Q.   What was the nature of the assistance that they

23   specifically requested you to do?

24   A.   They wanted one of our detectives to act as a relative and

25   communicate with the -- the smugglers to make the ransom  11:30:29
```

1    exchange.

2    Q.   A relative of the kidnap victim?

3    A.   Yes.

4    Q.   And was that kidnap victim a citizen of the United States?

5    A.   No.                                                      11:30:40

6    Q.   Was that kidnap victim an Hispanic?

7    A.   Yes.

8    Q.   So did ICE want an Hispanic officer to pose as the

9    relative?

10   A.   Yes.                                                     11:30:48

11   Q.   Why didn't ICE use one of their own officers?

12   A.   I don't know.

13   Q.   And whom did MCSO select to take on that risky operation?

14   A.   They selected me.

15   Q.   Did you volunteer to do it?                              11:31:00

16   A.   Yes.

17   Q.   Why'd you do that?

18   A.   A life was at stake.

19   Q.   Whose life?

20   A.   The smugglee's.                                          11:31:09

21   Q.   That's the non-U.S. citizen Hispanic we've been referring

22   to, is that correct?

23   A.   Correct.

24   Q.   What did you have to do to carry out that operation to

25   rescue that kidnap victim whose life was in danger?          11:31:19

 1    A.  I started making phone calls to the smugglers, trying to

 2    make out a deal.

 3    Q.  Did you get their contact information from the federal

 4    government?

 5    A.  Yes.                                                    11:31:32

 6    Q.  What information did you learn from those phone

 7    conversations with the smugglers?

 8    A.  That they had a person kidnapped, and that they wanted, I

 9    believe, $2200 for his release.

10    Q.  So what did you do next?                                11:31:52

11    A.  In the process of communicating with the smugglers, I

12    decided to pick a place where to -- where to meet the

13    smugglers.

14    Q.  Was that a public place or a place where there wasn't a

15    whole lot of activity?                                      11:32:06

16          MS. GALLAGHER:  Objection, Your Honor, as to the

17    relevance of this line of questioning.  I don't think the

18    details of this particular incident are relevant to the matters

19    at hand.

20          THE COURT:  You know, I said I don't like speaking     11:32:13

21    objections.

22          MS. GALLAGHER:  Excuse me, Your Honor.

23          THE COURT:  I'm going to give him a little bit more

24    leeway because frankly, you're the one who raised the issue of

25    whether or not this witness was prejudiced against Hispanics.  11:32:23

 1          So I don't think we have to go a whole lot further,

 2    Mr. Liddy, but I am going to allow you to pursue this a little

 3    bit further.

 4          MS. GALLAGHER:  Thank you, Your Honor.

 5          MR. LIDDY:  Thank you, Your Honor.                    11:32:34

 6    BY MR. LIDDY:

 7    Q.  Let me withdraw that question.

 8          The area that was selected for you to encounter these

 9    kidnappers and smugglers, would you consider that, in your

10    professional experience, a safe area, or not?              11:32:43

11    A.  No.

12    Q.  What did you do when you arrived in this dangerous area

13    where these dan -- with these violent people?

14    A.  Made contact with the smugglers.  They showed up in an SUV.

15    I approached the driver's side.  As soon as I approached the   11:32:58

16    driver's side the passenger had a -- a weapon pointed at me,

17    and the driver said if I had the money.

18    Q.  Then did you hand over the money?

19    A.  At that time the signal for the takedown was to take my hat

20    off.                                                        11:33:18

21    Q.  So you made a signal to other members of the Human

22    Smuggling Unit?

23    A.  Yes.

24    Q.  By taking off your hat?

25    A.  Yes.  I took off my hat and I started counting the money in  11:33:24

1    front of the smugglers.

2    Q.  Why did you count the money in front of the smuggler?

3    A.  To kill time, to make up time for HSU to -- to show up and

4    take down the --

5    Q.  And to save the Court some time, what was the end result of          11:33:38

6    that rescue operation?

7    A.  They were arrested eventually.

8    Q.  And what happened to the kidnap victim?

9    A.  He was turned over to his family members and he was saved.

10   Q.  He was safe when he was turned over to his family members?          11:33:53

11           Are you an anti-Hispanic bigot?

12   A.  No, I'm not.

13   Q.  When you received your 287(g) training, who provided that

14   training?

15   A.  ICE.                                                                 11:34:12

16   Q.  When you say ICE, do you mean Immigration and Customs

17   Enforcement from the Department of Homeland Security?

18   A.  Correct.

19   Q.  The federal government?

20   A.  Correct.                                                             11:34:22

21   Q.  How many instructors carried out that training on behalf of

22   you and your fellow students?

23   A.  It was quite a few.

24   Q.  Would you say more than 10?

25   A.  Close.                                                              11:34:34

1    Q.  And how long was that period of 287(g) instruction?

2    A.  I believe it was five weeks.

3    Q.  And how many days per week?

4    A.  Monday through Friday.

5    Q.  Were there written materials provided to go along with the     11:34:48

6    classroom instruction?

7    A.  Yes.

8    Q.  I'm going to ask you some questions about use of your

9    287(g) authority in the field.

10             Have you conducted traffic stops?     11:35:10

11   A.  Yes.

12   Q.  Typically, what do you do first when you conduct a traffic

13   stop?

14   A.  Look for indicators of human smuggling.

15   Q.  So when -- when you're answering my question about traffic     11:35:24

16   stops, you're specifically referring to human smuggling

17   investigations?

18   A.  Correct.

19   Q.  Is that because your job is to enforce laws against human

20   smugglers?     11:35:41

21   A.  Yes.

22   Q.  But have you ever in your career encountered traffic stops

23   that were not involved in targeting human smugglers?

24   A.  Yes.

25   Q.  When you operate in saturation patrols in Maricopa County,     11:35:47

1    are you targeting human smugglers?

2    A.  Yes.

3    Q.  When you operate in saturation patrols in Maricopa County,

4    do you ever target drop houses?

5    A.  Yes.                                                           11:36:00

6    Q.  Known drop houses?

7    A.  Yes.

8    Q.  Suspected drop houses?

9    A.  Yes.

10   Q.  Is it ever one of your goals to flush out human smugglers    11:36:05

11   and their human smuggling loads from their drop houses and stop

12   them on the roads through a traffic stop in the course of a

13   saturation patrol?

14   A.  Correct.

15   Q.  Is that a regular objective of human smuggling officers      11:36:21

16   conducting saturation patrols?

17   A.  Yes.

18   Q.  Approximately how many of those saturation patrols have you

19   participated in?

20   A.  I don't have an exact number, but quite a few.               11:36:31

21   Q.  Quite a few.  Would you say more than 13?

22   A.  Probably.

23   Q.  A lot more than 13?

24   A.  Yes.

25   Q.  And human smuggling has always been the focus of your law    11:36:45

1  enforcement operations during those saturation patrols?

2  A.  Yes.

3  Q.  Okay.  Back to our traffic stop.  You said the first thing

4  you're going to do is check the license plate?

5  A.  Yes.                                                    11:37:05

6  Q.  To determine what?

7  A.  When I suspect a vehicle's involved in human smuggling,

8  I'll check the license plate.  Checking the license plate in my

9  computer, in the car, I can determine if the vehicle's

10 registered to a -- to a person -- a real person.            11:37:22

11 Q.  By "a real person," you mean an actual human being that

12 exists on this earth?

13 A.  Yes.

14 Q.  As opposed to a fictitious creation of a criminal for the

15 purpose of perpetrating a fraud?                            11:37:36

16 A.  Yes.

17 Q.  In your experience, do some criminals create fictitious

18 people for the purpose of registering vehicles illegally?

19 A.  Always.

20 Q.  Why do they do that, in your experience?               11:37:50

21 A.  That's kind of a -- a dead-end paper trail for our

22 investigation, and that's the reason they do it.

23 Q.  Back to our traffic stop.  You've checked the license

24 plate.  Let's say in this instance, hypothetically, that you've

25 determined from your check of the license plate that it is     11:38:07

```
 1    registered to a person that does not exist.
 2            What does that tell you as a law enforcement
 3    officer that's focusing on human smuggling?
 4    A.  That it's possibly involved in human smuggling.
 5    Q.  What do you do next?                                11:38:19
 6    A.  After all -- all the -- find probable cause to do a traffic
 7    stop, and then I'll conduct a traffic stop.
 8    Q.  Let me back up a little bit.  Before you pull over a car,
 9    are there any indicia, any indicators on that vehicle that
10    cause an interest to arise in you as a law enforcement       11:38:40
11    officer as to why you want to check that license plate in the
12    first place?
13    A.  Yes.
14    Q.  What are those indicators?
15    A.  Besides the checking of the -- of the license plate, I'll  11:38:47
16    check for the vehicle being weighted down very heavily.
17    Q.  You mean carrying more weight than its suspension is
18    intended to carry?
19    A.  Correct.
20    Q.  And how can you detect that?                         11:39:03
21    A.  Visually you can see -- you can see the vehicle.  Like I
22    said, it looks weighted down.
23    Q.  Okay.
24    A.  Very dark-tinted windows --
25    Q.  Okay.                                                11:39:13
```

1  A.  -- that -- that you can't even see the silhouette.  And

2  that's about it.

3  Q.  Well, don't you look to see if the individuals in the

4  heavily loaded vehicle with dark-tinted windows are of a

5  specific nationality or race?                                    11:39:36

6         MS. GALLAGHER:  Objection, Your Honor, leading.

7         THE COURT:  I'll sustain that.

8  BY MR. LIDDY:

9  Q.  Officer Rangel, when you look inside a vehicle that you

10 suspect may be used in a human smuggling load, can you see the   11:39:57

11 race of the individuals in that vehicle?

12 A.  No.

13 Q.  Why?

14 A.  Because they tint the windows very dark.

15 Q.  What if they didn't tint the windows dark and you were       11:40:11

16 behind them?  Would the headrests cause a problem to determine

17 race or nationality?

18 A.  Yes.

19 Q.  What if you were operating at night, might the lack of

20 light be an impediment to determine the race or nationality?     11:40:24

21 A.  Yes.

22 Q.  Does it bother you that you wouldn't be able to determine

23 the race or nationality of individuals in a vehicle?

24 A.  No.

25 Q.  Why?                                                         11:40:33

```
 1   A.  Race has nothing to do with this.

 2   Q.  You mentioned earlier on direct examination that from time

 3   to time you would develop probable cause to pull over a

 4   vehicle.

 5   A.  Yes.                                                        11:40:55

 6   Q.  Do you recall that testimony?

 7   A.  Yes.

 8   Q.  And you mentioned perhaps it would be a cracked windshield,

 9   perhaps a broken taillight.  Do you recall that testimony?

10   A.  Yes.                                                        11:41:06

11   Q.  Are there any other moving violations or equipment

12   violations that you've used in the past to develop probable

13   cause to make a traffic stop of a suspected human smuggling

14   vehicle?

15   A.  Yes.                                                        11:41:18

16   Q.  Would you describe some of those for us, please.

17   A.  Speeding.  Weaving.  Not stopping at a stoplight.  Title 28

18   violations in general.

19   Q.  Once you have observed one or more of these indicators and

20   after you've checked the license plate and determined that it's 11:41:42

21   been registered to an individual that does not exist, what do

22   you do next?

23   A.  I conduct a traffic stop.

24   Q.  And how do you do that?  Do you turn on the lights?

25   A.  Yes.                                                        11:41:54
```

1    Q.   Do you typically turn on the siren?

2    A.   Sometimes I do; sometimes I don't.

3    Q.   After you turn on the lights does the vehicle typically

4    pull over and stop?

5    A.   Sometimes when you asked me if I'd use my siren or not, the    11:42:09

6    times that I use my siren is when the vehicle's taking a little

7    bit more time to pull over.  That's when I'll use my siren

8    to -- to do the traffic stop.  But if the vehicle right off the

9    bat pulls over to the side of the road, then I don't use my

10   siren.    11:42:33

11   Q.   Once the vehicle pulls over to the side of the road do you

12   pull in behind that vehicle?

13   A.   Yes.

14   Q.   What do you do next?

15   A.   I'll make contact with the driver.    11:42:39

16   Q.   Do you do that by exiting the vehicle?

17   A.   Yes.

18   Q.   You approach the vehicle physically?

19   A.   Yes, I do.

20   Q.   Do you remain behind the vehicle or do you walk all the way    11:42:47

21   up to the driver's side window?

22   A.   I'll walk to the passenger side window, for officer safety.

23   Q.   And will you speak to the driver through the passenger side

24   window?

25   A.   Yes.    11:43:04

```
 1   Q.  And what would you say, typically, to the driver?
 2   A.  I would ask for driver's license, registration, insurance.
 3   Q.  On a vehicle that you've suspected of being a human
 4   smuggling load vehicle, have you ever had occasion where the
 5   driver did not have a valid driver's license?                    11:43:23
 6   A.  Yes.
 7   Q.  Have you ever had occasion where the driver did not have
 8   proof of insurance?
 9   A.  Yes.
10   Q.  Have you ever had an instance where the driver did not have  11:43:31
11   a vehicle registration?
12   A.  Yes.
13   Q.  Does this happen often?
14   A.  It happens.
15   Q.  What do you do when you encounter a driver that doesn't      11:43:46
16   have a driver's license?
17   A.  I ask him why doesn't he have a driver's license.
18   Q.  Why?
19   A.  'Cause you need a driver's license to drive a vehicle in
20   the state of Arizona.                                            11:44:01
21   Q.  So are you asking them, just for my clarification, whether
22   they have it physically on their person, or whether they've
23   ever obtained one legally?
24   A.  Both.
25   Q.  Do you ever speak to the passengers in the vehicle?         11:44:10
```

1   A.  Yes.

2   Q.  Do you always speak to the passengers in the vehicle?

3   A.  Yes.

4   Q.  Why?

5   A.  I ask for identification as well.                    11:44:19

6   Q.  And why do you want to know the identity of the individuals

7   in the vehicle, the passengers?

8   A.  I just want to know who I'm dealing with on a traffic stop.

9   Q.  And why is that?

10  A.  Officer safety.  I don't know who I'm dealing with.    11:44:32

11  Q.  Do you make that decision based on the race or nationality

12  of the passengers?

13  A.  No.

14  Q.  Have you, on occasion, encountered a driver who is a

15  non-English speaker?                                      11:44:51

16  A.  Yes.

17  Q.  What does that mean to you?  From a law enforcement

18  perspective.

19  A.  He doesn't speak English.

20  Q.  And have you encountered drivers that don't speak English,   11:45:05

21  but that are able to communicate in a foreign language?

22  A.  Yes.

23  Q.  And what languages have those been?

24  A.  Spanish.

25  Q.  Any other languages?                                  11:45:15

```
 1   A.   No, not --

 2   Q.   And I think you've previously testified that you are a

 3   Spanish-speaker?

 4   A.   Yes.

 5   Q.   So then do you conduct your interview with the driver in      11:45:24

 6   Spanish?

 7   A.   Yes.

 8   Q.   And you're a native Spanish-speaker?

 9   A.   Yes.

10   Q.   So it doesn't delay -- it doesn't lengthen the stop at all    11:45:33

11   when you speak Spanish to a Spanish-speaker, does it?

12   A.   No.

13   Q.   Do you make an effort to determine whether the passengers

14   are able to communicate to you in -- in English or Spanish?

15   A.   Yes.                                                          11:45:51

16   Q.   Do you ask the passengers if they know the driver?

17   A.   Yes.

18   Q.   Typically, do they know the driver or do they not?

19   A.   No.

20   Q.   And what does that mean to you from a law enforcement         11:46:03

21   perspective?

22   A.   Possibly human smuggling.

23   Q.   And why is that?

24   A.   Typically, they don't know anybody that they're traveling

25   with; they don't know the driver's name; they don't know the      11:46:18
```

1   passengers' names.  And --

2   Q.  Excuse me.  I want you to finish your answer.

3   A.  And for someone that is traveling in a vehicle that -- that

4   has a lot of occupants and they don't know each other, that's a

5   major indicator of possible human smuggling.                    11:46:40

6   Q.  Does an officer have to be 287(g) qualified to ask a driver

7   or passengers about potential indicators of human smuggling?

8   A.  No.

9   Q.  Have you ever racially profiled anyone while you've been

10  employed by MCSO?                                               11:47:19

11  A.  No.

12  Q.  What was your training with regard to racial profiling at

13  the academy?

14  A.  Basically, that it was against the law to conduct a traffic

15  stop just based solely on -- on the color of the skin of the    11:47:45

16  person.

17  Q.  Can you ever conduct a traffic stop based on the color of a

18  person's skin?

19  A.  Can I?

20  Q.  Yes.                                                        11:47:57

21  A.  Could you rephrase that question again?

22  Q.  Let me withdraw that question.

23          Have you ever heard of the term BOLO?

24  A.  Yes.

25  Q.  What is BOLO, B-O-L-O?                                      11:48:07

```
 1  A.  It's a -- an ATL, an attempt to locate bulletin.
 2  Q.  Be on the lookout for an individual?
 3  A.  Yes.
 4  Q.  Do BOLO bulletins typically include a description of the
 5  individual whom law enforcement is on the lookout for?          11:48:24
 6  A.  Yes.
 7  Q.  And might that description include race or ethnicity?
 8  A.  Yes.
 9  Q.  Have you ever been told by someone in your chain of command
10  that you should use racial profiling as a law enforcement       11:48:44
11  technique?
12  A.  No.
13  Q.  Are you aware of any MCSO employee who's ever been told to
14  racially profile?
15  A.  No.                                                          11:48:59
16  Q.  Are you aware of any MCSO policies, written or otherwise,
17  that call for racial profiling?
18  A.  No.
19  Q.  Typically, prior to a Human Smuggling Unit operation is
20  there a briefing?                                               11:49:28
21  A.  Yes.
22  Q.  Does it typically take place on the morning the operation's
23  to begin?
24  A.  Yes.
25  Q.  Does that include saturation patrol operations in which     11:49:36
```

1    Human Smuggling Unit participates?

2    A.  Yes.

3    Q.  Who conducts those briefings?

4    A.  The sheriff, or either a sergeant or lieutenant.

5    Q.  Is the sheriff typically present during the briefing?        11:50:00

6    A.  No.

7    Q.  By the lieutenant you mean Lieutenant Sousa?

8    A.  Yes.

9    Q.  And prior to Lieutenant Sousa, another lieutenant who may

10   have been posted or billeted at the Human Smuggling Unit?       11:50:17

11   A.  Yes.

12   Q.  Have you ever been trained that day laborers are committing

13   criminal activity simply by seeking labor, seeking work day by

14   day?

15   A.  If I've been trained?                                        11:50:49

16   Q.  Yes.

17   A.  No.

18   Q.  Have you ever encountered day laborers during your

19   operations with the Human Smuggling Unit?

20   A.  No.                                                          11:51:01

21   Q.  Earlier on direct testimony you testified about your

22   recollection of the Ortega Melendres traffic stop.

23           Do you recall that?

24   A.  Yes.

25   Q.  I believe you testified that you were not the first          11:51:21

```
 1    officer on the scene of that traffic stop, is that correct?
 2    A.   Correct.
 3    Q.   Do you recall who that first officer was?
 4    A.   DiPietro.
 5    Q.   Did Officer DiPietro call for assistance during that          11:51:32
 6    traffic stop?
 7    A.   Yes, he did.
 8    Q.   Did he do so over the radio?
 9    A.   Yes, he did.
10    Q.   Do you recall that radio transmission?                        11:51:48
11    A.   I believe he requested a 287(g) officer, Spanish speaking
12    officer.
13    Q.   To your knowledge, is Officer DiPietro 287(g) trained?
14    A.   I believe so.
15    Q.   Is he with the Human Smuggling Unit?                          11:52:03
16    A.   No, he's not.
17    Q.   Is he with the K-9 unit?
18    A.   Yes, he is.
19    Q.   Is he a Spanish-speaker, to your knowledge?
20    A.   No, he's not.                                                 11:52:12
21    Q.   Did you respond to that call for a Spanish-speaking 287(g)
22    officer?
23    A.   Yes, I did.
24    Q.   When you arrived on the scene, what did you see?
25    A.   Saw the vehicle pulled to the side and DiPietro talking to    11:52:21
```

