1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega              )
     Melendres, et al.,                  )
5                                        )
                Plaintiffs,              )  CV 07-2513-PHX-GMS
6                                        )
                vs.                      )  Phoenix, Arizona
7                                        )  July 31, 2012
     Joseph M. Arpaio, et al.,          )  8:35 a.m.
8                                        )
                Defendants.              )
9    _____)

10

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            BEFORE THE HONORABLE G. MURRAY SNOW

17            (BENCH TRIAL DAY 5 - Pages 1094-1417)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

A P P E A R A N C E S

For the Plaintiffs:          Stanley Young, Esq.
                             Andrew C. Byrnes, Esq.
                             COVINGTON & BURLING, L.L.P.
                             333 Twin Dolphin Drive
                             Suite 700
                             Redwood Shores, California  94065
                             (650) 632-4704

                             David Hults, Esq.
                             COVINGTON & BURLING, L.L.P.
                             1 Front Street
                             35th Floor
                             San Francisco, California  94111
                             (415) 591-7066

                             Lesli Rawles Gallagher, Esq.
                             9191 Towne Centre Drive
                             6th Floor
                             San Diego, California  92122-1225
                             (858) 678-1807

                             Nancy Anne Ramirez, Esq.
                             MEXICAN AMERICAN LEGAL DEFENSE
                             AND EDUCATIONAL FUND
                             Regional Counsel
                             634 S. Spring Street
                             11th Floor
                             Los Angeles, California  90014
                             (213) 629-2512, Ext. 121

                             Annie Lai, Esq.
                             Daniel J. Pochoda, Esq.
                             AMERICAN CIVIL LIBERTIES
                             FOUNDATION OF ARIZONA
                             77 E. Columbus Avenue
                             Suite 205
                             Phoenix, Arizona  85012
                             (602) 650-1854

                             Andre Segura, Esq.
                             AMERICAN CIVIL LIBERTIES UNION
                             125 Broad Street, 18th Floor
                             New York, New York  10004
                             (212) 549-2676

1                    A P P E A R A N C E S

2

3                              Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Director
5                              Immigrants' Rights Project
                               39 Drumm Street
6                              San Francisco, California  94111
                               (415) 343-0775
7

     For the Defendants:       Timothy J. Casey, Esq.
8                              James L. Williams, Esq.
                               SCHMITT, SCHNECK, SMYTH,
9                              CASEY & EVEN, P.C.
                               1221 E. Osborn Road
10                             Suite 105
                               Phoenix, Arizona  85014-5540
11                             (602) 277-7000

12                             Thomas P. Liddy
                               Deputy County Attorney
13                             MARICOPA COUNTY ATTORNEY'S OFFICE
                               Practice Group Leader, Litigation
14                             Ann T. Uglietta, Esq.
                               Deputy County Attorney
15                             Civil Services Division
                               222 N. Central Avenue
16                             Suite 1100
                               Phoenix, Arizona 85004
17                             (602) 372-2098

18

19

20

21

22

23

24

25

I N D E X

Witness:                                                          Page

LYDIA GUZMAN

Direct Examination by Ms. Wang                          1109
Cross-Examination by Mr. Liddy                          1127

MANUEL JOSEPH MADRID

Direct Examination by Ms. Wang                          1131
Cross-Examination by Mr. Liddy                          1183
Redirect Examination by Ms. Wang                        1212

STEVEN ANDREW CAMAROTA

Direct Examination by Mr. Liddy                         1228
Cross-Examination by Mr. Young                          1299

MATTHEW RATCLIFFE

Direct Examination by Mr. Casey                         1354
Cross-Examination by Ms. Gallagher                      1367
Redirect Examination by Mr. Casey                       1375

JASON DOUGLAS KIDD

(By videotaped deposition)                              1380

E X H I B I T S

No.        Description                                  Admitted

455      E-mail string, Manuel Madrid, Joe Sousa,        1220
         William Hindman, Ryan Baranyos

456      E-mail string, Steven Camarota and Scott        1323
         Jefferys

M I S C E L L A N E O U S

Rule 52(c) Motion

By Mr. Casey                                            1241

1                         P R O C E E D I N G S

2

3              THE COURT:  Thank you.  Please be seated.

4              THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5    on for continuation of bench trial.                              08:34:57

6              THE COURT:  You ready to call your next witness,

7    Mr. Young?

8              MR. YOUNG:  We are, Your Honor.  However, before we do

9    that, I think the parties need your guidance on several issues.

10   We've had some discussions between the parties about how to      08:35:12

11   finish the trial, and I think we need your -- your guidance.

12             We have changed our view on this issue of whether we

13   should have briefing after the trial.  We believe that it would

14   suffice for the parties to have a half hour each of argument,

15   closing, whatever you want to call it, on Thursday.             08:35:31

16             We have decided that we do not need to have one of our

17   expert witnesses, Mr. Click, testify -- Stewart, Mr. Stewart,

18   thank you, in our case in chief.  We may have him for rebuttal,

19   but we believe that will save some time, and our interest would

20   be in having the trial over and the case submitted, and we      08:35:52

21   think we could do that if we had argument on Thursday.

22             THE COURT:  All right.

23             Mr. Casey.

24             MR. CASEY:  May I approach?

25             THE COURT:  Yes.                                       08:36:06

1          MR. CASEY:  Thank you, Your Honor.  Good morning.

2          First as an initial matter, in terms of post-trial

3     briefing, I wanted to alert the Court that I advised Mr. Young

4     on Saturday afternoon that I did settle my wrongful death case,

5     so that is not an issue any more, at least for Tim Casey as          08:36:20

6     counsel for defendants in this matter.

7          Since March, Your Honor, the anticipation has been

8     having post-trial briefs, written closings.  We oppose

9     plaintiffs' effort now to have any type of oral argument.  And

10    we really do so on a number of grounds, but plainly is one, we       08:36:41

11    have 20 hours, and any amount of time that we would have for

12    closing is going to be deducted from that, and so we don't

13    believe it's appropriate.  We're entitled to present our case,

14    and we don't want to subtract from it in closing.

15         The other thing, too, Your Honor, as you well know, in          08:37:05

16    a jury trial when you have several days of evidence, you have

17    lay jurors.  The idea of closing argument is to be able to

18    remind the jurors of the evidence, to be able to argue to them

19    what that evidence means, and then also to argue to the jury

20    what reasonable inferences can be drawn from that evidence.  We      08:37:21

21    don't have that here.  We've got a lawyer, a judge, who is the

22    trier of fact.  There is not, in my judgment, any utilitarian

23    value for the merits of this case in having closing argument.

24         I would respectfully submit that it's mostly geared, a

25    closing for both sides, if it's done, it's geared for people in     08:37:43

1  the gallery, for public consumption, not for the Court to

2  resolve this on the merits.

3          The other thing, too, Your Honor, is that it would be

4  unfair under the circumstances for us, when we are now in our

5  case, we've got today, we have tomorrow, I think we're going to    08:37:58

6  be able wrap up probably tomorrow.  But it is going to be very

7  difficult for me, after doing witnesses and preparing

8  witnesses, to spend the time to prepare an oral closing, since

9  this was sort of a new development since we've been relying on

10  basically what I understood to be the Court's preference for    08:38:21

11  written post-trial briefing.

12          My suggestion to the Court is whatever time you want

13  to put on the post-trial briefings, if you were to continue

14  that route, is the Court's prerogative, but I would suggest

15  something, for example, if the trial were to end on the 2nd,    08:38:38

16  plaintiff submit post-trial briefings within 14 days, we do our

17  response in 14 days, and whatever time period they think for

18  rebuttal.  If the Court shortens it, it shortens it.  We do

19  oppose that.

20          The other thing that I'd like to ask for the Court's    08:38:53

21  direction is, it's my reading of your order that they have 20

22  hours, defendants have 20 hours, and plaintiffs then have a

23  separate two hours for rebuttal.  My reading -- and I -- I hope

24  I'm not prejudicing myself by saying this, but my reading is

25  that any cross-exam we would have in rebuttal is going to come    08:39:12

1    out of our 20 hours.  That's how I read the order, although

2    it's not -- it doesn't address that, if I've got additional

3    time on top of my 20.

4         The reason I mention that is because that also factors

5    into closing argument.                                              08:39:28

6         THE COURT:  Well, it seems to me, Mr. Casey, that

7    that's a nonissue.  If you think you can end your case by

8    tomorrow, you won't have nearly exhausted your 20 hours.

9         MR. CASEY:  I don't think so, but that -- I tend --

10        THE COURT:  Let me tell you that if you use your time    08:39:40

11   wisely and you need time for cross-examination and rebuttal,

12   I'll give it to you.

13        MR. CASEY:  Thank you, Your Honor.

14        THE COURT:  Next witness.

15        I'm going to think about what I'm going to do           08:39:49

16   vis-à-vis closing arguments.  I'll let you know either after

17   the break or at noon.

18        MR. CASEY:  Thank you, Your Honor.

19        MR. YOUNG:  Your Honor, I would have one more comment

20   on that.  If Your Honor would prefer briefing -- and obviously    08:39:59

21   if there are issues that Your Honor would like to hear from the

22   parties, we would be happy to brief any particular issues,

23   but --

24        THE COURT:  Well, let me tell you that I've got a list

25   of questions.  And I haven't decided whether I'm going to tell    08:40:12

```
 1    you what they are or not.

 2            MR. YOUNG:  I appreciate that.  We'll obviously do

 3    whatever the Court would like.  We do have a -- a sense that if

 4    Your Honor would prefer briefing, that we could get it done

 5    very quickly, and --                                        08:40:34

 6            THE COURT:  Well, how long are you going to tell me

 7    that it would take you to file your opening brief?

 8            MR. YOUNG:  We think that we could -- we would

 9    propose, if Your Honor does want to have briefing, that we

10    exchange simultaneous 10-page briefs on August 13, and that we  08:40:43

11    exchange simultaneous five-page responsive briefs by August 20.

12    That would be our alternative.  It would allow the parties to

13    brief the case after the evidence is closed, but it would get

14    it done more quickly than under the schedule that Mr. Casey has

15    proposed.                                                   08:41:09

16            THE COURT:  So you have August 13 and August 20

17    simultaneous briefing?

18            MR. YOUNG:  Yes.  And again, because of the very

19    extensive briefing on the law that has taken place previously,

20    we don't think we need very many pages, but obviously if Your  08:41:20

21    Honor has questions, we'll do whatever we need to do.

22            There is one more issue that affects today's schedule

23    which Ms. Gallagher will address, and I think it might be good

24    to address that now since it will affect the schedule today,

25    and that is some deposition testimony that the defendants wish  08:41:35
```

1    to present, and I'll defer to Ms. Gallagher on this.

2         MS. GALLAGHER:  Your Honor, we understand that

3    defendants wish to present the video depositions, or the

4    depositions via video of Mr. Kidd and Mr. Pena, who are two of

5    the ICE members that are not available for trial.                    08:41:57

6         A couple of issues on that.  One, plaintiffs would

7    submit that the transcript should instead be submitted.  I

8    believe Your Honor already has copies of the transcripts

9    highlighted with the designations of both parties, and for the

10   sake of efficiency and so that Mr. Moll doesn't need to               08:42:17

11   retranscribe the entire depositions, we would request that

12   the -- the transcripts simply be submitted as opposed to

13   spending, I think it's about three hours of time on video.

14        In addition, there's a couple specific line item

15   objections that we had raised with Mr. Casey over the weekend        08:42:35

16   that I think if the videos are to be played, we need a ruling

17   on prior to, so that the videos can be appropriately edited if

18   necessary.

19        And finally, we would remind the Court of the ruling

20   on the motion in limine.  To the extent the defendants intend        08:42:52

21   to argue that any of the statements should be construed as

22   conclusions that racial profiling was not occurring, Your Honor

23   has already ruled that those conclusions will not be accepted.

24        THE COURT:  Right.  And I will tell you that to the

25   extent -- because this is a trial to the Court, to the extent        08:43:07

```
 1   they sneak in, I'm going to ignore them and give them

 2   absolutely zero credence.  So it doesn't matter whether I hear

 3   them or not.

 4           However, I'm glad to -- is it your desire, Mr. Casey,

 5   to present the video deposition testimony today?                    08:43:21

 6           MR. CASEY:  Your Honor, there's no objection as to

 7   Jason Kidd.  If we have time, since there's no objection to

 8   Jason Kidd, it is our intention, defendants' designations are

 9   47 minutes after editing.  Plaintiffs' are 20 minutes -- 20

10   minutes, 55 seconds.  Again, no objection.  We have two           08:43:40

11   objections on Pena that we can work with the Court.

12           I will also represent to the Court that we've taken

13   your motion in limine ruling to heart, and we don't -- we

14   believe it's in compliance not only with the letter but with

15   the spirit, and we're not intending to sneak in anything.  But    08:43:58

16   that's obviously in the eye of the beholder.

17           Defendant Pena's deposition right now is a little less

18   than an hour 25 minutes for our section, and 25 minutes and 40

19   seconds for the plaintiffs'.  We obviously defer to you, since

20   this is --                                                         08:44:18

21           THE COURT:  Well, let me tell you, it's your time.

22           MR. CASEY:  Yes.

23           THE COURT:  I'm more than happy, if you want me to

24   read it outside of court, I'll read it outside of court.  But

25   it's your time, and if you want to play it, as far as I'm         08:44:27
```

1    concerned you can play it.  I'll rule on the objections.

2              MR. CASEY:  Okay.  The -- let me consult with

3    co-counsel on this.  Does the time the Court spends on this

4    count against us if you were to take it back in chambers, for

5    example?                                                        08:44:44

6              THE COURT:  You want me to run a stopwatch?

7              MR. CASEY:  I just want to know if all of a sudden I

8    have, you know, more time or less time.

9              THE COURT:  Well, you clearly have more time, even if

10   I assert against you the time it takes me in chambers to read   08:45:00

11   it.

12             MR. CASEY:  Yes.  Your Honor, I have no objection to

13   you taking and reading it.  The only thing I wanted to offer

14   the Court is we can also provide you the CD, to the extent you

15   think you need to evaluate the witnesses' demeanor,             08:45:15

16   countenance, and all that for credibility.

17             THE COURT:  I probably will want to do that, and if I

18   want to do that, we might as well do it right here.

19             MR. CASEY:  Yes, sir.

20             THE COURT:  All right.                                08:45:28

21             MR. CASEY:  Thank you, Your Honor.

22             MS. GALLAGHER:  Your Honor, there are two specific

23   objections beyond the motion in limine that we had raised with

24   counsel that I would -- if Your Honor would permit, would like

25   to raise now so that they may edit the video.                  08:45:37

```
 1              THE COURT:  All right.
 2              MS. GALLAGHER:  There's some testimony -- they're both
 3     foundation issues and they both relate to Mr. Pena's testimony.
 4     In specific first is at page --
 5              MR. CASEY:  Excuse me.                              08:45:51
 6              May I interrupt Your Honor?  May we provide the Court
 7     with a copy of the transcript so he can follow along?
 8              MS. GALLAGHER:  Yes, of course.
 9              MR. CASEY:  Is that -- may I approach?
10              THE COURT:  Yes.                                    08:45:59
11              MR. CASEY:  And let the record reflect I'm providing
12     the Court with a copy of the transcript of Alonzo Pena, an ICE
13     witness.
14              THE COURT:  On what tab is it?  Oh.  Is it just
15     exhibits to the deposition?  I see.  Okay.                   08:46:26
16              Go ahead.
17              MS. GALLAGHER:  On page 72 of the deposition, at line
18     19, there's a question that refers to "this tactic."  We
19     believe there's no foundation for that question and answer, and
20     would ask that it be excluded --                            08:46:44
21              THE COURT:  On which lines?
22              MS. GALLAGHER:  Lines 19 through 23.
23              THE COURT:  Okay.  So start me, In your experience,
24     have other law enforcement organizations used this technique?
25     Is that what you're talking about?                          08:46:55
```

1          MS. GALLAGHER:  I believe it's actually this tactic

2     was not unique to Maricopa County, and so --

3          THE COURT:  Give me the page again.

4          MS. GALLAGHER:  Page 72, beginning at line 20.

5          THE COURT:  I don't --                                    08:47:05

6          MS. GALLAGHER:  Lines don't match up?  I know there

7     was perhaps two versions of this.

8          THE COURT:  Okay.  I'm with you now.  I found it.

9          MS. GALLAGHER:  Okay.  So our objection would be as to

10    foundation to -- as to "this tactic."  We believe the prior     08:47:21

11    testimony indicates that "this tactic" is not -- there's no

12    foundation for what "this tactic" is.

13         MR. CASEY:  Your Honor, the foundation begins at

14    page -- I can't tell you specifically, but it certainly begins

15    in the previous two pages.  It's discussing the use of          08:47:44

16    saturation patrols, crime suppression operations, and that last

17    question is whether or not it was simply unique to Maricopa

18    County.

19         THE COURT:  All right.  I'll read it.  Just hang on.

20         (Pause in proceedings.)                                    08:48:00

21         THE COURT:  I'm going to overrule the objection.  I'll

22    take the testimony for what it's worth.

23         MS. GALLAGHER:  Thank you, Your Honor.

24         Just one further objection we'd like to raise, and

25    that begins on page 133, line 4, with the question:  Did the    08:49:16

1   Maricopa County Sheriff's Office share their operation plans

2   with ICE, and continues to 134/17, which is the end of a rather

3   lengthy paragraph.

4           Our objection, again, is foundation.  This testimony

5   recites what Mr. Pena believes Mr. Kidd did.  There's no                08:49:37

6   foundation that he has personal knowledge of this and in fact,

7   we believe Mr. Kidd's testimony, which will also come in, is

8   contradictory.  So we would ask that this designation from

9   133/4 to 134/17 be stricken.

10          THE COURT:  Mr. Casey.                                          08:49:55

11          MR. CASEY:  Your Honor, the foundation is he said he

12  had a conversation with Jason Kidd as the liaison to Maricopa

13  County and the 287(g) program -- that's at page 133, lines 7

14  through 9 -- and he testifies to his understanding of what

15  Jason did have an opportunity to review.  The foundation is in        08:50:08

16  existence and it goes to the weight, not the admissibility,

17  Your Honor.

18          THE COURT:  Can you establish foundation by hearsay?

19          MR. CASEY:  He's -- I don't think he's testifying to

20  what Jason Kidd has necessarily -- he's not saying Jason Kidd        08:50:28

21  said this.  He said:  I had a conversation.  It's my

22  understanding of this.

23          THE COURT:  I want to read it.

24          I'm going to sustain the objection and have that part

25  out.                                                                  08:50:48

```
 1              MR. YOUNG:  Your Honor, thank you.

 2              One more thing, going back to the earlier discussion,

 3      another idea.

 4              We could, if a closing this week does not suit the

 5      defendants, we could have -- come back and have an argument,      08:50:59

 6      address any questions the Court may have orally, the week of

 7      August 13.  And that would be a little faster than a briefing

 8      schedule.  So I give that to you for your consideration.

 9              THE COURT:  All right.  Thank you.

10              You ready to call your first witness, or your next       08:51:12

11      witness?

12              MS. WANG:  Yes, Your Honor.  Good morning.

13              THE COURT:  Good morning.

14              MS. WANG:  Plaintiffs call Lydia Guzman.

15              THE CLERK:  Right up here.                               08:51:33

16              Could you please state and spell your full name.

17              MS. GUZMAN:  Lydia Guzman.  L-y-d-i-a, G-u-z-m-a-n.

18              THE CLERK:  Thank you.  Please raise your right hand.

19              (Lydia Guzman was duly sworn as a witness.)

20              THE CLERK:  Thank you.  Please take our witness stand.   08:51:53

21                            LYDIA GUZMAN,

22      called as a witness herein, having been duly sworn, was

23      examined and testified as follows:

24                          DIRECT EXAMINATION

25      BY MS. WANG:                                                     08:52:33
```

1   Q.   Good morning, Ms. Guzman.

2   A.   Good morning.

3   Q.   Where do you live?

4   A.   I live in Glendale, Arizona, in Maricopa County.

5   Q.   How long have you lived in Maricopa County?                08:52:40

6   A.   Oh, I've lived there since, like, 1998.

7   Q.   What is your occupation?

8   A.   I'm a community advocate, and I'm also the director of

9   Respect-Respeto.

10  Q.   What is Respect-Respeto?                                    08:52:54

11  A.   Respect-Respeto is a hotline, a hotline for the community.

12  Q.   Is it a nonprofit organization?

13  A.   We're working on -- on its status, yes.

14  Q.   And by that you mean that you're seeking 501(c)(3) status?

15  A.   That's correct.                                            08:53:10

16  Q.   Are you also involved with an organization called Somos

17  America?

18  A.   Yes, I am.

19  Q.   What is your involvement with Somos America?

20  A.   I'm on the board of directors.  I'm a past president of    08:53:20

21  Somos America, as well as one of the founding officers.

22  Q.   And are you still active in Somos America as a member of

23  the board of directors?

24  A.   Oh, yes.

25  Q.   Are you testifying here today as an authorized             08:53:34

1  representative of Somos America?

2  A.  Yes.

3  Q.  And is Somos America a plaintiff in this case?

4  A.  That's correct, yes.

5  Q.  Can you describe for me, what is Somos America?          08:53:43

6  A.  Well, Somos America is an organization -- well, actually,

7  it's a coalition of organizations in -- in Arizona, and it's --

8  it's, you know, made up of different -- of different, you know,

9  organizations, individuals, of -- of many times.

10 Q.  So Somos America has both organizations and individuals as  08:54:10

11 members?

12 A.  That's correct.

13 Q.  Can you name for me a few of the organizations that are

14 members of the Somos America coalition?

15 A.  Oh, yes.  Some of them are, like, Border Action Network,   08:54:23

16 LULAC.  We have members of the labor unions, the -- like SEIU,

17 UFCW, and other labor.  We also have student-based -- based

18 organizations like ADAC, and also, you know, some of the

19 individuals, you know, like different reverends.

20 Q.  And are any of the different members of Somos America      08:54:57

21 Latino?

22 A.  Oh, yes.

23 Q.  Do any of them live here in Maricopa County?

24 A.  Yes, the majority.

25 Q.  You mentioned that there are also organizations that are   08:55:04

1    members of Somos America, is that correct?

2    A.  That's correct.

3    Q.  Are any of their individual members residents of Maricopa

4    County?

5    A.  Yes.                                                                  08:55:14

6    Q.  And are any of the organizational members of Somos America

7    based here in Maricopa County?

8    A.  Yes.

9    Q.  What is the main mission of Somos America?

10   A.  Well, Somos America, we -- we work hard to educate, to              08:55:26

11   inform, and to engage our community with -- with reference to

12   some of the things with, like, CIR.  Also, we try to empower

13   the community with activities like voter registration and

14   citizenship fairs.

15   Q.  You said "our community."  What do you mean by that?              08:55:54

16   A.  The Hispanic community.

17   Q.  Here in Maricopa County?

18   A.  That's correct.

19   Q.  Ms. Guzman, is Somos America concerned with the civil

20   rights of Latinos in Maricopa County?                                  08:56:04

21   A.  Oh, yes.  Yes.

22   Q.  Ms. Guzman, are you familiar with crime saturation patrols

23   conducted by the Maricopa County Sheriff's Office?

24   A.  Yes.

25   Q.  Do you know those patrols by any other name?                       08:56:16

1113

```
 1   A.  Yes, immigration sweeps.
 2   Q.  How did you become familiar with MCSO's immigration sweeps?
 3   A.  Well, we -- we would hear about them, like, in the news,
 4   you know, the -- the news would talk about them.  And then
 5   also, you know, the sheriffs would -- the sheriff's department     08:56:37
 6   would send out their press releases, you know, we would hear
 7   about them then.  And, of course, the community would also let
 8   us know that there's, you know, these sweeps that are taking
 9   place.
10   Q.  As -- as a representative of Somos America, did you receive     08:56:49
11   complaints from Latino individuals that they had been racially
12   profiled by MCSO deputies during sweeps?
13   A.  Yes.
14   Q.  And did you receive complaints from Latino individuals that
15   they were stopped by MCSO deputies without justification?          08:57:05
16   A.  Yes.
17   Q.  Have you received individual complaints about racial
18   profiling by MCSO outside of the immigration sweeps?
19   A.  Yes.
20   Q.  How have these complaints come to Somos America's               08:57:17
21   attention?
22   A.  Well, they came to us through -- through a variety of
23   different ways.  Sometimes through the hotline, through the
24   Respect-Respeto hotline, and other times it's right there at
25   the sweeps, different individuals will come up to us and share      08:57:36
```

1    with us their experience.

2    Q.  You mentioned the Respect-Respeto hotline.  How was Somos

3    America involved in that hotline?

4    A.  Well, Somos America, our -- our volunteers help answer the

5    phones, you know, they help man that line, as well as, you                08:57:56

6    know, we also send volunteers from our coalition, from the

7    organizations, to go out and talk to some of the folks to see

8    how they can best help them.  You know, sometimes we need to

9    refer them to, like, lawyers, or, you know, whatever assistance

10   they may need.                                                            08:58:16

11   Q.  Thank you.

12        Has anyone reported to Somos America that they tried

13   to make a complaint about racial profiling to the Maricopa

14   County Sheriff's Office, but were not successful in getting a

15   response?                                                                 08:58:32

16   A.  Yes.

17   Q.  Ms. Guzman, does Somos America rely on volunteers to carry

18   out its mission?

19   A.  Oh, yes.  Yes.

20   Q.  How were Somos America's volunteer resources affected by             08:58:40

21   these complaints of racial profiling by MCSO?

22   A.  Well, our volunteers are from the different organizations,

23   and many of the organizations already part of the coalition

24   rely on their volunteers, and so we have to tap each other for

25   volunteers.                                                              08:59:01

1    And so the way that we were affected is we -- we've

2    stretched out our volunteer resources so thin that sometimes,

3    you know, it takes a few phone calls before, you know, if we

4    wanted to ask for an activity, we would just make one phone

5    call.  Now it's just, you know, a matter of trying to follow up          08:59:17

6    with -- with which volunteer can help us for these issues now.

7    Q.  Have complaints about racial profiling by MCSO affected

8    other activities of Somos America?

9    A.  Oh, yes.

10   Q.  Can you tell me about that.          08:59:31

11   A.  Yes.  Well, the other activities that were affected are

12   in -- in twofold.  One of them was we've had to -- when the

13   sweeps first started, we had to cancel a couple of the events

14   that we already were planning, and we'd scale back on some of

15   the other events that we normally engage in -- you know,          08:59:52

16   because of the volunteers.

17       Going back to what I was saying on the volunteers, our

18   volunteers would normally assist in things like the citizenship

19   fairs, where now, if they become involved in the sweeps, to

20   help us with the sweeps, then they're too tired to participate          09:00:09

21   in things like citizenship fairs or voter registration drives.

22       But the other way that, you know, some of the events

23   that we had to scale back on is, you know, we were planning to

24   do, you know, more, you know, forums out, and we had to scale

25   back on those.          09:00:30

1   Q.  You mentioned that your events, Somos America's events,

2   were affected by volunteer resources being stretched too thin.

3          Were events affected in any other way by MCSO's

4   immigration sweeps?

5   A.  Oh, yes.  Yes.  As a matter of fact, during some of the          09:00:46

6   sweeps, because the community was so concerned, we felt a need

7   to do forums in the community so that they knew -- so that the

8   community knew what their rights were, with having lawyers

9   present items like, you know, what their rights are, and how

10  to, you know, how to, you know, you know, act and all that       09:01:08

11  when -- when, you know, stopped by the police and everything.

12         And we've noticed that the forums were very poorly

13  attended.  They were poorly attended and, you know, one of the

14  things we do is we -- we found out that people were afraid to

15  come to the forums because they were afraid to drive to the        09:01:27

16  forums for fear that, you know, the sheriffs were going to be

17  there, or they were going to get stopped during, you know, on

18  their way to forums.

19  Q.  Ms. Guzman, why did Somos America spend its resources in

20  responding to complaints about the Maricopa County Sheriff's       09:01:44

21  Office sweeps?

22  A.  Well, I don't think that there is a way we could not.  I

23  mean, you know, when -- when the community is concerned, when

24  we have calls from the community, or even some of the members

25  of our organization say that, you know, their members are very     09:02:06

1    concerned, we can't just turn our back and ignore that this is,

2    you know, these events are happening.

3          So we had to respond and we had to put some of our

4    resources and, you know, by -- whether it's passing the hat to

5    do collections or whatever so that we can -- everything from          09:02:20

6    printing fliers to, you know, you know, doing other activities.

7    That took some resources.

8    Q.  Ms. Guzman, have you received any complaints from Latino

9    individual members of Somos America that they were racially

10   profiled by MCSO?                                                      09:02:41

11   A.  Yes.

12   Q.  And you testified earlier that Somos America has some

13   members that are organizations, correct?

14   A.  That's correct.

15   Q.  Have you received any complaints from those organizations         09:02:48

16   that are members of Somos America that their individual members

17   were racially profiled by MCSO?

18   A.  Yes.

19   Q.  Ms. Guzman, have you personally observed any of MCSO's

20   immigration sweeps?                                                    09:03:06

21   A.  Oh, yes.

22   Q.  And did you do that in your capacity as an officer in Somos

23   America?

24   A.  Yes.

25   Q.  About how many sweeps have you observed?                          09:03:12

1   A.  Oh, wow.  I want to say 10.  I -- you know, I'm not sure on

2   the number.  I -- but I think 10, 12, and --

3   Q.  Okay.

4   A.  I'm sorry.

5   Q.  That's fine.  Thank you.                                    09:03:32

6           When you observed the sweeps, where were you

7   physically posted?  Where were you?

8   A.  Well, during the sweeps I was actually two, you know,

9   sometimes I was in there next to where the sheriff would set up

10  their mobile command center, we would set up our, you know,     09:03:50

11  observation center as well.  So we were close there.  And I

12  just -- when I was there I wanted to make sure that all of our

13  volunteers were -- you know, they knew exactly what they needed

14  to do.

15          And then at other points during the sweeps I was out,   09:04:07

16  you know, driving around, you know, looking for stops.

17  Q.  Did you observe traffic stops during the MCSO immigration

18  sweeps?

19  A.  Yes.

20  Q.  And you also observed the mobile command center?            09:04:18

21  A.  Oh, yes.

22  Q.  Can you describe what you observed at the MCSO command

23  center.

24  A.  Well, the command center -- the command center was set up

25  in -- in different places.  Sometimes it would be, like, in an  09:04:35

```
 1    empty lot, or sometimes it would be, like, in a really big

 2    parking lot.  Of course, other sometimes it would be at, like,

 3    the sheriff's substation.

 4          But when they were at the -- in -- in the areas where

 5    the public could have access to them, they were mostly there in      09:04:52

 6    the heart of the Latino community, the Hispanic community.

 7    They were there with really big -- they looked like trailers

 8    that had MCSO writing on it.

 9          And then there were -- then there were, like, the big

10    RVs, you know, they also had, you know, like, two big RVs, and      09:05:14

11    they put them in kind of like a half circle, kind of like the

12    wagons where -- I'm not sure if I'm describing this right, the

13    wagons, the western where they do the circle, but it was kind

14    of like a half circle, leaving it open for the media, because

15    the media was always allowed to go in.                              09:05:32

16          Then there was also tables there so they could process

17    people.  And they had some chairs there where people that were

18    being detained were -- were sitting there with handcuffs.  You

19    know, not all of them had pink handcuffs, but I noticed the

20    pink handcuffs when the people that were detained, so that the      09:05:50

21    entire public can see.

22          But I also saw that they would put barricades up, and

23    the barricades were right there so that members of the

24    community, of that community, could not cross that barricade.

25    They had, you know, the -- like the stands, and then also           09:06:08
```

```
 1   yellow tape.  And there were also deputies there manning

 2   that -- those, like, stations.

 3           And members of the community or family members of

 4   people that were detained would go, you know, to see their

 5   loved ones there in handcuffs for the entire world to see them    09:06:25

 6   displayed there, you know, kind of like -- so -- I'm sorry.  So

 7   they're there, and, you know, for the entire world to see, just

 8   in handcuffs.

 9   Q.  Were you able to see detainees in custody at the MCSO

10   command posts when you observed the sweeps?                       09:06:45

11   A.  Yes.

12   Q.  Can you describe what was the overall racial makeup of that

13   group of detainees?

14   A.  All I noticed were Hispanic.

15   Q.  Did you see any MCSO personnel wearing balaclavas or ski      09:06:57

16   masks at the command centers?

17   A.  Yes, I did.

18   Q.  How did that make you feel when you saw those deputies in

19   ski masks?

20   A.  Wow.  It was -- it was very intimidating.  It was             09:07:12

21   intimidating, because not only were they wearing the ski masks,

22   they were also wearing the -- like, the vest, the bullet-proof

23   vest outside of their T-shirts, and on the vest you can see,

24   like, all of the other gear.

25           It was -- I mean, I hate to say this, but it kind of      09:07:31
```

```
 1   looked like something out of the Taliban or something, I'm
 2   sorry, but, you know, that's what it looked like.  And it was
 3   very scary.
 4   Q.  Did you ever see the sheriff at any of these sweeps?
 5   A.  Yes.                                                          09:07:45
 6   Q.  Did you ever see Chief Deputy Brian Sands at the sweeps?
 7   A.  Yes.
 8   Q.  Did you see Lieutenant Sousa at the sweeps?
 9   A.  Yes.
10   Q.  You mentioned before that you also observed traffic stops   09:07:55
11   during the MCSO immigration sweeps.  Is that true?
12   A.  Yes.
13   Q.  Did you observe white and Latino drivers being treated
14   differently during traffic stops by MCSO?
15   A.  Yes, I did.                                                  09:08:12
16   Q.  Can you describe that.
17   A.  Well --
18          MR. LIDDY:  Objection, foundation, Your Honor.
19          THE COURT:  You know, it would be helpful to me if I
20   could get a little bit more specific idea.                      09:08:26
21          MS. WANG:  Sure.  I'll go ahead and lay a little more
22   foundation, Your Honor.
23   BY MS. WANG:
24   Q.  Ms. Guzman, during MCSO immigration sweeps did you have an
25   opportunity to observe numerous traffic stops?                  09:08:35
```

1    A.  Yes.

2    Q.  And were you able to draw any -- withdrawn.

3         Were you able to make any observations about whether

4    white and Latino drivers were being treated differently by MCSO

5    personnel during those traffic stops?                    09:08:50

6    A.  Yes.

7    Q.  What observations did you make?

8    A.  Well, the --

9         MR. LIDDY:  Objection, foundation, Your Honor.

10        THE COURT:  Overruled.                               09:08:59

11        THE WITNESS:  During my observation of the different

12   sweeps, I noticed that the -- the Latino drivers, when they

13   were stopped, they were -- they were held much longer than the

14   Anglo drivers.  They -- they were questioned longer.  They

15   were, you know, just -- just held and -- and, you know,      09:09:24

16   detained longer.

17   BY MS. WANG:

18   Q.  Can you think of a specific example of a traffic stop where

19   you noticed a Latino driver being held for a longer period of

20   time?                                                      09:09:34

21   A.  Yes.  During one of the -- during one of the stops that I

22   observed, the -- the car was -- was pulled over and there were

23   several MCSO deputy vehicles there, I mean several.  And the --

24   the deputy, you know, when -- when I -- what I saw is he was

25   holding a document up -- up in the air, and he was looking at    09:10:00

1    it kind of like, you know, it looked like the size of a

2    driver's license, you know, could have been a driver's license,

3    but he was looking at it scrutinizing it, kind of twisting it

4    to see, you know, I don't know what he was looking for, and

5    questioning the driver, and, you know, I mean, it -- it was                     09:10:16

6    just for a long period of time.

7    Q.  And did you see the outcome of that traffic stop?

8    A.  Yes.

9    Q.  What happened?

10   A.  Well, afterwards, you know, when -- when, you know, she                     09:10:28

11   was -- afterwards when she was free to leave, you know, I

12   did -- I was able to catch up with her, and she's a legal

13   permanent resident.  She -- I spoke with her.  And she told me

14   that the officer was actually stating that, you know --

15           MR. LIDDY:  Objection, hearsay, Your Honor.                             09:10:50

16           THE COURT:  Sustained.

17   BY MS. WANG:

18   Q.  Ms. Guzman, so the outcome, was it -- was that driver

19   permitted to leave by MCSO at the end of that traffic stop?

20   A.  Yes.                                                                        09:11:00

21   Q.  You mentioned that you made observations about white --

22   sorry, withdrawn.

23           You made observations about stops of white drivers

24   versus Latino drivers, right?

25   A.  That's correct.                                                             09:11:13

1   Q.  Can you give us an example of a stop of a white driver that

2   you observed that differed from the one you just described.

3   A.  Yes.  The -- I saw a deputy that, you know, had just turned

4   on the lights and -- and was going to pull a car over, and I

5   was able to -- we were -- we were coming on different               09:11:33

6   directions, and as I saw this I was able to look inside.  And

7   so I was able to quickly manage to pull a U-turn.

8           Inside there were a bunch of Anglo kids, white kids.

9   They looked like they could have been maybe high school,

10  college kids.  But the -- the -- as -- as I -- as -- as safely      09:11:55

11  and as quickly as I could, I made a U-turn to get behind the --

12  the MCSO vehicle, and I did notice that the -- that during that

13  time that I was making the U-turn I noticed that the deputy

14  went into the window, he might have maybe crossed a few words,

15  said a few words, I'm not sure what happened, and then he went     09:12:17

16  back into his vehicle and then he took off.

17  Q.  The car was allowed to leave?

18  A.  The car was allowed to leave.  The -- actually, the deputy

19  left before the car.

20  Q.  And you actually saw the deputy turn on the lights to           09:12:28

21  signal to the driver to pull over?

22  A.  That's correct.

23  Q.  How long did it take between that time that the deputy

24  signaled for the car to pull over and the time the car was

25  permitted to leave?                                                 09:12:41

1   A.  Wow, it probably took, I mean, less than a minute, you

2   know, it seemed like it took less than a minute.

3   Q.  Okay.  Did you see any exchange of documents between the

4   driver and the deputy?

5   A.  No.                                                              09:12:56

6   Q.  Did you have an opportunity to see such an exchange of

7   documents?

8   A.  Well, my husband was driving so I wasn't driving, so I had

9   my eyes on that vehicle the whole time because I wanted to make

10  sure that I saw everything.                                         09:13:08

11  Q.  Okay.  Ms. Guzman, do you feel that you personally have

12  ever been racially profiled by MCSO?

13  A.  Yes.

14  Q.  Can you describe that for me.

15  A.  During the -- the Buckeye sweep of -- it was -- I believe      09:13:20

16  it was, like, January of 2009.  I was pumping gas on a gas

17  station of State Route 85 and Maricopa County 85.  There's a

18  gas station.  It's, like, rural out there, lots of farm land.

19       And so there was a sweep taking place, and -- but I

20  needed to pump some gas, so I -- I went inside and I saw a         09:13:49

21  deputy inside.  But, you know, I -- I gave the clerk $20 and I

22  told him in Spanish, Give me $20 on pump, I can't remember what

23  pump number it was, but, you know, pump so and so.

24       And so as I went outside to pump the gas, it didn't

25  take very long for me to pump the gas, it was just $20, and I      09:14:13

 1    noticed the deputy go into his car and he sat in his car.  And

 2    then as soon as I finished, I closed the cap and I took off in

 3    the -- in the Maricopa County Road 85 headed eastbound towards

 4    the town of Maricopa, and the -- the deputy vehicle went really

 5    close behind me.  He was following me very, very close behind    09:14:34

 6    me.  I could see him through my rearview mirror, and I saw him

 7    getting closer, and he was getting closer.  And I thought to

 8    myself, He's going to stop me, you know, and it was -- it

 9    was -- at that moment I knew I'm racially profiled, you know.

10    This -- this is -- this is happening.                           09:14:56

11            But my -- but my thoughts at that moment were, Do I

12    know -- okay.  My driver's license is in my wallet.  I know

13    that everything in my car is functioning, but where is my

14    registration, because my car's a mess.  Okay.  It's in my glove

15    compartment.  My insurance, my insurance information, do I have  09:15:14

16    that?  And then a thought came over me.  I don't have any

17    proof, I mean, I just have my driver's license, but what proof

18    is that?  You know, if I get stopped and questioned.

19    Q.  And were you pulled over by the deputy?

20    A.  I was -- I'm not sure if I was about to get pulled over,     09:15:30

21    but during that -- that whole, you know, that -- that incident

22    right there, because Maricopa County Road 85 is only one lane

23    going one direction and another lane coming in -- in my

24    direction.  I saw a -- a news van, a Spanish news van vehicle

25    coming towards me, and the reporter knew me and he waved to me   09:15:54

1    through the window.  You know, we weren't going that fast.  And

2    I kind of waved to them kind of like a nervous wave, and I

3    believe that he saw also, you know, the deputy vehicle behind

4    me, so he made a U-turn, you know, 'cause I was still watching

5    everything through the rearview mirror and I saw the vehicle          09:16:13

6    make a U-turn.  And as the vehicle -- the news vehicle was

7    approaching, the deputy went to the other lane and then just

8    sped right off.

9    Q.  So you were not pulled over?

10   A.  I was not pulled over.                                           09:16:27

11   Q.  Ms. Guzman, is Somos America still receiving complaints

12   about racial profiling of Latino residents of Maricopa County?

13   A.  Oh, yes.

14   Q.  By the MCSO?

15   A.  By the MCSO.                                                     09:16:37

16          MS. WANG:  Thank you.  No further questions.

17          THE WITNESS:  Thank you.

18          THE COURT:  Cross-examination.

19                    CROSS-EXAMINATION

20   BY MR. LIDDY:                                                        09:16:55

21   Q.  Good morning, Ms. Guzman.

22   A.  Good morning.

23   Q.  Just so the record is clear, in the incident you just

24   testified about that happened at the gas station and the road

25   at Route 85, did the deputy see you inside the convenience          09:17:07

1    store?

2    A.   Yes.

3    Q.   And he did not pull you over?

4    A.   No.

5    Q.   And I believe you testified that this was during a

6    saturation patrol?                                                    09:17:22

7    A.   That's correct.

8    Q.   Have you ever been pulled over by a Maricopa County

9    Sheriff's Office deputy?

10   A.   No.                                                              09:17:34

11   Q.   I believe you testified that you did see at a different

12   saturation patrol a vehicle with several young white men pulled

13   over by a Maricopa County Sheriff's Office deputy?

14   A.   Yes.

15   Q.   And you're sure that they were all Anglo?                        09:17:57

16   A.   Yes.

17   Q.   Is it possible that they may have appeared white to you but

18   been Latino?

19   A.   They appeared white to me.

20   Q.   Yet they were pulled over by a Maricopa County Sheriff's         09:18:13

21   Office deputy during a crime saturation patrol, that's your

22   testimony?

23   A.   That's correct.

24   Q.   Have you ever seen a member of the Taliban?

25   A.   I seen pictures.                                                 09:18:25

1    Q.  On television?

2    A.  Yes.

3    Q.  And in print media?

4    A.  Yes.

5    Q.  Have you ever seen a member of the Taliban wearing any type    09:18:31

6    of clothing or apparatus on his head?

7    A.  Yes.

8    Q.  What color was that?

9    A.  Black.

10   Q.  And what was it made of?    09:18:45

11   A.  I don't know.

12   Q.  Was it made of cloth?

13   A.  I don't know.  I mean, are you asking if it was made of,

14   like, cotton, silk?  I wouldn't know.

15   Q.  Was it made of Kevlar?    09:18:57

16   A.  I don't know.

17   Q.  The Taliban that you've seen pictures of, were they wearing

18   utility belts?

19   A.  You know, the -- the -- the pictures of the Taliban that

20   I've seen have guns on them on the outside, just like what I'm    09:19:16

21   describing and comparing with the deputies, and masks, and

22   vests.

23   Q.  I appreciate you saying that they had vests and masks and

24   guns, but my question was:  Did they have utility belts on?

25   A.  You mean like construction?  I don't --    09:19:37

```
1    Q.  I mean like the ones that are standard issue for Maricopa

2    County Sheriff's Office deputies that have an ability to put a

3    Taser, a firearm, handcuffs, a flashlight.  Have you ever seen

4    one of those utility belts on a member of the Taliban on

5    television or in print media?                                    09:19:57

6    A.  Well, I haven't paid that close attention.  I should have

7    probably paid closer attention.

8              MR. LIDDY:  I have no further questions, Your Honor.

9              THE COURT:  Any redirect?

10             MS. WANG:  No, Your Honor.  Thank you.                  09:20:07

11             Thank you, Ms. Guzman.

12             THE WITNESS:  Thank you.

13             THE COURT:  You may step down.

14             Next witness.

15             MS. WANG:  Your Honor, plaintiffs call Manuel Madrid.   09:20:16

16             (Pause in proceedings.)

17             THE CLERK:  Right up here, sir.

18             Can you please state and spell your full name.

19             MR. MADRID:  Manuel Joseph Madrid.  M-a-n-u-e-l,

20   J-o-s-e-p-h, M-a-d-r-i-d.                                        09:21:01

21             THE CLERK:  Can you please raise your right hand.

22             (Manuel Joseph Madrid was duly sworn as a witness.)

23             THE CLERK:  Can you please take our witness stand.

24             MS. WANG:  May I proceed, Your Honor?

25             THE COURT:  You may.                                   09:21:43
```

```
 1              MS. WANG:  Thank you.

 2                      MANUEL JOSEPH MADRID,

 3    called as a witness herein, having been duly sworn, was

 4    examined and testified as follows:

 5                      DIRECT EXAMINATION                    09:21:45

 6    BY MS. WANG:

 7    Q.  Good morning, sir.

 8    A.  Good morning.

 9    Q.  Sir, you're a sergeant at the Maricopa County Sheriff's

10    Office?                                                 09:21:48

11    A.  Yes.

12    Q.  And at one time you were a supervising sergeant of the

13    Human Smuggling Unit?

14    A.  I was.

15    Q.  But you're no longer assigned to HSU?               09:21:54

16    A.  Correct.

17    Q.  Where are you assigned now?

18    A.  District 2 Patrol.

19    Q.  And when did you move from HSU to District 2 Patrol?

20    A.  February of last year.                              09:22:04

21    Q.  Of 2011?

22    A.  Correct.

23    Q.  Okay.  And so you were a supervisor from the founding of

24    the Human Smuggling Unit, correct?

25    A.  Correct.                                            09:22:14
```

1  Q.  That was in 2007?

2  A.  Yes.

3  Q.  You did not apply for that supervising position at the

4  Human Smuggling Unit, correct?

5  A.  Correct.                                                    09:22:23

6  Q.  You were told you were being given that position, right?

7  A.  Yes, ma'am.

8  Q.  By Chief Brian Sands?

9  A.  Yes.

10  Q.  And he told you that was a promotion?                       09:22:29

11  A.  Well, I had been promoted prior to that.  My assignment

12  after my promotion ceremony hadn't been given to me; it was

13  given to me shortly afterwards.

14  Q.  I see.  So you became -- you were tapped to supervise HSU

15  shortly after you became a sergeant?                            09:22:43

16  A.  Correct.

17  Q.  It was your first assignment as a sergeant?

18  A.  Correct.

19  Q.  Sir, you've personally briefed both the sheriff and

20  Chief Sands about HSU's activities, correct?                    09:22:53

21  A.  Correct.

22  Q.  And you regularly gave information about HSU's activities

23  to MCSO's public information office, correct?

24  A.  Correct.

25  Q.  They would often disseminate the information that you gave  09:23:04

1    them to the press?

2    A.  Correct.

3    Q.  And they would often put out press releases about HSU's

4    activities, correct?

5    A.  Correct.                                          09:23:14

6    Q.  Sir, you've attended saturation patrols that involved HSU?

7    A.  Yes, I have.

8    Q.  And you saw the sheriff there?

9    A.  Yes.

10   Q.  In fact, you would give him progress updates during the    09:23:22

11   course of those patrols?

12   A.  I would.

13   Q.  And you've briefed the sheriff many times on how many

14   illegal immigrants were arrested during those patrols?

15   A.  Correct.                                          09:23:34

16   Q.  And the sheriff himself has held press conferences about

17   those HSU operations, correct?

18   A.  Yes.

19   Q.  You attended several of them yourself?

20   A.  Correct.                                          09:23:42

21   Q.  And in some cases, TV crews have ridden with HSU?

22   A.  Yes, ma'am.

23   Q.  That was with the sheriff's approval, correct?

24   A.  Yes.

25   Q.  Now, HSU was formed as part of the sheriff's effort to    09:23:53

1   enforce Arizona's human smuggling law, correct?

2   A.  Yes.

3   Q.  And also as part of the sheriff's policy of combatting

4   illegal immigration?

5   A.  I'm sorry.  Say it again?                              09:24:05

6   Q.  And also, HSU was also formed as partly of the sheriff's

7   policy of combatting illegal immigration, correct?

8   A.  I believe so, yeah.

9   Q.  And the original name of the Human Smuggling Unit was the

10  Triple I strike team, is that right?                       09:24:20

11  A.  Yes.

12  Q.  That stood for illegal immigration interdiction?

13  A.  I couldn't tell you what it stood for.

14  Q.  Does that sound about right to you?

15  A.  Yeah.                                                  09:24:28

16  Q.  Okay.  And the sheriff wanted HSU to use routine law

17  enforcement activities to screen individuals for immigration

18  status when there were certain factors present, correct?

19  A.  I'm sorry.  Say that again?

20  Q.  Sure.  The sheriff wanted HSU to use routine law        09:24:43

21  enforcement activities to screen individuals for immigration

22  status when certain factors were present --

23  A.  Correct.

24  Q.  -- correct?

25          And you understood the sheriff wanted investigations  09:24:55

1  into immigration status even in traffic stops that have nothing

2  to do with smuggling load vehicles, correct?

3  A.  Correct.

4  Q.  Now, I think you already testified that you've been present

5  at many of the saturation patrols that HSU was involved in, is        09:25:13

6  that correct?

7  A.  Yes, ma'am.

8  Q.  In 2007, when the unit was first formed, HSU did a number

9  of what we might call smaller saturation patrols, is that

10  right?                                                              09:25:26

11  A.  Yes, ma'am.

12  Q.  There might -- it was mostly HSU personnel at those

13  operations, correct?

14  A.  Correct.

15  Q.  With maybe a couple of other units involved?                  09:25:35

16  A.  Yes, ma'am.

17  Q.  And at some point HSU began conducting larger scale

18  saturation patrols, right?

19  A.  Yes.

20  Q.  That would involve maybe a hundred deputies, right?          09:25:44

21  A.  Correct.

22  Q.  Many other divisions or units of MCSO were involved in

23  those?

24  A.  Yes.

25  Q.  And while you were assigned to HSU you were present for       09:25:51

1    many of those larger saturation patrols, correct?

2    A.  Yes, ma'am.

3    Q.  As well as the smaller ones.

4    A.  Correct.

5    Q.  And you were supervisor at those patrols, correct?    09:26:00

6    A.  Yes.

7    Q.  Now, MCSO originally announced saturation patrols in

8    mid-2007 in connection with the opening of an immigration

9    hotline, correct?

10   A.  Yes, ma'am.    09:26:15

11   Q.  And the purpose of HSU's saturation patrols was looking for

12   any and all crime in addition to any illegal immigration that

13   HSU could come up with, correct?

14   A.  Correct.

15   Q.  And one goal of the saturation patrols was immigration    09:26:28

16   enforcement, correct?

17   A.  Correct.

18   Q.  One goal of the saturation patrols was to identify and to

19   detain undocumented immigrants, correct?

20   A.  In the course of traffic stops, yes.    09:26:43

21   Q.  Now, we talked a minute ago about some of the earlier

22   smaller saturation patrols done by HSU.  You recall that?

23   A.  Yes, ma'am.

24   Q.  In 2007 there were a number of those, correct?

25   A.  I don't know the number, but yes.    09:27:08

1  Q.  The locations for some of those smaller patrols were

2  selected because of complaints about day laborers, isn't that

3  right?

4  A.  I believe so, yes.

5  Q.  And saturation patrols were -- withdrawn.                    09:27:21

6        Saturation patrols by HSU have targeted day laborers

7  even when there's no human smuggling involved, correct?

8  A.  Correct.

9  Q.  Let's turn to one of the specific patrols.

10        There was a saturation patrol in the town of          09:27:39

11  Cave Creek on September 27th, 2007, is that correct?

12  A.  Yes, ma'am.

13  Q.  And you were present?

14  A.  I believe so, yes.

15  Q.  And you described the Cave Creek operation as, quote, a    09:27:49

16  detail addressing the complaints in Cave Creek regarding the

17  day laborers, end quote, correct?

18  A.  Correct.

19  Q.  That operation involved a church, right?

20  A.  Correct.                                                 09:28:07

21  Q.  It was the Good Shepherd of the Hills church in Cave Creek?

22  A.  I believe that was the name.

23  Q.  And that was a known site where day laborers would

24  congregate to be picked up for work, correct?

25  A.  I believe so.                                            09:28:16

1   Q.  And prior to the operation HSU sent an undercover

2   detective in to investigate the church, correct?

3   A.  I -- I don't recall that.

4            MS. WANG:  Okay.  Let's show the witness Exhibit 122,

5   which is already in evidence, please.                                    09:28:32

6            And Your Honor, may I publish exhibits that are in

7   evidence already?

8            THE COURT:  You may do so.

9            MS. WANG:  Thank you.

10           Let's highlight -- or, sorry.  Let's call out the top    09:28:50

11  half of this e-mail so we can see who's sending it.

12  BY MS. WANG:

13  Q.  Sir, this is an e-mail string that originated from someone

14  named Sean Ross.  Do you see that?

15  A.  Yes.                                                                  09:28:59

16  Q.  He was an MCSO deputy, is that correct?

17  A.  Correct.

18  Q.  And he sent it to Joseph Sousa, correct?

19  A.  Correct.

20  Q.  He was your lieutenant at the time, right?                          09:29:05

21  A.  Yes.

22  Q.  And you were cc'd on this e-mail, correct?

23  A.  Correct.

24  Q.  And then this was forwarded on to counsel.

25           Let's enlarge the bottom half of the e-mail so we can     09:29:14

1    read that.

2              And I'll give you a moment to read that, Sergeant.

3              So the -- the first paragraph here says:  On Wednesday

4    9-19-07 we sent Carlos Rangel in UC under the decoy he was a

5    day laborer looking for work.                                        09:29:47

6              Do you see that?

7    A.  Yes, ma'am.

8    Q.  Does this refresh your recollection that prior to the Cave

9    Creek operation you sent in an undercover detective to

10   investigate?                                                         09:29:55

11   A.  Really, I had no knowledge of this.  At the time Sean Ross

12   worked for me.  Had I been at this particular operation I would

13   have wrote this.  I would have wrote the summary, too.  So I'm

14   assuming I was not present for this particular detail.

15   Q.  Okay.  When you say operation and detail, you mean the         09:30:11

16   earlier undercover investigation, is that right?

17   A.  This particular where Carlos has actually went into the --

18   Q.  To the church?

19   A.  -- to the church, yes.

20   Q.  But you were at the saturation patrol that followed this      09:30:24

21   undercover work, is that right?

22   A.  Yes.

23   Q.  Okay.

24   A.  I believe so, yes.

25   Q.  But you were -- you were cc'd on this e-mail on September     09:30:29

1  24th, correct?

2  A.  Correct, I was.

3  Q.  So you were aware that Carlos Rangel was sent in undercover

4  to investigate that church, correct?

5  A.  I would assume so.  I just -- I don't recall actually          09:30:42

6  reading this, so...

7  Q.  Okay.  Fair enough.

8        Sir, looking at this document, isn't it true that when

9  Deputy Rangel went into the church he discovered no information

10  pertaining to forced labor?                                      09:30:59

11       I'll refer your attention down to the last line --

12  A.  Okay.

13  Q.  -- on both days, there was no information discovered --

14  A.  Thank you.

15  Q.  -- pertaining to forced labor?                               09:31:19

16  A.  Correct.

17  Q.  And there was no information discovered pertaining to human

18  smuggling, correct?

19  A.  Correct.

20  Q.  And there was no information discovered pertaining to        09:31:25

21  possible drop houses?

22  A.  Correct.

23  Q.  And after this undercover investigation, HSU proceeded with

24  the saturation patrol that centered on this church, correct?

25  A.  Correct.                                                     09:31:41

1  Q.  Now, during the Cave Creek operation, the saturation patrol

2  that followed this undercover investigation, there was a

3  certain procedure that was agreed upon in advance, right?

4  A.  I'm sorry.  Say that again?

5  Q.  For the actual saturation patrol in Cave Creek there was a          09:31:58

6  certain procedure or plan that was put in place beforehand,

7  correct?

8  A.  Correct.

9  Q.  And the plan was that you would have undercover vehicles

10  surveilling that church, correct?                                       09:32:08

11  A.  Yes.

12  Q.  And then there would be marked patrol vehicles that were

13  nearby in the vicinity, correct?

14  A.  Correct.

15  Q.  And the undercover surveillance vehicles would note when           09:32:16

16  day laborers got into a vehicle and left the church, correct?

17  A.  In addition to watching -- there was another reason that I

18  recall being there was the day laborers that were causing the

19  traffic hazards along Cave Creek road there.  They would watch

20  the day laborers at the church itself, and then for any other          09:32:36

21  infractions that they observed outside of the church grounds.

22  Q.  So you believed that part of the operation was dealing with

23  traffic issues caused by day laborers who were standing in

24  front of the church?

25  A.  I don't know necessarily in front of the church, but               09:32:51

1    outside along the roadway.

2    Q.  Okay.  To your knowledge, no -- no one was arrested that

3    day for impeding traffic, isn't that right?

4    A.  Correct, I guess.  I don't -- I don't know for sure, but I

5    don't recall it, no.                                          09:33:05

6    Q.  Okay.  But part of the plan was, again, that the

7    surveillance vehicles would be watching for day laborers

8    getting into cars at the church, right?

9    A.  Correct.

10   Q.  And then they would radio a description of the vehicle,   09:33:17

11   which the marked patrol vehicles would then follow up on?

12   A.  Correct.

13   Q.  And those marked patrol cars were instructed to follow

14   those vehicles that had been identified, correct?

15   A.  Correct.                                                  09:33:32

16   Q.  And then once they had probable cause to make a stop, they

17   were to stop the vehicle, correct?

18   A.  Correct.

19   Q.  Okay.  During the Cave Creek operation deputies arrested

20   passengers for being illegal immigrants, right?             09:33:45

21   A.  Correct.

22   Q.  They were turned over to ICE for processing?

23   A.  Correct.

24   Q.  And not charged with any state crime, correct?

25   A.  Not all of them, no.                                     09:33:55

1    Q.  Well, none of them was, isn't that right?

2    A.  On this particular, I don't recall.  I'd have to see the

3    summary.

4    Q.  Okay.  Fair enough.

5            And during the Cave Creek operation deputies were          09:34:04

6    instructed to investigate the occupants of the vehicles for

7    immigration violations, correct?

8    A.  I don't recall that specifically being briefed.

9    Q.  Okay.  Can we please show --

10           Well, Sergeant Madrid, you were deposed in this case,      09:34:21

11   correct?

12   A.  Correct.

13   Q.  Twice?

14   A.  Correct.

15   Q.  Your first deposition was on October 27, 2009?               09:34:25

16   A.  I think so.

17   Q.  Something like that.

18   A.  Something like that.  A while ago.

19   Q.  Okay.  Let's -- let's show you part of that deposition.

20   Can we please show the first deposition, page 58, line 22, to    09:34:35

21   page 59, line 4.

22           And sir, I can give you a copy of the entire

23   deposition transcript if you like, but I can tell you that at

24   this section you were discussing this Cave Creek operation.

25           So you testified in your deposition:                      09:35:07

```
 1              "QUESTION:  And then they were to investigate the
 2       occupants of the vehicles?
 3              "ANSWER:  Correct.
 4              "QUESTION:  And they were to investigate the occupants
 5       for immigration violations?                              09:35:17
 6              "ANSWER:  For anything.
 7              "QUESTION:  Including immigration violations?
 8              "ANSWER:  Correct."
 9       A.  Okay.
10       Q.  That was your testimony then?                        09:35:23
11       A.  Sure.
12       Q.  And you stand by it now?
13       A.  Yeah.  My recollection then to now is obviously a little
14       bit deteriorated, so, yeah.
15       Q.  Okay.  So just to be clear, during the Cave Creek operation 09:35:31
16       deputies were instructed to investigate occupants of vehicles
17       for immigration violations --
18       A.  Correct.
19       Q.  -- correct?
20              Now, during the Cave Creek operation the patrol       09:35:41
21       deputies who were in the marked cars were making traffic stops,
22       correct?
23       A.  Correct.
24       Q.  And do you recall that there were two traffic stops made
25       during the course of that operation?                     09:35:56
```

1    A.  I don't recall the number.

2    Q.  Okay.  Sir -- well, why don't we take a look at

3    Exhibit 126, which is already in evidence.

4         And let's enlarge the bottom half of that e-mail

5    string little.                                            09:36:37

6         So, sir, is this an e-mail that you wrote to Tom Tyo,

7    Brian Sands, Joseph Sousa, and others on September 27, 2007?

8    A.  Correct.

9    Q.  And the subject is Cave Creek day laborers and tip line --

10   A.  Correct.                                              09:36:54

11   Q.  -- correct?

12        So why don't we take a look at this.  This is an

13   e-mail you wrote after the operation, correct?

14   A.  Yes, ma'am.

15   Q.  It's a summary and a report of what happened during the   09:37:00

16   operation?

17   A.  Correct.

18   Q.  To your chain of command?

19   A.  Yes, ma'am.

20   Q.  Okay.  I'm going to call your attention to the first   09:37:05

21   paragraph.  You describe a traffic stop where the first vehicle

22   was stopped for a speed violation for doing 45 in a marked

23   35-mile-an-hour zone, is that correct?

24   A.  Yes, ma'am.

25   Q.  And then it describes some arrest that Detective Rangel   09:37:37

1    made, correct?

2    A.   Yes, ma'am.

3    Q.   And then a sentence later it says:  On the second stop the

4    probable cause was a broken rear tail lamp.

5             Do you see that?                                      09:37:51

6    A.   Yes, ma'am.

7    Q.   Does this refresh your recollection that there were two

8    traffic stops made during this operation?

9    A.   Yes.

10   Q.   And if you look at the second paragraph it says:  According  09:37:57

11   to the UC detectives --

12            That means "undercover," correct?

13   A.   Yes, ma'am.

14   Q.   So according to them, after the first stop, the U.S.

15   citizen driver went back to the church and appear -- it          09:38:12

16   appeared that he relayed what had just occurred and then left

17   by himself.

18            Do you see that?

19   A.   Yes, ma'am.

20   Q.   And then you wrote:  Shortly after the second stop and      09:38:19

21   taking more people into custody, the church seemed to shut down

22   their operation for the day, correct?

23   A.   Correct.

24   Q.   And so by that I take it that the church stopped permitting

25   day laborers to congregate there as a pickup spot, correct?      09:38:34

1  A.  Correct.

2  Q.  And then after that, you ended your operation, correct?

3  A.  Yes.

4  Q.  Okay.  Sir, let's turn to the Queen Creek saturation patrol

5  on October 4th, 2007.                                              09:38:52

6        Do you re -- do you remember that one?

7  A.  Yes.

8  Q.  That also involved a known day laborer pickup site,

9  correct?

10 A.  Correct.                                                       09:39:02

11 Q.  And the location was based on -- sorry.

12       The location was selected based on e-mails from the

13 town council in reference to the day laborers in the city, is

14 that right?

15 A.  My recollection of it was that we were there in complaints     09:39:13

16 that revolved around the day laborers harassing school children

17 that were going to school that day.

18       MS. WANG:  Well, let's show Plaintiffs' Exhibit -- or,

19 sorry, Exhibit 129, which is already in evidence, and let's

20 blow up the second -- the -- the main e-mail in this.             09:39:36

21 BY MS. WANG:

22 Q.  Sir, this was, again, another report that you wrote about

23 the Queen Creek operation to your chain of command, correct?

24 A.  Correct.

25 Q.  And I'd like to highlight the first sentence.                  09:39:48

1          You wrote:  On 10-4-07 HSU conducted a detail in the

2    Town of Queen Creek based on e-mails from the town council in

3    reference to the day laborers in their city, correct?

4    A.  Correct.

5    Q.  You didn't mention anything in your report about complaints          09:40:07

6    about anyone bothering children, right?

7    A.  No, I didn't, not in this.

8    Q.  Okay.  And this Queen Creek operation involved basically

9    the same plan and procedure as the earlier Cave Creek

10   operation, correct?          09:40:26

11   A.  To the best of my recollection, yes.

12   Q.  There were surveillance vehicles and there were marked

13   patrol cars, correct?

14   A.  Correct.

15   Q.  And basically they -- the HSU deputies were trying to          09:40:31

16   develop probable cause to stop vehicles that had picked up day

17   laborers, correct?

18   A.  Correct.

19   Q.  And in the Queen Creek operation, as in the Cave Creek

20   operation, the deputies who made the traffic stop often had a          09:40:51

21   minor traffic violation as the probable cause for the stop,

22   correct?

23   A.  Correct.

24   Q.  And then the deputies would question the occupants, right?

25   A.  Yes.          09:41:03

1    Q.  About their immigration status?

2    A.  Yes.

3    Q.  And ask them for identification, correct?

4    A.  Correct.

5    Q.  And they would see if there were any indicators that they    09:41:10

6    were illegally in the United States, correct?

7    A.  Correct.

8    Q.  Sir, let's turn to the saturation patrol at 36th and Thomas

9    on October 15, 2007.  Do you recall that one?

10   A.  We did several there, so I don't necessarily recall a    09:41:26

11   specific one, but yes, I know we were there.

12   Q.  You did several operations in the area of 36th -- 32nd and

13   Thomas, correct?

14   A.  Correct.

15        THE COURT:  Could I -- could I get you to tell me    09:41:39

16   again the date you're asking about?

17        MS. WANG:  Yes, sir.  It is October 15, 2007.

18        THE COURT:  Thank you.

19   BY MS. WANG:

20   Q.  Sir, that area around, you know, 32nd or 36th and Thomas is    09:41:52

21   a predominantly Latino neighborhood, isn't that right?

22   A.  I don't know.

23   Q.  Okay.  Again, that location for the October 15, 2007,

24   saturation patrol was again based on e-mails from local

25   businesses about day laborers, correct?    09:42:10

1  A.  That specific one I don't recall.  It very well could be.

2  I don't -- again, we were there I don't know how many times.

3  They kind of all mesh together at this point.  Now I don't

4  remember one specific one.

5  Q.  They were all pretty similar?                                    09:42:23

6  A.  Yes.

7  Q.  Okay.  Well, maybe I can help you out.  Let's show

8  Plaintiffs' Exhibit 131, which is also in evidence.

9          And let's enlarge the bottom half of this.

10          So, Sergeant, this appears to be a report that you       09:42:40

11  wrote to your chain of command on October 15th, 2007, about

12  this operation at 36th and Thomas, is that correct?

13  A.  Yes, ma'am.

14  Q.  And does this refresh your recollection that the detail was

15  based on e-mails from local businesses in reference to the day    09:42:57

16  laborers in the area?

17  A.  Yes.

18  Q.  Sir, you don't know whether anyone investigated these

19  e-mail complaints from local businesses before HSU undertook

20  these operations, do you?                                          09:43:15

21  A.  No, I couldn't testify to that, no.

22  Q.  And you don't know whose responsibility within MCSO it

23  would have been to check out that e-mail correspondence?

24  A.  No.

25  Q.  And again, at this 36th Street and Thomas operation, there    09:43:27

1  was basically the same protocol for how stops were to be made,

2  correct?

3  A.  Yes.

4  Q.  And again, deputies would make stops for traffic

5  violations, correct?                                          09:43:43

6  A.  Correct.

7  Q.  And then once the cars were stopped, the deputies would

8  interview the subjects in the vehicles in reference to their

9  legal status to be in the United States, correct?

10  A.  Providing that there was reasonable suspicion to believe   09:43:53

11  that they were here illegally, yes.

12  Q.  Okay.  So let's highlight, please, about in the middle of

13  this paragraph where it says "once the vehicle was stopped,"

14  the next one.

15         So you wrote in your e-mail to the chain of command:    09:44:07

16  Once the vehicle was stopped, HSU detectives would interview

17  the subjects in the vehicles in reference to their legal status

18  to be in the United States, correct?

19  A.  Correct.

20  Q.  And then you continued on:  Once it was determined that     09:44:19

21  they were in the U.S. illegally, they were taken into custody

22  under immigration law, correct?

23  A.  Correct.

24  Q.  And none of those people was actually arrested for a state

25  crime, correct?                                               09:44:31

1    A.  Correct.

2    Q.  They were simply turned over to ICE?

3    A.  Yes.

4    Q.  Okay.  We can take that down.

5          I'd like to ask you now about the Fountain Hills          09:44:46

6    operation on October 22nd, 2027.  Were you at that one?

7    A.  No, I was never involved with any of the Fountain Hills

8    operations.

9    Q.  Okay.  But you were familiar with it as a supervisor at

10   HSU?                                                            09:45:00

11   A.  Correct, I knew they occurred.

12   Q.  And the purpose of that operation was to investigate day

13   laborers for their immigration status, correct?

14   A.  I -- correct.

15   Q.  Sergeant, would you agree with this statement:  That it is  09:45:09

16   racial profiling for deputies to aggressively enforce traffic

17   laws in predominantly Latino neighborhoods because of an

18   assumption that illegal immigrants live or work there?

19   A.  I'm sorry, say that again?

20   Q.  Do you agree with this statement:  That it's racial         09:45:29

21   profiling for deputies to aggressively enforce traffic laws in

22   predominantly Latino neighborhoods because of an assumption

23   that illegal immigrants live or work there?

24   A.  I agree with that.

25   Q.  I'd like to ask you some questions now more generally about 09:45:45

```
 1    HSU saturation patrols, including both the small ones that
 2    center on day laborers and the large ones.  Okay?
 3    A.   Okay.
 4    Q.   Generally, HSU did not have a postoperation briefing after
 5    the saturation patrols, is that right?                          09:46:06
 6    A.   Correct.
 7    Q.   And there was no formal assessment of whether the operation
 8    was successful?
 9    A.   Correct.
10    Q.   And you generally did not assess, after these saturation    09:46:13
11    patrols, whether they met their goals?
12    A.   There was really never any goals ever set.
13    Q.   And you did shift summaries after many of these operations,
14    correct?
15    A.   Yes.                                                        09:46:29
16    Q.   You noted the number of illegal immigrants who had been
17    arrested, correct?
18    A.   Correct.
19    Q.   And you sent those numbers up the chain of command?
20    A.   Correct.                                                    09:46:36
21    Q.   You were asked by the chain of command to do that, correct?
22    A.   Correct.
23    Q.   And you don't know what the chain of command did with those
24    statistics that you compiled, correct?
25    A.   No, I don't.                                                09:46:45
```

1   Q.  Let's turn to some of the larger saturation patrols now.

2        You were a supervisor on the scene of a sweep in Mesa

3   on June 26th, 27th, and 28th of 2008, correct?

4   A.  Correct.

5   Q.  And you were present at the briefing before that operation,    09:47:01

6   correct?

7   A.  Correct.

8   Q.  The briefing did not cover particular people who were

9   targets of the investigation, correct?

10  A.  I don't recall any briefing.  Again, this is the same as --   09:47:14

11  they kind of all run together.  I don't remember any specific

12  one any more.

13  Q.  Okay.  Why don't we show again your first deposition

14  from -- at page 166, lines 12 through 14, please.

15       And you were asked:  "Did you receive any specific          09:47:39

16  information about persons to target during that sweep?

17       "ANSWER:  Not that I recall."

18       Is that accurate testimony?

19  A.  Sure.

20  Q.  And the preoperation briefing for the Mesa sweep in June of   09:47:48

21  2008 also did not cover any particular houses that were under

22  investigation, isn't that correct?

23  A.  Correct.

24  Q.  Those preoperation briefings in general would happen the

25  morning of the patrol, correct?                                  09:48:07

1   A.   Typically, yeah.

2   Q.   It might be the day before in some cases?

3   A.   Correct.

4   Q.   And you were present at all of the ones where you were

5   involved in the operation?                                        09:48:19

6   A.   Probably, yes.

7   Q.   And the briefings did not cover why the locations were

8   selected, is that right?

9   A.   Not that I recall.

10  Q.   At some of the smaller saturation patrols, deputies were    09:48:30

11  not given specific instructions, but instead were told to

12  basically work the area, is that correct?

13  A.   Correct.

14  Q.   And I believe at some point MCSO started to instruct

15  deputies on something called a zero tolerance policy for         09:48:50

16  saturation patrols, is that right?

17  A.   Yes, ma'am.

18  Q.   That was in force during these larger saturation patrols,

19  is that right?

20  A.   Yeah, it was implemented on the -- on the larger ones, yes.  09:48:59

21  Q.   And according to you, zero tolerance meant that deputies

22  were required to make a stop if they observed any basis for a

23  stop, is that right?

24  A.   Correct.

25  Q.   So the zero tolerance policy took away the ordinary          09:49:11

1   officer discretion to let something slide.

2   A.  Sure.

3   Q.  So if you saw someone who was speeding by five miles an

4   hour over the limit, you had to stop them under the zero

5   tolerance policy, correct?                                    09:49:27

6   A.  That's what they were briefed, yeah.

7   Q.  Sergeant, you're familiar with 287(g) agreements, right?

8   A.  The agreement, no, I -- I didn't ever read that.

9   Q.  You know what a 287 --

10  A.  Sure, I know what it is, yes.                             09:49:41

11  Q.  Thank you.

12       And MCSO once had a task force 287(g) agreement,

13  correct?

14  A.  I'm sorry?

15  Q.  MCSO once had a task force 287(g) agreement with the      09:49:48

16  federal government?

17  A.  I don't know.

18  Q.  Okay.  Well, there's -- there's -- there are 287(g)

19  agreements that cover jails, right?

20  A.  Yes.                                                      09:50:00

21  Q.  And then there are some --

22  A.  I'm sorry, I'm following you now.  Yes.  Yes, we did.

23  Q.  Okay.  And in fact, at one point all HSU deputies were

24  287(g) certified, is that right?

25  A.  Yes.                                                      09:50:12

1    Q.  And MCSO deputies with a 280 -- withdrawn.

2          You yourself were 287(g) certified, is that right?

3    A.  Yes.

4    Q.  As was Sergeant Palmer?

5    A.  I believe he was, yes.                                    09:50:23

6    Q.  Now, you know that the Department of Homeland Security

7    terminated the 287(g) agreement with MCSO in 2009, correct?

8    A.  Yes.

9    Q.  The termination of the 287(g) agreement did not interfere

10   with the Human Smuggling Unit's work, did it?              09:50:40

11   A.  Not really, no.

12   Q.  In fact, the termination of the 287(g) agreement did not

13   affect what HSU did during traffic stops, correct?

14   A.  On the human smuggling loads.

15   Q.  You mean it did affect --                               09:50:54

16   A.  I'm sorry.  Repeat that again.

17   Q.  The termination of the 287(g) agreement did not affect what

18   HSU did during traffic stops.

19   A.  Not really, no.

20   Q.  Sir, you believe that whether someone is an illegal      09:51:07

21   immigrant can be relevant in a human smuggling investigation,

22   correct?

23   A.  Yes.

24   Q.  And in investigations under Arizona's human smuggling law,

25   MCSO deputies could look into the immigration status of people  09:51:24

1    encountered in traffic stops, right?

2    A.   Once there was reason to believe that they were here

3    illegally, yes.

4    Q.   And according to you, MCSO does not need 287(g) authority

5    to do that, correct?                                          09:51:38

6    A.   Correct.

7    Q.   Sir, outside of saturation patrols, HSU has made stops of

8    smuggling vehicles, correct?

9    A.   Correct.

10   Q.   And outside of saturation patrols, HSU has busted drop    09:51:48

11   houses, correct?

12   A.   Yes.

13   Q.   When that happens, HSU often arrests the smugglees,

14   correct?

15   A.   Correct.                                                  09:51:59

16   Q.   Those were the people who were smuggled?

17   A.   Correct.

18   Q.   And those people are often booked into the jail for

19   conspiracy to commit alien smuggling under the Arizona law,

20   correct?                                                       09:52:07

21   A.   Yes.

22   Q.   Sir, it's fair to say that HSU deputies conducted traffic

23   stops during saturation patrols, correct?

24   A.   Yes.

25   Q.   And they also did traffic stops outside of saturation     09:52:18

```
 1  patrols, correct?

 2  A.  Yes.

 3  Q.  And you would occasionally go to the scene of traffic stops

 4  to check on your deputies, correct?

 5  A.  Correct.                                               09:52:33

 6  Q.  And in your deposition on October 27, 2009, you described

 7  your typical routine when you stopped by a deputy's traffic

 8  stop.  And I'm going to ask to show that.  It's the first

 9  deposition, page 53, at lines 17 through 19.

10          Can you enlarge that?  Oops.                       09:52:58

11          17 through 19.

12          So you testified:  "Typically, what I do, I will pull

13  up on a traffic stop:  Hey, what is going on?  What do you got?

14  This.  All right.  You good?"

15          Does that accurately describe your procedure for      09:53:17

16  supervising traffic stops?

17  A.  Yes.

18  Q.  So when you go to a traffic stop by one of your deputies,

19  you just stay briefly, isn't that right?

20  A.  Typically, yeah.                                       09:53:26

21  Q.  You don't sit and baby-sit them?

22  A.  Unless they need help with something, but typically they

23  don't.

24  Q.  And your practice in supervising traffic stops is in line

25  with MCSO policy and practices, right?                     09:53:36
```

1    A.  Correct.

2    Q.  While you were a supervisor in HSU you were present at most

3    saturation patrols that involved HSU, correct?

4    A.  Correct.

5    Q.  And you acted as the command post supervisor for much of          09:53:47

6    that time?

7    A.  Yeah.

8    Q.  You would often stay at the command center, right?

9    A.  Yes.

10   Q.  Would you say about 80 to 85 percent of your time during         09:53:55

11   saturation patrols was spent at the command post?

12   A.  I would probably say more like 95 percent --

13   Q.  Okay.

14   A.  -- if not more.

15   Q.  So you were not generally on the scene of traffic stops          09:54:04

16   during saturation patrols?

17   A.  Correct.

18   Q.  Sir, when HSU deputies are on patrol, they're looking for

19   human smuggling loads, right?

20   A.  On -- I'm sorry.  Say that again?                                09:54:21

21   Q.  When HSU deputies are on patrol, they're looking for

22   smuggling loads?

23   A.  During -- during a saturation patrol, or --

24   Q.  In general.

25   A.  Yes.                                                             09:54:33

1   Q.  And HSU's mission, again, is to enforce Arizona's human

2   smuggling statute?

3   A.  Correct.

4   Q.  As well as looking for illegal immigrants, correct?

5   A.  I wouldn't add the second part to it, but it's to enforce       09:54:42

6   the Arizona statute.

7   Q.  But if in the course of their work HSU deputies come across

8   people they believe are illegal immigrants, they'll arrest

9   them, correct?

10  A.  When we were 287(g), yes.                                       09:54:56

11  Q.  Okay.  But that would actually happen after 287(g)

12  authority expired, isn't that right?

13  A.  Correct.

14  Q.  Because if a deputy came across an illegal immigrant in the

15  course of their work, they wouldn't let them go?                   09:55:09

16  A.  Well, no, we would make the call to ICE.  If there was

17  reasonable suspicion to still believe that they were here

18  illegally, we would make a call to ICE and let them make that

19  determination.

20  Q.  So it's fair to say that HSU deputies don't exclusively        09:55:18

21  enforce Arizona's human smuggling statute; they do other

22  things, too, right?

23  A.  Sure, they're still deputy sheriffs; they enforce all state

24  laws.

25  Q.  And they turn over suspected illegal immigrants to ICE as      09:55:37

1    well?

2    A.  Correct.

3    Q.  And that continued to be true after there was no 287(g)

4    authority?

5    A.  Correct.                                              09:55:46

6    Q.  And HSU deputies can look for indications of immigration

7    violations during traffic stops, right?

8    A.  Before or after?

9    Q.  Both.

10   A.  Before, yeah, we could do it.  If -- again, if there was --  09:55:58

11   not necessarily look, but if they were -- reason to believe

12   that there was -- suspicion to believe that they were here

13   illegally, yeah, they would -- they wouldn't let that go, no.

14   They would, in addition, to call ICE and have them make the

15   determination what we were going to do with it, with the   09:56:13

16   people.

17   Q.  And to be clear, that's true both before and after the

18   termination of the 287(g) agreement, correct?

19   A.  Correct.

20   Q.  The only difference is now they need to call ICE in order  09:56:21

21   to have the person picked up, correct?

22   A.  Correct.

23   Q.  When there are certain indicators present, a deputy can

24   question passengers about immigration status, correct?

25   A.  Correct.                                              09:56:37

1    Q.  And you're familiar with those indicators, correct?

2    A.  Correct.

3    Q.  Some of those indicators include having multiple passengers

4    in a vehicle, correct?

5    A.  Correct.                                                    09:56:47

6    Q.  Passengers looking disheveled, right?

7    A.  Correct.

8    Q.  Having a foreign ID?

9    A.  Correct.

10   Q.  Not speaking English?                                       09:56:53

11   A.  Correct.

12   Q.  Or speaking broken English?

13   A.  Correct.

14   Q.  And Hispanic appearance can be considered as one factor,

15   among others, when deciding when to initiate an immigration     09:57:04

16   investigation once a traffic stop is underway, correct?

17   A.  I wouldn't necessarily say initiate it.  With the other

18   factors that you've already stated, it was already initiated at

19   that point.  I would say the only time that race ever came into

20   play was in the totality at the end.  You know, it was never a  09:57:23

21   factor of, Okay, I'm going to do the -- the investigation.  All

22   the other ones that were present were typically seen first,

23   and -- and the investigation had already started at that point.

24   Q.  Well, sir, a deputy could observe someone's race at the

25   same time they're observing that they're disheveled looking,    09:57:40

1  correct?

2  A.  Yes.  And all this happens in -- in a second.  I mean, you

3  can pretty much go through all that pretty quickly.

4  Q.  So deputies are looking at the totality of circumstances in

5  deciding whether someone is suspected of being an undocumented            09:57:52

6  immigrant in a smuggling load?

7  A.  I didn't hear that.

8  Q.  And race is one of the things they take into account in the

9  totality of circumstances, correct?

10  A.  Correct.                                                             09:58:05

11  Q.  And that's proper?

12  A.  That's what we were trained.

13  Q.  Okay.  Sir, I'm going to ask that we put up a -- an

14  exhibit.  This is not in evidence, and I do not intend to move

15  for its admission, but I want to show it to you.  It's --        09:58:20

16          MR. CASEY:  I'm sorry.  What was the exhibit?

17          MS. WANG:  It's Exhibit 157.

18          MR. CASEY:  Thank you.

19          MS. WANG:  I'll note for counsel and for the Court we

20  saw a very similar exhibit with Sergeant Palmer.  This one's       09:58:30

21  actually different, a different incident.

22          THE COURT:  Do you wish it to be shown to the witness

23  and the Court?

24          MS. WANG:  Yes, please, Your Honor.

25          THE COURT:  All right.  It's up on your screen.      09:58:43

```
 1            THE WITNESS:  Yes, sir.
 2   BY MS. WANG:
 3   Q.  Sir, this is a -- a form that's used by MCSO, correct?
 4   A.  Correct.
 5   Q.  And it's a narrative report, right?                    09:58:54
 6   A.  Yes, ma'am.
 7   Q.  This is a report for MCSO deputies to document arrests or
 8   stops that they make, correct?
 9   A.  Yes, this is an incident report.
10   Q.  And in this case the reporting officer is E.A. Quintero, is  09:59:07
11   that right?
12   A.  Correct.
13   Q.  That's Ernie Quintero?
14   A.  Yes, ma'am.
15   Q.  He was one of your HSU deputies under your supervision at  09:59:18
16   this time, correct?
17   A.  Yes, he was.
18   Q.  And that was February 28, 2008, correct?
19   A.  Correct.
20   Q.  And this was Deputy Quintero's report on a stop he made  09:59:28
21   on U.S. 93 at milepost 199, correct?
22   A.  Correct.
23   Q.  Okay.  Let's turn to page MCSO 024666, please.
24            By the way, I should ask:  You were present on the
25   scene of this stop, correct?                              09:59:55
```

1  A.  I don't recall.  I'd have to see the portion of the report.

2  Q.  Okay.  It's on your screen now.  This is page MCSO 024666.

3  You're listed as a deputy on the scene, correct?

4  A.  Yes.

5  Q.  So you would have been there, correct?                    10:00:06

6  A.  Correct.

7  Q.  Let's highlight -- oops.

8       MS. WANG:  I apologize, Your Honor.  We have some

9  technical difficulties.

10       (Pause in proceedings.)                                 10:00:35

11       MS. WANG:  We'll go to the paper.  I'm going to --

12       THE COURT:  I'll tell you what we can do if you want.

13  We can take a 20-minute break right now.

14       MS. WANG:  Sure.

15       THE COURT:  And we'll take the morning break for 20,    10:00:42

16  25 minutes, hopefully 20 minutes.  Well, I better give you 25.

17  We'll be back here at 10:25 to resume testimony.

18       MS. WANG:  Thank you, Your Honor.

19       (Recess taken.)

20       THE COURT:  You ready to resume, Ms. Wang?             10:25:25

21       MS. WANG:  Yes, Your Honor.  Thank you.

22       THE COURT:  Please do so.

23  BY MS. WANG:

24  Q.  Hello, Sergeant.

25  A.  Hello.                                                    10:25:34

1    Q.  Did you speak with anyone about your testimony during our

2    break?

3    A.  No.

4    Q.  We were looking or trying to look at Exhibit 157.  Can I

5    ask that it be put on the screen for the witness.  Again, it's          10:25:42

6    not in evidence.

7         And I believe before the break you told me that you

8    were present at the stop, correct?

9    A.  Correct.

10   Q.  And you were Deputy Quintero's supervisor at this time,             10:25:55

11   correct?

12   A.  Correct.

13   Q.  And so it would have been your responsibility to review

14   reports by Deputy Quintero?

15   A.  Yes.                                                                10:26:08

16   Q.  Now, the copy of this report that we have in evidence as

17   Exhibit 157 doesn't show any signature on the "reviewed by"

18   line at the bottom, correct?

19   A.  Correct, 'cause there -- there would be sheets prior to

20   this.                                                                   10:26:24

21   Q.  I see.  So you probably did review this report?

22   A.  I don't know.

23   Q.  But it was your job to review Deputy Quintero's reports,

24   correct?

25   A.  In addition to Ryan Baranyos, who was also sergeant at the          10:26:30

1    time.  So I don't know if I did this one or not.

2    Q.  Okay.  But you were there on the scene of the stop?

3    A.  Correct.

4    Q.  Let's enlarge the paragraph at the bottom of this page,

5    please.                                                          10:26:54

6          I'm sorry, the next one up.

7          So here Deputy Quintero describes his probable cause

8    for the traffic stop, correct?

9    A.  Correct.

10   Q.  He writes in the middle, and we can highlight this:  As    10:27:13

11   this vehicle approached milepost 199, I noticed that the

12   number two lane merged into one lane, the number one lane.  As

13   the vehicle merged into my lane of travel, the driver of this

14   vehicle failed to activate the left turn signal to indicate the

15   upcoming lane change.                                           10:27:34

16          Do you see that?

17   A.  Yes, ma'am.

18   Q.  So basically one lane of the highway ended here, correct?

19   A.  Correct.

20   Q.  And the driver failed to signal that he was going to merge  10:27:42

21   into the -- the next lane?

22   A.  Correct.

23   Q.  And that was the probable cause for the stop?

24   A.  Yes.

25   Q.  Okay.  Now let's go on to the next paragraph.  You can just  10:27:49

1    scroll down, please.

2          So Deputy Quintero then reports that he contacted the

3    driver, correct?

4    A.  Correct.

5    Q.  Who spoke only Spanish --                           10:28:06

6    A.  Correct.

7    Q.  -- correct?

8          And the deputy observed multiple passengers of

9    Hispanic descent within the passenger compartment, correct?

10   A.  Correct.                                             10:28:16

11   Q.  Okay.  Now let's turn to the next page.  We can take this

12   one down.

13         Now, here Deputy Quintero notes that there were some

14   suspicious factors that led him to believe that this was a

15   smuggling load, correct?                                10:28:41

16   A.  Correct.

17   Q.  Including the fact that there were three passengers seated

18   in the rear luggage area of the vehicle?

19   A.  Correct.

20   Q.  It was an SUV, right?                               10:28:48

21   A.  I didn't catch that, but --

22   Q.  Okay.  That's fine.

23         Let's enlarge the paragraph beginning "furthermore."

24         And highlight the last sentence, please.

25         Deputy Quintero wrote in his report:  The Hispanic      10:29:09

1    descent of his passengers, the pungent body odor, and the lack

2    of luggage for traveling also contributed to my suspicions.

3          Do you see that?

4    A.  Yes, ma'am.

5    Q.  So he lists Hispanic descent of the passengers as one of

6    the factors that contributed to his suspicions, correct?

7    A.  Correct.  And above that he had also talked about others as

8    well.

9    Q.  So he talks about Hispanic descent in addition to other

10   factors?

11   A.  Correct.

12   Q.  But it's clear that Hispanic descent was one of the factors

13   that contributed to his suspicion about this -- these

14   passengers, correct?

15   A.  Correct.  And at the time we were 287(g), and that's the

16   way we were trained to do so, that it could be used in addition

17   to multiple other indicators.

18   Q.  Thank you.

19          Now, you're not sure that you reviewed this report as

20   a supervisor, correct?

21   A.  Correct.

22   Q.  But if you saw this report while you were a supervisor in

23   HSU, you would not have talked to Deputy Quintero about his

24   mentioning the Hispanic descent?

25   A.  No, because at the time I -- I assume I wouldn't have at

10:29:22

10:29:38

10:29:44

10:29:59

10:30:11

1171

1  the time that we were 287(g) and that we were trained that you

2  could use that in addition to other indicators, just never

3  alone by itself.

4  Q.  Okay.  And this was a human smuggling -- a suspected human

5  smuggling load, correct?                                        10:30:24

6  A.  Correct.

7  Q.  And so Deputy Quintero was making -- doing an investigation

8  under state law, correct?

9  A.  Correct.

10 Q.  Okay.  As a supervisor, Sergeant, your view is that you     10:30:32

11 cannot know for sure whether race plays a role in a stop by one

12 of your deputies unless you're actually at the scene of the

13 stop, is that right?

14 A.  I couldn't testify that I know for sure, no, I'm not there.

15 We don't train anybody to use race, and I've never heard of any  10:30:55

16 type of training that we -- other than the 287(g) stuff that

17 we -- that the Sheriff's Office actually uses race for

18 anything.

19 Q.  And you've never received training in how you, as a

20 supervisor, can detect racial profiling at a stop where you're   10:31:12

21 not present?

22 A.  Correct.

23 Q.  You don't know whether race played a role in any traffic

24 stops in HSU's large saturation patrols for sure, do you?

25 A.  I wasn't there, no, so no.                                   10:31:23

1  Q.  And you have never spoken to one of the deputies under your

2  supervision to find out whether he racially profiled someone

3  during a traffic stop?

4  A.  I don't think I'd have to.  I don't see why we -- we would.

5  Nobody would.                                            10:31:37

6  Q.  Because you trust them not to racially profile?

7  A.  Yes.

8  Q.  You generally don't review your deputies' incident reports

9  for the purpose of determining whether they racially profiled

10 someone?                                                 10:31:47

11 A.  I'm sorry, say that again?

12 Q.  You generally don't review your deputies' incident reports

13 for the purpose of checking whether they're engaged in racial

14 profiling?

15 A.  No.                                                  10:31:57

16 Q.  Now, you do review incident reports to see if a deputy had

17 probable cause to make a traffic stop, right?

18 A.  Probable cause, elements of the crime that he's

19 investigating.

20 Q.  And once you're satisfied that a report shows there was    10:32:13

21 probable cause for the traffic stop, your view is that you know

22 there was no racial profiling involved in that stop, isn't that

23 right?

24 A.  I wouldn't even suspect it, so, no.

25 Q.  Okay.  And you do not review any data to monitor whether   10:32:27

1    there are racial disparities in the way that deputies are doing

2    traffic stops, correct?

3    A.  I don't think we have such data.

4    Q.  Sergeant, you yourself have noted Hispanic race in reports

5    that you've written about HSU work, correct?                    10:32:48

6    A.  I never wrote any reports.

7    Q.  Well, you've written e-mails to your chain of command,

8    correct?

9    A.  Those were summaries.

10   Q.  And you have noted Hispanic descent of people in those      10:32:56

11   e-mail summaries?

12   A.  Correct.

13   Q.  And when you write those e-mail summaries to your chain of

14   command, you do your best to convey information that would be

15   important to them, correct?                                     10:33:08

16   A.  Of what they're asking, yes.

17   Q.  Sir, you were involved in a large saturation patrol by HSU

18   on March 22nd -- sorry, March 21st to 22nd, 2008, at 32nd

19   Street and Thomas, correct?

20   A.  I believe so.                                               10:33:31

21   Q.  Okay.  Let's put up Exhibit 79, which is in evidence.

22           Okay.  Let's turn to the next page, please.

23           THE CLERK:  Counsel, do you want this published?

24           MS. WANG:  Yes, please.  With the Judge's permission.

25           THE COURT:  Yes.                                        10:33:56

1  BY MS. WANG:

2  Q.  And these are documents relating to an operation -- well,

3  here it says 16th Street to 44th Street, McDowell to Indian

4  School Roads in Phoenix, correct?

5  A.  Correct.                                                    10:34:13

6  Q.  And let's turn to page MCSO 001839.

7          This is your handwriting, right?

8  A.  Yeah, appears so.

9  Q.  And this is basically a list of people arrested during this

10 operation, is that correct?                                    10:34:34

11 A.  Yes, ma'am.

12 Q.  On 3-22-08, correct?

13 A.  Correct.

14 Q.  And let's turn to the next page.

15         We can leave them both up, actually, if possible,        10:34:48

16 Mr. Braun.

17         So looks like there were two pages of people arrested

18 that you wrote on this document, correct?

19 A.  Yes.

20 Q.  Both for Saturday, March 22nd, 2008?                        10:34:59

21 A.  Yes, ma'am.

22 Q.  Okay.  So it looks like you were there during this

23 operation, correct?

24 A.  Yes.

25 Q.  Okay.  Now, I think you testified before that HSU did a      10:35:07

1    number of saturation patrols in this general area, correct?

2    A.  Correct.

3    Q.  In 2007 and 2008 at the least, correct?

4    A.  Correct.

5    Q.  Day laborers tend to gather in part of that neighborhood,          10:35:19

6    right?

7    A.  My understanding, yes.

8    Q.  And with respect -- with respect to this saturation patrol

9    on March 22nd and 21st, 2008, you were present as a supervisor,

10   correct?                                                               10:35:35

11   A.  Correct.

12   Q.  And you compiled some summary statistics that we just saw,

13   correct?

14   A.  Say that again?

15   Q.  You compiled some statistics which we just saw, correct?          10:35:41

16   A.  Correct.

17   Q.  Let's show both of those pages again, please.

18   A.  And let me go back.  I don't know that I would call it

19   "statistics."  This is just noting who was contacted, or --

20   here, who was arrested for what charges.  I don't know if             10:35:59

21   that --

22   Q.  Fair to call it an arrest list?

23   A.  An arrest list.

24   Q.  Okay.  Thank you.

25        You see that last column says 287?                               10:36:06

1    A.  Yes.

2    Q.  That shows whether someone was turned over to ICE for

3    deportation purposes, correct?

4    A.  It was not necessarily turned over to ICE, but whether they

5    were here legally or illegally.                                    10:36:19

6    Q.  Okay.  But that's noted on your arrest list, correct?

7    A.  Correct.

8    Q.  All right.  Let's turn to page MCSO 001838.

9         This looks like it's an arrest list for the previous

10   day of the patrol, Friday, March 21st, 2008, correct?           10:36:51

11   A.  Correct.

12   Q.  You did not write this one out?

13   A.  No.

14   Q.  Except for maybe the first --

15   A.  Maybe the first -- maybe the first one, correct.            10:37:00

16   Q.  Yeah.  And this list should reflect all of the arrests made

17   on Saturday, the first day of the operation, correct?

18   A.  Yes.

19   Q.  Do you see that in the first list it says 287(g) only?

20   A.  Correct.                                                     10:37:17

21   Q.  That means all these people were arrested for -- under the

22   287(g) power, correct?

23   A.  Correct.

24   Q.  Nobody on this list was charged with a state crime,

25   correct?                                                         10:37:29

1    A.  It's kind of cut off here, but yeah, until it gets down to

2    Friday, state charges and transported, so everything above

3    that, yes.

4    Q.  And in the first group it looks like there are 13 names, is

5    that right?                                                        10:37:42

6    A.  Correct.

7    Q.  And all of those 13 names are Hispanic names, correct?

8    A.  Yes.

9    Q.  Looking at the second group on the same page, these are

10   people who were arrested on state charges, correct?               10:38:11

11   A.  Correct.

12   Q.  And there are eight names listed here?

13   A.  Yes.

14   Q.  And seven of those eight names are Hispanic names, correct?

15   A.  Number 4, I don't -- I couldn't tell you what that is.        10:38:27

16   Q.  Adolfo Montiel-Nolasco does not sound like a Spanish name

17   to you?

18   A.  No, the first part -- the Nolasco does, but the first one

19   doesn't really.

20   Q.  Okay.  So --                                                  10:38:44

21   A.  It could be, though.

22   Q.  It could be?

23        So -- but we think that Peter A. Gresh is probably not

24   a Hispanic name?

25   A.  Not a Hispanic name, no.                                      10:38:51

1   Q.  Okay.  So on this first day of the operation, it looks like

2   there was a total of 13 plus 8, or 21 people arrested in all?

3   A.  Correct.

4   Q.  And were -- at least 19 of them had Hispanic names, right?

5   A.  Correct.                                              10:39:11

6   Q.  Probably 20?

7   A.  Possibly, yes.

8   Q.  Let's turn again to the next page.  This was the first of

9   two lists of arrestees from the next day, Saturday, March 22nd,

10  2008.  And here we have, I believe, 12 names listed, is that    10:39:26

11  right?

12  A.  Correct.

13  Q.  And all 12 of these names are Hispanic names, correct?

14  A.  It could be, yes.

15  Q.  Let's turn on the next page, please, the continuation of    10:39:55

16  Saturday's arrests.  Here we have 10 names listed, correct?

17  A.  Correct.

18  Q.  And of the 10 names, every single one is a Hispanic name,

19  correct?

20  A.  Could be, yes, correct.                               10:40:08

21  Q.  So during this two-day saturation patrol we had a total of

22  43 people arrested, and at least 41, possibly 42 of them, had

23  Hispanic names, correct?

24  A.  Correct.

25  Q.  That did not raise a concern about racial profiling to you?  10:40:30

```
 1   A.  A name to me means absolutely nothing.

 2   Q.  Okay.

 3   A.  For instance, my wife, she's blond haired, blue eyes, would

 4   be considered white, but she's got a Madrid last name.  So

 5   based on her name, she's got a Latino last name, but she would        10:40:48

 6   never in a million years be considered Latino.

 7   Q.  And that's why it didn't concern you that you had 42 out of

 8   your 43 names on your arrest list Hispanic names?

 9   A.  Race, no.

10   Q.  Isn't it true that some people who are Hispanic have Anglo        10:41:00

11   names, too?

12   A.  Correct.

13   Q.  Some of those people look Hispanic, correct, but they have

14   Anglo names?

15   A.  Correct.                                                          10:41:12

16   Q.  Sergeant, actually, let me hand you a copy, a paper copy of

17   this exhibit, with the Court's permission.

18           THE COURT:  You might want to identify the exhibit for

19   the defendant.

20           MS. WANG:  Yes, it's Exhibit 79.                             10:41:30

21           THE COURT:  Has it been admitted?

22           MS. WANG:  May I, Your Honor?

23           THE COURT:  Yes.

24           MS. WANG:  I'm just giving this to you for your

25   convenience.                                                         10:41:40
```

```
 1              THE WITNESS:  Um-hum.
 2    BY MS. WANG:
 3    Q.  Sir, looking at the three pages of arrestees, isn't it true
 4    that not a single person was arrested for human smuggling
 5    during this two-day operation?                                    10:42:04
 6    A.  The 21st doesn't indicate down here the state charges that
 7    they arrested for, that I don't see.  The 22nd it indicates the
 8    charges, and I don't see anything that says they were for human
 9    smuggling.
10    Q.  Thank you.                                                    10:42:26
11              I'm going to have you now turn to the last page,
12    MCSO 001840, and we could just put that on the screen.
13    A.  Okay.
14    Q.  I'm going to call your attention to the line where it looks
15    like Isaias Franco Perez is listed.                              10:42:47
16              Do you see that?
17    A.  Yes.
18    Q.  And in the next column it says PC.  That would be the
19    probable cause for the traffic stop, correct?
20    A.  Correct.                                                      10:42:59
21    Q.  And here it looks like Mr. Franco Perez was arrested for
22    having a cracked -- stop.  Sorry, let me withdraw that.
23              Mr. Franco Perez was stopped for having a cracked
24    windshield, correct?
25    A.  Correct.                                                      10:43:13
```

1   Q.  And under Charge it says merely 287(g), correct?

2   A.  Correct.

3   Q.  So Mr. Franco Perez was not arrested on any state charge,

4   correct?

5   A.  Correct.                                                      10:43:22

6   Q.  He was only arrested for administrative deportation

7   purposes, correct?

8   A.  Correct.

9   Q.  Let's look at the next two lines.  Let's just enlarge that

10  portion.                                                          10:43:35

11          The next two lines list someone named Luis Roberto

12  Olea Contreras.

13          Do you see that?

14  A.  Yes, ma'am.

15  Q.  And it says, under PC for him, passenger number 19.          10:43:44

16          Do you see that?

17  A.  Yes.

18  Q.  So it seems that Mr. Contreras was a passenger of

19  Mr. Franco Perez, right?

20  A.  Correct.                                                      10:43:56

21  Q.  Mr. Contreras was arrested also under 287(g), correct?

22  A.  Correct.

23  Q.  No state criminal charge, correct?

24  A.  Correct.

25  Q.  And then the next person listed, Ivan Hernandez Sanchez?     10:44:07

1    A.   Correct.

2    Q.   He was also a passenger of Mr. Franco Perez, right?

3    A.   Correct.

4    Q.   He also was arrested under 287(g), correct?

5    A.   Yes.                                                    10:44:18

6    Q.   So the original cause for this traffic stop was a cracked

7    windshield, correct?

8    A.   Correct.

9    Q.   Nobody in that car was arrested or charged with any state

10   crime, correct?                                             10:44:27

11   A.   Correct.

12   Q.   They were all arrested because of immigration violations

13   only?

14   A.   Correct.

15   Q.   You did not find any of this to be a problem, Sergeant?    10:44:39

16   A.   I don't see a problem here.  I mean, I wasn't at the scene.

17   There's many things that we don't know just based off this, so

18   I'm not going to raise a suspicion just off of this, no.

19   Q.   And you do not recall ever going back to the arresting

20   deputy on this stop to inquire about that stop?              10:45:00

21   A.   No.

22            MS. WANG:  Okay.  We can take that down.

23            I think those are all the questions I have for you

24   right now.  I'll pass the witness.

25            THE WITNESS:  Thank you.                            10:45:24

```
 1              THE COURT:  Mr. Liddy, cross-examination.
 2                        CROSS-EXAMINATION
 3   BY MR. LIDDY:
 4   Q.  Good morning, Sergeant Madrid.
 5   A.  Good morning.                                       10:45:50
 6   Q.  I think we're going to get right to it.
 7              Let's go right back to the exhibit that was just being
 8   displayed.
 9              Mr. Casey --
10              MR. CASEY:  Exhibit 79.                      10:46:04
11              MR. LIDDY:  Yes, it's Exhibit 79.
12   BY MR. LIDDY:
13   Q.  Can you see that up on your screen?
14   A.  I don't have it on my screen.  I've got it --
15   Q.  Oh, you've got it on your hand.  Okay.              10:46:15
16              MR. CASEY:  I'm operating it from here, with the
17   Court's permission.
18              THE COURT:  You may put it up on the screen if you
19   wish, but if you don't wish, you don't have to.  Since you're
20   operating.                                             10:46:27
21              MR. LIDDY:  I'd like to, Your Honor.
22              Can you see it now, Your Honor?
23              THE COURT:  I can see it.
24              MR. LIDDY:  Counsel?
25              MS. WANG:  Yes.  Thank you.                  10:46:35
```

1    BY MR. LIDDY:

2    Q.  I direct your attention to Bates numbered MCSO 001389.

3            Do you have that page available, Sergeant?

4    A.  Yes.

5    Q.  Third column over it says Charge, handwritten.                    10:46:52

6            Do you see that?

7    A.  Yes.

8    Q.  And would you read for me, please, the first charge that is

9    listed under Reyes, Junior?

10   A.  It's DOSL, which stands for driving on a suspended license.    10:47:10

11   Q.  Is driving on a suspended license a race-neutral term?

12   A.  Yeah.

13   Q.  Have you encountered other drivers on suspended licenses in

14   your experience as a deputy for the MCSO?

15   A.  Yes.                                                            10:47:28

16   Q.  Have some of them been Hispanic?

17   A.  Yes.

18   Q.  Have some of them been non-Hispanic?

19   A.  Yes.

20   Q.  Does the MCSO have a policy for only enforcing driving on a    10:47:34

21   suspended license laws against one race and not another?

22   A.  No.

23   Q.  Would you go down one more on the same column and read that

24   for me for Arias.

25   A.  Criminal speed.                                                10:47:56

```
 1    Q.   What does criminal speed indicate to you?

 2    A.   That they were above the statute 28-701.A, which is normal

 3    speeding, they were above and beyond that speed that's in that

 4    threshold.

 5    Q.   Speeding?                                                      10:48:13

 6    A.   Speeding, correct.

 7    Q.   Exceeding the speed limit?

 8    A.   Yeah, which in this case would be criminal versus a civil

 9    violation.

10    Q.   In your opinion is that a race-neutral term?                  10:48:18

11    A.   No.

12    Q.   Is it race neutral?

13    A.   Or, I'm sorry, yes.

14    Q.   In your experience, you've enforced that law against

15    Hispanics and non-Hispanics alike?                                 10:48:31

16    A.   Yes.

17    Q.   Let me ask you to go down five columns, looks like it's

18    Jesus Corrales.

19            Do you see that?

20    A.   Yes.                                                          10:48:49

21    Q.   Back to the same column, Charge.  Would you read that for

22    me?

23    A.   Warrant.

24    Q.   What does that indicate to you?

25    A.   He was arrested on a warrant out of a court in Arizona.       10:48:53
```

1    Q.   So it was an outstanding warrant?

2    A.   Correct.

3    Q.   Is that a race-neutral term?

4    A.   Yes.

5    Q.   Okay.  You can set that exhibit aside, thank you.                    10:49:08

6             I believe you testified that when you served in the

7    Human Smuggling Unit you were a supervisor, is that correct?

8    A.   Correct.

9    Q.   And approximately how many deputy sheriffs did you

10   supervise?                                                                10:49:32

11   A.   Five to six.

12   Q.   Five to six at any one time?

13   A.   Correct.  The unit had a total anywhere from 10 to 12,

14   either Sergeant Palmer and I, or Sergeant Baranyos at the

15   beginning, would co-supervisor each other's squads.  But I had           10:49:45

16   five on paper, five to six under me on paper.

17   Q.   And how long were you stationed at the HSU?

18   A.   Roughly four and a half years.

19   Q.   And was there some turnover during that time period?

20   A.   Oh, yes.                                                             10:49:58

21   Q.   So what would you estimate would be the total number of

22   deputy sheriffs that you either supervised directly or

23   co-supervised during your term at HSU?

24   A.   25 to 30, maybe.

25   Q.   Have you ever seen any evidence of racial profiling on the          10:50:11

1    part of any of those deputy sheriffs?

2    A.  No.

3    Q.  Have you ever received a complaint about racial profiling

4    on the part of -- levied against any of those deputy sheriffs?

5    A.  No.                                                    10:50:28

6    Q.  Have you ever instructed any of those deputy sheriffs about

7    MCSO policy for racial profiling?

8    A.  I reiterated what Lieutenant Sousa would, but

9    Lieutenant Sousa would hit on it quite a bit.

10   Q.  Do you recall what Sousa's instructions were to those     10:50:47

11   deputy sheriffs with regard to racial profiling?

12   A.  Pretty much pretty simple:  We do not racial profile.

13   Q.  You're 287(g) trained, is that correct?

14   A.  What's that?

15   Q.  You were 287(g) trained, is that correct?             10:51:00

16   A.  Yes.

17   Q.  And who conducted that training?

18   A.  ICE.

19   Q.  When you say ICE, you mean Immigration and Customs

20   Enforcement?                                              10:51:09

21   A.  Yes.

22   Q.  Were those instructors employed by the federal government?

23   A.  Yes.

24   Q.  Department of Homeland Security?

25   A.  Yes.                                                   10:51:14

1   Q.  Approximately how many instructors from ICE executed that

2   training?

3   A.  I don't recall.  There were several.

4   Q.  Where was that training?  Where did it occur?

5   A.  It held -- it was held at our training facility.          10:51:24

6   Q.  You say "our training facility."  You mean MCSO's training

7   facility?

8   A.  Yes, Maricopa County Sheriff's Office training facility.

9   Q.  They have a classroom facility there?

10  A.  Yes, sir.                                                  10:51:37

11  Q.  And how long did that training last?  The period of

12  instruction, how long was it?

13  A.  I believe it was four to five weeks.

14  Q.  Do you recall during that training there being a period of

15  instruction that involved racial profiling?                   10:51:51

16  A.  Yes, I recall there being a portion of it.

17  Q.  What do you recall the training being with regard to racial

18  profiling, the training provided by ICE?

19  A.  I don't recall the specific training.  I don't recall what

20  was necessarily in the training.  It would cover topics of, you  10:52:09

21  know, prohibition of racial profiling, cultural diversity,

22  maybe.  I don't really recall.

23  Q.  You've participated in crime saturation patrols, have you

24  not?

25  A.  Yes.                                                       10:52:30

1  Q.  I believe you testified earlier this morning that at times

2  you were posted at the command post?

3  A.  Correct.

4  Q.  And at other times you were out in the field where deputies

5  were making stops?                                                10:52:40

6  A.  Not that -- that often.  Typically, I was at the command

7  post.

8  Q.  And was Sergeant Palmer also at the command post?

9  A.  In and out, but typically he was the one on the road.

10 Q.  So typically he was out in the field supervising the deputy  10:52:53

11 sheriffs making the stops during the saturation patrols?

12 A.  Correct.

13 Q.  And typically you maintained a presence at the command

14 post?

15 A.  Correct.                                                      10:53:06

16 Q.  But from time to time you went out and also supervised?

17 A.  From time to time.

18 Q.  And from time to time was Sergeant Palmer ever located at

19 the command post?

20 A.  Yes.                                                          10:53:13

21 Q.  Do you recall what type of perimeter the command post had

22 on any particular saturation patrol?

23 A.  Usually it was made up of several vehicles, along with

24 crime scene tape and MCSO personnel.

25 Q.  Were there ever any crowd control barriers also used to      10:53:26

1   construct the perimeter of the command post?

2   A.  Yes.

3   Q.  What would the purpose of the crowd control barriers be?

4   A.  Exactly what it said, crowd control to keep them out of our

5   command post.                                                      10:53:41

6   Q.  Keep who out of the command post?

7   A.  People that came.  There was several protesters at pretty

8   much every single one of them.

9   Q.  So you'd say that those devices had a security function?

10  A.  Yes.                                                           10:53:54

11  Q.  And what about the crime control tape that you referred to,

12  what would the purpose of that be?

13  A.  Same as the barricade.

14  Q.  Typically, what did you do prior to the commencement of a

15  sat -- strike that.                                                10:54:09

16          Typically, what did you do prior to the commencement

17  of a large saturation patrol?

18  A.  Get paperwork ready.  Things that would be -- we'd be using

19  during the course of the saturation patrol in the command post.

20  Q.  Would you participate in a briefing of the deputies that       10:54:28

21  were going to carry out the crime saturation patrol?

22  A.  Yes.

23  Q.  Would someone assist you in the briefing?

24  A.  I wouldn't give the briefings.  Joe Sousa would give the

25  briefings.                                                         10:54:43

1    Q.  Were you present during those briefings?

2    A.  Most of them, yes.

3    Q.  Do you recall any part of those briefings being related to

4    racial profiling?

5    A.  Other than what I'd already spoke about, I mean, he -- Joe          10:54:55

6    Sousa's pretty simple about it:  We don't racial profile.  He'd

7    yell it several times to make sure everybody was clear.

8    Q.  So you have a specific recollection of that direction being

9    given by Lieutenant Sousa prior to the commencement of the

10   large saturation patrols?                                              10:55:11

11   A.  Yes.

12   Q.  Now, have you ever conducted a traffic stop?

13   A.  Yes.

14   Q.  Typically, when you conduct a traffic stop, are you in a

15   vehicle behind the vehicle you're -- you're stopping?                  10:55:41

16   A.  Yes.

17   Q.  In your experience, can you see the occupant, the driver of

18   the vehicle?

19   A.  Typically, no.

20   Q.  Can you see the passengers in the vehicle?                         10:55:54

21   A.  Just maybe the back of their heads.

22   Q.  So you may be able to see how many passengers are in the

23   vehicle?

24   A.  Correct.

25   Q.  Would you be able, typically, to discern the sex of the            10:56:06

```
 1   individuals in the vehicle?

 2   A.  Not typically, no.  Depending on what their hairdo is.  So

 3   some yes, some no.

 4   Q.  What about the race of the individuals?

 5   A.  No.                                                        10:56:19

 6   Q.  Would it be your experience that most vehicles on the roads

 7   of Maricopa County have some form of tinting on their glass?

 8   A.  I could agree with that.

 9   Q.  Would it be your experience that the tinting impedes your

10   ability to see the drivers or passengers of the vehicle?       10:56:37

11   A.  It could.

12   Q.  What about headrests on the top of seats?  Is it your

13   experience that headrests impede the ability of an officer to

14   see the driver, occupants of the vehicle?

15   A.  Yes.                                                       10:56:52

16   Q.  Sergeant, would you consider yourself Hispanic?

17   A.  Yes.

18   Q.  Why is that?

19   A.  My mother's Hispanic.

20   Q.  Were you born in the United States?                        10:57:18

21   A.  Yes.

22   Q.  Was your mother born in the United States?

23   A.  Yes.

24   Q.  Where's her family from originally?

25   A.  New Mexico.                                                10:57:25
```

1   Q.  Do you have any anti-Hispanic bias?

2   A.  No.

3   Q.  During your course of enforcing law in Maricopa County,

4   have you ever encountered a day laborer?

5   A.  No.  Me personally, no.                              10:57:57

6   Q.  Never.

7   A.  No.

8   Q.  Is day labor a crime in Arizona?

9   A.  No.

10  Q.  Have you ever learned of any complaints by citizens about   10:58:15

11  day labor activity?

12  A.  Yes.

13  Q.  Do you recall any of the details of any of those

14  complaints?

15  A.  What I testified to earlier was the Title 28 violations in   10:58:35

16  the city of Cave Creek.

17  Q.  What is a Title 28 violation?

18  A.  It's a civil violation, could be criminal, but it's

19  typically something that's done on the roadway with -- with a

20  vehicle.                                                 10:58:49

21  Q.  Could that be impeding traffic?

22  A.  Yes.

23  Q.  Are there any other complaints you received from citizens

24  about activities of day laborers?

25  A.  Queen Creek, as I mentioned before, the harassment of the   10:59:02

1    school children by the day laborers in the area hooting and

2    hollering, taking pictures, sexual gestures, things like that.

3    Q.  Do you recall any other details of conduct by day laborers

4    that you've encountered while you were at HSU from reports of

5    citizens or from deputies?                                          10:59:22

6    A.  Not specifically.  I know the other day labor area was

7    32nd Street and Thomas, which there was issues of trespassing,

8    I believe.  I believe there was more, but I don't -- I don't

9    recall specific what those crimes were.

10   Q.  Do you ever recall MCSO targeting day laborers without any      10:59:38

11   complaints of potential criminal activity?

12   A.  No.

13   Q.  I believe earlier this morning you testified that you were

14   present during MCSO briefings of the press.

15           Do you recall that testimony?                               11:00:10

16   A.  Yes.

17   Q.  Do you recall ever seeing on television or reading in the

18   newspaper the subsequent press reports of those briefings?

19   A.  Yes.

20   Q.  In your opinion, were those reports accurate?                   11:00:21

21   A.  No.  I read them when I initially went to the unit and kind

22   of kept up on it, but they were typically so skewed that I just

23   stopped reading it generally, period.  And it still kind of

24   sticks with me today, still won't watch the news or read the

25   paper any more because of it.                                       11:00:42

1    Q.  Just so we're clear, your testimony would be that the press

2    accounts of MCSO activity in crime suppression patrols do not

3    comport with what your experience has been in crime suppression

4    patrols?

5    A.  Correct.                                                    11:00:56

6    Q.  Is it your experience that crime saturation patrols

7    conducted by the Maricopa County Sheriff's Office were

8    targeting all criminal activity?

9    A.  Yes.

10   Q.  Do you ever recall receiving an instruction to target      11:01:17

11   Latino drivers?

12   A.  No.

13   Q.  Do you ever recall receiving instruction to target Latino

14   passengers in vehicles?

15   A.  No.                                                         11:01:44

16   Q.  Not during any crime saturation patrol?

17   A.  No.

18   Q.  During any other patrols?

19   A.  No.  I was never given anything like that to target any

20   specific race, no.                                             11:01:59

21   Q.  Do you recall the human smuggling operation around the

22   vicinity of the Good Shepherd church?

23   A.  Yes.

24   Q.  What part of the valley was that in, what part of Maricopa

25   County?                                                        11:02:25

1   A.  Northern part.

2   Q.  Do you recall whether or not there was an apartment complex

3   adjacent to that church?

4   A.  I don't recall.

5   Q.  Do you recall any allegations of drop house activity in the          11:02:34

6   vicinity of the Good Shepherd church?

7   A.  Again, the only thing I recall is of -- of the Cave Creek

8   detail was the twenty -- Title 28 violations that were

9   occurring from the people from the Good Shepherd church.

10  Q.  When you were in the vicinity of the Good Shepherd church,          11:03:13

11  did you personally observe any traffic violations?

12  A.  Not that I recall.

13  Q.  Were HSU deputies ever instructed to investigate passengers

14  in vehicles for potential criminal violations?

15  A.  Yes.                                                                 11:03:50

16  Q.  Earlier this morning you testified about the October 15th,

17  2007, operation in the vicinity of 36th and Thomas.

18          Do you recall that?

19  A.  Yes.

20  Q.  Do you recall any complaints about destruction of property?        11:04:21

21  A.  I personally don't recall, no.  I typically wouldn't

22  receive -- would have received the complaints.

23  Q.  Typically, would you hear of any complaints during a

24  preoperation briefing?

25  A.  It's possible, yes.                                                 11:04:40

1    Q.  Have you ever been sent to a unit -- excuse me.  Let me

2    strike that.

3            Have you ever been sent to an area of Maricopa County

4    to patrol because that area was populated by Latinos?

5    A.  No.                                                    11:05:11

6    Q.  Have you ever been sent to an area to participate in a

7    saturation patrol because that area was heavily populated with

8    Latinos?

9    A.  No.

10   Q.  Earlier this morning you testified that you recall a time  11:05:24

11   when the 287(g) authority granted to MCSO by the federal

12   government was withdrawn.

13           Do you recall that?

14   A.  Yes.

15   Q.  You were working as a sergeant in the Human Smuggling Unit  11:05:53

16   while the 287(g) authority was in effect, is that correct?

17   A.  Correct.

18   Q.  And you continued working there for a time after the 287(g)

19   was withdrawn?

20   A.  Correct.                                                11:06:14

21   Q.  I just want to walk through a stop -- let me back up.

22           Have you ever participated in a traffic stop in which

23   287(g) authority was utilized?

24   A.  Yes.

25   Q.  And have you participated in a traffic stop subsequent to  11:06:32

1    287(g) authority being withdrawn by the federal government?

2    A.  Yes.

3    Q.  I want to walk you through each of those.

4    A.  Okay.

5    Q.  During an operation for the Human Smuggling Unit, do you          11:06:47

6    patrol known corridors of human smuggling?

7    A.  Yes.

8            MS. WANG:  Your Honor, I'm going to object to this

9    line of questioning.  There have been a lot of leading

10   questions.                                                            11:07:09

11           THE COURT:  I'll sustain the objection as to the

12   leading question at this point, but to the extent you haven't

13   earlier objected, the testimony's going to stand.

14           MS. WANG:  Thank you, Your Honor.  Move to strike the

15   last response.                                                        11:07:19

16           THE COURT:  It is stricken.

17   BY MR. LIDDY:

18   Q.  Sergeant, are you aware of any known human smuggling

19   corridors in Maricopa County?

20   A.  Yes.                                                              11:07:29

21   Q.  Have you ever patrolled any of them?

22   A.  Yes.

23   Q.  Could you share with the Court some of those known

24   corridors.

25   A.  U.S. 60, U.S. 93, I-17, Highway 87, and U.S. 60 eastbound.       11:07:37

1   Q.  Have you conducted HSU operations on those known corridors?

2   A.  Yes.

3   Q.  Have you ever encountered a human smuggling load vehicle on

4   any of those corridors?

5   A.  Yes.                                                          11:07:53

6   Q.  Would you tell me what the indicators are of a human

7   smuggling vehicle, in your experience.

8   A.  Prior to the stop?

9   Q.  Prior to the stop.

10  A.  Typically, the vehicle will ride very low.  It will have      11:08:08

11  either tinted windows or completely blacked out windows.  Their

12  speed is typically well under the posted speed limit.  Those

13  are typically the first things that raise our suspicion that we

14  might want to look at that vehicle.  And there's -- there's

15  more, of course, but it's been a while.                          11:08:31

16  Q.  Once your unit looks at the vehicle, what do you look for?

17  A.  We look for Title 28 violations.

18  Q.  Traffic violations?

19  A.  Correct.

20  Q.  Could they be moving violations?                             11:08:43

21  A.  Could be moving or non-moving.  Equipment -- non-moving

22  equipment violations.

23  Q.  When an HSU deputy develops probable cause to make a stop,

24  what is he referring to when he's developed probable cause?

25  A.  He has found a violation of Title 28 which would be --        11:09:07

1    could be speeding, could be cracked windshield, could be broken

2    taillight, a number of things.

3    Q.  So once an HSU deputy develops probable cause of a

4    suspected load vehicle, what does he or she do?

5    A.  Usually initiates a traffic stop.                    11:09:26

6    Q.  How is that done?

7    A.  Usually over radio he'll identify the vehicle's plate and

8    give his location, he'll turn on his lights and -- and wait for

9    the vehicle to pull over.

10   Q.  Once the vehicle pulls over, then what does the deputy do?  11:09:39

11   A.  He usually approaches one side or the other.  Typically, if

12   it's on the freeway he'll patrol -- excuse me, he'll approach

13   on the passenger side of the vehicle and contact the driver.

14   Q.  Does he approach on the passenger side of the vehicle for

15   officer safety?                                          11:09:56

16   A.  Correct.

17   Q.  And you said that prior to approaching the vehicle he

18   checks the license plate?

19          MS. WANG:  Objection to the leading.

20          MR. LIDDY:  Your Honor, I'm just asking about his  11:10:06

21   prior testimony.

22          THE COURT:  Even though that is technically a leading

23   question, I don't think it's important enough that I'm not

24   going to allow it, to expedite this a little bit.

25          You may answer.                                  11:10:19

 1          MR. LIDDY:  Thank you, Your Honor.

 2          THE WITNESS:  I'm sorry.  Repeat that again.  I

 3   apologize.

 4          THE COURT:  Do you want to read it again, Gary?

 5          THE WITNESS:  I'm sorry.                          11:10:25

 6          (The record was read by the court reporter.)

 7          THE WITNESS:  Yes.  Sorry.

 8   BY MR. LIDDY:

 9   Q.  So he approaches the vehicle after he's already checked the

10   license plate, is that correct?                          11:10:43

11   A.  Correct.

12   Q.  What is he checking for?

13   A.  To see if the vehicle's, number one, first and foremost,

14   officer safety, see if the vehicle's reported stolen or not.

15   That's pretty much -- and then find out if the registration's   11:10:56

16   current or not.

17   Q.  Now, up to this point, if this traffic stop is occurring

18   while 287(g) authority is in effect, up to this point has that

19   officer utilized any 287(g) authority?

20   A.  No.                                                  11:11:15

21   Q.  So the probable cause has already been developed without

22   287(g) authority, is that correct?

23   A.  Correct.

24   Q.  The stop has already been executed without 287(g)

25   authority, is that correct?                             11:11:30

A.  Correct.

Q.  The license plate's been checked, correct?

A.  Correct.

Q.  And the officer's approached the vehicle on the passenger

side without any 287(g) authority, is that correct?                    11:11:38

A.  Correct.

        MS. WANG:  Objection again to the leading, Your Honor.

        THE COURT:  I'm going to sustain that.

BY MR. LIDDY:

Q.  What does the officer do next?                                      11:11:51

A.  He typically contacts the driver.  He will check his

safety, look within the vehicle, any type of hazards, any

threats.

Q.  When he contacts the driver is he using his 287(g)

authority?                                                             11:12:11

A.  No.

Q.  When he checks inside the vehicle for safety is he using

his 287(g) authority?

A.  No.

Q.  If he observes a large number of passengers, what would          11:12:18

that mean to him?

A.  It's -- it's an indicator of a possible human smuggling

load.

Q.  Are there any other indicators of possible human smuggling

loads that a typical HSU officer may be able to view from that       11:12:40

1    standpoint?

2    A.  No.  Not at that point, no.

3    Q.  What other indicators are there in human smuggling?

4    A.  As we said, vehicle overloaded.  Loaded with occupants, but

5    no luggage whatsoever.  None of the occupants speak English        11:12:59

6    and/or can't produce an ID that's issued by the government of

7    the United States, from any state.  Typically, they'll give you

8    a voter registration card that's from Mexico.

9    Q.  Will the officer inquire as to whether the passengers know

10   each other?                                                        11:13:25

11   A.  Yes.

12   Q.  Will the officer inquire whether the driver knows the

13   passengers?

14   A.  Yes.

15   Q.  Would it be of any interest to an HSU officer to know where    11:13:31

16   the vehicle's coming from?

17   A.   In their line of questioning, yes, they'll ask -- there's

18   several questions that they ask, but typically, yeah, the first

19   thing that'll occur is they'll -- they'll pull a passenger out

20   and/or the driver, typically the driver first, and they'll        11:13:48

21   start talking to him and try to get a story of what they're

22   actually doing.

23   Q.  While the officer's talking to them, trying to get a story

24   of what they're actually doing, is that officer using 287(g)

25   federal authority?                                                 11:14:00

1    A.   No.

2    Q.   Help me understand at what point in the process would an

3    officer start to use the 287 authority -- 287(g) authority that

4    had been given to the MCSO.

5    A.   Once we've -- we've already talked -- has already occurred,    11:14:17

6    we'll talk to the driver and then start talking to multiple

7    passengers and find conflicts in their story.  At that point we

8    believe it's going to be a human smuggling load, and then we

9    would then go into the questioning of their alienage.

10   Q.   Now, I don't want to put words in your mouth and I'm not    11:14:33

11   going to lead.  I haven't heard anything about race or

12   ethnicity.

13   A.   No.

14   Q.   Is there any point in time prior to an HSU officer putting

15   on his 287(g) hat that he's looking at the race or ethnicity of    11:14:50

16   the driver or the passengers in the vehicle?

17   A.   No.

18        MS. WANG:  Your Honor, I would object, because there's

19   no particular stop specified that the witness is testifying

20   about.    11:15:04

21        THE COURT:  I'm going to overrule the objection.

22        MR. LIDDY:  And I want to make sure I'm being fair to

23   the witness.

24   BY MR. LIDDY:

25   Q.   I'm talking about in your experience.    11:15:18

1    A.  Correct.

2    Q.  So help me understand.  When would a deputy sheriff who's

3    been 287(g) qualified put on his 287(g) hat and start to use

4    the 287(g) authority for which he's been trained by the federal

5    government?                                                    11:15:38

6    A.  Once we believe -- in a human smuggling, once we believe

7    there was a human smuggling load that we had that, we would

8    then put on that hat and question their alienage to increase

9    our -- the facts to our case.

10   Q.  Okay.  Now I want to focus your attention on a similar     11:15:54

11   stop, in your experience, after such time that the 287(g)

12   authority was revoked by the federal government.  I'm talking

13   about the field authority, not in the Fourth Avenue Jail, the

14   field authority.

15        What would be different in a similar stop as that?       11:16:12

16   A.  Basically, everything would be the same up until the point

17   where we would put that hat on.  We would stop at that point,

18   and if we believed that it was a human smuggling load we would

19   make a call to ICE themselves and then they would conduct the

20   interviews over the phone with each individual person that was  11:16:25

21   in that -- that vehicle.

22   Q.  So after 287(g) authority had been revoked, MCSO officers

23   no longer conduct investigation regarding alienage.  Is that

24   your testimony?

25   A.  Correct.                                                   11:16:39

1    Q.   They would have to call ICE?

2    A.   Yes.

3    Q.   And ICE either would or would not come out and conduct an

4    investigation?

5    A.   They -- well, they wouldn't come out.  Typically, they          11:16:47

6    would either tell us that yes, this person or is not -- is or

7    is not in the country illegally.

8    Q.   And if the person is not in the country illegally, what

9    would the HSU deputy do then?

10   A.   Depending on if he was still part of the human smuggling        11:17:00

11   load, it -- he wouldn't be released.  He's still part of our

12   criminal investigation of the smuggling load.

13   Q.   Under Arizona state law.

14   A.   Correct.

15   Q.   What if --                                                      11:17:13

16            THE COURT:  Hold it.  Can you repeat that again?  I

17   want to make sure I understand it.

18            THE WITNESS:  Okay.  On a person that -- it's -- it's

19   not -- what we would find that people that weren't here --

20   excuse me, that were here legally were typically part of the         11:17:25

21   organization smuggling the people.  And each instance was

22   different, depending on what, you know, came up in interviews.

23            And then typically if -- if they were involved,

24   they -- they got a state charge as well for smuggling the

25   individuals.                                                         11:17:42

```
 1              THE COURT:  That's the smuggler?
 2              THE WITNESS:  Correct, the smuggler.
 3              THE COURT:  What about the smugglees?
 4              THE WITNESS:  I don't recall any smugglee every being
 5    a U.S. citizen.                                                    11:17:52
 6              THE COURT:  Was the smugglee nevertheless arrested for
 7    violating the state human smuggling statute?  Do you recall any
 8    such instance?
 9              THE WITNESS:  No.
10    BY MR. LIDDY:                                                      11:18:03
11    Q.  I want to make sure that I understand this.  It's your
12    testimony that the smuggler would be arrested on state charges?
13    A.  Correct.
14    Q.  And do you ever recall a stop where the passenger being
15    smuggled was also arrested for violating the state human          11:18:15
16    smuggling law?
17    A.  I'm sorry.  Say that again?
18    Q.  Do you recall an instance where the passenger being
19    smuggled was also arrested for violating the state human
20    smuggling law?                                                    11:18:31
21    A.  Yes, often.
22    Q.  At what point in time after 287(g) was revoked would the
23    deputy call ICE?
24    A.  At what point in time would he call ICE?
25    Q.  Yeah, what point in time during the stop would the trained    11:18:52
```

1    287(g) officer on the HSU who made the stop, who no longer has

2    287(g) authority, call ICE?

3    A.  What I just explained earlier, that once -- once we believe

4    that the vehicle that we were out with was an active smuggling

5    vehicle -- sorry.                                                    11:19:15

6    Q.  I want you to complete your answer.

7    A.  We would at that time put the ICE hat on to identify their

8    alienage, then at that point that's when the call would be

9    made.

10   Q.  But after 287(g) was revoked and there's no ICE hat to put    11:19:26

11   on, would you then call 287(g) -- excuse me, would you then

12   call ICE?

13   A.  Yes.

14   Q.  And if ICE indicated to you that the individuals were not

15   in the country illegally, what would the deputy do?              11:19:43

16   A.  I'm not following what -- I think what you're explaining

17   never occurred.  I don't know what you're explaining here.

18   Q.  So in your experience, you don't recall a stop where

19   suspicion of human smuggling was present, a call was made to

20   ICE, and ICE said, We've checked the names of these passengers   11:20:07

21   and we believe they're all in the country legally?

22   A.  I don't ever recall that occurring.

23          MR. LIDDY:  Okay.  Your Honor, I'd like -- excuse me.

24   Your Honor, I'd like to use Plaintiffs' Exhibit 126 that was

25   used in the direct examination.  If I may use the courtroom      11:20:58

1    document camera for that purpose.

2            THE COURT:  Is that admitted into evidence?

3            MR. LIDDY:  I believe the exhibit's already admitted

4    into evidence by stipulation, Your Honor.

5            THE COURT:  If so, you can publish it, Kathleen.        11:21:18

6            MR. LIDDY:  Thank you, Your Honor.

7            THE CLERK:  126?

8            THE COURT:  Did you say 126, Mr. Liddy?

9            MR. LIDDY:  Yes, Your Honor.

10           THE COURT:  I believe this was used during direct, was  11:21:41

11   it not?

12           MR. LIDDY:  Yes, that is correct, Your Honor.

13           THE COURT:  Go ahead.

14   BY MR. LIDDY:

15   Q.  Sergeant Madrid, can you see this document on your screen?  11:21:51

16   A.  Yes.

17   Q.  Do you recognize it from earlier this morning?

18   A.  Yes.

19   Q.  I want to direct your attention to the very last sentence,

20   the only sentence in the last paragraph that begins, "after all  11:22:08

21   the above."

22           Do you see that?

23   A.  Yes.

24   Q.  Would you read along with me:  After all the above was

25   complete, HSU detectives conducted knock and talks in the        11:22:17

1    Village Apartments based tips from the hotline.  The tips from

2    the hotline produced negative results.

3             Do you see that?

4    A.  Yes.

5    Q.  Would you explain for me, please, what is a knock and talk?    11:22:30

6    A.  Basically, you're doing a consensual stop, whether it be in

7    person, or we call it knock and talk if we're going to a house

8    and actually try and do a consensual talk there.

9    Q.  And what is the purpose of a law enforcement

10   officer conducting knock and talks?    11:22:46

11            MS. WANG:  Your Honor, I'm going to object on

12   relevance grounds, since this case concerns traffic stops and

13   counsel is asking about a knock and talk at a -- at a house.

14            THE COURT:  You know, I'm going to overrule the

15   objection.  It is true that the class, the certified class,    11:22:58

16   relates to traffic stops, but I think that I've allowed a

17   sufficient leeway to the plaintiffs to -- to explore how day

18   labor -- suspicions of day laborers who are not yet in cars may

19   lead to traffic stops, and as a result I think this is fair

20   cross-examination.    11:23:19

21            MS. WANG:  Thank you, Your Honor.

22            MR. LIDDY:  And I apologize.

23   BY MR. LIDDY:

24   Q.  The question was:  For what purpose would a law enforcement

25   officer conduct a knock and talk?    11:23:28

1    A.  It's a tool used to contact the occupants of -- of a house.

2    Q.  And what would be the purpose of contacting the occupants

3    of houses?

4    A.  To investigate a possible crime.

5    Q.  You see in that sentence it says that HSU detectives          11:23:41

6    conducted knock and talks in the Village Apartments?

7    A.  Correct.

8    Q.  You see that?

9    A.  Correct.

10   Q.  Does that refresh your recollection at all as to whether      11:23:50

11   there was an apartment complex next to the Good Shepherd

12   church?

13   A.  Yes.

14   Q.  Yes?

15   A.  Yes, it does.                                                  11:24:00

16   Q.  Does refresh your recollection?

17   A.  Correct.

18   Q.  Does it refresh your recollection that you may have -- that

19   you heard at the time that there were complaints about

20   potential criminal activity at the Village Apartments next to    11:24:15

21   the Good Shepherd church?

22   A.  Yes.

23   Q.  I mean, you see the last sentence says there, the tips from

24   the hotline produced negative results.  See that?

25   A.  Yes.                                                          11:24:29

1   Q.  What does that mean to you?

2   A.  The tips that we got, and I don't remember specifically

3   what any of these tips were, but there was nothing that

4   came of -- came of them.

5   Q.  You remember that there was nothing that came from them?    11:24:36

6   A.  Correct.

7        MR. LIDDY:  Thank you, Sergeant.  I have no further

8   questions.

9        THE COURT:  Any redirect?

10       MS. WANG:  Yes, Your Honor.    11:25:41

11                    REDIRECT EXAMINATION

12  BY MS. WANG:

13  Q.  I'd like to show you, Sergeant, Exhibit 79 again.

14  Mr. Liddy asked you about that.

15       This was the set of documents relating to the 32nd and    11:26:11

16  Thomas saturation patrol on March 21st and 22nd, 2008.

17       You see that?

18  A.  Yes.

19  Q.  And let's turn to page MCSO 001839, and let's highlight the

20  first line.  I believe this is what Mr. Liddy asked you about.    11:27:03

21  A.  Yes.

22  Q.  So this person, Mr. Reyes, was stopped originally because

23  of a cracked windshield, correct?

24  A.  Correct.

25  Q.  And he was charged with driving on a suspended license,    11:27:16

1   correct?

2   A.  Correct.

3   Q.  There's no way for an officer to know before he pulls

4   someone over that they're driving on an suspended license,

5   correct?                                                      11:27:26

6   A.  No.

7   Q.  And Mr. Liddy asked you some questions generally about what

8   happens when you are patrolling in an MCSO car behind another

9   vehicle.

10          Do you remember those questions?                      11:27:42

11  A.  Yes.

12  Q.  He asked you about whether you can see the race of a person

13  when you're following behind their vehicle.

14          Do you remember that?

15  A.  Yes.                                                      11:27:52

16  Q.  Officers are not always following behind a vehicle only

17  before they pull someone over, right?

18  A.  Correct.

19  Q.  It's not your testimony that an MCSO deputy could never see

20  the race of a motorist before pulling them over, right?       11:28:05

21  A.  Correct.

22  Q.  Sometimes they can see the race of a motorist before they

23  pull them over, correct?

24  A.  Yes.

25  Q.  Or their gender, right?                                   11:28:13

1   A.   Correct.

2   Q.   Mr. Liddy asked you some questions about training.

3           Do you remember that?

4   A.   Yes.

5   Q.   He asked you about some ICE training that you went through    11:28:22

6   in 2007, correct?

7   A.   Correct.

8   Q.   And do you recall that there was some coverage of racial

9   profiling issues in that training, correct?

10  A.   Correct.    11:28:36

11  Q.   But you testified you couldn't recall exactly what that

12  covered, correct?

13  A.   No.

14  Q.   Now, another point in time when MCSO personnel get training

15  on racial profiling is at basic academy, correct?    11:28:45

16  A.   Correct.

17  Q.   And do you recall that there is a component on racial

18  profiling at basic academy training?

19  A.   I'm sure there was.  I don't specifically remember now.

20  Q.   You don't specifically remember whether there was or not?    11:28:58

21  A.   It's 12 years ago, so I -- I'm sure it was, but I don't

22  remember the class.

23  Q.   Okay.  And so it's fair to say you don't remember what was

24  covered if there was a component on racial profiling?

25  A.   Yes.    11:29:08

1   Q.  And Mr. Liddy asked you what training HSU deputies got on

2   racial profiling.

3            Do you recall that?

4   A.  Yes.

5   Q.  And one of the things you mentioned is that you remembered          11:29:19

6   Lieutenant Sousa yelling:  Or don't racially profile during

7   presaturation patrol briefings.

8   A.  Correct, in his briefing.

9   Q.  And he did not say anything more specific than that about

10  racial profiling, did he?                                               11:29:35

11  A.  Not that I recall.

12  Q.  There were no examples given, correct?

13  A.  No.

14  Q.  No definition of racial profiling was given?

15  A.  I believe maybe in -- in one of the ops -- operation plans,         11:29:42

16  but I don't recall him giving, verbally, any definition of it.

17  Q.  Okay.  And you think there was a definition of racial

18  profiling in an operations plan?

19  A.  There may -- there may have been.

20  Q.  But you're not sure?                                                11:29:58

21  A.  I don't -- yeah.

22  Q.  You saw a lot of those operations plans, correct?

23  A.  Several.

24  Q.  Sir, let's turn to the Cave Creek saturation patrol.

25  Mr. Liddy also asked you about that, right?                             11:30:13

1  A.  Yes.

2  Q.  Mr. Liddy asked you whether that patrol had been spurred by

3  complaints about traffic issues relating to the day laborers,

4  is that right?

5  A.  Correct.                                                    11:30:29

6  Q.  And I think you testified on direct that to your knowledge

7  no one was actually arrested that day for impeding traffic,

8  isn't that right?

9  A.  Correct.

10 Q.  In fact that saturation patrol resulted in an arrest       11:30:37

11 stemming from vehicle stops, correct?

12 A.  Correct.

13 Q.  All the day laborers who were arrested that day were

14 actually in a car at the time they were arrested, right?

15 A.  Yes.                                                        11:30:46

16 Q.  They weren't even near the church any more, correct?

17 A.  Correct.

18 Q.  Mr. Liddy also asked you about another day laborer

19 operation where there was -- he asked you whether there were

20 complaints about harassment of children leading to that patrol, 11:31:01

21 is that right?

22 A.  Yes.

23 Q.  To your knowledge, no one was arrested for harassing

24 children during that patrol, isn't that right?

25 A.  Correct.                                                    11:31:12

```
 1   Q.  I think you testified in response to Mr. Liddy's question

 2   that you do not recall any MCSO saturation patrols that were

 3   based on complaints about day laborers without complaints of

 4   criminal activity.  Is that your testimony?

 5   A.  I'm sorry.  Say that again?                              11:31:31

 6   Q.  I believe you testified in response to Mr. Liddy's

 7   questioning that you do not recall any MCSO complaints --

 8   sorry, let me start over.

 9          You do not recall any MCSO saturation patrols that

10   were in response to complaints about day laborers without     11:31:48

11   complaints of criminal activity.  Is that your testimony?

12   A.  Yes, we wouldn't have gone there unless there was criminal

13   complaints.

14          MS. WANG:  I'd like to show the witness what has been

15   marked for identification only for now as Plaintiffs'         11:32:03

16   Exhibit 474 and request that the Court give us an exhibit

17   number for that.

18          THE COURT:  What will the exhibit number be, Kathleen?

19          THE CLERK:  455.

20          THE COURT:  Okay.  So it will be marked as             11:32:20

21   Exhibit 455.  You may show it to the witness, Kathleen.

22          MS. WANG:  And can we please show that to the witness

23   on his screen.

24          THE CLERK:  On his screen, or do you want --

25          MS. WANG:  On his screen will be fine.                 11:32:36
```

1           Okay.  Let's enlarge the top e-mail here.

2    BY MS. WANG:

3    Q.  Sir, is this an e-mail that you received from Joe Sousa on

4    February 25th, 2008?

5    A.  Yes.                                                        11:33:02

6    Q.  And let's blow up the next e-mail in the chain and see what

7    the original one said.  The entire thing, please.

8           So Lieutenant Sousa was forwarding you an e-mail from

9    someone named William Hindman, is that right?

10   A.  Right.                                                      11:33:24

11   Q.  And William Hindman is a sheriff's deputy -- I'm sorry, a

12   captain at MCSO, correct?

13   A.  Yes.

14   Q.  He is the commander of the District 2 Patrol division?

15   A.  Yes.                                                        11:33:31

16   Q.  And Captain Hindman writes:  Joe, just a reminder about the

17   issue we talked about today regarding the day laborers on

18   Dysart Road south of I-10.  They do seem to concentrate on the

19   west side of the road due to the signs on the east side

20   banishing them.  Thanks, Bill.                                 11:33:45

21          Do you see that?

22   A.  Yes.

23   Q.  Captain Hindman does not mention anything about criminal

24   violations, isn't that right?

25   A.  Correct.                                                    11:33:52

 1   Q.  And then let's go up to the top e-mail.  Lieutenant Sousa

 2   then forwards Captain Hindman's e-mail to you and to

 3   Sergeant Baranyos, correct?

 4   A.  Correct.

 5   Q.  The two of you were at that time co-supervisors of HSU,          11:34:02

 6   correct?

 7   A.  Yes.

 8   Q.  And Lieutenant Sousa wrote:  Manny/Ryan, we are going to

 9   conduct saturation patrol in the area of Dysart Road south of

10   I-10.  Let's have Squad 1 and Squad 2 meet at District 2,          11:34:17

11   et cetera, et cetera.  Chief Sands gave the thumbs up on the

12   district's request.  Do you see that?

13   A.  Yes.

14   Q.  So it appears that Captain Hindman was reminding Joe Sousa

15   about a request for this saturation patrol on Dysart Road,          11:34:30

16   correct?

17   A.  Yes.

18   Q.  He does not mention any criminal activity by day laborers,

19   correct?

20   A.  No, he doesn't.          11:34:40

21   Q.  And then you did conduct the saturation patrol?

22   A.  I believe we did, yes.

23          MS. WANG:  Your Honor, I'd move Exhibit 455 into

24   evidence at this time.

25          MR. LIDDY:  No objection, Your Honor.          11:34:49

1          THE COURT:  Exhibit 455 is admitted.

2          (Exhibit No. 455 is admitted into evidence.)

3          MS. WANG:  We can take that down now.  Thank you.

4     BY MS. WANG:

5     Q.  Sergeant, Mr. Liddy asked you whether anyone has ever sent          11:35:01

6     you to do a saturation patrol in an area because there are

7     Latinos there.

8          Do you recall that?

9     A.  Yes.

10    Q.  And you said no, right?          11:35:11

11    A.  Yes.

12    Q.  In fact, you do not know why the locations were selected

13    for saturation patrols, isn't that right?

14    A.  Typically, it was based off of criminal activity in that

15    area.  I can't speak of specific ones now, but typically it was          11:35:25

16    because of criminal activity.

17    Q.  But we just went through some evidence that shows that

18    there wasn't always a complaint of criminal activity leading to

19    a saturation patrol location --

20    A.  Correct.          11:35:41

21    Q.  -- being selected, correct?

22    A.  Correct.  That's one e-mail, though.  What else occurred in

23    their phone call, I don't know.  There could have been the

24    crime there.  I don't know.

25    Q.  Okay.  And -- sorry, I don't want to cut you off.          11:35:49

1  A.  The -- the crime could have been talked about there.  I --

2  I don't know.

3  Q.  Okay.  Well, at the presaturation patrol briefings that

4  MCSO had before larger saturation patrols, deputies were not

5  told why the locations were selected, isn't that right?      11:36:04

6  A.  Correct.

7  Q.  I'll tell you, sir, that your co-supervisor,

8  Sergeant Palmer, testified that he did not know why the

9  locations for those large saturation patrols were selected.

10  Are you telling me that you did know the reasons when        11:36:20

11  Sergeant Palmer did not?

12  A.  I'm sorry.  Say it again, now.

13  Q.  I'm telling you, sir, your co-supervisor, Sergeant Palmer,

14  testified earlier in this trial that he did not know the

15  reasons why locations were selected for large saturation     11:36:32

16  patrols.

17  A.  I think that's what I said.  Typically, we don't know.

18  However, it typically is based off of some type of crime, but

19  we don't know specifically what -- the reasoning for that

20  choice of location.                                           11:36:47

21  Q.  Okay.  So sometimes you were told that there have been

22  complaints about criminal activity with --

23  A.  Correct, we talked earlier about like Cave Creek and Queen

24  Creek and things like that.

25  Q.  Without being given any specifics?                        11:36:58

1    A.  Correct.

2    Q.  Sometimes you were told there was going to be a large

3    saturation patrol and weren't given any reason, correct?

4    A.  Correct.

5    Q.  So fair to say that with the smaller patrols that related          11:37:06

6    to day laborers, sometimes you heard generally that there was

7    criminal activity?

8    A.  Correct.

9    Q.  Sometimes you did not hear that?

10   A.  Correct.                                                            11:37:18

11   Q.  And for the larger saturation patrols, you did not know why

12   those locations were selected?

13   A.  Typically, no.

14   Q.  Sergeant, Mr. Liddy asked you about human smuggling

15   corridors in Maricopa County.                                          11:37:33

16        Do you recall that?

17   A.  Yes.

18   Q.  And you listed a few of the human smuggling corridors,

19   U.S. 60, U.S. 93, several other highways, correct?

20   A.  Yes.                                                               11:37:45

21   Q.  Those were all highways, right?

22   A.  Correct.

23   Q.  That's what you mean when you talk about a human smuggling

24   corridor, correct?

25   A.  Correct.                                                           11:37:51

1   Q.  Sir, Central Phoenix, the area of 32nd and Thomas, is not a

2   human smuggling corridor, correct?

3   A.  Correct.

4   Q.  Nor is the Town of Cave Creek?

5   A.  Correct.                                           11:38:02

6   Q.  In fact, HSU's saturation patrols that we've been talking

7   about didn't focus on highways, correct?

8   A.  Saturation patrols?

9   Q.  Correct.

10  A.  Towards the latter end they did, yes.              11:38:12

11  Q.  But the ones we've discussed in your testimony --

12  A.  I'm sorry, yes.

13  Q.  -- those all were in areas in -- in Maricopa County not

14  around freeways, correct?

15  A.  Correct.                                           11:38:23

16  Q.  Sir, I want to go back to an exhibit that Mr. Liddy asked

17  you about that was Exhibit 126, which is in evidence, and I'll

18  ask that that be displayed on the screen.

19          Please highlight the last paragraph -- well, that's

20  fine.  You can highlight the whole thing.              11:38:52

21          Mr. Liddy asked you about the last paragraph, which

22  reads:  After all the above was complete, HSU detectives

23  conducted knock and talks in the Village Apartments based on

24  tips from the hotline.

25          Do you see that?                               11:39:04

A.  Yes.

Q.  He asked you whether that refreshed your recollection that there was discussion of criminal activity before this operation, and you said it did refresh your recollection, correct?

A.  Correct.

Q.  Actually, there's no mention of any criminal activity in this paragraph, is there?

A.  No.

Q.  And this report that you wrote reflects that the tips from the hotline actually produced negative results in response to those tips, correct?

A.  Yeah, in my summary.

Q.  But HSU went ahead and did this operation anyway, correct?

A.  Well, the knock and talks had already occurred prior to me writing this.

Q.  Right.  And you knew already that the knock and talks produced negative results, correct?

A.  When I wrote this, yes.

Q.  And there was no criminal activity discovered as a result of those tips from the hotline, correct?

A.  Correct.

Q.  And, yet, the saturation patrol went ahead?

A.  No, the knock and talks would have probably occurred during or after.  I don't --

1    Q.  Oh, I see what you're saying.

2    A.  Yeah, I'm confused on the timeline there.  They were

3    probably during the time we would either have had a saturation

4    patrol running along with the knock and talks.  I don't recall

5    the specific day, but it would have kind of happened all at the        11:40:15

6    same time.

7    Q.  Understood.

8         So in fact, the tips from the hotline actually were

9    not investigated prior to the saturation patrol, correct?

10   A.  I don't know.                                                      11:40:26

11   Q.  Well, I think you just testified that the knock and talks

12   were -- that resulted from the tips from the hotline actually

13   occurred during the saturation patrol, correct?

14   A.  Correct.

15   Q.  No one did knock and talks before the saturation patrol?          11:40:38

16   A.  Correct.

17   Q.  Sir, Mr. Liddy asked you about what impact the loss of the

18   287(g) authority had on HSU.  Do you recall that?

19   A.  Yes.

20   Q.  And I want to ask you about that again, because I think           11:40:55

21   there were some things you testified about earlier during

22   direct examination I want to clear up.  Okay?

23        Sir, both before and after the 287(g) agreement was

24   revoked MCSO deputies might develop suspicion that a person is

25   an illegal immigrant during a traffic stop, right?                    11:41:19

1   A.  Correct.

2   Q.  And that can happen even when you're not dealing with a

3   suspected human smuggling load, correct?

4   A.  Correct.

5   Q.  The loss of the 287(g) authority does not mean that MCSO          11:41:28

6   now has to let a suspected illegal immigrant go, correct?

7   A.  Correct.

8   Q.  All it means now is that once the deputy has a suspicion

9   the person is an illegal immigrant, they have to call ICE,

10  correct?                                                              11:41:52

11  A.  Correct.

12  Q.  They can't arrest the person on their own with 287(g)

13  authority, correct?

14  A.  Correct.

15  Q.  That's the impact the loss of the 287(g) authority has had,       11:41:57

16  correct?

17  A.  Yes.

18  Q.  In other respects, HSU has continued to operate in the same

19  way in enforcing immigration laws, correct?

20  A.  Well, they weren't enforcing immigration law, but yes, to         11:42:10

21  that point, yes.

22  Q.  State immigration laws.

23  A.  Correct.  Correct.

24      MS. WANG:  Now, Your Honor, may I have one moment,

25  please?                                                               11:42:21

```
 1            THE COURT:  You may.

 2            MS. WANG:  Thank you.

 3            (Pause in proceedings.)

 4            MS. WANG:  Thank you.

 5            Thank you, Sergeant Madrid.  I have nothing further.      11:42:36

 6            THE WITNESS:  Thank you.

 7            THE COURT:  Sergeant Madrid, you may step down.

 8            THE WITNESS:  Thank you, sir.

 9            THE COURT:  Next witness.

10            MS. WANG:  Your Honor, plaintiffs rest.                   11:42:54

11            THE COURT:  All right.  Defense have witnesses they

12    want to call?

13            MR. CASEY:  Yes, Your Honor.  We can -- also I have a

14    Rule 52(c) motion, I can either make it now or at the Court's

15    direction, but I need to put on the record that I do have a      11:43:04

16    Rule 52(c).

17            THE COURT:  All right.  What I propose to do, I'd like

18    to make the most profit of the time we have.  If you have a

19    witness we can begin now, that will be fine, we'll go to lunch,

20    I'll take your motion at that time, and then we can break for    11:43:18

21    lunch.

22            MR. CASEY:  All right.  And I don't want to be overly

23    pedantic, but that's on the record, so I'm not waiving any Rule

24    52 issues.

25            THE COURT:  You are not.                                 11:43:29
```

```
 1              MR. CASEY:  Thank you, Your Honor.

 2              THE COURT:  In fact, if you're concerned about that,

 3    I'll let you make the motion right now.

 4              MR. CASEY:  No, Your Honor.  I -- I obviously trust

 5    the Court.  I just --                                    11:43:37

 6              THE COURT:  All right.

 7              MR. CASEY:  I've been caught sometimes in other

 8    courtrooms.

 9              MR. LIDDY:  Your Honor, we call Dr. Steve Camarota.

10              THE COURT:  Okay.                               11:43:56

11         You need to be right here, be sworn right here.

12              THE CLERK:  Please state and spell your full name.

13              MR. CAMAROTA:  Steven, S-t-e-v-e-n; Andrew,

14    A-n-d-r-e-w; Camarota, C-a-m-a-r-o-t-a.

15              THE CLERK:  Thank you.  Please raise your right hand.  11:44:31

16         (Steven Andrew Camarota was duly sworn as a witness.)

17              THE CLERK:  Thank you.  Please take our witness stand.

18                        STEVEN ANDREW CAMAROTA,

19    called as a witness herein, having been duly sworn, was

20    examined and testified as follows:                       11:44:41

21                        DIRECT EXAMINATION

22    BY MR. LIDDY:

23    Q.  Good morning, Doctor.

24    A.  Good morning.

25    Q.  Would you please state your full name for the record.  11:45:09
```

```
 1   A.   Steven Andrew Camarota.

 2   Q.   And where are you currently employed?

 3   A.   I am director of research at the Center for Immigration

 4   Studies in Washington, D.C.

 5   Q.   And how long have you been employed with the center?        11:45:23

 6   A.   Sixteen years.

 7   Q.   What are your duties and responsibilities at the center?

 8   A.   I supervise research there.  I do a lot of quantitative

 9   analysis of data, a lot of census data, some administrative

10   data as well, put out reports and statistical profiles and that 11:45:40

11   sort of thing.

12   Q.   And did you receive a bachelor's degree?

13   A.   I did.

14   Q.   And what was the subject matter of your -- the area of

15   inquiry?                                                         11:45:54

16   A.   Political science.

17   Q.   And did you subsequently receive any postgraduate

18   education?

19   A.   Yes, I have a master's degree from the University of

20   Pennsylvania in Philadelphia in political science, and then I    11:46:05

21   have a Ph.D. from University of Virginia in Charlottesville in

22   public policy and analysis.

23   Q.   Have you ever received any formal education on statistics?

24   A.   I have.  When I was a graduate student in particular,

25   though I had a little bit when I was an undergrad, I received     11:46:21
```

1    several semesters of statistics at the University of Virginia,

2    and then additionally I went to the University of Michigan and

3    took some additional statistical training there as well as part

4    of their ICPSR program.

5    Q.  And do you use statistics in the normal course of your                11:46:36

6    duties?

7    A.  I do.

8    Q.  A great deal?

9    A.  I would say yes, a great deal.

10   Q.  And have any of your academic works been published?                   11:46:48

11   A.  Yes, by journals such as Social Science Quarterly or The

12   Public Interest.  I've also had books, chapters in books

13   published by --

14   Q.  I would ask you just slow down a little bit for the court

15   reporter.                                                                  11:47:09

16   A.  Yes, of course.

17            THE COURT:  And for me, for what it's worth.

18            MR. LIDDY:  Would you read the question over again,

19   please.

20            (The record was read by the court reporter.)                     11:47:26

21            THE WITNESS:  Yes, they have.  By various journals,

22   such as Social Science Quarterly, Public Interest.  I've had

23   book chapters published by Princeton University Press, by

24   foreign relations -- Council on Foreign Relations Press, and of

25   course I've published a lot of publications for the Center for            11:47:42

1    Immigration Studies as well.

2    BY MR. LIDDY:

3    Q.  Have you ever been asked by the United States Congress to

4    testify?

5    A.  Yes, I've been -- I've testified before Congress 17 times,    11:47:50

6    I believe, in the last 16 years.

7    Q.  What were the areas of interest of the United States

8    Congress?

9    A.  Oh, a wide variety of interests, House and Senate, some

10   Democratic, some Republican, testifying on socioeconomic data    11:48:04

11   and issues surrounding immigration and immigrants.

12   Q.  Can you recall any of the members of Congress who

13   specifically asked you to come to the Hill and testify?

14   A.  Sure, Congressman Lamar Smith, Congressman Sensenbrenner,

15   Senator Dianne Feinstein invited me and I testified before her,    11:48:28

16   so kind of a wide range of folks.

17   Q.  Has any of your work ever been referenced by the Supreme

18   Court of the United States?

19   A.  Yes, a recent -- a recent Supreme Court ruling dealing with

20   SB 1070 cited my research looking at the illegal immigrant    11:48:44

21   population in Maricopa County, and also, you know, comparing

22   that to persons who were felons in this county also.  So an

23   analysis of crime of illegal immigrants in Maricopa County was

24   cited in the text of the recent Supreme Court ruling.

25   Q.  Did there come a time where anyone from Maricopa County    11:49:06

1   contacted you and asked you for your assistance?

2   A.  Yes.

3   Q.  Do you recall who that was?

4   A.  I think originally it was Clarice McCormick, who works for

5   Maricopa County.                                                    11:49:22

6   Q.  And do you recall what time she contacted you?

7   A.  It's been awhile.  Sometime in 2010, mid-2010.  Sometime in

8   mid-2010 was the first time I spoke with her, I think.

9   Q.  Do you recall what her interests were at the time?

10  A.  Yeah, she contacted me and asked me to explore the question   11:49:43

11  of whether there was evidence that Maricopa County,

12  particularly sheriff's deputies, were engaging in racial

13  profile.  Was there evidence of bias?  Were they doing

14  something that indicated a bias?

15  Q.  What information did you need -- well, let me back up.        11:50:00

16  Excuse me.  Strike that.

17          Did you agree to assist Maricopa County in that

18  inquiry?

19  A.  Yeah, I told them I'd let them know whatever I found.

20  Q.  What information did you need in order to commence your       11:50:13

21  look into that area?

22  A.  Yeah, well, this was one of the big challenges.  They

23  didn't have much data on the specific area that they talked

24  about was sort of enforcement action, specifically traffic

25  stops or the activities of their sheriff's deputies.  They       11:50:31

1    didn't record race or ethnicity in traffic stops or any kind of

2    enforcement, so that created a real challenge, because you

3    would want to have that so that you can look for evidence of

4    bias, but they don't collect it.

5    Q.  What information was available for you to examine?                    11:50:48

6    A.  Yeah.  The only thing in my conversations with her was that

7    they had something called CAD data, which is the records of

8    calls that -- that MC -- MCO does track.

9            But that information or that CAD data, they told me

10   explicitly, didn't have any information about race or                     11:51:14

11   ethnicity, but in many cases -- though, it turns out quite a

12   lot don't -- they have last names of the person who was

13   arrested or the person who was part of a traffic stop.

14   Q.  Did there come a time when another attorney from Maricopa

15   County contacted you on this very same issue?                             11:51:32

16   A.  Yes, yourself, Tom Liddy came on and began to ask me about

17   these same issues.

18   Q.  And did Maricopa County provide you with CAD data?

19   A.  They did.

20   Q.  Do you recall the universe of CAD data that was provided?            11:51:47

21   A.  I think the first thing they sent me was all of the CAD

22   data in Access format, a relational database.  So first thing

23   they gave me was this big giant dump -- it was on a CD -- of

24   their CAD data from 2005, I think, to 2009.

25   Q.  So when you say all the CAD data, you're limiting that from          11:52:09

1   2005 to 2009?

2   A.  Yes.

3   Q.  And that arrived in what software?

4   A.  Access, Microsoft Access.  It arrived in a relational

5   database in Microsoft Access.                                    11:52:27

6   Q.  Did that pose challenges to your inquiry?

7   A.  Yes, many, many challenges.  The way the data is organized

8   is confusing, it's nonregular.  Particularly the challenge with

9   this data is that the last name of the person stopped is not

10  recorded in -- in a set spot.  It's in a table.  This is the    11:52:45

11  concept of a relational database.  There's a primary record,

12  and then there's another table that has comments dealing with

13  the traffic stop, if it was a traffic stop.

14  Q.  So the CAD data really comes in two parts?

15  A.  You could say that, yes.                                     11:53:07

16  Q.  One primary record?

17  A.  Um-hum.

18  Q.  And the other comments?

19  A.  Comments.

20          MR. YOUNG:  Objection, leading.                          11:53:12

21          THE COURT:  I'm going to allow that question.

22  BY MR. LIDDY:

23  Q.  And in which area of the CAD data were the names located?

24  A.  Yes.  The names are stored in the comments section in the

25  comments table.                                                 11:53:29

1   Q.  Did that pose a challenge to your inquiry?

2   A.  Yes, a great deal of challenge.  One of the things, one of

3   the most frustrating aspects of CAD data is that it is not

4   uniform, particularly the format they use for their comments

5   table.                                                          11:53:41

6           So what happens is that the person gets stopped and

7   their name is in there, but so is a great deal of other

8   information.  And sometimes the name is one of the first things

9   in the comments, sometimes the name of the person in there is

10  one of the last things in the comments, and sometimes it's in   11:53:58

11  between.  And in between could be other factors that -- that

12  they recorded.  Sometimes the officers -- some information

13  about another officer who showed up or something else about the

14  traffic stop.

15          So it's -- the frustrating and the difficulty working   11:54:15

16  with this data I would say is its nonuniformity in the way the

17  names are put into the table.

18  Q.  Why is that a problem for a scholar making these inquiries?

19  A.  Yeah, the reason it creates a big challenge is that

20  computers are really good at doing the same thing over and over  11:54:33

21  again.  But if the columns, or if the place where the names are

22  stored are not uniform across these thousands -- well, over a

23  hundred thousand cases, traffic stops, then you can begin to

24  create problems 'cause you'll start to miss names.  You'll

25  think it's an officer name, but it's not.  Or the name is in,   11:54:55

1    there but there's so much other stuff around it that whatever

2    kind of algorithm that you create misses the name, and so you

3    think there's no name, but in fact there is a name there.

4    Q.  Is it your experience from examining this CAD data that

5    there was always a name of a driver or a passenger in the                11:55:13

6    comments section of the CAD data?

7    A.  Oh, no, no.  Very large fraction of the time there is not.

8    The -- for -- sometimes a driver's license number is -- is

9    used.  So at the very least, you know, 29, 30 percent of the

10   time, going by incidents, there is no -- there is no name of           11:55:34

11   the person who was stopped.

12   Q.  Does that pose a concern for a scholar making these

13   inquiries?

14   A.  Oh, absolutely, sure.  Because now you've got all this

15   missing data.  You have all these cases where there's no name.         11:55:49

16   And I don't know if we've explained it yet, but the subsequent

17   analysis, the Hispanic surname analysis, we try to estimate if

18   someone might be Hispanic or not is based on the names.  If

19   there's no name, then no determination can be made whether the

20   person is Hispanic and, thus, the case has to be thrown out.           11:56:09

21   You can't use it, at least, you know, for that purpose.

22   Q.  So did there come a time when you converted this data out

23   of the Microsoft Access software?

24            THE COURT:  I want to --

25            MR. LIDDY:  Sorry, Your Honor.                                 11:56:25

1        THE COURT:  What you're saying is that stop would have

2   to be thrown out for purposes of statistical analysis, correct?

3        THE WITNESS:  For the Hispanic surname, yes.

4        THE COURT:  If you're doing a Hispanic surname

5   analysis and you have no name, then you just simply cannot          11:56:36

6   include that stop as part of the analysis?

7        THE WITNESS:  Right.  I mean, just so you're clear, it

8   might be -- there are ways in which people try to reconstruct

9   data based on other information.  I didn't do that.  But the

10  census bureau, if you don't say whether you're Hispanic or not,    11:56:50

11  they'll impute whether you're Hispanic, you know, that kind of

12  thing.

13       So there is a way, maybe, to sort of reconstruct data,

14  but I didn't do that.  I just, if there was no name -- and the

15  other experts witness didn't do that, either.  Those names        11:57:02

16  are -- those incidents are excluded from the analysis.

17       THE COURT:  All right.  And they're excluded from the

18  analysis simply because the CAD data doesn't have the name?

19       THE WITNESS:  Right.

20       THE COURT:  For whatever reason, the officer didn't         11:57:14

21  put the name in the comments.

22       THE WITNESS:  Right.  So if you're going from, say,

23  traffic stop, there's lots of codes here, but -- I don't want

24  to confuse you, but the -- there's a T as an initial code,

25  should be a traffic stop.  That's different than the final        11:57:27

1    disposition or the final code, which can be a T or a 910 or

2    something else as well.

3            But if you go from the Ts as the initial, it's about

4    29.6 percent of all incidents have no name in the comment

5    field.                                                              11:57:44

6            THE COURT:  Okay.  Thank you.

7            I am still listening, Mr. Liddy, but thank you for the

8    courtesy.

9            MR. LIDDY:  Thank you, Your Honor.

10   BY MR. LIDDY:                                                       11:58:03

11   Q.  So if there was no name identified in the comment field --

12   A.  Right.

13   Q.  -- then there was no way to make the inquiry?

14   A.  That's right.

15   Q.  But if there was a name in the comment field, your          11:58:12

16   professional opinion that the inquiry should be made?

17   A.  Yes, oh, yeah, you would want to include it if -- if you

18   could, sure.

19   Q.  So you'd have more confidence in an examination of this

20   data if it included all the instances where there were names.  11:58:30

21   A.  Yeah, sure.  No, that would be right.  I mean, it would --

22   I'd have even more confidence if we didn't have to throw out so

23   much data.  But if there is a name there and you didn't include

24   it, you know, that is a problem.  That can introduce, like,

25   another type of selection bias.                                  11:58:50

1   Q.  Okay.  I want to back up just a little bit.  Forget about,

2   just for a moment, the instances where there were names that

3   may have been thrown out.

4        I want to know more about the universe of name -- of

5   instances where there were no names --                          11:59:05

6   A.  Right.

7   Q.  -- that were not looked at.

8   A.  Right.

9        MR. YOUNG:  Objection, lacks foundation.

10       MR. LIDDY:  Your Honor, the witness just --              11:59:14

11       THE COURT:  Are we talking about this witness's review

12  of another report, or what are we talking about?

13       MR. LIDDY:  No, Your Honor.  We're talking about this

14  witness's review of the data set he was provided.

15       THE COURT:  All right.                                   11:59:27

16       MR. YOUNG:  Your Honor, I was objecting to Mr. Liddy's

17  preface to the question, which I believe is the part that has

18  no foundation.

19       THE COURT:  All right.  Well, I understand where we're

20  going, and so you can ask the question and answer it.         11:59:38

21       THE WITNESS:  Could you ask it again?

22       MR. LIDDY:  May I ask that the question be read back?

23  I'm not even sure if I completed the question, but --

24       (The record was read by the court reporter.)

25  BY MR. LIDDY:                                                 12:00:08

1  Q.  Okay.  So just so we're clear, my question to you is about

2  the instances recorded in the CAD data provided for you from

3  2005 to 2009 for which there were no names associated with

4  those instances in the comments section.  Clear?

5  A.  Right.                                                          12:00:27

6  Q.  How large a percentage of the total universe was that?

7  A.  If you go from T as an initial traffic -- a T code, which

8  means it's supposed to be a traffic stop, then that's about

9  30 percent have no name.

10        THE COURT:  29.6 percent, to be precise?                     12:00:46

11        THE WITNESS:  Yes, 29.6.

12        THE COURT:  We're going to break for lunch now.

13        MR. LIDDY:  We'll thank the Court.  We'll break for

14  lunch on 29.6.  Thank you.

15        THE COURT:  You can step down, Dr. Camarota.  We'll         12:00:57

16  expect you back.  We're probably going to start --

17        Well, let me ask you, you shared with me when we broke

18  on Thursday afternoon your concern about having time to get

19  your case in.

20        MR. CASEY:  Yes, Your Honor.                                 12:01:11

21        THE COURT:  I want to make sure you get your case in.

22  Should we be back here at 1 o'clock?

23        MR. CASEY:  1:15 would be acceptable, Your Honor.

24        THE COURT:  Well, it would be acceptable to me so long

25  as you can get your case in.  If you can't, we'll be back here    12:01:23

1241

```
 1    at 1 o'clock.

 2              MR. CASEY:  We better start at 1 o'clock, then, Your

 3    Honor.

 4              THE COURT:  All right.  We'll see you back at

 5    1 o'clock, Dr. Camarota.                                    12:01:31

 6              (Pause in proceedings.)

 7              THE COURT:  Mr. Casey, you ready to bring -- make your

 8    motion?

 9              MR. CASEY:  Yes, Your Honor.  I will be brief.

10              Defendants now at this time make a Rule 52(c) motion  12:03:00

11    for judgment on partial findings.  I will break this down

12    between global arguments and specifically.

13              There is no evidence of any Fourth Amendment violation

14    or its state equivalent based on the evidence presented in

15    plaintiffs' case in chief.  There is no evidence of intentional  12:03:19

16    discrimination or racial animus as to any plaintiff or class

17    member under state -- under federal or state law.

18              There's been no evidence presented of a policy,

19    pattern, or practice of racial discrimination or racial animus

20    motivated by Sheriff Arpaio or as to any specific deputy that  12:03:35

21    has been presented here at trial.

22              No evidence that plaintiffs have demonstrated a real

23    and immediate threat of future injury, despite being allegedly

24    exposed since 2007 to the defendants' allegedly racially

25    discriminatory policy, custom, or practice.  Therefore, they  12:03:54
```

1    lack standing.

2        The next argument, Your Honor, is they have failed to

3    present a police practices, standard of care, and racial

4    profiling expert in the witness they designated is Robert

5    Stewart, who they said will be a witness at trial.                    12:04:08

6        That dovetails into their theory of the case that

7    there are certain components of the policy, pattern, and

8    practice that were allowed to exist because of substandard or

9    unreasonable police practices by the Sheriff's Office.  Namely,

10   there is no evidence established by a police practices/          12:04:26

11   standard of care expert of inadequate training leading, or

12   participating, or part of contributing to a prohibited policy,

13   pattern or practice.

14       There is no evidence of inadequate or unreasonable

15   supervision during MCSO saturation patrols, or on nonsaturation    12:04:45

16   patrol days that somehow led to or contributed to a prohibited

17   policy, pattern, or practice.

18       There is no testimony of any inadequate or

19   unreasonable MCSO policies and procedures, either in writing or

20   orally.  There's no testimony about inadequate safeguards that    12:05:03

21   somehow led to a prohibited policy, pattern, or practice.

22       There is -- again, without such testimony, Your Honor,

23   the trier of fact cannot reasonably find for the plaintiffs on

24   those elements contributing to or influencing or creating a

25   prohibited policy, pattern, or practice.                          12:05:26

```
 1                The next --

 2                THE COURT:  Let me ask -- let me interrupt you,

 3     Mr. Casey.

 4                MR. CASEY:  Yes, Your Honor.

 5                THE COURT:  Do the plaintiffs have to present a        12:05:32

 6     standard of care expert in this case?

 7                MR. CASEY:  Yes, Your Honor, they did as to those

 8     elements.  The Court makes the decision in its own judgment as

 9     to whether or not there's a Fourth Amendment violation, and

10     whether or not there's a Fourteenth Amendment violation.         12:05:45

11                As to their components, and one of their issues is a

12     component of a policy, pattern, or practice were certain

13     systemic problems in the MCSO that necessarily indicates

14     standard of care issues.  Reasonableness, unreasonableness.  It

15     is in their --                                                   12:06:04

16                THE COURT:  And so can't the trier of fact make that

17     determination without an expert, depending upon what the

18     testimony is?

19                MR. CASEY:  I would respectfully submit that -- can

20     the trier of fact?                                               12:06:15

21                THE COURT:  Yeah, this is a 52(c) motion.

22                MR. CASEY:  Yeah.  In candor, yes.

23                THE COURT:  All right.

24                MR. CASEY:  But I believe that it is a --

25                THE COURT:  And so what your tes -- what your argument 12:06:24
```

1   is is that there has been no such evidence?

2        MR. CASEY:  There has been no such evidence, and there

3   also -- a huge glaring hole in the case is the absence of

4   someone who we spent a great deal of time on, presumably to

5   defend against, who was supposedly going to establish that.  It    12:06:40

6   doesn't exist.

7        So what you do is you have uncontroverted testimony

8   from the MCSO deputies.  That is the record that you have right

9   now.

10       THE COURT:  What if I find that the testimony of the    12:06:50

11  MCSO deputies is actually conflicting with each other?

12       MR. CASEY:  That is -- that is a resolution the trier

13  of fact has to resolve on its own.

14       THE COURT:  Okay.

15       MR. CASEY:  Next, Your Honor, as to Mr. Melendres.    12:07:02

16  Mr. Melendres is a named plaintiff.  He did not testify at

17  trial, either live or via deposition.  Therefore, the testimony

18  here by Carlos Rangel, an MCSO deputy, as to that interaction

19  is that it's undisputed.  He did not have his I-94 on him at

20  the time of the stop.    12:07:19

21       It's undisputed that he told Carlos Rangel he was

22  working for compensation while on a tourist visa.  It's

23  undisputed, according to Carlos Rangel, that put him out of

24  status, being on a tourist visa.

25       Now, the next issue is that he is not an appropriate    12:07:34

1    class representative, and he should be dismissed as a named

2    plaintiff and as a class representative.

3        Next, as to plaintiff Jessika Rodriguez, she was not

4    here to testify live or via deposition.  My memory from the

5    Court's December 23rd, 2011 order was the Court has ruled on       12:07:57

6    the Fourth Amendment claim, but not the Fourteenth.  She was

7    not here to establish anything as to this particular stop, so

8    it falls on the policy, pattern, or practice claim.

9        I respectfully submit that she is not a fair class

10   representative based on her failure to appear and testify         12:08:17

11   either live or via deposition, and she should be dismissed as a

12   class representative.

13       Now, as to plaintiffs David Rodriguezes, Manuel Nieto,

14   and Velia Meraz, the evidence shows that those stops were based

15   on probable cause, the detentions were based on probable cause,   12:08:38

16   and were not unreasonably prolonged under the circumstances,

17   and no Fourth Amendment violation.

18       None of those individuals, Rodriguez, Manuel Nieto, or

19   Velia Meraz, are appropriate class representatives.  They

20   should be dismissed as class representatives based on the         12:08:55

21   foregoing.

22       In addition, Your Honor, we move the Court to

23   decertify the class based on the evidence that you've heard in

24   the plaintiffs' case in chief.  That concludes the Rule 52(c)

25   motion.                                                           12:09:08

 1          THE COURT:  What do I do about Somos America?

 2          MR. CASEY:  Somos America is an entity organization,

 3    Your Honor.  It is a plaintiff.  Its corporate representative,

 4    its 30(b)(6) representative, Lydia Guzman, testified today.

 5    The key testimony beside -- obviously, there was a lot of          12:09:22

 6    anecdotal, what I would describe as anecdotal discussion or

 7    evidence, but that representative has had no traffic stops at

 8    any time during the course of this, and she and her

 9    organization is supposedly exposed, since 2007, to the

10    allegedly racially discriminatory policy, custom, or practice.     12:09:43

11          What she did describe is a very subjective fear of

12    being profiled while handing cash while speaking the Spanish

13    language to someone, and being observed by an unknown MCSO

14    deputy.  She described being --

15          THE COURT:  Didn't she also assert fear in the -- and       12:09:59

16    concern about the members, Somos America members?

17          MR. CASEY:  She did.  That was the anecdotal evidence,

18    Your Honor.  But there is no firsthand information that she

19    relayed that indicated specific instances of there being actual

20    harm done.  And under the --                                      12:10:17

21          THE COURT:  Let me -- let me switch topics.

22          MR. CASEY:  Sure.

23          THE COURT:  I'm going a little quick on you here.

24          MR. CASEY:  Yes, Your Honor.

25          THE COURT:  What is your assertion that                     12:10:26

```
 1    Mr. Ortega Melendres cannot be an appropriate class

 2    representative?  What is the basis for that?

 3              MR. CASEY:  That he has not -- well, first of all,

 4    he's not been here to testify as to his grounds for the

 5    detention, the -- the issue --                                12:10:38

 6              THE COURT:  We have had plenty of testimony about that

 7    stop, haven't we?

 8              MR. CASEY:  But not from him.  At most what you have

 9    is I think the Court, over objection, allowed in an ICE

10    document that summarized the allegations in Mr. Melendres's   12:10:52

11    complaint.

12              THE COURT:  Right.

13              MR. CASEY:  That's it.

14              The problem with Mr. Melendres serving as a class

15    representative is that he is not here to establish the        12:11:03

16    essential facts alleged in his complaint, which is basically,

17    Look, I had my I-94 on me, so there was no basis for the

18    detention.  I did not tell him -- excuse me, Carlos Rangel

19    being "him" -- I never told him I was being paid to go to work.

20    That is not here under oath.  He cannot support his own claim  12:11:25

21    for either a Fourth -- I'm not addressing the Fourteenth right

22    now --

23              THE COURT:  Do you believe that if in fact the Court

24    were to accept the allegation that he had no I-94 on him, there

25    is no basis on which, based on the facts that I have received, 12:11:46
```

1    that there is no basis on which I could find a Fourth or a

2    Fourteenth Amendment violation by the MCSO or by the

3    defendants?

4              MR. CASEY:  Correct.

5              THE COURT:  Is that your position?                    12:11:58

6              MR. CASEY:  That is my position.

7              And also, let me, if I may, Your Honor, with your

8    permission, I respectfully submit that you cannot find a Fourth

9    Amendment violation as to the documents in the communications

10   between him and Carlos Rangel.  This is not talking about the   12:12:14

11   prolonging of the stop the Court addressed with DiPietro and

12   reasonable suspicion back in December.

13             What I'm saying here is there is no factual basis for

14   you to conclude anything other than the sworn testimony of

15   Carlos Rangel.  That Melendres told him, I don't have my I-94   12:12:29

16   on my person, I'm out of status, and I'm working for

17   compensation.  There is no other evidence that you have.  You

18   have predicates to questions from counsel.  You've got the ICE

19   document that summarizes the complaints.  But we have

20   undisputed testimony from Carlos Rangel and we don't have       12:12:48

21   anything.

22             THE COURT:  All right.  I think I understand your

23   argument.

24             MR. CASEY:  Thank you very much, Your Honor, for your

25   patience.                                                        12:12:55

```
1              THE COURT:  Thank you.

2          Mr. Young, do you want to be heard?

3          MR. YOUNG:  Yes, Your Honor, briefly.

4          I believe that the evidence has been fully sufficient

5   to indicate both Fourth Amendment and Fourteenth Amendment    12:13:03

6   violations.  We have direct evidence of racial animus.  We have

7   it from the sheriff.  We have it from Chief Sands.  We have it

8   from Sergeants Palmer and Rangel that they used race in order

9   to determine whether to make inquiries into alienage.

10         We have evidence of effect, which has come in through    12:13:27

11  Dr. Taylor's evidence.

12         Mr. Casey mentioned that we don't have an expert on

13  police practices.  That expert testimony could be relevant and

14  would be relevant if it were brought in to support an inference

15  of intentional discrimination.  You can say, Well, the          12:13:48

16  practices aren't there; therefore, you can infer that the

17  disparate effect was intended.

18         We believe that the evidence shows directly that there

19  is disparate effect -- intent, that there is discriminatory

20  intent, and therefore, we don't need to have an expert come in  12:14:07

21  to lay the foundation for an argument for an inference of

22  discriminatory intent.

23         With respect to Your Honor's question about whether

24  Your Honor could find as a matter of fact that there was

25  discriminatory intent, we agree with Mr. Casey.  Your Honor     12:14:26
```

1    could find that.  And we believe that based on the evidence,

2    Your Honor should find that.

3          With respect to the issue of whether the class

4    representatives should be accepted, or whether the class should

5    be decertified, Mr. Melendres's stop has been the subject of    12:14:43

6    testimony by other witnesses in the case.  Mr. Melendres did

7    appear for a deposition.  If Mr. Casey had wanted to present

8    Mr. Melendres's testimony under oath, that could be -- could

9    have been done, but he's chosen not to do that.

10          And we therefore contend that he should be an           12:15:03

11    appropriate class representative, and his case actually --

12    first of all, Your Honor's already ruled on summary judgment at

13    a general level with respect to Mr. Ortega Melendres, and we

14    believe that his specific case, and particularly in light of

15    Exhibit 1030 -- 1093, which is the ICE document that was        12:15:22

16    admitted, does actually support the claim with respect to the

17    I-94 and with respect to the stop generally.

18          I want to say that Mr. Casey's description of that

19    document we believe is not quite accurate.  It just doesn't

20    summarize his complaint.  It summarizes what the ICE            12:15:42

21    officer did and found after Mr. Ortega Melendres was brought in

22    to ICE, and that report is that he had the I-94.

23          Now, we also agree with Your Honor that it's not

24    necessary for him not to have had the I-94 in order for his

25    case to be a good case.  Based on the facts that              12:16:00

1    Officers DiPietro and Rangel have testified to, we believe that

2    there's a Fourth Amendment violation and also a Fourteenth

3    Amendment violation.

4          With respect to Jessika Rodriguez, her husband, David

5    Rodriguez, who was in the same car, went through the same stop,    12:16:18

6    testified as to that, and we don't believe we need both of them

7    to come in in order to establish that they are adequate class

8    representatives.

9          As to the others, we believe the facts speak for

10   themselves.  The -- the class allegation should stand.  We    12:16:32

11   believe Your Honor's earlier class certification order, on the

12   basis of the evidence that has been presented, was proper.

13         The Somos America testimony that Your Honor heard this

14   morning we believe also speaks for itself, both as to standing

15   and as to the underlying allegations.    12:16:54

16         Just a moment.

17         I'm going to yield to my co-counsel here, Ms. Wang, in

18   case she wants to add anything to what I said.

19         MS. WANG:  Your Honor, I'm ready to address the

20   organizational and associational standing of Somos America if    12:17:20

21   Your Honor has questions.

22         THE COURT:  No, I do appreciate it.  I appreciate the

23   argument.  I appreciate its organization.  And the response.  I

24   do think it's going to be appropriate at this time to hear the

25   defense case.  I'm not going to grant a Rule 52(c), so it's    12:17:31

1252

```
1    denied at this time.

2              I'll see you back at 1 o'clock.

3              (Lunch recess taken.)

4              THE COURT:  Please be seated.

5              You ready to resume, Mr. Liddy?          13:01:06

6              MR. CASEY:  I am, Your Honor.

7              THE COURT:  Please do so.

8    BY MR. CASEY:

9    Q.  Doctor, last we spoke, we were talking about a large

10   fraction of the universe you were provided that had no names   13:01:17

11   associated with them.  Do you recall that?

12   A.  Yes, I do.

13   Q.  I'm going to ask you about your professional concerns about

14   that large fraction that were -- had no names associated with

15   them.                                                  13:01:34

16              How large was that fraction?

17   A.  About 30 percent.

18   Q.  And what is your concern with that?

19   A.  That we know nothing about those cases.  We don't know if

20   they are the same as those that were retained; we don't know if   13:01:43

21   they're very different.  We don't know if there's a random

22   distribution of missing data, which means that we don't know

23   what kinds of distortions are in the data.  The traffic stops

24   that were excluded may have been very different.

25              So let's take the variable of interest being Hispanic.   13:02:02
```

```
1    It could be the case that if we had full data, the fraction of
2    Hispanics would be very different.  It could be much higher,
3    could be lower.  All those excluded cases just loom out there
4    as a problem, a significant problem, 'cause it's a very large
5    fraction.  If it was 1 percent it wouldn't make as much          13:02:19
6    difference.
7    Q.  And would that problem give a professional in the field
8    more or less confidence in the outcome of the analysis?
9    A.  Whenever you have missing data, you always have less
10   confidence in the analysis.  And the more missing data and the   13:02:36
11   less you know about it, that confidence gets even -- that lack
12   of confidence gets even bigger.  So the more cases that are
13   missing and the less you know about those cases, the less
14   confidence you have in any kind of analysis you do with the
15   remaining cases.                                                 13:02:52
16   Q.  When you say that you know less about the missing data, why
17   is that a problem?
18   A.  Well, if we knew, for example, that the missing data looked
19   exactly like the data that we do have information for, then we
20   could at least say that we don't have a selection bias.          13:03:08
21   Selection bias is the idea that you have data that is
22   unrepresentative of the universe that you're interested in, and
23   the universe that we're interested in is traffic stops.  But if
24   you're missing 30 percent of them, the remaining 70 percent may
25   give you lots of false information about the whole universe      13:03:28
```

 1   because you're missing all these cases.

 2   Q.  Regardless of these problems with the data, nevertheless,

 3   you undertook an effort to examine the data, is that correct?

 4   A.  That's true, yes.

 5   Q.  And what were you looking for?                          13:03:43

 6   A.  I was asked to look for evidence of bias against Hispanics.

 7   Are they being stopped at -- are they being targeted for

 8   enforcement.

 9   Q.  And did you produce a report?

10   A.  I did.                                                  13:03:59

11   Q.  And did that report contain some tables?

12   A.  Yes.

13   Q.  And figures?

14   A.  Yes.

15          MR. LIDDY:  Your Honor, at this time I would like to  13:04:22

16   use the court document camera in order to put up one figure

17   from Dr. Camarota's report, which has already been admitted by

18   stipulation as Exhibit 402, and publish it to the witness and

19   the Court.

20          THE COURT:  You may do so.                           13:04:45

21   BY MR. LIDDY:

22   Q.  Doctor, do you see what is labeled there as Figure 1?

23   A.  I do.

24   Q.  And would you read the title of Figure 1 for us, please.

25   A.  Hispanic share of MCSO stops compared to Maricopa County  13:05:01

1    and Arizona.

2    Q.   And do you recognize this as a demonstrative figure which

3    you included in your report?

4    A.   I do.

5    Q.   What were you trying to convey to the readers by your        13:05:12

6    creation of this figure?

7    A.   I think there are two important points here.

8         One is if you look at the blue line, that is doing

9    name checks, not incident checks but name checks, what fraction

10   of name checks by MCSO -- and the dates here, by the way, which   13:05:31

11   I think are being cut off at the bottom, are 2005 to 2009,

12   though we don't have complete data for 2009.  It's only through

13   October.

14        But in any event, the blue line shows the fraction of

15   stops that are -- have a Hispanic surname using a 70 percent      13:05:45

16   list, or 70 percent threshold.  That is, the names in the

17   census 70 percent of the time or more did a person indicate

18   that they were Hispanic who had that last name.  So it's a

19   pretty robust measure of Hispanic surnames.

20        And what you see is using that list, that the fraction      13:06:08

21   is somewhat less for most years than is the overall share of

22   Maricopa County or Arizona in terms of Hispanics.  Or maybe put

23   it different way, using a 70 percent surname list, Hispanics

24   are being stopped at roughly or maybe slightly less than their

25   share of the overall population.                                  13:06:33

1  Q.  And why is that significant to your inquiry?

2  A.  Well, one of the things we would suspect is if Hispanics

3  are being targeted systematically by MCSO, we would expect, for

4  one thing, that they're -- the rate at which they're being

5  stopped relative to their share of the local population or the          13:06:51

6  state would be much higher.

7          THE COURT:  Dr. Camarota, just for my placement -- I

8  hope this will facilitate things for you, too, Mr. Liddy --

9  this deals with all the T data?

10          THE WITNESS:  Yes.                                              13:07:06

11          THE COURT:  So this is all stops not related to what

12  we've been referring to in this trial as saturation patrols --

13          THE WITNESS:  No.  Absolutely, yes, sir, this is all

14  stops.

15          THE COURT:  Thank you.                                         13:07:15

16          THE WITNESS:  Yes.  And it goes back farther than any

17  of the saturation stuff that we've been talking about.  This

18  goes back to 2005 forward.

19          THE COURT:  Yes, I follow.

20          THE WITNESS:  So the share of the population that is           13:07:25

21  Hispanic is not the only thing to think about.  Other things

22  can matter.  But it's an important part of thinking about this

23  issue of bias or targeted or racial profiling.  And what we see

24  here first is that the Hispanic share of stops is simply not

25  out of line with the basic demographics of Maricopa or Arizona.       13:07:47

1    BY MR. LIDDY:

2    Q.  But there would be other variables that you would want to

3    inquire about, is that correct?

4    A.  Sure, there are other things that would matter.  It's not

5    simply that it settles the issue, but it's an important part,          13:08:00

6    it's important information to know how -- what the background

7    demographics are relative to the percentage.

8    Q.  And what might some of those other variables be?

9    A.  Oh, well, you would want to know, for example, if Hispanics

10   drive a lot less in Maricopa County, or something like that; or        13:08:18

11   are they -- are they much more likely to somehow then come in

12   contact with police, or more likely?  So there are other things

13   you'd want to know than just the basic demographics.

14         The other thing, if I could point out one other

15   thing --                                                               13:08:39

16   Q.  Sure.

17   A.  -- that I think is important here is that putting aside the

18   issue of demographics, there's no obvious trend in the data.

19   And yet, in Arizona we know that the issue of illegal

20   immigration became much more salient.                                  13:08:50

21         So if MCSO deputies are targeting Hispanics as a

22   consequence, we would have expected that the share that's

23   Hispanic to go up over time.  It doesn't.  It roughly stays --

24   it fluctuates a little bit, but it's pretty constant over this

25   time.                                                                  13:09:10

1   Q.  In your inquiry did you learn of a time when the issue of

2   illegal immigration became more salient in Maricopa County?

3   A.  Well, it certainly became more salient over this time

4   period.  For example, I think in 2007 is when the HSU unit is

5   created.  But the creation of that unit does that appear to          13:09:25

6   have created some trend in the data, at least over these five

7   years of which I had information.

8   Q.  And just so we're clear, what information were you looking

9   at in that CAD data from 2005 to 2009 when you drew these

10  conclusions?  Or made these observations, excuse me.                 13:09:42

11  A.  I'm looking at the -- I'm doing a Hispanic surname

12  analysis, a 70 percent threshold, so I'm looking at a Hispanic

13  surname over these five years.  So I'm looking at the names in

14  the comments field.

15  Q.  And where did you get your Hispanic surname analysis list?       13:09:56

16  A.  The list came from the 2000 Census.

17  Q.  Thank you.

18        I'd like to direct your attention now to figure 6 from

19  that same report that's been admitted into evidence.  Can you

20  see that?                                                            13:10:18

21  A.  Yes, I can.

22  Q.  And read along with me.  It says:  Hispanics have

23  dramatically lower socioeconomic status in Maricopa County?

24  A.  Yes.

25  Q.  What do you mean by that?                                        13:10:27

1    A.  I mean here we just see four measures of -- that typically

2    researchers use when we think about socioeconomic status,

3    though there might be others.  We look at poverty.  The

4    fraction of Hispanics in Maricopa County who are in poverty is

5    almost two and a half times the share for non-Hispanics.

6    That's the first column, 23 versus 9.7.

7         The second column shows the fraction under 200 percent

8    of poverty, a commonly used measure for a variety of reasons.

9    You might call people below this amount the low-income

10   population.  The non-Hispanics are 22.3; the Hispanics are more

11   than twice that at 53.6.

12        This is all from the American community survey.  The

13   survey asks people whether they speak English and do they speak

14   it very well.  And 48 percent of Hispanics in that survey said

15   that they speak English less than very well, compared to about

16   3 percent of the non-Hispanic population.

17        And this last one is less educated.  This is persons

18   who -- who are adults who have not completed high school, and

19   it's almost 43 percent for Hispanics compared to 8 percent for

20   the non-Hispanic populations.

21        So for me, the takeaway point here is something you

22   might know, but it's important, I think, to have the numbers,

23   is that there are enormous differences in the socioeconomic

24   status of Hispanics and non-Hispanics in Maricopa County.  The

25   gap between the two groups is extraordinarily large.

13:10:44
13:11:04
13:11:23
13:11:41
13:11:57

1  Q.  And when you refer to socioeconomic variables, you're

2  referring to poverty as one?

3  A.  Yeah, poverty would be one.

4  Q.  And the ability to speak English, quote, very well, end

5  quote, is another?                                           13:12:12

6  A.  Yes.

7  Q.  And the education level is a third?

8  A.  Yes.

9  Q.  Now, tell me, why would these variables be of interest to

10  an academic examining whether or not there may be racial      13:12:23

11  profiling in law enforcement stops in Maricopa County?

12  A.  Because they may matter -- they matter to a whole variety

13  of social outcomes and to social phenomenon.  In sociological

14  research, the socioeconomic status of the person is almost

15  always included because it can have such a big impact.        13:12:43

16          In the case of traffic stops, let's think of an

17  example.  If you have a policy of trying to pull everyone over

18  who has an equipment violation, it's very possible that people

19  with low incomes are going to have more difficulty, you know,

20  meeting the equipment standards of whatever their jurisdictions 13:13:06

21  require, and so they're much more likely to get pulled over.

22  The --

23  Q.  Is that be -- I'm sorry.  Go ahead and finish.

24  A.  I was just going to say 46 states actually provide some

25  assistance to their low-income population to help them to      13:13:18

1    maintain their cars, because they recognize that it's often

2    very difficult for people who have low incomes to maintain

3    their cars.

4    Q.  Where did you learn of that statistic, 46 --

5    A.  It's in a GAO report, they surveyed the states.        13:13:31

6    Q.  What does GAO stand for?

7    A.  It used to stand for General Accounting Office; now it

8    stands for Government Accountability Office.  They changed the

9    name.

10   Q.  So that's a government statistic.                       13:13:43

11   A.  Yeah.  Yes.  Yes.

12   Q.  And one that someone in your field would normally refer to

13   in examining these sorts of questions about socioeconomic

14   status?

15          MR. YOUNG:  Objection, leading.                      13:13:52

16          THE COURT:  I'm going to overrule the objection.

17          But I'm going to ask what statistic is it we're

18   talking about, the 46 percent of states provide assistance?

19          MR. LIDDY:  Would you like me to answer or the

20   witness, Your Honor?                                        13:14:06

21          THE COURT:  I'm going to ask the witness to answer.

22          Is that the statistic?

23          THE WITNESS:  I think that's what -- that 46 out of 50

24   states provide assistance to their low-income residents,

25   according to the GAO, to help them maintain their cars.     13:14:15

1          THE COURT:  All right.  And from that you have drawn

2    the inference that poor folks in Maricopa County have cars in

3    worse repair?

4          THE WITNESS:  No.  I draw the inference that that's a

5    very real possibility, and it's something you'd want to control        13:14:26

6    for if you -- if you want to compare what's happening on a

7    saturation patrol.

8          THE COURT:  But it wouldn't give rise to any

9    particular number.  You couldn't use that to arrive at any sort

10   of a number of how many Hispanics have cars that are in less          13:14:36

11   good repair than -- than, say, the non-Hispanic population?

12         THE WITNESS:  No, just -- no.

13         THE COURT:  It's just a fact.

14         THE WITNESS:  Just a fact, right.

15         THE COURT:  All right.                                          13:14:48

16   BY MR. LIDDY:

17   Q.  So it's just a fact that you would want to control for when

18   looking at the differences between the rate at which people

19   with Hispanic names are stopped and people with non-Hispanic

20   names are stopped?                                                    13:14:57

21   A.  Yes, it's something that you'd want to think a lot about,

22   because socioeconomic status is so highly correlated with being

23   Hispanic.  Otherwise, you might get a spurious correlation, a

24   spurious relationship.

25         In statistics, that means something looks like it's           13:15:13

1    being caused by one thing, but it's in fact being caused by

2    something else, because some other variable, some other

3    phenomenon, is so closely connected.  And that other factor is

4    said in that context to be confounding your statistical

5    results.                                                    13:15:31

6           I can give you an analogy if you think that would be

7    helpful.

8    Q.  Sure.  If you think it would help the Court, let's hear

9    your analogy.

10   A.  So just for example, and I believe I put this one in the  13:15:39

11   paper, that you could find, doing a statistical analysis, that

12   the larger someone's foot is, the higher their income.  And you

13   might conclude well, therefore, foot size has a positive impact

14   on income, increases it.

15          But the problem is foot size is highly correlated with  13:15:54

16   gender.  So it's not that people with big feet make more money;

17   it's that in fact, men tend to make more money.  But if you

18   don't have men as one of the factors, one of the control

19   variables in your analysis, you might mistakenly conclude that

20   it's foot size, because those two things are so highly         13:16:13

21   correlated.

22          And so that -- and in this case, why this is so

23   relevant is these enormous differences between the two

24   populations at issue, Hispanics and non-Hispanics, as a

25   potential confounding factor.                                 13:16:27

1  Q.  Okay.  I want to back up a little bit and talk about the

2  universe of CAD data that you had at your disposal to examine.

3  A.  Um-hum.

4  Q.  I believe you testified prior to the lunch break that it

5  was difficult data to use.                          13:16:43

6  A.  Very.

7  Q.  When you encountered these difficulties, did you reach out

8  to anyone in particular to try to learn more about the CAD

9  data?

10  A.  Yes, Scott Jefferys, the CAD coordinator.          13:16:54

11  Q.  CAD coordinator for --

12  A.  Maricopa County.  That's his -- he supervises; he's the

13  guru, if you will, of this data.

14  Q.  Does he work, as far as you know, for the Maricopa County

15  Sheriff's Office?                                   13:17:10

16  A.  I think he is a sheriff's office employee.  I'm not a

17  hundred percent sure of that, but I think so.

18  Q.  And how did you know to reach out to him if you had

19  questions about this CAD data?

20  A.  Oh, when the data was provided to me, they mentioned Scott  13:17:19

21  is the expert, and I think that that -- the CAD data, as I

22  recall, actually gives his phone number in there somewhere, if

23  you can call him.

24  Q.  Do scholars in your field -- let me strike that.

25       Is it the normal course and practice for scholars in   13:17:36

1   your field to reach out to people who work with databases on a

2   daily basis for assistance in learning how to make inquiries

3   into that database?

4   A.  Sure.  If you are working with new data, particularly

5   administrative data, you would want to talk to the person who          13:17:54

6   is the expert in that so that you don't make mistakes.

7           I was a lead -- give you an example very quickly.  I

8   was a lead supervisor for work at the census bureau evaluating

9   their data, and many times during the course of that we would

10  contact the people who were responsible for collecting it and         13:18:11

11  collating and so forth to make sure we understood the structure

12  of that data and so forth, because it was complex and it was

13  easy to make mistakes.

14  Q.  Now, you've talked about your concern about the large

15  fraction of CAD data with no names associated with them as an         13:18:25

16  area of concern for you.

17  A.  Yes.

18  Q.  Were there other characteristics of this CAD data that

19  caused you to be concerned?

20  A.  Well, there's all kinds of things with the CAD data.  Let         13:18:37

21  me give you one example.  There's no quality control with CAD

22  data.  The officers never review it to see if in fact the --

23  the information that they -- if they made a mistake.  No one is

24  in charge of checking with the officer.  There's no attempt to

25  verify the accuracy of anything in there.  So the CAD data has        13:18:55

```
 1   no quality control.

 2           There are other issues.  It may surprise -- well, it

 3   seems surprising to me not -- there are non-MCSO traffic stops

 4   within the CAD data.  For example, it's apparently the case

 5   that the Park Service uses the dispatch service and they record    13:19:14

 6   some of the CAD data is Park Service, it's not MCSO.  And I

 7   believe it's the Youngtown -- Youngstown Police Department.

 8   That data is in here, too, because for whatever reason they

 9   dispatch for them.  And I don't know what other ones, but

10   they're two that I can recall.                                     13:19:33

11           So when we're looking at CAD data, not every single

12   case, if you're not careful, anyway, is -- is MCSO.

13   Q.  So not every stop is an MCSO stop?

14   A.  That's right.

15   Q.  There's a large fraction with no names associated with the    13:19:49

16   incident report?

17   A.  Yes, that's correct.

18   Q.  There's no quality control for the veracity of the

19   information recorded on the CAD data?

20   A.  That's correct.                                               13:19:59

21   Q.  Can you think of any other shortcomings of this CAD data?

22   A.  The biggest shortcoming is trying to pull out the names,

23   because they're not stored in a regular fashion in the comments

24   field.  It's an enormous challenge and an enormous problem.

25   Q.  All of these shortcomings combined mean what to a scholar    13:20:17
```

```
 1    making such an inquiry that you're making?
 2    A.  Well, I mean, they would impact how much weight you should
 3    give any analysis that you do with it, given all these problems
 4    with the data that you -- that you'd want to recognize that all
 5    these missing cases and all these unknowns, that's an important    13:20:35
 6    issue.
 7    Q.  By weight, what exactly do you mean?
 8    A.  Well, how -- well, how should I put this?  Let me think.
 9          When I say how much weight, how -- you know, how --
10    how seriously -- maybe that's another way to put it -- do you      13:20:54
11    take any numbers from something that you have all these
12    problems with.
13          Is that helpful?
14    Q.  I'll let the Court decide if it's helpful or not.
15          Did there come a time when you learned that there is         13:21:08
16    another scholar who looked at CAD data making similar inquiries
17    to yours?
18    A.  Yes.
19    Q.  Who was that?
20    A.  Dr. Ralph Taylor.                                              13:21:22
21    Q.  And were you provided with a copy of his report?
22    A.  I was.
23    Q.  And were you given an opportunity to examine it?
24    A.  Yes.
25    Q.  Will you tell us what you found of interest in his report.     13:21:33
```

1  A.  Well, he had an original report, and looking at his

2  original data was one of the first things, and one of the first

3  big issues that came up was that he had failed to delete some

4  cases and had also failed to include cases.

5         In other words, there were names available that he          13:21:59

6  didn't use, but he also kept in his first report duplicate

7  names because sometimes an officer has to call in a lot of

8  names.  That information is recorded sometimes in the comments

9  field, but then you have to go into the comments field and

10 delete one and keep -- and keep one, and that's a real          13:22:16

11 challenge.

12        So the first report he had a series of data issues,

13 and then he revised that report and significantly reduced the

14 number of cases.  But unfortunately, when he did that, he

15 introduced a whole set of new problems.                          13:22:38

16 Q.  So you examined two separate reports from Dr. Taylor?

17 A.  Yes, two separate reports and two separate sets of data.

18 Q.  And what were some of the concerns you had with the second

19 report or the rebuttal report?

20 A.  Right.  In the -- in the second report he missed an          13:22:51

21 enormous number of names for his universe.  Now, my universe I

22 was mostly interested in people or I focused on Ts.  Okay?

23 People who were traffic stops in the initial code.

24        He went from the final disposition and he looked at

25 T 910s, that's a traffic stop or citation.  And so that's what   13:23:14

1  he was using, so that's his universe, right?

2  Q.  Did you have concerns with that?

3  A.  I -- I do.  Would you like me to talk about those first?

4  Q.  Yes, please.

5  A.  Well, one of the issues is that you have cases, like, for          13:23:27

6  example, there are something like 1344, I believe, suspended

7  licenses where the initial code is a T.  The person is pulled

8  over, seemingly using the exact kind of discretion that

9  Dr. Taylor says that he's interested in.  But the final

10 disposition code, because it's not a T or 910, it's entirely --      13:23:47

11 he drops that case from his analysis.

12       So the officer pulls the person over, subsequently

13 learns that, you know, they don't have a valid driver's

14 license, and Dr. Taylor drops them because the final code is

15 not a T or a 910.  Yet in his report he states he's interested    13:24:06

16 in traffic stops that involve discretion, that -- which would

17 seem to exactly fit the case I give.

18       I think the number is almost 400 DWIs or felony DWIs

19 that he excludes because the final code, again, is not T or

20 910.                                                                 13:24:27

21 Q.  So are you referring to incidents recorded in the CAD data

22 for which names were associated --

23 A.  Yes.

24 Q.  -- that Dr. Taylor intentionally --

25 A.  Yes.                                                             13:24:38

1   Q.   -- moved out of the universe for his examination?

2   A.   Right, because he was so focused on the T 910s.  He

3   excluded things like that.  And there are some others, I guess

4   felony possession of alcohol, or felony possession of drugs, if

5   someone was wanted on a warrant.  There were series of things    13:24:51

6   that seemed to begin as traffic stops, they're coded as Ts

7   initially, and then -- but they're not T 910 as the final

8   disposition, and so Dr. Taylor consciously excludes all those

9   cases.

10  Q.   In your examination of Dr. Taylor's rebuttal report did you  13:25:07

11  find any incidents of exclusions that were unintentional?

12  A.   Yes.  Yes.  As I recall, there were 16,804 incidents in

13  which there were names, and they are part of his universe,

14  T 910s, that he excludes.

15       Apparently, he missed them in the comments.  The way    13:25:35

16  they were stored there and the algorithm that he wrote missed

17  them.

18       So let me help you understand.  So the upshot of that

19  is if you look at all the incidents that are T 910 as a

20  disposition, exactly his universe, not my universe, his    13:25:55

21  universe, I believe it's 36.7 percent of all those are

22  excluded.  And the reason it's higher than that other figure I

23  gave is mainly because there were a bunch of names available

24  and he just missed them.

25  Q.   So when you say 37 percent of his universe of Ts and 910s,   13:26:12

1   final disposition were excluded --

2   A.  Yeah.

3   Q.  -- you're combining the intentional exclusions and the

4   unintentional exclusions?

5   A.  I'm combining the -- where there's no name with the names          13:26:24

6   he missed.  The names he intentionally excluded, or the cases

7   he intentionally included, which is maybe roughly another 5300,

8   that's a different group.

9   Q.  So you would add that 5300 intentionally excluded as -- to

10  the universe of total incidents that were excluded by               13:26:45

11  Dr. Taylor?

12  A.  Right, because he says the -- you know, they don't --

13  they're his T 910s or 910 Ts.  So there are three separate

14  problems, in my view, with his analysis, or with his data

15  preparation, or maybe I shouldn't talk about -- there's all the    13:27:02

16  cases where there's no name.  Then there's all the cases where

17  he missed the name.  And then there's all the cases where he

18  consciously excluded.  So there's three --

19  Q.  So in your professional opinion, in the instances where

20  there were no names, Dr. Taylor had no choice but to exclude        13:27:16

21  them.

22  A.  Yes, I would say so.

23  Q.  And in the instances where there were names, but they were

24  in the comment data and hard to find --

25  A.  Right.                                                          13:27:28

1  Q.  -- it --

2  A.  It's just a mistake.

3  Q.  Or an accident?

4  A.  Or an accident, yeah.

5  Q.  And then the others in which he intentionally excluded          13:27:34

6  because the final call type was different --

7  A.  Yes.

8  Q.  -- was intentional?

9  A.  Yes, that's correct.

10  Q.  And combined, would you say that's a large fraction of the      13:27:42

11  entire universe excluded, or not so large?

12  A.  Yeah, it's more than one out of every three cases.  One out

13  of every three incidents.

14  Q.  Is that problematic from your standpoint?

15  A.  Yes, potentially very problematic.                             13:27:56

16  Q.  Why?

17  A.  Because you could introduce a lot of selection bias.

18       Let me give you one example.  I can't say -- I can't

19  tell you that much about the cases where there's no names.  But

20  let's look at the ones where they were T 910s final               13:28:08

21  disposition, that 1600 -- yeah, 16,804 that he excluded.

22       If you look at those, they don't look exactly in the

23  one way that I was able to measure like the cases that he

24  retained.  It looks like in his -- as I recall, I'm doing this

25  from memory, but in his -- in his incident file, 81 percent of   13:28:31

```
 1   incidents are 910s.  But in the names that he missed it's
 2   64 percent 910s, which suggests that there's some significant
 3   difference between all these excluded names or these missed
 4   names than -- and it's not exactly the same as the data that he
 5   retained.                                                        13:28:55
 6   Q.  Why is that --
 7            MR. YOUNG:  Your Honor, I do have to interject an
 8   objection.  I guess it will be a motion to strike the last
 9   answer.
10            This subject and that particular point is not in his   13:29:04
11   expert report and was not disclosed to us prior to the trial.
12   And, therefore, I believe under Rule 26 ought to be excluded.
13            MR. LIDDY:  Your Honor, I'm not asking him about his
14   expert report; I'm asking him about his examination of
15   Dr. Taylor's report.                                            13:29:21
16            THE COURT:  Did you depose this witness?
17            MR. YOUNG:  Yes, and it was not in his deposition,
18   either.
19            THE COURT:  Did you ask him questions that would have
20   led to this testimony?                                          13:29:34
21            MR. YOUNG:  Yes.  I asked him, Please tell me all the
22   problems you have with Dr. Taylor's opinions, either in his
23   first or his second report, and I don't think this was part of
24   that answer.
25            THE COURT:  All right.  What I'm going to do is I'm     13:29:47
```

1    going to ask you to find that portion of the deposition and

2    show it to me, and I will strike this testimony if I find that

3    you asked the question and you didn't receive this -- this

4    information in your answer.

5            But I'm going to have to allow you to look that up,    13:30:01

6    and so I'm going to conditionally allow the testimony, and then

7    I may strike it later.

8            MR. YOUNG:  Thank you, Your Honor.

9            MR. LIDDY:  Thank you, Your Honor.

10   BY MR. LIDDY:                                                  13:30:19

11   Q.  In your examination of Dr. Taylor's rebuttal report, what

12   were his findings?

13   A.  Well, overall he also finds that the fraction of traffic

14   stops that were Hispanic were roughly in line with the basic

15   demographics of Maricopa and Arizona.  But then he also is very 13:30:47

16   much focused in -- there's two main areas that he's

17   particularly interested in.  One is saturation patrols, and the

18   other is length of traffic stop.

19           And when he -- well, let -- let's put it this way.

20   One of the areas that there is concern in terms of the         13:31:10

21   saturation patrols is that he's not able to find them all.  He

22   says that he has to exclude about one-seventh of the major

23   saturation patrols.  So he's trying to generalize about the

24   conditions or the possibility of Hispanic -- of Hispanics being

25   targeted in saturation patrols, but he -- he has to exclude, I  13:31:31

1    think he has 11 of 13.  So about one-seventh of the saturation

2    patrols he can't identify in the data, or the officers

3    involved.

4           So he -- he just -- he just -- they don't -- they're

5    not part of his saturation patrol.  And that's disconcerting,      13:31:53

6    because if you're interested in major saturation patrols, you'd

7    like to have them all, because you'd like to know what those

8    other two were like.  Were they similar?  Were they different?

9    Would you get the same results if they were in there?  So I

10   think that's an important question that he doesn't have in         13:32:07

11   there, so was -- I'm sorry.

12          MR. YOUNG:  Your Honor, same objection, but we'll deal

13   with it after the testimony.

14   BY MR. LIDDY:

15   Q.  How did Dr. Taylor identify who saturation patrol officers     13:32:20

16   were in his report?

17   A.  Yeah, he looked at a roster, he looked at when the

18   saturation patrols were, and then he looked at a roster and he

19   tried to match the officer to the saturation patrol so that he

20   would know which calls were associated with that saturation        13:32:38

21   patrol.

22   Q.  And does that cause any concerns for you?

23   A.  Well, as I've been told is that not all officers involved

24   in saturation patrols necessarily filled out that roster, so it

25   was the case that it's not complete.                               13:32:58

1    Q.  But you have no reason to believe that the percentage of

2    officers who work on saturation patrols that did not fill out

3    the roster is a large percentage?

4    A.  I don't know the percentage.  It's out there.  I don't

5    know.                                                              13:33:13

6    Q.  What is a goodness of fit statistic?

7    A.  A statistic that is used by statisticians when they have a

8    kind of statistical model, and they try to evaluate the overall

9    explanatory power of the model.  How much of the variation in

10   something, how much of the dependent variable is explained by    13:33:52

11   these variables that you've put into your equation.

12           So if you've ever -- so, for example, you might think

13   of it as one common goodness to fit statistic is R squared or

14   adjusted R squared in regression.  And it tells you, at least

15   in theory it's supposed to tell you, how much of the variation   13:34:14

16   are you accounting for when you include all these statistics or

17   all these variables in your model.  So it's an important to

18   evaluate the overall strength of a model.

19   Q.  Did you find a goodness of fit statistic in Dr. Taylor's

20   report?                                                           13:34:38

21   A.  No.  Oddly enough, in a logistic regression there are many

22   different ones that he could have used.  He doesn't provide

23   any.  So when you're evaluating the overall power of his model,

24   it's not there.  Which seems odd to me, because you'd -- the

25   reason a goodness of fit is so important in thinking is:  Are    13:34:52

1    there admitted variables?  Are there things unaccounted for in

2    this model?  The goodness of fit provides insight into that

3    kind of issue, that kind of problem.

4    Q.  Does the lack of goodness of fit give you -- statistic give

5    you more or less confidence in Dr. Taylor's findings?        13:35:12

6    A.  I'd have more confidence if it was there.  The lack of it

7    reduces my confidence in his results.

8    Q.  Do you know what statistical software Dr. Taylor used for

9    his inquiry?

10   A.  I'm reasonably sure he used Stata.  I'm almost certain.    13:35:25

11   Q.  Do scholars that use that software have the ability to

12   create a goodness of fit statistic?

13   A.  Yeah, there's a command called fit stat that will just give

14   you that when you do a logistic regression, and it spits out, I

15   think, five or six of them, different ones you could report.   13:35:45

16   Q.  So there's a command called what?

17   A.  Fit stat.  F-i-t --

18   Q.  Let me ask the question.  Did you say fit stat?

19   A.  Yes.

20   Q.  And that's a command inside that software?              13:36:02

21   A.  In Stata, yes.

22   Q.  How does one use the fit stat in order to acquire the

23   goodness of fit statistic?

24   A.  You type it into a command line as part of your other

25   commands, and then when you run the -- the program, it then    13:36:20

1    puts out the statistics for you.

2    Q.  Is it difficult to do?

3    A.  No.

4    Q.  What was the total number of type T or type 910 final

5    disposition instances in Dr. Taylor's final report?          13:36:40

6    A.  Yeah, in his final reprocess data, I think it's 106,804

7    incidents.

8    Q.  And how many, in the total universe of type T 910 final

9    dispositions, in the years of his inquiry?

10   A.  It's 168,869, I believe.  So that -- so that that would   13:37:03

11   mean there's about 37 percent.

12   Q.  Did you find any description of the random distribution of

13   the excluded data in Dr. Taylor's rebuttal report?

14   A.  No.

15   Q.  Did you find that Dr. Taylor examined saturation patrol    13:37:27

16   officers' stops separate from, as he defined, nonsaturation

17   patrol officers?

18   A.  Yes, that is part of his analysis.

19   Q.  And how did he define a saturation patrol officer?

20   A.  I believe he used those rosters and he tried to identify   13:37:56

21   those who were assigned on saturation patrol days to saturation

22   patrols based on the date of the saturation patrol and the

23   roster.

24   Q.  Did you have the opportunity to look at the units from

25   which those saturation patrol officers were assigned?         13:38:12

1    A.  Yes.

2    Q.  What did you find?

3    A.  Well, they were overwhelmingly from two units in

4    particular, as far as I could tell, from his data.  They were

5    on the HSU and Lake Patrol.  I believe the overall percentage          13:38:26

6    is about 70 percent of all the stops that he identifies as a

7    saturation patrol come from those two units.

8    Q.  Do you find that significant?

9    A.  Well, if you remember, in my report, in table 1, one thing

10   you'll notice is that those are somewhat unusual units.  One           13:38:45

11   has a very high Hispanic percentage and one has one of the more

12   lower Hispanic percentages.  I guess these things represent,

13   you know, the kinds of work that those two units do.

14        So it would have been a good idea to try to control

15   for the unit involved because when you then compare it when            13:39:02

16   it's on sat patrol or when it's not on sat patrol, it would be

17   nice to know which units, you know, the -- how should I say

18   this?  It would be nice to know which units are stopping whom.

19   And that information is in the CAD data, so you could have

20   created a variable that would have identified the unit                 13:39:23

21   involved.

22   Q.  And if such a variable were created and controlled for,

23   would you have more or less confidence in Dr. Taylor's report?

24   A.  I'd have more.

25   Q.  Did you inquire about the patrol area of Lake Patrol               13:39:34

1    officers on nonsaturation patrol days?

2    A.  I have in my report their general, the -- their stops.  So

3    they have a relatively lower Hispanic percentage, I found.

4    Q.  On nonsaturation patrol days?

5    A.  Just generally they do.  They have -- they're on the lower      13:39:56

6    end of the --

7    Q.  Earlier you testified that you believed it was significant

8    to know the overall Hispanic population of Maricopa County when

9    making this inquiry.  You recall that?

10   A.  Yes.                                                            13:40:10

11   Q.  Would it be of interest to you to know the overall Hispanic

12   population of the patrol area of Lake Patrol when there are

13   nonsaturation patrol days?

14   A.  Yes, that -- that's why in that kind of -- if you had -- if

15   you had controlled for the unit, it would have made -- he would   13:40:28

16   know something like that, or he would have -- he would have

17   taken that into account in his statistical model.

18   Q.  So why is it your opinion that it's significant that

19   70 percent of the saturation patrol officers, as defined by

20   Dr. Taylor, were from HSU and Lake Patrol?                        13:40:45

21   A.  Because it potentially could affect his results, because

22   the way in which he does his analysis is to compare when these

23   officers are assigned to saturation patrols to when they're

24   not.  So it's important to think a lot about how these units

25   differ.                                                           13:41:05

1       He also does comparisons in the report between just

2   saturation patrols and everything else as well, so it would be

3   a good idea to put the unit into the -- into the -- into the

4   model.  Because -- especially because they're somewhat unusual

5   units.                                                              13:41:20

6   Q.  When Dr. Taylor was examining the saturation patrol stops

7   by saturation patrol officers, what's the total number of stops

8   that he was looking at?

9   A.  I think it's around, I think, I'm just doing this from

10  memory, around 2,000, something like that, 2,066 names, not      13:41:37

11  incidents, smaller number of incidents.  So it's about

12  1.3 percent of the total names that he looked at, I think

13  that's the number, 1.3 percent.

14  Q.  Is that size as compared to the total universe of interest

15  to you in your inquiry?                                            13:41:58

16  A.  Whenever you focus in on just one small part of the data

17  you certainly have to be cautious.  One of things that raises

18  concerns is we move back to all those excluded cases.  If

19  you've excluded tens of thousands of cases because you didn't

20  have information, and because maybe you missed stuff, and the     13:42:18

21  amount of stuff that you've excluded is much larger than the

22  small area of data that you're focused on, then the exclusion

23  of that data could have a big impact, especially if you don't

24  know anything about or very little about all that excluded

25  information, all those excluded cases.                             13:42:37

1          So if you're -- if you slice the data very thin in the

2    context of a lot of missing data, you can kind of compound a

3    problem.

4    Q.   When examining Dr. Taylor's report, were you able to

5    discern how he categorized stops that had both Hispanics and          13:42:57

6    non-Hispanics in the vehicle?

7    A.   When he does his, as I recall, when he does his analysis of

8    length of stop, he -- if there -- if there's any person with a

9    Hispanic surname that he identifies, the whole stop is

10   considered Hispanic.  So if there are four people in the car,        13:43:20

11   one with a Hispanic surname and three not, that's a Hispanic

12   stop in the length of analysis, as I recall.

13   Q.   Is that a cause of concern for someone in your -- making an

14   inquiry such as yours?

15   A.   Well, you'd want to worry about because it's not unam --        13:43:36

16   it's not unambiguously a Hispanic stop.  So -- it's a mixed

17   stop, and so you'd want to think long and hard about that

18   question, and you might want to try to control for that rather

19   than assigning them all as Hispanic.

20   Q.   Would you control for that by running them once as Hispanic     13:43:56

21   stops and once as non-Hispanic stops?

22   A.   That might be a way to do it, sure.

23   Q.   Did you find anywhere in Dr. Taylor's rebuttal report that

24   he did that?

25   A.   Yeah, I don't recall him doing that in his rebuttal report.     13:44:07

1   Q.  I want to ask you about Hispanic surname analysis.

2   A.  Um-hum.

3   Q.  I think you testified earlier that to do so you used

4   U.S. census data.  Where did you get your Hispanic surname

5   lists to use in your queries on this CAD data from Maricopa          13:44:25

6   County?

7   A.  Yes.  I ran several different Hispanic surname lists, some

8   provided by other scholars in the field.  The list I ultimately

9   used was generated from the 2000 Census, and it used a

10  70 percent threshold.  That means that in the 2000 Census that       13:44:45

11  the name -- that 70 percent of the time or more persons with

12  that last name identified as Hispanic.  And that list is

13  available at the census bureau's website.

14  Q.  And the individuals were asked to self-identify and provide

15  that information to U.S. census workers?                             13:45:07

16  A.  Right.  It's part of -- was part of the census in 2000.  So

17  they took everybody and they took names, and then they -- they

18  ran a frequency what -- what fraction of people who had that

19  last name said they were Hispanic.  So it's based on

20  self-identification.                                                 13:45:27

21  Q.  Did you find anywhere in Dr. Taylor's reports that he

22  inquired as to whether the self-reporting in Maricopa County

23  was the same as the self-reporting done by the U.S. census

24  bureau?

25  A.  No, there's no -- no.                                            13:45:44

1    Q.  Would that be significant?

2    A.  Well, it's a general, it's -- the list comes from the

3    United States, the whole -- it comes from the whole country.

4    So the -- oh, I'm sorry.  Did you want me to stop?

5              MR. YOUNG:  It's the same objection.  We'll take care                    13:45:59

6    of it after the testimony, Your Honor.  Thank you.

7    BY MR. LIDDY:

8    Q.  Go ahead and continue your answer, please.

9    A.  Yes, there's no Hispanic -- the -- the list, the Hispanic

10   surname list has not been tested for this data, if that's what                    13:46:12

11   you're asking.  And there's no test in there to see if

12   Hispanics in Maricopa County respond the same way as Hispanics

13   across the country.  The list is a nationally drawn list.

14   Q.  Now, in your inquiry did you choose the 70 percent

15   threshold?                                                                         13:46:36

16   A.  I did, but I ran several others and I report them in a

17   footnote.

18   Q.  Okay.  Why did you choose a 70 percent threshold?

19   A.  I thought that was a good compromise, 'cause, remember,

20   there are names on that list where nearly a third of the people                   13:46:45

21   who have that last name do not say that they're Hispanic.  So

22   as you move down that list, let's say you're using a 60 percent

23   list, now you're getting to the point where there are some

24   names on that list where 40 percent of the people who have that

25   last name didn't respond that they were Hispanic in the census,                   13:47:03

1    and yet if you use that list, they get considered to be a

2    Hispanic, a Hispanic person.

3             THE COURT:  Can I ask a question?  Let me just

4    interrupt you.

5             THE WITNESS:  Yeah.                                   13:47:15

6             THE COURT:  For your work you used a 70 percent

7    threshold?

8             THE WITNESS:  Um-hum.

9             THE COURT:  And that was a 70 percent threshold from

10   the U.S. census data?                                          13:47:20

11            THE WITNESS:  Yes.

12            THE COURT:  That wasn't 70 percent geared on some sort

13   of Maricopa County self-reporting data?

14            THE WITNESS:  Right.

15            THE COURT:  So you used -- to the extent you were      13:47:26

16   using thresholds, you were using the same thresholds Dr. Taylor

17   was using?

18            THE WITNESS:  Yes, census-based data from the

19   national.

20   BY MR. LIDDY:                                                  13:47:39

21   Q.  As a scholar making the inquiry you were making, what are

22   some of the concerns you would have when using Hispanic surname

23   analysis?

24   A.  Well, there's an error around it.  You know, obviously,

25   no one in this data said they were Hispanic.  No one -- there   13:47:55

1    isn't the officer's opinion of whether the person's Hispanic.

2    This is an imputation or an allocation.  You are assigning

3    persons whether they're Hispanic or Hispanicity to a person

4    based exclusively on their last name.

5           What that means is obviously if a person, you know,          13:48:16

6    we've actually seen some, you know -- you know, there's

7    examples with -- an obvious example would be a person who is

8    married to someone who's Hispanic and takes their name, or a

9    person who is Hispanic and takes the name of their non-Hispanic

10   spouse, or a person who, say, from the Philippines would be          13:48:34

11   another classic example.  There are Portugese names that can be

12   both Portugese and Hispanic.  There are a few Italian names.

13   There's error around any Hispanic surname list.

14   Q.  So it's not a specific criticism of Dr. Taylor's use of it,

15   it's just an innate weakness of this type of analysis?             13:49:01

16   A.  Yes, it's innate problem, innate error around Hispanic

17   surname analysis.

18          MR. LIDDY:  Your Honor, I'd like -- I'd like to use

19   the court document camera to publish Exhibit 399I that is

20   already in evidence and has been used previously.                  13:49:58

21          May I have permission to do so?

22          THE COURT:  Well, you may.  I didn't -- it's not my

23   understanding that 399I is itself in evidence.

24          Am I wrong about that?

25          MR. LIDDY:  Well, before I do that I think we should        13:50:16

```
 1    clear that up.

 2              MR. CASEY:  It's a demonstrative.

 3              MR. LIDDY:  Okay, it's a -- you're correct, Your

 4    Honor, it's for demonstrative purposes only.

 5              THE COURT:  I'm sure Mr. Young would be happy to admit    13:50:24

 6    it in evidence if you were to withdraw your objection.

 7              MR. LIDDY:  I think the silence speaks for itself,

 8    Your Honor.  I'll use it as a demonstrative.

 9              THE COURT:  You may publish it.

10              MR. LIDDY:  Thank you, Your Honor.                       13:50:45

11              MR. YOUNG:  Just to clarify, Your Honor, is this

12    exhibit in evidence now based on stipulation, or is it not?

13              THE COURT:  Are you stipulating to admitting this

14    exhibit into evidence?

15              MR. LIDDY:  No, I'm not, Your Honor.                     13:50:53

16              THE COURT:  All right.  It is not in evidence.

17              It has been used as a demonstrative.

18    BY MR. LIDDY:

19    Q.  Dr. Camarota, do you recognize this table from Dr. Taylor's

20    report?                                                           13:51:11

21    A.  Yeah, it looks familiar.

22    Q.  And I would ask you to direct your attention down where I'm

23    pointing right here, where it says all days saturation patrol

24    days versus others.

25              You see that?                                           13:51:29
```

1    A.  Yes, I do.

2    Q.  And directly below that you see where it says using

3    90 percent probability threshold for Hispanic name?

4    A.  Yes.

5    Q.  Just below that it says official saturation patrol day.    13:51:40

6         You see that?

7    A.  Yes.

8    Q.  And then on the second column here it says no.

9         Do you see that?

10   A.  Right.    13:51:53

11   Q.  What does that "no" mean to you?

12   A.  It's not a saturation patrol day.

13   Q.  If you'll follow down here to this figure 21.82, see

14   Hispanic, 21.82 percent.

15        You see that?    13:52:10

16   A.  Yes.

17   Q.  What does that figure mean to you?

18   A.  That's the share of persons who had a Hispanic surname

19   using the 90 percent threshold.

20   Q.  The share of what?    13:52:23

21   A.  Of those stopped on the nonsaturation patrol days.

22   Q.  So on a nonsaturation patrol day --

23   A.  Oh, no, wait.  Wait.  Wait.  Official saturation.  No.  So

24   it's the share of people stopped on a nonsaturation patrol day,

25   right.    13:52:39

1  Q.  So it would be fair to read that that on a nonsaturation

2  patrol day, 21.82 percent of the stops for which names were

3  available --

4           THE COURT:  You know, can I stop you, Mr. Liddy?

5           MR. LIDDY:  Yes, Your Honor.                    13:52:53

6           THE COURT:  I want to make sure that I'm

7  understanding.

8           As I recall Dr. Taylor's testimony, these weren't

9  stops, but these were inquiries about Spanish names after

10  stops.                                                  13:53:02

11          Am I misremembering that?

12          MR. LIDDY:  I don't --

13          THE COURT:  The number of inquiries about Hispanic

14  names after stops compared to those inquiries on -- both on

15  saturation patrol days and nonsaturation patrol days.    13:53:20

16          In other words, I don't think there's anything in here

17  that reveals numbers of stops, tracks stops.  What it does is

18  it compares inquiries about persons who have Hispanic surnames.

19          Isn't that what it does?

20          MR. LIDDY:  I believe that's correct, Your Honor, but  13:53:35

21  just so that we're on the same sheet of music, this is CAD

22  data.  And CAD data, by its very nature, only records the

23  inquiries that are being made by the police officers that are

24  using the radio dispatch.

25          THE COURT:  I understand that.                   13:53:51

```
 1              MR. LIDDY:  Right.  So --
 2              THE COURT:  But I think that we've already established
 3    that there could be stops that are not here, there could be all
 4    kinds of stops.  But as I recall what Dr. Taylor was doing,
 5    maybe, Mr. Young, you can correct me if I'm wrong, was          13:54:02
 6    comparing Hispanic -- inquiries on Hispanic surnames.
 7              MR. YOUNG:  I believe you're right, Your Honor.
 8              THE COURT:  Okay.  I just want to make sure that I'm
 9    not missing the boat --
10              MR. LIDDY:  I think you're on the boat, Your Honor.   13:54:16
11              THE COURT:  All right.
12    BY MR. LIDDY:
13    Q.  So Dr. Taylor, this 21.82 figure to you means what?
14    A.  That on nonsaturation patrol days, 21.8 percent of those
15    names checked were Hispanic.                                   13:54:32
16    Q.  According to the U.S. census surname 90 percent list.
17    A.  Right.
18    Q.  And for this time period of the inquiry, what was the share
19    of the Hispanic population of Maricopa County?
20    A.  Around 30 percent through this time period, for the three  13:54:51
21    years that he's doing his analysis.
22    Q.  And if you'll follow along with me over to the next column,
23    which says yes.
24              Do you see that?
25    A.  Yes.                                                       13:55:04
```

1    Q.  And the figure is 25.8 percent.

2         You see that?

3    A.  Yes.

4    Q.  What does that figure indicate to you?

5    A.  That is the share of stops on when it's a saturation patrol    13:55:12

6    day.  So 25.8 percent of names checked --

7         THE COURT:  Again, I'm sorry for stopping you, it's

8    not stops, is it?  It's inquiries about Hispanic names.

9         THE WITNESS:  Right.  I'm sorry, you're right.  Yeah.

10        THE COURT:  I'm sorry.  I just want to be precise to    13:55:30

11   make sure that I know what we're talking about.

12        THE WITNESS:  25.8 percent of names checked on a

13   saturation patrol day were Hispanic, using the 90 percent

14   threshold.

15   BY MR. LIDDY:    13:55:44

16   Q.  Of the universe that Dr. Taylor was observing.

17   A.  Yes.

18   Q.  So there very well could have been other stops that were

19   not recorded in the CAD data, or were recorded in the CAD data

20   but Dr. Taylor did not look at, is that correct?    13:55:59

21   A.  Well, he has 123 -- I mean -- I'm not sure I completely

22   understand the question.  Are there lots of data missing, lots

23   of names, lots of incidents missing from CAD data?  Absolutely.

24   If that -- you know, if that's what you're asking me, then,

25   sure.  And could that have affected these numbers    13:56:19

1  significantly?  Sure.

2  Q.  But I'm only asking, this figure only represents those

3  which Dr. Taylor looked at.

4  A.  Right.

5  Q.  Not all those name inquiries made in Maricopa County for          13:56:29

6  that period of time.

7  A.  Right.  That's my understanding.

8  Q.  And would you agree with me that 25.8 is also less than

9  30 percent?

10  A.  Yes.                                                             13:56:43

11  Q.  And would you agree with me that the difference between

12  21.82 percent and 25.8 percent is approximately 4 percentage

13  points?

14  A.  Yes, it -- yes.

15  Q.  And if you'll follow all the way over here to the right          13:57:00

16  where it says -- the column, it's total.  And there's a figure

17  21.98 percent.

18        Do you see that?

19  A.  Yes.

20  Q.  What does that figure represent to you?                          13:57:12

21  A.  I believe that's the total for all stop -- all names that

22  were checked for the period of time that Dr. Taylor was

23  interested in.

24        THE COURT:  You know, just let me ask you, Mr. Liddy,

25  do you have any objection, for the Court's ease of access,          13:57:32

```
 1   because I'm pondering this, if I can get a copy of the

 2   demonstratives that have been introduced by the plaintiff?

 3           MR. LIDDY:  No, Your Honor.  We would have no

 4   objection to that.

 5           THE COURT:  All right.  Thank you.              13:57:47

 6   BY MR. LIDDY:

 7   Q.  Now, for the figures we were just looking at, they

 8   represented Dr. Taylor's inquiry using the 90 percent threshold

 9   of the U.S. census Hispanic surname analysis, is that correct?

10   A.  Yes.                                               13:58:18

11   Q.  And do you recall Dr. Taylor also providing data for a

12   similar inquiry, but for the 60 percent threshold?

13   A.  Yes.

14   Q.  What would be the purpose of looking at the 60 percent

15   threshold in addition to the 90 percent threshold?         13:58:37

16   A.  I assume he wanted to provide, you know, different --

17   different percentages using different, you know, thresholds so

18   he could -- you know, he could see how they differ.  That's why

19   he did it.

20   Q.  Well, if one were looking for racial profiling, would one   13:58:53

21   expect them to differ?

22   A.  Well, the percentage is going to differ if you're using a

23   much lower probability threshold, or percentage threshold,

24   however you want to talk about it, because a lot more names are

25   in the 60 percent list than are in the 90 percent list.     13:59:11
```

1      What the question is, maybe, or are you asking me:

2  Should the difference between the saturation patrol days and

3  the nonsaturation patrols, should they be more similar

4  regardless of the list that's used?  I'm not sure I -- I'm not

5  sure I completely understand the question.                    13:59:32

6  Q.  Well, let me ask you this.  Would you have more confidence

7  in the accuracy of the finding if we were using a 90 percent

8  surname list or a 60 percent surname list?

9  A.  Well, if you look at the two you'll see that the more

10 certain that the name is Hispanic, the more certainty that the  13:59:54

11 name is Hispanic, the smaller the difference between the

12 saturation patrol days and the nonsaturation patrol days.

13 Q.  And the inverse is true also, is that correct?

14 A.  Right.  The less sure that it's Hispanic, the difference is

15 bigger.  It's like 6 percentage points at the bottom and it's   14:00:14

16 like 4 at the top.

17 Q.  Do you recall from your examination of Dr. Taylor's reports

18 whether he controlled for the saturation patrol focus on human

19 smuggling?

20 A.  No.  As I said, there's no control for the unit.  So he     14:00:37

21 could have identified HSU, but he didn't.

22 Q.  Are you familiar with the term "zero tolerance"?

23      THE COURT:  Let me ask a follow-up question on that.

24 When you say he could have identified HSU but he didn't, that

25 would have required him identifying each officer on each        14:00:55

```
 1   saturation patrol that was a member of the Human Smuggling

 2   Unit, would it have not?

 3           THE WITNESS:  Well, in the CAD data every incident or

 4   name --

 5           THE COURT:  Sorry, but I gotta -- I gotta get my mind      14:01:07

 6   around this.  So is it a yes or a no?  Then you can explain.

 7   It would have required him to identify all officers on that

 8   saturation patrol who are members of the HSU unit.

 9           THE WITNESS:  It's in the data, so yes, he could have

10   done that.                                                         14:01:21

11           THE COURT:  But he would have had to break out the

12   data by the patrol -- by the unit in which that officer was a

13   member?

14           THE WITNESS:  But unit is something that's already in

15   the data.  So in Table 1 of my report where I show all the        14:01:32

16   different units --

17           THE COURT:  Right.

18           THE WITNESS:  -- that was easy.  It's already there.

19           THE COURT:  And so what we're getting in 399I is when

20   he gives those totals, it's all stops on that day whether or      14:01:44

21   not they were involved in a saturation patrol, period, right?

22           THE WITNESS:  I believe that that's what that was,

23   yes.

24           THE COURT:  Okay.

25           MR. LIDDY:  Your Honor, I'd like to publish figure 4      14:02:07
```

1    from Dr. Camarota's report, which is already admitted in

2    evidence by stipulation.

3            May I publish, Your Honor?

4            THE COURT:  You may.  It's already up there.

5    BY MR. CASEY:                                          14:02:26

6    Q.  Dr. Camarota, do you -- do you recognize this figure?

7    A.  I do.

8    Q.  And it says Hispanic share of stops by district.

9            Is that -- did I read that correctly?

10   A.  Yes.                                                14:02:38

11   Q.  2005 to 2009?

12   A.  Um-hum.

13   Q.  All the way over here on the right you see the districts

14   broken out?

15   A.  Um-hum.                                             14:02:45

16   Q.  Do those districts help identify the unit?

17   A.  The districts and units are not exactly the same thing.  If

18   you look at Table 1, most of the stops are identified by

19   district because that -- the district is also the unit.  But

20   there are specific units, like HSU that we've been talking      14:03:02

21   about, and then there are other kinds of units, you know,

22   Internal Affairs and stuff like that.

23            But these are the main districts.  I believe this

24   figure I have did it by geographic area, so that people are

25   recoded back based on their district.  So if it's HSU but it's   14:03:24

1    in District 1, then here it's District 1.

2    Q.    If it's Lake Patrol and they're in a particular district,

3    that could be identified from the CAD data?

4    A.    Yes.

5    Q.    What other variables would you want to know about when          14:03:36

6    making an inquiry as to whether or not there was racial

7    profiling that Dr. Taylor did not control for in his reports?

8    A.    Well, I think we've touched on the socioeconomic factors,

9    for example.  For length of stop, we'd like to know some things

10   about whether the person speaks English very well.  It might be   14:04:13

11   very interesting, we don't know this, how well the officer, the

12   deputy, speaks English, because if he only speaks Spanish,

13   because if he's trying to translate information and trying to

14   communicate, so we'd like to know that.  That can have a big

15   impact.  So you'd like to know things like that.                   14:04:29

16          Then you'd also like to know if you're trying to

17   explain to someone what law they violated, or what they have to

18   do to be in compliance, other socioeconomic factors like the

19   educational attainment of a person could be important.

20          So in, say, traffic stops, you'd like to know things        14:04:45

21   like language and educational attainment.  Maybe whether the

22   person was foreign born or not.  As I recall, 57 percent of

23   adult Hispanics in Maricopa County are foreign born.  That

24   would be sort of the -- the legal and the illegal population.

25   So that would be an example for those.                             14:05:04

1    And for the saturation patrol it would be very

2  helpful, and -- and very -- and important to know the

3  socioeconomic factors as well, such as the person's income,

4  poverty status, maybe language skills, things like that, given

5  the way sat -- particularly given the way saturation patrols          14:05:24

6  are supposed to work, as I understand it, where they try to

7  stop everyone who has an equipment violation or -- you know,

8  or, you know, a rules-of-the-road violation.

9  Q.  What about a variable for hyphenated names, either drivers

10  or passengers --                                                       14:05:43

11  A.  Yeah.

12  Q.  -- that use two last names?

13  A.  The hyphenated name issue is very difficult to deal with.

14  There's a -- anyway, there is evidence that Hispanics are more

15  likely to hyphenate names than non-Hispanics, and that can         14:05:54

16  complicate Hispanic surname analysis.

17  Q.  Might that affect the duration of stop, and your analysis

18  of the length of duration of stop?

19  A.  Yes, because when the officer calls in names, he may need

20  to call in the hyphenated name, the first name in the               14:06:13

21  hyphenation, and the second name in the hyphenation.  So there

22  would be a much longer stop as he waits for responses back on

23  each of those names.

24    MR. LIDDY:  Thank you, Doctor.  I have no further

25  questions, Your Honor.                                              14:06:28

```
 1              THE COURT:  Okay.  Thank you.

 2              Cross-examination.

 3                          CROSS-EXAMINATION

 4   BY MR. YOUNG:

 5   Q.  Good afternoon, Dr. Camarota.                          14:06:46

 6   A.  Nice to see you again.

 7   Q.  Nice to see you again.

 8              In your Ph.D. studies you focused on immigration

 9   issues, correct?

10   A.  I did.                                                 14:06:56

11   Q.  And you did that because you found the topic intrinsically

12   interesting?

13   A.  Yes.

14   Q.  After your Ph.D. in 1997 you continued to work on

15   immigration policy issues, correct?                       14:07:03

16   A.  Yes.

17   Q.  You were interested in immigration and how it affected

18   society as a whole, including labor markets, demography,

19   criminal justice, use of public services, congressional

20   reapportionment, and other issues, correct?              14:07:18

21   A.  Yes.

22   Q.  You're employed by the Center for Immigration Studies, I

23   hear, where you're the director of research.  That organization

24   contends that lower numbers of people should enter this

25   country, correct?                                         14:07:33
```

1    A.  Yeah, we -- I would say that we have a lot of diversity of

2    opinion within our staff, but that overall, the center's

3    position would be that a more moderate pace of immigration

4    would make sense for the country.

5    Q.  The Center for Immigration Studies also believes that it        14:07:46

6    would be beneficial to change the selection criteria to make

7    admission into this country more skills based, correct?

8    A.  I don't know that that's a -- a stated position.  I mean,

9    we have authors who have made the case for that.  As a think

10   tank, we have a lot of, you know, different points of view.        14:08:08

11   But I would say that most of the people who work there would

12   share that perspective, yes, a more skills-based system.

13   Q.  You represent the organization in a variety of settings,

14   including public speaking, testimony, interviews, research, and

15   publications?                                                      14:08:24

16   A.  Yeah, sure, yes.  Yes, I do.

17   Q.  And you've spoken to maybe 200 or 300 reporters on

18   immigration issues since July 2008?

19   A.  I don't know the number.  But I certainly speak to

20   reporters.                                                         14:08:40

21   Q.  And you speak to a lot of reporters, correct?

22   A.  I would say I do, yes.

23   Q.  You're not a criminologist, correct?

24   A.  I'm not a criminologist.

25   Q.  You have not worked with data regarding law enforcement        14:08:54

1    officer communication systems before this case, is that

2    correct?

3    A.  That is correct.

4    Q.  Let me ask you about some demographic issues.

5            About 30 percent of the population of Maricopa County    14:09:06

6    is Hispanic, is that right?

7    A.  Yes.  I think in 2009 it was like 31.8, or something like

8    that, yeah.  About 30 percent.

9    Q.  Now, you estimate that about one-third of the adult

10   Hispanics in this county are here illegally, is that right?    14:09:19

11   A.  Yeah, it's based on research from the Pew Hispanic Center.

12   Q.  That means that two-thirds of the adult Hispanics in

13   Maricopa County are here legally, is that right?

14   A.  Yes, that's -- that's about right, yeah.

15   Q.  Now, children are more likely to be legally present than    14:09:40

16   adults, so would you agree with me that if we said that

17   60 percent -- 67 percent of the Hispanics in Maricopa County

18   are here legally is a conservative estimate?

19   A.  Oh, yeah.  It's about two-thirds are legal, either green

20   card holders, naturalized citizens, or U.S. borns, yes,    14:10:01

21   absolutely.

22   Q.  Now, 67 percent of 30 percent is just over 20 percent,

23   correct?

24   A.  67 percent.  When I look at that number, 67 percent of --

25   Q.  Well, let me put it a different way.    14:10:16

```
 1   A.   Yeah.

 2   Q.   Two-thirds of 30 percent is 20 percent, right?

 3   A.   Two-thirds of 20 percent, did you say?

 4   Q.   No, two-thirds of 30 percent is 20 percent.  Would you

 5   agree with me on that?                                          14:10:28

 6   A.   Yes.   That sounds right.

 7   Q.   That means that 20 percent of the entire population of the

 8   county, in your estimate, would consist of Hispanics who are

 9   legally present in the United States.   Would you agree with

10   that?                                                           14:10:40

11   A.  Yes, that's -- that's about right.   Yeah, that sounds

12   right.

13   Q.   According to the 2010 census, Maricopa County had about

14   3.8 million people, is that right?   Does that sound right to

15   you?                                                            14:10:50

16   A.   That sounds right.   I haven't looked at that

17   number recently.

18   Q.   So 20 percent of 3.8 million people gives you at least

19   760,000 Hispanic people in Maricopa County who are here

20   legally.   Do you agree with that?                             14:11:02

21   A.   Yeah, that sounds -- that sounds about right.

22   Q.   Now, let's recap the sequence of events.

23         Dr. Taylor did a report initially which you looked at,

24   correct?

25   A.   Yes.                                                       14:11:15
```

1    Q.  And it had, among others, three conclusions.  First, that

2    Hispanic name check rates are higher on saturation patrol days

3    than nonsaturation patrol days, is that right?

4    A.  Yes, that's one of his conclusions.

5    Q.  And then he also concluded that saturation patrol active          14:11:27

6    officers are more likely than nonsaturation patrol active

7    officers to check Hispanic names on a saturation patrol day.

8         Do you recall that being in there?

9    A.  Yes, I think that's one of his conclusions.

10   Q.  And you also recall that he said that on all days, whether        14:11:43

11   saturation patrol days or not, stops last longer when there's

12   at least one Hispanic name checked, correct?

13   A.  That -- I think that's a fair summation of his --

14   Q.  Then you did a report criticizing Dr. Taylor for a couple

15   of things, or many -- many things.  Among those was, one:            14:12:01

16   Failure to account for duplications due to people putting in

17   aliases, but having the same birth date for all of those

18   aliases, correct?

19   A.  Yes.

20   Q.  And you also criticized him for counting the mobile               14:12:15

21   computer entries which you believe to be double counting, is

22   that right?

23   A.  That's what the -- the CAD coordinator had told me and

24   indicated to me, so that's why that -- that is the case.  They

25   are, apparently, the same information.                                14:12:33

1  Q.  Then Dr. Taylor took those two criticisms and he accounted

2  for the aliases by eliminating the duplicate date of birth

3  entries, and removed the mobile terminal file, reprocessed the

4  data, and basically came to the same conclusions he had come to

5  before, is that right?                                    14:12:52

6  A.  I think he -- yeah, I think he feels his conclusions are

7  the same the second time around.

8  Q.  Now, I'd like --

9  A.  I would disagree with one thing you said, and that is when

10  he reprocessed the data, he missed a whole lot of new cases, so  14:13:01

11  in some ways you might say that his first go-round included a

12  lot of stuff mistakenly.  In his second go-round he cut way too

13  much out, so that if you look at -- he has a table in -- I

14  believe, in his -- his reprocessed report where you could see

15  how many fewer incidents, for example, he has in this second   14:13:24

16  go-round.  And that's what we were talking about earlier: of

17  all these names that are available that this time around he

18  missed.

19  Q.  I didn't ask you about that, but I'll get to that.  So

20  let's talk about some of the areas where I think you may have   14:13:39

21  agreement with Dr. Taylor.

22       You agree with Dr. Taylor that it is possible to take

23  the CAD data and generate numbers about the role of race in

24  MCSO stops, or at least name checking, is that right?

25  A.  I believe that we can get an idea in the aggregate of, you   14:14:01

1  know, MCSO stops that have Hispanic surnames.  That's what I

2  think is definitely true, we can.

3  Q.  You agree that it is possible to gain insights from the CAD

4  data on the issue of whether there are patterns of ethnic

5  disparity in the behavior of the MCSO, is that correct?          14:14:23

6  A.  I think we can gain some insights, yes.

7  Q.  And in fact, you think that if that's the data you have,

8  you can work with it, is that right?

9  A.  I did work with it.

10 Q.  And that's what Dr. Taylor did as well, correct?            14:14:39

11 A.  Yes.

12 Q.  You commented in response to Mr. Liddy's questions about

13 the use of the census data and the surname analysis.  Do you

14 remember those questions and your answers?

15 A.  I'm not sure to which you refer.  Are you talking about the  14:14:56

16 construction of a Hispanic surname list, or the demographic

17 information about Maricopa and Arizona?

18 Q.  Well, the former.  Let me focus the question a little more.

19 A.  Sure.

20 Q.  Do you agree with the following statement:  Hispanic         14:15:09

21 surname analysis was first developed by the census bureau in

22 1950.  It is a well-established method for estimating the

23 Hispanic share of individuals in administrative or other data

24 when other information about ethnicity is not available?

25 A.  I would agree it's -- I basically agree with that            14:15:31

1    statement, yes.

2    Q.  That's in your report, correct?

3    A.  Right, yeah, I agree with it.

4    Q.  You yourself used the census data to come to your

5    conclusions, correct?                                    14:15:43

6    A.  Could you -- you mean did I use a Hispanic surname list

7    derived from the 2000 Census?  Is that what you're asking me?

8    Q.  That's my question, yes.

9    A.  Yes.  Yes, I did.

10   Q.  And you picked the 70 percent threshold for your findings,   14:15:57

11   but you could also use other thresholds, is that right?

12   A.  Yes.  In one of the footnotes I looked at several other

13   different lists that other people had developed.

14   Q.  But for purposes of your basic conclusions you used the

15   70 percent?                                              14:16:17

16   A.  Yes.

17   Q.  Now, Dr. Taylor used 60, 70, 80, and 90 percent, correct?

18   A.  I think for most of his results he reports 60, then like 80

19   and 90.  I don't know that he purported much for 70.

20   Q.  And that's a way of testing the rebustness of his          14:16:30

21   conclusions, to use different thresholds in order to see

22   whether the results are similar?

23   A.  I would assume that's his intent.

24   Q.  Okay.  You did not do that, did you?

25   A.  No, I did run them different numbers.  In fact, I do some   14:16:41

1   different results in the footnotes, and also other lists

2   developed by people.  But they all come out around, you know,

3   the same.

4   Q.  When you read Dr. Taylor's report initially, you knew that

5   he was comparing saturation patrol days with nonsaturation                14:16:58

6   patrol days, is that right?

7   A.  As one of his comparisons in his report, yes.

8   Q.  But you did not attempt to replicate Dr. Taylor's inquiry

9   comparing saturation patrol Hispanic name check rates with

10  nonsaturation patrol Hispanic name check rates, is that right?            14:17:16

11  A.  I did not replicate his -- his work.

12  Q.  And you did not do that because you did not know that that

13  would be a focus of this trial, is that right?

14  A.  When I was originally asked, I didn't know that that would

15  be a focus.  When they originally asked me to prepare a report,           14:17:37

16  I did not know that that would be the focus of the trial.

17  Q.  Also, you mentioned Mr. Jefferys.  He's an employee of the

18  MCSO?

19  A.  Yes.  He is the CAD coordinator there.

20  Q.  And Mr. Jefferys told you after you got Dr. -- well, let me           14:17:54

21  take it one at a time.

22          After you got Dr. Taylor's report you spoke to

23  Mr. Jefferys, correct?

24  A.  I have spoken to -- to Mr. Jefferys between the -- since

25  I've gotten Dr. -- Dr. Taylor's report, I certainly have done            14:18:12

1    that.  I didn't get it and call him.  I don't recall that.  But

2    I certainly have spoken to him since then.  Since the time I

3    received it, I've certainly spoken to him.

4    Q.  And Mr. Jefferys told you that Mr. Jefferys had concerns

5    about whether you could identify saturation patrol officers on          14:18:28

6    saturation patrol days, is that right?

7    A.  I did speak to him about that issue, yes.  I do recall

8    that.

9    Q.  And he had that concern, and he told you maybe you can't do

10   that?                                                                    14:18:43

11   A.  Right, because of the incomplete lists and so forth.

12   Q.  You accepted Mr. Jefferys' statement on that issue,

13   correct?

14   A.  I have no reason to believe he would lie to me.  I think he

15   was truthful.                                                           14:18:56

16   Q.  You have no reason to doubt Dr. Taylor's identification of

17   saturation patrols, is that right?

18   A.  I have no reason to doubt his -- his -- I assume they're

19   correct.

20         Well, let me -- let me rephrase.  There is this issue            14:19:10

21   out there that --

22   Q.  Actually, that's not an answer to my last question.

23   Mr. Liddy can ask you about it on redirect.

24   A.  But you said do I have any reason to doubt.  It's my

25   understanding that not all officers sign in, so there is that          14:19:26

1309

1    concern that I have.  I hope you feel that's responsive.

2    Q.  Excuse me.  You agree with Dr. Taylor that on days on which

3    a saturation patrol operation is underway, the Hispanic share

4    of names checked is higher compared to other times, is that

5    correct?                                                    14:19:50

6    A.  I agree that's what he found.

7    Q.  Do you agree with that finding?

8    A.  I have not gone into the data myself and identified all the

9    saturation patrols.  But if he has done so accurately, and

10   reported them accurately, then it's true.  But I haven't -- I    14:20:15

11   haven't verified that fact.

12   Q.  Well, Dr. Camarota, I'm going to ask you to take a look at

13   page 31 of your report, which is Exhibit 402, and if we could

14   bring that up on the screen.

15          Exhibit 402.  It's page 31.                          14:20:39

16   A.  I don't have anything yet.

17   Q.  I think Mr. Braun is getting it up on the screen.

18          And in the paragraph down toward the bottom where the

19   sentence says "thus, days," I want to focus on that.

20          Can we focus, can we enlarge that part of it?        14:21:00

21   A.  Thus, days on which saturation patrols -- okay.

22   Q.  So in your report you said, quote:  Thus, days on which an

23   SP operation was underway do show a Hispanic share that is 4.8

24   percentage points higher compared to the rest of the year, end

25   quote.                                                      14:21:25

1        You wrote that in your report, correct?

2   A.  Yes, I did.

3   Q.  Okay.  You have not modified or retracted that portion of

4   your report, correct?

5   A.  I have not.                                                14:21:35

6   Q.  And in fact, you think that Dr. Taylor may well be right in

7   his conclusion that Hispanic name check rates are higher on

8   saturation patrol days than on other days, is that right?

9   A.  Yes, I think they are.

10       I thought you were asking me if I verified his             14:21:52

11  research before, I'm sorry.  So I was confused.  I understand

12  what you're asking me now.  Okay.  Yes, I think that they are.

13  The days that are saturation patrol days are somewhat higher

14  than nonsaturation patrol days.

15  Q.  Thank you.                                                  14:22:06

16       You agree that the stated purpose of saturation

17  patrols by the MCSO is disruption of illegal immigration,

18  correct?

19  A.  It is my understanding that that is one of the goals.

20  Q.  In fact, Lieutenant Sousa --                               14:22:18

21       You spoke to Lieutenant Sousa during your --

22  A.  I did, yes.

23  Q.  -- your work?

24  A.  In September of 2010, I believe it was.

25  Q.  Lieutenant Sousa told you that the saturation patrols are   14:22:27

1  targeted at illegal immigration, correct?

2  A.  He said that was one of the -- definitely one of the goals,

3  yes, one of the objectives.

4  Q.  Because saturation patrols by the MCSO are aimed at illegal

5  immigration, you actually expect Hispanic stop rates, or

6  Hispanic name check rates, to be higher during saturation

7  patrols than at other times, is that right?

8  A.  Yes, you would expect that.  I would.

9  Q.  Okay.  In fact, you believe that if arresting illegal

10  immigrants is a goal of such patrols, then a large fraction of

11  those will be Hispanic, and if that's happening on a saturation

12  patrol day, then the Hispanic share that's stopped would have

13  to be higher.  Is that your belief?

14  A.  Yes, because of the large fraction of -- of illegal

15  immigrants in the state that are Hispanic.

16  Q.  Now, during saturation patrols some illegal immigrants are

17  stopped, but there are also many people who are not illegal

18  immigrants who are stopped, is that correct?

19  A.  Yes.

20  Q.  During the 11 saturation patrols that Dr. Taylor studied,

21  you concluded in your report that 338 of them were illegal

22  immigrants, is that right?

23  A.  I -- let me think.  What I said in my report, I believe, is

24  the number of illegal immigrants who were arrested during those

25  saturation patrols -- and I believe that number's 308,

14:22:43

14:23:01

14:23:19

14:23:36

14:23:59

```
 1   actually, because if you add up the number, there's a mistake
 2   in my report where I -- in the -- I think in the text I say,
 3   like, 338, but it's 308.  I can't remember the exact number.
 4   Q.  Let's look back, just to refresh your memory --
 5   A.  Yeah.                                                        14:24:17
 6   Q.  -- let's look back at your report, Exhibit 402, the bottom
 7   of page 30 and the top of page 31, if we could have that on the
 8   screen.
 9   A.  Yeah, here we go.
10   Q.  So there's a list there of 11 saturation patrols and a      14:24:31
11   bunch of numbers of illegal immigrants arrested.
12           Do you see that?
13   A.  Yes.
14   Q.  You got those numbers from Lieutenant Sousa, correct?
15   A.  I did.  I did, yes.                                          14:24:43
16   Q.  Now, you say in your report in total 338 illegal immigrants
17   were arrested, but you're saying that that isn't --
18   A.  Right, I misadded it up.  I think it's 308, as I recall.
19   Q.  You misadded?
20   A.  If you just take those numbers and add them up in the text  14:25:02
21   I think I said 338, right?  But that's not quite right.  It's
22   like 300 -- you see it here?  Thank you.  You see where it says
23   338?  I think it's 308, I think is the right number.  I can't
24   remember now.  I had to revise the report, so...
25   Q.  You have not revised the report, have you?                  14:25:18
```

1313

```
 1   A.  No.

 2   Q.  The mathematical error, that's your error?

 3   A.  I added them up wrong, yeah.

 4   Q.  Now, during those same 11 saturation patrols, Dr. Taylor

 5   testified, depending on the threshold that you use, that        14:25:33

 6   between 1,312 and 1,988 Hispanic names were checked.  And I'll

 7   tell you, that's on page 90 of the transcript.

 8        Have you read the transcript, by the way, of the

 9   earlier testimony in this case?

10   A.  Are you asking me my old transcript or do you mean         14:25:52

11   Dr. Taylor's testimony?

12   Q.  Dr. Taylor's testimony in this trial.

13   A.  I have.

14   Q.  You have read that.  Does it sound right to you that he

15   testified that between 1312 and 1988 Hispanic names were        14:26:01

16   checked during the 11 saturation patrols that he studied?

17   A.  I'm just not sure.  As I recall, the number, the total

18   number was 2,066.  I am going from memory here so I'm not sure,

19   but --

20   Q.  I'll represent to you that that's in the transcript.        14:26:22

21   A.  Okay.  I'll believe you.

22   Q.  Go with me on that.

23   A.  Okay.

24   Q.  So assuming that those numbers are right -- and again, it's

25   between 1300, roughly, and almost 2 ,000, depending on the      14:26:31
```

```
 1   probability threshold -- and assuming that all of the 308
 2   illegal immigrants that you list in your report were Hispanic,
 3   that means that in order to -- in the operation that found
 4   those 308 illegal immigrants, between 1,004 and 1680 other
 5   Hispanics who were not illegal immigrants were also stopped on          14:26:59
 6   those saturation patrol days, correct?
 7   A.  If those numbers are right, then, yeah.  That sounds right.
 8   Q.  In order to achieve the stated purpose of the saturation
 9   patrols to combat illegal immigration, and in order to
10   apprehend those 308 illegal immigrants, do you think it is           14:27:17
11   acceptable that between 1,000 and 1600 Hispanics who were not
12   illegal immigrants were subjected to a higher risk of being
13   stopped during those saturation patrol days?
14           MR. LIDDY:  Objection, argumentative, Your Honor.
15           THE COURT:  I'm going to sustain the objection.           14:27:41
16   BY MR. YOUNG:
17   Q.  Now, you were asked -- you remember there was some
18   questioning -- well, let me just ask you:  Do you see any
19   difference between the people who were arrested under the
20   MCSO's 287(g) authority and those who were arrested under           14:27:59
21   Arizona's state human smuggling law?
22   A.  I -- I'm not sure what you're asking me.  I don't have any
23   data on that information.
24   Q.  Well, okay.  So let's go back to the numbers that you
25   testified Lieutenant Sousa gave you that you --           14:28:15
```

1    A.  Yes.

2    Q.  -- you added up initially to get 338, but now -- how many

3    of those were arrested for human smuggling as opposed to

4    being --

5    A.  I don't know.  I don't know.                                    14:28:32

6    Q.  You don't know.

7         THE COURT:  All right.  I'm going to -- I am going to

8    impose a rule.  One person speaks at a time.  You speak, you

9    wait for the question before you answer.  All right?

10        You wait for the complete answer before you ask the       14:28:45

11   next question.

12        MR. YOUNG:  I apologize, Your Honor.

13        THE WITNESS:  I do, too.

14   BY MR. YOUNG:

15   Q.  So just for clarity, and I apologize for speaking over you,  14:28:51

16   Dr. Camarota --

17   A.  Me, too.

18   Q.  -- of the 308 illegal immigrants listed in -- in your

19   report, you don't know how many of them, if any, were arrested

20   for human smuggling, is that correct?                             14:29:06

21   A.  I do not know.

22   Q.  You didn't make any attempt to find out?

23   A.  I didn't ask.

24   Q.  Does it matter to you?

25   A.  It didn't occur to me to ask.  I just -- I didn't ask.      14:29:13

1    Q.   Now, let's go to the issue of saturation patrol active

2    officers on saturation patrol days, and whether they're more

3    likely to check Hispanic names than nonsaturation patrol active

4    officers.   You gave some testimony about some people being on

5    Lake Patrol and others being in the Human Smuggling Unit,                14:29:42

6    correct?

7    A.   Yes.

8    Q.   Okay.   Did you -- you didn't actually do any calculations

9    yourself to try to sort that out and account -- and determine

10   whether that fact made any difference for purposes of this               14:29:57

11   issue, correct?

12   A.   No, I only identified which ones were -- what the units

13   were, and -- and I identified that a total of 70 percent were

14   Lake Patrol or HSU.   But I certainly didn't try to rereplicate

15   Dr. Taylor's results with taking into account units.                     14:30:17

16   Q.   You agree that HSU operations on saturation patrol days

17   significantly increases the Hispanic share of those stopped?

18   A.   The fact that HSU makes up such a large fraction of stops

19   on saturation patrol days almost certainly has a significant

20   impact on the total fraction of Hispanics who are stopped on a           14:30:47

21   saturation patrol day.

22   Q.   With respect to the issue of stop length, you agree with

23   Dr. Taylor that where there is at least one Hispanic name

24   checked, the stop will last longer, correct?

25   A.   Yes, I think that's correct.                                        14:31:11

1  Q.  In fact, you think that somewhat longer traffic stops are

2  to be expected for Hispanics in Maricopa County, is that right?

3  A.  Yes, I do.

4  Q.  Now, you said that, well, maybe sometimes someone will need

5  to spend more time because of a language difference.  Is that         14:31:31

6  one of the things you told Mr. Liddy?

7  A.  Mr. Lee?  Oh, Mr. Liddy.  I'm sorry.

8  Q.  Yeah, I'm sorry.

9  A.  No, that's okay.  Yes.

10  Q.  You did not do any calculations, though, to determine what      14:31:44

11  effect, if any, differences in language might have on stop

12  lengths?

13  A.  That's a variable not available in CAD data.

14  Q.  If a passenger in a car has darker skin and speaks only

15  Spanish, a deputy could call in a Spanish-speaker to inquire         14:32:06

16  about the citizenship of that passenger, which could make the

17  stop longer, correct?

18  A.  Sounds plausible, yes.

19  Q.  If an officer had a carload of Hispanic eight-year-old Boy

20  Scouts and decided to ask for their identification, that could       14:32:24

21  also make the stop longer, correct?

22  A.  I guess so, yeah.

23  Q.  If an officer decided to do a full-body pat-down of a

24  65-year-old landscaping worker, that could make that stop

25  longer, correct?                                                     14:32:40

1318

1    A.  I think it could.

2    Q.  You answered some questions from Mr. Liddy about the

3    selection of stops, and in particular you -- you talked first

4    with Mr. Liddy about ignoring the stops in which no name

5    appeared in the comments field.                                    14:32:58

6    A.  Um-hum.

7    Q.  Do you recall those answers?

8    A.  Yes.

9    Q.  Okay.  You did exactly the same thing that Dr. Taylor did,

10   i.e., you discarded that data because there are no names,        14:33:06

11   correct?

12   A.  Yes, that was the percentage I gave, 29.6 percent of

13   initial code type Ts have no -- no identifiable name.

14   Q.  You believe it is understandable that Dr. Taylor did not

15   use the entries lacking names, is that right?                     14:33:24

16   A.  He couldn't.

17   Q.  And you -- that's an understandable decision by him,

18   correct?

19   A.  There was no other choice, he had to exclude them.

20   Q.  His throwing out that data was not careless, correct?        14:33:39

21   A.  My contention it was not careless, no.

22   Q.  Now, you asked Mr. Jefferys of the MCSO to try to get the

23   information where the names were not present in the CAD data

24   from the Department of Motor Vehicles, correct?

25   A.  I -- I don't recall ever having that conversation with him.   14:33:57

1  I think early on I had a discussion with Clarice McCormick

2  about seeing if there was some way to fill in this data.  I

3  don't remember having one with him.

4  Q.  Well, let me ask you this.  Did Mr. Jefferys tell you,

5  quote, Even if we were able to do that, it would only provide a

6  minimal amount of names to add to the study and probably

7  wouldn't change any figures that much, end quote.

8  A.  Did he say that?  He may have.  I don't remember.

9  Q.  Did Mr. Jefferys tell you, quote --

10  A.  I'm sorry, go ahead.

11  Q.  -- plus, the call types and dispositions didn't contain the

12  information needed for an outcome analysis that could be used

13  with confidence?

14  A.  I do not recall that conversation with Mr. Jefferys.

15       MR. YOUNG:  I have an exhibit, Your Honor, that I'd

16  like to show the witness which we've marked as an impeachment

17  exhibit, 501.  It's a series of pages containing e-mails

18  between Dr. Camarota and Mr. Jefferys.

19       THE COURT:  All right.  The exhibit will be re-marked

20  as --

21       THE CLERK:  456.

22       THE COURT:  -- 456.

23  BY MR. YOUNG:

24  Q.  Dr. Camarota, remember after your deposition and after all

25  the expert reports in this case you provided a set of materials

1320

1    to Mr. Liddy --

2    A.  Any e-mails I had, right, I remember.

3    Q.  And those e-mails included e-mails between you and

4    Mr. Jefferys?

5    A.  Okay.                                                    14:35:54

6            MR. YOUNG:  Okay.  I'm going to ask if we could go to

7    page 18 of that exhibit, Mr. Braun, if you have that.

8            MR. LIDDY:  Excuse me.  Your Honor -- here it is.

9    Never mind.

10   BY MR. YOUNG:                                                14:36:16

11   Q.  All right.  Let's focus on -- okay.  There's another

12   version of this, which is page 18 of the PDF version.  Or I can

13   actually try to use this machine, if we can.

14           MR. YOUNG:  Mr. Braun, you'll need to tell me whether

15   I use the ELMO or whether we're using -- thank you.           14:36:44

16           Your Honor, may I present the witness with a copy of

17   the exhibit?

18           THE COURT:  You may.

19           MR. YOUNG:  Thank you.

20           THE COURT:  You know, to be on the safe side, I think  14:37:04

21   that Kathleen has taken out the exhibit you have so designated

22   and is now re-marking it.  Why don't we have her hand that

23   exhibit to the witness.

24           MR. YOUNG:  That would be fine.

25           THE COURT:  That way, there will be no unclarity about  14:37:15

```
 1   what it states.
 2           MR. YOUNG:  Should I take back the one?
 3           THE COURT:  You may take back the one you've given the
 4   witness.
 5   BY MR. YOUNG:                                                    14:37:35
 6   Q.  Dr. Camarota, does the version that you have have page
 7   numbers on the bottom?
 8   A.  It does.  It does.
 9   Q.  Go to page 18.  Is what you have in your hands the same as
10   what's on the screen?                                            14:37:48
11   A.  Let me -- let me compare.  Looks the same.
12   Q.  Okay.  So there's an e-mail dated January 18, 2011, which
13   is your response to an earlier e-mail from Mr. Jefferys.
14           Do you see that?
15   A.  No, I'm not sure which one you're referring to.  I'm sorry.  14:38:07
16   Q.  Okay.
17   A.  Would you just tell me what it begins with.
18   Q.  Yeah, it says, From Steven Camarota, sent Tuesday, January
19   18, 2011.
20           Do you see that?                                         14:38:20
21   A.  Yes.
22   Q.  And then it's responding to an earlier e-mail that appears
23   in the string below from Mr. Jefferys to you dated December 14,
24   2010, correct?
25   A.  Okay.                                                        14:38:32
```

1    Q.  The second paragraph of Mr. Jefferys' e-mail says:  The

2    last I remember I was attempting to extract driver license

3    numbers that could be matched to MVD records so we could

4    extract additional names.  Last contact with Clarice indicated

5    that wasn't going to happen.  Even if we were able to do it, to    14:38:53

6    do that, it would only provide a minimal amount of names to add

7    to the study and probably wouldn't change any figures that

8    much.  Plus the call types and dispositions didn't contain the

9    information needed for an outcome analysis that could be used

10   with confidence, end quote.    14:39:14

11        Do you see that?

12   A.  I do.  I do.

13   Q.  Okay.  That's an e-mail that Mr. Jefferys of the MCSO wrote

14   to you, correct?

15   A.  Yes.  I remember -- like I said, I remember talking to    14:39:22

16   Clarice about this.  But this is, like, two years ago.  I

17   hadn't remembered talking to Mr. Jefferys about it.  But -- and

18   maybe I guess he had spoken to Clarice, too, and we were trying

19   to see, you know, if we could make the data better, but it

20   looked like we couldn't do it.  That's my recollection of it.    14:39:37

21        MR. YOUNG:  Your Honor, I move to admit this exhibit,

22   and I think it's 496.  I apologize if I've --

23        THE COURT:  456.

24        MR. YOUNG:  456.  I move to admit this exhibit into

25   evidence.    14:39:52

1    MR. LIDDY:  Without objection, Your Honor.

2    THE COURT:  Exhibit 456 is admitted.

3    (Exhibit No. 456 is admitted into evidence.)

4  BY MR. YOUNG:

5  Q.  You're not aware of any evidence that the omission of the    14:40:05

6  names -- of the incidents that had no names caused any change

7  in the Hispanic versus non-Hispanic name data, is that correct?

8  A.  Could you restate that?

9  Q.  Let me -- let me restate that.

10    You have no evidence that the group of incidents with    14:40:27

11  no names had any different mixture of Hispanic and non-Hispanic

12  names than the incidents that did have names, is that right?

13  A.  We don't know anything about those -- those ones, the

14  Hispanic names that weren't there.  We don't know about names

15  that weren't there, we don't know anything about.    14:40:45

16  Q.  Given that fact, in your view, it would be better, or may

17  be better, simply to accept the inability to use that data, is

18  that correct?

19  A.  If you're going to use the data you have no choice, you

20  have to exclude those cases.    14:41:01

21  Q.  And you didn't study those no-name incidents to see how

22  they were distributed, correct?

23  A.  No, I -- I did not.

24  Q.  From your standpoint, it would be possible that if one were

25  able to include those no-name entries, they could either    14:41:20

1    increase or decrease the disparity that Dr. Taylor found,

2    correct?

3    A.  Yes, it could go either way.  It could -- could have an

4    effect either way.

5    Q.  Now, you were also asked some questions by Mr. Liddy about                    14:41:34

6    the selection of stops where there were names present, and you

7    said that he should have -- and let me ask you:  You think he

8    should have counted all of the incidents with the initial call

9    type T, is that correct?

10   A.  What I would say is that he describes his report as                          14:41:56

11   interested in officer traffic stops in which -- where the

12   officer has discretion to look for incidence of bias.

13          The way those cases that I was mentioning where there

14   was, like I say, a suspended or revoked license looked to be

15   exactly the universe that he's interested in.  An officer is                    14:42:16

16   stopped who's -- an officer stops someone using his discretion

17   and it turn -- doesn't give him a citation or a -- or a

18   warning; he gives him -- he -- he cites them for the -- the

19   lack of a driver's license.  So they drop out of it now, so he

20   doesn't have them.  So that would be an example of about 1300                   14:42:37

21   cases that would seem to fit his universe perfectly that he

22   didn't include, and there are others.

23   Q.  My question was pretty simple, Dr. Camarota.  You believe

24   that he should have counted all of the incidents with the

25   initial call type T, correct?                                                    14:42:51

1  A.  I don't know that he should have counted them all, but

2  there are lots that seem to, you know, meet his criteria that

3  he didn't count.

4  Q.  He did count the vast majority of the incidents designated

5  with initial call type T, correct?                              14:43:04

6  A.  Yes.

7  Q.  And there are many initial call type T stops of a nature

8  that you would agree he would be justified in excluding from

9  his study, correct?

10  A.  Given what he was specifically interested in, there are    14:43:18

11  some like that, I think.

12  Q.  Animal problems?

13        THE COURT:  You know what?  I want to ask a question

14  here.  I want to interrupt and ask a question.

15        The stops that would have been excluded --               14:43:30

16        THE WITNESS:  Yes.

17        THE COURT:  -- were the -- that we're talking about

18  now are stops that would have resulted in an arrest?

19        THE WITNESS:  I -- I'm not an expert on what happens

20  when you have a suspended license.  I don't know.  I can tell  14:43:43

21  you that they're not coded as a T or 910.  I don't know what

22  happens.

23        THE COURT:  All right.  So if they resulted in an

24  arrest, or if driving with a suspended license would result in

25  an arrest -- well, I think you indicated it was driving with a  14:43:56

```
 1   suspended license and some DWIs --

 2            THE WITNESS:  Yeah, possession of narcotics --

 3            THE COURT:  And possession of narcotics?

 4            THE WITNESS:  -- I think that would, yeah.

 5            THE COURT:  So you would presume that DUIs would          14:44:09

 6   result in an arrest, correct?

 7            THE WITNESS:  Um-hum.

 8            THE COURT:  You would presume that possession of

 9   narcotics would result in an arrest?

10            THE WITNESS:  Result in arrest.                          14:44:18

11            THE COURT:  And it's possible, at least, that driving

12   on a suspended license would result in an arrest?

13            THE WITNESS:  Yeah, I -- I don't know.

14            THE COURT:  Did you ever look at the arrests, the

15   actual arrests that took place during saturation patrols to      14:44:30

16   compare whether or not those arrests were predominantly

17   Hispanic or non-Hispanic names?

18            THE WITNESS:  I have not done that, no.

19            THE COURT:  Thank you.

20   BY MR. YOUNG:                                                    14:44:44

21   Q.  Dr. Camarota, you'd agree with me that the following are

22   also initial call type T stops: reckless boat driving, ticket

23   scalping, runaway juveniles, welfare checks, abandoned

24   vehicles, vehicle accidents with injuries?

25   A.  There are a small number of cases that are coded T            14:45:03
```

1   initially, and then they have one of those kind of codes at the

2   end, yeah.

3   Q.  So would you agree that it's appropriate for Dr. Taylor not

4   to include those in his study?

5   A.  I think so.  I think he should have -- I don't think he   14:45:14

6   should have included those, given his interests.

7   Q.  Now, with the driving under the influence or the driving

8   while intoxicated, DWI, those would include incidents where the

9   officer has information that the operation of vehicle was

10   impaired before the stop, correct?   14:45:36

11   A.  No, we don't know that from the CAD data.  If a person --

12   Q.  I'm sorry.  Go ahead.

13   A.  Well, from the CAD data it's listed as a T as initial, and

14   then it's listed as, I can't remember, DWI, I think that is the

15   code, but I can't remember, on the final.   14:45:50

16        But we don't know if it was because he failed to

17   signal or because he's swerving between lanes.  There's no

18   information in the CAD data that would tell you that.

19   Q.  It could be a case, though, or one of them could be a case,

20   where someone was swerving between lanes?   14:46:04

21   A.  Could be.

22   Q.  With respect to that class of stops, is it correct that you

23   do not know whether the percentage of Hispanics for those stops

24   is higher or lower than the percentage Hispanic for the stops,

25   or name checks that Dr. Taylor did study, correct?   14:46:21

1        You don't know one way or the other.

2   A.  You -- could you just rephrase that?  I wasn't sure -- I

3   don't know the percentage -- could you rephrase it?  I'm sorry.

4   Q.  Okay.  For the suspended license cases and the driving

5   while intoxicated cases, you do not know whether the percentage          14:46:36

6   of Hispanics is higher or lower than for those cases that

7   Dr. Taylor did include in his study, correct?

8   A.  Correct.

9   Q.  That's true for the remainder of the instances that

10  Dr. Taylor did not include in his study, correct?                        14:46:58

11  A.  I don't know their Hispanic distribution.

12  Q.  You yourself could have done some looking at those stops to

13  see whether there was a difference in their distribution,

14  correct?

15  A.  Well, I used -- I had those in my analysis.  They are part          14:47:16

16  of my whole analysis.  But I didn't pull those single cases

17  out.  I go from initial call type T.  So it's a much broader.

18  So in that sense they are in my data, but I didn't pull out the

19  ones that he excluded.  I don't know what their Hispanic

20  distribution is.                                                         14:47:37

21  Q.  So you don't know whether including those stops would have

22  made any difference at all in Dr. Taylor's conclusions,

23  correct?

24  A.  It just looms as an unknown.

25  Q.  And it's an unknown to you because you don't know whether            14:47:49

1    it would make a difference or not, is that right?

2    A.  Don't know.  It's just out there.

3    Q.  You also answered some questions from Mr. Liddy about

4    socioeconomic factors.

5    A.  Um-hum.                                                    14:48:03

6    Q.  And basically, your assertion is that Hispanics generally

7    are poorer and less well educated and don't speak English as

8    well, and, therefore, that explains why their name checks might

9    be higher during saturation patrols, is that right?

10   A.  I said that possibility exists and it can play a role.      14:48:20

11   Given the nature -- as I recall, I said given the nature of

12   saturation patrols and their attempt, say, to stop everyone

13   with an equipment violation.

14   Q.  Other than the data issues that we just talked about, the

15   failure or lack of socioeconomic variables in Dr. Taylor's      14:48:37

16   report is your primary criticism of his analysis, correct?

17   A.  When you say data issues, the series of data issues that

18   we've been talking about, right?  Yes.  And then the lack of

19   socioeconomic factors, that could -- could make a significant

20   difference.  The lack of a goodness of fit so I can evaluate    14:48:57

21   the overall statistical model is another thing that I really

22   would be helpful to see, you know, that I've mentioned before,

23   so -- so those things.

24   Q.  Let me try it again, Dr. Camarota.

25            Do you agree with this statement, quote:  Putting      14:49:13

1330

```
 1    aside data issues, the primary weakness of his analysis is that
 2    Dr. Taylor does not control for any socioeconomic factors that
 3    could explain his results, end quote?
 4    A.   The primary, the biggest problem other than data factors,
 5    yes, I think that's a fair statement, that the...                      14:49:32
 6    Q.   You do not blame Dr. Taylor for omitting socioeconomic
 7    factors from his study, correct?
 8    A.   I don't blame -- there's no -- that doesn't exist in the
 9    CAD data.  We don't know anything about the socioeconomic
10    status.                                                                 14:49:48
11    Q.   My question, though, is you -- is it true that you do not
12    blame Dr. Taylor for omitting those factors from his study?
13    A.   I do not blame Dr. Taylor.
14    Q.   If the data's not there, which it isn't, then you simply
15    cannot do that analysis, correct?                                      14:50:04
16    A.   Correct.
17    Q.   In your own comparison between what the CAD data showed and
18    the overall population mix of Maricopa County, you yourself did
19    not account for socioeconomic factors, correct?
20    A.   No.  There's no socioeconomic factors.                            14:50:19
21    Q.   So you did not account for income?
22    A.   No.
23    Q.   You did not account for education level?
24    A.   No.
25    Q.   You did not account for language skills.                          14:50:29
```

1   A.   No.

2   Q.   It's possible for a foreign-born person to know the traffic

3   laws as well as a U.S.-born person, correct?

4   A.   Sure.

5   Q.   You can't think of any studies showing whether foreign-born    14:50:49

6   people are less likely to be law-abiding than native-born

7   people, is that correct?

8   A.   In general, the research on whether the foreign born are

9   less law-abiding or not is inconclusive.  It is unclear.  As a

10  general proposition, I am unpersuaded that there is strong    14:51:16

11  evidence that, say, immigrants are more likely to commit crime.

12  I don't think the evidence supports that.

13      But there is this important caveat: that in Maricopa

14  County, the analysis that the Supreme Court cited and my

15  research on that did tend to support that, that illegal    14:51:36

16  immigrants represented a disproportionate share of felons in

17  Maricopa County.  At least that's what the evidence seemed to

18  indicate, relative to their fraction of the overall population.

19      But as a general proposition, I do not think the

20  evidence is clear at all that the foreign born are -- have    14:51:49

21  higher rates of crime than the native born.  I don't think that

22  is true.  I'm not convinced of it, that's for sure.

23  Q.   I'm going to read to you from page 212 of your deposition,

24  starting at line 21.

25  A.   Um-hum.    14:52:04

```
1              MR. YOUNG:  Your Honor, I have a copy of it here for

2    the witness.  May I approach?

3              THE COURT:  You may.

4              (Pause in proceedings.)

5    BY MR. YOUNG:                                                    14:52:21

6    Q.  Dr. Taylor, at page 212 you were asked this question:

7              "My question was not about the legal population but

8    about the foreign born.  Have you done any research into the

9    issue of whether the foreign born are less likely to be

10   law-abiding, or are you aware of any studies that have been     14:52:33

11   done on that issue in Maricopa County?

12             "ANSWER:  In Maricopa.  People looked at Arizona.  I

13   can't think of -- foreign born, Maricopa.  Off the top of my

14   head, I can't think of anybody who has done a look at that."

15   A.  That's right.  That's consistent with what I just said, the 14:52:52

16   foreign born.  I don't think anyone's looked at the foreign

17   born.  My was talking about illegal immigrants we were just

18   talking about.  They're not the same populations.

19   Q.  You have no way of knowing from the CAD data whether

20   Hispanics or non-Hispanics have either higher or lower rates of  14:53:07

21   compliance with the law, correct?

22   A.  From the CAD data, no.  No, I mean --

23   Q.  And you don't know whether Hispanics are either more or

24   less likely to violate the traffic laws than non-Hispanics,

25   correct?                                                         14:53:19
```

1   A.  No, we don't, not -- it's not in the CAD data, per se.

2   Q.  Is it possible that Hispanics who hear about the MCSO's

3   saturation patrols may be more conscientious about following

4   the rules because they don't want to be subjected to stops?

5          MR. LIDDY:  Objection, Your Honor, calls for           14:53:40

6   speculation.

7          THE COURT:  I'm going to sustain the objection.

8   BY MR. YOUNG:

9   Q.  Did you read David Rodriguez's testimony earlier in this

10  case, Dr. Camarota?                                           14:53:57

11  A.  I have not.

12  Q.  You also said something about poorer people being less able

13  to maintain their cars, and therefore being perhaps more

14  susceptible to vehicles code violations, correct?

15  A.  I said that possibility definitely exists.                14:54:14

16  Q.  You have not attempted to ascertain the vehicle maintenance

17  habits of Hispanics in Maricopa County, correct?

18  A.  I have not.

19  Q.  Other than the fact that many states give assistance to

20  low-income people to help them maintain their cars, you have no  14:54:30

21  data showing that lower income people are less likely to keep

22  their vehicles up to code, correct?

23  A.  Yeah, other than that GAO report that found that states

24  found that to be the case and helped them out.

25  Q.  You think it's plausible that people who have less money   14:54:51

1334

1  would also have cars that are less expensive to maintain?

2  A.  It's certainly possible, sure.

3  Q.  It's also possible that a poorer person could care more

4  about his or her car than a more wealthy person, correct?

5  A.  Certainly possible.                                14:55:06

6  Q.  And someone who's concerned or fearful about being stopped

7  by the Sheriff's Office could be more careful about not driving

8  with a cracked windshield or a burned out headlamp because that

9  person does not want to be stopped, correct?

10 A.  I think I understood the question.  Could you just restate  14:55:23

11 that?

12 Q.  Sure.  If you -- if you're afraid of being stopped by the

13 Sheriff's Office, it's possible that you might be more careful

14 than other people to make sure that your car does not have a

15 cracked windshield, does not have a burned out headlamp or have  14:55:39

16 some other reason that you could be stopped, correct?

17 A.  If that's possible.

18 Q.  Your critique about traffic and vehicle maintenance code

19 violations and the effect on them of socioeconomic factors

20 assumes a zero tolerance policy for traffic stops by the MCSO,  14:55:57

21 is that correct?

22 A.  The way it was explained to me and the way I understand

23 their policy is they attempt when practicable, and when it's

24 viable, to pull over during saturation patrol anybody they see

25 in violation making equipment violations or violating the rules  14:56:15

1    of the road.

2    Q.   It's your belief that saturation patrols are different,

3    that they have a different criteria for which they use to stop,

4    which is that there's a zero tolerance policy, is that right?

5    A.   Something like a zero tolerance policy.                14:56:36

6    Q.   Okay.  And your assumption about saturation -- did you

7    finish your answer?

8    A.   No, go ahead.  That's okay.  I'm fine, yeah.

9    Q.   Your understanding about saturation patrols being governed

10   by zero tolerance policy comes from your discussion with       14:56:51

11   Lieutenant Sousa, correct?

12   A.   Yes, primarily.

13   Q.   And Lieutenant Sousa told you that on saturation patrols

14   the policy is to stop all violations -- broken windshields,

15   headlights out, fumes, all kinds of maintenance problems -- is  14:57:07

16   that right?

17   A.   Yeah, I think that's roughly what he said.

18   Q.   The only exception to that in your understanding is that

19   the officer should not endanger public safety, for example, by

20   shooting suddenly out into traffic, is that right?             14:57:20

21   A.   Yes, I think that -- that makes sense.

22   Q.   And if there is a zero tolerance policy, all violations are

23   pursued, then the fact that Hispanics have a higher name check

24   rate during saturation patrols may be due to the fact that they

25   maintain their cars more poorly, or they don't know the traffic  14:57:41

```
 1    laws as well as more educated people, is that right?  That's
 2    your claim?
 3    A.  Yes, I think that's a -- yeah, sure.  That's fine.
 4    Q.  If your assumption about the zero tolerance policy during
 5    saturation patrols is wrong, then that critique would not be         14:57:56
 6    valid, correct?
 7    A.  I didn't say zero tolerance, however; that's a term I
 8    believe you've used.  I don't think I used that term in my
 9    paper.  I thought I used, I said they tried to stop as many
10    people as possible when they violate -- when they see a             14:58:13
11    violation.  So --
12    Q.  Well --
13    A.  -- if that's not the case, if that has been misrepresented
14    to me, then that's not what happens during a saturation patrol,
15    then that can matter.                                               14:58:28
16    Q.  Didn't you say in your deposition at page 224, line 18,
17    that saturation patrols have what has been described as a kind
18    of zero tolerance policy?
19    A.  A kind of a zero tolerance policy.
20    Q.  Now, would it change your view if you knew -- and I'm          14:58:44
21    telling you this now -- that members of the MCSO have testified
22    that for traffic stops during saturation patrols, zero
23    tolerance is actually not something that's implemented?
24    A.  Would it change my view for traffic stops.
25    Q.  Would it change your view as to the socioeconomic factors       14:59:07
```

```
 1   if you knew that in fact during saturation patrols the MCSO,

 2   for traffic stops, does not in fact stop every violator?

 3   A.  It could -- it could matter.  I could see how it could

 4   matter.

 5   Q.  It would weaken the link between these alleged              14:59:27

 6   socioeconomic determinants of people being stopped and the fact

 7   that a higher number of Hispanics are stopped, correct?

 8   A.  It might.  It's possible.

 9   Q.  Let's talk a little bit about the length of stops.

10          You did not study whether there was any difference       14:59:55

11   between incidents where officers are called to translate and

12   incidents where officers are not called to translate, correct?

13   A.  I did not.

14          THE COURT:  Do you know what, Mr. Young?  I don't --

15   you know, I try not to interrupt you if I don't have to, but I   15:00:10

16   think I'm pushing folks a little far.  We need an afternoon

17   break.

18          How much longer do you have on --

19          MR. YOUNG:  I have a few more minutes, not long, but

20   if -- this would be a good time for a break.                     15:00:24

21          THE COURT:  All right.  Why don't we take a break

22   right now and we will reconvene at 20 after 3:00.

23          (Recess taken.)

24          THE COURT:  Thank you.  Please be seated.

25          Mr. Liddy, you ready for redirect?                        15:20:11
```

```
 1              MR. YOUNG:  Actually, Your Honor, I still have a few

 2    more questions.

 3              THE COURT:  Oh, I'm sorry.  That's right.  I

 4    apologize, Mr. Young.

 5              MR. YOUNG:  Thank you.                              15:20:18

 6    BY MR. YOUNG:

 7    Q.  Dr. Camarota, before the break we were talking about the

 8    stop length issue?

 9    A.  Yes.

10    Q.  You criticized Dr. Taylor for not running his analysis by   15:20:29

11    taking any stop where one non-Hispanic name is present and

12    counting that as a non-Hispanic stop, correct?

13    A.  As I recall that's how he did it, yes.

14    Q.  Well, did you do it the opposite way to see what would

15    happen?                                                       15:20:52

16    A.  I did not.

17    Q.  Your observation that's reflected in Figure 1 of your

18    report is based on your 70 percent threshold, correct?

19    A.  Yes.

20    Q.  And that's where you compare the number of Hispanic names   15:21:09

21    checked with the percentage of the population that is Hispanic,

22    correct?

23    A.  Yes.

24    Q.  Now, if you were to use a 60 percent threshold, the

25    number of Hispanic names checked would go up, wouldn't it?    15:21:22
```

1   A.  Yes, slightly.

2   Q.  Is it correct that you did not rely on any literature on

3   methodological approaches to racial profiling studies in your

4   analysis?

5   A.  I'm not sure I quite -- you're asking me did I cite a study   15:21:41

6   on racial profiling in my report, is that -- is that what

7   you're asking me?

8   Q.  You can answer that question.  Did you?

9   A.  I did not.

10  Q.  You're aware, aren't you, now, of the problem with using   15:21:54

11  census data as you used it as a de -- as a denominator problem

12  in racial profiling studies of police stops?

13  A.  I'm aware that it is something that you -- I mean, my

14  interpretation of the literature is that the fraction of the

15  population that is of the -- that is of the ethnicity of   15:22:16

16  interest is not irrelevant, but it is not the only thing that

17  matters.  Dr. Taylor reported it in his study.

18  Q.  Some -- well, Dr. Taylor called it the benchmarking

19  problem, correct?

20  A.  Yes, I think he also called it the denominator problem as   15:22:32

21  well.

22  Q.  And Dr. Taylor cited some articles, including the 2009

23  Ridgeway article about the Cincinnati Police Department traffic

24  stops, and then another article by Walker, S. Walker in 2001

25  called Searching for the denominator: Problems with police   15:22:51

1    traffic stop data and an early warning system solution.

2            Did you read his report, his rebuttal report in which

3    he cited those articles?

4    A.  I do, yes, I remember.

5    Q.  You did not in your own study take into account the            15:23:05

6    denominator problem or the benchmarking problem described in

7    those articles, correct?

8    A.  I'm not sure I understand your question.

9            When you're looking over time at the same data from

10   2005 to 2009, the issue that you just discussed is not even        15:23:22

11   relevant, because you're comparing the same thing over time.

12           So Figure 1 has two important components.  One

13   important component is the lack of a rise in the Hispanic

14   share, even though you have this big increase and concern over

15   illegal immigration.  That part of the analysis has nothing to     15:23:42

16   do with the fraction of the population that's Hispanic.  That's

17   looking at the same data over time.

18           On this question of the denominator problem, in my

19   report I talked about other things like the demography of the

20   area around it.  So I did talk about some of those other things    15:24:01

21   in my original report, and as -- and it turns out that

22   Hispanics are as likely to drive in Maricopa County as -- as

23   anyone else.  They're as likely to drive to work -- about

24   29 percent of -- 30 percent of Hispanics, roughly, drive to

25   work -- as non-Hispanics, and they make up about 29 percent of     15:24:20

1   people who drive to work.

2           So to the extent that we can look at those questions

3   and deal with this issue of, well, maybe Hispanics drive a

4   whole lot less, which is one of the -- basically, one of the

5   essential issues that you're talking about, the American          15:24:34

6   community survey shows that they actually drive about in

7   proportion to their share of the population.

8           MR. YOUNG:  Your Honor, I'll move to strike that

9   answer as nonresponsive.

10          THE COURT:  The motion is granted.  The answer is         15:24:46

11  stricken.

12  BY MR. YOUNG:

13  Q.  Dr. Camarota, referring specifically to the Ridgeway and

14  Walker articles, it is correct that you did not take them into

15  account in doing your analysis, correct?                          15:24:59

16  A.  I would argue strongly that the comparison between 2005 to

17  2009 doesn't -- doesn't -- is -- is most certainly taking that

18  into account, 'cause I'm comparing not the population base, but

19  change over time within the CAD data.

20  Q.  Did you read those articles before doing your report?         15:25:22

21  A.  I was aware of those articles.

22  Q.  Did you read them before doing your report?

23  A.  I -- I read them -- I read them.  Did I read them before

24  the report?  I think so.  But I certainly read them after.  I

25  have read them.                                                   15:25:38

1  Q.  So you're not certain whether you read them before doing --

2  A.  I'm not sure if I read them before or after.

3  Q.  You did not attempt to design your study to make use of

4  internal benchmarking, correct?

5  A.  Except for the comparison over time.                                          15:25:54

6        But I also -- let me take that back.  I also did look

7  at comparisons over time by district, as well as the overall

8  data, so that's an internal comparison, not comparising -- not

9  a comparison to the demography of the area.

10        And then I also looked at specific as many units as       15:26:16

11 could possibly be identified over time, and all that data is

12 reported in Figure 1.  So that's an internal comparison.  It's

13 not a comparison to the demography of Arizona or Maricopa.

14 Q.  You're conclusion would be invalid if Hispanics had a lower

15 rate of exposure to the MCSO, for example, because they drive    15:26:43

16 less, correct?

17 A.  What conclusion -- I'm not sure I understand what you're

18 asking.  What conclusion are you referring to?

19 Q.  Your conclusion based on a comparison between the MCSO name

20 check rates and the overall population of Hispanics in Maricopa  15:26:57

21 County, that conclusion would be invalid or at least be

22 undermined if Hispanics had a lower rate of exposure to the

23 MCSO, is that right?

24 A.  You mean they drive less; that's what you're essentially --

25 yes, if Hispanics drive less and so have a less likely, then     15:27:13

```
 1   that would change the percent, the chance that they would be
 2   stopped, if that's what you're asking me.
 3   Q.  So if Hispanics drove less for leisure, for shopping, for
 4   example, that would have the effect of making your conclusion
 5   less secure, correct?                                        15:27:30
 6   A.  I'm not -- when you say my conclusion, you mean my
 7   comparison just between the --
 8   Q.  That's right.
 9   A.  -- the basic demographics?
10   Q.  That's right.                                            15:27:41
11   A.  It could change that result.
12   Q.  So if Hispanics, for example, just suppose that they went
13   to work in carpools more often than non-Hispanics, and drove
14   together with other people, would that make your -- would that
15   change the basis on which you did your comparison as set forth  15:27:59
16   in Figure 1 in your report?
17   A.  It could have an effect on its comparison to the
18   demography, but not the change over time.
19   Q.  If Hispanics drove in areas of the county that are policed
20   by the MCSO more heavily, less frequently than non-Hispanics,  15:28:13
21   that would also undermine the relevance of your study, correct?
22   A.  No, I don't -- I don't quite understand that question.
23   Could you -- you're saying that if they drove in areas that
24   the -- well, re -- could you restate it?
25   Q.  Let me simplify the question.                            15:28:32
```

1  A.  Yeah.

2  Q.  It's possible that the MCSO patrols more in some areas and

3  less in other areas of the county, correct?

4  A.  Right.

5  Q.  And if Hispanics drove more in the areas that are less          15:28:40

6  heavily patrolled by the MCSO, that would weaken the validity

7  of your comparison, true?

8  A.  It -- it -- it would -- I understand.  You're asking me

9  whether the demographic could be different, right, that just

10  simply comparing them to the share of the population, not the    15:28:59

11  change over time, but the population number.  Yes, that -- that

12  could weaken that.

13  Q.  And if Hispanics drove less when the MCSO announces

14  publicly and has a press conference telling everyone that

15  they're going to do a saturation patrol, that would also affect  15:29:15

16  the validity of your comparisons, correct?

17  A.  If that -- if that sort of thing happened.

18  Q.  Now, your assumption is that Hispanics and non-Hispanics

19  violate the law, the traffic laws, at equal rates, right?

20  That's a basis that you use to show that your Figure 1           15:29:35

21  calculation is relevant to the issues in this case, correct?

22  A.  I provided -- I'm not sure I -- I quite understand what

23  you're saying.  Do I think -- you're not asking whether I think

24  that they do.  You're asking is -- if that's the case, does the

25  figure make the most sense?                                      15:30:06

1           Well, the part of the figure that compares the

2   population numbers to the share stopped.  I would say yes, that

3   makes sense.

4   Q.  You've not done anything to confirm that assumption,

5   correct?                                                          15:30:23

6   A.  What assumption is that?

7   Q.  The assumption that Hispanics and non-Hispanics violate the

8   traffic laws at equal rates.

9   A.  I have no information to suggest that they don't -- that

10  there's a fundamental difference between those two groups.        15:30:35

11  Q.  Now, I'd like to talk with you a little bit more about

12  Mr. Jefferys.  You received the first CAD data set from him,

13  correct?

14  A.  Yes.

15  Q.  Okay.  Then he gave you a second set of data, and that's     15:30:49

16  the one that you used for your analysis?

17  A.  Yes.

18  Q.  And the second set of data contained fewer incidents, and

19  Mr. Jefferys had created a separate field where he put the

20  names, is that correct?                                           15:31:02

21  A.  Yes.

22  Q.  Mr. Jefferys manually reviewed the comment fields of the

23  various data entries in order to pull the names out for you?

24  A.  He -- as -- he didn't just manually review.  He did an

25  algorithm, and then the remaining cases he used a manual          15:31:17

1    review.  So one of the things he did was a manual review, as I

2    say in the report.

3    Q.  So Dr. Taylor actually pulled the names out of the data

4    himself, correct?

5    A.  That's my understanding, yes.                                    15:31:29

6    Q.  So basically, Mr. Jefferys did for you what Dr. Taylor had

7    done for himself, is that right?

8    A.  I think that -- that's correct.

9    Q.  You did not know everything that Mr. Jefferys did to find

10   those names, correct?                                                15:31:45

11   A.  I had a long series of conversations with him on the phone

12   about it, but I can't say I know every single thing that he

13   did.

14   Q.  You can't remember or you don't know every query that was

15   done in Access to get those names, correct?                         15:32:01

16   A.  I don't know every one.

17   Q.  And you did not suggest to Mr. Jefferys any criteria to

18   distinguish names of people from things that were not names of

19   people, correct?

20   A.  I told -- well, I told him I wanted the last names of          15:32:12

21   everyone for whom there was an available last name for

22   T traffic stops.  So I told him exactly what I wanted.

23   Q.  I'm going to read from your deposition at page 41 --

24   A.  Okay.

25   Q.  -- line 17.                                                     15:32:34

1     "QUESTION:  Did you suggest any criteria by which to

2     distinguish names from things that were not names?

3          "ANSWER:  Did I suggest any criteria that he might

4     use?  No, I pretty much left it up to him.  I mean, he's worked

5     with the data for years.  He's been asked to do this kind of                15:32:49

6     thing where he pulls out people's names and stuff.  Apparently

7     he knows how to do it.  So he provided me with data with

8     names."

9     A.  Yes, he provided me with names.  And as I said, I asked him

10    for all the last names.                                                     15:33:03

11    Q.  Was that answer accurate?

12    A.  The testimony --

13    Q.  The one I just read?

14    A.  Yeah, he provided me with the names, absolutely.

15    Q.  You did not watch Mr. Jefferys prepare the data?                        15:33:11

16    A.  I did not.

17    Q.  You were not looking over his shoulder?

18    A.  No.

19    Q.  It was Mr. Jefferys who organized that data so that it

20    could be exported to a statistical software package, correct?              15:33:21

21    A.  Yes, he provided it to me as an Access, and then I exported

22    it to SPSS.

23    Q.  You did not, yourself, check the individual records to see

24    whether or not Mr. Jefferys was excluding any names

25    incorrectly?                                                                15:33:40

1    A.  No, I -- I did check names.  I -- I manually reviewed, but

2    I certainly didn't check everything that he provided.

3    Q.  You checked a subset?

4    A.  Yes, I checked -- I checked what he had provided to me

5    with -- against the original data, but I -- I certainly didn't        15:33:58

6    check every name he provided.

7    Q.  In fact, you looked at just a couple of hundred cases,

8    correct?

9    A.  I think that sounds about right, yes.

10   Q.  A couple of hundred out of how many?                              15:34:10

11   A.  Incidents or names?  170,000 names.

12   Q.  In addition to manipulating the names and removing some

13   incidents, Mr. Jefferys also removed other information,

14   including officer information and disposition of the stop,

15   correct?                                                             15:34:30

16   A.  Yes, I do not -- in the data that he provided me -- let me

17   be clear.  In the original data, that -- that information is

18   there.  But when he pulled out the names and provided me with

19   things like the unit and so forth, the officer's name was not

20   there.                                                              15:34:45

21   Q.  Let's go to Exhibit 402 of your -- which is your report,

22   and I want to go to page 14.

23   A.  Of my report?

24   Q.  Of your report.  Let's look at the first five lines.  In

25   the fourth line, actually the fifth line, you say:  In 2005,         15:35:18

```
 1    just 44 stops were attributed to HSU.

 2            You see that?

 3    A.  Yes, that's what the data showed.

 4    Q.  Now, you put that data also in a table that's in your

 5    report, correct?                                            15:35:30

 6    A.  Yes.

 7    Q.  That's on page 35, and we can take a look at that.

 8    A.  Okay.

 9    Q.  Actually, it's page 39.  Please pull up page 39 of

10    Exhibit 402.  And there you have a big table with various    15:35:46

11    operational areas and --

12    A.  I can't read here.

13    Q.  Let's go -- let's take the first half of the page, page 39.

14            All right.  That's -- that's fine.  You see there

15    there's a line HSU?                                          15:36:09

16    A.  Yes.

17    Q.  And under the column 2005 you have that same number, 44?

18    A.  Yes.

19    Q.  That's in the CAD data that Mr. Jefferys gave you, correct?

20    A.  Yes.                                                     15:36:20

21    Q.  Mr. Jefferys put that number -- put that data leading to

22    your 44 stops into the CAD data that he gave you, correct?

23    A.  He put that number in.  I don't understand your question.

24    He -- he did not -- I mean, I ran the data, and 44 for that

25    year showed the code HSU.                                   15:36:41
```

1   Q.  Those 44 stops are in an operational area field for the

2   HSU, correct?

3   A.  Yes.

4   Q.  And it was Mr. Jefferys who determined which incidents to

5   put into which operational field, correct?                      15:36:58

6   A.  No, that's not my understanding.  He pulled the data as it

7   existed.  The operational field, I said I wanted to know the

8   unit, and he gave me the unit.  I'm not -- maybe I'm not quite

9   understanding your question.  He didn't -- that's one of the

10  fields in the Access data, and it's one of the fields he        15:37:16

11  included in the information that he sent me.

12  Q.  Well, I'm going to read to you from your deposition again

13  starting at page 54, line 20.

14          "QUESTION:  Okay.  How did Mr. Jefferys determine

15  which incidents to put into the Human Smuggling Unit            15:37:44

16  operational field, operational area?

17          "ANSWER:  As I understand it, he went from the field

18  that says operational area, I mean --

19          "QUESTION:  What field was that?

20          "ANSWER:  In the CAD data there's a field, as I         15:38:02

21  understand it, that says operational area.  I mean there are

22  lots of fields.  I know that there is an indication of what the

23  officer, you know, what the officer is assigned to and what

24  operational area the officer is assigned to."

25          So as I read your deposition testimony, you said that   15:38:20

1   Mr. Jefferys put it there.  Is that accurate?

2   A.  I think what I was saying there, based on the context, is

3   that there's a field that indicates the unit, and that's just

4   what he went from.  He gave me that column.  That's all.

5   Q.  The Human Smuggling Unit did not exist in 2005, correct?          15:38:39

6   A.  That's my understanding, it did not exist.

7   Q.  And when you saw the 44 stops listed there, you believed

8   that that was an anomaly or a mistake, correct?

9   A.  Yeah, I -- in fact, I think I inquired about it.  I mean

10  this was a while ago.  It seemed strange to me.  Why would          15:39:00

11  there be 44 stops if the unit hadn't been created yet?  Yes, I

12  agree, I think it's some kind of anomaly.

13  Q.  In fact, at the time that you were preparing your report,

14  which we've just been looking at, you found it strange that

15  there were 44 stops reported for the Human Smuggling Unit,          15:39:13

16  correct?

17  A.  I think that's unusual, yes.

18  Q.  You found it strange, right?

19  A.  "Strange" seems like an appropriate word.

20  Q.  You nonetheless proceeded to incorporate that figure into       15:39:24

21  the table and paragraph of your report that we just looked at,

22  correct?

23  A.  Absolutely.  That was what the data showed.  I was not

24  going to manipulate the data to -- or suppress that.  I

25  couldn't account for it, but that's what's in -- and I think        15:39:39

1   what that is an indication of the thing that we had talked

2   about earlier of all the problems in HS -- in the CAD data.

3   Q.  You relied on that number in coming to your conclusions?

4   It's part of what you relied on in coming to your conclusions?

5   A.  The -- I didn't exclude that data.  That data's there and I    15:39:56

6   included it.

7   Q.  Now, as we discussed earlier, you -- you provided some

8   documents to Mr. Liddy, who provided them to us after your

9   deposition and after all the expert reports were completed in

10  this case, correct?                                              15:40:13

11  A.  Yes.

12  Q.  That's where we got that e-mail string between you and

13  Mr. Jefferys?

14  A.  Yes.

15  Q.  That data also included a data -- the data file that you    15:40:19

16  used consisting of names linked to incident numbers, correct?

17  A.  Yes, I'm -- I'm sure I sent that to you.

18  Q.  You did not provide that file for purposes of giving to

19  plaintiffs in this case at any time at or prior to your

20  deposition on March 22, 2011, is that right?                    15:40:45

21  A.  I can't remember when I sent it to you.  I don't know.

22  Q.  Well, if I represent to you that --

23  A.  If that --

24  Q.  -- I asked you about it at your deposition --

25  A.  Okay.                                                        15:40:57

```
 1   Q.  -- and you said that you would subsequently provide it to
 2   Mr. Liddy, you wouldn't have any reason to disagree with that,
 3   would you?
 4   A.  Yeah, that sounds right.
 5           MR. YOUNG:  Thank you very much, Dr. Camarota.      15:41:07
 6           THE COURT:  Redirect.
 7           MR. LIDDY:  No redirect, Your Honor.
 8           THE COURT:  All right.  You may step down, Doctor.
 9   Thank you.
10           THE WITNESS:  Thank you.                            15:41:21
11           MR. CASEY:  Your Honor, for defense's next witness
12   will be MCSO Deputy Matt Ratcliffe.
13           THE COURT:  Deputy Ratcliffe, please come right here
14   to be sworn in front of this microphone.
15           THE CLERK:  Can you please state and spell your full 15:42:13
16   name.
17           MR. RATCLIFFE:  Matthew Ratcliffe.  M-a-t-t-h-e-w,
18   R-a-t-c-l-i-f-f-e.
19           THE CLERK:  Thank you.  Please raise your right hand.
20           (Matthew Ratcliffe was duly sworn as a witness.)    15:42:34
21           THE CLERK:  Thank you.  Please take our witness stand.
22                       MATTHEW RATCLIFFE,
23   called as a witness herein, having been duly sworn, was
24   examined and testified as follows:
25                       DIRECT EXAMINATION                      15:43:04
```

1    BY MR. CASEY:

2    Q.  Please tell us your full name, sir.

3    A.  Matthew Ratcliffe.

4    Q.  And who are you employed by?

5    A.  Maricopa County Sheriff's Office.                    15:43:09

6    Q.  And how long have you been with the MCSO, sir?

7    A.  Approximately nine years.

8    Q.  So what year would that mean you started at MCSO?

9    A.  Started originally in 2002.

10   Q.  What year did you go to the academy?              15:43:22

11   A.  2002 and 2003.

12   Q.  When you were at the academy, do you recall ever undergoing

13   any training regarding the use of race or ethnicity in making

14   law enforcement decisions?

15   A.  Yes, sir.                                                15:43:36

16   Q.  What did you generally learn at the academy?

17   A.  There's no place for it in law enforcement.

18   Q.  At any point in your career did you ever become what's been

19   known as 287(g) certified?

20   A.  Yes, sir.                                                15:43:50

21   Q.  When did you become 287(g) certified?

22   A.  I believe it was early 2007.

23   Q.  Where was that training conducted?

24   A.  At the training facility for Maricopa County.

25   Q.  Do you recall who conducted that training?          15:44:02

1    A.  Various agencies in the federal level.

2    Q.  Now, when you say various agencies at the federal level,

3    what are you talking about specifically?

4    A.  I believe it was Customs Enforcement; Border Patrol, I

5    believe, was also there, a number of federal agencies.          15:44:17

6    Q.  What -- how long was the program?

7    A.  I don't remember the time frame.

8    Q.  Okay.  Did you learn anything there about their use of race

9    or ethnicity in making law enforcement decisions?

10   A.  There's no place for it there.                              15:44:32

11   Q.  Did you have any components in that ICE course about things

12   such as community policing, cultural awareness, cultural

13   sensitivity, things like that?

14   A.  Yes, sir, I did.

15   Q.  Let's turn now to the time period of December of 2007.      15:44:48

16   You, I assume, were employed still at MCSO?

17   A.  Yes, sir.

18   Q.  Where were you -- what -- where were you stationed?

19   A.  I was stationed at the Bartlett Lake area for the Lake

20   Patrol Division.                                                15:45:05

21   Q.  Explain for the Court, what is the Lake Patrol Division?

22   A.  Some of the duties that Lake Patrol covers is search and

23   rescue throughout the outlying areas, as well as Tonto National

24   Forest.

25   Q.  And what do lake -- what do deputies do who are assigned to  15:45:23

1    the Lake Patrol Division?

2    A.   Anything from mounted patrol, ATV, boats, search and

3    rescue, dive missions, various other patrol duties.

4    Q.   Thank you, sir.

5         I'm going to now turn to a different subject, that is,    15:45:42

6    a specific day back in December of 2007.  Specifically, I

7    believe it was a -- the record will reflect it was a Sunday,

8    December 2nd, 2007.

9         Did you make a traffic stop on a truck that you ended

10   up learning was driven by a man named David Rodriguez?    15:46:01

11   A.   That's correct.

12   Q.   All right.  Could you tell the Court, why did you make the

13   traffic stop on that truck?

14   A.   The vehicle had violated Title 28 law of bypassing a

15   traffic control device.    15:46:17

16   Q.   And what road was that truck traveling on?

17   A.   Bartlett Dam Road.

18   Q.   And what was the violation?

19   A.   Basically had violated the traffic control device by

20   driving around the traffic signs that were -- that stated that    15:46:30

21   the road was closed.

22   Q.   Do you know why the road was closed that day?

23   A.   We had a severe storm the previous evening.

24   Q.   And what -- and what was it that you understood as to why

25   the road was closed, other than there was a storm the previous    15:46:42

```
 1    evening?
 2    A.  Flash flooding is prone in that area, as well as a lot of
 3    road damage done to that area.
 4    Q.  Would you describe for us Bartlett Dam Road, is -- how many
 5    lanes there are; which direction it generally goes.        15:46:57
 6    A.  One lane east and west.  It's approximately 14 miles long
 7    starting at Cave Creek Road and ending at the lake.
 8    Q.  Okay.  Who closed the road?  Was that -- and let me strike
 9    that.  I apologize to the court reporter.
10         Who makes decisions in Maricopa County as to whether a  15:47:14
11    road should be closed or not?
12    A.  I believe that would fall to MCDOT.
13    Q.  And what does that stand for, sir?
14    A.  The Maricopa County Department of Transportation.
15    Q.  Did you close the road under your authority?           15:47:27
16    A.  No, sir.
17    Q.  And were there hazards on Bartlett Dam Road?
18    A.  Yes, sir.
19    Q.  And what type of hazards were there, sir?
20    A.  A lot of different washes cross Bartlett Dam Road leaving 15:47:38
21    different debris, whether they're rocks or sand.
22    Q.  On that day, please tell me precisely what was your cause,
23    probable cause, or reasonable suspicion to stop that vehicle?
24    And you mentioned it earlier.
25    A.  It was basically at that point in the road where I was    15:47:58
```

1358

1   located, the road had been closed to the west, closing all

2   traffic basically down to the lake.

3   Q.  What happened after you spotted this car on the road?  What

4   did you do?

5   A.  Got out of my vehicle and made a traffic stop on that          15:48:12

6   vehicle.

7   Q.  Were you in a marked or unmarked vehicle?

8   A.  I believe I was in a marked vehicle at that time.

9   Q.  Okay.  And what happened after you got in your vehicle and

10  pulled over this dark-colored vehicle?                            15:48:27

11  A.  I contacted the driver at the driver's window.

12  Q.  And what happened next, sir?

13  A.  I asked him for driver's license, insurance, and

14  registration, and asked them why they were driving on the road.

15  Q.  And do you recall what -- what were you told about them       15:48:37

16  driving on the road?

17  A.  The driver explained to me that they were taking the kids

18  to the lake.

19  Q.  And did you later identify who that driver was?

20  A.  Yes, sir.                                                     15:48:51

21  Q.  And who was it?

22  A.  David Rodriguez.

23  Q.  Did you at any time ever ask Mr. Rodriguez for a Social

24  Security card?

25  A.  No, sir.                                                      15:49:02

1    Q.  Is it your custom and practice at any point when you stop

2    vehicles for Title 28 violations to ask drivers for their

3    Social Security cards?

4    A.  No, sir.

5    Q.  At any point do you remember if you asked the driver for          15:49:15

6    anything else other than driver's license, proof of insurance,

7    and proof of registration?

8    A.  No, sir.

9    Q.  At some point did you make a decision that you were going

10   to issue a citation to Mr. Rodriguez?          15:49:37

11   A.  Yes, sir.

12   Q.  And what was that decision based on?

13   A.  My decision was based on him saying he was taking the kids

14   to the lake, putting them in harm's way.

15   Q.  And did at any time -- and I'm going to back up a minute --          15:49:49

16   at any time before you made the traffic stop could you identify

17   the number of people in that vehicle?

18   A.  No, sir.

19   Q.  Could you identify the gender of the people in the vehicle?

20   A.  Not prior to contact, no, sir.          15:50:04

21   Q.  Prior to contact, making the traffic stop, could you

22   determine the race or ethnicity of anyone in that vehicle?

23   A.  No, sir.

24   Q.  Did race or ethnicity play any role in your decision to

25   make that traffic stop?          15:50:17

1    A.  No, sir.

2    Q.  All right.  Now, let's go to this point where you decided

3    to issue a citation.  Did the race of Mr. Rodriguez, or his

4    ethnicity, play any role in your decision to issue him that

5    citation?                                                    15:50:31

6    A.  No, sir.

7    Q.  Did Mr. Rodriguez ask you any questions while the traffic

8    stop was occurring?

9    A.  Yes, sir.

10   Q.  What did he ask you?                                     15:50:42

11   A.  He asked why some people are being allowed to pass and

12   others weren't.

13   Q.  And what was your response?

14   A.  They were -- the people that were being allowed to pass at

15   that time were responding to the damages done to their boats   15:50:53

16   and the RVs down at the lake.

17   Q.  Explain for me why some people were being allowed to go to

18   take care of property damage on this dangerous road and others

19   were not.

20   A.  Simply because they had a right to try to recover and      15:51:08

21   recoup their property from the area.

22   Q.  Did -- was there -- were -- strike that.

23        Were there any other questions that he asked you about

24   the traffic stop or the effect of the citation on him?

25   A.  Yes, sir.  He was concerned about his CDL.                 15:51:26

1  Q.  And what did you do in response to that question about the

2  CDL?

3  A.  I explained to him that unfortunately, I didn't know what

4  effect it would have, if any, at that time.

5  Q.  And when you mentioned CDL, what does -- what does that          15:51:39

6  stand for?

7  A.  Commercial driver's license.

8  Q.  Do I understand your testimony is that he was asking you,

9  If I get a citation, Deputy, do you know what effect this is

10  going to have on my commercial driver's license?                    15:51:52

11  A.  Correct.

12  Q.  All right.  At any time did you have any conversation with

13  anyone else in the -- in this truck?

14  A.  Yes, sir.

15  Q.  And who did you have a conversation with?                        15:52:02

16  A.  The female passenger.

17  Q.  And where was that female passenger seated?

18  A.  I believe in the front passenger seat.

19  Q.  Do you remember what the nature or substance of that

20  conversation was about?                                             15:52:15

21  A.  It was a very heated conversation with her.

22  Q.  I'm sorry, what did you say?

23  A.  It was a very heated conversation with her.  She became

24  very agitated.

25  Q.  And why do you say she became very agitated?                    15:52:24

1    A.  Because I was issuing her husband a traffic ticket while

2    other people were being allowed to pass.

3    Q.  And what did she say, if anything, to you?

4    A.  She wanted to know why -- basically why I was giving her --

5    him a specific ticket, and everyone else was being turned          15:52:39

6    around or being allowed down the roadway.

7    Q.  And what did you tell her in response?

8    A.  I explained to her about the damage to the boats and RVs,

9    and I couldn't -- explained to her also that I was dealing with

10   her and not dealing with the other people, another deputy was.     15:52:53

11   Q.  Did she accuse you of anything at all during this heated

12   conversation?

13   A.  Not at that time.

14   Q.  Okay.  At any other time did she accuse you of anything

15   that day?                                                          15:53:05

16   A.  Not that day, no, sir.

17   Q.  Okay.  Her husband testified, I believe the record will

18   reflect, that she accused you of something called selective

19   enforcement.  Does that refresh your recollection as to whether

20   or not she made any comment like that?                             15:53:19

21   A.  I don't believe she made that comment, but I -- it's been

22   five years.

23   Q.  All right.  Thank you, sir.

24        What happened after you issued the citation to

25   Mr. Rodriguez?                                                     15:53:31

1   A.  I went back to my vehicle and cleared the traffic stop, and

2   then drove westbound on Bartlett Dam Road.

3   Q.  And where -- where was the Rodriguez vehicle as you were

4   driving westbound on Bartlett Dam Road?

5   A.  In front of my vehicle.                                    15:53:46

6   Q.  And why were you traveling westbound?

7   A.  Basically, after the complication that she provided, I

8   basically wanted to take photographs of the Road Closed signs

9   for later representation in court.

10  Q.  Explain for me, what was it about your interaction with the  15:54:02

11  lady in the car that made you want to take pictures.

12  A.  Just her extreme aggravation and hatred towards me.

13  Q.  When you say hatred towards you, help me understand, what

14  was it about that that led you to conclude she had hatred for

15  you?                                                           15:54:26

16  A.  Just highly confrontational about the entire 10-minute

17  process that we were there.  Her verbal tones and accusations

18  that she was making.

19  Q.  And those photographs, you provided those during the course

20  of the litigation that brings us to the courtroom today?        15:54:40

21  A.  Yes, sir, I have.

22  Q.  And those were used during your deposition by the

23  plaintiffs' lawyers?

24  A.  Yes, sir.

25  Q.  Okay.  And let me ask, were you following -- let me back     15:54:47

1    up.

2            Was there any other route for you to head out

3    westbound other than Bartlett Dam Road?

4    A.  No, sir.

5    Q.  Was there any other way for you to get to the location      15:55:02

6    where you took photographs other than Bartlett Dam Road?

7    A.  No, sir.

8    Q.  Were you following the Rodriguezes in their vehicle for any

9    reason?

10   A.  To get to the intersection to take photographs.              15:55:17

11   Q.  Were you following them to intimidate them?

12   A.  No, sir.

13   Q.  Did you ever use your lights or siren, anything like that

14   with them?

15   A.  No, sir.                                                     15:55:28

16   Q.  At any time -- and I'm backing up a little bit.

17           After you issued the citation until you took the

18   photographs, did you ever get on a horn, a loudspeaker, and

19   tell them anything?

20   A.  No, sir.                                                     15:55:41

21   Q.  Did you ever get on a loudspeaker and tell them:  Move on,

22   You gotta move on, You gotta get out, anything like that?

23   A.  No, sir.

24   Q.  Okay.  Did the race or ethnicity of the occupants of that

25   vehicle play any role in your decision to drive westbound on     15:55:59

1    Bartlett Dam Road?

2    A.  No, sir.

3    Q.  Did the race or ethnicity of anyone in that vehicle play

4    any role whatsoever in your decision to take photographs of the

5    Road Closed sign?                                            15:56:11

6    A.  No, sir, they did not.

7    Q.  Okay.  Now, one final area, sir.

8          Did you make other traffic stops that day?

9    A.  Yes, sir.

10   Q.  And do you remember how many traffic stops that you -- you   15:56:21

11   made before you stopped what turns out to be the Rodriguez

12   vehicle?

13   A.  No, sir, I don't recall.

14   Q.  Can you give us an estimate, sir?

15   A.  I don't remember, sir.                                   15:56:34

16   Q.  Okay.  Do you remember generally what you did with those

17   people that you stopped?

18   A.  Handled them over to the Tonto National Forest law

19   enforcement officer.

20   Q.  Could you explain, please, why you handed them over to the   15:56:44

21   Tonto National Forest ranger?

22   A.  He was in the area also enforcing the road closed as well,

23   and we were working a partnership between the two.

24   Q.  Is -- do you have, as an MCSO deputy on Lake Patrol, do you

25   have primary jurisdiction, concurrent, or how would you       15:57:02

1  describe that relative to the forest ranger?

2  A.  We are contracted through the Tonto National Forest to

3  assist in law enforcement activity enforcing state laws on

4  federal land.

5  Q.  Okay.  The people that you refer to, the Tonto National                    15:57:16

6  Forest ranger, do you know what, generally, was the outcome of

7  those referrals?

8  A.  They were issued citations from him.

9  Q.  And how do you know that?

10  A.  He told me.  And I was standing there at the time.                        15:57:29

11  Q.  So you actually saw that?

12  A.  Yes, sir.

13  Q.  Plus he also told you.

14  A.  Yes, sir.

15  Q.  Do you remember the race or ethnicity of those people you                 15:57:37

16  referred to the Tonto National Forest ranger?

17  A.  No, sir, I don't.

18  Q.  Do you care what the race or ethnicity is of the people you

19  referred to the forest ranger?

20  A.  No, sir.                                                                  15:57:51

21       MR. CASEY:  Those are all the questions I have for

22  you, Deputy.  Thank you.

23       THE COURT:  Cross-examination?

24       MS. GALLAGHER:  Yes, Your Honor.  Thank you.

25                                                                               15:58:05

CROSS-EXAMINATION

BY MS. GALLAGHER:

Q.  Good afternoon, Deputy Ratcliffe.

A.  Good afternoon.

Q.  I just want to clarify a few things that you spoke about    15:58:14

during your examination.

        You work for Lake Patrol, that's right?

A.  Yes, ma'am.

Q.  And Lake Patrol covers recreational areas?

A.  Yes, ma'am.    15:58:25

Q.  And there's not many residences in those areas, is that

correct?

A.  There's a few.

Q.  Not many, though?

A.  Depends on how many "many" is, ma'am.    15:58:33

Q.  It's largely national forest area, is that correct?

A.  Yes, ma'am.

Q.  So there's not many residences, this is a national forest

area, is that correct?

A.  Yes, ma'am.    15:58:42

Q.  You were 287(g) certified in the past, that's correct?

A.  That's correct.

Q.  But you were never part of the Human Smuggling Unit,

correct?

A.  No, ma'am.    15:58:54

1  Q.  And you understand -- but you did go on saturation patrols,

2  is that correct?

3  A.  Yes, ma'am.

4  Q.  And you understood that part of your job on those

5  saturation patrols was to find and arrest undocumented                15:59:01

6  immigrants, is that correct?

7  A.  No, ma'am.

8  Q.  Have you ever felt at any time that it was part of your job

9  to find and arrest illegal aliens?

10  A.  Yes, ma'am.                                                       15:59:29

11  Q.  Now, your counsel asked some questions about some training

12  that you took regarding racial profiling, both at the academy

13  and during your 287(g) training, is that correct?

14  A.  Yes, ma'am.

15  Q.  And you testified that you were -- excuse me.  Strike that.       15:59:47

16          What was the definition of racial profiling that was

17  provided to you at the academy?

18  A.  Basically, any traffic stop conducted due simply to the

19  color of someone's skin.

20  Q.  And you were also trained on racial profiling at the 287(g)       16:00:07

21  training, is that correct?

22  A.  Yes, ma'am.

23  Q.  And what was the definition of racial profiling provided to

24  you at the 287(g) training?

25  A.  Very similar.                                                     16:00:20

1  Q.  And when you participated in saturation patrols, there was

2  no particular information given to you about crime spikes in

3  the areas, is that correct?

4  A.  No, ma'am.

5  Q.  And during those saturation patrols you did not collect any    16:00:42

6  information about the ethnicity of persons stopped, is that

7  correct?

8  A.  No, ma'am.

9  Q.  I want to turn to the stop of the Rodriguezes that we were

10  talking about, or that you were talking about with your counsel    16:00:57

11  earlier.

12        On that day you could observe, in particular at the

13  time you stopped the Rodriguezes, you could observe other

14  motorists on the same stretch of road as the Rodriguezes, is

15  that correct?    16:01:08

16  A.  Yes, ma'am.

17  Q.  And in fact, several of those other vehicles were stopped

18  by Deputy Multz?

19  A.  Correct.

20  Q.  And that occurred at the same time as you were dealing with    16:01:17

21  the Rodriguezes, correct?

22  A.  Approximately.

23  Q.  That occurred at the same time as you were dealing with the

24  Rodriguezes?

25  A.  Yes, ma'am.    16:01:25

1370

1    Q.  And he was still dealing with some of those other motorists

2    at the time that you concluded your stop with the Rodriguezes,

3    is that correct?

4    A.  I don't recall.

5    Q.  Do you recall the number of other motorists he dealt with          16:01:36

6    in the time that you dealt with the Rodriguezes?

7    A.  No, ma'am.

8    Q.  Do you recall that it was more than one?

9    A.  Like I stated, ma'am, I don't remember how many there were.

10   Q.  You don't recall whether or not it was more than one?          16:01:51

11   A.  I'm sure it probably was.  I was tied up writing a

12   citation.

13   Q.  So you believe it was more than one?

14   A.  Yes, ma'am.

15   Q.  And you knew the area was popular for off-roading, is that          16:02:03

16   correct?

17   A.  Correct.

18   Q.  And you knew that there was approximately two miles between

19   the Road Closed sign and where you were stationed at the Camp

20   Creek Wash, is that correct?          16:02:16

21   A.  Approximately a mile and a half.

22   Q.  And at the time that you pulled -- excuse me.

23          At the time that you pulled over the vehicle, had you

24   already decided whether you were going to give them a citation?

25   A.  Yes, ma'am.          16:02:28

1  Q.  And in fact you had decided you were going to give them a

2  citation, is that correct?

3  A.  Yes, ma'am.

4  Q.  And at that time you did not know whether David Rodriguez

5  had driven around the Road Closed sign, is that correct?          16:02:38

6  A.  Correct.

7  Q.  And at that time you did not know that there were children

8  in the car, is that correct?

9  A.  Correct.

10  Q.  And at that time you did not know whether or not David      16:02:45

11  Rodriguez had any property, including a boat, down at the

12  marina, is that correct?

13  A.  Correct.

14  Q.  And it's correct that David Rodriguez was driving towards

15  you prior to making a U-turn and prior to when you stopped him,  16:02:57

16  is that correct?

17  A.  Correct.

18  Q.  When you first approached the Rodriguez vehicle you asked

19  Mr. Rodriguez for his license, registration, and insurance?

20  A.  Correct.                                                     16:03:11

21  Q.  And also his Social Security number?

22  A.  Not at that time.

23  Q.  You did ask him for his Social Security number at some

24  point during the day?

25  A.  Yes, ma'am.                                                  16:03:18

```
 1    Q.  And you requested the Social Security number even though

 2    you had already received a valid ID and registration, is that

 3    correct?

 4    A.  That is correct.

 5    Q.  But you did not ask David about his military status, is      16:03:32

 6    that correct?

 7    A.  No, ma'am.

 8    Q.  You testified during your examination that you did not

 9    place the Road Closed sign that day, is that correct?

10    A.  That's correct.                                              16:03:53

11    Q.  In fact, no one from MCSO placed that sign?

12    A.  Not that I believe.

13    Q.  And you don't know who exactly did place the sign?

14    A.  No, ma'am.

15    Q.  Now, you also testified earlier that you did not recall the  16:04:03

16    passenger in the vehicle saying anything to the effect of it

17    was selective enforcement?

18    A.  No, ma'am.

19    Q.  I want to direct your attention to your -- excuse me.

20         MS. GALLAGHER:  May I approach the witness with a copy      16:04:20

21    of his deposition from October 15th, 2009?

22         THE COURT:  Sure.

23    BY MS. GALLAGHER:

24    Q.  I want to direct you to page 28 of the deposition I just

25    handed you, starting at line 20 -- 21, excuse me, and if you     16:04:44
```

1    could read along as I read out loud.

2         "Do you recall either of them saying anything along

3    the lines of, 'This appears to be selective enforcement'?

4         "Yes, sir," was your answer.

5         "QUESTION:  Who do you recall saying that?                16:04:58

6         "ANSWER:  The female passenger."

7         That was your recollection at the time of your

8    deposition?

9    A.  Yes, ma'am.

10   Q.  So it's fair to say that as you sit here today, your      16:05:06

11   recollection may not be exact as to the events that happened

12   that day?

13   A.  No, ma'am, it's been five years.

14   Q.  And after you gave Mr. Rodriguez a citation, you followed

15   him and his family up the road, is that correct?             16:05:23

16   A.  Yes, ma'am.

17   Q.  And in fact, you followed them for approximately two miles

18   or so?

19   A.  Approximately mile and a half.

20   Q.  And you were no more than two car lengths behind them for  16:05:31

21   that entire time, is that correct?

22   A.  Correct.

23   Q.  And as you were leaving the area, you had no problems

24   navigating the road, is that correct?

25   A.  That's correct.                                           16:05:43

1374

1    Q.   And the Rodriguezes had no problems navigating the road?

2    A.   I don't believe so.

3    Q.   When you conduct a traffic stop, is it regular practice to

4    call in the license plate of the vehicle before conducting the

5    stop?                                                              16:06:13

6    A.   Yes, ma'am.

7    Q.   And when you do that, the information that is returned

8    about the vehicle typically includes the registered owner's

9    name, is that correct?

10   A.   Not entirely.                                                 16:06:21

11   Q.   Is it typical that it includes the registered owner's name?

12   A.   I would probably give it a fifty-fifty.

13   Q.   So in approximately half the cases it includes the

14   registered owner's name?

15   A.   Yes, ma'am.                                                   16:06:33

16   Q.   Now, it's your understanding that in order to determine

17   someone's nationality, you would ask them questions about where

18   their parents were born, is that correct?

19   A.   Are you referring to the 287(g) program, ma'am?

20   Q.   Let's take it in that context.  In terms of the 287(g)       16:06:50

21   program, it was your understanding that in order to determine

22   someone's nationality, you would ask them questions about where

23   their parents were born?

24   A.   Correct.

25   Q.   You would ask them questions that would help you determine   16:06:58

1375

```
 1    their heritage?
 2    A.  Correct.
 3    Q.  And that would include questions such as where their
 4    parents were born?
 5    A.  Yes, ma'am.                                            16:07:06
 6            MS. GALLAGHER:  No further questions, Your Honor.
 7            THE COURT:  Redirect?
 8            MR. CASEY:  Briefly, Your Honor.  Thank you.
 9                      REDIRECT EXAMINATION
10    BY MR. CASEY:                                              16:07:18
11    Q.  Deputy Ratcliffe, you were asked a question by plaintiffs'
12    counsel about whether it was your job to find and arrest
13    illegal immigrants.
14            Do you remember that question?
15    A.  Yes, sir.                                              16:07:27
16    Q.  Could you tell us, what were your duties, generally, when
17    you were 287(g) certified?
18    A.  I was assigned to Lake Patrol Division.  It entailed
19    everything that encompasses Lake Patrol.
20    Q.  Okay.  And when you were on saturation patrols, could you  16:07:39
21    tell the Court what, generally, were your duties as -- when you
22    were on a saturation patrol as a -- as a deputy?
23    A.  Go out and look for different Title 28 violations and
24    contact the drivers.  If we saw anything suspicious, to contact
25    whoever was being suspicious, things along that nature.      16:07:55
```

1  Q.  Okay.  When you said Title 28, you're talking about moving

2  violations?

3  A.  Yes, sir.

4  Q.  Talking about equipment code violations?

5  A.  Yes, sir.                                                    16:08:05

6  Q.  And what were your duties if you had reasonable suspicion

7  that someone was in the vehicle that was unlawfully present?

8  What would happen then?

9  A.  I don't understand your question, sir.

10 Q.  Sure.  If you made a traffic stop for someone, say, that    16:08:19

11 had made an unsafe lane change in violation of 28, Title 28,

12 and you had then stopped the vehicle, and then through whatever

13 factors developed reasonable suspicion that a person in that

14 vehicle was unlawfully present in the United States, what would

15 you do then?                                                     16:08:39

16 A.  Could detain them at that time and contact ICE.

17 Q.  Okay.  And what authority did you use to detain them?

18 A.  Depends on the totality of the circumstances, sir.

19 Q.  Okay.  One of those authorities would have been your 287(g)

20 at the time?                                                     16:08:55

21 A.  At the time yes, sir.

22        MR. CASEY:  Okay.  Those are all the questions I have.

23 Thank you, sir.

24        THE COURT:  Thank you, Deputy.  You may step down.

25        THE WITNESS:  Thank you, sir.                             16:09:02

```
 1                THE COURT:  Next witness.
 2                MR. CASEY:  Your Honor defendants call, via videotape
 3      deposition, the ICE employee Jason Kidd.  And if I may have
 4      your indulgence, I may have to ask Ms. Zoratti to assist with
 5      the volume on this that will be piped through.              16:09:16
 6                THE COURT:  All right.  Let me ask a question or two.
 7                Have you edited the program to take out -- to reflect
 8      my rulings on the objections this morning?
 9                MR. CASEY:  Yes.  There were no objections on Kidd.
10                THE COURT:  None on Kidd.  Okay.                  16:09:32
11                MR. CASEY:  But I have on Pena, yes.
12                THE COURT:  Let me ask this as well.  Are you going to
13      run the tape straight so that it contains both your
14      designations and plaintiffs' designations?
15                MR. CASEY:  Yes, Your Honor.                      16:09:42
16                THE COURT:  And how much time should be designated to
17      you?
18                MR. CASEY:  Defendants are 47 minutes, plaintiffs 20
19      minutes, 55 seconds, a total of one hour and seven minutes.
20                THE COURT:  Okay.  Do you care if I stop you or do you 16:09:56
21      want to run all of that this afternoon?
22                MR. CASEY:  Your Honor, we're not going to be able to
23      get it through by 5:00, so whenever you decide we're done we
24      can use this as filler tomorrow for the balance.  Since it
25      is -- I don't have a problem with the Court like I would with  16:10:09
```

```
 1    the jury picking up and dropping off.

 2            THE COURT:  All right.  Let me ask you as well, it

 3    doesn't seem to me to serve any purpose to make the court

 4    reporter retranscribe everything that is played on the

 5    videotape.  Is there any sort of stipulation to just accept the      16:10:26

 6    transcript of the video -- of the deposition as acceptable?

 7            MS. GALLAGHER:  Your Honor, that -- that's fine with

 8    us, assuming that what's played on the video reflects the

 9    designations we agreed upon earlier, with the objections that

10    we stated earlier being excluded from -- I guess that's            16:10:44

11    actually only Pena's deposition, but from Pena's deposition,

12    that's -- we agree.

13            THE COURT:  All right.

14            MR. CASEY:  Your Honor, I will -- I agree with

15    Ms. Gallagher, and we will provide your court reporter with       16:10:56

16    only those designations that are played.

17            MS. GALLAGHER:  Your Honor, I believe, actually, the

18    court reporter has a copy of the designations already high -- a

19    transcript already highlighted with the designations, so it

20    would just be removing the one paragraph -- couple lines that     16:11:11

21    we agreed -- or that Your Honor ruled would be removed this

22    morning.

23            THE COURT:  All right.

24            MR. CASEY:  I have a highlighted -- I have a new one

25    of that, so we'll give that to Mr. Moll when we get to            16:11:21
```

1    Mr. Pena.

2              THE COURT:  All right.  Thank you.

3              MS. GALLAGHER:  Your Honor, one other issue before we

4    play the videotape.  It's our understanding that the video --

5    or the transcript itself is under protective order, that a                16:11:31

6    redacted version of the transcript has been approved by the

7    government to be released that redacted a couple names.

8              I'd asked Mr. Casey earlier if those names had been

9    removed from the videotape.  He said he thought so, but it

10   seemed as though he wasn't sure, so I wanted to verify that           16:11:48

11   those names have been removed to the videotape before it's

12   played in open court with other members present.

13             MR. CASEY:  I can only represent my understanding of

14   it that we are in complete compliance with all protective

15   orders.  That's including the protective order entered into          16:12:03

16   with the federal government.

17             What I would suggest is if this is a concern, I have

18   the ability to hit a mute button immediately.  I don't know how

19   else to proceed on that.

20             THE COURT:  Well, I want to proceed.  If you know            16:12:28

21   what's protective order in your agreement with the government

22   and you can hit a mute button, in case anything's there I

23   expect you to hit it.

24             MR. CASEY:  Thank you, sir.

25             THE COURT:  All right.                                          16:12:37

1          (Videotaped testimony from the Deposition of Jason

2    Douglas Kidd played as follows:)

3          "QUESTION:  Good morning, Mr. Kidd.  I'm Thomas Liddy,

4    and I represent Defendant Sheriff Joe Arpaio."

5          (Videotaped deposition paused.)                    17:24:44

6          MR. CASEY:  I need to plug in the volume.  Excuse me.

7          THE COURT:  Go ahead.

8          MR. YOUNG:  Your Honor, if Mr. Moll's going to be

9    released, there was the issue of three objections to

10   Dr. Camarota's testimony on the ground that it had not been --    16:13:23

11   his opinions had not been disclosed in the deposition or expert

12   reports.

13         I do have a citation in his deposition where I asked

14   him whether he had any other disagreements with Dr. Taylor and

15   he said no.  And should we present a written motion where we    16:13:37

16   can cite the --

17         THE COURT:  No.  What we're going to do is take that

18   up at 8:30 tomorrow morning.

19         MR. YOUNG:  All right.  Thank you.

20         THE COURT:  Thank you.                              16:13:48

21         MR. CASEY:  Thank you, Your Honor.

22         (Videotaped deposition continues.)

23         "QUESTION:  Thank you for joining us this morning.

24         "Would you please state your full name for the record.

25         "ANSWER:  Jason Douglas Kidd.                       17:28:24

 1           "QUESTION:  Okay.  And where do you reside?

 2           "ANSWER:  In Ittigen, Switzerland.

 3           "QUESTION:  Mr. Kidd, where are you currently

 4    employed?

 5           "ANSWER:  I'm the assistant attaché in Bern,                    17:31:17

 6    Switzerland, for Immigration and Customs Enforcement.

 7           "QUESTION:  And are you stationed at the United States

 8    Embassy?

 9           "ANSWER:  I am.

10           "QUESTION:  And how long have you worked there?             17:33:06

11           "ANSWER:  Since August of 2010.

12           "QUESTION:  And where did you work immediately

13    preceding that posting?

14           "ANSWER:  I was the deputy special agent in charge in

15    Phoenix, Arizona -- acting deputy special agent in charge in      17:33:32

16    Phoenix, Arizona, for ICE.

17           "QUESTION:  Is that position sometimes referred to in

18    all caps as the DSAC Phoenix?

19           "ANSWER:  Yes.

20           "QUESTION:  And when did you start working as the DSAC   17:36:17

21    Phoenix?

22           "ANSWER:  In September 2009.

23           "QUESTION:  Okay.  And prior to serving as the deputy

24    special agent in charge in Phoenix, where were you employed?

25           "ANSWER:  In Phoenix, Arizona, as the assistant             17:37:12

```
 1   special agent in charge from 2008.

 2            "QUESTION:  Also at ICE?

 3            "ANSWER:  Yes.

 4            "QUESTION:  Prior to that?

 5            "ANSWER:  In Phoenix, Arizona as a group supervisor      17:37:31

 6   for ICE.

 7            "QUESTION:  And when did that begin?

 8            "ANSWER:  July 2006.

 9            "QUESTION:  How long have you been working with ICE?

10            "ANSWER:  Since its beginning in February 2003 or       17:37:50

11   March 2003.

12            "QUESTION:  And would you tell us your assignments

13   from February 2003 up until July 2006.

14            "ANSWER:  In February 2003, I was a special agent in

15   Houston, Texas.  And I transferred in 2- -- well, I transferred  17:38:54

16   to Atlanta, Georgia, in July 2003.  And then in July 2006, as a

17   group supervisor in Atlanta, Georgia.  In July 2006, I

18   transferred to Phoenix as a group supervisor -- excuse me --

19   supervisor.

20            "QUESTION:  Thank you.                                  17:39:38

21            "Prior to your employment with ICE, where were you

22   employed?

23            "ANSWER:  The Immigration and Naturalization Service.

24            "QUESTION:  That was prior to the creation of the

25   Department of Homeland Security?                                 17:40:22
```

```
1              "ANSWER:  That's correct.

2              "QUESTION:  Okay.  Now, what were your

3      responsibilities as the DSAC?

4              "ANSWER:  Excuse me.  I was responsible for all of

5      ICE's activities for the counties, Pinal County and north and      17:40:43

6      out to Yuma.  Because there's -- there's another deputy special

7      agent in charge in Tucson that has the southern part of

8      Arizona.

9              "QUESTION:  Would you describe for us ICE's

10     activities.                                                        17:41:11

11             "ANSWER:  ICE covers a wide range of different crimes,

12     anywhere from prosecuting child pornography cases, gang members

13     that are in the country legally -- illegally, I should say.

14     Financial crimes.  Asset removal.

15             "There's several -- I mean, just several different        17:42:38

16     things that ICE does, including immigration violations, customs

17     fraud, immigration fraud.  I think the list is very long.

18             "QUESTION:  What is the 287(g) program?

19             "ANSWER:  The 287(g) program was designed and -- and

20     started -- I should say was used to -- as a force multiplier to    17:44:22

21     be able to give state and local law enforcement the ability to

22     enforce immigration laws.

23             "QUESTION:  So is it your understanding that the

24     287(g) program only acted as a force multiplier for ICE's

25     activities with regard to immigration law?                         17:45:04
```

1        "Did you personally work directly with Maricopa County

2   Sheriff's Office employees that were certified under the 287(g)

3   program?

4        "ANSWER:  We didn't work in the same building or

5   anything of that nature.  I worked closely with them on the        17:50:22

6   program and the implementation of it.

7        "QUESTION:  Right.  Well, I want to narrow the scope

8   of the question to the DSAC responsibilities only with respect

9   to your activities with Maricopa County Sheriff's Office 287(g)

10  certified officers.                                                17:51:48

11       "ANSWER:  Okay.

12       "QUESTION:  What activities did you undertake in that

13  regard?

14       "ANSWER:  The activities would be consulting with the

15  Maricopa County, their command staff, and looking into any type   17:54:25

16  of situation that may arise that would cause question and

17  reporting back to the ICE headquarters and to others on the

18  activities.

19       "QUESTION:  Whom did you meet with in the command

20  staff of the Maricopa County Sheriff's Office when you were        17:56:25

21  undertaking those responsibilities?

22       "ANSWER:  I met with Sheriff Arpaio on many occasions.

23  Chief Brian Sands.  Chief Jerry Sheridan.  Occasionally Ray

24  Churay from Maricopa, but not necessarily with the 287 program.

25  Lieutenant Joe Sousa.  Lieutenant Irene Irby.                      17:57:33

1    "QUESTION:  Did you ever accompany Maricopa County

2    Sheriff's Office law enforcement personnel that were 287(g)

3    certified to the field when they were utilizing their 287(g)

4    authority?

5         "ANSWER:  No.                                              17:58:23

6         "QUESTION:  While you were coordinating with the

7    Maricopa County Sheriff's Office, were you provided advance

8    notice of their 287(g) certified officers being deployed to the

9    field to use their 287(g) authority?

10        "ANSWER:  I wasn't told they were going to use their        17:59:00

11   authority.  I was told that there were operations that were

12   going to take place that may encompass that authority.  Or

13   notified.

14        "QUESTION:  All right.  And generally speaking, how

15   much advance notice would you receive from them prior to them    18:00:06

16   going operational?

17        "ANSWER:  The time varied.  Some operations I knew two

18   weeks in advance.  Some operations I didn't find out till the

19   day before.

20        "QUESTION:  And were there some instances when you did      18:00:39

21   not find out until the operations were ongoing or after they

22   had occurred?

23        "ANSWER:  Not that I recall.

24        "QUESTION:  Were you involved in any way in the

25   training of Maricopa County Sheriff's Office personnel who       18:01:03

```
 1    became 287(g) certified?

 2            "ANSWER:  Yes.

 3            "QUESTION:  Would you describe your involvement.

 4            "ANSWER:  In 2007, I began coordinating the classes,

 5    bringing in instructors, instructing and putting together          18:01:19

 6    background packets and getting the background interviews and

 7    coordinating those with Maricopa County and with ICE

 8    headquarters.

 9            "QUESTION:  Did you provide any of the training

10    yourself?                                                           18:01:47

11            "ANSWER:  Yes.

12            "QUESTION:  And what aspects of the training did you

13    provide?

14            "ANSWER:  There's a course or a block of instruction

15    where they want to know -- where they have the local people        18:01:55

16    talk about how 287(g) and the laws are implemented within the

17    local district.  Since the instructors are from the academy,

18    they don't know how things actually work in each district.  So

19    they have the local people instruct in that block.

20            "QUESTION:  Okay.  So the faculty for this training        18:02:35

21    came from outside Arizona?

22            "ANSWER:  Most of the time.

23            "QUESTION:  And so they were not familiar with some of

24    the local activities in Customs?

25            "ANSWER:  Correct.                                         18:03:25
```

1    "QUESTION:  And so you filled that gap as part of the

2    training for the 287 certified officers?

3    "ANSWER:  Yes.

4    "QUESTION:  Can you give us some specific examples of

5    some of the information which you would provide to your              18:04:14

6    students in that regard?

7    "ANSWER:  One of the specific examples I would talk

8    about would be our alien smuggling activities within Arizona,

9    what ICE does, a general overview of ICE and their

10   responsibilities and how our alien smuggling program works        18:04:46

11   within and compliments the 287(g) program.

12   "QUESTION:  Did you ever discuss the issue of racial

13   profiling with your students when you were part of the

14   certification process?

15   "ANSWER:  I don't recall ever bringing that subject up    18:07:50

16   to the students in the classroom setting.

17   "QUESTION:  Do you know if other faculty members in

18   this 287 certification process raised the issue of racial

19   profiling?

20   "ANSWER:  Yes.  There's a course of instruction on the    18:08:18

21   use of race and some other related topics that are part of the

22   curriculum, and I was there for several of those courses.

23   "QUESTION:  Would you describe for us the information

24   that was provided the students regarding racial profiling.

25   "ANSWER:  The curriculum includes the Department of       18:09:23

1    Justice use of race memorandum or training that came out in

2    2003.

3            "QUESTION:  Is that sometimes referred to as the DOJ

4    guidelines?

5            "ANSWER:  Yes.  And there's a course of instruction          18:10:18

6    where they talk about -- they go over that.  It's at least an

7    hour.  It could be two hours.

8            "QUESTION:  Is there anything else that you recall

9    about racial profiling in the certification process other than

10   the DOJ guidelines?                                                 18:10:49

11           "ANSWER:  Some of the statutory authority and issues

12   of probable cause, reasonable suspicion and other policy -- ICE

13   policy is discussed around that time frame.

14           "QUESTION:  What is racial profiling?

15           "ANSWER:  It's the use of race to -- as a determining       18:11:10

16   factor for a law enforcement activity.

17           "QUESTION:  And what do you mean by determining

18   factor?

19           "ANSWER:  To single out or decide to use their race as

20   a means of deciding which person you encounter or talk to.         18:11:35

21           "QUESTION:  Does racial profiling entail using race as

22   the sole factor in making determinations about law enforcement

23   decisions?

24           "ANSWER:  No.  It's -- it talks about using it ever as

25   a factor is what the guidelines talk about.                        18:12:04

```
 1              "QUESTION:  Is racial profiling illegal?

 2              "ANSWER:  I don't know that there's a law.  I know

 3      that there are lawsuits about it.  I would have to look at it

 4      to see if there's anything.

 5              "QUESTION:  In your experience working in federal law      18:13:15

 6      enforcement, do you understand that the use of racial profiling

 7      by law enforcement personnel is improper?

 8              "ANSWER:  Yes.

 9              "QUESTION:  Are you familiar with the term saturation

10      patrol?                                                          18:13:40

11              "ANSWER:  Yes.

12              "QUESTION:  What is a saturation patrol?

13              "ANSWER:  The way I'm most familiar with it is the way

14      Maricopa County was -- or is using saturation patrol to bring

15      in extra officers to an area to look for violations of state    18:14:54

16      law and encounter those people.

17              "QUESTION:  Are you aware of saturation patrols used

18      as a tactic by law enforcement agencies outside of Maricopa

19      County?

20              "ANSWER:  Yes.  I've heard of other and talked to        18:15:18

21      other law enforcement that -- and they may call it something

22      different, but they -- they talk about going after crime using

23      this type of method.

24              "QUESTION:  Is that outside of Arizona?

25              "ANSWER:  Yes.                                           18:15:56
```

1     "QUESTION:  And in other areas in Arizona but outside

2  of Maricopa County?

3     "ANSWER:  I don't recall any outside of -- inside

4  Arizona but outside Maricopa County.

5     "QUESTION:  Did you ever attend any saturation patrols      18:17:28

6  in Maricopa County?

7     "ANSWER:  I went to the command center on occasion

8  during some of the saturation patrols.

9     "QUESTION:  And what is the command center for a

10  saturation patrol?                                              18:17:46

11     "ANSWER:  The command center's where the large

12  vehicles and tables and things of that nature are set up to be

13  able to process and talk to all the people encountered during

14  the saturation patrol.  It may include a processing vehicle, a

15  van or a wagon to be able to take people that are arrested.     18:18:04

16  Media area.  Things of that nature.

17     "QUESTION:  Was there communications equipment at the

18  command center?

19     "ANSWER:  Yes.

20     "QUESTION:  Do you recall whether that communications     18:18:50

21  equipment was used to communicate from the command center to

22  287(g) certified personnel in the field during the saturation

23  patrol?

24     "ANSWER:  I wouldn't know.

25     "QUESTION:  Would it be accurate to describe your          18:20:39

1    activities at the command center as observer?

2          "ANSWER:  Yes.

3          "QUESTION:  Okay.  With regard to this question, I'm

4    only interested in the area of the saturation patrol in which

5    you were present at the command post.                          18:21:01

6          "ANSWER:  On at least one of the saturation patrols,

7    it was in Guadalupe, and I went out to that.  And it was in --

8    the command center was in Guadalupe.

9          "QUESTION:  Did you visit the command center for a

10   saturation patrol in Mesa?                                     18:24:58

11         "ANSWER:  I don't recall.

12         "QUESTION:  Did you visit the command center during a

13   saturation patrol in Phoenix?

14         "ANSWER:  At least one of them, I did.

15         "QUESTION:  Did you visit the command center at a        18:25:56

16   saturation patrol in Fountain Hills?

17         "ANSWER:  No.

18         "QUESTION:  Approximately how many times did you visit

19   the command center during a saturation patrol?

20         "ANSWER:  I can only recall two."

21         (Videotaped deposition paused.)

22         MR. CASEY:  Your Honor, Tim Casey, for the record.

23         I just want to put on the record that I'm going to hit

24   the mute for a designation at page 29, line 22, and line 25,

25   which contains a name.  It's not marked out on my hard copy, so

1    I just want to alert the Court that I'm going to be doing that.

2            THE COURT:  Okay.

3            (Videotaped deposition continues.)

4            "QUESTION:  Can you recall -- can you recall when

5    those two were?                                                    18:27:33

6            "ANSWER:  No, not without some research.

7            "QUESTION:  Why did you attend those saturation

8    patrols?  Or let me rephrase that.

9            "Why did you visit the command post during those

10   saturation patrols?                                                18:28:07

11           "ANSWER:  We were informed that they were -- through

12   Maricopa County would likely encounter subjects and be using

13   the 287(g) authority, and we went out to observe and be able to

14   have people on scene if there were questions once the authority

15   was used.                                                          18:28:31

16           "QUESTION:  Do you recall whether there any -- do you

17   recall whether any questions arose during the saturation

18   patrols that you visited in either Guadalupe or Phoenix?

19           "ANSWER:  I recall in Guadalupe there was at least one

20   question, and it was fielded by someone else that I had come      18:29:16

21   out.

22           "QUESTION:  Do you recall who that person was?

23           "ANSWER:  ███████████████.

24           "QUESTION:  Do you recall what the question was?

25           "ANSWER:  No.                                              18:29:45

1     "QUESTION:  At the time, was ██████████████ an

2  employee of ICE?"

3     "ANSWER:  Yes.

4     "QUESTION:  While you were visiting the command post

5  in Guadalupe, did you observe any activity by MCSO 287(g)          18:49:08

6  certified personnel that was outside conformance with the MOA?

7     "ANSWER:  No.

8     "QUESTION:  When you were visiting the command post

9  during the saturation patrol in Phoenix, do you recall

10  observing any activity by Maricopa County Sheriff's Office         18:51:03

11  certified personnel that was outside the conformity with the

12  MOA?

13     "ANSWER:  No.

14     "QUESTION:  Did you ever express in writing to the

15  Maricopa County sheriff or any Maricopa County Sheriff's Office   18:52:46

16  command personnel any criticism of its use of crime suppression

17  patrols?

18     "ANSWER:  Not that I recall.

19     "QUESTION:  Are you familiar with the term zero

20  tolerance?                                                         18:53:32

21     "ANSWER:  Yes.

22     "QUESTION:  What is zero tolerance?

23     "ANSWER:  In the law enforcement setting, zero

24  tolerance is used to describe encountering, talking to and

25  citing or prosecuting anything within the purview or sight of     18:53:46

1    the law enforcement officer in that particular area at that

2    particular time.

3            "QUESTION:  Is it your understanding that zero and

4    tolerance -- excuse me.  Is it your understanding that zero

5    tolerance, when employed in that regard, involves all statutes    18:54:16

6    or just specified criminal statutes?

7            "ANSWER:  It's my understanding that it involves all

8    style -- all statutes that they're eligible to prosecute or

9    enforce.

10           "QUESTION:  Are you aware whether Maricopa County    18:54:49

11   Sheriff's Office 287(g) personnel -- let me withdraw that

12   question.  Start again.

13           "In your experience as the DSAC in Phoenix, were you

14   ever aware of the Maricopa County Sheriff's Office employing

15   the tactic of zero tolerance?    18:55:28

16           "ANSWER:  I don't remember receiving anything that

17   used those words.

18           "QUESTION:  While you were serving as the DSAC in

19   Phoenix, were you aware that Maricopa County sheriff's officers

20   could encounter a subject that could be charged in Arizona laws    18:56:39

21   and not federal immigration laws?

22           "ANSWER:  Yes.

23           "QUESTION:  Would that include traffic violations?

24           "ANSWER:  Yes.

25           "QUESTION:  When you were serving as DSAC in Phoenix,    18:57:47

1    were you aware that subjects encountered during saturation

2    patrols could be charged with violations of Arizona law,

3    including traffic violations?

4          "ANSWER:  Yes.

5          "QUESTION:  While you were serving as DSAC, were you          18:58:22

6    aware that Maricopa County Sheriff's Office crime suppression

7    patrols also encountered individuals that were charged with not

8    having legal status as aliens present in the United States?

9          "ANSWER:  Yes.

10         "QUESTION:  Did you ever express in writing any               18:59:25

11   concern to Maricopa County Sheriff or sheriff's office

12   personnel that you had regarding MCSO personnel identifying

13   aliens without legal status present in the United States during

14   civil traffic stops?

15         "ANSWER:  I don't recall having -- putting anything in       19:00:01

16   writing about that.

17         "QUESTION:  How about verbally?

18         "ANSWER:  We may have talked about -- or I recall

19   talking to them about how these saturation patrols went and

20   whether or not they were citing people that they encountered    19:00:28

21   with traffic violations and things of that nature.

22         "QUESTION:  Do you remember to whom you spoke on that

23   topic?

24         "ANSWER:  I'm pretty sure I spoke to Joe Sousa.

25         "QUESTION:  Do you recall ever expressing your             19:00:49

1    concerns that MCSO was identifying aliens without legal status

2    present in the United States during civil traffic stops to your

3    superiors in ICE?

4         "ANSWER:  We had internal discussions about how the

5    operations were going.  I wouldn't say they were concerns.  It          19:01:10

6    was just discussions of whether that was within the scope of

7    the MOA.

8         "QUESTION:  While you were serving as the DSAC in

9    Phoenix, did you ever review operations plans of the MCSO

10   287(g) certified personnel?                                            19:01:38

11        "ANSWER:  The operations plans were dealing with state

12   crime, not 287(g).

13        "QUESTION:  And how do you know that?

14        "ANSWER:  I reviewed the operations plans, and they

15   were talking about prosecuting state crime.                            19:03:23

16        "QUESTION:  So the answer is, yes, you did review the

17   operations plans?

18        "ANSWER:  Operations plans, yes.

19        "QUESTION:  Okay.  Why did you review the operations

20   plans?                                                                 19:03:48

21        "ANSWER:  They were sent to me in advance as a

22   notification.

23        "QUESTION:  Why were they sent to you if they did not

24   involve potential use of 287(g) authority?

25        "ANSWER:  They were sent to me because they were                  19:04:12

1    operations that the Human Smuggling Unit was doing, and they

2    could involve the use of 287(g).  So they would send them to

3    me.

4            "QUESTION:  What is the Human Smuggling Unit?

5            "ANSWER:  It's a group within Maricopa County                    19:04:44

6    Sheriff's Office of deputies and detention officers that work

7    human smuggling within the County of Arizona.

8            "QUESTION:  Did you ever meet with any of the members

9    of the Maricopa County Sheriff's Office Human Smuggling Unit?

10           "ANSWER:  Yes.                                                    19:05:53

11           "QUESTION:  Were any of them Hispanic?

12           "ANSWER:  Yes.

13           "QUESTION:  Were more than one of them Hispanic?

14           "ANSWER:  Yes.

15           "QUESTION:  Did you ever review shift summaries of the           19:06:13

16   Maricopa County Sheriff's Office?

17           "ANSWER:  Yes.

18           "QUESTION:  What is a shift summary?

19           "ANSWER:  The shift summary was a document prepared

20   and transferred -- or transmitted to ICE regarding like a              19:06:35

21   post-action report of an operation and entailed several details

22   of that operation.

23           "QUESTION:  What were some of the types of details

24   that would be included in a shift summary?

25           "ANSWER:  A shift summary would include a number of             19:06:57

1  arrests, number of aliens that were arrested of those -- of the

2  total number arrested, how many of those were illegal aliens.

3  It would include how many -- where -- what country they were

4  from, the male or female, juvenile or adult, custody status,

5  how they were processed, the way they were encountered and also   19:07:31

6  the other -- usually how many warrants were cleared based on

7  the shift.

8      "QUESTION:  Did the shift reports only include

9  information on individuals that were arrested?

10      "ANSWER:  No.                                                 19:08:12

11      "QUESTION:  What other information did the shift

12  summaries include other than about individuals that were

13  arrested?

14      "ANSWER:  Sometimes if there was a -- an incident or

15  something strange that would happen, they would put a note in   19:08:25

16  there so that we would be aware of things that would happen

17  within the media and things like that.  How many protesters

18  might be out or -- or anything of that nature.

19      "QUESTION:  Was there any information in the shift

20  summaries that you reviewed regarding the ethnicity of          19:08:47

21  individuals encountered by Maricopa County Sheriff's personnel

22  during one of these operations?

23      "ANSWER:  No.

24      "QUESTION:  Were there -- was there any information in

25  the shift summaries regarding individuals that were encountered   19:09:21

1    but were not arrested present in the shift summaries?

2          "ANSWER:  Not that I really recall other than what I

3    mentioned before of incidents.

4          "QUESTION:  Was it part of your responsibility as the

5    DSAC in Phoenix to handle inquiries from the field via the          19:11:28

6    telephone?

7          "ANSWER:  Not as the DSAC, no.

8          "QUESTION:  Was it ever part of your responsibility to

9    handle inquiries from the field via the telephone -- telephone?

10         "ANSWER:  Yes, when I was a group supervisor.          19:12:14

11         "QUESTION:  Tell me about that responsibility.

12         "ANSWER:  When Maricopa County would exercise their

13   287(g) authority following an -- an encounter and the clearance

14   of all state law or state violations, they would then talk to

15   the person about their alienage.  And occasionally they would          19:12:40

16   have questions as to whether they could detain, transport,

17   whether the -- and other technical questions regarding

18   determining -- determining alienage, and they would call me.

19         "QUESTION:  And would you answer the questions

20   yourself?          19:13:19

21         "ANSWER:  Either myself or one of the people that

22   worked for me would, yes.

23         "QUESTION:  Did ICE supervise the Maricopa County

24   Sheriff's Office when it was exercising its 287(g) authority?

25         "ANSWER:  Yes.          19:14:00

1    "QUESTION:  Describe for me, if you will, how that

2  supervision was carried out.

3    "ANSWER:  It depended on what operation and where they

4  might be.  In general, it would take place telephonically at

5  first, and then later on review of the documents produced and      19:14:23

6  signatory authority to sign those charging documents and accept

7  those aliens into ICE custody from Maricopa County.

8    "QUESTION:  Would the biographical data in the

9  charging sheets include country of origin?

10    "ANSWER:  Yes.                                                    19:15:18

11    "QUESTION:  Ethnicity?

12    "ANSWER:  No.

13    "QUESTION:  Sex?

14    "ANSWER:  Well, actually, it -- I'm trying to think

15  what the -- the term.  There is a place where it says            19:15:39

16  white/black.  That's about -- I mean...

17    "QUESTION:  Is it your recollection that it includes

18  only white/black, or might there also be other potential

19  options, such as Latino or Hispanic or Asian?

20    "ANSWER:  I believe Asian is one.  The FBI does not            19:16:38

21  accept Hispanic or Latino.  It's either white, black, Asian and

22  I think other.  But Hispanics are not put into either of

23  those -- any of those.  They're just put into white.

24    "QUESTION:  So is it your understanding that it's the

25  practice of federal law enforcement that when they take into      19:17:08

1   custody and charge an individual who is Hispanic or Latino,

2   that they are categorized as white?

3           "ANSWER:  Correct.

4           "QUESTION:  Can you describe for me any other

5   activities you undertook in your -- in carrying out your duties    19:18:27

6   as supervising MCSO 287(g) -- 287(g) personnel.

7           "ANSWER:  Coordinating training.  Recurring training.

8   Signing documents.  Answering questions.  Setting up equipment.

9   Getting computer equipment put into the processing locations

10  and reviewing those locations.    19:19:14

11          "Basically implementing the program.

12          "QUESTION:  Okay.  Would you describe for me some of

13  the recurring training of 287(g) personnel for Maricopa County

14  Sheriff's Office that was conducted while you were working for

15  ICE in Phoenix.    19:19:41

16          "ANSWER:  The -- excuse me.  The training included

17  online courses.

18          "QUESTION:  This is the recurring training?

19          "ANSWER:  Yes.

20          "QUESTION:  Okay.    19:20:11

21          "ANSWER:  Online courses that were required in order

22  to keep the certification and compete -- to keep access to ICE

23  computers.  It also included a post-academy class or secondary

24  academy class, where they would travel to Charleston to receive

25  additional training and refresher training, is what it was    19:20:37

1    called.  And we coordinated that training also.

2            "QUESTION:  Sure.  Were you ever aware of MCSO 287(g)

3    certified personnel using race to determine whether or not to

4    make a traffic stop?

5            "ANSWER:  No.                                          19:21:30

6            "QUESTION:  Were you ever aware of MCSO 287(g)

7    personnel using race when using their 287(g) authority?

8            "ANSWER:  No.

9            "QUESTION:  So is it your testimony that prior to

10   receiving information about this lawsuit, you did not know of   19:22:20

11   any allegations against Maricopa County Sheriff's Office

12   personnel regarding racial profiling?

13           "ANSWER:  I was not notified of any allegations.  I

14   read them in the paper like everyone else.

15           "QUESTION:  Were you ever asked by your supervisors to  19:22:53

16   investigate allegations of racial profiling by Maricopa County

17   Sheriff's Office law enforcement personnel that were 287(g)

18   certified?

19           "ANSWER:  No.

20           "MR. LIDDY:  34.  May I ask you to mark that as         19:23:31

21   Exhibit 34."

22           (Videotaped deposition paused.)

23           MR. CASEY:  Your Honor, Tim Casey again, interrupt.

24           There is a series of questions and the answers

25   beginning at page 45 that I'm not confident have been deleted

```
 1    that I believe are pursuant to the protective order, so I
 2    wanted to let the Court know at page 46, line 8, I'm going to
 3    be deleting a name; at page 46, line 12, deleting a name; line
 4    13, deleting a name; and then at page 47, line 17 and 18 I'll
 5    be deleting a name.  If the Court needs further continuity,
 6    we'll provide the transcript to the Court, but you will hear
 7    pauses.
 8              (Videotaped deposition continues.)
 9              "QUESTION:  Have you ever seen this document before?
10              "ANSWER:  Yes.                                        19:24:27
11              "QUESTION:  And when did you see it before?
12              "ANSWER:  I was during the time forwarded a copy of
13    these statistics from ████████████████.
14              "QUESTION:  Is that while you were serving as the
15    DSAC?                                                           19:24:54
16              "ANSWER:  I was probably an ASAC at the time since
17    it's in March of 2008.
18              "QUESTION:  Who is ████████████████?
19              "ANSWER:  ████████████████ is the field office director
20    for the Office of Enforcement Removal Operations, Phoenix,      19:26:25
21    Arizona.
22              "QUESTION:  And, as you understand them, what were her
23    responsibilities serving in that capacity?
24              "ANSWER:  She's responsible for all of the detention
25    and removal operations within the state and to include custody 19:26:44
```

1    of aliens and things of that nature.

2         "QUESTION:  What's the significance of the statistics

3    presented in this e-mail?

4         "ANSWER:  The statistics were sent to us, and

5    basically saying how many people Maricopa County has                    19:27:08

6    encountered and removed since the program began, and they were

7    provided to us on a recurring basis.

8         "QUESTION:  And when you say the program, are you

9    referring to the 287(g) program?

10        "ANSWER:  Yes.                                                      19:27:38

11        "QUESTION:  In your opinion, are those numbers high?

12        "ANSWER:  I can say they were -- they were the highest

13   numbers in the country.

14        "QUESTION:  I've asked the court reporter to mark as

15   Exhibit Number 35 a document Bates numbered ICE 497, which on           19:28:03

16   its face appears to be an e-mail from █████████████████████

17   to ████████████████████████ dated February 28th, 2008.

18        "Give you a moment to look at that document.

19        "ANSWER:  Uh-huh.  Yes.

20        "QUESTION:  Have you ever seen this document before?               19:29:57

21        "ANSWER:  This, I assume I have.  I -- I would get

22   these stamped things.  But we get them every -- we would get

23   them mostly every month, so...

24        "QUESTION:  So this is similar to Exhibit Number 34?

25        "ANSWER:  Yes.                                                     19:30:19

 1            "QUESTION:  So it also presents -- is this an update

 2      of statistics?

 3            "ANSWER:  Well, it's --

 4            "QUESTION:  Of the 287(g) program?

 5            "ANSWER:  Yes.                                          19:31:01

 6            "QUESTION:  Would you say that this -- that these

 7      statistics are also high?

 8            "ANSWER:  Yes, they're high.

 9            "QUESTION:  Would you say they represented the highest

10      in the country at that time?                                19:32:47

11            "ANSWER:  Yes.

12            "QUESTION:  Was it your understanding that Maricopa

13      County Sheriff's Office personnel could use their state police

14      authority to enforce traffic violations and they did not need

15      to use 287(g) authority to enforce those traffic violations?  19:33:45

16            "ANSWER:  Yes.

17            "QUESTION:  While you were serving in Phoenix, were

18      you aware of Maricopa County Sheriff's Office employees

19      enforcing any state law, traffic or otherwise, using their

20      287(g) authority?                                           19:34:22

21            "ANSWER:  I don't really understand the question.  But

22      to use that -- that authority.  They're two different things.

23            "QUESTION:  Okay.  Well, that answers the question to

24      my satisfaction.  Maybe to make the record clear -- well, let

25      me ask you something.  What do you mean by they're two       19:34:48

1    different things?

2            "ANSWER:  The 287(g) gives you a certain set of

3    authorities to enforce those -- those immigration laws.  The --

4    being a deputy of the state for the State of Arizona or County

5    gives you a certain set of authorities to enforce state laws.        19:35:12

6    And they're two separate laws.

7            "QUESTION:  So by immigration law, you mean federal

8    law?

9            "ANSWER:  Yes.

10           "QUESTION:  So by your understanding, a Maricopa        19:35:45

11   County Sheriff's Office employee who was certified by 287(g)

12   can still use his state police authority to enforce state law

13   without using the 287(g) authority?

14           "ANSWER:  Correct.

15           "QUESTION:  Did ICE have the authority to supervise        19:36:02

16   the Maricopa County Sheriff's Office personnel when -- while

17   they were enforcing state laws?

18           "ANSWER:  No.

19           "QUESTION:  Does the Maricopa County Sheriff's Office

20   have state authority to conduct immigration enforcement        19:36:42

21   operation?

22           "ANSWER:  The Maricopa County Sheriff's Office has the

23   authority to enforce the state laws, and some of those laws do

24   include immigration related matters.

25           "QUESTION:  Okay.  And the subject line is AZ Civil        19:37:18

Rights Advisory Board on 287(g) with Maricopa County.

"While you were working in Phoenix, were you familiar with the Arizona Civil Rights Advisory Board?

"ANSWER:  I knew they existed.  I didn't really have any dealings with them.

"QUESTION:  This e-mail represents that that letter -- in that letter, there was a request for an investigation be initiated regarding allegations of civil rights violations.

"Does that refresh your recollection as to whether or not you would have seen that letter?

"ANSWER:  No, it doesn't refresh.

"QUESTION:  While you were working in Phoenix, were you aware that such an investigation was requested?

"ANSWER:  Yes.

"QUESTION:  Do you know whether such an investigation was initiated?

"ANSWER:  No.

"QUESTION:  Were you ever interviewed as part of such an investigation?

"ANSWER:  No.

"QUESTION:  A fourth bullet point on that subcategory reads, 'MCSO utilizes their state statutory authority routinely when encountering aliens.'

"Does that conclusion comport with your experience while serving in Arizona?

1    "ANSWER:  Yes.

2    "QUESTION:  Were you present when Mr. Melendres was

3    arrested?

4    "ANSWER:  No.

5    "QUESTION:  Did you ever interview any ICE employees        19:43:39

6    who were present at the time he was arrested?

7    "ANSWER:  No.

8    "QUESTION:  Did you ever interview any 287(g)

9    authorized MCSO employees that were present?

10   "ANSWER:  Not that I recall.                                19:44:15

11   "QUESTION:  Do you recall when you first learned about

12   the arrest of Mr. Melendres?

13   "ANSWER:  It was pretty close to the time of the

14   incident, but I don't remember exactly when.

15   "QUESTION:  Do you remember who brought the                 19:44:29

16   information to you?

17   "ANSWER:  No.

18   "QUESTION:  Do you remember what you learned about the

19   arrest of Mr. Melendres at that time?

20   "ANSWER:  I learned that he was released, I remember,       19:44:38

21   and that there was some -- some questions about it.

22   "QUESTION:  Do you recall what the questions were?

23   "ANSWER:  It had to do with his -- whether or not he

24   was working in the United States and whether he was -- whether

25   he should have been released or not.                        19:45:00

1    "QUESTION:  How would the information about whether a

2    particular detainee was working in the United States or not

3    affect the decision as to whether or not that individual should

4    be released or detained in Maricopa County jail?

5    "ANSWER:  The release or detention wasn't based on            19:45:34

6    Maricopa County or state crimes.  This was a -- more of a

7    287(g) federal immigration violation.

8    "QUESTION:  Okay.  So with respect to the enforcement

9    of federal immigration law and whether a particular subject

10   would be detained or not, what does the role of that            19:45:54

11   individual's employment play in the decision as to whether or

12   not to detain that individual or release that individual?

13   "ANSWER:  There are several different ways that you

14   can fall out of status.  When you enter into the United States,

15   you're given a status that -- to be able to be here as a        19:46:39

16   visitor or whatever classification you receive at the time.

17   You can fall out of status by doing several things: committing

18   a crime, staying too long, working or doing something that your

19   visa does not allow you to do.

20   "And so working on a visit -- well, when you're           19:47:10

21   admitted as a visitor can cause you to fall out of status, and;

22   therefore, you would -- out of status may be detained.

23   "QUESTION:  So just so it's clear to me, if a foreign

24   national obtained a visa to enter into the United States as a

25   tourist for a fixed amount of time and remained in the United   19:47:41

1    States after the end of that fixed time, would that individual

2    fall out of status?

3           "ANSWER:  Yes.

4           "QUESTION:  If an individual obtained a visa to come

5    into the United States as a tourist for a fixed amount of time    19:49:14

6    and sought and gained employment, would that individual fall

7    out of status?

8           "ANSWER: Yes.

9           "QUESTION:  I'm asking you if you recall today what

10   you knew then about the significance of whether or not           19:49:54

11   Mr. Melendres was working at the time of his arrest?

12          "ANSWER:  Okay.  The -- Mr. -- from what I recall,

13   Mr. Melendres was admitted for a period of time as a visitor.

14   And once he accepts or takes employment, he would then be out

15   of status and subject to removal proceedings.                    19:50:46

16          "So when he claims he -- well, when it said that he

17   claimed he was working, then that would have put him into that

18   status of -- or that category of being subject to removal

19   proceedings.

20          "QUESTION:  Okay.  And you personally did not at the       19:51:08

21   time have any information as to whether or not Mr. Melendres

22   was working or was not working, is that correct?

23          "ANSWER:  That's correct.

24          "QUESTION:  And you personally did not witness

25   Mr. Melendres making any statement with regard to whether he     19:51:21

```
 1   was not working at the time, is that correct?
 2            "ANSWER:  That's correct.
 3            "BY MR. POCHODA:
 4            "QUESTION:  Mr. Kidd, this was an exhibit that you had
 5   looked at before, and it's an e-mail that has certain          19:54:01
 6   statistics.
 7            "Do you see that?
 8            "ANSWER:  Yes.
 9            "QUESTION:  And are those the -- what -- the program
10   total is what, the total number of -- of -- of folks turned    19:54:15
11   over to ICE from the MCSO, is that correct?"
12            THE COURT:  Do you want to pause that for a second,
13   please, Mr. Casey?
14            (Videotaped deposition paused.)
15            THE COURT:  Have we switched questioners here?        16:59:55
16            MR. CASEY:  Yes, Your Honor, we have.
17            THE COURT:  Who is questioning now?
18            MR. CASEY:  Plaintiffs' counsel, Dan Pochoda.
19            THE COURT:  Okay.  Sounded like Mr. Pochoda.  So are
20   we on plaintiffs' part of the questioning of this witness?     17:00:09
21            MR. CASEY:  They're actually inter -- interwoven with
22   the previous designations.  We're both plaintiffs and
23   defendants.  This is predominantly plaintiffs now.
24            THE COURT:  Okay.  Well, now it's as good a time as
25   any to take a break.  We're going to do that for the day.  I   17:00:22
```

1  will begin promptly at 8:30 tomorrow.

2        Let me ask you, how many more witnesses do you intend

3  to call in your case, just to make sure as we plan things we

4  can conveniently hear all your witnesses?

5        MR. CASEY:  Yes, Your Honor.  Our intention is with        17:00:40

6  the Court's permission, since this -- we could use this as

7  filler, is to call live Dan Beeks, Charley Armendariz,

8  Officer Francisco Gamboa, expert Bennie Click.  We need to

9  evaluate whether or not we'll be calling Scott Jefferys, and

10 then we have a videotape of Mr. Pena, which is, unfortunately,   17:01:00

11 long.

12        So I expect Mr. Beeks will be very quickly, probably

13 on the order of Mr. Ratcliffe today.  Mr. Armendariz may be 40

14 minutes to 45 on direct.  Gamboa may be 10 minutes on direct.

15 Click, I would expect that I'm going to take an hour with him.   17:01:20

16        And the -- I've got to check the notes how long Pena's

17 is, but Pena is -- Pena's deposition has been shortened based

18 on your ruling, but as of before that, it was an hour and 28

19 minutes with -- of defendants' designations.  Plaintiffs' are

20 25 minutes, 40 seconds.  So there's a total almost of one hour   17:01:49

21 and 53 minutes.

22        I will tell the Court that I may be looking at Pena

23 tonight personally and seeing if we can narrow that down.

24        THE COURT:  All right.  But it sounds to me like

25 between today and tomorrow you should be able to finish your     17:02:06

```
 1    case as well as we can give plaintiffs their two -- up to two

 2    hours if they need it for rebuttal.

 3              MR. CASEY:  I do not believe -- I think it would --

 4    their rebuttal would be late tomorrow afternoon, if not

 5    Thursday morning.  I --                                        17:02:22

 6              THE COURT:  That's fine.

 7              MR. CASEY:  That's the best guess.

 8              THE COURT:  When I said today and tomorrow, I actually

 9    meant tomorrow and the next day.  We have those two days

10    available.                                                     17:02:31

11              MR. CASEY:  I believe that we will -- my goal and

12    Mr. Liddy's goal is to finish our case in chief by 5:00 p.m.

13    tomorrow.

14              THE COURT:  All right.  I did indicate, and I think it

15    was the understanding of the parties, that I would allow        17:02:44

16    written submissions at the end of the case, and I will allow

17    them.  I, however, don't have any desire to drag on those

18    written submissions and if your case is over, Mr. Casey, it

19    doesn't sound to me like there's any real reason to prolong

20    them.                                                          17:03:01

21              MR. CASEY:  I don't -- I do not agree -- excuse me, I

22    do not disagree with the Court.

23              THE COURT:  All right.  Then plaintiffs, how many

24    pages are you going to need, Mr. Casey?

25              MR. CASEY:  Let's do the 17 pages.                   17:03:18
```

1      THE COURT:  All right.  Then here's what I'm going to

2  say.  Plaintiffs and defendants will file jointly on August 9th

3  17 pages.  And then they can file response -- when I said

4  jointly I meant simultaneously.  They can file simultaneously

5  responses on the 16th of 10 pages.  And then I will deem the        17:03:44

6  case submitted.

7      Let me ask, is there going to be any efforts to

8  provide me with any sort of reconciliation between the exhibits

9  used at depositions and the exhibit numbers that -- that

10  they've been admitted under in this case?                          17:04:03

11      For example, we talk about Exhibit 34, Exhibit 35.  Do

12  you have any idea what exhibit numbers those are in this case

13  and whether or not they've been admitted?

14      MR. CASEY:  Your Honor, Tim Casey.  I do not know, but

15  we will find that for these depositions and let you know.          17:04:20

16      MS. GALLAGHER:  Your Honor, I don't have the numbers

17  handy, but I do believe that neither of those exhibits have

18  been admitted at this point in this case.

19      THE COURT:  All right.  What about the -- I think

20  there was some discussion of the Department of Justice 2003        17:04:34

21  guidelines.  Have those been admitted in this case?

22      MR. CASEY:  Your Honor, I'm going to go through very

23  quickly.  I believe it has been.  I'm looking through the

24  plaintiffs' list of exhibits, and I do believe I just saw those

25  yesterday, I believe the DOJ guidelines are in evidence by        17:04:55

1    stipulation.  You know, there's a lot of exhibits here.  I

2    don't want to take the Court's time, but we can come in

3    tomorrow and let you know.

4              THE COURT:  All right.

5              MR. YOUNG:  I had a vague memory that's similar to     17:05:07

6    Mr. Casey's, but we need to find the exhibit number and provide

7    that to make sure.

8              THE COURT:  All right.  Anything else to be taken up

9    before the end of -- before I let you go?

10             MR. CASEY:  No, Your Honor.  I just understand that as     17:05:18

11   a matter of housekeeping tomorrow we'll be dealing with the

12   objections on Dr. Camarota's testimony.

13             THE COURT:  Yes.  After you've coordinated that I'll

14   rule on them in the morning.

15             Then I take it that you are not necessarily going to     17:05:32

16   want to start off with this deposition testimony?

17             MR. CASEY:  That is correct, Your Honor.  We'd like to

18   do the live witnesses, with the Court's permission, and I

19   assume that's agreeable to plaintiffs' counsel.  We'd like to

20   go live first and fill -- fill in with these.                    17:05:47

21             THE COURT:  All right.  Then I'm going to ask that

22   we -- I think we've gone through one question by Mr. Pochoda.

23   I'm going to ask that we resume when Mr. Pochoda starts

24   questioning here.

25             MR. CASEY:  Yes, Your Honor.                           17:06:00

1    THE COURT:  I'll be able to more easily keep track of

2  it that way.  We'll see you tomorrow at 8:30 prompt.

3    (Proceedings recessed at 5:06 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5

6

7        I, GARY MOLL, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17        DATED at Phoenix, Arizona, this 31st day of July,

18  2012.

19

20                    _____

21                        GARY MOLL

22

23                    _____s/Gary Moll_____

24

25