1418

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                   )
              Plaintiffs,           )   CV 07-2513-PHX-GMS
6                                   )
              vs.                   )   Phoenix, Arizona
7                                   )   August 1, 2012
    Joseph M. Arpaio, et al.,       )   8:32 a.m.
8                                   )
              Defendants.           )
9   _____)

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE G. MURRAY SNOW

17        (BENCH TRIAL DAY 6 - Pages 1418-1726)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
    Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                      A P P E A R A N C E S

2

3   For the Plaintiffs:          Stanley Young, Esq.
                                  Andrew C. Byrnes, Esq.
4                                 COVINGTON & BURLING, L.L.P.
                                  333 Twin Dolphin Drive
5                                 Suite 700
                                  Redwood Shores, California  94065
6                                 (650) 632-4704

7                                 David Hults, Esq.
                                  COVINGTON & BURLING, L.L.P.
8                                 1 Front Street
                                  35th Floor
9                                 San Francisco, California  94111
                                  (415) 591-7066

10
                                  Lesli Rawles Gallagher, Esq.
11                                9191 Towne Centre Drive
                                  6th Floor
12                                San Diego, California  92122-1225
                                  (858) 678-1807

13
                                  Nancy Anne Ramirez, Esq.
14                                MEXICAN AMERICAN LEGAL DEFENSE
                                  AND EDUCATIONAL FUND
15                                Regional Counsel
                                  634 S. Spring Street
16                                11th Floor
                                  Los Angeles, California  90014
17                                (213) 629-2512, Ext. 121

18                                Annie Lai, Esq.
                                  Daniel J. Pochoda, Esq.
19                                AMERICAN CIVIL LIBERTIES
                                  FOUNDATION OF ARIZONA
20                                77 E. Columbus Avenue
                                  Suite 205
21                                Phoenix, Arizona  85012
                                  (602) 650-1854

22
                                  Andre Segura, Esq.
23                                AMERICAN CIVIL LIBERTIES UNION
                                  125 Broad Street, 18th Floor
24                                New York, New York  10004
                                  (212) 549-2676

25

1                    A P P E A R A N C E S

2

3                              Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Director
5                              Immigrants' Rights Project
                               39 Drumm Street
6                              San Francisco, California  94111
                               (415) 343-0775

7

   For the Defendants:        Timothy J. Casey, Esq.
8                              James L. Williams, Esq.
                               SCHMITT, SCHNECK, SMYTH,
9                              CASEY & EVEN, P.C.
                               1221 E. Osborn Road
10                             Suite 105
                               Phoenix, Arizona  85014-5540
11                             (602) 277-7000

12                             Thomas P. Liddy
                               Deputy County Attorney
13                             MARICOPA COUNTY ATTORNEY'S OFFICE
                               Practice Group Leader, Litigation
14                             Ann T. Uglietta, Esq.
                               Deputy County Attorney
15                             Civil Services Division
                               222 N. Central Avenue
16                             Suite 1100
                               Phoenix, Arizona 85004
17                             (602) 372-2098

18

19

20

21

22

23

24

25

I N D E X

Witness:                                                    Page

DOUGLAS W. BEEKS

Direct Examination by Mr. Casey                             1433
Cross-Examination by Mr. Pochoda                            1450
Examination by The Court                                    1471

RAMON CHARLEY RAMIREZ ARMENDARIZ

Direct Examination by Mr. Casey                             1480
Examination by The Court                                    1519
Direct Examination Continued by Mr. Casey                  1526
Cross-Examination by Mr. Pochoda                            1540
Further Examination by The Court                            1579
Redirect Examination by Mr. Casey                          1591

FRANCISCO GAMBOA

Direct Examination by Mr. Liddy                             1595
Cross-Examination by Ms. Ramirez                           1618

BENNIE R. CLICK

Direct Examination by Mr. Casey                             1628
Cross-Examination by Mr. Pochoda                            1696

E X H I B I T S

No.       Description                                  Admitted

(None)

1                    P R O C E E D I N G S

2

3          THE COURT:  Thank you.  Please be seated.

4          THE CLERK:  This is CV-07-2513, Melendres v. Arpaio,

5   on for continuation of bench trial.                          08:32:32

6          THE COURT:  Do we have any matters to raise before

7   resuming testimony?

8          MR. CASEY:  Yes.  Yes, Your Honor.  Defendants have a

9   couple of matters to address with the Court pursuant to your

10  direction yesterday as to Jason Kidd's deposition.           08:32:44

11         THE COURT:  All right.

12         MR. CASEY:  Yesterday you inquired about Kidd

13  deposition Exhibit 34.  For the record, that is a document

14  produced by ICE, Bates number 484.  It's Defense Exhibit 1087.

15  We move for the admission of Defense Exhibit 1087.           08:33:02

16         MS. GALLAGHER:  Plaintiffs object on the basis of

17  hearsay, lack of foundation, and relevance.

18         THE COURT:  All right.  You know, what I'm going to do

19  is take a minute to look at the exhibit and then I'll rule, but

20  I'm not going to do it right now.                            08:33:22

21         MR. CASEY:  Sure.  And then the next, as a matter of,

22  I guess, practicality, when we begin playing the balance of it,

23  there's also Kidd Deposition Exhibit 35, which is ICE document

24  Bates labeled 497.  That's Defense Exhibit 1088.  We will move

25  for admission on that, Your Honor.                           08:33:40

1        MS. GALLAGHER:  And plaintiffs will object on the same

2   grounds.  They're similar documents.  We believe the testimony

3   does not lay the foundation.

4        THE COURT:  All right.

5        MR. CASEY:  The final thing as to the Kidd deposition        08:33:50

6   is Mr. Kidd referenced the use of a DOJ article entitled

7   Guidance Regarding Use of Race by Federal Law Enforcement

8   Agencies.  That has been stipulated in the pretrial into

9   evidence.  That's Exhibit 1194.  And that was referenced by

10  Jason Kidd.                                                      08:34:10

11       One final area, Your Honor, for the Court, I talked to

12  your clerk, and just putting on the record that I don't

13  remember which witness it was, but we referenced the following

14  exhibit, 1017.  It was Defense Exhibit 1017 not offered into

15  evidence, but it is duplicative of Exhibit 411.                  08:34:30

16       We referenced Exhibit 1020, which is not in evidence,

17  but Exhibit 71 is in evidence and is duplicative of 1020.

18       Exhibit 1043 was referenced but not offered into

19  evidence.  It is duplicative of Exhibit 34, which is in

20  evidence.                                                        08:34:51

21       Exhibit 1152, which was referenced but not offered

22  into evidence, is duplicative of Exhibit 114, which is in

23  evidence.

24       And finally, Exhibit 1188, which was referenced but

25  not offered into evidence because it was duplicative of          08:35:06

1  Exhibit 174, which is in evidence.

2          Thank you for your courtesy, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Let me -- Mr. Young.

5          MR. YOUNG:  Yes, Your Honor.  I did have a couple of          08:35:17

6  matters to raise.

7          On the Department of Justice guidelines on the use of

8  race in federal law enforcement, which Mr. Casey just mentioned

9  is Exhibit 1194, our memory was correct.  It is an exhibit.  It

10 was also, I would note, Exhibit C to the first-amended          08:35:33

11 complaint in the case.

12         With respect to Dr. Camarota's testimony yesterday, I

13 did raise three objections, and they are all on the basis that

14 the particular opinions stated by Dr. Camarota yesterday were

15 not in his expert report or in his deposition.          08:35:53

16         They appear in the final transcript which, thanks to

17 Mr. Moll's valiant efforts we received late yesterday, are

18 pages 1272, line 16, to 1273, line 12; 1274, line 11, to 1275,

19 line 13; and 1283, line 21, to 1284, line 13.

20         The first of those is an opinion about 81 percent and          08:36:22

21 64 percent being 910s.  The second was about 11 out of 13

22 saturation patrols being considered by Dr. Taylor, and

23 therefore one-seventh being missing, in his view.  And the

24 third is about comparing self-reporting in Maricopa County

25 versus in the U.S. census.  And none of those, in my view, were          08:36:44

1    in his report or in his deposition.

2          I did ask him in his deposition, and I confirmed this

3    with counsel yesterday, whether he had any other criticisms of

4    Dr. Taylor's opinions, and he said at that point he had none.

5          So my view is that under Rule 26(a)(2), the opinions        08:37:07

6    which I just identified ought to be excluded.

7          THE COURT:  You want to be heard on that, is it

8    Mr. Liddy?

9          MR. LIDDY:  Yes, please, Your Honor.  Our opinion

10   would be that Mr. Camarota's an opinion witness, not a fact       08:37:21

11   witness, and therefore he's permitted to either be in the

12   courtroom and hear the testimony or read the transcripts, which

13   he did.  And Dr. Taylor was specifically asked about the -- in

14   his direct -- excuse me -- in his testimony under

15   cross-examination, specifically asked about the universe of      08:37:42

16   incidents that he excluded, and whether or not it mattered

17   whether they were randomly distributed or not.

18         And on page 144 of his testimony, beginning at

19   line 15, he testified about his opinion as to whether it

20   mattered if there was random distribution or not.                08:38:04

21         So Mr. Camarota's testimony was in rebuttal to those

22   comments about the importance of random distribution in the

23   excluded incidents of the data file.

24         THE COURT:  Don't I recall -- and maybe I don't,

25   Mr. Young -- that you'd agreed to allow each other's experts to  08:38:22

1    attend or listen to, otherwise review the testimony of experts?

2         MR. YOUNG:  That is correct, Your Honor.

3         THE COURT:  All right.  Well, then I'm going to

4    overrule the objection and I'll allow the evidence in.

5         Anything else?                                08:38:37

6         MR. YOUNG:  No, Your Honor.

7         THE COURT:  I have one other thing that I want to

8    raise with the parties.

9         Just a second.  Kathleen, did you have something you

10   wanted to check with me on?                        08:38:45

11        (Off-the-record discussion between the Court and the

12   clerk.)

13        THE COURT:  This is just to clarify the record in

14   light of some of what you indicated earlier, Mr. Casey, about

15   duplicative exhibits.                              08:39:21

16        MR. CASEY:  Yes, Your Honor.

17        THE COURT:  That is, although at the first day of

18   trial when I read in the list of stipulated exhibits I read in

19   1017, 1020, 1043, 1152, and 1188, the parties had already

20   withdrawn those exhibits at that time.  So although I admitted  08:39:34

21   the exhibit numbers, there's no exhibit there, and I just want

22   the record to reflect that.

23        So to the extent that you've indicated they were

24   duplicates, you were right, but not technically so, because

25   there's no exhibit there.  But that's just for purposes of     08:39:52

1    clarity.

2            MR. CASEY:  Yes.  And that's why, thankfully, your --

3    Ms. Zoratti has been very helpful in pointing that out.  That's

4    why I read a few minutes ago that those are things that, yes,

5    were stipulated in, but withdrawn to avoid duplication.  I                08:40:06

6    identified the plaintiffs' exhibits which are in evidence which

7    correspond, so if anyone reads this the record in the future

8    when they hear, for example, 1017, they'll actually go to

9    admitted Exhibit 411, et cetera.

10            THE COURT:  Yeah, all right.  Just to make that clear.           08:40:23

11            Now, there's one other issue I wanted to raise with

12    the parties.  I have contemplated -- although I've asked

13    questions when I felt like I wanted to, and I appreciate the

14    parties' indulgence in allowing me to do that, there have been

15    a number of times when I haven't asked questions.  And one of         08:40:39

16    the things that came up yesterday in discussion of whether or

17    not I was going to take written closings or oral closings was

18    whether or not I cared to indicate to the parties what I was

19    interested in for purposes of written closing.

20            I have begun to compile a list of questions for               08:40:57

21    plaintiffs and questions for defendants that I'm interested in

22    that mostly cut to legal questions, which would be appropriate

23    for briefing, that is, both in light of what I perceive the

24    evidence, or at least some of the evidence to be that I have to

25    weigh, and thus, depending on how I weigh the evidence, what         08:41:19

1    the legal standard would be.

2         That's what it principally is.  But it also relates to

3    some factual questions that haven't quite been tied up in my

4    mind that I would invite supplementation on.

5         There's a problem with that, with doing that, though,          08:41:36

6    and that is to the extent that I identify what my thinking is,

7    I think it invites the parties to try to supplement the record

8    with all kinds of affidavits and other exhibits that I'm just

9    not interested in receiving, and that if you -- if you put them

10   in the record it would rather taint my view of their            08:41:55

11   credibility, anyway.

12        So I will -- I'll just make this offer to you.  I'm

13   more than glad to share with you what my principal questions

14   are for both sides.  But if I do that, I am not going to do it

15   until both parties agree that the record is closed except for     08:42:11

16   upon the topics on which I invite supplementation, and I don't

17   invite supplementation if the parties can't stipulate to the

18   facts that I ask about.

19        So I'll let you chew on that.  I'm more than happy to

20   give you your 17 pages, and you can do whatever you want with     08:42:28

21   it without me indicating the questions I'm interested in, or if

22   you want to acknowledge that the record, the factual record is

23   closed at the end of this trial, I will -- and -- I will

24   identify for you what I view to be principally the legal

25   questions.  But there are some factual questions in which I       08:42:46

1   remain interested.

2         MR. CASEY:  I should let plaintiffs go first.  I'm

3   sorry.

4         MR. YOUNG:  I think we would like a chance to think

5   about that, Your Honor, and we appreciate greatly the fact that    08:42:57

6   you've identified this issue for us and we'll try to get back

7   to you later today, perhaps after talking to defendants'

8   counsel.

9         MR. CASEY:  Your Honor, I'm prepared to tell you that

10  we want that.  We invite that.  You should do that.    08:43:13

11        As to the legal issues there, it's what I guess is

12  better known as a no-brainer.  That is completely appropriate.

13        On the factual issues, quite frankly, I welcome that.

14  My concern is if the Court asks that, it seems to necessarily

15  invite a supplementation of the record.  And I understand the    08:43:41

16  Court's concern, and I -- I believe I share that.

17        I'm not sure -- and I think this is where Mr. Young

18  and I have to get together, because there are probably some

19  things we can stipulate to.  But as you know, throughout this

20  trial, sometimes it's said tomato and we say tomato.  There are    08:44:00

21  nuances in the same facts.

22        My concern, just briefly, when I hear that, is:  How

23  can we answer factual questions of the Court without

24  necessarily supplementing it?  And I hear what you said

25  about -- about it perhaps affecting witness credibility, mostly    08:44:20

```
 1    on my clients' side.

 2            I'm not sure how we skin that cat, how we accomplish

 3    it, and still achieve the Court's goal of not effectuating

 4    negatively, particularly my clients' credibility.  I'd like to

 5    think about that.                                              08:44:37

 6            The other option that comes to my mind is we're going

 7    to try to finish up today --

 8            THE COURT:  Hold on to your thought, but I just wanted

 9    to add on to -- you don't have to sit down.  I want to add on

10    to what you've just said.                                      08:44:48

11            I think what I said, or what I intended to say and I

12    may not have said it clearly, is I don't mind laying out my

13    factual questions, and if you can stipulate to their answer,

14    I'll accept the stipulation.  And if you can't stipulate to

15    their answer, I don't want either side to supplement the       08:45:03

16    record.  I'll just take it as it is.

17            MR. CASEY:  Okay.  Let me throw this option out for

18    you.  Let's say hypothetically that you have questions that we

19    can't stipulate to, and we're going to have rebuttal tomorrow

20    in the morning.  My envision is the worst-case scenario, we're 08:45:21

21    done by noon tomorrow.  It might make sense, if we can't

22    stipulate to that, to bring in a witness or two under your

23    strict scrutiny and discretion in narrowing it to answer those

24    questions where they're open to answering those questions

25    directly from you, and then the plaintiffs get to question them 08:45:44
```

```
 1   and we get to question them.  Because I'm -- I am concerned
 2   that although we've, I think, counsel have gotten along
 3   famously well, we're probably not going to be able to, if
 4   history is -- we're not going to agree on certain things.
 5           THE COURT:  I understand that.  I will tell you that      08:46:03
 6   it strikes me that the factual questions that I have in mind
 7   are questions that I think are susceptible to stipulation.
 8           MR. CASEY:  Okay.
 9           THE COURT:  That doesn't mean that you will be able to
10   stipulate, and I'm not trying to suggest that you will.  But     08:46:14
11   they aren't of the nature that I think -- that I think is
12   inherently -- that you would inherently be unable to stipulate
13   to.
14           MR. CASEY:  Okay.
15           THE COURT:  They are, I think, facts that you may be     08:46:25
16   able to stipulate to.
17           MR. CASEY:  And I just throw out that option that
18   if for some reason they are not, and if we were to get them,
19   say, at the close of business today so we can talk this
20   evening, then maybe the Court would be willing to have some      08:46:41
21   sort of additional testimony under your direction.  In other
22   words, you doing the questioning and us following up.
23           THE COURT:  Well, I'll tell you, I'm not interested in
24   disclosing what my questions are, even though I think they're
25   susceptible to stipulation, until the evidence is closed.  I     08:46:55
```

```
 1    don't want to give either side an inherent advantage.  I don't

 2    want to -- I don't want to tell you what my questions are, for

 3    example, after you've closed your case and before rebuttal,

 4    because then that invites plaintiffs to stick in a bunch of the

 5    facts on rebuttal and may limit your opportunity to respond on        08:47:09

 6    cross-examination, or vice versa.

 7              MR. CASEY:  Yes, sir.

 8              THE COURT:  And I understand that's just your

 9    position.

10              Mr. Young, I understand you haven't yet taken a             08:47:22

11    position, and I'll be interested in hearing it when you arrive

12    at some sort of a position.

13              MR. YOUNG:  Yes.  Just to be clear, we would be happy

14    to get questions from the Court about legal issues that the

15    Court would like to hear about.  I think that would be very          08:47:33

16    helpful to all of us.  On the factual issues, I do think we

17    need to have some discussion, and we would like to have it with

18    defense counsel as well.

19              THE COURT:  That's fine.

20              You ready to resume, Mr. Casey?                             08:47:47

21              MR. CASEY:  Yes, Your Honor.  We ended yesterday with

22    Mr. Kidd.  We are going to continue that until later today at

23    the appropriate time.  Our first witness will be a former MCSO

24    deputy named Douglas Beeks.

25              THE COURT:  Was that Beeks?                                 08:48:08
```

```
1              MR. LIDDY:  Yes, Your Honor.

2              THE CLERK:  Right up here, sir.

3              Can you please state and spell your full name.

4              MR. BEEKS:  Douglas W. Beeks.  D-o-u-g-l-a-s, W.,

5     B-e-e-k-s.                                                      08:48:45

6              THE CLERK:  Thank you.  Please raise your right hand.

7              (Douglas W. Beeks was duly sworn as a witness.)

8              THE CLERK:  Thank you.  Please take our witness stand.

9                     DOUGLAS W. BEEKS,

10    called as a witness herein, having been duly sworn, was          08:48:58

11    examined and testified as follows:

12                     DIRECT EXAMINATION

13    BY MR. CASEY:

14    Q.  Good morning, sir.  How are you?

15    A.  Good morning.                                               08:49:26

16             THE COURT:  Can I get you to stop for just a second,

17    Mr. Casey?

18             MR. CASEY:  Yes, sir.

19             THE COURT:  I'm going to stop running your time.  I

20    just want to make sure that I am where I need to be to take      08:49:30

21    notes, and that's going to take me half a second.  I apologize.

22             (Pause in proceedings.)

23             THE COURT:  All right.  Thank you.

24             MR. CASEY:  Sorry.  You ready, Your Honor?

25             THE COURT:  I am.                                      08:49:56
```

```
 1              MR. CASEY:  All right.  Thank you, Your Honor.

 2              THE COURT:  I apologize.

 3              MR. CASEY:  No problem.  Thank you, sir.

 4   BY MR. CASEY:

 5   Q.  Please tell us your full name.                          08:49:59

 6   A.  It's Douglas W. Beeks.

 7   Q.  And where do you currently live?

 8   A.  I currently live in Cedar Rapids, Iowa.

 9   Q.  And are you employed in Iowa?

10   A.  Yes, I am.                                              08:50:08

11   Q.  And who are you employed by?

12   A.  Rockwell Collins Aviation.

13   Q.  And what do you do for Rockwell Collins Aviation?

14   A.  I'm a senior systems engineer with the radio systems group.

15   Q.  And just generally, what does that job entail?          08:50:18

16   A.  I'm a systems engineer with a product that does a radio

17   tuning on commercial and business jets.

18   Q.  Was there a time that you lived here in Maricopa County?

19   A.  Yes, I did.

20   Q.  And when you lived here in Maricopa County, who were you  08:50:32

21   employed by?

22   A.  By Maricopa County.

23   Q.  And what was your position with Maricopa County?

24   A.  Deputy sheriff.

25   Q.  And how long were you a deputy sheriff?                  08:50:41
```

1    A.  I was a reserve deputy from 1998 until 2005, and I

2    transitioned from reserve to full-time deputy from 2005 till

3    August 2010.

4    Q.  Were you -- would you explain for us, why did you leave

5    service as a deputy for the Maricopa County Sheriff's Office in    08:51:02

6    August of 2010?

7    A.  I had a good paying job offer outside of Maricopa County

8    with Rockwell Collins.  I have some friends that work there.  I

9    had prior engineering contacts before I came to -- to Maricopa

10   County, and they suggested me for a job position with a good    08:51:19

11   salary.  And having two kids going to college, I went ahead and

12   accepted that position.

13   Q.  How are the kids doing in college?

14   A.  They're doing well.  One will start this fall; the other

15   one is just finishing.    08:51:34

16   Q.  All right, good.

17        Tell me, when you -- when did you go to the academy,

18   the Arizona POST police academy?

19   A.  I started there in August of 1998.

20   Q.  And do you remember roughly how long that academy training    08:51:45

21   was?

22   A.  It was a reserve academy, so it actually took longer.  The

23   total number of training hours is the same, but it took -- the

24   calendar time was from August until May of 2000.  May 1999,

25   correction.    08:52:06

1   Q.  During your academy training did you have any training on

2   the use of race or ethnicity in making law enforcement

3   decisions?

4   A.  It was discussed, yes.

5   Q.  And in what context was it discussed?                    08:52:15

6   A.  That race and ethnicity is not criteria for -- for charging

7   or any criminal decisions that are made.

8   Q.  What about use of race or ethnicity to make any traffic

9   stops, what was --

10  A.  It's not a criteria for a traffic stop.                  08:52:30

11  Q.  What about using race or ethnicity to make any -- make any

12  decision to detain someone?

13  A.  It's not a criteria for any decision.

14  Q.  Or arrest someone?

15  A.  No, not for an arrest, either.                           08:52:43

16  Q.  I'd like to focus you now on a particular date in 2008.

17  Mr. Beeks, the parties have stipulated that the MCSO conducted

18  a saturation patrol, or a crime suppression operation, on March

19  27 and 28 of 2008 near Cave Creek Road and Bell Road.

20          Did you participate in that saturation patrol?       08:53:12

21  A.  Yes, I did.

22  Q.  And would you tell the Court, what were your duties or

23  responsibilities as a deputy during that saturation patrol?

24  A.  My duties at that time were to patrol and to perform on

25  duty -- or on-view enforcement of laws that were broken.  So  08:53:27

1   basically I wasn't responding to any radio calls, it was all

2   on-view traffic.

3   Q.  Do I understand, when you say that, you're talking about

4   you were on traffic patrol?

5   A.  Correct.                                                    08:53:41

6   Q.  And tell us what, if anything, you were looking for while

7   you were on traffic patrol.

8   A.  Criminal activity, traffic violations, any signs of

9   criminal activity.

10  Q.  On that date specifically, at some time during March 28,   08:53:52

11  2008, did you hear a radio call from Deputy Ramon Charley

12  Armendariz?

13  A.  Yes, I did.

14  Q.  Were you in a vehicle?  Were you on a motorcycle?  Describe

15  what kind of vehicle you were in.                              08:54:15

16  A.  I was in a marked patrol car at that time.

17  Q.  Do you know Charley Armendariz?

18  A.  I worked with him on several squads over approximately two

19  years prior to that.

20  Q.  And how familiar would you say you are with Charley as a    08:54:27

21  person, as a -- and as a deputy?

22  A.  As a person I'd consider him a friend.  We've hung out or

23  spent time with each other on duty and off duty.  I know him

24  fairly well.  And as a deputy he's a -- he's a good deputy.

25  Q.  Are you familiar with him to be able to identify his voice  08:54:43

```
 1   over a radio transmission or over a telephone?

 2   A.  Yeah, I've had voice contact with him throughout that time

 3   many times during the day, so I'm familiar with his voice.

 4   Q.  Please describe for us what you heard on the radio call

 5   when you heard Deputy Armendariz.                          08:55:05

 6   A.  Well, I know he was out on a traffic stop at Nisbet/Cave

 7   Creek Road area, and I wasn't too far from that area.  And I'd

 8   heard him check out, so I -- I'd say I was keeping ear out if

 9   he needed anything on that traffic stop, but as we do, we tend

10   to keep track of each other just in case they need assistance. 08:55:27

11          And I heard Charley put out a call on the radio

12   that -- that during his traffic stop, that another vehicle had

13   tried to -- had tried to run over him, or had done something

14   similar to that.  And the tone of his voice indicated that

15   there was a serious incident that had occurred.            08:55:44

16   Q.  Now, when you say you knew he was at a stop, and I -- you

17   mentioned this but I'm not sure I understood.  How did you know

18   he had -- he was in the progress --

19   A.  Well, he --

20   Q.  -- in progress of stopping?                            08:55:58

21   A.  He checked out on a traffic stop.

22   Q.  What's that mean?

23   A.  He gave his vehicle location and that he was out with a

24   vehicle at Cave Creek and Nisbet.  So I knew he was out on a

25   traffic stop with I don't know how many individuals, but that's 08:56:09
```

1    where he was at.

2    Q.  Now, when you mentioned the word "tone" in context of his

3    voice.  Did I understand that correct?

4    A.  Correct.

5    Q.  What do you mean when you say the tone of his voice?              08:56:20

6    A.  Well, there's a -- there's a normal conversational tone

7    such as what you and I are having.  But then there's a tone

8    that, a voice inflection that would be pretty obvious if

9    something significant had just happened to you, whether someone

10   had threatened you or come towards you or some incident where    08:56:37

11   you were potentially at risk of being harmed or had come close

12   to being harmed, you'd -- you'd have an excited tone or tenor

13   in your voice.  And that was very clear when Charley got on the

14   radio that something had occurred.

15   Q.  Was it clear based on your familiarity with Charley and his  08:56:57

16   voice in the past?

17   A.  Correct.

18   Q.  What did you believe or understood happened, based on what

19   you heard on that call and his tone?

20   A.  Knowing that he was on a traffic stop, his tone and what he  08:57:12

21   said, I believed that a vehicle had tried to strike him or had

22   come towards him.

23   Q.  Do you remember if he said that on the radio call or if

24   that -- what do you remember about actually the words said?

25   A.  I believe the words that I heard, and I don't know the       08:57:28

```
 1   exact words, but the word -- the sentence that he said
 2   contained the words that "a vehicle just tried to run me over."
 3   Q.  Now, there is testimony already in this case from a deputy
 4   named Michael Kikes.  Do you know Michael Kikes?
 5   A.  Yes, I do.  I've also worked with him.
 6   Q.  Now, he mentioned something called a station 45.  What is a
 7   station 45?
 8   A.  Well, while this was occurring, the dispatcher wasn't able
 9   to clear Deputy Armendariz to get a status update.
10   Q.  What's that mean?
11   A.  Basically, to find out if he was okay, what had happened,
12   because the -- the tone of his voice and what he had just said
13   indicated that things weren't okay where he was at.
14   Q.  Let me interrupt you real quick, and I apologize, with your
15   indulgence, sir.
16           Are you telling us that the dispatcher was trying to
17   reconnect or contact Armendariz and could not?
18   A.  Correct.
19           MR. POCHODA:  Objection, hearsay.
20           THE COURT:  I'm going to sustain that.
21   BY MR. CASEY:
22   Q.  What was your understanding of whether or not the
23   dispatcher could reconnect with Charley Armendariz on the radio
24   transmission?
25           MR. POCHODA:  Objection, hearsay.
```

08:57:46

08:58:03

08:58:20

08:58:31

08:58:46

1    THE COURT:  I'm going to overrule that.

2    THE WITNESS:  It elevates the priority if -- if she

3  can't get ahold of him, or he -- I don't remember if we had a

4  male or female dispatcher on that particular day -- can't

5  reconnect with him, and he's not responding back to a radio          08:59:02

6  call, it elevates the priority that something is not okay, and

7  they'll hold a station if there's a volatile or unknown

8  situation that could involve injury or significant risk to the

9  deputy.

10  BY MR. CASEY:                                                        08:59:23

11  Q.  So was there a station 45 placed on that?

12  A.  Yes, the station was held.

13  Q.  And that means what?

14  A.  Means that all other radio traffic is to be held that's not

15  directly related to that particular incident or case.  And        08:59:34

16  that's so that the deputy that's involved in that station 45

17  has an open frequency if they can get back on the frequency and

18  talk if they need to.

19  Q.  Based on what you believed you heard, the tone of Charley

20  Armendariz's voice, and what you understood was the inability     08:59:54

21  to reconnect with Mr. Armendariz, or Deputy Armendariz --

22    MR. POCHODA:  Objection, leading.

23    THE COURT:  I haven't heard the end of the question

24  yet.

25  BY MR. CASEY:                                                       09:00:07

1   Q.  -- what did you understand to be going on with Charley

2   Armendariz?

3            THE COURT:  Overruled.

4            THE WITNESS:  At that point all I can assume is that

5   he's not okay, he's not answering on his radio.  That it's          09:00:18

6   critical that I get there soon as possible to assess his

7   condition and situation to make sure that he's not hurt,

8   injured, or something else occurring.

9   BY MR. CASEY:

10  Q.  What kind of situation did you think that you were facing?      09:00:31

11  A.  Well, it could have been -- could have been any -- a number

12  of things.  He -- he had just stated that a vehicle had tried

13  to run him over.  He may have been struck.  He could have been

14  injured by that.  There could be other subjects on scene

15  that -- that he was now engaged in physically or otherwise.        09:00:48

16  It's an unknown situation.  We don't know why he's not

17  answering.  It's not normal.

18  Q.  When you say "not normal," you mean emergency?

19  A.  Right.

20  Q.  Now, what did you do at this point when you heard -- well,      09:01:02

21  let me back up a minute.

22            Was there ever a call for backup?

23  A.  At the particular time when he said that a vehicle had

24  tried to -- to strike him, to send another unit.

25  Q.  What did you do after you heard this call and his tone, and     09:01:17

1   there's the station 45 put on, what did you do next?

2   A.  I was nearby.  I was already starting to head -- to head

3   over that way anyway just as a cursory drive-by to make sure

4   everything was fine.  And when that call came out and the

5   situation presented itself, I expedited my travel to his -- to    09:01:35

6   his area.

7   Q.  And what happened next?

8   A.  When I came up, I -- I saw the traffic stop where he was

9   at.  I drove into the parking lot.

10  Q.  Let me -- and I apologize.  I may interrupt you every now    09:01:47

11  and then.

12  A.  That's fine.

13  Q.  When you say you saw the traffic stop, did you make the

14  traffic stop?

15  A.  No, I did not.  I drove up to the area where Deputy    09:01:55

16  Armendariz had made the traffic stop at Nisbet and Cave Creek

17  Road.  I came up from one of the side streets and drove into

18  the parking lot and saw -- saw Deputy Armendariz there at that

19  particular point and assessed that he was fine.  He signaled to

20  me that he was -- he was not injured, and I didn't have any    09:02:14

21  words with him at that time.  There was no time to do that.

22  And he signaled a direction that the vehicle had -- had gone.

23  Q.  What vehicle?

24  A.  The vehicle that Armendariz had said had tried to strike

25  him.    09:02:27

1444

```
 1   Q.  And what did you do after Deputy Armendariz had signaled

 2   towards the direction of the vehicle?

 3   A.  I left the parking lot, proceeded in that direction.

 4   Q.  Okay.  And what did you see next?

 5   A.  Not even a quarter of a mile down the road, be on the --      09:02:38

 6   the east side of the road, which would be to my left as I was

 7   going south, I saw a dark-colored SUV, I believe it was a

 8   pickup, pulled into a service drive, into a shop area, such as

 9   like an auto shop, and the vehicle had already been stopped.

10   Behind that vehicle was one of our motor officers and his bike,   09:03:03

11   and he was off that -- off of his bike and had made contact

12   with the driver of that vehicle.

13   Q.  Do you know the name of that motorcycle officer?

14   A.  Yeah, it was Deputy Kikes.

15   Q.  Okay.  What did you see after that?                           09:03:16

16   A.  As I was coming up, I approached kind of at a -- at a

17   diagonal to the traffic stop.  I didn't park behind it.  And I

18   could see Deputy Kikes engaged with the driver, and the driver

19   was noncompliant, combative, belligerent, and arguing with the

20   deputy, and it gave the impression to me that the -- the driver  09:03:34

21   was attempting, if possible, to drive off from the traffic

22   stop.

23   Q.  Do you know whether or not that vehicle that Deputy Kikes

24   stopped, whether its engine was on or off?

25   A.  It was on.                                                    09:03:52
```

```
 1    Q.  And how do you know that?
 2    A.  I could hear it when I exited my vehicle.
 3    Q.  Now, you described this driver of the vehicle had been
 4    stopped as combative and belligerent.  What did you see that
 5    led you to those conclusions?                              09:04:06
 6    A.  He was yelling at the deputy, pulling away from the deputy.
 7    The deputy was trying to get him to turn off the vehicle and
 8    put it into park and exit the vehicle.  He was leaning away
 9    from the deputy.  His -- his tone and demeanor were -- were
10    hostile and combative.  He was not compliant at all.      09:04:27
11    Q.  Now, you also said he was arguing.  Did you hear what he
12    was saying, the driver of the vehicle?
13    A.  I don't remember his exact words, no.
14    Q.  Okay.  And what -- what did you do at this point?
15    A.  Well, my concern at that point was for the -- the safety of 09:04:45
16    the deputy and the safety of the vehicle occupants and anyone
17    else that was on the scene.  Other deputies had also arrived on
18    scene.  And the situation was out of control and getting out of
19    control more -- more rapidly, and needed to be stopped at that
20    point.                                                    09:05:02
21         I drew my weapon and proceeded over to the area where
22    Mike Kikes, or Deputy Kikes, had made contact with the driver.
23    Q.  Did you see interaction, any physical interaction between
24    Deputy Kikes and the driver of this black-colored vehicle?
25    A.  I saw Deputy Kikes attempting to remove the driver from the 09:05:22
```

1   vehicle.

2   Q.  And would you describe for us how that attempted removal --

3   how that went.

4   A.  After I made contact with Deputy Kikes and the -- the

5   driver, and the driver became aware of my presence, and          09:05:35

6   presumably that I did have a weapon drawn, he became compliant

7   and exited the vehicle.

8   Q.  Okay.  At any time did you -- did Deputy Kikes, in your

9   sight, ever pull or use any force to remove this driver out of

10  the car?                                                        09:05:55

11  A.  The only force I saw Deputy Kikes use was he assisted the

12  driver out of the vehicle, keeping hands on him so that he

13  didn't pull away or get away from him, and placed him into

14  custody in restraints.

15  Q.  At any time did you ever see this driver -- first of all,   09:06:10

16  can you -- back up.  Strike that.

17          Did you see the appearance of the driver, whether --

18  his gender, for example?

19  A.  It was a -- it was, I assume, a Hispanic male.  He was dark

20  skin, dark hair.  35, 40 years old.  Average build.            09:06:25

21  Q.  Did you ever see that man ever on the ground or on his

22  knees?

23  A.  No, I did not.

24  Q.  Did you ever see him slammed up in any way against the car

25  where any part of his body hit that vehicle that he was in?     09:06:42

1    A.  No, he -- he may have been faced towards the vehicle.  He

2    was not slammed against the vehicle while he was placed in

3    restraints.

4    Q.  What did you see next?

5    A.  He was led away from the vehicle, and at that point I did        09:06:55

6    not have much further contact.  I went over to the passenger

7    side while others -- deputies had arrived and we made contact

8    with the passenger.

9    Q.  Did you ever point your gun at anyone?

10   A.  At one point it may have been pointed in the direction of        09:07:11

11   the driver.

12   Q.  Okay.  Did you ever point your gun at anyone else at the

13   scene?

14   A.  No, I did not.  After the issue with the driver was

15   resolved, my weapon was reholstered.                                 09:07:27

16   Q.  Did you ever see --

17          THE COURT:  Pardon me.

18   BY MR. CASEY:

19   Q.  Did you ever see the driver being cuffed?

20   A.  By Deputy Kikes, yes, while I was still with him.                09:07:38

21   Q.  And where -- where was he cuffed, and where was he located,

22   if you saw?

23   A.  My recollection is he was cuffed in back, right after he'd

24   exited the vehicle, alongside the vehicle.

25   Q.  What do you remember happening after that point?                 09:07:57

A.  With the driver, I don't remember anything specifically.
At that point I went around to the passenger side of the
vehicle and assisted the other deputies in making contact with
the passenger.

Q.  And who was the passenger by appearance?                    09:08:11

A.  It was a female subject.

Q.  Did you have any conversation with the female subject?

A.  Not directly, no.

Q.  Okay.  Do you know how this incident resolved and how it

cleared?                                                        09:08:26

A.  This particular incident, contact was made with Deputy

Armendariz back at -- back at his traffic stop that he was

still -- still on, finishing, and he advised that other than

the potential disorderly conduct charges, that no charges were

to be filed on the driver of the vehicle.                       09:08:44

Q.  Did you have that communication with Deputy Armendariz?

A.  No, not at that time.

Q.  At some later time you did?

A.  I went back to his traffic stop.

Q.  And this was after the people had already been released?    09:08:57

A.  That's correct.

Q.  Did deputy -- strike that.

        Do you have any understanding why there was no arrest

made?

A.  No.                                                         09:09:17

1   Q.  Do you have any understanding why no citation was issued?

2   A.  No.

3   Q.  Did the race or ethnicity of the driver of the vehicle that

4   you described as argumentative, combative, and belligerent have

5   anything to do with your decisions to withdraw your gun?                    09:09:35

6   A.  My decision was based on -- was based upon the situation,

7   the driver's behavior, and my concern for officer safety and

8   the occupants of that vehicle.

9   Q.  Did race have anything to do with it?

10  A.  That had no portion whatsoever.                                         09:09:50

11  Q.  If in fact you pointed your gun either at that man or at

12  his direction, did his race or ethnicity have any role in that

13  decision?

14  A.  No whatsoever.

15  Q.  Did race or ethnicity of the two occupants in that vehicle             09:10:06

16  play any role in your decision to respond to Charley

17  Armendariz's call for backup?

18  A.  None whatsoever.

19  Q.  Did race or ethnicity of any of the vehicle occupants have

20  any role or influence on your decision to have any                         09:10:23

21  participation in what turned out to be the traffic stop made by

22  Deputy Kikes?

23  A.  No.

24          MR. CASEY:  Okay.  Those are all the questions I have

25  for you.  Thank you for your time and your patience, sir.                  09:10:35

```
 1              THE WITNESS:  Thank you.
 2              THE COURT:  Cross-examination.
 3              MR. POCHODA:  Yes, sir.
 4                         CROSS-EXAMINATION
 5    BY MR. POCHODA:                                      09:10:49
 6    Q.  Good morning.
 7    A.  Good morning.
 8              THE COURT:  Good morning.
 9    BY MR. POCHODA:
10    Q.  Mr. Beeks, you testified that at some point you drew your   09:11:01
11    gun as part of a traffic stop, is that correct?
12    A.  Yes, it is.
13    Q.  And where did that traffic stop take place?
14    A.  Particular traffic stop was on Cave Creek Road south of
15    Nisbet.                                              09:11:16
16    Q.  And that -- do you know what the location was specifically?
17    A.  It was a shop area.  I don't know the exact name of the
18    shop.
19    Q.  And you were not the first MCSO deputy on the scene, is
20    that correct?                                        09:11:27
21    A.  That's correct.
22    Q.  Deputy Kikes had already stopped the vehicle, is that -- is
23    that right?
24    A.  Correct.  And there may have been one or two other deputies
25    on the scene, I don't recall exactly.                09:11:42
```

1  Q.  There were two other deputies on the scene?

2  A.  Possibly, I don't -- they showed up at some point.  I don't

3  know if they were there exactly at the time or showed up while

4  I had arrived.

5  Q.  But at some point, either just before or as you were                09:11:52

6  arriving, two other deputies also appeared on the scene, is

7  that correct?

8  A.  Correct.

9  Q.  And one of those deputies drew his weapon as well, is that

10  correct?                                                               09:11:58

11  A.  I did not see that.

12  Q.  Is it possible that one of them drew his weapon?

13  A.  I'd only be guessing.  I don't know.

14  Q.  It's possible, you don't know, is that the answer?

15  A.  That's correct.                                                    09:12:11

16  Q.  Now, when you were trained in traffic stops and vehicle

17  infractions at the MCSO, you were not taught as a matter of

18  course to draw your weapon, were you?

19  A.  Not in general practice, no.

20  Q.  Even though that might make the officer safer on any               09:12:30

21  particular stop, because you never know who's going to be in a

22  car, isn't that correct?

23  A.  You only re -- not on a general traffic stop, no.  You do

24  not draw your weapon.

25  Q.  There are occasions when what appears to be a general             09:12:42

1  traffic stop turns out to be a very dangerous individual in the

2  car, and indeed, someone who possesses weapons, is that

3  correct?

4  A.  It would be done in response to a threat.

5  Q.  You would only draw your weapon in response to a threat.                09:12:56

6  A.  A threat to myself or another individual, yes.

7  Q.  And it would have to be a very serious threat to dem -- to

8  display a gun, isn't that correct?

9  A.  Death or serious injury.

10  Q.  Would have to be a threat of death or serious injury,                09:13:10

11  correct?

12  A.  Correct.

13  Q.  And that would be -- in your continuum of force that was

14  taught at the MCSO, that would be your last -- last tactic

15  would be drawing a gun and pointing it at someone, is that                09:13:25

16  correct?

17  A.  It's at the top level of the force continuum, yes.

18  Q.  And you would only use it if none of the others were

19  adequate, is that right?

20  A.  You're not required to go one, two, three, four, all the                09:13:35

21  way to the top.

22  Q.  But you shouldn't use the tactic of pointing a gun at

23  somebody unless it was necessary to alleviate a situation that

24  involved a serious threat of death or serious injury.

25  A.  It was done in response to that, yes.                09:13:49

```
 1    Q.  A situation of death or serious injury, correct?

 2    A.  Potential for death or serious injury.

 3    Q.  Now, let me see what distinguished this particular stop

 4    from others where you would not be allowed or proper training

 5    would not indicate you should draw your weapon.                    09:14:05

 6          I'm trying to get at what factors were in your mind at

 7    that moment that led to your conclusion:  I have to draw my

 8    weapon in this case.

 9          The first factor is what you heard over the radio, is

10    that correct?                                                      09:14:18

11    A.  That was the first portion of it, yes.

12    Q.  And so when you approached that scene, you believed that a

13    vehicle had tried to run over the deputy, is that correct,

14    Mr. Armendariz?

15    A.  Correct.                                                       09:14:35

16    Q.  And of course, that would be an assault with a deadly

17    weapon, trying to run someone over with a car, is that correct?

18    A.  Correct.

19    Q.  And that's a crime, is that right?

20    A.  It's a felony, correct.                                        09:14:44

21    Q.  And if you did hear that on the radio you would indeed

22    respond very quickly, as you said you did, is that right?

23    A.  Correct.

24    Q.  And there was nothing else in the radio report that you

25    heard that indicated any other criminal activity on the part of   09:14:54
```

1454

```
 1   any of the occupants of the car, is that right?

 2   A.   That's correct.

 3             MR. POCHODA:  Let me -- if we could put up Plaintiffs'

 4   Exhibit 71 -- that has been admitted -- and publish it, please,

 5   with the Court's permission.                                        09:15:14

 6             It doesn't seem to be coming up.

 7             THE COURT:  All right.  We're going to shut down the

 8   system and reboot it.

 9             MR. POCHODA:  I have one extra copy, if the Court

10   can -- can get one from the file.                                   09:16:31

11             THE CLERK:  Exhibit 71?

12             MR. POCHODA:  71.  Plaintiffs' 71.

13             May I approach to give this to the witness, Your

14   Honor?

15             (Pause in proceedings.)                                   09:16:47

16             THE COURT:  I have -- I have a copy.

17   BY MR. POCHODA:

18   Q.   This exhibit, Exhibit 71, has a number of pages.

19             Do you see that, Mr. Beeks?

20   A.   Yes, sir.                                                      09:17:10

21   Q.   If you could turn to the page that's marked MCSO 001817.

22   It would be on the top right of that page.

23   A.   Okay.

24   Q.   And if you could quickly look at the next two pages and

25   then we'll turn back to the first page, up through 001820.         09:17:38
```

1    And is this a CAD incident history report, sir?

2   A.  Yes, it is.

3   Q.  And turning to that first page, 001817, do you recognize

4   any of the entries in this report?

5   A.  Yes, I do.  It has the call units for Deputy Armendariz and    09:18:20

6   myself.

7   Q.  And Deputy Armendariz is unit 135D, is that correct?

8   A.  That's correct.

9   Q.  And what is your unit?

10  A.  I'm 129D.    09:18:33

11  Q.  And at some point does this indicate that Deputy Armendariz

12  made a traffic stop?

13  A.  At the very beginning of the first line, "Out on scene."

14  Q.  And what would be the next entry from Deputy Armendariz?

15  A.  Shows that he ran some license registration vehicle --    09:18:51

16  license registration information for a vehicle.  He had two

17  detained.

18  Q.  And following that?

19  A.  There's a -- dispatch is requesting a code 4 from him and

20  there's no response.  The code 4 is a request for status,    09:19:12

21  whether or not you're okay or need assistance.

22  Q.  And as a matter of course, if there's no response, as

23  you've testified, the line would be kept open, is that correct?

24  A.  Generally.

25  Q.  Because it could be that the no response is due to a    09:19:30

1    problem that has arisen at the other end, is that right?

2    A.  That's correct, on a traffic stop it's a concern.

3    Q.  And it could be the officer was not at the radio at that

4    moment, is that correct?

5    A.  He could -- there's any number of things that would cause    09:19:44

6    him not to answer up.  He has a portable radio with him.  It

7    could -- could be any number of reasons.

8    Q.  And a number of those reasons would not be attributable to

9    the deputy being in any sort of problem or threatening

10   situation?    09:20:01

11   A.  Well, that's an assumption you can't make.

12   Q.  I'm not saying you make that assumption, but a number of

13   the reasons that people would -- do not answer when they are

14   asked about this code 4 turn out to be happily benign reasons,

15   is that right?    09:20:10

16   A.  There's always that chance, yes.

17   Q.  And then the next line, what does that indicate?

18   A.  They're requesting another unit to start towards that

19   traffic stop.

20   Q.  When you say "they," that's Deputy Armendariz, is that    09:20:23

21   correct?

22   A.  Correct.

23   Q.  And those are his words, is that correct, "Start me another

24   unit"?

25   A.  "Start me another unit," correct.    09:20:33

1457

```
 1    Q.  And that would be -- you've heard him use that terminology
 2    in such reports before, is that correct?
 3    A.  Yes.
 4    Q.  And that means he wants a backup car, is that right?
 5    A.  Yes.                                                        09:20:41
 6    Q.  And is there any indication on this page of any other words
 7    stated by Deputy Armendariz on that dispatch call at that
 8    moment?
 9    A.  Not on here.  Not all words will be transcribed onto a call
10    history.                                                        09:20:53
11    Q.  But there are no other words transcribed onto this call
12    history, is that correct?
13    A.  There's not, no.
14    Q.  There's no indication in this call history -- or take a
15    look at the following pages for a moment -- of any indication   09:21:04
16    from Mr. Armendariz that, "Someone has just tried to run me
17    over," is there?
18    A.  I'm not showing in the call history.  It was the voice
19    inflection and the tone of his voice --
20    Q.  I'm not asking that.                                        09:21:17
21    A.  Okay.
22    Q.  I'm asking on these pages is there any indication that
23    Mr. Armendariz stated to dispatch, such that others like
24    yourself could have heard, that someone had tried to run him
25    over?                                                           09:21:26
```

1    A.  It's not shown on this -- on this call history, no.

2    Q.  And that would be information that would be of interest to

3    any of -- other deputies listening in, is that correct?

4    A.  It would be, but not all words that are spoken during a

5    radio transmission get transcribed onto a call log.  There are          09:21:43

6    times when the message may be garbled that the dispatcher can't

7    enter those words.

8    Q.  You're saying there may be a reason why, even though he may

9    have said that, it's not listed here, is that correct?

10   A.  His -- his statement that a vehicle tried to run him over          09:22:02

11   does not appear on this call log.  However, that's what I did

12   hear.

13   Q.  And if -- if you can explain to the Court, if none of the

14   other deputies involved heard any such words over the dispatch

15   that day and it's not reflected in the records in front of us          09:22:21

16   today, how is it that you are the only person who heard that?

17   A.  I don't know what they heard.

18          MR. CASEY:  Excuse me.  Objection, Your Honor, to the

19   foundation to the predicate of the question.  It assumes facts

20   not in evidence.                                                       09:22:35

21   BY MR. POCHODA:

22   Q.  Deputy Kikes did not indicate in his testimony hearing

23   anything other than "Start me another unit."

24   A.  I don't know what Deputy Kikes heard; I know what I heard.

25          THE COURT:  I'm going to sustain the objection.                 09:22:48

1   BY MR. POCHODA:

2   Q.  In any event, others -- other deputies --

3           MR. CASEY:  Excuse me, Your Honor.  I'm going to move

4   to strike the answer of the witness that was given before --

5   why your -- why the --                                    09:23:03

6           THE COURT:  Yeah, I'll grant the motion to strike.

7           MR. CASEY:  Thank you, Your Honor.

8   BY MR. POCHODA:

9   Q.  Other deputies listening to the dispatch that day would

10  have heard the same things that you heard, is that correct?  09:23:09

11  A.  I can only assume.

12  Q.  In any event, turning back to the stop itself at the -- you

13  said it was some type of shop, is that correct?

14  A.  It's a convenience store/gas station on the corner.

15  Q.  And we have heard testimony that it's approximately 350   09:23:33

16  feet from the gas station itself.  Is that your understanding?

17  A.  Give or take a little bit.

18  Q.  And we were talking about the factors that led you to, in

19  this instance as opposed to normal traffic stops, draw your

20  weapon.  We talked about one of them being the fact that you  09:23:51

21  were under the impression that this particular driver had

22  already committed a crime in trying to run down Deputy

23  Armendariz, is that correct?

24  A.  That's correct.

25  Q.  And then the other factor is what you observed when you   09:24:03

1    came upon the scene, is that correct?

2    A.  That's correct.

3    Q.  And when you came upon the scene, the car had been stopped

4    and Deputy Kikes was already off of his vehicle, a motorcycle,

5    I believe, is that correct?                                    09:24:16

6    A.  Correct.

7    Q.  And where was Deputy Armendariz standing at that point?

8    A.  Deputy Armendariz was still back at the convenience store,

9    the gas station.

10   Q.  I'm sorry, Deputy Kikes.  I apologize.                     09:24:25

11   A.  Deputy Kikes made contact with the driver.  At that point I

12   don't recall exactly if the driver's door had been opened, but

13   he was at the driver's door making contact with the driver.

14   Q.  And his motorcycle was parked behind the driver's car, is

15   that correct?                                                  09:24:37

16   A.  I believe so, yes.

17   Q.  And so he had left that and was now speaking to the driver

18   at the driver's side of the car, is that right?

19   A.  Correct.

20   Q.  At any point in this did the -- was there any weapons      09:24:51

21   observed from inside the car?

22   A.  I didn't see any, no.

23   Q.  Did any -- anybody report any weapons to you, though, were

24   inside the car?

25   A.  No.                                                        09:25:03

1   Q.  And the others -- deputies that arrived on the scene, where

2   did they pull up their cars?

3   A.  I don't recall exactly.  Off to the -- I think one was to

4   the south, which would be opposite the side of the truck where

5   I was on.                                                      09:25:20

6   Q.  And if you could describe, as you approached, you also

7   approached on the driver's side, is that right?

8   A.  Correct.

9   Q.  The car's facing away from you.

10  A.  It's facing -- well, I'm coming up to the driver's side.   09:25:31

11  It's facing to the left of me.

12  Q.  But when you pulled in, the car was facing -- you pulled in

13  to the back of the car, in the back side of the car?

14  A.  I pulled off at a -- almost a 45-degree angle to the back

15  of -- back of the vehicle.                                     09:25:55

16  Q.  And at that point you were able to get up to the side door

17  and you were able to observe the occupants of the car, is that

18  correct?

19  A.  I pulled up in such a way that as I exited my vehicle I

20  could observe the deputy and the occupant of the vehicle.      09:26:05

21  Q.  You saw the faces of the occupants, is that correct?

22  A.  I saw the face of the driver; the passenger I couldn't see.

23  She was still somewhat obscured by the pillar of the -- of the

24  vehicle.

25  Q.  And you didn't hear specifically any of the words that the  09:26:19

```
 1   driver said, is that correct?
 2   A.  Not specifically that I can recall, no.
 3   Q.  And did you hear the words of Deputy Kikes?
 4   A.  He was telling him to turn off the vehicle and exit to
 5   vehicle.  The driver was yelling something; I don't remember
 6   his exact words.  He was combative, noncompliant.
 7   Q.  Combative and noncompliant because he didn't turn off the
 8   car, is that your opinion?
 9   A.  His whole physical demeanor and body language were -- were
10   not in --
11   Q.  What is his physical demeanor?  Did he raise his fists in
12   any way?
13   A.  He was tense and agitated.
14   Q.  He did not -- when you say combative, he did not take a --
15   a stance of combat, did he?
16   A.  He was still seated in the vehicle, no.
17   Q.  And his hands were not in a fist formation, were they?
18   A.  He was holding on to the vehicle's steering wheel, I
19   recall.
20   Q.  You recall that he had both hands on the steering wheel?
21   A.  One of them; I can't say about the other one.
22   Q.  So the -- the determination of him being combative is
23   because he wasn't complying with what you took to be orders
24   from Deputy Kikes to turn off the vehicle, is that correct?
25   A.  His -- his demeanor, his -- his yelling, his -- totality of
```

09:26:36

09:26:51

09:27:01

09:27:12

09:27:30

```
 1   the whole circumstances.
 2   Q.  And do you know if he was yelling at Deputy Kikes or
 3   somebody else?
 4   A.  He could have been yelling at somebody else, too.  I don't
 5   recall exactly.                                          09:27:43
 6   Q.  And if in fact Deputy Kikes testified that the driver of
 7   the car was on the telephone for the entire time during this
 8   incident, would that be consistent with what you observed?
 9   A.  I don't recall the driver being on a telephone.  I believe
10   the passenger was on a telephone at one point.           09:27:57
11   Q.  And if that's inaccurate, you might be inaccurate about
12   what the driver was doing, is that right?
13   A.  I didn't see the driver with a telephone in his hand.
14   Q.  It's your testimony the driver did not have a telephone and
15   the passenger did, is that -- is that your testimony?    09:28:11
16   A.  Didn't see the driver with a telephone in his hand.
17   Q.  Would you -- would you dispute the fact if Deputy Kikes,
18   who was closer, testified that the driver was on the phone for
19   the entire time that he was sitting in the driver's seat?
20   A.  He may have been on the phone before I came to the side of  09:28:26
21   the truck.  I don't know that.
22   Q.  Would you dispute Deputy Kikes' testimony that the driver
23   was on the phone for the entire time that he was sitting in the
24   driver's seat?
25   A.  I didn't see him on the telephone.                   09:28:36
```

1    Q.  So you do dispute that.

2    A.  I didn't see him on the telephone.

3    Q.  He would not be so combative if he was on the telephone, is

4    that correct?

5    A.  I wouldn't say that.                                          09:28:47

6    Q.  He might be combative.  He might not have liked the person

7    he was talking to, of course, is that right?

8              In any event, you did not see any weapons or direct

9    threats from the driver towards any deputy on the scene, did

10   you?                                                              09:29:03

11   A.  Based upon the totality of the circumstances, I can't make

12   the assumption that there's no vehicles -- or no weapons in

13   that vehicle.

14   Q.  Right.  So some of your -- some of your decision to pull

15   your weapon is 'cause there's always a possibility there might   09:29:11

16   be a gun in the vehicle, is that correct?

17   A.  In response to a threat.

18   Q.  That there's always the possibility of a weapon.  He never

19   threatened use of a weapon, did he?

20   A.  His vehicle could be considered a weapon.                    09:29:22

21   Q.  And again, we're going back to this report that you

22   allegedly heard about the driver trying to run over the deputy,

23   is that right?

24   A.  That's the beginning of it.  And then my observations on

25   the scene.                                                       09:29:35

```
 1   Q.  Your observation on the scene was that there was a driver

 2   who did not get out of the car when told, and was speaking

 3   loudly, is that right?

 4   A.  He was speaking loudly, yes.

 5   Q.  If both the driver and Deputy Kikes indicated that what the      09:29:45

 6   driver was in fact doing was making a 911 phone call because of

 7   his concern about being threatened by the deputies, you would

 8   not dispute the accuracy of those statements, would you?

 9   A.  I didn't see him on the telephone making that telephone

10   call, so I don't know.                                               09:30:09

11   Q.  And if there's no testimony that the woman was ever on the

12   phone, you would not dispute the accuracy of that testimony,

13   would you?

14   A.  I saw her on the telephone.  I don't know what her

15   testimony's been.                                                    09:30:24

16   Q.  And you testified on direct that you did not see the driver

17   being pulled from the car, is that correct?

18   A.  I saw the driver being pulled from the car.

19   Q.  And in fact, Deputy Kikes did pull him from the car, isn't

20   that right?                                                          09:30:43

21   A.  He didn't pull him out of the car.  He had hands on him

22   while the vehicle -- or while the driver exited the vehicle.

23   He did not forcibly remove him from the vehicle.

24   Q.  Mr. Beeks, did you give a deposition at an earlier time in

25   this case?                                                           09:31:02
```

```
 1   A.  Yes, I did.

 2   Q.  Do you recall doing that on or about October 22nd, 2009?

 3   A.  Yes.

 4          MR. POCHODA:  May I approach, Your Honor?

 5          THE COURT:  Yes.                                        09:31:11

 6          MR. POCHODA:  Would you like a copy for the Court?

 7          THE COURT:  Please.

 8          MR. POCHODA:  (Handing deposition to the clerk).

 9   BY MR. POCHODA:

10   Q.  Is that your deposition that you gave previously in this   09:31:37

11   matter, Mr. Beeks?

12   A.  Appears to be.

13   Q.  And you were under oath at the time you answered the

14   questions in this deposition?

15   A.  Correct.                                                   09:31:46

16   Q.  If you could turn to page 106, please, starting at line 3,

17   through line 6.

18   A.  Okay.

19   Q.  "QUESTION:  Did Deputy Kikes reach in to the driver?

20          "ANSWER:  I believe so.                                 09:32:13

21          "QUESTION:  And he pulled him out of the car; is that

22   right?

23          "ANSWER:  Yes."

24          Do you see that?

25   A.  Yes, I do.                                                 09:32:19
```

```
 1   Q.  And was that accurate testimony at the time?
 2   A.  He assisted him out of the vehicle.  You could read
 3   anything you want into that.  He did not yank him out of the
 4   vehicle, if you're assuming that that's what "pulled" means.
 5   Q.  I'm not assuming anything.  I asked you the question here:      09:32:32
 6   "And he pulled him out of the car; is that right?"  You chose
 7   to answer yes, is that correct?
 8   A.  That's correct.
 9   Q.  So at that point you answered yes, he did pull him out of
10   the car, is that right?                                            09:32:47
11   A.  Yes.
12   Q.  And then with assistance from other deputies he was
13   handcuffed behind his back and put against the car, is that
14   correct?
15   A.  Yes.                                                           09:33:02
16   Q.  And all this time you had a gun pointed at the driver, is
17   that right?
18   A.  At this point I believe I had reholstered, once he was
19   removed from the vehicle.
20   Q.  After he was handcuffed.                                       09:33:15
21   A.  Yes.  Well, at the point he was being handcuffed, I -- at
22   that -- during that point, that transition, I had reholstered
23   my -- my weapon.
24   Q.  But the driver was aware that there was a deputy with a gun
25   pointed at him as he was leaving the car, is that correct?        09:33:30
```

A.  I assume so.  I don't know what he was thinking or what he

saw.

Q.  But your goal was to let him know that he had a gun pointed

at him in order to stop being belligerent, is that right?

A.  Correct.                                              09:33:43

Q.  And the occupant -- at that point the driver was not free

to leave the scene, is that right?

A.  Not at that point, no.

Q.  At some point you said that there was a call made back to

deputy -- contact made with Deputy Armendariz, is that right,    09:34:01

about what should occur, is that right?

A.  I didn't hear what the -- about what?

Q.  Let me withdraw that question.

        At some point there was a contact made from the

officers on the scene of the stop to Deputy Armendariz, who was   09:34:15

back at the gas station, is that right?

A.  That's correct.

Q.  And Deputy Armendariz indicated that there was no need for

an arrest, and there may not have been any crime committed, is

that right?                                               09:34:25

A.  I did not speak with him directly, but his -- the decision

was made that charges would not be pursued at that time.

Q.  He didn't indicate that he had any charges, did he?

A.  Other than disorderly conduct, no.

Q.  He said it could be a disorderly conduct charge, is that    09:34:44

1469

1    right?

2    A.  I believe so.  He didn't say that to me specifically, but

3    that was the conversation he had with the other deputies.

4    Q.  It was reported to you.  And who was the victim of that

5    disorderly conduct behavior?                                09:34:54

6    A.  The disorderly conduct would be state of Arizona.

7    Q.  I know.  But did Deputy Armendariz indicate who was the

8    victim, who was offended by the conduct?

9    A.  State of Arizona.

10   Q.  State of Arizona?  You don't require someone to be offended  09:35:06

11   to bring a disorderly conduct charge?

12   A.  Well, I guess the deputy and the -- in the scene that he

13   was on would have been the site of the disorderly conduct

14   charge.

15   Q.  The deputy would have been the victim.                 09:35:20

16   A.  Yeah.

17   Q.  And did you file any reports about the events on March

18   28th, 2008 --

19   A.  I did not.

20   Q.  -- including the --                                    09:35:29

21           Let me finish.

22           -- including a use of force report?

23   A.  I did not.

24   Q.  You were required, as a member of the MCSO, when you draw

25   and point a weapon, to file a use of force report, is that  09:35:37

1  correct?

2  A.  Not for that, no.

3  Q.  Not for drawing your weapon?

4  A.  No.

5  Q.  So there are many occasions where people draw their weapon    09:35:45

6  and there's no written record of it, is that correct?

7  A.  Yes.

8  Q.  And did anyone at the MCSO ever speak to you about the

9  events that took place on March 28, 2008, at that shop?

10  A.  At that particular time, or later on during this court    09:35:59

11  hearing?

12  Q.  Did anyone from MCSO -- within, let's say, a month of the

13  events, did anyone speak to you about what occurred?

14  A.  No.

15  Q.  Did you have to in any way -- or did you in any way write    09:36:13

16  any incident report about what occurred on March 28th, 2008?

17  A.  No.

18  Q.  You're not required as a deputy to indicate anywhere in

19  writing what happened on your daily activities on a particular

20  shift, is that correct?    09:36:30

21  A.  We don't keep a log of that unless there's been a criminal

22  report filed or a citation.

23  Q.  So absent an arrest or a citation, a supervisor in your

24  unit would not know what other interactions you had with

25  citizens during your shift, is that right?    09:36:42

```
 1   A.  Correct.

 2          MR. POCHODA:  No further questions.

 3          THE COURT:  I don't know whether to call you Deputy

 4   Beeks or Mr. Beeks.  I'll call you Mr. Beeks --

 5          THE WITNESS:  Okay.                              09:36:55

 6          THE COURT:  -- since you're no longer a deputy.

 7                         EXAMINATION

 8   BY THE COURT:

 9   Q.  You were involved in several sat -- saturation patrols, you

10   said?                                                   09:37:04

11   A.  Correct.

12   Q.  Do you remember which ones?

13   A.  This particular one, it was at Cave Creek and 32nd Street,

14   or Bell Road --

15   Q.  Which would have been --                            09:37:12

16   A.  -- this particular one with the traffic stop that we just

17   discussed.

18   Q.  Right.  Which would have been in March 2008?

19   A.  Right.  One in Mesa and one in Sun City.

20   Q.  All right.  Were you ever -- did you ever receive 287(g)   09:37:21

21   training?  Were you ever 287(g) certified?

22   A.  I did in August of 2009.

23   Q.  In August of 2009.  So you were 287(g) certified after your

24   participation --

25   A.  After this --                                       09:37:40
```

1    Q.  -- in all of the saturation patrols?

2    A.  Correct.

3    Q.  Not just this saturation patrol, but you were 287(g)

4    certified after all of the saturation patrols in which you

5    participated?                                                    09:37:49

6    A.  That's correct.

7    Q.  Do you have any recollection as to whether or not you

8    received any instruction about who to stop or not to stop

9    during any of the saturation patrols in which you participated?

10   A.  We were instructed that there would be no stops based upon  09:38:06

11   race or -- race or ethnicity.  The stops would be -- if -- if a

12   traffic stop was performed, it would be for traffic infractions

13   or violations, or any other criminal activity.

14   Q.  Were you told that you had no discretion as to who to pull

15   over?                                                            09:38:24

16   A.  We have discretion as a patrol deputy, and, yeah, we have

17   discretion who we can stop, based upon the violation, the

18   totality of the circumstance surrounding that violation.

19   Q.  All right.  So I'm not -- I want to understand to the best

20   you understood what, if any, instruction you received about who  09:38:44

21   you should or should not pull over.

22   A.  There was no specifics as to who to stop or who not to

23   stop, other than race, ethnicity, would not be a factor in

24   making that decision.

25   Q.  When did you receive that instruction?                      09:39:01

1    A.  That's been spoken throughout the office for several years.

2    It comes up in briefings.  It's -- it's mentioned at the

3    beginning of the saturation patrols.

4    Q.  Okay.  At the beginning of the saturation patrols do you

5    have a specific recollection of attending each of the briefings    09:39:19

6    in each of these saturation patrols?

7    A.  Not the formal briefings.  Our squad would meet up

8    informally before the -- before we'd go out on patrol and we

9    would be briefed.

10   Q.  And who was -- what squad were you in?    09:39:35

11   A.  At that particular time I was on SAU, which is our Special

12   Assignment Unit, and Squad 5.  And our sergeant at that time

13   was Chris Scott, and we had an acting sergeant before that,

14   Deputy Tony Navarra.

15   Q.  And would -- and so you don't have any recollection of the    09:40:02

16   briefings, the formal briefings before the saturation patrols,

17   but you do have a recollection that you would meet with your

18   own special assignment patrol?

19   A.  With our squad members, yes.

20   Q.  "Special Assignment Squad" perhaps is a better way of    09:40:16

21   saying it.  And do you recall any instruction you received from

22   your squad leader specifically?

23   A.  Racial profiling was not a -- was not a criteria for any

24   stops or investigations that we did.

25   Q.  All right.  When they told you that racial profiling wasn't    09:40:36

1474

1    a criteria, what did you understand that to mean?

2    A.   That if I see a Hispanic male driving down the road, I

3    don't isolate him from -- excuse me -- 20 other vehicles just

4    based solely upon my assumption that -- that he would be an

5    illegal alien.                                            09:40:58

6    Q.   All right.

7    A.   And --

8    Q.   You hadn't received any 287(g) training at all at this

9    point?

10    A.   Not formally, no.                                  09:41:05

11    Q.   So to the extent that anybody referenced 287(g) training,

12    that wouldn't have meant anything to you anyway?

13    A.   I was aware we had 287(g) deputies, but I was not aware of

14    their training.

15    Q.   When you participated in a saturation patrol, do you recall   09:41:17

16    whether -- some of them were multiple days?

17    A.   Right.

18    Q.   Do you recall whether you participated in all days or only

19    some of the days?

20    A.   Generally, one of the two days.                    09:41:30

21    Q.   Do you recall whether you made arrests on all the days in

22    which you participated?

23    A.   No, I did not make arrests on all the days.

24    Q.   Okay.  Do you recall whether you were instructed that if

25    you saw anybody commit any traffic violation, you had to pull   09:41:42

1   that person over?

2   A.  We were told to be proactive, and if we saw violations, to

3   address them.

4   Q.  But you were given discretion as to how you would address

5   them?                                                          09:41:57

6   A.  We were given discretion.

7           THE COURT:  If you would, can one of the two parties

8   with the nice computers put up Exhibit 90.  And I'd like you to

9   bring up page MCSO 001905 in Exhibit 90.

10  BY THE COURT:                                                  09:42:28

11  Q.  Do you see on your screen the page I'm referring to?

12  A.  Yes.

13  Q.  Do you know what that is?

14  A.  It's a stat sheet that was kept at the command post of some

15  of our operations.                                             09:42:39

16  Q.  All right.  And you'd seen -- you've seen something like

17  this before, enough to know what this is?

18  A.  Yes.

19  Q.  I assume this is not in your handwriting?

20  A.  No, it's not my handwriting, no.                           09:42:49

21  Q.  But do you see where it's discussing a Mesa operation that

22  took place on June 26, 2007?

23  A.  Yes.

24  Q.  And do you see where on Arresting Deputy it has, in the

25  second, third, and fourth column, it has Beeks?                09:43:01

1    A.  Correct.

2    Q.  Are you aware of any other Beeks in the Maricopa County

3    Sheriff's Office that participated in saturation patrols?

4    A.  No, I'm not.

5    Q.  Are you aware -- for that matter, are you aware of any          09:43:11

6    other Kikeses in the MCSO who participated in saturation

7    patrols?

8    A.  None that I've heard of, no.

9    Q.  Any other Armendarizes who participated in saturation

10   patrols?                                                            09:43:21

11   A.  There's a possibility there with Armendariz, but I'm not

12   familiar with any of them.

13   Q.  All right.  Do you have any recollection of making this

14   arrest that it refers to on lines 20, 21, and 22?

15   A.  Yes, I do.                                                      09:43:36

16   Q.  All right.  So you arrest -- you -- it indicates here that

17   you're arresting deputy; that you observed -- that your

18   probable cause for a stop was speed, and you pulled over

19   somebody named Celerino -- Celerino Guzman Rodriguez?

20   A.  Correct.                                                        09:43:57

21   Q.  And charged him with failure to have ID?

22   A.  Correct.

23   Q.  And there was a determination on 287(g)?

24   A.  That determination was not made by myself.

25   Q.  Who made that determination?                                   09:44:07

```
 1   A.  It was 287(g) deputies that arrived on scene.

 2   Q.  All right.  Why did you call a 287(g) deputy in this case?

 3   A.  They were unable to provide any form of ID.  I was not able

 4   to -- I don't speak Spanish very well.  They were in the area,

 5   and they came by and assisted on the traffic stop to determine

 6   their names and so we could check their ID to see if they were

 7   a valid driver, and if they had a driver's license, and get

 8   their information so I could go ahead and do a -- a warrants

 9   check on them to see if there was any other criminal history as

10   to them.

11   Q.  All right.  So let me ask, the basis on which you called a

12   287(g) officer in this case was because the driver didn't have

13   an identification?

14   A.  He did not have a valid U.S. identification.

15   Q.  He didn't have a valid United States identification.

16   A.  Correct.

17   Q.  Any other reason?

18   A.  Not specifically.

19   Q.  Okay.  Do you call 287(g) officers any time you stop

20   someone who does not have a valid United States identification?

21   A.  No.

22   Q.  But you did in this case?

23   A.  Yes.

24   Q.  And was it your habit to call a 287(g) officer any time you

25   stopped anyone in a saturation patrol who didn't have valid
```

1    United States identification?

2    A.  No.

3    Q.  I don't want to make you go through the trouble to look

4    at -- but on some of our other arrests --

5    A.  Okay.                                                    09:45:54

6    Q.  -- when they've put down the PC for stop, they've indicated

7    a number.  And that number appears not just for you, but a

8    number of other times elsewhere.  Under the sample PC they just

9    list a number that says 2502.  I've heard a number of officers

10   refer to Title 28 violations, and I can't find any violation of   09:46:12

11   Title 28-2502.

12          Do you have any idea what 2502 means?

13   A.  No.  Where's that?  Is it on a stat sheet?

14   Q.  It's on a sheet like this, but it's --

15   A.  Maybe in context I could figure it out, but I don't --    09:46:28

16   Q.  You don't know where he's --

17   A.  Not off the top of my head, no.

18   Q.  All right.  Just let me check and see if I have any other

19   questions for you.

20          When you did patrols, were you on patrols alone?  Were    09:46:42

21   you alone in your patrol car or did you have a partner?

22   A.  It varied.  Sometimes I had a trainee with me, or I could

23   have had another deputy or posseman with me.

24   Q.  And you can't -- in this case on the sheet that we have up,

25   do you recall whether you had anybody with you?              09:46:59

```
 1   A.  I had a trainee with me on that particular day.

 2   Q.  I'm sorry?

 3   A.  I had a trainee with me.

 4   Q.  Okay.  And the trainee wasn't 287(g) certified?

 5   A.  No, he wasn't, no.                                      09:47:08

 6   Q.  And you weren't 287(g) certified?

 7   A.  Not at that time, no.

 8            THE COURT:  Thank you very much.

 9            THE WITNESS:  Thank you.

10            THE COURT:  Do you have any follow-up, Mr. Pochoda?  09:47:22

11            MR. POCHODA:  No, Your Honor.

12            THE COURT:  Any redirect?

13            MR. CASEY:  None, Your Honor.  Thank you.

14            THE COURT:  You may step down.

15            Next witness.                                      09:47:37

16            MR. CASEY:  Your Honor, defense calls Ramon Charley

17   Armendariz to the stand.

18            THE CLERK:  Right up here, sir.

19            Can you please state and spell your full name.

20            MR. ARMENDARIZ:  Sure.  Ramon, R-a-m-o-n; Charley,  09:48:20

21   C-h-a-r-l-e-y; Ramirez, R-a-m-i-r-e-z; Armendariz,

22   A-r-m-e-n-d-a-r-i-z.

23            THE CLERK:  Okay.  Please raise your right hand.

24            (Ramon Charley Ramirez Armendariz was duly sworn as a

25   witness.)                                                   09:49:04
```

```
 1              THE CLERK:  Thank you.  Please take our witness stand.
 2              MR. CASEY:  May I proceed, Your Honor?
 3              THE COURT:  You may.
 4                  RAMON CHARLEY RAMIREZ ARMENDARIZ,
 5    called as a witness herein, having been duly sworn, was
 6    examined and testified as follows:
 7                        DIRECT EXAMINATION
 8    BY MR. CASEY:
 9    Q.  Good morning, Deputy.  How are you today?
10    A.  Good morning, sir.  How are you?                         09:49:25
11    Q.  I'm doing very well.  Thank you.
12              Tell us your full name.
13    A.  My full name is Ramon Charley Ramirez Armendariz.
14    Q.  And where were you born, sir?
15    A.  I was born in El Paso, Texas.                            09:49:34
16    Q.  And where did you grow up?
17    A.  In El Paso, Texas.
18    Q.  You still have family there?
19    A.  Yes, I do.
20    Q.  I understand you recently lost an uncle?                 09:49:40
21    A.  I did, to cancer.
22    Q.  And did you go back there for the funeral services?
23    A.  I did.
24    Q.  And where was that funeral service held?
25    A.  In our family plot in Juarez, Mexico.                    09:49:50
```

1481

```
 1    Q.   What is your first language?
 2    A.   Spanish.
 3    Q.   Tell me a little bit, did you graduate from high school?
 4    A.   I did.
 5    Q.   And where'd you go to high school?                          09:50:00
 6    A.   Eastwood High School.
 7    Q.   And where was that?
 8    A.   In El Paso.
 9    Q.   And what did you do after high school?
10    A.   After high school I joined the military.                    09:50:06
11    Q.   What branch?
12    A.   United States Navy.
13    Q.   How long were you in the United States Navy, sir?
14    A.   For three and a half years' active duty, and then I
15    transferred over to reserve status.                             09:50:15
16    Q.   And what did you do in the Navy, sir?
17    A.   I was a corpsman.
18    Q.   And were you stationed anywhere particular, or --
19    A.   Kind of all the way around, but my final duty station was
20    the USS Abraham Lincoln.                                         09:50:25
21    Q.   Where was that stationed out of?
22    A.   Alameda, California, at the time.
23    Q.   After you left the -- the Navy, did you go into law
24    enforcement?
25    A.   I did, sir.                                                 09:50:35
```

```
 1   Q.  And a where did you go into law enforcement?

 2   A.  I began with the City of Austin Police Department.

 3   Q.  And that's Austin, Texas?

 4   A.  Yes, sir.

 5   Q.  And did you undergo training when you were in Austin,          09:50:42

 6   Texas?

 7   A.  I'm sorry, sir?

 8   Q.  Did you undergo -- I'm sorry, I'm going to speak up in the

 9   mike.

10        Did you undergo training while you were in Austin,           09:50:50

11   Texas?

12   A.  I did the basic law enforcement academy.

13   Q.  Okay.  When you were at the basic law enforcement academy

14   in Texas, did you have any training about the use of race or

15   the prohibition on racial profiling?                             09:51:01

16   A.  Sir, that was many years ago.  I don't remember.

17   Q.  Okay.

18   A.  I can't recall, I apologize.

19   Q.  All right.  That's fine.

20        How long were you at the City of Phoenix -- "City of        09:51:07

21   Phoenix."  Strike that.

22        How long were you with the City of Austin police

23   force?

24   A.  I was with the City of Austin on the law enforcement side

25   for two years, and then I transferred over to the emergency      09:51:16
```

1   medical services side, where I was a paramedic.

2   Q.  Okay.  Why'd you leave Texas?

3   A.  I came to Phoenix to be closer to my family.  My mother and

4   my grandmother both had terminal cancer, and it was more

5   appropriate for me to be closer to family at this time -- at          09:51:39

6   that time.

7   Q.  And when did you move to Phoenix?

8   A.  May of 2005.  Or December of 2004, I'm sorry.

9   Q.  When did you begin work at MCSO?

10  A.  May of 2005.                                                       09:51:50

11  Q.  And how did -- did you have to undergo, since you were

12  already an officer, a peace officer, did you have to redo

13  training?

14  A.  I opted to.  I was given the option to apply with the state

15  for reciprocity and test out, but I opted to go through another       09:52:03

16  academy with the Sheriff's Office.

17  Q.  Why did you do that?

18  A.  For training purposes.  It provides a better insight with

19  the agency that you're working for.

20  Q.  Why'd you decide, of all -- let me ask this:  Did you apply       09:52:18

21  anywhere else to -- to be employed in law enforcement when you

22  moved to Phoenix?

23  A.  No, sir, this is the only agency I applied for.

24  Q.  Why?

25  A.  Sheriff Joe had a very good reputation of being a law             09:52:28

1    enforcement officer and allowing his law enforcement personnel

2    to enforce laws, and so I wanted to be a part of that.

3    Q.  And when you went to the academy, do you recall roughly how

4    long that academy training was?

5    A.  Somewhere in the twenty some-odd weeks.                    09:52:46

6    Q.  During that --

7    A.  Eighteen, twenty weeks, somewhere.

8    Q.  Okay.  And during that training did you undergo any

9    training about the use of race or ethnicity in law enforcement

10   actions?                                                       09:53:03

11   A.  We under -- we attended a cultural diversity course that

12   was taught from the -- in the basic academy.

13   Q.  And what do you remember being taught there at the basic

14   academy on that subject?

15   A.  We were taught about different -- different races,         09:53:14

16   different religious groups, and what was important to them, and

17   how to handle certain situations with different races and --

18   and religious groups.

19   Q.  You are Latino yourself?

20   A.  I am Mexican.                                              09:53:32

21   Q.  Did you have any -- any difficulty understanding any issues

22   about the Latino culture in Arizona versus in Austin or

23   El Paso?

24   A.  I'm sorry.  Could you rephrase it, please, sir?

25   Q.  Did you have any adjustment, did you have any difficulty   09:53:44

1  understanding the cultural issues between the Latino

2  communities in Arizona versus in Texas?

3  A.  No.

4  Q.  Okay.  Tell me, what were you taught at the academy about

5  whether or not you could use race or ethnicity to make any                09:53:59

6  traffic stops or any law enforcement decisions?

7  A.  Well, I can't recall if we were ever taught anything

8  specific, but I know we were told that it was never a basis for

9  a traffic stop.

10  Q.  All right.  Now, at -- when did you -- after you completed      09:54:11

11  the academy, did you go through any type of monitoring or

12  training, if you will, actually out in the field with the MCSO?

13  A.  I did.  I went through a field training program.

14  Q.  And do you remember how long that field training program

15  was?                                                                      09:54:31

16  A.  No, sir, I do not.  I apologize.

17  Q.  Is -- after a deputy graduates from the academy at the MCSO

18  and before they actually go out on the street alone, is there a

19  field training program that's required?

20  A.  There is.  There is a time where the re -- the new deputy       09:54:46

21  will go out with -- with a seasoned or a field training

22  officer and go through a series of training protocols.  Mine

23  was abbreviated because I was a law enforcement officer prior,

24  so mine was abbreviated.

25  Q.  And let me also turn to another subject.                              09:55:05

1        At some point during your career were you ever

2   certified by the federal government to be a 287(g) deputy?

3   A.  Yes, sir, I was.

4   Q.  What -- when was that that you were certified?

5   A.  Approximately 2000 -- early 2007, early.  I know I          09:55:26

6   graduated in July 2007.

7   Q.  Do you recall where you -- where you had that training?

8   A.  At the Maricopa County Sheriff's training academy.

9   Q.  Who conducted that training?

10  A.  ICE did, sir.                                                09:55:41

11  Q.  Federal officials?

12  A.  Federal officials, yes, sir.

13  Q.  And I apologize if I asked you this, but do you recall

14  roughly the length of time the training was?

15  A.  No, sir.  I believe it was five or six weeks.               09:55:50

16  Q.  Okay.  Did the federal government ever teach you, the ICE

17  officials ever teach you about what you could and could not do

18  with race in law enforcement?

19  A.  Well, race was not a -- they never taught us that race was

20  a priority for a traffic stop.  They had other indicators with  09:56:10

21  287(g) to do their investigations; they had other indicators

22  that they had.

23  Q.  And would you explain for us, what were you taught by ICE

24  that were indicators, and what were they indicators of?

25  A.  I don't recall all -- I believe there were seven or eight   09:56:27

1    indicators.  I don't recall what they actually were.  But

2    what the indicators would lead to during the investigation was

3    the nationality of a person.

4    Q.  All right.  At any time during your career at MCSO did you

5    or have you ever used race or ethnicity of either a driver or          09:56:54

6    an occupant of a vehicle as part of your decision to stop the

7    vehicle?

8    A.  No, sir.

9    Q.  Now, did ICE ever teach you, sir, as part of the

10   indicators, about whether or not the use of race was one of            09:57:11

11   many factor to identify someone that may be in the country

12   unlawfully?

13   A.  I don't recall, sir.

14   Q.  Okay.  At any time while you were a 287(g) officer did you

15   ever use race or ethnicity as a factor among many to determine         09:57:28

16   whether someone was present in the United States unlawfully?

17   A.  No, sir.

18   Q.  Now, let's just assume that there's testimony that ICE

19   taught that that factor could be used.

20            If you didn't do that, why?                                   09:57:46

21   A.  There are other factors that I could have used in my

22   investigation.  One of them was the language the other person

23   spoke; their failure to provide appropriate identification.  I

24   know with myself, failure to provide appropriate identification

25   at the time.                                                           09:58:05

1488

1        There were so many other factors aside from race.

2   We're a border state, so I come across Latinos constantly, and

3   I don't base my decision on what occurs in a traffic stop just

4   based on their race.

5   Q.  Okay.  Now, are you a member of the Human Smuggling Unit?    09:58:20

6   A.  Yes, sir, I am, currently.

7   Q.  And how long have you been a member of HSU?

8   A.  Since approximately April or May of 2008.

9   Q.  And do you know how you became a member of that, how you

10  got there?                                                      09:58:38

11  A.  I was asked.  I was called by a supervisor and asked if I

12  would be a part of their team.

13  Q.  Do you have an understanding as to why you were asked to

14  join HSU?

15  A.  I was briefly told because of my work ethic.  They wanted   09:58:47

16  somebody like myself to work for them who would come actually

17  to work to work.

18  Q.  Are you fluent in Spanish?

19  A.  Yes, I am.  That's my first language.

20  Q.  Your first language.                                        09:59:00

21        Tell me, what is your understanding of the purpose of

22  HSU?

23  A.  As an interdiction unit, we work the roadways interdicting

24  human smuggling load vehicles that are traveling within

25  Maricopa County, and we also investigate drop houses.          09:59:15

1   Q.  Explain for us, when you talk about smuggling loads, the

2   Court's heard testimony about that but not from you.

3            What is a load vehicle?

4   A.  A load vehicle is any means of transportation which has

5   persons that are highly probable or likely to be in the United        09:59:34

6   States illegally, and who are being transported en masse

7   through the United States to other parts of the United States,

8   through Maricopa County to other parts of the States.

9   Q.  Explain for us, based on your experience, what's a drop

10  house?                                                                 09:59:52

11  A.  A drop house is a place where the -- what they're called,

12  they're called "pollos."  The smug --

13  Q.  What are they called?

14  A.  Pollos.

15  Q.  Chickens?                                                          10:00:02

16  A.  Chickens, for another word.

17           They're smuggled in by a coyote.  The coyote smuggles

18  them in.  What occurs is somewhere down the line along the

19  border with Arizona they encounter a coyote.  They make a

20  financial agreement to be smuggled into the United States             10:00:17

21  illegally.  Typically, they walk through the desert from, you

22  know, several hours to several days.  From that point they're

23  transported to a safe house, or a -- a drop house, where

24  they're held.

25           And then from that point on then they're transported         10:00:36

1   here within Maricopa County to another drop house, where

2   they're held until they're transported outside of Maricopa

3   County to other places in the United States.

4   Q.  Based on your experience, have you seen the pollos, have

5   you seen the smugglees, detained against their will?          10:00:51

6   A.  Yes.

7   Q.  How frequently in that -- in your experience does that

8   occur?

9   A.  Early on, when I came -- even prior when I was assigned to

10  the Special Assignment Unit, there were drop houses where we  10:01:06

11  would be called to assist the working detectives to clear

12  houses, tactically clear the houses where the persons were

13  being held against their will.

14        And in this case what happens is, and what's been in

15  my experience in the investigations of the drop houses that   10:01:23

16  I -- that I've investigated, where they're violent, there were

17  electronic restraint devices found in the house, firearms.

18        What they'll do is they'll turn the locks inside out

19  of the house, inside of the room that they're being held in.

20  They also at times will remove clothing, either keep them fully 10:01:42

21  nude, or at times keep them without their shoes on so that they

22  don't run away.

23  Q.  Do you have any experience as to whether the female pollos,

24  the smugglees, experience any particular violent crime?

25  A.  I've investigated a drop house where a female was sexually  10:01:59

1    assaulted.  And there was another one, another incident that we

2    as a unit investigated where the female who was pregnant was

3    also not only physically assaulted, but sexually assaulted, and

4    she ultimately had a miscarriage here.

5    Q.  Based on your experience in the years you've worked at HSU,    10:02:19

6    are these -- is there or are there organizations that are

7    running these human smuggling drop houses and these human

8    smuggling loads?

9    A.  I don't know of a particular organization, but I know of

10   the persons that run these -- not personally, but of the    10:02:41

11   persons that run these drop houses.

12   Q.  Are they associated at all with any of what is called in

13   the media "cartel"?

14   A.  Based on our investigations and based on the statements

15   that the coyotes have given us who they work for, yes.    10:02:56

16   Q.  Is it your experience, sir, that the same people involved

17   in narcotics trafficking are involved in the smuggling of human

18   beings from south of the border into Arizona?

19   A.  It has been our experience in the investigations that we've

20   conducted that we have found not only firearms, but also drugs,    10:03:13

21   marijuana, cocaine, and meth.

22   Q.  Have you had any experiences with smugglees, the pollos who

23   have negotiated a price to come into the United States, into

24   Maricopa County, and then the price changes?

25   A.  Yes.    10:03:34

1    Q.  Tell us about that.

2    A.  In one particular -- a violent drop house where we found

3    firearms and ERD devices.

4    Q.  What is that?

5    A.  Electronic restraint device; a shock device, if you will.          10:03:46

6    Q.  And how does that apply to this?  What are those used for?

7    A.  They're used to -- well, they can be used to incapacitate a

8    person, kind of the same function of a Taser, just not a Taser,

9    a Taser product.

10         And so what they'll do is they will smuggle -- I'll            10:04:05

11   give you an example.  They'll pay $1500 to be crossed over from

12   Mexico into the United States.  They'll be -- their final

13   designation is to be Denver, Colorado.  They'll be crossed over

14   to the United States illegally, be taken to a drop house.  They

15   already paid their $1500.                                           10:04:26

16         Once they get to this drop house, what will happen is

17   now they'll be detained by the coyotes, and what they'll be

18   told is they'll be told to contact their family members, and

19   now the price has gone up either to add an extra $1500 or add

20   another thousand dollars, and in order for them to be released     10:04:42

21   it has to be wired to them.

22   Q.  And what -- if in fact the family members can't wire the

23   money, is -- do you have any experience as to how the pollos,

24   the smugglees, now have to pay off the debt?

25   A.  Well, unfortunately, sometimes it's with their life.  The       10:05:02

1    coyotes will -- will continue to torture them until they either

2    pay up or they'll end up dying.  And there have been a couple

3    incidents where I responded to a pollo being killed by a

4    coyote.

5    Q.  Do you have any experience as to whether coyotes who have          10:05:21

6    extortionately raised the price requires these people who

7    they've smuggled to go out and try to work to pay off that

8    debt?

9    A.  To pay off their debt, yes, sir.

10   Q.  Okay.  Would you describe for the Court what types of jobs,        10:05:38

11   in your experience, you've seen people, the smugglees, have

12   taken in order to pay off that increased extortionate debt?

13   A.  Based on my experience and what I've --

14   Q.  Yes.

15   A.  -- the investigations that I've done, I know that they've          10:05:57

16   gone out, worked for lawn companies, they've gone out and

17   become day laborers, just looking for whatever work they can.

18   A majority of the time these people are really scared, and so

19   they're released to go work but are so scared that they do end

20   up coming back with money so that they can pay off their debt.         10:06:14

21   Q.  Okay.  Now, the Court has heard testimony about day

22   laborers congregating at location A or location B and working.

23   What is your experience as to whether smugglers are involved in

24   taking them to locations and then picking them up at the end of

25   the day?                                                               10:06:33

1   A.  I don't --

2           MR. POCHODA:  Objection, Your Honor.  No foundation.

3           THE COURT:  You want to lay any foundation?

4           MR. CASEY:  I was trying to by asking him what his

5   experience was.  I didn't think there was any question, quite          10:06:44

6   frankly, other than his experience, yet.

7           Do you want me to rephrase?

8           THE COURT:  Well, he hasn't described any operation in

9   which he's -- he's --

10  BY MR. CASEY:                                                          10:06:55

11  Q.  Do you have any experience where you have come across

12  people that have been working off coyote debts?

13  A.  Yes.

14  Q.  Okay.  Explain what is your experience in that, sir.

15  A.  Just based on my investigations and speaking with them of         10:07:07

16  what they were doing, and as I stated, you know, most of them

17  working for either lawn companies, you know, working -- working

18  in construction, finding whatever odd end jobs they could find

19  to earn any income they could.

20  Q.  Okay.  Thank you, sir.                                            10:07:22

21          I'd like to turn to a different subject, and that was

22  something you mentioned earlier was the purpose of HSU, and

23  that's human smuggling.

24          How can you determine whether or not a vehicle, when

25  you're driving down the road, may -- may or may not be a             10:07:35

1    smuggling load vehicle?

2    A.   There are some strong indicators of the vehicle that may --

3    may or may not be a load vehicle.  One of the typical ones that

4    I've come into contact as an investigator on the Human

5    Smuggling Unit is vehicles that are traveling which don't look          10:07:55

6    as if they're traveling on vacation and appear heavily weighted

7    down with persons in the vehicle.

8    Q.   What other -- what other indicators are there, if any?

9    A.   Well, those are the -- that's the main one that I look for

10   in vehicles.  But not -- that's not always typical, because            10:08:14

11   I've stopped a load vehicle in a -- in a Ford Mustang, which

12   had the coyote driver and two pollos in the vehicle.

13   Q.   Is there a particular -- the Court has heard testimony

14   about saturation patrols occurring in what we call the more

15   rural areas of the county and also in urban areas of the               10:08:37

16   counties.

17        Where have you identified load vehicles relative to

18   those two descriptions?

19   A.   Traveling on the major highways outside of -- that lead

20   outside of Maricopa County.                                            10:08:52

21   Q.   Okay.  All right.  So if you think you have a load vehicle

22   can you pull them over for that?

23   A.   No.

24   Q.   What do you need to pull them over?

25   A.   Well, our policy is, and it's state law, we look for             10:08:59

1   probable cause to initiate a legal traffic stop.

2   Q.  And when you say probable cause, you look -- what are you

3   looking for?

4   A.  Either a -- either a moving violation or a mechanical or

5   equipment violation to the vehicle.                          10:09:13

6   Q.  What happens if you see a vehicle, and in Officer

7   Armendariz's mind he -- that's a load vehicle and you don't

8   have PC, what happens?

9   A.  It's happened not only to myself, but other -- other

10  detectives at work, there have been times that we just let them  10:09:32

11  go.

12  Q.  Have you actually had that experience?

13  A.  I have.  I followed one from approximately I-17 and

14  Thunderbird all the way to the county line at Black Canyon, and

15  the driver did everything perfect.  There didn't appear to be   10:09:42

16  any equipment violations to the vehicle, and he continued out

17  of the county.

18  Q.  And you believed as an officer, in your experience, that it

19  was a load vehicle?

20  A.  Based on my training and experience that I've had with      10:09:54

21  stopping load vehicles, yes.

22  Q.  Have you had any load vehicle -- well, first of all, let me

23  back up.  And I apologize to Mr. Moll, our reporter.

24          How many load vehicles would you estimate in your

25  career that you have identified, found probable cause to stop,  10:10:11

```
 1   and then stopped?
 2   A.  I would say since I've been with the Human Smuggling Unit
 3   it would be more than 20, but I know the number would be
 4   higher.
 5   Q.  Okay.  Of those, have you had any load vehicles that          10:10:26
 6   contained smugglees, pollos, that were not from Mexico or
 7   Central America, non-Hispanic?
 8   A.  Me personally?
 9   Q.  Yes.
10   A.  Yes.  In 2009 I stopped a load vehicle that had six Chinese   10:10:46
11   nationals in it.
12   Q.  Do you remember where you stopped the load vehicle with six
13   Chinese nationals in it?
14   A.  I remember it was on I-17.
15   Q.  Have you stopped any other vehicles that had smugglees that   10:11:00
16   were non-Hispanic?
17   A.  Not me directly.  The Human Smuggling Unit has --
18           MR. POCHODA:  Objection, Your Honor, hearsay.
19           MR. CASEY:  Let me -- I'm going to ask him a new
20   question, Your Honor.                                             10:11:17
21           I'm sorry.  There's an objection.
22           THE COURT:  Go ahead.
23   BY MR. CASEY:
24   Q.  What, based on your experience in human smuggling, have
25   been the categories of people that were non-Hispanic that were   10:11:27
```

1    smugglees?

2          MR. POCHODA:  Objection, Your Honor, hearsay.

3          THE COURT:  Based on his experience.  The objection's

4    overruled.

5    BY MR. CASEY:                                              10:11:37

6    Q.  You can answer, sir.

7    A.  We've stopped load vehicles with Chinese nationals, and

8    also African nationals.

9    Q.  Is there in -- is there a predominant race or ethnicity of

10   illegals that you happen to come across in load vehicles?    10:11:54

11   A.  Based on my experience with HSU, it was Latinos.

12   Q.  Okay.  And have you, in your experience, formed a

13   conclusion or a determination of why it appears to be Hispanic

14   or Latino?

15   A.  We're a border --                                      10:12:07

16          MR. POCHODA:  Objection, it calls for speculation.

17          THE COURT:  I'm going to allow it.

18   BY MR. CASEY:

19   Q.  You may answer, sir.

20   A.  Well, we're a border state.  We border Mexico and we're   10:12:19

21   really close to the Mexican border.  A lot of the Latinos that

22   we do get from Guatemala, from El Salvador, travel through

23   Mexico and ultimately find it easier to cross through --

24   through the Mexican border.

25   Q.  I'd like to go back just for a minute.  The six Chinese    10:12:37

1  nationals that you've personally found, did you ever learn

2  during the course of your investigation how they got into the

3  United States?

4  A.  During my investigation with that, we determined the

5  language that they spoke after, you know, finding out.  We            10:12:56

6  actually contacted ICE, who had a -- a Mandarin translator who

7  came and translated for us.

8          Based on their statements and the monetary -- the

9  money that we found on them, we kind of got a -- an idea of the

10 path that they had traveled.  From China -- it was from China         10:13:17

11 through Germany, coming up through Cuba, and from Cuba into

12 Mexico, and then straight up through Mexico.

13 Q.  All right.  So the Chinese nationalists came through from

14 the Mexican-U.S. border?

15 A.  Yes, sir, that's correct.                                         10:13:35

16 Q.  From the Republic of Mexico?

17 A.  From Mexico.

18 Q.  Okay.

19 A.  From the Republic of China.

20         THE COURT:  Mr. Casey, I'm looking for a good                 10:13:43

21 opportunity.

22         MR. CASEY:  This is a perfect opportunity, Your Honor.

23         THE COURT:  All right.  Why don't -- why don't we come

24 back about 25 to the hour.

25         MR. CASEY:  Thank you, Your Honor.                            10:13:54

1500

```
 1                    (Recess taken.)

 2              THE COURT:  Thank you.  Please be seated.

 3              MR. CASEY:  May I proceed, Your Honor?

 4              THE COURT:  You may.

 5              MR. CASEY:  Thank you very much, sir.              10:36:34

 6    BY MR. CASEY:

 7    Q.  Deputy, we've just finished our break, and I'd like to turn

 8    to a different subject, and that is something the Court has

 9    heard testimony called saturation patrols, crime suppression

10    operations, and plaintiffs like to refer to them as immigration  10:36:49

11    sweeps.

12              How do you refer to special operations that HSU's

13    involved in?

14    A.  The crime suppression sweeps that are put on by the

15    Maricopa County Sheriff's Office --                            10:37:03

16              THE COURT:  Mr. Armendariz.

17              THE WITNESS:  Yes, sir.

18              THE COURT:  I want to hear what you say.

19              THE WITNESS:  Oh, I apologize, sir.

20              THE COURT:  And I want to have a good record of it.   10:37:09

21              THE WITNESS:  Yes, sir.

22              THE COURT:  You have a habit of speaking very fast.

23              Can you slow yourself down a little?

24              THE WITNESS:  Yes, sir, I will.

25              THE COURT:  Thank you.                               10:37:17
```

1        THE WITNESS:  The crime suppression sweeps that are

2   put on by the Maricopa County Sheriff's Office, which are

3   organized through our command staff, do not make the Human

4   Smuggling Unit a part of those suppression sweeps.

5   BY MR. CASEY:                                                    10:37:29

6   Q.  Okay.  What do you understand -- have you participated in

7   the --

8        THE COURT:  Can I -- can I --

9        MR. CASEY:  Please.

10       THE COURT:  I want to make sure I understand your          10:37:35

11  answer.

12       Would you repeat it again.  You say it doesn't make

13  HSU part of the crime suppression sweep?

14       THE WITNESS:  In the sense that we participate with

15  everybody, but we're not part of the initial program in the      10:37:46

16  sense of, from my point of view, we don't go to the briefings

17  for the crime suppression sweeps that are held.  The Human

18  Smuggling Unit doesn't attend the -- the initial briefings that

19  are held at the command post.

20       THE COURT:  So HSU doesn't go to those briefings.          10:38:02

21       THE WITNESS:  No, sir.  Typically, no, we do not.

22       THE COURT:  Okay.  But you are on patrol during those

23  operations?

24       THE WITNESS:  Yes, sir, that is correct.

25       THE COURT:  Thank you.                                     10:38:12

1        THE WITNESS:  Yes, sir.

2   BY MR. CASEY:

3   Q.  Explain for me:  Why do you, or HSU members, not go to

4   those presaturation patrol briefings?

5   A.  Typically, those crime suppression sweeps, the briefings go    10:38:22

6   over jurisdictions on where the command staff wants the

7   deputies to work.  The crime suppression sweeps bring in

8   deputies from other divisions, i.e., trails, lakes, district,

9   district offices, and sometimes call in detectives, you know,

10  to come in and work the crime suppression sweeps.    10:38:47

11       Those that are not assigned to the Human Smuggling

12  Unit, we go -- the briefing that is held for the crime

13  suppression sweeps will go over the jurisdiction, where they're

14  to work, remind them of policies, certain policies and

15  procedures.    10:39:04

16  Q.  What are those reminders?

17  A.  Well, such as there's no racial profiling is one of the big

18  ones that they -- that is continuously enforced in them.  One

19  of the reasons that we don't go is because that's something

20  that we as a Human Smuggling Unit do every day.  We work human    10:39:17

21  smuggling.  We deal with illegal aliens being in the United

22  States illegally.  And so something that we deal with every day

23  and know not to do, which is racial profile, is something

24  that's just reiterated to those deputies that don't do what we

25  do every day.    10:39:39

1    Q.  Thank you, sir.

2         Do you know how many, I'm going to call saturation

3    patrols, what you've called crime suppression sweeps, that you

4    participated in?

5    A.  It's been several, sir.  I can think of, like, two or three    10:39:49

6    off the top of my head.

7    Q.  What has been your role -- let me back up.

8         Have you had many different roles during your

9    participation in these patrols, or a single type of role?

10   A.  Just as a law enforcement officer.    10:40:05

11   Q.  Okay.  And what has your role been as a law enforcement

12   officer in the saturation patrols you've conducted?

13   A.  Nothing different than what I do on a daily basis when I am

14   at work, just the enforcement of federal, state, and local

15   laws, to include traffic laws.    10:40:24

16   Q.  And when you're on a saturation patrol, are you considered

17   a patrol deputy?

18   A.  No, I'm still a detective assigned to the Human Smuggling

19   Unit.  I'm just participating in a -- in a crime suppression

20   sweep.    10:40:40

21   Q.  All right.  Let me talk to you about a different subject.

22         The Court has heard evidence about saturation patrols

23   and arrest lists.  And I want you to assume that certain arrest

24   lists show, hypothetically, 22 names, and 20 or 21 of the 22

25   names will appear to be Hispanic surnames.    10:40:59

1    Will you assume that for me?

2  A.  Okay.

3  Q.  Okay.  Just on that information alone, and as an HSU

4  detective, and being on saturation patrols, does that cause you

5  any concern?                                                    10:41:16

6  A.  No.

7  Q.  Explain for me if there's a 90 or a 98 percent Latino

8  surname on your arrest list why that's not a problem for

9  Detective Armendariz.

10 A.  We're a Latino state, primarily Latinos in this state.    10:41:29

11 We're the majority, and so it's not uncommon that there would

12 be more Latinos, you know, arrested.

13 Q.  Is there any --

14 A.  I mean, it doesn't cause me any concern.

15 Q.  Is there any --                                            10:41:49

16         THE COURT:  Can you repeat that again, please?

17         THE WITNESS:  Sure.  It doesn't cause me any concern

18 because we're a Latino state.

19         THE COURT:  What does it mean that we're a Latino

20 state?                                                          10:41:58

21         THE WITNESS:  We border Mexico.  Majority of our

22 population is Latino.

23         THE COURT:  Is it your belief that a majority of

24 Arizona's population is Latino?

25         THE WITNESS:  It is my belief, yes, based on the fact   10:42:07

1    that we're on a, you know, border city, a majority of the

2    persons that I come into contact are Latinos.

3    BY MR. CASEY:

4    Q.   Is there any other information on an arrest list that you

5    would use to determine whether or not there is a problem with          10:42:23

6    the Latino surnames?

7    A.   Could you restate that?  I didn't understand the question.

8    Q.   Sure.  In the arrest list there is a category, sir, for the

9    probable cause for the stop, and then the charge, and then

10   there's for dispositions.                                              10:42:48

11        Would you also look at any of those factors if you

12   were at all concerned that predominantly the names are Latino?

13   A.   Are you speaking specifically about the charges?

14   Q.   Yes, sir.

15   A.   Well, no, 'cause the charges are ethnic neutral, I guess,          10:43:04

16   if you would put it that way.

17   Q.   Okay.  For example, if someone is pulled over for a DO --

18   excuse me.  If someone is charged with DOSL, what is that for?

19   A.   Driving on a suspended license.

20   Q.   And when you said ethnic neutral, or to paraphrase you,           10:43:22

21   what did you mean by that in context of someone driving on a

22   suspended license?

23   A.   Well, it doesn't matter whether you're white, Mexican, or

24   native: if you're driving on a suspended license, that's a

25   criminal offense.                                                      10:43:36

1    Q.   Okay.  Well, what happens if someone is charged with a

2    warrant?  What does that mean?

3    A.   To me, that means that somewhere down the line a judge,

4    prior to my encounter with that person, feels that the person

5    needs to be taken into custody for whatever that reason.          10:43:55

6    Q.   And what happens if there's something that says failure to

7    ID?  What does that mean?

8    A.   According to A.R.S. 28-1595, there are certain -- there are

9    certain elements to a proper identification in the state of

10   Arizona while operating a motor vehicle.                          10:44:17

11   Q.   And if they don't have that Title 28 identification, what

12   does that mean?

13   A.   It's a failure to provide, it's a misdemeanor in this

14   state.

15   Q.   And that's a criminal charge?                                10:44:29

16   A.   It is a criminal charge, yes, sir.

17   Q.   So if there are, for example, warrants or D -- driving on a

18   suspended license or failing to produce ID, does that have, in

19   your experience as a law enforcement officer, any bearing on

20   the race or ethnicity?                                            10:44:51

21   A.   No.

22   Q.   You can be any race or ethnicity and have that?

23   A.   That's correct.

24   Q.   What about if someone's pulled over and charged with DUI?

25   Does that have any bearing, driving under the influence, on      10:45:03

1    race or ethnicity?

2    A.  No.

3    Q.  Okay.  Now, what about if someone is charged with 287(g)?

4    In your experience, does that have anything to do with race or

5    ethnicity?                                                              10:45:16

6    A.  The term "287(g)" is a program that's designed by ICE, and

7    it's just a common nickname that's used for persons that I know

8    have been arrested, at the time when we were 287(g) certified,

9    that were arrested for being in the country illegally.

10   Q.  Okay.  Thank you very much, sir.                                    10:45:34

11          During saturation patrols have you ever used race or

12   ethnicity to make a decision to make a traffic stop on a

13   vehicle?

14   A.  No, sir.

15   Q.  Have you, during a saturation patrol, ever used race or            10:45:49

16   ethnicity to make a detention of a driver or an occupant?

17   A.  No, sir.

18   Q.  Have you ever used, during a saturation patrol, race or

19   ethnicity to initiate questioning of anyone?

20   A.  No, sir.                                                            10:46:08

21   Q.  All right.  I'd like to turn to a different subject.

22          The Court has heard testimony that traffic stops,

23   particularly on saturation patrol days, of Latinos, Hispanic

24   drivers, may take roughly two minutes longer than non-Latino

25   drivers.  I just want you to assume that that's what the Court         10:46:31

1    has heard.

2          Will you assume that for me?

3    A.  I will.

4    Q.  Okay.  Based on your experience in HSU, are there -- are

5    there any reasons that you can identify of why traffic stops of          10:46:43

6    Hispanic drivers may take longer than traffic stops of

7    non-Hispanic drivers?

8    A.  For a couple of reasons, and it's not just specific to the

9    Human Smuggling Unit.  This is a -- this would be generalized

10   to law enforcement officers that make any traffic stop dealing          10:47:04

11   with a Latino.

12         We'll take my name, for example.  If you get -- if I

13   get pulled over, my name is Ramon Charley Ramirez Armendariz.

14   In the system when we run people we have to run them several

15   different ways.  We'll run them first name Charley -- or Ramon,          10:47:21

16   middle name Charley, Ramirez Armendariz.  Then we'll go back

17   and rerun them again -- bless you -- then we'll go back and

18   rerun them again as Armendariz Ramirez.  Then we'll go back and

19   take off the hyphenated name and we'll run it as Ramon Charley

20   Armendariz and then Ramon Charley Ramirez.          10:47:39

21         So it takes a little bit of time to -- that's one

22   instance why it would take a little bit longer, because it does

23   take a little bit longer for us to run the person.  We have to

24   run them several different ways to make sure that we get

25   everything, we cover all our bases.          10:47:55

1   Q.  All right.  Well, let's put -- what you're talking about is

2   multiple names, surnames.

3   A.  Right, that's correct.

4   Q.  Let me -- let's say hypothetically my wife goes by Sheila

5   Galoon (phonetic) Casey and she gets pulled over, and she's        10:48:06

6   Irish ancestry.

7   A.  Yes, sir.

8   Q.  How are you going to run that name?

9   A.  The same way.  It would run Sheila --

10  Q.  Casey?                                                         10:48:18

11  A.  I forgot the --

12  Q.  Galoon.

13  A.  So we'd run it Sheila Galoon Casey, then we'd run it Sheila

14  Casey Galoon, then it would be just Sheila Galoon and Sheila

15  Casey.                                                             10:48:29

16  Q.  All right.  In your judgment -- strike that.

17          Has it been your experience that that takes a little

18  longer?

19  A.  Yes, it does.

20  Q.  And what databases do you run names through?                   10:48:36

21  A.  We have the justice -- the Maricopa County Sheriff's

22  justice web interface.  We also have the NCIC and the ACIC.

23  Q.  And what does the NCIC stand for?

24  A.  The National Crime Information Center and the Arizona Crime

25  Information Center, and we also run them through MVD.              10:48:54

1    Q.  In addition to running multiple surnames, possibly

2    making -- or actually, your testimony is making traffic stops

3    of Hispanic drivers a little longer, are there any other

4    factors in your experience that might account for the longer

5    duration of those stops?                                        10:49:14

6    A.  Yes.  I have to translate the citations and any information

7    that they want.  A person speaking English would be able to

8    reread the citation.  There is a -- an envelope that is given

9    to all persons that receive a civil citation.  That envelope is

10   generated by the county courts or the justice courts, not by    10:49:31

11   the Sheriff's Office, and it's only written in English.

12          And so one of the things that I have to do is I have

13   to make sure that they understand the citation fully prior to

14   them leaving, they understand the court date, if there's a

15   court date for them, and then translate the envelope.           10:49:48

16          Inside the envelope is a pamphlet that explains to

17   them other options.  And typically, a person that would -- you

18   know, that just spoke -- that understood the English language,

19   I would let them know that, you know, here's the envelope.

20   Inside the envelope is a pamphlet that explains to you other    10:50:03

21   options that you have on how to take care of the citation.

22          It's not written in Spanish.  Like I said, the

23   document is not generated by the Sheriff's Office, the document

24   is generated by the justice courts.  And I have to -- I take

25   time to go over and translate the other options that they do    10:50:19

1    have.

2    Q.   And that was going to be my next question.  You used the

3    word "I have to."  Is that something required, in your

4    experience, under law or policy, or is that your personal

5    practice?                                                      10:50:33

6    A.   Oh, no, sir, that's my personal practice.  My

7    grandparents -- my grandparents are Spanish-speakers only, so I

8    understand the difficulty sometimes that they have whenever

9    they go somewhere and something's not explained to them fully,

10   and they don't understand.  So I take that extra time to       10:50:44

11   explain it to them in Spanish.

12   Q.   Is that something that you're taught at the MCSO as part of

13   what's called something like good community policing?

14   A.   I think it's just something that I bring forth that's

15   something that my parents taught me.  It's just being -- just   10:51:02

16   doing my job and doing -- doing the best that I can.

17        One of the reasons that I became a sign language

18   interpreter is so that when I have pulled over persons that are

19   hearing impaired, I can sign to them.  And it just helps my job

20   a little bit easier and helps persons understand, because there 10:51:16

21   are times where I've pulled over a hearing impaired person, and

22   it takes me a little bit longer because I do have to sit there

23   and I have to sign the citation and explain to them, you know,

24   other options that they have.

25   Q.   Because Spanish is your first language, does it take you   10:51:28

1512

```
 1   any longer to communicate information in Spanish than it does

 2   in English?

 3   A.  No, I speak Spanish just about as fast as I speak English.

 4   Q.  Okay.  That was going to be the next question:  Are you as

 5   fast in Spanish?                                                    10:51:43

 6          All right.  So what you're talking about is

 7   translating, if I can summarize what I understand you're

 8   telling me, is that you -- you take as your practice to

 9   translate from Spanish to English -- excuse me, from English to

10   Spanish with the Spanish-speakers?                                  10:51:56

11   A.  That's correct, sir.

12   Q.  Okay.  Now, you've talked about multiple surnames; you've

13   talked about translation.  Are there any other factors

14   whatsoever that you have experienced that might extend the stop

15   of Hispanic drivers?                                                10:52:09

16   A.  Not necessarily Hispanic drivers, but other things that

17   might be, you know, be a factor, is a lot of times we do cite

18   and release.  And so waiting for a tow truck does kind of help

19   us, you know, does delay us a little bit longer.  There is

20   paperwork that has to be given to the person either being          10:52:29

21   arrested or cited and released, and we have to wait for the tow

22   truck to arrive on scene, and by our policy, I believe, is that

23   the tow truck has 30 minutes to arrive on scene from the time

24   it's requested.

25   Q.  Okay.  The Court has heard some evidence also --               10:52:41
```

```
 1              THE COURT:  Wait a minute, please.

 2              MR. CASEY:  Excuse me.

 3              THE COURT:  I'm trying to understand the situations in

 4    which you'd cite and release that would involve a tow truck,

 5    and why those situations would be more common with Hispanic      10:52:54

 6    drivers, and you haven't made that connection for my

 7    understanding.

 8              THE WITNESS:  Oh, I don't think it was anything that's

 9    just common directly to Latinos or to Hispanic drivers.

10              THE COURT:  Um-hum.                                     10:53:06

11              THE WITNESS:  It's other things that would, you know,

12    delay a traffic stop a little bit longer.

13              THE COURT:  Okay.  So it isn't -- it isn't related to

14    Hispanic drivers versus non-Hispanic drivers at all?

15              THE WITNESS:  No, it's just a general statement.        10:53:16

16              THE COURT:  When you cite and release, why would you

17    be waiting for a tow truck?

18              THE WITNESS:  In certain cases driving on a suspended

19    license --

20              THE COURT:  Okay.                                       10:53:24

21              THE WITNESS:  -- if a person drives on a suspended

22    license, and we have that option to cite and release.  The

23    person is released from the scene without any issues.  However,

24    their vehicle is impounded.

25              THE COURT:  All right.  And the -- so the person's      10:53:33
```

```
 1    just released, the passengers are released?

 2              THE WITNESS:  Yes, sir, that's correct.

 3              THE COURT:  Okay.  And the passengers are released

 4    presumably as soon as -- as soon as you issue the citation, or

 5    even before?                                                   10:53:43

 6              THE WITNESS:  Or even before.  I mean, the -- the

 7    citation, we take into consideration the driving on a suspended

 8    license, then we would only have our dealing with the driver --

 9              THE COURT:  All right.

10              THE WITNESS:  -- at that time.                       10:53:54

11              THE COURT:  And you wouldn't be any longer concerned

12    with the passengers?

13              THE WITNESS:  No.  A time that we would be concerned

14    with the passengers is if we pull over a vehicle, and maybe not

15    the driver is consuming alcohol in the vehicle, but the        10:54:03

16    passenger is consuming alcohol in the vehicle, which has

17    happened to me based on, you know, experiences that I've had

18    where the passenger's the one consuming an alcoholic beverage.

19    And so we issue a -- I'll issue a citation to the driver for

20    the initial reason for the stop, and the passenger will be     10:54:21

21    detained for the title --

22              THE COURT:  For the open container?

23              THE WITNESS:  For the open container, for the open

24    container and consuming in a vehicle, yes, sir.

25              THE COURT:  Okay.  But in situations where you were   10:54:30
```

1    going to detain a passenger because you'd cited the driver for

2    driving on a suspended license, there would have to be separate

3    probable cause as it pertains to the passenger?

4              THE WITNESS:  Yes, sir, that's correct.

5              THE COURT:  Thank you.                                10:54:44

6    BY MR. CASEY:

7    Q.  Have you, Deputy, stopped drivers in Maricopa County who

8    are unable to produce a form of identification that meets the

9    requirements of Arizona law?

10   A.  Yes, sir.                                                   10:55:05

11   Q.  Okay.  What I'd like to do is focus you on your experience.

12             Do you -- do you have any experience where you're able

13   to identify roughly for the Court what percentage of those

14   drivers -- again, in your experience -- were Hispanic?

15   A.  I couldn't give you a number, but I would say it was quite   10:55:20

16   a few.

17   Q.  Okay.  When a driver lacks proper identification, can you

18   explain for us how does that affect the stop and the duration

19   of the stop?

20   A.  Well, if the -- taking into consideration the driver, and    10:55:34

21   he fails to provide any form of identification, the driver's

22   taken into custody for failing to provide ID until that person

23   can be appropriately identified.

24   Q.  I want to see if this is more practical for me so I'm

25   understanding.                                                   10:55:55

1  A.  Okay.

2  Q.  You make a lawful traffic stop on me for probable cause.

3         You with me so far?

4  A.  Yes, sir.

5  Q.  And you ask me for my driver's license, proof of insurance,    10:56:02

6  and registration, and I tell you I don't have my driver's

7  license on me.

8  A.  Yes, sir.

9  Q.  I now tell you that my name is Tom Liddy.

10  A.  Okay.                                                          10:56:13

11  Q.  How do you know if I'm Tom Liddy or not?

12  A.  My practice, if a person tells me that they forgot their

13  driver's license, I will ask them for another form of

14  identification: a credit card with a picture on it; a school

15  ID; followed by their date of birth, followed by their date of    10:56:29

16  birth.

17         If they can't provide any of that information, it is

18  practice that they are taken into custody for failing to

19  provide ID.  That is a misdemeanor, a crime under A.R.S.  And

20  at that point -- which is typical, because persons -- I           10:56:45

21  generally run into it where persons will leave their wallet or

22  their purse at home and they forget their driver's license.

23  And I advise them that, You're being taken into custody for

24  failing to provide ID.  Once I figure out who you are, then

25  you'll be released.                                               10:57:02

1           And typically that just entails I'll remove the person

2    from the vehicle, secure them in my patrol vehicle, and run

3    them through our justice web interface, which may provide me a

4    picture, their driver's license picture and their identity.

5           And if they're identified and there are no wants and          10:57:17

6    warrants, they're released and sat back in their vehicle.

7    Q.  All right.  So that's how you determine that if I say I'm

8    Tom Liddy, you can pull up that picture and see we're not the

9    same --

10   A.  No, you're lying to me, right.                                    10:57:28

11   Q.  All right.  Does that, in your experience -- does that, in

12   your experience, sir, add to the time it takes to what we call

13   as lawyers authenticate who the person is?

14   A.  Yes, it does take some time.

15   Q.  All right.  Sir, what I'd like to do is change subjects now      10:57:46

16   and turn to what I hope will be the final area of my

17   questioning of you, and that is a saturation patrol that the

18   parties have stipulated into evidence occurred back on March

19   27th and 28th of 2008 near Cave Creek.

20          Were you on that saturation patrol?                           10:58:10

21   A.  I was assigned to the Special Assignment Unit for -- pardon

22   me -- for that saturation patrol, yes, sir.

23   Q.  And specifically I want to focus you on March 28th.  The

24   evidence is in evidence already -- or, excuse me, the evidence

25   shows that you made a traffic stop at a convenience mart.           10:58:26

1        Do you remember that?

2   A.  Yes, sir, I do.

3   Q.  Tell the Court, what -- what happened at the convenience

4   mart?  What were you doing there and what happened?

5   A.  I had initiated a traffic stop on a vehicle for no brake          10:58:39

6   lights.  During that traffic stop I had taken the driver into

7   custody for failure to provide ID.  He had no driver's license

8   or identification with him.  And subsequent to that he was also

9   found to be driving on a suspended license.  And he was

10  secured --                                                           10:58:59

11  Q.  When you say "secured" --

12  A.  He was handcuffed and locked -- secured in the back of my

13  marked patrol vehicle.

14        At that point I had turned my attention to the

15  passenger.  What's typical of me -- well, what's typical of law     10:59:08

16  enforcement officers is to voluntarily ask for the

17  identification of passengers.  And the reason that's primarily

18  done is to identify if they have any wants or warrants, you

19  know, within anywhere.

20  Q.  Well, let me ask you this.  If that guy says, I'm not            10:59:22

21  telling you diddly, what do you do?  I'm not telling you

22  anything?

23  A.  Well, then we just walk away.  I mean --

24  Q.  Walk away?

25  A.  Well, let him go, because if he doesn't -- if the person         10:59:33

1  hasn't violated any laws, and it's typically stated by me it is

2  my practice to say, Would you -- do you have any identification

3  with you?  Would you mind giving it to me?  No, 90 percent of

4  the time they don't mind giving me their identification.  If

5  they forgot their identification card, what will happen is I'll    10:59:48

6  ask them, Would you mind giving me your name and your date of

7  birth.  Typically, persons don't.

8          However, once they give me that name and date of

9  birth, if I run them through the database and I'm unable to

10  determine their identity, at that point they're taken into    11:00:02

11  custody until I can determine who their identity -- what their

12  identity is.

13  Q.  So whether or not they answer your question or give you ID

14  is voluntary on their part.

15  A.  Right, that's correct.    11:00:13

16  Q.  All right.  Now, I interrupted you and I appreciate your

17  patience, Deputy --

18          THE COURT:  I have a follow-up.

19                          EXAMINATION

20  BY THE COURT:    11:00:24

21  Q.  You're talking about whenever you pull anyone over --

22  A.  Yes, sir.

23  Q.  -- you ask all passengers for ID?

24  A.  If they'll voluntarily give it, yes, sir.

25  Q.  And what is the reason why you always ask passengers -- if    11:00:32

1  I understand correctly, and I think I do, there isn't any

2  requirement that a passenger in a car have identification?

3  A.  That's correct.

4  Q.  And so what is the reason that you will always ask everyone

5  in the car for identification?                          11:00:50

6  A.  Typically, when you run a person, what you're looking for

7  is you're looking to see if that person is either wanted or any

8  warrants, if there are any outstanding warrants for the person.

9  Q.  All right.  So you ask persons in the car for their

10  identification to investigate those persons?            11:01:05

11  A.  To -- yes, sir, to investigate if they have any warrants

12  for their arrest.

13  Q.  All right.

14  A.  Which is typical.

15  Q.  If they don't have identification, do you use that -- have  11:01:15

16  you used that as a factor in determining whether or not a

17  person should be detained for 287(g) violations?

18  A.  No, sir.

19  Q.  You never have.

20  A.  Not as a passenger.                                 11:01:30

21  Q.  All right.  So if you are going to investigate someone for

22  287(g) violations, the fact that they don't have identification

23  is not a factor used?

24  A.  Is not a factor used.

25          However, if I ask them to voluntarily give me their  11:01:49

1    name, and they give me their name and their date of birth, when

2    I go back to the database through JWI, NCIC, and ACIC, and MVD,

3    if a no record comes up and -- or no person not found, at that

4    point then they're detained until we can realize who they are.

5           It is typical for persons who are wanted to lie to the          11:02:09

6    police and give us, as Mr. Casey gave us an example, names of

7    other persons and dates of other persons so that they don't get

8    caught.

9    Q.   I take it from what you've said, and I'm not trying to put

10   words in your mouth, that the fact that a person is a passenger    11:02:23

11   in a vehicle, without more, is no basis to detain them?

12   A.   I'm sorry.  Say that again, sir.

13   Q.   The fact that a person is a passenger in a vehicle is no

14   basis to detain them?

15   A.   Right, that's correct.                                        11:02:40

16   Q.   So if you're going to cite the driver for driving

17   without -- on a suspended license, the passengers are free to

18   go?

19   A.   Right, that is correct, sir.

20   Q.   And if you're going to detain the passenger for 287(g)        11:02:49

21   purposes or otherwise, there has to be a reason to detain them

22   more than just they are a passenger in a vehicle you've stopped

23   for other purposes.  Is that your understanding?

24   A.   Well, they would be -- the passengers would be detained if

25   they voluntarily give me information.  There have been many,        11:03:06

1    many instances where a passenger refuses to give me their name

2    or date of birth and flat out says:  I don't have to give it to

3    you.

4    Q.  And?

5    A.  Okay, and that's that.                                    11:03:18

6    Q.  All right.  And --

7    A.  If I don't have a violation, then I don't have any reason

8    to detain them or look further.

9    Q.  All right.  But when you ask them for their identification,

10   you don't have any reason to detain them, either, is that     11:03:26

11   correct?

12   A.  That's correct.

13   Q.  All right.  So if you ask them for their identification and

14   they give you their name --

15   A.  Yes, sir.                                                  11:03:36

16   Q.  -- are they then free to leave?

17   A.  If they give me their name?

18   Q.  Yes.

19   A.  Yes.

20   Q.  All right.  If they ask you for -- if you ask them for     11:03:41

21   identification, you then -- they then give you their name, you

22   then run their name, are they still free to leave?

23   A.  Yes.

24   Q.  What happens to change that if you run their name and --

25   and nothing comes up on any of the databases?                 11:03:59

1    A.  Then it becomes a no record found and an investigation goes

2    into trying to identify the person.  Not a 287(g)

3    investigation, trying to identify the person.

4    Q.  So they're free to leave?

5    A.  After -- after I've determined that there's no record                    11:04:16

6    found?

7    Q.  Correct.

8    A.  No, sir.  At that point they're detained until I can

9    identify who they are.

10   Q.  All right.  So at that point they're arrested?                           11:04:22

11   A.  They're detained, investigatively detained.

12   Q.  Okay.  They're not free to leave?

13   A.  No, they're not free to leave, sir.

14   Q.  All right.  And what is the basis on which they are not

15   free to leave, in your mind?                                                 11:04:31

16   A.  We're trying to, at this point trying to figure out who

17   they are and then identify the person.

18   Q.  All right.  I think you've indicated it has nothing to do

19   with 287(g)?

20   A.  That's correct, sir.                                                     11:04:41

21   Q.  What does it have to do with?

22   A.  Trying to identify who the person is --

23   Q.  All right.

24   A.  -- and if they've given false info to a law enforcement

25   officer.                                                                     11:04:53

1   Q.  Well, is there any reason to believe that they've given

2   false information to you, even if their name doesn't turn up

3   any records on your record check?

4   A.  Say that again, Your Honor?

5   Q.  Okay.  I think that what we went through is a hypothetical          11:05:02

6   where you -- they're under no obligation to give you their

7   name, but they did give you their name.

8   A.  That's correct.

9   Q.  You go back, you check your records, no record comes up.

10          You indicated at that point they're detained                    11:05:18

11  investigatively?

12  A.  Yes, sir.

13  Q.  Doesn't pertain to 287(g), if I've understood you

14  correctly?

15  A.  That's correct, sir.                                                11:05:26

16  Q.  And it doesn't pertain to any particular criminal charge?

17  A.  That's correct, sir.

18  Q.  And so I'm trying to ascertain, and I think you said you

19  just have the right to detain them to determine their identity.

20  A.  That's correct, sir.                                                11:05:37

21  Q.  All right.  And then I think you said something about false

22  identity.  At this point do you have any probable cause that

23  you have been given a false identification?

24  A.  There's no probable cause, but there's reasonable suspicion

25  that they might have given me a false identification to elude           11:05:51

1    police.

2    Q.  All right.  And so you detain them for how long?  What --

3    what is your next step that you take?

4    A.  My next step is to continue running them through another

5    database.  I will ask them where they've -- at this point,                    11:06:03

6    where they've had identifications issued from, what states, and

7    I will run them through all those database -- through all the

8    databases that we can.

9           And I'll also contact our dispatch center and have

10   them run them through whatever databases they can, just in case   11:06:18

11   I miss something out in the field.

12   Q.  All right.  So your next step is to ask them additional

13   questions and to run them through additional databases?

14   A.  That's correct, sir.

15   Q.  And what happens then?  What happens if they don't indicate   11:06:29

16   they have any other -- well, how long does this process

17   typically take, to run this additional investigation?

18   A.  I can't give you a time frame, Your Honor.  Usually, that

19   depends on how busy we are and how busy the dispatcher is.

20   Q.  Can you give me an average?                                   11:06:50

21   A.  No, sir, I can't.  I mean, it takes a while because the

22   dispatchers -- the dispatcher that we have that we run on that

23   particular channel runs information for the entire county.

24   Q.  All right.  Now, let me ask you another question.

25          I'm sorry, Mr. Casey, I have stopped your time.           11:07:02

1526

```
 1        Does that change?  Do you still do that?  Is that
 2   still your practice?
 3   A.  Yes, sir, it is.
 4        THE COURT:  All right.  Mr. Casey.
 5        MR. CASEY:  Thank you, Your Honor.              11:07:14
 6              DIRECT EXAMINATION CONTINUED
 7   BY MR. CASEY:
 8   Q.  Are you able to give the Court any estimate of what
 9   additional, under the hypothetical that he gave me -- gave you,
10   do you have any estimate that you can give the judge about how  11:07:27
11   much additional time it takes to run that?
12   A.  You have to base it on the fact that when -- we're on the
13   satellite or we're on a mobile system and the computers
14   sometimes run real slow.  There are a lot of cases where DPS,
15   the DPS system itself is down and the queue is down.           11:07:47
16        There is when we go to our info channel and we run
17   them on our information channel where the dispatcher is
18   backlogged because, as I said, she runs -- it's one dispatcher
19   for the entire county, whoever transfers over to that channel
20   that needs information.                                        11:08:08
21        And also that I also request a PACE check, which is
22   through the City of Phoenix.  So she has to call -- the
23   dispatcher that is to contact the City of Phoenix for more
24   information.
25   Q.  Are we talking 30 seconds?  Are we talking a minute?  Two  11:08:17
```

1   minutes?  Five minutes?

2   A.  I would say it would be greater than a minute.

3   Q.  Okay.  Less than five?

4   A.  I can tell you it would be greater than a minute --

5   Q.  Okay.                                                    11:08:27

6   A.  -- and if the dispatcher's not busy --

7   Q.  I appreciate.  I'm just trying to get a better feel for

8   that.

9           Let's summarize real quick what I understand about

10  durations of traffic stops is drivers without ID can affect    11:08:39

11  time?  Is that yes?

12  A.  Yes, sir, that's correct.  I'm sorry.

13  Q.  You talked about translating documents and then running

14  multiple surnames?

15  A.  That's correct.                                          11:08:49

16  Q.  Okay.  Any of these things inherently, in your judgment,

17  your experience, are they based on race or ethnicity?

18  A.  No, sir.

19  Q.  All right.  Now, let's -- let's go back to this particular

20  event on March 28th, 2008.  And you were telling me you had    11:09:06

21  stopped two gentlemen and you were at a -- basically, a

22  convenience mart.  You had taken one into custody and put him,

23  as I remember, you said into the cab of your vehicle, and I

24  think you were beginning to talk about the second person.

25          What -- what happened with him?                      11:09:27

1   A.  The second person, when he gave me his name, running him

2   through the database, was unable to find any of his

3   information.  He was no record found initially.

4          From what I can remember on the traffic stop, after a

5   certain amount of time I believe identity was found, if I'm --          11:09:43

6   if I'm not correct, and he was released from the scene.

7   Q.  And what happened next when you at the scene with the two

8   men that were under detention?

9   A.  It did take a little bit longer to release the second

10  subject because I had to deal with another incident that was          11:09:59

11  occurring on my traffic stop.

12  Q.  Okay.  And what was that, sir?

13  A.  While I was on my traffic stop, from what I can recall, the

14  way that we had pulled into the gas station there was a dark

15  colored pickup truck that was -- had a loud -- drew my          11:10:14

16  attention to it because it had loud music playing.  One of the

17  other reasons that it drew my attention is to where it parked.

18  It parked directly behind my patrol vehicle, which is -- can be

19  an officer safety issue.  It's just one of those situational

20  awarenesses that you have to make yourself cognizant of what's          11:10:31

21  going on around you.

22  Q.  How far away was it parked behind you?

23  A.  I don't recall.  It was directly -- I mean, within a couple

24  a feet.  It was -- I was at the gas pumps and they had parked

25  alongside of the building.          11:10:46

1    Q.  Now, relative to all the other parking spaces, was there

2    anything that alerted you or heightened your senses about that

3    choice of parking versus other available parking?

4    A.  Typically, I don't mind if -- if persons park, if they're

5    parking to go into a store.  However, the persons that were in

6    that vehicle didn't immediately go into the store without

7    starting to yell at me.  And that kind of heightened my senses

8    a little bit more.

9    Q.  Tell me about that.  First of all, what was being yelled at

10   you, and by whom?

11   A.  If I can backtrack just a little bit.

12   Q.  Please.

13   A.  Prior -- prior to me being -- prior to me being told by my

14   supervisor to go out onto the roadway to -- to initiate traffic

15   stops, I was assigned to the Special Assignment Unit, which is

16   a tactical unit.  And the tactical units were called out by --

17   well, I was notified by my supervisor, who obviously must have

18   come down from the chain of command, to assist with command --

19   security for the command post, which was, I believe, at Bell

20   and Cave Creek.

21       Once every -- once security had been set, my

22   supervisor -- I typically am a hard worker, and so just sitting

23   around just basically kind of -- it kind of tends to ride on me

24   a little bit.  So my supervisor asked me if I wouldn't mind

25   going out and, you know, just working and doing some traffic

11:11:01

11:11:19

11:11:32

11:11:51

11:12:13

```
 1    stops.  I'm, like, just go out and work and just do what I do.

 2    Typically, what my supervisor tells me:  Just go out and do

 3    what you do.

 4          So at this point I got in my take-home vehicle and I

 5    began working -- working the roadways.                         11:12:25

 6    Q.  All right.  Well, let's get back to this black colored

 7    vehicle pulls behind you, and you said someone was yelling at

 8    you, and my question was --

 9    A.  And I apologize.

10    Q.  No, that's okay.  What was being yelled, and by whom?      11:12:38

11    A.  One of the things that heightened my senses at the -- at

12    the command post, there were protesters, and a lot of

13    protesters.  There were protesters that were walking around

14    armed, which they were legally -- they legally could.  And

15    there were a lot of protesters yelling, you know, in Spanish,  11:12:57

16    you know, "No diga nada," you know, I remember them yelling,

17    "No firma nada."  And that was --

18    Q.  Hold on.  You're going --

19          THE COURT:  Translation, please.

20    BY MR. CASEY:

21    Q.  We're going to give Mr. Moll a break.  If you could repeat

22    that.

23    A.  "No diga nada," don't say anything; "Pidale abo -- un

24    abogado," ask for a lawyer.

25    Q.  All right.                                                 11:13:18
```

A.  "No firme nada," don't sign anything.

          And it was a typical chant at all -- it was typical of what I encountered whenever I went to these command posts.

          And so when this traffic stop occurred I was dealing with -- I had already secured the driver of the vehicle for failing to provide ID, and then when I did identify him he was found to be driving on a suspended license, so he was taken -- he was arrested for that.

Q.  And he -- was he in cuffs?

A.  Yes, he was already in handcuffs secured in the back seat of my patrol car.

Q.  Okay.

A.  At this point I was dealing with the driver of the vehicle. I had already removed him from the vehicle and told him that I was unable to identify who he was, to give me his full name, and that way we could run through the database.

          And we were having a dialog.  At this point he was -- understood that he was being detained investigatively until I could determine who he was.

          While we were having the dialog, this dark colored pickup truck pulls up behind me.  And immediately I could see that there was a male driver and a female passenger, and they just immediately kept yelling at me, or not yelling at me, but in my direction, "No diga -- No diga nada" in Spanish.  You know, "No diga nada"; don't say anything, you know.  "Pidale un

1    abogado"; ask for a lawyer.  And they just continued yelling

2    over and over and over again.

3            I allowed it to go for just a few, and then at a point

4    where it kind of became more of an officer safety issue, I

5    began ordering them to leave.                              11:14:45

6    Q.  Okay.  Now, let me ask you this.  When you said they were

7    yelling, my wife and I have different views of what's yelling

8    and what's not yelling, so describe for us, when you say

9    "yelling," describe for us how that was occurring.  You don't

10   need to do it, but if you could in words describe what you mean  11:15:03

11   by yelling.

12   A.  Kind of like the mom in the grandstands yelling at her son

13   to hit a home run.

14   Q.  Screaming?

15   A.  Screaming, yelling.  It was -- it wasn't a -- it wasn't    11:15:16

16   a -- a gentle yell as to, you know, Call for a lawyer.  Don't

17   sign anything.  It was -- it was aggressive.

18   Q.  And how long did this yelling occur, when you said you gave

19   them some time until you asked them to leave?

20   A.  Well, just a few moments, and then I could tell that the   11:15:39

21   situation started getting very aggressive.  They were yelling

22   and screaming; at that point I told them that they needed to

23   leave.

24           This was for officer safety, not only for my safety,

25   but I have two persons in custody.  And once a person is taken  11:15:50

1    into custody, they're my responsibility.  I'm responsible for

2    their well-being.  So I have to make sure that first and

3    foremost they're safe and that I'm taken care of, and that, you

4    know, none of the other public is, you know, is being

5    interfered with at that time.                          11:16:08

6          I stayed where I was at and I just kept yelling at

7    them to leave.  And when they refused to leave they just kept

8    yelling over and over again the same thing --

9    Q.  Let me interrupt you.

10         Did you -- did you, sir, ever approach their vehicle?    11:16:21

11   A.  No, I couldn't.

12   Q.  Why?

13   A.  Because I had the passenger of the vehicle who was being

14   detained.  He was detained, he's my responsibility and I had to

15   care for him.  Because I didn't know what the persons in the    11:16:41

16   truck were going to do.

17   Q.  Were their windows down?

18   A.  Yes.

19   Q.  Were they both yelling, or was it one or the other?

20   A.  No, they were both yelling from the vehicle.              11:16:51

21   Q.  And they're only a few feet away from your vehicle?

22   A.  Yes, sir, that's correct.

23   Q.  Now, what re -- did they -- did they yell anything else at

24   you at that time?

25   A.  No, sir.  That's what they continuously kept yelling, and   11:17:04

 1   it just -- because it -- it almost seemed as if it was

 2   escalating, became very aggressive.  I called for another unit

 3   to back me up.

 4   Q.  When you told them to leave did they leave?

 5   A.  No, not initially.                                          11:17:16

 6   Q.  Okay.  And at any point did you see any of the occupants in

 7   that vehicle try to get out after you told them to leave?

 8   A.  Yes.

 9   Q.  What do you remember?

10   A.  From what I can recall, the driver tried to get out of the  11:17:29

11   vehicle.  And I just kept yelling at him:  Don't get out of the

12   vehicle.  Don't get out of the vehicle.  You guys need to

13   leave.  And I kept letting them know if they didn't leave they

14   were going to be arrested for disorderly conduct.

15   Q.  Okay.  At some point did they leave?                        11:17:42

16   A.  Yes.

17   Q.  And did they say or yell or scream anything to you as they

18   left?

19   A.  No, they just kind of zoomed out of the parking lot after

20   I'd already called for assistance, for backup.                 11:17:56

21   Q.  Now, I realize it's been since November 24, 2009, when your

22   first deposition was taken, so that was some time ago, so I'm

23   going to see if I can refresh your recollection.

24          Did they yell any profanities or vulgarities either

25   about you, about Sheriff Arpaio, or about the MCSO as they      11:18:16

1    left?

2            MR. POCHODA:  Objection, Your Honor, leading.

3            THE COURT:  Overruled.

4            You may answer.

5            THE WITNESS:  Thank you.                              11:18:26

6            From what I can remember it was -- pardon me my

7    language -- it was "fuck Arpaio" and they called us Nazis.

8    BY MR. CASEY:

9    Q.  You say "called us"?

10   A.  It was just Nazis.  It was in my direction, you know.     11:18:39

11   Q.  And this was being yelled at you as they were driving off?

12   A.  Well, while they were there.  I don't recall if it was also

13   as they were driving off, but that's part of the language that

14   was also there.

15   Q.  Now, also during your deposition you testified about what  11:18:51

16   lawyers call a state of mind, how you were feeling at the time.

17           Would you tell the judge, at the time you were calling

18   for backup, what was going on in your mind about this situation

19   with this car and the words?

20   A.  Don't let the uniform fool you, because I'm still just a   11:19:09

21   human being that's chosen to wear this uniform.  So you have to

22   start thinking of officer safety.  You have to start thinking

23   tactically:  What's going to happen next?  There's just so many

24   things that run through your head.

25           As I said, first and foremost, I've got two persons    11:19:29

1    that I'm -- I'm in charge of.  I have sole custody of these two

2    persons.  They can't defend themselves.  I have them in

3    handcuffs.  I have to defend them, one way or the other.

4            This is Arizona.  You have to make the presumption

5    that a majority of the persons carry weapons on them.  It          11:19:47

6    happens all the time whenever I do a traffic stop.  It's just

7    typical persons do carry handguns.  There's just so much that

8    was going through my head.  It was more officer safety and just

9    tactically thinking of what my next step would have to be if,

10   you know, the situation got worse.                                  11:20:07

11   Q.  Did you fear for your safety?

12   A.  Well, not only my safety, but the safety of the persons I

13   had in custody.

14   Q.  Tell me specifically whether you remember the fellow in the

15   car, whether he tried to get out of the car before or after you    11:20:20

16   called for backup.

17   A.  I can't recall, sir.

18   Q.  All right.  Now, I'm going to refresh your memory and

19   see -- and I'm trying to look at your deposition, and I cannot

20   seem to find it, but I'm just going to use a crass expression,     11:20:35

21   that you were concerned that this guy was going to kick you're

22   a.

23           Do you remember testifying to that?

24   A.  Well, I remember -- I mean, that would have been -- I was.

25   I mean, if this person came out and started fighting with me, I    11:20:47

1  mean, it would have been literally two against one, and I'm

2  still having to care for or protect this person that I have in

3  custody in front of me.

4  Q.  Do you remember what you said on the radio when you

5  requested backup?                                              11:21:02

6  A.  Not specifically.  It would have been just to request

7  another unit to assist me.

8  Q.  Okay.  Now, at any time did these folks try to run you

9  over?

10  A.  No.                                                       11:21:13

11  Q.  Okay.  Did they -- other than what you've described here,

12  did they do anything else confrontationally?

13  A.  No.

14  Q.  Okay.  Tell me what happened after the vehicle drives off.

15  What happened after you called backup and this other vehicle   11:21:31

16  leaves?

17  A.  Well, after continuing to yell at them, you know:  You guys

18  need to leave, You need to leave, I'm going to arrest you for

19  disorderly conduct, at that point they took off.  They left the

20  scene.  And as they left the scene they were traveling         11:21:43

21  southbound on Cave Creek from my traffic stop.

22        At that point I was still there kind of calming myself

23  down a little bit, but I remember a motorcycle unit, a

24  motorcycle unit came by, and I directed him in the direction

25  that the truck had left in.                                    11:22:02

1538

1    Q.   Why?   Why did you do that?

2    A.   Because that's the direction that the truck had left in and

3    I wanted them to go, you know, see if they could find that

4    truck and investigate it.

5    Q.   Okay.   What for?                                              11:22:13

6    A.   Well, at that point, you know -- you know, they were

7    disorderly, they were aggressive, and it was -- that was the --

8    they were the reason that I had called for backup.

9    Q.   Now, after the black vehicle leaves, you see another

10   officer go after him, did you return to your traffic stop?        11:22:31

11   A.   Yes, I do.

12   Q.   Okay.   Eventually, did you ever communicate with any other

13   MCSO deputies that were involved in either the traffic stop

14   with those people or somehow involved with them?

15   A.   Communicate at what point, or --                             11:22:50

16   Q.   Okay.   You go back to your traffic stop?

17   A.   Yes, sir.

18   Q.   And you had pointed in that direction, you know other

19   officers are going, at least one, right?

20   A.   And also Deputy Beeks, because Deputy Beeks had driven by    11:23:01

21   also just behind Deputy Kikes.

22   Q.   Do you know how that scene, after a traffic stop was made,

23   do you know how it was cleared, how it was resolved?

24   A.   I believe Deputy Beeks and I spoke about it, but I can't

25   recall what actually happened.                                    11:23:19

1   Q.  The testimony is, and I want you to assume that this is

2   accurate, that the people in the vehicle were not cited and not

3   arrested, not charged.  Assuming the accuracy of that, do you

4   have any information of why they were not cited, arrested, or

5   charged?                                                          11:23:35

6   A.  No, sir, I do not.

7   Q.  Okay.  Did you ever explain to Deputy Beeks or anyone what

8   had actually happened that led to your call for backup?

9   A.  I explained to -- I'm sure I told Deputy Beeks when he came

10  back.  After Deputy Beeks had cleared that scene, he came back   11:23:49

11  to my traffic stop and sat with me so that I wouldn't be alone

12  there any more, sat with me while we waited for the tow truck.

13  Q.  At any time before Deputy Beeks came back did you

14  communicate via radio or any other device, like a cellphone,

15  with any other deputy that was at the traffic stop, if you       11:24:10

16  recall?

17  A.  No, I did not.  I -- I finished my -- not pertaining to

18  that.  I remember I did call for a -- a posse unit to come and

19  transport my -- the person that I had arrested.

20  Q.  And let's just talk about that briefly.  The person that     11:24:27

21  you had arrested, what role did the posse member serve in -- in

22  that aspect of your stop?

23  A.  He arrived on my scene and took custody of my prisoner and

24  transported him back to the command post for processing.

25  Q.  Based on your experience in saturation patrols, do posse     11:24:44

1    members make traffic stops?

2    A.  No.

3    Q.  Why not?

4    A.  They're not sworn officers.

5    Q.  Do posse members question people?                    11:24:55

6    A.  No.

7        MR. CASEY:  Okay.  Those are all the questions,

8    Deputy, that I have.  Thank you.

9        THE WITNESS:  Thank you, sir.

10       THE COURT:  Cross-examination.                       11:25:08

11       MR. POCHODA:  Yes, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. POCHODA:

14   Q.  Good morning.

15   A.  Good morning, sir.                                   11:25:21

16   Q.  It's Detective?

17   A.  It's Detective, yes, sir.  Thank you.

18   Q.  Detective, you know Mr. Beeks, is that correct?

19   A.  Doug Beeks?  Yes, sir, I do.

20   Q.  And you are aware that he testified earlier this morning,   11:25:38

21   is that correct?

22   A.  Yes, sir.  I was made aware of that, yes, sir.

23   Q.  Were you made aware of any of the statements that he made

24   in court this morning?

25   A.  No, sir, I'm not.                                    11:25:47

1541

1   Q.  And you talked about the fact that you have an occasion

2   while at the MCSO to perform general patrol duties, is that --

3   is that correct?

4   A.  Yes, sir, that is correct.

5   Q.  What you call law enforcement op -- law enforcement duties,    11:26:08

6   is that --

7   A.  Law enforcement duties, yes, sir, that's correct.

8   Q.  And in doing so is it fair to say that you observed that

9   folks are bad drivers, and you could not go down the street

10  without seeing a moving violation?    11:26:24

11  A.  Sir, that is correct.

12  Q.  And would that have been your observation when you

13  performed, as a member of the HSU, doing general patrol work on

14  one of the saturation patrols?

15  A.  I perform law enforcement duties, enforcing state --    11:26:39

16  federal, state, and local laws, yes, sir, that's correct.

17  Q.  And you did that primarily through the tactic of traffic

18  stops, is that right?

19  A.  I made traffic stops, yes, sir.  I did initiate traffic

20  stops.    11:26:55

21  Q.  And did you use your discretion both when you were on the

22  HSU and a member -- and performing on a special operation and

23  when you were on general patrol, because you could not stop all

24  of the traffic violators that you observed, is that correct?

25  A.  That is correct, sir.    11:27:09

1    Q.  In terms of doing traffic work, on occasion you would have

2    a difficult time seeing inside a vehicle because of tinted

3    windows, is that right?

4    A.  Dark-tinted windows is a violation of Arizona state law,

5    yes, sir.                                                          11:27:32

6    Q.  That's correct.  But if you had trouble seeing inside, you

7    would focus on the front passenger window and the driver's side

8    window in order to be able to see the driver, is that right?

9    A.  Yes, sir, that's correct.

10   Q.  And that tactic enabled you to look inside a car, is that    11:27:45

11   correct?

12   A.  Well, if they have dark-tinted windows, sir, I wouldn't be

13   able to see inside the vehicle.

14   Q.  And in this instance, we'll get to it, but in this instance

15   we're talking about the instance -- incident on March 28th, the  11:27:59

16   car that drove in that you in -- that you eventually chose to

17   order out of the station, the windows were down, is that right?

18   A.  That is correct, sir.

19   Q.  You could see inside?

20   A.  Yes, sir, I could.                                            11:28:15

21   Q.  You could see the faces of the people inside that car?

22   A.  I could see a female and a male.  If you asked me to recall

23   it today I could not.

24   Q.  I understand.  But they were within 15 or 20 feet from you

25   when they parked, is that right?                                  11:28:28

1    A.  I wouldn't give you a space, but they were within a good

2    distance, yes, sir.

3    Q.  Let me go back to some of the general traffic issues.

4         You talked a little bit about the passengers.  You

5    said it was your practice to inquire of all passengers that          11:28:41

6    were in a car you stopped to produce their identification, is

7    that right?

8    A.  If they voluntarily produced it, yes, sir.

9    Q.  But you would ask everyone that was a passenger, no matter

10   the reason for the stop, you would ask them for their               11:28:58

11   identification, correct?

12   A.  I would ask, yes, sir.

13   Q.  And there have been occasions when you in fact detained and

14   arrested a, quote, Hispanic male, John Doe, for failing to

15   provide any form of ID while a passenger, and also for not          11:29:13

16   wearing a seat belt, is that correct?

17   A.  Yes, sir.

18   Q.  And there may have been other occasions when you also

19   detained and arrested folks for failing to provide ID when a

20   passenger?                                                           11:29:28

21   A.  I'm sorry, sir?

22   Q.  There might have been other occasions as well when you

23   detained or arrested for that purpose.

24   A.  For what purpose, sir?

25   Q.  For failure to provide an ID and not wearing a seat belt.       11:29:34

1   A.  Well, I don't know, sir.  I'd have to recall my records.

2   Q.  Okay.  Now, just to clarify, I believe you said if the --

3   if the passenger told you generally, I'm not going to tell you

4   my name, or give you any ID, that would be okay.  You would not

5   take any further action, is that right?                          11:30:00

6   A.  That's correct, sir.

7   Q.  But if they gave you some data about themselves and that

8   didn't turn up when you ran it, you would in fact detain them?

9   A.  I would for investigative purposes, yes, sir.

10  Q.  And when you were a member of the HSU and you were making   11:30:18

11  these stops on these saturation patrols, you would look into if

12  you -- if you felt that a passenger in any of the cars you

13  stopped on one of those patrols was suspected, you found, you

14  believed, based on the indicators, you suspected of that person

15  being in the country illegally, you wouldn't just let that       11:30:37

16  person go, would you?

17  A.  You need to rephrase that question for me, sir.

18  Q.  When you were acting on one of the saturation patrols as a

19  member of the HSU, or SAU, and you came upon -- stopped a car

20  for a vehicle violation, and you believed, after stopping the   11:30:53

21  car and looking and reviewing the situation with the

22  passengers, maybe asking some questions about ID, you came to

23  the conclusion that there was reasonable suspicion that the

24  passengers were here illegally.

25          You follow me that -- so far?                            11:31:13

1    A.  No, that would not be what I led to my conclusion.  It

2    would be failing to provide ID at that time and investigating

3    to identify them.

4    Q.  Right, I -- I may not have been clear.  I apologize.

5         Let's assume that for whatever reasons when you came          11:31:25

6    upon this car and stopped it for some vehicle violation, your

7    investigations or questions indicated to you that the passenger

8    was in fact -- you had reasonable suspicion that the passenger

9    was in the country illegally, you would not let that person go

10   at that moment, would you?                                          11:31:44

11   A.  I wouldn't come to that conclusion during the initial

12   traffic stop, sir.

13   Q.  No matter what information you found out about the

14   passenger?

15   A.  Well, I would have to first, if they voluntarily give me        11:31:51

16   their name, then identify them.  If -- as I stated before, if

17   they voluntarily give me their name or identification, or

18   failed to give me identification card but provided me a name,

19   and while running that name there was no record found or no

20   person found, at that point they would be detained to identify     11:32:11

21   them, not for illegal purposes.

22   Q.  No, I understand.  I was just asking you for whatever

23   reason, including this one here, based on the disparity when

24   you ran the information, you felt there was reasonable

25   suspicion that the person was here illegally, at that point you     11:32:33

1    would detain the passenger, is that correct?

2    A.  Are you speaking about a specific incident, sir?

3    Q.  No, generally -- your general practice when you stopped a

4    car, and based on your investigations, including running

5    these -- the information given to you, finding that there was        11:32:48

6    no match, you would -- you would detain the passenger for

7    further investigation, is that correct?

8    A.  That is correct.

9    Q.  And you would follow that practice when you were a member

10   of the HSU on one of the special operations patrols, correct?       11:33:00

11   A.  I still follow that practice.

12   Q.  And you did when you were on one of those special

13   operations patrols, correct?

14   A.  Yes, sir, that's correct.

15   Q.  And you do that -- and you did follow that practice when        11:33:10

16   you were on general patrol as well, is that right?

17   A.  Yes, sir, that is correct.

18   Q.  You became an HSU detective in April of 2008, is that

19   correct?

20   A.  Approximately April or May of 2008, yes, sir.                   11:33:28

21   Q.  And Sergeant Madrid was the commander of your unit, is that

22   right?

23   A.  No, sir.

24   Q.  Who was?

25   A.  Lieutenant Sousa.                                               11:33:35

1   Q.  I'm sorry.  Lieutenant Sousa was the head of the HSU?

2   A.  He's our commander.

3   Q.  And Sergeant Madrid, the head of your smaller unit within

4   HSU?

5   A.  He was my squad sergeant, yes, sir.                    11:33:46

6   Q.  Squad sergeant.  I apologize.

7           And amongst other things -- in any event, at that

8   point you did not receive any training on factors that make up

9   suspicion after you stop a smuggling load, did you?

10  A.  You need to restate your question for me, sir.        11:34:02

11  Q.  Did you receive any training from the M -- MCSO about

12  what -- the valid criteria that allowed you to find there was

13  reasonable suspicion that the persons that were in the car, the

14  load that you stopped, were here illegally?  Did you receive

15  any training on that?                                      11:34:21

16  A.  If you're asking if I received any training pertaining to

17  immigration, I did from ICE to become 287(g) certified.

18  Q.  And from MCSO did you receive any training on indicators of

19  being here illegally?

20  A.  Any indicators of being here illegally?  No.           11:34:33

21  Q.  And you talked a little bit about the training that you had

22  about racial profiling.  You -- you had some information

23  provided to you on that topic when you went through the academy

24  at the MCSO, is that correct?

25  A.  We went through a cultural diversity course, yes, sir.  11:35:00

1548

Q.  And you would agree that that was a -- the portion on

racial profiling was a -- in one class that was, quote, short

and sweet in that academy training, is that right?

A.  I don't recall when the class occurred and how fast the

class was.                                                        11:35:18

        MR. POCHODA:  May I approach with the depositions,

Your Honor?

        THE COURT:  You may.

        MR. POCHODA:  (Handing deposition to clerk).

BY MR. POCHODA:                                                   11:35:51

Q.  You recall giving a deposition in this case, Detective?

A.  I do, sir.

Q.  And you were under oath at the time, is that right?

A.  Yes, sir, that is correct.

Q.  If you could turn to page 198 of this deposition dated       11:35:58

November 24th, 2009.

A.  I'm sorry, sir.  Which one?

Q.  Page 198.

A.  Okay.

        MR. CASEY:  Excuse me, Your Honor.  My understanding      11:36:08

is the witness wants his glasses.

        MR. POCHODA:  Oh, I'm sorry.

        THE WITNESS:  I forgot them.  I apologize, yes.

        THE COURT:  Please approach and give him his glasses.

        THE WITNESS:  Thank you.                                 11:36:20

```
 1              MR. CASEY:  (Handing).

 2              THE WITNESS:  Thank you.

 3              MR. CASEY:  You're welcome.

 4              THE WITNESS:  198, yes, sir.

 5   BY MR. POCHODA:                                          11:36:32

 6   Q.  If you could turn to line 16, 16 through 23 of that page.

 7              MR. CASEY:  I'm sorry.  What page, Counsel?

 8              MR. POCHODA:  198.

 9              MR. CASEY:  Thank you.

10   BY MR. POCHODA:                                          11:36:43

11   Q.  And if you can see, the question is:

12              "Have you received training on either of these

13   subjects by MCSO?"

14              The answer:  "On racial profiling --"

15              The question:  "Yes.                          11:36:53

16              "ANSWER:  -- to whether or not?  Yes.

17              "QUESTION:  And what was the nature of that training?

18              "ANSWER:  I believe it was short and sweet, and we

19   don't racial profile.  It's -- it's in the basic ethics

20   class --"                                                11:37:08

21              Do you see that sir?

22   A.  I do, that's correct, sir.

23   Q.  And that was accurate testimony, is that correct?

24   A.  Yes, sir.  The ethics class, the cultural diversity class,

25   yes, sir.                                                11:37:14
```

1    Q.  That you were talking about at the academy, is that right?

2    A.  Yes, sir, that's correct.

3    Q.  And then continuing on that same page up on top, lines 1

4    through 5, see that the question:  "Have you received any

5    training on whether or not to racially profile or what racial    11:37:29

6    profiling is by MCSO?

7         "ANSWER:  We know what racial profiling is.  No, we

8    have not and do not racial profile, so I have not received any

9    training on racial profiling."

10        Do you see that?                                            11:37:46

11   A.  I do, sir.

12   Q.  And that was accurate when you said it, is that correct?

13   A.  Yes, sir, that's correct.  We don't train on how to racial

14   profile.

15   Q.  No, I understand.  But you also believe that you don't       11:37:53

16   racial profile, you as a member of the MCSO, is that correct?

17   A.  That's correct, and that's what I'm stating.

18   Q.  And you don't believe anyone else who's a member of the

19   MCSO has ever racially profiled, is that correct?

20   A.  That is correct, sir.                                        11:38:07

21   Q.  So there's no need for extensive training in that

22   situation, is that right?

23   A.  I'm sorry?

24   Q.  Take it back.  Withdraw the question.

25        You have never been provided any written definition of     11:38:23

1    racial profiling by the MCSO, have you?

2    A.   Not that I can recall.

3    Q.   That would be in writing or orally, is that right?

4    A.   I'm sorry, I can't recall.

5    Q.   You don't recall as you sit here today being provided such      11:38:36

6    a definition, is that right?

7    A.   Being provided what racial profiling is?

8    Q.   A definition, yes.

9    A.   I don't recall if we received it in the cultural diversity

10   class or the ethics class, but I can't recall if they gave us a     11:38:47

11   definition of it.

12   Q.   You don't recall receiving such a definition as we sit here

13   today?

14   A.   That's correct.

15   Q.   You do recall being told by persons at the MCSO to not          11:38:56

16   racially profile.  Is that fair to say?

17   A.   That is fair to say, sir.

18   Q.   But at the times they told you that, they did not provide

19   you a definition of what would encompass racial profiling, is

20   that right?                                                          11:39:11

21   A.   I personally didn't receive a definition of it, sir.

22   Q.   And I believe you mentioned that the -- when you were a

23   member of the Human Smuggling Unit, you did not go to the

24   briefings that occurred on the mornings of the -- the large

25   saturation patrols because, and I'm paraphrasing, so correct me     11:39:35

1    if I'm wrong, the Human Smuggling Unit already knew that it was

2    wrong to racially profile, is that right?

3    A.  That is correct, sir.

4    Q.  But all of the other units and personnel that were involved

5    in that saturation patrol were required to report to the          11:39:48

6    briefings, is that right?

7    A.  That's correct, sir.  HSU held its own briefing.

8    Q.  And you were involved in a number, you said a few, of these

9    crime suppression saturation patrols, is that right?

10   A.  Yes, sir.                                                      11:40:06

11   Q.  There's one that we'll talk about more, I believe was your

12   first such saturation patrol was the one in North Phoenix in

13   2008 near Cave Creek and Bell, correct?

14   A.  I believe so.

15   Q.  And then you participated in one in Mesa that took place on    11:40:19

16   July 14th in 2008.

17           Do you recall?

18   A.  I'll have to defer to whatever our records show that I

19   attended.  I don't recall what the dates were.

20   Q.  Okay.  But -- but it's possible that you did, would that be    11:40:33

21   your understanding?

22   A.  I'm sorry, sir?

23   Q.  It's possible that you took place -- took part in one in

24   Mesa in July of 2008?

25   A.  I'd have to look at the sign-in sheet to see if I was          11:40:46

1    actually there, sir.  I don't remember the dates that I

2    participated in.  There were several that I did not because I

3    was on vacation.

4    Q.  But you do recall participating in some in 2008 and 2009,

5    is that correct?                                            11:40:55

6    A.  That's fair to say.

7    Q.  And when you did participate, you were not told why a sweep

8    was being conducted in the area, is that correct?

9    A.  That is correct.

10   Q.  And you were not told to watch for any particular house or    11:41:11

11   person while you were on that sweep, were you?

12   A.  No, sir, I was not.

13   Q.  You were not given any instructions other than to go out

14   and patrol, isn't that correct?

15   A.  That's fair to say.                                      11:41:26

16   Q.  You were not told on any of them to look for particular

17   criminal acts, correct?

18   A.  That is correct.

19   Q.  And you had never, prior to the operation in March in 2008,

20   you had never previously, as a member of the MCSO, participated    11:41:37

21   in a law enforcement action of anywhere near such a large

22   scale, is that correct?

23   A.  I'm sorry, sir.  Would you restate --

24   Q.  Prior to the operation in March of 2008 you had never

25   previously participated in an MCSO law enforcement action of     11:41:53

```
 1   such a large scale, is that correct?
 2   A.  I'd have to defer back to whatever sign-in sheets that we
 3   have, sir.  I don't know which ones I participated in prior to
 4   that March one you speak of.
 5   Q.  Well, assume -- assuming that was your first saturation     11:42:06
 6   patrol prior to the -- being involved in saturation patrols,
 7   you had not participated as a member of MCSO in any such large
 8   enforcement actions, had you?
 9   A.  I don't know.  As a tactical unit I responded to many SWAT
10   call-outs, and it's a pretty big event.                        11:42:26
11   Q.  If we could turn to page 102 of your deposition.
12   A.  I'm sorry, sir.  102?
13   Q.  102.
14           Turn to line 19 through 23.
15   A.  19 through 23?                                              11:42:47
16   Q.  Um-hum.
17   A.  Okay.
18   Q.  And the question is:  "And before this particular crime
19   suppression detail in North Phoenix last year, have you -- had
20   you ever participated in a -- an enforcement action of a       11:42:57
21   similar scale as an MCSO officer?
22           "ANSWER:  As a deputy, no, ma'am."
23   A.  Well, you were speaking of the Mesa crime suppression
24   sweep, and I told you that I did not, I could not without
25   looking at a sign-in sheet.  Prior to the -- prior to the North 11:43:14
```

1555

1   Phoenix one, no, I had not.

2   Q.  I apologize for not being clear.

3        And in any event, there's no -- prior to your first

4   saturation patrol, you had not participated in any operation of

5   similar scale?                                                    11:43:29

6   A.  To the North Phoenix, that's correct, that I can recall.

7   Q.  Now, let's turn to the events of March 28th, 2008.  Let me

8   try to get some understanding of the location.

9        If we could look at Plaintiffs' Exhibit 411.  That's

10  admitted.  These are a series of photos of the gas station.      11:44:18

11       Can you see that on your screen?

12  A.  Here it is.  Yes, sir, I can.

13  Q.  And is this the location that you were describing in your

14  earlier testimony where you had initially detained two males

15  and then had the encounter with the two folks who drove in in    11:44:38

16  the black vehicle, is that right?

17  A.  From what I can recall, yes, sir, it is.

18  Q.  And does A indicate where you were parked in the patrol

19  car, do you recall?

20  A.  I would have to look at the actual one that I drew on,       11:44:52

21  because there's a diagram, I believe, behind it, and I think

22  there was a key to it that would identify which vehicle was

23  which.

24  Q.  Okay.  I'll provide that in a moment, but let -- since

25  we're on it, if we could turn to B of this same exhibit,         11:45:10

1556

```
 1   please, the next page.

 2            Is that doable?

 3            This again is a view of that -- I don't know, the

 4   Quick Stop & Gas that you described in your earlier testimony,

 5   is that right?                                                    11:45:37

 6   A.  That's correct, sir.

 7   Q.  And looking straight ahead that would be the store itself,

 8   the Quick Stop, is that right?

 9   A.  Yes, sir, that is correct.

10   Q.  And then the pumps were in front of that store.               11:45:43

11            And you don't recall as you sit here today what the

12   markings that you placed on as A, B, and C stand for?

13   A.  Well, I do recall them, sir, but when you initially showed

14   it to me it only showed one, so I didn't recall what the key

15   was.  But now that you show it, however, the A would be the      11:45:59

16   suspect's vehicle, B would be my vehicle, and C would be the

17   dark colored vehicle.

18   Q.  And you had -- the -- the suspects you had determined when

19   you were driving south on Cave Creek that you wanted to make a

20   traffic stop on that car, the car that eventually became A on    11:46:21

21   this diagram, is that correct?

22   A.  Yes, sir, that is correct.

23   Q.  And normally, when you make a stop and indicate to the car

24   ahead of you that you'd like it to stop, you want them to

25   turn -- pull over to the right, is that right?                   11:46:35
```

```
 1    A.  Well, I would hope.  Based on persons that receive driver's
 2    license training it does say that you should pull over to the
 3    right for emergency vehicles.  However, there are persons that
 4    do not, and continue driving into a location they feel more
 5    comfortable.
 6    Q.  And there's some persons that get confused, isn't that
 7    correct, when they see the sirens behind them, is that right?
 8    A.  Yes, sir, that is correct.
 9    Q.  Perhaps a little nervous, is that right?
10    A.  Of course.
11    Q.  And in this case they -- the folks pulled over to the left
12    from the Cave Creek Road, is that right?
13    A.  That's correct, off of Cave Creek they made a left and into
14    the gas station.
15    Q.  But they stopped fairly quickly after making that left, is
16    that correct?
17    A.  That is correct.
18    Q.  And that, in and of itself, the fact they pulled over to
19    the left as opposed to the right, did not increase your concern
20    about the situation, did it?
21    A.  Not at all, that's typical.
22    Q.  It's typical is what you said?
23    A.  It is.  Persons who get nervous, they just pull to the
24    right.
25    Q.  And --
```

11:46:49

11:46:58

11:47:07

11:47:15

11:47:24

1    A.  Or to the left.

2    Q.  I apologize.

3         And so they parked in front of the -- some -- the

4    pumps, is that -- is that correct?  That would be number --

5    letter A here.                                                    11:47:34

6    A.  That would be A.  However, they were stopped on the left

7    side of the pumps.  This diagram somehow I would have not put

8    them on that side.

9    Q.  Okay.  But B, you pulled your car basically behind them

10   slightly at an angle, but basically behind their car?             11:47:46

11   A.  Tactically, that's correct.

12   Q.  They could not back out, in other words?

13   A.  They could not back out but they could drive forward.

14   Q.  Right.  Okay.  Let's take a look at the other drawing,

15   which is seventy -- no, it's 3 -- if we could put up            11:47:58

16   Plaintiffs' Exhibit 397, which has been admitted, and publish

17   if that's okay.

18        THE COURT:  It's up.

19   BY MR. POCHODA:

20   Q.  We should go -- if we can turn this so that north is         11:48:14

21   actually on top.

22        That's fine.

23        You recognize this diagram?

24   A.  Yes, sir, it's a diagram that I drew.

25   Q.  And you drew this during your deposition, is that correct?    11:48:29

1    A.  Yes, sir, that's correct.

2    Q.  And the -- the lower right corner would represent this

3    Quick Stop station, is that right?

4    A.  The lower right corner?  Yes, sir, that's correct.

5    Q.  And sort of rec -- near the rectangular thing would be the    11:48:46

6    gas pumps, is that right?

7    A.  The fuel pumps, yes, sir.

8    Q.  And then the rectangle that starts on the lower right, that

9    would be the store itself, is that right?

10   A.  Yes, sir.    11:48:58

11   Q.  And where it says number 5 here, that's Cave Creek Road, is

12   that right?

13   A.  It is Cave Creek Road.  I don't know if that's what

14   number 5 actually indicates on the key.

15   Q.  Yeah, I didn't mean that that's what you designated, but    11:49:10

16   that is Cave Creek Road running north-south, is that right?

17   A.  That is correct, sir.

18   Q.  And Nisbet Road enters into Cave Creek, and Nisbet Road is

19   to the right, that's an east-west road?

20   A.  That is an east road, yes, sir.    11:49:24

21   Q.  Now, at some point the car that -- the black vehicle you

22   have marked here on the lower right as number 3, is that -- is

23   that correct?

24   A.  Yes, sir, that's correct.

25   Q.  And they pulled in from Nisbet Road, is that right?    11:49:38

1    A.  That is correct.

2    Q.  And they would have driven apparently straight down to park

3    in front of the store, is that right?

4    A.  They -- not in front of the store.  That's to the side of

5    the store, the north side of the store.                          11:49:54

6    Q.  Well, you could enter the store from that side, couldn't

7    you?

8    A.  No, sir, you could not.  You had to walk through the front,

9    and the front of the store is on -- faces Cave Creek.

10   Q.  I see what you're saying.  That the front -- but they would  11:50:04

11   have driven straight from Nisbet until they couldn't go any

12   more, is that correct, and hit some -- the structure of the

13   store?

14   A.  That's correct, sir.

15   Q.  And then at some point you ordered them to leave, is that     11:50:15

16   correct?

17   A.  It wasn't at some point.  It was at the point that they

18   became aggressive that I began ordering them to leave.

19   Q.  That's some point.  At some point you left -- I'm not going

20   into the reason at this time, you ordered them to leave, is      11:50:36

21   that right?

22   A.  That's correct.

23   Q.  At one point you said you saw the door begin to open, is

24   that right?

25   A.  It was, correct.                                             11:50:44

1   Q.  And if the -- that was the driver's side door, you thought?

2   A.  That is correct.

3   Q.  And if the driver wanted to enter the store he would have

4   to open his door to the car, is that right?

5   A.  That is correct.                                          11:50:54

6   Q.  And presume -- you don't know if they came there to buy

7   something at the store, is that right?

8   A.  That is correct.

9   Q.  In any event -- and at the point that he opened his door,

10  you don't know that he was looking to go into the store to     11:51:08

11  purchase cigarettes or something else?

12  A.  I don't know what his intentions were with the store.

13  Q.  But in any event, as soon as you saw the door begin to

14  open, you ordered him to close it and stay in the car, is that

15  right?                                                         11:51:18

16  A.  That's right.

17  Q.  And he complied with that?

18  A.  Yes, he did.

19  Q.  And at no point in the time from when this car first drove

20  in to that stop until the time that you ordered them to leave  11:51:28

21  did either of the occupants leave the car, is that right?

22  A.  That is correct.

23  Q.  And at no point did they ever throw anything from the car,

24  did they?

25  A.  Not that I can recall.                                     11:51:42

1    Q.  And at no point did they exhibit any weapons or dangerous

2    objects, did they?

3    A.  No, sir.

4    Q.  So that the -- the behaviors that you were concerned with

5    was basically the statements they were making as they were          11:52:03

6    yelling, is that right?

7    A.  The aggressive behavior.

8    Q.  Aggressive behavior was yelling, is that right?

9    A.  The yelling, that's correct.

10   Q.  But they didn't shake their fists at you or threaten to get     11:52:14

11   you in any way, did they?

12   A.  Not that I can recall.

13   Q.  And so that it was the content of what they say and the

14   manner they said it that was the concern that led to you

15   ordering them to leave, is that right?                              11:52:30

16   A.  I think any reasonable and prudent person would be fearful

17   of it and ask them to leave.

18   Q.  And for the most part, certainly for the initial time and

19   before you ordered them to leave, those were the Spanish words,

20   is that correct, that you described before?                         11:52:42

21   A.  I'm sorry, sir?

22   Q.  They were Spanish, words in Spanish, is that right?

23   A.  That they were yelling --

24   Q.  Yes.

25   A.  -- yes.                                                         11:52:51

1563

1    Q.  And the -- let me back up just a second.

2         As they came in, you indicated before that their

3    windows were down and you could see inside the car, correct?

4    A.  That's correct.

5    Q.  And they were playing music on the radio, is that correct?    11:53:07

6    A.  Yes, sir, that's correct.

7    Q.  And you could hear that music?

8    A.  I could.  I remember loud music playing.

9    Q.  And that was Hispanic music, Latino music, was that --

10   A.  I don't recall what the music was.    11:53:17

11   Q.  You don't recall.

12        But the -- the man is a male driver and a woman in a

13   passenger seat, correct?

14   A.  That's correct.

15   Q.  And the words that you remember the woman initially    11:53:24

16   yelling, and then both, were "No diga nada," and "Pida un

17   abogado," correct?

18   A.  That's correct.

19   Q.  And you understood those to mean, "Don't say anything,"

20   "Ask for a lawyer," right?    11:53:36

21   A.  That's correct.

22   Q.  And you're aware -- and who were they yelling those at?

23   A.  It was in my direction.

24   Q.  You think they were telling you to not ask for a lawyer?

25   A.  Of course not.    11:53:46

1  Q.  Who were they directing it at?

2  A.  Probably the person I had in custody.

3  Q.  And they did that by -- if we look back at the -- at the

4  exhibit, they had to turn to their right and look a little

5  behind so they could get the -- from their car to reach the --      11:54:01

6  the folks, one of whom was already in the back seat of your

7  patrol car, number two, is that correct?

8  A.  That's correct.  But this is not to scale and the exact --

9  exact location --

10  Q.  I understand.  But they would have been -- the two detained   11:54:15

11  persons would have been to the right and a little bit behind

12  the occupants in car number 3, correct?

13  A.  The two detained persons?

14  Q.  Yes.

15  A.  Okay.  Say that again.      11:54:28

16  Q.  They would have been a little to the right and behind the

17  people in car number 3, correct?

18  A.  One person would have already been in the back of my patrol

19  vehicle secured.

20  Q.  Correct.      11:54:38

21  A.  And if you see where approximately number 4 is, is where

22  myself and the second person I had in -- the second person I

23  had detained were.

24  Q.  So they had to look out of their window and look to their

25  right, whatever, would it -- would it have been approximately      11:54:52

1    15 or 20 feet from the detained person to the persons in

2    vehicle number 3?

3    A.  Are you asking me a question, sir --

4    Q.  Yes.

5    A.  -- or are you telling me?                                          11:55:03

6    Q.  Would it have been approximately 15 to 20 feet from the

7    detained person, number 4, let's say, and the persons in the

8    car, number 3?

9    A.  As I stated before, sir, I can't give you an approximate

10   amount.  It was just a distance.                                      11:55:14

11   Q.  Okay.  In any event, you had heard this expression before:

12   Don't say anything.  Get a lawyer.  That's an expression

13   that's --

14   A.  That was the typical chant that was chanted by the

15   protesters at the command posts.                                      11:55:31

16   Q.  It's also a typical chant by lawyers to tell their clients,

17   Don't speak to anybody, is that correct?

18   A.  I don't know.

19   Q.  You're not aware that it's common advice to persons when

20   they're confronted by law enforcement, detained or arrested,         11:55:44

21   Don't say anything.  Ask for a lawyer?  You're not -- you're

22   not aware that that's common advice given to -- to persons that

23   may encounter -- encounters with law enforcement?

24   A.  Well, I've never been arrested, so I wouldn't know what a

25   lawyer would tell me, and if a lawyer told that to the client,       11:56:00

1    it would be privileged.

2    Q.  Now, I understand you weren't sitting in.  I'm just in

3    general knowledge whether you're aware that attorneys --

4    A.  I can't answer that question.

5    Q.  -- tell their clients not to speak to law enforcement.    11:56:09

6    A.  I can't answer that question, sir.

7    Q.  Well, it's also your responsibility as a law enforcement

8    officer when you arrest somebody to tell them they have a right

9    to remain silent and get a lawyer, isn't that correct?

10    A.  If I'm conducting an investigation where I would ask them    11:56:18

11    questions pertaining to the -- the crime, yes, sir.  They would

12    be read their Miranda rights.

13    Q.  And this was similar.  They tell them to be silent and get

14    a lawyer was the advice they were telling these detain -- these

15    detainees, is that right?    11:56:35

16    A.  Well, the person being arrested for driving on a suspended

17    would not have his rights read to him because I had no

18    questions in reference to the crime.  The crime was he was

19    determined to have been driving on a suspended license, and

20    that was a matter of fact by the state.  So his rights --    11:56:45

21    Q.  So you didn't have to give him Miranda warnings in this

22    case?

23    A.  That's correct.

24    Q.  And you did not?

25    A.  That's correct.    11:56:53

1  Q.  When the -- when the occupants of 3 yelled out the

2  window -- and first of all, it was all directed towards you and

3  the detainees, is that correct?

4  A.  It was directed in our way, yes, sir.

5  Q.  And there was no one else standing in between car number 3    11:57:09

6  and yourself or the detainees, is that right?

7  A.  That's correct.

8  Q.  And there was no one immediately around the pumps at that

9  moment?

10  A.  Not to my left, that's correct.    11:57:18

11  Q.  And upon this yelling, the detainees, the persons you had

12  detained, did not change any of their behavior, actions, or

13  words, did they?

14  A.  They became more aggressive.

15  Q.  They became more aggressive?    11:57:35

16  A.  Yes, sir.

17  Q.  One was already in the back of your car with his hands

18  cuffed, is that correct?

19  A.  Are you talking about the detainees or the persons in the

20  black --    11:57:46

21  Q.  The detainees.

22  A.  The persons in the back?  No, they were cooperative the

23  entire time.

24  Q.  They were not impacted by these words that came out of the

25  car number 3, is that correct?    11:57:51

1   A.  I don't know what their feelings were.

2   Q.  They didn't change their behavior.

3   A.  My detainees?  No, they did not.

4   Q.  In any event, these words that on their face seem fairly

5   nondescript, Get a lawyer, Don't speak to anybody, to you raise    11:58:06

6   serious concerns.  They were ominous -- had an ominous meaning

7   and they caused you great concern, is that correct?

8   A.  We're speaking about those in the black pickup truck -- in

9   the dark colored pickup truck?

10  Q.  Yeah, the words about, Don't speak to them.  Get a lawyer.    11:58:23

11  A.  Well, it wasn't their words that caused me concern.

12  Q.  Well, you indicated that you were told that people who use

13  the exact same expression, saying in Spanish the exact same

14  words, were in fact protesters with guns and were running

15  around the command post.  Is that fair to say?    11:58:43

16  A.  I was told that there were persons that were armed running

17  around the command post, but I saw it for a fact the

18  protesters, and heard for a fact the protesters yelling that

19  same verbiage.

20  Q.  And it was reported to you that those people had guns.  Is    11:58:55

21  that fair to say?

22  A.  I was informed that there were people in the crowd that

23  were -- that were armed who were not law enforcement officers.

24  Q.  And those were the protesters, correct?

25  A.  I don't know.  They were persons at the command post who    11:59:06

```
 1   were armed.
 2   Q.  If you could turn to page 152 of your deposition, please.
 3           Let me get the -- that's not the right page.
 4           THE COURT:  You know --
 5           MR. POCHODA:  Page 143.  I apologize.  143.  Starting    11:59:36
 6   at line 13.
 7           Well, let's start at line 9.
 8   BY MR. POCHODA:
 9   Q.  Do you see that?
10   A.  Yes, sir.                                                    11:59:54
11   Q.  That's in the middle of one of your answers, and it says,
12   quote:  "My main concern was my safety, because not only did I
13   have myself dealing with, now I had these two people yelling --
14   and I knew they were protesters because there were protesters
15   at the command post yelling the same thing.  And I knew that    12:00:09
16   this command post in itself was a very touchy and violent
17   command post, because we had people running around the command
18   post who were not law enforcement officers who were protesters
19   running around with guns."
20           Do you see that?                                        12:00:24
21   A.  Okay.  I do.
22   Q.  So it was reported that the protesters were running around
23   with guns, is that right?
24   A.  There were the reports that persons, I don't know if they
25   were protesters.  I mean, I'm going to presume that they were   12:00:30
```

1   protesters.

2   Q.  I'm just looking at your answer here, sir.

3   A.  Okay.  They would be protesters.

4   Q.  Who were protesters running around with guns, is that

5   correct?                                                      12:00:38

6   A.  Right.

7   Q.  That's your answer, is that right?

8   A.  That's correct.

9   Q.  And that was accurate at the time?

10          THE COURT:  You know what -- Did you finish the        12:00:55

11  answer?

12          THE WITNESS:  I believe so at this time.

13          THE COURT:  Would you read back what you have, and

14  then we will complete the answer and then we're going to break

15  for lunch.                                                    12:01:08

16          (The record was read by the court reporter.)

17          THE COURT:  You want to ask the question again?

18  BY MR. POCHODA:

19  Q.  I was asking that they were in fact protesters.  You were

20  informed that there were protesters running around with guns,  12:01:30

21  is that correct?

22  A.  That's correct.

23          THE COURT:  All right.

24          MR. POCHODA:  Thank you.  I apologize for --

25          THE COURT:  That's all right.  We're going to break    12:01:37

1    for lunch.  Please be back at 1 o'clock.

2              (Luncheon recess taken.)

3              THE COURT:  Please be seated.

4              You ready to resume, Mr. Pochoda?

5              MR. POCHODA:  Yes.                          13:05:02

6    BY MR. POCHODA:

7    Q.  Detective, you had mentioned that at one point you noticed

8    the driver's car door open, is that correct?

9    A.  That is correct, sir.

10   Q.  And you told them, I gather, in a firm voice that, If you   13:05:09

11   get out of it car it will be considered disorderly conduct, is

12   that correct?

13   A.  I did tell them at one point that if they did not leave,

14   they would be arrested for disorderly conduct.

15   Q.  Okay.  Let me backtrack a little bit.  Did you also say, If  13:05:23

16   you get out of the car, at that point it would be disorderly

17   conduct?

18   A.  I can't recall at this time.  I know I did state to them

19   that, though.

20   Q.  In any event, they closed the door and they did not leave   13:05:33

21   the car?

22   A.  He did not.

23   Q.  He did not leave the car?

24   A.  That's correct.

25   Q.  And at some point you recall they asked if they could enter  13:05:39

```
 1   the store to buy cigarettes, correct?
 2   A.  No, sir.
 3   Q.  You don't remember that?
 4   A.  They did not ask.
 5   Q.  And going back, as we had been talking about, the constant          13:05:49
 6   yelling basically was the terms "No diga nada" and "Pida un
 7   abogado," is that right?
 8   A.  That's correct, sir.
 9   Q.  And you were concerned about the possibility of the guns
10   and violence because you had been informed that other                   13:06:07
11   protesters saying the same phrases in Spanish were running
12   around the command post with guns, correct?
13   A.  I was concerned because of the situation that I was
14   involved in, yes, sir.
15   Q.  But you also had in mind that there were other protesters           13:06:19
16   saying the same exact words, with guns, at the command station,
17   is that correct?
18   A.  That's correct.
19   Q.  And there was additional reason you were concerned because,
20   as you put it, this is Arizona, and you believe everybody              13:06:31
21   carries a gun at some point, is that correct?
22   A.  You make the presumption, yes, sir.
23   Q.  So there was no way you could rule out the possibility that
24   there wouldn't be an attack using a weapon in that situation,
25   is that right?                                                          13:06:41
```

1   A.  That's fair to say.

2   Q.  And you couldn't rule out the possibility that at some

3   point they would jump out of the car and attack you, is that

4   correct?

5   A.  That's a scenario that could have happened.                13:06:51

6   Q.  And while you had not observed at that point any crime,

7   your main concern was about personal safety and to ensure that

8   you would be going home to your family, is that right?

9   A.  Well, of course, but I also had the safety of my detainees

10  that I had to keep in mind.                                    13:07:09

11  Q.  As well as your detainees?

12  A.  That's correct.

13  Q.  And in fact, you never got the names of the occupants of

14  the car that was number 3 on our diagram, did you?

15  A.  No, I did not.                                             13:07:18

16  Q.  And when you ordered the occupants of that vehicle to leave

17  immediately, they asked why they were being ordered to leave,

18  is that correct?

19  A.  I'm sorry?

20  Q.  They asked you why they were being ordered to leave.       13:07:31

21  A.  They didn't ask me any questions, sir.

22  Q.  They didn't at that point ask why they were being ordered

23  to leave?

24  A.  No, they were just being ordered to leave.

25  Q.  In any event, you never explained to them, gave them any   13:07:43

1    reason for the order to leave, did you?

2    A.  Sir, based on the situation that was at hand and as

3    aggressive as it was, there was no time for dialog.  I had

4    to --

5    Q.  Please just answer the question.  You never gave them a        13:07:53

6    reason as to why you ordered them to leave, did you?

7    A.  No.

8    Q.  And at some point they asked for your badge number and they

9    wrote it down, is that correct?

10   A.  No, sir.                                                       13:08:05

11   Q.  If there was testimony to that effect you would dispute it,

12   is that right?

13   A.  They did not ask for my tes -- for my badge number.

14   Q.  Okay.  If we could take a look at Exhibit 71, please.

15   Turning to page 001817.                                           13:08:22

16   A.  Can you make this bigger?  Can this be made bigger?  Oh,

17   thank you very much.

18   Q.  And before we get to that, you at some point, as you were

19   about -- just before or at the time you ordered them to leave,

20   you asked for a backup, is that right?                            13:08:41

21   A.  According to this CAD unit, yes, at approximately 1449.

22   Q.  But you recall as we sit here today that you asked for

23   backup --

24   A.  Yes --

25   Q.  -- is that right?                                             13:08:51

```
 1   A.  -- that's correct.

 2   Q.  And if you could take a look at that, is that the CAD

 3   description starting on page 001817, the CAD report from that

 4   afternoon of March 28th, 2008?

 5   A.  It appears to be.                                              13:09:03

 6   Q.  And you are -- 135D would be your unit, is that correct?

 7   A.  At the time on the tactical unit, that's correct, I was 135

 8   David.

 9   Q.  And so you -- looking down about five or six from the top

10   in terms of the entries, you informed dispatch to start --       13:09:25

11   quote, Start me another unit, is that accurate?

12   A.  I don't know that's specifically what I said; that's what

13   the dispatcher wrote into the CAD history.

14   Q.  And that would be your custom when you're looking for

15   backup to use such words, is that right?                         13:09:39

16   A.  To ask for another unit, that's correct.

17   Q.  And as is your custom, you did not tell the dispatch

18   additional details about what was going on on the scene, isn't

19   that correct?

20   A.  I cannot recall.                                              13:09:50

21   Q.  But your custom is to not tell the details about what's

22   going on when you ask for another backup, is that right?

23   A.  That's generalized; you need to be more specific.  As to

24   this incident, I cannot recall.

25   Q.  Okay.  Let me turn to page 147 of your deposition.  Do you    13:10:01
```

```
 1   still have that?
 2   A.  Yes, sir, I do, still up here.
 3           You said 147?
 4   Q.  147, thank you.  On lines 13 through 17.
 5   A.  I'm sorry.  Which lines, sir?                          13:10:23
 6   Q.  Page 147, lines 13 through 17.
 7   A.  Thank you.
 8   Q.  You see that?  The question is:  "Have you ever told
 9   dispatch additional details when you ask for another unit?
10           "ANSWER:  Before in the past?                      13:10:39
11           "QUESTION:  Uh-huh.
12           "ANSWER:  No.  Usually, I just ask for an additional
13   unit."
14           Do you see that?
15   A.  I see that.                                            13:10:45
16   Q.  And does that accurately describe your general practice?
17   A.  It describes my practice that I would just ask for another
18   unit.
19   Q.  In any event, there's nothing -- there's no other entry
20   from you in that dispatch report that we looked at on the CAD  13:10:56
21   report, is there?
22   A.  Well, I don't make entries into that CAD report, sir.
23   That's not a -- that's not -- that's not a document that I
24   authored.
25   Q.  No, I understand.  There's no other indication that you     13:11:08
```

1    said anything other than, Start me another unit, is there?

2    A.  Not based on this document.

3    Q.  Now, the -- and if we could talk about Exhibit 397, which

4    is the hand-drawn map.

5             Again, the vehicle with the occupants that you were          13:11:31

6    concerned about is listed here as number 3, is that right?

7    A.  That is correct.

8    Q.  And when they did leave, they backed out, straight out onto

9    Nisbet, is that correct?

10   A.  From what I can recall, yes, sir.          13:11:45

11   Q.  And then they would have turned in a manner so they could

12   go west on Nisbet, is that right?

13   A.  They did go west on Nisbet and then north on -- I'm sorry,

14   south on Cave Creek.

15   Q.  And your primary goal was to make sure that they were          13:11:59

16   removed from the scene, because that was the only way you could

17   ensure that the possibility of gun use or attack on you could

18   be removed, isn't that right?

19   A.  Of course, sir.

20   Q.  And they didn't attempt to attack you or threaten you on          13:12:13

21   the way out, did they?

22   A.  I'm sorry, sir?

23   Q.  They didn't attempt to attack you or threaten you with any

24   weapons or in any manner on the way out?

25   A.  No, they did not.          13:12:27

1   Q.  And then at some point others reported to the scene, and is

2   it Deputy Kikes, I forget, who was the first to report to the

3   scene on a motorcycle, is that right?

4   A.  Right.  He didn't actually drive up onto my scene.  He was

5   on the roadway and continued southbound in the direction I          13:12:45

6   pointed.

7   Q.  Southbound on Cave Creek?

8   A.  On Cave Creek, yes, sir.

9   Q.  And you yelled at him something to the effect:  They are

10  gone.  They went thataway?                                          13:12:53

11  A.  Something to the effect, and pointed in the direction that

12  they had left.

13  Q.  And you gave him a description of their vehicle?

14  A.  I cannot recall that, sir.

15  Q.  But you would have not provided any other information to         13:13:00

16  Detective Kikes?

17  A.  To detective -- I'm pretty sure I would have given him a

18  description of the vehicle, but I can't recall exactly what I

19  told him.

20  Q.  I apologize.  Other than the description of the vehicle,         13:13:08

21  you didn't give him any other information about what had

22  occurred?

23  A.  No, sir, I did not.

24  Q.  And then Mr. Beeks pulled into the station and you waved

25  him down to continue going, is that correct?                        13:13:20

1579

```
1   A.  He did not pull into the station.  He stopped in front of

2   the roadway also, and I pointed him in the same direction that

3   I pointed Detective Kikes.

4   Q.  And you did not speak with Mr. Beeks?

5   A.  No, not at that time.                              13:13:30

6   Q.  And you did not make any notes or reports about this

7   incident at any point or after your shift on that day, did you?

8   A.  I did not.

9   Q.  And you were never asked about this incident by anyone at

10  MCSO, were you?                                        13:13:50

11  A.  No, I was not.

12          MR. POCHODA:  I have no further questions.

13                      FURTHER EXAMINATION

14  BY THE COURT:

15  Q.  Detective Armendariz --                            13:14:12

16  A.  Yes, sir.

17  Q.  -- I think if I understood your testimony earlier today you

18  said that you'd participated in a number of saturation patrols?

19  A.  Yes, sir, that is correct.

20  Q.  And I think you also testified that it's not very difficult  13:14:23

21  to find a traffic violation when you're looking for one.

22          Did I -- am I misstating your testimony?

23  A.  No, sir, it's not.

24  Q.  I think you also testified that you had your discretion

25  about who you could pull over when you were on patrol in a    13:14:38
```

1580

1    saturation patrol.

2    A.  There is discretion involved, yes, sir.

3    Q.  All right.  Did you ever hear anything about a zero

4    tolerance policy in connec -- just so I'm sure, in connection

5    with a saturation patrol?                                      13:14:54

6    A.  Yes, sir, I have.

7    Q.  And do you recall where you would have heard that from?

8    A.  It would have been relayed to me from my supervisors.

9    Q.  Okay.  And what did they tell you?

10   A.  Normally, these --                                         13:15:04

11   Q.  When you say your supervisors, did you say that

12   Sergeant Palmer or Sergeant Madrid was your supervisor?  I

13   can't remember who.  Or was it Lieutenant Sousa?

14   A.  Sergeant Madrid is my direct supervisor.  He is my -- we

15   have three squads, and the first squad was Sergeant Palmer.    13:15:20

16   Q.  Um-hum.

17   A.  He was the sergeant over Squad 1 and the five detectives

18   assigned to him.  Sergeant Madrid is a sergeant over Squad 2

19   and the five detectives assigned to him.

20   Q.  Um-huh.                                                    13:15:30

21   A.  And then acting Sergeant Cesar Brockman is a sergeant for

22   Squad 3 and the detectives that work for him.

23   Q.  All right.

24   A.  And Lieutenant Sousa is our commander.

25   Q.  All right.  So you were under Sergeant Madrid?             13:15:39

1581

1   A.  I was.

2   Q.  And when you say you heard something about zero tolerance

3   from your supervisors, or supervisor or supervisors, who was

4   it?

5   A.  We're a very integrated squad.  Squad 1 and Squad 2 were          13:15:48

6   integrated, so our supervisors, we have direction from both

7   supervisors.

8   Q.  Okay.

9   A.  So it would have come from either one of them, or

10  Lieutenant Sousa, during a briefing.          13:16:01

11  Q.  You don't have any specific recollection as to what

12  particular supervisor said what particular thing?

13  A.  No, sir, I don't.  I apologize.

14  Q.  Do you have any particular recollection about being

15  instructed about zero tolerance, or do you just have a general          13:16:13

16  recollection?

17  A.  What our understanding is of zero tolerance in the way it

18  was told is there -- if we make a traffic stop or come into an

19  incident where we have to -- where an arrest is -- is likely,

20  the person is not cited and released; the person is taken into          13:16:29

21  custody.

22  Q.  I think you have indicated -- well, is it your experience

23  that if you're going to participate in a saturation patrol you

24  need to participate for the whole day?

25  A.  Yes, sir, it is.          13:17:01

1  Q.  All right.  And how long did saturation patrols last in a

2  day?

3  A.  That varies on the hours and when we're called off.  I've

4  worked as long as midnight.  We just -- I'd just go out there

5  and work and await word, and usually it would be the commander,  13:17:18

6  which would be Lieutenant Sousa, unless he left and designated

7  somebody else, but a majority of the time it would be

8  Lieutenant Sousa, and he would announce over the radio that,

9  Finish up whatever you're doing, We're shutting down the

10  operation, and to just go ahead and bring everything in.  13:17:30

11  Q.  And you said that when you're on patrol in a saturation

12  patrol, you're just looking for violations of federal, state,

13  or local law?

14  A.  That's correct, sir.

15  Q.  And when you see one, did you pull somebody over?  13:17:40

16  A.  Yes, sir.

17  Q.  In your opinion, in, say, a seven-hour saturation patrol,

18  if an officer is being diligent and he's looking for violations

19  to pull people over without looking for anybody in particular,

20  just pulling people over when he sees a violation, how many  13:17:57

21  people will he pull over during a saturation patrol?

22  A.  I can't speak for any other deputy; I can speak for myself.

23  Q.  All right.  You were diligent.

24  A.  I'm very diligent.

25  Q.  Okay.  13:18:11

1    A.  I have a high work ethic.

2    Q.  All right.  So how many people would you pull over during

3    the course of a -- how many people would you pull over during

4    the course of a saturation patrol?

5    A.  I'd have to look back at my records, but, I mean, I had a          13:18:20

6    high number.

7    Q.  Would you think that other officers, if they were being

8    diligent and applying a zero tolerance policy, would have a

9    similar number?

10   A.  Yes, sir, I agree with that.                                        13:18:31

11   Q.  I think you've testified to this; I just want to make sure.

12   Did anybody ever review with you the ethnicity of the persons

13   that you actually arrested, and discuss with you whether that

14   might suggest that, whether intentionally or not, you might be

15   pulling over more of one kind of person than another?                  13:18:53

16   A.  No, sir.

17   Q.  Are you still a member of the HSU?

18   A.  Yes, sir, I am.

19   Q.  Okay.  But you're a detective now.

20   A.  We are detectives in that unit, sir.                               13:19:06

21   Q.  All right.  You remember when I was earlier asking you

22   questions during Mr. Casey's testimony, and we talked about you

23   were detaining persons that were passengers in cars?

24   A.  Yes, sir.

25   Q.  And you were saying that you would detain them for further         13:19:20

1584

```
 1   investigation, and you would go back and run them through, I
 2   think, other databases.  If they'd given you a name and you'd
 3   run them through a database and you couldn't find anything
 4   else, you'd run them through other databases.  And I think you
 5   indicated that that was not at that point a 287(g) arrest, it         13:19:37
 6   was just a detention for further investigation, is that
 7   correct?
 8   A.  Yes, sir, that's correct, to find out their true identity.
 9   Q.  All right.  And you indicated that that would take some
10   time, I think?                                                        13:19:51
11   A.  Yes, sir.
12   Q.  Now, as you work to investigate someone to find out their
13   true identity, I take it that sometimes that investigation
14   would ripen into a 287(g) arrest?
15   A.  Yes, sir, it has.                                                 13:20:03
16   Q.  And at other times did it not ripen into a 287(g) arrest?
17   A.  Yes, sir, it has.
18   Q.  All right.  So if you could, with me, go back and review
19   with me, you've run this person through all the databases, you
20   can't find anything.  Then what do you do?                           13:20:19
21   A.  Dealing with what type of person?
22   Q.  Well, you tell me.
23   A.  Okay.
24   Q.  Do you differentiate between persons?  We're talking about
25   a passenger now.                                                     13:20:32
```

1  A.  A passenger in a vehicle.

2  Q.  A passenger in a vehicle.  And we'll say that you've

3  stopped the driver for a traffic violation, but you don't have

4  any probable cause -- I mean, you indicated that you might see

5  a passenger with an open -- open container.  You don't have

6  that.

7          They're just a passenger in a vehicle.  You've asked

8  to provide their names, and you've indicated they didn't have

9  to do that, but they did give you a name.  And you went back,

10 you ran the name in at least one of the databases and you got

11 no hits.  And I think you indicated to me at that point that

12 person is no longer free to leave, is that correct?

13 A.  That's correct, they're placed in investigative detention.

14 Q.  All right.  And then you do the investigative detention.

15          Do you run them through other databases that you have?

16 A.  Yes, I'll -- at that point I'll switch over to our

17 information channel and have the dispatcher utilize whatever

18 other -- other databases that they have available for them in

19 radio, also to include PACE.

20 Q.  All right.  And what will you do next?

21 A.  Wait for a response to come back.

22 Q.  And?

23 A.  And during that time, during that time, of course, now at

24 this time I'm asking -- giving the person the benefit of the

25 doubt to prove -- to provide some form of identification,

13:20:44

13:20:57

13:21:11

13:21:26

13:21:37

1    school ID, credit card, credit card with a picture on it, or,

2    you know, a name on it.  A passport.  A passport or a visa.

3    And that's common to ask, you know, as a form of

4    identification.

5    Q.  So you'll go back while the computer check is running and          13:21:53

6    you'll ask further questions to the passenger?

7    A.  To continue to -- and letting them know why they're being

8    detained because I -- I'm unable to determine what their

9    identity is and who their identity is.  It's common just as --

10   I'm sorry, as -- as last week when I pulled over a vehicle,          13:22:09

11   same situation, the driver, for speeding, found out that she

12   was driving on a suspended license.

13         I asked everybody to -- she had four other -- three

14   other passengers in the vehicle with her.  I asked them for

15   voluntary IDs.  The front seat driver gave me her ID.  The back      13:22:23

16   seat driver -- the front seat passenger gave me her ID.  The

17   back seat driver's side passenger gave me her ID.  The male

18   that was on the rear passenger side said he didn't have an

19   identification card with him.

20   Q.  Right.                                                            13:22:39

21   A.  So at that point I asked him, Would you mind providing me

22   with your name and your date of birth?  Not a problem.  He

23   gives he his name, his date of birth.  Based on my training and

24   experience, the name that he had given me was not a common

25   spelling for the name, but I accepted it.  And I ran the date        13:22:55

1    of birth.  Went back to my system.

2         The other two young ladies were clear.  Went back to

3    the vehicle, gave them their driver's license, told them they

4    were free to leave.  They needed to step out of the vehicle

5    because at this point the vehicle's going to be impounded        13:23:09

6    because the owner of the vehicle is driving on a suspended.

7         Went and spoke to the male.  Asked him to step out of

8    the vehicle.  Detained him and told him he was being detained

9    because the name that he gave me came back with no record

10   found.  Immediately, he came back to me and said:  I apologize.  13:23:22

11   I lied to you because I think I have a warrant.  So -- which is

12   common for persons to lie to law enforcement officers when they

13   have warrants.

14   Q.  Um-hum.

15   A.  And so at that point I secured him in the back of my patrol   13:23:34

16   car, obtained his real name, once I ran him once again and

17   verified his real name and his identity through the JWI system

18   with a picture --

19   Q.  Um-hum.

20   A.  -- it was found out that he did not have a warrant for his    13:23:47

21   arrest.  However, at this time he was charged for false info to

22   a law enforcement officer.

23   Q.  What was the ethnicity of this person?

24   A.  He was white.

25   Q.  Okay.  Let me ask you, we're talking about 287(g)             13:23:58

1    arrests --

2    A.  Okay.

3    Q.  -- something that's going to eventuate into a 287(g)

4    arrest.  You indicated you'll go back to the passenger, you'll

5    ask them for other forms of identification.  What else will you    13:24:10

6    do?

7    A.  Continue to figure out his identity, see if he's had

8    driver's license identifications issued out of other states.

9    At that point I ask him where he's from.

10           One of the other tools that we can use is if they have    13:24:23

11   a Social Security number, we can let the dispatcher know that

12   we have a Social Security number and they can -- I believe that

13   there is a database that they can run it under to try to figure

14   out if they have an identification.

15   Q.  All right.  So you run a Social Security number, you ask    13:24:34

16   them more questions about other identification?

17   A.  Right.  And at that time we just kind of lead into -- it

18   will be led into trying to figure out who the person is.  It

19   will be -- you know:  Where were you born?  And from that point

20   on, the investigation progresses.    13:24:48

21   Q.  Okay.  Eventually, at some point you will acquire a belief

22   that this person may be in the country illegally?

23   A.  Yes, sir.

24   Q.  Okay.  I'm talking about current day, when you are not any

25   longer 287(g) certified.    13:25:09

```
1    A.   Okay.

2    Q.   Well, let's go back while you were 287(g) certified.

3             You were 287(g) certified, so you could make a 287(g)

4    arrest, correct?

5    A.   That's correct.                                            13:25:21

6    Q.   And if it was during a saturation patrol would you then

7    take those persons down to the command post yourself?

8    A.   No, I would call for a transport unit to come pick them up.

9    Q.   Okay.  And a transport unit would come pick then up and

10   take them in the transport?                                    13:25:31

11   A.   Yes, sir, that's correct.

12   Q.   All right.  Now, is there -- do you operate any differently

13   today?

14   A.   Yes.

15   Q.   How do you operate differently?                           13:25:36

16   A.   If I'm unable to figure out who their identity is --

17   Q.   Um-hum.

18   A.   -- at this point I just let them go.

19   Q.   You do.

20   A.   Yes.                                                      13:25:43

21   Q.   And then let me ask you, why do you go to the trouble of

22   investigating who they are?

23   A.   To a certain point there is a time where a person you're

24   going to find out and determine that they are wanted for a

25   warrant, you know, have a warrant issued for their arrest.  I  13:26:03
```

1    take my due diligence and making sure that the person I'm not

2    letting go for some reason is not wanted for any reason.

3         At that point if I have no other reason to detain him,

4    then I just let that person go.

5    Q.  What's the longest you've ever detained a person to make         13:26:22

6    that kind of identification attempt?

7    A.  I cannot give you a time frame, sir.

8    Q.  Be longer than a half hour?

9    A.  Oh, no.  No.

10   Q.  Longer than 15 minutes?                                          13:26:31

11   A.  Approximately, but it wouldn't be longer than -- I don't

12   believe it's ever taken anything longer than half an hour.

13   Q.  Okay.  Do you recall making a 287(g) arrest to anyone that

14   was not someone who appeared to you to be of Hispanic ancestry?

15   A.  Yes.                                                             13:26:57

16   Q.  Okay.  Do you have any -- can you give me any specifics

17   relating to that?

18   A.  The load vehicle that I stopped with the Chinese nationals.

19   Q.  Okay.  And you made 287(g) arrests in that case?

20   A.  Yes, sir.                                                        13:27:11

21   Q.  Did you ever make an arrest during a saturation patrol that

22   was a 287(g) arrest that wasn't a Hispanic person, or a person

23   that you believed to be a Hispanic person?

24   A.  Not that I can recall without looking at my report, sir.

25        THE COURT:  All right.  Thank you very much,                    13:27:35

```
 1    Officer Armendariz.

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  Do you have any follow-up questions,

 4    Mr. Pochoda?

 5              MR. POCHODA:  I do not.                          13:27:42

 6              THE COURT:  Any redirect?

 7              MR. CASEY:  Briefly, yes, Your Honor.

 8                          REDIRECT EXAMINATION

 9    BY MR. CASEY:

10    Q.  Detective, the Court asked you a question about the    13:27:48

11    number of people that you have pulled over during a sat --

12    saturation patrol day, and you were talking about your

13    diligence.  Do you remember that?

14    A.  Yes, sir.

15    Q.  Did I understand it correctly, what you were speaking is  13:28:05

16    about yourself and what your practice is?

17    A.  I can only speak about myself and my practice, yes, sir.

18    Q.  Okay.  Now, you were also asked in that context about

19    diligence and applying a zero tolerance, and what your

20    expectations were for your comrades or colleagues.         13:28:22

21              Do you remember that?

22    A.  Yes, sir.

23    Q.  Okay.  Are there factors that can affect how many people

24    are stopped, traffic stop, by any deputy during a saturation

25    patrol?                                                    13:28:38
```

```
 1   A.  Would you mind restating that question?

 2   Q.  Sure.

 3   A.  I don't understand.

 4   Q.  Yes, it's a poor question.  Let me break it up.

 5        You and I are both doing a saturation patrol.  You're      13:28:45

 6   located in section A.  You're a hard worker and you got a zero

 7   tolerance policy.  With me?

 8   A.  I understand.

 9   Q.  I'm in section B over here.  I'm a hard worker and I'm

10   diligent.                                                        13:29:00

11        Are there factors, separate and apart from our

12   respective work ethics and our respective following a zero

13   tolerance policy, that can affect whether you have more or less

14   stops than me?

15   A.  There could be.  The area that you're working in.  If I'm,   13:29:10

16   hypothetically speaking, working in the section A, which is a

17   majority of a city area, that would increase my traffic

18   population and my population.

19        If you're working in section B, hypothetically, and it

20   covers MC 85 into SR 85, you're primarily going to get very few  13:29:30

21   sporadic --

22        THE COURT:  Give me an interpretation.  What are you

23   talking about?  What area are you talking about?

24        THE WITNESS:  Oh, I'm sorry.  The west end leading

25   into Gila Bend.                                                  13:29:43
```

1        THE COURT:  Okay.

2        THE WITNESS:  SR 85 going into Gila Bend.

3        THE COURT:  Thank you very much.

4        THE WITNESS:  I apologize.

5   BY MR. CASEY:                                        13:29:50

6   Q.  When you say SR, is that State Route 85?

7   A.  State Route 85.  And if you're working that area leading

8   into Gila Bend, your traffic stops might be very minimal

9   because traffic -- there's not a lot of traffic and not a lot

10  of population there.                                  13:30:02

11  Q.  Okay.  Can the time of day that you're handling traffic

12  patrols, can that also play a role?

13  A.  Yes.  Time of day, most people are up and driving around

14  during the day, and at night most people -- there's not a lot

15  of traffic during the nighttime.                     13:30:18

16  Q.  All right.  So if I'm at -- near my office, I'm a little

17  bit by 13th Street and Osborn, that's -- just say that's my

18  area, and you're at Central and Indian School, would the

19  traffic volume disparities, could that affect our results,

20  regardless of our work ethics?                       13:30:40

21  A.  Regardless of your work ethics?

22  Q.  Yes, sir.

23  A.  Yes, it could.

24  Q.  All right.  Now, based on the Court's question, and human

25  nature being what it is, is it your experience in every    13:30:51

1   occupation you've held, whether it was in the Navy when you

2   were a corpsman, whether it was at the City of Austin Police

3   Department, or now at MCSO, has it been your experience that

4   some people work harder than others?

5   A.  Yes, sir.                                                    13:31:07

6   Q.  Some people are higher performers than others?

7   A.  I was trained to work, so that's what I do, so I can only

8   speak for myself --

9   Q.  Okay.

10  A.  -- and I do do my job.                                       13:31:17

11  Q.  All right.  So let's just say hypothetically Charley

12  Armendariz happens to make, on a saturation patrol, 27

13  contacts, and Tim Casey's over here and I've got four.

14          Just based on that data alone, are you able to

15  determine that -- anything about what I'm doing.                 13:31:38

16  A.  Can tell you're probably being lazy.

17  Q.  All right.  Other than being lazy, is there anything that

18  you can determine else about that?

19  A.  The demographics may be different of where you're at and

20  where you're working.                                            13:31:57

21          MR. CASEY:  Okay.  All right.  Those are all the

22  questions I have for you.  Thank you very much, sir.

23          THE WITNESS:  Thank you.

24          THE COURT:  Thank you, Detective Armendariz.

25          THE WITNESS:  Thank you, Your Honor.  I appreciate it.   13:32:07

```
 1    Have a good day.

 2            THE COURT:  You, too.

 3            MR. CASEY:  Your Honor, next witness the defendants

 4    will call will be MCSO Detective Francisco Gamboa.

 5            THE CLERK:  Right up here, sir.                    13:32:59

 6            Hi.  Can you please state and spell your full name for

 7    me.

 8            MR. GAMBOA:  It's Francisco Gamboa.

 9    F-r-a-n-c-i-s-c-o; last name Gamboa, G-a-m-b-o-a.

10            THE CLERK:  Thank you.  Please raise your right hand.  13:33:14

11            (Francisco Gamboa was duly sworn as a witness.)

12            THE CLERK:  Thank you.  Please take our witness stand.

13            THE COURT:  Please, Mr. Liddy.

14                            FRANCISCO GAMBOA,

15    called as a witness herein, having been duly sworn, was        13:33:51

16    examined and testified as follows:

17                          DIRECT EXAMINATION

18    BY MR. LIDDY:

19    Q.  Good afternoon, Officer Gamboa.

20    A.  Good afternoon, sir.                                  13:33:57

21    Q.  Just for the record would you put your full name on the

22    record, please.

23    A.  Deputy Francisco Gamboa.

24    Q.  And where are you currently employed?

25    A.  With the Maricopa County Sheriff's Office.            13:34:06
```

1   Q.  And how long have you been there?

2   A.  Approximately four years.

3   Q.  And where are you currently stationed?

4   A.  Communications division.

5   Q.  And what are your responsibilities with the communications          13:34:18

6   division?

7   A.  That's where we receive our emergency calls in the 911 --

8   in the 911 dispatch center.

9   Q.  How long have you been positioned there?

10  A.  Approximately six months, sir.          13:34:35

11  Q.  And prior to that, where were you stationed?

12  A.  Over at District 2, which is on the west valley.  Our

13  substation is on Dysart and Van Buren.

14  Q.  And what were your responsibilities while you were at

15  District 2?          13:34:50

16  A.  I was assigned to the patrol division, answering calls for

17  service.

18  Q.  And what does that mean when you say answering calls for

19  service?

20  A.  Going to residents' homes, taking any type of calls that          13:34:58

21  are for service for the public.

22  Q.  And did you ever patrol?

23  A.  Yes, sir.

24  Q.  And what were your duties and responsibilities when you

25  were on patrol?          13:35:12

1    A.  Pull over anybody that has a civil infraction, any type of

2    civil infractions, moving violations, equipment violations,

3    et cetera, et cetera.

4    Q.  And if there was a call for service while you were on

5    patrol, would you react to the call for service?          13:35:28

6    A.  Yes, sir.

7    Q.  And where were you -- well, let me strike that question.

8            Do you recall a traffic stop you made involving a

9    driver Lorena Saucedo?

10   A.  Yes, sir.                                             13:35:57

11   Q.  Approximately when was that traffic stop?

12   A.  September of 2009.

13   Q.  Do you recall where that traffic stop was?

14   A.  Yes, sir.

15   Q.  Where was it?                                         13:36:06

16   A.  In the area of 55th Avenue and Baseline.

17   Q.  Was there anything unusual about that traffic stop, in your

18   experience?

19   A.  Before or after making contact, sir?

20   Q.  Say through the entirety of the stop.                 13:36:22

21   A.  Yes, sir.

22   Q.  Does the fact it was unusual make it more memorable to you?

23   A.  Yes, sir.

24   Q.  What was unusual about that traffic stop?

25   A.  Well, in the beginning, as soon as I decided to pull over  13:36:40

1  the vehicle for having no rear license plate light, she failed

2  to pull over to my lights and sirens.  Then she pulled into a

3  residential area of a home and a driveway in that area of the

4  housing development of 55th Avenue and Ellis, which is known

5  for high drug traffic area.                                    13:37:02

6         As she pulled into the driveway, she -- I approached

7  the vehicle.  At that time she refused to provide

8  identification to me.  We went back and forth for several

9  minutes.  After that I ended up informing her that she can

10  actually go to jail for refusing to provide ID, in addition to  13:37:20

11  failing to stop for my lights and sirens.  After that, just her

12  behavior was very bizarre; very erratic; very noncompliant.

13  Q.  What do you recall about her behavior that was erratic?

14  A.  Not listening to anything that I was telling her;

15  refusing -- she was yelling.  At one point she was honking the  13:37:40

16  horn to her vehicle.  I don't know if she was signaling

17  somebody to come out.  I didn't know where we were at.  We were

18  just in some residential driveway.  I didn't know whose it was

19  until further investigation we found out it was her residence.

20  But at that time there's a lot of officer safety issues that    13:37:59

21  are going through my mind because of the area that I'm in, and

22  the person that I'm dealing with at that time.

23  Q.  Do you recall whether you issued Ms. Saucedo, now

24  Escamilla, a citation?

25  A.  Yes, sir.                                                   13:38:18

1    Q.  Did you write up an incident report based on this incident?

2    A.  Yes, sir, I did.  And the reason being was because of her

3    erratic behavior.  It's not common practice for a deputy

4    sheriff to write an incident report on a civil infraction,

5    which I did.                                              13:38:34

6    Q.  Did you have the opportunity to review that incident report

7    prior to today?

8    A.  Yes, sir.

9    Q.  And when did you review that report?

10   A.  Yesterday, sir.                                       13:38:42

11   Q.  And did that -- did your review of that report refresh your

12   recollection of the events of that day?

13   A.  Yes, sir.

14        MS. RAMIREZ:  Objection, Your Honor.  We do not have a

15   copy of that, and we've not been provided with anything prior  13:38:58

16   to today.

17        THE COURT:  All right.  So what's your objection?

18        MS. RAMIREZ:  Well, I'm objecting because this

19   witness -- we objected in the pretrial order that the witness

20   was nondis -- not disclosed or inadequately disclosed, that he  13:39:13

21   was only going to testify to rebut the testimony of

22   Ms. Escamilla.

23        THE COURT:  So are you objecting to his entire

24   testimony?

25        MS. RAMIREZ:  No, but we have not had an opportunity  13:39:26

1600

```
 1   to depose him or to review any kind of documents --

 2           THE COURT:  So what is your objection?  I don't mean

 3   to be unkind.  What is your objection?

 4           MS. RAMIREZ:  I'm objecting to the admissibility of

 5   the document.                                               13:39:42

 6           THE COURT:  Nobody has moved to admit the document, so

 7   I will overrule your objection at this point.

 8   BY MR. LIDDY:

 9   Q.  Where were you patrolling, as specific as you can be, when

10   you first saw the vehicle driven by Ms. Saucedo?            13:40:04

11   A.  After reviewing my police report, I was already in the

12   neighborhood of 55th Avenue and Ellis when I was driving

13   southbound.  My beat partner and I, that actually right after

14   shift we -- or right after briefing we had both discussed about

15   going into that area, because he works there off duty in the   13:40:26

16   HOA, which is a housing association, and he's -- he had the

17   intel that there was a lot of high-volume drugs going on in

18   there in that neighborhood.

19   Q.  A lot, he had intel of a lot of --

20   A.  Drug activity.                                          13:40:42

21   Q.  In that neighborhood?

22   A.  Yes, sir.

23   Q.  And did he share that information with you?

24   A.  Yes, sir.

25   Q.  Is that why you were patrolling that area?              13:40:47
```

1  A.  Yes, sir.

2  Q.  Okay.  Do you recall what roads you were driving on when

3  you first saw the vehicle by Ms. Escamilla?

4  A.  Yes, sir.  It was Ellis.

5  Q.  You were driving on Ellis?                    13:41:00

6  A.  Yes, sir, I was driving southbound on Ellis.

7  Q.  And was her vehicle also on Ellis?

8  A.  Yes, sir.

9  Q.  Which direction was she going?

10  A.  Northbound.                                   13:41:08

11  Q.  Did you pass each other?

12  A.  Yes, sir.

13  Q.  And at what point did you determine to have a traffic stop?

14  A.  After I viewed through my driver's side mirror that she had

15  no rear license plate light.                     13:41:24

16  Q.  So what did you do then?

17  A.  I made a U-turn and positioned my vehicle directly behind

18  hers.

19  Q.  Is it your normal practice to pull over cars with no rear

20  license plate light when you're patrolling a high drug    13:41:35

21  trafficking area?

22  A.  Yes, sir.

23  Q.  Why is that?

24  A.  Because it's probable cause for us to speak to the driver.

25  Q.  And why would you want to speak to a driver?    13:41:44

A.  To see what they're doing, see what they're doing in that

area; see if in fact they even live there.  There's numerous

contributing factors that we look for at night and then as

opposed to during day as well while you're on patrol looking

for probable cause to pull over a vehicle.                     13:42:01

Q.  And at this time this was at night?

A.  Yes, sir.  I believe it was approximately 2200 hours,

10:00 p.m.

Q.  So you executed a U-turn and came in behind her?

A.  Yes, sir.                                                  13:42:19

Q.  Then what did you do?

A.  I radioed in dispatch and ran the license plate, which is

normal practice, making sure that that vehicle isn't stolen.

Q.  This is prior to turning on any lights or sirens?

A.  Yes, sir.                                                  13:42:30

Q.  What do you recall about what Ms. Escamilla did at that

time?

A.  As soon as I -- as soon as dispatch advised me that the

vehicle was 29 negative, meaning that the vehicle was not

stolen, I activated my emergency lights.  At that time she     13:42:45

continued to drive northbound into the residential area.

Q.  Did she execute any turns?

A.  Yes, sir, I believe it was two turns.  She turned -- had a

right turn and then a left turn, and then she turned into a

private driveway.                                              13:43:02

1   Q.  And did she make these turns before or after you turned

2   your lights on?

3   A.  After.

4   Q.  In your experience, is it unusual for a vehicle that's in

5   front of you when you have your lights on to make two turns?     13:43:12

6   A.  Yes, sir.

7   Q.  What did that -- how did that information influence you at

8   that time?

9   A.  I'm even more on my toes now.  Officer safety issues,

10  knowing the -- the fact that it's not normal for a person to     13:43:28

11  keep driving and make two, three turns, and then turn into a

12  private driveway.

13  Q.  Approximately how long did she continue to drive until she

14  turned into the driveway?

15  A.  I would say approximately a minute, maybe a minute and a     13:43:43

16  half.

17  Q.  Can you tell us what she did after she pulled into the

18  driveway?

19  A.  She sat in the driver's side of the vehicle as I approached

20  the vehicle.  That's when I made contact.  I asked her if she    13:44:02

21  was the only person in the vehicle, which she stated yes, and

22  that's when I identified her as a young female.

23  Q.  So prior to that point you did not know whether the driver

24  of the vehicle was male or female?

25  A.  Correct.                                                     13:44:15

1  Q.  Did you know the race or ethnicity of the driver of the

2  vehicle?

3  A.  No, sir.

4  Q.  When you were able to visually meet the driver of the

5  vehicle were you able to determine --                    13:44:24

6  A.  Yes, sir.

7  Q.  -- her race or ethnicity?

8  A.  Yes, sir.

9  Q.  What did you determine her race or ethnicity to be?

10 A.  Just by looking at her I would have guessed that she was  13:44:32

11 Hispanic.

12 Q.  And how did that information influence your future conduct?

13 A.  Didn't influence at all, sir.

14 Q.  Officer, would you consider yourself Hispanic?

15 A.  Yes, sir.                                              13:44:48

16 Q.  And how would you determine that you're Hispanic?  You

17 personally.

18 A.  Through the culture and traditions and values that I have

19 with my family.

20 Q.  What are the cultures and traditions and values of your   13:44:57

21 family?

22 A.  Getting together, celebrating certain holidays; the foods

23 that we eat; the closeness and togetherness that we have as a

24 close -- close Hispanic family.

25 Q.  Do you speak Spanish?                                  13:45:15

1    A.  Yes, sir.

2    Q.  Have you ever been called upon to interpret for other law

3    enforcement officers in Maricopa County?

4    A.  Yes, sir.

5    Q.  Can you tell me about that?                                    13:45:30

6    A.  Sure.  Numerous times people who work in the south area,

7    South Phoenix, will call me, or if they have just a person who

8    is not quite understanding what they're either, A, getting the

9    trip ticket for, or just doesn't understand the deputy who's

10   involved with them or interacting with them, they'll call me     13:45:53

11   and I'll translate over the phone.  As well now as in

12   communications, dispatchers will receive calls by Spanish --

13   from many Spanish-speakers.  I'm not a call-taker or a

14   dispatcher, so I'll be translating for that person or the

15   complainant or the victim for our dispatch so they can enter a   13:46:08

16   call for service.

17   Q.  So it's your experience in Maricopa County that many of the

18   victims of crime are Hispanic?

19   A.  Could be, sir, yes, sir.

20   Q.  Do you consider it part of your duties and responsibilities  13:46:16

21   to protect Hispanics that are potential victims of crime?

22   A.  Yes, sir.

23   Q.  Have you ever been called to interpret a call for help from

24   an Hispanic who was in the country illegally?

25   A.  Yes, sir, quite often, sir.                                  13:46:35

1  Q.  Tell me about that.  What was your experience with that?

2  A.  While I was on patrol we got called for -- our code is a

3  670, which is a welfare check of two Hispanic males who had

4  crossed illegally.  We ended up finding them, who were very

5  dehydrated, pretty much crying for help to save them, because          13:46:55

6  they hadn't had water in certain amount days, I don't remember

7  exactly what they told me, but they hadn't had food or water

8  for a long period of time.

9       We ended up -- and when you work out there, and the

10  area that we're working is the Gila Bend area, which is          13:47:10

11  predominantly desert, which is where we encounter a bunch of

12  people trying to cross illegally.  It's for us, for me

13  personally, I carry an ice chest with some waters just in case.

14  Q.  Just in case what?

15  A.  For myself or for them, in case we get stuck on a call          13:47:25

16  somewhere.  Or sometimes we're searching for people who are

17  crossing illegally, and we can spend hours out there.  So we

18  ourselves, as well as the uniform we have and all the gear, you

19  can become dehydrated yourself.

20       So when I encountered these gentlemen they were just          13:47:40

21  asking for water.  We gave them water, and they just -- they

22  were asking for Border Patrol, in fact, to -- they just wanted

23  to get deported back, because they said they were left there,

24  stranded and abandoned by their coyote.

25  Q.  So it's your experience that often Hispanics who are in          13:47:53

1607

```
 1   this country illegally, their lives are in danger --

 2           MS. RAMIREZ:  Objection.

 3   BY MR. LIDDY:

 4   Q.  -- is that correct?

 5   A.  Absolutely.                                        13:48:06

 6           MS. RAMIREZ:  Objection, Your Honor.  This is outside

 7   the scope of this witness's testimony.

 8           THE COURT:  Are we going to be a lot longer on this?

 9           MR. LIDDY:  No, Your Honor.

10           THE COURT:  Okay.  I'm going to overrule the        13:48:15

11   objection.

12   BY MR. LIDDY:

13   Q.  Let me see if I can make this more brief.

14           Do you consider it part of your duties and obligations

15   to save the lives of Hispanics that are in this country    13:48:25

16   illegally?

17   A.  Yes, sir.

18   Q.  Have you actually done that?

19   A.  Yes, sir.

20   Q.  Do you harbor any anti-Hispanic bias?                  13:48:31

21   A.  No, sir.

22   Q.  You take pride in your own family's Hispanic cultural

23   background?

24   A.  Absolutely.

25   Q.  Did there come a point in time where you asked         13:48:44
```

1    Ms. Escamilla to exit the vehicle?

2    A.  Yes, sir.

3    Q.  And why did you do that?

4    A.  Try to calm her down a little bit.  And the other thing,

5    she kept on trying to get on her cellphone.                      13:48:58

6    Q.  You earlier testified that she was honking the horn.  Do

7    you recall that testimony?

8    A.  Yes, sir.

9    Q.  Were you concerned about her honking the horn?

10   A.  Yes, sir.                                                     13:49:13

11   Q.  What was your concern?

12   A.  From an officer's perspective or a deputy's perspective, it

13   was I don't know who she's trying to call; I don't know who

14   she's trying to warn.  I don't know what -- I didn't know that

15   was her residence at that time.                                  13:49:24

16   Q.  Did anyone exit the house?

17   A.  Yes, sir, a -- a Hispanic male who ended up identifying

18   herself -- identifying himself as her husband.

19   Q.  Did you speak with him?

20   A.  Yes, sir.                                                     13:49:35

21   Q.  Was he cooperative?

22   A.  Yes, sir.

23   Q.  Do you feel that his conduct was of assistance to you in

24   the stop?

25   A.  Yes, sir.                                                     13:49:43

1    Q.  Did there come a time where you told Ms. Escamilla it would

2    be okay for her to use her telephone?

3    A.  Yes, sir.

4    Q.  And why was that?

5    A.  She -- actually, we -- she asked her husband if she can          13:49:56

6    call her mom and her sister.  And at that time we ended up

7    explaining to the husband exactly kind of what happened, I

8    guess the scenario how it broke down, with her failing to

9    provide ID or refusing to provide ID at that time, and prior to

10   that failing to yield to my lights and sirens.  We explained     13:50:14

11   the situation and we asked him to go ahead and call the mom to

12   bring her down, to defuse the situation and try to talk to her

13   daughter.

14   Q.  All right.  Let me back up just a moment.  You asked her

15   for her ID?                                                       13:50:27

16   A.  Initially, yes, sir.  When I approached the vehicle and she

17   was the only one in there, I asked her routinely, as I do all

18   the time, for driver's license, insurance, and registration.

19   Q.  And how did she react to your request?

20   A.  She refused.                                                   13:50:39

21   Q.  Did she say why she refused?

22   A.  No, sir, she just -- we kept going on back and forth that

23   she was insistent that she didn't know why she got pulled over,

24   which is even after she exited the vehicle and finally produced

25   her driver's license, she was still asking why she got pulled     13:50:52

1    over, when prior to that I had told her she was being pulled

2    over because she had no rear license plate light illuminating

3    the rear plate.

4    Q.  Back to the telephone call.  Said she called her mother?

5    A.  Yes, sir.                                                    13:51:08

6    Q.  Did her mother later arrive on the scene?

7    A.  Yes, sir.

8    Q.  Did you allow Ms. Escamilla to speak with her mother?

9    A.  Yes, sir.

10   Q.  How was her mother's conduct on the scene?                   13:51:16

11   A.  Cordial.

12   Q.  Would you say that her mother's presence and conduct was

13   beneficial to the law enforcement stop?

14   A.  In a way, yes, sir.

15   Q.  When Ms. Escamilla exited the vehicle, did you search her?   13:51:31

16   A.  No, sir.

17   Q.  Did you frisk her?

18   A.  No, sir.

19   Q.  Did you ask her to place her hands on the vehicle?

20   A.  No, sir.                                                     13:51:49

21   Q.  Was there anything about her physical condition that you

22   recall?

23   A.  Yes, sir.  As she exited the vehicle I noticed that she was

24   pregnant.

25   Q.  So when you say you noticed she was pregnant, you mean       13:52:01

1   visually?

2   A.  Visually, sir.

3   Q.  Did you ever attack her?

4   A.  No, sir.

5   Q.  Did you ever assault her?                          13:52:16

6   A.  No, sir.

7   Q.  Did you ever cause her stomach to collide with her

8   automobile?

9   A.  No, sir.

10  Q.  Were there law enforcement officers present at this time?   13:52:24

11  A.  Yes, sir.

12  Q.  Who was that?

13  A.  My beat partner, Deputy Kevin Herring (phonetic).

14  Q.  Was he patrolling in this same vehicle as you?

15  A.  No, sir.  He was patrolling in another vehicle in the same   13:53:02

16  area that I was in.

17  Q.  At what point in time during the stop did he arrive on

18  scene?

19  A.  Approximately about 30 seconds after we pulled into the

20  private driveway.                                      13:53:13

21  Q.  Did he ever make comments to you such that your conduct was

22  inappropriate?

23  A.  No, sir.

24  Q.  Did Ms. Escamilla's mother ever make a comment to you that

25  your conduct was inappropriate or unprofessional?      13:53:28

1  A.  No, sir.  As a matter of fact, her mother thanked us.

2  Q.  How about her husband, did he make any comments to you such

3  that your conduct was unprofessional or otherwise

4  inappropriate?

5  A.  No, sir.                                                    13:53:44

6  Q.  Do you recall whether you ever called in for a K-9 unit?

7  A.  Yes, sir.

8  Q.  Did you?

9  A.  Yes, sir.

10 Q.  And describe for us what a K-9 unit is.                     13:53:58

11 A.  A K-9 unit is an officer with a -- with a patrol dog.

12 Q.  And what are patrol dogs used for?

13 A.  They're used to sniff out drugs, bombs, pretty much

14 anything you need.

15 Q.  Do you recall why you made a call for a K-9 unit?           13:54:15

16 A.  No, sir, I don't recall exactly why.

17 Q.  Have you ever had other instances in your years at Maricopa

18 County Sheriff's Office that you've called for a K-9 unit?

19 A.  Yes, sir.  At that particular time, I don't recall exactly

20 why, but there had -- had to have been some exhibiting factors  13:54:34

21 and the reason being that we called out just for a K-9 unit.

22 I'm not going to waste my time or the resources of Phoenix

23 PD -- because it was actually Phoenix who came out -- just for

24 the heck of it.

25 Q.  Well, setting aside this traffic stop and your training and 13:54:49

1    in your practice and in your experience, what are some of the

2    instances, what are some of the events that would have to occur

3    for you to want to call out a K-9 unit from Phoenix PD?

4    A.  We can have the smell of marijuana, any type of drug

5    paraphernalia in the vehicle, or just being a high traffic drug          13:55:07

6    area where you have a person who, if you see anything inside

7    the vehicle, anything that would give us the assumption that

8    there could be something inside.

9    Q.  But as you sit here today, you do not recall what prompted

10   you to call the K-9 unit?                                                13:55:26

11   A.  Correct.

12   Q.  Did you ever enter Ms. Escamilla's vehicle?

13   A.  No, sir.

14   Q.  Did the K-9 dog ever enter her vehicle?

15   A.  I cannot recall.  I don't think so.                                  13:55:45

16   Q.  Did you ever at any time place your hands on Ms. Escamilla?

17   A.  No, sir.

18   Q.  Did you at any time call Phoenix Fire Department?

19   A.  Yes, sir.

20   Q.  Why did you call Phoenix Fire Department?                            13:56:05

21   A.  If I recall, I believe Ms. Escamilla -- I believe her name

22   at that time was Saucedo.

23   Q.  Yes, that's correct.

24   A.  Her breathing was elevating.  She was -- I don't know if it

25   was anxiety or she was hyperventilating, but due to the fact            13:56:20

1  she was pregnant we had asked if she wanted to see fire, so

2  Phoenix fire arrived on scene shortly after and advised us that

3  her blood pressure was elevating.  At that time she refused to

4  go to the hospital.

5  Q.  You specifically called, that it was you who called the          13:56:36

6  fire department?

7  A.  Yes, sir.

8  Q.  And the fire department did arrive on the scene?

9  A.  Yes, sir.

10  Q.  Were you ever 287(g) trained?                                   13:56:44

11  A.  No, sir.

12  Q.  Have you ever encountered a driver during a traffic stop

13  that did not have an ID?

14  A.  Yes, sir.

15  Q.  Did you ever encounter a driver who did not have a driver's     13:57:07

16  license?

17  A.  Yes, sir.

18  Q.  In your experience, of the drivers you encountered that had

19  no driver's license, are they more often of one ethnicity than

20  another, in your experience?                                        13:57:23

21  A.  Yes, sir.

22  Q.  And what -- what's been your experience in regards to the

23  people who you've stopped that did not have a driver's license,

24  in terms of ethnicity?

25  A.  I would say out of a hundred percent, I'd say at least          13:57:37

1   anywhere from 30 to 40 percent don't have any type of valid

2   driver's license, they're Hispanic.

3   Q.  30 to 40 percent of Hispanic --

4   A.  Of Hispanics.

5   Q.  -- drivers?                                    13:57:48

6   A.  Of my stops.

7   Q.  Of your stops, do not have driver's license or IDs?

8   A.  Correct.

9   Q.  And is that rate --

10          THE COURT:  I want to understand what you're saying.  13:57:59

11          If you stop somebody and they don't have a valid

12   driver's license and they are Hispanic, between 30 to

13   40 percent of them -- I'm sorry.  If you stop somebody -- I

14   still don't understand what you're saying.

15          Are you saying 30 to 40 percent of all people that you  13:58:20

16   stop for driver's license, or for failure to have a driver's

17   license, are Hispanic?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.  So you're not saying -- okay.  So

20   you're saying that 60 to 70 percent are non-Hispanic?     13:58:33

21          THE WITNESS:  Or just people who in general have a

22   valid driver's license.

23          MR. LIDDY:  Do you want to continue, Your Honor?

24          THE COURT:  That doesn't translate.  You can try

25   and --                                            13:58:49

```
 1            MR. LIDDY:  I agree.  I agree.  Let's back up.

 2    BY MR. LIDDY:

 3    Q.  You've testified that it's been your experience that

 4    sometimes when you make a traffic stop the driver has no valid

 5    driver's license --                                              13:58:57

 6    A.  Yes, sir.

 7    Q.  -- is that correct?

 8            So I'm talking about all your experiences with someone

 9    who you pulled over who has not had a valid driver's license.

10    What percentage of those drivers are Hispanic?               13:59:08

11            MS. RAMIREZ:  Objection, Your Honor.  This goes beyond

12    the scope of the witness's testimony.

13            THE COURT:  What is the scope of the witness's

14    testimony?

15            MS. RAMIREZ:  What Ms. Escamilla testified to in her   13:59:19

16    stop.

17            THE COURT:  Is there any reason why they can't present

18    a witness for other reasons?

19            MS. RAMIREZ:  Because this is -- in the pretrial order

20    we objected that we have not had an opportunity to depose this  13:59:27

21    witness, and --

22            THE COURT:  All right.  So you've made that objection.

23    I'm overruling it.  I'm going to allow the answer.

24            MR. LIDDY:  Excuse me.  Can you reread the question?

25            (The record was read by the court reporter.)          13:59:40
```

```
 1            THE WITNESS:  Working in the South Phoenix area,
 2   predominantly Hispanic, I'd say about 30 or 40 percent.
 3   BY MR. LIDDY:
 4   Q.  So 30 or 40 percent of the drivers that you've encountered
 5   without driver's licenses are Hispanic?                        14:00:11
 6   A.  Yes, sir.
 7   Q.  And the other 60 to 70 percent are non-Hispanic?
 8   A.  Correct.
 9            THE COURT:  All right.  And you indicated that you
10   work in a predominantly Hispanic area?                         14:00:23
11            THE WITNESS:  Yes, sir.
12            THE COURT:  Did you ever do any test to see, of that
13   30 to 40 percent, how many are not legal residents in the
14   United States?  Do you have any idea?
15            THE WITNESS:  I could just give you approximate       14:00:35
16   number, sir, just through the experience that I've had.
17            THE COURT:  Which is?
18            THE WITNESS:  I would say at least half.
19            THE COURT:  Okay.  So in your experience working in a
20   predominantly Hispanic area, of all the people that you stop   14:00:44
21   for not having a valid driver's license, 30 to 40 percent are
22   Hispanic, 60 to 70 percent are non-Hispanic, and of the 30 to
23   40 percent who are Hispanic, you believe that half may have --
24   may have been in the country without authorization?
25            THE WITNESS:  Yes, sir.                               14:01:02
```

```
 1              THE COURT:  Thank you.

 2              MR. LIDDY:  I have no further questions.

 3              THE COURT:  Cross.

 4                      CROSS-EXAMINATION

 5   BY MS. RAMIREZ:                                          14:01:16

 6   Q.  Good afternoon, Officer Gamboa.

 7   A.  Good afternoon, ma'am.

 8   Q.  Did you review any documents other than the incident report

 9   in preparation of your testimony today?

10   A.  Yes, ma'am.                                          14:01:30

11   Q.  I'm sorry, was that a yes?

12   A.  Yes.

13   Q.  What other documents did you review?

14   A.  A CAD report.

15   Q.  And any other documents besides the incident report and the  14:01:38

16   CAD report?

17   A.  No, ma'am.

18   Q.  Officer Gamboa, you have been employed with the Maricopa

19   County Sheriff's Office for the last four years, is that

20   correct?                                                14:01:52

21   A.  Yes, ma'am.

22   Q.  And on September 2, 2009, you stopped Ms. Lorena Escamilla,

23   at the time Saucedo?

24   A.  Yes, ma'am.

25   Q.  You stopped her at about 10:00 p.m., correct?        14:02:04
```

1619

```
 1   A.  Yes, ma'am.

 2   Q.  And she was stopped in the driveway of her home, is that

 3   correct?

 4   A.  When she eventually pulled over?

 5   Q.  Yes.  She pulled over into the driveway of her home?         14:02:11

 6   A.  After failing to yield to my lights and sirens, yes.

 7   Q.  So your answer is yes, she pulled into the driveway of her

 8   home, is that correct?

 9   A.  Correct, after she failed to --

10   Q.  I'm just asking you to please answer the question.           14:02:27

11   A.  Okay.

12   Q.  You realized that she was pregnant, is that correct?

13   A.  After she was exiting from the vehicle, correct.

14   Q.  I would like to take a look at the MCSO CAD report, CAD

15   incident history for that evening.  It's been entered into      14:02:52

16   evidence as Exhibit 978.

17           MS. RAMIREZ:  Your Honor, may I approach the witness?

18           THE COURT:  Yes.  You're not going to put it up on the

19   screen?

20           MS. RAMIREZ:  I have a hard copy available.              14:03:10

21           THE COURT:  That's fine.  You can do it however you

22   wish.

23           MS. RAMIREZ:  (Handing document to witness).

24           MR. LIDDY:  Your Honor, may I inquire as to the

25   exhibit number?                                                 14:03:22
```

```
 1              THE COURT:  978.

 2              MR. LIDDY:  Thank you.

 3              THE COURT:  Is it --

 4    BY MS. RAMIREZ:

 5    Q.  Can you take --                                    14:03:29

 6              THE COURT:  Has this been admitted?

 7              MS. RAMIREZ:  Yes, it has.

 8              THE COURT:  Okay.

 9    BY MS. RAMIREZ:

10    Q.  Can you take a look at the first line under the comments,   14:03:34

11    has the time as 10:04.  That's the time that you stopped --

12              THE COURT:  There is no Exhibit 978.

13              MS. RAMIREZ:  Oh, it was marked as Plaintiffs'

14    Exhibit 63.

15              THE COURT:  That would make it Exhibit 63.    14:03:49

16              MS. RAMIREZ:  I apologize.

17              THE COURT:  Okay.

18              Has Exhibit 63 been admitted?

19              THE CLERK:  Yes, Judge.

20              MR. LIDDY:  Yes, Your Honor.                 14:04:00

21              THE COURT:  Why don't you take this document back.

22              Kathleen, why don't you give the witness Exhibit 63.

23    That way, we're not worried about what the exhibit is.

24    BY MS. RAMIREZ:

25    Q.  I'd like to turn your attention to the first line in the   14:04:28
```

1621

```
 1  comments section.  10:04, is that the time that you stopped
 2  Ms. Escamilla?
 3  A.  10:04 would be when I ran the plate.
 4          Is that where you're looking at, ma'am?
 5  Q.  Yes, the first line.                                    14:04:50
 6  A.  That's when I advised dispatch that I was about to pull her
 7  over.
 8  Q.  And if you look three lines down from that at 10:08, that's
 9  when you ran her name and her date of birth, is that correct?
10  A.  Yes, ma'am.                                             14:05:04
11  Q.  And that was about four minutes after the stop?
12  A.  Yes, ma'am?
13  Q.  And then the next entry after that at 10:13, that's when
14  you called the K-9 unit, is that correct?
15  A.  Yes, ma'am.                                             14:05:15
16  Q.  If you look at the last line on that page, at 10:30 you
17  called the fire department, is that correct?
18  A.  Correct.
19  Q.  And that was approximately 26 minutes after the stop.
20  A.  Correct.                                                14:05:28
21  Q.  You don't call the fire department in every traffic stop
22  you make, is that correct?
23  A.  Correct.
24  Q.  There was a posse member present at your -- during the
25  stop, is that correct?                                     14:05:40
```

1622

1    A.  I believe according to CAD, yes, ma'am.

2    Q.  And you only called the fire department because the posse

3    member asked you to, is that correct?

4    A.  No, ma'am, I don't recall that.

5    Q.  The fire department arrived and they checked                    14:05:53

6    Ms. Escamilla's vitals, is that correct?

7    A.  Yes, ma'am.

8    Q.  They checked her blood pressure, is that correct?

9    A.  Yes, ma'am.

10   Q.  They checked to make sure that she wasn't bleeding, is that    14:06:03

11   correct?

12   A.  I don't recall that, ma'am.

13   Q.  They offered to take her to the hospital, is that correct?

14   A.  Yes, ma'am.

15   Q.  The fire department was there for quite a while, is that       14:06:16

16   correct?

17   A.  I don't recall exactly how long they were there.

18   Q.  I'd like to turn your attention to page 2 of the CAD

19   incident report.  The very last entry says 11:35.

20        Is that the end of the detention?                             14:06:42

21   A.  Correct.

22   Q.  And that detention lasted approximately one hour and 31

23   minutes, is that correct?

24   A.  Correct.

25   Q.  During Ms. Escamilla's stop you requested the Phoenix          14:06:56

1623

```
 1   Police Department send a K-9 unit, is that correct?
 2   A.   Initially I asked for our K-9, but I don't think we had one
 3   available so we went with Phoenix.
 4   Q.   And you testified that if you smell marijuana, that gives
 5   you reason to call the K-9 unit, is that correct?          14:07:14
 6   A.   It could be one -- one or another where we are contributing
 7   factors, but if I don't find it, if I smell it, it could be
 8   somewhere in the vehicle, correct.
 9   Q.   You didn't smell marijuana coming from Ms. Escamilla's
10   vehicle, did you?                                           14:07:29
11   A.   I can't recall at this time, ma'am.
12   Q.   You didn't see any drug paraphernalia in your car -- in her
13   car, did you?
14   A.   Like I testified before, ma'am, I can't recall.  But I can
15   tell you this: that it's not my normal practice just to call a  14:07:37
16   K-9 unit just for the heck of it.  If there was going to be --
17   if I'm calling a K-9 unit, there's gotta be some type of
18   external factors that I've encountered through my training and
19   experience that this could be possibly dope or marijuana or
20   some type -- something in that vehicle.                     14:07:53
21   Q.   And is one of the those external factors the makeup or
22   demographics of the neighborhood?
23   A.   It could possibly, but I'm not -- if it's -- just because
24   it's the neighborhood, I mean, I work South Phoenix.  There's a
25   lot of areas in that neighborhood -- or that area that I could  14:08:05
```

```
 1   call.  But I didn't.  So it had to be something with that
 2   vehicle.  But again, this traffic stop occurred three -- about
 3   three years ago, I don't recall.
 4   Q.  The K-9 unit did search Ms. Escamilla's car, correct?
 5   A.  I don't believe he went inside.  I believe he just had his      14:08:23
 6   K-9 dog walk around the vehicle.  But I can't -- I don't
 7   recall.
 8   Q.  Is it the practice of the K-9 unit to come to a detention
 9   solely to walk around a vehicle and not to go inside of it?
10   A.  If they don't find anything -- or if the -- if the dog          14:08:38
11   doesn't hit on anything outside, yes, ma'am, it is; it is
12   common practice.
13   Q.  You testified that you saw Ms. Escamilla driving on
14   55th Avenue, correct?
15   A.  Correct.                                                        14:09:00
16   Q.  And that you made a U-turn?
17   A.  Correct.
18   Q.  And you made that U-turn after you saw her vehicle.
19   A.  After I saw no license plate light illuminating --
20   illuminating the rear plate.                                        14:09:16
21   Q.  Now, license plates are located in the back of a vehicle,
22   correct?
23   A.  Correct.
24   Q.  Then when -- if you made a U-turn, you were traveling in
25   the opposite direction.  How could you see the license plate in     14:09:26
```

1625

1    the back of the vehicle?

2    A.  Through my driver's side mirror.

3    Q.  You cited Ms. Escamilla for failure to provide

4    identification, is that correct?

5    A.  Initially.                                          14:09:47

6    Q.  And you cited her for failure to provide proof of

7    insurance?

8    A.  Correct.

9         MS. RAMIREZ:  Your Honor, I have what's been marked

10   for identification as impeachment Exhibit 463.          14:10:22

11        Your Honor, may I approach the witness?

12        THE COURT:  Not yet.

13        THE CLERK:  That will be 457.

14        THE COURT:  It will be Exhibit No. 457.

15        MS. RAMIREZ:  May I approach the witness?          14:10:43

16        THE COURT:  You may now.

17        What?  I'm sorry.

18        Yeah, why don't you pull it out of the packet.

19   BY MS. RAMIREZ:

20   Q.  Do you recognize this, Officer Gamboa?              14:11:27

21   A.  Yes, ma'am, I do.

22   Q.  And what is it?

23   A.  It's a traffic citation.

24   Q.  And is this -- this is the traffic citation for Lorena

25   Saucedo, correct?                                       14:11:38

1626

```
 1    A.  Yes, ma'am, it is.

 2    Q.  And it has your signature in the bottom right corner, is

 3    that correct?

 4    A.  That is correct.

 5    Q.  With your badge number next to it?                        14:11:44

 6    A.  Yes, ma'am.

 7    Q.  The middle of the page it says defendant committed the

 8    following, and it says in row A, Refused to provide ID, is that

 9    correct?

10    A.  Yes, ma'am, that's correct.                               14:11:56

11    Q.  And there's a line through it, correct?

12    A.  Correct, ma'am.

13    Q.  And next to the line or next to that entry there's some

14    letters and what looks like 1924.  Are those your initials?

15    A.  Yes, ma'am.                                               14:12:09

16    Q.  And row B it says, No proof of insurance, is that correct?

17    A.  Yes, ma'am.

18    Q.  Nowhere on this citation does it say broken license plate

19    light, does it?

20    A.  No, ma'am.                                                14:12:21

21    Q.  So Officer Gamboa, you could have written this citation in

22    less than an hour and 30 minutes, is that correct?

23    A.  If she wasn't as hostile, yes, ma'am.

24            MS. RAMIREZ:  I have no further questions.

25            THE COURT:  Redirect?                                 14:12:43
```

1627

```
 1           MR. LIDDY:  No, Your Honor.

 2           THE COURT:  Next witness.

 3           MR. CASEY:  Your Honor, the next witness defense calls

 4    is Bennie Click.

 5           THE COURT:  Okay.                                    14:12:53

 6           You may step down, Officer Gamboa.  You can just leave

 7    that there.  Thank you.

 8           THE WITNESS:  Thank you, sir.

 9           MR. CASEY:  Your Honor, may I have a moment to set my

10    computer up?                                                14:13:10

11           THE COURT:  You may.

12           MR. CASEY:  Thank you, sir.

13           THE COURT:  Right here, Mr. Click, please.

14           THE CLERK:  Right here, sir.

15           Can you please state and spell your name for me.     14:13:40

16           MR. CLICK:  Yes, it's Bennie R. Click.  First name is

17    B-e-n-n-i-e; last name is Click, C --

18           THE CLERK:  Did you say R?

19           THE WITNESS:  Yes, R.  Last name is Click, C-l-i-c-k.

20           THE COURT:  Please raise your right hand.            14:13:59

21           (Bennie R. Click was duly sworn as a witness.)

22           THE CLERK:  Thank you.  Please take our witness stand.

23           THE COURT:  Please.

24           MR. CASEY:  Your Honor, one minute.  I'm having --

25    thank you, sir.                                             14:14:37
```

```
 1              (Pause in proceedings.)

 2         MR. CASEY:  I apologize to the Court.  I'm having some

 3    problem here.

 4         THE COURT:  It's a little early for the afternoon

 5    break.  I'll take it now if you want me to.                  14:15:35

 6         MR. CASEY:  I'd love it very much, Your Honor, if we

 7    could do that.  For some reason, every time I transfer up here,

 8    I'm not sure what happens.

 9         THE COURT:  All right.  How about this?  We'll do 15

10    minutes, then we might take a quick break sometime in the rest  14:15:46

11    of the day, but we'll do 15 minutes now and hopefully, you can

12    change -- fix your problem.

13         MR. CASEY:  Thank you, Your Honor.

14              (Recess taken.)

15         THE COURT:  Please be seated.                            14:35:11

16         MR. CASEY:  May I proceed, Your Honor?

17         THE COURT:  You may.

18         MR. CASEY:  I'd like to first thank the Court and

19    counsel for their courtesies in allowing me to solve my

20    computer glitch.                                              14:35:29

21                        BENNIE R. CLICK,

22    called as a witness herein, having been duly sworn, was

23    examined and testified as follows:

24                        DIRECT EXAMINATION

25    BY MR. CASEY:                                                 14:35:31
```

1    Q.  Please introduce yourself to the Court.

2    A.  Yes.  My name is Bennie R. Click.

3    Q.  And Mr. Click, where do you currently live?

4    A.  Just south of Flagstaff.

5    Q.  Okay.  Specifically the heart of hearts, where is that?    14:35:40

6    A.  In Munds Park.

7    Q.  Okay, good for you.

8            And what is your current occupation, sir?

9    A.  I'm retired and do this part time.  I do expert witness

10   work or consulting work in the area of law enforcement    14:35:53

11   litigation.

12   Q.  Okay.  And tell me -- just describe for us briefly, what

13   does it entail when you do law enforcement consulting?

14   A.  Normally, it entails evaluating officers' conduct or

15   performance in a particular situation, and along with that,    14:36:11

16   generally ask to look at policies, procedures, and training of

17   the organization and offer opinions in regards to -- to both of

18   those categories.

19   Q.  How long have you been doing law enforcement consulting,

20   whether it's related to litigation or claims?    14:36:29

21   A.  You know, I started 22 years ago -- actually, maybe 24

22   years ago, about 1988, doing what I'm doing today, when I was

23   still with the Phoenix Police Department.  Did it with the

24   police department as an internal expert for -- for almost five

25   years.    14:36:49

1        I did not -- during the period of time when I was in

2   Dallas, I was a police chief in Dallas from '92 to 2000, I did

3   not do any expert witness work.  Came back in 2000 and was

4   approached by people that I knew from when I was here in

5   Phoenix, and from 2000 to now have part time been doing law          14:37:06

6   enforcement-related litigation consulting.

7   Q.  Would you please tell the Court, what is it that you have

8   been asked to do in this case that's known as Melendres

9   v. Arpaio?

10  A.  Yeah.  I was asked to evaluate the deputies' conduct and        14:37:23

11  performance in -- in the three instances that involved the

12  plaintiffs in this case, and also to offer opinions in terms of

13  the policies, procedures, training that -- of the Maricopa

14  County Sheriff's Office.

15  Q.  All right.  Thank you, sir.                                     14:37:46

16        Now, did you write in this case a report that

17  summarized your opinions?

18  A.  I did.

19  Q.  I'm going to show you what's been marked into evidence as

20  Exhibit 1070, and it's actually admitted into evidence, and I'm    14:38:01

21  just going to show you this first page.

22        And because I do, every now and then my computer gets

23  finicky, in front of you to your left I also have pulled the

24  hard copy of the exhibit, Mr. Click.

25  A.  Yes.  I see it.                                                 14:38:17

1  Q.  Okay.  So this is Exhibit 1070, and I can read through it,

2  you can go through the hard copy, but does this appear to be

3  the report you authored?

4  A.  It does.

5  Q.  And does that report fairly and accurately contain the          14:38:32

6  opinions that you have expressed in this case?

7  A.  It does.

8  Q.  Does it detail the factual bases in which you have rendered

9  your opinions or that support your opinions?

10  A.  Yes, it does.                                                    14:38:47

11  Q.  So if anyone wanted to go to find out what specific

12  opinions you have and the specific bases for that opinion, they

13  can go to Exhibit 1070?

14  A.  Correct.

15  Q.  All right.  Now, quickly what I'd like to do is go to a          14:38:56

16  particular page --

17          THE COURT:  Let me just ask, before we go into the

18  particulars so that I can evaluate your testimony.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  If you'll permit, Mr. Casey.                     14:39:16

21          MR. CASEY:  Yes, sir.

22          THE COURT:  Have you ever had any experience with the

23  287(g) program?

24          THE WITNESS:  No, sir.

25          THE COURT:  Have you ever had any experience with           14:39:21

```
 1   local law enforcement cooperating with ICE under 287(g)

 2   agreements or other agreements?

 3            THE WITNESS:  No, I haven't.

 4            THE COURT:  So when you offer your opinions, just to

 5   sort of net it out for me, are you offering your opinions based    14:39:32

 6   on the application of state law?

 7            THE WITNESS:  Yes.  I -- no, as I just stated, I've

 8   not had any personal experience with 287(g) or the application

 9   of 287(g), other than the materials I reviewed for this case.

10            Yes, I do offer some opinions in regards to              14:39:59

11   enforcement of state law.

12            THE COURT:  All right.  In the report do you offer any

13   opinions about the enforcement of federal immigration law?

14            THE WITNESS:  Not other than the discussion of 287(g),

15   the authority that 287(g) gave the deputies, and then what        14:40:18

16   the -- when 287(g) was rescinded, the process and procedure to

17   use at that point to notify ICE, to -- who are authorized to

18   enforce immigration law, as to that relationship at that point

19   and how that changed.

20            THE COURT:  Thank you.                                   14:40:44

21            MR. CASEY:  All right.  Thank you, sir.

22   BY MR. CASEY:

23   Q.  Sir, I have up on the screen, I pulled up attachment 1 to

24   Exhibit 1070.  This begins at page 50, I believe, of your

25   report.                                                          14:40:56
```

1       Would you tell us what is attachment 1?

2    A.  Attachment 1 are the materials that I reviewed in this

3    case.

4    Q.  And it goes for several pages, does it not?

5    A.  It does.                                                    14:41:08

6    Q.  And I'm thumbing through this.  Does this fairly and

7    accurately describe all the materials that you have received in

8    formulating your opinions?

9    A.  Yes, it does.

10   Q.  Also, the plaintiffs' standard of care expert, Mr. Stewart,   14:41:23

11   has been in the courtroom listening to testimony.  I know you

12   haven't been here, but have you received daily transcripts of

13   the testimony, both that the plaintiffs have presented and the

14   defense have presented in this case?

15   A.  I have.                                                    14:41:42

16   Q.  Okay.  Have you read those?

17   A.  Yes.

18   Q.  All right.  Thank you, sir.

19       Now, I don't have it on this particular image, but the

20   actual hard copy of Exhibit 1070 there's an attachment          14:41:50

21   number 2.

22       Would you tell the Court generally, what is attachment

23   number 2?

24   A.  Attachment number 2 is my curriculum vitae, my fee

25   schedule, and cases that I've offered testimony in in the past   14:42:06

1634

1    five years, either in deposition or in trial.

2    Q.  Okay.  Are you doing this for free?

3    A.  No.

4    Q.  All right.  How much are you charging?

5    A.  I believe at the time that you retained me, I think it's        14:42:18

6    $200 an hour.

7    Q.  And do you know how many hours you've spent on this,

8    roughly?

9    A.  The initial report I spent almost 80 hours.  I think as you

10   saw, there's a lot of material.  Since then -- that was about a    14:42:32

11   year and a half ago.  I think the only -- there was a

12   deposition that I gave, and then from the deposition till just

13   this last two weeks when we've met twice, I had no expenses.

14   Q.  All right.  Thank you very much, sir.

15         What I'm now interested is changing subjects.  Why do        14:42:58

16   you believe that you are qualified to address opinions about

17   officer conduct, standard of care, and the reasonableness of

18   policies and procedures in a law enforcement setting?

19   A.  I think I have the background in terms of my experience in

20   the Phoenix Police Department and the Dallas Police Department    14:43:22

21   to make judgments in terms of -- or offer opinions in terms of

22   policies, procedures, training, and officer conduct.

23   Q.  How long were you with the City of Phoenix Police

24   Department?

25   A.  I -- I spent almost 29 years with the City of Phoenix         14:43:39

1    Police Department.  I started as a police officer, worked my

2    way up through the ranks to where in 1992 I was promoted to the

3    executive assistant chief position, which is the number 2

4    position in Phoenix.

5            And during that almost 29 years I worked in 17                14:44:01

6    different assignments throughout the department, virtually

7    every aspect of -- of local law enforcement.

8    Q.  As a patrol deputy?

9    A.  Well, as a -- as a patrol officer.  I started out as a

10   patrol officer, worked traffic.  Worked planning and research.   14:44:19

11   Worked as a sergeant in patrol.  Worked community relations.

12   Worked -- as a lieutenant I worked both patrol and

13   investigations, property crimes.

14           As the captain I was the administrative assistant for

15   a period of time with the patrol chief.  Then I took over the     14:44:42

16   regional academy, which at that time it was under the auspices

17   of the City of Phoenix.  Ran the police academy for three

18   years.

19           At that time we trained about half the officers in

20   Arizona.  That academy is now under the state system, but        14:45:00

21   the -- from the academy I was assigned to open a new patrol

22   precinct, the South Mountain Precinct, and when that was

23   completed in 1980 I was promoted to major and was over two

24   patrol precincts.  As a major I made assistant chief, in 1983 I

25   think it was.  And as an assistant chief, part of that time I     14:45:29

1   was over patrol, all the patrol for the City of Phoenix.  I was

2   over investigations for a period of time.

3          And then when I became the executive assistant chief

4   in 1992, I was the number two person in the department that

5   would fill in when the chief wasn't there, but also oversaw          14:45:50

6   special investigations, oversaw Internal Affairs, some of

7   the -- some of the more sensitive functions in the department.

8   Q.  And did you say from beginning to the end of your career at

9   Phoenix it was total of 29 years?

10  A.  It was 28 years and seven months, or something like that.     14:46:09

11  Q.  During the course of your career have you had the

12  opportunity to hire police officers?

13  A.  Yes.

14  Q.  Have you had the opportunity to evaluate performance of

15  police officers?                                                     14:46:23

16  A.  Many, many hundreds, probably.

17  Q.  Have you had the opportunity to supervise the performance

18  of deputies -- excuse me, officers in various law enforcement

19  activities?

20  A.  As a sergeant I supervised probably eight or ten people.       14:46:35

21  By the time I made executive assistant chief in Phoenix, when I

22  had all the patrol, probably supervised about 1800 or 2,000

23  patrol officers.  I'm not touching on Dallas at this point,

24  but --

25  Q.  I understand, we're just talking about Phoenix.                 14:46:54

1  A.  So, yes, but also had the opportunity to supervise, either

2  directly or through other supervisors, other layers of

3  supervision, as many as 500 detectives.

4  Q.  During your career with Phoenix did you also, especially

5  when you were at management level, did you have the occasion to        14:47:15

6  develop policies and procedures for the City of Phoenix Police

7  Department?

8  A.  Yes.  In the various positions I was in, the -- it was a

9  period of change for law enforcement, so I preface that it was

10  a time when I think a lot of police departments around the        14:47:37

11  country were doing more to professionalize the policing.

12        And, yes, I think from the time I was -- well, 1968 I

13  was still a patrol officer, was brought into research and

14  development.  It was called planning the research at that time.

15  The previous chief had abolished all of our policies and        14:48:00

16  procedures for whatever reason, I don't think anybody really

17  understood.  He just felt that good judgment and common sense

18  was sufficient.

19        When Chief Weitzel was appointed police chief, he

20  disagreed with that and felt that we needed policies and        14:48:18

21  procedures, and it was a matter of putting all that back

22  together.  Myself and one sergeant did that.  Took us about a

23  year to -- to put together a policies and procedures manual for

24  the department at that point.

25        But from that point on, yes, I was involved in many,        14:48:33

1   many, either as the initiator, or involved in various

2   committees.  A lot of policies and procedures are developed in

3   committee where you're getting broad input.

4   Q.  Now, let's talk about a subject that's related to your time

5   in Phoenix.  You said you were running the police academy, and          14:48:54

6   then you said it took over by the state.

7            Did I understand that correctly?

8   A.  Yeah, it wasn't taken over by the state until 1993 or 1994.

9   Q.  Is that Arizona POST?

10  A.  It's Arizona -- well, Arizona POST is over all the                    14:49:07

11  academies in Arizona.  There's a proliferation of academies now

12  through the junior colleges, the community colleges.  But there

13  are several stand-alone academies, and the academy that is now

14  called the Arizona Law Enforcement Academy was the Phoenix

15  Regional Academy back at that time.  And it still probably             14:49:24

16  trains half the officers in Arizona through that academy.

17  Q.  Now, when you say you ran that when you were at the City of

18  Phoenix, explain for us what that entailed.

19  A.  I was in charge of the -- the training curriculum.  I was

20  responsible for the training both in -- both basic training,          14:49:44

21  the academy training that -- that new officers get, and at that

22  time all of the valley agencies, including the Maricopa County

23  Sheriff's Office, came through that academy.

24  Q.  All right.  Now, let's fast-forward.  You said that you

25  were the chief of police for the City of Dallas, Texas.  Did I        14:50:05

1639

1  understand that correctly?

2  A.  That's correct.

3  Q.  What years was that?

4  A.  I went there in July of 1993, and I left in -- my last day

5  of work was January of 2000.                                    14:50:22

6  Q.  And tell us generally, I know there's -- we don't need a

7  lot of detail, but can you give us generally an overview of

8  what you did in that time period as the chief of police of a

9  city that size.

10 A.  Well, you're overseeing all the law enforcement functions  14:50:38

11 in the city.  During that period of time there was a -- a

12 vacant position in the city manager's office, the assistant

13 city manager that was over public safety, which was police,

14 fire, and emergency services, and for six months I was asked to

15 fill that position.                                             14:50:58

16       For most of the time I was there as the police chief I

17 oversaw a department that, again, was a full-service local law

18 enforcement agency with about 4,000 people.  During the time I

19 was the public safety assistant city manager, oversaw about

20 6500 people.                                                    14:51:19

21 Q.  And that was kind of dovetailing into my next question,

22 what was the number -- yeah, what was the number of police

23 officers and other employees that you were responsible for as

24 chief of police of the City of Dallas?

25 A.  Well, as the police chief I was responsible for everybody  14:51:34

1  in the police department.  At that time it was almost 4,000

2  people.  Everything from investigations to patrol to K-9 to the

3  air patrol unit to -- I mean, it's a full gamut.  Dallas is

4  typical of most major United States police departments.

5  Q.  Did you -- at Dallas, in your role as chief of police, did      14:51:55

6  you have opportunity to review policies and procedures to

7  determine whether or not you believed they were appropriate for

8  your department, for your police department?

9  A.  Yes, I -- I think that during the time I was there we made

10  about 650 changes in policy and procedure, some new, some of it    14:52:15

11  revision, and I saw all of that.  I felt in my position that I

12  was responsible.  I was the person that made the final decision

13  on internal policy.  City policy was something established by

14  city council, but in terms of internal policy, I was the

15  individual that was responsible for reviewing and approving or     14:52:43

16  disapproving of it.

17  Q.  Now, this case that we're here today about involves

18  allegations of racial profiling.  Is that your understanding?

19  A.  Yes.

20  Q.  And there's been a lot of discussion of race.  Is race and     14:52:54

21  community relations between members of the community and a

22  police force something that's foreign to you in your

23  experience?

24  A.  No, I think if -- many people have asked me about what was

25  the -- my first perceptions of Dallas, because the racial          14:53:13

1    issues in Dallas were much more pronounced than they were in

2    here in Phoenix when I left, and throughout my tenure there it

3    was a major issue, the relationship between the minority

4    community.  Dallas is a minority/majority city, which --

5    Q.  What's that mean?                                              14:53:33

6    A.  That means that the majority of your citizenry are of

7    recognized minority group, either African-American or Hispanic,

8    primarily, although there was a -- a much smaller Asian

9    population, too.

10   Q.  Does your experience in Dallas, in that environment you       14:53:49

11   just described, do you believe that that has given you an

12   insight on how police practices can be perceived in the

13   community?

14   A.  Certainly.

15   Q.  Okay.  Does it give you insight in how to, what you believe   14:54:06

16   to evaluate whether a police practice is appropriate in law

17   enforcement standards, or under law enforcement standards?

18   A.  Certainly.

19   Q.  Okay.  At any time after -- during or after Dallas did you

20   ever receive any commendations by any organizations or any        14:54:25

21   governmental agencies?

22   A.  Yes, I did.

23   Q.  What -- and don't -- I don't want you to be modest.  Tell

24   me about what you received.

25   A.  And again, I think, and I do want to be a little bit          14:54:36

1    modest, because you're the police chief and you've got a lot of

2    people that contribute to what goes on in an agency.

3    Hopefully, you're providing the leadership for that.

4         But I was recognized by the Texas state legislature

5    for the work that I did involving -- the work that I did, or          14:54:53

6    the work that was done while I was there, let me put it that

7    way.

8    Q.  Okay.

9    A.  The improved relationship between minority communities and

10   police department was commended by the city council upon my          14:55:04

11   retirement for the same, and the mayor.  And I was commended by

12   the Department of Justice for the same, that the improved

13   relationship between the police department and the -- and the

14   minority community.

15        Probably, I guess from my end of it, probably the              14:55:23

16   most -- the thing I was proudest of is the mayor, who was

17   African-American, his compliment to me on the day I retired is

18   that we'd probably gone through the quietest time in the last

19   30 years in terms of the relationship between the police

20   department and the minority community.                              14:55:42

21   Q.  Thank you, sir.

22        And then you retired from full-time law enforcement

23   after you left Dallas?

24   A.  I did.

25   Q.  All right.  How have you kept active, or have you kept          14:55:50

1    active in law enforcement in terms of the standards and what is

2    accepted as generally acceptable or reasonable standards in law

3    enforcement?

4    A.  Yeah, I've continued -- there's several ways.  I've

5    continued my membership in several professional organizations.    14:56:11

6    I'm a life member of the International Association of Chiefs of

7    Police.  My first several years of retirement I continued to

8    participate in some of the communities that are there, that are

9    involved.

10           I've continued to be a member of the Police Executive    14:56:26

11   Research Forum, which is maybe one of the -- along with the

12   International Association of Chiefs of Police, maybe the other

13   preeminent research organization that looks at best practices

14   and standards for law enforcement.

15           I've got three kids that are all in law enforcement    14:56:46

16   here in the valley, and certainly there's ongoing discussion.

17   We can't hardly -- to my wife's displeasure, there's almost

18   always some discussion about what's going on in law

19   enforcement.

20   Q.  Are you knowledgeable right now on August 1st, 2012, about    14:57:04

21   what is generally accepted and reasonable police practices and

22   standards?

23   A.  I think I'm as knowledgeable now as I was when I was

24   working full time.

25   Q.  Do you believe that you are as knowledgeable now on August    14:57:20

1st, 2012, about police training?

A.  Yes, I -- I think if there was one area that I -- if I had

to pick out one area that was the highlight of my career, and I

had a great career in a lot of different areas, that it would

have been the training, because you can affect culture; you can    14:57:43

affect the direction of a department.  And I was at the -- I

was very fortunate at the time that I was directly in charge of

training, but indirectly I -- either as an assistant chief or

the executive assistant chief you still had some oversight of

the training function.    14:57:58

       And I guess a long way to get to your question is that

I think that training is -- training and policy, I don't know

that you can disconnect the two, but the two most important

things you can do to make sure the department is running the

way that you want it to run.    14:58:17

Q.  One final area, sir.  Since your retirement have you taught

law enforcement officers in some fort of -- some sort of

training?

A.  I've continued to teach.  I've taught in the academy here

in Phoenix for 20 -- 20-plus years when I left, everything from    14:58:37

laws of arrest to the last 10 years I taught ethics, the ethics

course, just because I think it's so important in law

enforcement.

       When I got to Dallas, I insisted that I was going to

teach the ethics course at the police academy in Dallas, which    14:58:51

1    I did for the six plus years that I was there.

2          It gave the officers an opportunity to see me eye to

3    eye as the police chief, and gave me a good feeling to look at

4    the new officers that are coming in and recognizing that we are

5    hiring good people, but I want that message to be there as to          14:59:10

6    what ethical conduct relates to.

7    Q.  Are you familiar with the general training that is provided

8    by Arizona POST to people that want to become peace officers,

9    such as the deputies at the MCSO?

10   A.  Yes.  I guess to digress just a moment, I also still teach.        14:59:29

11   I teach an online course in police ethics that is primarily law

12   enforcement officers, sometimes from other states, sometimes in

13   the military overseas, but I do teach an online ethics course

14   currently, and have since I retired.

15   Q.  And who is that for that you teach it?                             14:59:50

16   A.  Ottawa University.

17   Q.  Thank you, sir.

18   A.  I am familiar with the Arizona POST training.  I was

19   involved in the early stages when during my time at the police

20   academy, Arizona POST was really in its infancy.  It was          15:00:04

21   called -- it had a different acronym then, ALEOAC, for Arizona

22   Law Enforcement Officers Advisory Council is what it was called

23   then, but it's the same as Arizona POST.  And it was a matter

24   of taking and -- and professionalizing law enforcement training

25   in terms of making sure that you had trained instructors, that          15:00:24

1646

1    you had lesson plans that had been reviewed, that were

2    sufficient, current; that you had a review process set up.

3          I was on a committee early on as part of my role in

4    the early stages of what is today Arizona POST, and was part of

5    the -- the group that put that together, and many of the lesson    15:00:48

6    plans I look at today are not a lot different.  Many of them

7    have been updated to -- to fit whatever changes have occurred,

8    but I was involved in that process in helping Arizona POST

9    develop the curriculum and the lesson plans to go with that

10   curriculum.                                                        15:01:06

11   Q.  All right.  Thank you, sir.

12         I'd like to turn now to a different subject, and that

13   is the training of MCSO patrol deputies.

14         Have you formed any opinions on the quality of the

15   training provided by MCSO traffic patrol deputies?                 15:01:17

16   A.  I have.

17   Q.  And what are those opinions?

18   A.  They exceed the requirements of Arizona POST.  The current

19   academy that -- the Sheriff's Office has its own academy now,

20   and has I think for the last 10 or 15 years, both for officers    15:01:38

21   and for detention personnel, but I'm speaking about the

22   deputies at this point.  It's a -- I believe it may even be a

23   20-week academy, which exceeds POST.  POST has a minimum of 585

24   hours, which is about, I think, 17 weeks.

25         The Sheriff's Office, like most agencies today, has a        15:02:00

1    field training officer program, so if you successfully complete

2    the academy, which has a -- a very broad spectrum of law

3    enforcement topics, you go into the field training program.  A

4    field training program for the Sheriff's Office is 15 weeks.

5    As I understand it's actually 16 weeks, but the final week is a          15:02:27

6    riding solo with some oversight from a field training deputy.

7            But the field training program is where you have

8    specially-trained deputies that are overseeing the field

9    training, the application of what they learned in the academy

10   to being a patrol officer on the street.                                 15:02:45

11   Q.  All right.

12   A.  The -- so that -- that is basically the training program.

13           Many of the sheriff's deputies came through -- came up

14   through the detention system, I found, and not just in this

15   case but in other cases I've seen, and in that process they --          15:03:00

16   they go through I think it's a six- or eight-week academy as a

17   detention officer, along with a field training program that is

18   shorter, but for detention officers.

19           So many of these officers, or many of the deputies,

20   have not only had the POST, or the training that would apply to          15:03:21

21   deputies, to a law enforcement officer; they've also had

22   training that applies directly to the -- being a detention

23   officer.

24   Q.  Based on your experience in the national organizations that

25   you're a member of, former City of Dallas police chief, how             15:03:36

1   does the MCSO training at the academy, and then at basically

2   that mentoring program, the field training, how does that

3   compare to other programs nationally, in your judgment?

4   A.  You know, I'd have to add one piece to that, and that's the

5   continuing training requirement under POST, and also the          15:03:57

6   proficiency training, ongoing proficiency training that's

7   required by Arizona POST.

8          But in looking at all of that, the Sheriff's Office

9   far exceeds what is required by Arizona POST.  Arizona POST is

10  part of a 50-state organization.  There's an association         15:04:16

11  that -- of police trainers.  And they attempt to standardize

12  training to the extent it can be standardized between --

13  between states.

14         So when you look at Arizona POST standards, it's

15  basically the -- the standards that you would expect, minimally  15:04:37

16  expect a law enforcement officer to have.  The Maricopa County

17  Sheriff's Office has got a training program that far exceeds

18  that.

19  Q.  All right.  Now, I want to come back to you, and I've made

20  notes, I want to come back to you and talk to you more about     15:04:51

21  the field training MCSO deputies get after the academy, and I

22  want to get back to you about the continuing education.

23         But first what I'd like to do is talk to you about

24  some specific policies.  I'm going to show you Exhibit 1199,

25  which is in evidence.                                            15:05:18

1    Do you recognize, just generally, this document that
2    pops up on the screen, sir?
3    A.  It's a lesson plan, it's an Arizona POST lesson plan that's
4    part of a basic curriculum.
5    Q.  Okay.  Is this something that is taught at the academy
6    about how to do patrols and make observations?
7    A.  Yes, it is.  I --
8    Q.  You need me to blow anything up for --
9    A.  No, I think that -- I guess my only -- I'm not sure how
10   much of this you're going to go through, but it's a 16-hour
11   block of instruction that would probably be given over a period
12   of a week or two, maybe in two- or four-hour blocks.
13   Q.  Is it your understanding that every peace officer, wherever
14   they go, including MCSO, undergoes this Arizona POST training
15   on patrol and observations?
16   A.  They are required to meet the performance objectives, and
17   that was the other part I was going to point out, is that every
18   lesson plan has got performance objectives.  What is it that if
19   a person successfully completes this training program or
20   this -- this particular course, what is it you would expect
21   them to be able to do performance-wise.
22       So yes, it has to be -- this is part of the basic
23   curriculum, and would have to be satisfactorily completed as
24   part of -- before they could graduate from the academy.
25   Q.  All right.  Now, I'm going to turn to Exhibit 1201 which

15:05:41

15:05:56

15:06:15

15:06:31

15:06:48

1    has been admitted into evidence.

2            Do you recognize what this document is, generally,

3    sir?

4            And again, we're not going to go through all the

5    numerous pages.                                              15:07:00

6    A.  Again, I -- as I stated earlier, it's a -- it's a -- the

7    lesson plan for -- for teaching traffic law, substantive

8    traffic law that's presented at the -- at the academy.  It's a

9    15-hour block of instruction.

10   Q.  And that is something also that every MCSO deputy, before  15:07:15

11   he ever gets put into the field training program, has to

12   undergo?

13   A.  Yes.

14   Q.  All right.  Now, let's turn now to Exhibit 1203.  This is

15   another Arizona POST training.                               15:07:36

16           Would you read what the subject matter is on this,

17   please.

18   A.  This lesson plan is titled Police and the Community.

19   Q.  And what is your understanding of what this is?

20   A.  The last 20 or 25 years there's been lots of emphasis on --  15:07:49

21   on community policing, how to improve that relationship with --

22   between police and the community.  And through that improved

23   relationship that you're going to have a better -- a safer

24   community.

25   Q.  Why is teaching young men and women that are going to be in  15:08:09

```
 1   law enforcement about community policing, why is that

 2   important?  If it's important.

 3   A.  It's extremely important.

 4        I think it's to have the young officer -- this is at

 5   the -- at the academy level -- to have the young               15:08:31

 6   officer understand the importance of that relationship and what

 7   can be accomplished, you know, in terms of community safety, in

 8   terms of officer safety, in terms of reduced crime, all -- all

 9   of that aspect.  But what the community, how you can interact

10   with the community and let that community actually assist you   15:08:56

11   in doing what -- you know, that you haven't taken this job on

12   all by yourself, that there's a community out there that's

13   willing to help if you're -- if you create the right

14   environment for that.

15   Q.  Is there any relation, in your judgment, between this       15:09:08

16   course that's taught at Arizona POST and the type of community

17   policing commendation that you received while you were at

18   Dallas?

19        You understand my question?

20   A.  Well, I think I do.  Yeah, I think it -- it has to do with  15:09:26

21   all those things I've just mentioned, that, you know, it's --

22   in the last 25 or 30 years where law enforcement's recognized

23   that without that, without a positive relationship between the

24   department and the community, your job's going to be a lot

25   harder.                                                         15:09:48
```

1    Q.  Okay.  I'd like to now turn, if I could, please, to

2    Exhibit 1204 that is already in evidence.

3           And sir, this is another Arizona POST instruction

4    plan.  Would you tell us what that instruction plan is about?

5    A.  Yeah.  This is a high-risk vehicle stop lesson plan that          15:10:09

6    deals with stopping vehicles in which there appears to be a

7    heightened safety risk, where the officer perceives that there

8    may be a heightened safety risk.

9    Q.  And how many credit hours or hours does that take, sir?

10   A.  This one is, I think it's 20 hours, and it -- some of it's         15:10:31

11   hands-on, where you're actually out stopping in scenarios that

12   are set up to actually stopping vehicles, but also in the

13   classroom to be able to understand.  But everything from where

14   you position yourself to what you observe, the number of

15   officers or deputies that ideally you would have in this            15:10:54

16   situation, but really pointing out from experience what the

17   hazards are in stopping a vehicle that may be high risk to your

18   safety.

19   Q.  For example, if you had someone that left a scene and

20   wouldn't pull over to your lights and siren and pulled into          15:11:10

21   somewhere unexpected, that might be included in a high risk?

22   A.  Yes.  Maybe not to the same extent as if you're just

23   stopping the car that robbed the bank and you're behind it and

24   you know the people are armed.  But yes, it's going to -- a

25   person that won't stop, or the delayed stop, or you see          15:11:33

1  something going on in the vehicle as you try to stop them, yes,

2  this course would touch on why -- or what is the significance

3  or possible significance of that, and what precautions should

4  you take.

5  Q.  Now, before we go on, this is a little bit different, but    15:11:48

6  hopefully somewhat related, is there -- in your experience, is

7  there some sort of caution, concern, or signal that comes to a

8  police officer when someone is not obeying, apparently can see

9  a signal to stop and is not obeying?  Do you have any opinions

10  on what goes through a reasonable officer's mind?    15:12:14

11  A.  I think you're not really sure.  It's an unknown at that

12  point, but it's not common that a person would not obey or

13  comply.  So, I mean, it's going to trigger somehow that there's

14  something unusual about this situation.  Why is this person

15  doing that?  Are they going to try to get to some location    15:12:38

16  that's more advantageous to them, either to escape or to

17  assault you in some manner?  Are they going to at some point

18  run?  Are they trying to hide a gun under the seat?  Are they

19  trying to hide drugs under the car, to some other location?  It

20  can trigger all of those.    15:13:00

21      But bottom line is safety.  How do you -- how do you

22  address the potential safety issue?  Something is amiss, and

23  the person's not complying, and you just need to use, as you're

24  taught in the academy -- that's certainly taught by experience,

25  too, on the street -- you need to use an increased level of    15:13:22

1654

```
 1   caution.
 2   Q.  Thank you very much.
 3           So far, the lesson plans that we've gone through,
 4   every MCSO deputy that's gone through academy training has
 5   underwent that training?                                    15:13:35
 6   A.  That's correct.
 7   Q.  Okay.  Now I'd like to turn to the next exhibit, which is
 8   1205 that's already admitted into evidence.
 9   A.  You know, Counsel, I might just -- I'm not sure, I look at
10   the dates of these, and as I said earlier, a lot of the dates  15:13:47
11   of these are, I think, 2006, and I'm not sure when the deputies
12   all came on, and I guess it may be a minor point, but even
13   if -- and I think the oldest deputy was -- is it DiPietro, I
14   think is how he pronounces it, came on in 1988.  I would
15   propose that he had a similar, if not identical, lesson plan,   15:14:06
16   but I'm not sure.  This lesson plan's dated January --
17   Q.  And I probably should be more precise.
18           Is it your testimony that whether it is this
19   particular exhibit I'm showing you, whether it's this one, it
20   would be something substantially similar to it that you believe  15:14:27
21   every MCSO deputy would have received during the course of his
22   or her training?
23   A.  This lesson plan, as I look at it, was probably developed
24   in the, at least in its initial stages, in the early to
25   mid-1970s.                                                   15:14:43
```

1   Q.   Okay.

2   A.   And something similar, if not identical to this, has been

3   in place since the early 1970s.

4   Q.   Let's look at 1205 and let's go through these.  Briefly,

5   would you just describe what the subject matter is of that.          15:14:56

6   A.   This talks about pre-stop procedures.  It deals again with

7   high-risk vehicle stops.  It's a portion.  I don't see --

8   Q.   Does the Arizona POST training, does that spend a great

9   deal of time on traffic stops and the various stages of that

10  continuum?                                                           15:15:25

11  A.   Yes, I -- and the reason so much time's spent on that is so

12  much of your contact with citizens is going to be through

13  traffic stops, and as a result of that, just by the volume, a

14  lot of the risks that you may face out there, safety risks,

15  will be making traffic stops.                                        15:15:43

16          There are -- is another part of either this course or

17  it may be another lesson plan that talks about contacting

18  people at other than traffic stops, but very similar.

19  Q.   So every MCSO deputy would have either received the

20  training we see in Exhibit 1205 or its substantial equivalent?       15:15:59

21  A.   Yes.

22  Q.   All right.  I'm going to show you what's Exhibit 1206, and

23  this appears to be another part of high-risk vehicle stops but

24  adds another component of that.

25          Do you see what that is, sir?                                15:16:19

1   A.  Yes, this -- this deals with positioning of the police

2   vehicle.

3   Q.  All right.  Now, we have heard in this trial a particular

4   incident where one of the MCSO deputies made a traffic

5   patrol [sic] and parked a motorcycle behind a vehicle where he          15:16:32

6   testified its engine was still running.

7          Is that the type of vehicle positioning that this type

8   of lesson plan and Arizona POST talk about?

9   A.  You know, I'm not sure that in that particular situation

10  I -- you know, trying to say how it's included in this lesson        15:16:56

11  plan.

12         Certainly, whether you ride a motorcycle or a car,

13  there -- you've still got to -- you're still trained in terms

14  of position.  There may not be as much of an issue with a

15  motorcycle, because in the position of a motorcycle you're          15:17:11

16  still somewhat vulnerable.  It's not going to provide the same

17  cover or protection that -- that a car would.  But -- but yes,

18  it -- it would deal with motorcycles also.

19  Q.  Now I'm going to turn to the next exhibit, which is 1207

20  that's admitted into evidence.  And this exhibit deals with the     15:17:30

21  removal of subjects from the vehicle.  And we've had some

22  testimony here to -- in fact, today and recently, about people

23  being removed or assisted in being removed from vehicles.

24         Why is that taught to every academy trainee?

25  A.  To get the -- the new deputy to -- to consider their            15:17:53

1  personal safety, safety of the person in the car, perhaps other

2  people's safety, as to being able to evaluate the situation and

3  making a determination as to whether or not the person in the

4  vehicle presents a potential safety hazard.

5          If they do, it could be a drive-off, somebody decides          15:18:18

6  to drive off.  Somebody decides to back into your vehicle.  In

7  the vehicle they have access, if there is a gun in the vehicle,

8  they would have access to a gun or a weapon in the vehicle.

9          I think it's -- it's to educate the officer as to

10  looking for all those things that -- that they need to          15:18:38

11  evaluate, and as a result of that evaluation as to whether or

12  not this person needs to be removed from the -- from the

13  vehicle.

14  Q.  Okay.  I'm going to do a call-out on the performance

15  objectives.  Would you read out loud the performance objective          15:18:52

16  number 1 that's stated there?

17  A.  Yes.  It's:  Demonstrate or list the 12 tactical

18  considerations for the removal of subjects from the vehicle.

19  Q.  And that's something you were just talking about of how you

20  might remove, under what circumstances, et cetera?          15:19:08

21  A.  Yes.

22  Q.  All right.  Now, I'm going to turn to Exhibit 1208, which

23  is also in evidence.

24          What is the difference between what we just saw,

25  removal of a subject from a vehicle, and then clearing a          15:19:30

```
 1    suspect vehicle?
 2    A.  Clearing the vehicle generally has to do with after you've
 3    removed the driver or -- or perhaps a passenger or passengers,
 4    is to where you're still not certain that there isn't someone
 5    in the vehicle concealed in the trunk, concealed in the back     15:19:49
 6    seat.
 7             And again, a lot has to do with the situation,
 8    evaluating the situation and making an informed -- coming to an
 9    informed judgment about what type of, if any, potential risk
10    that this particular vehicle -- but again, it's based on best    15:20:06
11    practice and it's based on experience that the -- of instances
12    where officers have gotten the driver out, become complacent
13    because -- and not realizing that there's still someone in the
14    vehicle, and then wind up with that safety risk that that other
15    person in the vehicle presents to them.                          15:20:28
16    Q.  All right.  Now, let me turn to one other area, and that is
17    Exhibit 1213.  And I'm going to try to just do the call-out on
18    this whole section to make it larger for you.
19             What is the subject matter here?
20    A.  Subject matter here is search and seizure.                   15:21:01
21    Q.  And with the Court's permission, I guess preliminary
22    leading, but it says under course content:  Analysis of
23    constitutional requirements, statutes, and case law on search
24    and seizure.
25             Did I read that correctly, sir?                         15:21:17
```

1    A.  Correct.

2    Q.  Why is it important to teach every trainee, who are not

3    lawyers, by and large, about constitutional requirements,

4    statutes, and case law on search and seizure?

5    A.  Certainly they're all sworn to uphold or protect persons',    15:21:32

6    people's constitutional rights, and it's the foundation for so

7    much of what police officers do.

8         If there -- probably the three most common phrases

9    that are used in the academy throughout that period of time,

10   and then in continuing training, is reasonable suspicion,    15:21:54

11   probable cause, and reasonable force, and all those relate to a

12   constitutional requirement.

13   Q.  Okay.  And again, how many hours does this particular

14   course entail?

15   A.  Yeah, this particular course entails 18 hours.  And as I    15:22:13

16   look at the face sheet here, it appears to be search and

17   seizure for evidence.  There's a separate course that deals

18   with the seizure of a person.

19   Q.  Okay.  Thank you very much, sir.

20        Is this something that every MCSO deputy has been    15:22:33

21   trained on?

22   A.  Yes.

23   Q.  Now, does an MCSO deputy -- I go through there, I take my

24   18 hours, I do this, how does Arizona POST know whether I've

25   learned what I've been taught?    15:22:51

1    A.  Well, again it goes back to -- they've got to demonstrate

2    the -- that they can meet the performance objectives.  And

3    that's probably, in training programs that I've helped evaluate

4    in other areas, is the lack of performance objectives.  What is

5    it you want the student to be able to demonstrate or do at the        15:23:08

6    end of the training?  They've gotta meet those performance

7    objectives.

8    Q.  And how's that --

9    A.  And that's through a -- through either demonstration or

10   examination.                                                          15:23:19

11   Q.  All right.  Thank you, sir.

12            I'd like for you to pull out from your stack there a

13   document, Exhibit 1210 that is not in evidence, and let me know

14   when you find that.

15   A.  I have it.                                                        15:23:39

16   Q.  All right.  Why don't you take a look at it, please.

17   A.  Yes.

18   Q.  Can you tell me, what is Exhibit 1210?

19   A.  It's a lesson plan for cultural awareness.

20   Q.  And it's a lesson plan by whom or who?                           15:23:56

21   A.  It -- it's an Arizona Peace Officer Standards and Training

22   Board, the Arizona POST lesson plan.

23   Q.  Are you generally aware about that, or of that cultural

24   awareness training section at Arizona POST?

25   A.  Yes.                                                             15:24:11

1   Q.  And why is it important that law -- well, first of all,

2   sir, have you seen that document before?

3   A.  Again, my -- the only qualification I'd have is that I'm

4   certainly aware the -- that the course exists.  As to whether

5   or not this is a specific lesson plan I've seen, I couldn't sit          15:24:31

6   here and tell you.

7   Q.  All right.

8   A.  It looks like it's -- it is.

9   Q.  All right.  Is that the type of document that you, as an

10  expert in law enforcement, reasonably rely upon in forming your          15:24:45

11  opinions as to training of MCSO deputies in this case?

12  A.  Yes.

13          MR. CASEY:  Okay.  Your Honor, I would move for

14  admission of Exhibit 1210.

15          MR. POCHODA:  We object, Your Honor, on various                   15:24:59

16  grounds.  It was not mentioned as one of the documents that he

17  based any of his opinions on.  And also, hearsay, relevance,

18  and foundation.

19          THE COURT:  You're going to have to lay more

20  foundation if you want it in over some of exceptions for                  15:25:20

21  hearsay and some other things.

22          MR. CASEY:  That's fine, Your Honor.  I'm going to

23  withdraw my motion to admit this.

24  BY MR. CASEY:

25  Q.  Is every single deputy that -- MCSO deputy, does he or she           15:25:30

```
 1   have to go through that cultural awareness training at Arizona

 2   POST?

 3   A.  Yes.

 4          MR. POCHODA:  Objection, Your Honor.  No foundation;

 5   not part of his report.                                         15:25:42

 6          THE COURT:  Has there been more than one report

 7   admitted for Mr. Click?

 8          MR. CASEY:  Just one report.

 9          THE COURT:  Is there anywhere in his report where he

10   talks about this being a basis for his opinion?                 15:26:01

11          MR. CASEY:  It's all the Arizona -- everything that is

12   under attachment number 1 is a basis for his opinion.  He

13   discussed his training -- excuse me, his opinion on the

14   training.  That included the -- included Arizona POST, included

15   CLE, or continuing law enforcement education --                 15:26:16

16          THE COURT:  All right.

17          MR. CASEY:  -- in the field.

18          THE COURT:  All right.  If you lay foundation for his

19   knowledge as to whether or not, I'll allow the question.

20          MR. CASEY:  Thank you, Your Honor.                       15:26:27

21   BY MR. CASEY:

22   Q.  Sir, is this part of the Arizona POST requirement for a

23   peace officer to become certified and serve as a peace

24   officer in the state of Arizona?

25   A.  Yes.                                                        15:26:36
```

```
 1   Q.  Can Tim Casey go to the academy and fail this section and
 2   still go out and become a sworn peace officer?
 3   A.  No.
 4         MR. CASEY:  Your Honor, with that foundation, I
 5   believe that -- well, excuse me.  Let me ask the question.      15:26:50
 6   BY MR. CASEY:
 7   Q.  Sir, is every MCSO deputy that is certified by Arizona
 8   POST, has he or she undergone this cultural awareness training?
 9         MR. POCHODA:  Objection, Your Honor, hearsay, and no
10   facts in front of this witness as to whether any of the         15:27:09
11   Arizona --
12         THE COURT:  Overruled.
13         MR. POCHODA:  -- deputies went through this course.
14         THE COURT:  Overruled.
15         THE WITNESS:  Again, I would sit here and I was just      15:27:17
16   looking at the dates.  Certainly this is dated August 1995.  I
17   believe this lesson plan, or its predecessor, was probably
18   created in the late '70s or '80s, and certainly everyone has
19   gone through the cultural awareness training.
20         This particular lesson plan, certainly all the           15:27:36
21   deputies since August of 1995 would have -- would have
22   completed this specific course under this lesson plan.
23   BY MR. CASEY:
24   Q.  So even old-timers such as Chief Brian Sands may have even
25   undergone this?                                                 15:27:48
```

1   A.   If he came on -- I'm not sure when Chief Sands came on, but

2   if he came on anywhere after the mid-'70s, yes, he would have

3   had a course on cultural awareness.

4   Q.   Why, in your judgment, is it important that law enforcement

5   undergo this type of cultural awareness training?                    15:28:04

6   A.   It's because we've got a society that's made up of many,

7   many cultures, and it's one of our strengths, but it's also one

8   of our challenges.  And there's probably no other government

9   agency or official that is going to have more contact with the

10  various subcommunities out there, the minority communities, the      15:28:24

11  cultures, and it's extremely important that an

12  officer understand cultural differences and develop some

13  sensitivity to those differences.

14        It's important to -- we've talked about community

15  relations earlier.  It's important from a community relations        15:28:42

16  standpoint that you need a good relationship with this --

17  whoever -- whatever of the group is, if you're going to do any

18  problem solving, if you're going to try to get their assistance

19  in terms of making your community safer.  So it's an extremely

20  important course just by the very nature of our country.             15:29:01

21  Q.   During the course of your evaluation of the MCSO deputies

22  in this case on the three different traffic stops involving the

23  five plaintiffs, did you find any evidence that would indicate

24  to you that there was any type of cultural insensitivity or a

25  lack of cultural awareness?                                          15:29:30

1665

```
 1   A.  No.
 2   Q.  All right.  We just -- we just talked about, Mr. Click,
 3   your opinions about the training of MCSO patrol deputies and
 4   the training they had to get at Arizona POST.  You mentioned
 5   field training.  And what I understand is once you graduate          15:29:48
 6   from the academy, before you're sent loose, MCSO has a
 7   multiple-week mentoring program, is that correct?
 8   A.  Correct.
 9   Q.  Describe for us -- I know you mentioned already, and with
10   the Court's indulgence, what is the length of time of that           15:30:05
11   field training, and what does it entail, to your knowledge?
12            MR. POCHODA:  Objection, Your Honor.  I don't see that
13   anywhere in his report.
14            THE COURT:  Overruled.
15            THE WITNESS:  The field training program, which most        15:30:15
16   agencies have a field training program, there are
17   specially-trained deputies that serve in a training capacity
18   for new deputies.  In most agencies they're even given extra
19   pay during that time that they're training a new deputy.  And
20   I'm -- I'm not sure that's the case with the Sheriff's Office        15:30:33
21   or not, but in many agencies it is, because it's so important.
22            During that period of time, as I stated earlier,
23   generally, they're teaching the new officer how to apply the
24   knowledge that they gained in the academy to practical
25   situations on the street during that time.  It's a formal           15:30:52
```

1    process.  There's a sign-off sheet every day.  There's a weekly

2    evaluation by supervisors, and people can flunk the field

3    training program, and they do, periodically.

4         But it focuses -- one of the things it puts primary

5    focus on is policies and procedures.  And there's a sign-off

6    sheet as an officer displays knowledge and competence in

7    applying a particular policy or procedure.  As a result of

8    that, the training officer looks for training opportunities,

9    may even go into adjacent beat areas when they hear a call

10   that -- that their trainee has not handled before.  But it --

11   it attempts to familiarize the -- the new deputy with policies,

12   procedures, practices.

13        It's generally divided into three phases, rides with

14   one deputy for four or five weeks, rides with a second deputy

15   for four or five weeks, rides with a third deputy for four or

16   five weeks, and then the final week is either with the trainee

17   deputy in plainclothes letting the new deputy handle

18   everything, or the new deputy working by themselves with a

19   training deputy in another car working an adjacent beat that

20   can respond if the new deputy has any questions.

21        But it's a very formal program reviewed weekly by

22   supervisors, reviewed daily by the training officer and the --

23   and the new deputy.

24   BY MR. CASEY:

25   Q.  So this is anywhere from, do I understand correctly,

15:31:14

15:31:36

15:31:57

15:32:24

15:32:34

1    between 13 and 16 weeks of that field training?

2    A.  I think the Sheriff's Office is 15 weeks of actual training

3    with the training officer, and then a 16th week that's more of

4    an observation week where the individual's being observed that

5    16th week.                                                    15:32:53

6    Q.  All right.  A little bit of a different subject.  You

7    mentioned to the judge, to the Court earlier when I was showing

8    you the Arizona POST lesson plan about search and seizures, and

9    you mentioned that one of the most important jobs -- and I'm

10   paraphrasing you, Mr. Click -- of police is the protection of   15:33:09

11   the rights of people.

12            Did I understand that, at least that idea?

13   A.  Yes.

14   Q.  Have you looked at the MCSO code of conduct?

15   A.  I have.                                                   15:33:21

16   Q.  And what is significant to you about the MCSO code of

17   conduct relative to what you said was the most important thing

18   police can do?

19   A.  It requires that -- that deputies protect people's

20   constitutional rights.                                        15:33:38

21   Q.  Are you talking about just citizens?

22   A.  No, I'm talking about all people.

23   Q.  All people, whether they're in the country legally or

24   illegally.

25   A.  Correct.  It doesn't say "citizen."  I think it says:  You  15:33:49

1  will protect all people's rights.

2  Q.  Is there an oath of office that law enforcement officers

3  take in the state of Arizona?

4  A.  It's required by Arizona POST.

5  Q.  And is every MCSO officer, before he goes out, or she goes    15:34:07

6  out, into the public, required to swear that oath?

7  A.  They are.

8  Q.  What is the oath of office?

9  A.  Basically, that you will uphold the Constitution of the

10  United States and the Constitution of the State of Arizona;    15:34:24

11  that you will abide by all federal and state law.

12  Q.  Now, let's turn to the other subject that you mentioned,

13  and that is continuing education.  The Court and the counsel

14  here in our respective states have something called continuing

15  legal education.  We have to get certain credit hours per year.    15:34:45

16          Are you telling me that there is an equivalent of

17  something like that for sworn peace officers?

18  A.  There is.

19  Q.  Explain what's required, per year or per cycle.

20  A.  Arizona POST requires that -- and if you -- if you don't    15:35:01

21  meet these requirements you lose your certification so you're

22  no longer -- you no longer have peace officer authority --

23  that -- it requires that you have a minimum of eight hours of

24  continuing education each year.  And they designate proficiency

25  training differently, that you will have a minimum of eight    15:35:24

1   hours of proficiency training every three years.

2   Q.  Help me understand.  I think I can -- I think I know, but

3   what is the difference between the continuing education per

4   year and the three years of having a minimum proficiency

5   training?

6   A.  Let me explain, I think maybe to clarify it.  Proficiency

7   training is showing proficiency in using a baton, as an

8   example, or using your Taser, for example.  And this is

9   separate from your firearm.  There's a separate requirement

10  that you qualify with your firearm every year, and that's not

11  part of those years.  It could be proficiency in operating your

12  vehicle under emergency conditions on a track.

13      The continuing training is more classroom oriented,

14  update on new statutes, new law, some change in policy.  It --

15  it can be a variety of things.

16      Sometimes the continuing training is -- is mandated.

17  There will be an issue that is so important that POST will

18  mandate a certain number of hours of continuing training to be

19  on a particular topic.  One of them years ago that I can recall

20  is domestic violence that was required that you -- that as part

21  of the continuing training, that each agency would give a

22  certain number of hours of training in the area of domestic

23  violence.  I use that as an example.

24      I think there was a few years ago one on bias

25  policing.

15:35:42

15:36:03

15:36:23

15:36:40

15:36:57

1670

```
1   Q.  What's bias policing?

2   A.  You know, it's another name for -- for racial profiling.

3   If you -- and it's a broader term, because I think racial

4   profiling, it has to do with race, by its very definition.

5        Bias is are you showing a bias toward other groups,        15:37:14

6   and it includes race or ethnicity or color, but would it

7   include your homosexual community, as an example, or things of

8   that nature that -- that -- you know, that we do not do bias

9   policing.  I mean, that's the gist of the -- of the training.

10  And I think Governor Napolitano was behind that push at the     15:37:35

11  time that that training be provided.

12  Q.  Do you have any knowledge, based on the timing of that and

13  when Janet Napolitano was governor of our state, as to when it

14  would have been offered at the academy, or at part of the

15  continuing education?                                           15:37:57

16  A.  Yeah.  The continuing education, I think the Sheriff's

17  Office does do that primarily at their academy, although with

18  all the technology today some of that training could be done

19  online.  But --

20           THE COURT:  Well, I'm going to stop you.               15:38:07

21           Do you have any knowledge that the sheriff did this or

22  not?

23           THE WITNESS:  No, I don't, Your Honor.

24           THE COURT:  All right.  Then I think we can move on.

25           MR. CASEY:  Yes, sir.                                  15:38:15
```

1   BY MR. CASEY:

2   Q.  Is it correct that each year eight hours of continuing

3   education must be obtained?

4   A.  Correct.

5   Q.  All right.  What's the penalty for not complying with that          15:38:24

6   education?

7   A.  You lose your certification.  You're no long -- you no

8   longer have police powers.

9   Q.  All right.  Now, let me turn to an additional subject.

10          Are you aware of in this case that at some time in          15:38:35

11  2009 the federal government revoked what's called 287(g)

12  authority?

13  A.  Yes, I am.

14  Q.  Are you aware generally of what -- or specifically of what

15  training was provided to the MCSO deputies after that          15:38:51

16  revocation was made?

17  A.  Well, as I understood from the materials, it would change

18  the procedure.  They no longer had their own deputies that had

19  287(g) authority, so they had to do some training in terms of a

20  new policy that would define if -- if a deputy did have          15:39:11

21  reasonable suspicion to believe that a person was here

22  unlawfully, that they would call for an ICE officer, who -- who

23  does have the authority to enforce immigration law.

24  Q.  You read Joe Sousa's, Lieutenant Joe Sousa's testimony at

25  trial in this case?          15:39:35

1    A.  I did.

2    Q.  And did you see where he talked about that there was online

3    training that was mandatory for all patrol deputies at

4    sergeant and below after the revocation?

5    A.  Correct.                                                    15:39:45

6    Q.  And did you see that Joe Sousa testified that although he

7    was not required as a lieutenant to take it, he took it?

8    A.  Yes.

9    Q.  First of all, as to the mandatory nature of that training,

10   given the 287(g) revocation, do you believe that is a          15:39:56

11   reasonable, appropriate practice to implement?

12   A.  Sure.  I mean, you have -- you had a policy in place that

13   is no longer valid, because the 287(g) authority had been

14   revoked.  So clearly you had to change policy, and with that

15   you had to make sure that you took reasonable steps to make    15:40:19

16   sure the deputies understood that and what the new policy was.

17   Q.  Do you have any observation, comment, or opinion about what

18   it means, if anything, about Lieutenant Sousa not having to do

19   it as a requirement, but doing it because he's the head of HSU?

20   A.  Yeah.  I think because of his position, I think that's     15:40:37

21   commendable.  He didn't have to do it, but I think it's

22   commendable, he -- for him to sit in on it.  But it may apply

23   to his -- it didn't apply to his position so much perhaps

24   personally, but it certainly applied to his -- his function.

25   Q.  All right.  One final area, and that is, you've read the   15:40:52

1    materials, the witness depositions about 287(g) training.

2           Generally, do you have an understanding of the length

3    of that training, and generally what was taught?

4    A.  Yeah.  The training was five or six weeks long, and it, I

5    think, covered, as I understood it, covered the gamut of          15:41:19

6    immigration law, the authority that was necessary to enforce

7    immigration law, and the -- and emphasizing what authority that

8    287(g) gave to deputies.

9    Q.  Do you know how many MCSO deputies underwent such ICE

10   training before the revocation?                                  15:41:42

11          MR. POCHODA:  Objection, Your Honor.  This witness has

12   already testified that he doesn't have information about

13   287(g), nor about the content of the training.

14          THE COURT:  You know, Mr. Pochoda, I want one- or

15   two-word objections.  Okay?                                      15:41:55

16          MR. POCHODA:  Okay.

17          THE COURT:  So if you had to distill that into one or

18   two words, what would --

19          MR. POCHODA:  Foundation and hearsay, Your Honor.

20          THE COURT:  Do you want to lay foundation?                15:42:03

21          MR. CASEY:  I asked him if he knew.

22          THE COURT:  Is that what the question was?

23          MR. CASEY:  Yes, sir, Your Honor, I asked him if he

24   knew.

25          THE COURT:  Overruled.                                    15:42:28

1    BY MR. CASEY:

2    Q.  Let me repeat the question for you, Mr. Click.  Do you know

3    how many MCSO deputies underwent ICE training before the

4    federal government revoked 287(g) authority?

5    A.  The only specific number that I was made aware of was          15:42:40

6    Mr. Pochoda made me aware that 160.

7    Q.  All right.  Plaintiffs' counsel told you that?

8    A.  Correct.

9    Q.  All right.  Now, let me ask you, assuming that that

10   representation by Mr. Pochoda was accurate, does the fact that    15:42:59

11   100 or 160 deputies received such training indicate anything to

12   you about MCSO?

13   A.  It's a major commitment to take that large a number of

14   people and put them through five or six weeks of training.

15   It's a major commitment to the agency.  That's a -- that in       15:43:24

16   itself is a tough decision to make, and yet the Sheriff's

17   Office made that decision because -- and I'm assuming here --

18   that they wanted to make sure their deputies were well informed

19   as to what their authority was under 287(g).

20   Q.  Do you have any opinion as to whether or not that desire to    15:43:46

21   make sure they were well informed dovetails to the oath of

22   office and the MCSO code of conduct about protecting people's

23   rights?

24   A.  Yes, a portion of that training, all the officers' or the

25   deputies' depositions that I read indicated that the training     15:44:05

1675

1   covered the whole -- I think that racial profiling would not be

2   tolerated, was not allowed.  That to stop an individual had to

3   be strictly for criminal activity, not on the basis of race,

4   color, national origin.

5   Q.  All right.                                                    15:44:29

6           MR. POCHODA:  Objection, Your Honor, and ask that that

7   be stricken.  Foundation as to the content of the course.

8           THE COURT:  Remember what I told you about one or two

9   words, Mr. Pochoda?

10          MR. POCHODA:  Apologize.                                  15:44:38

11          THE COURT:  You want to give me one or two words?

12          MR. POCHODA:  Foundation.

13          THE COURT:  You know, I'm going to sustain that

14  objection.

15  BY MR. CASEY:                                                     15:44:54

16  Q.  Do you have an opinion, sir --

17          THE COURT:  You've asked him if he has an opinion.

18  That is exactly what you asked him.

19          MR. CASEY:  That is what I asked.  Thank you, Your

20  Honor.                                                            15:45:03

21          THE COURT:  That is what you asked him.

22          MR. CASEY:  Yes, Your Honor.

23          THE COURT:  That he has an opinion doesn't mean that

24  there's foundation for this opinion.

25          MR. CASEY:  I understand that.                            15:45:09

```
 1          THE COURT:  Okay.  So if you want me to hear his
 2    opinion, I want some foundation for the opinion.
 3    BY MR. CASEY:
 4    Q.  Would you explain for me what basis you have for that
 5    opinion that you've expressed, and that is that there is a          15:45:22
 6    relationship between the commitment to go to ICE training and
 7    compliance with the code of conduct.
 8    A.  I would base my opinion on the -- the officers'
 9    deposition -- depositions and -- or the deputies' depositions,
10    and I think comments, and I can't recall, I keep them            15:45:46
11    separated, the individuals that were in charge of the ICE
12    office here that also over -- basically gave a brief overview
13    of what -- of the specific function or the specific information
14    that was in that training that had to do with the prohibition
15    on racial profiling.                                            15:46:09
16    Q.  Thank you, sir.
17          I'd like to turn to a different subject, Your Honor,
18    and that is the MCSO policies and procedures.
19          Mr. Click, have you formed any opinions on the quality
20    of the MCSO's written policies and procedures?                  15:46:22
21    A.  Yes.  I -- again, in this case I -- I reviewed probably
22    eight or ten policies.
23          The policies that I reviewed certainly are -- are
24    reflective of best practices and standards that you would
25    expect on a national basis.                                     15:46:47
```

```
 1          In previous cases I've also been able to review the

 2   MCSO's -- various MCSO's policies in the area of the use of

 3   force and arrest, and I also found them to be -- to meet

 4   national best practices and standards.

 5   Q.  All right.  I have pulled up from Exhibit 1070,          15:47:08

 6   specifically page 37 of your report, and I've done a call-out

 7   under your section entitled MCSO policies and procedures.

 8          Do you see that, sir?

 9   A.  Yes, I do.

10   Q.  And does that summarize your opinions?                   15:47:25

11   A.  Yes, it does.

12   Q.  Does MCSO policy CP-2, code of conduct, do you believe that

13   that is a reasonable standard that meets and complies with the

14   national standards you've discussed?

15   A.  I do.  I don't think there's anything more important in the  15:47:42

16   code of conduct than the requirement that an individual, that a

17   deputy, would comply with the Constitution.

18   Q.  Does MCSO policy GJ-3 on search and seizure, is that, in

19   your opinion, a reasonable and appropriate policy and procedure

20   for the MCSO to have?                                        15:48:03

21   A.  Yes, and it relates directly to the Fourth Amendment of the

22   Constitution.

23   Q.  Does that meet or exceed the national standard, sir?

24   A.  It certainly meets it.

25   Q.  And, sir, just for the record, I'm putting in there that  15:48:15
```

1  the search and seizure policy is specifically Exhibit 1116

2  admitted into evidence.

3         Now let me go to the next point on your report, and

4  that's MCSO policy EB-1, traffic law enforcement guidelines.

5         Is that, in your opinion, a reasonable and appropriate          15:48:35

6  standard for the MCSO to have in its office?

7  A.  Yes.

8  Q.  Does that meet or exceed the national standard, sir?

9  A.  I think it meets it.

10 Q.  All right.  And for that particular traffic law enforcement        15:48:47

11 guidelines, for the Court's reference, is Exhibit 114, already

12 in evidence.

13        Now, the next thing I'd like to turn to is MCSO policy

14 EB-2, traffic violator contact.  Do you have an opinion of

15 whether or not that is a reasonable and appropriate policy and          15:49:07

16 procedure for the MCSO to have?

17 A.  It is.  It, again, requires that deputies comply with

18 federal and state law.

19 Q.  Does that meet or exceed the national standards in your

20 field?                                                                  15:49:20

21 A.  It meets them.

22 Q.  Okay.  And for the record, that traffic violator contacts,

23 for citation issuance, is Exhibit 1115 in evidence.

24        Also let's turn to MCSO policy echo alpha 11, arrest

25 procedures.                                                             15:49:41

1        Is that a reasonable and appropriate policy and

2   procedure for the MCSO to have?

3   A.  Yes.

4   Q.  Does that meet or exceed national standards?

5   A.  It requires deputies to protect the rights of all          15:49:53

6   prisoners, and it meets the national standard.

7   Q.  Is there, in your judgment, a recurring or dominant theme

8   in all the MCSO policies that you've reviewed in this case?

9   A.  Yes.

10  Q.  And what is that recurring theme?                            15:50:10

11  A.  That officers will protect people's constitutional rights.

12  Q.  Now, the plaintiffs in this case, I want you to assume,

13  have suggested or criticized that there's a deficiency in the

14  MCSO policies and procedures by not having a separate

15  stand-alone policy about racial profiling defining it and       15:50:33

16  giving examples.

17        Are you generally aware of that type of criticism?

18  A.  Yes.

19  Q.  What is your opinion about that criticism?

20  A.  I think the MCSO meets the standard.  I recognize that many  15:50:45

21  agencies have, as I stated earlier, many of them today do not

22  limit it to racial profiling, they have policies specifically

23  on bias policing.  But it really is a stand-alone policy that

24  that basically does the, I think as you pointed out, that the

25  recurring theme in MCSO's policy is that you will protect        15:51:09

 1    people's constitutional rights.

 2    Q.  Let's turn to a different subject now.

 3              THE COURT:  You know what, Mr. Casey?

 4              MR. CASEY:  Yes, sir.

 5              THE COURT:  We took a break earlier in the afternoon     15:51:25

 6    so you could fix your thing.

 7              MR. CASEY:  Yes.

 8              THE COURT:  I think everybody needs five or ten

 9    minutes, so I'm going to take 10 minutes.  We'll resume at

10    4 o'clock for the rest of the day.                                15:51:34

11              MR. CASEY:  Thank you, Your Honor.

12              (Recess taken.)

13              THE COURT:  Please be seated.

14              Please continue, Mr. Casey.

15              MR. CASEY:  Thank you.  Your Honor, I have just a        16:01:36

16    few -- three more categories that are shorter than last, so we

17    should finish up here shortly.

18    BY MR. CASEY:

19    Q.  Mr. Click, I'd like to turn to another and a different

20    matter, and that's the MCSO saturation patrol briefings and      16:01:52

21    operations plans.

22              First of all, you've read the deposition testimony of

23    the MCSO deputies that was taken in this case?

24    A.  I have.

25    Q.  Have you read their trial testimony?                         16:02:04

1  A.  Yes.

2  Q.  Do you have any opinions on whether the MCSO deputies that

3  were to participate in MCSO saturation patrols were reasonably

4  briefed before those patrols began?

5  A.  Yes.                                                        16:02:18

6  Q.  And what is that opinion?

7  A.  They were reasonably briefed.  They -- they understood

8  their purpose and their function during that patrol.

9  Q.  Now, there is some criticism in this case that they did not

10  know specific crime data or statistics of why they were going   16:02:30

11  to a location.  Is that at all important in your evaluation?

12  A.  You know, I think each one you have to look, I think

13  certainly you need to -- there has to be a basis for addressing

14  some type of criminal activity, but -- and it can be a variety

15  of things.  It can be surveillance; it can be intelligence from  16:02:56

16  talking to people; it can be statistical review, crime

17  analysis; it can be a combination of citizen complaints of

18  certain types of criminal activity.

19         So each one, I did not find any that I felt were

20  inappropriate.  It was perhaps clearer on some than others as   16:03:20

21  to what the criminal activity was.

22  Q.  Now, there is testimony in this case that before patrols,

23  when they were large-scale saturation patrols, that being

24  involving units other than HSU, there were operations plans

25  that made available, and there was oral instruction.            16:03:42

1       Can you tell the Court what opinions you have about

2  the efficacy of the instructions given to people participating?

3  A.  Yeah.  What I reviewed, yes, it was -- it was adequate in

4  terms of what their function was and what was expected of them

5  during the -- the saturation patrol.                        16:04:09

6  Q.  Okay.  Specifically what I'm going to do is I'm going to

7  pull up Exhibit 91, which is in evidence, and this is for a

8  Mesa saturation patrol document.

9       Do you see that on your screen?

10 A.  I do.                                                    16:04:25

11 Q.  And I'm just going to flip through this quickly and go to

12 page 5 of this.  I'm going to do a call-out, if I could,

13 Mr. Click, and highlight something here for you.

14      Have you formed any opinion as to whether the call-out

15 language in this saturation patrol plan is reasonable and      16:04:53

16 appropriate?

17 A.  Yes, I think it's reasonable and appropriate.

18 Q.  Why?

19 A.  I think it's a reminder that -- that you're going to

20 conduct all these stops in conformance with MCSO policies and  16:05:13

21 procedures, which we've touched on, and that again -- and I say

22 "reminder."  I -- I would be surprised anywhere in the United

23 States that you could find an officer today that didn't

24 understand that racial profiling was inappropriate and

25 unlawful.  But it's a reminder that they will not use race as   16:05:36

 1    the basis of stop -- for stopping somebody.

 2    Q.  Have you reviewed the saturation patrol plans that were

 3    prepared by the MCSO and produced in this case?

 4    A.  Yes, I think I reviewed 51 plans, as I recall.

 5    Q.  Okay.  And do you have an opinion whether the MCSO's          16:05:53

 6    saturation plans were reasonable and appropriate and met the

 7    standard of care in the law enforcement community?

 8    A.  Yeah.  When I say I reviewed 51, some of those were -- I'm

 9    not sure I would categorize them as saturation patrol.  They

10    were small operations that involved the Human Smuggling Unit,    16:06:11

11    maybe six officers, I think, six or seven in some of those.  I

12    think there were 18 of those that were large scale involving

13    numerous deputies, numerous personnel.

14          But, yes, I -- I did review those plans, and I think

15    based on the size, whether it was an HSU operation, which were   16:06:34

16    the same people each time, in some of those I don't think I saw

17    the admonition that -- that racial profiling would not occur,

18    that you would not stop a person on the basis of their race.

19    But again, you're dealing with people that had been through the

20    487(g) [sic] training, their academy training, and they had     16:06:56

21    done this before.

22          The large-scale operations, I don't recall that I saw

23    any of those that -- that did not have this admonition in it.

24    Q.  Why, in your judgment, is it important to give an oral

25    admonition about racial profiling if you have already in        16:07:14

1   writing language like we see in the call-out in Exhibit 91,

2   page 5?

3   A.  I think it's just a -- to -- a reminder to people that, you

4   know, be conscious of why -- be able to articulate why you stop

5   any particular vehicle, and that articulation cannot involve          16:07:38

6   race.

7   Q.  Let's turn to a different subject, and that's the

8   supervision during saturation patrols.

9        We touched on this briefly when you first got on the

10  stand, but during your law enforcement career, either as a            16:07:55

11  patrol deputy or officer or as command staff, were you involved

12  in crime suppression operations or saturation patrols like --

13  generally like what we had -- have had in Maricopa County?

14  A.  Yeah, I -- I've never been involved in one that -- that

15  was -- that dealt with immigration specifically, but I have no        16:08:19

16  way of knowing over 35 years, but my guess is that maybe a

17  hundred different saturation patrols, everything from drunk

18  drivers to high-accident locations to drug activity.

19       And some of these ran together.  You would have a

20  saturation patrol to address, perhaps, gang activity, but you         16:08:45

21  would -- as part of that you would -- you know, you had

22  statistical evidence of gunshots fired, you had evidence of

23  drug -- drug activity, and all of it kind of run together.  You

24  had gang activity, but -- but you've also found in that same

25  neighborhood, and perhaps the same individuals involved in            16:09:07

1    other kinds of criminal conduct.

2    Q.  Are crime suppression, or saturation patrols, whatever

3    label is affixed to that, is that a technique that is

4    recognized in the law enforcement community?

5    A.  It's used commonly.  Here in the valley I think every          16:09:24

6    holiday we see a saturation patrol for drunk drivers, is an

7    example.  But yes, it's a common tactic, particularly dealing

8    with neighborhoods that are beset with drugs, violence, gang

9    activity, things that are directly related to crime in that --

10   in that neighborhood.                                             16:09:47

11   Q.  Based on what you've read from this trial and the dozens of

12   depositions you have, do you have an opinion as to how long it

13   would take the MCSO to conduct what the Court has heard is a

14   large-scale saturation patrol; that is, a patrol that involves

15   more than HSU, several units, like K-9, TOU, Lake Patrol?        16:10:10

16         Do you know how long it would take to schedule, plan,

17   and prepare that?

18   A.  Yeah, I think it was -- I can use my own experience that

19   because you're pulling people in from other parts of the

20   agency, that -- and that takes some time to do that, depending   16:10:29

21   on the urgency of your saturation patrol, and usually they're

22   not urgent, but just the planning for that, and making sure

23   that you're not leaving yourself short in other areas or

24   creating other problems, would generally take at least -- at

25   least 30 days.                                                    16:10:48

1    I think Chief Sands or Lieutenant Sousa had indicated

2  in the SO 30 to 60 days to get that organized.  But it's really

3  because you're utilizing people that already have a full-time

4  job and you're pulling them in to -- to do the saturation

5  patrol for a day or two or whatever period of time that you're        16:11:05

6  going to do the saturation patrol.

7  Q.  Based on all the testimony you've reviewed and the

8  documents you've reviewed, have you formed an opinion as to the

9  quality or nature of the supervision of deputies during

10  saturation patrols?                                                    16:11:21

11  A.  Yes.  Well, what I -- again, from what I read, in terms of

12  the deputy -- from the deputies, their depositions, the

13  supervisors, the -- it was, I think, typical of a saturation

14  patrol.  You've got a -- you've generally got a command post

15  that will have supervisors, and maybe a couple of levels of       16:11:41

16  supervision at the command post.  And generally you have

17  supervision that's either available from the command post to go

18  into the field if a -- a deputy has a question, or the

19  supervisor's already in the field, just following in with what

20  deputies are doing.                                                    16:12:01

21  Q.  Now, there were a number of questions that have come up

22  during this trial of witnesses saying, But you -- to, say, a

23  sergeant, for example:  But you weren't there during a stop.

24  How do you know?

25    Is it in law enforcement, whether it's a saturation        16:12:14

```
 1   patrol or patrol, is it common to have supervisory officers
 2   actually routinely participate in traffic stops?
 3   A.  Generally they're going to do that supervision through the
 4   command post.  And if the need arises -- and everybody's
 5   equipped with radios today, or computers -- if the need arises,     16:12:33
 6   you're going to go to the -- to the location if there's a
 7   question or something happens that a supervisor needs to be
 8   present.
 9          But the other part is -- and I didn't see any
10   testimony as to the people, the -- the Human Smuggling Unit          16:12:48
11   that worked both the large-scale and the small-scale
12   operations, they were all experienced and would not -- you
13   would not anticipate that a problem would arise with -- with
14   those individuals.
15          But the decision has to be made.  You put people out          16:13:07
16   there based on -- the level of supervision's going to depend on
17   the individuals' training, their experience, and their previous
18   performance, what your knowledge is of their previous
19   performance.
20          Generally when you select people for a detail like            16:13:23
21   this you're not going to select somebody that's had performance
22   problems.  You're going to select people that have demonstrated
23   that they have the knowledge and the skill to function
24   independently, to do the job independently, with the knowledge
25   that they can call for supervision or they can ask a supervisor     16:13:38
```

1    that's readily available.

2         Supervision's readily -- readily available either by

3    phone, by radio, or generally these are smaller geographic

4    location and can respond within a matter of a few minutes.

5    Q.  What is your opinion as to whether or not the quality of          16:13:53

6    supervision was reasonable and appropriate?

7    A.  I felt it was reasonable.  I did not see any instance in

8    which supervision or lack of supervision played a role.

9    Q.  I'm going to turn to a related subject, and I'm going to

10   pull up Exhibit 79, which is in evidence.  And this is from a          16:14:13

11   saturation patrol in March of 2008 near 32nd Street and Thomas.

12        And specifically, what I'm going to do is enlarge an

13   arrest list, to the extent I'm able to do that.

14        Are you able to see that on your screen?

15   A.  Yes.                                                               16:14:41

16   Q.  And I just want you to assume that there have been

17   questions asked about the Latino surnames on the left vertical

18   column.

19        Do you see that?

20   A.  I do.                                                              16:14:52

21   Q.  Okay.  And I just want you to assume there's been a series

22   of questions asked about whether or not it troubles HSU

23   sergeants that there is a vast majority, if not significant

24   majority, of Latino surnames on arrest lists.

25        Will you assume that for me?                                     16:15:09

1    A.   Yes.

2    Q.   Based on the data that's contained in the arrest lists

3    you've reviewed, the fact that there may be a dominance of

4    Latino surnames, does that cause you any concern whatsoever?

5    A.   Not -- not when you look at the entire document.          16:15:23

6    Q.   Why?

7    A.   I think if I was just looking at the surnames, yeah, it may

8    raise a question with me.  I look over at the charge and, like

9    some of these, warrant, 287(g), 287(g), failure to ID, criminal

10   speed, open container, these are all -- these are all offenses   16:15:43

11   that are -- are race neutral, I guess, is the best way to put

12   it.

13          So I -- you know, I don't think you can control, you

14   know -- they're race neutral.  I don't think you can control if

15   you stop someone and they have a failure to have a driver's      16:16:09

16   license or they've got a warrant, any of these, you're going to

17   arrest the person.

18   Q.   Let's turn to a different subject, sir, and that's the MCSO

19   criteria for selecting sites for saturation patrols.

20          First of all, based on everything you've reviewed, who    16:16:37

21   actually selects the sites?

22   A.   My understanding is that Chief Sands was the one that had

23   the responsibility.  I think Lieutenant Sousa assisted him with

24   that, but I think Chief Sands had the responsibility to select

25   sites.                                                           16:16:55

1  Q.  When you were -- and I realize that Chief Sands is under

2  the elected sheriff, but when you were the boss, the chief of

3  police of the City of Dallas, Texas, did you ever select a site

4  for saturation patrols or crime suppression operations?

5  A.  No.                                                              16:17:10

6  Q.  Who did that when you did have those?

7  A.  It would be done generally, and I'm not sure how the ranks,

8  about two rank levels below me at the deputy chief level is

9  where that would generally occur.

10  Q.  Do you have an opinion as to the reasonableness and          16:17:26

11  appropriateness of the MCSO's selection of sites to conduct

12  saturation patrols?

13  A.  No.

14  Q.  Based on the evidence that you have reviewed, do you have

15  any opinion as to whether or not there is any overriding basis   16:17:42

16  for the MCSO conducting a saturation patrol in a given area?

17  A.  Could you repeat that, Counsel?

18  Q.  Sure.  Is there an overriding theme that you have gleaned

19  from all the evidence as to why the MCSO conducts a saturation

20  patrol in area A or area B?                                      16:18:02

21  A.  I think all the testimony and evidence that I saw, they

22  were looking for criminal activity.

23  Q.  All right.  Now, let's turn to a different subject that

24  came up at the beginning of our trial, and that is letters that

25  come in to Sheriff Arpaio from citizens.                         16:18:18

1            When you were the Dallas police chief did you receive

2    letters from citizens?

3    A.  You receive lots of letters from citizens.

4    Q.  Okay.  What was your practice when you received letters

5    from citizens?                                                16:18:40

6    A.  I would -- first of all, I had an administrative assistant

7    that would pretty much screen the letters, and some of them

8    were obvious: they needed to go to narcotics or they needed to

9    go to wherever.

10            But he would make a decision as to the ones that he    16:18:53

11   felt I needed to review and make a decision at that point what

12   to do with that particular letter.  I mean, it wasn't a long

13   process.  You glance at the letter and somebody had a new

14   theory on who killed President Kennedy, it didn't take long to

15   figure out where I was going to send it.  I would send it to   16:19:12

16   the FBI.

17            But when you had letters that dealt with some type of

18   criminal activity, if it was a gang -- if it was a gang

19   complaint, it would go to our gang unit.  Narcotics would go to

20   the -- to the drug unit.  If it was a truancy issue, it would   16:19:32

21   go to our youth crimes unit.  There would be a whole variety of

22   issues.

23            At that point, it would depend.  I didn't have time to

24   assess them.  Whoever I sent them to would assess them and make

25   a determination as to what should happen, if anything.          16:19:51

1  Q.  All right.  Let me make sure I'm understanding.

2          If you got something in, you would -- if something

3  jumped out of the page dealing with gangs or narcotics, do I

4  understand it correctly you would send it to the appropriate

5  people in the Dallas PD?                                    16:20:11

6  A.  Yes.

7  Q.  Do I understand what you're telling me is that you did not

8  put any independent value assessment, law enforcement

9  assessment, on that letter as to its merits?

10  A.  No.                                                     16:20:21

11  Q.  Now, what happened if you got a letter from a citizen that

12  made it to your desk that had either racially insensitive

13  comments or were racially charged?  How would you handle a

14  letter like that?

15  A.  Well, again, Dallas had a lot of racial issues.  And I had  16:20:40

16  some specific individuals, including our police chief here in

17  Phoenix today, he worked for me there as a deputy chief --

18  Q.  Who's that?

19  A.  Danny Garcia.

20  Q.  Thank you, sir.                                         16:20:55

21  A.  And these were individuals that had -- I depended on them,

22  because they had close relationships with the various

23  communities, and I would depend on them to evaluate the letter.

24          Certainly, I think there was an overriding

25  understanding that you're not going to allow the agency, your  16:21:12

1   police department or your sheriff's office to be used by some

2   individual who has their own particular agenda.

3          Some of the letters were very offensive in the manner

4   in which they -- the language that was used and what they were

5   suggesting that we needed to do as a police department.  I          16:21:31

6   think all police agencies have those types of letters.

7          As a general rule we would try to at least acknowledge

8   each letter, I think as just part of good management and

9   community policing.

10  Q.  What do you mean, acknowledge?          16:21:47

11  A.  Send them a -- just a short letter back.  It was

12  boilerplate:  Thank you.  I appreciate, you know, your support

13  for our department kind of a thing.

14  Q.  Well, wait a second.  Did that mean that you were agreeing

15  with the contents of that letter?          16:22:05

16  A.  No.  I think in most cases, and I'm talking about all the

17  letters now, not just the ones that were perhaps offensive in

18  terms of racially charged language, I'm talking about all of

19  them, I made no assessment.

20         But if somebody took the time to write a letter to the    16:22:22

21  police chief, I felt, and I think most chiefs feel, that in

22  most instances you're going to respond to those at least

23  acknowledging they received a letter.

24  Q.  Were you elected?

25  A.  No.          16:22:38

1   Q.  You were appointed?

2   A.  Yes.

3   Q.  At the pleasure of the council in Dallas?

4   A.  City manager, but yes, in effect the council.

5   Q.  Was there ever a time during your career as the city police    16:22:47

6   chief of Dallas that you received some offensive letter and

7   that you wrote back to the person correcting them on either

8   their offensiveness, their stupidity, or their racism?

9   A.  I can't recall that I did that, but I may well have had --

10  we had a unit in the department that dealt with racial issues,    16:23:12

11  and may well have had them either handle it personally with

12  personal contact, and with the understanding, again, that, you

13  know, we're not going to -- to support some individual out

14  there that is spouting some type of racial language, we're not

15  going to do that.    16:23:34

16  Q.  A related subject:  Would you regularly keep, you and your

17  department, keep letters that you received?

18  A.  Yes.

19  Q.  Why?

20  A.  One of the reasons is just intelligence.  You get some    16:23:42

21  chronic letter-writers.  You get people that have mental

22  issues, and you keep those letters.  And in some cases you

23  haven't responded back because it's nonsensical, or it's

24  perhaps just so offensive that it may be so offensive you're

25  not going to respond back.  But you would keep those letters    16:24:03

```
 1    just for future -- any possible future use that they might

 2    have.

 3              I'm just trying to think of an example.  The Secret

 4    Service interacts with police agencies all across the United

 5    States, and one of the things they're interested in are          16:24:22

 6    letter-writers that have certain language in their -- in their

 7    letters that might be threatening to the President or

 8    threatening the government or threatening things of that

 9    nature.

10              But there's other reasons you'd keep a letter, too,    16:24:35

11    perhaps, that an individual that is obvious -- or appears to --

12    to be obviously -- there's some racial hatred, what comes

13    through the letter is just racial hatred, that you would hang

14    onto that just in the event something would happen down the

15    line, it would become evidentiary, perhaps.                      16:24:55

16    Q.  In this case there has been criticism that Sheriff Arpaio

17    has received letters of various quality and nature and

18    forwarded them on to Chief Sands.

19              Have you seen that?

20    A.  I did.                                                       16:25:04

21    Q.  You read the testimony?

22    A.  Yes.

23    Q.  Do you have any criticism of Sheriff Arpaio forwarding on

24    letters to Chief Sands for whatever purpose Chief Sands will

25    attribute to them?                                               16:25:19
```

1    A.  No.  The sheriff, I think he's in the same position I was

2    in:  He doesn't have time to deal with them himself.  He needs

3    someone else to evaluate them and make some determination as to

4    what if any action needs to be taken based on that letter.

5    Q.  Final area.  There's been discussion about public comments    16:25:32

6    that Sheriff Arpaio has made and that it's trickling down into

7    the operations side and influencing that.

8          Based on all the testimony and the documents you've

9    read, do you have an opinion on whether or not public comments

10   made by Sheriff Arpaio, that you've been able to see any    16:25:51

11   demonstrable change or influence on operations by particular

12   deputies because of those comments?

13          MR. POCHODA:  Objection, foundation, Your Honor.

14          THE COURT:  Is there anything on the report on this?

15          MR. CASEY:  No.  I withdraw the question, Your Honor.    16:26:11

16          Those are all the questions I have for you, Mr. Click.

17   Thank you for your time and patience.

18          THE COURT:  Cross-examination?

19          MR. POCHODA:  Yes, Your Honor.

20                        CROSS-EXAMINATION    16:27:06

21   BY MR. POCHODA:

22   Q.  Good afternoon.

23   A.  Good afternoon.

24   Q.  Mr. Click, Mr. Casey asked you about whether you were an

25   elected official or not in Dallas, is that correct?    16:27:19

1   A.  Correct.

2   Q.  And you were not, is that right?

3   A.  I was not.

4   Q.  The sheriff here in Maricopa County is an elected official,

5   is that right?                                                    16:27:27

6   A.  Yes, sir.

7   Q.  And as an elected official, you agree that he must run his

8   organization in a manner that responds to his constituency,

9   isn't that right?

10  A.  I'm not sure I make that connection, because I -- I never    16:27:43

11  made that connection as I reviewed the -- the materials.  But I

12  think an elected official, if they want to remain an elected

13  official, has to make a decision as to how they're going to

14  respond to their constituency.

15  Q.  And as an elected official he has to be sensitive, and       16:28:04

16  indeed try to meet the needs and requests of his constituents,

17  is that -- isn't that correct?

18  A.  Well, I'm not a politician, I haven't been, but yes, I

19  think an elected official has -- has a responsibility to try to

20  meet the needs of their constituency.                            16:28:23

21  Q.  And if a constituent tells -- a group of constituents relay

22  to this elected official, to the sheriff, that a particular

23  matter is important, the sheriff has a responsibility to

24  consider that input, is that right?

25  A.  I think he has a responsibility to consider people's         16:28:41

1    concerns.  As to what he does about it, then I guess that --

2    that becomes another question.

3    Q.  Well, he would not last long as an elected official if he

4    did not generally meet the needs and concerns of his

5    constituents.  Is that fair to say?                          16:28:58

6    A.  Well, I think as long as he can get 51 percent of the vote

7    he's going to -- he's going to stay in office.

8            There may be, and I think we see this in -- in all

9    political offices, where very seldom would you find an elected

10   official would have a hundred percent approval.             16:29:17

11   Q.  No, I understand.  But an elected official as compared to

12   appointed official must be more sensitive to the needs of his

13   constituents and requests from constituents.  Is that fair to

14   say?

15   A.  I think directly that's the case, but I can tell you     16:29:31

16   that -- that as a police chief, even though you may be two

17   positions removed from the -- from the city council, if you're

18   not sensitive to the constituents' concerns, you probably

19   aren't going to be the chief very long.

20   Q.  You are aware, are you not, of the many statements made by 16:29:51

21   the sheriff, Mr. Arpaio, that the only votes that count are

22   those of his constituents; the only opinions that count to him

23   are those of his constituents, is that correct?

24   A.  Did you say votes, Counsel?

25   Q.  Opinions.  I take that back.  Opinions.  Those of his    16:30:10

1    constituents, is that correct?

2    A.  Well, he's going to -- he's going to consider.  I don't

3    think it would serve much purpose that he's going to consider

4    the opinions of somebody in some other state or some other

5    county.  He's the sheriff of Maricopa County, and -- and would          16:30:24

6    be, I think, sensitive -- maybe "sensitive's" not the right

7    word, but that he would know, at least be knowledgeable of the

8    concerns of his constituency here in Maricopa County.

9    Q.  Well, you're aware, for example, that the sheriff in

10   Maricopa County has received significant criticism, increasing          16:30:45

11   criticism from the media, from litigation, from public

12   officials, about the manner in which he runs his immigration

13   enforcement operations.  Is that fair to say?

14   A.  There has been certainly a lot of public criticism.

15   Q.  And you're aware that the sheriff's response to that is          16:30:59

16   that does not concern him, because he only cares about the

17   opinions of those who vote or do not vote for him.  Is that

18   fair to say?

19   A.  I'm not sure that I recall that statement that he made.

20   But again, as I said before, to be elected he has to get          16:31:15

21   51 percent of the vote, and if he gets 51 percent of the vote

22   he's -- he's elected again.

23        So I guess the concern, and to be knowledgeable about

24   the concerns of a constituency, yeah, it's -- if 49 percent of

25   the people disagree, yeah, I mean, that's significant.  But it          16:31:35

1    still does not relate to him not being elected to office.  He's

2    still elected to office.

3    Q.  You're aware that prior to 2006 the sheriff's department

4    here in Maricopa County had not made immigration enforcement a

5    priority, is that correct?                                    16:31:52

6    A.  Yeah, I'm not sure -- again, I'm not sure in the materials

7    it was clear to me.  I think in -- somewhere in that time

8    period certainly there was discussion about immigration issues,

9    and then the discussion proceeded to the 287(g) certification

10   training that went with that.  I'm not sure before that that I  16:32:15

11   really saw much material that addressed what was occurring

12   before that general time period.

13   Q.  But certainly you're aware that at the end of 2006,

14   beginning of 2007, the sheriff made several pronouncements that

15   illegal immigration enforcement is going to be a priority of    16:32:34

16   the MCSO, is that right?

17   A.  Yeah, I can't -- I don't recall the dates, but yes,

18   somewhere in that general time period that -- it's my

19   impression that he had indicated that that was going to become

20   an enforcement priority.                                        16:32:48

21   Q.  And he also indicated, if you know, that that was what his

22   constituents wanted him to do, is that correct?

23   A.  Again, I don't recall the specific -- any specific comment

24   that he made regards to that.  I'd just be making an

25   assumption.                                                     16:33:06

1    Q.  But in any event, as an elected official, you agree that

2    the sheriff had the discretion to make immigration enforcement

3    his main priority for the agency, is that right?

4    A.  Sure.

5    Q.  And he had the discretion to use saturation patrols to          16:33:15

6    implement that policy, correct?

7    A.  Yes.

8    Q.  And he had the discretion to set up a hotline to implement

9    the immigration enforcement priority, and to receive tips from

10   people in the community concerning, quote, illegal aliens?         16:33:29

11   A.  That's correct.

12   Q.  You have some concern, given your experience, that race

13   could be a factor for the persons that are calling in such

14   tips, is that right?

15   A.  I would -- I would use some caution about peoples' motives,    16:33:42

16   why someone would call in or write me a letter.

17   Q.  And the sheriff had the discretion on these saturation

18   patrols to adopt the tactic of pretextual traffic stops, even

19   though the concern in a particular area was not a traffic or

20   vehicle violation, is that correct?                                16:34:06

21   A.  Yes.  I think the county attorney had asked for a county

22   attorney's opinion and was told by the county attorney that --

23   that that was lawful.

24   Q.  And in none of the large saturation patrols that you

25   reviewed was the concern in an area having -- had anything to      16:34:21

1    do with traffic violations, per se, or high collisions, or even

2    DUIs.  Is that fair to say?

3    A.  I don't recall those specifically, no.

4    Q.  And the general information to officers and deputies on

5    these large saturation patrols was that this was an illegal                16:34:42

6    immigration enforcement effort, correct?

7    A.  Again, I think it was clearly the deputies understood that

8    that was an enforcement priority for the MCSO overall.  I

9    don't -- I don't recall, and I just don't remember, if during

10   the saturation patrols that there was -- during briefings,                 16:35:05

11   during the information given out to the deputies working it,

12   that the focus was going to be illegal immigration.

13   Q.  But they understood that, is that right?

14   A.  Well, I think if you read the newspaper, the sheriff had

15   made it clear that that was going to be an enforcement priority            16:35:19

16   for the -- for the Sheriff's Office.

17   Q.  But they understood that the goal of the specific large

18   saturation patrols was immigration enforcement, correct?

19   A.  No, I'm -- I don't think that's correct.  I think

20   Chief Sands had talked about some other factors that -- that he           16:35:35

21   considered in how they picked locations and what the criteria

22   was in picking those locations.

23        MR. POCHODA:  May I approach with the depositions,

24   Your Honor?

25        THE COURT:  You may.                                                  16:35:49

1   BY MR. POCHODA:

2   Q.  Mr. Click, you recall giving a deposition earlier in this

3   case, correct?

4   A.  I do.

5   Q.  And you were under oath at the time?                    16:36:11

6   A.  I was.

7   Q.  And would that have been on March 18th, 2011?

8   A.  Yeah, that's -- that's about right.  It's dated March 18,

9   2011.

10  Q.  If you could turn to page 295 of this deposition.        16:36:24

11  A.  Yes.

12  Q.  And starting with the line 13 on page 295, and towards the

13  end of that page, and then the beginning of 296, if you could

14  take a look at that.

15      The question is:  "But here, in any -- Correct me if     16:37:02

16  I'm wrong.  Did you see in any of the MCSO operational plans'

17  descriptions or mention of the particular underlying criminal

18  activity, other than illegal immigration, that they were

19  concerned about or descriptions of what they should be on the

20  lookout for?                                                 16:37:20

21      "ANSWER:  You know --"

22      This is line 21.

23      "-- I think there was maybe some that touched on

24  individuals in the roadway.  I've said that several times

25  today.  I'm not -- I couldn't identify it right sitting here  16:37:30

1   now where I saw that.  But I think the general information to

2   the officers or to the deputies was that this is a -- an

3   illegal immigration enforcement effort."

4            Do you see that?

5   A.  I do.

6   Q.  And that was accurate testimony at the time?

7   A.  Yes.  I'm trying to put it in the context in which I

8   answered that.  And I think --

9   Q.  You're talking about saturation patrols?

10  A.  Right.  But I'm thinking it's in the context at that

11  particular time, the -- the officers still had 287(g)

12  certification.

13  Q.  Okay.  There may be qualifiers on why you answered it that

14  way, but I'm not asking that at the moment.  I'm just saying

15  the question had to do with the MCSO operational plans for the

16  saturation patrols, correct?

17  A.  Correct.

18  Q.  And the answer was that the general information to the

19  officers or to the deputies was that this is an illegal

20  immigration enforcement effort, correct?

21  A.  That's what I said, yes.

22  Q.  Mr. Click, you are not aware of any specific saturation

23  patrols done by the MCSO prior to those that focused on this

24  immigration enforcement, were you?

25  A.  I did not, just in the -- no, in previous cases I've not

16:37:48

16:37:59

16:38:16

16:38:29

16:38:49

1   been aware of that.  I'm aware that on holidays they do

2   saturation patrols for drunk drivers, or people up at the lake.

3   But no, I have no personal knowledge, and there was certainly

4   nothing in the materials I reviewed that dealt with other

5   sat -- other saturation patrols that -- that were not provided          16:39:10

6   as part of the materials I reviewed.

7   Q.  So you don't know if prior to the first sat -- large

8   saturation patrol that had to do once the immigration

9   enforcement priority was adopted, whether there were any of

10  that size to target any other type of criminal activity, do             16:39:25

11  you?  In the MCSO.

12  A.  I just don't have enough information to respond to that.

13  Q.  Well, let me go more generally, then.

14          When you were chief in Dallas, at some times you would

15  in fact conduct large saturation patrols.  Is that fair to say?         16:39:42

16  A.  We would.

17  Q.  And historically those saturation patrols would target

18  specific criminal activity that you were concerned about, is

19  that right?

20  A.  It would target criminal activity.  As I stated earlier,            16:39:54

21  some of it may not have been as specific.  You target an area

22  where there's a lot of gang activity, but it's also drug

23  activity; people shooting their guns off; assaults; you know,

24  there was a combination of things.  But yes, it's -- it's

25  criminal activity.                                                      16:40:13

1    Q.  It might be more than one crime, is what you're saying.

2    A.  Correct.

3    Q.  But you had testified, I believe, that the saturation

4    patrols have targeted gangs, alcohol, DUI, and curfew

5    violations.  Is that your --                                    16:40:25

6    A.  It's probably not just limited to that.  I guess -- I think

7    we even did one on truancy one time.

8    Q.  But if you were, let's say, for example, concerned about a

9    gang problem, a concern for gang activity in an area, you would

10   site that patrol in an area where those gangs were believed to  16:40:46

11   hang out.  Is that fair to say?

12   A.  Could you, I guess, expand on that, Counsel?

13   Q.  If you were concerned about gang activity because of

14   reports you got, whether it's internally or externally, you

15   would try to site the patrol in the area where the gang         16:41:07

16   activity was alleged to be taking place.  Is that fair to say?

17   A.  Correct.

18   Q.  And then you would give instructions to those officers who

19   were going to be involved in that patrol, correct?

20   A.  Yes.                                                        16:41:19

21   Q.  And the instructions to the officers would be based on the

22   reason for that patrol.  Is that fair to say?

23   A.  The instruction in many, I won't say all, but I'm just

24   trying to think of any exceptions, is make as many contacts as

25   you can.  Be as visible as you can, and make as many contacts   16:41:36

1  as you can.  And of course, underlying that is that clearly

2  there -- they have to be lawful contacts.

3  Q.  If you could turn to page 292 of your deposition, please.

4  A.  Yes, sir.

5  Q.  Starting on line 2:                                    16:42:07

6       "QUESTION:  I'm talking about an affirmative

7  instruction when you have a saturation patrol that is set up

8  because of a serious reported gang problem.  What would, in

9  your experience, when you did that, be the instructions given

10  to the officers participating in terms of what to be looking   16:42:26

11  for on that patrol."

12       "ANSWER:  Well, I think the enforcement activity or

13  the enforcement priority.  Why are we doing this saturation

14  patrol?  If it's drunk drivers, I don't want somebody down

15  buying drugs at the park."                                  16:42:42

16       By the "somebody" you meant the officers, is that

17  correct?

18  A.  Correct.

19  Q.  So you wanted them to be focusing on the reason for the

20  patrol.  Is that fair to say?                              16:42:50

21  A.  Correct.

22  Q.  And then continuing on line 17, the question:

23       "So that the people involved in patrol would be told:

24  Our concern is gangs and they would be told if you knew the

25  M.O., or the description of gang members.  Is that fair to say?  16:43:06

1    "ANSWER:  Sure.  I use that as an example.  You might

2    have somebody from the gang unit come in and talk about the

3    local gangs, known gang members, who they are, where they live,

4    vehicles they drive."

5    Is that correct?                                          16:43:23

6    A.  Correct.

7    Q.  Because you want the patrol -- the patrol, to the extent

8    possible, to be focused on the underlying reason for the

9    patrol, is that correct?

10   A.  Yes.                                                   16:43:34

11   Q.  And then going on to page 293, starting on line 3:

12   "And, for example, just for a hypothetical, to get

13   your input.  If the reports are increased gang activity of a

14   very serious nature, in particular, a four- or five-block area,

15   the gang members are young males between 16 and 25, they're     16:43:56

16   Asian, and they wear a red bandana to identify themselves,

17   would the officers participating in that saturation patrol be

18   told this is what information we have about the nature of these

19   gang members?

20   "ANSWER:  They would be given information about the        16:44:11

21   individuals that -- whether it's that specific or not, but

22   about the individuals that are of concern.  Why are we doing

23   this?  And what are they -- What's been their activity?  What

24   are we out here trying to prevent or trying to put a stop to?

25   "QUESTION:  And they would be given a BOLO, if you         16:44:28

 1   will.  Be on the lookout for people who meet that description.

 2   Is that fair to say?

 3          "ANSWER:  It's probably not the right term.  It's

 4   usually for people that you actually -- an individual you are

 5   actually looking for.                                          16:44:43

 6          "Right.  So to speak.

 7          "ANSWER:  They're going to be looking for people that

 8   display behavior that is consistent with gang involvement."

 9          Question.  This is line 3 now on page 294.

10          MR. CASEY:  Your Honor, this is improper impeachment.   16:44:57

11          THE COURT:  Going way too long with this.  I don't

12   know how in the world you expect anybody to understand a

13   question.  If you want to read this into the record, you can

14   try and admit it.  So I'm going to sustain the objection.

15          MR. POCHODA:  We'll stop with the answer up to that     16:45:11

16   point.

17   BY MR. POCHODA:

18   Q.  The point being that the persons involved in the patrol

19   were given descriptions and to be on the lookout -- and again,

20   if that's the right term -- for persons that meet that         16:45:21

21   description of gang members or might be involved in the

22   activity that was the reason for the patrol in the first place,

23   is that correct?

24   A.  Correct.  I think the only thing I would add to that is it

25   doesn't exclude other activity that the -- that the officer may  16:45:34

1710

```
 1    come across.
 2    Q.  Oh, of course.  I didn't mean to imply that at all.  But
 3    that in your experience, when you had sat -- large saturation
 4    patrols, historically from what you know in other law
 5    enforcement, they were generally started because of a concern     16:45:52
 6    of a particular crime problem in a -- in an area.  Is that fair
 7    to say?
 8    A.  A particular, perhaps, related crime that you could say is
 9    related.
10    Q.  These large-scale patrol operations involve significant law    16:46:10
11    enforcement resources, is that right?
12    A.  Yeah, the larger -- I mean, it's just math.  The larger the
13    operation, the more resources.
14    Q.  And prior to permitting such a -- such an amount of
15    resources, you would want to have corroboration of any reported    16:46:27
16    criminal activity, is that right?
17    A.  I would want to take and have information -- I think
18    there's two things you're looking at, you know, in -- content
19    of the information that you have, and you're looking at the
20    reliability of that information.  But, yeah, you're going to --     16:46:44
21    you're going to have some information.  You just don't pick a
22    location and go out there for no reason and hope you find
23    something.
24    Q.  Right.  You would want to have some corroboration in some
25    form.  I'm not limiting the form.                                   16:46:58
```

1   A.  Correct.

2   Q.  And you do not recall seeing one example in the materials

3   that you looked at, or the testimony, where the MCSO

4   corroborated reported criminal activity before doing a

5   large-scale saturation patrol, do you?                    16:47:12

6   A.  Well, again, I -- trying to think back, I think either

7   Lieutenant Sousa or -- or Chief Sands talked about how they

8   screened -- or how they determined location.  And they talked

9   in generalities of the criteria that was used, that Chief Sands

10  I think primarily used, in picking that location.          16:47:35

11  Q.  But in the materials that you reviewed making your report,

12  you did not see a specific example where they corroborated

13  reported criminal activity prior to doing a patrol, is that

14  right?

15  A.  I can't recall.  There may have been -- it comes to mind   16:47:49

16  there may have been some reference in one of them to

17  individuals standing in the roadway creating traffic problems.

18  Q.  You recall one incident where there may have been some

19  corroboration of that before the patrol?

20  A.  Well, I -- I don't see that to exclude there may have been  16:48:05

21  others, but I just don't recall.  But I think there was at

22  least one that where the -- the information was that people

23  were standing in the roadway, and I'm not sure what they did,

24  do surveillance or just going out and checking or talking to

25  neighbors, as to how or if they corroborated that.          16:48:23

1    Q.  But in any event, in terms of police practice, good police

2    practice, given the amount of resources, you would, in your

3    experience, would want that corroboration of reported criminal

4    activity before the patrol took place, correct?

5    A.  Yeah, I think you're going to look -- you're going to look          16:48:42

6    at the criteria I think Chief Sands touched on before you

7    commit that type of resource, that level of resource as to a

8    location.

9    Q.  And you did not see in any of the materials that you

10   observed -- let me back up a little bit.                                 16:48:59

11        You said you also read all of the transcripts from

12   this proceeding, is that right?

13   A.  Correct.

14   Q.  And did anything in any of the testimony that you read

15   alter or change in any way your opinions that you provided in            16:49:10

16   your report?

17   A.  No.

18   Q.  And you did not see any example of an after-the-fact

19   assessment, after a patrol was over, by MCSO concerning whether

20   that patrol had any positive impact on crime rates or                    16:49:27

21   particular crime in that area?

22   A.  Well, there was a reference, and which is pretty standard,

23   that you do a debriefing.  Chief Sands didn't go into detail

24   what was covered in the debriefing after the -- and I think he

25   was probably referring more to the large operations, although           16:49:44

1    that wasn't clear, that they would debrief after the operation

2    to -- and again, I'm not sure what was covered in the

3    debriefing.

4    Q.  But there's no testimony from anybody who ever participated

5    in such a debriefing, was there?                                    16:49:58

6    A.  Well, I think Chief Sands -- it was either Chief Sands or

7    Lieutenant Sousa that said they participated and conducted the

8    debriefing.

9    Q.  If you could turn to page 297 of your deposition, please.

10   A.  Yes, sir.                                                       16:50:19

11   Q.  If you could look at line 13 through 19.

12        And the question is:  "And, in fact, did you see at

13   any time after any of these saturation patrols any assessment

14   by MCSO or any portion of MCSO as to whether that particular

15   patrol had any positive impact on crime rates or a particular     16:50:41

16   crime problem in the area that was patrolled?

17        "ANSWER:  I don't recall that I saw any."

18        Is that your testimony?

19   A.  It is.  And I think with the exception of seeing, again,

20   either Chief Sands' or Lieutenant Sousa's reference to a            16:50:57

21   debriefing, I think that's -- I would stand by that answer.

22   Q.  And you don't know what form, whether it was formal or

23   informal debriefing that Chief Sands was talking about, do you?

24   A.  No.

25   Q.  Mr. Click, you're familiar with the phrase "driving while     16:51:33

1714

1    black," is that correct?

2    A.  I am.

3    Q.  What does that mean?

4    A.  It means that an individual, a black individual,

5    African-American, is likely to get stopped solely because        16:51:44

6    they're black.

7    Q.  And do you recall when that phrase first became known in

8    the law enforcement community?

9    A.  I would suspect probably maybe in the '60s.

10   Q.  And that was a concern about improper use of race in law     16:52:03

11   enforcement decisions.  Is that fair to say?

12   A.  Fair to say.

13   Q.  And while it was driving while black, the same concern

14   would be for stopping people who are Latino improperly, is that

15   right?                                                            16:52:13

16   A.  Yes.  I think a person stopped for that reason -- it may

17   be -- it may be a little different in terms of -- and, you

18   know, we get into stereotypes, but -- but dark --

19   African-Americans generally have darker skin.  It may be

20   more -- harder to differentiate color of skin with -- with a     16:52:32

21   Hispanic.

22   Q.  They may look Caucasian, is that -- is that the point?

23   A.  Sure.

24   Q.  And the concern, the driving while black concept is that

25   people who were not Caucasian may well be discriminated against  16:52:45

1715

```
1    in law enforcement decisions, correct?
2    A.  Correct.
3    Q.  And that's been a concern and discussion amongst law
4    enforcement agencies for many years now, is that right?
5    A.  At least 25 or 30, yes.                              16:52:58
6    Q.  And a professional law enforcement agency will monitor
7    possible racial profiling on a day-to-day basis throughout the
8    entire organization, is that correct?
9    A.  Well, I think every agency that I'm aware of will monitor
10   that in some manner.  Because I -- I don't know of an agency    16:53:15
11   that would tolerate that today or condone that.
12   Q.  And before knowing whether it's even possibly going on
13   there has to be some system in place to monitor whether it's
14   possibly occurring, is that correct?
15   A.  Well, the system's in place.  You have a complaint system  16:53:31
16   and you have a lot of advocates today.  The systems may vary a
17   little bit, but the system's in place.
18        If you have an officer out there that is using race as
19   the basis to stop someone, it's going to come to your
20   attention.  The obligation you have as an agency is to         16:53:51
21   investigate it and determine whether or not you can -- you can
22   either sustain or not sustain that complaint.
23   Q.  Why are you so confident?  I want to explore why it would
24   come to your attention.  Let's use one of these patrols that
25   we've talked about, the large saturation patrols that were     16:54:12
```

1    concerned about immigration enforcement.

2         You've seen now some of the lists of the results of

3    those operations, and many persons, in terms of the result,

4    were in fact referred for immigration deportation proceedings,

5    correct?                                                      16:54:31

6    A.  Correct.

7    Q.  And many of those persons, if not all, were Latinos, is

8    that correct?

9    A.  If not all, certainly a significant percentage of them

10   were.                                                         16:54:40

11   Q.  And you would not expect that a person who is now facing

12   deportation proceedings and detained by ICE would be primarily

13   concerned about making a complaint to the MCSO about his or her

14   treatment while on the road.  Is that fair to say?

15   A.  I'm not sure it's fair to say.  I think Mr. Melendres is an  16:54:56

16   example, but -- made that known --

17   Q.  Mr. Melendres was a citizen, I mean was a lawful resident,

18   is that right?

19   A.  But he was concerned about racial profiling.

20   Q.  But he was released and he made his complaint after release  16:55:11

21   from detention, isn't that right?

22   A.  Correct.

23   Q.  The majority of these folks who were referred for

24   deportation may well have been deported, is that right?

25   A.  I don't know what that process is, no.                    16:55:23

1  Q.  But it certainly would not be an indicator of whether there

2  was a problem with their underlying traffic stop if there was

3  not a complaint on the books from one of these people who was

4  perhaps deported a day or two later?

5  A.  Well, sure.  I mean, you can't -- you can't deal with what                16:55:37

6  you don't know.

7  Q.  And there were plenty of complaints, if you will, about the

8  sheriff's activities about being racially motivated in terms of

9  his immigration enforcement, is that correct?

10 A.  Well, I'm not sure.  I guess you use a term "many                         16:55:51

11 complaints."  I think there were a lot of -- a lot of issues

12 that people brought up, and normally through the media, of

13 their opposition to the sheriff's enforcement priority, and --

14 and indicating that they felt that racial profiling was

15 occurring.                                                                    16:56:09

16 Q.  There would be no doubt in your mind if you were the

17 sheriff of Maricopa County at the time starting from 2000 --

18 early 2007 on that the possibility of racial profiling is

19 something that many people in the community, including this

20 lawsuit, including public officials, including media reports,                16:56:23

21 were concerned that the policies that were being adopted in

22 fact resulted in racial profiling, is that right?

23         MR. CASEY:  Objection, compound, Your Honor.  It's

24 vague.

25         THE WITNESS:  Could I get you to re-ask that,                        16:56:36

1    Counselor?

2              MR. POCHODA:  Sure.

3              THE COURT:  Why don't you let me rule on the objection

4    first.  I get to decide these things.

5              You want to rephrase the question?                    16:56:51

6              MR. POCHODA:  I would, Your Honor.

7    BY MR. POCHODA:

8    Q.  You had indicated before that the monitoring is important

9    to let an agency head know that there may be racial profiling

10   taking place in his or her agency, is that correct?           16:57:07

11   A.  Yes.

12   Q.  And to then take whatever actions are appropriate if there

13   is such a possibility, is that right?

14   A.  Correct.

15   Q.  And one of the ways that an agency head might know is      16:57:15

16   because there are complaints from people who were subjected to

17   these law enforcement decisions, is that right?

18   A.  That certainly would probably be the primary source.

19   Q.  Well, again, you don't know what the percentages of people

20   who are in fact deported would be making complaints in any     16:57:33

21   state, given their situations of the immigration system, is

22   that right?

23   A.  Correct.

24   Q.  So you don't know if it's the primary way that people are

25   made aware of racial profiling in the immigration enforcement  16:57:46

1  area, correct?

2  A.  I'm not sure I fully grasp the question, Counselor.

3  Q.  Well, you don't know that any of these people were in a

4  position to make a complaint about what happened when they were

5  stopped in the road.                                                16:58:01

6  A.  No, I -- I'm making an assumption here.  I think you're

7  talking about poor people who are probably not well educated in

8  terms of our system.  So I -- but I'm not sure.  I'm just

9  making an assumption that that may be the case.

10 Q.  As a general matter you're saying that when citizens or      16:58:19

11 residents in this country are subjected to bad practices by

12 police, they'll make a complaint.  Is that your point?

13 A.  I think many will, or they'll find out a means in which to

14 do that, yes.

15 Q.  But you have no idea whether that's an accurate statement    16:58:33

16 that -- that for persons who in fact were racially profiled and

17 as a result were stopped and subjected to the immigration and

18 deportation proceedings, you don't know if there's any

19 significant percent of those persons who will make a complaint

20 about the underlying stop, correct?                               16:58:51

21 A.  Well, I don't know if there is or there isn't.  I just

22 don't know.

23 Q.  That's what I'm saying.  So in this context you don't know

24 if that is the primary way for a law enforcement agency to find

25 out if there's a problem about racial profiling, correct?        16:59:01

1    A.  It may be true, yes.

2    Q.  So there has to be presumed -- and there are other

3    mechanisms that professional organizations will adopt to

4    monitor if there is even a suspicion of profiling going on in

5    their agency, is that right?                                    16:59:19

6    A.  That's correct.

7    Q.  And you did that when you were in Dallas, correct, as the

8    chief of police?

9    A.  Did?

10   Q.  Took steps to monitor to see if there was any possibly of   16:59:33

11   profiling going on, or improper decisions based on race.

12   A.  We listened to any complaints from individuals and/or

13   organizations that had concerns in that area.

14   Q.  And you would indicate to supervisors of the Dallas police

15   chief that racial profiling, starting with driving while black,  16:59:56

16   is a concern for large-scale professional police agencies, is

17   that right?

18   A.  Well, I think you limited it to large scale.  I think maybe

19   large scale --

20   Q.  Large.                                                       17:00:08

21   A.  Large police agencies are probably no different than small

22   police agencies.  I don't know of an agency out there of any

23   size that tolerates or condones racial profiling.

24   Q.  And none of those agencies should be failing to make sure

25   that they took steps to monitor whether racial profiling was     17:00:24

1    occurring, whatever those steps may be?

2    A.  Sure.  I mean, you're going to be sensitive to it.  It's

3    something that you do not want to have happen in your agency.

4    And if information comes from any source that that may be a

5    problem, you're going -- you're going to take some step to --                  17:00:42

6    to look at that.

7    Q.  Well, when you were in Dallas you had to discipline some

8    officers for improper racial decisions that affected their law

9    enforcement obligations, is that right?

10   A.  I did.                                                                      17:00:58

11   Q.  And that involved both white and black officers, is that

12   correct?

13   A.  It did.

14   Q.  And you would agree that the fact that you are a black or

15   Latino official does not mean you are incapable of using race                  17:01:08

16   in an improper manner in your law enforcement decisions,

17   correct?

18   A.  I'm just trying think of examples, if that's true, I -- I

19   think that the -- I think there may have been several black

20   officers that were disciplined for race related issues                         17:01:29

21   involving non-black.  So I'm not sure.

22   Q.  You don't believe you can assume that officers of color may

23   not have an improper -- make an improper decision in law

24   enforcement, even if it's against other persons of color, is

25   that right?                                                                     17:01:54

```
1    A.  I certainly think that's possible.  I can't think of an

2    example off the top of my head, but I think that's possible.

3    Q.  They're not immune from that possibility.  Is that fair to

4    say?

5    A.  Correct.                                                    17:02:07

6            THE COURT:  Mr. Pochoda, we've reached the end of the

7    day and past.  I assume you're not ready to wrap this up.

8            MR. POCHODA:  I am not, Your Honor.

9            THE COURT:  Okay.  Well, then we will resume tomorrow

10   at 8:30.                                                        17:02:20

11           MR. POCHODA:  Thank you.

12           THE COURT:  Thank you.  We'll see you tomorrow,

13   Mr. Click.

14           MR. YOUNG:  Your Honor --

15           THE COURT:  I'm going to ask Mr. Click to sit down, or  17:02:29

16   I'm going to let him go down, and then if you want to take up

17   housekeeping matters, you can.  I am also stopping the clock.

18           All right.  Go ahead.

19           MR. YOUNG:  Yes.  We talked this morning about

20   briefing, and you had given us a, I guess, a proposal with      17:02:45

21   respect to questions that you might ask us.

22           We've had a chance to talk among ourselves, and from

23   the plaintiffs' standpoint the procedure that you suggested is

24   fine with us and we would welcome that, that procedure.  With

25   respect to your factual questions, I believe, in particular, as 17:03:03
```

1723

```
 1   well as your legal questions.
 2            THE COURT:  Mr. Casey, do you have a position on that
 3   one way or the other?
 4            MR. CASEY:  I'm sorry, I was talking with Mr. Click.
 5            (Off-the-record discussion between defendants'          17:03:10
 6   counsel.)
 7            MR. CASEY:  Yeah, I think we expressed this morning
 8   that we were in agreement with what the Court proposed.
 9            THE COURT:  Yeah, you were, but --
10            MR. CASEY:  We have no change.                          17:03:23
11            Your Honor, I also wanted to share with the Court, to
12   the extent it matters, the Court and counsel, we will not be
13   calling Scott Jefferys.  With the conclusion of Mr. Click, if
14   there is -- finish the cross, then any redirect, then the only
15   thing that's remaining is to conclude Jason Kidd, the ICE       17:03:42
16   witness, his testimony, and we're probably 80 percent through
17   on that, and then Alonzo Pena.
18            The good news is that Ms. Gallagher and I worked on
19   narrowing Mr. Pena's testimony down.  And I don't have a
20   number for you, but it's shorter.                               17:04:01
21            THE COURT:  Okay.  And then do you anticipate
22   rebuttal?
23            MR. YOUNG:  We do.  We have at least one witness for
24   rebuttal, and I think we'll -- we'll notify defense counsel if
25   we have more, but we do have a -- a rebuttal.                   17:04:17
```

```
 1              MR. CASEY:  Well, I will put on the record that I will

 2     object to more, because we've had one witness disclosed to us

 3     in the 24-hour time period, and the one witness that we have

 4     we're prepared to deal with.  But if there's more, we object.

 5              MR. YOUNG:  I hear that objection.                      17:04:36

 6              Relevant to that, and this is really just

 7     housekeeping, I wonder, for our planning tomorrow, we have a

 8     time calculation, I think, but if -- would the Court do us --

 9              THE COURT:  Do you want me to give you my total?

10              MR. YOUNG:  That would be really helpful, Your Honor.  17:04:55

11              THE COURT:  Well, I will do that tomorrow morning.

12              MR. YOUNG:  Thank you.

13              THE COURT:  I will say that since that I've given you

14     the proposal this morning that you've now agreed, I've had

15     substantial doubts about it.                                   17:05:04

16              But I will -- I will indicate where I think that you

17     can most -- I will indicate areas that I'm interested in.  And

18     I will allow you to direct your briefing that way if you want

19     to.

20              I'm not going to change my page limits.  I'm not going 17:05:23

21     to pay any attention to any attempt to supplement the record

22     factually unless you can stipulate to the facts.  I want to

23     make that clear.

24              The only other thing that I may ask, and I may limit

25     my factual inquiries, as you know and appreciate, the number of 17:05:36
```

1    exhibits that I have admitted into evidence far exceeds what

2    you've done with those exhibits.  And I am trying the best I

3    can to understand what I have and to read what I have, to the

4    extent that you deemed it sufficient to put into evidence.  Or

5    the extent to which I'm interested in it.                    17:06:08

6           So I may ask you questions about the nature of the

7    exhibits, and that's the sort of thing that I think you might

8    be able to stipulate to.  It will save me some time and it will

9    allow you, perhaps, to focus my inquiries also in a useful way.

10          But as I indicated, to the extent that I'm going to    17:06:28

11   give you what I'm interested in, I'm not going to do it until

12   the evidence is closed, and that means the end of rebuttal.

13   And I'm not going to, as I've already said, allow any

14   supplementation of the record other than what you're going to

15   stipulate to.                                                 17:06:44

16          Any other housekeeping matters?

17          MR. CASEY:  None from defendants, Your Honor.

18          MR. YOUNG:  None from plaintiffs, Your Honor.

19          THE COURT:  All right.  We'll see you tomorrow morning

20   at 8:30.                                                      17:06:54

21          (Proceedings recessed at 5:07 p.m.)

22

23

24

25

1

2                           C E R T I F I C A T E

3

4

5

6

7            I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17           DATED at Phoenix, Arizona, this 1st day of August,

18   2012.

19

20

21                           _____s/Gary Moll_____

22

23

24

25