1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                    Plaintiffs,      )  CV 07-2513-PHX-GMS
6                                    )
                    vs.              )  Phoenix, Arizona
7                                    )  August 2, 2012
     Joseph M. Arpaio, et al.,       )  8:33 a.m.
8                                    )
                    Defendants.      )
9    _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17              (BENCH TRIAL DAY 7 - Pages 1727-1936)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:          Stanley Young, Esq.
                                  Andrew C. Byrnes, Esq.
4                                 COVINGTON & BURLING, L.L.P.
                                  333 Twin Dolphin Drive
5                                 Suite 700
                                  Redwood Shores, California  94065
6                                 (650) 632-4704

7                                 David Hults, Esq.
                                  COVINGTON & BURLING, L.L.P.
8                                 1 Front Street
                                  35th Floor
9                                 San Francisco, California  94111
                                  (415) 591-7066
10
                                  Lesli Rawles Gallagher, Esq.
11                                9191 Towne Centre Drive
                                  6th Floor
12                                San Diego, California  92122-1225
                                  (858) 678-1807
13
                                  Nancy Anne Ramirez, Esq.
14                                MEXICAN AMERICAN LEGAL DEFENSE
                                  AND EDUCATIONAL FUND
15                                Regional Counsel
                                  634 S. Spring Street
16                                11th Floor
                                  Los Angeles, California  90014
17                                (213) 629-2512, Ext. 121

18                                Daniel J. Pochoda, Esq.
                                  AMERICAN CIVIL LIBERTIES
19                                FOUNDATION OF ARIZONA
                                  77 E. Columbus Avenue
20                                Suite 205
                                  Phoenix, Arizona  85012
21                                (602) 650-1854

22                                Andre Segura, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
23                                125 Broad Street, 18th Floor
                                  New York, New York  10004
24                                (212) 549-2676

25

1                          A P P E A R A N C E S

2

3                              Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Director
5                              Immigrants' Rights Project
                               39 Drumm Street
6                              San Francisco, California  94111
                               (415) 343-0775
7
    For the Defendants:        Timothy J. Casey, Esq.
8                              James L. Williams, Esq.
                               SCHMITT, SCHNECK, SMYTH,
9                              CASEY & EVEN, P.C.
                               1221 E. Osborn Road
10                             Suite 105
                               Phoenix, Arizona  85014-5540
11                             (602) 277-7000

12                             Thomas P. Liddy
                               Deputy County Attorney
13                             MARICOPA COUNTY ATTORNEY'S OFFICE
                               Practice Group Leader, Litigation
14                             Ann T. Uglietta, Esq.
                               Deputy County Attorney
15                             Civil Services Division
                               222 N. Central Avenue
16                             Suite 1100
                               Phoenix, Arizona 85004
17                             (602) 372-2098

18

19

20

21

22

23

24

25

I N D E X

Witness:                                                          Page

BENNIE R. CLICK

Cross-Examination Continued by Mr. Pochoda                        1731
Redirect Examination by Mr. Casey                                 1771

JASON DOUGLAS KIDD

(By videotaped deposition)                                       1788

ALONZO R. PEÑA

(By videotaped deposition)                                       1810

RALPH BRECKEN TAYLOR

Direct Examination by Mr. Byrnes                                 1865
Cross-Examination by Mr. Liddy                                    1902
Redirect Examination by Mr. Byrnes                               1914


E X H I B I T S

No.       Description                                        Admitted

1075      Memorandum of Agreement (16 pages)                     1828
          (Ex. 4 to A. Pena Depo)




Defendants rest and renew Rule 52(c) motion                     1864

Plaintiffs rest                                                  1918

1          P R O C E E D I N G S

2

3          THE COURT:  Thank you.  Please be seated.

4          THE CLERK:  This is CV-07-2513, Melendres v. Arpaio,

5    on for continuation of bench trial.

6          THE COURT:  All right.  Mr. Pochoda, we're in the

7    middle of your cross-examination of Mr. Click.

8          But Mr. Young, you'd asked for me to do a calculation

9    of time you have left.

10          According to my time tabulation, you have exhausted 18

11    hours and 12 minutes of your time.  That does not subtract the

12    20 minutes that is -- or 21 minutes or whatever it is that's

13    attributable to you from the Kidd video.  I don't think we've

14    heard that portion yet.

15          I have defendants down as having exhausted 16 hours

16    and 34 minutes of their time.

17          Any questions on that, or is that vastly out of scale

18    to whatever your own tabulations have been?

19          MR. YOUNG:  That seems fine to us, Your Honor.

20          MR. CASEY:  It is agreeable and consistent with our

21    tabulations.

22          THE COURT:  All right.  That's good, 'cause as long as

23    it's sort of in the realm, I win, right?

24          So Mr. Pochoda --

25          MR. POCHODA:  Thank you, Your Honor.

1    THE COURT:  -- are you ready to begin your

2  cross-examination?

3                CROSS-EXAMINATION CONTINUED

4  BY MR. POCHODA:

5  Q.  Good morning, Mr. Click.

6  A.  Good morning.

7  Q.  We had talked yesterday about when you were the chief in

8  Dallas of having on occasion to discipline some officers for

9  racially improper law enforcement decisions, is that correct?

10  A.  Correct.

11  Q.  If you could give us an idea of the range of disciplinary

12  actions you took, I'm not interested in specific persons or

13  names, but if you could inform us of what the scope of the

14  discipline actions were.

15  A.  Yeah, I can't remember any -- I don't remember that I

16  terminated anybody, that I fired anyone for that.  I can

17  remember one instance where I transferred the individuals with

18  some time off without pay.

19       I think there probably -- I think that was probably

20  the primary discipline that I used, was the -- was giving

21  people -- there was no past infractions of that nature, so

22  based on their entire performance would give them time off.

23       And I remember at least one instance where I

24  transferred, I think, three officers, that along with the other

25  discipline, transferred them to other assignments.

1    Q.  You say there was no past infractions.  So in that instance

2    where it was the first example of this particular violation or

3    error, people were transferred with some time off, is that

4    correct?

5    A.  Correct.  I -- I don't remember that there were any where

6    there was a -- a repeat infraction.

7    Q.  And you were aware at the time that these officers knew

8    that it was wrong to racially profile or use race improperly at

9    the time that they did it, is that correct?

10   A.  Yes, they were.

11   Q.  It's fair to say that racial profiling then and now has

12   received significant publicity, and you would be hard pressed

13   to find any officer in any agency that did not know is wrong;

14   is that fair to say?

15   A.  That's fair to say.

16   Q.  An officer will not readily confess to using race

17   improperly if he or she does that, is that correct?

18   A.  Well, again, I can't remember specifics, but I do think

19   there were officers that acknowledged what they did was

20   improper.

21   Q.  Do you still have your deposition in front of you, sir?

22   A.  I do.

23   Q.  If you could turn to page 58, please.

24   A.  Yes, sir.

25   Q.  Starting on line 19 through 24.

```
 1                MR. POCHODA:  Oh, if you could --

 2                THE WITNESS:  Yes, sir, I've got it.

 3    BY MR. POCHODA:

 4    Q.  Well, let me read it as we're getting it, and starting on

 5    line 19, "QUESTION:  And if an officer, in fact, did knowingly

 6    use race as a factor improperly in making a law enforcement

 7    decision, he or she would have an interest in not coming forth

 8    and admitting that; isn't that right?

 9                "ANSWER:  True."

10                Do you recall answering it in that manner?

11    A.  I do.

12    Q.  And you agree with that statement today?

13    A.  I do.

14    Q.  And would you agree that there's a hesitancy of officers to

15    report bad acts by fellow officers?

16    A.  I think there may be a hesitancy, but I think in most

17    agencies most of the reports of misconduct by other officers or

18    deputies come from other officers or deputies.  From the day

19    they walk into the academy, we're well aware of, not just in

20    the police profession, I think you find it in all professions,

21    where there's a reluctance to report misconduct.

22                I sat on the board of the state bar for six years and

23    actually chaired the disciplinary committee, and it was one of

24    the big concerns within the legal profession, attorneys not

25    coming forth and reporting misconduct on the part of other
```

1  attorneys.  I think that from the day we recognize that -- we

2  talk about the Blue Wall of Silence or the Code of Silence that

3  was coined back in the 1960s, we recognize that -- that it's a

4  cancer.  It will destroy police agencies' integrity and

5  credibility.

6          As a result of that, literally from the day they walk

7  in the door, the ethics course really emphasizes it, what your

8  responsibility is, and what the dangers are in tolerating

9  misconduct on the part of other -- other officers.

10          And most agencies have a policy that require that you

11  report misconduct.  And if you don't report that misconduct and

12  it's discovered, you may well face as severe discipline as the

13  misconduct itself.

14  Q.  So in light of the experience in the past in police

15  agencies, this so-called blue call of silence, you focus on

16  that from day one, as you said?

17  A.  Absolutely.  Just, it can't be tolerated.  Are you able to

18  eliminate it completely?  Probably not.  I think there's some

19  human nature involved.  But you certainly emphasize the -- that

20  it's not tolerated and what the -- and try to educate the --

21  the new officer as to why they can't tolerate or they shouldn't

22  tolerate it.

23          And I think as a result of that you do find most, or

24  certainly the majority of complaints about misconduct come from

25  other officers or deputies.

1    Q.  But you would agree that there are complaints, I mean,

2    there are incidents where an officer will observe bad and

3    improper behavior by a fellow officer and he or she will not

4    report it, is that right?

5    A.  I think that's true.

6    Q.  And there's -- would you agree there's a disincentive for a

7    supervisor to acknowledge that there was racial profiling by

8    anyone in his or her unit?

9    A.  Well, I think -- well, and I'm not sure how you separate

10   the supervisor.  Supervisors go through some additional

11   training.  They've made a choice, an affirmative choice to

12   become a supervisor, and through the supervisory training as to

13   what their responsibility is in enforcing department policy,

14   and certainly this is the one -- the one area that is

15   emphasized, too.

16        I'm not sure that I would -- that I would agree with a

17   disincentive.  I think the incentive not to do it is you're

18   going to get disciplined; you're going to get fired; you're

19   going to get demoted.  Something's going to happen to you if it

20   comes to light. So I think the incentive is that you carry out

21   your responsibilities the way you're supposed to.

22        I think, again, are there instances when that doesn't

23   happen?  One of the things that most agencies do today is when

24   you have a disciplinary action, you look at training, whether

25   there was a training deficiency, you look at whether there was

1  a supervisory deficiency, and you look at whether there was a

2  policy deficiency that might have contributed to that

3  disciplinary action.

4          So I think it's recognized and you do look for that.

5  And I really have not seen that as a major -- a major problem.

6  I think supervisors by and large are pretty diligent in

7  carrying out their responsibility.

8  Q.  But you would agree that there -- there would be

9  circumstances where the supervisor would be considered

10  deficient if persons in his or her unit were found to be

11  improperly using race, is that correct?

12  A.  Well, yes, if a supervisor wasn't exercising proper

13  supervision, correct.

14  Q.  Now, in addition to -- we talked about the officers who

15  intentionally disregard what they know are rules against racial

16  profiling.  You would agree that some officers take actions

17  based on negative racial stereotypes that unconsciously creep

18  in, is that correct?

19  A.  You know, I guess I struggle with this, because Mr. Stewart

20  touched on it in his opinions as to this issue of

21  unconsciousness.  I've never had an officer tell me that --

22  that what he did was -- was done because he was not conscious

23  or aware of that.  So, no, I think the officers that -- that

24  I've had to deal with and that I'm aware of, they pretty much

25  knew what they were doing, and they were acting upon their own

1  bias.

2  Q.  So the ones that you actually disciplined were acting on

3  their own bias.  You don't know if there were others in the

4  Dallas department at some point that acted based on their

5  unconscious internalization of stereotypes about race, do you?

6  A.  No, I was never aware of that.  No, I -- I think that we

7  found people where there may be some training deficiency in

8  terms of why they stopped somebody.  They may have acted in an

9  inappropriate manner after they had stopped somebody, but --

10 but I'm not aware that it was somehow some kind of unconscious

11 bias that came into play.

12 Q.  Because you don't know about the possibility that person

13 could have such internalized bias and act on it, do you?

14 A.  No, I don't.

15 Q.  If you could take a look at your deposition on page 69,

16 please.

17 A.  Yes, sir.

18 Q.  Starting on line 5.

19      "QUESTION:  So it's also true that it happens

20 unconsciously sometimes, stereotyping; is that right?

21      "ANSWER:  I think it's more from stereotyping as

22 opposed to a bias to a group that's stereotyped.  That you make

23 some assumptions based on that stereotype.

24      "QUESTION:  But it would be a negative stereotype?  I

25 don't know if it's biased or not, but there were some actions

1    based on negative stereotypes that unconsciously creep in, is

2    that correct?

3              "ANSWER:  It's a possibility, sure."

4              You see that?

5    A.  I do.

6    Q.  And that would be your testimony today as well, is that

7    correct?

8    A.  Sure.  I think it -- as I read this, you know, I think

9    probably the most publicized stereotype is the young black

10   male.  To be a young black male in America there is a

11   stereotype I think that many people have.  And even people in

12   the African-American community have expressed that same

13   stereotype.

14             And so whether it's an unconscious bias or whether

15   it's just the stereotype you've -- whatever selectively you've

16   seen in terms of the news or you've seen in terms of personal

17   experience because of the neighborhood you worked, now, is

18   it -- is it fair?  You're acting on that stereotype without all

19   the legal bases.  No, it's not fair.

20   Q.  And you in fact, when you were in Dallas, implemented

21   training, regular training in racial and cultural sensitivity,

22   both to get at possible stereotyping as well as intentional

23   disregard, is that correct?

24   A.  Yeah.  I can't remember the specific training.  It was

25   certainly in the forefront.  Like I said yesterday, I think in

```
 1   the forefront of most police agencies today the importance of

 2   not having officers out there acting improperly, there's

 3   nothing to gain from that and everything to lose in terms of

 4   your agency.

 5          I don't remember any specific -- the specific

 6   training, but certainly from -- stereotypes are talked about

 7   from, again, from the time you hire the individual throughout

 8   their career.

 9   Q.  But in that training you would want to get at folks who

10   might be acting on internal stereotyping without recognizing

11   it, as well as folks who are intentionally violating the norm;

12   is that fair to say?

13   A.  Everybody's going to get the training, yeah.

14   Q.  And when you were in Dallas you adopted mechanisms to make

15   the -- the Dallas Police Department complaint process more

16   user-friendly, is that correct?

17   A.  Yes, we did that while I was there.  And not that that

18   hadn't been done before I got there.  I think that I was

19   preceded by a chief out of Los Angeles, and he had taken a

20   number of things they'd done in Los Angeles, so -- but we tried

21   to extend on that or expand on that.

22   Q.  And you did that by trying to make it more available to the

23   public, including putting complaint forms in public libraries

24   and notices in Hispanic and black newspapers and holding public

25   meetings, amongst other things, is that correct?
```

A.  Correct.

Q.  And have you seen any of such steps to make the complaint process more user-friendly and available to the public in the MCSO?

A.  In the materials I reviewed, no, I did not see that.

Q.  And did you read the testimony of some of the witnesses who were stopped by the MCSO, some of the folks that came forth, who testified about their difficulty in getting a complaint even accepted by the MCSO?  Did you hear that -- read that?

A.  Yes.  And I can't recall which -- there were one or two of the individuals, at least I recall, that did indicate that they had either attempted to complain and didn't feel that they were -- that it was addressed appropriately, or that they complained and they never heard anything back.

Q.  Right, that it was not even a complaint that was taken in the end; is that fair to say?

A.  Well, I'm not sure it went that far.  I think it was their perception of how the complaint was handled, or whether it was taken, or whether anybody responded to it was their -- what I expressed was I think their perception.

Q.  Well, some of the testimony involved folks who tried to reach the MCSO and were not successful in getting a call back to even discuss the complaint.  Is that -- is that your understanding?

A.  Yes.  There were one or two, I think, that expressed that.

1  Q.  And without asking you whether those were accurate reports

2  or not, if an agency in fact makes it difficult, more difficult

3  to file a complaint, that would reduce the number of

4  meritorious complaints that that agency had in front of it,

5  wouldn't it?

6  A.  It would.

7  Q.  Mr. Click, you talked yesterday during the questioning of

8  your attorney, and in your report, about a large number of MCSO

9  policies.  Do you recall that?

10  A.  I do.

11  Q.  Including in such areas as search and seizure and traffic

12  enforcement, is that correct?

13  A.  Correct.

14  Q.  And the great majority of those policies contain -- did not

15  contain any mention of racial bias or profiling or cultural

16  sensitivity, did they?

17  A.  Not specifically, no.

18  Q.  And you didn't purport that they did.  They don't purport

19  to be policies that have to do with racial bias or racial

20  profiling, is that right?

21  A.  Well, I think they per -- they don't use the language they

22  purport to be because they talk about constitutional rights.

23  Q.  So to the extent that there's discussion of racial bias,

24  it's:  You shall follow the Constitution.  That would -- that

25  would apply whether it's excessive force or racial bias or

1    whatever, is that --

2    A.  That's correct.

3    Q.  But when you testified yesterday -- let's take one of the

4    examples, one of the policies, say, on high risk stops.  And

5    you -- your opinion was that it met or exceeded accepted

6    standards.

7            You meant that within the universe of high-risk stop

8    policies in police agencies, the MCSO version was a good one,

9    is that -- is that correct?

10   A.  Correct.

11   Q.  And that would be true about your testimony of the other

12   standards that you discussed?

13   A.  Correct.

14   Q.  And you found that it was a good one both because of -- it

15   was good for the administration of the MCSO to put out such

16   policies, to make them known to the officers in the department,

17   is that right?

18   A.  Sure.  I think the primary way you give direction to -- to

19   officers is through policy and training.

20   Q.  And you thought they were good because you thought they

21   were well written policies that gave instructions and

22   definitions to the officers about what was accepted or not

23   accepted?

24   A.  Yes.  And I base it on the language that is consistent with

25   policies and procedures that you see pretty much throughout the

 1  United States and in terms of either best practice or

 2  standards.

 3  Q.  And in fact, the administration of the MCSO is to be

 4  commended by, in your opinion, because it did indicate to the

 5  officers by putting out a policy in a particular area that it

 6  was important that all officers follow that policy, is that

 7  correct?

 8  A.  Well, I don't know that I would commend them.  I would --

 9  because I think it's -- it's the standard today that they would

10  have policies, and that I think they would -- it would be

11  negligent not to have those policies in place.

12  Q.  In areas they considered important; is that fair to say?

13  A.  Correct.

14  Q.  They chose not to put out such a policy that focused on or

15  dealt with or defined racial profiling, did the MCSO?

16  A.  There is no policy that I saw that -- that was directly or

17  specifically addressed the language that would be racial

18  profiling.

19  Q.  And the policies that you did discuss and look at in these

20  areas such as traffic enforcement and search and seizure, those

21  are areas that were also covered in the, like the academy, the

22  Arizona POST instructions; is that fair to say?

23  A.  Yes.  Through the POST instruction and through the field

24  training officer program, and perhaps many of them through

25  ongoing continuing training.

1    Q.  But you would say it's important to refresh and reinforce

2    any officer's understanding of what they were taught on their

3    way to becoming an officer at the MCSO, is that correct?

4    A.  Yes.  I think you have the initial training, and then I

5    think as you have ongoing training you try to address training

6    needs:  What is going on?  What's happening?  Is there a

7    training need in this area?

8            I think to continue to train somebody where there's no

9    training need is frustrating both to the deputy that has to

10   attend that training, because it's not serving a purpose.  Also

11   I think there's an ongoing process within agencies as to

12   determining the training needs as opposed to just automatically

13   covering items that really don't -- 'cause time is valuable,

14   it's expensive.

15   Q.  Yeah, I obviously misstated the question.  I was talking

16   about the policies.  We had determined that the policies that

17   you said were above acceptable standards, such as in traffic

18   enforcement and search and seizure, were in areas that were

19   also in the curriculum of the Arizona POST academy training, is

20   that right?

21   A.  Correct.

22   Q.  And, indeed, in the academy, POST issues like search and

23   seizure or traffic enforcement were emphasized, is that right?

24   A.  Correct.

25   Q.  But that you felt it was a good idea to have policies, not

1    training I'm talking about, but these policies that reinforced

2    the lessons taught in the Arizona POST, is that correct?

3    A.  Yes.

4    Q.  And do you recall any testimony in this case when some of

5    the MCSO representatives were asked did they recall the

6    specifics of the lessons that they were taught about racial

7    profiling in the Arizona POST training, and they said they

8    couldn't at this time.  Do you recall that?

9    A.  I do.

10   Q.  And you would agree that that initial training in the

11   Arizona POST is not effective if it is not remembered and

12   practiced on a daily basis; is that fair to say?

13   A.  Yes.  I think it's fair to say, though, that if you ask

14   officers specific questions about what they were trained in,

15   they may not be able to give you the specific answer.

16        I think what you look for, one of the things you're

17   certainly looking for, and I mentioned it yesterday, is in all

18   of that training are performance objectives, and is the

19   officer, or the deputy, demonstrating their knowledge of that

20   policy through their performance?  Is there any performance

21   deficiency because they -- whether they remember the specific

22   training or not I think is secondary to whether their

23   performance reflects that training.

24   Q.  So that it's important in MCSO as in any other agency that

25   there be some mechanism in place to assess performance, is that

1  correct?

2  A.  Correct.

3  Q.  And if it's racial profiling, some mechanism to assess

4  whether racial profiling might be occurring?

5  A.  Sure.

6  Q.  In any event, there is no requirement that any officer at

7  the MCSO take any continuing courses once they start their

8  chores as an officer in the area of racial bias or cultural

9  sensitivity, is that correct?

10 A.  Well, it's -- I hesitate for a moment.  It -- they're going

11 to be required to take the -- whatever the decision has been

12 made by the agency and by Arizona POST as to what the

13 continuing training consists of, and so they are required to

14 take and attend that continuing training whatever the

15 curriculum is.

16       As in this case, to become 287(g) certified they were

17 required to take some additional training that specifically

18 addressed that --

19 Q.  Let me lead you off the 287(g)s for the moment and just

20 talk about the MCSO.  There is a requirement that there be

21 eight hours of continuing education, if you will, each year, is

22 that correct.

23 A.  Correct.

24 Q.  But there's no requirement that any part of that has to be

25 in the area of racial bias or cultural sensitivity, is there?

1    A.  Well, each year the -- the eight hours, and then, like I

2    said yesterday, MCSO exceeds this by about three times, as most

3    agencies do, because eight hours is just not sufficient.

4           So each year there's a different curriculum, but no, I

5    mean, up front, as I sit here right now, I'm not aware that

6    there's any requirement that part of that training be addressed

7    to racial profiling.

8    Q.  And you're not aware as you sit here today if any

9    officer in the MCSO has taken additional required education

10   courses in those areas after starting on the job, leaving aside

11   287(g)?

12   A.  No, I'm not.

13   Q.  There was some mention yesterday of -- of the -- well, let

14   me start with 287(g).  You indicated yesterday that you're not

15   very familiar with the workings of the 287(g) program; is that

16   fair to say?

17   A.  It's fair to say.

18   Q.  And you yourself are not familiar with the details of the

19   training given by 287 -- to become a 287(g) officer, are you?

20   A.  No, the -- the training itself was not detailed in the

21   materials I reviewed.  There was a general overview that

22   several people gave.

23   Q.  But you yourself have no independent understanding of what

24   that training was?

25   A.  I don't.

1   Q.  And there was some mention yesterday of a -- I guess a

2   one-shot training when the 287(g) authority was lost by MCSO,

3   the patrol authority, is that correct?

4   A.  Correct.

5   Q.  And were you familiar with the contents of that training?

6   A.  Only, I think, it was either Lieutenant Sousa or

7   commander -- Chief Sands that indicated that because of the

8   loss of the 280(c) -- 287(g) certification, that it required a

9   different procedure and that they needed to train to the new

10  procedure.

11  Q.  That's the extent of your knowledge about what that

12  training was?

13  A.  Well, I think it -- the detail was is that how do you, if

14  you have reasonable suspicion to believe somebody's here

15  unlawfully that you would no longer call for a 280(c) -- 287(g)

16  deputy because they were decertified, then you would call

17  for -- you would call the ICE office and -- and report it to

18  them and gain assistance, if possible, from ICE.

19  Q.  You yourself did not listen to the tapes that contain that

20  training, did you?

21  A.  I didn't.

22  Q.  And you don't know what was contained in there in the areas

23  of racial profiling or cultural sensitivity, do you?

24  A.  I don't.

25  Q.  So that as we -- you testify today, you're not familiar

1    with the extent and the content of the training of any one MCSO

2    officer, is that correct?

3    A.  I think in this particular case.  I've had other cases in

4    which I did review officers' training records; I can't recall

5    that I did that in this case.  So I do have some experience in

6    terms of -- or I guess knowledge in terms of training of other

7    deputies that I've reviewed training records.  In this case,

8    no, I don't.

9    Q.  You have been involved in other cases as an expert where

10   the MCSO has been a party, is that correct?

11   A.  Yes, I think over the last 12 years, probably maybe --

12   maybe 10, 12 cases.

13   Q.  And in all those you testified on behalf of the MCSO,

14   correct?

15   A.  Yes.

16   Q.  And you're saying in some of those you got some information

17   about training, but you -- that's not part of the record in

18   this case; is that fair to say?

19   A.  That's fair to say.

20   Q.  And you indicated that -- that it's good practice to review

21   an officer's record, or is it good practice, let me ask, to see

22   if he or she requires additional training in a particular area?

23   A.  You depend on a supervisor to do that, and in law

24   enforcement that's generally the sergeant that oversees a group

25   of individuals, maybe six or eight or ten individuals, that

1    monitors them day to day and is required on a formal basis to

2    evaluate their performance or any training needs.  But also

3    just day to day as he -- as he or she follows in on calls, as

4    they have discussions, there's some of this training that is

5    done very informally in briefings because before they go to

6    work they go to a short briefing, or it can be done more

7    formally.

8              But yes, it's a supervisory responsibility to identify

9    any training need that the person might have.

10   Q.  And you did not see, did you, in the materials you reviewed

11   for this case, that within the MCSO that they did review an

12   officer's records in the area of racial profiling or cultural

13   sensitivity, did you?

14   A.  No, I guess I would be making an assumption, but I think

15   it's a -- based on my experience as to the supervisory process

16   of law enforcement.  But I did not see a specific reference

17   to -- to that.

18             But day to day, when a sergeant is literally working

19   almost side by side with you, they're well aware what your

20   activity is, your competence level, and would be aware, I

21   think, if -- if they're there, would generally be aware of any

22   training need that the person had.

23   Q.  But you're not aware, in any of the documents that you

24   considered in formulating your report or in reading the

25   transcript, of any supervisor who specifically looked at,

1    whether informally or formally, looked at the practice of any

2    one of the persons in his or her unit to assess how that person

3    was operating in the area of racial profiling or cultural

4    sensitivity, did you?

5    A.  It was not dressed -- addressed specifically, as I saw.

6    Q.  And in order to assess an officer's performance generally

7    or specifically in a certain area, it's necessary to -- to

8    gather the information from that officer about what he or she

9    did during a shift; is that fair to say?

10   A.  Yes, it's fair to say that in most police agencies there is

11   some either computerized or handwritten record of the officer's

12   activities.

13   Q.  You would need some record that indicated the activities

14   during a shift, including interactions with the public, and

15   other activities; is that fair to say?

16   A.  Correct.

17   Q.  And did you see in this case, in any of the materials that

18   you reviewed, that the officers were required to turn in

19   information at the end of their shifts, a daily log or anything

20   of that nature, to their supervisors?

21   A.  I don't believe in the materials that it was addressed one

22   way or the other.

23   Q.  You did not see any such log?

24   A.  No, I did not.

25   Q.  You would agree that it's not generally acceptable practice

1   if there is no way for a supervisor in the MCSO to determine if

2   racial profiling may be occurring; is that fair to say?

3   A.  Could you repeat that again?

4   Q.  You would agree that it's not acceptable practice if the

5   supervisor has no way, no method, to document or determine if

6   racial profiling may be occurring in his or her unit?

7   A.  Well, I guess your verbiage of having no way, I mean, just

8   by --

9   Q.  Assuming there's no way, that would be unacceptable; is

10  that fair to say?

11  A.  Well, if there was no way, it wasn't the supervisor's

12  fault, I mean, I'm not quite sure I fully understand your

13  question.  I mean, if there's no way for that individual to

14  know something, I mean, I -- I guess -- maybe -- maybe I can

15  get you to reword your question.

16  Q.  Let me withdraw it.  Obviously, it wasn't clear.

17         If there was no testimony in this matter, or any of

18  the materials that you read, of any methodology or any way that

19  supervisors of the MCSO could determine if racial profiling

20  occurred in his or her unit, that would not be acceptable,

21  would it?

22  A.  No, I -- I think the record that I reviewed reflects

23  otherwise.  But, no, if the supervisor was not taking advantage

24  of the methods in which they're conducting their supervision,

25  sure, it would be -- it would be a deficiency on the part of

1    the supervisor.

2         As I said, that doesn't reflect what I saw in the

3    record.

4    Q.  Well, you would agree that it would not be generally

5    acceptable for a supervisor to conclude that racial profiling

6    is not occurring in his or her unit because the supervisor

7    trusts his officers, trusts his brothers, and knows they'd

8    never profile.  That would be unacceptable if that was the

9    basis for the conclusion by that supervisor that no racial

10   profiling was occurring.

11   A.  I think if it was solely, "I trust them, so I therefore

12   don't have to monitor them," that would -- that would fall

13   below the -- the standard of care.

14   Q.  And other than the one instance that we came up in this

15   case where Sergeant Madrid asked a deputy, one of his deputies

16   in the field, quote, How is it going? do you recall any

17   supervisor being on the scene when a deputy in his unit was

18   stopping a car or carrying out his duties when on a saturation

19   patrol?

