# EXHIBIT A TO:

## DEFENDANTS' BRIEF RE COURT'S PROPOSAL TO REQUIRE MCSO DEPUTIES TO ANNOUNCE BASIS FOR EACH TRAFFIC STOP OVER RADIO

(Assigned to the Hon. G. Murray Snow)

NO.: CV 07-02513-PHX-GMS

Timothy J. Casey (#013492)
James L. Williams (#026402)
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile: (602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Civil Services Division
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Joseph M. Arpaio, et al., <br><br> Defendants. | No. CV 07-02513-PHX-GMS <br><br> **AFFIDAVIT OF GERARD A. SHERIDAN** |

Gerard Sheridan, being first duly sworn upon oath, deposes and states:

1. My name is Gerard A. Sheridan. I am over eighteen (18) years of age, competent to testify, and make this Affidavit upon my personal knowledge.

2. I am the Chief Deputy of the Maricopa County Sheriff's Office ("MCSO").

3. I have served in law enforcement since 1977.

4. During my years of service in law enforcement, I have conducted countless traffic stops, obtained considerable training regarding how to conduct traffic stops, obtained considerable training regarding how to instruct law enforcement officers to conduct traffic stops, and have trained countless MCSO deputies regarding how to conduct

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

traffic stops.

5. It is widely known and publicized that traffic stops result in the injury or death of many law enforcement officers, including MCSO deputies, and is considered one of the most dangerous law enforcement activities an officer can undertake.

6. Based on my personal experience and review of law enforcement training materials and articles during my career, it is a generally accepted fact in the law enforcement profession that, once a law enforcement officer has initiated a traffic stop, he/she must concentrate as much of his/her focus and attention as possible on the subject vehicle and its occupants.

7. During the process of initiating a traffic stop, a MCSO deputy must be able to perform the following tasks and observe, process, and act upon the following circumstances, possibilities, and concerns for the safety of himself/herself, the occupants of the suspect vehicle, other drivers, pedestrians, and other law enforcement officers:

    a. Observe a traffic event and process whether it violates a provision of the traffic code;

    b. If on side of the road, enter the road safely;

    c. Increase speed to catch suspect vehicle;

    d. Watch surrounding traffic and pedestrians for safety of all drivers and pedestrians;

    e. Get close enough to read license, registration, etc. or determine that he/she cannot do so;

    f. Look for possible other traffic or equipment violations and process whether these indicate other concerns (e.g. a broken window or use of high beam headlights from broken steering column indicates the vehicle may have been stolen and stickers on car trigger additional concerns or require action

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C. Professional Corporation

such as a "Watch Your Car" sticker, which, by the owner's prior consent, serves as probable cause to believe the vehicle has been stolen if being driven between 1:00 a.m. and 6:00 a.m.);

g.  Monitor the driver's behavior (if physically possible);

h.  Monitor the behavior of any passengers in the suspect vehicle (if physically possible);

i.  Attempt to determine the number of passengers in the suspect vehicle;

j.  Watch for objects being thrown out of the suspect vehicle;

k.  Watch for windows opening to discard objects or potentially use a weapon;

l.  Watch for vehicle occupants bending down, potentially indicating an effort to obtain or hide objects;

m.  Process all of this information in the context of suspect vehicle's location and any additional concerns or issues that may raise;

n.  Look for a place to pull suspect vehicle over safely, which depends in part upon known locations of backup, traffic, time of day, etc.;

o.  Monitor other radio transmissions and process whether any of the other incoming calls are more emergent than the traffic stop he/she is initiating;

p.  Consider when to activate his/her lights & sirens for safety of all vehicles and individuals involved; and

q.  If the suspect vehicle does not stop when the deputy engages lights and sirens, re-evaluate all of the foregoing factors in light of the change in behavior and location.

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

8. Given the fact that suspect vehicles often do not immediately stop when deputies activate their lights and sirens, which alters the location of the stop, deputies often do not call in a traffic stop until the suspect vehicle is actually pulling over so that the deputy's precise and current location is known to MCSO dispatchers and other officers.

9. As a result, there is often no considerable lead-time between the deputy calling in the traffic stop to dispatch and the suspect vehicle pulling over.

