**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., <br><br> Plaintiffs, <br><br> v. <br><br> Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., <br><br> Defendants. | No. CV-07-02513-PHX-GMS <br><br> **SUPPLEMENTAL PERMANENT INJUNCTION/JUDGMENT ORDER** |

**BACKGROUND**

On May 24, 2013, the Court issued Findings of Fact and Conclusions of Law after conducting a bench trial in this matter. (Doc. 579.) The Court held that Defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

The Court permanently enjoined Defendants from the following:

(1) Detaining, holding or arresting Latino occupants of vehicles based on a reasonable belief, without more, that such persons are in the country without authorization;

(2) Following or enforcing its "LEAR" policy, as currently written, against any Latino occupant of a vehicle in Maricopa County;

(3) Using race or Latino ancestry as a factor in determining whether to stop any vehicle;

(4) Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle may be in the country without authorization;

(5) Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law;

(6) Detaining, holding, or arresting Latino occupants of a vehicle for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that the necessary elements of the crime are present; and

(7) Detaining, arresting, or holding persons who are occupants of motor vehicles based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

After issuing the injunctions, the Court held a status conference with the Parties on June 14, 2013. (Doc. 582.) The Parties desired to negotiate the terms of a consent decree to ensure Defendants' compliance with the injunctions. On August 16, the Parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement, and terms on which they could not agree. (Doc. 592.) The Court held a hearing on August 30 at which it discussed both the terms agreed upon and the disputed terms with the Parties. (Doc. 599.) As a result of the trial and the subsequent proceedings, the Court orders the following supplemental injunctive relief.

## **REMEDIES**

## I.     DEFINITIONS

1.     The following terms and definitions shall apply to this Order:

  a.   "Boilerplate" means language that is stock, formulaic, appears repeatedly in different reports, and fails to attest to the unique facts of an incident;

  b.   "CAB" means the Community Advisory Board;

  c.   "CAD" means  "Computer Aided Dispatch," the electronic system that tracks communications between MCSO deputies and dispatch while on patrol;

  d.   "CBP" means U.S. Customers and Border Protection;

e.   "Complainant" means any person, including a member of the public, MCSO deputy, detention officer, civilian employee, or posse member, who makes a complaint against MCSO;

f.   "Complaint" means any allegation of improper conduct made by a member of the public or MCSO personnel regarding MCSO services, policy or procedure, that alleges dissatisfaction with or misconduct by MCSO personnel;

g.   "Order" means this Order;

h.   "County" means Maricopa County, including its agents and employees;

i.   "Court" means the United States District Judge for the District of Arizona presiding over this case;

j.   "Defendants" means defendants in the above-captioned action, i.e., Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, and the MCSO;

k.   "Deputy" or "deputy" means any sworn law enforcement officer employed by or working for MCSO, including Supervisors, patrol and reserve officers;

l.   "Discipline" means a personnel action for violation of any law, regulation, rule, or MCSO policy, including, but not limited to, an admonishment, written reprimand, suspension, demotion or termination;

m.   "Discriminatory Policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on a person's actual or perceived race or ethnicity.  Discriminatory Policing does not include using a person's race or ethnicity in any reliable suspect-specific description or for purposes of data collection;

n.   "District" refers to one of the seven police service areas of MCSO;

o.   "Effective Date" means the day this Order is entered by the Court;

p.   "Exigent Circumstances" means emergencies in which a reasonable person would believe that imminent death or bodily harm to a person or persons or the destruction of evidence is likely or as otherwise defined by law;

q.   "EIS" means Early Identification System;

r. "Full and Effective Compliance" means compliance with all relevant provisions of this Order. The Defendants shall begin to be in Full and Effective Compliance with this Order when all of the following have been both completed and consistently maintained:

    i. A Monitor has been appointed pursuant to Paragraphs 119–121 of this Order.

    ii. The MCSO has formed an Implementation Unit pursuant to Paragraph 9 of this Order.

    iii. The MCSO has developed, and, pursuant to Paragraph 30, either the Monitor or the Court has approved, and the MCSO has fully implemented the Policies and Procedures and amendments to Policies and Procedures set out in Section V of this Order.

    iv. The MCSO has developed curriculum and training materials that have, pursuant to Paragraph 46 of this Order, been approved by the Monitor or the Court.

    v. The MCSO has developed and implemented a training schedule pursuant to Paragraph 44 of this Order.

    vi. The MCSO has trained all existing MCSO Supervisors, Deputies, and posse members pursuant to Paragraphs 41–53 of this Order.

    vii. The MCSO has developed proposed protocols, including draft templates and instructions for Significant Operations and Patrols as set out in Section VI of this Order that have, pursuant to Paragraph 37, been approved by the Monitor or the Court, and have been implemented.

    viii. The MCSO has provided an adequate number of Supervisors as well as proper Deputy assignments pursuant to Paragraphs 82 and 84 of this Order.

    ix. The MCSO has developed and implemented a system for performance evaluations pursuant to Paragraph 98 of this Order.

    x. The MCSO has developed and implemented eligibility criteria for assignment to specialized units pursuant to Paragraph 101 of this Order.

xi. The MCSO has developed and implemented an audit check plan to detect Deputy misconduct pursuant to Paragraph 103 of this Order.

xii. The MCSO has developed and implemented a system to collect traffic stop data and a protocol for audit checks of that system pursuant to Paragraphs 54–59 of this Order.

