WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

**IT IS HEREBY ORDERED** setting a Status Conference for **March 24, 2014 at 9:00 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151. Counsel for all parties are required to attend, as are Sheriff Arpaio and Chief Deputy Sheriff Sheridan. All counsel, Sheriff Arpaio, and Chief Deputy Sheridan were previously notified last Monday of the date and time of this hearing and their required attendance. At the hearing the parties will address the matters set forth in some detail below.

The hearing arises from the Monitor's early evaluation of some materials provided by the parties. These materials concern the actions of the parties taken between the entry of the Court's Order on October 2, 2013 ("Injunction") (Doc. 606) and the Monitor's appointment on January 17, 2014. The Monitor has considered various concerns expressed by the parties and made a recommendation to the Court that it take early

corrective action to avoid the perpetuation of patterns of conduct that may not be in good faith compliance with the Court's Injunction. These matters include: (1) some matters that were the subject of training conducted prior to MCSO's Significant Operation in October 2013; and, (2) MCSO's appointment of the Community Liaison Officer required by the Injunction. The Court also has concerns about and wishes to discuss: (3) the adequacy of the notice, times, locations, and facilities of the community meetings required by the Injunction and conducted by the MCSO; (4) matters concerning Monitor staff access to MCSO personnel, facilities, and information; (5) revisions of some of the dates in the Order; and, (6) the parties' requests concerning the Court's publication of the two orders at issue here.

In making the determination of the matters on which this hearing would be noticed, the Court was made aware of other concerns raised by the Plaintiffs, such as the timing of the MCSO's October Special Operation. The Court, however, notes that the MCSO remains entitled to great deference in its reasons for, and timing of, Significant Operations, so long as they do not violate the terms of this Court's Injunction in holding such operations. Although the MCSO did schedule the operation between the time that the Injunction was issued and a Monitor was appointed, it nevertheless took reasonable steps to comply with the Injunction in contemporaneously documenting that operation. It is, in fact, from that documentation that a number of the significant issues scheduled for this hearing arise.

## BACKGROUND

Some background will assist in clarifying the matters to be discussed at the hearing. In May 2013, this Court issued its detailed Findings of Fact and Conclusions of Law ("Findings and Conclusions") (Doc. 579) determining and setting forth in detail how and why the Defendants engaged in a number of separate violations of the constitutional rights of the Plaintiff class.

At a status conference in June, both parties indicated that, rather than having the Court enter an injunction without their input, they wanted to attempt to negotiate the

terms of a mutually satisfactory consent decree. (Doc. 586 at 6–8, 18–21.) They were granted considerable time in which to negotiate such an agreement. Although the parties were unable to reach agreement on all issues, they were, by their own account, "able to reach agreement on a substantial number of terms." (Doc. 592 at 4:8–10.) They submitted a Proposed Consent Order to the Court, illustrating their areas of agreement and disagreement. (Doc. 592-1.) The areas of substantial agreement included, among other things: establishing a MCSO Implementation Unit and performing an internal agency-wide assessment (*Id.* at 11–12), the implementation of specific policies, procedures and training to ensure constitutional policing and to comply with the Order (*Id.* at 13–32), the documentation of traffic stops and the nature of other specifically identified data to be collected to ensure that the MCSO was complying with the terms of the Court's Injunction (*Id.* at 33–40), the video-monitoring of all MCSO stops, and procedures for the adequate supervision and evaluation of officer performance, including the creation, implementation and supervisory use of an early identification system (*Id.* at 40–51) to alert supervisors of possibly unacceptable deputy conduct together with periodic evaluation sessions.

The principal areas of disagreement included whether a monitor should be appointed to implement the terms of the Order to which the parties had otherwise agreed, whether or not the Court would require the MCSO to establish and implement more effective internal complaint intake processing, and whether a community advisory board should be appointed, and, if so, the extent of that Board's authority. (Doc. 592 at 4–10.) There was also some disagreement as to the operational details and requirements the Court would impose even as to those topics on which the parties had reached conceptual agreement. For the most part, this Court adopted the "substantial number of terms" to which the parties had both agreed. The Court found that the parties had engaged in a good faith effort to come up with the proposed order, and thus the parties' Proposed Consent Order (Doc. 592-1) formed the basis and provided the exact language for the

great majority of this Court's Order, though at times the proposed order's provisions were re-arranged for organizational clarity.

