1                    UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                  Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                    )
                  vs.                )   Phoenix, Arizona
7                                    )   March 24, 2014
     Joseph M. Arpaio, et al.,       )   9:05 a.m.
8                                    )
                  Defendants.        )
9    _____ )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17                     (Status Conference)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                         A P P E A R A N C E S

2

3   For the Plaintiffs:          Stanley Young, Esq.
                                 COVINGTON & BURLING, L.L.P.
4                                333 Twin Dolphin Drive
                                 Suite 700
5                                Redwood Shores, California  94065
                                 (650) 632-4704
6
                                 Lesli Rawles Gallagher, Esq.
7                                COVINGTON & BURLING, L.L.P.
                                 9191 Towne Centre Drive
8                                6th Floor
                                 San Diego, California  92122-1225
9                                (858) 678-1807

10                               Daniel J. Pochoda, Esq.
                                 AMERICAN CIVIL LIBERTIES
11                               FOUNDATION OF ARIZONA
                                 77 E. Columbus Avenue
12                               Suite 205
                                 Phoenix, Arizona  85012
13                               (602) 650-1854

14                               Andre Segura, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
15                               125 Broad Street, 18th Floor
                                 New York, New York  10004
16                               (212) 549-2676

17                               Cecillia D. Wang, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
18                               FOUNDATION
                                 Director
19                               Immigrants' Rights Project
                                 39 Drumm Street
20                               San Francisco, California  94111
                                 (415) 343-0775

21

22

23

24

25

1                    A P P E A R A N C E S

2

3   For the Defendants:          Timothy J. Casey, Esq.
                                 James L. Williams, Esq.
4                                SCHMITT, SCHNECK, SMYTH,
                                 CASEY & EVEN, P.C.
5                                1221 E. Osborn Road
                                 Suite 105
6                                Phoenix, Arizona  85014-5540
                                 (602) 277-7000
7
                                 Thomas P. Liddy
8                                Deputy County Attorney
                                 MARICOPA COUNTY ATTORNEY'S OFFICE
9                                Civil Services Division
                                 222 N. Central Avenue
10                               Suite 1100
                                 Phoenix, Arizona 85004
11                               (602) 506-8541

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2

3          THE COURT:  Thank you.  Please be seated.

4          THE CLERK:  This is Civil 07-2513, Melendres v.

5  Arpaio, on for status conference.                          09:05:54

6          Counsel, please announce your appearances.

7          MR. POCHODA:  Dan Pochoda for plaintiffs.

8          MR. YOUNG:  Stanley Young, Covington & Burling, for

9  plaintiffs.

10          MS. GALLAGHER:  Lesli Gallagher, Covington & Burling,  09:06:05

11  for plaintiffs.

12          MR. SEGURA:  Andre Segura for the plaintiffs.

13          MS. WANG:  Cecillia Wang for the plaintiffs.

14          Good morning, Your Honor.

15          THE COURT:  Good morning.                          09:06:14

16          MR. CASEY:  Good morning, Your Honor.  Tim Casey and

17  James Williams at the Schmitt, Schneck, Smyth, Casey & Even

18  law firm, and also Tom Liddy for the Maricopa County Attorney's

19  Office.

20          THE COURT:  Good morning.  Can I ask, is there      09:06:25

21  somebody who principally plans to speak on behalf of plaintiffs

22  at this hearing?

23          MS. WANG:  Judge Snow, we've divided up the subject

24  matter that you indicated you'd like to discuss this morning.

25  I'm planning to address any dates in the order that you might  09:06:40

1   want to talk about, Mr. Segura will handle any matters relating

2   to the October briefing, Mr. Young will handle our request for

3   publication of the Court's orders, and Mr. Pochoda will handle

4   matters relating to the community outreach and the community

5   liaison.                                                          09:07:01

6          THE COURT:  All right.  Well, I'll ask you to keep

7   track of that.

8          MS. WANG:  Thank you, Your Honor.  We appreciate it.

9          THE COURT:  Mr. Casey, is there somebody who's going

10  to principally speak on behalf of the defendants?                 09:07:09

11         MR. CASEY:  I'll principally speak on behalf of the

12  defendants.  I may, at various times, defer particularly to

13  Mr. Williams in my office on some things.  I have some

14  prefatory comments, however you want to direct it.  I have a

15  number of people here, Your Honor, in addition to those you      09:07:22

16  ordered, that I would introduce to the Court, but we can do

17  that at the appropriate time.

18         THE COURT:  All right.  Unfortunately, we do have a

19  limited amount of time.  I hope we have enough time to

20  accomplish what we need to accomplish, but I have a day of       09:07:35

21  sentencings, so I don't mean to be rude to anybody but I may be

22  a little bit directive.

23         Let me just say, for purposes of those who are in

24  attendance, that there is a rule in the District of Arizona

25  that court hearings are not to be recorded, and so I'm going to  09:07:49

```
 1    ask you to abide by and comply with that rule.  There is a
 2    publicly available transcript that can be obtained but I'm
 3    asking you not to record the hearing.
 4         That does not mean that you cannot tweet or otherwise
 5    record it -- or not record it, but type on your laptop, so long    09:08:07
 6    as you do so in an unobtrusive manner.  But I have directed the
 7    marshals that if they detect anyone recording the hearing,
 8    because that is in violation of the rules of this district, you
 9    will be removed from the hearing, so I do request that you
10    please honor that rule.                                            09:08:23
11         Let me introduce, and I believe that he is known to
12    all of the parties here, Chief Robert Warshaw, who is -- who
13    the Court appointed as the monitor.  I swore in deputy -- or
14    Chief Warshaw as an officer of the court in mid-February of
15    this year to assume his monitor role.  Not all of his monitor     09:08:43
16    team, but a representative number of the monitor team are
17    available here, and they are in the jury box.
18         And so I don't know, Mr. Casey, if you want to
19    introduce to me who's here on behalf of the defendants, but now
20    would probably be the appropriate time.                           09:09:02
21         Plaintiffs, if you have any other introductions, I'd
22    be glad to hear those, too.
23         MR. CASEY:  Yes, Your Honor.  I'll speak loud enough.
24    I'm not on a mike.
25         The duly elected sheriff of Maricopa County, Joseph M.       09:09:19
```

1   Arpaio, is in attendance pursuant to the Court's order.  His

2   chief deputy, Jerry Sheridan, is also in attendance in uniform

3   sitting right behind counsel table.

4          I would also like to have lieutenant commander --

5   Lieutenant Larry Farnsworth, commander of the MCSO's court          09:09:38

6   compliance division, stand up, and if he would introduce his

7   team members that are present here today in the MCSO's court

8   compliance division.

9          CAPTAIN FARNSWORTH:  I'm Captain Larry Farnsworth.

10  This is Hector Garcia -- Hector Martinez, our community liaison     09:09:56

11  deputy, Sergeant Ben Armer, and Lieutenant Russ Skinner.

12         THE COURT:  Good morning.

13         CAPTAIN FARNSWORTH:  Good morning.

14         MR. CASEY:  We also have Chief David Trombi, head of

15  enforcement, and if you would introduce yourself, please, sir.     09:10:09

16         CHIEF TROMBI:  Dave Trombi with the Maricopa County

17  Sheriff's Office.  Good morning.

18         THE COURT:  Good morning.

19         MR. CASEY:  And the gentleman to your left, please.

20         CHIEF TROMBI:  To the left of me is Deputy Joaquin            09:10:20

21  Enriquez with our media relations.

22         MR. CASEY:  All right.  Thank you, sir.

23         THE COURT:  Thank you.  All right.

24         MR. CASEY:  And I apologize.  I said "lieutenant"; it

25  was "captain."  I apologize to Commander Farnsworth.               09:10:30

1          THE COURT:  I have sent out a rather detailed notice

2     indicating what I want to cover in this hearing, and in that

3     notice I indicated that there were three matters, essentially,

4     that concerned me about the training that occurred in October.

5     Most of it was done by Chief Deputy Sheridan.  There were a few          09:10:49

6     comments that I included in there in which Sheriff Arpaio

7     apparently, to me, ratified Chief Deputy Sheridan's training

8     and made a few other comments.

9          I realize those three matters are

10    Chief Deputy Sheridan's training concerning this Court's          09:11:09

11    holdings, findings of fact, and conclusions of law in this

12    lawsuit, his assessment of the resulting injunction order, and

13    his training regarding the specifics about assessing ethnicity

14    that are required by that order.  I realize that to some extent

15    they're not required by that order.  They are clearly, to some          09:11:35

16    extent, but the Sheriff's Department has, on its own authority,

17    required additional assessments made by deputies, but I'm

18    concerned to that -- to that training as it goes to the

19    implementation of my order.

20         I also realize that in that order I have necessarily          09:11:50

21    characterized Chief Deputy Sheridan's training, but I indicated

22    in the order that I do have that training here on videotape,

23    and if the defendants feel that I have mischaracterized it,

24    then I'm glad to play the training so that we can refer to it.

25         Is that your wish, or do you just simply wish to go          09:12:09

```
 1    into what I've asked you to do and assess and provide me with?

 2              MR. CASEY:  Your Honor, we've seen the video.  I think

 3    the counsel have.  There's no need for us to see it.  We're

 4    going to be prepared to address the questions that you have.

 5              THE COURT:  All right.  Mr. Young -- oh, I don't know,    09:12:24

 6    who's addressing the training?  That was --

 7              MR. SEGURA:  That's me, Your Honor.

 8              THE COURT:  Um-hum.  Do you see any need to play that

 9    training?

10              MR. SEGURA:  We do not, we've reviewed it, thank you.     09:12:33

11              THE COURT:  All right.  Then Mr. Casey, please

12    approach the podium.  I asked you to indicate whether after --

13    with respect to those three matters, if after viewing -- with

14    respect of each of the three you wish to assert that it was

15    appropriate training, or whether or not you believed corrective   09:12:48

16    action was in order, and, if so, what corrective action you

17    intend to take.

18              MR. CASEY:  Sure.  Let me give you the answer to your

19    question and then perhaps some background.

20              The short answer to your question is that               09:13:03

21    Deputy Chief Sheridan made mistakes at that briefing.  We can

22    discuss semantics about whether it constitutes training or

23    whether it's encouragement for the troops.  That's something

24    that perhaps is not necessarily key here, but what is true --

25              THE COURT:  It's kind of key to me, but I'll --          09:13:34
```

1          MR. CASEY:  Okay.

2          THE COURT:  -- I'll get to your point.

3          MR. CASEY:  Yeah.  Well --

4          THE COURT:  I mean, I'll let you say --

5          MR. CASEY:  Yeah.                                    09:13:34

6          THE COURT:  -- what you want to say.

7          MR. CASEY:  He made mistakes in summarizing his

8    interpretation of the Court's order.  He did not accurately

9    capture, really, what is a detailed order from May of 2013 and

10   then October, basically, the remedial aspects of it.          09:13:50

11         The second thing that was mistaken was that he allowed

12   a very emotive frustration to be displayed in front of troops,

13   in front of the support team.  What I want to do by sharing

14   that with you is we believe that corrective action is

15   appropriate.  We're not challenging the Court's assessment,    09:14:16

16   although there are probably nuances to it that we could bring

17   to bear.

18         But one of the things that I think is important, and I

19   suspect that everyone in this room understands it, one of the

20   most difficult things that we as human beings experience in    09:14:31

21   life is change.  Sometimes change is internal when we need to

22   do something for our health, so we set goals, we change

23   something.  Sometimes change is imposed on us by any number

24   of other factors, including a court order.  I think there is

25   no -- no issue that it is hard for any law enforcement officer, 09:14:53

```
 1   when a court has ruled against it and has determined a monitor

 2   is to be in place, that's not met with pleasure; it is

 3   respectfully disagreed with.  And as you know, on a parallel

 4   track, the MCSO is taking a number of issues it disagrees with

 5   the Court up on appeal.                                          09:15:16

 6           The other thing that I think is important is that

 7   on --

 8           THE COURT:  Yeah.  MCSO filed that appeal yet?

 9           MR. CASEY:  Yes.

10           THE COURT:  All right.  I haven't read it, I'm sorry.    09:15:24

11           MR. CASEY:  Yes.  It was filed on the day -- on the

12   24th.  Excuse me, on the 17th, I think the day that the order

13   came out.

14           THE COURT:  All right.

15           MR. CASEY:  So --                                        09:15:33

16           THE COURT:  I understand all those things.

17           MR. CASEY:  Yeah.  The reason I think it's important,

18   Your Honor, if I can --

19           THE COURT:  Okay.

20           MR. CASEY:  -- just finish --                            09:15:40

21           THE COURT:  I'll give a few minutes, and then I'm

22   going to tell you why I think it's important, too.

23           MR. CASEY:  Yeah.  I think it's important is this, is

24   that there's an adjustment process, and that process has a

25   continuum on this.  And I think even the monitor has expressed  09:15:52
```

1   when he's met with us that he understands that there's -- it's

2   always a difficult situation to be in any law enforcement shoes

3   when a monitor comes in.

