1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega            )
    Melendres, et al.,                )
5                                     )
                   Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                     )
                   vs.                )   Phoenix, Arizona
7                                     )   April 3, 2014
    Joseph M. Arpaio, et al.,         )   2 o'clock p.m.
8                                     )
                   Defendants.        )
9   _____  )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            BEFORE THE HONORABLE G. MURRAY SNOW

17                    (Status Conference)

18

19

20

21

22  Court Reporter:           Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

1                      A P P E A R A N C E S

2

3   For the Plaintiffs:        Stanley Young, Esq.
                                COVINGTON & BURLING, L.L.P.
4                               333 Twin Dolphin Drive
                                Suite 700
5                               Redwood Shores, California  94065
                                (650) 632-4704
6
                                Daniel J. Pochoda, Esq.
7                               AMERICAN CIVIL LIBERTIES
                                FOUNDATION OF ARIZONA
8                               77 E. Columbus Avenue
                                Suite 205
9                               Phoenix, Arizona  85012
                                (602) 650-1854
10
                                Cecillia D. Wang, Esq.
11                              AMERICAN CIVIL LIBERTIES UNION
                                FOUNDATION
12                              Director
                                Immigrants' Rights Project
13                              39 Drumm Street
                                San Francisco, California  94111
14                              (415) 343-0775

15  For the Defendants:         Timothy J. Casey, Esq.
                                James L. Williams, Esq.
16                              SCHMITT, SCHNECK, SMYTH,
                                CASEY & EVEN, P.C.
17                              1221 E. Osborn Road
                                Suite 105
18                              Phoenix, Arizona  85014-5540
                                (602) 277-7000
19
                                Thomas P. Liddy
20                              Deputy County Attorney
                                MARICOPA COUNTY ATTORNEY'S OFFICE
21                              Civil Services Division
                                222 N. Central Avenue
22                              Suite 1100
                                Phoenix, Arizona 85004
23                              (602) 506-8541

24

25

1                          I N D E X

2  <u>Witness:</u>                                          <u>Page</u>

3  DAVID TROMBI

4  Examination by the Court                            5
   Examination by Mr. Pochoda                         31

5

6

7                        E X H I B I T S

8  <u>No.</u>      <u>Description</u>                        <u>Admitted</u>

9                         (None)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2

3              THE COURT:  Thank you.  Please be seated.

4              THE CLERK:  This is civil case 07-2513, Melendres v.

5    Arpaio, on for status conference.                              14:08:08

6              Counsel, please announce your appearances.

7              MR. POCHODA:  For plaintiffs, Dan Pochoda from the

8    ACLU of Arizona, and by telephone Stan Young from Covington &

9    Burling and Cecillia Wang from the Immigrants Rights Project of

10   the ACLU.                                                      14:08:24

11             THE COURT:  Good afternoon.

12             MR. CASEY:  Good afternoon, Your Honor.  Tim Casey and

13   James Williams from our law firm, and with us is co-counsel Tom

14   Liddy from the Maricopa County Attorney's Office.

15             THE COURT:  Good afternoon.                          14:08:36

16             MR. CASEY:  Also, I wanted to -- pursuant to your

17   order, Chief David Trombi is also here, and also

18   Chief Sheridan.

19             THE COURT:  Chief Sheridan, good afternoon.

20             I also understand that on the line is Chief Raul      14:08:47

21   Martinez from the monitor staff.

22             Are you here, Chief Martinez?

23             CHIEF MARTINEZ:  Yes, Your Honor, I'm here.

24             THE COURT:  All right.  Thank you.

25             Now, I do have an outline of five or six things I'd   14:09:01

1   like to cover in this meeting, but Chief Trombi, how about we

2   handle your matter first, and then you can get off the hot seat

3   and so can I.

4           Would you come forward, please, and be sworn.

5           THE CLERK:  Can you please state and spell your first    14:09:20

6   and last name.

7           THE WITNESS:  David Trombi, T-r-o-m-b-i.

8           THE CLERK:  Please raise your right hand.

9           (David Trombi was duly sworn as a witness.)

10          THE CLERK:  Please take our witness stand.    14:09:40

11          THE COURT:  I am going to remind those who may be in

12   attendance in the public gallery that there is a rule that

13   prohibits recording any proceeding in the United States

14   District Court, so while you're welcome, if you can do so

15   quietly, to use your laptops if you wish to do so, or even your    14:09:56

16   Twitter, the marshals are observing, and if anyone is recording

17   this proceeding they'll be escorted out, just so that there's a

18   clear understanding.

19                      DAVID TROMBI,

20   called as a witness herein, having been duly sworn, was

21   examined and testified as follows:

22                      EXAMINATION

23   BY THE COURT:

24   Q.  Chief Trombi, good afternoon.

25   A.  Good afternoon, sir.    14:10:11

1    Q.  Thank you for being here.  You are in charge of the patrol

2    division at the MCSO?

3    A.  Yes, sir, that's correct.

4    Q.  And could you explain to me what the patrol division is?

5    A.  I can.  Patrol Bureau is basically just that:  All of the          14:10:21

6    deputies that work out on patrol in all of the districts within

7    the sheriff's office performing normal patrol functions, calls

8    for service, things of that nature.

9         In addition to that -- that duty, I also have our SWAT

10   division, Special Weapons and Tactics, as well as Enforcement        14:10:41

11   Support, which operates our posse and reserve program, and also

12   our animal crimes investigations unit.

13   Q.  Would it be an overstatement to say that apart from the

14   jail operations, which I realize are significant operations for

15   the sheriff, you're in charge of all the actual law enforcement      14:11:00

16   street operations that go on under the Sheriff's Office?

17   A.  With the exception of our special investigations and

18   major -- major crimes bureau.  So the detectives and narcotics

19   detectives are a separate part and not part of my bureau.

20   Q.  All right.  Thank you.  Now, I had the understanding, based      14:11:17

21   on stipulations made at trial, that you held your present

22   position during the time relevant to this lawsuit, is that

23   correct?

24   A.  Yes, sir.

25   Q.  I really don't want to talk -- I don't want to have you up       14:11:27

1  here for too terribly long, I do have a number of questions, I

2  hope they'll go quickly, but I want to lay some important

3  groundwork before I get to those.  I'm mostly going to be

4  talking to you about a public meeting that occurred a little

5  over two weeks ago.                                          14:11:44

6         Are you familiar with that meeting in which you

7  participated?

8  A.  Very much so, sir.

9  Q.  All right.  It was apparently on March 15th at a church in

10  the West Valley?                                            14:11:52

11  A.  Yes, sir, correct.

12  Q.  And we're both talking about the same meeting?

13  A.  I believe so.

14  Q.  All right.  Can you tell me, just so that I'm sure, do you

15  remember the name of the church that it occurred at?        14:11:59

16  A.  The name of the church, I'm sorry, but I know it was around

17  75th Av and Indian School on the south side of the road.

18  Q.  In any case, there was an MCSO officer there videotaping

19  that meeting?

20  A.  Yes.                                                    14:12:11

21  Q.  And you're aware that I've requested a copy of that

22  videotape?

23  A.  Yes, sir.

24  Q.  And it's that videotape that I'm mostly going to be talking

25  to you about today, just so that we're clear.               14:12:20

1    A.  I understand.

2    Q.  All right.  Now, I want to make a couple of other things

3    clear.  You were present in the hearing approximately a week

4    ago where I had some interaction with Chief Deputy Sheridan,

5    correct?                                                          14:12:34

6    A.  Yes, I was.

7    Q.  And you heard me say in that meeting that I have no intent

8    to hold anyone in contempt of my order based on their public

9    mischaracterization of my order at a public meeting?

10   A.  I heard that, yes, sir.                                       14:12:45

11   Q.  And I want you to know that I don't have any intent of

12   holding you in contempt for what I view to be your

13   mischaracterizations of my order at that meeting.  And in fact,

14   your attorney, in turning over the videotape, said to me -- or

15   indicated in that pleading that without waiving any privilege,   14:13:02

16   quote, Chief Trombi now knows, understands, and appreciates the

17   full evidentiary basis found by the Court in issuing its

18   injunctive relief.  Do you feel like that's a true statement?

19   A.  I absolutely do, sir.

20   Q.  All right.  So I want you to understand that my questions     14:13:15

21   today are going to be designed to explore your -- your

22   understanding of my order up until the time that you

23   participated in that meeting.  And then I want to find out what

24   your understanding of my order came to be after that meeting,

25   and what you did both before and after the meeting to inform      14:13:33

1    yourself or to be apprised of -- of that order and where it was

2    that you got the characterization that you gave in the meeting.

3            Do you understand --

4    A.  I do understand.

5    Q.  All right.  Now, I think your attorneys have been good and          14:13:46

6    I don't think they want to interfere in my questioning too

7    much, but they are here to represent your rights and to make

8    sure that I don't infringe them and they serve a role.  They're

9    not afraid to use that role, I don't think, but I want to

10   review with you, just before I get started, you understand what        14:14:05

11   it means to be under oath.

12   A.  I absolutely do.

13   Q.  All right.  Can you tell me what it means?

14   A.  To tell the truth; to ensure that what I -- the questions

15   that I -- excuse me, the answers I give to your questions are          14:14:18

16   the absolute truth, and that there are consequences for not

17   doing so.

18   Q.  All right, thanks.  Now, can I ask you, between the time

19   that you participated in that March 15th meeting and today, did

20   you review any documents to inform you about what my order            14:14:36

21   said?

22   A.  Yes, sir, I have.

23   Q.  And what documents would those be?

24   A.  The 140- -- I believe 146 pages, the findings of fact --

25   excuse me, findings of facts and conclusions of law dated, I          14:14:53

1    believe, May of 2013, as well as the October document from

2    yourself that you also -- also issued.

3    Q.  Okay.  We'll call it -- just for purposes of my questioning

4    so we're clear, we'll call the first document, the findings of

5    fact and conclusions of law, we'll call that the findings of          14:15:15

6    fact and conclusions of law, okay?

7    A.  Yes, sir.

8    Q.  And the second document which is in October, it's a little

9    bit of an oversimplification but we'll call that my injunction

10   order, all right --                                                    14:15:26

11   A.  Yes, sir.

12   Q.  -- or injunctive order?  Just so we're clear which ones

13   we're talking about?

14   A.  Very well.

15   Q.  Had you ever read my findings of fact and conclusions of          14:15:32

16   law prior to the time that you read it in preparation for this

17   hearing?

18   A.  Prior to.  Ashamedly, no, sir.

19   Q.  All right.  Had you ever read my injunction order before

20   the time that you read it just to prepare for this hearing?          14:15:46

21   A.  No, sir.

22   Q.  Do you believe it might have been incumbent upon you, since

23   my order had to do with the operation of the Maricopa County

24   Sheriff's Office, for you to read that order and understand its

25   basis?                                                                14:16:00

1    A.  Absolutely.

2    Q.  Let me ask you, where did you get the characterization of

3    my order that you gave in the meeting two weeks ago?

4    A.  I thought about that, and I cannot, in all honesty, tell

5    you who specifically.  I can tell you, sir, that I heard those      14:16:16

6    incorrect statements that I made in conversation in -- in

7    meetings or in settings with others within the Sheriff's Office

8    that -- that those statements over the last, I suppose, six

9    months kind of permeated my brain, unfortunately, and stuck

10   with me, and unfortunately, and regrettably, I used those.         14:16:45

11   Q.  All right.  Let me ask, I'm going to drill down a little

12   bit with some more specificity.  I take it from your answer,

13   and I don't want to take things from your answer that aren't

14   correct, but I take it from your answer that the

15   characterization you gave of my order is sort of your summary      14:17:00

16   of meetings that occurred at the Sheriff's Office, interactions

17   that occurred at the Sheriff's Office, conversations that

18   occurred at the Sheriff's Office, perhaps other memos that you

19   received at the Sheriff's Office, during the time between when

20   I entered the findings of fact and conclusions of law and your     14:17:19

21   participation in the meeting last March, is that correct?

22   A.  Almost.  No memos that I recall ever reading indicated the

23   incorrect facts that I used.  It was more -- it was more

24   conversation in nonformal settings.

25   Q.  All right.  And I think you used the word "meetings."          14:17:37

1              Were there meetings in which it was discussed?

2    A.  I don't know if "meetings" are accurate.  At times when I

3    might have been together with other deputies or office staff

4    members that we were just talking and those incorrect

5    statements were used, I retained them and then used them.          14:17:53

6    Q.  Do you recall any such meeting or conversation

7    specifically?

8    A.  I -- I do not, sir.

9    Q.  Do you recall how many of them were -- there were?

10   A.  I don't.  And again, sir, it's been -- it was six months, I   14:18:09

11   believe, that I -- is my best estimation, about six months how

12   long I've been hearing those statements.

13   Q.  But would you say a number of times you've heard such

14   statements?

15   A.  Yes, sir.                                                      14:18:23

16   Q.  And have you heard them from a number of different sources

17   within the Maricopa County Sheriff's Office?

18   A.  I don't know about "a number of" them.  I don't have a --

19   an honest, clear recollection of who said it or where I heard

20   it, other than it's just something that wasn't uncommon to hear   14:18:41

21   at times, if that makes any sense.

22   Q.  I think that I understand it.  Let me ask you, did you ever

23   have such a conversation with Lisa Allen?

24   A.  I don't reca -- no, sir.

25   Q.  Did you ever have such a conversation with Chief              14:18:54

1    Deputy Sheridan?

2    A.   Not that I can recall specific to that.

3    Q.   Did you ever have such a conversation with Sheriff Arpaio?

4    A.   I do not recall ever saying anything like that to him or

5    hearing that from him.                                        14:19:08

6    Q.   If I use the term "command staff" at MCSO, are you clear

7    what I mean by "command staff"?

