1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                  Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                    )
                  vs.                )   Phoenix, Arizona
7                                    )   May 7, 2014
     Joseph M. Arpaio, et al.,       )   10:05 a.m.
8                                    )
                  Defendants.        )
9    _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17        (Status Conference - Sealed Proceedings Omitted)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                        A P P E A R A N C E S

2

3   For the Plaintiffs:         Daniel J. Pochoda, Esq.
                                AMERICAN CIVIL LIBERTIES
4                               FOUNDATION OF ARIZONA
                                77 E. Columbus Avenue
5                               Suite 205
                                Phoenix, Arizona  85012
6                               (602) 650-1854

7                               Cecillia D. Wang, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
8                               FOUNDATION
                                Director
9                               Immigrants' Rights Project
                                39 Drumm Street
10                              San Francisco, California  94111
                                (415) 343-0775
11
    For the Defendants:         Timothy J. Casey, Esq.
12                              SCHMITT, SCHNECK, SMYTH,
                                CASEY & EVEN, P.C.
13                              1221 E. Osborn Road
                                Suite 105
14                              Phoenix, Arizona  85014-5540
                                (602) 277-7000
15
                                Thomas P. Liddy
16                              Deputy County Attorney
                                MARICOPA COUNTY ATTORNEY'S OFFICE
17                              Civil Services Division
                                222 N. Central Avenue
18                              Suite 1100
                                Phoenix, Arizona 85004
19                              (602) 506-8541

20

21

22

23

24

25

1                         I N D E X

2    Witness:                                      Page

3    LARRY FARNSWORTH

4    Examination by the Court                       16
     Examination by Mr. Pochoda                     20
5    Examination by Mr. Casey                       30

6

7

8                       E X H I B I T S

9    No.     Description                        Identified

10   1   Document prepared by MCSO with updated     23      10:30:30
         information provided to Chief Kiyler when
11       she was assessing interim compliance on
         Thursday, May 1, 2014
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3            THE COURT:  Thank you.  Please be seated.

4            THE CLERK:  This is civil case 07-2513, Melendres v.

5    Arpaio, on for status conference.                              10:05:33

6            Counsel, please announce.

7            MR. POCHODA:  Dan Pochoda for the ACLU of Arizona for

8    plaintiffs.

9            MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

10   the ACLU for the plaintiffs.                                   10:05:42

11           THE COURT:  Good morning.

12           MR. CASEY:  Good morning, Your Honor.  Tim Casey for

13   the defendants.  With me is my co-counsel, Tom Liddy, from the

14   Maricopa County Attorney's Office.

15           Also with me is --                                     10:05:51

16           CHIEF DEPUTY SHERIDAN:  Chief.

17           MR. CASEY:  Chief Deputy -- I always get the words

18   confused -- Jerry Sheridan; Larry Farnsworth; Russ Skinner from

19   the Court Compliance/Implementation Unit, Your Honor.

20           THE COURT:  Good morning.                              10:06:07

21           I just remind those who are in the public gallery that

22   while you're allowed to use devices, if you wish, to record

23   manually by type, there is no recording of these proceedings

24   allowed, and if you are observed recording the proceedings you

25   will be removed, just to remind you.                           10:06:31

```
 1            I did have my clerk distribute, I believe, to both

 2  parties a few minutes before the hearing began, I've taken

 3  material from a report Chief Warshaw gave me, the monitor, and

 4  I have all the material that pertains to the compliance with

 5  the court order, or the monitor's assessment of that          10:06:51

 6  compliance, I've had retyped and distributed to you a few

 7  moments ago.

 8            Were you not able to give it to them, Brian?

 9            All right.  Go ahead.

10            I assume -- after he gave me that report, I received  10:07:03

11  from the monitor this morning --

12            And by the way, Chief Martinez, are you there on the

13  line?

14            CHIEF MARTINEZ:  Yes, sir.  Good morning, Your Honor.

15            THE COURT:  Good morning.  I received from the monitor  10:07:15

16  additional materials that were provided him by the Sheriff's

17  Office that were updated concerning compliance.  He's informed

18  me that, of course, he has not been able to verify those at

19  this date, but I figured, Mr. Casey, that you were going to

20  take us through them, anyway.                                  10:07:31

21            MR. CASEY:  I apologize, Your Honor.  I was focusing

22  on what your clerk had handed to me and so I wasn't paying

23  attention.  I apologize.

24            THE COURT:  All right.  I was just saying that I

25  received this morning from the monitor materials that you      10:07:41
```

1   provided either this morning or late last evening that are

2   graphic materials pertaining to MCSO's compliance with my

3   enforcement order.  I haven't had a chance to review them in

4   any detail.

5          The monitor, of course, informed me when he                    10:07:57

6   transmitted them to me that he hasn't been able to verify them

7   in addition -- or take any steps other than the report I've

8   given you to verify compliance, but I assume you're going to

9   take us through that report now, anyway.

10         MR. CASEY:  If the Court would like, yes, I have              10:08:09

11  Commander Farnsworth here to address this in whatever order

12  you'd like, Your Honor.

13         THE COURT:  All right.  Well, do plaintiffs have any

14  objection if I have the defendant take us through their -- and

15  describe their compliance with my order?                             10:08:27

16         MR. POCHODA:  No, Your Honor.

17         THE COURT:  All right.  Mr. Casey.

18         MR. CASEY:  Yes, Your Honor.

19         Larry, you can come up.  We're going to approach.

20         Your Honor, what I understand has been handed out and        10:08:40

21  I provided to your clerk this morning, I also gave plaintiffs'

22  counsel this, I believe this is what was provided to the Court

23  yesterday.  It's a -- one, two, three, four -- five-page sheet

24  about Court Compliance and Implementation Division, about the

25  April 17th corrective statement.                                     10:09:07

1          The key phrase, if I was to summarize this, would be

2    at page 2, where there is some highlighted there about the

3    breakdown of employees who have completed the required reading,

4    documentation, and signed the attestation log, and there are

5    two dates there, Your Honor.  One is from May 1st.  Why is          10:09:29

6    that?  Because that's the first date I think that Sherry Kiyler

7    was there --

8          CAPTAIN FARNSWORTH:  Yes.

9          MR. CASEY:  -- from the monitor team.  And then from

10   yesterday as of 2:00 p.m.  And also we have other documents        10:09:40

11   that Larry Farnsworth can address as to why those who have not

12   signed have not signed.  For example, Family Medical Leave Act,

13   or they're serving overseas in Iraq or Afghanistan.

