1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )    **SEALED PROCEEDINGS**
5                                    )
                  Plaintiffs,        )    CV 07-2513-PHX-GMS
6                                    )
                  vs.                )    Phoenix, Arizona
7                                    )    May 14, 2014
     Joseph M. Arpaio, et al.,       )    10:02 a.m.
8                                    )
                  Defendants.        )
9    _____ )

10

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          BEFORE THE HONORABLE G. MURRAY SNOW

16      (10 O'clock a.m. Status Conference, Pages 35-104)

17                **SEALED PROCEEDINGS**

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                       A P P E A R A N C E S

2

3   For the Plaintiffs:         Daniel J. Pochoda, Esq.
                                AMERICAN CIVIL LIBERTIES
4                               FOUNDATION OF ARIZONA
                                77 E. Columbus Avenue
5                               Suite 205
                                Phoenix, Arizona  85012
6                               (602) 650-1854

7                               Cecillia D. Wang, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
8                               FOUNDATION
                                Director
9                               Immigrants' Rights Project
                                39 Drumm Street
10                              San Francisco, California  94111
                                (415) 343-0775
11
    For the Defendants:         Timothy J. Casey, Esq.
12                              SCHMITT, SCHNECK, SMYTH,
                                CASEY & EVEN, P.C.
13                              1221 E. Osborn Road
                                Suite 105
14                              Phoenix, Arizona  85014-5540
                                (602) 277-7000
15
                                Thomas P. Liddy
16                              Deputy County Attorney
                                MARICOPA COUNTY ATTORNEY'S OFFICE
17                              Civil Services Division
                                222 N. Central Avenue
18                              Suite 1100
                                Phoenix, Arizona 85004
19                              (602) 372-2098

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3          THE COURT:  Please be seated.

 4          THE CLERK:  This is civil case 07-2513, Melendres v.

 5   Arpaio, on for status conference.                                10:02:57

 6          Counsel, please announce.

 7          MR. POCHODA:  Dan Pochoda, ACLU of Arizona, for

 8   plaintiff.

 9          MS. WANG:  Cecillia Wang of the ACLU for the

10   plaintiffs.  Good morning again, Your Honor.                     10:03:10

11          THE COURT:  Good morning.

12          MR. CASEY:  Good morning, Your Honor.  Tim Casey, and

13   with me is co-counsel Tom Liddy of the Maricopa County

14   Attorney's Office.

15          Obviously, with us you recognize some of the faces:      10:03:19

16   Jerry Sheridan, Joseph Arpaio.  Ken, is it?

17          CAPTAIN HOLMES:  Yes.

18          MR. CASEY:  Ken Holmes --

19          CAPTAIN HOLMES:  Ken Holmes.

20          MR. CASEY:  -- from Internal Affairs.                     10:03:28

21          SERGEANT BENTZEL:  Sergeant Jason Bentzel, also from

22   Internal Affairs.

23          MR. CASEY:  And I think that will be it who may be

24   speaking to you, and I turn it over to you, Your Honor.

