TO: Honorable G. Murray Snow

FROM: Chief (Ret) Robert S. Warshaw, Monitor

DATE: May 28, 2014

SUBJECT: Review of MCSO's Investigative Plan

---

## BACKGROUND

**Various items of evidence were recovered, during a search warrant, executed at the home of former MCSO Deputy Ramon "Charley" Armendariz who on May 8th was found dead at his home. MCSO reports that they seized items "including several hundred driver's licenses and ID cards (Arizona, other states and Mexican), as well as Mexican Volar and Consular cards, Social Security cards, immigration cards, credit cards, license plates (mostly Arizona, but several from other states and Mexico), passports and vehicle registrations, drugs/drug paraphernalia, and firearms."**

**These events were the subject of a May 14, 2014 hearing before the Court. Further, there were several meetings involving me and my staff, who were involved in a site visit from May 13-15. On May 15th, the Court issued an extensive Order (originally under seal), requiring that several steps be taken to gather evidence and fully investigate the activities of Armendariz and any other MCSO employees who may have been using recording devices – either personally owned or agency issued – during the course of their duties.**

**MCSO's Internal Affairs Division (IAD) was tasked with conducting this investigation. We have received and reviewed *three iterations* of the investigative plan offered by IAD. The first was dated May 16, 2014 and was not submitted on time -- pursuant to your Order. It was instead delivered on May 19, 2014, dated May 16, 2014, and was woefully deficient. The second was provided on May 23, 2014. This version was to reflect the investigative steps taken in the investigation as of the date of submission, and was also to incorporate any new proposed activities based on Commander Girvin's numerous conversations with IAD commanding officer Captain Ken Holmes during the week of May 18, 2014.**

**On its face, the second version of the plan was *not very different* from the original submission. It appeared to be the same document submitted on May 16th with some very minor, non-substantive wording changes, and with the addition of three paragraphs at the end of the document relating to the "non-Armendariz" videos which are the subject of your May 15th Order.**

**Since the second plan was to document investigative steps already taken, we were left to conclude that either there had been no progress on the investigation, or there had been no effort put into updating and enhancing the written plan. While neither situation is acceptable, we suspect that it is both.**

On May 27th, Captain Holmes sent what he described as the "final" version of the plan, subject to the Monitor's approval. While this plan is slightly different from the earlier versions, in some areas it is less specific and proposes a less invasive approach than preceding versions.

Despite Captain Holmes' assertions that nearly all of his personnel have been consumed with reviewing DVDs seized from Armendariz's residence, the number of DVDs reviewed <u>is the same in the first two versions of the plan, and is not even addressed in the final version</u>. Steps that were supposed to have been implemented before the dates on which the second and third versions were submitted, are still listed as "future steps." Consequently, the plan does *not* reflect the various investigative suggestions provided by me and Chief Martinez during the site visit or discussed with Captain Holmes during numerous phone calls with Commander Girvin last week.

<u>Some examples of these missing items include:</u>

1. Since the very beginning of this investigation, Chief Martinez and I suggested that, because of their inherently coercive powers, IAD be the organizational component to reach out to other agency components to ascertain which employees were using recording devices and who may have recordings in their possession. Even as we were meeting on this topic, this approach was being thwarted by a far-reaching email to the major commands and commanders of the agency by Chief Trombi, thus eliminating any element of surprise.

2. Commander Girvin continued to suggest that IAD personally contact and interview those Deputies known to have access to recording equipment, but they remained steadfast in their reluctance to do this, even arguing through their attorney, Ms. Stutz, that the required Notice of Investigation (NOI), which must be given by Arizona Law prior to such an interview, would be difficult to construct.* Captain Holmes and Ms. Stutz expressed confidence that they would obtain the information they needed from the *voluntary survey approach* MCSO adopted. Commander Girvin expressed his reservations, and offered that deputies completing a written "survey," as was sent to all deputies, could never be an effective investigative substitute for a face-to-face interview, which would include administratively compelled cooperation (Garrity) during which follow-up questions could be immediately asked. Commander Girvin requested that Captain Holmes provide an assessment as to the quality of the written responses to the surveys and the measure to which they might be of assistance to the MCSO's initial fact gathering.

