1                      UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega              )
     Melendres, et al.,                  )
5                                        )
                     Plaintiffs,         )   CV 07-2513-PHX-GMS
6                                        )
                     vs.                 )   Phoenix, Arizona
7                                        )   August 26, 2014
     Joseph M. Arpaio, et al.,           )   10:04 a.m.
8                                        )
                     Defendants.         )
9    _____    )

10

11

12

13

14

15                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 BEFORE THE HONORABLE G. MURRAY SNOW

17                          (Oral Argument)

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24

     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3  For the Plaintiffs:          Stanley Young, Esq.
                                COVINGTON & BURLING, L.L.P.
4                               333 Twin Dolphin Drive
                                Suite 700
5                               Redwood Shores, California  94065
                                (650) 632-4700
6
                                Daniel J. Pochoda, Esq.
7                               AMERICAN CIVIL LIBERTIES
                                FOUNDATION OF ARIZONA
8                               P.O. Box 17148
                                Phoenix, Arizona  85011-0148
9                               (602) 650-1854

10                              Cecillia D. Wang, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
11                              FOUNDATION
                                Immigrants' Rights Project
12                              39 Drumm Street
                                San Francisco, California  94111
13                              (415) 343-0775

14  For the Defendants:         Timothy J. Casey, Esq.
                                James L. Williams, Esq.
15                              SCHMITT, SCHNECK, SMYTH,
                                CASEY & EVEN, P.C.
16                              1221 E. Osborn Road
                                Suite 105
17                              Phoenix, Arizona  85014-5540
                                (602) 277-7000
18
                                Thomas P. Liddy, Esq.
19                              Senior Litigation Counsel
                                MARICOPA COUNTY ATTORNEY'S OFFICE
20                              Civil Services Division
                                222 N. Central Avenue
21                              Suite 1100
                                Phoenix, Arizona 85004
22                              (602) 506-8066

23

24

25

I N D E X

Argument                                                          Page

By Mr. Young                                                        5
By Ms. Wang                                                        17
By Mr. Pochoda                                                    24
By Mr. Williams                                                  27

1                    P R O C E E D I N G S

2

3          THE COURT:  Please be seated.

4          THE CLERK:  This is civil case number 07-2513,

5     Melendres v. Arpaio, on for oral argument.                    10:04:33

6          Counsel, please announce your appearance.

7          MR. YOUNG:  Good morning, Your Honor.  Stanley Young

8     for plaintiffs.

9          MS. WANG:  Good morning, Your Honor.  Cecillia Wang,

10    also for the plaintiffs.                                       10:04:44

11         MR. POCHODA:  Good morning.  Dan Pochoda for

12    plaintiffs.

13         THE COURT:  Good morning.

14         MR. CASEY:  Good morning, Your Honor.  Tim Casey and

15    James Williams in private practice for the defendants, and also   10:04:51

16    from the Maricopa County Attorney's Office, Tom Liddy.

17         THE COURT:  All right.  I believe as you're all aware,

18    today I've set oral argument on a long pending motion, which is

19    the motion for the award of attorneys' fees that's been filed

20    by plaintiffs in this matter.                                  10:05:10

21         Are you all going to speak individually, or how are

22    you going to handle this?  Mr. Young?

23         MR. YOUNG:  For plaintiffs I'll speak primarily, Your

24    Honor.  To the extent there are specific questions relating to

25    the ACLU and the ACLU fees bills, I'll defer to my co-counsel.   10:05:26

1          THE COURT:  All right.

2          MR. CASEY:  For the defense, Your Honor, James

3    Williams will take the lead on this particular issue.  If

4    there's anything else the Court wants to discuss, then I may --

5    may chime in, to the extent you allow it or it's appropriate.          10:05:38

6          THE COURT:  All right.  Mr. Young.

7          MR. YOUNG:  Thank you, Your Honor.  I'll speak very

8    briefly to remind the Court of the policy behind 1988, which is

9    to provide for attorneys' fees in the event of a prevailing

10   party's efforts.  If plaintiffs had not prevailed in this case,          10:05:59

11   all of the expenditures and the time that you see before you

12   would not have been compensated.

13          And that's fine, but the statute provides, and the

14   policy provides, for purposes of fulfilling the civil rights

15   law's purpose, that in an event like this where there has been          10:06:17

16   a prevailing party for the plaintiff that the plaintiff should

17   get its fees.

18          I'd like to address just briefly the issue of the

19   rates, and I would point the Court to the cases such as Camacho

20   and the Guam Society, which provide that where --          10:06:34

21          THE COURT:  Is that the Seventh Circuit case?

22          MR. YOUNG:  The Guam is actually a Ninth Circuit case.

23   There's a Seventh Circuit case which actually also speaks very

24   eloquently to the policy, which is the Chrapliwy versus

25   Uniroyal case.          10:06:49

1           THE COURT:  Well, I'll look at the Seventh Circuit

2     case -- I already have; I remembered it was Seventh Circuit --

3     but can you give me the Ninth Circuit case again?

4           MR. YOUNG:  Yes, Camacho versus Bridgeport

5     Financial --                                              10:07:00

6           THE COURT:  -- judicial district, we do find the Ninth

7     Circuit a little bit more persuasive.

8           MR. YOUNG:  Yes.  Well, the Seventh Circuit case was

9     cited in our reply brief, so it may be a little fresher in your

10    memory.  The Ninth Circuit cases are Camacho, 523 973, which   10:07:08

11    also held that where local counsel are unavailable, either

12    because they are unwilling or unable to perform because they

13    lack the degree of experience, expertise, or specialization

14    required to handle properly the case, then the counsel's home

15    practice area rates become the measure for --                10:07:29

16          THE COURT:  The Camacho case?

17          MR. YOUNG:  Yes, that is the Camacho case.

18          THE COURT:  Do you have anything in which you've

19    indicated to me by way of affidavit -- and I have read the

20    affidavits, but it's been a while -- that no counsel within the   10:07:41

21    state was willing to take the case when Steptoe & Johnson left?

