# FIRST QUARTERLY REPORT

# Independent Monitor

# For the

# Maricopa County Sheriff's Office



Robert S. Warshaw

Independent Monitor

September 18, 2014

**Table of Contents**

**Section 1: Historical Chronology of Case leading to Monitoring** ................................................. **3**

**Section 2: Executive Summary** ................................................................................................... **6**

**Section 3: Synopsis of Sections** ................................................................................................. **10**

**Section 4: Implementation Unit Creation and Documentation Requests** ............................. **11**

**Section 5: Policies and Procedures** ............................................................................................. **14**

**Section 6: Pre-Planned Operations** ........................................................................................... **22**

**Section 7: Training** ...................................................................................................................... **26**

**Section 8: Traffic Stop Documentation and Data Collection** .................................................. **33**

**Section 9: Early Identification System (EIS)** ............................................................................. **48**

**Section 10: Supervision and Evaluation of Officer Performance** ........................................... **54**

**Section 11: Misconduct and Complaints** ................................................................................... **64**

**Section 12: Community Engagement** .......................................................................................... **67**

**Section 13: Concluding Remarks** ................................................................................................ **73**

**Section 1: Historical Chronology of Case leading to Monitoring**

This brief introduction is not meant to exhaustively delineate the chronological history of the case of Manuel de Jesus Ortega Melendres; et.al v. Joseph M. Arpaio; et.al. as that has been more comprehensively presented in the writings of the Federal District Court of Arizona; Case 2:07-cv-02513-GMS Document 579 filed on May 24,2013, but to provide context for the original determination by the Court as well as events leading up to subsequent orders of the Court since that time.

As indicated in several Court writings, in particular Document 606 filed on October 2, 2013, it is important to note that there were several attempts by all parties involved, at the behest of the Court, to negotiate the terms of a consent decree that would outline how the Defendants, Sheriff Joseph Arpaio, Maricopa County Sheriff's Office, and Maricopa County, Arizona, could modify their practices to satisfy the constitutional claims of the Plaintiffs and the legal rulings of the Court.  As noted in Document 606 several areas of agreement were reached during these negotiations, but there were significant differences that led the Court to order injunctive relief after determining that the Defendants had violated the rights of the Plaintiffs under the Fourth and Fourteenth Amendments to the Constitution.  For example, that the Defendants inappropriately used race, i.e., "Hispanic appearance" to conduct a variety of investigations, traffic stops, saturation patrols, employer sanction law enforcement and the like, for the sole purpose of determining whether persons were in the United States illegally.  It is important to note that being in the country illegally is a Federal civil violation and not a Federal or State criminal offense.

In that light, the context within which these issues first arose began in 2006 when the Maricopa County Sheriff's Office (MCSO) created the "Human Smuggling Unit" (HSU) within the larger Illegal Immigration Interdiction Unit (III) of MCSO to enforce the State of Arizona's Human Smuggling Law, A.R.S. 13-2319 passed in 2005.  Sheriff Joe Arpaio, in 2007, entered into a Memorandum of Agreement (MOA) with Immigration and Customs Enforcement (ICE) that allowed for the training of MCSO personnel to later enforce federal immigration laws in certain conditions under the federal 287(g) law.   The MOA allowed for up to 160 MCSO officers to be trained under the 287(g) law.  According to testimony from an ICE special agent the training received by MCSO only allowed for the inquiry of legal status in the United States as a result of "otherwise legitimate stops to enforce provisions of state law…and were not meant to allow for race to be used as a pretext to investigate immigration violations." (Document 579, pp. 9-10).  In contrast, MCSO interpreted their authority  under the MOA as  being a "full-fledged anti-illegal immigration agency" (Exhibit 328) with the responsibility of arresting suspects even if solely for the crime of being an illegal alien…if discovered during the normal course of the deputies duties" (Exhibit 184)… "Ours is an operation….to go after illegals, not the crime first…" according to Sheriff Arpaio (Exhibit 410d). (Document 579, pp. 10-11).

In the ensuing months MCSO conducted a variety of operations from "small-scale saturation patrols" to "day labor operations", those targeting locations where Latino laborers gathered to be

picked up for the purpose of conducting daily manual labor, to "large-scale saturation patrols", where a large number of deputies were involved in traffic enforcement of minor offenses in areas populated by high proportions of Latinos in order to check the immigration status of persons in those vehicles.  In each of these types of operations the Court heard testimony that suggested that not all MCSO personnel or posse members taking part in these operations had been 287(g) certified, but a certified officer would be contacted if an organization member stopped someone who was suspected of being in the country without documentation.  MCSO regularly issued news releases following these operations emphasizing that a significant purpose of the operation was immigration enforcement.  The nuances of protocols developed by MCSO for these operations can be seen throughout the Court order.  The Court noted the ambiguity of protocols and the lack of training for all personnel involved in these operations.  Of the hundreds of persons arrested during these operations the Court noted that the majority of persons arrested (approximately 70%) had Hispanic surnames.

In October of 2009 ICE revoked MCSO's 287(g) authority although MCSO continued to maintain that it had the authority to make immigration arrests due to a misinterpretation of the 1996 Immigration Control Act passed by Congress that allowed local agencies to participate in the enforcement of federal immigration laws.  The Court specifically notes that the premise for this enforcement under U.S. Code "did not then and does not now exist" (Document 579, pg. 31).  Shortly thereafter MCSO began the process of training 900 plus personnel in immigration enforcement; however, this training incorrectly included the assertion that being in the country illegally was a federal crime rather than a civil matter.  Even absent 287(g) authority MCSO continued to conduct a variety of operations and charge individuals with state offenses where applicable and contact ICE otherwise, up to 2 weeks prior to the beginning of the Melendres v. Arpaio case.  According to testimony and documents presented to the court, MCSO, following adverse rulings from Federal Courts, drafted the LEAR Protocol (Law Enforcement Agency Response) which continued to use the 287(g) training as its base in carrying out immigration enforcement (Document 579, pg. 35).  A major component of the LEAR protocol training rested upon prior ICE 287(g) training that the use of race was a relevant factor in the development of reasonable suspicion that a person was in the country illegally.  The Court noted, through testimony of ICE agents that while "Mexican ancestry" could not be a sufficient reason to suspect someone of being in the country illegally it could be used in combination with other factors to create reasonable suspicion.  It was also documented by the Court that MCSO did not have any specific training to prevent racial profiling although command staff often admonished officers involved in various operations not to racially profile even in the absence of a definition of racial profiling.  In this context the Court found that while MCSO policy prohibited racial profiling it did not require officers to be "race-neutral" in deciding how to conduct immigration investigations (Document 579, pg. 42). As a result of the above details the Court found that MCSO equated being a Hispanic day laborer with being an unauthorized alien and created specific operations to maximize the impact of those operations.  By extension the Court also concluded that MCSO, through the testimony of its own officers, acknowledged that any vehicle could be followed for a short period of time and found to have made some violation that would allow them to investigate the immigration status of the vehicles occupants, in fact, there was widespread disparity among MCSO personnel testifying what "zero-tolerance" enforcement during small and large scale saturation patrols meant.  The Court concluded that this ambiguity

was compounded by the fact that the majority of arrests during these patrol operations were of persons with Hispanic surnames suggesting that many of these stops were "pre-text" to conduct an immigration investigation of the vehicle occupants (Document 579, pgs. 66, 69 and 73 as examples).

The Court received testimony from MCSO personnel, and several persons stopped, including Ortega-Melendres, that during day-labor operations the length of time for traffic stops increased dramatically as the number of passengers being checked increased.  In the case of Melendres, who was in a vehicle with two other passengers, it took officers 40 minutes to complete their investigation.  The drivers of these vehicles were held until the immigration investigations were completed and often received only verbal warnings for the violations that led up to the stop of the vehicle to begin with.  It was also discovered through testimony that when physical identification of persons was lacking, the processes deputies conducted took considerably longer periods of time even when there were multiple deputies taking part in the investigations. Moreover, the testimony of deputies showed that it was common practice to investigate all passengers in vehicles stopped even absent reasonable suspicion (Document 579, pg. 97).

In the Order of May 24, 2013 the Judge found that the Plaintiffs met the burden of proof by establishing not only that they had been wronged but there was sufficient likelihood, given the policies and practices of MCSO, those persons would be wronged again in the future.  In that light the Order enjoined MCSO from continuing to enforce its LEAR policies.  Moreover, MCSO was enjoined from using Hispanic ancestry, or race, as any factor in making law enforcement decisions as this violates both the Fourth and Fourteenth Amendments to the U.S. Constitution. The Court also enjoined MCSO from unconstitutionally lengthening the time of traffic stops without reasonable suspicion that is based upon permissible factors that a **State** crime is being committed.  As a result of testimony by Sheriff Arpaio relating to Arizona's Human Smuggling and Employer Sanctions Laws, the Court enjoined MCSO from using reasonable suspicion that a person is in the country illegally, in and of itself, to justify investigatory detention or arrest.  Each of these statutes, according to the Court, requires additional burdens on MCSO before they can conduct further investigatory actions.

As a result of this order the Judge allowed the Parties sufficient time to negotiate terms of a consent decree.  However, due to several areas of disagreement the Court filed a Supplemental Injunction on October 2, 2013, Document 606, detailing the actions necessary for MCSO to come in to full and effective compliance with the Court Order.  These actions will make up much of the substance of the remainder of this report and therefore are not delineated here.

One of the provisions of the Order was that the Plaintiffs and Defendants were each to submit to the Court a list three persons/groups to monitor the process of implementing the Order. Following several failed attempts at negotiations, the Court designated me, Retired Chief Robert Warshaw, as the Monitor in January of 2014.  I assembled an experienced team of law enforcement professionals and academics to assist with the Monitoring duties.  The Monitoring Team made its first visit to Maricopa County from February 19 to February 21, 2014.  The Team met with both Plaintiff and Defendant groups to discuss aspects of the Order and how the Monitoring team would be working to assess compliance with the Court's Order.

The Monitor and smaller groups of his Team have visited Maricopa County every month since. A second full team site visit was conducted from June 16 to June 20 of 2014, to continue the process of assessing policies and practices of MCSO as well as to suggest steps necessary to achieve compliance with the Court Order.  During this latter site visit, numerous meetings were held between individual Monitoring Team members and responsible command personnel within MCSO.

The Court has entered supplemental amendments to the original Order as a result of difficulties encountered in the early processes of implementation.  Following several status conferences on the issue of Community Engagement, the Court filed Document 670 on 4/04/2014 relieving MCSO of several responsibilities related to community outreach.  These responsibilities were given to the Monitor.  It is now the responsibility of the Monitor to conduct meetings in the community following significant law enforcement operations as well as regularly scheduled community meetings throughout Maricopa County to allow citizens to ask questions or comment on the law enforcement services they receive from MCSO.  In addition, the Monitor was directed to work with the Plaintiffs to create a Community Advisory Board (CAB) to facilitate communication with the community and groups affected by MCSO.

Since training of MCSO is such an important aspect of implementing the Order, there have been a series of meetings involving the Monitoring Team, the Plaintiffs and Defendants regarding training curricula, trainers, and training schedules.  The parties continue to work through these issues, as described in later sections of this report.  In addition, on April 17, 2014, the Court filed an additional Enforcement Order, (Document 680), due to erroneous training being conducted by several command staff at MCSO that mischaracterized the prior Court Orders, Documents 579 and 606.  The Court deemed it necessary that all MCSO personnel be required to read a combination of a Corrective Statement, the Findings of Fact and Conclusions of Law, and entire October Supplemental Order as amended, depending on their rank and assignment, and sign attestations that they understand the Order.  The Monitor was given the task of verifying compliance with this Enforcement Order.

Many of the issues outlined above will be raised again throughout this report in much more detail.  This brief chronology is meant to describe the issues leading to the original findings by the Court and the processes of implementing the details of the Order thereafter.  The inability, as noted by the Court, of the parties to agree to all aspects of a consent decree have led to the Court, and its Monitor taking a more active role in ensuring full and effective compliance with the Order requirements.

## Section 2: Executive Summary

The history leading up to the Court Order and the ensuing appointment of a Monitor does not necessitate a contentious relationship in the future.  We have found members of MCSO in general, and in particular members of the Court Compliance and Implementation Division, very

accommodating to our scheduling requirements and receptive to our requests for documentation. It should also be noted that during visits to several District offices during our site visits, members of the Monitoring Team have found that the Court's attempt to improve MCSO has been well received by line-level personnel. The Monitoring Team has seen significant effort expended during the first six months of this process in terms of policy development.  However, we have also noted that some of the most crucial policies pertaining to this Order, such as a detailed Early Identification System (EIS) policy, have yet to be produced.

The full Monitoring Team has made two site visits during the first six month period of our appointment, along with several visits by smaller groups of the team as a result of emerging events that have taken place during that time period.  The first site visit by the full team occurred in February of 2014.  This initial two day site visit was scheduled to familiarize the team with MCSO; its policies, practices and command personnel who had control over aspects of MCSO operations pertaining to the Order.  In addition, the team met with representatives of the Plaintiffs to gauge their collective expectations and concerns as the process moves forward. Finally, the team was able to meet with the Court to gain a fuller understanding of the relevant issues in the case, including a historical perspective leading up to the Order, and the expectations of the Court in the near and long term to assist MCSO to gain full and effective compliance with the Order.

Throughout the two day site visit the Monitoring Team met twice with the majority of command staff of MSCO.  During the first meeting the team was provided with a lengthy history of MCSO, including the personal histories of the Chief Deputy and Sheriff.  In this review much of the blame for the current issues facing MCSO were placed upon the prior Chief Deputy who, it was suggested, "stonewalled" investigations by DOJ.  The culture of MCSO, according to the new Chief Deputy, has changed dramatically, and, specifically, in his view, this transformation began prior to the Melendres Order.  The Sheriff was present for a portion of this presentation and stated that while his opinions differed significantly from those of the Judge, he and his staff would work with the Monitoring Team until his appeals of the Court Order exonerated MCSO. The Sheriff also made it clear that his responsibilities were to the citizens who elected him and not to politicians or the courts.  During the second meeting with MCSO command staff the Chief Deputy reiterated that his organization was not racist and part of MCSO's difficulty during the Melendres trial was that the prior Chief Deputy had eschewed technology to such a degree that MCSO did not have the capacity to statistically defend itself.  According to the Chief Deputy, MCSO has now thoroughly sought advanced technical tools and has become a leader in the state for such things as E-learning in squad cars for line officers.  In addition, MCSO is working toward compliance in other ways with the introduction of IA Pro/Blue Team (collects and monitors data on commendations, complaints, disciplinary history and grievances), new disciplinary policies, the implementation of a citizen's academy and the development of a new traffic stop data form.  In these ways, the Chief Deputy stated that MCSO was well on its way to full compliance with the Court Order, but was looking to the Monitoring Team to clarify ambiguous aspects of the Court Order, develop state-of-the-art training, and assist with the improvement of supervisory training and team building within MCSO.

I acknowledged the efforts made by MCSO up to this point, and I emphasized that the Monitoring Team comes in with no preconceived notions that would impact our ability to assist MCSO in coming in to full compliance with the Court Order. Moreover, the wealth of law enforcement experience on the Monitoring Team will be at the disposal of MCSO to make this a coherent and beneficial process. However, I also cautioned MCSO command staff that the culture of an organization emanates from its leadership, so as we focus on particular aspects of the Order the command personnel will be crucial in preparing line officers for the changes that will be forthcoming. I also recommended to command staff that while it is not an element of the Order, they may want to develop an internal auditing unit that can work with the Court Compliance and Implementation Division to preemptively address issues before they come to the attention of the Monitoring Team or the Court.

The second site visit of the full Monitoring Team occurred from June 16 to June 20 of 2014. Since the first site visit in February 2014, the Monitoring Team had been involved in several activities, including policy reviews and the development of training protocols. We were also, at the Court's direction, heavily involved in overseeing an extremely complex internal investigation with a direct nexus to the issues that resulted in the litigation of this case.

Members of the Monitoring Team met with key MCSO personnel in small groups, focusing on activities ranging from internal investigations, EIS and other data collection systems, mobile video, training protocols and compliance with additional orders from the Court (for example, Document 680). These issues will be addressed more completely in the ensuing sections of this report.

In addition, on Thursday June 19th, I oversaw the first community meeting as directed under Document 670 which gave the responsibilities of community outreach, presentations, complaint gathering, and related activities to the Monitor. A fuller description of this event will follow, but it is significant to note that this bilingual event was well received by over 200 attendees and several media outlets (representing both English and Spanish networks). This event afforded us the opportunity to present the Community Advisory Board members, to provide an overview of my role, and most importantly the opportunity for audience members to ask questions or make statements. The main goal achieved during this first community meeting was to assure members of Maricopa County that I, as the Monitor, would be responsive to their concerns regarding MCSO, whether at events such as these or through written or telephonic communication that would allow individuals to request guidance or report issues that they believed were appropriate to the effective operations of the Sheriff's Office. Several members of MCSO were present at this meeting. We were very encouraged by the turnout, the tone and tenor of this first community meeting.

Below are some additional highlights:

- Although each member of the Court Compliance and Implementation Division appears committed and knowledgeable, it appears that agency policies are developed in a vacuum.

