Timothy J. Casey (#013492)
James L. Williams (#026402)
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile:  (602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Civil Services Division
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Joseph M. Arpaio, et al.,<br><br>Defendants. | No. CV 07-02513-PHX-GMS<br><br>**DEFENDANTS' RESPONSE BRIEF REGARDING MONITOR'S SEPTEMBER 28, 2014 UPDATE AND ASSESSMENT OF MCSO'S ARMENDARIZ AND RELATED INVESTIGATIONS** |

Defendants Joseph M. Arpaio and the Maricopa County Sheriff's Office ("MCSO") (collectively, "Defendants") respectfully submit this response to the Monitor's September 28, 2014 Update and Assessment of MCSO's Armendariz and Related Investigations (the "Monitor's Update").

**I.     Introduction**

For the Monitor's efforts to best serve the Court, it is essential that accurate and complete information be presented.  Any failure to provide a full and accurate depiction of the MCSO's many efforts and accomplishments will inevitably lead to delays and wasted expenditures along the way to the all the parties' common goal – full and effective

compliance with the Court's orders.

The Monitor's Update ignores the substantial progress made in these Armendariz-related investigations and contains countless misstatements and inaccuracies, only the most important of which are addressed herein, namely:

(1) the Monitor's confusion and/or conflation of the nature of *administrative* versus *criminal* investigations and resulting suggestion that the MCSO use "coercive" powers/pressure in violation of state law, and

(2) the Monitor's inaccurate tracking of information and documents previously provided by MCSO, resulting in repeated, counter-productive requests for such information.

The Monitor has had constant and intimate involvement with the MCSO Professional Standards Bureau ("PSB") and the investigations at issue. Moreover, the Monitor has continually complimented PSB for its accomplishments in these investigations, especially since Captain Steve Bailey assumed command of PSB in early June. Commander John Girvin, Deputy Monitor, has stated to the MCSO that the difference in the investigative effort under Captain Bailey's direction is "night and day."

However, the Monitor's Update provides no such positive assessment regarding the progress that has been made by the MCSO or the leadership and direction that has been provided by Captain Bailey. Instead, focusing on a number of alleged "missteps and questionable decisions" that largely pre-date the change in command (and in many cases the Monitor's last report to which the Monitor's September 28 report purports to be an update), the Monitor insinuates that PSB is pursuing its investigations neither aggressively, nor in good faith.

Nothing could be further from the truth. Within days of assuming his new assignment, Captain Bailey assigned a new case agent and enlisted the support of numerous detectives from the Special Investigations Division ("SID") to vigorously pursue all investigative leads. Over 8,900 video clips have been recovered, reviewed and initially assessed for potentially problematic conduct. Over 400 video clips have been sent for secondary review by lieutenants to assess potential problems and identify them with specificity. More than 1650 items of evidence have been recovered, researched and, where

possible, linked to related videos. Background investigations of the potentially problematic videos have already generated 39 internal investigations, four (4) notifications to the Maricopa County Attorney's Office ("MCAO") to address pending criminal matters, and several areas that will require further training of MCSO deputies in specific areas of law enforcement.

If PSB or the MCSO was simply trying to reach "paper compliance" with the Court's orders, as the Monitor unfairly alleges, this voluminous undertaking would not have been made. Countless employee hours have been spent on these investigations by MCSO personnel, including the recovery, cataloging, and review of all items of evidence, the identification of all possible criminal or civil misconduct, and the research to conduct thorough and complete follow up into the history of Deputy Ramon "Charley" Armendariz ("Armendariz"). If the MCSO did not intend to "fully, fairly and expeditiously investigate and resolve... employee misconduct investigations," as recommended by the Monitor on page 40 of the Monitor's Update, PSB would not have gone to the great lengths necessary to recover and review for potential misconduct 190 discs of unreadable video files by a separate screen capture process that took five full-time detectives nearly five full weeks to duplicate in a frame-by-frame manner.

One of the "flawed" approaches the Monitor criticizes at length is the video collection survey that the Monitor states was hastily designed and failed to capture the Court-ordered information. The survey actually mirrored all relevant provisions of the Court's Order.

