1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,               )
5                                     )
                     Plaintiffs,      )   CV 07-2513-PHX-GMS
6                                     )
                     vs.              )   Phoenix, Arizona
7                                     )   October 28, 2014
     Joseph M. Arpaio, et al.,        )   3:04 p.m.
8                                     )
                     Defendants.      )
9    _____ )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17   (Status Conference, Pages 1-80, Sealed Proceedings Omitted)

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24

     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                         A P P E A R A N C E S

2

3   For the Plaintiffs:         Cecillia D. Wang, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
4                               FOUNDATION
                                Immigrants' Rights Project
5                               39 Drumm Street
                                San Francisco, California  94111
6                               (415) 343-0775

7                               Andre Segura, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
8                               125 Broad Street, 18th Floor
                                New York, New York  10004
9                               (212) 549-2676

10  For the Defendants:         Timothy J. Casey, Esq.
                                James L. Williams, Esq.
11                              SCHMITT, SCHNECK, SMYTH,
                                CASEY & EVEN, P.C.
12                              1221 E. Osborn Road
                                Suite 105
13                              Phoenix, Arizona  85014-5540
                                (602) 277-7000
14
    For Defendant Arpaio:       Thomas P. Liddy, Esq.
15                              Senior Litigation Counsel
                                MARICOPA COUNTY ATTORNEY'S OFFICE
16                              Civil Services Division
                                222 N. Central Avenue
17                              Suite 1100
                                Phoenix, Arizona 85004
18                              (602) 506-8066

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2

3            THE COURT:  Thank you.  Please be seated.

4            THE CLERK:  This is civil case number 07-2513,

5   Melendres v. Arpaio, on for status conference.                  15:04:40

6            Counsel, please announce your appearances.

7            MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

8   and Andre Segura of the ACLU Immigrants Rights Project for the

9   plaintiff class.

10           THE COURT:  Good afternoon.                             15:04:52

11           MR. SEGURA:  Good afternoon.

12           MR. CASEY:  Your Honor, Tim Casey.  Along with me from

13   my law firm is James Williams and Maricopa County deputy

14   attorney Tom Liddy.

15           Also with us, Your Honor, from the MCSO is Chief Jerry  15:05:05

16   Sheridan.  Also is Sergeant Dave Tennyson.  Going from left to

17   right.  Ser -- excuse me, Captain Steve Bailey.  Deputy county

18   attorney Christine Stutz.  Also from the MCSO is Chief Scott

19   Freeman.

20           I'd also like to have on the record that the Chairman   15:05:31

21   of the Maricopa County Board of Supervisors, Denny Barney, is

22   here, along with the county manager, Tom Manos, sitting to his

23   immediate right.

24           At the counsel table, I don't want to be presumptuous,

25   but Doug Irish from the Maricopa County Attorney's Office is    15:05:48

 1    here with his client, deputy county manager Sandi Wilson, and

 2    her counsel, Kate Baker, in her law firm.

 3            THE COURT:  All right.  Thank you.  We have a lot to

 4    do this afternoon.  I'm going to pretty much keep it under my

 5    control.  If we don't finish what we have to do this afternoon    15:06:08

 6    I will reschedule.  But I would like to, if I possibly can, get

 7    it done this afternoon.

 8            Let me tell you how I plan to proceed.  There are

 9    really five separate matters.  The first has to do -- the first

10    that I want to address has to do with -- I'll ask a question to    15:06:25

11    the plaintiffs, but then I want to get into the recovery of

12    recordings made by MCSO personnel that were not disclosed

13    during the course of the underlying lawsuit, and to the --

14    explore the extent to which we have any disagreements about the

15    monitor's report.                                                  15:06:42

16            I will probably have the monitor make a summary of his

17    report in the first instance unless the plaintiffs have an

18    objection to the disclosure of that report.  After we do -- or

19    handle matter relating to the recovery of the recordings I will

20    then get into the report itself, the monitor's report.  It has    15:07:02

21    four or five distinct categories, and I'll hear anything you

22    want to say about that from the MCSO.

23            After that, we will discuss the contact between the

24    monitor and the Maricopa County Administration.  After that,

25    we'll talk about Sheriff Arpaio's statements that he'd do the     15:07:22

1    Guadalupe operation all over again.  After that, I'm going to

2    close and seal this hearing and only parties will remain as we

3    will have some specific questions -- as I will have some

4    specific questions about ongoing matters that I think are

5    appropriately kept privileged.                                    15:07:41

6              Everybody clear how I intend to proceed?

7              MR. CASEY:  The defense is, Your Honor.

8              THE COURT:  All right.  Ms. Wang?

9              MS. WANG:  Yes, Your Honor.

10             THE COURT:  Ms. Wang, let me first ask, and you may     15:07:49

11   have read my report yesterday, you did file your response to

12   the monitor's report under seal.  Maricopa County did not.  I

13   assume that they don't mind if it's public, I don't mind if the

14   monitor's report is public, I don't mind if your response is

15   public, but because you'd filed your report under seal, I        15:08:05

16   wanted to give you the opportunity to object.

17             MS. WANG:  Your Honor, plaintiffs do not object to

18   either the monitor's report or the plaintiffs' response to it

19   being part of the public record.

20             As we noted in our notice that we filed at the time we  15:08:17

21   lodged our response under seal, we filed it under seal merely

22   in an abundance of caution, given the defendants' pending

23   objection.  I believe we filed it before defendants filed their

24   response.  If they had filed theirs first, I probably would

25   have just filed ourself publicly.  So at this time I would ask    15:08:38

1    that the Court deem our response to be part of the public

2    record of the Court.

3            THE COURT:  All right.  I will sign an order, then,

4    unsealing your response, and I will file the Maricopa County --

5    or I will file the monitor's report to me.                    15:08:50

6            Mr. Casey.

7            MR. CASEY:  Your Honor, as to the monitor's report, we

8    request that you allow us to submit to the Court within 24

9    hours appropriate redactions, because there are matters in

10   there, particularly names, that need, under Title 38, to be    15:09:06

11   excluded.  We understand --

12           THE COURT:  Well, I'm not sure that you haven't waived

13   any right to request that now.

14           MR. CASEY:  No.  Your Honor, with all due respect --

15           THE COURT:  Guess what?  I get to make the call,       15:09:19

16   Mr. Casey.

17           MR. CASEY:  Yes, Your Honor, but I'm allowed to make a

18   record.  I just wanted to point out for the Court that in our

19   filing we did not identify any names or enough information that

20   would be able to connect.                                      15:09:30

21           THE COURT:  All right.  I'll give you 24 hours to

22   submit proposed redactions.

23           MR. CASEY:  Okay.  Thank you, Your Honor.

24           THE COURT:  I'm not sure that I'll take them, but --

25   but I think that -- I respect the fact that you're trying to   15:09:36

 1  protect an ongoing investigation, and certainly I want to do

 2  that, too.

 3          MR. CASEY:  Thank you, Your Honor.

 4          THE COURT:  To the extent, I think, that you've

 5  legitimately done that and the plaintiffs have no objection, we      15:09:45

 6  will make that redaction.

 7          I, however, am going to invite the monitor to

 8  summarize his report, and if in the summary you are concerned

 9  that he names any names that shouldn't be named, you better be

10  on your feet pretty quickly.                                         15:10:00

11          All right.  Monitor Warshaw, could I please have you

12  give us a brief summary of your report and what we're

13  addressing here today.

14          MONITOR WARSHAW:  Yes.  Good afternoon, Your Honor.

15          The monitors were advised on April 30th that the            15:10:14

16  Phoenix Police Department, in response to a burglary call at

17  the home of Deputy Charlie Armendariz, found drugs and other

18  items that appeared to be evidentiary in nature.  We learned

19  that MCSO was dispatched to the scene, which ultimately led to

20  a May 1st search warrant.                                            15:10:34

21          At that time, a variety of items were found, none the

22  least of these being hundreds of DVDs which captured traffic

23  stops made by Deputy Armendariz.

24          On May 2nd, Deputy Armendariz was interviewed as part

25  and parcel of a criminal statement, at which time he made          15:10:51

1    reference to other members of the Maricopa County Sheriff's

2    Office who had deposited items, videos and perhaps other items,

3    through a third person at his house, that's Armendariz's house.

4          On the 4th of May, Armendariz had barricaded himself

5    in his house.  He was taken to a hospital.  On the 5th of May,       15:11:17

6    he was booked on drug and other charges.  On the 7th of May,

7    the Probation Department drew a warrant.  On May 8th, during

8    the execution of this warrant, which was done by units from the

9    Maricopa County Sheriff's Office, entry was made into the

10   house, during which time they discovered the body of Deputy        15:11:33

11   Armendariz.  On the evening of May 8th I received a phone call

12   from Chief Deputy Sheridan, who advised me of this development.

13         Our first concern was the decision by the Maricopa

14   County Sheriff's Office to essentially seize the investigation

15   of the Armendariz death from the Phoenix Police Department, as      15:11:53

16   Mr. Armendariz's home was clearly within the limits of the City

17   of Phoenix.  The monitoring team kept in touch regularly with

18   the Maricopa County Sheriff's Office from that point

19   thereafter.

20         On May 14th, this Court held a hearing during which           15:12:09

21   the monitoring team was ordered by the Court to assist the

22   Maricopa County Sheriff's Office in the conduct of its

23   investigation.  Specific details as to what our mandate was was

24   committed in writing by the Court on May 15th.

25         But getting back to May 14th, during a lengthy meeting        15:12:28

1   in the afternoon, I, and other members of the monitoring team,

2   met with Chief Deputy Sheridan, then-Captain of Internal

3   Affairs Captain Kenneth Holmes, and Ms. Christine Stutz from

4   the Maricopa County Attorney's Office.  That was a long

5   exchange at which time, or by its conclusion we had reached an            15:12:51

6   investigative course of action.

7          Late that afternoon we came to this Court to report to

8   the Court on the status of our dialog with the Sheriff's

9   Office, only to be interrupted by a phone call from

10  Chief Deputy Sheridan, who advised me that earlier in the day a           15:13:09

11  different course of action, one that was specifically contrary

12  to what we had mutually agreed upon, had been hatched.

13         We were perplexed that present at the Maricopa County

14  Sheriff's Office meeting in which we were in attendance were

15  Ms. Stutz and Chief Sheridan, and we learned eventually that            15:13:33

16  the decision that had been made taking the department in a

17  different direction included their attendance as well.

18         We learned that at that meeting earlier in the

19  afternoon it was determined that Deputy Chief Trombi would

20  issue a survey via e-mail to all personnel in the police                 15:13:56

21  department, this being contrary to what we earlier had decided.

22  There were many turning points in this investigation, but

23  unfortunately, the greatest turning point was right at the

24  outside when we believe that against our specific advice, the

25  Maricopa County Sheriff's Office compromised its ability to              15:14:22

1    determine if other members of the Maricopa County Sheriff's

2    Office had in fact engaged in videoing or audioing of traffic

3    stops.

4         In the report I filed with the Court and in subsequent

5    responses filed by the parties, specifically the defendants,          15:14:42

6    there have been numerous references to administrative and

7    criminal investigations.  In sum and substance, there has been

8    only one criminal investigation that we're aware of which I

9    shall discuss in a moment.  But from the inception, I would ask

10   that the Court be made aware that it was the original thinking        15:15:05

11   of the Maricopa County Sheriff's Office that an attempt to

12   determine the -- the process through which Deputy Armendariz

13   had came into possession of licenses, passports, and assorted

14   other identifications, that it was the MCSO's thinking that a

15   community satisfaction survey be undertaken, which we felt was        15:15:32

16   a ruse as a means to determine how all of these items came into

17   the possession of Deputy Armendariz.  We wholly rejected that.

18        During the course of this investigation other

19   information came to the attention of the MCSO and the

20   monitoring team, specifically information relevant to a former        15:15:56

21   deputy who had alleged that members of the Human Smuggling Unit

22   had, quote, pocketed items from, quote, safe houses that had

23   been raided and taken them back to the HSU office.  This led to

24   the opening of a criminal investigation in which 46 personnel

25   were given their Miranda rights.                                      15:16:22

1        I'd like to at this time emphasize in our collective

2   judgment as a monitoring team, and we have hundreds of years of

3   experience, we have never seen, having viewed a good number of

4   the interviews that occurred as part and parcel of that

5   criminal inquiry, we had never seen a more deficient,                15:16:39

6   unprofessional set of aimless interviews, interviews replete

7   with extraordinary familiarities, informalities, and apologetic

8   treatment towards those who were being interviewed.  This, in

9   our view, Your Honor, called into question seriousness in which

10  the Maricopa County Sheriff's Office had taken the order of        15:17:05

11  this Court.

12        We learned that there were no policies on the use of

13  videos.  We learned that the handling of evidence was at best

14  done loosely.  And notwithstanding the exchange of general

15  cordialities between our team and members of the MCSO, we would    15:17:28

16  have to say that our interaction with the MCSO as it pertains

17  to this investigation we felt they displayed a cavalier, if not

18  a contemptuous, attitude towards our assistance, and, by

19  extension, the order of this Court.

