1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                   )
                 Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                   )
                 vs.                )   Phoenix, Arizona
7                                   )   October 28, 2014
    Joseph M. Arpaio, et al.,       )   3:04 p.m.
8                                   )
                 Defendants.        )
9   _____)

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          BEFORE THE HONORABLE G. MURRAY SNOW

17      (Volume 2 - Status Conference, Pages 81-119)

18                 SEALED PROCEEDINGS

19

20

21

22  Court Reporter:          Gary Moll
                             401 W. Washington Street, SPC #38
23                           Phoenix, Arizona  85003
                             (602) 322-7263
24
    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3   For the Plaintiffs:        Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Immigrants' Rights Project
5                              39 Drumm Street
                               San Francisco, California  94111
6                              (415) 343-0775

7                              Andre Segura, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
8                              125 Broad Street, 18th Floor
                               New York, New York  10004
9                              (212) 549-2676

10  For the Defendants:        Timothy J. Casey, Esq.
                               James L. Williams, Esq.
11                             SCHMITT, SCHNECK, SMYTH,
                               CASEY & EVEN, P.C.
12                             1221 E. Osborn Road
                               Suite 105
13                             Phoenix, Arizona  85014-5540
                               (602) 277-7000
14
    For Defendant Arpaio:      Thomas P. Liddy, Esq.
15                             Senior Litigation Counsel
                               MARICOPA COUNTY ATTORNEY'S OFFICE
16                             Civil Services Division
                               222 N. Central Avenue
17                             Suite 1100
                               Phoenix, Arizona 85004
18                             (602) 506-8066

19

20                                                              16:47:49

21

22

23

24

25

1       THE COURT:  All right.  Some questions.  Do you have

2  any objection to providing the material you provided me under

3  seal to the plaintiffs if I place them under an obligation not

4  to disclose it, period?

5       MR. CASEY:  No objection.                                16:47:58

6       THE COURT:  All right.  Then I'm going to require you

7  to do that.

8       I don't have any problem as it relates to closing

9  criminal investigations where the only possible criminal

10 malfeasant was Sergeant Armendariz.  It's kind of hard to      16:48:12

11 prosecute him at this point.

12      I am con -- and so to the extent that you talk about

13 departmental report 2014570, 2012201793, 201236220, 2011156447,

14 the only concern I have is I note that some of those

15 departmental reports are from previous years, 2012.  Do they   16:48:38

16 arise because of your videotape review, or do they -- did they

17 arise, did they come to your attention from some other source

18 of information which may implicate other Maricopa County

19 deputies or personnel?

20      MR. CASEY:  Your Honor, I can take the lead on this.      16:48:55

21 I'm going to have defer to Ms. Stutz and Captain Bailey.

22      My understanding is all of them arise from the videos,

23 is that accurate?

24      MS. STUTZ:  Your Honor, with respect to those matters,

25 those initial inquiries did arise from the process of video    16:49:07

1    review, as well as the secondary backup investigation that is

2    conducted.

3          If I could, briefly, Your Honor, essentially there was

4    an initial video review done by a detective.  If they

5    identified any potential violation -- policy, administrative,      16:49:24

6    or criminal in nature -- or that they believed to be the case,

7    they would subsequently forward that to a lieutenant review

8    process.  The items that we're talking about are all items and

9    videos that were reported for lieutenant review.

10          Subsequent to a lieutenant review, all background          16:49:40

11    information about that stop that can be gathered from any other

12    MCSO source -- such as a citation, or any other type of

13    documentation, running through a JWI database, or things of

14    that nature -- there's a background packet, we call it, that is

15    put together in connection with that, and it's a result of all   16:49:58

16    of that that information that then identified that, for

17    example, one of those cases involved an inconsistency between

18    what was seen on the video and what was reported in a search

19    warrant.  So it was the inconsistency between the video review

20    and what was observed on the video and what was reported in the  16:50:14

21    search warrant that caused the MCSO to forward that information

22    to the MCAO for purposes of quashing a warrant, if it was

23    outstanding, or otherwise addressing the criminal matter.

24          THE COURT:  All right.  I don't have any problem to

25    the extent you dismiss those, as long as there isn't any other   16:50:31

1   information in the video itself that would suggest or implicate

2   any other knowledge or cooperation by any other MCSO employee,

3   participant, posse member, whatever.

4        MS. STUTZ:  Correct, Your Honor.  With respect to the

5   four that we have identified thus far, I do believe that there          16:50:50

6   was possibly one that did involve another personnel on scene.

7   However, the appearance of that person, my understanding is --

8   and Sergeant Fax is available as well; we could address that

9   more specifically.  But I do believe that with respect to that

10  particular one, the individual was not present at the time that         16:51:09

11  the particular incident that gives rise to the reason for the

12  dismissal occurred, is that -- no.

13        Do you want -- come forward.

14        This is Sergeant Steve Fax, Your Honor.

15        THE COURT:  Hello, Sergeant Fax.

16        SERGEANT FAX:  Good afternoon, sir.

17        THE COURT:  My monitor has been complimentary of your

18  work, sir.

19        SERGEANT FAX:  I appreciate it.  Thank you.

20        The specific case that we're talking about, there was          16:51:36

21  another MCSO employee initially on scene when this conduct

22  occurs, and that case is currently under investigation as to

23  what he saw, what he heard, and what his participation was in

24  that.

25        THE COURT:  All right.  That's a separate                     16:51:49

1   investigation as opposed to the one that you seek to dismiss?

2           SERGEANT FAX:  That is -- the criminal aspect of that

3   was sent to MCAO for dismissal of the warrant and any

4   subsequent charges for that individual.  There is currently an

5   administrative investigation of that incident occurring.          16:52:02

6           THE COURT:  All right.  I'm not sure that I understand

7   what you just told me, and I want to pursue it.

8           SERGEANT FAX:  Okay.

9           THE COURT:  There's a criminal and an administrative

10  investigation, or not?                                            16:52:11

11          SERGEANT FAX:  No, there is -- there was solely an

12  administrative investigation as far as we are concerned.  That

13  based on the video review, as Ms. Stutz said, we saw the

14  discrepancies where we felt that basically the warrant should

15  not have been issued for this individual.  So we forwarded that   16:52:26

16  based off of Deputy Armendariz's initial arresting of that

17  person, that criminal complaint.  That was forwarded to MCAO

18  for dismissal.

19          THE COURT:  All right.

20          SERGEANT FAX:  We now have, since there was a             16:52:39

21  secondary employee on scene, an administrative investigation

22  occurring.

