1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Manuel de Melendres, et al.,                    No. CV-07-02513-PHX-GMS

10                    Plaintiffs,                    **ORDER**

11  v.

12  Maricopa, County of, et al.,

13                    Defendants.

14          Pending before this Court are Defendants' (1) Application to Withdraw as Counsel

15  of Record for Defendants (Doc. 773) and (2) Request to Redact the Monitor Report, the

16  Brief and Response to which have been filed under seal. (Docs. 784, 791.) After

17  considering such matters in briefing and at oral argument the Court further perceives the

18  need to set forth specifications for further proceedings under its order. The Court

19  therefore determines as follows.

20                            **I.      BACKGROUND**

21          Approximately one year after the Court entered its Findings of Fact and

22  Conclusions of Law (Doc. 579), and seven months after it entered its Supplemental

23  Injunction (Doc. 606), it was informed by Defendants that MCSO had assumed the

24  investigation of Deputy Charley Armendariz from the Phoenix Police Department.

25  Armendariz was an MCSO deputy who was assigned to the Human Smuggling Unit

26  (HSU). He testified at the underlying trial and his arrest statistics were admitted into

27  evidence and proved relevant to the outcome for Plaintiffs. Armendariz was also

28  personally implicated by some of the specific allegations made by two representatives of

the Plaintiff class.

After MCSO's criminal investigation into Deputy Armendariz began, MCSO obtained a search warrant for his home. During their execution of the search warrant, MCSO discovered significant quantities of illegal drugs as well as hundreds of personal items belonging to unknown individuals—including credit cards, drivers licenses, Mexican identification cards, and other personal property. Many of these items potentially belonged to members of the Plaintiff class.  Officers also discovered numerous video recordings, apparently going back several years, of traffic stops Armendariz had made while on patrol with a camera mounted in his eyeglasses. The video from that eyeglass camera also revealed that a camera was mounted on the dashboard of his patrol vehicle. Deputy Armendariz was arrested, and after he failed to report to probation the following week officers discovered Armendariz's body in his home after an apparent suicide.

MCSO reviewed a few of Armendariz's videotaped stops prior to the hearing with the Court on May 14, 2014 and determined that, in a number of them, Deputy Armendariz engaged in what MCSO classified as problematic behavior—e.g. behavior that was contrary to departmental policy, the law, the constitutional rights of those he stopped, or otherwise in violation of this Court's orders. Further, MCSO determined that other officers, and at least one supervisor of Deputy Armendariz who also testified at the trial in this action, were present during one or more problematic stops.

Upon questioning by the Court at the hearing, Chief Deputy Sheridan acknowledged that there was no departmental policy that prevented deputies from videotaping their own traffic stops and that there was reason to believe that some deputies did so. Further many, if not all, deputies made audio recordings of their traffic stops pursuant to departmental practice and had done so for some time, and there were other video devices, both dashboard and body-mounted, that had been used by MCSO. There was no procedure by which such recordings were collected and catalogued by the MCSO. No such materials had been provided to Plaintiffs, although Plaintiffs avowed that they

asked for such materials prior to trial.

This Court's supplemental injunctive order (Doc. 606) was fashioned to a great extent with the participation of the parties, both by brief and at the Status Conference held on August 30, 2013. The Supplemental Injunction was based upon the factual determinations made at trial concerning both specific instances of past MCSO operations that ran afoul of the Constitution, as well as the general policies and practices in place within MCSO that required systematic correction to cure the ongoing deprivation of the constitutional rights of the Plaintiff class. These flawed practices included erroneous police training, MCSO's failure to adequately supervise rank-and-file officers, and other deficits. The measure of the Court's injunctive relief, however, was necessarily based on the evidence admitted at trial of these various shortcomings. Thus, if there was not sufficient evidence of system-wide deficiencies on the part of the MCSO admitted at trial, the Court did not enter remedies to the extent requested by the Plaintiff class. (*See, e.g.*, Doc. 603 at 89–91 (declining to incorporate into the Supplemental Order Plaintiffs' suggestions regarding the inadequacy of MCSO's existing internal investigative practices due to the lack of evidence presented at trial on that issue).)

The matters raised by the Armendariz materials implicated a number of different concerns for the Court:

1.      In light of the property found in the possession of Deputy Armendariz, some of which apparently came from members of the Plaintiff class, and the generalized allegations he made, the Plaintiff class may have had their constitutional rights systematically deprived by the MCSO and the HSU in ways in addition to those previously identified by the Court.

2.      The failure of MCSO to produce the materials properly requested by Plaintiffs, and which the MCSO was under an obligation to provide, may have denied Plaintiffs the opportunity to present such evidence at the original trial.

