TO:            Honorable G. Murray Snow

FROM:      Chief (Ret) Robert S. Warshaw, Monitor

DATE:        September 28, 2014

SUBJECT:    Update and Assessment of MCSO's Armendariz and Related Investigations

---

BACKGROUND

On April 30, 2014, Former Deputy Charlie Armendariz was arrested by the Maricopa County Sheriff's Office on various drug charges, stemming from a police response to the Armendariz home by the Phoenix Police Department (PPD).  PPD responded for a burglary in progress call.  There was no merit to the call – Armendariz was essentially hallucinating – but PPD Officers observed narcotics and potential evidentiary property which should have been in the custody of MCSO.  MCSO served a search warrant and recovered marijuana and other narcotics, numerous license plates, United States and Mexico driver licenses, other types of identification, credit cards, and over 500 DVDs which were later determined to contain videos of thousands of enforcement actions taken by Armendariz.

On May 8, 2014 at approximately 1435 hours, the MCSO Special Investigations Unit and the MCSO Tactical Operations Unit found Ramon C. "Charlie" Ramirez-Armendariz deceased at his home located at 3214 W. Eugie Ave., Phoenix, AZ.  Armendariz was found lying face down on the floor with his head suspended 4-6 inches off the floor by a rope affixed to a pool table.  His death was ultimately ruled a suicide.

These events were the subject of a May 14, 2014 hearing before the Court.  Further, there were several meetings involving me and my staff, who were present for a site visit from May 13-15.  On May 15th, the Court issued an extensive Order (originally under seal), requiring that several steps be taken to gather evidence and fully investigate the activities of Armendariz and any other MCSO employees who may have been using recording devices – either personally owned or agency issued – during the course of their duties.  This Order also mandated that MCSO work closely with the Monitor on this investigation.

From the start, the investigation was poorly planned and executed.  Rather than taking the targeted and more invasive approach we suggested, MCSO initiated an ill-conceived survey process designed to capture the existence of audio and video recording devices in use by MCSO personnel, as well as any saved recordings.  Internal Affairs, currently Professional Standards Bureau (PSB), received hundreds of CDs and DVDs of motor vehicle stops, contacts and interactions with residents and individuals in Maricopa County, including from the Armendariz residence and the Human Smuggling Unit (HSU).

In the midst of the Armendariz investigation, a terminated deputy, Cisco Perez, alleged during an unemployment hearing that it was common for HSU members to retrieve items from raids and safe houses and retain them for personal or MCSO use.  These statements seemed to corroborate

the activity which led to the finding of many seized personal items at the Armendariz home. This revelation derailed the in-progress administrative investigation, and prompted a criminal investigation into the activities of current and former HSU members.

EXECUTIVE SUMMARY

A voluntary, self-survey instrument was hastily designed and deployed in response to the requirements of the Court Order. This self-survey instrument was not provided careful developmental attention and as a result was designed in what the Monitoring Team considers to be a flawed manner. The instrument failed to adequately and completely address the needs as expressed in the Court Order to obtain specific information. Additionally, the instrument was designed as a "voluntary" instrument that also led to delayed responses, incomplete responses, and no response at all from members of the MCSO. As a result of the use of this instrument, data received has been inconsistent and incomplete and remains so to this date.

MCSO failed to recognize the complexities of the Armendariz suicide investigation from its initiation. The pursuit of this investigation by the MCSO has uncovered severe deficiencies in several areas of MCSO operations. Flaws have been identified in critical areas such as investigatory training and interrogation techniques. Poor interrogation skills were observed during the administrative and criminal interviews conducted in response to allegations made by Deputy Cisco Perez, who had been terminated. The lack of a properly prepared investigative plan prior to initiating the interview process highlighted the lack of training and established protocols for investigators assigned to the Professional Standards Bureau.

Also revealed were weaknesses in the evidence collection and cataloging mechanisms employed by the department. As a result, witnesses were subject to secondary interviews and the cataloging of evidence has remained in constant turmoil. This turmoil has caused extensive investigatory delays in attempts to correlate multiple items of seized evidence with individuals, property and audio and/or video recordings.

Video reviews have been conducted without a standardized review process and are subject to personal views and bias. This lack of standardized process has exacerbated problems with the cataloging of evidence that was seized from the Armendariz residence, as well as the documentation of the individual reviews themselves.

The established chronology of the MCSO tenure of Deputy Armendariz highlighted problems in the performance review and appraisal process for MCSO personnel. Lacking were supervisor reviews that included developmental programs and documentation, and the follow through with progressive discipline. His career has provided insight into institutional problems with the receipt and logging of citizen complaints, the initiation and investigation of internal investigations, and the cataloging of PSB proceedings. Also of concern is the lack of a viable and consistently utilized disciplinary system department wide.

I.   SELF-SURVEYS

1.   *INITIAL OBSERVATIONS*

Following the court hearing of May 14, 2014, Monitoring Team members Chief Martinez, Ms. Ramirez and I met with Chief Deputy Sheridan, Captain Holmes and Ms. Christine Stutz from the Maricopa County Attorney's Office (MCAO) to develop an investigative strategy that would incorporate the coercive powers of Internal Affairs to ascertain information regarding deputies' personal use, capture, and cataloging of audio and video recordings.   Chief Deputy Sheridan initially advocated for a softer approach.  I expressed my strong opinion that MCSO should use a more elevated approach.  After MCAO attorney Christine Stutz supported my position, Chief Deputy Sheridan then announced that it was always his position to employ the Internal Affairs methodology.  During the course of this meeting Sheriff Arpaio made an appearance, but offered no substantive contribution prior to his departure approximately 10 minutes later.  As all of us departed the meeting, it was my belief that the attendees were in clear agreement of the future process that would be undertaken.

At approximately 5:15PM, while returning to your chambers, I received a phone call from Chief Deputy Sheridan. He notified me that without his knowledge, Deputy Chief Trombi distributed an email in direct conflict with the decisions of our collective group. This email follows.

*From: David Trombi - SHERIFFX <D_Trombi@MCSO.Maricopa.gov>*
*Date: May 14, 2014 at 15:41:22 MST*
*To: Bill VanAusdal - SHERIFFX <w_vanausdal@MCSO.maricopa.gov>, Dan Whelan - SHERIFFX <D_Whelan@MCSO.maricopa.gov>, Dante Proto - SHERIFFX <D_Proto@MCSO.maricopa.gov>, David Toporek - SHERIFFX <D_Toporek@MCSO.maricopa.gov>, Donald Rosenberger - SHERIFFX <D_Rosenberger@MCSO.Maricopa.gov>, Fred McCann - SHERIFFX <F_McCann@MCSO.maricopa.gov>, George Hawthorne - SHERIFFX <G_Hawthorne@MCSO.maricopa.gov>, James Schoeninger - SHERIFFX <J_Schoeninger@MCSO.maricopa.gov>, Joe Rodriquez - SHERIFFX <J_Rodriquez@MCSO.maricopa.gov>, John D'Amico - SHERIFFX <j_damico@MCSO.maricopa.gov>, "John Kleinheinz (Capt) - SHERIFFX" <J_Kleinheinz@MCSO.Maricopa.gov>, Joseph Sousa - SHERIFFX <J_Sousa@MCSO.maricopa.gov>, Ken Booker - SHERIFFX <K_Booker@MCSO.maricopa.gov>, Kristina Henderson - SHERIFFX <K_Henderson@MCSO.maricopa.gov>, Larry Kratzer - SHERIFFX <L_Kratzer@MCSO.maricopa.gov>, MaLinda Johanning - SHERIFFX <M_Johanning@MCSO.maricopa.gov>, Markley Johnson - SHERIFFX <markley_johnson@MCSO.maricopa.gov>, Paul Ellis - SHERIFFX <P_Ellis@MCSO.maricopa.gov>, Peter Metzler - SHERIFFX <P_Metzler@MCSO.maricopa.gov>, Randy Brice - SHERIFFX <R_Brice@MCSO.maricopa.gov>, Todd Hoggatt - SHERIFFX <T_Hoggatt@MCSO.maricopa.gov>, William Hindman - SHERIFFX <W_Hindman@MCSO.maricopa.gov>, Brian Jakowinicz - SHERIFFX <B_Jakowinicz@MCSO.maricopa.gov>*
*Cc: Jerry Sheridan - SHERIFFX <J_Sheridan@MCSO.Maricopa.gov>, "Ken Holmes (A) <Captain> - SHERIFFX" <K_Holmes@MCSO.maricopa.gov>, Larry Farnsworth - SHERIFFX <L_Farnsworth@MCSO.maricopa.gov>, Edward Lopez - SHERIFFX*

&lt;*E_Lopez@MCSO.Maricopa.gov*&gt;
*Subject: Past Video Recordings*

*Several weeks back we collected information from your districts/divisions regarding how many video cameras (dash and body) were being utilized in your normal patrol functions. A general list was compiled by district/division outlining how many, personal or issued and what is done with the video when obtained. I am now directing all district /division commanders to immediately ascertain where these past videos are or what has been done with them. More importantly, I need to have ALL these videos gathered and sent to Internal Affairs ASAP Attn: Sgt. Mike Reese. Please note;\* ALL VIDEO IS TO BE PRESERVED. Simply gather it and send as directed. If video is currently in Property and Evidence, please note that on a spreadsheet along with the name of the deputy. Ensure we go back as far as possible to gather all video. It is imperative that we are as thorough as possible in this endeavor. If you have questions please call me directly.*

At approximately 6:00pm that evening, Chief Martinez spoke with Chief Deputy Sheridan by phone, reaffirming the retention of video data requirements as directed by your Order. It is during this conversation that Deputy Chief Sheridan described another early afternoon meeting that had occurred at MCSO and included Sheriff Arpaio, Chief Deputy Sheridan, Attorney Tom Liddy, Attorney Tim Casey, and Attorney Christine Stutz. Chief Deputy Sheridan stated that towards the end of the meeting, Deputy Chief Trombi was summoned into the meeting and was directed to pursue the course of action outlined in his email.

Chief Martinez attempted to ascertain why Chief Deputy Sheridan would allow our meeting to continue for two and a half hours, identifying a preferred investigative strategy, when MCSO executive staff with counsel present had already made and communicated a contrary decision to subordinate personnel. Chief Deputy Sheridan appeared dumbfounded and could not recall that Deputy Chief Trombi had been directed to pursue this course of action in a meeting in which Chief Deputy Sheridan was present. I note that Attorney Christine Stutz was present in both meetings as well, and did not volunteer that an alternative course of action had already been instituted.

At approximately 7:00pm that evening, Chief Martinez, Ms. Ramirez and I met with Chief Deputy Sheridan. The Chief Deputy incredulously had no recollection of Deputy Chief Trombi being advised to take the course of action he had taken. Chief Deputy Sheridan attributed his mental lapse to fatigue, stress and distractions. He would later write in a letter to me dated May 14, 2014, "The fact that Chief Trombi had been directed earlier to make contact with the Division Commanders never occurred to me. Whether it was from mental fatigue, confusion from many options presented throughout the day I simply do not know why I did not recall."

