1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
                  Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                    )
                  vs.                )   Phoenix, Arizona
7                                    )   November 20, 2014
     Joseph M. Arpaio, et al.,       )   1:35 p.m.
8                                    )
                  Defendants.        )
9    _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17       (Status Conference - Sealed Proceedings Omitted)

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:          Annie Lai, Esq.
                                  Daniel J. Pochoda, Esq.
4                                 AMERICAN CIVIL LIBERTIES
                                  FOUNDATION OF ARIZONA
5                                 P.O. Box 17148
                                  Phoenix, Arizona  85011-0148
6                                 (602) 650-1854

7                                 Andre Segura, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
8                                 125 Broad Street, 18th Floor
                                  New York, New York  10004
9                                 (212) 549-2676

10   For the Defendants:          Timothy J. Casey, Esq.
                                  James L. Williams, Esq.
11                                SCHMITT, SCHNECK, SMYTH,
                                  CASEY & EVEN, P.C.
12                                1221 E. Osborn Road
                                  Suite 105
13                                Phoenix, Arizona  85014-5540
                                  (602) 277-7000
14
     For Defendant Arpaio:        Thomas P. Liddy, Esq.
15                                Senior Litigation Counsel
                                  Deputy County Attorney
16                                MARICOPA COUNTY ATTORNEY'S OFFICE
                                  Civil Services Division
17                                222 N. Central Avenue
                                  Suite 1100
18                                Phoenix, Arizona 85004
                                  (602) 506-8066
19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2

3          THE COURT:  Good afternoon.  Please be seated.

4          THE CLERK:  This is CV 07-2513, Melendres versus

5   Arpaio, on for status conference.                              13:35:45

6          Counsel, please announce your appearances.

7          MR. POCHODA:  For plaintiff, Dan Pochoda for the ACLU

8   of Arizona.  Assisting is Josh Bendor from the ACLU, who's

9   awaiting admission, Your Honor.

10         And on the phone, I believe, is that right, is for     13:35:56

11  plaintiffs, Annie Lai and Andre Segura.

12         MS. LAI:  That's right, Your Honor.  And I also wanted

13  to inform Your Honor that there's a paralegal from the law firm

14  of Covington & Burling on the phone.  Her name is Julie

15  Romanow.  She's on the phone just to make sure the conference   13:36:15

16  line stays open for the duration of the call.

17         THE COURT:  All right.  Thank you.

18         MR. CASEY:  Good afternoon, Your Honor.  Tim Casey.

19  With me is my law partner, James Williams.  Also is co-counsel

20  Tom Liddy from the Maricopa County Attorney's Office.  Also,    13:36:29

21  Chief Deputy Jerry Sheridan is here.

22         I would also like to point out in the gallery is the

23  county attorney, Bill Montgomery, who I just wanted to address

24  to the Court, I wanted to share with the Court Mr. Montgomery

25  is by law the appointing authority that can appoint and replace  13:36:49

1    counsel on cases in Maricopa County.

2            THE COURT:  All right.  Is that why you're here,

3    Mr. Montgomery?

4            MR. MONTGOMERY:  Yes, Your Honor.  I did not otherwise

5    intend to appear.                                          13:37:01

6            THE COURT:  All right.  Thank you.

7            I believe that last time we met I neglected to inform

8    those persons who may be in the gallery, whether members of the

9    public or members of the press, that pursuant to federal court

10   rule, we don't allow recordings of our proceedings.  That means 13:37:17

11   we don't allow you to record it on your cell phone or anything

12   else.

13           I have modified that rule.  To the extent that you

14   want to take notes on your laptop, that's fine, as long as you

15   can do it unobtrusively.  But if you're detected recording the 13:37:31

16   proceedings you will be removed and your device will be erased,

17   and so I just want people to know that ahead of time so no one

18   gets caught up in something that they don't expect.

19           This afternoon, Mr. Casey, we're here both on your

20   application to withdraw as well as the matters that you've      13:37:52

21   filed under seal pertaining to your arguments about redacting

22   the monitor's report pertaining to some of the investigations

23   the MCSO has undertaken.  I don't know whether you intend to

24   argue that on behalf of the defendants before your withdrawal

25   so is that what you'd like us to take up first?                 13:38:19

1          MR. CASEY:  Your Honor, I intend to address with the

2    Court, obviously, in due course, whatever inquiries you have on

3    the motion to withdraw.  But in your order about additional

4    materials that I alerted the Court that would be reviewing, I'm

5    prepared to address that.                                    13:38:43

6          James Williams in my office is going to be addressing

7    your second paragraph, which is the redactions of the monitor's

8    report.  And to the extent it gets particularly detailed, we

9    also have in an advisory capacity, although not counsel of

10   record, Christine Stutz, who also, as she did last time,       13:38:59

11   perhaps would be in a position to assist the Court.

12         So I don't want to be presumptuous, but it probably

13   would make some sense to go -- start with that and perhaps end

14   with the motion to withdraw, whatever your preference.

15         THE COURT:  Here's what I intend to do.  I think to       13:39:15

16   the extent -- I think that to the extent your filing under seal

17   relates to the generalities of legal argument -- for example,

18   the scope of 38-1101, or any official documents privilege, or

19   any sort of legal argument pertaining to the scope of those

20   statutes or privileges -- I think we need to and are obliged to  13:39:33

21   address it publicly.

22         To the extent that you believe the application of any

23   argument of redaction goes to any matter that at least so far

24   has been kept under seal, then I would propose that we postpone

25   the specificity of such an argument until we have handled all    13:39:53

 1    the other matters and can proceed in a closed proceeding.

 2            Do you have any objection to proceeding in that

 3    manner?

 4            MR. CASEY:  One minute, Your Honor.

 5            (Pause in proceedings.)                           13:40:16

 6            MR. CASEY:  Your Honor, the majority of what we can

 7    address can be in open court.  Mr. Williams is going to take

 8    the lead on it, but he's alerting me that there is, as to

 9    specifics between a connection and a specific investigation,

10    that he believes that that would need to be done under seal.  13:40:32

11            THE COURT:  That's fine.  So Mr. Williams, you're

12    going to do this argument?

13            MR. WILLIAMS:  Yes, Your Honor.

14            THE COURT:  All right.  Here's what we're going to do.

15    I'm going to ask you what I think are generalized questions.   13:40:43

16    If your answer gets into what you believe to be something that

17    you're asserting needs to be under seal, then I'll allow you to

18    defer that part and those parts of your argument until after

19    I've handled, for example, other aspects of the motion to

20    redact, as well as probably your application as well as         13:41:01

21    Mr. Casey's to withdraw, and my questions to you pertaining to

22    that application.  Then we will close the courtroom and proceed

23    under seal.

24            Do you have any objections to that, Mr. Pochoda?

25            MR. POCHODA:  No.                                   13:41:18

1          THE COURT:  All right.  Mr. Williams, since it's

2   basically your motion to redact, I'm going to let you go first,

3   and then we'll hear from --

4          Are you going to be doing the argument, Mr. Pochoda?

5          MR. POCHODA:  Yes.                                        13:41:27

6          THE COURT:  All right.  Mr. Williams.

7          MR. WILLIAMS:  Thank you, Your Honor.

8          As an initial introduction, just to remind the Court,

9   at issue is not the sealing of an entire judicial proceeding or

10  a transcript, as is the case with the case that Mr. Pochoda    13:41:47

11  cited.

12         Also not at issue is the forever sealing of an entire

13  document to shield it from the public.  Also not at issue is

14  the forever redaction of a document to shield it --

15         THE COURT:  Right.                                        13:41:59

16         MR. WILLIAMS:  -- from the public.

17         THE COURT:  Right.  All of this is subject to being

18  opened up and it will be opened up at the appropriate time.

19         MR. WILLIAMS:  That's correct.  And my point, too,

20  Your Honor, is they are initially simply reaction; it is not   13:42:10

21  the sealing of the entire document.

22         THE COURT:  That's true.

23         MR. WILLIAMS:  We tried to be very careful as we went

24  through to identify those matters that really did have some

25  pertinence to ongoing investigations.                           13:42:20

1          THE COURT:  That's my understanding as well, but you

2     were here last time when I took pretty sharp exception to the

3     arguments made by Ms. Stutz as it pertains to 38-1101, were you

4     not?

5          MR. WILLIAMS:  Yes, Your Honor.                          13:42:34

6          THE COURT:  38-1101 doesn't have anything to do with

7     litigation, does it?

8          MR. WILLIAMS:  Your Honor, whether -- I don't believe

9     it has to do with a litigation privilege.  I believe it does

10    have to do with the privilege, and that's why we continued to   13:42:44

11    cite the Arizona state case that interprets it that way.

12         THE COURT:  Okay, but let's -- let's focus your

13    argument, and let me be specific with you so you know where I'm

14    coming from.  I don't think 38-1101 has any application in a

15    federal court at all.  That does not mean that some of the      13:42:59

16    policies behind 38-1101 might not have application when you're

17    trying to meet the compelling interest standard or the good

18    cause standard, whichever standard is applicable, given the --

19    given the scope of the matter at issue.

20         MR. WILLIAMS:  Right.                                     13:43:20

21         THE COURT:  All right?  Do you disagree with that?

22         MR. WILLIAMS:  I do not disagree with that, Your

23    Honor.

24         THE COURT:  All right.  So to the extent that you're

25    asserting that 38-1101 would apply to keep the monitor's        13:43:27

 1   report -- or to redact the monitors's report, it doesn't, does

 2   it?

 3           MR. WILLIAMS:  No, Your Honor.  I think the argument

 4   was that in the absence of a controlling statute, as Your Honor

 5   stated, the federal court should certainly at least look to the     13:43:40

 6   state law.

 7           THE COURT:  And considerations of comity and the --

 8           MR. WILLIAMS:  Correct.

 9           THE COURT:  -- and the considerations of the reason

10   behind the state statute all can apply reasons that this Court     13:43:49

11   can evaluate in determining whether or not I think that the

12   good cause or the compelling interest standard is met, but the

13   statute itself is not applicable.

14           MR. WILLIAMS:  Your Honor, I would agree with that as

15   to the Court.  I would remind the Court, though, it still     13:44:04

16   governs the defendants.

17           THE COURT:  I completely understand that.  And I

18   understand that when one of the things that my monitor has to

19   do is monitor your Internal Affairs investigations, you are

20   bound in your Internal Affairs investigations by whatever     13:44:20

21   privileges the statute gives it actually apply.

