# SECOND QUARTERLY REPORT

## Independent Monitor

## For the

## Maricopa County Sheriff's Office



Robert S. Warshaw

Independent Monitor

December 15, 2014

**Table of Contents**

**Section 1: Introduction to the Second Quarterly Report** ........................................................ **3**

**Section 2: Executive Summary** ........................................................................................ **4**

**Section 3: Synopsis of Sections** ....................................................................................... **6**

**Section 4: Implementation Unit Creation and Documentation Requests** .............................. **8**

**Section 5: Policies and Procedures** .................................................................................. **10**

**Section 6: Pre-Planned Operations** ................................................................................ **20**

**Section 7: Training** ....................................................................................................... **23**

**Section 8: Traffic Stop Documentation and Data Collection** ............................................. **32**

**Section 9: Early Identification System (EIS)** ................................................................... **50**

**Section 10: Supervision and Evaluation of Officer Performance** ....................................... **59**

**Section 11: Misconduct and Complaints** .......................................................................... **72**

**Section 12: Community Engagement** ............................................................................... **76**

**Section 13: Concluding Remarks** .................................................................................... **82**

## Section 1: Introduction to the *Second Quarterly Report*

This is the Monitor's ***Second Quarterly Report*** that measures the Maricopa County Sheriff's Office's compliance with the Court's ***"Supplemental Permanent Injunction/Judgment Order"*** of October 2, 2013. While the report cites several instances of progress by the MCSO, it is clear that there is still significant work to be done, and both the agency and the general community should have legitimate cause for concern. Further, there have been other publicly noted events, such as the adequacy of MCSO's internal investigations that while not the subjects of this report are nonetheless issues that define the serious challenges ahead.

One of the more significant ramifications of the Court Order was the creation of a process by which the Maricopa County Sheriff's Office could reconnect with all of the residents of Maricopa County.  In the original Findings of Fact and Conclusions of Law (Document 579) the Court reviewed the actions of MCSO with regard to several "large-scale patrols" that targeted specific locations where day-laborers routinely gathered, or areas of the County where there was a large concentration of Latino residents.  Guadalupe was the site of the fourth large-scale saturation patrol conducted by MCSO as noted by the Court (pp. 53-55).  Although this operation occurred over six years ago (April 3-4, 2008), the resentment of the residents toward MCSO was palpable at the Community meeting conducted by the Monitor on September 24, 2014 at Frank Elementary School in Guadalupe, AZ.  The purposes for holding a major Community meeting in Guadalupe were straightforward; first, to engage a portion of the community that was most affected by the actions of MCSO operations that led to the intervention by the Court; second, to enlist the support of the community in the healing process as MCSO works to change its policies and practices that disrupted this particular community for two days in 2008 but which have also stigmatized the residents since that time[1]; third, to allow the residents to voice their concerns over what occurred during this operation, and, more importantly, to set the stage for what their expectations of the future are with regard to interactions with MCSO; and, finally, to allow select MCSO personnel to have an open dialogue with community members.

What remained apparent from the interchange between MCSO personnel and community members was that the former wanted to focus on moving forward while the latter clearly believed that moving forward meant acknowledging the mistakes of the past.  Several citizen speakers directly asked for an apology from the MCSO personnel present and Sheriff Arpaio, in particular, while several others wanted recognition of what they perceive to be harassment and illegal practices of MCSO that they believe continue to exist to this day.  Another theme present

---

[1] Critics of Arpaio, at the time of these raids, point to the fact that none of the communities in which these special operations were conducted actually gave permission for Sheriff Arpaio's operations as they interpreted was necessary given the language of the agreement between MCSO and Federal Authorities (Arizona Republic, April 25th, 2008 "Critics claim Joe Arpaio's crime sweeps violate rights of cities"; New York Times, July 21, 2012, "In Arpaio's Arizona, They Fought Back"; The Associated Press, April 26, 2008 "Arizona Sheriff defends illegal-immigrant sweeps".

throughout the meeting was the belief by community members that sheriff's deputies never received adequate training in cultural sensitivity.  While two representatives of MCSO addressed the cultural training that current MCSO staff receive, another citizen, who also is a professor from South Mountain Community College, resident of Guadalupe, and an arrestee of MCSO, noted that she has developed a curriculum of culturally relevant material that she has successfully taught for several years, and, in fact, has offered to make available to MCSO on numerous occasions; none of which has been accepted.  This meeting was a perfect example of the continuing tension between minority communities in Maricopa County and the Sheriff's Office.  It is also emblematic of the disconnect highlighted in the first quarterly report to the Court.

While policies and practices of MCSO are being improved as a result of the Court's intervention, there is little that can alter the culture within MCSO without the support and motivation of all administrators of that organization.  Unfortunately, the top Administrator seized the opportunity presented by this community meeting to divide rather than unite.  In a statement to the Associated Press, prior to the community meeting held in Guadalupe, the Sheriff said he had no regrets about his Department's actions in that city and," With the same circumstances, I'd do it all over again ."[2]  While his attorneys acknowledged the statement of the Sheriff, they also indicated that he has a First Amendment right to speak his mind.  This goes without question; however, it also sends a signal to the employees of MCSO and the community about the attitudes that prevail in the hierarchy of the Sheriff's Office.

**Section 2: Executive Summary**

There has been a tremendous amount of activity during this reporting period – July 1 to September 30, 2014 – surrounding significant policy finalizations, the onset of training to these policies, and two Community meetings that showed just how important the issues contained within the Court Order are to the citizens of Maricopa County, as well as many personnel working within the Sheriff's Office.  Since our first site visit in March to the most current one in September, we have seen a shuffling of personnel and the movement and creation of Units that we believe bodes well for the future progress of achieving compliance with the Court Order.  This will not be an easy task, but we recognize the ambition and determination of key individuals particularly within the Court Compliance and Implementation Division and the new Bureau of Internal Oversight.  In addition, we met many motivated and professional Deputies and Supervisors in our visits to the Patrol Districts.  MCSO asserts that each of these Districts now

---

[2] http://www.washingtontimes.com/news/2014/oct/28/hearing-to-focus-on-investigations-of-ex-officer/?page=all
This article, and the one to follow, refers to the Court hearing held on Tuesday, October 28th, 2014.
http://www.azcentral.com/story/news/local/phoenix/2014/10/28/judge-blasts-arpaio-office/18096347/ . While this article reports that Sheriff Arpaio has completed training required by the Court as a result of his statements preceding the Guadalupe Community meeting
http://www.azcentral.com/story/news/politics/immigration/2014/11/09/arpaio-gets-training-as-part-of-profiling-case/18758739/.

meets the 1/12 ratio of supervisors to deputies.  While we need to independently verify this claim, it represents a positive step in fostering accountability at the line level.  Additionally, the Captains, Lieutenants and Sergeants seemed engaged and well versed in the requirements of the Order.  This is a testament to MCSO's implementation of the Court's Corrective Notice Order, issued in April, 2014.  Supervisors interviewed were also well versed in the citizen complaint process.  This is likely due to the initiative of a Chief Deputy who consulted with the Professional Standards Bureau to put together an instructional package for Sergeants on how to conduct investigations of citizen complaints.

We are also heartened by the finalization of several significant policies during this reporting period, from the basic Code of Conduct to the more specific Preventing Racial And Other Biased-Based Profiling, as well as Traffic Enforcement and Data Collection policies.  The finalization of each of these represents a significant step forward.  What follows is the more difficult endeavor of training personnel to these policies and ensuring that each person connected with the operation of the Sheriff's Department uses these policies to guide their interactions with community members moving forward.  Of their own initiative, MCSO has required that deputies taking the test following the Court Ordered Fourth and Fourteenth Amendment training must pass the post-training exam with a perfect score.  Such a standard is not required by the Court Order or Arizona Police Officer Standards and Training.  Our concern, of course, is that such a standard may negatively impact the learning environment and will provide little useful information about what needs to be modified in the future training of officers.

Even with the success of final approval of several critical policies, MCSO must not grow complacent, as there remains several significant policies that have not been finalized.  Among them is the policy governing the Early Intervention System (EIS).  We have significant concerns regarding the software solution MCSO has chosen, which does not allow first line supervisors to access the risk management data of their employees without going through a "middle person".  This defeats one of the basics tenets of a risk management database, which is to provide immediate feedback to supervisors at any time of the day.  MCSO has not yet identified an acceptable alternative.

MCSO, after considerable input from the Monitor and the Plaintiffs is now in the process of acquiring "on-body" or personally worn cameras instead of the in-car cameras required by the Order.  We advocated for this more versatile recording format based on our experiences with other agencies that have initiated such programs. While discussions began during this review period, the parties agreed to and the Court approved a stipulation after September 30.  We will comment on progress achieved in our next report.

MCSO has also made substantial improvement in the quality of data reported in TraCs, as noted in the discussion of sample data provided for Paragraph 54, among others.  In addition, the protocols for audits have now been memorialized by the EIU and can stand as the foundation for improvement in the future.  We remain concerned, however, that the audits and measures employed up to this time do not thoroughly delve into the underlying issues which may be

indicative of "biased" policing.  Although MCSO has conducted over a dozen of these internal inspections/audits, we believe the analysis done to this point is more akin to bookkeeping attempting to identify potential issues.  That being said, MCSO has progressed significantly from their earlier capabilities, and we look forward to working with the personnel assigned to the newly created Bureau of Internal Oversight (BIO) to increase their capacities in this area.

The feedback from personnel working in the Districts has been extremely encouraging.  The manner in which they have embraced their new training, regardless of what brought them to this point, demonstrates the resilience of the line officers who are seeking a way to improve their level of professionalism.  However, our interviews continue to reveal a disconnect between policy "writers" and "practitioners".  We will continue to work with MCSO in closing that gap.

Finally, MCSO has repeatedly taken the position that they no longer have units which enforce immigration related laws.  While this may be true, we cannot simply accept this assertion without some form of verification.  We have requested enforcement documentation from the commanding officers responsible for the Special Investigations Division in order to assist us in making our determination.

## Section 3: Synopsis of Sections

The purpose of this short Section is to provide a summary of each of the Sections to follow.  This summary will by no means capture every important aspect of the Sections, but will provide the reader with information that may guide their examination of the material.

- Section 4:The Court Compliance and Implementation Division (CCID) remains a critical conduit of change, information, creativity and responsibility.  As this Unit has evolved we have found their responsiveness to our requests to be beyond reproach.  We remain significantly involved in policy development but have also added the dimension of data requests to fulfill additional aspects of the Court Order.  CCID has coordinated the response to these requests in a timely fashion.   Additionally, CCID has produced their 3rd Quarter Report for 2014, dated November 6, 2014, in a time sufficient for our review process.

- Section 5:  MCSO has worked in conjunction with the Monitor and Plaintiff's Attorneys to incorporate requirements of the Court Order into several key policies involving Bias-Free Policing, Code of Conduct, and Traffic Enforcement.  Much more policy work and training remain to be done but there is also much that has already been accomplished.

- Section 6:  This section covers Pre-Planned Operations.   During this period MCSO has finalized and distributed the Significant Operations Policy GJ-33.  The Protocols, Planning Checklist, Supervisor Daily Checklists and inclusion of the notification of Plaintiffs have also been finalized.  The training associated with these policy issues is ongoing.

- Section 7: Training of personnel is one of the most important aspects of any law enforcement organization.  Through collaborative efforts of the Parties, training in Bias Free Policing and Detentions, Arrests, Immigration Related Laws has successfully commenced. Issues remain with regard to Supervisory training but a dialogue continues between the Plaintiffs, the Defendants and the Monitoring Team.

- Section 8: Four significant policies on Traffic Stops, Biased-Free Policing and Data Collection went through several revisions before being approved in September of 2014.  In addition, MCSO in collaboration with Plaintiffs and Monitoring Team, created forms to capture the necessary information to conduct useful analyses pertinent to the Court's Order.  While the data provided by MCSO has been useful in determining whether individual officers are appropriately filling out these forms, there remains a significant issue regarding whether the measures collected can be used to insure that biased-free policing can be proven in both a statistical and in a relevant operational way.  All parties continue to pursue these issues in a collaborative manner.

- Section 9: The physical aspects of the Early Identification System (EIS) have been developing well during this review period.  In addition MCSO has completed and received comments on a draft EIS policy.  Several issues remain regarding specific definitions, what detail should exist in the policy, who will participate in data entry and who will have access to the system data to make it most useful for both organizational transparency and accountability.   Many of these issues will be revisited during upcoming site visits.

- Section 10:  Supervision and Evaluation of Officer Performance is another area of great importance in law enforcement.  Several critical issues remain regarding both supervisory policies and practices.  As a result, training for supervisors is incomplete.  Moreover, as mentioned in Section 9, first line supervisors do not have access to all aspects of information collected by MCSO with regard to the deputies that they supervise.  All parties continue to work toward a consensus in the areas of concern.

- Section 11: Communities must have faith that organizations designated to uphold the law actually abide by the law.  Therefore, an organization must develop the highest standards of checks and balances to correct officer misconduct.   During this review period several significant policies have been finalized.  It is now imperative that every necessary individual connected with MCSO receive the proper training.  There are additional policies that must be developed, and practices that must be put into place, for both the organization and the community to be assured that MCSO is holding its personnel to the highest standards of law enforcement.

- Section 12: Two community outreach events were held during this review period.  The purpose of these events is to inform community members of the many changes happening within MCSO to better provide the services they expect as well as to allow community

members the opportunity to voice support or criticism within a safe forum. No law enforcement agency can successfully accomplish its goals without a thoughtful, supportive and engaged community.  The responsibility for Community Engagement has been transferred to the Monitor; however, key members of the MCSO's leadership and Court Compliance and Implementation Division have participated at each of these events.

**Section 4: Implementation Unit Creation and Documentation Requests**

**COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (***court order wording in italics***)**

*Paragraph 9. Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

Shortly after the issuance of the Order, MCSO created an Implementation Unit.  At the beginning of our tenure, the Unit was staffed with a Captain, two Lieutenants, and two Sergeants.  As mentioned in our last report, the Unit has undergone some transition and continues to do so.  The driving force behind most of the change has been the promotions of incumbents, resulting in their transfers.  The original Lieutenants are now Captains.  One assumed command of the Court Compliance and Implementation Division (CCID), formerly the Implementation Unit.  He continues to do a remarkable job, and he and his staff are always responsive to all of our requests.  The other has a command assignment in a District.  Both of the original sergeants have been promoted, but one remains involved in the process by virtue of his work in the newly created Bureau of Internal Oversight.  The Division is well supported by two MCAO attorneys, who frequently participate in our meetings and phone calls with Division Personnel.

*Paragraph 10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

As mentioned above, CCID has always been responsive to our requests. In many instances, we have asked for material that has not been routinely collected – or even generated – by MCSO. In this respect, our first few months have served as a learning curve for CCID and our team regarding what may be available and the best ways to produce it. Our first inquiries focused on policies more than data. As progress on policies moved forward, as outlined in this report, our requests have become more data driven. We continue to work with MCSO on what constitutes appropriate compliance assessment data – a process that will continue for the next review period or two until we and MCSO are comfortable with the data requests.

*Paragraph 11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

MCSO filed its Third Quarter Report for 2014 as required by this Paragraph on November 6, 2014. MCSO's report covers the period from July 1, 2014-September 30, 2014.

Their report was divided into three Parts. Part I of this document provides a summary of MCSO's major efforts toward compliance to date. Part II, in narrative format, describes the specific steps taken by MCSO during this reporting period to implement the Court Order as well as their strategy to achieve full compliance with the Court Order. Part III provides responses to the concerns raised in the Monitor's previous Quarterly Report.

Some key points highlighted in MCSO's report include the creation of a Bureau of Internal Oversight (BIO) that incorporates the Court Compliance and Implementation Division (CCID), and the Early Intervention Unit (EIU), which also added key personnel. In addition, MCSO finalized several important policies, along with the creation of numerous Briefing Boards. They also report the beginning of training to the Bias-Free Policing policy. In order to provide better supervision of Deputies, MCSO has also promoted seventeen individuals to the Sergeant level and assert that they have met the 1:12 ratio specified by the Court Order. Finally, MCSO reports that they conducted twenty-eight inspection/audits in total since February, and they have participated in all Community Meetings held by the Monitor.

MCSO submitted its status report in a timely manner, and is compliance with this Paragraph.

*Paragraph 12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies*

*and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

*Paragraph 13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

MCSO submitted its first internal assessment on April 7, 2014.  The 11-page document outlined MCSO's efforts to date to comply with the Order's requirements, and discussed Patrol Operations, Written Policies and Procedures, Training, Supervisor Review, Intake and Investigation of Civilian Complaints, Discipline of Officers, Community Relations, and Miscellaneous Procedures.  We found the document to be informative and a very good summary of the state of play as we were beginning our tenure.  All of these areas have been topics of our meetings, discussions and correspondence with CCID personnel and other MCSO staff.  MCSO's and the Monitor's responsibilities in some of these areas have been modified by Court Order.  MCSO did not assert Full and Effective Compliance with the Order in this assessment.  We are working with CCID to identify the due dates for this and other annual responsibilities identified in the Order.

