A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7847
melmcdonald2@gmail.com

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., <br><br> Plaintiffs, <br><br> v. <br><br> Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., <br><br> Defendants. | NO. CV-07-02513-PHX-GMS <br><br> **MEMORANDUM IN SUPPORT OF SHERIFF ARPAIO'S DECLARATION OF COMPLIANCE WITH COURT ORDERS AND OPPOSING THE IMPOSITION OF A CRIMINAL CONTEMPT REFERRAL** |

Defendant Joseph Arpaio, Sheriff of Maricopa County, Arizona, ("Defendant" or "Sheriff Arpaio") submits the following memorandum in response to the issues raised by this Court on December 4, 2014, regarding Sheriff Arpaio's actions regarding this Court's Orders. For the reasons stated in this memorandum, there is not a sufficient basis to refer Sheriff Arpaio's actions to the United States Attorney's Office for consideration in filing criminal contempt proceedings against Sheriff Arpaio. The Sheriff is committed to carrying out the Orders of the Court, and avows that he will strive to be in full compliance with all past, present and future court orders, ensure that those Orders are presented to his entire office, and ensure that supervisory protocols are established to maintain compliance.

Sheriff Arpaio readily concedes that mistakes have been made in the

4031292.1

communication and, in some instances, implementation of Court Orders. He genuinely regrets those mistakes, and is committed to working with the Court Monitor to carry out existing directives and minimize further mistakes. While he ultimately bears responsibility for the breakdown in communications, none of his actions have been done with contemptuous disregard of this Court's Orders. He is not guilty of criminal contempt, and we respectfully urge the Court to refrain from making a referral for criminal contempt against the Sheriff or any of his assistants. We further join in the County's argument that civil contempt should not be imposed against MCSO.

## I. INTRODUCTION

### A. Sheriff Arpaio's Background and Service to his Country.

Sheriff Joe Arpaio has devoted almost his entire adult life to serving his country, both in the military and as a law enforcement officer. He has served not only throughout the United States, but around the world in many foreign countries. Born on June 14, 1932, Sheriff Arpaio's mother, knowing that her life would be imperiled with the pregnancy, lost her life giving birth to Sheriff Arpaio after refusing medical advice to get an abortion. After a challenging childhood where he was moved from family to family, as age 18 Sheriff Arpaio joined the U.S. Army in 1950, near the beginning of the Korean conflict. He served on active duty from 1950-1953, eventually leaving active duty as a Staff Sergeant. After his honorable discharge from active duty, the Sheriff continued his military service for years as a member of the Army Reserve, serving as a Warrant Officer in the Criminal Investigation Division from 1954-1964.

Sheriff Arpaio began his law enforcement career in 1954, becoming a patrol officer with the Washington D.C. Police Department. He walked a beat in one of the toughest areas of Washington D.C. for three years, from March of 1954 to June of 1957. In June of 1957, he was hired by the Las Vegas Police Department, serving in Las Vegas for six months. In November of 1957, he was hired as a Special Agent with the Federal Bureau of Narcotics. He served in Chicago from 1957-1961.

In 1961, Sheriff Arpaio was transferred by the Federal Bureau of Narcotics

2

4031292.1

to serve as Special Agent in Charge in Istanbul, Turkey. During his three years of service, from 1961-1964, he was involved in key investigations involving the "French Connection." He was widely recognized for his service in Turkey, which covered not only Turkey, but major portions of the Middle East.

In 1964, Sheriff Arpaio returned to the United States and was appointed Special Agent in Charge of the San Antonio, Texas field office of the Federal Bureau of Narcotics. He served in that assignment from October of 1964 to January of 1968.

In January 1968, Sheriff Arpaio was assigned to serve as Special Agent in Charge of the Washington D.C. field office. Later that year, the Federal Bureau of Narcotics was merged with the Bureau of Drug Abuse Control to create the Bureau of Narcotics and Dangerous Drugs. After the merger, Sheriff Arpaio was transferred to Maryland to serve as Deputy Regional Director of the Bureau of Narcotics and Dangerous Drugs. He served in that capacity until December of 1969.

In December of 1969, Sheriff Arpaio was appointed Regional Director of the Bureau of Narcotics and Dangerous Drugs in Mexico City. He moved to, and lived in, Mexico City, having close contact with government leaders, including the President of Mexico and other governmental leaders of Latin American countries, during his service. He was Regional Director from January 1970 to July of 1973. His investigative jurisdiction covered all of Latin America.

In 1973, during the Nixon presidency, a decision was made to consolidate the Bureau of Narcotics and Dangerous Drugs, the Office of Drug Abuse Law Enforcement, and the Bureau of Customs into a single agency, thereafter known as the Drug Enforcement Administration (DEA). After this merger, Sheriff Arpaio was assigned as Section Chief of Intelligence for the entire Middle East. He served in that position from July 1973 to July 1974. His duties involved the collection and classification of evidence and intelligence and strategic planning in the war on drugs.

