Cecilia D. Wang (*Pro Hac Vice*)
cwang@aclu.org
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950

Daniel J. Pochoda
dpochoda@acluaz.org
ACLU Foundation of Arizona
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | CV-07-2513-PHX-GMS |
| Plaintiffs, | ) ) | **PLAINTIFFS' MEMORANDUM OF LAW AND FACTS RE CONTEMPT** |
| v. | ) ) | **PROCEEDINGS AND REQUEST FOR ORDER TO SHOW CAUSE** |
| Joseph M. Arpaio, et al., | ) ) | |
| Defendants. | ) ) | |

Additional Attorneys for Plaintiffs:

Andre I. Segura (*Pro Hac Vice*)
asegura@aclu.org
ACLU Foundation
Immigrants' Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654

Anne Lai (*Pro Hac Vice*)
alai@law.uci.edu
401 E. Peltason, Suite 3500
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-0066

Priscilla G. Dodson (*Pro Hac Vice*)
pdodson@cov.com
Covington & Burling LLP
One City Center, 850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5996
Facsimile:  (202) 778-5996

Jorge M. Castillo (*Pro Hac Vice*)
jcastillo@maldef.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone:  (213) 629-2512
Facsimile:  (213) 629-0266

Stanley Young (*Pro Hac Vice*)
syoung@cov.com
Hyun S. Byun (*Pro Hac Vice*)
hbyun@cov.com
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Tammy Albarran *(Pro Hac Vice)*
talbarran@cov.com
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7066
Facsimile: (415) 955-6566

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.   Defendants Committed Contempt by Violating the Court's
     December 23, 2011, Preliminary Injunction ............................................. 1

     A.   Defendants' In-Court Admissions and Deposition
          Testimony Establish That They Failed to Comply with the
          Preliminary Injunction ................................................................. 2

     B.   Defendants Knowingly Continued Their Policy of
          Detaining Persons Solely Based on Unlawful Presence
          After Such Conduct Was Ruled Unlawful and Enjoined .............. 4

II.  Defendants Committed Contempt by Violating This Court's May
     14, 2014, Order Concerning Collection of Video Evidence .................... 9

III. Defendants' Numerous Acts of Defiance Support the Need for
     Serious Sanctions To Compensate Plaintiffs and To Ensure Future
     Compliance. ........................................................................................... 12

IV.  The Court Should Begin With Limited and Expedited Document
     Discovery and an Evidentiary Hearing on Civil Contempt Against
     Defendants and Individual MCSO Personnel ......................................... 17

V.   Court Ordered Remedies Are Necessary To Compensate the
     Plaintiffs and To Secure Future Compliance with Court Orders ............ 18

     A.   The Court Should Order Defendants To Assist in the
          Identification of Victims of Defendants' Noncompliance
          with the December 23, 2011, Preliminary Injunction, and
          To Pay Compensation to Individual Victims ............................... 19

     B.   The Court Should Order Compensation to the Plaintiff
          Class as a Whole ........................................................................ 21

     C.   The Court Should Order Injunctive Relief Provisions To
          Ensure That Defendants' Violations Stop, and That Future
          Violations Do Not Occur ............................................................ 22

     D.   The Court Should Order Attorneys' Fees and Costs.................... 24

CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Cases**

*Ahearn ex rel. Nat'l Labor Relations Bd. v. Int'l Longshore and Warehouse Union*,
   721 F.3d 1122 (9th Cir. 2013) .................................................................... 20

*Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779 (7th Cir. 1981). 25

*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ........................................ 12

*Falstaff Brewing Corp. v. Miller Brewing Corp.*, 702 F.2d 770 (9th Cir. 1983)
   .................................................................................................... 19, 22, 24

*Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821 (1994) .............. 20, 22, 25

*Lance v. Plummer*, 353 F.2d 585 (5th Cir. 1965), *cert. denied*, 384 U.S. 929
   (1966)...................................................................................................... 19

*Nat'l Labor Relations Bd. v. Local 825, Int'l Union of Operating Engineers*, 430 F.2d
   1225 (3d Cir. 1970) ................................................................................ 25

*Perry v. O'Donnell*, 759 F.2d 702 (9th Cir. 1985)........................................................ 24

*Peterson v. Highland Music, Inc.*, 140 F.3d 1313 (9th Cir. 1998)................................. 17

*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992), *as amended on
   denial of reh'g* (Aug. 25, 1992).......................................................... 2, 12

*United States v. Ayres*, 166 F.3d 991 (9th Cir. 1999) .............................................. 17

*Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510 (9th Cir. 1992) .................. 17, 19, 22

*Xcentric Ventures, LLC v. Stanley*, No. 2:07-cv-00954- GMS, 2009 WL 113563
   (D. Ariz. Jan. 16, 2009) ........................................................................ 12

**Statutes**

Fed. R. Civ. P. 37(b); ................................................................................ 24

ii

Plaintiffs respectfully submit the following memorandum of law and facts in support of the initiation of civil contempt proceedings against Defendants and certain other command staff of the Maricopa County Sheriff's Office ("MCSO").

## INTRODUCTION

Though Defendants have not yet disclosed numerous documents that may support a finding of contempt of the Court's orders, there is already ample evidence on which this Court could find Defendants in civil contempt for violating two separate orders of the Court.

First, Defendants admit that they failed to take steps to comply with the Court's December 23, 2011, preliminary injunction, a failure which predictably led to repeated violations of that order. Second, and also by their own admission, Defendants directly contravened this Court's May 14, 2014, order directing them to consult with the Monitor to formulate a plan to quietly collect deputies' self-recorded videos of traffic stops, instead acting unilaterally and in a manner that may have led to the destruction of evidence, and then misleading the Monitor as to their actions.

Plaintiffs therefore request that the Court initiate a civil contempt proceeding to expeditiously vindicate the rights of the Plaintiff Class and compensate those injured by the contempt. And because there appears already to be evidence supporting a finding of criminal contempt, Plaintiffs also submit that the Court should refer these matters for criminal contempt proceedings following the civil contempt proceedings.

## ARGUMENT

**I.      Defendants Committed Contempt by Violating the Court's December 23, 2011, Preliminary Injunction**

The Court's preliminary injunction was entered on December 23, 2011. It required changes in the widespread unconstitutional practices of the MCSO by prohibiting "MCSO and all of its officers . . . from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." Doc. 494 at 40, ¶ 5, *aff'd by Ortega Melendres v. Arpaio,*

1

695 F.3d 990 (9th Cir. 2012).  Defendants committed civil contempt because, far from taking the legally required "all reasonable steps within their power to insure compliance with the court's order[,]" *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (internal quotations omitted), Defendants, by their own admission, failed to take the most basic steps to comply with the Court's order, and apparently never intended to comply.

