1
2
3
4
5
6              **IN THE UNITED STATES DISTRICT COURT**
7                 **FOR THE DISTRICT OF ARIZONA**
8

9  Manuel de Jesus Ortega Melendres, on      No. CV-07-02513-PHX-GMS
   behalf of himself and all others similarly
10  situated; et al.                          **ORDER TO SHOW CAUSE**
11                          Plaintiffs,
12  v.
13  Joseph M. Arpaio, in his individual and
    official capacity as Sheriff of Maricopa
14  County, AZ; et al.
15                          Defendants.
16

17        Pending before the Court is Plaintiffs' Request for an Order to Show Cause (Doc.

18  843) and the opposition thereto by Defendants and those non-parties who have specially

19  appeared in this action. (Docs. 838–42, 844.) For the reasons stated below, Plaintiffs'

20  Request is granted.

21                          **BACKGROUND**

22        In December 2007, Latino motorists brought a class action under 42 U.S.C. § 1983

23  against the Maricopa County Sheriff's Office and Sheriff Joseph Arpaio, among others,

24  alleging that Defendants engaged in a custom, policy, and practice of racially profiling

25  Latinos, and a policy of unconstitutionally stopping persons without reasonable suspicion

26  that criminal activity was afoot, in violation of Plaintiffs' Fourth and Fourteenth

27  Amendment rights. (Doc. 1, *amended by* Doc. 26.) The Plaintiffs sought declaratory and

28  injunctive relief to prevent Defendants from engaging in racial profiling and exceeding

the limits of their authority to enforce federal immigration law. (Doc. 1 at 19–20.)

After pre-trial discovery was closed, the parties filed competing motions for summary judgment; Plaintiffs' motion included a request for the entry of a preliminary injunction. (Docs. 413, 421.) This Court granted the Plaintiffs' motion in part, and entered a preliminary injunction on December 23, 2011.[1] (Doc. 494.) The injunction prohibited MCSO from "detaining individuals in order to investigate civil violations of federal immigration law," and from "detaining any person based on actual knowledge, without more, that the person is not a legal resident of the United States." (*Id.* at 39.) The injunction further stated that, absent probable cause, officers may only detain individuals based on reasonable suspicion that "criminal activity may be afoot." (*Id.* at 5 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968).) The Court explained that being present in the country without authorization to remain does not, in and of itself, violate any criminal statute and, therefore, "actual knowledge, let alone suspicion, that an alien is illegally present is not sufficient to form a reasonable belief he has violated federal criminal immigration law." (*Id.* at 7.) Moreover, Hispanic appearance, an inability to speak English, and proximity to the border do not supply reasonable suspicion that a crime was being committed sufficient to stop a vehicle to investigate the immigration status of the occupants. (*Id.* at 6.)

Seventeen months later and following a bench trial, the Court issued its Findings of Fact and Conclusions of Law in May 2013 in which it found MCSO liable for a number of constitutional violations in its operations and procedures. (Doc. 579 at 115–31.) After allowing the Parties, at their request, to attempt to negotiate the terms of a consent decree, in October 2013 the Court ordered supplemental injunctive relief to remedy the violations it outlined in its Findings and Conclusions and defined enforcement mechanisms for such remedies. (Doc. 606.) This Court has continuing authority over the enforcement and implementation of that order.

---

[1] The Ninth Circuit affirmed the preliminary injunction in September 2012. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Around this time, Chief Deputy Jerry Sheridan was videotaped during an October 2013 training session for deputies about to engage in a large-scale patrol, where he referred to this Court's order as "ludicrous" and "crap," and incorrectly stated that this Court had found only a small number of officers had unconstitutionally used race as a factor in traffic stops. (*See* Doc. 662 at 22–23.) On the recording, which did not surface until early the next year, both Chief Deputy Sheridan and Sheriff Arpaio are seen apparently directing deputies not to take seriously the Court's requirement that they track the race and ethnicity of individuals whom they stop. (*Id.* at 23.) This Court has since held a number of hearings to address the repeated mischaracterization and condemnation of its Orders by MCSO officials. (*See* Docs. 662; 672; 776 at 61–68.) For example, at a March 2014 community meeting, Deputy Chief David Trombi told residents that the Court had only found that MCSO deputies detained Latinos fourteen seconds longer than other drivers, which was not in the Court's Findings of Fact. (Doc. 672 at 14.) In April 2014, Deputy Chief John MacIntyre made a statement to the press denying that the Court had concluded the Sheriff's Office had engaged in racial profiling. (Doc. 684 at 4.) In lieu of contempt, the Court entered an enforcement order requiring that a corrective statement summarizing the Court's holding and emphasizing that the order was to be followed, pending appeal, be distributed within MCSO. (Docs. 680, 684.)

On May 14, 2014, Defendants informed the Court that a former member of the Human Smuggling Unit, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appear to have been appropriated from members of the Plaintiff class. (*See* Doc. 700 at 12–13.) Deputy Armendariz was a regular participant in the HSU's saturation patrols, both large and small scale. He also testified at trial and was personally implicated by the allegations of two representatives of the Plaintiff class regarding his involvement in a 2008 immigration sweep in which two Hispanic American citizens were allegedly profiled and illegally detained on the basis of their suspected undocumented status. (Doc. 576.) After his apparent suicide, in addition to the numerous personal items apparently seized from persons he had stopped, MCSO

also discovered numerous video recordings of traffic stops Armendariz had conducted, apparently going back several years. (Doc. 700 at 11.) Some of those videos revealed what MCSO characterized as "problematic activity" on the part of Deputy Armendariz during the stops. (*Id.* at 35, 57.) Other officers, and at least one supervisor of Armendariz who also testified at the trial in this action, were depicted on these recordings during one or more problematic stops. (*Id.* at 35.)

Upon questioning by the Court, Chief Deputy Sheridan acknowledged that many, if not all, deputies made audio recordings of their traffic stops pursuant to departmental practice and had done so for some time. (*Id.* at 29–31.) Further, Sheridan stated that there was reason to believe that some deputies videotaped their own traffic stops, that there was no departmental policy that prevented deputies from doing so, and that some video devices had been purchased in earlier years by MCSO or through other government programs for use during traffic stops. (*Id.* at 21, 23–24.) Prior to May 2014, there was apparently no agency-wide policy that governed the collection and catalogue of such recordings. (*Id.* at 24.)

