1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                   )
              Plaintiffs,           )   CV 07-2513-PHX-GMS
6                                   )
              vs.                   )   Phoenix, Arizona
7                                   )   March 20, 2015
    Joseph M. Arpaio, et al.,       )   3:34 p.m.
8                                   )
              Defendants.           )
9   _____)

10

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           BEFORE THE HONORABLE G. MURRAY SNOW

17                  (Status Conference)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
    Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                      A P P E A R A N C E S

2

3   For the Plaintiffs:        Cecillia D. Wang, Esq.
                               AMERICAN CIVIL LIBERTIES UNION
4                              FOUNDATION
                               Immigrants' Rights Project
5                              39 Drumm Street
                               San Francisco, California  94111
6                              (415) 343-0775

7                              Stanley Young, Esq.
                               Hyun Byun, Esq.
8                              Lauren Pedley, Esq.
                               COVINGTON & BURLING, L.L.P.
9                              333 Twin Dolphin Drive
                               Suite 700
10                             Redwood Shores, California  94065
                               (650) 632-4700
11
                               Tammy Albarran, Esq.
12                             COVINGTON & BURLING
                               1 Front Street, 35th Floor
13                             San Francisco, California  94111
                               (415) 591-7077
14
                               Daniel J. Pochoda, Esq.
15                             Joshua Bendor, Esq.
                               AMERICAN CIVIL LIBERTIES
16                             FOUNDATION OF ARIZONA
                               P.O. Box 17148
17                             Phoenix, Arizona  85011-0148
                               (602) 650-1854
18
                               Jorge M. Castillo, Esq.
19                             MEXICAN AMERICAN LEGAL DEFENSE
                               AND EDUCATIONAL FUND
20                             Regional Counsel
                               634 S. Spring Street, 11th Floor
21                             Los Angeles, California  90014
                               (213) 629-2512
22
                               Andre Segura, Esq.
23                             AMERICAN CIVIL LIBERTIES UNION
                               125 Broad Street, 18th Floor
24                             New York, New York  10004
                               (212) 549-2676

25

1                              A P P E A R A N C E S

2

3       For the Defendants:        Michele M. Iafrate, Esq.
                                    IAFRATE & ASSOCIATES
                                    649 N. 2nd Avenue
4                                   Phoenix, Arizona  85003
                                    (602) 234-9775

5

6       For the Defendant Arpaio:  Thomas P. Liddy, Esq.
                                    Senior Litigation Counsel
                                    MARICOPA COUNTY ATTORNEY'S OFFICE
7                                   Civil Services Division
                                    222 N. Central Avenue, Suite 1100
8                                   Phoenix, Arizona 85004
                                    (602) 506-8066

9

                                    A. Melvin McDonald, Esq.
10                                  JONES, SKELTON & HOCHULI, P.L.C.
                                    2901 N. Central Avenue, Suite 800
11                                  Phoenix, Arizona  85012
                                    (602) 263-1700

12

        ALSO PRESENT:

13

                                    Deputy Chief John Girvin

14

                                    Deputy Chief Raul Martinez

15

        For the United States of America:

16

                                    Lynnette C. Kimmins

17                                  Rosaleen T. O'Gara
                                    Assistant United States Attorneys

18                                  UNITED STATES ATTORNEY'S OFFICE
                                    405 W. Congress Street, Suite 4800

19                                  Tucson, Arizona  85701
                                    (520) 620-7300

20

        For Chief Deputy Sheridan: Lee D. Stein, Esq.

21                                  Barry D. Mitchell, Esq.
                                    MITCHELL STEIN CAREY

22                                  One Renaissance Square
                                    2 North Central Avenue

23                                  Suite 1900
                                    Phoenix, Arizona  85004

24                                  (602) 358-0290

25

1                    A P P E A R A N C E S

2


3    For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
                                 DICKINSON WRIGHT, P.L.L.C.
4                                Attorneys at Law
                                 1850 N. Central Avenue, Suite 1400
5                                Phoenix, Arizona  85004
                                 (602) 285-5000
6
     For Executive Chief Brian Sands:
7
                                 Greg S. Como, Esq.
8                                LEWIS BRISBOIS BISGAARD
                                 & SMITH, L.L.P.
9                                Phoenix Plaza Tower II
                                 2929 N. Central Avenue
10                               Suite 1700
                                 Phoenix, Arizona  85012-2761
11                               (602) 385-1040

12                               Dennis I. Wilenchik, Esq.
                                 John Wilenchik, Esq.
13                               WILENCHIK & BARTNESS
                                 2810 North Third Street
14                               Suite 103
                                 Phoenix, Arizona  85004
15                               (602) 606-2810

16   For Lieutenant Joseph Sousa:

17                               David S. Eisenberg, Esq.
                                 DAVID EISENBERG, P.L.C.
18                               2702 N. 3rd Street
                                 Suite 4003
19                               Phoenix, Arizona  85004
                                 (602) 237-5076
20
     For Maricopa County:        Douglas L. Irish
21                               Deputy County Attorney
                                 MARICOPA COUNTY ATTORNEY'S OFFICE
22                               222 North Central Ave,  Suite 1100
                                 Phoenix, Arizona  85004
23                               (602) 506-8541

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  Thank you.  Please be seated.

4          This is civil case 07-2513, Ortega Melendres versus

5   Joseph M. Arpaio and others.  This is the time set for status          15:34:49

6   conference.

7          THE COURT:  Counsel, please announce.

8          MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

9   of the ACLU for the plaintiffs.  With me at counsel table are

10  Stanley Young of Covington & Burling, Joshua Bendor of the ACLU          15:35:04

11  of Arizona, and Dan Pochoda of the ACLU of Arizona.

12          We also have co-counsel on the telephone.

13          THE COURT:  Okay.  Good afternoon.

14          MS. IAFRATE:  Good afternoon, Your Honor.  Michele

15  Iafrate on behalf of Maricopa County Sheriff's Office and          15:35:18

16  Joseph Arpaio.  With me is Maricopa County Attorney Tom Liddy.

17          THE COURT:  Good afternoon.

18          MR. McDONALD:  Mel McDonald appearing on behalf of

19  Sheriff Arpaio on the potential criminal contempt issue.

20          THE COURT:  All right.  Thank you.          15:35:34

21          MR. BIRNBAUM:  Good afternoon, Your Honor.  Gary

22  Birnbaum appearing on behalf of Deputy Chief John MacIntyre,

23  and Deputy Chief MacIntyre's in the courtroom as well.

24          MR. COMO:  Good afternoon, Your Honor.  Greg Como

25  appearing on behalf of Brian Sands.  Mr. Sands is in the          15:35:49

 1   courtroom, as is Dennis Wilenchik.

 2          THE COURT:  Good afternoon.

 3          MR. EISENBERG:  Good afternoon, Your Honor.  David

 4   Eisenberg.  I'm appearing on behalf of Lieutenant Joseph Sousa

 5   for possible referral for criminal contempt.  The lieutenant is      15:36:03

 6   here in the courtroom.

 7          THE COURT:  All right.  And Mr. Eisenberg, just so I'm

 8   clear, your appearance is new in this matter, is it only a

 9   special appearance or is it a general appearance?

10          MR. EISENBERG:  Specially, Your Honor.                        15:36:14

11          THE COURT:  All right.  Thank you.

12          MR. STEIN:  Good afternoon, Your Honor.  Lee Stein and

13   Barry Mitchell specially appearing for Deputy Chief Sheridan,

14   who's present in the courtroom.

15          THE COURT:  Good afternoon.                                   15:36:22

16          MR. IRISH:  Good afternoon, Your Honor.  Doug Irish

17   from the County Attorney's Office on behalf of Maricopa County,

18   pursuant to your invitation.

19          THE COURT:  All right.  Good afternoon.

20          MS. KIMMINS:  Good afternoon, Your Honor.  Lynnette          15:36:30

21   Kimmins on behalf of the United States, with Rosaleen O'Gara

22   specially appearing.

23          THE COURT:  All right.

24          We have appearing telephonically on behalf of the

25   monitor team Deputy Chief John Girvin and Deputy Chief Raul         15:36:49

```
 1    Martinez, is that correct?

 2              DEPUTY CHIEF GIRVIN:  That's correct.

 3              DEPUTY CHIEF MARTINEZ:  Yes, Your Honor.

 4              THE COURT:  All right.  Do we have anybody else on the

 5    phone?                                                          15:37:00

 6              MR. SEGURA:  This is Andre Segura of the ACLU for the

 7    plaintiffs.

 8              THE COURT:  All right.

 9              MR. CASTILLO:  This is Jorge Castillo from MALDEF with

10    plaintiffs.                                                     15:37:14

11              MS. ALBARRAN:  Good afternoon, Your Honor.  Tammy

12    Albarran from Covington & Burling on behalf of class

13    plaintiffs.

14              MR. BYUN:  And this is Hyun Byun from Covington &

15    Burling for plaintiff.                                          15:37:17

16              MS. PEDLEY:  And Lauren Pedley from Covington on

17    behalf of plaintiff.

18              THE COURT:  Do we have anybody else appearing on the

19    phone?

20              All right.  Pursuant to the rules of the United States  15:37:36

21    District Court for the District of Arizona, and I've indicated

22    this before, recordings are not allowed.  So although you're

23    able to take notes if you wish, members of the audience, I ask

24    you to do that in a quiet manner, and anybody who is observed

25    recording these proceedings will be ushered out.  It's against   15:37:55
```

1    court rules and I request that you not do it.

2         I noticed up this status hearing and I noticed up the

3    reasons for the status hearing.  After I noticed the status

4    hearing I received, Ms. Iafrate, you're expedited motion for

5    entry of judgment, and I received, Ms. Wang, your objection to     15:38:14

6    that motion.  It seems to me that it will be most -- well, I'll

7    make a few comments.

8         Obviously, Ms. Iafrate -- I heard a cell phone go on.

9    Please, everybody, turn off your cell phones.

10        Ms. Iafrate, obviously your motion was a serious one,     15:38:37

11   and it may change everything or it may change a little, but I

12   think that we need to go through and explore exactly what some

13   of the details of your motion are or may mean, and the reason I

14   do that is this.  I am not -- although you've requested me to

15   vacate the hearing, I'm not going to vacate the hearing until I     15:39:02

16   have a signed settlement agreement between the parties, and so

17   until then we are pushing forward.

