# THIRD REPORT

# Independent Monitor

# For the

# Maricopa County Sheriff's Office



Review Period – Fourth Quarter 2014

Robert S. Warshaw

Independent Monitor

April 16, 2015

**Table of Contents**

**Section 1: Introduction** ...................................................................................... 3

**Section 2: Executive Summary** ........................................................................ 4

**Section 3: Implementation Unit Creation and Documentation Requests** ............................... 7

**Section 4: Policies and Procedures** .................................................................. 10

**Section 5: Pre-Planned Operations** ................................................................... 26

**Section 6: Training** ........................................................................................... 32

**Section 7: Traffic Stop Documentation and Data Collection** ............................... 47

**Section 8: Early Identification System (EIS)** ............................................... 71

**Section 9: Supervision and Evaluation of Officer Performance** ....................... 80

**Section 10: Misconduct and Complaints** ........................................................ 100

**Section 11: Community Engagement** ............................................................. 106

**Section 12: Concluding Remarks** ................................................................. 112

**Section 1: Introduction**

This is my third report issued in my capacity as the Court-appointed Monitor in the case of Manuel de Jesus Ortega Melendres, et al., v. Joseph M. Arpaio, et al. (No. CV-07-02513-PHX-GMS), and documents activities occurring during the fourth quarter of 2014.

This review period saw measured progress in some areas, such as policy development and training, contrasted by a lack of advancement in other key areas which are critical to the Maricopa County Sheriff's Office (MCSO) coming into compliance with the Supplemental Permanent Injunction/Judgment Order ("Order") issued by the Honorable G. Murray Snow in the above-referenced litigation.  Advances and setbacks will be chronicled in the pages that follow.

Subsequent to my appointment, and as a result of further Court proceedings, my duties have been expanded in the areas of community engagement, oversight of internal investigations, and independent investigative authority.  The Order was amended on April 4th, 2014 with respect to community engagement, and therefore my community engagement activities and those of my Team are detailed in this report.

Our expanded authority regarding investigations – MCSO's and our own – is outside the confines of the Order and will not be addressed in detail here.  There are other mechanisms established to advise the Court and the Parties of our activities, which respect the confidentiality issues associated with this subject matter.  However, I am compelled to comment in general regarding some of the insights we have gained from that process as they have a direct bearing on MCSO's ability to comply with the Order's requirements.

We have stressed from the beginning of our tenure that complying with the Order can be neither a paper and pencil, or a check the box exercise.   Unless there are systemic and cultural changes in the organization, all of the new structures and forms implemented to address *technical* compliance with the Order will not significantly impact delivery of law enforcement services to the community or increase the level of trust for certain segments of MCSO's service population.  This has been brought into sharp focus as we fulfill our other responsibilities.

There is lack of leadership at all levels of the Maricopa County Sheriff's Office, and in particular, in the upper command ranks of the Office.  In short, the organization, and its leadership team, has failed both the community and its personnel.  Incumbents in command positions are quick to blame their predecessors for misdeeds, be they acts of commission or omission.  This is done while completely ignoring their own complicity during the events which led to this litigation and throughout the duration of the Court proceedings.  Each of the current command staff held accountable positions under their predecessor superiors and followed their lead without challenge.

MCSO does not provide formal supervisory training prior to, or at the time of promotion of their personnel to supervisory positions.   There exists no documented training process within the

organization to develop, implement, and improve supervision.   While MCSO successfully delivered the legal training required by the Order, the development of Order-required supervisory training has stalled, despite accommodations by the Plaintiffs and my Team to allow for the offering of training in two phases in order to expedite its delivery.

This is not to say that MCSO does not have good personnel and, in some cases, good supervisors.  We have met many.  But they seem to acquire their skill sets in spite of – and not because of – the environment in which they work.  In general, MCSO's supervisors are set up for failure due to a lack of training and a lack of agency wide systems of accountability.

MCSO has made progress in implementing the Order's requirements, and it is not my intent to minimize that progress.  It is well documented in these pages.  But without systemic changes that reach to every level of the Office, the ethos which allowed the activities at the heart of this litigation to flourish will not be significantly impacted.


**Section 2: Executive Summary**

The Order is divided into several main parts, as outlined below, along with a brief description of some of the developments in each area over the review period.

- COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT:  MCSO's Court Compliance and Implementation Division saw an increase in staff over the review period.  The Captain and his staff continue to be available and responsive to our requests.  The Division published its quarterly report as required by Paragraph 11.
- COURT ORDER V. POLICIES AND PROCEDURES:  MCSO has promulgated and trained to the policies identified in this section of the Order.  The policies were distributed in conjunction with the agency wide Fourth and Fourteenth Amendment training which was completed during the review period.  While this training provided the vehicle for documenting receipt of these policies, MCSO is still developing a system to document receipt of policies that are distributed outside of Order-mandated training.
- COURT ORDER VI. PRE-PLANNED OPERATIONS:  During this reporting period, MCSO conducted "Operation Borderline" from October 20th, 2014 to October 27th, 2014.  This operation was intended to interdict the flow of narcotics being transported into Maricopa County.  MCSO complied with all requirements as outlined in this section of the Order.
- COURT ORDER VII. TRAINING:  MCSO completed delivery of the Fourth and Fourteenth Amendment Training during this review period.  However, progress has stalled on development of the Supervisory Training required by the Order.  MCSO's policy GG-2 – Training Administration requires substantial changes.  Review of this policy was delayed because of conflicting information provided by CCID and the Deputy Chief responsible for Training.

- COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW: MCSO continues to provide traffic stop data to us on a monthly basis. Most of the systems used to collect the data have been automated, and deputies for the most part are complying with the information capture and documentation requirements associated with traffic stops. We also continue to note some of the inadequacies of MCSO practices surrounding the setting of alert thresholds used for ongoing monthly and quarterly data analyses related to these. However, MCSO is in the process of contracting with an outside consultant to improve the statistical legitimacy of their monthly, quarterly and annual analyses of data. On October 10th, 2014, the Order was amended to allow MCSO to substitute "on-person" recording devices for "fixed mounted" recording devices. MCSO has received approval for the purchase of this equipment and is in the process of drafting policies to cover all aspects of their distribution, operation and maintenance. We intend to have an active role in assessing the quality of these policies.

- COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS"): The policies which describe the EIS and the Bureau of Internal Oversight in which it is housed remain under development. MCSO in in the process of acquiring software (EI Pro) which should address an issue we have raised in prior reports – the lack of unfettered access by supervisors to their subordinates' information stored in the EIS System.

- COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE: We have noted deficiencies in GB-2, Command Responsibility, and the policy is in the process of being revised. We note that many supervisors are not adequately documenting their interactions with their deputies or properly memorializing their oversight of deputy activity. MCSO has yet to create a daily activity log that would provide an additional means for supervisors to monitor the activities of their deputies, and also allow for documentation of supervisory response to scenes. This is a matter that we have raised with the organization since the inception of our engagement.

- COURT ORDER XI. MISCONDUCT AND COMPLAINTS: While necessary policies have been promulgated, and training begun, the turnover in personnel impedes the ability of MCSO to adequately conduct investigations and respond to concerns about the performance of employees in a consistent and cohesive fashion, particularly at the District level. There is a disparity in the quality and types of documentation submitted, depending on which unit conducts an investigation. MCSO has made no progress in the area of integrity testing as required by Paragraph 103.

- COURT ORDER XII. COMMUNITY ENGAGEMENT: Two community outreach events were held during this review period. The purpose of these events is to inform community members of the many changes taking place within MCSO, as well as to provide community members the opportunity to voice support or criticism in a safe forum. The responsibility for Community Engagement has been transferred to the Monitor. However, key members of the MCSO's leadership, representatives from the Court Compliance Implementation Division, and District personnel have participated at each of these events.

This report documents compliance with applicable order requirements, or Paragraphs, in two phases. For Phase 1, compliance is assessed according to whether requisite policies and procedures have been developed and approved and agency personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that the applicable Order requirements are being complied with more than 94% of the time, or in more than 94% of the instances being reviewed.

We use four levels of compliance: In compliance, Not in compliance, Deferred, and Not applicable. "In" compliance and "Not" in compliance are self-explanatory. Deferred is used in circumstances in which we are unable to fully determine the compliance status due to a lack of data or information, incomplete data, or other reasons which are explained in the narrative of the report. We will also use Deferred in those situations in which the Office, in practice, is fulfilling the requirements of a Paragraph but has not yet memorialized the requirements in a formal policy. "Not applicable" is only used when describing Phase 1 compliance, and is reserved for those Paragraphs where a policy is not required.

The table below and subsequent chart summarize the compliance status of paragraphs tracked in this report. The percent in compliance estimate of 44.3 percent for Phase I is calculated by dividing the number of Order paragraphs determined to be in compliance by the total number of paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while paragraphs with the status of Not Applicable are not included. The percent in compliance estimate of 25.8 percent for Phase II is calculated in the same manner (as there are no paragraphs Not Applicable to Phase II, the denominator is 89).

| Third Quarterly Report Summary | | |
|---|---|---|
| Compliance Status | Phase 1 | Phase 2 |
| | | |
| Not Applicable | 19 | |
| Deferred | 3 | 11 |
| Not in Compliance | 36 | 55 |
| In Compliance | 31 | 23 |
| | | |
| Percent in Compliance | 44.3% | 25.8% |

**Section 3: Implementation Unit Creation and Documentation Requests**

**COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (***court order wording in italics***)**

*Paragraph 9. Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

Shortly after the issuance of the Order, MCSO created an Implementation Unit.  At the beginning of our tenure, the Unit was staffed with a Captain, two Lieutenants, and two Sergeants.  As mentioned in our last report, the Unit has undergone some transition and continues to do so.  The initial driving force behind most of the early changes has been the promotions of incumbents, resulting in their transfers, although additional staff was added.  One of the original Lieutenants is now a Captain and has assumed command of the Court Compliance and Implementation Division (CCID), formerly the Implementation Unit.  His staff has grown significantly, and as of this writing consists of one lieutenant, five sergeants, two deputies, one management analyst, and one administrative assistant.  The Captain and his staff continue to be responsive to all of our requests.  The Division is well supported by MCAO attorneys, who frequently participate in our meetings and phone calls with Division Personnel.

Compliance Status:
Phase 1: Not Applicable
Phase 2: In compliance

*Paragraph 10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

As mentioned above, CCID has always been responsive to our requests.  In many instances, we have asked for material that has not been routinely collected – or even generated – by MCSO.  In this respect, our first several months served as a learning curve for CCID and our team regarding what may be available and the best ways to produce it.  Our first inquiries focused on policies

more than data.  As progress on policies moved forward, our requests have become more data driven.  Despite their diligent efforts, CCID on occasion struggles with compiling compliance data in a timely manner.  As of this writing, some of our requests made before and during our December site visit remain unfilled, and consequently the requested material cannot be considered when determining compliance verification.

We have taken two significant steps to address this issue.  First, we adjusted the dates of our full Team site visits, pushing them back by one month.  Second, we collaborated with CCID on a list of data that will be collected and sent to the Monitoring Team on a monthly basis.  This should relieve some of the pressure of assembling the entire data request at the end of the quarter.  It will also allow our Team members additional time to review the data for compliance verification purposes.  We will continue to work with MCSO on what constitutes appropriate compliance assessment data, as well as assess if these changes alleviate some of the data collection issues.

Compliance Status:
Phase 1: Not applicable
Phase 2: Deferred

*Paragraph 11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

MCSO filed its Fourth Quarter Report for 2014 as required by this Paragraph on February 25th, 2015.  MCSO's report covers the period from October 1, 2014 – December 31, 2014.

Their report was divided into three major Parts.  PART I: Background and Overview of MCSO's Major Efforts Towards Compliance, outlines the key activities undertaken by MCSO and CCID during the reporting period.  It also includes a table that was developed from information provided in our Second Quarterly Report (covering the reporting period of July 1 – September 30, 2014) and then updated by MCSO to reflect what MCSO believes to be its compliance progress.  It appears that MCSO's assessment is based on publication of policies (which we distinguish as Phase 1 compliance) rather than compliance in practice with the Order's requirements.  MCSO also highlighted its compliance with the Court's Corrective Statement Order of April 2014, and its successful completion of the Fourth and Fourteenth Amendment Training in December 2014.

PART II: Steps Taken By MCSO and Plans to Achieve Full and Effective Compliance, provides greater detail on MCSO's activities working towards compliance, and is organized by the major sections of the Order.

PART III: Response to Concerns Raised in Monitor's Previous Quarterly Report, addresses some of the concerns raised in our Second Report.  In one instance, MCSO cites the numerous times that Policy GG-2: *Training Administration*, was provided for our review.  The report fails to mention the numerous times we advised MCSO that their Training Director asserted that this policy was under revision and the policy we were provided would be changed.  We therefore refrained from reviewing it.  The Training Director took this position as recently as our December site visit, after our last report was published.

In another instance, MCSO cites documentation it provided on December 9th, 2014 in response to one of our document requests.  This material was received after the Second Report was drafted and circulated to the Parties.

MCSO submitted its status report in a timely manner, and is compliance with this Paragraph.

Compliance Status:
Phase 1: Not applicable
Phase 2: In compliance

*Paragraph 12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

See Paragraph 13.

Compliance Status:
Phase 1: Not applicable
Phase 2: Deferred

*Paragraph 13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance*

*with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

MCSO submitted its first internal assessment on April 7, 2014.  The 11-page document outlined MCSO's efforts to comply with the Order's requirements, and discussed Patrol Operations, Written Policies and Procedures, Training, Supervisor Review, Intake and Investigation of Civilian Complaints, Discipline of Officers, Community Relations, and Miscellaneous Procedures.  We found the document to be informative and a very good summary of the state of play as we were beginning our tenure.  All of these areas have been topics of our meetings, discussions and correspondence with CCID personnel and other MCSO staff.  MCSO's and the Monitor's responsibilities in some of these areas have been modified by Court Order.  MCSO did not assert Full and Effective Compliance with the Order during this review period.

During our December site visit, we and CCID established the schedule for future comprehensive annual assessments as required by these Paragraphs.  They will cover MCSO's fiscal year, which runs from July 1st to June 30th.  Reports are to be submitted on or before September 15th.

Compliance Status:
Phase 1: Not applicable
Phase 2: Deferred

**Section 4: Policies and Procedures**

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."  MCSO

has taken steps towards a comprehensive review of its Patrol Operations Policies and Procedures in three phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the Order.   Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, MCSO, in response to our requests, provided all of the policies and procedures it believes are applicable to the Order for our review and that of the Plaintiffs.  MCSO received our feedback on these policies, which also included the Plaintiffs comments, on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on those policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.  Many policies unrelated to the training, however, remain in development, and MCSO has not completed a review of ALL Patrol policies and procedures for potential conflicts with the Order's requirements.  We will work with MCSO to identify an acceptable means to document such a review in the next reporting period.


Compliance Status:
Phase 1: Not applicable
Phase  2: Not in compliance

*Paragraph 20. The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures*


*a. Policies and Procedures to Ensure Bias-Free Policing*
*Paragraph 21. The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*
*a.       define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*
*b.       prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*
*c.       prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*
*d.       specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*
*e.       include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio*

*recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

MCSO has developed policies and has addressed the policy deficiencies previously noted by my team. They have finalized and published policies, including: CP-2 Code of Conduct (September 5, 2014); CP-8 Preventing Racial and Other Bias Based Profiling (September 5, 2014); EA-5 Communications (September 5, 2014); EA-11 Arrest Procedures (September 5, 2014); EB-1 Traffic Enforcement, Violators Contacts and Citation Issuance (September 22, 2014); EB-2 Traffic Stop Data (September 22, 2014); and GJ-33 Significant Operations (September 5, 2014). Each of these contains the appropriate policy direction related to this Paragraph. These policies have been distributed to Department personnel and specifically trained to during the required Fourth and Fourteenth Amendment training conducted by MCSO in 2014. Specific references to areas of required compliance in this section have been personally observed by a member of my team during the training.

The Department has achieved Phase 1 compliance with this Paragraph. Implementation of these policies is covered in the other Paragraphs of the Order. Therefore, Phase 2 compliance with this Paragraph is Deferred.

Compliance Status:
Phase 1: In compliance
Phase 2: Deferred

*Paragraph 22. MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

MCSO Policy CP-8 Preventing Racial and Other Biased-Based Profiling and EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance have been finalized, approved, distributed and trained to in the MCSO Fourth and Fourteenth Amendment Training for sworn personnel and Posse members. This training was completed in 2014. The Department has achieved Phase 1 compliance with this Paragraph.

During our December 2014 site visit, we met with members of the CCID to discuss methods and procedures MCSO could put in place to "consistently reinforce to subordinates that Discriminatory Policing is unacceptable." This discussion included the review of monthly supervisor notes, facility and vehicle inspections, as well as conducting both e-mail and CAD (Computer Aided Dispatch) audits.

During this same site visit, members of our team visited Districts 4, 6 and 1 to conduct facility inspections and, where feasible, meet with supervisory personnel.

At District 4, a facility inspection was done by my team and no evidence of any inappropriate or discriminatory posters, pictures or other items were noted. The District 4 Captain advised that the topic of racial profiling is covered regularly in supervisor meetings, but was not able to provide any specific documentation.  The Captain was able to show my team documentation of a December 15, 2014 meeting with the District sergeants and lieutenants, during which a discussion was held regarding professional e-mails, appropriate use of the Internet, and appropriate "language" when utilizing radio communication.  One sergeant interviewed advised that he regularly reinforces appropriate policing methods in his shift briefings, but could not provide any written documentation to support this.  One sergeant advised that he regularly discusses immigration topics with his team and they all know that he must be contacted on any such arrests.  Supervisory personnel present at the meeting also said that they will now be doing their notes in Blue Team.

At District 6, a facility inspection was done by my team and no evidence of any inappropriate or discriminatory posters, pictures or other items were noted.  This is a very small District Office and no interviews were conducted with first line supervisory personnel during this visit.

At District 1, a facility inspection was done by my team.  While no evidence of any inappropriate or discriminatory posters or pictures were noted, there was what appeared to be an old street sign from Guadalupe in the office of one of the deputies.  When questioned about the presence of this sign, a sergeant at the District did immediate follow up with the deputy.  According to the deputy the street sign was there when he was assigned the office.  The sergeant assured my team that he would take appropriate action to deal with the sign.

MCSO's Bureau of Internal Oversight (BIO) conducted its first quarterly audit for the time period of October through December 2014.  This audit included supervisory notes, emails, CAD/MDC communications, and facilities.  A vehicle inspection was not conducted during this first audit.  The Bureau of Internal Oversight also noted that all of the inspections are published on the BIO website at MCSOBIO.org.

The first supervisory notes inspection by the BIO was conducted in November of 2014.  The stated purpose of this inspection was to determine "compliance with office policies, promote proper supervision, and support compliance with the Melendres Order."  Inspectors utilized IA Pro to select random employees from each District/Division and included a matrix procedure to determine compliance.

Inspectors randomly selected 47 supervisors from all patrol districts/divisions.  Out of the 47 supervisors, thirty-two (68%) of the supervisors, including Chiefs, Captains, Lieutenants, and Sergeants did not make any entries into supervisory notes.  Fifteen (32%) of the 47 did make at least one entry. Following the first month of availability of Blue Team, it was concluded that 1 (2%) supervisor was in monthly compliance.  A list of those supervisors who were not in compliance and comments as to why was included.  The deficiencies included some instances where there were no notes at all, and many instances where there were some notes, but none on traffic or collected data. At the conclusion of this first inspection, the Bureau of Internal Oversight recommended that there should be a review of GB-2 and additional training in the

proper use of Blue Team Supervisory Notes with a signature log to document the completion of that training.

MCSO has made efforts in this area, has developed policies, and implemented Blue Team for the reporting of supervisory notes.  Individual supervisory personnel have told my team that they are consistently reinforcing this information. However, there is a lack of documentation to support these statements.  The supervisory inspection conducted by the Bureau of Internal Oversight clearly shows that there is still much to be done for MCSO supervisory personnel to consistently show that the paragraph is being complied with.  In addition, this paragraph applies to those personnel supervising both deputies and detention officers.   It does not appear that the "detention" population was included in the supervisory notes inspection completed by the BIO.

During this reporting period, the Bureau of Internal Oversight also conducted an inspection of both email and CAD messages. They found numerous instances of inappropriate emails and several instances of inappropriate CAD messages.   The detailed outcomes of these inspections/audits are covered in Paragraph 23.

MCSO has made notable efforts to inspect and identify any deficiencies in meeting the requirements of this paragraph.  Future reviews by my team will include follow up on the outcome of any noted potential violations. The inspections conducted by the BIO have identified that there needs to be further training and accountability at both the employee and supervisory level to obtain Phase 2 compliance with this paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

*Paragraph 23. Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

On September 5, 2014, MCSO Policy CP-2, (Code of Conduct) was published and has since been distributed.  It has been specifically trained to in the Fourth and Fourteenth Amendment training that was completed by MCSO in 2014. The Department has achieved Phase 1 compliance with this Paragraph.

During the prior reporting period, discussion took place with MCSO CCID and BIO personnel regarding the potential to conduct random e-mail audits or other inspections to show compliance with this paragraph.

On December 8, 2014, a random sample of the entire population of MCSO employee email accounts was generated.   This sampling included 35 employees being selected using a randomized process.  Emails for these 35 employees, between November 8, 2014 and Dec. 8, 2014, were checked for compliance with MCSO CP-2 (paragraph 1) and MCSO GM-1 policies.

The actual number of emails inspected from the total population of 11,745 available for inspection was 2,474.  MCSO business emails were eliminated from the population.  Employees in the sample included 8 from Enforcement, 21 from Detention, 5 from Administration, and 1 from Operations Command. Twenty-seven of the 35 randomly selected accounts (77.1%) had no deficiencies notes.  Fifty-seven issues from 12 employees were discovered, documented, and disseminated to MCSO Chain of Command. MCSO BIO noted the following deficiencies:

- 48 emails were not professional in content or appearance.
- 45 emails could be perceived as offensive.
- 6 emails could be perceived as discriminating or denigrating.
- 9 emails contained profane or offensive language.
- 3 emails that could be perceived as discriminating or denigrating were forwarded by employees.
- 1 employee forwarded a non-business chain email.
- 1 employee's email signature contained an embedded quote.

As a result of this inspection, MCSO' Bureau of Oversight authored and forwarded 5 deficiency memorandums to Division Commanders for review and 4 memorandums of concern to Professional Standards Bureau for review. In addition, the Bureau of Internal Oversight recommended additional training to employees and the reinforcement for MCSO employees to immediately report any violations of MCSO Policy GM-1 or CP-2 to a supervisor. A BIO Follow-up Action Form is required to be completed and returned within 30 days for any instance where discrepancies were noted.  The documentation provided stated that the Bureau of Internal Oversight would conduct a follow up inspection within the following 30 days.

On December 31, 2014, the Bureau of Internal Insight again generated a random sample of the entire population of MCSO employee email accounts.  This sampling included 35 employees being selected.  Emails for these 35 employees, generated between December 9, 2014 and December 31, 2014, were checked for compliance with MCSO CP-2 Policy and MCSO GM-1 Policy.

