1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Manuel de Melendres, et al.,                No. CV-07-02513-PHX-GMS

10                        Plaintiffs,             **ORDER**

11   v.                                           **[FILED UNDER SEAL]**

12   Maricopa, County of, et al.,

13                        Defendants.

14

15        On April 27, 2015, District Judge G. Murray Snow referred to this Court an in

16   camera review of two documents to determine whether those documents are protected

17   from disclosure by the attorney-client privilege and/or work-product immunity.  (Doc.

18   1033.)  On April 29, 2015, Thomas Liddy and Karen Clark, ethics counsel for Thomas

19   Casey, each submitted to Magistrate Judge Boyle: (1) an October 23, 2013 letter from

20   Mr. Casey to an outside private investigator, Don Vogel; and (2) a November 6, 2013

21   letter from Mr. Casey to Sheriff Joseph Arpaio, copied to Chief Deputy Jerry Sheridan,

22   Deputy Chief John MacIntyre, and Mr. Liddy.

23        As detailed below, the Court finds that the letters are not protected by the attorney-

24   client privilege or, to the extent the privilege attaches, the privilege has been waived.

25   Additionally, the Court finds that the work-product immunity applies to both letters.   Mr.

26   Casey's mental impressions and opinions in the November 6, 2013 letter regarding

27   litigation strategy based on the information provided by the Grissom-investigation

28   materials and findings are protected from disclosure as opinion work-product, and that

immunity has not been waived.  The Court will therefore redact those mental impressions and opinions.  However, the immunity as to remaining portions of the letters has been waived.

## I.    Attorney-Client Privilege

"Where legal advice of any kind is sought from a professional legal advisor in his capacity as such, communications relating to that purpose, made in confidence by [a] client are, at his instance[,] permanently protected from disclosure by himself or by the legal advisor, unless the protection be waived."  *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (internal numbering omitted).

The attorney-client privilege conceals only those communications and advice that the client has a reasonable expectation will remain solely within the knowledge of the client, the attorney, and the necessary agents of each.  *Id.* at 212; *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) (finding a client's communication to his attorney was not "made in confidence" where it was made for the purpose of transmission to outside auditor).  Confidentiality must be affirmatively established by the privilege proponent and is not presumed.  *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) ("[T]he burden of proving that the attorney-client privilege applies rests . . . with the party asserting it."); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 354 (4th Cir. 1994) ("[T]he mere relationship between the attorney and the client does not warrant a presumption of confidentiality.").

Additionally, "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice.  If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist."  *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *Weil*, 647 F.2d at 24).  "'What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal advice from the lawyer*.'"  *United States v. Gurtner*, 474 F.2d 297, 288-99 (9th Cir. 1973) (emphasis in original) (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

1    Finally, when the client voluntarily discloses privileged communications to

2    someone outside the attorney-client relationship, the privilege is waived.  *Tennenbaum v.*

3    *Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996).  The voluntary disclosure of a

4    privileged communication may also destroy the privilege as to other communications

5    relating to the same subject matter that, in fairness, ought to be considered together.

6    *Weil*, 647 F.2d at 24; Fed. R. Evid. 502(a).

7               **a.  October 23, 2013 Letter**

8    The October 23, 2013 letter is authored by Mr. Casey and addressed to Mr. Vogel,

9    an outside private investigator retained by Mr. Casey as authorized by MCSO and Sheriff

10   Arpaio.  The letter details Mr. Casey's retention of Mr. Vogel as an investigator and the

11   scope of Mr. Vogel's investigation.  Based on the letter, Mr. Casey engaged Mr. Vogel to

12   conduct an investigation of allegations made by Ms. Grissom, including conducting

13   interviews of third parties, obtaining witness statements, and assessing the credibility of

14   the allegations.

15   Even assuming Mr. Casey's October 23, 2013 communication to Mr. Vogel was

16   sufficiently made in confidence and the privilege attaches, the Court finds that the

17   privilege was waived by Sheriff Arpaio's and Chief Sheridan's hearing testimony.

