FILED ____ LODGED
____ RECEIVED ____ COPY

MAY 0 7 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1  Jonathon A. Moseley
   Freedom Watch, Inc.
2  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
3  (310) 595-0800
   leklayman@gmail.com
4  Attorney for Intervenor

5  *(Pro hac vice pending)*

6  Larry Klayman
   Freedom Watch, Inc.
7  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
8  (310) 595-0800
   leklayman@gmail.com
9  Attorney for Intervenor

10 Of Counsel

11             **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF ARIZONA**
12

13 MANUEL de JESUS ORTEGA MELENDRES, on
   behalf of himself and all others similarly
14 situated; *et al.*

15             Plaintiff,

16      v.

17 JOSEPH M. ARPAIO, in his individual
   And official capacity as Sheriff of Maricopa      Civil Action No.
18 County, Arizona; *et al.*                          CV-07-2513-PHX-GMS

19             Defendants.

20
   DENNIS L. MONTGOMERY
21
               Intervenor.
22

23        **INTERVENOR DENNIS L. MONTGOMERY'S MEMORANDUM OF LAW
24 IN SUPPORT OF INTERVENOR's MOTION TO RECUSE/DISQUALIFY JUDGE G.
                  MURRAY SNOW UNDER 28 U.S.C. §144**
25

26 **I.      INTRODUCTION**

27      Pursuant to 28 U.S. Code § 144, Intervenor Dennis L. Montgomery hereby respectfully

28
                              - 1 -

moves for disqualification of the Honorable G. Murray Snow. (Exhibit 2). Intervenor hereby presents this Memorandum and files the attached affidavits and corresponding certificate of filing in good faith by counsel.  Intervenor hereby respectfully demands the transfer of what remains of this case to a different judge, immediately, as provided by 28 U.S. Code § 144 and the disqualification or recusal of Judge Snow in further related proceedings concerning Dennis L. Montgomery and his attorney Larry Klayman.

The legal opinion of Professor Ronald Rotunda, a renowned expert on Professional Responsibility and Constitutional Law, is attached and incorporated herein in support of this Court's disqualification. (Exhibit 1). As explained by Professor Rotunda, Judge Snow now has – by his own admission – an incurable personal interest in the case, at least in this new phase of this case as it has metastasized into something entirely new.  At this stage, Judge Snow is the sole decision-maker in the case.

By his own official inquiry, statements, and questions in open court, on the transcript, Judge Snow admits that the investigation now concerns – at least as the Judge believes – the Judge's wife. As proclaimed by Judge Snow himself, Judge Snow is now unethically investigating issues about his own family.

This began when reports were published that Judge Snow's wife stated to several witnesses at a restaurant that her husband, Judge Snow, wanted to do everything possible in his conduct of this case to make sure Arpaio is not re-elected as Sheriff in the upcoming elections.

Apparently neither Judge Snow nor his wife have denied nor sought to explain his wife's public statement as far as Intervenor or counsel are able to determine. Instead, Judge Snow is determined to investigate and threaten Dennis Montgomery and others have confirmed that Judge Snow's wife did make the statement at issue.

These matters can only, even if relevant and not unethical (which they are not) be heard by a

different judge and the inquiry concerning Mr. Montgomery should be shut down and his documents and property returned forthwith.

Intervenor Dennis Montgomery strongly rejects the insinuations and implications of this inquiry sparked by scurrilous lies and defamation by blog postings, particularly <u>The Phoenix New Times,</u> a disreputable, dishonest and low-class internet rag that has a far-left political agenda and which hates Sheriff Joe Arpaio and anyone associated with him.[1]  Mr. Montgomery was not working on this case or investigating Judge Snow or Snow's family.  However, just as physicians are not supposed to treat their own family for anything serious, it is doubtful that accurate facts can be presented and correctly interpreted by a person considering allegations about his wife and family.

Now, Dennis Montgomery's own documents, intellectual property, patented technology, copyrighted material, and other information has been seized by order of Judge Snow.

Also, this week, Judge Snow has also ordered to be produced from the Maricopa County Sheriff's Office ("MCSO") and Cold Case Posse all documents concerning Dennis Montgomery's attorney Larry Klayman and all documents relating to any communications with another federal judge, thus also invading the authority of another federal judge.

II.   **STATEMENT OF FACTS RELEVANT TO MOTION**

The mainstay of this case is concluded and only contempt proceedings are now underway. On October 2, 2013, Judge Snow entered a "Supplemental Permanent Injunction / Judgment Order."  Sheriff Joe Arpaio and the MCSO filed a Notice of Appeal from the October 2, 2013, final order to the U.S. Court of Appeals for the Ninth Circuit., which heard the appeal from the October 2, 2013, Order.

Yet 19 months after the final judgment was entered in this Court, ongoing proceedings now,

---

[1] <u>The Phoenix New Times</u> employs as so-called reporters a pornographer, drug addict and convicted felon, as discovered in other lawsuits.

post-judgment, have become focused on irrelevant and scandalous allegations concerning Mr. Montgomery published by a disreputable and dishonest, ultra-leftist rag, <u>The Phoenix New Times</u>, which hates anyone remotely associated with Sheriff Joe Arpaio and his office.

Dennis Montgomery provided his software work, analysis, technological work, copyrighted material, patents, programs, source code, output data, and information to the MCSO.  Thus, Dennis Montgomery retains a proprietary interest in those documents including as intellectual property and/or trade secrets.  Yet, documents about and generated by Dennis Montgomery working on confidential matters were demanded by Judge Snow and turned over without the opportunity for a review of privilege or documents subject to trade secrets protection or confidentiality agreements with third parties.

On April 23, 2015, Judge Snow also launched his own inquiry of the Intervenor Dennis L. Montgomery during the testimony of Sheriff Joe Arpaio.

In the hearing in this case on April 23, 2015, Judge G. Murray Snow was conducting the questioning of Sheriff Joe Arpaio.  At Page 646, lines 4-6, Judge Snow asked Sheriff Arpaio:  **"Q. Did you ever -- you see that the article says that what Montgomery was actually doing was investigating me. You see that that's what the article says?"**

Although Sheriff Arpaio answered **"It's not true,"** Judge Snow puts his faith in hearsay by blogger Stephen Lemons at an unreliable and dishonest rag, <u>The Phoenix New Times</u>, proffering such scandalous stories as "Judge Snow Rips the Lid Off an MCSO Riddled With Corruption, Confirming My Reporting in the Process," "Arpaio Cops to Investigating Federal Judge, Judge's Wife, Confirming *New Times* Story," "Arpaio's Chief Deputy Confirms Wack Investigations of Judge's wife, CIA, DOJ, etc."

Specifically, starting on Page 646, Judge Snow asked Sheriff Arpaio, in which "the article" refers to Lemons' blog posting in <u>The Phoenix New Times</u>:

Q. Now, the article says that you were personally conducting these investigations and personally aware of them. Were you?

