Jonathon A. Moseley
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenor

*(Pro hac vice application filed)*

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenor

Of Counsel

FILED _____ LODGED
RECEIVED _____ COPY

MAY 13 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ P DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

MANUEL de JESUS ORTEGA MELENDRES, on
behalf of himself and all others similarly
situated; *et al.*

                Plaintiff,

    v.

JOSEPH M. ARPAIO, in his individual
And official capacity as Sheriff of Maricopa
County, Arizona; *et al.*

                Defendants.

DENNIS L. MONTGOMERY

                Intervenor.

Civil Action No.
CV-07-2513-PHX-GMS

### INTERVENOR DENNIS L. MONTGOMERY'S NOTICE OF SUPPLEMENTAL
### AUTHORITY AND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR INTERVENTION OF RIGHT

Intervenor, Dennis L. Montgomery, by proposed counsel (*pro hac vice* pending) seeks to

supplement his Motion to Intervene and Memorandum in support thereof and files the attached

- 1 -

1  notice of supplemental authority.

2      The Court recently ordered that the Defendants provide notice to the chief legal counsel of

3  the Central Intelligence Agency (CIA) concerning allegations that Dennis L. Montgomery has

4  possession of CIA property which was characterized as obtained without authorization.

5      However, Intervenor files the attached supplemental authority and clarifies for his motion to

6  intervene that the ownership of Dennis Montgomery's intellectual property has already been

7  litigated and resolved in Dennis Montgomery's favor.  This prior litigation is *res judicata* binding

8  upon the U.S. Government including the CIA and National Security Agency (NSA).  Intervenor

9  demands the return of his intellectual property from the Court.  The data, information, and

10 intellectual property was provided under limited license to the Maricopa County Sheriff's Office for

11 limited purposes, not provided to the Court.

12     The U.S. District Court for the District of Nevada has already ruled that

13         (1) the data and intellectual property belongs to Dennis Montgomery,

14         (2) none of the data or information is classified,

15         (3) the U.S. Government was required to return all of the data and

16         information to Dennis Montgomery, and

17         (4) the U.S. Government deceived the Court in falsely claiming that

18         the data, information, and/or intellectual property did not belong to

19         Dennis Montgomery and/or was classified.

20     Attached as Exhibits 1 and 2 are the Orders in *Dennis Montgomery and the Montgomery*

21 *Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*,

22 Case Nos. 3:06-CV-00056-PMP-VPC and 3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro,

23 March 19,2007, and *In the Mater of the Search of:  The Residence Located at 12720 Buckthorne*

24 *Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888*

1   *Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC,

2   Order, Magistrate Judge Valerie P. Cooke, November 28, 2006.  These Orders are *res judicata* and

3   are now final.

4          Intervenor notes that Defendants, by counsel, have objected that there was no notice that

5   these topics would be raised in the evidentiary hearing from April 21-24, 2015, and they were not

6   prepared to address these topics.  The Court did not accept the objections that the witnesses made

7   on April 21-24, 2015, and the witnesses were not expecting questioning on these topics and did not

8   come prepared to address these issues.  As a result, the Defendants have notified the Court that they

9   did not come prepared to discuss any of these topics on April 23 and 24, 2015, and did not have this

10

11  information at their fingertips.

12  Dated: May 13, 2015                    Respectfully submitted,

13                                         Larry Klayman, Esq.
14                                         Washington, D.C. Bar No. 334581
                                           Freedom Watch, Inc.
15                                         2020 Pennsylvania Avenue N.W., Suite 345
                                           Washington, D.C. 20006
16                                         (310) 595-0800
                                           leklayman@gmail.com
17
18                                         Of Counsel

19

20

21                                         Jonathon Moseley, Esq.

22
                                           Virginia State Bar No. 41058
23                                         Freedom Watch, Inc.
                                           2020 Pennsylvania Avenue N.W., Suite 345
24                                         Washington, D.C. 20006
                                           (310) 595-0800
25                                         leklayman@gmail.com
                                           Attorney for Plaintiff
26

27

28

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3        I hereby certify that on May 13, 2015, I served by U.S. mail and email the foregoing

4   document on the following participants:

5   Dated: May 13, 2015                                    Respectfully submitted,

6                                                          Larry Klayman
                                                           Freedom Watch, Inc.
7                                                          2020 Pennsylvania Ave. NW Ste. 345
                                                           Washington, DC 20006
8                                                           (310) 595-0800
                                                           leklayman@gmail.com
9                                                          Attorney for Dennis Montgomery

10                                                         Of Counsel

11

12                                                         _____
                                                           Jonathon Moseley, Esq.
13
                                                           Virginia State Bar No. 41058
14                                                         Freedom Watch, Inc.
                                                           2020 Pennsylvania Ave. NW Ste. 345
15                                                         Washington, DC 20006
                                                            (310) 595-0800
16                                                         leklayman@gmail.com
                                                           Attorney for Dennis Montgomery
17
                                                           (*Pro Hac Vice* application filed)
18

19

20

21

22

23

24

25

26

27

28

1
2

## CERTIFICATE OF SERVICE

3          I hereby certify that on May 13, 2015, I served this document by U.S. mail and email to the

4     following participants:

5     Stanley Young, Esq.
      Andrew Carl Byrnes, Esq.
6     333 Twin Dolphin Road
      Redwood Shores, California 94065
7     syoung@cov.com
      650-632-4700
8     Attorneys for Plaintiffs
      (Service via Email)
9

10    Daniel Pochoda, Esq.
      ACLU FOUNDATION OF ARIZONA
11    3707 N. 7th Street, Suite 235
      Phoenix, Arizona 85014
12    dpochoda@acluaz.org
      602-650-1854
13    Attorney for Plaintiffs
      (Service via Email)
14

15    Cecilia D. Wang, Esq.
      ACLU FOUNDATION
16    IMMIGRANTS' RIGHTS PROJECT
      39 Drumm Street
17    San Francisco, California 94111
      cwang@aclu.org
18    415-343-0775
      Attorney for Plaintiff Melendres
19    (Service via Email)

20
21    Thomas P. Liddy, Esq.
      CIVIL SERVICES DIVISION
22    MARICOPA COUNTY ATTORNEY'S OFFICE
      222 North Central Avenue, Suite 1100
23    Phoenix, Arizona 85005
      liddyt@mcao.maricopa.gov
24    602-506-8541
      Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
25    (Service via Email)

26
      Michele M. Iafrate, Esq.
27    IAFRATE & ASSOCIATES

28

649 North Second Avenue
Phoenix, Arizona 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Melvin McDonald, Esq.
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio
(Service via Email)

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, New York 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs
(Service via Email)

Anne Lai, Esq.
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, California 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, California 90014

1  jcastillo@maldef.org
   213-629-2512
2  Attorney for Plaintiffs
   (Service via Email)

3
   Richard K. Walker, Esq.
4  WALKER & PESKIND, PLLC
   16100 N. 71st Street, Suite 140
5  Scottsdale, Arizona 85254-2236
   rkw@azlawpartner.com
6  480-483-6336
7  Attorney for Defendant Maricopa County
   (Service via Email)

8

9                                    _____
                                     Jonathon Moseley, Esq.
10

11

12                                   Virginia State Bar No. 41058
                                     Attorney for Plaintiff
13
                                     *(Pro Hac Vice Application Filed)*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DENNIS MONTGOMERY and the MONTGOMERY FAMILY TRUST, ) | 3:06-CV-00056-PMP-VPC |
| Plantiffs, ) | **BASE FILE** |
| ) | 3:06-CV-00145-PMP-VPC |
| v. ) | |
| ) | **O R D E R.** |
| ETREPPID TECHNOLOGIES, LLC; WARREN TREPP; and the UNITED STATES DEPARTMENT OF DEFENSE, ) | |
| Defendants. ) | |
| ) | |
| AND ALL RELATED MATTERS. ) | |

        Attached hereto is a copy of the Order entered this date in "IN THE MATTER

OF THE SEARCH OF: THE RESIDENCE LOCATED AT 12720 BUCKTHORNE LANE,

RENO, NEVADA, AND STORAGE UNITS 136, 140, 141, 142, AND 143, DOUBLE R

STORAGE, 888 MADESTRO DRIVE, RENO, NEVADA, 3:06-CV-0263-PMP-VPC,

3:06-MJ-00023-VPC."

        Counsel for the parties to this action are hereby directed to comply with the

requirements set forth in the attached Order that they forthwith review the sealed case file

and file any objections to the unsealing of any portion thereof within twenty-one days of

this date.

        IT IS SO ORDERED.

DATED:  March 19, 2007.

                                        PHILIP M. PRO
                                        United States District Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

IN THE MATTER OF THE SEARCH OF: )
                                )
THE RESIDENCE LOCATED AT 12720  )        3:06-CV-0263-PMP-VPC
BUCKTHORNE LANE, RENO,          )        3:06-MJ-00023-VPC
NEVADA, AND STORAGE UNITS 136,  )
140, 141, 142, AND 143, DOUBLE R )
STORAGE, 888 MAESTRO DRIVE,     )
RENO, NEVADA.                   )        ORDER
                                )
_____ )

     On November 28, 2006, the Honorable Valerie P. Cooke, United States

Magistrate Judge, entered an Order (#86) granting the Motion of Dennis Montgomery,

Brenda Montgomery, and the Montgomery Family Trust ("Montgomery") to unseal search

warrant affidavits and return seized property pursuant to Federal Rule of Criminal

Procedure 41(g) (#21). Magistrate Judge Cooke's Order further denied Montgomery's

Motion for Segregation and Sealing of all Attorney-Client and Trade Secret Material as

moot because the Court ordered the return of all seized property.

     On December 12, 2006, Respondent United States of America filed Objections to

Magistrate Judge Cooke's Order (#99). On December 21, 2006, Dennis Montgomery filed

an Opposition to the Government's Objections (#100). On February 21, 2007, this action

was reassigned to the undersigned District Judge for further proceedings (#112).

/ / /

/ / /

/ / /

/ / /

2

## I. FACTUAL BACKGROUND

The FBI searched Dennis and Brenda Montgomery's home and leased storage space pursuant to search warrants executed on March 1, 2006, and March 3, 2006. In granting Montgomery's Motion to unseal the search warrant affidavits and return seized property, Magistrate Judge Cooke followed the line of authority that requires the Government to demonstrate a compelling government interest in keeping the affidavit under seal and that no less restrictive means are available to prevent disclosure.  Following a three day evidentiary hearing and extensive pre- and post-hearing briefing, Magistrate Judge Cooke found the Government failed to meet its burden of establishing a compelling Government interest to prevent unsealing the search warrant affidavits and the return of property seized pursuant to Rule 41(g).  Additionally, Magistrate Judge Cooke concluded the Government had made no showing whatsoever that probable cause existed to justify the issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832.

## II. AUTHORITY TO ISSUE THE ORDER

The Government argues that 28 U.S.C. § 636 does not authorize a magistrate judge to issue an order unsealing documents or returning seized property to putative property owners in the context of a pre-indictment Rule 41(g) motion.  As a result, the Government argues Magistrate Judge Cooke's order should be treated as a finding and recommendation.  In Response, Montgomery argues Magistrate Judge Cooke did not exceed her authority by issuing an "order."

Title 28, United States Code, § 636(b)(1)(A) outlines the authority of a magistrate judge in pertinent part as follows:

> . . . a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a

1   claim upon which relief can be granted, and to involuntarily dismiss an
action. A judge of the court may reconsider any pretrial matter under
2   this subparagraph (A) where it has been shown that the magistrate
judge's order is clearly erroneous or contrary to law.
3
28 U.S.C. § 636(b)(1)(A). Section 636(b)(1)(B) provides:
4
5   . . . a judge may also designate a magistrate judge to conduct hearings,
including evidentiary hearings, and to submit to a judge of the court
proposed findings of fact and recommendations for the disposition, by
6   a judge of the court, of any motion excepted in subparagraph (A), of
applications for postrial relief made by individuals convicted of
7   criminal offenses and of prisoner petitions challenging conditions of
confinement.
8
28 U.S.C. § 636(b)(1)(B). Therefore, if Magistrate Judge Cooke's Order derived its
9
authority from section 636(b)(1)(A), the district court may reconsider the Order if it is
10
clearly erroneous or contrary to law. If Magistrate Judge Cooke's Order was issued
11
pursuant to section 636(b)(1)(B), the district court's review is de novo.
12
In ruling on Montgomery's motion, Magistrate Judge Cooke labeled her decision
13
as an "Order" indicating the decision was made pursuant to section 636(b)(1)(A). In
14
addition, her Order cited to LR IB 3-1 and stated, "any party wishing to object to this order
15
shall . . . file and serve specific written objection to the ruling together with points and
16
authorities in support thereof." LR IB 3-1 is essentially a local rule setting forth a
17
magistrate judge's authority under 28 U.S.C. § 636(b)(1)(A). Therefore, Magistrate Judge
18
Cooke's Order was issued pursuant to 28 U.S.C. § 636(b)(1)(A).
19
The Government cites In the Matter of Application and Affidavit for a Search
20
Warrant v. Hughes, 923 F.2d 324 (4th Cir. 1991) and United States v. Urlacher, 136 F.R.D.
21
550 (W.D. N.Y. 1991) for the proposition that Magistrate Judge Cooke exceeded her
22
authority. In Hughes, a newspaper requested the federal court unseal a search warrant
23
affidavit. 923 F.2d at 325. A magistrate judge held a hearing on the matter and denied the
24
motion. Id. The parties appealed to the district court. Id. After hearing argument, the
25
district judge ruled that the affidavit should be released in its entirety. Id. In reviewing the
26

4

1    prior proceedings, the Fourth Circuit determined that the district court's decision would be

2    reviewed for an abuse of discretion.  However, in a footnote, the court addressed the

3    dissent's assertions that the discretion of the magistrate judge and not the district judge, was

4    at issue in the case.  Id. at 325 n.2

5            In Hughes, the overriding concern about unsealing the affidavit was the prejudice

6    that might result to the criminal defendant in that case.  The Hughes court opined, "[t]he

7    dissent's assertion that a reviewing court must ignore the judgment of a district court and

8    defer to the opinion of a magistrate who has no experience with voir dire in felony cases

9    involving pretrial publicity cannot stand as a matter of logic or law."  Id.  However, the

10   Hughes court did note that "[w]here a magistrate holds hearings and issues complete

11   findings and the district court only summarily reviews the ruling . . . evaluation of the

12   magistrate's actions may be appropriate."  Id.  In Hughes, "the magistrate's order provided

13   a legally inadequate record and the district court properly reconsidered the issue by holding

14   hearings and making findings."  Id.  The Hughes court noted that "[a] magistrate's power to

15   seal or unseal a document derives from the district court's power to take such actions and

16   the dissent points to no statute or court rule empowering magistrates to making final rulings

17   in such cases."  Id.