```
 1   the -- the driver.
 2   Q.  Do you recall seeing any passengers in the vehicle?
 3   A.  Yes.
 4   Q.  Approximately how many?
 5   A.  Three or four, I believe.                              11:52:37
 6   Q.  Did Officer DiPietro ask for your assistance in the
 7   investigation by questioning the passengers?
 8   A.  Yes.
 9   Q.  Did you do so?
10   A.  Yes, I did.                                            11:52:48
11   Q.  Do you recall what you learned from your questioning the
12   passengers?
13   A.  What was that, again?
14   Q.  I was going to ask you:  Do you recall what you learned
15   from the passengers when you were questioning them at the   11:53:00
16   scene, presumably in Spanish?
17   A.  Yes.
18   Q.  Tell us what you learned.
19   A.  That they were headed to work.
20   Q.  And I want to be really clear here.  When you say "to     11:53:12
21   work," to a specific place of work?
22   A.  That's all I can recall, that they were headed to work.
23   Q.  Okay.
24   A.  I recall Melendres having a B-1/B-2 visa.
25   Q.  Okay.                                                   11:53:29
```

1    A.   Requested -- I requested his I-94.

2    Q.   Right.

3    A.   He did not have it on him, and I believe his pass -- the

4    passengers also had Mexican IDs on them as well.

5    Q.   Did Mr. Ortega Melendres have a Mexican ID on him?                    11:53:48

6    A.   I don't recall if he had besides the B-1/B-2 visa.

7    Q.   Do you recall specifically whether Mr. Ortega Melendres

8    told you he was going to work?

9    A.   Yes.

10   Q.   Did he indicate to you either way whether he knew any of        11:54:05

11   the other passengers in the vehicle?

12   A.   I don't recall if he did or not.

13   Q.   Did he indicate to you either way whether he knew the

14   driver?

15   A.   I don't -- I don't remember.                                          11:54:19

16   Q.   When you arrived on the scene, do you recall whether or not

17   you looked at the chassis to see if it was weighted down?

18   A.   No.

19   Q.   Did you conclude that that vehicle that was stopped by

20   Officer DiPietro was a load vehicle involved in human                     11:54:39

21   smuggling?

22   A.   No.

23   Q.   Did you inform DiPietro that you had concluded it was not

24   involved in human smuggling?

25   A.   Correct.                                                              11:54:52

1   Q.  Did you have -- do you recall any reason to believe that

2   the driver of that vehicle was involved in human smuggling?

3   A.  No.

4   Q.  I think earlier you testified that there was a -- an

5   apartment complex close to the parking lot and near the -- this          11:55:13

6   traffic stop?

7   A.  Yes.

8   Q.  Do you recall in the briefing whether you were given any

9   information about any suspected activity inside that apartment

10  complex?                                                                  11:55:29

11  A.  I believe we had gotten some info reference a drop house in

12  that apartment complex.

13  Q.  Not specific to this case, but typically, in your

14  experience, do the coyotes or the smugglers force their

15  smugglees, their human cargo, to do day labor in order to pay            11:55:47

16  off fees?

17  A.  Yes.

18  Q.  Typically, are those day laborers or those smugglees

19  victims of crime by the human smugglers?

20  A.  Yes.                                                                  11:56:07

21  Q.  What are some of the crimes that you have experienced of

22  human smugglers at the hands -- excuse me, human smugglees at

23  the hands of smugglers?

24  A.  The common ones are extortion.  They're told a certain

25  amount, and once they're here in the United States the amount            11:56:22

1    gets increased.

2    Q.  Just so I'm clear, they'll be told, for example, It's going

3    to cost you $1500, and we'll get you across the border into the

4    United States legally?

5    A.  Correct.                                                    11:56:37

6    Q.  But in your experience, once they arrive they're extorted

7    for a higher fee?

8    A.  Yes.

9    Q.  Do the smugglees typically have that money on their

10   persons?                                                        11:56:49

11   A.  No.

12   Q.  What do the smugglers make them do in order to get it?

13   A.  Usually they have them contact relatives here in the States

14   and have them send the money to -- to the smugglers.

15   Q.  Do they ever keep them inside drop houses for a longer      11:57:05

16   period of time than the smugglees had anticipated?

17   A.  Yes.

18   Q.  Do they ever make them go to work to earn income to pay the

19   extortion fees?

20   A.  Yes.                                                        11:57:19

21   Q.  Is that why HSU investigates drop houses?

22   A.  Yes.

23   Q.  Do you recall during that operation whether any evidence

24   was developed to determine that there was in fact a drop house

25   in that apartment complex that was next to the parking lot out  11:57:36

1    of which those day laborers were operating?

2    A.  I don't believe so.

3            MR. LIDDY:  Just a moment, Your Honor.

4            THE COURT:  Sure.

5            (Pause in proceedings.)                    11:58:10

6    BY MR. LIDDY:

7    Q.  Officer Rangel, have you ever seen a press release that was

8    published by the Maricopa County Sheriff's Office?

9    A.  Yes.

10   Q.  You read them regularly?                       11:58:40

11   A.  No, I don't.

12   Q.  In your experience, is the information in those press

13   releases accurate with regard to HSU operations?

14   A.  No.

15   Q.  Is it accurate with regard to human smuggling -- excuse me,  11:58:58

16   with saturation patrols?

17   A.  No.

18   Q.  Have you ever made a law enforcement decision based upon

19   information published in an MCSO press release?

20   A.  No.                                            11:59:17

21           MR. LIDDY:  Your Honor, I have no further questions.

22           THE COURT:  All right.  Thank you.

23           I think we're going to break for lunch.  Please be

24   back at 1:15.

25           (Lunch recess taken.)                      11:59:40

1          THE COURT:  Thank you.  Please be seated.

2          Deputy Rangel, I'm just going to have a few questions

3     for you, if I might.

4                          EXAMINATION

5     BY THE COURT:                                               13:17:06

6     Q.  I think you testified, if I understood you, that you're

7     involved in a lot of saturation patrols.

8     A.  Yes.

9     Q.  Big saturation patrols and little saturation patrols?

10    A.  Correct.                                                13:17:24

11    Q.  You also indicated that one of the things that you do in

12    saturation patrols is target drop houses?

13    A.  Yes.

14    Q.  And by drop houses, I'm assuming you mean houses in which

15    human smugglers have collected large numbers of victims and are  13:17:35

16    collecting them together.  Am I understanding you correctly?

17    A.  Yes.

18    Q.  When you're involved in a saturation patrol that is related

19    to a drop house or drop houses, how big is that patrol?

20    A.  Are you talking about the -- all the units involved in the   13:17:53

21    saturation?

22    Q.  Yes, I am, thank you.

23    A.  We've had a couple units involved in saturation patrols.

24    Q.  By "a couple units," how many number of deputies would that

25    actually be?                                               13:18:12

1    A.  Usually in a unit there's either 15 to 20 deputies.

2    Q.  Okay.  So a couple units would be 30 to 40 deputies?

3    A.  Yes.

4    Q.  Okay.  Is that as large as they tend to be when you're

5    going after a drop house?                                    13:18:23

6    A.  Yeah, pretty much so, that's about it.

7    Q.  So -- and then you've been involved in saturation patrols

8    that have been even larger?

9    A.  Yes.

10   Q.  And what is the purpose of those saturation patrols?      13:18:34

11   A.  The larger ones?

12   Q.  Yes.

13   A.  That we don't have no information of drop houses?

14   Q.  Correct.

15   A.  I believe those are the ones where we've gotten information 13:18:42

16   from citizens complaining about certain crimes in the area.

17   Q.  All right.  And how do you proceed when you're in one of

18   those operations?

19   A.  It's a zero tolerance.  We go out and do patrol and look

20   for Title 8 -- Title 28 violations.                          13:19:00

21   Q.  Okay.  When you say patrol, that means you're going to be

22   either on a motorcycle or in a traffic unit --

23   A.  Correct.

24   Q.  -- Crown Victoria or whatever you have at the Sheriff's

25   Office?                                                      13:19:16

1    A.   Yes.

2    Q.   And you're going to be looking for traffic violations?

3    A.   Yes.

4    Q.   If you see a traffic violation, what are you going to do?

5    A.   Do the traffic stop, a issue ticket for the traffic          13:19:21

6    violation.

7    Q.   All right.  Do you do anything more?

8    A.   That's about it.

9    Q.   What if you see somebody else in the car?

10   A.   What I do is I'll ask everybody in the vehicle for           13:19:36

11   identification.

12   Q.   Now, let me ask you, is that just a matter of habit?  You

13   always ask everybody you pull over, every passenger in the

14   vehicle, for identification?

15   A.   Yes.  I've always done that because I've gotten warrants     13:19:53

16   for arrests on passengers.

17   Q.   What do you do if a passenger doesn't have identification?

18   A.   Ask for their name and date of birth.

19   Q.   What do you do if the passenger doesn't have identification

20   and can't speak English?  Then do you speak to them in Spanish?   13:20:09

21   A.   Yes, I do.

22   Q.   And what do you do when they give you their -- when they

23   give you their name and date of birth?

24   A.   I run their name through our computer database.

25   Q.   And what do you do if you determine that they don't show up  13:20:21

1    as an American citizen?

2    A.  Actually, what happens is it will show no record --

3    Q.  Okay.

4    A.  -- in the computer.

5    Q.  All right.                                              13:20:31

6    A.  When that shows up in the computer, then I'll start asking

7    questions:  Why don't you have any identification?  Why don't

8    you have an ID, at least?  If the person has no record in the

9    system here in the state of Arizona.

10   Q.  Do you know what it means -- tell me what it means if a    13:20:44

11   person has no record in the system.

12         Do you know what records the system can access?

13   A.  The DMV records, their driver license history, and if they

14   have any warrants.

15   Q.  Okay.  So it'll have if they have outstanding warrants?    13:21:03

16   A.  Correct.

17   Q.  It'll have if they have an Arizona driver's license?

18   A.  Or an ID.

19   Q.  Or an ID.

20   A.  Yes.                                                       13:21:12

21   Q.  Issued by the Department of Motor Vehicles?

22   A.  Yes.

23   Q.  Will it have record of any other ID?

24   A.  No.

25   Q.  And will it have -- what else did you say? -- their traffic  13:21:18

1   history?

2   A.  Yes.

3   Q.  Is that all that will come up on your screen?

4   A.  Yes, that's all.

5   Q.  So if you have no records, you have a passenger, you will          13:21:30

6   then do what?

7   A.  I'll ask them if they have any other form of ID, anything

8   with a picture on it that can tell me your name.

9   Q.  And if they don't?

10  A.  Then I don't do anything about it 'cause they're a                 13:21:47

11  passenger.

12  Q.  Okay.  You don't arrest them?

13  A.  No.

14  Q.  You don't turn them over to ICE?

15  A.  No.                                                                13:21:57

16  Q.  I will tell you that during your examination I looked

17  through a number of the records.  We've -- we've been given

18  some records.  They've been admitted into evidence, that

19  purport, at least, to list arresting officers in a particular

20  encounter.                                                             13:22:13

21          And just during your cross -- during your examination

22  I was looking through and found several where the records say

23  you were the arresting officer.  You arrested the driver for a

24  traffic infraction.  Then it says you arrested the passenger

25  for 287(g) violation, and it listed the probable cause for your       13:22:29

1    arrest as the person was a passenger.

2         Now, if I understood what you've just told me, you

3    wouldn't do that.

4    A.  Yes.  But we're speaking about saturation patrols, crime

5    suppression details.                                           13:22:45

6    Q.  Okay.

7    A.  That's when I would do that.

8    Q.  Okay.  You would operate differently --

9    A.  Yes.

10   Q.  -- in a crime suppression patrol?                          13:22:52

11   A.  Yes, because like I said, it's zero tolerance.

12   Q.  All right.  So in a crime -- tell me what you would do

13   differently in a crime suppression patrol that you -- that is

14   different than what you would normally do.

15   A.  What we just talked about right now.                       13:23:08

16   Q.  Okay.

17   A.  The passenger, I wouldn't arrest the passenger.

18   Q.  But if it's in a crime suppression patrol you would arrest

19   the passenger?

20   A.  Yes.                                                       13:23:18

21   Q.  Okay.  And you'd arrest them on a 287(g) charge?

22   A.  If I was 287(g).

23   Q.  Right.  And you were 287(g) certified for a while?

24   A.  Yes.

25   Q.  And did you know for sure when you arrested the passenger  13:23:27

1    whether in fact they were authorized or not authorized to be in

2    the country?  Or did you just make the arrest?

3    A.  I just made the arrest based on the information that I was

4    given by --

5    Q.  I see.                                                        13:23:41

6    A.  -- the passenger.

7    Q.  All right.  Thank you.

8         You talked about your 287(g) training that you

9    actually had that was, I think you said five weeks.

10   A.  Yes, correct.                                                 13:23:52

11   Q.  Do you remember everything that you were trained on during

12   that five weeks?

13   A.  No, I don't.

14   Q.  All right.  Do you remember -- I think, and I think it may

15   have been Mr. Liddy when he asked you what the gist of your      13:24:01

16   racial profiling training was, you said -- you gave it in a

17   sentence.  Do you remember how long they spent with you on the

18   topic of racial profiling?

19   A.  I believe it was just a few hours, if I -- if I remember,

20   on that topic itself.                                            13:24:19

21   Q.  Um-hum.

22   A.  The rest of the -- the class was recognizing fraud

23   documents and the history of -- of the immigration laws.

24   Q.  It was how to be an effective --

25   A.  Correct.                                                     13:24:33

1  Q.  -- border enforcement officer -- or immigration --

2  A.  Yes.

3  Q.  -- officer?

4       When you -- well, let me ask a couple of other

5  questions that I forgot to ask earlier.                    13:24:47

6       If in fact the target of a saturation patrol is a drop

7  house, then you're not going to be motorized -- well, you might

8  be motorized, but your focus is going to be the drop house,

9  right?

10  A.  Yes.                                                   13:25:00

11  Q.  You're not on what I think you referred to as patrol?

12  A.  Correct.

13  Q.  When you are involved in the larger saturation patrol

14  operations in which you are on patrol, do you have any idea

15  whether the people who are with you have been 287(g) trained?  13:25:14

16  Do you know who among them is 287(g) trained and who isn't?

17  A.  No, I don't.

18  Q.  But since you were 287(g) trained, at least as long as

19  there was a certification, would you ever get special requests

20  to respond to a situation by other officers who weren't 287(g)  13:25:29

21  trained?

22  A.  Back when I was 287(g)?

23  Q.  Yes.

24  A.  Yes.

25  Q.  How often would that happen?                          13:25:36

1    A.  It's happened a couple of times, a few times.  I mean, it

2    wasn't something like constantly --

3    Q.  Okay.  A couple of times during a patrol, or a couple a

4    times during the whole saturation patrols that you were

5    involved in?                                                13:25:52

6    A.  Saturation patrols.

7    Q.  Okay.  We talked a little bit, or you testified a little

8    bit about the September 2007 incident in which you were

9    operating in Cave Creek and watching day laborers who were

10   operating out of a church parking lot?                      13:26:17

11   A.  Correct.

12   Q.  What was your role during that operation?

13   A.  My role was to be on patrol, look for, again, Title 28

14   violations in the immediate area.  And whenever undercover

15   detective needed assistance, they would call me and other    13:26:35

16   287(g)s.

17   Q.  All right.  So was it your impression that the undercover

18   detective was watching the parking lot?

19   A.  Correct.

20   Q.  So they had eyes on the parking lot, and if they wanted you  13:26:46

21   to develop probable cause as to a particular car, they would

22   identify that car to you?

23   A.  Correct.

24   Q.  Do you re -- I -- well, I don't want to misstate your

25   testimony so I'm just going to ask you:  How is it that you   13:27:00

1  became involved in Deputy DiPietro's stop?

2  A.  DiPietro, when he did the traffic stop, he got on the

3  radio -- after doing the contact with the driver, he got on the

4  radio and asked dispatch that he was requesting a 287(g)

5  Spanish speaking deputy.                                    13:27:24

6  Q.  All right.  So it was your understanding that Deputy

7  DiPietro did the initial contact with the driver, he came back

8  to the car and he asked for a Spanish speaking 287(g)?

9  A.  Well, at the time I was listening to the radio and it came

10  out a blind call, it's called a blind call they put out, any   13:27:37

11  287(g) deputy nearby to assist DiPietro.

12  Q.  Okay.  And that came from dispatch, not from DiPietro

13  directly?

14  A.  Correct.

15  Q.  And did dispatch say why DiPietro needed a 287(g)?        13:27:50

16  A.  No, I don't believe so.

17  Q.  Okay.  This was an HSU operation, right?

18  A.  Yes.

19  Q.  The purpose of the operation wasn't to write traffic

20  tickets?                                                     13:28:01

21  A.  Correct.

22  Q.  How long after you got that dispatch did it take you to

23  arrive at the scene?

24  A.  I got there within a few minutes.

25  Q.  Five?                                                    13:28:13

1    A.  Yeah, something.

2    Q.  'Cause you were in the general area.

3    A.  Yes.

4    Q.  All right.  How long then -- well, do you recall how long

5    the driver stayed on the scene?                                    13:28:26

6    A.  I would have to say approximately 30, 40 minutes.

7    Q.  After you got on the scene.

8    A.  Oh, after I got on the scene?

9    Q.  Yeah.  No, after you arrived, how long was the driver

10   there?                                                             13:28:53

11   A.  Oh.  Yeah, I'd say about 30 minutes.

12   Q.  So you think he was there 30 minutes after you were there?

13   A.  Yes.

14   Q.  You never spoke to him?

15   A.  No, I did not.                                                 13:29:03

16   Q.  Okay.  Now, you indicated that you had no reason to believe

17   that the driver was involved in human smuggling?

18   A.  Correct.

19   Q.  Can I ask you, in your training as an HSU officer, have you

20   ever looked at the human smuggling statute?                       13:29:17

21   A.  The state statute?

22   Q.  Yes.

23   A.  Yes.

24   Q.  Have you ever been provided training on that statute?

25   A.  No, I have not.                                                13:29:24

1   Q.   But you have looked at it.

2   A.   Yes.

3   Q.   And you just sort looked at it on your own?

4   A.   Yes.

5   Q.   Okay.  Let me ask you, if you observed a driver pull up in          13:29:30

6   a day laboring location and take on somebody who was there who

7   you had reason to believe was in the country illegally, would

8   that give you probable cause to believe that the driver had

9   violated the human smuggling -- the -- the human smuggling

10  statute?                                                                   13:29:53

11  A.   No.

12  Q.   Why not?

13  A.   Because the vehicle that was used on DiPietro's stop was, I

14  believe, kind of like a construction vehicle, that it appeared

15  that the driver was going to work --                                      13:30:14

16  Q.   Okay.

17  A.   -- not that he was smuggling.

18  Q.   But it was your understanding -- well, I don't know.  Did

19  you have an understanding of why he was picking up those other

20  passengers?                                                               13:30:23

21  A.   I believe to work.

22  Q.   All right.  So you think that if somebody picked up

23  passengers and he was taking them to work for him and he had

24  reason to believe that they weren't in the country legally,

25  that still wouldn't constitute a violation of the Arizona human            13:30:39

1   smuggling statute?

2   A.  No.

3           THE COURT:  No?  Thank you very much.  I think those

4   are all my questions.

5           THE WITNESS:  Thank you.                          13:30:58

6           THE COURT:  All right.  Do you have any follow-up,

7   Mr. Liddy?

8           MR. LIDDY:  Yes, Your Honor.

9                       CROSS-EXAMINATION CONTINUED

10  BY MR. LIDDY:                                             13:31:11

11  Q.  Officer Rangel, just some brief questions for

12  clarification.

13          Regarding your working on large saturation patrols,

14  that would be saturation patrols in excess of 40 officers being

15  involved in it, the HSU officers that are part of that large    13:31:23

16  saturation patrol working to solve crime related to load

17  vehicles during that saturation patrol?

18  A.  Correct.

19  Q.  And that would involve human smuggling?

20  A.  Yes.                                                  13:31:43

21  Q.  And that would involve potential drop houses?

22  A.  Yes.

23  Q.  Or perhaps finding locations of drop houses?

24  A.  Yes.

25  Q.  Or perhaps picking up load vehicles that are fleeing --   13:31:54

1    attempting to flee the saturation patrol area?

2    A.  Yes.

3          MS. GALLAGHER:  Objection, Your Honor, this is

4    leading.

5          THE COURT:  Sustained.                              13:32:06

6          MS. GALLAGHER:  Move to strike the testimony.

7          THE COURT:  I'm going to allow -- I will strike the

8    last answer.  As to your unobjected to answers, they're going

9    to stand.

10   BY MR. LIDDY:                                             13:32:16

11   Q.  Officer Rangel, in your experience working in large

12   saturation patrols, have you ever encountered load vehicles

13   involved in human smuggling attempting to flee the area of a

14   large saturation patrol?

15   A.  I don't recall ever seeing a vehicle -- I mean pulling over  13:32:45

16   a vehicle of an area that we're patrolling during a saturation

17   patrol, but we have done vehicles during a saturation patrol

18   that are leaving the county that are involved in human

19   smuggling.

20   Q.  They could have moved outside the area of the saturation  13:32:58

21   patrol?  Is that your testimony?

22   A.  Perhaps, but not -- not that I knew specifically that.

23   They came out of that area.

24   Q.  Thank you.

25          If you execute a traffic stop during a saturation  13:33:18

```
 1    patrol after finding probable cause for a Title 28 violation

 2    and you observe evidence of criminal activity not in any way

 3    related to Title 28, would you investigate that potential

 4    criminal activity?

 5    A.  Of course.                                              13:33:43

 6         MR. LIDDY:  I have no further questions.

 7         THE COURT:  Redirect?

 8         MS. GALLAGHER:  Yes, Your Honor.

 9                   REDIRECT EXAMINATION

10    BY MS. GALLAGHER:                                           13:34:06

11    Q.  287(g) gave you the authority to detain individuals to

12    determine alienage, is that correct?

13    A.  Yes.

14    Q.  Were there -- and there were circumstances other than human

15    smuggling for which you used your 287(g) authority, is that   13:34:25

16    correct?

17    A.  As to what?  I don't understand.

18    Q.  Was there any circumstance in which you used your 287(g)

19    authority, but in which you did not suspect human smuggling?

20    A.  Correct.                                                13:34:37

21    Q.  Correct, there were those situations?

22    A.  Yes.

23    Q.  And you're no longer 287(g) certified, is that correct?

24    A.  I'm -- no, I'm not.

25    Q.  You testified earlier today about a number of factors that  13:34:45
```

1    you use to establish reasonable suspicion of a human smuggling

2    load vehicle?

3    A.  Yes.

4    Q.  And you still use those factors today?

5    A.  Yes.                                                          13:34:57

6    Q.  Has every vehicle that you've ever suspected of human

7    smuggling had dark tint on the windows?

8    A.  Yes.

9    Q.  You've never stopped a vehicle with suspicion of human

10   smuggling that did not have dark tint on the windows?          13:35:11

11   A.  That did not?

12   Q.  Yes.

13   A.  No.

14        MS. GALLAGHER:  Your Honor, I'd like to show on the

15   screens Exhibit 180, which has been admitted into evidence.    13:35:23

16   BY MS. GALLAGHER:

17   Q.  Deputy Rangel, I can represent to you that your counsel has

18   identified this document as relating to a saturation patrol

19   that occurred on November 16th to 18th, 2009.

20        You participated in that patrol?                          13:35:52

21   A.  Yes.

22   Q.  And you see on this document, starting with line number 6,

23   the arresting deputy, Rangel.  That's yourself?

24   A.  Yes.

25   Q.  And continuing down actually through the rest of the page   13:36:10

```
 1   each -- each entry there is Rangel.  That's you?

 2   A.  Yeah.

 3   Q.  And each one of the traffic stops was made for a probable

 4   cause of speeding, is that correct?

 5   A.  Correct.                                               13:36:24

 6   Q.  And the first two stops -- or the first two individuals

 7   listed there on 6 and 7, it says Turned over to LEAR.  That's

 8   ICE, that's correct?

 9   A.  Yes.

10   Q.  We go to the next page.  On 15 through 18, once again it   13:36:38

11   says Rangel.  That's you?

12   A.  Yes.

13   Q.  Once again the probable cause is speeding --

14   A.  Correct.

15   Q.  -- for each one of those?                              13:36:55

16   A.  Yes.

17   Q.  None of the stops you made that day were for suspicion of

18   human smuggling, were they?

19   A.  No.

20   Q.  None of the arrests were made under human smuggling state  13:37:11

21   law?

22   A.  No.

23   Q.  Now that you no longer have 287(g) authority, if you

24   contact an individual that you suspect is an illegal immigrant

25   but for which you do not have probable cause of a state crime,  13:37:28
```

```
 1   you would turn them over to ICE, is that correct?
 2   A.  Yes.
 3   Q.  And that individual would be taken into MCSO custody
 4   initially?
 5   A.  Yes.                                                      13:37:40
 6   Q.  While waiting to be transferred to ICE custody?
 7   A.  Correct.
 8   Q.  And that individual would be detained by the MCSO until the
 9   MCSO re -- excuse me, receives a response from ICE as to
10   whether ICE wants the individual or wants them to be released?  13:37:54
11   A.  Correct.
12   Q.  And just to be clear, this would be an individual that was
13   being detained for no state charges, correct?
14   A.  Correct.
15          MS. GALLAGHER:  No further questions, Your Honor.       13:38:07
16          THE COURT:  Thank you, Deputy Rangel.  You're through.
17          THE WITNESS:  Thank you.
18          THE COURT:  You may step down.
19          Next witness.
20          MR. SEGURA:  Plaintiffs call Diona Solis.              13:38:20
21          THE CLERK:  Can you please state and spell your name
22   for the record.
23          MS. SOLIS:  Diona Solis, D-i-o-n-a, S-o-l-i-s.
24          THE COURT:  Thank you.  Please raise your right hand.
25          (Diona Solis was duly sworn as a witness.)             13:39:16
```

```
 1              THE CLERK:  Thank you.  Please take our witness stand.

 2              MR. SEGURA:  May I proceed, Your Honor?

 3              THE COURT:  Please.

 4                          DIONA SOLIS,

 5     called as a witness herein, having been duly sworn, was        13:39:48

 6     examined and testified as follows:

 7                       DIRECT EXAMINATION

 8     BY MR. SEGURA:

 9     Q.  Good afternoon, Ms. Solis.

10     A.  Good afternoon.                                            13:39:53

11     Q.  Ms. Solis, where do you live?

12     A.  I currently live in Pompano Beach, Florida.

13     Q.  And how long have you lived there for?

14     A.  About two years.

15     Q.  And where did you live before that?                       13:40:01

16     A.  Arizona.

17     Q.  In what part of Arizona?

18     A.  I lived in Laveen, which is in Maricopa County.

19     Q.  Okay.  And how long have you lived in Maricopa County?

20     A.  I lived in Maricopa County for about 25 years.  I lived in 13:40:12

21     Pinal County for about two of those years.

22     Q.  Okay.  And do you have any children?

23     A.  I have two boys.  Caleb's 11, he's in the Boy Scouts, and

24     Giovanni just turned one.

25     Q.  And why did you move to Florida?                          13:40:26
```

1    A.  My sister was in medical school.  She recently finished and

2    is doing her residency there, and she asked us if we wanted to

3    come out there for a while, so we decided to move to Florida.

4    Q.  And before this trip, when was the last time that you were

5    in Phoenix?                                                    13:40:42

6    A.  In March 2012.

7    Q.  Okay.  And how often -- do you come back to Phoenix often?

8    A.  I try to come back three to four times a year.

9    Q.  Okay.  Have you ever been stopped by a Maricopa County

10   sheriff deputy?                                                13:40:56

11   A.  Yes, I have.

12   Q.  And when was that?

13   A.  That was in March of 2009.

14   Q.  And where were you traveling from when you were stopped?

15   A.  We were traveling back from the Grand Canyon.  We were on a  13:41:05

16   Boy Scout troop trip.

17   Q.  And were there others in the vehicle with you?

18   A.  Yes.  It was myself in the passenger seat, Jaime Flores

19   Sanchez was driving, my son Caleb was in the car, his son was

20   in the car, and two other Boy Scouts.                         13:41:21

21   Q.  And what ethnicity is Jaime?

22   A.  He's Hispanic.

23   Q.  Okay.  And his son?

24   A.  Hispanic as well.

25   Q.  And how about your son?                                    13:41:30

```
1    A.   Hispanic.

2    Q.   Okay.  And where did this stop occur?

3    A.   It occurred on the U.S. 60, Grand Avenue.

4    Q.   Tell me what happened when you were stopped.

5    A.   We were traveling in the right-hand lane and we saw the        13:41:46

6    patrol lights come on behind us, so we pulled over.

7    Q.   Okay.  And then what happened?

8    A.   The officer approached the vehicle and asked Jaime for his

9    driver's license, registration, and insurance card.  Jaime's

10   English isn't very good, so I was translating for him.  And at      13:42:07

11   that time the officer questioned if he was a citizen.

12   Q.   And did Jaime say anything?

13   A.   He said that he was a resident.  And then the

14   officer turned to me and said:  You?  And you?  And I told him

15   that I was a citizen.                                               13:42:26

16   Q.   Okay.  And what happened after that?

17   A.   After that he started questioning where we were coming

18   from, what we were doing.  And I explained that we were coming

19   back from a camping trip with the Boy Scouts from the Grand

20   Canyon.                                                             13:42:40

21   Q.   Okay.  And what happened after that?

22   A.   The officer acted like he didn't believe what we were

23   saying and he continued to question us about where we were

24   coming from and what we were doing.

25        And then he started asking the boys for their                 13:42:53
```

1    identifications as well, if they had IDs.  And which I said:

2    They're minors.  They don't have IDs.

3    Q.  How old were the boys?

4    A.  The boys ranged in age from, like, eight to eleven.

5    Q.  And what was your reaction to the officer asking the boys            13:43:11

6    for IDs?

7    A.  I thought it was unreasonable, because they're not of age

8    to have IDs.  They hadn't done anything wrong.

9    Q.  Did the deputy tell you why he stopped the vehicle?

10   A.  He did only after he continually questioned us.  He said           13:43:25

11   that we were going 75 in a 65.

12   Q.  And did Jaime say anything in response?

13   A.  He said that the last sign that he saw, he thought it said

14   75.  And at that point the officer said, Don't you have eyes?

15   Can't you see?                                                         13:43:51

16   Q.  Do you have an understanding of how fast the vehicle was

17   driving when it was stopped?

18   A.  I wasn't looking at the speedometer, but we were traveling

19   in the right-hand lane.  And we had children in the vehicle so

20   we were traveling with care, and several cars had passed us on         13:44:02

21   the left-hand side.

22   Q.  Do you think it was fair that you were pulled over?

23   A.  No, because all the other cars that had passed us that were

24   going faster than we were weren't pulled over.

25   Q.  Okay.  So what happened after the officer explained why he         13:44:17

```
 1    had pulled the car over?
 2    A.  After that, he had taken the IDs and gone back to his
 3    patrol car to run the checks, and then he came back and issued
 4    the citation.
 5    Q.  Do you think the stop lasted a normal amount of time?        13:44:36
 6    A.  No, it would have been sufficient just to, you know, pull
 7    us over, let us know what we had done wrong.  But he
 8    continually questioned us about where we were coming from, like
 9    he didn't believe us.
10    Q.  And how did the stop make you feel?                          13:44:53
11    A.  It made me feel uncomfortable like he was treating us
12    different upon hearing me translate for Jaime speaking Spanish.
13    And it bothered our boys as well.  They felt -- they felt
14    scared.  They were, like, What -- what did we do wrong?
15    Q.  What -- what is it that made you feel as though you were     13:45:12
16    treated differently?
17    A.  The way he -- his tone.  The way he spoke to us.  He was
18    rude to us.  He was mocking Jaime.
19          MR. SEGURA:  I have no further questions, Your Honor.
20          THE COURT:  Cross-examination?                             13:45:31
21          MR. LIDDY:  Your Honor, we have no questions for this
22    witness.
23          THE COURT:  Ma'am, thank you.  You may step down.
24          Next witness.
25          MS. RAMIREZ:  Plaintiffs call Lorena Escamilla.            13:45:44
```

```
 1                THE CLERK:  Right up here, ma'am.