20   A.  I did not see that, but I also did not find that unusual.

21   Q.  That wasn't the question.  You did not see any occasion

22   where supervisors were able to assess the performance because

23   they were on the scene, other than that moment where

24   Sergeant Madrid asked one of his officers, How's it going? is

25   that correct?

1    A.  Well, are we talking in general or we talking about --

2    there was -- I think Sergeant Madrid indicated that -- that --

3    when he responded to the Melendres stop, that -- I think in his

4    testimony that his standard practice was to stop, make sure

5    everything was okay, and generally would not stay while the

6    deputy processed or completed the activity, but that he would

7    respond and check and make sure everything was okay.  I think

8    that was Sergeant Madrid's --

9    Q.  What --

10   A.  -- testimony.

11   Q.  I apologize.

12          What was your understanding that Sergeant Madrid in

13   fact did when he reported to that location of the Melendres

14   stop?

15   A.  Well, he's -- again, he's observing what's going on; he's

16   talking to the deputies that are there; he is --

17   Q.  I don't want your surmise.  What in fact did he do, in your

18   opinion?  Was there information provided you of what he in fact

19   did?

20   A.  I don't think it was that specific as to what he did.  He

21   came, and, again, I made an assumption he's going -- he's got

22   two eyes and two ears and he understands what his

23   responsibility is.

24   Q.  You generally are making assumptions that the MCSO

25   supervisors would use their eyes and ears and act properly; is

1  that fair to say?

2  A.  Correct.

3  Q.  And that's in part based on your prior experience with the

4  MCSO in other cases, isn't that right?

5  A.  Yes.  I think in the 10 or so cases that I've been involved

6  in I've not found supervisory deficiencies.  I think the

7  supervisors have understood their responsibilities and have

8  carried them out.

9  Q.  Do you recall any occasion in this case, based on the

10  materials or the testimony, where a deputy called a supervisor

11  to assist or review a stop while it was going on?

12  A.  I don't recall in -- in the materials I reviewed that that

13  occurred.

14  Q.  And did you see any mechanism in place in this case, in the

15  materials or in the testimony, that allowed supervisors to

16  check if MCSO deputies, the officers, were doing what they

17  should on saturation patrols?

18  A.  No.  Again, as I testified yesterday, I think the -- the

19  supervisory structure that was in place during saturation

20  patrols is what I would have expected through the command post,

21  and either supervisors are in the field or they're immediately

22  available, but any specific incident, no, I don't recall any

23  specific incident.

24  Q.  Well, for example, the MCSO did not check after any

25  saturation patrol whether deputies were following a zero

1  tolerance policy, is that correct?

2  A.  I did not see that that was the -- that there was an actual

3  specific check.  I'm not quite sure how -- how you would do

4  that.  I mean, if a deputy is -- decides not to stop somebody,

5  for whatever reason, maybe it's not practical to stop that

6  person, or maybe they just decided not to stop that person, I'm

7  not sure how you would know that.

8  Q.  But you didn't see any attempt on the part of MCSO

9  supervisory up the line to assess whether their zero tolerance

10  policy on saturation patrols was being followed?

11  A.  No.  I think it was the general feeling the supervisors,

12  what -- from what I got from the material is the supervisors

13  did not feel that there was any abuse of -- of that order.

14  Q.  And who testified to that?

15  A.  I think -- well, I'm not sure it was directly testified to.

16  Certainly, there was no testimony of any of the supervisors

17  that -- that deputies were not complying with the zero

18  tolerance policy.

19  Q.  I understand that.  And the adoption of the zero tolerance

20  policy on the saturation patrols by MCSO was to avoid

21  accusations of picking and choosing, to blunt criticism that

22  the deputies were in fact selecting and possibly profiling, is

23  that right?

24  A.  Yes, I think yesterday we touched on the -- clearly, I

25  think deputies understood the -- the criticism that some people

1    had of saturation patrols and immigration enforcement, and they

2    were attempting -- I think they did a couple of things, and one

3    of them, to try to blunt that, to try to counter that.  And one

4    of them was the zero tolerance to take away discretion, and the

5    other one was that if you do stop a vehicle, you'll question

6    everybody in the vehicle, not just single someone out.  I think

7    it was an attempt, according to either captain -- commander --

8    excuse me, Chief Sands or Lieutenant Sousa to try to counter

9    the criticism that there was abuse of discretion.

10   Q.  And that there was racial profiling, correct?

11   A.  Certainly, yes.

12   Q.  And, therefore, in order to ascertain whether in fact it

13   was an effective method of countering racial profiling, you

14   would have to know as a member of the MCSO what the

15   understanding was of that zero tolerance policy amongst the

16   officers, and if they were following it, is that correct?

17   A.  Yes, I -- I think it's pretty elemental, or fundamental

18   that, you know, you have to understand what -- what zero

19   tolerance is, and I don't think that's a very complicated

20   concept.

21        And to know whether they were following it, you'd

22   almost have to have a supervisor in the car with them to -- to

23   know that they were following the policy.

24   Q.  You've heard the tes -- read the testimony in this case,

25   did you not?

1   A.  I did.

2   Q.  You would agree that different persons who testified --

3   sergeants, lieutenants -- had different understandings of how

4   the zero tolerance policy was to be applied on saturation

5   patrols; is that fair to say?

6   A.  It's fair to say, I think, as I recall, there was some

7   discussion about the practicality.  I mean, it can't be you're

8   going to stop everybody.  I mean, if somebody -- if you're

9   going to have to run a red light or do something that's

10  dangerous, or there's some other reasonable cause not to stop

11  someone, I think that would be acceptable.  But no, I -- I

12  don't think, from my understanding, that there was any real

13  confusion over what zero tolerance was.

14  Q.  Well, you recall testimony from some folks involved in

15  patrols that to them, zero tolerance meant stop whenever they

16  saw a traffic violation, no matter what the violation was, is

17  that correct?

18  A.  Well, zero -- yeah, I think -- I think it -- zero

19  tolerance, but you certainly have to have a lawful reason.  You

20  don't just stop everyone; you have to have a lawful reason to

21  stop somebody.

22          THE COURT:  Let me -- let me interrupt here,

23  Mr. Click.

24          You describe in your expert report having a zero

25  tolerance policy described to you by Lieutenant Sousa.

1          Do you recall that in your report?

2          THE WITNESS:  I do.

3          THE COURT:  And did you listen to Lieutenant Sousa's

4    testimony in which he described the zero tolerance to this

5    Court?

6          THE WITNESS:  Yes, sir, I did.

7          THE COURT:  Did you see any difference in the policy

8    as he testified to it in this court, and in the policy as you

9    described it in your report as having received it from

10   Lieutenant Sousa?

11         THE WITNESS:  You know, I can't distinguish that I can

12   right now, Your Honor.

13         THE COURT:  I'm sorry, what?

14         THE WITNESS:  I said I can't distinguish any

15   differences.  I guess I'd have to look back at my report first.

16         THE COURT:  Thank you.

17   BY MR. POCHODA:

18   Q.  In any event, Mr. Click, you agree that deputies need to

19   have enforcement priorities, and, therefore, they must have

20   discretion on patrol, saturation patrol, as to when and who to

21   stop; is that fair to say?

22   A.  Well, I think it's fair to say that -- that discretion, to

23   the extent that I think they're still, I think, expected to

24   comply with the -- I can't think of the term.  They understand

25   that zero tolerance, they understand you have to have a lawful

1  reason to stop somebody, but there may well be other factors

2  that come into play where you would have to take and exercise

3  some discretion.  Get two vehicles, both of them are committing

4  violations.  Which one do you stop?  I don't think you can

5  completely take all discretion away.

6  Q.  And Mr. Click, in your opinion it would violate your

7  definition of racial profiling if MCSO personnel took apparent

8  Mexican ancestry or ethnicity into account, amongst other

9  factors, in finding reasonable suspicion to investigate

10  someone, is that right?

11  A.  I'm sorry, could you repeat that, Counselor?

12  Q.  It would violate your definition of racial profiling if

13  MCSO personnel took apparent Mexican ancestry or ethnicity into

14  account, amongst other factors, in finding reasonable

15  suspicion?

16          MR. CASEY:  Objection, Your Honor, it's vague.

17          THE COURT:  Overruled.

18          THE WITNESS:  I think if the -- the police action

19  that's being initiated has anything to do with race or

20  ethnicity or national origin, I think it's improper, it's

21  unlawful.

22  BY MR. POCHODA:

23  Q.  So that would violate your definition of racial profiling

24  if that occurred?

25  A.  Well, it would violate my definition, it might support my

1  definition --

2  Q.  I may be phrasing it wrong.  But if it was taken into

3  account in this formula for reasonable suspicion, Mexican

4  ancestry or ethnicity was taken into account, that would

5  violate racial profiling norms, is that correct?

6  A.  Yes.

7  Q.  Mr. Click, you were asked by counsel yesterday, or you were

8  shown the results of a saturation patrol, a list of names.  Do

9  you recall that?

10  A.  I do.

11  Q.  And those were almost all Latino names; is that fair to

12  say?

13  A.  I think maybe all of them were Latino surnames on what I

14  was shown yesterday.

15  Q.  And you were asked, should that be a cause for concern?

16          Do you remember that?

17  A.  Yes.

18  Q.  And do you recall counsel had also asked such questions of

19  other MCSO witnesses, is that right?

20  A.  Yes.

21  Q.  And they responded they were not concerned because of the

22  nature of the charges that were ultimately brought against

23  these persons, is that right?

24  A.  Correct.

25  Q.  And they explain that they weren't concerned because the

1  charges that were brought were racially neutral charges.  Is

2  that your understanding?

3  A.  Correct.

4  Q.  That the actual crime that people were charged with was a

5  racially neutral crime.  Is that what we're talking about?

6  A.  Yes.

7  Q.  That there was nothing in the definition of the crime that

8  singled out a particular race; is that what we mean, you mean

9  by racially neutral?

10  A.  I think the -- the crime would apply -- the crime would

11  apply regardless.  If you stop somebody for drunk driving, it

12  doesn't make any difference what race or ethnicity they are.

13  They are going to be treated the same.

14  Q.  Well, let's go back.  The charge itself, I mean, there are

15  no racially discriminatory crimes on its -- on their face, are

16  there?  Let me give an example.

17      There's not a crime of speeding that says speeding is

18  if you drive over the -- the posted limit and you're black.

19  A.  Correct.

20  Q.  And if that -- anyone tried to pass such a law, it would

21  quickly be struck down as unconstitutional on its face,

22  correct?

23  A.  Correct.

24  Q.  So that all of the charges brought, whether it's driving on

25  a suspended license or speeding, would, by definition, be

1  racially neutral crimes, correct?

2  A.  Yes.

3  Q.  So if the MCSO was doing as they appeared to be, assessing

4  whether there was the potential for racial profiling based on

5  whether the charges used were racially discriminatory, they

6  would never come up with an answer "yes," would they?

7  A.  No, I think you have to look beyond that.  I think you have

8  to look -- determine whether or not the stop itself, how did

9  you discover the offense?  Whether the stop itself was -- was

10  lawful.

11  Q.  Correct.  And when you mean lawful, did it -- do you mean

12  was there probable cause for the stop?

13  A.  Correct.

14  Q.  And if there was probable cause -- let's use speeding as an

15  example.  That's a racially neutral crime, of course, because

16  we only have racially neutral crimes.  And let's assume that

17  there was probable cause that the individual was going 75 in a

18  65 mile zone, and you assess that as the supervisory personnel

19  at MCSO, all of these names in fact are associated with charges

20  and there was probable cause for that particular stop.  Would

21  that end your inquiry as to whether there was racial profiling

22  or possibility of racial profiling in that circumstance?

23  A.  Unless there was something else that would trigger, no.  I

24  guess to look at the bigger picture, how many people did the

25  either individual deputy stop or how many were stopped, how

1    many total people were stopped during the patrol?  I think to

2    look at it in a broader context, I'm not a statistician.  I'm

3    not sitting up here telling you that I somehow could evaluate

4    that.  But I think as just a supervisor I think you're going to

5    consider it in the whole -- total context.  What was the nature

6    of the neighborhood that we're working?

7            I know in the past I've personally had to deal with

8    issues that -- where everybody the officer stopped was of a

9    particular race, but when you look at the neighborhood where

10   the officer worked, virtually everyone in the neighborhood, it

11   was an ethnic neighborhood, was of that same race, and -- so I

12   think there are other factors that have to be considered.  But

13   I think anything that would raise the specter of racial

14   profiling needs to be investigated and looked at further.

15   Q.  But you would agree that in assessing this sheet of names,

16   which as you said were entirely Latino, you have to go beyond

17   looking at what they were ultimately charged with; is that fair

18   to say?

19   A.  Yes.

20   Q.  And it's possible that even if there was probable cause,

21   that a particular officer or all of the officers were targeting

22   that particular vehicle because they observed that the

23   occupants of that vehicle were Latino.  Is that a possibility?

24   A.  I don't think it could be excluded just based on that.  I

25   guess in terms of the specific facts, you had supervisors,

1  again, as we've already discussed, that were not available --

2  certainly were not present at every stop or -- and we really

3  don't know what their presence was.

4       But you've got supervisors who were also at least

5  involved in the operation that -- and I think it's another

6  factor as to how a supervisor's going to evaluate the

7  statistical information that you've gathered in the end.  And

8  so part of that analysis is going to be the supervisor's own

9  observations and experience dealing with that particular

10  operation.

11  Q.  In some ways, whatever they are, and I'm not asking for

12  those at the moment, you would have to go beyond the results on

13  that paper to determine if racial profiling was occurring or

14  not, is that correct?

15  A.  Yes, I think so.

16  Q.  And I'm not going to get into these, but your report also

17  covered your opinions about the three stops of the named

18  plaintiffs in this case, correct?

19  A.  I'm sorry?

20  Q.  Your opinions about the stops of the named plaintiffs in

21  this case was part of your report, is that right?

22  A.  It is.

23  Q.  And you yourself had no expertise or information about the

24  mindset, the motivation of the officers involved in the -- in

25  the stops, did you?

1    A.  Other than what -- what is contained in the record as to

2    why the officer made the stop, or the deputy.

3    Q.  You were able to determine that there could have been a

4    nonracial reason, or that there was a nonracial reason for the

5    stop, correct?

6    A.  Correct.

7    Q.  You could not determine whether the officer in fact would

8    have acted differently if the persons in front of him were

9    Caucasian as opposed to Latino.  You did not have the

10   information or expertise to do that, correct?

11   A.  I think based on the record, I think I certainly have the

12   expertise.  I think based on the record in all three instances

13   it was reasonable -- I think I reached a reasonable conclusion

14   that the officer had a -- a lawful reason to stop the

15   individual that was stopped.

16   Q.  Correct, there was a nonracial reason.  But you don't know

17   if in fact Mr. Beeks, for example, would have in fact pointed

18   his gun as he did at the occupants of the car with the Meraz

19   and the Nieto stop if those persons had been Caucasian.  You

20   don't know that for a fact?

21   A.  No.  All I can testify to is what the standard police

22   practice or what the best practice would be in that same

23   circumstance as it was described.

24   Q.  And in coming to your conclusion, you accepted in all these

25   instances the version of what took place that the officers put

1  forth, is that right?

2  A.  Well, in my report -- no, I don't pick and choose.  I think

3  I included information in there from both sides and attempted

4  then to determine, basically to develop my opinion, to

5  determine what I felt, in my opinion, occurred, and whether or

6  not it was appropriate.

7  Q.  But in making that determination, you would agree that in

8  no case did you discredit or not believe to any degree any of

9  the versions of what occurred that the officers put forth, and

10  you did discredit some of the versions that the plaintiffs put

11  forth; is that fair to say?

12  A.  I think it's fair to say that I found in my opinion that

13  the -- the officers that made the stop acted appropriately in

14  all three instances.

15  Q.  Correct.  But in coming to that conclusion you were

16  dependent on the folks on the scene to give you information,

17  right?  You weren't there.

18  A.  Sure.

19  Q.  Let me give an example.  You talked about one of the stops,

20  again the Meraz/Nieto stop, and a lot of that depended on what

21  in fact Mr. Armendariz said on the CAD dispatch, is that right?

22  A.  Correct.

23  Q.  You did not attempt to listen to that dispatch or read the

24  dispatch, did you?

25  A.  I don't believe I did.

1   Q.  So you were depending on the officers when they said, "I

2   heard that a car tried to run Mr. Armendariz over," correct?

3   A.  I'm depending on that, but also I guess evaluating that

4   from my own experience.  Can you determine from an officer's

5   radio transmission that there's a potential problem?  And

6   certainly in my experience, I mean, you can.

7   Q.  So based on your own understanding and experience on

8   listening to CAD reports, you assumed this might have been the

9   same thing that led you in those prior cases to conclude there

10  was an officer in trouble, an officer who perhaps had been the

11  target of a car running him over, is that right?

12  A.  Yes.  And again, I think as part of that evaluation it was

13  not only one -- one deputy that interpreted that way; it was at

14  least two deputies interpreted it that way.  I think both

15  Deputy Kikes and Deputy Beeks both interpreted it that way and

16  responded.

17  Q.  And as I said -- I won't go into it again.

18       You have three children, as you mentioned, adult

19  children who are all in law enforcement here in Maricopa

20  County, is that correct?

21  A.  I do.

22  Q.  And you would agree that they would be made uncomfortable

23  if their father was seen as publicly criticizing the MCSO or

24  the sheriff, correct?

25  A.  No, I have -- I'm not sure at this point what the stage of

1    the case is, but there was just a case involving the MCSO in

2    which I was critical of them.

3            My uncomfortableness in why I think I have a personal

4    conflict is where three, as you stated, three of our kids are

5    in law enforcement, and they interact with other law

6    enforcement agencies, and by and large I will not take a -- a

7    case that -- against -- now, do I turn cases down?  Certainly,

8    I turn cases down.

9            But I think in the last couple of years there's

10   probably only been a couple of instances in which I've offered

11   critical opinions, and one was of a detective in the Scottsdale

12   Police Department.  One of them was the chief of police in

13   Surprise, Arizona, in which I was critical of.  And the third

14   one is the MCSO case that is still in litigation, and I don't

15   know as it's proper for me to discuss it, which --

16   Q.  The public records case?

17   A.  I'm sorry?

18   Q.  Is that the public records case?

19   A.  No, that was the Surprise, Arizona, police department's

20   case.  But the current MCSO case in which I felt that a deputy

21   acted improperly.

22   Q.  Let me, if we --

23           MR. POCHODA:  Well, I have no further questions for

24   you.

25           THE COURT:  Redirect?

```
 1              MR. CASEY:  Thank you, Your Honor.

 2                    REDIRECT EXAMINATION

 3   BY MR. CASEY:

 4   Q.  Good morning, Mr. Click.

 5   A.  Good morning.

 6   Q.  A few areas.  You were asked questions about whether or not

 7   the MCSO has a separate stand-alone written policy about racial

 8   profiling.  You remember those series of questions?

 9   A.  I do.

10   Q.  Is there a national standard that -- in law enforcement

11   that uniformly requires every law enforcement agency to have

12   policies and procedures on every conceivable subject?

13   A.  No.

14   Q.  Let's focus on racial profiling.  Is there a national

15   standard in your field of expertise that requires an agency the

16   size of MCSO to have a separate stand-alone policy prohibiting

17   racial profiling, as Mr. Pochoda addressed, where it defines

18   racial profiling, gives examples of racial profiling, and then

19   says it's prohibited?

20   A.  As I testified yesterday, I think many agencies today, it's

21   not a standard.  I think we talk best practice.  I don't think

22   there's any requirement that an agency have that policy, that

23   many agencies do have policies and many of them are not titled

24   racial profiling.  They're broader than that.  They try to

25   address more constitutional issues.  And one of them is the --
```

1       the gay and lesbian community has pushed hard.

2               So there are policies, many agencies have policies

3       that address bias policing that -- where the officer, or

4       deputy, demonstrates a bias, that that's prohibited, that you

5       will not act upon that bias.  And racial profiling is within

6       that, that definition of bias policing.

7       Q.  Well, you mentioned a couple things.  You mentioned

8       standard and best practices.  Explain what is -- when you use

9       the word "standard," what you mean by that, and if you could,

10      explain what you mean by "best practices."

11      A.  Yes.  I think a standard is something that's mandated

12      either by court decision, by statute, by some governmental

13      regulatory agency such as POST, Arizona POST.  Those are

14      standards.  You don't have a choice.

15      Q.  What about -- let me interrupt you.  What about, at least

16      in the negligence setting, what about a reasonable standard of

17      care?  Is that also part of it in addition?

18      A.  Yes.

19      Q.  Okay.  Now, what is best practices?

20      A.  Best practice is where there's been some consensus from

21      your professional police organizations that -- of what a -- a

22      policy, what kind of direction and training should be done in

23      terms of any particular issue or law enforcement function.

24      Q.  Okay.  So I -- do I understand your testimony correctly

25      that a best practice may include a separate stand-alone broad

1   policy dealing -- dealing with bias issues?

2   A.  Correct.

3   Q.  But that is not what the standard of care or the standard,

4   as you mentioned or defined, requires?

5   A.  Yes.

6   Q.  Do you have any criticism about the MCSO not having what

7   the plaintiffs' lawyers have suggested they should have in

8   terms of a separate stand-alone policy?

9   A.  No.  And I say no because as we touched on yesterday, just

10  the policy we looked at, and we didn't look at all the policies

11  that deal with different constitutional issues, is the

12  continual emphasis in policy on protecting constitutional

13  rights, which I think is the bottom line.

14          But it -- the whole issue of constitutional rights is

15  broader than just racial profiling.  Where we see, perhaps, the

16  most litigation today is either in the area of arrest or use of

17  force.  Use of force may well be the primary area of litigation

18  in terms of violation of constitutional rights.

19  Q.  Let's turn to a different subject.  You were asked a series

20  of questions about supervision of deputies.

21          Is it a standard practice to have a supervisor attend

22  or monitor a deputy or an officer's traffic patrol stops?

23  A.  No, I -- the supervisor needs to -- and I think I did

24  yesterday testify that he has to make a decision based on how

25  closely an individual needs to be supervised based on their

1   training, their experience, and their past job performance.  If

2   it's a relatively new deputy, they're -- I think it's just

3   clear they're going to perhaps need more supervision, more

4   oversight, until they can gain more experience.

5           If it appears that there's some training deficiency,

6   clearly, there -- the supervisor needs to pay attention to

7   that.

8           If there's been previous performance problems with a

9   particular deputy -- and I think these apply to probably any

10  profession or occupation -- you're going to pay more attention

11  to that person that's had performance problems, at least you

12  should.  That's your supervisory responsibility to do that.

13  Q.  Are you aware, sir, in the United States, of any law

14  enforcement agency the size of, for example, the MCSO, where on

15  regular traffic patrols or on special operations there is

16  actually a supervisor that goes out and monitors the actual

17  traffic stops to determine compliance with policy,

18  constitutional law, or anything else?

19  A.  No.  It's impractical.

20  Q.  Why?

21  A.  Well, several reasons.  One of them is I think the -- I

22  mean, if you're -- if you're going to do that, you might as

23  well just make everybody a supervisor.

24          And then the question comes up:  Well, if you can't

25  trust that supervisor, maybe you have to get another level of

1   supervisor.  I think as I stated earlier, pretty quick you got

2   a bus driving down the street because nobody trusts anyone

3   else.  But no, I'm not aware.  It's just -- it's not practical.

4        There are some other factors that come into play.  I

5   know -- and I single them out only because I try to make my

6   point, is the Arizona Department of Public Safety has such vast

7   areas, particularly in Northern Arizona, to cover, that the

8   supervisor generally only sees the officer once or twice a week

9   because they may live a hundred miles apart, or be assigned an

10  office a hundred miles apart, unless there's an issue.

11       If a supervisor's needed, clearly every officer, I

12  think, in every law enforcement agency in the country has the

13  ability to call for a supervisor to come.

14       The Sheriff's Office has a little bit of that same

15  dynamic.  It's a very large county and there are some areas in

16  this county that are fairly remote.  And so there's a practical

17  side to it to how often.

18       Now, is a supervisor in most agencies expected to, on

19  a random basis, follow in?  Certainly.  To follow in and

20  observe just on a random basis.

21       And then you're dealing with -- and we touched on this

22  yesterday about complaints.  One of the ways you become aware

23  of some deficiency, perhaps some performance deficiency, is

24  either through citizen complaint or through fellow officers or

25  fellow deputies complaining about an individual, the conduct of

1  an individual.

2  Q.  Now, during the course of your examination, attachment 1,

3  you told us, were all the materials that you received in

4  formulating your opinions, which are part of your report in

5  evidence, Exhibit 1070, true?

6  A.  Correct.

7  Q.  You received all the depositions of the MCSO personnel?

8  A.  I did.

9  Q.  And did you read the deposition of Sergeant Palmer?

10  A.  Yes, I did.

11  Q.  What about Sergeant Madrid?

12  A.  Yes.

13  Q.  Lieutenant Sousa?

14  A.  Yes.

15  Q.  And I think each one of those may have been deposed twice.

16  Did you read all of the depositions?

17  A.  I don't know that I recall twice.  I read the depositions I

18  was -- I was provided.

19  Q.  Okay.  Now, there was a question asked of you about

20  supervision.  Do you remember the testimony, either what you

21  read from here at trial or in the transcripts, about what

22  Sergeants Madrid and Palmer testified how they would handle

23  supervision between the two of them during saturation patrols?

24  A.  I think there was some testimony that one would pretty much

25  stay at the command post and handle any issues there, and keep

1  track of the data, the enforcement data that was coming in

2  as -- as arrests were made or detentions were made, and the

3  other would either be available or be out in the field

4  observing what was going on.

5  Q.  Let's just assume the evidence the Court has heard is that

6  Manuel Madrid mostly stayed at the command post and

7  Sergeant Palmer would go to scenes where there were stops made

8  by deputies.  Just assuming that that's what the Court has

9  heard, is that, in your judgment, a reasonable and standard

10  practice as a supervisor?

11  A.  Yes.  And our discussion yesterday about saturation patrols

12  or these types of operations, that is standard practice.

13  You're going to have supervisors at the command post and you're

14  going to have supervisors in the field.

15  Q.  Is that type of supervision, assuming that was the

16  evidence, of Sergeant Brett Palmer on a saturation patrol going

17  to various stops as they're occurring, is that something that's

18  reasonable and standard in your judgment?

19  A.  Yes.

20  Q.  Is that the type of supervision that you believe is

21  appropriate to determine whether or not laws, statutes, and

22  policies are being complied with?

23  A.  Yes.

24  Q.  Now, this is also related to this.  You were also asked

25  some questions -- and I don't know if it was prefaced within a

1    perfect world or not, but the question related -- at least

2    according to my notes -- was about documenting information

3    about contacts, traffic stops.

4          Is it a standard reasonable practice that every time a

5    law enforcement officer has a contact with a person, either a

6    traffic stop, or I bumped into Ann and we had an interaction,

7    that I document that in writing in some fashion?

8    A.  I think today in most instances, in some fashion it is

9    documented, either in the deputy's notes, in a daily log.  It

10   will vary by agency.  Many agencies today have gone to complete

11   computerization.  But there -- in most agencies I think there

12   is some -- something that is documented by the -- the deputy or

13   the officer.

14   Q.  In the years 2007 until the end of 2009, was that a

15   reasonable and standard practice that you expected of the MCSO

16   for every contact?

17   A.  Yes.

18          And yet I -- let me qualify that.  I mean, there's

19   some where somebody flags you down because they've got a flat

20   tire and they don't have a cellphone.  I mean, there may be

21   some -- most non-law enforcement related contacts you may not,

22   I mean they're very brief and you may not document.

23   Q.  The next issue that I'd like to address with you is what

24   the plaintiffs talked about was the method of detecting racial

25   profiling, and specifically you were asked a series of

1    questions about mechanisms to determine racial profiling.

2         Do you have an opinion as to whether or not the MCSO

3    had a mechanism, a methodology of some form, to determine

4    whether or not its officers were racial profiling?

5    A.  Yes.

6    Q.  And what was that?

7    A.  I think it reflects probably what occurs in most police

8    agencies in the United States through the policies, procedures,

9    the training, the supervision, the dependence on reporting of

10   any alleged misconduct.  I think it's a combination of all

11   those things that we've touched on that are in place in the

12   Sheriff's Office, and that the majority of police agencies in

13   the United States I think utilize those same mechanisms.

14   Q.  Okay.  And explain for me why you believe the methodology

15   and the mechanism that's in place, from what you just

16   described -- the training, the supervision, the interaction --

17   why you believe that's reasonable and appropriate.

18   A.  Well, I think that -- I think just the result, I'm not

19   aware, and I certainly didn't come to the conclusion.  I would

20   probably have another response to this if there was a pattern

21   and practice of factual, where you've got factual information

22   that racial profiling -- there's a pattern and practice of

23   racial profiling, then, yeah, I think you could -- I would come

24   to the opinion that the system was failing.

25         I did not come to that conclusion, that there's a

1    pattern and practice within the Sheriff's Office of racial

2    profiling.  From that I -- I would propose that the current

3    systems that are in place are working.

4    Q.  All right.  Well, let's talk about that for a minute.  I

5    understand that's your opinion, but the plaintiffs' lawyers

6    have suggested in this trial that we don't make contact and

7    document every -- strike that.

8          The plaintiffs' lawyers have suggested, Mr. Click,

9    that we don't contact -- I'm sorry, I'm having a brain cramp.

10   I'm going to start for the third time.

11         Plaintiffs' counsel has suggested that in this case,

12   that because we don't, at MCSO, document everything about every

13   contact we make, and that we don't have a stand-alone policy on

14   racial profiling, defining it and describing it, and that

15   because we don't go and supervise every traffic stop, and

16   because we don't go through every single reason for the traffic

17   stop or for an arrest, that there's absolutely no mechanism to

18   determine whether racial profiling exists or not.

19         Do you agree, assuming that's even remotely similar to

20   what they're suggesting in this case, do you agree with that?