10. The deputy's attention during this time must be directed as completely as possible at assessing the risks and circumstances involving the now-stopped suspect vehicle and not on replaying in his mind all the lawful reasons for initiating the traffic stop and relaying these to an MCSO dispatcher.

11. In my professional judgment, and based on the foregoing concerns, requiring MCSO deputies to call-out the basis for a traffic stop over the radio would not only make traffic stops more dangerous for the deputy conducting the stop, such a practice would also place other deputies at risk for, at least, the following reasons:

   a. The MCSO utilizes four geographically-based radio channels (East West, Lakes, and Civil).

   b. All the deputies on patrol in each of these areas must be able to hear all traffic on that channel in order to be able to respond to events relating to officer safety, emergencies, or requiring backup.

   c. Only one MCSO deputy or communications officer may broadcast on each Channel at any given time.

   d. Thus, there is a fixed amount of airtime for each radio channel.

   e. This fixed amount of airtime cannot be filled with information, such as the reasons each traffic stop is initiated, that is unnecessary for MCSO dispatchers to perform their duties – to receive information regarding the

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

location of deputies, to provide information to deputies (e.g., results of license plate or driver's license search), and to take appropriate action in response thereto.

f. Even more importantly, MCSO dispatchers rely upon radio communications as indicators that a deputy is in danger or needs assistance – even if the deputy is unable to call for backup.

g. MCSO dispatchers are listening for signs of stress, unusual events, background noise, tone of voice, rate of speech, and a number of other sounds that trigger their instinctual responses to such communications.

h. A mere "click-on" by a MCSO deputy of his radio is one of the most important sounds a MCSO dispatcher may hear, as this is (and has been with regard to shot and fallen MCSO deputies) a sign that the deputy has been injured, perhaps fatally, and cannot speak into his/her radio.

i. If the dispatcher hears such a "click-on" or other alarming sound and is unable to obtain a response from the deputy, the dispatcher will immediately direct other deputies to proceed to the last known location for this deputy.

j. The most serious consequence of requiring MCSO deputies to occupy radio airtime to state the reason for each traffic stop is that such a "click-on" or other alerting sound would not even be transmitted because another deputy was reciting the reason for a traffic stop during the same time and thereby occupying the airtime for that channel.

k. Transmissions explaining the reason for a traffic stop would not only be irrelevant to dispatchers, they would potentially preclude dispatchers from hearing information necessary to fulfill their duties and protect MCSO deputies and work against the dispatchers' instinctual reactions (e.g.

5

downgrading the seriousness of a traffic stop in the dispatcher's mind because it was called out simply as a "broken tail light").

12. Additionally, this increased radio traffic would be heard by a deputy engaging in all the activities and analyses listed above while he/she is monitoring his radio and processing whether any of the other incoming calls are more emergent than the traffic stop he/she is in the process of initiating.

13. When traffic stops become dangerous, MCSO deputies must be able to respond as quickly as possible to assist the deputy in jeopardy.

14. The MCSO has taken, and continues to take, every reasonable measure and precaution to improve the effectiveness of radio communications for the safety of its deputies during traffic stops.

15. To require deputies to announce over the radio the reason for each traffic stop, which deputies would necessarily try to do as completely as possible to avoid a possible later challenge by the ticketed driver, would significantly distract and endanger MCSO deputies for the reasons set forth above.

16. I am not aware of *any* law enforcement agency that requires its officers to call-out the basis for a traffic stop over the radio.

17. After directing my staff to contact 27 other law enforcement agencies in and around Maricopa County, the MCSO has been unable to locate *any* law enforcement agency that requires its officers to call-out the basis for a traffic stop over the radio.

*/s/ Gerard A. Sheridan*

Gerard A. Sheridan

6

1  STATE OF ARIZONA    )
                       ) ss.
2  County of MARICOPA  )

3  SUBSCRIBED AND SWORN to before me, the undersigned notary public, this 11th day of September, 2013 by Gerard A. Sheridan.

_____
Notary Public

My Commission Expires:
July 29, 2016

[Notary Seal: OFELIA CANO, Notary Public - State of Arizona, MARICOPA COUNTY, My Commission Expires July 29, 2016]