xiii.    The MCSO has developed and implemented a protocol for the periodic analysis of the traffic stop data pursuant to Paragraph 64 of this Order.

xiv.    The MCSO has developed and implemented a system for electronic data entry by Deputies pursuant to Paragraph 60 of this Order.

xv.    The MCSO has developed and implemented a system for the audio and video recording of traffic stops and a protocol for reviewing the recordings pursuant to Paragraphs 61–63 of this Order with the understanding that Full and Effective Compliance may be achieved once all traffic patrol vehicles that make traffic stops used by Specialized Units have been mounted with the audio and video equipment, so long as the remaining vehicles are timely equipped with the audio and video equipment according to the requirements of those Paragraphs.

xvi.    The MCSO has formed a Unit to aid in the development and implementation of the EIS, developed and implemented the EIS, and trained all MCSO personnel on the use of the EIS pursuant to Paragraphs 72–81 of this Order.

xvii.    The MCSO has developed and implemented a community outreach program pursuant to Paragraphs 107–112 of this Order.

xviii.   The MCSO has selected or hired a Community Liaison Officer pursuant to Paragraphs 113–114 of this Order.

xix.    The MCSO has worked with Plaintiffs' representatives and community representatives and created a Community Advisory Board pursuant to Paragraphs 115–116 of this Order.

xx. The MCSO has conducted at least one comprehensive internal assessment pursuant to Paragraphs 12–13 of this Order.

xxi.   The Monitor has conducted a comprehensive assessment pursuant to Paragraphs 13 or 138 and has certified that the MCSO is in compliance with all of the scheduled obligations described above in Paragraph 1 and in compliance with all other periodic and/or continuing obligations in this Order since the Effective Date.

s.   "IA" means Internal Affairs, the MCSO unit charged with conducting internal and administrative investigations of MCSO deputies, agents, and employees;

t.   "ICE" means U.S. Immigration and Customs Enforcement;

u.   "Immigration-Related Law" means any civil or criminal offense related to immigration status;

v.   "Immigration-Related Crime" means any statute imposing criminal punishment in which immigration status is an element of the offense;

w.   "include" or "including" means "include or including, but not limited to";

x.   "Investigatory Stop," "Investigatory Contact," or "Investigatory Detention"  means a detention short of an arrest in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968);

y.   "LEAR Policy," means the MCSO policy described on page 2 and 113 of the Court's May 24, 2013 Findings of Fact and Conclusions of Law of detaining persons believed to be in the country without authorization but whom they cannot arrest on state charges, in order to summon a supervisor and communicate with federal authorities;

z.   "MCSO" means the Sheriff of the Maricopa County Sheriff's Office acting in his or her official capacity, including the MCSO's agents, deputies, detention officers, Supervisors, employees (both sworn and unsworn), and posse volunteers;

aa. "MCSO Implementation Unit" means the unit created by the MCSO and consisting of MCSO Employees to facilitate implementation of this Order;

bb. "MCSO Personnel" or "MCSO Employee" means all MCSO Employees, contractors and volunteers, including command staff, deputies, detention officers, civilian employees and posse volunteers;

cc. "MDT" means Mobile Data Terminal, the computerized system used in MCSO vehicles to conduct inquiries on individuals encountered on patrol;

dd. "Monitor" means a person or team of people who shall be selected to assess and report on the Defendants' implementation of this Order;

ee. "On-site Observation" means first-hand observation by the Monitor of MCSO activities, e.g., ride-alongs with Deputies on patrol or attendance at MCSO meetings or trainings;

ff. "Parties" means Plaintiffs and Defendants collectively in the above-captioned action;

gg. "Patrol Operations" means all MCSO law enforcement operations conducted by Deputies in a law enforcement support or patrol capacity which involves motor vehicle traffic stops, including Significant Operations as defined below. Jail or detention facility operations are not a part of Patrol Operations;

hh. "Plaintiffs" means plaintiffs in the above-captioned action;

ii. "Policies and Procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of MCSO personnel, and providing specific direction in how to fulfill those duties, functions, or obligations. All Policies and Procedures should be available in hardcopy and electronically;

jj. "Sheriff" means the current and future sheriffs of MCSO;

kk. "Significant Operation" or "Significant Patrol" means any pre-planned Patrol Operation that will involve traffic stops of vehicles within Maricopa County involving 10 or more MCSO Personnel excluding posse members;

ll. "Specialized Unit" means a temporary or permanent organization of deputies within MCSO whose operational objectives are focused on a specific law enforcement purpose beyond general patrol or criminal investigations;

mm.   "Supervisor" or "supervisor" means a sworn MCSO employee at the rank of sergeant or above (or anyone acting in those capacities) with oversight responsibility for MCSO personnel;

nn. "Training" or "training" means MCSO instruction that aspires towards industry best practices and includes adult-learning methods that incorporate realistic role-playing scenarios, interactive exercises, traditional lecture formats, and testing and/or writings that indicate that MCSO personnel taking the Training comprehend the material taught;

oo. "Vehicle stop" means any instance where a MCSO Deputy directs a civilian operating a motor vehicle of any type to stop and in which the driver and any passengers are detained for any length of time.

## II.   EFFECTIVE DATE, JURISDICTION AND PARTY REPRESENTATIVES

2.   This Order shall become effective upon entry by the Court.

3.   To ensure that the requirements of this Order are properly and timely implemented, the Court will retain jurisdiction over this action for all purposes until such time as the Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three years.