As to the areas of disagreement, the Court accepted briefs from the parties and held a Status Conference on those topics. (Docs. 593, 603.) One of those areas arose from the Court's determination that the MCSO used pre-textual stops of vehicles whose occupants were persons of Hispanic ancestry and then prolonged those stops to investigate the identity of such persons, including vehicle passengers, based merely on the deputy's belief, without more, that such persons were in the country without authorization. In light of those findings, Plaintiffs urged the Court to prohibit MCSO personnel during the effective term of the Injunction from making any inquiries of passengers of the vehicles it stopped. The Plaintiffs further requested the Court to require MCSO personnel to record their perception of the ethnicity of a vehicle's occupants for each stop.

While the Court recognized the need to effectively monitor the MCSO to prevent its selection of a vehicle for pre-textual stop based on the ethnicity of its occupants, it declined to prohibit the MCSO from questioning the occupants of a vehicle once stopped. Rather, the Court required the MCSO in the initial radio call that preceded a traffic stop to briefly state the original purpose of the stop, or to otherwise record the original purpose of the stop, before the stop was executed. It further required that the officers participating in the stop record their perception of the ethnicity of the occupants in a vehicle. Together this information would provide sufficient information to monitor MCSO's compliance with the Order, and determine whether it continued to disproportionately stop vehicles with Hispanic occupants, without preventing MCSO officers from questioning the occupants of any vehicle.

The Court decided the other remaining issues on which there was disagreement based on the Court's previous rulings, the parties' briefings, and the information presented at the status conference on August 30, 2013. Specifically, the Court did decide

to appoint a Monitor but it did not require everything the Plaintiffs proposed in terms of changes in discipline and the responsibilities and scope of the Community Advisory Board.

Two weeks after the Injunction, Defendants chose to conduct a Significant Operation. Defendants filed a protocol with the Court after part of the operation had already begun and only one day before the major portion started. (Docs. 609, 615 at 5.) As part of this operation, the Defendants held a training session and the Court has received a video recording of that training. This, and a number of the other events and actions by Defendant, occurred after the entry of the Injunction but before the appointment of the Monitor.

**A.     The Training Held Before the Significant Operation in October 2013**

In the training given by Chief Deputy Sheridan and Sheriff Arpaio to the deputies that were participating in the Significant Operation on October 18, 2013: (1) Chief Deputy Sheridan summarized the Court's Findings of Fact and Conclusions of Law in *Melendres* and indicated that the Injunction is "absurd" and "ludicrous." (2) He provided specific instruction to those participating in the Significant Operation as to how to approach the obligation to record their impression of the race of the person stopped during traffic stops. To the extent that the content of Chief Deputy Sheridan's training is at issue, it will be available for reference at the hearing (in total the training that concerns the Court takes about fifteen minutes).

In his training Chief Deputy Sheridan summarizes this Court's Findings of Fact and Conclusions of Law which lead to the Injunction as follows.

> With the *Melendres* case, Judge Snow did not say that we were racist. He did not find that the Maricopa County Sheriff's Office was racist. What Judge Snow found was that three deputy sheriffs used the ICE training that they received by the federal government in determining the alienage of some individuals; to determine whether they were here legally or not. He found that that was unconstitutional. He found that we detained Hispanic drivers fourteen seconds

> longer than non-Hispanic drivers. So, therefore, he found that we violated the Fourth and Fourteenth Amendment with those two things. That's why we're here today. And we have the same--this judge put the same constraints on us that a federal judge did with the City of New Orleans Police Department. And their police officers were murdering people. That tells you how ludicrous this crap is.

Chief Deputy Sheridan then briefly observed that the Injunction was nevertheless the law, which the MCSO was obliged to implement, but that the MCSO was appealing the ruling. He offered his prediction, based on his apparently unfavorable view of the Ninth Circuit, that the Ninth Circuit would not only uphold the ruling but commend the District Court. He then stated that Defendants would be appealing to the Supreme Court

> because it is not just my opinion, and the Sherriff's opinion, but every lawyer that I've talked to that it is Judge Snow that violated the United States Constitution. It's Judge Snow that violated the Tenth Amendment. The Federal Government does not have the authority to do what he did.