4         The issue at that time -- really, 16 days

5   afterwards -- was you have a level of frustration that the          09:16:09

6   Deputy Chief made a mistake in conveying.  Shouldn't happen; it

7   will not happen again.  You also have as individual deputies

8   and as an institution, you still have an institution that was

9   grieving because of an -- what they considered an assassination

10  of a uniformed deputy in their front yard, in his front         09:16:28

11  driveway.  So I wanted just to put that in context.

12        It doesn't justify, Your Honor, the concerns that you

13  have.  And quite frankly, I think anyone over here now can

14  understand, and I think they're upset internally because they

15  sent you the wrong message.  It's obvious from your order.       09:16:48

16  They have sent you the wrong message.

17        And I think you're probably less interested in

18  representations of counsel than perhaps you are from hearing

19  from the actual player himself, Chief Sheridan, who actually

20  wants to address your questions here today and asks you for      09:17:06

21  permission to do that, because one of the things that's very

22  important is that I want to assure you as counsel, and you can

23  hear it directly from the Deputy Chief, they are not interested

24  in so-called paper compliance.  They are interested only in

25  good faith actual compliance with both the letter and the       09:17:26

1    spirit.

2             And they understand that the comments made in the

3    briefing by the deputy have sent you the wrong message.  And

4    that is not the message that they wanted to send to you, to

5    anyone else.  And they understand that there's a period of          09:17:46

6    adjustment, and perhaps that provides explanation, but no

7    justification.

8             What they want you to understand is the man who's

9    heading this up who's in charge of it for the last 12 years

10   before he became the chief deputy in the new -- after the          09:17:57

11   previous deputy was removed was responsible in Graves v. Arpaio

12   for real compliance.

13            THE COURT:  Let me --

14            MR. CASEY:  Yes, sir.

15            THE COURT:  Let me get more to the point.                  09:18:11

16            MR. CASEY:  Sure.

17            THE COURT:  I want to make a couple of things clear.

18            MR. CASEY:  Yes, sir.

19            THE COURT:  I understand that for much of the action

20   in which I found that the MCSO violated the constitutional         09:18:19

21   rights in several respects of the plaintiffs' class, that Chief

22   Deputy Sheridan was not -- I don't have any evidence that he

23   was involved in those decisions, or in the operational

24   decisions, or in anything else.  I understand that.

25            I also understand the need for Sheriff Arpaio and         09:18:35

1   Chief Deputy Sheridan to have authority.  And they have been

2   given authority by the people of Maricopa County to direct the

3   law enforcement in Maricopa County.  I understand that.  I

4   intend to respect that.  I intend also to have my orders

5   respected.                                                    09:18:57

6        Let me tell you, you talk about a period of

7   adjustment.  In December of 2011 I entered a preliminary

8   injunction.  That preliminary injunction was not complied with.

9   I found that.  I found that in May 2013.  I did not decide at

10  that time to require the sheriff to tell me why he shouldn't be  09:19:18

11  held in contempt for his violating that preliminary injunction

12  order because I did not want to create artificial and

13  meaningless disputes about authority.  And I did sense,

14  frankly, and I want to say this to the sheriff, I did sense a

15  real effort on his part, through your cooperation with the      09:19:39

16  plaintiffs, in trying to reach agreement and, in fact, in many

17  areas you reached substantial agreement about what kind of an

18  order I should enter.  I respected that and I entered those

19  orders.

20       It isn't a new order that he had in October; it was a     09:19:57

21  findings of fact and conclusions of law that were entered in

22  May.  His characterization of those findings completely

23  dismisses the responsibility of the MCSO.

24       And I'm not saying, I agree with him, I'm not saying

25  that any particular individual in the MCSO was racist, but --   09:20:15

1    and I'm not saying, I did find evidence, and I laid it out,

2    that MCSO received incorrect instruction from ICE.  Whether or

3    not that was the motive for how and why they chose to operate,

4    I don't know.  And it doesn't matter, because it was the MCSO

5    that implemented those orders and followed through on them and    09:20:36

6    made policies; policies, directions, and orders that did not

7    apply to three officers, that applied on a department-wide

8    basis and governed those operations.

9           I also found, and I don't want to embarrass you, I

10   don't want to go into huge detail, I've already done this, but    09:20:54

11   I also found that the MCSO claimed that they had implemented

12   policies that simply did -- were not implemented in order to

13   eliminate some of the problems proposed by their operation as

14   far as racial profiling went.  It's all behind the -- it's all

15   by the boards.  I'm not finding that anybody was an individual    09:21:11

16   racist.

17          But I am finding, and I did find, and it's laid out in

18   a very long opinion in which I evaluated all the evidence, that

19   the MCSO used race as one factor among others in selecting many

20   of their locations for their operations; that they used race as   09:21:25

21   one factor among others in determining who they were going to

22   pull over; that they used race as one factor among others in

23   determining who they were going to question once they pulled

24   them over; and that they didn't implement appropriate policies

25   which they'd indicated they had implemented to prevent            09:21:42

1   racial -- the use of race inappropriately in making those

2   determinations.  Again, I realize that they did, and I don't

3   contest this, received inappropriate instruction from ICE, and

4   to the extent on which they base that, I don't know.

5        But here's another thing that ICE said in the trial,      09:22:00

6   and I didn't find the need to decide this.  In fact, I found it

7   in the sheriff's favor.  ICE said they thought it was

8   completely inappropriate for the sheriff to use pretextual

9   stops to try and make immigration enforcements with its 287(g)

10  authority.  I read the agreement that the sheriff had with ICE,  09:22:17

11  and while ICE may have thought it was inappropriate, it never

12  put it in the agreement.  Nevertheless, the sheriff did it; the

13  sheriff bears the responsibility for it.

14       There's a whole separate section, and this was the

15  subject of my preliminary injunction in May of 2011 that has     09:22:29

16  nothing to do with ICE, and that is whether or not the sheriff

17  likes it, there is a -- distinctions in immigration law that

18  are not well understood by the population, and apparently, and

19  with all due respect to you, sir, they were not well understood

20  by the sheriff, and that is it is not a criminal violation to    09:22:51

21  be in this country without authorization.  That isn't enough to

22  create a crime.

23       It may not be something that most people understand.

24  It is a violation of the law.  It makes people removable,

25  civilly removable, but it doesn't constitute a crime, and the    09:23:08

1  sheriff has no authority to detain anyone based merely, and I

2  say merely, on the presumption that they're in the country

3  without authorization.  I laid that all out very clearly in

4  December in 2011.

5          And here we have, after I've entered the findings of          09:23:27

6  fact and conclusions of law and the permanent injunctive order

7  years later, we still have the sheriff mischaracterizing that.

8          Now, does the sheriff have the right to

9  mischaracterize it?  Absolutely, he does.  I saw

10  Chief Deputy Sheridan's article in the paper, which is the same          09:23:43

11  mischaracterization, or virtually the same mischaracterization

12  about my findings of fact and conclusions of law that he

13  trained his deputies on.  It was also in light of the fact of

14  the cooperation that the sheriff's department entered into with

15  the plaintiffs and the detailed specifications you agreed to.          09:24:01

16          I agree, you didn't agree to everything and there were

17  some important differences.  But the detailed specifications,

18  the detailed programs that you'd agreed to, and when he said

19  that, you know, my order was outrageous and the other stuff, he

20  said that in public.  He can say that in public.  I can't stop          09:24:20

21  him.

22          I was worried when I read it that he was sending the

23  deputies of the MCSO the wrong message.  But I -- you know, I

24  recognize that he has a right, and he's a politician, to

25  mischaracterize my order if he wants to, because I have to be          09:24:35

```
 1   held accountable, too.  And I don't get to say what the fair

 2   characterization of my order is after I've done it.  But it

 3   changes when, instead of addressing the general public, he's

 4   training his deputies about what that means.

 5          And if you're going to tell me that you have agreed       09:24:52

 6   to, in your initial proposal, that the deputies would be fully

 7   trained about the legal ramifications of Melendres versus

 8   Arpaio, if you're telling me that all that means is you have to

 9   provide a formal training in which you do that, and then you

10   can have all sorts of other trainings in which you              09:25:09

11   mischaracterize that, I want to know it right now.

12          Is that what you're saying?

13          MR. CASEY:  Absolutely not.

14          THE COURT:  All right.  And then why is it that when I

15   entered that order in December of 2011 it's still being         09:25:19

16   mischaracterized two years later and there's still a term of

17   emotional adjustment and anger two years later, and six months

18   after my findings of fact and conclusions of law?

19          Do you have an explanation for that?

20          MR. CASEY:  Your Honor, I don't have an explanation.     09:25:38

21   All I can tell you as counsel is that my clients -- and let me

22   be absolutely frank on this, because I appreciate very much

23   what the Court is saying, my clients know, understand, and

24   appreciate that your orders are the law.  And I think this

25   hearing and your order from March 17th are important for not    09:26:04
```

```
 1   only the lawyers, but for our clients to have read, digested,

 2   and considered, which they have.  It's important.

 3          You asked me the question so here's my best estimate.

 4   Everyone grieves and handles things differently.  How long does

 5   it take to grieve and be upset?  Everyone handles it          09:26:32

 6   differently, and I understand the Court's concerned about the

 7   one year and the six months and that.

 8          THE COURT:  That would be two years.

 9          MR. CASEY:  Two years.  The only thing that I can say

10   as an attorney, Your Honor, is that it is a -- while my clients  09:26:45

11   are absolutely committed and, you know, and you're going to

12   have to hear from them, but are absolutely committed to -- and

13   recognize that your order is the law, and they will comply with

14   it in the intent and the spirit, at the same time they disagree

15   fundamentally with a number of conclusions that you reached.   09:27:06

16          THE COURT:  And let me say, right away, that I respect

17   their ability to disagree.  I respect their ability to publicly

18   state their disagreement.  And I even don't even expect them to

19   be fair about their public statements about their disagreement

20   and the reasons why.  From my assessment, they certainly        09:27:26

21   haven't been, but that is their right.  I recognize that.  It

22   changes when we talk about how they instruct their officers.

23          MR. CASEY:  Yes, absolutely.  And I can tell you

24   without waiving --

25          THE COURT:  And, let me --                              09:27:41
```

```
 1              MR. CASEY:  Yes, sir.

 2              THE COURT:  -- just be clear, and I think I was clear

 3     in my order, I don't even object if they instruct their

 4     officers that they disagree, if they do it professionally.  And

 5     I don't even object if they want to explain why they disagree.      09:27:53

 6     But I'll tell you what.  We had a long trial.  You gave me tons

 7     of evidence that took me a long time to review after trial.

 8              MR. CASEY:  Yes, sir.

 9              THE COURT:  I've looked at it all very thoroughly.  I

10     gave your clients and I gave the plaintiffs as fair a hearing       09:28:06

11     as I could.  We are not relitigating in this court or as a

12     matter of law whether or not the MCSO has violated the

13     constitutional rights of the plaintiff class.  You can take

14     that up with the Ninth Circuit, you can take it up with the

15     Supreme Court, but as you've said, that has been a legal           09:28:26

16     determination that is made.

17              MR. CASEY:  It's done.  And I will tell you from --

18     without waiving any privilege, other than the appeal, it's

19     done.  It's over.  What matters now is their good faith

20     compliance with Mr. Warshaw and that team and your order.  And     09:28:42

21     what we have done is we've made mistakes.  Because you're

22     absolutely right, they have a First Amendment right to disagree

23     with you; they have a right to go up on appeal and take it to

24     whatever they want.  But the issue is is when you're in front

25     of the line troops, how appropriate it is to be in that           09:29:00
```

```
 1   adjustment process, that grieving process --
 2            THE COURT:  Let me tell you something else.
 3            MR. CASEY:  -- that's where the mistake was.
 4            THE COURT:  Let me tell you something else that
 5   concerns me.                                              09:29:10
 6            MR. CASEY:  Yes, sir.
 7            THE COURT:  I sensed in the training, to be fair to
 8   Chief Deputy Sheridan, to be fair to Sheriff Arpaio, I sensed
 9   in the training a very sincere and real concern for the safety
10   of their officers, and they may believe that this Court does   09:29:21
11   not share that concern.  But I want them to know, I want you to
12   know, I share that concern.
13            You may recall that in balance -- in the long sessions
14   when we were hamming out your disagreements with the order, the
15   plaintiffs wanted to, and I believe they have a very firm      09:29:37
16   constitutional basis, in light of my findings, to request that
17   during the period of the injunction the MCSO not be allowed to
18   make any inquiries at all of passengers that they've pulled
19   over for stops.
20            Do you recall that?                               09:29:53
21            MR. CASEY:  I do.
22            THE COURT:  And do you recall that I let them do that?
23            MR. CASEY:  I do.
24            THE COURT:  No, I didn't let them do that.  I said:
25   You're not going to get that.  What we're going to get in      09:30:01
```

1  place, because I want to protect the right to -- this law

2  enforcement tool and the protection of the deputies, I said

3  we're going to come up with a rather imperfect solution, but

4  I'm going to require the deputy, when he pulls over, to state

5  the reason why he's pulling them over so we know whether it's          09:30:18

6  pretextual, and then after the stop is over he's gotta give us

7  the best estimate of the ethnicity, not ask, because that would

8  be inappropriate, and I realize that that was a difficult and

9  imperfect solution.  But it was better than requiring the

10 deputies never to ask any occupants any questions and for their        09:30:37

11 safety.