8    A.   I am, yes.

9    Q.   Did you ever have any such conversation with any command

10   staff member at MCSO?                                         14:19:17

11   A.   I wish I could honestly tell you the group, the command

12   staff, or any -- any group that those statements were made.

13   It's just general conversation that I've had around the office

14   and in different areas.

15   Q.   Let me ask -- and, by the way, from your perspective, you  14:19:37

16   may be thinking "no good deed goes unpunished."  I realize that

17   you participated in the community meeting, at least my

18   understanding is you participated at the request of community

19   members.

20   A.   Yes, sir, that's correct.                                14:19:54

21   Q.   And you stated several times in the videotape, which I've

22   reviewed, that you wanted to tell them the whole truth, and you

23   told them that particularly with respect to my order.  Am I

24   misstating --

25   A.   No, sir, you are not.                                    14:20:06

1   Q.  All right.  You made some fairly specific statements to

2   that group and I want to talk to you about some of them

3   specifically.  You stated that the people with Hispanic -- that

4   my order -- or the order of this Court came down based on a

5   couple of points that the ACLU prevailed on.                    14:20:42

6            Do you remember saying that?

7   A.  I absolutely do.

8   Q.  And that the first of those points was that people -- that

9   the ACLU prevailed on was that people with Hispanic surnames

10  were held 14 seconds longer than people without Hispanic        14:20:54

11  surnames.  Do you remember that?

12  A.  I do remember saying that.

13  Q.  You've now reviewed my order.

14  A.  I have.

15  Q.  There is nowhere in my order where I even discuss that, is   14:21:01

16  there?

17  A.  There is not.

18  Q.  Do you recall where you would have gotten the impression

19  that my order relied on a determination that four -- that

20  people with Hispanic surnames were held 14 seconds longer than  14:21:14

21  people without Hispanic surnames?

22  A.  No, and as I previously testified to, or under oath stated,

23  I hadn't read the order prior to that -- ashamedly, again --

24  and so other than the conversations that I mention as to where

25  I had heard it, retained it, and then regurgitated it,          14:21:33

1    unfortunately, is the only place that I had heard that -- that

2    statement.

3    Q.  All right.  Were you present -- you heard me discuss a

4    meeting with Chief Deputy Sheridan last week in which he made a

5    very similar statement.  Were you present at that training?     14:21:47

6    A.  At the training -- yes, sir.  At the -- at the training

7    auditorium, yes, sir.

8    Q.  And so at least one time you've heard Chief Deputy Sheridan

9    say that, and it apparently was repeated a number of times

10   throughout the department, if I understand your testimony        14:22:03

11   correctly, is that fair?

12   A.  No, sir, it isn't.  I was at that meeting -- excuse me.  I

13   was at that, you know, that briefing, actually, at the training

14   auditorium that took place.  I was engaged in other activities.

15   I can neither say I heard him say it, nor can I say that I        14:22:22

16   didn't hear him say it.  I don't recall him having said that,

17   sir.

18   Q.  I appreciate the specification.  Whether or not you heard

19   Chief Deputy Sheridan say it, you had heard it a number of

20   times and you can't be specific because you've heard it so many  14:22:37

21   times at other places throughout the MCSO.

22   A.  That is correct, sir.

23   Q.  All right.  And you can't give me a specific idea where you

24   got that -- from any specific conversation about that 14

25   seconds, other than that just seemed to be -- and again, I       14:22:54

1   don't want to put words in your mouth, so correct me -- but

2   that was sort of the general received knowledge that's over at

3   the MCSO.

4   A.  It was my general perceived knowledge, yes.

5   Q.  All right.  And you obtained that from others at the MCSO,    14:23:07

6   because you didn't come up with it on your -- on your own,

7   correct?

8   A.  I did not, correct.

9   Q.  And was that the view that seems to -- seemed to generally

10  prevail, as far as you're aware, over at the MCSO?               14:23:16

11  A.  Yes.

12  Q.  All right.  Now, are you aware of the actual facts now on

13  which this Court made a finding that the MCSO was

14  unconstitutionally detaining people in both its special

15  operations and its normal operations?                           14:23:32

16  A.  Yes, sir.

17  Q.  All right.  Can you review with me what some of those are?

18  A.  The fact that we cannot hold an individual merely on the

19  fact or the belief that an individual is here unlawfully or in

20  the country --                                                  14:23:43

21  Q.  All right.  Let me stop you there.

22  A.  Yes, sir.

23  Q.  Thank you.  I understand that you may have a disagreement

24  about that, but you -- but you understand my -- or perhaps

25  you're indicating you don't have a disagreement about it.  Do   14:23:54

1  you?

2  A.  I do not disagree with that.

3  Q.  All right.  And do you understand that at trial, Sheriff

4  Arpaio, among others, testified that in the two weeks before

5  trial, even though MCSO wasn't conducting special operations,    14:24:05

6  they detained 40 people that they couldn't -- that they

7  couldn't charge with a state crime and turned them over to ICE.

8        Do you remember that that was one of the bases on

9  which I based my determination?

10  A.  I'm only now becoming aware of that in reading the 145    14:24:20

11  pages.  I was not part of that trial process, so --

12  Q.  That's true.  I don't remember you testifying at trial, and

13  I didn't mean to imply that you had.

14        Did you attend any part of trial?

15  A.  No, sir.    14:24:37

16  Q.  All right.  But now that you've read the order, you realize

17  that that was a basis on which I entered the order.

18  A.  Among other things, yes, sir.

19  Q.  Yes.  Can you review what some of those other things are?

20  A.  It's quite lengthy.    14:24:47

21  Q.  Fair enough.  I mean, I'll review a few points, but

22  there -- I spent a long time on that order, and I'd reviewed --

23  what I think, I reviewed the evidence quite extensively.  And

24  do you understand that one of the reasons I did that is whether

25  or not the MCSO agreed with me, I wanted them to understand    14:25:07

1    clearly the bases on which I found that they were violating the

2    constitutional rights of the plaintiff class?

3            Do you understand that?

4    A.  I absolutely understand that.

5    Q.  And do you understand why it would be crucial that you, as          14:25:19

6    the commander of those operations, have that understanding and

7    that it be a correct understanding?

8    A.  And it shall be.

9    Q.  Now, I mean, you're aware that I found that after the

10   287(g) authority was revoked --                                         14:25:41

11   A.  Yes.

12   Q.  -- that the sheriff trained all 900 deputies that they had

13   the inherent authority to enforce immigration law and that it

14   was a crime to be here illegally?

15   A.  I am reading that now, yes.                                         14:25:53

16   Q.  All right.  And you understand that even before 287(g)

17   authority was revoked that to the extent MCSO was using

18   noncertified officers to detain people that they believed were

19   in the country without authorization, that that was also a

20   violation?                                                              14:26:10

21   A.  I haven't -- I don't recall that specifically.

22   Q.  That's all right.  In any case, and we don't have to go

23   over these, you remember that there was a LEAR policy that I

24   found that was unconstitutional?

25   A.  I have read that, yes, sir.                                         14:26:21

1   Q.  And you found -- and you remember that I had entered a

2   preliminary injunction in December of 2011 and I found that the

3   MCSO had not complied with my injunction?

4   A.  I have read that just within the last day or two, sir.

5   Q.  And you remember that Chief Sands, Lieutenant Sousa,                14:26:35

6   Sergeants Palmer and Madrid, among others, testified that that

7   was the current practice of the MCSO?

8   A.  I have read that, yes, sir.

9   Q.  All right.  So I think there's lots of other bases on which

10  I found that the detentions that the MCSO was doing both in the       14:26:50

11  operations and outside of the operations were not

12  constitutional, and you're now familiarizing yourself with

13  those?

14  A.  As quickly as I can.

15  Q.  All right.  Now, let me ask you, another point that you           14:27:02

16  made to that assembled group was that I found that two MCSO

17  officers unconstitutionally used race as one factor among

18  others in making law enforcement decisions.

19          Do you remember making that statement or something

20  like it?                                                              14:27:22

21  A.  Yes, I do.

22  Q.  Do you have any idea who those two officers you assert I

23  based my testimony on were?

24  A.  I believe it might have been Armendariz and Rangel, but I'm

25  not a hundred percent certain.                                        14:27:37

1   Q.  Okay.  And that would have been your characterization of

2   their testimony.  There's never anywhere in my opinion where I

3   said that my opinion rested alone on two -- the testimony of

4   two officers, is there?

5   A.  There is not.                                              14:27:46

6   Q.  Do you remember where in the world you ever got -- and I --

7   sorry, that makes it sound unfair, and I believe that -- I

8   believe you're doing your best to give me truthful testimony, I

9   appreciate it, and I appreciate that some of what you're

10  telling me is very embarrassing to you personally, and I don't  14:28:02

11  want to embarrass you any more than I have to --

12  A.  Thank you.

13  Q.  -- so I don't want to be argumentative and I apologize for

14  that.  Do you remember where you got the characterization that

15  my opinion was based only on the testimony of a few officers of  14:28:14

16  what they did, my opinion specifically that found that you --

17  you know, I -- I have been careful to avoid the term "racial

18  profiling," but I do think that my opinion clearly finds that

19  the MCSO, both as a matter of policy and practice, in and

20  outside of saturation patrols, used race as one factor among    14:28:36

21  others in making law enforcement decisions.

22          Can we agree that -- that my decision says that?

23  A.  It does, yes, sir, and I agree.

24  Q.  And my decision also found, or this Court's decision found,

25  that that was unconstitutional.                                 14:28:54

1          Do you agree that that's what the decision says?

2   A.  Yes, sir.

3   Q.  All right.  Do you have any recollection where you got the

4   characterization that that decision was based only upon the

5   action of two officers?                                        14:29:08

6   A.  Your Honor, both of those statements that I made were

7   usually hand in hand, if you will, so not knowing where I

8   specifically heard my first incorrect statement regarding 14

9   seconds longer, I can no more tell you where the other usually

10  hand-in-hand statement of and two deputies were found to have   14:29:31

11  used race when making the determination whether or not to

12  arrest somebody, they were -- they were joined together usually

13  in that conversation or where I had heard those things.

14  Q.  All right.  And is it fair to say that if they are joined

15  together, you'd heard it from a number of different sources     14:29:50

16  throughout the MCSO over the six-month period that preceded

17  your participation in the community meeting a few weeks ago?

18  A.  Yes, sir.

19  Q.  All right.  And you -- you couldn't identify any particular

20  source but that it was many sources, is that fair?             14:30:04

21  A.  Several, many, yes, sir.  I can't argue -- I can't say one

22  way or the other.

23  Q.  But if I were to say, Was it more than 20? could you answer

24  that?

25  A.  I think 20 might be a little bit much.  I really can't put   14:30:21

1   a number on it, to be honest with you.

2   Q.  All right.  That's fine.  And I'm not --

3   A.  Okay.

4   Q.  -- trying to --

5   A.  Sure.                                                          14:30:31

6   Q.  I'm just trying to be as specific as we can be, but I'm not

7   trying to suggest that you should in any way be uncomfortable

8   with the testimony that you give me.

9   A.  Thank you.

10  Q.  You also indicated, I believe -- well, let's talk for a      14:30:39

11  second.  You've now read my order.

12  A.  Yes, sir.

13  Q.  Do you understand the bases on which -- the multiple bases

14  on which I found that the MCSO used race as one factor among

15  others in making law enforcement decisions?                      14:31:03

16  A.  Yes.

17  Q.  What are some of those?  Again, there are many; I'm not

18  going to require you to list them all.  But there are -- I want

19  to make sure that you have some idea of the depth and breadth

20  of the evidence on which I based my findings.                    14:31:16

21  A.  And I apologize.  Could you repeat the question one more

22  time?  I was --

23  Q.  Sure.  Can you list what some of the bases of this Court's

24  factual findings were?

25  A.  Again, that we had detained drivers longer than was          14:31:29

1   reasonably necessary under the fourth and four -- I'm sorry.

2   Q.  I've already kind of covered the Fourth Amendment part.

3   Now I'm talking about what I will call the Fourteenth Amendment

4   violation, which is loosely called racial profiling.  We're not

5   going to use that term, because what it is more precisely is          14:31:47

6   the determination that the MCSO used race as one factor among

7   others in making law enforcement decisions in a way that was

8   not constitutional.

9        Do you understand my question now?

10  A.  I don't, and I apologize.  I'm not trying to be difficult.        14:32:00

11  Q.  No, no, no.  Do you understand, for example, that I looked

12  at the reports that were made from what I called day labor

13  operations?

14  A.  Yes, sir.

15  Q.  And that I found that the only vehicles that were pulled          14:32:14

16  over during day labor operations were the vehicles that had

17  picked up a Hispanic occupant?

18  A.  I recall that now.

19  Q.  And do you recall that during what I called small --

20  small-scale saturation patrols, vehicles were only stopped that      14:32:25

21  had Hispanic occupants, apparently, by a number, at least, of

22  the arrest reports detailing the number of stops made during

23  the operation?

24  A.  I do recall that in your order now.

25  Q.  All right.  And do you recall that I similarly traced --         14:32:40

1    traced through the fact that the location for the large-scale

2    saturation patrols was based at least on some of the same

3    locations in which you'd conducted both small-scale saturation

4    patrols and day labor operations?

5    A.  I don't recall that in the order, but I don't doubt that          14:32:57

6    it's there, either, sir.

7    Q.  All right.  Well, thank you.

8         Do you recall that Sheriff Arpaio, Chief Sands, and

9    others, indicated that they did use race as one factor among

10   others in determining who -- when officers determined who they      14:33:10

11   would question once a vehicle was pulled over?

12   A.  I remember something in the order that stated the fact

13   that -- that people who were of Latino ancestry were

14   questioned.  I don't recall all of the details to -- to who

15   that was attributed to.                                             14:33:30

16   Q.  Do you recall that I discussed MCSO press releases that

17   indicated that they weren't racially profiling because race

18   wasn't the only factor used in determining which vehicles to

19   pull over?