14         But with that, I'm going to turn it over to Larry

15   Farnsworth to deal specifically -- he's obviously prepared to       10:09:57

16   answer your question either by avowal to the Court or under

17   oath, whatever your preference is.

18         THE COURT:  Well, I'll accept your avowal,

19   Chief Farnsworth, but I will say that if the plaintiffs want to

20   ask you questions, at that time I may put you under oath.          10:10:13

21         CAPTAIN FARNSWORTH:  Yes, sir.

22         THE COURT:  All right.  Go ahead, please, sir.

23         MR. CASEY:  If you would just go ahead and explain for

24   the Court what the overall summary is in terms of what was

25   done --                                                            10:10:26

1          THE COURT:  I'll tell you what let's do, just so

2     everybody can see this.  You have next to you an ELMO.

3          Can we bring up the ELMO, Kathleen?

4          And why don't you just put the sheets that you've

5     provided the Court on the ELMO.  We'll put them up on the          10:10:40

6     monitor.  That way, plaintiffs' counsel and everyone in the

7     gallery can see what you're describing for me, and I can see it

8     clearly, too.

9          It will take just one moment for us to bring it up.

10          Do you have access to that yet, Mr. Liddy?          10:10:59

11          MR. LIDDY:  Yes, I do, Your Honor.  It's not on the

12     larger screen, however.

13          THE COURT:  Yeah, we'll get it up there.

14          Ms. Wang, can you see it on your monitor?

15          MS. WANG:  Yes, Your Honor.  Thank you.          10:11:12

16          MR. CASEY:  With the Court's permission, I'll serve as

17     not the scribe, but maybe the --

18          THE COURT:  Page-turner?

19          MR. CASEY:  The page-turner, that's -- yes.

20          THE COURT:  That will be fine.          10:11:26

21          (Off-the-record discussion between the Court and the

22     clerk.)

23          THE COURT:  It will just take one moment before I let

24     you begin, Mr. Farnsworth, or Commander Farnsworth.

25          Is it Captain or Commander?          10:11:32

1          CAPTAIN FARNSWORTH:  It's Captain.

2          THE COURT:  All right.  Thank you.

3          There we go.  All right.  Now, what you see on your

4    screen is what everybody else sees on their monitors.

5          CAPTAIN FARNSWORTH:  All right, Your Honor.  The first    10:11:48

6    page is a listing of Sheriff's Office employees.  It's broken

7    out by sworn, detention, and civilian.  It's all compensated

8    employees within the Sheriff's Office.

9          On the very first page you can see there's two dates.

10   The first one's May 1st, 2014.  That's the day the date was --    10:12:01

11   met with the monitor's representative.  It's also the date that

12   the Court had required that we be in compliance.

13         The 5-6 of '14 at 2:00 p.m. was yesterday's date.  We

14   had to have a cutoff.  These are the number of employees that

15   we have within the Sheriff's Office, based on classification.    10:12:20

16   And it's a fluid number -- people resign, people get hired --

17   so the base number at the bottom of the report is we now have

18   3,381 employees, different by one from the day -- Thursday of

19   3,382, so we've lost one employee, there's a net loss of 1.

20         That's page 1.  Any questions, Your Honor?    10:12:45

21         THE COURT:  I'm not sure I have the same numbers.

22   Give me a second.

23         Oh, okay.  The sheet I'm looking off is apparently not

24   an updated sheet.  I'll look off the screen like everyone else.

25         Okay.  I'm following you.    10:13:01

1          MR. CASEY:  How would you like us to proceed, Your

2     Honor?

3          THE COURT:  Well, let me ask, do plaintiffs have any

4     questions based on the first page?

5          MR. POCHODA:  Not at this time.  We may have some      10:13:08

6     overall about who --

7          THE COURT:  That's fine.  I'm just going to go page by

8     page.  I'm not going to prevent you from asking some overall

9     questions --

10         MR. POCHODA:  Thank you.                                10:13:17

11         THE COURT:  -- at the end.

12         Go ahead, Captain.

13         CAPTAIN FARNSWORTH:  Okay.  That's the end of page 2,

14    I'll move to page 2 -- end of page 1, I'll move to page 2.

15         Page 2 is the breakdown of employees, again by level    10:13:26

16    of classification: sworn, detention, and civilian.  On the

17    sworn side -- and because the order required that we have both

18    line officers and supervisors, this was broke out that way.

19         As far as the sworn staff, we had 475, and now as of

20    5-6 it's 480.  The highlighted yellow part is the delta, or the   10:13:52

21    change between the two, so we increased 400 -- 1.4 percent,

22    being that that's how many more signatures we got, people

23    complied with the order.  It wasn't that it was because they

24    came back from vacation or military or whatever it was they

25    came back from.                                              10:14:13

 1          So the second line is -- there's supervisors,

 2   sergeants, and above, and we had 158.  We had a 99.3 percent

 3   compliance.  The reason it's 99.3 is we have somebody off on

 4   medical leave, so that's why it's not a hundred percent.

 5          Going back to detention staff we have 1,117, or          10:14:33

 6   96.6 percent.  I'm sorry, sir.

 7          THE COURT:  That's all right.  I'll let you go through

 8   the page and then I'll ask my question.

 9          MR. CASEY:  Okay.  Please continue.

10          CAPTAIN FARNSWORTH:  Okay.  And so it's a 1 percent       10:14:45

11   increase in the number of signatures and training that we

12   required.