25          THE COURT:  All right.  I'd like to see the parties       10:03:40
```

1    alt sidebar, please.

2              (Bench conference on the record.)

3              THE COURT:  All right.  Everybody knows our sidebar

4    mike is a little not sensitive enough, so when you speak,

5    please make sure you get close.                                    10:04:04

6              Ms. Wang, Mr. Pochoda, there are matters that have

7    come to my attention through the monitor, items disclosed by

8    the MCSO to the monitor in good faith --

9              MR. POCHODA:  Um-hum.

10             THE COURT:  -- that it seems to me involve an ongoing,    10:04:19

11   and perhaps now areas of new investigation that in order to

12   preserve evidence must be kept confidential.

13             That being said, because they relate directly to this

14   lawsuit, as well as, perhaps, to many other collateral

15   things --                                                          10:04:40

16             MR. POCHODA:  Um-hum.

17             THE COURT:  -- and who knows what, but because they

18   relate to this lawsuit, I just do not feel comfortable

19   proceeding without plaintiffs being aware of the nature of what

20   you have found.                                                    10:04:50

21             And I've reviewed the order.  I can give you the --

22   the actual paragraph numbers that I think are applicable.  But

23   it would be my recommendation that I receive a motion to put

24   this hearing under seal, and whoever the other side is can

25   object if they want.                                              10:05:06

1          Do I have such a motion?

2          MR. CASEY:  To put it under seal?

3          THE COURT:  Yes.

4          MR. CASEY:  Yes.  I'm moving on behalf of the

5   defendants to put this under seal for the basis, Your Honor,          10:05:14

6   that while Charley Armendariz has committed suicide, is no

7   longer subject to criminal charges, this is a criminal ongoing

8   investigation that may lead to other MCSO personnel, also

9   involving witnesses, evidence potential tampering, obstruction,

10  things like that.  And so even though Charley is no longer --          10:05:32

11  Charley Armendariz is no longer subject to administrative

12  penalties or criminal sanctions, this may lead -- is a criminal

13  investigation that could lead anywhere.

14          THE COURT:  Yeah.  And what I would propose to say to

15  the public simply is that because this matter involves what          10:05:50

16  I -- or may involve what I have defined in the order as a

17  special operation, and "special operation" actually refers to

18  patrol activities involving traffic stops.

19          MS. WANG:  Um-hum.

20          THE COURT:  But it's my understanding that some of the          10:06:07

21  material definitely involves traffic stops here.

22          MR. POCHODA:  Um-hum.

23          THE COURT:  So I don't think I'm misstating the facts

24  if I just say this pertains to a special operation as defined

25  by the order and so the Court is going to put this hearing --          10:06:16

1   the Court has moved and is -- it has been moved and the Court

2   has granted the motion that this hearing is under seal until

3   further order of the Court.

4         MS. WANG:  Um-hum.

5         MR. CASEY:  Yes.  I also want to put on the record                10:06:28

6   that I had some traveling yesterday, so I wasn't able to

7   communicate with anyone in this hearing today, but I did, right

8   before this hearing started, speak with plaintiffs' counsel

9   Cecillia Wang and Dan Pochoda and invited them, subject to the

10  Court's permission, to be in this room during this presentation   10:06:47

11  on behalf of my clients, the MCSO, because the monitor is also

12  here.  It is important that everyone be aware of it.

13        THE COURT:  Well, I appreciate that, because -- I

14  appreciate that sign of good faith, and I clearly would have

15  involved you, anyway, but I'm glad you're --                      10:07:00

16        MR. CASEY:  But I wanted you to know that I appreciate

17  the Court's position, but it was a -- as counsel, we thought

18  they needed to be here.

19        THE COURT:  All right.

20        MR. CASEY:  I'm glad they're here.  We never did            10:07:09

21  invite them so I'm glad they're here.

22        THE COURT:  All right.

23        (Bench conference concluded.)

24        THE COURT:  All right.  Ladies and gentlemen, I have

25  received a motion at sidebar to put this hearing under seal.      10:07:29

1    There is a substantial amount of case law that requires

2    virtually everything that we do be done in public.  On

3    occasion, however, there are reasons that justify putting a

4    matter under seal.  One of those reasons I set forth in my

5    order pertain to special operations by the Maricopa County            10:07:50

6    Sheriff's Office, both anticipated and ongoing special

7    operations.

8            After having received the explanation, there is no

9    objection by either party to proceeding under seal, and so I

10   will -- I am going to grant the motion, subject to anybody            10:08:05

11   making an objection who may have one in the audience.

12           Is there any such objection?

13           Okay.  Hearing none, I am going to now put this

14   hearing under seal and it will remain under seal only so long

15   as is necessary as determined by further order of this Court.         10:08:23

16   And so the courtroom will now be cleared.  Thank you.

17           (The courtroom is cleared.)

18           MR. CASEY:  Your Honor, I --

19           THE COURT:  Just one moment, please, Mr. Casey.

20           All right.  I recognize the United States marshals in          10:09:13

21   the room; I recognize my clerk staff; I recognize the members

22   of the MCSO that were introduced to me.

23           I don't know who three people who weren't introduced

24   to me are, so I want them introduced to me or I want defendants

25   to avow that they're MCSO personnel.                                  10:09:29

1          MR. CASEY:  Christine Stutz is a Maricopa

2     county attorney, works with Tom Liddy, who has been working

3     with the monitor and the MCSO on HR employment issues, trying

4     to make sure things are in compliance.

5          Angelo, what is your last name?                          10:09:48

6          SERGEANT CALDERONE:  Calderone.

7          MR. CASEY:  And Angelo Calderone works with the MCSO

8     and is with the sheriff.

9          And I apologize --

10         MR. HEGSTROM:  Chris Hegstrom.                            10:10:01

11         MR. CASEY:  Chris is also with the MCSO, and Chris is

12    in media?  He's in media relations, and he -- I just wanted to

13    put on the record that even though he's with media relations,

14    what happens here does not go to the media.

15         And then I think I introduced everyone else?             10:10:17

16         THE COURT:  Yes.  I will indicate that the four

17    persons in the back of the room are all United States Marshals

18    and authorized by my order to be here.

19         Do plaintiffs have any question about anybody else in

20    the room?                                                     10:10:32

21         MS. WANG:  I don't think we heard what Mr. Calderone's

22    position is at the MCSO.

23         MR. CASEY:  He is the head of the personal security

24    for the sheriff, Your Honor.

25         MS. WANG:  Thank you.                                    10:10:42

1        THE COURT:  Okay.  Do the --

2        MR. CASEY:  Goes wherever the sheriff goes.

3        THE COURT:  Do the defendants have any questions about

4   anybody else in the room?

5        We need to have Chris's last name.                          10:10:54

6        MR. HEGSTROM:  Chris Hegstrom.  H-e-g-s-t-r-o-m as in

7   Mary.

8        MR. CASEY:  I have no other questions.  My

9   understanding is that these are your law -- your capable law

10  clerks.                                                          10:11:08

11       THE COURT:  Oh, they're more than capable.

12       We also have Chief Martinez --

13       MR. CASEY:  Yes.

14       THE COURT:  -- and Chief Warshaw in the room.

15       MR. CASEY:  Yes.  No objections from the defendants,        10:11:14

16  Your Honor.

17       THE COURT:  All right.

18       All right.  I became aware yesterday through

19  disclosures made by the Maricopa County Sheriff's Office --

20  specifically, I believe, Chief Deputy Sheridan to the           10:11:28

21  monitor -- of some extensive information that I believe

22  requires this Court to address it, address on the record, and I

23  want to have an explanation of that evidence made available so

24  all parties can hear it pursuant to the terms of the order.

25       I will then have -- I want to explore it with the          10:11:53

 1   parties to make sure that we are all on the same page, or if we

 2   have objections, that I hear what they are and can rule on

 3   them.  And I want to make it clear how I expect the parties to

 4   proceed to the extent that I have authority to do so.

 5        And I will have questions for the parties.  I                    10:12:10

 6   appreciate, Sheriff Arpaio, you being here.  I may have

 7   questions for you.  I realize that you may not have all the

 8   answers and you may need to defer to Deputy Chief Sheridan.

 9        Deputy Chief Sheridan -- or Chief Deputy Sheridan, I'm

10   sorry, you may also not have all the answers.  I'm not going to   10:12:30

11   place you under oath unless there's some specific reason to do

12   so.  I would appreciate, however, your best effort at answering

13   any questions that I may have that aren't covered by a

14   presentation that I anticipate you intend to give us,

15   Mr. Casey.  The only reason I say that is because you wanted to   10:12:43

16   use the monitor of the courtroom.

17        MR. CASEY:  Your Honor, yes, I mean, we are prepared

18   to answer your questions.  We also have, my understanding is

19   the clip of what you showed me on Monday.  So we have -- we

20   just learned this as counsel, a lot of us learned it on Monday   10:13:16

21   afternoon at a briefing, and then I headed out of town to pick

22   up my son at Baylor, back at 2:30 this morning.  The reason I

23   preface that is that Mr. Liddy capably told me that I may need

24   to share with you some background about what was found --

25        THE COURT:  That would be good.                              10:13:36

1    MR. CASEY:  -- and I'm going to tell you, I'm going

2  off of my memory, which is fatigued, so they may have to get

3  it, but my understanding is that during the course of this, you

4  know, Mr. Armendariz has committed, unfortunately, suicide, God

5  rest his soul, but there is now still ongoing criminal                    10:13:54

6  investigation, and during the course of the investigation it

7  was discovered that there are --

8         Is it 2500 hours?  5,000 hours of video?

9         CAPTAIN HOLMES:  There's about 900 hours.  There's

10  about 540 disks.                                                          10:14:11

11         MR. CASEY:  Okay.  540 disks.  500 hours?

12         CAPTAIN HOLMES:  More like about 900.

13         MR. CASEY:  900?  I'm sorry.  Of traffic stops

14  conducted by Charley Ramon Armendariz.

15         It appears that he has both a dash cam; it appears         10:14:27

16  that he may have some type of camera mounted to the frames of

17  his glasses, so what you see on the screen is what he is

18  looking at.  I saw clips presented to me by my client on Monday

19  afternoon, I believe it was two of them that I remember, and if

20  I remember correctly, the two clips were done in May of 2013 if  10:14:58

21  the legend on the lower right of the screen is accurate.

22         They show conduct of Charley Ramon Armendariz dealing

23  with one man in one image, would appear to be a Caucasian male.

24  The second image was a different traffic stop dealing with what

25  appear to be two Caucasians, one female, one male.  And they     10:15:27

 1  will be self-explanatory, but that is there for the Court to

 2  evaluate.

 3          We discussed with, obviously without waiving any

 4  privilege, we knew that the monitor was coming in on the

 5  following day, which was yesterday, needed to brief him on          10:15:45

 6  that.  What effect this has on this case, do not know, but what

 7  I can tell you is that we are, as an organization, the MCSO

 8  Internal Affairs is doing, as I understand it, two primary

 9  things.  They're quickly reviewing the huge volume of stored

10  data that no one knew existed.  It appears that these -- and       10:16:11

11  we're trying to confirm this, that at least the camera that

12  appears to be part of the eyeglasses for Ramon Armendariz may

13  have been a personal purchase.  We're trying to figure out when

14  that was done; when it started; why he recorded it; why it

15  wasn't logged into MCSO databases of some sort; why there was      10:16:42

16  no review, comparison to CAD data.