   In his response, Captain Holmes confirmed Commander Girvin's concerns and wrote, in part, "Regarding the written responses, we have received 393 memos concerning the use of audio/video equipment on traffic stops. Those memos cover 409 deputies. The data collected is being entered into a comprehensive spread sheet and the DVDs are being placing in a secure location. *There are a number of responses that are incomplete and we are missing some deputy responses. That's going to take some follow up. Some deputies are providing a lot of detail. There is still a lot of*

*work to be done."* The update and the work that would be required as a result of these deficient surveys was not made a part of the second and final iterations of the Investigative Plan.

(**Note:* *The Notice of Investigation argument appears to be mitigated by the fact that IAD immediately noticed all current and former members, including supervisors and command, of the Human Smuggling Unit (HSU), and all recent members of Armendariz's last patrol squad at District II, including his supervisor. IAD, therefore, is free to speak with these individuals but has chosen not to do so until their review of the Armendariz videos are complete.*)

3. **Commander Girvin advised Captain Holmes that the plan was missing a case management component; that is, a means to chronicle all known investigative tasks/leads, capture additional ones as they are discovered, assign responsibility for investigation of these tasks, and track all these indicia until they are completed. He further suggested that for an investigation of this magnitude, those involved should meet once or twice a day to assign investigative priorities and review progress made. This component was missing from the final and preceding versions, simply stating, "<u>Weekly meetings</u> will be held with key personnel as to the progress of this investigation and reported accordingly..." An investigation of this importance cannot be managed through only weekly meetings.**

4. **During one of his discussions with Captain Holmes, Commander Girvin asked if Armendariz's "dash cam" and "head cam" were in the custody of MCSO. On May 21st, Captain Holmes advised that it was believed that a private company called Watch Guard loaned the camera to Armendariz, and it was returned to that company in August 2013 after Armendariz left the Human Smuggling Unit. Commander Girvin advised that this lead should be followed up, and the camera secured if it is still in possession of the company. Captain Holmes also advised that the head cam in possession of MCSO may not be the same one from which some of the seized videos were taken. The uncertainty of how many head-cams are at issue, and their current locations, loom over this inquiry. These investigative issues were *not* included in the second version of the plan, which still indicated that "The dash-cam recorder may have been purchased by the Sheriff's Office and we are working to confirm that information." The final version of the plan acknowledges that "the dash-cam recorder was loaned to MCSO (and assigned to Armendariz) for test or pilot purposes and was returned to the vendor after Armendariz was reassigned from HSU in August of 2013." However, there is no reference to attempts to retrieve this camera, and the issue of Armendariz having more than one head-cam is not addressed.**

5. **MCSO was directed to provide the Monitor with copies of the DVDs seized from the Armendariz residence. During the past week, 320 DVDs were turned over to the Court, but there are 189 that cannot be duplicated for yet unknown technical reason. Captain Holmes advised that MCSO's Computer Crimes Investigators are examining some of these DVDs to ascertain what the issue may be. *None of these***

*steps were reflected in any of the plans, but were learned by us in the course of our queries.*

6. **Preliminary survey results indicated that there is a high concentration of cameras assigned to Lake Patrol (32 county owned body cameras and 1 personally owned dash cam). Commander Girvin suggested that because of the high concentration of recording devices in this one area of assignment, a uniquely defined investigative track should be designated for that area.** *This was not included in the "final" or preceding investigative plans.*

7. **Similarly, Commander Girvin also suggested that the investigation must account for the whereabouts, use practices, and recovery of any video associated with the HIDTA funded cameras owned by the agency, and this should be treated as a separate investigative track assigned to an individual or individuals.** *This was not included in the "final" or preceding investigative plans.*