22          MR. YOUNG:  That is correct, Your Honor.  And that's

23    in Mr. Pochoda's declaration.  He describes how he went to five

24    different law firms and was unable to find someone here in

25    Arizona who was willing to take the case.  And for whatever   10:08:00

1   reason, plaintiffs were just unable to find someone to do that.

2       And I can somewhat attest to a little bit of that just

3   in my own discussions with respect to this motion that the

4   plaintiffs did need to go outside the state in order to find

5   counsel with the staffing and all of the logistical                    10:08:25

6   capabilities that were necessary to bring this case to a

7   successful conclusion.

8       Your Honor, we said a lot in our reply brief, I would

9   be happy to answer questions that you may have, but would

10  request leave to either answer your questions or save the               10:08:45

11  balance of my time for rebuttal.

12      THE COURT:  Well, I do think, and I've only brought in

13  a small number of the papers that I thought might be helpful

14  today, both parties have given me lots of paper and I've tried

15  to review most of it, but I do -- among the matters that have          10:09:01

16  been raised by the defendants, I do want to ask you

17  particularly about one.

18      They have said -- and I do think that I have to weigh

19  the extent -- they've cited the Gonzalez case for the

20  proposition, of course, that the rate we're looking at is the          10:09:26

21  rate within the venue, and that's a Ninth Circuit case as well

22  so --

23      MR. YOUNG:  And that says "generally," Your Honor, I

24  would point out --

25      THE COURT:  Yeah.                                                    10:09:34

1          MR. YOUNG:  -- it says generally.

2          THE COURT:  I'll take a look at Gonzalez; I'll take a

3     look at Camacho.  To the extent it's appropriate to consider

4     your rates, I will consider those.

5          But even if I do that, and I am certainly not saying       10:09:45

6     you're not a very valuable attorney, nor would I suggest that

7     about Ms. Wang or Mr. Pochoda, there were nine attorneys at

8     counsel table during trial.  I don't mean to be unfair to any

9     of them, and it seems to me that in a case like this, I realize

10    that there are a couple of other things that are at issue:       10:10:16

11    One, many people, many different organizations, may want to be

12    involved and may have given resources; two, in an organization

13    like yours, Mr. Young, you also, understandably, want to train

14    younger attorneys how to conduct trial and do things like that.

15         But if you were billing this to a paying client, would     10:10:40

16    you really have had nine attorneys conducting examinations

17    during the trial?

18         MR. YOUNG:  I think in a case where we would have a

19    paying client we would have done something very similar.  I

20    don't know whether everyone would have been in there, perhaps a   10:11:01

21    paying client would not have had as many different

22    organizations representing it, but we had a number of

23    organizations who had been involved who lent their expertise to

24    the trial, and their experience with the case, their deep

25    knowledge of the case.                                          10:11:19

1      Covington & Burling came in the case in the spring of

2  2010.  There had been a lot of work that had gone on prior to

3  that by MALDEF and the ACLU Human Rights Project and the ACLU

4  of Arizona.  I think that the trial effort would have suffered

5  if all of those organizations had not been present in the          10:11:37

6  trial, who would have -- who were able to provide their

7  knowledge as to the individual class members and named

8  plaintiffs who were coming in to testify.

9      The people who were in the trial I know from our firm

10 had done a great deal of work leading up to the trial, and I       10:12:01

11 think Your Honor is correct that some of the junior attorneys

12 were able to examine witnesses.  I know our most junior

13 attorney I think examined a witness, and it's quite possible

14 that in a different circumstance, that would have gone to a

15 more senior attorney.  But they were there, they would have       10:12:24

16 been there --

17      THE COURT:  The senior attorney would have been you.

18      MR. YOUNG:  Well, perhaps, depending on the client.

19 Different --

20      THE COURT:  And I'm not saying, and please don't          10:12:34

21 misunderstand me, I'm not saying it's inappropriate; in fact, I

22 think it's commendable for a firm to develop younger lawyers.

23 But I do think that it's fair to say that it's rare that you

24 would expect your clients to pay extra for that development.

25      Is that a fair statement, do you think?          10:12:50

1     MR. YOUNG:  I think that there would be write-offs,

2  and we did do write-offs in this case.  I mean, the bills that

3  you have seen do reflect some editing, and -- based on desire

4  to avoid duplication.

5     I don't think there was duplication in the trial          10:13:05

6  effort.  I think the efforts of the younger attorneys in seeing

7  the trial, doing the witness examinations, but more importantly

8  for the purposes of the post-hearing briefing, seeing how the

9  evidence came in; in some cases, arguing for admission of

10  evidence.                                                    10:13:23

11     For example, I know with respect to some of the

12  documents whose admissibility was in question Ms. Gallagher had

13  more time reviewing the documents and figuring out why they

14  should be admitted and -- than I had.  Now, perhaps she could

15  have given that to me, but that time still would have been     10:13:42

16  spent on behalf of a paying client in any case.  I wouldn't

17  have been reviewing all --

18     THE COURT:  The non-trial time would have been spent,

19  certainly.

20     MR. YOUNG:  Right.                                         10:13:52

21     THE COURT:  And some pretrial preparation time.  But

22  present throughout the trial?

23     MR. YOUNG:  Again, we have, I think, in some cases,

24  written off time for more junior attorneys --

25     THE COURT:  That were present in our trial?              10:14:04

1    MR. YOUNG:  For presence in a trial, you're right,

2  Your Honor.  And we have done that for some clients, and I

3  think that if Your Honor thought it appropriate here we could

4  take another look at that.  But I do think that the time was

5  useful, and we say this to clients even who -- for whom we          10:14:23

6  write it off, the time is useful and inured to the benefit of

7  the client.

8    But I will grant you that sometimes just for client

9  relations purposes if the client is there and they see the

10  person there, they know the person's spending the time, we'll      10:14:39

11  tell them, Okay, we acknowledge that that person is more

12  junior, and although they were very supportive of the trial

13  effort, for you we'll write the time off.  So you're correct,

14  that does sometimes happen.

15    THE COURT:  Let me also ask a question, and I don't     10:14:56

16  really know the extent to which Covington & Burling has been

17  involved in the ongoing efforts at

18  monitoring-compliance-implementation of my order.