- o There is no requirement for review or input by District Commanders and/or the Command Staff of any affected Unit.
- o The requirement for training review and acknowledgement is haphazard and not standardized.
- o Policies and directives are allowed within each District and Unit without central oversight and approval, and in many cases, without the knowledge of Administrative Personnel.
- The Staff of the Court Compliance and Implementation Division appears to interact with personnel without the serious involvement of the chain of command. Obtaining information and feedback from field personnel is invaluable, but the chain of command needs to be involved in the process to insure buy in and accountability.
- The process of conducting Internal Affairs investigations at the District level is unorganized, poorly trained to, and lacks sufficient oversight to catch tardy or inadequate investigations. During our recent site visit, some command personnel advised that they had never been trained in conducting internal affair investigations, yet they were required to do so.
  - o There is a lack of guidelines, checklists or protocols for those assigned investigations.
  - o There is no training to teach those charged with internal investigations proper investigative techniques, such as avoiding leading questions, resolving material inconsistencies, etc.
- No Early Identification System policy has been created as yet.
  - o The EIS Unit is particularly enthusiastic and has compiled its own data system using hardcopies of TraCS[1], Vehicle Stop Contact Sheets, and forms generated in April, May and June, to conduct evaluations of traffic stops before reports were automated. However, they conducted these evaluations without any protocols or guidelines to use in their investigations. Their reports appear thorough, but without guidelines the results and their use is ambiguous.
  - o It remains a concern that without a policy, the EIS process will be interpreted as a punishment system rather than an early warning and correction process.
- MCSO has advised the Monitor that it has yet to send out a request for proposals for In-Car Video Recording. Moreover, while MCSO staff realizes the limited capabilities of standard police car mounted cameras, they have not sought out additional information about other options.
- The collection of uniform traffic stop data consistent with the Order did not begin until April 1, 2014; therefore, any analysis of the data is incomplete at this time. However, the Order did not require MCSO to collect this data prior to this date.
  - o As noted in Paragraph 54, later in the report, there remain several discrepancies in how officers are filling out the TraCS forms. MCSO should work to fill in this void of information as quickly as possible.

---

[1] TraCS provides a paperless system for the Sheriff's Office that allows information to be transferred between forms, as well as to gather statistical data, while making police reporting more streamlined and efficient.

- o In addition, as noted in Paragraphs 64 to 68, the training in TraCS was done in such a way that there is no record of who received training and when.
  - o Moreover, as noted in the response to Paragraph 60, as of June 30, 2014 there were 257 vehicles equipped with the TraCS e-citation system (195 marked patrol vehicles and 62 un-marked patrol vehicles), that are used to conduct traffic stops, and officers can enter the traffic stop data electronically through their MDT.  In order to be compliant, all of MCSO's vehicles that make traffic stops must demonstrate the system(s) ability to capture the required data electronically and demonstrate its ability to generate summary reports and analyses.
- The training of MCSO personnel is one of the most important aspects of the Court's Order.  MCSO has been involved in an ongoing dialogue with the representatives of the Plaintiff and Monitor to develop new policies and practices for training employees and posse members.  Significant progress has been made, despite the slow pace of the process.
- On a positive note, in our observations of Communications/Dispatch functions we found that if the deputy fails to announce a reason for the stop, the dispatcher will quickly prompt them for a reason.
- From our visits to the Districts we found that the majority of deputies and commanders are supportive of the changes being imposed by the Order and are looking forward to a more well trained and professional Department.
- The unique identifier for each incident/stop required by Paragraph 55 has been operational since September 2013.  With the addition of new data systems this identifier links information from several data systems and can be accessed easily.  Of the 94 traffic stops reviewed for Paragraph 55, 93 included the identifier.
- On July 20th, 2014, we were advised that the EIS Unit would be moved to the Human Resources Unit and that Internal Affairs was being renamed to Professional Standards.  Both of these changes coincide with suggestions made during the site visit of June 2014.

**Section 3: Synopsis of Sections**

The purpose of this short Section is to provide a summary of each of the Sections to follow.  This summary will by no means capture every important aspect of the Sections, but will provide the reader with information that may guide their examination of the material.

- Section 4:  The Court Compliance and Implementation Division is a crucial conduit of change, information, creativity and responsibility.  This section underscores the need for this Unit to have the authority to be responsive to the Order of the Court and promote well organized internal assessments of the culture and practices of the organization.
- Section 5:  This section pertains to Bias-Free Policing.  We have provided MCSO with feedback regarding what is required for them to ensure that their policies are consistent with the Order of the Court.
- Section 6:  In this section we cover the area of Pre-Planned Operations.  Meetings have been held with MCSO since March of this year and we have yet to receive a full list of Units that may be involved in immigration-related operations.  In addition, the policies

referred to in this section require further revision by MCSO.  We have made suggestions to assist in those revisions.

- Section 7:  Training of personnel is one of the most important aspects of any law enforcement organization.  There has been a collaborative effort by Plaintiffs, Defendants and the Monitoring Team to ensure that the curricula, instructors, and materials that are used to train MCSO personnel meet the highest standards.
- Section 8:  Documentation of Traffic Stops and Data Collection processes are covered in this section.  MCSO has provided data that were used to conduct initial assessments necessary by the Court Order.  However, this data collection only goes back to April 1st, 2014.  In addition, the new pieces of technology adopted by MCSO, in particular the TraCS system, have greatly enhanced the data collection capabilities of the department.  However, the process of introducing this system throughout the County has been slowed by training and equipment installation schedules.
- Section 9: The Early Identification System (EIS) exists in a rudimentary form.  There is currently no coherent policy outlining the data to be collected, the protocols to be used to examine that data, who will have access to the data and the purposes of this particular Unit.  Pre-EIS investigations have been done, which are evidence of the creativity of several MCSO personnel; however, a rigorously defined policy is necessary to insure that the data is used to its utmost potential.
- Section 10:  The Supervision and Evaluation of Officer Performance is another area of great importance in law enforcement; without it, an organization can become marred by inappropriate and unchecked conduct on the part of its line personnel.  As of the date of this report, training in Supervisor Responsibilities has not been conducted and all policies relating to Supervisor responsibilities have not been promulgated.
- Section 11:  For an organization to retain the faith of the community, that community must know that there are checks and balances in place to correct officer misconduct.  This section provides suggestions for improving the policies and practices of MCSO regarding investigations into misconduct and the tracking of complaints to ensure that citizen concerns are heard.
- Section 12:  Finally, community engagement is a fundamental aspect of every law enforcement agency.  Without the support of the community, no law enforcement agency can successfully accomplish its goals.  The responsibility for Community Engagement has been transferred to the Monitor.  This section describes the development of the Community Advisory Board and the community meeting that has recently taken place.

**Section 4: Implementation Unit Creation and Documentation Requests**

**COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** (*court order wording in italics*)

*Paragraph 9. Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and*

*compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

Shortly after the issuance of the Order, MCSO created an Implementation Unit.  At the beginning of our tenure, the Unit was staffed with a Captain, two Lieutenants, and two Sergeants.  Over the past few months, there have been some changes to the Unit, now called the Court Compliance and Implementation Division (CCID).  There has been a change in command, with one of the Lieutenants being promoted to Captain and assuming the duties of Commanding Officer.  The staff consists of a Lieutenant, three Sergeants, two Detectives, and administrative support personnel.  The Division is well supported by two MCAO attorneys, who frequently participate in our meetings and phone calls with Division Personnel.  We have always found the Division to be responsive and accommodating to all of our requests.

*Paragraph 10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

As mentioned above, CCID has always been responsive to our requests.  In many instances, we have asked for material that has not been routinely collected – or even generated – by MCSO.  In this respect, our first few months have served as a learning curve for CCID and our team regarding what may be available and the best ways to produce it.  Our first few inquiries have been focused on policies more than data.  Once MCSO's policies are compliant with the Order, our focus will shift to data collection necessary to fulfill our outcome assessment, compliance review, and audit responsibilities.

*Paragraph 11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

MCSO filed its first report as required by this Paragraph on August 8, 2014.  We advised the Court Compliance & Implementation Division that no response would be required pursuant to Paragraph 11 (iii), above, since we have not submitted a previous quarterly report.  MCSO's report covers the period from January 1, 2014-June 30, 2014.

The report was divided into two Parts.  Part 1 provides an overview of MCSO major efforts towards compliance to date, organized by Order Chapter.  Part 2 provides a narrative explanation of specific steps taken by MCSO during this period to implement the Court Order, and its future plans for compliance.

The report describes the creation of the Court Compliance and Implementation Division, and identifies the various policies which have been drafted and submitted for the Plaintiffs' and our review.  It outlines the process to develop the Order required training, including the hiring of an outside consultant.  It describes the development of forms and the acquisition of technology specifically related to traffic enforcement and the Early Identification System.  The report identifies staffing and structural changes to the organization, including promotions to meet the supervisor to officer ratios identified in the Order.  It also describes MCSO internal auditing activities to assess its compliance with Order requirements.

MCSO submitted this status report in a timely manner, and is in compliance with this Paragraph.

*Paragraph 12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

*Paragraph 13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days*

*thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

MCSO submitted its first internal assessment on April 7, 2014.  The 11-page document outlined MCSO's efforts to date to comply with the Order's requirements, and discussed Patrol Operations, Written Policies and Procedures, Training, Supervisor Review, Intake and Investigation of Civilian Complaints, Discipline of Officers, Community Relations, and Miscellaneous Procedures.  We found the document to be informative and a very good summary of the state of play as we were beginning our tenure.  All of these areas have been topics of our meetings, discussions and correspondence with CCID personnel and other MCSO staff.  MCSO's and the Monitor's responsibilities in some of these areas have been modified by Court Order.  MCSO did not assert Full and Effective Compliance with the Order in this assessment.

## Section 5: Policies and Procedures

## COURT ORDER V. POLICIES AND PROCEDURES

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."   MCSO has conducted a comprehensive review of its Patrol Operations Policies and Procedures in three phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believes complies with the various Paragraphs of the Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, and most importantly, MCSO, in response to our request, provided in three submissions, all of the policies and procedures it believes are applicable to the Order for our review and that of the Plaintiffs.  MCSO has received our feedback and is in the process of adjusting its policies to meet the Order's requirements.

*Paragraph 20. The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures*

### a. Policies and Procedures to Ensure Bias-Free Policing

*Paragraph 21. The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

*a.       define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

*b.       prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

*c.       prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

*d.       specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

*e.       include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

We conducted a review of the fifteen-plus documents submitted by MCSO in reference to this Paragraph; including updated versions of EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance).  They were evaluated, in particular, regarding their compliance with the requirements listed in Sub-Paragraphs 21.a. through 21.e. While there were areas of compliance with some of the Sub-Paragraphs, certain elements were missing.  For example, submitted policies covered the issue of prohibiting police tactics and strategies and selective enforcement based on race or ethnicity; however, the submitted documents do not mention the rejection or non-enforcement of same based on race or ethnicity.  We provided feedback regarding policy deficiencies in a separate process, and will review updated policies for compliance when they are submitted.  MCSO is currently not in compliance with Paragraph 21.

*Paragraph 22. MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

The draft CP-8 (Preventing Racial and Other Biased-Based Profiling), and a resubmitted EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) do meet the requirements of Paragraph 22.  The policies, however, are being changed to meet compliance with other

Paragraphs, and have not been published or disseminated to Agency personnel.  MCSO is currently not in compliance with Paragraph 22.

*Paragraph 23. Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

We reviewed policy CP-2 (Code of Conduct, effective 10/28/13), prohibiting the use of County property in a manner that discriminates.   CP-2 also prohibits the use of email in a manner that discriminates.  The wording of CP-2 supports compliance with this Paragraph 23.  However, CP-2 lists policy GM-1 (Electronic Communications and Voicemail) as providing more specific instructions as to the use of email by personnel.  GM-1 was not supplied in support of this Paragraph using the protocol established by the Monitoring Team and CCID.  However, after reviewing a draft of this report, CCID provided a copy of GM-1, which was previously submitted to the Court.  While this Order does not contain the prohibition required by this Paragraph, it does not conflict with CP-2, and provides general guidelines on email and voicemail usage.  Additionally, MCSO has not provided proof of dissemination of these policies to Agency personnel.  Until we receive and review this information, MCSO is not in compliance with Paragraph 23.

*Paragraph 24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

The requirements of this Paragraph were included in the second, updated version of EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance).  The policy, however, is being changed to meet compliance with other Paragraphs, and it has not been published or disseminated to Agency personnel.  MCSO is currently not in compliance with Paragraph 24.

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**
*Paragraph 25. The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*
*a.        prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*
*b.        provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.      prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.      prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.      prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.      require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.      prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;

i.      provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j.      Instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

We reviewed the draft policies of EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), EB-2 (Traffic Stop Data Collection), EA-5 (Enforcement Communications), and CP-8 (Preventing Racial and other Bias-Based Policing).  In our policy feedback, we required that the definition of racial profiling be consistent throughout all policies where it is included, and that it mirror the definition provided in the Order.

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.

Until the required changes are finalized and the policies are disseminated and trained to, MCSO is not in compliance with this Paragraph.

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

Paragraph 26. The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:

a.      require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;

b.      require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;

c.       provide Deputies with guidance on factors to be considered in deciding whether
to cite and release an individual for a criminal violation or whether to make an arrest; d.
require Deputies to notify Supervisors before effectuating an arrest following any
immigration-related investigation or for an Immigration-Related Crime, or for any crime
by a vehicle passenger related to lack of an identity document;
e. prohibit the use of a person's race or ethnicity as a factor in establishing reasonable
suspicion or probable cause to believe a person has, is, or will commit a crime, except as
part of a reliable and specific suspect description; and
f.  Prohibit the use of quotas, whether formal or informal, for stops, citations,
    detentions, or arrests (though this requirement shall not be construed to prohibit the
    MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's
    overall effectiveness or whether the Deputy may be engaging in unconstitutional
    policing).

We reviewed the draft policies of Traffic Enforcement, EB-1 (Traffic Enforcement,
Violator Contacts, and Citation Issuance), and EA-11 (Arrest Procedures).  In our
policy feedback, we required that the definition of racial profiling be consistent
throughout all policies where it is included, and that it mirror the definition provided in
the Order.  All of the elements of Paragraph 26a. – f. are covered via a combination of
these two policies.  In many cases, the policy language tracks exactly with that of the
Order.

Until the required changes are finalized and the policies are disseminated and trained
to, MCSO is not in compliance with this Paragraph.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27. The MCSO shall remove discussion of its LEAR Policy from all agency written
Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify
that it is discontinued.*

MCSO has provided current policy drafts for EA-11 (Arrest Procedures), Investigations Division
Operations Manual and the former "HSU" Operations Manual.  The only reference to a LEAR
(Law Enforcement Agency Response) Policy is in the **former** HSU Operations Manual where
references are made to a U.S. Immigration and Customs Enforcement (ICE) LEAR Policy.  We
have reviewed the proposed draft policies and find no reference to an MCSO LEAR Policy.  We
have met with MCSO staff and have been told that MCSO has never had a LEAR Policy of its
own, though ICE does have one that was referenced in former policies and draft memorandums.
These draft memorandums and policy references to the ICE LEAR policy may have contributed
to the belief by many MCSO personnel that MCSO did in fact have a LEAR policy.  MCSO
needs to ensure that any future references to policies or procedures of other agencies are clearly
defined and explained to their personnel. The agency is in compliance with Paragraph 27.

*Paragraph 28. The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

*a. specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

*b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

*c. prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

*d. prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

*e. prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

*f. unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

*g. prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

*h. Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time Supervisor approval was received, (c) when ICE/CBP was contacted, (d) the time it took to*

*receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

MCSO has submitted numerous draft policies and existing policies and manuals to comply with the requirements of this Paragraph. They include CP-8 (Preventing Racial and Other Biased Based Profiling), EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and EA-11(Arrest Procedures). They have also submitted the Investigations Division Manual and numerous Briefing Boards, and memorandums. In the Investigations Manual submitted by MCSO, Section 207 covers all of the requirements of Paragraph 28 with the exception of 28.g, as there is no statement that the transportation or delivering of an individual to ICE/CBP is prohibited without a voluntary request by the individual. The requirements of 28.g should be added to the Manual.

In our policy feedback, we required that the definition of racial profiling be consistent throughout all policies where it is included, and that it mirror the definition provided in the Order. Some of the policies are also being modified to insure compliance with other Order Paragraphs. Until such time as they are updated, reviewed, and published, MCSO is not in compliance with Paragraph 28.

### e. Policies and Procedures Generally
*Paragraph 29. MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

*Paragraph 30. Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

As outlined in this report, we conducted an extensive review of all policies and procedures offered by MCSO as applicable to the Order. MCSO submitted policies and procedures to us in three major submissions between April 7 and June 24, 2014. The first submission was in response to our initial document request of March 21. This submission was missing several of the requested documents, and was replaced with a second submission on May 12. This submission contained the policies offered in the first submission – many of them updated – as well as the material identified as missing. This was also formatted by Paragraph number, with the sections MCSO asserted supports compliance highlighted in each policy. Finally, MCSO submitted the updated EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection) on June 24. These policies were also highlighted by Paragraph number.