The Monitor criticizes the MCSO for not engaging in "coercive" investigative tactics and rejecting the Monitor's recommendation to conduct administrative interviews in parking lots to gain "the element of surprise," even though such tactics are prohibited by Arizona law. When the MCSO has informed the Monitor of these limitations imposed by Arizona law, the MCSO and its counsel have been criticized for "resisting" the Monitor's efforts. The MCSO and the PSB have made every effort to comply with "recommendations" of the Monitor, but Defendants must perform their duties in accordance with the law.

It is the purpose of this Response to supply with the Court with the additional information, clarifications, and corrections necessary to fairly evaluate the MCSO's efforts.

## II. Administrative and Criminal Investigations

A *criminal* investigation seeks information regarding potential violations of state and/or federal criminal laws; suspects and interviewees must be granted all appropriate protections afforded by the U.S. Constitution. In contrast, an *administrative* investigation seeks information regarding potential violations of civil laws and/or agency policy(ies); such investigations of law enforcement officers must also comply with all statutory requirements provided in A.R.S. §38-1101, et seq. Statements made by officers during an administrative investigation are compelled and cannot be used against them in a criminal prosecution. *Garrity v. New Jersey*, 385 U.S. 493 (1967). This legal and investigatory distinction is crucial in assessing the Monitor's critique of PSB's investigations.

What is commonly referred to as the Law Enforcement Officers Bill of Rights confers upon law enforcement officers certain rights with respect to interviews during *administrative* investigations by their employers, including **pre-interview written notice** informing the officer of the **alleged facts** that are the basis of the investigation, the **specific nature of the investigation**, the **officer's status in the investigation**, <u>**all known allegations of misconduct that are the reason for the interview**</u>, **pre-interview copies of all complaints that contain the alleged facts** that are reasonably available, and the officer's right to have a representative present at the interview. A.R.S. § 38-1101(A).

These procedures expressly require full disclosure in advance of all the facts and allegations to the officer being investigated. In direct contrast to these requirements, the Monitor team stressed that the approach to gathering the audio/video recordings required by the Court should preserve the "**element of surprise**." For example, the Monitor stressed, as advocated in the Monitor's Update, that the "**coercive**" powers of PSB should have been used to gather all audio and video (not just that relating to traffic stops) ever taken by any MCSO deputies or posse members. The Monitor's position reflects a clear misunderstanding of Arizona state law, despite the MCSO's many (and continuing) efforts to clarify the legal requirements. If a law enforcement officer is going to be questioned in an administrative investigation, he/she must be afforded all statutory rights associated with his employment. See A.R.S. §38-1101, *et seq*.

A. <u>Audio/Video Recording Collection was properly (and legally) handled.</u>

The MCSO has, and will continue to, "resist" the Monitor's recommendation that MCSO ambush its own deputies in violation of their due process rights, with respect to video collection or otherwise. This legal requirement was discussed extensively with the Monitor at the inception of the investigation on May 15 during the meeting with Chief Deputy Sheridan, MCAO attorney Christine Stutz, and Captain Ken Holmes, then head of PSB. MCSO was resistant to the Monitor's suggestion that deputies should be approached by PSB investigators, without notice or warning, in the parking lot on the way into work and questioned about their use and preservation of audio/video recordings in violation of their statutory rights. Attorney Christine Stutz stated her disagreement with the Monitor's suggested approach,[1] and the Monitor ultimately acquiesced to a slightly less invasive approach of allowing PSB to gather the information as an audit-type process. It was this approach that Chief Deputy Sheridan ultimately agreed would be used, having forgotten his directive hours before to Chief David Trombi to take immediate action to gather the information through the chain of command. It was agreed that only after a potential policy violation was established would personnel be interviewed consistent with A.R.S. §38-1101. Again, this was not resistance by MCSO, but a requirement of the law.