20        We were perplexed that they had removed Captain Holmes        15:17:50

21  from Internal Affairs.  Captain Kenneth Holmes had been the

22  original commander of Internal Affairs with whom we had dealt.

23  We were led to believe that this had been done presumably

24  because of his leadership on this matter, but we were somewhat

25  puzzled by the fact that he was removed and promoted to a          15:18:14

 1   chief's position.

 2            We were equally puzzled that Chief Trombi, who was

 3   instrumental in the dissemination of the e-mail that was

 4   contrary to our directions, and who's been in front of this

 5   court on another matter and has been NOI'd.  A notice of          15:18:33

 6   investigation for an administrative matter relevant to this

 7   case was also --

 8            MR. CASEY:  Excuse me, Your Honor.  I'm going to

 9   object on Title 38, privacy matters.

10            THE COURT:  All right.                                    15:18:48

11            MONITOR WARSHAW:  We were concerned --

12            THE COURT:  I'm going to just indicate that the

13   record, to the extent that it contains any names there, will be

14   stricken.

15            MR. CASEY:  Yes.  Thank you, Your Honor.                  15:19:05

16            MONITOR WARSHAW:  We were also concerned that the

17   department moved into the command of internal affairs the

18   incumbent, Captain Bailey, from his previous position as the

19   commander of the Special Investigations Division, especially

20   considering that the Special Investigations Division was the      15:19:27

21   parent component that oversaw the Human Smuggling Unit, and

22   these personnel assigned to the Human Smuggling Unit and their

23   activities would be the specific subject of the inquiry being

24   made by Internal Affairs.  At all times relevant to our

25   interaction with MCSO there was a representative from the         15:19:52

1   Maricopa County Attorney's Office present, and to the best of

2   our recollection, we can think of no time that there was any

3   concern that even approximated the kind that was articulated in

4   the defendants' response to us during the course and conduct of

5   our interaction with the Maricopa County Sheriff's Office to          15:20:19

6   date.  We cannot recall her objections or concerns regarding

7   any of the points that have been raised in the defendants'

8   response to us.

9          Regarding the closeout of a criminal investigation

10  that was specifically referenced to the possible taking of          15:20:35

11  property, we are also perplexed that an official closeout of a

12  criminal investigation is accomplished through an internal

13  memorandum sent from an investigative sergeant to a captain of

14  police with no signatories or approvals from anyone above that

15  particular position of captain of police.                            15:21:01

16         We have worked diligently to be of assistance to the

17  Maricopa County Sheriff's Office in the pursuit of the truth,

18  but as we have indicated on our report, that our best efforts

19  have been consistently met with resistance and displeasure.

20         THE COURT:  Thank you.                                        15:21:28

21         You care to address any of that, Mr. Casey?

22         MR. CASEY:  I'm not sure where to begin, Your Honor.

23         THE COURT:  Well, I'll tell you how I'd like to focus

24  the proceeding.

25         MR. CASEY:  Please.                                           15:21:37

1          THE COURT:  As I indicated, let's talk about the May

2    14th events first, and then we can move on to the report as a

3    whole.

4          Do you have anything to say with respect to the May

5    14th events?                                                    15:21:47

6          MR. CASEY:  You're talking specifically about the

7    Sheridan-Trombi?

8          THE COURT:  Well, I'm talking about the whole event.

9    We had a proceeding here under seal.

10         MR. CASEY:  Yes.                                          15:21:59

11         THE COURT:  That seal has since been removed.

12         MR. CASEY:  Yes.

13         THE COURT:  You've withdrawn any objection to the

14   removal of the seal.  And in that hearing you came forward, and

15   I commend you for it, you came forward and said that you had    15:22:09

16   found that in -- well, and let me just state this Deputy

17   Armendariz was a principal witness and had a lot of evidentiary

18   matters involved in the trial which resulted in the current

19   operation, the current exec -- well, current injunctive order

20   under which we're operating, and so his misconduct was alleged, 15:22:31

21   and then you informed us that upon his -- the investigation of

22   his apartment or his home after his decease, you uncovered a

23   number of self-recorded videos that he'd done in his

24   eyeglasses, and that you had been able to review a few of them,

25   and a few of them were what you called problematic --           15:22:54

1          MR. CASEY:  Yes, sir.

2          THE COURT:  -- meaning that they were in violation --

3   the videos showed stops in violation of department policy;

4   perhaps stops that were even illegal; perhaps stops that even

5   violated somebody's civil rights.  At that point you had not          15:23:07

6   reviewed anything close to all the stops.

7          You did note that on occasion, the few stops you'd

8   reviewed there were supervisors -- you were able to identify

9   one in which one of the HSU supervisors was present during the

10  stop, and so you had concerns that others administratively may          15:23:25

11  have been aware of these problematic stops and not taken

12  appropriate action.

13         You indicated as well that in addition to the videos

14  there were narcotics, there were a large number of driver's

15  licenses, credit cards, identification cards, other matters          15:23:42

16  that -- that posed some real concerns, that you wanted to keep

17  track of that investigation.

18         We had Deputy Sheridan, Chief Deputy Sheridan, avow

19  that -- I asked him if in fact it was possible that other

20  deputies were recording videos, and he indicated that it was          15:24:06

21  not in violation of department policy for deputies to record

22  their own videos; and, in fact, he had reason to believe that

23  that may have been happening, that there were other deputies

24  recording videos.  He, I think, came forth at that time with

25  other body mount videos that he was aware of that had been          15:24:22

1    recording -- been used by I think he said Lake Patrol.

2            In the video that you showed us that -- one of the

3    videos you showed us that Deputy Armendariz took with his

4    eyeglasses, we saw that there was a dash-mount camera in the

5    vehicle, and so Chief Sheridan couldn't tell me how many          15:24:41

6    dash-mount cameras there could have been out there.

7            I did express my surprise at the time, because

8    plaintiffs had asked for the recordings, all the recordings in

9    the earlier action, and the sheriff had requested that the

10   County fund all the vehicles and perhaps -- deputy chief,        15:24:58

11   perhaps he was unaware, and so he was unaware of how many more

12   videos there may have been out there that should have been

13   disclosed to plaintiffs and what they may have disgorged.

14           I think I acknowledge, and stop me if I say -- if I

15   missummarize anything.  I think I acknowledge that although I      15:25:14

16   could use my coercive power to make sure that we -- or to try

17   to recover from deputies any videos that they might have, that

18   we needed to operate quietly, so that we weren't alerting

19   deputies that might have been taking records -- and I didn't

20   say there were any; I'm not saying now there were any -- so we     15:25:38

21   would not be alerting deputies who might have problematic

22   recordings that they should ditch their recordings because

23   they're being collected.  I emphasized that I think a couple of

24   times; I've marked up the transcript if you want to see it.

25           I then directed the sheriff, who was here, and Chief       15:25:56

1    Deputy Sheridan cooperate with the monitor and together to

2    formulate a plan in which they could quietly go forward, the

3    monitor approve the plan, they would quietly go forward and do

4    their best to quietly see if they could get in all the videos

5    that may have been recorded by deputies without advertising          15:26:13

6    that we were collecting them.

7           I then believe that a meeting was set for a few hours

8    later in which you were to discuss and come to a course of

9    operation.  And then it's my understanding that the chief and

10   the sheriff went back and directed Chief Trombi, who was not         15:26:33

11   here, and, thus, you couldn't disclose to him anything that we

12   discussed here, they directed Chief Trombi to send out a memo

13   to all of the people under his command, one of which was one of

14   the people identified as -- in one of the problematic -- as the

15   supervisor in one of the problematic Armendariz videos and           15:26:54

16   informed them that we were going -- that you were going -- they

17   were responsible for collecting all the personal videos.  And

18   then, when the monitor came, you went through three hours, you

19   came up with a different plan.  Nobody told the monitor that

20   the plan you came up with was not possible because of what had       15:27:15

21   already happened.  In fairness to Chief Sheridan, he called

22   when he realized that he'd already messed that up and the

23   monitor was back in my chambers.  Do you disagree with any of

24   that?

25           MR. CASEY:  There's -- Your Honor -- no is the short         15:27:33

 1   answer.

 2           THE COURT:  Well, let me ask you, then.  And we don't

 3   have to spend a whole lot of time worrying about this if "no"

 4   is the short answer.

 5           The plaintiffs have asked for certain remedies; you've      15:27:47

 6   probably seen what those remedies are.

 7           MR. CASEY:  Yes.

 8           THE COURT:  I made a note of them.  They request a

 9   finding that MCSO committed numerous and serious additional

10   discovery violations that resulted in the failure to provide       15:27:57

11   plaintiffs with relevant evidence prior to trial, and that that

12   resulted in the destruction of much of that evidence.  That all

13   of these discovered recordings that are still in existence in

14   response to plaintiffs' discovery requests should be produced

15   to them immediately, and that they should be awarded their        15:28:14

16   attorneys' fees for that failure.

17           Do you have any dispute with any of the relief that

18   they request?

19           MR. CASEY:  Yes, two -- a couple of points, Your

20   Honor.  First of all --                                           15:28:28

21           THE COURT:  Oh, by the way --

22           MR. CASEY:  Sure.

23           THE COURT:  -- before I forget --

24           MR. CASEY:  Yes, sir.

25           THE COURT:  -- in the ensuing -- in the end, the          15:28:33

 1  monitor and MCSO was not able to implement the plan that they

 2  arrived at with the monitor, but they did do a survey; they did

 3  get some -- some recordings in.

 4          In addition, they found that virtually every

 5  detective -- or every deputy and every sergeant had audio                15:28:51

 6  recording devices, and had during the period.  They found that

 7  HSU, since 2008, had required recordings and had still kept

 8  some of those recordings and they were there; and there were

 9  other recordings that were found that have since been turned

10  over.  But it does seem to me, at least by my review of -- and           15:29:14

11  I realize that there's some problematic stuff, there has been

12  since from the beginning, because the date stamps on the --

13          MR. CASEY:  Yes, sir.

14          THE COURT:  -- on the films are not always accurate,

15  but it seems to me quite likely that there was known to the              15:29:25

16  MCSO that they were recording these traffic stops, it looks to

17  me based on the discovery that plaintiffs have again provided

18  that that was squarely requested and that there was never

19  provided.  So I guess I invite you to address that question.

20          MR. CASEY:  Well, yeah, and I will be brief.                      15:29:43

21          I've gone through the discovery.  There is no doubt

22  that video existed at the time that discovery was outstanding.

23  It was broad enough in order to include videos.  If you go

24  through --

25          THE COURT:  And audios.                                          15:30:02

1          MR. CASEY:  And audios.  I didn't mean to make a

2     distinction there.  In fact, when I reviewed the October,

3     November, and December of 2009 depositions -- which, in

4     fairness to these counsel, they weren't there, it was the

5     Steptoe & Johnson law firm -- was the first reference of them        15:30:17

6     first coming online was the testimony.  And that was in '09,

7     and that many of the officers had testified that they hadn't

8     even taken out of the packaging the videos.  So I'm -- I see

9     the Court's hand gesturing, I have trouble reconciling, quite

10    frankly, that with that testimony.                                   15:30:46

11          There's no question that some video exists before the

12    discovery cutoff.  Based on our preliminary review, and there

13    are thousands of them, the vast majority are after the

14    discovery cutoff date, for whatever that is worth to the

15    Court --                                                             15:31:01

16          THE COURT:  Well, let me -- let me just tell you one

17    thing that causes me some --

18          MR. CASEY:  Yes, sir.

19          THE COURT:  -- concern.  The monitors have provided me

20    with this.  It's the Maricopa County Sheriff's operational          15:31:08

21    manual dated February 2008, and it has in here directions that

22    every traffic stop will be recorded.  And so it looks to me

23    like even though -- even though many of those are presumably

24    destroyed by now, there was, when these discovery requests were

25    issued, -- yeah, it's page 3 and 4, Use of Scorpion Micro          15:31:35

1  video cameras by the Human Smuggling Division.  HSU deputies

2  will record their traffic stops when practical.  It just looks

3  to me like in addition to what you have -- have provided, and I

4  don't question that you've now provided everything you have --

5        MR. CASEY:  Yes, sir.                          15:31:54

6        THE COURT:  -- there was a lot that was destroyed that

7  would not have been destroyed if you would have responded

8  fairly to that request when it was issued.

9        MR. CASEY:  I cannot conclude that right now, but I

10 can conclude that while we determined the vast majority of the   15:32:09

11 videos were recorded after the discovery cutoff date --

12        THE COURT:  The existing videos.

13        MR. CASEY:  The existing videos.  That's all -- that's

14 all I can say, the existing videos.  I don't know if it's the

15 universe; I can't vow one way or the other.              15:32:22

16        THE COURT:  You can't avow now.

17        MR. CASEY:  Certainly, I cannot.  And I don't think

18 anyone can.