23          THE COURT:  All right.  But are you satisfied that

24  there is no possible criminal charge against the secondary

25  employee?                                                         16:52:48

1           SERGEANT FAX:  It does not appear that it would rise

2    to that level, Judge.

3           THE COURT:  Have you reviewed it, Chief?

4           MONITOR WARSHAW:  Yeah, we're aware of those cases.

5           THE COURT:  And have you done a review of the          16:52:56

6    videotape?

7           MONITOR WARSHAW:  No.  No.

8           THE COURT:  Okay.

9           MONITOR WARSHAW:  No.  But we are aware of it.

10          THE COURT:  All right.  You're aware of it and you can  16:53:03

11   review it if you choose to do so, I presume?

12          MONITOR WARSHAW:  Pardon?

13          THE COURT:  You can review any videotape, so you can

14   review that if you want to.

15          MONITOR WARSHAW:  Yes.                                  16:53:12

16          THE COURT:  All right.  Thank you, Sergeant Fax.

17          SERGEANT FAX:  Yes, sir.

18          THE COURT:  In the in-camera review, you talk about

19   the criminal inquiry that was generated as a result of the

20   statements made by former deputy Cisco Perez, IA2014-0295.    16:53:26

21          When you give it an IA number, I don't know whether

22   it's a criminal investigation or administrative investigation,

23   and I apologize for my ignorance.  Which is it?

24          MS. STUTZ:  Sir, it could be either.

25          THE COURT:  Which is it, then?                         16:53:44

1        MS. STUTZ:  In that particular case, it was initiated

2   as a criminal inquiry.  That's why it was given a number

3   pursuant, of course, to the Court's order, that all allegations

4   of potential misconduct be identified with a number.

5        So that number, that 295 number, is considered                16:53:52

6   associated to the criminal inquiry regarding the statements

7   made by Deputy Perez.

8        THE COURT:  And that's --

9        MS. STUTZ:  Former Deputy Perez.

10       THE COURT:  -- the one that is now closed?                     16:54:01

11       MS. STUTZ:  Yes, Your Honor.

12       THE COURT:  I would suggest that you reopen it to the

13   extent that it may involve -- well, I've already expressed

14   earlier my dissatisfaction with the idea that you resolve one

15   investigation related only to what Deputy Cisco says when you      16:54:18

16   have -- and again, I'm not saying it's true -- but you have

17   very similar allegations made by Deputy Armendariz, with very

18   much contraband to back it up, it strikes me that there ought

19   to be an overarching criminal investigation here that is not

20   complete.                                                          16:54:35

21       MS. STUTZ:  Sir, if I could address that concern.  The

22   items of evidence that we're speaking of with regard to the

23   seizure of license plates, driver's licenses, or what was

24   described by most as small statues or other trinkets that they

25   would take back that were to be used as training aids, those      16:54:54

1    items would not, under most circumstances, amount to a theft,

2    and so --

3              THE COURT:  You're telling me credit cards don't

4    amount to a theft?

5              MS. STUTZ:  No, sir, a credit card certainly could.    16:55:04

6              THE COURT:  Well, how many credit cards do we have in

7    Armendariz's home?

8              MR. CASEY:  Your Honor, let me add, there are a lot.

9    Okay?  There's a lot of those things.  But what we're also

10   talking about is Cisco Perez, so there's no confusion, is      16:55:22

11   apparently -- what'd he say?  "Pocketing" was the language he

12   used -- items from abandoned homes, drop houses, where there's

13   no identifiable owner, so I just want to make sure that you've

14   got Armendariz, then you got an abandoned -- abandoned personal

15   property on a home site.                                        16:55:45

16             THE COURT:  Chief, did you have anything you wanted to

17   say there?

18             MONITOR WARSHAW:  Yes.  I'm not in agreement with what

19   Ms. Stutz said that the -- that the items that she cited, in

20   terms of their worth, would not -- would not constitute a       16:55:56

21   theft.  I --

22             THE COURT:  Well, I think that Ms. Stutz, when she

23   thinks about it, realizes a credit card constitutes a theft and

24   a driver's license constitutes a theft, theft of identity,

25   doesn't it?                                                     16:56:11

1          MS. STUTZ:  Your Honor, potentially.  However --

2          THE COURT:  Potentially.  I'm not saying it does, but

3     it certainly potentially does.

4          MS. STUTZ:  Yes, Your Honor, but if I could address

5     that concern.  There's also a presumption that -- I mean,          16:56:20

6     driver's licenses can be seized legally.  That's something that

7     has never been addressed by the monitor team.  We have

8     identified that issue that in this state, if a driver's license

9     is suspended, it can be taken from the driver, and -- and that

10    could have occurred --                                              16:56:34

11         THE COURT:  Sure.

12         MS. STUTZ:  -- legally, but --

13         THE COURT:  But you haven't done anything to determine

14    whether that was the case at this point.

15         MS. STUTZ:  No, sir.  We have done quite a bit of            16:56:39

16    investigation, the MCSO has done quite a bit of investigation

17    with respect to those issues.  In fact, as I --

18         THE COURT:  You haven't gone back and talked to the

19    people.

20         MS. STUTZ:  Sir, actually, with regard to the               16:56:48

21    two hundred -- there's approximately 218 items -- 239, I

22    apologize, 239 items of evidence for which the MCSO was unable

23    to connect those items to either a video or other documentation

24    within the MCSO databases --

25         THE COURT:  Did you go do an open inquiry?                  16:57:07

1        MS. STUTZ:  I'm sorry?

2        THE COURT:  Did you do an open inquiry?

3        MS. STUTZ:  "Open inquiry"; I'm not sure I

4   understand --

5        THE COURT:  In other words, you take the name, you run     16:57:13

6   the name as against any stops by any MCSO officer, not just

7   against Armendariz.

8        MS. STUTZ:  Your Honor, in order to do that, my

9   understanding is that that's the log scan process.  And the log

10  scan process essentially, Your Honor, is something we have to     16:57:25

11  run in coordination with the Department of Public Safety --

12       THE COURT:  So your answer would be no, you haven't

13  done it.