3.      Because of MCSO's apparent failure to proffer such materials at an earlier juncture, many pieces of evidence that may once have been available and highly relevant

to the Plaintiffs' rights to relief may have since been destroyed.

4.     The Plaintiffs may have also been precluded from presenting evidence related to deficiencies in MCSO's investigation of complaints against deputies, the adequacy of employee supervision within MCSO and the HSU specifically, and the overall sufficiency of the internal investigation process within MCSO, as revealed by the Armendariz materials and their sequelae.

5.     Evidence kept from Plaintiffs may have hampered Plaintiffs' ability to impeach the testimony of various MCSO witnesses.  Such evidence now may suggest that some witnesses were untruthful on the witness stand or in pretrial discovery processes.

6.     This evidence and impeachable testimony, if admitted at the trial of this matter, could have resulted in a significantly expanded scope of injunctive relief entered by this Court.[1]

7.     To the extent that officers had recorded problematic behavior, and MCSO had no policy regarding the collection or maintenance of these recordings, there was a substantial risk of which MCSO should have been aware that officers might destroy existing recordings rather than surrender them to the MCSO once they understood they were being gathered in light of the Armendariz videotapes.

---

[1] In making this observation the Court observes that, among other things, before trial in this matter, Plaintiffs established that Defendants had destroyed other documents that may have pertained to whether Defendants were violating the constitutional rights of the Plaintiff class. (Doc. 493.) Plaintiffs nevertheless succeeded at trail in establishing that the Defendants were violating their constitutional rights without recourse to the evidentiary inferences that such destruction might have permitted. Plaintiffs also proved at trial that at least some MCSO deputies were violating the preliminary injunction entered by this Court on December 23, 2011. (Doc. 494.)  Further, as they have acknowledged, after this Court made findings of fact and conclusions of law, both Sheriff Arpaio Chief Deputy Sheridan and Chief Trombi mischaracterized this Court's findings and subsequent Orders to MCSO deputies and to the public.  Despite MCSO's compliance with some of the Orders of the Court, the above occurrences do not inspire confidence in the MCSO's willingness to comply with its legal obligations or with this Court's Orders.

At the May 14, 2014 hearing in which the MCSO presented the Court with the Armendariz material, the Court was concerned with how best to ensure the rapid and department-wide retrieval of all outstanding, relevant recordings made by officers that might still be in existence. The Court thus sealed the hearing and ordered that its substance was not to be shared with those outside the Courtroom. (Doc. 700 at 39–40, 69.) The Court further noted that MCSO was to immediately formulate and obtain the Monitor's approval of a plan designed to quietly retrieve such recordings from its officers and employees. (*Id.* at 25–27.) Approximately two hours later, the Monitor then held a lengthy meeting with the higher officials of MCSO and members of the monitoring team in which an investigative course of action was agreed upon. Immediately after that meeting, however, Chief Deputy Jerry Sheridan informed the Monitor that between the hearing in the morning and the meeting with the Monitor in the early afternoon, he and Sheriff Joseph Arpaio had met with MCSO's lawyers. At some point, Chief David Trombi was called into the meeting and instructed to send an e-mail to all Departmental Commanders, including the supervisor who had been present during one of Armendariz's problematic stops, to advise them that they should collect all such recordings from their personnel. This department-wide email compromised the plan arrived at by MCSO and the Monitor for collecting such recordings. Neither the Sheriff nor Chief Deputy Sheridan informed the Monitor during their meeting that MCSO had already subverted the plan at which they subsequently arrived. As a result, the hearings related to the Armendariz recordings were taken out from under seal, as there was no longer any reason to suppose that deputies would not be warned in advance that the MCSO was collecting such recordings. Following this, MCSO conducted a survey-approach of its present and past employees to collect any outstanding recordings.

During this same period, MCSO also uncovered and disclosed the existence of systematic recordings undertaken by HSU and recordings made at the apparent direction of other MCSO departments. There was also evidence that recordings were made during the relevant period and that are apparently no longer in existence.  Apparently at least

some of these recordings were requested by Plaintiffs in pre-trial discovery, but were not provided to Plaintiffs prior to trial.

MCSO began an internal criminal and administrative investigation into HSU, triggered both by the Armendariz evidence and by the allegations of Deputy Cisco Perez—a former MCSO deputy who had been dismissed for misconduct. The administrative investigations were placed on hold while the HSU criminal investigation proceeded. Experienced members of the Monitor team observed the internal investigations, provided questions for both the criminal investigation and the administrative investigation when it recommenced, and offered suggestions as to various areas of inquiry.

When the Monitor was informed that MCSO had completed and closed the criminal investigation into HSU, it prepared an initial evaluative report for the Court on which both parties were allowed to comment. The Report found the conduct of two of the assigned investigators, Lieutenant Seagraves and Sergeant Fax, satisfactory and even praiseworthy. Lieutenant Seagraves was assigned to investigate the cause of Deputy Armendariz's death. Sergeant Fax was assigned to compile the complaints and other issues surrounding Deputy Armendariz's service within the MCSO.