Deputy Chief Trombi was then summoned into the meeting in order to assess what responses and actions he had received from recipients of his email. More specifically, had the recipients forwarded the directive to their subordinates as provided or did they alter the direction in any way? In an attempt to obtain this information, Deputy Chief Trombi entered and left the meeting on several occasions. At one point he indicated that some recipients had seen his email, while others had not.

During this meeting, I requested that Captain Holmes, the then commanding officer of Internal Affairs (who has since been promoted to Deputy Chief), come into the meeting, to assess the viability of resurrecting the originally agreed upon Internal Affairs approach with the Trombi email directive as a possible parallel approach. Captain Holmes reluctantly supported the Internal Affairs investigative approach.

During our meeting, we discussed the prospects of there being additional MCSO personnel who, like Armendariz, had kept recordings. Deputy Chief Trombi stated that he did not believe other MCSO deputies would do what Armendariz had done and that any deputies that may be in possession of videos would come forward with their files. This was illustrative of the MCSO's preconceived notion that appears to permeate through this entire investigation – that Charlie Armendariz was a rogue employee and no other MCSO employees would engage in the same types of activity.

We left MCSO at approximately 9:30 PM, somewhat dismayed at the events which had unfolded. We reaffirmed the contents of your Order and advised Chief Deputy Sheridan that he could expect continued follow up in the morning of May 15, 2014.

On May 15, 2014, an email was forwarded to all MCSO deputies requesting a response to the requirements of the May 15th Court Order issued by Judge Snow in response to the arrest and subsequent suicide of MCSO Deputy Ramon "Charlie" Ramirez-Armendariz. This email contained a self-reporting survey. The target date for return of these surveys was May 21, 2014, but by that date only 466 surveys had been returned. It was anticipated that the remaining 266 surveys would be returned no later than June 14, 2014.

The self-reporting survey as created was a flawed instrument that, although intended to retrieve the desired information as ordered by the Court, would ultimately return incomplete and inconsistent data, and would cause frustration and lead to the need for further inquiries.

As of September 26, 2014, 1408 self-reporting surveys have been received. A total of 521 individuals have reported access to audio/video recording devices. A total of 100 individuals reported the use of 142 recording devices from 2007 to the present. Of these, 77 devices are county owned, and 67 are personally owned devices. Currently 991 Posse members have responded to the survey. The initial slow response from the posse was troubling, but not unexpected given the voluntary nature of the survey instrument. As a result of the flawed methodology utilized to gain insight into the use of recording devices, the investigatory element of surprise was lost. It is our belief the methodology failed to produce an accurate accounting of recording devices that were in use throughout the period in question, as well as the total number of actual recordings. The survey period covers any recording devices used for traffic stops from 2007 until present.

The survey failed to capture not only the Manufacturer of the device, but the type of recording device (i.e.: audio, video, and audio/video). This has hampered the cataloging of reported devices, and the number of devices inventoried has fluctuated upward, almost weekly.

To date 121 CDs have been turned in with the survey.  MCSO command, believing this inquiry to be a "fishing expedition", has hesitated to initiate a full investigation until each CD is reviewed individually and an assessment made as to whether any criminal or departmental violations have occurred. Capt. Holmes, then the Commanding Officer of PSB, believed that only after a violation had been found and documented, should an interview be conducted. As of this writing, MCSO has received 121 CDs. These CDs contain 2146 videos and all have been reviewed. Further lieutenant reviews were required of 30 videos, and these have been completed. Additionally, there were 14 videos in which the only language spoken was Spanish.  It is unknown if these Spanish only videos are included in this number. MCSO has never provided the Monitoring Team with specific information regarding any of these incidents, the deputies involved or the types of infractions being investigated.

On July 9, 2014, Capt. Bailey, who replaced Captain Holmes as commander of PSB, requested clarification from the Monitoring Team regarding the self-reporting memorandums on traffic stop audio/video. His request follows:

*To the Monitor Team,*
*Regarding the Self-Reporting memorandums on traffic stop audio/video, we are seeking clarification.  As we read the Court Order;*

*(a) identify all of its officers, volunteers, and employees both current and former who used or had access to any kind of recording device during traffic stops from 2007 forward; (b) identify specifically what kinds of devices each officer/volunteer/employee*
*used (e.g. audio, video, dashcam, eyeglass cam, body mount camera, etc.); when*
*those devices were acquired; and whether the devices were issued by the MCSO,*
*provided by the officer/volunteer/employee him or herself, or how the devices*
*were otherwise acquired or came into use;*

*We believe the task at hand is to identify, regarding traffic stops, "kinds of devices," when acquired, and whether they were MCSO issued or personally owned. We would like clarification that this is indeed the only information we need to provide per the Court Order.*

*Through conversations with Major Peters it is the understanding of my staff that the Monitors are requesting us to specifically identify every recording device from 2007 to current, including make, model, serial number, and if applicable every vehicle number associated to a deputy who recorded a traffic stop.  The Order does not appear to require this level of specificity.*

*As we have advised you, we have found that historically there was no consistency and/or record keeping for recording devices; therefore, we are not in a position to readily identify such specific information as what has been requested by Major Peters (make model and serial number or vehicle information) other than what we have already provided. I believe that our spreadsheet for the self-reporting memorandums has captured the information that was required by the May 15 Order by identifying who used or had access to the recording devices, the kinds of devices that were used and whether they were personally owned or issued by MCSO.  A majority of memorandums list specifically what kinds of devices people had access to or whether they were used for traffic stops but not the specific make, model and serial number of each device.  As*

*such, these memorandums would potentially be considered "deficient" requiring further investigative effort that is not specifically required by the Order. It seems the purpose of the Order was to ascertain the types of devices being used (or able to be accessed) during traffic stops from 2007 to present- the additional requirement of make, model and serial number does not appear to be directly relevant to this purpose.*

*Also, with respect to the analysis of the data that was requested by the Monitor team, if we were to count every device, as requested, we would run into an accounting issue due to specific devices being counted multiples times if issued or used by multiple personnel from 2007 to present. <u>We are happy to run the analysis with this caveat, we just wanted to be sure that is what you were requesting (that we run it off of the total number of devices identified even if that might mean that a device has been counted twice).</u>*

*Major Peters also requested we specifically identify each unit/work assignment where personnel were assigned. We have included this information in the current Reformatted Self-Reporting Survey results spreadsheet.*

*Please advise whether you believe that identifying the "kind" of device (as indicated by the "(e.g. audio, video, dashcam, eyeglass cam, bodymount camera, etc.)" of the May 15 Order) with whatever level of specificity was used by the responding person (some indicated just the type of device, some identified the devices by name, etc.) is insufficient for Compliance with paragraphs (a) and (b), and state whether it is your position that failure to identify the make, model and serial number constitutes a deficient response requiring further investigative effort. Once we have your clarification, we will determine how to proceed.*

*Sincerely,*

*Captain Steve Bailey*
*Maricopa County Sheriff's Office*
*Commander, Professional Standards Bureau*

Clearly MCSO continues to resist seeking specific recording device information.

Commander Girvin provided the following advice and direction:

*Captain Bailey,*

*As I understand it, the topic of capturing make, model, and serial number for recording devices came up in conversation during our last site visit when your spreadsheets were being discussed. Major Peters asked if MCSO was capturing this information, and when he was informed that it was not being captured, he suggested that it should be, particularly for devices acquired by MCSO. Most agencies are able to provide this type of information for property they acquire. He also suggested that, at a minimum, MCSO would need to capture this information moving forward for any newly acquired devices.*

*I'd like to clarify a few issues you raise.*

*You wrote, "Through conversations with Major Peters it is the understanding of my staff that **the Monitors are requesting us** to specifically identify every recording device from 2007 to current, including make, model, serial number, and if applicable every vehicle number associated to **a deputy who recorded a traffic stop.** (Emphasis added.) As mentioned above, Major Peters suggested that you capture the specific device information. The vehicle information is actually required under section (c) of the order, which states: "(c) identify each patrol car that may have had such a device mounted in it and the current location of that device and/or patrol car;" Keep in mind that the standard in the Order is "used or had access to" during a traffic stop. A recording need not have taken place.*

*You wrote, "Also, with respect to the analysis of the data that was requested by the Monitor team, if we were to count every device, as requested, we would run into an accounting issue due to specific devices being counted multiples times if issued or used by multiple personnel from 2007 to present." This statement appears to contradict itself. Please consider whether you are counting every device, or you are counting some devices more than once. Your concern appears to derive from the flawed survey instrument used in this process. Identifying each device with as much specificity as possible would eliminate this concern. This is also why we emphasized identifying which organizational components had multiple agency-owned cameras assigned to it. For example, if 20 officers working in a unit with 10 agency owned cameras assigned to it claimed access to cameras, you could reasonably conclude that these 20 officers were referring to these same 10 cameras. You would not count the cameras 20 times.*

*In answer to your question, "Please advise whether you believe that identifying the 'kind' of device (as indicated by the '(e.g. audio, video, dashcam, eyeglass cam, bodymount camera, etc.)' of the May 15 Order) **with whatever level of specificity was used by the responding person** (some indicated just the type of device, some identified the devices by name, etc.) is insufficient for Compliance with paragraphs (a) and (b), and state whether it is your position that failure to identify the make, model and serial number constitutes a deficient response requiring further investigative effort." (Emphasis added.) The standard cannot be "with whatever level of specificity was used by the responding person". If an objective reviewer can determine that a response is deficient, that response is not acceptable simply because it was submitted as such.*

*At a minimum, the agency must capture type of device (dashcam, eyeglass cam, bodymount, digital voice recorder, pocket cassette recorder, etc.) and its recording capability (video, audio, or both). Any other information that is readily available (make, model, serial number) should be noted. Please note that simply identifying a manufacturer is insufficient, particularly if that manufacturer produces multiple types of devices.*

*Regards,*

*John*

*Commander (Ret.) John M. Girvin*

*Deputy Monitor*

In addition to the CDs received as a result of the self-reporting survey, the HSU also turned in 3 binders of CDs from their Unit. There are 2203 reported videos on these CDs and MCSO reports that all have been reviewed. Of those, 48 videos were identified for further review by a lieutenant for potential MCSO policy violations and/or state law violations.

## 2. *PRELIMINARY FINDINGS*

MCSO to date has not created a plan to address individuals who have not responded to the survey, nor to address those individuals whose surveys have been deemed insufficient. The bulk of the missing surveys are from the volunteer Posse members. This lack of response appears to be a result of the inadequate manner in which MCSO administers and oversees the program. Anecdotal information leads the Monitoring Team to believe that if Posse members were to respond to MCSO as requested, the number of surveys would dramatically increase, but not necessarily the number of recordings. Posse members have been observed in recordings presently.