22           MR. WILLIAMS:  Yes, Your Honor.

23           THE COURT:  But now let's take a look at that.

24           38-1101 doesn't apply to -- 38-1101A, anyway, only

25   applies to trigger certain rights of an officer who's being     13:44:38

1    investigated whether or not an official investigation has

2    begun, right?

3              MR. WILLIAMS:  I believe so, Your Honor.  I apologize,

4    I don't have it in front of me, so if we're going to go word

5    for word, that might be something that Ms. Stutz could help          13:44:50

6    with.  But I believe that's the case, that the statute is

7    designed to cover investigations of identified officers.  I

8    think it's a little broader than that, but we've argued that

9    and you've found to the contrary before.

10             THE COURT:  And I will again, I promise you.              13:45:03

11             MR. WILLIAMS:  That's not surprising, Your Honor.

12             THE COURT:  38-1101 says, at least -- and I may have

13   an old version here, because I -- you know, they don't give us

14   the update -- we can't afford the updated versions, but if an

15   employer interviews a law enforcement officer and the employer     13:45:19

16   reasonably believes that the interview could result in

17   dismissal, demotion, or suspension, or if the law enforcement

18   officer or probation officer reasonably believes the

19   investigation could result in a dismissal, demotion, or

20   suspension, then it gives certain rights for the law               13:45:36

21   enforcement officer to request legal assistance --

22             MR. WILLIAMS:  Yes, Your Honor.

23             THE COURT:  -- essentially, correct?

24             MR. WILLIAMS:  Yes, Your Honor.

25             THE COURT:  And that applies totally independent of      13:45:45

 1   whether or not you've begun an internal investigation or not.

 2          MR. WILLIAMS:  I would agree with that, Your Honor.

 3          THE COURT:  All right.  But just because you've begun

 4   an internal investigation doesn't mean that any question would

 5   qualify under that privilege.  As I went through with Ms. Stutz      13:46:00

 6   last time, and I think to the extent that she still makes a

 7   contrary argument, I think she's still wrong, that when in fact

 8   clear policies allow officers to do what they do, the mere --

 9   there is no basis for suspension, demotion, or anything else

10   involved, but we'll let that -- we'll set that aside.               13:46:17

11          The other statute I think that you rely on that

12   gives -- the other section of the statute, 38-1101, that gives

13   rise to what you would call a particular protection if not a

14   privilege is a protection for a particular law enforcement

15   officer's personnel file.                                          13:46:39

16          MR. WILLIAMS:  Yes, Your Honor.

17          THE COURT:  And when there is an administrative

18   investigation, certain materials during the course of that

19   ongoing investigation, which, as Ms. Stutz and I, I think,

20   agree on goes through the end of an appeal, if there is an         13:46:53

21   appeal, then you can't get certain information that you

22   otherwise might be able to get out of a law enforcement

23   officer's personnel file.  Correct?

24          MR. WILLIAMS:  I would agree that that's the language

25   of the statute, Your Honor.  I think it's perhaps not drafted      13:47:09

1    perfectly to -- to state that the -- that information is not to

2    be disclosed, period.  And I think that the primary means of

3    disclosing it would be by virtue of producing the employee's

4    personnel file.

5           THE COURT:  All right.  And so even though you might        13:47:23

6    argue for a broader interpretation in the state court, doesn't

7    work in a federal court, right?

8           MR. WILLIAMS:  I understand that, Your Honor, yes.

9           THE COURT:  All right.  And the other thing that I

10   guess I would say is as a general rule, privileges are narrowly    13:47:34

11   interpreted because they operate in derogation of the truth,

12   right?

13          MR. WILLIAMS:  I believe that's true, Your Honor, yes.

14          THE COURT:  All right.  And so are there any other

15   provisions of 38-1101 that provide any other substantive           13:47:48

16   protections in any other settings?

17          MR. LIDDY:  I believe the reference to information

18   about an investigation is in subsection L.  Provided it's in

19   subsection L, then I don't think there are any other separate

20   sections.                                                          13:48:05

21          THE COURT:  I think you're right, but I won't hold to

22   that.

23          MR. WILLIAMS:  Whatever section that is, I think that

24   provision also has some applicability.

25          THE COURT:  All right.  But it doesn't -- it talks          13:48:12

1    about a law enforcement officer's personnel file, right?

2            MR. WILLIAMS:  Again, Your Honor, I believe that the

3    language could be strictly construed to say that, yes.

4            THE COURT:  All right.  So to the extent that you want

5    to argue that maybe there's stuff in the monitor's report that      13:48:27

6    I shouldn't let out because you're still conducting good faith

7    investigations, I appreciate that and I appreciate its

8    validity.

9            I also appreciate that that leaves it up to me to

10   decide whether or not you are conducting good faith                  13:48:46

11   investigation, and if in fact the material that you are seeking

12   to redact would really make any material difference in the

13   investigation that you've identified.

14           Do you have any disagreement with that?

15           MR. WILLIAMS:  I think that's the central issue, Your        13:49:00

16   Honor.

17           THE COURT:  All right.  Then I'm ready to move on from

18   38-1101.  Do you have anything you want to say?

19           MR. WILLIAMS:  No, Your Honor.

20           THE COURT:  All right.  Then as it pertains to any           13:49:07

21   official documents privilege, that also requires a similar

22   balancing test, not unlike the compelling interest standard

23   which governs the Ninth Circuit and federal courts.

24           Would you agree with that?

25           MR. WILLIAMS:  And I think we perhaps have some              13:49:21

```
 1   agreement as to what the compelling interest standard governs,

 2   but I would agree with you regardless the official documents

 3   test there is a balancing standard.  I've seen some courts

 4   address that as an even balancing; I've seen some courts

 5   address that as a balancing slightly tipped in favor of            13:49:35

 6   disclosure.  And I haven't seen the Ninth Circuit weigh in on

 7   exactly which of those applies.

 8         THE COURT:  I appreciate that.  But in any case, that

 9   balancing is going to require me to take into account lots of

10   different things about whether or not you're conducting the       13:49:47

11   investigation competently in good faith, whether or not it's

12   designed to obscure or reveal or accomplish the purpose for

13   which an Internal Affairs investigation division exists,

14   correct?

15         MR. WILLIAMS:  I would agree.                                15:08:11

16         THE COURT:  All right.  So I think we agree with that

17   one.  Are there other privileges that you would like to

18   discuss?

19         MR. WILLIAMS:  I think the only other privilege issue,

20   Your Honor, is the -- the general common law privacy interest     15:08:11

21   of Deputy Armendariz with respect to his medical issues, and

22   for the purposes of this being an open hearing I'll leave it at

23   that.  But I think that's the only other separate issue.

24         THE COURT:  You have -- I appreciate that that -- that

25   does come into accounting, but do you have any authority that     15:08:11
```

1    would suggest that it isn't also a balancing test?

2         MR. WILLIAMS:  No, Your Honor.

3         THE COURT:  So when Deputy Armendariz has passed away

4    and there isn't any way we're going to investigate him because

5    there's no purpose in it, and you didn't give me any authority,          15:08:11

6    although there may be authority that suggests that his former

7    employer can invoke the privilege to prevent the disclosure of

8    information, isn't that -- aren't those all factors I have to

9    take into account in determining whether or not the information

10   can or ought to be disclosed under the balancing test?          15:08:11

11        MR. WILLIAMS:  I think that those are factors you

12   ought to take into account.  I think in our search for support

13   supporting that position I couldn't find any with a post -- a

14   postmortem privilege in that respect.

15             However, I also don't think that the idea that the          15:08:11

16   statutory carve-out that a claim for invasion of privacy, that

17   tort claim as carved out by statute doesn't foreclose it,

18   either, which is the only authority the plaintiffs had that

19   other way around.  So I believe it squarely does fall into

20   balancing the public's interest versus the interest of his          15:08:11

21   family at least in those being disclosed.  And certainly I

22   think the Court can understand why we wouldn't want to

23   voluntarily disclose that information.

24        THE COURT:  Has his family come forth here?

25        MR. WILLIAMS:  I'm unaware of that, Your Honor, no.          15:08:11

1      THE COURT:  Okay.  Now, I suppose that, really, the

2  nub of what we're getting to in your argument is:  Does the

3  compelling interest standard apply or does the good faith test

4  apply?  Or is there something else that you wanted to address

5  with me?                                                        15:08:11

6      MR. WILLIAMS:  No, Your Honor.  I think addressing

7  that issue and then whether that standard is met is obviously

8  the Court's determination.  I think there are both compelling

9  reasons and the good cause standard is met.  I think it makes

10  sense to address that next.                                    15:08:11

11      THE COURT:  All right.  Go ahead.

12      MR. WILLIAMS:  Your Honor, every case that I've seen

13  applies the compelling reasons standard to the sealing of an

14  entire judicial record and the sealing of dispositive motions

15  and documents attached thereto.  We don't have either one of   15:08:11

16  those in this case.

17      There was also a case that we cited for you that said

18  when you have tangentially related matters, and I understand

19  the plaintiffs have a different argument as to how tangential

20  the relation is, but from our discussion there was no internal 15:08:11

21  affairs proceedings whatsoever --

22      THE COURT:  Let me ask about that for a second, and I

23  think that at least to the extent that we have unsealed

24  everything that we did in this courtroom in May, we've had some

25  discussion that is on the record and in the public domain about 15:08:11

1   what was found at Deputy Armendariz's home during the execution

2   of the search warrant or after his death, I don't remember

3   which it was.  But we've already discussed that, right?

4            MR. WILLIAMS:  Yes, Your Honor.

5            THE COURT:  And so you're not going to make any sort          15:08:11

6   of assertion that the facts pertaining to the items found

7   are under seal, are you?

8            MR. WILLIAMS:  Not the facts pertaining to the items

9   that were found.  It's the next step after that as to how those

10  items got there, et cetera, that begins to get into --          15:08:11

11           THE COURT:  All right.  But so what we have, as I

12  recall, is a great number of identifications of at least a

13  significant number of persons who were -- who had Latino

14  surnames, right?  And thus could be -- because of Deputy

15  Armendariz's service, could be possibly members of the          15:08:11

16  plaintiff class here, correct?

17           MR. WILLIAMS:  I believe so, Your Honor.

18           THE COURT:  And we also had videotapes that

19  Deputy Armendariz took in his eyeglasses and videotapes from

20  his eyeglasses that showed that he had a camera mounted on at          15:08:11

21  least one of his patrol cars, and again the dates were not

22  certain, but seemed to go back for a number of years, these

23  recordings, is that correct?