**Section 5: Policies and Procedures**

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."   MCSO has conducted a comprehensive review of its Patrol Operations Policies and Procedures in three phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, and most importantly, MCSO, in response to our requests, provided all of the policies and procedures it believes are applicable to the Order for our review and that of the Plaintiffs.  MCSO received our feedback on these policies, which also included the Plaintiffs comments, on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on those policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.  Many policies unrelated to the training remain in development.  Once policies are approved and promulgated, our focus will shift to assessing MCSO's compliance with its own policies as they relate to the Order's requirements.

*Paragraph 20. The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures*

### a. Policies and Procedures to Ensure Bias-Free Policing

*Paragraph 21. The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

*a.       define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

*b.       prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

*c.       prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

*d.       specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

*e.       include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and*

*oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

During this review period, MCSO has addressed the policy deficiencies noted in the Monitor's first report and has finalized and published policies, including CP-2 Code of Conduct (September 5, 2014), CP-8 Preventing Racial and Other Bias Based Profiling (September 5, 2014), EA-5 Communications (September 5, 2014), EA-11 Arrest Procedures (September 5, 2014), EB-1 Traffic Enforcement, Violators Contacts and Citation Issuance (September 22, 2014), EB-2 Traffic Stop Data (September 22, 2014), and GJ-33 Significant Operations (September 5, 2014), all of which contain the appropriate policy direction related to this Paragraph. These policies have been distributed to Department personnel and are being specifically trained to during the required Fourth and Fourteenth Amendment training currently underway for sworn personnel and Posse members.  Specific references to areas of required compliance in this section have been personally observed by the Monitoring Team during observations of training.

Until the training is completed, MCSO is not in compliance with Paragraph 21.

*Paragraph 22. MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

MCSO Policy CP-8 Preventing Racial and Other Biased-Based Profiling and EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance have been approved, finalized, distributed and are being trained to in the currently ongoing MCSO Fourth and Fourteenth Amendment Training for sworn personnel and Posse members. The training has not been completed and MCSO has provided no specific plan as to how they will "unequivocally and consistently" reinforce this information in the future.

MCSO is not in compliance with Paragraph 22.

*Paragraph 23. Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

On September 5, 2014 MCSO Policy CP-2 was published and has been distributed.  It is being specifically trained to in the ongoing Fourth and Fourteenth Amendment training currently in progress for sworn personnel and posse members.  Discussion has also taken place with MCSO CCID personnel regarding the potential to conduct random e-mail audits to show compliance in the future, but no such process has yet been implemented.

MCSO is not in compliance with Paragraph 23.

*Paragraph 24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

MCSO policy EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance was finalized and published on September 22, 2014.  It is being specifically trained to during the ongoing Fourth and Fourteenth Amendment training currently underway for sworn personnel and posse members.

Until the training is completed, MCSO is not in compliance with Paragraph 24.

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

*Paragraph 25. The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

*a.        prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

*b.        provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

*c.        prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

*d.        prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

*e.        prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

*f.        require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

*g.        prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;*

*i.        provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

*j.*      *Instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

We reviewed the approved policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), dated September 22, 2014; EB-2 (Traffic Stop Data Collection), dated September 22, 2014; EA-5 (Enforcement Communications), dated September 5, 2014; and CP-8 (Preventing Racial and other Bias-Based Policing), dated September 5, 2014.  In our policy feedback, we required that the definition of racial profiling be consistent throughout all policies where it is included, and that it mirror the definition provided in the Order.  MCSO made the requested policy changes in each of the affected documents that we then reviewed and approved.

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.

The required policies are being specifically trained to during the ongoing Fourth and Fourteenth Amendment training currently underway for sworn personnel and posse members.

Until the training is completed, MCSO is not in compliance with Paragraph 25.

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

*Paragraph 26. The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*
*a.      require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*
*b.      require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*
*c.      provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest; d. require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*
*e. prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*
*f. Prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

During this review period MCSO has finalized and published policies EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance on September 22, 2014 and EA-11 Arrest Procedures on September 5, 2014. Both contain the appropriate policy direction related to this Paragraph. These policies have been distributed to Department personnel and are being specifically trained to during the required Fourth and Fourteenth Amendment training currently underway for sworn personnel of the Department and Posse members.  Specific references to areas of required compliance in this section have been personally observed by the Monitoring Team during observations of training.

MCSO's Court Compliance and Implementation Division conducted a database search of all calls that could be potentially related to their criteria for "immigration related enforcement" (misconduct involving weapons, forgery, and human smuggling).  They determined through their search that there were no cases that would qualify under these crimes for the reporting period of July 1, 2014 – Sept. 30, 2014 and provided memorandum documentation. They further determined that no arrests were made where a vehicle passenger was arrested for any crime relative to a lack of identity document.  While not specified in the requirements of this paragraph, MCSO did provide documentation that there were arrests of vehicle "drivers" for lack of an identity document during this reporting period.  In a review of the 15 cases provided by MCSO where vehicle "drivers" were arrested/cited for lack of identity documents (driver licenses), all were traffic related stops and none appeared to be related to immigration enforcement.  A review of the 15 stops showed that all stops were all made for legitimate traffic violations.  The violators were all cited or booked for the original violation and additional violations, including no driver's license, suspended or revoked driver's license, refusal to produce a driver's license or driver's license not in possession.  In all cases none of the required boxes for immigration status check, delay for immigration violation, or ICE contact were checked in the affirmative. In eleven of the cases the involved deputy failed to notify a supervisor of the lack of identity investigation or arrest.  All were stops for traffic violations and all those noted have been forwarded to the chain of command to ensure supervisors advise deputies to notify them of these types of investigations and that the supervisor notification is contained in the deputies incident report.

Until the completion of the required training, MCSO is not in compliance with Paragraph 26.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27. The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

MCSO has provided the finalized policy for EA-11 (Arrest Procedures), Investigations Division Operations Manual and the former "HSU" Operations Manual.  The only reference to a LEAR (Law Enforcement Agency Response) Policy is in the **former** HSU Operations Manual where references are made to a U.S. Immigration and Customs Enforcement (ICE) LEAR Policy.  We

have reviewed the relevant policies and find no reference to an MCSO LEAR Policy.  We have met with MCSO staff and have been told that MCSO has never had a LEAR Policy of its own, though ICE does have one that was referenced in former policies and draft memorandums. These draft memorandums and policy references to the ICE LEAR policy may have contributed to the belief by many MCSO personnel that MCSO did in fact have a LEAR policy.  MCSO needs to ensure that any future references to policies or procedures of other agencies are clearly defined and explained to their personnel.

MCSO is in compliance with Paragraph 27.

*Paragraph 28. The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

*a. specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

*b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

*c. prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

*d. prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

*e. prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

*f. unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

    *g. prohibit Deputies from transporting or delivering an individual to ICE/CBP custody*
      *from a traffic stop unless a request to do so has been voluntarily made by the*
      *individual;*
    *h. Require that, before any questioning as to alienage or immigration status or any*
      *contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the*
      *circumstances justify such an action under MCSO policy and receive approval to*
      *proceed. Officers must also document, in every such case, (a) the reason(s) for making*
      *the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was*
      *received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response*
      *from ICE/CBP, if applicable, and (e) whether the individual was then transferred to*
      *ICE/CBP custody.*

On September 5, 2014, MCSO finalized policies CP-8, Preventing Racial and Other Biased Based Profiling, and EA-11 Arrest Procedures.EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance was finalized on September 22, 2014. These policies have been approved, distributed and are being specifically trained to during the mandatory Fourth and Fourteenth Amendment training currently ongoing at MCSO.

The Court Compliance and Implementation Division has provided memorandum information that during this reporting period, no arrests have been made for: misconduct involving weapons, forgery, or human smuggling, that would qualify under this Paragraph.  They have also provided written documentation that no instances of an individual being transported to ICE, or their Officers having contact with ICE occurred during this evaluation period.  They determined this by a search of the Early Identification System for vehicle stop contacts in TRACS.

Until the ongoing training is completed, MCSO is not in compliance with Paragraph 28.

### e. Policies and Procedures Generally

*Paragraph 29. MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

*Paragraph 30. Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

As outlined in our first report, we conducted an extensive review of all policies and procedures offered by MCSO as applicable to the Order.  MCSO submitted policies and procedures to us in three major submissions between April 7 and June 24, 2014.

MCSO was provided with our feedback on the submitted policies on August 12 in a separate document.  The Plaintiffs also provided comments on each of MCSO's policy submissions for both the Monitor's and MCSO's review, pursuant to Section IV of the Order.  Since this initial review process, this same procedure has been followed for each proposed new or updated policy.

*Paragraph 31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

MCSO notifies employees of changes to policies and procedures via its Briefing Board System.  MCSO defines this system as "an official informational publication produced by the Policy Development Section that contains material having the force and effect of Policy."   Prior to some policies being revised, time-sensitive changes are often announced in a Briefing Board, until the entire Policy can be revised and finalized.  We acknowledge the authority of these documents, but we do not, however, consider them a substitute for a formal policy required by the Order.  MCSO disagrees, but the definition of Briefing Boards indicates "Prior to some Policies being revised, time-sensitive changes are often announced in a Briefing Board, *until the entire Policy can be revised and finalized*" (italics added), supporting our position that they are not final versions of a policy.  Their contents may be altered or adjusted in some manner prior to inclusion in a final policy.

Many of MCSO's policies are still in draft form, while others have been approved and are being disseminated and trained to in the ongoing Fourth and Fourteenth Amendment training.  We have advised MCSO that we will accept the training attendance documentation as proof of dissemination and training for these specific policies, but that they still must come up with a system to demonstrate that all affected personnel have received and understand other policies as they are developed.  They are exploring a system called E-Policy, an offshoot of their E-Learning Program, but plans have not yet been finalized or presented to us.

MCSO is not in compliance with this Paragraph.

*Paragraph 32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.*

We previously reviewed policies CP-2 (Code of Conduct), CP-8 (Preventing Racial and other Biased-Based Profiling), GC-17 (Employee Disciplinary Procedure), and GH-2 (Internal Investigations) and rejected them as not comporting with the requirements of this paragraph.

These policies were revised and re-issued effective September 5, 2014.  The requirements of this Paragraph are incorporated in the combination of these policies.   These policies are being distributed to all attendees at the Fourth and Fourteenth Amendment Training, described later in this report.

We requested the list of all internal investigations that were closed during July, August and September 2014.  From the list of 185 cases, we selected 21 where the allegations appeared to be applicable to paragraphs 32 and 33. In those 21 cases, we found four related to Patrol Operations reported violations of policy. One involved a sergeant who filed an internal complaint against a deputy who failed to turn in five reports over a three month period. Three involved policy violations by Posse members.  Of these, two received suspensions and training and one was terminated from the volunteer program.

Until such time as the training is complete, MCSO is not in compliance with Paragraph 32.

*Paragraph 33. MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

MCSO offered policies CP-8 (Preventing Racial and other Biased-Based Profiling) and GC-17 (Employee Disciplinary Procedure) as proofs of compliance.  The requirements of this Paragraph are incorporated in the combination of these policies.  MCSO considers acts of discriminatory policing as Category 6 violations under its Disciplinary Matrix, and the penalties range from a 40-hour suspension to dismissal for a first offense.  Penalties for a second offense range from an 80-hour suspension to dismissal, and dismissal is the mandatory penalty for a third offense. CP-8 and GC-17 were revised and re-issued effective 09-05-2014. These policies are being distributed to all attendees at the Bias Free Policing and Fourth Amendment Training, described later in this report.

From the 21 investigations referred to in paragraph 32, we found one case where the allegation was a derogatory racial remark made by a custodial officer to a prisoner.  The investigation deemed the allegation to be Not Sustained.

Until such time as the Fourth and Fourteenth Amendment Training is complete, MCSO is not in compliance with Paragraph 33.

*Paragraph 34. MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."   As mentioned above, throughout the first few months of our tenure, MCSO has been reviewing its policies in response to Order requirements and our document requests.  Many of their policies have been adjusted based on our feedback and that of the Plaintiffs.  Several have been issued to sworn personnel and posse members in conjunction with the ongoing Fourth and Fourteenth Amendment Training.  We expect that MCSO will document its policy review activities in accord with this paragraph at the end of this calendar year.

**Section 6: Pre-Planned Operations**

Members of the Monitoring Team held a meeting on pre-planned operations with two Deputy Chiefs and CCID staff on March 25th, 2014.  The Deputy Chiefs noted that the last operation conducted by MCSO was on October 18-19, 2013, in response to the killing of a detention officer in front of his house.  Moreover, they stated that MCSO had been conducting crime suppression operations, not immigration operations.  MCSO personnel have alleged that the last time they had conducted immigration operations was in 2007-2008, as they were enforcing SB 1070[3].

We advised MCSO that we would not consider multi-agency operations during which they simply assisted and were not the host or the initiator to be pre-planned operations for the purposes of the Order.  The Monitoring team did express concern over operations that MCSO refers to as identity theft operations. These appear to be raids of work places seeking those that may be using someone else's social security number in order to be able to work.  MCSO was informed that we would like to be made aware of these operations when they take place.

MCSO was advised to notify the Monitor, as well as the two Deputy Monitors, of any upcoming Significant Operation via email, and by a phone call, to insure a prompt response by monitoring team personnel.   MCSO was asked to provide the Monitor with a submitted plan, as well as the name and contact information of the on-scene commanding officer of any scheduled operation.

The following Paragraph responses provide more detail with regard to particular aspects of the Court Order for Pre-Planned or Significant Operations.

**COURT ORDER VI. PRE-PLANNED OPERATIONS**

*Paragraph 35. The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

---

[3]SB 1070 was not enacted until 2010.

MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws.  The Special Investigation Division (SID) Operational Manual identifies eleven different units, none of which appear to be directly involved in enforcing immigration laws.  During discussions with the Court Compliance and Implementation Division (CCID) and attorneys from the Maricopa County Attorney's Office (MCAO), we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination could be made as to which units, if any, enforce these laws as one of their core missions.

During this evaluation period, MCSO has articulated that the three criminal violations they believe qualify as potentially immigration related include, human smuggling, forgery, and misconduct with weapons, since immigration status is an element of these offenses.  We have requested the monthly arrest and enforcement statistics for the months March – August 2014 for the Units assigned to SID, as well as all arrests for the identified immigration related crimes.  We also requested any documentation that outlines the core mission of the various SID Units.  Until such time as MCSO provides the requested documentation, they are not in compliance with Paragraph 35.

*Paragraph 36. The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

On September 5, 2014 MCSO finalized and distributed the Significant Operations Policy GJ-33. The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized. The policy (GJ-33) is being specifically trained to during the ongoing Fourth and Fourteenth Amendment training currently underway for sworn personnel and posse members. During this review period, MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor.  Until such time as the training is completed, MCSO is not in compliance with this paragraph.

*Paragraph 37. The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

On September 5, 2014 MCSO finalized and distributed the Significant Operations Policy GJ-33. The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized.

The policy (GJ-33) is being specifically trained to during the ongoing Fourth and Fourteenth Amendment training currently underway for sworn personnel and posse members.MCSO has not conducted any Significant Operations or Patrols that required notification to the Monitor during this review period.  Until such time as the training is completed, MCSO is not in compliance with this paragraph.

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within ~~30~~<u>10</u> days after the operation:*
*a. documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*
*b. information that triggered the operation and/or selection of the particular site for the operation;*
*c. documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*
*d. documentation of command staff review and approval of the operation and operations plans;*
*e. a listing of specific operational objectives for the patrol;*
*f. documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*
*g. any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*
*h. a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*
*i. arrest lists, officer participation logs and records for the patrol; and*
*j. data about each contact made during the operation, including whether it resulted in a citation or arrest.*

During this review period, MCSO finalized and distributed the Significant Operations Policy GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized.  The policy (GJ-33) is being specifically trained to during the ongoing Fourth and Fourteenth Amendment training currently underway for sworn personnel and posse members. During this review period, MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor.  Until such time as the training is completed, MCSO is not in compliance with this paragraph.

(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)

*Paragraph 39. The ~~MCSO~~ Monitor shall hold a community outreach meeting no more than ~~30~~ 40 days after any Significant Operations or Patrols in the affected District(s). ~~MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol~~ The Monitor shall communicate the operational details provided to it by the MCSO and shall hear any complaints or concerns raised by community members.  The Monitor may investigate and respond to those concerns.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

The Court has amended the original Order to move responsibility for Community Outreach to the Monitor.  This section no longer applies to the activities of MCSO.

During the review period, MCSO has not conducted any Significant Operations or Patrols that required follow-up.

*Paragraph 40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

The Significant Operations Protocol has been modified to include Section 7 that requires notification to the Plaintiffs as required.  MCSO did not conduct any significant operations during this reporting period that required notification under the Order.  Until such time as the Fourth and Fourteenth Amendment Training is completed, MCSO is not in compliance with this paragraph.

**Section 7: Training**

**VII. TRAINING**

*a. General Provisions*
*Paragraph 41. To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

The initial drafts of the curricula for the Order-required training were deficient.  MCSO and their Counsel have been involved in an ongoing dialogue with the representatives of the Plaintiffs and the Monitoring Team to develop training programs for employees and posse members.  During the Review Period, significant progress was made in the development of curricula required by this Order.  Further detail is provided in the following Paragraph responses.