In July of 1974, Sheriff Arpaio was appointed Deputy Regional Director of DEA for the New England states, with headquarters in Boston. He held that position from

4031292.1

August 1974 to July 1978. In 1978, Sheriff Arpaio was appointed Special Agent in Charge of the Arizona office of DEA. He served in that assignment for four years, from 1978-1982. In 1982, he retired from federal government service, ending 31 years of federal service (which includes his military service). This government service took him around the world and earned him great respect from American and foreign law enforcement leaders.

His awards and achievements during his years of federal law enforcement are noteworthy. Those awards include Outstanding Italian-American for Arizona, Sons of Italy (2003); Anslinger Award for Counterdrug Activity, International Narcotic Enforcement Officers Association (2000); Special Award of Honor from International Narcotic Officers Association (1982); Award from Arizona Association of Chiefs of Police (1982); Outstanding Contribution in the Field of Narcotic Enforcement Award, presented by the International Narcotic Enforcement Officers Association at Minneapolis, Minnesota (1981); Sustained Superior Performance Award, U.S. Drug Enforcement Administration, Department of Justice (1980); Excellence of Performance Award, U.S. Drug Enforcement Administration, Department of Justice (1978); Letter of Commendation, U.S. Ambassador to Mexico (1973); Letter of Commendation, U.S. Attorney General, Washington, D.C. (1972); Award from Mexico's Attorney General, Mexico City (1971); Award from Baltimore, Maryland, Police Department (1969); Special Service Award, U.S. Bureau of Narcotics & Dangerous Drugs (1968); Letter of Commendation, U.S. Attorney General, Washington, D.C. (1968); Award from San Antonio, Texas, Police Department (1968); Extraordinary Service Award from Office of Special Investigations, U.S. Air Force, Washington, D.C. (1968); Exceptional Service Award from General Director, Turkish National Police (1964); and Superior Performance Awards, U.S. Treasury Department (1963, 1964, and 1967).

In addition, Sheriff Arpaio has been affiliated as a Life Member of the International Association of Chiefs of Police; Past President and Life Member of International Narcotic Enforcement Officers Association; Life Member of National

Sheriffs' Association; Member of the Arizona Association of Chiefs of Police; Charter Member of the Association of Former Federal Narcotics Agents; Commissioner of the Governor's Arizona Criminal Justice Commission; Member of the American Legion; Member of the National Italian-American Foundation; and numerous other affiliations and memberships in organizations since taking office as Maricopa County Sheriff on January 1, 1993. He has received dozens of awards as Sheriff of Maricopa County.

In 1992, with the encouragement of friends and supporters, Sheriff Arpaio ran for and was elected Sheriff of Maricopa County. He has been reelected as Sheriff six times. In June of 2015, he will become the longest serving sheriff in Maricopa County's history. His federal and state service, including military service, totals 55 years. At age 82, he continues to serve the people of this state even though he could have retired on state and federal retirement benefits.

During Sheriff Arpaio's 55 years of service, he has been a key figure in the criminal justice system in both federal and state governments. As part of this system, he has worked with federal and state court judges, not only in Arizona, but throughout the country and around the world. The Sheriff has been a staunch supporter and advocate of the criminal justice system. While he may have his detractors, those who know him, and have seen his service know that he would NEVER knowingly and willfully disregard an Order of any court. While the First Amendment gives him every right to disagree with decisions made by the United States Supreme Court, the Federal courts, the State courts, and the Executive or Legislative branches of the Federal and State Government, he would never, and has not in this case, knowingly, willfully, or contemptuously ignore Orders of this Court. He has spent many millions of dollars, devoted thousands of man-hours of training to, and demonstrated a commitment to implementing programs to work with, and comply with this Court's directives.

B.  **Procedural history**

On December 23, 2011, the Court entered a preliminary injunction against the Sheriff's Office, enjoining MCSO and all of its officers "from detaining any person

5

4031292.1

based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States..." *See* Order, dated December 23, 2011 at pg. 40.

After the December 23, 2011 injunction, this Court issued a 142 page "Findings of Fact and Conclusions of Law" on May 24, 2013, confirming the December 2011 injunction that "MCSO has no authority to detain people based only on reasonable suspicion, or probable cause, without more, that such persons are in this country without authorization." *See* Findings of Fact, dated May 24, 2013 at pg. 4. Based upon the Findings of Fact, the Court permanently enjoined MCSO from: (1) enforcing its LEAR policy; (2) "using Hispanic ancestry or race as a factor in making law enforcement decisions"; (3) "unconstitutionally lengthening stops unless, during the legitimate course of the stop, it develops a reasonable suspicion, based on permissible factors, that a state crime is being committed"; and (4) "using reasonable suspicion of unauthorized presence, without more, as probable cause or reasonable suspicion that the Human Smuggling Act or Employer Sanctions Law has been violated sufficient to justify an investigatory detention or arrest". *See id.* at pgs. 109, 115, 131, and 142.[1]

On October 2, 2013, the Court issued a Supplemental Permanent Injunction and Judgment Order setting forth a definition for "Full and Effective Compliance" and outlining eleven separate areas that MCSO needed to address. *See* Order, dated October 2, 2013. The October Order required that MCSO work with a monitor to report back on MCSO's progress toward compliance with the Court's Orders. On January 17, 2014, Robert Warshaw was appointed to serve as the independent monitor. *See* Order Appointing Monitor, dated January 17, 2014.