### A. Defendants' In-Court Admissions and Deposition Testimony Establish That They Failed to Comply with the Preliminary Injunction

On November 20, 2014, Defendants revealed that they never transmitted the Court's December 2011 preliminary injunction order to relevant MCSO personnel, including deputies in the Human Smuggling Unit ("HSU").  Transcript of Nov. 20, 2014 Hearing ("Nov. 20 Tr.") at 67 ("MCSO has concluded, that this Court's order was not communicated to the line troops in the HSU."), *unsealed by* Doc. 811.  HSU was the principal unit charged with the very activities enjoined.  Defendants have further admitted that news of the preliminary injunction was communicated by defense counsel to three top commanders and the Lieutenant overseeing the HSU at MCSO. Nov. 20 Tr. at 67-68 ("We have identified an e-mail from Mr. Casey to Brian Sands, Chief Brian Sands, Chief Jack MacIntyre, Chief Jerry Sheridan, and Lieutenant Sousa.").  And yet, Defendants admit, not one of those commanders communicated the Court's preliminary injunction order to MCSO personnel.

The sworn testimony of command staff in a related matter, *United States v. Maricopa County*, No. 2:12-cv-00981-ROS (D. Ariz. filed May 10, 2012), demonstrates that the commanders had the responsibility to communicate the Court's order, and failed to do so.  In depositions in the *United States v. Maricopa County* case, Sheriff Arpaio, Chief Deputy Jerry Sheridan, and Executive Chief (Ret.) Brian Sands all testified that they took no action to communicate the Court's preliminary injunction order to MCSO rank and file or otherwise ensure that those responsible for

2

interacting with civilians in the implementation of MCSO policy were aware of and complied with the preliminary injunction.

Sheriff Arpaio testified that he was aware of the preliminary injunction when the Court issued it but did not recall doing anything to ensure that MCSO complied with the order. *See* Declaration of Anne Lai ("Lai Decl."), Ex. B ("Arpaio Dep.") at 65:13-68:18; *see generally id.* at 59:5-73:17. Chief Deputy Sheridan testified that it would have been his responsibility as Chief Deputy to inform MCSO officers about the preliminary injunction, *see* Lai Decl. Ex. D ("Sheridan Dep.") at 122:13-18, but that he assumed that Executive Chief Sands would take care of it, *id.* at 123:22-125:7. Sheridan admitted that he did not communicate with Sands about this purported delegation of responsibility, however, and did not know whether Sands understood he had any responsibility to relay the Court's preliminary injunction to deputies. *Id.* at 124:14-125:7. Sands, on his part, responded to a question about whether he had informed his subordinates about the Court's preliminary injunction by stating, "Our attorney, as I remember, handled all of that with our staff." *See* Lai Decl. Ex. C ("Sands Dep.") at 183:7-185:15. Lieutenant Sousa could not recall any electronic bulletin board posting (or "Briefing Board") being issued after the preliminary injunction order. *See* Lai Decl. Ex. F ("Sousa Dep.") at 178:6-23. Deputy Chief Jack MacIntyre should also have taken responsibility for communicating the preliminary injunction, as he is an attorney who works with outside counsel defending lawsuits against Defendants, *see* Doc. 235-1 ¶¶ 1-2, and previously was held responsible for failing to communicate a document retention notice in this litigation, leading to the spoliation of evidence and sanctions against Defendants, *see* Doc. 261 at 3.

In sum, Defendants' own admissions establish that they took *no* steps—much less the required "all reasonable steps"—to follow this Court's clear order.[1]

### B. Defendants Knowingly Continued Their Policy of Detaining Persons Solely Based on Unlawful Presence After Such Conduct Was Ruled Unlawful and Enjoined

Since Defendants took no steps to implement and to obey the preliminary injunction, MCSO continued to detain persons solely based on unlawful presence in direct violation of the Court's order. *See* Doc. 494 at 40, ¶ 5 (prohibiting "MCSO and all of its officers . . . from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States"). As set out below, Sheriff Arpaio's public statements as to specific MCSO operations reveal that he was not only aware of the continued use of the LEAR policy, but sought to ensure that individuals held only on suspicion of unlawful presence were not released. Sheriff Arpaio directed that if ICE refused to accept a person detained by MCSO solely under the LEAR protocol, MCSO deputies should retain custody of that person and attempt to transfer that person to the custody of U.S. Border Patrol. The continued detention of individuals solely on the basis of suspected unlawful presence is in clear violation of this Court's preliminary injunction.

As evidence disclosed thus far establishes, MCSO repeatedly detained persons based solely on unlawful presence, after the Court's preliminary injunction prohibiting that practice. While Plaintiffs have not had the opportunity to determine the full scope or timeframe of the violations, Plaintiffs are aware of at least the following four incidents in which individuals were held unlawfully on this basis alone. Given that

---

[1] The above deposition testimony also establishes that Defendants failed to inform *any* patrol officers of the preliminary injunction, *see* Arpaio Dep. 65:13-68:18; Sheridan Dep. 122:13-18, 123:22-125:7; Sands Dep. 183:7-185:15; Sousa Dep. 178:6-23, not merely that they failed to inform HSU officers, as Defendants admitted in court on November 20, 2014, *see* Nov. 20 Tr. at 67.

4

MCSO has maintained an affirmative policy of detaining individuals based on suspected unlawful presence alone, it is likely that there have been other similar incidents yet to be uncovered.

**First,** on September 20, 2012, MCSO deputies detained five suspected "illegal aliens." *See* Declaration of Andre Segura ("Segura Decl."), Ex. A at A3-A5 (News Release, MCSO, ICE Refuses to Accept Illegal Aliens from Sheriff's Deputies During Human Smuggling Operation, Sept. 21, 2012). The MCSO deputies detained the suspects and summoned HSU officers to interview them. *Id.* at A3. The HSU officers arrested three of them on human smuggling charges. *Id.* at A3-A4. The MCSO deputies then continued to detain the two remaining individuals—who were not charged with any crime—in order to transfer them to ICE custody. *Id.* MCSO's press release states that the only basis for the detention of the two remaining individuals was MCSO's belief that they were unlawfully present in the United States. *See id.* at A4 ("Sheriff's detectives were unable to gather enough evidence on the remaining two suspects to charge them with a state charge of human smuggling and attempted to turn the suspects over to ICE as has been the practice during the last six years."). This detention plainly violated the preliminary injunction.