In light of the inappropriate activity observable on Deputy Armendariz's videotapes and the ambiguity surrounding other officers' use of video- and audio-recording devices during the time period in which pre-trial discovery in this case was occurring, the Court ordered Defendants to immediately formulate and obtain the Monitor's approval of a plan designed to quietly retrieve all recordings made by officers that might still be in existence. (*Id.* at 25–27.) The Court emphasized that the substance of the hearing was not to be shared with those outside the Courtroom. (*Id.* at 7, 50–51, 69.) Within two hours of this hearing, however, Chief Deputy Sheridan met with Sheriff Arpaio and attorneys for MCSO. An e-mail was circulated immediately thereafter by Deputy Chief Trombi (who was not present at the hearing), at the direction of Chief Deputy Sheridan, to twenty-seven Departmental Commanders—including the supervisor who had been present during one of Armendariz's problematic stops. (*See* Doc. 795, Attach. 1, at 3–4.) The e-mail advised MCSO commanders that they should "simply

gather" all such recordings from their personnel. (*Id.* at 4.) When, later that afternoon, the Monitor met with MCSO officials to develop a retrieval strategy, neither the Sheriff nor Chief Deputy Sheridan informed the Monitor that MCSO had already broadcast its collection efforts. (*Id.* at 4–5.) In the end, MCSO conducted a survey-approach of its present and past employees to collect any outstanding recordings (*Id.* at 4), incurring the additional risk that advertising their collection efforts might prompt officers to destroy existing recordings rather than surrender them to MCSO leadership.

Even so, the ensuing investigations unearthed previously undisclosed recordings of traffic stops undertaken by the HSU and at the apparent direction of other MCSO departments. They have also unearthed documents apparently requiring officers to make such recordings during the period of time relevant to Plaintiffs' claims. In addition, dozens of personal identifications have been found in offices formerly occupied by the HSU. There is evidence that, during the period relevant to this lawsuit, a number of deputies were also confiscating items of personal property—such as identifications, license plates, Mexican currency and passports, credit cards, cell phones, purses, and religious shrines—from individuals detained in conjunction with immigration enforcement activities. These items were apparently routinely retained by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO.

While these materials appear to have been requested by Plaintiffs prior to the trial of this lawsuit, it does not appear that any of them were identified or provided to the Plaintiff class. There is also evidence that at least some recordings made during the period relevant to the Plaintiffs' claims are no longer in existence. Moreover, the Armendariz videotapes resulted in administrative interviews with MCSO personnel that have apparently revealed that Defendants, as a matter of regular practice and operation, continued actively enforcing federal immigration law by conducting immigration interdiction operations, and detaining persons after officers concluded that there was no criminal law basis for such detention, for at least seventeen months after this Court issued its preliminary injunction. Plaintiffs previously contacted Defendants in October 2012

1    about suspected violations of the injunction after MCSO published News Releases

2    pertaining to three immigration enforcement endeavors. (Doc. 843, Ex. A, at A1–A5.)

3    The Court also noted in its May 2013 Findings of Fact and Conclusions of Law that "as a

4    matter of law . . . MCSO has violated the explicit terms of this Court's preliminary

5    injunction set forth in its December 23, 2011 order because the MCSO continues to

6    follow the LEAR policy and the LEAR policy violates the injunction." (Doc 579 at 114.)

7                                          **DISCUSSION**

8    **I.      Contempt Power**

9            Federal courts have the authority to enforce their Orders through civil and criminal

10   contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition to the Court's

11   inherent power, Title 18, Section 401 of the United States Code provides:

12           A court of the United States shall have power to punish by
             fine or imprisonment, or both, at its discretion, such contempt
13           of its authority, and none other, as—

14                                          . . .

15           (3) Disobedience or resistance to its lawful writ, process,
             order, rule, decree, or command.
16

17   18 U.S.C. § 401(3); *United States v. Powers*, 629 F.2d 619, 624 (9th Cir. 1980) ("Section

18   401 applies to both criminal and civil contempt."). Within the enumerated statutory limits

19   of this power, a district court has wide latitude in determining whether there has been a

20   contemptuous defiance of its orders. *Stone v. City & Cnty. of San Francisco*, 968 F.2d

21   850, 856 (9th Cir. 1992). Because an injunctive decree binds not only party-defendants

22   but also those who are represented by them, are subject to their control, or are

23   in privity with them, contempt charges may be brought against non-parties to the

24   underlying litigation who are also bound by an injunction but fail to comply with its

25   terms.[2] For non-party respondents to be held liable in contempt for violating a court's

26

27           [2] *See* Fed. R. Civ. P. 65(d)(2) (defining scope of individuals bound by a court
     order to include the parties, the parties' officers, agents, servants, employees, and
28   attorneys; and other persons who are in "active concert or participation with" the parties
     and their officers, agents, etc., provided they receive actual notice of the order); Fed. R.

order, they must have had notice of the order and either abet the defendant or be legally identified with him. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998) (quoting *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977)). The Ninth Circuit's rule regarding contempt "has long been whether defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders." *Stone*, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)).

The moving party bears the initial burden of establishing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). The contemnors must show that they took every reasonable step to comply. *Sekaquaptewa*, 544 F.2d at 406. In assessing whether an alleged contemnor took "every reasonable step," a district court may consider a history of noncompliance. *Stone*, 968 F.2d at 857. A party's subjective intent is irrelevant to a finding of civil contempt.[3] *Id.* at 856.

A court's exercise of its contempt authority must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (internal quotation marks omitted). If contemptuous conduct is punished criminally, Federal Rule of Criminal Procedure 42(a) requires the appointment of a federal prosecutor, notice to the contemnor of the charges against him, and a trial. *See* Fed. R.

---

Civ. P. 71 (noting that the procedure for enforcing an order against a non-party is the same as against a party); *United States v. Baker*, 641 F.2d 1314 (9th Cir. 1981) (finding that non-party fishers were bound by and could be criminally prosecuted for contempt for non-compliance with an injunction issued by a federal court to manage the state salmon fishing industry, because the evidence was sufficient to prove that the defendants had notice of the injunction and violated it intentionally).