18        I realize that the settlement that you may make with

19   plaintiffs or may not make with plaintiffs in this matter is a

20   matter subject to your own individual negotiation, but it     15:39:21

21   occurs to me that clarification of a few matters might help you

22   both to the extent that it might facilitate understandings and

23   negotiations; it will also help you know where I'm coming from.

24        As it pertains to the possible criminal contempt

25   proceedings, the United States Attorney's Office has opted out,     15:39:41

1   and that leaves me in an unusual situation.  One of the reasons

2   the United States Attorney's opted out is because they

3   indicated they don't think it's appropriate for a judge to be

4   involved in a settlement discussion on potential charges, and I

5   understand their reasoning and I don't criticize it, but I do          15:40:05

6   respectfully disagree when it pertains to criminal contempt

7   proceedings.

8         It would have been nice, for that reason, to have

9   their presence.  I understand and, again, don't criticize their

10  withdrawal.  But in light of the -- in light of their                  15:40:21

11  withdrawal on that basis --

12        MS. KIMMINS:  Your Honor, could I be heard just for

13  some clarification, if I may?

14        THE COURT:  Yes, Ms. Kimmins, but why don't you wait

15  until we get there, because we're going to take them item by           15:40:35

16  item.

17        In light of that apparent declination, and because I

18  don't want the civil contempt process to be meaningless, and

19  because it doesn't seem to me that it's impossible that a good

20  faith resolution by the Sheriff's Office proposed to me could          15:40:59

21  satisfy criminal contempt concerns, I think that it is

22  appropriate to discuss whether or not I'm going to bring

23  criminal contempt charges, and if the United States Attorney

24  won't be involved, then, as I've indicated, we can discuss a

25  special prosecutor, or to the extent that that's no longer             15:41:20

1    necessary because of the nature of the motion you filed, and at

2    least its outlines of proposals to which I think I can

3    adequately respond we can discuss that later in this hearing

4    and see and if we can get some guidance there.

5            That's sort of thinking off the top of my head, but do   15:41:36

6    you understand where I'm coming from?

7            And I guess, Mr. McDonald, I'm really asking you, I'm

8    asking you, Mr. Birnbaum, I'm asking you, Mr. Eisenberg,

9    because you're the ones that are dealing with the criminal

10   contempt matters, so I will discuss that with you later on in   15:41:49

11   the hearing, but let's take first things first.

12           I did receive notice of a postponement of a

13   completed -- of the completion of the underlying investigations

14   of misconduct.  Well, I shouldn't say that.  Internal

15   investigations.  I don't want to characterize it one way or     15:42:10

16   another for Ms. Iafrate.  That's document 923 on the docket.

17   And as I've indicated, it seems to me that that postponement

18   might merit supplemental hearing or hearings after the April

19   proceedings, I don't intend to postpone the April proceedings,

20   and my thinking behind that was a little bit similar to what I   15:42:30

21   perceive to be some of the plaintiffs' objections, so I'm going

22   to state that, and, then Ms. Wang, you can respond, and also

23   you, Mr. Como, since you're separately representing in the

24   civil matter.

25           It seemed to me that there are internal investigations   15:42:54

 1    being conducted by the MCSO with respect to potential officer

 2    and command staff misconduct.  Some of those are being

 3    conducted by the PSB; some of them have been completed; some of

 4    them are being conducted by Mr. Vogel, who is an independent

 5    contractor to Maricopa County employed for that purpose.                     15:43:14

 6           But it does seem to me that because, as I think

 7    defendants have indicated in their motion, one of the things

 8    that would make logical sense as a result of a civil contempt

 9    is to expand the scope of the present injunction that governs

10    the MCSO.                                                                     15:43:35

11           It also seems to me that I need to know whether or not

12    there are adequate self-investigative procedures at MCSO.

13    Because the goal of this whole exercise of the injunctive

14    period is not simply to punish MCSO or to direct MCSO for a

15    three-year period, but it's to ensure that policies,                          15:43:55

16    mechanisms, and procedures are put in place so that this never

17    happens again, and obviously one of those things has to be a

18    facility at MCSO to investigate itself and its own officers'

19    misconduct.  A very important part of that would be the

20    monitor's evaluation of how the MCSO has investigated itself                  15:44:19

21    with respect to the Armendariz allegations and other matters.

22           I have already raised in these hearings my concerns

23    about some of those investigations.  I have a few other

24    concerns.  Some of those, just because I don't want to infringe

25    on any self-investigative privilege, I'm going to be careful                  15:44:39

1    about talking about today, but there are some process concerns

2    that I think I can discuss without going into them too deeply.

3            For example, I've been told that Mr. Vogel's

4    performance -- my monitor has evaluated that performance, and

5    while I think that it may be likely that he would be concerned          15:44:57

6    about some of the potential conflicts and procedural

7    irregularities relating to the engagement of Mr. Vogel, I think

8    he has been satisfied, and perhaps even -- this is preliminary,

9    just based on my conversations with him -- satisfied, and even

10   somewhat praiseworthy, of Mr. Vogel's investigation to date.           15:45:22

11           However, it is my understanding that Mr. Vogel has

12   been directed by the MCSO that he is to provide facts only and

13   is not to evaluate those facts.  And he is to provide those

14   facts to somebody at MCSO and they will decide what the facts

15   mean, and whether or not there will be any discipline, and what        15:45:46

16   that discipline will be.  I think that's pretty concerning,

17   since Mr. Vogel has interviewed everyone from Sheriff Arpaio to

18   Chief Deputy Sheridan to everyone else.  It seems to me like

19   there's an inherent conflict there, especially if Mr. Vogel

20   can't come to his own conclusions or make any recommendations.         15:46:08

21           But even though I have those concerns and I share them

22   with you freely, it gets to the larger point, which is we have

23   those investigations, we have all the other investigations,

24   some of which are not complete and some of which are, and we

25   really don't have a complete evaluation of whether or not there        15:46:27

1   has been a fair and capable investigation, self-investigation

2   of MCSO of itself.  And if there isn't that facility and that

3   procedure, I think it's completely appropriate that in addition

4   to whatever other expansion that plaintiffs may seek of the

5   existing injunction that it include an expansion relating to          15:46:46

6   MCSO's self-investigative processes.

7          I kind of read your Exhibit A as suggesting that the

8   MCSO was open to that, but I don't really know how we flesh

9   that out in a way that doesn't require the completion of those

10  investigations unless you're just going to leave it up to the         15:47:12

11  discretion of the Court and the monitor, Ms. Iafrate.

12         Do you understand what I'm saying?

13         MS. IAFRATE:  I do.

14         THE COURT:  All right.  So that's a first concern, and

15  it strikes me that regardless of whatever else happens, we need       15:47:27

16  to have adequate relief that relates to that.

17         The second concern -- well, and so if in fact you

18  can't complete the investigations, I have some dates that I'll

19  want to review with you both that will be supplemental

20  hearing -- possible supplemental hearing dates for this civil         15:47:50

21  contempt after that investigation report is complete.  And I

22  also realize that that may be appealed, depending upon what

23  discipline may or may not be imposed or suggested by the

24  individual persons involved.

25         I understand that it may be the department's position        15:48:12

 1  that that results in the privilege of some information.  We've

 2  kind of battled back and forth about the extent of that

 3  privilege before.  I've read the statute carefully.  I'm not

 4  sure there is a privilege.  I do think there are some

 5  directives to keep it out of the officer's file and some other      15:48:31

 6  things, and I certainly don't want to -- I've treated it as

 7  privileged because I don't want to prevent a vigorous

 8  self-investigation at this point by MCSO.  But I also am not

 9  going to just postpone this hearing forever.  And if there

10  isn't a privilege, and even if there is an appeal, I'm going to    15:48:49

11  consider whether or not all of that information can be

12  released.

13          Again, all of that may prove to be irrelevant to the

14  extent that you're willing to be open to an unlimited scope of

15  the monitor's -- well, I shouldn't say "unlimited," but a scope    15:49:04

16  of the monitor's authority to revise and evaluate existing

17  self-investigative procedures within the MCSO.  I just don't

18  know that.  You did suggest that that may be the case in some

19  of your language, but I don't know that I understood it

20  appropriately.                                                      15:49:23

21          Do you have any comment on that?

22          MS. IAFRATE:  Yes, Your Honor.  You want me to start

23  with the last question first?

24          THE COURT:  Sure.

25          MS. IAFRATE:  The intent of Exhibit B to the filing of    15:49:45

1  document 948 was intended to offer suggestions and concrete

2  ideas regarding how best to remedy if Your Honor was to accept

3  Sheriff Arpaio and Chief Deputy Sheridan's admission of civil

4  contempt.  One of the areas that was discussed was the running

5  of the Professional Standards Bureau that's currently run by      15:50:15

6  Captain Bailey.

7          One of the things that the Sheriff's Office was

8  agreeable to was that the monitors may conduct, conclude, and

9  follow up on the internal investigations regarding these issues

10 and what we are calling the spin-off investigations of Deputy     15:50:33

11 Armendariz so that would give them free rein to review not only

12 what has been done, but also to begin their own investigations

13 and to critique the investigations that have been done by PSB.

14         THE COURT:  I appreciate that, and I did understand it

15 correctly, then, but I guess one of the things that I'm saying    15:50:54

16 is would the monitor, in your view, be free under the language

17 you propose, or under language you're willing to propose, to

18 require policies and procedures that pertain to internal

19 investigative processes that currently do not adequately exist

20 at the MCSO?                                                      15:51:13

21         MS. IAFRATE:  The free-rein pieces concern me a little

22 bit, Your Honor, because obviously, I can't anticipate

23 everything.  However, would they have the authority to

24 recommend policies --

25         THE COURT:  Let me just put it this way.  If you're      15:51:29

1   going to communicate with plaintiffs about settlement, one of

2   the things that I'm very interested in, you remember how we

3   implemented policies for training, for education for officers?

4   We required that training; we required certain supervision

5   levels; we required things like that.                    15:51:48

6         I would suggest that you consider discussing with

7   plaintiffs the implementation of policies and procedures

8   pertaining to your own internal investigations that currently

9   do not exist or, if they do exist, are very archaic.

10        Is that something -- well, I just point that out.    15:52:06

11        MS. IAFRATE:  Your Honor, I can stand before you today

12  and say yes, that would be something that we would consider.