The actual number of emails inspected from the total population of 10,261 available for inspection was 1,872.  MCSO business emails were eliminated from the population.  Employees in the sample included 9 from Enforcement, 20 from Detention, 4 from Administration, and 2 from Operations Command.  Thirty-four of the thirty-five randomly selected employee accounts had no deficiencies noted (97.2%).  Eight potential issues from one employee were discovered, documented, and disseminated to the MCSO Chain of Command to be handled in accordance with MCSO Policy and Procedure.  There were 8 emails by this single employee that were not professional in content and appearance, and could be "perceived as offensive, discriminating, or denigrating."   In addition to addressing the one deficiency found, the Bureau of Internal Oversight recommended additional training for the employee and the reinforcement for MCSO employees to immediately report any violations of MCSO Policy GM-1 or CP-2 to a supervisor. A BIO Follow-up Action Form is required to be completed and returned within 30 days for any

instance where discrepancies were noted.  The documentation provided stated that the Bureau of Internal Oversight would conduct a follow up audit within 30 days.

Between December 22, 2014 and January 5, 2015, The MCSO Bureau of Oversight conducted an inspection of CAD messages from Office components listed in the CAD System database. Using a Generally Accepted Government Auditing Standard (GAGAS), ten days out of the 31 days in December were selected as samples.  The CAD messages were reviewed in an effort to identify compliance with MCSO policies CP-2, CP-3, and GM-1.  A total of 5 concerns were identified during the inspection.

The documentation provided by MCSO did include the specific nature of most of the identified concerns.  The concerns included such things as personal conversations, disrespectful remarks about a supervisor, and a possible violation of the required supervisory oversight.  One CAD message was identified that was potentially disrespectful to residents of the community, but the specific comments were not included in the summary.

The Bureau of Oversight forwarded the noted concerns through the respective MCSO Chain of Commands to be addressed in accordance with MCSO Policy and further recommended that employees should be reminded of Office policy and procedure related to CAD Messaging System entries.

MCSO has made notable efforts to inspect and identify any deficiencies in meeting the requirements of this paragraph.  Future reviews by my team will include robust follow- ups on the outcome of the noted potential violations and requests for more detailed information on potential violations in future audits. The inspections conducted by the BIO have identified that there needs to be further training and accountability at both the employee and supervisory level to obtain Phase 2 compliance with this paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

*Paragraph 24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

MCSO policy EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance was finalized and published on September 22, 2014 and trained to during the 4th and 14th Amendment training completed by MCSO in 2014. The Department has achieved Phase 1 compliance with this Paragraph."

To determine Phase 2 compliance, MCSO will be requested to provide information on hotlines maintained by MCSO or other means by which they receive information from the public regarding potential criminal activity. Requests will also be made for information and documentation of all operations conducted at the District levels in response to public input or requests regarding potential criminal activity.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Deferred

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**
*Paragraph 25. The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*
*a.        prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*
*b.        provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*
*c.        prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*
*d.        prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*
*e.        prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*
*f.        require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*
*g.        prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;*
*i.        provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*
*j.        Instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

MCSO has developed several policies that, in concert, incorporate the requirements of this Paragraph.   These include: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), dated September 22, 2014; EB-2 (Traffic Stop Data Collection), dated September 22,

2014; EA-5 (Enforcement Communications), dated September 5, 2014; and CP-8 (Preventing Racial and other Bias-Based Policing), dated September 5, 2014.  In our policy feedback, we required that the definition of racial profiling be consistent throughout all policies where it is included, and that it mirror the definition provided in the Order.  MCSO made the requested policy changes in each of the affected documents, which were then reviewed and approved.  The policies were disseminated and trained to during the Fourth and Fourteenth Amendment training which was completed in December, 2014.  MCSO is in Phase 1 compliance with this paragraph.

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured in Paragraph 54 by the TracS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has been making ongoing changes to the TracS system to ensure that mandatory fields on the forms utilized to collect the data must be completed by the deputies in order to capture the required information.

Paragraph 25.a prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed.  Our review of the 103 traffic stops provided in the sample indicated that MCSO was following protocol and we did not determine that they were in violation of the Order or internal policies.  MCSO is compliant with this Subparagraph.

Paragraph 25.b requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.  MCSO policy EB-1.A-E addresses these concerns.  Our review of the data indicates MCSO is compliant with this Subparagraph.

Paragraph 25.c requires MCSO to prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.  Our review of the sample data for the quarter did not indicate MCSO was in violation of this Subparagraph.

Paragraph 25.d requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity.  When we reviewed the data we determined that deputies did not base their traffic stops to any degree on race or ethnicity.  (See Paragraph 54e).  MCSO is compliant with this Subparagraph.

Paragraph 25.e requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity.  (See Paragraph 54e).  Our review indicated that traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County; therefore, MCSO is compliant with this Subparagraph.

Paragraph 25.f requires deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact dispatch.  Our review indicates that MCSO is compliant with this Subparagraph (See Paragraph 54e).

Paragraph 25.g prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed.  In our review of the documentation of 103 traffic stops we determined that one stop may have been for a longer duration than necessary; therefore MCSO is compliant with this Subparagraph (See Paragraph 54i).

Paragraph 25.h requires the duration of each traffic stop to be recorded.  In our review we determined that traffic stops were recorded accurately in 97 of the 103 traffic stops.  In the remaining six cases there was a difference of five or more minutes in the start or end time of the stop, when comparing the Vehicle Contact Face Sheet (VCFS) and the dispatch CAD printout (See Paragraphs 54b and 54i).   MCSO is compliant with this Subparagraph.

Paragraph 25i requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver license or other state-issued identification.  The Plaintiffs and MCSO have agreed on acceptable forms of identification and this information has been included in the Fourth and Fourteenth Amendment training conducted by outside consultants.  MCSO is compliant with this Subparagraph.

Paragraph 25j requires MCSO to instruct deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.  We have not reviewed any documentation from MCSO that has indicated deputies are requiring motorists or passengers to provide their Social Security number during the stop.   The forms completed by deputies on a traffic stop (VCFS, Warning/Repair Form and the Arizona Traffic Complaint) do not contain boxes to capture this information.  MCSO is compliant with this Subparagraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In Compliance

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests
*Paragraph 26. The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*
***a.*** *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

**b.**      *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*
**c.**      *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest; d. require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*
*e. prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*
*f. Prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

The MCSO has finalized and published policies EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance on September 22, 2014 and EA-11 Arrest Procedures on September 5, 2014. Both contain the appropriate policy direction and have been specifically trained to during the required Fourth and Fourth Amendment training completed by MCSO in 2014. Specific references to areas of required compliance in this section were personally observed by the Monitoring Team during the training. The Department has achieved Phase 1 compliance with this Paragraph.

During this reporting period, CCID has provided documentation that there were no immigration related enforcement actions or operations.  MCSO's Court Compliance and Implementation Division conducted a database search of all calls that could be potentially related to their criteria for "immigration related enforcement" (misconduct involving weapons, forgery, and human smuggling).  They determined through their search that there were no cases that would qualify under these crimes for the reporting period of October 1 – December 31, 2014 and provided memoranda to that effect.  They further determined that no arrests were made where a vehicle passenger was arrested for any crime related to a lack of identity documentation.

There were fourteen arrests of vehicle drivers that included charges for lack of an identity document. In all cases, these were traffic stops with articulated Title 28 violations precipitating the stop.  The drivers were all cited or booked on the traffic charges and for the lack of an identity document. There were no cases where the required boxes for immigration status check, delay for immigration violation, or ICE contact were checked in the affirmative on the "Vehicle Stop Contact Form." In six cases (43%), the report was not reviewed by a supervisor within 72 hours. In eleven of the cases the involved deputy failed to notify a supervisor of the lack of identity investigation or arrest. In 11 cases (79%), there was no documentation of the notification of a supervisor and in 3 cases (21%), there was no IR attached.  We intend to closely scrutinize the measure of supervisory oversight.

During this review period, we have reviewed all arrests made by the Anti-Trafficking Unit (formerly the HSU).  All arrests reviewed between Oct. 1st and Dec. 31st, 2014 were made for

narcotics trafficking.  Almost without exception the initial contacts with suspects was made by U.S. Border Patrol patrolling the area near Gila Bend.  All of the suspects were arrested by Border Patrol and turned over to MCSO for charging and booking.  The charges noted were exclusively for the transportation of marijuana for sale.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27. The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

MCSO has provided the finalized policy for EA-11 (Arrest Procedures), the Investigations Division Operations Manual and the former "HSU" Operations Manual.  The only reference to a LEAR (Law Enforcement Agency Response) Policy is in the **former** HSU (Human Smuggling Unit) Operations Manual where references are made to a U.S. Immigration and Customs Enforcement (ICE) LEAR Policy.  We have reviewed the relevant policies and find no reference to an MCSO LEAR Policy.  We have met with MCSO staff and have been told that MCSO has never had a LEAR Policy of its own, though ICE does have one that was referenced in former policies and draft memorandums.  These draft memorandums and policy references to the ICE LEAR policy may have contributed to the belief by many MCSO personnel that MCSO did in fact have a LEAR policy.  MCSO needs to ensure that any future references to policies or procedures of other agencies are clearly defined and explained to their personnel.

MCSO is in Phase 1 and Phase 2 compliance with this Paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

*Paragraph 28. The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*
*a. specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*
*b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*
*c. prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d. *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e. *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f. *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g. *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h. *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

On September 5, 2014, MCSO finalized policies CP-8, Preventing Racial and Other Biased Based Profiling, and EA-11 Arrest Procedures. EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance was finalized on September 22, 2014. These policies have been approved, distributed and trained to during the mandatory Fourth and Fourteenth Amendment training completed during 2014. Specific references to areas of required compliance in this section were personally observed by the Monitoring Team during the training. The Department has achieved Phase 1 compliance with this Paragraph.

During the previous reporting period, The Court Compliance and Implementation Division provided memorandum information that during the previous reporting period there were no arrests made for: misconduct involving weapons, forgery, or human smuggling that would qualify under this Paragraph. They also provided written documentation that no instances of an individual being transported to ICE, or their Officers having contact with ICE occurred during

this evaluation period.  They determined this by a search of the Early Identification System for vehicle stop contacts in TRACS.

During the current reporting period, at the request of my team, the document request related to contacts and transportation to "ICE" was modified to include contacts, transportation to "ICE/Border Patrol".  MCSO has provided written documentation that there were no instances of any subject being transported to ICE/Border Patrol, no instances of officers having contacts with ICE/Border Patrol for the purpose of making an immigration status inquiry, and that there were no arrests made following any immigration related investigation or for any immigration-related crime during the period between October 1 and December 31, 2014.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

**_e. Policies and Procedures Generally_**
_Paragraph 29. MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards._

See Paragraph 30.

Compliance Status:
Phase 1: Not applicable
Phase 2: In compliance

_Paragraph 30. Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation._

MCSO has provided the Monitoring Team and the Plaintiffs with drafts of its Order-related policies and procedures prior to publication as required by the Order.  We and the Plaintiffs' attorneys review the policies to insure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards.  Once drafts are finalized, incorporating the feedback of the Plaintiffs and the Monitoring Team, they are again provided to the Monitoring Team for final review and approval.  As this process has been followed for those Order-related policies published thus far, MCSO is in compliance with this Paragraph.

Compliance Status:
Phase 1: Not applicable
Phase 2: In compliance


*Paragraph 31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

Thus far, the only Order related Policies that have been approved and disseminated to the rank and file have been in conjunction with the required Fourth and Fourteenth Amendment Training. Therefore, there has been appropriate records kept of receipt of the policies, and their contents were covered in the course of the training.

MCSO has yet to finalize the means by which they will document the receipt of future Order-related policies – particularly those that are not distributed in conjunction with structured training classes.  They are exploring an addition to their E-Learning system – their online training vehicle – which they project will be able to adequately document receipt and understanding of new policies.  This system, E-Policy, is slated to become operational in the first quarter of 2015. We consider this imperative and shall follow up accordingly.

While we acknowledge compliance with this Paragraph for the policies distributed with the above-referenced training, until such time as a system is in place for all policies, compliance is deferred.

Compliance Status:
Phase 1: Not applicable
Phase 2: Deferred


*Paragraph 32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.*

The following MCSO policies were originally offered in response to this Paragraph: CP-2 (Code of Conduct), CP-8 (Preventing Racial and other Biased-Based Profiling), GC-17 (Employee Disciplinary Procedure), and GH-2 (Internal Investigations).  However, we  rejected them as not comporting with the requirements of this paragraph.  These policies were revised, and approved,

effective September 5, 2014. The requirements of this Paragraph are incorporated through the combination of these policies.   These policies were disseminated and trained to during the Fourth and Fourteenth Amendment Training that was completed during this review period.

We requested the list of all internal investigations that were closed during October, November and December, 2014. From the list of 185 cases, we selected 36 where the allegations appeared to be applicable to paragraph 32. In those 36 cases, we found five that were related to violations of policy in Patrol Operations. One case involved a sergeant who filed an internal complaint related to Truthfulness against a deputy who failed to complete a report on a recovered bicycle. Three involved policy violations by Posse members.  All three members were removed from the program. Finally, one involved a commander who did not advance a complaint of racially discriminatory remarks to the Professional Standards Bureau for investigation.

Not all policy or procedure violations will – or should – rise to the level of an internal investigation.  Paragraphs 91 and 94 require supervisors to address all violations or deficiencies in investigatory stops, detentions, and arrests.  We and MCSO noted several instances in which apparent policy violations went unaddressed by first line supervisors.   These are further described in those paragraphs.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance


*Paragraph 33. MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

MCSO offered policies CP-8 (Preventing Racial and other Biased-Based Profiling) and GC-17 (Employee Disciplinary Procedure) as proofs of compliance with this Paragraph.   The requirements of this Paragraph are incorporated in the combination of these policies.  MCSO considers acts of discriminatory policing as Category 6 violations under its Disciplinary Matrix, and the penalties range from a 40-hour suspension to dismissal for a first offense.  Penalties for a second offense range from an 80-hour suspension to dismissal, and dismissal is the mandatory penalty for a third offense.

CP-8 and GC-17 were revised and re-issued effective September 5th, 2014. These policies were distributed to all attendees at the Bias Free Policing and Fourth Amendment Training described later in this report.

We requested a list of all complaints received during October – December 2014 alleging Discriminatory Policing as well as documentation of any discipline associated with these complaints, where discipline was recommended and /or imposed during this period.  In response,

we received a spreadsheet containing six external complaints.  Only one was closed during the reporting period, with a finding of not sustained.

Given the small sample size, we will defer a compliance determination until we have a larger universe of completed cases to assess.

Compliance Status:
Phase 1: In compliance
Phase 2: Deferred

*Paragraph 34. MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

MCSO Policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."  As mentioned above, throughout the first few months of our tenure, MCSO has been reviewing its policies in response to Order requirements and our document requests.  Many of their policies have been adjusted based on our feedback and that of the Plaintiffs.  Several have been issued to sworn personnel and posse members in conjunction with the ongoing Fourth and Fourteenth Amendment Training.

During our December site visit, we established a schedule for the annual reviews required by the Order.  We agreed that the cycle for this review requirement will be MCSO's fiscal year, which runs from July 1 to June 30.  Documentation of the first annual review will be submitted on or before September 15, 2015.

Compliance status:
Phase 1: In compliance
Phase 2: Deferred


## Section 5: Pre-Planned Operations

MCSO was advised to notify the Monitor, as well as the two Deputy Monitors, of any upcoming Significant Operation via email, and by a phone call, to insure a prompt response by monitoring team personnel.   MCSO was asked to provide the Monitor with a submitted plan, as well as the name and contact information of the on-scene commanding officer of any scheduled operation.

The following Paragraph responses provide more detail with regard to particular aspects of the Court Order for Pre-Planned or Significant Operations.

**COURT ORDER VI. PRE-PLANNED OPERATIONS**

*Paragraph 35. The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

MCSO has taken the position that they no longer have Specialized Units that enforce immigration laws.  The Special Investigation Division (SID) Operational Manual identifies eleven different units, none of which appear to be directly involved in enforcing immigration laws.  During discussions with the Court Compliance and Implementation Division (CCID) and attorneys from the Maricopa County Attorney's Office (MCAO), we suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination could be made as to which units, if any, enforce these laws as one of their core missions.

During the previous evaluation period, MCSO articulated that the three criminal violations they believed qualified as potentially immigration related include human smuggling, forgery, and misconduct with weapons, since immigration status may be an element of these offenses.  At that time, we requested the monthly arrest and enforcement statistics for the months March – August 2014 for the Units assigned to SID, as well as all arrests for the identified immigration related crimes.  We also requested any documentation that outlines the core mission of the various SID Units.

During the December 2014 site visit, we met with the MCSO Special Investigations Division Chief and his staff.  He advised that the CEU (Criminal Employment Unit) would be disbanded in January or February of 2015 and removed from the agency organizational chart.  Any information regarding the kinds of violations previously investigated by MCSO CEU that came to their attention would be forwarded to a federal agency for review and any action. He also advised that MCSO would be returning any unused grant funds dedicated to these types of investigations.  He told us that they are not doing any human smuggling investigations and that the Human Smuggling Unit's name has been changed to the Anti-Trafficking Unit (ATU).  He said there is no Unit within MCSO whose core function is the investigation of immigration related crimes. Those crimes that may in some cases have immigration status as an element of the crime (misconduct with weapons, forgery) would be investigated by District Detectives, as would be the case for those same crimes without the element of immigration status.

During our review of the arrests made by the Anti-Trafficking Unit for the reporting period between October 1 and Dec. 31, 2014, we did not note any arrests for human smuggling violations.  All arrests made by this Unit were for the trafficking of narcotics.

While MCSO has addressed the crimes and investigative responsibilities verbally, there has been no documentation received by my team that memorializes these decisions and protocols.  Phase 1

and Phase 2 compliance is deferred until such time as we receive documentation that CEU has been disbanded, and we review the mission statement, policies and operations documents of ATU to verify MCSO's assertion that this Paragraph is not applicable to that Unit. We urge MCSO to address this matter expeditiously.

Compliance Status:
Phase 1:  Deferred
Phase 2:  Deferred

*Paragraph 36. The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

As of September 5, 2014 MCSO had finalized and distributed the Significant Operations Policy GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized and distributed.  The policy (GJ-33) has been specifically trained to during the Fourth and Fourteenth Amendment training for sworn personnel and posse members. We have found their policies and protocols to accurately reflect the requirements of the Order. The Department has achieved Phase 1 compliance with this Paragraph.

During the first two reporting periods, MCSO did not report any significant operations that would invoke the requirements of this paragraph.

During this reporting period, MCSO did conduct a significant operation meeting the requirements of this paragraph.  "Operation Borderline" was conducted from October 20th, 2014 through October 27th, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County.  MCSO submitted  documentation, including the statement of operational motivations and objectives, and the parameters for supporting documentation to us as required. During the pre-operation briefing on October 15, 2014, attended by a member of my team, MCSO provided all attendees with copies of the required operational documents and policies and conducted a thorough briefing on the requirements of this paragraph. The attending member of my team also received a copy of the same briefing packet that included all documents for the operation and copies of all relevant policies.

MCSO has completed the required 4th and 14th Amendment training for sworn employees and posse members, and those involved in this operation were provided specific direction and training as required to comply with this paragraph during the Oct. 15th pre-operation briefing for Operation Borderline.

On January 12, 2015, MCSO submitted documentation to us that no additional significant operations as defined in this paragraph were completed during this reporting period.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

*Paragraph 37. The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

As of September 5, 2014 MCSO finalized and distributed the Significant Operations Policy GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized. The policy (GJ-33) was specifically trained to during the Fourth and Fourteenth Amendment training conducted by MCSO during 2014. The Department has achieved Phase 1 compliance with this Paragraph.

MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor during the first two reporting periods.

During this reporting period, MCSO did conduct "Operation Borderline" from Oct. 20th, 2014 to October 27th, 2014.  This operation was intended to interdict the flow of narcotics being transported in to Maricopa County. MCSO did submit all required documents to us for this operation and specifically provided relevant information to those assigned during their pre-operation briefing on Oct. 15, 2014 that was attended by a member of our team.

On January 12, 2015, MCSO submitted documentation to us that no additional significant operations as defined in this paragraph were completed during this reporting period.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within ~~30~~ 10 days after the operation:*

a. *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b. *information that triggered the operation and/or selection of the particular site for the operation;*

c. *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d. *documentation of command staff review and approval of the operation and operations plans;*

e. *a listing of specific operational objectives for the patrol;*

f. *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g. *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h. *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i. *arrest lists, officer participation logs and records for the patrol; and*

j. *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

On September 5th, 2014 MCSO finalized and distributed the Significant Operations Policy GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized. The policy (GJ-33) was specifically trained to during the Fourth and Fourteenth Amendment training completed by MCSO is 2014. The Department has achieved Phase 1 compliance with this Paragraph.

During the first two reporting periods, MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor.

During this reporting period, MCSO did conduct "Operation Borderline" from Oct. 20th, 2014 through Oct. 27th, 2014.

On November 5th, 2014, 9 days after concluding this operation, MCSO submitted complete documentation as required under this Paragraph.  A memo entitled "The Post Operation Analysis" was included.  It contained an overview of the operation and contained required information including an overview of the operation, and significant events during the operation. Also included was all original documentation of the Operation and other requirements of this paragraph including: documentation of the specific reason for the Operation drafted prior to the Operation (38.a), information that triggered the Operation (38.b), documentation of law enforcement intelligence received (38.c), verification of command staff review and approval (38.d), a listing of specific operational objectives (38.e), documentation of operational objectives and instructions to participating MCSO personnel (38.f), operations plans and post operation debriefing (38.g), post operation analysis (38.h), arrest lists and officer participation logs (38.i), and data about each contact made (38.j).  All submitted documents have been reviewed and determined to contain the information required under this paragraph.

On January 12, 2015, MCSO submitted documentation to us that no additional significant operations as defined in this paragraph were completed during this reporting period.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**


*Paragraph 39. The ~~MCSO~~ <u>Monitor</u> shall hold a community outreach meeting no more than ~~30~~ <u>40</u> days after any Significant Operations or Patrols in the affected District(s). ~~MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol~~ <u>The Monitor shall communicate the operational details provided to it by the MCSO and <u>shall hear any complaints or concerns raised by community members.  The Monitor may <u>investigate and respond to those concerns.</u>  The community outreach meeting shall be advertised and conducted in English and Spanish.*

The Court has amended the original Order to move responsibility for Community Outreach to the Monitor.  This section no longer applies to the activities of MCSO.

During this review period, MCSO conducted Operation Borderline from October 20th, 2014, through October 27th, 2014.  While no longer required under this Order to conduct a community meeting regarding Significant Operations, MCSO did conduct such a meeting after the conclusion of this operation.  This meeting was held by MCSO on November 18, 2014 at the School District Auditorium in Gila Bend, Arizona. Numerous members of MCSO were present at the meeting, as was a member of my team.   The meeting was publicized by MCSO and attended by six community members.  MCSO provided a briefing on the intent and outcome of the operation and then opened the floor for questions.   All attendees were supportive of the operation and appreciative of MCSO's efforts to interdict the flow of narcotics and hold this meeting. Attendees had few questions regarding the operation and only a couple of comments regarding their concern about the drug trafficking as it affected their community.

On December 16th, 2014, we conducted a community outreach meeting regarding Operation Borderline as required under this Paragraph.  The meeting was publicized by my team and held in Buckeye, Arizona. Numerous members of the MCSO were also present at the meeting.  We were prepared to provide all the information required in this Paragraph in both English and Spanish to those who attended.   No interested parties or community members attended the meeting.

*Paragraph 40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

MCSO developed The Significant Operations Protocol as required, and has modified it to include Section 7 that requires notification to the Plaintiffs.  The Department has achieved Phase 1 compliance with this Paragraph.

MCSO did not conduct any significant operations during the first two reporting periods that required notification under this Paragraph.