18   Sheriff Arpaio testified that: (1) he received an email from Ms. Grissom regarding a

19   comment allegedly made about him in a restaurant by Judge Snow's wife; (2) Mr. Casey

20   retained a private investigator to conduct an investigation of the information provided by

21   Ms. Grissom; (3) as part of that investigation, the private investigator interviewed alleged

22   witnesses; and (4) the results of the investigation were that the investigator confirmed the

23   alleged comment was made.  (Doc. 1027 at 647:19-648:9, 654:6-655:12.)  By voluntarily

24   making these disclosures in open court, and by failing to object to questions and

25   testimony about these topics, Sheriff Arpaio waived any attorney-client privilege as to the

26   October 23, 2013 letter containing much of the same information.  *Tennenbaum*, 77 F.3d

27   at 341; *United States v. Sanders*, 979 F.2d 87, 92 (7th Cir. 1992) (holding that failure to

28   object during testimony constitutes waiver); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206

(5th Cir. 1999) ("A client waives the attorney-client privilege, however, by failing to assert it when confidential information is sought in legal proceedings."); Fed. R. Evid. 502(a).

Further, Ms. Iafrate, Sheriff Arpaio's and MCSO's attorney, elicited these and additional details regarding the Grissom investigation—the same subject matter discussed in the October 23, 2013 letter—from Chief Sheridan during his testimony.  (Doc. 1030 at 960:21-964:6, 966:24-967:9.)  Therefore, any attorney-client privilege as to the October 23, 2013 letter was also waived by Chief Sheridan's testimony in response to Ms. Iafrate's questions.

### b. November 6, 2013 Letter

The November 6, 2013 letter from Mr. Casey to Sheriff Arpaio was copied to Deputy Chief MacIntyre.  There is no basis for this Court to find that Deputy Chief MacIntyre needed to receive the November 6, 2013 letter and, therefore, the Court finds that the attorney-client privilege does not attach to the November 6, 2013 letter.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977)) ("The test . . . is whether the agency is able to demonstrate that the documents, and therefore the confidential information contained therein, were circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'").  This conclusion is consistent with Judge Snow's previous ruling that the privilege did not attach to different communications distributed to Deputy Chief MacIntyre.  (*See* Doc. 986.)  Further, even if the privilege attached to the November 6, 2013 letter, for the reasons explained above, the privilege was waived by Sheriff Arpaio's and Chief Sheridan's hearing testimony on the same subject matters.

### II.   Work-Product Immunity

To qualify for work-product protection, documents must: (1) be "prepared in anticipation of litigation or for trial" and (2) be prepared "by or for another party or by or

for that other party's representative." *In re Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt.*, 357 F.3d 900, 907 (2003); Fed. R. Civ. P. 26(b)(3). The party asserting the work-product immunity has the burden of demonstrating that the at-issue documents are work-product. *Hernandez v. Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010) (recognizing burden is on party invoking work-product immunity).

The Court finds that both of the letters were prepared by Mr. Casey in anticipation of litigation, as each letter was prepared because and in the course of the underlying litigation. *In re Grand Jury Subpoena*, 357 F.3d at 907 (citing Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024 (2d ed. 1994)). Further, portions of the November 6, 2013 letter contain Mr. Casey's mental impressions and opinions regarding litigation strategy. *See Hickman v. Taylor*, 329 U.S. 495, 522 (1947) (Work-product protection is designed to prevent parties from "perform[ing] its functions either without wits or on wits borrowed from the adversary."); *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992). Therefore, both letters are covered by the work-product immunity.

Below, the Court addresses whether the letters are nonetheless subject to disclosure based on waiver and/or a compelling need.