A. Well, on a certain issue I was.

Q. And what issue was that?

A. It was the president's birth certificate.

Q. Okay. So you were -- Mr. Montgomery was doing research into the president's birth certificate. Did Mr. Montgomery ever tell you -- or, well, did you ever use Mr. Montgomery to investigate anything about the Department of Justice?

A. I don't believe that Montgomery was involved in the birth certificate. It was other violations that he was looking into.

Judge Snow continued questioning Sheriff Arpaio on page 647:

Q. And what were those?

A. Had to do with computer tampering and also bank fraud, that type of thing.

Q. Did you ever -- you see that the article says that what Montgomery was actually doing was investigating me. You see that that's what the article says?

A. It's not true.

Q. All right. Are you aware that I've ever been investigated by anyone?

A. You investigated?

Q. Yes.

A. No. No.

Q. Any of my activities?

A. No.

Q. Any of my family members?

A. That have been investigated?

Q. Yes.

A. Not by our office.

Q. Are you aware of anybody who's investigated any of my family members by any -- any office. Or anybody.

A. I believe there was an issue, but once again, it wasn't my office.

Q. Well, whose office was it?

- 5 -

A. It was an outside investigator not hired by us.

Q. Who hired the outside investigator?

Judge Snow continued questioning Sheriff Arpaio on pages 648 -649:

A. Could have been counsel.

Q. "Counsel" meaning your counsel?

A. Yes.

Q. And would that have been Mr. Casey or Ms. Iafrate?

A. I believe it would have been Mr. Casey.

Q. And who did he hire?

A. It was the counsel.

Q. I'm sorry?

A. Mr. Casey.

Q. Mr. Casey. Who did Mr. Casey hire?

A. Pardon?

Q. Who did Mr. Casey hire? To investigate me or a member of my family, or members of my family.

A. We weren't investigating you, Your Honor.

Q. Well, who were you investigating?

A. We were investigating some comments that came to our attention.

Q. Okay. And how did they come to your attention?

A. Through e-mail.

Q. And do you know who the author of the e-mail was?

A. I don't have the name right now.

Q. Okay. Let me ask, in his article Mr. Lemons indicates -- well, let me get -- let me get this clear. Your testimony is that Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, never were involved in any investigation of the Department of Justice or of me, is that correct?

A. Not -- no, not of you.

Q. Well, were they involved in an investigation of the Department of Justice?

A. I'm not sure.

Q. Were they trying to determine whether the Department of Justice had contacted me in any way?

1  A. I'm not sure about that.

   Q. You're not sure about that?

2  A. No.

3  Q. And would Mr. Montgomery have been involved in assisting
   them to determine whether the Department of Justice had
4  contacted me in any way?

5  A. No. I believe there was information about many judges being
   infiltrated or wiretaps and that type of thing. That's what the
6  informer said that right now we don't have much confidence in.

7  Q. Well, who was the informer and what did the informer say?

8  A. We're speaking about Montgomery.

   Q. All right. Montgomery said that judges had been infiltrated?
9
   A. That many judges -- if I recall, that they're wire -- their phones
10 were tapped, e-mails, that type of thing.

11 Q. By the Department of Justice?

12 A. By someone.

13 Judge Snow continued questioning Sheriff Arpaio on pages 650:

14 Q. And so Mr. Montgomery proposed to -- who did he propose to
   at the MCSO that the DOJ was inappropriately -- I assume it was
15 of interest to you if they were wiretapping my phone, among
   others?
16
   A. Yes. And mine, too.
17
   Q. And yours, too. And so were you conducting this investigation?
18
   A. No.
19
   Q. Who was in your department?
20
   A. This is Zullo and I think Mackiewicz.
21
   Q. What rank does Mackiewicz have?
22
   A. He's a detective.
23
   Q. Who did he report to about this investigation?
24
   A. I think he and Zullo worked together.
25
   Q. And who did they report to?
26
   A. And Jerry Sheridan.

   Q. They reported to Deputy Chief Sheridan?
27
   A. At one time, but let me just say that the information we're --
28 we've been getting is the informer's not very viable.

1    Q. Well, I understand that, I think the article itself says, that you became aware after a considerable amount of time that the reporter was giving you junk. Is that fair to say?

2    A. Yes.

3    Q. Or the informer was giving you junk?

4    A. Yes.

Judge Snow continued questioning Sheriff Arpaio on pages 654, line 5 onward:

6    Q. Now, I think in addition to the investigation that may have involved me and my phone or any contact or tapping by the Department of Justice, you indicated that there were investigations made into members of my family. Did you indicate that?

8    A. That had nothing to do with Montgomery.

9    Q. What did it have to do with?

10   A. I believe there was a, as I say, e-mail that came to me.

11   Q. And do you still have that e-mail?

12   A. We may have it, yes.

13   Q. I'm going to direct you to keep that e-mail.  What did the e-mail say, to the best of your recollection?

14   A. I think it mentioned that Judge Snow wanted to do everything to make sure I'm not elected.

15   Q. Do you recall who the author of that e-mail was?

16   A. I believe it was someone named Grissom.

17   Q. Grissom?

18   A. Grissom.

19   Q. Okay. And how did this person purport to know that?

Judge Snow continued questioning Sheriff Arpaio on pages 655, line 5 onward:

20   A. The person met your wife in a restaurant, and she's the one that made those comments.

21   Q. According to whatever Mr. Grissom said.

22   A. There was other witnesses, yes.

23   Q. Okay. And so you turned that over to your counsel and counsel hired a private investigator, and what did the investigator do?

24   A. He investigated it.

25   Q. And what was the result of the investigation?

26   A. Results were that he confirmed that your wife was in that restaurant and con -- I guess talked to the witnesses, three or four, that confirm that remark was made.

27

28

1

Q. All right. And do you have any materials pertaining to that investigation?

2

A. We should have.

Q. Okay. Will you save those as well?

3

A. Yes.

4

Q. All right. Thank you.  Who has told you that the information that Mr. Montgomery provide -- or how is it that you've come to conclude that the information you were getting from Mr. Montgomery is not reliable?

5

6

A. I think the investigators, as time progressed, figured that he may not be reliable.

7

Q. Did the MCSO also purchase computer equipment for ….

8

9

Nowhere does it appear that either Judge Snow or his wife have ever denied that his wife

10

made those comments about Judge Snow's intention to conduct this case in a manner to ensure

11

Sheriff Arpaio's defeat in the upcoming election for Sheriff or that she was misreported or

12

misunderstood.  And, his wife's indeed having made the prejudicial comments have been confirmed

13

by other third party witnesses. Nor have Judge Snow or his wife even, however convincingly or not,

14

offered an apology for making these unethical and prejudicial statements.