18           In Urlacher, a magistrate judge ordered the unsealing of the motion papers and

19   the docket entries relating to a motion for a subpoena duces tecum.  However, in a footnote,

20   the magistrate judge noted that the portion of the order directing unsealing was, in essence,

21   a report and recommendation for the reasons stated in Hughes.  136 F.R.D. at 559 n.5.  "A

22   stay thus ensures district court review before unsealing is accomplished.  Such review

23   would be meaningless if the unsealing recommended here was effected prior to the district

24   court review ensured here."  Id.

25           Although the cases cited by the Government arguably support the proposition that

26   Magistrate Judge Cooke's decision should be reviewed de novo as a report and

1    recommendation, the plain language of section 636 indicates otherwise.  Section

2    636(b)(1)(A) initially permits a magistrate judge to "hear any pretrial matter pending before

3    the court."  Section 636(b)(1)(A) continues by not permitting a magistrate judge to decide

4    the following motions:  motion for injunctive relief, for judgment on the pleadings, for

5    summary judgment, to dismiss or quash an indictment or information made by the

6    defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a

7    class action, to dismiss for failure to state a claim upon which relief can be granted, and to

8    involuntarily dismiss an action.  28 U.S.C. § 636(b)(1)(A).  Applying the statutory cannon

9    of construction *expressio unius est exclusio alterius* indicates that magistrate judges are

10   permitted to decide any pretrial matter not included within the list above.  Therefore,

11   Magistrate Judge Cooke had the authority to issue her Order pursuant to 28 U.S.C. §

12   636(b)(1)(A) and this Court's review is limited to whether the Order is clearly erroneous or

13   contrary to law.

14            Regardless, for the reasons set forth below, this Court would reach the same

15   result under a *de novo* standard of review.

16   **III. THE GOVERNMENT'S SPECIFIC OBJECTIONS**

17            The Government objects to several specific findings made by Magistrate Judge

18   Cooke.

19        **A. Page Three**

20            Page three of Magistrate Judge Cooke's Order states that in the affidavit of

21   February 28, 2006, in support of the search warrants, Special Agent ("SA") Michael West

22   relied on three categories of eTreppid documents:  the Contribution Agreement, the

23   amended and restated operating agreement of eTreppid, and ten patent assignments from

24   Montgomery to eTreppid.  The Government argues that a review of the affidavit

25   demonstrates that a majority of the affidavit speaks to software development efforts on the

26   part of all software developers at eTreppid.

1    Although the Government is correct that a small portion of the affidavit relates to

2  the three documents discussed by Magistrate Judge Cooke, her finding is not clearly

3  erroneous.

4    **B.  Page Three, Line 10-13**

5    With respect to the Contribution Agreement, Magistrate Judge Cooke's Order

6  states, "[t]he court drew the inference from this summary of the Contribution Agreement

7  that Montgomery assigned *all* intellectual property and related property he owned to

8  eTreppid because that is what the plain meaning of the excerpt of the Contribution

9  Agreement states." The Government points to language in SA West's affidavit that ends

10 with the following language: "relating to or used in connection with, or otherwise

11 describing or consisting of any part of, the software compression technology."

12    The paragraph of SA West's affidavit relating to the Contribution Agreement

13 reads as follows:

14        MONTGOMERY signed a Contribution Agreement, dated September
          28, 1998, in which MONTGOMERY effectively assigned all rights to
15        his "Contributed Assets" to eTreppid in exchange for a fifty percent
          (50%) interest Management Interest in eTreppid. The "Contributed
16        Assets" means all of MONTGOMERY's know-how; trade secrets;
          patent rights, copyrights, trademarks, licenses and permits, registered
17        or unregistered, pending or approved; software programs and all
          programming and Source Codes used in connection therewith or
18        otherwise required to operate any component thereof; and all
          programming documentation, designs, materials and other information,
19        all in whatever form and wherever located, relating to or used in
          connection with, or otherwise describing or consisting of any part of,
20        the software compression technology.

21 (Aff. of Michael A. West (#1) at 2.)  It was not clearly erroneous for Magistrate Judge

22 Cooke to infer that this Contribution Agreement assigned all intellectual property from

23 Montgomery to eTreppid.  There is no indication in the affidavit that Montgomery owned

24 any additional intellectual property that was not part of the Contribution Agreement.

25    **C.  Page Four, Lines 1-3**

26    The pertinent lines of Magistrate Judge Cooke's Order relevant to the

1   Government's objection are as follows: "The affidavit states that through these patent

2   assignments, Montgomery assigned full and exclusive use of the technologies described in

3   the patents to eTreppid.  The next paragraph of the affidavit describes 'trade secrets,' which

4   [Magistrate Judge Cooke] inferred were the patented technologies Montgomery assigned to

5   eTreppid in 2000-2001:  Software programs relating to data compression, pattern

6   recognition, and change and anomaly detection."  The Government argues that SA West's

7   affidavit contains no indication that the trade secrets were covered by the ten patents

8   described in the preceding paragraph of the affidavit.

9           The relevant language in SA West's affidavit is as follows:

10                  MONTGOMERY filed ten Patent Assignment applications with
     the United States Patent and Trademark Office during the period of
11   November 2000 to November 2001 for patents pertaining to various
     technologies developed by MONTGOMERY while an employee at
12   eTreppid and on each patent MONTGOMERY assigned full and
     exclusive rights, title, and interest of these technologies to eTreppid.
13
             Trepp considers eTreppid's trade secrets to be various software
14   programs relating to data compression, pattern recognition, change and
     anomaly detection, among other things, which derive independent
15   economic value, actual or potential, from not being generally known
     to, and not being readily ascertainable through proper means by the
16   public.  eTreppid has earned in excess of ten million dollars in
     revenues since 1998 from various government and commercial
17   contracts.  Trepp anticipates that eTreppid's development efforts will
     result in other multi-million dollar contracts.
18

19   (Aff. of Michael A. West (#1) at 3.)  SA West's affidavit indicates that Montgomery

20   assigned patents relating to various technologies to eTreppid.  In reviewing the affidavit,

21   Magistrate Judge Cooke was attempting to determine whether there was probable cause to

22   support the issuance of a search warrant.  Specifically, the alleged criminal activity related

23   to the theft of trade secrets and unlawfully retaining national defense information.  Because

24   the subject matter of the trade secrets was of primary importance to the affidavit, it was not

25   clearly erroneous for Magistrate Judge Cooke to infer that the trade secrets were related to

26   the assigned patents.

**D.  Page Fourteen, Lines 15-18**

At page fourteen, lines fifteen through eighteen, Magistrate Judge Cooke's Order states, "[t]he Government has denied Montgomery is a target, and there has never been any indication that either Ms. Montgomery or the Montgomery Family Trust is a search warrant target.  Nine months have passed since the Government executed the search warrants, and it appears there are no current plans to prosecute any of the movants."  The Government objects to this portion of the Order stating that no evidence has been presented that would indicate whether law enforcement has terminated their investigation of Mr. Montgomery. The Government further asserts that the investigation is ongoing.  According to the Government, "While the sworn statements/declarations of eTreppid employees provide evidence of criminal conduct on the part of Mr. Montgomery, it is apparent that the results of a forensic examination of the seized computer storage media would provide strong corroboration of their statements."

Magistrate Judge Cooke, in the relevant section of her Order, was discussing the issue of whether there was an adequate remedy at law.  This is one factor to be considered before the Court can reach the merits on a pre-indictment motion pursuant to Rule 41(g). See United States v. Kama, 394 F.3d 1236, 1238 (9th Cir. 2005).  In light of the fact that almost one year had passed since the Government executed the search warrants, this Court does not find clearly erroneous the statement by Magistrate Judge Cooke that "it appears there are no current plans to prosecute any of the movants."

**E.  Page Sixteen, Lines 20-24**

The relevant language to this objection is as follows:

[t]urning to the evidence in the proceeding, the redactions involve direct and recent contacts Montgomery had with other individuals, and it is difficult to imagine that the Government is concerned about revealing identities of witnesses or protecting an ongoing investigation. In fact, Montgomery has already surmised that part of the redaction relates to seeking investors for the source code.  Moreover, at the June 29, 2006, evidentiary hearings, SA West revealed the identity and

1    involvement of SA Haraldsen during his testimony.

2    The Government argues that Montgomery's suppositions about investigative techniques

3    should not result in an order directing the Government to disclose information to support his

4    beliefs. The Government further asserts that, with the exception of Magistrate Judge

5    Cooke's Order, there was no disclosure of investigative techniques used by SA Haraldsen.

6    In the relevant section of the Order, Magistrate Judge Cooke was addressing the

7    issue of whether the Government had demonstrated a compelling government interest in

8    keeping the affidavit under seal. Upon addressing this issue and the relevant language

9    above, Magistrate Judge Cooke found that the Government has not met its burden to

10   establish a compelling government interest. Here, the Government has failed to show clear

11   error in Magistrate Judge Cooke's reasoning. Even if new information would be revealed,

12   the Government has not made any showing to this Court that would establish a compelling

13   government interest.

14   **F. Page Nineteen, Lines 22-26**

15   The Order reads:

16   [h]ad this court been provided the entire contribution
     agreement, it would have concluded that whatever is on
17   CD No. 1 - nothing more and nothing less - belonged to
     eTreppid. The court would have expected the
18   Government to demonstrate there was probable cause to
     believe that CD No. 1 contained the disputed trade
19   secrets. However, SA West testified that he does not
     know what CD 1 contains, and he never inquired as to
20   how long Montgomery has been creating software
     technology.

21   The Government argues that this finding ignores the majority of the search warrant

22   affidavit, which describes the efforts of eTreppid software developers. According to the

23   Government, the affidavit clearly established that the search warrant was for evidence of

24   source code that both Montgomery and other software developers worked on while at the

25   eTreppid facility, and not certain technology contained on CD No. 1.

26

1    In discussing the business relationship between Montgomery and eTreppid,

2  Magistrate Judge Cooke stated that SA West had a "fundamental misunderstanding of the

3  operating agreement and the business relationship between Montgomery and eTreppid."

4  This statement was based on SA West's testimony that he believed that eTreppid owned

5  more than what was on CD No 1. because Montgomery had worked at eTreppid for eight

6  years.  Based on the record before the Court and the affidavit in support of the search

7  warrant at issue, it is unclear exactly when the source code was developed, who developed

8  it and who owns it.  However, the affidavit in support of the search warrant does not

9  "clearly establish" that the search was for a source code developed while Montgomery was

10  employed at eTreppid.  Magistrate Judge Cooke's findings in this regard are not clearly

11  erroneous.

12    **G.  Page twenty-two through twenty-three, Lines 11-8**

13    In her Order, Magistrate Judge Cooke wrote, "[a]lthough SA West referred to the

14  patent assignments to illustrate Montgomery's employment relationship with eTreppid, this

15  is what the reference conveyed to this court:  that since Montgomery had conveyed all of his

16  technological know-how to eTreppid, the ten patents bore an integral relationship to the

17  trade secrets that Montgomery allegedly stole."  The Order continues, "[i]t is now evident

18  that these patents had nothing to do with the trade secrets alleged to have been stolen."

19  The Government argues that Magistrate Judge Cooke focused on "software technology

20  contained on a certain CD that was not identified or referenced in the initial affidavit to the

21  exclusion of the allegedly stolen eTreppid software that was explicitly identified in the

22  search."

23    The affidavit does discuss the Contribution Agreement that began the business

24  relationship between eTreppid and Montgomery.  As a result, it was not clearly erroneous

25  for Magistrate Judge Cooke to conclude that the software on CD No. 1 was at issue and that

26  the patents bore a relationship to the trade secrets that Montgomery allegedly stole.