 2                Can you please state and spell your full name.

 3                MS. ESCAMILLA:  Lorena Escamilla.  L-o-r-e-n-a; middle

 4    initial S; last name Escamilla, E-s-c-a-m-i-l-l-a.

 5                THE CLERK:  Thank you.  Please raise your right hand.    13:46:37

 6                (Laura S. Escamilla was duly sworn as a witness.)

 7                THE CLERK:  Thank you.  Please take our witness stand.

 8                        LORENA S. ESCAMILLA,

 9    called as a witness herein, having been duly sworn, was

10    examined and testified as follows:

11                        DIRECT EXAMINATION

12    BY MS. RAMIREZ:

13    Q.  Good afternoon, Ms. Escamilla.

14    A.  Good afternoon.

15    Q.  How old are you?                                               13:47:09

16    A.  I'm 33.

17    Q.  And where do you live?

18    A.  In Laveen, Arizona.

19    Q.  How long have you lived in Laveen?

20    A.  Almost all my life.                                            13:47:17

21    Q.  What is your occupation?

22    A.  A customer service represent for QBE Insurance.

23    Q.  And what is your educational background?

24    A.  I'm currently working on my degree in the bachelor's of

25    psychology and human resources.                                   13:47:30
```

1    Q.    Where do you attend school?

2    A.    University of Phoenix.

3    Q.    When will you be graduating?

4    A.    In the next six to nine months.

5    Q.    Do you have a family?                                    13:47:40

6    A.    I do.

7    Q.    Are you married?

8    A.    I'm married.

9    Q.    How many children?

10   A.    I have three boys.                                       13:47:45

11   Q.    What is your ethnicity?

12   A.    I'm Hispanic.

13   Q.    I'd like to turn your attention now to the incident that

14   occurred on September 2, 2009.  Were you stopped by the

15   Maricopa County Sheriff's Office on September 2, 2009?          13:47:59

16   A.    Yes.

17   Q.    Where did your trip begin?

18   A.    At the University of Phoenix.

19   Q.    What was your designation?

20   A.    I was going home.                                        13:48:09

21   Q.    What time were you heading home?

22   A.    It was close to 10:00 p.m.

23   Q.    What was the weather like at this time?

24   A.    It was really hot, so I rolled my windows down.

25   Q.    I'm sorry, I couldn't hear that last part.               13:48:22

1    A.  Oh, I'm sorry.  It was really hot, I remember, 'cause I

2    rolled my windows down.

3    Q.  Were you alone?

4    A.  Yes.

5    Q.  What kind of car were you driving?                      13:48:29

6    A.  A Mitsubishi Galant 2002.

7    Q.  Where were you when you first noticed the MCSO vehicle that

8    pulled you over?

9    A.  I was about 300 yards from my house and I saw him.  He was

10   in front of me heading eastbound, I was heading southbound.   13:48:48

11   Q.  And did the MCSO vehicle pass you?

12   A.  I -- I thought he was, but right when we met he looked at

13   me and made a U-turn, followed me.

14   Q.  And what happened after he made the U-turn?

15   A.  He followed me for about 200 -- I'm sorry, for about 20    13:49:05

16   yards, it seemed like.

17   Q.  And did he activate his emergency lights?

18   A.  He did.

19   Q.  How far away from your home were you when he activated his

20   emergency lights?                                            13:49:22

21   A.  I was a house away from my house.

22   Q.  Where did you pull over?

23   A.  In my carport.

24   Q.  Had you been driving the speed limit?

25   A.  Yes.                                                     13:49:28

1    Q.  Had you obeyed all traffic signs?

2    A.  Yes.

3    Q.  Was your car operating correctly?

4    A.  Yes.

5    Q.  What happened when the officer approached you?          13:49:35

6    A.  He asked me for my license, my registration, and my

7    insurance.

8    Q.  Did you provide him with those items that he asked for?

9    A.  Yes, all but my insurance.

10    Q.  Why didn't you provide him with your insurance?          13:49:48

11    A.  I was changing insurance companies and had just done the

12    transaction, so I didn't have the paper yet.

13    Q.  Did you say anything to him?

14    A.  Yes.

15    Q.  What did you say to him?          13:50:02

16    A.  I asked him what I was being pulled over for.

17    Q.  And how did he respond to you?

18    A.  There was no response.  He just turned around and walked

19    back to his patrol unit.

20    Q.  Did he return your documents?          13:50:12

21    A.  When he returned, yes.

22    Q.  Did you say anything to him when he returned your

23    documents?

24    A.  I did.  I asked him what he was pulling me over for.

25    Q.  And what did he respond to that?          13:50:24

```
1    A.  He said that he had reasonable belief that I had drugs,

2    alcohol, and weapons in my car.

3    Q.  And what did you tell him?

4    A.  I said, No, I'm pregnant.  I'm on my way home from school.

5    Q.  Did you notice the officer's name?                          13:50:40

6    A.  I did.

7    Q.  And what was his name?

8    A.  F. Gamboa.

9    Q.  How did you notice his name?

10   A.  It's on his badge, on his uniform.                          13:50:48

11   Q.  How tall was Officer Gamboa?

12   A.  About five and a half feet.

13   Q.  So when you say five and a half feet, do you mean five feet

14   half inch, or what do you mean by five and a half?

15   A.  Almost six feet.  He looked a lot taller than me.           13:51:06

16   Q.  Did you notice anything else about his physical appearance?

17   A.  Yes, he -- he was bulgy, big biceps man with a lot of

18   tattoos on his biceps.

19   Q.  What happened after you told him you were pregnant and

20   didn't have any drugs in your car?                              13:51:25

21   A.  He said, It doesn't matter.  People still do drugs when

22   they're pregnant.  I said, Well, not me.

23   Q.  Did he request anything further from you?

24   A.  He demanded to search my vehicle.

25   Q.  And what did you tell him?                                  13:51:38
```

1    A.  I said absolutely not.  I do not give you consent.  You

2    have no reason to.

3    Q.  Did you feel threatened by his behavior toward you?

4    A.  Yes, I did.  He was being very unprofessional, unethical,

5    and he didn't tell me why he was pulling me over.                13:51:54

6    Q.  Did you do anything to act on your fears?

7    A.  I did.  I reached -- I had my cellphone, so I was prepping

8    to dial for law enforcement to come.

9    Q.  And were you able to dial for law enforcement to come?

10   A.  No.  He reached into my car and took my cellphone from me.  13:52:12

11   Q.  What did you do when he reached in to take your cellphone

12   from you?

13   A.  I feared for my safety, so I honked -- I put my hands on my

14   horn like this and I just held it down until my neighbors'

15   lights turned on and my husband came out.                       13:52:30

16   Q.  So your husband came outside of the house?

17   A.  Yes, he opened the garage door and saw.

18   Q.  And were there any other officers at the scene?

19   A.  Yes, there was.

20   Q.  Can you tell us who -- what other officers were there, how  13:52:42

21   many other officers were there?

22   A.  There -- at that moment, it was the Sheriff Gamboa, and to

23   my right side was Cherches, Posse Member Cherches.

24   Q.  And how did you know his name was Posse Member Cherches?

25   A.  He and I had had a civil conversation prior to that, and he 13:53:04

```
 1   gave me his name and I saw it also on his badge.
 2   Q.  Did Officer Gamboa ask you to do any tests?  Did he ask you
 3   to do anything while you were --
 4   A.  Yes.  He demanded me to sit down on my hot hood of my car.
 5   Q.  Let's step back for a second.                                13:53:25
 6           Were you in your car or did you exit your car?
 7   A.  Well, my husband -- when my husband came out I then, you
 8   know, stepped out of the vehicle and I was, you know, telling
 9   him what happened, and, you know, I was starting to feel a
10   little scared and I wanted him to call someone.  So we -- I was  13:53:39
11   standing in the front part of my car.
12   Q.  When you were outside of your car did Officer Gamboa ask
13   you to -- to do any type of test?
14   A.  Yes.  He asked me to put my hands out, put my head back,
15   close my eyes, and allow Officer Cherches to run a little light  13:53:55
16   by my eyes.
17   Q.  And did you pass that test?
18   A.  Yes, of course.
19   Q.  Did he ask you to do anything else?
20   A.  He demanded I sit on my car.                                 13:54:08
21   Q.  And did you sit on your car?
22   A.  No.  It was just really hot.
23   Q.  So what happened after you did not sit on your car as he
24   had requested?
25   A.  I told him, you know, it's really hot, and my hips hurt,     13:54:23
```

1    and I'm pregnant I've been sitting all day.  I need to get my

2    blood flowing.  And he said, Well, I can be an asshole if you

3    want to be a bitch.

4    Q.  Did he do anything else after he said that to you?

5    A.  Yes, he -- he attacked me.  He grabbed my hands and he put          13:54:42

6    them behind me as if he was gonna arrest me, and then he moved

7    me from where I was.

8    Q.  Can you describe how he moved you from where you were?

9    A.  He dragged me backwards towards the side view of my car,

10   and he slammed me back and forth with my stomach on my car, and         13:55:06

11   he -- that's what he did.

12   Q.  So when he said he -- he slammed you back and forth, are

13   you saying that he slammed you with your belly first?

14   A.  He --

15        MR. LIDDY:  Objection, Your Honor.  The question calls            13:55:29

16   for evidence about use of force.  There's no excessive force

17   charged in this litigation.  It's irrelevant.

18        THE COURT:  Overruled.

19        THE WITNESS:  I'm sorry.

20   BY MS. RAMIREZ:                                                         13:55:38

21   Q.  Go ahead and answer the question.

22   A.  I thought he was going to arrest me, is what I thought, and

23   instead he slammed me.

24   Q.  Okay.  And my question is:  Which part of your body hit the

25   car first?                                                              13:55:50

1    A.   My pregnant belly.

2    Q.   And how many times did he slam you against the car?

3    A.   Three to four times.

4    Q.   Did it hurt?

5    A.   A lot.                                                13:55:58

6    Q.   Can you describe where it hurt?

7    A.   My entire abdomen on the top, on the bottom, my hips, my --

8    Q.   Did you say anything?

9    A.   Yes, I said:  Stop.  Stop.  What are you doing?  I told you

10   I was pregnant.                                            13:56:12

11   Q.   What was his response?

12   A.   There was no response.

13   Q.   What part of your body was he holding onto as he slammed

14   you into the car?

15   A.   My wrists.                                            13:56:24

16   Q.   And you mentioned that he slammed you into the side of the

17   car?

18   A.   Where the rearview mirror is.

19   Q.   Are you talking about the rearview mirror or are you

20   talking about --                                          13:56:33

21   A.   I'm sorry, the side -- sorry, the side-view mirror, you

22   know, where the little words say, you know, things are larger

23   than they appear, side view on the outside of the car.

24   Q.   And then where did he drag you to?

25   A.   He dragged me backwards to his patrol unit.           13:56:46

```
 1   Q.  And what happened when he got you to his patrol unit?

 2   A.  He -- he remained keeping hold of my hand, and then he

 3   opened the unit, the car door, and threw me in the back seat of

 4   his car, yelling at me.

 5   Q.  And when you say he threw you in the back seat of his car,     13:57:07

 6   how -- with how much force did he throw you in the back seat?

 7   A.  I hit the center where the little square is that's, like,

 8   up, and I bounced in there and I hit the edge of that and then

 9   I fell on the -- on the actual seat.

10   Q.  Now, you -- you mention that you bounced.  Is there a          13:57:26

11   cushion in the back seat of a patrol car?

12   A.  No.

13   Q.  And where did he have his hands as he shoved you into the

14   patrol car, on your body?

15   A.  On my wrists still.                                            13:57:41

16   Q.  How far into your pregnancy were you?

17   A.  Five months.

18   Q.  Had you told Officer Gamboa that you were pregnant before

19   he slammed you into the car?

20   A.  Several times.                                                 13:57:51

21   Q.  Can you describe the size of your belly at that time?

22   A.  May I stand up?

23   Q.  Yes, you may.

24   A.  I was to about here, so about eight inches.

25   Q.  How were you feeling at this time?                             13:58:11
```

1    A.  I felt myself pass out a little bit.  I had a lot of

2    shortness of breath, and I had felt my baby flutter and then

3    stop.

4    Q.  What did Officer Gamboa do after he threw you into the

5    patrol car?                                                13:58:30

6    A.  He yelled at me and told me:  You did this to yourself.

7    You did this to yourself.

8    Q.  Did he get back into the patrol car with you?

9    A.  No, he walked back to my vehicle.

10   Q.  How long were you seated in the back of the patrol car?   13:58:41

11   A.  Probably about 30 minutes.

12   Q.  And were the windows up or down in the patrol car?

13   A.  My door was open about four inches, maybe.

14   Q.  Your door or --

15   A.  My window, my side door was about four inches.           13:58:58

16   Q.  Was it hot in the patrol car?

17   A.  Yes.

18   Q.  Were you uncomfortable?

19   A.  Yes.

20   Q.  Did anyone come to assist you?                            13:59:07

21   A.  Yes, Posse Member Cherches came.

22   Q.  And what did Posse Member Cherches do?

23   A.  He offered me medical attention.

24   Q.  And did you accept the medical attention?

25   A.  Yes.                                                      13:59:24

```
 1   Q.  And who came to attend to you?

 2   A.  The fire department, Engine 58.

 3   Q.  What did the fire department do to you?

 4   A.  They took my vitals, iron test, they checked my belly, make

 5   sure I wasn't, you know, bleeding.  And had me try to control     13:59:39

 6   my breathing again.

 7   Q.  Did they offer to take you to the hospital?

 8   A.  They did.

 9   Q.  Did you accept?

10   A.  I was extremely tired.  I did not go.                          13:59:50

11   Q.  Did they offer you any medication?

12   A.  No.

13   Q.  How long were you attended to by the fire department?

14   A.  Twenty to thirty minutes.

15   Q.  What did you observe happening to your car during this         14:00:02

16   time?

17   A.  I observed the Phoenix Police Department arrive with the

18   K-9 unit, and he made a couple of turns around my vehicle and

19   then he allowed the K-9 to go in the front seat of -- through

20   the front, the entire front part of the car.                      14:00:24

21   Q.  Had you provided your consent for them to search your car?

22   A.  Absolutely not.

23   Q.  Did they find any evidence of drugs?

24   A.  No.

25   Q.  Weapons?                                                       14:00:34
```

1    A.   No.

2    Q.   Did you receive a citation from Officer Gamboa?

3    A.   Yes.

4    Q.   What was the citation for?

5    A.   Failure to provide ID and no insurance.                    14:00:42

6    Q.   Had you provide -- provided identification?

7    A.   Several times.

8    Q.   Had you provided proof of insurance?

9    A.   No, I didn't, until the following day.

10   Q.   How long were you detained by Officer Gamboa?             14:00:56

11   A.   Over an hour and a half.

12           MS. RAMIREZ:  I have what is marked as Plaintiffs'

13   Exhibit 63.  It's a CAD incident report.

14           Your Honor, may I approach the witness?

15           THE COURT:  You may.                                    14:01:11

16   BY MS. RAMIREZ:

17   Q.   This is a CAD incident history for MA 09163575.  This is a

18   document that's generated by MCSO computer dispatch system.

19           Do you see the second line in the Comment section

20   about halfway down the page where it says:  At 391LKK?          14:01:41

21   A.   Yes.

22   Q.   Is that -- is that the license plate number of the vehicle

23   you were driving that evening?

24   A.   Yes, I see that.  That is my license plate.

25   Q.   And a couple of lines down from there it says:  Saucedo,   14:01:53

```
 1   Lorena S.  Is that your name?
 2   A.  Yes.
 3   Q.  Next to that it says 09261978.  Is that your date of birth?
 4   A.  Yes.
 5   Q.  And can you go back to the line that has your car's license    14:02:10
 6   plate number, and can you tell me the name that appears next to
 7   that license plate number?
 8   A.  Number S1924 Gamboa III, Frank.
 9           MS. RAMIREZ:  Your Honor, I move into evidence
10   Plaintiffs' Exhibit 63.                                           14:02:30
11           MR. LIDDY:  Without objection, Your Honor.
12           THE COURT:  Exhibit 63 is admitted.
13           (Exhibit No. 63 is admitted into evidence.)
14   BY MS. RAMIREZ:
15   Q.  How was your health with regard to your baby following the    14:02:36
16   incident?
17   A.  I was traumatized, sore, and I couldn't eat for a few days,
18   like three or four days.  I didn't really feel any activity of
19   my baby.  And that's all I could just think of the entire
20   incident for weeks.                                               14:02:54
21   Q.  Was your baby okay?
22   A.  I did follow-up with my doctor and he seemed -- he said
23   everything seemed okay at the time.
24   Q.  Did you have any bruising?
25   A.  I did.                                                        14:03:03
```

1    Q.  Can you tell us where you had bruising?

2    A.  Yes.  I had bruising on my wrist right here and on my butt

3    bone.

4    Q.  And can you tell us how the bruising looked on your wrist?

5    A.  I had fingerprint marks still on me.                          14:03:17

6    Q.  Did you take any action regarding Officer Gamboa's behavior

7    toward you?

8    A.  Yes, I did.

9    Q.  What did you do?

10   A.  I made several attempts to call the non-emergency            14:03:27

11   number that they have to make an official complaint.

12   Q.  And were you able to make an official complaint with MCSO?

13   A.  No.

14   Q.  Why is that?

15   A.  No one ever took me seriously or called me back, or they     14:03:42

16   told me to call back, depending on which -- I tried, like,

17   three or four times to make an official complaint, and I

18   finally spoke with Megan, who's a dispatcher, and she referred

19   me to another supervisor.

20   Q.  And did you speak to that supervisor?                         14:04:04

21   A.  I was able to leave a message, but he never returned my

22   call.

23   Q.  Were you able to successfully lodge a complaint against the

24   Maricopa County sheriff's officer?

25   A.  Yes, I did, finally.                                          14:04:19

1    Q.   And where did you lodge that complaint?

2    A.   Phoenix Police Department.  I filed assault charges.

3    Q.   And when did you file that complaint?

4    A.   January of this year.

5    Q.   And why did you file a complaint with the Phoenix Police    14:04:28

6    Department?

7    A.   They were the only credible law enforcement that were

8    taking me seriously and would take the crime that I felt was

9    committed against me.

10   Q.   Can you tell us what happened to the citation that you    14:04:38

11   received from Officer Gamboa?

12   A.   It was dismissed.

13   Q.   Why was that?

14   A.   He crossed out "failure to provide ID" and he initialed it.

15   I asked the courthouse -- I called the courthouse to see what    14:04:52

16   date I had to go --

17             MR. LIDDY:  Objection, Your Honor, hearsay.

18             THE COURT:  I haven't heard any hearsay yet.

19             You can sit down, Mr. Liddy.

20             MR. LIDDY:  Your Honor, I think she was saying -- she    14:05:05

21   was about to testify as to what another person said, an out of

22   court --

23             THE COURT:  She may have been, but she hasn't done

24   that yet.

25             THE WITNESS:  The courthouse faxed me the document to    14:05:15

```
 1   show me where he crossed out his name, that I didn't have to go
 2   to court.
 3   BY MS. RAMIREZ:
 4   Q.  And did you have any other further charges on that
 5   citation?                                                         14:05:24
 6   A.  No, because I faxed my proof of insurance that same day to
 7   them.
 8   Q.  After your incident with Officer Gamboa are you fearful of
 9   being pulled over by the Maricopa County Sheriff's Office?
10   A.  Yes.                                                          14:05:37
11   Q.  And have you taken any actions, acted upon that fear?
12   A.  Yes, I've -- I've changed my route that I normally take on
13   my school nights from the shortcut to a well-lit area, to make
14   sure I'm in a public area in case anything happens.  And I
15   carry my cellphone, and if I see a patrol unit, MCSO, I just     14:05:55
16   911 it in case I have to press -- press it, in case it's Gamboa
17   or someone else.
18            MS. RAMIREZ:  I have no further questions.  Thank you.
19            THE COURT:  Mr. Liddy, cross-examination?
20                         CROSS-EXAMINATION                          14:06:09
21   BY MR. LIDDY:
22   Q.  Good afternoon.
23   A.  Good afternoon.
24   Q.  To address you, is it -- is your name Escamilla or Saucedo?
25   A.  I'm married, so it's Escamilla now.                          14:06:30
```

1    Q.   Escamilla.

2    A.   Yes, it used to be Saucedo.

3    Q.   Thank you.

4         Ms. Escamilla, I believe you testified that you filed

5    a complaint arising out of this incident with the Phoenix          14:06:42

6    Police Department, is that correct?

7    A.   Yes.

8    Q.   And when did you file that complaint?

9    A.   I filed it this year in January.

10   Q.   Is that approximately three years after the incident?        14:06:50

11   A.   About, yes.

12   Q.   Would you tell us why you waited three years to file the

13   complaint?

14   A.   I hadn't moved from where the incident happened, and I felt

15   like he would retaliate against me.  And I was traumatized, I      14:07:04

16   just had a baby, I needed time to heal.

17   Q.   And was your child born without incident?

18   A.   He's healthy.

19   Q.   Thank you.  That's good to hear.

20        I believe you testified that when the deputy passed           14:07:21

21   you, you saw him execute a U-turn?

22   A.   Yeah, he looked me -- right at me.

23   Q.   But he wasn't looking right at you when he executed the

24   U-turn --

25   A.   Yes.                                                          14:07:36

1    Q.  -- was he?

2    A.  Yes, he did.

3    Q.  Did he execute the U-turn on the side of the street or

4    behind your vehicle?

5    A.  I was heading -- we were, I want to say head-on, if you        14:07:41

6    will, so I'm heading southbound and he's heading northbound.

7    And there's a streetlight right next to me, and right at that

8    mark he -- we both had our windows rolled down and he flipped a

9    U-turn and followed me at that moment.

10   Q.  Well, if he had flipped the U-turn -- and excuse me, I'm       14:08:04

11   just trying to understand this -- when he was directly next to

12   you, he would have collided with your vehicle, wouldn't he

13   have?

14   A.  He's on his side of the street on his right side and I'm on

15   my right side of the street.                                       14:08:15

16   Q.  So I guess my question is, did he pass --

17   A.  No, he never passed me.

18   Q.  Well, let me finish my question.

19   A.  Oh, I'm sorry.

20   Q.  Did he pass behind you and flip a U-turn and come in behind    14:08:22

21   you?

22   A.  No.

23   Q.  Well, please explain to me how he can execute a U-turn

24   without going behind you.

25   A.  Well, he was eye to eye, even as you are to me, in his car,    14:08:31

1  and as soon as we made eye contact he made the U-turn on the

2  spot.

3  Q.  Okay.  At the end of his U-turn where was his vehicle in

4  relation to yours?

5  A.  After his U-turn he was right behind me.                    14:08:45

6  Q.  Did there come a time during his execution of the U-turn

7  that he was behind you?

8  A.  I'm sorry, I don't understand your question.

9  Q.  Did there come a time during the execution of the U-turn

10  that he was behind you?                                         14:08:57

11  A.  Well, after he made the U-turn he was behind me.

12  Q.  So your testimony today is he did not start the U-turn

13  after he had already cleared your vehicle and was behind you?

14  A.  He was right next to my car and made a U-turn.  I don't

15  know how to explain that any different.                         14:09:14

16  Q.  Okay.  I believe you testified that after he first spoke to

17  you and you inquired as to why you were pulled over, you got no

18  response and he went back to his vehicle, is that correct?

19  A.  Correct.

20  Q.  Were you able to see him in his vehicle?                    14:09:32

21  A.  Yeah, I was able to turn my head and see him.

22  Q.  What was he doing while he was in the vehicle?

23  A.  It looked like he was just sitting in his vehicle.

24  Q.  Was he talking on the radio?

25  A.  I couldn't tell from where I was.                           14:09:45

1   Q.  Could you see whether or not he had an onboard computer?

2   A.  When I was in the back of the patrol unit I did see his

3   onboard computer.

4   Q.  When you were watching him could you see him operating the

5   onboard computer before he came back to speak to you again?        14:09:57

6   A.  No.

7   Q.  I believe you testified that when you sat in the back of

8   the police cruiser there was no cushion in the seating, is that

9   correct?

10  A.  That's correct.        14:10:15

11  Q.  Do you recall what the seat was made of?  Was it leather --

12  A.  Hard plastic.

13  Q.  Hard plastic?

14  A.  Yes.

15  Q.  Was there any foam rubber underneath the hard plastic and        14:10:22

16  above the frame of the vehicle?

17  A.  No, not that I recall.

18  Q.  Was the temperature of the hard plastic on the surface of

19  the chair cooler than the hood of your car where you did not

20  want to sit?        14:10:38

21  A.  Yes, it was cooler.

22  Q.  This incident occurred at night, is that correct?

23  A.  Yes.

24  Q.  Approximately 10:00 p.m.?

25  A.  About.  It was around that time, yeah.        14:11:04

1    Q.  Did you take any photographs of the bruises on your wrist?

2    A.  Unfortunately, not.

3    Q.  Was the light on the back of your vehicle intended to

4    illuminate your license plate broken?

5    A.  Not that I'm aware of.                                    14:11:46

6    Q.  Did you ever contact the Civil Rights Division of the

7    Department of Justice?

8    A.  The -- the civil -- I'm sorry.

9    Q.  Are you aware -- are you aware that the Department of

10   Justice, United States Department of Justice, has a Civil      14:12:13

11   Rights Division?

12   A.  Oh, yes.

13   Q.  Did you contact them and complain about this incident?

14   A.  I eventually did, yes.

15   Q.  And when was that?                                         14:12:21

16   A.  After I had the baby.

17   Q.  And what's -- what is the day or the month of the birth of

18   your baby?

19   A.  He was born January 23rd of 2010, so about six or seven

20   weeks after that.                                              14:12:35

21   Q.  Thank you.

22           Did you write them a letter or did you call them?

23   A.  I ended up speaking with someone over the phone.

24   Q.  Did you file a notice of claim against Maricopa County for

25   an excessive force?                                            14:13:00

1   A.  Well, I filed my complaint with the Phoenix Police

2   Department.

3   Q.  And your complaint against the Phoenix Police Department,

4   do you have a paper record of that complaint?

5   A.  I do have one.  I just don't have it with me right now.          14:13:17

6   Q.  Have you provided it to counsel?

7   A.  I believe I showed her the little yellow booklet that they

8   give us.

9           MR. LIDDY:  I have no further questions.  Thank you.

10          THE COURT:  Thank you, Mr. Liddy.                            14:13:29

11          Redirect?

12          MS. RAMIREZ:  No further questions, Your Honor.

13          THE COURT:  Ms. Escamilla, you can step down.  Thank

14   you.

15          THE WITNESS:  Thank you.                                     14:13:38

16          THE COURT:  Next witness.

17          MR. BYRNES:  Your Honor, plaintiffs call Lieutenant

18   Joe Sousa.

19          THE CLERK:  Right up here, sir.

20          Can you please state and spell your full name.              14:14:29

21          MR. SOUSA:  Joseph Sousa.  J-o-s-e-p-h; Sousa,

22   S-o-u-s-a.

23          THE CLERK:  Thank you.  Please raise your right hand.

24          (Joseph Sousa was duly sworn as a witness.)

25          THE CLERK:  Thank you.  Please take our witness stand.       14:14:54

```
 1                        JOSEPH SOUSA,

 2   called as a witness herein, having been duly sworn, was

 3   examined and testified as follows:

 4                     DIRECT EXAMINATION

 5   BY MR. BYRNES:                                              14:15:22

 6   Q.  Good afternoon, Lieutenant Sousa.

 7   A.  Good afternoon, sir.

 8   Q.  Lieutenant Sousa, you've served under Sheriff Arpaio since

 9   1997, isn't that right?