21   A.  No, I don't agree with that.

22   Q.  Why is that?

23   A.  Well, again, as I stated, I -- I did not find information

24   that led me to believe there was a pattern and practice of

25   racial profiling.  And from that it leads me to believe that

1    the -- the training -- and we've not talked about the hiring

2    process.  I mean, it's a very critical hiring process that

3    we've not touched on, at least in my testimony, of how you try

4    right up front, through psychological screening, through

5    polygraphs, screening people out that have certain biases, to

6    the extent that's possible with today's knowledge.  But I think

7    through those entire processes it led me to believe that the

8    current process is working.

9         We talk about the lack of -- of documentation, and

10   yes, I think most agencies do in some manner document.

11        Now, sometimes as I state, it's in the officer's

12   notes, that's kind of informal, keep them in case something

13   comes up.  A few days later, if there's nothing there, you

14   throw them away, there's nothing that -- no reason to keep

15   them.

16        But logs, I think we need to look at the purpose of

17   many agencies.  Now, we could take those, and I guess somebody

18   could try to interpret what they mean if -- if logs are kept of

19   every contact.

20        But daily logs are kept primarily for performance

21   purposes.  You know, you have an officer or deputy out there

22   that's not performing, one way you try to determine that is

23   through whether or not -- you know, what are they doing with

24   their time?  It's not really focused as to whether or not

25   they're stopping whoever.  It just has to do with how they're

1    spending their time and trying to account for their time.

2           And a lot of those logs that are kept are strictly

3    license plates numbers of their traffic stops.  Stopped a

4    vehicle, its license number.  It doesn't have any other data

5    there in many agencies.

6    Q.  Is there, in your mind, based on everything you reviewed

7    and all your experience, any concern that you have that the

8    MCSO is using race or ethnicity in any manner that is

9    inappropriate?

10   A.  No.

11   Q.  Now, you were asked a series of questions, and during one

12   of your answers you said there was no incentive to racially

13   profile.  And the questioner then began to go on to a different

14   subject, and I'd like to talk to you about that.

15          Explain for the Court, in your judgment, why there is

16   no incentive to use race in law enforcement in the MCSO.

17   A.  Well, I think part of it is it's going to get you in

18   trouble.  Could get you fired.  Lose your livelihood.  Under

19   federal statute, 'cause you can be -- and perhaps even under

20   state statute, but certainly under federal statute you can be

21   charged criminally.  It's a federal felony.  There's been

22   officers that's gone to prison for this.  This is all part of

23   the training that -- that officers receive.

24          And I think to just make them aware that not only is

25   it damaging to you or your reputation, as I stated, it's going

1    to cost you your job, perhaps, or it's going to damage the

2    agency's reputation; it's going to damage your relationship

3    with the community.

4         There's a lot of disincentives.  To go to prison or to

5    lose your job is a major disincentive if you are inclined to --

6    to racially profile.

7    Q.  It sounds like what you're describing for me, based on your

8    experience, that those are very deeply personal incentives not

9    to do something like that.

10   A.  Correct.  It goes beyond the policies and procedures and

11   those kinds of things that there's some potential personal loss

12   that is -- I think would discourage most people, even if they

13   were inclined to racially profile.

14   Q.  You were asked a question about the disincentive of

15   supervisors to identify racial profiling, and I'd like to have

16   you address for me a little bit more about why you think

17   that -- that that doesn't exist, a disincentive.

18        And specifically -- first of all, I want you to tell

19   me a little bit about that.

20   A.  Well, I mean, I think most -- most -- and not just in

21   reference to law enforcement, I think most people are proud of

22   who they are and what they do and their jobs.  But beyond that,

23   I mean, to know what your job function is and not to carry that

24   out, and as a supervisor to hold your people accountable to the

25   agency's policies, to the law, to get demoted, the

1    embarrassment that comes with that, I think most people are

2    pretty sincere, a great majority are very sincere about

3    carrying out their function.

4            We talked about the oath of office and, you know, it

5    sounds kind of hokey up front.  But when you really talk to

6    people about what they took an oath to do and they promised to

7    do, most people take that very seriously.  I think that applies

8    to supervisors, that -- that it would be a personal

9    embarrassment.  But it also could cost them, can cost them

10   their job, can cost them their livelihood, could result in a

11   demotion.  And within agencies, I mean, there's a real stigma

12   attached to that.

13   Q.  Let me -- what about -- let's say Mr. Liddy and I are two

14   cops.  And I think he's doing something wrong, but he is very

15   well connected to my superiors, he's very well connected in

16   inter-office politics, and he has the ear of the powers that

17   be, what about -- do I -- are you aware of protections that

18   would be provided to someone like me who said, All right.  I'm

19   going to go against this powerful fellow cop because I think

20   he's doing something wrong?

21   A.  Yes.  I think that we've built in protections legally for

22   whistle-blowers, people that bring forth alleged misconduct

23   within an agency, and there's a process to be followed to do

24   that just to address this particular scenario that you just

25   presented.

1    But I think, as I stated earlier with Mr. Pochoda,

2  that maybe within the first few days they walk in the door, the

3  code of ethics, the ethics training is done almost -- I'm not

4  sure it's in that first week, but it's very early in the

5  academy, as to what your responsibilities are.  And what are

6  your -- and we talk about the Code of Silence and the Blue

7  Wall, and how damaging and how that's destroyed the reputation

8  of some very large agencies in this country, and what their

9  responsibility is and what the consequences are if they don't

10  follow through.

11    There are scenarios built into the ethics training as

12  to what you should do, or what you will do, are expected to do,

13  if you observe various types of misconduct.  And what you're

14  expected to do is you're going to bring that to a supervisor's

15  attention.  And if you don't, the consequences for you, as I

16  stated earlier, may be as severe as the person that actually

17  was involved in the inappropriate action.

18  Q.  Let's turn to a different subject.  One of the -- one of

19  the end questions that Mr. Pochoda asked you was about

20  essentially in this context.  There's probable cause for the

21  stop, there may have been probable cause for an arrest, but you

22  really don't know what was going on in the mindset of the

23  officer.

24    Do you remember that?

25  A.  Correct.

1   Q.  Okay.  You mentioned earlier to me when I started this

2   redirect about some type of screening of officers.  Back at the

3   hiring level, you mentioned polygraphs as well.

4        Explain for me what you meant by screening, and how

5   that plays a role into I guess that subjective intent of an

6   officer.

7   A.  Over the last -- I'm just thinking back, probably 30 years

8   ago, started in San Jose, California, with a psychologist, and

9   since it has expanded, there's a whole association today of

10  police psychologists.  And they were looking for the ideal

11  profile for a police officer.  And, of course, one of the

12  primary things they were looking at was any biases.

13  Everybody's going to bring biases, but to hire people that are

14  not going to act on those biases.

15       Now, it looks at a number of other things, too.  But

16  looking at whether or not -- and this is used today by many

17  agencies, including here in Arizona, that you not only take a

18  polygraph -- one of the few occupations.  As a matter of fact,

19  I'm not sure there's any other occupation that -- in many

20  instances, you go through not only the polygraph exam to make

21  sure that there's nothing in your background that you haven't

22  revealed; and secondly, to go through the psychological

23  evaluation that is required, and it's to make sure that you're

24  weeding people out that aren't suited, that do not fit that

25  profile.

1        And I think it's been very successful.  I think it's

2   like a lot of areas, it's not as hard a science as we'd like.

3   We start talking about psychological makeup and those kinds of

4   things, but -- but it's certainly been an effective tool in

5   weeding out individuals right up front that aren't suited.

6   Q.  It's not a hard science, is what you're telling us, but

7   it's a tool that helps identify people that may not be suitable

8   to have a badge, a gun, interacting with the community?

9   A.  Correct.

10       MR. CASEY:  Okay.  Those are the questions I have for

11  you, Mr. Click.  I thank you and the Court for your patience.

12       THE WITNESS:  Thank you.

13       THE COURT:  Thank you.  I believe you may step down.

14  Thank you for your testimony.

15       Mr. Casey, where next?

16       MR. CASEY:  Your Honor, I would like to continue with

17  the remaining portion of -- of Mr. Jason Kidd, the ICE

18  employee.  Pursuant to the Court's direction, we will begin

19  with Mr. Pochoda's -- most of his examination at page 132, line

20  7.

21       THE COURT:  All right.  Now, I understood, if I recall

22  correctly, that 21 of the minutes are to be allocated to the

23  plaintiffs, is that correct?

24       MR. CASEY:  That's correct.

25       THE COURT:  All right.  I will allocate that.

```
 1              How many minutes left do we have on that videotape?

 2         Can you tell?

 3              MR. CASEY:  Your Honor, I cannot tell you accurately.

 4              THE COURT:  Okay.

 5              MR. CASEY:  I would suggest, perhaps, maybe we take

 6    a -- if it's appropriate for the Court to take a recess.

 7              THE COURT:  All right.  Well, we will take the morning

 8    break at this time and we'll resume and begin with the

 9    videotape at 10:20.  Thank you.

10              (Recess taken.)

11              THE COURT:  Thank you.  Please be seated.

12         Mr. Casey.

13              MR. CASEY:  Yes, Your Honor.  Jason Kidd, the

14    continuation, beginning at 132, line 7.

15              (Videotaped deposition of Jason Douglas Kidd

16    commences.)

17              "BY MR. POCHODA:

18              "QUESTION:  Mr. Kidd, this was an exhibit that you had

19    looked at before, and it's an e-mail that has certain

20    statistics.

21              "Do you see that?

22              "ANSWER:  Yes.

23              "QUESTION:  And are those the -- what -- the program

24    total is what, the total number of -- of -- of folks turned

25    over to ICE from the MCSO, is that correct?
```

```
 1                "ANSWER:  I believe so.

 2                "QUESTION:  Now, of that total number -- well,

 3     let's -- let's stick to the fiscal year '08 total of 18,302.

 4                "Do you see that?

 5                "ANSWER:  Yes.

 6                "QUESTION:  Of that total number, how many of those

 7     were due to a -- persons that were processed by 2 -- 287(g)

 8     during crime suppression operations by the MCSO?

 9                "ANSWER:  I have no way of knowing.

10                "QUESTION:  Do you know approximately how many of

11     those were due -- of that number was due to the jail

12     operations?

13                "ANSWER:  I don't know.

14                "QUESTION:  Do you have any sense of which is larger,

15     the number that was processed by the jail operations or those

16     processed for the -- by crime suppression operations?  Do you

17     know which was larger?

18                "ANSWER:  Yes.

19                "QUESTION:  Which was larger?

20                "ANSWER:  The jail operations.

21                "QUESTION:  And before when you talk about another

22     e-mail that said, gee, this -- we're embarrassing the rest of

23     the country, you were referring to the large numbers from jail

24     operations at the MCSO, is that correct?

25                "ANSWER:  I was referring to the total number.
```

1          "QUESTION:  And -- and do -- you do -- you are aware

2     of some sense of what the total numbers were, is that correct?

3          "ANSWER:  Yes.

4          "QUESTION:  And you are aware that the total numbers

5     for the jail operations were significantly greater than those

6     for the 287(g) during the suppression operations?

7          "ANSWER:  Can you restate that?

8          "QUESTION:  That the jail operation referrals were

9     much greater than the -- those for the 287(g) operations.

10         "ANSWER:  The jail operations are 287(g).  You mean

11    for the task force?

12         "QUESTION:  Yes, for the task force.

13         "ANSWER:  Yes, they're greater.

14         "QUESTION:  So the great majority of this program

15    total that's mentioned here in this Exhibit 34, the great

16    majority of those numbers would continue even now even though

17    the Maricopa County Sheriff's Office is not utilizing task

18    force 287(g)s, is that correct?

19         "ANSWER:  The -- the number would be very similar

20    because of the fact that they're still doing saturation patrols

21    and interdiction patrols based on human smuggling laws.

22         "It's kind of a difficult number to break down because

23    of the fact when the saturation patrols or the interdiction

24    teams would take place, many of the people arrested would go to

25    the jail, and then the jail people would process those even

1  though they came from a saturation patrol or an interdiction.

2  "QUESTION:  Uh-huh.  You talked about earlier the --

3  the fact that the -- you did receive some reports about

4  operational plans by MCSO.  Those would include crime -- the

5  so-called suppression sweeps and saturation patrols, is that

6  right?

7  "ANSWER:  I -- I did get report -- or the shift

8  summaries of saturation patrols.

9  "QUESTION:  And that was -- that was to alert you in

10  case any of those might involve, when they took place, the need

11  for 287(g) authority?

12  "ANSWER:  That's correct.

13  "QUESTION:  You did not review those with an eye

14  towards giving an up or down or okay to the Sheriff's Office to

15  go ahead with those plans or not, did you?

16  "ANSWER:  That's correct.

17  "QUESTION:  And you had -- did not review them with an

18  eye towards assessing whether any of the information contained

19  in those operational plans were accurate or not?

20  "ANSWER:  I did work with them on inserting language

21  into operational plans and making sure that things were being

22  done to make sure that we were doing -- the 287(g) portion

23  kicked in after state crimes.

24  "QUESTION:  Okay.  Let me give you an example.  If the

25  report said we're going to go to Mesa because we've been asked

1    to go there by these eight elected officials, would that be

2    something you would review to see if that was an accurate

3    statement or not?

4              "ANSWER:  No.

5              "QUESTION:  And you didn't do an independent

6    verification about what the -- if there really was, in fact, a

7    criminal problem in the area that was stated in the -- in the

8    operational plan?

9              "ANSWER:  No.

10             "QUESTION:  And you didn't do any assessment

11   afterwards whether the operational plan had any impact on the

12   crime rates in that particular area, did you, as ICE?

13             "ANSWER:  No.

14             "QUESTION:  You -- you said that you were present at

15   two of the saturation patrols in the field itself, is that

16   right?

17             "ANSWER:  Yes.

18             "QUESTION:  And so the -- you were aware -- do you

19   have any sense of how many saturation patrols that the

20   Sheriff's Office, MCSO, engaged in starting with 2007 to the

21   date you left the Phoenix ICE office?

22             "ANSWER:  A number.  Probably greater than a dozen.

23             "QUESTION:  It might have been upwards of 20?  Is that

24   possible?

25             "ANSWER:  It's possible.

1           "QUESTION:  You had mentioned something along the

2    lines of that there was such patrols, that there was law

3    enforcement that used those before.  Could you give us any

4    other example when a law enforcement agency concerned about a

5    particular criminal activity in the area would flood the area

6    in order to stop every car or vehicle that they saw that had an

7    infraction?

8           "ANSWER:  I've talked to other 287(g) programs who --

9    who -- in Florida that have talked about using these -- these

10   types of methods for gangs.  ICE uses this mess -- method for

11   gang enforcement and things of that nature.

12          "QUESTION:  And the ICE -- when ICE uses it, their --

13   their method is to tell their employees, their -- the officers

14   in the field to stop every car, whether that car is suspected

15   of criminal activity or not, if there's a traffic violation?

16          "ANSWER:  Not to stopping the cars, but for other --

17   for encounters and for like a zero tolerance type thing.

18          "QUESTION:  Right.  If they were concerned, for

19   example, about gang activity, they would be observing for

20   people who were suspected of gang activity, is that fair to

21   say?

22          "ANSWER:  And talking to whoever they could.

23          "QUESTION:  Are you aware of that finding in the

24   Goldwater report?

25          "ANSWER:  I don't recall the exact wording, but that

1    sounds accurate.

2             "QUESTION:  And was that something that was discussed

3    in the ICE office here in Phoenix upon that report going

4    public?

5             "ANSWER:  I believe I discussed it with my supervisor

6    at the time.

7             "QUESTION:  And what was the reaction in the ICE

8    office, if any, once that report was made public?

9             "ANSWER:  I don't think there was anything.

10            "QUESTION:  The fact -- that fact, whether true or

11   not, did not impact your role as ICE in terms of running --

12   supervising or monitoring the 287(g) program here in Maricopa,

13   is that right?

14            "ANSWER:  Correct.

15            "QUESTION:  I won't continue.  So there's a

16   number more on this page and on the other pages.

17            "When you were out there looking at -- at the -- the

18   operations of the MCSO during suppression hearings, was -- was

19   your function as ICE to assess whether they were valid stops

20   made of the cars?

21            "ANSWER:  No.

22            "QUESTION:  And so you wouldn't take a look at it and

23   say, no, in fact, it was not actually speeding when it said

24   speeding?  That was not your job, was it?

25            "ANSWER:  Correct.

1          "QUESTION:  And it was not your job to assess what the

2    motivation was of any particular MCSO who stopped --

3    officer who stopped anyone during a crime suppression hearing,

4    was it?

5          "ANSWER:  No, that wasn't my...

6          "QUESTION:  And, as we sit here today or even then,

7    you don't know if any one of these stops listed on the -- on

8    this page was made by an MCSO officer because of the

9    observation of Latino race of the driver or passengers, do you?

10          "ANSWER:  I don't know.

11          "Oh, sorry.

12          "QUESTION:  It was not ICE's job or function at the

13    time to look into whether there were racial motivations that

14    caused any one of these particular stops by an MCSO officer,

15    right?

16          "ANSWER:  That's correct.

17          "QUESTION:  So there's no basis for ICE to -- to be

18    able to conclude one way or the other whether there was racial

19    profiling in these state traffic violations during a crime

20    suppression operations by the MCSO?

21          "ANSWER:  Correct.

22          "QUESTION:  And you were not asked at any point during

23    your tenure here as an ICE official in Phoenix to look into

24    whether there was racial profiling involved in the stops made

25    by MCSO during crime suppression operations, is that correct?

 1             "ANSWER:  I don't recall being asked that.

 2             "QUESTION:  Mr. Kidd, the -- you've been given what's

 3     been marked as Exhibit 55.

 4             "Do you have that?

 5             "ANSWER:  Yes.

 6             "QUESTION:  And the -- that's a -- an article from The

 7     Arizona Republic from March 2nd, 2007, by Richard Ruelas, is

 8     that correct?

 9             "ANSWER:  Yes.

10             "QUESTION:  Now, we'd -- you had talked before in

11     answer to a question from Mr. Liddy about pure immigration

12     programs.  And I direct your attention to the middle of this

13     first page, and there's starting with the sentence that says,

14     'Arpaio said his deputies.'

15             "Do you see that?

16             "ANSWER:  Yes.

17             "QUESTION:  And it continues:  'Would go after illegal

18     immigrants no matter the offense.'

19             "And then in quotes, 'Ours is an operation where we

20     want to go after illegals, not the crime first,' he said.

21     'It's a pure program.  You go after them, and you lock them

22     up.'

23             "Is that what you were referring to before in answer

24     to Mr. Liddy when you said that the sheriff had the authority

25     to do pure immigration enforcement?

1          "ANSWER:  No.  I was referring to the MOA.  In the

2     statement -- in the MOA, it does not limit the type of

3     enforcement, the first MOA.

4          "QUESTION:  That -- the MOA is -- is -- is -- is --

5     well, let me ask you:  When is the MOA authority supposed to be

6     utilized by a local enforcement agency as they go about doing

7     criminal investigations?

8          "ANSWER:  Are we talking about the 2007 MOA?

9          "QUESTION:  Yes.

10          "ANSWER:  The 2007 MOA basically had the 287(g) -- the

11     statute 287(g) cut and pasted right into it.  And it did not

12     delineate when the authority necessarily was able to be used,

13     only that -- that what it was -- the different task forces and

14     things like that were to be used.

15          "QUESTION:  Correct.  But they didn't -- did it

16     envision or require that the MOA was used in the course of a

17     criminal activities and investigations by the local enforcement

18     agency?

19          "ANSWER:  Did it envision that they would use the --

20          "QUESTION:  The --

21          "ANSWER:  -- the MOA?

22          "QUESTION:  -- 287 authority only as part of criminal

23     investigations under state law by that local enforcement

24     authority.

25          "ANSWER:  That is not what the 287(g) statute says.

1        "QUESTION:  So that if they just suspected a person on

2    the street of being in this country -- an MCSO deputy, being in

3    this country illegally but had no other reason to stop the

4    person, the MOA would allow that deputy to just go up and use

5    the 287(g) authority to detain that person, is that correct?

6        "ANSWER:  The MOA basically gave the -- anyone that

7    was cross-designated the same authority that an ICE

8    officer has.  That ICE officer still has to develop reasonable

9    suspicion and move forward into the continuum before -- you

10   know, before they contact someone, they have to have a

11   reasonable suspicion and to continue that contact.

12       "QUESTION:  And if, in fact, that law enforcement

13   encounter included a traffic stop, you would want that traffic

14   stop to be at the -- prosecuted first before you use the 287(g)

15   authority, is that correct?

16       "ANSWER:  That's correct.

17       "QUESTION:  But, in fact, during the MCSO crime

18   suppression operations, they generally did not, in fact,

19   prosecute the traffic violations before the 287(g) authority

20   was used.

21       "Is that your understanding and experience?

22       "ANSWER:  No.  That's incorrect.  They did prosecute

23   or cite in general the -- for the traffic violations, they made

24   arrests, they cleared warrants and were able to arrest many

25   people on criminal warrants prior to the execution of 287(g).

1        "QUESTION:  In all of these cases, for example the

2    ones I read earlier about speeding or a cracked windshield,

3    it's your understanding that first there was some sort of a --

4    a -- a disposition of that traffic violation before the 287(g)

5    authority kicked in?

6        "ANSWER:  That's correct.

7        "I relied primarily on the shift summaries that would

8    come to me --

9        "QUESTION:  Uh-huh.

10        "ANSWER:  -- that would say a certain alien was

11    stopped for a certain state violation.  That state violation

12    was then cited.  And then following that, they were interviewed

13    and detained based on 287(g) authority.

14        "A fact sheet was put on there for people and programs

15    that might be interested in starting a 287(g) program within

16    their jurisdiction and answered a few questions that they may

17    have of how 287(g) were to be used.

18        "QUESTION:  And this is put out by ICE?

19        "ANSWER:  It was an ICE employee wrote up the -- some

20    of these fact sheets.

21        "QUESTION:  And they were posted then on the ICE

22    website, is that correct?

23        "ANSWER:  Yes.

24        "QUESTION:  And this was to give information about

25    what an MOA does or does not do, is that fair to say?

1        "ANSWER:  Yes.

2        "QUESTION:  It says on the bottom of page 21 of 41 --

3   do you see that?  If you could turn to 21 of 41.  It's page 3

4   of 7 of the fact sheet.

5        "ANSWER:  Uh-huh.

6        "QUESTION:  The -- the bottom entry's -- the heading

7   is, 'What is the program designed to do?'

8        "Do you see that?

9        "ANSWER:  Yes.

10       "QUESTION:  And it says, 'The 287(g) program is

11  designed to enable state and local law enforcement personnel

12  incidental to the lawful arrest and during the course of their

13  normal duties to question and detained individuals for

14  potential removal from the United States if these individuals

15  are identified as undocumented illegal aliens and they are

16  suspected of committing a state crime.'

17       "Do you see that?

18       "ANSWER:  Yes.

19       "QUESTION:  Is that your understanding of what the

20  MOA's supposed to do -- the 287(g) program?  I'm sorry.

21       "ANSWER:  I'm not crazy about the wording, but it's

22  somewhat accurate.

23       "In our implementation of the program in Arizona, we

24  did focus on at least having some sort of state crime for the

25  initial contact.

1     "QUESTION:  That would be -- require a crime and not a

2  civil violation, is that correct?

3     "ANSWER:  No, that's not correct.

4     "QUESTION:  So it didn't matter to you whether it was

5  a civil or a low-level, low-impact criminal activity or even a

6  civil violation and -- and as a focus of the 287(g) program?

7     "ANSWER:  What mattered was that there was a

8  legitimate law enforcement encounter.  So it could be anything

9  from a traffic violation to a criminal -- criminal violation

10  that they were able to encounter those people that was a

11  legitimate law enforcement encounter.

12     "QUESTION:  You talked about the situation at

13  Cave Creek and Mr. Ortega Melendres's arrest, correct?

14     "ANSWER:  Yes.

15     "QUESTION:  Did you have any information about how

16  that car was stopped in the first place that

17  Mr. Ortega Melendres was riding in?

18     "ANSWER:  Yes.

19     "QUESTION:  And you're aware that they were concerned

20  about a day laborer site in Cave Creek that was run by a church

21  there, is that correct?  Were you aware?

22     "ANSWER:  Yes.

23     "QUESTION:  And you were aware that there was

24  undercover activity by the sheriff's department to observe the

25  activities of cars entering and leaving that day laborer center

1    in Cave Creek, is that right?

2         "ANSWER:  I was aware of that.

3         "QUESTION:  And on the occasion of the date of

4    Mr. Ortega's detention, you were aware that the MCSO had

5    observed a car leaving that Mr. Ortega was in the day laborer

6    center, is that accurate?  If you are aware.

7         "ANSWER:  I was told about the incident and how that

8    came -- came to be, yes.

9         "QUESTION:  And were you told that after they

10   identified this car as leaving the day laborer center and

11   picking up the day laborers, they, the MCSO folks, waited until

12   there was probable cause in the form of a speeding violation?

13        "ANSWER:  I don't recall what the violation was, but I

14   was told that once the traffic stop -- that there was a traffic

15   stop made.

16        "QUESTION:  And do you recall what the specifics were

17   in terms of the request to increase whether it was the level or

18   the type of supervision that you exercised?

19        "ANSWER:  I don't recall which reports.  It just

20   states -- some of these reports state that ICE supervision

21   is -- needs to be more, and so we made corrective actions to

22   make sure we supervised more.

23        "QUESTION:  So that it's -- is it fair to say that the

24   thrust of the GAO report is that there needs to be better

25   controls over the program in order to increase effectiveness,

1    is that fair?

2             "ANSWER:  It seems to be the title.

3             "QUESTION:  If we could continue under what GAO found

4    a couple of sentences down, it states, 'ICE officials stated

5    that the objective of the program is to address serious crime

6    such as narcotics smuggling committed by removable aliens.

7             "And is it fair to say that at least as to the extent

8    that the 287(g) or any of the MCSO officers were exercising

9    their authority to investigate or process solely state crimes,

10   the ICE office would not be involved in terms of supervising?

11            "ANSWER:  Are you saying I would not be involved in

12   supervising state crime violations?  Or actually --

13            "QUESTION:  Or enforcement by MCSO.

14            "ANSWER:  That's correct.  I don't get involved in the

15   state crime -- or ICE did not get involved in the state crime

16   violations.

17            "QUESTION:  And I was just asking, what steps, if any,

18   were taken by ICE to ensure that there was no racial profiling

19   that came into play in decisions made that led to the use of

20   287(g) authority here in Arizona?

21            "ANSWER:  Okay.  Fine.  We had the initial training,

22   which was the training on the use of race and the proper use.

23   And following that, there was reviews of the different

24   operations, whether it be internal or speaking with Maricopa.

25   We had additional verbiage put into some of their documents,

1    including that SOP and the other document where it states, and

2    their operational plans.  Myself and Joe Sousa, we collaborated

3    on several of those to say race will not be used, it will not

4    be tolerated -- use of race will not be tolerated.  It's in

5    many of their written documents.

6         "QUESTION:  So what was done specifically as one,

7    there's part of the training curriculum.  Do you know how many

8    hours were devoted to racial profiling or racial sensitivity

9    issues in the training for 287(g) certification?

10        "ANSWER:  I know that use of race -- DOJ use of race

11   is at least one hour, it may be two.  And then there's another

12   couple of hours in the same vain.

13        "QUESTION:  And there was no required continuing

14   education in the area of racial profiling or racial sensitivity

15   by 287(g) as a requirement, was there?

16        "ANSWER:  None.  None that I know of.

17        "QUESTION:  And the second that you mentioned is that

18   they put in the -- to operational plans at some point, you

19   shall not racially profile?  Is that -- is that fair to say,

20   the statement?

21        "ANSWER:  It's in their operational plans as we -- as

22   the program evolved, it was put in their operational plans,

23   their SOP and their other documents and briefed.  The reason it

24   was put in the -- in the operational plan is because it's

25   briefed.  Every time there's an operation, the briefing takes

1    place, and they go over the operational plan.

2         "QUESTION:  Right.  And there's a statement that says,

3    you shall not racially profile, in those plans?

4         "ANSWER:  Yes, there is.

5         "QUESTION:  Anything else that was done to ensure that

6    there was no racial profiling during the use of 287(g)

7    authority here in Maricopa?

8         "ANSWER:  Not that I can recall at this time.

9         "QUESTION:  As we sit here today, you are not in a

10   position to know what the motivation of any particular MCSO

11   officer was when he or she made a stop that led to the use of

12   287(g), is that -- is that a fair statement?

13        "ANSWER:  Correct.

14        "QUESTION:  The -- if I get back just through some of

15   this suppression patrols.  I -- just to confirm, ICE was not

16   involved in selecting or approving the locations of those

17   patrols, is that -- is that accurate?

18        "ANSWER:  I would -- yeah, I was not involved or ICE

19   was not involved in starting those.

20        "QUESTION:  Was ICE concerned if it appeared that

21   there was a predominance of -- of patrols in -- in

22   neighborhoods with heavy Latino concentrations?

23        "ANSWER:  We saw it in the media reports, but the

24   truth didn't really bear out to where the report -- where

25   the --

1           "QUESTION:  Did you under --

2           "ANSWER:  -- saturation patrols were.

3           "I was born and raised here, so I know the

4    neighborhoods.  And so we would talk -- I would talk with

5    the --

6           "QUESTION:  And, in your opinion, the statement that

7    they were predominantly in neighborhoods with a higher levels

8    of Latino population was not an accurate statement?

9           "ANSWER:  That's correct.

10          "QUESTION:  And as an example of that, Fountain Hills

11   is -- is -- has a uniquely low percentage of Latinos as a

12   neighborhood, is that a fair statement?

13          "ANSWER:  That would be fair.

14          "QUESTION:  Are you aware that the overwhelming

15   majority of the persons stopped by MCSO during their crime

16   suppression operation in Fountain Hills were Latino?

17          "ANSWER:  I don't know who were stopped, so...

18          "QUESTION:  So that's not something that ICE looked

19   into, the percentages?

20          "ANSWER:  No.