4.   The Parties may agree to jointly ask the Court to terminate this Order if the Parties agree that Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three continuous years.  If the Parties disagree on whether Defendants have achieved Full and Effective Compliance for no less than three continuous years, either Party may seek to terminate this Order. If Defendants move to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so at least 60 days prior to filing a motion to terminate. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court.  If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or

interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order.  If the Defendants move for termination of this Order, Plaintiffs will have 60 days after the receipt of the Defendants' motion to object to the motion.  If Plaintiffs do not object, the Court may grant the Defendants' motion.  If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

5.   After Defendants have reached Full and Effective Compliance, Defendants shall also have the right to move to terminate any part, portion, or term of this Order if they believe that they have maintained compliance with such portion, part, or term of this Order for no less than three continuous years. At least 60 days prior to filing a motion to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court.  If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order.  Plaintiffs shall have the right to oppose such motion within 60 days after receipt of the Defendants' motion. If Plaintiffs do not object, the Court may grant the Defendants' motion.  If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

6.   At all times, the Defendants shall bear the burden of demonstrating Full and Effective Compliance with this Order.

7.   This Order shall run against the Sheriff in his official capacity, as well as the MCSO. For purposes of implementation and enforcement of the Order, the representatives for the Parties shall be:

    a.   Plaintiffs: The American Civil Liberties Union of Arizona ("ACLU-AZ") and any other representative(s) designated by the ACLU-AZ;

b.  Defendants: Chief David Trombi and Captain Larry Farnsworth (or other designee selected by the Sheriff).

8.  The Court, upon 60 days' notice to the Parties, retains the right to modify or terminate this Order in whole or in part if it is satisfied that the Defendants have substantially complied with any or all of the terms of the Order for a period of three years, or if it is otherwise satisfied that a modification is justified.

## III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT

9.  Defendants shall hire and retain, or reassign current MCSO employees to form an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.

10.  MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.

11.   Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.

12.   The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.

13.   The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the

determination.  Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).

### IV.    MONITOR REVIEW PROCESS

14.    In any place where this Order provides for Defendants to submit policies, procedures, protocols or other materials to the Monitor for his or her review, Defendants shall submit such materials to the Monitor and provide a copy to Plaintiffs' representatives within the specified time.

15.    Plaintiffs shall have an opportunity to provide any comments or recommendations on the materials within 14 days of receipt. The Monitor shall thereafter communicate to the Parties the results of its review. If the Monitor has any concerns or recommendations regarding the materials, it will include those concerns or recommendations. The MCSO may then amend the materials and resubmit them to the Monitor within 14 days for further review. Either Party may apply to the Monitor for an extension of the deadlines in this Paragraph. In conducting its review, the Monitor may take into account industry best practices and the record in this litigation.

16.    If the Monitor approves the matter submitted, the Monitor will make a record of his or her approval and inform both parties.  In cases where neither party objects to the Monitor's action, the Monitor's determination will be final.  When the Monitor approves such matter, no further action is needed before the MCSO implements the relevant policies, procedures, protocols or materials. The MCSO shall do so promptly and without delay.

17.    If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute. The non-moving Party may

respond to such motion within 14 days of filing. The moving Party may file a reply within 7 days after that. Any policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination.

## V.   POLICIES AND PROCEDURES

18.   MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.

19.   To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.

20.   The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

### a.   Policies and Procedures to Ensure Bias-Free Policing

21.   The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:

a.   define racial profiling as the reliance on race or ethnicity to *any* degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

b.   prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

c.   prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

d.   specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

e.   include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

22.   MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.

23.   Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.

24.   The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.

**b.      Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

25.   The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

a.   prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

- 14 -

b.   provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c.   prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.   prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.   prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.   require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.   prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h.   require the duration of each traffic stop to be recorded;

i.   provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j.   instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

c.   **Policies and Procedures to Ensure Bias-Free Detentions and Arrests**

26.   The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:

- 15 -

a.   require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;

b.   require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;

c.   provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;

d.   require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an  identity document;

e.   prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and

f.   prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).

**d.     Policies and Procedures Governing the Enforcement of Immigration-Related Laws**

27.   The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.

28.   The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:

a.   specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;

b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;

c. prohibit officers from initiating a pretextual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

d. prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);

e. prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

f. unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

g.   prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop  unless a request to do so has been voluntarily made by the individual;

h.   require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time Supervisor approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**e.     Policies and Procedures Generally**

29.   MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.

30.   Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.

31.   Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.

32.   The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to

policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.  The MCSO shall apply policies uniformly.

33.     MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.

34.     MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.

## VI.     PRE-PLANNED OPERATIONS

35.     The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.

36.     The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.

37.     The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in

Section IV within 90 days of the Effective Date.  In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.

38.   If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:

a.   documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);

b.   information that triggered the operation and/or selection of the particular site for the operation;

c.   documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;

d.   documentation of command staff review and approval of the operation and operations plans;

e.   a listing of specific operational objectives for the patrol;

f.   documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;

g.   any operations plans, other instructions, guidance or post-operation feedback or de-briefing provided to participating MCSO Personnel;

h.   a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

i.   arrest lists, officer participation logs and records for the patrol; and

j.   data about each contact made during the operation, including whether it resulted in a citation or arrest.

39.    The MCSO shall hold a community outreach meeting no more than 30 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.

40.    The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation.  In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.