Also, at the same training, Chief Deputy Sheridan presented a new form that had been created to comply with the data collection requirements of the Injunction. According to the form, deputies are required to record their perception of the race and ethnicity of all of the vehicles occupants both before and after every stop they make.[1] During the training on how to complete this form Chief Deputy Sheridan indicated that determining ethnicity would be hard to do without asking and he said that he felt it was "absurd" for the deputies to be asked to guess. He then asked for the door to be closed

---

[1] Plaintiffs have correctly objected that this double recording is not required by the Injunction. Defendants' explanation to the Monitor that the Injunction obliges them to record their subjective impressions of the vehicle occupants ethnicity both before and after any stop is simply incorrect. The Injunction does require that Deputies record their subjective perception of the "race, ethnicity and gender of the driver and any passengers" but does not require them to do so both before and after a stop. The Court recognizes that the Sheriff may, on his own authority, require his deputies to collect such additional information as he may deem useful, even if it is not required by the Injunction. He has apparently done so. Any attempt to characterize this additional and supplemental information as required by the Injunction, however, is simply incorrect.

because did not want the media to hear what he had to say. After the door closed he said they were "safe," but he then noted the camera in the room. He then emphasized that perceiving the ethnicity before the stop would be particularly hard to do. He emphasized that there might be reasons that someone might not be able to ascertain the racial identity of occupants of a stopped vehicle and he offered several reasons why they might find it impractical. In doing so, it appears to the Court that he was suggesting to the deputies that they were not obliged to use their best reasonable efforts to comply with the Court's order.

Immediately after Chief Deputy Sheridan's remarks, Sheriff Arpaio spoke. He apparently ratified Chief Deputy Sheridan's comments by saying, "What the Chief Deputy said is what I've been saying." Sheriff Arpaio went on to say, "We don't racially profile. I don't care what everybody says. We're just doing our job. We had the authority to arrest illegal aliens under the federal programs." As noted, these comments were given as part of a formal training meeting.

    **1.**    **Chief Deputy Sheridan's Incorrect and Misleading Description of The Court's Findings, Conclusions and Injunction.**

It is imperative that the personnel of the MCSO obtain an accurate understanding as to why their past policies, practices, and procedures are unconstitutional. As the Court observed in its findings, at least some of the MCSO's unconstitutional conduct either occurred as a result of, or was exacerbated by, faulty training or communication failures within the MCSO. To be corrected, the unlawful policies, patterns and practices of the MCSO must be clearly, accurately and completely communicated to, and understood by, MCSO personnel.

Both parties, in submitting the terms of the proposed injunction to the Court, agreed that the MCSO should provide complete and accurate training to its personnel concerning "background information on the *Melendres v. Arpaio* litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio*, the parameters of the Court's permanent Injunction, and

the requirements of this Order." (Doc. 606 at ¶ 49(q).) The parties also agreed, and the Injunction specified, that the Training shall correct "any misconceptions about the law or MCSO policies" "to the extent past instructions to personnel on [the topics covered in *Melendres*] were incorrect." (*Id.* at ¶ 49(f).)[2]

It appears that Chief Deputy Sheridan's summary of the Court's Findings and Conclusions and the resulting Injunction at the October 18 training meeting is in violation of these provisions of the Court's Injunction. In his statement, Chief Deputy Sheridan said that the Court's factual basis for its conclusion that the MCSO violated the Fourteenth Amendment arose solely from conduct of three officers who were mistrained by ICE. He further stated that this Court's finding that MCSO deputies illegally detained Plaintiff class members arose from its finding that the MCSO detained Hispanic drivers fourteen seconds longer than it detained non-Hispanics. Instead of summarizing this Court's actual conclusions, the summarization made by Chief Deputy Sheridan mischaracterizes and trivializes the significant period and the significant extent to which the Court found that the MCSO's operations violated the Constitution.