12          You can ask Chief Warshaw.  As soon as he was

13 appointed, I said, Chief, this is what I've ordered.  I've

14 ordered that they give the reason for the stop on the radio

15 call before they pull somebody over.  Is that endangering           09:30:51

16 deputies?  He said, No, it isn't.  I checked with the other

17 members of the monitoring team.  Said it's fairly common

18 practice throughout the nation.  But I am concerned.

19          And so I'll tell you something else I'm concerned

20 about.  I'm concerned about sending mixed messages to those         09:31:06

21 deputies about whose orders they have to comply with.  Is it my

22 order, or is it the characterization of my order in this sort

23 of wink and nod mentality that says:  This is a bunch of crap.

24          And I -- you know what?  "Crap" is not a very decorous

25 word.  But it's not my word, it's Deputy Chief Sheridan's word.      09:31:27

1    He called the order ludicrous.  He called it crap.  What kind

2    of message is he sending to his own deputies?  Whose order,

3    then, do they follow?  And what kind of protection does that

4    make for them?

5          And if in fact the chief deputy is concerned about his          09:31:44

6    officers' safety in drawing their attention away during the

7    second that it takes to add the reason why he's pulled over

8    police officers, then why is he worried about them making an

9    assessment of the ethnicity both before and after the stop?

10   That seems to me to draw away the attention of the deputy          09:32:02

11   before the stop is made in a way that may create a danger.

12   However, I accept that the sheriff and the chief deputy have a

13   right to ask their deputies to engage in that information.  And

14   I do not doubt their sincere believe that those deputies be

15   kept safe.          09:32:22

16         So if in their balance they find that's appropriate,

17   they can implement that.  I'm not going to override it.  But I

18   just want, to the extent that there is some sort of implication

19   that I'm not very concerned about allowing them to do their job

20   so long as they don't violate the Constitution, I reject that          09:32:36

21   completely.  And that's why I have a monitor team.  If you've

22   got concerns, you raise them.  We're not trying to put you out

23   of business; we're just trying to keep you in line with the

24   Constitution.

25         All right.  I've said a lot of my peace.  Do you have          09:32:51

```
 1   any more you want to say, or are you going to get down to what
 2   your -- you propose to ameliorate, and we still have other
 3   issues to talk about, are you going to propose what steps you
 4   take to do corrective?
 5            And I don't want -- by the way, if                        09:33:05
 6   Chief Deputy Sheridan has come and he's willing to talk to me
 7   and address me, I don't want to deprive him of that privilege.
 8   But I do want to make very clear what I've made clear to you.
 9   And I also don't want to deprive the plaintiffs of their chance
10   to address things.                                                 09:33:18
11            MR. CASEY:  Your Honor, let me consult briefly with
12   Chief Sheridan.
13            THE COURT:  All right.
14            (Pause in proceedings.)
15            MR. CASEY:  Before I get to the proposed correction,      09:33:34
16   Chief Sheridan does want to talk to --
17            THE COURT:  All right.
18            MR. CASEY:  -- address you.
19            THE COURT:  All right.  Chief, would you like to hear
20   from the plaintiffs before you address me?                        09:33:42
21            CHIEF DEPUTY SHERIDAN:  No, sir.
22            THE COURT:  All right.  Well, please come talk to me,
23   then.
24            CHIEF DEPUTY SHERIDAN:  First thing I'd like to say,
25   Your Honor, is I heard every word you said loud and clear.        09:33:55
```

1        THE COURT:  Okay.  Thank you.

2        CHIEF DEPUTY SHERIDAN:  But I also wanted to take a

3   few minutes to tell you who Jerry Sheridan really is, and so

4   I've prepared a few comments.

5        I've been with the Sheriff's Office for 35 years,        09:34:10

6   since I was 18 years old.  I hold a master's degree.  I teach

7   ethics at the community college level.  I've been a member of

8   the FBI national academy, and I was a member of the Arizona

9   POST peace officer standards and training, considered an ethics

10  expert, and I can tell you that I am ashamed of some of the    09:34:32

11  things that I said during that briefing.  But I consider it to

12  be a briefing, Your Honor, and I disagree with you that it was

13  training.

14        THE COURT:  Well, let me ask you, sir, do you think

15  that once entering the order -- and it may have been a         09:34:45

16  briefing; I don't know what the technicalities are -- but once

17  your department has suggested to me and I've implemented that

18  there will be training that implements the appropriate holding

19  in Melendres versus Arpaio, do you think you can in good faith

20  compliance with my order provide that training and then in     09:35:04

21  briefings mischaracterize my order?

22        CHIEF DEPUTY SHERIDAN:  Let me just say, Your Honor,

23  that was the first time I discussed the issues in front of a

24  large group of deputy sheriffs.  I know I made some mistakes.

25  I mischaracterized your order.  There's no doubt about that.   09:35:25

```
 1   My counsel briefed me on that after they saw the video.  I had

 2   got some of the facts incorrect.  I was very emotional.  And

 3   I'd like to address some of those issues.

 4          THE COURT:  Well, I appreciate that, but I want to go

 5   back to my point and get an answer.                          09:35:43

 6          CHIEF DEPUTY SHERIDAN:  Yes, sir.  And the reason I

 7   would say yes, sir, you know I stood in this court and I

 8   disagreed with you on the issue of calling out the reason for

 9   the traffic stop prior to the traffic stop.

10          THE COURT:  I appreciate that.                        09:35:58

11          CHIEF DEPUTY SHERIDAN:  And I even signed an

12   affidavit.  We did some research about that --

13          THE COURT:  You know what?  We're not going to

14   relitigate that.

15          CHIEF DEPUTY SHERIDAN:  I know, sir.  But the reason   09:36:07

16   I'm telling you that is today, since your order, those deputy

17   sheriffs are calling in the reason for the traffic stop.  So I

18   would agree that, yes, they are doing everything that you have

19   ordered.

20          THE COURT:  All right.  Now back to my question.      09:36:23

21          If in the order I've ordered that you provide correct

22   training on the legal principles of Melendres versus Arpaio, do

23   you believe that you are in good faith compliance with the

24   order if you provide that training, but in briefings or other

25   contacts with your deputies you mischaracterize that holding?  09:36:41
```

```
 1          CHIEF DEPUTY SHERIDAN:  I'm not sure I completely

 2    understand your question, but I would say no if I was to

 3    continue to do what I did in that one 15-minute segment six

 4    months ago.

 5          THE COURT:  Do you also understand that because it was     09:36:58

 6    the first time you'd addressed the deputies after the

 7    injunction order was released, that can send a very powerful

 8    signal about how they're supposed to address the seriousness of

 9    that order once it becomes fully implemented?

10          CHIEF DEPUTY SHERIDAN:  Yes, sir.                           09:37:18

11          THE COURT:  All right.  So do you understand my

12    concern?

13          CHIEF DEPUTY SHERIDAN:  Completely.

14          THE COURT:  All right.  Please go ahead.

15          CHIEF DEPUTY SHERIDAN:  Okay.  This all happened, this     09:37:23

16    all started in October of 2010 when the sheriff appointed me as

17    the interim chief deputy.  I began meeting with the Department

18    of Justice lawyers in a separate case, and I sat across the

19    table from about six or seven of the lawyers from Washington,

20    and one of the lawyers who sat directly across from me, the      09:37:46

21    lead attorney for the Department of Justice, said that we, the

22    Sheriff's Office, were ignorant, and we were racist, and I was

23    furious with that.  And I asked him, Where did you get that?

24    And he told me: Community leaders, your press releases, and

25    inmates.  This was not the Sheriff's Office that I knew; this    09:38:07
```

 1    was not the Sheriff's Office that I grew up in.

 2         Two people that trained me early on in my career --

 3    one a Black man from Los Angeles and another a white man that

 4    grew up in Queen Creek -- they taught me -- they had most

 5    influence on my career.  They taught me the lessons of            09:38:24

 6    kindness, compassion, and empathy for people.  This, again, was

 7    the office that I knew.

 8         And I remember specifically one day Chuck took me down

 9    in his patrol car to a day labor work camp in the orange

10    orchards of Queen Creek --                                        09:38:39

11         THE COURT:  For what it's worth --

12         CHIEF DEPUTY SHERIDAN:  Your Honor, this is very

13    important for me to tell me who I am.

14         THE COURT:  Well, do you know what?  I'm going to let

15    you do that, but I'm going to tell you we have a lot of things    09:38:47

16    to cover, so I'm going to ask you to be brief.  And for what

17    it's worth, I'm going to tell you a couple of things.

18         I have a lot of respect for the MCSO officers who came

19    in here and told me the truth, even though I think they were

20    under real pressure not to.  And so I'm not -- you're not going   09:39:00

21    to -- if not, I'm not saying from you, maybe there their

22    colleagues, other people.  They told me the truth.  It

23    performed -- it provided the basis for a lot of the factual

24    reasoning that I ended up with.

25         You don't have to convince me that -- that the MCSO is       09:39:15

```
 1    not racist in orientation.  I don't -- I never made such a
 2    finding.  But what I did say, sir, is that you used race as one
 3    factor among others in making your decisions.  I mean, that's a
 4    fine distinction, I realize.  That's what I found.
 5             Do you understand what I'm saying?                         09:39:36
 6             CHIEF DEPUTY SHERIDAN:  Yes, sir, very clearly.
 7             THE COURT:  All right.
 8             CHIEF DEPUTY SHERIDAN:  Very clearly.
 9             All right.  So let me brief through my notes now that
10    I don't have to explain to you who I am as an individual, but     09:39:44
11    what I did when I left that meeting is I realized we had a
12    policy -- we had a perception that we were racist, and so what
13    I did is I began thinking about ways to fix this.  We developed
14    the integrity-accountability bulletin.  We started to do
15    things.  We started to change some policies.  We added some        09:40:14
16    policies.  We added briefings.  We added code of conduct and
17    we strengthened our code of conduct.  I began doing a lot of
18    things.  I reached out to the Hispanic community.  I contacted
19    my friends over at Phoenix Police Department.  I did all these
20    things way before the Melendres case ever came to trial.          09:40:30
21             And part of my frustration that day -- again, I'm
22    telling you, Your Honor, I apologize for my actions that day,
23    but I can tell you I am not a person to hide what I do or who I
24    am.  It was --
25             THE COURT:  Well, let me ask you, is that your frank      09:40:50
```

```
 1    assessment?  What you put in the newspaper article, the
 2    training you gave, is that your frank assessment about what my
 3    holding was?
 4             CHIEF DEPUTY SHERIDAN:  It was incorrect.  I realize
 5    that now.                                                    09:40:59
 6             THE COURT:  All right.
 7             CHIEF DEPUTY SHERIDAN:  It was -- and I -- I don't
 8    know what else to say.  It was incorrect.
 9             THE COURT:  I appreciate it.
10             CHIEF DEPUTY SHERIDAN:  So the day that I gave that  09:41:09
11    briefing in October --
12             THE COURT:  But the newspaper article came
13    significantly after October, didn't it?
14             CHIEF DEPUTY SHERIDAN:  After October, but we
15    really --                                                    09:41:22
16             THE COURT:  Let me ask you, did you --
17             CHIEF DEPUTY SHERIDAN:  -- didn't begin talking about
18    the --
19             THE COURT:  Can I ask a question?
20             CHIEF DEPUTY SHERIDAN:  Yes, sir.                   09:41:25
21             THE COURT:  Did you post that newspaper article or
22    otherwise distribute it to MCSO officers?
23             CHIEF DEPUTY SHERIDAN:  No, sir.
24             THE COURT:  All right.  Go ahead.
25             Did anybody in the MCSO do that?                    09:41:40
```

1          CHIEF DEPUTY SHERIDAN:  No, sir, not that I'm aware

2    of.