20   A.  Yes, sir.                                                       14:33:44

21   Q.  And do you recall, for example, my determination about the

22   fact that despite the testimony of some, but not all, MCSO

23   officers that there was a zero tolerance policy, that there was

24   in fact no such zero tolerance policy, or, if there was, it had

25   not been communicated to officers?                                  14:34:03

1   A.  Yes, sir.

2   Q.  All right.  Now, you indicated that the actions of the

3   officers were directed to the ICE training that you received,

4   and in fact, in my decision, I did find that there was evidence

5   that you were mistrained by ICE in this regard.  But I did not          14:34:18

6   make any finding, did I, that the unconstitutional actions of

7   the MCSO were the result of the ICE training?

8   A.  Not that I noticed or read, sir.

9   Q.  All right.  Now, you indicated in the meeting that you

10  disagreed with my order, and as I've indicated, that is                 14:34:40

11  something you certainly have the right to do, as long as you

12  correctly train your officers about the nature and basis and

13  understanding and effect of my order, and the factual bases on

14  which it was made.  But you also indicated that the Sheriff's

15  Office was appealing my order.                                          14:34:59

16          Now, in fairness to you, that appeal had not been

17  filed at the time that you made that representation but it has

18  since -- the opening brief in the appeal has since been filed.

19          Are you aware of what -- what parts of my order the

20  Sheriff's Office is -- or the sheriff has appealed and what             14:35:15

21  parts of my order the sheriff has not appealed?

22  A.  No, sir.

23  Q.  When you said to the people in the community that my --

24  that the sheriff was going to appeal the order all the way to

25  the Supreme Court, what impression were you trying to give              14:35:29

1    them?

2    A.  Your Honor, I was responding to a question that had been

3    asked of me by someone in the audience, and I was, as I had

4    stated at the beginning of that meeting, being honest with

5    them.  And so I was simply telling them what I knew, or had          14:35:49

6    been told or heard, with regards to what I incorrectly believed

7    to be how we got to this point, and then the fact that there

8    was an appeal that was going to be filed and that the sheriff

9    has stated -- publicly, I believe -- that he would appeal it

10   all the way up to the U.S. Supreme Court.                             14:36:12

11   Q.  And you also expressed, I believe, a lack of confidence in

12   the Ninth Circuit to make the right decision, is that fair to

13   say?

14   A.  That is fair to say.  I did say it.

15   Q.  Where did you get that impression?                               14:36:25

16   A.  From the Ninth Circuit -- or rather --

17   Q.  I'm talking about the Ninth Circuit -- about the Ninth

18   Circuit's -- about your lack of confidence in the Ninth Circuit

19   in terms of your appeal.

20   A.  Over the years I have seen or heard, I suppose, that -- if       14:36:37

21   I'm being honest, as I have to be here -- that the Ninth

22   Circuit was very liberal, and that this appeal probably

23   wouldn't get -- get any results, or at least the results that I

24   anticipated that the Sheriff's Office was looking for.

25   Q.  Do you remember whether that was part of the training that       14:37:02

1    Chief Sheridan gave that you recall hearing from

2    Chief Sheridan?

3    A.  No, sir.

4    Q.  Do you remember hearing from Chief Sheridan the idea

5    that -- I think Chief Sheridan said three, not two, but do you          14:37:16

6    remember him saying that my decision resulted merely from the

7    acts of three officers?  Do you have any recollection of that

8    at all?

9    A.  No, sir.

10   Q.  All right.  Let me ask, did you participate -- have you              14:37:24

11   participated in any other community meetings like the one that

12   you participated in on the 15th?

13   A.  Yes and no.  The one on the 15th, sir, was a -- a voluntary

14   meeting, if you will, one that had been requested of us, and

15   not court ordered or court mandated that we perform, so yes is          14:37:42

16   the answer.

17   Q.  And you have also participated in some court-mandated

18   meetings.

19   A.  Yes.

20   Q.  And in those court-mandated meetings did you ever                   14:37:50

21   characterize the Melendres versus Arpaio decision?

22   A.  I did not.

23   Q.  Were those meetings videotaped?

24   A.  I be -- yes, sir.  Yes.

25   Q.  I noted that there were handouts that you made at the 15th          14:38:04

1    of March meeting, is that correct?

2    A.  Our implementation unit brought with them the -- the

3    pamphlets or the books, integrity-accountability handbooks, and

4    I believe they also brought some other pamphlets, but I'm not

5    sure as to what they were.                                    14:38:25

6    Q.  Okay.  Did you review that material?

7    A.  I have reviewed the integrity-accountability book, for lack

8    of a better term, in the past, and I don't recall if I've

9    looked at the other pamphlets.  I may have, I just -- I don't

10   recall if I have or haven't at this point.                    14:38:39

11   Q.  How did you first find out about the March 15th meeting,

12   and how did you come to participate in it?

13   A.  Sure.  At the December 2013 meeting, and it was the latter

14   part of the month, I'm not exactly sure of the exact date, but

15   it was a Saturday, and it was one of, I believe, seven         14:39:01

16   community meetings that, per your order, we were required to

17   perform before the end of the year.  And the location that I

18   was to be at was the one located down on -- at our -- what

19   we -- Dysart and Avondale Road.

20           And at that meeting there were two women that actually 14:39:24

21   approached us at the end, and they asked if we would be

22   willing -- "we" being myself and the other deputy that was with

23   me -- to attend a meeting that they organized that they

24   scheduled date/time/location, to which we said, Sure, you bet.

25   We'd be happy to do that.                                     14:39:44

1    Q.  Let me ask, have you ever been present in trainings in

2    which the Melendres versus Arpaio findings of fact or other

3    decisions were discussed?

4    A.  I know I'm not supposed to guess, but for some reason I --

5    I recall something, something that had to do with that, but I'm          14:40:09

6    not a hundred percent sure.

7    Q.  All right.  I understand that you're not a hundred percent

8    sure, but to the extent you have any recollection, when would

9    that have been?

10   A.  Yeah, I'm -- I'm not sure I actually was at something like           14:40:30

11   that.  I may be confusing the conversations regarding Melendres

12   in your order as training, which they were clearly not.

13   Q.  Do you have any other impressions that you feel like you

14   could testify to about any such training?

15   A.  No, sir, not that I can recall right now.                            14:40:46

16   Q.  All right.  I think you testified earlier that you've never

17   seen anything in writing, electronically or otherwise, that

18   would attempt to characterize my decision that was distributed

19   within the MCSO?

20   A.  I'd received the e-mails that contained the order.  I --             14:41:09

21   ashamedly, again -- never opened them up and simply read them.

22   Q.  All right.  And none of your command staff ever indicated

23   that you should read it.

24   A.  I believe I recall Chief Sheridan saying that we -- we

25   needed to read this.                                                     14:41:33

1    Q.  And you just didn't do it.

2    A.  I did not.

3    Q.  Are you aware of anyone else that has read my order in the

4    MCSO?

5    A.  Not that I could testify that in fact they did, no.  But          14:41:42

6    that's not to say, Your Honor, that they didn't.

7    Q.  I understand.

8    A.  Okay.

9    Q.  But you don't have any personal knowledge, other than

10   yourself, that anyone at MCSO has read my findings of fact and        14:41:56

11   conclusions of law in its entirety.

12   A.  Correct.

13           THE COURT:  Chief, I think I'm done with my questions

14   for you, but in fairness, I'm going to give your counsel the

15   opportunity to ask you any follow-up questions if they wish.          14:42:11

16   Then I'm going to give Mr. Pochoda the same opportunity if he

17   wishes, and then I might have a few other clarification

18   questions.  But I do thank you for appearing, and I thank you

19   for being as truthful as you could be.

20           THE WITNESS:  Thank you, sir.                                  14:42:27

21           THE COURT:  Mr. Casey.

22           MR. CASEY:  Your Honor, may I have plaintiffs'

23   counsel, if he chooses, to question first, since I guess

24   technically it's my witness.

25           THE COURT:  Yeah, I think that's fair.                         14:42:34

1          Mr. Pochoda do you have any questions for

2    Chief Trombi?

3          MR. POCHODA:  I just had one, Your Honor.

4                    EXAMINATION

5    BY MR. POCHODA:                                          14:42:39

6    Q.  Chief, have you read the op-ed piece Chief Sheridan wrote

7    and put in the newspaper?

8    A.  That was in the Arizona Republic?

9    Q.  Yes.

10   A.  I believe I did, sir, yes.                           14:42:50

11   Q.  And do you recall anything from that piece?

12   A.  Do I -- I'm sorry, sir?

13   Q.  Do you recall that that piece, let me be more specific,

14   included this statement that the -- that detentions were found

15   to be illegal because of this 14-second gap?              14:43:04

16   A.  I don't recall reading that in there, but I don't know if

17   it was or wasn't.

18   Q.  But you would have read it approximately the date it was

19   published in the Arizona Republic, is that correct?

20   A.  Possibly.  I don't know.  I can't tell you exactly if it   14:43:18

21   was the day it came out, couple day -- I don't know.

22   Q.  And other than that, the judge asked you had you read

23   anything in writing that characterized the requirements under

24   the order for the MCSO personnel, including yourself?

25   A.  Not until just recently being -- reading the judge's      14:43:37

 1   hundred-and-some-odd pages, and then the -- the other document

 2   that -- or order that he placed on us.

 3           MR. POCHODA:  Thank you.  Nothing further.

 4           MR. CASEY:  Your Honor, I have no questions, but I do

 5   have -- would like to address the Court and express -- express          14:43:53

 6   some points and make an objection for the record.

 7           THE COURT:  All right.  Do you want to do that at the

 8   end?  Because there may be some other objections you want to

 9   make for the record, but if you'd like to do it now, that's

10   fine with me.                                                           14:44:07

11           MR. CASEY:  Yeah, let's do this, perhaps, piecemeal,

12   Your Honor.  Very briefly, let me tell you what defense counsel

13   has tried to do to figure out about this 14 seconds and the two

14   persons, and I think --

15           THE COURT:  You know what?                                      14:44:20

16           MR. CASEY:  Yeah.

17           THE COURT:  I really don't want to cut you off.

18           MR. CASEY:  Okay.  If the Court's --

19           THE COURT:  But in terms -- just for what it's worth,

20   Mr. Casey --                                                           14:44:30

21           MR. CASEY:  Yeah.

22           THE COURT:  -- I have no presumption that -- and no

23   reason to believe that counsel has acted other than

24   professionally in this matter.  I am not, with all due respect,

25   not really interested in the counsel that you would have given        14:44:42

```
 1    to your clients.  It's none of my business, anyway.
 2            What I'm interested in is what your clients have
 3    done --
 4            MR. CASEY:  Yes.
 5            THE COURT:  -- in terms of reading the order, and        14:44:51
 6    informing themselves about the order, and fairly characterizing
 7    the order within the MCSO, so what the perception is there.
 8            MR. CASEY:  Sure.
 9            THE COURT:  And I believe that from Chief Trombi I've
10    received what I need to -- needed to hear.                      14:45:04
11            So if you want to tell me about that, that's fine,
12    I'll give you time to do it, but I want to do it at the end of
13    the meeting, okay?
14            MR. CASEY:  Okay.  It's -- yeah, it is less about
15    anything about counsel, but I think it -- what I was going to   14:45:16
16    share with you I thought at least for edification, because your
17    order mentions concerns about operating in good faith, it
18    really doesn't -- look, we've made our advice and
19    recommendations as counsel.  We're not concerned, really, one
20    way or the other about some of the things you mentioned.        14:45:35
21            But what we are concerned about is addressing to you
22    what we've tried to piece together about how this comes
23    together that it's --
24            THE COURT:  All right.  Well, let me tell you where --
25            You can step down, Chief.                               14:45:46
```

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Thank you.  Let me tell you, I am going to

3    raise in a few minutes, but it's going to be in a few minutes,

4    some concerns about whether any additional modifications need

5    to be made to the injunction about the training, and I think          14:45:57

6    that what you say might be helpful in that context, and perhaps

7    even more helpful in that context, so can I get you to put it

8    off until then?

9          MR. CASEY:  Your Honor, it's your court.  Yes, Your

10   Honor.                                                                 14:46:15

11         THE COURT:  But you did have an objection you wanted

12   to enter?

13         MR. CASEY:  Just briefly for the record, Your Honor,

14   I'm sorry.  I just wanted to place on the record, because we do

15   have an appeal, an objection, respectfully, Your Honor --             14:46:22

16         THE COURT:  Yes.

17         MR. CASEY:  -- an objection that your rulings on the

18   non-saturation patrol days, or the regular patrol days set

19   forth in your May 24th, 2013, order, not as you have

20   characterized those particular bases in your order.                   14:46:38

21         I'm not suggesting anything in that, other than I have

22   not had a chance to study how you characterized your questions

23   with those factual findings --

24         THE COURT:  That's fine.

25         MR. CASEY:  And I don't want it to be used by anyone            14:46:52

1   in amici or otherwise to suggest that your characterization

2   today is the ruling, and that -- I don't believe that's the

3   case.

4          THE COURT:  That is not the case.  Whatever I've said

5   in my order, to the extent you feel I may have characterized it    14:47:03

6   differently today, whatever I said in my order is what I said

7   in my order and that is what my order contains.

8          MR. CASEY:  And the final objection, Your Honor, is

9   there were some characterizations about the testimony of

10  Sheriff Arpaio and Chief Sands, and I just wanted to put on the    14:47:18

11  record just the objection that we have the trial transcript

12  that will address what exactly they said.  Obviously, the

13  Court's order drawing its conclusions is its findings of fact

14  dated May 24th, 2013, but the transcript dictates exactly what

15  the witnesses said.  Thank you.                                    14:47:37

16         THE COURT:  I agree that the transcript states exactly

17  what they said.  Let me say that to the extent there's any

18  difference in what they said and what my order finds, my order

19  is the part you have to worry about.