13          MR. CASEY:  And that's on the detention side.

14          CAPTAIN FARNSWORTH:  Yes, on the detention side.

15          MR. CASEY:  This is supervisors for detention side.      10:14:54

16          CAPTAIN FARNSWORTH:  Right.  And then it's a

17   .7 percent increase, or 275, and we're at 98.9 percent

18   compliance with that.

19          MR. CASEY:  Okay.  What's this next category?

20          CAPTAIN FARNSWORTH:  The next one is civilian staff      10:15:05

21   and we're at 546.  As of yesterday we're up, increased by

22   .9 percent, 97.1 percent compliance rate.

23          The civilian staff we're -- will be equivalent of a

24   sergeant above.  We're at 98.3 percent, and it's increased by

25   1.6 percent.                                                    10:15:26

1          And our total civilian staff is 1.3 percent increase

2    from what it was on Thursday.

3          The total compensation aggregate for all MCSO

4    employees is that we're at 97.5 percent compliance.  And the

5    reason we're not at a hundred percent, again, is statement          10:15:43

6    because of staff that are on medical leave, vacation, sick

7    time.  We do have a listing of all those employees, and if we

8    have the information as far as when they anticipate return,

9    then we have that listed.

10         We do have a policy and practice in place that          10:15:59

11   addresses both when those employees come back that they cannot

12   return to duty until they complete their training and sign the

13   attestation log.

14         MR. CASEY:  And so I make it clear for the Court, is

15   this the log that identifies who's not signed, and the          10:16:15

16   reason --

17         THE COURT:  You know, Mr. Casey, I appreciate any

18   clarifications you want to make, but if you would speak into a

19   microphone so that the court reporter and I and everybody else

20   can hear you.          10:16:24

21         MR. CASEY:  I apologize, Your Honor.

22         Is this the document?

23         CAPTAIN FARNSWORTH:  That's correct.  That's the

24   document listing all employees that haven't signed.

25         MR. CASEY:  Your Honor, for the record, we have a          10:16:33

```
 1    color-coordinated document entitled "MCSO Employees Who Have

 2    Not Signed Attestation Logs."

 3           THE COURT:  Um-hum.

 4           MR. CASEY:  And briefly, I'm going to just put this up

 5    on the board to give the Court -- you may have seen this        10:16:43

 6    already, but this goes through the reasons why, it's all color

 7    coded, the reasons why they have not signed an attestation log,

 8    so it can be followed up, et cetera.

 9           CAPTAIN FARNSWORTH:  Yeah, the color coding is to show

10    what rank, what classification they are.  There's a color      10:17:02

11    schedule in the back that tells what red and blue and green and

12    gray are.  But this is what we track to find out why they

13    haven't done it so we're staying on top of it.

14           It actually changes day to day.  When I walked in my

15    office this morning there was two attestation logs that had     10:17:17

16    come in, so it's a continuous shooting target as far as

17    completion.

18           THE COURT:  And when you get the -- from here on out,

19    when you get the logs, I assume you'll just provide the updates

20    to the monitor.                                                 10:17:30

21           CAPTAIN FARNSWORTH:  Yes, sir.

22           THE COURT:  All right.  I just had a couple of

23    questions, but I think what I'll do before I ask them is I'll

24    let you get through all of the sheets and then I'll ask my

25    questions.  You may or may not know the answers to them.        10:17:42
```

1       MR. CASEY:  And I guess the next question I have for

2   you, Captain Farnsworth, is:  What else out of this particular

3   document would you like to explain to the Court to show what

4   has been done, if anything?

5       CAPTAIN FARNSWORTH:  The third page just gives the          10:17:55

6   breakdown based on that color-coded descriptor of who has not

7   done what, both by classification, pretty self-explanatory.

8       MR. CASEY:  Next page.

9       CAPTAIN FARNSWORTH:  Next page, please.  That's just a

10  continuation from the third page.  This is the total number of   10:18:14

11  employees that remain -- have not been take -- have not been

12  addressed, so --

13      MR. CASEY:  And what is this next page?

14      CAPTAIN FARNSWORTH:  The very last page is the posse,

15  the posse page that -- the total number of posse personnel that  10:18:27

16  we have.  That includes also a listing of our reserves, and

17  they're active retired reserves.

18          And the bottom of the page talks -- gives us the

19  statistical breakdown.  As far as the posse, we've had a

20  39 percent increase in signatures from Thursday till today, or   10:18:48

21  till yesterday.  We now are at 1,410 that have become

22  compliant, or 78.4 percent, active reserves are at a

23  hundred percent compliance right now, and retired active

24  reserves are at 56.6 percent.

25          And the reason that that number, just an explanation      10:19:08

1   on active retired, they were typically deputy sheriffs that

2   have retired, continue to keep their status as a peace officer,

3   but they may be anywhere in the nation, and so getting to them

4   is problematic as far as they've been sent letters, they've

5   been sent e-mails, but we haven't got a response back yet.          10:19:28

6          MR. CASEY:  Please tell the Court if I, Tim Casey, am

7   a member of the posse, I happen to live in the metro Phoenix

8   area and I refuse, for whatever reason, to sign this, what's

9   the result?

10         CAPTAIN FARNSWORTH:  All posse members were               10:19:42

11  inactivated and cannot perform any function as a posse member

12  until they become compliant.  That was distributed to all posse

13  and posse commanders.

14         MR. CASEY:  Thank you.  Is there anything else about

15  this document, Captain Farnsworth, that you think is important      10:19:56

16  for the Court to know, for the plaintiffs' lawyers behind you

17  to know, about your efforts; what's been done; what do you hope

18  to accomplish?

19         CAPTAIN FARNSWORTH:  Your Honor, this is a continuing

20  process until it's a hundred percent compliant.  We'll continue     10:20:14

21  to manage it.  We'll continue to provide to the monitor our

22  updates.  And we have a process in place to ensure that people

23  don't go back and don't do anything until they've completed

24  this training and the signature attestation log.