17          We are also, based on the stops, trying to identify

18  those that the MCSO internally looked at and say, let's put it

19  diplomatically, these are problems.  So on Monday we saw two

20  problem stops and we're trying to figure out:  Were there any      10:17:10

21  complaints that were ever made by these citizens?  What became

22  of those incidences?  They have a tremendous volume of other --

23  a universe of stops to find out.  Anecdotally, my guess is

24  we're going to find more problems.

25          The second thing that they can address with you, and I     10:17:36

1   did not bring my sheet here, is the volume of data of license

2   plates, the volume of Arizona-issued licenses, the volume of

3   Mexican-issued licenses, and I apologize for the inconvenience.

4           (Pause in proceedings.)

5           MR. CASEY:  Arizona driver's licenses, ID cards, right   10:18:17

6   now there are 153 that were seized pursuant to the search

7   warrant at Ramon Armendariz's residence on May 1st.

8           Out-of-state licenses, ID cards, there are 43 of them.

9   The one that is -- what we're really looking at is the Mexican

10  voter IDs, the consular cards, driver's licenses issued by the   10:18:40

11  states in Mexico, 180.

12          Mexican civil documents, that's just a broad category,

13  six.  Mexican currency, bills, four, various denominations.

14  Social Security cards from the United States, 11.  U.S.

15  immigration cards, five.  Credit, debit, bank and merchant   10:19:03

16  cards, 26.  Vehicle registrations, something labeled TRP, there

17  are five.  Foreign passports, four.  Miscellaneous cards or

18  papers, 49.  And then actual license plates, either from

19  Arizona or out of state, are 104.  And then Mexico are two.

20          My understanding is that we've done up to a certain   10:19:33

21  percentage, maybe all the license plates?

22          CAPTAIN HOLMES:  All of the license plates.

23          MR. CASEY:  And out of the U.S. ones, maybe how many

24  of them were actually expired?

25          CAPTAIN HOLMES:  They were all expired.   10:19:48

1    MR. CASEY:  They were all expired.

2    THE COURT:  When you say they're all expired, you mean

3  they're all expired now.

4    MR. CASEY:  They were expir -- well, yeah.  What's

5  that mean?                                                    10:19:56

6    CAPTAIN HOLMES:  Yes.  We understand that they were

7  expired --

8    MR. CASEY:  This is Ken Holmes.

9    THE COURT:  Sir?

10    CAPTAIN HOLMES:  Yes.                                      10:20:03

11    THE COURT:  If I could get you to approach a

12  microphone if you're addressing me, please.

13    MR. CASEY:  And would you mention your first name,

14  please.

15    CAPTAIN HOLMES:  Thank you, Your Honor.  My name is       10:20:08

16  Ken Holmes, H-o-l-m-e-s.  Our understanding is that they were

17  expired at the time they were taking, but it's still

18  information that is yet to be a hundred percent confirmed.

19    THE COURT:  How do you get -- how do you obtain that

20  understanding?                                               10:20:24

21    CAPTAIN HOLMES:  They ran a registration check on all

22  of the vehi -- at the time that they were expired, and that was

23  my understanding that they were expired at the time.

24    THE COURT:  Well, have you been able to place the time

25  that the license plates were seized by Deputy Armendariz?    10:20:35

 1          CAPTAIN HOLMES:  That, I don't know yet.

 2          THE COURT:  So it's really impossible to -- I mean,

 3   it's possible to know they're expired now, but it isn't

 4   possible to know at this point whether they were expired at the

 5   time Deputy Armendariz seized them.                    10:20:52

 6          CAPTAIN HOLMES:  I would agree with that.

 7          THE COURT:  And I think I heard Mr. Casey talk about,

 8   and I realize that this would be a very intensive undertaking,

 9   but trying to match up these seizures with CAD data, has that

10   effort begun?                                          10:21:07

11          CAPTAIN HOLMES:  It hasn't begun yet but is starting,

12   yes.

13          THE COURT:  All right.  Thank you.

14          Has there been any effort made to determine the race

15   of the persons that were not -- that had American            10:21:16

16   identifications or driver's licenses?  And by "race," I realize

17   that we have to be careful, but I'm talking about hispanicity.

18          MR. CASEY:  Particularly, what I understand the

19   question is is we do what we did at trial: looking at Hispanic

20   surname probability.                                   10:21:37

21          THE COURT:  That would be fair enough.  Have you --

22          MR. CASEY:  Okay.

23          THE COURT:  -- done that?

24          MR. CASEY:  And my understanding is we are in the

25   process, the MCSO is in the process of trying to identify, out   10:21:43

1    of U.S. I -- or Arizona driver's licenses, out of the 153, what

2    names appear to be of Hispanic surnames.

3         But literally, just so the Court is aware, we have a

4    huge amount of work to do and try to do it as efficiently and

5    accurately as possible, so we don't -- I don't have that          10:22:10

6    information for you right now.

7         Do we have an idea?  I know that -- go ahead,

8    Chief Sheridan.

9         CHIEF DEPUTY SHERIDAN:  Your Honor, I might be able to

10   address how we're going to approach that.                         10:22:21

11        What we have is two teams of detectives that are going

12   to review the data.  We have over 500 DVDs with thousands of

13   hours of information on them.

14        With that, we've got eight detectives from Internal

15   Affairs under the direction of Captain Holmes that we have        10:22:47

16   chosen to review the data on the traffic stops.  Those traffic

17   stops on those DVDs are realtime, and it takes --

18        THE COURT:  Do they have dates on them?

19        CHIEF DEPUTY SHERIDAN:  Yes, sir.  However, and we are

20   prepared to show you a few exemplars if you wish to see them      10:23:05

21   today.  We're not sure if date and time stamp on those are

22   accurate.  We feel that they're not because -- you'll see one

23   today -- it shows, like, 5 o'clock in the afternoon and it's

24   dark out.  It's probably 2 o'clock in the morning.  So we're

25   not really confident of that.                                     10:23:26

1        But the reason we chose eight detectives from

2   Internal Affairs is because we wanted those individuals who are

3   used to discussing policy, they know policy in and out and have

4   the same ethical microscope that they will look at the actions

5   of Deputy Armendariz from the same perspective.  So we have one          10:23:46

6   team of detectives that are doing that.

7        Now, more on point to the last question of the hard

8   copy documents that we were discussing, we have a team of 10

9   detectives that are doing the research on these individual

10  documents along with two crime analysts and a lieutenant and a          10:24:11

11  few deputies that work at ACTIC, which is linked with Homeland

12  Security and have access to many databases.  So when we want to

13  try and find somebody, a fugitive or somebody that we're

14  looking for, they have a lot of access to information that the

15  normal detective unit would not have.  So we've also employed          10:24:38

16  them in an attempt to identify and contact the individuals

17  where we have hard copies of their IDs.

18        THE COURT:  All right.  Thank you.

19        Let me just step back a minute and I want to make a

20  few observations.  They're going to, perhaps, be painful.  I          10:25:04

21  don't intend them to be that way.  But I think it's important

22  that we have clear understanding between us.

23        When did you take over your present responsibilities?

24        CHIEF DEPUTY SHERIDAN:  It was September of 2010, sir.

25        THE COURT:  And prior to you, who held your position?          10:25:34

1        CHIEF DEPUTY SHERIDAN:  Chief Deputy Dave Hendershott.

2        THE COURT:  All right.  I realize that you may or may

3   not know the answer to the questions I'm about to ask, but I

4   want your best faith answer.

5        And Sheriff, if you have information, I expect you to          10:25:50

6   give it, okay?

7        SHERIFF ARPAIO:  Yes.

8        THE COURT:  I'm not going to put either one of you

9   under oath, but I expect your best best faith answer to the

10  questions I'm about to ask you.                                     10:26:02

11        If I understood correctly from the information that

12  I've received from my monitor about communications that you had

13  with him, and further, if I understood correctly what I've just

14  heard from your counsel, Deputy Armendariz had a dash cam and

15  he had an eyeglass cam.  Did he have any other kind of camera       10:26:30

16  that we see recordings of?

17        CHIEF DEPUTY SHERIDAN:  Not that I'm aware of, sir.

18        THE COURT:  All right.  Did the Maricopa County

19  Sheriff's Office issue eyeglass cameras to any of its officers?

20        CHIEF DEPUTY SHERIDAN:  Not that I'm aware of.              10:26:46

21        THE COURT:  Was the Maricopa County Sheriff's Office

22  aware that some of its officers were recording traffic stops?

23        CHIEF DEPUTY SHERIDAN:  The best way to answer that,

24  Your Honor, is the dash cams would have been purchased and

25  installed by the Sheriff's Office, so the answer would be yes,     10:27:11

1    to some extent.

2         THE COURT:  All right.  How many dash cams were in

3    existence in 2010, do you know?

4         CHIEF DEPUTY SHERIDAN:  I do not know.

5         THE COURT:  Do you know what happened to the                10:27:27

6    recordings from those dash cams?

7         CHIEF DEPUTY SHERIDAN:  I do not know.

8         THE COURT:  You have counsel here, and I don't want to

9    compromise you in any way, but is there any reason to think

10   that other officers may have been doing what Deputy Armendariz   10:27:47

11   was doing, which is, in addition to whatever data they received

12   from the marico -- or data they recorded through MCSO-issued

13   devices, they were also doing their own recordings?

14        MR. CASEY:  Your Honor, I just want to -- I'm going to

15   just lodge -- you're asking him to speculate about --           10:28:11

16        THE COURT:  That's fine.  And if you -- if you really

17   don't know, you should say you don't know.  And let me make one

18   other thing clear before you answer this question so you'll

19   know where I'm coming from, and if plaintiffs have any

20   objection they can object.                                       10:28:28

21        I have reviewed my order this morning, and I believe

22   that there is very little doubt that your investigation of what

23   you have discovered is subject to my monitor's review because

24   of its association with this lawsuit and the issues that relate

25   to it.                                                           10:28:51

1     I also am not unmindful that the Sheriff's Office has

2   done things that I didn't like very much and that I think

3   violated my order and I required you to undertake corrective

4   action and you've done so, and done so to my satisfaction in

5   terms of that corrective action.  So there's reasons that I'm          10:29:15

6   wary of you, and also reasons that you have -- that you've

7   operated in good faith.  I recognize that all of the

8   information you are now sharing with us is information you have

9   because you've come forward, and I respect that.

10     Let me say, however, that it must have occurred to you       10:29:31

11   that there is, in addition to this lawsuit, a broad range of

12   other potential ramifications for the information that you

13   contain.  And so to the extent that I believe I have

14   jurisdiction over your investigation, and to the extent that

15   you have made the decision to maintain this investigation             10:30:00

16   instead of giving it out to another government -- investigative

17   agency, and even if you were to give out parts of it, it seems

18   to me you have to maintain certain parts that would then be

19   subject to my jurisdiction, let me tell you unequivocally what

20   I think.  And Sheriff, Chief Deputy, my two monitors, if you         10:30:19

21   have questions about what I'm about to say, now's the time to

22   say it.

23     But it seems to me that the first thing we ought to do

24   before we analyze information is make sure that we gather all

25   the information that exists that needs to be analyzed.  And it        10:30:38

1    seems to me if in fact the MCSO had dash cams that were

2    operating at the time, we need to know who had those dash cams,

3    and we need to know where those traffic stops are being held,

4    and we need to know who we have reason to believe may have

5    otherwise been recording traffic stop activity.                    10:31:02

6           It is my understanding from my monitor, and I may have

7    misunderstood him so I'm telling you now, so you can correct me