8. **Captain Holmes advised Commander Girvin that MCSO homicide conducted the Armendariz death investigation. Commander Girvin suggested that IAD review that investigation for sufficiency and for any potential investigative leads for IAD's investigation.** *This was not included in the "final" or preceding investigative plans.*

**In addition to the items identified above, based on our review of the most recent version of the plan, it appears that MCSO failed to consider the following in determining their investigative approach in this matter:**

1. **While the plan contains a brief background on the Armendariz incident beginning with his initial call to 911, it fails to document any kind of historical perspective on the use of recording devices by MCSO, and an approach to ascertain what is or is not authorized for use by MCSO personnel, whether personally or county owned devices. There does not appear to be any governing policies on the use of these devices. Still, the investigation has to account for the acquisition and deployment of MCSO-owned devices, where they are currently located, and where they have been deployed throughout their history with the agency. This cannot be left to self-reporting. Unless they are stand-alone, portable cameras, some or all of the <u>dash cams</u> must have been <u>installed</u> by MCSO fleet support personnel. If these work-order transactions exist, they must be reviewed.**

   **We are lead to believe that Chief Trombi attempted to assemble an inventory of video recording devices in Patrol on February 19, 2014. Some of the results of that survey have been offered as part of the investigation. What is missing is what lead to Trombi's survey, who ordered it, and why it was conducted in the first place.** *In light of the Armendariz incident, there does not appear to be any investigative curiosity into the timing of this. Deputy Armendariz was one of the self-identifying deputies on Trombi's list.*

**IAD must develop a single, clear, understandable inventory of all video recording devices, no matter how acquired. This initial inventory should list ALL such devices; their ownership and their use history. The MCSO is attempting to accomplish this through a "survey," disseminated to sworn personnel. This needs to be accomplished through an investigative tactic, not an employee survey. Preliminary results underscore the importance of *invasive follow-up interviews*. For example, one response indicates that <u>no traffic stops</u> were recorded with state-funded cameras over a period of more than two years. It also appears that a former deputy took one of these devices to his current employer, another law enforcement agency.**

**Of note, the second version of the plan does indicate that all employees who admitted to, or are suspected of, using a video recording device would be interviewed. In the final version, IAD is proposing to conduct interviews only in those cases where the recordings reveal potential violations of law or policy. This is contrary to our advice and is a step backwards.**

2. **IAD should be putting together a comprehensive file on Ramon "Charley" Armendariz, including his history with the agency, associates on, and off, the job, and family members. Beyond MCSO's reluctance to interview sworn personnel, there is no justifiable reason for their not interviewing non-MCSO personnel in Armendariz' sphere of influence, including his roommate who was referred to in one call with Captain Holmes as his "live-in boyfriend."**

3. **If we understand MCSO policy correctly, Armendariz shared his vehicles with co-workers. The final plan, and preceding iterations, fail to include research into, and interview of, those in HSU and/or District 2 who shared a vehicle with him.**

4. **The final plan *does not account* for resolving any criminal/traffic convictions that, after viewing the videos or researching the confiscated documents, do not appear to be legally supported. Further, as was explained to the defendants' counsel, the Court has not limited the search and review of videos to traffic stops only. The final plan and previous iterations are focused exclusively on incidents involving traffic stops.**

5. **IAD's final plan describes their approach for investigating the documents, including license plates, located at the Armendariz residence, and describes two tracks – items that appear to be seized legally and those that appear to be seized illegally. In our view, this is an <u>irrelevant distinction</u>. The history of each item must be investigated similarly. Given that the items were never turned into the Sheriff's Office, regardless of how they were seized, they are in effect stolen property. IAD must attempt to ascertain, for each seized item, if any other employees were involved in the incidents which lead to the seizures.**

6. **The final plan, and preceding plans, are silent on audio recording devices, which by the agency's own admission, are MCSO issued and in wide circulation and use. These are included in the Court's Order.**

No investigative plan can anticipate every step in an investigation as involved and as complex as this one. However, the plan should enumerate with some detail the known investigative steps which must take place, as well as identify some system to capture and track to conclusion, all of the new investigative leads which will invariably be discovered as the investigation progresses.