19    I do know that Ms. Wang has been somewhat involved, as

20  well as Mr. Pochoda, and without trying to prejudice any sort      10:15:18

21  of result or supposing that I know any of the facts that lead

22  to that result, there have certainly been disclosures made by

23  MCSO after trial which would suggest that there were materials

24  that were not provided prior to trial that were requested,

25  which may, of course -- I mean, I don't know what the              10:15:51

1    appropriate remedy, if any, may or may not be for that, and I

2    think that MCSO is trying to get their arms around that, as we

3    are.

4         Should any award I make be without prejudice to an

5    additional request for attorneys' fees that might result from    10:16:11

6    noncompliance if I make such a finding, or efforts made on

7    appeal to the extent that the court of appeals doesn't make its

8    own reward or other matters?  And is Covington & Burling

9    involved in that effort?  Or is it essentially the ACLU and the

10   Immigrants' Rights Project?  And MALDEF.  I don't know whether   10:16:35

11   MALDEF's involved or not.

12        MR. YOUNG:  I think on the monitor issues and some of

13   the discovery or new information that has come out I'll defer

14   to my colleague, Ms. Wang.

15        I will say that with respect to additional fee           10:16:49

16   motions, there's the appeal in which Covington is very heavily

17   involved.  And as we've stated in our papers, there will be a

18   motion for fees relating, actually, to this fee motion in which

19   our firm was also involved.  But for the other questions, which

20   actually involve more significant amounts of time, and maybe    10:17:09

21   more significant issues, I'll defer to Ms. Wang.

22        THE COURT:  Well, I'm not quite through with you --

23        MR. YOUNG:  All right.

24        THE COURT:  -- Mr. Young, so I'll ask you all my

25   questions before I ask Ms. Wang.                                10:17:23

1          MR. YOUNG:  Yes, Your Honor.

2          THE COURT:  The defendants have provided me with the

3    Economics of Law Practice, the most reinstate iteration by the

4    Arizona -- I think it was the Arizona bar that did that, wasn't

5    it, Mr. Williams?                                          10:17:35

6          MR. WILLIAMS:  Yes, Your Honor.

7          THE COURT:  And it suggests that for lawyers above 25

8    years of practice, only the top 5 percent in Arizona bill $515

9    an hour.  How long have you been in practice, Mr. Wang?

10         MR. YOUNG:  We feel I've been -- Mr. Young -- I've       10:17:57

11   been --

12         THE COURT:  I -- I apologize.

13         MR. YOUNG:  No problem, Your Honor.  It's been a long,

14   complicated case.

15         THE COURT:  It's been long enough that I should know    10:18:03

16   that you're --

17         (Laughter.)

18         MR. YOUNG:  I've been in practice since 1986, so that

19   would be 28 years, Your Honor.  And I --

20         THE COURT:  And would it offend you to be awarded $515  10:18:17

21   an hour for your time?

22         MR. YOUNG:  I recognize that the Arizona statistics --

23   and actually, if you'll let me step back and retrieve my binder

24   here, as we stated in our papers, I think that we're entitled

25   to rates measured from our --                               10:18:39

1      THE COURT:  And by my questions, you shouldn't infer

2  that I won't give you some credit for coming from San

3  Francisco.

4      MR. YOUNG:  Thank you, Your Honor.

5      THE COURT:  But let me ask you, doesn't it -- doesn't      10:18:48

6  it cut a little bit both ways, too?  Keep my $515 question;

7  I'll allow you to answer that.  But it seems to me that on the

8  nontaxable costs -- you've asked for meals and hotels and

9  travel -- and it seems to me that all that is quite reasonable

10  since you're coming from out of town.      10:19:05

11      But if you were in town, those are not the sort of

12  things that you would necessarily bill for, would they be?  I

13  mean, we might expect you to pay for your own lunch if you

14  lived here.

15      MR. YOUNG:  I think that's right.  If it's not a      10:19:17

16  traveling expense then it wouldn't be appropriate, and -- but

17  these are traveling expenses for us.

18      THE COURT:  And so if we -- if you were billing, for

19  example, a --

20      And you're not exactly in San Francisco, are you?      10:19:29

21  What's --

22      MR. YOUNG:  I'm somewhat south of San Francisco in

23  what we call our Silicon Valley office.

24      THE COURT:  If you were billing a Silicon Valley

25  client, you wouldn't, of course, have the -- and you were      10:19:40

```
 1   billing your rate that you get in Silicon Valley, you wouldn't
 2   be also billing for --
 3           MR. YOUNG:  Travel and meals.
 4           THE COURT:  Right.
 5           MR. YOUNG:  Yes, for a client in Silicon Valley.        10:19:49
 6           THE COURT:  Okay.
 7           MR. YOUNG:  Going back to the Arizona Economics of Law
 8   Practice, I'm looking at Exhibit C, which is the 2013 rates,
 9   and I would point a couple of things out.  If Your Honor wants
10   to look at this, I would note that on page 2 of that exhibit,   10:20:06
11   the 95th percentile number for law firms of 51 and more, which
12   is Covington & Burling, is $545 an hour.
13           THE COURT:  That is on what page?
14           MR. YOUNG:  That's on the second page of Exhibit C to
15   the opposition.                                                 10:20:34
16           THE COURT:  Okay.
17           MR. YOUNG:  It's document 652-2, page 20 of 35.  And
18   on the next page, page 21 of 35, I would note, actually, since
19   there is an appeal in this case, that there is an entry for the
20   95th percentile for appellate practice, which is $600 an hour.  10:20:47
21           THE COURT:  Right, and I'm not -- and to be truthful,
22   I don't really know whether you're going to -- assuming you
23   prevail on appeal, I don't know whether you make that request
24   to the Ninth Circuit or whether you're going to make it to me,
25   but I'll take that into account.                                10:21:04
```

1          MR. YOUNG:  Okay, Your Honor.  So there are -- I think

2     I would at least look to the larger law firm figure that I

3     mentioned earlier, but my primary argument and request would be

4     that the Court look at the situation that the plaintiff class

5     was in: being unable to find counsel to carry this case through          10:21:23

6     trial here in Arizona and needing to find counsel elsewhere.