MCSO was provided with our feedback on the submitted policies on August 12 in a separate document.  The Plaintiffs also provided comments on each of MCSO's policy submissions for both the Monitor's and MCSO's review, pursuant to Section IV of the Order.

*Paragraph 31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

MCSO notifies employees of changes to policies and procedures via its Briefing Board System.  MCSO defines this system as "an official informational publication produced by the Policy Development Section that contains material having the force and effect of Policy."   Prior to some policies being revised, time-sensitive changes are often announced in a Briefing Board, until the entire Policy can be revised and finalized.  We were provided with several Briefing Boards as part of our document request.  We acknowledge the authority of these documents, but we do not, however, consider them a substitute for a formal policy required by the Order.  MCSO disagrees, but the definition of Briefing Boards indicates "Prior to some Policies being revised, time-sensitive changes are often announced in a Briefing Board, *until the entire Policy can be revised and finalized*" (italics added), supporting our position that are not final versions of a policy.  Their contents may be altered or adjusted in some manner prior to inclusion in a final policy.

Many of MCSO's policies are still in draft form because of the above described review process.  For those policies that are in effect, MCSO was unable to provide any proof of dissemination.  MCSO has been advised that for a policy to be accepted as proof of compliance, they must demonstrate that all affected personnel have received and understand the policy.  As the updated policies are promulgated, we will ascertain if their dissemination has been properly recorded.  MCSO is not in compliance with this Paragraph.

*Paragraph 32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.*

We reviewed policies CP-2 (Code of Conduct), CP-8 (Preventing Racial and other Biased-Based Profiling), GC-17 (Employee Disciplinary Procedure), and GH-2 (Internal Investigations).  The requirements of this Paragraph are incorporated in the combination of these policies.

CP-8 was submitted as a draft, and some of the other policies are also being modified to insure compliance with other Order Paragraphs.  Until such time as they are updated, reviewed, and published, MCSO is not in compliance with Paragraph 32.

*Paragraph 33. MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

MCSO offered policies CP-8 (Preventing Racial and other Biased-Based Profiling) and GC-17 (Employee Disciplinary Procedure) as proofs of compliance.  The requirements of this Paragraph are incorporated in the combination of these policies.  MCSO considers acts of discriminatory policing as Category 6 violations under its Disciplinary Matrix, and the penalties range from a 40-hour suspension to dismissal for a first offense.  Penalties for a second offense range from an 80-hour suspension to dismissal, and dismissal is the mandatory penalty for a third offense. CP-8 was submitted as a draft, and GC-17 is being modified to insure compliance with other Order Paragraphs.  Until such time as they are updated, reviewed, and published, MCSO is not in compliance with Paragraph 33.

*Paragraph 34. MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."   As mentioned above, throughout the first few months of our tenure, MCSO has been reviewing its policies in response to Order requirements and our document requests.  Many of their policies are being adjusted based on our feedback and that of the Plaintiffs.  We expect that MCSO will document its policy review activities in accord with this paragraph at the end of this calendar year.

**Section 6: Pre-Planned Operations**

Members of the Monitoring Team held a meeting on pre-planned operations with two Deputy Chiefs and CCID staff on March 25th, 2014.  The Deputy Chiefs noted that the last operation conducted by MCSO was on October 18-19, 2013, in response to the killing of a detention officer in front of his house.  Moreover, they stated that MCSO had been conducting crime

suppression operations, not immigration operations. MCSO personnel stated that the last time they had conducted immigration operations was in 2007-2008, as they were enforcing SB 1070[2].

We advised MCSO that we would not consider multi-agency operations during which they simply assisted and were not the host or the initiator to be pre-planned operations for the purposes of the Order. The Monitoring team did express concern over operations that MCSO refers to as identity theft operations. These appear to be raids of work places seeking those that may be using someone else's social security number in order to be able to work. MCSO was informed that we would like to be made aware of these operations.

MCSO was advised to notify the Monitor, as well as the two Deputy Monitors, of any upcoming Significant Operation via email, and by a phone call, to insure a prompt response by monitoring team personnel. MCSO was asked to provide the Monitor with a submitted plan, as well as the name and contact information of the on-scene commanding officer of any scheduled operation.

The following Paragraph responses provide more detail with regard to particular aspects of the Court Order for Pre-Planned or Significant Operations.

## COURT ORDER VI. PRE-PLANNED OPERATIONS

*Paragraph 35. The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

We reviewed several documents offered by MCSO, including: Significant Operations Protocol, Implementation Division Memo, Special Investigation Division Operational Manual, as well as numerous memos and Briefing Boards. Most documents reviewed had little or no relevance to the requirements of this Paragraph because they did not identify those units which enforced immigration laws. MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws. The Division manual (around 157 pages) identifies eleven different units, none of which appear to be directly involved in enforcing immigration laws. During discussions with the Court Compliance Implementation Division (CCID) and attorneys from the Maricopa County Attorney's Office (MCAO), we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified. From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions. Until such time as this review is completed, MCSO is not in compliance with this Paragraph.

*Paragraph 36. The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol*

---

[2] SB 1070 was not enacted until 2010.

*including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

We reviewed several documents submitted by MCSO including drafts of the Significant Operations/Patrol Protocol, the Significant Operations Planning Checklist, and the Significant Operations Supervisor Daily Checklist.  We have suggested modifications to each of these documents to meet the requirements of the Paragraph.

During the review period, MCSO has not conducted any Significant Operations or Patrols which required notification to the Monitor.  Until such time as the Protocol and supporting checklists are modified and reviewed, MCSO is not in compliance with this Paragraph.

 *Paragraph 37. The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

For this Paragraph we reviewed the Significant  Operations/Patrols Protocol, which provides a list of instructions for Supervisors/Deputies and Posse members involved in significant operations.  MCSO been advised to create a more comprehensive standardized template for significant operations.  We note that exigent circumstances are not defined within the protocol, and we have suggested that MCSO include the definition provided in the Order.  The template must also be modified so that those completing it are not inadvertently encouraged to identify exigent circumstances for every significant operation.

During the review period, MCSO has not conducted any Significant Operations or Patrols which required notification to the Monitor.  Until such time as the template and supporting checklists are modified and reviewed, MCSO is not in compliance with this Paragraph.

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within ~~30~~ <u>10</u> days after the operation:*
*a. documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*
*b. information that triggered the operation and/or selection of the particular site for the operation;*

c. *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d. *documentation of command staff review and approval of the operation and operations plans;*

e. *a listing of specific operational objectives for the patrol;*

f. *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g. *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h. *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i. *arrest lists, officer participation logs and records for the patrol; and*

j. *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

Our initial review of the Significant Operations/ Patrols Protocol and associated checklists noted that the current draft lacks the specificity detailed in Subparagraphs a. through j. of Paragraph 38. The submission date of the after action reports must also be changed to 10 days to be in compliance with the amended Court Order.  MCSO personnel have been advised of the changes needed to be in compliance during subsequent reviews.

During the review period, MCSO has not conducted any Significant Operations or Patrols which required notification to the Monitor.  Until such time as the template and supporting checklists are modified and reviewed, MCSO is not in compliance with this Paragraph.

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 39. The* ~~*MCSO*~~ <u>*Monitor*</u> *shall hold a community outreach meeting no more than* ~~*30*~~ <u>*40*</u> *days after any Significant Operations or Patrols in the affected District(s).* ~~*MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol*~~ <u>*The Monitor shall communicate the operational details provided to it by the MCSO and*</u> *shall hear* <u>*any complaints or concerns raised by community members.  The Monitor may*</u> <u>*investigate and respond to those concerns.*</u> *The community outreach meeting shall be advertised and conducted in English and Spanish.*

The Court has amended the original Order to move responsibility for Community Outreach to the Monitor.  This section no longer applies to the activities of MCSO.

During the review period, MCSO has not conducted any Significant Operations or Patrols which required follow-up Community Outreach Meetings pursuant to this Paragraph.

*Paragraph 40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

We reviewed the draft Significant Operations Protocol, Section 7, which describes the notification of the Monitor of any Significant Operation involving the arrest of 5 or more people. However, this document does not include the requirement to notify the Plaintiffs, nor the notification timeframe of 24 hours as required by Paragraph 40.  Until such time as these modifications are made, MCSO is not in compliance with Paragraph 40.

## Section 7: Training

## VII. TRAINING

### a. General Provisions
*Paragraph 41. To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

The initial drafts of the curricula for the Order-required training were deficient.  MCSO and their Counsel have been involved in an ongoing dialogue with the representatives of the Plaintiff and Monitor to develop training programs for employees and posse members.  Significant progress has been made in the development of curricula required by this Order.  Further detail is provided in the following Paragraph responses.

*Paragraph 42. The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

We have reviewed the proposed list of instructors agreed upon by the attorneys for the Defendants and the attorneys for the Plaintiffs and determined that they have qualifications which are compliant with the requirements of Paragraph 42.  Final verification of compliance is pending the actual selection and hiring of the instructors from the list of qualified proposed instructors.  Thus, at this point, MCSO is not in compliance but has been cooperatively working with Plaintiff and Monitor representatives towards that end.

*Paragraph 43. The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

MCSO's compliance with Paragraph 43 has not yet been verified.  In order to verify that Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training as required for compliance with Paragraph 43, the MCSO Training Schedule and relevant lesson plans must be finalized and provided to the Monitor for review.  We will also observe live and on-line training on an announced and unannounced basis.  The lesson plans for Detentions, Arrests and Immigration-Related Laws; and for Bias-Free Policing have been reviewed by the attorneys for the Defendants, the attorneys for the Plaintiffs' and the Monitoring Team and are in compliance with Paragraph 43.  The process used to finalize the lesson plans – as well as some of the challenges encountered – will be documented in our next report.

As of the date of this report, the lesson plan for Supervisor Responsibilities-Effective Law Enforcement is pending review by the Parties' attorneys and the Monitoring Team.

*Paragraph 44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

Our verification process for determining whether MCSO is in compliance with Paragraph 44 entails reviewing the schedule for delivering all Trainings required by the Order, observing live and on-line Training sessions and reviewing live and on-line course attendance rosters.  MCSO has provided the Monitor with copies of the Sample ELS Report, Sample Training Plan Compliance Report and Sample Training Sign-in Sheet Class Roster.  These are sample forms which do not contain actual data.  The Sample ELS Report contains the learner's name, course title, course start and end dates, days spent training and total time spent on the course.  The Sample Training Plan Compliance Report records the courses and hours of each course and the names of those who have not completed the required training.  The Sample Sign-in Sheet records the course title, class number, date and time of the course and number of course hours.  In order to achieve compliance, the MCSO must provide the Monitor with the finalized schedule for all Trainings required by the Order and the actual up-to-date list of live and on-line Training sessions and hours attended or viewed by each officer and Supervisor.  Until such time, MCSO is not in compliance with this Paragraph.

*Paragraph 45. The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

We have been involved in a joint collaborative review with attorneys for the Plaintiffs and attorneys for the Defendants of Detentions, Arrests and Immigration-Related Laws; Bias-Free Policing; and Supervisor Responsibilities – Effective Law Enforcement curricula.  The Bias-Free Policing and Detentions, Arrests and Immigration-Related Laws curricula have been reviewed and are in compliance with the recommendations in Paragraph 45. A similar review process for the Supervisor Responsibilities – Effective Law Enforcement to determine compliance is pending the availability of the Parties.  As proposed, the training meets the requirement of the Paragraph.

*Paragraph 46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

MCSO has provided the curricula for Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws; and Supervisor Responsibilities-Effective Law Enforcement to the Monitor and the Plaintiffs.  These have been jointly reviewed by the Parties, and the Defendants' attorneys have been very receptive to the input from the Plaintiffs' attorneys and the Monitoring Team.  We have reviewed the proposed list of instructors and identified those who are qualified.  While the material was not provided within 90 days of the Effective Date, MCSO is in compliance with this Paragraph.

*Paragraph 47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

Compliance will be determined based upon whether or not MCSO's policy GG-2 (Training Administration) complies with this paragraph and is followed in practice.  The policy is currently under revision, and no draft was provided for our review.  MCSO is not in compliance with Paragraph 47.

### b. Bias-Free Policing Training

*Paragraph 48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

As noted above, the Parties have worked collaboratively to finalize the curriculum for Bias-Free Policing.  However, the training was not delivered within the review period, and is slated to commence in September.  MCSO is not in compliance with the requirements of Paragraph 48.

*Paragraph 49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum: a. definitions of racial profiling and Discriminatory Policing;*

*b.       examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

*c.       the protection of civil rights as a central part of the police mission and as essential to effective policing;*

*d.       an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

*e.       constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

*f.       MCSO policies related to Discriminatory Policing, the enforcement of Immigration- Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or*

*MCSO policies;*

*g.       MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion; h. police and community perspectives related to Discriminatory Policing;*

*i.       the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

*j.       methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

*k.       methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

*l.       methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination; m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

*n. problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

*o. the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

*p. the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

*q. background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

*r. Instruction on the data collection protocols and reporting requirements of this Order.*

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities. The

process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will review any associated training materials as they are developed, and also observe training when it commences to verify that the approved lesson plan is being adhered to by the instructors.  Despite this progress, until such time as the training is delivered, MCSO is not in compliance with this Paragraph.

### c. Training on Detentions, Arrests, and the Enforcement of Immigration- Related Laws

*Paragraph 50. In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

As noted above, the Parties have worked collaboratively to finalize the curriculum for Detention, Arrests, and the Enforcement of Immigration-Related Laws.  However, the training was not delivered within the review period, and is slated to commence in September.  MCSO is not in compliance with the requirements of Paragraph 50.

*Paragraph 51. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

*a.        an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

*b.        guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

*c.        guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

*d.        constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

*e.        MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

*f.        the circumstances under which a passenger may be questioned or asked for identification;*

g.      the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.      the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.      the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.      a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.      a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.      an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.      the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.      provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.      Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities. The process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 51 of the Order. We will review any associated training materials as they are developed, and also observe training when it commences to verify that the approved lesson plan is being adhered to by the instructors. Despite this progress, until such time as the training is delivered, MCSO is not in compliance with this Paragraph.

### d. Supervisor and Command Level Training

*Paragraph 52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

As noted above, the Parties have worked collaboratively on the curriculum for Supervisor Responsibilities- Effective Law Enforcement.  That curriculum has not yet been finalized, and the training was not delivered in the review period.  MCSO is not in compliance with the requirements of Paragraph 52.

*Paragraph 53. The Supervisor-specific Training shall address or include, at a minimum:*
*a. techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*
*b. how to conduct regular reviews of subordinates;*
*c. operation of Supervisory tools such as EIS;*
*d. evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*
*e. how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*
*f. how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*
*g. incorporating integrity-related data into COMSTAT reporting;*
*h. how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP; i. how to respond to the scene of a traffic stop when a civilian would like to make a complaint against a Deputy;*
*j. how to respond to and investigate allegations of Deputy misconduct generally;*
*k. evaluating Deputy performance as part of the regular employee performance evaluation; and*
*l. Building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan.

That process has not been finalized, as priority was given to the Bias-Free Policing and Fourth Amendment curricula. Once that process is concluded, we will review any associated training materials as they are developed, and also observe training when it commences to verify that the approved lesson plan is being adhered to by the instructors. Until such time as the training is delivered MCSO is not in compliance with this Paragraph.

## Section 8: Traffic Stop Documentation and Data Collection

For Paragraphs 54 and 55, in particular, it was necessary to request traffic stop data from MCSO. The following explanation describes how this was done and how the data were handled once received. These data may also be referred to in other areas of Section 8 and the report as a whole.

> In selecting traffic stop cases for our compliance review, we employed a statistical technique that involved selecting a representative random sample of 100 cases from the Districts and the Lakes Patrol (the areas). By way of background, MCSO reported a total of 5,520 cases of traffic stop events for these areas for the time from April 1st, through June 30, 2014. Once we received this file of 5,520 case numbers from MCSO, denoting which area they came from, our task was to first select a sample of 100 traffic stop events representing the areas and then select a subsample of 30 cases, from those 100 selected cases, to obtain CAD tapes. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final 30 cases for CAD review, was achieved using a statistical software package (IMB SPSS Version 22), which contains a specific function that randomly selects cases. Our utilization of SPSS first required that we convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample of 100 cases for the areas and then randomly selected the 30 CAD cases from these 100 cases. The unique identifiers for these two samples was relayed back to MCSO personnel, who produced 94 (six cases ultimately did not meet the criteria and were deselected) of the stratified sample cases and 30 of the random CAD subset sample including all of the information necessary to conduct the analyses for the following Paragraphs.

## VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a. Collection of Traffic Stop Data

*Paragraph 54. Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a. *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b. *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c. *the license plate state and number of the subject vehicle;*

d. *the total number of occupants in the vehicle;*

e.  *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.  *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.  *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.  *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.  *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.  *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.  *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.  *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.  *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

We reviewed MCSO draft policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), EB-2 (Traffic Stop Data Collection), EA-5 (Enforcement Communications) and CP-8 (Preventing Racial and Other Biased- Based Profiling).  In order to capture the information required for this paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Face Sheet, The Vehicle Stop Contact Supplemental Sheet, The Incidental Contact Receipt and the Written Warning/Repair Order for those motorists who commit a traffic violation or are operating a vehicle with defective equipment and provided with a warning.  We also reviewed the Arizona Traffic Ticket and Complaint forms issued for violation of Arizona Statutes.  We selected a sample of 94 traffic stops conducted by MCSO deputies from April 1, 2014 through June 30, 2014 for purposes of this review and assessed the collected data for compliance with Subparagraphs 54.a-54.m. Prior to April 1, 2014, MCSO did not collect all of information required by this Paragraph, and so we limited our sample to this period.  MCSO correctly noted that they were not required to collect this information until April 1, 2014 ("*Within 180 days of the Effective Date*").  All of the above listed documentation was used for our review of the following subsections of this paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which will be discussed further in subsequent sections of this report.