The Monitor Update misstates that the survey directive regarding recording devices was "voluntary" and posits the "belief" that the survey process "failed to produce an accurate accounting of recording devices that were in use throughout the period in question, as well as the total number of actual recordings." The Monitor's "belief" is unfounded. The MCSO has collected over 2,000 videos from the surveys, over 2,000 videos from the HSU, and over 4,000 videos from former Deputy Armendariz, nearly 9,000 videos in all. The MCSO chain of command <u>directed</u> deputies to provide all such data to PSB under threat of disciplinary action. This was not a "voluntary" survey, as the Monitor continually alleges. It was a

---

[1] Ms. Stutz also disputed the Monitor's suggestion that the failure to preserve videos in the past constitutes a sufficient basis for an administrative investigation because it is undisputed that MCSO lacked policies and procedures about the use of recording devices and, therefore, could not allege misconduct by deputies for failing to impound videos in the past unless the videos otherwise held evidentiary value.

directive from the MCSO chain of command that required all personnel affected to respond.

The Monitor has been advised since June 13, 2014 that <u>all</u> sworn, compensated personnel[2] responded to this survey directive. The Monitor criticizes MCSO for failing to receive all of the responses by the initially set deadline of May 21, 2014, but fails to note that, when Chief Deputy Sheridan was advised that not all responses had been received, he ordered Chief Trombi to issue a second directive that would hold an employee's entire chain of command responsible for a failure to respond. All of this information was supplied to Chief Kiyler of the Monitor team on June 11, 2014. <u>In fewer than 48 hours</u>, all remaining surveys from compensated sworn personnel had been received. The Monitor's Update ignores all of these efforts and accomplishments, but instead focuses on the Monitor's suspicions of the inadequacy of this investigative process addressed further in Section II, *infra*.

The Monitor has continually questioned whether self-reporting was the correct investigatory mechanism because the Monitor presupposes that deputies would destroy evidence of their own misconduct. But this has proven not to be the case. All Self-Reporting Survey recordings received **are** being reviewed for Policy and/or Criminal violations. MCSO received no less than 2,163 videos from the self-reporting surveys, with 30 incidents being forwarded for lieutenant review. Of those 30 lieutenant reviewed videos, 6 were referred back to the Division for investigation which could result in disciplinary action. This information was presented in detail to the Monitor Team during the August 25th – 27th meetings with Chief Kiyler and Chief Martinez along with the results of the lieutenant reviews on the Armendariz videos and HSU videos.

    B. <u>Unfair Criticism of Investigative Techniques Due to Monitor Conflation of Criminal and Administrative Investigations</u>

---

[2] MCSO has continued to pursue responses from non-compensated reserve personnel and from volunteer posse members. Admittedly, the MCSO's databases for tracking MCSO posse personnel could be improved, and efforts are underway to update the rosters and to deactivate any posse personnel who have not completed any Court-ordered requirements: signing the attestation logs, completing the audio/video survey, or mandatory training.

In the Monitor's Update and during countless interactions with the MCSO, the Monitor has consistently confused (or conflated) the criminal and administrative interview and investigative processes.

1. *Monitor's Assumption of Deputies' Guilt*

Former deputy Cisco Perez, whose testimony the Monitor credits, was terminated from MCSO in September 2013 for *untruthfulness* following a criminal and administrative investigation that was the product of an eight-month-long wiretap conducted by MCSO on its own personnel. As a result of this wiretap, initiated by the MCSO, another former deputy is still facing criminal charges of human smuggling and drug trafficking, and several other MCSO employees were disciplined, terminated, or resigned. On June 5, 2014, following his termination, former deputy Perez raised allegations of taking of property (by himself *and others in HSU*) in an after-the-fact attempt to explain his misconduct to obtain unemployment benefits. Although his motives and his history call into serious doubt the veracity of his statements, PSB immediately notified the Monitor of his allegations and of their intent to pursue any possible criminal misconduct.

None of these actions by the MCSO/PSB are consistent with the Monitor's insinuations that the MCSO/PSB intentionally overlooked or failed to act upon misconduct by MCSO personnel – they support the opposite conclusion. Moreover, the PSB investigator who is extensively criticized by the Monitor had, in fact, been previously assigned to this aggressive wiretap investigation and interviewed Deputy Perez, who was later terminated for untruthfulness. It is imperative that the Court also be made aware of these facts.