19        THE COURT:  You can't avow that the best method has

20 been used to recover those videos against -- from officers that   15:32:35

21 may have been self-recording.

22        MR. CASEY:  I cannot, but I can, in answer to one of

23 your questions, say that the conversation as I understand it

24 between Chiefs Trombi and Sheridan occurred before the meeting

25 with the honorable Warshaw -- monitor Warshaw and his crew, and   15:32:47

1   there was clearly a snafu that occurred.

2          So, you know, the practice that was agreed upon did

3   not take place.

4          THE COURT:  It was more than agreed upon.  Let me read

5   my order from the hearing that occurred just prior --          15:33:07

6          MR. CASEY:  It was your order, Your Honor.

7          THE COURT:  All right.  Well, I'm going to direct the

8   monitor to work with you on a plan that he can approve that

9   your best thinking about how you can, without resulting in any

10  destruction of evidence, gather all the recordings, and then   15:33:21

11  based on what you find, and/or maybe beginning before you can

12  assess what you find, depending upon your thoughts, you result

13  in an appropriate and thorough investigation.

14         So I ordered --

15         MR. CASEY:  You did.                                     15:33:35

16         THE COURT:  -- I ordered you to consult and get the

17  approval of the monitor before you proceeded in a way that now

18  we have no way of knowing if -- I'm not saying there is, but

19  certainly it wasn't the best way, it wasn't the way that was

20  agreed on, to make sure that we would get all the recordings   15:33:50

21  that officers may have done that may have been incriminating.

22         MR. CASEY:  It was not pursuant to your order.

23         THE COURT:  All right.  Let me raise one other concern

24  I have, and it's a concern based on your response.  I'm going a

25  little bit afield, and I do want to give you the opportunity to  15:34:09

 1    say what you want to say.

 2            MR. CASEY:  Yes, sir.

 3            THE COURT:  But I noticed language in your response

 4    that concerns me which says that the MCSO has and will continue

 5    to resist the monitor's recommendation that MCSO ambush its own    15:34:21

 6    deputies in violation of their due process rights.

 7            MR. CASEY:  Yes, sir.

 8            THE COURT:  Let me just tell you that in that hearing,

 9    and again I found it today, Chief Deputy Sheridan assured me

10    that there was no policy that prevented officers from recording    15:34:35

11    their own videos.  If there is no policy that prevents officers

12    from recording their own videos, there is no way that an

13    administrative hearing can be held against an officer for

14    recording his own videos.

15            And so to the extent that you have suggested in your        15:34:53

16    response that you have the right to disregard my orders --

17            MR. CASEY:  No.

18            THE COURT:  -- that were then filed on May 2015, and

19    impose a whole bunch of procedural requirements that do not

20    come from my order, but come from an argument that has no          15:35:10

21    merit, that this sort of investigation amounts to an

22    administrative process, I am very concerned that the MCSO is

23    subverting my orders.

24            MR. CASEY:  And Your Honor, let me, for --

25            THE COURT:  And to the extent --                            15:35:29

1           MR. CASEY:  Yes.

2           THE COURT:  -- that you say you're going to continue

3     to do it, I don't like it.

4           MR. CASEY:  That is not, and I apologize to the Court,

5     because we have failed in our ability to write clearly and          15:35:35

6     communicate effectively, because that is not what we would as

7     counsel nor would we ever have our client do.  We're not in the

8     business of disobeying intentionally or otherwise the Court's

9     order.  I apologize to you for that lack of clarity.

10           THE COURT:  All right.                                        15:35:54

11           MR. CASEY:  I will tell you that when a monitor

12     suggests ambushing -- our word --

13           THE COURT:  Did he ever use the word "ambush"?

14           MR. CASEY:  I understand that the monitor's team

15     suggested that we corner people without due process notice in       15:36:05

16     parking lots, coming out from behind whatever location to ask

17     them about videos.  That is a violation of Title 38.

18           THE COURT:  Then how come Deputy Chief Sheridan

19     thought that also would be the best plan?

20           MR. CASEY:  I can only share with you, after               15:36:22

21     consulting with human relations, HR people, that the law in

22     Arizona is such --

23           THE COURT:  Well, let me talk --

24           MR. CASEY:  -- that we cannot.

25           THE COURT:  If HR people think that they can remand my    15:36:30

1    order on a meritless argument that this is -- this constitutes

2    an administrative hearing, then I want to see them, and I'm

3    going to issue an order to show cause why they shouldn't be

4    held in contempt.

5         MR. CASEY:  Your Honor, the only point that I think          15:36:43

6    we're trying to suggest to the Court is not a disobeyance that

7    is not even within the realm of what I understand or any of my

8    co-counsel.  And we can say that sincerely to the Court.  That

9    is not -- that wouldn't do that.  They're suggesting that when

10   a suggestion is being made --                                     15:37:03

11        THE COURT:  So you tell me --

12        MR. CASEY:  Yes.

13        THE COURT:  -- Mr. Casey --

14        MR. CASEY:  Yes.

15        THE COURT:  -- what about a procedure that I think           15:37:07

16   Deputy Chief Sheridan in his own language in the report agreed

17   was the best procedure, what about an Internal Affairs officer

18   talking individually to deputies that they believe have been

19   recording their own videos, what about that invokes any sort of

20   administrative process under state law?  Especially when, as     15:37:25

21   Chief Deputy Sheridan indicated to me, there is no policy

22   against deputies recording their own traffic stops?

23        MR. CASEY:  I'm going to have to defer to -- I'm going

24   to have to defer to HR counsel on that.  I cannot tell you

25   other than telling you --                                        15:37:45

1    THE COURT:  Well, I'll tell you what:  I'm going to

2  order HR counsel to show cause why she or he should not be held

3  in contempt to the extent that they're asserting that that

4  constitutes an administrative process.  We can move on.

5    MR. CASEY:  Is there anything else, Your Honor?      15:38:02

6    THE COURT:  You can -- you can say what you want to

7  say.  Are you saying that administrative -- or that counsel

8  wants to address me now, Mr. Liddy?

9    MR. LIDDY:  If it would help the Court, yes, Your

10  Honor.                                                 15:38:17

11    MS. STUTZ:  Your Honor --

12    THE COURT:  Please.

13    MS. STUTZ:  Certainly, Your Honor.

14    THE COURT:  Do you understand my concern, Ms. Stutz?

15    MS. STUTZ:  Yes, I do, Your Honor, very much so, and I   15:38:24

16  appreciate your concern.  I would like to provide clarity to

17  what I recall happened at that particular meeting with the

18  monitor team on that afternoon, if I may --

19    THE COURT:  Well, let me ask you:  Did you sit through

20  the previous meeting?                                  15:38:38

21    MS. STUTZ:  Your Honor, I did.  There was --

22  obviously, it was an attorney-client privileged conversation.

23    THE COURT:  You weren't asked about anything.

24    MS. STUTZ:  Yes, I was -- I was present at that

25  meeting, yes, sir.                                     15:38:50

1          (Off-the-record discussion between Ms. Stutz and

2     Mr. Liddy.)

3          MS. STUTZ:  Okay.  Your Honor, I was there for a

4     portion of the meeting, and apparently there was a meeting

5     that, excuse me, occurred prior to my coming into the meeting.      15:38:58

6          THE COURT:  All right.  Thank you for that

7     clarification, Mr. Casey.

8          MS. STUTZ:  So Your Honor, to address your concern,

9     which is that we would be advocating that something was an

10    administrative proceeding when in fact it was not, it was my      15:39:10

11    understanding, Your Honor, having been obviously also at your

12    under-seal hearing that day, that the intention and purpose was

13    to identify whether other recordings had been made, but there

14    was also a presumption or supposition, it appeared, that

15    misconduct would be there comparable to the misconduct or      15:39:27

16    violations of civil rights.

17         THE COURT:  Well, you heard Ms. -- you heard Deputy

18    Chief Sheridan say there was to policy against recording.

19         MS. STUTZ:  Yes, Your Honor, and I don't -- and we're

20    not disputing that there was no policy against recording.      15:39:40

21         THE COURT:  Has there been any administrative

22    proceeding begun against any of the deputies who turned in

23    their recordings?

24         MS. STUTZ:  Your Honor, with respect to simply making

25    a recording --      15:39:51

1          THE COURT:  Yes.

2          MS. STUTZ:  -- if that's your --

3          THE COURT:  Yes.

4          MS. STUTZ:  No, Your Honor.  There has not been any

5     proceeding with respect to making --                          15:39:58

6          THE COURT:  -- this court, correct?

7          MS. STUTZ:  That's correct.

8          THE COURT:  All right.

9          MS. STUTZ:  Your Honor, it --

10         THE COURT:  Thank you.                                    15:39:59

11         MS. STUTZ:  If I may explain, though, Your Honor, what

12    the basis was.  Obviously, the videos that had been brought

13    forward with regard to Armendariz's misconduct were, you know,

14    potential violations of the very rights that were at issue in

15    the underlying litigation.                                     15:40:11

16         THE COURT:  Certainly.

17         MS. STUTZ:  And so Your Honor --

18         THE COURT:  And that merits an administrative

19    investigation.

20         MS. STUTZ:  Correct.  However, requiring someone to       15:40:17

21    undertake or turn over those particular videos, if in fact they

22    revealed that level of misconduct, could also invoke those

23    protections, sir.

24         THE COURT:  I have the statute right here.

25         MS. STUTZ:  Yes, sir.                                     15:40:29

1        THE COURT:  And it is only when, and I'm quoting from

2   the statute, you can tell me if I'm quoting a bad version,

3   because the federal government doesn't give us enough money to

4   update our state statutes.

5        MS. STUTZ:  And I don't have it in front of me, Your          15:40:41

6   Honor, but I --

7        THE COURT:  All right.  It says:  If an employer

8   interviews a law enforcement officer or probation officer and

9   the employer reasonably believes that the interview could

10  result in dismissal, demotion, or suspension -- now, just          15:40:49

11  asking for recordings you made that were pursuant to policy

12  gives you no basis to have a reasonable belief that the

13  interview could result in dismissal, demotion, or suspension,

14  does it?

15        MS. STUTZ:  Well, sir, certainly the                         15:41:04

16  impression that --

17        THE COURT:  The content -- if you've recorded --

18        MS. STUTZ:  Correct.

19        THE COURT:  -- something bad, the content might.  But

20  that -- just because you have done a recording does nothing to     15:41:13

21  that end.

22        MS. STUTZ:  Your Honor, we're in complete agreement

23  with that.

24        THE COURT:  All right.  Let me ask you, Ms. Stutz --

25        MS. STUTZ:  Um-hum.                                          15:41:18

1          THE COURT:  -- the plaintiffs filed a request for all

2     recordings.  Is it your posi -- and that was not responded to.

3     Is it your position that before seeking to collect those

4     recordings from every officer, every officer was entitled to

5     the protections of an administrative hearing in what is a          15:41:32

6     discovery process in federal litigation?

7          MS. STUTZ:  No, Your Honor, that is not my position.

8     And in fact, I had a specific discussion with Chief Warshaw on

9     that very day which was the one that I would like to share what

10    I believe occurred during that meeting, sir --                     15:41:47

11         THE COURT:  All right.

12         MS. STUTZ:  -- if you would so indulge me.

13         THE COURT:  Go ahead.

14         MS. STUTZ:  Your Honor, during that meeting I

15    specifically did discuss the issues about notices of             15:41:53

16    investigation, the possibility of misconduct being contained

17    within the content of those very videos.  And it was for that

18    reason that I expressed concern about the notice of

19    investigation process.  In fact, Chief Warshaw references that

20    in one of his other filings with this Court, Your Honor.  And      15:42:07

21    at that time --

22         THE COURT:  Which one?

23         MS. STUTZ:  I'm sorry?

24         THE COURT:  Which one?

25         MS. STUTZ:  That item, I believe, Your Honor, may            15:42:15

1    still be under seal, so I'm not sure whether you would

2    prefer --

3            THE COURT:  Well, you can identify it for me later.

4            MS. STUTZ:  Okay.  Yes, sir.  I will do so.

5            THE COURT:  All right.                                    15:42:22

6            MS. STUTZ:  And so the particular approach that was

7    suggested and what has been advised by the monitor here today I

8    have a different recollection of events.  Chief Warshaw stated

9    that it's the position of the monitor team that I had never

10   discussed those particular issues with them or had any concerns   15:42:33

11   raised about the notice of investigation process.  And in fact

12   I did discuss those concerns with them.

13           THE COURT:  I thought he was referring to concerns

14   related to other matters raised in the report.

15           MS. STUTZ:  Sir, my understanding of what he said was    15:42:48

16   in connection also with the May 15 discussion and our approach

17   to take a different direction.

18           THE COURT:  All right.  So you tell me what your

19   understanding was.