14       MS. STUTZ:  We requested it to be performed, sir, but

15  we have not received any results, that's correct.     16:57:34

16       THE COURT:  All right.  That's my concern.

17       MS. STUTZ:  Yes, sir.  And Your Honor, I believe it

18  was, let's see, October 8th, I believe, don't quote me on that

19  date, I'm going off of memory there, sir, but in which we

20  initiated in-service training with an action plan that had been     16:57:51

21  submitted to the monitor team with regard to how we intended to

22  make citizen contact on those items of evidence, because we did

23  not want to continue to delay the investigation any further

24  when we understood that it would take quite some time to get

25  the data results from the Department of Public Safety.  And     16:58:08

1  so --

2          THE COURT:  Well --

3          MS. STUTZ:  -- that citizen contact has been

4  initiated, and individuals are being contacted with regard to

5  those items.                                    16:58:19

6          THE COURT:  Let me just say, Ms. Stutz, you said

7  earlier that the fact that you haven't initiated a criminal

8  investigation doesn't mean you won't, with respect to these

9  items.

10         MS. STUTZ:  Yes, sir.                    16:58:28

11         THE COURT:  You can be assured that before I sign off

12  on the idea that you've got a functioning IA department that

13  meets standards, you're going to have to run those down.  And

14  that's only to the extent that you aren't under any time clock

15  under the IA for administrative investigations.   16:58:41

16         Do you understand what I'm talking about?

17         MS. STUTZ:  Yes, Your Honor.

18         THE COURT:  All right.  Do you have any problem with

19  that, Ms. Wang?

20         MS. WANG:  No, Your Honor.               16:58:48

21         THE COURT:  All right.  Do you have any comment on

22  that, Chief?

23         MONITOR WARSHAW:  No.

24         THE COURT:  Okay.  With respect, then, to the

25  Armendariz investigation which you have as IA 2014-0221, is   16:58:55

1    that administrative?

2              MS. STUTZ:  Your Honor, that is the overarching.  It

3    is both at this time I would say criminal and administrative,

4    Your Honor, and that is because those items of evidence, for

5    example, what we were just describing, fall under that 221 item    16:59:11

6    number.

7              THE COURT:  Okay.

8              MS. STUTZ:  So there's still the potential for that

9    item to be criminal or administrative --

10             THE COURT:  All right.                                    16:59:18

11             MS. STUTZ:  -- in nature.

12             THE COURT:  Then pursuant to the understanding that

13   I've just indicated, I'm all right with that.

14             Did you have something you wanted to say?

15             MONITOR WARSHAW:  No, Your Honor.                         16:59:24

16             THE COURT:  Let's talk for a second about what you

17   call the spin-off investigations.

18             MS. STUTZ:  Yes, sir.

19             THE COURT:  IA number 2014-0541.  Currently identified

20   principles -- and this has to do with the seizure of property      16:59:35

21   by HSU.  The currently identified principals are Trowbridge,

22   Madrid, Sousa, Jakowinicz, Lopez, Montoya, and as many as 36

23   additional deputies who may be identified as principals in this

24   investigation.

25             I guess my only concern is, I'm satisfied as you go      16:59:53

1   forth with this you've disclosed it to the monitor, he can

2   monitor everything, but it does seem to me that the potential

3   at least is there that the Armendariz property will add -- or

4   has the potential to add to this investigation.

5         MS. STUTZ:  You're speaking specifically, sir, about          17:00:11

6   the additional 239 items we were just discussing?

7         THE COURT:  Yes.

8         MS. STUTZ:  Yes, sir.  It certainly could be added

9   into that one, Your Honor.  Or if the conduct warrants and the

10  information is appropriate, it would generate a separate IA         17:00:22

11  number as well.

12        THE COURT:  All right.  I take it that investigation

13  is not complete and no discipline has been determined to be

14  appropriate or meted out in that case.

15        MS. STUTZ:  That's correct, Your Honor, because the           17:00:33

16  investigation is not yet complete.

17        THE COURT:  All right.  And then 0542 concerns the

18  potential supervisory issues in reference to Armendariz?

19        MS. STUTZ:  Yes, sir.

20        THE COURT:  And again the principals appear to be the         17:00:44

21  same: Trowbridge, Madrid, Powe, Sousa, Jakowinicz, Letourneau,

22  Trombi.

23        Let me just share with you, Captain, this is a concern

24  that I have -- and I'm not trying to suggest that you have done

25  your job -- that you haven't made great efforts to do your job.     17:01:06

1    I mean, I think that we have been critical in some aspects, but

2    you've seemed to receive that well.  But when the monitor

3    mentioned that you -- you were in charge and supervising the

4    HSU during the events at issue here, it does seem to me to

5    create problems of conflict of interest and I think we have too     17:01:28

6    many of those in your department right now.

7            Do you understand my concern about that?

8            CAPTAIN BAILEY:  Yes.  Can I explain, Your Honor?

9            THE COURT:  Yes.  You can explain, but I'm not sure

10   that -- you can understand that even if -- well, let me listen     17:01:42

11   to you first.

12           CAPTAIN BAILEY:  In May of 2013, the chief deputy put

13   HSU under the division which I was a lieutenant.

14           THE COURT:  In May of what?

15           CAPTAIN BAILEY:  2013.                                     17:01:54

16           THE COURT:  Okay.

17           CAPTAIN BAILEY:  I was a lieutenant of the HIDTA

18   federal task force.  I was not in charge of --

19           THE COURT REPORTER:  Excuse me.

20           THE COURT:  Spell that.

21           THE COURT REPORTER:  You're Mr. Bailey, right?

22           CAPTAIN BAILEY:  Yes, sir.

23           THE COURT REPORTER:  Okay.  And you were saying you

24   were a lieutenant of the --

25           THE COURT:  H-I-D-T-A, High Intensity Drug Trafficking     17:02:07

1   Area task force.  I did not have supervision over HSU at any

2   time.  When I promoted to captain in October of last year, I

3   was in charge of HSU for a brief period of time as they were

4   transitioning out of any human smuggling activity as outlined

5   in your order.  They did not do any human smuggling activities      17:02:28

6   under my command, and I don't believe there was any misconduct

7   that we're currently investigating and that came out of my

8   command or my supervision.

9           THE COURT:  All right.  Well, to the extent that any

10  conflict arises because you become aware of anything that          17:02:46

11  happened during any time that you may have had any

12  responsibility for HSU, I expect you to come up with a pretty

13  good alternative plan for investigation that does not involve

14  you.  You understand what I'm saying?

15          CAPTAIN BAILEY:  Yes, Your Honor, I do.                     17:03:02

16          THE COURT:  All right.  Anything else that should be

17  raised on that as far as you're concerned, Ms. Wang?