In addition to the satisfactory work of Lieutenant Seagraves and Sergeant Fax in their limited roles, however, the Report also found a great number of deficiencies in the investigation of alleged misconduct of HSU deputies generally. These investigations were conducted by other department personnel. The Report determined that in this investigation the MCSO employed deficient investigative tactics, suffered from serious irregularities in departmental processes as it related to persons under investigations, and suffered from potential conflicts of interest. During the process of responding to the report, MCSO identified under seal (and with more specificity than it previously had) pending administrative investigations and their identified targets that were spawned by the two investigations.

The Court then held a status hearing on October 28, 2014 to evaluate the adequacy

of MCSO's self-investigation. The part of the hearing that related to the ongoing administrative investigations identified by Defendants was held under seal.  During the public portion of the hearing the Court expressed its concern that the internal criminal investigation conducted by MCSO's Professional Standards Bureau (PSB) was inadequate and prematurely closed.  Since the hearing, additional evidence has come to light further demonstrating the inadequacy of that investigation.

In addition, the Court questioned the Defendants' assertion of privilege to attempt to justify their countermand of the Court's mandate regarding the collection of recordings made by officers that had previously been uncollected by the MCSO.  At the hearing, and in the briefing that preceded it, MCSO defended the instructions to Chief Trombi to broadcast their collection efforts to all departmental commanders, even though such instructions violated the direct order of this Court, by claiming that the original plan was inconsistent with protections offered to MCSO employees by Title 38 of the Arizona Revised Statutes. Defendants further represented that MCSO will continue to resist the Monitor's directives to the extent that they are inconsistent with such "rights." *See* Ariz. Rev. Stat. § 38-1101.

After the October 28 hearing, significant additional materials responsive to both Plaintiff's pretrial discovery requests, and apparently relevant to the criminal investigation closed by Defendants was discovered and subsequently revealed to this Court.

The failures to follow the Court's directives, the substantive inadequacies of many of the MCSO's internal investigations, the narrowness of the scope of the continuing administrative investigations noticed by the MCSO, and the subsequent materials found after the closure of the MCSO internal criminal investigation are troubling for the Court. In addition to the concerns set forth above, the matters above suggest that Defendants and/or some of their employees may continue to be engaged in efforts to frustrate the implementation of this Court's Orders, and may in fact be using the internal investigative processes to conceal widespread departmental misconduct, as alleged at least in part by

1 Deputies Armendariz and Perez, that occurred during the periods relevant to this lawsuit
2 and this Court's subsequent Orders. The statements previously made by Deputies
3 Armendariz and Perez substantiate these suspicions in part. Accordingly, the Court
4 makes the following rulings regarding MCSO's redaction request, and issues the
5 following clarification of the Monitor's independent authority to investigate under its
6 previous orders.

## II.   PRIVILEGE

8 As this Court has previously articulated, MCSO's assertions of statutory and
9 common law privileges over its evidence-collection and investigative efforts are largely
10 without colorable merit.

11 Issues of privilege in federal question cases are determined by federal law. Fed. R.
12 Evid. 501; *Lewis v. United States*, 517 F.2d 236, 237 (9th Cir. 1975). The privilege and
13 personal privacy doctrines embodied in state statutes and constitutions may warrant
14 consideration by this Court for reasons of logic and comity, but they are not controlling.
15 *Breed v. U.S. Dist. Ct. for N. Dist. of Cal.*, 542 F.2d 1114, 1115 (9th Cir. 1976); *Kerr v.*
16 *U.S. Dist. Ct. for N. Dist. of Cal.*, 511 F.2d 192, 198–99 (9th Cir. 1975). Federal courts
17 adopt new evidentiary privileges only to the very limited extent they "promote[]
18 sufficiently important interests to outweigh the need for probative evidence." *Univ. of Pa.*
19 *v. E.E.O.C.*, 493 U.S. 182, 189 (1990) (quoting *Trammel v. United States*, 445 U.S. 40,
20 51 (1980)). A "strong presumption in favor of access" is the starting point for any
21 privilege analysis, which can be overcome only if the party seeking to seal a judicial
22 record establishes "compelling reasons, supported by specific factual findings," for the
23 application of the asserted privilege. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d
24 1172, 1178–79 (9th Cir. 2006). Moreover, courts "strictly construe" the rules governing
25 claims of privilege. *Trammel*, 445 U.S. at 50.