## 3. *RECOMMENDATIONS*

MCSO should be directed to continue to pursue the collection of the self-reporting surveys in spite of the flaws with the instrument.

All recordings received with the surveys should be reviewed for policy and/or criminal violations. At this time MCSO, claims that this has occurred. Discipline, if appropriate after the conclusion of the reviews, should be dispensed as well. Given MCSO's video collection methodology, the Monitoring Team questions whether anyone would have submitted a recording of a bad citizen interaction and the validity of any outcomes reported.

During September 2014, the Monitoring Team reviewed a non-scientific sample of the HSU videos. During these reviews, no conduct similar to that observed in the Armendariz video reviews was noted. Persons stopped were both males and females of various races/ethnicity. Almost without exception, the drivers were asked for their licenses and insurance and were told the reason for the stop. In many cases, records checks were not completed on the drivers and little if any conversation took place with any passengers.

With the number of reviews conducted, it was difficult to tell if there were any patterns, other than a significant number of stops for minor violations with few records checks and almost no citations. It was not possible to determine from the video segments reviewed if deputies were focusing on some particular types of violators or violations. The Monitoring Team expects to conduct additional reviews once specific information is received from MCSO on those identified as problematic in their review.

During September 2014 the Monitoring Team also reviewed a non-scientific sample of the self-reporting videos. Some of the videos were only seconds long, others clearly did not contain the entire contact, and still others would not play at all. In the videos that could be reviewed, no

conduct similar to that seen in the Armendariz videos was observed. The Monitoring Team expects to conduct additional reviews once specific information is received from MCSO on those identified as problematic in their reviews.

The Posse program should receive direct attention and modification, should Posses continue to have access to recording equipment. Although the use of citizen volunteers is a generally accepted and welcomed practice in community policing, there needs to be a well-defined structure governed by policies and procedures, in order to ensure that individuals serving under this program have a clear understanding of its purpose, and are accountable and responsive to the agency.

The issue of management and oversight of audio video recording within the MCSO has never received the proper level of attention it requires. Initial policies written in February 2008, directed organizational concerns toward the protection of HSU deputies "from false and frivolous allegations made by violators and passengers." There was only minor acknowledgement of usage for law enforcement purposes. Internal controls for the public purchase, identification and distribution of these devices did not exist. Personal purchase and use of recording devices was undeterred, further hampering the gathering of specific information regarding the types of recording devices in use. To this day, MCSO command personnel and legal counsel continue to resist efforts to identify with specificity the types of devices that were used by agency personnel

II.   ARMENDARIZ CASE

A.  SUICIDE INVESTIGATION

*1. INITIAL OBSERVATIONS*

On May 8, 2014 at approximately 1435 hours, MCSO Special Investigations Unit and MCSO Tactical Operations Unit found Ramon C. "Charlie" Ramirez-Armendariz deceased at his home located at 3214 W. Eugie Ave., Phoenix, AZ. Armendariz was found lying face down on the floor with his head suspended 4-6 inches off the floor by a rope. The initial report as written by Dep. R. Barraza #S1891 and approved by Sergeant G. Pepe #1319, indicates this incident occurred on May 8, *2013*.

The Monitoring Team recognizes that PSB was and is confronted with a formidable task. A deputy sheriff committed suicide, vast amounts of evidence were discovered, and are still being discovered, which revealed that this individual was involved in possible criminal acts and bizarre behavior that negatively impacted the lives of many Maricopa County residents and visitors.

After the suicide and during the Monitoring Team's initial meeting with PSB, PSB members appeared motivated and ready to meet the challenges of the Charlie Armendariz suicide investigation. This investigation became much more involved and complex after former Deputy Cisco Perez made disparaging comments during his unemployment hearing regarding the conduct of Human Smuggling Unit members during law enforcement operations, prompting a second investigation. Perez's comments regarding the inappropriate and illegal seizures of

personal property appeared on the surface to be corroborated by the vast amounts of evidence seized in the Armendariz residence.

On June 4, 2014, Chiefs Kiyler, Martinez and Commander Girvin attended the PSB daily meeting regarding the ongoing Armendariz investigation. Lt. Munley led the meeting, which was normally chaired by Captain Holmes who was unable to attend due to a personal conflict. Throughout the meeting, specific MCSO personnel provided updates, sometimes utilizing power point presentations, on various components of the investigation.

A chronology of events was provided by MCSO as follows:

| | |
|---|---|
| 05/01/14 | Burglary report, Armendariz residence (Phoenix PD) |
| 05/02/14 | Armendariz Resignation |
| 05/05/14 | Armendariz Barricade Subject |
| 05/05/14 | Search Warrant served by MCSO on Armendariz |
| 05/06/14 | Armendariz Arrest Warrant on drug and other charges |
| 05/08/14 | Attempted Arrest Warrant on Armendariz |
| 05/08/14 | Armendariz Suicide |

We were advised that Probation's inability to serve their warrant led to a tactical entry by MCSO and the finding of the body of Armendariz within the residence. MCSO contends that a request for assistance had been made to Phoenix PD by Probation, but that request had been refused. Lt. Pierce from Phoenix PD had advised that they would respond to calls for service or 911 calls at the residence, but would not assist with the Probation request. MCSO provided the name of Lt. Pierce as the Watch Commander at Phoenix PD who declined assistance to Probation, and also provided an internal email from Lt Ellis of MCSO regarding that communication. MCSO acknowledged that once Armendariz was found deceased, no requests were made for Phoenix PD to assume the death investigation. MCSO personnel were directed by Command Staff to conduct the death investigation. In the meeting with the Monitoring Team on June 5th, Captain Holmes, who was at that time the IA Commander, stated that he thought Phoenix PD should have conducted the death investigation. Captain Bailey, during a subsequent meeting with the Monitoring Team after he took over as the IA Commander, also stated that he thought that Phoenix PD should have conducted the death investigation. These positions are at odds with MCSO's failure to make such a request.

In addition to other evidence that was seized from the residence, cocaine and amphetamines were also found by MCSO. As a result, a full toxicology review has been requested by the Medical Examiner. (As of this writing no report has been received by MCSO nor provided to the Monitoring Team.) At the time of the barricade incident with Phoenix PD, MCSO drug tested Armendariz and found cocaine, Ambien and amphetamines (possibly a breakdown of diet pills) in his system.

Armendariz, prior to death, had recorded what has been termed a "good-bye" video that was approximately 35 minutes long. Investigative reporter Donna Rossi, from CBS 5, apparently had contact with Armendariz and had spent time with him prior to his suicide. After becoming aware of his suicide, it has been reported that she made contact with an MCSO employee, Yolanda Gibb, seeking information.

It was noted that as of June 4, 2014, when the suicide report was provided to the Monitoring Team, no one from PSB had reviewed the entire suicide report, although Captain Holmes advised that the only existing full copy had been given to the Monitoring Team.

Following the death of Armendariz, MCSO Major Crimes Division responded and investigated the incident as a suicide. On June 11, 2014, Lt. Kim Seagraves was selected by Captain Bailey and temporarily assigned from the Special Investigations Division to PSB to conduct additional follow up.  In the opinion of the Monitoring Team, she has competently directed the course of the investigation, including the follow-up of leads, and conducting interviews of friends, neighbors and associates of Armendariz.

Lt. Seagraves has provided updates to the Monitoring Team on her investigation in the weekly reports submitted by MCSO, and in a meeting with Chief Kiyler on July 22, 2014.  At that time, Lt. Seagraves provided a lengthy briefing regarding the investigation to date. During this meeting, Lt. Seagraves specifically referenced interviews with Wally Canales (domestic partner of Armendariz), Jonathan Chacon Serrano (an individual who associated with Armendariz and who was originally believed to be a member of the Police Explorers but was later determined to be a Posse member), John Kaniscar (friend of Armendariz), Patricia Darcey (Armendariz landlord), Larry Esau (roommate of Armendariz), Miguel Brusuelas (friend of Armendariz), and several neighbors as having provided the most information.  Chief Kiyler has also been provided with 26 CDs of all the interviews conducted, or attempted to be conducted, by Lt. Seagraves during her investigation.

The outcome of the civilian interviews conducted by Lt. Seagraves indicated that many of those interviewed believed that Armendariz was working with the Department of Justice (DOJ) or others regarding the MCSO, and that he was being mistreated (picked on) by the MCSO. None of those interviewed were able to provide any specificity regarding Armendariz working with the DOJ or others except that it was about traffic stops and the MCSO's treatment of "illegals". A number of those interviewed believed Armendariz was a former marine, had multiple college degrees, and was suffering from serious medical conditions, including cancer. According to information from the MCSO, none of these beliefs are true. References were also made regarding Armendariz's excessive drinking and use of diet pills, particularly during the last month of his life, and that he was a "cry wolf" kind of guy who was always looking for attention.

Lt. Seagraves has completed her interviews with the exception of those who are employees of the MCSO.  MSCO command staff directed PSB to stop employee administrative interviews until the conclusion of the criminal interviews conducted based on the allegations of Cisco Perez. During the meeting of July 22, 2014, with Chief Kiyler, Lt. Seagraves did not know who would be assigned to complete the employee administrative interviews or when they would occur.

Lt. Seagraves intends to have all weapons taken from the Armendariz residence tested via the National Integrated Ballistic Information Network. She is still awaiting the results of the forensic examination of Armendariz's personal computer and the final toxicology results for Armendariz.

Lt. Seagraves has been to the Armendariz residence and has obtained additional items from "trash" which she has impounded in the Property Room. Lt. Seagraves stated that she would be asking that all items currently impounded for safekeeping as a result of this investigation be moved to "evidence" holds to ensure that these are retained until the conclusion of the investigation.

Lt. Seagraves was returned to her normal assignment with the Special Investigations Division on June 30, 2014. This return to duty implies that the Armendariz suicide case has been completed and all leads have been investigated. The Monitoring Team was not advised or consulted prior to this action.

## 2. PRELIMINARY FINDINGS

On June 5th, after a review of the suicide report, the Monitoring Team provided a list of questions and concerns regarding the suicide investigation, specifically as it related to actions of Armendariz and others prior to the suicide. These questions and concerns included the need for additional interviews and re-interviews; and the need to review the contents of Armendariz's personal computer and cell phone.

During a meeting with Chief Kiyler on June 11, 2014, Lt. Seagraves was introduced as the person who had been assigned to conduct the further follow up on the Armendariz suicide. At that time Lt. Seagraves was in the process of reviewing the report to determine all of the interviews that needed to be conducted as well as other follow up necessary.

During the site visit of June 16-20, 2014, Lt. Seagraves provided an update to the Monitoring Team on the Armendariz Suicide investigation. Since that time, Lt. Seagraves has conducted numerous interviews, reviewed evidence, and responded to the list of questions asked by the Monitoring Team on June 5, 2014.