24           MR. WILLIAMS:  Yes, Your Honor.

25           THE COURT:  And I think, and, you know, to deputy --          15:08:11

1    well, it wasn't just Chief Deputy Sheridan, but to his credit

2    he came and told me, and those who were with him, that they'd

3    only been able at that point in May to review a very few, but

4    they had reviewed a very few of those videos, and in some of

5    them Deputy Armendariz was engaging in behavior which I believe          15:08:11

6    you labeled as problematic, correct?

7            MR. WILLIAMS:  I think that would be fair, Your Honor,

8    yes.

9            THE COURT:  All right.  In some of the videos it also

10   appeared that at least once Deputy Armendariz's supervisor was          15:08:11

11   present during the problematic behavior, and again that was in

12   the few numbers that you had reviewed to that point.

13           MR. WILLIAMS:  Yes, Your Honor.

14           THE COURT:  All right.  Now, you would acknowledge

15   that part of problem I think we had in that discussion was             15:08:11

16   plaintiffs had asked MCSO for all videotapes or recordings of

17   stops that occurred during the relevant period to this lawsuit

18   and they have -- they have indicated since that time that that

19   would be at least for part of the periods that may or may not

20   be covered by what Deputy Armendariz did.                              15:08:11

21           MR. WILLIAMS:  I'll have to think through that

22   statement for a second, Your Honor, but I think that's true.  I

23   believe there was a discovery request that defined documents in

24   a way that would have included recordings.

25           THE COURT:  All right.  And I will tell you that it's          15:08:11

1  my recollection -- which is not always flawless, but you were

2  here, too; you can dispute it if you want -- that in

3  determining the scope of the supplemental injunction which I

4  entered in this action and which was entered after I'd given

5  you both -- both of you parties a substantial opportunity to        15:08:11

6  work things out, you weren't able to work everything out but

7  you worked a lot of stuff out, and then we had an almost

8  all-day hearing where I went through it all and asked questions

9  as to the matters that I was unsure on, and as I recall, I

10  refused to enter a number of sections of the disputed          15:08:11

11  injunctive relief based on the evidence that was introduced at

12  trial, correct?

13          MR. WILLIAMS:  Yes, Your Honor.

14          THE COURT:  Now, if in fact what is demonstrated by

15  what was found at Deputy Armendariz's apartment and the         15:08:11

16  allegations made about it are true, then there might be a whole

17  different scope of constitutional deprivation that the

18  plaintiff class suffered here that was not disclosed to

19  plaintiffs prior to the lawsuit occurring, is that not correct?

20          MR. CASEY:  Your Honor, may I address Your Honor?      15:08:11

21          THE COURT:  No.  I mean --

22          MR. CASEY:  Your Honor, my under -- with all --

23          THE COURT:  Did you understand me to say yes,

24  Mr. Casey?

25          MR. CASEY:  No, Your Honor.  I apologize.            15:08:11

 1          THE COURT:  I don't mean to be -- I don't mean to be

 2   smart-alecky.  I do think we need to give Mr. Williams the

 3   opportunity to make the argument since he's been designated.

 4          And if, Mr. Williams, you would like to consult with

 5   Mr. Casey to find out what he would like to say and if you then          15:08:11

 6   think he can say it better, I'll defer to Mr. Casey.  All

 7   right?  I'll give you a minute.

 8          MR. CASEY:  Thank you, Your Honor.

 9          (Pause in proceedings.)

10          MR. WILLIAMS:  Your Honor, I do think Mr. Casey could          15:08:11

11   address these issues better.  I was actually out of town for

12   the May 15 hearing, and so to the extent we're talking about

13   those issues --

14          THE COURT:  Fair enough.  Mr. Casey.

15          MR. WILLIAMS:  And the redactions are certainly my          15:08:11

16   issue, Your Honor.

17          THE COURT:  All right.  Mr. Casey.

18          MR. CASEY:  Your Honor, as I understand, your question

19   is whether or not I think we are getting -- is will there be

20   additional -- could there potentially be additional remedies          15:08:12

21   that the Court would order based on the findings?

22          THE COURT:  Yes.  Additional remedies based on what --

23   I mean, I'm not sure that it's true, but at least there was

24   clear evidence of a lot of possible deprivation suffered,

25   maybe, by members of the plaintiff class that related to          15:08:12

1    evidence that plaintiffs arguably wouldn't have had prior to

2    the trial.

3            MR. CASEY:  Let's assume that that's accurate.

4            THE COURT:  All right.

5            MR. CASEY:  And because the -- the proverbial jury is          15:08:12

6    still out because we don't know.  As I represented to you,

7    there are videotapes that clearly were called for by

8    plaintiffs' counsel in their discovery between that date and

9    the discovery cutoff date that exist; we're still trying to get

10   our hands around that.                                                 15:08:12

11           But let's assume all that's true.  The allegations in

12   this complaint were a Fourth Amendment improper detention,

13   lengthy detention; Fourteenth Amendment on Equal Protection

14   Clause.  So assuming all those things turn out to be horrible:

15   We have a theft, we have extortion; I'm just making these             15:08:12

16   things up --

17           THE COURT:  Sure.

18           MR. CASEY:  -- hypothetically.

19           THE COURT:  Sure.  Sure.

20           MR. CASEY:  We have a theft of narcotics, we have a           15:08:12

21   theft of ID, we have a theft of stereo, whatever it is, I have

22   difficulty seeing how the complaint framed by the plaintiffs

23   under the Fourth Amendment and Fourteenth Amendment --

24           THE COURT:  Well, let me ask you, let me just cut you

25   short and ask you:  During the period of discovery, if they          15:08:12

1   would have asked for these things, couldn't they have amended

2   their complaint?

3          MR. CASEY:  Absolutely.  Other than specifically an

4   individual plaintiff, I'm unaware of them being able to do a

5   class action for conversion or theft.  Conversion's an                    15:08:12

6   equitable remedy.  So I guess what I'm suggesting to you when I

7   heard this, because I saw it being beyond Armendariz redaction

8   issue for the monitor's report, what I'm sharing with you, if

9   we assume --

10         THE COURT:  Well, I'll tell you, and maybe we'll get        15:08:12

11  back to this, but when I'm looking at the monitor's report, and

12  I think Mr. Williams phrased it correctly, I'm looking at

13  whether or not the report itself is --

14         What's the word, Mr. Williams?

15         -- collateral to --                                         15:08:12

16         MR. WILLIAMS:  Tangentially related.

17         THE COURT:  Tangentially related to the litigation.

18  It seems to me there's two ways that it's not tangentially

19  related to the litigation.  The first is the item we've just

20  been discussing.  And the second is that the report itself is     15:08:12

21  part of the cure that I imposed based on the violations that I

22  did find.

23         I imposed a monitor.  I required him to make reports

24  pertaining to the cures or lack of cures or lack of standards

25  that were being implemented to the Maricopa County Sheriff's      15:08:12

1   Office.  Both of those matters make it seem to me that this

2   matter is not tangentially related to the underlying litigation

3   and, hence, if I'm applying Ninth Circuit law, you must meet a

4   compelling interest standard to achieve the redaction.

5          Do you understand what I'm now saying?                          15:08:12

6          MR. CASEY:  I understand, yes.  I do understand it.  I

7   don't agree, however, because if we assume that all the

8   evidence is in that area that it would alert -- amend the

9   complaint, assume there's valid causes of action, we have to

10  operate, instead of on the hypothetical, I think we have to      15:08:12

11  operate on what the facts were here and the allegations here

12  and the remedies that you have.

13         The primary concern that I see real quick, Your Honor,

14  is this.  And here I'm getting to the brass tacks as I see it.

15  If we disclose it, we disclose a playbook to people who are      15:08:12

16  being interviewed.

17         THE COURT:  I completely get that.

18         MR. CASEY:  Yeah.

19         THE COURT:  And maybe we want to discuss that under

20  seal.                                                            15:08:12

21         MR. CASEY:  Yes, sir.

22         THE COURT:  To the extent that you have disclosed

23  particular administrative investigations with specificity, I'm

24  glad to hear you.  But it seems to me that in individual

25  instances you might be able to make -- you might be able to      15:08:12

1    meet the compelling test.

2         But there's one other aspect to it as I -- as I relate

3    that, and, you know, if you want me to discuss this with you at

4    sidebar, and I don't know if you want to turn this back over to

5    Mr. Williams, but is it not true that subsequently what I          15:08:12

6    ordered you to do, what I ordered your client to do, and what

7    actually happened, is also in the public domain, is it not?

8         MR. CASEY:  Talking about the investigations?

9         THE COURT:  Yes.  I'm not talking about the

10   investigations in general; I'm talking about what happened on     15:08:12

11   May 14th after I put the original thing under seal.

12        MR. CASEY:  It is in the public domain.

13        THE COURT:  All right.  So I also have a concern, and

14   with all due respect to Chief Deputy Sheridan, who is here, he

15   may well -- and there may be a basis on which he can assert his   15:08:12

16   good faith, but there is also certainly a basis, based on the

17   actions that happened, and I can't tell what happened yet

18   because there hasn't been any specific clarity, but I can tell

19   you, and if I misstate something you are here, you tell me I'm

20   wrong, I put everybody in this courtroom under seal.  I said      15:08:12

21   nobody discuss this with anybody outside this courtroom and we

22   are going to quietly now go and get from each officer who has

23   recorded material, we're going to just quietly get that

24   recorded material so nobody knows and is pre-warned that we're

25   now collecting these recordings that have never been cataloged,   15:08:12

1  or except by the MCSO.  Am I right about that?

2         MR. CASEY:  You're accurate.  It's a matter of record.

3         THE COURT:  All right.  So I also said that the plan

4  had to be approved by my monitor and my monitor would go meet

5  with the MCSO folks at 2 o'clock that very afternoon about two          15:08:12

6  hours later and you would get an approved plan.  And in between

7  the time that you left this courtroom and you began meeting

8  with my monitor two hours later -- when I say "you" I don't

9  mean you, but I mean your client, Chief Trombi, or Captain

10 Trombi, or --                                                          15:08:12

11        MR. CASEY:  Chief.

12        THE COURT:  -- whatever his rank was at that time, was

13 instructed to announce by that e-mail to all the commanders

14 under his command -- which was, I counted them once; it's a

15 great number -- were advised that we were going to now collect          15:08:12

16 all of these recordings, and one of those commanders happened

17 to be one of the commanders that was present when

18 Deputy Armendariz engaged in what was called problematic

19 behavior, isn't that correct?