*Paragraph 42. The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

We have reviewed the proposed list of instructors agreed upon by the attorneys for the Defendants and the attorneys for the Plaintiffs and have determined that they have qualifications which are compliant with the requirements of Paragraph 42.  The final joint selection of qualified instructors to deliver Bias Free Policing; and Detentions, Arrests, Immigration Related Laws training was completed in August 2014.   In response to an objection raised by the Plaintiffs, one of the Defendant's instructors was disqualified based upon his conflict of interest in serving as an expert witness for MCSO in the United States v. Maricopa County case.

The selection and hiring of instructors to provide Supervisor Specific Training has not begun during this review period. While the process to select instructors for the Fourth and Fourteenth Amendment Training was cooperative and successful, MCSO is not in compliance with this Paragraph.

*Paragraph 43. The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

Beginning September 8, 2014, MCSO began delivery of the Order mandated Bias Free Policing and Detentions, Arrests, Immigration Related Laws training, utilizing 100% live training (i.e., with a live instructor). This training was observed by members of the Monitoring Team on an announced and unannounced basis. Students were assigned to the training by their respective supervisors and were required to sign into and out of the training sessions on Training Division provided Sign-In Rosters. Students were provided additional reference materials to include copies of PowerPoint presentations and MCSO policies GH-2 Internal Investigations, GC-17 Employee Disciplinary Procedures, GJ-33 Significant Operations, CP-8 Preventing Racial and Other Biased- Based Profiling, EA-5 Enforcement Communications, and CP-2 Code of Conduct. There were several additional policies referenced in the training curriculum that have not been finalized and approved, and therefore were not provided to students.  Documents relative to the Melendres Case, such as the Court's Findings of Fact and Conclusions of Law, the Court's Supplemental Permanent Injunction of October 2, 2013, and the April 17, 2014 Corrective Statement summary are all available to the students on the E-Learning system. Each student is

required to access the E-Learning system within 5 days to take the testing portion of the training program. The students are provided with a Course Assessment at the end of the training program, requesting feedback relative to the instructors and course content on a rating scale of 1-5, along with four additional questions soliciting specific feedback.

The final MCSO Training Schedule was provided to the Monitor for review, and documented training sessions beginning September 8, 2014 and are scheduled to continue at least through December 6, 2014. The lesson plans for Detentions, Arrests and Immigration-Related Laws, and for Bias-Free Policing were previously reviewed by the attorneys for the Defendants, the attorneys for the Plaintiffs, and the Monitoring Team.

MCSO has implemented a post training testing requirement for the Bias Free Policing and Detentions, Arrests, Immigration Related Laws training, that each Deputy must attain a minimum passing score of 100% in order to receive credit for the Order mandated training. However, each Deputy is allowed up to 5 attempts to achieve this score.  This training is delivered in a classroom setting with a live instructor. MCSO cites this 100% requirement to be a mandate of the Arizona Peace Officers Standards and Training Board. MCSO would be accurate in the application of this requirement if the training had been delivered through an on-line platform or an e-learning system, which would then be required to contain an assessment model wherein there would be a 100% score on each assessment. However, Arizona Peace Officers Standards and Training Board has informed us that there is no learning assessment requirement for in-person continuing training sessions. MCSO may wish to revisit this 100% testing policy in order to create an avenue to enhance the growth and improvement to the organizational training program by increasing the ability to conduct a thorough reassessment of several critical areas of the training. The first critical area would be the testing tool itself, the second the curriculum as developed, the third the delivery by the instructor, and the fourth an accurate level of personal achievement by the Deputy. This process would assist in achieving compliance with paragraph 47 of this Order.

As of the date of this reporting period, the lesson plan for Supervisor Responsibilities-Effective Law Enforcement is pending review by the Parties' attorneys and the Monitoring Team. MCSO is not in compliance with this paragraph.

*Paragraph 44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

The training for Bias Free Policing and Detentions, Arrests, Immigration Related Laws training began on September 8, 2014 and is scheduled to go through December 6, 2014. Training has been observed on an announced and unannounced basis during the review period ending September 30, 2014. Anticipated issues such as sick time, court scheduled appearances and operational issues have impacted the training schedule and required the scheduling of additional

training sessions. These issues are normal and faced by law enforcement organizations on a daily basis. It is assumed the same issues will continue to impact this schedule until the training is completed.  Additionally, the training of volunteer Posse members continues to have an impact on the training schedule in two ways. MCSO has yet to identify a final and accurate accounting of Posse personnel during this review period.  1250 Posse personnel have been accounted for and are identified on the Posse Reserve Roster and are required to receive the Bias Free Policing and Detentions, Arrests, Immigration Related Laws mandated training. The Master MCSO Sworn Roster indicates a total complement of 676 sworn (compensated) personnel also required to receive the Order mandated training.

As of September 26, 2014 approximately 519 Deputies had been trained in the Bias Free Policing and Detentions, Arrests, Immigration Related Laws training according to provided classroom sign in sheets. The Skills Manager Database report titled the "2014 Required Training Passed", displays a total number of 518 deputies identified by name, badge number, dates of attendance, and group designation. Entry in this database signifies classroom attendance and test completion. Although a discrepancy existed, the discrepancy between Deputies trained and those passing was identified and clarified by the Court Compliance and Implementation Division. One deputy had attended the training on September 10-11, 2014 in Group C. The Deputy then resigned from the Sheriff's Office on September 15, 2014. MCSO currently does not possess the ability to link together the Skills Manager Database, the MCSO Master Sworn Roster, and the Posse Reserve Roster. This inability may possibly hamper an accurate accounting of trained personnel as the volume of training increases as other Order mandates come into compliance, such as EIS and the use of Body Cams.

MCSO is not in compliance with this Paragraph.

*Paragraph 45. The Training may incorporate adult-learning methods that incorporate role-playing scenarios, interactive exercises, as well as traditional lecture formats.*

We were involved in a collaborative review with attorneys for the Plaintiffs and attorneys for the Defendants of Detentions, Arrests and Immigration-Related Laws; Bias-Free Policing; and the initial Supervisor Responsibilities – Effective Law Enforcement curricula.  The Bias-Free Policing and Detentions, Arrests and Immigration-Related Laws curricula are in compliance with the requirements in Paragraph 45. The final approved curriculum incorporated adult-learning methods and included PowerPoint presentations, interactive learning exercises, and lecture.

The Supervisor Responsibilities – Effective Law Enforcement Training requires that MCSO provide training on policies and systems that are not yet developed, such as the Early Identification System.  MCSO requested that they be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that they have the capability to deliver in the near future.  We and the Plaintiffs agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice.  We anticipate that the Parties will engage in a similar curriculum review process for these various components of Supervisor Responsibilities – Effective Law Enforcement training.

MCSO is not in compliance with this paragraph.

*Paragraph 46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

MCSO has provided the curricula for Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws; and Supervisor Responsibilities-Effective Law Enforcement to the Monitor and the Plaintiffs.  These have been jointly reviewed by the Parties, and the Defendants' attorneys have been very receptive to the input from the Plaintiffs' attorneys and the Monitoring Team.  We have reviewed the proposed list of instructors and identified those who are qualified.  While the material was not provided within 90 days of the Effective Date, MCSO is in compliance with this Paragraph.

*Paragraph 47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

Compliance will be determined based upon whether or not MCSO's policy GG-2 (Training Administration) complies with this paragraph and is followed in practice.  MCSO indicates that they have submitted this policy to us, but the Deputy Chief responsible for Training advised us during our most recent site visit that this policy is currently under revision.  MCSO is not in compliance with Paragraph 47.

### b. Bias-Free Policing Training

*Paragraph 48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

As noted above, the Parties have worked collaboratively to finalize the curriculum for Bias-Free Policing.  While the training commenced in September, it was not completed within the review period.   MCSO is not in compliance with the requirements of Paragraph 48.

*Paragraph 49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum: a. definitions of racial profiling and Discriminatory Policing;*
*b.        examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*
*c.        the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.      *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.      *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.      *MCSO policies related to Discriminatory Policing, the enforcement of Immigration- Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.      *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion; h. police and community perspectives related to Discriminatory Policing;*

i.      *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.      *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.      *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.      *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination; m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n. *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o. *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p. *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q. *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r. *Instruction on the data collection protocols and reporting requirements of this Order.*

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the approved lesson plan is being adhered to by the instructors.  Despite this progress, until such time as the training is completed, MCSO is not in compliance with this Paragraph.

***c. Training on Detentions, Arrests, and the Enforcement of Immigration- Related Laws***

*Paragraph 50. In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

As noted above, the Parties have worked collaboratively to finalize the curriculum for Detention, Arrests, and the Enforcement of Immigration-Related Laws.  However, the training commenced in September and is ongoing.  MCSO is not in compliance with the requirements of Paragraph 50.

*Paragraph 51. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*
*a.       an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*
*b.       guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*
*c.       guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*
*d.       constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*
*e.       MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*
*f.       the circumstances under which a passenger may be questioned or asked for identification;*
*g.       the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*
*h.       the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*
*i.       the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

*j.        a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

*k.        a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

*l.        an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

*m.        the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

*n.        provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

*o.        Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 51 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the approved lesson plan is being adhered to by the instructors.  Despite this progress, until such time as the training is completed, MCSO is not in compliance with this Paragraph.

### d. Supervisor and Command Level Training

*Paragraph 52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth*

*Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

As noted above, the Parties have worked collaboratively on the curriculum for Supervisor Responsibilities- Effective Law Enforcement.  That curriculum has not yet been finalized, and the training was not delivered in the review period.

During our September site visit, MCSO noted that the Supervisor Responsibilities – Effective Law Enforcement Training requires that MCSO provide training on policies and systems that are not yet developed, such as the Early Identification System.  MCSO requested that they be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that they have the capability to deliver in the near future.  We and the Plaintiffs agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice.  MCSO has the responsibility to revise the curriculum to reflect this bifurcated approach.  The Parties agreed that 4th and 14th Amendment curriculum development would take precedence over the Supervisors' curriculum.  The 4th and 14th Amendment training has been developed, and, for the most part, delivered.  MCSO must submit a draft of the Supervisors' curriculum as soon as possible.  MCSO is not in compliance with the requirements of Paragraph 52.

*Paragraph 53. The Supervisor-specific Training shall address or include, at a minimum:*
*a. techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*
*b. how to conduct regular reviews of subordinates;*
*c. operation of Supervisory tools such as EIS;*
*d. evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*
*e. how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*
*f.  how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*
*g. incorporating integrity-related data into COMSTAT reporting;*
*h. how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP; i. how to respond to the scene of a traffic stop when a civilian would like to make a complaint against a Deputy;*
*j. how to respond to and investigate allegations of Deputy misconduct generally;*
*k. evaluating Deputy performance as part of the regular employee performance evaluation; and*
*l. Building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

We conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities. The process included a line-by-line scrutiny and discussion by all Parties of the entire lesson plan. That process has not been finalized, as priority was given to the Bias-Free Policing and Fourth Amendment curricula. In the interim, it has been decided that MCSO will offer the Supervisor Training in two phases. Once curriculum development is concluded, we will review any associated training materials as they are developed, and also observe training when it commences to verify that the approved lesson plan is being adhered to by the instructors. Until such time as the training is delivered, MCSO is not in compliance with this Paragraph.

**Section 8: Traffic Stop Documentation and Data Collection**

For Paragraphs 54 and 55, in particular, it was necessary to request traffic stop data from MCSO. The following explanation describes how this was done and how the data were handled once received. These data may also be referred to in other areas of Section 8 and the report as a whole.

> In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month. The sample of traffic stop cases continues to be pulled from the Districts and the Lakes Patrol (the areas). By way of background, MCSO reported a total of 2,174 cases of traffic stop events for these areas in July, 2,419 cases in August, and 1,793 cases in September. Once we received files each month containing these traffic stop case numbers from MCSO, denoting which area they came from, we then selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD tapes. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IMB SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our utilization of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD subsample from the selected cases. The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

## VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a. Collection of Traffic Stop Data

*Paragraph 54. Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a. *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b. *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c. *the license plate state and number of the subject vehicle;*

d. *the total number of occupants in the vehicle;*

e. *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f. *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g. *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h. *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i. *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j. *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k. *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l. *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m. *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) dated September 22, 2014; EB-2 (Traffic Stop Data Collection) dated September 22, 2014; EA-5 (Enforcement Communications), dated September 5, 2014 and CP-8 (Preventing Racial and Other Biased-Based Profiling), dated September 5, 2014.  We should note that these four policies underwent several revisions and all were

finally approved in September 2014.  In order to capture the information required for this paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Face Sheet, The Vehicle Stop Contact Supplemental Sheet, The Incidental Contact Receipt and the Written Warning/Repair Order for those motorists who commit a traffic violation or are operating a vehicle with defective equipment and provided with a warning.  We also reviewed the Arizona Traffic Ticket and Complaint forms issued for violation of Arizona Statutes.  We selected a sample of 102 traffic stops conducted by MCSO deputies from July 1, 2014 through September 30, 2014 for purposes of this review and assessed the collected data for compliance with Subparagraphs 54.a-54.m.  All of the above listed documentation was used for our review of the following subsections of this paragraph..

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which will be discussed further in subsequent sections of this report.

Paragraph 54.a requires MCSO to document the name, badge/serial number, and unit of each deputy and posse member involved.  Our review indicated that in the 102 vehicle traffic stops, there were 19 incidents where the deputy's unit had another deputy assigned to the vehicle or another deputy unit was on the scene, and these members were identified by the primary unit.  In another case, the primary unit during the traffic stop indicated a citizen observer was in the deputy's vehicle as an observer.  There were 20 instances where the deputy failed to indicate their unit number on the Vehicle Contact Face Sheet. Note: the Vehicle Contact Face Sheet is completed by the deputy on every traffic stop whether a citation is written or a warning issued.  In one of these stops the primary deputy did indicate their unit number but the second deputy's unit box was left blank. During our September 2014 site visit, CCID advised that a programming change has been made to the Vehicle Contact Form and if the deputy fails to indicate their unit number in the appropriate box the system will not allow them to complete the form.  We found that deputy serial numbers were listed on all required forms. MCSO is not in compliance as a result of these issues.

Paragraph 54.b requires MCSO to document the date, time and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all stops in the sample indicate that this data is captured and is geocoded with the time the stop is initiated and the time the stop is cleared.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from 3 or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.   Since the CAD data system has been upgraded to include the geocoding of traffic stops, MCSO is in compliance with this Subparagraph.

Paragraph 54.c requires MCSO to document the license plate and state of the subject vehicle.  In our First Quarterly Report there were three instances of the 94 where the vehicle stop did not result in the deputy indicating a tag number on the Vehicle Stop

Contact form.  For this review the deputy properly recorded the license plate and state of origin in 101 instances.  In one stop there was no license plate or vehicle description listed and the Vehicle Contact Face Sheet was missing.  In another instance the deputy made a stop of a vehicle that was not a stop for a traffic offense, but rather for suspicious activity by two individuals on a motorcycle who pulled into the side of a house in a residential neighborhood.  The deputy contacted the homeowner who advised that he did not know the individuals and they had no right to be on his property.  The driver of the motorcycle was subsequently issued a citation for driving with a suspended license.  The deputy, in this instance, conducted an appropriate investigation on the scene and may have prevented potential criminal activity.  MCSO is in compliance with this Subparagraph.

Paragraph 54.d requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  There was one investigatory stop (one passenger) submitted in the sample and 101 motor vehicle stops reviewed.  There were a total of 35 stops where the vehicle was occupied by one or more passengers.  The Vehicle Contact Face Sheet, completed by the deputy on every traffic stop, is utilized to capture the total number of occupants and contains a separate box on the form for that purpose.  In one instance the deputy failed to list the number of occupants of the subject vehicle and in another case the Vehicle Contact Face Sheet was not in the package and could not be located.  MCSO is in compliance with this subparagraph.

Paragraph 54.e requires MCSO to document the perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into the occupant's ethnicity or gender is required or permitted).  Thirty-five of the stops indicated there were passengers in the vehicle and in one stop the deputy failed to indicate the number of occupants, if any, on the form and in another instance the Vehicle Contact Face Sheet was not included in the package and could not be located by MCSO; therefore, we were unable to determine if any passengers were in the vehicle.  We identified 100 traffic stops where the post stop race, ethnicity and gender could be clearly identified.  The stops included 52 white male drivers, 19 white females, ten Hispanic males, four Hispanic females, five black males, four black females, two Indian/Alaskan males, two Indian/Alaskan females one Pacific Islander and one Asian male.  In one case a Vehicle Contact Face Sheet was not included with the information provided and in the remaining case the deputy indicated "unknown" on the form for ethnicity.  A memorandum was forwarded to the District in this case indicating there was a slight difference in times from the CAD printout and the Vehicle Contact Face Sheet, but the memorandum failed to document that the deputy did not indicate the race/ethnicity of the driver.

There were 45 instances where deputies chose to issue warnings to drivers instead of issuing a citation.  The ethnic breakdown of those receiving warnings reflected the numbers indicated in the number of total stops.   We did review documentation where CCID would send memorandums to the District commanders when their audits found

that deputies were not following protocol when completing required documentation for traffic stops.  Deputies did not indicate the race, ethnicity or gender of passengers when no contacts were made with them. The Order requires MCSO deputies to document the perceived race, ethnicity and gender of any passengers whether contact is made, or not made with them.  MCSO is aware of the deputies' failure to indicate the race/ethnicity of passengers when no contact is made with them and is working on a solution to include this documentation. The Order does not require the names of passengers unless a passenger is contacted and the reason for the contact is documented; in those instances where contact is made the passenger's name should be listed on the Vehicle Stop Form.