The Court ordered the Monitor to submit quarterly reports to the Court assessing MCSO's activities toward compliance with the Court's Orders. *See* Order, dated October 2, 2013 at pgs. 50-51. The Monitor submitted two Quarterly Reports in 2014—August 2014 and December 15, 2014. The Monitor also submitted an Update and

---

[1] Because this Court did not contend that Sheriff Arpaio violated these Findings, they will not be discussed in detail in this Memorandum.

6

4031292.1

Assessment on September 28, 2014.

On December 4, 2014, the Court raised the possibility of prosecuting Sheriff Arpaio for criminal contempt based on alleged violations of the December 23, 2011 injunction. Admittedly, when the December 2011 injunction was issued, MCSO and Sheriff Arpaio did not have the infrastructure in place to ensure that proper attention was given to the Court's Order. Mistakes were made because of the lack of training, accountability, and general oversight. The Sheriff readily concedes, and genuinely regrets, that these mistakes were made. Had the programs, training, and supervision gone off as he and MCSO had hoped, we would not be addressing these issues to the Court. These mistakes include: (1) MCSO falling short in communicating and training personnel on the implications and requirements of the Court's injunction; (2) a lack of supervision of patrol and "line troop" deputies; and (3) Sheriff Arpaio's statements related to MCSO's ability to detain immigrants. These mistakes are related to the issues raised by the Court at the December 4, 2014 hearing.

Sheriff Arpaio and his team of dedicated public servants regret that these mistakes were made. The mistakes were not willful, and their actions were not intended to be contemptuous of the Court's Orders. MCSO has spent millions of dollars implementing programs and policies directed by this Court. The Sheriff and his team respect the Court's authority in mandating these changes. As evidence of their good faith, we would urge the Court to focus on the numerous efforts that Sheriff Arpaio and his MCSO team have made to ensure that these mistakes do not happen again, and focus on the progress that Sheriff Arpaio and his team have made toward compliance with the Court's Orders, as well as federal and state law.

II. **MCSO'S EFFORTS AT COMPLIANCE**

When the Court issued the injunction in December 2011, MCSO did not have a specific individual or unit assigned to receive and communicate the Court's Orders to other personnel. This was also one of the issues raised by the Court in its October 2013 Order. In response to this problem, and one of the directives issued by the Court in the

7

4031292.1

October, Sheriff Arpaio and his MCSO team implemented the Court Compliance and Implementation Division ("CCID"). The CCID is staffed by a captain, lieutenant, four sergeants, two detectives, and an administrative assistant; the captain is designated as the point of contact. The CCID is responsible for creating Briefing Boards, updating and disseminating new policies, keeping updated records, and acting as an internal audit system to ensure that MCSO is compliant with Court Orders.

Additionally, in working to comply with the Court's Orders, Sheriff Arpaio and MCSO have spent over $7.5 million and recently budgeted an additional $3.7 million to obtain body cameras for their sworn deputies. Some of the other notable steps taken to comply with the Court's Order include:

(1)  Using Attestation Logs to ensure that all MCSO personnel read and review the Court's Findings of Fact, Orders, and Corrective Statement. To date, 100% of sworn Supervisors, 99.9% of compensated, sworn Deputies (with the exception of one on leave), 100% of reserve Deputies, 99.9% of Detention Officers, and 99.9% of Detention Supervisors have done this.

(2)  Implementing policies related to Bias-Free Policing, Code of Conduct, and Traffic Enforcement. Since October 2013, MCSO has issued 18 different Briefing Boards on various aspects of the Courts' Order, changed its Code of Conduct, and promulgated 12 new policies and procedures that were also approved by the Monitor. These policies emphasize race-neutral, bias-free policing, and prohibit deputies from enforcing immigration laws for unauthorized presence in the United States.

(3)  Improved training requirements and curriculum. The Court outlined three areas of training: (1) Bias-Free Policing; (2) Detentions, Arrests, and Enforcement of Immigration-Related Laws; and (3) Supervisor training. In September 2014, training on Bias-Free policing, and the 4th Amendment issues began, and as of December 2014, 1,083 posse members, 68 reserve officers, and 681 deputies (all but three who are on extended leave) have been trained on the 4th and 14th Amendments and Bias-Free Policing.