The press release further states that the LEAR policy had been "the practice during the last six years," thus indicating that it had not been altered in response to the preliminary injunction. *See id.* at A4. It is clear that MCSO considered the detentions a routine application of policy. What made the operation noteworthy to MCSO was that ICE refused to take the suspects. *Id.* at A3. The press release also reveals that Sheriff Arpaio had been actively considering the possibility that ICE might cease to accept alleged undocumented immigrants from MCSO in this manner, and had devised a "back up plan" to turn them over to the Border Patrol instead. *Id.* at A4 ("'I expected that it [ICE's refusal] would happen eventually, so I had a back up plan in place which was to take these illegal immigrants not accepted by ICE to the Border Patrol,' Sheriff

Arpaio said.").  In other words, Sheriff Arpaio was well aware that MCSO was continuing to implement the LEAR policy even though, as he has admitted in deposition testimony in the *United States* case, he was aware of this Court's preliminary injunction at the time it issued (*see supra* at 3).  The September 21, 2012, press release closes with the Sheriff's announcement that he would continue his immigration detention policy: "Regardless of the Obama Administration[']s policy, I am going to continue to enforce all of the illegal immigration laws."  *Id.* at A4-A5.

**Second,** on September 26, 2012, MCSO again detained individuals based on civil immigration violations alone, this time in the course of a worksite raid seeking suspects believed to be using false identification in employment.  *See* Lai Decl. Ex. A ("Brockman Dep.") at 225:23-235:4; Lai Decl. Ex. E ("Almanza Dep.") at 218:7-223:24; Lai Decl. Ex. G ("Jakowinicz Dep.") at 150:8-154:3; Lai Decl. Ex. H; Lai Decl. Ex. I.  During the operation, MCSO made a traffic stop of a vehicle that was leaving the site.  Brockman Dep. 233:11-23.  MCSO determined that two of the occupants were not current employees and therefore that no state charges could be brought against them.  *Id.* at 234:11-20.  MCSO then detained the occupants solely on suspicion that they were unlawfully present in the United States, in violation of the preliminary injunction.  *See id.*; *id.* at 229:17-18.  As with the September 20, 2012 detentions, this was a typical application of MCSO policy.  *See id.* at 234:19-20 ("We did what we normally [did], which was to call ICE ERO or DRO."); Jakowinicz Dep. 153:10-22 (it was protocol at the time that when a person admitted to being unlawfully present, HSU would detain them and call ICE).  After ICE declined to take the individuals into custody, MCSO called Border Patrol and then had "a couple posse units" drive the detainees to the Border Patrol office south of Gila Bend, *see* Brockman Dep. 234:19-22, 234:23-235:1, a distance of approximately 66.5 miles.

MCSO issued a press release about the incident the next day, noting Sheriff Arpaio's personal role: "[ICE] refused to arrest two illegal aliens that were looking for

6

work while deputies were investigating the establishment.  Arpaio refused to allow the suspected illegal aliens to be released into the streets and ordered the deputies to transport these two suspects to the United States Border Patrol."  *See* Segura Decl. Ex. A at A6-A7 (News Release, MCSO, Sheriff's Deputies Execute Search Warrant at Construction Company: Criminal Employment Investigation Nets 17 Arrests of Suspected Illegal Aliens, Sept. 27, 2012).  The conduct described in the press release violated the preliminary injunction and the U.S. Constitution.

**Third,** on October 8, 2012, HSU officers stopped a vehicle with two men and again detained them based solely on suspected civil immigration violations.  *See id.* at A8 (News Release, MCSO, 2nd Time ICE Refuses to Accept Illegal Alien From Sheriff's Deputies Since September, Oct. 9, 2012).  The driver was arrested on a state-law charge of operating a motor vehicle without a license.  *Id.*  Meanwhile, MCSO maintained custody of the passenger and attempted to turn him over to ICE.  *Id.*  After ICE refused to take the passenger, MCSO transported him to the Border Patrol office in Casa Grande.  *Id.*  Sheriff Arpaio is quoted as saying, "My back up plan is still in place and we will continue to take these illegal aliens not accepted by ICE to the Border Patrol."  The press release concludes: "[t]his is the 82nd arrest made over the last month."  *Id.*

In each of these three incidences, MCSO kept the individuals in custody in violation of the Court's preliminary injunction during the time it took (a) to communicate with ICE, (b) to await ICE's decision not to take custody, (c) to subsequently communicate with Border Patrol, and (d) to transport the individuals to Border Patrol custody.

7

**Fourth,** although Plaintiffs notified Defendants of the problematic nature of these stops,[2] Defendants apparently nevertheless continued to detain individuals unlawfully on the basis of their immigration status.  On November 1, 2012, MCSO officers engaged in what Defendants have referred to as the "Korean stop" during a status conference before this Court.  *See* Nov. 20 Tr. at 67.  The documents detailing this stop are under seal, but Defendants have indicated in an unsealed portion of a court proceeding that the stop occurred during an immigration interdiction patrol and that MCSO deputies detained persons on suspicion of unlawful presence, in violation of the preliminary injunction.  *Id.*

As discussed above, there are likely other incidents of violations not known to Plaintiffs.  In sum, well after December 23, 2011, Defendants' policy of detaining undocumented immigrants based on their immigration status remained wholly intact and was knowingly endorsed, if not personally directed, by Sheriff Arpaio.  The only apparent change after the Court's preliminary injunction order was that pursuant to the Sheriff's new directive, if ICE refused to take individuals held solely on suspected

---

[2] On October 11, 2012, Plaintiffs sent Defendants a letter expressing serious concerns about the September 20, September 26, and October 8, 2012 events.  *See* Segura Decl. Ex. A at A1-A2.  On October 18, 2012, Defendants responded, insisting that these events did not constitute violations of the preliminary injunction, apparently because U.S. Border Patrol had, in response to MCSO's calls, directed MCSO to deliver the already detained persons to a Border Patrol station or, in the alternative in one instance, to hold them for transport.  *See* Segura Decl. Ex. B.  But this course of action, which necessitates detaining an individual pending an inquiry to federal authorities based on nothing more than suspected civil immigration violations, did in fact violate the Court's injunction.  As this Court subsequently found, "the LEAR policy that requires a deputy to (1) to detain persons she or he believes only to be in the country without authorization, (2) to contact MCSO supervisors, and then (3) to await contact with [federal officials] pending a determination how to proceed, results in an unreasonable seizure under the Fourth Amendment" and violates the Court's preliminary injunction.  Doc. 579, May 24, 2013 Findings of Fact and Conclusions of Law, 4, 113-14; *see also id.* at 114 ("The Court further concludes, as a matter of law, that the MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction.").

civil immigration violations, MCSO would call Border Patrol.  Through this practice, Defendants repeatedly violated the preliminary injunction.