[3] "A party cannot disobey a court order and later argue that there were 'exceptional circumstances' for doing so. This proposed 'good faith' exception to the requirement of obedience to a court order has no basis in law." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987).

- 7 -

Crim. P. 42; *Powers*, 629 F.2d at 625. The Supreme Court has suggested that a trial judge should first consider the feasibility of prompting compliance through the imposition of civil contempt, utilizing criminal sanctions only if the civil remedy is deemed inadequate. *See Young*, 481 U.S. at 801. The Court does so through these proceedings.

## II.    Application

In their Request for an Order to Show Cause, as supplemented by the telephonic status conference held with the parties and specifically named non-parties on January 15, 2015, Plaintiffs have provided sufficient evidence that Defendants and their specified agents have committed contempt insofar as their conduct amounted to disobedience of (1) the Court's preliminary injunction; (2) the Federal Rules governing pre-trial discovery;[4] and (3) the Court's oral directives at the sealed hearing held on May 14, 2014.[5]

At its December 4, 2014 hearing, the Court expressed concern whether, if a contempt finding was appropriate, civil contempt alone would be sufficient to vindicate the constitutional substantive rights involved and compensate the Plaintiff class for its injuries resulting from the contemnors' behavior, particularly in light of the scope of individuals possibly affected by their contempt of the preliminary injunction. Nevertheless, out of deference to the elected office held by Sheriff Arpaio and because the "principle of restraint in contempt counsels caution" in this Court's exercise of its

---

[4] Plaintiffs' Request for an Order to Show Cause outlines two grounds for civil contempt: the violation of the preliminary injunction and the conduct surrounding the May 15, 2014 hearing and development of an evidence-retrieval plan with the Monitor. (Doc. 843 at 5.) After reviewing the briefs, the Court held a telephonic conference with the parties regarding the possible pre-trial discovery violations and whether or not any such violations should be included in these contempt proceedings. (See Doc. 858 at 14–18.) At that time, Plaintiffs orally moved for an Order to Show Cause on this basis, and Defendants consented to resolve any questions involving MCSO's obligation to disclose and produce audio and video evidence of traffic stops at the hearing in April. (*Id.*)

[5] The Court specifies below the factual basis on which it deems Plaintiffs have set forth evidence sufficient to present a prima facie case of contempt with respect to the various parties and non-parties named in this Order. Additional facts and/or persons subject to contempt may become known during the expedited discovery process that the Court concurrently authorizes. A failure to include facts in this Order does not prevent the parties from relying on them at the evidentiary hearing to the extent they relate to the grounds for which the parties and non-parties have been ordered to show cause.

powers, the Court noted that it would hold civil contempt hearings first to assess the adequacy of civil remedies before referring the matter, if appropriate, for criminal contempt prosecution. *Id.*; *see also United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983). Accordingly, this Order to Show Cause and the noticed hearings to be held in April 2015 only contemplate civil contempt charges. If further action proves necessary, the Court will give separate notice, appoint a prosecutor pursuant to Rule 42, and initiate criminal proceedings that are separate from this matter.

### A.     Preliminary Injunction Violations

A party may be held in civil contempt when, after receiving notice, it fails to take all reasonable steps within its power to comply with a specific and definite injunctive decree. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The preliminary injunction detailed that MCSO lacked the authority to enforce civil federal immigration law and, concomitantly, lacked the authority to detain persons not suspected of violating any state or criminal law based on the belief, however reasonable, that such persons were present in the country unlawfully. (Doc. 494 at 39– 40.) The Court orders the following individuals/entities to show cause why they should not be held in contempt for their failure to abide by and apprise MCSO deputies of the terms of the preliminary injunction:

### 1.     Maricopa County Sheriff's Office

Defendant MCSO does not appear to contest that it received notice of the injunction and that it failed to implement the order. By MCSO's own admission, the preliminary injunction was also not distributed within the HSU—the special operations unit which bore the primary responsibility for enforcing state and federal immigration laws and conducting interdiction patrols. (Doc. 804 at 5 ("MCSO has concluded[] that this Court's order was not communicated to the line troops in the HSU."); Doc. 843, Ex. F, at 62 (Dep. of Lt. Joseph Sousa at 178:6–23, *United States v. Maricopa Cnty.*, No. 2-12-cv-00981-ROS (D. Ariz. filed May 10, 2012) ("I don't remember a briefing board because it would be contradictory to the LEAR policy . . . .").) Nor was the preliminary

injunction communicated to any other MCSO patrol officer. (*See* Doc. 843 at 8 n.1.) As a result, MCSO immigration enforcement activities continued apace despite the issuance of the preliminary injunction.

While it continued this immigration enforcement activity in violation of the injunction, MCSO also wrongfully believed that it could consider Hispanic ancestry in making law enforcement decisions—such as whom to detain to investigate immigration violations. In addition to a Fourth Amendment violation, this error in belief would have resulted in the violation of the Fourteenth Amendment rights of persons of Hispanic ancestry who were detained and investigated by MCSO for immigration violations due to their ethnic heritage, regardless of whether the initial stop resulted in a further detention.

There is also evidence that, during the period relevant to this lawsuit, a number of deputies confiscated items of personal property—such as identifications, license plates, credit cards, cell phones, purses, Mexican currency and passports and religious shrines—from individuals detained in conjunction with immigration enforcement activities and who were members of the Plaintiff class. These items were apparently routinely kept by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO. The confiscation of these items apparently continued during the period in which MCSO was enjoined from all immigration enforcement and illustrates further damage that was inflicted as a result of MCSO's violation of the preliminary injunction.

The MCSO officials who received notification of the injunction when it was issued via an e-mail from then-counsel Timothy Casey[6] have conceded that this failure was the result of inaction on their part. (Doc. 804 at 5–6.) As a result of these shortcomings, the order enjoining Defendant from enforcing federal immigration law, operating under the LEAR policy, and unconstitutionally detaining persons based solely on the belief that they were in the country without authorization was never implemented.

---

[6] Defendants have identified an e-mail from Casey to Chief Deputy Sheridan, Executive Chief (Retired) Brian Sands, Chief MacIntyre, and Lieutenant Sousa regarding the injunction shortly after its filing. (Doc. 804 at 5–6.)