13  That was your question.

14        THE COURT:  All right.

15        MS. IAFRATE:  And it would be a good discussion to     15:52:14

16  have with plaintiff.

17        THE COURT:  All right.  The other thing is I would

18  expect that if that was going to happen, the same sort of

19  period of compliance would have to exist that the monitor could

20  monitor MCSO's ability to self-investigate.               15:52:26

21        Do you understand --

22        MS. IAFRATE:  Yes.

23        THE COURT:  -- what I'm saying?

24        MS. IAFRATE:  Yes.

25        THE COURT:  All right.  Do you have anything else you   15:52:34

1    wanted to say on this point?

2            MS. IAFRATE:  Regarding this issue?  No.

3            THE COURT:  Okay.  Thanks.

4            Ms. Wang, do you want to be heard on this?

5            MS. WANG:  Your Honor, one question to clarify.            15:52:46

6        I actually had read paragraph 4 of Exhibit B to the

7    motion to vacate the hearing to provide that the monitor would

8    actually have coextensive authority over internal

9    investigations including disposition.

10           THE COURT:  I'm not fighting that.  I --            15:53:02

11           MS. WANG:  I'm not --

12           THE COURT:  I think that's appropriate.

13       I'm sorry, I thought that was appropriate and that's

14   how I understood it, but I was actually talking to Ms. Iafrate

15   about something more, which is the beginning of new procedures            15:53:12

16   or the creation of procedures and practices within the MCSO

17   about how it investigates itself on an ongoing basis so that

18   after the monitor leaves we have policies, procedures, and

19   practices in place that are adequate.

20           And so I didn't mean to suggest that I was disavowing            15:53:32

21   what I believed to be the sheriff -- the defendants' very

22   helpful suggestions as it pertains to this matter in paragraph

23   4, if that's what you're saying.

24           MS. WANG:  Your Honor, I understood what -- the point

25   that the Court was making.  I actually was seeking            15:53:48

1    clarification from the defendants --

2            THE COURT:  I apologize.

3            MS. WANG:  -- because what Ms. Iafrate just said in

4    response to the Court's question led me to question whether in

5    fact they would agree, under paragraph 4 of Exhibit B, to the          15:54:02

6    monitor actually having the authority to make dispositions of

7    internal investigations, not merely the ability to have --

8            THE COURT:  I see.

9            MS. WANG:  -- a parallel investigation, which is what

10   I thought I heard Ms. Iafrate saying.                                   15:54:17

11           THE COURT:  No?

12           MS. IAFRATE:  That is not what I said, Your Honor.

13           THE COURT:  Okay.  Well, could you respond to Ms. Wang

14   so we understand?

15           MS. IAFRATE:  Well, Your Honor, I think that                    15:54:30

16   Exhibit B, as set forth, I read it to you, read a portion of it

17   to you regarding the monitors, and that was what was proposed.

18   Now what I'm hearing you suggest to me is that I have a

19   conversation with plaintiffs' counsel regarding this paragraph

20   and that it could be expanded further, and I'm saying that MCSO        15:54:50

21   is willing to have that conversation.

22           THE COURT:  All right.  Ms. Wang?

23           MS. WANG:  I think there's a misunderstanding.

24           What I'm asking is:  Is the intent of what's written

25   in paragraph 4 of Exhibit B that the monitor would have                15:55:02

```
 1   authority to make dispositions of internal investigations under

 2   your proposal, and not just the ability to have a parallel

 3   investigation and make findings of fact, but the authority to

 4   make a disposition whether a charged misconduct is unfounded,

 5   exonerated, sustained, or not sustained?                              15:55:26

 6           MS. IAFRATE:  Your Honor, the paragraph allows the

 7   monitors to either conduct investigations with PSB or separate

 8   from PSB, and so they aren't all parallel; the monitors can do

 9   their own.

10           THE COURT:  Let me tell you how -- what I understand       15:55:50

11   Ms. Wang's question to be, and she can correct me.

12           There isn't anything in the paragraph as she reads

13   it -- and I think she's right -- that says that if, for

14   example, the monitor and the PSB conduct a joint investigation,

15   the PSB were to determine that -- let's say scenario number 1:     15:56:05

16   The PSB were to determine independently that allegations were

17   unfounded and the monitor determined that they were founded.

18           Whose determination counts?

19           MS. IAFRATE:  I'm sorry, Your Honor.  I have two

20   conversations going on at once.                                     15:56:32

21           THE COURT:  Sure.

22           MS. IAFRATE:  So are you saying that they're doing a

23   parallel investigation or the monitor did a separate

24   investigation?

25           THE COURT:  Yeah.  In other words, does the monitor       15:56:41
```

 1    have the final word about whether an allegation is founded or

 2    not?

 3              MS. IAFRATE:  Yes.

 4              THE COURT:  Okay.  Does the monitor have the final

 5    word about what discipline should be imposed against an officer          15:56:48

 6    if there is a determination that there is foundation for the

 7    charges?

 8              MS. IAFRATE:  That is not how these paragraphs are

 9    written in Exhibit B.

10              THE COURT:  Right.                                             15:56:57

11              MS. IAFRATE:  And I thought that that was your

12    question to me, your follow-up question to me:  Would we be

13    willing to have that conversation with --

14              THE COURT:  That was.

15              MS. IAFRATE:  -- plaintiffs' counsel.                          15:57:04

16              THE COURT:  That was, but I just want to make sure

17    that it's clear.

18              MS. IAFRATE:  Yes.

19              THE COURT:  Okay.  In addition, my follow-up to you

20    was about ongoing procedures, so that after the monitor leaves          15:57:11

21    this process we have a process in place at MCSO that is up to

22    law enforcement standard and is functioning effectively.

23              MS. IAFRATE:  Yes.

24              THE COURT:  All right.

25              I don't think we need to discuss at this point whether        15:57:25

 1   any privilege applies to internal investigations you've made.

 2   That may come up, but you may be able to resolve it through

 3   negotiation, and I don't think we have to spend a whole lot of

 4   time at this point anticipating problems.

 5          But I will say that we are going to set a supplemental    15:57:42

 6   hearing date and if we don't clear it off, I may raise that,

 7   because if somebody files an appeal, I want to go -- go ahead

 8   with this matter.  It has been pending for far too long.  But

 9   I, of course, want to respect a privilege if there is one.

10          Ms. Wang.                                                 15:58:03

11          MS. WANG:  Your Honor, I do want to alert the Court

12   that we began Chief Deputy Sheridan's deposition this

13   morning --

14          THE COURT:  Yes.

15          MS. WANG:  -- and the defense did assert a privilege     15:58:11

16   over matters relating to the independent investigation by

17   Mr. Vogel, to the extent that they instructed the witness not

18   to answer questions about who the principals are in those

19   investigations.  I don't think it's ripe yet to bring that

20   dispute to the Court, but I wanted to alert you that that is    15:58:32

21   brewing.

22          THE COURT:  All right.  I will just indicate to the

23   parties that I have -- I don't know all the possible privileges

24   that you may be asserting.  I have looked at the statute

25   extensively here, and I think that all privileges are to be     15:58:48

 1    narrowly construed and I would -- to the extent I find any

 2    privilege in the statute, and I'm not sure there is one, I will

 3    construe it -- it will be my inclination to construe it

 4    narrowly.

 5              That doesn't mean that I understand all of the bases          15:58:58

 6    on which you've offered that instruction, and I'll certainly

 7    wait and hear what those are if that comes to a head.

 8              Ms. Wang, I have something for you now.

 9              MS. WANG:  Yes, sir.

10              THE COURT:  The monitor has received an e-mail request        15:59:09

11    from the plaintiffs not only for underlying data -- for

12    example, the investigations that he independently conducted,

13    and not only for the material that he has independently

14    received from the MCSO at his request, both of which things I

15    think are fair game for you to ask -- but he's received a         15:59:30

16    request for his work product, since he hasn't yet issued a

17    report on the adequacy of the investigations.

18              I must tell you that I have no inclination to have the

19    monitor give you his work product.  With all due respect, I

20    believe there is a judicial privilege and a judicial immunity.        15:59:48

21    The monitor -- I'm not sure about that, either, just as I'm not

22    sure about the bases on which Ms. Iafrate's going to claim a

23    privilege.  But if you want to have the monitor's work product

24    and impressions, you're going to have to file a motion with me

25    to get it, because I'm not inclined to have my monitor being        16:00:04

1   deposed about conversations he has with his staff that are --

2   that are implementing my direction, because I just believe that

3   there is a judicial privilege and a judicial immunity that

4   needs to be protected in this matter.

5           You understand what I'm saying?                          16:00:20

6           MS. WANG:  Understood, Your Honor.

7           THE COURT:  Okay.

8           MS. WANG:  I will ask, Your Honor, to the extent that

9   the monitor is having discussions with defendants and

10  defendants are privy to information through those discussions,   16:00:32

11  we do take the position that plaintiffs should have --

12          THE COURT:  Well --

13          MS. WANG:  -- the content of those discussions.

14          And how that's conveyed I understand the Court is

15  concerned about, since it would be the work product of the       16:00:49

16  monitor.  But I do feel that plaintiffs, you know, are not

17  party to all the conversations the monitor has with defendants.

18  That's completely understandable, given how injunctions of this

19  type are carried out.  But it does put us in a position of

20  having less knowledge as we come to these proceedings.           16:01:09

21          THE COURT:  I do perceive that occasionally you have

22  been at that disadvantage, and it will be my direction to

23  him --

24          And to you, Ms. Iafrate, Mr. Liddy.

25          -- that if he has such discussions that relate to        16:01:21

1    anything substantive involving this lawsuit, that they be

2    had -- that they be shared with both sides.

3            If you have hesitancy about that, and if it's a matter

4    that you believe involves privilege or something else that he's

5    had access to that you don't think the plaintiffs are entitled          16:01:36

6    to, you should raise it with him and then he'll raise it with

7    me, I'll let both parties be heard and I'll rule immediately,

8    if we need to go forward on that basis.

9            Any problem with that?

10           MS. IAFRATE:  I have a point of clarification, Your          16:01:51

11   Honor.  How should that communication be conveyed?  For

12   example, when the monitors come and do their site visits --

13           THE COURT:  Yes.  Well, if he's having a communication

14   with you and he perceives that this is information that, in

15   fairness, the plaintiffs ought to have access to, I'll have him          16:02:06

16   tell you that.