From October 20th, 2014 through October 27th, 2014, MCSO did conduct one significant operation, "Operation Borderline".  During this operation, there were two occasions that arrests were made of more than five people.  On October 25, 2014, MCSO arrested nine male suspects for transportation of marijuana and on October 26, seven male suspects were arrested for transportation of marijuana. The MCSO Operation Borderline team notified the CCID in both cases and provided a shift summary.  This information was transmitted to us as required.

On January 12, 2015, MCSO submitted documentation that no additional significant operations as defined in this operation were completed during this reporting period.


Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

## Section 6: Training

## COURT ORDER VII. TRAINING

### a. General Provisions
*Paragraph 41. To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

*Paragraph 42. The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

MCSO has developed a single policy, GG-2, Training Administration, created January 24, 2014, that was intended to incorporate the requirements of this Paragraph.   GG-2, Training Administration, fails to identify instructor criteria, including for Order mandated areas of Bias-Free Policing, Fourth Amendment, and Supervisor and Command Level Training. It is recommended that areas such as Academy training, Post Academy, and Field Training Officers training also be included. The document in its present form does not include any provisions for the establishment of instructor selection criteria, proof of expertise and educational achievements, Professional Standards Bureau reviews or the establishment of an instructor database.

The aforementioned criteria was previously utilized to generate the proposed list of instructors agreed upon by the attorneys for the Defendants and the attorneys for the Plaintiffs to determine that they possessed qualifications that were compliant with the requirements of Paragraph 42. The final joint selection of qualified instructors to deliver Bias Free Policing; and Detentions, Arrests, Immigration Related Laws training was completed in August 2014.

During the previous monitoring period we had been advised by Training Command that policy GG-2, Training Administration, was in draft form and under review for modification. On December 16, 2014, Training Command personnel reaffirmed to our team that this policy remained in draft form due to pending modifications.  Further query during our exit interview on December 19, 2014, prompted MCSO Command Staff to inquire internally regarding the status of this policy. On December 22, 2014, the policy as approved on January 24, 2014, was resubmitted as the final official submission. This policy was not reviewed during this review period.

During this review period it was anticipated that MCSO would have taken the opportunity to memorialize the instructor selection process within their training policy and allow for party review of newly created instructor criteria and documentation. As newly developed training is delivered it will be incumbent upon MCSO to institutionalize this process.

The selection and hiring of instructors to provide Supervisor Specific Training did not commence during this review period. The process to select instructors for the Fourth and Fourteenth Amendment Training was cooperative and successful. We noted that additional training for EIS was delivered during this period. To our knowledge there was no use of this criteria to identify instructors eligible to deliver the training program.

MCSO is not in compliance with this paragraph.

Compliance Status:
Phase 1: Not in compliance
Phase 2:  Not in compliance

*Paragraph 43. The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

MCSO has developed a single policy, GG-2, Training Administration, created January 24, 2014, that was intended to incorporate the requirements of this Paragraph. The existing policy fails to make distinction between the requirements of a live training delivery and an on-line training delivery. Additionally, it fails to establish mandated testing criteria and administration.

Although not a requirement of the Order, live training mandates could be better addressed in this policy with the establishment of a database designed for the documentation of all approved training lesson plans. GG-2 could include provisions for the development of such a database and a requirement that the Training Division would have sole responsibility for update and maintenance of this database. This database would contain all Academy training lesson plans, Field Officer Training lesson plans, In-service training lesson plans, and Advanced or Specialty training lesson plans and would specifically include provisions to identify all lesson plans requiring an in class delivery. A review of this type of database would provide the required information to effectively review compliance in this regard as well as improve MCSO's ability to update lesson plans in accordance with paragraph 47 in order to gain institutionalized compliance.

Obviously, a pre-requisite to database development would be specific language developed and incorporated into policy GG-2, Training Administration. This language should include: 1) documentation of the need for training lesson plan development; 2) standardized lesson plan development criteria and format; 3) standardized instructor selection protocols; 4) inclusion on the Master Training Calendar; and 5) documentation of the delivery of the training. This language would improve not only the quality of the development and delivery of training, but ensure that the Training Division embraces their responsibility for all departmental training.

Additionally, GG-2, Training Administration should specifically outline their required testing processes and the documentation of testing delivered to training recipients. In its current form GG-2 is deficient in this regard.

Between October 1, 2014 and continuing through December 21, 2014, MCSO continued to deliver the Order mandated Bias Free Policing and Detentions, Arrests, Immigration Related Laws training, utilizing 100% live training (i.e., with a live instructor). During the period the training was observed by a member of the Monitoring Team on an announced and unannounced basis. Students were assigned to the training by their respective supervisors and were required to sign into and out of the training sessions on Training Division provided Sign-In Rosters. Students were provided reference materials to include copies of PowerPoint presentations and MCSO policies GH-2 Internal Investigations, GC-17 Employee Disciplinary Procedures, GJ-33 Significant Operations, CP-8 Preventing Racial and Other Biased- Based Profiling, EB-1 Traffic

Enforcement, Violator Contacts, and Citation Issuance, EB-2 Traffic Stop Data Collection, EA-5 Enforcement Communications, and CP-2 Code of Conduct. Documents relative to the Melendres Case, such as the Court's Findings of Fact and Conclusions of Law, the Court's Supplemental Permanent Injunction of October 2, 2013, and the April 17, 2014 Corrective Statement summary are all available to the students on the E-Learning system. Each student is required to access the E-Learning system within 5 days to take the testing portion of the training program. The students are provided with a Course Assessment at the end of the training program, requesting feedback relative to the instructors and course content using a rating scale of 1-5, along with four additional questions soliciting specific feedback.

The final MCSO Training Schedule for the period of October 1, 2014 through December 31, 2014 was provided to the Monitor for review along with documented modifications for Week 12 (December 6 and 7, 2014), Week 13 (December 13 and 14, 2014), and Week 14 (December 20 and 21, 2014). The provided Training Schedule specifically included Bias Free Policing and Detentions, Arrests, Immigration Related Laws training. Notably absent from this schedule was EIS Blue Team training that had been conducted October 6-10, 13-17, 2014, November 17,2014, December 2, 4, 15, 17, 18, 2014. The lesson plans for Detentions, Arrests and Immigration-Related Laws, and for Bias-Free Policing were previously reviewed by the attorneys for the Defendants, the attorneys for the Plaintiffs, and the Monitoring Team. We had reviewed and commented on the first segment of the EIS Blue Team Training. Due to its complexity and interrelatedness with several paragraphs of the Order, EIS training as a whole has not been approved by our team. We recognize that paragraph 80 is specific to the training on the EIS, however the development and delivery of these Order mandated trainings are addressed within the paragraphs of section VII, Training, more specifically paragraphs 42 through 47.

MCSO has implemented a post training testing requirement for the Bias Free Policing and Detentions, Arrests, Immigration Related Laws training, that each deputy must attain a minimum passing score of 100% in order to receive credit for the Order mandated training. However, each deputy is allowed up to 5 attempts to achieve this score. This training is delivered in a classroom setting with a live instructor. MCSO cites this 100% requirement to be a mandate of the Arizona Peace Officers Standards and Training Board. MCSO would be accurate in the application of this requirement if the training had been delivered through an on-line platform or an e-learning system, which would then be required to contain an assessment model wherein there would be a 100% score on each assessment. However, Arizona Peace Officers Standards and Training Board has informed us and MCSO that there is no learning assessment requirement for in-person continuing training sessions. We revisited this subject with MCSO during our December site visit in an attempt to encourage movement away from what is considered to be an unrealistic passing score requirement. In the most simplistic terms it is unreasonable to expect every deputy to achieve 100% for the testing process. Actual test score reviews bear this out. A recommendation to revise this mandate was presented by our team during our December 2014 site visit but it has met resistance by Training Division Command and as of this date remains in effect. In order to effectively evaluate the whole testing process and review the individual scores for each deputy, one is required to review several different reports and cross reference each. A

summary from the E-Learning administrative reports, Skills Manager reports of "Passed" students, and the Master Rosters individually for Sworn, Posse and Reserves are required to accomplish this. The ability to conduct thorough training assessments and improve the organizational training program continues to remain deficient.

As of the close of this reporting period, the lesson plan for Supervisor Responsibilities-Effective Law Enforcement is under development and pending review by the Parties' attorneys and the Monitoring Team.

MCSO is not in compliance with this paragraph.

Compliance Status:
Phase 1: Not in compliance
Phase 2:  Not in compliance

*Paragraph 44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

MCSO has developed a single policy, GG-2 Training Administration, created January 24, 2014, that was intended to incorporate the requirements of this Paragraph.  The policy fails to identify the establishment and adherence to the development and maintenance of the Order mandated Training Calendar, and attendance sign in requirements for all training attended.

The training for Bias Free Policing and Detentions, Arrests, Immigration Related Laws training continued between October 1, 2014 and December 21, 2014. Training has been observed on an announced and unannounced basis during the review period ending December 31, 2014.

The Sworn Training Compliance Report Roster indicates that as of December 31, 2014, a total of 684 sworn (compensated) personnel were required to receive the Order mandated training and 682 had completed same.   Two deputies have not completed the mandatory training due to leave issues.

The Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 34 reserve personnel were required to receive the Order mandated training and 33 had completed the mandatory training.

The Retired Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 30 reserve personnel were required to receive the Order mandated training and 28 had completed the mandatory training.

During the previous monitoring period the Posse Reserve Roster accounted for 1250 Posse personnel who were required to receive the Bias Free Policing and Detentions, Arrests, Immigration Related Laws mandated training. In November 2014, CCID provided what was termed a baseline number of 1033 Posse personnel requiring the mandated training. CCID had indicated that this number was being created from the actual number of Posse personnel who had completed the mandatory training. CCID has advised that failure to complete the training results in mandatory deselection from the Posse Program.

The Quarterly Training Report, issued by the Training Division accounts for a combined total of 1346 (318 sworn personnel, 34 reserve personnel, 29 retired reserve, 957 posse personnel, and 8 civilians) who have received the mandatory training during the monitoring period.

The inability of MCSO to link together the Skills Manager Database, the MCSO Sworn Training Compliance Report, the Posse Training Compliance Report, the Reserve Training Compliance Report, and the Retired Reserve Training Compliance Report with Master Rosters continues to hamper documentation of training. This deficiency will continue to hamper documentation efforts as the volume of training increases with the development and delivery of other Order mandated training in order to achieve compliance, such as EIS and the use of Body Cams.

Mandatory Supervisory training has yet to occur.  MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 45. The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

We were involved in a collaborative review with attorneys for the Plaintiffs and attorneys for the Defendants of Detentions, Arrests and Immigration-Related Laws; Bias-Free Policing; and the initial Supervisor Responsibilities – Effective Law Enforcement curricula.  The Bias-Free Policing and Detentions, Arrests and Immigration-Related Laws curricula are in compliance with the requirements in Paragraph 45. The final approved curriculum incorporated adult-learning methods and included PowerPoint presentations, interactive learning exercises, and lecture.

During the previous monitoring period MCSO had requested that they be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that they have the capability to deliver in the near future. We and the Plaintiffs agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice. We anticipate that the Parties will engage in a similar curriculum review process for these various components of Supervisor Responsibilities – Effective Law Enforcement training. On December 17, 2014 the monitor was presented with an initial outline document to be utilized to develop a segment of a supervisor course entitled Supervisor Responsibilities-Effective Law Enforcement Course. No lesson plan has been developed that could be reviewed by the parties.

MCSO is not in compliance with this paragraph.

Compliance Status:
Phase 1:  Not Applicable
Phase 2:  Not in compliance

*Paragraph 46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

MCSO has previously provided the curricula for Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws; and Supervisor Responsibilities-Effective Law Enforcement to the Monitor and the Plaintiffs.  These have been jointly reviewed by the Parties, and the Defendants' attorneys have been very receptive to the input from the Plaintiffs' attorneys and the Monitoring Team.  We reviewed the proposed list of instructors and identified those who are qualified.

During our December site visit, we were advised that training entitled "Blue Team Entry System for IAPro" had been delivered on multiple dates (October 6-10, 13-17, 2014, November 17, 2014, and December 15, 18, 2014) during the review period. The delivery of this training did not appear on the Master Training Calendar in accordance with paragraph 44 and as a result we were not afforded the ability to observe this training segment. Although the Order specifies that the Training Calendar is to document all Order mandated training, it is recommended that the newly developed calendar incorporate all training.   We previously reviewed, commented on and approved this segment of EIS curriculum that is primarily focused on the processes for completing an entry into the Blue Team database and for completing a Supervisor Note in the Blue Team system, in accordance with paragraph 46. Due to the complexity of the EIS training, and a need for segmented training, which has not been currently developed, all EIS training has not been approved by the monitor. The Training Division lesson outline indicates that this was a one-hour computer based presentation that included an on-line testing component, although no test results were provided. Although specific instructors were identified to deliver this training, the "Instructor Schedule" indicated that substitutes had been assigned to deliver the training component.  Submitted "Class Rosters" indicated that alternative instructors actually delivered the training. In light of the criticality of EIS training, it is recommended that the Training Division document the criteria and selection of all instructors for EIS components in accordance with paragraphs 42 and 73 and that instructor assignments as well as all modifications should be documented as well. Additionally, although "Class Rosters" indicating sign in to the class took place, we have not received a Master Supervisory Roster indicating who the total complement of supervisors are that require this training. Therefore there is no ability, based upon the submitted documentation, to determine who has not received the training.

MCSO has not provided the lesson plans for the bi-furcated Supervisory Training.

MCSO is not in compliance with this paragraph.

Compliance Status:
Phase 1:  Not applicable
Phase 2:  Not in compliance


*Paragraph 47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

MCSO has developed a single policy, GG-2 Training Administration, created January 24, 2014, that was intended to incorporate the requirements of this Task.  The policy fails to identify any semblance of a "Training Cycle" that should include such issues as diagnosis and needs assessment, development of training, delivery of training, evaluation of training, revision of training, an observation and evaluation of how deputies perform the field activities associated with the training, and documentation of each step of the process. It is recommended that existing policy be modified to direct that an annual review of all training lesson plans be conducted. During this annual review each lesson plan would be updated with new developments in law, participant feedback and training evaluations.

Compliance will be determined based upon whether or not MCSO's policy GG-2, Training Administration complies with this paragraph and is followed in practice.  The intended purpose of this policy should be to delineate the procedures and clearly establish the duties and responsibilities of all contributors to the MCSO training process.  Adequate development and adoption of a complete policy will enable the Training Division to oversee and ensure the quality of **all** training provided by, or under the direction of the MCSO.

A total of 93 randomly selected course evaluations from the Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws training were reviewed. In general, the selected instructors and the course content were perceived to be above average although there were noticeable repeat deviations. It is recommended that the MCSO conduct a thorough analysis and review of these evaluations in order to improve upon the course content, provide critical feedback to the instructors, and determine instructor retention. MCSO can reasonably expect that members of the Monitoring Team shall attend training for the purposes of rendering assessments to the parties and the Court.

MCSO is not in compliance with this paragraph.

Compliance Status:
Phase 1: Not in compliance

Phase 2: Not in compliance

**b. Bias-Free Policing Training**

*Paragraph 48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

Previously we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny of the entire Bias-Free Policing; Detentions lesson plans until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the approved lesson plans are being adhered to by the instructors.

The training continued between October 1, 2014 and December 21, 2014.  The Sworn Training Compliance Report Roster indicates that as of December 31, 2014, a total of 684 sworn (compensated) personnel were required to receive the Order mandated training and 682 had completed same.   Two deputies have not completed the mandatory training due to leave issues.

The Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 34 reserve personnel were required to receive the Order mandated training and 33 had completed the mandatory training.

The Retired Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 30 reserve personnel were required to receive the Order mandated training and 28 had completed the mandatory training.

During the previous monitoring period the Posse Reserve Roster accounted for 1250 Posse personnel who were required to receive the Bias Free Policing and Detentions, Arrests, Immigration Related Laws mandated training. In November 2014, CCID provided what was termed a baseline number of 1033 Posse personnel requiring the mandated training. CCID indicated that this number was being created from the actual number of Posse personnel who had completed the mandatory training.  CCID has advised that failure to complete the training results in mandatory deselection from the Posse Program.

The Quarterly Training Report accounts for a combined total of 1346 (318 sworn personnel, 34 reserve personnel, 29 retired reserve, 957 posse personnel, and 8 civilians) who have received the mandatory training during the monitoring period.

On November 7, 2014, in the United States District Court for the District of Arizona, Order No. CV-10-01413-PHX-SRB was filed finding that A.R.S. § 13-2319, as amended by Section 4 of S.B. 1070, was declared preempted by federal law and was permanently enjoined. This finding impacted the curriculum and training materials related to the Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws training. The parties came together jointly and immediately modified the training documents to reflect the current legal standard in accordance with paragraph 49.

As noted above, the Parties have worked collaboratively to finalize the curriculum for Bias-Free Policing. The training continued between October 1, 2014 and December 21, 2014, and was completed within the review period.   As a result of CCID's accounting of Posse Personnel, Reserve Personnel, and Retired Reserve Personnel, MCSO is in compliance with this paragraph.

Compliance Status:
Phase 1:  Not applicable
Phase 2:  In compliance

*Paragraph 49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum: a. definitions of racial profiling and Discriminatory Policing;*

*b.       examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

*c.       the protection of civil rights as a central part of the police mission and as essential to effective policing;*

*d.       an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

*e.       constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

*f.       MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

*g.       MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion; h. police and community perspectives related to Discriminatory Policing;*

*i.       the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

*j.       methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

*k.       methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

*l.       methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination; m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n. *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*
o. *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*
p. *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*
q. *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*
r. *Instruction on the data collection protocols and reporting requirements of this Order.*

Previously we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the approved lesson plans are being adhered to by the instructors.

On November 7, 2014, in the United States District Court for the District of Arizona, Order No. CV-10-01413-PHX-SRB was filed finding that A.R.S. § 13-2319, as amended by Section 4 of S.B. 1070, was declared preempted by federal law and was permanently enjoined. This finding impacted the curriculum and training materials related to the Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws training. The parties came together jointly and immediately modified the training documents to reflect the current legal standard.

Compliance Status:
Phase 1:  Not applicable.
Phase 2:  In compliance

### c. Training on Detentions, Arrests, and the Enforcement of Immigration- Related Laws

*Paragraph 50. In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

Training on the Fourth Amendment, including detentions, arrests and the enforcement of Immigration-Related Laws continued between October 1, 2014 and December 21, 2014. As previously noted, the Parties had worked collaboratively to finalize this curriculum.

The Sworn Training Compliance Report Roster indicates that as of December 31, 2014, a total of 684 sworn (compensated) personnel were required to receive the Order mandated training and 682 had completed same.   Two deputies have not completed the mandatory training due to leave issues.

The Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 34 reserve personnel were required to receive the Order mandated training and 33 had completed the mandatory training.

The Retired Reserve Training Compliance Report indicates that as of December 31, 2014, a total of 30 reserve personnel were required to receive the Order mandated training and 28 had completed the mandatory training.

During the previous monitoring period the Posse Reserve Roster accounted for 1250 Posse personnel who were required to receive the Bias Free Policing and Detentions, Arrests, Immigration Related Laws mandated training. In November 2014, the CCID provided what was termed a baseline number of 1033 Posse personnel requiring the mandated training. CCID had indicated that this number was being created from the actual number of Posse personnel who had completed the mandatory training.  CCID advised that failure to complete the training results in mandatory deselection from the Posse Program.

The Quarterly Training Report accounts for a combined total of 1346 (318 sworn personnel, 34 reserve personnel, 29 retired reserve, 957 posse personnel, and 8 civilians) who have received the mandatory training during the monitoring period.

On November 7, 2014, in the United States District Court for the District of Arizona, Order No. CV-10-01413-PHX-SRB was filed finding that A.R.S. § 13-2319, as amended by Section 4 of S.B. 1070, was declared preempted by federal law and was permanently enjoined. This finding impacted the curriculum and training materials related to the Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws training. The parties came together jointly and immediately modified the training documents to reflect the current legal standard in accordance with paragraph 51.

MCSO is in compliance with the requirements of Paragraph 50.

Compliance Status:
Phase 1:  Not applicable
Phase 2:  In compliance

*Paragraph 51. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.      an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;

b.      guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;

c.      guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;

d.      constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;

e.      MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

f.      the circumstances under which a passenger may be questioned or asked for identification;

g.      the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.      the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.      the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.      a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.      a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.      an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.      the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.      provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.      *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

Previously we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in person or by teleconference with document viewing capabilities.  The process included a line-by-line scrutiny of the entire Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws lesson plans until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate and fully compliant with the requirements set forth in Paragraph 51 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the approved lesson plans are being adhered to by the instructors.

On November 7, 2014, in the United States District Court for the District of Arizona, Order No. CV-10-01413-PHX-SRB was filed finding that A.R.S. § 13-2319, as amended by Section 4 of S.B. 1070, was declared preempted by federal law and was permanently enjoined. This finding impacted the curriculum and training materials related to the Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws training. The parties came together jointly and immediately modified the training documents to reflect the current legal standard in accordance with paragraph 51.

Compliance Status:
Phase 1:  Not applicable.
Phase 2:  In compliance

### d.      *Supervisor and Command Level Training*

*Paragraph 52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

MCSO has developed a single policy, GG-2 Training Administration, created January 24, 2014, that was intended to incorporate the requirements of this Task. The policy does reference the requirements of paragraph 52 in section 2 Mandatory Training, A. 5., in minimal fashion. The policy fails to identify a standardized process for the development of training in general, and the

inclusion of adult-learning methodology. The requirements of paragraph 52 are very specific in regards to minimum topics that must be included in the curriculum for the supervisory training. Although we are aware that specific lesson plans would not be included within an administrative policy, a standardized process for development and oversight should be included.

As noted above, the Parties worked collaboratively on the curriculum for Supervisor Responsibilities - Effective Law Enforcement.  We and the Parties jointly agreed that development of this training should be placed on hold and precedence given to development of the Fourth and Fourteenth Amendment training, which was scheduled to commence in September.

During our September site visit, MCSO requested they be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that they have the capability to deliver in the near future.  We and the Plaintiffs agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice. However, the development and submission of appropriate training materials for ANY phase of supervisory training has been completely lacking.  The alleged reason for the bifurcated approach – to allow some supervisor training to occur sooner rather than later – appears to be baseless.  This is unacceptable, particularly given that a lack of consistent, quality supervision is a key contributor to the environment that allowed the behaviors at the center of this case to flourish.  MCSO must make delivery of supervisory training a priority.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 53. The Supervisor-specific Training shall address or include, at a minimum: a. techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*
*b. how to conduct regular reviews of subordinates;*
*c. operation of Supervisory tools such as EIS;*
*d. evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*
*e. how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*
*f. how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*
*g. incorporating integrity-related data into COMSTAT reporting;*
*h. how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP; i. how to respond to the scene of a traffic stop when a civilian would like to make a complaint against a Deputy;*
*j. how to respond to and investigate allegations of Deputy misconduct generally;*

k. *evaluating Deputy performance as part of the regular employee performance evaluation; and*
l. *Building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

As noted above, there has been essentially no progress in the development of Supervisory Training, despite the Parties agreeing to an approach that was predicated on speeding up the development and delivery of this training to the Agency's supervisors. This situation must be addressed as soon as possible. In the investigations we are conducting and/or monitoring as part of our other Court assigned responsibilities, a consistent theme appears to be a lack of supervisory training for anyone with supervisory authority, regardless of rank.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

## Section 7: Traffic Stop Documentation and Data Collection

For Paragraphs 54 and 55, in particular, it was necessary to request traffic stop data from MCSO. The following explanation describes how this was done and how the data were handled once received. These data may also be referred to in other areas of Section 8 and the report as a whole.