### a. Waiver

Work-product protections may be waived by voluntary disclosures or using the at-issue materials as evidence at trial. *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 239 (1975); *Hernandez*, 604 F.3d at 1100 (9th Cir. 2010) (finding that the work-product protection for attorney's notes of a witness interview was waived with regard to the subject matter covered). The disclosure of work-product materials to a third party can result in waiver if "the material is disclosed in a manner inconsistent with keeping it from an adversary." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (citation and quotations omitted); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). Further, pursuant to Rule 502(a) of the Federal Rules of Evidence, waiver of work-product may extend to undisclosed materials if: "the disclosed and

undisclosed communications or information concern the same subject matter; and [] they ought in fairness to be considered together."

However, the work product doctrine "is distinct from and broader than the attorney-client privilege." *Nobles*, 422 U.S. at 238 n.11. "Work product immunity furthers the client's interest in obtaining complete legal advice and creates 'a protected area in which the lawyer can prepare his case free from adversarial scrutiny.'" *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024-25 (7th Cir. 2012) (citing *Hickman*, 329 U.S. at 511). "Accordingly, 'disclosure of some documents does not necessarily destroy work-product protection for other documents of the same character.'" *Id.* (quoting 8 Wright & Miller, Federal Practice & Procedure, § 2024).

Here, the Court finds that Sheriff Arpaio's and Chief Sheridan's disclosures regarding the retention of Mr. Vogel, the scope of the Grissom investigation, and the investigation findings, including findings regarding whether the Grissom information is credible, constitute a waiver of the work-product immunity covering those portions of the October 23, 2013 and November 6, 2013 letters that relate to the same subject matters.

However, the Court finds that the waiver does not extend to Mr. Casey's mental impressions and opinions in the November 6, 2013 letter regarding litigation strategy based on the information provided by the Grissom investigation materials and findings.[1] First, the testimony did not cover Mr. Casey's mental impressions and opinions on that issue. *See Hernandez*, 604 F.3d at 1100 ("The work product privilege is also only waived 'with respect to matters covered in . . . testimony.'") (quoting *Nobles*, 422 U.S. at 239-40). Second, Defendants have not thus far used the Grissom investigation information in these proceedings. Further, Mr. Casey's mental impressions and opinions regarding litigation strategy based on that information do not relate to Defendants' failures to implement the Court's Orders and the Court's determination of the appropriate remedies for such failures. Therefore, those portions of the November 6, 2013 letter do not relate

---

[1] The Court identifies the subject matter of the protected mental impressions and opinions contained in the November 6, 2013 letter so that the parties are clear as to the scope of the Court's findings.

to the issues in the current contempt proceedings, and, need not in fairness be disclosed. *See* Fed. R. Evid. 502(a).

The Court will redact those mental impressions and opinions from the November 6, 2013 letter. *See United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010) (remanding to the district court "for the purpose of independently assessing whether the document was entirely work-product, or whether a partial or redacted version of the document could have been disclosed"); *United States v. $1,379,879.09 Seized From Bank of America*, 374 Fed. Appx. 709, 711 (9th Cir. 2010) (unpublished) ("records should be redacted only to the extent absolutely necessary to protect information covered by the attorney-client privilege or the work-product doctrine").

### b. Mental Impressions at Issue and Compelling Need—Opinion Work-Product

Finally, the opinion work-product in the November 6, 2013 letter that has not been waived may still be subject to disclosure under limited circumstances. *Holmgren*, 976 F.2d at 577. Specifically, a party seeking opinion work-product must show that "mental impressions are *at issue* in a case and the need for the material is compelling." *Id.* This standard requires "a showing beyond the substantial need/undue hardship test required under Rule 26(b)(3) for non-opinion work product." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 401-02 (1981)).

Here, as stated above, Mr. Casey's mental impressions regarding litigation strategy based on the Grissom information and investigation findings does not relate to the issues in the current contempt proceedings. Therefore, the other parties do not have a compelling need for those portions of the November 6, 2013 letter.[2]

---

[2] Because, as discussed above, the Court finds that the immunity has been waived as to the other work-product in the two letters, the Court need not address whether any party has established a "substantial" or "compelling" need for those portions of the letters. Fed.R.Civ.P. 26(b)(3) (A party may obtain non-opinion work-product upon a showing "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."); *Holmgren*, 976 F.2d at 577.