15

16

Instead, Judge Snow, to pursue his won personal interests and agenda, then questioned

17

improperly Chief Deputy Sheridan and others about Mr. Montgomery on issues having nothing to

18

do with the on-going contempt proceedings.

19

This is all very far removed from the final order entered 19 months ago on October 2, 2013,

20

ending this case.

21

## III.    ARGUMENT

22

### A.  The Governing Law

23

Pursuant to 28 U.S. Code § 144:

24

25

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

26

27

28

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

## B. Governing Legal Precedents and Principles

An impartial judiciary is a fundamental component of the system of justice in the United States. The right to a "neutral and detached judge" in any proceeding is protected by the Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). *See also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) ("powerful" constitutional interest in fair adjudicative procedure). Congress has sought to secure the impartiality of judges by requiring them to step aside, or in some instances, disqualify themselves, in various circumstances.

In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct." *York v. United States*, 785 A.2d 651, 655 (D.C. 2001). "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned. . . ." ABA Code Of Judicial Conduct Canon 3(C)(1) *see also Scott v. United States*, 559 A.2d 745, 750 (D.C. 1989) (en banc).

The language of the Code of Conduct for United States Judges leaves no doubt that that recusal process is to be self-executing, as the judge should not unethically wait for a recusal motion to be filed. **"It is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings . . . [E]ven before appraising participation in the case under the [Judicial Code], the judge should first consult his own emotions and conscience, and pass an 'internal test of**

**freedom' from disabling conflicts."** Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct 10 (2d ed. 1992).

Here, of course, the case has embarked on a dramatically new phase quite unrelated to the past history of the case.  At this juncture, the analysis should be applied.

Disqualification or recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *See also Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001) (recusal was proper because the judge "ha[d] created an appearance of personal bias or prejudice").

> The disqualification statute, 28 U.S.C. §144, is **mandatory and automatic,** requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations, and truth must be presumed. *United States v. Hanrahan*, 248 F. Supp. 471, 474 (D.D.C. 1965)(Emphasis added);  and the allegations may be based upon information and belief, *Berger v. United States*, 255 U.S. 22, 34, 65 L. Ed. 481, 41 S. Ct. 230 (1920).

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.*, 380 F.2d 570, 576 (D.C. 1967).

Under§ 455(a), a judge must recuse himself if a reasonable person with knowledge of all the facts would conclude that his impartiality might reasonably be questioned." *United States v. Nelson*, 718 F .2d 315, 321 (9th Cir. 1983).

Further, the Supreme Court has held that a violation of section 455(a) takes place even if the judge is unaware of the circumstance that created the appearance of impropriety. In *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), the trial judge was a member of the board of trustees of a university that had a financial interest in the litigation, but he was unaware of the financial interest when he conducted a bench trial and ruled in the case. The court of appeals

nevertheless vacated the judgment under Fed. R. Civ. P. 60(b) because the judge failed to recuse

himself pursuant to section 455(a), and the Supreme Court agreed. Noting that the purpose of

section 455(a) is to promote public confidence in the integrity of the judicial process, the Court

observed that such confidence "does not depend upon whether or not the judge actually knew of

facts creating an appearance of impropriety, so long as the public might reasonably believe that he

or she knew.

The U.S. Courts of Appeals for the First, Fifth, Sixth, Tenth, and Eleventh Circuits have said

that close questions should be decided in favor of recusal. *See Republic of Pan. v. American

Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir.

1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th

Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888

F.2d 732, 744 (11th Cir. 1989).

In *SCA Servs. v. Morgan*, 557 F.2d 110 (7th Cir. 1977), the judge's brother was an attorney

in the firm appearing before the judge. Similar to the relationship between Judge Snow and his

wife: "This appearance of partiality begins with the natural assumption that brothers enjoy a close

personal and family relationship and, consequently, would be inclined to support each other's

interests. When one's brother is a lawyer in the firm representing a party before his brother who is

the judge in the case, the belief may arise in the public's mind that the brother's firm and its clients

will receive favored treatment, even if the brother does not personally appear in the case." *Id.* at

116. The U.S. Court of Appeals for the Seventh Circuit also found that "the judge's 'Memorandum

of Decision' suggests that he made a confidential inquiry, presumably to his brother, to determine in

what capacity Donald A. Morgan was involved in this case (Petitioner's App. D-3). Counsel were

not present and were unaware of the inquiry at the time it was made. While it is understandable why

the judge may have felt his brother could present the most accurate evidence as to his role in the

pending litigation, the judge's inquiry creates an impression of private consultation and appearance

of partiality which does not reassure a public already skeptical of lawyers and the legal system." *Id.*

The Seventh Circuit granted a petition for writ of mandamus requiring the trial court to abstain from

presiding over further proceedings.  The same situation appears here.  Judge Snow will have access

to his wife's explanation outside of court as to whether she did or did not make the statement at

issue.

     In *In re Faulkner*, 856 F.2d 716 (5th Cir. 1988), the U.S. Court of Appeals for the Fifth

Circuit reversed a refusal to recuse where a relative of the judge was a major participant in

transactions relating to the defendant's indictment and "that relative had communicated to the judge

. . . material facts and her opinions and attitudes regarding those facts." *Id.* at 721.

     Also on point is *In re Aetna Casualty & Surety Co.*, 919 F.2d 1136 (6th Cir. 1990), where

the U.S. Court of Appeals for the Sixth Circuit, sitting en banc, required recusal. In *In re Aetna*

*Casualty & Surety Co.*, seven claims against an insurance company were consolidated for trial, and

the trial judge initially recused himself because his daughter's law firm represented four of the

claimants. The judge later separated the cases and planned to try the three claims in which his

daughter's firm was not involved. On mandamus petition the court reversed because the cases

remained intimately connected: A "decision on the merits of any important issue in any of the seven

cases . . . could constitute the law of the case in all of them, or involve collateral estoppel, or might

be highly persuasive as precedent." *Id.* at 1143. The court did not specify whether it based its

decision on section 455(a) or section 455(b)(5)(ii), but a concurring opinion, joined by seven

judges, emphasized that there was an actual conflict of interest pursuant to section 455(b)(5) as well

as an appearance of partiality.

     Providing further definition and guidance, 28 U.S. Code § 455 also requires:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

* * *

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

* * *

Moreover, the Code of Conduct for United States Judges

CANON 2 requires:
* * *
(B) Outside Influence. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

CANON 3 requires:
* * *
(C) Disqualification.
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

           (a)the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

                    \* \* \*

           (c)the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

           (d)the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

                    \* \* \*

           (iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

           (iv) to the judge's knowledge likely to be a material witness in the proceeding;

## C. Case Must Be Transferred to Another Judge Immediately

Nothing can create more of the appearance of a conflict of interest – much more an actual conflict of interest – than when a presiding judge has a personal interest in the litigation or matters related to it.  The applicable standard for recusal is whether a judge's participation in a lawsuit will, at a minimum, create the *appearance* of bias and prejudice. *See Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001), *supra.*[2]

As explained by Professor Ronald Rotunda, Judge Snow should be disqualified or recuse himself. (Exhibit 1).