### H. Pages twenty-three through twenty-five

Pages twenty-three through twenty-five of Magistrate Judge Cooke's Order discuss the security clearance of Montgomery and eTreppid. Magistrate Judge Cooke concluded that "although SA Haraldsen and Venables represented to SA West that eTreppid possessed a facility clearance to store secret material, eTreppid did not have one." With respect to Montgomery, Magistrate Judge Cooke stated, "Although SA West's affidavit never specifically stated the level of Montgomery's security clearance, the inference was that it was tied to his work at eTreppid and that he lost it. However, SA West's testimony conflicts as to whether he knew what, if any, security clearance Montgomery possessed at the time of the search." According to the Government, "the affidavit established that SA West ascertained that eTreppid did have a facility clearance and that Montgomery no longer had a special access program, top secret clearance based on his interview with Special Agent Paul Haraldsen, Air Force Office of Special Investigations and Director of Policy for Special Access Programs, United States Air Force." Therefore, the Government disputes Magistrate Judge Cooke's finding that SA West displayed callous disregard for the constitutional rights of Montgomery because he did not obtain additional information. The Government asserts that Magistrate Judge Cooke's finding "begs the question of what additional investigation, beyond consulting with an AFOSI Special Agent and the USAF Director of Policy for Special Access Programs and obtaining DoD documents indicating that Montgomery's clearance has been suspended."

Magistrate Judge Cooke's Order states, "[a]fter examination of his affidavit, his testimony concerning his investigation, and the protocols the Department of Justice has implemented for these crimes, this Court can only conclude that SA West acted with callous disregard of Montgomery's fundamental Fourth Amendment rights." Therefore, it is clear that Magistrate Judge Cooke based her ruling on the totality of the circumstances surrounding the issuance of the search warrant. With respect to the security clearance

1    issues, the Government does not dispute Magistrate Judge Cooke's conclusions concerning

2    whether or not Montgomery and eTreppid had security clearances.  Even if this Court were

3    to accept the Government's argument that SA West adequately investigated this portion of

4    the case, Magistrate Judge Cooke's ultimate conclusion is not clearly erroneous in light of

5    the other findings made in the Order.

6        **I. Page twenty-seven, lines 13-18**

7            A portion of Magistrate Judge Cooke's Order reads, "[a]s a preliminary

8    observation, the court notes that SA West never disclosed in his affidavit that Trepp and

9    Montgomery were engaged in civil litigation concerning ownership of the trade secrets,

10   which are intertwined with the allegation in the affidavit that Montgomery engaged in the

11   criminal theft of trade secrets."  The Government disputes this statement and points out that

12   the affidavit references a TRO filed against Montgomery by eTreppid.  The reference in the

13   affidavit referred to by the Government states as follows:

14           On or about February 26, 2006, at approximately 8:00 p.m. (Eastern
             Standard Time) SA Haraldsen, received an unsolicited call from
15           MONTGOMERY in which MONTGOMERY expressed concerns
             about providing SA Haraldsen with information concerning anomoly
16           detection and pattern recognition technical capabilities as doing so
             would violate the Temporary Restraining Order filed against him by
17           eTreppid.  MONTGOMERY suggested that the U.S. Government
             remove the Temporary Restraining Order if they were truly interested
18           in these capabilities.

19   (Aff. of Michael A. West (#1) at 12.)

20           The fact that the affidavit makes reference to a temporary restraining order does

21   not render Magistrate Judge Cooke's statement clearly erroneous.  There is no explicit

22   reference to the two related civil cases or the fact that the parties are disputing the

23   ownership of the software code at issue.  From the portion of the affidavit stated above, the

24   exact nature of the dispute between Montgomery and eTreppid is unclear.

25       **J. Pages twenty-nine through thirty**

26           The Government's final objection to the Order challenges Magistrate Judge

1   Cooke's findings concerning callous disregard of Montgomery's constitutional rights. First,

2   the Government disputes Magistrate Judge Cooke's reliance on a Department of Justice

3   manual that suggests disputes between two potential owners are better left to a civil forum.

4   According to the Government, the Order ignores the evidence establishing that the software

5   purportedly stolen from eTreppid premises was not subject to a legitimate ownership

6   dispute. In addition, the Government asserts that "SA West personally interviewed SA Paul

7   Haraldsen, Warren Trepp, Sloan Venables, and Patty Gray, along with obtaining sworn

8   declarations of Venkata Kalluri and Barjinder Bal." The Government concludes, "In doing

9   so, he focused on individuals knowledgeable regarding allegations of trade secrets, i.e.,

10  employees of the victim company, and corroborated this information by obtaining DoD

11  documents and interviewing an AFOSI Special Agent and USAF Director of Policy for

12  Special Access Programs."

13          The Court finds untenable the Government's argument that the software at issue

14  is not subject to a legitimate ownership dispute which has manifested itself in related

15  federal civil actions filed by both Montgomery and eTreppid currently pending before this

16  Court. See Dennis Montgomery, et al. v. eTreppid Technologies, Inc., et al., 3:06-CV-

17  0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis Montgomery, et al.,

18  3:06-CV-0145-PMP (VPC). Magistrate Judge Cooke's reference to the Department of

19  Justice manual in support of her finding that the ownership of material seized pursuant to

20  search warrants is better left to the pending civil litigation cannot be characterized as clearly

21  erroneous. This is particularly so in light of the numerous examples cited by Magistrate

22  Judge Cooke wherein she was misled by unchallenged factual representations which upon

23  closer examination were reveled to be inaccurate.

24  ///

25  ///

26  ///

**IV.  THE RELATED CIVIL ACTIONS  3:06-CV-0056-PMP-(VPC) and 3:06-CV-0145-PMP-(VPC)**

          In resolving the Governments objections to Magistrate Judge Cooke's Order for the return of seized property, this Court is mindful that the ownership of some of the items seized pursuant to the search warrants is heavily contested by Montgomery and eTreppid in two civil lawsuits currently pending before this Court.  See Dennis Montgomery, et al. v. eTreppid Technologies, Inc., et al., 3:06-CV-0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis Montgomery, et al., 3:06-CV-0145-PMP (VPC).  As a result, both in this case and the related civil cases eTreppid has expressed its objection to the return of any property to Montgomery as which to eTreppid claims an ownership interest.  Indeed, eTreppid unsuccessfully attempted to intervene in this action by way of a motion for return of seized property (#88).

          However, property which is the subject of the ownership dispute between Montgomery and eTreppid in the two related civil actions is the subject of a Preliminary Injunction entered February 8, 2006, by the Honorable Robert Perry, District Judge of the Second Judicial District Court, State of Nevada.  As a result, any items currently in the Government's possession which the Court's orders returned to Montgomery in this case, and which also are subject to the ownership dispute in the related civil cases, remain subject to the Preliminary Injunction, unless and until that Preliminary Injunction is modified by order of this Court.

          Nevertheless, there is one additional issue which must be confronted by this Court before it enters an order unsealing the volumes of materials filed in this case over the past year.  On March 15, 2007, the Court conducted a status conference hearing in the related civil cases.  Those proceedings involve assertions of state secrets privileges on behalf of the United States and trade secrets on behalf of eTreppid.  It is unclear whether any of the filings made in this case concerning the return of seized property under Rule 41

1   (g), contain material which maybe subject to a valid claim of privilege by the parties in the

2   related civil cases.  This rather anomalous circumstance stems from the fact that all of the

3   filings in this case have to date been filed under seal and thus were not in every instance

4   available for review by each of the parties to the two related civil cases.  As a result, as the

5   Court advised the parties at the status conference conducted March 15, 2006, in the related

6   civil cases, it is appropriate to permit counsel for the parties to the two related civil cases to

7   review the sealed filings made in this case prior to giving effect to the order unsealing these

8   proceedings.

9          It should be understood by the parties to the related civil actions that the

10  permission granted by this Court to review the filings in this case prior to unsealing does

11  not extend to an examination of the items of property seized pursuant to the search warrants

12  at issue.  Those items of property were in the possession of Montgomery prior to execution

13  of the warrants and shall be returned to him.  To the extent those items of property are

14  otherwise implicated in the two related civil actions, they remain subject to the Preliminary

15  Injunction entered in the related civil actions.

16  **V. CONCLUSION**

17         IT IS THEREFORE ORDERED that the Objections filed on December 12, 2006,

18  by Respondent United States of America (#99), to Magistrate Judge Cooke's Order (#86),

19  are overruled and  Magistrate Judge Cooke's Order is affirmed.

20         IT IS FURTHER ORDERED that within ten days of the date of this order,

21  Respondent United States shall return to Dennis Montgomery all materials seized pursuant

22  to the search warrants at issue in the case which were executed on March 1, 2006  and

23  March 3, 2006.  To the extent any of the property returned to Montgomery is the subject of

24  dispute in the related civil cases, Dennis Montgomery, et al. v. eTreppid Technologies,

25  Inc., et al., 3:06-CV-0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis

26  Montgomery, et al., 3:06-CV-0145-PMP (VPC), said property remains subject to the

1  Preliminary Injunction issued in those related cases.

2          IT IS FURTHER ORDERED that all filings made in this action with the

3  exception of the declaration of Dennis Montgomery (#115) filed on February 28, 2007,

4  shall be unsealed unless for good cause shown the Court determines that assertion of state

5  secrets, trade secrets, or other privilege is found to be meritorious and requires the

6  continued sealing of a particular filing, declaration or exhibit in this case.  In this regard,

7  counsel for the parties in the related civil actions shall have twenty-one days from the date

8  of this order within which to review the sealed case file in this case **and** to file with the

9  Court any objection to the unsealing of any portion thereof.  To assist in the review of the

10  sealed search warrant case file, counsel for Montgomery, eTreppid, and the United States

11  shall immediately contact Chief Deputy Clerk of Court, Cynthia Jensen, at (702) 464-5477,

12  who will provide limited access to the sealed case file through the Court's electronic case

13  filing system.

14          IT IS FURTHER ORDERED that the Government's Motion to Strike Pleadings

15  filed by Michael James Flynn and preclude Pro Hac Vice of Michael James Flynn (#110),

16  filed February 13, 2006, is DENIED as moot.

17          IT IS FURTHER ORDERED that eTreppid Technologies Motion for

18  Reconsideration (#98), filed December 12, 2006 is DENIED.

19          IT IS FURTHER ORDERED that the Motion to Intervene ( #120), March 13,

20  2006, by proposed intervener Reno Newspapers Inc., is DENIED as moot.

21  DATED:  March 19, 2007.

22

23  _____

24  PHILIP M. PRO
    United States District Judge

25

26

# Exhibit 2

NOV/28/2005/MON 03:44 PM                    FAX No. 775                         P. 001/034



# United States District Court
## District of Nevada
Bruce R. Thompson U.S. Courthouse and Federal Building
400 South Virginia Street, Room 404
Reno, Nevada 89501

Chambers of Valerie P. Cooke                              Telephone: (775) 686-5855
United States Magistrate Judge                            Facsimile: (775) 686-5864

# *FAX  TRANSMITTAL*

DATE:        November 28, 2006

THE FOLLOWING PAGES ARE BEING FAXED TO:

NAME:        Michael J. Flynn, Esq. (#1-888-235-4279)
             Phillip Stillman, Esq. (#1-888-235-4279)
             Ronald Logar, Esq. (#786-7544)
             Eric A. Pulver, Esq. (#786-7544)
             Paul Pugliese, Esq. (#784-5181)

RE:          . In the Matter of the search of 12720 Buckthorn Lane

NUMBER OF PAGES INCLUDING COVER SHEET:  34

FROM:        The Honorable Valerie P. Cooke
             United States Magistrate Judge

PHONE:       (775) 686-5855

FAX NO.:     (775) 686-5864

If you do not receive all the pages indicated above or the message is poorly received, please
contact our office as soon as possible at the phone number above. If the reader of this message
is not the intended recipient, please contact our office as soon as possible at the phone number
listed above.

ADDITIONAL COMMENTS:

NOV/28/2005/MON 03:45 PM                    FAX No. 775                          P. 002/034

1

2

3

4

5                           UNITED STATES DISTRICT COURT

6                                DISTRICT OF NEVADA

7
     In the matter of the search of:        )      3:06-CV-0263-LRH (VPC)
8    12720 BUCKTHORN LANE,                   )      3:06-MJ-0023-VPC
     RENO, NEVADA,                           )
9    and                                     )
     888 MAESTRO DRIVE, RENO,                )      ORDER
10   NEVADA, STORAGE UNITS                   )
     136, 140, 141, 142, and 143,            )
11                                           )

12          Before the court is a motion by Dennis Montgomery, Brenda Montgomery and the Montgomery

13   Family Trust ("Montgomery") (1)  to unseal search warrant affidavits; (2) for the return of property

14   pursuant to Fed. R. Crim. P. 41(g); and (3) for the segregation and sealing of all attorney client and trade

15   secret material seized (#21, 50).  The Government opposed (#s 23, 24, & 25) and Montgomery replied

16   (#26).  The parties engaged in additional briefing (#s 45, 46, 47, 48, 49, 50, & 51), and the court held

17   an evidentiary hearing on June 29, July 31, and August 17, 2006.  Thereafter, the parties submitted post-

18   hearing briefs (#s 74, 76, & 77).

19          The court has thoroughly reviewed the record and the papers submitted herein, and

20   Montgomery's motion is granted as follows: 1) the search warrant affidavits shall be unsealed, and 2)

21   Montgomery's property shall be returned.[1]

22                       I.  HISTORY & PROCEDURAL BACKGROUND

23   A. Basis for Probable Cause for Search Warrant Applications and Affidavits

24          Dennis and Brenda Montgomery ("Montgomery") own a home located at 12720 Buckthorne

25   Lane, Reno, Nevada and lease storage space located at 888 Maestro Drive, Reno, Nevada, storage unit

26   numbers 136, 140, 141, 142, and 143 (#21). The Federal Bureau of Investigation ("FBI") searched both

27   _____

28          [1]Since the court is ordering the return of Montgomery's property, the request to segregate and
     seal all attorney-client and trade secret material is denied as moot.