10   A.  Yes, sir.                                               14:15:30

11   Q.  And you have been -- strike that.

12           Starting in September of 2007 you were the unit

13   commander of the Human Smuggling Unit, correct?

14   A.  That sounds right, sir.

15   Q.  You're no longer the unit commander of the Human Smuggling  14:15:44

16   Unit, is that right?

17   A.  No, sir.

18   Q.  When did you stop being the unit commander?

19   A.  I left the unit completely as of April 1st of this year,

20   sir.                                                       14:15:57

21   Q.  Were you the unit commander of the HSU when you left on

22   April 1st of this year?

23   A.  That was my first day on my new assignment.

24   Q.  During the entire time you were with the Human Smuggling

25   Unit were you the unit commander?                          14:16:12
```

A.  I was the unit commander for the first two or three years.

Then I became the division commander.  They made human

smuggling a division.

Q.  Did anyone succeed you as the unit commander of the HSU?

A.  Yes, sir.                                                          14:16:28

Q.  And who is that?

A.  Lieutenant Jackavinich (phonetic).

Q.  Can you please spell the lieutenant's last name?

A.  I'm not sure on spelling, sir.  Sorry.  I wouldn't pass

that spelling bee.                                                    14:16:38

Q.  That's okay.  It's not a spelling test.

        And what is your current role, Lieutenant?

A.  I'm the executive officer for the SWAT division.

Q.  Focusing on the HSU for a moment, the Human Smuggling

Unit's -- and let's just clarify nomenclature.  When I say HSU,      14:17:01

you understand that it's Human Smuggling Unit, correct?

A.  Yes, sir.

Q.  The HSU's primary job is to enforce state immigration laws,

including the human smuggling law, isn't that right?

A.  Primary job is to enforce the state human smuggling law,         14:17:14

sir.

Q.  Another job of HSU is to investigate and arrest illegal

aliens, correct?

A.  No, sir.

Q.  I just want to make sure I understand your testimony.  Your      14:17:28

```
 1   testimony is that one job of HSU is not investigating and

 2   arresting illegal aliens?

 3   A.  Our primary job is enforcing the state human smuggling law.

 4   And our deputy sheriffs at the time back in 2007, 2008, early

 5   2009, were 287(g), and that was a secondary, if they came          14:17:46

 6   across contact with folks in the course of our duties as deputy

 7   sheriffs, then they could use that training.  But it's not a

 8   primary function.

 9           MR. BYRNES:  Your Honor, the response was

10   nonresponsive.  Move to strike.                                    14:18:07

11           THE COURT:  Overruled.

12   BY MR. BYRNES:

13   Q.  Let me ask the question again, Lieutenant Sousa.  One job

14   of the HSU is investigating and arresting illegal aliens, isn't

15   that correct?                                                      14:18:13

16   A.  For the human smuggling statute.

17   Q.  Lieutenant Sousa, I'm going to show you the transcript for

18   your first deposition in this matter.  It's taken on December

19   10th, 2009.

20           MR. BYRNES:  Your Honor, may I approach?                   14:18:39

21           THE COURT:  You may.

22   BY MR. BYRNES:

23   Q.  Lieutenant Sousa, I want to direct your attention to

24   page 38 of that deposition.  And before I ask you this

25   question, I just want to confirm you were under oath when you      14:19:16
```

1    gave this deposition --

2    A.  Yes, sir.

3    Q.  -- is that right?

4         Let's focus in on lines 6 through 20.

5         "QUESTION:  So as part of enforcing that law --"      14:19:32

6         That's referring to the human smuggling law.

7         "-- your deputies would have to investigate and -- and

8    arrest people who are not in the country lawfully?

9         "ANSWER:  But it's the secondary -- it's not the

10   primary focus.  Once again, our main focus is to enforce the      14:19:47

11   state charges.  If I put state charges on somebody, we don't

12   even -- all we are doing is putting a detainer at the jail.

13   They are being booked on state charges for human smuggling.

14        "Now, if there's people that we come across that we

15   can't make state charges or we don't reach the probable cause,    14:20:00

16   then the guys would go into their 287(g) training and -- and

17   process them that way.  But once again, it's secondary to

18   enforcing the state laws in the course of our duties."

19        You see that, Lieutenant Sousa?

20   A.  Yes, sir.      14:20:15

21   Q.  And do you stand by that testimony today?

22   A.  Yes, sir.  It's not our primary job.  It's a secondary.

23   Q.  Lieutenant Sousa, the majority of people that the HSU comes

24   across being smuggled speak Spanish and not English, isn't that

25   correct?      14:20:24

1   A.  In my experience, yes, sir.

2   Q.  And the majority of people the HSU comes across are from

3   Latin America, am I correct?

4   A.  In my experience, yes, sir.

5   Q.  Lieutenant Sousa, Sheriff Joe Arpaio is the commander in          14:20:39

6   chief of the Sheriff's Office, isn't he?

7   A.  Yes, sir.

8   Q.  And you understand that he is the ultimate authority over

9   law enforcement matters at the MCSO, isn't he?

10  A.  Yes, sir.                                                         14:20:53

11  Q.  And in general, you follow the policy that the sheriff

12  sets, isn't that correct?

13  A.  In general, yes, sir.

14  Q.  Okay.  And in the course of doing so you follow the

15  sheriff's directives that come down through the chain of             14:21:02

16  command, right?

17  A.  If they're lawful, yes, sir.

18  Q.  Do you recall a directive from the sheriff that was

19  unlawful?

20  A.  No, sir.  That came down the chain of command, no, sir.          14:21:15

21  Q.  So in the MCSO the buck stops with Sheriff Arpaio, isn't

22  that right?

23  A.  In general, yes.

24  Q.  Your role as the unit commander of the HSU was to make sure

25  that your sergeants adhered to the sheriff's policies and law,       14:21:36

1  correct?

2  A.  In general, yes, sir.

3  Q.  Do you recall an instance in which you failed to make sure

4  that the sergeants adhered to the sheriff's policies and law?

5  A.  I don't know of any incidents intentionally, sir.          14:21:51

6  Q.  One of those sergeants in the HSU is Manuel Madrid,

7  correct?

8  A.  Yes, sir.

9  Q.  And until several months ago, Brett Palmer was also one of

10  the sergeants?                                                 14:22:05

11  A.  Yes, sir.

12  Q.  Do you know who Mr. Palmer's successor is as one of the HSU

13  sergeants?

14  A.  I believe it's Matthew Summers.

15  Q.  Lieutenant Sousa, the HSU works on saturation patrols,      14:22:15

16  correct?

17  A.  Yes, we have.

18  Q.  And during your time with the HSU you were incident or

19  operations commander for numerous saturation patrols, is that

20  right?                                                         14:22:28

21  A.  Operations, yes, sir.

22  Q.  The MCSO usually picks the area for saturation patrols

23  based on citizen complaints, correct?

24  A.  I believe the ones that come down the chain of command to

25  me were based on citizens' complaints reference criminal      14:22:45

```
 1   activity or criminal nuisance activity, that kind of stuff.
 2   Q.  The average manpower of a saturation patrol in which you
 3   were involved ranged from 80 to a hundred deputies, isn't that
 4   right?
 5   A.  Not deputies.  I would say total 80, but we're talking      14:23:02
 6   reserve deputies and posse making that up, sir.
 7   Q.  Lieutenant Sousa, you typically conducted briefings to
 8   supervise your deputies prior to saturation patrols, correct?
 9   A.  Yes, sir.
10   Q.  And those briefings occurred at the command post?           14:23:33
11   A.  Yes, sir.
12   Q.  Operation plans were drafted before saturation patrols were
13   launched, is that right?
14   A.  Yes, sir.
15   Q.  And for at least certain saturation patrols, you yourself    14:23:41
16   drafted the operations plans?
17   A.  I would say the operation plan, sir, when I took over,
18   evolved.  The first few of those crime saturation patrols it
19   was Lieutenant Chuck Siemens, and over time those evolved.  And
20   I believe the first couple when I took over I did, and then I    14:24:02
21   turned that over, I believe, to Sergeant Palmer.  I believe
22   Sergeant Madrid did a couple, too.  But I would sign off on
23   those.
24   Q.  So after lieutenant Siemens?
25   A.  Lieutenant Chuck Siemens, yes, sir.                          14:24:19
```

1    Q.  Lieutenant Chuck Siemens.  Once you took over from

2    Lieutenant Chuck Siemens, the operations plans, starting in

3    2008, were drafted by you or Sergeant Madrid or

4    Sergeant Palmer, is that right?

5    A.  Yes, sir.                                                  14:24:32

6    Q.  And those plans were distributed up the chain of command

7    through Chief Trombi and on upward?

8    A.  Yes, sir.

9    Q.  Deputies were required to read the operations plan before

10   they signed in for the saturation patrol, correct?           14:24:45

11   A.  Yes, sir.

12   Q.  The plans were not, however, distributed to all the

13   deputies who participated --

14   A.  Yes, sir.

15   Q.  -- correct?                                               14:24:56

16          At some point --

17          THE COURT:  I want to understand that last question.

18   You said yes, sir.  Does that mean that the plans were not

19   distributed, but people had to read them when they signed in?

20          THE WITNESS:  Correct, sir.  We did not distribute     14:25:10

21   them.  They had to read them and sign in.

22          THE COURT:  Okay.  So when they signed in they read a

23   copy of the operation plan?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.                                 14:25:18

1        THE WITNESS:  You're welcome, sir.

2   BY MR. BYRNES:

3   Q.  Lieutenant Sousa, at some time operations plans started

4   instructing deputies that they should, quote, arrest people on

5   arrestable offenses, isn't that correct?                    14:25:28

6   A.  Yes, sir.

7   Q.  You did not instruct deputies to investigate any specific

8   people or suspects in the context of a saturation patrol,

9   correct?

10  A.  No, sir, no specifics.                                   14:25:41

11  Q.  In the briefings that you conducted prior to the saturation

12  patrols, deputies were told to have zero tolerance of any

13  criminal activity, correct?

14  A.  Yes, sir.

15  Q.  The first couple of saturation patrols were not zero       14:25:53

16  tolerance, though, correct?

17  A.  No, sir, correct.

18  Q.  Zero tolerance means that everyone who is stopped will

19  receive a citation or go to jail if there is a criminal

20  offense, correct?                                            14:26:08

21  A.  Zero tolerance, the way I put it in place, was if we made

22  a -- a lawful traffic stop, and you had a criminal defendant

23  with an arrestable charge, they would get booked.  And whoever

24  we stopped, we would write a citation for the probable cause

25  for the stop.                                                14:26:26

1   Q.  The Sheriff's Office adopted a zero tolerance policy to

2   avoid the perception of racial profiling --

3          THE COURT:  I'm sorry.  I'm sorry.  I want stop you.

4   Hold your question.

5          Would you repeat that answer again?  Zero tolerance     14:26:37

6   meant that you would arrest somebody if there was an arrestable

7   offense, and then something about a citation if there was

8   probable cause for the stop?

9          THE WITNESS:  If -- no.  Any time we arrested anybody

10  out of a vehicle on a state charge, we wanted them to -- they   14:26:50

11  didn't have discretion on writing a citation, 'cause usually on

12  a traffic stop, deputies had discretion whether to write a

13  citation or not write a citation.

14         THE COURT:  All right.

15         THE WITNESS:  We took away that discretion.  We wanted   14:27:01

16  them to write citations if they arrest somebody out of a

17  vehicle.

18         THE COURT:  All right.  And does that mean you --

19  they -- you wanted a citation if it was criminal traffic, if it

20  was civil traffic, whatever it was?                            14:27:11

21         THE WITNESS:  No, sir.  Criminal, any arrestable

22  offense.

23         THE COURT:  Okay.

24         THE WITNESS:  Then we would write that civil citation

25  for that, whatever the PC, the probable cause was for the stop.  14:27:18

```
1              THE COURT:  All right.

2              MR. BYRNES:  May I proceed, Your Honor?

3              THE COURT:  You may.  I'm sorry for interrupting.

4    BY MR. BYRNES:

5    Q.  Lieutenant Sousa, the MCSO adopted its zero tolerance          14:27:28

6    policy to avoid the perception of racial profiling that

7    deputies' discretion was exercised based on race, correct?

8    A.  I believe the conversation was I didn't want discretion, I

9    wanted -- I wanted to take away the discretion when it came to

10   making arrests.  I wanted everyone arrested and booked.          14:27:48

11   Q.  You were concerned that there would be a perception of

12   racial profiling, correct?

13   A.  Yes.  I didn't want it to be a perception.

14   Q.  And it was your concern about that perception of racial

15   profiling that led to the MCSO's adopting the zero tolerance      14:28:01

16   policy, correct?

17   A.  It was all the media reports, and I wanted to be proactive.

18   Q.  There was no zero tolerance policy, however, as to whether

19   someone would be stopped in the first instance, correct?

20   A.  No, there was no zero policy that you would make every        14:28:16

21   single traffic stop, due to the fact that would be impossible.

22   Q.  And because it would be impossible to stop every vehicle,

23   deputies would have to use discretion to determine who to stop,

24   correct?

25   A.  They would have to use discretion.                            14:28:31
```

1   Q.  Now, even under the MCSO's zero tolerance policy, officers

2   have the discretion regarding whether to question passengers in

3   a vehicle, correct?

4   A.  I'm sorry, sir.  Can you repeat that?

5   Q.  Sure.  Officers in the MCSO have the discretion to question    14:28:50

6   passengers in vehicles they stop, correct?

7   A.  Yes, sir.

8           MR. BYRNES:  Your Honor, I'm going to hand

9   Lieutenant Sousa PX 82, which has been admitted.

10          May I approach?    14:29:09

11          THE COURT:  You may.

12          MR. BYRNES:  And may we publish?

13          THE COURT:  Yes.

14  BY MR. BYRNES:

15  Q.  Lieutenant Sousa, I've handed you -- and you can see it's    14:29:34

16  on the second page of the document is the title page.  The

17  first page has -- is for the Court's purposes.

18          I've handed you a document that concerns a saturation

19  patrol conducted on March 27th and 28th of 2008 between 19th

20  Avenue to 40th Street and from Thunderbird to Pinnacle Peak in    14:29:57

21  Phoenix.  You can see that on page labeled 1845 in the lower

22  right.

23          Lieutenant Sousa, looking at page 1845, you notice at

24  the top there's a title which includes the words "incident

25  action plan."  Do you see that?    14:30:20

```
 1    A.  Yes, sir.

 2    Q.  Is an incident action plan essentially the same thing as an

 3    operations plan?

 4    A.  Correct, sir.

 5    Q.  And for this particular saturation patrol, looking a few          14:30:29

 6    lines down, you were one of the incident commanders, correct?

 7    A.  Yes, sir.

 8    Q.  Do you know how many deputies and posse members

 9    participated in this particular saturation patrol?

10    A.  I don't recall.  I'd have to look if we have a sign-in           14:30:44

11    sheet.

12    Q.  Of the individuals listed on this page, including

13    yourself -- and by that I mean Captain Ray Jones, you,

14    Lieutenant Chuck Siemens, and Sergeant Lupe Rios -- where were

15    you four located during the saturation patrol, physically?         14:31:03

16    A.  Usually it would be at this command post, sir.  I -- I

17    can't say with 100 percent certainty, but usually we'd be at

18    that command post.

19    Q.  Were there supervisors for this saturation patrol who were

20    not located at the command post?                                    14:31:22

21    A.  I believe during all the saturation patrols we tried to

22    bring enough sergeants out to be out on the road.

23    Q.  Were those sergeants out on the road also responsible for

24    making traffic stops?

25    A.  Yes, sir.                                                        14:31:36
```

1  Q.  Were there any MCSO personnel responsible for supervision

2  out on the road not making traffic stops, but supervising?

3  A.  Normally at MCSO, sergeants are in a supervisory role, but

4  they also work, but they don't -- but they manage their time.

5  Q.  Roughly how many sergeants were out on the road during this   14:31:56

6  saturation patrol referred to in Exhibit 82?

7  A.  Can I look at the sign-in sheet?

8  Q.  Absolutely.

9          (Pause in proceedings.)

10          THE WITNESS:  Well, looking at this, sir, I don't   14:33:01

11  recognize a lot of the names on here, but I do see I believe

12  it's Lieutenant Skinner on here, if that's Lieutenant Skinner.

13  BY MR. BYRNES:

14  Q.  Was there a mandated ratio between the sergeants out on the

15  road and the deputies who were making stops?   14:33:18

16  A.  No, we didn't have a mandated ratio, sir.

17  Q.  I'd like to turn your attention back, to the extent you've

18  looked elsewhere, on page 1845 where we began.

19          You notice in the middle there's a section titled

20  Incident Objectives, and the last several sentences read:  The   14:33:38

21  detail will involve proactive criminal and traffic patrol

22  activity.  All criminal violations encountered will be dealt

23  with appropriately.  Contacts will only be made with valid PC.

24          Do you see that?

25  A.  Yes, sir.   14:33:56

1    Q.  PC means probable cause, correct?

2    A.  Yes, sir.

3    Q.  Was the information that I just read delivered verbally

4    during your briefing prior to the saturation patrol?

5    A.  I don't recall, sir.  This ops plan is one of Chuck          14:34:07

6    Siemens'.  Chances are he would have took lead.

7    Q.  I'm sorry, what did you say?

8    A.  This ops plan is Chuck Siemens's.  He would have took lead.

9    Q.  Took lead.  And by "took lead" you mean delivered the

10   briefing?                                                        14:34:27

11   A.  Took lead with this operation.

12   Q.  I see.

13   A.  I don't recall who gave the briefing for this one, sir.

14   Q.  I'd like you to turn to page 1851.  And again, I'm

15   referring to the pages in the lower right-hand corner.           14:34:37

16   A.  Yes, sir.

17   Q.  This is -- and actually look -- note this page and also the

18   next page, 1852.

19          Lieutenant Sousa, these are arrest lists, correct?

20   A.  Yes, sir.                                                    14:34:50

21   Q.  Now, most, if not all, arrests during saturation patrols

22   were of Hispanics, correct?

23   A.  Well, if we're going by surnames in looking at this one, I

24   see a lot of surnames that could be Hispanic, that would be

25   Hispanic.                                                        14:35:15

1  Q.  Looking not simply at this particular arrest list but at

2  saturation patrols in general, most, if not all arrests during

3  saturation patrols were of Hispanics, correct?

4  A.  I would say a lot of them, the arrest lists I looked at, I

5  would say the majority of the saturation patrols.          14:35:44

6          THE COURT:  Could you repeat your answer, please?

7          THE WITNESS:  What was the question, sir?

8          MR. BYRNES:  Can you please read the question back,

9  Mr. Moll?

10          (The record was read by the court reporter.)     14:36:06

11          THE WITNESS:  I would say the majority of the arrest

12  lists that I reviewed had a large amount Hispanic surnames on

13  it.

14  BY MR. BYRNES:

15  Q.  Is your testimony today that most, if not all arrests     14:36:17

16  during saturation patrols were not Hispanic?

17  A.  No.  My testimony is that the majority of the arrest lists

18  that I looked at had a lot of Hispanic surnames on them.

19  Q.  So your testimony today is a lot of Hispanics were

20  arrested, but you're not willing to testify that most, if not     14:36:33

21  all of the arrests were of Hispanics?

22  A.  Well, I'd have to look at all the lists, sir.

23  Q.  Please take -- direct your attention to page 123 of your

24  deposition in front of you.

25  A.  Yes, sir.          14:36:48

1    Q.  In particular, lines 2 through 5, please.

2    A.  123?

3    Q.  That's correct.

4         Do you see that page, Lieutenant Sousa?

5    A.  Yes, sir.                                          14:37:03

6    Q.  Reading starting at line 2:

7         "QUESTION:  In your experience were most, if not all

8    of the people arrested during these operations --" referring to

9    saturation patrols "-- Hispanic?

10        "ANSWER:  In my experience, the two years on the unit   14:37:15

11   during these operations, yes, sir."

12        Lieutenant Sousa, do you stand by that testimony

13   today?

14   A.  The testimony in my deposition, that would be the freshest

15   in my head, yes, sir.                                  14:37:26

16   Q.  Let's return to the arrest lists.  There appear to be a

17   number of column headings at the top of each of these pages.

18   That's page 1851 and 1852.

19        One column is titled PC.  Do you see that?

20   A.  Yes, sir.                                          14:37:42

21   Q.  That means "probable cause," correct?

22   A.  Correct, sir.

23   Q.  Two columns to the left there's a column titled Charge.  Do

24   you see that?

25   A.  Yes, sir.                                          14:37:52

1005

1   Q.  Now, there are no human smuggling charges on either the

2   arrest list on page 1851 or the arrest list on page 1852, isn't

3   that correct?

4   A.  Just a sec to review, sir.

5           MR. CASEY:  Excuse me.  May I have, Your Honor, the          14:38:15

6   exhibit number again, please?

7           THE COURT:  Certainly.

8           MR. BYRNES:  82.

9           MR. CASEY:  82.  Excuse me.

10          THE WITNESS:  No, I don't see any human smuggling          14:38:28

11  charges, sir.

12  BY MR. BYRNES:

13  Q.  How are human smuggling charges indicated on arrest lists?

14  A.  I'm not sure.  It would probably be HSU, or human

15  smuggling, or maybe the statute or the code, but I don't see it          14:38:43

16  here, sir.

17  Q.  Do you ever recall seeing a notation for a human smuggling

18  charge on an arrest list for a saturation patrol?

19  A.  Yes, I have.

20  Q.  You just don't remember sitting here today exactly what the          14:38:52

21  notation might be?

22  A.  Yeah, I don't -- I don't remember how we would put the

23  charge.  They could actually write human smuggling charge, and

24  they might put the A.R.S. code.  I don't recall exactly how we

25  do it.          14:39:04

1   Q.  Another of the columns is titled 287(g).  It's in the

2   middle.

3           Do you see that?

4   A.  Yes, sir.

5   Q.  And this is a special column designated for whether a          14:39:13

6   person was turned over to ICE as a suspected undocumented

7   immigrant for administrative processing, isn't that right?

8   A.  Yes, sir.  That would be a column if we took someone into

9   custody under our federal authority.

10  Q.  You are not 287(g) certified, isn't that right?                14:39:31

11  A.  No, sir.

12  Q.  And over time, deputies who also were not 287(g) certified

13  joined HSU, correct?

14  A.  I think on our criminal employment squad we had a couple of

15  deputies that were not 287(g) certified.  I'm not sure about       14:39:51

16  the actual human smuggling squads.  There could have been one

17  or two.  I don't -- I don't recall not having one on those two

18  squads.

19  Q.  Since the 287(g) task force authority was withdrawn by the

20  federal government in October 2009, no HSU deputies were 287(g)    14:40:19

21  certified, correct?

22  A.  Correct, sir.

23  Q.  And since that time, October 2009, nothing changed out in

24  the field for the HSU deputies, correct?

25  A.  No, we changed how we do business in the field 'cause we       14:40:32

1    didn't have the 287(g) authority.  We had to do -- we change --

2    we -- if I remember correctly, we talked to the county attorney

3    about how to proceed further without detainment, doing more

4    extensive interviews without detainment in the field to develop

5    probable cause for the human smuggling arrests.                    14:40:51

6    Q.  But it's your view that those that had been 287(g) couldn't

7    turn off their training regarding how to make a determination

8    as to whether someone was in the country unlawfully, correct?

9    A.  Correct.  They still had the training, so they would

10   definitely know the indicators to make that phone call to ICE    14:41:07

11   if they didn't have the state charge.

12   Q.  Since December of last year, 2011, the MCSO's 287 authority

13   with regard to its jail was terminated as well, correct?

14   A.  I don't remember the date, but it was terminated.

15   Q.  I'd like to turn your attention, staying with the same       14:41:36

16   exhibit, 82, to page 1848.  And this is the stat sheet for the

17   saturation patrol we've been discussing, correct?

18   A.  I'm trying to find it.  1848?

19   Q.  Yes.

20   A.  Looks like the total, sir.                                    14:42:04

21   Q.  And these are the totals for both -- in the handwriting, at

22   least, the totals for both March 27th and March 28th, 2008,

23   correct?

24   A.  That's what I'm assuming, sir.

25   Q.  Now, at the end of each day of a saturation patrol, a        14:42:17

1    sergeant at the command post would collect the individual stat

2    sheets from deputies involved in the patrol, and those would be

3    compiled into shift summaries like this one, correct?

4    A.  It would be compiled into a file report like this one.

5    Q.  And this particular summary reflects that there were 270          14:42:39

6    contacts on both days combined, is that right?

7    A.  That's what I'm assuming, sir.  I didn't fill this out.

8    Q.  Were you -- sitting here today, you recall seeing forms of

9    this nature, right?

10   A.  Yeah, similar, sir.                                               14:43:01

11   Q.  There's also a -- a row on the right side that states:

12   State charges with ICE detainers.

13        You see that?  And 13 people?

14   A.  Yes, sir.

15   Q.  That indicates that 13 people were arrested for state            14:43:14

16   charges and booked into the jail with an immigration detainer,

17   correct?

18   A.  Yes, sir.

19   Q.  And immediately below that there's a row that reads:

20   287(g) arrests, and then parentheses, no state charges, and         14:43:25

21   then 14 people fell into that category, is that right?

22   A.  Yes, sir.

23   Q.  And those 14 people were turned over to ICE for

24   administrative processing but were not arrested on state

25   charges, correct?                                                    14:43:38

1    A.  Those 14 people were arrested by 287(g) deputies that were

2    federal officers that made the arrests and processed them, and

3    just turned them over to ICE, DRO, detention and removal

4    center.

5    Q.  And the 287(g) officers to which you've just referred,                14:43:52

6    those were MCSO employed individuals, correct?

7    A.  Yes.  They were trained part-time federal agents.

8    Q.  At some point you changed the stat sheet to include the

9    number of total traffic stops, isn't that right?

10   A.  Yes, sir.                                                              14:44:13

11   Q.  And your intent to do -- in doing that was not to see the

12   individual officers' traffic stops, but rather to see the

13   overall numbers of traffic stops for an entire operation,

14   correct?

15   A.  That is correct, sir.                                                  14:44:26

16   Q.  And in fact, all of your concern has always been about just

17   those overall numbers, correct?

18   A.  The stat sheet purpose was for a final product for overall

19   numbers, sir.

20   Q.  And you and your team didn't review the individual stat             14:44:39

21   sheets except to compile the totals, right?

22   A.  Yes, sir, and to see who was working and who wasn't

23   working.

24   Q.  Well, for an individual to have prepared, an individual

25   deputy to have prepared a stat sheet, they must have been               14:44:55

1   working that day, correct?

2   A.   Correct.

3   Q.   Other than the totals of the individual stat sheets, such

4   as this page 1848 in Exhibit 82, neither you nor anyone else at

5   the MCSO prepared a written report after the saturation patrol,    14:45:14

6   correct?

7   A.   We would send -- after each -- I don't know if we did it

8   for this one, but we would send out an e-mail, a briefing of

9   the total numbers breakdowns, and I believe we started adding

10  notes of highlights for the day, whether we -- how many         14:45:33

11  warrants we cleared and that kind of thing, but it wasn't a

12  report; it was more of an e-mail.

13  Q.   And did this e-mail evaluate the success of the saturation

14  patrol in achieving its goals?

15  A.   Well, depending on the arrests, yes.                        14:45:48

16  Q.   I'm asking a different question.  Did the e-mail about

17  which you just testified evaluate the success of the patrol as

18  a whole in achieving its goals, for example, the goals

19  identified in this operations plan?

20  A.   No, I don't recall that kind of analysis, if that's what    14:46:12

21  you're talking about.

22  Q.   Nor was there any report or e-mail or any other written

23  documentation identifying possible improvements in the

24  operation that should be considered in the future, isn't that

25  right?                                                           14:46:27

1    A.   There was no written report, but we did verbally debrief on

2    how we could better do these operations.

3    Q.   There's no other source of information beside an -- besides

4    an individual officer's stat sheet that would record the

5    number of contacts per officer per shift, correct?                    14:46:52

6    A.   Outside the arrests, it would be the individual stat sheets

7    for all contacts.

8    Q.   And the stat sheets, the individual stat sheets, don't

9    allow a comparison of deputies' activities, correct?

10   A.   They don't allow a comparison?                                   14:47:16

11   Q.   Do not.  Isn't that right?

12   A.   Are you talking quantitative information, or...

13   Q.   Well, looking at the individual stat sheets without talking

14   to the deputies, you couldn't determine -- you couldn't compare

15   their activity, correct?                                             14:47:33

16   A.   I'm -- I'm still not following you.  Are you -- are you

17   talking about using quantitative data to find out who's working

18   or who's not working, or --

19   Q.   Let's -- let's take that.  So with regard to quantitative

20   data, individual stat sheets, without speaking with the              14:47:51

21   deputies, does not allow you to compare the activity of those

22   deputies, isn't that right?

23   A.   Not necessarily, 'cause it would be depending on what they

24   were assigned to do during that particular patrol.  If you

25   had -- if we had a specialized unit out, auto theft, they might      14:48:10