21          "QUESTION:  And it would not be troubling to you that

22   in a predominantly white neighborhood if the overwhelming

23   number of people stopped when they -- as a predicate for using

24   the 287(g) were, in fact, Latino?  That was not a concern for

25   the ICE office?

 1          "ANSWER:  It was not a surprise.

 2          "QUESTION:  Why would it not be a surprise in an

 3   overwhelmingly white neighborhood that the majority of people

 4   stopped for traffic violations were Latino?

 5          "ANSWER:  It just wouldn't be a surprise that

 6   that's -- that's what would happen based on the time and date,

 7   the time -- the time of the operation, when they were and how

 8   they were conducted on vehicle traffic stops.  It wouldn't be a

 9   surprise.

10          "QUESTION:  It was my understanding that the officers

11   of MCSO who went on the suppression hearings were told to stop

12   any car they saw violating any traffic or vehicle law.

13          "Is that your understanding?

14          "ANSWER:  Yes.

15          "QUESTION:  And it's your testimony that even with

16   those instructions, it's not surprising that during any given

17   day, they would stop an overwhelming number of Latino drivers

18   as compared to white drivers in Fountain Hills?

19          "ANSWER:  No.

20          "QUESTION:  And that's because Latino drivers are

21   worse drivers?  Or why would that be?  Explain.  I don't -- I

22   don't understand.

23          "ANSWER:  It's just the way -- like I said, the time

24   and date, those -- that's who's going to be out driving around.

25          "QUESTION:  And why would there be such a higher

1    percentage of Latinos in Fountain Hills streets when the

2    neighborhood is predominantly white?  In your experience.

3            "ANSWER:  I wouldn't know.  I just...

4            "QUESTION:  Okay.  But you don't know if it was, in

5    fact, because there was a higher percentage of Latino drivers

6    or the MCSO people selected Latino-looking drivers to, in fact,

7    stop for traffic violations?

8            "You don't know one way or the other as we sit here

9    today?

10           "ANSWER:  I just know what their operation orders

11    were.

12           "QUESTION:  But ICE -- it was not an issue that ICE

13    got involved in one way or the other, whether local law

14    enforcement in that area wanted MCSO to come in to use its

15    287(g) or didn't?  It was not an area -- an issue that ICE was

16    concerned about?

17           "ANSWER:  Correct.

18           "QUESTION:  I'm asking you, in terms of the results of

19    the arrests of any particular suppression operation, you or ICE

20    knew if those arrests were based on animus towards Latinos.

21           "ANSWER:  No.

22           "BY MR. LIDDY:

23           "QUESTION:  Did there come a time where the priorities

24    of the 287(g) program changed?

25           "ANSWER:  Yes.

1          "QUESTION:  Was that before or after January 20th,

2    2009?

3          "ANSWER:  I believe it was after 2000 -- January

4    2009."

5          (Videotaped deposition of Jason Douglas Kidd

6    concluded.)

7          MR. CASEY:  Your Honor, that concludes the deposition

8    testimony of Mr. Kidd.

9          The defendants would now call via video deposition ICE

10   witness Alonzo Péna, and I will queue that up.

11         THE COURT:  You and Ms. Gallagher work out the time

12   allocation?

13         MR. CASEY:  Your Honor, I believe -- Your Honor, I

14   believe the plaintiffs may be reduced to five minutes and 40

15   seconds and defendants are at an hour and 20 from a little --

16   almost an hour and 50 minutes.  So it looks like I have -- I

17   can't be more precise than that, unfortunately, but it looks

18   like we have a total run time of one hour and 23 minutes.  And

19   this is after further editing from our basically

20   two-and-a-half-hour designation.

21         THE COURT:  So the total time is what?

22         MR. CASEY:  An hour and 23 minutes, and I believe

23   plaintiffs may be only 5 minutes and 40 seconds.

24         MS. GALLAGHER:  We're happy to take only 5 minutes and

25   40 seconds, Your Honor, but my understanding was that we -- we

```
1   removed five minutes and 40 seconds of an original time that

2   was around 20 minutes, so --

3           MR. CASEY:  Okay.

4           MS. GALLAGHER:  But we're happy to take the five

5   minutes.

6           MR. CASEY:  Your Honor, Ms. Gallagher may be very

7   correct.  I can just tell the Court that we have a total run

8   time of an hour and 23, according to this.

9           THE COURT:  All right.

10          (Videotaped deposition of Alonzo R. Peña commences.)

11          "QUESTION:  Mr. Peña, where are you currently

12  employed?

13          "ANSWER:  I'm currently employed in Washington, D.C.,

14  with the Department of Homeland Security Immigration and

15  Customs Enforcement.

16          "QUESTION:  How long have you been working for the

17  Department of Homeland Security?

18          "ANSWER:  Since its creation in 2003.

19          "QUESTION:  And prior to the creation of the

20  Department of Homeland Security, where were you employed?

21          "ANSWER:  I was employed by the Department of Treasury

22  with the U.S. Customs Service.  And prior to that, I was part

23  of the Treasury Department as well as under Bureau of Alcohol,

24  Tobacco and Firearms.

25          "QUESTION:  Okay.  Now, you've stated that you're
```

1    currently employed in the Department of Homeland Security

2    office in Washington, D.C.  And prior to working there, where

3    were you -- where was your duty station?

4              "ANSWER:  In Mexico City at the U.S. Embassy.

5              "QUESTION:  And when were you there?

6              "ANSWER:  I believe I was there from July the 9th,

7    2008, till May of 2009.  I believe that's the -- those are

8    the -- the period of time.

9              "QUESTION:  And do you speak Spanish?

10             "ANSWER:  Yes.

11             "QUESTION:  Prior to a posting in Mexico City with the

12   U.S. Embassy, where were you posted?

13             "ANSWER:  Here in Arizona.

14             "QUESTION:  And specifically where?

15             "ANSWER:  At -- at the Office of the Special Agent in

16   Charge for Immigration and Customs Enforcement in Phoenix.

17             "QUESTION:  Now, is SAC, S-A-C, an acronym for the

18   special agent in charge?

19             "ANSWER:  Correct.

20             "QUESTION:  And was that your title?

21             "ANSWER:  Yes.

22             "QUESTION:  So you were the SAC?

23             "ANSWER:  Yes.

24             "QUESTION:  And how long were you posted as the

25   special agent in charge in Phoenix, Arizona?

1           "ANSWER:  I believe the dates were -- I arrived in

2     October of 2006 and departed in March -- end of March of 2008.

3           "QUESTION:  And was your departure due to a normal

4     rotation as professionals in -- in your -- in your career path?

5     Was there some event that led to your choosing to change duty

6     stations?

7           "ANSWER:  They created for the first -- the Department

8     of Homeland Security created the first attaché for the

9     department in Mexico City, and I was asked to apply for that

10    position.

11          "QUESTION:  Okay.  When you were serving as the SAC in

12    Phoenix, what were your duties?

13          "ANSWER:  At -- I was the -- as a special agent in

14    charge, I was in charge of the District of Arizona, which

15    included offices in Phoenix, Tucson, Nogales, Douglas, Yuma,

16    Sells.  And we had approximately 400 employees, and I was the

17    principal in charge of administering the immigration and

18    customs investigative activities for the entire district and

19    also the -- administering the administrative responsibilities

20    as well.

21          "QUESTION:  And would it be fair to say that those 400

22    employees were organized in the Department of Homeland Security

23    in which they had leaders to whom they answered that were

24    between you?

25          "ANSWER:  Yes, sir.

1          "QUESTION:  And who were the -- who were the

2    responsible persons in leadership positions directly below you?

3          "ANSWER:  Well, I had two deputies:  One here, deputy

4    special agent in charges.  One was Troy Henley.  He was

5    assigned here in Phoenix.  The second deputy was assigned in

6    Tucson, Richard Crocker.  Underneath those deputies are

7    assistant special agent in charges.  And I believe it was Pat

8    Schmidt, Terri Tollefson.  And shortly after I arrived, there

9    was a third special -- assistant special agent in charge added

10   to the roster here in Phoenix, and that was Angel, Angel,

11   Rascon.  And in Tucson, Deputy Crocker had, I believe, two

12   ASACs as well.

13         "QUESTION:  At the time you were serving at the SAC,

14   were you familiar with the 287(g) program generally?

15         "ANSWER:  Generally, yes.

16         "QUESTION:  Would you in your own words tell us what

17   287(g) stands for and what the 287(g) program is generally.

18         "ANSWER:  The 287(g) program is a -- is referred to by

19   a -- the -- the statute of -- of federal law that was, I

20   believe -- I can't remember if it was '96 -- 1996, '98, when it

21   was -- was enacted.  And it was under the Department of Justice

22   where -- during the old INS where it was a statute of law that

23   based on certain training and supervision, that ICE could -- or

24   at the time it was the Department of Justice under Justice

25   Immigration and Naturalization could cross-designate the

1    authorities of -- of -- of immigration officers to state and

2    local law enforcement agents, again, based on a particular

3    training and supervision.

4         "QUESTION:  Do you -- do you recall how the Maricopa

5    County Sheriff's Office first got engaged with 287(g)?

6         "ANSWER:  No.

7         "QUESTION:  Once local law enforcement seeks to

8    become -- to have some of its officers qualified under 287(g),

9    how are the local law enforcement officers certified to work

10   under the program?

11        "ANSWER:  Once an agreement's been signed and entered

12   into and -- and the program's been accepted?

13        "QUESTION:  Yes.  That's my question.

14        "ANSWER:  Yeah.  There is a -- a training course.

15   It's divided into two different areas.  One is a task force

16   model, and one is a jail model.  The officers, they have --

17   there's a certain criteria, I think the amount of time that

18   they've been on duty.  There's a back -- background provisions

19   that -- that are done.

20        "And -- and so once the -- the personnel has been

21   identified and they've cleared the background, this training,

22   dependent on whether they're going to be a task force

23   officer on the street, an investigator patrolman, or they're

24   going to be in the jail model, they -- they receive training

25   that's provided by -- by ICE and -- and I don't remember

```
 1   whether it's -- what -- the -- the task force model is a little

 2   longer than the jail model.  I don't know, but one's 10 weeks

 3   and one's 12 weeks or there's a different -- but it -- I do

 4   know that the task force model gets a little additional

 5   training than -- than the jail model.

 6          "And then they during that -- during the course of

 7   training, there's certain exams that have to be passed.  And --

 8   and based on -- on -- and I don't know what the -- the --

 9   the -- the cutoff pass -- pass grade is.  But those that

10   complete the training -- successfully complete the training are

11   then certified as -- as 287(g) officers.

12          "QUESTION:  Who are the trainers?  Who teaches the

13   classes?

14          "ANSWER:  It's -- it's -- some of them are taught by

15   staff from Glynco, Georgia, from our Federal Law Enforcement

16   Training Center.  Some are -- some -- it's a -- it's a

17   combination of -- of -- of officers -- maybe agents from the

18   existing offices and from the -- but it's -- it's coordinated

19   by the training center, and so they're the ones that -- that

20   actually are, you know -- who -- who -- who get the curriculum

21   and ensure that who -- who the instructors are.

22          "So I'm not sure how the -- you know, in particular

23   they go about picking the instructors, but -- but it's the

24   responsibility of the training center to ensure that the

25   instructors are -- are -- are knowledgeable and -- and have the
```

1  right background to teach the courses.

2       "QUESTION:  Are you aware of where the 287(g)

3  certified law enforcement officers of the Maricopa County

4  Sheriff's Office were certified?

5       "ANSWER:  I believe that the first class was here

6  in -- in Phoenix for Maricopa.  And, now, that was, I think,

7  the initial 100 -- approximately about 160 were trained here

8  in -- in Phoenix.

9       "QUESTION:  So, just to be clear, not every state or

10 local law enforcement department that applies to the 287(g)

11 program is accepted?

12      "ANSWER:  Correct.

13      "QUESTION:  Can you tell me what are some of the

14 variables the Department of Homeland Security looks at when

15 they are -- when they are evaluating a local law enforcement

16 application to determine whether it's appropriate to accept and

17 certify people from that law enforcement agency or not.

18      "ANSWER:  One would be, do we have the -- do we have

19 the -- the sufficient staffing to supervise the program?

20 Another one would be, is there sufficient activity in that

21 jurisdiction that would merit us having a program with them?

22 Another would be, is there another program that best fits the

23 needs of that department and not a 287(g) program?

24      "So those are -- those are...

25      "QUESTION:  Okay.  Is the SAC in Phoenix -- let me

1    rephrase that.

2         "Was the SAC in Phoenix a decision maker when the

3    determination was made to accept the Maricopa County Sheriff's

4    Office's application for participation in the 287(g) program?

5         "ANSWER:  The -- the decision to accept Maricopa

6    County Sheriff's was made in Washington, D.C. --

7         "QUESTION:  Was it --

8         "ANSWER:  -- not by the -- not by the SAC Phoenix.

9         "QUESTION:  Right.  Was it made with input from the

10   SAC?

11        "ANSWER:  Yes.

12        "Well, let me -- let me clear that answer.  The

13   position that I had that -- now, whether it was -- I don't know

14   that -- that it was used, but I can say that I did believe that

15   it would be an appropriate program here, and I did convey that

16   to Washington.

17        "QUESTION:  When the decision was made to have an

18   agreement with Maricopa County and to certify, were you the

19   SAC?

20        "ANSWER:  Yes.

21        "QUESTION:  Okay.  Were you familiar with the

22   curriculum that was taught to those who were being certified

23   under 287(g)?

24        "ANSWER:  In general, generally.  And I -- you know,

25   not -- I didn't review the materials or -- you know, in detail.

1   And I don't recall attending -- I think I -- I walked into one

2   of the classes to say -- to visit and say hello.  And then,

3   again, I said I -- I attended the graduation.  But I -- I just

4   had a very general...

5           "QUESTION:  So you were familiar with the curriculum,

6   but you would not hold yourself out as an expert in the

7   curriculum?

8           "ANSWER:  Correct.

9           "QUESTION:  And at any time, did you participate in

10  teaching any of the curriculum to any of the Maricopa County

11  Sheriff's Office employees that were 287(g) certified?

12          "ANSWER:  No, I did not.

13          "QUESTION:  Okay.  To your knowledge, does the

14  training include prohibition of using race as a consideration

15  or a factor for developing probable cause or reasonable

16  suspicion?

17          "ANSWER:  Yes, I believe it does.

18          "QUESTION:  Is the phrase racial profiling ever used

19  in the certification process?

20          "ANSWER:  Yes.  It's -- there is -- from -- from my

21  understanding of the curriculum, racial profiling and civil

22  rights issues are part of the curriculum of the 287(g) program.

23          "QUESTION:  What is racial profiling?

24          "ANSWER:  Racial profiling, the way I understand it,

25  is that where a law enforcement officer picks an individual for

1    some type of enforcement action based solely on his race and no

2    other particular criteria.  Just -- just based on the person's

3    skin color or speech or -- or what -- what may be...

4              "QUESTION:  Okay.  Is it your understanding that

5    racial profiling is an act by a law enforcement officer who

6    uses solely the factor of race in determining whether to

7    approach a suspect and not in conjunction with other factors?

8              "ANSWER:  My understanding of racial profiling is

9    where that's -- that is the sole factor that is used in -- in

10   whatever action that officer takes.  That it was based on the

11   person's race.

12             "QUESTION:  My question was, is racial profiling by

13   law enforcement unacceptable and in the law enforcement

14   community?

15             "ANSWER:  From my experience, absolutely.

16             "QUESTION:  Is racial profiling, from your experience,

17   unacceptable in the 287(g) program?

18             "ANSWER:  Absolutely.

19             "QUESTION:  I am going to hand you a document --

20             "Which let me hand it to you first and ask you that

21   you mark it as Exhibit Number 3.

22             "Let me show it to you first.  This is a letter that

23   was purportedly written by you to Benjamin Miranda.  And it is

24   marked in this litigation as Melendres MCSO 071805 through

25   071807.

1          "Is this letter familiar to you?

2          "ANSWER:  Yes, it is.

3          "QUESTION:  Did you write this letter?

4          "ANSWER:  No, I did not.

5          "QUESTION:  Okay.  If you would go to the final page

6     of this document, which is MCSO 071807.

7          "ANSWER:  Yes.

8          "QUESTION:  Is that your signature on the signature

9     line there?

10         "ANSWER:  Yes, it is.

11         "QUESTION:  Who wrote the document?

12         "ANSWER:  I -- I don't know exactly who -- who wrote

13    it.  It would have most likely been a collaboration of members

14    of my staff with --"

15         (Videotaped deposition of Alonzo R. Peña paused.)

16         MR. CASEY:  Your Honor, may I pause briefly?

17         I would just like to point out that Exhibit No. 3 is

18    Exhibit 1074 with the Court.

19         Is that admitted in evidence?

20         At this -- I don't believe it is admitted into

21    evidence.  At this time we would move it for admission.

22         MS. GALLAGHER:  Your Honor, it's correct it is not

23    admitted into evidence, and plaintiffs object on the basis of

24    hearsay, foundation.

25         THE COURT:  What's the purpose you're seeking to have

1    it admitted?

2            MR. CASEY:  Actually, just -- I don't think we need

3    it, actually, Your Honor.  To be candid with you, it's to allow

4    him to address his response to specific allegations that were

5    made in here, and the process in which he evaluated the

6    allegations as part of the supervision of MCSO.  So -- Your

7    Honor, I'm going to withdraw the motion at this point.  I may

8    renew it.

9            THE COURT:  Okay.

10           MR. CASEY:  Okay.  Thank you, Your Honor.

11           (Videotaped deposition of Alonzo R. Peña resumes.)

12           "ANSWER:  -- review and possibly with our chief

13   counsel's office here.

14           "QUESTION:  And you did sign this letter?

15           "ANSWER:  Yes, I did.

16           "QUESTION:  Okay.  And you were familiar with all of

17   its contents when you signed it?

18           "ANSWER:  Yes, I was.

19           "QUESTION:  And at the time that you signed it, did

20   you believe that everything stated in this letter was true?

21           "ANSWER:  Yes, I did.

22           "QUESTION:  And at this time today, do you believe

23   that everything that is in this letter is true?

24           "ANSWER:  Yes.

25           "QUESTION:  Would you tell me what the circumstances

1   were in which this letter was written and you signed it.

2          "ANSWER:  Ben Miranda, the State representative,

3   had -- I had had the opportunity to meet with him on a few

4   occasions, and so we were introduced.  And he was familiar with

5   who I was, and I was familiar with who he was.  And we had had

6   an ongoing dialogue whenever issues would come up within --

7   with our agency.  And I believe he had sent me a letter with

8   some concerns about Maricopa County, and this was in response

9   to his concerns.

10          "QUESTION:  I mean, were you serving at the -- as the

11  SAC at the time that you had these conversations with

12  Representative Miranda?

13          "ANSWER:  Yes.

14          "QUESTION:  Did you assign your staff the task of

15  drafting this letter to Mr. Miranda?

16          "ANSWER:  Yes.

17          "QUESTION:  Okay.  The individuals that wrote this

18  letter, how did they learn the information that they put in the

19  letter?

20          "ANSWER:  You're asking me the -- the purpose -- the

21  people that helped draft this?

22          "QUESTION:  Yes.

23          "ANSWER:  What?

24          "QUESTION:  How did they come to know the information

25  that they put in the document?

1        "ANSWER:  I -- I don't remember.

2        "QUESTION:  I'll direct your attention to paragraph 4,

3    which is the last paragraph on the first page of this letter,

4    MCSO 071805.

5        "ANSWER:  Okay.

6        "QUESTION:  If you'll follow along with me, at the

7    beginning of that paragraph it says, 'The Sheriff was correct

8    in stating that his offices now have broad powers, with their

9    new authority to enforce federal immigration laws, in

10   conjunction with their state criminal investigations,' period.

11       "How did you learn that that was a fact?

12       "ANSWER:  I know that because his officers were

13   trained and they had 287(g) authority, that that authority

14   broadened what they had under their state authorities.

15       "QUESTION:  Okay.  And, if you will, in the same

16   paragraph, the third sentence begins on the fourth line, 'The

17   training includes instruction on how to avoid civil rights

18   violations as well as cautions against so-called 'racial

19   profiling,' which is in quotations.

20       "And how did you learn that that was part of the

21   instruction?

22       "ANSWER:  Because we -- I had had conversations

23   with -- with my staff and with the people that were at -- at --

24   on the curriculum of this -- of the program, and I knew that it

25   had racial profiling sections in it.

1  "QUESTION:  I'll direct your attention to the next

2  page, which is 071806, the third paragraph down, seven lines up

3  from the bottom of that paragraph, the sentence that begins,

4  'At this point.'

5  "Do you see that?

6  "ANSWER:  Yes, I do.

7  "QUESTION:  If you'll follow along with me.  It says,

8  'At this point, I am pleased to say that there have been no

9  issues in the interpretation or implementation of the MOA that

10  have been significant enough to be raised to my level of

11  attention, something fairly remarkable in light of the

12  number of officers trained and the speed of implementation of

13  the program within Maricopa County.'

14  "Can you tell me upon what basis you signed a letter

15  that said that.

16  "ANSWER:  Because I -- I had not had issues that --

17  that -- that were brought to my attention that were in

18  violation of the MOA that were significantly as it states

19  there.  I -- I knew that as a fact.

20  "QUESTION:  Okay.  And it is your experience that that

21  was remarkable, quote, unquote, in light of the number of

22  officers in Maricopa County that were involved in 287(g)

23  program?

24  "ANSWER:  Yeah.  Yes, I -- I believe that it -- it

25  was -- we had trained quite a few officers in a -- in a very

1    short period of time.  Well, I wouldn't say a short period of

2    time.  I think what -- because the training was the same

3    training everybody got.  But as far as us being able to bring

4    it in and implement it and get it going, yes.

5           "QUESTION:  And was it remarkable that there had not

6    been any problems brought to your attention at that time?

7           "ANSWER:  I would say that it was, you know -- yes,

8    I -- I would say that it was pretty significant that we had

9    not -- we trained a lot of -- of officers, a lot of work.  Yes,

10   I'd say.

11          "QUESTION:  That document which you've just been

12   handed, which is designated as Exhibit Number 4, is that

13   document familiar to you?

14          "ANSWER:  Yes, it is.

15          "QUESTION:  And what is that document?

16          "ANSWER:  This is the Memorandum of Agreement that was

17   entered into between ICE and Maricopa County Sheriff's

18   Department allowing for the creation of a task force model and

19   a jail model in which 100 -- I believe it was 160 officers were

20   trained by ICE and eventually certified to perform the -- the

21   duties of -- under the 287(g) statute, which allowed them with

22   certain -- with supervision of ICE to perform immigration

23   activities.

24          "QUESTION:  Would it be fair to describe this document

25   as the governing document that would govern the activity of the

1    287(g) certified personnel of the Maricopa County Sheriff's

2    Office operating in Maricopa County underneath the supervision

3    of the Department of Homeland Security's Phoenix office?

4         "ANSWER:  This is -- yes.  This -- it would be fair to

5    say that this document is the framework for that relationship.

6         "QUESTION:  Okay.  You mentioned two phrases which I'd

7    like to inquire about.  One is task force model, and the other

8    is?

9         "ANSWER:  Jail model.

10        "QUESTION:  Jail model.

11        "Would you please describe for me the task force

12   model.  What did that mean, and how is it operating under

13   287(g)?

14        "ANSWER:  The task force model is the designation of

15   law enforcement officers, either state or local, that are --

16   that are either investigators or patrolman who work outside the

17   detention facilities on -- on -- on a daily basis doing either

18   routine patrol or -- and mainly it's -- and investigative --

19   and investigative work.

20        "And the jail model are either corrections officers,

21   or depending on the -- the jurisdiction, whatever title they

22   have, officers that work inside the -- the detention facilities

23   and institutions, correctional institutions.

24        "QUESTION:  So it would be fair to say that the task

25   force would be law enforcement officers on the street operating

1    under their 287(g) certification?

2          "ANSWER:  Yes.

3          "QUESTION:  Is it your understanding that the 287(g)

4    certified officers that operated under the task force model

5    were supervised by Department of Homeland Security personnel?

6          "ANSWER:  The -- the program calls for supervision of

7    the task force model.  And that definition of supervision, I

8    think, is where I want to be -- be clear that I'm explaining

9    this.  Is -- is it does not -- you know, it does not require

10   that -- that, you know, we're side by side everywhere they go.

11   I mean, it is oversight supervision available to, you know, for

12   consultation and discussion and -- and advice.

13         "So I just want to -- but, we -- there is a

14   responsibility and oversight supervision responsibility of ICE

15   with the -- with the model."

16         (Videotaped deposition of Alonzo R. Peña paused.)

17         MR. CASEY:  Your Honor, at this point I'd like to move

18   into evidence, offer for evidence, admission, Exhibit 4,

19   which -- from the deposition, which is Exhibit 1070 marked as

20   an exhibit.  It's the memorandum of agreement between ICE and

21   Maricopa County and the Sheriff's Office.

22         MS. GALLAGHER:  Your Honor, I believe it's actually

23   Exhibit 1075, and with that correction, we have no objection.

24         MR. CASEY:  Excuse me.  You have no objection?

25         MS. GALLAGHER:  To 1075, not to 1070, which is not

1    what he was talking about.

2            MR. CASEY:  I -- I misspoke.  It is 1075, and we move

3    that into evidence.  Sorry.

4            MS. GALLAGHER:  No objection.

5            THE COURT:  Exhibit 1075 is admitted.

6            (Exhibit No. 1075 is admitted into evidence.)

7            MR. CASEY:  Thank you, Your Honor.

8            (Videotaped deposition of Alonzo R. Peña resumes.)

9            "QUESTION:  May I direct you to Exhibit Number 4,

10   which is the MOA.

11           "ANSWER:  Okay.

12           "QUESTION:  On the bottom of the first page, which is

13   the fourth paragraph underneath the heading Roman numeral III,

14   Policy.  The fifth line down, about midway through the column

15   there, if you'll read along with me.

16           "ANSWER:  Yes.

17           "QUESTION:  'For the purposes of this MOA, ICE

18   officers will provide supervision for participating MCSO

19   personnel only as to immigration enforcement functions.  MCSO

20   retains supervision of all other aspects of the employment and

21   performance of duties of participating MCSO personnel.'

22           "So when you described in the response to the last

23   question the various aspects of supervision, is that what you

24   were referring to, that provision of the MOA?

25           "ANSWER:  That is part of it, yes.

1        "QUESTION:  So I believe you've already said that as

2   the SAC, you were directly involved with the supervision of the

3   task force model 280(c) -- 287(g) officers?

4        "ANSWER:  That is correct.

5        "QUESTION:  If I can direct your attention to the

6   second page of the MOA.  It falls underneath Roman numeral IV,

7   Assignments.  The second paragraph, three lines down, there is

8   a reference to Community Action Teams, open parens, CAT, close

9   parens.

10       "What are Community Action Teams?

11       "ANSWER:  From my understanding of that Community

12  Action Teams, this is teams that would be designated to assign

13  certain areas within the community where there was a need to

14  conduct law enforcement operations based on either intelligence

15  or referrals and for -- regarding security and public safety in

16  that area.

17       "QUESTION:  Okay.  Did these CAT teams operate under

18  the task force model?

19       "ANSWER:  Yes.

20       "QUESTION:  Just so I'm clear, these CAT teams operate

21  in areas where local law enforcement learned of intelligence or

22  federal law enforcement learned of intelligence or both?

23       "ANSWER:  It could be both.  But, primarily, I -- I

24  believe in this particular case, it would -- it would have been

25  that the state and local officers believed they needed to

1    enforce laws.

2         "QUESTION:  Now, under the 287(g) program, the

3    certified officers are enforcing federal law, is that correct?

4         "ANSWER:  Under 287(g)?

5         "QUESTION:  Yes.

6         "ANSWER:  That is correct.

7         "QUESTION:  So with regard to intelligence of ongoing

8    criminal activity that would warrant requests for CAT team

9    support, would that be for the enforcement of federal law, such

10   as smuggling personnel or moving drugs across the border, that

11   sort of thing?

12        "ANSWER:  From what I understand, CAT teams could get

13   information regarding certain criminal activity that could be

14   state jurisdictional matters, but that -- that -- but at the --

15   at the same time, there could be a -- a -- a segue or a -- into

16   federal statutes for -- for -- for -- so it could be -- it

17   could initially start off that they were going to be doing a

18   state activity that -- but as they got there and they get more

19   information, it could lead to federal violations.

20        "QUESTION:  Okay.  And, in your experience, what were

21   some of the federal violations that warranted CAT team

22   involvement?

23        "ANSWER:  It would be alien smuggling.  It would be

24   narcotic smuggling.  It could be gang activity with -- with

25   foreign nationals that were here illegally.  It could -- it

1    could be major -- it could be a -- a group -- you know, a major

2    false document activity.

3          "QUESTION:  May I direct your attention to the next

4    page of the MOA.  Under Roman numeral 5, Designation of

5    Authorized Functions, you'll see there are a list of items

6    designated by an individual bullet there.  And the second

7    bullet down, if you'll read with me.  'The power to arrest

8    without warrant any alien entering or attempting to unlawfully

9    enter the United States, or any alien in the United States, if

10   the officer has reason to believe the alien to be arrested is

11   in the United States in violation of law and is likely to

12   escape before a warrant can be obtained.'

13         "In your experience, what are the indicators that

14   would give rise to a law enforcement officer's reason to

15   believe that an alien to be arrested is in the United States in

16   violation of the law?

17         "ANSWER:  It would require several factors in

18   combination, such as the person doesn't possess valid documents

19   or possesses false documents.  It could be that the -- in

20   combination with the location the -- the individual's at, such

21   as, you know, proximity to the -- to the border.  It could --

22   it could be a factor.  It could be the language could be a

23   factor.  A particular knowledge of -- of information regarding

24   specific issues that somebody would be knowledgeable of that --

25   that is here illegally.  It could be a factor -- a -- the --

1    the other one -- I'm trying to remember.  The -- the

2    self-admissions made by the -- the individual could.

3            "So, but it -- again, I just want to emphasize that it

4    is a combination of these factors, not one.  So they don't --

5    they don't stand alone.  It would have to be in combination

6    with numerous of these -- of these factors to make a

7    determination that somebody is unlawfully in the country.