## VII.    TRAINING

### a.    General Provisions

41.    To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.

42.    The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.

43.    The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training

shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.

44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order.  Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training.  Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.

45. The Training may incorporate adult-learning methods that incorporate role-playing scenarios, interactive exercises, as well as traditional lecture formats.

46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.

47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.

**b.      Bias-Free Policing Training**

48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.

49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.   definitions of racial profiling and Discriminatory Policing;

b.   examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;

c.   the protection of civil rights as a central part of the police mission and as essential to effective policing;

d.   an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;

e.   constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

f.   MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g.   MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h.   police and community perspectives related to Discriminatory Policing;

i.   the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.   methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.   methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.   methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.   cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.   problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.  the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.  background information on the *Melendres v. Arpaio* litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio*, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.  instruction on the data collection protocols and reporting requirements of this Order.

**c.      Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws**

50.   In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.

51.   The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.  an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;

b.  guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;

c.  guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;

d.   constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;

e.   MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

f.   the circumstances under which a passenger may be questioned or asked for identification;

g.   the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.   the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.   the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or

apparent race or ethnicity, speaking Spanish,  speaking English with an accent, or appearance as a day laborer;

l.   an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.   provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio* and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.   instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**d.      Supervisor and Command Level Training**

52.   MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.

53.   The Supervisor-specific Training shall address or include, at a minimum:

a.   techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;

b.  how to conduct regular reviews of subordinates;

c.  operation of Supervisory tools such as EIS;

d.  evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;

e.  how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;

f.  how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;

g.  incorporating integrity-related data into COMSTAT reporting;

h.  how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;

i.  how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;

j.  how to respond to and investigate allegations of Deputy misconduct generally;

k.  evaluating Deputy performance as part of the regular employee performance evaluation; and

l.  building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.

## VIII.   TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a.   Collection of Traffic Stop Data

54.  Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:

a.  the name, badge/serial number, and unit of each Deputy and posse member involved;

b.  the date, time and location of the stop, recorded in a format that can be subject to geocoding;

c.  the license plate state and number of the subject vehicle;

d.  the total number of occupants in the vehicle;

e.  the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

f.  the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

g.  an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

h.  the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

i.  time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

j.  whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and  if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

k.  whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

l.  whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.  the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

55.     MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.

56.     The traffic stop data collection system shall be subject to regular audits and quality control checks.  MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.

57.     MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.

58.     The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties.  If the Parties cannot agree, the Court shall make the determination.

59.     Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.

**b.      Electronic Data Entry**

60.   Within one year of the Effective Date, the MCSO shall develop a system by which

Deputies can input traffic stop data electronically.  Such electronic data system shall have

the capability to generate summary reports and analyses, and to conduct searches and

queries. MCSO will explore whether such data collection capability is possible through

the agency's existing CAD and MDT systems, or a combination of the CAD and MDT

systems with a new data collection system. Data need not all be collected in a single

database; however, it should be collected in a format that can be efficiently analyzed

together. Before developing an electronic system, the MCSO may collect data manually

but must ensure that such data can be entered into the electronic system in a timely and

accurate fashion as soon as practicable.

**c.      Audio-Video Recording of Traffic Stops**

61.   The MCSO will install functional video and audio recording equipment in all traffic

patrol vehicles that make traffic stops, and shall commence regular operation and

maintenance of such video and audio recording equipment.  MCSO shall prioritize the

installation of such equipment in all traffic patrol vehicles that makes traffic stops used

by Specialized Units that enforce Immigration-Related Laws, and such installation must

be complete within 180 days of the Effective Date.  MCSO shall equip all traffic patrol

vehicles that make traffic stops with video and audio recording equipment within 2 years

of the Effective Date.  Subject to Maricopa County code and the State of Arizona's

procurement law, the Court shall choose the vendor for the video and audio recording

equipment if the Parties and the Monitor cannot agree on one.

62.   Deputies shall turn on any in-vehicle video and audio recording equipment as soon the

decision to initiate the stop is made and continue recording through the end of the stop.

MCSO shall repair or replace all non-functioning video or audio recording equipment, as

necessary for reliable functioning. Deputies who fail to activate and to use their recording

equipment according to MCSO policy or notify MCSO that their equipment is non-

functioning within a reasonable time shall be subject to Discipline.

- 30 -

63.   MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.

**d.      Review of Traffic Stop Data**

64.   Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.

65.   MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.

66.   MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.

67.     In this context, warning signs or indicia of possible racial profiling or other misconduct
        include, but are not limited to:

   a.   racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns,
        including disparities or increases in stops for minor traffic violations, arrests
        following a traffic stop, and immigration status inquiries, that cannot be explained by
        statistical modeling of race neutral factors or characteristics of deputies' duties, or
        racial or ethnic disparities in traffic stop patterns when compared with data of
        deputies' peers;

   b.   evidence of extended traffic stops or increased inquiries/investigations where
        investigations involve a Latino driver or passengers;

   c.   a citation rate for traffic stops that is an outlier when compared to data of a Deputy's
        peers, or a low rate of seizure of contraband or arrests following searches and
        investigations;

   d.   indications that deputies, units or the agency is not complying with the data collection
        requirements of this Order; and

   e.   other indications of racial or ethnic bias in the exercise of official duties.