While it is true that the Court never found that the MCSO was racist, it did find, among other things not enumerated at length here, that MCSO deputies received incorrect training that they could consider Hispanic ethnicity as one factor among others in forming reasonable suspicion in the context of immigration enforcement. MCSO apparently does not dispute this fact, at least as far as it extends to ICE materials. The extent to which MCSO was, or may have been independently involved in such training is not clear except as is set forth below.

The Court further found that MCSO inappropriately used race as a factor in selecting at least some of the locations for its day labor operations and small and large-

---

[2] With the exception of some added punctuation, this language specifying the content and format of the required training exactly tracks the language that Defendants submitted to the Court in the jointly filed Proposed Consent Order. (Doc. 592-1 at 25–28.)

- 8 -

scale saturation patrols. The Court made this determination after examining complaints received by the MCSO about Hispanics and/or day laborers which lead to MCSO's location of day labor operation locations in those locales, which then subsequently lead to small and large scale saturation patrols centered on those same locations.

The Court further found that, in conducting its immigration enforcement operations, the MCSO systematically and as a matter of routine practice, used race in deciding which vehicles to pre-textually stop for traffic violations in order to investigate whether the occupants of the vehicle were authorized to be in the country. The Court made such findings of fact after considering all of the extensive testimony of both deputies and command staff and the extensive exhibits admitted at trial. The arrest reports for all such operations demonstrated that vehicles were frequently, if not always, selected for pre-textual enforcement of traffic laws based on the presence of Hispanic occupants in those vehicles. Those reports demonstrated a very high number of immigration-related arrests of Hispanics per stops made during such operations, and otherwise made clear that a principal purpose of such operations was immigration enforcement. Further, the purpose for those operations was frequently stated in contemporaneous MCSO press releases—one of which included quotes from the Sheriff indicating that race was a criterion, but not the only criterion, for stopping vehicles during such patrols. The Court further found that the "zero tolerance policy" that MCSO claimed was in place to mitigate any inappropriate racial profiling in such MCSO operations either never existed or was never communicated to MCSO personnel. The Court further credited some of the testimony of Plaintiff's expert over Defendant's expert in part because Defendants told their expert that their stops were governed by the zero tolerance policy which the Court found either did not exist or was not communicated to those participating on patrols.

The Court further found that in determining whom to interview within a vehicle once pre-textual traffic stops were made, MCSO deputies considered race as one such factor. It was not seriously disputed, even by MCSO command staff personnel, that deputies determined who to question once a stop was made using race as one factor. In

making this finding, the Court also relied on the explicit text of the operations plans that specified the criteria which should be used to determine whether someone should be investigated for immigration compliance during such stops. The plans incorporated race as one factor among others in making that determination.

The use of race as one factor among others not only violated the Plaintiff Class's Fourteenth Amendment rights, but to the extent it was used as a factor supporting reasonable suspicion that a crime was being committed, it also violated the Class's Fourth Amendment rights. As it pertained to the MCSO's violation of the Plaintiff Class's Fourth Amendment rights, the Court never made any determination, despite Deputy Chief Sheridan's assertions to the contrary, that the MCSO detains vehicles with Hispanic stops fourteen seconds longer than vehicles without Hispanic occupants. The Court did find, however, based on ample MCSO press releases that all MCSO deputies were improperly trained that they had the inherent authority to enforce civil and/or administrative aspects of federal immigration law with or without valid 287(g) certification. This fundamental misunderstanding, together with MCSO's LEAR policy and routine MCSO practices, and the way it staffed its patrols with non-287(g) officers even when such certification was in force, resulted in routine and systematic detentions of persons absent sufficient reasonable suspicion that a crime had been or was being committed. These practices violated the Fourth Amendment. These findings were confirmed not only by the testimony of a number of officers concerning their practice in interrogating and detaining persons they suspected of being in the country without authorization during pre-textual traffic stops, but by the MCSO's operations plans that set forth its LEAR policy, and by the testimony of command staff personnel concerning those policies, as well by the Court's finding that the MCSO had failed to comply by the terms of its preliminary injunction set forth in December 2011 by routinely continuing to enforce its LEAR policy or something like it by detaining persons on the belief, without more, that such persons were in the country without authorization.