3          THE COURT:  Any of your attorneys do that?

4          CHIEF DEPUTY SHERIDAN:  No, sir.  As a matter of, I --

5          THE COURT:  Do you have something to say, Mr. Liddy?          09:41:47

6          MR. LIDDY:  Not to the Court, Your Honor.

7          THE COURT:  All right.  Thank you.

8          CHIEF DEPUTY SHERIDAN:  As a matter of fact, Your

9    Honor, it was Mr. Casey's advice that I not send that out.

10         MR. CASEY:  Your Honor, I want to make sure it's clear          09:42:00

11   that any comments that we have up here are not going to be

12   interpreted as waiving any privilege.

13         THE COURT:  Well, I appreciate that.  And let me

14   advise you, Chief Deputy Sheridan, one of the things you said

15   in your training is that every attorney you talked to indicated          09:42:14

16   that I had violated the Constitution.

17         One of the things that you risk when you do that is

18   called waiving the attorney-client privilege.  I could now ask

19   you to tell me the names of all the attorneys who gave you that

20   advice because you waived the privilege.          09:42:31

21         I would, of course, hear from your attorney first, and

22   let him say you hadn't waived the privilege, but it gives you

23   the -- I suspect, really, and I don't mean to be disrespecting

24   of you, I suspect they really hadn't told you that; they

25   perhaps had told you that there were some arguments they could          09:42:49

1  make that some of the steps that I had done violated your

2  constitutional rights in certain particulars.  But I doubt very

3  much that any attorney would tell you that my whole order was

4  unconstitutional.

5          I'm not going to make you tell me who those lawyers          09:43:01

6  are.  But please be advised that when you tell me what lawyers

7  have told you, you risk waiving your privilege.

8          Do you understand that?

9          CHIEF DEPUTY SHERIDAN:  Yes, sir.

10         THE COURT:  All right.                                      09:43:14

11         MR. CASEY:  Your Honor, I --

12         THE COURT:  You need to be at a microphone.

13         MR. CASEY:  Your Honor, it's absolutely important you

14  can ask him that question, because that privilege only applies

15  if it comes from his lawyers in this case.                         09:43:23

16         THE COURT:  I understand that.  But I'm not going to

17  try to embarrass those lawyers, or --

18         MR. CASEY:  It's important for this case, for the

19  credibility of defense counsel, I will ask him if you don't ask

20  him, because I believe it's important for this team for this      09:43:38

21  Court to understand that that source, he can tell you whether

22  it's from us or it's not.  We believe it's important, because

23  we are practicing before Your Honor.

24         THE COURT:  All right.  Well, ask him the question,

25  then.                                                             09:43:54

1    DEPUTY CHIEF SHERIDAN:  Excuse me, Your Honor.  You

2   don't have to ask me the question because I have it already

3   written down here what I was going to say about that issue.

4    THE COURT:  All right.

5    CHIEF DEPUTY SHERIDAN:  Okay.  But before I get to          09:44:02

6   that, again, I was doing all these things, I was trying to

7   correct the issues that we were dealing with, our 287(g)

8   authority was taken away, all those issues, and shoring up our

9   training, and bam, your order comes telling us that we're going

10  to have a monitor and we're going to do some other things.  I      09:44:25

11  was frustrated.

12    So that's -- again, I'm not making excuses.  I take

13  full responsibility for every word that I said.  And to address

14  the issue that just came up, I used hyperbole.  I was

15  exaggerating about the issue of you violating the Tenth          09:44:46

16  Amendment of the Constitution.  None of my counsel here at this

17  table or in this courtroom advised me that you had violated the

18  Tenth Amendment of the Constitution, so ...

19    In no way did I ever intend to give my deputies the

20  impression that they should deny or ignore your order.  I was     09:45:12

21  animated that evening because I know how hard they work; I know

22  how they feel about their jobs and how proud they are being a

23  deputy sheriff.  But I also know and I saw that their morale

24  has been trashed.  Their morale has been trashed mainly because

25  of the media, maybe just like what I did, misrepresented what     09:45:39

1    the Court's ruling was, maybe in a different manner, and the

2    community activists out there reporting and calling my deputy

3    sheriffs racist.  I became very angry over that and very

4    disheartened.

5         So as a part of my attempt to raise their morale, I          09:45:56

6    became very animated, and subsequently I mis -- misunderstood,

7    misstated your rulings.  And in no way did I ever intend for

8    them to do anything other than comply, and I believe I did make

9    the statement that your order was the law of the land --

10        THE COURT:  You did, sir.                                     09:46:18

11        CHIEF DEPUTY SHERIDAN:  -- and that has been my

12   ruling.  And I've got six pages, I know your time is short, of

13   things that we have accomplished since your ruling.

14        THE COURT:  Well, for what it's worth, let me just say

15   that one of the reasons I was really disappointed in some of       09:46:31

16   the things you said is because I did recognize the extensive --

17   I mean, it is true that the order that I entered is extensive

18   and it is detailed, and most of that is because you agreed with

19   plaintiffs to extensive, reasonable, specific detail about how

20   to comply.  I was very optimistic that this was going to be a      09:46:53

21   very short monitorship, and that you would have complied in

22   every respect.

23        Then, in both the newspaper article and your training,

24   you tell people that the order is so ridiculous, it is so

25   specific and so exacting that it resembles a New Orleans order     09:47:09

1    where people were murdering people as opposed to merely

2    depriving them of significant constitutional rights for six

3    years.

4          Can you understand why I'm not really impressed by

5    that kind of what appears to me to be double-dealing?          09:47:23

6          CHIEF DEPUTY SHERIDAN:   Completely, Your Honor.

7          My actions and words, I understand have gotten your

8    attention.  But I hope that they don't overshadow any doubts

9    that the monitor -- as a matter of fact, I had this discussion

10   with Chief Warshaw, and maybe even in front of his team, that   09:47:51

11   during that briefing I had said some things that I shouldn't

12   have.  I realized that a while back.

13         And one final thing, Your Honor, and then I'll close.

14   As the chief of custody in the Graves versus Arpaio, I worked

15   for many years to deal with and comply with Judge Neil Wake's   09:48:12

16   rules and ended the 31-year process with that case.  What I

17   learned from that was that -- the value of documenting

18   activity; it's clear that's one of the main things in your

19   order.  Continual internal inspections; we're going to do that

20   internally, we're going to do that with the monitor.  And      09:48:42

21   improve training.

22         The Maricopa County Sheriff's Office now has the

23   best-run jail system, in my opinion and in many others',

24   because of this process that we went through.  And there's no

25   reason for me to doubt that the sworn side of the Maricopa      09:48:58

1  County Sheriff's Office is going to come out and have the same

2  results through this process, through complying with your

3  order, through the additional training, and all the other

4  things that your order brings.

5       THE COURT:  Let me just raise something, and I                09:49:18

6  appreciate that.  I certainly hope it will be true.  I hope

7  this is an early corrective that won't need to be repeated, or

8  that I won't have to use the coercive authority of this Court,

9  because I'm not anxious to promote some sort of a confrontation

10  between your authority and mine.  I really am not.  But that     09:49:34

11  doesn't mean I'm unwilling to do it.

12       Let me raise something for your consideration.  I

13  realize that you have the right to request whatever

14  documentation you want to request.  But in terms of the safety

15  of your officers, I am still requiring that you give me an       09:49:50

16  assessment of the ethnicities, their assessment of the

17  ethnicities of the people that they stop during the term of the

18  monitorship.

19       I do not require that that be made both before they

20  engage with the -- with the people they've stopped and after.    09:50:06

21  You've created a form that requires that.  You have every right

22  to do so.  I'm not contesting that.  But I am saying if you're

23  concerned, as you indicated you were about the extra second

24  that it took to talk about the stop, if you're concerned about

25  drawing your officers' attention away to estimate ethnicity      09:50:23

1   before the stop, that's not something my order requires.  If

2   you want to do it, fine.  I'm not requiring that.

3         Do you understand what I'm saying?

4         CHIEF DEPUTY SHERIDAN:  Yes, sir, I knew that from the

5   beginning, that we wanted to do that.  But in the process of a        09:50:41

6   traffic stop, Your Honor, the deputy sheriffs, any police

7   officer's paying very close attention to the individual in that

8   car, their movements and those kinds of things, if you can even

9   see into the vehicle.

10        THE COURT:  Well, I understand that that's an issue.           09:50:57

11  Do you understand how, having viewed the training, I perceive

12  that you were telling them that they should give less than

13  their best effort at making that estimation?

14        CHIEF DEPUTY SHERIDAN:  No, sir, I don't feel that.

15        THE COURT:  You want me to play it so you can                  09:51:13

16  understand how I -- how I have that concern?

17        CHIEF DEPUTY SHERIDAN:  No, sir.  I've watched that

18  video several times and it's very clear in my head.  The part

19  that I said, what was ludicrous, what I was talking about, was

20  the guessing of the ethnicity of the individual.                    09:51:28

21        THE COURT:  Would you rather that I impose the order

22  originally requested by plaintiffs and say that you can't

23  inquire of the occupant, make any inquiry of the occupants of a

24  vehicle during the term of the injunction?

25        CHIEF DEPUTY SHERIDAN:  Your Honor, I -- my personal          09:51:44

```
 1   opinion is I think that would be a better way to do it is to
 2   inquire to an individual, because I --
 3            THE COURT:  You misunderstood my question.  My
 4   question was plaintiffs suggested, as you may recall, that I
 5   enjoin you from making any inquiries of occupants of vehicles          09:52:01
 6   made at a stop.
 7            CHIEF DEPUTY SHERIDAN:  That's correct.
 8            THE COURT:  Would you prefer that I enjoin the MCSO
 9   during the term of the injunction from making any inquiries at
10   all of occupants of a vehicle during a stop?                          09:52:13
11            (Pause in proceedings.)
12            CHIEF DEPUTY SHERIDAN:  Your Honor, I guess I'm
13   confused, and -- but my counsel here says no, we don't want
14   that.
15            THE COURT:  All right.  Thank you.  Appreciate your          09:52:30
16   addressing the Court, Chief Deputy.
17            CHIEF DEPUTY SHERIDAN:  Thank you.
18            THE COURT:  Plaintiffs, do you want to be heard on
19   this?
20            MR. SEGURA:  Yes, Your Honor.  We were anticipating          09:52:41
21   hearing from defendants first on their corrective action.
22            THE COURT:  All right.  Well, I'll tell you what.  I
23   am going to hear from defendants first.  I want them to get
24   right to the point what corrective action they suggest.
25            I don't want to hear from you at great length.  I'm          09:52:50
```

1   going to ask you to summarize very briefly your comments after

2   we hear from Mr. Casey, because we have other ground to cover.

3         MR. SEGURA:  Of course, Your Honor.

4         MR. CASEY:  Your Honor, I need to make an objection to

5   something you said earlier to Jerry Sheridan about you believe      09:53:04

6   that deputies told the truth but were under pressure not to.

7         THE COURT:  Um-hum.

8         MR. CASEY:  I don't recall --

9         THE COURT:  Well, let me -- let me clarify my comment,

10  and I tried to do that with Chief Deputy Sheridan.                  09:53:19

11        I am not suggesting that either Sheriff Arpaio,

12  Chief Deputy Sheridan, or any of the attorneys in any way tried

13  to pressure any of the MCSO witnesses to say anything other

14  than the truth.  I'm not suggesting that.

15        But I'm suggesting that in a very heated environment,         09:53:36

16  where those deputies don't want to contribute to a finding that

17  they behaved unconstitutionally wouldn't feel some pressure

18  just by the circumstances in which they were in to otherwise

19  vary their testimony.  And I believe that you will recall that

20  I said that in the context of praising those deputies for doing     09:53:57

21  their best for telling the truth in that environment.  That's

22  what I meant.