20         MR. CASEY:  Absolutely, and I also want to place on         14:47:49

21  the record that I totally -- I completely agree with the Court.

22  You're able to draw inferences from the testimony and reach

23  your own conclusions.  I just wanted to place on the record

24  that the testimony is in the record --

25         THE COURT:  Correct.                                        14:48:04

1        MR. CASEY:  -- your conclusions are in your order.

2        THE COURT:  That's correct.

3        MR. CASEY:  Yes, sir.  Thank you.

4        THE COURT:  Now, let me raise another point with both

5   parties before we proceed with other matters, and you've given      14:48:11

6   me some -- I've given you some draft changes, you've given me

7   your feedback; I want to cover those.

8        But I do believe that -- and it's a point, I think,

9   counsel, that you've alluded to, my order is my order, and to

10  the extent that you have appealed my order, there -- there is      14:48:32

11  some -- there are some very real limits on my ability to now

12  change that order.

13       But I don't think, and I don't mean to mischaracterize

14  your views expressed last week, there was a whole lot of

15  disagreement about the fact that I still have the right to         14:48:50

16  enforce my order, and that -- well, I'll quote to you from

17  Hoffmann v. Beer, which is at 536 F.2d 1268, quote:  "... where

18  the court supervises a continuing course of conduct and where

19  as new facts develop additional supervisory action by the court

20  is required, an appeal from the supervisory order does not         14:49:12

21  divest the district court of jurisdiction to continue its

22  supervision, even though in the course of that supervision the

23  court acts upon or modifies the order from which the appeal is

24  taken."

25       So clearly, the revisions to the order I sent out for         14:49:27

 1    you to comment on do revise the order in some aspects.  They

 2    revise the order because I found that, last week, and we don't

 3    need to go through everything we found last week, the sheriff

 4    does not want to participate in the community outreach efforts

 5    that the order contained.                                      14:49:51

 6          As I considered my ability to enforce that order, I

 7    was uncomfortable with the thought that I would hold the

 8    sheriff in contempt for saying whatever he wanted to say in a

 9    community meeting, and because that didn't really accomplish

10    the purpose for which the order was implemented, because there  14:50:04

11    were, I think, legitimate doubts by plaintiff about the

12    adequacy of the implementation, even though I'm not necessarily

13    making a finding of that, the sheriff didn't want to

14    participate in that, he didn't want to participate in the

15    community advisory board, I stayed the order at the -- at the   14:50:20

16    sheriff's suggestion, and I didn't hear a whole lot of dispute

17    from the sheriff's office that I could revise the order in that

18    respect.

19          If you want to say something on the record or indicate

20    whether I'm right or wrong, Mr. Casey, now's the time to do it.  14:50:33

21          MR. CASEY:  Your Honor, I would agree with your

22    assessment that you have what we describe as supervisory

23    jurisdiction over your order and the ability to enforce it

24    without impacting the appeal.  I don't think there needs to be

25    any remand or anything like that.  The sheriff's particular      14:50:50

1   objection was not to community outreach, which he intends to

2   do, which he has been doing as demonstrated by the voluntary,

3   but being compelled by a federal court to do that.  That --

4           THE COURT:  All right.

5           MR. CASEY:  -- was the distinction I just wanted to          14:51:05

6   put on the record.

7           THE COURT:  I recognize that that's the sheriff's

8   position, and let me just say -- and to the extent this is part

9   of your appeal existing then it will be judged just the same as

10  every other part of my appeal, or my order.  But I think the     14:51:21

11  order itself indicates that there was a significant part of the

12  Maricopa County population, and I've said this before, I said

13  it last week, that has been deprived for a considerable

14  number of years of some basic constitutional rights, and that

15  in that light, some community outreach is required.              14:51:37

16          I understand the view that you've set forth.  The

17  sheriff wants to do it on his own, he does not want to do so

18  under any supervision of the Court, and that does not change my

19  view that in light of the constitutional violations that I

20  found, that particularly the community that had its rights       14:51:59

21  infringed is entitled to have confidence in the process which

22  the Court orders to effectuate change.

23          So to the extent that the sheriff chooses not to be

24  involved, I am going to order that the monitor assume those

25  functions, and that's why I sent out my order, and that's going  14:52:18

```
1   to be the basis on which I enter that order as well as

2   everything that was said last week.

3           Any questions about that?  I realize there may or may

4   not be disagreement.

5           Mr. Casey?                                          14:52:33

6           MR. CASEY:  Your Honor, I mean, we -- we filed

7   something yesterday.  I take it you received our --

8           THE COURT:  I have, and I'm going to go over those

9   things --

10          MR. CASEY:  All right.                              14:52:41

11          THE COURT:  -- point by point with both parties.

12          MR. POCHODA:  No questions, Your Honor.

13          THE COURT:  All right.  Well, then let's take up,

14  then, and I intend to take up the proposed revisions to my

15  draft order made by the ACLU first, and then we'll go over your 14:52:53

16  proposed revisions from the MCSO.

17          Paragraph 109, the ACLU wanted me to -- instead of one

18  community meeting, wanted me to do one on the east side, one on

19  the west side, and then do up to three community -- or three

20  meetings on both sides as opposed to the one to three in each  14:53:27

21  district.

22          Do you want to be heard on that at all, Mr. Pochoda?

23          MR. POCHODA:  Well, we just want to say briefly, Your

24  Honor, we were trying to balance.  We very much appreciated

25  the -- the draft from the Court that recognized the importance 14:53:38
```

```
 1    of community involvement.  We wanted to balance that with the
 2    practicalities of people being able to turn out, and we thought
 3    that it would be more effective if we didn't go by the five
 4    districts.  As it turns out, I would think it would make it
 5    easier on the defendants to basically split the county into two          14:53:56
 6    districts and only have two meetings per year as opposed to
 7    five districts, with three meetings per year in each district.
 8    So we were trying to work out the practicalities to have an
 9    effective format for the meetings.
10            THE COURT:  Anything you want to say on that,                    14:54:13
11    Mr. Casey?
12            MR. CASEY:  Your Honor, I think most of the comments I
13    would say -- may I go over here?
14            THE COURT:  Yeah, but I -- I hope your comments aren't
15    going to be too terribly long, because we've got a lot to go            14:54:24
16    through.
17            MR. CASEY:  Your Honor, most of my comments are
18    identical on this.  The question that the defendant has, it's
19    really the underlying basis of everything of the objection, is
20    that your remedy order is to protect the plaintiffs' federal,          14:54:38
21    constitutional, and statutory rights, but not to go any further
22    than necessary to assure the defendants' compliance with
23    federal law, and the CAB and the community meetings, we're
24    having great difficulty understanding how that assures the
25    MCSO's compliance.                                                      14:55:03
```

1          You know, I understand like today how this will help

2     lead to compliance in understanding the order, because you

3     can't comply unless you understand.  But it seems to me that

4     whether it's my client or the monitor, how -- that seems to be

5     the fundamental question:  How does it assure compliance?        14:55:20

6          THE COURT:  Let me just say, for what it's worth, I

7     understood the basis of your objection, and having made it

8     once, you can just say the same thing if you want to repeat it.

9          MR. CASEY:  No, thank you.

10         THE COURT:  But it does seem to me that because the        14:55:30

11    sheriff does not want to be involved, and I'm not going to make

12    the sheriff be involved, the community meetings and the CAB do

13    change their fundamental nature.  Rather -- and I think your

14    point is correct.  Rather than being -- so I'm going to make

15    some changes.                                                   14:55:46

16         Rather than being something that tries to rehabilitate

17    the MCSO in the eyes of the community, the CAB and the

18    community meetings serve, it seems to me, two essential

19    purposes.  One is to build community confidence in at least

20    what the monitor is doing to monitor and implement my order     14:56:03

21    with the MCSO; and the second is to serve the investigative

22    function of the monitor in terms of taking complaints from the

23    community that your office isn't complying with the order, and

24    being able to investigate those complaints.

25         So it is true, and I am going to make some changes         14:56:24

 1   that reflect that difference.  It's not the monitor's job to

 2   rehabilitate the reputation of the MCSO among the aggrieved

 3   community.  But it is the monitor's job to assure the aggrieved

 4   community and inform the aggrieved community about what the

 5   monitor is doing to assure compliance with my order.  And it is    14:56:40

 6   the monitor's job to take complaints from the community and to

 7   investigate those complaints through the MCSO.

 8          And so I'll make some -- I think I'll make some

 9   clarifying changes pursuant to your suggestions that indicate

10   that that is the nature of the monitor's authority.  And to the    14:56:56

11   extent that your objection nonetheless persists, you've got an

12   appeal, and you've preserved it for appeal.

13          All right, Mr. Casey?

14          MR. CASEY:  Yes -- yes, Your Honor.

15          THE COURT:  All right.  So I'm going to consider the        14:57:08

16   comments made by both sides.  I will say that -- and I don't

17   know if, Chief Martinez, you want to say anything on this

18   point, but one of the things that I've implemented in the order

19   is that if these meetings are adequately noticed and nobody

20   shows up, I've left in my order the ability -- well, that's one    14:57:25

21   eventuality.  The other eventuality is the monitor's still

22   going to have the ability to monitor the MCSO's independent

23   outreach.

24          So if the monitor feels like the MCSO is doing an --

25   an adequate job on outreach, and/or if it notices these           14:57:42

1    meetings and nobody shows up, then I've preserved in the order,

2    and I think you've both noted it, the ability for the monitor

3    to come back and say, These meetings have served their purpose,

4    and recommend the cancellation or the modification of the

5    meeting format.  I'm all into that for both of those reasons.          14:57:57

6            But I've also talked to my monitor, and he's indicated

7    that just to divide it into one-half of the county and the

8    other half of the county is such a large group that it makes it

9    completely infeasible to have any sort of personal impact on

10   the policing.                                                          14:58:19

11           So he recommends that we don't divide into two

12   communities, that we have one community meeting for the whole

13   county one month, and then that we have from between one to

14   three meetings in each district annually, he can decide.  And

15   if we don't get any participation in those meetings so that        14:58:32

16   they aren't doing anything other than providing expense to the

17   county, he's going to come back and say, We cancel these.  Or

18   if he determines that MCSO is doing adequate community

19   outreach, then we cancel these.

20           But if we get participation, if he gets meaningful           14:58:48

21   complaints in these community meetings, then he can pursue

22   them.  And that is something that during the course of the

23   order, as is the case with everything, both parties can make

24   comments to the Court on.  All right?

25           MR. POCHODA:  That's fine, Your Honor.                        14:59:03

1        THE COURT:  Moving on to the next one, it seems to me

2   that you -- in paragraph 110 you want to incorporate the

3   community advisory board within the community meetings, and

4   that just seems to me to confuse the issue, Mr. Pochoda.  There

5   is a community advisory board.  There are community meetings.          14:59:19

6   I'm not going to necessarily coordinate one and require the

7   monitor to discuss what happens at the community advisory board

8   in the community meetings unless the monitor thinks that it

9   makes sense to do so and the information is otherwise public.

10  So I'm not inclined to accept that revision to the order.               14:59:37

11       Do you understand where I'm coming from?

12       MR. POCHODA:  That's fine.

13       THE COURT:  Do you have any comment on that,

14  Mr. Casey?

15       MR. CASEY:  I just repeat my same objection before,           14:59:45

16  Your Honor.

17       THE COURT:  That's fine.  Thank you for doing so in

18  such an economical and efficient manner.

19       On paragraph 110 -- I'm sorry, in paragraph 111,

20  you -- you put something in there, Mr. Pochoda, that says that        15:00:05

21  your representatives and attorneys can attend.  Well, it's a

22  public meeting.  It's a community meeting.  Of course you can

23  attend.  I don't really know that it's necessary to put that

24  line in there.  Is there any reason why I should?  It's a

25  community meeting.  Anybody can attend.  It's open to the              15:00:21

 1  public.

 2         MR. POCHODA:  That's fine.

 3         THE COURT:  Do you want to repeat again your same

 4  objection, Mr. Casey?

 5         MR. CASEY:  Same objection, Your Honor.  Thank you.    15:00:30

 6         THE COURT:  All right.  Again in paragraph 111 you

 7  have the CAB in there again.  Again, we talk about CAB in a --

 8  in a minute in a different section but I want to keep the two

 9  separate.

10         Do you understand why I'm not inclined to put the CAB   15:00:43

11  in here?

12         MR. POCHODA:  We are.

13         THE COURT:  All right.

14         MR. CASEY:  Same objection, Your Honor.

15         THE COURT:  Thank you, Mr. Casey.                       15:00:49

16         In fact, can I just say that with respect to

17  everything you have the same objection, and then the only time

18  you have to indicate is if you have something in addition to

19  that.

20         MR. CASEY:  Yes, I agree, Your Honor.  Thank you.       15:00:59

21         THE COURT:  All right.  Paragraph 112, the plaintiffs

22  suggest 10 days as opposed to one-week notification.  Do you

23  care one way or the other?

24         MR. CASEY:  No.

25         THE COURT:  All right.  Paragraph 112, again you        15:01:14

1    request that I put in here the review -- put in the review

2    authority, Mr. Pochoda, the ability to compel the MCSO to

3    attend such meetings.

4            I'm not going to do that.  I think it would be great,

5    it might be more economical for the MCSO to attend such          15:01:32

6    meetings, but they've made clear they don't want to attend such

7    meetings, and I'm not going to compel them to do something that

8    I would not enforce with the compulsory powers of this Court if

9    they violated.  So I don't see the point in putting that in

10   here now when I don't have any intention of enforcing it later.  15:01:52

11           Now, it may be true that we might arrive at --

12   something might happen in the course of the order that's rare

13   that you would suggest arises to the compulsory power of this

14   Court.  If that's the case you can raise it then.  Again, this

15   is a flex -- this is an order that has flexibility built into    15:02:12

16   it.