25         THE COURT:  All right.  I appreciate that.  I just          10:20:30

1   have a few follow-up and then I'm going to, as I said, allow

2   the plaintiffs to ask follow-up, and if it would be easier for

3   the plaintiffs, I might have you come sit in the witness box

4   when you do that.

5          Would you prefer to have Captain Farnsworth sworn?        10:20:43

6          MR. POCHODA:  Yes, we would, Your Honor.

7          THE COURT:  All right.  Captain Farnsworth, would you

8   please step right here.

9          MR. CASEY:  May I also hand this to the witness?

10         THE COURT:  You certainly may.                            10:21:01

11         MR. CASEY:  (Handing).

12         THE CLERK:  Please raise your right hand.

13         (Larry Farnsworth was duly sworn as a witness.)

14         THE CLERK:  Thank you.  Please take our witness stand.

15                      LARRY FARNSWORTH,

16  called as a witness herein, having been duly sworn, was

17  examined and testified as follows:

18                         EXAMINATION

19  BY THE COURT:

20  Q.  Captain, I just have a few questions, and I'm going to ask   10:21:29

21  them first.  After I ask you my questions, I'm going to allow

22  plaintiffs to ask their questions, and then I'll allow your

23  attorneys to ask any follow-up or clarification questions that

24  they might have.  All right?

25  A.  Yes, sir.                                                    10:21:43

1   Q.  A couple of days after I entered my enforcement order, the

2   MCSO requested clarification and a limitation of my order, and

3   I did limit my order in some aspects.  But in both cases, two

4   major categories, I provided, if you want, an out of compliance

5   for the MCSO.                                                    10:22:04

6           In both of those categories I required the sheriff to

7   make certain attestations to me.  One wasn't quite so

8   demanding.  It involved volunteers that serve in the jail, and

9   all that you had to do was indicate that all these folks are

10  religious or instructive volunteers that serve in the jail and  10:22:23

11  the sheriff just had to sign and say that's all -- the only

12  connection they have with the MCSO.

13          Has the Sheriff's Office invoked that certification?

14  A.  Yes, sir, they have.  I brought a copy with me, both of the

15  roster and the sheriff's request to have them excused.  It's    10:22:38

16  only the -- the jail volunteers that we ask, but I do have a

17  copy, and it's --

18  Q.  That's all right.  How many jail volunteers were excused

19  from the order, do you know?

20          MR. CASEY:  You need your file, sir?                     10:22:51

21          THE WITNESS:  I do.  I think it's 780, but I'm not a

22  hundred percent sure.

23  BY THE COURT:

24  Q.  That's fine.  A rough estimate is fine for me.  Let me --

25          MR. CASEY:  May I approach?

1          THE COURT:  Sure.

2          MR. CASEY:  This is your file?

3          THE WITNESS:  Yes, sir.  Thank you.

4  BY THE COURT:

5  Q.  Now, Captain, there was also another category, and this was          10:23:08

6  more -- I imposed more limits on the ability for the sheriff to

7  get excused for complying with other employees.  I set forth

8  certain criteria that the sheriff had to attest to.

9          Were any MCSO either volunteer posse members,

10  volunteers, or MCSO paid staff, excused from compliance by          10:23:31

11  virtue of what I'll call that second possible way of being

12  excused from compliance?

13  A.  No, sir, there was -- there was zero on that part.  The

14  only ones that were excused were the jail volunteers.

15  Q.  All right.  Now, I don't know whether you'll know the          10:23:50

16  answer to this, but the request by the MCSO gave rise to

17  certain questions, because, as you will have gathered by my --

18          I assume you read my response to your request.  It

19  was --

20  A.  Several times.          10:24:04

21  Q.  -- filed as a supplemental order.  I'm not sure to what

22  extent there is overlap in MCSO functions, I'm not sure to what

23  extent detention personnel may also supplement their salary by

24  doing -- by engaging in law enforcement, traffic control, and

25  other things, but have you made any attempt to determine that?          10:24:23

1    A.  No, sir.  There was no attempt at all.

2    Q.  All right.  In the substantive trial of this matter,

3    evidence was admitted into evidence that involved -- and I went

4    back and looked at it a little bit in connection with your

5    request for clarification.  Evidence was admitted that when the          10:24:45

6    287(g) certification of the Sheriff's Office was revoked --

7             Do you know what I'm talking about now?

8    A.  Yes, sir.

9    Q.  -- the Sheriff's Office hired an exterior consultant from

10   Kansas to come in and train what it said was 900 enforcement             10:25:02

11   personnel about their inherent authority to enforce federal

12   immigration law.  And I'm concerned that my corrective order,

13   of course, cover all those folks.  It seems to me that you've

14   made a very good-faith effort to make sure that it has.  But I

15   was interested that that 900 figure doesn't seem to match up            10:25:29

16   with any of the subsets that you've provided me here today.

17            Do you have any idea who the persons were, who the 900

18   people were that received what I determined to be the erroneous

19   training that the Sheriff's Office had the inherent authority

20   to enforce federal immigration law?                                     10:25:47

21   A.  Your Honor, I -- I can't speak to it.  I don't have

22   knowledge of it.  As far as the 900, we have 2,055 detention

23   officers, so I know that a majority of the 287(g) that were

24   trained, many were within the jail system, but I don't know

25   where the 900 --                                                        10:26:08

1   Q.  Yeah.  It did seem, the evidence did suggest that 287(g)

2   training there was a jail component and there was a non-jail

3   component.  Is that also your understanding?

4   A.  That's my understanding, yes, sir.

5   Q.  All right.                                          10:26:20

6           THE COURT:  Well those are my questions.  Thank you,

7   Captain.

8           Plaintiffs?

9                          EXAMINATION

10  BY MR. POCHODA:                                         10:26:34

11  Q.  Captain, good morning.  I just wanted to get some

12  clarification about what these documents mean.

13          This document that was up and that was showed to

14  everybody, this is something you prepared, is that right?