8    if I do have a misunderstanding, that the MCSO had no policy

9    relating to the self-recording of traffic stops by deputies, is

10   that correct?                                                       10:31:24

11          CHIEF DEPUTY SHERIDAN:  That is correct, sir.

12          THE COURT:  So it neither encouraged nor discouraged

13   or in any way regulated such activity.

14          CHIEF DEPUTY SHERIDAN:  That is correct.

15          THE COURT:  Do you have any reason to believe that       10:31:36

16   other deputies may have been doing what Deputy Armendariz was

17   doing, which is self-recording their police activities?

18          MR. CASEY:  Your Honor, I just want to put on the

19   record, it is calling for speculation.

20          THE COURT:  That's fine.                                 10:31:47

21          MR. CASEY:  May I also just put on the record, Your

22   Honor, so to the extent it's clear for the Court, the reason I

23   contacted the monitor originally, the reason why we're here, is

24   because we agree, on behalf of the MCSO and Joe Arpaio, that

25   what we have discovered is pertinent to the monitor's scope of   10:32:03

1    his.  There will be no mission creep allegation based on what

2    we have discovered here.  I want that clear for the Court.

3         This presents issues beyond this litigation as well.

4    It needs to be -- information needs to be gathered responsibly,

5    thoroughly, and in good faith.  The monitor needs to evaluate          10:32:32

6    it, my client needs to evaluate it, a lot of people need to

7    evaluate it, because, you know, there is that pending DOJ

8    lawsuit.

9         THE COURT:  Yes.  And let me just say, and I don't

10   mean to interrupt you if I haven't let you finish, that it           10:32:43

11   seems to me, and one of the reasons we're under seal -- and by

12   the way, if I find out that anybody in this room has disclosed

13   what is discussed here today, I will use the full authority of

14   this Court to make sure that you are corrected.

15        But it seems to me that the first thing that we ought          10:33:02

16   to do, because this information will inevitably leak, to the

17   extent it has not already, and if in fact there are any other

18   officers that are involved in recording their activity, either

19   legitimately through an MCSO-issued device, and I can't say

20   illegitimately because there was no policy, but otherwise           10:33:20

21   recording their activity, we need to recover that now.

22        Because particularly if they were involved in

23   surreptitious activity or activity that -- and I don't mean to

24   characterize anything that I haven't seen yet but you have

25   yourself characterized it, some of the stops as inappropriate,      10:33:38

1    if they realize that they may have taped stops that were

2    inappropriate that have relation to this lawsuit or otherwise,

3    their tendency is going to be to destroy that material.

4            And my first order of business, and I hope that you

5    join me in this, I expect you do, Chief Deputy, and I hope you        10:33:59

6    join me in this, Sheriff Arpaio, and I expect that you do, and

7    if you don't I want you to tell me right now, is the first

8    order of business is to obtain all of the material that is

9    possibly out there that we might be able to obtain before it is

10   otherwise --                                                          10:34:21

11           CHIEF DEPUTY SHERIDAN:  Your Honor, if I can answer

12   your question.

13           THE COURT:  Please do.

14           CHIEF DEPUTY SHERIDAN:  Okay.  I do believe that there

15   are other deputies that have recorded traffic stops and other        10:34:36

16   activities with their own purchased video cameras.  We also

17   discovered within the past couple of months that the Sheriff's

18   Office purchased, under a GOHS grant, a Governor's Office

19   Highway Safety Grant, to be used during DUI stops, a series of

20   on-body video cameras that were issued to Lake Patrol deputies       10:35:11

21   during the task force, the DUI task forces.

22           When we discovered this about two months ago, we

23   talked about a policy.  Where's the policy governing the

24   retention of these -- this evidence that is captured on these

25   devices?  We discovered, Chief Freeman and I, that there was no      10:35:42

1    policy involved so I ordered that a policy be promulgated.

2    That policy was signed by me.  It takes a period of time to

3    look at best practices policy, and that policy was initially

4    given to me about two weeks ago.  I sent it back for some

5    questions and corrections.  It was given to me yesterday.  I          10:36:10

6    signed off on it yesterday.  It goes into effect on the 15th of

7    this month.  I do have a copy of that with the Briefing Board

8    that went out this morning addressing those issues.

9         THE COURT:  I want to see it, but let me ask you

10   before we get there, because I want to drill down on this point       10:36:30

11   before I go to policy, does the policy involve requiring

12   deputies who've self-recorded data or requiring -- accounting

13   for videotape data that has been recorded through an MCSO or

14   other -- otherwise departmentally-issued device?

15        CHIEF DEPUTY SHERIDAN:  I'm sorry, sir.  I don't                  10:36:53

16   understand your question.

17        THE COURT:  Well, that's fine.  Let me get to the

18   point a little bit more directly.

19        Does your policy have anything to do with gathering up

20   the recordings that have been made either by deputies through         10:37:03

21   their own personal device or through a departmentally-issued

22   device and accounting for that data?

23        CHIEF DEPUTY SHERIDAN:  No, sir.  However, in light of

24   the discovery of these disks on Friday afternoon, yesterday I

25   ordered the chief of patrol, Chief Trombi, to begin to identify       10:37:25

1    who has the devices and to gather any information on where

2    those videos were, and if they were not in evidence, to obtain

3    them.

4           We're in the very beginning of this investigation.  We

5    have an internal investigation that --                              10:38:01

6           THE COURT:  I can appreciate that.  Do you mind if I

7    interrupt you to just sort of drill down on that point you've

8    just made and --

9           CHIEF DEPUTY SHERIDAN:  Yes, sir.

10          THE COURT:  -- then I'll let you go on?                       10:38:11

11          I want to do that, and I want to assist you in doing

12   it, and the monitor wants to assist you in doing it, and I

13   suspect the plaintiffs want to assist you in doing it, in the

14   way that will be the most effective and efficacious possible.

15   It occurred to me last night while I was thinking about this       10:38:24

16   that I could issue subpoenas for every one of your officers

17   that you believe has such information, requiring them to

18   disclose it.  Alternatively, that may only result in them

19   destroying the data.

20          And so it might be better, to the extent that you and       10:38:41

21   the sheriff can feel comfortable doing so, quietly collecting

22   the data.  But I would also want to know, if it can be quietly

23   collected, to not make a big fuss, I would also want to know

24   where it came from, where they were storing that data, and if

25   they claim to have deleted any such data, when they claim to       10:39:06

1   have deleted it.

2        If we have them on record making such statements, if

3   in fact further investigation finds that any officer likely had

4   such data, and that it might be -- might provide probable cause

5   to believe that they engaged in other criminal activity, we          10:39:24

6   would then have the basis, perhaps, if it was appropriate, to

7   seize where they claim they stored the data, and look at the

8   technology to determine and/or recover it.

9        It seems to me that we need to go to that level, but I

10  agree -- it seems to me that I tend to agree with any concern       10:39:42

11  that you express that if I take formal action at this point,

12  it's only going to drive -- and I'm not saying -- please, don't

13  misunderstand me.  I'm not saying that the bulk of your

14  officers or deputies are crooked.  But I'm certain that you

15  share my interest in determining exactly what they've been          10:40:01

16  doing and if any of are crooked, finding out that they have

17  been crooked, finding out what their activities are.

18        So do you have any input for me on that?

19        CHIEF DEPUTY SHERIDAN:  Yes, sir.  I would ask the

20  Court to allow us to do it in a softer manner than subpoenas.        10:40:15

21  I think we'll be more productive.  And I understand your

22  concerns, and I think we share the same concerns about the

23  documentation of where/when/how this information has been

24  stored, because I would -- I'm guessing that not all those

25  videos have been stored properly in the evidence and property       10:40:45

1    room.

2         THE COURT:  That would seem to be an assumption that I

3    would share.  And so I will tell you that I will have my

4    monitor work with you to develop a pro -- if you want his

5    assistance.  But I'm going to tell you that what I want from          10:41:02

6    the department and what I expect is -- and I understand that

7    the best way to do it may not be through my formal involvement,

8    but what I expect is a thought-through plan that is executed

9    very quickly, because this is all, likely, already through part

10   of the department, in which you can quietly gather up such          10:41:24

11   material, such data, and that you can determine where it was

12   held, when it was held, and if any particular officer says it

13   was deleted, when that deletion occurred, and from where.  Or

14   destruction, if it was held on DVDs like Armendariz's.

15        Is there any other category of information that the          10:41:42

16   plaintiffs would suggest that the Maricopa County Sheriff's

17   pursue?  With respect just to this topic.

18        MS. WANG:  Your Honor, given that we're hearing this

19   for the first time, I think it's hard for us to determine

20   whether there are additional categories of data.  I would ask          10:42:01

21   that MCSO, obviously, disclose whether other data besides

22   video recordings come to light and document those as well.

23        THE COURT:  Well, we're not there yet.  I'm about to

24   get there.

25        MS. WANG:  Okay.          10:42:18

1        THE COURT:  And I am not precluding you from making

2   requests for additional information.  We're all doing this on

3   the fly, including the MCSO, but we're trying to recover and

4   maintain as much as information as quickly as we can, and it

5   seems to me that we need to act quickly.                          10:42:35

6        Now, Chief Deputy Sheridan, Sheriff Arpaio, I'm a

7   little concerned about the dash cams.  How many do we have out

8   there that the MCSO knows it issued?

9        CHIEF DEPUTY SHERIDAN:  I do not know right now, Your

10  Honor.                                                            10:42:49

11       THE COURT:  Do you know if there was any repository

12  within the MCSO for such traffic stops?

13       CHIEF DEPUTY SHERIDAN:  I do not know.

14       THE COURT:  All right.  So I take it you don't --

15  well, I would expect that you'd run down that information as      10:42:59

16  quick as possible.  And again, whether individual officers have

17  maintained it, whether it's been maintained on police

18  department computers or other data, I would expect you would do

19  your best to gather that up.

20       Is that something that's reasonable to request?             10:43:13

21       CHIEF DEPUTY SHERIDAN:  Yes, sir, it is.

22       THE COURT:  All right.  Let me tell you two other

23  concerns I have, and I want to check one second briefly with my

24  monitor.

25       (Pause in proceedings.)                                     10:43:23

1      THE COURT:  I have two other matters I want to raise

2  with you.  The monitor, in his initial activities, has come

3  across the fact that during the term of the traffic stops that

4  are at issue in this lawsuit there have been digital audio

5  devices that have been delivered to members of the MCSO to make      10:44:18

6  recordings of all such stops.

7      Are you aware of that?

8      CHIEF DEPUTY SHERIDAN:  Yes, sir.

9      THE COURT:  Where are such recordings kept?

10     CHIEF DEPUTY SHERIDAN:  Those digital recording      10:44:29

11  devices are issued to all deputy sheriffs, and there is a

12  specific policy on the final repository of those in evidence in

13  the property room.

14     THE COURT:  All right.  Do you know how long such

15  material is maintained for?      10:44:51

16     CHIEF DEPUTY SHERIDAN:  Well, if they're evidence,

17  Your Honor, it would be until the case has been adjudicated.

18     THE COURT:  Yeah, I'm talking about recordings that