## SUGGESTED INVESTIGATIVE APPROACH
### (Arguably Omitted from the Plan)

Even though it is too late to salvage parts of this investigation, it is hopefully not too late to uncover everything that needs to be pursued. The Court emphasized the urgency of gathering any and all evidence as a primary step.

### GATHER EVIDENCE:

MCSO was aware of a number of personally owned, as well as County/State/HIDTA owned, recording devices. There were at least 13-14 video recorders identified as far back as February of this year; HIDTA cameras; 32 county owned Lake Patrol body cameras; as well as a number of State funded video cameras primarily used for DUI operations. We estimate there to be at least 65 devices of which MCSO had knowledge of.

If "Notices of Investigations" have to be issued, they can initially be limited to the collection of recorders as well as recordings.

**Steps that should have been taken immediately and still may be possible:**

1. **Identify all current or former video camera carriers.**
2. **Without advising the deputies who are known, or thought to be in possession of these items, teams of IA investigators simultaneously approach all the identified Deputies as they report to work and seek the following:**
    a. **Location of recording devices.**
    b. **Seizures of said devices**
    c. **Location of any recordings, identification of any property or evidence, inventory numbers, determinations if any such devices, data, or other relevant property has been placed into the evidence facility.**
    d. **Recordings of any and all citizen encounters to include arrests, traffic stops, uses of force, etc.**
    e. **If stored at home, trunk of car, etc., IA personnel are to accompany deputies to their repository and seize such recordings to include any recording that might still be in any device.**

# INSPECT EVIDENCE

**1. Armendariz Seized Videos and Identifications/Tags:**

- **IA investigators must catalog all Armendariz seized videos. They must access CAD, and other databases to learn as much as possible about the meaning of each video. There must be an earnest attempt to cross reference the assessment of each video with the ID's, licenses, license tags and other identification items found at the Armendariz residence.**
- **IA investigators must identify if any misconduct was observed on any of the Armendariz videos and if such misconduct was perpetrated by Armendariz, other MCSO personnel, or officers from other agencies.**
- **IA must conduct interviews with the alleged owners of items seized from Armendariz' home. This must be done with care and sensitivity and such persons are to be treated more as crime victims, regardless of the video showing a legitimate violation of the law. The seizure of their personal property was *also* a violation of the law. A carefully thought out plan must be conceived for the return of items wrongfully seized by Armendariz, or others. Even though no action can be taken against Armendariz, a final report must include all the instances wherein misconduct perpetrated by Armendariz (and others on his videos) were identified**
- **IA and the MCSO must, in conjunction with the MCAO, determine what legal remedies need to be pursued as they pertain to wrongful charges lodged against persons whose encounters with Armendariz (and others) were found on the videos.**
- **IA must interview Armendariz' supervisors as to their knowledge of all equipment, recordings, and properties seized at the Armendariz home.**

**2. Seized videos or recording devices from other Deputies or Volunteers**

- **IA must pursue a course of action that is essentially the same as what must be pursued relevant to the seizures at Armendariz' residence.**

**3. Audio Recordings**

- **IA must review all products derived from identified audio digital recordings. The review will be conducted to corroborate the actions taken by the Deputy as well as identify any misconduct that may have occurred.**

**<u>Final Comments</u>**

**It is conceivable, though not likely, that MCSO is doing some of these things. My concern is that they appear to be so disorganized in their planning and implementation that the results will be of little value. Its attempt, two weeks ago, to infuse a new (and first-ever) policy governing the use of recording equipment is unacceptable and does not consider all contingencies. This must be rectified immediately.**

**The MCSO must prepare a final report to be submitted to the Court. I am deeply concerned about the organizational will to pursue this matter with the energy, commitment, and scope it requires.**


**Respectfully,**

*[signature: Robert S. Warshaw]*

**Chief (Ret) Robert S. Warshaw
Monitor**