7          THE COURT:  It seems to me that I -- I understand, and

8     I want to make sure I don't misunderstand from your briefing,

9     that when I got this case, at least, Steptoe was the primary

10    assistance to the ACLU; and, in fact, we all had a number of          10:21:42

11    proceedings with Steptoe before they withdrew and Covington &

12    Burling came into the case.

13         MR. YOUNG:  Correct.

14         THE COURT:  Is it your representation that neither

15    Steptoe nor, I think, Ballard and Spahr, which was also          10:21:55

16    involved prior to Steptoe's involvement, but that was also

17    prior to my involvement, is it your representation that neither

18    of those firms is going to be seeking any remuneration for

19    their costs or expenses as a result of being -- or representing

20    prevailing plaintiffs in this matter?          10:22:12

21         MR. YOUNG:  That is correct.  We had those

22    conversations in connection with filing this motion.  They will

23    not be submitting a time or fee requests to this court.

24         THE COURT:  All right.  Thank you, Mr. Young.

25         MR. YOUNG:  Thank you, Your Honor.          10:22:25

1            THE COURT:  Ms. Wang?

2            MS. WANG:  Thank you, Your Honor.

3            To answer Your Honor's question, it would be

4    plaintiffs' request that the Court make whatever ruling it will

5    make on this current motion without prejudice to a future fee            10:22:47

6    motion by the plaintiffs on any time spent since October 2nd,

7    the cutoff for this motion.

8            There are two primary areas which have already been

9    discussed.  First is the pending appeal, which the ACLU has

10   invested significant time in along with the Covington            10:23:07

11   co-counsel; and the second, Your Honor, as you noted, is that

12   we have had to spend significant time on monitoring matters

13   related to your supplemental injunction.  Primarily, the ACLU

14   has taken charge of that, and it represents a significant

15   expense, which, frankly, I had hoped we would not have to            10:23:28

16   invest at this stage of the case.  So yes, that would be our

17   request, that we leave that aside for future request of the

18   Court.

19           I do want to add a word to Mr. Young's presentation

20   about the issue of our hourly rates.  I think that the Ninth            10:23:44

21   Circuit cases, particularly Camacho, make it clear that there

22   are actually two different reasons why an out-of-town market

23   rate should apply here, and in the case of nonprofit

24   organizations like the ACLU, there's a particular reason that I

25   think the law has developed that way.            10:24:07

 1            The first, as Mr. Young noted, is that both

 2   Mr. Pochoda and I made significant efforts, both in the state

 3   of Arizona, and then, frankly, outside the state of Arizona, it

 4   was not easy to find a pro bono law firm that was willing to

 5   come in after discovery had closed and pick up this case at                10:24:24

 6   that point in time.  We were very fortunate that Covington &

 7   Burling stepped up to do this on a pro bono basis when no firm

 8   in Arizona would touch the case.

 9            THE COURT:  Right.  Can I stop you there?

10            MS. WANG:  Sure.                                                  10:24:42

11            THE COURT:  I forgot to ask you, Mr. Young, do you

12   have varying rates that you charge varying clients in your

13   Redwood Shores office?

14            MR. YOUNG:  We have a set of uniform rates which we

15   give to clients.  I will say that not everyone pays exactly               10:24:55

16   those rates.  Depending on volume, we have some, for example,

17   very large clients who engage us on very large multiyear

18   engagements, and to them we do offer some discounts.

19            THE COURT:  Thank you.

20            And now sort of the related question for you,                    10:25:18

21   Ms. Wang --

22            MS. WANG:  Yes, sir.

23            THE COURT:  -- the Immigrants' Rights Project, how do

24   you decide what cases you will intercede in and what you won't?

25            And again, by these questions, and I think's important           10:25:29

```
 1    that I ask them, I don't mean to in any way diminish the value

 2    of your services to this case, but I do want to know -- I do

 3    think that defendants have offered some relevant inquiries

 4    about the number of parties that were involved here, and the

 5    concern that -- the extent to which that coordination may have    10:25:53

 6    been overlapping, duplicative --

 7            MS. WANG:  Um-hum.

 8            THE COURT:  -- and I think that deserves some

 9    exploration.  And so I guess I would like to have you tell me

10    to what extent do you --                                          10:26:07

11            Are you the director of the Immigrants' Rights

12    Project?  Are you the director?

13            MS. WANG:  I am.

14            THE COURT:  Do you get to choose in what matter -- I

15    assume that you get requests from all over the country about      10:26:16

16    what matters you'll intercede in, is that correct?

17            MS. WANG:  Yes, Your Honor.  This brings me to the

18    second reason in the Ninth Circuit case law for why our hourly

19    rate should apply.

20            THE COURT:  May I finish my question, though, and I       10:26:26

21    will --

22            MS. WANG:  Sure.

23            THE COURT:  -- let you speak.

24            MS. WANG:  Yeah, of course.

25            THE COURT:  How do you decide which cases you're going    10:26:29
```

1    to intervene in and which you don't?

2         MS. WANG:  Well, Your Honor, we have a number of

3    different factors that play in.  In terms of this particular

4    case, the national ACLU Immigrants' Rights Project came in

5    because of the specialized expertise that was needed to          10:26:43

6    litigate this case.  There were a number of issues in the case,

7    as Your Honor knows, from the trial and from before the trial,

8    that had to do with the intersection of local law enforcement

9    authority and federal authority over immigration enforcement

10   matters.  That is an area of particular expertise for the       10:27:02

11   Immigrants' Rights Project of the national ACLU, and it's a

12   major focus of my own personal practice as a lawyer.  So we

13   came in as the national ACLU to do the case with the ACLU of

14   Arizona, and at that time Steptoe & Johnson because of the need

15   for that special legal expertise.                               10:27:23

16        THE COURT:  And when you do fee applications -- and I

17   assume that you don't really have billable rates, do you?