Paragraph 54.a requires MCSO to document the name, badge/serial number, and unit of each deputy and posse member involved. Our review indicated that in the 94 vehicle traffic stops there were eight incidents where the deputy's unit had another deputy assigned to the vehicle or another deputy unit was on the scene and these members were identified by the primary unit. In another incident, the primary unit during the traffic stop indicated a posse member was on the scene but the MCSO Vehicle Stop Contact Face Sheet did not identify the posse member on the scene. Note: the Vehicle Contact Face Sheet is completed by the deputy on every traffic stop whether a citation is written or a warning issued. In one other traffic stop the deputy failed to list his unit on the Vehicle Contact Face Sheet. MCSO is not in compliance as a result of these issues.

Paragraph 54.b requires MCSO to document the date, time and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all stops in the sample indicate that this data is captured and is geocoded with the time the stop is initiated and the time the stop is cleared. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from 3 or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. Since the CAD data system has been upgraded to include the geocoding of traffic stops, MCSO is in compliance with this Subparagraph.

Paragraph 54.c requires MCSO to document the license plate and state of the subject vehicle. There were three instances of the 94 where the vehicle stop did not result in the deputy indicating a tag on the Vehicle Stop Contact form. In one instance the subject vehicle did not have a tag and another one was a bicycle stop. In the third instance the deputy failed to indicate after his investigation if the stopped vehicle had a tag when the stop was made. In this case the deputy wrote on the Vehicle Contact Form the reason for the stop was a non-moving violation and announced the stop to dispatch as a speeding violation. The violator was subsequently issued a citation for speeding. MCSO is in compliance with this Subparagraph.

Paragraph 54.d requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. There was one bicycle stop (no passengers) submitted in the sample and 93 motor vehicle stops reviewed. The Vehicle Contact Face Sheet, completed by the deputy on every traffic stop, is utilized to capture the total number of occupants and contains a separate box on the form for that purpose. In one instance the deputy failed to list the number of occupants of the subject vehicle. MCSO is in compliance with this subparagraph.

Paragraph 54.e requires MCSO to document the perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into the occupant's ethnicity or gender is required or permitted). Thirty-five of the stops indicated there were passengers in the vehicle and in two stops the deputy failed to indicate the number of occupants, if any, on the form. We identified 88 traffic stops where the post stop race, ethnicity and gender could be clearly identified. The stops included 32 white male drivers, 30 white females, eight Hispanic males, six Hispanic females, six Black males, two Black females, two Indian/Alaskan males and two Indian/Alaskan females. There were 34 instances where deputies chose to issue warnings to drivers instead of issuing a citation. The ethnic breakdown of those receiving warnings reflected the numbers indicated in the number of total stops. There were five instances where the post stop information was indicated as unknown and in one case the Event number did not match the traffic stop data we received. We did review documentation where CCID would send memorandums to the District commanders when their audits found that deputies were not following protocol by marking "unknown" for post stop perceptions on the Vehicle Contact Stop Form. Deputies did not indicate the race, ethnicity or gender of passengers when no contacts were made with them. MCSO is not in compliance with this subparagraph as a result of these issues.

Paragraph 54.f requires the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). There were two individuals identified during one of the 94 traffic stops we reviewed who had queries (record checks) indicated on the CAD printout. There were no passenger names listed on the form for the stop and no explanation of why two separate record checks were run on subjects with different names and dates of birth. In addition, the box for listing the number of occupants indicated there were no passengers in the vehicle and no passenger information was listed on the Vehicle Stop Contact Sheet. The documentation does not describe the action that required two queries if the driver was the only occupant of the vehicle. MCSO is not in compliance with this subparagraph.

Paragraph 54.g requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. There were five instances where deputies made contact with passengers. In one case the reason for contact with the passenger was "investigative stop" without listing the specific purpose for the investigation. In two cases the reason for the passenger contact was "moving violation" which also does not indicate why the passengers were contacted. In another case the reason for the passenger contact was listed as "curfew violation" and does contain the proper reason for the contact. In the last case, a passenger may have been contacted due to two record checks being documented for one traffic stop. Deputies must ensure that they explain why they made contact with any passengers. Indicating moving or non-moving violation as a reason for the stop describes why they stopped the driver, but not why they made contact with any passengers. Of the five cases, in three of the cases the deputy listed the name of the passenger, in one case the deputy indicated he

contacted the passenger, and in the fifth case the name of the passenger was not listed on the Vehicle Stop Contact form.   MCSO is not in compliance with this Subparagraph.

Paragraph 54.h requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed and any indicators of criminal activity developed before or during the stop.  We listened to 30 CAD dispatch recordings from the sample of 94 used for this review and found that in all cases the deputies advised Communications of the location and license plate and state of all 30 stops.  In 29 of the 30 cases, the audio was clear and the deputy advised of the reason for the stop.  In the exception, the deputy may have advised of the violation but we were unable to make the determination.  The CAD printout does document the time the stop begins and when it is concluded either by arrest, citation or warning.  MCSO is in compliance with this Subparagraph.

Paragraph 54.i requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or the Deputy's departure from the scene.  In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact forms created by MCSO along with the E-Ticketing system and the Arizona Ticket and Complaint form captures the information required.   Using a benchmark of 20 minutes per stop (the same time used by CCID personnel in their audits of traffic stops), there were 12 traffic stops that exceeded this time frame (four white males, one white female, one Hispanic male, two Hispanic females, two black males and two of Indian/ Alaska ethnicity).  MCSO is in compliance with this Subparagraph.

Paragraph 54.j requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.  During our review of the data collection of the traffic stop data there were no immigration status investigations conducted.  We have been advised that MCSO is no longer conducting immigration investigations when deputies are initiating traffic stops. MCSO is in compliance with this Subparagraph.

Paragraph 54.k requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and frisk search was performed on any individual.  In our review we did not find any incidents where an individual was asked for a consent search or of any individual who was frisked during the stop.  There were no probable cause searches, but two searches incident to arrest did occur.   MCSO is in compliance with this Subparagraph.

Paragraph 54.l requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence.  During our review of the collected traffic stop data, there were no stops where contraband or evidence was seized.  MCSO is in compliance with this Subparagraph.

Paragraph 54.m requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In 93 of the cases we found the documentation including the final disposition of the stop, whether an arrest was made or a release was made without a citation.  In the one case, there was a warning issued according to the Vehicle Stop Contact Sheet but the Warning/Repair form was not completed or in the package.  Despite this issue, MCSO is in compliance with this Subparagraph.

*Paragraph 55. MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

We reviewed the draft Policy EA-5 (Enforcement Communications), which complies with the Paragraph requirement.

We met with the Deputy Chief of the Technology Bureau who confirmed that the unique identifier went live when the CAD system was implemented in September 2013.  This number provides the mechanism to link all data related to a specific traffic stop.  The number is automatically generated by the CAD software and is sent to the Deputy's MDT. We visited the Communications Center (Dispatch) where we observed and listened to several traffic stops and conversed with dispatchers about how the unique identifier is assigned.  We also visited one of the Districts and spoke with the Captain and administrative aide who were responsible for entering traffic stop data for those field units who were unable to enter traffic stop data electronically. Since then, TraCS has been implemented in all Districts and the unique identifier (CFS number) is automatically entered from the Deputy's MDT; no user intervention is required. In order to determine compliance we reviewed 94 traffic stop cases and reviewed the CAD printouts and the Vehicle Contact Forms for all stops; we reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment.  The unique identification number assigned to each event was listed on all CAD printouts for every stop and the number was also listed on 93 Vehicle Contact Forms.  In the one exception the deputy failed to list the number in the space provided.   EA-5 is still in draft form.

Therefore, MCSO is not in compliance for the review period, but should attain compliance once EA-5 is published.

*Paragraph 56. The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

The draft EB-2 (Traffic Stop Data Collection) addresses the issue of regular audits and quality control checks. We recommended that the policy distinguish between the two. While audits require in-depth analysis, quality control checks are more of an inspection or spot check of the data. We have not yet been provided with the protocol developed by MCSO for maintaining the integrity and accuracy of the traffic stop data. MCSO also indicated that the requirements of this paragraph would be included in the yet-to-be-provided policy GH-2 (Internal Investigations).

We were advised that MCSO conducted an audit of traffic stop data in January of 2014 and then again beginning in April 2014. Since the January 2014 audit, new forms have been created to collect the data required by policy. MCSO advises that they are currently in the process of conducting another audit. CCID (Court Compliance Implementation Division) advises that they have conducted spot audits that were directed at portions of data or the actions of individual deputies. In order to be in compliance MCSO must develop the protocol specifically addressing the requirements of the Paragraph, as well as revising and publishing the policies identified. At present, MCSO is not in compliance with this Paragraph.

*Paragraph 57. MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

The system for providing "receipts" is outlined in the draft EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and draft EB-2 (Traffic Stop Data Collection). Every person contacted on a traffic stop will be provided with either an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. The policies fail to enumerate how CAD and/or MDT systems will be used for verification of the recording of stops. Once MCSO acquires in-car recording equipment, policy(ies) must be developed which account for its use in verifying stop duration.

We reviewed a memorandum from the Technology Bureau sent to the Sheriff on July 17, 2014, indicating that MCSO had collected in-car recording equipment RFP's from other agencies, which will be consolidated to form a starting point for the procurement of in car recording

equipment.  MCSO will not be in compliance until the in-car recording equipment is purchased, installed and found to be operational.

*Paragraph 58. The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

Policies GF-1 (Criminal Justice Data Systems ) and GF-2 (Criminal History Record Information and Public Records) state that all databases containing specific data identified to an individual comply with federal and state privacy standards and it limits access to only those employees who are authorized to access the system.  The policies go further to include that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona Statutes, the Department of Public Safety, the Arizona Criminal Justice Information System and that any violation is subject to fine.  No secondary dissemination is allowed.  We reviewed an internal MCSO memorandum of April 12, 2014 that required all TOC (Terminal Operator Certification) personnel in these positions to be re-certified on a new testing procedure developed by the Training Division and the Systems Security Officer.  We will continue to observe the security issue outlined in Paragraph 58 of this Order, but at present MCSO is in compliance with this Paragraph. .

*Paragraph 59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

Electronic traffic stop data capture  began on April 1, 2014.  In our review of 94 traffic stop cases from April 1, 2014 through June 30, 2014, there were 15 instances where the data provided by MCSO was written in by hand on the Vehicle Stop Contact form which is completed by the deputy on every traffic stop.  This form captures most of the traffic stop details required by MCSO policy and paragraphs 25 and 54 of the Order.  We do not know if the handwritten data completed by the deputy has been entered into the electronic system for these 15 cases.  The Implementation Division provided the traffic stop data which included a spreadsheet of all traffic stops since April 1, 2014, listing event numbers, as described at the beginning of Section 8, we then requested a stratified sample from all traffic stops.  However, since not all patrol vehicles used for traffic stops are equipped with the automated TraCS system and there are some deputies who have not yet been trained in TraCS data entry, we surmise that these fifteen cases fit one of these two categories.   MCSO has provided full access to all available collected data since April 1st despite the fact that electronic data were not collected before this time.  MCSO is in compliance with this Paragraph.

***b. Electronic Data Entry***

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

We reviewed the new drafts of MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and EB-2 (Traffic Stop Data Collection) and found them to be compliant with the provisions of the paragraph; however, the system must be able to generate summary reports and analyses as well as be used to conduct searches.  The requirement also includes that the system enable the deputies to enter the traffic stop electronically.

While the policies are in place to capture the required traffic stop data, the ability to provide all the data for the reporting period, subject to analyses, has not been provided.   MCSO indicated that they would have a complete audit of the traffic stop data on May 31, 2014, but it was not provided.  We have reviewed documents indicating that the Unit responsible for the Early Identification System is conducting spot checks of the data and forwarding those instances of non-compliance to the Districts for action.  The CCID provided a memorandum on April 28, 2014, that indicates MCSO was in the process of conducting an audit to determine the validity of the data captured.  Initially the traffic stop data was captured on forms created by MCSO, completed by the Deputy in the field, and manually entered in the data base by administrative personnel located at each District.  As of June 30, 2014, there were 257 vehicles equipped with the TraCS e-citation system.  One hundred ninety-five marked patrol vehicles and 62 un-marked patrol vehicles allow for the entering of traffic stop data electronically via MDT.  In order to be compliant, all of MCSO's vehicles that make traffic stops must demonstrate the system(s) ability to capture the required data electronically, and the Agency must have the ability to conduct searches and queries, and generate summary reports and analyses.

In addition, MCSO must provide documentation pertaining to the training of deputies that use electronic data entry systems for traffic stops (TraCS).  During the June site visit, we were informed that training was being done through "train the trainer" processes, whereby EIS personnel train Supervisors who then train deputies under their command.  However, no documentation of said training had been created; therefore, MCSO is not able to document who has received this training and who hasn't.  It was suggested that a process be created to document the receipt of such training.  Therefore, while progress is being made, MCSO is not in compliance with Paragraph 60.

### c. Audio-Video Recording of Traffic Stops

*Paragraph 61. The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date. MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date. Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

MCSO has yet to develop a policy on the use of in-car video and audio recording equipment. We reviewed MCSO's research and internal memorandums on the installation of the equipment in all patrol vehicles that make traffic stops. We also met with two Deputy Chiefs to specifically address the requirements of the installation of in-car video and audio equipment in patrol vehicles that make traffic stops. Little if any progress has been made to date. We reviewed an internal memorandum dated July 2, 2014 from the Deputy Chief of the Technology Management Bureau that indicates MCSO has received several examples of in-car video/audio recording RFPs from similar jurisdictions that will be consolidated to form a starting point of MCSO's procurement process. The CCID is developing recommendations for field personnel to participate in drafting the business requirements. Recommendations made by the Monitoring Team during the June 2014 site visit regarding specific items to address in an RFP will be included in the requirements. When the procurement process is finalized, MCSO must develop a policy/protocol to address the requirements of the use of the video/audio recording of every traffic stop, and the security and maintenance of associated equipment. The policy must address, in addition, what deputies are required to do if equipment is malfunctioning, as well as the documented process of how such malfunctions are reported and serviced. MCSO is not in compliance with this Paragraph.

*Paragraph 62. Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

MCSO is in the process of evaluating in-car recording RFPs from other jurisdictions and they have yet to decide on a vendor. In order to be compliant MCSO must purchase and install the equipment within two years. When the policy is developed it must state the requirement that deputies are subject to discipline if they fail to activate and use their recording equipment. At present MCSO is not in compliance with this Paragraph.

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.*

The draft Policy EB-2 (Traffic Stop Data Collection) includes the requirement that MCSO retain traffic stop data completed on the Vehicle Stop Contact form for a minimum of five years after it is created, unless a case involving a traffic stop remains under investigation by the Office or is subject of a Notice of Claim, civil litigation or criminal investigation, in which case MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals.  However, MCSO has yet to develop a protocol for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order. This policy must address the retention of recordings.  MCSO is not in compliance with this Paragraph.

### d. Review of Traffic Stop Data

*Paragraph 64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

We reviewed MCSO draft polices EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection), the proposed Significant Operations/Patrols protocol, and several memoranda from MCSO staff.   We also reviewed information obtained from MCSO staff interviews conducted during the June 2014 site visit.  Members of the EIS (Early Identification System) Unit were able to show evidence of thorough investigations based upon data they had compiled from Vehicle Stop Contact Forms that had not yet been entered into the TraCS system due either to a lack of officer training or the lack of available equipment in the Districts.  However, only one member of the EIS Unit could explain how the investigations had been done since there was no written documentation and no standardized protocol for these investigations.  According to the EIS members, these policies were currently in the process of development.  MCSO must provide policies and protocols providing definitions of key concepts, precise explanations of the methodologies that will be used to conduct the periodic analyses specified in the Order, and procedures for collecting required data from special operations.  At present MCSO is not in compliance with Paragraph 64.

*Paragraph 65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to*

*analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

We reviewed all the documentation set forth in Paragraph 64 above in addition to information obtained from MCSO staff interviews conducted during the June 2014 site visit that have bearing on our compliance review.  During the June visit, we met the current members of the EIS (Early Intervention System) Unit.  This Unit is comprised of a Lieutenant, who is in command of the Unit, two Sergeants, who conduct in-depth investigations at the direction of the Lieutenant, and an administrative staff.  The Lieutenant speculated that this would be the group responsible for the regular analysis of data referred to in the Order, but that no policy exists as yet laying out the roles and responsibilities of the EIS Unit.  Additionally, on July 20, 2014, we were advised that MCSO had moved the EIS Unit from Internal Affairs to the Human Resources Bureau, as suggested by the Monitoring Team during the June meetings.  However, as of this writing we have received no policy covering the EIS Unit or the responsibility for the regular data audits referenced in this Paragraph.  MCSO must develop a policy that specifically identifies the review group that will conduct the monthly, quarterly, and annual analysis of traffic stop data.  The policy must include the requirement that review group members recuse themselves from analyzing data pertaining to their own activities. MCSO must also develop a protocol delineating the methodological (including statistical) tools and techniques that the review group will use to conduct the periodic analyses.  At present MCSO is not in compliance with Paragraph 65.