2. *Monitor's Lack of Knowledge About Historical Investigation*

The Monitor criticizes PSB for "put[ting] forth the theory" that the alleged misconduct was "confined to a small group of rogue employees" and that "this opinion would permeate the investigations and would inhibit good investigatory and interviewing practices." This so-called "theory" was actually the investigative conclusion of the aforementioned eight-month-long wiretap investigation and the misconduct it revealed. It was not theory but, rather, a fact proven by the prior investigation. The Monitor's assumption of widespread corruption, on the other hand, is not supported by the extensive

wiretap investigation or the nearly 50 interviews conducted during the recent criminal inquiry. The Monitor's theory of corruption is, in fact, only supported by the self-serving claims of a deputy terminated for dishonesty.

### 3. *Monitor's Overreaching Statements*

The Monitor's Update alleges that "poor interrogation skills were observed during the administrative and criminal interviews conducted in response to allegations made by Deputy Cisco Perez, who had been terminated." See Monitor's Update at p.2. However, at the time of the Monitor's submission, **no administrative interviews** had been conducted regarding the allegations made by former Deputy Cisco Perez. A *criminal* interview cannot be used to ask questions regarding *administrative* violations without the statutory prerequisites for an *administrative* interview being met. The Monitor's overreaching criticism appears to be more than mere confusion, as the Monitor recently requested (and received) a proposed script of questions that would be asked of the deputies in the *administrative* investigation relating to the allegations made by Perez - the potential mishandling of property and evidence.[3]

Nevertheless, the Monitor's suggested questions for the criminal interviews attempted to do just that – to use the criminal interview process to acquire information that was not related to a pending *criminal* charge, but instead as an improper tactic for establishing *administrative*/civil violations. MCSO's attempts to explain and maintain this distinction have been criticized as "resistance" and underlie many of the Monitor's criticisms, when, in fact, such actions by the PSB were to comply with the due process protections mandated by law.

The Monitor's criticism of the techniques used by PSB, including the failure to act on leads provided through the interviews, reinforces the Monitor's confusion or conflation of the distinction between criminal and administrative investigations. On page 34 of the

---

[3] There are eight (8) separate administrative investigations being handled by PSB in relation to Armendariz and HSU. The Monitor refers generally to an "HSU Administrative Investigation," and an "HSU Criminal Investigation" but the discussions with the Monitor team have addressed different aspects of different investigations with different decisions made for each, including the questions to be asked.

Monitor's Update, for example, the Monitor criticizes PSB for failing to follow up during a *criminal* interview to determine whether a deputy in the Human Smuggling Unit ("HSU") was responsible for the inventory and assignment of video cameras – an *administrative issue*. Such questioning would be utterly irrelevant with respect to the *criminal* conduct being investigated – i.e. potential theft of property.

Similarly, the Monitor's Update criticizes PSB for failing to follow up regarding the potentially improper impounding, retention, or handling of property. This is an *administrative* issue, not a criminal one. The *criminal* interview process cannot be used to delve into administrative matters and circumvent the legal requirements for conducting an administrative interview.

The Monitor's Update also complains that PSB failed to "consistently and properly provide *Miranda* warnings" and that the PSB investigator's "friendly" demeanor demonstrated poor interview technique that "lacked rigor." Both statements are inaccurate. The investigator's conduct was the result of (1) the questionable "investigative detention" (because employees were free to refuse to be interviewed) and the "reasonable suspicion" underlying the criminal inquiry for theft (given the lack of reliability of the source of this information), (2) the angst the investigator felt about being asked by the Monitor to explore *administrative* lines of questioning during a *criminal* investigation, and (3) the investigator's strategy with respect to obtaining information under the circumstances (including the fact that the investigation stemmed from a self-serving allegation of possible criminal conduct by a former MCSO deputy who was terminated for dishonesty, as discussed below).

The Monitor's Update states that "after significant hesitation and negotiation" the Monitor team was "afforded the opportunity to review and comment on proposed questions in the criminal investigation." The only hesitation on the part of MCSO, aside from the legal constraints of the 4th Amendment and A.R.S. §38-1101 et seq., was to scripting questions at all. Trained investigators do not write a script of questions in advance of their interviews but work with a framework of question topics and adapt their questions to the reactions and

answers provided by the witness.[4]  This Monitor approved the Court-ordered training for all deputies, which includes this statement: "the initial suspicion that gave rise to the justification for the investigative detention must remain the focus of the questioning and investigative techniques during the encounter."  The Monitor's suggested line of questions for the *criminal* investigation went well beyond the "initial suspicion that gave rise to the justification for the investigative detention," even assuming that such interviews rise to the level of an investigative detention and that the statements made by Perez give rise to "reasonable suspicion" of theft.