20           MS. STUTZ:  Sir, at that time the approach that had      15:42:59

21   been suggested by the monitor team as I understood it was that

22   they believed that we should surreptitiously approach deputies

23   and essentially demand their recordings and require them to

24   turn those over without notice.  And under those circumstances

25   I believe that because potential misconduct could exist, in      15:43:14

1    fact because of the very concerns that everyone has expressed

2    here about the conduct by those other potential deputies, that

3    that could result in disciplinary action.  And so I was

4    concerned about how --

5              THE COURT:  Do you have any reasonable belief that            15:43:26

6    that particular question will result in administrative action?

7    Just getting the recording --

8              MS. STUTZ:  That was the position that was being

9    advocated by the monitor team.  So if that's not a reasonable

10   belief, then that's -- that's perfectly acceptable to me, Your          15:43:38

11   Honor.  Obviously, the position that was articulated by myself

12   was that I didn't -- I didn't believe so.  I didn't believe so,

13   Your Honor.  But that being the case, I also think that the law

14   enforcement officers' Bill of Rights should be taken very

15   seriously.                                                              15:43:53

16             THE COURT:  Well, if you didn't believe so, then the

17   law enfor -- then the statute doesn't apply, does it?

18             MS. STUTZ:  Sir, I believe that the possibility exists

19   that that could happen.

20             THE COURT:  Possibility, but that's not what the              15:44:00

21   statute says.  It says a reasonable belief that it will result

22   in discipline.  And asking an officer for the recordings that

23   he made that he's allowed to make does not give rise to a

24   reasonable belief that it's going to result in discipline of

25   the officer, does it?                                                   15:44:15

1          MS. STUTZ:  Your Honor -- Your Honor, my personal

2   belief in a situation would not constitute what is or isn't a

3   reasonable belief.  That being said, Your Honor --

4          THE COURT:  No, a legal --

5          MS. STUTZ:  -- I think that the --                    15:44:26

6          THE COURT:  -- a legal opinion.

7          MS. STUTZ:  The coercive power that was being

8   suggested to be used was that there should be an element of

9   surprise, that those deputies should be shocked by what was

10  going to happen, and that they should be essentially attacked   15:44:35

11  in the parking lot.  And I did not believe that in the -- in

12  the defense of those law enforcement officers' rights --

13         THE COURT:  All right.

14         MS. STUTZ:  -- that they should be attacked in such a

15  way.                                                           15:44:47

16         THE COURT:  I've got you.  Thank you, Ms. Stutz.

17         MS. STUTZ:  Yes, sir.

18         THE COURT:  Anything else, Mr. Casey?

19         MR. CASEY:  No, Your Honor.  With -- at the sound

20  of -- risking sounding like a broken record, I wanted to -- I   15:44:55

21  want to assure you that the comment that you quoted that

22  elicited very strong response from you is never and will never,

23  by the legal team or our clients at our advise under any

24  circumstances, ever be used to try to thwart, undermine, or

25  undercut your orders.                                          15:45:19

```
 1                THE COURT:  All right.  Thank you.

 2                MR. CASEY:  We will -- okay.

 3                THE COURT:  Now, how would you like to respond to

 4     plaintiffs' request?

 5                MR. CASEY:  To plaintiffs' request, there's no -- I      15:45:22

 6     think we need briefing.  I'm not sure, there's no doubt that

 7     something --

 8                THE COURT:  All right.  I'll give you briefing.

 9                MR. CASEY:  Yeah.  Well, and I -- I want -- I mean,

10     all I have is their thing saying we ought to be getting some      15:45:33

11     sort of sanctions.  I don't even know what the fees would be

12     for.  Is it for filing their response?

13                THE COURT:  That's fine.  That's fine.

14                MR. CASEY:  You know, so that's what I think --

15                THE COURT:  But let's -- listen --                      15:45:42

16                MR. CASEY:  -- need to do.

17                THE COURT:  -- is there any dispute that to the extent

18     you have existing recordings that are responsive to their

19     original discovery requests that you turn those over now?

20                MR. CASEY:  They have been turned over.                  15:45:52

21                THE COURT:  All right.  Do you have any question --

22                MR. CASEY:  They just weren't turned over in

23     litigation.

24                THE COURT:  Ms. Wang, do you have any question about

25     that?                                                              15:45:59
```

1          MS. WANG:  I do, Your Honor.  My understanding is that

2     the universe of records that have been uncovered through the

3     investigation of Deputy Armendariz's death and other related

4     matters has not all been turned over.  I thought that the

5     defendants were continuing to withhold some of those documents          15:46:13

6     from the plaintiffs as being privileged under A.R.S. 38-1101

7     and 1104.

8          THE COURT:  All right.

9          MS. WANG:  If that's not the case, then I'd like to

10    follow up with Mr. Casey just to ensure that -- that we have          15:46:28

11    everything.  I believe they've given us some form of privilege

12    log that indicates there are documents outstanding that have

13    not been disclosed.

14         MR. CASEY:  Your Honor --

15         THE COURT:  All right.  You will follow that up.  To          15:46:41

16    the --

17         MR. CASEY:  Yes.

18         THE COURT:  -- extent that there are responsive

19    documents that you have not provided, you'll provide them?

20         MR. CASEY:  Yes, and I --          15:46:46

21         THE COURT:  And the rest of the matters can be subject

22    to briefing.  Ms. Wang, I invite you to initiate the briefing

23    at your convenience.

24         MS. WANG:  Thank you, Your Honor.

25         THE COURT:  All right.  Do we need to do anything else          15:46:55

1   about this first issue?

2        MR. CASEY:  No.  No, Your Honor.

3        THE COURT:  All right.  Second issue.  As it pertains

4   to the report, the other aspects of the report, the report is

5   divided into essentially five subcategories, and each one has          15:47:14

6   initial observation, preliminary findings, and recommendations.

7   Just let me say -- let me point out a couple of things.

8        Chief Warshaw came to me and said that it was their

9   understanding that the only criminal investigation that

10  resulted from the Armendariz matter had just been closed.  He          15:47:34

11  told me that when he received the memo from Dave Tennyson and

12  then subsequently received a follow-up memo from

13  Captain Bailey.

14       And that memo, I looked at it, says, quote:  The

15  following memorandum is a written summary of the Maricopa               15:47:51

16  County Sheriff's Office Human Smuggling Division criminal

17  inquiry.  It was my concern that the only criminal inquiry that

18  you had ongoing -- undergoing, had now been closed.  And what

19  deputy -- what Monitor Warshaw told me about the substance and

20  quality of that investigation concerned me considerably.  So I         15:48:09

21  directed him to write me a report so you could be allowed to

22  respond and we could initiate this process.

23       In the middle of writing the report, Chief Warshaw

24  told me that you had subsequently informed him of additional

25  things that he previously had not realized or been aware of or         15:48:22

```
 1    noticed of, and he asked me if I wanted him to revise the

 2    report.  And I said:  No, we will be revising the report

 3    forever.  Let's just get the report down so that the Maricopa

 4    County Sheriff's Office can know where we believe they're

 5    inadequate, and if they want to update the investigation we can      15:48:39

 6    deal with it then.  So that is what I told him; that is why he

 7    filed the report; that's why I gave it to you.

 8         I still think, by the way, even after reading your

 9    response, that much of it has purchase and gives me great

10    concern, and to the extent that the ongoing order requires us        15:48:54

11    to monitor supervision of deputies, it requires us to monitor

12    Internal Affairs processes and requires us to monitor those

13    processes, I think much of what is said needs to be considered,

14    but I do want to hear your responses to it.  I suggest we take

15    it one by one and we not talk about what we don't need to talk       15:49:15

16    about.

17         First, after the document stuff was the suicide

18    investigation, and the monitor's report, I think, in terms of

19    the suicide investigation, was nothing but complimentary.  It

20    said -- I forget the officer's name, I'm sorry.  Kim Seagraves?      15:49:32

21         MR. CASEY:  Seagraves.

22         THE COURT:  Lieutenant Kim Seagraves said that she had

23    done an exemplary investigation.  The only thing the monitor

24    recommended is she apparently was removed from the

25    investigation before it could be complete into the suicide          15:49:44
```

 1    investigation, and the monitor recommended that Lieutenant

 2    Seagraves be allowed to finish the suicide investigation.

 3              Is there anything you want to say about that?

 4              MR. CASEY:  Your Honor, I'm going to introduce you

 5    formally on the record to Captain Steve Bailey, the head -- he          15:49:59

 6    took over from Ken Holmes.  He is the head of the Professional

 7    Standards Bureau, formerly known as Internal Affairs, to

 8    address that.

 9              CAPTAIN BAILEY:  Good afternoon, Your Honor.  In

10    reference to Kim Seagraves, I didn't order her to stop; I               15:50:14

11    merely sent her back to her original division, where she could

12    continue to type and finish the remainder of that

13    investigation.

14              THE COURT:  All right.  So she'll finish the remainder

15    of the suicide investigation?                                          15:50:26

16              CAPTAIN BAILEY:  Yes.  It's completed now, sir.

17              THE COURT:  It is.  I gather that there was some

18    things relating to the search of Armendariz's computer and

19    maybe his blood chemistry and some other things that were

20    relatively minor?                                                      15:50:37

21              CAPTAIN BAILEY:  Yes, Your Honor.  His toxicology has

22    not been returned by the medical examiner's office at this

23    time.

24              THE COURT:  All right.  So you still have the

25    toxicology report?                                                     15:50:45

1          CAPTAIN BAILEY:  Yes.

2          THE COURT:  Okay.  She'll finish that part of the

3   report?

4          CAPTAIN BAILEY:  Yes, Your Honor.

5          THE COURT:  All right.  The evidence collection        15:50:49

6   analysis.  Do you have anything you want to say on that,

7   Mr. Casey?  Mr. -- or Captain Bailey?

8          Is it Captain Bailey or Commander Bailey?

9          CAPTAIN BAILEY:  Captain Bailey --

10         THE COURT:  Okay.                                       15:51:00

11         CAPTAIN BAILEY:  -- Your Honor.

12         MR. CASEY:  Your -- Your Honor, as an initial matter,

13  we had some deficiencies, unquestionably, in the collection of

14  evidence.  With that, I can allow the -- allow Captain Bailey

15  to explain what happened after we recognized there were some   15:51:13

16  initial collection issues.

17         THE COURT:  All right.

18         CAPTAIN BAILEY:  When District II originally

19  responded, it was clear to us shortly afterwards that they had

20  made a number of missteps in the collection of evidence from   15:51:24

21  Deputy Armendariz's home.  I ordered -- or requested Special

22  Investigations detectives to reconcile all those pieces of

23  evidence.  The 618 items eventually turned into 1657 items as a

24  part of that reconciliation, and when I realized the missteps,

25  I ordered an administrative inquiry be done in my unit.        15:51:47

1        District II was explaining that they felt it was PSB

2   was responsible for the miscommunication, I felt like it was

3   District II, so I ordered an administrative investigation to

4   occur, which has now been given an IN number.

5            THE COURT:  So it's ongoing.                                15:52:04

6            CAPTAIN BAILEY:  Yes, sir.

7            THE COURT:  All right.  Have you informed the monitor

8   of that?

9            CAPTAIN BAILEY:  I believe so.

10           THE COURT:  Okay.  Chief Warshaw, you're saying yes,        15:52:10

11  you've been --

12           MONITOR WARSHAW:  Yes.

13           THE COURT:  -- informed of that.

14           MONITOR WARSHAW:  Yes.

15           THE COURT:  When were you informed of that?                 15:52:14

16           MONITOR WARSHAW:  I'm not full -- I'm not fully

17  certain, but I --

18           THE COURT:  But you have been informed.

19           MONITOR WARSHAW:  -- within the approximate time in

20  which it was accomplished.                                          15:52:22

21           THE COURT:  All right.  So you're able to consult with

22  Captain Bailey on that.

23           MONITOR WARSHAW:  Yes.

24           THE COURT:  All right.  Thank you.

25           Videos and reviews.                                        15:52:29

1        MR. CASEY:  Your Honor, the -- the video review has

2   been an enormous undertaking.  We can give you data about that.

3   We also have here present in the room a non-sworn peace

4   officer, Jennifer Johnson, who has created a spreadsheet

5   hopefully of enormous value that I believe has been shared with        15:52:49

6   the monitor, but let's -- we have Captain Bailey just --

7        THE COURT:  You know, I don't want to deprive you of

8   the opportunity to say what you want to say.  I will say I

9   was -- although I think the monitor's criticisms deserve

10  consideration, because you have preserved all the videos and        15:53:08

11  the monitor doesn't say otherwise, it seems to me that we're

12  going to be able to eval -- we'll have time to evaluate whether

13  or not your criteria exists and whether or not they were

14  appropriate by looking at the reviews.  So I'm not particularly

15  concerned about this, we're spending a great deal of time on        15:53:23

16  it --

17        MR. CASEY:  Okay.

18        THE COURT:  -- because -- I am concerned to the

19  extent, however, let me tell you, I'm concerned to the extent

20  that you are not continuing to review those videos, and to the        15:53:33

21  extent that you have closed out any investigations, criminal,

22  administrative, or otherwise, that may rely on the review of

23  those videos.  I am not satisfied, and I'm not saying you

24  haven't done this, but I don't know that you've reviewed those

25  videos to determine whether other officers, supervisors, and        15:53:53

 1    others were present during problematic behaviors, and whether

 2    in fact if they were, they've been identified and

 3    investigations, whether criminal or administrative, are

 4    ongoing.  That's what concerns me.