18          MS. WANG:  Your Honor, I'm at a little bit of a loss,

19  since I haven't seen the documents that were produced in

20  camera.  I would share the Court's concerns about a possible       17:03:15

21  conflict of interest or appearance of one.  So I would just say

22  at this point that in the additional briefing that we plan to

23  submit to flesh out the remedies we asked for in our response

24  to the monitor's report we will also be proposing additional

25  remedies that have to do with IA, among other things.              17:03:36

1          THE COURT:  All right.  Well, to the extent that they

2    involve the matter under seal that you're going to receive,

3    you'll have to file your motion partly under seal to the extent

4    the investigative administrations aren't complete.

5          And I should add, I assume it's obvious to everybody,     17:03:50

6    that we're holding this under seal only because they're ongoing

7    investigations, but as soon as those investigations are over

8    we're lifting the seal.  People have a right to know what's

9    going on.

10         Any problem with that?                                    17:04:01

11         MS. STUTZ:  Your Honor, I would just briefly advise

12   the Court that under 38-1101, the investigation is not

13   considered complete until the conclusion of any disciplinary

14   action as well as its appeal process.

15         THE COURT:  That was my understanding from reading the    17:04:15

16   statute.

17         MS. STUTZ:  Thank you, Your Honor.  I just wanted to

18   clarify that point.  I wasn't clear when you said the --

19         THE COURT:  That's fine.

20         MS. STUTZ:  -- investigation being completed.             17:04:21

21         THE COURT:  That's fine.  So basically, the allegation

22   we're talking about, Ms. Wang, and I do appreciate that you are

23   at a loss -- actually, this allegation and the conflict also

24   applies to the last allegation -- this allegation has to do

25   with property issues, and that is some HSU folks were taking,   17:04:35

1   as you've heard Mr. Casey state, they were taking items and,

2   like, putting them as trophies on their desk or their wall

3   or --

4       MR. CASEY:  Actually, my understanding is they were

5   using them for training purposes.  You'd have Santa Muerto and      17:04:52

6   other --

7       THE COURT:  I don't -- I don't want to suggest or

8   characterize it other than to say it seems to me Sergeant

9   Trowbridge indicated that he put them as trophies on his wall,

10  license plates, and there were other, as Mr. Casey has             17:05:05

11  suggested, there were other religious statutes which may have

12  been used for training or may have been used as trophies, I

13  don't know, but that's -- that's part of the administrative

14  investigation, and although Mr. Casey's presenting it to me

15  here in the best light for the Sheriff's Department,               17:05:25

16  Captain Bailey, I assume you're not going to bother doing that:

17  You're going to be open-minded and you're going to find out

18  what the truth is.

19      CAPTAIN BAILEY:  Of course, Your Honor.

20      THE COURT:  All right.  To the extent that any of             17:05:37

21  those things involve the time that you were over HSU, though,

22  you have a conflict.

23      And the second thing that we talked about, Ms. Wang,

24  the second matter, has to do with the supervisory issues

25  relating to Armendariz and his personnel issues.                   17:05:49

1        And that, in fact, may involve you, Captain Bailey;

2   you'll have to look at it carefully.  I don't know when

3   Armendariz was moved out of HSU, but you need to look at that

4   very carefully.

5        CAPTAIN BAILEY:  Your Honor, I transferred Charley          17:06:04

6   Armendariz out of Special Investigations about three weeks

7   after I took it over.

8        THE COURT:  All right.  Well, you probably need to

9   consult with the monitor, then, as to how to handle that.

10        CAPTAIN BAILEY:  Yes, sir.                                 17:06:19

11        THE COURT:  2014-0544 has to do with a stop,

12   apparently, by Deputy Gandara.  What does that have to do with

13   the Armendariz matter?

14        MS. STUTZ:  Your Honor, did you intend to surpass 543

15   investigation, or --                                           17:06:37

16        THE COURT:  Did I do that?  I apologize.

17        MS. STUTZ:  No, that's all right.  I just wanted to be

18   sure Your Honor had asked any questions that you had.

19        THE COURT:  No, I didn't.  I did not intend to do

20   that, thank you.  Thank you, Ms. Stutz.                        17:06:47

21        543.  I'll the tell you that what concerns me about

22   this one is -- and you mentioned it, Mr. Casey.  I'm not

23   suggesting that you were trying to evade it in any way.  You

24   mentioned it and brought it to my attention.  Not only was this

25   after my order that prohibited any sort of immigration          17:07:04

1    enforcement, which makes me very interested, Captain Bailey, to

2    know what sort of procedures existed in the MCSO to inform

3    deputies of my orders and their requirements, that's one thing.

4           The other thing is as I recall, and I think I do

5    recall correctly, Sergeant Armendariz, in his testimony here,      17:07:26

6    testified to stopping five Asians as his proof that MCSO was

7    not racially profiling.  It disturbs me to the extent that

8    Deputy Armendariz might have been seeking to manufacture

9    evidence to disprove Hispanic racial profiling by profiling

10   South Koreans after I had prohibited any such order.              17:07:52

11          So I want all of that fully looked into, and I want to

12   know what the MCSO did to inform all of its deputies of my

13   December 23rd, 2011, order, which required them not to engage

14   in immigration enforcement.  Okay?

15          CAPTAIN BAILEY:  Yes, sir.                                 17:08:17

16          THE COURT:  Any question about that?

17          CAPTAIN BAILEY:  Could I mention something about that,

18   Your Honor?

19          THE COURT:  Sure.

20          CAPTAIN BAILEY:  That is a part of 542, and will be a      17:08:21

21   part of 543, as a -- as an issue that will be investigated

22   vigorously and under those two numbers.

23          THE COURT:  All right.  Thank you.

24          Anything else you wanted to add on that, Ms. Wang?

25          MS. WANG:  No, Your Honor.  Again, Your Honor, I'm at      17:08:34

1    a loss, so I just ask that I be able to respond after I've seen

2    the documents.