26 Federal civil rights cases brought against state and local law enforcement
27 crystallize the tension between the confidentiality interests reflected in the privilege rules
28 and the overarching truth-seeking principles that demand open access to judicial records

in the administration of justice. *Cf. Kamakana*, 447 F.3d at 1178. Federal statutes that empower plaintiffs to check abuses of power by state governments would be impotent if "state authorities could effectively insulate themselves from constitutional norms simply by developing privilege doctrines" that frustrate plaintiffs' ability "to develop the kind of information they need to prosecute their federal claims." *Kelly v. City of San Jose*, 114 F.R.D. 653, 656 (N.D. Cal. 1987). Nevertheless, the court's calculus must also accommodate the legitimate risk that law-enforcement interests might be compromised by the disclosure of certain kinds of sensitive information to the general public.

It is against this backdrop that the Court considers the applicability of the identified privileges to portions of the Monitor's Report dated September 28, 2014, as well as the argument Defendants advanced during the October 28, 2014 Status Conference that Arizona law justified their subversion in advance of the agreed-upon course of action in retrieving audio and video recordings by rank-and-file officers. The Report was made pursuant to the Monitor's obligations under the Supplemental Permanent Injunction (Doc. 606) to provide an update and assessment to the Court on the sufficiency of ongoing MCSO investigations. Defendants' primary justification for the requested redactions of the Report is section 38-1101 of the Arizona Revised Statutes, which gives rise to limited protections for a statutorily-defined "law enforcement officer" when he or she is being questioned by his or her "employer" and the officer or "the employer reasonably believes the investigation could result in a dismissal, demotion, or suspension." *Id.* § 38-1101(A). Section 38-1101(L) also creates a narrow exception to information in an officer's personnel file that otherwise must be available for public inspection.

The Court rejects Defendants' overly broad use of section 38-1101 for three reasons. First, nothing in the language of the Arizona Revised Statutes lends itself to the conclusion that section 38-1101 creates a civil litigation privilege that could be invoked in the face of Court-ordered disclosure requirements. In other instances in which a state statute creates litigation privileges, it does so explicitly. *See* Ariz. Rev. Stat. §§ 12-2232–

2235. In contrast, the plain language of section 38-1101 merely sets forth procedural rights conferred on state law enforcement officers facing administrative inquiries, such as limitations on what portions of the officers' personnel files are publically accessible during the investigation. *Compare id.* § 38-1101 *with id.* § 39-121 (requiring that public records be open for inspection by "any person" "at all times"). Apart from the Minute Entry cited to by Defendants (Doc. 783, Ex. B), which is from a state Superior Court and is, at any rate, not binding on this Court for the reasons set forth above, the Court has found no Arizona case holding that section 38-1101 creates the kind of privilege Defendants assert. Given that privilege rules are strictly construed, *see Trammel*, 445 U.S. at 50, the Court declines to adopt Defendants' construction of Title 38.

Second, the narrow provision relied upon by Defendants (specifically, sub-section (L)) does not excuse Defendants' deviation from the Orders of this Court. Defendants have indicated that MCSO had no policy prohibiting an officer from self-recording a traffic stop, and, in fact, issued audio and video equipment to officers and directives to record such stops. As such, neither MCSO nor its employees had a reasonable basis for believing that the collection and inventory of these recordings would result in an employee's "dismissal, demotion, or suspension." Ariz. Rev. Stat. § 38-1101(A). Moreover, section 38-1101(C) states that employers need not "[d]isclose any fact to the law enforcement officer . . . that would impede the investigation," and section 38-1101(D)(2) further exempts employers from the process requirements of sub-section (A) when engaging in "[p]reliminary questioning to determine the scope of the allegations or if an investigation is necessary." Thus, even section 38-1101, by its own terms, reflects a legislative prioritization of efficacy and integrity in internal investigations over some of its enumerated process rights. MCSO's insistence that section 38-1101 mandated that it inform officers of its retrieval efforts prior to recovering the recordings is without merit.

Third, this action was instituted in federal court pursuant to a federal statute; accordingly, it is federal law—not Arizona law—that governs the existence and scope of an asserted privilege. *See Kerr*, 511 F.2d at 197. The Arizona legislature's choice to

1    create some statutory protection may inform the calculus this Court employs to determine

2    questions of privilege in federal question cases, but it is not determinative. There is no

3    reason state officials who violate federal laws should receive preferential treatment in

4    asserting privileges based on their state of residency. To conclude otherwise would

5    undermine two major federal policies: ensuring the vigorous enforcement of civil rights

6    statutes against persons who violate the Constitution under the color of state law, and

7    maintaining the broadest scope of access to relevant evidence in civil litigation.