As of September 24, 2014, the Monitoring Team believes that Lt. Seagraves has thoroughly pursued all investigative leads that were identified in the original suicide report. Twenty-six interview CDs have been presented to the Monitoring Team as a result of her efforts. MCSO employee interviews and interviews of other civilians identified through her investigation have not been completed to date and no one has been assigned to complete these interviews. MCSO is continuing with their review of both Armendariz's personal computer and cell phone, and expected to have the data information in a spreadsheet format by September 25th. The toxicology report regarding Armendariz has still not been received from the Medical Examiner's Office.

## 3. RECOMMENDATIONS

The Monitoring Team recommends that the investigation continue to follow the direction as provided by Lt. Seagraves, to include the forensic computer review, the NIBIN weapons testing and the review of the toxicology report when provided. The Monitoring Team expected that, because of Lt. Seagraves' extensive knowledge of the case, she would be assigned to conduct the

employee interviews and the additional civilian interviews when the decision is rendered to move forward with Administrative Interviews, but we have learned that she is no longer working on this case.

To ensure transparency in the event of a future incident of this type, MCSO should contact the police department with primary jurisdiction and request that they conduct the initial criminal investigation.

    B.  EVIDENCE COLLECTION/ANALYSIS

        1.  *INITIAL OBSERVATIONS*

MCSO investigators had originally reported that 618 items of evidence had been seized from the Armendariz residence. This number would prove to be wholly inaccurate. The Monitoring Team can only surmise that this inadequacy was due to a lack of policy and procedure on the part of MCSO. Multiple items of evidence were packaged and numbered together as one, with the assigning of a single evidentiary number as depicted in the original Excel spreadsheet "618 Items Evidence and Supplemental Tracking Database 6 26 14".

        2.  *PRELIMINARY FINDINGS*

The Special Investigations Division (SID) was charged with the initial collection of evidence and the pursuit of intelligence and research of the seized items in order to correlate these items with individual and motor vehicle stops conducted by Armendariz. They are currently conducting reviews of the driver licenses and personal identification cards found, and have been inputting all the information into a spreadsheet as their research continues to unfold, which will then be compared to the traffic stop data. Every document is intended to be identified and cataloged on the spreadsheet. Ultimately, most if not all of the property should be returned to the rightful owner, requiring further investigative efforts to accomplish this.

During the June 16-20, 2014 site visit, the Monitoring Team recommended that the individual spreadsheets listing the evidentiary items be merged so that the contents could be cross referenced and "linked" together. This process would provide a more comprehensive overview of this investigation.

As a result of the recommendations, SID conducted a review and spreadsheet modification which has now increased the total number of evidentiary items to 1657. It is the opinion of the Monitoring Team that even this number is less than accurate based upon the fact that MCSO continues to list multiple pieces of evidence in single line item. Each additional item requires further investigation and follow-up. No date has been provided to the Monitoring Team for completion of this task. On September 22, 2014, Captain Bailey advised the Monitoring Team that there has been minimal follow up on the evidentiary items that were seized. Investigators have researched whether or not Armendariz conducted a Justice Web Interface (JWI) inquiry

associated with the items, and have identified "18 to 20" such instances where he did so, but they have not yet followed up on these instances beyond the database research.

### 3. RECOMMENDATIONS

The Monitoring Team continues to be dissatisfied with the continuous modifications of the total number of evidentiary documents and items, but believes the accounting has vastly improved since the initial seizure. The Monitoring Team believes that further spreadsheet refinement will identify an even greater number of seized items than what was initially reported. The PSB has recently acquired an analyst, Jennifer Johnson, who has been most receptive to suggestions made by the Monitoring Team, and has been able to create documents of substantially better quality as a result. The Monitoring Team recommends that MCSO continue to utilize the services of Ms. Johnson in order to resolve the immediate issues at hand, and to establish future protocols for the seizure and documentation of seized evidentiary items.

One of the single-most important factors in any investigation is the manner in which physical evidence is handled by the investigating agency. Personnel utilized for this purpose are tasked with the effective collection, preservation, packaging, and transportation of all collected evidence. Evidence is required to have specific documentation of its location at the scene, the date of collection, and the officer who collected it. Each individual item collected is identified as evidence and numbered as such, in order to establish the chain of custody. MCSO should have recognized early on that the death of a Deputy would be a high profile investigation mandating the careful collection and cataloging of evidence.

It would appear that these simple processes have not been adopted and are not institutionalized within MCSO by virtue of policy and training. The importance of physical evidence in a case cannot be overstated. The credibility and integrity of the evidence is wholly contingent on its handling from its initial observance through presentation in court. Evidence procedures should be developed for the purpose of providing the investigator with a working knowledge of physical evidence handling.

### C. VIDEOS/REVIEWS

#### 1. INITIAL OBSERVATIONS

During the June 4, 2014 meeting, lengthy discussions took place regarding how MCSO would determine if a reviewed stop was "problematic" and if any guidelines have been developed to ensure consistency of reviews.  Specifically, the Monitoring Team desired to see the direction given to those MCSO employees reviewing the CDs. No such guidelines were provided.

PSB personnel indicated that the reviewers were looking for policy violations, legal issues, the seizure of property and discretionary concerns. The reviewers were directed to identify "any" problematic issue, no matter how small.  Reviewers were also advised that MCSO personnel were not the only ones reviewing the videos. Reviewers were shown what was perceived by some to be a "problematic" video as an example of what reviewers should be looking for.

The Monitoring Team noted that there were no specific guidelines or protocols established for the review process. Recommendations were made to develop a clear, standardized and specific methodology that could be utilized by all reviewers. This recommendation was ignored.

Technical Management Bureau Deputy Chief Shelly Bunn discussed CDs that are corrupted and cannot currently be copied, and in some cases, cannot be viewed. At the time they advised that they were looking at a number of solutions. (Ultimately, prior to the end of the site visit, the Monitor was provided with a memo detailing the attempts made by MCSO to date to deal with these videos, and their further intentions to solve the problem.)

As of the June 4, 2014 meeting, of the 510 Armendariz CDs, 265 CDs had been viewed, with a total of 1731 videos reviewed. Traffic stop videos accounted for 1211 videos, with the remainder being referred to as "other." These "other" videos include Armendariz being parked at locations with the video running, and in some cases, driving with the video running.

During the meeting, Captain Holmes advised the Monitoring Team that they (MCSO) felt pressured by the Monitoring Team to get the CD reviews completed. The Monitoring Team continually impressed upon MCSO that the quality of these reviews are more important than the timeliness of the reviews.

As of Monday, June 16, 2014, an additional 10 detectives from the Special Investigations Unit were temporarily assigned to review Armendariz videos, for a period of seven days.

Sgt. Rick Morris, also later promoted to the rank of Lieutenant, was assigned to oversee SID members who were reviewing CDs associated with the suicide investigation. Two Spanish speaking investigators were added to the group reviewing the CDs to specifically review the videos containing Spanish dialogue.

The Monitor required further clarification and status on the CDs/DVDs that had been deemed to be corrupted. Chief Bunn identified internal attempts to retrieve the corrupted data. Ultimately, a private consultant advised MCSO to acquire a software program called "Screen Capture". This program is designed to capture data from corrupted discs.

MCSO installed Screen Capture on 5 computer work stations and assigned 5 detectives to review and monitor the 190 corrupted videos. They were averaging 5-6 CD reviews per day. Some were as long as 7 hours, and each had to be monitored and reviewed during the entire "capture" process.

Captain Bailey advised that they had obtained search warrants for both the computer and cell phone belonging to Armendariz. MCSO personnel assigned to Arizona Counter Terrorism Information Center were to conduct a forensic analysis of the computer and MCSO SID personnel were to perform the examination of the cell phone.

As of July 15, 2014 and until the present date, MCSO has had a total of 602 DVDs capturing the activities of Armendariz. Taken from the Armendariz residence were a total of 560 DVDs. An

additional 42 DVDs were located in binders held by the HSU Administrative Officer. No additional DVDs have since been located.

## 2.  PRELIMINARY FINDINGS

In regard to the reviews of the DVDs, each investigator appeared to be making independent decisions on what was problematic. PSB commanding officers felt that the investigators tasked with reviewing videos were experienced personnel and they did not believe they needed to give them more specific direction than that which was previously provided.

The only information captured by reviewers, according to the spreadsheet "Armendariz Linked Spreadsheet 7 16 14 MASTER" was: Disc #, File Date, Video Length, Name Listed, Potential Race/Ethnicity, License Plate, Other Passengers, Potential Race/Ethnicity, Other MCSO, Other Agencies, Items Seized, Spanish Spoken, Further Review, Comments, Reviewer. There were no specific notations of policy violations or law violations.

Of particular note were the documented dates that recordings were made. The Armendariz DVDs seized from his residence ranged in date from January 1, 2010 through March 14, 2014. The additional Armendariz DVDs seized from his computer ranged in date from December 15, 2008 through October 8, 2013. The Armendariz DVDs maintained in the HSU ranged in date from March 18, 2010 through April 5, 2013. DVDs attributed to other HSU members ranged in date from January 1, 2007 through February 7, 2014. Many of the videos also have an automatically inserted time stamp indicating the date and time of the recording, but both MCSO and the Monitoring Team have noted obvious inaccuracies with this data. The self-survey requested a response for traffic stops from "2007 forward".

## 3.  RECOMMENDATIONS

The review of motor vehicle stop recordings is only one piece of a larger organizational process. This process begins with the formation of specific patrol procedures taught during the pre-service phase of training and reinforced during in-service training.

On August 26, 2014, the Monitoring Team reviewed a non-scientific sample of the seized Armendariz DVDs The intent of this review process was to observe incidents that MCSO previously considered both problematic and non-problematic in nature. This initial review of 19 video incidents revealed a recurring pattern. Armendariz would:

- begin contacts with citizens by asking them if they had any "guns, knives, bombs, or weapons of mass destruction"
- lecture drivers about traffic infractions
- use inappropriate language (fucking) often
- arrest, handcuff and place persons in the backseat of his police vehicle and then cite and release them for the traffic violation
- advise drivers that their speeds were higher than he actually cited them for

- appear to make pretextual stops for motor vehicle violations, (i.e.: license plate light out) for vehicles with Hispanic drivers and passengers, and then request ID's of the driver and passengers
- ask drivers if they would prefer to receive a "tongue lashing" in lieu of summons
- tow the vehicle for an alleged violation of law and then subsequently seize and search the passengers' pocket books without reason while requesting ID
- place drivers and passengers under arrest for minor violations, handcuff them, place them in the sheriff's vehicle, search the subject's vehicle, and when no evidence was found, release the subject's with a motor vehicle summons
- seize driver licenses and license plates without supervisory follow up to ensure same were properly placed into evidence & property.

Additionally, the Monitoring Team noted that in many cases it is apparent that other MCSO personnel were on scene, but they were not identified by the reviewer.