20        MR. CASEY:  I can't avow to that last part.  I don't          15:08:12

21 know that.  But as to whether that supervisor was present, my

22 assumption is that is accurate but I can't avow to it.

23 Otherwise, everything you say is accurate.

24        THE COURT:  All right.  And so now I'm concerned that

25 in fact, the administrative investigative process is being          15:08:12

1    subverted by the MCSO rather than promoting the truth.  And I

2    have to take that into account in doing my weighing, and that

3    certainly isn't a matter that is tangential to this litigation

4    or to my order, is it?

5              MR. CASEY:  No, sir.  But I have trouble understanding   15:08:12

6    how the disclosure of certain information in the monitor's

7    report promotes your interest in making sure there's integrity

8    in the process that --

9              THE COURT:  Well, and that clearly is the case.  There

10   is very much such an interest.  There is.  But I have to   15:08:12

11   balance that against the public's right to know and I have to

12   balance that against any concern I have that the investigation

13   is not being competently administered by the MCSO, don't I?

14             MR. CASEY:  Your Honor, maybe I'm missing it because I

15   hear what you said about the interest.  What we're talking   15:08:12

16   about is a public disclosure, and if the -- if the interest is

17   making sure there's integrity in that process, the public

18   disclosure of what I call the playbook, I'm having trouble

19   understanding how that public disclosure -- I'm not talking

20   about to the Court; to the monitor; to the plaintiffs -- how   15:08:12

21   that promotes the interest in having a good faith process with

22   integrity because --

23             THE COURT:  Well, I see your point, but I will tell

24   you that to the extent I'm concerned that the MCSO is not

25   implementing a good faith process, then perhaps the only remedy   15:08:12

1    is a public disclosure, is it not?

2         MR. CASEY:  No.  And let me with you what the concern

3    is.  I'm not an expert like Christine Stutz or James has

4    become.  But let me tell you --

5         THE COURT:  Well, if we're back to where Mr. Williams    15:08:12

6    ought to be arguing, let's get him up here.

7         MR. CASEY:  Well, I'm not sure it is yet, but, Your

8    Honor, the concern I have is another thing.  Compelling or good

9    cause is:  What do we do under state law at the end of that

10   investigation?  If we release the playbook --                 15:08:12

11        THE COURT:  Well, I'll tell you what --

12        MR. CASEY:  I'm sorry.

13        THE COURT:  I'll tell you what I've got.

14        MR. CASEY:  Yes, sir.

15        THE COURT:  I've thought about this quite a bit.  And    15:08:12

16   in my order today I've got an order ready to go and I'm going

17   to wait and see if anything that you say or anything that the

18   plaintiff says changes my order.  But I have an order ready to

19   go which I think will set forth the procedure by which we are

20   going to proceed in this matter, and I have tried to balance   15:08:12

21   the right and the obligation that MCSO has to be faithful to

22   the state statute in its investigations with my obligation to

23   be sure that that process is not abused.  And I propose in my

24   order, at least as it now stands, my draft order, that if

25   you -- that we're going to proceed under that protocol for the  15:08:12

 1  time being, but I set a hearing, I believe it's December 4th,

 2  in which you'll be free to come and address concerns we have

 3  with proceeding under that protocol.  But in the meantime, I

 4  believe we need to proceed and proceed with some diligence and

 5  for reasons that you can understand.  And if you feel like                15:08:12

 6  it's, you know, there's an emergency that you need to raise,

 7  you'll have the protocol set out in front of you.  It's in

 8  writing and you can address that.

 9          MR. CASEY:  Your Honor, the only point I was making,

10  in the protocol I would -- this is what I was thinking, Your              15:08:12

11  Honor.  Is there a mechanism by which under state law my client

12  is still allowed to exercise discipline if it's violated

13  Rule 38 even by court order?  For example, if our investigation

14  reveals something --

15          THE COURT:  Well, let me just be clear.                          15:08:12

16          MR. CASEY:  Yes, sir.

17          THE COURT:  To the extent -- in my protocol I make a

18  distinction between three things.

19          MR. CASEY:  Yes, sir.

20          THE COURT:  MCSO's initiated administrative                      15:08:12

21  investigations.  One of the reasons why I made you file in

22  court under seal the identified administrative investigations

23  and their targets is I want a clear record of what you are

24  investigating and what you're not investigating.

25          MR. CASEY:  Yes, sir.                                            15:08:12

 1          THE COURT:  We now have that in court.  Okay?  By

 2   which it can be evaluated by me and eventually by the whole

 3   world.  If you commence that investigation, I propose in my

 4   protocol that as long as the monitor, in his evaluation, is

 5   convinced that you are proceeding in good faith and with          15:08:12

 6   diligence and you're meeting adequate professional standards,

 7   neither he nor this Court will conduct a separate investigation

 8   but will allow you to proceed under his observation and

 9   evaluation.  And then all rights pursuant to the state law are

10   applicable.                                                       15:08:12

11          If, however, he determines that the process is being

12   abused, you are not proceeding in good faith, or you're

13   otherwise inadequate, then he can immediately notify you that

14   he believes that's the case, and if he wants to undertake his

15   own independent investigation, he comes to me.                   15:08:12

16          MR. CASEY:  What was the last word you said,

17   "inadequate"?

18          THE COURT:  "Independent."

19          MR. CASEY:  Independent.  I see.  Thank you.

20          THE COURT:  He comes to me and I either authorize it      15:08:12

21   or I don't.  And I either authorize him to use material that

22   you have gathered in your own administrative investigation or I

23   don't.  And we can take up those questions in a very then

24   factually precise manner relating to an individual

25   investigation.                                                    15:08:12

 1          But I also set forth in that protocol, and you'll see

 2   this, too, the fact that the monitor, under the order, has an

 3   independent right to undertake his own investigations.  And he,

 4   if he believes that you are not investigating matters that

 5   should be investigated, can undertake his investigation              15:08:12

 6   independently.

 7          I've sealed off -- I've made provisions to seal off

 8   any members of his team that are assisting your internal

 9   investigators or evaluating it, any information that

10   independent investigation might undertake absent other              15:08:12

11   compliance with the order, but if he's doing an internal

12   investigation, he is not the employer of the investigating

13   officer and there is no state privilege that is then

14   applicable.

15          Further, I have the right to enforce compliance with         15:08:12

16   my own orders and to make inquiries into that, and I fully

17   intend if I find it's appropriate to exercise that right.  And

18   if I need to, and I think it's my intention at this point to

19   bring in officers and to put them on the stand under oath and

20   ask them questions, I will do that.                                 15:08:12

21          I don't, by doing that, intend to waive any of their

22   rights under the Fifth Amendment, the Constitution, Garrity,

23   any other state privilege; they can assert those rights fully

24   and completely.  But I have the right and the inherent

25   authority to investigate the MCSO's compliance with my own          15:08:12

1    orders, and so I have independent authority, I have independent

2    authority I can delegate to my monitor to do that.  He has

3    independent authority under the order, but he also has the

4    obligation to monitor your own initiation of Internal Affairs'

5    investigation.                                                    15:08:12

6         So I've set it all forth.  It's somewhat detailed.

7    Take a look at it.

8         MR. CASEY:  Yes, sir.

9         THE COURT:  Or maybe you won't be taking a look at it,

10   but MCSO, your client, can be taking a look at it and they        15:08:12

11   can -- I'll make provision on the 4th to hear what you have to

12   say.  But that is my balancing of the obvious point that you

13   make, that to the extent that the MCSO is investigating

14   something in good faith, they have to comply with the state

15   privilege law.  But again, the state privilege law only applies   15:08:12

16   to a personnel file and to questions asked to officers; that's

17   all 38-1101 does.

18        MR. CASEY:  I don't have anything else, Your Honor, to

19   mention, and I don't think it's probably productive for

20   Mr. Williams to come up any more.  We'll await your order.        15:08:12

21        THE COURT:  All right.  Are we ready, then,

22   Mr. Pochoda, to address anything that I've just said?

23        All right, Mr. Pochoda.  Go ahead.

24        MR. POCHODA:  Thank you, Judge.  Just a few comments

25   and then I'm available for questions.  We appreciate the          15:08:12

 1    Court's thoroughness in looking into the contours of the state

 2    law.  We still agree with this Court's order of the 4th of this

 3    month stating that clearly and accurately, that in this court

 4    it is the federal law that will control.  And only if there's

 5    some reason because it's not fully defined do we look to the          15:08:12

 6    state law.  And indeed, the only -- in its present submission,

 7    the defendants go back and basically start off by staying state

 8    law is what is controlling here and we disagree with that.  And

 9    they provide only one case to this Court, it's in Exhibit B of

10    their present submission, which not only is the case concerning      15:08:12

11    the scope of --

12            THE COURT:  Yes, the minute entry from the superior

13    court.

14            MR. POCHODA:  Excuse me?

15            THE COURT:  Is that the minute entry --                       15:08:12

16            MR. POCHODA:  Yes.

17            THE COURT:  -- from superior court?

18            MR. POCHODA:  Yes, it is.  It sort of "doubles" state

19    law, if you will, Judge.  It's Section 38 and Section 9.  It's

20    the definition of a public record under the state public record     15:08:12

21    law, so it's little, if any, relevancy to anything that's going

22    on in this court.  There has been no showing that the federal

23    law is not adequate here and should presumptively control as

24    this Court has already ordered, and I don't believe defendants

25    seek to address -- have addressed that at all in their present       15:08:12

1    submission.

2           A couple of other just observations.  Obviously, the

3    need for public disclosure, the importance and the reason why

4    it requires a compelling or even a good faith reason to

5    overcome is not because -- and the disclosure itself may help          15:08:13

6    the investigation, although in fact I think it's been shown

7    many times that the absence of transparency has in fact

8    fostered improper actions by public officials and abusive

9    actions, whether it's in the sheriff's department, a mayor's

10   office, or prison system, so I think it would foster but that's          15:08:13

11   certainly not the test.

12          The issue is whether there's a compelling reason to

13   overcome the presumption of public disclosure and the

14   importance of public disclosure of court proceedings and the

15   public's right to know and access such information.  And here          15:08:13

16   we find -- and we'll discuss some of this later on, as the

17   Court said -- there is absolutely nothing to balance that

18   compelling or good faith reason against: no articulable facts

19   showing any significant harm, prejudice, or divulging

20   confidential information here in defendants' submission.  And          15:08:13

21   we can go through that.