MCSO is not in compliance with this subparagraph.

Paragraph 54.f requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname).  When we reviewed traffic stop documentation for our First Report, there were only two individuals identified during one of the 94 traffic stops that had queries (record checks) indicated on the CAD printout.  When we visited one of the Districts during our September 2014 site visit, we interviewed a deputy who indicated that license plate or driver record checks are made on almost every traffic stop.  We inquired further and the deputy produced a copy of a record check on the Intergraph "I/Viewer" system that revealed a copy of the license/warrant check that the deputy had run.  Note:  we did not receive the information from the Intergraph "I/Viewer system for our first report.  However, we did review 'I/Viewer' checks deputies had run for the September sample.   In addition, on the deputy's Mobile Data Computer (MDC), there is an icon that allows the deputy to run checks on the Justice Web Interface (JWI).  This system provides deputies additional tools that Intergraph CAD does not, such as photographs, criminal history and booking history. MCSO must provide a mechanism to verify the existence of all access to the JWI in the samples we request.  MCSO indicated in a memorandum dated October 8, 2014 that they will provide the documentation beginning with the October sample request. MCSO will not be in compliance with this subparagraph until they provide, and we review all license/warrant checks from the CAD printout, the Intergraph I/Viewer and the JWI system for the quarterly traffic stop samples.

Paragraph 54.g requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  There were three instances where deputies made contact with passengers.  In one case the reason for contact with the passenger was indicated as a "non-moving violation" which is the reason the driver was stopped, and not why the passenger was contacted.  In the other two cases the reason for the passenger contact was not described.  There was one other case involving a deputy who made a stop on a vehicle that was towing another car.  The deputy ran a query on two males but the Vehicle Contact Face Sheet does not show any passengers.  MCSO made several changes to the Vehicle Stop Contact Face Sheet during the quarter to better capture the reason for the stop and the reason the passenger was

contacted by removing the check box on the form to a "fill in the blank section" requiring the deputy to indicate the precise violation or reason for the passenger contact.

Deputies must ensure that they explain why they made contact with any passengers. Indicating moving or non-moving violation as a reason for the stop describes why they stopped the driver, but not why they made contact with any passengers.  Of the three cases, the deputies listed the name of the passenger for one stop, but did not list the passengers name in the other two.  In our experience the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care.  If contact with a passenger is made, deputies should indicate the name of the person contacted.  MCSO is not in compliance with this Subparagraph.

Paragraph 54.h requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed and any indicators of criminal activity developed before or during the stop.  For this review, we took a random sample of 10 cases from the 34 cases we initially requested each month for a CAD audio review. We listened to 30 CAD dispatch audio recordings from the sample of 102 used for this review and found that in all cases the deputies advised Communications of the location and license plate and state for all 30 stops.  The audio recordings we reviewed were clear and the deputy advised of the reason for the stop in 29 of the cases; in the exception, the dispatcher prompted the deputy and he advised of the violation.  There were 72 instances in the sample where we did not listen to the CAD audio tapes but did review the CAD printout where the reason for the stop, if advised by the deputy, is documented by the dispatcher.  In two instances, the documentation of the stop is not listed on the CAD report and it would indicate the deputy did not advise Communications of the reason for the stop. The CAD printout does document the time the stop begins and when it is concluded either by arrest, citation or warning.  MCSO is in compliance with this Subparagraph.

Paragraph 54.i requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or the Deputy's departure from the scene.  In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact forms created by MCSO along with the E-Ticketing system and the Arizona Ticket and Complaint form capture the information required.

We understand that some stops vary in time for a variety of reasons that may, or may not, be justified. We looked at all stops in our sample and determined that there were 13 traffic stops where the duration of the stop *may* have been excessive.  In two of these stops the deputy failed to describe the circumstances for the extension, while in the remaining 11 the deputies justified the reason for extending the stop.  The ethnicity and

gender of the extended stops are as follows: six white males, one Hispanic male, one Hispanic female, two black females, two black males and one female of Indian/ Alaska ethnicity).   MCSO is in compliance with this Subparagraph.

Paragraph 54.j requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.   Our review of the collection of the traffic stop data for this reporting period did not reveal any immigration status investigations.   We have been advised that MCSO is no longer conducting immigration investigations when deputies are initiating traffic stops.   We will continue to verify this assertion in our reviews.   MCSO is in compliance with this Subparagraph.

Paragraph 54.k requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and frisk search was performed on any individual.   In our review we did not find any incidents where an individual was asked for a consent search or of any individual who was frisked during the stop.   We did find what appeared to be a consent search of a vehicle but there is no category on the Vehicle Stop Contact Form to capture this information.   MCSO should capture this information for management purposes.   There were no probable cause searches, but one search incident to arrest did occur.   There were two stops where the deputy failed to indicate if a search occurred. MCSO is in compliance with this Subparagraph.

Paragraph 54.l requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence.   During our review of the collected traffic stop data, there were no stops where contraband or evidence was seized.   MCSO is in compliance with this Subparagraph.

Paragraph 54.m requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.   In all 102 of the cases we found documentation indicating the final disposition of the stop, whether an arrest was made, or a release was made without a citation.   We did review one Incident Report Memorialization form where the deputy was investigating a traffic accident and the TracS system entered an incorrect violation into the system. The violation was amended by the Court and the issue was rectified.   MCSO is in compliance with this Subparagraph.

*Paragraph 55. MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

We reviewed Policy EA-5 (Enforcement Communications; effective September 5, 2014), which complies with the Paragraph requirement.

We met with the Deputy Chief of the Technology Bureau during our June 2014 site visit, who confirmed that the unique identifier went live when the CAD system was implemented in September 2013.  This number provides the mechanism to link all data related to a specific traffic stop.  The number is automatically generated by the CAD software and is sent to the Deputy's MDT at the time of the stop. We visited the Communications Center (Dispatch) where we observed and listened to several traffic stops and conversed with dispatchers about how the unique identifier is assigned.

We visited two Districts for this review and had an in-car demonstration of how the deputy inputs the traffic stop data into TraCS.  Once the deputy scans the motorist's driver license the system automatically populates most of the information into one or more forms required by the Order.  If the data cannot be entered into TraCS from the vehicle (malfunctioning equipment), policy requires the deputy to enter the data electronically prior to the end of the shift.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts and the unique identifier (CFS number) was automatically entered from the Deputy's MDT; no user intervention was required.  TracS Administrators discovered that the Event Number (unique identifier) was being duplicated on the vehicle stop forms.  The Event Number was previously auto-populated by CAD, however, when connection to CAD was lost because of dead zones, CAD populated the last known number, which assigned an incorrect number to the stop.  To overcome this deficiency, deputies must now manually enter the previously supplied unique Event Number on the vehicle stop forms; a warning alert is given prompting the deputy to confirm the number.

In order to determine compliance, we reviewed 102 traffic stop cases and reviewed the CAD printouts and the Vehicle Contact Forms for all stops.  We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment.  The unique identification number assigned to each event was listed on all CAD printouts for every stop, and the number was also listed on the Vehicle Contact Forms.  Policy EA-5, Enforcement Communications, effective September 5, 2014, has been disseminated and training is being provided as part of the Fourth and Fourteenth Amendment Training. MCSO is in compliance with the requirements of this paragraph.

*Paragraph 56. The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

PolicyEB-2 (Traffic Stop Data Collection), effective September 22, 2014, addresses the issue of regular audits and quality control checks.  We recommended in our First Quarterly Report that

the policy distinguish between the two.  While audits require in-depth analysis, quality control checks are more of an inspection or spot check of the data. MCSO has made the required distinction between the two and changed the policy to comply.  We have not yet been provided with the protocol developed by MCSO for maintaining the integrity and accuracy of the traffic stop data.   MCSO originally indicated that the requirements of this paragraph would be included in GH-2 (Internal Investigations), but it may be better served when the EIS (Early Intervention System) policy is developed.

We were advised that MCSO conducted an audit of traffic stop data in January of 2014 and then again beginning in April 2014.  After the January 2014 audit, new handwritten forms were created to collect the data required by policy until full electronic data entry began on April 1, 2014.  MCSO advises that they are currently in the process of conducting another audit.  CCID advises that they have conducted spot audits that were directed at portions of data or the actions of individual deputies.  They did provide us with an inspection during our September 2014 site visit.  We reviewed CCID's inspection of the traffic sample and found it complete and thorough. In order to be in compliance MCSO must provide the protocol specifically addressing the requirements for maintaining the integrity and accuracy of the traffic stop data.  The approved policy requires regularly scheduled audits on a monthly, quarterly and annual basis.  At present, MCSO is not in compliance with this Paragraph.

*Paragraph 57. MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014.  Every person contacted on a traffic stop will be provided with either an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. There were 45 incidents where the deputy gave a warning to the motorist for a traffic violation and in 12 of these cases, the deputy failed to have the violator sign the warning/repair form and in two instances the violator failed to sign the Arizona Traffic Complaint.  In order to verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign the deputy may note the refusal on the form.  The approved policy dictates that the CAD system will be used for verification of the recording at the initiation of the stop.  The stop's termination is noted by the deputy verbally announcing the same on the radio.  CAD then permanently records this information.   Once MCSO acquires on-body recording equipment, policies must be developed which account for its use in verifying stop duration.

MCSO is not in compliance with this subparagraph.

*Paragraph 58. The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

Policies GF-1 (Criminal Justice Data Systems ), effective November 7, 2006, and GF-2 (Criminal History Record Information and Public Records), effective January 7, 2000, state that all databases containing specific data identified to an individual comply with federal and state privacy standards and it limits access to only those employees who are authorized to access the system.

The policies go further to include that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona Statutes, the Department of Public Safety, the Arizona Criminal Justice Information System and that any violation is subject to fine.  No secondary dissemination is allowed.  We reviewed an internal MCSO memorandum of April 12, 2014 that required all TOC (Terminal Operator Certification) personnel in these positions to be re-certified on a new testing procedure developed by the Training Division and the Systems Security Officer.  We met with two Deputy Chiefs who advised that MCSO had been vigilant in security of the data systems and had previously prosecuted violators and currently have one outstanding case in the system.   We will continue to observe the security issues outlined in Paragraph 58 of this Order, but at present MCSO is in compliance with this Paragraph..

*Paragraph 59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

Electronic traffic stop data capture began on April 1, 2014.  In our review of 102 traffic stop cases from July 1, 2014 through September 30, 2014, there was one instance where the data provided by MCSO was written in by hand on the Vehicle Stop Contact form.  This form captures most of the traffic stop details required by MCSO policy and paragraphs 25 and 54 of the Order.  We do not know if the handwritten data completed by the deputy has been entered into the electronic system for this case.  CCID provided the traffic stop data which included a spreadsheet of all traffic stops from July 1, 2014 through September 30, 2014, listing event numbers as described at the beginning of Section 8.  We then requested a stratified sample from all traffic stops.  With the exception of two vehicles, all patrol vehicles used for traffic stops are now equipped with the automated TraCS system, but there may be some deputies who have not yet been trained in TraCS data entry.  MCSO has provided full access to all available collected

data since April 1st.  Electronic data were not collected before this time.  MCSO is in compliance with this Paragraph.

### b. Electronic Data Entry

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

We reviewed the approved MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014 and found them to be compliant with the provisions of the paragraph.  However, the system must be able to generate summary reports and analyses as well as be used to conduct searches of the data.  The requirement also includes that the system enable the deputies to enter the traffic stop electronically.  If TracS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO indicated in the previous reporting period that they would have a complete audit of the traffic stop data on May 31, 2014, but it was not provided.  We have reviewed documents indicating that the Unit responsible for the Early Identification System is conducting spot checks of the data and forwarding those instances of non-compliance to the Districts for action.  The CCID provided a memorandum on April 28, 2014, that indicates MCSO was in the process of conducting an audit to determine the validity of the data captured.  We did receive from CCID an inspection of the traffic stop data sample for September 2014 and upon our review found it to be accurate and thorough.  Initially the traffic stop data was captured on forms created by MCSO, completed by the Deputy in the field, and manually entered in the data base by administrative personnel located at each District.

As of June 30, 2014, there were 257 total vehicles equipped with the TraCS e-citation system.  We were advised that at the end of the review period, 267 units were so equipped.  We looked specifically at all Districts for those units that are used to conduct traffic enforcement to ensure that Deputies were able to enter the data electronically from the field.   Note: we did remove from the vehicle population those vehicles that were obviously specialized or special purposed, and are not used to conduct traffic stops. All but two marked vehicles assigned to the Districts that are used to enforce traffic laws have TracS currently installed.  We have discussed this issue with CCID personnel and it will be rectified during the next quarter.  Until the above issue is resolved MCSO is not compliant with the ability to enter traffic stop data electronically from the field.

In addition, MCSO must provide documentation pertaining to the training of deputies that use electronic data entry systems for traffic stops.  During the June site visit, we were informed that training was being done through "train the trainer" processes, whereby EIS personnel train Supervisors who then train deputies under their command.  However, no documentation of said training had been created; therefore, MCSO is not able to document who has received this training and who hasn't.  It was suggested that a process be created to document the receipt of such training.  Therefore, while progress is being made, MCSO is not in compliance with Paragraph 60.

### c. Audio-Video Recording of Traffic Stops

*Paragraph 61. The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date. MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date. Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

During our September 2014 on-site visit we met with two MCSO Deputy Chiefs and other staff to discuss the progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops.  MCSO had initially set out to purchase fixed in-car cameras, but along with the plaintiff's attorneys and at the urging of the Monitor, began to express an interest in acquiring on-body video and audio recording devices for their deputies. We believe this is prudent in that it allows for capturing additional data, where a fixed mounted camera has limitations.  The change will capture more citizen interactions when contact is away from the vehicle.  In addition, an on-body system is far less expensive and easier to repair or replace in case of a malfunction.

During the meeting we discussed data storage capacity of the system and due to the distances between Districts, there was uncertainty as to the best way to accomplish the infrastructure needs once the system it is acquired. The Parties began discussing a stipulation to the Order that will be commented on in detail in our next report.

CCID is developing recommendations for field personnel to participate in drafting the business requirements for on-body cameras.  When the procurement process is finalized, MCSO must develop a policy/protocol to address the requirements of the use of the video/audio recording of every traffic stop, and the security and maintenance of associated equipment.  The policy must address, in addition, what deputies are required to do if equipment is malfunctioning, as well as the documented process of how such malfunctions are reported and serviced.  MCSO is not in compliance with this Paragraph.

*Paragraph 62. Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

MCSO is in the process of evaluating on-person body cameras from other jurisdictions and they have yet to decide on a vendor (See Paragraph 60).  When the policy is developed it must state the requirement that deputies are subject to discipline if they fail to activate and use their recording equipment and it must address how non-functioning equipment will be repaired or replaced.  At present MCSO is not in compliance with this Paragraph.

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.*

Policy EB-2 (Traffic Stop Data Collection) includes the requirement that MCSO retain written traffic stop data completed on the Vehicle Stop Contact form for a minimum of five years after it is created, unless a case involving a traffic stop remains under investigation by the Office or is subject of a Notice of Claim, civil litigation or criminal investigation, in which case MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals.  They have developed a protocol and a policy that requires the original hard copy form to be kept at the division level and filed separately for each deputy.  When a deputy is transferred, his written traffic stop information will follow him to his new assignment.  MCSO has yet to develop a protocol for reviewing the in-car (now on-body) camera recordings and for responding to public records requests in accordance with the Order.  This policy must address the retention of recordings.  MCSO is not in compliance with this Paragraph.

### d. Review of Traffic Stop Data
*Paragraph 64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014) and EB-2 (Traffic Stop Data Collection, dated September

22, 2014), the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014), and responses to Monitor production requests related to this paragraph. We also reviewed information obtained from MCSO staff interviews conducted during the September 2014 site visit. Members of the EIU (Early Intervention Unit) responsible for the EIS system were able to show evidence of thorough investigations based upon data they had compiled from Vehicle Stop Contact Forms entered into the TraCS system. EIU staff did explain how they conducted analysis of traffic stop data to identify cases of "outliers" that might involve racial profiling or other misconduct. In addition, EIU staff did subsequently provide documentation of the methodology used weekly and monthly to analyze traffic stop data. While the documentation did provide considerable insight into what EIU staff consider "outliers", "racial profiling", and "improper conduct", the documentation did not delineate the theoretical underpinnings or statistical basis of outliers or cases of improper conduct. For example, the documentation provided in response to our request identifies that one criterion of racial profiling is to see if a particular ethnic group is being stopped at a rate higher than demographics would suggest. While intuitively appealing on its surface, this criterion that is based on a population-based approach does not provide adequate evidence of racial profiling. More sophisticated standards must be explored and incorporated into the methodology being used by the EIU . At present MCSO is not in compliance with Paragraph 64.