(4)  Improvements in supervision. The Court required that MCSO have a

4031292.1

1:12 ratio of supervisor to subordinate. Sheriff Arpaio promoted 35 sergeants to supervisory roles, and required all supervisors to attend training to ensure uniformity and effective supervision. Supervisor roles were revised to clarify their responsibilities and emphasize proper supervision of their subordinates to ensure that their subordinates performed their duties properly and lawfully.

    (5) Creation of the Early Identification Unit (EIU) and Bureau of Internal Oversight to identify problematic behavior, conduct self-audits, and allow supervisors to intervene and correct inappropriate activity.

    (6) Improvements in data collection by implementing a TraCS system, which electronically captures data at vehicle stops, and updating deputies' Mobile Data Terminals (MDT) so patrol officers can collect the data requested by the Court. This also allows supervisors to review their subordinates' activities, and provides supervisors an early warning system to address any potential problems.

    (7) Establishment and implementation of the Professional Standards Bureau (PSB) to address complaints and allegations of misconduct, both internally and from the public.

  A. **Quarterly Reports**

    Further detailed evidence of MCSO's compliance is outlined in the Monitor's First and Second Quarterly Reports. According to the Monitor's First Quarterly Report, MCSO engaged in "several activities" with the Monitoring Team during the reporting period, including policy review and developing training protocols. *See* First Quarterly Report at pg. 8. Monitor Warshaw noted that, "the majority of deputies and commanders are supportive of the changes being imposed by the Order and are looking forward to a more well trained and professional Department." *Id.* at pg. 10.

    The Monitor's Second Quarterly Report was completed on December 15, 2014. This report further described the progress made by MCSO between July 1, 2014 and September 30, 2014. In the Second Quarterly Report, Monitor Warshaw noted that "[t]here has been a tremendous amount of activity during this reporting period—July 1 to

9

September 30, 2014—surrounding significant policy finalizations, the onset of training to these policies, and two Community meetings that showed just how important the issues contained within the Court Order are to the citizens of Maricopa County, as well as many personnel working within the Sheriff's Office." *See* Second Quarterly Report, dated December 15, 2014, at pg. 4. Monitor Warshaw also noted "many motivated and professional Deputies and Supervisors" and a "shuffling of personnel and the movement and creation of Units that…bodes well for the future progress of achieving compliance with the Court Order." *Id.*

The Second Quarterly Report further described several significant steps that MCSO and Sheriff Arpaio have taken to address the issues raised by the Court's December 23, 2011 injunction, including modifying policies to directly address issues surrounding racial profiling. The Monitor noted in the Second Quarterly Report that MCSO was in compliance with 14 of 87 paragraphs in the Court's Order, and that Sheriff Arpaio and MCSO are continuing to work with the Monitoring Team to develop the policies, protocols, training, and data collection systems to meet the Court's requirements.

## III.   CRIMINAL CONTEMPT PROCEEDINGS

The Court raised the possibility of criminal contempt proceedings against Sheriff Arpaio based on three areas of alleged "non-compliance" with the December 23, 2011 injunction: (1) MCSO's failure to communicate the December 23, 2011 injunction to "line troops" in the Human Smuggling Unit (HSU); (2) Sheriff Arpaio's alleged claim that he (and presumably MCSO patrol officers) could continue to detain immigrants who did not have any state charges and turn them over to ICE; and (3) MCSO's failure to disclose alleged information prior to trial, including audio and video recordings, license plates, licenses, identification cards, and other materials that were found in May 2014 inside Deputy Armendariz's home.

To prove criminal contempt, a jury must find, beyond a reasonable doubt, that Sheriff Arpaio "willfully" disobeyed the Court's Order. *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 782 (9th Cir. 1983). "Willful disobedience" is a

10

"deliberate or intended violation" of the Court's Order, it cannot be accidental, inadvertent, or negligent. *Id.* Acting in good faith is a defense to a finding of intent, but it does not immunize all conduct. *See U.S. v. Thoreen*, 653 F.2d 1332, 1342 (9th Cir. 1981) (attorney found to be in criminal contempt when he substituted someone for his client at counsel table intending to cause misidentification; in doing so, the attorney misled the Court, counsel, and witnesses, and delayed trial. The Court stated that making misrepresentations to the Court is "inherently obstructive because it frustrates the rational search for truth.")

There is no evidence suggesting that Sheriff Arpaio intentionally or deliberately violated the Court's orders. There is no evidence that Sheriff Arpaio intentionally withheld the injunction from members of HSU, directed his MCSO team to continue immigration enforcement knowing that it would violate the Court's orders, and there is no evidence showing that Sheriff Arpaio willfully withheld evidence from Plaintiffs in the underlying lawsuit.