## II.  Defendants Committed Contempt by Violating This Court's May 14, 2014, Order Concerning Collection of Video Evidence

There is also ample evidence to show that Defendants were in contempt of a separate order by this Court concerning the necessary role of the Court-appointed Monitor in the investigation arising from the arrest and death of former MCSO Deputy Charley Armendariz.

On May 14, 2014, in a now-unsealed proceeding, counsel for the Defendants revealed that MCSO discovered about 900 hours of video recordings of Deputy Armendariz's traffic stops in his home.  Transcript of May 14, 2014 Hearing ("May 14 Tr.") at 45, *unsealed by* Doc. 706.  None of these recordings had been officially logged into an MCSO database or turned over to Plaintiffs during discovery.[3]  *Id.* at 45-66. Armendariz had recorded these videos using a dashboard camera and an eyeglass-mounted camera.  *Id.*  Upon questioning, Chief Deputy Sheridan further revealed that MCSO had purchased and installed Armendariz's dashboard camera, along with dashboard cameras for other deputies, and that MCSO was also aware that some deputies recorded their activities with body-mounted cameras.  *Id.* at 52 ("THE COURT: Was the Maricopa County Sheriff's Office aware that some of its officers were recording traffic stops?  CHIEF DEPUTY SHERIDAN: The best way to answer that, Your Honor, is the dash cams would have been purchased and installed by the

---

[3] As the Court has noted, these videos should have been produced during discovery. Question Four of Plaintiffs' First Set of Requests for Production, dated February 25, 2009, requested "[a]ll documents relating to all traffic stops performed by every MCSO supervisor, officer, posse member, or volunteer for years 2005 to present" that include information such as the location, time, and duration of the stop; the reason for the stop; the questions asked of the drivers and passengers; etc. *See* Declaration of Jessie Baird, Ex. A at 7, ¶ 4.  That Request for Production also defined "documents" specifically to include "video tapes." *Id.* at 3, ¶ 11.

Sheriff's Office, so the answer would be yes, to some extent."); *id.* at 57 ("I do believe that there are other deputies that have recorded traffic stops and other activities with their own purchased video cameras.").  Sheridan stated that he did not know how many dashboard cameras were in existence when he took over his current duties in 2010 or what happened to the recordings from those cameras.  *Id.* at 53, 57.  Sheridan also stated that MCSO had, until recently, not had any policy governing deputies' self-recording of traffic stops.  *Id.* at 55, 57-58.

Both Plaintiffs and the Court expressed substantial concern about these recordings, MCSO's failure to disclose them, and the possibility that deputies might destroy incriminating recordings in response to a request for production.  *See, e.g.*, *id.* at 56-61, 79-81.  The Court mentioned that it could order subpoenas requiring every MCSO officer with videos and other pertinent information to disclose them, *id.* at 59, but Defendants asked the Court "to allow us to do it in a softer manner than subpoenas," *id.* at 60.  The Court allowed such an approach, but stated that it expected "a thought-through plan . . . in which you can quietly gather such material."  *Id.* at 61.  The Court therefore directed Defendants to "cooperate completely with my monitor," *id.* at 72, and to work with the Monitor "on a plan that [the Monitor] can approve that's your best thinking about how you can, without resulting in any destruction of evidence, gather all the recordings," *id.* at 75.  The Court also directed Defendants to bring any disagreements with the Monitor to the attention of the Court.  *Id.* at 73, 94, 96.  Defendants assented, *id.* at 72-73, 96, noting that the Monitor had already provided "some good advice" that MCSO would "incorporate into how we approach this situation," *id.* at 76.

Within hours of assenting to the Court's clear directions, Defendants acted in a manner inconsistent with these mandates and their representations to the Court, as well as with best practices for the critical and complex investigation of MCSO personnel. These events of May 14, 2014, have been recounted in detail by the Monitor, who was

himself a witness to some of these events.  In brief, after the hearing, in the early afternoon of May 14, 2014, Arpaio, Sheridan, and counsel met and decided, without consulting with the Monitor and therefore in violation of the Court's direction during the earlier status conference, to collect any videos of traffic stops in the hands of MCSO personnel by sending an email to division commanders.  *See* Doc. 795-1 ("Monitor's Report") at 4.  Deputy Chief David Trombi was then summoned into the meeting and directed, by Sheridan, to send the email.  *Id.*; Nov. 20 Tr. at 59.  Sheridan, Captain Holmes, and defense counsel then held a two-and-a-half hour meeting with the Monitor to discuss how to collect the videos, without disclosing that they had already formulated and executed a plan that contradicted the Court's directions to collect the videos "quietly" and in cooperation with the Monitor.  *See* Monitor's Report at 3; May 14 Tr. at 61, 72, 75.  Sheriff Arpaio briefly attended the latter meeting.  Monitor's Report at 3.

Later that day, Sheridan informed the Monitor of Trombi's email, which had already been disseminated widely to MCSO personnel.  *Id.*  Initially, Sheridan claimed that Trombi had sent the email without Sheridan's knowledge.  *Id.*  It was not until later that evening that Sheridan revealed to the Monitor that there had been an earlier meeting in which MCSO had directed Trombi's email.  *Id.*  And it was not until the November 20, 2014 hearing that Sheridan revealed, through counsel, that he himself had authorized the Trombi email.  Nov. 20 Tr. at 59.  The Monitor found Sheridan's shifting explanations and lack of memory not credible.  Monitor's Report at 4.

On May 15, 2014, the Court issued an order under seal, directing MCSO to collect quickly certain information relating to officers' video recording of traffic stops.  Doc. 693, *unsealed by* Doc. 706.  MCSO then sent an email to all deputies, containing a self-reporting survey linked to the Court's order.  At that point, any possibility of collecting the recordings "quietly," as directed by the Court, had been foiled by

11

Sheridan's direction to Trombi and by Trombi's subsequent email widely disseminated to MCSO personnel.