1    Plaintiffs have identified sufficient evidence confirming the occurrence of
2    violations of this Court's injunction. The Armendariz videotapes, for example,
3    demonstrate that Deputy Armendariz participated in immigration enforcement well after
4    the issuance of the preliminary injunction and even the trial in this matter. (*See* Doc. 843
5    at 12.) The MCSO investigations that stemmed at least in part from the Armendariz
6    videotapes resulted in an acknowledgement by Defendants that the HSU continued to
7    conduct immigration interdictions as a part of its regular operations well after the
8    issuance of the preliminary injunction and at least up to the entry by this Court of its
9    Findings of Fact and Conclusions of Law. (Doc. 804 at 5.)
10    Plaintiffs have also provided evidence that civil immigration laws were being
11    enforced by regular MCSO patrol deputies—e.g., including those not in the HSU—and
12    that such immigration enforcement was occurring as a matter of MCSO policy and
13    directive. (*See* Doc. 843, Ex. A, at A3–A8 (detailing three other possible violations of the
14    preliminary injunction).) On September 20, 2012, MCSO deputies apparently detained
15    five Mexican nationals on the belief that they were "clearly recent border crossers" and
16    summoned HSU officers to the scene to question them. (*Id.*, Ex. 2, at A3–A4 (News
17    Release, MCSO, ICE Refuses to Accept Illegal Aliens from Sheriff's Deputies During
18    Human Smuggling Operation, Sept. 21, 2012).) The MCSO press release regarding the
19    incident details that, after detectives were unable to charge two of the men for any state
20    crimes, they nevertheless continued to detain these individuals and attempted to transfer
21    them to U.S. Immigration and Customs Enforcement, "as [had] been the practice during
22    the last six years." (*Id.* at A5.) In at least two other instances over the next few weeks,
23    individuals stopped by MCSO deputies on the belief that they were in the country without
24    authorization but who could not be charged with any crime were apparently detained
25    pursuant to department policy until they could be transferred to ICE or U.S. Customs and
26    Border Patrol. (*See id.*, Ex. B, at A4 (discussing MCSO's "back-up plan"); *see also id.*,
27    Ex. B, at A8.) This course of action—detaining individuals based solely on suspected
28    civil immigration violations pending an inquiry to federal authorities—would have been

in direct contradiction of the terms of the preliminary injunction. This is true regardless of whether deputies believed to be operating at the direction of federal officers, to the extent that obedience necessitated conduct that violated this Court's Orders. (*See id.*, Ex. B, at 2–3.)

### 2.     Sheriff Joseph M. Arpaio

Defendant Joseph M. Arpaio is the head of MCSO, its chief policy maker, and has "final authority over all of the agency's decisions." (Doc. 530 at 6.) Moreover, as a named Defendant, he has been under a duty at all times during this litigation to take such steps as are necessary to reasonably ensure MCSO is in compliance with this Court's Orders. To this end, Sheriff Arpaio received a Notice of Electronic Filing through his lawyer when the injunction was issued. Sheriff Arpaio has confirmed under oath that he was aware of the order when it came out and "discussed it with [his] attorneys." (Doc. 843, Ex. B, at 31–32 (Dep. of Sheriff Joseph M. Arpaio at 65:13–67:20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) A front-page article published in the Arizona Republic on December 24, 2011, the day after the injunction was filed, corroborates Arpaio's knowledge of the preliminary injunction, noting his intention to appeal it but nevertheless obey its terms in the meantime.[7]

Plaintiffs have proffered evidence that Arpaio failed to take reasonable steps to implement the preliminary injunction's proscriptions. *See Sekaquaptewa*, 544 F.2d at 406. In a related case brought by the U.S. Department of Justice, Sheriff Arpaio stated that he could not recall giving any instructions to ensure his office complied with the preliminary injunction's terms. (Doc. 843, Ex. B, at 32 (Arpaio Dep. at 67:25, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Plaintiffs have also identified evidence that suggests, to the contrary, Sheriff Arpaio directed operations and promulgated policies that violated the terms of the preliminary injunction. For example the September 21, 2012 press release described above in which MCSO announced ICE's refusal to accept custody over

---

[7] *See* J.J. Hensley, *Judge Curbs MCSO Tactics*, Ariz. Republic, December 24, 2011, at A1.

two Mexican nationals against whom MCSO could bring no criminal charges, Sheriff Arpaio is credited with organizing a "back up plan" in which suspected illegal aliens not taken by ICE would be transferred to Border Patrol: "as directed by the Sheriff," the deputies took the two suspects detained near the Mexico border that could not be arrested to a CBP station. (Doc. 843, Ex. 2 at 7.) The press release further quotes Sheriff Arpaio as saying "Regardless of the Obama Administration['s policy, I am going to continue to enforce all of the illegal immigration laws," (*id.* at 8), despite the preliminary injunction prohibiting him from doing so.

Similarly, according to another MCSO press release, on September 26, 2012 Sheriff Arpaio personally ordered deputies to transport two persons for whom no criminal charges could be brought to Border Patrol after ICE refused to take custody of them. (*Id.*, Ex. 2, at 9 (News Release, Sheriff's Deputies Execute Search Warrant at Construction Company, September 27, 2012).) An additional MCSO press release dated October 9, 2012 again emphasized that it was Sheriff Arpaio's personal directive that deputies detain persons believed to be in the country without authorization but who could not be charged with crimes until they could be transported to Border Patrol agents: "[m]y back up plan is still in place and we will continue to take these illegal aliens not accepted by ICE to the Border Patrol." (*Id.*, Ex. 2, at 11 (News Release, 2nd Time ICE Refuses to Accept Illegal Alien From Sheriff's Deputies Since September, October 9, 2012).)

Sheriff Arpaio's public pronouncements, in conjunction with MCSO's admission that the HSU continued to conduct immigration interdictions as part of its regular law enforcement activities, contextualize his July 12, 2012 trial testimony as reflecting a more problematic enforcement approach than just continuing the LEAR policy on an *ad hoc* basis—which itself violated the preliminary injunction. At trial, Arpaio testified that, despite the federal government revoking MCSO's 287(g) authorization in 2009, he believed his agency "still had the authority, pursuant to a legitimate arrest, to determine that person was here illegally. And then if there was no state charge to book that person into the jail, [to] turn that person over to ICE." (Doc. 572 at 502.) In response to

questioning by defense counsel, Sheriff Arpaio testified to some instances in which MCSO continued to retain custody of individuals who could not be lawfully detained on any criminal charges and attempt to transfer them to federal Border Patrol agents:

> Q:     And you have that authority today [July 24, 2012]. In any of your law enforcement actions can you, if you come across someone unlawful, detain them?
>
> A:     Yes. . . . I think probably in the last two weeks we've made over forty arrests of illegal aliens coming into our county, and a few we did not have the state charge, including some young children, and ICE did accept those people. . . . We haven't had any problem yet turning those that we cannot charge in state court over to ICE.