17           MS. IAFRATE:  Very well.

18           THE COURT:  And then you can file an objection.

19           And by the way, Mr. Como, I haven't forgotten you,

20   when I say "plaintiffs" I also mean Chief Sands can have access          16:02:17

21   to that same information.

22           MR. COMO:  Thank you, Your Honor.

23           THE COURT:  All right?

24           MS. WANG:  Thank you, Your Honor.

25           THE COURT:  Let's talk about compensation for victims          16:02:27

1    here.  I raised this concern last time, and if you want to

2    create, as a part of the settlement of this matter in your

3    settlement discussions, or if you want to request, if this

4    matter does not settle, Ms. Wang, that this Court create some

5    sort of compensation fund from which victims of the -- you                16:02:47

6    know, I don't know -- I don't know how to refer to it, but the

7    violations of my court's order that were contemptuous, I think

8    you can do that, but here is my concern.

9           I do not believe that the mechanism is in place --

10   that would be in place if this was a class action lawsuit --            16:03:07

11   for me to terminate the rights of any potential plaintiffs in

12   this case.  And so if you want to set up a mechanism by which

13   plaintiffs can come to you and receive a payment for the

14   surrender of their claims, I suppose -- I can't really think,

15   immediately, of a problem with that, I haven't really thought           16:03:26

16   it through, but the point is I cannot, in this settlement

17   proceeding, preclude any potential victim of the sheriff's

18   contempt.

19          So, you know, you may well, for example, Ms. Iafrate,

20   in your motion you've suggested funding to the tune of                   16:03:44

21   $350,000, and more if necessary.  But I guess the point I'm

22   making is I don't see how I can cut off the rights of any

23   potential victim of the misconduct at any particular dollar

24   amount as a part of this contempt proceeding.

25          Is there any -- you know, there's opt-in and opt-out              16:04:03

1    procedures that apply to class action; there's notice, there's

2    all those things.  I may well require notice.  I'm certainly

3    going to require, as you've suggested, that the department put

4    forth every effort to identify every possible victim.  But I'm

5    not sure that I can preclude any victim from seeking recovery          16:04:20

6    through a class action or whatever mechanism they may choose,

7    and they're not going to be bound by this contempt proceeding.

8    I just don't see how that's a legal possibility.

9         I just wanted to have that out there on the table.  If

10   anybody disagrees with that, let me know.                             16:04:39

11        MS. WANG:  We agree with that, Your Honor.

12        MS. IAFRATE:  I understand what you're saying, Your

13   Honor.  We are working diligently to try to identify these

14   people.  There are, you know, outlayers that we may never find.

15   But that is one of the primary goals of MCSO since I started         16:05:09

16   with this case.

17        THE COURT:  I appreciate that, and I appreciate the

18   difficulty of being sure you've identified everybody.  As I've

19   indicated, it seems to me that one of the problems with the

20   contempt was because at the time the sheriff believed he could      16:05:21

21   use race as one factor among others in determining probable

22   cause, there may be a number of victims that were stopped and

23   detained and never arrested or -- but were investigated, and

24   that constituted a Fourteenth Amendment violation, and I'm not

25   sure how you find those people.                                      16:05:43

1           The other reality is, of course, and this has come out

2    as a matter that has already been disclosed in open court, so

3    even though there are some aspects that are being internally

4    investigated I think I can discuss it, Deputy Armendariz

5    thought he saw some Hispanic people so he pulled them over and          16:06:00

6    they turned out to be Korean.  He still took their passports,

7    but they're not members of the class, they're Koreans, and the

8    class is defined as Hispanics.

9           Now, the sheriff still violated the injunction.  They

10   still may have a remedy.  I'm not sure that that remedy is          16:06:21

11   going to be through any sort of a fund that you may make --

12   they may have available to pay to the victims who are members

13   of the class, and those are just things that I think you're

14   going to need to think about.  They may be small details, but

15   the devil's always in the details.          16:06:37

16           Then we can discuss the special pros -- the

17   appointment of a special prosecutor.

18           Ms. Kimmins, you wanted to be heard on that.

19           MS. KIMMINS:  Yes, Your Honor.

20           THE COURT:  Please come to the podium.          16:06:56

21           MS. KIMMINS:  Thank you, Your Honor.

22           For clarification, the government would like to

23   indicate that we do have strong and well recognized interests

24   in ensuring the enforcement of the court orders, and it's

25   something certainly in which the United States is interested in          16:07:15

1    doing.

2         With respect to Rule 42, we wanted to make sure the

3    Court understood that the U.S. Attorney's Office has not

4    declined a request or referral of an appointment as a

5    prosecutor for the potential criminal contempt proceeding,          16:07:31

6    should that referral be made.  The purpose of our notice was to

7    indicate that we were only declining participating in the

8    settlement negotiations based on the precedence of U.S. versus

9    Davila and our DOJ policies which are in line with that with

10   respect to court-facilitated settlement conferences which could     16:07:55

11   be facilitated either with a district court judge or a U.S.

12   magistrate judge.

13        In line with our DOJ policies, we have guidance that

14   even if the Court is ordering or referring the case for

15   settlement purposes, that could have implications of Rule 11        16:08:12

16   and also Davila, and those are our concerns.

17        At the hearing in February, February 26th, the Court

18   inquired of our office regarding the participation with a

19   private mediator, and we indicated in our notices that we also

20   did not believe that that was something that we could              16:08:33

21   participate in and would respectfully decline with respect to a

22   private mediator, for many of the implications that could be

23   with the Court referring or facilitating the settlement as in

24   Davila, but also as far as the fact that it's the government's

25   position that it would be premature at this point because the      16:08:51

 1    referral has not been made.

 2            Although we do participate in global settlements in

 3    cases, that's usually where we are a party to both the civil

 4    and the criminal matter.  In this particular case, we have some

 5    practical considerations involved that we're not in a situation          16:09:08

 6    where we could craft a suitable criminal resolution without

 7    knowing the full extent of the charges, the potential

 8    defendants, that the civil contempt proceedings may clarify

 9    that as they go forward and as the Court determines the

10    remedies and also makes findings.                                        16:09:27

11            In addition, as the Court's well aware, this is not a

12    normal situation by any means, and especially not a normal

13    situation that we would be dealing with with criminal

14    prosecutions.  We have no sentencing guidelines that would help

15    us craft any kind of plea negotiations.  It's a situation where         16:09:45

16    the Court has indicated that there's a number of issues that

17    the Court would have requirements that would need to be made,

18    and those requirements would, if they're not met, they would

19    preclude a global settlement, and we're not privy to what all

20    of those are.                                                            16:10:08

21            In addition, the Court has indicated that should this

22    become a criminal matter the Court would recuse themselves,

23    which then leaves us in a situation where we have another

24    judge, and the sentencing itself really becomes, as far as the

25    criminal aspect, is what the sentencing judge contemplates.              16:10:26

1        In addition, there are considerations regarding

2   whether or not it would be a jury trial, which again would

3   determine on whether or not what the sentencing judge would be

4   contemplating as a sentence.

5        Most important for the government at this point is we          16:10:44

6   have not participated and have not begun any kind of criminal

7   investigation or criminal discovery.  We've been privy to

8   certain items as a result of PACER or documents that have been

9   provided for us, but the government really has not had an

10  opportunity, and would not have an opportunity until a referral     16:11:02

11  is made, to conduct their independent investigation.

12       THE COURT:  You know, I really do want to give you an

13  opportunity to have fully stated your position.  I think I've

14  now done that.

15       MS. KIMMINS:  Yes.                                             16:11:15

16       THE COURT:  Let me just say that although the

17  government and I may disagree about whether or not your

18  participation is appropriate, I certainly respect and

19  understand that you have to make your own calls in that matter

20  and you have adequate justification.                                16:11:29

21       But let me also say, let me just state on the record,

22  because I think I need to to proceed, the two or three reasons

23  why I believe that it is not inappropriate for the defendants

24  in this case to make settlement proposals before a charge.  And

25  I'm not saying I'm going to accept them.  And if the defendants     16:11:49

1    think that, they will learn otherwise.  However, I think they

2    have made a good faith settlement proposal that merits

3    consideration.

4         You've talked about Rule 11, some other things that

5    pertain to judges' participation in settlement discussions and          16:12:04

6    how that's not appropriate.  I appreciate that.  But as you

7    said, a contempt proceeding is a very, very different

8    proceeding.  It isn't a proceeding where a grand jury has

9    brought a charge that has been brought to the grand jury by the

10   government; it is a case where the judge decides whether          16:12:23

11   criminal contempt needs to be made necessary.

12        Recognizing that it is difficult for a judge to be

13   involved in a negotiation process at all, I made the suggestion

14   and hoped that I could recruit you but I respect your

15   determination not to do it.          16:12:41

16        That being said, if I want to, what prevents me from

17   appointing a special prosecutor for settlement purposes?

18        MS. KIMMINS:  I think pursuant to the rule what the

19   Court would need to do is articulate the interests of justice

20   that --          16:12:55

21        THE COURT:  Well, I'll tell you what the interests of

22   justice are.  The interests of justice are that if -- well, the

23   interests of justice as I see them are this.  There is real

24   reason to believe that the individual defendants in this case

25   may need to be punished pursuant -- and the Court, the          16:13:08

```
 1   authority of this Court may need to be vindicated pursuant to a

 2   criminal contempt proceeding.

 3        Nevertheless, at least one of those defendants is a

 4   duly elected official of Maricopa County.  So I have to be

 5   careful about the respect that such an official is due, the        16:13:25

 6   uproar that it causes if in fact a settlement proposal is

 7   tendered to this Court which results in virtually the same

 8   thing that that defendant would -- punishment that that

 9   defendant may receive in a criminal contempt proceeding.  If

10   they offer it up, I don't see any reason to go forward with the    16:13:44

11   process of naming a prosecutor and initiating a criminal

12   contempt proceeding.

13        Now, they may not offer that up.  But I do think, for

14   what it's worth, you've certainly made a good faith proposal

15   towards that end.  If I'm not going to have you to evaluate and     16:14:00

16   recommend that proposal, I'll either do it myself or I'll

17   appoint a special prosecutor.

18        But the interests of justice seem to me to be a sort

19   of respect for the citizens, or taking into account a respect

20   for the citizens of Maricopa County, a desire to avoid             16:14:16

21   unnecessary proceedings if in fact the result can be achieved

22   without those proceedings, and the public good.

23        Those would be my reasons, and I'm just stating them

24   on the record.

25             MS. KIMMINS:  Thank you, Judge.                          16:14:32
```

 1          THE COURT:  Thank you for allowing me to do that,

 2   Ms. Kimmins.

 3          MS. KIMMINS:  Thank you.

 4          THE COURT:  All right.  I'm going to talk about the

 5   special prosecutor if we need that, but first I'm going to ask          16:14:39

 6   some questions about the criminal contempt proceeding and your

 7   proposals that relate to that.