> In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month. The sample of traffic stop cases continues to be pulled from the Districts and the Lakes Patrol (the "areas"). By way of background, MCSO reported a total of 6,105 cases of traffic stop events for these areas between October 1, 2014 and December 31, 2014. Once we received files each month containing these traffic stop case numbers from MCSO, denoting which area they came from, we then selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD tapes. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our utilization of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD subsample from the selected cases. The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014 the Court issued an ORDER GRANTING STIPULATION TO AMEND SUPPLEMENTAL/PERMANENT INJUNCTION/JUDGMENT ORDER (Document 748).  The stipulation affects Paragraphs 57, 61, 62 and Paragraph (1)(r)(xv) and will be incorporated in the body of our next Quarterly Report.  The stipulations referenced amends the Court's Order of October 2, 2013 and will be addressed in Chapter VIII.

## COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a. Collection of Traffic Stop Data
*Paragraph 54. Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a. *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b. *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c. *the license plate state and number of the subject vehicle;*

d. *the total number of occupants in the vehicle;*

e. *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f. *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g. *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h. *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i. *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j. *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k. *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l. *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m. *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

MCSO developed several policies that, together, incorporate the requirements of these Paragraphs. These include: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) dated September 22, 2014; EB-2 (Traffic Stop Data Collection) dated September 22, 2014; EA-5 (Enforcement Communications), dated September 5, 2014 and CP-8 (Preventing Racial and Other Biased-Based Profiling), dated September 5, 2014. We note that these four policies underwent several revisions and all were finally approved in September 2014 and disseminated during the Fourth and Fourteenth Amendment training conducted from September through December of 2014. According to documents received, 99% of the sworn, compensated personnel were trained, and all existing posse members[1] attended the training as of the close of the reporting period.

In order to capture the information required for this paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Face Sheet, the Vehicle Stop Contact Supplemental Sheet, the Incidental Contact Receipt and the Written Warning/Repair Order for those motorists who commit a traffic violation or are operating a vehicle with defective equipment and provided with a warning. We also reviewed the Arizona Traffic Ticket and Complaint forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout and any Incident Report associated with the event. We selected a sample of 103 traffic stops conducted by MCSO deputies from October 1, 2014 through December 31, 2014 for purposes of this review and assessed the collected data from the above listed documents for compliance with Subparagraphs 54.a-54.m. All of the listed documentation was used for our review of the following subsections of this paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which will be discussed further in subsequent sections of this report.

Paragraph 54.a requires MCSO to document the name, badge/serial number, and unit of each deputy and posse member involved. Our review indicated that in the 103 vehicle traffic stops, there were 34 cases where the deputy's unit had another deputy assigned to the vehicle or another deputy unit was on the scene, and these members were identified by the primary unit. In our previous report there were 20 instances where the initial deputy failed to indicate their unit number on the Vehicle Contact Face Sheet. However for this reporting period the deputies indicated their unit numbers for every stop.

There were seven instances where we found another unit or units on the scene that were not identified on the Vehicle Contact Face Sheet (VCFS). We have yet to see a Posse member noted as being on the scene of a traffic stop and listed on the Vehicle Contact Face Sheet in the nine months of samples we have reviewed. There were at least two instances in this sample where Posse members were on the scene but not noted on the VCFS by the initial deputy. Note: the Vehicle Contact Face Sheet is completed by the deputy on every traffic stop whether a citation is written or a warning issued. During our September 2014 site visit, CCID advised that a

---

[1] Failure to attend the training resulted in deselection from the Posse Program.

programming change had been made to the Vehicle Contact Form and if the deputy fails to indicate their unit number in the appropriate box, the system will not allow them to complete the form. The identity of personnel on such scenes is a core issue in this case, and we shall consistently evaluate the agency's measure of compliance with this requirement. We found that the deputies' serial numbers were listed on all required forms and identified on the VCFS. While progress was made, with 93% compliance, MCSO is not in compliance with this Subparagraph.

Paragraph 54.b requires MCSO to document the date, time and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 103 traffic stops in the sample indicate that this data is captured and is geocoded with the time the stop is initiated and the time the stop is cleared. We note that occasionally the CAD time of stop and end of stop times may not be exactly the same time as those listed on the Vehicle Contact Face sheet, due to extenuating circumstances the deputy may encounter. We found six instances where the start or end time on the VCFS differed by five minutes or more from the CAD printout. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from 3 or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. Since the CAD data system has been upgraded to include the geocoding of traffic stops, MCSO is in compliance with this Subparagraph.

Paragraph 54.c requires MCSO to document the license plate and state of the subject vehicle. In our First Quarterly Report there were three instances of the 94 where the vehicle stop did not result in the deputy indicating a tag number on the Vehicle Stop Contact form. We found in our Second Quarterly Report that deputies properly recorded the license plate and state of origin in all instances. For this review we found that 102 of the 103 traffic stop cases included the vehicle tag number and state of origin for a compliance rate of 100%. In the one exception the vehicle did not have a vehicle license plate displayed and that was the reason the deputy made the traffic stop. MCSO is in compliance with this Subparagraph.

Paragraph 54.d requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. There were a total of 103 traffic stops and in 37 of these stops, the vehicle was occupied by more than one occupant. The Vehicle Contact Face Sheet, completed by the deputy on every traffic stop, is utilized to capture the total number of occupants and contains a separate box on the form for that purpose. In four instances the deputy did not document the number of occupants of the subject vehicle and therefore, MCSO's compliance rate is 96% for this Subparagraph (see para. 54f). MCSO is in compliance with this Subparagraph.

Paragraph 54.e requires MCSO to document the perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into the occupant's ethnicity or gender is required or permitted). In thirty-seven of the 103 stops, there were more than one occupant in the vehicle. In our review of the traffic stops we identified four cases where the post stop race/ethnicity and gender for the driver was listed on the Vehicle Contact Face sheet as "unknown", in violation of MCSO policy. The compliance rate for identifying the race/ethnicity of the driver is 96%.

In the 37 traffic stops where passengers were in the vehicle, we found nine cases where the deputy failed to identify the race/ethnicity or gender of one or more passengers in each vehicle. We have been advised by MCSO that they have instructed the deputies not to indicate the word "unknown" when describing the race/ethnicity of drivers or passengers.  In one of these cases the deputy indicated the driver's name was the same as the passenger in the vehicle.  We were able to determine the passenger's name from the comments made by the deputy in the accompanying Incident Report.  The compliance rate for identifying the race/ethnicity of the passengers is 76%. This is not acceptable.

The stops included 46 white male drivers, 21 white females, 15 Hispanic males, 6 Hispanic females, 7 black males, 2 black females, 1 Indian/Alaskan male, and 1 Indian/Alaskan female. When the Bureau of Internal Oversight (BIO) conducts audits of the traffic stop data, they issue memorandums to the individual Districts so they are aware of the deficiencies and can provide corrective action.  We do review the internal audits and associated matrices conducted by MCSO and occasionally we will disagree with their findings.

There were 42 instances where deputies chose to issue warnings to drivers instead of issuing a citation.  The ethnic breakdown of those receiving warnings reflected the numbers indicated in the number of total stops.  The breakdown of those motorists issued warnings is as follows: 22 white males, 9 white females, 4 Hispanic males, 1 Hispanic female, 3 Black males and 1 Indian American/Alaskan male.  In two of the cases where warnings were issued in lieu of a citation the deputy failed to indicate the race/ethnicity of the driver.  We note that while deputies do a good job of completing the Arizona Traffic Complaint, their completion of the Warning/Repair form is lacking in thoroughness and accuracy.  They frequently fail to list the registered owner or fail to indicate the full description of the driver.  MCSO is aware of these deficiencies and is working to correct them.

We did review documentation where BIO would send memorandums to the District commanders when their audits found that deputies were not following protocol when completing required documentation for traffic stops.  Previously deputies did not indicate the race, ethnicity or gender of passengers when no contacts were made with them. The Order requires MCSO deputies to document the perceived race, ethnicity and gender of any passengers whether contact is made with them or not.  MCSO is aware of the deputies' failure to indicate the race/ethnicity of passengers when no contact is made with them and is working on a solution to include this documentation. The Order does not require the names of passengers unless a passenger is contacted and the reason for the contact is documented; in those instances where contact is made the passenger's name should be listed on the Vehicle Stop Form.

MCSO is not in compliance with this Subparagraph.

Paragraph 54.f requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname).  When we reviewed traffic stop documentation for our First Report, there were only two individuals identified during the 94

traffic stops that had queries (record checks) indicated on the CAD printout.  When we visited one of the Districts during our September 2014 site visit, we interviewed a deputy who indicated that license plate or driver record checks are made on almost every traffic stop.  We inquired further and the deputy produced a copy of a record check on the Intergraph "I/Viewer".  However, we did not receive the information from the Intergraph "I/Viewer system for our first report.   We did review 'I/Viewer' checks deputies had run for the September sample.    In addition, on the deputy's Mobile Data Computer (MDC), there is an icon that allows the deputy to run checks on the Justice Web Interface (JWI).  This system provides deputies additional tools that Intergraph CAD does not, such as photographs, criminal history and booking history. MCSO must provide a mechanism to verify the existence of all access to the JWI in the samples we request.  MCSO indicated in a memorandum dated October 8, 2014 that they will provide the documentation beginning with the October sample request.   MCSO has provided the JWI documentation for the October-December 2014 quarter for our review.

For this review we found that in the 103 traffic stops conducted all stops had license checks run and there were 77 (82 total checks including passengers) stops where the driver or one or more passengers had a warrant check run.  Four of these warrant checks were not listed on the Vehicle Contact Face Sheet and thus are in violation of the policy.     MCSO's compliance rate is 95% and is compliant with this Subparagraph.

Paragraph 54.g requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  There were four instances where deputies made contact with passengers.  In one case the reason for contact with the passenger was indicated as a "contact during a traffic stop"; this phrase is ambiguous and does not adequately describe the reason the deputy initiated the contact.   In another case the deputy made contact with a passenger to determine if she had a valid driver license due to the possibility of the vehicle being towed.  In the remaining two cases the deputy documented the reason for the contact: one a passenger seatbelt violation; and in the other, the passenger initiated the contact.  MCSO made several changes to the Vehicle Stop Contact Face Sheet during the previous quarter to better capture the reason for the stop and the reason the passenger was contacted by changing the check box on the form to a "fill in the blank section" requiring the deputy to indicate the precise violation or reason for the passenger contact.

To insure that deputies are accurately capturing passenger information and if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers on the Vehicle Contact Face sheet.  We also review the I/Viewer System and the Justice Web Interface to see if a record check was requested for anyone other than the driver.

Deputies must ensure that they explain why they made contact with any passengers.  Indicating moving, non-moving violation or contact during a traffic stop as a reason for the stop describes why they stopped the driver, but not why they made contact with any passengers.  Of the four cases where passengers were contacted, the deputies listed the name of the contacted passenger for three of the stops.  In the exception, the deputy listed the driver of the vehicle twice, once in the box marked for the driver and again in the box for the passenger.  We were able to determine

the passengers name by locating it in the Incident Report completed by the deputy.   In our experience the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care.  If contact with a passenger is made, deputies should indicate the name of the person contacted.  Due to the infrequent contact of passengers during traffic stops, deputies must be diligent in documenting passenger contacts as one or two violations have a direct impact on compliance.  MCSO's compliance rate for this Subparagraph is 75%.

Paragraph 54.h requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed and any indicators of criminal activity developed before or during the stop.  For this review, we took a random sample of 10 cases from the 34 cases we initially requested each month for a CAD audio review. (Note: for the December sample we requested 35 cases for review and 11 CAD audio recordings.) We listened to 31 CAD dispatch audio recordings from the sample of 103 used for this review and found that the deputies advised Communications of the location and license plate and state for all 31 stops.  The audio recordings we reviewed were clear and the deputy advised of the reason for the stop in all 31 of the cases.  There were 72 instances in the sample where we did not listen to the CAD audio tapes but did review the CAD printout where the reason for the stop, if advised by the deputy, is documented by the dispatcher.  In two instances, the documentation for the reason for the stop is not listed on the CAD report and it would indicate that either the deputy did not advise Communications of the reason or the dispatcher failed to list the reason for the stop on the printout. The CAD printout does document the time the stop begins and when it is concluded either by arrest, citation or warning.  We did find six instances where the deputy did advise dispatch of the reason for the traffic stop but indicated moving violation, "M" or signal 910 as the reason for the stop on the VCFS.   These comments by the deputy do not meet the requirements of the Order.  The issues were identified during MCSO's internal audit and our review.  MCSO's compliance rating for this Subparagraph is 98%.

Paragraph 54.i requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or the deputy's departure from the scene.  In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact forms created by MCSO along with the E-Ticketing system and the Arizona Ticket and Complaint form capture the information required.   As we noted in Subparagraph 54b, the stop times on the CAD printout and the Vehicle Contact Face Sheet varies slightly on occasion.  We understand that this may occur due to extenuating circumstances and we reported on those that were five minutes or more in duration from either the initial stop time or end time.

We understand that some stops vary in time for any number of reasons that may, or may not, be justified. We looked at all stops in our sample and determined that there were 16 traffic stops where the duration of the stop *may* have been excessive.  In one of the stops the deputy failed to describe the circumstances for the extension, while in the remaining 15 the deputies justified the reason for extending the stop.  Our review of the extended stops indicates that four individuals

were arrested and booked into a facility; there were six cases where the driver of the vehicle was charged with a criminal traffic offense and in the five remaining cases the deputy justified the extension of the stop.

The ethnicity and gender of the extended stops are as follows: nine white males, three Hispanic males, one white female, one black male, one male of Indian/Alaskan ethnicity and one male where the deputy failed to indicate the ethnicity of the driver on the Vehicle Contact Face Sheet. MCSO is in compliance with this Subparagraph with a compliance rating of 99%.

Paragraph 54.j requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual. Our review of the collection of the traffic stop data for this reporting period did not reveal any immigration status investigations. We have been advised that MCSO is no longer conducting immigration investigations when deputies are initiating traffic stops. We will continue to verify this assertion in our reviews.

On November 7, 2014 a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319 commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the Act and from extending the duration of traffic stops or other deputy-civilian encounters in order to do so.

MCSO is in compliance with this Subparagraph.

Paragraph 54.k requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and frisk search was performed on any individual. In our review we did not find any indications where an individual was asked for a consent search or of any individual who was frisked during the stop. We did find 12 cases where an arrest was made for a criminal traffic offense. In eight of these cases the violator was cited and released. In one case the violator received a warning for the traffic violation but was arrested and booked on an outstanding warrant. The deputy indicated a search incident to arrest on this case. In another case the driver was arrested and booked on a reckless driving charge. The other two cases involved DUI arrests where the violator was arrested and transported and the deputy failed to document a search incident to arrest, if one occurred. Although other MCSO policies were possibly violated as a result of the two DUI arrests, MCSO's compliance rate for this Subparagraph is 97% since in all but three cases reviewed the deputy did indicate whether a search was or was not made.

Paragraph 54.l requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. During our review of the

collected traffic stop data, there were no stops where contraband or evidence was seized during the reporting period.  MCSO is in compliance with this Subparagraph.

Paragraph 54.m requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In all 103 of the cases we found documentation indicating the final disposition of the stop, whether an arrest was made, a citation was issued, a warning was given, or a release was made without a citation.  MCSO's submission of the December sample included a duplicate case that they discovered prior to our review and advised us.  We mutually agreed to replace the duplicate with another traffic case in an email exchange.    MCSO is in compliance with this Subparagraph with a compliance rating of 100%.

In order to be compliant with Paragraph 54 of the Order, all Subparagraphs must be in compliance.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance


*Paragraph 55. MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

We reviewed Policy EA-5 (Enforcement Communications; effective September 5, 2014), which complies with the Paragraph requirement.

We met with the Deputy Chief of the Technology Bureau during our June 2014 site visit, who confirmed that the unique identifier went live when the CAD system was implemented in September 2013.  This number provides the mechanism to link all data related to a specific traffic stop.  The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time of the stop. We have visited the Communications Center (Dispatch) in previous site visits where we observed and listened to several traffic stops and conversed with dispatchers about how the unique identifier is assigned.

We visited two Districts for the July-September review and had an in-car demonstration of how the deputy inputs the traffic stop data into TracS.  Once the deputy scans the motorist's driver license the system automatically populates most of the information into one or more forms required by the Order.  If the data cannot be entered into TracS from the vehicle (malfunctioning equipment), policy requires the deputy to enter the data electronically prior to the end of the shift.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts and the unique identifier (CFS number) is automatically entered from the deputy's

MDT; no user intervention was required.  TracS Administrators discovered that the Event Number (unique identifier) was being duplicated on the vehicle stop forms.  The Event Number was previously auto-populated by CAD, however, when connection to CAD was lost because of dead zones, CAD populated the last known number, which assigned an incorrect number to the stop.  To overcome this deficiency, deputies must now manually enter the previously supplied unique Event Number on the vehicle stop forms; a warning alert is given prompting the deputy to confirm the number.

In order to determine compliance, we reviewed 103 traffic stop cases and reviewed the CAD printouts and the Vehicle Contact Forms for all stops.  We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment.  The unique identification number assigned to each event was listed on all CAD printouts for every stop, and the number was also listed on the Vehicle Contact Forms.  Policy EA-5, Enforcement Communications, effective September 5, 2014, has been disseminated and trained to.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

*Paragraph 56. The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

Policy EB-2 (Traffic Stop Data Collection), effective September 22, 2014, addresses the issue of regular audits and quality control checks.  We recommended in our First Quarterly Report that the policy distinguish between the two.  While audits require in-depth analysis, quality control checks are more of an inspection or spot check of the data. MCSO has made the required distinction between the two and changed the policy to comply.  We have not yet been provided with the protocol developed by MCSO for maintaining the integrity and accuracy of the traffic stop data.   MCSO originally indicated that the requirements of this paragraph would be included in GH-2 (Internal Investigations), but they may be more appropriate for the EIS (Early Intervention System) policy.

We were advised that MCSO conducted an audit of traffic stop data in January of 2014 and then again beginning in April 2014.  After the January 2014 audit, new handwritten forms were created to collect the data required by policy until full electronic data entry began on April 1, 2014.  MCSO advises that they are currently in the process of conducting another audit.  CCID advises that they have conducted spot audits that were directed at portions of data or the actions of individual deputies.  They did provide us with an inspection during our September 2014 site visit.  We reviewed the BIO's October – December monthly audits of the traffic samples and found them complete and thorough.  In order to be in compliance MCSO must provide the protocol specifically addressing the requirements for maintaining the integrity and accuracy of

the traffic stop data.  The approved policy requires regularly scheduled audits on a monthly, quarterly and annual basis.  At present, MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 57. MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014.  Every person contacted on a traffic stop will be provided with either an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. During this reporting period, there were 42 incidents where the deputy gave a warning to the motorist for a traffic violation and in nine of these cases, the deputy failed to have the violator sign the warning/repair form and in five instances the deputy wrote "SERVED" in the box requiring a signature for the warning.  In order to verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign the deputy may note the refusal on the form.  We cannot verify that motorists have been given a receipt without a signature on the form or the deputy advising of the refusal of the receipt from the driver.  Placing "SERVED" in the signature box without any explanation does not comply with the requirement.  MCSO's compliance for this portion of the Subparagraph is 67%.

In the 61 cases where drivers were issued citations, we found five instances where the driver did not sign the Arizona Traffic Citation.  In three of the cases, the deputies indicated a valid reason for not obtaining a signature and in the remaining two cases, they indicated "SERVED on the citation.

The approved policy dictates that the CAD system will be used for verification of the recording of the initiation of the stop.  The stop's termination is noted by the deputy verbally announcing the same on the radio.  CAD then permanently records this information.   Once MCSO acquires on-body recording equipment, policies must be developed which account for its use in verifying stop duration.

In order to address the use of in-car recording equipment to check on whether deputies are accurately recording stop length, MCSO developed a draft policy, EA-4, Use of Body Worn

Cameras, and provided the Monitor and the Plaintiff's with copies for our input on December 4, 2014. Recommendations were provided, and MCSO advises that a new draft is pending.

The Court amended, on October 10, 2014, the word "in-car" with "*on-person*" in the first sentence of Paragraph 57. (See also Paragraph 61).

MCSO is not in compliance with this subparagraph.

Compliance Status:
Phase 1: Not in Compliance
Phase 2: Not in Compliance

*Paragraph 58. The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

Policies GF-1 (Criminal Justice Data Systems ), effective November 7, 2006, and GF-2 (Criminal History Record Information and Public Records), effective January 7, 2000, state that all databases containing specific data identified to an individual comply with federal and state privacy standards and it limits access to only those employees who are authorized to access the system.

The policies go further to include that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona Statutes, the Department of Public Safety, the Arizona Criminal Justice Information System and that any violation is subject to fine. No secondary dissemination is allowed. We reviewed an internal MCSO memorandum of April 12, 2014 that required all TOC (Terminal Operator Certification) personnel in these positions to be re-certified on a new testing procedure developed by the Training Division and the Systems Security Officer. We previously met with two Deputy Chiefs who advised that MCSO had been vigilant in security of the data systems and had previously prosecuted violators and currently have one outstanding case in the system. We will continue to observe the security issues outlined in Paragraph 58 of this Order, but at present MCSO is in compliance with this Paragraph.

Compliance Status:
Phase 1: In compliance
Phase 2: In compliance

*Paragraph 59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If*

*proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

Electronic traffic stop data capture began on April 1, 2014.  In our review of 103 traffic stop cases from October 1, 2014 through December 31, 2014, there were two instances where the data provided by MCSO was written in by hand on the Vehicle Stop Contact form.  Both of these cases involved the motorist's signature on either the citation or warning/repair form.  The deputy did explain the reason in both cases and it was acceptable.  This form captures most of the traffic stop details required by MCSO policy and paragraphs 25 and 54 of the Order.  BIO provided the traffic stop data which included a spreadsheet of all traffic stops from October 1, 2014 through December 31, 2014, listing event numbers as described at the beginning of Section 8.  We then requested a stratified sample from all traffic stops.  With the exception of two vehicles, all patrol vehicles used for traffic stops are now equipped with the automated TraCS system, but there may be some deputies who have not yet been trained in TraCS data entry.  MCSO has provided full access to all available collected data since April 1st.  Electronic data were not collected before this time.  MCSO is in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not applicable
Phase 2:  In compliance

### b. Electronic Data Entry

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

We reviewed the approved MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014 and found them to be compliant with the provisions of the paragraph.  However, the system must be able to generate summary reports and analyses as well as be used to conduct searches of the data.  The requirement also includes that the system enable the deputies to enter the traffic stop electronically from the field.  If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

We have reviewed documents indicating that the Bureau of Internal Oversight (BIO) is conducting spot checks of the data and forwarding those instances of non-compliance to the Districts for action.  The CCID provided a memorandum on April 28, 2014, that indicates MCSO

was in the process of conducting an audit to determine the validity of the data captured.  We did receive from BIO an audit of the traffic stop data sample for October-December 2014 and upon our review found it to be thorough.  Initially the traffic stop data was captured on forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District.