### III.    Conclusion

Based on the above, the Court finds that the attorney-client privilege (to the extent it attaches) has been waived as to both letters.  Further, Mr. Casey's mental impressions and opinions regarding litigation strategy based on the Grissom information and investigation findings, which are contained in the November 6, 2013 letter, are protected from disclosure as opinion work-product, and that immunity has not been waived.  The work-product immunity as to the remaining portions of the letters has been waived.

The Court encloses with this sealed Order a sealed, redacted version of the November 6, 2013 letter.  Unless the Court receives objections regarding lifting the seal by **Tuesday, May 13, 2015 at 5:00 P.M.,** the Court will unseal this Order and the appended, redacted document.

The Court further advises the parties that as discussed in Judge Snow's April 27, 2015 Order, they are still obligated to take any remedial measures required by Ethics Rule 3.3 with regard to Sheriff Arpaio's hearing testimony.  (*See* Doc. 1033.)

Dated this 7th day of May, 2015.


Honorable John Z. Boyle
United States Magistrate Judge

cc:    Counsel for Plaintiffs
       Counsel for Defendants
       Karen Clark
       Lee David Stein
       Gregory Stephen Como
       Melvin McDonald
       Gary Birnbaum
       David Eisenberg
       Robert Warshaw

- 8 -

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

### ATTORNEYS AT LAW

**Timothy J. Casey**
e-mail: timcasey@azbarristers.com

Client No. 5754.030

October 23, 2013

## VIA HAND-PICK UP

Don Vogel
VOGEL INVESTIGATIONS, LLC
1334 Chandler Boulevard, Suite D-7
Phoenix, AZ 85048

> **Re:**   *Melendres, et al. v. Arpaio, et al. United States District Court, District of Arizona, CV-07-02513-PHX-GMS*

Dear Mr. Vogel:

I represent defendants Sheriff Joseph M. Arpaio and the Maricopa County Sheriff's Office ("MCSO") in the above-referenced litigation.  In that capacity, I have been authorized by my clients, and the Maricopa County Attorney William Montgomery, to retain your investigation services.

The scope of your services are the following: (1) to interview Karen Morris Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the attached communication from Mrs. Grissom to Sheriff Arpaio's *Facebook* page that occurred on or about August 21-22, 2013, and to learn her motivations and timing for communicating with Sheriff Arpaio; (2) to voluntarily obtain, if possible, a recorded and/or sworn statement about the same from Mrs. Grissom and/or her husband; (3) to provide me with your candid assessment of the credibility of Mrs. Grissom (and possibly her husband); and (4) to provide me with your findings and any statement(s) from the Grissoms.

If during the course of the foregoing investigation, it becomes necessary or appropriate to reasonably expand your investigation based on information learned or discovered and if time is of the essence, you are authorized to pursue such investigatory leads subject to keeping me reasonably informed about such leads.

It is my understanding that your hourly rate is $125 plus costs and expenses.  This is agreeable on behalf of my clients.  Please send your invoice to me and I will make payment.

Thank you for your assistance on this matter.

Sincerely,

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

---

Timothy J. Casey

TJC:eh

Encl.

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

### ATTORNEYS AT LAW

Timothy J. Casey
e-mail:  timcasey@azbarristers.com

Client No.: 5754.030

November 6, 2013

***ATTORNEY-CLIENT PRIVILEGED/ATTORNEY WORK PRODUCT
PRIVILEGED/CONFIDENTIAL/NOT SUBJECT TO A PUBLIC RECORDS REQUEST***

## VIA HAND-DELIVERY

Hon. Joseph M. Arpaio
MARICOPA COUNTY SHERIFF'S OFFICE
100 W. Washington St., Suite 1900
Phoenix, Arizona 85003-1812

> Re:  *Melendres v. Arpaio, CV2007-02513-PHX-GMS (United States District Court
> for the District of Arizona)*

Dear Sheriff Arpaio:

This letter provides the following information for your consideration: (1) the transcripts of private investigator Don Vogel regarding Karen Morris Grissom, Dale Eugene Grissom, and Scott Grissom; (2) the potential legal options available to you and the MCSO based on the Grissom investigatory materials; and (3) my analysis and recommendation to you and defendant MCSO regarding the Grissom information.