Pursuant to 28 U.S. Code § 455(a), at a minimum Judge Snow's impartiality may reasonably be questioned, because the Judge has a personal interest running an inquiry concerning possible

---

[2] Here, we have much more than an "appearance." Judge Snow has misused the ongoing proceedings to pursue his own personal agenda and interests concerning him and his wife.

investigations of himself and his family, and also, according to Rotunda, because the transcript indicates Judge Snow investigating matters on his own outside of the evidentiary hearing.

Pursuant to 28 U.S. Code § 455(b)(1), Judge Snow has personal knowledge of disputed evidentiary facts concerning the proceeding.  The Court unethically and improperly determined that an inquiry about investigations into his wife's statement should come within the current case.  Yet, undoubtedly, Judge Snow has or will find out from his wife if she made the statement or not. Therefore, Judge Snow has personal knowledge of disputed facts which the Court has determined to be relevant.

To the extent that the Court determines the topic to be relevant at all, pursuant to 28 U.S. Code § 455(b)(5)(iv),  Judge Snow's wife would be a likely witness as to whether she made the statement or not and/or what she meant and the context, etc.

Sheriff Arpaio testified that Dennis Montgomery had nothing to do with any investigation of Judge Snow or his wife.  Yet when Court resumed after lunch on April 23, 2015, at page 657-660 of the transcript, Judge Snow immediately started up again with further inquiries about Dennis Montgomery's alleged funding and records.  Judge Snow's orders after the lunch recess indicated a determination to undertake a major examination concerning Dennis Montgomery.

**D.  <u>Seizing Dennis Montgomery's Documents Without Review</u>**

Dennis Montgomery provided his software work, technology, and analysis to the MCSO retaining the rights to his proprietary work and interests, trade secrets, and intellectual property.

However, the Court also ordered the immediate production of documents about, written to or from, or generated by Dennis Montgomery, without an opportunity for Mr. Montgomery and his counsel to review the documents for compliance with confidentiality agreements with third parties such as Dennis Montgomery, privilege, work product, proprietary interests or other concerns.

Furthermore, counsel for Intervenor is advised that when Sheriff Arpaio's counsel requested

the opportunity to review the documents promptly provided to Judge Snow to retrieve any documents that might be privileged and not subject to disclosure, Judge Snow refused.

The seizure of Dennis Montgomery's intellectual property and work without an opportunity for review, at a minimum demonstrates the appearance of bias or conflict of interest in the case.

## IV.    CONCLUSION

Pursuant to 28 U.S.C. § 144, this case must be immediately transferred to a different judge, , and Judge Snow should remove himself or be disqualified on the case as required by the statute, as he has used it to pursue his own personal agenda with regard to scurrilous statements made by his wife and violated sacrosanct attorney client and work product privileges.


Dated: May 7, 2015

Respectfully submitted,

Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

Of Counsel



Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2015, I served this document by U.S. Mail to:

Honorable John Z. Boyle
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160

Honorable G. Murray Snow
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
*Attorneys for Plaintiffs*

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
*Attorney for Plaintiffs*

Cecilia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
*Attorney for Plaintiff Melendres*

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES

- 18 -

649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Melvin McDonald
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
*Attorney for Plaintiffs*

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616

Jorge M. Castillo
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
*Attorney for Plaintiffs*

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
Attorney for Defendant Maricopa County

_____
Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

*(Pro Hac Vice Application Filed)*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Action No. 07-2513-PHX-GMS
Judge G. Murray Snow

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 07-2513-PHX-GMS |
| Joseph M. Arpaio, et al., Defendants. | ) ) ) ) | |
| | ) ) ) | The Hon. G. Murray Snow, *Judge Presiding*. |

## DECLARATION OF RONALD D. ROTUNDA

I, RONALD D. ROTUNDA, declare as follows:

### I.   INTRODUCTION

1. My name is Ronald D. Rotunda.  I am currently the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law in Orange, California, where I teach courses in Legal Ethics and Constitutional Law. Attached, as <u>Exhibit A</u> is a copy of my current resume.

2. Except where otherwise noted, I make this declaration based on my personal knowledge and if called upon as a witness, I could and would testify competently to its contents.

1.

- 2 -

## II.   QUALIFICATIONS

3.  Before I joined Chapman U. in August 2008, I was the George Mason University Foundation Professor of Law from August 2002 (when I started teaching at George Mason University School of Law), until August 2006, when I became University Professor and Professor of Law at George Mason University School of Law.  Please see my resume, Exhibit 1, for more information, including a list of my publications.

4.  Prior to that (from 1993 until 2002), I was the Albert E. Jenner, Jr. Professor of Law at the University of Illinois.  I left the University of Illinois in 2002, and then began working full-time at George Mason University.

5.  I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.  During the course of my legal career, I have practiced law in Illinois, New York, Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee.

6.  I am the co-author of PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including ROTUNDA & DZIENKOWSKI, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA/Thompson, 2014).

7.  In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume. State and federal courts at every level have cited my treatises and articles over 1000

- 3 -

times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

8. In 2000, the University of Chicago Press published a lengthy study that sought to determine the influence, productivity, and reputations of law professors over the last several decades. That study ranked me as the 17th highest in the nation. *See Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000).

9. The 2002-2003 New Educational Quality Ranking of U.S. Law Schools (EQR) ranked me the 11th most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml . I was selected the Best Lawyer in Washington, DC, in 2009 in Ethics and Professional Responsibility Law, as published in the November 2008 in the Washington Post in association with the Legal Times. I was also selected as one of the Best Lawyers in Southern California, in 2010 in Ethics and Professional Responsibility Law, and yet again in 2011, 2012, 2013, 2014, as published in the Los Angeles Times, in association with American Law Media.

10. I am a member of the bars of New York, Illinois, Washington, D.C., the Second Circuit, Seventh Circuit, the D.C. Circuit, the Fourth Circuit, the Central District of Illinois, D.C. District Court, and the U.S. Supreme Court.

11. Over the years, I have spoken at various ABA conferences on legal ethics and was a featured speaker on an ABA videotape series on legal ethics. I am a former —

- Member of the Bar Admissions Committee of the Association of American Law Schools;
- Chair of the Section on Professional Responsibility of the Association of American Law Schools;
- Member of the ABA Standing Committee on Professional Discipline (1991-1997);

- 4 -

- Chair of the ABA Subcommittee on Model Rules Review (1992-1997); member of the Consultant Group of the American Law Institute's Restatement of the Law Governing Lawyers.
- Member of the Advisory Council to Ethics 2000, the ABA Commission that proposed revisions to the ABA Model Rules of Professional Conduct (1998-2000).
- Liaison to the ABA Standing Committee on Ethics and Professional Responsibility (1994-1997).