1   the residence and storage units pursuant to search warrants executed on March 1 and March 3, 2006.

2   *Id.* This court granted the Government's motions to seal the affidavits in support of the warrants (#3,

3   14). A copy of the warrant and receipt for items seized was left with counsel for Montgomery (#15).

4   On March 8, 2006, returns on the search warrants were executed, and the requisite inventories of items

5   seized were provided to this court. (#15-20).

6          The Government set forth the original basis for probable cause in the affidavits accompanying

7   the applications for the search warrants (#s 1, 4, 6, 8, 10, & 12).[2]  With respect to the search of the

8   Montgomery residence at 12720 Buckthorne Lane, Reno, Nevada, Michael West, Special Agent, Federal

9   Bureau of Investigation ("SA West"), states that he first became involved in the investigation of Dennis

10  Montgomery based on a complaint made by Warren Trepp ("Trepp"), management committee chair of

11  eTreppid Technologies, LLC, of Reno, Nevada (#1). Trepp alleged that Dennis Montgomery, eTreppid's

12  chief technical officer, removed eTreppid computer equipment and storage media containing "source

13  code" files derived from eTreppid's development of certain data compression and pattern recognition

14  software, removed hard disk drives containing "Secret" information provided to the Department of

15  Defense ("DOD"), and systematically deleted source code files from the remaining eTreppid data

16  servers, all in violation of 18 U.S.C. § 1832, Theft of Trade Secrets, and 18 U.S.C. § 793(e), Unlawful

17  Retention of National Defense Information. *Id.*

18         The basis for probable cause is described in detail below; in sum, the majority of information was

19  provided by Trepp or eTreppid employees. The only other information appears to have come from Neil

20  Azzinaro, a businessperson with whom Montgomery allegedly had a conversation about seeking

21  investors for the source code and/or a new business venture of Montgomery's, and Air Force Special

22  Agent Haraldsen ("SA Haraldsen") with whom Montgomery had conversations about continuing to

23  perform work for the government, independent of eTreppid. To better understand the chronology of

24  events and the complex factual issues giving rise to these searches, the court has divided its discussion

25  of the affidavit into six segments.

26

27         [2]For the ease of reference, this order will refer to docket #1 as the search warrant affidavit.

28                                              2

1.    **The Documents Offered in Support of the Affidavit**

To establish probable cause for the search warrant SA West relied on three categories of eTreppid documents: 1) a contribution agreement between Montgomery and eTreppid ("contribution agreement"); 2) the eTreppid amended and restated operating agreement ("operating agreement"); and 3) ten patent assignments from Montgomery to eTreppid.

a.    **The Contribution Agreement - page 2, lines 3-12[3]**

SA West attested that Montgomery signed a contribution agreement in which he assigned his rights to "contributed assets" to eTreppid in exchange for fifty percent management interest in eTreppid. According to the affidavit, "contributed assets" included trade secrets, patent rights, copyrights, licenses and permits, software programs and source codes, etc. (#1, 2:3-12). The court drew the inference from this summary of the contribution agreement that Montgomery assigned *all* intellectual property and related property he owned to eTreppid because that is what the plain meaning of the excerpt of the contribution agreement states.

b.    **The eTreppid Amended and Restated Operating Agreement - 2:13-25; 3:1-4**

Montgomery also signed an amended and restated operating agreement of eTreppid Technologies, and SA West quoted a provision of that agreement which states that Montgomery agreed to devote substantially all of his time and efforts to the business and affairs of eTreppid and also restricted Montgomery's independent activities; in other words, it is a non-compete agreement. According to the affidavit, Trepp considered eTreppid's trade secrets to be various software programs relating to data compression pattern recognition, change and anomaly detection, among other things. *Id.* at 3:10-13.

c.    **Ten Patent Assignments from Montgomery to eTreppid - 3:5-16**

Finally, SA West identified ten patents that Montgomery, as an eTreppid employee, assigned to eTreppid in 2000-2001. *Id.* at 3:5-9. The affidavit states that through these patent assignments,

[3]The references that follow are to the page and line numbers in SA West's affidavit in support of the search warrant (#1).

3

1   Montgomery assigned full and exclusive use of the technologies described in the patents to eTreppid.

2   The next paragraph of the affidavit describes "trade secrets," which the court inferred were the patented

3   technologies Montgomery assigned to eTreppid in 2000-2001: software programs relating to data

4   compression, pattern recognition, and change and anomaly detection. *Id.* at 10-16.

5           **2.     The Source Code and eTreppid Security - 3:17-26; 4:1-12**

6           The next section of the affidavit is devoted to a description of the protocols eTreppid established

7   to insure the security for the source code files, which contained data compression and pattern recognition

8   software. *Id.* at 3:17-26. The affidavit states that only two eTreppid employees, Montgomery and Sloan

9   Venables ("Venables"), had access rights to duplicate, modify or delete source code. The affidavit

10  describes Montgomery's responsibility to maintain a back-up copy of the source code server data on

11  specifically described hardware units, and that Trepp required Montogomery to provide him with current

12  source code files, which Trepp stored at a secure off-site location. *Id.* at 4:7-9. The affidavit then

13  summarizes eTreppid's locks, alarm system and video surveillance system. *Id.* at 4:10-12.

14          **3.     The SOCOM Contract and Montgomery's Security Clearance -
                      4:13-26; 5:1-4**

15          Having established ownership of the technology in eTreppid, Montgomery's role in the work of

16  eTreppid, and the sophisticated security system in place at eTreppid, the affidavit turns to a March 2003

17  agreement between eTreppid and U.S. Special Operations Command ("SOCOM"), which required

18  eTreppid to have access to secret material. *Id.* at 4:13-18. The affidavit states that eTreppid was

19  permitted to store secret material onsite pursuant to DD Form 254. *Id.* at 4:16-18.

20          The affidavit then states that Montgomery received and signed two security briefings in August

21  and September of 2003, which outlined his obligation to protect classified material of concern to the

22  United States, to protect unauthorized disclosures, and to prevent negligent handling of marked or

23  unmarked classified information, which could irreparably damage the United States and be used to

24  advantage by a foreign nation. *Id.* at 4:19-26; 5:1-4.

25

26

27

28

4

4.      **November 2005 Visit to Nellis Air Force Base and the Nine Secret Hard Drives – 5:5-13**

In the next section of the affidavit, SA West develops the chronology of events concerning the "nine eTreppid hard drives," which are then characterized as the "nine Secret hard drives," and ultimately transformed into "classified material." In November 2005, Patty Gray ("Gray") of eTreppid visited the Predator Drone Operations Center at Nellis Air Force Base where she recorded "Secret Predator Drone video images" onto nine eTreppid hard drives for use in developing "Automatic Target Recognition" software. *Id.* at 5:5-8. The affidavit states that pursuant to instructions from "contractor personnel at Nellis AFB," Gray marked these nine hard drives with "red standard U.S. Government Secret labels" and mailed them to eTreppid's facility in Reno. *Id.* at 5:8-11. The nine secret hard drives were stored in a GSA-approved safe as required by the DOD. Gray, Trepp and Montgomery were the only persons with access to the safe. *Id.* at 5:11-13.

5.      **December 2005: Montgomery's Breaches of Protocol, Deletion of Classified Material and Trade Secrets, and Removal of Classified Material and Trade Secrets from eTreppid – 5:14-26; pages 6, 7, 8, 9, and 10**

This portion of the affidavit recounts the events which led to the allegations of theft of trade secrets and unlawful retention of national defense information. According to SA West's affidavit, during December 2005, Gray and other eTreppid employees noticed that Montgomery was not following the standard protocols for use and storage of the nine secret hard drives. Gray discovered on two occasions that Montgomery was not properly securing them in the safe, and they were returned after Montgomery was questioned. *Id.* at 5:14-26;6:1-7. Despite these incidents, Gray continued to find the nine secret hard drives missing from the safe, and Trepp intervened to insure that all "classified material" be kept in the top drawer of the safe. *Id.* at 6:13-17. Gray changed the combination to the top drawer of the safe, and she was the only eTreppid employee who had it. *Id.* at 6:15-17.

Montgomery requested access to the classified material, and Trepp not only gave Montgomery authorization; he also instructed Gray to give Montgomery the combination to the top drawer of the safe, which she did. *Id.* at 6:18-22. From December 18th until December 21st, other eTreppid employees reported that Montgomery was deleting eTreppid source code files and that certain computer hardware

1   was missing. *Id.* at 6:23-26;7:1-6. When asked about the missing equipment, Montgomery responded

2   that he had taken the equipment home, although the eTreppid employee who reported the missing

3   equipment had never known Montgomery to take this equipment home. *Id.* at 7:6-12.

4            Prior to leaving for the holidays, Venables installed software to back up all of eTreppid's server

5   data, including the source code server, and he verified that it was operating properly before his departure.

6   *Id.* at 7:13-17. Two key eTreppid employees, Gray and Venables, departed for the holidays on

7   December 22, 2005, and did not return until January 3, 2006. *Id.* at 7:18-19. During their absence, one

8   eTreppid employee discovered portions of the eTreppid source code he was working on had been

9   deleted, and when he asked Montgomery about this, Montgomery advised he would provide the

10  employee with the source code he needed to do his work. *Id.* at 7:20-26;8:1-3. Montgomery also asked

11  another eTreppid employee to load some boxes into Montgomery's truck, which had never happened

12  before. *Id.* at 8:4-8.    After Venables returned from the holidays in January, he noticed that the source

13  code server cabinet and keyboard were in disarray and the screen was active. *Id.* at 8:9-10. When he

14  asked Montgomery about this, Montgomery responded that he was "cleaning up stuff," but when

15  Venables went into the warehouse, he also noticed that the units Montgomery used to back up the source

16  code server were still missing. *Id.* at 8:13-17. Montgomery told Venables he would bring back the

17  equipment, as he no longer needed it. *Id.* at 8:17-19. When he looked at the source code server,

18  Venables discovered that most of the folders used by the eTreppid software developers had been deleted,

19  and he could not access the ISA server either. *Id.* at 8:20-23.

20           Shortly thereafter, Trepp became aware source code was missing when employees complained

21  that they could not operate their computer systems, and Venables reported that all source code had been

22  deleted from the source code server, the ISA server, and all of the software developers' work stations.

23  *Id.* at 8:24-26;9:1-2. Although Montgomery then told Trepp that the source code could be located on

24  removable hard drives, a two-day analysis failed to locate the source code. *Id.* at 9:3-5. It was also at

25  this time that Gray found seven hard drives containing copies of the nine original secret hard drives from

26  Nellis AFB in Montgomery's file cabinet, and she found seven additional hard drives also containing

27  copies of the nine original hard drives in the safe. *Id.* at 9:6-10. A search of the eTreppid facility failed

28                                             6

1  to locate the nine original secret hard drives, and Gray and Montgomery were the only employees with

2  access to the top drawer of the safe. *Id.* at 9:10-14. At Trepp's request, Venables reviewed all of the

3  video surveillance cameras and found that none was recording video, and he also discovered that all

4  stored video had been deleted. *Id.* at 9:15-18.

5        Despite Montgomery's assurances that the source code was stored on hard drives in the building,

6  the hard drives were never located, and on his last day at eTreppid, Montgomery was reported to have

7  said that if Trepp wanted the source code, "he [Trepp] needs to give me big money if he wants it." *Id.*

8  at 9:19-24. Montgomery never returned to eTreppid and he was terminated on January 18, 2006. *Id.*

9  at 10:14-16. Warren Trepp told SA West that Montgomery had devoted eight years of his life to

10  developing software products at eTreppid, that Montgomery worked on these products every day and

11  on weekends, that Montgomery would never delegate these projects to anyone else, and that in order to

12  continue this work, Montgomery would require substantial computing power, similar to the workstation

13  and RAID unit removed from the warehouse, and have access to the nine secret hard drive video images.

14  *Id.* at 10:4-13.

15           **6.    Montgomery's Conversations with Neil Azzinaro and Special Agent
                     Paul Haraldsen ("SA Haraldsen") – p. 10:17-24; 11:1-26; 12:1-7**

16       Apart from the information provided SA West from Trepp and eTreppid employees, SA West

17  also relied on two other individuals who had conversations with Montgomery during this same time

18  period. The first is Neil Azzinaro, a casino host and Montgomery's friend. In a January 2006

19  conversation, Montgomery recounted the business dealings of Trepp, Montgomery's unhappiness that

20  he had not received a raise, and Montgomery's interest in looking for individuals who would invest

21  several million dollars. *Id.* at 10:17-23. Montgomery specified the investor would have to be an

22  individual with United States citizenship. *Id.* at 10:23-24. SA West stated that based on this

23  conversation with Azzinaro, and possibly others, it appeared that Montgomery may have provided source

24  code to others and was looking for investors for the source code. *Id.* at 11:1-3.