```
1   be working straight auto theft and be doing something
2   different.
3   Q.  And you cannot assess how deputies use their time during a
4   shift based on those individual stat sheets, correct?
5   A.  No, I cannot account for their -- all their time based on        14:48:25
6   those stat sheets.
7   Q.  In fact, regardless of the individual stat sheets, you
8   could not, when you were in charge of HSU, assess how deputies
9   use their time during a shift, correct?
10  A.  Our deputies, our HSU deputies, were being supervised by          14:48:40
11  our sergeants, and they had a good feel for who's doing what.
12  But on these saturation patrols with this many people, I can't
13  account for all their time.
14  Q.  And no one could account for all their time, correct?
15  Except themself, presumably.                                         14:48:59
16  A.  That would be impossible, sir.
17  Q.  Lieutenant Sousa, you do not review citations or other
18  documents to determine whether racial profiling was occurring
19  in your human smuggling unit because you believe it's a
20  nonissue, correct?                                                   14:49:15
21  A.  Yeah, I believe -- I believe it was a nonissue based on the
22  fact I don't get complaints, I haven't got complaints from
23  above me, below me, and I don't think I've ever taken -- I've
24  never taken a citizen's complaint about racial profiling.
25  Q.  Ask you a few questions about citizen complaints of a             14:49:29
```

1    different sort.

2         Lieutenant Sousa, the Sheriff's Office receives some

3    complaints through its tip line, correct?

4    A.  Yes, sir.

5    Q.  And Perla Plata runs that tip line?                    14:49:42

6    A.  She -- she monitors it, yes, sir.

7    Q.  And she files complaints that come in through the tip line?

8    A.  Files them?

9    Q.  Yes.

10   A.  I believe she logs them.                               14:49:57

11   Q.  There's a tip disposition sheet, correct, that allows -- as

12   a tip comes in, allows it to be categorized, for example, as

13   founded or unfounded?

14   A.  I implemented -- we -- at some point I implemented a

15   clearance form, a tip disposition sheet, yes, sir.         14:50:18

16   Q.  And following the -- the receipt of a tip and the

17   preparation of a tip disposition sheet, those would be

18   forwarded to Perla Plata, Ms. Plata, to be logged, correct?

19   A.  Tips that came in on the tip line, sir, she logged on a

20   log.  Letter tips that come in or that got forwarded to me got    14:50:43

21   the disposition form attached to it, I believe is how we were

22   doing it.

23   Q.  I see.  And were you in -- you were in charge of

24   determining which letter tips Ms. Plata would retain, correct?

25   A.  Yes, sir.                                              14:51:02

1   Q.  And you identified on the tip disposition sheet whether a

2   certain tip was founded or unfounded, is that right?

3   A.  I didn't do them all, but I did some.

4   Q.  And on some tip disposition sheets you indicated in your

5   handwriting that a tip was, quote, for -- sorry, for, quote,          14:51:26

6   info, i-n-f-o, isn't that correct?

7   A.  I believe I used that term, yes.

8   Q.  And when you marked info, you created the category info and

9   marked it, you didn't mark whether that tip was founded or

10  unfounded, correct?                                                   14:51:47

11  A.  Well, the understanding is if I marked it just info, we're

12  just going to save it and not do anything with it.

13          I'm sorry, what was the question again?

14          MR. BYRNES:  Can you please read the question back?

15          (The record was read by the court reporter.)                 14:52:13

16          THE WITNESS:  Correct.  When I would mark something

17  that's info only, to me it was just either a citizen -- and in

18  raising or just passing along info.  Info means I'm not going

19  to do anything with it.

20  BY MR. BYRNES:                                                        14:52:30

21  Q.  And some of the tips that you marked for info were tips

22  that described no criminal activity, correct?

23  A.  Correct.

24  Q.  And others appeared to be potentially racially motivated,

25  correct?                                                             14:52:42

1   A.  Oh, some of them I cleared out, citizen racial profiling.

2   Q.  Lieutenant Sousa, racial profiling, in your view, involves

3   using race even as just one factor to make a law enforcement

4   decision, isn't that correct?

5   A.  If you -- to make an in -- racial profiling is basing          14:52:58

6   someone's race to make a contact with somebody.

7   Q.  And you believe that racial profiling involves using race

8   even as just one factor -- and there may be others -- to make a

9   law enforcement decision, correct?

10  A.  To make a law -- to make a law -- to make a law enforcement    14:53:15

11  contact, absolutely not.  You can't make contact using race.

12  Q.  You believe that racial profiling involves using race even

13  as just one factor in the decision to select a neighborhood,

14  for example, in which to aggressively enforce speeding,

15  traffic, and other public area laws, correct?                     14:53:36

16  A.  Absolutely not.

17  Q.  You also believe that racial profiling involves using race

18  even as just one factor in the decision to stop a car, correct?

19  A.  No, sir, to stop a car, absolutely not.

20  Q.  I just want to be clear I understand your testimony.  You      14:53:48

21  believe that it would be racial profiling to stop a car using

22  race even as just one factor, correct?

23  A.  To stop a car, yes, sir.

24  Q.  You also believe that racial profiling involves using race

25  even as just one factor in a law enforcement decision to extend   14:54:03

1   a detention to question a driver or passenger, isn't that

2   correct?

3   A.  I -- I believe that under the ICE training, if I remember

4   correctly, I believe under the ICE training, when making an

5   alienage determination, they taught that you can use ethnicity   14:54:22

6   as long as it's one amongst a bunch of other indicators.

7   Q.  You didn't have ICE training, did you?

8   A.  No, I didn't have ICE training.

9   Q.  Lieutenant Sousa, you believe that racial profiling

10   involves using race even as just one factor to make a law   14:54:40

11   enforcement decision to issue a citation, correct?

12   A.  Using racial profiling to issue a citation?  Of course not.

13   Q.  And it would be racial profiling to make an arrest using

14   race even as -- even as just one factor in the decision to make

15   that arrest, correct?   14:55:00

16   A.  Well, my understanding under the federal authority they

17   taught these deputies, that determining an alienage, as long as

18   it was one amongst several indicators, that you could use it to

19   determine that alienage.  But I'm not 287(g), that's my

20   understanding.   14:55:23

21   Q.  And just to make sure I understand, many of your HSU

22   deputies were 287(g) certified during the time where MCSO had

23   that certification, correct?

24   A.  On human smuggling, the two squads, yes, sir.

25   Q.  They had had the 287(g) certified -- strike that.   14:55:40

1       They had had the 287(g) training that, as you've

2   testified, indicated that ethnicity could be used as one factor

3   in determining alienage, right?

4   A.  That was the training they had had.

5   Q.  Right.  And they -- they can't turn off that training, even    14:55:55

6   though MCSO no longer has 287(g) authority, right?

7   A.  Well, I believe we made a decision.  If I remember during

8   my original deposition when that question was asked, I answered

9   the question that -- 'cause I was pretty sure I had that

10  conversation when I first came into the unit, whether we were    14:56:16

11  using that part of the training that ICE gave us, and I was

12  pretty sure we weren't.

13      But during my deposition I think the question was yes

14  or no, are they using it to determine ethnicity, and I'm -- I

15  believe my answer was, I don't know, or no to I don't know.      14:56:35

16      Right after that deposition, I believe I -- I

17  immediately spoke to my sergeants and my deputies and I

18  questioned them, Are we using this part of the 287(g) training?

19  And they said they weren't using that part of that training.

20  Q.  You just testified they were not using that part of the      14:56:55

21  training?

22  A.  That's what I was told.  So after the deposition I was very

23  confident that we were not using that part of the 287(g)

24  training.

25  Q.  I see.  So that part of the 287(g) training -- and by that    14:57:06

```
1    I mean that ethnicity can be used as one factor to determine

2    alienage -- was a part of the 287(g) deputies' training that

3    was turned off, is that right?

4    A.   After my deposition that's the one thing I needed to

5    clarify on the 2009.  That's what I was told when I talked to     14:57:26

6    the sergeants and the deputies.

7    Q.   They had told you they had -- something to the effect they

8    had turned off that part of the training?

9    A.   That we don't use that indicator.

10   Q.   Lieutenant Sousa --                                          14:57:39

11            THE COURT:  You know what, Mr. Byrnes?  I think we

12   need to take a break for the afternoon.

13            MR. BYRNES:  Okay.  Thank you, Your Honor.

14            THE COURT:  Lieutenant Sousa, appreciate that.  We're

15   going to take a 20-minute break so that everyone can relax.  If   14:57:48

16   you'd be back about 3:20, we'll resume.

17            (Recess taken.)

18            THE COURT:  Thank you.  Please be seated.

19            You ready to resume, Mr. Byrnes?

20            MR. BYRNES:  I am.                                        15:20:59

21            THE COURT:  Please do so.

22   BY MR. BYRNES:

23   Q.   Lieutenant Sousa, to clarify the testimony you were giving

24   prior to the break, what you remember your sergeants telling

25   you is that they didn't use that part of the ICE training we      15:21:12
```

```
 1   were discussing earlier, correct?

 2   A.  I don't remember the exact conversation, but after my 2009

 3   deposition where I wasn't 100 percent sure so I had to answer

 4   that question that I don't know if they were, I remember

 5   calling and clarifying that up, and I remember being clear that      15:21:30

 6   we were not using that part of the training and that particular

 7   indicator.

 8   Q.  And in fact, your understanding was that your sergeants and

 9   deputies had never used that indicator, correct?

10   A.  That was my understanding when I called to clarify.              15:21:48

11   Q.  Thank you.

12           Lieutenant Sousa --

13           THE COURT:  You know, I'm sorry, I just want to make

14   sure that I understand what you're saying.

15           So it's your understanding that even when your              15:21:56

16   officers were acting pursuant to their 287(g) authority when

17   they were 287(g) certified, they were not using the training

18   that they got from ICE about what acceptable indicators were,

19   insofar as they would have allowed the use of race as a factor?

20           THE WITNESS:  Basically, the training they received --      15:22:24

21           THE COURT:  Let me ask.

22           THE WITNESS:  Okay.

23           THE COURT:  Did you understand my question --

24           THE WITNESS:  Yes.

25           THE COURT:  -- or do you want me to rephrase it?            15:22:29
```

1    THE WITNESS:  No, I'm just trying to make sure.  They

2  weren't using that one indicator, it was my understanding, that

3  they were trained that they can use amongst other indicators to

4  determine alienage.  So that one indicator, ethnicity, they

5  weren't using.                                         15:22:43

6        THE COURT:  Okay.  Now I'm going to restate that,

7  because I want to make sure that I understand you.

8        It was your understanding after your 2009 deposition

9  when you talked to your two sergeants --

10       And your two sergeants at the time were Palmer and   15:22:53

11 Madrid, right?

12       THE WITNESS:  Yes, sir.

13       THE COURT:  And you talked to them after your

14 deposition?

15       THE WITNESS:  Yes, sir.                            15:23:01

16       THE COURT:  And it's your understanding, after your

17 deposition when you talked to them, that they told you they

18 were never using race as -- race or ethnicity as an indicator

19 of any kind, not even one amongst another factor, even when

20 they were acting pursuant to their 287(g) authority?         15:23:16

21       THE WITNESS:  Correct.  That was my understanding,

22 sir.

23       THE COURT:  All right.  So it would be your

24 understanding that even though -- well, let me ask you another

25 question.                                              15:23:26

1          Was it your understanding that in their 287(g)

2    training they were told that they could use race as one factor

3    in determining ethnicity?

4          THE WITNESS:  No, they cannot -- they could never use

5    it as one factor.  You had to use it as long as you had several    15:23:38

6    factors.  I don't know -- I'm not 287(g) trained, but you have

7    to have -- it had to be -- you could use that indicator or that

8    factor amongst several factors.

9          THE COURT:  That was -- that was what you understood

10   their ICE training to be.                                         15:23:53

11         THE WITNESS:  Yes, sir.

12         THE COURT:  And it was your understanding that they

13   never followed that training.

14         THE WITNESS:  They never followed -- they never used

15   that one training when it said you could -- you can use that      15:24:01

16   indicator.

17         THE COURT:  Thank you.

18         I'm sorry, I just needed to be clear, Mr. Byrnes.

19         MR. BYRNES:  Thank you, Your Honor.

20   BY MR. BYRNES:                                                    15:24:11

21   Q.  Lieutenant Sousa, the MCSO doesn't collect data about the

22   race or ethnicity about the people that it stops, correct?

23   A.  Correct.

24   Q.  The MCSO in fact doesn't make any attempt to determine the

25   race or ethnicity of drivers and passengers in vehicles that      15:24:23

1  are stopped, correct?

2  A.  If you're writing a citation it's there, and if it's

3  obvious you'll write it in.

4       From my experience as a deputy sheriff I never would

5  ask, because as soon as you asked, people got really defensive    15:24:39

6  and started asking, Why are you asking, if you didn't know?

7  Q.  So other than identifying in the citation race, the race or

8  ethnicity of the driver, MCSO does not make any other attempt

9  to determine the race or ethnicity of drivers and passengers,

10  correct?    15:25:00

11  A.  Currently in our automated system, no, sir.

12  Q.  In fact, you believe that the MCSO does not track race or

13  ethnicity because racial profiling is a nonissue at the MCSO,

14  correct?

15  A.  Correct.  In my experience I've never had a citizen    15:25:14

16  complain about anybody racial profiling.

17  Q.  You don't conduct, or you didn't when you were the head of

18  the HSU, the unit commander, you don't conduct any sort of

19  analysis of individual deputies' vehicle stops and contacts to

20  determine whether racial profiling might be occurring, correct?    15:25:32

21  A.  I never have, sir.

22  Q.  Your testimony was "I never asked"?

23  A.  I never have, sir.

24  Q.  Never have.

25       In fact, you testified in your deposition that you    15:25:48

```
 1   know for a fact that the arrest of Latinos during saturation
 2   patrols were not based on race, correct?
 3   A.  Correct, I believe so.
 4   Q.  And that's not based on whether you were actually present
 5   at the arrest of a Latino during a saturation patrol?
 6   A.  Whether I was there and watched the arrest?
 7   Q.  Right.  I mean, you know for a fact that the arrests were
 8   not based on race, completely independent of whether you were
 9   actually at the arrest, correct?
10   A.  Yeah, correct.
11   Q.  All right.  And in fact you were present for few, if any,
12   of the saturation patrol arrests, correct?
13   A.  I was at the CP most of the time.
14   Q.  The reason -- the reason why you know, when you testified
15   that you know that these arrests were not based on race, is
16   because you trust your people, correct?
17   A.  Correct, I trust my people.
18   Q.  You believe that racial profiling never occurs in the HSU?
19   A.  Absolutely, does not occur.
20   Q.  You don't believe it's even possible that racial profiling
21   might be occurring in the HSU, correct?
22   A.  Not even possible, sir.
23   Q.  You're not aware of the Sheriff's Office ever having
24   disciplined an officer for racial profiling, right?
25   A.  I'm not aware of it, sir.
```

15:26:02

15:26:19

15:26:34

15:26:48

15:27:04

1    Q.  Now I'm going to ask you a few questions about your

2    briefings before the saturation patrols.  In the briefings that

3    you gave, the first thing you did, first thing you did, is to

4    tell the participants not to racially profile, right?

5    A.  It was one of the first things I would do, sir.          15:27:19

6            But let's -- if I can backtrack, remember, this was

7    evolving and it got added in.  So I would say from early -- or

8    late 2008 is when -- to be proactive, is when I first actually

9    started addressing that in the briefings.  But we were

10   addressing it all the time with HSU as a proactive measure.     15:27:40

11   Q.  So in your briefings before saturation patrols starting in

12   roughly late 2008, the first thing that you did was tell

13   your -- the participants in the saturation patrol not to

14   racially profile?

15   A.  One of the first things, yes, sir.                          15:28:01

16   Q.  And in those briefings you told deputies that you trust

17   them?

18   A.  No.  I told -- I told deputies I'm not -- I'm not briefing

19   on this 'cause I think you racially profile; I'm briefing this

20   to remind you of what people are saying out there and being     15:28:16

21   proactive.

22   Q.  You told the deputies as part of this discussion of racial

23   profiling that they were doing their job, right?

24   A.  I told the deputies as part of that, don't even look in the

25   vehicles; we don't have to look in the vehicles.               15:28:31

1   Q.  But you also told them that they were doing their job?

2   A.  Yeah, correct, Go out there and do your job.

3   Q.  You trusted them and you believed they were doing their

4   job, right?

5   A.  Oh, I believe they were doing their job.                    15:28:40

6   Q.  And you told them that I know you're not racially

7   profiling.  You said that, didn't you?

8   A.  Yes, I did.

9   Q.  And you also told them that you would sound like a broken

10  record and bring it up anyway, right?                           15:28:51

11  A.  I probably used that language, yes.

12  Q.  In fact, the reason why you told your deputies not to

13  racially profile is so you can come in here and tell me that

14  you're being proactive, isn't that right?

15  A.  I was being proactive for everybody, sir, because the       15:29:05

16  perception was out there.  But yes, I also wanted to come in

17  here and tell you, sir.

18  Q.  And you wanted to come in here and tell the judge that you

19  were being proactive.  That's why you briefed on racial

20  profiling, correct?                                             15:29:17

21  A.  No, sir.  I wanted to come in here and tell the person

22  asking me the questions.

23  Q.  And you knew that you were under oath at this deposition?

24  A.  Yes, sir.

25  Q.  And you knew that at some point in time there could be a     15:29:26

```
 1   trial in this matter before a judge?
 2   A.  Yes, sir.
 3   Q.  And I just want to be clear.  So the reason why -- your
 4   testimony is that the reason why you told your deputies not to
 5   racially profile is so you could come in here and say that to       15:29:39
 6   me.
 7   A.  Being -- being proactive, due to the public perception.
 8           MR. BYRNES:  No further questions at this time.
 9           THE COURT:  Who's doing the cross-examination?
10           MR. CASEY:  I am, Your Honor.                               15:29:59
11           If I may have a moment again, please --
12           THE COURT:  You certainly may.
13           MR. CASEY:  -- to set up my computer.
14                       CROSS-EXAMINATION
15   BY MR. CASEY:                                                       15:30:56
16   Q.  Lieutenant, I'm going to jump around here, but I have some
17   questions for you in follow-up to what the lawyers have asked
18   you on the other side.
19           First of all, I'd like to show you an exhibit, 1113,
20   which is not yet into evidence, so I will offer it in a little      15:31:18
21   bit.
22           Is it popped up on your screen, sir?
23   A.  Yes, sir.
24   Q.  And if you would take a look at it.
25           Sir, Exhibit 1113 -- and let me know after you've read     15:31:34
```

1    the, reviewed the first page, I'll --

2    A.  I can barely make it out on this thing, sir.

3    Q.  All right.  Let me enlarge this, if I could, please.

4         You see the heading, though?

5    A.  I can see the heading, yes, sir.                          15:31:52

6    Q.  Okay.  Let me enlarge that.  And let me know after you've

7    reviewed that.

8    A.  Yes, sir.

9         (Pause in proceedings.)

10        THE WITNESS:  I've reviewed it, sir.                      15:32:19

11   BY MR. CASEY:

12   Q.  All right.  Now, let me turn to the next page, and I'm also

13   going to enlarge this for you so you can also see.

14        And let me know when you complete your review of that

15   document, sir.                                                 15:32:41

16        MR. BYRNES:  Your Honor?

17        THE COURT:  Yes.

18        MR. BYRNES:  This particular exhibit doesn't appear to

19   be in the pretrial order, either in the stipulated section or

20   the section identifying exhibits and objections.              15:33:03

21        THE COURT:  I was just noticing that myself.

22        Mr. Casey?

23        MR. CASEY:  Your Honor, let me look through here,

24   because it is in -- 1113 is on our list of defendants' exhibit

25   list filed with the Court.                                    15:33:22

1        THE COURT:  I'm not talking about that.  I'm talking

2   about the pretrial order.

3        MR. CASEY:  May I consult with a member of my staff

4   real quick?

5        THE COURT:  You certainly may.                        15:33:31

6        (Pause in proceedings.)

7        MR. CASEY:  Your Honor, I'm going to move on until we

8   can have an answer for you, because I don't understand why it's

9   here but not in the pretrial.  That's what it indicates.

10  BY MR. CASEY:                                              15:34:04

11  Q.  Let me move on and talk to you about the purpose of HSU.

12       You were asked a series of questions about what that

13  role was.  Tell us, what is the role of HSU?

14  A.  To interdict.  Interdict means go out on the road and find

15  human smuggling vehicles, any vehicle being used to smuggle    15:34:23

16  people into the country for profit, or take down drop houses.

17       And we also took the role on as a kidnapping squad.

18  Unfortunately, we became really good at kidnappings, and we

19  actually worked a good handful of kidnapping cases.

20  Q.  Was the role of human smuggling to target and go after      15:34:46

21  people in the United States that were present unlawfully?

22  A.  No, sir.

23  Q.  Now, let's turn just to a different subject, and that is

24  saturation patrols.  Well, let me back up and strike that.

25       Tell me how you managed and supervised HSU on general    15:35:09

1  terms.

2  A.  On general terms I tried to get out on the road as often as

3  I could, but my administrative duties, unfortunately, took me

4  from that, so I relied heavily on my sergeants in the field.  I

5  mostly took care of the administrative duties, the meetings    15:35:29

6  that went on during the day.

7        And then when these lawsuits started I was absolutely

8  bombarded with getting information to the lawyers, Freedom of

9  Information Act.  I -- I would say my last couple of years in

10 human smuggling was just nothing, being in the office and      15:35:46

11 looking for paperwork.

12 Q.  Is that one of the reasons you're no longer with HSU?

13 A.  I am absolutely no longer with HSU 'cause I got tired of

14 dealing with lawyers.  To include my own.

15 Q.  I do not blame you.  Duly noted for the record.           15:36:08

16 A.  Yes, sir.

17 Q.  Tell us how you supervised people on what has been known

18 during this trial as large-scale saturation patrols, those in

19 which HSU was joined by non-HSU MCSO members.

20 A.  I think HSU, our discipline has always been human          15:36:30

21 smuggling.  Any time you bring in specialized units to these

22 crime saturation patrols they're going to automatically focus

23 on what their discipline is.  If you bring in auto theft, then

24 these guys are going to focus on auto theft.  Human smuggling's

25 going to focus on human smuggling.  We brought narcotics guys   15:36:50

1    in, they focused on narcotics.

2    Q.  I'm sorry, I was talking to my --

3    A.  And then also as it evolved we actually took -- I would say

4    middle of 2009, late 2009, we actually took human smuggling out

5    of the op area and actually put them into smuggling corridors,          15:37:11

6    because we were noticing a lot of coyotes were actually trying

7    to move their human loads while the saturation patrols were

8    going on, so we were actually having human smuggling peripheral

9    to the freeways and highways.

10   Q.  All right.  Please, sir, tell me how would you supervise          15:37:42

11   people if you were in a command post.

12   A.  I would supervise them through the sergeants, the pe -- and

13   the folks in the field, and I would listen to the radio as best

14   I could.  Most of the time during these operations I was

15   running logistics.                                                     15:38:13

16          MR. CASEY:  What I'd like to do now is go back, Your

17   Honor.  I think I've figured out the problem.  We've removed

18   what I have as Exhibit 1113 as a duplicate of Plaintiffs'

19   Exhibit 137.

20          THE COURT:  So it's plaintiffs' 137.  Is it already in        15:38:39

21   evidence.

22          MR. CASEY:  We usually have this prepared, Your Honor,

23   and I apologize.

24          MR. BYRNES:  Your Honor, yes, it is.

25          THE COURT:  All right.                                         15:38:50

```
 1              MR. CASEY:  Thank you, Your Honor.