8            "QUESTION:  So, is it your experience that no one of

9    those factors you mentioned would be enough to give rise to a

10   reason to believe?

11           "ANSWER:  No, I -- I don't think that one alone

12   would -- would be sufficient.

13           "QUESTION:  Now, you did not mention in that series

14   that you just gave us race or ethnicity.  Is that because you

15   forgot and left it out, or is it because race and ethnicity is

16   not an indicator to give reason to believe, in your experience?

17           "ANSWER:  It -- it could be used, but, again, it

18   couldn't -- it is not to be used solely.  It is never to be

19   used just as a -- as a individual factor.

20           "QUESTION:  You mentioned that location is an

21   indicator, and you --

22           "ANSWER:  Could be an.

23           "QUESTION:  Could be.

24           "You mentioned that location could be an indicator and

25   you mentioned proximity to the border.

1          "Would location also be an indicator, or could it also

2     be an indicator if it was not necessarily close to the border

3     but in a known corridor for the trafficking and -- of illegal

4     immigrants?

5          "ANSWER:  I -- again, I would just need a little bit

6     more clarification what you refer to as a corridor.  I mean, if

7     you're talking about something that has been established by --

8     by law enforcement that known that -- known smugglers use that

9     corridor --

10         "QUESTION:  Yes.  That's exactly what I'm referring

11     to.  A corridor that has been established by law enforcement

12     officers as a known avenue for traffickers in either narcotics

13     or undocumented immigrants.

14         "ANSWER:  I would say that, again, with -- in

15     combination with other factors, that could be also.

16         "QUESTION:  Mr. Peña, Exhibit 4, I believe, was the

17     MOA, the Memorandum of Agreement.  And I just want to ask, for

18     the record, did ICE enter into a Memorandum of Agreement with

19     the Maricopa County Sheriff's Office regarding 287(g)

20     participation?

21         "ANSWER:  ICE entered into an agreement with -- it was

22     signed by our assistant agent, Julie Myers, and the Maricopa

23     County, I believe, the board of supervisors and the sheriff.

24     The -- the agreement was between the -- the sheriff's

25     department and ICE.

1          "QUESTION:  And, to your knowledge, when was that

2   agreement reached?

3          "ANSWER:  I believe the signature date for Julie Myers

4   was February 24th of 2007.

5          "QUESTION:  2007?

6          "ANSWER:  Yes, sir.

7          "QUESTION:  Okay.  And, to your knowledge, when did

8   that agreement become operational?

9          "ANSWER:  At the completion -- to my -- to my

10  understanding, it was at the completion of -- of the training,

11  but -- but the training could begin at the execution of the

12  document.

13         "QUESTION:  Specifically with regard to 287(g) and the

14  Maricopa County Sheriff's Office, what was your role?

15         "ANSWER:  My role was, again, as the person

16  responsible for the district activities, to have myself and my

17  staff ensure compliance with the -- with the -- with the

18  agreement, that -- and to ensure that it was providing the --

19  the results that we would -- and monitor and supervision and --

20  and -- and oversight of the agreement.

21         "Again, with me at the -- with me at the top and

22  having subordinate staff under me -- underneath delegated and

23  to -- you know, on the -- more on the daily activities and --

24  and -- and then also reporting to Washington any issues and

25  successes of the program.

1    "QUESTION:  Would racial profiling on the part of

2    Maricopa County Sheriff's Office participants be deemed by you

3    as noncompliance?

4    "ANSWER:  Racial profiling is not allowed under the

5    MOA.

6    "QUESTION:  So if a 287(g) participant racially

7    profiled, that would be in violation of the MOA, as you

8    understand it?

9    "ANSWER:  Yes.  It would be, because racial profiling

10   is not allowed.

11   "QUESTION:  So would it be fair to describe racial

12   profiling in 287(g) as noncompliance?

13   "ANSWER:  Again, I -- I'll have to say that that

14   287(g) agreement does not allow for racial profiling.  It does

15   not accept it.  It does not allow it.  It does not...

16   "QUESTION:  Okay.  So in your role as supervising and

17   ensuring compliance of the MOA, what actions would you have

18   taken had there been racial profiling from a participating

19   local law enforcement officer?

20   "ANSWER:  It would be a -- reported to the -- first of

21   all, it would be confronted with the jurisdiction, unless there

22   was some type of -- of -- of effort to assist in an

23   investigation by the Department of Justice.  We'd notify the

24   Department of Justice, because they're responsible for

25   investigating civil rights violations.

1         "So it would be -- it -- again, it -- dependent on the

2    circumstances if it was -- if it was something that we thought

3    that -- that it was best not to notify the agency right away so

4    that the Department of Justice could investigate.  But I would

5    think in -- in most cases, if we became aware, we would want to

6    confront the -- the agency and bring it to their attention, to

7    the management and the supervision of that if it was a

8    particular individual officer or -- or whatever the factors

9    were.

10        "So it -- it's -- it -- it would be -- I mean, I can't

11   say exactly how it would be -- dependent on the circumstances,

12   but it would -- again, it would be reported, and it would be

13   investigated.

14        "QUESTION:  While you were serving as the SAC here in

15   Phoenix, did you ever report an MCSO 287(g) officer for racial

16   profiling?

17        "ANSWER:  No, I did not.

18        "QUESTION:  Did you ever confront the Maricopa County

19   Sheriff's Office for one of its officers racial profiling?

20        "ANSWER:  No, I didn't.

21        "QUESTION:  And did you ever notify ICE headquarters

22   that there was racial profiling on the part of a 287(g)

23   certified officer at the Maricopa County Sheriff's Office?

24        "ANSWER:  I never notified Washington that there was

25   incidents of racial profiling in Maricopa County.

1       "QUESTION:  Is it your understanding that MCSO

2   personnel participating in the 287(g) program would be

3   exercising their immigration related authorities during the

4   course of criminal investigations involving aliens that they

5   encounter within Maricopa County?

6       "ANSWER:  I mean, I would need a -- you know, like

7   a -- a more specific -- I mean, did they have the authority

8   they were -- to administer immigration law during the course of

9   criminal investigations if they encountered immigration

10  violations?  Those that were trained and certified did.

11      "QUESTION:  Yes, they did?

12      "ANSWER:  Those that were trained and certified could

13  use the authority that they possessed.

14      "QUESTION:  And to your knowledge, did they?

15      "ANSWER:  I -- I don't know the -- the specific

16  incidents that -- that they did use it.  I -- because in --

17  with Maricopa and Arizona somewhat unique, they had state

18  authority in many cases.  So I'm just -- I know that there was

19  certain statistics that we kept, I don't recall what they are,

20  of -- of when they used the federal authorities versus when

21  they were using their state authorities.

22      "So what I'm trying to answer for you here is that

23  the -- they did possess it.  They could use it.  Exactly how

24  many instances when, I don't know the -- that answer.

25      "QUESTION:  Okay.  To your knowledge, is human

1    smuggling a crime in Arizona?

2            "ANSWER:  Yes.

3            "QUESTION:  Could you answer again so we have a clear

4    record.

5            "ANSWER:  Yes.

6            "QUESTION:  To your knowledge, is identity theft a

7    crime in Arizona?

8            "ANSWER:  Yes.

9            "QUESTION:  Now, the sentence that I just read said,

10   'Officers indicated that ICE typically reviews the actions of

11   the HSU members after they have exercised their 287(g)

12   authority.'

13           "Is that your recollection of the operations?

14           "ANSWER:  During my -- during my tenure as SAC here,

15   ICE and Maricopa had established communications on operations

16   and, in most instances, were practical.  ICE was notified, and

17   the -- and discussed the operations, and then there were times

18   where MCSO officers could have encountered activity, you know,

19   just in the -- in the course of their duties that led to 287,

20   and then they would subsequently notify us.  So that would --

21   that would be correct.

22           "QUESTION:  When you were serving as the SAC in

23   Phoenix, were you aware that the Maricopa County Sheriff's

24   Office conducted operations that it called crime suppression

25   patrols or saturation patrols?

1       "ANSWER:  Yes, I was.

2       "QUESTION:  Would you describe for me your

3  understanding of what a crime suppression patrol or saturation

4  patrol was.

5       "ANSWER:  It was an -- a law enforcement technique in

6  which either based on reporting or intelligence or -- or

7  observations by the -- by the department of criminal activity

8  in a certain area, that they would respond to that area with

9  resources to address whatever the criminal activity that was

10  alleged to be taking place in that -- in that particular area.

11       "QUESTION:  In your experience, have other law

12  enforcement organizations used this technique?

13       "ANSWER:  I -- I don't have -- I -- it -- that term.

14  I know that as a member of the Texas Department of Public

15  Safety as a trooper, we would have certain tasks, we'd call it

16  a task force, and we'd saturate a certain area.  And -- and it

17  could be enforcement of -- of a -- you know, DWIs, or it could

18  be enforcement of seat belt laws or some type of -- of law.

19       "So, I mean, I...

20       "QUESTION:  So, in your experience in law enforcement,

21  this tactic was not unique to Maricopa County?

22       "ANSWER:  I do not believe it is.

23       "QUESTION:  While you were serving as the SAC in

24  Phoenix, did -- do you recall some of these operations

25  resulting in complaints?

1          "ANSWER:  Yes.

2          "QUESTION:  Would you tell me about those you recall.

3          "ANSWER:  The -- the ones that come to mind and -- and

4    probably were activities involving the -- a -- what I'll refer

5    to as the Pruitt's Furniture location.  I believe there was --

6    I don't know where the location was, but it involved corn

7    vendors.  And another one was, I believe, in either -- I get

8    them mixed up, but I think there was in both locations, but I'm

9    not sure of the particular facts to each one.  Cave Creek and

10   Queen Creek areas.

11         "QUESTION:  Were these complaints brought to the

12   attention of you at the time, or did you learn about them

13   later?

14         "ANSWER:  I learned about them -- the complaints.  I

15   learned about the complaints after they had taken place.

16   The -- about the complaints.  I learned about the operations

17   prior to them taking place.

18         "QUESTION:  Well, let me ask you about both of those

19   but just one at a time.

20         "As SAC in Phoenix, did you investigate any of the

21   complaints arising out of the Pruitt's Furniture saturation

22   patrols?

23         "ANSWER:  I had my subordinate staff make inquiries

24   and -- and -- and -- and meet with the sheriff's department

25   and -- and -- and look into allegations to see that they were

1    in compliance.  If they were using our authorities, that they

2    were in compliance if -- if, in fact, they were using 287(g).

3    If they were not -- if they were operating within their state

4    authorities and doing their state, that was not my

5    responsibility.  I was interested in were they using 287(g)

6    authorities and were there abuses or -- or -- or noncompliance

7    with that.

8         "QUESTION:  Did your subordinates that conducted this

9    inquiry find that the Maricopa County Sheriff's Office

10   personnel were using their 287(g) authority with regard to

11   Pruitt's?

12        "ANSWER:  What I believe we found was that they were

13   using their state authorities conducting operations at Pruitt.

14   If they encountered somebody and they arrested that person and

15   he was put in -- into the county jail, he very -- that person

16   very well may have come under then the task force model of our

17   287(g) authorities.

18        "QUESTION:  While you were serving as SAC in Phoenix,

19   did you ever express in writing to the Maricopa County Sheriff

20   or the Sheriff's Office any concern that you had over the use

21   of criminal complaints as the basis for conducting suppression

22   patrols?

23        "ANSWER:  No.  I don't think I ever wrote a -- a

24   correspondence to the sheriff that stated that.

25        "QUESTION:  You -- you previously had testified that

1    Sheriff's Office personnel may be engaged in enforcing local

2    law, and circumstances would arise at which they may employ

3    their 287(g) authority, is that correct?

4         "ANSWER:  In relationship that what I said was they

5    could initially start using their state authorities --

6         "QUESTION:  Right.

7         "ANSWER:  -- and they could encounter what could turn

8    out to be a major alien smuggling operation, and they could --

9    they could work with us on that, and their offices could use

10   their authorities working with us.

11        "They could also be enforcing -- using their state

12   authorities, encounter somebody that is apprehended and that

13   person ends up, you know, under a state charge in the jail.

14   And then that person, if he's illegal, he could become under

15   our jurisdiction where their deputy identify -- their 287(g)

16   deputy identified that person in the screening process.

17        "So my answer is could -- yes, they could be initially

18   starting an -- an activity using their state authority that

19   could migrate into the -- the 287(g) authorities.

20        "QUESTION:  While you were serving as SAC in Phoenix,

21   did you ever express in writing to the Maricopa County Sheriff

22   or the Sheriff's Office any concern over the use of community

23   leaders' requests for saturation patrols as the basis for

24   conducting a saturation patrol?

25        "ANSWER:  No.

1          "QUESTION:  While you were serving as the SAC here in

2   Phoenix, did you ever express in writing to the Maricopa County

3   Sheriff or anyone at the Sheriff's Office any criticism of the

4   use of crime suppression patrols for any reason whatsoever?

5          "ANSWER:  I -- in writing I never expressed that, no.

6          "What I was aware of is that Arizona had its -- its

7   own authorities that they could elect to use at -- in lieu of

8   federal authorities.

9          "QUESTION:  And did that authority include the

10  enforcement of traffic violations?

11         "ANSWER:  As I understand, the sheriff's -- the

12  sheriff's department here in Maricopa has the authority to

13  enforce traffic laws.

14         "QUESTION:  When you served as SAC Phoenix, did you

15  ever express in writing any concern to the Maricopa County

16  Sheriff or the Sheriff's Office regarding the identification of

17  aliens during civil traffic stops?

18         "ANSWER:  Let me just say that, you know, most of my

19  contact with the sheriff was verbally; I mean, either on the

20  phone, a meeting in person, you know, attending meetings.  It

21  was not through written correspondence.  And -- and sometimes

22  I'm -- I met with my staff and had discussions regarding -- I

23  would be briefed regarding the sheriff's department's

24  activities.

25         "And so the question you're asking me now is, did I in

```
 1   writing express concern?  Was that --

 2            "QUESTION:  Yes, that's correct.

 3            "ANSWER:  I -- like I said, most of the -- most of my

 4   contact if -- was -- was going to be, again, verbal contact

 5   with the sheriff and -- and his staff --

 6            "QUESTION:  Okay.

 7            "ANSWER:  -- as well.

 8            "QUESTION:  Would it be fair to say that if while

 9   serving as SAC Phoenix you had a concern that 287(g) certified

10   Maricopa County Sheriff's Office employees who are identifying

11   aliens during civil traffic stops and that in so doing put them

12   out of compliance with the MOA, that you would have reported it

13   in writing?

14            "ANSWER:  If there was violations of the MOA, if there

15   was an abuse of the -- of -- and a noncompliance, I would have

16   probably -- again, going back to my previous answer, based on

17   what the circumstances were and the allegations were and what

18   was in the best -- how would you be the best to proceed, I

19   would either -- either verbal -- you know, spoken with the

20   sheriff or his representatives or -- or pursued other,

21   through -- you know, again, depending on the circumstances,

22   through the Department of Justice and -- and reported it to

23   headquarters.  And, if necessary, I would have put it in

24   writing if I felt that that was the best course to -- you know,

25   to -- to -- to express to the sheriff -- sheriff's department
```

1    that they were in noncompliance.  But, again, it just depended

2    on what that noncompliance was and those circumstances.

3           "But just to hopefully be clear, it would have not

4    been tolerated.  I -- and it -- there would have been action

5    taken.  But exactly what that action, that would, again, be

6    dependent on the circumstance.

7           "QUESTION:  If a non-287(g) certified deputy had a

8    traffic stop and then determined that the person stopped was

9    not violating any Arizona state laws but did suspect that the

10   person did not have legal status, he could then call a T -- a

11   287(g) certified officer to the scene?

12          "ANSWER:  What is critical is that -- that he has to

13   have the legal basis to detain that person on his own state

14   charges.  And it has to be reasonable, the amount of time

15   reasonable in -- in -- in requesting assistance to come make a

16   determination regarding the status.

17          "QUESTION:  As SAC, do you recall ever expressing in

18   writing any concern that Maricopa County Sheriff's Office

19   employees that were not 287(g) certified were detaining

20   individuals that were determined not to have violated the

21   Arizona state law and were calling 287(g) certified officers to

22   the scene to determine whether there's legal status?

23          "ANSWER:  I never put anything in writing that

24   addressed that, as you stated it there.

25          "QUESTION:  While you were serving as SAC Phoenix,

1  were you aware that the Maricopa County Sheriff's Office

2  routinely notified ICE when planning and executing activities

3  where the Sheriff's Office anticipated the possibility of using

4  its 287(g) authority?

5          "ANSWER:  That is the agreement that we had with

6  Maricopa, was that if they -- if they believe that there would

7  in the course of their activities would use the 287(g)

8  authority, to in advance, where practical, to discuss it with

9  our -- with our officers, with our -- with our 287(g)

10 coordinator.

11         "QUESTION:  And, as you sit here today, do you recall

12 that that was the practice?

13         "ANSWER:  In -- in the majority of the cases, yes.

14 I'm -- sorry.

15         "QUESTION:  I direct your attention to Bates

16 number ICE 775, which is the first of these three pages.

17         "ANSWER:  Yes, sir.

18         "QUESTION:  The second-to-last line of the second

19 paragraph, which begins, 'SAC Peña commended MCSO activities

20 and cooperation with his office.'

21         "Is that a correct statement?

22         "Is that correct?  Did you commend MCSO activities and

23 cooperation with your office?

24         "ANSWER:  I -- as I said earlier, I -- I do not recall

25 this specific interview.  I -- I see that it says that I was

1    interviewed, so most likely I was.  I don't remember this

2    specific, you know, this comment, but I do -- do recall at --

3    and whether it was here in this context, having said that MCSO

4    was to be commended for the assistance they provide our agency.

5            "QUESTION:  On the next page, ICE 776 --"

6            (Videotaped deposition of Alonzo R. Peña paused.)

7            MR. CASEY:  Your Honor, I just want to make reference

8    for the Court that the document being referenced, ICE Bates

9    label 775 through 777, is Exhibit 1081.

10           THE COURT:  Has that been admitted?

11           MR. CASEY:  It is -- I do not believe it is admitted.

12   I just wanted to reference it for the record.

13           THE COURT:  Thank you.

14           (Videotaped deposition of Alonzo R. Peña resumes.)

15           "QUESTION:  -- at the very last paragraph, which is

16   subtitled number 2, it begins 'Approximately 30 miles southwest

17   of Phoenix was a day laborer site in the Queen Creek area.'

18           "Does that refresh your recollection as to whether or

19   not incidents at the Queen Creek area day laborer site came to

20   your attention while you were SAC Phoenix?

21           "ANSWER:  Yes.

22           "QUESTION:  What do you recall as you sit here today

23   the issues were back then regarding the Queen Creek area day

24   laborer site?

25           "ANSWER:  Well, this is refreshing my memory.  I

1    remember there was one incident where there was complaints of

2    the lewd comments, the young girls passing, and harassment at

3    one of the -- one of the locations.  That was an issue that --

4    where complaints had been received and that -- that the

5    sheriff's department was going to take action regarding that.

6              "QUESTION:  While you were SAC Phoenix, were 287(g)

7    officers reminded before each saturation patrol not to use or

8    consider race in developing probable cause?

9              "ANSWER:  That's a very -- well, I can't answer that

10   question.  I mean, it's a broad question.  I mean, reminded by

11   who?  By -- by their own personal -- I don't know.  I wasn't

12   out there on the scene before they went outside.  I can't

13   answer that question.

14             "QUESTION:  So are you aware of ICE personnel

15   reminding 287(g) officers from the Maricopa County Sheriff's

16   Office before they went out on a saturation patrol not to use

17   race as a consideration for developing probable cause?

18             "ANSWER:  Yeah.  I wasn't out there, so I don't know.

19             "QUESTION:  Did you ever attend an MCSO saturation

20   patrol?

21             "ANSWER:  No, I did not.

22             "QUESTION:  Did you ever personally observe any

23   violations of the MOA?

24             "ANSWER:  The -- there was what I believe to be a

25   violation of one of the provisions where it had to do with

1    coordination of -- of media, the press, without working to --

2    to -- together with us.  And I think there was a couple, one or

3    two times that the sheriff independently held press events

4    discussing 287(g) without the -- what we believe to be the

5    coordination on that issue.

6         "QUESTION:  Are you aware of any other ICE personnel

7    from the Phoenix office other than Mr. Kidd who attended any of

8    the MCSO saturation patrols?

9         "ANSWER:  Again, I'm -- I don't know -- and if I

10    stated it, let me correct myself.  I don't know that Mr. Kidd

11    did himself.  He may have.  I -- he -- I -- you'd have to ask

12    him.  I -- I -- I -- I don't recall with specificity --

13    specifically that he did.

14         "QUESTION:  That's consistent with your last answer --

15         "ANSWER:  Okay.

16         "QUESTION:  -- so you didn't misspeak.

17         "And, but are you aware of anyone other than Mr. Kidd

18    who attended?

19         "ANSWER:  No, I'm not.

20         "QUESTION:  Generally, what is the role of ICE in its

21    supervising capacity of MCSO 287(g) certified personnel

22    exercising their 287(g) authority?

23         "ANSWER:  Generally, it is to ensure that the

24    personnel that are executing the -- the duties are -- are

25    personnel that were trained and certified and -- and in current

1    standing.  Ensure that the activities that they are performing

2    are consistent with the -- the frame of the MOA.  That the --

3    that -- that the -- that the efforts that are being undertaken

4    are consistent with our priorities, ICE's priorities.  That

5    there's a consistency with our priorities as well.  And that at

6    the -- at the end of the day, that we are -- are confident that

7    we are bringing public safety to the community that we serve.

8         "QUESTION:  So specifically with regards to ICE

9    Phoenix, that community would be the entire state of Arizona?

10        "ANSWER:  Well, for that -- that agreement would be

11   within -- where we -- and my answer to that question was it

12   would be within the jurisdiction that Maricopa County had.

13        "QUESTION:  Were you aware of a complaint of racial

14   profiling while you were SAC Phoenix?

15        "ANSWER:  I received concerns from several angio

16   groups and also from State Representative Ben -- Ben Miranda

17   that there was concerns about the sheriff's department's use of

18   287(g).  And it -- it was more -- it was -- I don't believe it

19   was ever expressed specifically that it was racial profiling.

20   I think it was expressed that fear in the community.  It was

21   expressed as, you know, disruptive type -- to -- but I -- I

22   don't recall that anybody made a specific claim to me that said

23   of a specific incident where -- where there was a racial

24   profiling.  I -- I -- let me go back and think this.

25        "I -- I know that there was -- there -- there was some

1  discussions regarding their sheriff's deputy doing traffic

2  stops and that some of those traffic stops were for minor

3  violations and there were Hispanics involved in those traffic

4  stop, but I -- I cannot recall that anybody used the term and a

5  charge that there was racial profiling.

6        "I mean, there was a heavy emphasis on that the

7  community was -- was concerned that Hispanic -- that the

8  Hispanic community was concerned about the activities that the

9  sheriff's department and then when I was -- was conducting.

10  But when we drilled down on those, there weren't -- there were

11  usually, in most cases, in -- issues involving the state

12  authority, not the 287(g) authorities.

13        "QUESTION:  Do you recall the purpose of the meeting?

14        "ANSWER:  It was to inform MCSO that there was a

15  decision had been made in Washington to terminate their task

16  force model of the 287(g) program.  And that basically that it

17  would not be renewed, I should say, which would result in a

18  termination.

19        "QUESTION:  Do you recall that there had been a change

20  in priorities for the 287(g) program within the Department of

21  Homeland Security?

22        "ANSWER:  Yes.

23        "QUESTION:  And did that change in priorities produce

24  a new proposed Memorandum of Understanding?

25        "ANSWER:  When the new administration took office,

1    there was a -- a change in focus and priority of the -- of ICE

2    and -- and -- and in that change, they -- all 287(g) agreements

3    were reviewed.  I think it was a 90-day period that they were

4    all going to be renewed to see which ones would be renewed and

5    which ones would not be renewed to be -- and to ensure that

6    they were going to be consistent with the new priorities set

7    forth by ICE.

8            "QUESTION:  Were you a decision maker in 2009 when the

9    decision was made to terminate the MCSO field authority under

10   the old MOA?

11           "ANSWER:  I was not the decision maker.

12           "QUESTION:  Would it be accurate to describe your role

13   as a messenger?

14           "ANSWER:  Yes.

15           "QUESTION:  Do you know the specific reasons and the

16   factual bases for the decision by the Department of Homeland

17   Security to discontinue the task force model MOA in Maricopa

18   County?

19           "ANSWER:  No, I do not.

20           "QUESTION:  At any time while you served as the

21   special agent in charge in Phoenix, had the Maricopa County

22   Sheriff's Office violated any portion of the Memorandum of

23   Understanding -- excuse me -- Memorandum of Agreement other

24   than what you previously referred to involving press

25   availabilities and press conferences?

1           "ANSWER:  To my knowledge, no, I was not aware of any

2   other, other than the one I mentioned as you described."

3           (Videotaped deposition of Alonzo R. Peña paused.)

4           MR. CASEY:  Your Honor, we're at the noon hour and

5   we're now at a good point where some questioning of plaintiffs'

6   counsel begins.  We can continue, we can break, whatever Your

7   Honor desires.

8           THE COURT:  Well, as I gather, it's about 15 minutes

9   left?

10          MS. GALLAGHER:  I don't -- I don't know precisely

11  since they're interwoven, our designations and theirs, but --

12          THE COURT:  Well, I'll tell you --

13          MS. GALLAGHER:  -- I don't believe there's much more

14  than that.

15          THE COURT:  I'm on a roll.  I'd rather finish.

16          MS. GALLAGHER:  Thank you, Your Honor.

17          MR. CASEY:  The roll will continue.

18          (Videotaped deposition of Alonzo R. Peña resumes.)

19          "BY MR. POCHODA:

20          "QUESTION:  Okay.  Then turning on to page -- the next

21  page, under the -- the top under the heading, 'What is the

22  program not designed to do,' in reading that, it says, 'The

23  287(g) program is not designed to allow state and local

24  agencies to perform random street operations.'

25          "Continuing:  'It is not designed to impact issues

1    such as excessive occupancy and day laborer activities.  In

2    outlining the program, ICE representatives have repeatedly

3    emphasized that it is designed to identify individuals for

4    potential removal who pose a threat to public safety as a

5    result of an arrest and/or conviction for state crimes.'

6         "Was that your understanding in 2007 of what the

7    287(g) program -- was -- was directed at?

8         "ANSWER:  I understand that the program was designed

9    to -- in the -- specifically as it was stated there, to

10   produce -- to reduce the threats to public safety and bring

11   security to communities.

12        "QUESTION:  And did you have any instructions about

13   whether it mattered to the -- the folks in the headquarters of

14   your agency whether it was a low-impact of civil violation or a

15   criminal activity for which the 287(g) was used for?

16        "ANSWER:  Our -- our priority for the resources that

17   we had here in Arizona were to not pursue low -- low-level

18   civil types of -- of immigration violations.

19        "QUESTION:  And that would include civil traffic

20   violations, is that correct?

21        "ANSWER:  That's -- that -- that's correct.  But I --

22   and I will -- but I will state that at -- there had been formed

23   by the -- a -- what was called a Law Enforcement Response Team,

24   a LEAR team --

25        "QUESTION:  Or put it another way, put it in the way

1  that it's stated here, it says they -- that -- that the

2  officers trained and certified in the 287(g) program may use

3  their authority when dealing with someone suspected of state

4  crime that is more than a traffic offense.

5       "When you were then the head of SAC, did you approve

6  use of the 287(g) authority by the MCSO when they were only

7  dealing with traffic offenses?

8       "ANSWER:  When I was the -- the agent in charge,

9  there -- we were not using 287(g) officers to make traffic

10 stops.

11      "QUESTION:  No.  But this is about the 287(g) program.

12      "Did you in any way indicate to the 287(g) officers in

13 the MCSO that if only a traffic offense is involved, the 287(g)

14 authority should not be used?  Did you ever say that?

15      "ANSWER:  No, I did not say that.

16      "While they were using their state authorities, not

17 287(g) authorities.  That's what -- I just want to be clear I

18 said that, that they -- that the sheriff's department has their

19 own state authorities.  And they would use their state

20 authorities, not 287(g) authorities.  287(g) authorities were

21 not used to conduct traffic stops.

22      "QUESTION:  So if they were using their state

23 authorities to make traffic stop saturation patrols and as a

24 result of making the stops they would call in the 287(g), that

25 was consistent with what you believed the program should be

1    used for, is that right?

2            "ANSWER:  If they made a traffic stop and there was a

3    reasonable suspicion that that person may be and they wanted

4    further inquiry, just like any other police agency here in

5    Arizona could, they -- they could call us.  But -- but instead

6    of calling ICE to come to the scene, they would call their own

7    287(g) officer who had received training.

8            "QUESTION:  And so did -- you did not know one way or

9    the other if the sheriff's people were making traffic stops in

10   order to bring in 287(g) people?  You had no way to know that,

11   did you?

12           "ANSWER:  I did not go to the scene and see the

13   traffic stops, if that's your -- you know, the question.  It's,

14   no, I was not on the scene to see the traffic stops.

15           "QUESTION:  This has been marked as Exhibit 16.  And

16   if you look on the second page of this article, Mr. Peña, page

17   51, it states in the middle of the page -- of the -- of the

18   page, there's a quote from you.  And let me ask you if that was

19   the gist or the accurate -- the quote.

20           "The quote in the middle, do you see this?  'That's

21   not the purpose of this agreement to use it in that manner,'

22   Peña said.  'It's to go after gang members, smugglers, people

23   who committed crimes.'

24           "Have you -- do you see that?

25           "ANSWER:  Yes, I do.

1        "QUESTION:  Would that be something that you said at

2   that time?

3        "ANSWER:  Yes, it would.