68.     When reviewing collected patrol data, MCSO shall examine at least the following:

   a.   the justification for the Significant Operation, the process for site selection, and the
        procedures followed during the planning and implementation of the Significant
        Operation;

   b.   the effectiveness of the Significant Operation as measured against the specific
        operational objectives for the Significant Operation, including a review of crime data
        before and after the operation;

   c.   the tactics employed during the Significant Operation and whether they yielded the
        desired results;

   d.   the number and rate of stops, Investigatory Detentions and arrests, and the
        documented reasons supporting those stops, detentions and arrests, overall and broken
        down by Deputy, geographic area, and the actual or perceived race and/or ethnicity

and the surname information captured or provided by the persons stopped, detained or arrested;

e. the resource needs and allocation during the Significant Operation; and

f. any Complaints lodged against MCSO Personnel following a Significant Operation.

69. In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy.  Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit

70. If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation.   Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.  If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.  All interventions shall be documented in writing.

71. In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.

## IX.    EARLY IDENTIFICATION SYSTEM ("EIS")

### a.    Development and Implementation of the EIS

72.    MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.

73.    Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").

74.    MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.

75.    The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:

　　a.    all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);

　　b.    all internal investigations of alleged or suspected misconduct;

     c.   data compiled under the traffic stop data collection and the patrol data collection mechanisms;

     d.   all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;

     e.   all arrests;

     f.   all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;

     g.   all arrests in which the individual was released from custody without formal charges being sought;

     h.   all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;

     i.   all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

     j.   all disciplinary action taken against employees;

     k.   all non-disciplinary corrective action required of employees;

     l.   all awards and commendations received by employees;

     m.  Training history for each employee; and

     n.  bi-monthly Supervisory observations of each employee.

76.   The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).

77.   MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.

78.   MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS.  On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.  No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.

79.   The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date.  Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.

   **b.       Training on the EIS**

80.   MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.  Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following

the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.

**c.     Protocol for Agency and Supervisory Use of the EIS**

81.   MCSO shall develop and implement a protocol for using the EIS and information obtained from it.  The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit.  Additional required protocol elements include:

a.   comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;

b.   identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:

   i.   failure to follow any of the documentation requirements mandated pursuant to this Order;

   ii.  racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;

   iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

   iv.  a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

- 37 -

v.  Complaints by members of the public or other officers; and

vi.  other indications of racial or ethnic bias in the exercise of official duties;

c.  MCSO commander and Supervisor review, on a regular basis, but not less than bi-monthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;

d.  a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;

e.  identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;

f.  a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and  not solely on the number or percentages of incidents in any category of information recorded in the EIS;

g.  a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.  an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

i.   mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

## X.   SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE

82.   MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and  laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.  To achieve these outcomes, MCSO shall undertake the following duties and measures:

### a.   General Duties of Supervisors

83.   MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors:  respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.

84.   Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.

85.   First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.

86.    On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.

87.    MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

    **b.    Additional Supervisory Measures**

88.    To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.

89.    A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.

90.    MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred.

Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.  Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.

91.     As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

92.     Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.

93.     Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.

94.     As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that

indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

95.     Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.

96.     A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.

97.     MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).

**d.      Regular Employee Performance Review and Evaluations**

98.     MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance

to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.

99.    The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.

100.   The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.

101.   Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.  Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.

# XI.   MISCONDUCT AND COMPLAINTS

### a.   Internally-Discovered Violations

102.   MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.

### b.   Audit Checks

103.   Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including:  Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.

### c.   Complaint Tracking and Investigations

104.   Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.

105.   Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.

106.   Records of Complaints and investigations shall be maintained and made available, unredacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.

## XII.   COMMUNITY ENGAGEMENT

### a.   Community Outreach Program

107.   To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the period that this Order is in place. To this end, the MCSO shall create the following district community outreach program.

108.   Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.

109.   As part of its Community Outreach and Public Information program, the MCSO shall hold a public meeting in each of MCSO's patrol Districts within 90 days of the Effective Date, and at least one meeting in each District annually thereafter. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

110.   The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.

111.   English- and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the

Community Liaison Officer (described below) shall participate in the meetings. Plaintiffs' representatives shall be invited to attend.

112. The meetings shall be held in locations convenient and accessible to the public. At least one week before such meetings, the MCSO shall widely publicize the meetings using English and Spanish-language television, print media and the internet.

**b.      Community Liaison Officer**

113. Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.

114. The CLO shall have the following duties:

    a.   to coordinate the district community meetings described above in Paragraphs 109 to 112;

    b.   to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118;

    c.   to compile any Complaints, concerns and suggestions submitted to CLO by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;

    d.   to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and

    e.   to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.

**c.      Community Advisory Board**

115. MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the

MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

116.    The CAB shall have six members, three to be selected by the MCSO and three to be selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case.  However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB. The CAB shall continue for at least the length of this Order.

117.    The CAB shall hold public meetings at regular intervals of no more than four months. The meeting space shall be provided by the MCSO. The CLO shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.

118.    During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and make reasonable efforts to address such concerns. Members will also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.

### XIII.   INDEPENDENT MONITOR AND OTHER PROCEDURES REGARDING ENFORCEMENT

#### a.      Selection of the Monitor

119.    The Court shall appoint an Independent Monitor to assist with implementation of, and assess compliance with, this Order. Within 60 days of the Effective Date, the Parties shall agree on the selection of a Monitor to be appointed by the Court.