Although these are not the only factors on which the Court concluded that the MCSO had department policies that violated the Plaintiff Class's Fourth and Fourteenth Amendment rights, the above recitation is sufficient to demonstrate the misleading nature of Deputy Chief Sheridan's description of the Court's Findings and Conclusions. In short, the Courts findings that the MCSO committed multiple violations of the Plaintiff Class's constitutional rights were in no way based on the trivialized and invented findings that Chief Deputy Sheridan presented.

The summary appears to be in direct violation of the Injunction's requirement that training include accurate summaries of the Court's findings. (Injunction ¶ 49(q)). In addition, having the Chief Deputy of the MCSO use training sessions and other opportunities at the outset of the monitoring period prior to the appointment of a Monitor to mischaracterize the specific findings of the Court will prevent such problems from being understood and cured. It also poses the danger of greatly impairing the value of any subsequent training concerning the Court's findings, no matter how accurate that subsequent training may be.

Further, Deputy Chief Sheridan and Sheriff Arpaio's use of the training to assert that "we had the authority to arrest illegal aliens under the federal programs," and to apparently assert that the MCSO never used race as a factor in its immigration enforcement operations, also defies other requirements in the Injunction. Those include MCSO's obligation that "[t]he Training shall . . . address or include, at a minimum . . . a correction of any misconceptions about the law or MCSO policies," to the extent that past erroneous instructions were given to its personnel. (*Id.* ¶ 49(f).) As Chief Deputy Sheridan himself indicates at one point in his training, the Court's order is the existing law. It will so remain unless and until all or any part of it is vacated by a higher court. To the extent therefore that in training the Sheriff or others make legal assertions that have been directly rejected by this Court, they may not, consistent with the terms of the Injunction, teach that the law dictates to the contrary.

The Court would not interpret its Injunction so strictly as to prevent the Chief Deputy, the Sheriff, or any other MCSO command staffer from professionally and accurately stating in training that the MCSO disagrees with this Court's Findings of Fact and Conclusions of Law and the resulting Injunction and has thus taken appropriate action to appeal those orders. Nevertheless, when they present such arguments as legal realities, as opposed to their legal assertions on appeal, they are misrepresenting the law as it has already been determined to apply to the actual facts of their own past operations. Rather than correcting past instructions or practices, such statements continue to mis-train deputies that they had the authority to engage in their unconstitutional actions of the past, or that any mistakes made were only trivial infractions by less than a handful of deputies.

Further, when such training misstates and trivializes the Court's findings and then states after such misstatement and trivialization that the Court's orders are "crap" "ludicrous," and unconstitutional, it causes the Court concern that MCSO leadership may be choosing to present a paper appearance of compliance while at the same time fostering an attitude of contempt and subversion of the Court's orders among MCSO personnel.[3] It is not unreasonable to suppose that MCSO personnel might be inclined to follow the directions of their Sheriff and Chief Deputy. The direction that the MCSO leaders have demonstrated in this training only reconfirms to the Court the very great need for an independent Monitor who engages in close observation of those areas required by the Injunction. It further raises the possibility that the MCSO may choose not to be compliant with some or all aspects of this order, or only facially compliant, resulting in an extended

---

[3] Further, the Injunction requires that "[t]hose presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia." (*Id.* ¶ 42.) Although again, the Court would not interpret its Injunction to prevent Deputy Sheridan or Sheriff Arpaio from responsibly expressing their own views about the Constitution, to the extent that Chief Deputy Sheridan used the training to make legal arguments that this Court's order is unconstitutional, the Court is not aware that either Chief Deputy Sheridan or Sheriff Arpaio meet the Injunction's requirements for the presenters of such training, which at any rate seems more appropriately made to the Court of Appeals.

- 12 -

period in which the MCSO is subject to this Court's direct supervision caused by non-compliance. The Court, by this hearing, seeks to minimize any such periods.