23        MR. CASEY:  I just wanted to assert my objection on

24  the record, because I thought it was inappropriate, with all

25  due respect to the Court.                                           09:54:07

1          THE COURT:  That's fine.  You've preserved -- you've

2     preserved your objection.

3          MR. CASEY:  Thank you, Your Honor.  Corrective action.

4          Number 1, I recommend that we issue defense counsel

5     working with our client to summarize the case and make specific          09:54:19

6     point-by-point clarifications -- actually, corrections about

7     what this order requires.  We have a total of 200-plus pages.

8     It has to be realistic, but I am suggesting to the Court that

9     what I do is I circulate with plaintiffs' counsel something

10    that they think would be appropriate.  They've watched the          09:54:39

11    video.  We will try to summarize that.  In return, we can then

12    have something where it goes to Mr. Warshaw or goes to the

13    Court for approval.

14         Second thing I'm suggesting --

15         THE COURT:  And to whom would you distribute that          09:54:52

16    corrective?

17         MR. CASEY:  I'm suggesting right now that it go

18    completely throughout the entire MCSO.  However, a more

19    logical, arguably more logical group would be the only deputies

20    that were in that room during the saturation patrol briefing on          09:55:05

21    October 18, but I guess I'm -- I'm open to an entire MCSO wide.

22         In addition, because you have raised legitimate,

23    serious concerns in the judgment of counsel and my client,

24    we're going to have to rebuild some trust.  Briefing board goes

25    to the firm -- "firm wide"; from my old days at a large firm --          09:55:28

1      goes to the MCSO wide.

2              There's also a program that we can reinstitute called

3      Chat With the Chief.  I'm not sure exactly how that works but

4      we can do that.  We were also thinking that based on what was

5      mischaracterized, that the chief can do a video that can be put          09:55:48

6      on the website for the MCSO that could be advertised to the

7      MCSO deputies that will allow them to search it that look at

8      them and watch -- and they can watch it at their convenience.

9      So we have four different areas that we think are corrective

10     and meaningful.                                                          09:56:11

11             You know, that video hasn't gone.  We created that,

12     hopefully, that it would be a benefit to us in this matter, but

13     the only people that really got that briefing were those that

14     were on the October 18th saturation patrol, but we think that

15     that isn't appropriate.                                                  09:56:31

16             Now, the reason -- just so it's clear, the reason I'm

17     suggesting that I have the plaintiffs get involved is because

18     we have been able to solve some problems together.

19             THE COURT:  I recognize that.

20             MR. CASEY:  And I don't know what you -- what you                 09:56:41

21     would like, but I would like the Court's involvement, because

22     here's the reality.  You have 159 pages-plus in your May order,

23     you've got 59 in the agreed-upon order, plus some additional

24     things.  I'm concerned that no matter what we do, it's never

25     going to be a good enough summary unless I have agreement by            09:57:00

```
 1   these people and I've got agreement either from Mr. Warshaw or

 2   the Court, because --

 3           THE COURT:  Fine.

 4           MR. CASEY:  -- I don't want this to happen again, Your

 5   Honor.                                                          09:57:11

 6           THE COURT:  I don't, either.

 7           MR. CASEY:  Okay.  Thank you, Your Honor.

 8           MR. SEGURA:  Would you like me to approach?

 9           THE COURT:  Yes.

10           Again, I don't mean to be disrespectful, but we have a  09:57:23

11   lot of ground to cover.

12           MR. SEGURA:  Definitely, Your Honor.  First of all,

13   we're pleased to hear that defendants are willing to take some

14   form of corrective action.  We feel that action needs to be

15   strong.  We first raised these concerns with defendants in     09:57:36

16   December in our letter to counsel and were hoping to meet and

17   confer on this.  Unfortunately, we weren't able to do that, and

18   Chief Deputy Sheridan's op-ed actually came out a month after

19   our first letter expressing the very concerns we're talking

20   about today.  We believe these statements from the top really  09:57:52

21   impede constructive compliance with the Court's order.

22           We agree that there needs to be a statement from the

23   MCSO correcting the prior misrepresentations by Chief Sheridan

24   and Sheriff Arpaio.  We think that should be signed by Sheriff

25   Arpaio and Chief Deputy Sheridan.                              09:58:10
```

1          THE COURT:  Any objection to that, Mr. Casey?

2          MR. CASEY:  Your Honor, we're going to have to

3    consider that, Your Honor.  At first blush, no, but we have to

4    consider it.

5          THE COURT:  All right.                                     09:58:20

6          MR. SEGURA:  And we agree that any summary of the

7    case, we'd be happy to work with defendants on that.  We've

8    been able to do that in the past very well, so we're definitely

9    able to do that.

10          But most importantly, we think there needs to be a       09:58:31

11    clear direction that the data collection requirements need to

12    be complied -- complied with as provided by the Court.  I think

13    there was an instruction that deputies -- that could be

14    perceived as instructing the deputies to err on the side of

15    "unknown."  The deputies should -- it should be made clear that  09:58:46

16    they should use their best judgment in determining the race of

17    both the driver and the passengers that are encountered during

18    any stop.  And, you know, "unknown" should really not be an

19    option for deputies to be -- for deputies to be choosing.

20          In addition --                                           09:59:06

21          THE COURT:  Let me just make an observation.

22          I guess I'm going to make an objection; I'm going to

23    direct part of this to you, Mr. Casey.

24          MR. CASEY:  I'm sorry, Your Honor.  I was talking to

25    co-counsel.                                                     09:59:17

1            THE COURT:  I understand.  I'm going to require -- I

2    think it's perfectly reasonable to have you negotiate with

3    plaintiffs a rather understandable brief summary of what is a

4    very detailed recitation of my evidence, but whatever it is is

5    going to have to be signable by Sheriff Arpaio and by          09:59:31

6    Deputy Chief Sheridan to get my approval.

7            Do you understand that?

8            MR. CASEY:  I understand what you've said.

9            THE COURT:  Second thing, whether or not

10   Chief Deputy Sheridan believes that his state -- I will accept  09:59:43

11   his statement that he didn't intend to suggest that his

12   deputies not use their best efforts in compliance with my

13   order.  But it certainly appears, I believe to me and to the

14   rational person, that it could be interpreted that way.  So I'm

15   going to require, as plaintiffs suggest, that that make clear   10:00:04

16   that sheriff deputies, personnel, should use their best efforts

17   to comply with my order.

18           Now, I will tell you that to the extent that

19   Chief Deputy Sheridan wants to collect other data, he's

20   certainly free to do that.  It may prove useful later on to him 10:00:24

21   or to anybody else.  But to the extent -- and I'm not going

22   to -- I'm not going to require -- I'm not going to say his

23   officers can't put "unknown."  But to the extent that they're

24   going to try and convince me that I reconsider my order based

25   on such data, or to the extent they're going to try and        10:00:42

```
 1    convince the public that they have reformed based on such
 2    data -- and I'm not saying they haven't; I certainly hope they
 3    have -- to the extent that he ever instructed them they should
 4    put "unknown," I think that calls into question the validity of
 5    the data itself.                                              10:00:58
 6            MR. SEGURA:  That's right, Your Honor, and we -- and
 7    we -- we agree with that.  Just to make clear, we did not
 8    object to their -- to the additional data collection
 9    requirement pre-stop; we were pointing out that that was not
10    required by the Court's order.                                10:01:10
11            THE COURT:  That's fine, and it isn't.  But they still
12    have lar -- I mean, they're still -- Sheriff Arpaio is still
13    the sheriff of Maricopa County.  He can require his deputies to
14    do what they want to do.
15            MR. SEGURA:  I understand, Your Honor --              10:01:21
16            THE COURT:  As long as it's in compliance with the
17    Constitution.
18            MR. SEGURA:  But we think that there needs to be clear
19    direction that the officers should use their best judgment.
20    "Unknown" should really be the very last resort the officers  10:01:32
21    should be instructed to use.
22            THE COURT:  Have any problem with that, Mr. Casey?
23            MR. CASEY:  Yeah.  Your Honor, the most truthful
24    answer may in fact be "unknown."
25            THE COURT:  And I've said, he can put down "unknown";  10:01:40
```

```
 1   I'm not telling him he can't.  But he is going to be required
 2   to say they will use their best efforts.  And to the extent
 3   they put down "unknown," I think it calls into question the
 4   data.
 5            MR. CASEY:  Well, we also have part of your order are          10:01:52
 6   the cameras.  The problem --
 7            THE COURT:  Absolutely.
 8            MR. CASEY:  The problem is is we have a credibility
 9   gap based on what you've seen, and I think the Court is
10   accurate.  A reasonable, objective person can interpret certain        10:02:02
11   things the way that you've done, and what we're telling you is
12   we will do the best effort and we're telling it.  The idea that
13   "unknown," if it's a truthful answer, is somehow wrong --
14            THE COURT:  No problem.  We're not going to spend time
15   talking about this.                                                    10:02:21
16            MR. CASEY:  Yes, sir.
17            THE COURT:  I am not going to prohibit deputies from
18   indicating "unknown."
19            MR. SEGURA:  Lastly, our concern, which was also
20   expressed by you, Your Honor, is that we do have some concern          10:02:27
21   with Chief Deputy Sheridan continuing to provide trainings with
22   respect to the requirements of the order after the message
23   that -- that he has conveyed at least twice that -- that we
24   know about.  We think that he should not be involved in
25   trainings with respect to the mandates of your order.                  10:02:42
```

```
 1              THE COURT:  Well, let me tell you how I feel about

 2      that.  I understand the basis for the request, in light of the

 3      video, but Chief Deputy Sheridan is still the chief deputy of

 4      Maricopa County Sheriff's Office.  I've got a monitor.  He's

 5      got a great team.  They get complete access to every training,     10:02:57

 6      everything that happens.  If Chief Deputy Sheridan does it

 7      again, this doesn't just serve as a corrective; this serves as

 8      creating a record.  And if I have to use the coercive power of

 9      this Court, I don't want to do it, but I will have laid a

10      record.                                                            10:03:15

11              I'm not going to tell him he can't be in training.

12      But I think he knows and he's expressed sincere desire to do it

13      right.  If he doesn't do it right, I'll take appropriate

14      action.

15              MR. SEGURA:  Okay.  Thank you, Your Honor.  That's all    10:03:30

16      that we have.

17              THE COURT:  All right.  Thank you.

18              Okay.  Is that clear, what my order's going to be?

19      Here is my order:  I'm going to allow the plaintiffs and the

20      defendants to confer on a correct but brief summary of the        10:03:45

21      Melendres versus Arpaio order to be placed in a corrective

22      letter that both Sheriff Arpaio and Chief Deputy Sheridan can

23      sign that will be distributed to all MCSO personnel, indicating

24      both that his previous summary -- summaries were inaccurate;

25      that they do not wish to provide inaccurate summaries; nor do     10:04:09
```

```
 1     they wish to provide any suggestion that best efforts should

 2     not be used by the deputies in compiling the data required by

 3     the order.  Is that clear?

 4              MR. CASEY:  It is to the defense, Your Honor.

 5              THE COURT:  Plaintiffs have any question about it?     10:04:25

 6              MR. SEGURA:  No, Your Honor.

 7              THE COURT:  All right.  Let's move on, then, to the

 8     community liaison officer, the notice of the community

 9     meetings, and I also want to raise, although I didn't put it in

10     the order, what I think is a fairly related point, which is the  10:04:39

11     community advisory board.

12              Defendants did, at my request, send me the deposition

13     of Hector Martinez, and I will just say, it's -- it's another

14     situation where I admire Deputy Martinez for being truthful

15     when he says things that are, perhaps, unflattering; when he     10:05:04

16     indicates that he was -- and by the way, I did receive and

17     understand your corrective that his deposition, even though he

18     was involved in the HSU, and even though it involved the

19     circulation of the cartoons that were at issue in this case,

20     his deposition did not occur in this case; it actually occurred  10:05:22

21     in the Department of Justice case.  So I do get that

22     clarification and I appreciate it.  And I appreciate your

23     attaching the relevant pages from Deputy Martinez.

24              I must admit, although the order requires a deputy, I

25     had assumed that it might be something more along the lines of   10:05:39
```

1    a chief deputy, or somebody higher, some deputy higher in the

2    staff would be appointed, but I don't think the fact that he is

3    only -- is a basic deputy is not in compliance with my order.