17           Do you understand my predisposition?

18           MR. POCHODA:  We do, Your Honor.  I would just say

19   that, well, obviously, if the Court is not planning to enforce

20   it, that would make some of this a nullity, but we want to make  15:02:23

21   clear that the Court has the authority and power to enforce it.

22           THE COURT:  Well, and maybe I do; I'm not deciding I

23   don't have the authority and power.

24           MR. POCHODA:  I just --

25           THE COURT:  But I'm just saying that in terms of the     15:02:35

1   practicality, it's a weird case because Sheriff Arpaio is a

2   politician.  And Sheriff Arpaio has the right, even if I

3   believe, and even if I find that he's misinforming the public

4   about something, unfortunately, he can do that under the First

5   Amendment, or at least even if he can't do it, and even if I                15:02:53

6   have the power to compel him to do otherwise, unless he puts

7   forth a real case that he is doing otherwise sufficient to the

8   fact that it causes me grave concern, I'm not going to hold him

9   in contempt for just that.

10          Now, as I made clear today, and in discussing with          15:03:08

11   Chief Trombi, it doesn't mean that his public statements may

12   not carry over into how the MCSO perceives what he's saying as

13   their leader, and how that impacts their performance of the

14   other -- of the other obligations under this order.  And if it

15   does, the fact that he is misstating things in public and that       15:03:32

16   it is affecting the performance of his officers under the parts

17   of the order will be taken up under those other parts of the

18   order.  It isn't irrelevant, but it isn't a basis alone on

19   which I'm going to find him in contempt.

20          Do you understand what I'm saying?                          15:03:44

21          MR. POCHODA:  We do, Your Honor, and we're somewhat

22   puzzled because we never stated anywhere, including in our

23   suggestions to the Court today, that the sheriff has to attend

24   any one of these meetings, we didn't expect the sheriff to

25   attend any one of these meetings, nor that any particular          15:03:57

 1   message had to be given by any of the representatives of the

 2   MCSO.  And it's clear that by it's very nature, any remedial

 3   order requires, in a number of the provisions, that there be a

 4   mandatory showing up of some representative of the MCSO,

 5   whether it's to take a complaint from a citizen; whether it's          15:04:14

 6   to answer the questions from a monitor.  If the position of

 7   defendants were accepted, there would be no remedial orders

 8   that would persevere under a First Amendment challenge --

 9          THE COURT:  Oh, well --

10          MR. POCHODA:  -- it's just a frivolous position,          15:04:31

11   and --

12          THE COURT:  I agree with all of that.  What I'm

13   talking about and what I indicated last week was I'm talking

14   about orders that I am willing to enforce.  And I don't know

15   that I'm willing to enforce something which is going to require          15:04:42

16   the MCSO to speak even truthfully.

17          I will consider it as relevant as it relates to other

18   obligations, but I'm not sure that I'm willing to enforce such

19   an order, and that's why I'm -- I'm disinclined to enter the

20   relief you request, at least at this point.          15:05:01

21          MR. POCHODA:  I understand.  Just to clarify, I assume

22   you would be looking to enforce that order if, for example, the

23   MCSO representatives did not speak truthfully to the monitor.

24   For example, paragraph --

25          THE COURT:  Oh, absolutely.          15:05:14

```
 1              MR. POCHODA:  -- paragraph 145 requires --
 2              THE COURT:  Absolutely.  If they don't speak
 3     truthfully to the monitor, if I find they're withholding
 4     information from the monitor, and I'm not saying you would do
 5     any such thing, if I find that, they're in huge contempt of my      15:05:23
 6     order --
 7              MR. POCHODA:  Okay.
 8              THE COURT:  -- and I will use the --
 9              MR. POCHODA:  Again, we --
10              THE COURT:  -- compulsory power of the court.               15:05:28
11              MR. POCHODA:  -- obviously defer to your position,
12     Your Honor, but we did make clear that we didn't in any way try
13     to dictate what the response would be by the representative, we
14     didn't expect it to be a command person, necessarily, but
15     someone who had information so that the community advisory          15:05:44
16     boards in particular were more productive.
17              THE COURT:  All right.  Now, on one -- your suggested
18     change on 114C, you know, I'm not saying that the monitor can't
19     report such things at a meeting, but I'm reluctant to compel
20     him to.  It seems to me that if the monitor becomes apprised of     15:06:07
21     an issue at a community meeting and he believes that it's not
22     wise to directly raise that issue with the MCSO, but to
23     otherwise investigate it without raising it with the MCSO, and
24     if it takes more than four months to raise it with the MCSO and
25     fully investigate it, I'm not going to compel him to raise it       15:06:28
```

1    at the next community meeting.  So he may choose to do so, and

2    I'm not saying he can't, but I'm not going to include your

3    requested language in that respect in the order.

4         Do you understand where I'm coming from?

5         MR. POCHODA:  I do, Your Honor.                        15:06:42

6         THE COURT:  Do you want to say anything about that,

7    Mr. Casey?

8         MR. CASEY:  No, Your Honor.

9         THE COURT:  Let me ask, Mr. Pochoda, you've said that

10   the open meeting law has to apply to the CAB.  And I don't mean   15:06:55

11   to suggest that I think that the CAB has to or necessarily

12   should operate in secret.  But there may be times when they

13   want to hold a confidential meeting, and the simple fact of the

14   matter is there is no open meeting law, unless you can give me

15   authority to the otherwise -- to the contrary, that applies to   15:07:12

16   the CAB.

17        You know, I have told you, I told you a while ago that

18   I swore in Chief Warshaw as my -- as the agent of the Court for

19   purposes of being a monitor.  And there is no federal law that

20   applies to court agencies; there is no state law that applies    15:07:29

21   to court agencies.  And so if -- I certainly want to be in

22   compliance with the law, but I am aware of no law that requires

23   the CAB to operate in public.

24        This is, under the revision, not something in which

25   Sheriff Arpaio or the MCSO's going to participate.  They desire   15:07:46

```
 1   affirmatively to opt out.  They're not going to be involved at

 2   all.  And so I don't think there's any -- anything that

 3   applies.  So can you tell me what law you think applies?

 4         MR. POCHODA:  I can't, Your Honor, and it was put in

 5   here under -- for the sake of caution that if there were, it          15:08:03

 6   was not any -- an indication that there were some, but we were

 7   concerned that if one existed, that it should be consistent

 8   with that law.

 9         I admit that in terms of trying to get the inputs to

10   you in a timely fashion, we did not do research to see if there       15:08:19

11   was anyone we could point to, and the intent of this phrase was

12   that if there were any open meeting laws that applied, the

13   decision to hold the meeting had to be consistent with those.

14   If there aren't, we certainly would expect that -- that they

15   would not have to be open.                                            15:08:39

16         THE COURT:  Mr. Casey, do you want to be heard on this

17   point?

18         MR. CASEY:  Well, Your Honor, my clients' objections

19   are previously stated, but it appears to me whether there is an

20   open meeting law or not, this courtroom is open to the public.        15:08:50

21   We have people here.  When light shines on anything that is

22   governmental -- this is quasi-governmental because it is under

23   your creation.  It appears to me that there is a public good

24   that is served by having that body created by this Court open

25   to the public whether or not we can, as counsel, cite to the         15:09:11
```

1    Court a specific statute.

2            Sunshine, as our Arizona law says, is good for

3    government; it's good for wholesome discussion.  I think, quite

4    frankly, if they're going to hold a meeting, it's under -- it's

5    being created by the Court, it ought to be done in public.        15:09:30

6            THE COURT:  I certainly generally agree, but it does

7    seem to me that there are people who might want to issue

8    complaints that would be intimidated from doing so if they felt

9    like they were being monitored and observed by the people

10   they're complaining about, and so in those rare circumstances    15:09:46

11   where such a meeting is appropriate to be held in private, I'm

12   going to authorize the CAB to hold such meetings in private,

13   unless you can give me any authority that suggests I can't do

14   it.

15           MR. CASEY:  Your Honor --                                 15:10:00

16           THE COURT:  And I've got a lot of authority that

17   suggests, quite frankly, that that's exactly what should be

18   done in a monitoring situation; I can cite you some cases if

19   you want.

20           MR. CASEY:  No, sir.  I don't doubt that you have that    15:10:09

21   authority and I don't have any other authority, but it seems to

22   me that we have a provision in the order for increased

23   reporting of complaints directly to MCSO, now you have a system

24   in which you're going to have your monitor now take complaints,

25   and so if the genesis or the motivation behind having a private  15:10:27

```
 1    meeting is to allow people that are sensitive to my clients
 2    watching them do a complaint, I'm not sure that that fully
 3    exists, especially if the whole idea is the monitor can take
 4    complaints then.
 5              THE COURT:  Well, you certainly wouldn't be a good      15:10:43
 6    lawyer if you had -- if you didn't have confidence in your
 7    client, and you've done a fine job of representing his
 8    position.  But with all due respect, and it may be that your
 9    client deserves confidence, but with all due respect, I'm not
10    going to require any of the possible complainants of the        15:10:59
11    community to operate under that assumption.
12              All right.  Now, let's deal with -- as it pertains to
13    the required reevaluation, you know, I'm not going to require
14    that the monitor reevaluate after a year's time, because it
15    seems to me if he comes forward and says, look, we full -- if   15:11:18
16    he comes forward after a month two and says, We fully
17    advertised these meetings, We held it at a convenient time and
18    a convenient place and nobody came, I'm not going to require
19    that to be a year before I knock them off.
20              On the other hand, it may be that during the course of 15:11:34
21    the year the monitor determines that it took that long to have
22    the community come and provide valuable information or receive
23    valuable information and so I'm not going to prevent either one
24    of you from acting as you deem fit, and I'm not going to impose
25    a specific time schedule in which that reevaluation must occur.  15:11:54
```

```
 1    But the monitor will be open to your suggestions and he will be

 2    available to receive them, and, you know, we're certainly not

 3    going to hold these community meetings in private, so you'll

 4    all be aware of the facts of what happens there and move

 5    forward with that.                                            15:12:12

 6            Now let's deal with the MCSO's objection.

 7            MR. POCHODA:  Your Honor, if I may, just briefly on

 8    that, we aren't -- have no problem with that.  I did want to

 9    say that we would distinguish between the community advisory

10    board meetings and the community meetings, and we think that  15:12:24

11    there's significant positives that come out of the meeting that

12    is between basically the community advisory board and the

13    monitor, because the community advisory board will be taking it

14    upon themselves to get inputs between meetings from the

15    community.                                                    15:12:42

16            THE COURT:  Right.

17            MR. POCHODA:  So that can't be judged by who -- the

18    numbers that turn out.

19            THE COURT:  I know.  But that -- the provisions that

20    pertain to the community advisory board are separate from the 15:12:48

21    provisions that pertain to the community meetings, public

22    community meetings.  That's why I didn't want to mix them up as

23    you have done.

24            MR. POCHODA:  Thank you.

25            THE COURT:  They're very separate.  They have         15:13:02
```

1    different meaning.

2              MR. POCHODA:  Thank you.

3              THE COURT:  As it pertains to defendants' objection on

4    paragraph 109, which is something about public trust, what is

5    it, Mr. Casey?                                                    15:13:22

6              MR. CASEY:  Is that the one about the monitor

7    reporting?  I'm sorry.  I didn't bring it, Your Honor.

8              THE COURT:  I have 109, I'll read it:  Monitor shall

9    hold a public meet -- oh, no -- shall hold a public meeting on

10   the east side of Maricopa County -- we've already talked -- oh,  15:13:35

11   I've got the plaintiffs' suggestions, and those I didn't opt

12   for.  I'm sorry, let me get to my own.

13             Monitor shall hold a public meeting in each of MCSO's

14   patrol districts within 180 days of the issuance of this

15   amendment to the order in at least three -- I'm going to say     15:14:03

16   "one to three" -- in each district annually thereafter.  The

17   meeting shall be held under the direction of the monitor and/or

18   his designee.  These meetings shall be used to inform community

19   members of the policy changes or other significant actions that

20   the MCSO has taken to implement the provisions of this order.    15:14:15

21   Summaries of audits and reports completed by the MCSO shall be

22   provided.  The monitor shall clarify for the public at these

23   meetings that the MCSO lacks the authority to enforce

24   immigration laws, except to the extent that it is enforcing

25   Arizona and federal criminal laws.                               15:14:30

1           Any objection to that, Mr. Casey?

2           MR. CASEY:  The same objections I asserted earlier,

3    Your Honor.

4           THE COURT:  All right.  Thank you.

5           110, you've made objections to language in there          15:14:37

6    saying that the monitor shall listen to community members'

7    experiences and concerns about MCSO practices implementing this

8    order, including the impact on public trust.

9           Well, why in the world can't the monitor take

10   complaints from the -- that pertain to this order that detract   15:14:59

11   from the public trust?  In other words, if a community member

12   thinks that you're not implementing the order, that impacts

13   public trust, doesn't it?

14          MR. CASEY:  Your Honor, I understand your position.

15   Our objection is it is too broad and it doesn't assure the       15:15:17

16   compliance of these defendants with federal law.

17          THE COURT:  All right.

18          MR. CASEY:  So it's just the same objection, Your

19   Honor.

20          THE COURT:  All right.  Thank you.                        15:15:29

21          Paragraph 111.  You know, with all due respect,

22   Mr. Casey, it seems to me that your objection is trying to

23   rewrite what the order says.  I'm making it clear you don't

24   have to attend any such meetings and no sanctions are going to

25   follow from your failure to attend the meetings alone.  But it   15:15:45

1    is perfectly legitimate for me to receive a report whether or

2    not you were requested to attend the meetings and you don't,

3    because for one thing, it may impact on my ability and

4    determination as to whether the monitor needs to continue to

5    hold these meetings, and that is the basis of my order.          15:16:05

6           I think I might, in light of the consideration that

7    you've raised, change the language to say the following:  The

8    defendants are under no obligation to attend such meetings, but

9    to the extent they do not attend such meetings after being

10   requested by the monitor to do so, the monitor "may" -- instead  15:16:20

11   of "shall" -- report their absence to the public and shall

12   report their absence to the Court, for the reasons I've

13   indicated.