15  A.  My staff did, but I was part of it, yes, sir.       10:26:44

16  Q.  And you gave this to the monitor's office yesterday, is

17  that accurate?

18  A.  Yes, sir, I did.

19  Q.  And what else did you give?  What other documents

20  accompanied this that went to the monitor?              10:26:57

21  A.  Actually, you know what?  I have to retract that.  I

22  believe I provided it to the monitor this morning, not this --

23  not yesterday.

24  Q.  Thank you.  Whenever you provided it to the monitor, were

25  there any other documents or information provided to the  10:27:13

1    monitor --

2    A.   There were three other documents that we provided to the

3    monitor.  One was the -- a list of the efforts that we had

4    conducted to be compliant with this order.  It's a four-page

5    document.  And then the other one is the color-coded document          10:27:29

6    of employees who have not signed the attestation log.  Those

7    three documents were provided to the monitor this morning.

8            THE COURT:  You know, if I can interrupt, I'm not

9    sure, Brian, did you distribute this to the parties?  Can you

10   come take a look at it?                                                10:27:47

11           Because I've actually received three separate

12   documents from the monitor this morning that he, at least,

13   represented were provided to him, and I just want to make sure

14   that he didn't give me something that you're unaware of,

15   Captain.                                                              10:28:02

16           You didn't give that?  All right.

17           Do you recognize the document I've just handed you?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Is that something you also provided the

20   monitor this morning?                                                 10:28:22

21           THE WITNESS:  Yes, sir.

22           THE COURT:  All right.  Do you want to describe that

23   for Mr. Pochoda.

24           And Mr. Pochoda, if you'd like to get a look at it,

25   you can approach the witness and retrieve it.                         10:28:31

1        And then Mr. Casey, I don't know if you've seen this

2   or not, but maybe you want to come up and take a look at it,

3   too.

4        MR. CASEY:  Is it, Your Honor, different than what he

5   went over on the --                                              10:28:44

6        THE COURT:  It is.

7        MR. CASEY:  It is?

8        THE WITNESS:  This is what I sent the monitor, so this

9   is what I just received.

10        MR. CASEY:  Your Honor, I apologize.  Is this what you   10:28:59

11   just handed the witness?

12        THE COURT:  It is.

13        If you want to take it back to the podium and take a

14   look at it, both of you.

15        MR. POCHODA:  Sure.                                       10:29:11

16        (Pause in proceedings.)

17        MR. POCHODA:  I won't stop to read this all now, Your

18   Honor, but if we could have it marked for the record.

19        THE COURT:  That's fine.

20        Kathleen, would you please mark the document.  Just      10:29:40

21   mark it as Exhibit 1.

22        (Off-the-record discussion between the Court and the

23   clerk.)

24        THE COURT:  Then we'll put it as Plaintiffs'

25   Exhibit 1.                                                     10:29:51

1          THE WITNESS:  Your Honor, if I could clarify, when the

2    monitor visited with us on Thursday, we provided Chief Kiyler

3    with documents to help her with the report, and then the

4    monitor asked us on Friday to provide what we provided to her.

5          So we provided to them on Friday what was provided to          10:30:14

6    Chief Kiyler on Thursday.  I sent updated documents to them

7    this morning at 7:00 a.m.

8          THE COURT:  All right.  So this document is the

9    updated document -- or a document with updated information that

10   you'd provided to Chief Kiyler when she was assessing interim          10:30:32

11   compliance with you last Thursday?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  All right.  Thank you.

14         You'll see, Mr. Pochoda, and I don't know if you've

15   had a chance to review Chief Kiyler's report that I also          10:30:45

16   submitted to you this morning.

17         MR. POCHODA:  We have not yet.

18         THE COURT:  All right.

19   BY MR. POCHODA:

20   Q.  Maybe I could just briefly, then, we'll take a look at          10:30:53

21   this, but if you could indicate what you base this report on,

22   the one that you did provide them on it, or what

23   documents/data/information did you look at to get these numbers

24   and figures?

25   A.  I just --          10:31:09

1   Q.  How did you know, for example, that it was 98 percent of a

2   certain category that indeed had read and signed?  How did you

3   come to that conclusion?

4   A.  Okay, now I understand your question.

5         We have a master log of all employees within the                  10:31:26

6   Sheriff's Office on that date, and we compared all the

7   attestation logs to the master list.  And then on the master

8   list every attestation log had been numbered.  And so on the

9   master list we have a list of where the signature is so we can

10  go back and document on an audit function.                              10:31:48

11        So the master list has the name, has the -- the

12  number of the attestation number that we gave to it so that we

13  can go back and do an audit for it, and that's where our

14  numbers came from.

15  Q.  Let me ask something about those, what an attestation log          10:32:05

16  looks like and what information it contains, but first let me

17  ask you:  Did you provide the monitor the corresponding

18  attestation logs?

19  A.  A copy of every one of them, no, we did not.

20  Q.  So the monitor just got this, the conclusions from -- drawn        10:32:19

21  from those logs.

22  A.  The monitor, while they were here, we showed them our

23  process of how we did the -- the audit, and then we -- she

24  randomly picked, I believe, 10 names, and I may be wrong on the

25  number, I'm not sure exactly, but she randomly picked names          10:32:36

1    from the -- she had the logs, so she went by the logs and --

2    or, I'm sorry, she went by the master list.  Showed me on the

3    master list, Here it is, the names.  Then she said, Show me the

4    signature and the attestation, you know, the attestation log.

5    We provided that to her from the number.                          10:32:56

6          And then she went out to further verify that and

7    randomly select people in the Sheriff's Office -- we had both

8    logs with us so that we could show the master, the signature,

9    and the real person -- and then she interviewed the real

10   person.                                                           10:33:12

11   Q.  You did not, in providing -- or deciding what to provide

12   the monitor, take a look at the Court's order of April 17th of

13   2014 that indicated you should provide the attestation logs as

14   well to the monitor?

15   A.  Yes, it did say that.  And we provided all the requested      10:33:33

16   documents that the monitor asked us for.