19  may not have resulted in any charges.

20     CHIEF DEPUTY SHERIDAN:  That, I -- I do not know, sir.      10:45:05

21     THE COURT:  All right.  Can you find that out and do

22  your best, and I mean your level best, come up with a plan,

23  review it with the monitor if you will, if you need to, to

24  recover all of that data?

25     CHIEF DEPUTY SHERIDAN:  Yes, sir.      10:45:20

 1          MR. CASEY:  And Your Honor, if I may add, I believe

 2    the Court's order of October 2013 also has a provision in there

 3    regarding document retention, length of time for data-related

 4    material, which I understand, based on what I've heard here,

 5    this would fall under that.                                          10:45:40

 6          THE COURT:  Well, clearly.  But I want to make clear

 7    that to the extent the order can be read as applying -- I mean,

 8    I was under the misimpression, and I -- well, the order is

 9    written as if there is no recording going on, because I believe

10    I was under that misimpression, and I suspect the plaintiffs       10:45:56

11    were as well.

12          MS. WANG:  We were, Your Honor.

13          THE COURT:  And now that I find out that recording was

14    going on, I believe that clearly, we need to find out what

15    those recordings were and recover them.                            10:46:08

16          And I agree with you, Mr. Casey, there is a retention

17    requirement in the order which will maybe be extended,

18    depending upon how long it takes to -- for the plaintiffs to

19    digest this information and for it to be of use to others.

20          MR. CASEY:  May I consult with my client briefly?           10:46:25

21          THE COURT:  You certainly may.

22          (Pause in proceedings.)

23          MS. WANG:  Your Honor, could we ask for clarification

24    on when the audio recordings began as a matter of policy?

25          THE COURT:  You may certainly do so.                         10:46:41

1      MR. CASEY:  I'm sorry.  I just needed to consult real

2   quick so I didn't misstate anything to the Court.

3      THE COURT:  That's perfectly fine.

4      Do you know when the audio recording began, Chief

5   Deputy Sheridan?                                          10:46:56

6      CHIEF DEPUTY SHERIDAN:  Your Honor, I -- I don't.

7   However, audio recording has been used by detectives for as

8   long as I can remember, in different formats as the technology

9   has changed, and -- several years ago, and that's as far as my

10  memory can allow me --                                    10:47:17

11     THE COURT:  Well, you will understand that's something

12  I'm very interested in?

13     CHIEF DEPUTY SHERIDAN:  Yes, sir, and I will get that

14  time, because I know we made a large purchase of digital

15  recording devices for just about all deputy sheriffs throughout 10:47:29

16  the organization.  And part of that was mandated by the change

17  in rules of how to investigate domestic violence cases and

18  those kinds of things, along with cameras and -- and those

19  devices to record evidence.

20     THE COURT:  In addition to the dash-mount cameras or    10:47:54

21  any other cameras that MCSO may have issued, in addition to the

22  audio recording devices, in addition to any recording devices,

23  including audio or video recording devices that may have been

24  officers doing their own recording, I have received information

25  that the Maricopa County Board of Supervisors approved in 2005  10:48:17

 1    a mobile computers program that was shut down by the office of

 2    management and budget for the MCSO, but it was reapproved in

 3    2007.  And the first year of that program required patrol

 4    computers, and the second and third year required electronic

 5    citation capacity and cameras in cars, and detectives getting          10:48:43

 6    computers and equipment.

 7          Do you know anything about that program?

 8          CHIEF DEPUTY SHERIDAN:  No, sir, very little.  I was

 9    in charge of the jail system at that time.

10          THE COURT:  All right.  I'm going to ask you, in               10:48:59

11    conjunction with whatever else you do, to find out what may

12    have been recorded, to look into the mobile computer program as

13    it was partially implemented in 2005 or 2007, to determine what

14    recordings that that may have resulted in, and also gather

15    those recordings.                                                    10:49:19

16          MR. CASEY:  Does the Court have an MBOS executive

17    session or public meeting notice date that would help us

18    identify?

19          THE COURT:  I do not.

20          MR. CASEY:  Okay.  Thank you, Your Honor.                      10:49:32

21          THE COURT:  The only information I have received is it

22    was -- that the paperwork for the MCSO labeled this stuff the

23    mobile computer program.

24          MR. CASEY:  Okay, mobile computer program.

25          CHIEF DEPUTY SHERIDAN:  Your Honor, that would mean to         10:49:49

1    me the MDCs, the mobile data computers in the patrol vehicles,

2    which on one of the videos you'll see Deputy Armendariz

3    actually using it, it's not a recording device; it's just a

4    communications tool in the vehicle to get -- it's part of the

5    CAD system, and -- but I will have to do the research on the          10:50:09

6    in-car cameras and those things --

7              THE COURT:  Well --

8              CHIEF DEPUTY SHERIDAN:  -- because I'm not familiar

9    with that.

10             THE COURT:  That's fine.  I will expect you to do          10:50:20

11   that.

12             CHIEF DEPUTY SHERIDAN:  Yes, sir.

13             THE COURT:  Now, let me just say I want the very first

14   thing to happen, unless you tell me this is unreasonable for

15   some reason, I think the very first part of your operation, and     10:50:29

16   I realize that the information you now have is extensive and

17   may well be damaging, but as I've said, I think that the first

18   obligation that you owe the public and that I clearly owe the

19   public, as well as the parties in this lawsuit, is that we find

20   out all the truth and gather all the information that may be        10:50:44

21   implicated here.

22             So I have listed for you certain categories of

23   recordings that I either believe or have reason to believe have

24   taken place, and some of that at least is in regard to

25   information that you've voluntarily disclosed, and I recognize      10:51:00

 1   that.

 2          But regardless of whether I've listed the kinds of

 3   recordings that may or may not take place, I expect your plan

 4   to be to find out what has been recorded, whether legitimately,

 5   illegitimately, or whether just patrol officers doing it -- and        10:51:12

 6   that doesn't necessarily mean it was wrong, but it wasn't

 7   authorized by the department -- I expect you to find all of

 8   that and to do your best to capture it.

 9          And to the extent that you decide at some point my

10   assistance is necessary or wise in terms of being able to             10:51:27

11   identify particular officers and procedures that may have that,

12   I'm telling you, I'll give it to you.

13          Do you understand what I'm saying?

14          CHIEF DEPUTY SHERIDAN:  Yes, sir.

15          THE COURT:  Do you have any concerns about that,               10:51:42

16   Ms. Wang, before I go on?

17          MS. WANG:  No, Your Honor.

18          THE COURT:  All right.  Now, I guess I want to ask

19   you, Chief Deputy Sheridan, in any of the recordings that you,

20   the department, has viewed, has there been anybody else other        10:51:54

21   than Deputy Armendariz that is MCSO personnel that is in those

22   recordings?

23          CHIEF DEPUTY SHERIDAN:  Your Honor, I'd like to defer

24   the answer to that question to Captain Holmes, because the

25   videos that I have seen my answer would be no, but his would be      10:52:10

 1    different.

 2              THE COURT:  All right.

 3              CAPTAIN HOLMES:  Thank you, Your Honor.

 4              THE COURT:  Thanks.  Please identify yourself for the

 5    record again.                                              10:52:18

 6              CAPTAIN HOLMES:  Ken Holmes, spelled H-o-l-m-e-s.

 7              THE COURT:  Thank you.

 8              CAPTAIN HOLMES:  Again, we've looked through maybe 250

 9    traffic stops, of which the volume we believe to be somewhere

10    between 2500 and 5,000.  But of the ones that we've watched, we  10:52:32

11    have noted possibly a couple of additional officers that were

12    present while Deputy Armendariz was conducting a traffic stop.

13              THE COURT:  And in any of them would you characterize

14    Deputy Armendariz engaging in inappropriate activity in those

15    stops?                                                     10:52:56

16              CAPTAIN HOLMES:  With respect to the dispositions,

17    possibly.

18              THE COURT:  Can you identify who those officers were?

19              CAPTAIN HOLMES:  One I believe is Lieutenant Sousa was

20    present, and the other one I don't know the name currently, but  10:53:07

21    there are others that have recognized the voice.

22              THE COURT:  All right.  Well, thank you.

23              Do you have any other information that's responsive to

24    my question?

25              CAPTAIN HOLMES:  No, Your Honor.  Thank you.       10:53:22

1           THE COURT:  Thank you.

2           MR. CASEY:  Your Honor, before he sits down, and I

3    apologize, it's your courtroom, but I was wondering, would it

4    be helpful for you to get a feel for what they're estimating

5    right now as a time frame for reviewing this and staffing it?        10:53:32

6    Does that matter to the Court, or --

7           THE COURT:  Well, it does matter to me, but as I said,

8    my first priority, I think, would be --

9           MR. CASEY:  Sure.

10          THE COURT:  -- to gather everything.  Once we're sure        10:53:42

11   we've got everything we can get, at least we've got the data

12   that will give rise to the appropriate investigations at that

13   point.  So I will get back to that, but I first want a time

14   plan in terms of gathering the material.  That's what I'm more

15   concerned with at the moment.        10:53:58

16          Chief Deputy Sheridan, Sheriff Arpaio, of course I am

17   concerned to the extent to which other deputies may be involved

18   and have witnessed these inappropriate depositions, and I'm

19   highly concerned to the extent that Lieutenant Sousa, who was

20   also a witness at trial, may have been involved in those, and I        10:54:21

21   assume that you share my concern, is that correct, Sheriff?

22          SHERIFF ARPAIO:  Your Honor, I didn't hear that

23   question.  Could you --

24          THE COURT:  Yeah.  I assume that you share my concern

25   about others in the MCSO, particularly those who may have        10:54:39

1    supervisorial responsibilities, that appear in those

2    videotapes, especially to the extent that they reflect

3    inappropriate activity on behalf -- on the part of your

4    deputies.

5              SHERIFF ARPAIO:  Yes, I do.                          10:54:53

6              THE COURT:  And I assume, then, that your office will

7    take full and complete steps to investigate who may have been

8    aware that this activity was going on, no matter how high up

9    the chain it goes.

10             SHERIFF ARPAIO:  That's right.  We will do that.      10:55:07

11             THE COURT:  Do you have a plan in place to do that?

12             SHERIFF ARPAIO:  I have delegated the -- this

13   situation to the Chief Deputy, and I'm sure, with all his

14   experience, that he knows how to carry it out and put the

15   resources to accomplish that mission.                          10:55:23

16             THE COURT:  Well, sir, I appreciate that somebody that

17   has your office has to be able to delegate and has to be able

18   to trust who you delegate, but I just want to make it clear,

19   and I don't want this to sound like a threat, you understand

20   that you are the party to this lawsuit and so while it is       10:55:39

21   certainly appropriate that you delegate, you also need to be

22   involved in the supervision and the understanding and the

23   direction of -- and setting the tone that no matter who the

24   truth hurts or how it hurts, it's coming out.

25             SHERIFF ARPAIO:  That's correct.                     10:55:56

1          THE COURT:  Are you going to be setting that tone?

2          SHERIFF ARPAIO:  Yes.

3          THE COURT:  And will you be involved in coordinating

4    with Chief Deputy Sheridan to make sure that that investigation

5    goes forward on that basis?                                    10:56:05

6          SHERIFF ARPAIO:  He will keep me advised.

7          THE COURT:  All right.  And you will -- and you don't

8    share any concerns with my primary concern of making sure that

9    we find out all this data, and that we investigate it

10   appropriately.                                                 10:56:19