18        MS. WANG:  What we do, Your Honor, is survey previous

19   fee awards for ACLU and other nonprofit attorneys who've

20   litigated civil rights cases that are of similar complexity;    10:27:41

21   we've provided some of that information in the supporting

22   documentation attached to my declaration.  And we look at the

23   market rates because we come in from San Francisco and New York

24   to do these cases.

25        And, frankly, a moment ago you asked Mr. Young whether     10:27:57

1  he would be offended if he were awarded a lower rate than

2  Covington's market rates.  Well, it's a matter of great

3  importance for nonprofit organizations because an award at a

4  rate that is lower than market rate for us will have a tendency

5  to depress our rate in future fee applications in other cases.  10:28:18

6         THE COURT:  So bottom line, is the market rate you've

7  given me a national market rate, or is it a San Francisco

8  market rate, or is it -- what kind of a market are we talking

9  about?

10        MS. WANG:  It's a Northern California market rate,  10:28:34

11  Your Honor.  And I would -- I would urge the Court, in looking

12  at the overall fee request, to follow the case law about

13  setting the hourly rate and separate that from other --

14        THE COURT:  I promise you, Ms. Wang, I will do my best

15  to follow the case law, but it does seem to me that the case  10:28:51

16  law does allow some discretion on the part of the Court,

17  doesn't it?

18        MS. WANG:  It does, Your Honor.  I guess what I'm

19  trying to get across is that you've discussed with Mr. Young

20  various ways that defendants have questioned the total amount.  10:29:09

21  There are ways the Court can look at the overall fee request in

22  terms of duplication of effort, in terms of various discounts

23  that we have already applied and are reflected in our request,

24  and additional discounts that could be made.

25        I guess what I'm saying is that to us as nonprofit  10:29:26

1  organizations, the matter of the hourly rate is an important

2  one in itself, and I would hope that that be kept as a separate

3  issue from some of the other questions about discounting the

4  total request.

5        THE COURT:  Well, and certainly it's something to be          10:29:44

6  considered, but let me ask you, I have Covington's application

7  in a specific dollar amount, I have your application in a

8  specific dollar amount, I have MALDEF's application in a

9  specific dollar amount, and I have the ACLU of Arizona's

10 application in a specific dollar amount.                              10:30:04

11       If I were to determine in my -- and again, I only have

12 my own perspective, which is only my perspective but,

13 unfortunately, in this case it's kind of dispositive, if I were

14 to determine that -- to the extent it isn't reversed on appeal.

15 If I were to determine that your services were very valuable        10:30:30

16 and Mr. Young's services were very valuable, should I deal with

17 you differently than I would, say, deal with MALDEF if I

18 determined that at least from my perspective, MALDEF's

19 participation, while valuable, was less valuable to the

20 plaintiffs and, hence, should I cut MALDEF's application more       10:30:45

21 than I cut yours, or more than I cut Mr. Young's, or should I

22 just do an across-the-board reduction in which you all

23 participate if I determine that such a reduction is merited?

24       MS. WANG:  Well, Your Honor, we would urge you to

25 consider our request; it's made on behalf of all the                10:31:01

1   plaintiffs.  And I think that each organization submitted a

2   separate declaration, but our application for fees is joint and

3   made on behalf of all the plaintiffs and all plaintiffs'

4   counsel.

5           So I would say in answer to your question, no, we          10:31:16

6   would prefer the Court not to pick and choose among the

7   different requests.  Those are simply reflected in separate

8   declarations, but the request is a joint one.  And we would ask

9   the Court to consider the fact that we have exercised billing

10  judgment, each of us who submitted a declaration, that already    10:31:34

11  represents a significant discount off of our actual

12  out-of-pocket investment in the case, and we think it's a fair

13  request.

14          Beyond that, if the Court is inclined to award less

15  than the amount that's requested, I think we've discussed         10:31:50

16  various ways of doing that.  And Mr. Young and I both have

17  talked about openness -- obviously, the Court is going to

18  decide as it decides, but we understand that there are

19  considerations and arguments the defendants have made.

20          THE COURT:  All right.  Thank you.                        10:32:07

21          MR. YOUNG:  Your Honor, might I add something to that?

22          Just to take one of the issues that you raised

23  earlier, I certainly wouldn't expect that if the Court were to

24  reduce the total fees requested because a more junior Covington

25  lawyer's presence at the trial shouldn't be paid for by the      10:32:23

1    defendants, that that would only be subtracted from Covington's

2    share and that wouldn't be spread across everyone.

3            THE COURT:  I guess I appreciate that generosity,

4    Mr. Young.  Let me ask you a question, though, since you've

5    raised it.  It seems to me that it wasn't just young Covington    10:32:39

6    lawyers that were able to participate at trial.  There were

7    also younger lawyers from MALDEF, maybe the ACLU, and other

8    lawyers that also participated.

9            Is that a mischaracterization, do you think?

10           MR. YOUNG:  No, Your Honor.    10:32:58

11           THE COURT:  Okay.  Thank you.

12           MR. POCHODA:  Your Honor, if I may just briefly add a

13   little bit that I think might be of some assistance --

14           THE COURT:  Do you want to approach the podium --

15           MR. POCHODA:  Yes.    10:33:08

16           THE COURT:  -- Mr. Pochoda?  Thank you.

17           MR. POCHODA:  In light of your last line of

18   questioning and the number of entities, if you will, that were

19   involved as counsel for plaintiffs, and leaving aside the issue

20   that you raised earlier about the number at trial per se, but    10:33:22

21   historically, I was asked by Steptoe back in 2007, when they

22   agreed to take over the case from Ballard, they felt that there

23   was a chunk of areas of expertise that they were not that --

24   had not had the same experience that the ACLU had, including

25   class actions, civil rights matters, and so forth, and other    10:33:47

 1    areas and as to -- I felt should be involved as well in the

 2    litigation itself.