*Paragraph 66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

MCSO provided the same documents for the review of Paragraphs 64 through 68.  As noted above we reviewed all the documentation provided for this Paragraph along with the information obtained from MCSO staff interviews conducted during the June 2014 site visit.
During the site visit we were shown several Pre-EIS investigations that the EIS Unit had conducted using data they had compiled from Vehicle Stop Contact Forms.  While the EIS Unit has not yet developed a policy or protocol for investigations looking for indicia of biased policing they believe that these early investigations will make it easier to develop the EIS policy that will then become a major ingredient for the annual analysis covered in this Paragraph.
MCSO must establish a protocol for the annual, all-agency comprehensive review of data.  It must include benchmarks previously reviewed by the Monitor and it must describe the methodological (including statistical) tools and techniques that will be used to conduct the annual evaluation.  These benchmarks may include aspects of analysis used by the EIS Unit that incorporates data from IA Pro/Blue Team.  However, the incorporation of these data should be

approved by the Monitor as outlined in Section IV of the Order.  Until those documents are developed and evaluated MCSO is not in compliance with this Paragraph.

*Paragraph 67. In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

*a.        racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

*b.        evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

*c.        a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

*d.        indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

*d. other indications of racial or ethnic bias in the exercise of official duties.*

We reviewed all the documentation that was provided for the analysis of Paragraphs 64 through 68 against the requirements of the Order specified for this Paragraph.  We also reviewed information obtained from MCSO staff interviews conducted during the June 2014 site visit.  In particular we found that while the EIS Unit had begun doing investigations of data they had compiled from Vehicle Stop Contact Forms the EIS personnel had not yet created a written standard/protocol for conducting these investigations.  In fact, only one member of the EIS Unit could articulate how the data were used to conduct these early investigations.   MCSO must establish a protocol that includes the five criteria required by the Order for use in identifying warning signs or indicia of racial profiling or other police misconduct as well as list other criteria that will be included above and beyond those specified in Paragraph 67.  In addition, the protocol should ensure that all members understand that the criteria will be used in the annual, comprehensive, agency-wide evaluation required by Paragraph 66.  MCSO is not in compliance with this Paragraph.

*Paragraph 68. When reviewing collected patrol data, MCSO shall examine at least the following:*

*a. the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

*b. the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

*c. the tactics employed during the Significant Operation and whether they yielded the desired results;*

> *d. the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*
>
> *e. the resource needs and allocation during the Significant Operation; and*
>
> *f. any Complaints lodged against MCSO Personnel following a Significant Operation.*

We reviewed all the same documentation provided for this Paragraph, as was provided for Paragraphs 64 through 68, against the requirements of the Order specified for this Paragraph. We also reviewed information obtained from MCSO staff interviews conducted during the June 2014 site visit. During these interviews we were shown the results of several "data" investigations conducted by EIS personnel. The EIS Unit had gone through tremendous effort to compile data from the District offices, comprised of Vehicle Stop Contact Forms that had not yet been entered into TraCS due to a lack of officer training or the lack of equipment in patrol units. While these early investigations were instructive of the potential for the EIS Unit, there was only one member of the Unit who could explain how the investigations had been conducted. The EIS Unit must develop a written protocol outlining how it will review traffic stop data from significant operations, that includes the procedures that were followed during the implementation of a significant operation; the specific crime data that will be analyzed before and after an operation related to the significant operation; the statistical tools and techniques that will be used to analyze and report crime data; the methodology that will be used to assess the effectiveness of a significant operation; information about tactics employed during a significant operation, including a methodology that will determine whether the tactics achieved the desired results; the protocol for assessing the resource needs and their actual allocation for a significant operation; protocols for data analysis; and a protocol for reporting on Complaints in After Action Reviews. At present MCSO is not in compliance with Paragraph 68.

*Paragraph 69. In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit*

We reviewed the draft MCSO policy EB-2 (Traffic Stop Data Collection), which requires supervisors to conduct a review of the collected traffic stop data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of immigration laws. We also reviewed a memorandum from the CCID dated July 9, 2014, indicating that MCSO supervisors have not conducted formal reviews of their Deputies' traffic stop data due to the lack of training on the topic.

We have been advised that MCSO has completed audits and random inspections of traffic stop data, but there has been no documentation of traffic stop reviews of Deputies' activities by supervisors to date.   MCSO is working on developing mechanisms to complete and retain the required supervisory review reports in the future by utilizing TraCS, and IA Pro/Blue Team software programs.  The mandatory supervisory training program has been developed and is currently in the review and approval process.  IA Pro/Blue Team training is also being developed for review and implementation.  In order to be in compliance MCSO must provide training on how to conduct the reviews of their Deputies' traffic stop data.  We have also suggested that the policy pertaining to Supervisor monthly audits include a requirement that these analyses be forwarded to CCID.  Additional training is necessary for the personnel in Internal Affairs and for members of the EIS Unit, now housed in the Human Resources Bureau.  MCSO is not in compliance with this Paragraph.

*Paragraph 70. If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

We reviewed GH-2 (Professional Standards, formerly Internal Affairs Division Operational Manual, effective, April 2, 2014).  As initially drafted, the Early Identification System was housed within Internal Affairs and would analyze and investigate cases involving deputies or units that may be engaging in racial profiling, unlawful immigration enforcement, or when there may be systematic problems with the any of the foregoing.  The Early Identification System has now been placed under Human Resources.   Policy EB-2, Traffic Stop Data Collection, indicates that on a monthly basis, EIS, will review 10% of the MCSO Vehicle Stop Forms against the data entered to ensure it was properly entered.

MCSO indicated in a memorandum dated April 25, 2014, that the EIS has already begun using available resources to identify patterns of improper conduct, including indicators of racial bias in policing.  The EIS Unit is receiving and checking copies of the newly developed traffic stop forms, and they will eventually be entered into a central database.  Currently this data is being entered into an excel format until the new systems (IA Pro\Blue Team) are in place.  The Unit has identified 30 other indicia of misconduct that they will track in addition to the traffic stop data.  The conclusions discovered in those reports have been forwarded to the Districts and Commanders for action when it is determined that deputies were violating policy.  However, MCSO must put the proposed systems in place to track traffic stop data to identify, investigate

and provide corrective action or discipline if warranted.  We have also suggested that all relevant policies contain a statement of the possible intervention actions and consequences should a deputy be found to be engaging in racial profiling.   At present MCSO is not in compliance with this Paragraph.

*Paragraph 71. In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

We have been provided access to all <u>existing</u> data.  We obviously cannot access data that does not exist, as in the case of Supervisor reviews, but compliance with this Paragraph has not been at issue.  We will continue to expect unfettered access to these reviews as they are completed.

### Section 9: Early Identification System (EIS)

This Section will include a description of the early requests for documentation and what was found during the June 2014 site visit.  References will be made to the Pre-EIS data analysis done by the EIS Unit.  We will address the breadth of the presentations made during the June site visit and some of the problems that continue to exist; in particular, that there is no detailed policy delineating what exactly the EIS unit is looking for.  Similar comments have been made repeatedly by Plaintiffs' Attorneys.

## IX. EARLY IDENTIFICATION SYSTEM ("EIS")

### a. Development and Implementation of the EIS

*Paragraph 72. MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

There were several meetings during the June 2014 site visit centered on the creation, implementation, and dissemination of an EIS policy.  The Plaintiff's Attorneys have consistently suggested criteria for inclusion in such a policy, as have several Monitoring Team personnel. To achieve compliance MCSO should develop an EIS policy that also includes protocols for its use.  Many of these protocols already exist due to their development as part of the Pre-EIS period; however, they need to be coherently brought together.  Even during the Pre-EIS process, there was only one person in the EIS Unit that completely understood what protocols had been used to inspect the traffic stop data.  This needs to be standardized so that everyone connected with MCSO can transparently understand the processes in place.  At present MCSO is not in compliance with this Paragraph.

*Paragraph 73. Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

The EIS Unit has come together well to this point.  It is coordinated by a Lieutenant, with two Sergeants working investigations, and an administrative staff.  The team has conducted Pre-EIS data analysis using data that they have compiled from hard copies of Vehicle Stop Contact Forms.  They have also gone through the steps of investigations as expected for those cases that were considered outliers, for one reason or another.  On 7/20/14 we were advised that the Early Identification System (EIS) has been moved from Internal Affairs (now called Professional Standards) to the Human Resources Bureau.  This action coincides with suggestions made during the site visit of June 2014.

An added concern arising from this Paragraph is how long it will take for the hard copies of Traffic Stop forms that went in to effect April 1, 2014, to be completely entered into the computerized system.  Placing the responsibility for data entry at the District level allows the process to remain uncoordinated and incomplete.  A centralized process was recommended during the site visit of June, 2014.

In addition, The Lieutenant from the EIS Unit has set up a training process for IA Pro\Blue Team that meets expectations for this Paragraph and records the history of who has been trained and when.  Similar processes should be developed for TraCS training and deployment.  MCSO is not in compliance with this Paragraph.

*Paragraph 74. MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

While MCSO has detailed in EB-2 (Traffic Stop Data Collection) how traffic stop data is collected and used, they have not yet developed a protocol for its use.  We continue to suggest to MCSO to bring together an EIS policy that makes it clear to line employees that the goal of an EIS unit is proactive behavior modification, rather than reactive disciplinary processes.  This policy must include protocols to be employed by EIS personnel as noted by Plaintiffs Attorney's and Monitoring Team personnel.  In addition, as noted in Paragraph 73, the data entry for traffic stops that occurred prior to the implementation and training in TraCS remains a District level responsibility.  The two districts visited during the June 2014 time period had a large backlog of forms, with limited personnel available to input them into the system.  MCSO is not in compliance with Paragraph 74.

*Paragraph 75. The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

*a. all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e.,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

*b. all internal investigations of alleged or suspected misconduct;*

*c. data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

*d. all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

*e. all arrests;*

*f. all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

*g. all arrests in which the individual was released from custody without formal charges being sought;*

*h. all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

*i. all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

*j. all disciplinary action taken against employees;*

*k. all non-disciplinary corrective action required of employees;*

*l. all awards and commendations received by employees;*

*m. Training history for each employee; and*

*n. bi-monthly Supervisory observations of each employee.*

IA Pro and TraCS were operational at the time of the site visit in June 2014.  Blue Team was going to be introduced later in June as well.  IA Pro/Blue Team collects and monitors data on commendations, complaints, disciplinary history and grievances while TraCS provides a paperless system for the Sheriff's Office that allows information to be transferred between forms, as well as to gather statistical data, while making police reporting more streamlined and efficient.  Reports have been created using elements from these data systems, however, there is no map of the data showing how the EIS Unit pulls these pieces of information together.  In addition, the memorandum created by MCSO in response to the document request does not fulfill the requirements of Paragraph 75.  While the incident types and thresholds described in this memorandum are informative, they do not cover the breadth of criteria enumerated in this Paragraph.  MCSO needs to develop an EIS policy that specifically describes what data are being

pulled together from each system; how it will be used; the protocols looking for anomalies; who, exactly, has access to the data in this system; in addition to several other criteria.  MCSO is not in compliance with this Paragraph.

*Paragraph 76. The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

The newly proposed EB-2 (Traffic Stop Data Collection) requires capture of the information necessary for EIS personnel to link an officer's traffic stops, along with the racial and ethnic make-up of those stopped, to the actions they take in those stops.  However, a formal EIS policy and associated protocols do not yet exist.  The EIS system purportedly will contain data fields that include the information required by this Paragraph.  In addition, EIS personnel have indicated that excessive use of "unknown" for race and/or ethnicity will be flagged by the system.  MCSO is not in compliance with this Paragraph.

*Paragraph 77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

During two District site visits in June 2014 we found that not all traffic enforcement units had been equipped with TraCS.  More alarming though was that MCSO does not have a means of reflecting who has received training in TraCS and who has not.  This should be rectified.  MCSO must provide evidence that it has enough equipment necessary to support TraCS in each and every District.  In addition, since supervisors are supposed to monitor the activity of line personnel, MCSO must show that it has a sufficient amount of computer hardware and software to provide for the seamless supervision of all traffic enforcement personnel.  MCSO is not in compliance with this Paragraph.

*Paragraph 78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

MCSO has yet to create an EIS policy that incorporates the elements described in Paragraph 78. During the Pre-EIS phase, the EIS unit has conducted analyses similar to what is expected to occur when the EIS unit is completely operable.  EIS personnel stated during the site visit of June, 2014 that the EIS Unit is already keeping records of data analyses conducted and actions taken, such as: investigations, contacting supervisors, supervisor training of subordinates and the like.  However, there is no policy describing who has access to the EIS data, how this data is to

be used, where it will be stored, in addition to several other concerns expressed by Plaintiff's Attorneys and members of the Monitoring Team.  MCSO is not in compliance with this Paragraph.

*Paragraph 79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

There are no written Pre-EIS protocols and policy.  However, MCSO personnel in EIS have done a notable job pulling together data that is not yet inputted into TraCS to conduct analyses looking for behavior that may appear to be outside the norm.  The EIS policy should build upon what has been done to date and should include a description of protocols used to uncover aberrant behavior on the part of employees.  A major concern arising out of the site visit of June, 2014, was that only one person within the EIS unit really knew what the protocols were when exploring the data for examples of behavior that was outside the norm.  MCSO needs to memorialize these protocols in a policy that is disseminated throughout the organization so that the process is transparent and without any bias.  MCSO is not in compliance with this Paragraph.

### b. Training on the EIS
*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

At present there is no EIS policy that describes the system, its use, or the training required to insure efficient operation.  TraCS, IA Pro\ Blue Team hardware and software programs used by EIS have come, or are about to come, into operation.  However, training records are not complete at this point. TraCS, for example, uses "train the trainer" processes, whereby EIS Unit personnel are trained by software providers who then train supervisors who use this training to train line personnel, but there is no requirement for those receiving training to document having been trained.  As of August 1st, there are new lesson plans and training regimens for IA Pro\Blue Team.  MCSO has incorporated a process for those receiving training to acknowledge the receipt of training.  This is a tremendous improvement.  We do still need to assess the ability of

supervisors to easily access the compilation of EIS data as this has been planned but unsubstantiated.  MCSO is not in compliance with Paragraph 80.

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

*a.       comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

*b.       identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

*i. failure to follow any of the documentation requirements mandated pursuant to this Order; ii. racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

*iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers; iv. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

*v. Complaints by members of the public or other officers; and vi. other indications of racial or ethnic bias in the exercise of official duties;*

*c.       MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

*d.       a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

*e.       identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.      *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.      *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.      *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.      *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

As noted above, the data and programs are under development or acquisition for a fully functional EIS Unit to operate.  However, there is no coherent EIS policy that describes the protocols to be used for data examination, by whom, and with access to whom.  During the June site visit many of these issues were discussed but it
 remains unclear how much training has taken place up to this point.\ We were advised that the upcoming training of supervisors in the Blue Team program would be done through "train the trainer" processes.  We recommended that all training require that the employee signoff that they had received the training.  According to the most recent memos from MCSO, IA Pro\Blue Team appears to have this built into the E-learning process, but this is not the case for TraCS.  Finally, we need to substantiate how accessible these programs are to line level supervisors, as well as command staffs that are responsible for the evaluation of line level supervisors.  MCSO is not in compliance with Paragraph 81.

**Section 10: Supervision and Evaluation of Officer Performance**

**X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

**a. General Duties of Supervisors**

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

We reviewed the requirements outlined in Policy GB-2 (Command Responsibility), compared to the Supervisory responsibilities identified in Paragraph 83 as required to provide effective supervision necessary to direct and guide Deputies.  Policy GB-2 did not include many of the requirements identified in Paragraph 83, including: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of Misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and an elaboration of how Supervisors are to be held accountable for performing each of  these duties. These requirements must be included in Policy GB-2 and/or other related policies.  Once these requirements are memorialized, we will then ascertain if they are implemented in practice through interviews with Deputies and Supervisors, as well as the review of appropriate written records.  MCSO is not in compliance with this Paragraph.

*Paragraph 84. Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

We reviewed GB-2 (Command Responsibility), dated April 19, 1996 and Briefing Board 14-43, (Immediate Change to GB-2), dated May 1, 2014, as they pertain to Paragraph 84 which requires that, within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor and that first-line Supervisors shall be assigned to supervise no more than 12 Deputies.  GB-2, as written, is non-compliant in that it states that no individual shall report to more than one (1) commander or supervisor at any given time but does not state that it would be a single, consistent and clearly identified Supervisor.  GB-2 also does not require that first-line Supervisors shall be assigned to supervise no more than 12 Deputies. The proposed changes to the policy outlined in the Briefing Board will not address all of these issues, particularly that all patrol deputies shall be assigned to a single, consistent, clearly identified Supervisor. In Order to be compliant, GB-2 must include these requirements.