The Monitor's complaint[5] that it was not made aware of the commencement of interviews in the criminal inquiry until June 16 is false.  PSB notified the Monitor of the allegations made by the former deputy on June 12, that Captain Bailey called Deputy Monitor John Girvin that same day to discuss the matter, and that PSB notified the Monitor in writing on June 13 that the criminal inquiry had been initiated, reciting the prior call to Commander Girvin.

Finally, the Monitor's Update states that this criminal inquiry "derailed" the overall investigative effort.  However, during the entire criminal inquiry, the video review process continued, the cataloging and investigation of the evidence retrieved from Armendariz' residence continued, and PSB continued to draft weekly reports to the Monitor demonstrating this progress.

          C.        <u>Monitor's Concerns Regarding Prosecutorial Review</u>

The Monitor's criticism focuses in large part upon there being no criminal charges arising from the criminal investigation.  Such a conclusion, especially given the genesis of this particular investigation, presumes the guilt of MCSO deputies.  The Monitor's concern that "no official [prosecutorial] review had been conducted by MCAO" is unfounded and

---

[4] The Monitor did not request that the MCSO investigator in charge of the Armendariz death investigation submit her entire line of questions in advance of conducting interviews; and yet the Monitor raises no criticism of her interview techniques in this or any other respect.

[5] The Monitor's criticism even extends to the location of interviews, which was changed in order to address the Monitor's stated concerns that some of the interviews were only being recorded via audio, rather than audio-video.

mischaracterizes the interactions between MCSO and MCAO. On occasion, MCSO will contact MCAO over the phone or in an informal setting to discuss threshold issues of law and statutory interpretation to establish a minimum standard for submitting charges for prosecutorial review. It was the opinion of Captain Bailey and the investigator at that time that there was not sufficient evidence of a crime to submit the matter to the MCAO for prosecution. Submitting any type of report or transcripts of interviews[6] to the MCAO for prosecution without probable cause to support a crime would be a waste of resources.

In this matter, the investigator spoke with an MCAO prosecutor, who, based on the facts provided, was of the opinion that there was not sufficient facts of theft stated to meet a prosecutorial threshold, but stated that he would also staff the case with his prosecutorial team members. Theft requires an identifiable victim that can testify to the ownership of property and an expressible monetary value of an item taken without permission. None of those elements were present.

This information was reported the following day in the weekly PSB report to the Monitor. But during the following Monitor site visit, the Monitor *again* asked whether the MCSO intended to obtain a written opinion of the MCAO turning down any possible cases for prosecution. MCAO attorney Christine Stutz questioned the basis for the Monitor's "suggestion" – was the Monitor suggesting that all criminal inquiries where MCSO determines that there is insufficient evidence to charge someone with a crime be submitted to the MCAO for formal review and turndown? The response from Chiefs Kiyler, Martinez and Major Peters of the Monitor team was that it was the "high profile" nature of this case that warranted having a "second opinion" about the conclusion reached by the MCSO that there was no basis for pursuing any criminal charges.[7]

In an effort to satisfy the Monitor team, Captain Bailey advised that he would again review the Monitor's concern with Chief Deputy Sheridan. Thereafter, MCSO decided to

---

[6] Captain Bailey informed the Monitor that he thought the investigator had "conferred with and briefed the county attorneys on this case but was unsure." Captain Bailey was, however, confident that the county attorneys had not seen any transcripts or reports.

[7] It is not MCSO's determination whether criminal charges will be pursued. MCSO only submits facts where it believes a crime has been committed.

seek the additional assistance and opinion of the MCAO Law Enforcement Legal Liaison, Keith Manning, in order to quell the concerns of the Monitor that the MCSO was failing to pursue criminal charges as a result of its "preconceived notions" or "lack of investigatory skills." After reviewing the HSU Criminal Inquiry memorandum, on October 7, 2014, Mr. Manning confirmed that in order to proceed with a criminal prosecution, the state would need to be able to prove beyond a reasonable doubt that the item seized had some value and that there was an identifiable victim who could testify accordingly. There was no such evidence available.