 5         MR. CASEY:  Yes, Your Honor.  It is a legitimate                    15:54:10

 6    concern, and it is also shared with -- or by the MCSO.  In

 7    fact, on Friday when you -- we had something in camera

 8    delivered to you, without getting into specifics, because I

 9    don't want to waive what we believe is subject to privacy under

10    Title 38, is we have identified -- now, when I say "we," my       15:54:30

11    client has identified.  I've also -- it's been -- some have

12    been shown to me that are clearly problematic and there are

13    other MCSO personnel that are in there, and in the judgment of

14    counsel or others, not only does there appear to be a violation

15    of office policy, but it also appears to me as an outside        15:54:49

16    lawyer, for what it's worth, to perhaps extend beyond just an

17    office violation.

18         My understanding, and I'm going to look over my

19    shoulder, is that on Friday we submitted to the Court and

20    identified some investigations of other people that were        15:55:05

21    present in those, because we're determining what you knew, when

22    you knew it, what you saw, all those things, because there were

23    violations of office policy.

24         And so at least --

25         THE COURT:  Let me just say --                             15:55:17

 1           MR. CASEY:  -- administratively it has gone in that

 2    direction.

 3           Is that a correct --

 4           THE COURT:  Yeah.  Let me just say one thing.  I was

 5    concerned, and I think I can raise -- if you have concerns that      15:55:29

 6    I've encroached -- encroaching, you can tell me before I say

 7    this.

 8           MR. CASEY:  Yes, sir.

 9           THE COURT:  But I was concerned when I looked at your

10    in camera submission that it dealt with, from what I could          15:55:40

11    tell, only administrative investigations.

12           MR. CASEY:  No.

13           THE COURT:  And those administrative investigations

14    have a clock that's running that's tolled when there's criminal

15    investigations.  And it seems to me that matters pertaining to      15:55:54

16    the video, as well as matters that pertain to the property in

17    Armendariz's house, could give rise very easily and should be

18    the subject of active criminal investigations.

19           Is that happening?

20           CAPTAIN BAILEY:  I'm not sure I understand the               15:56:14

21    question, Your Honor.

22           THE COURT:  All right.

23           MR. CASEY:  Well, Your Honor, let me -- let me address

24    one thing so -- I'm going to ask Christine Stutz to address it.

25    Let me point out one thing without naming something.  Beyond        15:56:23

1    administrative issues we as counsel, not the MCSO, have

2    identified and then alerted our client without waiving any

3    privilege, a concern on one of those stops that it's a

4    violation of your order from December of 2011.

5            THE COURT:  Yes, I'm aware of that and I'll discuss --    15:56:39

6            MR. CASEY:  Yeah.

7            THE COURT:  -- it with you later.

8            MR. CASEY:  But as to whether or not --

9            Can you answer the criminal?

10           MS. STUTZ:  I believe so, Your Honor.  If I understood    15:56:47

11   the question correctly, your question is whether the items of

12   misconduct that are identified in the in-camera review as the

13   subject of administrative inquiry should also have been

14   identified as criminal --

15           THE COURT:  Yes.    15:56:59

16           MS. STUTZ:  -- misconduct?  To my knowledge, Your

17   Honor, no, there's no potential criminal misconduct with regard

18   to those items.

19           THE COURT:  Well, it certainly seems to me possible

20   that there could be criminal misconduct both from the items    15:57:08

21   seized, or at least in the possession of Sergeant Armendariz,

22   and if I don't miss out, Sergeant Armendariz claimed -- and

23   again, I'm not accepting his claim at face value any more than

24   I'm accepting Cisco Perez's claim at face value.

25           MS. STUTZ:  Yes, sir.    15:57:27

1          THE COURT:  But he claimed that that was a result --

2     those materials were not his alone, but they were collected by

3     the entire HSU.  When you have Cisco Perez making a similar

4     allegation -- maybe garbage, maybe true -- I think you need to

5     continue investigating where those items came from, and even          15:57:44

6     finding the people and asking them who took their credit cards?

7     Who took their driver's licenses?  Who took their license

8     plates?  And that is criminal behavior.  So I think a criminal

9     investigation ought to be open.

10         And one of the reasons why I was disappointed with the          15:57:58

11    closure of the Perez criminal investigation is you were just

12    dealing with what Perez said, even though you knew that

13    Armendariz said the same thing and he had hundreds of licenses

14    and credit cards and license plates that had to come from

15    somewhere.  That's my concern.                                       15:58:15

16         MS. STUTZ:  Yes, Your Honor.  Certainly understood.

17         I believe what we identified in the response that was

18    filed, Your Honor, to -- the public response, did indicate that

19    with regard to the overall Armendariz investigation, there is

20    still the possibility that items of evidence for which we have       15:58:30

21    not been able to identify the source of why that information is

22    in the possession of the MCSO has the potential to still have

23    ongoing administrative or criminal outcome for those items.

24    There's a --

25         THE COURT:  Well, let me tell you my concern about              15:58:45

 1   that, Ms. Stutz, and I appreciate it, and we can talk about it

 2   more when we're under seal.

 3           MS. STUTZ:  Yes, sir.

 4           THE COURT:  But my concern about that is -- and I

 5   re -- that's why I requested:  Is there a time limit on          15:58:54

 6   administrative investigations?

 7           MS. STUTZ:  Yes, sir.

 8           THE COURT:  I do not want all those potential

 9   administrative investigations to be tolled by time because you

10   haven't initiated a criminal investigation that would toll it   15:59:05

11   when you should have initiated a criminal investigation that

12   would toll your ability to subsequently bring an administrative

13   investigation.

14           Do you understand what I'm saying?

15           MS. STUTZ:  I do understand that, Your Honor, and --    15:59:17

16   and I think that with respect to that, Your Honor, those items

17   of evidence for which we have yet to ascertain why they were in

18   the possession of Deputy Armendariz or otherwise, those items

19   we could not be running a statute of limitations in either

20   direction --                                                    15:59:34

21           THE COURT:  All right.  If you're satisfied that

22   that's true --

23           MS. STUTZ:  Yes, and --

24           THE COURT:  -- and if you can satisfy me that that's

25   true, I'm all right with it.                                    15:59:40

```
 1            MS. STUTZ:  Yes, sir.

 2            THE COURT:  All right.

 3            MS. STUTZ:  I would be happy to do so and answer any

 4   further questions you have.

 5            THE COURT:  All right.  Thank you.                        15:59:44

 6            Anything else you want to say on that?

 7            MR. CASEY:  No, other than it has -- at least

 8   administratively, Your Honor, it has gone off in a number of

 9   directions to find out --

10            THE COURT:  Yeah.                                          15:59:53

11            MR. CASEY:  -- that -- that very issue.

12            THE COURT:  Well, we can discuss the administrative

13   investigations, but I was a little --

14            MR. CASEY:  Concerned about the criminal.

15            THE COURT:  Yeah, and I am concerned about some of the    16:00:00

16   administrative; we can talk about that later.

17            MR. CASEY:  Yes, sir.

18            THE COURT:  All right.  We're moving on to personal

19   history and again -- personnel history.

20            MR. CASEY:  Yes, sir.                                      16:00:08

21            THE COURT:  It seemed to me like even though they

22   didn't explicitly say it, the monitor's report was quite

23   complimentary of the work done by Sergeant Fax in this respect.

24            MR. CASEY:  It was.

25            THE COURT:  But I got to say the conclusions that          16:00:17
```

```
 1    Sergeant Fax came up with were a little disturbing about the

 2    number and nature of complaints that were registered against

 3    Armendariz, and the relative lack of department action to take

 4    action on his behalf, or related to him --

 5            MR. CASEY:  Yeah.                                  16:00:35

 6            THE COURT:  -- for years.

 7            MR. CASEY:  Yes, sir.  Your Honor, two things in

 8    response to that.  There's no doubt that your assessment is

 9    shared by many, and what proverbially -- what is often called

10    red flags existed for this officer.                        16:00:58

11            I will tell you that there are --

12            What's the number, 221?

13            221 is an investigation currently ongoing to find out

14    in those that were in the chain of command that those -- how

15    did this person with these issues miss the identification     16:01:15

16    process that should have been inherent in the supervision at

17    the time even before the Court supplemented that level of

18    supervision with your -- with your order?

19            It's troubling to my client, and administratively they

20    are investigating it right now.  If anything else comes out of  16:01:33

21    it, we've heard what you said about your concern about perhaps

22    not focusing enough on the criminal end or potential.  This

23    transcript obviously will be ordered and shared with everybody

24    on the defense side.  But I can tell you that that is a

25    recognition shared by my clients and that they are -- currently  16:01:52
```

 1  have a dedicated investigation to try to determine:  How did

 2  that happen?

 3          THE COURT:  Have you informed the monitor of these

 4  administrative investigations?

 5          MR. CASEY:  I'm going to look over my -- my shoulder,      16:02:05

 6  but my -- my understanding is every investigation that is

 7  ongoing has been informed multiple times to the monitor.

 8          THE COURT:  Chief Warshaw?

 9          MONITOR WARSHAW:  Yes, that's correct.

10          THE COURT:  All right.  Thank you.                        16:02:16

11          All right.  Then we raise the HSU administrative

12  investigation and the HSU criminal investigation.  I've already

13  raised my major concern about that.

14          MR. CASEY:  Yes, sir.

15          THE COURT:  It seems to me that you have -- when          16:02:25

16  you're only looking at the Cisco Perez allegations and you're

17  dealing with that in isolation, and you're completely ignoring

18  the similar allegations made by Armendariz, not saying that

19  either one of them are true, but they're both saying the same

20  thing, and there was some evidence both under Perez and under    16:02:40

21  Armendariz that lots of things have been seized, I'm a little

22  concerned that there was a myopic approach on the Cisco Perez

23  thing.

24          I've also gotta say I read the four questions that

25  Sergeant Tennyson was asking in his criminal investigation       16:02:55

1    before he was coached by the monitor to add 33 or 34 more.

2    I've seen videotapes of what Sergeant Tennyson did.  That is

3    not a criminal investigation.  Those four questions, I don't

4    even think you have to graduate from high school to know that

5    that, nobody is going to confess or give you any information of    16:03:13

6    any value if you only ask four questions.

7            Those are my concerns.

8            MR. CASEY:  Your Honor, I think the appropriate

9    response from me is on behalf of my clients your concerns are

10   noted, the emphasis is noted, and with the representation that    16:03:29

11   it will be thoroughly evaluated by my client, the command

12   structure, with defense counsel.

13           THE COURT:  Okay.  Captain Bailey, anything you wanted

14   to say on that?

15           CAPTAIN BAILEY:  Your Honor, the four questions    16:03:42

16   weren't the only questions we were going to ask.  We were asked

17   to provide a set of baseline questions that would start the

18   interview.  What Sergeant Tennyson informed me of is he would

19   take the interview in the direction that it went if he asked

20   the appropriate interview questions you would ask in a criminal    16:03:55

21   investigation.

22           THE COURT:  Do you have something you wanted to say to

23   that, Chief Warshaw?

24           MONITOR WARSHAW:  No, Your Honor.

25           THE COURT:  I was wondering if you were turning around    16:04:04

1    looking at me.

2          MONITOR WARSHAW:  No.

3          THE COURT:  I've seen -- I've seen some videotapes,

4    though.  Actually, I shouldn't lie.  I've seen one videotape

5    of -- of an investigation, and it did not seem to me to be --          16:04:12

6          CAPTAIN BAILEY:  Can I answer that, Your Honor?

7          THE COURT:  You can.

8          CAPTAIN BAILEY:  Sergeant Tennyson was concerned that

9    if he was asking administrative questions inside of a criminal

10   investigation that it would violate the deputy's 38-1101          16:04:25

11   privileges.

12         THE COURT:  You know, I have not been very happy with

13   Ms. Stutz.  I think she knows I'm not very happy with her.  But

14   if -- in at least that one respect, Ms. Stutz.  But if -- but

15   if the sergeant has questions he can ask Ms. Stutz.  And if          16:04:41

16   Ms. Stutz has questions, I'd suggest, Ms. Stutz, that you raise

17   it with me under seal, and we can resolve those things.

18         But it sure seems to me that the items put forth in

19   the report, or in the response to the report that you had

20   concerns about, could well have been legitimate questions for a          16:04:58

21   criminal investigation.

22         CAPTAIN BAILEY:  And those that we thought were

23   legitimate we asked, Your Honor.  We did ask all of those

24   questions, to be clear.

25         THE COURT:  All right.  Well, it didn't seem that way          16:05:09

 1   from -- and again, I only saw one.