3            THE COURT:  And you will certainly be able to do that.

4            MS. WANG:  Thank you.

5            THE COURT:  Just so you're aware, what Deputy                    17:08:42

6    Armendariz apparently did, or at least the investigation is

7    after I issued my December 23rd, 2011, order, he stopped a car

8    because it had five South Koreans in it.  He detained them

9    while he summoned a supervisor and they turned them over to ICE

10   based on flaws in their passport, which, as Mr. Casey suggested   17:09:04

11   earlier, seems to be a very direct violation of my order that

12   was suborned not only by Deputy Armendariz, and not only,

13   perhaps, in the hope to create evidence, but was also

14   participated in by a Maricopa County Sheriff's Office

15   supervisor.  Any correction to that?                             17:09:20

16           MR. CASEY:  That is an accurate assessment, Your

17   Honor.

18           THE COURT:  All right.  544.  And I hope, Ms. Stutz,

19   I'm in the right place.  Deputy Gandara, what can you tell me

20   about that one?                                                  17:09:39

21           MS. STUTZ:  Your Honor, as we reported, essentially

22   Deputy Gandara is accompanying Deputy Armendariz on a traffic

23   stop, so it arose out of review of video associated to Deputy

24   Armendariz.  We identified that Deputy Gandara -- I hope I'm

25   saying his name correctly -- was also present on the stop.  It   17:09:53

1    appears from what shows on the video that Deputy Armendariz

2    approaches a vehicle and is calling for a transport unit -- in

3    other words, a detention unit that's going to transport people

4    to jail -- prior to even actually approaching the vehicle.  So

5    in the view of the MCSO, that is a problematic behavior and for          17:10:13

6    which Deputy Gandara will be questioned as to whether he knew

7    that that unit had been contacted.  It doesn't -- it's not

8    clear from just the video itself.

9          THE COURT:  All right.  Have you made all the

10   determinations from the video review that -- well, have you --          17:10:27

11   I guess I'm going to ask you, Captain Bailey, have you started

12   all the administrative investigations that you're going to

13   start as a result of the video review?

14         CAPTAIN BAILEY:  As far as I can tell at this point,

15   yes.  Thirty-one of them went out to the districts and              17:10:43

16   divisions and we kept eight in the Professional Standards

17   Bureau.  As I understand it, we may have a few more videos to

18   be reviewed, and certainly more cases could come out, but as of

19   today, what we've identified is what we have underway.

20         THE COURT:  All right.  Major Peters and Chief Kiyler,     17:11:00

21   have you started to review any of these videos or any of the

22   videos flagged by the MCSO?

23         MONITOR PETERS:  No, Your Honor.  We've only sampled a

24   few of the videos.

25         THE COURT:  Okay.  Well, I assume that at your            17:11:14

1   discretion, they have complete authorization to do that.

2          MONITOR PETERS:  Of course.

3          THE COURT:  Okay.  Anything you wanted to add to that,

4   Ms. Wang?

5          MS. WANG:  No, Your Honor, but the colloquy just now          17:11:25

6   reminds me that one thing I would request from defense counsel

7   is there's going to be a very large volume of video recordings

8   produced.  To the extent that defense counsel can help us to

9   identify those that have been flagged for lieutenant review or

10  are the subject of these administrative or criminal                 17:11:45

11  proceedings, we would very much appreciate that.

12         THE COURT:  I thought we'd already done that.

13         MR. CASEY:  Your Honor, we've already produced all the

14  videos.  We can -- I suppose we can do it again.  In terms of

15  flagged -- I'm sorry, in terms of flagging, I don't have any        17:11:58

16  trouble at all with co-counsel doing it.  I just don't

17  appreciate it when we flag it and then it ends up on the

18  evening news out here as Arpaio's greatest hits.  There's

19  nothing I can do about it.  That's the only reluctance I have

20  in identifying it for Cecillia.  Not that she does it, but          17:12:17

21  somehow, whenever we -- we identify our greatest hits, it ends

22  up being in the news.

23         THE COURT:  Well, I will tell you that to the extent

24  you're doing it --

25         MR. CASEY:  And again, I'm not -- again, I --               17:12:27

1          THE COURT:  Ms. Wang, do you want to address that at

2    all?

3          MS. WANG:  Your Honor, I would just say that no one on

4    the plaintiffs' team has ever leaked any discovery that was

5    given to us by defense counsel.  We've been extremely careful,    17:12:41

6    as Mr. Casey knows from the fact that we, in an abundance of

7    caution, filed our response under seal.  So I hope that

8    Mr. Casey isn't suggesting that anyone on the plaintiffs' team

9    has ever leaked any video or other discovery to reporters.

10          MR. CASEY:  That's why I hopefully was careful in         17:13:04

11    saying I'm not critical of Cecillia; I just hope that that

12    doesn't happen.  Because I can remember in 2009 being in

13    Lourdes, France, learning that their predecessor counsel had

14    leaked the deposition of Joe Arpaio to the media, which ran for

15    about five days.                                                17:13:22

16          And so, you know, that's the only thing I point out

17    for you, Your Honor, is it's certainly no problem sharing with

18    the plaintiffs, but I really don't want to highlight the bad

19    stuff if it's just going to be highlighted for KPHO.  And I

20    really -- I'm not asking the Court to make any resolution; I'm   17:13:37

21    just telling you what our -- we're -- we'll do it.

22          MS. WANG:  Your Honor, all I will say is to the extent

23    that videos that have been flagged for lieutenant review are

24    identified in an existing document, that should be produced to

25    us.  I hope that defense counsel will work with us to help      17:13:55

 1   identify those videos to facilitate our review.  If not, to the

 2   extent the monitor team has identified videos that have been

 3   flagged, we would appreciate receiving that as well.

 4            MR. CASEY:  Your Honor, I can share -- I can assure

 5   the Court and plaintiffs' counsel despite some missteps, we've      17:14:17

 6   had some spoliation, there hasn't -- I don't think there was a

 7   discovery dispute, so much, in this case.  We're not going to

 8   start one now.  I will work with Cecilia and we'll operate and

 9   assume each other's good faith.

10            THE COURT:  Okay.  If there is any issues about it,       17:14:34

11   Ms. Wang, you can raise them to me.  I will tell you that I am

12   reluctant in some ways -- I have sort of competing views.  One,

13   the public is entitled to know what has happened here

14   eventually.

15            To the extent it involves an ongoing investigation,       17:14:47

16   Ms. Stutz is going to win that every time until the

17   investigation is through.  And to the extent it doesn't involve

18   an ongoing investigation and there is no privilege, it seems

19   difficult to me, if you're going to receive the benefit of the

20   highlighting, that you would identify to the press that it was     17:15:11

21   highlighted by the MCSO.  I don't know that I can really

22   prohibit you from giving it to the press if it isn't otherwise

23   privileged.

24            And I guess the only other observation I would have to

25   make is to the extent that all of these videos were in            17:15:25

1   existence and were requested by the plaintiffs prior to this

2   lawsuit, it may raise an issue about the damages that

3   plaintiffs can eventually seek.  So if you cooperate now, you

4   may incur less of an expense later.