8        In spite of the foregoing, the Court recognizes that full public disclosure of the

9    record is often injudicious and may even threaten Defendants' ability to observe the

10   Orders of this Court. In instances like this in which discretion may be warranted, the

11   party seeking to seal the record must, by Motion, set forth compelling reasons for

12   withholding particular pieces of information from the public. *Kamakana*, 447 F.3d at

13   1178–79. In determining whether to seal the challenged materials, the Court will consider

14   all relevant factors including, on the one hand, the public's history of access and the civic

15   interest in judicial oversight, accountability, and overall understanding of the judicial

16   process, and, on the other, the likelihood that disclosure would result in "improper use of

17   the material for scandalous or libelous purposes" or infringe on the needs of law

18   enforcement officials. *See id.* at 1179; *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d

19   1122, 1134–35 (9th Cir. 2003).  Invoking a general category of privilege, without further

20   elaboration or specific linkage with particular evidence, is insufficient to satisfy the

21   compelling reasons standard. *See Kamakana*, 447 F.3d at 1184. Nor will hypothetical

22   harms to law enforcement interests, or the potential that disclosure would expose a party

23   to "embarrassment, incrimination, or . . . further litigation," compel the Court to seal its

24   records. *Id.*

25       Despite this Court's earlier Order that Defendants articulate compelling reasons

26   for redacting the Monitor's Report, Defendants still insist that a showing of "good cause"

27   suffices. The Ninth Circuit has identified two exceptions to the compelling reasons

28   standard, neither of which applies here. First, the standard of review is relaxed for

documents that have traditionally been kept secret for important policy reasons. *Id.* The class of materials covered by this exception is small: it extends only to those documents for which there is "neither a history of access nor an important public need justifying access." *Id.* (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)). Courts have found only two types of records to fall within this category: grand jury transcripts and pre-indictment warrant materials. *Id.* The *Kamakana* court emphasized that documents are not sealed on the grounds that they are traditionally kept secret "simply because such documents are usually or often deemed confidential," and it rejected the argument that "documents subject to the privacy, law enforcement, and official information privileges" automatically merit this exception. *Id.* at 1185. In other words, while federal common law does recognize these qualified privileges, *see Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033–34 (9th Cir. 1990), litigants must still satisfy the compelling reasons test in demonstrating that the potential disadvantages of disclosure outweigh the potential benefits.

A second exception to the compelling reasons standard exists for materials "unrelated, or only tangentially related, to the underlying cause of action." *Foltz*, 331 F.3d at 1135. Specifically, in drawing this distinction, the Ninth Circuit concluded that a "particularized showing" of "good cause" suffices to preserve the secrecy of documents attached to non-dispositive motions that are already the subject of a protective order, such as private materials unearthed during discovery. *Id.*

Although the Monitor's Report was not filed in connection with a dispositive motion, it is a court-ordered compliance report that not only constitutes one of the court-required remedies in this case, but also springs from allegations that are directly relevant to the underlying causes of action and the Defendants' failure to comply with its discovery obligations. Accordingly, under the reasoning of *Kamakana*, the presumption of access attaches to the Report unless Defendants can establish compelling reasons for its sealing. *See Rocky Mountain Bank v. Google, Inc.,* 428 Fed. Appx. 690, 692, 2001 WL 145832 (9th Cir. Apr. 15, 2011) (concluding that a compliance report lodged with

1   the district court was a "quintessential judicial document" and that "[a]bsent some further

2   determination, the public would be entitled to access to" it).

3   　　　While Defendants identified the redactions they seek by page number, they have

4   not provided similarly specific explanations to justify the redactions. *See Kamakana*, 447

5   F.3d at 1183–84. Instead, Defendants offer only generalized reasons for withholding

6   categories of information from the public, such as that disclosure "threatens both the

7   integrity and effectiveness of such investigations" and that the information for which

8   redaction is sought "fall[s] squarely within the domain protected by the constitutional

9   right to informational privacy." This is precisely the type of justification the court

10  rejected in *Kamakana*. *Id.* at 1184 ("Simply mentioning a general category of privilege,

11  without any further elaboration or any specific linkage with the documents, does not

12  satisfy the burden."). Accordingly, the Court finds that Defendants have not demonstrated

13  compelling reasons to redact the following items in the record.[2]

14  　　　**A.　　References to the Status of the Armendariz Investigation**

15  　　　Defendants have proposed redactions to several generic references to forensic

16  examinations being conducted on Armendariz's personal computer and cell phone, but

17  have not specified how their investigations would be affected by the publication of this

18  information. Defendants also object to the Monitor's description of a timeline of

19  Armendariz's employment history—including citizen complaints, internal investigations,

20  and other incidents—that was constructed by a sergeant within MCSO. Incongruously,

21  Defendants do not request redaction of the timeline itself, which is also published in the

22  Report. In any case, as the *Kamakana* court made clear, blanket claims of harm to law

23  enforcement interests do not constitute "compelling reasons" to keep information out of

24  the public record. *See* 447 F.3d at 1185. Without more, redaction is unmerited.