## D.  ARMENDARIZ PERSONNEL HISTORY

### 1.  *INITIAL OBSERVATIONS*

Mr. Armendariz was a poor representative of law enforcement.  The fact that Mr. Armendariz was able to pass the MCSO pre-employment background is worrisome, but even more concerning is the fact that even after a long list of complaints and numerous red flags were raised by supervisors, Mr. Armendariz remained in the Human Smuggling Unit.

Early in June 2014, members of the Monitoring Team reviewed the timeline of Armendariz employment, beginning in 2005 with the hiring of Armendariz, obtaining deputy status in October 2005, his transfer to HSU in 2007 and his "disciplinary" transfer back to patrol in 2013.

We asked MCSO to identify and document all efforts undertaken by MCSO to review his background, criminal history, employment history and contemporary associates.  The initial personnel review process seemed to lack direction.

A review of civilian complaints against Armendariz revealed that not all complaints were documented with PSB and that some complaints remained at the district level, never being seen or reviewed by PSB.  MCSO intended to follow up with the appropriate supervisors on this issue.

Armendariz was interviewed, both criminally and administratively.  During the criminal interview Armendariz invoked his 5th Amendment rights. Subsequently, the criminal interview was terminated and the administrative interview began. It was during the administrative interview that Armendariz resigned.  Once he expressed an interest in resigning, securing his resignation became the focus of the interview, and there was virtually no questioning about his behavior and the vast amounts of property discovered at his residence.  Armendariz did state during his interview that it was common for other members of the HSU to leave items like identifications laying around the office and that the Detention Officer would just gather them up and take them up to his house and put them in the garage. During her interview, the Detention

Officer named by Armendariz denied that this ever occurred. All opportunities for further questioning regarding this statement or other concerns were lost when Armendariz committed suicide. Captain Holmes advised the Monitoring Team that the administrative interviews of HSU personnel commenced, and as of June 18, 2014,

Captain Holmes also stated that "anecdotally" he heard that there had been approximately 14 complaints about Armendariz over a 12 month period (the information regarding these 14 complaints was later found by the Monitoring Team while reviewing the supervisor notes of Sgt. Trowbridge), and that MCSO "made" him wear a camera as a result. The Captain indicated that reviews had been conducted on videos associated with complaints alleging wrongdoing by Armendariz, but he did not know if videos recorded by Armendariz had been randomly reviewed by supervisors. The Captain was unable to provide specific documentation to support these assertions. Additionally, on November 30, 2009, prior to the Court Order, MCSO implemented a 9-month retention period for recordings. After 9 months, recordings were destroyed.

## 2. *PRELIMINARY FINDINGS*

As of July 17, 2014, Sgt. Fax, assigned to PSB and Armendariz case officer, began to construct a narrative timeline of Armendariz citizen complaints, PSB investigations and other incidents that occurred while Armendariz was employed with the MCSO. When this timeline is completed, the MCSO and the Monitoring Team should have a much clearer understanding of the Armendariz employment history. Additional members of PSB have continued to work on the merging of the spreadsheet data in order to link persons, incidents, evidence, DVDs and other items.

As early as 2007, Armendariz committed what was referred to in his performance evaluation as a "serious policy violation." This incident involved Armendariz, while off duty, using his marked police vehicle to drive himself and his friend to a bar, where after receiving a citizen's complaint, MCSO personnel responded and found him inside the bar drinking alcohol. While memorandums about the event were located, there was no indication found that any discipline or other administrative actions took place. Throughout his tenure with MCSO, supervisors continued to reference complaints and concerns about Armendariz, many of them related to his interaction with members of the public, and some associated with "internal affairs" investigations.

In a review of performance evaluations of Armendariz by the Monitoring Team, it was noted that Armendariz was consistently referred to by supervisors as one of the hardest working deputies. The performance evaluations also consistently noted a concern over the number of complaints Armendariz had, stemming from his interactions with members of the public.. These comments took several different forms, in some cases saying that he had been talked to, and in others, that his number of complaints seemed to have lessened. Armendariz still received a "satisfactory" rating in personal relations, and there appeared to be no structured remedial training provided to Armendariz to address these concerns. The complaints seemed to consistently indicate concern from citizens regarding their treatment by Armendariz.

On May 29, 2012, Armendariz was involved in a domestic violence situation with his domestic partner and he contacted his sergeant for assistance. Armendariz was very emotional, and based on a number of factors, Sgt. Trowbridge became concerned that Armendariz might be considering harming himself. Ultimately, Armendariz voluntarily entered a Behavioral Treatment Center. By June 13, 2012, Armendariz had been released from the treatment center and had a signed fit-for-duty packet releasing him for full duty.

On February 13, 2013, Sgt. Trowbridge authored a memorandum saying that between May 2011 and Feb 2013, he documented fourteen citizen complaints on Armendariz and had no less than four sit down conversations with Armendariz about these complaints. He concluded his two-page memo to Lt. Jakowinicz by saying that while Armendariz was one of the hardest working deputies he had ever been around or supervised, Armendariz seemed to have a problem interacting with the public. In a subsequent memo to Chief Trombi on February 21, 2013, Lt. Jakowinicz supported the concerns of Sgt. Trowbridge and requested that Armendariz be transferred to a different assignment. In a one-paragraph memo from Chief Trombi to Lt. Jakowinicz on 3/13/13, Chief Trombi indicated that he had met with Armendariz to discuss his performance issues and recurring complaints and was convinced Armendariz was receptive and would make a concerted effort to meet goals and work on his interpersonal relations skills. It appears that no transfer of assignment or structured remedial training occurred as an immediate result of this series of communications between supervisors, though Sgt. Trowbridge had previously discussed interpersonal training with Armendariz.

.                                                                               3. Sgt. Madrid became the direct supervisor for Armendariz and would eventually write a memo requesting that Armendariz be removed from his squad

Sgt. Fax completed the timeline of Armendariz citizen complaints, PSB investigations and other incidents that occurred while Armendariz was employed with the MCSO. The information contained in the timeline and written summary validates the early assessment of the Monitoring Team that Armendariz had a long history of issues, including policy violations, citizen complaints and personal issues that were not addressed by MCSO. That timeline is paraphrased below:

May 31, 2005
- Armendariz is hired by the MCSO as a Detention Officer.

August 1, 2005
- Armendariz successfully completes the detention academy.

October 10, 2005

- Armendariz is promoted to deputy trainee.

February 27, 2005
- Armendariz successfully completes deputy academy.

July 6, 2005
- Internal Affairs Case number 2006-0116.

July 9, 2009
- Armendariz is transferred to the special assignment unit.

Dec. 3, 2007
- Administrative Inquiry conducted.

January 2, 2008
- Armendariz is transferred to general investigations division.

April 14, 2008
- Armendariz is transferred to the court security division.

June 2008
- Armendariz is transferred to the human smuggling unit.

September 2009
- Internal Affairs case number 2009-0134.

May 4, 2010
- Internal Affairs case number 2010-0137.

May 2, 2011
- Citizen Complaint – No Internal Affairs Number Issued.

May 12, 2011
- Citizen Complaint – No Internal Affairs Number Issued.

May 17, 2011
- Citizen Complaint – No Internal Affairs Number Issued.

June 25, 2011
- Citizen Complaint – No Internal Affairs Number Issued.

February 17, 2012
- Citizen Complaint – No Internal Affairs Number Issued.
  - Actual Administrative Inquiry Completed

Unknown date believed to be between February and July of 2012

- Citizen Complaint – No Internal Affairs Number Issued.

Unknown date believed to be between February and July of 2012
- Citizen Complaint – no Internal Affairs Number issued.

Unknown date believed to be between February and July of 2012
- Citizen Complaint – No Internal Affairs Number Issued.

May 27, 2012
- Phoenix Police Department responds to the Armendariz residence in reference to a domestic violence call.

May 29, 2012
- Sgt. Trowbridge receives a text message from Armendariz stating that he needs help

May 30, 2012
- Armendariz is given a fit for duty packet by Sergeant Trowbridge while in Aurora Behavioral Health Services.

May 31, 2012
- Armendariz requests Sgt. Trowbridge come to see him at behavioral health service. Sgt. Trowbridge told that another deputy had advised that Armendariz had alcohol and other issues.

June 1, 2012
- Armendariz's Sheriff's Office vehicle removed from his home.

June 2, 2012
- Sgt. Trowbridge advised by treating physician of concerns and that Armendariz will remain in the facility until the following Monday.

June 4, 2012
- Sgt. Trowbridge responds to behavioral health facility and advised of ongoing concerns regarding Armendariz after which Armendariz is released from the facility.

June 14, 2012
- Armendariz turns in his fit for duty packet returning him to duty.

July 10, 2012
- Citizen Complaint – No Internal Affairs Number Issued.

July 10, 2012
- Citizen Complaint – No Internal Affairs Number Issued.

October 12, 2012
- Citizen Complaint – No Internal Affairs Number Issued.

January 23, 2013
- Citizen Complaint – No Internal Affairs Number Issued.

February 8, 2013
- Citizen Complaint – No Internal Affairs Number Issued.

February 11, 2013
- Citizen Complaint – No Internal Affairs Number Issued.

February 13, 2013
- Sgt. Trowbridge authors memo to Lt. Jakowinicz about all the citizen complaints against Armendariz.

February 20, 2013
- Citizen Complaint – No Internal Affairs Number Issued.

February 21, 2013
- Lt. Jakowinicz authors a memo to Chief Trombi concurring with Sgt. Trowbridge's concerns.

March 5, 2013
- Chief Trombi authors a memo to Lt. Jakowinicz in reference to speaking with Armendariz about his performance and the ways he dealt with the public.

May 20, 2013
- The Phoenix Police Department is called to Armendariz's residence reference a domestic violence situation.

May 27 2013
- The Phoenix Police Department is called to the Armendariz residence reference a welfare check as Armendariz had hinted in a text about committing suicide.

June 11, 2013
- A deputy becomes concerned about some statements made by Armendariz about possibly harming himself. A welfare check is done on Armendariz. It appears that the Armendariz chain of command was notified about the incident.

June 13, 2013
- A Detention Officer writes a memo to Lt. Jakowinicz regarding the domestic violence incident at the Armendariz residence.

June 14, 2013
- Lt. Jakowinicz requests Kelly Grennan speak to Armendariz about their concerns about him and ensure that the County was providing him all assistance they could.

June 24, 2013
- The HSU is transferred from the Enforcement Support Division to the Special Investigations Division.

August 8, 2013
- Citizen Complaint – No Internal Affairs Number Issued.

August 19, 2013
- Armendariz is transferred from the HSU to Patrol District 2.

January 25, 2014
- Internal Affairs case Number 2014-0077.

March 14, 2014
- Internal Affairs Case Number 2014-0142.

March 26, 2014
- MCSO contacted regarding Armendariz possibly giving drugs to the son of a friend. Determined that no crime had occurred.

April 15, 2014
- Claim filed against Maricopa County in reference to damages stemming from a traffic stop by Armendariz.