22          There are, as this Court, again, ordered on the 4th,

23   the -- it requires both that legal showing and the factual

24   showing of specific articulable facts, and as the Court stated

25   on the 4th and remains equally as relevant to the present, a          15:08:13

1    redacted document, there is no such showing.  There are some

2    generalized assertions, but nowhere near what is required to

3    balance whether their harm, alleged harm, is sufficient to

4    overcome the presumption of disclosure.

5         And I would just say, finally, in terms of some of the          15:08:13

6    comments made before, that it's clear to plaintiffs that

7    defendants cannot have it both ways.  As the Court pointed out,

8    the reasons that we're here is because of the failures of

9    defendants to meet their obligations during this litigation,

10   the failures to provide the requested information to assess          15:08:13

11   whether such information existed in the sheriff's agency,

12   including all the personnel in that agency as a lawyer is

13   required to do, as the agency is required to do.  The failure

14   to turn over requested information that was clearly relevant

15   not only to deprivation suffered by plaintiffs -- and, of           15:08:13

16   course, this is a class of persons who are stopped in vehicles

17   and all of this had to do with stops in vehicles -- even if

18   some of the information, and Mr. Casey may well be citing some

19   that would lead to other types of wrongs than aren't part of

20   this case that has no relevancy as to whether any of it was a       15:08:13

21   part of this case, and indeed even as to, for example, the

22   failures of defendants to properly monitor their people, to

23   take action when there are sufficient complaints against a

24   particular officer, that clearly would have been another factor

25   that would have been revealed had we had this information, and      15:08:13

1   those failures inevitably lead to and led to the deprivations

2   that the plaintiffs suffered in this case.

3         Those are just some comments I had on the prior

4   discussion.  If you have any specific questions, I'm available.

5         THE COURT:  I don't have any.  Thank you, Mr. Pochoda.   15:08:13

6         MR. POCHODA:  We would also rest on our written

7   materials in response to this.

8         THE COURT:  Which were also placed under seal upon

9   your motion.  So again, at some point they will be -- at some

10  appropriate point they will come out of seal, but not right   15:08:13

11  now.

12        Did you have rebuttal, Mr. Casey?

13        MR. CASEY:  Yes, Your Honor.

14        THE COURT:  Okay.

15        MR. CASEY:  It's actually, after talking to            15:08:13

16  co-counsel, Your Honor --

17        THE COURT:  Let me ask, I'm sort of jumping ahead, but

18  is Mr. Liddy going to be lead counsel if I allow your

19  withdrawal?

20        MR. CASEY:  I can't speak for that because it's a      15:08:13

21  decision, my understanding, between Mr. -- really, Mr. Liddy's

22  employer, the elected county attorney, Mr. Montgomery.

23        THE COURT:  I do take it there isn't going to be any

24  down time.  I'm going to deal with Mr. Liddy if that's all

25  that's appointed, and I don't mean to suggest any offense,    15:08:13

 1    Mr. Liddy; we've dealt with each other for many years now.

 2            MR. LIDDY:  None taken, Your Honor.

 3            MR. CASEY:  Your Honor, and I say this with great

 4    respect, because I don't want it taken any way, but is it not,

 5    perhaps, premature, without any finding from the Court, to have          15:08:13

 6    what I've understood you to relay as an order coming out of

 7    simple redact -- I argue simple redactions of sections of the

 8    monitor's report that seems now all the sudden -- and again,

 9    maybe I'm not understanding exactly what you've said, but it

10    seems to me that what you're doing is opening up the                     15:08:13

11    opportunity for the monitor to take over investigations.

12            THE COURT:  Oh, you bet I'm doing that, but he already

13    has that authority.  He has that authority in the initial

14    order.

15            MR. CASEY:  Okay.                                                15:08:13

16            THE COURT:  And --

17            MR. CASEY:  Just for clarification, do I understand it

18    that my client is still responsible for the investigations

19    until there is some determination by your monitor and this

20    Court that the monitor needs to either do a parallel or take            15:08:13

21    over?

22            THE COURT:  Well, that is partly correct, but as you

23    will see in the order, I am also pointing out that wholly in --

24    that if in fact you have an investigative order in place and

25    the monitor believes that you are adequately pursuing it, the          15:08:13

1    monitor has no authority to initiate an independent

2    investigation.

3           If you have an investigation already in place and the

4    monitor believes that you are not pursuing it either adequately

5    or in good faith, then the monitor has the authority to come to          15:08:13

6    me after having notified you and say:  I don't believe they're

7    pursuing it in good faith.  I want to take it over.

8           I will then decide whether or not you're pursuing it

9    in good faith or whether or not I will allow the monitor to

10   take it over, and if I will allow him to take it over, I then          15:08:13

11   decide whether or not I will allow him in any independent

12   investigation to use information that has been uncovered in

13   your administrative process.

14          However, that is separate from the monitor's

15   independent authority, which exists both under the order and by          15:08:13

16   my delegation to him of my authority to see that my orders are

17   enforced, to indicate -- to begin his own independent

18   investigations.  And we will clearly have on file, according to

19   my order, what you are investigating and what you are not, and

20   he doesn't have to, nor do I, take and offer to you matters          15:08:13

21   that you aren't investigating that I believe or that he

22   believes are relevant to this investigation.  He is free to

23   begin his own investigation of things you are not

24   investigating, topics you're not investigating or subjects

25   you're not investigating, and he need not offer it to you          15:08:13

1    first.  Because there is ample -- again, I'm not prejudging

2    this matter, but there is ample evidence in the record, and I'm

3    citing some of it in my background, to demonstrate that there

4    is reason to believe whether or not, and there is also,

5    perhaps, reason not to believe, but there is reason to believe          15:08:13

6    that at least some people at the MCSO are abusing and misusing

7    this process.

8           So I'm not going to require him to clear things with

9    you and allow them, if you aren't already investigating them in

10   good faith, and allow them to be misused.  And just so you will       15:08:13

11   not misuse the interim period, I've already sent to him a

12   number of items that I think need to be investigated and that

13   on which he will begin investigation.  And it won't matter

14   whether or not you now subsequently notice up those

15   investigations unless he determines that you're pursuing it in        15:08:13

16   good faith and there's no reason for him to independently

17   pursue it and I'm convinced by that.

18          MR. CASEY:  Your Honor, I guess at this point I would

19   like -- I'm going to preserve our ability to make objections.

20          THE COURT:  Well, you certainly have it and I put it           15:08:13

21   in the order.  I welcome your comment and I've set a hearing.

22   It's December 4th.

23          MR. CASEY:  Yes, sir.

24          THE COURT:  You can set out all day, because I may

25   also be using it to conduct my own investigations, and I say          15:08:13

1    that in the order, too.

2         MR. CASEY:  Well, Your Honor, what I would ask for is

3    if there will be an investigation --

4         THE COURT:  If there will be an investigation, I will

5    give you timely notice of who I require to be here.  I will          15:08:13

6    also give them notice that they have the right to counsel that

7    will be independent of you and the MCSO, because it doesn't

8    seem to me that in many of those cases your interests will be

9    coterminous with theirs, and that if they can't afford counsel,

10   they can apply to this Court for such appointment for the           15:08:13

11   limited purpose of the investigation.

12        MR. CASEY:  The investigations, is the Court prepared

13   to share where in the Court's eyes it's civil or criminal in

14   nature, or both?

15        THE COURT:  Well, I mean, that is one of the                    15:08:13

16   interesting things I'm looking at.  The only authority I think

17   I have, although I'm going to listen to plaintiffs on this

18   point, is the authority to hold the MCSO in contempt for its

19   violation of my orders.  There is civil contempt and there is

20   criminal contempt.  And I'm trying to look and understand now        15:08:13

21   the difference, and sometimes it's pretty blurry, and it may be

22   that matters are appropriate subjects both of criminal and

23   civil contempt.

24        So I don't want to -- I mean, I don't really -- I

25   don't want to infringe anybody's rights.  That's why I've put        15:08:13

1    in the order that my investigations or the monitor's

2    investigations, everybody has all the rights they have and I

3    want to make sure that everybody feels free to exercise them.

4            MR. CASEY:  Your Honor, let me put on the record,

5    respectfully, an objection to holding any evidentiary or            15:08:13

6    investigatory questioning at December 4th.  Today is the date

7    that it is.

8            THE COURT:  Well --

9            MR. CASEY:  We have a week -- may I at least -- I

10   just -- I'm sorry, Your Honor.                                      15:08:13

11           THE COURT:  You may finish.

12           MR. CASEY:  Your Honor, a week from today is the

13   Thanksgiving holiday.  Most businesses, including the MCSO,

14   people are taking vacations.  If in fact it is the magnitude

15   that the Court is discussing for December 4, I believe it is       15:08:13

16   insufficient time under the due process, for individual

17   deputies that you may or may not identify to secure counsel,

18   prepare, and counsel and attend this hearing on the 4th.

19           It would seem to me, respectfully, that the things

20   that you have identified in terms of protocol are perfectly        15:08:13

21   timely on the 4th, but an investigation in which the Court or

22   your agent questions MCSO employees does not allow them

23   sufficient time under due process and other considerations to

24   prepare.  I just wanted to make my record.

25           THE COURT:  Today is the 19th of November.                 15:08:13

1          MR. CASEY:  Yes, Your Honor, and a week from now is

2     Thanksgiving, and we know the time at this time of year is very

3     difficult.

4          THE COURT:  Well, thank you for your objection.

5     You've placed it on the record.                                    15:08:13

6          MR. CASEY:  Thank you, Your Honor.

7          MR. LIDDY:  Your Honor, for the record, it's the 20th

8     of November.

9          THE COURT:  Oh.  Well, thank you for the corrections.

10         What did I say it was?                                         15:08:13

11         THE CLERK:  The 19th.

12         MR. LIDDY:  The 19th.

13         THE COURT:  I apologize.  20th of November.

14         As I've said, I'll give timely notice to everybody to

15    obtain counsel, and if they need counsel and can't afford it,      15:08:13

16    then I'll appoint counsel and I will make sure that counsel are

17    fully apprised of anything that I think may impinge on the

18    rights, the individual rights of people I'm going to question.

19    But you're, of course, free to make the objection whenever you

20    want to and to repeat it.                                          15:08:13

21         But I would also point out, Mr. Casey, that it seems

22    to me that in this case I have given your client opportunity

23    after opportunity after opportunity and that opportunity has

24    been not always subverted.  I would like to again state on the

25    record that when I attended the training that was done to          15:08:13

1   individual deputies I was impressed by its quality.