*Paragraph 65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

We reviewed all the updated documentation set forth in Paragraph 64 above in addition to information obtained from MCSO staff interviews conducted during the September 2014 site visit that have bearing on our compliance review. During the September visit, we met members of the EIU (Early Intervention Unit) who provided an overview of their approach to identify individual-level, unit-level, or systemic problems. MCSO then provided updated information about protocols currently used to analyze traffic stop data. The documentation, "protocols to Analyze Traffic Stop Data," dated October 8, 2014 describes the analytic steps used to conduct weekly and monthly analyses. The document also notes that a similar process could be conducted quarterly or annually. The documentation reports that deputy-level data from TraCS are collected weekly and monthly. According to the documentation, problems are identified at the individual deputy level, but not at the unit level or the systemic level. Alert thresholds are set to identify those deputies who may be engaged in biased-policing, but the thresholds appear to be arbitrarily set by MCSO analysts. The protocols provided in the October 8, 2014 documentation describe the process MCSO staff utilize to identify what they believe to be potential cases of biased-policing, but these protocols do not include a scientific basis supported by the literature on racial profiling and biased-policing. A protocol for analyzing individual-level, unit-level, and systemic-level still does not exist.

Additionally, during the September site visit, we were advised that MCSO had moved the EIU from the Human Resources Bureau to the newly created Bureau of Internal Oversight (BIO). As of this writing we have received a draft policy covering the EIS Process, and the responsibilities of the EIU. MCSO must develop a policy that specifically identifies the review group that will conduct the monthly, quarterly, and annual analysis of traffic stop data. The policy must include the requirement that review group members recuse themselves from analyzing data pertaining to their own activities. MCSO must also develop a protocol delineating the methodological (including statistical) tools and techniques that the review group will use to conduct the periodic analyses. At present MCSO is not in compliance with Paragraph 65.

*Paragraph 66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

MCSO provided information about the methodology it will use to conduct one annual agency-wide analysis of traffic stop data in two responses to the Monitor production request related to paragraph 66. The two responses to paragraphs 66, labeled as Monitor Production Request related to Paragraph 66(A) and Monitor Production Request related to Paragraph 66(B), respond to the Monitor's request for information about the analytical benchmarks MCSO will use for the annual comprehensive analysis. Both MCSO responses were identical and noted that as of October 8, 2014, no protocols involving analytical benchmarks have been established. During the September 2014 site visit, we interviewed MCSO staff about the comprehensive analysis and were informed that the newly formed BIO (Bureau of Internal Oversight) will take responsibility for conducting the annual agency-wide comprehensive analysis. MCSO staff requested that the Monitor team provide background information about the literature related to studying racial profiling and biased-based policing to help them gain more understanding of technical aspects of paragraph 66. This information is being assembled, along with a brief summary of methodologies, to help MCSO come into compliance with paragraph 66.

The EIU has developed a draft policy for investigations looking for indicia of biased policing. MCSO staff are continuing to analyze traffic stop data to identify possible cases of biased policing. MCSO staff believes that these early investigations will make it easier to develop the policy that will then become a major ingredient for the annual analysis covered in this Paragraph.

MCSO still must establish a protocol for the annual, all-agency comprehensive review of data. It must include benchmarks previously reviewed by the Monitor and it must describe the methodological (including statistical) tools and techniques that will be used to conduct the annual evaluation. These benchmarks may include aspects of analyses used by the EIU that incorporate data from IA Pro/Blue Team. However, the incorporation of these data needs to be approved by the Monitor as outlined in Section IV of the Order. Until those documents are developed and evaluated MCSO, is not in compliance with this Paragraph.

*Paragraph 67. In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

*a.      racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

*b.      evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

*c.      a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

*d.      indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

*e.      other indications of racial or ethnic bias in the exercise of official duties.*

We reviewed all the documentation that was provided for the analysis of Paragraphs 64 through 68 against the requirements of the Order specified for this Paragraph. We also reviewed information obtained from MCSO staff interviews conducted during the September 2014 site visit. In particular we found that while the EIU had begun doing investigations of data compiled from Vehicle Stop Contact Forms and the EIU personnel now have documented their methodology for conducting these investigations, the methodology they are using, while seeking to comply with the intent of the Order, does not provide a statistically defensible approach in identifying warning signs or indicia of racial profiling or other police misconduct. This also pertains to the list of other criteria offered by MCSO that will be included above and beyond those specified in Paragraph 67. In addition, the protocol should ensure that the criteria will be used in the annual, comprehensive, agency-wide evaluation required by Paragraph 66. MCSO is not in compliance with this Paragraph.

*Paragraph 68. When reviewing collected patrol data, MCSO shall examine at least the following:*

*a. the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

*b. the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

*c. the tactics employed during the Significant Operation and whether they yielded the desired results;*

*d. the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity*

*and the surname information captured or provided by the persons stopped, detained or arrested;*
*e. the resource needs and allocation during the Significant Operation; and*
*f.  any Complaints lodged against MCSO Personnel following a Significant Operation.*

During the September 2014 site visit, CCID staff were asked if any Significant Operations had occurred during the period from July to September of 2014.  CCID personnel advised that they were not aware of any Significant Operations as defined by the Order.  In response to a request for documentation for this paragraph, CCID personnel produced a Memorandum, dated September 30, 2014, stating that CCID had contacted the Chief of Patrol and Enforcement Support Bureau and the Chief of Detectives and Investigations Bureau, who both stated that no applicable Significant Operations had occurred during this reporting period.  At present MCSO is in compliance with Paragraph 68, but MCSO must have a plan for conducting the analysis required by this Paragraph when future Significant Operations are conducted.

*Paragraph 69. In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

Blue Team draft training curriculum has been reviewed and returned to MCSO.  A major issue with Blue Team must be overcome before it can be effectively put into service.  Specifically, MCSO must resolve when and how first line supervisors will be able to access information pertinent to the people under their command.  At present, EIU personnel control access to these data.  During the September site visit we made clear that first line supervisors must have immediate access to information regarding the deputies assigned to them.  MCSO has offered alternatives that were equally unacceptable.  MCSO has carried out several training dates in September and has additional training planned for October 2014.  In addition, we have reviewed the draft EIS policy and coordinated the response of Plaintiffs along with our own suggestions.  During interviews conducted during the September 2014 site visit, both CCID and EIU staff described progress being made toward the full implementation of all data systems necessary for analyses and audits related to this paragraph.  In a memorandum dated October 8, 2014, responding to our document request for this report, the EIU administrators project that all Blue Team training for patrol should be completed by the end of October 2014.  We will need to verify this information.  In addition, the memorandum provides additional details about the tools that will be available to supervisors that will allow them to monitor the actions of their subordinates.  However, there is no mention of the problem outlined at the beginning of this Paragraph.  The training in these supervisory tools will not be complete until the EIU has the time to conduct preliminary analyses of the data collected by these tools to ensure they are operating as anticipated.  Following this exploratory period, supervisors will be trained in these

new policies and protocols.  We will continue to evaluate the training and progress being made.
MCSO is not in compliance with this Paragraph.

*Paragraph 70. If any one of the foregoing reviews and analyses of the traffic stop data indicates
that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or
seizures, or unlawful immigration enforcement, or that there may be systemic problems
regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely
monitor the situation. Interventions may include but are not limited to counseling, Training,
Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments,
Discipline, or of other supervised, monitored, and documented action plans and strategies
designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of
racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the
MCSO shall take appropriate steps at the agency level, in addition to initiating corrective
and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All
interventions shall be documented in writing.*

As noted in response to Paragraph 64, we have reviewed EB 1 (Traffic Enforcement, Violator
Contacts and Citation Issuance) as well as EB 2 (Traffic Stop Data Collection) both dated
September 22, 2014.   We also met with several CCID and EIU staff during the September site
visit regarding issues in this paragraph.  The Early Intervention Unit has now been placed under
the Bureau of Internal Oversight.  Policy EB-2, Traffic Stop Data Collection, indicates that on a
monthly basis, EIU will review 10% of the MCSO Vehicle Stop Forms against the data entered
to ensure it was properly entered.  In addition, the draft EIS policy, which has been returned to
MCSO with suggestions by both the Monitor Team and Plaintiffs' Attorneys, includes a
description of the audits, analyses and monitoring roles of the EIU.

EIU staff has provided memoranda on their methodology used to analyze traffic stop data on a
weekly and monthly basis.  These documents, and communication during the site visit, have
clarified how EIU personnel try to identify "outliers", "racial profiling", and "improper
conduct". Members of the Monitor Team will continue working with EIU staff to fine-tune their
analysis.

Members of the Monitor Team were apprised of the weekly and monthly audits being conducted
by EIU personnel during the September site visit.  Subsequently, MCSO has provided a
memorandum, dated October 9, 2014, that enumerates the alerts discovered during the third
quarter of 2014 through the use of the TraCS and IA Pro.  Of the 190 alerts found during this
period, eighteen were as the result of citizen complaints, nineteen were based on TraCS alerts
and sixty nine were internal alerts involving deputies, civilian staff, detention officers and
supervisory personnel.  Of the ninety-five "questionable behavior" alerts, seventy-one involved
sworn deputies and the majority of these appear to be for driving at excessive speeds while on
patrol.  A few deputies had several alerts.

In one case a deputy had ten alerts involving speed and checking the "unknown" box on the
Vehicle Stop form for ethnicity. EIU transferred the alert notification to the deputies' supervisor

who was able to reasonably articulate why the instances happened.  Two additional deputies had triggered alerts because they had checked the "unknown box" on the Vehicle Stop form for ethnicity twice in the period of one month.  These alerts were forwarded to the deputies' respective Districts.  A third deputy triggered an alert because he checked the box in TraCS indicating he inquired about someone's immigration status on four occasions within the last year.  The alert information was sent to his supervisor who upon review with the deputy found that he had been inadvertently checking the wrong box on the TraCS form.  The deputy was counseled to be more thorough in his paperwork in the future.

Two alert instances resulted from entering historical "use of force" information dating back to 2013 into the Blue Team data system.  Two deputies had two use of force instances within a short period of time causing EIU to be alerted.  Upon investigation EIU cleared these instances as occurring over a year ago and no similar instances were found in the deputy's history.

These are examples of alerts that could be handled in relatively quick order, through the notification of supervisors who then took corrective action.  However, there are several questions remaining about the number of alerts caused by external (18 alerts) and internal (69 alerts) complaints.  There was no supporting memorandum showing how EIU handled these complaints.  In the future EIU personnel should be more complete in explaining how these serious alerts were handled within the EIS process.  At present MCSO is not in compliance with this Paragraph.

*Paragraph 71. In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

We have been provided access to all <u>existing</u> data.  Since the majority of supervisors have not been trained in all aspects of Blue Team, there have been limited Supervisory reviews.  We will continue to expect unfettered access to these reviews as they are completed.

**Section 9: Early Identification System (EIS)**

This Section will include a description of the early requests for documentation and what was found during the June and September 2014 site visits.  References will be made to the Pre-EIS data analysis done by the Early Intervention Unit.  We will address the breadth of the presentations made during the June and September site visits and some of the problems that continue to exist.  It is important to note that MCSO did provide a draft EIS policy for review on September 4, 2014.  This policy was examined by the Monitor Team and Plaintiff's Attorneys.  A set of detailed comments were provided to MCSO on October 16th, 2014.  Some of those comments will be reiterated here.  Also, in response to our document request, MCSO has supplied additional memorandum pertaining to the following paragraphs.

**IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

### a. Development and Implementation of the EIS

*Paragraph 72. MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

Early Intervention Unit (EIU) staff have done a noteworthy job of providing data, conducting audits, and developing an EIS system that incorporates pieces of information from throughout the organization. This was accomplished without the benefit of an over-arching policy to guide them. However, this early experience culminated into a draft policy provided on September 4, 2014 to the Monitor Team and the Plaintiffs' Attorneys, who suggested several changes and modifications. The EIS policy was returned to MCSO on October 16, 2014. While all components of the EIS system are in place, IA Pro, TraCS, and Blue Team, the requisite training for all personnel has not been completed. In addition, a major issue with Blue Team must be overcome before it can be effectively put into service; – specifically, when and how first line supervisors will be able to access information pertinent to the people under their command. At present, EIU personnel control access to these data. During the September site visit we made it clear that first line supervisors must have immediate access to information regarding the deputies assigned to them at all hours of the day. MCSO has offered alternatives which were equally unacceptable. We will continue to work with MCSO to overcome these issues. At present MCSO is not in compliance with this Paragraph.

*Paragraph 73. Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

The EIU has come together well to this point. It is coordinated by a Lieutenant, with three Sergeants working investigations, one analyst and one administrative staff. The team had conducted Pre-EIS data analysis using data that they have compiled from hard copies of Vehicle Stop Contact Forms. Now that nearly all Districts have caught up with the backlog of data entry, the EIU should become an even more useful tool for MCSO. In addition, the EIU staff has gone through the steps of investigations as expected for those cases that were considered outliers, represented behavioral problems, or received some form of internal or external complaint. The EIU has now become a part of the newly created Bureau of Internal Oversight (BIO).

A major concern expressed in the First Quarterly Report pertained to the backlog of Vehicle Stop Contact Forms that accumulated at District Offices prior to the automation and training for

TraCS. This issue was raised during the September site visit and while the EIU and CCID staff could not suggest the number of hard copies that might still need to be entered into the automated system, the belief was that it was minimal. In a follow-up memorandum, we were advised that all hard copies have been entered into the automated system with the exception of 215 from Lakes Patrol, and 15 from District 7. We will assess whether these latter two districts are up-to-date during our next site visit. With the complete automation of TraCS, the deputies themselves are now responsible for data entry, with EIU personnel conducting integrity audits.

A second issue raised in both the September site visit and the Request for Documentation regarded whether all of the vehicles on routine patrol assignments were supplied with equipment to facilitate TraCS entry. In response, CCID personnel have supplied an exhaustive list of vehicles owned, leased, or surrendered to MCSO in a memorandum dated October 21, 2014. Nearly 90% of all vehicles assigned to the Districts have been equipped with TraCS. These are the vehicles most likely to be used for traffic control. According to CCID personnel during the September site visit it is a rare occasion when deputies assigned traffic enforcement do not have a TraCS equipped vehicle, however, when they do they have been trained to use the hard copy of the Vehicle Stop Contact Form and enter it at the District office before their shift is over.

According to a CCID memorandum, MCSO is still reliant on paper forms for Incidental Contact Receipts, Written Warning and Repair Orders and Citizen Complaint Forms. These are entered manually and should be automated at a later date. We will be checking on the progress of this process during the December site visit.

Finally, while all deputies and supervisors have been trained in TraCS, only about 60 deputies have been trained in Blue Team. As noted above, of particular concern regarding Blue Team is the fact that first line supervisors do not have direct access to all the necessary information regarding deputies under their command. MCSO was informed that such a limitation would be unacceptable. While several alternatives were explored during the site visit, none were deemed appropriate.

MCSO is not in compliance with this Paragraph.

*Paragraph 74. MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

As mentioned above, a draft EIS policy was received by the Monitor and Plaintiff Attorneys in September, 2014. Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014. The draft policy generally specified who was responsible for data entry. Clarification has been requested for this responsibility when it comes to ICE contacts and Immigration Inquiries.

Additionally, we have asked for clarification of the definitions included in the draft EIS policy including, but not limited to, "biased –based policing", "critical incidents", "County Attorney

Actions", and the like.  In a memorandum responding to a request for documentation the EIU has further specified some, but not all, of these definitional issues.  Once MCSO has created a new draft proposal we can evaluate if these problems have been ameliorated.

In addition, at the September site visit, EIU personnel provided insight into the ways that they used the data to conduct weekly and monthly analysis looking for "outliers", "potential questionable behavior", and "racial profiling".  As a result of these discussions we requested more documentation to support the analysis conducted.  Similar to our response in Paragraphs 64 and 65, the protocols listed in a Memorandum, dated October 13, 2014, provide definitions for racial profiling and improper conduct but the description of protocols do not adequately appear to capture the definition of racially biased policing as discussed during the September site visit.  In addition, what is often found when alerts are triggered, as noted in our response to Paragraph 70, is that deputies have appropriately marked "unknown" for ethnicity or committed some clerical error in the automation system, neither of which actually approaches a definition of profiling.  Therefore, MCSO must incorporate more appropriate measures as discussed at the September site visit to investigate these concepts.  The actual description of the process of conducting the audits and traffic stop analysis is sound for insuring that officers are acting appropriately but will not lead to a determination of whether biased-policing has occurred.  We will work with MCSO to build a more acceptable model that can be investigated in a statistically rigorous manner.  MCSO is not in compliance with Paragraph 74.

*Paragraph 75. The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*
*a.  all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e.,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*
*b.  all internal investigations of alleged or suspected misconduct;*
*c.  data compiled under the traffic stop data collection and the patrol data collection mechanisms;*
*d.  all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*
*e.  all arrests;*
*f.  all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*
*g.  all arrests in which the individual was released from custody without formal charges being sought;*
*h.  all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable*

*suspicion of or probable cause to believe a crime had been committed, as required by law;*

i. *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j. *all disciplinary action taken against employees;*

k. *all non-disciplinary corrective action required of employees;*

l. *all awards and commendations received by employees;*

m. *Training history for each employee; and*

n. *bi-monthly Supervisory observations of each employee.*

As mentioned earlier MCSO has provided a draft EIS policy that was returned to them with extensive comments from both Monitor personnel and Plaintiffs' Attorneys. Some of the issues raised in the evaluation of the draft policy are definitional; for instance, in 75a the IR Memorialization (IRM) includes the concept of biased-based policing but does not define it, and, in 75c (IRM) we suggested that MCSO should provide definitions of Investigatory Stop Violations and Incidental Contacts. Plaintiffs' Attorneys have also suggested a more complete definition of "County Attorney Actions" in 75f, g, h and i. Issues such as these can be easily rectified. However, we have also noted in our suggestions regarding the draft EIS policy that MCSO include an appendix of data elements drawn from various data bases to create the EIS process in addition to a more complete listing of what the threshold limits for these activities will be. In response to this request for documentation MCSO advises that "A rudimentary start on the referenced database has been initiated. At this point, the information is primarily limited to Human Resource data, specifically chain of command/reporting structure information. Once this very critical part of the database is complete, additional elements or pointers to the systems housing the necessary data will be included to meet the requirements of this paragraph." Therefore, at this time, MCSO is not in compliance with this Paragraph.