### A. Failure to inform HSU of December 2011 injunction

Sheriff Arpaio testified under oath that he only "vaguely" recall the December 23, 2011 injunction. *See* Deposition of Joseph Arpaio in Case No. 2:12-cv-00981-ROS, dated April 29, 2014 at pg. 65: 13-19. Sheriff Arpaio did not personally know whether MCSO officers were continuing to detain immigrants in violation of the Order after it was issued, because there were several members of his staff "working on this issue," and MCSO had conferred with several attorneys on the lawsuit. *Id.* at pg. 68: 1-18. Sheriff Arpaio is not a lawyer, and he did not directly supervise the HSU officers. The responsibility for interpreting, implementing, and explaining the Court's orders to all of MCSO cannot be solely left up to him. None of this constitutes contempt or "willful disobedience".

Sheriff Arpaio did not willfully disobey the Court's Orders simply because the HSU did not know about the injunction, and there is no evidence that Sheriff Arpaio deliberately withheld the injunction from HSU or other patrol units. At most, the failure

11

4031292.1

to communicate the injunction was an accident, a mistake due to a lack of communication within the organization. This is not an intentional act of defiance or disobedience toward the Court. *See United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980) (finding that "criminal contempt is established when there is a clear and definite order of the court, the contemnor knows of the order, and the contemnor willfully disobeys the order.")

For criminal contempt, it is insufficient to show that MCSO, as an entity, failed to communicate the Court's December 23, 2011 injunction to HSU—there needs to be direct knowledge and direct disobedience by Sheriff Arpaio himself. Without direct evidence that Sheriff Arpaio "willfully disobeyed" the Order, a prosecution for criminal contempt against Sheriff Arpaio lacks merit. As a result, a referral for criminal contempt against him would be unjustified. The significant investment in funds, improved training for all personnel, and effort of MCSO as a whole are indicative of MCSO and Sheriff Arpaio's commitment toward compliance.

Although several Deputy Chiefs have also acknowledged that they did not receive any information about the December 23, 2011 injunction, this was a result of a since remedied lack of communication throughout the office, rather than criminal contempt. Chief Sheridan, Chief Deputy and former head of the Maricopa County Detention System, testified under oath that he did not remember receiving any information about the December 2011 Order. *See* Deposition of Gerard Sheridan in Case No. 2:12-cv-00981-ROS, dated March 27, 2014 at pg. 123: 22-25. Chief Sheridan testified that he would have remembered if he had known about the injunction because he would have been able to recall "something significant like this…." *Id.* at 124: 1-2. Chief Sheridan noted that issues related to the *Melendres* case were "pretty much left…to Chief [Brian] Sands to deal with," and that Chief Sands was the point of contact if the County Attorney needed to communicate with MCSO about the injunction. *Id.* at 124: 4-12, 12: 8-12. Furthermore, according to Chief Sheridan, any judicial orders directed toward MCSO would likely be communicated through legal counsel for MCSO who would then advise the affected Chief, Chief Deputy, or possibly Sheriff Arpaio. *Id.* at 126: 9-18.

12

4031292.1

Chief Sheridan did not recall any requirement that Sheriff Arpaio was supposed to communicate Court Orders to patrol and other MCSO personnel. Sheriff Arpaio, as previously stated, has addressed this issue by creating a specific division (CCID) to address and handle Court Orders. *See id.* at 126: 19-25, 127: 1-21.

Lieutenant Joseph Sousa, Lieutenant in the HSU from 2007/ 2008 until 2012, also testified that he could not recall the injunction that was issued in December 2011, and that all operations within the HSU were dealt with by Chief Sands. *See* Deposition of Joseph Sousa in Case No. 2:12-cv-00981-ROS, dated February 4, 2014 at pg. 171: 21-25, 118: 21-25, 119: 1-22. Lieutenant Sousa never testified that Sheriff Arpaio was responsible for distributing court rulings, or training the HSU on compliance with Court Orders.

The critical standard for evaluating these mistakes should focus on MCSO's acknowledgement that mistakes were made, and that MCSO has since implemented policies and procedures to ensure that these communication problems do not occur in the future. MCSO has, in fact, learned from the mistakes in 2011, and has significantly improved the procedures for educating MCSO personnel regarding court orders both up and down the chain of command.

**B. Statements related to detention of immigrants.**

The second issue raised by the Court was Sheriff Arpaio's statements after the December 2011 injunction that he could continue to detain immigrants for ICE without any more than reasonable suspicion that they were in the country illegally. In making these statements, Sheriff Arpaio did not mean to defy the Court's position or encourage or persuade his deputies to violate the law. *See Kasper v. Brittain*, 245 F.2d 92, 95 (6th Cir. 1957) (the First Amendment does not protect speech that was "clearly calculated to cause a violation of the law"). Sheriff Arpaio's statements cannot form the basis for contempt proceedings unless the Government can prove that the statement(s) presented a "clear and present danger to the administration of justice." *See Wood v. Georgia*, 370 U.S. 375, 383-84, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) (citations omitted).