By sending the Sheridan-Trombi email without consulting with the Monitor—and then participating in a meeting in which they made a show of agreeing upon a different course of action with the Monitor, without mentioning that the Sheridan-Trombi email had already been sent out—Defendants violated the Court's specific and definite order to "cooperate completely with my monitor" in gathering the videos. Because that violation is already established, "[t]he burden . . . shifts to the contemnors to demonstrate why they were unable to comply." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The excuses that Sheridan made to the Monitor are not credible on their face and, even if they were credible, would not establish that Defendants were "unable to comply." *See also Stone*, 968 F.2d at 856 (the law requires enjoined parties to "perform[ ] all reasonable steps within their power to insure compliance with the court's order[]"); *Xcentric Ventures, LLC v. Stanley*, No. 2:07-cv-00954- GMS, 2009 WL 113563, at *4 (D. Ariz. Jan. 16, 2009) (there is no willfulness requirement or good faith defense for civil contempt).

## III. Defendants' Numerous Acts of Defiance Support the Need for Serious Sanctions To Compensate Plaintiffs and To Ensure Future Compliance.

The two bases on which Plaintiffs move for contempt are not isolated matters, but rather part of a pattern of consistent disregard by Defendants of this Court's orders. As set forth by Plaintiffs during the October 28, 2014 hearing, on numerous occasions, Defendants have directly contravened and misrepresented this Court's trial findings and injunctions. This history of misconduct solidifies the need for strong sanctions to prevent further recurrence and to compensate Plaintiffs who have been injured.

Defendants' failure to comply with this Court's orders dates back to the start of this litigation. This Court has previously issued sanctions against Defendants for conduct nearly identical to the present issue of Defendants' failure to properly preserve and produce video recordings made by deputies. In 2010, the Court found that

1    Defendants had failed to preserve and actively destroyed documents that they had an

2    obligation to produce for purposes of discovery.  Doc. 261.  As detailed in that order,

3    Defendants had similarly failed to properly communicate down the chain of command

4    that certain documents must be preserved.  In fact, Deputy Chief MacIntyre testified

5    with respect to this previous spoliation of evidence that he "must have simply, albeit

6    regrettably, forgot to forward [the demand for documents] to others at the MCSO."  *Id.*

7    at 3.  Unfortunately, monetary sanctions against Defendants, in the form of Plaintiffs'

8    attorneys' fees and costs, were insufficient to prevent history from repeating itself.

9        Since this earlier transgression, Defendants have displayed little regard for

10   ensuring compliance with this Court's orders.  In addition to the violations of their

11   earlier spoliation of evidence, this Court's preliminary injunction and the failure to

12   preserve video recordings, Defendants have directly violated this Court's orders on

13   several other occasions.  On October 28, 2014, the Court conducted a hearing to

14   address a public statement by Defendant Arpaio—regarding a law enforcement

15   operation in the town of Guadalupe that this Court held unconstitutional—that "[w]ith

16   the same circumstances, I'd do it all over again."[4]  This Court found that Arpaio's

17   statement demonstrated that MCSO was not in compliance with this Court's October

18   24, 2013, Supplemental Injunction order and, as a result, ordered Defendant Arpaio to

19   personally complete the training required of all MCSO sworn personnel and posse

20   members.  Transcript of Oct. 28, 2014 Hearing at 64-65.  Clearly, this remedy and the

21   others ordered so far by the Court have not been adequate to deter Defendants'

22   repeated violations, as demonstrated by the long history of Defendants defiance of this

23   Court's orders.

24

25

26   [4] Jacques Billeaud, *Judge unleashes criticism on Arpaio's office*, Associated Press,
     Oct. 28, 2014, http://www.washingtontimes.com/news/2014/oct/28/hearing-to-focus-
     on-investigations-of-ex-officer; *see also* Doc. 746 ¶ 3.

27

28

Since the Court issued its trial findings and remedial order, Defendants have consistently misrepresented those decisions both internally and publicly. Shortly after this Court's May 24, 2013, trial findings, Defendant Arpaio stated publicly that the Court's finding of liability was based only on faulty training by the federal government, ignoring the several other findings of independent constitutional violations that permeated the MCSO itself.[5] As of at least January 2014, Defendant Arpaio continued to blame the federal government for all of the Court's findings, going as far as to send a letter to Attorney General Eric Holder demanding payment by the federal government for all litigation costs as a result of this case. In the letter, Defendant Arpaio again laid the blame on the federal government, stating that "the Court determined that MCSO had violated the constitutional rights of the class members because some MCSO deputies acted and relied on the ICE training and education provided to them in the 287(g) program which was, in fact, contrary to Ninth Circuit law" and stating, contrary to the Court's actual findings in the May 2013 order, that "[b]ut for [this training], there would have been no adverse finding against the MCSO."[6] Other members of MCSO top command staff, including Chiefs Sheridan and Trombi, also made misrepresentations of this Court's May 24, 2013, trial order by inaccurately describing the order as limited to a finding of racial profiling by only two MCSO deputies or a showing that people with Hispanic surnames were held 14 seconds longer than people without.[7] And just two days after this Court ordered

---

[5] *Sheriff Arpaio responds to federal judge ruling on racial profiling*, YouTube, May 29, 2013, https://www.youtube.com/watch?v=w38eFaTmufY.

[6] Letter from Sheriff Joseph M. Arpaio to Attorney General Eric H. Holder, Jr., Jan. 16, 2014, http://www.mcso.org/MultiMedia/PressRelease/Arpaio%20Letter%20to%20Holder.pdf.

[7] *See*, *e.g.*, Jerry Sheridan, *Here are the facts in profiling suit vs. MCSO*, Ariz. Republic, Jan. 12, 2014, http://archive.azcentral.com/opinions/articles/20140112facts-profiling-suit-mcso.html.

Defendants to issue a corrective statement to address all of these inaccuracies, news outlets reported that Defendant Arpaio had sent out a fundraising letter in which he stated that there have been "rampant, UNFOUNDED charges of racism and racial profiling in my office."[8]

These misstatements by the Sheriff and his top command staff are not merely statements of opinion; in the command structure of a law enforcement agency, they have a direct impact on deputies' conduct because they represent the official views of the highest policy makers within MCSO as to how court orders should be interpreted and observed.  By repeatedly misrepresenting the Court's orders, Defendants failed to properly inform all MCSO employees of the full scope of the Court's findings and the requirements under the Court's injunctions.