(*Id.* at 502–03.) From his testimony and other public statements he has made, a prima facie case has been made that Arpaio directed his deputies to carry out immigration enforcement operations and promulgated a policy within MCSO that individuals who could not lawfully be detained on any criminal charges should still be held solely on suspicion of unlawful presence for months after the Court enjoined such practices.

### 3.     Chief Deputy Gerald Sheridan

Sheridan has held the position of MCSO's Chief Deputy since November 2010. (Doc. 840 at 3.) The position is second-in-command in the department and is responsible for supervising all of MCSO's operations on both the enforcement and detention sides. (Doc. 530 at 6.) Neither MCSO nor Sheridan denies that he was a recipient of the e-mail from Timothy Casey to which the December 23, 2011 order was attached. (Doc. 840 at 4.) Nevertheless, in his Memorandum re: Criminal Contempt Sheridan asserts that he was not aware of the preliminary injunction when it was issued and it was not his responsibility to disseminate such information. (*Id.*)

Chief Deputy Sheridan's deposition testimony in *United States v. Maricopa County*, provided by Plaintiffs, appears to be inconsistent with these statements. Under oath, Sheridan indicated that it was his responsibility to communicate the injunction to inferior MCSO officers but that he assumed Executive Chief Sands would "deal with" it. (Doc. 843, Ex. D, at 46–49 (Dep. of Gerard Sheridan at 122:1–125:7, *Maricopa Cnty.*,

- 14 -

No. 2-12-cv-00981-ROS).) Sheridan concedes, however, that he never discussed this purported delegation with Sands. (*Id.*) Neither MCSO nor Sheridan took any steps to ensure MCSO's compliance with the injunction. (Doc. 840 at 4.)

In addition, the Court may evaluate Sheriff Arpaio and Chief Deputy Sheridan's history of non-compliance with respect to other and related orders of this Court in determining whether contempt is merited in this instance. *See Stone*, 968 F.2d at 857.

### 4.      Executive Chief Brian Sands

Before his retirement, Chief Sands was the Chief of Enforcement at MCSO and reported directly to the Chief Deputy. (Doc. 530 at 6.) With respect to the injunction's execution, Sands allegedly understood it to be the attorney's responsibility to communicate the order to his subordinates, but could not confirm whether or not any directives to this effect had actually been given. (Doc. 843, Ex. C, at 43 (Dep. of Brian Sands at 185:12–20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Therefore, it appears that Executive Chief Sands may also have failed to take reasonable steps to communicate the injunction to the appropriate individuals within MCSO after receiving notice of it from defense counsel.

### 5.      Deputy Chief John MacIntyre

Deputy Chief John McIntyre acknowledges that he received notice of the preliminary injunction from Timothy Casey shortly after its issuance. (Doc. 839 at 3.) He further acknowledges that he did nothing to communicate the existence and/or terms of the order to patrol personnel. (*Id.*) MacIntyre justifies his inaction on the grounds that he believed to be under no obligation to implement the preliminary injunction within MCSO. (*Id.* at 3; Doc. 838 at 2.) However, as Plaintiffs note, there is evidence suggesting that Deputy Chief MacIntyre may bear accountability. In addition to his duties deriving from his rank as a commander, MacIntyre is an attorney who consults with the County Attorney's Office and outside counsel as needed in MCSO's defense. (Doc. 235, Ex. 1, at 12.) Furthermore, in 2009 at least MacIntyre appears to have been a principal contact within MCSO for outside counsel relating to matters involving the Melendres litigation.

- 15 -

(Doc. 235 at 7.) MacIntyre also assumed responsibility for MCSO's disregard of the document retention notice sent to Casey as outside counsel for Defendants, (*see* Doc. 235 at 7–8, Ex. 3, at 3), that resulted in court-imposed sanctions for spoliation of evidence. (Doc. 261.) Thus, at some points over the course of this litigation, MacIntyre has apparently been under just such an obligation to ensure Defendants' compliance with its duties that he now contests. (*See* Doc. 838.)

### 6. Lieutenant Joseph Sousa

Beginning in 2007, Sousa was the unit commander for the HSU. (Doc. 530 at 7.) Lieutenant Sousa was noticed by Timothy Casey of the preliminary injunction and, in his role as a supervisor, had the ability to direct and oversee the routine policing of inferior officers including Deputy Armendariz. Based on the evidence Plaintiffs have presented of persistent immigration interdiction patrols being conducted by the HSU after December 2011, Plaintiffs have sufficiently demonstrated that Lieutenant Sousa may not have taken all reasonable steps as required to ensure the injunction was being complied with by line officers in his division.

------------------------

Defendants, joined by the specially appearing non-parties, argue that they had no fault for the deficiencies that resulted in the preliminary injunction not being shared with officers, citing "a lack of communication throughout the department." (Doc. 842 at 14, 18.) This argument lacks merit. Apart from the evidence in the record that MCSO and Sheriff Arpaio have had no difficulty communicating their enforcement priorities throughout the department, the nature of an injunction is such that compliance is mandatory even if it requires some effort by the party bound; the standard by which a party's efforts to comply are judged is one of reasonableness. *See Sekaquaptewa*, 544 F.2d at 406.

Rather than offering evidence that any reasonable steps were undertaken to encourage compliance with the injunction, Defendants insist that their subsequent "good faith" efforts to disseminate the terms of the May 2013 permanent injunction to MCSO

personnel should excuse their noncompliance with the previous order. (Doc. 842 at 19.) As has been previously noted, bad faith is not a prerequisite to a finding of civil contempt. *Stone*, 968 F.2d at 856. Further it does little to ameliorate the harms incurred by the Plaintiff class in the seventeen months after the injunction was issued that in 2013—pursuant to a subsequent order—Defendants "implemented a new policy . . . to ensure all deputies received proper training and guidance to ensure compliance with the Court's Order." (*See* Doc. 842 at 19.) The history of MCSO's compliance with the permanent injunction, which incorporated and extended the terms of the preliminary injunction, does not illustrate good faith on the part of MCSO; rather, it illustrates and justifies, in part, the very necessity of this Order to Show Cause.