 8          First of all, Ms. Iafrate, in your expedited motion

 9   you indicated that MCSO -- well -- I guess I'll get to that

10   later.  You indicated that MCSO chief -- Chief Deputy Sheridan          16:15:03

11   and Sheriff Arpaio would accept a civil -- acknowledge, they

12   basically acknowledge that they're in civil contempt.

13          But I did individually notice not just those persons,

14   but I also noticed Chief MacIntyre, Chief Sands, and Lieutenant

15   Sousa.  What do you propose to do with respect to Chief                 16:15:24

16   MacIntyre and Lieutenant Sousa, who you represent?

17          MS. IAFRATE:  As far as civil contempt is concerned,

18   Your Honor?

19          THE COURT:  Yes.

20          MS. IAFRATE:  If Your Honor is not -- does not accept           16:15:36

21   this proposal and accept that Sheriff Arpaio and Chief Deputy

22   Sheridan accept full responsibility, then the hearing would

23   need to continue as to those three remaining individuals.

24          So if this is not a satisfactorily global situation,

25   it would at least minimize the number of issues that would go           16:16:00

 1    forward regarding civil contempt.  And I believe that I heard

 2    you last hearing that we had that you recommended that I --

 3    that I at least attempted to do such minimization as I could,

 4    because, I think in your own words, some of these contempt

 5    issues were already out there.                                16:16:20

 6           THE COURT:  Yeah.

 7           MS. IAFRATE:  And so that's what I was attempting to

 8    do if you don't accept it globally.

 9           THE COURT:  Let me just -- I may have misunderstood

10    and I don't want to misunderstand.                           16:16:28

11           So what you've said is as far as you're concerned, the

12    civil contempt of Sheriff Arpaio, Chief Deputy Sheridan, and

13    the MCSO will stay in place.  They accept responsibility for

14    civil contempt.  However, we would need to proceed with respect

15    to Chief MacIntyre, Chief Sands, and Lieutenant Sousa.       16:16:49

16           Is that what you've said?

17           MS. IAFRATE:  Well, if I could hit the ball out of the

18    park, what I would hope for is that you would accept this what

19    we're kind of fluctuating between calling a settlement and a

20    motion to vacate and the acceptance of responsibility by     16:17:04

21    Sheriff Arpaio and Chief Deputy Sheridan, if you would accept

22    this as a proposal to satisfy the civil contempt as to MCSO and

23    all of the individuals, I would ask you to do that.  If not,

24    then the hearing regarding the individuals would need to

25    proceed.                                                     16:17:24

1      THE COURT:  Well, when you say "the individuals," are

2  you talking about who?

3      MS. IAFRATE:  I'm talking about Chief MacIntyre,

4  Lieutenant Sousa --

5      THE COURT:  But you're not --                          16:17:31

6      MS. IAFRATE:  -- and Chief Sands.

7      THE COURT:  And Chief Sands.  Okay.  Thank you.

8      Mr. Como.

9      MR. COMO:  Well, Your Honor, we would obviously

10  welcome having the entire contempt hearing vacated if the Court  16:17:42

11  accepts the proposal or some variation of that proposal,

12  certainly.

13      THE COURT:  But at this point Chief Sands is not

14  volunteering to take a criminal contempt citation again him

15  himself?                                                   16:17:58

16      MR. COMO:  That's correct, nor a civil contempt at

17  this point.

18      THE COURT:  Okay.  Thank you.

19      Any questions about that, Ms. Wang?

20      MS. WANG:  Your Honor, I confess I am somewhat        16:18:12

21  confused about what exactly the defendants' expedited motion to

22  vacate is at this point.  As I read it, the sheriff and

23  Chief Sheridan and the agency have admitted to civil contempt,

24  they have stipulated to various facts and admitted to various

25  facts contained in Exhibit A, and those actions are not        16:18:42

1    conditioned on any action to be taken by the Court.  They have

2    proposed in Exhibit B a number of remedies that the Court could

3    impose for the civil contempt.

4           At this point, however, Ms. Iafrate seems to be

5    describing the expedited motion to vacate the hearing as some          16:19:08

6    kind of proposal to the Court which needs to be accepted in

7    order for the admission of liability for civil contempt to

8    stick.

9           THE COURT:  Now, let me just, just for clarification

10   purposes, let me state what I heard Ms. Iafrate say.                    16:19:22

11          I heard her be a good lawyer, and a good lawyer says:

12   We'd like to resolve this globally based on the proposition

13   we've made.  If you're not going to take that, then the hearing

14   will have to proceed as to the other -- the individual three,

15   but I haven't heard her say that Sheriff Arpaio or Chief Deputy         16:19:38

16   Sheridan or the MCSO is going to withdraw their acknowledgment

17   and admission of contempt if the hearing goes forward.

18          Did I misstate that, Ms. Iafrate?

19          MS. IAFRATE:  You did not misstate that.

20          THE COURT:  All right.  So --                                    16:19:54

21          MS. WANG:  Thank you for the clarification.

22          THE COURT:  -- does that clarify it for you?

23          MS. WANG:  Yes.  Thank you.

24          THE COURT:  All right.  Now, let me ask a couple of

25   other things.  One of the things, one of the bases of                   16:20:01

 1    Ms. Wang's objection to going forward is -- or objection to

 2    your motion is she has taken the position that she doesn't know

 3    everybody who may be possible contemnors within the division,

 4    and she doesn't know -- or there has been no acknowledgement

 5    that the sheriff -- sheriff's, shall we say, noncompliance with        16:20:20

 6    this Court's order, was willful, and that it makes a difference

 7    to her in terms of the remedy that she would seek for such

 8    civil contempt whether the violation was willful.

 9         So let me ask:  Is the sheriff willing to acknowledge

10    that his violation of my orders was willful?                            16:20:49

11         MS. IAFRATE:  Well, Your Honor, now you're getting

12    into criminal contempt.

13         THE COURT:  I do appreciate that.

14         MS. IAFRATE:  And that is -- plaintiffs' counsel is

15    not a party to --                                                       16:21:00

16         THE COURT:  Okay.  Mr. McDonald?

17         Fair enough, Ms. Iafrate.  I didn't mean to --

18         MR. McDONALD:  Your Honor --

19         THE COURT:  -- be rude and cut you off, but your point

20    is well made.                                                          16:21:10

21         MR. McDONALD:  The answer is no, he's not conceding

22    that it was willful and we don't believe it was willful.  We

23    saw this remedy --

24         THE COURT:  Let me ask you, Mr. McDonald, just for

25    purposes of exploring settlement possibilities, when I set            16:21:19

1    forth the order to show cause, I explicitly left out some facts

2    of which I am aware that suggest that the sheriff's

3    noncompliance might have been willful.  I haven't set them

4    forward in this hearing, but I think they're now pretty much

5    public; they've made available, I think, to most parties, most          16:21:36

6    of those facts.

7         Is there something that might promote the increased

8    settlement discussion between the civil parties -- I guess this

9    is really a question for Ms. Iafrate, but I'll ask you:  Does

10   it make a -- well, I'm going to ask Ms. Iafrate first, then            16:22:01

11   I'll ask you:

12        Does it make a difference, Ms. Iafrate, in terms of

13   the defendants' settlement posture, and I'm going to try and

14   explain what I mean here, as if -- is there any difference in

15   the relief that you are willing to extend to plaintiffs based         16:22:20

16   on whether or not the sheriff's noncompliance was willful?

17        In other words, are you willing to assume, even though

18   the sheriff is not admitting it, are you willing to assume, in

19   conducting your negotiations with plaintiff and the remedies

20   that they might seek, that the sheriff's noncompliance was            16:22:43

21   willful?

22            MS. IAFRATE:  If I could back into that, Your Honor --

23            THE COURT:  Um-hum.

24            MS. IAFRATE:  -- I believe that the remedies that we

25   proposed were not only proposal for civil contempt, but also I        16:22:55

1    heard you in the last hearing that you were alluding to and you

2    would not accept anything unless the criminal contempt

3    component was also addressed.

4            THE COURT:  Right.

5            MS. IAFRATE:  So yes, the MCSO has assumed that they          16:23:11

6    are going to be facing both civil and criminal contempt when

7    they filed this motion to vacate and entry of judgment, the

8    stipulation of facts, and the proposed remedies.

9            THE COURT:  All right.  But really what I'm getting to

10   is Ms. Wang's saying:  Look, I might seek different remedies if     16:23:30

11   I found out the sheriff's noncompliance was willful than if I

12   found out it was merely irresponsible, or negligent, or

13   whatever you want to call it.  And so I'm saying in terms of

14   your willingness to entertain any changes in the existing

15   consent decree or any other remedies which she might seek, are     16:23:52

16   you willing to assume, without admitting, that the sheriff's

17   noncompliance was willful?

18           MS. IAFRATE:  We assumed that he would face that risk,

19   Your Honor --

20           THE COURT:  That's --                                       16:24:07

21           MS. IAFRATE:  -- so yes.

22           THE COURT:  -- that's really not quite the question

23   I'm asking.

24           MS. IAFRATE:  Well, but, Your Honor, if I just may,

25   when fashioning the remedies we considered punitive remedies,      16:24:14

1   and that was something that you suggested would be necessary.

2            THE COURT:  Um-hum.

3            MS. IAFRATE:  And the punitive nature goes to the

4   criminal contempt.  So I am attempt -- I'm not Sheriff Arpaio's

5   criminal contempt attorney, but I was instrumental in helping      16:24:30

6   to fashion this document, and it did assume both criminal and

7   civil contempt.

8            THE COURT:  All right.  Ms. Wang, do you have any

9   questions?

10           MS. WANG:  No, Your Honor.                                 16:24:41

11           THE COURT:  Okay.  Do you have any concerns about

12  that, Mr. McDonald?