As of June 30, 2014, there were 257 total vehicles equipped with the TraCS e-citation system. We were advised that at the end of the review period, 267 units were so equipped.  We looked specifically at all Districts for those units that are used to conduct traffic enforcement to ensure that deputies were able to enter the data electronically from the field.   Therefore, we did remove from the vehicle population those vehicles that were obviously specialized or special purposed, and are not used to conduct traffic stops. We reviewed a document from MCSO generated in October 2014 that indicated all but four of the 180 marked vehicles assigned to the Districts that are used to enforce traffic laws have TraCS currently installed.  During the December 2014 on-site visit, MCSO advised they now have 181 patrol vehicles and seven marked patrol vehicles that are not equipped with TraCS, for 96% compliance.

In addition, MCSO must provide documentation pertaining to the training of deputies that use electronic data entry systems for traffic stops.  During the June site visit, we were informed that training was being done through "train the trainer" processes, whereby EIS personnel train Supervisors who then train deputies under their command.  However, no documentation of said training had been created; therefore, MCSO is not able to document who has received this training and who hasn't. We spoke with a Deputy Chief during the December 2014 site visit who indicated that there is a new training and documentation process being developed by the Training Division to identify those deputies who have received TraCS training.   We reiterated that a process of memorialization for training was required by the Order. Therefore, while progress is being made, MCSO is not in compliance with Paragraph 60.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

### c. Audio-Video Recording of Traffic Stops
*Paragraph 61. The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date. MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date. Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

During our September 2014 on-site visit we met with two MCSO Deputy Chiefs and other staff to discuss the progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops.  MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring on-body video and audio recording devices for their deputies. We believe this is a prudent choice in that it allows for capturing additional data, where a fixed mounted camera has limitations.  The change will capture more citizen interactions when contact is away from the vehicle.

On October 10, 2014 the Court issued an Order providing an amendment/stipulation for Paragraph 61 of the Court's Order of October 2, 2013.  The stipulation strikes the word "in-vehicle" and adds the phrase "*issued-on-person" audio and video equipment*."  The Order goes on to state that *"issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa Board of Supervisors."*

During the December 2014 site visit we met with the Deputy Chief of Technology and staff from BIO and CCID and were advised that MCSO personnel visited an out-of-state agency to view their operation of body-worn cameras.  MCSO advised that their request to the County Board will be to purchase 700 body cameras, 150 docking stations and 50 individual docking stations for those deputies who do not regularly report to District Offices.

CCID is developing recommendations for field personnel to participate in drafting the business requirements for on-body cameras.  When the procurement process is finalized, MCSO must develop a policy/protocol to address the requirements for the use of the video/audio recording of every traffic stop, and the security and maintenance of associated equipment.  The policy must address, in addition, what deputies are required to do if equipment is malfunctioning, as well as the documented process of how such malfunctions are reported and serviced.  MCSO did provide a draft policy, EA-4, Use of Body Worn Cameras, which did not meet all of the requirements. The Monitoring Team and the Plaintiffs provided input on the draft, and a new policy will be forthcoming.  MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 62. Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

In the Court's amended Order of October 10, 2014, the word "in-vehicle" should be struck from the first sentence of Paragraph 62.

MCSO has evaluated on-person body cameras from other jurisdictions and have decided on a vendor (Taser International).  We have suggested that MCSO deputies conduct a functionality test at the beginning and end of their tour of duty.  When the policy is developed it must state the requirement that deputies are subject to discipline if they fail to activate and use their recording equipment and it must address how non-functioning equipment will be repaired or replaced.  At present MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.*

Policy EB-2 (Traffic Stop Data Collection) includes the requirement that MCSO retain written traffic stop data completed on the Vehicle Stop Contact form for a minimum of five years after it is created, unless a case involving a traffic stop remains under investigation by the Office or is subject of a Notice of Claim, civil litigation or criminal investigation, in which case MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals.  They have developed a protocol and a policy that requires the original hard copy form to be kept at the division level and filed separately for each deputy.  When a deputy is transferred, his written traffic stop information will follow him to his new assignment.  MCSO has yet to develop a protocol for reviewing the in-car (now on-body) camera recordings and for responding to public records requests in accordance with the Order.  This policy must address the retention of recordings.  MCSO is not in compliance with this Paragraph.

The Court, in an Order issued October 10, 2014, amended the last sentence of Paragraph 63 as follows:  *"MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to review by the District Court to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections.  The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order*

*approving the use of on-body cameras as set forth in this stipulation.  The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras."*

MCSO developed and submitted a draft policy, EA-4, that did not meet the requirements of the Paragraph.  We, along with the Plaintiffs provided the agency with suggestions to correct the deficiencies in the proposed draft.  MCSO advised that they have incorporated our concerns into a new draft that would be submitted in the near future.  In order to be compliant the new policy governing the use of on-person cameras must consider accountability measures to ensure compliance, activation of video cameras for traffic stops, review of camera recordings and response to public records request.  Therefore, until the policy is approved, disseminated and trained to, they remain not in compliance with the requirements of the Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

### d. Review of Traffic Stop Data
*Paragraph 64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014) and EB-2 (Traffic Stop Data Collection, dated September 22, 2014), the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014), and responses to the Monitor production requests related to this paragraph (dated January 26, 2015).  A draft EIS policy was also received by the Monitor and Plaintiff Attorneys in September, 2014.  Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014.   The EIS policy remains under development and review.

However, none of the aforementioned policies sufficiently address the issue of protocols to look for warning signs or indicia of possible racial profiling or other improper conduct.  Therefore, MCSO is not in Phase 1 compliance at this time.

We also reviewed information obtained from MCSO staff interviews conducted during the December 2014 site visit.  Members of the EIU (Early Intervention Unit) responsible for the EIS system were able to show evidence of investigations based upon data they had compiled from Vehicle Stop Contact Forms entered into the TraCS system.  During the site visit, we discussed how EIU staff conducts analyses of traffic stop data to identify cases of "outliers" that might involve racial profiling or other misconduct.  In general, we learned that the EIU staff sets "alerts" (identifying cases that require further review beyond a spreadsheet analysis) based on

assumptions made about excessive activities (e.g., more than 10 traffic stops in a month by a single officer). MCSO personnel recognize that setting alerts in this fashion creates an arbitrary boundary that may or may not uncover all inappropriate behavior. Therefore, while they have begun the inspection of traffic data, they have not developed a protocol that adequately captures the requirements of Paragraphs 54 to 59. MCSO is in the process of contracting with persons who can assist them in the development of this protocol. We will continue to advise on and observe this process. Finally, in addition to conducting these analyses MCSO should develop a template for describing why some alerts may be cleared while others warrant investigation. At present MCSO only provides a table of alerts and investigations without any additional information.

EIU staff would prefer to use statistical methods for identifying outliers, such as setting alerts for those officers two to three standard deviations from the mean behavior for the unit, but such criteria will have to wait until MCSO hires their own consultant on research methods. In addition, EIU has provided documentation about their current methodology used to conduct analyses for indications of racial profiling. While the documentation did provide valuable insight into what EIU staff considers "outliers", "racial profiling", and "improper conduct", it continues to lack information about how their opinion will be supplanted with more sophisticated techniques for detecting cases of improper conduct. For example, the documentation in January 2015, in response to our request, does a good job of describing how analysts currently review traffic stop data on a weekly and monthly basis (note, there is no mention of quarterly or annual analyses). However, as was discussed during our December 2014 site visit with EIU staff, the current methodology is too qualitative to satisfy the requirements of the Order. MCSO stated that they intend to identify more sophisticated statistically valid methodologies with outside experts who have been identified. Once the contract with the outside experts is finalized, MCSO recommended that the Monitor's team meet with them (and EIU and BIO Staff) to discuss methodologies. At present, while EIU staff is working in earnest to address the requirements of this paragraph, MCSO is not in compliance with Paragraph 64.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

We reviewed all the updated documentation set forth in Paragraph 64 above (MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014), EB-2 (Traffic Stop Data Collection, dated September 22, 2014), and the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014)). Additionally a draft EIS

policy was received by the Monitor and Plaintiff Attorneys in September, 2014. Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014. The EIS policy remains under development and review at this time. We also received information obtained from MCSO staff interviews conducted during the December 2014 site visit that have bearing on our compliance review. While MCSO has designated the EIU as the unit to conduct the monthly and quarterly analyses of data, in particular in the draft EIS policy, consistent with this Paragraph they are still in the process of negotiating with an outside contractor to assist with the annual analysis. In addition, the manner of data analyses conducted up to this time, while informative, does not allow for the statistically defensible approach implied by this Paragraph. Therefore, MCSO is not in Phase 1 compliance with Paragraph 65.

During the December visit, we reviewed detailed information provided by MCSO staff about their approach to identifying individual-level, unit-level, or systemic problems. The discussion was based on the documentation, "Protocols to Analyze Traffic Stop Data," dated October 8, 2014 that describes the analytic steps used to conduct weekly and monthly analyses. Subsequent documents recently provided by EIU staff delineates the criteria used by the EIU to identify cases requiring investigations of potential racial profiling. This document mirrors what we learned from our December 2014 visit—that thresholds used for identifying potential cases are arbitrarily set. For example, one of the criterion involves looking for outliers after comparing deputies making 10 traffic stops a month in one zip code to other deputies making 10 traffic stops in the same zip code in terms of percentages of race or ethnicity in post stop perceived race or ethnicity. The percentages used are not based on any systematic statistical analysis, which renders them to be qualitative rather than quantitative. According to the documentation, problems are identified at the zip code level, but not at larger geographic levels or district-wide. Thus, protocols that the Order requires MCSO staff to use in identifying potential cases of biased-policing at the individual-level, unit-level, and systemic-level still do not exist.

According to the draft EIS policy the newly formed Bureau of Internal Oversight (BIO) incorporates the Early Intervention Unit (EIU). As of this writing we have received a draft policy covering the EIS Process, and the responsibilities of the EIU. However, MCSO must develop a policy that specifically identifies the review group that will conduct the monthly, quarterly, and annual analysis of traffic stop data. The policy must include the requirement that the review group members recuse themselves from analyzing data pertaining to their own activities. This latter issue will be moot if MCSO hires an outside consultant as indicated in the December site visit interviews. MCSO must also develop a protocol delineating the methodological (including statistical) tools and techniques that the review group will use to conduct the periodic analyses. At present MCSO is not in compliance with Paragraph 65.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or*

*IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

MCSO provided documentation on January 27, 2015 stating "[T]he analytic benchmarks for the annual agency wide review of data has not yet been established."  During the December 2014 site visit, MCSO staff informed us that one of the top priorities of the newly formed BIO will be to work with an outside expert to develop a proposed methodology and benchmarks for conducting the annual, agency-wide comprehensive analysis.  This methodology will include establishing a protocol for the annual, all-agency comprehensive review of data.  It must include benchmarks previously reviewed by the Monitor and it must describe the methodological (including statistical) tools and techniques that will be used to conduct the annual evaluation. These benchmarks may include aspects of analyses currently used by the EIU that incorporate data from IA Pro/Blue Team.  However, the incorporation of these data needs to be approved by the Monitor as outlined in Section IV of the Order.  Until those documents are developed and evaluated MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 67. In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

*a.       racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

*b.       evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

*c.       a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

*d.       indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

*e.        other indications of racial or ethnic bias in the exercise of official duties.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014) and EB-2 (Traffic Stop Data Collection, dated September 22, 2014), the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014), and responses to the Monitor production requests related to this paragraph (dated January 26, 2015). A draft EIS policy was received by the Monitor and Plaintiff Attorneys in September, 2014. Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014.  The EIS policy remains under development and review.  None of the aforementioned

policies sufficiently develops measures, methods and protocols to conduct a statistical analysis as prescribed by this Paragraph.  Therefore MCSO is not in Phase 1 compliance.

MCSO has begun conducting analyses of traffic stop data, looking for outliers or persons who have triggered particular alerts, but these types of analyses are not sufficient to address the requirements of this Paragraph.  We will continue to work with MCSO and their designated contractors in future review periods.

In addition we reviewed information obtained first-hand from MCSO staff interviews conducted during the December 2014 site visit.  We continue to find that while the EIU has begun doing investigations of data compiled from Vehicle Stop Contact Forms and the EIU personnel now have documented their methodology for conducting these investigations, the methodology they are using, while seeking to comply with the intent of the Order, does not provide a statistically defensible approach in identifying warning signs or indicia of racial profiling or other police misconduct.  This also pertains to the list of other criteria offered by MCSO that will be included above and beyond those specified in Paragraph 67.  In addition, the protocol should ensure that the criteria will be used in the annual, comprehensive, agency-wide evaluation required by Paragraph 66.  Finally, in addition to conducting these analyses MCSO should develop a template for describing why alerts may be cleared while others warrant investigation.  At present MCSO only provides a table of alerts and investigations without any additional information.  A well-defined template would eliminate the perception that both the alerts and the investigations may be arbitrary.  MCSO is not in compliance with Paragraph 67.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 68. When reviewing collected patrol data, MCSO shall examine at least the following:*
a. *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*
b. *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*
c. *the tactics employed during the Significant Operation and whether they yielded the desired results;*
d. *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*
e. *the resource needs and allocation during the Significant Operation; and*
f. *any Complaints lodged against MCSO Personnel following a Significant Operation.*

As referenced in Paragraph 36, MCSO has finalized, distributed and trained personnel to a Significant Operations Policy GJ-33. Therefore the department has achieved Phase 1 compliance with this paragraph.

During the December 2014 site visit, we were informed that one Significant Operation had occurred during the period from October to December of 2014 – Operation Borderline – which was a drug interdiction effort described completely in Section 6: Pre-Planned Operations. In response to a request for documentation for this paragraph, CCID personnel produced a Memorandum, dated January 12, 2015, stating that CCID had contacted the Chief of Patrol and Enforcement Support Bureau and the Chief of Detectives and Investigations Bureau, who both stated that no applicable Significant Operations had occurred during this reporting period that involved only traffic patrol. We believe that this Paragraph references Significant Operations as described in Section 6, and the one operation described in that section complies with the requirements of this Paragraph.

Compliance Status:
Phase 1: In compliance
Phase 2: In compliance

*Paragraph 69. In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

As noted elsewhere in this report MCSO has provided a new draft of the EIS policy which incorporates the Blue Team reporting system that allows supervisors to make regular notations about the traffic stop activity of persons under their command. While this policy has yet to be approved, MCSO is conducting ongoing training for Blue Team as noted in a memorandum pertaining to this Paragraph dated January 27th, 2015. Therefore, MCSO is not in Phase 1 compliance at this time.

MCSO's memorandum in response to the request for information for this paragraph describes a new drop down menu for supervisors making notations about their subordinates that allows the supervisor to choose from a list of MCSO policies regarding the notations they are making. These include EA11-Arrest Procedures, CP2- Code of Conduct, CP3-Workplace Professionalism, CP8- Preventing Racial and Other Biased based Profiling, EB1-Traffic Enforcement, Violator contact and Citation Issuance, and EB2-Traffic Stop Data Collection, among other criteria.

The EIS policy is now also purported to include an EI Pro component that allows supervisors to review all information, except the details of internal and external complaints, regarding persons

under their command.  In addition, supervisors are able to use a drop down menu that would trigger concerns the supervisor has about deputies' "workplace professionalism", "preventing Racial and Other Biased based Profiling" and the like as enumerated in this memorandum.  In addition, MCSO provided the supervisory notes from October 20th to December 31st, 2014.  As noted in the memorandum, there is not one particular way for supervisors to draft these notes indicating a particular problem.  EIU personnel and command staff will regularly review these notes for indications of problems with deputy behavior with the drop down menu mentioned above.  A review of the 324 Supervisory Notes attached to this memorandum shows that supervisors are reviewing the traffic stop activity of their subordinates.  Included in these notes are descriptions of the type of traffic stops deputies are involved in as well as the race and ethnicity of the persons they come into contact with.  The majority of these notes indicate deputies are meeting the requirements of their position.  However, there are also clear examples of deputy behavior that has caused the supervisor to include a negative appraisal and counseling to their subordinate, including notations about their failure to stay up-to-date on e-learning systems and a lack of evidence of patrol activity.  These positive or negative appraisals can be viewed by deputies and their supervisors, with the addition of EI Pro.  However, MCSO should develop a method by which they can capture these aberrations in a swift and effective manner.  In coming site visits, this will be a major issue to address with EIU and supervisory personnel.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 70. If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

As noted in response to Paragraphs 64 and 65, we have reviewed EB 1 (Traffic Enforcement, Violator Contacts and Citation Issuance) as well as EB 2 (Traffic Stop Data Collection).  In addition a draft EIS policy was received by the Monitor and Plaintiffs' Attorneys in September, 2014.  Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014.  We also met with several CCID and EIU staff during the December site visit regarding issues related to this paragraph.  Several concerns were raised with MCSO about definitions and protocols in earlier drafts of the EIS policy.  Since the EIS policy remains under development and review MCSO is not in Phase 1 compliance with Paragraph 70.  In addition, we

note below that the documentation describing the "alert" of problematic behavior is not sufficient to judge whether any particular alert may have been "cleared" prematurely.

In response to the latest documentation request MCSO has produced a new draft policy that will be reviewed and returned with comments.   Also in response to the latest request for documentation MCSO has included a memorandum for Paragraphs 67 and 74 that includes a description of the audits, analyses and protocols to be employed by the EIU.  These protocol descriptions are general in nature but refer to "alert triggers" that will be included in the "Early Intervention Program Supervisors Manual" as described in a memorandum dated November 19, 2014.  We will address the sufficiency of that list with the review of the proposed EIS policy.

EIU staff has provided memoranda on their methodology used to analyze traffic stop data on a weekly and monthly basis.  These documents, and communication during the site visit, have clarified how EIU personnel try to identify "outliers", "racial profiling", and "improper conduct". Members of the Monitoring Team will continue working with EIU staff to fine-tune their analysis.  However, as we have noted in earlier paragraphs, MCSO should develop a statistically defensible process that excludes as much as possible the arbitrary and artificial setting of "alert" thresholds.

The EIU also produced a memorandum regarding this Paragraph, dated January 27th, 2015, detailing the process they conducted in response to the data request for Paragraphs 65, 67, 74 and 70, since they dealt with similar issues but requested different specific details.  For example, the memorandum notes that in October of 2014 the review of TraCS data indicated that seventeen deputies' activity required further analysis.  After review of these 17 cases, only one required further investigation which led to counseling of a deputy about the proper way to fill out the TraCS forms.  In both November and December of 2014, the data of ten and nine deputies, respectively, resulted in a closer look and in each month there is an ongoing investigation of a single deputy's actions. While illuminating, these descriptions lack the details necessary to adequately judge whether the clearing of these alerts was appropriate.  This appears to be a judgment call on the part of EIU personnel conducting the investigation.  However, there is no memorialization of why these alerts were unfounded.  This remains an area of concern that we will continue to raise with MCSO until such time as they draft requirements, or create a template, that requires that these internal reviews result in a document supporting such outcomes.

Furthermore, this memorandum notes that analysis of TraCS data yielded no indication of INS inquiries by deputies or the contacting of ICE/CBP.  Finally, alerts for the use of "unknown" for post stop perceived ethnicity occurred in 92 instances from October 1st to December 31st of 2014. Of these, 18 involved continued investigation beyond the EIU team and four of these remain open; several were closed with counseling or training of deputies and one turned out to be a false alert.  However, once again, there is no report that explains who conducted the investigations, and why they came to the conclusions they did.  We will continue to work with MCSO on issues such as these to improve the transparency of such alert investigations and reviews.  At present MCSO is not in compliance with this Paragraph.

Compliance Status:

Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 71. In addition to the underlying collected data, the Monitor and Plaintiffs'
representatives shall have access to the results of all Supervisor and agency level reviews of the
traffic stop and patrol data.*

We have been provided access to all existing data.  Several memoranda have shown that not all
personnel have been trained in all aspects of Blue Team, and the new EI Pro component of the
EIS is still under review and installation. However, to this point we have had access to all data
that we have requested.   We will continue to expect unfettered access to these reviews as they
are completed.

Compliance Status:
Phase 1:  Not applicable
Phase 2:  In compliance

**Section 8: Early Identification System (EIS)**

**COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

***a. Development and Implementation of the EIS***
*Paragraph 72. MCSO shall work with the Monitor, with input from the Parties, to develop,
implement and maintain a computerized EIS to support the effective supervision and
management of MCSO Deputies and employees, including the identification of and response to
potentially problematic behaviors, including racial profiling, unlawful detentions and arrests,
and improper enforcement of Immigration-Related Laws within one year of the Effective Date.
MCSO will regularly use EIS data to promote lawful, ethical and professional police practices;
and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units
and shifts.*

The Early Intervention Unit (EIU) staff continues to do a noteworthy job of providing data,
conducting audits, and developing an EIS system that incorporates pieces of information from
across the organization.  This was accomplished without the benefit of an over-arching policy to
guide them.  This early experience culminated in a draft policy provided on September 4, 2014 to
the Monitor Team and the Plaintiffs' Attorneys, who suggested several changes and
modifications.   The EIS policy was returned to MCSO on October 16, 2014.   MCSO has
provided an additional draft policy after the close of the review period.  In coming weeks we will
evaluate the changes proposed and relay that information to MCSO.

MCSO is not in Phase 1 compliance with this Paragraph.

While several physical components of the EIS system are in place – IA Pro, TraCS, and Blue Team – MCSO is proposing the addition of EI Pro which would afford supervisors direct access to the historical information about deputies under their command.  This is in response to earlier critiques of their existing data processes.   In addition, according to training records, much of the training has been accomplished for Blue Team, aside from persons out on medical or other leave. In coming reviews, we will insure that training for the newest components, which have yet to be completely installed, is properly documented.   Notwithstanding these developments, there remain significant issues being addressed in the continued revision of an over-arching EIS policy.  For example, a major issue with Blue Team, as it stood during this reporting period, was when and how first line supervisors would be able to access information pertinent to the people under their command.  During the reporting period, EIU personnel maintained control over access to these data.  During the September site visit we made it clear that first line supervisors must have immediate access to information regarding the deputies assigned to them at all hours of the day.   MCSO offered alternatives that were equally unacceptable.   However, at the December site visit we were informed that MCSO was evaluating the inclusion of EI Pro into the EIS system.  With this new component, supervisors would have immediate access to all deputy information, except for internal and external complaints, which would have to be requested from the Professional Standards Bureau.  First line supervisors would benefit from having access to, at a minimum, summary or aggregate information regarding complaints without the need to interact with the Professional Standards Bureau.  We will continue to work with MCSO to evaluate and overcome these issues.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance


*Paragraph 73. Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

The EIU has come together well to this point.  It is coordinated by a Lieutenant, with three Sergeants working investigations, one analyst and one administrative staff.  MCSO has provided an up-to-date organizational chart for the Bureau of Internal Oversight that incorporates the EIU personnel.  The EIU staff  continue to conduct Pre-EIS data analysis, since there is not yet an approved EIS policy, using data they have compiled from across the organization: CAD, RMS, Blue Team, TraCS, etc.  MCSO is not in Phase 1 compliance with this Paragraph.

Several issues remain from past site visits or reports pertaining to the sufficiency of data entry and inclusion even though the EIU unit has been organized as outlined above.  Some of these

issues are technological in nature and others result from inadequate training or personnel unable to enter data into the electronic system.

For instance, in a memo from the Deputy Chief  of the Technology Bureau in response to a request for information, we were advised that the current RMS system does not accommodate the incorporation of Incident/Field Based Reporting narratives into the data sharing system; therefore, MCSO is in the process of developing the necessary forms in TraCS.