Upon my receipt later this week of the balance of Mr. Vogel's investigation report, I will forward the same to you immediately.

## A.   EXECUTIVE SUMMARY

Karen and Dale Grissom, husband and wife, had a chance encounter at a Tempe restaurant with a woman who was, in fact, Judge Murray Snow's wife. Mrs. Snow mistook Karen for her sister Irene. This encounter probably occurred in May of 2012. The encounter led to a conversation between Ms. Grissom and Mrs. Snow in the presence of Dale Grissom and Scott Grissom (the adult son of Karen and Dale Grissom). The fact that the woman was married to Judge Snow came up in the conversation. Mrs. Snow made a comment that Karen and Dale interpreted as hostile, negative, or unfavorable toward you. Karen Grissom reported to you the contact with Mrs. Snow 14 months after it happened. According to investigator Mr. Vogel, Karen and Dale Grissom present as sincere and truthful in their statements about what they believe they heard from Mrs. Snow ("the Grissom information").



**B.  BACKGROUND INFORMATION**

    To place this letter and its advice in context, some background information and key dates in this case are important to know.

**1.  Key Litigation Dates**

    The bench trial in this matter took place on July 19, July 24-26, July 31, August 1, and August 2, 2012 before the Honorable Murray Snow.  The trial received daily local and national print and television media attention.

    On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law (Dkt#579).  The Court held that defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendment to the United States Constitution.  The Court, therefore, issued various permanent injunctions as set forth in that Order.  The Court's Order received considerable local and national media attention.

    On June 14, 2013, the Court held a status hearing with the parties.  The parties advised the Court of their mutual desire to try to negotiate the terms of a consent decree to ensure defendants' compliance with the Court's injunction.  The Court also indicated its current intention to implement certain elements into any final order (i.e., a monitor).  This hearing was

2

covered extensively by the local and national media.

On August 16, 2013, the parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement and terms on which they could not agree. The parties' proposal also received significant coverage in the media.

On or about August 21-22, 2013, a person named Karen Morris Grissom sent you a private message on your *Facebook* page purporting to have had a conversation in 2012 with Judge Snow's wife wherein Mrs. Snow reported that her husband, Judge Snow, did not like you and wanted you out of office.

On August 30, 2012, the Court held a hearing to discuss the terms agreed-upon by the parties and to hear oral argument on the terms the parties could not agree to. Argument was extensive. This hearing was covered by the media.

On October 2, 2013, the Court issued its Supplemental Permanent Injunction/Judgment Order (Dkt#606). Again, this Order was extensively covered in the media.

### 2. Karen Morris Grissom Message to Sheriff Arpaio

On or about August 21-22, 2013, Karen Morris Grissom sent the following private[1] message to you on your *Facebook* page:

> "Karen Morris Grissom
> Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

(Lack of punctuation and spelling not changed).

Upon being advised of the foregoing and directed by your office to do so, I began to try to locate Ms. Grissom and interview her. I eventually sent a message to Ms. Grissom on her *Facebook* page and she called me on my cell telephone on August 28, 2013.

I spoke with Ms. Grissom around 3:00 p.m. on August 28, 2013 and explained the reason for contacting her. She advised that she and her husband (Dale) were driving to a job interview for her in Avondale (a teaching assistant position), she was experiencing poor cell phone connection, and we talked for a period of time and each time I lost the cell phone connection with her I called her back and she answered my call.