12. Since 1994, I have been a member of the Publications Board of the A.B.A. Center for Professional Responsibility. I am a Life Fellow of the American Bar Foundation and the Illinois Bar Foundation, and a former consultant to the Administrative Conference of the United States on various issues relating to legal ethics.

13. During May 1996, I was the Consultant to the Chamber of Advocates of the Czech Republic: under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for lawyers in the Czech Republic. I also wrote the original draft of the first Czech Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of that Court to create an independent judiciary.

14. During November-December, 2002, I was Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law in, Leuven, Belgium.

15. In May 2004, and December 2005, I was visiting lecturer at the Institute of Law and Economics, Institut für Recht und Ökonomik, at the University of Hamburg.

16. During July 2007, I was in Latvia where I conferred with various judges from the Baltic States on judicial ethics, under the auspices of the U.S. Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. A copy of my curriculum vitae is attached.

III.   DOCUMENTS

- 5 -

17. I have reviewed the followings documents in connection with this matter. It appears that

the judge is getting most of his "information" from articles of the Phoenix New Times:

    a. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/judge_murray_snow_joe_
arpaio_contempt_trial.php

    b. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaio_cops_to_investigat
ing_federal_judge_judges_wife_confirming_new_times.php ("judge's spouse
allegedly made at a restaurant, to the effect that Judge Snow wanted to 'make
sure' Arpaio's not re-elected")

    c. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaios_chief_deputy_con
firms_wack_investigations_of_judges_wife_cia_doj_et.php ("I know Judge
Snow's wife, she told me he hates you and wants to see you out of office.")

    d. Order re evidentiary hearing of 4/27/2015; MEO re Day 4 evidentiary hearing

    e. Transcripts of Evidentiary Hearing of 4/21/2015; 4/22/2015;/ 4/23/2015;
4/24/2015

## IV.   SUMMARY OF THE FACTS

18. On April 22, 2015, and on April 23, 2015, Judge Snow conducted a cross examination of

Sheriff Arpaio. Judge Snow quickly learned that Sheriff Arpaio was not investigating the

judge (Evidentiary Hearing, 4/23/2015, p. 648, l. 14.) Instead, the judge was interested in

learning all he could about an email that Sheriff Arpaio received from "someone named

Grissom," who met the judge's wife in a restaurant." (Evidentiary Hearing, 4/23/2015, p.

654-55.). Mr. Grisson heard the judge's wife say that "Judge Snow wanted to do

everything to make sure I'm [Sheriff Arpaio] not elected." (Evidentiary Hearing,

4/23/2015, p. 655, ll. 19-20.)

19. Sheriff Arpaio wanted to confirm that Mr. Grisson's statement was actually true. The

judge then asked Sheriff Arpaio various leading questions (indicating that the judge was

cross-examining the witness). Q is Judge; A. is Sheriff

    **Q.**      Okay. And so you turned that over to
your counsel and counsel hired a private
investigator, and what did the
investigator do?

    **A.**      He investigated it.

> Q.    And what was the result of the investigation?
>
> A.    Results were that *he confirmed that your wife was in that restaurant* and con -- I guess *talked to the witnesses, three or four, that confirm that remark was made.* [Evidentiary Hearing, 4/23/2015, p. 655, ll. 5-12(emphasis added)]

20. The *judge apparently engaged in his own investigation of facts outside the courtroom* he thought relevant that were not in evidence. (Evidentiary Hearing, 4/23/2015, at p. 657, l. 25 & p. 658, ll. 1-2.)  The judge said, "I *was told* [during the luncheon break] that you also have various sources of funding within the MSCO," and Sheriff Arpaio responded that the judge's information was false. [Emphasis added.]  The judge did not say who told him this false information, nor does he say if he questioned others as well.

21. Later, the *judge* said, "Well, so he found information that the DOJ [Department of Justice] had sent a communication to my computer?"  Evidentiary Hearing of 4/24/2015, at p. 1000, ll. 19-20.  Note that this is a leading question, to which the witness (Sheridan) responds, "Something to that effect, yes."

22. Shortly thereafter, Mr. Sheridan said that he did not think the evidence of this email showed "collusion," to which the judge promptly replied, "Well, I certainly agree with that . . . ." Evidentiary Hearing of 4/24/2015, at p. 1002, l.3.

23. The judge appears to be taking evidence outside of court (See ¶ 20), asking leading questions (e.g. ¶ 21), and giving his own testimony (¶ 22).

24. The judge also becomes argumentative. He tells Mr. Sheridan that he did not have to hire Mr. Montgomery as a "confidential" consultant — "Well, but what was he doing that needed to be confidential for?"  The witness tries to answer, but the judge *interrupted* the witness, preventing him from finishing his sentence.  Then the judge argues that there

was no need for confidentiality because the consultant was not a mole infiltrating organized crime. The witness responds that the investigation was confidential because it concerns the CIA breaching personal information at least 50,000 American citizens, including "citizens that lived here in Maricopa County." However, the judge became more argumentative, telling the witness, "I still don't understand" why such a witness should be called "confidential," even though the witness informed the judge that this informant qualified as "confidential" under the *written* rules of the operations manual. Evidentiary Hearing of 4/24/2015, at pp. 1005-0116.

25. I am told that Judge Snow is now ordering that documents showing communications with or referring to Larry Klayman, the lawyer for Mr. Montgomery, be turned over to him, including documents covered at least by the Attorney Work Product Privilege.

    a. Mr. Klayman and Mr. Montgomery are not parties to this case;
    b. No party has issued subpoenas for any of these documents;
    c. I am advised that the documents are confidential and within the Attorney Client and/or Work Product Privileges.

26. In the judge's order of April 27, he states that he ordered the "MCSO defendants to *immediately disclose* certain materials discussed in the Court's colloquy Sheriff Arpaio." [Emphasis added.] The judge states, "Attorney review for privilege was conducted contemporaneously with this production . . . ." I have been advised that this is not true.

## V.   CONCLUSION

27. We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that

- 8 -

Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

28. Moreover, we also know that in the several days of hearing, the judge —

    **a.** asked leading questions,
    **b.** gave his own version of the facts,
    **c.** conducted his own investigation outside the courtroom,
    **d.** argued with witnesses, and
    **e.** was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected.

29. Under these set of facts, the judge should be disqualified because of his personal bias or prejudice against a party, Sheriff Arpaio. See 28 U.S.C. §144.   This section has no provision for any waiver.

30. The judge should also be disqualified pursuant to 28 U.S.C. §455(b)(1) ("personal bias or prejudice concerning a party" *or* "personal knowledge of disputed evidentiary facts concerning the proceeding." Section 455(e) allows for waiver of some disqualifications but does not allow any waiver for any disqualification under §455(b). 28 U.S.C 144 is also implicated here.