25       In mid-February 2006, SA West was contacted by SA Haraldsen, Air Force Office of Special

26  Investigations, Pentagon. During this period SA Haraldsen placed consensual, recorded telephone calls

27

28                                                      7

1   with Montgomery. During these calls, Montgomery made several representations to SA Haraldsen: 1)

2   that Trepp did not have the capability to continue the work; 2) that Montgomery had made certain that

3   the assets of the U.S. Government were protected; 3) that if the work is to continue, it must be through

4   Montgomery; and, 4) that the capability to do the work continued to exist. *Id.* at 11:4-10. SA Haraldsen

5   and Montgomery had two additional telephone calls on February 24, 2006, during which Montgomery

6   indicated he might just give the technology to the government, and when SA Haraldsen asked for proof

7   that the technology still exists, Montgomery became agitated. *Id.* at 11:11-17. Later that same day,

8   Montgomery purchased computer disks, and business card stock. *Id.* at 11:18-21.

9        Finally, on February 26, 2006, Montgomery telephoned SA Haraldsen again and expressed

10  concerns about supplying SA Haraldsen with information about anomaly detection and pattern

11  recognition technical capabilities, as to do so might violate a temporary restraining order filed against

12  him by eTreppid. *Id.* at 12:1-7.

13       Based upon SA West's affidavit, the court found probable cause existed that Montgomery may

14  have unlawfully retained classified material and stolen trade secrets, and it issued the search warrant.

15  The court also granted the Government's motion to seal the affidavit (#3).

16     **B.**    **The Search Warrants for the Storage Units**

17       With respect to the search of the storage units, SA West's affidavit sets forth the following basis

18  for probable cause: the CPU and RAID storage unit used by Montgomery and the nine original secret

19  hard drives were not located during the search of the residence of Buckthorne Lane (#4, 6, 8, 10, 12).

20  Montgomery rented five storage units at Double R Storage in Reno, Nevada. *Id.* The storage units were

21  accessed a total of ninety-two times between November 1, 2005 and March 3, 2006. *Id.* Double R

22  Storage's video surveillance showed that a truck registered to Brenda Montgomery entered the facility

23  on March 3, 2006, an individual walked between the storage unit and the truck, but no observable items

24  were taken from or transported to the truck. *Id.* SA West stated that this constituted probable cause to

25  believe that the storage units contained the evidence of theft of trade secrets and unlawful retention of

26  national defense information. *Id.* Based upon SA West's affidavit, the court found probable cause

27

28                                       8

1   existed for issuance of these search warrants, and the court also ordered these search warrant affidavits

2   sealed (#14).

3          The court granted the Government's motion to seal the search warrants and affidavits because

4   the Government argued that the information contained therein related to proprietary intellectual property

5   and national security classified materials (#3, 14).

6          **C. Search Warrant Returns**

7          The following items were seized from the Montgomery residence:

8          HP Pavilion laptop
           6 SanDisk compact flash cards
9          letter on white paper and yellow pages of ripped up paper
           rolodex
10         15 computer CDs
           white shredded paper
11         miscellaneous post-it notes
           Network Solutions account paperwork 4 pages
12         check stubs -- Montgomery Family Trust
           Western Digital hard drive serial number WEAL 71844911
13         Grante digital devserver labled 12/17/2005 serial number F05090650042-A
           silver CPV (tower) labeled ATI 3
14         16 computer CDs
           3 pieces of paper containing phone numbers
15         Grante digital server labeled DEO 1/2/06 PROG
           8 containers of medicine, each with 40-168 tablets
16   (#15).

17         The following items were seized from storage unit 140:

18         1 yellow/gray case containing eTreppid disks
           7 compact disks
19         9 mini DV cassettes
           1 Sony Hi8 video cassette
20         1 USB (black 2.0 flashback)
           1 256MB SanDisk compact flash card
21         1 IBM travel star hard drive serial number V29CH7080N5
           11 sealed Western Digital hard drives
22         1 TDK mini DV video cassette
           10 various manufacturer hard drives
23         1 box containing 78 compact disks
           bank statements 12/2005 through 1/2006
24         financial documents and phone bills
           1 removable hard drive labeled "Dennis Eyes Only" and 1 compact disk labeled
25         eTreppid
26   (#17).

     No items were seized from the other four storage units searched (#16, 18, 19, 20).
27

28                                              9

### D. Chronology of Motions

On March 10, 2006, Montgomery filed a motion to unseal the search warrants and affidavits and for the return of property pursuant to Fed. R. Crim. P. 41(g) and for the segregation and sealing of all attorney-client privileged materials seized (#21). Montgomery argued that he has a Fourth Amendment right to view the search warrant affidavits and that the Government cannot show a compelling governmental interest that cannot be served by a less restrictive means than withholding the entire affidavits. *Id.* Next, he contended that the warrants are facially invalid because they lack specificity and are overbroad. *Id.* Therefore, Montgomery asserted that he is entitled to the return of his property. *Id.* Finally, Montgomery also sought to have attorney-client privileged information segregated prior to any inspection by the Government. *Id.* Montgomery's overarching argument is that the entire investigation stems from Trepp having convinced the United States Attorney to use the power of the federal government to achieve what Trepp could not accomplish through a civil action – a search of Montgomery's property in an effort to obtain certain technology. *Id.*

The Government filed three separate responses (#23, 24, 25). In its response to the Rule 41(g) motion, the Government first argued that because the balance of the equities favored the Government, the court should decline to consider the merits of this pre-indictment Rule 41(g) motion (#23). The Government further asserted that it would produce evidence at an evidentiary hearing to demonstrate that probable cause for the searches existed, that the warrants were valid, and to refute Montgomery's assertions regarding how the searches were executed. *Id.* In its response to the motion to unseal the search warrant affidavits, the Government contended that Montgomery failed to support his position that he has a constitutional right for pre-indictment review of the affidavits (#24). The Government also asserted that its interests in maintaining the secrecy of the information in the affidavits including: (1) the premature identification of possible witnesses; (2) the possibility that such witnesses could be compromised or influenced; (3) the possibility that potential subjects could alter, remove, or destroy information sought by the Government; and, (4) that the affidavits identify specific, sensitive information. *Id.* Finally, the Government opposed the motion to seal and segregate all attorney-client privileged information and trade secrets prior to the DOD conducting an analysis of the seized electronic

10

1    storage media and documents for classified information and information relating to the national defense

2    (#25). Montgomery replied to the government's oppositions (#26).

3          The court set a sealed evidentiary hearing for May 3, 2006, on the motion to unseal the affidavits,

4    return the property pursuant to Rule 41(g) and segregate attorney-client privileged information and trade

5    secrets (#27). On April 19, 2006, the court further ordered that the parties file simultaneous

6    supplemental briefs concerning certain specific issues identified by the court (#28). On April 28, 2006,

7    the Government filed a partial compliance with court order of April 19, 2006 (#31). The Government

8    explained that it had provided redacted affidavits to Montgomery and did not oppose supplemental

9    filings by Montgomery subsequent to his review of the affidavits. *Id.* The Government argued that the

10   redacted information could (1) expose witnesses; (2) identify investigative techniques prior to

11   completion of the investigation; (3) interfere with the identification of other suspects; and (4) interfere

12   with the recovery of equipment that may contain evidence of criminal violations. *Id.* Also on April 28,

13   2006, the court vacated the hearing set for May 3, 2006 and vacated the order for supplemental briefing

14   (#32). The court stated that there appeared to be serious concerns about the search warrants issued by

15   the court as they relate to certain classified information. *Id.*

16         On May 8, 2006, the Government moved for a protective order prohibiting disclosure of

17   classified information (#34). Montgomery opposed (#36, 39), and the Government replied (#38). The

18   court held a hearing and denied the motion (#42).   At the hearing, the Government provided

19   Montgomery with redacted versions of the applications and affidavits for the search warrants,[4] which

20   were supplemented on June 1, 2006 (#40, 41, 43, 44). The only portions of the affidavits that remain

21   redacted, after the supplements, are the conversation between Montgomery and a business friend about

22   finding investors for the source code, and Montgomery's telephone conversations with SA Haraldsen.

23   *Id.*; *compare* #40 at 10-12 to #1 at 10-12.

24

25

---

26       [4]It is unclear whether this is the second redacted version of affidavits provided by the
     Government, or the same version referred to in Government's partial compliance with court order of
27   April 19, 2006 (#31).

28                                              11

1    On June 2, 2006, Montgomery filed a supplemental memorandum in support of his motion to

2    unseal the affidavits, return the property, and seal attorney-client communications (#45). Montgomery

3    again stated that the court need not hold an evidentiary hearing on the Rule 41(g) issues. *Id.* The

4    Government filed a response to issues identified in court minute order of April 19, 2006 (#46). The

5    Government noted in parentheses that recent information provided by the DOD indicated that the

6    information was not classified. *Id.* at 2. The Government argued that the search warrants set forth

7    probable cause and described the items sought as specifically as possible. *Id.* The Government did not

8    explain whether the determination that the information was improperly classified affects whether

9    probable cause for the search existed, and thus apparently took the position that probable cause existed

10   independent of the belief that classified information was sought. *Id.* The Government provided a

11   declaration by SA West which describes the execution of the searches in detail (#47). The Government

12   still sought to establish a protocol to screen attorney-client privileged material and suggested two

13   alternatives (#46).

14   Upon receipt of the redacted affidavits and the supplements, Montgomery filed a second

15   supplemental memorandum in support of its motion to unseal the search warrant affidavits, for the return

16   of property pursuant to Rule 41(g), and to segregate privileged material (#48, 49, 50). Montgomery then

17   requested an evidentiary hearing, arguing that a hearing is the only way to pin down the Government's

18   shifting positions (#50). He asserted: "The Government has essentially admitted that it did not raid Mr.

19   Montgomery's property to retrieve 'classified information being in a place it shouldn't be;' but rather

20   to do the bidding of wealthy Warren Trepp and thrust itself into a private, civil dispute between the two

21   owners and founders of eTreppid Technologies. The search for 'classified information' was obviously

22   only the cover story seeking to justify the search." *Id.* Montgomery also stated that Assistant United

23   States Attorney Pugliese informed Montgomery's counsel that the "classified information thought to be

24   in Mr. Montgomery's possession had been found." *Id.* at 3. Montgomery's counsel included his

25   declaration that he had conversations with AUSA Pugliese and SA West, during which they discussed

26   approximately ten compact discs, which were the only materials marked "classified" and the only

27

28                                                  12

1   material sought in the search (#49). Montgomery questioned why the Government did not list that

2   information or the storage media containing it in the search warrants (#50).

3        The court held an evidentiary hearing over the course of three days, which concluded on August

4   17, 2006. At the conclusion of the final day of the hearing, the court directed the parties to file post-

5   hearing briefs (#67). The Government filed three separate post-hearing briefs addressing Montgomery's

6   motion to unseal search warrant affidavits (#74), the motion to seal and segregate all attorney-client and

7   trade secret information (#76), and the motion for return of the seized property (#77). Montgomery filed

8   a consolidated brief regarding all three issues (#80).

9        **II.   DISCUSSION AND ANALYSIS**

10       **A.   Equitable Jurisdiction over Rule 41(g) Motion to Return Property**

11       Federal Rule of Criminal Procedure 41(g) generally is used to seek the return of property after

12  an indictment is issued; however, "district courts have the power to entertain motions to return property

13  seized by the government when there are no criminal proceedings pending against the movant."

14  *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993). "These motions are treated as civil equitable

15  proceedings, and, therefore, a district court must exercise 'caution and restraint' before assuming

16  jurisdiction." *Id.*

17       Before the court can reach the merits of a pre-indictment motion pursuant to Rule 41(g), the court

18  must consider whether: (1) "the Government displayed callous disregard for the constitutional rights of

19  the movant; (2) the movant has an individual interest in and need for the property he wants returned; (3)

20  the movant would be irreparably injured by denying return of the property; and (4) the movant has no

21  adequate remedy at law for the redress of his grievance." *U.S. v. Kama*, 394 F.3d 1236, 1238 (9th Cir.

22  2005) (internal citations omitted). If the balance of equities favors reaching the merits, the court should

23  exercise its equitable jurisdiction to entertain the Rule 41(g) motion. *Ramsden*, 2 F.3d at 326.

24       **1.   Callous Disregard**

25       Here, the Government has conceded that *none* of the seized material is classified; therefore, there

26  is a question whether the Government displayed callous disregard for Montgomery's constitutional

27  rights. SA West testified that the central focus of the search was classified information: ". . . [The search

28                         13

1  warrant] was based on the possession of classified information.  Obviously there's a lot of things going

2  on at eTreppid, but nothing was more influential than the information that [Montgomery] may have been

3  in possession of secret information." Tr. II, 144:17-19.[5]  As will be more fully discussed herein, the

4  court concludes that the Government acted in callous disregard of Montgomery's rights.

5           **2.**      **Individual's Interest in and Need for the Property**

6      Montgomery has established that the seized property includes items covering many years of his

7  work as a computer programmer, an inventor, as well as items of personal family property (#21, 26; Tr.

8  Ex. 38). Many of the items seized are also integral to the two civil actions pending between Montgomery

9  and Trepp/eTreppid. *Id.  See In re Singh*, 892, F.Supp. 1, 3 (D.D.C. 1995).

10           **3.**      **Irreparable Harm**

11      In addition to the concerns identified above regarding Montgomery's interest in and need for

12  the property, he contends that some of the seized information includes attorney-client privileged

13  information, which will be compromised if a third party reviews it. *See id.* at 3-4.

14           **4.**      **No Adequate Remedy at Law**

15      The Government has denied Montgomery is a target, and there has never been any indication that

16  either Ms. Montgomery or the Montgomery Family Trust is a search warrant target. Nine months have

17  passed since the Government executed the search warrants, and it appears there are no current plans to

18  prosecute any of the movants. *See Ramsden*, 2 F.3d at 326 (movant does not have the opportunity to

19  challenge the seizure of the documents and request their return at a later date, without a current plan to

20  prosecute). Mindful that Montgomery has not been indicted, the balance of equities favors reaching the

21  merits of his 41(g) motion. *Id.* at 4.