 2              And Mr. Byrnes, thank you for your courtesy.

 3   BY MR. CASEY:

 4   Q.  Sir, I'm now going to blow this up again.

 5              First of all, would you tell the Court what is        15:38:58

 6   Exhibit 137, as a general matter?

 7   A.  It looks like the ops manual for human smuggling that was

 8   effective in 2-19 of '08.

 9   Q.  And did you have any -- did you prepare this?

10   A.  I believe I prepared it or revised it with the help of my   15:39:13

11   sergeants and my deputies.

12   Q.  Why did you prepare that?

13   A.  We didn't -- when I came to the unit we didn't have a

14   mission statement, we didn't have an SOP.  There was nothing

15   there.  I felt we needed one.                                   15:39:32

16   Q.  Okay.  Now, specifically what I'd like to do is have you go

17   to the mission statement and read that for the record, please.

18   A.  The mission of the Maricopa County Sheriff's Office Human

19   Smuggling Unit, HSU, is to interdict human smuggling loads and

20   drop houses and to conduct investigations that result in the    15:39:49

21   successful prosecution of all suspects under A.R.S. 13-2319.A,

22   which would be the human smuggling statute.

23              HSU responds to all calls for service and incidents in

24   Maricopa County that may involve illegal aliens engaged in

25   criminal activity, and deploy a law enforcement strategy        15:40:08
```

```
 1  accordingly in an effort to reduce the amount of violent crime

 2  and peripheral crime associated with human smuggling.

 3          MR. CASEY:  Your Honor, I'd like to make a record, if

 4  I could, and ask the Court for permission.  It appears to me

 5  that Plaintiffs' Exhibit 137 only contains page 1.  Our exhibit     15:40:25

 6  1113 contains all the pages of this document, and we made a,

 7  what I'd call a flat-out mistake by removing this as

 8  duplicative, when in fact it was not duplicative.  I would like

 9  permission, Your Honor, to use my Exhibit 1113.

10          THE COURT:  Mr. Byrnes?                                      15:40:52

11          MR. BYRNES:  Could I review the exhibit?

12          (Pause in proceedings.)

13          MR. BYRNES:  No objection, Your Honor.

14          THE COURT:  All right.  Let me just ask, Mr. Byrnes,

15  if you have no objection can we then, to avoid a lot of             15:41:10

16  confusion, can we replace your Exhibit 137 with this exhibit

17  that has the multiple pages?

18          MR. BYRNES:  Yes, Your Honor.

19          THE COURT:  All right.  We will do that and you can

20  take care of it with Kathleen later.                                15:41:23

21          MR. CASEY:  May I approach the clerk?

22          THE COURT:  You may.

23          MR. CASEY:  Your Honor, I apologize for that.  I

24  should have been more careful in prescreening the exhibits

25  before they went out.                                               15:41:41
```

```
 1              Let me blow that up now.

 2              THE COURT:  Can I get 137, the first page, blown up

 3       while we're waiting?

 4              MR. CASEY:  Yes.

 5              I've cut off a little bit of the first words, Your      15:42:22

 6       Honor.

 7              THE COURT:  That's all right.

 8              MR. CASEY:  That's the substance of it.

 9       BY MR. CASEY:

10       Q.  All right.  Mr. Sousa, unless --                        15:42:33

11              MR. CASEY:  May I proceed, Your Honor?

12              THE COURT:  You may.

13              MR. CASEY:  All right.  Thank you, sir.

14              Okay.  Thank you very much.  We have everything

15       solved.  Thank you for your patience and for your staff's, Your  15:42:50

16       Honor.

17       BY MR. CASEY:

18       Q.  Exhibit 1113, which is actually 137 that we've substituted,

19       sir, you've told us that this is something that you in your

20       office prepared in HSU?                                     15:43:03

21       A.  Yes, sir.

22       Q.  And tell us generally, what was its intended purpose?

23       A.  So we had guidelines to operate under.

24       Q.  Was this document, Human Smuggling Unit standard operating

25       procedures, something that was a policy in your HSU?        15:43:18
```

1  A.  Yes, sir.  When I sent it out I had every

2  sergeant distribute it to their deputies, and I believe I also

3  wanted the sergeants to have them initial it that they've read

4  it.

5  Q.  And when you were going through it before we started the          15:43:34

6  debacle caused by my mistake, did you see anywhere in here

7  where it indicated that the mission of HSU was illegal

8  immigrants, undocumented persons?

9  A.  No, sir.

10  Q.  Now, what I'd like to do is I've shown you now page --          15:43:53

11  Exhibit 137, and this is page 2 of it.  And I'd like to

12  specifically show you down at the critical note.

13          Do you see the critical note?

14  A.  Yes, sir.

15  Q.  Would you please read that for the Court for the record.          15:44:15

16  A.  You get it a little bigger?

17  Q.  I'm going to do my best, sir.  Let's try this.

18  A.  Read it now, sir?

19  Q.  Please.

20  A.  At no time will a deputy call for a 287(g) certified deputy          15:44:40

21  based on the race or religion of the violator/suspect they are

22  out with.

23  Q.  Why did you include that that as a policy of the HSU?

24  A.  I wanted to make sure everybody, all the non-287(g)

25  deputies, were on the same page.          15:44:58

1    Q.  Why?

2    A.  Just to make sure they weren't calling 287(g) deputies --

3    being proactive, so they're not calling 287(g) deputies over

4    when they're not supposed to.

5    Q.  Was that a -- a policy that you had in order to try to    15:45:13

6    alleviate some of the concerns Mr. Byrnes was asking --

7    A.  It was once again being proactive, sir.

8    Q.  When you say proactive, what do you mean?

9    A.  Putting -- putting -- putting things in place so they don't

10    become a problem.  So being -- thinking ahead.    15:45:29

11    Q.  Okay.  Thank you, sir.

12         Now, let me turn to something else, some other

13    policies.  And I'm not going to ask you to read through these.

14    We're going to go through some.  But could you just tell me,

15    based on your initial review, what is this document,    15:45:55

16    Exhibit 1114?  And it my understanding has been stipulated into

17    evidence.

18    A.  Traffic law enforcement guidelines.

19    Q.  What is it?

20    A.  Guidelines on enforcing traffic.    15:46:06

21    Q.  Is it a policy and procedure of the MCSO?

22    A.  Yes, sir.

23    Q.  Do these policies apply to your deputies in their

24    operations?

25    A.  Absolutely.    15:46:19

1  Q.  Do they apply to non-HSU deputies participating in any

2  special operations?

3  A.  They apply to all deputy sheriffs, sir.

4  Q.  I'm going to show you the next number.  And again,

5  generally this is Exhibit 1115, which is admitted into          15:46:41

6  evidence.

7          What is this document?

8  A.  Once again, it's a policy.

9  Q.  And what is the -- what is it a policy on?

10 A.  Traffic violator contacts and citation -- issue of          15:46:52

11 citations.

12 Q.  Is this policy applicable to your members when they're

13 doing anything related to their duties at HSU?

14 A.  HSU is not above any MCSO policy.  We follow all MCSO

15 policies.                                                        15:47:09

16 Q.  So you follow this one, exhibit --

17 A.  Yes, sir.

18 Q.  You -- I know you know where I'm going, but let me finish.

19          Your people at HSU follow Exhibit 1115, do they not?

20 A.  Yes, sir.                                                    15:47:19

21 Q.  Okay.  Now, let's turn to Exhibit 1116, which has been

22 stipulated into evidence.  Would you tell the Court what is

23 this document, Exhibit 1116?

24 A.  MCS -- MCSO policy.

25 Q.  On what?                                                     15:47:47

1  A.  Search and seizure.

2  Q.  Does this policy apply to your unit?

3  A.  Yes, sir.

4  Q.  Does it apply to all MCSO deputies that may work on any

5  special operations with your unit?                        15:47:57

6  A.  Yes, sir.

7  Q.  Now I'm going to show you Exhibit 1117.  Would you tell us

8  what that is, please.

9  A.  MCSO policy and procedure, sir.

10  Q.  Okay.  And what is that a policy and procedure on?      15:48:22

11  A.  Arrest procedures.

12  Q.  Is that also applicable to your unit?

13  A.  Yes, sir.

14  Q.  Is it applicable to all MCSO deputies that work with you on

15  special patrols?                                           15:48:32

16  A.  Yes, sir.

17  Q.  When I say "you," I'm talking HSU.

18  A.  Yes, sir.

19  Q.  Okay.  Now what I'd like to do is shift to something else.

20  You were asked a series of questions about tip lines, hotlines.  15:48:40

21  Do you remember that?

22  A.  Yes, sir.

23  Q.  Would you tell the Court, generally, how are tips that come

24  in from anyone that may want to call in, how are those

25  handled -- how are those handled?                          15:48:53

1  A.  Sometimes we just hang up.

2  Q.  Okay.  I appreciate that.  But I need a little bit more

3  detail.

4  A.  The tips that would come in on a tip line, Officer Perla

5  Plata just would log them, would -- would log them and would     15:49:06

6  log them on a -- a flow chart or a log she had.

7          Letter tips would usually come to me, and depending on

8  the amount I would take them and divide them up between the

9  sergeants.  Those would be read.  I would read those.  If there

10  was a contact number, I always assigned someone to contact --    15:49:27

11  to make contact, if anything just for a PR contact, and advise

12  people of why we can't take action and give them a lesson in

13  constitutional law.  And I've done that personally a couple of

14  times.

15  Q.  Have you had experience where people have called in and      15:49:43

16  mentioned nothing but racial characteristics?

17  A.  I have, and I've hung up.

18  Q.  Have you had circumstances where they've given you a

19  combination of nothing but racial characteristics and then,

20  arguably, crime?                                                 15:50:02

21  A.  I remember one very specific person called me was

22  describing some crime but kept using the term anchor baby.  I

23  didn't know what that meant.  I asked her to explain, she told

24  me, and she told me what -- how she referred it to her, and I

25  told her:  Bye.  I don't want anything to do with you.          15:50:18

1  Q.  Why?

2  A.  Because what she was describing wasn't worth listening to

3  her offensive language and how she was describing people.

4  Q.  Who else handles the tip line other than yourself?

5  A.  The tip line is primarily handled by Officer Perla Plata.        15:50:31

6  She would be the one that would check it.  But I'd be also --

7  I -- command staff up on the 19th floor, which would be the

8  Sheriff's Office headquarters, a lot of times they would

9  actually just transfer people to my line, and that's how I got

10  a good sampling of these calls, because I would talk to these        15:50:49

11  people directly.

12  Q.  You were asked during your direct examination by

13  plaintiffs' counsel about a tip -- tip disposition sheets.

14          Do you remember those questions?

15  A.  Yes, sir.                                                        15:51:02

16  Q.  What I'd like to do is show you Exhibit 1122.  It's not yet

17  in evidence.  Would you please look at this.  Particularly --

18  this is Exhibit 1122.  It's page 8 of that, for the court

19  record.

20          Would you tell the Court, what is this document?            15:51:17

21  A.  It's the -- it's a disposition sheet.

22  Q.  Is this the form that you created for use in handling

23  those?

24  A.  Now that I think about it, I think I had Sergeant Palmer

25  create it, but I approved the form, but yes.                        15:51:31

```
 1   Q.  All right.  Did you -- did Sergeant Palmer create this form
 2   at your request?
 3   A.  Yes, sir.
 4   Q.  Does this exhibit, 1122 at page 8, does that fairly and
 5   accurately represent the type of form called tip disposition        15:51:46
 6   sheet?
 7   A.  Yes, sir.
 8   Q.  Is this an MCSO document that you folks at HSU used
 9   regularly in the course and scope of your business?
10   A.  Since we developed it, it was SOP.                              15:51:57
11         MR. CASEY:  Okay.  Now I'm going to move, Your Honor,
12   move to admit Exhibit 1122, only page 8.
13         MR. BYRNES:  Your Honor, plaintiffs object to the
14   admission of this exhibit on several grounds, including, there
15   are multiple documents included in this exhibit and thus should    15:52:13
16   not be submitted as a single exhibit, that those constituent
17   documents are unauthenticated and therefore lack foundation.
18   They're also hearsay.
19         THE COURT:  Well, first off, Mr. Casey, are you
20   planning on revising your exhibit?                                 15:52:36
21         MR. CASEY:  Yes, I will do -- in fact, I'm going
22   through several of these, and I'm only asking for the admission
23   of the ones that -- the particular pages.  Not all of 1122, and
24   only the ones that I address with him as examples of how
25   matters have been disposed of.                                     15:52:56
```

```
 1            THE COURT:  Well, under the Remarks section, are you

 2   going to review any of that for the truth of the matter

 3   asserted in the Remarks section?

 4            MR. CASEY:  Your Honor, no.  What I am going to do is

 5   use it with the witness and ask him to -- not that it's          15:53:08

 6   truthful information, but that the information is recorded

 7   there, and then how it was disposed of in juxtaposition with

 8   some other things that were determined to be founded versus

 9   unfounded.

10            THE COURT:  All right.  The objection is overruled.     15:53:27

11   The first page of this -- I mean, we're going to have to

12   re-mark the exhibit now because --

13            MR. CASEY:  Yes, sir.

14            THE COURT:  -- your --

15            MR. CASEY:  And my office, Ms. Henry will work on that   15:53:33

16   and she'll listen to my -- which ones I put in or ask -- move

17   in, and if you admit it, we will do it and work with your

18   clerk.

19            THE COURT:  All right.

20            MR. CASEY:  All right.                                  15:53:46

21            (Exhibit No. 1122A is admitted into evidence.)

22   BY MR. CASEY:

23   Q.  Now, sir, specifically --

24            (Off-the-record discussion between the clerk and the

25   Court.)                                                         15:53:51
```

```
 1              THE COURT:  I'm going to specify.  I'm informed it

 2   will be much more -- much easier for recordkeeping, since we've

 3   already admitted 1122, we're not going to -- we're not going to

 4   revise the admission of 11 -- or, I'm sorry.  1122 has already

 5   been marked.                                                      15:54:06

 6              MR. CASEY:  May we call it --

 7              THE COURT:  So we're going to call it 1122A.

 8              MR. CASEY:  Yes, sir.  Thank you.

 9         All right.  Let me make a note.

10   BY MR. CASEY:                                                     15:54:19

11   Q.  I'm going to show you, sir, this page that's on the screen

12   will be marked into evidence, and my understanding is the

13   Court's admitted it, 1122A.

14              THE COURT:  Correct.

15              MR. CASEY:  It's page 8 of 1122.                       15:54:30

16   BY MR. CASEY:

17   Q.  Sir, let's just go immediately to the disposition.  What

18   does it say was done on this case?

19   A.  Unfounded.

20   Q.  Okay.  Now, what I'm going to do, sir, is blow up the        15:54:39

21   remarks.  And I'm not asking you whether these are true or

22   false, but just looking at that, you see that there's a remark

23   about someone complaining of people speaking Spanish, roaming

24   and going all the time, a lot of cars.

25         Do you see that?                                           15:55:03
```

1    A.  Yes, sir.

2    Q.  Okay.  Would you read just silently to yourself the rest of

3    that?

4    A.  If I can make it out.

5    Q.  I know -- are you having trouble reading the legibility or        15:55:09

6    the size?

7    A.  No, it's the legibility of the print.  I'm worse, so I

8    guess I can't complain.

9            MR. BYRNES:  Excuse me, Your Honor.  May I ask

10    opposing counsel to identify the Bates number to the particular      15:55:23

11    page to which he's referring?

12            MR. CASEY:  I will pull it up for you, Counsel.

13            MR. BYRNES:  Thank you.

14            MR. CASEY:  You're most welcome.

15            Bates label is Melendres MCSO 016040.  And this is           15:55:48

16    actually page 8 of Exhibit 1122 marked into evidence as

17    Exhibit 1122A as in Alpha.

18    BY MR. CASEY:

19    Q.  Now, let me go back and blow this up for you, Lieutenant,

20    and let me know after you've reviewed it.                            15:56:10

21            Have you reviewed it, sir?

22    A.  Just a sec, sir.

23            Yes, sir.

24    Q.  Is there any mention of crime in this?

25    A.  On this one, smells pot, which I'm inferring is slang for        15:56:39

1   marijuana.

2   Q.  Other than that is there any basis for determining that

3   just because there's Spanish speaking there's any crime going

4   on?

5   A.  No, sir, speaking -- speaking just another language is not        15:56:53

6   a crime.  My mother would be in jail if that was the case.

7   Q.  You believe, based on your experience at HSU, that the

8   unfounded conclusion for this disposition was the correct one?

9   A.  Correct.  I believe that there's not enough here to look

10  into this.                                                          15:57:16

11  Q.  All right.  Now I'm going to show you, sir, also from

12  Exhibit 1122, and it's page 10 --

13              THE COURT:  I believe you mean 1122A.

14              MR. CASEY:  Yes.  I was going to do the full thing.

15  It's -- it will be now 1122A, at page 10.                           15:57:33

16              THE COURT:  Well, wait a minute.  We've only admitted

17  one page as 1122A.

18              MR. CASEY:  Yes.  And Your Honor -- excuse me.  I'd

19  like to -- I thought I was starting it the correct way.  I'm

20  going to pull up from 1122.  I'm going to try to get it into       15:57:52

21  evidence and see if I can also mark that as 1122B.

22              THE COURT:  All right.

23              MR. CASEY:  There's -- I have three or four of them.

24              THE COURT:  All right.

25              MR. CASEY:  Okay.  Thank you for your -- I know it's,    15:58:03

1    perhaps, confusing.

2    BY MR. CASEY:

3    Q.  All right, sir.  What I've pulled up here is a Bates

4    labeled document from Exhibit 1122.  It's not -- it's Bates

5    labeled MCSO 16042, and it is not yet admitted.          15:58:36

6            Is this also a tip disposition sheet?

7    A.  Yes, sir.

8    Q.  Is this something, again, that was regularly used in your

9    office?

10   A.  Yes, sir.                                            15:58:50

11   Q.  Does it fairly and accurately represent the types of

12   dispositions of tips received on the hotline?

13   A.  Yes, sir.

14           MR. CASEY:  Okay.  Again, this is from Exhibit 1122.

15   It's page 10.  I'd like to mark that, Your Honor, as          15:59:06

16   Exhibit 1122B for identification and then move it into

17   evidence, please.

18           MR. BYRNES:  Your Honor, plaintiffs object on the

19   ground of hearsay.  There's no foundation for the proximity in

20   time and creation of this exhibit as to its date.        15:59:25

21           THE COURT:  Okay.  I assume that you're not admitting

22   anything for the truth of the matter asserted?

23           MR. CASEY:  That is correct, Your Honor.

24           THE COURT:  All right.  So I'm going to overrule the

25   hearsay objection, but what about the foundation objection?   15:59:35

1       MR. CASEY:  I can lay more foundation --

2       THE COURT:  Well, I accept that the ex -- the exhibit

3  is what you say it is, which is a tip sheet.  But I don't have

4  any foundation that Lieutenant Sousa had anything to do with

5  filling out the tip sheet.                                    15:59:50

6       MR. CASEY:  Okay.  Your Honor, I'm spending more time

7  on this than is probably appropriate.

8  BY MR. CASEY:

9  Q.  All right.  I'm now going to turn to another subject, and

10  that's the saturation patrols.                               16:00:04

11       When you were at the command post, who else was

12  usually with you, sir?

13  A.  Usually a series of folks.  I could have Officer Perla

14  Plata, who was documenting the arrests as they came in.

15  Usually, I would have a -- one of the sergeants with me,      16:00:24

16  whether it be Sergeant Madrid or Sergeant Palmer.

17       I would also have one of the enforcement support

18  sergeants who were coordinating the logistics out at the scene

19  nearby.  I would have other folks that were coordinating the

20  volunteers.                                                   16:00:40

21  Q.  After the time period in which the Maricopa County

22  Sheriff's Office entered into a 287(g) agreement with the

23  federal government, after that time period and before its

24  revocation in October of 2009, did any ICE officials receive

25  operations plans before saturation patrols were conducted?    16:01:02

1    A.  When we had the agreement with them --

2    Q.  Yes.

3    A.  -- we copied them on everything.

4    Q.  Why?

5    A.  Almost everything.                                              16:01:13

6    Q.  Why?

7    A.  We wanted them to know full disclosure what we were doing.

8    Q.  At any time did you ever receive, either orally, via

9    telephone, or in person, any type of communication indicating

10   any concern with the operations plans that you sent to ICE?       16:01:26

11   A.  I don't recall any communications via e-mail or telephone.

12        MR. BYRNES:  Objection, Your Honor.  This line of

13   questioning counters Your Honor's ruling on the motion in

14   limine concerning ICE.  In particular it goes to the alleged

15   approval of ICE of the HSU's activities.                          16:01:44

16        THE COURT:  Okay.  We're going to take a break.  I'm

17   going to go review my motion in limine ruling.

18        (Recess taken.)

19        THE COURT:  The motion is overruled.

20        The witness may answer the question.                         16:07:44

21        MR. CASEY:  May the court reporter, Mr. Moll, please

22   read back my last question to the witness.

23        (The record was read by the court reporter.)

24        THE WITNESS:  No, sir.

25   BY MR. CASEY:                                                     16:08:15

1    Q.  Did you ever receive anything in writing that expressed any

2    concerns or criticisms about your operations plans?

3            MR. BYRNES:  Objection, hearsay.

4            THE COURT:  Sustained.

5    BY MR. CASEY:                                                          16:08:27

6    Q.  Sir, did any officials of the federal government -- in

7    particular ICE -- ever actually attend any saturation patrols?

8    A.  Yes, sir.

9    Q.  And what was your understanding of why they attended?

10   A.  I believe some upper management folks were at one to see        16:08:43

11   how we were operating, and then from time to time we would have

12   some of the ICE agents that were liaison stop by in some of the

13   other operations.

14   Q.  And do you remember their names, the ones that stopped by?

15   A.  I believe -- I'd be -- I'd be guessing, sir.  I can't say       16:09:00

16   with hundred percent certainty which ones.

17   Q.  Let me see if I can refresh your recollection.  The names

18   Troy Henley.  Jason Kidd.  Does that sound familiar or not?

19   A.  Yeah, those would be higher-ups.  I was talking about the

20   ICE liaisons, the lower agents is what I was --                     16:09:23

21   Q.  Thank you very much.

22   A.  You're welcome.

23   Q.  When -- how frequently, whether it's one time or a number

24   of times, how frequently would someone from ICE attend a

25   saturation patrol?                                                  16:09:37

1    A.  When we were under the 287(g) agreement, I would say

2    50 percent of the time.

3    Q.  And where would they be located that you knew that?

4    A.  They would come by the command post.

5    Q.  Do you know if they did anything else other than come by                16:09:52

6    the command post on 50 percent of the saturation patrols?

7    A.  I believe when the higher-ups from D.C., when they did that

8    tour at one of them, I was -- I was busy running and listening

9    to the radio on the operation, but I believe they -- I think

10   one of the chiefs gave them a tour through and was explaining            16:10:11

11   how we were doing business.

12   Q.  Now, under -- when those officers that exercised 287(g)

13   authority, were they supervised by MCSO people?

14   A.  Alternately, anyone that was 287(g) certified was basically

15   a federal agent and was under the supervision of ICE for those          16:10:33

16   powers.

17   Q.  What do you mean, for those powers?

18   A.  When it came to the 287(g) program, ICE liaisons would

19   super -- when it came to doing that particular work was

20   ultimately their supervisors.  MCSO supervisors would also be          16:10:55

21   there indirect, but anything that came up, any -- any issues

22   with the -- under the 287(g) program, then ICE liaisons would

23   step in.

24   Q.  Did any of -- any ICE federal official ever express any

25   concerns about how the MCSO 287(g) authorities were exercising         16:11:13

1   that authority?

2   A.  Not to my knowledge.

3           MR. BYRNES:  Object, hearsay.

4           THE COURT:  Sustained.  Stricken.

5   BY MR. CASEY:                                                16:11:27

6   Q.  Were you ever advised, orally or in any way, about any

7   concerns that ICE had about the 287(g) officers exercising that

8   authority?

9           MR. BYRNES:  Objection, hearsay.

10          THE COURT:  I'm going to sustain it.                 16:11:43

11          MR. CASEY:  Thank you, Your Honor.

12  BY MR. CASEY:

13  Q.  Sir, after saturation patrols were conducted, you indicated

14  that there were some types of documents that were prepared.

15          What were those documents?                           16:11:54

16  A.  Once a saturation patrol was concluded, we tallied up the

17  individual stat sheets into one stat sheet that compiled all

18  the data, quantitative data for the entire operation, and then

19  we usually would write an e-mail briefing with the notes.  And

20  then we would send it up the chain of command and copy the ICE  16:12:20

21  liaisons on it.

22  Q.  All right.  When you said you'd send it up the chain of

23  command, what do you mean by that?

24  A.  I would -- I would e-mail my chief and captains, if I had

25  one at the time, and copy the ICE officials.                 16:12:34

1    Q.  Now, when you say "ICE officials," why would you copy them

2    on this after-action report?

3    A.  We were 287(g), so they knew what we were doing.

4    Q.  All right.  Thank you, sir.  I'm going to turn to a

5    different subject.  And fortunately, these are all admitted          16:12:49

6    exhibits.

7            I'm going to show you Exhibit 111.  Specifically, I'm

8    going to show you page 8 of admitted -- admitted Exhibit 111.

9            Do you recognize this document, sir?

10   A.  Yes, sir.                                                        16:13:10

11   Q.  And can you tell us what it is?

12   A.  It's an ops plan.

13   Q.  All right.  And you're familiar with operations plans?

14   A.  Yes, sir.

15   Q.  And this is something that you've already told the Court is      16:13:20

16   what you would talk to in briefing before operations were

17   conducted?

18   A.  Yes, sir.

19   Q.  All right.  Now, one of the things that I'd like to do, and

20   I'm going to pull up here -- I'm not as good at this as             16:13:33

21   Mr. Braun, but it's going to have to make do.

22           I'm going to -- do you see the call-out?

23   A.  Conducting traffic stops on saturation patrol.

24   Q.  Is this something that you wrote?

25   A.  Either I wrote it or I directed someone to put it in.           16:13:56

1  Q.  And would you please read into the record what is contained

2  under the section, Conducting traffic stops on saturation

3  patrol.

4  A.  All sworn personnel will conduct all traffic stops in

5  accordance with MCSO policy and procedures, as well as training     16:14:10

6  received at the basic academy level.  Note:  At no time will

7  MCSO personnel stop a vehicle based on the race of the subjects

8  in the vehicle.  Racial profiling is prohibited.

9  Q.  Why is that last sentence, the note, in bold?

10 A.  Once again, being proactive, we want to make sure everybody     16:14:32

11 sees, everybody reads it.

12 Q.  Why is that sentence italicized?

13 A.  To get -- to grab everybody's attention, to be proactive,

14 make sure no one's doing it.

15 Q.  Now, what -- did you ever do any oral instructions in          16:14:48

16 addition to making these available in writing?

17 A.  During the course of the operation I would also talk about:

18 Don't racial profile, don't look into vehicles, and attempt to

19 be proactive.

20 Q.  Thank you, sir.                                                 16:15:08

21      I'm now going to turn to admitted Exhibit 127 and

22 we're going to look at the first page of that, sir.

23      You recognize this document?

24 A.  Yes, sir.

25 Q.  And that's another operations plan but for the southeast       16:15:21

1    valley?

2    A.  Yes, sir.

3    Q.  And I'm going to turn to the second page, and I'm going to

4    also do the call-out.

5        Is the call-out the same on this plan as the one you                16:15:36

6    just identified, the previous one, Exhibit 111?

7    A.  Yes, sir.

8    Q.  Again, was that the type -- strike that.

9        You described an evolution of warning of information

10   being given.  How did that come about, sir?                              16:15:55

11   A.  Being proactive.  When I originally took over in -- I

12   believe like Chuck Siemens, at the beginning was coordinating

13   it and putting the ops plans together.  Once again, once I took

14   over the -- there was that public -- there was that perception

15   out there due to media reports that we're racially profiling,            16:16:14

16   so we decided to be very proactive and address it.

17   Q.  I'm going to now show you a third operations plan, and

18   that's Exhibit 164, page 1 of that.  That's admitted into

19   evidence.

20       What -- where -- what saturation patrol does this                    16:16:31

21   cover?

22   A.  West valley, Buckeye, Avondale, Goodyear, Tolleson, Gila

23   Bend, Tonopah, all major thoroughfares within to include I-10,

24   MC-85, SR-85, I-8, Yuma Road, Wickenburg Road, and Van Buren

25   Road.                                                                    16:16:57