4        "QUESTION:  And it continues -- not continues.  I'm

5   sorry.  The paragraph above, it states, 'Alonzo Peña, Special

6   Agent in Charge of ICE investigations in Arizona, confirmed

7   that federal authorities are negotiating an agreement with

8   Arpaio.  But he seemed surprised that Arpaio plans to use

9   deputies designated as immigration officers in such a broad

10  scope, including possibly routine traffic stops.'

11       "Do you see that?

12       "ANSWER:  Yes, I do.  And to be clear, my answer is

13  that they would not be using 287(g).  The deputies that were

14  trained could -- he could use them for whatever else he wanted

15  to use them for.  That's not my -- under my jurisdiction of

16  what he could use them for.

17       "But so I -- just to be clear, I would -- this is not

18  in any way saying that he was going to use our 287(g) training

19  officers to do routine traffic stops that -- for under the

20  287(g) umbrella.  Whether they're using their state authority

21  to do traffic stops...

22       "QUESTION:  Correct.  I believe you have said a couple

23  of times that -- that Arizona, in particular, was using some of

24  the 287(g) people and other personnel for state crimes, is that

25  correct?

1          "ANSWER:  No.  I never said -- what I -- what I said

2    is they use their state authority to enforce their state laws.

3          "QUESTION:  Yes.  That's what I meant.  I didn't mean

4    to imply anything else.

5          "And -- and the ICE would not be concerned about

6    supervising operations where they were enforcing state laws, is

7    that correct?

8          "ANSWER:  That's not our responsibility.

9          "QUESTION:  Did you at any time investigate whether

10   they had reasonable suspicion or probable cause for any of

11   those stops that led to 287 authority?

12         "ANSWER:  Again as I said, the -- the traffic stops,

13   whether they were made, were not being made under 287(g)

14   authority.

15         "QUESTION:  Correct.  And I just want to clear that

16   for the record.

17         "So that -- that if, for example, a particular

18   sheriff's officer stopped a car because that person had people

19   of color in it, you wouldn't know one way or the other if that

20   occurred or not?

21         "ANSWER:  Again, I -- I was not on the scene, the

22   scene where the traffic stops were being made.  I -- and my

23   inquiry when I -- there was -- when these incidents were

24   brought to our attention, we had -- I had my officers inquire

25   to make sure that these were legal -- legal traffic stops being

1    made pursuant to state authorities.

2         "QUESTION:  Is it -- are you saying that you in some

3    way had a method -- had a method to investigate whether any

4    particular traffic stop was -- was -- was attributable to

5    racial animus by an officer?

6         "ANSWER:  What I'm -- what I'm -- what I'm saying is

7    that when allegations surfaced regarding Maricopa County, I did

8    ask my staff to look into those allegations and to see what

9    authorities were being used, if our 287(g) authorities were

10   being used; and, if there were, you know, were they in

11   compliance.  And I was never -- I was never informed that any

12   of the traffic stops were based on 287(g) authority.

13        "QUESTION:  You, ICE, when you were here, did not know

14   one way or the other the motivation in any particular MCSO

15   officer in making a particular traffic stop?

16        "ANSWER:  I personally did not.

17        "QUESTION:  Would it be a concern to ICE and you when

18   you were in charge of ICE here if the Sheriff's Office was, in

19   fact, using these stops of traffic violators as a pretext for

20   getting folks who may be here illegally?

21        "ANSWER:  I would definitely be concerned if traffic

22   stops were being used as a pretext, yes.

23        "QUESTION:  So when you got information like this from

24   another stop when you were on -- in charge, would you have

25   asked anyone on your staff to assess whether these were

1    accurate statements of the probable cause?

2        "ANSWER:  While I was here, what I asked my staff was

3    to look into these operations.  And, again, to -- if they were

4    using our authority, and in the majority of these cases that

5    I'm aware of, they were not.  They were either using their own

6    authorities to enforce whatever laws, whatever state laws and

7    their own human smuggling laws, not ICE's 287(g) authorities.

8        "QUESTION:  Correct.  So then you -- you didn't have

9    the same supervisory responsibilities at that stage?

10       "ANSWER:  At that stage, no, sir.

11       "QUESTION:  'Therefore, ICE agents decided that they

12   did not need to be present for these operations or approve

13   related operational plans.'

14       "Do you see that?

15       "ANSWER:  Yes, I do see that.

16       "QUESTION:  Okay.  And then continuing, 'ICE is

17   statutorily required to supervise agencies participating in the

18   287(g) program, and internal control standards require an

19   agency's organizational structure to clearly define key areas

20   of authority and responsibility.'

21       "Continuing:  'Defining the nature and extent of the

22   agency's supervision over this large and growing program would

23   strengthen ICE's assurance that management's directives are

24   being carried out.'

25       "Was that discussed?

1          "ANSWER:  Not in my conversation with Mr. Stana, no.

2          "QUESTION:  'Finally' -- continuing -- 'while ICE

3     states in its MOA that participating agencies are responsible

4     for tracking and reporting data to ICE, in 20 of 29 MOAs GAO

5     reviewed, ICE did not define what data should be tracked or how

6     it would be collected and reported.'

7          "Was that discussed?

8          "ANSWER:  No.

9          "QUESTION:  And you didn't ask your staff to compare

10    the percent of Latinos in a particular location that the

11    suppression operation took part in and the percentage of

12    Latinos who were, in fact, stopped by MCSO in that location?

13         "ANSWER:  No, I did not ask that.

14         "QUESTION:  So that during these crime suppression

15    sweeps, would you agree that the MCSO officers could not use

16    race or ethnicity in deciding which motorists to pull over?

17    Would you agree with that?

18         "ANSWER:  I would agree that that would be illegal, to

19    use race as a -- as the sole factor for conducting a traffic

20    stop.

21         "QUESTION:  It can be a factor in combination with

22    other factors?

23         "ANSWER:  I -- I -- for -- I -- I -- I would see no --

24    no -- no reason that a race would be used to stop for -- for a

25    traffic violation, to use race.

1    "QUESTION:  And do you know while you were here as

2    the -- in the position as SAC what steps MCSO took to prevent

3    racial profiling amongst its officers during these crime

4    suppression sweeps?

5    "ANSWER:  I -- I do not know what the sheriff's

6    department's procedures are in that.

7    "QUESTION:  Do you know if there are any procedures in

8    the agency at MCSO to monitor or deter racial profiling amongst

9    its officers?

10    "ANSWER:  I'm not familiar with the MCSO's procedures

11    in that regard.

12    "QUESTION:  And you were not aware of whether the MCSO

13    requires any continuing education in the area of racial

14    profiling or racial sensitivity, do you?

15    "ANSWER:  No, sir, I do not.

16    "QUESTION:  And did not at the time?

17    "ANSWER:  No, sir, I did not at the time.

18    "QUESTION:  But you had indication, did you not, at

19    the time that you were with SAC that one of the goals of the

20    crime suppression sweeps was to reduce the number of illegal

21    immigrants here in Arizona?

22    "ANSWER:  I don't know what his -- what his -- you

23    know, the -- what his goals were, again, when he was using the

24    state authorities.  I -- I don't know.

25    "QUESTION:  And, again, that was the state authority

1    area, so you didn't have to intensely look into that?

2            "ANSWER:  That's correct.

3            "QUESTION:  Okay.  But so you don't know as we sit

4    here today -- and we can ask Mr. Kidd -- if -- if any of those

5    287(g) MCSO officers, in fact, primarily directed their -- or

6    stops towards traffic violations in order to use their MC --

7    287(g), do you?

8            "ANSWER:  I -- I don't.

9            "QUESTION:  And you're not in a position as we sit

10   here today to know if any of those 287(g) officers, in fact,

11   stopped a car because of racial considerations?

12           "ANSWER:  I -- again, I -- I don't know personally,

13   no.

14           "QUESTION:  And he says, quote, that -- is quoted as

15   saying, 'At the end of the day I determined the sweeps and

16   immigration enforcement of Maricopa was not consistent with new

17   priorities, which is removing severe criminal offenders who

18   pose a danger to society.'

19           "Do you see that?

20           "ANSWER:  Yes, I do.

21           "QUESTION:  So assuming this is accurate, the

22   authority was removed because Maricopa County Sheriff's Office

23   was not focusing on serious criminal offenders in use of the

24   duties under 287(g), correct?

25           "ANSWER:  And, as I stated, I do not personally know

1    why that agreement was not renewed.

2         "QUESTION:  Okay.  Do you have any reason to doubt

3    that this was a statement made by Mr. Morton?

4         "ANSWER:  No, I do not."

5         (Videotaped deposition of Alonzo R. Peña concluded.)

6         MR. CASEY:  Your Honor, the defense rests its case.

7         At this time we would renew our Rule 52(c) motion on

8    the same grounds that were tendered at the close of the

9    plaintiffs' case.

10        THE COURT:  Okay.  Thank you.  That motion is denied.

11        Are we going to have a rebuttal case?

12        MR. YOUNG:  Yes, we will, Your Honor.

13        THE COURT:  Okay.  Why don't we start at -- well, I'm

14   going to give you two hours.  I think that defendants have even

15   on their own time reserved time for cross-examination, and I

16   indicated to them if they needed it I'd give them more.

17        How long do you think your rebuttal case is going to

18   take?

19        MR. YOUNG:  I don't think we'll use the whole two

20   hours.  I'll have to talk to Mr. Byrnes as to exactly how long

21   it will be.

22        THE COURT:  All right.  Let's be back at 1:30.

23        (Lunch recess taken.)

24        THE COURT:  Please be seated.

25        Who's doing the rebuttal witness for the plaintiffs?

1           MR. BYRNES:  Yes, Your Honor.  Your Honor, before I

2    call our rebuttal witness, the clerk has requested that I state

3    the following on the record.  That is, that Exhibits 130 and

4    207, while admitted by the Court earlier in the proceedings,

5    are in fact exhibits that were withdrawn and therefore should

6    not be included -- are unavailable to be included in the record

7    and therefore should not be.

8           THE COURT:  All right.  Thank you.

9           MR. BYRNES:  Your Honor, plaintiffs call Dr. Ralph

10   Taylor in rebuttal.

11          THE COURT:  You're still under oath, Dr. Taylor.

12   You're still under oath.  You can take the stand, but you're

13   still under oath.  Understand?

14          MR. BYRNES:  Your Honor, may I proceed?

15          THE COURT:  You may.

16                     RALPH BRECKEN TAYLOR,

17   recalled as a rebuttal witness herein, having been previously

18   sworn, was examined and testified as follows:

19                     DIRECT EXAMINATION

20   BY MR. BYRNES:

21   Q.  Dr. Taylor, were you present in the courtroom for

22   Dr. Camarota's testimony?

23   A.  Yes.

24   Q.  Did you hear Dr. Camarota testify regarding your

25   conclusions?

1    A.  Yes.

2    Q.  Do you -- did you understand that Dr. Camarota agreed with

3    any of those conclusions?

4    A.  Yes.

5    Q.  With which of your conclusions do you believe Dr. Camarota

6    agreed?

7    A.  He agreed with my findings concerning the impact of

8    saturation patrol days on name checking patterns, and he agreed

9    with my finding regarding the impacts of Hispanic name checking

10   on stop lengths.

11   Q.  Dr. Camarota testified that the CAD data are irregular and

12   organized in a confusing way.  Are you concerned that the type

13   and organization of the CAD data prevented you from conducting

14   a scientifically valid analysis of the data?

15   A.  No.

16   Q.  Why not?

17   A.  Because I was able to extract the information that I needed

18   to answer the questions that I was examining.

19   Q.  Dr. Camarota testified that approximately 30 percent of the

20   incidents in the CAD database had no name of the person

21   stopped.  What, if any, significance does your not considering

22   incidents without names have for the validity of your analysis?

23   A.  It's not -- not necessarily known at this point whether

24   that would make my findings more or less valid.  The key point

25   is that I concentrated on the outcome variables that -- that

1  were available, and that would be the scholarly approach.

2  Q.  What outcome variables -- on which outcome variables did

3  you focus?

4  A.  There were two -- two outcome variables.  One was whether

5  or not a name checked was Hispanic, and the other one was stop

6  length.

7  Q.  Did your decision not to consider the incidents without

8  names introduce selection bias into your study?

9  A.  No, that -- that term has been -- no.

10  Q.  Why didn't it introduce selection bias?

11  A.  Selection bias refers to a very specific outcome of a

12  specific selection process, and as that's been described by

13  Dr. Camarota, that's not what's going on here with these data.

14  Q.  Dr. Camarota testified that it is difficult to accurately

15  determine which names are included in the data.

16      How did you extract names from the CAD database?

17  A.  I started by looking at hundreds and hundreds of records,

18  focusing on different fields, but also specifically the comment

19  field, which is a large text field, and the names appear in

20  there in different patterns and in different positions.

21      So I looked at those visually and then wrote programs

22  to extract the names and put them into a column for names, and

23  then I went back and looked again for additional ways that

24  names would be test -- would be nested in that field, and again

25  wrote other programs to extract more names.

1          And having done that to the best of my ability through

2    several programs, and followed by examination, I then pulled

3    200 random records, and then I looked to see if the names in

4    those records, specifically in the comment fields, were treated

5    appropriately by my programs, and they all were.

6    Q.   Is the approach that you used to extract names one that's

7    generally accepted in your field?

8    A.   Yes.

9    Q.   Dr. Camarota testified that he would want to inquire about

10   certain variables in evaluating whether Hispanics are

11   disproportionately targeted for traffic stops, including

12   whether Hispanics are more likely to drive or come into contact

13   with police.

14          Did you consider those variables?

15   A.   I did not consider those variables directly, but my

16   analysis controlled for those factors as well as possible,

17   given the data we have available.

18   Q.   How did your analysis control for those factors?

19   A.   It controlled for those factors by examining the difference

20   between saturation patrol days and three types of comparison

21   days: all nonsaturation patrol days, nonsaturation patrol days

22   occurring either a week before or a week after a saturation

23   patrol day, and contrasting saturation patrol days with

24   comparison days a year earlier.

25   Q.   How did your consideration of saturation patrol days

1  contrasted with control days control for whether Hispanics are

2  more likely to drive or come into contact with police?

3  A.  Right.  Well, if we're looking at name checking patterns on

4  a saturation patrol day at a particular day of the week and

5  we're also comparing that to the same day of the week a week

6  earlier or a week later, a plausible presumption generally is

7  that Hispanics' driving patterns would be comparable on the

8  saturation patrol day compared to a week earlier or a week

9  later.

10  Q.  Dr. Camarota testified that the MCSO did not QC the CAD

11  data.  Do you recall that testimony?

12  A.  Yes.

13  Q.  Does the MCSO's failure to QC the CAD data impact your

14  analysis?

15  A.  Not -- not necessarily.  Would have been better -- I was

16  able to find the variables that I needed and to extract the

17  information that I needed so I could answer the questions --

18  questions of interest.

19  Q.  Is it typical in your field to draw conclusions from data

20  that has not been QC'd?

21  A.  This often -- this often happens.  In criminal justice

22  there are many data sets that I and my colleagues work with,

23  and we always complain about data quality issues.

24  Q.  Did you conduct your analyses using a 70 percent

25  probability threshold for determining whether a name is

1    Hispanic?

2    A.  Yes.

3    Q.  I'd like to show you a number of demonstrative exhibits

4    that you saw when you testified several weeks ago.

5              MR. BYRNES:  Your Honor, may I display Demonstrative

6    Exhibit 399H?

7              THE COURT:  Yes.

8    BY MR. BYRNES:

9    Q.  Do you see the exhibit on your screen, Dr. Taylor?

10   A.  Yes.

11   Q.  Using the 70 percent probability threshold and the

12   re-processed data, what proportion of the names checked by the

13   MCSO were Hispanic?

14   A.  32.2 percent.

15   Q.  Is there a statistically significant difference between

16   your findings using the 70 percent probability threshold and

17   your findings using the 60, 80, and 90 percent probability

18   thresholds?

19   A.  No.

20   Q.  I'd like to show you Demonstrative Exhibit 399A.

21             MR. BYRNES:  Your Honor, may I show the witness and

22   the gallery?

23             THE COURT:  You may.

24   BY MR. BYRNES:

25   Q.  Dr. Taylor, using the 70 percent probability threshold,

1  what did you find about the likelihood of Hispanic name

2  checking on saturation patrol days as compared with control

3  days?

4  A.  First of all, if I may, we've got three different types of

5  control days, but the clearest and I think the strongest in

6  comparison is using the control days a week earlier or a week

7  later.

8        So if we focus on -- on that row, using the 70 percent

9  minimum probability threshold, what we see is that if a name

10 was checked using a 70 percent minimum probability threshold

11 for classifying a surname Hispanic, if a name was checked on

12 the saturation patrol day compared to a day a week earlier or a

13 week later, it was 34.4 percent more likely to be a Hispanic

14 name.  And the column right next to that shows, with the .001,

15 tells us that we would be unlikely to get a result like this

16 just due to chance more than one time in a thousand.

17 Q.  Dr. Taylor, I'm going to show you another demonstrative

18 exhibit.  This is 399C.

19        MR. BYRNES:  Your Honor, may I show the witness and

20 the gallery?

21        THE COURT:  You may.

22 BY MR. BYRNES:

23 Q.  Dr. Taylor, using the 70 percent probability threshold,

24 what did you find about the likelihood of Hispanic name

25 checking on saturation patrol days by saturation patrol active

1    officers as compared with officers who were not active in a

2    saturation patrol on that day?

3    A.   What I found was that if a name was checked, it was

4    53.5 percent more likely to be a Hispanic surname if it was

5    checked by the saturation patrol officer active on the

6    saturation patrol day.

7    Q.   Was there a statistically significant difference between

8    your findings using the 70 percent probability threshold and

9    your findings using the 60, 80, and 90 percent thresholds?

10   A.   No.  As you can see here in the column P less than, all of

11   these results are statistically significant at P less than

12   .001, which means that the chance of something like this just

13   coming up randomly are less than one in a thousand.

14   Q.   I'd like to show you, Dr. Taylor, Demonstrative

15   Exhibit 399D.

16             MR. BYRNES:  Your Honor, may I show the witness and

17   the gallery?

18             THE COURT:  You may.

19   BY MR. BYRNES:

20   Q.   Dr. Taylor, using the 70 percent probability threshold,

21   what did you find about the likelihood of Hispanic name

22   checking on saturation patrol days by saturation patrol active

23   officers as compared with officers who had never been involved

24   in saturation patrols and were making a stop on nonsaturation

25   patrol days?

1  A.  What I found using the 70 percent threshold was that the

2  first group of officers was 39.4 percent more likely to check a

3  Hispanic name.

4  Q.  Was there a statistically significant difference between

5  your findings using the 70 percent probability threshold and

6  your findings using the 60, 80, and 90 percent thresholds?

7  A.  No.  When we go to the models that control for many

8  factors, all -- the impact of this variable, regardless of the

9  threshold used, is statistically significant at P less than

10 .001, which means that it's unlikely to occur just due to

11 chance more than one time in a thousand.

12 Q.  Dr. Taylor, I'd like to show you Demonstrative

13 Exhibit 399F.

14       MR. BYRNES:  Your Honor, may I show the witness and

15 publish to the gallery?

16       THE COURT:  Yes.

17 BY MR. BYRNES:

18 Q.  You see it on your screen, Dr. Taylor?

19 A.  Yes.

20 Q.  Using the 70 percent probability threshold, what did you

21 find about the impact of checking one or more Hispanic names on

22 the length of stops?

23 A.  What I found was that checking one or more Hispanic names

24 resulted in a stop that averaged two and a half minutes longer,

25 and that this was 22 percent longer than the stops where no

1  Hispanic names were checked.

2  Q.  Was there a statistically significant difference between

3  your findings using the 70 percent probability threshold and

4  your findings using the 60, 80, and 90 percent thresholds?

5  A.  No.  And regardless of the threshold, this particular

6  impact was always significant at the .001 level, which means

7  that it's unlikely to have occurred just due to chance more

8  than one time in a thousand.

9  Q.  Dr. Taylor, did you control for whether the stop resulted

10  in a citation?

11  A.  Yes.

12  Q.  Did you control for whether the stop resulted in an arrest?

13  A.  Yes.

14  Q.  Moving to a different topic, Dr. Taylor.  Dr. Camarota

15  testified at some length about goodness of fit.

16      Did you measure goodness of fit, Dr. Taylor?

17  A.  Yes.

18  Q.  Did you use the fitstat command in the Stata statistical

19  software program about which Dr. Camarota testified?

20  A.  No, I did not.  It was not necessary to use the fitstat

21  command.  That's a command you issue after running a logit

22  model.  I did not need to run that because the logit model

23  itself generated a goodness of fit measure called Wald,

24  W-a-l-d, chi, c-h-i, squared.

25  Q.  Why did you not include the Wald chi-squared -- well,

1    actually, let me ask, did you include the Wald chi-squared data

2    in your reports?

3    A.  I did not include it in my reports.

4    Q.  Why didn't you?

5    A.  Because having confirmed to myself that all these models

6    provided significant fit, I then moved on to focus on -- focus

7    on the important -- having satisfied that that was the case,

8    move on to the important question, which is what's happening

9    with the particular key predictors of interest for these

10   outcomes?

11   Q.  Is that approach that you just -- about which you just

12   testified, that is, using the Wald chi-squared measure of

13   goodness of fit but not including it in this -- this particular

14   type of report, is that consistent with the typical approach in

15   your field?

16   A.  Yes.

17   Q.  Other than the Wald chi-squared measure, did you conduct

18   any other tests of the robustness of your model?

19   A.  Yes.  As we've been talking about, I checked to see what

20   would happen if we used different minimum probability

21   thresholds for defining a name Hispanic, and in addition to

22   doing analyses with the full set of data, I took random

23   50 percent samples for each analysis and replicated the

24   analysis.

25   Q.  Dr. Taylor, Dr. Camarota testified that you excluded from

1  your analysis one-seventh of major saturation patrols by

2  analyzing 11 of 13 of them.  Why didn't you include the other

3  two major saturation patrols in your analysis?

4  A.  There were two different reasons.  One of the major

5  saturation patrols occurred in November 2009, and the data I

6  had available ended October 31st, 2009.

7           The other major saturation patrol that I did not treat

8  as such was the January 2008 saturation patrol.  And I did not

9  treat that as a saturation patrol because I did not have

10  complete information about which officers were active.  I did

11  not have both the arrest list and the sign-in roster.

12  Q.  What are the ramifications for your analysis that you

13  considered 11 of these 13 saturation patrols?

14  A.  Well, the -- the implication is that my analysis for the

15  time period -- January 1, 2007, through October 31st, 2009 --

16  is conservative in the sense that I've uncovered a certain

17  difference or discrepancy between patterns on saturation patrol

18  days and on nonsaturation patrol days.  And had I included the

19  saturation patrol day in -- the January 2000 [sic] saturation

20  patrol day and the other saturation patrol days, it would have

21  increased the differences that I see.

22  Q.  Dr. Camarota also testified that your reliance on sign-in

23  rosters to identify officers participating in saturation

24  patrols was of concern because not all officers may sign in

25  using those forms.

1        Did you rely only on sign-in rosters as Dr. Camarota

2   claimed?

3   A.   No.

4   Q.   On what else did you rely in determining officers

5   participating in saturation patrols?

6   A.   I also relied on the arrest lists from the saturation

7   patrols.

8   Q.   Assuming, as Dr. Camarota appears to, that you've missed

9   some saturation patrol active officers, what are the

10  ramifications for your analysis if you included some officers

11  who were actually participating in saturation patrols in the

12  category of officers who were not?

13  A.   The implication is that the comparison that I see between

14  what active saturation patrol officers were doing and nonactive

15  saturation patrol officers, as I've classified them, that

16  comparison would be even larger if I had correctly gotten every

17  single one of the saturation patrol officers in the correct

18  group.

19  Q.   Are you -- are you certain that there are officers that

20  you've miscategorized?

21  A.   No, I am not certain of that.

22  Q.   On to a different topic.

23        Dr. Camarota testified that the rates that Hispanics

24  had their names checked in 2005, 2006, 2007, 2008, and in 2009,

25  is roughly the same or even lower than the proportion of

1  Hispanics in the population.

2        Do you recall that testimony?

3  A.  Yes.

4  Q.  Do you agree with Dr. Camarota's conclusion that this shows

5  that Hispanics are not being targeted by the sheriff?

6  A.  No.

7  Q.  Why don't you agree with Dr. Camarota?

8  A.  Dr. Camarota's approach uses an approach that scholars who

9  study these things have criticized.  It's called external

10 benchmarking.  The external benchmarking approach that

11 Dr. Camarota has taken cannot distinguish between three

12 potentially separate dynamics that are at work here.

13 Q.  What are the three dynamics that Dr. Camarota's failed to

14 account for?

15 A.  The three -- the three dynamics are the exposure of

16 Hispanics versus non-Hispanics to law enforcement; secondly,

17 potential differences in the rate at which Hispanics versus

18 non-Hispanics violate laws; and third, possible differentials

19 in police activity.

20 Q.  Dr. Camarota testified that at some point in time he had

21 read a report by Ridgeway that you had cited in your expert

22 reports.  In your view, is Dr. Camarota's analysis consistent

23 with Dr. Ridgeway's approach?

24 A.  No.

25 Q.  How does it differ?

1    A.  Dr. Ridgeway, and many of the other current scholars in the

2    field, recommend an internal benchmarking approach, which

3    attempts to separate out these three dynamics I've described,

4    rather than the external benchmarking approach that

5    Dr. Camarota took, and he -- he didn't do that, Dr. Camarota

6    didn't do that.

7    Q.  Well, Dr. Camarota testified that he did use internal

8    benchmarking because he was making comparisons of this data for

9    successive years, 2005 to 2009.

10           Do you agree with him that that is internal

11   benchmarking?

12   A.  I think his exact term was internal comparisons, and the

13   internal comparisons are not internal benchmarking.  He's got

14   external benchmarking in 2007, external benchmarking in 2008,

15   external benchmarking in 2009.

16   Q.  And do you get internal benchmarking if you combine five

17   successive years of external benchmarking?

18   A.  No.

19   Q.  I'd like to direct your attention to demonstrative exhibit

20   399I.

21           MR. BYRNES:  Your Honor, may I display it to the

22   witness and to the gallery?

23           THE COURT:  Yes.

24   BY MR. BYRNES:

25   Q.  Dr. Taylor, you may remember that Dr. Camarota spent some

1   time on this particular demonstrative exhibit.  I'm going to

2   direct your attention to, I believe, the same parts of the --

3   of the demonstrative that he was looking at.  Maybe with some

4   help from Mr. Braun we'll direct everyone's attention to those

5   sections.

6          So looking at the top half of the demonstrative, which

7   corresponds to using 90 percent probability threshold for

8   Hispanic name, you see that for -- on a nonsaturation patrol

9   day, under the column No, 21.82 percent of the names checked

10  were Hispanic.

11          Am I reading that correctly, Dr. Taylor?

12  A.  Yes.

13  Q.  Okay.  And then on saturation patrol days that percentage

14  increased almost 4 percent to 25.8 percent.

15          Do you see that?

16  A.  Yes.

17  Q.  And is that an accurate depiction?  Am I accurately

18  characterizing the exhibit?

19  A.  Yes.

20  Q.  Below, using the 60 percent probability threshold, the

21  percentage of Hispanic names checked on nonsaturation patrol

22  days according to this exhibit appears to be 33.33 percent.

23          Is that an accurate characterization, Dr. Taylor?

24  A.  Yes.

25  Q.  And on saturation patrol days, just to the right there, the

1    percentages of Hispanic names checked is 39.09 percent.

2              Again, is that accurately characterizing the exhibit?

3    A.  Yes.

4    Q.  And just to do some quick math that I believe Dr. Camarota

5    did as well, if you compare under the 90 percent probability

6    threshold for Hispanic names, am I correct that there is almost

7    exactly a 4 percentage point difference between the percentages

8    of Hispanic names checked on saturation patrol days versus

9    nonsaturation patrol days?

10   A.  Yes.

11   Q.  And challenging my math even further, looking below, is it

12   correct that it's roughly just shy of 6 percentage point

13   difference between the percentage of Hispanics whose names were

14   checked on nonsaturation patrol days versus saturation patrol

15   days using the 60 percent probability threshold?

16   A.  Yes.

17   Q.  And Dr. Camarota, in his testimony, found it significant

18   that if you sub -- if you look at the 90 percent probability

19   threshold and subtract the Hispanic percentages based on

20   saturation patrol day you get 4 percent, whereas if you do the

21   same subtraction in the 60 percent probability threshold you

22   get almost 6 percent.

23             Do you agree with Dr. Camarota that comparing those

24   differences in percentage points is informative?

25   A.  No.

1   Q.  Do you agree with the conclusion he derives that based on

2   the fact that 4 is small -- is smaller than 6, that is, the 4

3   percentage point difference with regard to 90 percent is

4   smaller than the 6 percentage point difference with regard to

5   60 percent, that that difference means that the more certain

6   that a name is Hispanic, the smaller the difference between

7   saturation patrol days and nonsaturation patrol days?

8   A.  No.

9   Q.  Why isn't the fact that 4's smaller than 6 dispositive of

10  this question?

11  A.  The issue here is the ratio between the two percentages.

12  So, for example, just to do a little bit of rounding, if I may,

13  if we take for the 90 percent threshold and we take 26 percent

14  over, let's say, 22 percent, that's roughly -- that's roughly a

15  20 per -- no, 15 to 20 percent difference.

16       If we do 30 -- going down to the 60 percent threshold,

17  if we look at the 39 percent over the 33 percent, that's also a

18  difference of about 18, 19, 20 percent.  So the ratios are the

19  same, roughly.

20  Q.  Is there a statistically significant difference with regard

21  to the percentage of Hispanic names checked comparing any of

22  the probability thresholds that you've used in your analysis?

23  A.  In the analysis the odds ratios, that is, the odds of a

24  Hispanic name being checked or not checked on an official

25  saturation patrol day, all of those odds ratios for the

1    different thresholds with population data were significant at

2    P less than .001, which means there's less than one chance in a

3    thousand that those results could have occurred due to chance.