120.    The Parties shall have an opportunity to separately interview prospective candidates if they choose, as well as request additional information about prospective candidates' background and experience, proposed annual fees and costs, proposed annual budget,

including references and a list of recent consulting or monitoring work and the fees and costs from that prior consulting or monitoring work as well as information as to whether the candidate meet or exceeded any budgets for that prior consulting or monitoring work.

121. If the Parties are unable to agree on a Monitor or an alternative method of selection within 60 days of the Effective Date, each Party shall, no later than 70 days from the Effective Date, submit the names and resumes of three candidates with experience as law enforcement practices experts or monitors to the Court, and the Court shall select a Monitor from among the qualified candidates.

122. The Monitor shall be appointed for the term of this Order.  In the event a Monitor is to be replaced, the Parties shall select a new Monitor by the same process as above.   The Court may order the removal of the Monitor for any reason sua sponte, or upon Motion by any party.

123. Defendants shall provide the Monitor with permanent office space and reasonable office support such as office furniture, secure internet access, telephones, secure document storage, and photocopying, faxing and scanning equipment. Defendants shall bear all reasonable fees and costs of the Monitor. However, the Parties recognize the importance of ensuring that the fees and costs borne by Defendants are reasonable.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, Defendants, Plaintiffs, and the Monitor shall attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  All Parties shall be included in any communications related to such a dispute.

124. The Monitor, at any time after his or her initial selection, may request authorization from the Court to be allowed to hire or employ or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Order or by the Court. The Monitor shall submit to the Court the task to be performed by the proposed additional person or entity, the scope of the work to be performed, the project fees and expenses associated with such work, the expected length of time for such work, and the reasons the Monitor is unable to perform such work and requires the

assistance of the additional person or entity and why existing MCSO personnel cannot perform the task requested by the Monitor.  Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Order shall be subject to the provisions of this Order.  The Monitor shall notify the Defendants and Plaintiffs' representatives in writing if the Monitor wishes to hire such additional persons or entities. The notice shall identify and describe the qualifications of the person or entity to be hired, the monitoring tasks to be performed, the estimated cost and length of time of the task, and explain why existing MCSO personnel cannot perform the task requested or desired by the Monitor.  If the County and Plaintiffs agree to the Monitor's proposal, the Monitor shall be authorized to hire or employ such additional persons or entities.  The County or Plaintiffs have 15 business days to state any disagreement with the proposal. If the County and Plaintiffs are unable to reach agreement within 15 business days of receiving notice of the disagreement by the other Party, the Court shall resolve the dispute.

125.   Should any Party determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by this Order, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors. The Party or Parties, as the case may be, shall attempt to resolve such disputes cooperatively prior to seeking the assistance of the Court. All Parties shall be included in any communications related to such a dispute.

**b.**     **Role of the Monitor**

126.   The Monitor shall be subject to the supervision and orders of the Court, consistent with this Order. The Monitor shall have the duties, responsibilities and authority conferred by the Court and this Order, including, but not limited to: (1) reviewing the MCSO Patrol Operations Policies and Procedures provided for by this Order and making recommendations to the Court regarding the same; (2) reviewing a protocol with the

Parties to ensure that any Significant Operations conducted by the MCSO are conducted in a race-neutral fashion; (3) reviewing the curriculum, materials and proposed instructors for Training required by this Order; (4) reviewing the collected traffic stop data and the collected Saturation Patrol data to determine whether the data required to be gathered by this Order is, in fact, being collected by the MCSO; (5) reviewing protocols regarding the collection, analysis, and use of such data and determining whether the MCSO is in compliance with those protocols; (6) reviewing the collected data to determine whether, in the opinion of the Monitor, MCSO is appropriately reviewing the collected data to determine possible isolated or systemic racial profiling occurring, and if so, reporting the factual basis supporting that judgment to the Parties and the Court; (7) evaluating the effectiveness of the MCSO's changes in the areas of supervision and oversight and reporting the same to the parties and the Court; (8) reviewing the corrective action taken by the MCSO concerning any possible violations of this Order or MCSO policy and procedures and reporting the same to the parties and the Court; (9) evaluating the MCSO's engagement with the communities affected by its activities as set forth by this Order; and (10) assessing the MCSO's overall compliance with the Order.

127. To assess and report on the Defendants' implementation of this Order and whether implementation is resulting in the constitutional and professional treatment of individuals by MCSO, the Monitor shall conduct the audits, compliance reviews and outcome assessments specified below, and such additional audits and assessments as the Monitor or the Parties deem appropriate.

128. The ultimate arbiter of compliance is the Court and Parties may make their own submissions regarding compliance separate from the Monitor's reports.  In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution.

129. In carrying out these duties, the Monitor shall be permitted to have ex parte communications with the Parties.

c.    **Monitoring Plan and Review Methodology**

130.  The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

   a.  a description of the work conducted by the Monitor during the reporting period;

   b.  a listing of each Order requirement which indicates whether each requirement has been addressed by the MCSO, is the subject of sufficient Training, and whether the MCSO is in compliance with that requirement of the Order in the judgment, opinion, and experience of the Monitor;

   c.  the methodology and specific findings for each audit or review conducted;

   d.  for any requirements that were audited and reviewed and found not to have been fully implemented in practice in the judgment, opinion, and experience of the Monitor, the Monitor's recommendations to the Court regarding necessary steps to achieve compliance;

   e.  in the judgment, opinion, and experience of the Monitor an assessment of MCSO's progress in achieving the desired outcomes for each area covered by the Order, noting issues of concern or particular achievement;

   f.  the methodology and specific findings for each outcome assessment conducted; and

   g.  a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Order.