### 2. Chief Deputy Sheridan's Instructions About Approximating Ethnicity

Unfortunately Chief Deputy Sheridan's instructions to officers on how they might find it inconvenient to provide an estimate of the probable ethnicity of the occupants of a vehicle without asking them to identify their own ethnicity only further illustrates this point. The Injunction requires the Defendants to document "the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers." As is explained above, this does not require a deputy to make such an estimation both before and after the stop, but only after the stop. Further, it would be inappropriate, and foster the wrong impression, for the reasons already reviewed by the parties in hearings before the Court, for the MCSO to directly ask all of the occupants of a vehicle that they stop to identify their ethnicity. Nevertheless, as is further stated above, the Court needs the deputies to make such good faith estimates as a tool by which this Court, its Monitor, and the community may measure whether the MCSO is continuing to use ethnicity as one factor among others in making traffic stops. Admittedly, it is imperfect, and further relies, to some extent, on the good faith of each deputy making the estimate. But, it is a measure which prevents this Court from having to resort to more extreme measures such as were suggested by Plaintiffs to ensure MCSO's compliance, including barring deputies from asking any questions whatsoever to vehicle occupants during the term of the Injunction.

Despite that reality, in this same training discussed above, Deputy Chief Sheridan characterized this aspect of the Court's Injunction as "absurd" and suggested several reasons why deputies would find that they would be unable to make a good faith estimation of the ethnicities of occupants of vehicles that they stop. In light of this training the Court makes two observations. First, there is a difference between the MCSO being in non-compliance with an order, and its leadership providing training that encourages MCSO officers to circumvent this Court's order. To the extent that willful circumvention of the Court's order is separate from non-compliance with it, it would give

rise to additional concerns and would require separate remedies. Second, to the extent that Chief Deputy Sheridan or any other member of MCSO training staff or leadership gives training that frustrates the Court's ability to monitor MCSO's compliance with the terms of its Injunction, and to the extent such training succeeds, the Court will have no choice but to consider more restrictive measures to ensure that the MCSO is not continuing its past discriminatory practices.

If the MCSO believes, upon review, that Chief Deputy Sheridan's summary of the Court's findings, as apparently ratified by Sheriff Arpaio, was in compliance with the MCSO's obligations under the Injunction, it shall at the hearing, explain to the Court all of the reasons it believes that summary to be in compliance with this Court's Injunction. In doing so, it will address all of the Court's observations and concerns expressed above. To the extent, however, that upon review the MCSO believes that Chief Deputy Sheridan's summary was not in compliance with its obligations under the Injunction, it shall, at the hearing, present to the Court a proposal for corrective action. That proposal shall include a complete accounting of any and all disseminations by the MCSO of inaccurate summaries of this Court's holding in *Melendres* to MCSO personnel and necessary corrective action.

Further, if the MCSO believes, upon review, that Chief Deputy Sheridan's instructions to the deputies concerning recording their appraisal of the ethnicity of those they stop does not serve to undermine good faith effort in complying with this Court's Injunction, it shall at the hearing, explain to the Court all of the reasons it believes that Chief Deputy Sheridan's instruction does not serve to undermine compliance with this Court's Injunction. In doing so, it will address all of the Court's observations and concerns expressed above. To the extent, however, that upon review the MCSO believes that Chief Deputy Sheridan's instruction may have been capable of being misperceived by those receiving the instruction, it shall, at the hearing, present to the Court a proposal for corrective action.

/ / /

**B.     The Community Outreach Program and Community Liaison Officer**

The Injunction requires the Defendants to create a Community Outreach Program and appoint a Community Liaison Officer ("CLO"). The purpose of this program is "[t]o rebuild public confidence and trust" by requiring MCSO to "work to improve community relationships and engage constructively with the community." (Injunction ¶ 107.) Plaintiffs have expressed concerns about the deputy that Defendants chose as the Community Liaison Officer. Apparently he was a member of the Human Smuggling Unit ("HSU") that was central to this case. One of the issues that occupied some time at the trial concerned offensive cartoons that were circulated among the deputies of the HSU concerning persons of Hispanic ethnicity. The deputy chosen as the CLO apparently received an offensive email that was being forwarded around the HSU and, as a result, was deposed in this action. In his deposition testimony he apparently testified the he considered the cartoon funny. Without commenting on his merit as an employee or as a deputy, the Court can understand how such testimony in the course of the current litigation would lead the Plaintiffs to believe that the designated CLO would not be sensitive to their concerns in this matter and that the MCSO was insensitive to that realistic concern. Accordingly, the parties are asked to submit the relevant portions of the transcript of that deputy's deposition prior to the Monday hearing.