4         But what concerns me is Deputy Martinez's

5    truthfulness.  And I don't mean to in any way suggest that he's        10:05:58

6    not an appropriate deputy, or that he's not otherwise faithful

7    in his duties.  But he does say in there that he found at least

8    one -- the Mexican yoga cartoon? -- that he found that funny,

9    and that he found it funny because of what happens in the

10   Hispanic culture: because in our culture, a lot of friends and        10:06:22

11   family tend to get really drunk and do things like that.

12        You know, if I were members of the plaintiff class, I

13   can understand why that truthfulness would cause me very grave

14   reservations about whether or not the attitudes of this person

15   who you'd selected to be the community liaison officer are the        10:06:44

16   attitudes, especially in light of his involvement with the

17   circulation of that cartoon, and I understand and don't mean to

18   suggest that he sent it on, but he received it as a member of

19   the HSU, would be an appropriate community liaison officer.

20        I also, just to be brief about it, have had concerns           10:07:00

21   expressed to me that some of these community meetings took

22   place in parking lots early in the morning on the Saturday

23   before Christmas.  I have read that you were trying to comply

24   before the time ran out.  I appreciate that.  But the order did

25   require that it be in reasonable accommodations, reasonably          10:07:21

 1    noticed, so I have some concern about that.

 2           And I just wondered if you want to address that

 3    briefly, Mr. Casey, if you want to indicate whether or not you

 4    believe the MCSO would see any corrective action as being

 5    appropriate or not, and then I'll hear from plaintiffs.  Then I        10:07:36

 6    have a few thoughts.

 7           In addition to that, though -- well, I'll have a few

 8    questions for you when you're through.  Please.

 9           MR. CASEY:  Your Honor, briefly as to Hector Martinez,

10    Mr. Martinez is here today.  Also Lieutenant Russ Skinner is          10:07:52

11    here to have -- could answer any questions that you have.

12           You know, quite frankly, you know, Deputy Martinez is

13    also a member of the class, and I find it understandable why

14    the plaintiffs might be concerned because we have a

15    truth-teller that speaks the truth that says something that           10:08:14

16    doesn't fit in with a preconceived idea of a particular culture

17    or otherwise, but he's a member of that class and that culture.

18           It seems to me that if -- you know, quite frankly,

19    instead of painting him with the scarlet letter because he

20    found something, as you say, truthful, let's see how he does in      10:08:33

21    the next 12 months.  Let's give him the benefit of the doubt.

22    If this is about sensitivity, then let's also be sensitive to

23    his membership in the class and his trial effort, because quite

24    frankly, with all the --

25           THE COURT:  Okay.  I got your point.  Move on now to          10:08:50

```
 1    the others.

 2            MR. CASEY:  Yeah, okay.  And the next one was the

 3    community meetings.  Your Honor, this is a process where we're

 4    holding hands as we're crossing a busy street and we're

 5    learning.  We tried in good faith to get everything done in the     10:09:03

 6    Court's order in the time we did it.  Can we do it better?

 7    Yes.  I think lieutenant -- excuse me, yeah, Captain Farnsworth

 8    can address what we're going to try to do for the next annual

 9    meeting that will be at the end of 2014.

10            We're open to suggestions, but with all due respect,      10:09:21

11    Your Honor, what we get is a week ahead of time criticisms, and

12    we've already spent the money to do advertising, we've already

13    got the locations, we are actually open to getting feedback

14    from the monitor and from the plaintiffs but it's gotta be

15    timely.  Because what we're worried about is coming in here       10:09:40

16    like this and being in trouble not doing it timely.

17            Now, plaintiffs were gracious, I think, perhaps

18    Cecillia Wang, Ms. Wang, was saying that, Hey, we'll give you

19    more time.  But whether you do it on December 21st or you do it

20    on January 6th, quite frankly, in that time period after         10:09:57

21    Thanksgiving, there is no good time.

22            THE COURT:  Well, there may not be, but assuming she'd

23    given you an extra month, enough for you to be able to hold the

24    meeting inside as -- in the middle of winter as opposed to

25    outside might have been more convenient, don't you agree?        10:10:11
```

1          MR. CASEY:  You know, I can't agree with it, because I

2     don't know enough of the details of where it was at.  That's

3     why I was going to say that the commander can address the

4     specifics.

5          THE COURT:  I appreciate the commander wants to          10:10:20

6     address me.  I want to cover some ground, and then if we have

7     time I'll hear from him.  You made the point, and --

8          MR. CASEY:  Want me up here, Your Honor?

9          THE COURT:  Yeah, I do.  I want you up there.

10         I want to talk about the community advisory board.        10:10:33

11     Has anything been done to implement the community advisory

12     board?

13         MR. CASEY:  I communicated without waiving any

14     privilege with the Commander Farnsworth, and my understanding

15     is we have, what, three picks?  I understand that there have    10:10:45

16     been two people, perhaps, that are looked at favorably and

17     they're still evaluating the third.  I don't know any specifics

18     other than that.

19         THE COURT:  All right.  I do recall when we were

20     having our meeting back at the end of August last year ironing   10:10:58

21     out the order that you objected to the creation of the

22     community advisory board at all.

23         MR. CASEY:  Yes.

24         THE COURT:  And one of the things that I did in

25     entering the final order, I don't know if anybody noticed, the   10:11:08

```
 1   community advisory board had a large scope of authority to
 2   advise the sheriff about all aspects of policing.  I limited
 3   that to giving advice to the sheriff only about the
 4   implementation of this order.
 5           Did you appreciate that I made that distinction?      10:11:26
 6           MR. CASEY:  Your Honor, I always appreciate the
 7   Court's distinctions.
 8           THE COURT:  Why, thank you, Mr. Casey.  Does it make
 9   any difference to the sheriff, does he still object to
10   participating in the community advisory board?              10:11:36
11           MR. CASEY:  Yes, Your Honor.
12           THE COURT:  And does he still object to the
13   requirement that he do annual -- assuming that I find that
14   these meetings were sufficient, does he still object to my
15   requiring that he disseminate the information that I've       10:11:53
16   required in the annual meetings, and to the appointment of a
17   community liaison officer at all?
18           MR. CASEY:  Yes, Your Honor.  In fact, one of the
19   things I was going to ask you is to -- for permission, I was
20   going to orally move for a stay of that aspect to your order  10:12:07
21   with permission, asking permission to brief that --
22           THE COURT:  Well, let me tell you what I'm thinking,
23   and this may be better, and I'm going to say it for the benefit
24   of plaintiffs.  One of the things that viewing the videotape
25   caused me to do was to think, you know, if I have to invoke the 10:12:25
```

1   compulsive power of this Court to get compliance, am I going to

2   be comfortable with the order?

3          I gotta say, with all due respect to Deputy Martinez,

4   I can understand why plaintiffs don't -- are hesitant about his

5   appointment.  And I can understand why they feel like the          10:12:47

6   sheriff didn't really give them a fair shot when he holds

7   meetings outside in the cold on a December morning.  That

8   doesn't mean that I think that the sheriff didn't make good

9   faith efforts to be in compliance.

10         But the sheriff is doing something that I don't want        10:13:01

11  him to do -- or, I'm sorry, that he doesn't want to do under

12  the order, and he feels like it's an infringement on his

13  sovereignty that I'm compelling him to speak.  I didn't really

14  appreciate that till I started focusing on the fact that I

15  would need to compel compliance with my order if I thought it     10:13:23

16  was in violation.

17         And then I thought about the reason, ultimately, that

18  I limited the scope of that authority and entered it, and that

19  is because I believe that the sheriff's actions have violated

20  basic constitutional rights of particular and identifiable        10:13:37

21  members of the community, a plaintiff class, and that they were

22  entitled to have some assurance that the MCSO was responding to

23  their concerns and being -- considering their voices.  And

24  that's why I entered sort of the compromise order that I did.

25         I have to tell you that the monitor has and I have         10:14:00

1   received a number of complaints about the quality of the

2   meetings that have been conducted by the sheriff, both formally

3   and informally, in terms of them saying things about me

4   requiring to do things when in fact it was their suggestion

5   about the demeaning of this order; about Chief Trombi, for          10:14:16

6   example, rolling his eyes.

7          By the way, I understand that there was a March 15th

8   meeting that was taped by the MCSO; I'd like to get a copy of

9   that tape if it exists.

10          MR. CASEY:  A March 15th what?                              10:14:31

11          THE COURT:  A March 15th community meeting that took

12   place in -- I've got it written down here.  A March 15th

13   community meeting at which Chief Trombi was in attendance that

14   was filmed partly by community and partly by the MCSO.  I'd

15   like to get a copy of that MCSO tape if it's in existence.         10:14:45

16          MR. CASEY:  Yes, Your Honor.

17          THE COURT:  But here's the point.  You know, I thought

18   they don't like the community liaison officer, and with all due

19   respect to Deputy Martinez, I understand that, they don't like,

20   you know, where the meetings were held, and I understand that,    10:15:04

21   too.  Not saying you're not trying to be in compliance with a

22   very quick order.  And maybe I don't like some of the things

23   that they say in the meeting.

24          But as I indicated to Chief Deputy Sheridan, I don't

25   like, and I think what he said in the paper was completely         10:15:20

inaccurate, he said he thinks so, too, now, but the truth is he

has a First Amendment right to say it.  And so they might --

the sheriff might well take these meetings and use them to

put -- to state their spin on things, and as long as it's

stating it to members of the community, I gotta tell the          10:15:38

plaintiffs, I'm not very comfortable enforcing any sort of an

order against Sheriff Arpaio saying whatever he wants to say to

the community in those community meetings.  But I have thought

of a different way to address my concern, which is, I think, a

very legitimate concern on behalf of the plaintiffs.              10:15:58

        When I entered that order I had not gone through the

process of selecting a court monitor, and because the parties

couldn't agree, I had the benefit of taking a month and really

researching, doing a lot of interviews, trying to find the best

court monitor I could.                                            10:16:15

        Now, I'm not telling you that I'm not going to

disagree with Chief Warshaw; I may well during the course of

this monitorship.  But I have had the privilege of working with

him over the last several months; I've had the privilege of

meeting his team.  I believe that I have selected very well.      10:16:28

        And so I would propose to you this: that I modify the

order, and to the extent that community meetings need to be

given, Chief Warshaw give them.  That way, I can approve

whatever is said at those community meetings, and you will have

a chance to object, as will the plaintiffs.  It can be an        10:16:50

```
 1    assurance that what is said is neutral and fair to all parties

 2    and explains exactly the monitor's assessment of MCSO's

 3    progress and takes concerns.

 4         That way, Sheriff Arpaio, Chief Deputy Sheridan, can

 5    say whatever they want to say in the community, and however      10:17:08

 6    they want to say it.  Further, to the extent that the sheriff

 7    does not want to be involved in the community advisory board, I

 8    frankly had hoped that he would be involved, because this would

 9    be an occasion to repair relations.

10         But, you know, the truth is that that community           10:17:22

11    advisory board was to advise the sheriff about various

12    complaints about the implementation of the order as I limited

13    it, the sheriff doesn't want to be involved, and that's

14    perfectly fine, because now we have a monitor who I am

15    perfectly satisfied will be fair to the sheriff, but will       10:17:40

16    investigate every complaint he receives that has any

17    credibility to it.

18         So instead of being a community advisory board to the

19    sheriff in which the sheriff has the right to appoint

20    representatives and evaluate the complaints, I am perfectly     10:17:55

21    happy to revise the community advisory board so that plaintiffs

22    still can appoint members to the community advisory board, and

23    those members will report directly to Chief Warshaw, and

24    Chief Warshaw will evaluate and investigate the complaints.

25         That actually might be a better process, because I        10:18:12
```

1    know that although Chief Warshaw will be fair to the sheriff, I

2    think he wants to promote any complaints that he might get from

3    the community to be sure that the sheriff is fairly

4    implementing the order.  And to the extent that the sheriff was

5    involved in the process, that might inhibit people from being          10:18:29

6    willing to come forward.

7          This way, the sheriff is not involved in being

8    compelled to speak in any way he doesn't want to be; he's not

9    being compelled to participate in a community advisory board

10   that he doesn't want to participate in.  But I am convinced          10:18:43

11   that plaintiffs' complaints have a way to be heard and

12   investigated.  And, to the extent there needs to be community

13   meetings that set this forth, the monitor can pre -- you know,

14   can run by the parties and give them a chance to object to

15   anything that's being said.          10:19:01

16          That way, the sheriff is free to do whatever the

17   sheriff wants to do, I think that the plaintiffs' concerns are

18   being adequately addressed, perhaps not perfectly addressed,

19   but it isn't a perfect world.  As you pointed out, you have

20   reached agreement on many things, but you haven't reached          10:19:12

21   agreement on this.  And this, I think, will prevent the sheriff

22   from being compelled to speak in a way -- he can speak however

23   he wishes to about this order and the complaints, nevertheless,

24   of the plaintiffs will be fully investigated.