14          MR. CASEY:  Your Honor, that change is -- we would

15   welcome that, but I also wanted -- I do not waive my underlying  15:16:34

16   objection that I've been asserting here.  And I appreciate what

17   the Court said, because we did read that very differently than

18   the explanation that you provided.  Your explanation makes it

19   very clear.  Thank you.

20          THE COURT:  All right.  Now, just to make sure that       15:16:52

21   you understand, as I've indicated -- well, I don't think that

22   really pertains.  It has to do with misstatements that you make

23   in public as opposed to nonattendance, and I've already -- I

24   think I've made my position clear on that.

25          Paragraph 115, you have objected to the community         15:17:10

 1   trust language.  Let me just say that I don't think that the

 2   community trust language, to the extent it applies to the trust

 3   in what the monitor is doing, is without the scope of my order,

 4   especially when the monitor now has to assume the expense and

 5   the function of doing the community meetings and the community         15:17:35

 6   advisory board.  But I do take your point that it's not

 7   necessarily the monitor's job, unfortunately, to increase

 8   community trust in the MCSO, and the MCSO has decided to opt

 9   out completely from this order.

10        I think I can leave the "increased community trust            15:17:55

11   and" language in there, but if you're more comfortable, I'll be

12   happy to delete the phrase "increased community trust and" so

13   long as you understand that as far as it pertains to the

14   community trust in what the monitor's doing, I believe the

15   monitor has full authority to do whatever is needed to increase     15:18:11

16   the trust in what he's doing, but not in what you're doing.

17        MR. CASEY:  I understand the Court, I agree with the

18   changes that you just proposed, but I do not waive the

19   underlying objections, Your Honor.

20        THE COURT:  That's fine.                                      15:18:27

21        Mr. Pochoda, do you want to be heard on that?

22        MR. POCHODA:  Well, we continue our response to that

23   objection that this entire section is clearly within the

24   remedial powers of the board of this Court, has been used in

25   other cases.  Defendants have not come up with any case before      15:18:41

1   this trial court or in their appellate brief that indicate that

2   this would be beyond the scope, nor any First Amendment

3   violations in this remedial setting, so we think this

4   nitpickiness is -- does not make sense.

5          THE COURT:  I appreciate that.  This is unique in many    15:18:58

6   ways, including mostly there's consent orders, because the

7   agency involved wants to cooperate and this not a consent

8   order.

9          MR. POCHODA:  Most, but not all, Your Honor.

10         THE COURT:  Yeah.  Mr. Casey --                            15:19:09

11         MR. CASEY:  Your Honor, I --

12         THE COURT:  -- please, I have other matters, but I'll

13  hear from you.

14         MR. CASEY:  I pass, Your Honor.

15         THE COURT:  All right.  Now, Mr. Casey, again, in good     15:19:15

16  faith you've indicated to me that you think you can implement

17  training within 120 days after the monitor and the Court

18  approve the curriculum and the instructors.

19         MR. CASEY:  Your Honor, I need to interrupt you.  I'm

20  going to defer on this to Mr. Williams in my office.            15:19:32

21         THE COURT:  All right.  Mr. Williams.

22         MR. WILLIAMS:  And, Your Honor, yes, that is correct.

23         THE COURT:  All right.  I appreciate that.

24         Let me tell you my biggest concern.  We've just heard

25  today that it is widespread -- and I realize that I am          15:19:45

 1    characterizing Chief Trombi's words, so whatever he said, he

 2    said -- but in any case, he indicated that it's widespread a

 3    fundamental misunderstanding about this Court's order and,

 4    frankly, a dismissal of it as being petty and ridiculous when,

 5    in fact, it was extremely wide ranging and cuts to, from my          15:20:07

 6    perspective, almost every aspect of MCSO's external operations,

 7    and yet we've been here now 10 months, almost, from when I

 8    entered those findings of fact and conclusions of law, and up

 9    until last week there was apparently a very widespread

10    misunderstanding and complete mischaracterization of this          15:20:32

11    Court's order within the MCSO.

12            I also want to tell you, in full disclosure, that last

13    week somebody sent me Sheriff Arpaio's campaign fund-raising

14    brochure that was sent out on Wednesday saying people -- that

15    he was being wrongfully accused of racial profiling.  Again, as   15:20:54

16    with Chief Trombi, I want to be careful and say that the

17    Maricopa County Sheriff's Office has used race -- has

18    illegitimately used race as a factor, and to the extent that

19    constitutes racial profiling, that's what it is and that's what

20    I found and the sheriff is saying that people have wrongfully      15:21:14

21    accused him of that as of last Wednesday, which was after the

22    meeting in which he was here.

23            So to the extent that I have a sheriff, who I'm not

24    going to prohibit from mischaracterizing my order publicly, to

25    the extent that I have an MCSO that is rife with a                  15:21:28

1    misunderstanding of my order and a mischaracterization of it

2    when they are the people that have to understand it and

3    implement it, I have grave concerns about who provides the

4    training.

5         Do you understand what those concerns are?        15:21:48

6         MR. WILLIAMS:  Yes, I do, Your Honor.

7         THE COURT:  And so I guess I want to say I appreciate

8    the good faith of you saying that you can get the training done

9    within 120 days -- I want to hear from Mr. Pochoda whether

10   that's adequate -- of the approval of the training materials   15:22:06

11   and the instructors.

12        But first off, I want to know what kind of progress

13   we're making.  I realize that the monitor hasn't approved those

14   things yet.  And frankly, the monitor has to approve those

15   things, because I'm going to make sure that they're absolutely   15:22:22

16   accurate; and that the instructors have integrity; and at this

17   point I'm thinking, and it may be that you're searching for

18   such people, instructors who are not part of the MCSO, where

19   there is already an apparently very wide ranging misconception

20   and misunderstanding of my order.                              15:22:41

21        So do you want to address that for me, please?

22        MR. CASEY:  Your Honor, may I approach the --

23        THE COURT:  You may.

24        MR. CASEY:  Mr. Williams will address the specifics.

25        I think the concern the Court -- we may -- we may        15:22:57

 1   disagree with your characterization, but it's the Court's

 2   characterization that is the important characterization, and I

 3   understand that --

 4          THE COURT:  I'll just interrupt you.  I'm sorry.  And

 5   then I'll try not to interrupt you again.                    15:23:09

 6          MR. CASEY:  Yes, sir.

 7          THE COURT:  Part of my concern is the length of time

 8   that this matter's gone on.  And I think I, in good faith, and

 9   in respect, tried to allow you to arrive at a consent decree.

10   I think one of the things Chief Trombi was honest about in the  15:23:22

11   community meeting is the Sheriff's Office used the consent

12   decree to fund a lot of stuff that it thought was necessary it

13   previously hadn't been able to get funded.

14          So I realize that you used that, you're trying to

15   improve the quality of policing, I'm not concerned about the  15:23:36

16   expense so much, but this has been an awful long time for,

17   frankly, somebody like Chief Trombi never even to have read my

18   order and not even to understand its basis.  And the length of

19   time that goes on is par -- without the correction and

20   appropriate instruction is also a very great concern that I   15:23:55

21   have.  Now --

22          MR. CASEY:  Your Honor, your concern is -- this is not

23   placating -- it's legitimate and it's understandable.  I think

24   Chief Trombi, to his credit, said the word "ashamedly" several

25   times.                                                        15:24:13

```
 1              THE COURT:  And let me say that I appreciate his

 2      efforts --

 3              MR. CASEY:  Yeah.

 4              THE COURT:  -- to believe truthful.

 5              MR. CASEY:  There is -- you know, what I was thinking,    15:24:19

 6      Your Honor, is unquestionably we have an issue, and I've told

 7      you several times from talking to my clients about their

 8      willingness, their intent, and I absolutely can represent that

 9      they have a good faith intent to comply with the letter and the

10      spirit, but everything that you have mentioned is a legitimate,   15:24:39

11      objective concern.

12              One of the things that we addressed last week, and I

13      hope we're not in front of you every other week or so --

14              THE COURT:  Nobody hopes that more than I do --

15              MR. CASEY:  I'm sure.                                     15:24:55

16              THE COURT:  -- Mr. Casey.

17              MR. CASEY:  -- is that one of the things we've got to

18      do is a corrective summary, and defense counsel are working on

19      that and have a version that's very well close that we want to

20      circulate to our client, to Mr. Pochoda and his team, and to    15:25:08

21      the monitor.  One of the things that --

22              THE COURT:  Let me just ask in --

23              MR. CASEY:  Yeah.

24              THE COURT:  -- that respect, does the corrective

25      summary indicate what areas in which the sheriff has appealed   15:25:18
```

1   and what areas in which the sheriff has not appealed my order?

2        MR. CASEY:  Not yet, but I'm recommending -- I'm going

3   to -- here's what I would suggest, Your Honor, is that that

4   corrective action, that we need to have something where a

5   certain level is ordered internally and we are going to          15:25:36

6   recommend that internally the order is read.  No more --

7   there's no more reasons not to read it if you're in a position

8   of command authority.  You've read it from top to bottom.  And

9   that everyone in the MCSO gets the summary that defense

10  counsel, Mr. Pochoda, has approved, the monitor and the Court    15:25:56

11  has approved.

12        And internally I am confident that Chief Sheridan will

13  order his people that they have to read it, because, to tell

14  you the truth, and I will -- Chief Trombi will tell you, he

15  doesn't want to come in here and tell you, I'm a horse's patoot  15:26:14

16  because I didn't read it, but he knows that that shouldn't have

17  happened.  So we have to make these changes because somehow,

18  and I won't bother you with the detail, I think rather

19  innocently, it's like the old circle of the story about people

20  in a circle.  You tell them the light is red, and by the time    15:26:31

21  it goes around, the light is fuchsia or purple.  I think that's

22  how it happened, because we had testimony at trial when Brian

23  Sands was here and people, the 14 seconds is a -- is a fiction.

24  The only testimony with "14" in it is Ralph Taylor's 14 seconds

25  long -- 14 percent longer traffic stops for Hispanics.           15:26:54

```
 1            THE COURT:  Yeah.  And I did --

 2            MR. CASEY:  Yeah.  So --

 3            THE COURT:  It wasn't a big part of my order.

 4            MR. CASEY:  It was not.  It was not part of your

 5   order, but that was the only evidence that was in there, and I      15:27:05

 6   will tell you as to the two, these aren't excuses, but I think

 7   it understands how the circle goes --

 8            THE COURT:  Let me just interrupt you again.

 9            MR. CASEY:  Yeah.

10            THE COURT:  I told you I wouldn't do this.  I want to      15:27:18

11   make something clear.  I mean, you remember we had a huge issue

12   with documents early on in --

13            MR. CASEY:  Yes, sir.

14            THE COURT:  -- this case.

15            MR. CASEY:  Yes, sir.                                      15:27:27

16            THE COURT:  The destruction of documents that,

17   frankly, you had ordered your client to maintain and they

18   weren't maintained.  I didn't even rely very much -- I don't

19   even know if I mentioned it in my order that the documents were

20   destroyed and I could have drawn an adverse inference from         15:27:41

21   that.

22         In my order I also determined that you were in

23   violation of the preliminary injunction that was in case -- in

24   place for 18 months before I even issued my ruling.  I

25   understand that it is conceivable that, as Chief Deputy            15:27:59
```

1    MacIntyre said when he fell on his sword, it was his fault.  I

2    understand that it is conceivable that it was somebody else's

3    fault that my preliminary injunction was never fully

4    implemented.  But at this point I don't care whether there's an

5    innocent explanation.  If my order is violated, I am at the end       15:28:17

6    of my rope, in light of the history of this case, and there

7    will be appropriate measures to ensure and compel compliance

8    with my orders despite good faith noncompliance.

9          MR. CASEY:  Your Honor, I could tell you as counsel

10   that that is a consummately reasonable position at this point.        15:28:37

11   Now, we will come before you and we will defend anything and

12   offer what we think is exculpatory or appropriate.  But the

13   goal here is not to come before you and ever force you to use

14   those -- I think you used two weeks ago "coercive powers."

15   No one wants that.  My clients don't want it.  You don't want        15:29:04

16   it.  You have that authority.  There has been -- there are no

17   more excuses.  It has to get done.

18          As a former athlete, it doesn't make a difference how

19   hard you try on the field:  You either win or you lose.  We

20   either win or we lose.  Now we have to perform.  And the fact         15:29:21

21   of the matter is is when people aren't reading things and

22   there's mischaracterization, even though it's innocent and

23   there are explanations for it, and I personally, you know,

24   evaluate, Is there bad faith? -- because that has to stop --

25   and I determine it's good faith and innocent, nonetheless,            15:29:40

1    whether it's good faith or innocent, it stops.

2           The issue is when you have an institution, whether

3    it's General Motors, Ford, or a smaller one but still large

4    like the MCSO, there is a bureaucracy and there's a difference,

5    there's a difficulty because of the size.  I think that's part      15:29:58

6    of it.  But my clients understand, it changes.  No more of

7    this.  We understand you're at the end of the rope.  No one

8    wants to do this.  You don't want to be back here.  So what

9    we're trying to do is figure out:  How do we make sure that

10   this nonsense about 14 percent is gone, or 14 seconds is           15:30:19

11   gone --

12           THE COURT:  And two --

13           MR. CASEY:  All those things.

14           THE COURT:  -- or three officers --

15           MR. CASEY:  I mean --                                       15:30:28

16           THE COURT:  -- when it was --

17           MR. CASEY:  Yeah.

18           THE COURT:  -- the sheriff and others themselves.

19           MR. CASEY:  Yeah.  They're all -- and I won't spend my

20   time, there are explanations why I think that's how it got         15:30:38

21   around the water cooler that way.  And I think, perhaps, you

22   know, people want to believe what they want to believe.  But

23   the reality is you've made your orders, we respectfully

24   disagree with some of it, we understand that we have that

25   appeal, but the fact is --                                         15:30:51

1           THE COURT:  It's the law.

2           MR. CASEY:  -- it's the law.  Come heck or high water

3     it's the law.  And it's going to be complied with.  If I didn't

4     believe that, I wouldn't be up here representing that, but I

5     understand the proverbial proof is in the pudding.  My client          15:31:02

6     has to produce now.  We're either going to perform or we're

7     not.