17   Q.  As opposed to what is in this court order of April 17th.

18          Let me strike that.

19          What does an attestation log look like?  What

20   information for a command staff -- let's start with the command   10:33:50

21   staff.  What information is in there for each person who's a

22   member of the command staff at MCSO?

23   A.  I apologize to you.  I didn't bring a copy with me.

24          The line officer is different than from the

25   supervisor --                                                     10:34:06

1    Q.  Yeah, the command staff, the higher-ups.

2    A.  From sergeant and above --

3    Q.  Yeah.

4    A.  -- because the order required that they had a different --

5    they had more reading to do, so the logs were different.  And I    10:34:14

6    apologize I didn't bring copies of either one.

7    Q.  But if you can describe what -- for any one particular

8    person who's in that category, what would be the entries, the

9    columns in an attestation log for that person?

10   A.  It would have their name printed, their serial number,    10:34:29

11   their assignment, their signature, and on the top header part

12   of the document would say under -- under -- and I'm -- please,

13   I'm -- I've not memorized it, but basically it would say that I

14   attest that I complied with the required orders and the reading

15   that was -- that was required, and that was listed in that on    10:34:52

16   every one of the logs.

17          And then under our policy for providing false

18   documentation, if you did that you could be charged with or

19   some complaint with false documentation.  So it was a clear

20   statement that says, you know, You need to be -- to be truthful    10:35:11

21   with everything that you signed.

22   Q.  Right.  And if you recall, do you remember what the

23   specific documents on the top of the command staff logs were

24   that they attested that they had read, or were there specific

25   documents listed at all, or just a general statement, We have    10:35:28

1  complied with the Court's orders?

2  A.  No, sir, it was created from the order itself, and we

3  listed the specific what had to be read.

4        THE COURT:  Let me ask, Captain Farnsworth, do you

5  have any problem providing the plaintiffs with a copy of --                10:35:41

6        THE WITNESS:  No --

7        THE COURT:  -- those logs?

8        THE WITNESS:  -- I have nothing.  I can do that when

9  we get back.

10  BY MR. POCHODA:                10:35:47

11  Q.  I appreciate that.

12  A.  I apologize for not bringing it with me; I should have.

13  Q.  And just briefly, how were these distributed?  Where do the

14  folks who signed it, both the command staff and the sergeants

15  and below the sergeants, where were these logs located                10:36:02

16  physically that they were able to sign them?

17  A.  They were -- they were part of a briefing board that went

18  out, and so on a -- on a log, depending on how many people were

19  in the group, I could have one signature or I could have, I

20  believe, 25 signatures.  It went to everybody within the                10:36:23

21  Sheriff's Office.  There wasn't a person -- it went to all

22  supervisors, all employees.  It was an e-mail that we have an

23  e-mail distribution that went to everybody.

24  Q.  We'll take a look at the logs, but since we're here for the

25  moment, was there any part of that form that indicated that the                10:36:39

1   person who signed it had taken the time to understand the

2   documents?

3   A.  I don't remember what the -- I don't remember what the

4   wording said, but -- I don't remember what the wording said.  I

5   couldn't -- I couldn't testify to it right now.                    10:36:56

6   Q.  You don't remember if they -- if they stated, I have read

7   them and I took the time to understand them, or they just said,

8   I have read them?

9   A.  I don't recall, Your Honor --

10  Q.  Thank you.                                                     10:37:07

11  A.  -- I'm sorry.

12  Q.  In any event, Captain Farmsworth -- excuse me, Farnsworth,

13  whether they attested to understanding or not, did the MCSO

14  take any steps, for the group or any individual, to test

15  whether they had in fact read and understood the documents?       10:37:37

16  A.  Yes, sir, there was.  There was a random survey.  Every

17  supervisor and commander was asked to conduct a random survey

18  of three of their employees and asked the question, Did they

19  read it, and did they take the time to read it, and com -- I

20  believe read and comprehend, but I'm -- I don't know that's the   10:37:57

21  exact wording.  I could provide a copy of the survey.  We have

22  the documents of that also, and -- and the results.

23  Q.  But there were no questions about the content of those

24  documents to the people who asserted they had read them.

25  A.  No, sir, because they were different levels.  The             10:38:12

1  supervisors had one level of reading they had to and the line

2  officers had a different, so we didn't have a different

3  questionnaire for each.

4  Q.  All persons had to --

5  A.  Can I clarify?                                              10:38:25

6  Q.  Please.

7  A.  I do believe it said, Do you understand that there was

8  racial -- that decisions were -- law enforcement decisions were

9  made.  Do you understand that law enforcement decisions were

10  made that were based on racial profiling?  I'm misquoting what   10:38:39

11  I'm saying, but there was a questionnaire that asked if there

12  was two questions that were specific to it, to the order.

13          MR. POCHODA:  Thank you.

14          THE COURT:  Thank you.  Any follow-up?

15          MR. CASEY:  Yes, sir.                                    10:38:55

16          THE WITNESS:  To clarify a question, I did bring the

17  master log of what all the signatures were and how the process

18  works if -- it's a thick, long, lengthy document, but it does

19  show all the employees, their sig -- not their signatures, but

20  where they are in the log process, so -- it's the master list    10:39:15

21  that we're using, so --

22          THE COURT:  Does it show what the attestation was that

23  each employee made?