11         SHERIFF ARPAIO:  No.  I can understand your concern,

12   and I've been in law enforcement 50 years, many years as a top

13   federal official and all over the world, so I understand the

14   concern of the courts, the federal system, and now as the

15   elected sheriff we will do everything we can to get to the     10:56:38

16   bottom of this.

17         THE COURT:  All right.  And you will cooperate

18   completely with my monitor.

19         SHERIFF ARPAIO:  Yes, I --

20         THE COURT:  And no information will be withheld from     10:56:50

21   him.

22         MR. CASEY:  Your Honor, with all due respect to the

23   Court, I just -- he can answer that question, but where we --

24   we have an obligation to work with Your Honor's monitor under

25   your order, and quite frankly, I think we have.  I don't want  10:57:05

1    to be a nitpicking lawyer, but I think we have, and it sounds

2    from the -- if someone were to read that transcript, it makes

3    it sound as if we've not been cooperating with the monitor.

4           THE COURT:  Well, I appreciate your avowal that you'll

5    cooperate with the monitor in the future, and I don't mean to          10:57:22

6    characterize anything or infringe on your right to make

7    clarifications, Mr. Casey, and you've down that.

8           You will cooperate with the monitor, Sheriff?

9           SHERIFF ARPAIO:  Yes.  If we have some differences --

10          THE COURT:  Bring them to me.                                    10:57:34

11          SHERIFF ARPAIO:  -- I'm sure we will bring that

12   forward and try to alleviate any problems.

13          THE COURT:  And do that in a timely fashion.  But

14   with -- to me.  But in the meantime, I believe that all records

15   and all activity pursuant to any of these investigations is           10:57:47

16   under his authority.

17          And Mr. Casey, if you have any problem with that, it's

18   time to let me know now.

19          MR. CASEY:  No.  In fact, I'm going to reiterate what

20   I said maybe an hour ago:  I agree with the Court, and on             10:57:58

21   behalf of my clients, if there's any mission creep we'll come

22   to the Court.  But right now we agree that Bob Warshaw and his

23   team, because of the Armendariz material, have the need, as an

24   officer of the Court, to investigate those matters.

25          That's why I wrote him the other day.  We welcome his          10:58:16

 1   involvement.  We welcome the Court's involvement.  And we

 2   realize we've gotta get some information to you, but that's why

 3   we came to your agent is because we understand that's in his

 4   purview.

 5        THE COURT:  Thank you.  And I do acknowledge that the      10:58:30

 6   information that we've received in this regard has come from

 7   the MCSO.

 8        Now, Chief Deputy Sheridan, Sheriff Arpaio has

 9   indicated he's delegated this responsibility principally to

10   you.  Do you have a plan for going forward with the             10:58:47

11   investigation of personnel that may, either by Deputy

12   Armendariz's tapes or by any of the other recordings that you

13   find, be implicated in inappropriate activity?

14        CHIEF DEPUTY SHERIDAN:  Yes, sir.  On Monday I

15   instructed Captain Holmes, our commander of the                10:59:07

16   Internal Affairs division, to initiate an internal

17   investigation and to put on notice all the members of the Yuma

18   smuggling unit, that's the unit that Deputy Armendariz

19   primarily worked with during the time of -- under the

20   direction -- discretion of this Court, to put them under notice 10:59:32

21   of investigation that we were going to begin this internal

22   investigation.

23        Everyone that was in contact with detective -- Deputy

24   Armendariz will be interviewed, to include their supervisors

25   and their chain of command, because I believe we, the sheriff   10:59:56

1    and I, Captain Holmes, everyone that is in the know about this,

2    share the same concerns the Court does about who knew what,

3    when, and how did this happen?  How did things get this far

4    along?  And I expressed those concerns with Chief Warshaw

5    yesterday when I briefed him, and I believe even Thursday night    11:00:26

6    when I discussed that with him last week.

7          So we are very concerned about this, and we've been

8    working very closely with the monitor on this issue, because we

9    understand the gravity of this new information.

10          THE COURT:  Any questions?  Ms. Wang?    11:00:51

11          MS. WANG:  Your Honor, I do have some -- some

12    reactions I'd like to share with the Court if we're done with

13    gathering information.

14          THE COURT:  Well, let me just say, I'm going to meet

15    with the monitor.    11:01:05

16          Are you going to be here through tomorrow?  Or not.

17          CHIEF WARSHAW:  I'm scheduled to leave.

18          THE COURT:  All right.  Well, I'm going to direct the

19    monitor to work with you on a plan that he can approve that's

20    your best thinking about how you can, without resulting in any    11:01:22

21    destruction of evidence, gather all the recordings, and then

22    based on what you find, and/or maybe beginning before you can

23    assess what you find, depending upon your thoughts, you result

24    in an appropriate and thorough investigation.

25          Is there any issue with that?    11:01:40

1        MS. WANG:  No, Your Honor, and we appreciate that.  I

2   would like to --

3        THE COURT:  All right.  I just want to hear from

4   Deputy --

5        MS. WANG:  Yeah, of course.                          11:01:49

6        THE COURT:  -- Chief Sheridan first.

7        CHIEF DEPUTY SHERIDAN:  I'm sorry, Your Honor.  I

8   thought that question was for me.

9        Yes, I've consulted with Chief Warshaw about this and

10  we discussed this issue yesterday.  He had some good advice for  11:02:00

11  me Thursday night and yesterday about some of the concerns the

12  Court had, some of his advice from dealing with issues like

13  this -- Chief Martinez, also -- and I took what they had to say

14  and we will incorporate that into how we approach this

15  situation.                                                 11:02:21

16        THE COURT:  All right.  And for what it's worth, I'm

17  going to say I'm no law enforcement professional.  I certainly

18  want to protect you, protect your men in an appropriate way.

19  But I also want to move quickly, especially in terms of

20  gathering evidence.  I cannot justify withholding this from the  11:02:34

21  public forever, but I certainly understand the law enforcement

22  need that you have, at least for a reasonable period, to do

23  your best to make sure that you can obtain all the evidence

24  without its destruction.

25        So I will be asking you for reasonable estimates about  11:02:49

1  how long this information needs to be kept under seal, because

2  I don't want to keep it under seal longer than it has to be

3  kept under seal.  You understand that.

4          CHIEF DEPUTY SHERIDAN:  Yes, sir.  Captain Holmes is

5  in the process of writing an investigative plan, and he should          11:03:03

6  be getting that to us rather quickly.

7          THE COURT:  All right.  Thank you.

8          Ms. Wang.

9          MR. CASEY:  Your Honor, three -- may I put three

10  things on the record --          11:03:21

11          THE COURT:  You may.

12          MR. CASEY:  -- real quick, briefly.

13          I'm going to assume, unless the Court tells me

14  otherwise, that our point of contact -- our, my client MCSO --

15  will be the monitor, Bob Warshaw, and his delegee, and that to          11:03:33

16  the extent the Court wants to have another hearing like this or

17  needs something in writing, filed under seal or whatnot, you'll

18  issue an order directing us to that.  Otherwise, we will keep

19  your agent informed.  Is that --

20          THE COURT:  That's correct.          11:03:47

21          MR. CASEY:  Okay.  The second thing I wanted to let

22  you know on the record is Cecillia Wang mentioned that she has

23  not had a fair opportunity yet to digest everything, and did

24  not know the purpose of the 10:00 a.m.

25          We are open, and I convey this to the Court and on the          11:04:03

 1    record, when they have -- if they come up with other ideas of

 2    other areas, we are not going to automatically exclude them

 3    because they're coming from Cecillia or the ACLU.  We will

 4    consider them in good faith.  We will be receptive.  And if Bob

 5    Warshaw or Raul Martinez say, That's a good idea, then it's          11:04:22

 6    likely to be adopted by my client.

 7            And the third thing I want to just point out, because

 8    I heard from my co-counsel, through Captain Holmes, just a

 9    matter of clarification on the record so if this is ever

10    unsealed, that Lieutenant Joe Sousa was never seen or observed      11:04:36

11    doing or saying anything inappropriate or unlawful or illegal;

12    that he may have been present during, perhaps, an improper

13    disposition done in his presence by Charley Ramon Armendariz.

14            Did I accurately capture that?  Thank you very much.

15            THE COURT:  All right.  And that is based on the 250         11:05:00

16    tapes that you reviewed so far.

17            CAPTAIN HOLMES:  That is correct, Your Honor.

18            THE COURT:  All right.  I will expect, by the way,

19    updates in terms of who else you may find on those tapes and

20    whatever else you may find, I'll expect the monitor to be           11:05:14

21    providing full updates of that information.

22            MR. CASEY:  And that's exactly why I clarified it,

23    because that man to your right, Bob Warshaw, will get it as

24    soon as we have the sense to give it to them.  What I mean, as

25    soon as we understand what we've got --                             11:05:27

1           THE COURT:  All right.

2           MR. CASEY:  -- then it will go to him.  I think you're

3    looking at a 24 to 48 hours from the moment of discovery.  I

4    can't imagine why, unless there's an intervening weekend, why

5    it would take longer.  And without waiving anything, that's          11:05:38

6    always been counsels' advice:  Sooner is better than later;

7    thorough is better than sloppy.

8           THE COURT:  All right.  Thank you.

9           Ms. Wang.

10          MS. WANG:  Thank you, Your Honor.                              11:05:49

11          I have two main points in reaction to what we've heard

12   today.  The first is that based on the limited information

13   we've now gotten, it seems quite likely that there were

14   discovery violations in this case.  It seems that there were a

15   number of -- quite a volume of recordings and other data that        11:06:09

16   were available before the close of discovery as well as through

17   the time of the trial and the discussions about the remedies in

18   this case that we should have gotten as plaintiffs.  I'm

19   concerned about that, particularly in light of the spoliation

20   of evidence which the Court sanctioned MCSO for.                      11:06:28

21          Relatedly, Your Honor, I do have concerns that there

22   is no outside agency that is participating in this

23   investigation.  After last week's sidebar discussion I did ask

24   Mr. Liddy whether any other agencies would become involved in

25   investigating this matter, and he said no.  My understanding         11:06:52

1  was that the initial instigation of the investigation of Deputy

2  Armendariz began with the Phoenix Police Department responding,

3  and so as plaintiffs we have a number of questions about the

4  process that MCSO has undertaken to date and going into the

5  future.                                                                    11:07:14

6         For that reason, we would ask that the Court order

7  MCSO to document all steps they've taken to investigate this

8  matter, starting with the instigation of the Armendariz

9  investigation, and that they provide that to the monitor, to

10  the Court, and to the plaintiffs, so that we fully understand    11:07:34

11  what steps were taken.

12         I do have some concerns, I think analogous to the ones

13  that Your Honor expressed, about how best to preserve evidence,

14  and to gather it, and to avoid the possibility of destruction

15  of evidence.  Chief Deputy Sheridan indicated that they are      11:07:52

16  about to promulgate a new document retention policy tomorrow.

17         I think that that timing of an announcement of a

18  policy, combined with the notice they've already given to

19  members of the Human Smuggling Unit, combined with the

20  notoriety of what happened with Deputy Armendariz in the past    11:08:14

21  couple of weeks, gives rise to some concerns about that, and so

22  I think that having some clarity about the investigation is all

23  the more important.

24         Finally, Your Honor, I think it's pretty clear already

25  from what we've heard, which is, I'm sure, just the tip of the   11:08:35