 3            Without going into a litany of our other cases, I said

 4    I would consider that and give them my recommendation based on

 5    what I thought would be the minimal amount needed for this case   10:34:05

 6    and the expertise involved, including the immigration related

 7    and federal law related that IRP had, and MALDEF's relationship

 8    with the community, much of which I believe would require a

 9    great number of hours to go into in terms of the actual

10    contributions, but it was really pretty streamlined compared to   10:34:26

11    many of our other cases -- for example, the challenge to 1070

12    and some of the others had many more -- and we discussed that

13    at length, to keep it as few as possible.

14            Within the ACLU of Arizona I was the primary person.

15    A few others had some involvement, but not very much.  And I      10:34:46

16    believe that we could show, I don't think you need to take the

17    time and effort, that the contributions of all of the

18    organizations, including, obviously, the law firm, which was a

19    prerequisite, would not have been responsible to even consider

20    this litigation if we did not come up with a firm that had the    10:35:02

21    wherewithal, the resources, and the competent attorneys,

22    excellent attorneys to do this.  But I think we did in fact

23    keep it as limited a group as possible, and it did, throughout

24    the almost, well, six years of litigation, in fact was a very

25    efficient model of operation.                                     10:35:25

1    THE COURT:  All right.  Let me ask you, Mr. Pochoda,

2    you heard Ms. Wang indicate to me that her fee request, and I

3    believe you had another colleague that came from New York that

4    also submitted --

5    MS. WANG:  Yes, Your Honor.  Mr. Segura.    10:35:38

6    THE COURT:  Yes.  That her fee request was generated

7    based on actual fee awards out of the San Francisco Bay Area.

8    Is your fee request generated out of actual fee awards

9    out of the Arizona?

10    MR. POCHODA:  Well, in a roundabout way, Your Honor.    10:35:53

11    My only fee award in the history of -- in Arizona was

12    in 1989 when the District Court Judge Muecke, may he rest,

13    awarded me $240 an hour.  If you go to the labor statistics,

14    that would translate into $487 today.  If you add -- well, if

15    you had figured that out back in 1989 based on the added years    10:36:14

16    of experience and it went up to $300 an hour, it would go up to

17    587 today.

18    So that was my only direct fee award.  I did a lot of

19    field research -- not just for this case, Your Honor, but in

20    past cases with many attorneys here in Arizona -- to see what    10:36:31

21    would be the range for someone of my experience and background

22    and reputation.  And as you know, we put in one of the

23    affidavits from the former managing partner of Perkins Coie

24    here, Joel Nomkin, to attest to that.

25    THE COURT:  Well, and I don't mean to either -- I also    10:36:51

 1    don't mean to undervalue, and I won't under --

 2            MR. POCHODA:  Thank you.

 3            THE COURT:  -- I will do my best not to undervalue

 4    your participation, but do you -- are you aware of any Arizona

 5    court that has given a fee award to a local attorney of $500 an     10:37:02

 6    hour?

 7            MR. POCHODA:  I don't offhand.  I was told that there

 8    were, yes, but I don't offhand, Your Honor.  I was told that,

 9    in fact, it is a commercial rate that is regularly charged by

10    senior partners with over 40 years of experience in large firms    10:37:16

11    in Arizona.

12            THE COURT:  All right.

13            MR. POCHODA:  And that is the standard.

14            THE COURT:  Thank you, Mr. Pochoda.

15            Mr. Williams.                                               10:37:23

16            MR. WILLIAMS:  Good morning, Your Honor.

17            THE COURT:  Good morning.

18            MR. WILLIAMS:  I'm going to reiterate, if I can, what

19    you had expressed, that none of our concerns or my statements

20    here today are in any way, shape or form disparaging on these      10:37:41

21    lawyers.  I have the utmost respect for them, and I think

22    they've become friends working through this process, so please

23    don't take any of the criticisms --

24            THE COURT:  I won't; you're doing your job.

25            MR. WILLIAMS:  I'm doing my job for my clients, that's      10:37:57

 1   right, Your Honor.  I think --

 2          THE COURT:  Let me ask, Mr. Williams --

 3          MR. WILLIAMS:  Sure.

 4          THE COURT:  -- to get some things out of the way

 5   first, it didn't seem to me like there's any contest from          10:38:04

 6   Maricopa County that a fee award isn't merited in this case

 7   pursuant to the requirements of 1988.

 8          You're conceding that the plaintiffs qualify for a fee

 9   award, aren't you?

10          MR. WILLIAMS:  Yes, Your Honor.          10:38:17

11          THE COURT:  All right.  If in fact you're not going to

12   get dinged, or nobody's going to ask you from Steptoe & Johnson

13   and from Ballard Spahr for any fees, and I think you were there

14   at least when I came onto the case, too, so there was a fair

15   amount that we did in this court, let alone what happened in          10:38:36

16   Judge Murguia's court, with Steptoe & Johnson.  I mean, there

17   would be a fair amount of time that would have been required by

18   Covington to get up to speed on the case, wouldn't there?

19          MR. WILLIAMS:  Yes, Your Honor.

20          THE COURT:  And --          10:38:54

21          MR. WILLIAMS:  I think the issue, of course, is:

22   What's a fair amount of time?  And how was the time spent?  And

23   as we detailed --

24          THE COURT:  Do you remember those proceedings where we

25   found all those documents that Mr. Casey had to sort through          10:39:03

1    from Maricopa County that were presumably destroyed, and there

2    were literally thousands and thousands and thousands of

3    documents on disks that he had to go through and that, to some

4    extent, were disclosed to the other side?

5             MR. WILLIAMS:  And I was personally not that actively          10:39:22

6    involved in the case at that point.  I became actively involved

7    more at the summary judgment phase, but --

8             THE COURT:  Well, I'm reminding you, and Mr. Casey,

9    and I think -- well, to a lesser extent, others were involved

10   at the time, but there was a lot of paperwork, a lot of                  10:39:38

11   requests, a lot of things to go through, were there not?

12            MR. WILLIAMS:  Yes, Your Honor.

13            THE COURT:  And you wouldn't contest, for example,

14   that big cases require pretty heavy staffing.

15            MR. WILLIAMS:  I would not contest that, Your Honor.            10:39:53

16   In fact, I think one of the cases that they cited gave an

17   example of that of a trial that was honestly more complicated

18   than ours, and the total fee award was about $2.2 million.