CCID staff indicated that prior to and during the review period, Districts were not required to keep daily and weekly work assignments in any uniform format.  Nonetheless, we asked for samples from each District to ascertain how records were kept.  We reviewed some examples of shift rosters or daily assignment sheets for each of the Districts provided by MCSO from the period between January 1 and June 30, 2014 except for District 4, for which we reviewed shift rosters or sheet assignments from the period between June 30 and July 4.  Prior to June 30, 2014, a daily shift roster or assignment sheet was not required in District 4, but has been kept for each squad in District 4 since June 30, 2014.  Understanding that the format for shift rosters or daily assignment sheets has not been standardized as of yet – and in some cases, does not exist – our limited review noted that, in most cases, Deputies were assigned a single, consistent, clearly identified Supervisor and the first-line Supervisors were assigned to supervise no more than twelve Deputies.

CCID indicated that the format and content will be standardized across Patrol in the future. MCSO is not in compliance with this Paragraph.

*Paragraph 85. First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

GB-2 (Command Responsibilities) is missing the requirement that first-line field Supervisors discuss individually the stops made by each Deputy they supervise, with their respective Deputies, no less than one time per month.  The requirements of this Paragraph were added to the proposed EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance).  MCSO has confirmed that no discussions required by this Paragraph have yet to take place.   MCSO is not in compliance with this Paragraph.

*Paragraph 86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

We reviewed Policy GB-2 (Command Responsibility), with regard to the Paragraph 86 requirement that on-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Paragraph 86 also requires that Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.  GB-2 is non-compliant in that it does not address the Paragraph 86 requirements. As of the date of this report, GB-2 was under review and revision by MCSO.  Policy GB-2 must include the Paragraph 86 requirements cited above in order to be compliant.

We have reviewed some examples of shift rosters or daily assignment sheets for each of the Districts provided by MCSO from the period between January 1 and June 30, 2014, except for District 4 for which we reviewed shift rosters or sheet assignments from the period between June 30 and July 4.  Prior to June 30, 2014, a daily shift roster or assignment sheet was not required in District 4. Understanding that the format for shift rosters or daily assignment sheets has not been standardized as of yet, our review noted that, in most cases, Supervisors were assigned to the same days as the Deputies they were assigned to supervise.  In most cases, the Supervisors did not work the exact same hours as the Deputies they were assigned to supervise, either working an hour before some of the Deputies were on duty or going off duty an hour before some of the Deputies they supervised.  MCSO is not in compliance with Paragraph 86.

*Paragraph 87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

We reviewed GB-2 (Command Responsibility), and GC-17 (Employee Disciplinary Procedure) with regard to the Paragraph 87 requirements.  While these policies outline various supervisory duties, they fall short in outlining the accountability mechanisms for the supervisors in performing their duties, including through the use of performance evaluations, counseling, and the disciplinary process.

We reviewed the performance evaluations for 14 employees and their supervisors who had received an evaluation between January 1, 2014 and June 30, 2014.  The evaluations of the supervisors contained an assessment of the quality and effectiveness of their supervision.  Seven of the evaluations of the supervisors did not contain comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.  MCSO is not in compliance with this Paragraph.

### b. Additional Supervisory Measures
*Paragraph 88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws.  During discussions with CCID and MCAO attorneys, we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.  Until such time as this review is completed, MCSO is not in compliance with this Paragraph.  Nonetheless, We reviewed the Special Investigations Division (SID) Operations Manual with regard to the Paragraph 88 requirement that first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.  This specific requirement was not included for any Unit, including, for example, the Criminal Employment Unit.  MCSO is not in compliance with Paragraph 88.

*Paragraph 89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The*

*responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

We reviewed the following documents submitted by MCSO as supporting documentation relative to Paragraph 89 requirements: EA-11(Arrest Procedures), GC-17 (Employee Disciplinary Procedure); proposed EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and proposed EB-2 (Traffic Stop Data Collection).  The requirements of the paragraph are covered via the combination of policies.

Thus far we have reviewed 21 Incident Report Memorialization Forms completed between January 1 and June 30, 2014 provided by MCSO.  The Incident Report Memorialization Forms are completed by supervisors to document any issues noted with an Incident Report and identify any corrective action taken.  Examples of such issues include conclusory or boilerplate language, no probable cause for arrests, no reasonable suspicion, missing elements of a crime, inconsistent information, or biased policing.  Districts 1, 2, 4 and the Lake District had not completed any Report Memorialization Forms, while District 3 had completed 17, District 6 completed 3 and District 7 completed 1.  None of the Incident Report Memorialization Forms involved failure to notify a Supervisor before initiating any immigration status investigation or for an Immigration-Related Crime, or for any crime related to identity fraud or lack of an identity document.  We have advised MCSO of those areas of policy that are compliant and others that were not sufficient.  As the policies indicated above are in still in draft form, MCSO is not in compliance with the Paragraph.

*Paragraph 90. MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

We reviewed the following documents which were submitted as relating to Paragraph 90: EB-1 (Traffic Enforcement, Violators Contacts, and Citation Issuance), GC-17 (Employee Disciplinary Procedure), an Incident Report Memorialization Form, and Briefing Board 14-28 (Immediate Incident Report Submittal and Supervisor Review Change), dated April 3, 2014.  EB-1 is compliant in that it states Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred and, absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently review the reports.  The Incident Report Memorialization Form

was submitted as a blank form, but identifies categories of issues to be addressed by supervisors, if appropriate, which are in compliance with Paragraph 90.  Examples of such issues include conclusory or boilerplate language, no probable cause for arrests, no reasonable suspicion, missing elements of a crime, inconsistent information, or bias policing.  It also contains a section to be completed by supervisors to identify any corrective action taken.   Briefing Board 14-28 includes requirements stated in Paragraph 90, but is not a formal policy.  GC-17 made no reference to the Paragraph 90 requirements.

We reviewed 21 completed Incident Report Memorialization Forms and noted that the supervisors identified deficiencies and corrective actions as required in Paragraph 90.  Most of the deficiencies were minor and unrelated to the issues identified in this Paragraph.  However, six did involve the enumerated deficiencies as follows: five involved lack of articulation of the legal basis for the action and one involved conclusory language.  MCSO is not in compliance with the Paragraph.

*Paragraph 91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

MCSO provided draft policy EB-1 (Traffic Enforcement, Violator Contacts and Citation Issuance) for our review.  EB-1 is compliant with the Paragraph 91 requirements in that it states that Supervisors shall document any investigatory stops or detentions that appear unsupported by reasonable suspicion or are otherwise in violation of Office policy; or stops or detentions that indicate a need for corrective action or review of Office policy or training. It also states that Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy or referring the incident for administrative or criminal investigation.

More in-depth verification processes will be possible only when the respective policies are in place and the Supervisor Responsibilities training has been conducted.  However, we have reviewed 21 Incident Report Memorialization Forms completed between January 1 and June 30, 2014 provided by MCSO. Districts 1, 2, 4 and the Lakes District had not completed any Report Memorialization Forms; while District 3 had completed 17, District 6 completed 3 and District 7 completed 1. None of the Report Memorialization Forms involved any Investigative Stops or detentions that appeared unsupported by reasonable suspicion or were otherwise in violation of agency policy, or stops or detentions that indicated a need for corrective action or review of agency policy, strategy, tactics or training.  MCSO is not in compliance with this Paragraph.

*Paragraph 92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies*

*needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

Paragraph 92 states that Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective action taken, in order to identify Deputies needing repeated corrective action.  MCSO has not developed an EIS policy.

Paragraph 92 also requires that Supervisors ensure that each violation or deficiency is documented in the Deputy's performance evaluations and that the quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO offered GC-4 (Employee Performance Appraisals), GC-17 (Employee Disciplinary Procedure), GH-2 (Internal Investigations), and EB-1 (Traffic Enforcement, Violator Contacts, And Citation Issuance).

EB-1 is compliant in that it states Supervisors shall track each deputy's deficiencies or violations and the corrective action taken, in order to identify deputies who need repeated corrective action. EB-1 also states that Supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops.

GC-4 is not compliant in that it does not contain the requirement that Supervisors ensure that each violation or deficiency is documented in the Deputy's performance evaluations and that the quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.

GC-17 is not compliant in that, while it contains a section entitled "Supervisor Role in Early Intervention", there is no mention of the Paragraph 92 requirement that Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.

GH-2 outlines procedures for accepting, processing and investigating complaints of employee misconduct or wrongdoing. It does not address the Paragraph 92 requirements.

We reviewed performance evaluations for 14 employees and their supervisors who had received an evaluation between January 1, 2014 and June 30, 2014.  The evaluations of the supervisors contained an assessment of the quality and effectiveness of their supervision. Seven of the evaluations of the supervisors did not contain comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.  MCSO is not in compliance with this Paragraph.

*Paragraph 93. Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

MCSO offered draft EA-11 (Arrest Procedures), GC-17 (Employee Disciplinary Procedure), EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and Briefing Board 14-28, dated April 3, 2014.  EA-11 and GC-17 did not have any references to this Paragraph's requirements.  The requirements were contained in EB-1 as they pertain to traffic stops.  We do not consider Briefing Boards to be formal, final policy, although it does contain the Paragraph 93 requirements verbatim.

Additional verification processes have only partially begun because the respective policies are not in place and the Supervisor Responsibilities training has not been conducted.  We were able to review a random sampling of all documentation associated with all arrests made on four randomly selected dates: January 23, March 15, May 5, and June 8, 2014. Our random sampling consisted of a total of 26 Booking Forms and 34 Incident Reports that resulted in an arrest or detention. Our review noted that it was not possible to discern if the Deputy had completed all incident reports before the end of shift because there was no time indicated by the Deputy's signature. We noted that, of the 34 Incident Reports reviewed, 22 were reviewed and signed by a supervisor within 72 hours of the arrest, 9 were not reviewed with 72 hours of the arrest, 2 supervisor reviews were undated and 1 was not reviewed.  This initial review is instructive regarding what policies and training need to be emphasized as we move forward.  MCSO is not in compliance with this Paragraph.

*Paragraph 94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

Our process for verification consists of reviewing Supervisors' documentation of any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  MCSO submitted policies EA-11(Arrest Procedures), and GC-17 (Employee Disciplinary Procedure). They did not contain the requirements outlined in the Paragraph.

We have been able to review 21 Incident Report Memorialization Forms completed between January 1 and June 30, 2014 provided by MCSO.   Districts 1, 2, 4 and the Lake District had not completed any Report Memorialization Forms; while District 3 had completed 17, District 6 completed 3 and District 7 completed 1.  None of the Report Memorialization Forms involved a

Supervisor documenting any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

MCSO is not in compliance with this Paragraph.

*Paragraph 95. Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

The requirements of Paragraph 95 are similar to, but not synonymous with the Paragraph 92 requirements.  We reviewed policies GC-4 (Employee Performance Appraisals), GC-17 (Employee Disciplinary Procedure), and GH-2 (Internal Investigations).  The Paragraph requirements are not covered by these polices.  Both EIS and a Performance Evaluation System are in development.

However, we have reviewed the performance evaluations for 15 randomly selected employees who had received an evaluation between January 1, 2014 and June 30, 2014, along with copies of the evaluations for the employees' supervisors who completed the employee evaluation forms. The evaluations did not contain any documentation of subordinates' violations or deficiencies in arrests.   As noted previously in this report, the EIS Unit has been conducting pre-EIS evaluations based upon existing documents and data.  Only a few of these investigations have resulted in the counseling of employees about their documentation practices and none have shown any arrest protocol deficiencies.  MCSO is not in compliance with this Paragraph.

*Paragraph 96. A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

MCSO noted that policy GB-2 (Command Responsibility) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy.

In addition we had the opportunity to review 21 Incident Report Memorialization Forms completed between January 1 and June 30, 2014 provided by MCSO. Districts 1, 2, 4 and the Lake District had not completed any Report Memorialization Forms; while District 3 had completed 17, District 6 completed 3 and District 7 completed 1. None of the Report Memorialization Forms involved Supervisory reviews related to arrests that are unsupported by

probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  MCSO is not in compliance with this Paragraph.

*Paragraph 97. MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

MCSO noted that policy GB-2 (Command Responsibility) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy.  The EIS System is under development.  Until such time as the system becomes operational and is supported by policy, MCSO is not in compliance with Paragraph 96.

### d. Regular Employee Performance Review and Evaluations
*Paragraph 98. MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  We will meet with appropriate MCSO during our September site visit and begin the consultation required by this Paragraph.  MCSO is not in compliance with Paragraph 98.

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO is currently not in compliance with Paragraph 99.

*Paragraph 100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph. We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy. MCSO is not in compliance with this Paragraph.

*Paragraph 101. Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws. During discussions with the Court Compliance Implementation Division (CCID) and attorneys from the Maricopa County Attorneys' Office (MCAO), we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified. From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions. Until such time as this review is completed, and MCSO can definitively prove that it has no qualifying Units, MCSO is not in compliance with this Paragraph.

## Section 11: Misconduct and Complaints

## XI. MISCONDUCT AND COMPLAINTS

### a. Internally-Discovered Violations

*Paragraph 102. MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

We reviewed the following MCSO policies offered in response to this Paragraph: GH-2 (Internal Investigations), CP-8, (Preventing Racial and Other Biased-Based Profiling), CP-5 (Truthfulness), CP-2, (Code of Conduct), CP-3, (Workplace Professionalism), and GC-17 (Employee Disciplinary Procedure). The policies do not comport to the requirements of the Paragraph, and are not specific enough to provide clarity to employees at all levels.

During our first site visit, we queried officers at all levels and found that many were not cognizant of GH-2, dated December 4, 2013, containing the procedures for the receipt of complaints, notification to Internal Affairs, assignment of a control number, and the subsequent assignment of the investigation. Many complaints are routed through the Communications

Center to the Unit or patrol station.  Some supervisors are still operating under past practices, when they had discretion over which complaints to report to Internal Affairs.  The Communications Center is now responsible for notifying Internal Affairs, via email, of all complaints that they receive.  Notably, the operations lieutenants at the Districts that we interviewed were knowledgeable about the changes.

In addition to the documents above, we asked MCSO to provide any cases involving bias-based activities, retaliation, truthfulness or failure to report violations of the Order since January 1, 2014, and any such cases still open that were initiated in 2013.  We received twenty-two investigations from MCSO Internal Affairs.  Ten were complaints of Racial Bias and twelve were complaints of Truthfulness.  Of the twenty-two cases, eleven were still awaiting assignment or investigation. Eight of the remaining complaints were investigated at the subject's division and three were investigated by Internal Affairs.  Four of the cases alleging racial or other bias were investigated at the division level, which conflicts with MCSO policy GH-2 (Internal Investigations). One of the cases involved incidents occurring over three years and included thirteen participants or "investigative leads."  A case with this level of complexity should have been investigated by Internal Affairs.  There was no evidence in any of the documents that the divisional investigations were monitored by Internal Affairs or that the Internal Affairs Unit was notified at the inception of the investigation.  MCSO should set clear guidelines regarding when investigations will be handled locally at the District level and when they should be transferred to Command Personnel or Internal Affairs.  These guidelines should include clear time limitations which, when exceeded, will result in the investigation being transferred to the next highest level.

The three investigations that were completed by Internal Affairs investigators appeared relatively complete and included transcribed interviews. Two had been initiated as Internal Criminal investigations.  The new headquarters facility affords the Internal Investigations unit state-of-the-art interviewing rooms, workspace and equipment. Supervisors in Internal Affairs and at other MCSO units should not be conducting internal affairs investigations without the benefit of training in the subject.  MCSO is not in compliance with this Paragraph.

### b. Audit Checks

*Paragraph 103. Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

MCSO did not submit any policies in support of this paragraph.

During our first site visit, we were made aware of the MCSO's acquisition of IA Pro for case management and tracking.  At that time, the system had not been completely populated with the cases, nor had all IA employees been trained on the system.  In future visits and reviews, we will determine if the system is being used to accomplish the objectives of this Paragraph.

During our June site visit, we discussed the concept and purpose of "integrity tests" with IA personnel.  They advised that they were unfamiliar with the concept and have not previously had an integrity testing program as this Paragraph contemplates.  We will review the policy on this topic when it is developed and make sure that it incorporates an understanding of the intent of this Paragraph.

While it is not necessarily on point with the topic of this Paragraph, we reviewed an MCSO memorandum that described twelve inspections/audits conducted since January 1, 2014.  The first audit was conducted on March 24.  Eight of the issues were still pending resolution because all of the documents had not been reviewed.  MCSO is not in compliance with this Paragraph.

### c. Complaint Tracking and Investigations
*Paragraph 104. Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

Our review of policy GH-2 (Internal Investigations) indicates that MCSO needs to add language which requires personnel to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Commanders shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

In addition, we reviewed eleven completed Internal Affairs investigations.  There were no documents included that addressed compliance with appearing for interviews. There were also no forms or memoranda that indicated that commanders or supervisors were notified when a Deputy under their supervision had been summoned as part of an administrative investigation.  MCSO is not in compliance with this Paragraph.