### III. Inaccurate Tracking of Information and Documents Provided by MCSO

The MCSO faces a constant barrage of requests from the Monitor team for information and documents that have already been provided and questions from the Monitor team that call into serious question whether the documents being provided (often on multiple occasions) are even being reviewed. Unfortunately, these errors have contaminated a number of points raised in the Monitor's Update.

#### A. Recording Devices Survey

Against the merits of this monumental collection effort, the Monitor harps on the fact that the survey allegedly failed to capture the manufacturer of the device and the type of recording device (i.e. audio, video, and audio/video). In fact, the survey did capture the type of recording device exactly as the directive was made by the Court's May 15 Order. The MCSO had identified all types of cameras and recording devices that were purchased by the MCSO from 2007 forward. All of this information was supplied to the Monitor team by the Court Compliance and Implementation Division ("CCID") and then supplied again by PSB. Three separate tabs in the survey spreadsheet (*Original, Reformatted, and Splits*), reference **Audio and Video**, and if the specific device for each person was an **Eyeglass cam, Dash cam, Body-Mount cam, Taser-Weapon cam, Taser-Axon cam, Video, or Audio, as well as whether the device was County Owned or Personally Owned.** This wording was pulled directly from the May 15 Court Order. Updated versions of this spreadsheet have been supplied weekly to the Monitor Team since the beginning of July 2014.

Nevertheless, the Monitor continuously pushed the MCSO beyond the Court's orders

to obtain the make, model *and serial number* of every device that had been identified. At one point, after the Monitor was informed that certain recording devices had no serial numbers, Captain Bailey was required to bring in an example of one of the devices to prove that devices of this type contained no serial number. As evidenced by the Monitor's Update (p.8), the Monitor has now finally agreed that compliance with the Court's Orders required "at a minimum, the agency must capture the type of device. . . and its recording capability… and any other information that is readily available (make, model, serial number) should be noted." This information has been provided to the Monitor on numerous spreadsheets provided to the Monitor team on a weekly basis. Yet, as late as the Monitor's most recent site visit during the week of September 22-26, 2014, the Monitor team still did not believe that this information had been provided. Detectives and analysts were required to explain, yet again, that the Court-required information had been collected and recorded on the summary spreadsheets.

The Monitor Update indicates the video spreadsheet did not capture specific notations regarding policy and law violations. This is an inaccurate statement. During the in-service training, detectives were advised that if they saw a policy, law or civil rights violation, the detectives were to indicate the video needed "further review" by a Lieutenant. This process was clearly outlined to the Monitor Team during their visit in June 2014 and in subsequent site visits in July, August and September 2014. The videos that were referred to a Lieutenant for further review included columns that focused on the type of violation, (e.g. policy, A.R.S. or civil rights violation) that was observed in the video and the personnel involved. In a memorandum dated July 21, 2014, PSB submitted an action plan to the Monitor Team detailing the process in which the Lieutenants Reviews would occur. The results of the Lieutenant Review process were discussed in detail with the Chief Kiyler and Chief Martinez during the August 2014 site visit. The PSB team reviewed the outcome of the videos that were referred for further review with the Monitor Team including how many were referred to the Divisions or PSB for further investigation and possible disciplinary action. Case Summaries for each of the incidents that were referred back to the Division or to PSB were submitted to the Monitor Team in the September 17 and September 24, 2014

Weekly reports.

### B. Investigative Plans

The Monitor has inserted itself in virtually every aspect of the investigative process. After the Monitor criticized the lack of a comprehensive investigatory plan in late May, more detailed investigative plans were developed and submitted, including a supplemental investigatory plan dated June 12, 2014. Following that plan, numerous action plans have been submitted to the Monitor team identifying every significant milestone step in the investigatory process. The Monitor also receives a written weekly report on all of the investigative actions taken, in addition to their numerous site visits, phone calls, and emails about these investigations.