 2           CAPTAIN BAILEY:  With the exception of two, I'm sorry.

 3           THE COURT:  -- some of the others.  It can be

 4   improved, for sure.

 5           Chief, did you have anything you wanted to say on      16:05:16

 6   that?

 7           MONITOR WARSHAW:  No.  We concur.

 8           THE COURT:  All right.

 9           MR. CASEY:  Your Honor, let me say one thing, because

10   you mentioned displeasure with Ms. Stutz and I --             16:05:23

11           THE COURT:  That was unfair.

12           I apologize, Ms. Stutz.  It's obvious I was not happy

13   with your determination in that one respect, but I'm not trying

14   to impugn your integrity or otherwise.

15           MR. CASEY:  And I just wanted to point out, Your       16:05:36

16   Honor, working, obviously, with all the people at that table, I

17   know that it is just one lawyer's perspective telling you, and

18   you can count it for whatever you wish, but I will tell you --

19           THE COURT:  Let me just say --

20           MR. CASEY:  Yes, sir.                                  16:05:51

21           THE COURT:  -- you don't have to tell me that -- you

22   know, I've had very positive interaction with Mr. Liddy; I

23   think he's trying to implement this order.  Despite my

24   disapproval of Ms. Stutz' legal advice, the monitor tells me

25   that she has been very cooperative and very facilitative, and I  16:06:05

```
 1    want you to know, Ms. Stutz, that he's told me that.  But it

 2    still disturbs me when I think that an erroneous legal advice

 3    is interfering with my order.

 4          And so that's why I've grilled you today, Ms. Stutz; I

 5    hope I won't have to do it again in the future.                    16:06:18

 6          Mr. Casey, for what it's worth, I do not believe that

 7    you would misrepresent anything to me, and I do believe that

 8    the -- I mean, I am not satisfied with some of what's happened

 9    in the Maricopa County Sheriff's Office.  But I -- and we'll

10    talk about this in a minute -- I have seen real efforts there,   16:06:35

11    too, in terms of training.  And we're going to talk about that.

12          There are efforts that I recognize are being made.

13    I'm not saying you're trying to undermine everything at every

14    step.  But I will say that certain things certainly give that

15    appearance, and to the extent they do, they need to be           16:06:52

16    corrected and rectified.

17          MR. CASEY:  And Your Honor, fair.  And I -- and I

18    understand because that appearance, not that you need Tim

19    Casey's imprimatur on legitimacy, that's a real appearance

20    that's there.  But what I'm sharing with you is that, you know,  16:07:10

21    we made a mistake in how we characterized that about assisting

22    or resisting, but our job as counsel is to give the best advice

23    that we can and to comply with the letter and the spirit.  And

24    I can only represent to you that that is what we're doing with

25    our client and I was -- I'm pleased that you recognize there     16:07:29
```

 1  are some positive developments.  There are problems that you've

 2  identified.  Having a hearing like this is valuable to identify

 3  them and let everyone know, particularly my clients understand

 4  the importance of it --

 5          THE COURT:  All right.  Are we ready to move on to the    16:07:48

 6  next item?

 7          MR. CASEY:  Yes, Your Honor.

 8          THE COURT:  All right.  Next item is contact between

 9  the monitor and the Maricopa County Administration.

10          MR. CASEY:  Yes, sir.  I'm going to call Chief Freeman   16:07:58

11  up, please, because he'll have specific information for you.

12          THE COURT:  Well, and let me just tell you, I don't

13  intend to spend a whole lot of time on this.

14          MR. CASEY:  Sure.

15          THE COURT:  I'll tell you why.  Chief Deputy Sheridan    16:08:11

16  will remember, and I suspect Ms. Wang will remember as well,

17  that when I had the hearing with the parties about the

18  injunctive order before I entered it, long before there was

19  even a monitor in this action, I asked Chief Deputy Sheridan, I

20  think we ought to use body cams, or we ought to at least use    16:08:27

21  the ability to use body cams because they're cheaper.  And

22  while we want -- while I recognize that this order is going to

23  require a lot of money, I don't want it to require any more

24  money than it has to require.

25          And you consulted with the chief and you responded:     16:08:43

1    The chief says that body cams are worth what you pay for them.

2    They're cheaper because they're garbage.  The plaintiffs didn't

3    object.  I said, Well, I would like to leave it open for body

4    cams, but if you're both saying you need dash cams even though

5    they're more expensive, I'll put dash cams in the order.          16:09:01

6         Then when I did my order appointing the monitor, I

7    told everybody in the order that I checked with all the monitor

8    candidates and all the monitor candidates said body cams are

9    the way to go, so I said I'm still open to changing this to

10   body cams and by the way, because a thought had occurred to me   16:09:18

11   in the meantime, that as any good politician would, the

12   Sheriff's Office might be inflating the cost of what this order

13   actually takes in order to get better funding, I indicated in

14   that order that if Maricopa County Administration had any

15   suggestions or concerns about how we could more effectively      16:09:38

16   implement this order to be cost effective, they could consult

17   the monitor about that.

18        I am glad to see, frankly, that after that happened,

19   you determined that body cams work and they'll save Maricopa

20   County a lot of money.  I've read your order.  I mean, I've      16:09:57

21   read your submission saying, you know, we're going to take this

22   much overtime.  You know, I'm sorry, I'm -- I'm sure you're not

23   dealing in bad faith, Captain Freeman, but that's all smoke and

24   mirrors.

25        I've talked to my monitor and my monitor talks about        16:10:10

 1   the requirement that everybody have the reports done by the end

 2   of shift.  That's just a standard requirement.  It's built into

 3   every law enforcement officer's obligation.  Some of the things

 4   that you're requiring in your reports are not things required

 5   by my order.  We already had that dispute.  To the extent that          16:10:24

 6   Maricopa County Administration wants to consult with my monitor

 7   about whether or not this is really a cost from the order, then

 8   I'm going to allow them to consult with my monitor.  And

 9   believe me, it is not in my interest to undercut your ability

10   to comply with my order.  And I don't care if Maricopa County          16:10:42

11   supervisors want to give you $500 million.  But you're not

12   going to be doing it if you're saying it comes from my order

13   and my monitor thinks otherwise.

14           Do you understand what I'm saying?

15           MR. CASEY:  Yes, and -- yes, Your Honor, I do.                  16:10:58

16           THE COURT:  All right, so doesn't mean he's right.

17   And we'll be more than willing to talk -- talk with you about

18   things.

19           MR. CASEY:  Your Honor --

20           THE COURT:  And the decision is not mine.  I don't             16:11:09

21   intend to make this a budgetary proceeding.  But I want -- I

22   want you, Chairman Barney, I want you, Ms. Wilson, to know that

23   if you want to, you have absolute access to my monitor to get

24   his take on what it really will take to comply with this

25   orders.                                                                 16:11:26

1          I don't want to shut you out of that, too, Ms. Wang.

2    If you think we're cutting you too much, you can make your beef

3    known, too.  But I will promise you, I'll make sure that

4    Maricopa County complies with my order.  I've always made that

5    clear to Chief Warshaw and to Sheriff Arpaio.  But in the          16:11:37

6    meantime, we can do it as inexpensively as possible.

7          Captain Freeman, do you have anything you want to say

8    about that?

9          CAPTAIN FREEMAN:  I would agree wholeheartedly, Your

10   Honor: as inexpensively as possible.                               16:11:51

11         THE COURT:  All right.  Anything else to be said on

12   that?  Ms. Wang?

13         MS. WANG:  Your Honor, I did have a few observations

14   about the defendants' response on this point that I wanted to

15   make.  First, I agree with the Court that all reasonably          16:12:00

16   necessary expenses to comply with the Court's order should be

17   undertaken and paid for by the County.  And second, we also

18   agree that if there are expenses that are -- that make it

19   possible for MCSO to comply with the best practices in the law

20   enforcement profession, those are not items that should be        16:12:24

21   counted as complying with the Court's order.

22         There are a couple things I do want to observe,

23   though.  One is that I have personally observed, and I've heard

24   reports in the media, that MCSO command staff have made

25   comments to the effect that this Court's order gives the agency   16:12:40

1    all the resources it has long wished for in order to modernize.

2    And I took some of those statements to imply that in fact, the

3    efforts to comply with the Court's order were not out of a

4    desire to comply with the Constitution and were not

5    acknowledging the Court's finding that this agency violated the      16:13:06

6    Fourth Amendment and Fourteenth Amendment rights of the

7    plaintiff class.

8            So to the extent that statements like that have been

9    made, I would just observe that those -- we believe as

10   plaintiffs are inappropriate, and there should be a recognition      16:13:20

11   that these are not just matters of having resources to live up

12   to the best practices of law enforcement in this country, but

13   also to redress the constitutional violations that MCSO

14   committed.

15           A couple of details I wanted to note.  I did look at        16:13:37

16   the spreadsheet of expenses that -- that the defendant

17   submitted.  I noted that there was $109,479 attributed to the

18   appointment of the community liaison officer, Hector Martinez.

19   We had objected to the appointment of that individual, and our

20   understanding was that the Court had relieved MCSO of that           16:13:57

21   responsibility, so I was puzzled by that expense.

22           A couple of other things that I wanted to note is that

23   there are some expenses, significant expenses undertaken by

24   MCSO that don't appear to have been pre-approved by the

25   monitor.  And a couple of the ones I would note is that MCSO         16:14:17

1    hired the Randy Means law firm in order to draft the training

2    curriculum that's required in the Court's order.  Counsel for

3    both parties in this case have spent countless hours, along

4    with members of the monitor team, rewriting and reworking that

5    curriculum.  And at the end of the day, Mr. Means himself was        16:14:41

6    removed as a trainer because of a conflict of interest, as he

7    is now serving as an expert witness for MCSO in a pending case

8    brought by the United States Department of Justice.

9           A similar expense that MCSO's undertaken was prior to

10   the appointment of the monitor, Chief Warshaw, MCSO purchased        16:14:59

11   some IT systems in order to implement various provisions of the

12   Court's order, including an application called IA Pro in order

13   to deal with the early identification system and E-Ticket

14   system.

15          I don't know, based on the monitor's first quarterly         16:15:22

16   report -- actually covering the first two quarters of the

17   compliance period -- whether at the end of the day those will

18   turn out to be wise expenses.  We don't know yet whether those

19   systems are adequate.  And so I do think it's appropriate for

20   there to be oversight and for the monitor to continue to look        16:15:37

21   at those expenses and to decide whether they are, number 1,

22   properly attributable to the Court's -- compliance with the

23   Court's order; and number two, whether they are in fact

24   allowing the agency to comply with the Court's orders.

25          THE COURT:  Thank you, Ms. Wang.                              16:15:57

 1             I don't take it you want me to act on anything you've

 2    just said.  It just seems to me like you've expressed your

 3    position and I've understood it, I believe.

 4             MS. WANG:  Yes, Your Honor.  We're not requesting any

 5    action at this time.                                          16:16:09

 6             THE COURT:  All right.  I thank you.

 7             With that being said, since you're here, Mr. Barney, I

 8    want you to know that I do not make any judgments if this case

 9    about what is necessary or even wise for the successful and

10    good operation of the MCSO.  They may make all kinds of        16:16:24

11    meritorious requests for budgetary funding.

12             What I am requiring is what is required by my order to

13    make sure that this agency meets constitutional standards.  You

14    can fund them however you want, that's not my concern, except

15    that I'm not going to get involved in disputes about whether or 16:16:41

16    not you will fund what is required by this order.  And if I

17    order it you will fund it.  Is that clear?

18             CHAIRMAN BARNEY:  Very clear, Your Honor.  Thank you.

19    We'll continue to work with the monitor and the Sheriff's

20    Department in that regard.                                     16:16:56

21             THE COURT:  Would you repeat that again for the court

22    reporter.

23             CHAIRMAN BARNEY:  I'm very clear, Your Honor, I thank

24    you.  We will continue to work closely with the Sheriff's

25    Department and the monitor in fully implementing the order.    16:17:07

1          THE COURT:  All right.  Thank you.

2          CHAIRMAN BARNEY:  Thank you very much.

3          MR. CASEY:  So it's clear on the record, that was

4   Chairman Denny Barney.

5          THE COURT:  All right.  Anything more we need to say          16:17:15

6   about the contact between Maricopa County Administration and

7   the monitor?

8          MR. CASEY:  No, Your Honor.

9          THE COURT:  All right.  Let's talk, then, about

10  Sheriff Arpaio's comments that have been attributed to him.          16:17:27

11         The press says what he said.  You can understand my

12  concern, I've said it before.  Sheriff Arpaio can say what he

13  wants.  But there isn't any doubt that he is the chief

14  policy maker for the Maricopa County Sheriff's Office.  I think

15  the Maricopa County Sheriff's Office has spent much money in          16:17:47

16  implementing a training program that ex -- and by the way,

17  Maricopa County Sheriffs know this, I think you know this, I

18  spot checked.  I want to the train -- the trainers and I went

19  to two sessions in which one of them, Chief Deputy Sheridan was

20  in taking the training himself.  And I appreciate that, Chief,          16:18:11

21  I want you to know that.  But they were pretty good training

22  sessions.  They were not cheap; they were accurate and they

23  were well done.