5           MR. CASEY:  We will cooperate.                          17:15:47

6           THE COURT:  All right.

7           MS. WANG:  Thank you, Your Honor.

8           MS. STUTZ:  Your Honor, if I may, just briefly.

9           Pursuant to the Court's prior order following the

10  August 7th hearing, all videos have been turned over to the    17:15:54

11  plaintiffs' counsel, as well as all of the spreadsheets that

12  identify which items have been the subject of further review.

13  So those documents, to the extent they exist, have been

14  provided to the plaintiffs' counsel.

15          THE COURT:  I thought that that may have been the       17:16:07

16  case, and I thank you for refreshing my recollection.

17          Deputy Hechavarria, what do we have with him?

18          MS. STUTZ:  Your Honor, I apologize again, but did you

19  want to go over 545?

20          THE COURT:  I did not if I did.                         17:16:21

21          MS. STUTZ:  Okay.

22          THE COURT:  Oh, Deputy Gonzalez, sorry.

23          MS. STUTZ:  That's okay, Your Honor.  I just want to

24  be sure we've addressed any questions that you did have.

25          This particular traffic stop had a video associated to  17:16:29

1    it, and it was not apparent what the violation of Arizona law

2    was when Deputy Gonzalez approached the vehicle.  And pursuant

3    to policy, the deputies are supposed to advise the violator

4    when they -- when they approach the vehicle or shortly

5    thereafter what the nature of the traffic law violation is, so          17:16:47

6    he'll be questioned as to that.

7           THE COURT:  All right.  Is that pretty much the nature

8    of the Hechavarria, Palmer, Joya, and Douglas investigations?

9           MS. STUTZ:  I'm just skimming, Your Honor, to be sure

10   that's a --                                                            17:17:02

11          Yes, Your Honor.  With respect to -- I would just

12   address investigation 548, which is the Douglas investigation.

13   And Detective Douglas at this point is an investigative lead,

14   because it does not appear on the video that he was aware that

15   Deputy Armendariz tased an individual while they were in the            17:17:26

16   back seat of a vehicle.  However, we need to, obviously,

17   inquire as to whether or not he was aware that that had

18   occurred.

19          To our knowledge, he subsequently did observe an

20   encounter that occurs once the subject has been exited from the         17:17:42

21   vehicle, but again, that's really the subject of the

22   investigation.  So it's not -- I wouldn't necessarily

23   characterize it as similar in nature, which was what you were

24   asking.

25          THE COURT:  All right.  I appreciate that.                       17:17:53

1        The investigations that have been sent out to the

2    districts, how will that go, Captain Bailey?

3        CAPTAIN BAILEY:  As of this morning I have about a

4    dozen outstanding.  I've been assured that they'll be back to

5    PSB by Friday completed.  The cases that were sent out to the          17:18:09

6    districts and divisions were of minor policy violations.  We

7    felt like due to the volume that we were trying to handle in

8    PSB, we could send those out to the commanders in those various

9    areas where those violations occurred and they could do a

10   district or division level investigation.                              17:18:27

11       THE COURT:  Has there been any determination of any

12   discipline in any of those cases that you're aware of?

13       CAPTAIN BAILEY:  I have a stack of those on my desk

14   which after this hearing and the remaining days of this week I

15   was going to review with members of PSB their findings.  I            17:18:44

16   understand that there are some sustained findings in those

17   cases, but they are going to be thoroughly reviewed by us

18   before final determination is made.

19       THE COURT:  And I apologize for my ignorance of the

20   administrative process, but once findings have been sustained,        17:18:55

21   who determines discipline?

22       CAPTAIN BAILEY:  Right now, chief -- Deputy Chief

23   Lopez.  We use -- utilize our matrix based on their past

24   disciplinary history and the severity of this violation that

25   was sustained, and that comes up with the appropriate                 17:19:12

1    discipline or punishment.

2          THE COURT:  And he will do that for all -- sustained

3    discipline in all of the districts, even if the districts have

4    done the investigations?

5          CAPTAIN BAILEY:  Yes, sir.                          17:19:24

6          THE COURT:  Do you have any questions on any of those,

7    Ms. Wang?

8          MS. WANG:  Not at this point, Your Honor.

9          THE COURT:  Chief Warshaw, anything you wanted to say?

10         MONITOR WARSHAW:  No, Your Honor.                    17:19:33

11         THE COURT:  I appreciate your being here.  Anything

12   else?

13         MR. CASEY:  Yes, Your Honor.  Excuse me.

14         Your Honor, you had previously suggested that we

15   forward certain materials to the United States Attorney, who's  17:19:41

16   recused himself on this.  However, he's designated Elizabeth

17   Strange, Betsy Strange, to receive records.

18         Obviously, the transcript that is part of the open

19   record I will -- I'm just representing to you because of your

20   concern over some of the criminal issues, I'm going to be     17:19:58

21   forwarding that transcript to Betsy Strange for whatever reason

22   it may serve.

23         If I'm able to secure her agreement to keep

24   confidential the sealed portion of this, may I have the Court's

25   permission to provide it to her if I get in writing that she   17:20:19

1  will not disseminate it outside the bounds of the United States

2  Attorney's Office?

3           THE COURT:  Yes.

4           MR. CASEY:  Thank you.

5           THE COURT:  Or any -- I suppose that she needs to --     17:20:28

6  should she find any actionable things that require its use, any

7  official use she can use it for.

8           MR. CASEY:  Yeah, I did not mean to preclude that.  I

9  just meant not disseminating it for other than that.

10          And just so it's clear for the record, this is for the     17:20:44

11  record, I'm just based -- on the Court's concern about possible

12  items not being evaluated thoroughly enough for criminal

13  issues, I want to have that there in the record, the

14  U.S. attorneys at least seeing what's here, so that information

15  is shared, because I think my client agrees that light on a     17:21:05

16  subject is a good thing, and this has shed light.

17          THE COURT:  All right.  The other thing that I guess I

18  want to mention that's related to that, Mr. Casey, is this.

19          MR. CASEY:  Yes, sir.

20          THE COURT:  This case has a lot to do with just the     17:21:18

21  normal operation of the MCSO under the order even if it were a

22  garden variety case.  But so much of this is intertwined with

23  Sergeant Armendariz, and he was directly involved in this case.

24          MR. CASEY:  Yes, he was.

25          THE COURT:  You can be assured that I will be looking     17:21:37

 1  at this one very carefully, and there are two things that I

 2  think I would like to make observations on about that.

 3          There seems to be some unsurety, based on the response

 4  in the report, whether or not things were actually referred to

 5  the Maricopa County attorney for evaluation under prosecution.     17:21:53

 6  I would think that at least in this case, the benefit of the

 7  doubt ought to go to seeking the Maricopa County attorney's

 8  opinion about whether or not there's a criminal prosecution

 9  available here.