25

26

---

27  　　　[2] An appropriately redacted version of the Monitor's Report has, thus, been made
28  available, withholding only those portions for which compelling reasons favor non-
　　disclosure.

- 13 -

### B.   Statements by Armendariz Relating to Property and Evidence Mishandling by HSU

Defendants have proposed to redact statements made by Deputy Armendariz during a criminal interview that "it was common for other members of HSU to leave items like identifications laying around the office" and that a "Detention Officer would just gather them up and take them up to his house and put them in the garage." (Monitor's Report at 18–19.) Defendants offer only that disclosure of this information would undermine the effectiveness of their ongoing investigations. Nevertheless, information regarding Armendariz and possible evidence mishandling by HSU is already widely known, has been discussed in hearings open to the public, and has been reported on by the media. *See Kamakana*, 447 F.3d at 1184 (concluding that sealing documents was unwarranted where the information sought to be redacted was already publicly available). Moreover, the property discovered at Armendariz's residence is discussed elsewhere in the Monitor's Report without redaction. (*See* Monitor's Report at 18.) Although Defendants also contend that disclosing this information would "contravene the purpose" of section 38-1101(L), the proposed redactions do not implicate any identifiable law enforcement officers other than the deceased Armendariz. Again, such undifferentiated statements do not establish compelling reasons to seal the record.

### C.   Information Concerning Armendariz's Mental Health Records

The Monitor's Report contains several mentions of Armendariz's voluntary entrance into and subsequent release from a Behavioral Treatment Center, at which time he was deemed "fit for duty." The reasons given in support of these redactions are grounded in the personal privacy rights of Deputy Armendariz. The Court concludes these do not constitute compelling justification for withholding these statements.

Individuals have a constitutional right to privacy in avoiding disclosure of personal matters, which extends to medical information. *Whalen v. Roe*, 429 U.S. 589, 599 (1977); *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998). However, this right is conditional, and subject to limited impairment if properly

justified. *Whalen*, 429 U.S. at 602. Like all qualified privileges, the individual's right to privacy in this regard must be balanced against the public's interest in disclosure. *Carlson v. Pima Cnty.*, 141 Ariz. 487, 491, 687 P.2d 1242, 1246 (1984); *see also Scottsdale Unified Sch. Dist. No. 48 of Maricopa Cnty. v. KPNX Broad. Co.*, 191 Ariz. 297, 302, 955 P.2d 534, 539 (1998).

With respect to Armendariz's history of mental health and substance abuse problems, several factors weigh in favor of disclosure. First, Defendants have cited no cases establishing that an employer can invoke a deceased employee's right to privacy to withhold information in litigation. To the extent that the right to privacy exists for this sort of information, the privilege is intended for Armendariz's benefit alone and is personal to him. Furthermore, Armendariz's mental health and suicide are already a matter of public record. While an individual's right to privacy in information does not vanish merely because the information may be available through some other public source, the expectation of privacy in it is certainly diminished. *See Scottsdale Unified*, 191 Ariz. at 303, 955 P.2d at 540. Finally, and most importantly, the information bears on several important issues in this case: Armendariz was a witness at the initial trial, and a participant in many of the activities that gave rise to Plaintiffs' claims.  Further, his competency as an officer and his performance before and after trial and this Court's Orders relate directly to both the underlying police practices that gave rise to this litigation and the quality of supervision within MCSO. Because public policy supports disclosure and Defendants have not demonstrated that withholding this information is justifiable, the redactions are rejected.

### D.    Non-specific Information Regarding Ongoing Investigations

Defendants have also requested that generic references to the existence of ongoing investigations be redacted, such as the phrases "two lieutenants, two sergeants, and 4 detectives," "to do what he referred to as 'thematic' interviews," "supervisory investigation," and "the 'property' investigation," among other things. Again, Defendants have not explained how their investigations will be in any way impeded by the release of

1    this information, and the request for redaction is denied.

2        **E.    Other Proposed Redactions for Which No Justification Is Offered.**

3        Defendants have proposed redactions to several other sentences on page nineteen

4    of the Monitor's Report but do not offer any explanation for why redaction is warranted.

5    Because Defendants' have made no effort to comply with *Kamakana*, those portions of

6    the Report will not be sealed.