April 30, 2014
- Phoenix Police Department responds to the Armendariz residence regarding a burglary. Armendariz acting erratic and MCSO Watch Commander notified. Upon the arrival of MCSO personnel, drugs and other evidentiary items were located at the residence.

May 1, 2014
- MCSO personnel serve a search warrant at the Armendariz residence and start an investigation in to Armendariz in reference to the drugs and other criminal activity.

May 2, 2014
- Armendariz is interviewed criminally and administratively by MCSO and resigns.

May 4, 2014
- Phoenix Police Department responds to Armendariz residence reference an attempted suicide by Armendariz. Armendariz barricades himself in the residence and makes threats to commit suicide, at the conclusion of the barricade situation, Armendariz is sent to the hospital for threatening suicide.

May 5, 2014
- Armendariz is booked into the 4th Avenue jail in reference to drug and weapons charges.

May 7, 2014
- Armendariz fails to show up for his electronic tracking device and a warrant is issued for his arrest.

May 8, 2014
- Armendariz is found deceased in his residence from an apparent suicide.

June 6, 2014
- A claim is filed against Maricopa County in reference to Armendariz and Sheriff's Office personnel taking the complainant's identification card.
- A claim is filed against Maricopa County in reference to Armendariz seizing the complainant's vehicle.

June 10, 2014
- A claim is filed against Maricopa County, Sheriff Arpaio and Armendariz in reference to false arrest, imprisonment, theft, negligence, negligent supervision and excessive force based on a traffic stop Armendariz conducted on January 16, 2014.

### 3. RECOMMENDATIONS

MCSO lacks nationally recognized policies and procedures relative to the implementation and use of recording devices. Although implementation of these systems cannot completely ensure the appropriate behavior of law enforcement officers, implementation does provide for adequate levels of oversight and an ability to terminate those who fail to follow proper procedures in a timely manner.

MCSO must fully implement the Order-required Early Identification System. Such a system, if properly administered, would certainly have identified Armendariz as an extremely problematic and troubled employee. While we will never know if an early identification system could have prevented the ultimate tragic outcome, we do know that such intervention would have saved the agency a great deal of time and resources resulting from the actions of Armendariz.

III.   HSU ADMINISTRATIVE INVESTIGATION

### 1. INITIAL OBSERVATIONS

From the beginning of the Monitor's review of the Armendariz and HSU investigations, there has been a recurring pattern of missteps and questionable decisions made by PSB investigators and command staff. A lack of a satisfactory investigative plan provided the opportunity for these missteps.

On approximately June 18, 2014 the administrative interviews were stopped as a result of the statements made by Deputy Cisco Perez during his unemployment hearing alleging criminal activities among members of the HSU. Perez claimed that HSU members were inappropriately

seizing personal property from locations being searched. As a result of these statements, Captain Bailey made a decision to interview all members criminally.

This decision was not well received by the criminal investigators of the PSB.

### 2. *PRELIMINARY FINDINGS*

Two lieutenants, two sergeants, and 4 detectives had been interviewed prior to the administrative interviews being stopped.

had been served with a Notice of Investigation in the HSU administrative investigation. A

During a meeting with Chiefs Martinez and Kiyler on August 27, 2014, Captain Bailey along with Sergeant Fax advised them that since the criminal investigation was complete, they would be moving forward with the HSU administrative investigation. After significant hesitation and negotiation, our team was afforded the opportunity to review and comment on proposed interview questions in the criminal investigation. Chiefs Martinez and Kiyler requested that we once again be afforded the opportunity to review the questions for the HSU administrative investigation prior to the commencement of these interviews. Captain Bailey agreed to this request.

On the afternoon of Friday, September 12, 2014 Chief Kiyler received an email from Ms. Christine Stutz on behalf of Captain Bailey. This email provided a list of questions to be asked in the administrative interview of Sgt. Trowbridge. Ms. Stutz requested that these questions be forwarded to appropriate members of the Monitoring Team for review. This email was acknowledged and responded to the same afternoon. The supervisory questions follow.

*in supervisory investigation)*

*Although these questions may not be asked exactly as written below, the general concept of the questions will be asked. These may not be the only questions asked; based on the answers, there will probably be spin off questions or clarifying questions. It should also be noted these questions are only for the supervisory investigation and are not related to any other investigation than may be involved in. It          be noted that these questions may not be the same questions that are asked to          in this investigation; however some of the questions could overlap and be asked*

On the afternoon of Monday September 15, 2014, a message was left by Chief Kiyler for Ms. Stutz that my team had questions about the interview process. On Wednesday, September 17th, 2014, Chief Kiyler spoke with Ms. Stutz about our concerns. A short time later, Captain Bailey sent an email to Chief Kivler advising that PSB had already started the administrative interviews and already interviewed                        , one detention officer and three deputies.

This information surprised the Monitoring team, and Captain Bailey's email to Chief Kiyler is included below.

*Chief,*

*As a result of a conversation you had with Christine Stutz I would like to clarify our intention on the administrative investigations. We will independently develop questions for each interview that will be conducted based on what information we have collected from video review, spreadsheet data, reports, etc...that is why we suspended the interviews earlier in the process.*

*However, we anticipate that questions could change or new questions could be developed based on the answers we are given. To date, we have interviewed S                              . As we discussed during your last visit, the administrative interviews started on September 15th as planned.*

*I am directing Sgt. Fax to provide a further written outline that will be provided in this week's report.*

*Sincerely,*

*Captain Steve Bailey*
*Maricopa County Sheriff's Office*
*Commander, Professional Standards Bureau*

A follow up phone call was made to Captain Bailey by Chief Kiyler, during which Captain Bailey indicated that they did not intend to have any scripted questions for the administrative investigation regarding HSU's potential misappropriation of property. He said that they had decided to just do what he referred to as "thematic" interviews. He further clarified that the questions sent to her on September 12, 2014 were specific to the "supervisory investigation". Captain Bailey said that they began the interviews after not hearing back from Chief Kiyler. It was determined that the interview of ___ ___. When reminded by Chief Kiyler that the request for review of the interview questions by the Monitoring Team had only been made on the afternoon of Friday September 12, 2014, Captain Bailey provided no meaningful response, saying basically that they had just proceeded after not hearing from her. Captain Bailey was again asked to forward the "supervisor" questions to the Monitoring Team prior to proceeding any further with them and he agreed to do so.

During the on-site compliance meeting with PSB personnel September 22, 2014, Captain Bailey was again urged by my team to develop standard questions for the "property" investigation, as this had been the approach during the previous administrative and criminal interviews. Captain Bailey, although clearly resistant to our request, stated that he would discuss it with his team and provide a response by close of business Tuesday, September 23, 2014. As of this writing, Captain Bailey has not responded regarding the standardized questions for the "property" investigation and no proposed questions for supervisor interviews have been received.

On September 26, 2014, Major Peters and Chief Kiyler were advised by Lauren Sanchez, Administrative Assistant to Captain Bailey, of the status of the administrative interviews. She forwarded the following email as sent by Sgt. Fax, presumably to Captain Bailey.

*Sir,*

*In reference to the interviews of Sheriff's Office personnel for all of the different IA's that are being conducted I have '*
    *The rest of the interviews are still being scheduled based on the fact I am completing the writing of questions for the supervisors so they can be submitted to the monitoring team and I have mandatory training on the 1st and 2nd of October. As the interviews are scheduled I will update you and the monitoring team. If there is any further information I can help with please let me know.*

*Sergeant Stephen Fax S1243*
*Maricopa County Sheriff's Office*
*Professional Standards Bureau*

*550 West Jackson Street*
*Phoenix, Arizona 85003*
*(602) 876-4972*

### 3. *RECOMMENDATIONS*

The Monitoring Team recommends that a more detailed investigative plan be developed to include specific background information on each subject identified for interview. Additionally, the Monitoring Team requests that they have input into the development of the basic line of questions to be asked of each subject, as we have done in the past.

## IV.   HSU CRIMINAL INVESTIGATION

### 1. *INITIAL OBSERVATIONS*

Former Deputy Perez's allegations, described above, resulted in a criminal investigation of HSU members.   Deputy Perez's firing stemmed from a prior criminal investigation involving a wiretap, which revealed potential criminal conduct of others in MCSO, some of whom worked or had association with members of the Human Smuggling Unit.   Deputy Alfredo Navarette was arrested on felony charges.   It would be during the unemployment hearing for Cisco Perez that other allegations of criminal wrongdoing would be made, setting the stage for the conduct of the criminal interviews.

As a result of the wiretap investigation, an MCSO Detention Officer, Sylvia Najera was arrested and ultimately dismissed, and other MCSO members were disciplined. PSB personnel have put forth the theory that the stated corruption and misdeeds of the HSU personnel were aberrations that were confined to a small group of rogue employees.   This opinion would permeate the investigations and would inhibit good investigatory and interviewing practices. The Monitoring Team reminded investigators to remain objective and to seek the truth, no matter where it may lead and in spite of their pre-conceived notions.

On June 16, 2014, members of the Monitoring Team met with Chief Deputy Sheridan and the PSB chain of command.   PSB was asked to provide an update on the progress of the investigation and the status of the development of the line of questions to be asked of subjects. It was at this time that the Monitoring Team became aware that the criminal interviews were already underway.

This would prove to be problematic as the interview procedures lacked consistency. It was learned that the criminal interviews, which are normally conducted in the PSB office where there is video/audio recording capability, had been moved off-site to the same building where the Human Smuggling Unit was located.  After several interviews had been conducted, the interview location was moved, in response to investigators' concerns that several current employees who are related to Alfredo Navarette or Cisco Perez worked in close proximity to where the interviews had been conducted previously.  This is but another issue that may have been negated if a complete and thorough investigative plan had been developed and adhered to.

The interviews were then moved to a third location. However, the new location could only provide audio recording capability in contrast to the conduct of the previous interviews and PSB policy. Additional interviews were then conducted with the use of audio-only recordings, before the PSB command staff stopped the interviews pursuant to a Monitoring Team recommendation. At issue once again was the inconsistency of the interview process.

The Monitoring Team asked why the interviews were not conducted in PSB, in concert with normal protocol, and we were advised that the interview room was in use by three deputies reviewing the Spanish dialogue Armendariz videos. The Monitoring Team recommended moving the three deputies into the same room where all other Armendariz DVDs were under review. As a result of the recommendation, the PSB interview room quickly became available. This entire incident was indicative of a pattern of poor decision making and lack of flexibility with the interviewers and the interview process.

## 2. *PRELIMINARY FINDINGS*

During the June 16-20, 2014 site visit, the Monitoring Team was advised by Captain Bailey, that he had personally decided that the best approach to this investigation would be to interview the subjects in a criminal interview. Captain Bailey advised the Monitoring Team that he had personally hand-picked Sgt. Dave Tennyson as the lead investigator and interviewer for the criminal investigation. This decision would ultimately call into question the ability of the Captain to assess the skill levels of his investigators.