2        So there have been some good things that your client

3   has done, at least as far as I have observed.  But I don't need

4   to repeat for you opportunity after opportunity after

5   opportunity where your client has either violated the law,        15:08:13

6   violated my express orders, and at least apparently, I'm not

7   saying they have, but they've apparently subverted my -- or the

8   investigation that I've ordered for their own potential

9   benefit, and to keep matters under -- and maybe abused the

10  process; maybe they're not.                                       15:08:13

11       But I think it was pretty clear at the last hearing I

12  am trying and I will continue to try to give your client the

13  respect that he is due as a representative elected by the

14  people of Maricopa County.  But I have an obligation to make

15  sure that my own orders and that the Constitution of the United  15:08:13

16  States are enforced, even by the sheriff of Maricopa County.

17       And I will fulfill that obligation and I will, after

18  having given you many opportunities, your client many

19  opportunities, I am not going to be tolerant any more.  We are

20  going to proceed with all dispatch.  My monitor will do it.  I   15:08:13

21  will do it.  I will give you the opportunity to do what you're

22  going to do if you do it in good faith.  But if you don't, I am

23  not any more giving you any second chances.

24       Do you understand my position on this point?

25            MR. CASEY:  Your Honor, for the record, I understand   15:08:13

 1  your position.  I make objection to some of the

 2  characterizations, but I do understand your position.

 3       THE COURT:  All right.  Are we ready now to take up

 4  your application to withdraw?

 5       MR. CASEY:  Yes, Your Honor.                          15:08:13

 6       THE COURT:  All right.  You know, I really -- let me

 7  just say, and I don't know if we can net this out, but let me

 8  just say I don't -- in light of your clarifications, I realize

 9  that plaintiffs have some legitimate objections because you

10  have been valuable to the process in terms of the cooperation,  15:08:13

11  the training I've mentioned, and some other things, as has

12  Mr. Williams, as has Mr. Liddy.  You have cooperated and -- at

13  least on the training, and you've implemented that well, and

14  your continued participation is valuable to them.  But in light

15  of the basis that you have clarified for your withdrawal, I       15:08:13

16  really don't think there's any way I can compel you and keep

17  you in this lawsuit.

18       I will, of course, hear Mr. Pochoda before making that

19  determination.  But in light of my determination to pursue

20  investigations, just let me share with you a couple of things I   15:08:13

21  think I can ask you today and a couple of things that I may

22  have to contemplate asking you in the future and bringing you

23  back in here so you are aware and you have the full opportunity

24  to consider and brief these issues.

25       First, I think I can ask you today, you indicated           15:08:13

 1   after the last hearing that additional materials were found.  I

 2   don't think I need to characterize them any further.  I don't

 3   want to -- well, I'll characterize them a little bit further,

 4   but I want to preserve your opportunity and my opportunity to

 5   make sure that these materials are fully investigated.                  15:08:13

 6           And let me just say that as I've said before, I

 7   appreciate your candor to this Court, your vigorous

 8   representation of your client, and I'm not trying to cast any

 9   aspersions on you, Mr. Liddy, or plaintiffs' counsel,

10   certainly.  But you fully -- you, I think, in the interest of   15:08:13

11   full disclosure, indicated that after the last hearing

12   additional materials were found that may be relevant to this

13   lawsuit.  I think that I can ask you, and I believe that either

14   you or Mr. Williams would have the expertise to know, whether

15   or not any of those materials -- you indicated that some of     15:08:13

16   them may have been copies of materials that were intended to be

17   disclosed to the plaintiffs in the underlying action.

18           Were any of those materials -- and I'm including all

19   the materials that have been found since the last hearing, all

20   of the materials -- were any of those materials provided to the  15:08:13

21   plaintiffs in this case?

22           MR. CASEY:  Some.

23           THE COURT:  Which ones were provided to the

24   plaintiffs?

25           MR. CASEY:  Your Honor, I, candor, it is impossible to  15:08:13

 1  tell because there is a substantial amount of material.  I

 2  personally went through earlier this week the evidence storage

 3  under the supervision of Sergeant Fax.  I will tell you that it

 4  appears that we have audio and video of interviews, a mix of

 5  photographs and audio interviews that appear to me to be either          15:08:13

 6  human smuggling traffic load vehicles or identity theft issues.

 7  Those videos on the CDs range from 2009, '10, and '11.  We also

 8  have a bunch of CDs that have DR numbers on it that

 9  apparently --

10          THE COURT:  What is a DR number?  Departmental report?          15:08:13

11          MR. CASEY:  Either an accident report number or

12  department report number that didn't make it into inventory and

13  evidence.

14          I will share with you that some of the incident

15  reports, some of the traffic reports that I saw, I mean,          15:08:14

16  there's substantial volume and it is -- it will be a sizeable

17  undertaking, but I will share with you that as to the traffic

18  reports, we did produce to the plaintiffs in 2009, I think it

19  was, a mere image of our CAD database that produced literally

20  tens of thousands of traffic stops from 2005 to whenever that          15:08:14

21  date was.  I cannot represent to you that the universe that's

22  there was produced -- my guess is it's going to be a yes and no

23  answer on a case by case.

24          I will also share with you that there are some things,

25  cell phones, Miranda cards, vehicle license plates, those --          15:08:14

1          THE COURT:  Think we had purses, maybe.

2          MR. CASEY:  Yeah.  Your Honor, there also -- and if

3    the Court is interested, on November 3rd of this year PSB

4    member Sergeant Dave Tennyson was at the enforcement support

5    building which historically housed HSU.  He was there for          15:08:14

6    interviewing on another matter.  An MCSO sergeant hailed him

7    down and handed him some stuff which included a steno pad, a

8    little one that would look like a reporter's notes or a

9    deputy's notes, four ID cards that appeared to be foreign

10   national cards, one CD case that was empty, one CD case that       15:08:14

11   did contain a music CD.  I know we know the name of the CD.  I

12   think it's a foreign CD based on the --

13         THE COURT:  In the Hispanic language?

14         MR. CASEY:  My recollection it was.

15         THE COURT:  Okay.                                            15:08:14

16         MR. CASEY:  On November 5th, to his credit, Jerry

17   Sheridan immediately had the captain, the head of PSB conduct a

18   thorough search of that entire building.  It had been done --

19   my understanding it was prophylactically done before, but

20   during that search on November 5th in a locked locker, like a      15:08:14

21   high school locker, had a lock on it, inside of it were two

22   purses.  And there are some ID cards, one ID card.  There were

23   keys, a cell phone.  There is apparently a DR connected to both

24   purses, and there were apparently involved -- and again I'm

25   telling you my understanding after communicating --                15:08:14

 1           THE COURT:  Well, let me just say, and I appreciate

 2    your desire to go through and be fully forthcoming, it sounds

 3    to me like there's some things that clearly were not turned

 4    over to plaintiffs.  There are some reports, and I gather that

 5    the reports are massive, and a number of them don't look like          15:08:14

 6    they would have been turned over to plaintiffs if they were

 7    never entered into the system, some of them may well have been

 8    turned over to plaintiffs, but you haven't been able to make

 9    that assessment yet.

10           MR. CASEY:  No.  There is one other area, Your Honor,          15:08:14

11    that I don't know, unless your monitor has reported, on the

12    10th of this month a deputy provided to PSB 53 identity cards

13    that were in his possession.  Another one had 111 identity

14    cards.

15           THE COURT:  These are two separate deputies?                   15:08:14

16           MR. CASEY:  Two separate deputies.  One deputy was

17    using them for training purposes; the other deputy was

18    basically a conduit to turn it over to PSB.  There's 164 new ID

19    cards.

20           THE COURT:  Either of these deputies ever belong to           15:08:14

21    HSU?

22           MR. CASEY:  Yes.

23           THE COURT:  Did both of them belong to HSU?

24           MR. CASEY:  Yes.  And I'm referring in the corner over

25    there to Sergeant Fax.  I will tell you I looked through the ID        15:08:14

1   cards.

2           THE COURT:  Were either of them interviewed by

3   Sergeant Tennyson?

4           MR. CASEY:  No.  And the -- the cards --

5           THE COURT:  Was anybody interviewed in connection with   15:08:14

6   these ID cards?

7           MR. CASEY:  My understanding is not yet.  Sergeant

8   Fax?

9           SERGEANT FAX:  They haven't at this time, sir.  We're

10  still conducting the --                                           15:08:14

11          THE COURT:  You know, Sergeant Fax, I appreciate it,

12  but could you come to a microphone so we can be sure we get you

13  on the record?

14          MR. CASEY:  Again, just for record, Sergeant Fax of

15  the MCSO.                                                         15:08:14

16          THE COURT:  Thank you.

17          SERGEANT FAX:  Sir, in reference to the ID cards with

18  the two separate DR numbers, those are still currently being

19  cataloged and research is beginning to run them through the

20  different databases that we have, the CAD, JWI, all of those,    15:08:14

21  potentially log scans in the future.

22          Deputy Gandara, as Mr. Casey stated --

23          THE COURT:  You know, I appreciate your desire to be

24  forthcoming, but please don't use names.

25          SERGEANT FAX:  I apologize.  One of the deputies, Your    15:08:14

1  Honor, as he said, was just the deputy who impounded those

2  items; the second deputy actually identified as being having

3  those items.

4       THE COURT:  All right.  So one of the deputies

5  impounded items that he obtained from another deputy.          15:08:14

6       SERGEANT FAX:  From a box when -- when a --

7       THE COURT:  All right.

8       MR. FOX:  -- cleaning was going on those were located.

9  He was instructed to place those into evidence.

10       The second deputy, based on the record, states that he   15:08:14

11  was in those -- he had those IDs in his possession for his

12  tenure and was -- then placed those items into evidence.

13       THE COURT:  All right.  Thank you, Sergeant Fax.

14       SERGEANT FAX:  Yes, sir.

15       THE COURT:  So how many ID cards is this?               15:08:14

16       MR. CASEY:  On the November 10th, 53 plus 111, so

17  we've got 164 new ID cards.

18       THE COURT:  And the position of MCSO is that all 164

19  of these were used for training purposes?

20       MR. CASEY:  No.  The only information I can represent   15:08:14

21  to the Court right now is that one of the stack, the 53?  The

22  111 were training purposes.  And the other 53 we don't know

23  what reason they were kept, confiscated, and used for.  That is

24  a new development.