*Paragraph 76. The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

The newEB-2 (Traffic Stop Data Collection) requires capture of the information necessary for EIU personnel to link an officer's traffic stops, along with the racial and ethnic make-up of those stopped, to the actions the officers take in those stops. In addition, the integrity analyses conducted by Monitor personnel have shown that this information is rarely missing from the TraCS data supplied by MCSO. MCSO is in compliance with this Paragraph.

*Paragraph 77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

As noted above, during our September site visit, the issue of "necessary equipment, in sufficient amount and in good working order" had to be shown by MCSO. As noted in Paragraph 73

MCSO provided documentation that over 90% of vehicles assigned to Districts are already equipped with TraCS.  Moreover, in the rare event that a TraCS vehicle is not available, or the vehicle equipment is not working, each District has equipment within their offices that would allow a deputy to input their traffic stop information before the end of their shift (EB 2 Traffic Stop Data Collection, 4A1).  In addition, the Deputy Chief of the Technology Management Bureau has included a memorandum, dated October 17, 2014, in response to our document request that comprehensively shows the deployment of personal computers and printers across the Districts and Specialty Units.  The memorandum is also a testament to the security of the system.  At present it would appear that the technology and equipment meet the requirements of the Order, however, since supervisory personnel have yet to be trained in all aspects of the EIS data system (in particular, Blue Team) they cannot conduct timely reviews with the equipment at their disposal.  Therefore, MCSO is not in compliance with this Paragraph.

*Paragraph 78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

As noted previously, a draft EIS policy was received by Monitor and Plaintiffs' Attorneys on September 4, 2014.  This document was returned to MCSO on October 16, 2014 with extensive comments from both Monitor personnel and Plaintiff Attorneys.  The Deputy Chief of the Technology Management Bureau provided a memorandum in response to Paragraph 77 that is also pertinent to Paragraph 78.  On page 2 of her memorandum dated October 17, 2014, she provides a description of the security of the database and server. Taken together with the security measures outlined in the draft EIS policy, MCSO will meet the requirements of this Paragraph when all policies are finalized.   However, at present, MCSO is not in compliance with this Paragraph.

*Paragraph 79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

In the absence of a finalized EIS policy, or a fully integrated database, MCSO personnel in the EIU have done a notable job pulling together data to conduct analyses looking for behavior that may appear to be outside the norm.

Members of the Monitor Team were apprised of the weekly and monthly audits being conducted by EIU personnel during the September site visit.  Subsequently, MCSO has provided a memorandum dated October 9, 2014 that enumerates the alerts discovered during the third quarter of 2014 through the use of the TraCS and IA Pro.  Of the 190 alerts found during this period, eighteen were as the result of citizen complaints, nineteen were based on TraCS alerts and sixty nine were internal alerts involving deputies, civilian staff, detention officers and supervisory personnel.  Of the ninety-five "questionable behavior" alerts, seventy-one involved sworn deputies and the majority of these appear to be for driving at excessive speeds while on patrol.  A few deputies had several alerts.

In one case a deputy had ten alerts involving speed and checking the "unknown" box on the Vehicle Stop form for ethnicity. EIU transferred the alert notification to the deputy's supervisor who was able to reasonably articulate why the instances happened.  The deputy was counseled by his supervisor.  Two additional deputies had triggered alerts because they had checked the "unknown box" on the Vehicle Stop form for ethnicity twice in the period of one month.  These alerts were forwarded to the deputies' respective districts.  A third deputy triggered an alert because he checked the box in TraCS indicating he had inquired about someone's immigration status on four occasions within the last year.  The alert information was sent to his supervisor who upon review with the deputy found that he had been inadvertently checking the wrong box on the TraCS form.  The deputy was counseled to be more thorough in his paperwork in the future.

Two alert instances resulted from entering historical "use of force" information dating back to 2013 into the Blue Team data system.  Two deputies had two force instances each within a short period of time causing EIU to be alerted.  Upon investigation EIU cleared these instances as occurring over a year ago with no similar instances being found in the deputy's history.

These alerts were handled in relatively quick order, through the notification of supervisors who then took corrective action.  However, there are several questions remaining about the number of alerts caused by external (18 alerts) and internal (69 alerts) complaints.  There were no supporting memoranda showing how EIU handled these complaints.  In the future EIU personnel should be more complete in explaining how serious alerts, like citizen complaints, were processed within the EIU system, even if the only information is that they were forwarded to Internal Affairs, Supervisors or District Command Staff.  MCSO is in compliance with this Paragraph on <u>Pre-EIS data</u> analysis.

### b. Training on the EIS
*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial*

*implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

MCSO provided a detailed description of the training plans that were taking place in September with regard to both Blue Team and EIS.  Blue Team training curriculum has yet to be approved and the draft EIS policy has been returned to MCSO with extensive comments and suggestions from Plaintiffs' Attorneys and the Monitor Team.  However, a significant issue remains with the training curriculum for supervisors.  First line supervisors do not have unfettered access to information about deputies in their command.  EIU personnel control access to this data and supervisors need to request information from them.  During the site visit, MCSO was informed that this would be unacceptable as first line supervisors should be able to access information about their personnel at any time of the day.  MCSO offered several alternatives, but none were found to be acceptable.  We will continue to monitor supervisory training material as it becomes available.

EIU has provided a memorandum that reiterates that there was no training in IA Pro/Blue Team during the third quarter.  However, starting in October the training plan was for Blue Team to be taught to all patrol districts.  Following this training, EIU will analyze data received in this program to ensure that it is acceptable, at which time all other MCSO personnel will be trained in Blue Team.  Patrol supervisors will also receive extensive training in how to monitor deputies in their command as well as apprise them of additional CAD tools "deputy activity logs" to enhance their oversight.  The issue of access to the data for supervisors will have to be dealt with before Blue Team training can be completed.  While the plan for training appears sound, with the caveat above, we will revisit these issues during the December site visit.  At present MCSO is not in compliance with Paragraph 80.

### c. Protocol for Agency and Supervisory Use of the EIS
*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*
*a.        comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*
*b.        identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*
*i. failure to follow any of the documentation requirements mandated pursuant to this Order; ii. racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot*

*be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*
*iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers; iv. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*
*v. Complaints by members of the public or other officers; and vi. other indications of racial or ethnic bias in the exercise of official duties;*

*c.      MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

*d.      a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

*e.      identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

*f.      a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

*g.      a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

*h.      an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

*i.      mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

Both the Monitor and Plaintiffs' Attorneys have made suggestions and comments on the draft EIS policy and returned same to MCSO on October 16, 2014.  Highlights of those suggestions for this Paragraph include: a) delineating a more thorough description of the threshold limits for actions that could result in an alert and include it in the policy; including how the EIU may set different thresholds dependent on the assignment of any given deputy (81f); b) training on EIS should be included in the checklist of training and MCSO should attempt to capture which

individuals received training in TraCS since there is no memorialization of this at present; c) as noted previously in the discussion of alerts related to racial profiling, MCSO should consider a richer operationalization of this concept in a way that is understandable to all parties; d) ensure that notification includes Plaintiffs in the policy language.  We will evaluate the next version of the EIS policy to insure that these and other suggestions are incorporated.  At present, MCSO is not in compliance with Paragraph 81.

**Section 10: Supervision and Evaluation of Officer Performance**

**X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*a. General Duties of Supervisors*
*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

We have reviewed all policy submissions and the policy requirements for Paragraph 83 are covered under GC-17 Rev. September 5, 2014 (Employee Disciplinary Procedure).  MCSO's policy is in compliance with Paragraph 83.  We conducted interviews with deputies and supervisors to determine if there is compliance with the policy.  Supervisors from District 1, District 3, and Lakes Patrol advised us that supervisors are responding to most arrests and are reviewing all incident reports.  Since neither deputies nor supervisors complete worksheets, we are unable to independently verify compliance.

From June 16, 2014, 15 incident reports were reviewed to check for supervisory reviews. Of those, all had been signed off by a supervisor. From July17, 2014, nine (9) incident reports were submitted in addition to two  (2) traffic citations; eight (8) of the incident reports had been

reviewed by a supervisor.  For August 10, 2014, twenty-two (22) incident reports and one (1) Arizona Crash Report were submitted.  All had been reviewed and approved by a supervisor. One DUI arrest report was submitted that did not have a supervisor's signature on it.  Paragraph 83 requires that supervisors respond to the scene of certain arrests, and it requires that they confirm the accuracy of Deputies' daily activity reports. Deputies do not complete worksheets to document when a supervisor responds to the scene of any call for service. No documentation has been provided as proof that MCSO is in compliance with this requirement.

MCSO is not in compliance with Paragraph 83.

*Paragraph 84. Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

We reviewed GB-2 (Command Responsibility), dated April 19, 1996 and Briefing Board 14-43, (Immediate Change to GB-2), dated May 1, 2014, as they pertain to Paragraph 84 which requires that, within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified supervisor and that first-line supervisors shall be assigned to supervise no more than 12 Deputies.  GB-2, as written, is non-compliant in that it states that no individual shall report to more than one (1) commander or supervisor at any given time but does not state that it would be a single, consistent and clearly identified supervisor.  GB-2 also does not require that first-line supervisors shall be assigned to supervise no more than 12 Deputies. The proposed changes to the policy outlined in the Briefing Board will not address all of these issues, particularly that all patrol deputies shall be assigned to a single, consistent, clearly identified supervisor. In Order to be compliant, GB-2 must include these requirements.

We conducted interviews of supervisors from District 1, District 3, and Lakes Patrol during our September site visit. District 1 and 3 supervisors stated that Deputies are assigned to a single supervisor and that they are no longer using "acting sergeants".  Overtime is used to staff patrol in the event that a supervisor is unavailable.  District 1, District 3 and Lakes Patrol supervisors were aware of the requirement that Deputies report to a single supervisor, and that no more than twelve (12) Deputies could be assigned to a single supervisor, and stated that they are in compliance.  We reviewed some examples of shift rosters and daily assignment rosters for each of the districts visited and our limited review noted that in most cases, Deputies were assigned a single, consistent, clearly assigned supervisor, and the first line supervisors were assigned no more than twelve Deputies. A request for daily patrol rosters and shift rosters from each district was made but none were submitted.  We understand that MCSO is in the process of standardizing the format and content.  At this time we are unable to verify that in each district Deputies are assigned to a single, consistent, clearly identified supervisor, or that supervisors are assigned to supervise no more than twelve (12) Deputies.

MCSO is not in compliance with this Paragraph.

*Paragraph 85. First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

We have reviewed the submissions and the policy requirements for Paragraph 85 covered under EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) as revised on September 22, 2014. A document request was made for MCSO to provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. Five (5) supervisory notes from one sergeant were submitted as proof. The supervisory notes were not detailed sufficiently, as they did not address whether deputies detained any individuals, the reasons for such detentions, or if there were any stops that at any point involved immigration issues. MCSO is not in compliance with Paragraph 85.

*Paragraph 86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

We reviewed Policy GB-2 (Command Responsibility), with regard to the Paragraph 86 requirement that on-duty field supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide supervisory assistance to other units. Paragraph 86 also requires that supervisors shall be assigned to work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances. GB-2 is non-compliant in that it does not address the Paragraph 86 requirements. GB-2 was under review and revision by MCSO. Policy GB-2 must include the Paragraph 86 requirements cited above in order to be compliant.

We conducted interviews of supervisors from District 1, District 3, and Lakes Patrol in our September site visit. All supervisors interviewed stated that supervisors are assigned the same workdays and hours as the deputies that work under their supervision. We reviewed some examples of shift rosters and daily assignment rosters for each of the districts visited and our limited review noted that in most cases, supervisors work the same days and hours as the Deputies assigned to them. We understand that MCSO is in the process of standardizing the format and content of the daily patrol rosters; however, without documentation from each Patrol District, we cannot verify compliance with this Paragraph. A request for daily patrol rosters from each district was made to verify that supervisors are assigned to work the same days and hours as the Deputies they are assigned to supervise. No daily patrol rosters or shift rosters were submitted.

MCSO is not in compliance with this Paragraph.

*Paragraph 87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

We have reviewed the submissions and the policy requirements for Paragraph 87 covered under GC-17, Rev. September 5, 2014 (Employee Disciplinary Procedure). MCSO's policy is in compliance with Paragraph 87.

We reviewed fifty-two (52) performance evaluations submitted for deputies who received evaluations between July 1, 2014 and September 30, 2014.  One (1) of the fifty-two (52) evaluations submitted was for a Detention Officer assigned to the Lower Buckeye Jail. We also reviewed performance evaluations for thirty-six (36) sergeants who were supervisors for the deputies who received performance evaluations in 2014.  Of the thirty-six (36) evaluations submitted; three (3) were for a rating period when the sergeants were still deputies, so there was no assessment regarding their ability to supervise. The thirty-three (33) evaluations of the supervisors contained an assessment of the quality and effectiveness of their supervision. Twenty-nine (29) of the thirty-three (33) supervisor performance evaluations did not contain comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.

MCSO is not in compliance with this Paragraph.

### b. Additional Supervisory Measures
*Paragraph 88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

MCSO has taken the position that they no longer have Specialized Units that enforce immigration laws.  During discussions with CCID and MCAO Attorneys, we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.

During this evaluation period, MCSO and their attorneys have articulated that the three criminal violations they believe qualify as potentially immigration related include: human smuggling, forgery, and misconduct with weapons.  We have requested the monthly arrest and enforcement statistics for the months March – August 2014 for the Units assigned to Special Investigations Division (SID), as well as all arrests for the identified immigration related crimes.  We also requested any documentation that outlines the core mission of the various SID Units.

Until such time as this material is provided and analyzed, MCSO is not in compliance with this paragraph.

*Paragraph 89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

We reviewed the following documents submitted by MCSO as supporting documentation relative to Paragraph 89 requirements: EA-11 Rev. September 5, 2014 (Arrest Procedures), GC-17 Rev. September 5, 2014 (Employee Disciplinary Procedure); proposed EB-1 Rev. September 22, 2014 (Traffic Enforcement, Violator Contacts, and Citation Issuance). The requirements of the paragraph are covered via the combination of policies.

We requested to inspect all reports related to immigration status investigations, any immigration related crime, or incidents or arrests involving lack of identity. The incident reports submitted were from the period from July 1, 2014 to September 30, 2014. The MCSO submission consisted of 15 incident reports that occurred during the time period requested. The sampling produced 15 reports as follows: District 1- 4 reports, District 2- 1 report, District 3- no reports, District 4- 4 reports, District 6- 1 report, District 7- 3 reports, Lakes Patrol -2 reports. According to an MCSO memorandum dated October 15, 2014, 11 of the 15 reports had deficiencies related to failure to notify or document notification of the supervisor in incident reports involving an investigation or arrest related to lack of identity documents. These cases were referred to the MCSO chain of command for corrective action. The corrective action was identified as need for training or guidance. Due to the fact that deputies failed to notify their supervisors in 11 of 15 incidents related to detentions or arrests involving lack of identity documents, it appears that the majority of MCSO deputies are not adhering to this policy.

MCSO is not in compliance with Paragraph 89.

*Paragraph 90. MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014. EA-11 states that Deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently review the reports. If the incident did not include an arrest or detention, the supervisor shall review the IR within seven calendar days, absent exigent circumstances. Supervisors shall review reports and forms for boilerplate or conclusory language; inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy; or referring the incident for administrative review or criminal investigation.

EA-11 Rev. September 5, 2014 is in compliance with Paragraph 90. We reviewed 7 completed Incident Report Memorialization Forms for the period of July 1, 2014 to September 30, 2014 and noted that the supervisors identified deficiencies and corrective actions as required in Paragraph 90.  The issues identified included failure to audio record the statement of a victim of domestic violence, failure to read Miranda prior to questioning, turning in a late report, improper documentation of probable cause, incorrect violations cited, and lack of articulation in a report. All but one of the Report Memorialization Forms contained adequate information.

We reviewed traffic stop data for July of 2014.  Thirty-four (34) reports for traffic related events were submitted.  Of the thirty-four reports, twenty-two (22) traffic related events had no deficiencies noted; twelve (12) noted specific deficiencies. Of the events that were identified as deficient; in five (5), the vehicle stop time information did not coincide with CAD.  In six (6) traffic related events, the deputies failed to note the unit number on the Vehicle Stop Contact Form.  In one (1) traffic related event, neither the recorded audio nor CAD indicated a reason for the stop.

We reviewed traffic stop data for the month of August of 2014. Thirty-five (35) reports for traffic related events were submitted.  Of the thirty-five (35) reports submitted, in six (6), the start and end times on the Vehicle Stop Contact Form did not coincide with the CAD information.  In another six (6) reports, the Vehicle Stop Contact Form did not contain the unit number of the MCSO member initiating the stop.  In one (1) report, the incident report was not memorialized by a supervisor within 72 hours. In one (1) incident report, the original reason for the stop did not coincide with the Vehicle Stop Contact Form.  In one (1) report, the Vehicle Stop Contact Form ethnicity did match the citation.  Two (2) of the reports cite multiple deficiencies.