13

4031292.1

In other words, before the Court can sanction Sheriff Arpaio for stating that he could continue to detain immigrants without state charges in order to turn them over to ICE, the Court must find, beyond a reasonable doubt, that there is an "imminent, not merely a likely, threat to the administration of justice. The danger must immediately imperil." *Id.* (citing *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947)).

Sheriff Arpaio's statements did not create an "immediate peril" or "imminent threat" to the administration of justice. Sheriff Arpaio did not direct his patrol officers or deputies to violate the law or defy the Court's injunction and detain immigrants and/ or violate their constitutional rights. Sheriff Arpaio's statements did not direct his deputies to engage in unlawful conduct. Without more, the statements alone, are therefore insufficient to justify a proceeding for either civil or criminal contempt. In point of fact, and practice, immigrants illegally in the United States are not being detained without state charges in order to turn them over to ICE.

### C. Alleged non-disclosure of discoverable materials.

The third issue raised by the Court involves allegedly discoverable materials. There are two separate concerns, the first involving materials found in former Deputy Ramon Armendariz's home, and the second involving recordings of various traffic stops made by other MCSO deputies.

#### 1. Materials found in Armendariz's home.

On May 8, 2014, officers went to former MCSO Deputy Ramon Charley Armendariz's home to serve a felony arrest warrant after he had failed to comply with criminal court orders. Following a standoff, Armendariz hung himself and was found dead in his home. Officers searched his home and found several items related to traffic stops, and possibly related to criminal cases, including license plates, driver's license information, traffic stop audio and video, and identification cards.

A sheriff can only be liable for "official acts" of his deputy. *See Dogarin v. Connor*, 6 Ariz.App.473, 477, 433 P.2d 653 (App. 1967) (liabilities of sheriff limited by "official" acts of deputy). "Official acts are done under color and virtue of his office. *See*

14

4031292.1

*Miles v. Wright*, 22 Ariz. 73, 194 P. 88 (1920). Here, no evidence exists to demonstrate that the Sheriff actually knew about Armendariz's actions or the property he confiscated and improperly processed until May 2014, let alone intentionally or knowingly violated any Court order relevant to Armendariz's actions. The Sheriff does not condone any illegal or out of policy conduct of any of his deputies. Moreover, if he was aware that any conduct violated MCSO policies, or that was illegal, Sheriff Arpaio would ensure that proper investigations by MCSO and/or the Maricopa County Attorney would occur, and that the appropriate, corresponding discipline would result.

Sheriff Arpaio did not "willfully disobey" the Court simply because of Armendariz's alleged misconduct. Sheriff Arpaio did not claim, and cannot claim to know what Armendariz had in his house, or whether it was relevant to Plaintiffs' lawsuit. The allegation that several "immigration-related" items were found in Armendariz's home which "may well have limited" Plaintiffs' presentation of evidence at trial is simply too speculative to justify a prosecution for criminal contempt or form the basis of a civil contempt proceeding. To allege that Sheriff Arpaio should be found in contempt for an alleged discovery violation based on a "rogue" officer's wrongdoing is unsubstantiated and relies on speculation. Any wrongdoing related to Armendariz, therefore, should not, and cannot be imputed to Sheriff Arpaio for purposes of moving forward with criminal contempt proceedings against the Sheriff.

The magnitude of the Maricopa County Sheriff's Office and their operations must be also considered by the Court before finding Sheriff Arpaio liable for Armendariz's actions. Maricopa County is the fourth largest county in the United States, and has a total area of 9,224 square miles. The County is currently divided into six geographical areas, referred to as Districts. Districts are staffed by a District Commander (Captain), Deputy Commander (Lieutenant), uniformed sergeants and patrol deputies, detectives, and administrative staff. Districts overlap city agencies, as the Sheriff's Office has concurrent jurisdiction in these areas. It would be unfair to hold the Sheriff, or any of his Chiefs, responsible for the actions of one rogue deputy when one considers the size of

15

4031292.1

the office, and number of employees—consisting of 524 deputies, 126 Sergeants, 37 Lieutenants, 24 Captains, 2059 Detention officers, 658 staff, and 1,083 active posse members and 89 reserve officers for a total of 4,601 employees.

      2.    <u>Sheriff Arpaio has made good faith efforts to obtain recordings by other MCSO deputies.</u>

The Court also expressed concern about the non-disclosure or recent discovery of recordings made by other MCSO officers. MCSO deputies were not required to, but sometimes recorded traffic stops. Upon learning that this information may still exist, the Court required MCSO to implement a plan to obtain these recordings. MCSO began working diligently to obtain this information, and due to the scope and investigatory nature of the request, MCSO has worked closely with the Professional Standards Bureau ("PSB") and Monitor to come up with an appropriate plan that did not infringe upon the Law Enforcement Officer's Bill of Rights. To date, they have recovered over 8,900 video clips, including over 4,000 from Armendariz and over 1,650 items of evidence. MCSO's timely investigation does not demonstrate Sheriff Arpaio's alleged "willful disobedience" of the Court's Order or any intent to defy the Court's request.