Defendants have repeatedly and openly defied the Court's authority.  In an August 2013 fundraising letter, Defendant Arpaio stated that he "won't stand for" a Court-appointed monitor and insinuated that MCSO will continue enforcing immigration laws, stating that "[m]illions enter our country illegally every year with very little consequence" and that he is "working day and night to protect our land and keep Arizona and America safe."[9]  Just days after the Court issued the October 2013 Supplemental Injunction, Sheriff Arpaio announced plans for a large-scale operation and outwardly mocked this Court's requirement that MCSO engage in community

---

[8] Yvonne Wingett Sanchez, *Sheriff Arpaio: Donate in case I run for governor*, Ariz. Republic, Mar. 26, 2014, http://www.azcentral.com/story/politicalinsider/2014/03/26/joe-arpaio-considering-run-for-governor/6916521; Letter from Sheriff Joe Arpaio, http://archive.azcentral.com/ic/pdf/arpaio-donation.pdf.

[9] Stephen Lemons, *Arpaio's Letter Shows Why Judge Snow Must Appoint a Monitor in Melendres*, Phoenix New Times, August 29, 2013, http://www.phoenixnewtimes.com/2013-08-29/news/arpaio-s-letter-shows-why-judge-snow-must-appoint-a-monitor-in-melendres/full/; Letter from Sheriff Joe Arpaio, http://httpmyblogblogspotcom-norsu.blogspot.com/2013_08_01_archive.html.

outreach to remedy past violations and built trust with the community, stating that "some courts want community outreach.  I just started it."[10]  During a briefing prior to that operation, Chief Deputy Sheridan went as far as to direct deputies not to take seriously the Court's order that they track the race or ethnicity of individuals whom they stop.  *See* Recording of Oct. 18, 2013 Crime Suppression Briefing.  After that operation, Defendant Arpaio stated to the media that he was "not concerned about being in violation" of the Court's order because "no one is going to take away my authority I have under the constitution."[11]

Further, as documented in the Monitor's Report, Defendants not only defied the Court's May 14, 2014, order about the collection of video recordings, but also demonstrated contempt for the Monitor's role throughout that investigation, which undermined the effectiveness and likely outcome of the investigation.  Doc. 795-1.  Such contempt was also displayed in Defendants' recalcitrant response to the Monitor's report.  Doc. 755.

Defendants' transgressions of this Court's orders are abundant.  In the command structure of a law enforcement agency, Defendants' misrepresentations and defiant attitude have direct consequences because they set the tone for, and give direction to, inferior officers in the rank and file of MCSO.  In determining the nature and extent of sanctions against Defendants, this Court should take these prior flagrant contraventions into account.  *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510,

---

[10] CBS, *Sheriff Arpaio Defends Latest Crime Sweep*, Oct. 19, 2013, updated Nov. 2, 2013, http://www.kpho.com/story/23737670/sheriff-arpaio-defends-latest-crime-sweep.

[11] Stephen Lemons, *Arpaio's Sweep of the West Valley Could Turn Judge Snow's Order Into a Paper Tiger*, Phoenix New Times, Oct. 24, 2013, http://www.phoenixnewtimes.com/2013-10-24/news/arpaio-s-sweep-of-the-west-valley-could-turn-judge-snow-s-order-into-a-paper-tiger/full/; CBS, *supra* n.10.

516 (9th Cir. 1992) (taking into account Defendants' "flagrant contempt" in affirming the propriety of a high fine as a civil sanction).

**IV.   The Court Should Begin With Limited and Expedited Document Discovery and an Evidentiary Hearing on Civil Contempt Against Defendants and Individual MCSO Personnel**

Based on the foregoing, Plaintiffs request that the Court issue an order to show cause why Defendants and specific individuals named below should not be held in civil contempt, and schedule an evidentiary hearing. *See United States v. Ayres*, 166 F.3d 991, 995-96 (9th Cir. 1999) ("[C]ivil contempt 'may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard,'" and, although a "full-blown evidentiary hearing" is not required, the Ninth Circuit "do[es] not encourage the imposition of contempt sanctions 'on the papers.'"); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998) (a non-party can be held in contempt if he (1) had notice of the court's order and (2) either abetted the defendant's violation or is legally identified with him).  Plaintiffs also request that subpoenas issue to each of the individuals named below and to any further witnesses that Plaintiffs timely name by a date set by the Court, or subsequent to that date if new information comes to light.

Sheriff Arpaio should be subject to contempt proceedings for the reasons set forth above.  He is a named defendant with full knowledge of the Court's orders and the greatest ability to implement them.  His knowing violations of the orders warrant a contempt finding.

Chief Deputy Sheridan should be subject to contempt proceedings for causing and abetting Defendants' violation of both the December 23, 2011, preliminary injunction and the May 14, 2014, order.  Sheridan must answer to the first charge because there is evidence that it was his responsibility to inform MCSO officers about the preliminary injunction, but that he did not do so.  *See* Sheridan Dep. 122:13-18; Nov. 20 Tr. at 67.  Sheridan must answer to the second charge because he directed Deputy Chief Trombi to send the May 14, 2014 email, and then misrepresented his

17

actions to the Court-appointed Monitor.  *See* Nov. 20 Tr. at 59; Monitor's Report at 3-4.

Executive Chief Sands, Deputy Chief MacIntyre, and Lieutenant Sousa should be subject to contempt proceedings for abetting Defendants' violation of the December 23, 2011 preliminary injunction.  All three, as well as Chief Deputy Sheridan, received the email from counsel about the preliminary injunction but failed to take action to communicate it to others at MCSO and to direct that MCSO follow the Court's order.  *See* Nov. 20 Tr. at 67-68.

Deputy Chief Trombi should be subject to contempt proceedings for participating in Defendants' violation of the May 14, 2014 order, by sending the email that contravened the Court's order. *See* Monitor's Report at 3-4.