In evaluating the appropriateness of a contempt order, Defendants' record of compliance and non-compliance with this Court's previous orders may be considered. In March and April 2014, the Court held several hearings to address misrepresentations of its orders by multiple high-ranking MCSO officials, including Sheriff Arpaio and Chief Deputy Sheridan. (*See* Docs. 662, 672.) Sheridan, in addition to describing the permanent injunction as "ludicrous," averred that attorneys had informed him the Court's May 2013 order was unconstitutional—a statement that he later repudiated in a hearing before this Court. These hearings also confirmed that other MCSO command staff members, without having read this Court's orders, were repeating Sheridan's mischaracterizations to members of the general public. Sheriff Arpaio and Chief Deputy Sheridan both apologized to the Court, and agreed to sign and promulgate a corrective statement within MCSO. After the text of the statement was drafted by both parties and submitted to the Court for approval, however, Sheriff Arpaio rescinded his assent to sign and distribute it. In the end, the Court coerced the statement's transmission to and signature by all MCSO law enforcement personnel, other than Sheriff Arpaio or Chief Deputy Sheridan, via court order under the Monitor's supervision. (Doc. 680.) The Defendants' compelled circulation of the memorandum correcting their previous contemptuous mischaracterizations of this Court's orders, therefore, is not an example of past

- 17 -

compliance and in no way mitigates the need for the present hearings.

### B.    Pre-Trial Discovery Violations

The Federal Rules of Civil Procedure require parties to reasonably and diligently respond to discovery requests. As the Advisory Committee explains, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." Fed. R. Civ. P. 26(g) (Advisory Committee Notes); *cf. Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B, 2010 WL 1336937 (S.D. Cal. Apr. 2, 2010) (discussing the good faith and professional obligations inuring to litigants and counsel to search for and produce responsive documents). In addition to Rule 37, the Court possesses inherent powers to punish misconduct in discovery proceedings by an order finding the offending person in contempt. Fed. R. Civ. P. 37(d); *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Individuals who are not parties to a lawsuit may be held in contempt for their noncompliance with a discovery order. *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 79 (1988).

During the pre-trial phase of litigation Plaintiffs submitted a number of formal discovery demands, including requests for admissions, requests for documents, and interrogatories, for records on MCSO's traffic stops:

> Describe all documents that an MCSO officer may request, review, reference or create during, or as a result of, a Routine Traffic Stop, including the purposes of each document identified and the factors that guide the exercise of an officer's discretion, if any, to request such documents from a driver or passenger.

(Pls.' 1st Set Interrogs. at 5.)

> If incident histories or summaries of the traffic stops conducted in the above-listed operations are not contained with MCSO's computer aided dispatch (CAD) database that was produced to Plaintiffs, please explain in detail: (1) what documents would reflect those traffic stops; (ii) how such documents are created and maintained; and (iii) who would have access to, or control over, those documents.

(Pls.' 2d Set Interrogs. at 4.)

> [Produce] [a]ll documents relating to all traffic stops performed by every MCSO supervisor, officer, posse member or volunteer for years 2005 to present that may include one or more of the following [information][8] . . . [and] [a]ll documents relating to MCSO's policies, practices, instructions, or training pertaining to traffic stops of any type. . . .

(Pls.' 1st Req. Produc. at 7–8.)

> [Produce] [a]ll documents relating to MCSO's Human Smuggling Unit, Illegal Immigration and Interdiction Unit . . . or volunteer posses as they pertain to . . . MCSO's enforcement of federal immigration law, state immigration law . . . and [t]he performance of Routine Traffic Stops.

(*Id.* at 9.) The term "document" was defined broadly by Plaintiffs to include all

> matters, instruments or other tangible things, including any electronically stored information ("ESI") contained on computer diskette or other media, within the scope of Federal Rules of Civil Procedure 26 and 34, including, without limitation: any and all correspondence, memoranda, complaints, grievances, citations, booking papers, arrestee statements, arrest reports, incident reports, field reports, departmental reports, disciplinary reports or "write-ups," draft reports, preliminary reports, final reports and underlying materials, witness statements, witness interview summaries, field interrogation cards, meeting minutes, meeting agendas, notes of meetings, bulletins, written briefings, intra- and interoffice communications, including CAD and MDT reports, policies, manuals, training materials, books of account, worksheets, desk diaries, appointment books, daily logs, end-of-shift logs, expense accounts, and records of every type and description, all written, recorded and graphic matter of every type and description, electronic mail, electronic databases, radio logs, recordings, transcriptions of recordings, notes of conversations, telegraphic communications, pamphlets, schedules, studies, books, computer printouts, photographs and photographic records, maps, charts, tapes (including video tapes), transcriptions of tapes, and any other device or medium on or through which

---

[8] The location, time and duration of the stop; The specific reason(s) or justification(s) for the stop; any and all details about the vehicle, such as plate number, make, model and year; The names of driver(s) and passenger(s); The age, gender and race or ethnicity of the driver(s) and passenger(s); Whether any driver or passenger was questioned, warned, cited, searched, arrested, detained or investigated and the reason(s) therefor; The specific questions asked of driver(s) and passenger(s); Any database checks run on the driver(s), passenger(s) or vehicle; Whether a search was conducted and the basis therefor; If searched, whether any contraband was found; and Whether any driver or passenger was referred to, held for, or subsequently transferred to the custody of ICE and the reason(s) therefor. (Pls.' 1st Req. Produc. at 7–8.)

information of any type is transmitted, recorded, or preserved.
The term "document" also means every copy of a document
where such copy is not an identical.