13           MR. McDONALD:  Your Honor, great effort went into that

14  motion that we submitted to the Court.  Part of the sanctions,

15  I mean, there was a lot of discussion, obviously, you wouldn't     16:24:54

16  have been privy to.  I felt that the $100,000 contribution,

17  when you talk about punitive, was there.

18           THE COURT:  Um-hum.

19           MR. McDONALD:  I think that the public apology was

20  there.  Interesting enough, that same day I had people from the    16:25:12

21  community calling applauding that kind of an approach wanting

22  to set something up for this apology.

23           Your Honor, when we went through this --

24           THE COURT:  Let me just say, for what it's worth,

25  Mr. McDonald, I have some questions about that.  But in terms      16:25:32

1   of if the sheriff is really paying $100,000 out of his own

2   pocket, and not from the Sheriff Joe Arpaio Legal Fund, and not

3   from other sources, I'm very satisfied that that is puni --

4   that goes a long way towards satisfying a punitive sanction and

5   it's in good faith.  I'm going to ask you questions about that.    16:25:54

6           I am very satisfied that in conjunction with that, the

7   public apology that I might require -- and I will require it

8   here in this courtroom and I'll probably require it in one

9   other place and I'll have to approve it -- also goes a very,

10  very long way, as long as I can approve the content and it       16:26:10

11  isn't in any -- there is no effort in it to escape or evade

12  responsibility.

13          That's really not what I'm asking.  I'm asking a

14  slightly more refined question, and that is:  In terms of the

15  civil relief that plaintiffs might be negotiating on the civil   16:26:28

16  side of this case, Ms. Wang has said it makes a difference to

17  her whether or not the sheriff was acting willfully in terms of

18  the remedies they might seek, presumably in terms of an

19  expanded injunctive scope, do you really care if -- if

20  Ms. Iafrate assumes, without conceding, that the sheriff's       16:26:48

21  conduct was willful in entertaining discussions with Ms. Wang

22  that may settle this case?

23          MR. McDONALD:  If it may settle it, and if there was

24  not a determination of federal criminal contempt, yes.

25          THE COURT:  All right.  Now, the other thing I'm going    16:27:08

```
 1   to raise with you -- the other thing I'm going to raise with
 2   you, I'm going to require that the sheriff make some more
 3   factual statements.  I think they're in the discovery.  There
 4   are not many more.
 5          But one of the things I was considering is if I'm            16:27:22
 6   not -- I want him to understand, this is a long process, and
 7   what it is designed to do is bring the Maricopa County
 8   Sheriff's Office in compliance with injunctive procedures that
 9   will ensure good policing and the constitutional rights of the
10   plaintiffs going forward.                                            16:27:43
11          I want the sheriff to understand, I want Chief Deputy
12   Sheridan to understand, I want Chief MacIntyre to understand, I
13   want everybody -- and I want chief -- or Lieutenant Sousa to
14   understand, that the fact that I may -- that I will or may be
15   entering civil contempt orders against them will certainly be      16:28:02
16   an -- will be in my consideration if in fact I face any more
17   contumacious conduct in the implementation in any way of my
18   order.
19          I'm not, in the future, unless civil contempt is
20   required, I'm not going to go through this process of having a     16:28:20
21   civil contempt hearing first.  I'll just order up a criminal
22   contempt hearing, and from my own perspective, a monetary fine
23   may well be insufficient if it was previously insufficient to
24   ensure that my orders are complied with.  So I'd probably make
25   sure that he understands that on the record.  That's another       16:28:43
```

1    thing I want to talk about.  But we'll get to that later.

2         MR. McDONALD:  Okay.

3         THE COURT:  Any other questions with respect to that?

4         I am concerned with paragraph 9 of Exhibit A only to

5    the extent I'm going to say that it seems to me -- and again,        16:29:08

6    there are a few other factual matters that we can discuss if we

7    actually ever get down to this, that Sheriff Arpaio not only

8    failed to take steps necessary to ensure that the MCSO complied

9    with the preliminary injunction, but he did issue directives

10   that violated the injunction, and I indicated those in the        16:29:27

11   order to show cause.  And I can -- those are some of the press

12   releases that the MCSO issued in which he talked about his

13   orders that folks, if they couldn't be given a criminal charge,

14   be escorted to Border Patrol, and there's some other things,

15   but I think I would require that.        16:29:48

16        I would also require an acknowledgment, which I think

17   is pretty clear in the record, that while there were the four

18   or five instances listed in plaintiffs' order to show cause,

19   Sheriff Arpaio himself at trial indicated a number of others in

20   his testimony, and I think that the interviews since then have        16:30:06

21   indicated that through HSU's continuing operations and the

22   operation of the rest of the department, that the violations

23   are likely numerous, and I think that's a quote from one of the

24   command officials.

25        So I think we need to acknowledge that there aren't        16:30:23

1    just five instances; there are a great number, or at least

2    potentially a great number.  But if he's willing -- those would

3    be the two principal additions, factual additions, in addition

4    to those matters from discovery that I'd want to talk about.

5            In paragraph 13, I believe that the evidence appears          16:30:47

6    to be that the confiscated personal identifications and items

7    of personal property did not uniquely pertain to HSU; that

8    they -- is there any problem with that, Ms. Iafrate?

9            MS. IAFRATE:  No, I would a -- I would agree with

10   that, Your Honor.                                                     16:31:37

11           THE COURT:  Okay.  So we would need to change that.

12           Exhibit B, I've already discussed in Exhibit A some of

13   the changes that I would think need to be made, but in

14   paragraph -- well, in paragraph 1 I've indicated some of the

15   changes that I would think need to be made in my discussion of       16:32:12

16   Exhibit A.

17           In paragraph 2, as I've indicated, I have no problem

18   if you arrive at a settlement deal that will involve some sort

19   of funding mechanism from which victims can seek recourse, as

20   long as it's clear that I can't terminate the rights of any          16:32:30

21   plaintiffs in this matter.

22           And I just want particularly you, Mr. Irish, to be

23   aware of this.  And I don't know whether the MCSO wants

24   separate representation in conjunction with considering any

25   negotiations that might be arrived at with the plaintiff.            16:32:46

1          MS. IAFRATE:  Your Honor, just so that I'm clear,

2     I'm -- I'm the attorney for MCSO, so you meant "MCAO"?

3          THE COURT:  Yes.  I'm sorry.  Thank you for that

4     clarification.

5          MS. IAFRATE:  So I mean the County, Maricopa County.          16:33:01

6          THE COURT:  Yeah.  I thank you for that clarification,

7     because here's what it comes to.  I appreciate that, you know,

8     you propose to request from the County $350,000 to fund this

9     fund.  What if they don't pay it?  And what if it ends up being

10    millions of dollars that are required as a matter of liability?   16:33:19

11         It's sort of an odd situation, and I realize that the

12    sheriff's independently elected, but the budget is created by

13    the Maricopa County Supervisors.  I don't know whether that

14    really amounts to a conflict here, but suppose you say you're

15    willing to consider more than $350,000, but all you're really   16:33:40

16    offering me is a proposal that you're asking Maricopa County to

17    fund?

18         And you weren't in this case then, but I've previously

19    indicated to Chief Deputy Sheridan when we were discussing the

20    first injunctive decree, I don't mind if you agree to it, but I  16:33:54

21    don't care whether Maricopa County funds it or not.  If they

22    don't fund it, you will from your budget.  That's the sort of

23    thing that I want to talk about.  And I don't know whether or

24    not MCAO needs separate representation in that light.

25         Mr. Irish?                                                   16:34:12

1        MR. IRISH:  May I come forward?

2        THE COURT:  You may.

3        MR. IRISH:  Thank you for your invitation.  I'm glad

4   to be here, although I have to confess this came at us pretty

5   fast, your invitation on Monday and then the sheriff's proposal          16:34:30

6   on Wednesday.

7        I really need to consult with the board.  This is

8   board-level inquiries.  I haven't been able to get an exec

9   session on that short notice, and principally, in order to

10  advise the board, I need to know more about what your rulings          16:34:51

11  are, because -- well, I can say some things in general.

12        First, certainly the County fully supports the right

13  thing being done, not only for the people who have been

14  injured, but also for the taxpayers on whose behalf the board,

15  and therefore I, speak.          16:35:11

16        So in some way, limited way, we think that the County

17  should have some representation, but because the issues of

18  police practices and policies are beyond the scope of what we

19  do, we really don't want to become a party to full-blown

20  litigation.          16:35:36

21        Much of the County's position, I anticipate, with

22  regard to your inquiry, and what its role might be, will depend

23  on your findings and your rulings, and then I hope I'll have

24  enough information to advise the board.  And if I am, let me

25  give an example, because it's exact -- you put your finger on          16:35:53

 1  it just a moment ago.

 2          Suppose you approve the sheriff asking the board to

 3  reserve certain funds as compensation for these people.

 4  Depending on the facts and your findings, what if the board

 5  says, No, contempt citations are not part of the taxpayers'                16:36:09

 6  responsibility, and I think that's one of the questions that

 7  you pose.  I haven't had time to talk to them in exec session

 8  about that, but one of the questions if that happens is:  Does

 9  the County, as a legal matter, have liability for financial

10  responsibility for contempt citations?  I don't know the answer   16:36:33

11  to that.  In large part --

12          THE COURT:  You may civil contempt citations.

13          MR. IRISH:  Pardon me?

14          THE COURT:  You mean civil contempt citations or

15  criminal contempt citations?                                              16:36:45

16          MR. IRISH:  Either or both, I don't know where we're

17  going to end up; that's one of the questions.

18          So what I can say to you is if the County does have

19  financial responsibility for whatever sanctions you impose,

20  whether you call them criminal or civil, resulting from                   16:37:02

21  contemptuous behavior, then I think the next question is:  How

22  do we go about resolving those claims?

23          THE COURT:  You know, I don't -- you've been very

24  polite, Mr. Irish, and I don't mean to be impolite, but I would

25  make this observation:  At the end of the day, the County is              16:37:19

1  going to be holding the bag.  That's part of the problem.  I

2  mean, if the victims here sue for 1983 violations that are done

3  by the Sheriff's Department, they're -- and to the extent that

4  there may be liability found, the County will pay.  It seems to

5  me that really the issue is, maybe to be more direct, is the          16:37:40

6  County going to take that from the sheriff's budget or are they

7  going to take it from some other pot?