A major concern expressed in the First and Second Quarterly Reports pertained to the backlog of Vehicle Stop Contact Forms (VCSF) that accumulated at District Offices prior to the automation and training for TraCS.  This issue was raised during both the September and December site visits. In a follow-up memorandum responding to a request for documentation, we were advised that all hard copies have been entered into the automated system, including over two hundred that had accumulated in Lakes Patrol and District 7.   The complete automation of TraCS means that the deputies themselves are now responsible for data entry, with EIU personnel conducting integrity audits.  However, during the December site visit we were also apprised of the fact that some Districts continued to have several hundred "open" VCSF's in TraCS as the result of missing information that would not allow the form to be closed.  We will continue to work with the Operations Audit/Inspections Unit to follow these issues.

A second issue raised in both the September and December site visits, as well as the Request for Documentation, regarded whether all of the vehicles on routine patrol assignments were supplied with equipment to facilitate TraCS entry.   In response to requests regarding Paragraph 60, MCSO has shown that over 98% of all patrol vehicles have TraCS equipment installed. Moreover, the Sheriff's Department has now put in place a tracking system to be able to ascertain the status of equipment available to patrol personnel.  We will evaluate this system during our next site visit.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 74. MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

As mentioned above, a draft EIS policy was received by the Monitor and Plaintiff Attorneys in September, 2014.  Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014.   The EIS policy remains under development and review. Therefore, MCSO is not in Phase 1 compliance with this Paragraph.

We have asked for clarification of the definitions included in the draft EIS policy including, but not limited to, "biased–based policing", "critical incidents", "County Attorney Actions", and the like.  In a memorandum responding to a request for documentation the EIU has further clarified

these definitional issues.  Once MCSO has created a new draft proposal, we can evaluate if these problems have been ameliorated.  This will require input from both the Monitor Team and Plaintiffs' Attorneys.

In addition, at the September and December site visits, EIU personnel provided insight into the ways that they used the data to conduct weekly and monthly analysis looking for "outliers", "potential questionable behavior", and "racial profiling".  As a result of these discussions we requested more documentation to support the analysis conducted.  Similar to our observations in Paragraphs 64 and 65, the documentation provided in January of 2015 does provide insight into what EIU personnel are doing, but the process remains largely "qualitative" since they rely heavily on judgments of EIU personnel.  MCSO is in the process of contracting with an outside vendor to develop a quantitative protocol for these alerts and investigations.  In addition, while MCSO appears to be capturing the necessary information through the alert settings, the way in which they arrived at these alert thresholds remains unclear.  From the documents they have provided, it remains ambiguous how and why these alerts are cleared or transferred for further processing to District personnel.  We will continue to work with MCSO to clarify these issues. We have recommended that MCSO develop an "alert" protocol or template that includes a description of what judgments may lead an EIU personnel to clear an alert, or, in the case of further processing by District personnel, what the outcome of that process is and why.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 75. The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*
*a.  all misconduct Complaints or allegations (and their dispositions), excluding those*
*made by inmates relating to conditions of confinement or conduct of detention officers (i.e.,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*
*b.  all internal investigations of alleged or suspected misconduct;*
*c.  data compiled under the traffic stop data collection and the patrol data collection mechanisms;*
*d.  all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*
*e.  all arrests;*
*f.  all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*
*g.  all arrests in which the individual was released from custody without formal charges being sought;*

h. *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*
i. *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*
j. *all disciplinary action taken against employees;*
k. *all non-disciplinary corrective action required of employees;*
l. *all awards and commendations received by employees;*
m. *Training history for each employee; and*
n. *bi-monthly Supervisory observations of each employee.*

The EIS policy outlining the data elements and processes remains under development and review.  Therefore, MCSO is not in compliance with this Paragraph.

Some of the issues raised in past evaluations of the draft policy are definitional; for instance, in 75a the IR Memorialization (IRM) includes the concept of biased-based profiling but does not define it, and, in 75c (IRM) we suggested that MCSO should provide definitions of Investigatory Stop Violations and Incidental Contacts.  Plaintiffs' Attorneys have also suggested a more complete definition of "County Attorney Actions" in 75f, g, h and i.  Issues such as these can be easily rectified.    Others involved access to the data for Supervisory personnel who, under previous versions of the draft policy, were not able to review information for deputies under their command without the assistance of EIU personnel or their designees.  The purported introduction of EI Pro in the most recent formulation of EIS software appears to afford such access for Supervisors.  However this will have to be confirmed through onsite examination.

Finally, as noted in Paragraph 73, the Technology Bureau Chief has advised that they are working to insure that Field reports are included in the data that combines to make the entirety of the EIS data system.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 76. The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

EB-2 (Traffic Stop Data Collection) requires the capture of the information necessary for EIU personnel to link an officer's traffic stops, along with the racial and ethnic make-up of those stopped, to the actions the officers take in those stops.  In addition, the integrity analyses conducted by our personnel have shown that this information is rarely missing from the TraCS data supplied by MCSO.    MCSO is in compliance with this Paragraph.

Compliance Status:

Phase 1:  In compliance
Phase 2:  In compliance

*Paragraph 77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

As noted above, during our September and December site visits, the issue of "necessary equipment, in sufficient amount and in good working order" was requested from MCSO.  As noted in Paragraph 73, MCSO provided documentation that over 98% of vehicles assigned to Districts for patrol activities are already equipped with TraCS.  Moreover, in the rare event that a TraCS vehicle is not available, or the vehicle equipment is not working, each District has equipment within their offices that would allow a deputy to input their traffic stop information before the end of their shift (EB 2 Traffic Stop Data Collection, 4A1).  In addition, the Deputy Chief of the Technology Management Bureau has included a memorandum in response to our document request that comprehensively shows the deployment of personal computers and printers across the Districts and Specialty Units.  The memorandum is also a testament to the security of the system.  At present it would appear that the technology and equipment available meet the requirements of the Order.


Compliance Status:
Phase 1:  Not applicable
Phase 2:  In compliance

*Paragraph 78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

As noted previously the EIS policy remains under development and review.  Therefore, MCSO is not in Phase 1 compliance with this paragraph.

Prior to the September site visits a draft EIS policy was received by Monitor and Plaintiffs' attorneys on September 4, 2014.  This document was returned to MCSO on October 16, 2014 with extensive comments from both Monitor personnel and Plaintiff Attorneys.  In response to a document request for this report, MCSO provided a new draft EIS policy on February 23, 2015.  Future reports will discuss this latest policy effort.

In addition, The Deputy Chief of the Technology Management Bureau provided a memorandum in response to Paragraph 77 that is also pertinent to Paragraph 78.   On page 2 of this memorandum, dated October 17, 2014, there is a description of the security of the database and server.   At present, MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

*Paragraph 79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

In the absence of a finalized EIS policy, or a fully integrated database as noted previously, MCSO personnel in the EIU have done a notable job pulling together data to conduct analyses looking for behavior that may appear to be outside the norm. However, at present MCSO is not in Phase 1 compliance with this Paragraph.  A new draft of the EIS policy is under development and the Chief of the Technology Bureau has enumerated in a memorandum provided after the December site visit how they are developing new forms in TraCS to deal with the inadequacies of the current RMS system to integrate Incident/Field Based Reporting narratives into the data sharing system.

We were apprised of the weekly and monthly audits being conducted by EIU personnel during the December site visit.  Subsequently, MCSO has provided a memorandum dated February 12, 2015 that enumerates the alerts discovered during the fourth quarter of 2014 through the use of TraCS and IA Pro.  Of the 411 alerts found during this period, 106 were sent out for what is presumed to be additional investigation by supervisors or District Staff.  However, it should be noted that at the December site visit, EIU personnel were notified that a chart enumerating these alerts would not be sufficient without a descriptive report explaining how alerts are cleared by EIU personnel and what the follow-up with District personnel involves. These reports were not included with the memorandum.  Therefore, while these descriptions were discussed in detail during the December meeting, there was no follow-through that allows us to understand what causes some alerts to be cleared quickly and what causes further investigation.  For instance, we can see from the chart that there were 30 External Complaints as noted by IA Pro, but only 14 of these were sent out for investigation.  It is crucial that we be apprised of the details surrounding these decisions.

Therefore, while EIU personnel are doing well during this pre-EIS stage, they need to be more comprehensive and detailed in the process and production of their reports.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

**b. Training on the EIS**
*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

As noted above and in a memorandum for Paragraph 80 dated January 26th, 2015, the EIU is currently developing a new version of the EIS policy.  However, at this point since the policy has not yet been approved MCSO is not in Phase 1 compliance with this Paragraph.

According to statements made by MCSO personnel at the December site visit, the EIS system includes an addition to the IA Pro software named EI Pro that allows supervisors and commanders in the Districts to access data for people under their command.  The sufficiency of these changes will be evaluated during the next site visit.

MCSO has provided a detailed description of the training plans and dates that were taking place in January and February of 2015 with regard to both Blue Team and EIS.  An evaluation of this training will also be incorporated into future reports. The concerns regarding previous versions of the Blue Team process included the lack of unfettered access to information for first line supervisors and District command staff about personnel under their command.  EIU personnel previously had control over access to this data and supervisors needed to request information from them.   During the December site visit, MCSO was informed that this would be unacceptable, as first line supervisors should be able to access information about their personnel at any time of the day.  Now that MCSO has acquired the EI Pro addition to EIS, we will review its functionality to monitor supervisory training material as it becomes available.   The memorandum for the above Paragraphs shows the Blue Team notations made by supervisors and command staff.  These notations appear to respond to many of the concerns brought to the attention of MCSO during past site visits and document requests.

 However, as a result of the limitations outlined above, MCSO is not in compliance with Paragraph 80.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

*a.       comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

*b.       identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

*i. failure to follow any of the documentation requirements mandated pursuant to*

*this Order; ii. racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

*iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers; iv. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

*v. Complaints by members of the public or other officers; and vi. other indications of racial or ethnic bias in the exercise of official duties;*

*c.       MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

*d.       a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

*e.       identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

*f.       a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's*

*assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

*g.      a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

*h.      an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

*i.      mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

The EIS policy and the protocols to be used by supervisory personnel remain under development and revision.  Therefore, MCSO is not in Phase 1 compliance with this Paragraph.  Both the Monitor and Plaintiffs' Attorneys have made suggestions and comments on the draft EIS policy and returned same to MCSO on October 16, 2014.  Highlights of those suggestions for this Paragraph include: 1) delineating a more thorough description of the threshold limits for actions that could result in an alert and including it in the policy; including how the EIU may set different thresholds depending on the assignment of any given deputy (81f); 2) training on EIS should be included in the checklist of training and MCSO should attempt to capture which individuals received training in TraCS, since there is no memorialization of this at present; 3) as noted previously in the discussion of alerts related to racial profiling, MCSO should consider a more robust operationalization of this concept in a way that is understandable to all parties; and 4) create a protocol or template for EIU and District personnel to further memorialize how alerts are cleared, forwarded for additional investigation, or result in counseling or retraining.   At present, MCSO is not in compliance with Paragraph 81.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

## Section 9: Supervision and Evaluation of Officer Performance

## COURT ORDER X.  SUPERVISION  AND  EVALUATIONS  OF  OFFICER PERFORMANCE

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

### a. General Duties of Supervisors

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain*

*arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

We have reviewed all policy submissions and the policy requirements for Paragraph 83 are covered under GC-17 (Employee Disciplinary Procedure) that was revised on September 5, 2014. MCSO's policy is in compliance with Paragraph 83.

We conducted interviews with supervisors and commanders from two districts during our December visit to determine if there is compliance with the policy. In our interview with the District 6 Commander, he advised us that Field Interview (FI) cards are automated into the Justice Web Interface (JWI), which provides a searchable index. There is no review of FI cards by supervisors. In regard to field supervision, sergeants are encouraged to go by every call and required to go by every critical call.

We conducted interviews with a District 4 supervisor and a District 4 Commander. The supervisor indicated that he responds to all arrests but rarely goes by any other stops, and that supervisors review, sign and date all incident reports. The Commander indicated that District 4 deputies do not complete Field Interview (FI) cards. The commander stated that the same information that would go on an FI card could be placed in the CAD Alpha Page, where it can be stored for later review. In MCSO's document submission of seventeen (17) Field Interview cards, four (4) were completed in District 4. The only district that did not complete an FI card was District 7. Deputies and sergeants do not complete daily activity reports in either District 4 or District 6.

We reviewed a representative sample of incident reports for the months of October, November, and December of 2014 to check for supervisory reviews. We reviewed incident reports for the randomly selected dates of October 31, November 22, and December 10. A total of one hundred and forty-six (146) incident reports were evaluated for timeliness of supervisory reviews. For October 31, forty-four (44) reports were reviewed. Of the forty-four (44) reports, thirty-five (35) had been reviewed, signed, and the date of the review was memorialized, as required by this paragraph. Of the forty-four (44) reports, nine (9) were reviewed at least five (5) days after the completion of the report. The longest time elapsed for an incident report before the supervisory review was completed was forty-seven (47) days. Of the forty-four (44) reports, nine (9) were crash reports that were signed by a supervisor, but do not contain the supervisor's date of review.

For November 22, forty-eight (48) reports were reviewed: thirty-three (33) had been reviewed and signed by a supervisor, and the date of the review was memorialized as required by this paragraph. Ten (10) incident reports had been signed but not memorialized with the date of the review; nine (9) of the ten (10) incidents, which did not have a date of review were crash reports. Of the forty-eight (48) reports, one (1) was reviewed six (6) days after the completion of the report; another was reviewed twenty (20) days after the completion of the report.

For December 10, fifty-four (54) reports were reviewed.  Of the fifty-four (54) incident reports, thirty-four (34) were signed by a supervisor and the date of the review was memorialized as required by this paragraph.  Of the fifty-four (54) reports, ten had been reviewed by a supervisor and the date of the review was memorialized but the review was conducted at least six (6) days after the completion of the report; the longest time lapsed for an incident report before the supervisory review was completed was thirty-eight (38) days. Four (4) crash reports were reviewed and signed by a supervisor, but the date of the review was not memorialized.   In addition, four (4) crash reports contained the name of the supervisor, but not the supervisor's signature or date of review.

We reviewed seventeen (17) Field Interview (FI) cards that were completed in the review period. The FI cards are done in the Justice Web Interface (JWI). There is no evidence of supervisory review in any of the completed FI cards; the FI information format on JWI does not have a field to capture or memorialize supervisory review.


Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 84. Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

We reviewed GB-2 (Command Responsibility), dated April 19, 1996 and Briefing Board 14-43, (Immediate Change to GB-2), dated May 1, 2014, as they pertain to Paragraph 84 which requires that, within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified supervisor and that first-line supervisors shall be assigned to supervise no more than 12 Deputies.  GB-2, as written, is non-compliant in that it states that no individual shall report to more than one (1) commander or supervisor at any given time but does not state that it would be a single, consistent and clearly identified supervisor.  GB-2 also does not require that first-line supervisors shall be assigned to supervise no more than 12 Deputies. The proposed changes to the policy outlined in the Briefing Board will not address all of these issues, particularly that all patrol deputies shall be assigned to a single, consistent, clearly identified supervisor. In Order to be compliant, GB-2 must include these requirements. On November 16, 2014, we received MCSO's Third Quarter Report.  In the report, MCSO states that they continue to work on GB-2, Command Responsibility.   MCSO is not in Phase 1 compliance with this Paragraph.

We reviewed monthly rosters and shift rosters for October, November, and December of 2014 for Districts 1, 2, 3, 4, 6, 7, and Lake Patrol as proof of Phase 2 compliance.  Monthly and daily rosters show that deputies are assigned to one single consistent supervisor and supervisors are

assigned no more that twelve (12) deputies. With the exception of Lake Patrol, all districts are completing monthly rosters. Lake Patrol has daily shift rosters that are updated when personnel transfer in and out. For better tracking of personnel and for consistency throughout the districts, it is recommended that Lake Patrol also complete monthly personnel rosters.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Deferred

*Paragraph 85. First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

We have reviewed MCSO's policy submissions and the requirements for Paragraph 85 are covered under EB-1 Rev. 09/22/2014 (Traffic Enforcement, Violator Contacts, and Citation Issuance) as revised on 9/22/2014. EB-1 is in compliance with Paragraph 85. EB-1 (Rev. 09/22/2014) states, "Supervisory Responsibilities: First line supervisors shall individually discuss the traffic stops made by each deputy under their supervision at least one time per month. The discussion shall include whether the deputy detained any individuals and the reason for such detention, and whether any stops involved immigration issues."

We have reviewed MCSO's submission as proof of compliance with Paragraph 85. A document request was made for MCSO to provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. The documentation requested was for one randomly selected supervisor from each district, and the squad of deputies that reports to that supervisor. Only one supervisor out of seven (7) had documentation of discussions related to stops or detentions, for all deputies reporting to the supervisor; the documentation only covered two of the three months of the review period, and only the last month's comments covered the requirements of this paragraph. A second supervisor submitted documentation of the discussions related to stops and detentions with one (1) deputy from his squad. The discussions covered the last two (2) of the three (3) months of the review period, but the comments did not cover the requirements of this paragraph.

MCSO submitted the following information in response to our request for proof of Phase 2 compliance with this paragraph, "Per the Bureau of Internal Oversight, the 'supervisor note' function within Blue Team was not in place in October 2014, and Blue Team training for the Patrol Bureau was not complete until December of 2014. There were only two sergeants from the follow-up request who had entries fitting the request parameters."

It is further noted that supervisors need to specify the month they are reviewing with the deputy, and include comments regarding all stops and detentions, not only traffic. These discussions

need to address whether the deputy made any stops or detentions during the preceding month, the reason for the stop or detention, and whether the stop or detention involved any immigration issues.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

We reviewed Policy GB-2 (Command Responsibility), with regard to the Paragraph 86 requirement that on-duty field supervisors shall be available throughout their shift to provide adequate on-scene field supervision to deputies under their direct command and, as needed, to provide supervisory assistance to other units. Paragraph 86 also requires that supervisors shall be assigned to work the same days and hours as the deputies they are assigned to supervise, absent exceptional circumstances.  GB-2 is non-compliant in that it does not address the Paragraph 86 requirements. GB-2 is under review and revision by MCSO.  Policy GB-2 must include the Paragraph 86 requirements cited above in order to be compliant. On November 16, 2014, we received MCSO's Third Quarter Report.  In the report, MCSO states that they continue to work on GB-2, Command Responsibility.

We conducted interviews of supervisors from District 4, and District 6, in our December 2014 site visit. The supervisor from District 4 that was interviewed stated that he responds to all arrests but rarely goes by any other type of call. The supervisor stated that he has regular contact with his subordinates but does not document these contacts. We conducted an interview with the captain in charge of District 6. The captain from District 6 stated that supervisors are encouraged to go by every call, but are required to respond to every critical incident. MCSO has now standardized monthly rosters, and all districts, with the exception of Lake Patrol, are using the standard format. We reviewed monthly rosters and shift rosters from all the districts for the months of October, November, and December of 2014.  The rosters show supervisors working the same days and hours as the deputies that report to them.  However, MCSO deputies and supervisors are not presently completing daily activity reports.  There is no documentation that can be audited, of contacts that occur throughout the shift between supervisors and deputies, and no documentation that supervisors are responding to incidents in the field.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

We have reviewed the submissions and the policy requirements for Paragraph 87 covered under GC-17, which was revised on September 5, 2014 (Employee Disciplinary Procedure). MCSO's policy is in compliance with Paragraph 87.

GC-17 (Rev. 9/15/2014) states, "Commanders and supervisors shall be accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of performance evaluations or through non-disciplinary corrective action, or through the initiation of a formal investigation and the disciplinary process, as appropriate."

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  GC-4 must include the requirement of Paragraph 87 since it directly relates to Performance Appraisals. Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this paragraph.

We requested the performance appraisals for all deputies and supervisors who were evaluated during the review period. We reviewed thirty-six (36)[2] performance evaluations submitted for deputies who received evaluations between October 1, 2014, and December 31, 2014. We also reviewed performance appraisals for fifteen (15) sergeants who received performance appraisals in the time period being reviewed. All fifteen (15) evaluations of the supervisors contained an assessment of the quality and effectiveness of their supervision.  Eleven (11) of the fifteen (15) supervisor performance evaluations did not contain comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.  In one performance evaluation, the employee (a supervisor) signed the performance appraisal four (4) months after the reviewer had completed the evaluation.  In another appraisal, the employee (a supervisor) signed the appraisal three (3) months after the review had been completed.  Performance appraisals should be provided to the employee in a timelier manner in order to provide feedback and to assist the employee with correcting areas of underperformance as quickly as possible, as well as to acknowledge areas of strong performance.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

---

[2] MCSO submitted thirty-seven (37) but one was a duplicate performance appraisal.

*b. Additional Supervisory Measures*

*Paragraph 88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

MCSO has taken the position that they no longer have Specialized Units that enforce immigration laws.  During discussions with CCID and MCAO Attorneys, we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.

During the previous evaluation period, MCSO and their attorneys articulated that the three criminal violations they believe qualify as potentially immigration related include: human smuggling, forgery, and misconduct with weapons.  During our December site visit we were informed that MCSO was disbanding the Criminal Employment Unit, which was part of the Special Investigation Division. We requested the monthly arrest and enforcement statistics for the months October, November and December of 2014, which includes all reports related to immigration status investigations, any immigration related crime, or incidents or arrests involving lack of identity. We have reviewed MCSO's submissions and discussed our findings in our review of Paragraph 89 compliance.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319 commonly referred to as the Arizona Human Smuggling Act.   On November 17, 2014, MCSO issued Administrative Broadcast 14-75 prohibiting deputies from enforcing the above statute including arresting, detaining, or questioning persons for suspected (or even known) violations of the Act and from extending the duration of traffic stops or other deputy-civilian encounters in order to do so.

Compliance is deferred until such time as we verify the disbanding of the Criminal Employment Unit, and we review the mission statement, policies and operations documents of ATU to verify MCSO's assertion that this Paragraph is not applicable to that Unit.

Compliance Status:
Phase 1: Deferred
Phase 2: Deferred

*Paragraph 89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The*

*Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

We reviewed the following documents submitted by MCSO as policy documentation relative to Paragraph 89 requirements: EA-11 which was revised on September 5, 2014 (Arrest Procedures), GC-17 which was revised on September 5, 2014 (Employee Disciplinary Procedure); proposed EB-1 which was revised on September 22, 2014 (Traffic Enforcement, Violator Contacts, and Citation Issuance). The requirements of the paragraph are covered as a result of the combination of these policies.

We requested to inspect all reports related to immigration status investigations, any immigration related crime, or incidents or arrests involving lack of identity. The incident reports submitted were for the period from October 1, 2014 to December 31, 2014. The MCSO submission consisted of nineteen (19) incident reports that occurred during the time period requested. The request produced reports as follows: District 1- 3 reports, District 2 - 2 reports, District 3 - 2 reports, District 6 - 2 reports, Lake Patrol - 4 reports. We reviewed fourteen (14) arrest reports for Lack of Identity Documents for the period in review.  Out of fourteen (14) arrests, six (6) were not reviewed by a supervisor within 72 hours; Eleven (11) had no documentation that a supervisor was notified prior to the commencement of the investigation or arrest; three (3) were cited as traffic violators and released, with no Incident Report associated.  Only one (1) Lack of Identity arrest of fourteen (14) was in 100% compliance.

As a corrective measure, the Bureau of Internal Oversight recommended that policy GF-4, Office Reports, include a directive that requires MCSO deputies to sign and date the face sheet of the report to memorialize that it was turned in before the end of the shift.  The recommendation also includes additional training for deputies and supervisors on this issue.