In short summary, and as you may recall from my prior oral report, Ms. Grissom, age 63, reported that she grew up in Yuma, Arizona, she went to the same church as Judge Snow's wife when she was a single woman, the judge's wife (as a single woman) was her piano teacher at one

---

1   The message was private to you only.  The message was not publicly posted. ████████████

time, and something to the effect that the Judge's wife had a step-mother that was murdered in Yuma years ago.

Ms. Grissom advised that on an unknown date in 2012 she and her husband were eating at a *Some Burros* Mexican food restaurant at Baseline Road and Mill Road in Tempe, Arizona when a middle-aged woman came into the restaurant with a younger woman (they left a dog outside) and walked up to her and her husband. The woman asked Ms. Grissom if she was "Irene." Ms. Grissom believed that the date of this encounter was sometime before school started, so likely in July or August 2012. The woman was tall, thin, with short hair, and light brown-colored hair. Ms. Grissom said that she was not Irene, that Irene was her younger sister (age 55), and the woman began to tell Ms. Grissom that she was friends with Irene, that she (the woman) eventually went to BYU, was a teacher, she married a man that was now a federal judge, and her husband was ruling on a case involving Sheriff Arpaio. According to Ms. Grissom, the woman volunteered that her husband "wanted to burn the Sheriff because he did not like him."

Ms. Grissom advised that her husband, Dale, was present and heard the same exchange. *She did not remember the woman's first name, or her maiden name.* She was firm in what she claimed to have heard, and that she was speaking the truth. We discussed the reasons she waited over a year to disclose this information to you. Ms. Grissom advised that the woman's statement "bothered [her] at the time but eventually [she] needed to share this." Ms. Grissom stated that she viewed your public services very favorably but had never met or interacted with you.

I wanted to meet Ms. Grissom in person to evaluate her credibility, and obtain from her either a recorded statement or a statement under oath before a court reporter. Ms. Grissom advised that she was willing to meet with me in person, to provide a statement under oath, and that she would call me back after her job interview. She was adamant that she was telling the truth about what the judge's wife had said to her. She expressed no fear or reservation about telling the truth. Ms. Grissom again told me she would call me back after her job interview. The call ended.

As I reported initially to you and Chief Sheridan, Ms. Grissom came across telephonically as sincere and credible (despite not knowing the date of the encounter, the name of the woman, and the 12-13 month delay in reporting the incident) but I reserved final credibility judgment until I could meet her in person and speak with her in detail.

Ms. Grissom, however, did not call me back after the job interview. She also did not take my two separate telephone calls to her around 5:30 pm that same date (08/28/13).

Over the next four weeks, Ms. Grissom and I had no contact despite my occasional telephone call into her. It appeared to me that Ms. Grissom did not wish to talk further for whatever reason. I reported the same to you and your chiefs and further shared my prior historical experience with witnesses sometimes being willing to say certain things privately on a telephone call to an attorney and then decline further involvement or more formal documentation of the substance of the earlier communication. The absence of further contact from Ms. Grissom after August 28, 2013 led me to personally conclude the matter was over and the information from Ms. Grissom lacked substance or merit.

4

### 3.   Retention of Vogel Investigations

Pursuant to the conversation we had at your office on October 17, 2013 with Chief Sheridan regarding Ms. Grissom, I formally retained on October 23, 2013 investigator Don Vogel. The scope of Mr. Vogel's services were the following: (1) to try to interview Ms. Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the communication from Ms. Grissom to your *Facebook* page that occurred on or about August 21-22, 2013, and to try to learn her motivations and timing for communicating with you; (2) to voluntarily obtain, if allowed, a recorded and/or sworn statement about the same from Ms. Grissom and/or her husband; (3) to provide me with Mr. Vogel's candid assessment of the credibility of Ms. Grissom (and possibly her husband); and (4) to provide me with Mr. Vogel's findings and any statement(s) from the Grissoms.

## C.   THE INFORMATION FROM INVESTIGATOR VOGEL

Attached for your review and file are the transcripts of Mr. Vogel's recorded interviews with the Grissoms.