31. I declare under penalty of perjury that the foregoing is true and correct and that I signed this declaration on 6 May 2015, in Orange, California.

_____
RONALD D. ROTUNDA

Attachment A

RONALD D. ROTUNDA
Email: rrotunda@chapman.edu

April 27, 2015
Home Page 🏠 http://www1.chapman.edu/~rrotunda

**Office Address:**

    Chapman University
    Dale E. Fowler School of Law
    Room 406
    One University Drive
    Orange, CA  92866-1005
    ☎:    (714) 628-2698
    Fax:    (714) 628-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:**  HARVARD LAW SCHOOL      (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:**  HARVARD COLLEGE      (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000). Best teacher selected by George Mason U. Law School Graduating Class of 2003.

## Scholarly Influence and Honors:

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times*, picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

- 4 -                                                    Ronald D. Rotunda

### LIST OF PUBLICATIONS:

### BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

Ronald D. Rotunda

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

Ronald D. Rotunda

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW:   CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE:  LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW: PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

    1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

    1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

    1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

    1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

    1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

    1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

    1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

    1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

Ronald D. Rotunda

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

**Treatise on Constitutional Law:  Substance and Procedure** — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

- 10 -                                          Ronald D. Rotunda

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

Ronald D. Rotunda

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

- 12 -                                                    Ronald D. Rotunda

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

Ronald D. Rotunda

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd.  Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

- 14 -                                   Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

- 15 -                                                    Ronald D. Rotunda

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

Ronald D. Rotunda

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

    2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

    2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

    2014 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Academic Publishing, St. Paul, Minnesota, 2014).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

Ronald D. Rotunda

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:   SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:   SUBSTANCE AND PROCEDURE (Thomson Reuters, Eagan, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA- Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, Eagan, Minn., 12th ed. 2014) (a Treatise on legal ethics, jointly published by the ABA and Thomson Reuters) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(unabridged edition).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(abridged edition).

## ARTICLES:

*The "Liberal" Label:  Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:  An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74*, 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:  A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

Ronald D. Rotunda

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies:  Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases:  Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information:  The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time:  Can the E.R.A. Be Saved*, 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

- 20 -                                       Ronald D. Rotunda

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct:  Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW:  EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

- 21 -                                     Ronald D. Rotunda

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators*, Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in,  LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering*, 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

- 22 -                                    Ronald D. Rotunda

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW
JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW
BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988
at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988),
reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS
LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4,
1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in,
25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND
MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988),
reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1
MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12,
1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE
RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26,
1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*,
1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW
QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15
(1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989),
reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989)
(Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

Ronald D. Rotunda

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE
    JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited
    remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5
    ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2,
    1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's
    Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35
    (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb.
    1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS
    BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p.
    B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law
    Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4,
    1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK
    OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1,
    1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991),
    32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH
    (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW
    JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319  (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law:  An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment*, 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

- 26 -                                              Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past*, HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers*, 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment*, 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act*, THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?*, WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press*, in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters,* 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention,* 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens,* CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.,* 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families,* 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers,* 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines,* 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers,* 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto,* 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer,* 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective,* 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones,* CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?,* 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

- 28 -                                              Ronald D. Rotunda

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act,*
    66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal,* 9 THE PROFESSIONAL LAWYER 2 (ABA,
    No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege,* 1 PROFESSIONAL RESPONSIBILITY,
    LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4
    (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union,* 1 THE GREEN BAG,
    2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues,* 15 CONSTITUTIONAL
    COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts,* 3
    COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers,* 9 THE
    PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA —
    FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M.
    Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom,* 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments,* 29 TEXAS TECH
    LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29,
    1998).

*Remarks on School Choice,* in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR
    SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL
    82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v.
    Flores,* 32 INDIANA LAW REVIEW 163 (1998).

Ronald D. Rotunda

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers,* 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics,* 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich,* CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?,* WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking: A Brief Case Study,* 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums,* LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts,* WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate,* 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws,* LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers,* THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence,* LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment,* 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention,* CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

Ronald D. Rotunda

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g., Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics*, in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

- 31 -                                     Ronald D. Rotunda

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention,* NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia,* PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

Ronald D. Rotunda

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

- 34 -                          Ronald D. Rotunda

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

Ronald D. Rotunda

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN
     SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15,
     2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University
     Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30,
     2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510
     (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the
     Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE
     LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010,
     http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD
     QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010,
     http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-
     First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2,
     http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21,
     http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-
     20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010,
     http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-
     law/?singlepage=true

Ronald D. Rotunda

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 McGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution*, NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

Ronald D. Rotunda

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară*, REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training*, 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare*, WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

- 38 -                                       Ronald D. Rotunda

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What did he know, and when did he know it?*', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

- 39 -                                                Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata,* 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade,* CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil,* THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial,* WALL STREET JOURNAL, May 2, 2014, at p. A13.

*The Ninth Circuit Departs from Tinker in Upholding Ban on American Flag T-Shirts in School,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 12, 2014, http://verdict.justia.com/2014/05/12/ninth-circuit-departs-tinker-upholding-ban-american-flag-t-shirts-school#sthash.pHSroRA6.dpuf

*Prayers before Meetings of the Town Board of Greece, New York,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 19, 2014, http://verdict.justia.com/2014/05/19/prayers-meetings-town-board-greece-new-york#sthash.pIt3d53k.dpuf

*Amending the First Amendment,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 9, 2014, http://verdict.justia.com/2014/06/09/amending-first-amendment

*Increasing Revenue by Lowering Taxes,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 23, 2014, http://verdict.justia.com/2014/06/23/increasing-revenue-lowering-taxes

*Changes in the Legal Profession and the Progress of Female Lawyers,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 7, 2014, http://verdict.justia.com/2014/07/07/changes-legal-profession-progress-female-lawyers#sthash.wKzv73e1.dpuf

*Banning the Export of American Oil,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 21, 2014, http://verdict.justia.com/2014/07/21/banning-export-american-oil

Ronald D. Rotunda

*Using Facebook as a Discovery Device*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 4, 2014, http://verdict.justia.com/2014/08/04/using-facebook-discovery-device

*Suing the President*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 18, 2014, http://verdict.justia.com/2014/08/18/suing-president

*IRS Monitoring Religious Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 15, 2014, http://verdict.justia.com/2014/09/15/irs-monitoring-religious-groups

*A Special Counsel to Investigate the IRS Targeting of Tea Party Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 29, 2014, http://verdict.justia.com/2014/09/29/special-counsel-investigate-irs-targeting-tea-party-groups

*Qualifications for Representatives,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 64-67 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Privileges and Immunities Clause,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 349-54 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Civil Forfeiture in Philadelphia*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 6, 2014, http://verdict.justia.com/2014/10/06/civil-forfeiture-philadelphia