22      The court now considers Montgomery's requested relief: (1) the unsealing of the redacted

23  portions of the search warrants affidavits, and (2) the return of the seized property.

24      **B.**    **Right to View Affidavits**

25

26      [5]Transcript I is the transcript of the June 29, 2006 evidentiary hearing.

      Transcript II is the transcript of the July 31, 2006 continued evidentiary hearing.

27        Transcript III is the transcript of the August 17, 2006 continued evidentiary hearing.

28                       14

1          Some courts have held that no right to inspect sealed affidavits for search warrants exists under

2     the Constitution or the Federal Rules of Criminal Procedure prior to the initiation of a criminal

3     proceeding against the movant. *See Matter of Eyecare Physicians of America*, 100 F.3d 514, 517 (7th

4     Cir. 1996); *Matter of the Search of S & S Custom Cycle Shop*, 372 F.Supp.2d. 1048, 1051-52 (S.D. Ohio

5     2003).[6] The court in *Eyecare Physicians* applied a "right of access committed to the sound discretion

6     of the court." *Eyecare Physicians*, 100 F.3d at 517.

7          Other courts have held that a search target has a pre-indictment Fourth Amendment right to

8     examine the search warrant affidavit. *In re Search Warrants Issued on April 26, 2004*, 353 F.Supp. 2d

9     584, 585 (D. Md. 2004), *see also United States v. Oliver*, 208 F.3d 211, 2000 WL 263954 (4th Cir.

10    2000) (unpublished opinion); *In re Search Warrants Issued Aug. 29, 1994*, 889 F.Supp. 296, 299 (S.D.

11    Ohio 1995); *In re the Search of Up North Plastics, Inc.*, 940 F.Supp. 229, 232 (D. Minn. 1996). The

12    right is not unqualified; the Government bears the burden to "demonstrate compelling government

13    interests in keeping the affidavit under seal and . . . that no less restrictive means, such as redaction, is

14    available to prevent disclosure." *In re Search Warrants Issued on Apr. 26, 2004*, 353 F.Supp.2d at 587.

15    The United States District Court for the District of Maryland emphasized that the plain words of the

16    Fourth Amendment protect the public from unreasonable intrusions and specifically require that

17    probable cause support search warrants. *Id.* at 588. The Court reasoned that "implicit in that language

18    is the public's right to challenge both the reasonableness of the search and the degree to which the

19    warrant was supported by probable cause." *Id.* The Court invoked Justice Harlan's statement that

20    "constitutional provisions for the security of person and property should be liberally construed" and

21    concluded that without a right to access the affidavit upon which a search warrant is based, a search

22    target could never challenge the warrant for probable cause. *Id.* "More than a conclusory allegation

23

24

25         [6]In *Search of S&S Custom Cycle Shop*, the court stated that "Absent the existence of a criminal
      action, an individual simply has no basis for bringing a motion to unseal an affidavit under the Criminal
26    Rules. If it is a constitutional right, such as the Fourth Amendment right to be free from unreasonable
      search and seizures, that has been violated by federal authorities, vindication is civil in nature and can
27    be achieved through a *Bivens* action." 372 F. Supp. 2d at 1051.

28                                                     15

1   about the need to protect a continuing investigation is necessary to meet the Government's burden of

2   showing compelling need" to keep the affidavits sealed. *Up North Plastics*, 940 F.Supp. at 232.

3          Apart from the arguments it advanced initially to seal the entire affidavit – generalized concerns

4   that unsealing will reveal witnesses, investigative techniques, or compromise on ongoing criminal

5   investigation – the Government has not explained why remaining portions of the affidavit should still

6   remain redacted (#74). The Government contends the standard in the Ninth Circuit for unsealing such

7   information is the balancing test established in *United States v. Napier*, 436 F.3d 1133, 1137 (9th Cir.

8   2006). However, *Napier* had nothing to do with a search target's pre-indictment Fourth Amendment

9   right to review a search warrant affidavit; rather, it concerned a post-indictment challenge to a search

10  warrant that the defendant sought to unseal in order to make the "substantial preliminary showing"

11  required by *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In that instance, the court rejected the

12  view that *Franks* creates an unlimited right to all information possibly needed to meet the preliminary

13  showing requirement and held that the court must balance the defendant's interests against those of the

14  government. *Napier* at 1133.

15         The court has considered the authorities addressing a search target's pre-indictment Fourth

16  Amendment right to review the search warrant and concurs with those courts that have required the

17  Government to "demonstrate compelling government interests in keeping the affidavit under seal and

18  . . . that no less restrictive means, such as redaction, is available to prevent disclosure." *In re Search*

19  *Warrants Issued Apr. 26, 2004*, 353 F.Supp. 2d at 587.

20         Turning to the evidence in this proceeding, the redactions involve direct and recent contacts

21  Montgomery had with other individuals, and it is difficult to imagine that the Government is concerned

22  about revealing identities of witnesses or protecting an ongoing investigation. In fact, Montgomery has

23  already surmised that part of the redaction relates to seeking investors for the source code (#50).

24  Moreover, at the June 29, 2006 evidentiary hearing, SA West revealed the identity and involvement of

25  SA Haraldsen during his testimony. Tr. I, 15. Accordingly, the court finds that the Government has not

26  met its burden to establish a compelling government interest in keeping the remaining portions of the

27  affidavits sealed, and it further finds that Montgomery has a right to view the affidavits in their entirety.

28                                                16

NOV/28/2005/MON 03:50 PM                    FAX No. 775                         P. 018/034

**C.    Return of Montgomery's Seized Property Based Upon Lack of Probable Cause**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "A search warrant . . . is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *U.S. v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006) quoting *Steagald v. United States*, 451 U.S. 204, 213 (1981). The United States Supreme Court has

> reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for conclu[ding] that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The Supreme Court also explained that the "probable cause standard . . . is a practical, nontechnical conception." *Id.* at 231. Further, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules. *Id.* at 232. "[A]n affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's conclusions . . . ." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

"In assessing whether a warrant passes constitutional muster, a court is therefore obliged to make two inquiries: first, whether the scope of the search authorized by the warrant was justified by probable cause and, second, whether the warrant was sufficiently particular to limit the discretion of the officers." *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F.3d 853, 856 (9th Cir. 1997). If the court finds that a search warrant lacked probable cause and, thus, that movant was aggrieved by the unlawful search and seizure of his property, Rule 41(g) dictates the remedy: "the court must return

17

1  property to the movant, but may impose reasonable conditions to protect access to the property and its

2  use in later proceedings." Since this court finds that the Government lacked probable cause, as more

3  fully explained below, the court does not reach the particularity analysis.

4          Montgomery argues that no probable cause supports SA West's affidavits in support of the

5  search warrants (#21). The Government responds that SA West properly investigated Trepp's

6  allegations, including interviewing Trepp and other employees and compiling information SA Haraldsen

7  provided (#23). It is now clear that no probable cause existed to believe that Montgomery had removed

8  classified information from eTreppid and improperly stored it at his home because after the warrants

9  issued, it was determined that the material was, in fact, not classified (#46; Tr. Ex. 4). As noted earlier,

10 SA West testified that the central focus of the search was classified information: ". . . [the search

11 warrant] was based on the possession of classified information. Obviously there's a lot of things going

12 on at eTreppid, but none was more influential than the information that [Montgomery] may have been

13 in possession of secret information." Tr. II, 144. Three months after the search was executed, the

14 Government determined that the information sought was not classified. Tr. I, 123.

15         In light of this very critical fact, the court now examines SA West's affidavit and testimony at

16 the evidentiary hearing to determine whether probable cause exists to support the search warrants.[7]

17         **1.      Documents Offered in Support of the Affidavit**

18         SA West relied on three documents discussed below to support a finding that there was probable

19 cause to believe Montgomery had stolen eTreppid's trade secrets.

20         **a.      The Contribution Agreement**

21         As noted earlier, SA West referred to the 1998 contribution agreement, and he quoted an excerpt

22 from the agreement which stated that Montgomery contributed *all* of his intellectual property, software

23 programs, and source codes to eTreppid; therefore, this court inferred that eTreppid owned *all* of the

24 assets described in the balance of SA West's affidavit. This inference was incorrect. At the evidentiary

25

26    [7]For ease of reference, the court considers SA West's affidavit in the same order set forth in the
   section of this order entitled "procedural history," *supra*, at pages 3-8.

27

28                                              18

hearing, the entire contribution agreement was admitted into evidence, and the relevant portions state as follows:

> 1.2 <u>Contributed Assets</u>.   As used in this Agreement, the term "Contributed Assets" shall mean and include, collectively, all the following assets, together with all of Contributor's rights, title and interest therein, tangible and intangible, present or future, including, but not limited to, all development, distribution and exploitation rights, or to any proceeds derived therefrom:

> 1.2.1   All of Contributor's know-how; trade secrets; patent rights, copyrights, trademarks, licenses and permits, registered or unregistered, pending or approved; software programs and all programming and source codes used in connection therewith or otherwise required to operate any component thereof; and all programming documentation, designs, materials and other information, all in whatever form and wherever located, relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology *contained on that certain Software Compression Engine Development Program contained on CD No. 1, all of which is being contributed by Contributor hereunder (collectively, the "Technology").*

> 1.2.2   Certain of Contributor's tangible personal property used in connection [sic] the Technology as more particularly described on SCHEDULE 1.2.2 attached hereto and made part of this Agreement.

> 1.2.3 All of Contributor's books and records relating to the Contributed Assets.

> *1.3   Excluded Assets and Liabilities.   Notwithstanding any of the foregoing, Contributor is specifically not contributing, transferring or conveying to INTREPID under this Agreement or by any other means, nor is INTREPID acquiring from Contributor, any other tangible or intangible assets of Contributor not specified herein, and expressly is not assuming any claims, liabilities or obligations of Contributor of any kind or nature, whether existing as of the Closing Date or arising thereafter, on account of Contributor's ownership, development, exploitation or operation of the Contributed Assets at any time prior to the Closing Date.*

Tr. Ex. 7 (emphasis supplied).[8]

Had this court been provided the entire contribution agreement, it would have concluded that whatever is on CD No. 1 – nothing more and nothing less – belonged to eTreppid. The court would have expected the Government to demonstrate there was probable cause to believe that CD No. 1 contained the disputed trade secrets. However, SA West testified that he does not know what CD 1 contains, and

---

[8]INTREPID was the predecessor of eTreppid.

19

1  he never inquired as to how long Montgomery has been creating software technologies. Tr. I, 51, 53,

2  60. SA West did not investigate whether Montgomery had created software that was not contributed

3  under the contribution agreement or ask what assets Montgomery had not contributed. Tr. I, 60. SA

4  West stated that the fact that his affidavit does not refer to CD No.1 was not intended to mislead the

5  court. Tr. II 124. His impression was that any work that Montgomery performed while at eTreppid was

6  also part of what eTreppid owned; he did not believe that it was limited to CD No. 1. Tr. II, 124.

7  Montgomery's counsel and SA West had the following exchange:

8           Counsel: . . . as I understand your testimony today you're saying that
            notwithstanding paragraph 1.3 [of the Contribution Agreement],
9           excluding everything if it's not specified, you thought that [Montgomery]
            conveyed everything, patents, trademarks, copyrights, didn't limit it to
10          CD No. 1.

11          SA West: No, I think what the – my thought at the time was that that
            agreement was in 1998 and that the CD and the particular CD 1 was
12          conveyed. We're in 2005. He has worked there for eight years working
            on various projects for eTreppid, one as the chief technology officer.
13          They've employed ten other programmers to do the programming, and
            what he took wasn't just his.

14
   Tr. II, 124. This interchange conveys SA West's fundamental misunderstanding of the operating
15
   agreement and the business relationship between Montgomery and eTreppid.
16
          On the final day of the evidentiary hearing SA West was once again asked about CD No. 1 and
17
   the discrepancy between the entire contribution agreement and the excerpt quoted in his affidavit. SA
18
   West testified that he received an incomplete copy of the contribution agreement from SA Haraldsen,
19
   who had sent it to him in a different "landscape format;" therefore, the crucial reference to CD No. 1 was
20
   cut off. See Tr. Ex. 31; Tr. III, 47-54. SA West testified that he did not realize the tops of each page
21
   were missing until Government's counsel pointed it out to him. Tr. III, 52:17-53:6. The court finds SA
22
   West's explanation difficult to comprehend, since one has only to read Exhibit 31 to realize that it is
23
   quite obviously an incomplete document with missing sentences and paragraphs. Yet, it is this fatally
24
   incomplete document that SA West relied on to obtain the warrants to search Montgomery's home and
25
   the storage units for stolen trade secrets.
26

27

28                                                 20

b.    **The eTreppid Operating Agreement**

SA West quoted an excerpt from the operating agreement in his affidavit, which led this court to conclude that Montgomery was contractually bound by a non-compete agreement; therefore, Montgomery was prohibited from developing or purchasing any software programs or technology competitive with eTreppid, or in engaging in any similar business to that of eTreppid. However, at the evidentiary hearing the entire operating agreement was admitted, and it, too, revealed that SA West omitted a critical phrase from the sentence he quoted in his affidavit:

> 6.6. **Restriction on Independent Activities; Agreement not to Compete.** *So long as MONTGOMERY is appointed a Committee Member and/or as Chief Technology Officer pursuant to this Agreement,* MONTGOMERY and his Affiliates agree that, during the terms of this Agreement, non of them shall compete with the LLC, whether for their own account and/or for the account of others, individually, jointly with others, or as a part of any other limited liability company, limited partnership, general partnership, joint venture, corporation, or other entity, by: (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC, or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC as set forth in this Agreement; (ii) purchasing or otherwise acquiring, owning, holding, operating, managing, investing in or otherwise disposing of a like business of the LLC's Business and interests therein of any kind or nature; or (iii) otherwise engaging in any or all aspects of a like business of the LLC's Business. MONTGOMERY's or his Affiliates' participation in any of the activities restricted by this paragraph shall be deemed a breach of his duties and obligations as a Committee Member hereunder.