```
 1   Q.  All right.  Thank you.

 2           And again, I'm going to turn to the second page and

 3   I'm going to do a call-out on this section.

 4           Is this the same type of no racial profiling warning

 5   that was provided in the first two saturation patrol operation      16:17:09

 6   plans that we've gone over?

 7   A.  Yes, sir.

 8   Q.  Now I'm going to go to the next one, and this is

 9   Exhibit 169, already admitted into evidence.

10           Does this appear to you to be an operations plan for a      16:17:39

11   separate saturation patrol?

12   A.  Yes, sir.

13   Q.  And it says the Durango/35th Avenue corridor?

14   A.  Yes, sir.

15   Q.  All right.  I'm going to turn to the second page now, do        16:17:54

16   the call-out again.  Is the call-out the same type of no racial

17   profiling admonition that was in the first three saturation

18   patrol exhibits I've shown you?

19   A.  Yes, sir.

20   Q.  All right.  Thank you, sir.                                     16:18:10

21           I'm now going to show you Exhibit 174 admitted into

22   evidence.

23           And I'd like to draw your attention to something.

24   This appears to be an operations plan for the northwest valley

25   crime suppression patrol?                                          16:18:35
```

1    A.  Yes, sir.

2    Q.  And would you look at the date and tell me what the date

3    is.

4    A.  October 16th and 17th of 2009.

5    Q.  Now, the reason I pointed that out to you is you mentioned    16:18:43

6    earlier to plaintiffs' questioning that HSU evolves as things

7    changed.

8         Did I understand your testimony correctly?

9    A.  Yes, sir, the ops plans evolved.

10   Q.  All right.  Do you know when the federal government removed    16:18:58

11   287(g) field authority from the MCSO?

12   A.  I believe it was around October of 2009.

13   Q.  Okay.  Around the -- around the date of this operation

14   plan, was it not?

15   A.  Could be.  I believe so.    16:19:18

16   Q.  All right.  Now, the reason why I was going to show you

17   page 2, and I'm then going to first do a call-out up here.

18        That call-out looks like the familiar admonition that

19   you folks had been giving in saturation patrols, doesn't it?

20   A.  Yes, sir.    16:19:38

21   Q.  All right.  Now, there appears to be some additional

22   information down here.  What is this new section we see on this

23   date?  Says LEAR procedures, critical.  What is that?

24   A.  Based on losing the 287(g), we had to put in a new SOP --

25   Q.  Why did --    16:20:02

1   A.   -- standard operating procedure.

2   Q.   Why did you need to put in a new SOP?

3   A.   Because we were no longer making federal arrests under

4   federal authority.

5   Q.   You no longer had 287(g) authority.                    16:20:17

6   A.   Correct.

7   Q.   All right.  Would you read in the first point, that first

8   paragraph, into the record of the critical procedure.

9   A.   When a deputy sheriff has indicators as outlined above

10  leading him to believe, reasonable suspicion, a violator or   16:20:30

11  other subject he is in lawful contact with is in fact an

12  illegal alien in the United States, the deputy will call for a

13  field supervisor to respond to his location.

14  Q.   Why did you include -- well, first of all, did you write

15  this?                                                         16:20:46

16  A.   I don't believe so, sir.

17  Q.   Who did?

18  A.   I -- it would have been one of my sergeants, sir.

19  Q.   That would have either been Sergeant Palmer or Sergeant

20  Manuel Madrid?                                                16:20:58

21  A.   Yes, at my direction.

22  Q.   All right.  So at your direction?

23  A.   Yes, sir.

24  Q.   All right.  Why did you direct them to include this new

25  evolved information?                                          16:21:05

1057

```
 1   A.  I believe because there was a -- because we -- we were no

 2   longer 287(g).  I wanted to make sure -- it sounds like I

 3   wanted to make sure a supervisor was there, make sure we're

 4   playing within the rules and doing everything within the law.

 5   Q.  All right.  Now, I want to em -- I want to go back to that.    16:21:20

 6        Why is it important to play within the rules and

 7   follow the law?

 8   A.  Because we don't want to violate anybody's rights.

 9   Q.  Now, you were asked a question --

10        THE COURT:  Mr. Casey, go ahead and ask your question,    16:21:40

11   but can I ask you to put up the whole page again, please.

12        MR. CASEY:  Yes, Your Honor.  And I can -- I'm not

13   sure I can blow it up much more.

14        THE COURT:  That's fine.  I can read it.

15        MR. CASEY:  Thank you.  Do you want me to wait until    16:21:52

16   you're done?

17        THE COURT:  No, go ahead.

18   BY MR. CASEY:

19   Q.  You were asked a question by Mr. Byrnes about the buck

20   stopping.  Do you remember that?    16:21:59

21   A.  Yes, sir.

22   Q.  And he said the buck stopped with Arpaio?

23   A.  Yes.

24   Q.  Where does the buck really stop, sir?

25   A.  When it comes to enforcing the law in HSU and making sure    16:22:05
```

1    everything is done in accordance with the law, me.

2    Q.  Okay.  The buck stops with the law is what you're telling

3    us?

4    A.  Yes, sir.

5    Q.  All right.  Thank you, sir.                                    16:22:16

6            I'm now going to show you Exhibit 176, which is marked

7    into evidence.  You see that this is another operations plan?

8    A.  Yes, sir.

9    Q.  And do you see the time period there?

10   A.  Yes, sir.                                                      16:22:43

11   Q.  And that -- what is the time for the date of operation?

12   A.  November 16th, 17th, and 18th of 2009.

13   Q.  Is that before or after the federal government revoked

14   287(g) field authority?

15   A.  If my -- if my belief is correct that it was in October,      16:22:59

16   it's after.

17   Q.  All right.  Now, I'm going to turn the page 2.  Is the same

18   new LEAR critical procedures listed in this saturation patrol

19   document?

20   A.  Looks like that, sir.                                         16:23:17

21   Q.  All right.  Now, let me just go to a little bit different

22   subject.  You testified that during briefings you would make

23   these documents available to your officers that were

24   participating.

25   A.  They were available for them to read and they had to read     16:23:30

1    them before they signed in.

2    Q.  Why did you not just give them a copy?

3    A.  Simple fact is they would leave them all over the place,

4    the media would get ahold of them and I would be getting phone

5    calls.                                                           16:23:43

6    Q.  Okay.  Now, why is that a problem if we have an open

7    government, we want to have -- I forget -- sunshine.  We want

8    sunshine in government.  Why is that a problem for the media to

9    get ahold of it?

10   A.  Strictly 'cause of the -- just strictly 'cause of the phone  16:23:57

11   numbers.  I don't want to take those calls.  The PIOs are there

12   to address those -- those issues.

13   Q.  Now, let me ask you this.  If, let's say, a deputy we

14   clearly know from the evidence actually makes a traffic stop on

15   a day that a saturation patrol occurs, but he doesn't sign in   16:24:15

16   on the sign-in sheet, how do we know whether he actually read

17   or heard anything like this?

18   A.  Everyone has to come to the command post first before they

19   go out.

20   Q.  If a deputy did not sign in on a sign-in sheet does that     16:24:34

21   necessarily mean he did not attend the meeting?

22   A.  No, it does not.

23   Q.  Or have there been occasions that for whatever reason

24   people have not signed in, yet attended, in your memory?

25   A.  I'm sure people coming in late, coming in late.             16:24:49

1    Q.   Okay.

2    A.   There's always going to be a few stragglers.

3    Q.   Now, let me turn to another exhibit.  That's 11 -- 1110,

4    and I'm going to show you the first page.  That's -- excuse me.

5    That's not yet admitted into evidence.                    16:25:21

6            MR. CASEY:  I'm going to withdraw that question, Your

7    Honor.

8    BY MR. CASEY:

9    Q.   You were asked during -- well, first of all, there's been

10   evidence here that the plaintiffs have a statistician that has    16:25:43

11   done some work involving 13, or actually I think 11 -- 11

12   saturation patrols.

13           Assuming that's correct, sir, how many saturation

14   patrols, either large or small, were you involved in during

15   your time at HSU?                                         16:26:05

16   A.   Where I was actually involved and coordinating and being

17   there?

18   Q.   In any way while you were at HSU.

19   A.   I would say large ones with multiple units, divisions,

20   probably 20, 21.  And then I would say small ones, I would say    16:26:24

21   maybe the same number.  I'm not sure.

22   Q.   All right.  Thank you, sir.

23           And during what time period did that take place?

24   A.   Late 2007 till late 2011, I believe, was our last, sometime

25   in 2011 --                                               16:26:48

```
 1   Q.  All right.

 2   A.  -- or 2012.  No, it was 2011.

 3   Q.  Thank you very much, sir.

 4        Let me now turn to a different exhibit that is

 5   admitted, and that's Exhibit 82, and I'm going to turn to the    16:26:57

 6   8th page of that exhibit.

 7        Why did that happen?

 8        MR. CASEY:  Excuse me, Your Honor.  I'm hitting the

 9   wrong buttons.

10   BY MR. CASEY:                                                    16:27:18

11   Q.  Do you remember being asked about -- for clarity, you

12   recognize this as an arrest list?

13   A.  Correct.  Before we actually formed an actual arrest list

14   this is how we did.

15   Q.  And what I'm going to try to do is blow -- this is probably  16:27:30

16   as good as I'm going to get, sir.

17        You were asked about whether or not all, what appeared

18   to be the Hispanic surnames, were a concern to you.

19        Do you remember being asked that question?

20   A.  Yes, sir.                                                    16:27:51

21   Q.  Would you explain for us what is the abbreviation -- under

22   the charge section of Exhibit 2, page 8, what's "charge" mean?

23   A.  The offense.

24   Q.  All right.  What's DOSL mean?

25   A.  Driving on a suspended license.                             16:28:05
```

1    Q.  If someone is driving on a suspended license, does that

2    have any bearing whatsoever on their race?

3    A.  No, sir.

4    Q.  Does it have any bearing whatsoever on their ethnicity?

5    A.  No, sir.                                                    16:28:17

6    Q.  The next thing I'd like to ask you about is where it talks

7    about failure to ID.

8            Is that required under Title 28, to have ID?

9    A.  Yes, sir, if you're driving.

10   Q.  All right.  And failure to ID, that is what, failure to    16:28:30

11   produce a state-issued license?

12   A.  Failure to produce valid identification as recognized by

13   the state of Arizona.

14   Q.  So if a car is pulled over and the person doesn't have a

15   Title 28 recognized form of identification, that is something  16:28:47

16   they can be criminally charged with?

17   A.  Yes, sir.

18   Q.  And does that have any bearing -- if someone doesn't have

19   their ID on them, assuming they have one at all, does that have

20   anything to do with what race they are?                        16:29:03

21   A.  No, sir.

22   Q.  Have anything to do with what ethnicity they are?

23   A.  No, sir.

24   Q.  Have anything to do with their skin color?

25   A.  No, sir.                                                    16:29:11

1    Q.  What about DUI, does that have -- if someone's arrested for

2    DUI, does that have anything to do with race?

3    A.  No, sir.

4    Q.  Now, the other sections that's in here, there's something

5    called disorderly at the very bottom there.  That's for an                    16:29:20

6    Aaron.  What is disorderly?

7    A.  Disorderly conduct, you can have several underneath.  It --

8    it could be several different type of crimes that fall

9    underneath that statute, whether it could be getting in

10   somebody -- another citizen's face, calling them names, trying          16:29:40

11   to provoke them, that would be disorderly conduct.

12           To charge disorderly conduct, though, you gotta have a

13   victim.  The courts usually -- the courts usually expect the

14   police to tolerate some of that behavior.

15   Q.  All right.  Now, I'm going to turn to the next page that            16:29:56

16   you were shown here.  And real quickly, what I'd like to do --

17   and it's hard to tell, but item number 6, the name is what it

18   is, but it says under charge warrant slash something.  Can you

19   tell what that is?

20   A.  Warrant/failure to appear.  Didn't appear for his court            16:30:21

21   date, a warrant was issued.

22   Q.  So that means a court at some previous time to the stop had

23   issued an arrest warrant?

24   A.  Yes, sir.

25   Q.  And that -- does that have anything to do with race,               16:30:32

1   ethnicity, or skin color?

2   A.  No, sir.

3   Q.  All right.  Now, there are -- if we could go back up to the

4   first page there are a number of things characterized as

5   287(g), and the plaintiffs' lawyer asked you about that.          16:30:46

6           What does that indicate?

7   A.  That means that they -- during the course of the stop, the

8   287(g) officer had the indicators that someone was in violation

9   of federal statute --

10  Q.  Do you -- I'm sorry, I interrupted you.                       16:31:01

11  A.  Immigration violation.

12  Q.  Does that in your view have anything to do with race,

13  ethnicity, or skin color?

14  A.  No, sir.

15  Q.  What's it have to do with?                                    16:31:10

16  A.  Somebody being here illegally.

17  Q.  Okay.  Now, does it have -- does it have anything to do

18  with, since we're a border state, and our county goes fairly

19  far south, does it have anything to do with your experience

20  that you've learned that many of the people that are             16:31:24

21  undocumented are from south of the border from the Republic of

22  Mexico?

23  A.  In my -- in my experience, my first four years on human

24  smuggling, we had a large flow of coming in, folks being

25  smuggled in, drop houses.  We were taking down load vehicles,    16:31:43

```
 1   two or three a night.  We were extremely busy.
 2   Q.  All right.  So the 287(g) characteristic accompanying
 3   Hispanic surnames is a product of -- of what, our geographic
 4   location?
 5   A.  Yes, sir, could be.                                  16:31:59
 6   Q.  Now, if we were -- have you ever worked in the southeastern
 7   United States?  I know you're from Providence, Rhode Island
 8   originally.  You ever do law enforcement up there?
 9   A.  I was a reserve deputy down in Harrison County,
10   Mississippi.                                             16:32:17
11   Q.  So if we had a border, hypothetically, with China, or Haiti
12   across some water, Cuba across water, we might be dealing with
13   different ethnicities falling within unlawful presence.
14        Is that a fair statement?
15   A.  That would be the --                                 16:32:32
16        MR. BYRNES:  Objection, lacks foundation.  Calls for
17   speculation.
18        THE COURT:  Sustained.
19   BY MR. CASEY:
20   Q.  Now, let me turn, sir, to the same exhibit, 82.  It's going  16:32:38
21   to be the fifth page.  And this was what you described as a
22   stat sheet for the saturation patrol, was it not?
23   A.  Yes, sir.
24   Q.  And tell us again how many total -- first of all, when it
25   says all contacts, what does that mean?                  16:32:58
```

1  A.  All contacts can be -- it can be a traffic stop.  They

2  could be somebody you went into Circle K to get a cup of coffee

3  but then that person started talking to you about law

4  enforcement, or something came up about a law enforcement

5  issue.  It could be somebody you stopped to talk on the side of      16:33:15

6  the -- on the side of the road to give advice or get intel

7  from.

8  Q.  Okay.  And out of the 270 people, what does it mean when it

9  says warrant arrest, 8?

10  A.  That we made eight warrant arrests out of the 270.           16:33:29

11  Q.  So out of 270 contacts, there were eight people that you

12  somehow discovered that had arrest warrants issued for them.

13  A.  We cleared eight warrants.  Sometimes folks could have

14  multiple warrants.

15  Q.  And how many arrests were made for criminal reasons under      16:33:47

16  state law?

17  A.  Criminal arrests for adults, we got 37; a juvie, one; and

18  then criminal citations, 25.  Criminal citations is in lieu of

19  detention.  It's still considered an arrest; we just didn't

20  book.                                                            16:34:06

21  Q.  All right.  Now, traffic citations, is that for things like

22  when you -- speeding, equipment violations --

23  A.  Civil traffic violations that don't meet the criminal.

24  Q.  And out of the 270 contacts, how many traffic citations

25  were issued at this particular operation at Cave Creek and Bell     16:34:23

1    in March of 2008?

2    A.  156.

3    Q.  Now, out of the 270 stops, can you tell me how many people

4    were determined to be 287(g) or otherwise perhaps unlawfully

5    present in the country?                                      16:34:43

6    A.  Looks like about 27.  If you take the state charges with

7    the ICE detainers and the 287(g) arrests, it looks like 27.

8    Q.  Now, help me understand.  Why the breakup of the 27 between

9    the two categories, one being the state charges with ICE

10   detainers, and the second category being 287(g) arrests, no    16:35:03

11   state charges?  I don't understand.  Why --

12   A.  Under -- under the 287(g) arrests they made a probable

13   cause stop, ended up with the indicators, put their federal hat

14   and actually made the federal arrest, and those folks were

15   transported right to ICE.                                    16:35:23

16            On state charges with ICE detainers they never put

17   that hat on.  They arrested them and just booked them for the

18   state charge, and then at some point later somebody put an ICE

19   detainer on them.

20   Q.  All right.  So basically people unlawfully in the country    16:35:34

21   are either charged with the state crime or the 287(g)

22   administrative proceedings?

23   A.  If you were able to put that training in effect.

24   Q.  Okay.  And 27, that looks like it's about 10 percent of all

25   the people, all the contacts.                                16:35:51

A.  Looks like that.

Q.  All right.  Now, finally -- and then we're going to finish
up, I'll be done -- and that is, you said you trust your
people.

A.  Yes, sir.                                                    16:36:02

Q.  What is that trust based on?

A.  Working -- working with them for years.  Early on spending
a lot of time in the field.  Knowing -- knowing them
individually.

Q.  What about -- what about their training?  Does that have    16:36:16
any role in your trust?

A.  They were -- they were all -- they were all trained at the
basic academy level that you cannot racial profile.  The 287(g)
training, I'm not 287(g) training but I was told there was a
block on racial profiling when they went through 287(g).        16:36:35

        Also, we were extremely proactive with everything, and
especially 2007, 2008, 2009, when they were just all over the
media, all the perceptions of what the Sheriff's Office was
doing, morale would get down and we'd bring guys in and we'd
just reinforce, Hey, look.  Our primary concern is us.  It's    16:36:54
the state charges, that's all we care about.

        In the course of doing your job enforcing the state
charges, you come -- if you come across someone that you can --
and you get the indicators that you can put your federal hat on
and use your federal authority, I'm not going to tell people    16:37:10

1   not to do it.

2   Q.  Let me ask you this, and tell me if you're unable.  But

3   because of this lawsuit and press did you folks in HSU feel

4   like you were in a fishbowl being observed?

5   A.  No doubt.                                              16:37:25

6   Q.  What effect did that have on keeping you effective in your

7   operations?

8   A.  It would -- we had plenty of meetings bringing people in

9   and -- and reinforcing what we do do, and reminding people we

10  don't racially profile.  And -- and I think when it comes down  16:37:43

11  to it, the number one thing is that I think everybody forgets

12  is that whether you want to believe it or not, Human Smuggling

13  is a life-saving organization.  We save a lot of people that

14  were in violent drop houses.  We save -- we recovered a lot of

15  people being held against their will.  And that's why I stayed  16:38:01

16  there as long as I stayed.

17  Q.  After the federal government terminated or revoked the

18  field authority for MCSO in October of 2009, did there come a

19  time that any additional training of any type was provided to

20  HSU officers and other deputies out on patrol?              16:38:22

21  A.  Well, for deputy sheriffs I know a briefing board went out

22  briefing everybody that we no longer had 287(g), to cease all

23  that.  Also to stop using the -- the deputy sheriffs could no

24  longer use the ICE computers, the ICE systems, that were linked

25  right to ICE.                                               16:38:44

1    　　　　Also in-house, in Human Smuggling, we did the training

2    with the new LEAR protocol that we talked about here, law

3    enforcement response for ICE.

4    Q.  Was that online, did you say?

5    A.  No, the briefing -- the -- the training we did was, I          16:39:03

6    believe we met with the county attorney on how we were going to

7    do business since we lost 287(g), which was determined that in

8    the course of our traffic stops we'd do more interviewing in

9    the field before we -- without detention or detainment.  Also,

10   the reinforcement.                                                  16:39:24

11   　　　　Also, when we changed, we added it to the LEAR

12   protocol.  We put that one part in about supervisors going to

13   the scenes, just to make sure things were being done

14   appropriately.

15   Q.  At any time was there any online training that you folks       16:39:37

16   were mandatory -- it was required you folks to do?

17   A.  Yes.  May of 2010 there was mandatory racial profiling

18   training.

19   Q.  And tell me a little bit about that.  What did it cover?

20   A.  I wasn't required to do it, but I did do it.  And it just      16:39:55

21   basically covered some of the topics that we've talked about.

22   We don't stop people based on -- on the color of their skin.

23   We don't stop people based on religion.  We don't target areas

24   based on the ethnicity or the color of people's skin in that

25   particular area.                                                   16:40:15

1  Q.  And when do you believe that that online training began?

2  A.  I believe -- I believe it was May of 2010.

3  Q.  All right.  And who was required to attend that?

4  A.  I believe it was the online E-learning training, which was

5  mandatory training.  Online E-learning training is mandatory                16:40:31

6  for everybody from sergeant and below.

7  Q.  All right.  And even though you are a lieutenant, you still

8  took it?

9  A.  I still took it, yes, sir.

10  Q.  Do you know who prepared that training?                                 16:40:41

11  A.  Our training division did, I believe.

12  Q.  All right.  Let me -- I lied to you.  I do have a couple of

13  additional questions for you.

14          Are you involved in any way in preparing press

15  releases for Sheriff Arpaio on the 19th floor?                             16:41:02

16  A.  No, sir.

17  Q.  Do you see his press releases after the fact?

18  A.  In the last six, seven, eight months, they started a new

19  procedure where they actually send the press releases out

20  office-wide now, as like a briefing board, but prior to the                16:41:19

21  last six or seven months, no.

22  Q.  Did any public statements while you were -- strike that.

23          While you were at HSU, did any statements by Sheriff

24  Arpaio ever in -- ever influence you in any way about how you

25  were to conduct operations, or supervise, or manage your                   16:41:40

1    people?

2    A.  Absolutely not.  That's why I said at HSU it stops with me.

3    And what I meant by that is that I tell my people, We're going

4    to focus within the rules.  We're going to do our jobs.  We're

5    not even going to worry about this illegal immigration stuff.          16:41:55

6    We're just going to do our jobs.  And if the 287(g) folks did

7    come across people in the course of doing their jobs, I also

8    wasn't going to tell them not to use that training.

9    Q.  Now, let me also talk to you a little bit about things on

10   television, since the sheriff appears to be on television a            16:42:10

11   great deal.  Is there anything -- have you ever seen him on

12   television commenting, quotings, making statements?

13   A.  I've never seen him make a speech, but I've -- I know every

14   time -- I've been around every time he talks.  It's a topic

15   that comes up and he does talk about it.                                16:42:30

16   Q.  Anything that you've ever heard in any comments off the

17   cuff, whatever it might be, that he's made, either on the

18   television or to reporters, has that ever influenced any law

19   enforcement decision, supervision, or management that you have

20   done in HSU?                                                            16:42:46

21   A.  Absolutely not.

22   Q.  Okay.  Now, there was some testimony earlier when Brian

23   Sands was in here that there are some operational details in

24   saturation patrols that are simply not given to the 19th floor

25   public information officer.                                             16:43:02

1      Were you aware of that?

2  A.  Yes.  If we have drug units working with us, these guys

3  work undercover; we've had our civil division working warrants

4  during some of these.

5  Q.  I think this might be it, Lieutenant.                          16:43:16

6      During the course of your career at HSU have you come

7  across load vehicles of non-Hispanics?

8  A.  Yes.

9  Q.  And would you describe for us what races or ethnicities, to

10  the extent you were able to determine, or nations of origin     16:43:34

11  where these people were from?

12  A.  Off the top of my head, the one I can think of was a load

13  of Chinese nationals.

14  Q.  Do you remember when that was?

15  A.  I'd be guessing, sir.  I'm not sure.                         16:43:49

16  Q.  Okay.  Does race or ethnicity play any role whatsoever in

17  any of your decisions as lieutenant of HSU?

18  A.  Absolutely not.

19  Q.  Has it ever?

20  A.  Absolutely not.                                              16:44:02

21  Q.  I know you're not there again -- you're no longer there,

22  but at any time did you have any concerns, given the fishbowl

23  that you were in, that your deputies may be improperly relying

24  on or using race or ethnicity to make law enforcement

25  decisions?                                                      16:44:21

1    A.  I have -- I have no reservations whatsoever they did not

2    racially profile.

3            MR. CASEY:  All right.  Thank you, sir.  I have no

4    other questions.

5            Thank you for your patience and the Court's indulgence    16:44:32

6    with my exhibit issues.

7            THE COURT:  No problem.

8            Let me ask you, Mr. Byrnes, how long do you think you

9    have on redirect?

10            MR. BYRNES:  Yeah, I would say 15 to 20 minutes.    16:44:41

11            THE COURT:  Let's go, Mr. Byrnes.

12            MR. BYRNES:  Noticing it was 4:44, so...

13                        REDIRECT EXAMINATION

14    BY MR. BYRNES:

15    Q.  Lieutenant Sousa, can you please direct your attention    16:45:16

16    again to the Exhibit PX 82?  In particular, to page 1851 in the

17    lower right.

18            You'll note, if you look at lines 11 and lines 25 that

19    in both those instances the charge is listed as fail or failure

20    to ID.    16:45:55

21            Do you see that?

22    A.  Yes, sir.

23    Q.  That means that the charge is that the person failed to

24    provide legal identification, correct?

25    A.  Yes, sir.    16:46:02

1    Q.  And then if you look -- follow those rows over to the PC

2    column, you'll notice that both of them begin with pass, and

3    there's a number, in one case 12 and in one case 24, is that

4    correct?

5    A.  Yes, sir.                                          16:46:18

6    Q.  Failure to carry identification as a passenger in a car is

7    not a crime in Arizona, is it?

8    A.  Unless you're committing another violation.

9    Q.  But the failure to present legal identification is itself

10   not a crime, correct?                                  16:46:30

11   A.  If you're a passenger in a vehicle not in violation, no,

12   sir.

13   Q.  Mr. Casey showed you a number of operations plans, and one

14   in particular, the operations plan marked Exhibit 169, and if

15   you'll look at the second page of that, which is labeled 57031.  16:46:55

16        And Mr. Braun, can you please call out the third

17   paragraph.

18        Lieutenant Sousa, do you recall testifying about that

19   second sentence, the note that is in italics?

20   A.  Yes, sir.                                          16:47:21

21   Q.  Did you add that line to the -- to this operations plan?

22   A.  Did I personally add it?

23   Q.  Yes.

24   A.  I don't recall, sir.

25   Q.  Do you believe that perhaps either Sergeant Madrid or       16:47:38

1   Sergeant Palmer added this line?

2   A.  They probably did, but at my direction.

3   Q.  There was a point in time where you handed over the

4   creation of the operations plans to your sergeants, is that

5   right?                                                        16:47:51

6   A.  Yes, sir.

7   Q.  And this addition was in response to public criticism

8   concerning potential racial profiling at the Sheriff's Office,

9   correct?

10  A.  Correct, being proactive.                                16:48:03

11  Q.  Mr. Casey asked you a number of questions toward the end of

12  his cross-examination concerning training, and one you

13  responded concerning in-house HSU training with -- with regard

14  to a LEAR protocol.

15          Do you remember that testimony?                      16:48:28

16  A.  Yes, sir.

17  Q.  Was that LEAR protocol provided by Sergeant Palmer?

18  A.  I believe he typed it up, yes, sir.

19  Q.  I'd like to -- you also testified concerning ICE, and in

20  particular, the attendance at some aspects of some saturation   16:48:46

21  patrols of a number of ICE agents, one of which was Jason Kidd,

22  is that correct?

23  A.  Yes, sir.

24  Q.  Who is Mr. Kidd?

25  A.  When I first came to the unit he was our agent liaison, and  16:48:58

1    then while I was in the unit I believe he was promoted to ASAC,

2    assistant special agent in charge.

3    Q.  Are you aware that Mr. Kidd gave a deposition in this case

4    on October 21st, 2010?

5    A.  I think he did, I'm not sure.                           16:49:17

6    Q.  Are you aware that Mr. Kidd testified that there was no

7    basis, quote, no basis for ICE, quote, to conclude one way or

8    another whether there was racial profiling during saturation

9    patrols?

10          MR. CASEY:  Your Honor, this is improper impeachment.   16:49:32

11          THE COURT:  I'm going to sustain that.

12   BY MR. BYRNES:

13   Q.  Do you recall Mr. Kidd's role concerning the saturation

14   patrols that he did attend?

15   A.  No, I don't, sir.                                       16:49:48

16   Q.  But his role was not super -- he was not a supervisor of a

17   saturation patrol, correct?

18   A.  No, sir.  For MCSO, no, sir; but for federal guys, yes,

19   sir.

20   Q.  He stayed near the command post, correct, as you recall?   16:50:03

21   A.  I couldn't tell you where he was, sir.

22   Q.  Mr. Kidd was not on -- did not observe traffic stops,

23   correct?

24   A.  I don't believe he ever went out on patrol, sir.

25   Q.  You testified earlier concerning the tip line, and in     16:50:18

1    particular the -- you testified concerning tip disposition

2    sheets.

3            Do you recall that?

4    A.  Yes, sir.

5    Q.  And during -- when I questioned you earlier you had talked    16:50:37

6    about, with regard to some disposition sheets, you would write

7    in a category in addition to founded and unfounded that was

8    info, and sometimes you would check that, correct?

9    A.  Yes, sir.

10   Q.  And what did the designation "info" signify, again?    16:50:51

11   A.  That signified to me somebody was just giving us

12   information and we weren't going to do anything with it.

13   Q.  How, if at all, did that differ from the unfounded

14   disposition designation?

15   A.  'Cause I would get tips where citizens were calling in and    16:51:11

16   just, Hey, have you looked at this, or have you seen this, or

17   have you tried -- giving us advice.

18   Q.  That would be -- you would -- you would mark those as info?

19   A.  Info only.

20   Q.  Info only?    16:51:28

21   A.  Also we got tips.  I mean, we would get tips:  I hate the

22   sheriff.  I like the sheriff.  Info only.

23   Q.  Do you recall ever requesting that Ms. Plata file a tip

24   from a woman Lesli, last name starting with F, in a file under

25   36th Street and Thomas?    16:51:50