4    Q.  Dr. Taylor, Dr. Camarota, referencing one of his tables or

5    his charts in his report that showed data over -- purported to

6    show data over time, talked a lot about long-term trends.

7            Did you control for long-term trends in your analysis?

8    A.  Yes.

9    Q.  And how did you do that?

10   A.  I controlled for three different types of long-term trends.

11   First of all, you'd look at what months did this occur in to

12   control for linear trend.  If you square the number of months,

13   you're controlling for if things are changing faster or slower,

14   earlier or later.  And you can also put in another control in

15   case the way that things are changing changes direction.

16   Q.  And did you control for the trends in the way you've just

17   described?

18   A.  Yes, I did.

19   Q.  Dr. Camarota testified about how there can be, as he put

20   it, spurious correlation in data.  And he used as an example

21   the relationship between foot size and income, which, according

22   to Dr. Camarota, requires an investigator to control for an

23   additional factor, in this example, gender.

24           In your analysis did you control for factors that

25   might otherwise introduce a spurious correlation in your data?

1  A.  Yes, I did, in the -- I controlled for several factors.

2  Q.  Can you provide some more detail for the Court on how you

3  controlled for these factors.

4  A.  Well, first of all, as just mentioned, we're controlling

5  for three long-term trends.  And we're also controlling for

6  whether or not the stop took place on a weekend day or a -- or

7  a weekday.  And for the analysis of names, I'm also controlling

8  for the clustering of multiple names within a single incident.

9       For the analyses of stop length, I'm controlling for

10  the long-term trends again.  I'm also controlling for the

11  number of people in the vehicle, and then for whether there was

12  an arrest or a citation.  So these are all attempts to take

13  care of the concern about possible confounds.

14  Q.  Now, did Dr. Camarota himself control for such factors?

15  A.  I did not see such controls in his report.

16  Q.  Switching gears a little bit, Dr. Camarota testified about

17  analyzing stop data by operational area, by geographic

18  districts within the county.

19       Do you believe that it's informative to review the

20  data geographically?

21  A.  Not given the approach he took in his report.

22  Q.  Well, why wouldn't it be informative to look at the data by

23  these geographic districts?

24  A.  Because with an external benchmarking approach you're

25  increasing the problematic nature of your benchmark by focusing

1  on smaller areas, since this is a study where the clients of

2  interest are driving.

3  Q.  Why would the fact that the -- that we're dealing with

4  traffic stops and driving here have any impact on what

5  geographic area we choose to do the analysis?

6  A.  Because it makes it increasingly likely that there will be

7  a discrepancy between the Hispanic population in that subarea

8  and Hispanic name checking in that subarea.

9  Q.  Dr. Camarota also testified that -- he testified 70 percent

10  of the stops during saturation patrols were made by either the

11  Human Smuggling Unit or the Lake Patrol.

12        Dr. Taylor, did you consider to which unit a

13  particular officer making a stop was assigned?

14  A.  A data file, no, I did not.

15  Q.  And why didn't you consider that?

16  A.  Because the data file that I received did not have that

17  field.

18  Q.  Did the data file you received contain unit assignment

19  information?

20  A.  No.

21  Q.  Has Dr. Camarota provided evidence showing the rate at

22  which HSU officers checked Hispanic names -- let me rephrase.

23        Has Dr. Camarota provided evidence showing that the

24  rate at which HSU officers checked Hispanic names on saturation

25  patrols is higher than the rate at which those officers check

1    Hispanic names on nonsaturation patrol days?

2    A.  No.

3    Q.  Has Dr. Camarota provided evidence demonstrating that Lake

4    Patrol officers on nonsaturation patrol days check Hispanic

5    names at lower rates than they do on saturation patrol days?

6    A.  No.

7    Q.  Did you conduct any analysis that controls for the unit to

8    which the officer is assigned?

9    A.  No.

10   Q.  In your analysis of comparing Hispanic name checking on

11   saturation patrol days versus nonsaturation patrol days --

12             You with me?

13   A.  Okay.

14   Q.  How, if at all, does the unit to which -- how could -- how

15   could the unit to which an officer is assigned impact your

16   findings with regard to saturation patrol days versus

17   nonsaturation patrol days?

18   A.  Well, it would not affect the overall finding.

19   Q.  In that sense did you control -- does that analysis then

20   control for the unit to which the officer is assigned?

21   A.  Yes.  I have in my analysis there is -- in the reports

22   there's a table that separates out the impact of a saturation

23   patrol officer being active on a saturation patrol day.  Once

24   that's separated out, one can also examine the impact of the

25   saturation patrol day itself so you are, in effect, controlling

1    for the units to which the officers are assigned.

2    Q.  Dr. Taylor, Dr. Camarota criticized you in his testimony

3    for not considering the socioeconomic status of those whose

4    names were checked by the MCSO during traffic stops.

5              Do you recall that testimony?

6    A.  Yes.

7    Q.  Do you agree with Dr. Camarota that someone with lower

8    socioeconomic status is more likely to drive a vehicle that is

9    out of compliance with vehicle codes?

10   A.  No.

11   Q.  Why do you disagree with that?

12   A.  I have seen no data specific to this -- to this population

13   that demonstrates that to be the case.

14   Q.  Do you agree that Hispanics' lower socioeconomic status

15   might explain why they're pulled over more often during

16   saturation patrols?

17   A.  No.

18   Q.  Why do you disagree with that?

19   A.  I disagree with that because the analysis that I ran and

20   showed that if a Hispanic was pulled over on a saturation

21   patrol day by a saturation patrol active officer, he or she was

22   less likely to receive a citation.  And on the presumption that

23   on saturation patrol days officers are looking particularly for

24   vehicle violations, then the Hispanics should have been more

25   likely to receive a citation.

1    Q.  Are you familiar with scholarship in the field concerning

2    potential racial profiling in traffic stops by law enforcement?

3    A.  Yes.

4    Q.  Are there studies of racial profiling in traffic stops that

5    do not include the socioeconomic status of the driver?

6    A.  Yes.

7    Q.  Are those studies published in refereed journals?

8    A.  Yes.  They are.

9    Q.  Excuse me.  I want to return briefly to your testimony with

10   regard to likelihood of Hispanics receiving citations.

11          Were the results that you found concerning that

12   likelihood statistically significant?

13   A.  Yes, they were.

14   Q.  And how much less likely were Hispanics to receive

15   citations?

16   A.  It would depend a little bit on the threshold, but it would

17   be around 25 to 30 percent less likely.

18   Q.  And what are the chances that such findings could be

19   obtained due simply to chance?

20   A.  I think for those findings it was less than one in a

21   hundred.  I can't recall specifically if it was less than one

22   in a hundred or less than one in a thousand.

23   Q.  Dr. Taylor, using American Community Survey data,

24   Dr. Camarota testified that Hispanics are far more likely than

25   non-Hispanics to speak English, quote, less than very well.

1    Do you recall that testimony?

2  A.  Yes.

3  Q.  Do you agree with his conclusion that many Hispanics'

4  limited English language skills could account for longer stop

5  duration?

6  A.  No.

7  Q.  Why do you disagree with him?

8  A.  Because I can easily -- well, first of all, I have, you

9  know, no data specific to that that I've read about.

10    And second, it's quite plausible to imagine the

11  reverse.  If during a saturation patrol operation officers are

12  seeking to gather intelligence, and if they stop -- stop a

13  vehicle and the driver is quite fluent in English, it's quite

14  plausible that diligent officers would seek to engage that

15  driver in conversation to extract additional -- additional

16  intel, and therefore resulting in a longer stop.

17  Q.  Dr. Camarota also testified that a person's being foreign

18  born could be correlated with a longer stop.

19    Do you agree with him?

20  A.  No.

21  Q.  Why do you disagree?

22  A.  Again, there are -- are no data on that, and again I can

23  imagine alternate, you know, plausible -- plausible scenarios.

24  Q.  With regard to being foreign born, what alternate plausible

25  scenarios can you envision?

1    A.  Well, for example, I mean if -- we haven't specified where

2    their -- where their foreign birthplace was.  And if somebody

3    was born in the Philippines, or somebody was born in a foreign

4    country where English is the first language, or a country where

5    there's lots of good English instruction, we would expect their

6    fluency to be comparable.

7    Q.  Switching gears a bit here, Dr. Taylor, Dr. Camarota

8    testified that there is evidence that Hispanics are more likely

9    to hyphenate their surnames than non-Hispanics.  And for

10   purposes of this question I want to have you assume that that's

11   true.

12        Even assuming Hispanics are more likely to have

13   hyphenated names, does that explain the difference in stop

14   length between Hispanics and non-Hispanics?

15   A.  I don't think so.

16   Q.  And why do you doubt that that explains the difference?

17   A.  Because after looking at hundreds of these comment fields,

18   one sees not only, and as has been mentioned in previous

19   testimony, multiple name checks as officers reverse first and

20   last surnames, but many, many instances where they take a name

21   that's just one last name and run it repeated times through

22   multiple databases going to different states or to different

23   database sources.

24   Q.  Dr. Camarota, among other criticisms, criticizes you for

25   using in your analysis of stop length a variable to predict

1    stop length when at least one Hispanic name was checked.

2           Why did you choose to use such a variable?

3    A.  There are a couple of -- a couple of reasons.

4           One is that if I define the variable to say, Let's

5    classify the stop as Hispanic if at least one name was checked,

6    then I can apply that to all of the stops, regardless of how

7    many -- how many people -- how many names were checked in that

8    stop.

9           Secondly, using that variable keeps the name checking

10   pattern separate from another factor, or Dr. Camarota would say

11   another potential confound, which is the number of names

12   checked during the stop.  So I can keep the name checking

13   patterns and the number of names separate.

14          And number three, this was a -- the logic here was

15   that this is a conservative approach in the sense that I'm

16   saying even if only one Hispanic name was checked, here's the

17   impact on the stop length difference.

18   Q.  Testifying here at trial, Dr. Camarota suggested a

19   different approach; essentially, I think the converse approach.

20   He suggested that one could examine whether there was any

21   impact by considering whether one non-Hispanic name was checked

22   and using that as a variable.

23          Do you recall that testimony?

24   A.  Yes.

25   Q.  Did you conduct an analysis of the variable that

1    Dr. Camarota suggested here at trial?

2    A.  Yes.

3    Q.  And what did you find?

4    A.  I found the exact reverse of what I found with the original

5    coding that I had used; that is, if at least one non-Hispanic

6    name was checked during a stop, controlling for arrest or

7    citation, controlling for the number of names checked, the stop

8    averaged about two and a half minutes shorter.

9    Q.  Just to make sure I understand, was it your conclusion that

10   when one non-Hispanic name was checked, the stop was shorter?

11   A.  Right.  If at least one of the names checked was

12   non-Hispanic, the stop was two and a half minutes shorter on

13   average.

14   Q.  And did you find that result across the 60, 70, 80 and

15   90 percent probability thresholds?

16   A.  Yes, I did.

17   Q.  Was that a statistically significant finding?

18   A.  Yes, it was.

19   Q.  Dr. Taylor, did you hear Dr. Camarota's testimony about

20   Mr. Jefferys' role in providing him with the data set he used

21   in conducting his analysis?

22   A.  Yes.

23   Q.  How did the arrangement between Dr. Camarota and

24   Mr. Jefferys affect, if at all, your view of the -- of

25   Dr. Camarota's findings?

1    A.  I would have been happier if Dr. Camarota had done all of

2    his data processing himself.

3    Q.  I appreciate your levels of happiness.  Let me ask the

4    question a different way:  How did the arrangement between

5    Dr. Camarota and Mr. Jefferys affect your view of the

6    scientific validity of Dr. Camarota's findings?

7    A.  It raises potential concerns.

8    Q.  Why does that arrangement raise concerns for you?

9    A.  Because it's one thing to have the administrative agency

10   providing the data to provide the raw data, to have discussions

11   with the investigator as the investigator seeks to understand

12   what's in those data, and that's something that I and my

13   colleagues, those are the kinds of arrangements we -- we often

14   have.  But it's a different thing if the agency itself

15   prepares -- prepares all the -- all the variables.

16   Q.  Does Dr. Camarota's use of the data that Mr. Jefferys

17   provided impact another investigator's ability to replicate

18   Dr. Camarota's findings?

19   A.  Yes.

20   Q.  Is the ability to replicate a study's findings important

21   for its scientific validity?

22   A.  Yes.

23   Q.  In your research projects that have dealt with data from

24   criminal justice agencies, have you ever had anyone from the

25   criminal justice agency prepare the final data files on which

1    your analysis was based?

2    A.  No.

3    Q.  Are you aware of any scientific studies whose purpose was

4    to evaluate a police department where the data extraction and

5    extensive processing was carried out by personnel affiliated

6    with that agency?

7    A.  No.

8    Q.  Dr. Taylor, have you received the data file that

9    Mr. Jefferys provided Dr. Camarota?

10   A.  Yes.

11   Q.  When did you receive that file?

12   A.  Subsequent to submitting my two reports and subsequent to

13   my deposition.

14   Q.  What did you receive?

15   A.  I received a disk, and it had on it the following types of

16   files.  It had on it the Microsoft Access database.  It had on

17   it also what appeared to be the list of names that Mr. Jefferys

18   had provided to Dr. Camarota.

19        It also had on it files of e-mail correspondence

20   either between Mr. Jefferys and Dr. Camarota or Mr. Liddy and

21   Dr. Camarota.  And it also had on it some files that appeared

22   to have been prepared by Mr. Jefferys in which he was either

23   describing features of the MCSO data or, in one particular

24   file, comparing the MCSO data to my data.

25   Q.  You stated at the end that one of the files on the disk

1    that you were provided was a file prepared by -- apparently

2    prepared by Mr. Jefferys that compared the MCSO data to your

3    data.  Can you -- can you explain what you mean by the

4    comparison between the MCSO data and your data?

5    A.  Right.  What the spreadsheet had was information for the

6    number of incidents total, and the number of incidents with

7    names; and then it would give a count by year for 2007, 2008

8    and 2009; and then there would be a count for what came from

9    the MCSO file, Mr. Jefferys' file, and what I had in my file

10   that had been released -- released to MCSO and Dr. Camarota.

11   Q.  So you appear to be making a distinction between data from

12   the MCSO and your data.  Do you -- what -- what do you

13   understand to be the origin of the data you used for your

14   analysis?

15   A.  Well, what I'm -- what I'm speaking to in that last -- that

16   last question was that when I had finished my analyses, I then

17   sent my data files back -- back to you and your co-counsel, who

18   then forwarded them to the appropriate parties, and that that

19   data -- the data that I had worked with found its way back

20   to -- found its way back to Mr. Jefferys.  And so then he was

21   comparing the original MCSO data that he had prepared for

22   Dr. Camarota with my files.

23   Q.  And your data -- from the data that you used, the CAD data,

24   where did that data come from initially?

25   A.  Well, that was originally from MCSO, the MCSO database

1    that -- that you provided me.

2    Q.  Did you evaluate what, if any, differences there were with

3    regard to the incidents in Dr. Camarota's data file and the

4    incidents in your data set in terms of numbers of incidents?

5    A.  Yes.

6    Q.  And what did you find?

7    A.  What we found is that our numbers just about perfectly

8    matched in terms of the total number of incidents, and if we're

9    looking at incidents with names, my numbers were -- were lower

10   than his were.

11   Q.  Let me ask you about that.  Dr. Camarota testified on that

12   point that there were 16,804 more names with final call types

13   910 or T that were included in his data set than were included

14   in your data set.

15        Do you recall that testimony?

16   A.  Yes.

17   Q.  Was Dr. Camarota comparing the number of names in each data

18   set?

19   A.  I think he -- I think what he was comparing was the

20   number -- the number of incidents with names.

21   Q.  Are you aware of any comparison of the number of names in

22   each data set?

23   A.  Yes.

24   Q.  Okay.  And where -- where did the comparison of the

25   number of names appear?

1  A.  Oh, I'm sorry.  Could you repeat the question, please?

2  Q.  Sure.  Are you -- you've just testified about incidents

3  with names and that comparison.  I'm asking you to focus on

4  names.  Are you aware of any comparison of the number of names

5  in each of the data sets; that is, your data set and

6  Dr. Camarota's data set?

7  A.  No.

8  Q.  You mentioned earlier that there was a file in this disk

9  that Mr. Jefferys had prepared concerning the differences that

10  he found between your and Dr. Camarota's data.

11          Did Mr. Jefferys' comparison specify the difference in

12  the number of incidents with names between your re-processed

13  data set and the data set Dr. Camarota used?

14  A.  Yes.

15  Q.  And what was that difference?

16  A.  That difference was 16,354.

17  Q.  That difference wasn't 16,804?

18  A.  No.

19  Q.  As I mentioned, Dr. Camarota focused on names with final

20  call types or incidents with final call types 910 or T.  Did

21  you use final call type 910 or T to determine the incidents to

22  include that in your analysis?

23  A.  No.

24  Q.  What field did you use?

25  A.  I looked at final call type description.

1    Q.  Dr. Taylor, what, if any, significance does your having

2    considered fewer incidents have for your analysis?

3    A.  The -- it's not -- it's not clear what the implications

4    are.  The point is that given the information that's available,

5    given the information available, the only plausible scientific

6    alternative is you concentrate on where your -- your outcome is

7    available, and those are the records on which I concentrated.

8    Q.  When you say your outcome is available, what do you mean by

9    "outcome" there?

10   A.  I mean the Hispanic name.  I need the Hispanic name as an

11   outcome for my name checking analysis, and I need it as the

12   predictor in the stop length analysis.

13   Q.  Dr. Taylor, did you attempt to replicate your analysis

14   using Dr. Camarota's data file?

15   A.  Yes, I did.

16   Q.  Were you able to do so?

17   A.  Yes, I was.

18   Q.  How did you go about replicating your analysis?

19   A.  What I did was I took the name file that Mr. Jefferys had

20   apparently provided to Dr. Camarota and then I linked it up

21   with my incident file.  And then focusing on my original scope

22   of incidents, traffic stops or traffic violations, I was able

23   to replicate significant impacts of saturation patrol days

24   versus comparison days on name checking patterns, and I was

25   able to replicate the significant impacts of one or more

1    Hispanic names checked on stop lengths using his, Mr. Jefferys'

2    slash Dr. Camarota's name file.

3    Q.  What specifically did you find using Dr. Camarota's data

4    file regarding the likelihood of Hispanic name checking on

5    saturation patrol days when compared with other days?

6    A.  What I found was that Hispanic names were significantly

7    more likely to be checked on saturation patrol days in

8    comparison to either all nonsaturation patrol days or

9    saturation patrol day -- I'm sorry, nonsaturation patrol days a

10   week earlier or a week later, or nonsaturation patrol days a

11   year earlier.

12   Q.  Were your findings statistically significant?

13   A.  Yes, they were.

14   Q.  And using Dr. Camarota's data file, what did you find

15   regarding the impact of Hispanic stop -- Hispanic name checking

16   on stop length?

17   A.  I was able to replicate my original set of findings that

18   appeared in my rebuttal report showing that if at least one

19   Hispanic name was checked, the stop lasted, on average, about

20   two and a half minutes longer, controlling for other factors.

21   Q.  And were those findings statistically significant across

22   the probability thresholds that a name was Hispanic?

23   A.  Yes, these were significant results for the 60, 70, 80, and

24   90 percent probability thresholds.

25   Q.  Dr. Camarota testified that for his analysis of his data,

1    he included incidents with certain final call types that you

2    excluded when you analyzed the data you received.  Those

3    included driving on a suspended license; DWI, or driving while

4    intoxicated; and felony possession of alcohol and drugs.

5             Why did you exclude those incidents from your analysis

6    of the data you used for your expert report?

7    A.  Because the type of incidents on which I concentrated,

8    traffic stops and traffic violations are the classes of

9    incidents that allow the most potential for officer discretion.

10   Q.  When you analyzed Dr. Camarota's data, what types of

11   incidents did you include?

12   A.  Well, after I had replicated my initial results focusing

13   just on traffic stops and traffic violations, I then added into

14   that, using his name file, all DWIs, all suspended licenses,

15   and just about all drugs and alcohol types.  If the alcohol

16   involved an accident or injury I didn't include that, there

17   were a small number of those, but all the other drug and

18   alcohol type mentions.

19   Q.  Including those incidents -- that is, driving with a

20   suspended license, driving while intoxicated, the alcohol and

21   drug offenses you've mentioned, as well as traffic stop and

22   traffic violation -- what percentage of the incidents with

23   names in Dr. Camarota's data file did you analyze?

24   A.  94.3.

25   Q.  Using Dr. Camarota's data file and including the incidents

1   about which you've just testified, what did you find regarding

2   the likelihood of Hispanic name checking and traffic stops?

3   A.  I found that a Hispanic name was more likely to be checked

4   on a saturation patrol day relative to either all nonsaturation

5   patrol days or relative to saturation patrol days a year

6   earlier or relative to sat -- I'm sorry, nonsaturation patrol

7   days a year earlier, or nonsaturation patrol days a week

8   earlier or a week later.  All of those findings were

9   statistically significant at all four name probability

10  thresholds.

11  Q.  Using -- actually, let me ask:  Were the magnitude of the

12  differences -- that is, the increased likelihood of Hispanic

13  name checking -- how did the magnitude of that difference

14  compare with the findings that you -- when you used your data?

15  A.  Yes.  Generally, the magnitude was around 80 to -- 80 to

16  90 percent of what I had originally found, if not slightly

17  higher.  On average, if you look at all the odds ratios, which

18  is our basic measure of impact, those odds ratios averaged

19  about 94 to 95 percent of the original odds ratios observed.

20  Q.  Using Dr. Camarota's data file and including the types of

21  incidents you mentioned, including driving with a suspended

22  license, driving while intoxicated, and the alcohol and drug

23  related incidents, what did you find regarding the impact of

24  Hispanic name checking on stop length?

25  A.  If one or more Hispanic names were checked, the stop lasted

1    longer, significantly longer.

2    Q.  Was there any difference in the magnitude of the length of

3    the stop in this analysis versus the analysis you and conducted

4    on the data that you had received?

5    A.  On the analysis that includes over 94 percent of the

6    incidents with names, the stop difference between those stops

7    where no Hispanic names were checked and at least one Hispanic

8    name was -- was checked, the difference was a little over three

9    minutes, whereas with the original analysis the difference was

10   only about two and a half minutes.

11            MR. BYRNES:  Pass the witness.

12            THE COURT:  Mr. Liddy?

13            MR. LIDDY:  Thank you, Your Honor.

14            May I ask the clerk to retrieve this witness's

15   deposition?

16            THE CLERK:  Is it dated March 21st, 2011?

17            MR. LIDDY:  I believe it is.

18            MR. BYRNES:  He doesn't have it, Tom.

19                        CROSS-EXAMINATION

20   BY MR. LIDDY:

21   Q.  Doctor, do you have that deposition in front of you?

22   A.  Yes.

23   Q.  Were you deposed in relation to this litigation?

24   A.  Yes.

25   Q.  Do you recall that deposition?

1    A.  Yes.

2    Q.  Would you please turn to page 149.

3           Doctor, are you there on page 149?  If I can direct

4    your attention to line 9.

5           Did you have an opportunity to review the transcript

6    of your deposition?

7    A.  Yes, I did.

8    Q.  Did you review it?

9    A.  Yes, I did.

10   Q.  Did you find it to be accurate?

11   A.  There were a few corrections that I sent in.

12   Q.  To -- you sent them in, sent them in to your counsel?

13   A.  Yes.

14   Q.  Would you read along with me, starting at line 9:

15          "QUESTION:  Then why did you choose not to include --"

16          Well, let me -- let me go up a little bit further

17   there.

18          MR. LIDDY:  Your Honor, I apologize.  Let me direct

19   you to the page earlier, page 148, line 21.

20   BY MR. LIDDY:

21   Q.  Are you there?

22   A.  Yes.

23   Q.  Okay.  Line 25:

24          "QUESTION:  Are the goodness of fit measures included

25   in your report?

1          "ANSWER:  They are not included in my report.  And

2    it's important to know that there is a variety of disagreement

3    about which goodness of fit measures to include.

4          "QUESTION:  Are you referring to a disagreement in the

5    field?

6          "ANSWER:  Yes.

7          "QUESTION:  Or disagreement regarding this report?

8          "ANSWER:  I'm referring to there is no consensus in

9    the field on the best fit indicator measured for cluster logic

10   models."

11         Scroll down to page 149.

12   A.  If I just may, that should read -- I think I sent in this

13   correction -- that should read "clustered" logit model.

14   Q.  Okay.  Thank you for that correction.

15         Now, on page 149, line 9:

16         "QUESTION:  Then why did you choose not to include

17   that in your report?

18         "ANSWER:  In part, but not wholly, in order not to run

19   up more billable hours."

20         Did I read that correctly?

21   A.  Yes, you did, but if -- if I may.

22   Q.  Please do.

23   A.  May we go back and follow the -- the thread of this -- of

24   this discussion, 'cause there are different -- there are

25   different points that are of concern here, and --

1  Q.  Well, I'm interested in whether or not you stand by your

2  testimony that you did not include the goodness of fit model

3  because you didn't want to run up the bill.

4          Is that accurate or is that not accurate?

5          MR. BYRNES:  Objection, Your Honor.  For

6  completeness --

7          THE COURT:  Overruled.  You will be allowed to

8  redirect.

9          THE WITNESS:  If you would read the section right

10  before that, because there are different fit measures that are

11  under discussion in this -- at this point in the deposition.

12  BY MR. LIDDY:

13  Q.  Okay.  Doctor, I do want to be fair and I will get back to

14  that.

15  A.  Okay.

16  Q.  I'd like you to respond to my question first.

17          Is that -- did I accurately read that transcript?

18  A.  You read that, but this is in the context of a very

19  particular type of prediction for a case level.  This is

20  different from overall model fit.

21  Q.  Did you include a goodness of fit statistic in your report?

22  A.  No.

23  Q.  Did you include a goodness of fit statistic in your

24  rebuttal report?

25  A.  No.

1           MR. LIDDY:  Your Honor, I would like to -- excuse me,

2     Your Honor.  I would like to call up Exhibit 399.

3           THE COURT:  Straight 399, or --

4           MR. LIDDY:  Straight 399.

5           THE COURT:  Okay.

6     BY MR. LIDDY:

7     Q.  Now, Doctor, just moments ago during your rebuttal

8     testimony you were shown this exhibit.

9           Do you recall that?

10    A.  Yes.

11    Q.  And your attention was directed to the 90 percent column

12    here?

13    A.  Yes.

14    Q.  And do you see where it says here proportion Hispanic,

15    22 percent.  Did I read that correctly?

16    A.  Yes.

17    Q.  And if we go down on this column to 60 percent and scroll

18    over, where you see proportion Hispanic, 33.6 percent.  Am I

19    correct in that reading?

20    A.  Yes.

21    Q.  Now, the difference between 33.6 percent and 22 percent is,

22    give or take, 11.6 percent.  Would you agree with me?

23    A.  Yes.

24    Q.  Would you consider that difference statistically

25    significant?

1    A.  I wouldn't ask about statistical significance.

2    Q.  You would?

3    A.  I would not.

4    Q.  You would not.  Okay.  Thank you.

5           Would you understand while someone else in your field

6    might ask about the statistical significance of such a

7    disparity?

8    A.  Yes.

9    Q.  Earlier in your testimony I believe you testified that

10   Dr. Camarota's findings with regard to the likelihood of a

11   Hispanic surname to be stopped in a saturation patrol versus a

12   nonsaturation patrol by a saturation patrol officer was similar

13   to your own.

14          Do you remember that testimony in your rebuttal?

15   A.  Could -- could you say specifically?

16   Q.  You were asked if Dr. Camarota agreed with any of your

17   findings.

18          Do you recall that?

19   A.  Yes.

20   Q.  And you testified that he agreed with your findings about

21   the increased likelihood of a Hispanic surname to be checked by

22   a saturation patrol officer on a saturation patrol day when

23   compared to a saturation patrol officer on a nonsaturation

24   patrol day.

25          Do you recall that testimony?

1    A.  Yes.

2    Q.  Do you recall Dr. Camarota ever testifying that he analyzed

3    those figures for saturation patrol officers on saturation

4    patrol days and nonsaturation patrol officers on saturation

5    patrol days?

6    A.  No, but I recall him saying in his testimony just the other

7    day that that first statement that you gave, he certainly found

8    that plausible.

9    Q.  Found it plausible.

10   A.  And he did not disagree with it.

11   Q.  He agreed that those were your findings, correct?

12   A.  He did not disagree with it.

13   Q.  And he stated under oath that he did not do similar

14   analysis, correct?

15   A.  Correct.

16   Q.  Would you agree with me that you did your very best to

17   identify all of the names in the comments section of the CAD

18   data report that were related to incidents in the CAD data?

19   A.  Yes.

20   Q.  And you would agree with me that it was a difficult task to

21   do.

22   A.  Yes.

23   Q.  And did you hear Dr. Camarota say that he was able to

24   extract -- extract an additional 6,000 plus names from the

25   comments section of CAD data from final stop T and 910s?

1  A.  An additional -- yes, an additional 16,000.  And when I

2  analyze his name file with those additional 16,000, I generate

3  the same pattern of findings that I found with my earlier name

4  file.

5  Q.  I believe you just testified in rebuttal, I want to get

6  this correct, that Dr. Camarota wanted to control for other

7  variables but your analysis controlled for the best variables

8  that were probably given that data.

9         Is that your testimony?

10  A.  Yes.

11  Q.  If you had the ability to get the other variables, would it

12  have been helpful in your findings to obtain them and control

13  for them?

14  A.  Not necessarily.

15  Q.  And by "not necessarily" do you mean maybe yes?

16  A.  What I mean by "not necessarily" is it depends on the

17  scholarship in the field.  It's possible -- what one wants to

18  do in a study of this nature is one wants to look at the

19  scholarship, and look at the types of predictors and outcomes

20  that are used and the way that the scholarship understands

21  these dynamics and processes, and use those relevant variables.

22  And that's what I've tried to do.

23  Q.  Okay.  Would people that are in the field, the scholars,

24  would they understand that "not necessarily" means yes, it

25  might; no, it might not?