131.  The Monitor's reports shall be public except for information covered by privacy laws or that is otherwise confidential. If any information is redacted from the Monitor's report, an unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit, review or assessment need not be made publicly available but shall be retained by the Monitor and provided to either or both Parties upon request.

132.  The Monitor shall provide a copy of quarterly reports to the Parties in draft form at least 21 business days prior to filing them with the Court to allow the Parties to provide written comment on the reports.  The Monitor shall consider the Parties' responses and make any

changes the Monitor deems appropriate before issuing the report. The Monitor shall

attach to his or her report copies of any comments submitted by the Parties.

133.   Within 60 days of his or her appointment, the Monitor shall develop a plan for

conducting the above audits, reviews and outcome assessments, and shall submit this plan

to the Parties for review and approval. In the event that the Parties cannot agree, the plan

will be submitted to the Court for final approval. This plan shall:

   a.   clearly delineate the requirements of the Order to be assessed for compliance,

        indicating which requirements will be assessed together;

   b.   set out a schedule for conducting an initial audit or review of each requirement of the

        Order, and periodic audits and reviews thereafter;

   c.   set out a schedule for conducting initial outcome assessments for each area of the

        Order, and periodic assessments thereafter.

134.   Where the Monitor recommends and the Parties agree, the Monitor may refrain from

conducting an audit or review of a requirement previously found to have been fully

implemented in practice by the Monitor, or refrain from conducting an outcome

assessment if previous assessments indicate that the outcome intended by a requirement

has been achieved.

135.   At least 30 days prior to the initiation of any audit, review or assessment, the Monitor

shall submit a proposed methodology to the Parties. The Parties shall submit any

comments or concerns regarding the proposed methodology to the Monitor within 15

days of the proposed date of the assessment, review or audit. The Monitor shall modify

the methodology as necessary to address any concerns or shall inform the Parties in

writing of the reasons it is not modifying its methodology as proposed. If Parties do not

agree with the proposed methodology, the Monitor shall then file with the Court the

proposed methodology for approval.

136.   In conducting the outcome assessments, the Monitor should measure not only the

MCSO's progress in implementing the provisions of this Order, but the effectiveness of

the reforms. To do so, the Monitor shall take into account the following performance-based metrics and trends:

a.  Deputies' awareness and comprehension of issues addressed by departmental policies and Training;

b.  data relating to the race and ethnicity of individuals stopped, detained and arrested by the MCSO, including the rate at which investigations result in a citation or arrest;

c.  data related to the documented reasonable suspicion or probable cause to stop, detain or arrest individuals encountered on traffic stops, broken down by the actual or perceived race or ethnicity of the person(s) stopped/arrested;

d.  the use and deployment of Specialized Units;

e.  the execution of any significant operations, including planning and site selection, tactics employed, staffing and units involved, and the intended and actual results of such operations;

f.  the amount and quality of supervision provided by the MCSO's chain of command;

g.  the prevalence of civilian Complaints regarding biased policing or unlawful detentions and arrests by MCSO Patrol Operation deputies;

h.  the number and rate of Complaints that are accepted, sustained and not sustained, overall and broken down by type, unit, geographic area and the actual or perceived race or ethnicity of Complainants;

i.  disciplinary outcomes for any violations of departmental policy;

j.  whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct; and

k.  the level of MCSO engagement and participation with the community advisory board;

137.  To facilitate the Monitor's outcome assessments, the Monitor may also conduct his or her own periodic analysis of the traffic stop and Significant Operations data collected by the MCSO pursuant to this Order, subject to the terms of this Order as to the Monitor's proposed hiring of assistance. The Monitor shall retain an individual or entity with

expertise in social science research and statistics to conduct the survey if the Monitor does not have this expertise him/herself.

138. The Monitor shall conduct a comprehensive re-assessment each year after the Effective Date to determine whether and to what extent the outcomes intended by this Order have been achieved, and any modifications to the Order that he/she believes are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement.  This re-assessment shall also address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Full and Effective Compliance.  Based upon this comprehensive re-assessment, the Monitor may recommend to the parties and the Court modifications to the Order that he/she believes are necessary to achieve and sustain intended outcomes.

**d.      Monitor Recommendations and Technical Assistance**

139. The Monitor may make additional recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives.  Such recommendations may include a recommendation to change, modify, or amend a provision of the Order, a recommendation for additional Training in any area related to this Order, or a recommendation to seek technical assistance. In addition to making recommendations, the Monitor may also, at the request of the Parties, provide technical assistance directly to the MCSO consistent with the Monitor's responsibilities under this Order. In the event that full and effective implementation of this Order requires technical assistance beyond the scope of what the Monitor can provide, Defendants shall reasonably arrange for prompt initiation of such technical assistance consistent with the terms of this Order.

**e.      Communication between Monitor and Parties**

140. The Monitor shall maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of Defendants' implementation of and compliance with this Order.

**f.      Public Statements, Testimony, Records, and Conflicts of Interest**

141.    Except as required or authorized by the terms of this Order or the Parties acting together: neither the Monitor, nor any agent, employee, or independent contractor thereof, shall make any public statements, outside of statements to the Court as contemplated in this Order, with regard to any act or omission of the Defendants, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Order.  Any press statement made by the Monitor regarding its employment or monitoring activities under this Order shall first be approved by the Parties.