The Community Outreach Program further requires that public meetings be held to engage with the community. The order requires that "[t]he meetings shall be held in locations convenient and accessible to the public" and that "[a]t least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the Community Liaison Officer . . . shall participate in the meetings." (Injunction ¶ 111–12.) There are concerns that such of these meetings as have been held under the order, were not held at a time or place that was convenient to the community. The meetings were apparently held outside on the Saturday morning before Christmas and all of the meetings in the various districts across the county were scheduled at the same time.

The Defendants should provide the Court with a description of all such meetings that have occurred, including the locations chosen and available seating. Defendants should also provide a list of the supervisors with extensive knowledge of the case that were in attendance at each of these meetings. Finally, Defendants will be asked to explain how the Community Liaison Officer was able to participate in all of the meetings across the county when Defendants chose to schedule them all simultaneously.

**C.      The Monitor's Access to Defendant's Personnel and Records**

The Injunction clearly provides that "[a]t all times, the Defendants shall bear the burden of demonstrating Full and Effective Compliance with this Order." (Injunction ¶ 6.) In order to meet that burden, the Injunction describes in detail that the Defendants must provide the Monitor with "timely, full and direct access" including allowing "On-Site Observations, visits and assessments without prior notice." (Injunction ¶ 145.) It also specifies the timely and confidential handling of all document requests. (Injunction ¶¶ 146–50.) Defendants have raised with the Monitor some hesitations and additional conditions that they feel are appropriate. The Court will address these concerns and ensure that all parties understand the requirements of the Injunction.

**D.      Whether the Court Should Publish Its Previous Orders**

The Court has received a request that it publish two orders, the Findings of Fact and Conclusions of Law from May 2013 and the Supplemental Permanent Injunction/Judgment Order from October 2013, in the West F. Supp. 2d reporter. Plaintiff's request notes that the Court previously published its December 2011 Order from this case, and they argue that publication would have a beneficial effect for courts and litigants in similar cases. Defendants oppose publication, or at least believe that it is unnecessary. The Court will address this request and the parties' positions on this matter.

**E.      Deadline Dates**

The Injunction set a deadline for the parties to agree on a Monitor and the Court granted the parties' stipulated request for more time to agree or submit their candidates.

(Docs. 619–20.) The parties did not agree on a Monitor by the extended deadline of December 9, and continued to file motions even after that deadline. (Doc. 630–32.) On December 17, this Court gave the parties one final opportunity to make any Monitor-related filings. (Doc. 635.) The parties made multiple final filings on December 20. (Doc. 636–42.) After reviewing all filings and interviewing candidates, the Court selected the Monitor on January 17, 2014.

Over the two months since that announcement, the Monitor has begun work but has also been working with the Defendants to establish the funding contract and office space required. The Injunction provides various compliance deadlines. These deadlines are defined based on a prescribed number of days after the Effective Date, but many of them require communications with the Monitor. The Injunction was issued on October 2, 2013 (Doc. 606) but the Monitor was not appointed until January 17, 2014.

The Monitor has asked whether any of the deadlines require adjustment because his selection and implementation has taken longer than anticipated. The Court will hear from the parties on that issue and determine what adjustments, if any, need to be made.

**CONCLUSION**

The Court has selected the Monitor to resolve concerns in virtually all cases. Thus, it will not be the Court's routine practice to notice a hearing on such issues; it will be its routine practice to act upon reports from the Monitor, and/or requests to do so from the parties that it may grant. Nevertheless, because it is necessary at the inception of the injunctive period for all parties to have a clear idea of expectations, and because some of the above matters present some particular concerns to the Court, the Court has ordered the hearing and requires the parties to come prepared to discuss the above issues.

Dated this 17th day of March, 2014.

_____
/G. Murray Snow
United States District Judge