25          Would you check with your clients and see if they're          10:19:28

```
 1    favorable to that sort of a proposal?  And I would be

 2    interested -- I don't know who was addressing this on behalf of

 3    plaintiffs.  Mr. Pochoda, was that you?

 4              MR. POCHODA:  Yes.

 5              THE COURT:  Why don't you let Mr. Pochoda speak to me       10:19:40

 6    about what he thinks about that, and you check with your

 7    clients and see if they would approve that kind of --

 8              MR. CASEY:  Your Honor, I will do that, but, quite

 9    frankly, it may require some more consideration than simply a

10    couple minutes --                                                    10:19:50

11              THE COURT:  Oh, yeah, I completely agree.  But here's

12    what I propose to do.  I looked at the order last night while I

13    was thinking about this.  I've penciled in some amendments to

14    the order that you'll implement what I've just told you.  I

15    rather like the idea myself.  And I will propose a modified        10:20:04

16    order that I will submit to both parties and then you will have

17    the opportunity to object.

18              MR. CASEY:  Yes, Your Honor.  Your Honor --

19              THE COURT:  I would just like to know if it's worth --

20    I mean, I do think that it takes care of your concern that I'm     10:20:18

21    in some way compelling your client to speak, and I understand

22    that.  I think it also takes care of the concern that, you

23    know, if I -- if I feel like the sheriff or his chief deputy

24    are misinstructing their deputies, I'll come after them.  But

25    I'm not going to come after them for saying whatever they want    10:20:36
```

```
 1    to say in the community unless they say it in the community as
 2    a way of instructing their own deputies about this order.
 3            MR. CASEY:  One clarification before -- because I am
 4    going to need time to talk with my clients.  And so I
 5    appreciate you being able to send out your proposed changes.    10:20:52
 6            In the order currently, the Warshaw -- Chief Warshaw
 7    and his team are not permitted to speak to the media.  That was
 8    an agreed-upon term.
 9            THE COURT:  That's an agreed-upon term.
10            MR. CASEY:  And what I want to understand --            10:21:05
11            THE COURT:  Unless I authorize it.
12            MR. CASEY:  And that's what I'm asking you.
13            THE COURT:  Yeah.
14            MR. CASEY:  It is one thing --
15            THE COURT:  I will authorize -- I saw, for example, an  10:21:13
16    Exhibit D that you submitted in which you gave me the script
17    that was read at community meetings.  I will be glad to
18    authorize the script before any community meeting.
19            MR. CASEY:  I need to ask -- I'm sorry, Your Honor,
20    and I -- if I sound -- well, let me just ask the question.      10:21:27
21            THE COURT:  Sure.
22            MR. CASEY:  If in fact part of your order will be
23    authorizing Chief Warshaw to communicate to the media at any
24    time in addition to --
25            THE COURT:  Yeah.                                       10:21:45
```

```
 1            MR. CASEY:  -- speaking to the community, then it is
 2    an absolute no-go.  We will not agree.
 3            THE COURT:  Well, I appreciate that you wouldn't
 4    agree --
 5            MR. CASEY:  Yeah.                                    10:21:51
 6            THE COURT:  -- but I decide what the order is.
 7            MR. CASEY:  You're absolutely right.  No, but I'm
 8    just -- you asked whether we objected, and I would just say
 9    that --
10            THE COURT:  Yeah, well --                           10:21:58
11            MR. CASEY:  -- it would be over that objection.
12            THE COURT:  I understand, but I'm not authorizing
13    Chief Warshaw to make any statements to the media except for
14    those statements that I authorize him to make.
15            MR. CASEY:  And that -- thank you very much, because 10:22:06
16    that helps me be able to go, obviously, to my client and talk
17    to them.  Thank you.
18            THE COURT:  All right.  Mr. Pochoda, how does my
19    proposal strike you?
20            You are, after all, the American Civil Liberties    10:22:18
21    Union.
22            MR. POCHODA:  There you go.
23            THE COURT:  You marched in favor of the Nazis in
24    Skokie.  Even if you don't like Sheriff Arpaio, I assume you
25    acknowledge that --
```

1          MR. POCHODA:  There's gotta be other things you can

2     raise about the ACLU.

3          THE COURT:  -- that he has the right to say whatever

4     he wants to say.

5          MR. POCHODA:  We agree.  We don't believe there was a          10:22:29

6     shred of an attempt to impose any words on Sheriff Arpaio.  We

7     didn't impose that he even had to attend any one of these

8     community meetings nor any particular script, so we don't

9     believe there are any First Amendment implications whatsoever

10    on any of the community outreach programs, limited as they are          10:22:50

11    in the order.

12         So it was just setting up a meeting.  It had no more

13    First Amendment implications than the training sessions and so

14    forth.  They had to have some representatives from the

15    department there to take the information from the community and          10:23:05

16    to perhaps provide answers, but there was no script nor

17    compulsory attendance by anyone in the Sheriff's Department,

18    including the sheriff.

19         THE COURT:  So you don't have any problem with my

20    proposed change, or at least the concept of my proposed          10:23:19

21    changes?

22         MR. POCHODA:  Well, I will have to take this back to

23    the plaintiff class, Your Honor.  This one is of great concern

24    to the members of the community.

25         By the way, we'll not include Mr. Martinez as a member          10:23:33

```
 1    of the class because, to my knowledge, he has not ever been

 2    stopped in a vehicle by MCSO.

 3               THE COURT:  I'm sorry, I didn't define the class that

 4    narrowly.

 5               MR. POCHODA:  It has to be someone --                   10:23:45

 6               THE COURT:  I believe that Deputy Martinez is most

 7    definitely a member of the class.

 8               MR. POCHODA:  You have to be stopped in a vehicle, a

 9    Latino.

10               THE COURT:  I'm sorry, they don't.  You need to        10:23:53

11    reread --

12               MR. POCHODA:  You changed the class on us, Your Honor?

13               THE COURT:  -- the class definition.

14               MR. POCHODA:  I will do that.  I did not realize that,

15    I apologize.                                                      10:24:03

16               THE COURT:  No problem.  Let me ask, do you have any

17    problem, in light of my proposal, if I stay those aspects of

18    the order, since they haven't -- I mean, to the extent they've

19    been implemented, they've been implemented, but nothing

20    currently is going on with respect to those orders.              10:24:16

21               MR. POCHODA:  No, just the opposite, Your Honor.  We

22    believe there's been a conscious attempt to sabotage the

23    community provisions in the order.  We know that the defendants

24    are opposed to it.  They've taken every action --

25               THE COURT:  Well, again, I appreciate that, but what   10:24:32
```

1   would you propose -- here's my -- as I was mulling this over,

2   what would you propose I really do?  Would you propose I muzzle

3   the sheriff?  I'm not inclined to do that.  I think the

4   sheriff, to the extent he says he has a First Amendment right

5   to say whatever he wants to say as a politically responsible          10:24:48

6   and elected representative of Maricopa County, if I'm going to

7   make him hold meetings, he can say whatever he wants to say in

8   those meetings.

9           MR. POCHODA:  Correct.  And we've never disputed that,

10  don't dispute it today, Your Honor.  When I said they were          10:25:02

11  sabotaging, it was because of who they selected to be their

12  community liaison, and the -- and the terms of the community

13  meetings, which were geared to get the lowest possible turnout,

14  because they didn't give us notice, and so forth.

15          THE COURT:  I will tell you that if we have               10:25:16

16  Chief Warshaw doing it, we'll do it very fairly.  And if in

17  fact we do it very fairly, we give all kinds of notice, we have

18  it in a nice location, and then we get very little turnout, I

19  will tell you that I may consider canceling the requirement to

20  have the meetings.                                                 10:25:31

21          But it will be something that I can coordinate with

22  Chief Warshaw on, and we can do it in a way that there just

23  won't be any question about whether we're providing such a fair

24  opportunity, and at the same time, Sheriff Arpaio won't feel

25  muzzled.                                                           10:25:40

1          MR. POCHODA:  Yeah, I -- I'm not sure where the

2     muzzling comes in, since we never were --

3          THE COURT:  I don't think there was muzzling, either,

4     but I can understand his viewpoint.  And to the extent that I'm

5     going to be required to enforce this order -- and I want to          10:25:51

6     have an order that I'm going to enforce because, believe you

7     me, I intend to enforce it -- I want to be comfortable

8     enforcing it.

9          MR. POCHODA:  Your Honor, we think it is a very

10     reasonable suggestion and we'll take it back.  It does not get     10:26:05

11     to the issue of the community liaison officer, which we still

12     feel is an important -- to have someone within the Sheriff's

13     Department, not this particular choice, for various reasons.

14          THE COURT:  Well, I will tell you the community

15     liaison officer has two functions, basically: one is to hold       10:26:19

16     community meetings; the other is to be assistant to the

17     community advisory board.  If I eliminate those and vest them

18     in the monitor, I will require Maricopa County to pay a little

19     extra money necessary to fund that, but it's not a -- I checked

20     with him briefly.  It is some extra money, but it isn't           10:26:37

21     extraordinary.  And to allow the sheriff to give me an order

22     that I'm comfortable enforcing and allow the sheriff to say

23     whatever he wants to say, and especially since he does not want

24     to have any role in the community advisory board or community

25     meetings, I think it's a great suggestion.  I don't want to        10:26:54

```
 1   love my own suggestions too much --
 2              MR. POCHODA:  And who am I to argue?  But we never
 3   expected, to be honest, that the sheriff would show up a lot of
 4   the -- at a lot of those community meetings, but --
 5              THE COURT:  That's good.  We've got a lot of ground to    10:27:06
 6   cover.  You have anything else to say, Mr. Pochoda?
 7              MR. POCHODA:  Yeah.  Yeah, we do think it's important
 8   to have, then, an identified person at a minimum.  And I hate
 9   to say this today, but we have to take it back to discuss
10   amongst ourselves within the monitor team who is the liaison to    10:27:16
11   the community.  We think it's very --
12              THE COURT:  That will be fine.
13              All right.  Other issues?
14              MR. POCHODA:  I should come up with something I can
15   ask you for now quick.                                             10:27:26
16              THE COURT:  Now --
17              MR. POCHODA:  Thank you, Your Honor.
18              THE COURT:  -- other issues.  I wanted to discuss --
19   the members of the monitor team have received word, feedback,
20   that in their tentative and initial discussions with MCSO         10:27:37
21   personnel, that they've been ordered or instructed that they're
22   not to talk to members of the monitor team until an attorney
23   comes and is present.  At least I've heard that; I don't know
24   if that's actually instruction that you've given.
25              Let me tell you that again, in terms of rights that     10:28:00
```

1    the Sheriff's Office has, I think that the sheriff has the

2    right to require, if he's going to -- I mean, I think he has a

3    right to instruct his employees that they shouldn't talk to the

4    monitors unless they have counsel.  But I think that does

5    violate -- I mean, it doesn't -- you can't really say it          10:28:20

6    violates the order, but it violates the spirit of the order in

7    which the monitor team has full and complete access to the

8    Sheriff's Department and operations and ability to ask

9    questions to determine what's going on.

10          I'm not going to tell you you can't instruct your          10:28:33

11   employees that.  But if you are going to instruct your

12   employees that, I've counseled with Chief Warshaw about it, and

13   it will be -- it will require, in order for him to make the

14   fair assessments that I'm going to require him to make, it will

15   require that I appoint, and authorize him to appoint, very many  10:28:51

16   more monitors, so that they can go and watch the operations of

17   MCSO and determine for themselves information that they could

18   otherwise determine by simply asking a question, without

19   creating some sort of environment that I'm concerned, frankly,

20   Chief Deputy, that your instruction started to create, which is  10:29:13

21   a dual enforcement track.