8           So what I'm saying with you is I think the first step

9     towards solving the problem with Dave Trombi today and with the

10    chief deputy was the corrective action.  I think we need to          15:31:18

11    roll in a clarification.  I also think -- and I'm not asking

12    for an order, I'm not asking that -- but for our client that

13    it's mandatory that these guys at command level have to read

14    everything, and that the summary that is going to be approved

15    by everyone has to be read office/patrol-wide, sworn deputy          15:31:38

16    side -- I'm not talking the detention, the officers there, but

17    the sworn deputy side -- so no one ever again says:  I didn't

18    read it; and that it is inexcusable to say:  I got it, I was

19    told to read it, but I didn't read it.  No more.  It's your job

20    duty to read it, to understand it.          15:32:05

21           I think we need to do that because your order is long

22    but it's clear.  The summary we put together is still rather

23    long, but it's clear.  And we started that with Chief Trombi,

24    part of that summary, in helping him fully appreciate what was

25    in your order.  I think that is a real productive, tangible          15:32:21

 1  tool to make sure that we're not before you again, and that

 2  it's -- from here on out it's us, the plaintiffs and the

 3  monitor, and the monitor reporting to the Court.

 4          THE COURT:  I appreciable that.  Let me ask you, and I

 5  didn't mean to interrupt you.  I've waited until you --                    15:32:37

 6          MR. CASEY:  No, I'm sorry.  I'm long-winded.  I

 7  apologize, Your Honor.

 8          THE COURT:  What do you intend to do about training?

 9  You can understand at this point I have zero confidence that --

10          MR. CASEY:  Yeah.                                                  15:32:48

11          THE COURT:  -- an MCSO officer whose sheriff is out

12  saying that my order is illegitimate or mis -- wrongfully

13  accuses him of something can adequately train officers about

14  what really is in my order.

15          MR. CASEY:  Two responses.  First, I understand and     15:33:05

16  appreciate your concern.  The second thing is I respectfully

17  submit that's too broad of a brush to paint a line deputy even

18  at a -- like a lieutenant level who might be doing training, by

19  saying that if Arpaio sends out through his private political

20  campaign something that says something, that might be protected  15:33:24

21  First Amendment.  Your concern is the trickle-down effect, the

22  influence it's going to have.

23          I don't think it's fair to say that everyone in the

24  MCSO is going to be affected, maybe the Court would say

25  polluted by that, and that therefore MCSO is excluded from       15:33:41

1    that.  I understand the Court's concern.  It's an objective,

2    valid one.  But I wanted to say that I do not think because

3    it's a large organization and you have a lot of people,

4    including the men there --

5             THE COURT:  Let me ask a couple of questions.          15:33:55

6             MR. CASEY:  -- they're professionals.

7             THE COURT:  All right.

8             MR. CASEY:  They're not political.

9             THE COURT:  And let me just say, I am not assuming

10   that -- and I'm not trying to paint with a broad brush.  I      15:34:02

11   believe that there are many professionals, doubtless, within

12   the MCSO who try their very best to do a good job for the

13   people of this county.  I want to enable them and not disable

14   them.  But you stipulated, and I think its beyond cavil, that

15   Sheriff Arpaio is the spokesperson for the MCSO and he makes    15:34:23

16   policy --

17             MR. CASEY:  He does.

18             THE COURT:  -- for the MCSO, and, in fact, we're going

19   to discuss this in a minute, if I'm enjoining anybody, or if

20   I'm using the coercive powers of this court, it's Sheriff       15:34:35

21   Arpaio, who is a legitimate party to this suit, over whom I

22   exercise those powers.

23             And so if he's out there raising funds or doing

24   whatever he's doing saying that the order is illegitimate or

25   makes wrong -- wrongful accusations, would you expect his       15:34:53

1    officers to ignore what he says?

2          MR. CASEY:  I was hoping that was rhetorical.  It's

3    not.

4          THE COURT:  It's not.

5          MR. CASEY:  Your Honor, I think the answer is there          15:35:09

6    are statements made in a political context that are not office

7    context, and I don't like even addressing -- your question is

8    fair.

9          (Off-the-record discussion between Mr. Liddy and

10   Mr. Casey.)                                                       15:35:35

11         MR. CASEY:  I just had it pointed out that, for

12   example, and this might just, for what it's worth, is that

13   Arpaio didn't say the Court order was wrongfully accusing him

14   but people were wrongfully accusing him.

15         THE COURT:  That is true.  He said that.                    15:35:45

16         MR. CASEY:  Okay.  And --

17         THE COURT:  And who do you suppose has said that in

18   the most public way over the last year?

19         MR. CASEY:  There's no question, Your Honor, that this

20   Court has made its findings, but all you have to do is walk      15:35:56

21   down to their old office building and have people up there that

22   are protesting, at least as of two hours ago, on various

23   things, and you look at the Internet, and we can go back there

24   and find --

25         THE COURT:  All right.  So you understand my concern?      15:36:13

1    MR. CASEY:  Yeah.  Let's just say this.  I want you to

2    know that as counsel, we talk with our folks to understand that

3    the political hat, with protected by First Amendment, can be

4    said, but at the same time the government act that you have the

5    authority to use your coercive power on, that this, while          15:36:36

6    protected, can spill over on how you're going to view

7    compliance.

8         THE COURT:  Let me ask -- okay.  Let me ask a couple

9    of specifics; I think it will help direct us.  Who do you

10   intend now to provide this training?                                15:36:48

11        MR. CASEY:  What I was suggesting on the corrective

12   action was that it goes firm wide, the whole MCSO.

13        THE COURT:  I appreciate the corrective action, and --

14        MR. CASEY:  Yeah.

15        THE COURT:  -- certainly that's an important step.             15:37:00

16        MR. CASEY:  Yeah.

17        THE COURT:  But I'm talking about the training that's

18   required by the order.  Who do you intend to provide that

19   training?

20        MR. CASEY:  To everyone that's in the order, and if I          15:37:07

21   remember correctly, I think it's all --

22        THE COURT:  No, no, no, no.

23        MR. CASEY:  -- sworn deputies.

24        THE COURT:  Not provided to; who do you intend to have

25   provide that training?                                             15:37:16

1          MR. CASEY:  Your Honor, I don't know if anyone else is

2    really prepared to speak.  I know that we had proposed Mr. --

3          THE COURT:  Mr. Liddy, do you know anything?

4          MR. LIDDY:  I volunteer to help with training, Your

5    Honor.                                                        15:37:34

6          MR. CASEY:  And he's a certified -- I forget what

7    certification it is, but --

8          THE COURT:  Well, I don't doubt that Mr. Liddy has

9    passed a bar.

10         MR. CASEY:  No, no, no.  Actually, he actually had law   15:37:40

11   enforcement cer -- you have to get some training to be

12   certified --

13         THE COURT:  Well --

14         MR. CASEY:  -- by Arizona POST --

15         THE COURT:  All right.  I'll tell you what I'm going    15:37:47

16   to do.  I'm going to make it clear in this meeting, and I'm

17   going to make it clear why, that not only does the training

18   have to be approved by the monitor, but who provides it has to

19   be approved by the monitor.  And I'm going to require you to

20   give me a schedule of the training and I'm going to show up    15:37:59

21   unannounced at that training and I'm going to make sure that

22   there isn't any sort of baloney going on, even assuming that

23   the monitor approves it.

24         Are we clear on that?

25         MR. CASEY:  Very clear.                                 15:38:18

1          THE COURT:  All right.  And how long is it going to --

2    has the monitor requested these materials yet, do you know,

3    Mr. Liddy?

4          MR. WILLIAMS:  Yes, Your Honor, he has requested them,

5    and that's part of the -- we had sent training materials              15:38:26

6    already, and then I believe we're sending them again.  The

7    monitor essentially requested that we resend everything we'd

8    previously sent together so they have it in one shot, so that's

9    going out tomorrow.

10         THE COURT:  Have you indicated who you propose to                 15:38:39

11   provide that training?

12         MR. WILLIAMS:  We had done that at some earlier point,

13   Your Honor, and then I believe there was some disagreement as

14   to certain --

15         THE COURT:  Well, I'm going to ask that you come to               15:38:45

16   agreement and you provide that proposal to the monitor, so that

17   the monitor can approve it or otherwise.  All right?

18         MR. WILLIAMS:  Yes, Your Honor.

19         THE COURT:  All right.  Anything else on this point,

20   Mr. Casey?                                                             15:38:56

21         MR. CASEY:  No, Your Honor.  Thank you.

22         THE COURT:  All right.

23         MR. LIDDY:  Your Honor, I have one thing on this

24   point, if I may, Your Honor.

25         THE COURT:  Sure.                                                 15:39:00

1    MR. LIDDY:  Just to be clear that when I informed the

2   Court that I have -- my name has been submitted and

3   subsequently the Court said you might find it advisable to make

4   sure no baloney's going on that the Court, being clear to

5   everyone here, that the Court doesn't suspect me --                15:39:12

6    THE COURT:  No.

7    MR. LIDDY:  -- of participating in baloney.

8    THE COURT:  I do not -- I do not suspect you at this

9   point, Mr. Liddy, of participating in any baloney.

10    MR. LIDDY:  I appreciate that, Your Honor.                        15:39:18

11    THE COURT:  Which does not mean that I'm going to

12   constrain the monitor to find you as an acceptable teacher at

13   this point.  I'm going to allow him to use his professional

14   judgment in the matter and I might use my own professional

15   judgment, without intending to give you any slight whatsoever     15:39:32

16   or any implication that I believe you have been involved in

17   any, quote, unquote, baloney.  Doesn't mean I'm going to

18   approve you as an instructor.

19    MR. LIDDY:  Perfectly understandable, Your Honor.

20    THE COURT:  All right.                                           15:39:44

21    Do you want to be heard on this at all, Mr. Pochoda,

22   before we go on to the next point?

23    MR. POCHODA:  If I may defer to Cecillia Wang, who's

24   been the person on our -- plaintiffs' side that's been dealing

25   with this and with defendants.  I'm not sure where we stand on    15:39:53

1    dates or any of the other issues, but if Cecelia could be

2    heard.

3          MS. WANG:  Yes.  Good afternoon, Your Honor.  This is

4    Cecillia Wang.  I'll just speak very briefly on this.  I think

5    there are two points I want to address very concretely.          15:40:07

6          The first is that plaintiffs share the Court's concern

7    that training happen expeditiously and that training happen

8    appropriately.  And the second point I want to make is that we

9    believe it is logistically possible for the training to happen

10   much sooner than the defendants are indicating, and should      15:40:29

11   happen much sooner, even given all the things that need to

12   happen, including the identification and approval of

13   appropriate trainers.

14         I want to make it clear that the defendants submitted

15   proposed training materials and the identification of certain   15:40:48

16   proposed trainers with their December 31st submission to the

17   Court.  We began meeting and conferring with the defendants in

18   great detail and at some length shortly thereafter.

19         We had the meet and confer process in January.  We

20   provided very detailed comments and suggestions and objections  15:41:10

21   to the content of their proposed lesson plans and to some of

22   the trainers, including Mr. Liddy.  We've apprised Chief

23   Warshaw and his team of the content of that meet and confer

24   process.  And my understanding is that MCSO indicated that they

25   would take plaintiffs' objections and comments into             15:41:33

1    consideration and would be revising their proposed material to

2    some extent, and I believe that those revised versions will be

3    provided to the monitor and to the plaintiffs by April 4th.

4         We obviously share the understanding that how quickly

5    the training can actually be rolled out is going to be          15:41:55

6    triggered by when the monitor team is able to approve the

7    materials and the instructors.  We do think that whenever that

8    happens, 120 days is an unnecessary delay from that point going

9    forward.  I think that the sending out of a corrective

10   statement is not sufficient to address the dire need for        15:42:19

11   training on the three areas the Court has ordered.

12        The issues are not just about the erroneous statements

13   about the basis for the Court's findings, but also, very

14   critically, about the MCSO deputies' and supervisors' ongoing

15   obligations to comply with the injunction and to comply with    15:42:44

16   the Constitution.

17        Our hope is that given the extensive meet and confer

18   that has already happened, that this training can actually be

19   rolled out much sooner than 120 days after the monitor's

20   approval of the materials and the trainers.                     15:43:01

21        THE COURT:  All right.

22        MS. WANG:  With respect to what was originally in the

23   Court's order, two of the trainings were supposed to be

24   completed by March 31st and the third by May 30th, and our hope

25   is that we won't see much delay beyond that.                    15:43:15

1        THE COURT:  Well, that's understandable, but, of

2   course, I think the original schedule was done in the rather

3   naive hope that the parties would be able to select a monitor,

4   and they weren't.  And so it took me a month to inform myself

5   and be competent with the one I've chosen, so there is a little      15:43:32

6   bit of a delay.