24          THE WITNESS:  No, sir, it didn't.  I didn't --

25          THE COURT:  All right.                                   10:39:25

```
 1                          EXAMINATION

 2   BY MR. CASEY:

 3   Q.  Captain, quickly, in follow-up to plaintiffs' counsel's

 4   questions, what was the date that you met with Chief Kiyler,

 5   monitor?                                                          10:39:32

 6   A.  May 1st.

 7   Q.  And did you provide the master list of employees to

 8   Chief Kiyler?

 9   A.  I did.

10   Q.  And did you provide her access to the actual logs for her   10:39:39

11   to review if she so chose?

12   A.  Yes.  In fact, we actually did a random sampling of about

13   10.

14   Q.  Did you also offer Chief Kiyler a thumb drive of all the

15   information and data of any type that she might want?           10:39:52

16   A.  Yes.

17   Q.  Did she accept that invitation?

18   A.  She advised me to contact the monitor team on Monday and

19   ask -- and advise -- find out from them what documents they

20   wanted.                                                         10:40:07

21   Q.  Okay.  And did you do that?

22   A.  Yes.  Actually, I talked to them on Friday, they called me

23   on Friday, so yes, we did.

24   Q.  And who is "they"?

25   A.  Chief Warshaw.                                              10:40:15
```

1    Q.  Chief --

2    A.  I'm sorry, Chief Martinez.

3    Q.  Chief Martinez.  Did Chief Martinez make specific request

4    of you of what he wanted?

5    A.  Yes.                                                          10:40:23

6    Q.  And did you provide that to Chief Martinez --

7    A.  I did.

8    Q.  Okay.  Was there anything that was asked of you by the

9    monitor team that was not provided to the monitor team?

10   A.  No, sir, everything was provided.                            10:40:33

11   Q.  All right.  Now, you mentioned earlier that the -- the

12   attestation was directly from the Court's order.

13          Did I understand that correctly?

14   A.  That's correct.

15   Q.  And you also said you don't remember specifically the        10:40:45

16   attestation, but I want to see if this refreshes your

17   recollection, okay?

18   A.  Yes.

19   Q.  That each person that was asked to sign was asked whether

20   or not they actually read it, is that a correct statement?      10:40:58

21   A.  That's correct.

22   Q.  And the second thing is whether they took sufficient time,

23   in their own subjective judgment, to try to understand what

24   they read.  Is that a correct statement?

25   A.  I believe that is a correct statement.                       10:41:12

1    Q.  Okay.  So I'm not holding you to the precise verbiage, but

2    generally that's what your understanding is of what this

3    honorable court required, right?

4    A.  Yes.

5    Q.  And that's what you required as compliance for everyone to          10:41:24

6    read it, right?

7    A.  Yes, sir.

8    Q.  All right.  Now, you also -- in closing here, you also

9    mention that there were sort of a -- an internal test.  Do you

10   remember answering that series of questions by Mr. Pochoda?            10:41:35

11   A.  Could you clarify again?  Sorry.

12   Q.  Yeah.  Mr. Pochoda asked you, Well, how do you know if they

13   understood it?  Do you remember that section?

14   A.  Yes, we did a random sampling.

15   Q.  All right.  And there were two questions, weren't there?          10:41:48

16   A.  Yes, there were.

17   Q.  And to refresh your recollection, was one of the questions,

18   quote, Did you carefully read the seven-page corrective

19   statement document from Judge Snow?  Yes or no.

20   A.  Yes.                                                               10:42:00

21   Q.  Does that sound accurate to you?

22   A.  That's correct.

23   Q.  Without holding you to the exact verbiage.

24   A.  Yes, sir.

25   Q.  Okay.  And the second question which was asked randomly           10:42:06

 1  was:  Do you understand that Judge Snow in the Melendres v.

 2  Arpaio court decision found that the Maricopa County Sheriff's

 3  Office impermissibly used race or ethnicity as one factor among

 4  others in making law enforcement decisions?  Yes or no.

 5          Was that generally what was asked of --                    10:42:26

 6  A.  Yes, sir, that's correct.

 7  Q.  Okay.  Now, the final area that I want to make sure is

 8  important because you mentioned that everything that was

 9  attested to by anyone in the MCSO was pursuant to your

10  truth telling policy, isn't it?                                    10:42:38

11  A.  That's correct.

12  Q.  And so it's clear for the Court, and with the Court's

13  indulgence, leading you a little bit, but that is a policy that

14  says if you lie, that is a terminable, fireable offense, isn't

15  it?                                                                10:42:51

16  A.  Yes, sir, and it's been followed strictly.  It's if you

17  lie, you die, basically is --

18  Q.  Okay.

19  A.  -- you go away.

20  Q.  You lie, you die, yes?                                         10:42:58

21  A.  Yes, sir.

22  Q.  And so if they tell their supervisor that they've read

23  something this Court has ordered and they haven't, lie or die.

24  A.  Yes, sir.

25  Q.  If they don't sufficiently understand it and they've         10:43:08

```
 1    attested it --
 2              Now, everyone has their own abilities to understand
 3    things.  Some of the orders -- some of the lawyers have
 4    difficulty understanding sometimes certain parts of orders, but
 5    they have an obligation to fully understand to their best        10:43:25
 6    ability, right?
 7    A.  Yes, sir.
 8    Q.  And if they don't tell the truth, that's lie or die, right?
 9    A.  That's correct.
10              MR. CASEY:  All right.  Those are all the questions.    10:43:33
11    Thank you, Your Honor.
12              THE COURT:  Thank you.
13              Any follow-up?
14              MR. POCHODA:  No, Your Honor.
15              THE COURT:  Ms. Wang?                                   10:43:39
16              MS. WANG:  Your Honor, I'm sorry to interrupt.  I just
17    was a little bit unclear.  I think Captain Farnsworth said that
18    he provided Chief Kiyler from the monitor's office with the
19    document that was projected on the ELMO this morning, which was
20    a summary of the compliance numbers, and three other documents,  10:43:53
21    and I'm not sure he ever managed to finish listing those three
22    documents.
23              THE WITNESS:  There were two other documents, and it
24    wasn't the document that was provided today because today's
25    document has yesterday's -- up to yesterday's statistics.  So    10:44:09
```

1    what Chief Kiyler was provided was what we had complied with on

2    that Thursday, May 1st, date.  So it's a different document,

3    but there was only three documents provided to her.

4            MS. WANG:  And what were the other two documents, sir?

5            THE WITNESS:  The documents were the status or the                    10:44:30

6    percentage of update, what we've done to comply with the order,

7    a time line type, and I believe it was also those that had

8    failed to -- the color coded one that hasn't -- hadn't --

9    hasn't been complied with yet.