```
 1    iceberg, that this new information could certainly affect

 2    MCSO's pending appeal of Your Honor's orders to the Ninth

 3    Circuit.  Just what we've heard today indicates that there were

 4    very serious failures in supervision in the complaint process

 5    that MCSO has for civilians to record their -- or to register      11:08:58

 6    their complaints about deputies with the agency, serious

 7    concerns about discipline arise from what we've heard today.

 8    All of those things have been addressed in Your Honor's October

 9    supplemental injunction, and those are all things that

10    defendants have challenged on appeal.                              11:09:21

11            And so the status of the appeal is that the

12    plaintiffs, our answering brief is due to the Ninth Circuit

13    this Friday.  And in light of what appears to be some very

14    serious discovery violations, I think we'll need to do some

15    work as plaintiffs to decide whether to take steps in light of    11:09:39

16    the pending appeal, and we'll be happy to meet and confer with

17    the defense counsel about that.

18            THE COURT:  All right.  If you'll hold there, I have a

19    few questions for you.

20            Would it be your suggestion that the MCSO not             11:09:55

21    promulgate its new document retention policy?

22            MS. WANG:  I would want, frankly, to hear the

23    monitor's thoughts about that as a law enforcement -- with his

24    law enforcement expertise.  I do have concerns just as a matter

25    of common sense.  That may be mitigated by the fact that         11:10:14
```

1  they've already sent out notice to HSU members that this

2  investigation is ongoing, I'm not sure it makes a difference at

3  this point, but that raised a red flag for me.

4  　　　　THE COURT:  Yeah.  Do you have any concerns consulting

5  with the sheriff and/or with the plaintiffs about how they                11:10:32

6  proceed to best obtain the material that we're talking about,

7  Chief?

8  　　　　CHIEF WARSHAW:  I have no concerns, Your Honor, but I

9  do think it would be instructive, because if I understood

10  Chief Deputy Sheridan's representation to the Court, he said          11:10:50

11  that the preference would be for the agency to gather this

12  information in a soft -- in a soft way, and I think as long as

13  we're in session here with you now, Judge, I would like some

14  clarity on that.

15  　　　　Clearly, as it pertains to the digital recording               11:11:08

16  devices that they have acknowledged was in fact -- were in fact

17  purchased by the County, in our interactions with the command

18  of two districts, it was very clear that there has been no

19  policy on that, so I would not be familiar with any retention

20  of those documents, since one district commander made it all        11:11:32

21  too clear that deputies were free and clear to delete anything

22  that was either exculpatory or inculpatory.  There were

23  basically no governing rules.

24  　　　　But to the point of Ms. Wang's question, instead of a

25  single silo regarding a retention policy, I'd like to have the        11:11:54

1   opportunity to speak with MCSO more specifically, so I could

2   ultimately advise the Court on your question, understanding it

3   in context.  So I'm just going to hold in abeyance any views I

4   have about the -- about the publishing of any retention policy

5   until I've had a few minutes with the MCSO.                    11:12:22

6           THE COURT:  Any objection to that?

7           MS. WANG:  No, Your Honor.

8           THE COURT:  Is there any objection that the MCSO wants

9   to set forth to providing a written report as to all of the

10  steps that have been taken with respect to the Armendariz      11:12:35

11  investigation to date?

12          MR. CASEY:  Your Honor, I have just been advised that

13  state law requires HSU to be notified that there is an

14  investigation by Internal Affairs; that state law also requires

15  a certain level of confidentiality.                            11:12:57

16          As a matter of principle, we don't object to reporting

17  to the Court under seal, to the monitor under seal, to the

18  plaintiffs under seal, so long as we can also do it consistent

19  with Arizona law, which I'm sure there is a way we need to do.

20  We can do that.                                                11:13:15

21          THE COURT:  All right.  Then I'm going to order you to

22  do that.

23          MR. CASEY:  And that would be to the Court.  To the

24  monitor --

25          THE COURT:  It would be to the Court, with copies to   11:13:21

 1    the monitor and the plaintiff.

 2              MR. CASEY:  And under seal.

 3              THE COURT:  Under seal.

 4              MR. CASEY:  Yes, sir.

 5              THE COURT:  And let me just note that either party can    11:13:26

 6    have access to this hearing and its transcript without further

 7    order of the Court.  However, this transcript, this hearing is

 8    under seal, and so is the transcript.  It is not to be

 9    disclosed until further order of the Court.  All right?

10              MS. WANG:  Your Honor, one clarification on that.    11:13:46

11         Obviously, we're all aware of the pending Justice

12    Department litigation before another judge in this district.  I

13    just wanted to know whether they've been apprised of these

14    developments.

15              MR. CASEY:  I can tell you that counsel for the    11:14:01

16    sheriff in the DOJ case was present with us on Monday.  They

17    are separately represented by the Jones, Skelton law firm.  I

18    don't know what they've done, but I know that they've got a lot

19    to do, so I can't tell you what representations are.

20         I can tell you, however, it is my position, I will    11:14:23

21    work with Cecillia Wang on this, but it's our position, even

22    though they have a -- I think you guys have some sort of

23    sharing agreement or cooperation agreement with the DOJ Civil

24    Rights Division, but that you cannot share -- it's our position

25    as defendants you cannot share this conversation with DOJ until    11:14:40

1    we clear it with our, you know, compatriots over at the Jones,

2    Skelton law firm and then get back with you.  Otherwise,

3    there's no purpose for having confidentiality in this hearing.

4          But we will work with the plaintiffs, and this is

5    not -- so it's clear for the plaintiffs and clear for the          11:14:58

6    Court, we're not trying to compartmentalize this and use the

7    protective order seal of the Court to accomplish any nefarious

8    activity in one litigation or game the system there.  That's

9    not happening.  So we'll work with you, but we can't agree at

10   this point for you to go call, pursuant to a cooperation          11:15:17

11   agreement, call the DOJ and share this with them yet.

12          THE COURT:  Any concern about that, Ms. Wang?

13          MS. WANG:  No, Your Honor.

14          THE COURT:  All right.  It is my understanding that

15   regardless of whatever agreement you have with the Department     11:15:31

16   of Justice, this suit is this suit.  The confidentiality order

17   and the seal applies to this suit and it applies to you, and

18   you cannot share this information with the Department of

19   Justice unless and until I authorize you to do so.

20          That being said, I do not intend, as I've already         11:15:48

21   indicated, to keep this matter under seal any longer than it

22   has to be kept under seal, so I expect both parties to keep me

23   apprised as to their position with respect to that.

24          MS. WANG:  Understood.

25          THE COURT:  Have I taken care of all of your concerns?    11:16:01

1        MS. WANG:  Yes, Your Honor, other than the pending

2    issue with the -- the retention policy being promulgated.

3        THE COURT:  All right.  And that, the monitor will

4    consult with both of you after this hearing.

5        I do recognize, Ms. Wang, for what it's worth, that          11:16:16

6    this information does seem to implicate whether or not

7    disclosure was fully made to the plaintiffs in this action it

8    may have further ramifications for this lawsuit, but it is, of

9    course, at this time premature to speculate about what, if any,

10   such implications there may be.                                  11:16:38

11       To the extent that you might reasonably seek an

12   extension in the time to respond in the Ninth Circuit, that is

13   a matter over which I have no jurisdiction.  It would seem to

14   me, and I would just offer on the record, that it would be

15   incumbent upon defendants to offer you an extension of time,     11:16:52

16   just as I expect that they are not going to commit perjury in

17   any other lawsuit because of what they've talked about today,

18   and they may well want to give you an extension of time for

19   them to be able to get an arm -- their arms around what you

20   also want to get your arms around, but I will leave that to      11:17:14

21   you, Mr. Casey.

22       MR. CASEY:  Your Honor, Eileen GilBride at

23   Jones, Skelton is lead appellate counsel, but I'll represent to

24   plaintiff that if she will contact Eileen and I, they will have

25   an extension.  Whatever we can get from the Ninth Circuit we     11:17:26

 1  will give it to the plaintiffs, because that is in the best

 2  interest of all the parties and the proverbial the interest to

 3  the justice system, so that will happen.

 4          MS. WANG:  Well, I'll consult with the rest of our

 5  plaintiffs' counsel team.  I don't know whether we will or will    11:17:39

 6  not seek an extension of time on the answering brief, but we'll

 7  consult with defense counsel about next steps in the Ninth

 8  Circuit case.

 9          THE COURT:  All right.  I will say that I had intended

10  to finally take up the matter of attorneys' fees, which has         11:17:52

11  been fully briefed, in the matter next week, but I may defer

12  that, pending my determination as to whether or not that time

13  period needs to be extended or otherwise revisited.

14          How long is your tape that you had to show us?

15          (Pause in proceedings.)                                    11:18:23

16          MS. WANG:  Your Honor, do you intend to have a hearing

17  on the fee motion?

18          THE COURT:  Well, would you like one?

19          MS. WANG:  Yes.

20          THE COURT:  I'll tell you what:  After I have my arms       11:18:34

21  around it, I'll determine whether I want a hearing or not.

22  I'll take into account that you've requested one.

23          MS. WANG:  All right, Your Honor.  Thank you.

24          THE COURT:  Um-hum.

25          MR. CASEY:  Your Honor, there are two that I remember       11:18:46