19   That would be Agster, 2.339, with a seven-week trial.

20            THE COURT:  Which case is that that's more complex?            10:40:10

21            MR. WILLIAMS:  Agster.

22            THE COURT:  What?

23            MR. WILLIAMS:  Agster, A-g-s-t-e-r.  That's at

24   486 F.Supp.2d 1005.

25            THE COURT:  Is that the prison conditions case, or             10:40:17

 1    what is it?

 2              MR. WILLIAMS:  I don't remember, Your Honor.  I had

 3    the facts about 167 potential witnesses, 771 exhibits,

 4    seven-week trial; interlocutory appeal, as we had in this case;

 5    818 docket entries, which is a little higher, but not by much,    10:40:29

 6    than we had; and, again, the total fees were about 2.3.

 7              So I don't think anybody in this room believes that

 8    this was a simple case to try.  I think the problem is 2.3 is

 9    one thing; 6.6 is another matter.

10              And I think you can see that the challenge, Your    10:40:47

11    Honor, I think, as you were pointing out in the structure of

12    how you choose to accomplish the representation, when you

13    involve three civil rights organizations and a national level

14    law firm, you end up with 634 time entries referring to team

15    meetings, et cetera, 992 conferences --    10:41:06

16              THE COURT:  Well, you wouldn't -- let's drill down now

17    on that now a little bit.

18              MR. WILLIAMS:  Sure.

19              THE COURT:  Covington & Burling was necessary.  Do you

20    concede?    10:41:14

21              MR. WILLIAMS:  I don't -- I don't know that, Your

22    Honor.  I don't dispute it, but I don't know that.

23              THE COURT:  Well, do you concede that if not

24    Covington & Burling, a firm with substantial resources was

25    necessary to try this case?    10:41:24

 1          MR. WILLIAMS:  I think that's probably the case, yes.

 2          THE COURT:  Would you concede that ACLU as the

 3     original plaintiff is an appropriate party to this case?

 4          MR. WILLIAMS:  Yes, Your Honor.

 5          THE COURT:  Would you concede that there are                    10:41:33

 6     immigrants -- immigrants' rights issues that were involved in

 7     this case from which the national Immigrants' Rights Project's

 8     participation was necessary and/or useful?

 9          MR. WILLIAMS:  I think so.  I think the uniqueness of

10     those interests is perhaps an issue, as compared to the ACLU       10:41:50

11     and the plaintiff class.

12          THE COURT:  Well, was there any case prior to this

13     one -- well, I mean, it was the case, was it not, I don't mean

14     to be misstating the facts, that even after the 287(g)

15     certification was lost by the MCSO, the MCSO had a national        10:42:12

16     prominent lawyer training his folks -- training the sheriff's

17     deputies that they had the inherent right to engage in

18     immigration enforcement, isn't that so?

19          MR. WILLIAMS:  I believe that's -- I believe that's

20     accurate.                                                          10:42:31

21          THE COURT:  And so wouldn't -- wouldn't this case be

22     considered as resolving a fairly novel issue, at least from

23     your perspective?

24          MR. WILLIAMS:  I believe that's accurate, yes, Your

25     Honor.                                                             10:42:39

1       THE COURT:  And wouldn't that issue also be directly

2   related to immigrants' rights?

3       MR. WILLIAMS:  And that's my point, Your Honor.  I

4   think it's probably directly related to all of the plaintiffs.

5   The issue is the uniqueness of any particular interest such          10:42:49

6   that there couldn't have been a much more streamlined approach

7   than having nine lawyers spread across here and 19 lawyers

8   total, leaving out the Steptoe & Johnson period, and 20

9   paralegals.

10      THE COURT:  Your firm is how big?                                 10:43:05

11      MR. WILLIAMS:  Eight lawyers.

12      THE COURT:  Okay.  Have any of your lawyers left

13  during the course of that six years?

14      MR. WILLIAMS:  Have any of our lawyers left?  Yes.

15      THE COURT:  It does happen.                                       10:43:16

16      MR. WILLIAMS:  It does happen, Your Honor, yes.

17      THE COURT:  And is it unreasonable for -- for me to

18  reimburse Covington for lawyers that have left?

19      MR. WILLIAMS:  No, Your Honor, and I don't mean --

20      THE COURT:  That does inflate the total number of                10:43:29

21  lawyers whose billings you see on the bill, right?

22      MR. WILLIAMS:  That's fair.  I think as Your -- as

23  Your Honor pointed out, I think that to take a snapshot is

24  probably a more accurate picture, so to take a snapshot at

25  trial, or to take a snapshot as we did with the motion for          10:43:41

1    summary judgment where you have four hundred and some-odd

2    thousand dollars and a thousand man-hours spent on one motion.

3    Not the motion and the reply; not the response to our motion;

4    just the initial motion.  I think --

5        THE COURT:  You've done me the favor of highlighting          10:43:55

6    certain things and numbering them and coding them, and I've

7    looked at them.  Do you expect me to go through and with

8    respect to every time entry --

9        MR. WILLIAMS:  No, Your Honor.

10       THE COURT:  -- evaluate whether or not I believe that          10:44:07

11   the time has been appropriately spent?

12       MR. WILLIAMS:  No, Your Honor.  I think this is a

13   case, as is mentioned in one of the cases that we cited where

14   when you have voluminous, and this is certainly a voluminous

15   fee entry case, I think you have to look at them across the       10:44:19

16   board.

17       THE COURT:  All right.  So what would you suggest by

18   way of an across-the-board cut in terms of efficiencies?  And

19   back that up with why.

20       MR. WILLIAMS:  Well, can I address, on a related              10:44:30

21   topic, block billing?  Because I think that's one where you had

22   a measure for an across-the-board reduction.

23       The number that I consistently saw for an

24   across-the-board reduction for block billing was about a

25   30 percent reduction for those entries block billed, not for     10:44:42

1   all the entries, but for those entries that were block billed,

2   to account for the fact that now, me sitting in my shoes and

3   you sitting in yours, you can't figure out what was what.