*Paragraph 105. Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

The policy, GH-2, Internal Affairs, and the related SOP for Internal Affairs, do not include language that investigators shall have access to and take into account as appropriate, the collected traffic stop and patrol data, training records, discipline history, and any past complaints and performance evaluations of involved officers.

During our first site visit we were told that Internal Affairs was in the process of revising these documents. The newly purchased software is intended to capture this data and have it available for retrieval as necessary.

We reviewed eleven completed internal affairs investigations, eight of which were completed at the division level. We observed notations regarding past discipline histories in all investigations, but no listings. There were no complaint or training records, traffic stop data or patrol data, when appropriate, or performance history included in the investigations.  MCSO must incorporate the correct language in their policies and insure proper training to those policies.  MCSO is not in compliance with this Paragraph.

*Paragraph 106. Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

No policies were offered for this Paragraph.  MCSO has two obligations under this Paragraph – to *maintain* and make records available.  We have no reason to believe that MCSO has withheld any data requested.  MCSO's record maintenance and/or retention policy as it pertains to complaints was not provided.  Until such time as that is provided and approved, MCSO is not in compliance with this Paragraph.

## Section 12: Community Engagement

The Plaintiffs, the Court and the Monitor became increasingly concerned during the first three months of 2014 that MCSO had not fully lived up to Chapter XII's requirements of the Court Order (Document 606) filed on October 2, 2013.  After several in-depth conversations in chambers and between Plaintiffs, Monitor, MCSO and the Court, the Court filed a Supplemental Permanent Injunction/Judgment Order (Document 670) on April 4, 2014 that removed the responsibilities of Paragraphs 107 – 118 from the purview of MCSO and gave them to the Monitor in consultation with the Plaintiffs.  As a result, the following Paragraph requirements have been taken from that new order and repeated here.  (Note: areas in red, italicized and in { } have been removed by the Court.  Underlined portions have been added by the Court).  The comments below show what has been done in reference to Community Engagement since April 4, 2014.

### *XII. COMMUNITY ENGAGEMENT*

**a. Community Outreach Program**
**(Note: Unchanged language is presented in italicized font. Additions are indicated by underlined font. Deletions are indicated by crossed-out font. Where an entire paragraph has been removed, that is indicated with brackets, but the numbering remains unchanged. For example: "108. [REMOVED]".)**

*Paragraph 107. To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO Monitor shall work to improve community relationships and engage constructively with the community during the period that this Order is in place. To this end, the MCSO shall create the following district community outreach program.*

On April 4, 2014 an amended Order (Document 670) made this a Monitor's function.  This is no longer an MCSO responsibility.  In that vein, the Plaintiffs and the Monitor have communicated repeatedly about engaging community leaders; selecting Community Advisory Board (CAB) members; advertising upcoming community events; providing for the development of a complaint system that goes through the Monitor to assure access to the appropriate process; and informing the public about the authority of MCSO regarding immigration enforcement.  Each of these issues will be dealt with in more detail in the following Paragraphs.

*Paragraph 108. [REMOVED] Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.*

*Paragraph 109. As part of its Community Outreach and Public Information program, the MCSO The Monitor shall hold a public meeting in each of MCSO's patrol Districts within 90 180 days of the Effective Date issuance of this amendment to the Order, and at least between one and three meetings in each of MCSO's patrol Districts annually thereafter. The meetings shall be under the direction of the Monitor and/or his designee. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The MCSO Monitor shall clarify for the public at these meetings that it the MCSO does not lacks the authority to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

On April 4, 2014 an amended Order (Document 670) made the requirement to hold public meetings a Monitor's function.  On June 19, 2014, the first community meeting was held at the Arizona State University High School Preparatory Academy located at 735 E. Fillmore Street, Phoenix, Arizona 85006.  The meeting was held from 6:30 PM until 9:00 PM.  Approximately 200 community members attended this meeting.  Also attending were members of MCSO, attorneys for the Defendants, attorneys for the Plaintiffs, representatives from the ACLU, and Community Advisory Board Members.  The meeting was conducted in both English and Spanish to insure the maximum amount of participation and understanding took place. In addition, the advertisements prior to this meeting had been dispersed in both English and Spanish to a variety of media outlets.

The Monitor explained to the meeting attendees the role of the Monitor, his responsibilities to the community, the progress being made, as well as challenges ahead in implementing the Order. Within this initial presentation, and reiterated later during questions and answers, we made it clear that MCSO did not have the authority to conduct immigration enforcement except if they were already enforcing Arizona or Federal criminal laws, but even then, the authority of MCSO is limited.  It was also explained to those in attendance that the Monitoring Team would have a regular presence in Maricopa County and we provided our contact information to all parties.  We advised the attendees that the Monitor had the authority to take complaints about treatment received at the hands of MCSO personnel and insure that these complaints were investigated completely.  Further, we explained that new policies, procedures, training and equipment were being developed for MCSO officers and supervisors to ensure that they were working within the law and toward the best interests of the people of Maricopa County.

A number of questions were asked by community members attending the meeting. The Monitor, Plaintiffs' representatives or CAB members responded to these inquiries.  The entire discussion, both questions and answers, were conducted in English and Spanish.  For those who declined to ask their questions publicly, separate cards were made available for them to write their questions. Attendees were also provided with forms to document complaints or concerns.

*Paragraph 110. The meetings present an opportunity for* ~~MCSO representatives~~ *the Monitor to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.* ~~MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.~~ *The* *Monitor may investigate and respond to those concerns. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendants' compliance with this order, it may assist the complainant in filing an appropriate complaint with the MCSO.*

While over 200 people attended the first community meeting held by the Monitor on June 19, 2014, there was an opportunity for well over twenty people to ask questions either by stepping up to microphones that were available or by writing their comments on note cards that were provided.  Questions were successfully fielded through each method.  People stood politely in line waiting their turn at the microphone and Monitoring Team personnel moved throughout the meeting location, providing microphones where needed, or notecards for those who wished to ask their questions in writing.

A key objective of this first public meeting was to let those in attendance know that the Monitor had the authority, provided by the Court, to take complaints about any activity involving MCSO personnel and make sure that an investigation was adequately conducted.  Forms were made available for this purpose.  After the meeting, all Monitoring Team personnel remained behind to individually answer questions, and did so until the last attendee left the building.

*Paragraph 111. English- and Spanish-speaking* ~~*MCSO*~~ *<u>Monitor</u> Personnel shall attend these meetings and be available to answer questions from the public <u>about its publicly available reports concerning MCSO's implementation of this Order and other publicly-available information.</u>* ~~*At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the Community Liaison Officer (described below) shall participate in the meetings.*~~ *<u>The Monitor may request</u> Plaintiffs' <u>and/or</u> Defendants' representatives* ~~*shall be invited*~~ *to attend <u>such meetings and assist in</u> answering inquiries by <u>the community. The Defendants are under no obligation to attend</u> such meetings, but to the <u>extent they do not attend such meetings after being requested by</u> the Monitor to do so, the <u>Monitor may report their absence to the public and shall report</u> their absence to the Court.*

Nine members of the Monitoring Team were present for the community meeting held on June 19, 2014.  The Monitor and two of his team in attendance are bilingual, and the Monitor made several of his remarks in Spanish.  Another Team member assisted a contracted interpreter in the translation process from English to Spanish or Spanish to English.

In addition, opening comments were made by Ms. Victoria Lopez of the ACLU of Arizona and Community Advisory Board Members Dr. Maldonado and Dr. Santos as well as Plaintiffs' Attorney Ms. Lai.  Furthermore, eight members of MCSO were recognized to be in attendance. Several of these individuals play instrumental roles in the implementation of the Courts Order.

*Paragraph 112. The meetings shall be held in locations convenient and accessible to the public. At least* ~~*one week*~~ *<u>ten days</u> before such meetings, the* ~~*MCSO*~~ *<u>Monitor</u> shall widely publicize the meetings using English and Spanish-language television, print media and the internet. <u>The Defendants shall either provide a place for such meetings that is acceptable to the</u> Monitor, or <u>pay the Monitor the necessary expenses incurred in arranging for such</u> meeting places. The <u>Defendants shall also pay the reasonable expenses of publicizing the</u> meetings as required <u>above, and the additional reasonable personnel and other expenses</u> that the Monitor will incur <u>as a result of performing his obligations with respect to the</u> Community Outreach Program. If <u>the Monitor determines there is little interest or</u> participation in such meetings among <u>community members, or that they have otherwise fulfilled their purpose, he can file a request <u>with the Court that this requirement be</u> revised or eliminated.*

Preparations for the first meeting began in April 2014.  Issues such as site selection, advertisement in local radio and print media in English and Spanish, agenda creation, and meeting logistics were of utmost importance in the planning stages.  Input from the Community Advisory Board (CAB) as well as ACLU was taken into consideration before finalizing these items.  MCSO's Court Compliance and Implementation Division staff, as well as the Chief Deputy, were kept abreast of the planning as well as consulted on meeting security issues. Members of the Monitoring Team met with the ACLU of Arizona and Community Advisory Board (CAB) members to discuss preparations for the public meeting.

The meeting was held in a central Phoenix location, Arizona State University Preparatory Academy, and was widely publicized.  Advertisements, in both English and Spanish, appeared in State-wide newspapers, in Prensa Hispana, the Phoenix New Times, and in Segunda Mano. These ads were also included in the media outlets' Facebook pages and websites.  With the assistance of the ACLU, we were able to encourage and support the formation of a flyer to announce the Monitor's public meeting, to be distributed to community members at designated community meetings.  The ACLU also submitted the meeting notice to numerous online calendars via their local radio media contacts, and prepared a Public Service Announcement. CAB member Angeles Maldonado and Victoria Lopez of the ACLU appeared on a local radio to publicize the meeting.

In addition there were multiple English and Spanish media outlets recording the event and conducting interviews of participants and attendees thereafter.

**b. ~~Community Liaison Officer~~ <u>Monitor</u>**

*Paragraph 113. [REMOVED] Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.]*

*Paragraph 114. <u>In addition to the duties set forth in Title XIII of this order,</u> ~~The CLO~~ <u>the Monitor</u> shall have the following duties <u>in relation to community engagement:</u>*
   *a.      to coordinate the district community meetings described above in Paragraphs 109 to 112;*
   *b.      to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 111; <u>and</u>*
   *c.      to compile any Complaints, concerns and suggestions submitted to ~~CLO~~ <u>him</u> by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;*

*[d.     [REMOVED] to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and]*
*[e.     [REMOVED] to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.]*

At the initial community engagement meeting, the Monitor, CAB members and Plaintiffs' representatives explained the breadth of the Order to the community members in attendance. Community members were also allowed to ask any question of these representatives and were given an opportunity to comment on the information provided by these representatives. Community members were also provided forms to document any concerns or complaints.  After the meeting, members of the Monitoring Team remained and spoke to several attendees who voiced their opinions and concerns regarding MCSO's operations.

### c. Community Advisory Board

*Paragraph 115. ~~MCSO~~ <u>The Monitor</u> and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the ~~MCSO~~ <u>Monitor</u> and community leaders, and to provide specific recommendations to MCSO about policies and practices that will ~~increase community trust and~~ ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

We worked with Plaintiffs to create a three member Community Advisory Board (CAB).   Since that time meetings and other communications have been held between the Monitor and CAB members to go over their responsibilities.  Advisory Board Members were also instrumental in the planning, advertising and preparation of the initial community meeting of June 19, 2014. Moreover, two of the Advisory Board members spoke to the crowd at the first community meeting.  Advisory Board members have notified the Monitor that they have engaged in ongoing communication with community leaders.

*Paragraph 116. The CAB shall have ~~six~~ <u>three</u> members, ~~three to be selected by the MCSO and three to be~~ selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case. ~~However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB.~~ The CAB shall continue for at least the length of this Order.*

The CAB is currently comprised of three community members. None of these members are, or have been, MCSO employees, named as class representatives in this matter, or are attorneys involved in the Melendres litigation.

*Paragraph 117. The CAB shall hold ~~public~~ meetings at regular intervals of no more than four months. <u>The meetings may be either public or private as the purpose of the meeting dictates, at the election of the Board. The Defendants shall either provide a suitable place for such</u>*

*meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses* incurred in arranging for such a meeting place. The Defendants shall also pay to the *Monitor the additional reasonable expenses that he will incur as a result of performing his* obligations with respect to the CAB including providing the CAB with reasonably *necessary administrative support.* ~~The meeting space shall be provided by the MCSO.~~ The ~~CLO~~ *Monitor* shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.

We have been informed that the CAB has already held a meeting with key community stakeholders. For instance, the CAB organized a meeting with Latino community leaders on May 6th to introduce themselves as CAB members and discuss the community engagement provisions of the Court's Order. We will continue to collaborate with CAB members to facilitate more of these meetings in the future.

*Paragraph 118. During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter* ~~and make reasonable efforts to address such concerns.~~ *and transmit them to the Monitor for his investigation and/or action. Members will* *may* *also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

The Monitor has met with CAB members to discuss the issue of transmitting to the Monitor any complaints received by CAB members that may require investigation. In addition, the Monitor has discussed the crucial role of the Community Advisory Board's ability to reach into the community in a way that the Monitoring Team cannot. The Board members have been advised to compile concerns regarding MCSO actions or compliance with the Order. To facilitate this effort, the ACLU of Arizona has launched a bilingual website, ChangingMCSO.org/CambiandoMCSO.org. According to the ACLU, the website serves as a place where the public can gather information about the monitoring process, including the times and locations for community meetings, Monitor reports, MCSO reports and other court filings. The website also includes a form for filling out complaints, which will then be directly conveyed to the CAB and Monitor.

## Section 13: Concluding Remarks

The matter before us is a serious one. The backdrop is a national dialogue on the relationship between the police and their constituent communities. Questions of the commitment of the Maricopa County Sheriff's Office to long-term, sustainable change are abundant. The Maricopa County Sheriff's Office is to be commended for their spirit of cooperation and their facilitation of our efforts.

The compact between the MCSO and the diverse nature of the communities it serves must be the matter that  should be of paramount concern to the citizens, deputies and assorted others who

realize that the delivery of constitutional police practices cannot be mitigated or compromised by any single individual, sets of policies, or deficient past practices.

Notwithstanding the Court's mandate that the Monitoring Team assume the community engagement responsibilities articulated in the Order, we find that the MCSO enjoys only a distant relationship with the communities it serves.  The ethos of the organization does not appear to embrace the value of community collaboration or the requisite sensitivities to the plight of those whose lives have been impacted by the behaviors clearly described in the findings of the Court.

There has been, in our view, far too much attention given to what we call "technical compliance," a numeric result, that perhaps in the eyes of the agency, is the attainment of a compliance level that might set aside an organizational need to persevere and sustain.  Numeric results must be accompanied by concomitant cultural changes which together can serve as a basis for long-term changes.  We are struck by the degree to which the current executives of the MCSO assign blame to high ranking personnel who are no longer with the agency, but who nonetheless served under the leadership of the incumbent Sheriff.

During these past six months, this has been exacerbated by the inappropriate comments of senior MCSO officials whose public statements about the Order needed to be addressed by the Court, culminating in a Court-ordered remedy that required internal training and dissemination of significant reading material.

While this is a new experience for the MCSO, and with it a variety of unanticipated developments, there have been a significant number of personnel changes that have mitigated the flow of information, the continuity of the reform process, the progress of certain investigations, and the needed unanimity of purpose that must exist if change is to flourish.

Roles of supervisors have been found to be wanting.  In some instances, senior deputies have been given charge of entire districts, especially in the evening hours, when mature, enlightened experience is necessary to meet the mission of the agency and the expectations of the community.  Even questions posed to District Commanders about crime rates in their areas of responsibility have been met with bewildered explanations that clearly lack an understanding of the metrics essential to understanding outcomes of enforcement and preventive strategies.

The Maricopa County Sheriff's Office, and the Sheriff in particular, cannot see this matter as a mere exercise; one with a beginning and an end.  For there to be meaningful change, the implementation of the Court's Order must be seen, and accepted, as a blueprint for change; a living document that with the passage of time, and the approval of the Court, can be adapted to changes in laws, generally accepted police practices, community input, and new enforcement challenges.

We are only in the early stages of this process but at this point, we have yet to see the emergence of a vision for the future that comports with the sensitivities and resolve of an agency determined to be the servants of all the people.

*Ortega Melendres v. Arpaio*
**Plaintiffs' Comments on Monitor's Draft First Quarterly Report**
**September 15, 2014**

Pursuant to Paragraph 132 of the Court's October 2, 2013 Supplemental Permanent Injunction/Judgment Order (hereinafter "Supplemental Order"), Plaintiffs provide the following comments on the Monitor's Draft First Quarterly Report.