### C. Physical Evidence

The collection of evidence from Armendariz' residence was initially done by detectives from MCSO's District Two, not the Special Investigations Division ("SID") as the Monitor Update states. The evidence was not packaged consistent with MCSO standards. Multiple items of evidence were packaged together, resulting in an inaccurate number of the total items of evidence being reported. The evidence was later repackaged and renumbered by MCSO SID. SID also discovered and seized additional items of evidence from other locations. However, *with the agreement of the Monitor Team*, MCSO has continued to refer to these items as the "618" items or the "618" list. The Special Investigations Division ("SID") was tasked with research and intelligence as to the seized items in order to ultimately correlate those items with the individuals and incidents from which they were seized.

The Monitor's Update at page 14 states that the SID's research was being input into a spreadsheet "which *will then be compared* to traffic stop data." (Emphasis added.) This task was accomplished when the spreadsheets of video reviews were merged[8] with the

---

[8] Although the Monitor claims credit for the concept of a "merged" spreadsheet, the concept was actually suggested and implemented by the MCSO. The Monitor also alleges that the spreadsheets have been improved based upon the Monitor's suggestions. In fact, the spreadsheets have been modified multiple times as a result of the Monitor's inquiries, often

14

evidentiary spreadsheets in August 2014. The report goes on to state "[e]very document *is intended to be identified* and cataloged on the spreadsheet." (Emphasis added.) This task was accomplished on approximately August 15, 2014. In fact, during the Monitor's September site visit, the Monitor team was advised that MCSO was now going to begin contact with those civilians for whom the MCSO was unable to locate any related video or other traffic data pursuant to the Action Plan that was drafted and submitted to the Monitor on June 19, 2014. A revised plan of action began to be developed on September 26, 2014 and was completed and provided to the Monitor on October 2, 2014.

PSB has kept the Monitor advised of these efforts, and supplemental reports were written on every aspect of the repackaging and recovery of evidence. The Monitor has never requested to review these supplemental reports or anything related to the handling of the evidence other than the MCSO's spreadsheets of data.

Nevertheless, the Monitor's Update ignores all of this information received from PSB and made available to the Monitor and simply alleges that "MCSO continues to list multiple pieces of evidence in a single line item." The Monitor's Update also inaccurately claims that "On September 22, 2014, Capt. Bailey advised that there has been minimal follow up on the evidentiary items that were seized." What Captain Bailey actually advised the Monitor was that there had been extensive research conducted on every item of evidence but that no civilian/citizen contact had been made at that time. MCSO advised the Monitor Team that it had researched all items of property found in the Armendariz home, including searching through all of his TOC data (over 70,000 lines of information) to confirm whether or not he had run the identification. In all, by researching CAD history, his TOC history, JMS Booking history, traffic stop video data, and Citation/Tow information for Armendariz, there were 239 items of searchable property that could not be linked by information in MCSO database searches. Those items will be followed up by civilian interviews and a "log-scan" that can be provided by the Department of Public Safety.

---

for information already contained in the previous version of the spreadsheet. Unfortunately, the modification of the spreadsheets to address these requests has also consumed a considerable amount of the analyst's time and slowed progress.

It is a misrepresentation of facts by the Monitor to insinuate minimal follow-up has been done on the items of property found in the Armendariz home; almost 100,000 lines of data have been searched on each item of property to try and understand why that piece of property was found in his residence.

### D.   Copies of Videos

The Monitor team repeatedly demanded instantaneous reproduction of the video evidence retrieved from the Armendariz residence and supplied in response to the surveys. Yet, the Monitor did not even retrieve their copies of hundreds of video discs at issue until August 28, 2014, even though all videos had been copied (at great expense in terms of MCSO personnel time) and offered to the Monitor in July 2014. Captain Bailey even reminded the Monitor team of the availability of those videos on August 1, 2014.

### E.   Armendariz' Personnel History

With respect to Armendariz' personnel history, pages 18 and 19 of the Monitor's Update discuss what occurred in June 2014 and the information Captain Ken Holmes reported to the Monitor team at that time. The Monitor is critical of Captain Holmes' reporting of what he had learned "anecdotally" about Armendariz' personnel history from his subordinate investigators. The Monitor's Update is also critical of Captain Holmes for being "unable to provide specific documentation to support the assertions he made about the supervision of Armendariz."