24         I also had attended some community meetings where

25  we're trying to reach out -- and I attended the Guadalupe          16:18:25

 1    community meeting -- we're trying to reach out or trying to

 2    have the sheriff's office reach out and repair relations with

 3    the community against whom he's committed the constitutional

 4    violations.  And Chief Sheridan also was there as well as

 5    Captain Hastings, was it?                                        16:18:42

 6            MR. CASEY:  Hawthorne.

 7            THE COURT:  Hawthorne, Captain Hawthorne and some

 8    others.  That was helpful.  When they do that, and then when

 9    you have the sheriff saying, "I would do it all over again,"

10    when I found that constitutional violation three or -- on three  16:18:55

11    or four different grounds, even assuming he still had 287(g)

12    authority, I think he's completely undoing what the Maricopa

13    County Sheriff's Office is spending a great deal of time

14    building.

15            And so I just wanted to give parties an opportunity to   16:19:11

16    express their view about whether or not you're in compliance

17    when despite -- and I have no reason to question the training

18    compliance to date.  When you have training compliance like you

19    have, but you also have the sheriff saying, "I would do it all

20    over again" in a very public way.  So I'm anxious to hear your   16:19:31

21    comments, Mr. Casey.

22            MR. CASEY:  Your Honor, the short answer is the

23    sheriff's comments that are protected, as you have indicated

24    before by the First Amendment, even though he's the

25    policy maker, should not, under any circumstances, be           16:19:44

 1    considered by this Court, or by the monitoring team, in making

 2    recommendations about whether or not there is compliance.  And

 3    the argument is simple.  Compliance under your order is a pure

 4    factual matter; it either exists or it doesn't exist.

 5         THE COURT:  I think that I could abide that, but I'm        16:20:03

 6    still not sure that it gives me much comfort when the chief

 7    policy making officer of the Maricopa County Sheriff's Office

 8    says he'd do it all over again.  What kind of training is that?

 9         MR. CASEY:  Okay.  Well, let me give you an anal --

10    what comes to my mind.  I'm wearing lace shoes.  I'm under an     16:20:20

11    order to lace my shoes.  It doesn't matter who laced them,

12    doesn't matter how they're laced, they're laced.  I'm factually

13    compliant.  I may tell you I don't like the fact that I'm under

14    an order; I may say I would never wear these shoes again; I may

15    even say I prefer slip-ons, it's immaterial, because if in fact  16:20:39

16    you connect a public statement that we've all said is First

17    Amendment protected to finding somehow that there's compliance

18    when there's factual compliance --

19         THE COURT:  So there's no good faith obligation that

20    accompanies my order?                                            16:20:54

21         MR. CASEY:  That -- that's not what I'm saying.  What

22    I'm saying is this:  If you require, if you require speech to

23    be acceptable to the Court in addition to factual compliance,

24    you're now chilling speech.  And the whole point is if there is

25    good faith, doesn't that -- isn't that represented by the fact   16:21:14

1    that we have the training implemented that was found acceptable

2    by the Court?  That we have supervision that's there?  That we

3    have an EIS system that's up?  That we're going to have a BIO

4    that's actually going to help us police ourselves --

5            THE COURT:  Bottom line, though, if you were a Latino      16:21:33

6    in Maricopa County and the sheriff of Maricopa County said he

7    would do it all over again, would you feel like you had

8    adequate protection for your constitution -- the deprivation of

9    your constitutional rights?

10           MR. CASEY:  I don't think it's -- well, the answer to      16:21:47

11   your question is the full context of the quote, as I

12   understand, was relayed by the sheriff to Mr. Warshaw, and he

13   asked Mr. Warshaw to relate to you what he meant.

14           THE COURT:  Well --

15           MR. CASEY:  I assume that was done to explain what the     16:22:03

16   context was.

17           THE COURT:  You know, let me tell you that the context

18   was apparently -- and the reporter, I've got the report here,

19   says it was in response to his request about the Guadalupe town

20   meeting.  What the monitor passed on to me that the sheriff      16:22:18

21   said to him was that he only meant if he had 287(g) authority

22   again.  Well, if he read my order --

23           And by the way, Chief Deputy, you took the training.

24   Has Sheriff Arpaio taken the training?

25           CHIEF DEPUTY SHERIDAN:  No, Your Honor.                    16:22:37

1          THE COURT:  All right.  Well, I think you better take

2     the training before you're in compliance.  What he said was he

3     would do it all over again.  And then he told my monitor that

4     he would -- he only meant if he had 287(g) authority, but if

5     you read my order, it would still be unconstitutional under two          16:22:50

6     or three different grounds.  And finally, he told my monitor

7     that he understands I'm a nice guy, but he thinks I lack a

8     sense of humor.

9          I understand that.  I try to be a nice guy, and I try

10    to have a sense of humor.  But I don't think it's very funny          16:23:04

11    when we're talking about the Constitution, or about my -- about

12    the injunctive orders that I have specified.

13          MR. CASEY:  No.

14          THE COURT:  And so I would ask you, if nothing else,

15    that you have this portion of the transcript transcribed, and          16:23:16

16    because Sheriff Arpaio chose not to attend I'd ask you to

17    review it with him personally.

18          MR. CASEY:  Your Honor, I can avow to you that that

19    will happen.  But I -- again, please, your courtroom, tell me

20    to shut up if I've gone too much, but the point is you asked if          16:23:31

21    good faith requires.  Good faith exists in the deed, not in the

22    spoken word.  And I respectfully submit to you that if you

23    condition a formal imprimatur of approval by this Court on

24    compliance on whether or not you agree with an elected

25    official's public speech --          16:23:50

 1           THE COURT:  That is not at all what I'm conditioning

 2    it on.

 3           MR. CASEY:  Well, that's what --

 4           THE COURT:  I'm conditioning it on what he is saying

 5    as the chief policy maker of Maricopa County.                    16:23:59

 6           MR. CASEY:  Then what I would respectfully submit --

 7    okay.  I understand that.  I would respectfully submit that if

 8    that is the case, then there ought to be some evidence by these

 9    good, honorable people, by these folks, by these folks, that

10    will come in and tell the Court:  You know what?  Joe Arpaio    16:24:14

11    was saying this.  And look at the effect on it.  There's no

12    cause and effect.  Right now, right now we're in the baby --

13    the infancy of this whole matter.  The issue is whether we're

14    going to be compliant or not compliant.  And if in fact we come

15    to a day that items 4, 7, 72 were not compliant, it's not       16:24:30

16    appropriate to believe that it's due to Joe Arpaio's comment;

17    it's not appropriate to guess or speculate.  There ought to be

18    some evidence showing a causal link --

19           THE COURT:  You need to move closer to the microphone.

20           MR. CASEY:  I apologize, Your Honor.  I get carried       16:24:48

21    away.  There ought to be a causal link that the monitor that we

22    come forward, all this.  And ultimately good faith, I believe,

23    results in action.

24           THE COURT:  All right.  Anything else you wanted to

25    say on that point?                                               16:25:00

 1        MR. CASEY:  I'm trying to read a note real quick, Your

 2   Honor.  You know, the final -- yeah, the final -- the final

 3   point is this on good faith.  Sheriff Arpaio himself and his

 4   chief deputy have directed that everyone in their office,

 5   orally and in writing, especially after the early hearings we          16:25:18

 6   had, comply with your order.  And I wanted to reiterate that to

 7   you because of the strong feelings, the strong position the

 8   Court had that it was mentioned in the monitor's quarterly

 9   report and we respect that assessment.  We're not interested in

10   technical compliance; it is factual, good faith compliance.           16:25:39

11        And we understand that this is a new road that we're

12   traveling down.  There will be hiccups; some we wish didn't

13   exist.  But I will tell you that everyone wants to see that

14   happen.  It is not gamesmanship; it's not dotting the I's and

15   crossing the T's.  It means we get it done.  And it's either          16:26:02

16   done or it's not.

17        And it's irrelevant, whoever is the elected official,

18   whatever he says, because the sheriff is going to disagree

19   about certain findings.  That's his constitutional right.  But

20   whether or not we have actual compliance, Your Honor, ought to        16:26:15

21   rest on its own --

22        THE COURT:  All right.

23        MR. CASEY:  -- and if there's good faith, there ought

24   to be a causal link.

25        THE COURT:  I've got your message, I think.                      16:26:25

1            MR. CASEY:  Yes, sir.

2            THE COURT:  Do you have anything else you want to say?

3            MR. CASEY:  No, sir.

4            THE COURT:  All right.  I'm going to hear from

5    Ms. Wang, and then I see that Chief Warshaw would want like to    16:26:29

6    make a comment.  Ms. Wang?

7            MS. WANG:  Thank you, Your Honor.

8            Your Honor, the sheriff, as the head of the law

9    enforcement agency, does not have a First Amendment privilege

10   to make public statements and statements to his rank and file    16:26:45

11   that countermand this Court's orders and the good faith efforts

12   of others in MCSO to comply with this Court's orders.  The case

13   law makes that clear.

14           Under the Spallone versus United States case in the

15   Supreme Court, Stone versus City and County of San Francisco in    16:27:05

16   the Ninth Circuit, Hook versus Arizona Department of

17   Corrections in the Ninth Circuit, and a Sixth Circuit case most

18   on point because it addressed specifically the issue of

19   expressive conduct that countermanded a court's injunction,

20   quote:  The right to speak is not absolute and may be regulated    16:27:23

21   to accomplish other legitimate objectives of government.  The

22   First Amendment does not confer the right to persuade others to

23   violate the law.  And that's a quote from Kasper versus

24   Brittain in the Sixth Circuit.

25           Your Honor, all these cases teach that it is relevant,    16:27:43

1   in considering whether any conduct of an agency that's under a

2   court's injunction, has a record of past violations of the

3   Court's orders.  And with the sheriff's latest statement which,

4   with all due respect to Mr. Casey, was not merely expressing

5   disagreement, but was saying "I would do it all over again,"          16:28:04

6   you look at the record of what's happened before and I think

7   it's worth taking a moment to go through all of the instances

8   in which the sheriff or other command staff at MCSO have

9   violated this Court's orders.

10          First there was the spoliation of evidence during the        16:28:21

11  litigation of this case resulting in the Court sanctions

12  orders.

13          Second, as the Court noted in its trial findings of

14  fact and conclusions of law, MCSO violated the Court's summary

15  judgment order and preliminary injunction.                            16:28:36

16          Third, in a video statement made after the Court made

17  its findings of fact, the sheriff said, I will abide by the

18  Court's decision, but he blamed all of the findings on the

19  federal government, which was contrary to the specific findings

20  of the Court that MCSO engaged in intentional discrimination.         16:28:55

21          Fourth, in August of 2013, the sheriff sent out a

22  fund-raising letter which was reported in the media in this

23  city, where he said again, I will abide by the Court's order,

24  but the rest of the statements were all defiant.  He said,

25  Ultimately, the Court wants me to have a federal monitor in my        16:29:16

1    office looking over my shoulder making sure everything I do is

2    politically correct.  I was elected by the people and won't

3    stand for it.  And he insinuates that despite what this Court

4    found about the source of all of the constitutional violations,

5    the Sheriff's Office would continue to enforce the immigration          16:29:33

6    laws.

7           Fifth, days after this Court issued its remedial

8    injunction and supplemental permanent injunction in October of

9    2013, the sheriff was quoted in the press saying, Some people

10   want more community outreach, as he was standing out doing a            16:29:48

11   saturation patrol.  Well, I just started it.

12          Sixth, we all know very well, after having been in

13   this court on other status conferences, that at the

14   preoperation briefing before that October saturation patrol

15   days after the Court's supplemental permanent injunction, Chief         16:30:06

16   Deputy Sheridan made statements that were very derogatory of

17   this Court's power and its orders, and Sheriff Arpaio expressly

18   endorsed those statements.

19          Seventh, after the October saturation patrol, Sheriff

20   Arpaio stated to the media that he was not concerned about              16:30:26

21   being in violation of the Court's order, and that, quote,

22   No one is going to take my authority under the Constitution,

23   end quote.

24          Eighth, we had Chief Deputy Sheridan's op-ed in the

25   Arizona Republic in January which again was very derogatory of          16:30:41

1    the Court's orders.

2          Ninth, in March, in an unofficial community meeting,

3    Chief Trombi made again statements that mischaracterized the

4    Court's findings of fact, and summarized the Court's finding as

5    being based on the fact that the ACLU prevailed because we          16:31:00

6    showed only that people with Hispanic surnames were held 14

7    seconds longer than people without; and also, that the Court

8    found that the MCSO had violated the constitutional rights of

9    the plaintiff class only because two MCSO deputies

10   unconstitutionally used race as one factor, both false             16:31:18

11   statements and mischaracterizations of the Court's orders.