10          MR. CASEY:  In what matter?                                17:22:08

11          THE COURT:  In any matter that you find that there may

12  be criminal liability, you should run it by the Maricopa County

13  attorney, prosecutor.

14          MR. CASEY:  I'd like to have Mr. -- Captain Bailey

15  address that, because there seems to be a -- it seems to me     17:22:24

16  that that has been done but there's a dispute over form that we

17  have at the monitor.

18          THE COURT:  I'm not trying to make -- I'm just saying

19  it's unclear.  So in the future -- and I don't have any huge

20  concern over what you've done, other than the fact that it       17:22:39

21  seems to me that the Cisco Perez allegations are very much tied

22  in with the Armendariz allegations and they can't be dismissed.

23          But if in the future you run by some things that cause

24  you some concern, you should know they will cause me concern.

25  And if you're not sure about whether or not there ought to be a   17:22:59

```
 1   criminal prosecution, the benefit of the doubt ought to be

 2   going to letting the Maricopa County attorney weigh in on that.

 3          MR. CASEY:  Do you want to hear about our process, or

 4   should we just take your -- your comments and learn from them?

 5          THE COURT:  Well --                                         17:23:20

 6          MR. CASEY:  Because my understanding is that we --

 7          THE COURT:  -- please share with me your process, if

 8   you can do it quickly.

 9          MR. CASEY:  Yeah.

10          MS. STUTZ:  Your Honor, with respect to particularly      17:23:27

11   the Perez situation, or in general the MCSO-MCAO process of

12   criminal referral?

13          THE COURT:  To the latter.

14          MS. STUTZ:  Your Honor, in general, the process of

15   criminal referral depends upon the nature of the case.  There     17:23:40

16   certainly are times when my understanding is the MCSO

17   deputies -- or sergeants, as the case may be -- on any

18   particular criminal matter may contact a county attorney with

19   respect to discussing particular elements of a crime or what

20   kind of data might be there.  There's a very cordial              17:23:58

21   relationship as between the two offices, and that does occur on

22   occasion, not necessarily with regard to any specific

23   allegation.

24          THE COURT:  Well --

25          MS. STUTZ:  If I criminal -- I can --                      17:24:08
```

1         THE COURT:  That's fine.  It doesn't sound to me like

2   you really have a policy; it's sort of an informal consultation

3   arrangement.

4         MS. STUTZ:  Well, sir, with respect to -- I was going

5   to say that subsequent to that, if the MCSO believes that they          17:24:17

6   have criminal charges to submit, those would be submitted

7   through a formal process for what -- you know, for either

8   further -- for acceptance further or turn-down.  And so -- in

9   other words, the issue, really, as it pertains to as I believe

10  what I understood to be the monitor's concerns as it was          17:24:34

11  expressed to us, was that the decision that there was

12  essentially no theft -- in other words, that we didn't have

13  something to submit to the MCAO -- had undergone that kind of

14  informal process, and the concern that was expressed was that

15  there was no written policy with regard to that particular          17:24:52

16  process.

17        THE COURT:  I'd certainly suggest that you consider

18  that, and when there is an informal consultation you should

19  make some sort of record of it, and --

20        MS. STUTZ:  And, sir, I believe that that is in fact          17:25:04

21  what occurred with respect to this particular issue.  In fact,

22  the monitor was advised that we had spoken with Ed Leiter, who

23  was an attorney at the MCAO in the criminal division, and

24  subsequent to that we again heeded the monitor's advice that

25  they felt something more formal was necessary in this          17:25:24

1    particular case, given the high-profile nature of the case.

2         And so subsequently, the HSU criminal inquiry document

3    was submitted to law enforcement liaison Keith Manning, and he

4    provided a written e-mail back to the MCSO, saying that based

5    upon that review, he really did not think that there was a          17:25:42

6    prosecutable theft because there was no identifiable victim,

7    and that information has been provided to the monitor team,

8    sir.

9         THE COURT:  Okay.  Chief Warshaw.

10        CHIEF WARSHAW:  Yes, Judge.  I think that's a little          17:25:55

11   out of sequence.  Chief Kiyler was given an internal memorandum

12   that was authored by Sergeant Tennyson and sent to

13   Captain Bailey.  The internal memorandum was replete with

14   commentaries about the role of the monitor in the

15   investigation.                                                      17:26:11

16        THE COURT:  I've read that one.

17        MONITOR WARSHAW:  After that, there was a second

18   memorandum, which was essentially the same as the first absent

19   some of the acrimony.

20        What I'm extremely troubled by, especially since the          17:26:23

21   investigation in question is the result of an order of this

22   Court, that a sergeant of police is making a prosecutorial

23   recommendation to a captain who hands, or eventually that

24   memorandum is handed to a member of the monitoring team.  I

25   would think, A, they should have a formalized process; and B,      17:26:46

1   especially given the fact that it is this Court's order that is

2   the genesis of these investigations, I believe Captain Bailey

3   should through some formalized process be sending something to

4   the chief deputy and the chief deputy should sign off.

5          What Ms. Stutz is referring to is an internal decision    17:27:05

6   that was made that there was nothing there criminally.  The

7   references to informal communications with members of the MCAO

8   came after our expressed concerns, so --

9          THE COURT:  All right.  I can see that there's

10  disagreement on that, and I'm going to tell you I'm not going    17:27:24

11  to run my monitor -- or my court reporter into the ground.

12  He's been doing two and a half hours already.

13         Did you want to say something, Mr. Liddy?

14         MR. LIDDY:  Yes, Your Honor.  I just want to make two

15  points clear to the Court.  That is that the Maricopa County    17:27:38

16  Attorney's Office has a policy of no verbal turn-downs.  They

17  won't deal with any law enforcement agency over the phone and

18  say:  Let me hear what you -- let me hear what you got.  No,

19  don't submit that.  They have a policy of not doing that.

20         The law enforcement agency has to have a good faith      17:27:52

21  basis that they can meet all the elements of a prosecution and

22  then submit it in order to get the Maricopa County Attorney's

23  Office to formally act upon it.  Now, they'll either act upon

24  it and prosecute it or there will be a written turn-down.  I

25  just wanted to make sure the Court was aware of the Maricopa    17:28:10

1    County Attorney's process.

2            THE COURT:  I appreciate that.

3            Ms. Wang, did you have something you wanted to say?

4            MS. WANG:  I just wanted to add one more thing.  I

5    agree with what Chief Warshaw said about the process.  The only    17:28:17

6    thing I would add is I recall that on May 14th, when we were

7    all here, I expressed concern about some confirmation bias that

8    was expressed by the defendants at that time, and the monitor's

9    report on the Armendariz and related investigation certainly

10   bears out that those fears were well founded.    17:28:35

11           So whether it's an internal decision within MCSO not

12   to forward a case for consideration by MCAO or a decision by

13   MCAO not to prosecute, plaintiffs do think that should be

14   memorialized so that there is a record of it.