7        **III.    ORDERS CONCERNING ONGOING INVESTIGATIONS**

8        It is obviously one of the fundamental goals of the supplementary injunctive relief

9    to bring MCSO's regular PSB operations up to the standard required to ensure that the

10   Constitutional rights of the members of the Plaintiff class are guaranteed by MCSO going

11   forward.  In satisfaction of its injunctive obligations, MCSO must both investigate past

12   and potential ongoing violations by MCSO officers and their supervisors and also

13   evaluate the adequacy of their investigations. (*Id.* at 44–45.) This applies both to routine

14   PSB operations, and to PSB investigations like this one that are directly related to the

15   underlying case involving alleged widespread MCSO misconduct. MCSO has admitted—

16   indeed, insisted—on numerous occasions that it understood its responsibilities under this

17   Court's Orders to undertake investigations where appropriate and to generally cooperate

18   with the appointed Monitor in doing so. (*See, e.g.*, Doc. 700 at 38, 62.)

19       The Monitor is under a duty from this Court to certify when the MCSO's internal

20   investigation procedures render it in full and effective compliance with the requirements

21   of the injunction, which carries with it the concomitant responsibility to evaluate the

22   extent to which individual investigations comply with the Order.  For example, under the

23   Supplemental Injunction the Monitor is specifically tasked with "evaluating the

24   effectiveness of the MCSO's changes in the areas of supervision and oversight and

25   reporting the same to the parties and the Court;" with "reviewing the corrective action

26   taken by the MCSO concerning any possible violations of this Order or MCSO policy

27   and procedures and reporting the same to the parties and the Court;" and with

28   "assess[ing] and report[ing] on the Defendants' implementation of this Order, " in

addition to appraising MCSO's compliance with the Order generally. (*Id.* at 47, 50.)  The Order also provides that the "Monitor may make additional recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives." (*Id.* at 54.)

In making such assessments, cases like the present one—which provide the MCSO with both significant allegations of departmental misconduct and significant motivation to obfuscate the truth to avoid embarrassment—public exposure should the allegations prove true in whole or in part, provide the Monitor with a unique opportunity to assess MCSO's willingness to implement an appropriate investigation and make appropriate determinations in cases in which it might have significant impulse to do otherwise.  An adequate internal affairs division must be willing to engage in thorough examination and, in appropriate cases, agency exposure to discipline and painful public accountability.  Of course, to make an appropriate assessment of whether MCSO's PSB is so acting, the Monitor must necessarily have complete access to Defendants' internal affairs investigations. This includes familiarity with the manner in which MCSO pursues an investigation—be it criminal or administrative in nature—the investigation's initial and continuing scope in light of the information the investigation uncovers, the performance of the investigators, and the kind of discipline—if any—ultimately imposed at its conclusion.

To protect that information gathered by MCSO in internal administrative processes that are adequately conducted from being publicly disclosed contrary to relevant state law or policy, or from being drawn upon by the Monitor in whatever other independent investigations he or the Court deems necessary to implement, the Monitor shall implement the following procedure:

1.     The Monitor shall assign two or more dedicated members of the Monitoring team who shall be specifically identified to all parties as such (hereafter "IA Monitors").

2.     These IA Monitors will continue to oversee MCSO internal investigations,

and are to evaluate, educate, assist, and provide investigative suggestions and/or suggested appropriate investigate subjects and targets to MCSO.

3.      The IA Monitors shall be walled off from other members of the Monitoring team, and, with the exception of the Monitor or either of the two Deputy Monitors, and this Court, the IA Monitors shall not share with anyone the information obtained through any PSB investigation or MCSO personnel file. Nor, except as set forth in Clause 8 below, shall the IA Monitors play any role in any independent investigation conducted by the Monitor. Nothing in this Order prevents the Monitor from communicating any information to the Court.

4.      To the extent that the IA Monitors suggest possible subjects and targets for internal investigation to the MCSO that are related to the MCSO's compliance with this Court's Orders, the subject matter of this lawsuit, or investigations related to or arising from the allegations of Deputies Armendariz and Perez, such suggestions shall be in a dated writing or electronic format submitted to the Captain of PSB and to the Monitor and his Deputy Monitors.

5.      When MCSO undertakes a new investigation that relates to (a) the MCSO's compliance with its discovery and/or disclosure obligations in this case, (b) the MCSO's compliance with the resulting orders of the Court in this case, or, (c), any criminal or administrative investigations arising from or related to the Armendariz or Perez investigations, it is ordered to lodge under seal with the Court and to provide the Monitor written notice specifically identifying the subjects and targets under inquiry and specifically referencing the administrative number assigned to the investigation. Moreover, Defendants are to update the Court, through lodging a document under seal, and the Monitor by a separate writing when new subjects are added as targets of an existing investigation.  The Monitor, Deputy Monitor or IA Monitors may have access to such information but may not disclose it to the public or other members of the Monitor team without the authorization of the Court.  The MCSO will similarly inform the Court when it closes such an investigation without action, when it closes an investigation with

adverse action to the employee, if the adverse action is appealed, and if so, when the appeal is abandoned, terminated or dismissed, or the matter is otherwise terminated.