Sgt. Tennyson advised the Monitoring Team that he was not in agreement with the decision made by Captain Bailey regarding the need to conduct criminal interviews. As a result of that disagreement, Sgt. Tennyson did not appear to apply any effort in developing a comprehensive investigative plan. The initial line of inquiry was composed of four questions that could be answered with a yes or no response. The four questions were:

*Q1 Do you recall using the word pocket as a slang term within the unit with a meaning other than what most think it is.*

*Q2 Do you recall any of those things being taken "pocketed" during the course of an operation?*

*Q3 Do you recall seeing items like these at enforcement support?*

*Q4 During your time with HSU do you recall anyone pocketing or taking items for personal use instead of properly handling the items and entering them into property as evidence?*

Upon learning the limited scope of questioning the Monitoring Team strongly suggested that a proper set of questions be formulated and provided some examples that could be used during the interviews. On June 23, 2014, the Monitoring Team provided the following questions and advice to Captain Bailey and his team of investigators.

*The suggestions from the Monitoring Team are intended to be baseline questions only and asked of all Subjects in a consistent manner, allowing for additional branching of questions as a result of statements made by the Subject.*

*Prior to questioning the Subject, a personnel review should be conducted to precisely ascertain the period of time the Subject was assigned and worked with the HSU.*

*Additionally, an IA review should be conducted to ascertain if any of the Subject's was a principal in investigations of complaints that could fall within the arena of questioning.*

*All interviews should provide specific documentation relative to the interviewer, all observers, the specific start time and date and the specific end time and date.*

1. *When were you transferred into HSU?*
2. *Who did you work with?*
3. *When did you transfer out of HSU? If transferred out involuntarily, what do you believe the reason was for your transfer.*
4. *Who was your chain of command in HSU? Who did you directly report to?*
5. *Was there an informal leader in the Unit, someone who seemed very knowledgeable and sought after for assistance by other HSU members? If yes, who?*
6. *Were you aware of any Standard Operating Procedures (SOP) while working in HSU?*
7. *It has been alleged that items not considered having evidential value have been seized by HSU members. Can you describe the types of items that may have been seized and what their intended purpose may have been?*
8. *Did you ever see anyone take items (or cash) during a search warrant or other operation/traffic stop that were not impounded after their seizure? If so, what, where and when? Did you report it to a supervisor?*
9. *Describe the locations where these items may have been seized from and the type of operation that may have been ongoing.*
10. *If you saw any of the items mentioned (or other items), on people's desks or other places in the office, where do you believe they came from?*
11. *Describe the process that an HSU deputy would follow when he/she made a traffic stop of a vehicle with an illegal or unauthorized license plate.*
12. *An individual assigned to HSU stated that license plates were sometimes taken to the office and placed on the wall. What was the purpose?*
13. *Can you describe the license plates? Who had these license plates?*
14. *Describe the process that an HSU deputy would follow when he/she came into possession of a suspended, revoked, or otherwise invalid driver's license. Did everyone do it the same way?*
15. *If an item was seized by an HSU member, can you describe how that would occur? For example were they packaged as evidence?*
16. *Did the supervisors have knowledge of this practice and if so who were they?*
17. *Is there paperwork to document the seizure of the items mentioned?*
18. *Identify the specific training and approximate dates that you have attended, where HSU seized items have been used as training aids.*

19. *What agency (ies) or specific instructors delivered training to HSU members utilizing non-evidentiary seized property as training devices?*
20. *Is there documentation of the training?*
21. *Cisco Perez references a 62 inch flat screen. Do you recall anyone taking either as evidence or for training purposes?*
22. *Was there a 62" TV in the Unit?*
23. *Was cash ever recovered as a result of any of the HSU operations that you know of? If so who handled the seizure and how was the cash processed?*
24. *Please describe the operational protocols for initiating a search warrant operation. For example who keeps logs? Is there a briefing prior to? Is there a debriefing at the conclusion of the operation?*
25. *For items you have seized as evidence, describe the process you have taken to document the seizure. For items not seized as evidence please describe the process taken to acquire the item.*
26. *Describe the disposition process for seized property. Was the intake of this property documented? How?*
27. *Was there ever a time when confiscated property that was not of evidentiary value was used in the HSU office? For what purpose? How was this property documented? How was it disposed of when it was no longer useful?*
28. *During the execution of a search warrant or any other activity where evidence will be seized, how many people are designated to receive the seized property?*
29. *Is there always a supervisor on scene?*
30. *Do you believe supervisors were aware that items not considered by HSU members to be evidence were seized by those officers for other reasons?*
31. *Do the squads work independently or is ever an operation (not) planned and approved by a supervisor?*
32. *While an employee of MCSO, have you ever seized any item from an individual or operation that has not been properly logged into evidence?*
33. *While an employee of MCSO, have you ever observed any other MCSO employee seize any item from an individual or operation that to your knowledge was not properly logged into evidence?*

Upon receipt of the advice of the Monitoring Team, Captain Bailey responded, indicating his agreement and advising the Monitoring Team that the provided questions and suggestions will be seriously considered. He further indicated that the questions were fair and important to ask, and would provide a pathway for the administrative interviews as well. The Captain was requested to provide the final list of questions to the Monitoring Team.

Captain Bailey never responded to the Monitoring Team. Instead, on June 24, 2014 the following response was received by Major Peters directly from Sgt. Tennyson.

*Mr. Peters*

*I intend to continue interviewing HSU members beginning tomorrow June 25th 2014. I have recieved (sic) what I believe is an accurate roster of all past and present members. According to*

*my roster there are 24 individuals remaining. I will schedule no more than four individuals per day in an attempt to thoroughly cover the topics of interest and properly document my findings. The interviews will be conducted at the Criminal Internal Affairs Offices and will be both audio and video taped. Upon completion of each intervieiw (sic) two copies will be made, as one will be sent out for transcription. Interviews will be scheduled based on availabilty (sic) however it is my goal to complete the remaining interviews by Thursday July 3rd 2014. The remainder of this day will be spent organizing the questions to be asked and contacting HSU Detectives in an attempt to begin scheduling. A completed question list will be sent to you as soon as possible, thank you.*

*David Tennyson*
*Sgt. Criminal Internal Affairs Division*
*Maricopa County Sheriffs Office*
*602-876-4975*

Preparation of a distinct and comprehensive line of questioning did not appear to be the Sgt.'s priority. When the interviews resumed, questions 31, 32, and 33 and been removed.

A review of the initial audio/video taped interviews raised serious questions regarding the commitment and capability of Sgt. Tennyson and the investigative team. On many occasions, the Sergeant would ask leading questions, thereby narrowing the responses of the individuals being interviewed. At times, when subjects appeared to want to offer additional statements, the Sergeant would cut off their responses as if to limit where the conversation or statement may lead. In one particular interview, a Sergeant began to vent about HSU being improperly used for political purposes by the Sheriff. Upon hearing these statements the interview was immediately stopped by Sgt. Tennyson, apparently on the directive of outside commanding officers who were observing the interview remotely. These actions created the impression that investigators are or could be intimidated, and they were doing just enough to make the interviews appear credible.

The Monitoring Team noted on several occasions the failure of Sgt. Tennyson to act on leads provided through interviews. For example, during one interview, a supervisor stated that a deputy that worked in HSU was responsible for the inventory and assignment of video cameras. This statement was not given proper follow-up, as PSB had no knowledge if the inventory list even existed. During the same interview, the same supervisor identified two hard drives where video recordings from HSU cameras were downloaded. These two hard drives were left in HSU for several weeks after their existence became known, instead of having them removed and taken to PSB for safekeeping, and to ensure the integrity of any evidence which may be contained therein. The Monitoring Team noted that several of the interviews conducted appeared to corroborate the claims by Cisco Perez that items including religious statues, license plates, ID's and personal effects had been seized during HSU operations. These items were retained and displayed in HSU in lieu of impounding.

During another interview, a supervisor complained that he saw Armendariz wearing a ski mask while in full police uniform, conducting traffic stops during saturation patrols. This supervisor worked in HSU, but in a different squad. He was incredulous that Armendariz was allowed to do

that. The Monitoring Team mentioned this to Captain Bailey and asked if there had been a follow-up. Capt. Bailey indicated he would follow up on this issue and subsequently advised the Monitoring Team that he was unable to find any additional information supporting this allegation. There seems to have been a lack of interest in this behavior or in corroborating or disproving the action.

Sgt. Tennyson failed to consistently and properly provide Miranda warnings to MCSO members being interviewed. While in most cases, he would read Miranda from a card, other times he just stated that Miranda applied and that the person being interviewed had the right to an attorney. The Monitoring Team considered the interview techniques of Sgt. Tennyson to be poor, failing to convey the seriousness of the allegations, and his approach to the interviews was very apologetic in nature. In one interview, a deputy stated that sometimes there were large amounts of cash confiscated from load vehicles. The Sergeant failed to follow up or inquire further about how large amounts of currency were normally handled. The Sergeant's general interview demeanor presented an air of informality, friendliness and lacked rigor.

The Monitoring Team has continually requested to be provided with a list of every employee who has worked in the Human Smuggling Unit, and a complete and comprehensive list of those deputies who have been interviewed. To date, we have been provided with four different lists. The Monitoring Team is not confident of the accuracy of any of these documents since record keeping is haphazard. According to PSB, there is no system that tracks employee transfers. Compiling a list of personnel who have worked in HSU has been laborious for the PSB investigators.

Continued interactions between the Monitoring Team, Professional Standards Bureau investigators, and their command staff solidified the opinion of the Monitoring Team that the Professional Standards Bureau investigators required closer scrutiny and guidance than they were being provided. It is unclear whether their individual actions were intentional, or committed as a result of a lack of expertise and training. However, it is clear to the Monitoring Team that the Professional Standards Bureau investigators committed a series of missteps that would not have been committed if Professional Standards Bureau investigators followed a professional and comprehensive investigatory process.

On August 27, 2014 the MCSO presented the Monitoring Team with a document entitled "HSU Criminal Inquiry: Summary" and advised that "an Agency" decision had been reached that no referral would be made to the Maricopa County Attorney's Office seeking a prosecutorial decision. This decision was made despite the recommendation of the Monitor to MCSO to develop a policy for referral to MCAO for prosecutorial declinations.

The document was submitted directly from Sgt. Tennyson to Chief Kiyler and raised serious questions by the Monitoring Team. The document was printed on white bond paper, but contained no addressee and no signatures. The document was not printed on official MCSO letterhead.

The document appears to have been written by Sgt. Tennyson, and as a result of the delivery process, the Monitoring Team believed this document to have been intended for their records,

although it abounds with inaccuracies and personal opinions of Sgt. Tennyson. Sgt. Tennyson alleges that:

> Major Peters and Chief Rojas prompted detectives to "expedite this investigation in order to protect the citizens of Maricopa County."