25       THE COURT:  And do you have -- have you done any        15:08:14

1    research yet, Sergeant Fax, perhaps, on the allegation that 111

2    IDs were used for training purposes?

3              SERGEANT FAX:  Sir, we're currently putting some

4    further detectives together so that we can start running those

5    IDs through those databases.  We have just --                    15:08:14

6              THE COURT:  Do you have any idea where they came from?

7              SERGEANT FAX:  The 111 we are assuming at this point,

8    and it is an assumption, Your Honor, is that they came from

9    operations that occurred while that deputy was in HSU.

10             THE COURT:  Well, let me ask you, the deputy who       15:08:14

11   turned them in was at HSU.  Was the deputy he got them from

12   ever at HSU?

13             SERGEANT FAX:  No, sir.  What --

14             THE COURT:  Or do you know?

15             SERGEANT FAX:  Let me clarify, sir.  The 53 that we're  15:08:14

16   talking about, while they were doing a cleanup effort in that

17   building, several reports were found in a box and those 53 ID

18   cards were in that box unknown how they got there, whose they

19   were, who confiscated them, or who placed them there.  Those

20   were collected and placed into the property room.                15:08:14

21             The 111 a deputy has self-admitted he had those and

22   that he placed them into the property room.  So the

23   investigation in reference to the 111, sir, will attempt to

24   determine what operations he had those, why he had those for so

25   long, and why they were not put in the property room.            15:08:14

1          THE COURT:  Thank you.

2          SERGEANT FAX:  Yes, sir.

3          MR. CASEY:  Your Honor, just in case there's another

4    question on that, I'm going to ask Sergeant Fax to stay within

5    arm's length of me.                                                    15:08:14

6          THE COURT:  You can go sit, though, in Mr. Casey's

7    chair.

8          MR. CASEY:  Thank you, Your Honor.

9          THE COURT:  It's a nice chair.

10         MR. CASEY:  I broke it in for you.                               15:08:14

11         Your Honor, the other item I wanted -- I felt was

12   important because it came up, I alerted the Court to it

13   earlier, 35 license plates, 14 of which MCSO currently is

14   unable to determine how it came into the possession of those.

15   21 of those -- there was another 21.  13 are related to Charley        15:08:14

16   Armendariz.  We've been able to link those to either --

17         THE COURT:  Are those 13 --

18         MR. CASEY:  Of the 21.  There's 14 we -- there's a

19   total of 35.  14 we can't connect, we don't know where -- how

20   we got them.                                                          15:08:14

21         THE COURT:  The 13, did they come from

22   Mr. Armendariz's home?

23         MR. CASEY:  No.

24         THE COURT:  How many came from Mr. Armendariz's home?

25         MR. CASEY:  I don't -- I'm not pre -- I don't know               15:08:14

1    that, Your Honor.

2            THE COURT:  Are you saying that 14 more came from the

3    offices of HSU?

4            MR. CASEY:  What I'm saying is that that is what we

5    were -- that's what we did find over there was 35 additional    15:08:14

6    license plates.

7            THE COURT:  And how did you connect them to Sergeant

8    Armendariz?

9            MR. CASEY:  My understanding is that -- just my

10   understanding is that we were able to run those plates.  They    15:08:14

11   linked either in showing a CAD entry by Armendariz or a DR

12   initiation or authorship by Armendariz.

13           SERGEANT FAX:  That's correct, Your Honor.  The 13

14   that were from Armendariz hit when we searched his CAD data.

15           THE COURT:  Well, did you search any deputy's CAD    15:08:14

16   data?

17           SERGEANT FAX:  We did, sorry.

18           THE COURT:  So you did an open search.

19           SERGEANT FOX:  Based on the data we had, the initial

20   background separation was out of those 35 we ran every deputy    15:08:14

21   that had been in HSU since its existence which we do have CAD

22   data for.  I can tell you that three hit to a deputy; two hit

23   to a deputy; several more hit to other deputies.  We then have

24   the 14 that were unaccounted for.

25           Since Mr. Casey and I spoke, two of those have    15:08:14

1  actually come back to a leasing company that the county uses,

2  so it is believed at this point for two of those, those would

3  have been take off -- taken off of a lease vehicle when the

4  vehicle was issued out to the person.

5          THE COURT:  Have investigations been done of the          15:08:14

6  license plates that were confiscated from Deputy Armendariz's

7  home as to their source?

8          SERGEANT FAX:  Yes, sir.

9          THE COURT:  And do they all relate back to

10  Deputy Armendariz?          15:08:14

11          SERGEANT FAX:  Off the top of my head, Your Honor, I

12  can't tell you yes, Your Honor, because I don't remember that.

13  But I can tell you that we have linked items to other personnel

14  that are not linked to Armendariz, and those are being

15  investigated separately.          15:08:14

16          THE COURT:  All right.  Thank you.

17          MR. CASEY:  In addition to Armendariz there are one,

18  two, three, four, there's three individuals that were in HSU.

19  Each had a single plate.  One other guy had two plates.

20  Another guy who testified here at trial had three plates.  And          15:08:15

21  obviously it's going to be investigated.  The bottom line is it

22  is MCSO policy this goes into property and evidence, and

23  obviously it was not in property and evidence.

24          And that is the extent of my report, Your Honor.

25          THE COURT:  Thank you, Mr. Casey.          15:08:15

```
1              MR. CASEY:  Thank you.

2              THE COURT:  I appreciate that.  Now, let me just --

3              MR. LIDDY:  Your Honor, could I make one

4    clarification?

5              THE COURT:  Sure.                                    15:08:15

6              MR. LIDDY:  The MCSO protocol for the license plates

7    would be to process them to go back to the motor vehicles

8    division, not into property and evidence.

9              THE COURT:  All right.  But in any case, there isn't

10   any reason to believe that was done?                          15:08:15

11             MR. LIDDY:  The fact that they were found indicates it

12   was not done.

13             THE COURT:  Yes.  Thank you.

14             MR. CASEY:  My apologies for not --

15             THE COURT:  That's all right.                       15:08:15

16             MR. CASEY:  I did know that; I forgot it.

17             THE COURT:  Let me just explore with you again, I'm

18   going to let Mr. Pochoda talk, but, Mr. Casey, as I said, my

19   inclination is to withdraw and to acknowledge -- well, is to

20   let you withdraw.  But as I investigate and as my monitor     15:08:15

21   investigates and as MCSO investigates the scope of what is now

22   opening up ahead of us, it seems to me that there may be a

23   couple of things I come back to you for.

24             MR. CASEY:  Yes, sir.

25             THE COURT:  And I just want to alert you to them in  15:08:15
```

 1   advance, and I want to alert you to my tentative thoughts on

 2   them in advance --

 3           MR. CASEY:  Yes, sir.

 4           THE COURT:  -- so that you can be fully prepared, and

 5   if you're going to assert due process violations on behalf of          15:08:15

 6   others, you won't be able to assert them on behalf of yourself.

 7   Because I'm going to give you full -- I think you've made

 8   efforts to be forthcoming with me, I'm going to be the same --

 9   do the same to you.

10           There may be issues now that are going to require me          15:08:15

11   to come back and ask you, I give you -- I will not come back

12   and ask you if there are other ways to find them out, because I

13   recognize that there is an attorney-client privilege that is

14   substantial and you also have ethical obligations to your

15   client, and I want to tell you some things that I may be asking          15:08:15

16   you about so that you can consider whether or not you have an

17   obligation to assert such matters if in fact I ever do ask you

18   about them.

19           I don't think that either of those things are

20   compelled by asking you, and I think you're the person with the          15:08:15

21   knowledge, maybe Mr. Williams also, but you both filing the

22   motion to withdraw and your firm, I don't think it's an ethical

23   obligation, and I don't think that MCSO would have -- Sheriff

24   Arpaio would have any objection to you completing an evaluation

25   as to what materials you have recently found and what materials          15:08:15

 1   you found before -- when I say "before," there's a whole trove

 2   of materials that after May 14th have been found that were

 3   never disclosed.  I believe that the most economical way for

 4   the County and for this Court to determine what if any of that

 5   was disclosed is to have you and Mr. Williams make that          15:08:15

 6   evaluation.  Do you disagree?

 7          MR. CASEY:  No, Your Honor.  And I can represent to

 8   this Court that I have shared with Mr. Liddy, with the request

 9   that it go up his chain of command, I've shared with Jerry

10   Sheridan and the sheriff that I will be available to review      15:08:15

11   that and help out in whatever way in a transition and

12   subsequently, because there are some things that I can probably

13   identify more cost effectively than a successor counsel, and

14   I'm prepared to do that.

15          THE COURT:  All right.  I'm going to ask you to do        15:08:15

16   that.  And I guess I'm going to order you to do that.  But

17   I'm --

18          MR. CASEY:  I obey orders.

19          THE COURT:  I'm going to allow you to withdraw from

20   the representation of the defendant and defendants in this       15:08:15

21   matter, but it is my expectation that you will complete that

22   obligation.  It's also my expectation that the County will

23   reimburse you for it.

24          The second thing I want to talk to you about, and as I

25   said, there may be other things, but it occurs to me that if in  15:08:15

 1    fact, and it appears to me to be so, you haven't contested it,

 2    plaintiffs provided you with the dis -- your client with the

 3    discovery that they did during the pendency of this lawsuit,

 4    much that they requested was not turned over.  I presume that

 5    in the course of litigation -- and I'm not necessarily          15:08:15

 6    expecting you to answer this now, but I'm going to tell you so

 7    that you're aware that I'm going to inquire, perhaps, if in the

 8    course of litigation, normal litigation, the interrogatory

 9    requests would have been served on you and you would have

10    transmitted them to your client, this was an issue previously   15:08:15

11    in litigation.  I intend to find out who at MCSO was in charge

12    of processing those litigation requests, but if I can't find it

13    out because there are lapses of memory or other things, it is

14    my impression that the attorney-client privilege applies to

15    communications in which your client is communicating with you   15:08:15

16    seeking your advice and to communications that you are making

17    to your client giving advice, but it does not apply to every

18    communication between lawyer and client.

19            MR. CASEY:  No, sir.

20            THE COURT:  So I'm not sure that the attorney-client     15:08:15

21    privilege would cover me asking you, if I have to, to whom you

22    sent the litigation -- or the interrogatories, and I may at

23    some point come back and ask you to answer that question.