We reviewed traffic stop data for the month of September of 2014.  We reviewed data for thirty-four (34) traffic related events randomly selected from each district.  MCSO found that ten (10) traffic related events had no deficiencies. Of the twenty-four (24) that had deficiencies, there were a total of forty-two (42) issues noted. In eleven (11) incidents, the post stop race/ethnicity was not noted on the Vehicle Stop Contact Form. In eight, (8) incidents, there was missing, incomplete, or inaccurate information on a citation, written warning, or Incidental Contact Form.

In four (4) incidents, the receipt does not contain a signature/acknowledgement.  In three (3) incidents, DAD/JWI indicates the deputy ran an MVD/NCIC check on subjects who do not appear on the Vehicle Stop Contact Form. In three (3) incidents, the Vehicle Stop Contact Forms did not contain the unit number. In four (4) incidents the CAD times did not match the times on the Vehicle Stop Contact Form. In one (1) incident the Vehicle Stop Contact Form was not completed and validated.  In one (1) incident the Vehicle Stop Contact Form does not contain any or an accurate reason for contacting a passenger(s). In one (1) incident the Vehicle Stop Contact Form is missing information or has inaccurate information. In one (1) incident, the Citation/Complain, Written Warning, MCSO Incidental Contact Form, or Vehicle Stop Contact Form could not be found. In one (1) incident the Deputy did not document additional units on the stop. In one (1) incident the Deputy indicated contact with a passenger(s) but did not document the information in the Vehicle Stop Contact Form.

Only seven (7) Incident Memorialization Forms were submitted for the period of July 1, 2014 to September 30, 2014, which appears to be a very low number considering the total number of incident reports.  Of the seven (7) Incident Memorialization forms submitted, only one (1) had the date of the occurrence and the date that the Incident Memorialization Form was completed so that we could verify that the documentation was reviewed within the 72 hour required review period.  Two (2) of the seven (7) Incident Memorialization Forms were done by Internal Affairs several days after the incident; these Memorialization Forms did not have the date and time of occurrence.  We must be able to verify compliance that deputies are submitting documentation of all investigatory stops and detentions by the end of their shift, and that the supervisory review required by this paragraph is occurring within 72 hours of receiving such documentation.

MCSO is not in compliance with this paragraph.

*Paragraph 91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

MCSO provided policy EB-1 Revised September 22, 2014 (Traffic Enforcement, Violator Contacts and Citation Issuance) for our review.  EB-1 is compliant with the Paragraph 91 requirements in that it states that supervisors shall document any investigatory stops or detentions that appear unsupported by reasonable suspicion or are otherwise in violation of Office policy; or stops or detentions that indicate a need for corrective action or review of Office policy or training. It also states that supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy or referring the incident for administrative or criminal investigation.

We reviewed traffic stop data for July of 2014.  Thirty-four (34) reports for traffic related events were submitted.  Of the thirty-four reports, twenty-two (22) traffic related events had no deficiencies noted; twelve (12) had noted specific deficiencies. Of the events that were identified as deficient, in five (5), the vehicle stop time information did not coincide with CAD.  In six (6) traffic related events, the deputies failed to note the unit number on the Vehicle Stop Contact Form.  In one (1) traffic related event, neither the recorded audio nor CAD indicated a reason for the stop.

We reviewed traffic stop data for the month of August of 2014. Thirty-five (35) reports for traffic related events were submitted.  Of the thirty-five (35) reports submitted, in six (6), the start and end times on the Vehicle Stop Contact Form did not coincide with the CAD information.  In another six (6) reports, the Vehicle Stop Contact Form did not contain the unit number of the MCSO member initiating the stop.  In one (1) report, the incident report was not memorialized by a supervisor within 72 hours. In one (1) incident report, the original reason for the stop did not coincide with the Vehicle Stop Contact Form.  In one (1) report, the Vehicle Stop Contact Form ethnicity did not match the citation.  Two (2) of the reports cite multiple deficiencies.

We reviewed traffic stop data for the month of September of 2014.  We reviewed data for thirty-four (34) traffic related events randomly selected from each district.  MCSO found that ten (10) traffic related events had no deficiencies. Of the twenty-four (24) that had deficiencies, there were a total of forty-two (42) issues noted. In eleven (11) incidents, the post stop race/ethnicity was not noted on the Vehicle Stop Contact Form. In eight, (8) incidents, there was missing, incomplete, or inaccurate information on a citation, written warning, or Incidental Contact Form. In four (4) incidents, the receipt does not contain a signature/acknowledgement.  In three (3) incidents, DAD/JWI indicates the deputy ran an MVD/NCIC check on subjects who do not appear on the Vehicle Stop Contact Form. In three (3) incidents, the Vehicle Stop Contact Forms did not contain the unit number. In four (4) incidents the CAD times did not match the times on the Vehicle Stop Contact Form. In one (1) incident the Vehicle Stop Contact Form was not completed and validated.  In one (1) incident the Vehicle Stop Contact Form does not contain any or an accurate reason for contacting a passenger(s). In one (1) incident the Vehicle Stop Contact Form is missing information or has inaccurate information. In one (1) incident, the Citation/Complain, Written Warning, MCSO Incidental Contact Form, or Vehicle Stop Contact Form could not be found. In one (1) incident the Deputy did not document additional units on the stop. In one (1) incident the Deputy indicated contact with a passenger(s) but did not document the information in the Vehicle Stop Contact Form.

In each of the traffic related events that a deficiency was found, a Deficiency Memorandum was generated.  The Deficiency Memorandum identifies the event by case number and type.  The memorandum includes the name of the employee involved, a summary, issues, analysis, action required, and reference section to the policy or directive that applies.  The action required section states the corrective action to be taken on the employee.

MSCO is in compliance with Paragraph 91.

*Paragraph 92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

MCSO offered EA-11 Rev. September 5, 2014 (Arrest Procedures), and EB-1 Rev. September 22, 2104 (Traffic Enforcement, Violator Contacts, and Citation Issuance).  EB-1 is compliant in that it states supervisors shall track each deputy's deficiencies or violations and the corrective action taken, in order to identify deputies who need repeated corrective action. EB-1 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops. EB-1 states that supervisors shall track, through the Early Intervention System (EIS), each Deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action. EB-1 also states supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the Deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations. EB-1 also states that MCSO shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete thorough and accurate reviews of deputies' investigatory detention and stops. EB-1 meets all the requirements of Paragraph 92.

EA-11 Rev. 09/05/2014 (Arrest Procedures) is compliant with the requirement that supervisors shall use EIS to track each subordinate's violations or deficiencies in investigatory stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  EA-11 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops. EA-11 states that supervisors shall track, through the Early Intervention System (EIS), each Deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action. EA-11 also states supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the Deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations. EA-11also states that MCSO shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete thorough and accurate reviews of deputies' investigatory detention and stops. EA-11 meets all the requirements of paragraph 92.

We reviewed performance evaluations for 51 employees and 33 supervisors who had received an evaluation between July 1, 2014 and September 30, 2014.  The evaluations of the supervisors contained an assessment of the quality and effectiveness of their supervision. Twenty-nine (29) of the thirty-three (33) evaluations of the supervisors did not contain comments regarding the

supervisor's demonstrated ability to identify and effectively respond to misconduct among their subordinates.

MCSO is currently revising their EIS policy. MCSO is not in compliance with Paragraph 92.

*Paragraph 93. Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

EA-11 (Arrest Procedures) as revised on September 5, 2014 states that Deputies shall submit documentation of all stops, investigatory detentions and arrests to their supervisors by the end of the shift in which the action occurred.

We reviewed 7 completed Incident Report Memorialization Forms submitted for the period of July 1 to September 30, 2014. The rest of the MCSO submissions for the period were traffic related events already covered in Paragraph 90. We noted that the supervisors identified deficiencies and corrective actions. One of the Incident Report Memorialization Forms was not accompanied by the incident report; the Incident Memorialization Form was completed six days later. Of the 7 completed Incident Memorialization Forms reviewed, three (3) were not memorialized within the 72 hour required period. Only one (1) Incident Memorialization Form was issued for a late report submission.

MCSO is not in compliance with Paragraph 93.

*Paragraph 94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

Our process for verification consists of reviewing supervisors' documentation of any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. MCSO submitted policies EA-11 Rev. September 5, 2014 (Arrest Procedures). EA-11 states that supervisors shall document any arrests that appear unsupported by probable cause or are otherwise in violation of Office policy; or indicate a need for corrective action or review of Office policy, strategy, tactics, or training. Supervisors shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved deputy, and/or referring the incident for administrative or criminal investigation. EA-11 is in compliance with the requirements of Paragraph 94.

We reviewed 7 completed Incident Report Memorialization Forms submitted for the period of July 1, 2014 to September 30, 2014, and noted that the supervisors identified deficiencies and corrective actions as required.  The issues identified included failure to audio record the statement of a victim of domestic violence, failure to read Miranda prior to questioning, turning in a late report, improper documentation of probable cause, incorrect violations cited, and lack of articulation in a report.  Only one Memorialization Form was issued for an arrest that failed to document probable cause. There is insufficient data at this time to conclude that MCSO is complying with the EA-11.  MCSO is not in compliance with Paragraph 94.

*Paragraph 95. Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

We have reviewed EA-11 (Arrest Procedures) as revised on September 5, 2014 and the policy meets most of the requirements of Paragraph 95.  Both EIS and a Performance Evaluation System are in development. Paragraph 95 states that supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. EA-11 Rev. 09/05/2014 (Arrest Procedures) is compliant with the requirement that supervisors shall use EIS to track each subordinate's violations or deficiencies in investigatory stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  EA-11 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops. EA-11 states that supervisors shall track, through the Early Intervention System (EIS), each Deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action. EA-11 also states supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the Deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations

We reviewed performance evaluations for 51 employees and 39 supervisors who had received an evaluation between July 1, 2014 and September 30, 2014.  Eight (8) of the Deputy Performance Evaluations that were reviewed had disciplinary activity.  None of the evaluations reviewed contained any documentation of subordinates' violations or deficiencies in arrests.  None of the Performance Evaluations for supervisors had any disciplinary activity.

Given the absence of an EIS or governing policy, MCSO is not in compliance with Paragraph 95.

*Paragraph 96. A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or*

*Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

We reviewed EA-11 Rev. September 5, 2014 (Arrest Procedures) and the policy meets the requirements of Paragraph 96. EA-11 states that Command level personnel shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of Office policy; or that indicate a need for corrective action or review of Office policy, strategy, tactics, or training.  The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.

We reviewed 7 completed Incident Report Memorialization Forms submitted for the period of July 1 to September 30, 2014. Of the 7 Report Memorialization Forms, only one had the date reviewed by a commander. The 5 hard copy versions of the Memorialization Forms are signed by commanders, but no dates of review are noted. Two were computerized Memorialization Forms that show the entry by the Internal Affairs commander, but it appears that they do not have a review date by the Deputy's chain of command; these computer generated forms also do not state the date and time of the occurrence.  One Incident Memorialization Form did not state the corrective action taken.

MCSO is not in compliance with Paragraph 96.

*Paragraph 97. MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

MCSO noted that policy GB-2 (Command Responsibility) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy.  The EIS System and policy is under development.  Until such time as the system becomes operational and is supported by policy, MCSO is not in compliance with Paragraph 97.

### d. Regular Employee Performance Review and Evaluations
*Paragraph 98. MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first line supervisor access issues identified in Section IX (Early Intervention System).  MCSO is not in compliance with Paragraph 98.

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

Policy GC-4 (Performance Appraisals) is currently under revision and will purportedly contain the requirements of Paragraph 99.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first line supervisor access issues identified in Section IX (Early Intervention System).  MCSO is currently not in compliance with Paragraph 99.

*Paragraph 100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of Paragraph 100.  We will verify once we receive a draft of the completed policy as well as the EIS policy.

We reviewed 39 supervisors Performance Evaluations submitted for the period of July 1, 2014 to September 30, 2014. The quality of supervisory reviews is not specifically addressed in any of the dimensions on the Performance Evaluation Form.

MCSO is not in compliance with Paragraph 100.

*Paragraph 101. Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

MCSO has taken the position that they no longer have Specialized Units which enforce immigration laws.  During discussions with CCID and MCAO attorneys, we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the

Order, be identified.  From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.

During this evaluation period, MCSO and their attorneys have articulated that the three criminal violations they believe qualify as potentially immigration related include: human smuggling, forgery, and misconduct with weapons.  We have requested the monthly arrest and enforcement statistics for the months March – August 2014 for the Units assigned to Special Investigations Division (SID), as well as all arrests for the identified immigration related crimes.  We also requested any documentation that outlines the core mission of the various SID Units.

Until such time as this material is provided an analyzed, MCSO is not in compliance with this paragraph

*Section 11: Misconduct and Complaints*

## XI. MISCONDUCT AND COMPLAINTS

### a. Internally-Discovered Violations
*Paragraph 102. MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

For our first site visit, we reviewed the following MCSO policies offered in response to this Paragraph: GH-2 (Internal Investigations), CP-8, (Preventing Racial and Other Biased-Based Profiling), CP-5 (Truthfulness), CP-2, (Code of Conduct), CP-3, (Workplace Professionalism), and GC-17 (Employee Disciplinary Procedure).  The policies did not comport to the requirements of the Paragraph, and were not specific enough to provide clarity to employees at all levels. The MCSO recently provided the revised policies: GH-2 Internal Investigations, CP-2 Code of Conduct, GC-17 Employee Disciplinary Procedure and CP-8 Preventing Racial and other Biased –Based Policing (all effective September 5, 2014). These policies are being disseminated and trained to during the ongoing Fourth and Fourteenth Amendment Training.

During the week of our site visit in September 2014, several patrol districts had experienced changes in personnel assignments due to department wide promotions and transfers. The newly assigned staffs were adjusting to their positions and were vaguely aware of the responsibilities outlined in the earlier version of GH2 Internal Investigations (effective 12-04-2013). We will be interviewing these staff during the next visit to determine their level of knowledge.

In addition to the documents above, we asked MCSO to provide any cases involving bias-based activities, retaliation, truthfulness or failure to report violations of the Order for the quarter July,

August and September 2014.  MCSO responded with a list of 185 cases. We selected the 21 cases where the allegations might be applicable to this paragraph. We also requested the case number for any open cases involving allegations of discriminatory policing since January 2014.We received twenty-one investigative packages with various allegations of MCSO policy violations. Two investigations had been reviewed during the last quarter but discipline had been added to one in July 2014, this reviewing period. Three were abstracts of IA case numbers that had been "pulled in error".   Eighteen were completed investigations.  One of those was complete, except for the findings (determination of whether violation occurred). Thirteen investigations were conducted by Custody, Patrol Districts, or Enforcement Support. Four were conducted by Professional Standards Bureau (PSB). Three of the investigations involved Posse members. Two of the Posse members were given suspensions and one was terminated.

There was no evidence in any of the documents that the divisional investigations were monitored by an assigned resource from the Professional Standards Bureau.  GH-2, Internal Investigations, includes a decision matrix for determining where investigations will be assigned as well as the responsibility for assigning a PSB resource to the investigator at any other assignment. We also recommend that PSB develop a template for the investigative documents, with indexing, to be used at the other units.  Currently, most investigations that are done, especially at the patrol districts, are difficult to navigate due to lack of organization. This will benefit the investigator as well as the administrative command staff that have the responsibility to review and make recommendations for discipline.

Despite interviewing supervisors in the field who appeared conversant on the complaint process, the investigations that are completed in divisions other than Professional Standards Bureau indicate the need for training of the supervisors. Most importantly, potential witnesses are not interviewed, and leading or ineffective questions are asked.  These questions are not designed to evoke the answers from the persons being interviewed that will give clarity to the case. For example, a case was transferred to Professional Standards for investigation of Truthfulness. The investigator believed the Principal was untruthful in his responses. The problem was that the investigator repeatedly offered statements that the Principal refused to accept. Based on the dialogue that was documented and the re-interviews by the Professional Standards investigator, a determination of untruthfulness could not be validated.

MCSO is not in compliance with this Paragraph.

### b. Audit Checks
*Paragraph 103. Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

MCSO did not submit any policies or audits in support of this paragraph.

During our first site visit, we were made aware of the MCSO's acquisition of IA Pro for case management and tracking.  At that time, the system had not been completely populated with the cases, nor had all IA employees been trained on the system. During the September site visit, we were informed that several personnel changes had taken place in Professional Standards Bureau. They were not familiar with the operations at the time.

During our June site visit, we discussed the concept and purpose of "integrity tests" with IA personnel.  They advised that they were unfamiliar with the concept and have not previously had an integrity testing program as this Paragraph contemplates. Members of MCSO are researching other agencies that have existing integrity test protocols and are expected to conduct a site visit to one of those agencies in November.  We will review the policy on this topic when it is developed and make sure that it incorporates an understanding of the intent of this Paragraph.

MCSO is not in compliance with this Paragraph.