## IV.   <u>18 U.S.C. §402</u>

The Court raises 18 U.S.C. §402 as a possible remedy for criminal contempt. This allows the Court to impose a fine, imprisonment, or both if a defendant is found guilty of criminal contempt. However, in order to find Sheriff Arpaio guilty of criminal contempt, ***the Government must prove, beyond a reasonable doubt, the Sheriff's intent to willfully disobey the Court's order.*** See *Falstaff Brewing Corp.*, 702 F.2d at 782 (9th Cir. 1983), *see also In re D.I. Operating Co.*, 240 F.Supp.672 (D.C. Nev. 1965) (willfulness is an essential element of offense of criminal contempt) (emphasis added

Sheriff Arpaio did not willfully disobey, or have any intent to defy the Court's December 2011 injunction, and there simply is no evidence to show that Sheriff Arpaio willfully disobeyed the injunction, or intended to ignore and defy the Court's

16

December 2011 directive. Upon learning about the injunction, Sheriff Arpaio relied on his legal counsel and subordinates to relay the information to the other officers; he did not simply ignore or disobey it. Any failure to communicate the injunction was accidental and an unintentional mistake. Since then, Sheriff Arpaio and the rest of his MCSO team have diligent worked to remedy these issues and come into compliance with the Court's Orders. And, as reported by the Monitor, MCSO has made significant progress toward full compliance and the attitudes of those within MCSO "bode well" for future compliance. As such, there is insufficient evidence to prove, beyond a reasonable doubt, that Sheriff Arpaio is guilty of criminal contempt.

## V.   THE CHALLENGES FROM THE PAST

Sheriff Arpaio and his team of chiefs never intended to disobey or defy the Orders of this Court or any other court. He is the Sheriff of the largest county in the state and is responsible for overseeing over 4,000 employees. When the Court issued the December 2011 injunction, the Sheriff acknowledged it, and relied upon his legal team and others to distribute the information accordingly. He did not know how the information was disseminated or whether it was actually passed down. When the Sheriff learned that this Court's Orders were not effectively communicated to personnel at all levels of the department, he implemented new communication protocols to ensure that future orders of this Court would be effectively relayed throughout MCSO.

In connection with his responsibilities as Sheriff, Sheriff Arpaio also engages in public speaking to maintain and garner support from the community. His statements commenting on the Court's Orders or illegal immigration were not intended to direct his deputies to disobey the law. His statements were not intended to stir up discontent within the community, or promote illegal activities. Sheriff Arpaio would not, and did not make these statements with the intent to willfully disobey the Court's Orders. There is rarely a decision from the United States Supreme Court, the 9th Circuit Court of Appeals, or Federal Courts within Arizona, that is beyond the bounds of criticism. The very essence of our First Amendment privileges of speech guarantee to each individual,

particularly an elected official charged with protecting the public safety, the right to voice opinions or disagreements. Sheriff Arpaio respects this Court, and he respects the authority of this Court. For 55 years, cases prepared for prosecution by Sheriff Arpaio have undergone judicial scrutiny. That is the very essence of our judicial system – the final word rests with the Court, and Sheriff Arpaio respects and supports the separation of powers, and the role that the courts play in our free democracy.

Sheriff Arpaio should not be responsible for the actions of a "rogue" officer. He did not know, and could not have known that Armendariz was allegedly violating the law and possibly improperly processing confiscated items from traffic stops. Upon discovering this information, Sheriff Arpaio directed MCSO to begin gathering and review all audio and video recordings. This is a tedious task that requires filtering through thousands of recordings. Sheriff Arpaio's top aides directed this investigation, and implemented several other significant changes to MCSO training, policies, data collection, and other protocols to ensure more accountability and compliance with the Court's Order. This is not criminal contempt and cannot justify charging him with criminal contempt.

Finally, Maricopa County is not paying the legal fees of legal counsel for Sheriff Arpaio, Chief Sheridan, Chief MacIntyre, or others in this criminal contempt inquiry. Each of the attorneys making appearances are looking to their clients for payment of their legal fees.