In addition, Plaintiffs request that the Court order Defendants to respond to limited document discovery on an expedited basis, in advance of an evidentiary hearing.[12]

## V. Court Ordered Remedies Are Necessary To Compensate the Plaintiffs and To Secure Future Compliance with Court Orders

Plaintiffs will not be in a position to recommend the full scope of remedies warranted in light of Defendants' violations of the Court's orders until they have had an opportunity to engage in limited document discovery and question MCSO personnel during an evidentiary hearing.  However, based upon Defendants'

---

[12] At the December 4, 2014 hearing, Sheriff Arpaio's counsel, Mr. McDonald, requested that he be provided "any information that you're turning over to the United States Attorney."  Transcript of Dec. 4, 2014 Hearing at 30.  Plaintiffs requested the opportunity to research that request.  *Id.* at 31.  Plaintiffs do not object to Mr. McDonald receiving unsealed information that is provided to the United States Attorney.  To the extent this Court comes into possession of information that is not in the public record and pertains to potential criminal contempt or other criminal misconduct by Sheriff Arpaio, Mr. McDonald should receive that information pursuant to the normal processes defined by the Federal Rules of Criminal Procedure, unless he can identify authority supporting earlier or more expansive disclosure.

admissions and the evidence that has already come to light, Plaintiffs submit that the following remedies are justified and minimally needed in order (1) to compensate the Plaintiff Class for harms suffered as a result of Defendants' noncompliance with the Court's orders and (2) to stop ongoing harms and to prevent future noncompliance to the detriment of the Plaintiff Class.  *See Falstaff Brewing Corp. v. Miller Brewing Corp.*, 702 F.2d 770, 778 (9th Cir. 1983) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)) (two purposes of civil contempt are to compensate the moving party for injuries arising from noncompliance and to compel obedience to the court's order); *see also Whittaker*, 953 F.2d at 517-18 (district court could properly use its coercive civil contempt authority to prohibit the contemnor corporation from engaging in the airline parts business until the corporation demonstrated to the satisfaction of the court that it would comply with the court's prior injunction in good faith); *Lance v. Plummer*, 353 F.2d 585, 591-92 (5th Cir. 1965), *cert. denied*, 384 U.S. 929 (1966) (district court could properly use its coercive civil contempt authority to prohibit deputy sheriff who had violated civil rights injunction from acting as a law enforcement officer until the officer satisfied the court that he would comply with the injunction in good faith).

### A. The Court Should Order Defendants To Assist in the Identification of Victims of Defendants' Noncompliance with the December 23, 2011, Preliminary Injunction, and To Pay Compensation to Individual Victims

Defendants' violations of the Court's preliminary injunction order—a direct result of the actions (and in some cases failures) of the MCSO command staff that Plaintiffs identify above as proposed targets of contempt proceedings—caused the illegal detentions of members of the Plaintiff class and others.  Each of those individuals who have been detained in violation of the Court's preliminary injunction should be compensated for their unconstitutional detention in violation of this Court's preliminary injunction order in an amount commensurate to the length of his or her detention and any other facts particular to the harm suffered.  Such a compensatory

19

fine is proper in a civil contempt proceeding as it makes the Plaintiff whole for harms suffered from the Defendants' noncompliance with the Court's orders.[13]  *See Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994) (citing *United States v. Mine Workers*, 330 U.S. 258, 303-04 (1947)).  Plaintiffs intend to submit detailed requests for damages after identifying such individuals and investigating the extent of the harms they have suffered.

The Court should order Defendants to take steps to identify and assist Plaintiffs in locating all victims of illegal detentions pursuant to MCSO's policy and practice of continuing to detain individuals based solely on suspected unlawful presence in the United States after the Court enjoined that practice on December 23, 2011.  Defendants should work in cooperation with the Monitor and Plaintiffs' counsel to determine what steps would be useful.  At a minimum, they should disclose the following information:

1)  Identification documents seized by MCSO personnel from apparent members of the Plaintiff class;[14]

2)  All individuals who were the subject of any ICE or CBP inquiry and/or detained by MCSO after December 23, 2011 based on suspected unlawful presence, and who were not charged with or cited for any crime;

---

[13] This compensation is not necessarily limited to members of the Plaintiff class.  *See Ahearn ex rel. Nat'l Labor Relations Bd. v. Int'l Longshore and Warehouse Union*, 721 F.3d 1122, 1131 (9th Cir. 2013) (civil contempt sanctions may be awarded to non-parties "where doing so [is] directly necessary to enforce an injunction").

[14] Plaintiffs have so far not received from Defendants the identity documents that Defendants recently described to the Court, which were found in the possession of former HSU deputies in November 2014, *see* Nov. 20 Tr. at 47-50, even though Plaintiffs requested those documents on December 3, 2014.  Plaintiffs should have access to this information, so that they may conduct their own follow-up inquiries into the circumstances in which such documents were seized by MCSO deputies, and whether the owners of these identity documents were detained in violation of the Court's preliminary injunction order.

20

3)  All information concerning the circumstances and length of any detention described in point (2) above, including but not limited to MCSO incident reports, departmental reports, field interview cards, traffic stop data collection forms, CAD data and recordings or MDT records, video or audio recordings, and officer or supervisor notes.

4)  All communications, in any form, between MCSO and CBP or ICE after December 23, 2011, concerning the immigration status or custody status of any individual in MCSO custody or detention; and

5)  A description of all forms in which any communication described in point (4) above might be documented, including radio, telephonic, or electronic communications by a MCSO deputy on patrol to CBP and ICE.

In addition, the Court should order individual MCSO deputies and supervisors involved in any such detentions to testify at an evidentiary hearing, as set forth below, so that Plaintiffs' counsel may question them about the MCSO policies and practices that permitted such detentions to occur and the extent of unlawful detentions, despite the Court's order prohibiting them.

Plaintiffs also intend to take additional measures to identify and locate potential victims, such as by seeking relevant information from federal officials.

**B.  The Court Should Order Compensation to the Plaintiff Class as a Whole**

Defendants' obstinate, continued enforcement of the LEAR policy caused untold numbers of Plaintiff class members to spend 18 months living in fear that they would be unlawfully seized by Defendants and further damaged the relationship between the Latino community and the MCSO.  The Plaintiff class as a whole should be compensated for this harm, potentially by an award from Defendants to a non-profit organization or organizations (other than Plaintiffs' counsel) that works with the Latino community in Maricopa County to educate members about their civil and constitutional rights.  The Court could take additional steps to ensure the award would

21

go towards services that would substantially benefit the Plaintiff class and be related to the issues in this lawsuit.

### C. The Court Should Order Injunctive Relief Provisions To Ensure That Defendants' Violations Stop, and That Future Violations Do Not Occur

Defendants' separate violations of the Court's December 2011 preliminary injunction order and the May 2014 order directing Defendants to cooperate with the Monitor in the collection of video recordings demonstrate persistent, structural command and supervision problems at MCSO that leave the members of the Plaintiff Class at risk for ongoing violations of their constitutional rights. Accordingly, the Court should order additional injunctive and remedial relief, as follows:

1)  Communication of court orders and other litigation-related matters to MCSO personnel:  Defendants' admitted failure to communicate a critical federal court order to MCSO personnel, coming after admitted spoliation of evidence after a similar failure of communication earlier in this litigation, demonstrates the need for (a) a thorough evaluation of MCSO policies and practices concerning the communication of court orders and document preservation notices and reform of those policies and practices, in cooperation with the Monitor and Plaintiffs' counsel; (b) a court order putting Defendants on notice of the likely need to increase the amount of such fines upon future violations, and possibly setting out a conditional fine schedule.  Such a conditional schedule serves the purpose of coercing future compliance with the Court's orders and therefore is a proper remedy in civil contempt.  *See Falstaff Brewing Corp.*, 702 F.2d at 780; *Int'l Union*, 512 U.S. at 827.  Such a conditional coercive fine is especially warranted where a contemnor, like Defendant Arpaio and other MCSO command staff here, have a record of flagrant violations of prior court orders as set forth above in Section III.  *See Whittaker*, 953 F.2d at 516.