(*E.g.*, *id.* at 3–4.) Despite these requests, Defendants apparently never disclosed to Plaintiffs that (1) some—if not the majority—of MCSO deputies had audio-recording devices issued to them as a matter of policy; (2) such audio-recording devices were in use during the relevant discovery periods; (3) at least some MCSO deputies had body- and/or vehicle-mounted video-recording devices issued to them during the relevant discovery periods; (4) at least some MCSO deputies recorded their on-duty activities with privately purchased video equipment during the relevant discovery periods; (5) HSU procedures apparently required some video recordings of traffic stops to be made; (6) HSU maintained a catalog of DVDs containing recordings of traffic stops by officers; and (7) at least some MCSO deputies had video cameras issued to them as a supervisory measure to monitor their on-duty activities. Defendants apparently never identified nor produced to Plaintiffs the associated physical copies of these audio and video recordings. In addition, dozens of personal identifications and items of personal property have been found in offices previously used by the HSU and elsewhere, along with a number of boxes of written reports pertaining to HSU operations. There is also no evidence that they were ever provided to the Plaintiffs as part of Defendants' pre-trial discovery obligations in this matter.

These materials appear to be relevant both to the merits of Plaintiffs' civil rights claims and for impeachment purposes, and their production prior to trial may have led to the admission at trial of evidence of additional infringements suffered by the Plaintiff class as a result of MCSO's actions. Such evidence may have resulted in a broader scope of injunctive relief ultimately entered by this Court. MCSO leadership has acknowledged that officers—both within the HSU and in other units—were regularly making audio recordings of their traffic stops pursuant to departmental practice and that some deputies even videotaped their traffic stops using devices purchased by MCSO for such purpose. (Doc. 700 at 21, 23–24.) There is also evidence that MCSO officers routinely confiscated

- 20 -

items of personal property from members of the Plaintiff class during periods that were either subject to discovery disclosure and/or during the time that the MCSO was violating the preliminary injunction. Plaintiffs have sufficiently demonstrated the likelihood that Defendants had at least some of this knowledge at a time in which they had an obligation under the Federal Rules of discovery to disclose it. For these reasons, Defendants MCSO and Sheriff Arpaio are ordered to show cause why the non-disclosure of this evidence does not constitute a contemptuous violation of Defendants' pre-trial discovery obligations.

In addition to the named Defendants, Deputy Chief MacIntyre is also ordered to show cause why he should not be held in contempt for abetting Defendants' discovery violations. MacIntyre has already once borne responsibility for evidence spoliation at an earlier stage in this litigation: in July 2008, counsel for Plaintiffs wrote a letter to Timothy Casey demanding the preservation of all MCSO records that had to do with immigration patrols since the initial putative class action complaint was filed and any subsequent crime suppression operations. Deputy Chief MacIntyre is an attorney who also served as Casey's contact within MCSO at this time and admitted that he "simply, albeit regrettably, forgot to forward [the demand for documents] to others at the MCSO. . . ." (Doc. 235, Ex. 3, at 3.) In an affidavit, MacIntyre explained that his

> standard practice upon receiving requests for the production of MCSO documents in litigation or requests to preserve MCSO documents in litigation . . . [is] to forward such requests for handling to the MCSO Legal Liaison Division, and the appropriate personnel within the MCSO that . . . may have documents potentially responsive to the particular request.

(*Id.* at 2–3.) His statements as to the role he played in MCSO's discovery process are sufficient evidence that he may also have been responsible for Defendants' failure to disclose the evidence at issue now.

## C.  Failure to Cooperate with May 14, 2014 Oral Orders

The third ground on which Plaintiffs assert that Defendants should be ordered to show cause relates to Defendants' non-compliance with the Court's May 14, 2014

Orders. In sealing the hearing in which the Armendariz evidence was disclosed, the Court commanded that the information discussed therein be kept confidential. (Doc. 700 at 7, 50–51, 69.) The Court then directed Defendants to "quietly" develop an evidence collection protocol to retrieve outstanding recordings, such as those made by Armendariz, that were in the possession of patrol deputies. (*Id.* at 25–27.) The following persons are ordered to show cause why their conduct subsequent to this hearing did not constitute contempt of Court:

### 1.    Maricopa County Sheriff's Office

The Maricopa County Sheriff's Office is responsible for its leaders' apparent sharing of confidential information discussed under seal with non-participants, in contravention of this Court's order. At the hearing, both MCSO and the Court acknowledged the need for confidentiality to preserve the efficacy of an ongoing criminal investigation and to discourage the destruction of evidence by culpable parties within MCSO. (*Id.* at 5, 22–23.) In the early afternoon, Deputy Chief Trombi was summoned into a meeting that included Sheriff Arpaio, Chief Deputy Sheridan, and MCSO's attorneys and directed to e-mail division commanders about collecting past video recordings of patrol operations. (Docs. 795, Attach. 1, at 4; Doc. 803 at 59.) Neither Trombi nor any of the twenty-seven MCSO commanders he subsequently notified by memorandum were present at this hearing.

The resulting e-mail from Trombi to division commanders, and the survey-approach strategy of collecting the recordings described in the e-mail and ultimately employed by MCSO, also apparently constituted disobedience to the Court. During the hearing, the Court indicated that what it expected from MCSO with respect to a video-retrieval course of action

> is a thought-through plan that is executed very quickly, because this is all, likely, already through part of the department, in which you can quietly gather up such material, such data, and that you can determine where it was held, when it was held, and if any particular officer says it was deleted, when that deletion occurred, and from where. Or destruction, if it was held on DVDs like Armendariz's.

(Doc. 700 at 27.) At numerous points the Court discussed the Monitor's involvement in the development of a retrieval plan,[9] and near the end of the hearing the Court concluded,

> I'm going to direct the monitor to work with you on a plan *that he can approve* that's your best thinking about how you can, without resulting in any destruction of evidence, gather all the recordings, and then based on what you find, and/or maybe beginning before you can assess what you find, depending upon your thoughts, you result in an appropriate and thorough investigation.

(*Id.* at 41 (emphasis added).) Tim Casey, representing MCSO, affirmatively stated that the investigation was within the "purview" of the Monitor's authority: "[W]e agree that Bob Warshaw and his team, because of the Armendariz material, have the need, as an officer of the Court, to investigate those matters." (*Id.* at 39–40.) In the end, the executive leaders of MCSO and their legal counsel pursued an independent plan without consulting the monitoring team, communicated that plan to subordinate personnel, and failed to inform the Monitor at the first available opportunity that they had done so. Chief Deputy Sheridan and Christine Stutz, another attorney for MCSO who had been present during the earlier meeting with Trombi, later met with the monitoring team for several hours discussing investigative strategies for retrieving outstanding recordings without mentioning that a contrary decision had already been reached and implemented.