8          And I assume that you're talking about that same

9  analysis may apply to whether or not you're willing to fund

10 some sort of a mechanism in this contempt process.                     16:37:52

11         MR. IRISH:  I'm not sure that I'm able today to

12 concede the points you make about County liability, because the

13 County may not be liable for willful contempt sanctions as

14 distinguished from injuries, and if they get merged --

15         THE COURT:  Well, and --                                       16:38:10

16         MR. IRISH:  -- together, I don't know the answer to

17 that.

18         THE COURT:  -- I certainly don't mean to prejudice the

19 County's ability to raise that argument in any way.  However,

20 you're going to have a -- it will be interesting in terms of           16:38:20

21 liability that the sheriff incurs for the County in his conduct

22 under the color of state law.

23         MR. IRISH:  Okay.

24         THE COURT:  And he certainly was the sheriff at that

25 time in which he did what he did.                                      16:38:34

1     MR. IRISH:  Whether he was, in being contemptuous --

2     THE COURT:  And that's a matter of 1983 law; it's

3  really not a matter of state law.

4     MR. IRISH:  Yeah, but whether he was -- yes.  But

5  whether, in being contemptuous, there was willfulness and          16:38:49

6  intentionality, may raise the question whether he was acting

7  within the scope of his position.

8     THE COURT:  All right.

9     MR. IRISH:  And that's -- that's --

10     THE COURT:  I understand your position better.  All          16:39:02

11  right.  Thank you.

12     MR. IRISH:  So but the point is, if we get to the

13  point the County has got to look at compensation and paying it,

14  then the mechanics for doing it, the County is skilled and

15  experienced in settling class actions, personal injury claims,     16:39:13

16  and we think to that extent that's something that ought to be

17  handled in some separate way so we don't have a room full of

18  very expensive lawyers doing something that can be worked out

19  in the, you know, usual claims resolution process.  The risk

20  management people do that with claims all the time.                16:39:33

21     So if we're going to be paying for it, we'd like to

22  have it separated from a thousand lawyers getting involved with

23  that, because it's going to be the County and the claimants

24  that -- and the merits -- the validation of their claims and

25  the evaluation of a resolution, and I think we can save time      16:39:55

```
 1   and a lot of money by doing it --

 2              THE COURT:  Well --

 3              MR. IRISH:  -- some way.

 4              THE COURT:  And also settlement may be to your --

 5              MR. IRISH:  Okay.                                  16:40:04

 6              THE COURT:  -- advantage.  You may desire to

 7   participate in this settlement discussion because that, too,

 8   may be to your economic advantage, and if you're skilled at

 9   knowing that, I assume you're skilled at evaluating that.  I

10   just wanted to raise that so that you could be involved in this  16:40:12

11   and know that matters that may pertain to you are going on, so

12   I appreciate your being here.

13              MR. IRISH:  Thank you.  And a class action may be the

14   resolution.  I just don't know, Judge.  I need to know where

15   you're going to go on it.                                    16:40:26

16              THE COURT:  All right.

17              MR. IRISH:  Thank you.

18              THE COURT:  Thank you.

19              It does seem to me, just as I'm looking at things in

20   paragraph 2A, that the length of detention certainly would be a  16:40:37

21   basis on which you could make out an appropriate reimbursement

22   decision from the pot.  But it also seems to me that there may

23   be other factors that should be considered.  For example, it

24   would appear that a number of such persons may have had their

25   property confiscated, such as personal identifications and    16:40:56
```

 1    other things.  I think that that ought to be taken into

 2    account.

 3          Mr. McDonald, again, although I'm being frank with

 4    you, I do recognize that the sheriff's position is one that's

 5    set forth in good faith and provides a basis worthy of                16:41:17

 6    discussion about whether or not I should bring criminal

 7    contempt charges.  But I think I've made it clear, and again, I

 8    don't mean to be offensive to the sheriff, but he has made a

 9    number of choices, which I believe as the sheriff of Maricopa

10    County he's entitled to make, that have cost, again, the               16:41:34

11    County, money, because, for example, he decided he didn't want

12    to hold the community meetings, and so I had the monitor hold

13    the community meetings and the County's paying the bill for

14    that.  And it seems to me that one of the things that I'm going

15    to consider about whether or not we have to proceed with              16:41:53

16    criminal contempt is whether or not this provides some,

17    frankly, personal punishment to the sheriff, to the extent that

18    he may merit it.

19          I do think, frankly, that a hundred thousand dollars

20    is enough money, if it's coming out of his pocket, but I want         16:42:10

21    it coming out of his pocket and I don't want it coming out of

22    the Sheriff Joe Arpaio Legal Fund or any other fund from whom

23    he has solicited.

24          Are you going to make any representations about that?

25          MR. McDONALD:  Judge, I couldn't make representations,          16:42:26

1  other than the fact that I believe the fair thing would be to

2  allow both personal but also people to help.  When we went in

3  and the number was decided upon, his annual income a year is I

4  think 102,000, and that's not including taxes.

5      Mistakes have been made and he's stepped forth and                    16:42:48

6  done that, but to take a year of his gross income and say that

7  is going to be the penalty, one of the things that I looked at

8  when we were going through this was the cost of defense if he

9  was referred for criminal contempt, the cost of trial.  I have

10  no doubt that some of that money would be coming from his        16:43:08

11  personal funds, but also I believe that some of the money would

12  come from friends and supporters of his, which I think would be

13  helpful and necessary to him also.  I don't know that he's got

14  the money to be able to dip in and take a hundred thousand

15  dollars out of his own pocket.                                          16:43:28

16      THE COURT:  Well, I don't know, and certainly as a

17  public official I understand that he has a limited income.  I

18  am also under the impression that he has made -- and this may

19  be a misimpression, I acknowledge, that he has had significant

20  sources of other income over the years from his books and other    16:43:41

21  things.

22      MR. McDONALD:  Honestly, Judge, I hadn't gone through

23  that, and the proposal, when we submitted the proposal I

24  thought it was --

25      THE COURT:  Well --                                                 16:43:50

 1          MR. McDONALD:  -- exceptionally positive and --

 2          THE COURT:  Please be -- and again, I've said a

 3   hundred thousand dollars is a number, is a fine number.  But

 4   more than the number, I'm interested in sending a message to

 5   the sheriff, and to Chief Deputy Sheridan, and/or anybody else,      16:44:07

 6   potentially, that comes from them having a little skin in the

 7   game, and I don't know that they've had skin in the game yet.

 8          MR. McDONALD:  Judge, let me just, from my

 9   perspective, we have -- if I can provide some of the

10   confidential communication, we know that your control over this      16:44:35

11   case is continuing.  Mr. Sheridan, Chief Sheridan and the

12   sheriff know the potential power for the contempt.

13          Since I've been on this case in December, we have been

14   looking at remedies, ways to implement this program, the whole

15   idea of a settlement.  We have gone in, the public apologies, I      16:44:58

16   think every perception that people have of this sheriff, with

17   that document that we filed earlier this week, hopefully

18   dispels a lot of that.

19          He's willing to make that public apology.  He's

20   willing to go before other people in open court and acknowledge      16:45:18

21   that serious mistakes were made.  He is on the page.  I avow,

22   Your Honor, I'm convinced, in meeting with the staff, that he

23   wants this order to be enforced; that he wants to implement the

24   safeguards.  We have been bantering forth different ideas.

25          One of the arguments, ideas we had, I would be happy       16:45:36

1   to serve on something to make sure we monitor this.  We meet

2   every two weeks.  Let's find out if we're getting these reports

3   in.  Let's get an accountable system so that we can satisfy you

4   and satisfy the monitor that these changes are in good faith

5   being made.  They will always have that club that you've got          16:45:56

6   over their head, and they understand it and they take it

7   serious.

8           Judge, I am convinced that Sheriff Arpaio and

9   Chief Sheridan and those that are connected with the department

10  are serious wanting to get this behind them and to move              16:46:16

11  forward.  This hearing is disrupting the office like I've never

12  seen, the constant meetings and the pressure of this.  We want

13  to be able to go forth and let them fill their law enforcement

14  function.

15          So your ideas, with the Internal Affairs types of            16:46:34

16  investigations working with the monitor, you've got people with

17  receptive ears, and I can tell you that the sheriff is there

18  and he's committed to it, and Sheridan is committed to it and

19  the other people in the chain, in the hierarchy, are committed

20  to it, and we want to be able to prove to you that we mean           16:46:51

21  business, and that there will not be a violation of your orders

22  as has happened in the past several years.  They are going to

23  get it right this time and will do whatever it takes to

24  accomplish that.

25          THE COURT:  Mr. Stein, do you have anything you want         16:47:06

1   to say?

2          MR. STEIN:  No, Your Honor.

3          THE COURT:  Do you have anything you want to say?

4          MR. COMO:  No, Your Honor.

5          THE COURT:  Mr. Eisenberg, do you have anything you          16:47:17

6   want to say?

7          MR. EISENBERG:  Not with respect to the civil

8   settlement and discussions that have gone on so far.

9          THE COURT:  Oh, I'm not talking about civil settlement

10  now; I'm talking about criminal proceedings.                       16:47:27

11         MR. EISENBERG:  Then I will, Your Honor, thank you.

12         The position of my client is that if this matter is

13  referred for criminal contempt, he --

14         THE COURT:  I'm sorry.  I can't hear you,

15  Mr. Eisenberg.                                                     16:47:37

16         MR. EISENBERG:  If the matter is referred for criminal

17  contempt, Your Honor, his position is going to be that he's

18  going to fight that, he's not going to admit to contemptuous

19  action, because in his view, he did not operate willfully in

20  violation of the Court's order.  So that's looking down the       16:47:53

21  line.

22         I can't control the outcome of this with respect to

23  civil contempt; I think that's really up to the County and the

24  people that represent the County and the Sheriff's Office.  But

25  as I stand here today, my client is not prepared to admit to      16:48:11

1    any criminal contempt.

2              THE COURT:  Mr. Birnbaum?

3              MR. BIRNBAUM:  Well, Your Honor, on behalf of --

4              THE COURT:  Do you know what, Mr. Birnbaum?

5              MR. BIRNBAUM:  I'm sorry.                                16:48:25

6              THE COURT:  Could I get you to speak into a

7    microphone?  Thank you.

8              MR. BIRNBAUM:  I'm sorry.  On behalf of Chief

9    MacIntyre, Your Honor, I don't have anything substantively to

10   add, but you have suggested in your comments a number of things  16:48:33

11   that I think the parties perhaps should consider.