MCSO has yet to establish daily activity reports for deputies and supervisors.  Daily activity reports can be used document any arrests or investigations related to immigration, immigration related crime, identity fraud, or lack of identity documents, and corresponding supervisory approvals or disapprovals.  A supervisor's daily activity report may also be used to document any deficiencies or corrective actions related to any arrest or investigation in violation of MCSO policy.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 90. MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not*

*authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014. EA-11 states that deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently review the reports. If the incident did not include an arrest or detention, the supervisor shall review the IR within seven calendar days, absent exigent circumstances. Supervisors shall review reports and forms for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy, or referring the incident for administrative review or criminal investigation. We reviewed EA-11 that was revised on September 5, 2014, and it is in compliance with Paragraph 90.

We reviewed thirty-four (34) incidents involving traffic stops for October of 2014.  Out of thirty-four, three (3) had the required documented supervisory review within the 72 hour timeline. Only those stops that had an Incident Report associated with it had documentation of supervisory review.  The remaining thirty-one (31) stops had Vehicle Stop Forms, and in some instances also traffic citations, but none of these contained any notations or signatures from a supervisor indicating that a review had taken place, and the date of the review.  There are no notations or signatures on the Vehicle Stop Forms indicating the time they were submitted, so we are unable to verify if any were turned in by the end of the deputy's shift as required by this paragraph.

We reviewed thirty-four (34) incidents involving traffic stops for November of 2014.  Out of thirty-four stops, three (3) had the required documented supervisory review within the seventy-two (72) hour timeline.  Only those stops that had an Incident Report associated with it had documentation of supervisory review.  Two (2) other traffic stops with Incident Reports associated had documented supervisory review on the Incident Report, but not within the seventy-two (72) hour time requirement. The remaining twenty-nine (29) stops had Vehicle Stop Forms, and in some instances also traffic citations, but none of these contained any notations or signatures from a supervisor indicating that a review had taken place, and the date of the review. There are no notations or signatures on the Vehicle Stop Forms indicating the time they were submitted, so we are unable to verify if any were turned in by the end of the deputy's shift as required by this paragraph.

We reviewed thirty-five (35) incidents involving traffic stops for December of 2014.  Out of thirty-five stops, two (2) had the required documented supervisory review within the seventy-two (72) hour time requirement.  Only those stops that had an Incident Report associated with it had documentation of supervisory review. One (1) other traffic stop with an Incident Report associated with it had a supervisor's signature on the Incident Report, but it was not dated within the seventy-two (72) hour time requirement. The remaining thirty-two (32) stops had Vehicle Stop Forms, and in some instances also traffic citations, but none of these contained any

notations or signatures from a supervisor indicating that a review had taken place, and the date of the review.  There are no notations or signatures on the Vehicle Stop Forms indicating the time they were submitted, so we are unable to verify if any were turned in by the end of the deputy's shift as required by this paragraph.

Only eight (8) Incident Memorialization Forms were submitted for the period of October 1, 2014 to December 31, 2014 (nine were submitted but two Incident Memorialization Forms were for the same incident).  This still appears to be a very low number considering the total number of incident reports completed on a quarterly basis.  Of the eight (8) Incident Memorialization forms submitted, only one (1) was completed within 72 hours.  The remaining seven (7) were completed between five (5) and nineteen (19) days after the incident occurred.  Seven (7) of the eight (8) Memorialization Forms had a corrective action listed.  One Memorialization Form made reference to an attachment that was not included.  The deficiencies noted were lack of articulation, missing elements of the crime, failure to read Miranda warnings, lack of probable cause for arrest, and improper procedure.  All deficiencies were addressed through counseling and training. There were two (2) Incident Memorialization Forms done for the same incident and one number in the Internal Affairs (IA) Incident Memorialization Form sequence was skipped.  It appears MCSO is still working out issues with the format.

MCSO does not presently have a process to record the time when deputies turn in documentation related to investigatory stops and detentions to their supervisor, so we are unable to ascertain if deputies are submitting this documentation before the end of their shift.  MCSO does not presently have the capability to sort out all stops that involve investigatory detentions for review. MCSO advised us that they will work with the Technology Department to correct both issues.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

EB-1 Revised September 22, 2014 (Traffic Enforcement, Violator Contacts and Citation Issuance) is compliant with the Paragraph 91 requirements.

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014. EA-11 states that deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently

review the reports. If the incident did not include an arrest or detention, the supervisor shall review the IR within seven calendar days, absent exigent circumstances. Supervisors shall review reports and forms for boilerplate or conclusory language; inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy; or referring the incident for administrative review or criminal investigation. We reviewed EA-11 that was revised on September 5, 2014, and it complies with Paragraph 91.

We reviewed traffic stop data for October of 2014.  Thirty-four (34) reports for traffic related events were submitted.  MCSO reported that of the thirty-four (34) reports, fifteen (15) traffic related events had no deficiencies noted. Thirty-five (35) potential issues were discovered. A breakdown of the deficiencies discovered per district is as follows: District-1 with 25.7%; District 2 with 42.8%; District 3 with 11.4%; District 4 with 2.8%; District 7 with 8.5%; and Lake Patrol with 8.5%.

MCSO found that of the thirty-four (34) reports submitted, one (1) incident report was not memorialized within the timelines outlined in MCSO Policies and Procedures; five (5) had TRACS training issues; in two (2) the CAD times did not match times annotated on the Vehicle Stop Forms; in six (6) Vehicle Stop Contact Forms the post stop perceived race/ethnicity did not match with the Citation or Written Warning; three (3) Vehicle Stop Contact Forms had missing, incomplete, or inaccurate information; one (1) Vehicle Stop Contact Form did not document additional units on the scene; five (5) were instances of missing, incomplete or inaccurate information on Citations, Written Warnings, Incidental Contact Forms or incident reports; two (2) Vehicle Stop Contact forms did not record the perceived post stop race/ethnicity; in one (1) stop the deputy ran an MVD/NCIC check on subjects who did not appear on the Vehicle Stop Contact Form; in three (3) stops, the receipts did not contain a signature or acknowledgement that the subject was served and did not contain the reason for the lack of signature or service.

We reviewed traffic stop data for November of 2014.  Thirty-four (34) reports for traffic related events were submitted.  MCSO reported that of the thirty-four (34) reports, eleven (11) traffic related events had no deficiencies noted. Forty-four (44) potential issues were discovered in the remaining 23 traffic stops. A breakdown of the deficiencies discovered per district is as follows: District-1 with 20.5%; District 2 with 20.5%; District 3 with 20.5%; District 4 with 9%; District 6 with 0%; District 7 with 2.3%; and Lake Patrol with 27.2%.

MCSO found that of the thirty-four (34) reports submitted, two (2) incident reports were not memorialized within the timelines outlined in MCSO Policies and Procedures; three (3) had TRACS training issues; four (4) the CAD times did not match times annotated on the Vehicle Stop Forms; in nine (9) Vehicle Stop Contact Forms the post stop perceived race/ethnicity did not match with the Citation or Written Warning; three (3) Vehicle Stop Contact Forms had missing, incomplete, or inaccurate information; four (4) Vehicle Stop Contact Forms did not document additional units on the scene; six (6) were instances of missing, incomplete or inaccurate information on Citations, Written Warnings, Incidental Contact Forms or incident

reports; four (4) Vehicle Stop Contact forms did not record the perceived post stop race/ethnicity; in two (2) traffic stops the deputy ran an MVD/NCIC check on subjects who did not appear on the Vehicle Stop Contact Form; in five (5) stops, the receipts did not contain a signature or acknowledgement that the subject was served and did not contain the reason for the lack of signature or service; in two (2) instances the passenger did not appear to have been issued a receipt for a Citation, Written Warning or Incidental Contact Form; in two (2) stops, the reason for the stop on CAD was not the same as the one listed in the Vehicle Stop Contact Form.

The MCSO Bureau of Oversight discovered that the "served" box on Citations, Written Warnings and Incidental Contact Forms was only visible in the TRACS system.  It was not visible when forms are printed. MCSO stated that this issue was scheduled to be fixed by the end of November of 2014.  Training was also recommended to ensure deficiencies in capturing data are addressed.

We reviewed traffic stop data for December of 2014.  Thirty-five (35) reports for traffic related events were submitted.  MCSO reported that of the thirty-five (35) reports, fourteen (14) traffic related events had no deficiencies noted. Thirty-one (31) potential issues were discovered in the remaining 21 traffic stops. A breakdown of the deficiencies discovered per district is as follows: District-1 with 29%; District 2 with 19.4%; District 3 with 5.7%; District 4 with 0%; District 6 with 3.2%; District 7 with 16.1%; and Lake Patrol with 32.3%.

MCSO found that of the thirty-five (35) reports submitted, one (1) Lack of Identity investigation was conducted and the incident report does not indicate the supervisor was made aware of the investigation; one (1) incident report was not memorialized within the timelines outlined in MCSO Policies and Procedures; in three (3) incidents the CAD times did not the match times annotated on the Vehicle Stop Forms; in six (6) Vehicle Stop Contact Forms the post stop perceived race/ethnicity did not match with the Citation or Written Warning; one (1) Vehicle Stop Contact Form had missing, incomplete, or inaccurate information; two (2) Vehicle Stop Contact Forms did not document additional units on the scene; eight (8) were instances of missing, incomplete or inaccurate information on Citations, Written Warnings, Incidental Contact Forms or incident reports; in two (2) traffic stops the deputy ran an MVD/NCIC check on subjects who did not appear on the Vehicle Stop Contact Form; in three (3) stops, the receipts did not contain a signature or acknowledgement that the subject was served and did not contain the reason for the lack of signature or service; in two (2) instances the passenger does not appear to have been issued a receipt for a Citation, Written Warning or Incidental Contact Form; in one (1) stop the reason for contacting the passenger was not stated or was ambiguous; in four (4) stops, the reason for the stop on CAD is not the same as the one listed in the Vehicle Stop Contact Form.

The MCSO Bureau of Internal Oversight discovered that the "served" box on Citations, Written Warnings and Incidental Contact Forms was only visible in the TRACS system.  It was not visible when forms are printed. MCSO stated that this problem had been scheduled to be fixed by the end of November of 2014, however this did not occur. MCSO stated that progress has been made and the solution may be in place by January 2015.

Eight (8) Incident Memorialization Forms were submitted for the period of October 1, 2014 to December 31, 2014 (nine were submitted but two Incident Memorialization Forms were for the same incident). This still appears to be a very low number considering the total number of incident reports completed on a quarterly basis. Of the eight (8) Incident Memorialization forms submitted, only one (1) was completed within 72 hours. The remaining seven (7) were completed between five (5) and nineteen (19) days after the incident occurred. Seven (7) of the eight (8) Memorialization Forms had a corrective action listed. One Memorialization Form made reference to an attachment that was not included. The deficiencies noted were lack of articulation, missing elements of the crime, failure to read Miranda warnings, lack of probable cause for arrest, and improper procedure. All deficiencies were addressed through counseling and training. There were two (2) Incident Memorialization Forms done for the same incident and one number in the Internal Affairs (IA) Incident Memorialization Form sequence was skipped. It appears MCSO is still working out issues with the format.

MCSO is conducting periodic inspections of investigatory stops and detentions to ensure the deficiencies are identified and addressed. While we support BIO conducting reviews and identifying issues associated with specific stops and detentions, this Paragraph requires that the first line supervisors identify these issues as part of their review of their subordinates' activities. BIO should continue its efforts, but to the extent that they routinely identify deficiencies that supervisors fail to identify, MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

EA-11 was revised on September 5, 2014 (Arrest Procedures), and EB-1 was revised on September 22, 2104 (Traffic Enforcement, Violator Contacts, and Citation Issuance). EB-1 is compliant in that it states supervisors shall track each deputy's deficiencies or violations and the corrective action taken, in order to identify deputies who need repeated corrective action. EB-1 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops. EB-1 states that supervisors shall track, through the Early Intervention System (EIS), each deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action. EB-1 also states

supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations. EB-1 also states that MCSO shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete thorough and accurate reviews of deputies' investigatory detention and stops. EB-1 meets the requirements of Paragraph 92.

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph. GC-4 must include the requirement of Paragraph 92 since it directly relates to Performance Appraisals. Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this paragraph.

We requested all performance appraisals done for deputies and supervisors during the review period. We reviewed the performance evaluations of fifteen (15) sergeants who received performance appraisals in the time period being reviewed. Five (5) of the fifteen (15) appraisals contained an assessment of the quality and completeness of the supervisor's reviews.  None of the supervisors had any discipline taken against them during the period of evaluation. In one performance evaluation, the employee (a supervisor) signed the performance appraisal four (4) months after the reviewer had completed the evaluation.  In another appraisal, the employee (a supervisor) signed the appraisal three (3) months after the review had been completed. Performance appraisals should be provided to the employee in a timelier manner in order to provide feedback and to assist the employee with correcting areas of underperformance as quickly as possible, as well as to acknowledge areas of strong performance.

In response to our request for proof of compliance, MCSO submitted the following response:
"Review of deputies EIS profile is currently accomplished through the Blue Team dashboard. This dashboard displays colored lights. Red shows an alert has been set, Yellow shows one incident away from an alert. Green shows more than one incident away from an alert. The dashboard does not record when a supervisor looks at a deputy's EIS profile. We have received requests from supervisors concerning information in an employee's EIS profile and we have provided the information requested.  However, there is no tracking method in place to record or track these requests."

"The Maricopa County Sheriff's Office has purchased from the IA Pro vendor, CI Technologies, a new program called EI Pro. The Sheriff's Office is beta testing the original version of EI Pro. This program does record when a supervisor looks at a specific incident in a deputy's profile. In the actual user log for the specific IA Pro incident, the following is recorded:

"EIPRO: Employee user name [S…] accessed incident XXXX, where XXXX is the specific IA PRO internal number for the incident."

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 93. Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

EA-11 (Arrest Procedures) as revised on September 5, 2014 states that deputies shall submit documentation of all stops, investigatory detentions and arrests to their supervisors by the end of the shift in which the action occurred.   EA-11 that was revised on September 5, 2014 is compliant with Paragraph 93.

We reviewed forty-four (44) incident reports for the month of October 2014.  These incident reports were from a randomly selected date of October 31, 2014. Twenty-eight (28) of the forty-four (44) incident reports were memorialized within the seventy-two (72) hour time requirement. Nine (9) incident reports were signed but not dated. Seven (7) incident reports were signed and dated by a supervisor after the seventy-two (72) hour time requirement; the time lapse from the completion of the report to memorialization in these seven (7) reports varied from five (5) days to forty-seven (47) days.

We reviewed forty-eight (48) incident reports for the month of November 2014.  These incident reports were from a randomly selected date of November 22, 2014. Thirty-three (33) of the forty-eight (48) incident reports were memorialized within the seventy-two (72) hour time requirement. Ten (10) incident reports were signed but not dated.  Two (2) incident reports were signed and dated by a supervisor after the seventy-two (72) hour time requirement; the time lapse from the completion of the report to memorialization in these two were five (5) days for one and twenty (20) days for the other. Three (3) reports were not memorialized.

We reviewed fifty-four (54) incident reports for the month of December 2014.  These incident reports were from a randomly selected date of December 10, 2014. Thirty-four (34) of the fifty-four (54) incident reports were memorialized within the seventy-two (72) hour time requirement. Four (4) incident reports were signed but not dated.  Four (4) incident reports have the supervisor's name printed on the report but no signature or date.  Eleven (11) incident reports were signed and dated by a supervisor after the seventy-two (72) hour time requirement; the time lapse from the completion of the report to memorialization in these eleven (11) reports ranged from six (6) days to thirty-eight (38).  One (1) report was not memorialized.

MCSO has no auditable method to document that Deputies are completing reports before the end of their shift.  MCSO reported that they are working on a solution.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that*

*indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

Our process for verification consists of reviewing supervisors' documentation of any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  MCSO submitted policies EA-11 that was revised on September 5, 2014 (Arrest Procedures).  EA-11 states that supervisors shall document any arrests that appear unsupported by probable cause or are otherwise in violation of Office policy; or indicate a need for corrective action or review of Office policy, strategy, tactics, or training. Supervisors shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved deputy, and/or referring the incident for administrative or criminal investigation.    EA-11 is in compliance with the requirements of Paragraph 94.

MCSO's submission cover sheet indicated that eight (8) incidents were submitted as proof of compliance with Paragraph 94, for the period of review from October 1, 2014 to December 31, 2014.  Only seven (7) reports were submitted.  The seven (7) reports were submitted as arrests that were unsupported by probable cause or were otherwise in violation of MCSO policy, or indicated a need for corrective action or review of agency policy, strategy, tactics, or training. With the exception of one (1) report that included a "decline prosecution notification" from the Maricopa County Attorney, there was no documentation as to the reason the reports were submitted as part of Paragraph 94 compliance.  Three of the incidents involved an actual physical arrest, three incidents involved citations to appear in court, and one was a robbery report with no arrest. In four (4) of the seven incidents, the supervisor did not review and memorialize the review within 72 hours.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 95. Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

We have reviewed EA-11 (Arrest Procedures) as revised on September 5, 2014 and the policy meets most of the requirements of Paragraph 95.   Both EIS and a Performance Evaluation System are in development. Paragraph 95 states that supervisors shall use EIS to track each

subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify deputies needing repeated corrective action. EA-11, revised on September 5th, 2014 (Arrest Procedures) is compliant with these requirements.  EA-11 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops.  EA-11 states that supervisors shall track, through the Early Intervention System (EIS), each deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action. EA-11 also states supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations.

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph. GC-4 must include the requirement of Paragraph 95 since it directly relates to Performance Appraisals. Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this paragraph.


We reviewed performance appraisals for thirty-six (36) deputies and sixteen (16) supervisors who had received an evaluation between October 1, 2014 and December 31, 2014.  Two (2) of the deputy Performance Appraisals that were reviewed showed formal written disciplinary actions had been taken.   Five (5) deputies had noted deficiencies and received counseling.  None of the thirty-six (36) deputy Performance Appraisals reviewed had any dimension rated as "Improvement Needed".    In addition, none of the appraisals reviewed contained any documentation of subordinates' violations or deficiencies in arrests.  Finally, none of the sixteen (16) Performance Appraisals for supervisors had any disciplinary activity, and none had any dimension rated as "Improvement Needed."


Given the absence of an EIS or governing policy, MCSO is not in compliance with Paragraph 95.


Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance


*Paragraph 96. A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*


We reviewed EA-11(Arrest Procedures) which was revised on  September 5, 2014 and the policy meets the requirements of Paragraph 96.  EA-11 states that Command level personnel shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of Office policy; or, that indicate a need for corrective action

or review of Office policy, strategy, tactics, or training.  The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and make recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.

We reviewed eight (8) completed Incident Report Memorialization Forms (nine (9) were submitted but two (2) were for the same incident) submitted for the period of October 1, 2014 to December 31, 2014. Of the eight (8) Report Memorialization Forms, six (6) had been reviewed by a command level officer within the 14-day time requirement. Three Incident Report Memorialization Forms had not been reviewed by a command level officer. The Incident Report Memorialization Forms have designated areas for chain of command signatures, but none were signed.  The total amount of Incident Memorialization Forms submitted seems low considering the number of incident reports that MCSO completes in a period of three months.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

*Paragraph 97. MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision.  We have not seen evidence that MCSO is compliant with requirements of Paragraph 97. Until such time as GC-4 is published, and we confirm that the requirements of Paragraph 97 are covered by policy, MCSO is not in Phase 1 compliance with this paragraph.

In response to our request for proof of compliance, MCSO submitted the following response:

"Review of Deputies EIS profile is currently accomplished through the Blue Team dashboard. This dashboard displays colored lights. Red shows an alert has been set, Yellow shows one incident away from an alert and green shows more than one incident away from an alert. The dashboard does not record when a supervisor looks at a Deputy's EIS profile. We have received requests from supervisors concerning information in an employee's EIS profile and we have provided the information requested.  However, there is no tracking method in place to record or track these requests."

"The Maricopa County Sheriff's Office has purchased from the IA Pro vendor, CI Technologies, a new program called EI Pro. The Sheriff's Office is beta testing the original version of EI Pro. This program does record when a supervisor looks at a specific incident in a Deputy's profile. In the actual user log for the specific IA Pro incident, the following information  is recorded:

"EIPRO: Employee user name [S…] accessed incident XXXX, where XXXX is the specific IA PRO internal number for the incident."

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

### d. Regular Employee Performance Review and Evaluations

*Paragraph 98. MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first line supervisor access issues identified in Section IX (Early Intervention System).   MCSO is not in compliance with Paragraph 98.

MCSO has not submitted the updated policy GC-4, Performance Appraisals. GC-4 is still under revision. Until the policy is revised and meets the requirements of Paragraph 98, MCSO is not in compliance.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

Policy GC-4 (Performance Appraisals) is currently under revision and will purportedly contain the requirements of Paragraph 99.  We will verify once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO believes that the IA Pro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first line supervisor access issues identified in Section IX (Early Intervention System).

MCSO has not submitted the updated policy GC-4, Performance Appraisals. GC-4 is still under revision. Until the policy is revised and meets the requirements of Paragraph 98, MCSO is not in compliance.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of Paragraph 100.  We will verify once we receive a draft of the completed policy as well as the EIS policy.

We reviewed 15 supervisors' Performance Evaluations submitted for the period of October 1, 2014 to December 31, 2014. Sixteen (16) Performance Appraisals were submitted, but one (1) was for a recently promoted sergeant who was evaluated as a deputy. The quality of supervisory reviews is not addressed in twelve (12) of the fifteen (15) Performance Appraisals. One supervisor's Performance Appraisal was signed four (4) months after the appraisal was completed. Another supervisor's Performance Appraisal was signed three (3) months after the appraisal was completed. We recommend that in order for Performance Appraisals to be effective, they should be provided to the employee in a timelier manner.

Compliance Status:
Phase 1: Not in compliance
Phase 2: Not in compliance

*Paragraph 101. Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*
*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

MCSO has taken the position that they no longer have Specialized Units that enforce immigration laws.  During discussions with CCID and MCAO Attorneys, we have suggested that applicable immigration laws and immigration related crimes, as those terms are defined in the Order, be identified.  From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.

During the previous evaluation period, MCSO and their attorneys articulated that the three criminal violations they believe qualify as having the potential to be immigration related include: human smuggling, forgery, and misconduct with weapons.  During our December site visit we

were informed that MCSO was disbanding the Criminal Employment Unit, which was part of the Special Investigation Division. We requested the monthly arrest and enforcement statistics for the months October, November and December of 2014, which includes all reports related to immigration status investigations, any immigration related crime, or incidents or arrests involving lack of identity. We have reviewed MCSO's submissions and discussed our findings in our review of Paragraph 89 compliance.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319 commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75 prohibiting deputies from enforcing the above statute including arresting, detaining, or questioning persons for suspected (or even known) violations of the Act and from extending the duration of traffic stops or other deputy-civilian encounters in order to do so.

Compliance is deferred until such time as we can verify the disbanding of the Criminal Employment Unit, and we review the mission statement, policies and operations documents of ATU to verify MCSO's assertion that this Paragraph is not applicable to that Unit.

Compliance Status:
Phase 1: Deferred
Phase 2: Deferred

## Section 10: Misconduct and Complaints

## COURT ORDER XI. MISCONDUCT AND COMPLAINTS

### a. Internally-Discovered Violations
*Paragraph 102. MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

The following MCSO policies were offered in response to this Paragraph: GH-2 (Internal Investigations), CP-8, (Preventing Racial and Other Biased-Based Profiling), CP-5 (Truthfulness), CP-2, (Code of Conduct), CP-3, (Workplace Professionalism), and GC-17 (Employee Disciplinary Procedure).  These policies were disseminated and trained to during the Fourth and Fourteenth Amendment training that was completed during this review period.