### 1.   Karen Grissom

Mr. Vogel showed up unannounced to the Grissom residence on Saturday, October 26, 2013. Dale Grissom was not at home. Karen Grissom, however, agreed to talk to Mr. Vogel and provide a recorded statement. The recorded statement lasted 20 minutes and 29 seconds.

Ms. Grissom is supportive of you and your law enforcement policies. While the precise details and context of the statement are contained on the attached transcript and audio, Ms. Grissom, her husband Dale, and their adult son, Scott, visited a *Some Burros* restaurant in Tempe Arizona on an unknown date in 2012. A woman entered the restaurant and approached Ms. Grissom and asked if she was Irene, the sister of Ms. Grissom. Irene and Karen apparently look very similar even though they differ in age by about a decade. The woman introduced herself as Sherry Snow; that name meant nothing to Ms. Grissom and the woman then mentioned her maiden name was Smock (or Smoch). The woman then described her background and that she was married to a federal judge. She presented as proud of her husband serving as a judge. Somehow the subject of Sheriff Arpaio surfaced in the conversation. The operative part of Ms. Grissom's statement is where Mrs. Snow is reported to have said to Ms. Grissom in response to a question by Ms. Grissom that **"my husband does not like him [Arpaio] and wants him out of office."**

Mr. Vogel's separate report will assesses Ms. Grissom's credibility from his perspective.

### 2.   Dale Grissom

Mr. Vogel arranged to meet with Dale Grissom the following Monday.

Mr. Vogel interviewed and took a recorded statement of Dale Grissom on Monday, October 28, 2013. Mr. Grissom is age 64, but will turn 65 in a few weeks. The recorded

statement lasted 20 minutes and 41 seconds. Dale Grissom is supportive of you and your law enforcement policies. The details and context of the statement are contained on the attached transcript and audio. The operative part of Dale Grissom's statement is where Mrs. Snow is reported to have said in his presence to Karen Grissom sometime in late April or May of 2012 that **"my husband wants to get him [Arpaio] or wants him to go down"** or something negative to that effect.

Mr. Grissom does not remember the precise details about what was said. He does not recall Mrs. Snow ever reporting that her husband had actually said that her statements or views were those held by her husband but Mr. Grissom assumed that Mrs. Snow got her information or positions from her husband. While he does not remember the details of the conversation, and would be unable to personally identify Mrs. Snow in person or by photograph, he remembers that whatever precisely was said was negative toward you. Mr. Grissom also reported that there may have been two people with Mrs. Snow, a younger female and a younger male.

Mr. Grissom followed the *Melendres* case in the media stories as they were published or aired. Eventually, he learned that you and Judge Snow were "at odds."

Mr. Grissom was unaware of whether Karen Grissom had returned any of my telephone calls. He thought she had on an occasion but was uncertain.

Mr. Vogel's separate report will assesses Mr. Grissom's credibility from his perspective.

### 3. <u>Scott Grissom</u>

Mr. Vogel interviewed and took a recorded statement of Scott Grissom on Monday, October 28, 2013. Scott Grissom is the adult son (age 40) of Karen and Dale Grissom. He was visiting his parents and recalls eating a meal at *Some Burros*. The details and context of the statement are contained on the attached transcript and audio. The operative part of Scott Grissom's statement is where he remembers hearing, despite the noise in the restaurant, someone saying something to the effect of "**I'm going to get him or somebody's going to get him.**" This occurred while his mother was speaking with an unknown woman. Scott Grissom remembers very little else about that date or the characteristics of the woman. He has no idea what or who the woman was talking about.

Mr. Vogel's separate report will assesses Scott Grissom's credibility from his perspective.

















I am available at your convenience to discuss or answer any questions you might have regarding the foregoing analysis or recommendation.

Sincerely,



SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

Timothy J. Casey

TJC:eh

Encls.

cc:   Chief Jerry Sheridan, via hand-delivery w/encl.
      Chief Jack MacIntyre, via hand-delivery w/encl.
      Tom Liddy, via e-mail w/o encl.

14