*The Military Commissions Are Still Proceeding*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 20, 2014, http://verdict.justia.com/2014/10/20/military-commissions-still-proceeding

*Law Firms Creating In-House Ethics Counsel*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 3, 2014, http://verdict.justia.com/2014/11/03/law-firms-creating-house-ethics-counsel

*Targeting Political Speech for the Next Election*, WALL STREET JOURNAL, Nov. 5, 2014, p. A19, http://online.wsj.com/articles/ronald-rotunda-targeting-political-speech-for-the-next-election-1415145765

*The Problem of Inflating Billable Hours*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 17, 2014, http://verdict.justia.com/2014/11/17/problem-inflating-billable-hours

*The Mystery of Case Assignment in the Ninth Circuit,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 1, 2014, http://verdict.justia.com/2014/12/01/mystery-case-assignment-ninth-circuit

- 41 -                                  Ronald D. Rotunda

*The Ferguson, Missouri, Tragedy and the Future of Eyewitness Identification*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 15, 2014, http://verdict.justia.com/2014/12/15/ferguson-missouri-tragedy-future-eyewitness-identification

*Jonathan Gruber and the Wisdom of Crowds*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 29, 2014, https://www.facebook.com/ronald.rotunda/posts/10205409160371299?notif_t=like

*The President's Power to Waive the Immigration Laws*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Jan. 12, 2015, http://verdict.justia.com/2015/01/12/presidents-power-waive-immigration-laws

*The House of Representatives Lawsuit against the Executive Branch*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 2, 2015, https://verdict.justia.com/2015/02/02/house-representatives-lawsuit-executive-branch

*Je Suis Charlie Hebdo*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 16, 2015, https://verdict.justia.com/2015/02/16/je-suis-charlie-hebdo?utm_source=twitter&utm_campaign=wordtwit&utm_medium=web

*Protecting Rights in the Supreme Court*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 3, 2015, https://verdict.justia.com/2015/03/02/protecting-rights-supreme-court

*Lawyers Lying in Negotiations*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, MAR. 16, 2015, HTTPS://VERDICT.JUSTIA.COM/2015/03/16/LAWYERS-LYING-IN-NEGOTIATIONS

*King v. Burwell and the Rise of the Administrative State*, 23 U. MIAMI BUSINESS REV. 267 (2015)

*Hillary's Emails and the Law*, WALL STREET JOURNAL, March 17, 2015

*Is the Federal Government Really a State, if the IRS Says It Is?*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 30, 2015, https://verdict.justia.com/2015/03/30/is-the-federal-government-really-a-state-if-the-irs-says-it-is

*Ignoring the Supreme Court When You Don't Like the Result*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 13, 2015, https://verdict.justia.com/2015/04/13/ignoring-the-supreme-court-when-you-dont-like-the-result

*The Way of Death in the Netherlands, Oregon, and, Perhaps, California*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 27, 2015, https://verdict.justia.com/2015/04/27/the-way-of-death-in-the-netherlands-oregon-and-perhaps-california

Ronald D. Rotunda

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
> CHAIR, Subcommittee on Model Rules Review (1992-1997).  [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA.  I traveled to Cambodia and worked with officials of UNTAC (the United Nations

Ronald D. Rotunda

Transitional Authority in Cambodia) and Cambodian political leaders, who were charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (e.g., Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

- 44 -                                          Ronald D. Rotunda

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, Distinguished International Research Fellow at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, Associate Editor of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

Exhibit 2

Jonathon A. Moseley
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenors

*(Pro hac vice pending)*

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenor

Of Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated; *et al.* <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH M. ARPAIO, in his individual and official capacity as Sheriff of Maricopa County, Arizona; *et al.* <br><br> Defendants. <br><br> DENNIS L. MONTGOMERY, and LARRY KLAYMAN <br><br> Intervenors. | Civil Action No. CV-07-2513-PHX-GMS |

## DECLARATION OF DENNIS MONTGOMERY
## PURSUANT TO 28 U.S.C. 144 MOTION

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that

the following is true and correct based on my personal knowledge and belief:

- 1 -

1) I am over the age of 18 years old and mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain **aneurysm** and serious related health issues.

2) However, there are reasons now why Judge Snow cannot continue with this case.

3) I was surprised to learn from the local Arizona news media that on or about April 23- 24, 2015, the Honorable Judge G. Murray Snow began to investigate me in this Court and undertake his own questioning to take testimony about me.

4) The news was published on April 30, 2015, when it came to my attention.

5) I was even more surprised to discover that the reports – which this Court has apparently relied on – from the disreputable and dishonest publication, the Phoenix New Times, falsely claiming that I investigated Judge Snow's wife, because that is absolutely and categorically false. Phoenix New Times is an ultra-leftist publication, with its own political ideologies that it thrusts on everyone standing in their way, owned by Voice Media Group. It employs as reporters pornographers, convicted felons and drug addicts; persons who have little to no respect for the facts or the law.

6) Similarly, the Phoenix New Times reported falsely that I worked to find "compromising information about Snow, the judge overseeing the racial profiling case against Arpaio."

7) That is false and it is a scurrilous insinuation, particularly (but not limited to) because the familiar phrase "compromising information" tends to suggest a certain kind of dirt.

8) Nevertheless, starting at least about two weeks ago, Judge G. Murray Snow launched an inquiry into whether I had been investigating him and/or his wife.

9) It is important to recognize that the focus of the case has dramatically changed.  These are issues that have nothing to do with the original case or the ongoing contempt proceedings.

10) Such an inquiry must be conducted by another judge who does not have a personal interest in the subject matter.

11) On April 27, 2015, Judge Snow ordered all documents and records about me and my work to be handed over to the Court – including those which are privileged, subject to work product, and are proprietary, as well as my intellectual property.

12) More recently, Judge Snow, I am told, ordered the MCSO to produce all documents about my attorney, Larry Klayman, and about another federal judge in another jurisdiction, and even an attorney (now deceased) who worked to help Sheriff Joe Arpaio in a re-call petition election, and ordered production of all communications to or from any of them.

13) Judge Snow did not allow these documents seized by the Court to be reviewed to screen for attorney-client and/or work product privilege or confidential information such as trade secrets, proprietary information and intellectual property which I own.

14) As Professor Ronald Rotunda, in a companion affidavit filed herewith, points out, no party requested those documents.  They were not part of any discovery / document request by a party.

15) ***Therefore, Judge Snow is acting as a party himself*** conducting his own discovery.

16) I have become concerned that Judge Snow's personal interests in these matters could cloud the judgment of any normal human being so as to confuse the work of the "Cold Case Posse" and myself as being only about Judge Snow.

17) I intervene in this case because I am forced into the case by these events.  It is not my desire to be dragged into this controversy.