Tr. Ex. 30 (emphasis in italics supplied). SA West omitted the beginning phrase of paragraph 6.6, which expressly limits the non-compete to Montgomery's tenure as a committee member or chief technology officer. Based on SA West's omission, this court drew the incorrect inference that in addition to giving all of his intellectual property to eTreppid, Montgomery had also agreed not to compete with eTreppid. This is not true.

SA West testified that he had in his possession the entire operating agreement prior to preparing his affidavit. Tr. III, 34-35 and stated:

> No. It was not an intentional - - as I said before, I tried to capture the pertinent parts out of these voluminous documents like you've done, giving me three pages of probably a fifty-page document, and to try to capture those parts that were relevant to the investigation.

21

1    Tr. I, 173. SA West admitted that he included this excerpt of the operating agreement in his affidavit

2    to demonstrate that Montgomery had a covenant not to compete, and he also testified that the evidence

3    of Montgomery's efforts to sell to potential investors in violation of the operating agreement concerned

4    the redacted portion of his affidavit, which was the single conversation Montgomery had with Azzinaro

5    in late December or early January. Tr. I, 174-175. The affidavit states that Montgomery talked with

6    Azzinaro about his problems at eTreppid and inquired whether Azzinaro might know of anyone willing

7    "to invest" – nothing more (#1 at 10:17-24). Based upon the incomplete provision of the operating

8    agreement, followed by the conversation between Montgomery and Azzinaro, the court concluded that

9    in violation of the operating agreement, Montgomery solicited Azzinaro for new investors and intended

10   to use stolen trade secrets as a new competitor of eTreppid. This is not true.

11                     c.      **The Ten Patent Assignments**

12          SA West identified ten patent assignments provided by SA Haraldsen, which he also referred to

13   in his affidavit. Tr. III, 5. SA West testified that he referred to these patent assignments to "illustrate that

14   Dennis Montgomery is employed by eTreppid and has done work at eTreppid, that he is assigned to

15   eTreppid." Tr. III, 6. SA West believed that these documents also confirmed that Montgomery was not

16   only an assignor of the patents, but also an "employee" of eTreppid, Tr. III, 7, and this is what SA West

17   stated in his affidavit (#1 at 3:5-9). However, Montgomery was not an employee of eTreppid when he

18   made these assignments; he was an independent contractor as evidenced by Montgomery's form K-1s

19   for the period 1999-2001. Tr. Ex. 29. SA West testified that he was unaware that Montgomery had

20   received 1099 independent contractor forms from eTreppid during the period November 2000 to

21   November 2001. Tr. II, 174.

22          The patent assignments concern various items, ranging from "method and apparatus for

23   streaming data using rotating cryptographic keys," to "system and method for generating alert conditions

24   in a surveillance system," to "method and apparatus for encoding information using multiple passes and

25   decoding in a single pass." Tr. Ex. 26. SA West did not ask Trepp whether Montgomery had assigned

26   patents to eTreppid for the source code that SA West sought. Tr. II, 174-175.

27

28                                           22

1    Although SA West referred to the patent assignments to illustrate Montgomery's employment

2   relationship with eTreppid, this is what the reference conveyed to this court: that since Montgomery had

3   conveyed all of his technological know-how to eTreppid, the ten patents bore an integral relationship

4   to the trade secrets that Montgomery allegedly stole. One has only to review SA West's affidavit to see

5   how the juxtaposition of his reference to the ten patent assignments to eTreppid's trade secrets –

6   software programs relating to "data compression, pattern recognition, change and anomaly detection"

7   – led the court to draw this conclusion. (#1 at 3:5-16). It is now evident that these patents had nothing

8   to do with the trade secrets alleged to have been stolen.

9              **2.    The SOCOM Contract and eTreppid's Security Clearance**

10            SA West's affidavit states that a government contract from SOCOM in March 2003 required

11   eTreppid to have access to secret material; therefore, eTreppid received government authorization to

12   store secret material at its facility (#1 at 4:13-18). The court inferred from this portion of SA West's

13   affidavit that eTreppid was engaged in work for the United States involving secret materials, and that

14   eTreppid had the proper facility clearance to conduct this work. It appears eTreppid never had a facility

15   clearance.

16            SA West first stated that his understanding is that eTreppid had not received approval to store

17   certain classified material at eTreppid facilities. Tr. I, 145. Subsequently, SA West testified that, as

18   stated in his affidavit, eTreppid was permitted to store secret material at least since August 2005. Tr.

19   II, 156-62. To the query, "And to your knowledge despite the three years of government contracts,

20   Trepp's facility never got a facility clearance?" SA West responded, "I don't know what the reasoning

21   was. It could have been Montgomery that held it up." Tr. II, 186.

22            However, SA West testified later that SA Haraldsen told him that eTreppid had a facility

23   clearance to store secret material, which is based upon a DOD form DD 254. Tr. III, 141-142; Tr. Ex.

24   34. SA West relied on this information in preparing his affidavit, but he never saw the form. Instead,

25   he relied on SA Haraldsen's statements to him. Tr. III at 141-143. SA West included this information

26   in his affidavit "[t]o show that eTreppid had access, had permission by the U.S. Government or the

27   author of that form to possess secret information." Tr. III, 142. SA West only saw a copy of the actual

28                                              23

1   DD 254 form just days prior to the final August 17, 2006 evidentiary hearing when Venables faxed it

2   to him. Tr. III, 103-104. Although a signature line is provided on form DD 254, presumably to signify

3   certification for a facility clearance, there is no signature. Tr. Ex. 34. Therefore, the court now

4   concludes that although SA Haraldsen and Venables represented to SA West that eTreppid possessed

5   a facility clearance to store secret material, eTreppid did not have one.

6          **3.   Montgomery's Security Clearance**

7          SA West attested that Montgomery received and signed two security briefings in 2003, which

8   outlined his duty to protect classified material and to protect it from unauthorized disclosure (#1 at 4:19-

9   26;5;1-4). Later in the affidavit, SA West recounted a conversation between Montgomery and Gray

10  during which Gray warned Montgomery that his improper storage of classified material could result in

11  the loss of Montgomery's security clearance. *Id.* at 6:8-17. Montgomery allegedly replied, "I don't care

12  about my clearance. They'll always give me my clearance because they want me to do the work." *Id.*

13  at 6:12-13. The affidavit then recites continued problems with Montgomery's storage and handling of

14  classified material and, ultimately, the allegation that he removed it from eTreppid. *Id.* at 6:13-26-7:10.

15         The court concluded there was probable cause to believe that Montgomery breached his security

16  clearance and took classified materials in violation of the law. Although SA West's affidavit never

17  specifically states the level of Montgomery's security clearance, the inference was that it was tied to his

18  work at eTreppid and that he lost it. However, SA West's testimony conflicts as to whether he knew

19  what, if any, security clearance Montgomery possessed at the time of the search. SA West testified that

20  he knew Montgomery had a top secret clearance in the fall of 2005. Tr. I, 115. SA West stated that he

21  did not look into who at eTreppid had what level security clearance prior to November 2005. Tr. I, 114

22  at 9-13. SA West initially stated that he did not remember whether he contacted Defense Security

23  Services ("DSS"), the determining agency, regarding Montgomery's security clearance before or after

24  the search. Tr. I, 112-113. SA West subsequently testified that Jay Dixon of DSS and Venables both

25  told him that Montgomery's security clearance was suspended, and SA West said that he believed that

26  he learned that information prior to the search. Tr. I, 116-117. SA West later testified that Dixon told

27  him Montgomery's clearance was suspended, but only after the search. Tr. III, 92. In any event, SA

28                                              24

1   West made no reference to Dixon in his affidavit, and the court finds that SA West did not rely on

2   Dixon.

3          SA West testified that, as he understood it, Montgomery's clearance was contingent on his

4   employment with eTreppid. Tr. II, 113. SA West stated that he is unfamiliar with Jpass, the electronic

5   system that governs security clearance, but that Venables provided him with a computer printout

6   indicating that Montgomery's clearance had been suspended. Tr. II, 129-132. To the question "[s]o this

7   was an issue to you before you raided his home whether he still had his security clearance?" SA West

8   responded: *"Yes. I mean it would be significant if he had legitimate access to classified information*

9   *or not."* Tr. II, 132 at 6-9 (emphasis supplied).

10         SA West stated that he did not know whether Montgomery had notice that his security clearance

11  had been suspended. Tr. II, 156-157. He testified that eTreppid tried to provide Montgomery with

12  termination documents and that he did not know if those documents informed Montgomery that his

13  security clearance had been suspended. Tr. II, 156. Montgomery's counsel questioned SA West about

14  DOD directives, which movant's counsel represented governed the revocation or suspension of security

15  clearance. Tr. II, 155-156. The DOD directive outlines steps that must be taken, including providing

16  notice and an opportunity to be heard to the applicant, before an "unfavorable clearance decision" is

17  made. Tr. II, 159-160. SA West had no knowledge of the directive or whether the procedures were

18  followed prior to suspending Montgomery's security clearance. Tr. II, 160. SA West testified that the

19  basis for searching Montgomery's home was the unlawful retention of national security information and

20  that Montgomery did not have permission to store it at home. Tr. II, 160-161. Contrary to SA West's

21  understanding, Montgomery attests that the Government has never revoked his security clearance. Tr.

22  Ex. 38, para. 21.

23         **4.**    **The November 2005 Visit to Nellis Air Force Base and Nine Secret**
                   **Hard Drives**

24         The evidentiary centerpiece of SA West's affidavit insofar as it concerns unlawful retention of

25  classified material are the "nine Secret hard drives," which Gray recorded at Nellis Air Force Base and

26  "marked with red standard U.S. Government Secret labels as instructed by contractor personnel" and

27

28                                              25

1   which were "stored [at eTreppid] in a GSA approved safe as required by DOD" (#1 at 5:5-12).  These

2   are the "Secret hard drives" that metamorphosized  into "classified material" three paragraphs later in

3   the affidavit.  As is now clear, there was no secret material and there was no classified material;

4   therefore, no probable cause existed that Montgomery unlawfully retained national defense information

5   in violation of 18 U.S.C. § 793(e).  The court agrees with SA West's testimony on one fact:  *Nothing*

6   *was more influential to this court in the issuance of these search warrants than the information that*

7   *Montgomery might unlawfully be in possession of secret material belonging to the United States.*  *See*

8   Tr. II, 144.

9          SA West testified that in mid-February, Gray provided him with an inventory of classified

10  material that was either missing or destroyed. Tr. III, 27-28.[9]  The inventory  itemizes hard disk drives,

11  dated November 4, 2005, "Nellis, SOCOM."  Tr. Ex. 40.  SA West testified that when Gray provided

12  him with the inventory, he did not inquire about the original classification authority, although Gray did

13  tell him that an unnamed contract employee from Nellis provided the information concerning

14  classification. Tr. III, 30-31.  SA West never contacted Nellis Air Force Base or checked its logs to

15  verify whether the material was, in fact, classified. Tr. I, 96, 100, 124-126; Tr. III, 30-31. Venables and

16  Gray did tell him that the classified information was on "nine hard drives" and two digital videotapes,

17  but SA West did not include detailed descriptions in his affidavit. Tr. I, 39, 92-93, 103-104, 119-120;

18  #1.  SA West testified that in addition to relying on interviews with Venables and Gray, as well as

19  Gray's  inventory, he also "relied on Mr. Haraldsen, who had been working – who is an Air Force

20  official who is familiar with the project that eTreppid was working on, who said they were handling

21  classified information, and then the other, you know, disclosure documents that they – that eTreppid

22  employees had signed to take possession of classified information." Tr. II, 86-87; *see also* Tr. II, 104.

23

24

25          [9]The Government never provided the court with the actual inventory Gray provided to SA West.
      Instead, the court was provided with a copy of an August 11, 2006 memo from the Government's
26  counsel to Montgomery's counsel, which states that on February 14, 2006, Gray provided an inventory
      of classified material to SA West.  Tr. Ex. 40.  That memo summarizes missing or destroyed classified
27  material.

28                                                  26

1       Based upon this section of SA West's affidavit, the court concluded that probable cause existed

2   that the nine eTreppid hard drives were classified as secret by the appropriate government agency, that

3   they contained information of importance of the United States government, and that the Department of

4   Defense had provided instructions concerning their classification, access, and storage. It is now

5   abundantly clear that this conclusion was incorrect because there was no classified material.

6          5.   **December 2005: Montgomery's Breaches of Protocol, Deletion of**

7             **Classified Material, and Removal of Classified Material and Trade Secrets from eTreppid**

8       Since it is now evident that there was no classified material, the court will only note that the

9   chronology of events in December 2005, which SA West described in his affidavit, led the court to

10  conclude that there was probable cause to believe that in breach of his security clearance, Montgomery

11  had unlawfully removed classified information from eTreppid. The court now turns to the theft of trade

12  secrets.