```
 1   A.  No, I'm not going to be able to recall specifics.

 2   Q.  Might it refresh your recollection if I informed you of the

 3   substance of Ms. F's complaint?

 4   A.  Yeah, you can.  I've read so many of them, sir, but...

 5   Q.  Okay.  So I'm reading this.  This is an e-mail -- in fact,      16:52:07

 6   let me provide a copy.

 7            MR. BYRNES:  May I approach the witness, Your Honor?

 8            THE COURT:  You may.

 9            MR. BYRNES:  And this is a document that has been

10   marked for identification as Impeachment 560.                      16:52:32

11   BY MR. BYRNES:

12   Q.  I note that the exhibit that I am showing you is redacted,

13   so this individual's last name cannot be seen, or e-mail.

14            THE COURT:  You want to give me the correct number?

15            MR. CASEY:  I'd like to get a copy of that.  May I,        16:52:57

16   please?  I'm not sure I understood, Your Honor, the -- what

17   exhibit number it was.  56B or --

18            THE COURT:  Well, if we're marking it as an

19   impeachment -- marking it for purposes of impeachment it is --

20            What's the number, Kathleen?                              16:53:15

21            THE CLERK:  454.

22            THE COURT:  454.

23   BY MR. BYRNES:

24   Q.  Okay.  And first if you could please turn to the second

25   page of Impeachment Exhibit 454.  Lesli F writes:  Please do       16:53:28
```

1    something about the, quote, illegals in front of the Wal-Mart

2    slash Home Depot entrance driveway.  There must be at least 30

3    of them lining the drive into Wal-Mart slash Home Depot

4    yesterday at approximately 11:30 a.m.  I am tired of driving

5    with aliens waving and cat-calling as I drive past them to get    16:53:52

6    to Thomas Road.  Another, quote, sweep is in order.  Thanks,

7    Lesli F.

8             Do you see that?

9    A.  Yes, sir.

10   Q.  Does that refresh -- and please turn to the first page of    16:54:01

11   the document.

12             Is that your handwriting, Lieutenant Sousa?

13   A.  Yes, sir.

14   Q.  And at the bottom under Detective/Supervisor, that's your

15   signature?                                                        16:54:19

16   A.  That's my initials, yes, sir.

17   Q.  And in the Remarks section of this exhibit it reads:

18   Perla, please file under 36th Street and Thomas fold.

19             Am I reading that correctly?

20   A.  Yes, sir.                                                     16:54:34

21   Q.  And does fold refer to a folder?

22   A.  Oh, I don't know how she was doing it.  However she was

23   tracking it.

24   Q.  But does reviewing this document refresh your recollection

25   that you marked this, on this tip disposition sheet, info, and    16:54:48

```
 1   then forwarded it to Ms. Plata to file under 36th Street and

 2   Thomas?

 3   A.  Yes, sir.

 4   Q.  Turn to the second page just real briefly.  Nothing in this

 5   e-mail refers to a crime, correct?                               16:55:06

 6   A.  Well, not necessarily, sir.  You got someone cat-calling

 7   somebody.  I mean, that could be criminal nuisance.  I mean, it

 8   could -- I mean, somebody cat-calling, cat-calling can mean a

 9   lot of things, and that's probably why I didn't unfound it and

10   just put it in info, 'cause if you get multiple tips -- that's   16:55:22

11   my whole thing.  That's why we're not taking any action here.

12   File it under that, because if I get multiple tips about the

13   same type of behavior in the same area, because for 36th Street

14   and Thomas, if I remember correctly, we were getting tips about

15   not just cat-calling, defecating, urinating, stuff like that.    16:55:40

16   So all together.

17        That's why -- it's not -- we're not taking action on

18   this, but based on the fact the woman is saying she's driving

19   by there and to me she's being cat-called, we're gonna -- we're

20   gonna file it just in case we need it.                           16:55:59

21   Q.  In Arizona cat-calling is not a crime, is it, Lieutenant?

22   A.  When you say cat-calling, but I know what that means.

23   Q.  You say you do not know what that means?

24   A.  I've heard that term before.  It's basically a woman

25   walking down the street and people whistling and gawking at      16:56:15
```

1  her.

2  Q.  And in Arizona cat-calling is not a crime, correct?

3  A.  That could be disorderly conduct, sir.  Cat-calling could

4  fall under disorderly conduct.

5  Q.  Lieutenant Sousa, I asked you earlier whether the buck          16:56:30

6  stops with Sheriff Arpaio and you told me that, no, it doesn't.

7  You said that at HSU the buck stops with you and not the

8  sheriff, correct?  Or it did until you changed jobs, correct?

9  A.  No, it's -- the buck stops with me when it comes to working

10  within the rules.  I don't go by press releases.                   16:56:51

11  Q.  That's not what I asked you.  At the Human Smuggling Unit

12  the buck stops with you and not with Sheriff Arpaio, correct?

13  A.  The way we do business, it stops with me.

14  Q.  If Chief Sands told you when you were the head of the HSU

15  to conduct a saturation patrol, you would do it, wouldn't you?    16:57:10

16  A.  I would -- without reason?

17  Q.  Has Chief Sands told you to do things without reason in the

18  past?

19  A.  No, he hasn't.

20  Q.  Okay.  So let's say Chief Sands comes to you and tells you     16:57:25

21  to do a saturation patrol, and the reason is he's told you to

22  do a saturation patrol.  Would you do it?

23  A.  And if I -- a police agency is a paramilitary agency, we

24  have to obey orders.  We have policies and procedures.  If the

25  orders are lawful and I have no reason to believe they're         16:57:40

```
 1   unlawful, I have to follow them.
 2   Q.  And similarly --
 3              MR. BYRNES:  Actually, Your Honor, before I continue,
 4   we move the admission of Impeachment 454 as an impeachment
 5   exhibit.                                                        16:57:58
 6              MR. CASEY:  No objection, Your Honor.
 7              THE COURT:  Okay.  454 is admitted.
 8              (Exhibit No. 454 is admitted into evidence.)
 9   BY MR. BYRNES:
10   Q.  Lieutenant Sousa, if Sheriff Arpaio told you to do a --    16:58:07
11   perform a saturation patrol and the reason was that he had told
12   you to do a saturation patrol, you would do a saturation
13   patrol, wouldn't you?
14   A.  I would not.  I would check with my chiefs.
15   Q.  So you would -- you take direction -- if there were         16:58:24
16   conflicting direction from Chief Sands and Sheriff Arpaio, you
17   would take direction from Chief Sands, correct?
18   A.  I would let the chief deal with it.
19   Q.  You would tell Sheriff Arpaio, I'm sorry, Sheriff, I'm not
20   going to take your direction.  I'm going to defer to           16:58:43
21   Chief Sands, is that right?
22   A.  If I was told to do a saturation patrol by the sheriff,
23   I -- which I never have -- I would go to Chief Sands and say,
24   Hey, this is what I'm being told.  Is this -- is this what
25   we're doing?                                                   16:58:56
```

```
 1              MR. BYRNES:  No further questions.

 2              THE COURT:  Thank you, Lieutenant.

 3              THE WITNESS:  Thank you, sir.

 4              Am I dismissed?

 5              THE COURT:  You are.                         16:59:11

 6              Anything we need to raise before the weekend?

 7              MR. CASEY:  Yes, Your Honor.

 8              THE COURT:  All right.

 9              MR. CASEY:  Your Honor, I just want to -- I realize

10    the Court's timing is the one that governs here.  I think both   16:59:30

11    sides are probably keeping track of time.  By my rough

12    estimate, plaintiffs are at 13 hours and eight minutes, plus or

13    minus --

14              THE COURT:  What's your estimate?

15              MR. CASEY:  13 hours, eight minutes of time.  Now,     16:59:44

16    again --

17              THE COURT:  Total for the day, but I'll check.

18              MR. CASEY:  The Court's time is the one that governs,

19    I understand that.  So I'm just throwing these things out as an

20    advocate.  But nine hours and 24 minutes for defendants.        16:59:56

21              THE COURT:  Um-hum.

22              MR. CASEY:  I am concerned -- now, I think both

23    parties have worked cooperatively to make sure that we don't

24    call back witnesses again in the defense case.  I have

25    Deputy Ratcliffe, Deputy Armendariz, former Deputy Beeks, two   17:00:11
```

1   ICE officials via deposition Jason Kidd, Alonzo Pena, and two

2   experts, Mr. Click and Mr. Camarota.  I also know that there

3   are at least two witnesses, one being an expert for the

4   plaintiffs, that need to go.

5         Next week we are scheduled to go on the 31st, Tuesday,     17:00:30

6   and the 1st.  I am very concerned about our ability right now

7   to be able to put on our witnesses and finish it in that time

8   period the way that we're going, and even if you were to extend

9   it, as you said, to the 2nd.

10        I wanted to make that record because I'm very     17:00:51

11  concerned, we have the -- obviously, the Court has said we have

12  the right to bring in people that they don't call in their

13  case.

14        So I'm not asking for the Court to make any ruling,

15  'cause there's nothing to rule on at this point, but I do think     17:01:08

16  the plaintiffs' case needs to come to an end at a reasonable

17  time that allows us within the framework that you're ending

18  5:00 p.m. on August 1st, I think we're entitled to more than a

19  day to present our case, Your Honor.

20        MR. YOUNG:  Your Honor, we'll have to confirm the     17:01:27

21  timing, and obviously Your Honor will look at it, too.  But it

22  seems to me, based on Mr. Casey's calculations, that we have

23  seven hours left for plaintiffs, roughly.  Defendants have

24  roughly 10 hours.  That's 17 hours.  And if we actually go

25  three days at six hours, or six and a half hours a day, it is     17:01:48

1    possible to fall within that.

2              I certainly share Mr. Casey's concern that we need to

3    look at this.  I think over the next few days both parties will

4    look at their cases, and I'm certain that we can confer with

5    each other before we meet again on Tuesday morning and let Your      17:02:05

6    Honor know if we all think there are issues about the overall

7    schedule.

8              We do have on the plaintiffs' side two hours of

9    rebuttal, so I want to get that in there.  But I am happy to

10   work with -- or we are happy to work with defense counsel to        17:02:26

11   make sure that we can get this case done in a very efficient

12   way.

13             THE COURT:  All right.  Well, you've -- you've made

14   your records.

15             Let me just say, and -- and I've said it before, I        17:02:41

16   want to say it again, I have appreciated the professional

17   courtesies that counsel have extended to each other in a case

18   which is both highly disputed and also apparently of some

19   interest to the public, understandably so.

20             I have given you your hours restrictions based on the      17:03:06

21   witnesses that you've set forth, and partly because I wanted to

22   restrict the extent to which this case was going to be tried to

23   the press rather than to me.  To some extent that has

24   nonetheless happened, in my judgment, and -- and both sides

25   have participated in it a little bit, at least.                       17:03:24

1    That is not by the way of criticism.  I understand

2  that the parties have an obligation to their clients to put --

3  to -- to inform the public to the extent they think that it is

4  necessary to do so, but it doesn't mean I'm going to extend

5  your time.                                                          17:03:48

6    If you've used it well and we arrive at the end of

7  this case, I am keeping Thursday open and we will push hard on

8  Monday and Tuesday -- or, I'm sorry, Tuesday-Wednesday.  I will

9  look at my calendar.  I can probably free up another day fairly

10  quickly if necessary, and we can talk with you about that on    17:04:03

11  Tuesday.  But I'm not saying that I'm going to extend past

12  Thursday of next week, depending upon whether the parties use

13  their time wisely.

14    How many witnesses do you have left in your case,

15  Mr. Young?                                                         17:04:17

16    MR. YOUNG:  Possibly three, Your Honor.

17    THE COURT:  So you have three witnesses left in your

18  case?

19    MR. YOUNG:  We are going to -- we are going to look at

20  this based on how things have gone and who's come in and make    17:04:28

21  some assessments about what we do going forward, because we --

22  we do want to try to allow the Court to finish this trial in

23  the time frame that it has set aside.

24    THE COURT:  All right.  Well, I will -- I will join

25  the parties in looking at what is necessary, if it is            17:04:43

1    necessary, and we can discuss this Tuesday morning next week.

2          But -- and again, I -- I commend you both for behaving

3    with courtesy and professionalism with each other.  But that

4    doesn't mean I'm going to open up the floodgates and let

5    this -- let this case go hog wild.  I'm not hearing you asking          17:05:03

6    for that, but I'm just advising you.

7          Yes, Mr. Casey.

8          MR. CASEY:  Yes, Your Honor.  I'm not asking you to

9    extend it.  I'm just telling -- sharing, not telling you

10   anything, I'm sharing with you that my assumption was the 2nd          17:05:19

11   had to be earned by the parties, and I've heard what the Court

12   has said about perhaps we've not done that as well as we should

13   have.  I realize that was not a criticism.

14         But the concern is that I hear three witnesses, and

15   the way it's going, that would leave us with one day on the          17:05:39

16   1st, and I would strenuously object to that.

17         The other thing, too --

18         THE COURT:  Well, hold it.  We have what?  Let's focus

19   here.  I don't have my magic little calendar up here.

20         MR. CASEY:  The 31st is Tuesday; the 1st is Wednesday.          17:05:53

21         THE COURT:  And I've kept the 2nd open.

22         MR. CASEY:  Yes, sir.

23         THE COURT:  And I assume all parties have, since I

24   indicated that that would be --

25         MR. CASEY:  Yes, sir.          17:06:01

```
 1              THE COURT:  All right.

 2              MR. CASEY:  And I just wanted to -- I don't think we

 3     need to go beyond that, but I wanted to remind the Court --

 4              THE COURT:  You wanted to make sure the 2nd is open?

 5     The 2nd is open.                                                   17:06:11

 6              MR. CASEY:  Yes, sir.  But to the extent you were

 7     suggesting it go beyond the 2nd, I would object to that only on

 8     the grounds that I did mention when you set this, I think in

 9     March, I'm representing a 12-year-old in a wrongful death that

10     starts next Tuesday.                                               17:06:23

11              THE COURT:  All right.  Well, if we need to we'll

12     get -- I do not want to drive Mr. Moll into the ground.  I

13     think it's really important to acknowledge how difficult it is

14     to do his job, but I may line up supplemental court reporters

15     if we need to do seven hours on -- on those days.                 17:06:38

16              MR. CASEY:  Thank you, Your Honor.

17              THE COURT:  And I will also point out, have we

18     discussed -- what do parties want to do by way of closing?  I

19     know we discussed this at -- somewhat at the final pretrial

20     conference, but have you considered that?                         17:06:51

21              MR. CASEY:  My understanding is the Court has ordered

22     that there will be written briefings instead of oral arguments.

23              THE COURT:  That was my recollection as well, so we're

24     not going to be spending time doing that, I presume.

25              MR. YOUNG:  That's our memory, too, Your Honor.  And     17:07:06
```

```
 1    what I would suggest, and we have not yet had a chance to

 2    confer with each other about the timing or structure of that,

 3    that we can -- before -- between now and sometime next week we

 4    confer with each other and talk about the timing and schedule

 5    for that.                                                      17:07:24

 6           THE COURT:  All right.  I will tell you that I will be

 7    most interested in a very expeditious briefing schedule.  I

 8    presume that the parties are just as interested as I am -- as I

 9    am in that.

10           MR. YOUNG:  Yes, Your Honor.                            17:07:33

11           THE COURT:  Okay.  Mr. Casey, does the defense have

12    any problem with an expeditious, very expeditious briefing

13    schedule by way of written closings?

14           MR. CASEY:  Yes.  I -- Your Honor, I do.  And here --

15    it's two issues.  My trial calendar's not important in the     17:07:49

16    stream of all justice, but it's a reality.  Everyone at this

17    table will help us work on it.

18           I would suggest that there is, since it would be an

19    opening if we had a jury trial, they go first, and we can

20    respond to their closing, so I would expect -- that sounds     17:08:05

21    presumptuous.  I would hope there would a --

22           THE COURT:  Well, if it was a jury trial, they'd go

23    first.

24           MR. CASEY:  We go second.

25           THE COURT:  You'd go next.  They'd get the final word.  17:08:15
```

1          MR. CASEY:  And I would hope that there would be

2   briefing along a similar way.

3          I would ask the Court, I am after hours trying to

4   settle my case on the 7th, but I would like to be an active

5   participant in the legal writing for the -- the brief.  I'm                17:08:27

6   scheduled to be in that wrongful death trial from August 7th

7   to --

8          THE COURT:  All right.  I will tell you that I do have

9   my preference, I would like to be quick.  But you did raise

10  with me this trial.  I do recall that you did so.                          17:08:41

11         MR. CASEY:  Thank you.

12         THE COURT:  I do recognize your right, at least to

13  some extent, to be involved with the writing.  You'll keep us

14  apprised as to whether or not you're able to settle your other

15  trial?                                                                     17:08:52

16         MR. CASEY:  If I settle it tonight it's not an issue.

17  I just wanted to be straightforward with the Court and with

18  plaintiffs' counsel that that's a factor for at least my --

19         THE COURT:  I understand that.  But why don't -- this

20  is another thing you can discuss.  You will have a better idea           17:09:04

21  whether you're going to settle the case and what maybe a

22  briefing schedule might look like, you may be better informed

23  on Tuesday morning.  We can take that up then.

24         Anything else?

25         MR. YOUNG:  Nothing for plaintiffs, Your Honor.                    17:09:17

```
 1              MR. CASEY:  Nothing for the defense.  Thank you, Your

 2    Honor.

 3              (Off-the-record discussion between the Court and the

 4    clerk.)

 5              THE COURT:  I need to have you stick around and just      17:09:25

 6    review some final exhibits with Kathleen to make sure we have

 7    them straight, in light of some of the jockeying we've done in

 8    light of impeachment exhibits and tearing apart exhibits and

 9    other things.  Thank you.

10              (Proceedings concluded at 5:09 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4

5

6

7            I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10            I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17            DATED at Phoenix, Arizona, this 26th day of July,

18   2012.

19

20

21                              s/Gary Moll

22

23

24

25