1  A.  They might -- they might understand that.

2  Q.  Would you understand if laymen -- not scholars, not in the

3  field -- would interpret "not necessarily" as maybe yes, maybe

4  no?

5  A.  I can understand that, and if you would allow me to give

6  you an example.

7  Q.  Sure.

8  A.  Suppose I came up to a -- a layperson and said, I have a

9  model that predicts a hundred percent of the variation in

10  whether the name checked is Hispanic or non-Hispanic.  A

11  hundred percent.  The layperson would be -- you as a typical

12  layperson would probably be quite excited about that.

13  Q.  Unless I study metahysics and I want certitude.

14  A.  Well, certitude, if I explain a hundred percent of the

15  outcome variation, that is certitude.

16  Q.  For a statistician.

17  A.  Right, not for -- not for a metaphysician.

18       But for a layperson, if I came up to a layperson and

19  said, I have a model that can explain a hundred percent of the

20  variation in this outcome that is important to you, I would

21  think a layperson would be excited.

22       However, that model would also be nonsensical.  I

23  can -- for any outcome that I'm given, I can create a model

24  that predicts a hundred percent of that outcome.  But the model

25  would be nonsensical.

1  Q.  But if you had more data available to you to control for

2  more variables, would you or would you not have more confidence

3  in the analysis that resulted?

4  A.  No, not if those variables were not relevant.  And I may go

5  back -- just bear with me a minute.  If I may go back to my

6  example here.

7          With this data set I could have conducted an analysis

8  that would have given me a hundred percent explanation for

9  Hispanic name checking patterns.

10 Q.  Did you control for all the possible variables that may

11 have contributed to increased length of traffic stops when

12 Hispanic surnames were found by saturation patrol officers

13 during saturation patrols?

14 A.  Yes, given the scholarship in the field, I have controlled

15 for the appropriate variables.

16 Q.  Okay.  But I didn't ask you about the scholarship in the

17 field, and I didn't even ask you about the appropriate

18 variables; I asked you if you controlled for all the possible

19 variables that may have controlled the outcome other than

20 chance or statistical noise.

21 A.  No, and I could have, but it would have made no sense.

22          And just let me play out my example here.  This will

23 only take a second, if I may -- if I may.

24          If I have 123,000 names, let's say, I'm going to make

25 up a -- I'm going to make up 122,999 variables, one variable to

1    capture each person.  Could I do that?  Yes.  Could I do that

2    with these data?  Yes.  Economists do this kind of thing all

3    the time.

4            And then if I put it in my model to predict my

5    outcome, my explained variation, my goodness of fit would have

6    been a hundred percent.  It would make no sense.

7    Q.  To scholars in the field?

8    A.  To anybody.

9    Q.  Are you sure it wouldn't make any sense to anybody?  It's a

10   big world out there.

11   A.  If I've got a model with 122,999.01 variables, it's kind of

12   hard to explain to make sense of that.

13   Q.  Did you control for poverty?

14   A.  No, I did not.

15   Q.  If a scholar in the field said, quote, I disagree because I

16   have seen no data that shows that correlation, end quote, would

17   it be permissible for a layman to infer that if the scholar did

18   have data that the scholar would want to see it?

19   A.  I'm sorry, I missed the question.  No correlation -- you

20   just gave me a quote about no correlation between what and

21   what?

22           MR. LIDDY:  May I ask that the question be read back

23   to the witness.

24           (The record was read by the court reporter.)

25           THE WITNESS:  Yes.

1    BY MR. LIDDY:

2    Q.  In your rebuttal testimony you testified that you theorize

3    that a traffic stop of a Spanish speaking driver would go more

4    quickly during a saturation patrol because the officer would be

5    able to gather intelligence more quickly.

6           Do you recall that testimony?

7    A.  No, I don't think that's exactly what I said.

8    Q.  Do you recall what you did say?

9    A.  I think what -- what I said was that I can imagine a

10   scenario where if an officer encounters a fluent English

11   speaking driver during a saturation patrol, and the officer is

12   seeking to gather background information, that the stop might

13   last longer as the officer engages the driver or a passenger in

14   conversation.

15   Q.  And that's your theory?

16   A.  It's a plausible scenario.

17   Q.  Have you ever tested that theory on the CAD data?

18   A.  I -- there's no way I can test that -- well, actually, what

19   I've test -- give me a second.

20          What I -- what I've shown is that if at least one

21   non-Hispanic name is checked, the stop lasts shorter.

22   Q.  Have you been in the courtroom when the MCSO deputies that

23   were actually making the stops testified?

24   A.  Not for all of them, but I was here for Officer Armendariz

25   and Gamboa and DiPietro, and I think that was it.

1    Q.  How about Sergeant Madrid, Manuel Madrid?

2    A.  I was not here for that.

3    Q.  Did you read his testimony?

4    A.  No, I have not.

5    Q.  How about Carlos Rangel?

6    A.  I have -- was not here for that, nor have I read his

7    testimony.

8    Q.  Well, if an MCSO officer who actually conducts those stops

9    testified that stops in Spanish tend to take longer than stops

10   in English, would you have any reason to disagree with that?

11   A.  No.

12          MR. LIDDY:  I have no further questions.  Thank you,

13   Doctor.

14          THE COURT:  Thank you.

15          Redirect?

16                     REDIRECT EXAMINATION

17   BY MR. BYRNES:

18   Q.  Dr. Taylor, I was told that I was speaking so loud that

19   some folks had their ears cleaned out, so I'm going to talk a

20   little -- I'll talk a little bit softer and maybe you can talk

21   a little bit louder, we'll even each other out.

22          I'd like to direct your attention back to

23   Demonstrative Exhibit 399H.

24          MR. BYRNES:  Your Honor, may I display it to the

25   witness and the gallery?

```
 1              THE COURT:  Yes.

 2              MR. BYRNES:  Thank you.

 3   BY MR. BYRNES:

 4   Q.  And this is a table that Mr. Liddy had referred to.

 5              He asked you whether -- about the statistical

 6   significance between the proportion of Hispanic names checked

 7   under the 90 percent probability threshold and the 60 percent

 8   probability threshold and those differences.

 9              You testified that you wouldn't ask about statistical

10   significance, but understood why others in the field would do

11   so.

12              Could you please explain why you wouldn't ask about

13   statistical significance between those two figures?

14   A.  The purpose of showing these -- these numbers in terms of

15   the proportion of Hispanic names checked with re-processed data

16   is it's descriptive.  It's not asking about a statistical

17   difference.

18              The purpose is simply to say:  If I define -- if I use

19   different minimum probability thresholds to define a surname as

20   Hispanic, here is a percentage of names that are checked

21   classified Hispanic.  And it simply shows how those percentages

22   vary, depending upon the minimum probability threshold used.

23              So this is simply a way of describing the different

24   outcome -- the different ways I have of cutting my outcome, my

25   outcome variable.  Asking about -- if I may be permitted just a
```

1   short analogy.

2           Suppose somebody is analyzing the height of people and

3   somebody decides, Okay, let's classify somebody who's, you

4   know, six feet or higher as tall, so that will give us a

5   certain percentage of people who are tall.

6           Oh, well, let's also look at the outcome if we

7   classify somebody who's six foot two or higher as tall.  Is

8   that going to give us a difference -- different percentage?

9   Sure it is, because we're using a different cutoff.

10          It's simply a different way -- this is simply showing

11  that the population of interest varies, depending upon how you

12  define the minimum probability to classify Hispanics --

13  classify a surname as Hispanic.

14  Q.  Why would others in your field ask about statistical

15  significance of the data you've just described?

16  A.  Well, there might be some reason why they would -- they

17  would want to do this, but -- in other words, there might be

18  some in my field who would do that, but I cannot imagine that

19  most of them would want to do that.

20          I mean, you might say does -- if I go 5 percentage

21  points does my percent, you know, differ significantly, you

22  know?  Is my percentage if I use 85 significantly higher than

23  if I use 90?  Somebody might want to do that.

24  Q.  Don't need the exhibit any more.

25          Finally, Dr. Taylor, during your cross-examination you

1    testified about a model that would explain a hundred percent, a

2    hundred percent of the -- of the variation, if any, between

3    Hispanic name checking patterns in terms of saturation patrols

4    and other variables.

5    A.   Um-hum.

6    Q.   And you -- but you stated that such a model would be

7    nonsensical.  Can you explain why you wouldn't -- and I'm -- as

8    a layperson, I am one of those excited laypeople about such a

9    model.

10          Can you explain why, in your field, such a model would

11   be nonsensical and would not be undertaken?

12   A.   It -- it would be nonsensical in two -- in two regards.

13          First of all, what you've simply done is you've

14   created a predictor variable that matches each observation.  So

15   I simply -- for every outcome score, except for one, for every

16   outcome score except one, I have a predictor variable for each

17   outcome score.  So, therefore, I have one predictor, one score,

18   all the scores are explained.

19          The reason -- the reason this wouldn't make sense in

20   the field is because now I've generated a statistical model

21   that has an extremely large number of predictors.  And in our

22   social science model, even in regular science models, we try to

23   develop prediction models which are relatively -- relatively

24   simple.  The word is parsimonious.

25          You want a theory that, you know, doesn't have

1    hundreds, or even dozens of factors, but a theory or an

2    approach to understanding the real world that uses just a

3    relatively small number of factors to capture a significant

4    amount of the outcome differences that you're interested in.

5    And you can always add in more predictors, but then your model

6    is no longer simple or theoretically appropriate.

7    Q.  Dr. Taylor, is the analysis that you undertook in this

8    case, in your view, the -- a statistically valid model using

9    generally accepted techniques in your field?

10   A.  Yes.

11          MR. BYRNES:  No further questions.  Plaintiffs rest.

12          THE COURT:  Thank you.

13          All right.  You may step down, Dr. Taylor.  Thank you.

14          I've already indicated what the briefing schedule will

15   be.  Let me just ask, and I indicated that I would go over some

16   things that I may be interested in if you have an opinion on

17   them.

18          Before I begin that, let me ask what the parties

19   contem -- and I haven't begun to weigh the evidence in this

20   case, but I certainly will be in the -- begin the process of

21   doing that while you are writing up your briefs.

22          But I guess I want to ask if in fact the result of my

23   analysis is that some sort of injunctive relief is appropriate,

24   do the parties want to be heard again on the nature and scope

25   of that injunctive relief, the appropriate nature and scope?

1          MR. YOUNG:  Your Honor, plaintiffs would appreciate

2    that -- oh, plaintiffs would appreciate that opportunity, Your

3    Honor.

4          MR. CASEY:  Defendants would as well.

5          THE COURT:  All right.  I have indicated that I'm

6    going to tell you basically how I -- mostly, it will be the

7    legal questions I'm interested in.  There are a few factual

8    questions that I'm going to point you to.  I'm not going to

9    change the page limits I've given you, so if there's -- if you

10   want to write more, too bad.  Put it in the page limits.

11   You're just going to have to make choices.

12          But I did indicate that I would -- one of the things

13   that I have an idea I'll be interested in is the actual arrest

14   records and the actual operational plans, and to some extent,

15   shift summaries.

16          I have, for small -- I've gone through the record with

17   my staff and we've identified lots of duplicates of the -- of

18   the same arrest records, and duplicates of operational plans

19   throughout this.  And so what I've tried to do is give exhibits

20   that -- that identify different plans.

21          I want to tell you what those exhibits are.  And if

22   I've missed summaries, arrest records, or arrest summaries,

23   that have individual arrest names, individual officers' names

24   and individual arrestees -- more important than anything is

25   individual arrestees' names on them -- then I would like and

1920

```
 1   invite you to supplement.  Or if I've erroneously repeated

 2   some.

 3           But on small-scale saturation patrols, I have

 4   Exhibit 80 for a November 29th, 2007, patrol.  Exhibit 81 for a

 5   December 5th, 2007, patrol.  Exhibit 76 for a December 14,

 6   2007, patrol.  Exhibit 114 for a January 14, 2008 patrol.

 7           Exhibit 5 appears -- I'm sorry.  Another part of

 8   Exhibit 14 appears to deal with a January 31st, 2008,

 9   small-scale saturation patrol.

10           Exhibit 108 for a May 6 and 7, 2008, small-scale

11   saturation patrol.  Exhibit 109 for an August 19, 2008,

12   small-scale saturation patrol.  Exhibit 112, September 4, 2008.

13   I've been referring to them as small-scale saturation patrols.

14   I realize that these may be more correctly identified as HSU

15   operations and not saturation patrols at all, but whatever.

16           As for large-scale saturation patrols that include

17   arrest summaries with officer names, I have Exhibit 77, which

18   refers to a January 18 and 19, 2008, large-scale saturation

19   patrol.  I have Exhibit 79, which refers to a March 21st and

20   22nd, 2008, large-scale saturation patrol.  I have Exhibit 82,

21   which refers to a March 27 and 28, 2008, large-scale saturation

22   patrol.  I have Exhibit 87, which refers to an April 3rd and

23   4th, 2008, large-scale saturation patrol.  I have Exhibit 90,

24   part of which refers to a June 26th and 27th, 2008, saturation

25   patrol.
```

1          Now, I will tell you, and you can correct me if you

2     look at this and find that I'm wrong, while I believe it refers

3     to a June 26 and 27, 2008, large-scale saturation patrol, the

4     document actually has 6 slash 27 slash 07.  But I think that

5     the written handwriting must be an error, and if I'm wrong

6     about that, if you can stipulate and let me know.

7          Exhibit 97 has documents in it pertaining to a July

8     14, 2008, large-scale saturation patrol.  Document 102 has

9     documents referring to an August 13 and 14, 2008, large-scale

10    saturation patrol.  Exhibit 110 refers to a January 9th and

11    10th, 2009, large-scale saturation patrol.  Exhibit 111 refers

12    to an April 3rd and 24th, 2009, large-scale saturation patrol.

13         Exhibit 168 refers to a July 23rd-24th, 2009,

14    large-scale saturation patrol.  And that is also replicated,

15    apparently, in Exhibit 128 titled ICE Refusals, but unless

16    there's information in one that's not in the other, I don't

17    need to know about that.

18         Exhibit 169 refers to a September 5, 2009, large-scale

19    saturation patrol.  Exhibit 174 refers to an October 16 and 17,

20    2009, large-scale saturation patrol.

21         Exhibit 178 refers to an undated saturation patrol

22    which appears to be of large scale.  The surrounding material

23    suggests that it would be November 16, 2009, but I can't be

24    sure about that.

25         And Exhibit 180 is also undated, but the surrounding

1    material suggests that that would be the next day, so November

2    17, 2009.  So I presume that it would be two days of the same

3    saturation patrol, but I don't know that.

4        Now, let me talk to you about how I tend to view this

5    case -- well, before I get to that, it also occurs to me, as --

6    as you've noted earlier, this case has been with me for a

7    while, and it was with me through the summary judgment stage.

8    In the summary judgment stage all parties submitted statements

9    of fact in which they cited to various deposition transcripts,

10   and sometimes cited to portions of those transcripts which have

11   not been reviewed at trial.

12       I will tell the parties right now that I'm not aware

13   of any significant difference between deposition transcripts

14   and trial transcripts in terms of anything that would give me

15   pause, but I find sometimes that when I'm going through things

16   carefully and doing statements of fact I might want to refer to

17   something that the parties have referred to me in the

18   deposition transcripts that didn't come up at trial.

19       Is there any party that feels that it would be

20   inappropriate for me to consider those matters?

21       MR. CASEY:  Defendants have no objection to you using

22   the statements of facts submitted to the Court in our summary

23   judgment motions and in our responses to their summary judgment

24   motion.

25       MR. YOUNG:  Plaintiffs also have no objection, Your

1   Honor.

2           THE COURT:  All right.

3           MR. CASEY:  Your Honor, the only thing I would point

4   out is the only objection that we would have is the Melendres

5   deposition, I believe, is used, Mr. Melendres's, and

6   Ms. Rodriguez's I think are submitted in the summary judgment

7   motions.  That, obviously, they did not come to trial, and we

8   would have -- we preserve our objection on the use of that

9   testimony.

10          THE COURT:  All right.  Let me tell you that if you

11  want to spend some of your pages, or at least a footnote in

12  your briefing, I did a little legal research to see if I could

13  consider those matters, and I didn't spend a long time on it.

14  The little research I reviewed suggested that I can.  If you

15  find contrary authority, Mr. Casey, I'd invite you to drop that

16  in one of your footnotes or somewhere in part of your written

17  briefing, but I'll note that you've preserved your objection to

18  my doing so.

19          At least as it -- if I understand you, at least as it

20  pertains to Jessika Rodriguez and Mr. Ortega Melendres, and

21  that is because they didn't appear at -- or didn't testify at

22  trial?

23          MR. CASEY:  That is correct, Your Honor.

24          THE COURT:  All right.  Now, it seems to me that the

25  complaint basically has a statutory cause of action and two

1    what I'll call 1983 causes of action that are a little bit

2    multifaceted.  The 1983 causes of action, though, for the most

3    part, are based on a Fourth Amendment violation with a

4    Fourteenth Amendment violation.

5            I believe we've already resolved this through summary

6    judgment, but I'm just going to state some things that if you

7    have a different point of view, I invite you to brief them.

8            First is if I find through the evidence submitted --

9    and there's been, without commenting on how I find the evidence

10   either way, there has been evidence presented from which the

11   Court could find, if I -- depending on how I weigh the

12   evidence, that the defendants have violated and are violating

13   the Fourth Amendment rights of members of the class.

14           If I were to find that, my understanding of the law is

15   that I need not find any subjective intent element on the part

16   of the defendants before injunctive relief is appropriate.  I

17   can just enjoin what I find to be Fourth Amendment violations.

18           Is there any disagreement about that?

19           MR. CASEY:  On behalf of defendants, your statement is

20   correct.

21           THE COURT:  All right.

22           Plaintiffs?

23           MR. YOUNG:  We agree, Your Honor.

24           THE COURT:  All right.  Then we move to what I will

25   call the Fourteenth Amendment, or the equal protection claims.

1    And the Fourteenth Amendment claims are different than the

2    Fourth Amendment claims, as I understand it, because in

3    addition to finding that there is an equal protection

4    violation, before I can enter injunctive relief I have to find

5    a certain element of intent.

6            Is there any disagreement about that?

7            MR. YOUNG:  No, Your Honor.

8            MR. CASEY:  There is not.

9            If I could add one element.  The law that we cited,

10   and I believe both parties cited, was discriminatory intent,

11   discriminatory purpose described often as racial animus.  And

12   that, I believe, is the intent standard.  It's not --

13           THE COURT:  Well, that's really what I'm going to get

14   to.  That is what I'm going to get to in terms of what I would

15   be interested in briefing.  Because it seems to me that -- and

16   I haven't done intense research on this, but it seems to me,

17   for example, if I were to find that the Sheriff's Office were

18   deliberately indifferent, that may not rise to the level of

19   intent required for me to enter injunctive relief.

20           However, deliberate indifference strikes me as being,

21   for example, different than deliberate ignorance.  Certainly,

22   in a criminal context if I find that some -- someone is

23   deliberately ignorant, I can find that they acted knowingly and

24   with the requisite level of intent.

25           But I will tell you that this is an area that is not

1    particularly clearly briefed, and that's why I invite the

2    parties to consider addressing it in their briefing, which is:

3    Do I have to find racial animus?  Or is there something less

4    than racial animus but more than deliberate indifference that

5    constitutes intent?  And I would like to know what the cases

6    say on that, and invite the parties to address it from their

7    various positions.

8            MR. CASEY:  And Your Honor, so I'm clear, that is

9    included in our 17 pages?

10           THE COURT:  It is.

11           MR. CASEY:  Thank you, sir.

12           Be more than happy to provide you separate pages.

13           THE COURT:  Well, I'll consider that.  I'll consider

14   it.  Just a second.  There is a -- there is a refinement to

15   that.  Because, as I've indicated, I am not accepting any more

16   testimony or factual argument.  So I'm going to now go into

17   something different.  Or not something different, but something

18   quite a bit more precise.

19           In the parties' joint pretrial statement, or joint

20   pretrial order, which I accepted and signed, and which cannot

21   be varied unless you can convince me there's manifest

22   injustice, the parties stipulated to something, a legal

23   proposition, and I don't think it's a "gotcha" legal

24   proposition; I think both parties knowingly stipulated to it.

25   And they knowingly stipulated that since the year 2000, in the

1   Ninth Circuit Court of Appeals, because of law set down in an

2   immigration context, race cannot be considered as any factor in

3   forming reasonable suspicion or probable cause.

4          I haven't misstated that, I don't think.  Have I

5   misstated that?

6          MR. CASEY:  Did you say year 2000?

7          THE COURT:  I think it's year 2000.  It's the

8   Montero-Camargo case.  I think you've cited -- I think you

9   cited it.  I think you cited Montero-Camargo, and I cited it in

10  my order on motion for summary judgment.  I don't think it's a

11  surprise to anybody.  That's why I wasn't really surprised to

12  see the stipulation to that as a proposition of law that the

13  parties agreed to in the joint pretrial statement.

14         But let me tell you, it seems to me, and I'm not going

15  to character -- I've heard a number -- I've heard testimony

16  from a lot of people that under certain circumstances race can

17  be and is considered as a factor by the Maricopa County

18  Sheriff's Office.  And that doesn't mean I credit that.  I've

19  heard testimony on both sides.

20         But for example, I will tell you Agent Peña's

21  testimony today I think we heard clearly ICE say, or an ICE

22  officer say that race could be considered as a factor among

23  other factors in certain contexts.  Well, to the extent that

24  ICE said that, it seems to me that they're dead wrong in the

25  Ninth Circuit.

```
 1              So assuming -- is there any -- is there any
 2    disagreement about that proposition?  And if there is, I invite
 3    you to brief that, and to brief how in the world you think --
 4    how that isn't foreclosed by the stipulation you've already
 5    made in the joint pretrial statement as a proposition of law.
 6    But if you have -- if you have a view that that is distinct,
 7    then I want you to brief it.  And I may expand the page number,
 8    since I'm giving you some specific stuff on which I expect your
 9    briefing will be helpful.
10              But now I want to get to an even more precise point
11    when we deal with intent.  Let's say that I determine -- and
12    again, I'm not trying to foreshadow anything, but it seems to
13    me a possibility, in light of testimony I've heard.  If I
14    determine that MCSO believed and did and continues to use race
15    as one factor among many in making certain law enforcement
16    decisions in certain contexts, does it matter, when they intend
17    to and do use race as a factor, is the intent requirement for
18    injunctive relief satisfied?  Even though they may have had,
19    some officers or all officers may have had a good faith belief
20    that they were acting in compliance with the law if they were
21    wrong.
22              Do you understand what I'm asking you?
23              MR. CASEY:  May I paraphrase you to see if I
24    understand?
25              THE COURT:  Yes.
```

1          MR. CASEY:  As I understand what you've asked, if an

2     officer uses race as one component to determine reasonable

3     suspicion or probable cause, for example, maybe an unlawful

4     presence situation, is that factor alone sufficient to meet the

5     racial animus standard --

6          THE COURT:  Well, keep in mind, Mr. Casey --

7          MR. CASEY:  I'm sorry.

8          THE COURT:  Keep in mind, Mr. Casey, I'm not sure that

9     racial animus is the standard.  But there has to be an intent

10    requirement.

11         MR. CASEY:  Right.  Is that sufficient to prove

12    whatever standard the par -- the Court is going to adopt --

13         THE COURT:  Well --

14         MR. CASEY:  -- is that sufficient to meet that intent

15    element?

16         THE COURT:  Correct.  In other words, if you intend

17    and know you intend to use race as a factor, does it matter

18    that you didn't intend to violate the law?

19         MR. CASEY:  Okay.  Right.

20         THE COURT:  All right.  Now, that's the second -- I

21    realize that all of these ways of looking at the 1983 part of

22    the case are some -- to some degree intertwined, because some

23    of the evidence pertaining to whether or not there's Fourth

24    Amendment violations blends into some of the evidence whether

25    there's Fourteenth Amendment violations, and vice versa.

1          But there's another way to look at Fourteenth

2   Amendment violations, which is, frankly, what all the press is

3   interested in and I haven't focused on yet.

4          Mr. Casey, did you want to talk about something?

5          MR. CASEY:  Yes.  I think this directly relates to

6   that issue of briefing.  Is the inquiry of the Court as to

7   specific officers and, in addition, to a policy, pattern, or

8   practice?

9          THE COURT:  Well --

10         MR. CASEY:  I assume it is both.

11         THE COURT:  You know, I'm not going to answer that

12  question, because the evidence is closed, and I am going to

13  consider what specific officers have said in -- well, I guess I

14  can answer this, and maybe this is your question, without being

15  unfair.

16         I am going to determine what the Maricopa County's

17  office -- I am going to be determining what the policy --

18  policies of the Maricopa County Sheriff's Office are.  I am

19  also going to be determining what the practices of the Maricopa

20  County Sheriff's Office are, regardless of what the policies

21  state or may or may not state.

22         MR. CASEY:  Right.

23         THE COURT:  And I will be considering, in considering

24  what their practices are, the testimony of individual deputies

25  as well as the testimony of -- as to policies.

1          MR. CASEY:  All right.  Thank you, sir.  That helps

2    me.

3          THE COURT:  All right.

4          It seems to me, when I'm considering injunctive

5    relief, however, that I can't lose sight of the fact that I

6    have certified a specific class that relates to persons in

7    vehicles, and that I have to keep in light -- I have to also

8    take into account the evidence actually offered.

9          Now, I realize that to the extent that the standard

10   used by the Maricopa County Sheriff's Office, or the definition

11   of what racial profiling is, and the extent to which they may

12   or may not be wrong as a matter of law, may have larger

13   implications for other operations.  And I realize that the

14   standard, or legal practices pertaining to the Fourth Amendment

15   may have larger application.

16         But here's a question I have for plaintiffs.  I

17   realize that there has been testimony on both sides of what I

18   will call the Dr. Taylor issue, Dr. Taylor/Dr. Camarota issue,

19   about whether -- and I will tell you that I'm interested in

20   both aspects of their testimony, but I'm principally interested

21   in this question, in the aspect that pertains to his work

22   pertaining to numbering of Hispanic names run during saturation

23   patrols.  And I realize that there are a few exceptions in his

24   statistical analysis.

25         But if I accept his statistical analysis and the

1    internal benchmarking, and if I am to find that the internal

2    benchmarking is appropriate, don't I then also have to find

3    that because of the nature of the internal benchmarking, all

4    nonsaturation patrol days operated by the Maricopa County

5    constitute an acceptable baseline and do not implicate racially

6    biased policing outside of a saturation patrol?

7            Do you understand my question?

8            MR. YOUNG:  Yes, Your Honor.  And I take it you're not

9    seeking an answer now?

10           THE COURT:  I am not seeking an answer now, but I'm

11   inviting you to consider that in your briefing.

12           MR. YOUNG:  Thank you.

13           THE COURT:  All right.  Those are my principal

14   questions that I'd appreciate that you address in your

15   briefing.

16           And I'm not saying there aren't others.  There are

17   really quite a few others, but it just won't do for me to list

18   them all, and I've given you the major ones.

19           MR. CASEY:  Perhaps risking laughter, let me share

20   with you what my thought is on briefing.

21           My experience is is, you know, to argue the case

22   factually, and that is a factual thing.  I'm not used to

23   usually arguing the law.  That's usually in the briefs.

24           What I would hope is that the Court would allow us to,

25   if the Court were so inclined, to give us 17 pages, or make it

1933

1   15 pages to argue the facts to the Court and then have another,

2   whatever you decide, to address the legal issues you have,

3   because these legal issues can consume 17 pages without any --

4           THE COURT:  All right.  How about I give you 35 pages,

5   both sides?

6           MR. CASEY:  That's all I can ask for.  Thank you.

7           MR. YOUNG:  Thank you, Your Honor.

8           THE COURT:  And I'll give you, then, 17 pages in

9   response.  And I'm not going to change the deadline.  If you

10  can get it done in a week, I'd like it done in a week.

11          MR. CASEY:  We will get it done in a week, Your Honor.

12          MR. YOUNG:  Yes, Your Honor.  Thank you.

13          THE COURT:  All right.  Let me ask you, if you want,

14  I'll allow you to --

15          When is the last one due?

16          MR. CASEY:  On the 16th.

17          THE COURT:  Do we have any time on the 17th?

18          (Off-the-record discussion between the Court and the

19  clerk.)

20          THE COURT:  All right.  I will accept your briefing.

21  I will make a decision.  If it's my determination that any

22  injunctive relief is appropriate I will set forth in my

23  findings of -- I will try and be detailed in my findings of

24  fact and conclusions of law.

25          If I have supplemental questions that I just really

1   don't feel I can answer without your help, I may issue

2   supplemental requests for briefing.  But if I feel like I can

3   proceed, I will do detailed findings of fact and conclusions of

4   law on all of the points that we just addressed.

5           By the way, I didn't address the statutory cause of

6   action, but please feel free to address whatever relevant

7   authority you feel like you want me to consider in the

8   statutory cause of action.

9           I will try and be, as I said, detailed, and if I

10  should determine that any injunctive relief is appropriate, I

11  will request the parties and give them the opportunity to be

12  heard on that.  But it will be as well, I hope, expeditious.

13          Any other questions?

14          MR. CASEY:  Is it presumptuous to ask if the Court has

15  a time period in which it thinks it may try to issue something?

16          THE COURT:  Yes.

17          MR. CASEY:  Thank you, Your Honor.

18          THE COURT:  What I can tell you is that I will do my

19  best.  But I can't tell you how long that will take until I get

20  into it.

21          MR. CASEY:  Thank you, Your Honor.

22          THE COURT:  All right.

23          I also would like to say, because from here on out we

24  get into results and results aren't fun, that I would commend,

25  as I have during the course of these proceedings, that I would

1  commend the attorneys for their cooperation and

2  professionalism, and I do appreciate it.  And with that, I'll

3  see you when next I see you.

4           (Proceedings concluded at 3:22 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

        I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

        DATED at Phoenix, Arizona, this 2nd day of August, 2012.

                        s/Gary Moll