142.    Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Maricopa County or its departments, Deputies, agents or employees.

143.    The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

144.    The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Order.

**g.      Access and Confidentiality**

145.    Defendants shall ensure that the Monitor has timely, full and direct access to all personnel, documents, facilities and Order-related Trainings and meetings that the Monitor reasonably deems necessary to carry out its duties. The Monitor shall cooperate with the Defendants to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations. To facilitate his or her monitoring responsibilities, the Monitor may conduct On-Site

Observations, visits and assessments without prior notice to the Defendants absent Exigent Circumstances.

146. Defendants may withhold from the Monitor any documents or data protected by the attorney-client privilege. Should the Defendants decline to provide the Monitor access to documents or data based on attorney-client privilege, the Defendants shall inform the Monitor and Plaintiffs that it is withholding documents or data on this basis and shall provide the Monitor and Plaintiffs with a log describing the documents or data.

147. Defendants shall ensure that Plaintiffs' representatives and their consultative experts and agents shall have full and direct access to all Defendants' staff, employees, facilities, documents and data relevant to this Order upon reasonable notice.   Plaintiffs' representatives and their consultative experts and agents shall cooperate with the Defendants to access involved personnel, facilities, and documents in a reasonable manner that, consistent with Plaintiffs' responsibilities to enforce this Order, minimizes interference with regular duties.

148. The Monitor and Plaintiffs shall provide the Defendants with reasonable notice of a request for copies of documents.  Upon such request, the Defendants shall provide in a timely manner copies (electronic, where readily available) of the requested documents.

149. The Monitor shall have access to all records and information relating to criminal investigations relevant to this Order as permissible by law. The Monitor shall treat such records as confidential and shall not disclose the same to any third party. The Monitor and Plaintiffs shall have access to all documents in concluded or closed MCSO criminal investigation files. The Monitor shall also have reasonable access to all arrest reports, warrants, and warrant applications whether or not contained in open criminal investigation files absent Exigent Circumstances.

150. The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Order shall not be deemed a waiver of any privilege or right the Defendants may assert, including those recognized at common law or created by statute,

rule or regulation, against any other person or entity with respect to the disclosure of any document.

### h.      Modification and Enforcement of the Order

151.   Where the Parties agree with the Monitor's recommendations to change a provision of the Order, the Parties may apply to the Court via stipulated Motion or other appropriate filing to make the desired change.

152.   Plaintiffs' representatives may seek enforcement of this Order if they determine that the Defendants have failed to fully comply with any provision contained herein. Plaintiffs' representatives are not required to prove that the MCSO is engaged in racial profiling in order for the Court to find that Defendants have failed to fully comply. Plaintiffs may demonstrate that the MCSO has failed to fulfill a particular obligation under this Order or failed to make sustained and continuing progress on applicable performance-based metrics.

153.   The Parties shall first attempt to resolve any dispute informally by notification and conferral. If a dispute cannot be resolved informally, Plaintiffs' representatives may apply to the Court for appropriate relief, up to and including the imposition of contempt sanctions. Interventions short of an imposition of contempt sanctions may include, but are not limited to, additional oversight, further restrictions on agency activities, and additional Training or reporting requirements.

154.   Defendants may move the Court for a protective order and/or other appropriate relief if they reasonably believe Plaintiffs' representative is abusing its rights under this Order or acting solely to annoy or harass Defendants.  Prior to moving for any such protective order or other relief, Defendants shall be required to provide Plaintiffs with notice of their intent to do so and shall confer with Plaintiffs in good faith to resolve any such dispute.

155.   The Parties shall notify each other of any court or administrative challenge to this Order. In the event any provision of this Order is challenged in any local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to this District will be sought.

156.   The Defendants agree to promptly notify Plaintiffs if any term of this Order becomes subject to collective bargaining consultation and to consult with Plaintiffs in a timely manner regarding the implications of any collective bargaining consultation in relation to this Order.

157.   Defendants shall pay reasonable fees and costs incurred as a result of having to initiate litigation to secure enforcement, should Plaintiffs prevail in such litigation. Nothing in this provision affects the right of Plaintiffs to seek fees and costs for work performed in the case prior to the Effective Date or in connection with any appeal taken by Defendants of the Court's May 24, 2013 Findings of Fact, Conclusions of Law and Order.

158.   Defendants reserve the right to move the Court to alter, amend, modify, or terminate this Order at any time based on an adverse decision of an appellate court of competent jurisdiction ruling on the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

159.   Nothing in this Section, nor in this Order is intended to, nor shall, constitute a waiver, termination, abrogation, or ending of the appeal rights of the Defendants to challenge the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

**IT IS THEREFORE ORDERED** that the Court's injunction of December 23, 2011 is made permanent. The Court's injunction of May 24, 2013 shall remain permanent.  For removal of doubt, both the December 23, 2011 injunction and the May 24, 2013 injunction shall survive the termination of this Order until and unless specifically dissolved or modified by the Court or an appellate court of competent jurisdiction.

**IT IS FURTHER ORDERED** that this Order is an appealable final judgment. The Clerk of Court is directed to enter judgment accordingly.

/ / /

/ / /

/ / /

1      **IT IS FURTHER ORDERED** that this Court retains jurisdiction over this case for the

2   purposes of implementing this Order.

3      Dated this 2nd day of October, 2013.

4

5

6                                          G. Murray Snow
7                                    United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28