22          So if that is going to be your position, my concern is

23   that it's going to significantly impair Chief Warshaw's ability

24   to monitor the actual compliance by the MCSO, and to the extent

25   that it costs more money, I'm going to authorize that he         10:29:32

```
 1    increase his monitor staff.
 2            Now, I do realize that that indication made to members
 3    of the monitor staff may have been a misinstruction, but I
 4    thought since we're all gathered together I'd inquire into it.
 5            MR. CASEY:  Your Honor, I think there's been a          10:29:49
 6    misunderstanding, a miscommunication on this, but let me tell
 7    you what I do understand to be the case.
 8            There will be instance -- no one on the defense team
 9    has any intention or desire to sit in on anything the monitors
10    do.                                                            10:30:09
11            THE COURT:  You mean defense attorneys.
12            MR. CASEY:  Yeah, the defense attorney.
13            THE COURT:  Okay.
14            MR. CASEY:  But what I want you to understand -- you
15    know, I say that sounds -- yes, I apologize.  It's like talking  10:30:15
16    with my wife, "I want you to understand, Sheila."
17            THE COURT:  You talk to your wife that way?
18            MR. CASEY:  No, that's -- that's why I stopped myself,
19    because I work for her.
20            Your Honor, I apologize.  I get carried away.  My        10:30:29
21    Irish blood gets up.  But here's really what we're looking at
22    is, you know, there's a lot of regulation in the MCSO, and, for
23    example, there's a whole lot that deals with what I call HR,
24    issues I don't have any concept about.  What we want --
25            THE COURT:  Can you get to the point --                 10:30:47
```

```
 1              MR. CASEY:  Yes.  The point is if someone from the
 2    MCAO wants to attend to help make sure, if they're culling over
 3    policies and procedures, to add value to it, they ought to be
 4    able to attend.  It's not --
 5              THE COURT:  Sure.                                        10:30:58
 6              MR. CASEY:  -- an adversarial process.
 7              THE COURT:  Sure.  And we don't want to make it that.
 8    I'm just telling you that if it gets in the way of the
 9    monitor's function, it may increase the monitor's costs.
10              MR. CASEY:  Well, and let me also put in there here      10:31:06
11    also, if in fact -- I don't have any intention, but if in fact
12    defense counsel wanted to attend and be a fly on the wall --
13              THE COURT:  Plaintiffs' counsel, you mean.
14              MR. CASEY:  Plaintiffs' counsel.  But I have the right
15    to go and --                                                      10:31:20
16              THE COURT:  Sure.
17              MR. CASEY:  -- give my client --
18              THE COURT:  Sure.
19              MR. CASEY:  -- advice, what is the problem with me in
20    attendance?                                                       10:31:24
21              THE COURT:  Nothing.
22              MR. CASEY:  Absolutely.
23              THE COURT:  Except if there arises a perception that
24    there is any sort of wink and nod understanding in the MCSO.
25              Do you understand what --                               10:31:38
```

```
1              MR. CASEY:  Yes --

2              THE COURT:  -- I'm saying?

3              MR. CASEY:  -- I think absolutely.  That's what -- and

4    that's, unfortunately, why we're here, because the perception

5    is there's going to be an adversarial process if counsel is        10:31:44

6    present.  That's not what the purpose would be on those

7    occasions we'll be there.

8              The other thing that's important, and, you know, we've

9    talked to -- well, we may not have talked to, but one of the

10   things that we have been advised from other jurisdictions is       10:31:57

11   that the lawyers need to be at least aware of what's going on

12   because of monitor creep --

13             THE COURT:  Nothing --

14             MR. CASEY:  -- so --

15             THE COURT:  Nothing in my -- what I just said            10:32:05

16   indicates that you can't do whatever you want to do.

17             MR. CASEY:  Yeah, but there's the implication that

18   there's a potential for obstruction, an adversarial process.  I

19   just wanted to convey to the Court that's not our intent.

20             THE COURT:  All right.  Thank you.                       10:32:19

21             MR. CASEY:  Thank you.

22             THE COURT:  Anything that I -- I had a sentencing two

23   minutes ago.  There's still some grounds I have to cover.  Is

24   there anything plaintiffs want to be heard on that point?

25             MS. WANG:  Your Honor, we were prepared to address the   10:32:29
```

1  possible resetting of various deadlines in the Court's October

2  order.  If Your Honor is going to do a modified order to submit

3  to the parties for comment and review, we can take care of that

4  then, but we are prepared to address that today --

5      THE COURT:  Well --                                    10:32:43

6      MS. WANG:  -- if you like.

7      THE COURT:  -- let me tell you that I talked with

8  Chief Warshaw about this, too.  And his suggestion to both

9  parties, see what you think, the parties have been diligent,

10  really.  Both parties have been diligent in trying to comply   10:32:53

11  with preparing the policies and get -- get everything in order.

12      The reason there has been a delay is because you

13  couldn't agree on the monitor; I had to take the time necessary

14  to be sure I was appointing a good monitor; he then had to work

15  out his logistics with the County.  So there's been a delay    10:33:08

16  that is the fault of neither party, and I think both parties

17  have tried very diligently to meet the requirements they've

18  tried.

19      What Chief Warshaw suggests and what seems reasonable

20  to me is he's now geared up and he's starting to be able to    10:33:21

21  assess these things.  There was, apparently, the first deadline

22  of things to be submitted by March 31st.  He suspects -- and I

23  suspect, too, given the parties' previous diligence -- that the

24  parties have still been working on these things.  He's just

25  unable to take all at once everything on March 31st.           10:33:41

1          So what he suggests that you do is be ready on March

2     31st.  He will issue interrogatories saying:  Give me these

3     items.  You give him those items.  When the sheriff submits

4     those items that are designated on March 31st, that triggers

5     the deadline in the order for you to respond as to those items          10:33:57

6     only.  It doesn't mean that you give compliance, you're going

7     to get automatic acceptance, because he's going to evaluate

8     them, plaintiffs are going to evaluate them.  And then when

9     he's ready to move on to the next he'll say, Give me the

10    next -- he'll specify which other sets of information, and we          10:34:13

11    can proceed in that orderly fashion.

12         Does that make sense to you, Mr. Casey?

13         MR. CASEY:  It does, Your Honor.  Thank you.

14         THE COURT:  Does that make sense to you, Ms. Wang?

15         MS. WANG:  Yes, Your Honor.  The one caveat we have is          10:34:24

16    that in addition to the submission of certain documents and

17    proposed trainings and policy revisions, there were a few

18    concrete deadlines for certain trainings to be completed, I

19    believe there are three.  And the plaintiffs would like to see

20    a hard stop that would be a no-later-than date for those          10:34:42

21    trainings actually to be completed.

22         We understand that that will take some time to have

23    the monitor team review and approve the curriculum and the

24    trainers and all that, but we would like to see those

25    trainings, particularly given the misstatements that have gone          10:35:00

1    out so far.

2          THE COURT:  I understand that, and let me suggest I

3    doubt that defendants will disagree, why don't you just submit

4    such a date to them for their approval; put it to me; I'll

5    revise the order in that respect?                          10:35:13

6          MS. WANG:  Thank you.  That's fine.

7          THE COURT:  All right.  I think the only other

8    question that I wanted to address was the publication request

9    that I'd received from Ms. Young -- Mr. Young, and Ms. Dennis

10   opposed that request.  I'm glad to hear from you, I hate to    10:35:23

11   have you travel all this way and not hear from you, but I've

12   got -- I think I've decided what I'm going to do.

13         But go ahead, Mr. Young.

14         MR. YOUNG:  I'm sorry, Your Honor, you've decided

15   what?                                                      10:35:33

16         THE COURT:  I've decided what I'm going to do.

17         MR. YOUNG:  Okay.  Well, I would note that, Your

18   Honor, it's obviously a very important issue.  Your ruling in

19   this respect is going to be the final outcome at least as to

20   saturation patrols, since the defendants are not appealing your  10:35:45

21   findings as to saturation patrols.

22         I would note that while in federal court it is

23   permissible to cite unpublished opinions, in various state

24   courts it is not.  For example, in Arizona, under the Arizona

25   Rules of Civil Appellate Procedure 28(c), it's not permissible  10:36:03

1   to cite, and it's not precedent -- unpublished opinions are not

2   precedent.

3         So your ruling, for example, in May of 2013, which

4   talks about the Arizona employer sanctions law and the Arizona

5   human smuggling law actually are not citable in the courts of          10:36:25

6   Arizona, notwithstanding the fact that Your Honor's rulings

7   have dealt with matters relating to Arizona law.  It's quite

8   possible that there would be state court lawsuits that would

9   benefit from --

10         THE COURT:  Well --                                             10:36:38

11         MR. YOUNG:  -- the citation --

12         THE COURT:  -- it is possible, but my ruling isn't

13   precedent in state court, anyway, even if it's published, is

14   it?

15         MR. YOUNG:  Well, it wouldn't be binding precedent,            10:36:46

16   that's correct, because the Arizona courts would need to -- to

17   come up with their own judgments as to Arizona law.  But it

18   would certainly be informative and beneficial, and just

19   generally speaking, having your rulings be searchable more

20   easily on Westlaw and more easily found by people who are            10:37:03

21   researching on these issues would be a great public benefit.

22         THE COURT:  All right.  Thank you.

23         I think I called you Ms. Dennis.  I'm sorry, Ms.

24   GilBride.

25         MR. CASEY:  I only stood up because we've decided if          10:37:15

1    the Court wishes to publish, the Court may publish --

2              THE COURT:  Well, thank you.

3              MR. CASEY:  -- not over objection.

4              THE COURT:  Well, thank you.

5              Here's my inclination.  I do think that, without going    10:37:26

6    into it, I think to the extent that there's questions that are

7    raised by the Sheriff's Office or -- which I'm certainly going

8    to allow him to raise, about what actually I held, to the

9    extent that publishing my order makes it more accessible to the

10   public, it's going to be published.                               10:37:42

11             However, to the extent that my injunction, you've

12   requested me to publish my injunction, as you've -- as I've

13   just indicated, I feel perfectly clear -- or perfectly able to

14   adjust my injunction to really meet the practical needs -- I'm

15   not going to do it lightly, but I think we've talked about one    10:38:02

16   area today where adjusting the injunctive order makes more

17   sense for the sheriff and it makes more sense to the

18   plaintiffs.

19             So the injunction is not necessarily set in stone, and

20   because it's not set in stone, and because, as Ms. GilBride      10:38:16

21   pointed out in her letter, in this day of Westlaw, everybody

22   can access everything, if you've got a computer, I'm not

23   inclined to publish my injunction at this point.

24             Do you want to be heard one final shot on that,

25   Mr. Young?                                                        10:38:33

```
 1            MR. YOUNG:  If you mean by "injunction" your October

 2    2nd, 2013 order --

 3            THE COURT:  That's exactly what I mean, yeah.

 4            MR. YOUNG:  We still believe that whatever its final

 5    form is, and I understand that there may be some modification     10:38:41

 6    to it, that ultimately having that available on -- on Westlaw

 7    in a published form, in F.Supp., would be helpful, because it

 8    would add to the ability to search it and find it years from

 9    now, it would be of benefit to --

10            THE COURT:  All right.                                    10:38:56

11            MR. YOUNG:  -- be published.

12            THE COURT:  Well, I note that the sheriff doesn't

13    object to it, and if I decide to publish it when -- when we

14    next arrive at the final version, I'll just do that.  But I'm

15    not going to do -- I'm not going to make any decision on that     10:39:09

16    until we revise it to be what I consider to be final form.

17            MR. YOUNG:  Thank you, Your Honor.

18            THE COURT:  All right.  Last chance, is there any -- I

19    do want to express -- well, I appreciate the sheriff coming

20    today.  I appreciate what Chief Deputy Sheridan said.  I hope     10:39:26

21    today will prove to be, even if somewhat painful for all of us,

22    a valuable corrective that helps me enforce this order.  I hope

23    to do so in a way that does not impinge upon the sheriff's

24    authority as the sheriff of Maricopa County to enforce law

25    enforcement.                                                      10:39:51
```

1          But I hope in addition to making that corrective this

2     hearing served one other purpose, and that is, with all due

3     respect, and I hope you don't misunderstand me, it is to create

4     a record.  To create a record that you've been clearly advised

5     of what is acceptable and not acceptable.  And it creates a          10:40:09

6     record so that even though I would be very reluctant to enforce

7     any sort of coercive action against the Maricopa County

8     Sheriff's Office or the individuals within it, I am perfectly

9     willing to do it if I need to.  And this record makes clear, I

10    believe, that I have done my very best to give fair notice of      10:40:31

11    what is required under my order.

12          So I appreciate all parties being here.  We will

13    proceed as we've indicated.  Thank you very much.

14          (Proceedings concluded at 10:40 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 26th day of March,

18  2014.

19

20

21                          s/Gary Moll

22

23

24

25