7        But let me propose this to you, Ms. Wang.  I'm going

8   to order Mr. Williams, in addition to providing who is going to

9   conduct the training, setting forth the training schedule that

10  they propose once the monitor has approved the trainers and the     15:43:49

11  training.  And I will invite you to submit to the monitor the

12  training schedule that you believe the MCSO could follow.  And

13  then if you can't arrive at an agreement and the monitor enters

14  an order, it will come up to me and I'll make the decision

15  about how quickly the training will be provided.                    15:44:05

16        Is that clear?

17        MS. WANG:  Yes, Your Honor.  That would be fine.

18  Thank you.

19        THE COURT:  Mr. Williams, can you do that

20  expeditiously, please, sir?                                         15:44:13

21        MR. WILLIAMS:  I believe so, Your Honor.  Can you give

22  me some clarity as to what you mean by "schedule" --

23        THE COURT:  I mean --

24        MR. WILLIAMS:  -- in terms of --

25        THE COURT:  -- you now say:  I'll take 120 days.              15:44:20

```
 1    Start with day 1 after the approval is received from the

 2    monitor, and then lay out your time line of the amount of time

 3    you believe will be necessary to train all the persons that are

 4    required to be trained by my order, and any priority of

 5    training that you would anticipate implementing in that          15:44:36

 6    schedule.  You'll provide a copy to Ms. Wang.  Then Ms. Wang

 7    can provide what she believes would be an alternately --

 8    alternatively feasible schedule if you're unable to arrive at

 9    agreement with her, and if you aren't able to arrive at an

10    agreement, the monitor will make a recommend -- make a          15:44:52

11    decision, and if you wish to appeal that decision you can

12    appeal it to me.

13          MR. WILLIAMS:  Your Honor, do you have a time line in

14    mind?

15          THE COURT:  How long is it going to take you to          15:45:01

16    provide that?

17          MR. WILLIAMS:  Well, obviously when have a bit on our

18    plate before tomorrow to get out to the monitor, but I think we

19    can probably tackle it in the next 14 days for sure.

20          THE COURT:  How about seven?          15:45:10

21          MR. WILLIAMS:  Absolutely, Your Honor.

22          THE COURT:  Seven days.  Thank you.  I see Chief

23    Farnsworth saying you can do that.

24          All right.  Ms. Wang, do you want me to give you a

25    time line in which you must reply?          15:45:23
```

1       MS. WANG:  We can certainly reply within another seven

2   days after that, but I think we'll make every effort to do it

3   even sooner than that.

4       THE COURT:  All right.  So Mr. Williams' obligation is

5   seven days from today's date, and your obligation to reply, if          15:45:37

6   you have any dispute, is 14 days from today's date.

7       Everyone understand that?

8       MR. WILLIAMS:  Yes, Your Honor.

9       MS. WANG:  Yes, Your Honor.

10      THE COURT:  All right.  Now, I wanted to take up a                   15:45:47

11  couple of other matters.  In the course of this, I thought I

12  don't want to be revising my order very much.  I realize that I

13  might have to do -- do it for supervisory purposes.  I still

14  don't want to do it.  I want to make it clear for all parties

15  and I want compliance.                                                   15:46:08

16      And so I did read yesterday the appeal filed by the

17  MCSO to the court of appeals.  I saw what you are appealing, I

18  saw what you're not appealing.  I appreciate that

19  Ms. GilBride's here and she can address this.  I do not want to

20  infringe the MCSO's rights to appeal my order as it existed            15:46:27

21  when you filed the appeal.

22      I do want to avoid -- and one of the things

23  Chief Sheridan said in his newspaper article was that if my

24  injunction was wrong, nobody would reimburse the taxpayers for

25  all the money they have to spend in the interim.  And I agree,          15:46:44

 1    I don't want to make the taxpayers expend money purposefully --

 2    purposelessly, although that is not my major concern; I

 3    recognize it is the sheriff's concern, but I think it's a

 4    legitimate concern for me to consider.

 5          I was -- I was surprised, because this has been a very      15:47:00

 6    long case, and I realize it's not a major point of your appeal,

 7    but in the appeal you point out that this Court issued an order

 8    that the MCSO is a jural entity and you're appealing saying

 9    that it's not a jural entity.  And the thought occurred to me

10    that it might be worth exploring with the parties whether       15:47:20

11    there's any objection about a curative -- well, I'm not even

12    sure that a curative order is necessary, because of the nature

13    of the injunction.  But that the parties might agree that that

14    does not and will not affect the injunction going forward, even

15    if defendants are successful on appeal, I thought I would       15:47:38

16    explore that with you for a few minutes.

17          Mr. Casey, let me set forth a time line as I

18    understand it, and then, Ms. GilBride, if you want to address

19    the Court, you may do that.  Let me set forth a time line,

20    because I think --                                              15:47:54

21          MR. CASEY:  Oh, for the appeal?

22          THE COURT:  No, no, no, no.  For this case.

23          MR. CASEY:  Yes, sir.

24          THE COURT:  I think, and I may be wrong, Mr. Liddy may

25    have been involved with you, but I think that you were the only  15:48:02

1  person in this courtroom who was involved in this case in the

2  inception -- at the inception.  I don't think any of

3  plaintiffs' counsel were, and I know it was in front of a

4  different judge.

5          But at some point, it looks to me like in 2009, you          15:48:14

6  did file -- well, this suit was originally filed against a

7  number of the defendants, but the M -- Maricopa County was also

8  a party to this suit, and I believe you represented Maricopa

9  County and the MCSO at that point, is that correct?

10          MR. CASEY:  Correct.          15:48:31

11          THE COURT:  And then at some point when this was still

12  with Judge Murguia, a motion was filed that the MCSO ought to

13  be dismissed because they're not a jural entity, the suit had

14  to be against Maricopa County, and she pointed out that it was

15  unclear, but she was going to keep MCSO in the case.  And then          15:48:48

16  the case was transferred by Judge Murguia and it eventually

17  ended up with me.

18          It looks to me, and I'm not sure whether you still

19  represented Maricopa County at this point or not, or whether

20  you were just separately representing the MCSO --          15:49:02

21          MR. CASEY:  Separately represented, Your Honor.

22          THE COURT:  -- but Maricopa County arrived at a

23  stipulation they filed with the Court right after I entered the

24  case that said that they agreed with the plaintiffs that they

25  weren't a necessary party to this suit, and that they would be          15:49:17

 1    dismissed, subject to them being renamed in the suit if it was

 2    necessary to accomplish full relief, full and complete relief.

 3    And as I recall, the sheriffs did not join in that stipulation

 4    but they did not oppose it.  Is that a correct

 5    characterization?                                              15:49:37

 6              MR. CASEY:  I don't remember.

 7              THE COURT:  Well, it's document 178.  Take a look and

 8    see if you think I'm wrong about that.

 9              And then later on we got in a situation where in fact,

10    you had to withdraw, you and I had a discussion about that       15:49:48

11    because the Maricopa County Sheriff's Office moved to sanction

12    Maricopa County and asked that a sanction be imposed on

13    Maricopa County in this suit, and because you had represented

14    both, we both discussed that if Maricopa County wanted to

15    proceed with that, you were going to have to withdraw, in light  15:50:03

16    of your duty to Maricopa County, and in fact, Maricopa County

17    Sheriff's Office did pursue and I allowed them to pursue the

18    sanctions sought against Maricopa County, and at that time you

19    withdrew.

20              MR. CASEY:  Yes, sir.                                   15:50:19

21              THE COURT:  And you reentered this case after I

22    ultimately denied MCSO's request to sanction Maricopa County,

23    and I believe you -- you received an appropriate waiver from

24    Maricopa County allowing you to continue to represent this

25    court.                                                           15:50:33

1          MR. CASEY:  Yes.

2          THE COURT:  When I filed the injunction here, and I

3    don't think you have to do this, but I don't recall you

4    pointing out the jural entity argument as an objection to the

5    injunction.  But it seems to me that there's two -- two things          15:50:49

6    we might explore here that won't affect your appellate

7    jurisdiction, but Ms. GilBride, you let me know what you think

8    on that point.

9          The first is since Maricopa County stipulated to their

10   return to this case if it was necessary to achieve full relief,          15:51:04

11   and they aren't a party to this lawsuit, it's conceivable to

12   the Court that I could reenter -- or require that pursuant to

13   the stipulation, Maricopa County be returned as a party to this

14   suit, to the extent that it is necessary to achieve full relief

15   in the injunction.          15:51:23

16         Do you have a position on that one way or the other,

17   Ms. GilBride?

18         MS. GILBRIDE:  I don't think that's necessary, Your

19   Honor, because Sheriff Arpaio is in the case in his official

20   capacity, and I think that --          15:51:33

21         THE COURT:  You know, that -- that struck me as the

22   second point I was going to raise.  When I look at the order --

23         (Off-the-record discussion between the clerk and the

24   Court.)

25         THE COURT:  You know, I'm sorry if the people on the          15:51:43

1    phone are going to get cut off, but if they're going to get cut

2    off, they're going to get cut off.  We aren't going to be a

3    whole lot longer.

4         I did look in the order at my definition -- I refer to

5    the MCSO a lot in the injunctive relief order, but I looked at        15:51:54

6    it, and I've got a definition section in the injunctive relief

7    order and I define MCSO.  It's Title I, and it's Z, definition

8    Z.  I entitle MCSO as:  MCSO means the sheriff of the Maricopa

9    County Sheriff's Office acting in his or her official capacity.

10        So I don't think, as long as there isn't a dispute           15:52:21

11   that the sheriff is an appropriate party to this suit, that

12   it's going to make any -- I mean, no disrespect intended, but

13   in terms of the practical effect, Ms. GilBride, there won't be

14   any difference in terms of the practical effect even if you

15   prevail on your appeal, will it?                                   15:52:36

16        MS. GILBRIDE:  You're correct.

17        THE COURT:  All right.

18        MS. MCBRIDE:  And the reason we raised it is so that

19   we could have a Ninth Circuit ruling on the -- on the issue.

20   Since the courts had been in disagreement about it before, we    15:52:48

21   have no Ninth Circuit ruling on the issue, and that's why you

22   raised --

23        THE COURT:  Well, in this cir -- you know, I do think

24   that there -- you cited the court of appeals opinion, it's kind

25   of interesting, but this also provoked -- this case has some     15:52:58

 1  unusual factual elements when the MCSO moved to sanction the

 2  Maricopa County in the course of the lawsuit itself.  It's

 3  interesting that they would be viewed as the same jural entity,

 4  but that's a matter for the appeal and the appeal can resolve

 5  it.  I just want to make sure that it won't have any practical          15:53:19

 6  effect on this order so that we're spending a lot of money that

 7  will never have effect, and I take it that --

 8          MS. GILBRIDE:  I fully agree.

 9          THE COURT:  All right.  Thank you.

10          Mr. Pochoda, do you want to be heard on that point?          15:53:31

11          MR. POCHODA:  No, we agree that that is clearly the

12  law, Your Honor, and I should state for the record despite my

13  youthful appearance, I was around since the amended complaint

14  was written and included by me in 2007 and '8.

15          THE COURT:  All right.  I apologize to you,          15:53:45

16  Mr. Pochoda.  You'll excuse me because I wasn't around.  I've

17  been around for a lot of this case but not the initial

18  inception.

19          Is there anything about which the parties now need

20  additional clarification?          15:53:57

21          MR. POCHODA:  Not plaintiffs, Your Honor.

22          MR. CASEY:  Not from the defendants, Your Honor, but I

23  was going to ask the Court and plaintiffs for, and the monitor,

24  for an extension of time from tomorrow until Monday to get the

25  monitor the requested materials.  We just need another time          15:54:13

1   because of some things in my office.

2          THE COURT:  When you say "requested materials," what

3   do you mean?

4          MR. CASEY:  Do you know the --

5          MR. WILLIAMS:  Your Honor, the monitor submitted a          15:54:28

6   document request, I think about an 18-page document request,

7   and we're in the process of Bates stamping and reviewing all

8   those.

9          THE COURT:  All right.  You can have till Monday.  But

10  please, don't misunderstand me:  I'm not going to give          15:54:38

11  extensions any more.

12         MR. CASEY:  I appreciate your courtesy.  Thank you,

13  Your Honor.

14         THE COURT:  All right.  I mean, if you have a good

15  reason and it's a really good reason you can raise it, I'm not   15:54:46

16  telling you you can't, but this case has gone on far too long.

17         Now, Mr. Pochoda, I understand the reason why you

18  asked me to just enter an amended order that would incorporate

19  the changes I'm going to incorporate as a whole new order.

20         I'm not going to do that.  And the reason I'm not          15:55:02

21  going to do it is I want to make it clear, for purposes of the

22  MCSO's appeal, what my order was, and what the supplementary

23  order was, so to the extent that they want to argue about

24  whether my supplementary order was enforcement of my original

25  order, they can make that argument with clarity.                 15:55:20

1           Do you understand why I'm doing what I'm doing?

2           MR. POCHODA:  Yes, Your Honor.  We assumed that that

3   would be brought up.  We didn't think that required to have

4   both orders sort of in place, but we have no objections to that

5   method of proceeding.                                         15:55:32

6           THE COURT:  I don't think it requires it, but it will

7   make it very clear, and --

8           MR. POCHODA:  Fine, Your Honor.

9           THE COURT:  -- and as I believe I've set forth on the

10  record, I believe there are reasons pertaining to the          15:55:40

11  enforcement of my original order which go to this order, but to

12  the extent the MCSO views it as otherwise, I'm going to

13  preserve their right to make whatever argument they wish on

14  appeal.

15          MR. POCHODA:  All right.                               15:55:52

16          THE COURT:  All right.  I thank the parties.  Chief

17  Trombi, thank you.  I will expect full and complete compliance.

18  I think I've made it clear, I'm not going to tolerate any good

19  faith slip-ups any more, but I appreciable your coming here,

20  and I hope that these occasions will be exceedingly rare in the  15:56:03

21  future.

22          (Proceedings concluded at 3:56 p.m.)

23

24

25

1

2                      C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 4th day of April,

18   2014.

19

20

21                         s/Gary Moll

22

23

24

25