10           MS. WANG:  Thank you.                                               10:44:48

11           THE COURT:  The parties, perhaps, have not been able

12   to read Chief Warshaw's summary to me of Chief Kiyler's

13   activity.  In addition to doing the session that chief -- or

14   that Captain Farnsworth described, you'll see that Chief Kiyler

15   indicates that she randomly went to two different districts              10:45:10

16   within the MCSO and selected patrol, or sworn officers randomly

17   from those districts, and then quizzed them about their

18   compliance with the policy and found that everyone that she had

19   contacted was in compliance with the policy.

20           It is clear to me that the monitor -- well, it seems             10:45:31

21   to me, based on the testimony, that the Sheriff's Office is in

22   substantial compliance with my enforcement order, and to the

23   extent that the Sheriff's Office is not in complete compliance,

24   they have implemented policies which will require complete

25   compliance before anyone reassumes any law enforcement                   10:45:51

 1   responsibilities or obligations.

 2            To the extent that there may yet remain an inadequate

 3   level of understanding at the MCSO, that is something that the

 4   monitor will continue to verify compliance on, and so I am

 5   going to find the MCSO in compliance with my enforcement order,    10:46:11

 6   subject to only if when you see the actual attestation

 7   language, Mr. Pochoda, you feel like it's inadequate, you can

 8   indicate as much to me, but based upon the clarification

 9   provided Mr. Casey, it sounds to me like the attestation

10   language is in compliance with my order.  And so I am going to    10:46:31

11   find, at least -- I'm going to find, unless you can demonstrate

12   otherwise, that the MCSO is in compliance with my April 17th

13   enforcement order.

14            Thank you, Captain.  You may step down.

15            Is there anything else that we need to raise while    10:46:46

16   we're all here?

17            MR. CASEY:  Your Honor, I would like to approach the

18   bench for a sidebar, with plaintiffs' counsels' permission, on

19   a matter, just a housekeeping matter, real brief, but I think

20   it might be important.    10:46:59

21            THE COURT:  All right.  Is there a reason why we need

22   to do it at sidebar?  Is there a personal matter, or something

23   that --

24            MR. CASEY:  Yes, Your Honor.

25            THE COURT:  All right.    10:47:07

1          (Bench conference on the record.)

2          (Page 37, Line 2, through Page 46, Line 18, sealed by

3    order of the Court.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          (Bench conference concluded.)

20          (Pause in proceedings.)                          10:59:23

21          THE COURT:  All right.  Other issues, Ms. Wang?

22          MS. WANG:  Just to keep the Court apprised of some

23     other issues that we're conferring with the defense about,

24     there are a number of issues about the training that's required

25     under this Court's supplemental injunction.  We're meeting and   10:59:45

1    conferring with Mr. Casey.

2         As the Court knows, the plaintiffs have proposed a

3    list of alternative or additional instructors for those

4    training subjects, and we're conferring both with the defense

5    and with the monitor about that.  We plan to get our comments         11:00:00

6    on the two training curricula that MCSO has prepared and

7    submitted to the monitor in to the monitor and the defense on

8    time, which would be next Wednesday, which is the 14th.

9         THE COURT:  All right.  Anything on that, Mr. Casey?

10        MR. CASEY:  No, Your Honor.  Thank you.                           11:00:22

11        THE COURT:  All right.  I will just offer, the monitor

12   is very good at keeping me apprised of everything that's going

13   on.  It's one of his many strengths.

14        Let me just say, I have a word or two, an observation

15   or two to make; otherwise, I will let him handle the matter.          11:00:34

16   But out of a desire to comply with my order as it pertains to

17   my legal rulings, and the order requires that there be a

18   bar-certified lawyer involved in that training, the monitor has

19   observed, and he has apparently spoken directly with the

20   County's curriculum subcontractor, the monitor suggested, and I       11:00:58

21   wouldn't think there's a whole lot of disagreement about this,

22   but in case there is I want to raise it now, that in order to

23   make the training of value to law enforcement officers, the

24   deputies who are actually going to receive it, I am going to

25   require that there be a certified lawyer there.  But lest we          11:01:20

 1    engage in too much lawyer-speak that a typical deputy can't

 2    understand, it would be my expectation that there is also an

 3    experienced law enforcement officer who can translate what may

 4    be legal language into practical street language involved in

 5    that training.                                                    11:01:45

 6           Is there going to be any objection to that by the

 7    County?

 8           MR. CASEY:  No.

 9           THE COURT:  Any objection by the plaintiffs?

10           MR. POCHODA:  No.                                          11:01:53

11           MS. WANG:  No.

12           THE COURT:  All right.  So if that oral clarification

13    is enough, I will deem it enough, but if we're going through

14    the exercises I've deemed that we must do to provide this

15    supplemental -- provide this additional training with new        11:02:05

16    policies, I want to make sure that it is a training that is of

17    value and can be appreciated, understood, and applied by the

18    deputies and those who receive it.  So I'm going to be very

19    open to things that, while legally correct, and we have the

20    assurances that they are legally correct, are also practically   11:02:26

21    understood and understandable by those who must benefit from

22    the training, and that, I hope, would not be an object of too

23    much disagreement between the parties.

24           All right.  With that, then we will have the minor

25    status matter I've set for next week, and then we will proceed   11:02:44

 1    under the terms of the order.

 2            One moment.

 3            (Off-the-record discussion between the Court and the

 4    court reporter.)

 5            THE COURT:  I am going to authorize the Sheriff's         11:02:58

 6    Department and/or the plaintiffs to have a copy, if they

 7    request it, of the matters that occurred under seal.  But, of

 8    course, when you get that copy -- I'm going to authorize that

 9    without further order of the Court, but if you do get such a

10    copy, it must remain under seal.  All right?  Thank you.        11:03:13

11            (Proceedings concluded at 11:03 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 15th day of May,

18   2014.

19

20

21                         s/Gary Moll

22

23

24

25