```
 1    pretty clearly.  One is very -- very short.  It might be less

 2    than five minutes.  It's the pull-over with the woman driver.

 3              Okay, you say 10 minutes.

 4              And then there's another one that we watched that's

 5    problematic that's quite lengthy, but you can get a flavor.      11:19:04

 6    It's maybe 20, 25 minutes, maybe longer, but you're going to

 7    get a flavor of what's going on there within the first 10.

 8              THE COURT:  All right.  Why don't you spin them up,

 9    please.

10              MR. CASEY:  Okay.  And I ask the Court's indulgence.   11:19:15

11              Sir, what is your name?  I apologize.

12              SERGEANT BENTZEL:  Sergeant Jason Bentzel.

13              MR. CASEY:  Okay.  And who do I need to give this CD

14    to?

15              THE CLERK:  Oh, I thought you were going to play it on 11:19:25

16    your own --

17              MR. CASEY:  Do you have a D -- do you have a computer?

18    I apologize.

19              (Off-the-record discussion between the Court and the

20    clerk.)                                                         11:19:42

21              MR. CASEY:  Would you like to take a quick break, Your

22    Honor?  Five minutes?

23              THE COURT:  All right.  We'll take a five-minute break

24    while you set that up.

25              MR. CASEY:  Thank you, Your Honor.                    11:19:48
```

1           (Recess taken.)

2           THE COURT:  Please be seated.

3           MR. CASEY:  Your Honor, the first, with the Court's

4   permission, Ken Holmes, we have queued up the video.  Before we

5   start, I'd like to have Ken Holmes, in 10 seconds or so, give          11:30:35

6   you his general understanding of orientating you on this

7   particular video that you're going to see.

8           CAPTAIN HOLMES:  Thank you, Your Honor.

9           This is typical of some of the five or six that we

10  noted out of the 250, 'cause most of which appear to be good          11:30:54

11  traffic stops.

12          This is a stop, we don't know how it was -- we don't

13  know what the reason was for the stop.  We're picking it up

14  right here after the stop has already occurred.  He's

15  approaching a couple of middle-aged individuals.                      11:31:13

16          And one other thing I want to mention, the date stamp,

17  we're not sure if that's accurate.  Clearly, it isn't the, you

18  know, 0040 hours.  That would be something a little after

19  midnight, and we can see that it's daylight.  So the date and

20  the time --                                                           11:31:31

21          THE COURT:  The date would be February 25th, 2010, if

22  accurate?

23          CAPTAIN HOLMES:  We don't know for certain.

24          THE COURT:  All right.  And it looks to me like this

25  would be an eyeglass cam?                                             11:31:41

1          CAPTAIN HOLMES:  That is correct, yes.

2          THE COURT:  Okay.

3          (Video clip played.)

4          MR. CASEY:  Stop the video.

5          (Video clip paused.)                              11:36:19

6          THE COURT:  I saw it.  Were you --

7          MR. CASEY:  Okay.

8          THE COURT:  -- trying to point out the dash camera?

9          MR. CASEY:  Yeah.  I just wanted to point out for the

10    Court and for the plaintiffs that if this is in 2010, that    11:36:24

11    appeared to us to be a dash cam.

12          MS. WANG:  Uh-huh.

13          MR. CASEY:  Okay.  And I just wanted the Court to be

14    aware of that.

15          THE COURT:  Thank you.                            11:36:32

16          (Video clip played, then paused.)

17          MR. CASEY:  Your Honor, I just wanted to point out

18    what is on the lower portion of this screen right here at the

19    4552 mark is what we understand to be the mobile computer --

20          MDC?                                              11:38:35

21          CAPTAIN HOLMES:  Mobile data computer.

22          MR. CASEY:  Mobile data computer.  Just that's what

23    that is.  That was what was mentioned that the board authorized

24    in 2005 and went back in in '07, so --

25          Please continue.                                  11:38:47

 1               (Video clip played, then paused.)

 2               MR. CASEY:  Okay.  Just queue it up for the next one.

 3     That would be --

 4               Your Honor, basically, what happens, the rest of it is

 5     he ends up, you know, releasing-citing him.                    11:42:04

 6               The next video that we'd like to share with you is a

 7     much longer one, and I don't -- it's entirely up to the Court

 8     and the parties, but it's essentially a traffic stop that turns

 9     into a debate match -- I'm going to put this diplomatically,

10     because it's on the record, it may be unsealed -- it turns into  11:42:23

11     a debate match, into a "You're going to be arrested," and

12     ultimately ends up 40 minutes, or whatever time it is later, a

13     cite and release.

14               I think that's the most -- probably the most it's

15     appropriate for me to say at this, but it's been designated     11:42:41

16     internally at the MCSO as problematic.

17               THE COURT:  All right.

18               MR. CASEY:  So that would be the Jacobs, Part 1, and

19     let's start that, please.

20               THE COURT:  Just before you start it, have you        11:42:51

21     identified --

22               (Video clip played momentarily, then paused.)

23               MR. CASEY:  Please stop that.  I'm sorry?

24               THE COURT:  Have you identified the two persons that

25     we just viewed be detained?                                     11:42:56

1          MR. CASEY:  Captain Holmes?

2          CAPTAIN HOLMES:  Not at this time, no.

3          THE COURT:  All right.  Thank you.

4          MR. CASEY:  And the other thing, I'd like to just

5   point out on this why we're queueing this up.  This is dated,          11:43:09

6   obviously, just almost a year ago, and we don't know the

7   accuracy of this, either.  I will represent to the Court when

8   we watch this it does have the computer dash, as you can see

9   this, in the car.  Excuse me.  It does have the MDS in there,

10  and also there is also the dash cam that we also observed.          11:43:27

11          And you can see that this seems to be indicating

12  5:06 p.m., which, since we're already in May, we know that at

13  5:06 the ambient light conditions are different than this.

14  This is very dark.  And during the course of the extended stop

15  there's actually a discussion about, What the heck are you          11:43:48

16  doing out at 2:00 a.m.?  So it appears that that's not a

17  correct time, although the date may be correct.

18          So if you would please start it.  Thank you, Your

19  Honor.

20          (Video clip played, then paused.)          11:50:17

21          MR. CASEY:  Your Honor, next basically he's -- Charley

22  Armendariz' voice, as I recognize it, instructs the witness

23  basically to be quiet.  Then there's an exchange.  He takes him

24  outside.  There's more debating where it appears that

25  Armendariz is exercising his authority.  And it goes back and          11:50:31

1   forth, and the guy, as I understand it, is cited and released.

2          Is that accurate --

3          CAPTAIN HOLMES:  That's correct.

4          MR. CASEY:  -- Captain Holmes?

5          CAPTAIN HOLMES:  Yes.                                    11:50:43

6          THE COURT:  How long does the stop -- what's the

7   duration of the stop?

8          CAPTAIN HOLMES:  My best recollection, it was about 25

9   minutes.

10          MR. CASEY:  We can watch all of it, Your Honor, but I   11:50:53

11  just -- as a courtesy, I just wanted to let you know it's --

12          THE COURT:  I appreciate that.

13          Is there anything more you want to see, Chief?

14          CHIEF WARSHAW:  No, sir.

15          THE COURT:  Anything more you want to see --          11:51:04

16          MS. WANG:  No, Your Honor.

17          THE COURT:  -- Ms. Wang?

18          I assume -- I guess I'm not going to assume.  I'm

19  going to order, and I think I already have, that all these

20  materials be made available to the monitor, and you've       11:51:12

21  indicated that you're going to give full compliance.

22          Let me just say -- make a few observations.  I do

23  appreciate the MCSO coming forward with this information

24  voluntarily.  I'm sure it's very embarrassing to them as an

25  organization and it does cause me grave concern.             11:51:26

1        As a result, however, I am going to say that to the

2   extent that the MCSO is going to undertake this investigation

3   on its own, and if the plaintiff is going to take the position

4   that I have the authority, somehow, to remove the MCSO from

5   this investigation, I guess I'd invite you to submit that          11:51:46

6   authority, but I'm not sure that I have it.  But to the extent

7   that the MCSO is going to pursue this investigation on its own,

8   I do believe that I am extremely interested in my monitor being

9   proscriptive and involved.

10       To the extent that the MCSO wants to reject               11:52:03

11  suggestions made by my monitor, I'm going to direct the monitor

12  to tell me that they've rejected those suggestions, and why,

13  and I'll let you explain that.  But it seems to me that in

14  light of the potential conflicts of interest -- and I'm not

15  trying to suggest that you haven't been as honorable as          11:52:18

16  possible, given the information that you have -- it's very

17  important that there be very close observation.

18       We've just had a session with Sandi Miller at which

19  you were present.  It seems to me --

20       MR. CASEY:  Sandy Wilson?                                 11:52:35

21       THE COURT:  I'm sorry, yes, I said Sandi Miller.  Yes,

22  Sandi Wilson, at which you were present.  It seems to me that

23  the nature of the task involved here in monitoring this

24  investigation alone, which could be extremely far reaching, is

25  going to involve a great deal of resources from the monitor.     11:52:47

1          And I don't know, Mr. Liddy, if you want to advise --

2    or if any party's going to object if you advise your folks at

3    MCAO that any cap is probably going to be a ridiculous thought

4    here.  And in any case, I don't -- I don't know what the cap

5    is, maybe that's a little bit of a rash statement, but in any          11:53:15

6    case, this is going to involve substantial additional

7    responsibility by the monitor, and I just want to make that

8    clear and placed on the record.

9          I do recall as I observed the videotape -- and I do

10   again thank you for bringing it forward, and the disclosure of        11:53:32

11   it -- that one of the things on which I didn't make findings,

12   because I didn't have sufficient evidence, involved a stop by

13   Deputy Armendariz against the named plaintiffs in this case,

14   and I believe that the allegations do relate to what I may have

15   just seen, and so I take Ms. Wang's suggestion that there in          11:53:49

16   fact may be additional matters that are required for this case.

17         But of course, I do recognize that that is only a

18   possibility and at this point is very premature.  We need to

19   get our arms around everything that I'm sure the MCSO is going

20   to want to get their arms around as much as I do, and to the          11:54:14

21   extent that there's any question about that, I'm going to

22   require the monitor to inform any concerns he has that the MCSO

23   is not fully and completely cooperating in an independent and

24   thorough investigation of all of this would give rise to.

25         Anything else you'd like to say, Mr. Casey?                     11:54:35

1    MR. CASEY:  Yes, I'd like to address your order, your

2  direction.  I looked over at Chief Sheridan when you said the

3  monitor is to be involved; the monitor is to have input; the

4  monitor is to give advise, recommendation.

5    I understand that I received an affirmative nod that          11:54:50

6  that was agreeable, is that correct, sir?

7    CHIEF DEPUTY SHERIDAN:  Yes, it is.

8    MR. CASEY:  Okay.  I want to make sure I'm

9  understanding what my client is telling me, because I want to

10  represent to you, in answer to your question, that that will be   11:55:02

11  done.  It's on the record.  It's in front of the Court.  My

12  client is agreeable to having the monitor's involvement in

13  doing that.  Again, if there's any issues, hopefully we're

14  going to resolve them as adults.  If there are any big

15  difficulties, then we'll be back in front of you.              11:55:19

16    The second thing I wish to address to you as a matter

17  of candor is that Mr. Liddy and I have talked about the very

18  issue that you addressed, the Meraz-Nieto stop, and in candor I

19  talked to Dan Pochoda and Cecillia Wang before they saw the

20  videotape.  And when I saw that last -- that first episode,    11:55:37

21  something popped in my mind.

22    What effect it's going to have on any of your

23  evidentiary rulings is unknown.  But what's important about

24  this is what we need to do, and that's gather information, as

25  embarrassing as it is, is to find out what's out there.        11:55:53

1        I do want to point out for the Court that this is --

2   just be mindful, because my just is an advocate.  We have the

3   truth to seek here and we're going to do that.  But as an

4   advocate, I also wanted to point out that we have one deputy

5   who obviously was in a dark place mentally, spiritually,          11:56:17

6   otherwise, that ended up in a desperate act of taking his own

7   life.  The toxicology report will soon be made available, I

8   think to whomever, but my understanding is that the deputy had

9   in his system methamphetamine and cocaine.  They were unable to

10  test for mind -- like LSD.                                        11:56:46

11       It is our hope that what we have here is a rogue

12  person.  That's what we hope.  But I can tell you that the

13  sheriff and his chief are absolutely committing to seeing the

14  truth out, whatever it may be, and holding any and all persons

15  responsible, whatever might be the outcome.  It's our hope that  11:57:08

16  it's a rogue, it's an outlier.  But whatever it is it's going

17  to be, and we're going to find out, and the Court's going to

18  find out and the monitor's going to find out.

19       And this is a very good thing for the community, it's

20  a good thing for this office, and the Court needs to             11:57:29

21  understand, to the extent that it's appropriate for me to say

22  that, that that is shared by these folks.  That's why we came

23  to you.  It's not a matter of telling you we've got a problem

24  so you can be easy on us; it's a matter that we've got an issue

25  and we need to solve it, and we know that more minds are better  11:57:45

 1    than a single mind on the issue.  With that, I thank you for

 2    the Court's time.

 3              THE COURT:  Thank you.  I'm going to make one other

 4    observation that may not be really truly related to what we do

 5    under seal, and I may say it in public, but I think it bears        11:57:58

 6    being said so that nobody will misunderstand and misunderstand

 7    that I am punishing them when I'm not punishing them.

 8              We have had a request, and we need to -- we need to

 9    proceed with the rest of the implementation, to the extent we

10    can, of my order, and that involves training; it involves         11:58:16

11    instruction; it involves approval of curriculum; it involves

12    other matters.

13              Now, one of the things that we're involved here is

14    with the approval of training, and Mr. Liddy, you raised with

15    me last time whether you would be an appropriate trainer.  And    11:58:33

16    after that hearing was over, I'm going to tell you, I did watch

17    the news that night.  I watched you in your interview.

18              And what you did was, I think, completely appropriate.

19    You did what a lawyer should do, and that is you represented

20    and defended your client, and you did it on television, and       11:58:51

21    that is your job to do.  And in that process, you represented

22    that some of the things he said in his solicitation brochure

23    did not violate the Court's order, something to that effect as

24    I recall the interview.  I understand that.  I understand that

25    that was a complete and appropriate fulfillment of your role,     11:59:13

1     and in fact it may be the appropriate position to take.

2              But it makes me think, in light of the fact that there

3     have been statements, and I've indicated that the sheriff can

4     make these statements in public and represent his department

5     however he wishes to the public, that allowing you, or                    11:59:28

6     requiring you to represent the sheriff does not make you

7     somebody who I think is appropriate to involve as an instructor

8     in the course.

9              Similarly, I'm going to find the same as to Chief

10    MacIntyre.  He may be a great police officer, and he may, in               11:59:47

11    other settings, be wonderful for training.  But if he is going

12    to take the position -- and again, I'm not saying it's an

13    inappropriate position -- if he's going to take the lead

14    position in saying that the sheriff's department hasn't

15    racially profiled here, I think it's important that the                    12:00:04

16    officers, and the instruction that we give the officers, not be

17    involved in that kind of a question.

18             So it isn't that I think he's an inappropriate

19    instructor in general or that I doubt his qualifications or

20    bona fides, but I'm not going to be approving him as somebody              12:00:19

21    to be giving that instruction.  I want somebody who is neutral,

22    and I think it is especially underlined and important while the

23    MCSO is undergoing this investigation that relates so closely

24    to the instruction.

25             I've indicated today that Mr. Irish has to be walled             12:00:37

 1   off from the sheriff's -- from Sandi Wilson, and that all the

 2   rest of you do, too.  And that may well be my position with

 3   respect to providing training and instruction for the reasons

 4   that I have just stated.

 5           That being said, I do appreciate what you've said,        12:00:55

 6   Mr. Casey, and I expect that you know that I will hold you to

 7   it.  And I believe that in doing so, I'm doing you and your

 8   clients as much of a favor as I am the plaintiffs, because

 9   whatever the truth is here, it has to come out.  And it may

10   well be that it is one rogue police officer, but if it is not,   12:01:13

11   we need to make every effort to assure the public that it is

12   not, and that the investigation has been as thorough as it

13   could possibly be under the circumstances and as intelligent,

14   and that is what I intend to implement.

15           And I appreciate the sheriff's avowal that that will     12:01:34

16   be the case, the chief deputy's avowal that that will be the

17   case, and that all in their department who have any role with

18   this will make it the case and will not be dealing to the

19   department's self-interest, to my self-interest, to the

20   plaintiffs' self-interest, or anybody else's self-interest, but  12:01:49

21   to uncovering the truth.

22           Is there anything else that needs to be said?

23           MS. WANG:  Your Honor, briefly, two points.

24           First, we also objected to Chief Deputy Sheridan

25   serving as a trainer.  Does the Court have a ruling on that?     12:02:03

1    THE COURT:  Again, Chief Deputy Sheridan, I am not

2  prohibiting you from training and other exercises, nor do I

3  mean to suggest to you that I disapprove of your activity.  But

4  I believe that under the circumstances in which you publicly

5  declined to sign the corrective statement -- and again, that's            12:02:22

6  your right.  I'm not going to make you sign the corrective

7  statement.  That would have made life a lot easier in terms of

8  my view of you correcting yourself in front of your officers so

9  there wouldn't be any question about your providing unbiased

10  teaching.                                                                 12:02:42

11    And so we went through the corrective step.  I do

12  acknowledge, and I did last week, that you undertook all of

13  those steps that I asked you to.  I'll do it again.  But I just

14  don't see any need, in this -- in this training where the

15  training has to be unbiased and correct, and have the                    12:02:58

16  appearance of impropriety, I just think it's more appropriate

17  that you pursue the investigation you're pursuing now, and so I

18  am not going to approve Chief Sheridan as an instructor.

19    Again, not -- I intend nothing personally about your

20  integrity or anything else, sir, like I don't try to impugn             12:03:17

21  Mr. Liddy's integrity or Mr. Irish's integrity.  But you're all

22  doing the job that you have to do as a party in this lawsuit,

23  as well as a participant in trying to find the truth, and I'm

24  just going to seal you off from any perceived conflicts in

25  those roles.  That's why.                                                12:03:35

1    Anything else?

2    MS. WANG:  The final point, Your Honor, is we

3 appreciate defendants' candor in coming forward with this

4 information and clueing us as plaintiffs into it.  I do have a

5 reaction to Mr. Casey's comments.                                  12:03:49

6    I think it's understandable that defense counsel hopes

7 that Deputy Armendariz was a rogue officer and that the problem

8 is limited to him.  Just based on what we've seen today, which

9 was limited, that does not appear to me to be the case.  There

10 are at a minimum very serious problems with supervision, with   12:04:09

11 MCSO's complaint process, and those things are true even if no

12 other deputies were engaged in this sort of conduct, and that's

13 something that we don't know yet.

14    I think it's critical for MCSO, currently as the sole

15 investigating agency, not to go into the investigation with a   12:04:30

16 presupposition about the outcome or a desired outcome, but

17 approach that investigation with an open mind to wherever it

18 may lead.

19    THE COURT:  I do agree, but I also agree that it's

20 appropriate for Mr. Casey, as an advocate for the MCSO, to      12:04:48

21 present the most favorable possibility for the MCSO, just as it

22 is appropriate for you, as an advocate for the plaintiffs, to

23 present the least favorable possibility for the MCSO.  And

24 fortunately, we're going to find the facts, and we will let the

25 facts make the determination here.                              12:05:09

1        Thank you all for your participation this morning.  I

2   do remind everyone here, especially my friends at the marshal's

3   office, even though I have complete confidence in you, this is

4   not something to be discussed with your colleagues or anyone

5   else.  And that goes, of course, for anybody else in this        12:05:26

6   courtroom.  It will not be discussed until I enter an order

7   allowing this material to be removed from seal.

8        Thank you.

9        MR. CASEY:  Thank you.

10       (Proceedings concluded at 12:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 15th day of May,

18   2014.

19

20

21                        ____s/Gary Moll____

22

23

24

25