4        So I think that's a component.  I think a similar

5   reduction, depending on what Your Honor does with the hourly        10:44:57

6   rate, too, I think that the challenge in this case with

7   Lodestar is it is a two-step process, and so you do have to

8   determine first what hours were reasonably spent.  And I would

9   agree with plaintiffs that probably does look at an overall

10  picture of how many people were involved, what would a        10:45:14

11  reasonable attorney have done with regard to the structure and

12  with regard to those hours and how much everybody was

13  conferencing in on all of the issues, which is what it appears

14  happened in the case so that everybody was involved all the

15  time, which again, the nine hundred and some-odd entries for        10:45:28

16  conferencing.

17       So I think something akin to a percentage reduction

18  there.  And it sort of depends on how far you do the block

19  billing.  I mean, nobody -- nobody in this room intends to

20  deprive them of a fair fee award.  The issue is:  What is a        10:45:45

21  fair fee award in the case?

22       THE COURT:  Well, let me ask, then, about the other

23  component of the Lodestar, which is Mr. Young came from

24  Thousand Shores, or Redwood Shores, or some very elegant

25  sounding location in the Bay Area --        10:45:58

 1          MR. WILLIAMS:  To Phoenix in the summer, nonetheless.

 2          THE COURT:  He did, and all -- many other times

 3     otherwise.  And Mr. Pochoda and Ms. Wang have both represented

 4     to this Court today, if not in their affidavits, and I will

 5     look in their affidavits, that they did look in the Phoenix          10:46:17

 6     area, even among national firms with Phoenix offices after

 7     Steptoe was departing, and found nobody that would take the

 8     case.

 9          So to the extent that is true, and to the extent that

10     Camacho dictates that I can take into account that Mr. Young         10:46:34

11     came from that very elegant bay sounding location, what

12     difference do the Economics of Law Practice make?

13          MR. WILLIAMS:  I think the problem with Camacho, Your

14     Honor, is that Gonzalez, which is the Ninth Circuit case that

15     they cited, specifically acknowledges Camacho, which we pointed      10:46:51

16     out in our response, and yet still that was a remand down to

17     the district court to consider the rates in the forum district.

18          THE COURT:  But now we don't have to do the remand,

19     because I'm here doing it the first time around.

20          MR. WILLIAMS:  That's our hope, Your Honor, yes.                10:47:08

21          THE COURT:  It doesn't say that I shouldn't consider

22     the fact that Mr. Young had to come in from San Francisco, does

23     it?

24          MR. WILLIAMS:  And I don't think that we would propose

25     that you not consider it.  I think we would propose that the         10:47:17

 1   appropriate target would be the forum district.  And then I

 2   think, as always, Your Honor has discretion to determine:  What

 3   is a reasonable hourly rate under all the facts?  Including, as

 4   Your Honor pointed out, the travel expenses down to meals and

 5   trial snacks and parking and everything else.  But I think you          10:47:31

 6   have to look at the overall picture, and it sounds like that is

 7   your intent.  That would our position as well.

 8        I will say with regard to the Arizona practices, we

 9   noted in our brief that many of their attorneys do charge right

10   within the range of the Arizona rates, so it's not as if the            10:47:49

11   Arizona rates are artificially low or are not real numbers;

12   they are very much real numbers.  But I think to the degree --

13        THE COURT:  Different markets could have different

14   rate structures for different levels of experience, wouldn't

15   that make sense to you, Mr. Williams?                                    10:48:03

16        MR. WILLIAMS:  No question they do, Your Honor, yes.

17        THE COURT:  Let me ask the question that I started out

18   with Mr. Young:  Should any fee award be without prejudice to

19   an additional request after appeal and/or after issues

20   pertaining to compliance and/or whether or not the MCSO -- and          10:48:22

21   again, I'm not trying to impugn the integrity of the MCSO in

22   providing a full disclosure of those materials that are -- they

23   are now disclosing, but it does seem to me that there is at

24   least the possibility that we are now -- it's clear that there

25   are recordings that were not turned over that seem to be --             10:48:48

1    have been requested by the plaintiffs that might have affected

2    the trial of this case.

3           It seems also possible to this Court that the MCSO was

4    aware of those recordings, at least some or all of them, and

5    that that might affect whether or not the plaintiffs should be          10:49:06

6    reimbursed for their efforts necessitated in evaluating that

7    and coming forth with appropriate curative measures.

8           And I realize that that is deciding things -- or

9    assuming things that I have not yet decided and I'm not

10   expressing any opinion on at this point.  But simply because          10:49:27

11   there are facts that I do not know on that point, is there any

12   reason why I should not grant this motion without prejudice?

13          MR. WILLIAMS:  Your Honor, I think you should rule on

14   the fee ap before you.  And I think the fee ap before you takes

15   us through --                                                           10:49:43

16          THE COURT:  October 2nd.

17          MR. WILLIAMS:  -- I believe Octobers 2nd.

18          THE COURT:  All right.

19          MR. WILLIAMS:  So no, I do not believe that that

20   forecloses their ability to then prove up eligibility,                  10:49:48

21   entitlement, and reasonableness, should a further fee ap come.

22          THE COURT:  All right.  Anything else?

23          MR. WILLIAMS:  As you said, I think we highlighted a

24   number of things in our brief, so I don't want to -- I don't

25   want to belabor the point if your Court -- if Your Honor               10:50:02

1   doesn't need it.

2           THE COURT:  All right.  Any rebuttal?

3           MR. YOUNG:  No, Your Honor.

4           THE COURT:  All right.  I will review again the

5   materials and I will enter an order as expeditiously as          10:50:18

6   possible.  Anything else we need to take up while we're all

7   together?

8           MR. YOUNG:  None from plaintiffs, Your Honor.

9           MR. CASEY:  None from the defense, Your Honor.

10          THE COURT:  All right.  Thank you all.                    10:50:32

11          MS. WANG:  Thank you.

12          MR. YOUNG:  Thank you, Your Honor.

13          (Proceedings concluded at 10:50 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 27th day of August,

18    2014.

19

20

21                              s/Gary Moll
                          _____

22

23

24

25