## Section 1: Chronology of the Case

On page 3, the draft report notes that the Court had determined Defendants violated the rights of Plaintiffs under the Fourth and Fourteenth Amendments to the Constitution. The report then goes on, "Specifically, that the Defendants inappropriately used race, i.e., 'Hispanic appearance' to conduct a variety of investigations, traffic stops, saturation patrols, employer sanction law enforcement and the like, for the sole purpose of determining whether persons were in the United States illegally. *The use of the term "Specifically" may give rise to the impression that this was the only basis for the Court's findings, when the grounds were multiple and more complex. We suggest use of the term "For example" instead here.*

## Section 5: Policies and Procedures

*We assume, in general, that the draft report will be updated to reflect additional policies MCSO has submitted for review since the draft was generated.*

On page 20, in discussion of Paragraph 30 of the Court's Supplemental Order, the draft notes several submissions made by the MCSO pursuant to Section IV of the Supplemental Order and the Monitor's provision of feedback on those submissions. *We suggest adding that Plaintiffs provided comments on each of MCSO's submissions as well, pursuant to Section IV of the Supplemental Order.*

We also note that during the "train-the-trainer" event in preparation for the Fourth Amendment and Bias-Free Policing training, it came to light through a question from a trainer that MCSO deputies and commanders alike have understood there to be an unwritten "20-minute" policy for traffic stops; *i.e.*, MCSO deputies have been working under an unwritten policy or practice that traffic stops should last no longer than 20 minutes.  As previously discussed in connection with the train-the-trainer event, this unwritten rule is problematic in two ways: it may lead to a traffic stop being artificially curtailed when it reasonably should take longer than 20 minutes, or it may lead to deputies unreasonably prolonging a traffic stop that should take less than 20 minutes. *For purposes of commenting on the draft Report, Plaintiffs recommend only that Section 5 indicate that unwritten policies or procedures have come to light so far in the monitoring process, and that future monitoring and compliance efforts should account for this and ensure that all important or material law enforcement practices be committed to a written policy, and that such written policies govern deputies' activities.*

**Section 6: Pre-Planned Operations**

*Plaintiffs recommend using the term "Significant Operations" rather than "Pre-Planned Operations" in the title and throughout this section, for consistency with the Supplemental Order.*

On page 22, the draft states that "MCSO personnel stated that the last time they had conducted immigration operations was in 2007-2008, as they were enforcing SB 1070." *Plaintiffs were not a part of the meeting being discussed, but note that SB 1070 was not enacted until 2010.*

On pages 22-23, in discussion of Paragraph 35 of the Court's Supplemental Order, the draft notes that the Monitor team "reviewed several documents offered by MCSO, including: Significant Operations Protocol, Implementation Division Memo, Special Investigation Division Operational Manual, as well as numerous memos and Briefing Boards. Most documents reviewed had little or no relevance to the requirements of this Paragraph because they did not identify those units which enforced immigration laws. MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws. The Division manual (around 157 pages) identifies eleven different units, none of which appear to be directly involved in enforcing immigration laws." *While Plaintiffs agree with the Monitor's suggestion that attorneys from the Maricopa County Attorney's Office (MCAO) identify applicable immigration-related laws as that term is defined in the Court order in order to help facilitate the determination of which specialized units are enforcing such laws, Plaintiffs note that page 10 and 22 of the Special Investigation Division (SID) Operational Manual indicates that the Human Smuggling Unit (HSU) is still in operation and is part of the SID.[1] It would be useful for the MCSO to provide additional information about what specifically the HSU is doing and which statutes it is enforcing. Further, the SID Operational Manual, on pages 22-27, indicates that the MCSO continues to have a Criminal Employment Unit (CEU) whose primary mission is to apprehend individuals that utilize false information in order to work. This is an additional specialized unit Plaintiffs understand to be enforcing immigration-related laws, since the requirement to prove lawful authorization to work is part of the federal immigration laws. The CEU was formerly part of HSU, and consistent with its mission, has focused its investigative resources on individuals suspected to be unlawfully present in the United States.*

On page 23, in discussion of Paragraph 36 of the Court's Supplemental Order, the report notes that MCSO has not conducted any Significant Operations or Patrols which required notification to the Monitor. *Plaintiffs do not disagree, but note that there have been worksite/identity theft operations during the relevant time period. The Monitor team had informed MCSO it would like to be made aware of such operations.*

---

[1] Plaintiffs note that the MCSO has designated the SID Operational Manual as confidential. If the Monitor attaches these comments to his report, information about what is contained in the Manual should be redacted.

On page 23, in discussion of Paragraph 37 of the Court's Supplemental Order, there is a reference to the "Special Operations Protocol." *Plaintiffs suggest this be changed to "Significant Operations/Patrol Protocol" for consistency.*

## Section 7: Training

Throughout the section, the draft indicates that the curriculum for the training on Supervisor Responsibilities is under discussion by the Parties and the Monitoring Team. More specifically, however, Defendants provided at least two cursory and bare-bones documents that did not meet the requirements for a "lesson plan" or curriculum. Plaintiffs have provided detailed comments indicating areas of deficiency. Initially, Defendants indicated that it was up to Plaintiffs to provide content that was missing or inadequate, but the Monitoring Team opined that it is Defendants' responsibility to draft a lesson plan that is compliant with the Court's requirements. *Plaintiffs recommend that the Report indicate that Defendants' initial drafts were deficient, and that Defendants are responsible for completing and have yet to complete the lesson plan for the Supervisor Responsibilities training session.*

On page 26, the Report discusses the Court's requirement that a licensed attorney teach any "legal matters" covered in the mandatory trainings. Plaintiffs have two observations on the subject of the qualifications of the instructors chosen by Defendants.

*First, Plaintiffs request that the Report indicate that until the eve of the first trainings on Bias-Free Policing, the Defendants were operating on the incorrect view that the entirety of that training does not cover "legal matters." They had scheduled non-attorneys to serve as sole instructors for multiple Bias-Free Policing sessions. We also request that the Report indicate that there will be continued monitoring of compliance on this requirement.*

*Second, Plaintiffs request that the Report make a record of the Monitor's decision, on Plaintiffs' objection, to disqualify Randy Means as an instructor based upon his conflict of interest in serving as an expert witness for MCSO in the* United States v. Maricopa County *case.*

On page 27, the Report discusses the Monitoring Team's plans for observing the training sessions in order to assess compliance with the Court's orders. *Plaintiffs request that the Report mention Plaintiffs' prior request that every training session be video recorded in order to facilitate observation by the Monitoring Team and Plaintiffs, as well as the Monitor's response that such video recording may be undertaken in the future to facilitate ongoing monitoring of compliance with the Court's training requirements.*

**Section 8: Traffic Stop Documentation and Data Collection**

On page 34, when discussing Paragraph 54 of the Court's Supplemental Order, the draft discusses MCSO's creation of various forms to collect traffic stop data. *The Order requires the MCSO to "develop a system" to ensure such traffic stop data is collected. Plaintiffs recommend the Monitor's report provide additional detail regarding MCSO's development of a* system *for data collection, not just the forms, and how the agency is doing in developing such a comprehensive system.*

On page 34, when discussing Paragraph 54(b) of the Court's Supplemental Order, the draft notes that the Monitor's review of the CAD printout for stops in a sample indicate the specified data is captured and "geocoded" with the time the stop is initiated and the time the stop is cleared. *During the* Melendres *litigation, the CAD system did not appear to capture the location for stops in a way that could be subject to geocoding (such as with longitudinal and latitudinal coordinates). Geocoding is important because it allows one to analyze a high volume of traffic stop data while controlling for stop location. We recommend that the draft specify whether the CAD system has been changed to allow for this.*

On page 35, when discussing Paragraph 54(e) of the Court's Supplemental Order, the draft notes that the Monitor team "identified 88 traffic stops where the post stop race, ethnicity and gender could be clearly identified. The stops included 32 white male drivers, 30 white females, eight Hispanic males, six Hispanic females, six black males, two black females, two Indian/Alaskan males and two Indian/Alaskan females." *These numbers suggest a possibility that deputies may be underreporting Hispanic vehicle occupants and listing them as white, which would limit the usefulness of the data collected. For example, in 2009, Arizona Department of Public Safety (DPS) officers reported stopping approximately 25% Hispanic motorists and 62% white motorists. See DPS Traffic Stop Data Analysis Study: Year 3 Final Report (2009) at pp. 38-39, 42, available at http://www.azdps.gov/About/Reports/docs/Traffic_Stop_Data_Report_2009.pdf. Plaintiffs suggest that the Monitor or the MCSO conduct an audit to ensure deputies are properly recording their best perception of the race/ethnicity of the individuals they stop.*

On page 35, when discussing Paragraph 54(e) of the Court's Supplemental Order, the draft notes that "Deputies did not indicate the race, ethnicity or gender of passengers when no contacts were made with them." *This is an issue Plaintiffs anticipated when they suggested that the data collection form be revised to clearly indicate that such information must be collected for passengers even when no contact is made. See Plaintiffs' April 21, 2014 letter to the Monitor. Plaintiffs make the same suggestion again.*

On page 42, in discussion of Paragraph 63 of the Court's Supplemental Order, the report does not mention that MCSO still needs to set forth a requirement in policy that camera recordings be retained for a minimum of three years. *Plaintiffs recommend the report state that the MCSO should do so.*

On pages 42-45, when discussing Paragraphs 64-48 of the Court's Supplemental Order, the draft does not note that the TraCS training was done in such a way that there is no record of who received training and when. However, the Executive Summary states that this would be discussed in the sections addressing Paragraphs 64-68. See pp. 9-10 (Executive Summary). *Plaintiffs recommend that this be included.*

On page 45, when discussing Paragraph 69 of the Court's Supplemental Order, the draft describes the requirement that supervisors conduct monthly review of data. *Plaintiffs suggest that agency policy require the monthly analyses be forwarded to CID, as noted in the Monitor's August 12, 2014 letter providing feedback on submitted policies.*

On pages 46-47, when discussing Paragraph 70 of the Court's Supplemental Order, the draft describes several steps taken by the MCSO to conduct reviews and analysis of the traffic stop data. *Plaintiffs suggest noting that potential interventions in case of possible racial profiling be memorialized in agency policy, as noted in the Monitor's August 12, 2014 letter providing feedback on submitted policies.*

## Section 9: Early Intervention System (EIS)

*Plaintiffs are still reviewing the new draft EIS policy and training recently provided by the MCSO and will share comments with the Monitor team separately.*

## Section 11: Misconducts and Complaints

On page 64, when discussing Paragraph 102 of the Court's Supplemental Order, the draft mentions an IA case that is more complex and therefor "should have been investigated by Internal Affairs." *Plaintiffs suggest that the Monitor set forth some guidance or criteria for when it is appropriate for a case to be investigated by IA and when it is appropriate for a case to be investigated at the division level. This may be influenced by who has access to IA Pro to do the needed analysis for an investigation.*

On pages 64-65, when discussing Paragraph 103 of the Court's Supplemental Order, the draft mentions audit efforts by the MCSO. *Plaintiffs suggest the Monitor say clearly that the audit efforts the agency has undertaken are inadequate.*

## Section 12: Community Engagement

On page 67, in discussion of Paragraph 109 of the Court's Supplemental Report, the draft notes that the first community meeting was held at the Arizona State University Preparatory Academy located at 300 E. University Drive, Tempe, Arizona 85281, in District 1. *The address of the Arizona State University Preparatory Academy is 735 E Fillmore St., Phoenix, AZ 85006, and it is located in District 2, not 1.*

On page 71, the report discusses Paragraph 115 of the Court's Supplemental Report pertaining to the Community Advisory Board (CAB) and their role in providing specific recommendations to MCSO about policies and practices that will increase community trust, among other responsibilities. *Plaintiffs note that the CAB members have expressed strong interest in providing inputs on the training that is required under the Court's Supplemental Order and on MCSO policies created or revised under the same. Plaintiffs believe their input would be quite valuable, and we ask that the Monitor team work with the parties to facilitate a process for that going forward.*

On page 71-72, the report discusses Paragraph 117 of the Court's Supplemental Report related to CAB meetings. *To provide additional detail for the Monitor's report, the CAB organized a very productive meeting with Latino community leaders on May 6th to introduce themselves as CAB members and discuss the community engagement provisions of the Court's order. The CAB will continue to meet with leaders of various communities throughout the county as part of their efforts to facilitate regular dialogue.*

On page 72, the report discusses Paragraph 118 of the Court's Supplemental Report related to CAB meetings. *To provide additional detail for the Monitor's report, in order to facilitate the CAB's role in gathering concerns from the community, the ACLU of Arizona launched a bilingual website, ChangingMCSO.org/CambiandoMCSO.org. The website serves as a place where the public can gather information about the monitoring process including the times and locations for community meetings, Monitor's reports, MCSO reports and other court filings. The website also includes a form for filing complaints, which are then directly conveyed to the CAB and Monitor team.*



# Maricopa County Sheriff's Office

**Joseph M. Arpaio, Sheriff**

*Court Compliance & Implementation Division*
*Response to Monitor's 8/22/14 Draft of First Quarterly*

The Monitor Team for the Maricopa County Sheriff's Office provided a draft copy of the First Quarterly Report from the Independent Monitor (dated August 22, 2014) on August 23, 2014, to the MCSO Court Compliance and Implementation Division.  In review of the draft copy, the MCSO would like to provide a response to the following areas:

- Page(s) 15 and 16, in the draft, relative to Paragraph 23 of the Court Order, states: "We reviewed CP-2 (Code of Conduct, effective 10/28/13), prohibiting the use of County property in a manner that discriminates.  CP-2 also prohibits the use of email in a manner that discriminates.  The wording of CP-2 supports compliance with this Paragraph 23.  However, CP-2 lists policy GM-1 (Electronic Communications and Voicemail) as providing more specific instructions as to the use of email by personnel.  **GM-1 was not supplied in support of this Paragraph**.  We have requested GM-1 to ensure it provides a consistent message. Additionally, MCSO has not provided proof of dissemination of CP-2 to Agency personnel.  Until we receive and review this information, MCSO is not in compliance with Paragraph 23."

  In response to this draft statement, specifically "GM-1 was not supplied in support of this paragraph"; GM-1 was originally filed with the court by the MCSO on 12-31-13 (Document 643-1, Exhibit A, pages 35 - 38).   CP-2 was also filed with the Court on 12-31-13 and reproduced to the Monitor Team on 4-7-14 and 5-21-14.  MCSO was not requested to provide another copy of GM-1 to the Monitor Team until August 2, 2014 (outside the time of this reporting period).  On August 22, 2014, MCSO advised the Monitor Team that GM-1 had been previously produced. For ease of reference an additional copy of GM-1 (Bates range Melendres Compliance 000567) has been included with this response.

- Page(s) 20 and 21, in the draft, relative to Paragraph 31 of the Court Order, states:  "MCSO notifies employees of changes to policies and procedures via its Briefing Board System.  MCSO defines this system as "an official informational publication produced by the Policy Development Section that contains material having the force and effect of Policy."  Prior to some policies being revised, time-sensitive changes are often announced in a Briefing Board, until the entire Policy can be revised and finalized.  We were provided with several Briefing Boards as part of our document request.  **We did not, however, consider them a substitute for a formal policy required by the Order**.

  In response to this draft statement, specifically "We do not, however, consider them a substitute for a formal policy required by the Order."  MCSO Policy GA-1, Development of Written Orders, lists Briefing Board under Definitions: ***Briefing Board***:  An official informational publication produced by the Policy Development Section that contains material **having the force and effect of Policy**.  Prior to some Policies being revised, time-sensitive changes are often announced in a

MELC011733

Briefing Board, until the entire Policy can be revised and finalized. Therefore, statements or directives in Briefing Boards that precede formal revisions to policy are policy and should be treated as such by the Monitor Team.

- Page(s) 34 - 37, in the draft, relative to Paragraph 54.a-m of the Court Order, states in relevant part: "We reviewed MCSO draft policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), EB-2 (Traffic Stop Data Collection), EA-5 (Enforcement Communications) and CP-8 (Preventing Racial and Other Biased- Based Profiling). In order to capture the information required for this paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Face Sheet, The Vehicle Stop Contact Supplemental Sheet, The Incidental Contact Receipt and the Written Warning/Repair Order for those motorists who commit a traffic violation or are operating a vehicle with defective equipment and provided with a warning. We also reviewed the Arizona Traffic Ticket and Complaint forms issued for violation of Arizona Statutes. We selected a sample of 94 traffic stops conducted by MCSO deputies from April 1, 2014 through June 30, 2014 for purposes of this review and assessed the collected data for compliance with Subparagraphs 54.a-54.m. Prior to April 1, 2014, MCSO **by its own admission did not collect all of information required by the Order**, and so we limited our sample to this period. **In order to be compliant the data should have been available beginning January 1, 2014**. All of the above listed documentation was used for our review of the following subsections of this paragraph. However, **MCSO is not in compliance with this Paragraph as a result of the missing information prior to April 1, 2014**."

The bolded statements are repeated throughout these pages. These are incorrect statements based upon the language of the Court Order. Specifically, paragraph 54 of the Court Order states (emphasis added), "*Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they resulted in the issuance of a citation or arrest.*" In accordance with this language of the October 2, 2013 Supplemental Order, the MCSO developed a system that was implemented April 1st, 2014 (180 days from the Effective Date), to capture all of the traffic stop data in handwritten form and electronically. The Court Order did not require MCSO to collect this data prior to April 1, 2014, unless it was in connection with a Significant Operation. MCSO did not conduct a Significant Operation during this assessment period of January 1, 2014 – June 30, 2014. Therefore, MCSO did collect all of the information required by the Court Order under this paragraph. There is no "missing information" prior to April 1, 2014 because there was no requirement to gather such information.


Thank you –

Captain Russ Skinner
Maricopa County Sheriff's Office
Court Compliance and Implementation Division

MELC011734