This criticism is unproductive at this time. Captain Holmes was replaced by Captain Bailey on June 6, 2014, nearly four (4) months ago. And the MCSO has, in fact, provided the Monitor team with complete copies of Armendariz' personnel and division files on May 22, 2014 and May 28, 2014. This update renders the Monitor's historical critique irrelevant.

### F.   Timeline of Armendariz Citizen Complaints and Merging of Data

The Monitor's Update states that, as of July 17, 2014, PSB "began to construct a timeline of Armendariz citizen complaints, PSB investigations and other incidents that occurred while Armendariz was employed with the MCSO" and that "**when this timeline is completed**, the MCSO and the Monitoring Team should have a much clearer understanding of the Armendariz employment history."

In actuality, the timeline was started by Sergeant Fax on June 30, 2014, completed, and provided to the Monitor in person during the September 22-26 site visit and by electronic document production with the weekly PSB report. Moreover, it is notably "paraphrased" in the Monitor's Update. The plan for merging of the spreadsheet data began June 25, 2014, action plans were submitted to the Monitor on this process in early August and the merging was completed by the August 15, 2014 weekly report, subject to being audited for quality assurance.

### G. Video Review Process

The Monitor's Update states that no guidelines were provided to the detectives who were assigned to review videos for possible criminal or civil misconduct. This is inaccurate. Both Sgt. Morris and Sgt. Fax drafted written guidelines that were provided to the Monitor Team and Sgt. Fax provided an in-service to all detectives who were assigned to this process. The MCSO further provided a written action plan for the lieutenant review process as well as in-service training.

### H. Pending Investigation of Armendariz' Supervisors

The Monitor's Update alleges that Armendariz' supervisors failed to take administrative action against Armendariz. Once again, however, the Monitor fails to provide to the Court the most crucial information with respect to this complaint – that the MCSO has a pending administrative investigation concerning this very matter. By omitting this salient fact, the Update gives the appearance that MCSO tacitly approves of such conduct or is treating it with "nonchalance."

Finally, the Monitor's criticism of the promotion of persons while an administrative investigation is pending not only raises again the concern that the Monitor has presumed the guilt of such persons but also ignores that such persons may be removed from such positions at any time, for any reason (or no reason) at the pleasure of the Sheriff or his designee. While the Monitor team states to MCSO that "personnel decisions are yours to make," the Monitor's Update is consistently critical of all such decisions.

## V. Conclusion

The Monitor's Update is premised upon misstatements, material omissions,

mischaracterizations, and unfounded assumptions that create the false appearance of an organization not deeply committed to conducting its criminal and administrative investigations with the utmost integrity and vigor and in compliance with Arizona law and the Court's orders.  The MCSO's investment in these investigations, whether measured by time, expense, or work product, evidences its sincere commitment to these endeavors and earnest desire that justice be served.

The MCSO is willing to provide *under seal* or for the Court's *in camera* inspection, copies of the documents supporting this Response and will ensure the attendance at the October 28, 2014 hearing of members of the PSB to provide to the Court *under seal* such additional updates and information as the Court requires regarding these investigations.

DATED this 21st day of October, 2014.

                                                        SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

                                                        *s/James L. Williams*
                                                        James L. Williams
                                                        Timothy J. Casey
                                                        1221 E. Osborn Rd., Suite 105
                                                        Phoenix, Arizona 85014
                                                        Counsel for Defendants Joseph M. Arpaio and the Maricopa County Sheriff's Office

                                                         Thomas P. Liddy
                                                         Deputy County Attorneys, Civil Services Division
                                                         Maricopa County Attorney's Office
                                                         222 N. Central, Suite 1100
                                                         Phoenix, Arizona 85004
                                                         Co-counsel for Defendants Joseph M. Arpaio and the Maricopa County Sheriff's Office

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

Stanley Young, Esq.
COVINGTON & BURLING, LLP

18

333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

Cecillia Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

Andre Segura, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Counsel for Plaintiffs

Jorge Castillo, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

Thomas P. Liddy
Deputy County Attorneys, Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100
Phoenix, Arizona 85004
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

*s/Eileen Henry*
Eileen Henry, Paralegal
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.