12         Tenth, it was reported in the media that in March of

13   2014 the sheriff sent out a fund-raising letter.  This was just

14   two days after another status conference that addressed the

15   Arpaio and Sheridan comments before the October saturation         16:31:37

16   patrol, and the requirement for a corrective statement.  In

17   that fund-raising letter in March of 2014 the sheriff stated

18   that, and I quote, There have been rampant unfounded charges of

19   racism and racial profiling in my office.  He also said, We

20   don't racially profile.  I don't care what everybody says.         16:32:00

21   We're just doing our job.  We have the authority to arrest

22   illegal aliens under the federal program.  Again, the letter

23   mischaracterized this Court's findings.

24         Eleventh, MCSO and the defendants continue to insist

25   on the appointment of Hector Martinez as the community liaison     16:32:14

1    officer under this Court's orders, even though he had been

2    involved in the circulation of racist anti-Mexican and

3    anti-Latino e-mails among MCSO deputies on agency e-mail.

4           And we've learned today that Hector Martinez, despite

5    being relieved of the responsibility for being a community        16:32:36

6    liaison officer under this Court's order, is still listed as

7    the community liaison officer of the MCSO on MCSO's website

8    today.

9           Twelfth, the sheriff has continued to blame the

10   federal government for the Court's findings.  For example, he     16:32:52

11   sent a well publicized letter publicized by his own press

12   office to the Attorney General of the United States again

13   blaming the federal government for its liability in this case

14   and demanding payment from the federal government.

15          Thirteenth, and this will circle back to the first        16:33:10

16   subject we addressed today in the status conference, we see in

17   the information contained in the monitor's report on the

18   Armendariz and related investigations, and I would submit in

19   the defendants' response to this Court, literal contempt for

20   the monitor as an arm of this Court and for the Court's orders.    16:33:33

21          Based on that record, Your Honor, and under the case

22   law that I've cited, I think that it is time to issue remedies

23   to prevent the countermanding of MCSO's other compliance

24   efforts and the corrosive effect of statements of the sheriff

25   and other command staff that are derogatory toward the Court's     16:34:01

1   orders and dismissive of the power of the federal judiciary to

2   correct constitutional violations.

3           As the Court noted, the sheriff made his most recent

4   comments in response to a question about the Guadalupe raid, or

5   saturation patrol, in 2008.  This Court made specific findings          16:34:20

6   about that 2008 operation.  In Your Honor's trial order at page

7   53, you found that the MCSO considered race as one factor among

8   others in selecting Guadalupe as the site for a large-scale

9   saturation patrol.  And that is what the sheriff was referring

10  to when he said recently that he would do it all over again.            16:34:43

11          Your Honor, I think that plaintiffs have a list of

12  remedies that we would urge the Court to adopt at this point to

13  address the repeated statements and other conduct of the MCSO

14  that undermine the Court's orders.  And in thinking about what

15  some of those options are, we see exactly why the sheriff's            16:35:05

16  comments are not merely expressing disagreement and not

17  privileged First Amendment expression.

18          The first option that I think needs to be addressed

19  is, as the Court noted, other personnel in MCSO, with counsel

20  for the parties and members of the monitor team, have spent an         16:35:29

21  enormous amount of time and energy in making a training program

22  to implement this Court's provisions in supplemental permanent

23  injunction.  That training is undermined and countermanded by a

24  sheriff saying that he would do it all over again.

25          And when you think about what the remedy should be,            16:35:50

1   additional training to say, Don't listen, MCSO rank and file,

2   to your sheriff, to the head of your agency, we need to do what

3   we're training you to do now --

4           THE COURT:  Let me ask you, Ms. Wang --

5           MS. WANG:  Yes.                                          16:36:09

6           THE COURT:  I would ask you to consider, Sheriff

7   Arpaio is an elected official.  He's got to be allowed to say

8   what he wants to say, doesn't he, to get elected?

9           MS. WANG:  Um-hum.

10          THE COURT:  But that assistant mean that if I let him   16:36:26

11  say what he wants to say, that there aren't corresponding

12  sanctions.

13          MS. WANG:  That's right, Your Honor.  I don't

14  believe -- plaintiffs are not asking at this time that the

15  Court enjoin the sheriff from saying anything --               16:36:40

16          THE COURT:  All right.

17          MS. WANG:  -- but there should be consequences.

18          THE COURT:  And in fact, he has a broad range and a

19  presumptively broad range of being able to say whatever he

20  wants.  It is only to the extent that he frustrates the        16:36:48

21  provisions of my order as the chief policy maker of Maricopa

22  County that I have the authority to do anything, isn't it?

23          MS. WANG:  That's right, Your Honor, and that is our

24  position.

25          THE COURT:  So do you have sanctions that you -- not    16:36:59

 1    sanctions, but do you have an appropriate response by this

 2    Court that you think is indicated?

 3         MS. WANG:  Yes, Your Honor.  We believe that

 4    additional new training and new policy guidance needs to be

 5    issued in order to keep --                                    16:37:15

 6         THE COURT:  Well, what do you want me to train them to

 7    do, ignore their sheriff?

 8         MS. WANG:  Essentially, Your Honor, that's the

 9    position that the sheriff and other command staff had put the

10    Court into in order to --                                     16:37:28

11         THE COURT:  I will order today, and I think I've

12    already ordered it, that Sheriff Arpaio --

13         Is the training done?

14         MR. CASEY:  No.

15         THE COURT:  I'll order that Sheriff Arpaio, I think     16:37:37

16    he's already required to take the training and he hasn't taken

17    it yet, I'll order that today as a result.

18         And then, you know, MCSO, again, we've recognized that

19    they've made significant efforts, but they're not close to

20    being in compliance yet.  So their three-year compliance period  16:37:59

21    hasn't even begun.

22         I would ask you, I would invite you to file a brief

23    whenever you file it appropriate, you feel like the sheriff is

24    undermining the training required by the order and in his

25    directions to his department.  But I would invite you when you  16:38:17

1   do that to consider carefully, very carefully, the actions you

2   wish this Court to take.  I do not wish to in any way prevent

3   Sheriff Arpaio from being able to say what he wants to say as a

4   candidate.  But I do have to be careful about that effect both

5   on his department and the effect on the community which --          16:38:45

6   against which he has engaged in discriminatory conduct.

7          MS. WANG:  Yes, Your Honor.

8          THE COURT:  So I'd invite you to give that some

9   thoughtful consideration.

10         MS. WANG:  Yes, Your Honor, we will.  And one thing I        16:38:56

11  will mention before sitting down is that we do believe that it

12  is time, in light of the litany of conduct that I just

13  outlined, for the Court to issue an order that specifies that

14  if MCSO command staff, including the sheriff, make statements

15  to MCSO personnel, or publicly, that, number one, express an       16:39:23

16  intent or a desire to disobey any order of the Court, or to

17  countermand MCSO's compliance with any order of this Court,

18  other than pursuing legal relief such as their pending appeal,

19  that there will be consequences attached to those statements.

20         Again, plaintiffs do not ask the Court to prevent the       16:39:45

21  sheriff from saying anything he wishes.  But fact is, as the

22  Court has noted, the sheriff's words as the chief of the law

23  enforcement agency will have an impact and in fact are orders

24  to the rank and file.

25         And with all due respect to Mr. Casey, the sheriff's        16:40:05

1   most recent comment, like those that preceded it, were not

2   merely disagreeing with the Court's orders; it was a statement

3   of a desired action.  And we ask the Court to keep that in mind

4   and we will submit briefing on this as well.

5           THE COURT:  All right.  Thank you.                      16:40:27

6           Chief Warshaw, do you have something you wanted to

7   say?

8           MONITOR WARSHAW:  Very briefly, Your Honor.  As the

9   Court is aware, I am not an attorney, so I'm not in a position

10  to comment on First Amendment issues.  But as the Court is also 16:40:34

11  aware, I have been a monitor for 15 or 16 years, and we do

12  bring hundreds of years of police experience.

13          I respectfully disagree with what Mr. Casey said,

14  though I'm certainly not in a position to contest his First

15  Amendment argument on behalf of his client.  But it has been    16:41:01

16  our experience that the utterances of chief executives of

17  police agencies, and in this case we've had other executives of

18  the agency here before this Court regarding their comments, has

19  a chilling impact on the reform process in any police agency.

20  And while I don't disagree with what Mr. Casey's saying about   16:41:23

21  at the end of the day it's the deed that counts, I think

22  certainly in the presence of Chairman Barney, Mr. Manos,

23  Ms. Wilson, who do not want this project to go on in

24  perpetuity, attitudes as expressed by executives of police

25  agencies are the final determining factors as to whether or not 16:41:43

 1   these projects come to a close after three years or after seven

 2   years.  These organizations are very, very difficult to move.

 3   Reform does not come easily.  Even the comments that -- that

 4   Mr. Casey indicated were perhaps not artful in their response

 5   to us feeds a certain resistance factor that already exists        16:42:05

 6   within the ranks of the department, and I think it would be

 7   very good for the welfare of this project, but most importantly

 8   for the welfare of this community if we can be prudent in these

 9   kinds of comments or else our job, and ultimately the job of

10   those who are committed to making these reforms, becomes that     16:42:25

11   much more difficult.

12            THE COURT:  Mr. Casey.

13            MR. CASEY:  Yes, Your Honor.  May I briefly reply?

14            THE COURT:  I'm going to require it be brief, because

15   I do want to finish today, and I still had some stuff that I      16:42:36

16   want to talk to you about under seal.

17            MR. CASEY:  Yes, sir.  Your Honor, briefly, I've heard

18   the words from plaintiffs "undermine," "frustrate the order,"

19   "minimize the order"; I've heard from the monitor "attitude."

20            And I respect these individuals, but the fact of the     16:42:52

21   matter is there needs to be a burden of proof to make a causal

22   link.  This is not about attitude; this is about compliance.

23            What we're also hearing being suggested by the ACLU is

24   for the first time in its history it is against the First

25   Amendment of anyone -- excuse me, it's in favor of the First      16:43:12

1    Amendment except for my client.  It's advocating a prior

2    restraint.  A penalty for speech it disagrees with and the

3    Court may disagree with.  The Court has done an exceptional job

4    of not politicizing this.  That interjects the politics back

5    into this.                                                      16:43:28

6         So I guess there needs to be a burden of proof in

7    showing a link between whatever comments, if the Court

8    disagrees with them, doesn't like them, the plaintiffs don't,

9    and somehow a noncompliance issue.  It's not about attitude.

10   Attitude helps, but not the sheriff's attitude.                 16:43:44

11        THE COURT:  Well, I appreciate what you say.  It's

12   clear that what we're talking about here mostly is a status,

13   the status of how the Maricopa County Sheriff is doing under

14   the monitor.  He's issued his first of many reports.

15        I expect that there will be extremely positive change      16:43:59

16   as a result of this meeting.  I expect it not only from

17   Internal Affairs, from Investigations, from Administration, but

18   I expect it from Sheriff Arpaio.  And to the extent it doesn't

19   come, I will take it into account when I am determining whether

20   or not this agency is in compliance, because I can't ignore      16:44:27

21   things that he says when they are as direct and provocative as

22   they are.

23        Now, I'm not going to make that determination now.  I

24   will allow Ms. Wang to file whatever motion she wants.  The

25   sheriff is allowed to say whatever he wants.  But to the extent  16:44:48

```
 1   as the chief administrative officer and policy maker of the

 2   Maricopa County Sheriff's Office he suggests that there should

 3   not be complete compliance with this order and that he's not

 4   willing to comply, I'm willing to take that into account in

 5   making a determination whether the MCSO is in compliance with      16:45:03

 6   my order.  And I'm just advising him now so that when the time

 7   comes that I have to make that determination, he'll be aware

 8   and he can make his choices.  He can continue to be the

 9   sheriff.  But if he violates my orders, he'll continue to do it

10   under the sanction of this Court.  And I'm not talking simply      16:45:22

11   about what he says; I'm talking about what he does more than

12   what he says.  But that also factors in.

13          With that being said, and I do appreciate your

14   willingness to stay, I have some questions for you about the

15   material that you submitted to me under seal and so this          16:45:38

16   hearing is now going to be closed to the public.  The parties

17   may remain, my monitors may remain, and the Court security

18   staff may remain.  Everyone else must leave.

19          (The courtroom is cleared.)

20          THE COURT:  Sir, who are you?                              16:47:26

21          MR. BENDOR:  I'm with the ACLU of Arizona, Your Honor.

22          MS. WANG:  Your Honor, this is Josh Bendor.  He's a

23   new attorney with the ACLU of Arizona and is not yet admitted

24   to the bar but has joined our plaintiffs' team.

25          MR. CASEY:  No objection.                                  16:47:43
```

1          (Page 81, line 1, through page 118, line 23, are

2    omitted and sealed by order the Court.)

1

2                     C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 3rd day of November,

18   2014.

19

20

21                         s/Gary Moll
                    _____

22

23

24

25