15           THE COURT:  All right. Well, I'm going to suggest that    17:28:55

16   you consider my real concerns about that and you work something

17   out that's acceptable to the monitor or about you want to bring

18   up to me for resolution, but let's get it worked out.

19           MR. CASEY:  Recognizing the short time, that's what I

20   wanted to articulate: that what I'm understanding from the    17:29:11

21   monitor, what I understand from plaintiffs' counsel and the

22   Court, is that there needs to be structure, formality and

23   structure, to make sure that we don't have I think what

24   Cecillia called "confirmation bias"?

25           THE COURT:  Confirmation bias.    17:29:30

1          MR. CASEY:  Confirmation bias.  So this is productive.

2     We will leave here and evaluate that without making a formal

3     commitment, okay?

4          THE COURT:  That's fine, because --

5          MR. CASEY:  I understand you may order a formal          17:29:41

6     commitment.

7          THE COURT:  I may.  The only other thing I want to

8     say, Captain Bailey, and I want to say it to you, Chief Deputy,

9     I want to say it to you, this may in the end be a very

10    beneficial process for you.  I hope it will be.  But we're          17:29:57

11    going through one now that's getting my intense attention both

12    because of its relation directly to this lawsuit and because of

13    all the collateral issues that also relate to this lawsuit.

14          But the processes that we work through and put in

15    place with respect to the Armendariz investigation I expect to          17:30:18

16    be used in every sort of investigation and complaint whether or

17    not I am closely looking at it, and I will be asking the

18    monitors when we start dealing with real sort of garden variety

19    IA investigation-supervision issues, complaints by citizens,

20    I'll be asking them to look to see that the same kinds of rigor          17:30:38

21    are applied.  I am sure that that's what you want, too.

22          CAPTAIN BAILEY:  I assure you that will happen, sir.

23          THE COURT:  All right.  Ms. Stutz, did you have

24    anything else you wanted to say?

25          MS. STUTZ:  I did, briefly, Your Honor.          17:30:51

1          You had inquired during the open hearing about a

2     matter with respect to information that had been exchanged

3     between myself, and I indicated that the monitor's prior report

4     I believe was still under seal.

5               THE COURT:  Sure.  Go ahead.                    17:31:02

6               MS. STUTZ:  You asked me to refer to that.

7          It's the May 28th report, Your Honor, that

8     Chief Warshaw submitted following the May 14 and May 15 issues,

9     and there are -- I would just briefly, Your Honor, say I would

10    refer you to pages 2 as well as 6 through 8 with regard to what  17:31:15

11    was being advocated to be done by the monitor team --

12              THE COURT:  All right.  Because I was -- because I

13    jumped on you, I promise I will look at that carefully.  All

14    right?

15              MS. STUTZ:  And, Your Honor, and, again, if there's  17:31:29

16    further questions, I would be happy to explain my legal

17    position with regard to those.

18              THE COURT:  Well, that's fine, and if you want to

19    explain your legal position, go ahead.  But I think you've

20    already got the sense I'm not very persuaded.                17:31:38

21              MS. STUTZ:  No, I understand that, sir.  And I just

22    wanted -- I would be happy to articulate that.  I don't want to

23    burden the Court with any more time.  I realize that it's been

24    a long hearing, so --

25              THE COURT:  All right.                           17:31:46

1        MS. STUTZ:  -- if you would prefer, I would certainly

2   be happy to submit something to you in writing on that issue.

3            What would you prefer?

4        THE COURT:  Well, what I really prefer is that we

5   don't have any more dragging.  I mean, it's too late now as it          17:31:55

6   pertains to that.  But to the extent that the department is

7   going to try to take an aggressive position as to what

8   constitutes an administrative investigation that will get into

9   the way of effective IA procedures, you won't receive a very

10  receptive audience here unless you can really qualify with            17:32:14

11  subsection A of that statute.

12       MS. STUTZ:  Yes, sir.

13       MR. CASEY:  Your Honor, it will not.  And it was not

14  intended to do that or come across, but it will not.

15       THE COURT:  Okay.  The only other thing that I want to           17:32:27

16  say, and this is going to be the last word -- and, Gary, thank

17  you very much for hanging in there -- when we talk about

18  confirmation bias, I want you to know that it seems to me, you

19  know, the monitor asked Chief Trombi why he did the assessment

20  in February as to -- this is well before any of the events, why      17:32:49

21  he did the assessment in February of who had body cams, who had

22  personal cams, and Chief Trombi told him:  I can't remember.

23          And then, with all due respect, after the mistake, or

24  maybe it wasn't a mistake but I'm not making any assumptions,

25  and Chief Trombi was ordered to go out and e-mail to 28              17:33:14

1    supervisors, Chief Trombi then is apparently under an

2    administrative investigation and Chief Trombi gets promoted.

3    That strikes me as a real problem in terms of confirmation bias

4    and other things.

5            And so to the extent that Chief Trombi is under            17:33:36

6    investigation, you're going to have a real issue dealing with

7    that, and I suggest that you start dealing with it in a way

8    that will result in a real investigation of what Chief Trombi

9    has and has not done in this case.  Thank you for attending.

10           All right.  I'm going to make one other order on the     17:34:06

11   record to make the court monitor's -- the court reporter's life

12   easy.  The parties can have access to the transcript of this

13   record without further order of this Court.  But the parties

14   need to be aware if they share this with anybody that is not

15   directly subject to the jurisdiction of this Court or otherwise  17:34:25

16   involved in this case, there will be consequences.

17           The transcript is under seal.  You can have -- pardon

18   me.  You can have access to it.  You're not to share it.  Okay?

19           MR. CASEY:  Except for U.S. attorney Strange, if she

20   agrees.                                                          17:34:49

21           THE COURT:  That's correct.

22           MR. CASEY:  Thank you.

23           (Proceedings concluded at 5:34 p.m.)

24

25

1

2                        C E R T I F I C A T E

3

4

5

6

7           I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 3rd day of November,

18   2014.

19

20

21                            s/Gary Moll
                       _____

22

23

24

25