6.     If the IA Monitors offer suggested investigative topics or targets that are not adopted or implemented by MCSO, the IA Monitors are directed to communicate MCSO's inaction to the Monitor and his Deputies, and the Monitor is entitled to consider such declinations in assessing MCSO's full and effective compliance with the Court's Orders.

7.     The IA Monitors will evaluate the diligence, efficiency, and thoroughness with which MCSO undertakes and completes the internal investigations that it undertakes. To the extent that the Monitor with or without consultation with his Deputy Monitors and IA Monitors, concludes that MCSO investigations are needlessly prolonged, underinclusive, otherwise do not comply with adequate standards of investigation or are not being conducted in good faith, he shall immediately communicate such an assessment to MCSO and to the Monitor and his Deputies.

8.     Should the Monitor desire to undertake an independent investigation of such matters, the Monitor will then raise the matter with the Court and the parties.  The Court will then determine, after affording the parties an opportunity to be heard, whether the MCSO's investigation is being adequately conducted, and whether the Monitor may initiate his own investigation, and/or whether, in doing so, the Monitor may have access to any information uncovered in MCSO's PSB investigation.

Under the provisions of the Supplemental Injunctive Order, the Monitor also has the authority to conduct independent investigations that he, or the Court, deems necessary.   In addition to any authority explicitly contained in the Order, the Court also has the inherent authority necessary to ensure the compliance with its own orders. Federal courts may freely invoke the weight of judicial authority if state and local authorities, who have the primary responsibility for curing constitutional violations, fail in their affirmative obligations. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977). Where rights secured by the Constitution have been traduced, "federal courts possess whatever

powers are necessary to remedy [these] violations because they are charged with protecting these rights." *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 861 (9th Cir. 1992). To this end, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). The Court's delegation to the Monitor of the authority to conduct investigations is not exclusive of the Court retaining authority to make its own inquiries and to compel attendance of MCSO officials necessary to undertake such inquiries as it pertains to the enforcement of the orders of this Court. *See Degen v. United States*, 517 U.S. 820, 827 (1996).

When the Monitor conducts inquiries at the Court's behest or pursuant to his independent authority in the Order:

1. MCSO's cooperation with such investigations is required. MCSO shall also provide any necessary facilities or resources to facilitate such investigations.

2. Neither the Monitor nor the Court is required to first offer topics or subjects for internal investigation to MCSO that MCSO is not otherwise internally investigating prior to initiating their own investigation.

3. The Monitor shall not initiate independent investigations into matters that the PSB is investigating when the Monitor believes that MCSO is adequately, timely and reasonably conducting the investigation.

4. Nothing in this Order waives any of the applicable rights or privileges belonging to subjects of the Monitor's investigations or interviews, including those guaranteed by the Fifth Amendment, *see Miranda v. Arizona*, 384 U.S. 436 (1966); *Garrity v. New Jersey*, 385 U.S. 493 (1967), and the common law.

5. To the extent that the subjects of these investigations claim any recourse to the statutory rights outlined in section 38-1101, however, those rights are limited to those set forth in the statute itself. Investigations initiated by the Monitor at the direction of the Court are not investigations conducted by an "employer," and do not implicate the statutory protections of section 38-1101. *See* Ariz. Rev. Stat. § 38-1101(A). There are

also no statutory protections for persons that are not subject to being dismissed, demoted or suspended as the result of an administrative process. Nor is there ongoing protection for materials generated in investigations that are terminated without action, that are terminated because any adverse action is not timely appealed, or are terminated because the appeal is terminated. *See id.* § 38-1101(L).

6. To the extent that the MCSO claims that it is privileged or otherwise protected from providing information to the Monitor in an independent investigation or otherwise,  and the Monitor contests the existence of the privilege or the protection, the matter shall be decided by the Court.

The parties and the Monitor will proceed pursuant to these protocols.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendants' Redactions to the Monitor's Report are **ACCEPTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** granting Application to Withdraw as Counsel of Record for Defendants, Doc. 773, subject to the conditions set forth on the record,

**IT IS FURTHER ORDERED** setting a hearing on **Thursday, December 4, 2014 at 8:30 a.m**. in Courtroom 602 of the Sandra Day O'Connor Courthouse at 401 W. Washington Street, Phoenix, Arizona 85003. The Court may, upon further notice require MCSO command staff and other personnel to be present to respond to inquiries concerning their compliance with the Court's orders on this date.

**IT IS FURTHER ORDERED** that a copy of this Order shall be delivered to the Maricopa County Administrative Offices to the extent that it may require the augmentation of the Monitors' investigative staff.

Dated this 20th day of November, 2014.

*A. Murray Snow*
_____
G. Murray Snow
United States District Judge