> The "absence of the two questions delayed the investigation approximately one week potentially allowing time for communication between alleged suspects possibly affecting the integrity and outcome of the case."

> The "demand" by Monitoring Team members Peters, Rojas, and Kiyler that interviews continue to be audio and video recorded to avoid inconsistency. (The Monitoring Team has consistently made recommendations – not "demands".)

> There was a "tremendous push made by the court appointed monitors to schedule, complete and notify, not the findings of the interviews instead the dates times and number of individuals who had completed the process."

The document itself bears no resemblance to a criminal investigation report.

In light of the manner in which a subordinate of the MCSO delivered this document to the Monitoring Team bypassing his chain of command, several questions arose and were addressed by Deputy Monitor Raul Martinez in an email to Captain Bailey.

*Good afternoon Captain Bailey. I have been given a copy of a report that was handed to Chief Kiyler by Sergeant Tennyson before I was able to join your meeting this morning. This internal document is titled "HSU Criminal Inquiry" and it is not signed by anyone.*
*Some questions we have are:*
*- Is this the format of your investigative close out reports?*
*- If so, is this the close out of the criminal investigation efforts on all these matters?*
*- Do the comments by the Sergeant within this report reflect the views of the Maricopa County Sheriffs Office?*
*- Since we do not see any signatures in this document, are you in concurrence with all the comments made by the Sergeant in this report?*

*Thanking you in advance.*

*Raul Martinez*
*Chief (Retired)*
*Deputy Monitor*

Captain Bailey provided the following response to Chief Martinez on August 28, 2014.

*Chief Martinez,*

*Early in the meeting we discussed that Sgt. Tennyson had completed his investigation, because he had just interviewed Deputy Quintero. Last week Sgt. Tennyson discussed with me that he felt strongly about a number of things that happened during the investigation. I could tell he was frustrated so I told him to write what he felt was necessary so I could review it. That is the document you are in possession of.*

*The opinions of Sgt. Tennyson are going to be placed in memo format addressed to me. The findings of his criminal inquiry/investigation are going in a more formal document. However, I do agree that what Sgt. Tennyson wrote in this document is an accurate description of what happened. When Sgt. Tennyson finishes his final report on the criminal inquiry/investigation and I sign it an electronic copy will be forwarded to you.*

*Thank you,*

*Captain Steve Bailey*
*Maricopa County Sheriff's Office*
*Commander, Professional Standards Bureau*

On August 29, 2014 an additional document was provided to the Monitoring Team. This document was written on MCSO memo form from Sgt. Tennyson to Captain Bailey. The report had been amended as described by the Captain, and obviously missing were the personal opinions and inaccuracies of Sgt. Tennyson.

On September 4, 2014, Captain Bailey and Counsel Christine Stutz were questioned about this report by Major Peters. The inquiry focused on the format of the report and whether or not the submitted report was considered by the Captain to be the final criminal investigation report. The Captain indicated that he had discussed the format of the report with Sgt. Tennyson and both had agreed that documenting the interviews and the procedures on an investigation report was unnecessary and that this decision had been approved by the MCAO. Major Peters further queried the Captain on this development, but the Captain was unable to provide further specifics. The Captain stated that this was an "odd ball criminal investigation" and that Sgt. Tennyson came to the Captain and asked him if it would be ok to put the summary on a memo in lieu of an investigation report. Based on the Sergeant's comments, Captain Bailey approved the action. Major Peters specifically asked him if this investigation were to receive a prosecutorial referral would this be the report that would be provided to them. The Captain responded historically no, further reinforcing the Major's opinion that no official review had been conducted by MCAO.

The Captain stated that he believed Sgt. Tennyson had conferred with and briefed the county attorneys on this case but was unsure. The Captain was sure that the attorneys had not seen any reports or transcripts of the interviews. The Captain possessed no knowledge of who the Sergeant may have spoken with, if anyone, and was unable to identify who in the MCAO had provided this advice.

It is the understanding of Major Peters that the interaction between any representative of MCAO and Sgt. Tennyson was not a formal review of any type relative to the investigation and no specific advice or direction was requested or received from them.

The Captain was emphatic that based upon the way the complaint was received and his personal assessment of Perez's credibility, it was a coin toss as to whether they even should have done a criminal investigation. In the interest of thoroughness, the Captain decided that this should be a criminal investigation.

The Captain asked Major Peters as to whether or not he agreed with this position.

Major Peters advised the Captain of his opinion that once he had reached the decision to conduct criminal interviews, all subsequent documentation should be on a criminal investigation report. MCSO's ultimate purpose of this report and subsequent transcripts of the interviews should be to pursue a referral to the prosecuting authority, in this case MCAO. In the opinion of Major Peters, MCAO should determine their own prosecutorial position. If decided that no further criminal actions would be undertaken, then a prosecutorial declination letter should be received by the MCSO, allowing for any possible administrative follow up or interviews to occur. The decision whether or not to pursue prosecution does not lie within the MCSO or its counsel. The fact that this entire report was not captured in an investigatory format appears to display the original opinion of Sgt. Tennyson and the investigators that no criminal acts occurred.

On September 5, 2014, in a memo from Lt. Dave Munley to Captain Bailey which was provided to the Monitoring Team in the September 5, 2014 weekly submission, the Lieutenant advises the Captain that "...this matter has been informally staffed with Maricopa Deputy County Attorney Ed Leiter. Based on the case information relayed Mr. Leiter is of the opinion the actions of the HSU Detectives in their totality do not rise to a criminal level. However due to the high profile nature of this investigation Mr. Leiter will staff the case summary with supervisory staff."

The issue of Prosecutorial Review was revisited during our on-site compliance visit on September 22, 2014. At this time, Captain Bailey once again advised my team that he did not believe that it was appropriate to submit the criminal investigation to the County Attorney's Office for review as he did not believe there was any basis to do so. He told our team they had "informally" staffed this case with a Deputy County Attorney, who said he would staff the case summary with supervisory staff. This would not constitute a formal submittal and would not result in any formal response from the County Attorney's Office.

My team again reiterated to Captain Bailey, as well as to Attorney Christine Stutz, the importance of having a prosecutorial review of this investigation and a written determination from MCAO in writing that no criminal conduct existed. The following issues, although not necessarily conclusive of theft or misappropriation of property, warranted further scrutiny by MCAO:

1. Personal items found in Armendariz garage that were apparently seized from enforcement actions.
2. Armendariz stating during an interview that it was common practice for HSU members to leave seized items such as IDs around the office, and a Detention Officer would gather them and take them to his garage.
3. Cisco Perez statements that HSU members would "pocket" items.
4. HSU members' criminal interviews in which some acknowledged that they had kept items for training purposes.

5. A lack of requests to convert confiscated evidence into Office property to be used for training purposes.

On July 16, 2014 during an on-site visit, Chief Warshaw, Major Peters, Chief Rojas and Chief Kiyler met with MCAO Attorney Christine Stutz and Capt. Bailey. At this meeting the Monitoring Team requested that MCSO provide a comprehensive listing of all deputies assigned to HSU, who had submitted evidence to Property & Evidence in accordance with MCSO policy. This list should also indicate all deputies who had subsequently removed that evidence for the sole intended purpose of training.

On July 31, 2014, Sgt. Stephen Fax of the PSB submitted a memo to Captain Bailey. Sgt. Fax sought the assistance of John Shamley (property custodian). Mr. Shamley had provided documents that identified each of the HSU deputies' property and evidence history and whether or not items had been released to the deputies. If an item had been released to the deputy, a further search would be required to ascertain the reason for the release. Items also received designations of RICO or diversion program. When an item was released to the diversion program, the considered property value of the item was less than or equal to $25 and the released item was intended for office use only. The diversion program utilizes a document entitled "Property & Evidence Diversion List". Items on these lists are considered to be "non-accountable" and less than $25 in value. The value is determined by the potential auction sale price.

Approximately 1000 pages of information were provided to Sgt. Fax, but only 15 deputies were identified as having removed evidentiary items designated as Officer, diversion, or RICO. The identified deputies were: Dep. Ortega-Rodriguez S1717, Dep. Lopez S1853, Dep. Locksa S1312, Dep. Ross S1654, Dep. Martinez S1593, Dep. Garcia S1244, Dep. Frei S1570, Dep. Sedlacek S1413, Dep. Almanza S1329, Dep. Monroe S1713, Dep. Joya S1739, Dep. Ochoa S1802, Dep. Hechavarria S1851, Dep. Gandara S1906, and Dep. Voeltz S1658.

The 20 provided Diversion Lists were handwritten documents in which items were described, dated, signed with badge number and assignment of the deputy. Each sheet may have several days' worth of information. Many of the documents were incomplete and required information had been omitted.

Two deputies, Dep. Hechavarria and Rangel (former HSU members) removed two computers via the use of a request for diverted property document. Both computers were designated for training purposes on these document requests, and both were dated March 25, 2014.

Although several other items had also been removed by current or former HSU members via the use of the 20 pages of diversion logs provided, none were identified for use in training.

If left uncorrected, it is the opinion of the Monitoring Team that these management and investigatory errors will adversely impact the resolution of not only these cases, but future cases as well. Several interviews observed by the Monitoring Team appeared to corroborate the statements of Cisco Perez and the response or failure to respond by the investigators appeared to reflect a nonchalance regarding the proper procedures for seizures of personal property.

Monitoring Team investigative suggestions and guidance designed to minimize negative impact have not been instituted in a timely and comprehensive fashion. The ultimate effect of MCSO's actions and missteps remains to be seen.

### 3.  *RECOMMENDATIONS*

The MCSO should be required to provide the Professional Standards Bureau with a statement of purpose, which should be to protect the professional integrity of the MCSO and to fully, fairly, and expeditiously investigate and resolve citizen complaints and employee misconduct investigations. The Professional Standards Bureau should be provided with sufficient staff, funds, and resources to perform these functions independently. Only highly qualified candidates should become Professional Standards Bureau investigators.

Formal criteria should be established for selection of the commanding officer of the Professional Standards Bureau and for staff who supervise or conduct internal investigations. Established criteria should apply to the incumbent Professional Standards Bureau commanding officer and the investigative staff, and all candidates for these positions, and also should be used to evaluate the performance of persons serving in these positions.

Maricopa County should be required to ensure that the Professional Standards Bureau commanding officer and staff who supervise or conduct internal investigations receive adequate training to enable them to carry out their duties. This training should at minimum include misconduct investigation techniques; interviewing skills; observation skills; report writing; criminal law and procedure; court procedures; rules of evidence; and disciplinary and administrative procedures.

In light of the extensive list of personal items seized from the Armendariz residence, and the corroborating statements of several HSU members, MCSO should be required to develop policy and procedure specifically prohibiting the improper seizure of property. This policy should directly prohibit deputies from keeping any items seized from a scene, or the seizure of abandoned property, without the explicit request and approval for internal use by the MCSO.