24            MR. CASEY:  Well, Your Honor, I appreciate it, I make

25    no decision because I have, obviously, ethical duties, but I    15:08:15

1   think we crossed that -- we had a similar issue earlier in this

2   case in which you did -- if you remember --

3           THE COURT:  I have the affidavit in front of me now

4   but I am not presuming that that affidavit is applicable --

5           MR. CASEY:  No.  What I was suggesting there is we did

6   disclose to you, without waiving privilege, e-mail from counsel

7   to client to address issues the Court had at that time, and the

8   client as well as counsel, even though albeit former counsel,

9   despite some of the things that have been said here today my

10  clients believe in complying with this Court's order in good

11  faith with good intent.

12          In fact, one of the things I wanted to mention to you

13  is in follow up to your October 28th hearing, the sheriff has

14  undergone the training that was ordered of him in the order on

15  the 28th.

16          THE COURT:  I am glad to hear that.

17          MR. CASEY:  And he found it to be a very useful and

18  valuable time that he invested in it, and that is an order

19  that's been complied with, obviously, in spirit and letter.

20          And so I guess my Irish, long-winded explanation for

21  it is I can tell you that my client is interested and will

22  comply with the letter and spirit, and counsel will work with

23  the Court on those issues.

24          THE COURT:  All right.  Well, let me tell you one

25  other thing that you might consider.  In your meeting on May

15:08:15
15:08:15
15:08:15
15:08:15
15:08:15

1  14th, apparently there was a meeting at which you appear to

2  have been present --

3          MR. CASEY:  Yes, sir.

4          THE COURT:  -- at which direction was given to

5  Chief Trombi by somebody, at least the tentative information I          15:08:15

6  have been given is that Chief Trombi doesn't remember who told

7  him and nobody else remembers who told Chief Trombi to send out

8  that e-mail blast to all of the commanders of the MCSO.

9          Again, I don't intend to come back and ask you that

10  information if I don't have to.  But it does strike me that          15:08:15

11  what you may have heard in a meeting in which you were not

12  seeking -- in which legal advice was not sought from you and in

13  which you were not giving legal advice is not necessarily

14  covered by the attorney-client privilege, but I want to give

15  you the opportunity to brief that.          15:08:15

16          MR. CASEY:  We may be able to handle this right now if

17  you give me a minute.

18          THE COURT:  All right.

19          (Pause in proceedings.)

20          MR. CASEY:  I'm authorized to -- by Chief Deputy          15:08:15

21  Sheridan to tell you that he authorized Trombi to send out the

22  e-mail.  Thank you.

23          THE COURT:  All right.  Thank you.  Well, you don't

24  have to worry about that one, then.  There may, however, and I

25  don't have any to give you right now, there may, however, be          15:08:15

1   other issues that will come up in the course of running all

2   these matters to ground, and I will try to avoid getting you or

3   Mr. Williams involved, both out of a courtesy to you and

4   respect for the law, respect for valid privilege, and it may be

5   that MCSO will not -- will be forthcoming and we won't need to          15:08:15

6   come to you.  But there may be instances where, despite their

7   desire to be forthcoming, memories fail, and if it doesn't --

8   if it isn't covered by the attorney-client privilege, I may

9   come back and ask you.

10          MR. CASEY:  And I understand that.  And Your Honor, I          15:08:15

11  did bring counsel here, ethics counsel here, Karen Clark in the

12  front row of the gallery, because, you know, it's not often

13  that you need such advice.  But if in fact the Court needs

14  anything, I will have counsel so I make sure, because I'm not

15  the holder of the privilege, Mr. Arpaio and his office is the          15:08:15

16  holder of the privilege, and I am duty-bound by those

17  confidences and privilege, and to the extent I'm authorized and

18  my counsel tells me that I'm authorized, then I will be more

19  than able to assist.

20          THE COURT:  All right.  Thank you.  I think we need to          15:08:15

21  hear from Mr. Pochoda before I make a determination as to your

22  application.

23          MR. POCHODA:  Thank you, Judge.  Just briefly on this

24  matter.  We would like to say, plaintiffs' counsel, that

25  Mr. Casey and Mr. Williams and others in his firm have been          15:08:15

 1    involved in this matter for some six years, and in a difficult

 2    and sometimes charged case they have always performed in a

 3    straightforward and professional manner, both in court and out,

 4    and certainly in all dealings with plaintiffs' counsel.

 5         Having said that, we, of course, were privy to the           15:08:15

 6    need to withdraw at this time and cannot comment on that.  We

 7    are concerned, and we were concerned even before some of the

 8    more recent disclosures have occurred, that the withdrawal does

 9    not prejudice plaintiffs nor unnecessarily interfere with the

10    progress on compliance, things they they've been intermittently   15:08:15

11    involved in, including the setting up of the training that Your

12    Honor mentioned, thereby continued need for some input,

13    probably, on the supervisory training that has not yet begun

14    and that defendants have to provide the initial template for,

15    and certainly some of the lessons that's gone on there will be     15:08:15

16    helpful on that, and, of course, the other matters today.  We

17    did want to make that clear for the record.

18         In addition, it is obviously very troubling to hear

19    about the new disclosures and, of course, not knowing how many

20    other disclosures will be coming out in the future.  It's         15:08:16

21    something that obviously cannot be dealt with in a piecemeal

22    manner, and so we appreciate the Court's taking greater

23    interest and control as it has all the way through in this,

24    because there is, obviously, a human tendency on all of us to

25    not disclose actions that, at a minimum, demonstrate a failure     15:08:16

1  to meet clear obligations to this Court and to the plaintiffs

2  in this litigation, and some of which may be illegal under the

3  criminal laws of this state.

4       So we just very much encourage these new disclosures

5  to be folded in, and then the other new ones, to the more          15:08:16

6  comprehensive approach the Court is now seemingly adopting and

7  necessarily adopting, and we find great gaps in what has

8  occurred so far, as I think any reasonable person would in

9  terms of the types of investigations, the failures to properly

10 investigate that have gone on so far based on the publicly         15:08:16

11 available materials that we have seen, so we very much

12 appreciate the Court's involvement, necessary involvement at

13 this time.

14      THE COURT:  All right.  Thank you.  Mr. Pochoda, I

15 do -- well, did you want to speak again, Mr. Casey?               15:08:16

16      MR. CASEY:  Briefly on one issue I think is important.

17      For plaintiffs' counsel, thank you for their remarks,

18 but in my notice to the Court, and I put it on the record here

19 again, is the new materials that came up that were found, as

20 unpleasant as it is to find new things, when it happens, the      15:08:16

21 MCSO is absolutely committed to full and prompt disclosure.

22      And I realize we have to prove that to the Court, but

23 it is committed to that.  I hope there's not a lot, but if

24 there is, they're going to learn about it, and I have -- the

25 plaintiffs will have the ability, not just for Tim Casey, but     15:08:16

1    there is nothing that's in there that's privileged, to be able

2    to look at ID cards, look at videos, and do that independently.

3    So even though I will do that, they have the ability to also do

4    that, and the MCSO was prepared to do that.

5           So they don't have to just rely on my client or                    15:08:16

6    counsel or my successor counsel.  If things come up in the

7    future, to the extent that there is not some administrative

8    issue it will be disclosed, made available, not copies, but

9    made available.  So ironically, one thing I did forget to

10   mention is during the review, the Court may recall that we had         15:08:16

11   some issues earlier in the litigation years ago over stat

12   sheets.

13          THE COURT:  Yes.

14          MR. CASEY:  I found some stat sheets from individual

15   officers, so not -- maybe 30 or 40 of them, dated January 9th          15:08:16

16   and 10th.  And I didn't look back at the year, but I wanted to

17   share that there -- there's no hiding these things.  They're

18   open and the plaintiffs can look at it and I hope they reach

19   whatever conclusion they reach.  But quite frankly -- well, I'm

20   not able to determine what impact they have on their case, but,        15:08:16

21   in any event, it will be available for them.

22          THE COURT:  All right.  Thank you.

23          Mr. Casey, with the caveats that I have indicated on

24   the record, your application, Mr. Williams' application, your

25   law firm's application to withdraw is granted.                          15:08:16

 1            Mr. Liddy, you're lead counsel and we are going to

 2   proceed apace.

 3            Mr. Montgomery, if you're going to engage other

 4   counsel, know that we are proceeding apace and take that into

 5   your evaluation.                                              15:08:16

 6            Do we still need to proceed under seal with respect to

 7   anything?

 8            MR. POCHODA:  I can speak for plaintiffs, Your Honor.

 9   We're happy to rest on our written submissions.

10            MR. CASEY:  One moment, Your Honor.  I apologize.     15:08:16

11            (Pause in proceedings.)

12            MR. CASEY:  Your Honor, may we -- I apologize.  This

13   is your note.  Your Honor, I'm going to request that we alert

14   the Court to a matter, but under seal or closed regarding what

15   I think you may have referred to earlier as the Korean stop.   15:08:16

16            THE COURT:  All right.

17            MR. CASEY:  Your Honor, before we close, the county

18   attorney would like the Court to know that he's already

19   selected counsel to be lead counsel in this litigation but did

20   not name her pending whether or not you -- how you were going  15:08:16

21   to rule on the motion.

22            THE COURT:  All right.  Do you want to name her now?

23   Is she here?  You may.

24            MR. MONTGOMERY:  Good afternoon, Your Honor.

25            THE COURT:  Good afternoon.                           15:08:16

1      MR. MONTGOMERY:  We'd already selected successor

2   counsel.  It's Michele Iafrate, who has consented to be

3   appointed and take over as lead counsel in this matter.  And at

4   my direction, both she and Mr. Casey had already begun

5   communicating for that transition.  The only reason I held off          15:08:16

6   on doing anything was out of deference to the Court and the

7   fact that you had set this hearing.  Pending your

8   determination, we were going to move forward from there.

9      THE COURT:  All right.  Thank you.

10     Ms. Iafrate has been in this court before and she          15:08:16

11  knows how to enter an appearance, and so as soon as you've

12  taken care of that I'll expect that she'll do so.

13     MR. MONTGOMERY:  Yes, Your Honor.

14     THE COURT:  Thank you.  What I propose to do is give

15  my court reporter a break and take a break and we will clear          15:08:16

16  the courtroom, and then I'll take what -- what else you have to

17  disclose under seal.  Thank you.

18     MR. CASEY:  Thank you.

19     (Recess taken.)

20     (Page 65, line 20, through page 77, line 15, are filed

21  under separate cover and are sealed by order the Court.)

22

23

24

25

1

2                          C E R T I F I C A T E

3

4

5

6

7            I, GARY MOLL, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15

16

17           DATED at Phoenix, Arizona, this 25th day of November,

18    2014.

19

20

21                          _____s/Gary Moll_____

22

23

24

25