### c. Complaint Tracking and Investigations
*Paragraph 104. Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

Our review of policy GH-2 (Internal Investigations) Section G. 1, revised September 5, 2014, requires personnel to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Commanders shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

In addition, we reviewed sixteen completed Internal Affairs investigations.  There were no documents included that addressed compliance with appearing for interviews. There were also no forms or memoranda that indicated that commanders or supervisors were notified when a Deputy under their supervision had been summoned as part of an administrative investigation.

GH-2 is being disseminated and trained to during the ongoing Fourth and Fourteenth Amendment Training.  MCSO is not in compliance with this Paragraph.

*Paragraph 105. Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

The policy, GH-2, Internal Affairs, revised September 5, 2014,now includes language that investigators shall have access to and take into account as appropriate, the collected traffic stop and patrol data, training records, discipline history, and any past complaints and performance evaluations of involved officers. A revised Internal Affairs SOP has not been submitted for review during this quarter.

We received 21 cases for review for this reporting period. Of those, two cases had been reviewed during the last reporting period and three were abstracts of duplicate IA case numbers or numbers pulled in error. In the sixteen remaining cases, one was complete except for the findings. One case included the discipline history of the subject. Another included the past two performance evaluations. There were no traffic stop or patrol data included, where appropriate. We anticipate more consistent inclusion of the required elements after the distribution and training on the revised GH-2 Internal Affairs policy.

MCSO is not in compliance with this Paragraph.

*Paragraph 106. Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

MCSO has two obligations under this Paragraph – to maintain and make records available. At this time, we have no reason to believe that MCSO has withheld any data requested from the Monitor.  However, the Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs as well. The Plaintiffs advise that MCSO has not produced certain information requested by Plaintiffs' representatives after multiple requests.

MCSO's record maintenance and/or retention policy as it pertains to complaints is now incorporated in GH-2 Internal Investigations (effective September 5, 2014). Professional Standards Bureau investigative files will be maintained for five years after an employee's separation or retirement from Office employment."

Until such time as MCSO addresses the issue of the Plaintiffs' access to requested records, MCSO is not in compliance with this Paragraph.

*Section 12: Community Engagement*

**XII. COMMUNITY ENGAGEMENT**

**a. Community Outreach Program**
**(Note: Unchanged language is presented in italicized font. Additions are indicated by <u>underlined font</u>. Deletions are indicated by crossed-out font. Where an entire paragraph has been removed, that is indicated with brackets, but the numbering remains unchanged. For example: "108. [REMOVED]".)**

*Paragraph 107. To rebuild public confidence and trust ~~in the MCSO and~~ in the reform process, the ~~MCSO~~<u>Monitor</u> shall ~~work to improve community relationships and~~ engage constructively with the community during the period that this Order is in place. ~~To this end, the MCSO shall create the following district community outreach program.~~*

On April 4, 2014 an amended Order (Document 670) made community outreach a Monitor's function.  This is no longer an MCSO responsibility.  In that vein, the Plaintiffs and the Monitor have communicated repeatedly about engaging community leaders; selecting Community Advisory Board (CAB) members; advertising upcoming community events; providing for the development of a complaint system that goes through the Monitor to assure access to the appropriate process; and informing the public about the authority of MCSO regarding immigration enforcement.  Each of these issues will be dealt with in more detail in the following Paragraphs.

*Paragraph 108. [REMOVED] Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.*

*Paragraph 109.~~As part of its Community Outreach and Public Information program, the MCSO~~<u>The Monitor</u> shall hold a public meeting ~~in each of MCSO's patrol Districts within 90~~<u>180</u> days of the ~~Effective Date~~<u>issuance of this amendment to the Order</u>, and ~~at least~~<u>between</u> one <u>and three</u> meetings in each of <u>MCSO's patrol</u> Districts annually thereafter. <u>The meetings shall be under the direction of the Monitor and/or his designee.</u> These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The ~~MCSO~~<u>Monitor</u> shall clarify for the public at these meetings that ~~it~~<u>the MCSO</u>~~does not~~<u>lacks the authority</u> to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

On April 4, 2014 an amended Order (Document 670) gave the requirement to hold public meetings to the Monitor. Two community meetings were held by the Monitor during this reporting period. On August 28, 2014, a community meeting was held in MCSO District 6 at the Queen Creek Library located at South Ellsworth Road, Queen Creek, AZ 85142.  The meeting was held from 6:30 PM until 9:00 PM.  Seven community members attended this meeting.

Although there were few attendees, there was good interaction and a number of questions were asked. There were a few complaints voiced about MCSO and a genuine interest displayed by the attendees in the efforts for changes in MCSO policies and procedures.  Also attending were members of MCSO, attorneys for the Defendants, attorneys for the Plaintiffs, and representatives from the ACLU.

The second community meeting held by the Monitor during this reporting period was conducted on September 24, 2014 in MCSO District 1 at Frank Elementary School located at 8409 South Avenida Del Yaqui, Guadalupe, AZ 85283. The meeting was held from 6:50 PM to 9:45 PM. Approximately 130 community members attended. The attendees asked a number of questions and relayed their personal experiences of what they perceived as mistreatment by members of MCSO. There was considerable emotion displayed by a number of the attendees.

The Monitor was prepared to conduct both meetings in English and Spanish to ensure the maximum amount of participation and understanding took place. There was no requirement for translation into Spanish at the Queen Creek meeting. The advertisements prior to both meetings had been dispersed in both English and Spanish to a variety of media outlets.

At both meetings, the Monitor, or Deputy Monitor, explained to the meeting attendees the role of the Monitor, his responsibilities to the community, the progress being made, as well as challenges ahead in implementing the Order.  As part of the initial presentation, and during questions and answers, the Monitor and Deputy Monitor made it clear that MCSO did not have the authority to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.  It was also explained to those in attendance that the Monitoring Team would have a regular presence in Maricopa County and we provided our contact information to all parties.  We advised the attendees that the Monitor had the authority to take complaints about treatment received at the hands of MCSO personnel and insure that these complaints were investigated completely.  Further, we explained that new policies, procedures, training and equipment were being developed for MCSO officers and supervisors to ensure that they were working within the law and toward the best interests of the people of Maricopa County.

At both meetings, a number of questions were asked by community members. The Monitor, Plaintiffs' representatives, or members of MCSO, as appropriate, responded to these inquiries. The Monitor was prepared to have the entire discussion at both meetings, both questions and answers, conducted in English and Spanish, although, as mentioned earlier, Spanish translation was not required at the Queen Creek meeting.  For those who declined to ask their questions publicly, separate cards were made available for them to write their questions.  Attendees were also provided with forms to document complaints or concerns.

*Paragraph 110. The meetings present an opportunity for ~~MCSO representatives~~the Monitor to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust. ~~MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.~~TheMonitor may investigate*

*and respond to those concerns. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendants' compliance with this order, it may assist the complainant in filing an appropriate complaint with the MCSO.*

Approximately 130 community members were in attendance at the meeting in Guadalupe, and seven community members attended the meeting in Queen Creek. Both meetings allowed for ample opportunity for attendees to ask questions or offer comments. They could either use the roving microphone provided by the Monitor, or write their comments or complaints on note cards that were provided for the Monitor to read aloud and provide answers.   Questions were successfully fielded at both meetings.  At the meeting in Guadalupe, people politely waited their turn at the microphone and Monitoring Team personnel moved throughout the meeting location, providing microphones where needed or note cards for those who wished to ask their questions in writing. At the Queen Creek meeting, people also waited politely for their turn to speak. Although note cards were available for use by the attendees, no attendees asked to use them at the Queen Creek meeting.

A key objective of both meetings was to let those in attendance know that the Monitor had the authority, provided by the Court, to take complaints about any activity involving MCSO personnel and make sure that an investigation was adequately conducted.  Forms were made available for this purpose.  After both meetings, all Monitoring Team personnel remained behind to individually answer questions, and did so until the last attendee left the building.

*Paragraph 111. English- and Spanish-speaking ~~MCSO~~Monitor Personnel shall attend these meetings and be available to answer questions from the public <u>about its publicly available reports concerning MCSO's implementation of this Order and other publicly-available information.</u>~~At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the Community Liaison Officer (described below) shall participate in the meetings.~~<u>The Monitor may request</u> Plaintiffs' <u>and/or Defendants'</u> representatives ~~shall be invited~~ to attend <u>such meetings and assist in answering inquiries by the community. The Defendants are under no obligation to attend such meetings, but to the extent they do not attend such meetings after being requested bye Monitor to do so, the Monitor may report their absence to the public and shall report their absence to the Court.</u>*

Every member of the Monitoring Team in Phoenix for site assessment visits with MCSO attended the meetings.  The Monitor and three of his team members are bilingual and the Monitor made several of his remarks in Spanish.

In addition, opening comments were made by Alessandra Soler of the ACLU of Arizona, Cecillia Wang of the ACLU Immigration Rights Project, and Chief Deputy Sheridan of the MCSO. MCSO was well represented at both meetings and were recognized for their attendance. Several of the MCSO personnel in attendance at both meetings play instrumental roles in the implementation of the Court's Order.

*Paragraph 112. The meetings shall be held in locations convenient and accessible to the public. At least ~~one week~~ten days before such meetings, the ~~MCSO~~Monitor shall widely publicize the meetings using English and Spanish-language television, print media and the internet. <u>The Defendants shall either provide a place for such meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and other expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If the Monitor determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, he can file a request with the Court that this requirement be revised or eliminated.</u>*

Preparations for both meetings began over two months in advance of the meeting dates.  Issues such as site selection, advertisement in local radio and print media in English and Spanish, agenda creation, and meeting logistics are of utmost importance in the planning stages.  Input from the Community Advisory Board (CAB) as well as ACLU is taken into consideration before finalizing these items.  MCSO's Court Compliance and Implementation Division staff, as well as the Chief Deputy, are kept abreast of the planning as well as consulted on meeting security issues.  Members of the Monitoring Team met with the ACLU of Arizona and Community Advisory Board (CAB) members to discuss preparations for the public meetings.

Selection of venues for both meetings was based on accessibility, adequate meeting space, adequate parking and ease in locating the meeting site. The meetings in Queen Creek and Guadalupe were widely publicized. Advertisements, in both English and Spanish, appeared in newspapers with the widest circulation in the areas in which the meetings were held.  These ads were also included in the media outlets' Facebook pages and websites.  With the assistance of the ACLU, we were able to encourage and support the formation of a flyer to announce the Monitor's public meetings, to be distributed to community members at designated community events.  The ACLU also submitted the meeting notice to numerous online calendars via their local radio media contacts, and prepared a Public Service Announcement.  In addition there were multiple English and Spanish media outlets recording the event in Guadalupe and conducting interviews of participants and attendees thereafter.

**b.~~Community Liaison Officer~~<u>Monitor</u>**

*Paragraph 113. [REMOVED] Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.]*

*Paragraph 114.* In addition to the duties set forth in Title XIII of this order, ~~The CLO~~ the Monitor *shall have the following duties* in relation to community engagement:

    *a.    to coordinate the district community meetings described above in Paragraphs 109 to 112;*

    *b.    to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 111;* and

    *c.    to compile any Complaints, concerns and suggestions submitted to* ~~CLO~~him *by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;*

*[d.    [REMOVED] to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and]*
*[e.    [REMOVED] to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.]*

At both of the community meetings the Monitor and Plaintiffs' representatives explained the breadth of the Order to the community members in attendance.  An MCSO representative provided a summary of actions taken by the MCSO to comply with the Order. Community members were also allowed to ask any question of these representatives and were given an opportunity to comment on the information provided by these representatives.  Community members were also provided forms to document any concerns or complaints.  After the meeting, members of the Monitoring Team remained and spoke to several attendees who voiced their opinions and concerns regarding MCSO's operations.

### c. Community Advisory Board

*Paragraph 115.* ~~MCSO~~The Monitor *and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the* ~~MCSO~~Monitor *and community leaders, and to provide specific recommendations to MCSO about policies and practices that will* ~~increase community trust and~~ *ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

We worked with Plaintiffs to create a three member Community Advisory Board (CAB).  Since that time meetings and other communications have been held between the Monitor and CAB members to go over their responsibilities.  Advisory Board members have notified the Monitor that they have engaged in ongoing communication with community leaders.

*Paragraph 116. The CAB shall have* ~~six~~three *members,* ~~three to be selected by the MCSO and three to be~~ *selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case.* ~~However, a member of the MCSO Implementation Unit and at least one representative for~~

*~~Plaintiffs shall attend every meeting of the CAB.~~ The CAB shall continue for at least the length of this Order.*

The CAB is currently comprised of three community members. None of these members are, or have been, MCSO employees, named as class representatives in this matter, or are attorneys involved in the Melendres litigation.

*Paragraph 117. The CAB shall hold ~~public~~ meetings at regular intervals of no more than four months. <u>The meetings may be either public or private as the purpose of the meeting dictates, at the election of the Board. The Defendants shall either provide a suitable place for such meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses incurred in arranging for such a meeting place. The Defendants shall also pay to the Monitor the additional reasonable expenses that he will incur as a result of performing his obligations with respect to the CAB including providing the CAB with reasonably necessary administrative support.</u>~~The meeting space shall be provided by the MCSO.~~The ~~CLO~~<u>Monitor</u> shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.*

The CAB participated in meetings with various members of the Monitor team and Plaintiffs' representatives during the reporting period. It did not hold any community meetings during the reporting period. We will coordinate with the CAB to insure that a meeting or meetings as required by this paragraph occur during the next reporting period, providing logistical support as required.

*Paragraph 118. During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter ~~and make reasonable efforts to address such concerns.~~<u>and transmit them to the Monitor for his investigation and/or action.</u> Members~~will~~<u>may</u> also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

The Monitor has met with CAB members to discuss the issue of transmitting to the Monitor any complaints received by CAB members that may require investigation. In addition, the Monitor has discussed the crucial role of the Community Advisory Board's ability to reach into the community in a way that the Monitoring Team cannot. The Board members have been advised to compile concerns regarding MCSO actions or compliance with the Order. To facilitate this effort, the ACLU of Arizona has launched a bilingual website, ChangingMCSO.org/CambiandoMCSO.org. According to the ACLU, the website serves as a place where the public can gather information about the monitoring process, including the times and locations for community meetings, Monitor reports, MCSO reports and other court filings. The website also includes a form for filling out complaints, which will then be directly conveyed to the CAB and Monitor.

**Section 13: Concluding Remarks**

Theodore Roosevelt once said "Nothing in the world is worth having or worth doing unless it means effort, pain and difficulty…"  MCSO is in the midst of some of the hardest work it will ever do, and it is important that they do it to the best of their abilities.  The importance of their work was clearly evident in the Guadalupe community meeting in September.  People who reside in that City from all walks of life, from academics to day laborers, want the Sheriff's Office to be responsive to their needs and representative of an institution they can depend upon to provide services in a fair and constitutionally appropriate manner.

The hard work is beginning to pay dividends with the finalization of significant policies that have allowed MCSO to begin training its personnel to the standards of the Fourth and Fourteenth Amendments, to which all law enforcement agencies should aspire.  These are laudable objectives that required substantial energy to get under way, but also require tenacious oversight to insure that they guide the behavior of all MCSO personnel in the future.

A key component of this oversight will center on successful implementation of the Early Intervention System (EIS).  A core function of the EIS system should be the ability of line supervisors to oversee and evaluate the behavior and activities of Deputies at a moment's notice, before problems get out of hand.  This will require MCSO to rectify the access issues for first-line supervisors that are enumerated in our report.

We have seen the creation and realignment of significant responsibilities during this reporting period.  MCSO has created the Bureau of Internal Oversight, which incorporates CCID and EIU.  More importantly, each of these entities has received additional resources and personnel to carry out their responsibilities.  However, with this realignment and infusion of resources, expectations for performance increase.  It is clear that MCSO is counting on BIO and its subcomponents to be ground zero for its efforts to comply with the Order's requirements.  This centralization of responsibility certainly facilitates coordination and oversight of the Office's reform efforts, and we are supportive of the structural design, but we remind MCSO that the obligation for reform rests with all employees.  In the end, unless the diverse communities policed by MCSO experience a palpable difference in the manner in which services are provided, restructuring and handling the mechanical duties of the Order are meaningless.

Finally, MCSO participated in two community meetings held by us during this reporting period.  Their presence, while not required, signals to the community the desire by MCSO to improve the way it provides services and law enforcement to the citizens.  These are not often easy meetings as they involve critique toward the organization and, at times, outbursts by citizens overwhelmed with the emotion because of what they've experienced.  To a person, the MCSO personnel who have attended these meetings have done so with the professionalism and openness that is required for these meetings to serve a useful purpose.  In addition, MCSO conducted its first Spanish-speaking Citizen's Academy during this reporting period.  Efforts such as these can go a long way towards building public trust.  However, as we have seen, all of these advances can be jeopardized with a single action or comment that denigrates the Court Order or the reform process that continues to unfold.

In the final analysis, with all the activities, the MCSO is only in compliance with 14 of 87 Paragraphs[4].  Organizational personnel from Sheriff Arpaio on down have been pleasant and cooperative in their interactions with the Monitoring Team.  But civility and facilitation have not manifested themselves in the compliance findings nor in positive community perception as observed in the Community Meetings.  The executive staff of the MCSO will have to create for themselves, and others, a level of expectation and excellence that can give better assurance to the public and the Court that the reform process has been institutionalized and can be sustained.

---

[4] Excluded from consideration are Paragraphs that are introductory in nature, and those Paragraphs that have been deleted or assigned to the Monitor.