## VI.  CONCLUSION

Sheriff Arpaio would encourage this Court to refrain from proceeding in the direction of making a criminal referral to the United States Attorney's Office. While he can understand the Court's frustration regarding the actions of a rogue deputy, those actions by former Deputy Armendariz represent an aberration, not the culture, of MCSO. **More importantly, the rogue actions of Armendariz certainly do not justify any criminal contempt by Sheriff Arpaio.**

A criminal referral and possible federal criminal jury trial would have devastating consequences to the efficient operation of the Maricopa County Sheriff's

18

4031292.1

Office. It would not only bring personal financial hardship to Sheriff Arpaio and his team of leaders at MCSO, but it would be grossly unfair—MCSO has made significant changes to their training, policies, supervision, and chain of command, which clearly demonstrates their commitment toward complying with the Court's Orders and directives. It would, in counsel's opinion, severely undermine these positive changes and unfairly tarnish the good name and legacy of a public servant who has given over a half century of extraordinary service to the citizens of this country.

The Sheriff and his team have certainly received the message from the Court, loud and clear. The attitude of MCSO is not one of defiance or disregard to the Court's Orders; rather, there is a clear commitment to implement the directives of this Court through training and requirements of compliance. We would urge the Court to not make a criminal contempt referral and to refrain from finding civil contempt, and allow the Sheriff and his team to continue implementing the Court's directives, and to take note of all that has been done to date, and will be done in the future.

RESPECTFULLY SUBMITTED this 9th day of January, 2015.

JONES, SKELTON & HOCHULI, P.L.C.

By /s/ A. Melvin McDonald
A. Melvin McDonald
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012

ORIGINAL e-filed this 9th day of January, 2015,
Copies emailed to:

Michael D Moberly    mmoberly@rcalaw.com

Katherine Elizabeth Baker    keb7333@earthlink.net, paralegal@greenandbaker.com

David A Selden    dselden@cavanaghlaw.com, eharden@cavanaghlaw.com, mbryant@cavanaghlaw.com

Eileen Dennis GilBride    egilbride@jshfirm.com, efiling@jshfirm.com, kgawel@jshfirm.com

Leigh Eric Dowell    eric.dowell@ogletreedeakins.com, glenda.ready@ogletreedeakins.com, trish.simon@ogletreedeakins.com

Ann Thompson Uglietta    uglietta@mcao.maricopa.gov, conrade@mcao.maricopa.gov,

19

4031292.1

| | |
|---|---|
| 1 | naranjo@mcao.maricopa.gov |
| 2 | Julie A Pace (Terminated)   jpace@cavanaghlaw.com, nhiggins@cavanaghlaw.com |
| 3 | Elizabeth A Strange   elizabeth.strange@usdoj.gov, pamela.vavra@usdoj.gov |
| 4 | Diane Loretta Bornscheuer   dbornscheuer@greenandbaker.com, paralegal@greenandbaker.com |
| 5 | |
| 6 | Michele Marie Iafrate   miafrate@iafratelaw.com, TCryan@iafratelaw.com, cshehorn@iafratelaw.com, jlafornara@iafratelaw.com |
| 7 | Thomas P Liddy   liddyt@mcao.maricopa.gov, gulley@mcao.maricopa.gov, kautzman@mcao.maricopa.gov |
| 8 | |
| 9 | Daniel Joseph Pochoda   dpochoda@acluaz.org, danpoc@cox.net, gtorres@acluaz.org |
| 10 | Alec R Hillbo   alec.hillbo@ogletreedeakins.com, robin.mcadams@ogletreedeakins.com |
| 11 | John Michael Fry   jfry@rcalaw.com, tkaminski@rcalaw.com |
| 12 | Kerry Scott Martin   kerry.martin@ogletreedeakins.com, kathy.hubert@ogletreedeakins.com, trish.simon@ogletreedeakins.com |
| 13 | Thomas George Stack   thomas.stack@phoenix.gov, alice.valenzuela@phoenix.gov, law.civil.minute.entries@phoenix.gov |
| 14 | |
| 15 | Cecillia D Wang   cwang@aclu.org, jbaird@aclu.org, lfernandez@aclu.org |
| 16 | Charitie L Hartsig   chartsig@rcalaw.com, ckhartsig@cox.net, swalker@rcalaw.com |
| 17 | Anne Lai   alai@law.uci.edu |
| 18 | Andre Segura   asegura@aclu.org, tding@aclu.org |
| 19 | Stanley Young   syoung@cov.com, jkoch@cov.com, jromanow@cov.com, rhouston@cov.com |
| 20 | Tammy Albarran   talbarran@cov.com, eerlich@cov.com |
| 21 | James Duff Lyall   jlyall@acluaz.org, gtorres@acluaz.org |
| 22 | Edward G Caspar   edward.g.caspar@usdoj.gov |
| 23 | Jorge Martin Castillo   jcastillo@maldef.org, iaparicio@maldef.org |
| 24 | Patrick Matthew Malgieri   pmalgieri@harrisbeach.com, keldred@harrisbeach.com, pmmalgieri@gmail.com |
| 25 | |
| 26 | Priscilla G Dodson   pdodson@cov.com |
| 27 | Hyun Sik Byun   hbyun@cov.com |
| 28 | |

4031292.1