2)  Procedures for immediate notification to Plaintiffs' representatives and the Monitor of future immigration detentions: To ensure that future immigration-related detentions do not go undetected, in addition to the current provisions in the

22

Court's Supplemental Injunction/Order, MCSO should be required to notify Plaintiffs and the Monitor within 24 hours of any traffic stop involving MCSO personnel in which ICE or CBP is contacted and/or an individual is questioned about his or her citizenship or immigration status.  All information concerning the circumstances and length of any such stop, including but not limited to, MCSO incident reports, departmental reports, field interview cards, traffic stop data collection forms, CAD data and recordings or MDT records, video recordings, and officer or supervisor notes, should be disclosed to Plaintiffs and the Monitor as soon as possible.

        3)    <u>Procedures for collection, disposition, and chain of custody of evidence</u>: The information revealed so far demonstrates that MCSO's policies and procedures concerning the collection and disposition of evidence, including possessions seized during traffic stops and video recordings of traffic stops, are utterly inadequate. Defendants admit that it was common knowledge at MCSO that deputies have for years used both MCSO-issued and personally-purchased video cameras to record traffic stops and other activities, but that there has been no MCSO policy concerning the collection and retention of such video recordings.  Similarly, the Armendariz and related investigations have revealed that MCSO personnel have retained items seized during patrol (including identity documents, vehicle license plates, and purses and other personal belongings) without properly delivering them to the official evidence/property unit or even logging them.  This is unacceptable by any standard and has led to the current situation in which the parties to this action are unable to readily identify the owners of any item or to associate any given item of evidence to a traffic stop or other MCSO law enforcement action.

        Plaintiffs have already proposed to the Defendants that the parties engage in a collaborative process to formulate a policy governing the use of MCSO-issued body-mounted video cameras.  Such a policy should govern all video recordings made by MCSO personnel.  In addition, the Court should order new injunctive relief to ensure

that MCSO promulgates and follows a proper policy on the seizure and chain of custody for all evidence seized by MCSO personnel.

4)   <u>Misconduct investigations and civilian complaints</u>:  The limited evidence revealed so far reveals serious deficiencies in MCSO's procedures for handling civilian complaints and internal investigations.  First, the conduct of MCSO command staff in the Armendariz-related investigations—including the Sheridan-Trombi email sent in disregard of the plan agreed upon in Court, to quietly collect video recordings without triggering possible destruction of evidence, demonstrates that MCSO's internal investigation policies and practices fall short of generally accepted standards—even when the highest levels of command staff are directly involved and even under the eye of the Court and the Court-appointed Monitor.  These failures come after numerous investigative deficiencies revealed by the failure of MCSO supervisors and commanders to adequately address numerous civilian complaints against Deputy Armendariz.  Plaintiffs submit that new MCSO policies and practices relating to the handling of civilian complaints and internal investigations are needed to protect the interests of the Plaintiff Class.  Plaintiffs will be requesting additional supplemental injunctive relief separately from the contempt proceedings, because there is relevant evidence unrelated to the contempt proceedings.

**D. The Court Should Order Attorneys' Fees and Costs**

The Court should order attorneys' fees and costs to Plaintiffs' counsel to compensate for the expense of litigating the compliance issues and other monitoring work since the Court's October 2012 Supplemental Injunction.  Such fees are justified, among other reasons, as a penalty for Defendants' failure to produce records in response to discovery requests pre-trial.  Fed. R. Civ. P. 37(b); *Falstaff Brewing Corp.*, 702 F.2d at 784.  An award of attorneys' fees and costs is also justified as compensation for the time and costs of Plaintiffs' counsel in responding to Defendants' noncompliance with the Court's orders, separate from any award of compensatory damages.  *Perry v. O'Donnell*, 759 F.2d 702, 704-06 (9th Cir. 1985) (affirming award

24

of attorneys' fees and costs in civil contempt proceeding as a remedial measure); *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785-86 (7th Cir. 1981); *Nat'l Labor Relations Bd. v. Local 825, Int'l Union of Operating Engineers*, 430 F.2d 1225, 1229 (3d Cir. 1970). Indeed, the Supreme Court has held that the failure to comply with document discovery is "appropriate for imposition through civil proceedings" and also can be remedied through means other than contempt, including assessing costs, "to penalize a party's failure to comply with the rules of conduct governing the litigation process." *Int'l Union*, 512 U.S. at 833. Plaintiffs will submit a separate, detailed application for attorneys' fees and costs.

## CONCLUSION

For the foregoing reasons, the Court should issue an order to show cause why Defendants and the individuals named herein should not be held in civil contempt, order limited written discovery, and schedule an evidentiary hearing.

Respectfully submitted this 8th day of January, 2015.

By: /s/ Cecillia D. Wang

| | |
|---|---|
| Daniel Pochoda | Cecillia D. Wang (*Pro Hac Vice*) |
| ACLU Foundation of Arizona | Andre I. Segura (*Pro Hac Vice*) |
| | ACLU Foundation |
| Anne Lai (*Pro Hac Vice*) | Immigrants' Rights Project |
| | |
| Stanley Young (*Pro Hac Vice*) | Jorge M. Castillo (*Pro Hac Vice*) |
| Tammy Albarran (*Pro Hac Vice*) | Mexican American Legal Defense and |
| Hyun S. Byun (*Pro Hac Vice*) | Educational Fund |
| Priscilla G. Dodson (*Pro Hac Vice*) | |
| Covington & Burling, LLP | |

*Attorneys for Plaintiffs*

On the brief:
Joshua Bendor

25

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2014, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and caused the attached document to be e-mailed to:

Thomas P. Liddy
liddyt@mcao.maricopa.gov

Michele M. Iafrate
miafrate@iafratelaw.com

A. Melvin McDonald
mmcdonald@jshfirm.com

*Attorneys for Defendant Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office*

/s/ Cecillia D. Wang