## 2.     Sheriff Joseph Arpaio

Sheriff Arpaio, a named Defendant in this case, was present at the hearing in which the Court ordered MCSO to develop a plan to comprehensively collect any outstanding recordings of traffic stops while minimizing the risk of evidence destruction. He was also apparently present at the meeting in which Deputy Chief Trombi was instructed by Chief Deputy Sheridan to e-mail commanders. In clear terms, the Court ordered Arpaio to take "full and complete steps to investigate who may have been aware

---

[9] (*See, e.g.*, Doc. 700 at 27 ("I will have my monitor work with you to develop a pro—if you want his assistance."); *id.* at 29 ("[D]o your best, and I mean your level best, come up with a plan, review it with the monitor if you will, if you need to, to recover all of that data.").)

that this activity was going on, no matter how high up the chain it goes," and "to be involved in the supervision and the understanding and the direction of . . ." such investigations. (*Id.* at 37.) Arpaio assented, and further acknowledged the role the Monitor would play:

| | |
|---|---|
| The Court: | All right. And you will cooperate completely with my monitor. |
| Arpaio: | Yes, I— |
| The Court: | And no information will be withheld from him. . . . You will cooperate with the monitor, Sheriff? |
| Arpaio: | Yes. If we have some differences . . . we will bring that forward and try to alleviate any problems. |
| The Court: | And do that in a timely fashion. But with–to me. But in the meantime, I believe that all records and all activity pursuant to any of these investigations is under his authority. And Mr. Casey, if you have any problem with that, it's time to let me know now. |
| Casey: | No. |

(*Id.* at 38–39.) Despite his statements to the Court, Sheriff Arpaio apparently failed to take such steps as were necessary to ensure MCSO was in compliance with this Court's May 14, 2014 orders as they related to evidence collection and administrative oversight. As MCSO's elected leader, Arpaio may delegate the authority vested in him by the residents of Maricopa County to his subordinates. Ultimately, however, he must bear responsibility for any deficiencies on their part that causes MCSO as an agency to violate this Court's directives.

### 3.    Chief Deputy Gerald Sheridan.

Chief Deputy Sheridan was also present at the May 14 hearing. Apparently at the direction of Sheriff Arpaio, Sheridan bore primary responsibility for collecting outstanding recordings and investigating MCSO personnel implicated by the tapes as having engaged in problematic police practices. (*Id.* at 37, 40.) Sheridan has admitted that, despite the sealed nature of the hearing and his admonition that he would work with

the Monitor, (*see id.* at 42), he instructed Deputy Chief Trombi to send the e-mail to commanding officers that countermanded the Court's order and preemptively undermined the arrangement subsequently agreed to in consultation with the monitoring team. (Doc. 803 at 59.)

## III.   Remedies

Civil contempt sanctions are imposed to coerce obedience to a court order, or to compensate injured parties for harm resulting from the defendant's contemptuous behavior, or both. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994). Given the remedial purpose of the sanction, a finding of civil contempt should be accompanied by conditions by which the contempt judgment may be purged. *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010). In contrast, a criminal contempt proceeding punishes intentional disobedience with a judicial order and, thus, vindicates the authority of the court. *Bagwell*, 512 U.S. at 828. The crime of contempt is completed when the contumacious conduct occurs, regardless of whether the subject later complies with the order he or she violated. The same conduct may give rise to both civil and criminal contempt. *Rylander*, 714 F.2d at 1001.

It is the Court's expectation that these contempt proceedings will allow for the development of an evidentiary record sufficient for the Court to evaluate whether it can fashion an appropriate judicial response that vindicates the rights of the Plaintiff class, and whether other remedies may be appropriate. To this end, the Parties have proposed a number of suggestions for providing remuneration to the individuals harmed by Defendants' violations of the injunction and/or an award of damages to the Plaintiff class as a whole. (Doc. 843 at 22–25.) However, the feasibility of these measures remains to be seen: Defendants have cautioned, for example, that the compensatory purpose of civil contempt could prove impractical under the circumstances. (Doc. 842 at 17; Doc. 858 at 30.) The viability of crafting suitable civil relief for each of the grounds on which contempt is charged will be of chief interest to the Court if Defendants, or their subordinates, are ultimately adjudged to be in contempt of court.

**CONCLUSION**

Based upon the foregoing facts, Plaintiffs have set forth sufficient evidence that MCSO and the aforementioned individuals acted in contempt of this Court's "lawful writs, processes, orders, rules, decrees, or commands" by (1) failing to implement and comply with the preliminary injunction; (2) violating their discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders. *See* 18 U.S.C. § 401(3).

After an appropriate hearing, the Court will determine whether these individuals have committed contempt of court and the sanctions for any such violations. In conjunction with this Order to Show Cause, an order has also been filed granting Plaintiffs' requests for expedited discovery in anticipation of an evidentiary hearing in these matters.

**IT IS THEREFORE ORDERED** setting an evidentiary hearing for **April 21, 22, 23, and 24, 2015.** Proceedings will begin daily at **9:00 a.m.** in Courtroom 602 of the Sandra Day O'Connor Courthouse at 401 W. Washington Street, Phoenix, Arizona 85003.

**IT IS FURTHER ORDERED** that the following parties are to appear before the Court and show cause, as indicated, why the Court should not impose sanctions on them pursuant to 18 U.S.C. § 401 and/or Federal Rule of Civil Procedure 37(d): the Maricopa County Sheriff's Office, Sheriff Joseph Arpaio, Chief Deputy Gerald Sheridan, Executive Chief (ret.) Brian Sands, Deputy Chief John MacIntyre, Lieutenant Joseph Sousa.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1    **IT IS FURTHER ORDERED** that the Clerk of the Court is **DIRECTED** to

2    submit a copy of this Order to Show Cause to the United States Marshal for service upon

3    the following: the Maricopa County Sheriff's Office, Joseph Arpaio, Gerald Sheridan,

4    Brian Sands, John MacIntyre, and Joseph Sousa. A copy of this Order shall also be

5    provided to the United States Attorney for the District of Arizona.

6    Dated this 12th day of February, 2015.

Honorable G. Murray Snow
United States District Judge