12             Chief MacIntyre will not stipulate -- as you know,

13   he's also an attorney -- he will not stipulate that he was in

14   contempt of any court order.  We don't believe he was in

15   contempt --                                                       16:48:54

16             THE COURT:  Civilly or criminally?

17             MR. BIRNBAUM:  No, we don't believe he was civilly or

18   criminally in contempt.  Your Honor, we believe that the

19   discovery that has gone on simply confirms that in those areas

20   that you've identified specifically, Jack MacIntyre neither had  16:49:05

21   the authority to take actions of the type you're concerned

22   about properly, nor did he have responsibility for any such

23   action, nor did he do anything in contempt of the Court's

24   orders.

25             Now, with respect to the notion of settlement, Your    16:49:26

1    Honor, I think there have been a few suggestions.  Is Chief

2    MacIntyre willing to stipulate to certain facts if they are

3    helpful or necessary as part of an overall settlement?  Yes, he

4    is.

5            Is he willing to acknowledge, as you've suggested in          16:49:45

6    talking to others, that in the event of some future violation

7    of your ultimate order, order on settlement, if there is one,

8    that in the event of any such violation by anyone, including

9    Chief MacIntyre, that your intent would be to proceed directly

10   with contempt, or perhaps even criminal contempt, we certainly     16:50:08

11   would acknowledge that, Your Honor.  But I think that there is

12   a line where you then say:  Well, are you prepared to agree you

13   acted contemptuously?  And the answer to that is no, because we

14   don't think it's true.

15           And I appreciate the opportunity to tell you this,          16:50:29

16   Your Honor, because that's the reason why we were not part of

17   the motion that's before you, because the way we read it, Chief

18   MacIntyre would have been asked, as the sheriff, MCSO, and

19   Chief Sheridan has, to admit violation of a court order on his

20   own behalf, and we're not prepared to do that, Your Honor, and    16:50:52

21   we don't think there's evidence to support such a violation.

22           Thank you for the opportunity to say that.

23           THE COURT:  Mr. Wilenchik, do you have anything you

24   wish to say?

25           MR. WILENCHIK:  Nothing now.  I can't even remember        16:51:07

1    the question, Your Honor, so I apologize.  But if you're asking

2    should there be a criminal contempt proceeding, is that the

3    question?

4         THE COURT:  That's all right.  What I'm asking,

5    Mr. Wilenchik, is:  Is your client willing -- if I'm going to          16:51:20

6    consider not bringing a criminal contempt proceeding against

7    individually named contemnors, I think I've indicated, and I do

8    view Sheriff Arpaio as the principal party here, but it does

9    seem to me that the evidence also may point to your client in

10   terms of someone who had knowledge of this order and who defied      16:51:46

11   it.

12        MR. WILENCHIK:  Okay.

13        THE COURT:  And I want to know if, when I talk about

14   the skin, the personal skin --

15        MR. WILENCHIK:  Oh, okay.                                        16:52:00

16        THE COURT:  -- that I expect Sheriff Arpaio to have in

17   the game, and I'm very interested in what his personal skin is

18   and not just that of his friends and others, I want to know if

19   you've talked to your client about any settlement position in

20   this regard.                                                          16:52:14

21        MR. WILENCHIK:  Yes.  I'll repeat what Mr. Birnbaum

22   said in part, but I'll keep it brief.  We also declined to be a

23   part of that agreement, obviously.  There is no personal skin

24   that former Executive Chief Sands intends to put in this unless

25   the Court orders it for some reason that I can't fathom right         16:52:28

 1    now after the evidence is heard.  We're happy to have the

 2    hearing, any hearing, and to have him testify.  We waive the

 3    privilege, as we did before.  We've asked for documents to be

 4    produced which they've objected to also, you might note, last

 5    week, and I don't think our position could be any clearer,          16:52:45

 6    Judge.

 7              THE COURT:  Okay.  Thank you.

 8              MR. WILENCHIK:  Thank you.

 9              THE COURT:  All right.  It does seem to me,

10    Mr. McDonald, for what it's worth, although I've indicated a        16:53:09

11    desire to settle all matters globally, it's conceivable to me,

12    well, that the civil contempt matter can be settled through

13    discussions, and that does not dictate my determination on the

14    criminal contempt proceeding.

15              But I do want to know, I do want to say that I'm not      16:53:33

16    going to be unreasonable, but -- I'm not going to unreasonable,

17    and I do recognize that you've offered some very reasonable

18    suggestions.  But my concern, I think as I've said it, is I

19    believe in order to satisfy the purposes of calling off a

20    criminal contempt hearing, I'm going to have to be personally      16:53:56

21    satisfied that there is some sacrifice by your client, and,

22    Mr. Stein, by yours.

23              But I do want to say, I do think I should say, that in

24    allocating that responsibility, and I am concerned about the

25    contempt to which Chief Deputy Sheridan has acknowledged in         16:54:18

1    terms of notifying the department of the order that we agreed

2    to to try to preserve evidence in this matter.  I do recognize

3    the difference in authority between Sheriff Arpaio and Chief

4    Deputy Sheridan.  And I've also noted when I have observed

5    things, when I went to a town meeting I noticed -- and it was a          16:54:47

6    contentious town meeting -- I did notice that Chief Deputy

7    Sheridan was there.  And while I do think he engaged in

8    contemptuous behavior, he acknowledged it quickly, at least.

9    And so in terms of the allocation of the amount of skin I'm

10   going to expect in the game, I expect more from Sheriff Arpaio,          16:55:03

11   and that's just the way it is.

12          I also would say that when I happened to drop in on

13   the Maricopa County Sheriff's Office unannounced to observe the

14   training, I happened to drop in on a session where Chief Deputy

15   Sheridan was in attendance.  So I do recognize some good faith          16:55:24

16   on behalf -- on the part of Chief Deputy Sheridan.  And while I

17   think that his actions were contemptuous and he admits it, I

18   think that there is less of a concern, or less of a requirement

19   that he have skin in the game than Sheriff Arpaio have skin in

20   the game.          16:55:46

21          I think I've said enough about what I would expect to

22   see from -- if you want to have a settlement of the criminal

23   proceeding.  I think I've provided enough guidance to the

24   parties about what they need to do if they want to settle the

25   matter civilly.          16:56:01

1       Does anybody have any questions or any purpose that

2  this hearing can serve in terms of going forward?

3       MS. WANG:  No, Your Honor.

4       MS. IAFRATE:  No, Your Honor.  Thank you for the time.

5       THE COURT:  All right.  Well, let me just make clear,          16:56:21

6  then, that the schedule remains the same, and we will proceed

7  under that schedule.  If in fact there is a settlement of all

8  or part of the matter, let me know it and we will act

9  accordingly.

10      Mr. Stein.                                                      16:56:39

11      MR. STEIN:  Your Honor, I guess I wonder whether, in

12  light of the motion that we filed and the discussion we've had

13  in court today, whether it's now time to reconsider whether

14  some judicial involvement is appropriate to help us get to the

15  next step, whether that's the appointment of a magistrate or    16:56:56

16  whether Your Honor would be willing to participate as a -- in a

17  settlement capacity.

18      THE COURT:  Well, I don't think -- I mean, I think

19  I've gone about as far as I'm willing to go to facilitate

20  settlement in this matter, because I am keeping hold of the     16:57:12

21  civil contempt matter.

22      I think as Ms. Iafrate has -- and I think also

23  Ms. Kimmins has accurately stated, if this matter goes for

24  criminal contempt proceeding, because my monitor has been

25  involved in the evidence and even in the production of some     16:57:29

 1   evidence, I don't believe it's appropriate that I sit as a

 2   judge on the criminal contempt matter.

 3          But I do intend to maintain the rights to hear the

 4   criminal contempt matter, and I will also be making -- the

 5   civil contempt matter, thank you -- and I will also be the one          16:57:48

 6   who decides whether or not I refer this matter to criminal

 7   contempt and then I recuse.

 8          I think I've done about as much in open court as I

 9   care to to settle this matter.  If the parties believe that it

10   would facilitate settlement to appoint a magistrate, a federal          16:58:05

11   magistrate judge, I will go talk to a federal magistrate judge

12   and see if any has time on their schedule.

13          But the problem that you'll have with that is I don't

14   think there's very many federal magistrate judges who have the

15   time to get up to speed on this case very quickly.  But I'm          16:58:21

16   more than happy to do it.  I will tell that you that they're

17   busy people.  They're very good people, they're good at what

18   they do, but it usually takes six weeks to get a settlement

19   conference.

20          If you think one would be helpful, I'll go ask if          16:58:38

21   somebody's available next week.  But in order to be practical,

22   Mr. Stein, you're going to have to do that much sooner than

23   later.  That's my only thought.

24          Anything else?

25          MR. EISENBERG:  Yes, Your Honor.  I have a question          16:58:56

 1    for you.

 2             I was looking at the transcripts of previous hearings

 3    in which the Court discussed the privileges, various privileges

 4    including the attorney-client privilege.  In listening to

 5    Mr. Stein and the Court engage in the potential pro-settlement        16:59:09

 6    discussions, it dawns on me that if there are issues of

 7    privilege that I think should be litigated on behalf of my

 8    client, I'm not sure of the forum to go to, and they may be

 9    helpful with respect to any settlement discussions.

10             I am aware of the use of magistrate judges in some          16:59:28

11    cases for settling issues.  This would be more of a whether a

12    privilege attaches or whether it has been waived, so that I

13    could offer --

14             THE COURT:  Well, I will tell you that I'm having a

15    hearing on that next Friday.  You may not be aware of that.          16:59:44

16    You're new to the case.  I'm having a hearing on it next

17    Friday.  If you want to be heard on it, file and get in here

18    next Friday, 2 o'clock.

19             MR. EISENBERG:  Thank you, Your Honor.

20             THE COURT:  Anything else?  All right.  See you next        16:59:58

21    Friday.  Thank you.

22             (Proceedings concluded at 5 o'clock p.m.)

23

24

25

1

2                    C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8  appointed and qualified to act as Official Court Reporter for

9  the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11 a full, true, and accurate transcript of all of that portion of

12 the proceedings contained herein, had in the above-entitled

13 cause on the date specified therein, and that said transcript

14 was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 24th day of March,

18 2015.

19

20

21                         s/Gary Moll

22                    _____

23

24

25