During the week of our site visit in September 2014, several patrol districts had experienced changes in personnel assignments due to department wide promotions and transfers. The newly assigned staffs were adjusting to their positions and were vaguely aware of the responsibilities

outlined in the earlier version of GH-2 Internal Investigations (effective December 4th, 2013). When we conducted our site visit in December 2014, there had been more personnel movement. Additionally, the Patrol Division had assigned a sergeant to each of the district stations to enhance supervision and serve in an administrative capacity, specifically to conduct internal investigations.

We were aware that there had been little or no formal training for internal investigations that had been conducted at the Districts and Jails during the last year. We were told during the visits that the Professional Standards Bureau was planning to create a training program for those assigned to conduct internal investigations. We will be interviewing these staff during the next visit to determine their level of knowledge.

We asked MCSO to provide a list of all cases completed during this reporting period, and specifically, any cases involving possible bias-based activities, retaliation, truthfulness or failure to report violations of the Order for the quarter of October through December,2014.  Of the 185 cases offered we selected 32 cases where the allegations might be applicable to this Paragraph. The investigative packages that we received contained allegations that represented almost all of the elements of this Paragraph. Eight cases were investigated by the Professional Standards Bureau and twenty cases were investigated by Custody and Patrol.  Four were memoranda that represented the details of the investigations, with IA numbers and statement summaries from witnesses, reporting the results of Official Inquiries. One included a Written Reprimand to a supervisor for failure to complete the investigation that we requested during the required time frames. Three of the cases involved allegations against Posse members. One had made inappropriate racial comments during the Racial Bias training. One, who had previously resigned from the Posse, sent a racially biased email to a member of the department. One had visited an inmate acquaintance while he was wearing a department uniform.  They were subsequently removed from the program.

There was one investigation that was submitted that involved a Commander who did not forward a complaint of racially discriminatory remarks by one officer to another to the Professional Standards Bureau for further investigation.  Additionally, we reviewed two investigations that had been submitted during the last review period and deemed incomplete by us.  We requested them these to be resubmitted for further review.  Both cases were determined to be sustained and discipline was imposed.  All of the investigations were signed by the respective chain-of-command, including the Deputy Chiefs.  In addition the Chief Deputy signed all allegations involving truthfulness.

There was no evidence in any of the documents that the divisional investigations were monitored by an assigned resource from the Professional Standards Bureau. We discussed this issue during the December site visit and were told that any person conducting an internal affairs investigation could call and get assistance from any Professional Standards investigator.  GH-2, Internal Investigations, includes a decision matrix for determining where investigations will be assigned as well as the responsibility for assigning a PSB resource to the investigator at any other

assignment. We had also recommended that PSB develop a template for the investigative documents, with indexing, to be used by the other units.  This template has been developed. We saw it in only two of the district cases that were reviewed during this period. It is still a work in progress and should include more of the mandatory elements found in the policy GH-2, Internal Investigations.  GH-2 requires, as appropriate, the inclusion of collected traffic stop and patrol data, training records, performance evaluations and discipline history of the involved employees. The absence of a checklist, as well as a lack of training, has resulted in these documents not being included in almost all of the investigations that were reviewed. Additionally, several district sergeants said that they were waiting for training on the electronic personnel tracking system, IA Pro /Blue Team, where they are supposed to be able to access this information. Patrol data should be available to supervisors through the TraCS system.  Obviously, access to this information will benefit the investigator as well as the administrative command staff that have the responsibility to review and make recommendations for discipline. If the training and checklist development takes place, we would expect to see examples of more complete investigation packages in the next review period.

We requested audio and/or video recordings related to the investigations. GH-2, Internal Investigations 5.A states "Audio and/or video recordings of the interview *should* be made by the assigned investigator for administrative purposes."  We reviewed ten of the recordings. Two were not recordings of interviews, but were recordings of the "Pre-disciplinary hearings".  One was a statement by the principal recalling the events and another was merely a reading of a prepared statement. Other recordings included questions from the investigator(s) that demonstrated the use of leading questions, or questions not designed to evoke other than minimal information from the person being interviewed. One audio did not have the names of participants, or any relevant information, identified on the recording.  In spite of interviews not being mandatory, it is a "best practice" and all efforts should be made to record all interviews. We have been told that all interviews conducted at MCSO Headquarters, Internal Affairs are audio and video recorded when conducted in the designated interview rooms.

MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

### b. Audit Checks

*Paragraph 103. Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

MCSO did not submit any policies or audits in support of this paragraph.  They did submit a document showing a record of audits of Incident Reports.

During our first site visit, we were made aware of MCSO's acquisition of IA Pro for case management and tracking.  At that time, the system had not been completely populated with the cases, nor had all IA employees been trained on the system. During the September site visit, we were informed that several personnel changes had taken place in the Professional Standards Bureau. They were not familiar with the all of the operations of the Unit at that time.  None were familiar with conducting integrity checks and proactively investigating deputies who may be engaging in illegal or improper behavior.  We referred them to an agency that has developed multiple protocols for these types of investigations.

During our December site visit, we discussed the concept and purpose of "integrity tests" with a different set of IA command staff. They stated that they had not been able to do the research on other agencies' use of integrity tests up to this point.. We were shown how the IA Pro system is used to conduct some audits e.g., Property Storage (Missing Property Inquiries), Status of Investigations, and "missing" Incident Reports. While these audits are important to the operation of the department, there still is no development of policies and protocols for conducting the integrity checks.  The movement to date to develop this process is inadequate and we urge MCSO to delegate someone in a management position to explore other agencies that have these programs in place. We will review the policy on this topic when it is developed and ensure that it incorporates an understanding of the intent of this Paragraph.

MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  Not in compliance
Phase 2:  Not in compliance

### c. Complaint Tracking and Investigations
*Paragraph 104. Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

MCSO policy GH-2 (Internal Investigations) Section G. 1, revised September 5, 2014, requires personnel to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Commanders shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

We reviewed 32 completed Internal Affairs investigations for this review period.  There were no documents included that addressed compliance with appearing for interviews. There were also no forms or memoranda indicating that commanders or supervisors were notified when a deputy under their supervision had been summoned as part of an administrative investigation. More importantly, at the end of this reporting period, Professional Standards Bureau personnel reported that it has begun notifying supervisors by memorandum as they attempt to add a task to the IA Pro System that will require investigators to acknowledge that supervisory personnel are notified when employees under their supervision are being interviewed by PSB. Also, investigators have been directed to make e-mail notifications to the interviewee's supervisor and save the e-mail in IA Pro under the investigation link.   Traditionally, phone calls to supervisory staff have been the manner in which investigators have made such notifications.

GH-2 was disseminated and trained to during the ongoing Fourth and Fourteenth Amendment Training.  MCSO is therefore in Phase 1 compliance with this Paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

*Paragraph 105. Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

The policy, GH-2, Internal Investigations, was revised September 5th, 2014 and includes language that investigators shall have access to and take into account, as appropriate, the collected traffic stop and patrol data, training records, discipline history, and any past complaints and performance evaluations of involved officers. A revised Internal Affairs SOP (Standard Operating Procedure), which should include a checklist with these tasks, has not been submitted for review during this quarter.  The SOP should not only encourage investigators to consider this critical data, but also provide detailed guidance to investigators regarding how such data should and should not be used.

We reviewed 32 cases for this reporting period. Of those, four were memos reporting the results of Official Inquiries, eight were investigated by Professional Standards, and twenty were investigated by Patrol, Custody and Enforcement Support. There were no training records, discipline history (besides the two), traffic stop or patrol data included, where it was clearly appropriate.   Discipline histories were found in various locations, including memoranda, Personnel Action Forms and Pre-Disciplinary Hearing Notices.  Any discipline that is imposed should be determined by using the Discipline Matrix found in GC-17. We anticipate more consistent inclusion of the required elements after the Internal Affairs SOP is amended to reflect these requirements and the distribution and training on IA Pro/Blue Team is completed.

MCSO is not in compliance with this Paragraph.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Not in compliance

*Paragraph 106. Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

MCSO's record maintenance and/or retention policy as it pertains to complaints is incorporated in GH-2 Internal Investigations (effective September 5, 2014) "Professional Standards Bureau investigative files will be maintained for five years after an employee's separation or retirement from Office employment."

MCSO has two obligations under this Paragraph – to maintain and make records available. At this time, we have no reason to believe that MCSO has withheld any data requested by the Monitoring Team.  However, the Paragraph also covers the requirement that MCSO make un-redacted records of such investigations available to the Plaintiffs as well. The Plaintiffs advised that MCSO had not produced certain information requested by Plaintiffs' representatives after multiple requests.

There still appears to be a problem with tracking cases while they are being investigated. Several memos were included in the document production that indicated there were a number of delayed investigations. Additionally, there is no format included in the investigations that we reviewed that indicate any deadlines or supervisors oversight of on-going cases. The tracking system that was purchased for the Professional Standards Bureau should be used to manage all of the internal investigations, at least by case number, that are conducted throughout MCSO. The PSB needs to be able to exhibit proof that this tracking occurs.

Phase I is not applicable for this paragraph.

Compliance Status:
Phase 1:  Not Applicable
Phase 2:  Not in compliance

**Section 11: Community Engagement**

**COURT ORDER XII. COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*
*(Note: Unchanged language is presented in italicized font. Additions are indicated by* <u>*underlined font. Deletions are indicated by crossed-out font. Where an entire paragraph has*</u> *been removed, that is indicated with brackets, but the numbering remains unchanged. For* **example: "108. [REMOVED]".)**

*Paragraph 107. To rebuild public confidence and trust* ~~*in the MCSO and*~~ *in the reform process, the* ~~*MCSO*~~ <u>*Monitor*</u> *shall* ~~*work to improve community relationships and*~~ *engage constructively with the community during the period that this Order is in place.* ~~*To this end, the MCSO shall create the following district community outreach program.*~~

On April 4, 2014 an amended Order (Document 670) made community outreach a Monitor's function.  This is no longer an MCSO responsibility.  We and the Plaintiffs have communicated repeatedly about innovative ways to engage community members and leaders; supporting and encouraging Community Advisory Board (CAB) members; advertising upcoming community events; providing for the development of a complaint system that goes through us to assure access to the appropriate process; and informing the public about the authority of MCSO regarding immigration enforcement.  Each of these issues will be dealt with in more detail in the following Paragraphs.

*Paragraph 108. [REMOVED] Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.*

*Paragraph 109.* ~~*As part of its Community Outreach and Public Information program, the MCSO*~~ <u>*The Monitor*</u> *shall hold a public meeting* ~~*in each of MCSO's patrol Districts within 90*~~ <u>*180*</u> *days of the* ~~*Effective Date*~~ <u>*issuance of this amendment to the Order*</u>*, and* ~~*at least*~~ <u>*between*</u> *one* <u>*and*</u> <u>*three*</u> <u>*meetings*</u> *in each* <u>*of MCSO's patrol*</u> *Districts annually thereafter.* <u>*The*</u> <u>*meetings shall be*</u> <u>*under the direction of the Monitor and/or his designee.*</u> *These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The* ~~*MCSO*~~ <u>*Monitor*</u> *shall clarify for the public at these meetings that* ~~*it*~~ <u>*the MCSO*</u> ~~*does not*~~ <u>*lacks the authority*</u> *to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

On April 4, 2014 an amended Order (Document 670) gave the requirement to hold public meetings to the Monitor. We held two community meetings during this reporting period. The first community meeting was held on October 29, 2014 at Parkview Elementary School located at 16066 N. Parkview Place, Surprise, AZ 85374. Surprise is located in MCSO Patrol District 3. The meeting was held from 6:40 PM until 8:00 PM.   15 community members attended this meeting.  The attendees brought up a few complaints about MCSO and demonstrated a genuine interest in the ongoing efforts to bring about change in MCSO policies and procedures. There were a number of questions and comments offered by the attendees.  Members of MCSO and representatives of the ACLU were in attendance and offered comments. One of the CAB members was in attendance. Media representatives from the Arizona Republic and La Voz were also in attendance.

The second community meeting held during this reporting period was conducted on December 17, 2014 at the Fountain Hills Community Center at 13001 N. La Montana Drive, Fountain Hills, AZ.  Fountain Hills is located in MCSO Patrol District 7. The meeting began at 6:30 PM and ended at 9:00 PM.  Approximately 120 community members attended. The meeting was attended by members of the MCSO, representatives of the ACLU and a CAB member. The attendees asked a number of questions. Many of the attendees expressed their support and appreciation for Sheriff Arpaio and the MCSO, while other attendees relayed their personal experiences of what they perceived as mistreatment by members of MCSO. There was considerable emotion displayed by a number of the attendees. There was no media coverage at the meeting.

We conducted both meetings in English and Spanish to ensure the maximum amount of participation and understanding took place.

At both meetings, we explained to the meeting attendees the role of the Monitor, his responsibilities to the community, the progress being made, as well as challenges ahead in implementing the Order.  As part of the initial presentation, and during questions and answers, we made it clear that MCSO did not have the authority to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.  It was also explained to those in attendance that the Monitoring Team would have a regular presence in Maricopa County and we provided our contact information to all parties.  We advised the attendees that the Monitor had the authority to take complaints or compliments about MCSO, and to insure that complaints were investigated completely.   Further, we explained that new policies, procedures, training and equipment were being developed for MCSO officers and supervisors to ensure that they were working within the law and toward the best interests of the people of Maricopa County.

At both meetings, a number of questions were asked by community members. We responded to these inquiries, as did Plaintiffs' representatives, or members of MCSO, as appropriate.  For those who declined to ask their questions publicly, separate cards were made available for them to write their questions.  Attendees were also provided with forms to document complaints or concerns.

*Paragraph 110. The meetings present an opportunity for ~~MCSO representatives~~ the Monitor to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust. ~~MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.~~ The Monitor may investigate and respond to those concerns. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendants' compliance with this order, it may assist the complainant in filing an appropriate complaint with the MCSO.*

Approximately 120 community members were in attendance at the meeting in Fountain Hills and 15 community members attended the meeting in Surprise. Both meetings allowed ample opportunity for attendees to ask questions or offer comments. They could either use the roving microphone we provided, or write their comments or complaints on note cards that were provided for us to read aloud and provide answers. Questions were successfully fielded at both meetings. Attendees at both meetings politely waited their turn at the microphone and Monitoring Team personnel moved throughout the meeting location, providing microphones where needed or note cards for those who wished to ask their questions in writing.

A key objective of both meetings was to let those in attendance know that the Monitor had the authority, provided by the Court, to take complaints about any activity involving MCSO personnel and make sure that an investigation was adequately conducted. Forms were made available for this purpose. After both meetings, all Monitoring Team personnel remained behind to individually answer questions, and did so until the last attendee left the building.

*Paragraph 111. English- and Spanish-speaking ~~MCSO~~ Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly-available information. ~~At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the Community Liaison Officer (described below) shall participate in the meetings.~~ The Monitor may request Plaintiffs' and/or Defendants' representatives ~~shall be invited~~ to attend such meetings and assist in answering inquiries by the community. The Defendants are under no obligation to attend such meetings, but to the extent they do not attend such meetings after being requested by the Monitor to do so, the Monitor may report their absence to the public and shall report their absence to the Court.*

Selected members of the Monitoring Team in Maricopa County for site visit assessments attended the meetings. The Monitor and three of his team members are bilingual and they provided translation into Spanish to insure all remarks, questions and answers were understood by the Spanish speaking attendees.

In addition, Mr. Josh Bendor, attorney for ACLU and Chief Deputy Sheridan of MCSO offered remarks at the meeting in Surprise. At the meeting in Fountain Hills, remarks were offered by Sheriff Arpaio, Ms. Cecillia Wang of the ACLU Immigrants' Rights Project, and Chief Deputy Sheridan. MCSO was well represented at both meetings and were recognized for their

attendance. Several of the MCSO personnel in attendance at both meetings play instrumental roles in the implementation of the Court's Order.

*Paragraph 112. The meetings shall be held in locations convenient and accessible to the public. At least ~~one week~~ ten days before such meetings, the ~~MCSO~~ Monitor shall widely publicize the meetings using English and Spanish-language television, print media and the internet. <u>The Defendants shall either provide a place for such meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and other expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If the Monitor determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, he can file a request with the Court that this requirement be revised or eliminated.</u>*

Preparations for both meetings began well in advance of the meeting dates. Issues such as site selection, advertisement in local radio and print media in English and Spanish, agenda creation, and meeting logistics are of utmost importance in the planning stages. Input from the Community Advisory Board (CAB) as well as ACLU is taken into consideration before finalizing these items. MCSO's Court Compliance and Implementation Division staff, as well as the Chief Deputy, are kept abreast of the planning as well as consulted on meeting security issues. Members of the Monitoring Team met with the ACLU of Arizona and Community Advisory Board (CAB) members to discuss preparations for the public meetings.

Selection of venues for both meetings was based on accessibility, adequate meeting space, adequate parking and ease in locating the meeting site. The meetings in Fountain Hills and Surprise were widely publicized. Advertisements, in both English and Spanish, appeared in print media with the widest circulation in the areas in which the meetings were held. These ads were also included in the media outlets' Facebook pages and websites. The ACLU also submitted the meeting notice to numerous online calendars via their local radio media contacts.

*b. ~~Community Liaison Officer~~ <u>Monitor</u>*

*Paragraph 113. [REMOVED] Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.]*

*Paragraph 114. <u>In addition to the duties set forth in Title XIII of this order,</u> ~~The CLO~~ <u>the Monitor</u> shall have the following duties <u>in relation to community engagement:</u>*
   *a.  to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.     to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 111; and*

*c.     to compile any Complaints, concerns and suggestions submitted to ~~CLO~~ him by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;*

*[d.     [REMOVED] to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and]*

*[e.     [REMOVED] to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.]*

At both of the community meetings, we and Plaintiffs' representatives explained the breadth of the Order to the community members in attendance.  An MCSO representative provided a summary of actions taken by the MCSO to comply with the Order. Community members were also allowed to ask any question of these representatives and were given an opportunity to comment on the information provided by these representatives.  Community members were also provided forms to document any concerns or complaints.  After the meetings, members of the Monitoring Team remained and spoke to several attendees who voiced their compliments and/or concerns and opinions regarding MCSO's operations.

### c. Community Advisory Board

*Paragraph 115. ~~MCSO~~ The Monitor and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the ~~MCSO~~ Monitor and community leaders, and to provide specific recommendations to MCSO about policies and practices that will ~~increase community trust and~~ ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

We have worked with Plaintiffs to support and provide guidance to the three member Community Advisory Board (CAB).  We have had meetings and other communications with CAB members to discuss and explain their responsibilities.  Advisory Board members have notified us that they have engaged in ongoing communication with community leaders.

*Paragraph 116. The CAB shall have ~~six~~ three members, ~~three to be selected by the MCSO and three to be~~ selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case. ~~However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB.~~ The CAB shall continue for at least the length of this Order.*

The CAB is currently comprised of three community members. None of these members are, or have been, MCSO employees, named as class representatives in this matter, or are attorneys involved in the Melendres litigation.

*Paragraph 117. The CAB shall hold ~~public~~ meetings at regular intervals of no more than four months. <u>The meetings may be either public or private as the purpose of the meeting dictates, at the election of the Board. The Defendants shall either provide a suitable place for such meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses incurred in arranging for such a meeting place. The Defendants shall also pay to the Monitor the additional reasonable expenses that he will incur as a result of performing his obligations with respect to the CAB including providing the CAB with reasonably necessary administrative support.</u> ~~The meeting space shall be provided by the MCSO.~~ The ~~CLO~~ <u>Monitor</u> shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.*

The CAB participated in meetings with various members of the Monitoring Team and Plaintiffs' representatives during the reporting period. While individual CAB members have attended the community meetings we have held and communicated with members of the community to increase community trust, the CAB has not initiated and held any community meetings during the reporting period as required by the Order. We will continue to work with the CAB and continue to emphasize the criticality of their holding community meetings in accordance with the requirements of Paragraph 117. We will provide the CAB logistical support as required.

*Paragraph 118. During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter ~~and make reasonable efforts to address such concerns.~~ <u>and transmit them to the Monitor for his investigation and/or action.</u> Members ~~will~~ <u>may</u> also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

We have met with CAB members to discuss the issue of transmitting to us any complaints received by CAB members that may require investigation. In addition, we have discussed the crucial role of the Community Advisory Board's ability to reach into the community in a way that the Monitoring Team cannot. The Board members have been advised to compile concerns regarding MCSO actions or compliance with the Order. To facilitate this effort, the ACLU of Arizona has launched a bilingual website, ChangingMCSO.org/CambiandoMCSO.org. According to the ACLU, the website serves as a place where the public can gather information about the monitoring process, including the times and locations for community meetings, Monitor reports, MCSO reports and other court filings. The website also includes a form for filling out complaints, which will then be directly conveyed to the CAB and Monitoring Team.

**Section 12: Concluding Remarks**

MCSO has made some noteworthy progress during the review period.  We assess compliance with 89 Paragraphs of the Order.  MCSO is in Phase 1 compliance with 31 of those Paragraphs, or 44%.  In 19 Paragraphs, Phase 1 compliance is not applicable – that is, a policy is not required.  MCSO is in Phase 2 compliance with 23 Paragraphs, or 26%.

Most of MCSO's gains in compliance stem from the successful delivery during this review period of the Fourth and Fourteenth Amendment training, and the associated publication of policies which were distributed and referenced in this training.  MCSO must develop the capacity and processes to develop and distribute policies that are not provided in conjunction with a major training initiative.  This includes acquiring the capability to document receipt and appropriate orientation for each effected employee receiving the policies, in a manner that is verifiable and auditable.  Some of the critical policies required by the Order will be distributed in this fashion, rather than as part of an agency wide training initiative.

While we recognize that by necessity each Patrol District must have some autonomy and the flexibility to address crime and quality of life issues which are unique to its service area, we do note that in too many instances, there is a lack of standardization from District to District in practices impacted by the Order.  These include use of agency forms such as FI cards, documentation of work attendance, and supervisory expectations such as responding to calls with their subordinates or review of completed reports.  MCSO must be mindful of those practices that should be standardized across the agency, including but not limited to those required by the Order.   High, and consistent quality of police service must be a standard value of the organization and its most important deliverable to the public.  Anything short of this is wholly unacceptable.

While we will not comment on specific investigations that we are monitoring as part of our expanded duties, a common theme associated with many of them is the mishandling of non-agency property that comes into the possession of MCSO.  The suicide of a former deputy brought this issue to the forefront, but subsequent investigations revealed how potentially widespread the problems are, impacting every District and some specialized units.  Most troubling is MCSO's apparent lack of urgency to address the issue.  As recently as our December site visit, we were learning of unsecured property – much of it potentially evidentiary in nature – being found in used and unused workspaces and in vehicles.  Each District handles seized property differently, but a common theme in each is a lack of generally accepted minimum security measures and appropriate documentation.

Finally, as I stated in my opening comments, complying with the Order cannot be looked at as a written exercise.  To its credit, MCSO has made some progress in its technical compliance with many of the Order's requirements.  Much of the credit for this is attributable to CCID's oversight of compliance processes and its attention to detail in assembling appropriate documentation.  However, at the very same time that MCSO is diligently trying to demonstrate compliance with the *letter* of the Order, several members of its leadership team – including the Sheriff and the

Chief Deputy – are facing potential civil and criminal contempt charges for egregious behaviors which demonstrate a clear lack of respect for the *spirit* of the Order.  Until such time as intent matches practice, MCSO will not be able to demonstrate to the satisfaction of the community and the Court that meaningful changes have been made to the fabric of the organization.