18) But I also am moving for the immediate return of my documents, my work, and my intellectual property that the Court ordered handed over. In so doing, the Court violated

my attorney-client privilege and work product, as well as my property and intellectual property rights.

19) I am also moving the Court to strike the scandalous and false smears against me in the Court transcript and to end this unethical, improper and irrelevant inquiry of Judge Snow.

20) Even after being told that my work has nothing to do with this case, Judge Snow continued to ask extensive leading and prejudicial questions about me and my work on April 23 and 24 and followed up with orders for document production and further discovery.

21) Therefore, it is Judge Snow's incorrect determination – not my own – that I and my work are relevant within the Court's proceedings.

22) Because of that, I have the legal right and the necessity to intervene in this case.

23) Judge Snow's own questioning of witnesses, persistently concerning me, indicates that Judge Snow is conducting his own personal inquiry into whether I and/or Sheriff Joe Arpaio's office were investigating Judge Snow and/or his wife.

24) Judge Snow's investigation is not relevant to the gravamen of the ongoing contempt proceeding and he cannot be the official who will conduct such an inquiry about himself and/or his wife, even were it proper, which it is not.

25) The Code of Conduct for United States Judges requires this case to be transferred to a different judge:  *(Emphases added.)*

> **CANON 2** requires:
> * * *
> (B) Outside Influence. ***A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment.*** A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression

that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

**CANON 3** requires:

\* \* \*

(C) Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding *in which the judge's impartiality might reasonably be questioned,* including but not limited to instances in which:

(a)the judge has a personal bias or prejudice concerning a party, *or personal knowledge of disputed evidentiary facts concerning the proceeding;*

\* \* \*

(c)the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, *or any other interest that could be affected substantially by the outcome of the proceeding;*

(d)the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

\* \* \*

(iii) *known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;* or

(iv) to the judge's knowledge *likely to be a material witness in the proceeding;*

26) Here, if Judge Snow's wife made the statement about Judge Snow's conduct of this case as confirmed by several witnesses, even if the substance of the statement is untrue about Judge Snow's conduct of the case, Judge Snow's wife could be affected either way, at least in reputation or emotionally if she made the statement.

27) Judge Snow will be "emotionally compromised" in examining the matter because no matter how the inquiry turns out there could be potential ramifications, if only in the form of stress in personal relationships.

28) Furthermore, the Judge's wife could become a witness, and the more so if the Court (not I) determines that the topic is important enough to warrant investigation.

29) Based upon my reading of the affidavit of Professor Ronald Rotunda, Judge Snow must recuse himself including for the following reasons:

30) Pursuant to 28 U.S. Code § 455(a), Judge Snow's impartiality may reasonably be questioned, because the Judge has a personal interest running an inquiry concerning possible investigations of himself and his family, and also, according to Rotunda, because the transcript indicates Judge Snow investigating matters on his own outside of the evidentiary hearing (such as during the lunch break).

31) Pursuant to 28 U.S. Code § 455(b)(1), Judge Snow has personal knowledge of disputed evidentiary facts concerning the proceeding. The Court determined that an inquiry about investigations into his wife's statement should come within the current case. Yet, undoubtedly, Judge Snow has or will find out from his wife whether she made the statement or not. Judge Snow is running the case in such a manner as to ensure that Sheriff Arpaio is not re-elected as Sheriff. Therefore, Judge Snow has personal knowledge of disputed facts which the Court has determined to be relevant.

32) To the extent that the Court determines the topic to be relevant at all, pursuant to 28 U.S. Code § 455(b)(5)(iv), Judge Snow's wife would be a likely witness as to whether she made the statement or not and/or what she meant and the context, etc.

33) Sheriff Arpaio testified that I, Dennis Montgomery, had nothing to do with any investigation of Judge Snow or his wife. Yet when Court returned after lunch on April 23, 2015, at page 657-660 of the transcript, Judge Snow immediately started up again with further inquiries about Dennis Montgomery's funding and records. Judge Snow's orders after the lunch recess indicated a determination to undertake a major examination of me, even after learning that I had nothing to do with this case.

34) As Professor Rotunda notes in his affidavit paragraph 24:

The judge also becomes argumentative. He tells Mr. Sheridan that he did not have to hire Mr. Montgomery as a "confidential" consultant — "Well, but what was he doing that needed to be confidential for?" The witness tries to answer, but the judge *interrupted* the witness, preventing him from finishing his sentence. Then the judge argues that there was no need for confidentiality because the consultant was not a mole infiltrating organized crime. The witness responds that the investigation was confidential because it concerns the CIA breaching personal information at least 50,000 American citizens, including "citizens that lived here in Maricopa County." However, the judge became more argumentative, telling the witness, "I still don't understand" why such a witness should be called "confidential," even though the witness informed the judge that this informant qualified as "confidential" under the *written* rules of the operations manual. Evidentiary Hearing of 4/24/2015, at pp. 1005-0116.

35) As Professor Rotunda stated in his affidavit paragraph 27: "We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

36) As Professor Rotunda stated in his affidavit paragraph 28: "Moreover, we also know that in the several days of hearing, the judge —

    i.   asked leading questions,
    ii.  gave his own version of the facts,
    iii. conducted his own investigation outside the courtroom,
    iv. argued with witnesses, and
    v.  was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected."

37) As Professor Rotunda stated in his affidavit paragraph 29: "Under these set of facts, the judge should be disqualified because of his personal bias or prejudice against a party, Sheriff Arpaio. See 28 U.S.C. §144.  This section has no provision for any waiver."

38) As Professor Rotunda stated in his affidavit paragraph 30: ""The judge should also be disqualified pursuant to 28 U.S.C. §455(b)(1) ("personal bias or prejudice concerning a party" *or* "personal knowledge of disputed evidentiary facts concerning the proceeding." Section 455(e) allows for waiver of some disqualifications but does not allow any waiver for any disqualification under §455(b). 28 U.S.C 144 is also implicated here.

39) Furthermore, Judge Snow in his questioning spent considerable time on the question of whether or not the alleged money paid by MCSO to me was well-spent or a wise use of County funds. Unfortunately, this persistent inquiry by Judge Snow starts to look like exactly what his wife stated.

40) An inquisition by Judge Snow into whether Sheriff Arpaio misspent MCSO funds creates the appearance of Judge Snow collecting ammunition to be used in the partisan re-election campaign against Sheriff Arpaio's re-election.

41) Therefore, Judge Snow's inquiry runs the danger of turning into a fulfillment of the statement that several witnesses claim Judge Snow's wife made, that the case would be handled so as to ensure Sheriff Arpaio's defeat in his re-election campaign.

42) Therefore, it is mandatory and beneficial for the remaining aspects of this case to be handled by a different judge. I therefore move pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455(b)(1), et seq., that Judge Snow recuse himself from this case, or otherwise be disqualified.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief:

Mr. Dennis Montgomery