13      As a preliminary observation, the court notes that SA West never disclosed in his affidavit that

14  Trepp and Montgomery were engaged in civil litigation concerning ownership of the trade secrets, which

15  are intertwined with the allegation in the affidavit that Montgomery engaged in the criminal theft of trade

16  secrets.[10] Over the course of SA West's meetings with Trepp prior to the search warrant applications,

17  he knew that Trepp was engaged in trade secret litigation against Montgomery and that Trepp was

18  attempting to obtain a temporary restraining order against Montgomery. Tr. I. 20-22, 47. Trepp and

19  SA Haraldsen also provided SA West with declarations of eTreppid employees and other court

20

21  [10]In fact, two civil cases are pending in federal court: *Montgomery v. eTreppid Technologies, LLC, et al.*, 3:06-CV-0056-LRH (VPC); *eTreppid Technologies, LLC v. Montgomery, et al.*, 3:06-CV-0145-LRH (VPC). In Case No. 3:06-CV-00056 LRH (VPC), the complaint was filed on January 31,

22  2006 (#1), and as of the dates this court issued the search warrants, February 28 and March 3, 2006, there were no matters under submission to this court; therefore, the court was unaware of this pending

23  action. On January 25, 2006, Montgomery filed a petition to remove the state court proceeding initiated by eTreppid against Montgomery to the United States District Court in Case No. 3:06-CV-00041-HDM

24  (RAM); however, that matter was remanded to the state district court on January 31, 2006 (#14). Thereafter, the United States Department of Defense filed its notice of removal to the United States

25  District Court on March 20, 2006, in Case No. 3:06-CV-00145-LRH (VPC). Thus, this second civil action between Montgomery and eTreppid was not pending in this court at the time the search warrants

26  were issued.

27

28                                    27

1   documents. Tr. I, 22-23, 74-75; Vol. II, 199-200; Tr. Ex. 10. SA West was aware that the trade secrets

2   at issue are valued in millions of dollars, but he did nothing during his pre-search warrant investigation

3   to determine the extent of Montgomery's claim to ownership. Tr. I, 60-62,141; Tr. II, 176, #1 at 3:10-16.

4   Had this court had even the slightest inkling that Trepp and Montgomery were engaged in civil litigation,

5   it is an understatement to say that the court would have scrutinized the theft of trade secrets allegation

6   very, very carefully.

7          As discussed earlier, SA West omitted critical portions of the contribution agreement and the

8   operating agreement, which stated that whatever Montgomery contributed to eTreppid could be found

9   on CD No. 1. However, SA West testified that he did not know what CD No. 1 contained. Tr. I, 51-53.

10  He never inquired as to how long Montgomery had been creating software technologies, Tr. I, 60. SA

11  West did not investigate whether Montgomery had created software that was not included under the

12  contribution agreement or ask anyone what assets Montgomery had not contributed. Tr. I, 62; Tr. II, 123,

13  128, 214. SA West testified that his impression was that any work Montgomery performed while at

14  eTreppid was also part of what eTreppid owned; he did not believe that it was limited to CD No. 1.

15         Putting aside the questions concerning SA West's investigation, the court understood that the

16  trade secret Montgomery had allegedly stolen was "source code" (#1 at 1:16-23). However, to this day,

17  it is unclear to the court exactly how "source code" is a trade secret that Montgomery allegedly stole.

18  SA West was unable to describe the allegedly stolen trade secret because no one at eTreppid was

19  adequately able to identify it. Tr. I, 84-85, 87, 131-132, 136, 152; Tr. II., 78-79, 192. SA West never

20  checked eTreppid's computers for the missing source code, and it appears that Trepp referred SA West

21  to Venables for source code questions. Tr. I, 84-87. However, Venables admitted that he did not know

22  what source code was "ever there" at eTreppid; therefore, Venables had no way of knowing what to look

23  for to confirm missing source code (Tr.I, 136; 152-154; Tr. Ex. 33, Vol. 1:11-120). Venables's

24  testimony at the preliminary injunction hearing appears to contradict the assertions SA West made in

25  his affidavit that the source codes at issue were located on the "source code server," using the "RAID

26  Unit" and "back-up ISA" on the premises at eTreppid, and that Venables had access to them (#1 at 3:17-

27  26; 18:1-2).

28                                            28

1    Montgomery asserts that the term "source code" is meaningless and that the Montgomery Family

2    Trust owned the software pursuant to copyrights filed years before Montgomery's involvement with

3    Trepp (#21). Montgomery also states:

4         The source codes used on military contracts are derived from my
          copyrighted source codes on file in the Copyright Office. None of those
5         source codes are on CD No. 1 or in the patents I assigned to eTreppid.
          They were all created by me with no other input from anyone and none
6         of them were created as part of my work at eTreppid. Approximately 90%
          of the codes were developed before September 28, 1998, and 99% were
7         developed prior to November 2002, when even eTreppid treated me as an
          independent contractor.

8    Tr. Ex. 38, ¶ 16.

9        Had the court been apprised of the civil litigation between Trepp and Montgomery and the

10   disputed facts summarized herein, it would have concluded – as the court does now – that there was no

11   probable cause to issue a search warrant based upon the allegation of theft of trade secrets.[11]

12        **6.    Callous Disregard of Montgomery's Constitutional Rights**

13       The court has reviewed the record in this proceeding in great detail, since the power of the

14   Government to safeguard a citizen's privacy in his or her home and possessions against unjustified

15   intrusions by government officials is a "basic purpose" of the Fourth Amendment. *Camara v. Municipal*

16   *Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). In this proceeding, SA West was

17   charged with the investigation of two very serious and two potentially very complex criminal violations.

18   After examination of his affidavit, his testimony concerning his investigation, and the protocols the

19   Department of Justice has implemented for these crimes, this court can only conclude that SA West

20   acted with callous disregard of Montgomery's fundamental Fourth Amendment rights. The over-arching

21   concern in this proceeding is that SA West became an unwitting pawn in a civil dispute, and as a result

22   of his inexperience and lack of training, he prepared search warrant affidavits that are riddled with

23   incorrect statements, edited documents, and uncorroborated conclusions, which caused this court to

24

25

26   _____

     [11]Because the court has concluded that there is no probable cause as to the trade secret allegation,
27   the court notes that the conversations Montgomery had with Azzinaro and SA Harraldsen do not change
     the court's finding of lack of probable cause, and they need not be addressed.

28                                              29

1  exercise its formidable power to authorize the government to search Montgomery's home and storage

2  units.

3      In 2000, the Department of Justice's Computer Crime and Intellectual Property Section

4  ("CCIPS") published the *Prosecuting Intellectual Property Crimes Manual*. Tr. Ex. 12. With respect

5  to theft of commercial trade secrets, it states:

6          The EEA [Economic Espionage Act of 1996] is violated only where
           someone acts knowingly without authorization. Under certain
7          circumstances, however, two individuals or companies may have a
           legitimate dispute over ownership rights in a trade secret. This type of
8          dispute is likely to arise where the two potential owners previously
           worked together to develop the disputed technology and where the
9          contractual arrangements governing each party's respective ownership
           interests are unclear or entirely absent. In these circumstances, unilateral
10         action with regard to the trade secret by one of the owners may precipitate
           an EEA referral. *Such cases are rarely appropriate for criminal*
11         *prosecution, especially where the party taking unilateral action has*
           *obtained advice of counsel.* Notwithstanding the passage of the EEA,
12         many disputes regarding ownership of intellectual property, including
           trade secrets, continue to be best resolved in a civil forum.

13 *Id.* at 17, section VIII.B.6.e (emphasis supplied). Prior to this case, SA West had never investigated a

14 trade secrets case, he was unfamiliar with Department of Justice manuals relating to intellectual property

15 crimes, and he did not consult with anyone within the Department of Justice for guidance, such as the

16 Department of Justice's Computer Hacking and Intellectual Property Unit ("CHIPS Unit"). Tr. I, 14,

17 18, 23-24; Tr. II, 187-188; 216-218; Tr. Ex. 12, 14, 21, 25. Like SA West, SA Haraldsen had no training

18 in investigating intellectual property crimes, and his role was to act as a liason between eTreppid and

19 the U.S. Air Force and Department of Defense on contracts eTreppid had with these government

20 agencies. Tr. I, 17-18. SA West was aware that Trepp and Montgomery were engaged in civil trade

21 secret litigation, and he relied on one side of that dispute – Trepp's – for critical evidence concerning

22 potential criminal prosecution for theft of trade secrets against the adverse party, Montgomery. SA West

23 relied on Trepp's representation that court records were sealed, but he never confirmed this

24 representation. Tr. I, 74-76; 136-138. In fact, although certain portions of eTreppid's lawsuit were

25 sealed, the parallel lawsuit filed by Montgomery was not. SA West blindly relied on the documents,

26 sworn statements, and evidence supplied by eTreppid, and he never appeared to question whether he had

27

28                                        30

1    become an agent, not for the Government, but for private interests engaged in litigation valued in
2    millions of dollars. The litigation that has ensued based upon the seizure of Montgomery's property is
3    a cautionary tale to heed the admonition that trade secrets litigation is best left to the civil forum.

4         The court has similar concerns about SA West's investigation of unlawful retention of national
5    defense information. SA West took SA Haraldsen, Trepp, Venables, and Gray at their word and never
6    confirmed basic facts they alleged. Upon learning of these serious allegations, one would presume that
7    an FBI agent with no experience in this area would consult with Department of Justice officials or his
8    own supervisors regarding the investigation. However, SA West never confirmed with the proper
9    government agency whether eTreppid had a facility clearance to store classified materials; he simply
10   relied on statements of Haraldsen and Venables. SA West did not even see the actual DD Form 254
11   until a few days before the final day of the evidentiary hearing – six months after the search warrants
12   were issued. SA West never confirmed the status of Montgomery's security clearance with the
13   appropriate government agency, and once again relied on Venables's statement. Moreover, SA West
14   had no knowledge of government procedures for suspension or revocation of an individual's security
15   clearance. When Gray supplied SA West with a list of so-called classified materials, he never confirmed
16   with anyone at Nellis Air Force Base that they were, in fact, classified. He continued to rely on
17   Venables, Gray and Haraldsen's representations concerning classification, and he never verified himself
18   whether the allegedly classified materials were actually missing.

19        The evidence before this court compels the conclusion that SA West acted with callous disregard
20   of Montgomery's constitutional rights, which resulted in the improper search of Montgomery's home
21   and storage units, and the improper seizure of his property.

22        **7.    Conclusion**

23        Once the Government conceded that "nine Secret hard drives" were not, in fact, classified and
24   that the material "was not properly classified by an Original Classification Authority within the U.S. Air
25   Force," (Tr. Ex. 4), the obvious question is whether the search warrant can stand based on probable
26   cause that Montgomery violated 18 U.S.C. § 793(e), unlawful retention of national defense information.
27   Throughout the three days of the evidentiary hearing and in its post-hearing brief, the Government made

28                                              31

1    no showing whatsoever that probable cause still exists to justify keeping the seized material based on

2    this criminal violation, notwithstanding this court's invitation that the Government do so. Tr. III, 211-

3    212.   Likewise, the Government has also failed to demonstrate that probable cause exists to justify the

4    issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832, theft of trade

5    secrets. The Government's post-hearing brief is devoid of any legal or factual argument in opposition

6    to Montgomery's motion for a return of the seized property, other than a defense of SA West's

7    investigation prior to the issuance of the search warrants.  Having considered the evidence adduced at

8    the hearing, and all of the papers submitted in this proceeding, the court grants Montgomery's motion

9    for a return of the seized property (#21).[12]

10                                      **III. ORDER**

11           Based upon the foregoing,

12           **IT IS ORDERED** that Montgomery's motion to unseal the search warrant affidavits (#21) is

13    **GRANTED,** and Montgomery's motion for the return of property pursuant to Fed.R.Crim.P. 41(g) (#21)

14    is **GRANTED**.  Montgomery's motion for the segregation and sealing of all attorney-client and trade

15    secret material (#21) is **DENIED AS MOOT**, since the court has ordered the return of all seized

16    property.

17           Pursuant to LR IB 3-1, any party wishing to object to this order shall, on or before **Tuesday,**

18    **December 12, 2006,** file and serve specific a written objection to the ruling together with points and

19    authorities in support thereof.   The opposing party shall within ten days thereafter file points and

20    authorities opposing the objection. Points and authorities filed in support of or in opposition to the order

21    are subject to the page limits set forth in LR 7-4. This proceeding shall remain sealed until the deadline

22    for filing a written objection has expired.  If no objection to this order is filed by **Tuesday, December**

23    **12, 2006**, this order shall stand as the final order, and all papers filed in this proceeding shall be

24    **UNSEALED** without further order of this court.

25

26    _____

27           [12]Since this court concludes that the Government lacked probable cause, it does not reach the
       particularity analysis.

28                                          32

1    **IT IS FURTHER ORDERED** that in the event an objection is filed, this proceeding shall

2    remain **SEALED** until such time as the District Court issues its final order.  The parties shall file any

3    written objection to this order or opposition to the objection under seal by delivering any documents to

4    be filed in a sealed envelope addressed to Jake Herb or Lia Griffin or the U.S. District Court, District

5    of Nevada, Reno Office.

6    **IT IS SO ORDERED.**

7    Dated this 28th day of November, 2006.

8

9                                           _____

10                                          **UNITED STATES MAGISTRATE JUDGE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  33