```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega        )
     Melendres, et al.,            )
 5                                 )
                  Plaintiffs,      )   CV 07-2513-PHX-GMS
 6                                 )
                  vs.              )   Phoenix, Arizona
 7                                 )   May 14, 2015
     Joseph M. Arpaio, et al.,     )   9:35 a.m.
 8                                 )
                  Defendants.      )
 9   _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            BEFORE THE HONORABLE G. MURRAY SNOW

17                    (Status Conference)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

1                       A P P E A R A N C E S

2

3   For the Plaintiffs:          Cecillia D. Wang, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
4                                FOUNDATION
                                 Immigrants' Rights Project
5                                39 Drumm Street
                                 San Francisco, California  94111
6                                (415) 343-0775

7                                Stanley Young, Esq.
                                 COVINGTON & BURLING, L.L.P.
8                                333 Twin Dolphin Drive
                                 Suite 700
9                                Redwood Shores, California  94065
                                 (650) 632-4700
10
    (Telephonically)            Tammy Albarran, Esq.
11                               COVINGTON & BURLING, L.L.P.
                                 One Front Street, 35th Floor
12                               San Francisco, California  94111
                                 (415) 591-7066
13
                                 Daniel J. Pochoda, Esq.
14                               Joshua Bendor, Esq.
                                 AMERICAN CIVIL LIBERTIES
15                               FOUNDATION OF ARIZONA
                                 P.O. Box 17148
16                               Phoenix, Arizona  85011-0148
                                 (602) 650-1854
17
    (Telephonically)            Andre Segura, Esq.
18                               AMERICAN CIVIL LIBERTIES UNION
                                 125 Broad Street, 18th Floor
19                               New York, New York  10004
                                 (212) 549-2676
20
    For the Defendant Maricopa County:
21
                                 Richard K. Walker, Esq.
22                               WALKER & PESKIND, P.L.L.C.
                                 16100 N. 71st Street
23                               Suite 140
                                 Scottsdale, Arizona  85254
24                               (480) 483-6336

25

```
 1                    A P P E A R A N C E S

 2


 3   For the Defendants Arpaio and MCSO:

 4                              Michele M. Iafrate, Esq.
                               IAFRATE & ASSOCIATES
 5                              649 N. 2nd Avenue
                               Phoenix, Arizona  85003
 6                              (602) 234-9775

 7   For the Defendant Arpaio:  A. Melvin McDonald, Esq.
                               JONES, SKELTON & HOCHULI, P.L.C.
 8                              2901 N. Central Avenue, Suite 800
                               Phoenix, Arizona  85012
 9                              (602) 263-1700

10   For Chief Deputy Sheridan: Barry D. Mitchell, Esq.
                               MITCHELL STEIN CAREY
11                              One Renaissance Square
                               2 North Central Avenue
12                              Suite 1900
                               Phoenix, Arizona  85004
13                              (602) 358-0290

14   For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
                               DICKINSON WRIGHT, P.L.L.C.
15                              Attorneys at Law
                               1850 N. Central Avenue, Suite 1400
16                              Phoenix, Arizona  85004
                               (602) 285-5000
17
     For Executive Chief Brian Sands:
18
                               Greg S. Como, Esq.
19                              LEWIS BRISBOIS BISGAARD
                               & SMITH, L.L.P.
20                              Phoenix Plaza Tower II
                               2929 N. Central Avenue
21                              Suite 1700
                               Phoenix, Arizona  85012-2761
22                              (602) 385-1040

23


24


25
```

1                      <u>A P P E A R A N C E S</u>

2

3   For Lieutenant Joseph Sousa:

4                               David S. Eisenberg, Esq.
                                DAVID EISENBERG, P.L.C.
5                               2702 N. 3rd Street
                                Suite 4003
6                               Phoenix, Arizona  85004
                                (602) 237-5076
7
    For Timothy J. Casey:       Karen Clark, Esq.
8                               ADAMS & CLARK, P.C.
                                520 E. Portland Street
9                               Suite 200
                                Phoenix, Arizona  85004
10                              (602) 258-3542

11  Also present:               Chief Robert S. Warshaw, Monitor
                                Deputy Monitor John Girvin
12                              Deputy Monitor Sherry Kiyler
    (Telephonically)            Deputy Monitor Raul Martinez
13                              Ms. Cari Shehorn

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2

3              THE COURT:  Please be seated.

4              THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5    on for status conference.                                         09:35:06

6              Counsel, please announce your appearances.

7              MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

8    the ACLU for plaintiffs.

9              THE COURT:  Good morning.

10             MR. YOUNG:  Good morning, Your Honor.  Stanley Young,   09:35:14

11   Covington & Burling, for plaintiffs.

12             MR. BENDOR:  Good morning, Your Honor.  Josh Bendor,

13   ACLU of Arizona, for plaintiffs.

14             MR. POCHODA:  Dan Pochoda, ACLU of Arizona, for

15   plaintiffs.                                                       09:35:26

16             MS. IAFRATE:  I thought the people on the phone were

17   going to announce, Your Honor.  That's why I paused.

18             Michele Iafrate on behalf of Sheriff Arpaio.  With me

19   is my law clerk, Cari Shehorn.

20             MR. WALKER:  Richard Walker on behalf of the County as  09:35:40

21   I've defined in previous proceedings.

22             MR. McDONALD:  Mel McDonald, limited appearance for

23   Sheriff Arpaio.

24             MR. COMO:  Good morning, Your Honor.  Greg Como on

25   behalf of former Chief Brian Sands.                              09:35:53

1        THE COURT:  Is Chief Sands waiving his presence?

2        MR. COMO:  He is, Your Honor.

3        MR. MITCHELL:  Good morning, Judge.  Barry Mitchell,

4   specially appearing on Chief Gerard Sheridan's behalf.  He is

5   here in the courtroom.                                          09:36:06

6        THE COURT:  Thank you.

7        MR. BIRNBAUM:  Good morning, Your Honor.  Gary

8   Birnbaum, special appearance for Deputy Chief MacIntyre, who

9   may appear later this morning.  Otherwise, we'll waive his

10  appearance.                                                     09:36:16

11       THE COURT:  Thank you.

12       MR. EISENBERG:  Good morning, Your Honor.  David

13  Eisenberg on behalf of Lieutenant Joseph Sousa, special

14  appearance for him.  We will waive his appearance today.

15       MS. CLARK:  Karen Clark, specially appearing on behalf    09:36:28

16  of non-party Tim Casey, Your Honor.  He is not here today.

17       THE COURT:  Who's on the phone?

18       MR. SEGURA:  Good morning, Your Honor.  Andre Segura

19  of the ACLU for the plaintiffs.

20       MS. ALBARRAN:  Good morning, Your Honor.  Tammy           09:36:43

21  Albarran from Covington & Burling on behalf of the plaintiffs.

22       CHIEF MARTINEZ:  Good morning, Your Honor.  Raul

23  Martinez, deputy monitor.

24       THE COURT:  Good morning, Chief.  I do recognize the

25  monitor staff:  The monitor, Chief Robert Warshaw in the       09:36:54

 1   witness box, and assistant monitor John Girvin and

 2   Chief Sherry Kiyler in the jury box, members of the monitor

 3   team.

 4           As always, or at least as is not atypical, there have

 5   been a number of last-minute filings, but I would still like to          09:37:17

 6   roughly follow the order I set out in my order and notice.

 7   I'll insert some things that seem to make sense to insert where

 8   we do, and in a few places, because of the nature of the

 9   subject matter, I thought we might be able to resolve some

10   topics that were raised last week.                                        09:37:32

11           But we start off, Ms. Iafrate, with your response to

12   my inquiry regarding Ethical Rule 3.3(a)(3).  I've read your

13   pleading and I've read the sheriff's affidavit.  And I also, to

14   put it in context, went back and read Judge Boyle's order

15   regarding the two documents that were submitted to him by                 09:37:54

16   Ms. Clark and Mr. Liddy, and I read those documents as redacted

17   by Judge Boyle.

18           I'm just going to try and roughly set out a chronology

19   here so that I understand it, and if you have any objection

20   with my word choice or anything else you can let me know.  But            09:38:13

21   it seems to me from Mr. Casey's November 6th letter to the

22   sheriff like he set forth certain facts pertaining to the

23   timing of Mrs. Grissom's Facebook message relative to the

24   events they report, a history of his interactions with

25   Mrs. Grissom and his evaluation of the consistency of the                 09:38:31

 1   accounts of Mr. and Mrs. Grissom, and he said that he'd

 2   personally concluded that the matter was over, the information

 3   lacked substance.

 4          Then it seems that pursuant to a meeting he had with

 5   the sheriff and Chief Deputy Sheridan he further retained          09:38:45

 6   Don Vogel, and the letter sets forth the scope of Mr. Vogel's

 7   charge in terms of the inquiries.  And I believe Mr. Casey's

 8   letter notes that the sheriff could refer to Mr. Vogel's

 9   separate conclusions on these same points.

10          And it does seem to me that at trial Chief Deputy          09:39:03

11   Sheridan and Sheriff Arpaio testified in some detail about

12   Mr. Vogel's report and his conclusions, and it was on that

13   basis, among others, that Judge Boyle determined that the

14   attorney-client privilege in the letters had been waived.

15          Have I misstated anything, according to your              09:39:22

16   understanding?

17          MS. IAFRATE:  Your statements are correct.

18          THE COURT:  Okay.  I guess, then, last time I think I

19   heard plaintiffs' counsel indicate that you were reserving the

20   Vogel report itself from production.                             09:39:39

21          Are you still reserving that from production?

22          MS. IAFRATE:  Not based on Magistrate Boyle's

23   conclusion.  I was waiting for Magistrate Boyle's decision

24   whether it was going to be sealed or unsealed before disclosing

25   the report.                                                      09:39:59

1      THE COURT:  All right.  It does seem to me that the

2  entire Vogel report -- and I guess we need to bifurcate Vogel

3  reports now, because I have now become aware that Vogel was the

4  attorney that was -- or the private investigator hired to do

5  the Grissom inquiries.  But the Grissom Vogel report in its        09:40:14

6  entirety needs to be produced.

7      But it does seem to me -- and now I am basing this on

8  a newspaper article, I just want to check with you, that

9  appeared over the weekend, and I want to make sure the

10  understanding is correct -- that regardless, even though the      09:40:34

11  sheriff and chief deputy both testified about the content and

12  confirmation provided by Mr. Vogel in his separate

13  investigation, it appears to me, based on the content of the

14  news report, that regardless of whatever Detective Vogel found,

15  they accepted the advice of Mr. Casey, determined it would be     09:40:57

16  unethical to try to file ethical charges, and let the matter

17  go.

18      I guess I'm asking:  Do you contest what Chief Deputy

19  Sheridan is quoted as saying in the newspaper article?

20      MS. IAFRATE:  Your Honor, I do not know what article       09:41:17

21  you're referring to.

22      THE COURT:  Sure.

23      MS. IAFRATE:  But if you are asking, "Did they accept

24  the advice of counsel and let it go?" that was the

25  determination.                                                    09:41:27

1        THE COURT:  Kathleen, can you please give -- you can

2   just give that to counsel.

3        This was an article in the print -- I understand it

4   was in the Sunday Arizona Republic, and it may have been in an

5   earlier electronic version of The Republic.  It's divided up          09:41:47

6   into three columns, and if you go to the bottom of the second

7   column, it says:  "Days later, a private investigator arrived

8   at their home.  Jerry Sheridan, Arpaio's chief deputy, said Tim

9   Casey, Arpaio's former defense attorney on the racial profiling

10  case, hired the investigator to look into the veracity of the          09:42:09

11  message.  Sheridan said the office was obligated to look into

12  Karen's note:  'The sheriff and I felt that we should have our

13  lawyer look into the comment in the event that it was made, and

14  it was credible, because it went to the judge's state of mind,'

15  Sheridan said in an interview.  Dale ..." -- referring to             09:42:27

16  Dale Grissom -- "... says he never learned what happened after

17  their interviews, 'But I don't believe the investigator went to

18  investigate Snow's wife.'  When asked that question, Sheridan

19  said Casey told him and Arpaio there wasn't enough evidence to

20  take the tip any further.  'And it sat in my desk drawer for a         09:42:42

21  year and a half, until it came out in court when the sheriff

22  was on the stand,' Sheridan said.  'We had no intention to do

23  anything with it because we were told it would be unethical for

24  us to make a complaint on a third-party hearsay.'"

25        I guess, and we have Chief Deputy Sheridan here, I               09:43:00

 1  want to know if that's an accurate statement that he -- or an

 2  accurate recitation of a statement that he made.

 3           MS. IAFRATE:  May I have a moment?

 4           THE COURT:  You may.

 5           (Pause in proceedings.)                          09:43:23

 6           MS. IAFRATE:  Your Honor, I'm told that those

 7  statements that you just read attributed to Chief Deputy

 8  Sheridan are accurate statements.

 9           THE COURT:  All right.  Thank you.

10           So that -- I think there are two ramifications of   09:44:06

11  that.  One is the Sheriff's Office at the time chose to follow

12  their attorney's advice and they didn't pursue the matter

13  further.

14           I also think, however, that upon reading Judge Boyle's

15  report, he'd made a determination that the attorney work       09:44:22

16  product immunity had not been waived, and I believe that this

17  statement may waive the attorney-work-product immunity, and so

18  I'm going to refer this matter back to Judge Boyle to evaluate

19  whether the November 6 letter should be unredacted due to a

20  waiver of the attorney-work-product immunity based on the      09:44:40

21  statements made by Chief Deputy Sheridan.

22           Obviously, I don't know the unredacted portions, but

23  Judge Boyle does, and he can make the determination whether or

24  not there's such a waiver.

25           MS. IAFRATE:  Your Honor?                           09:44:55

1          THE COURT:  Yes.

2          MS. IAFRATE:  If you are going to refer this back to

3    Magistrate Boyle, this piece of information was not briefed to

4    Magistrate Boyle.  We were dealing with other instances.  So

5    could we have an opportunity to brief at least this limited --      09:45:10

6          THE COURT:  Sure.

7          MS. IAFRATE:  -- position?

8          THE COURT:  He will set the briefing schedule, but I

9    will tell him that I would prefer that it be quick, because we

10   are on a limited time frame.                                        09:45:23

11         I must say, though, that -- and I suppose because the

12   motion was -- or the clarification on 3.3 was only filed last

13   night, I'm not sure that the parties have had a chance to

14   react.

15         Ms. Clark, do you have anything you want to add?             09:45:42

16         MS. CLARK:  Your Honor, it has been an extremely

17   limited amount of time.  We got the documents --

18         THE COURT:  Could I have you come to a microphone?

19         MS. CLARK:  Yes.  Thank you, Judge.  Sorry about that.

20         Yes, Your Honor.  It has been an extremely limited          09:45:58

21   amount of time.  We got it short -- I received it shortly

22   before 5:00 p.m. and forwarded it to Mr. Casey, who was

23   reviewing it late last night.

24         Based on that very fast review, Mr. Casey's authorized

25   me to inform the Court that he does not believe at this time,      09:46:14

 1    based on the information he's aware of right now, that he has

 2    further remedial duties towards the Court.

 3            THE COURT:  All right.  Thank you.

 4            Ms. Wang -- I don't know who's speaking for the

 5    plaintiffs on this.  Do the plaintiffs have any concerns with        09:46:27

 6    the clarification?

 7            MS. WANG:  Your Honor, plaintiffs don't have any

 8    comment on it at this time.

 9            THE COURT:  All right.  So I don't -- when I saw it, I

10    didn't think that it required any sort of special scheduling.        09:46:38

11    I'll still allow the parties to speak if they want to be heard,

12    but I don't think the clarification is of such a nature that it

13    requires separate testimony by the sheriff.

14            I realize that the parties may have reserved the right

15    to recall him and interim developments may necessitate his          09:46:53

16    recall, but I don't know that anything about the clarification

17    statement is of such a nature that I think it needs anything

18    more than what you've already done, Ms. Iafrate, and so can we

19    move on?

20            MS. IAFRATE:  Yes, please.                                   09:47:13

21            THE COURT:  All right.  The next thing that I would

22    like to address is last night, Ms. Iafrate, you also filed --

23    and it might not have been last night; it actually might have

24    been a day ago, I can't remember -- you filed sort of a

25    reconciliation, which is what I had asked for, on closed           09:47:33

 1  investigations.

 2          And one of the reasons I'd asked for it is because

 3  when you represented last week that there were 40 some-odd

 4  closed investigations, my monitor only had 31.  And you do have

 5  41 that are closed, but let me tell you the ones that my                    09:47:49

 6  monitor does not have.

 7          (Cell phone rings.)

 8          THE COURT:  Everybody turn off your cell phones,

 9  please.

10          We don't have 2014-0572, 574, 576, 578, 581, 584, 588,             09:48:01

11  761, 817, and we also -- my monitor doesn't have 2015-0103.

12          Can we get those, please?

13          MS. IAFRATE:  Yes, Your Honor.  And actually, since

14  last week two more have been completed, so that's why the

15  number is at 43 now rather than 41.                                        09:48:44

16          THE COURT:  Well, when they're completed, would you

17  give copies to the monitor?  And we're about to -- we're going

18  to take up probably at this time, if we can, what plaintiffs

19  filed late last night or early this morning.

20          And let me just clarify that -- well, let me give you             09:48:56

21  a little bit of history.  You may know this, and if you do,

22  Ms. Iafrate, I apologize, but it was just before you entered

23  the case.

24          Last October we held a hearing in which we determined

25  that Captain Bailey was conflicted.  He is the captain of                 09:49:16

 1   the -- he was at the time the captain of the PSB but was also

 2   involved in matters being investigated, and it required the

 3   appointment of a special investigator.  So the monitor wrote to

 4   Chief Deputy Sheridan, indicated that we were going to need a

 5   special investigator, or an independent investigator.  Chief          09:49:39

 6   Sheridan wrote back and suggested Mr. Vogel.  We said fine.

 7   Mr. Vogel began his work.

 8          Then Mr. Vogel, I think it was Mr. Vogel, said, Well,

 9   you know, I've done work in the past for Tim Casey.  And

10   Chief Warshaw, the monitor, wrote to Tom Liddy and said:  We          09:49:58

11   need to stop.  It's very irregular to have an independent

12   investigator be the investigator for the defense attorney.

13   What investigations has he done?  And of course, we didn't know

14   at the time, and I didn't know until last week, that one of the

15   investigations was the Grissom inquiry.                               09:50:18

16          And we never did get an answer to that question, but

17   it was in that interim that Mr. Casey withdrew from the case

18   and you came in the case, and you may remember this.  We

19   established a criteria whereby the monitor could oversee and

20   supervise internal investigations as well as external                09:50:38

21   investigations.

22          And so I said, Well, if they want to proceed with

23   Vogel, that's irregular, but it's their choice.  We'll note it,

24   and if there's any problem, but why don't we assign a monitor

25   to accompany chief Vogel on all his inves- -- or Deputy Vogel        09:50:53

1    on all his investigations, and we did.  It was one of our

2    internal monitors.  It was Chief Kiyler, who's here.  She did

3    accompany Deputy Vogel on all of his investigations through the

4    months, on the two investigations that he did complete within

5    the limits within which MCSO placed on him.                    09:51:13

6           I do believe, and I don't mean to put words in

7    anybody's mouth, that the monitor is satisfied that his report

8    is adequate and independent, despite the irregularity of having

9    him be selected in the way that he was, meaning somebody who

10   had done work for Tim Casey.  And I don't believe that the      09:51:34

11   monitor's evaluation has changed even though he was involved in

12   the Grissom inquiries.

13          Now, the monitor has not evaluated his Grissom

14   inquiries, but I think that the monitor is satisfied that in

15   the main, it wouldn't be acceptable, really, to pick a          09:51:53

16   defendants' private investigator to do an independent

17   investigation, but I think that the monitor is satisfied that

18   despite that irregularity, in the main his investigation has

19   been adequate and thorough.

20          Am I misstating that?                                    09:52:10

21          CHIEF WARSHAW:  No.

22          THE COURT:  Towards that end, that's one of the things

23   that plaintiffs want, and I thought last week you said you'd

24   give it to them.

25          Why are you going to withhold it?                        09:52:21

1          MS. IAFRATE:  What are you referring to, Your Honor?

2          THE COURT:  The Vogel investigations.

3          MS. IAFRATE:  I don't think that that's what they were

4   requesting only; I think that they were requesting much more

5   than that.                                                    09:52:37

6          THE COURT:  They were.  One of the categories --

7   you're right, and I don't mean to misstate that.  But one of

8   the categories that they were asking for was the Vogel

9   investigations, and they said that you had elected not to

10  provide that as well, I think.                                09:52:51

11         Let me see.  I have here -- they're asking for all

12  documents related to the four investigations originally

13  assigned to be conducted by Don Vogel; all documents related to

14  investigations stemming from former Deputy Charley Armendariz,

15  including, but not limited to, the investigations referenced in  09:53:12

16  defendants' reports on the status of current IA investigations;

17  and all MCSO Internal Affairs or Professional Standards Bureau

18  documents relating to investigations of alleged misconduct

19  involving race discrimination and/or illegal detentions.

20         Why can't they have those?                             09:53:27

21         MS. IAFRATE:  Well, first of all, Your Honor, I'm

22  unsure what you're reading from.

23         THE COURT:  Oh.  Fair enough.  This is another one of

24  those late filings.  This is one we got last night.  I got a

25  ton from you and I got a few things from plaintiff and so you  09:53:41

1    may not have seen this yet.

2              THE CLERK:  (Handing document to Ms. Iafrate).

3              MS. WANG:  Your Honor?

4              THE COURT:  Yes.

5              MS. WANG:  We did recognize that we filed the motion          09:54:03

6    to compel on these documents late last night, and plaintiffs

7    didn't expect it to be teed up --

8              THE COURT:  All right.

9              MS. WANG:  -- for today.

10             THE COURT:  Well, we can take it up next week if you         09:54:14

11   want.

12             MS. WANG:  Sure.  We do have an interest in getting

13   them sooner rather than later, given that the continuation of

14   the evidentiary hearing is looming, but we would not object to

15   giving Ms. Iafrate a chance to respond to the motion.               09:54:24

16             THE COURT:  All right.  Why don't you do that,

17   Ms. Iafrate, and if there's not going to be a problem, turn

18   them over to her.

19             I thought you said you were going to give the Vogel

20   investigations on the 18th, anyway, last week.  Did I               09:54:35

21   misunderstand you?

22             MS. IAFRATE:  Right.  I don't think that that's the

23   category.  I mean, it's very difficult for me, Your Honor, to

24   read this and respond to you at the same time.

25             THE COURT:  No problem.  And I won't make you.             09:54:47

1          MS. IAFRATE:  Okay.

2          THE COURT:  But if you read through those things and

3     we can resolve problems, resolve it and we won't take it up.

4          MS. IAFRATE:  Okay.

5          THE COURT:  Okay?                                      09:54:55

6          I have a few questions on the parties' briefings re

7     the depositions of Casey, Liddy, and Stutz.  I don't know if

8     you wanted to actually make oral arguments, and if you do I'll

9     hear them, but I have a few questions and I want to get that

10    out so that you can move on it as well.                     09:55:18

11         It's plaintiffs' motion.  Who's arguing?

12         MS. WANG:  Your Honor, Mr. Bendor will argue that.

13         THE COURT:  All right.

14         MR. BENDOR:  Thank you, Your Honor.

15         And if you want to, just ask questions.  I don't need  09:55:48

16    to belabor what's in the written papers.

17         THE COURT:  I appreciate the invitation, but you can

18    rest assured I will ask you questions.

19         MR. BENDOR:  I wasn't concerned that you wouldn't.

20         Your Honor, defendants have raised the advice of       09:56:06

21    counsel --

22         THE COURT:  Let me tell you, let's just cut right to

23    the quick of it, Mr. Bendor.  I'm persuaded on the preliminary

24    injunction issue.  Of course, I'm going to allow Ms. Iafrate to

25    speak and listen carefully to what she says, but it seems to me 09:56:18

1    that defendants have clearly raised the advice of counsel on

2    the preliminary injunction issue, and I think they've waived

3    the attorney-client privilege and the work-product immunity.

4    We can go through all that, and maybe Ms. Iafrate wants to go

5    through it in more detail.                                    09:56:35

6            More concerning to me is the May 14th -- now, it seems

7    clear to me, based on Chief Deputy Sheridan's testimony, that

8    clearly you can depose these folks on matters that -- in which

9    the defendants were neither seeking nor obtaining legal advice,

10   and Chief Deputy Sheridan, for example, has already indicated  09:57:00

11   that he was not seeking nor obtaining legal advice in his

12   conversation with Chief Trombi and Ms. Stutz.  So clearly, you

13   can depose her on that, I think.

14           But it isn't so neatly teed up on the rest of the May

15   14th meeting.  I did read in your briefing, and I appreciate   09:57:20

16   that Ms. Iafrate invoked the privilege when you asked at

17   deposition about the May 14th meeting, and then in hearing she

18   seems to have sure skated awfully close to the line when she

19   said in her questioning of Sheriff Arpaio -- well, the

20   question:  "Chief Sheridan told him to send out the e-mail?"   09:57:45

21           "Sheriff Arpaio:  I believe he did."

22           "Ms. Iafrate:  Did anyone in the room object to that

23   directive?"

24           "Answer:  No.

25           "Question:  Not even counsel?                          09:57:58

1          "Answer:  No."

2          That's skating pretty close to being a sword and a

3     shield on the one hand, but on the other hand, Mr. Bendor, is

4     silence of counsel the same thing as advice of counsel?  I

5     mean, I'm the one that's going to be the trier-of-fact here.          09:58:15

6     I'm not particularly persuaded that when counsel don't say

7     anything it means anything at all.  I think she might have been

8     trying to draw an implication, but I'm not going to draw it,

9     and I don't know that that breaches the attorney-client

10    privilege.                                                            09:58:30

11         Do you understand my question?

12         MR. BENDOR:  I do understand your question, Your

13    Honor, and I think we would argue that that is the -- first of

14    all, it's clear this is the sort of question that defendants

15    were objecting to at deposition and they were assert --             09:58:45

16         THE COURT:  I read that in your brief.

17         MR. BENDOR:  Right.  And would say that if counsel's,

18    you know, asked, you know, "Can I do A or B?" and counsel

19    doesn't say anything, then that communication back and forth is

20    a communication intended to obtain advice, and the fact of the       09:59:08

21    question and the answer or non-answer appears to be relevant.

22         THE COURT:  Well, let me ask you this:  Is the way to

23    proceed, then, to proceed somewhat like a privilege log, which

24    is to allow you to take the deposition, and to tee up what was

25    actually said, and if they're going to seek to invoke the            09:59:27

 1   privilege, they have to sort of assert enough in a privilege

 2   log for me to know, and then I can rule on whether or not this

 3   question waived that.

 4          Do you understand what I'm saying?

 5          MR. BENDOR:  I believe I do.  Your Honor, I guess I          09:59:46

 6   think it would be unfair to allow defendants to object to

 7   questions about what non-attorneys said or -- or other advice

 8   that was given, right?  I mean, if attorneys said, "Well, you

 9   can do A or B," but they didn't happen to speak to us another

10   issue, what they did give advice towards seems clearly          10:00:10

11   relevant --

12          THE COURT:  Well --

13          MR. BENDOR:  -- to the statement that they didn't

14   object to --

15          THE COURT:  I think I've indicated you can depose          10:00:18

16   them, but then you're going to have to think very carefully

17   about your questions, right?

18          MR. BENDOR:  Yes.  I think we would argue that we're

19   going to end up in basically the same place, and that by --

20          THE COURT:  Well, you may well end up in the same          10:00:35

21   place, but if you want my ruling now, I think my ruling is

22   silence of counsel is not the same thing as advice of counsel.

23          I do think that you can take the deposition, and I do

24   think Ms. Iafrate's questioning of the sheriff may, in certain

25   contexts, waive a privilege.                                      10:00:56

1           I do think you're also require -- allowed, and I'll

2    say this, but I do want to hear from Ms. Iafrate on this, I do

3    think you're allowed to ask questions to make sure that there's

4    actually a good faith basis for the invocation of the

5    attorney-client privilege.  And so I'm not -- not going to          10:01:13

6    deprive you of asking questions about that May 14 meeting.

7           But it does seem to me that it's quite possible that

8    advice was sought and/or given in that meeting, and that if it

9    can be cabined, you're going to have to determine whether

10   Ms. Iafrate's question to the sheriff was sufficient to waive      10:01:32

11   it.

12           MR. BENDOR:  Understood, Your Honor.  I think I would

13   also note that we have a second argument on waiver for May

14   14th, which is the voluntary disclosure of otherwise privileged

15   information, and --                                                  10:01:47

16           THE COURT:  Which would be what?

17           MR. BENDOR:  Which would be -- I mean, it pertains to

18   the same portion of the transcript, which is that counsel was

19   silent on whether or not the Trombi e-mail was proper, and we

20   would argue that that is disclosure as to what counsel did or      10:02:10

21   did not say.

22           And I understand they are similar arguments, but I

23   think that you could say that whether or not it's advice, it

24   certainly is a disclosure of the facts regarding potentially

25   privileged communications.                                          10:02:29

 1          If they want to assert that the meeting isn't

 2   privileged at all, then, I mean, that makes the matter moot.

 3          THE COURT:  Well, they may do that.  We'll have to

 4   see.

 5          MR. BENDOR:  Okay.  Your Honor, do you have any                10:02:40

 6   further questions of me?

 7          THE COURT:  Well, I guess I'll just point out I'm

 8   going to ask Ms. Iafrate, and I don't know if you're interested

 9   in this, but it seems to me, and I think Ms. Iafrate's

10   acknowledged this, that Judge Boyle's already said there's a        10:02:52

11   waiver of the attorney-client privilege on any of the Grissom

12   stuff.  I don't know if you want to ask about that, but I just

13   am telling you that I'm going to ask Ms. Iafrate in case this

14   becomes an issue.

15          MR. BENDOR:  I don't think we have anything further to       10:03:05

16   say about this at the time, other than it appears that

17   defendants have waived that privilege and work product

18   immunity.

19          THE COURT:  All right.  Ms. Iafrate.

20          MS. IAFRATE:  Your Honor, regarding the pleading, I do       10:03:15

21   not want to make an oral argument that reiterates my papers to

22   you.  I'm certain that you've read them already.  They weren't

23   filed last night, so you had a little bit of time to review

24   them.  But regarding the May 14 hearings -- or May 14 meetings,

25   I recall that during examination you were very, very particular    10:03:41

1    how you defined attorney-client privilege.

2              So for example, when I had Chief Deputy Sheridan on

3    the stand I asked him, "Were you seeking advice from Christine

4    Stutz?"  He testified:  "No."  Therefore, I elicited further

5    testimony from him regarding those statements.                  10:04:06

6              THE COURT:  Um-hum.

7              MS. IAFRATE:  That is not a waiver.  I was not going

8    into --

9              THE COURT:  I don't view that as a waiver.

10             MS. IAFRATE:  Right.                                   10:04:17

11             THE COURT:  I don't view that as a waiver at all.  I

12   just don't think the privilege has been established there,

13   right?

14             MS. IAFRATE:  Correct.  I'm with you.  I guess that my

15   point to you is this regarding this overreaching waiver of it    10:04:28

16   all.  The sheriff's --

17             THE COURT:  Well, did you understand where I'm going

18   with Mr. Bendor?  Do you have any concerns about that?

19             MS. IAFRATE:  I didn't understand how -- what that

20   would look like.  So, for example, the deposition can be set.    10:04:39

21             THE COURT:  Right.

22             MS. IAFRATE:  The deponent will appear.  And then do

23   we go on a question-by-question basis?

24             THE COURT:  I'm afraid that it may go that way and

25   you'll just kind of have to -- maybe what we'll have to do is    10:04:55

1    when you're going to take that, you'll just have to reserve

2    some time with me.  And if I'm available I'll come sit in the

3    deposition; if I'm not available you'll just cabin the

4    questions.  And then I can resolve them at the end of the day.

5        MS. IAFRATE:  Well, my client has a privilege, but I      10:05:08

6    believe that these attorneys also have concerns and attorney --

7        THE COURT:  Clearly, they do.

8        MS. IAFRATE:  And so I would --

9        THE COURT:  In terms of their ethical

10   responsibilities?                                            10:05:24

11       MS. IAFRATE:  Yes.

12       THE COURT:  Right.

13       MS. IAFRATE:  So I would assume that those attorneys

14   would be invited to the table as well.

15       THE COURT:  I think they have to be.  I don't disagree    10:05:29

16   with that at all.

17       Do you have any problem with that, Mr. Bendor?

18       MR. BENDOR:  No, Your Honor.

19       MS. IAFRATE:  So if that is your ruling, so be it.

20   However --                                                   10:05:41

21       THE COURT:  Well, it is my inclination.  I'm just

22   asking you if you have any problem.  I'm going to also ask

23   Mr. Como if he -- if he wants to be heard on that.  Or if you

24   have any suggestion that would be different if you think that

25   would appropriate, I'm giving you an opportunity to be heard, I   10:05:51

 1    guess, is what I'm saying.

 2              MS. IAFRATE:  Well, I'm trying to -- this is yet one

 3    more unique situation in this case.

 4              THE COURT:  Yeah, there's lots of them in this case.

 5              MS. IAFRATE:  Yes.  I would suggest that an                    10:06:04

 6    alternative would be to do -- I assume that to err on the side

 7    of caution, plaintiffs will be writing out their questions,

 8    similar to a script.  I would suggest that the deposition be

 9    based on written questions so that then we could identify which

10    ones we would be objecting to and which ones would be easily        10:06:23

11    answered.

12              If we're doing this on the fly, Your Honor, you know,

13    I'm doing a lot on the fly right now, and it's not the best way

14    to protect something as important as the attorney-client

15    privilege to all be in a room and listening to the question for   10:06:37

16    the first time.  So I would recommend that we do this as the

17    rules allow, that it be done by written questioning and then we

18    do written objections.

19              THE COURT:  I don't think I'm going to do that.  You

20    know that the idea that you're entitled to pre-knowledge of all   10:06:55

21    the questions doesn't float very well with me.  But I do -- you

22    will know the subject matter and I believe -- I have great

23    confidence in your competence and the competence of Ms. Clark

24    and the other attorneys who will be present.

25              If you -- you know, I do think it's important to go      10:07:15

 1   carefully.  So if you need some time in the deposition, I don't

 2   think you're going to need a lot of time.  You're a very

 3   experienced attorney.  But I don't think they -- I'm not going

 4   to buy into them writing out the questions in advance.  So just

 5   try and cabin in the way I've indicated.                    10:07:30

 6         If I can be there I will.  If not, you just save the

 7   areas and get in touch with me.  Let me know when you're going

 8   to do it and I'll try and make myself available to make those

 9   rulings.

10         Mr. Como, do you want to be --                        10:07:43

11         Oh, did you have anything more, Ms. Iafrate, on this?

12         MS. IAFRATE:  Nothing other than what I've written in

13   the pleading.

14         THE COURT:  All right.  Thank you.

15         Mr. Como.                                             10:07:52

16         MR. COMO:  Your Honor, I don't have any objection to

17   the preliminary, I guess, rulings or thoughts that you've

18   expressed on these issues, nor the procedure that you've

19   outlined.

20         THE COURT:  All right.  Ms. Clark.                    10:08:00

21         MS. CLARK:  Thank you, Judge.  Just briefly, I, of

22   course, would ask to be able to attend the depo to advise

23   Mr. Casey about his obligations in this increasingly complex

24   matter.  I think more clarification ahead of time on the

25   parameters of what has been waived and what has not been waived  10:08:24

1   and what he can testify to is going to be extremely helpful.

2          THE COURT:  I'm going to do a written order on this

3   one.  But I'm just going to tell you, it's a very broad waiver

4   as it pertains to the preliminary injunction advice.  It's a

5   very broad waiver, as I read it, but it's really Judge Boyle's     10:08:40

6   order.

7          If you want me to clarify it or expand it or detract

8   it, I will, but it seems to me that Judge Boyle has already

9   ruled that there's a waiver on the Grissom stuff.

10          And my ruling on the 2014 May meeting, which may be of     10:08:54

11   interest, is that the deposition can proceed to the extent that

12   the discussion involved matters in which legal advice was not

13   sought nor given, but that's why I was, you know, sparring a

14   little bit with Mr. Bendor.  The questions are going to have to

15   be very skillfully asked and carefully answered so that we can     10:09:22

16   cabin those areas and protect the privilege.

17          There's also the issue of whether or not any of the

18   questions or answers would potentially be waived by

19   Ms. Iafrate's subsequent questioning of Sheriff Arpaio, but I

20   am not ruling that that -- at this point I'm not ruling that     10:09:42

21   that constitutes any sort of definable waiver of an

22   attorney-client privilege absent a factual context.

23          MS. CLARK:  Right.  Thank you for that clarification,

24   Judge, that's very helpful.

25          Of course, in addition to the privilege, there's also     10:09:54

 1  client confidentiality, which is Mr. Casey's --

 2          THE COURT:  I am well aware.

 3          MS. CLARK:  Yes, I am aware that you're aware.

 4          In regard to this entire issue, I do need to make a

 5  record about one thing, and that is that a lot of what's going          10:10:08

 6  on in these proceedings is involving Mr. Casey, who is a

 7  non-party, who's paying out of his pocket for me to attend

 8  these hearings.

 9          Up until the hearing on the 21st and 24th of April, we

10  were receiving copies of transcripts of these hearings from the          10:10:24

11  defense and then that stopped.  Mr. Casey was required to pay

12  out of his own pocket for the transcript of the April 23rd and

13  24th testimony so that he could comply with his ethical

14  obligations to this Court.  And I've also asked for a copy of

15  the May 8th hearing transcript and that is not forthcoming,          10:10:41

16  either.

17          So he needs to be having these transcripts in order to

18  comply with this Court's order the day that he withdrew that he

19  have a continuing obligation to assist in the transition of

20  this case, to ensure that Your Honor's concerns about the          10:10:55

21  defendants and carrying out the orders and Mr. Casey's

22  involvement in that is carried out.  So I guess I'm asking for

23  the Court to help me to help Mr. Casey by somehow ordering the

24  defendants to provide him with copies of transcripts they're

25  ordering.          10:11:13

1          THE COURT:  Well, the defense, I think Ms. Iafrate

2    made a position that because Mr. Casey was a potential witness,

3    she was invoking the rule with respect to him.

4          Is that right, Ms. Iafrate?

5          MS. IAFRATE:  That is correct, Your Honor.                    10:11:26

6          THE COURT:  And I assume that's why you haven't been

7    providing the transcripts?

8          MS. IAFRATE:  Your Honor, I forwarded that information

9    to the County, because they are paying for the transcripts.  So

10   the answer to that question is more appropriately asked of the    10:11:35

11   County, not of me.

12         THE COURT:  Mr. Walker.

13         MR. WALKER:  I have no objection in principle to

14   providing Mr. Casey with transcripts, but I do need to evaluate

15   the issue about the invocation of the rule.                       10:11:53

16         THE COURT:  All right.  Well, I would ask you to do

17   that and get back with Ms. Clark promptly.

18         MR. WALKER:  I'll do that.

19         THE COURT:  Thank you.

20         MS. CLARK:  Then the last thing, Judge, was just to         10:12:04

21   clarify that I would be allowed to not only attend the

22   deposition, but also to raise appropriate objections.

23         THE COURT:  You will.  But as I recall, there are a

24   number of client confidentiality obligations that can be

25   overcome by court order.                                          10:12:15

1          MS. CLARK:  Correct.  That's why I would suggest that

2     we need you there, Judge Snow.

3          THE COURT:  Well, it hasn't been scheduled yet.  If I

4     can be there, I will be.

5          MS. CLARK:  It will be very difficult for me to advise          10:12:27

6     him about how to answer in light of what you just said.

7          THE COURT:  All right.

8          MS. CLARK:  Thank you, Judge.

9          THE COURT:  Uh-huh.

10         Now, I want to take up the application for admission          10:12:36

11    to practice pro hac vice of Mr. Jon -- oh, was there anybody

12    else who had anything to say on that?

13         I want to take up the application for admission to

14    practice pro hac vice of Mr. Jonathon A. Moseley.  He called

15    and asked to appear telephonically.  We authorized him to          10:12:52

16    appear telephonically but I did not hear him appear.

17         Are you there, Mr. Moseley?  Mr. Moseley?

18         All right.  Let me tell you my concerns, and I guess

19    I'm going to lay them out.

20         Ms. Iafrate, Mr. Moseley is affiliated with Freedom          10:13:11

21    Watch, which represents Sheriff Arpaio in another action in the

22    district court of -- or in the D.C. Circuit now, so he has an

23    attorney-client relationship with Sheriff Arpaio.  Sheriff

24    Arpaio, and I believe Chief Deputy Sheridan, have both

25    testified in this action that the material they received from          10:13:35

 1   Mr. Montgomery has been discredited, and I don't mean to put

 2   words in their mouth but I think it's pretty clear they said

 3   that on a number of occasions.  At my invitation, I think

 4   Sheriff Arpaio at one time called it junk.  I mean, that was my

 5   word but he said yes.                                          10:13:52

 6           Is the sheriff -- are you withdrawing that testimony?

 7           MS. IAFRATE:  No, Your Honor, we're not withdrawing

 8   it.

 9           THE COURT:  If that's the case, then it seems to me

10   like it's just not possible for Mr. Moseley, without creating a  10:14:04

11   conflict, to represent Mr. Montgomery in this action while

12   representing Sheriff Arpaio in another action and challenging

13   the validity of Sheriff Arpaio and Chief Deputy Sheridan's

14   statements about Mr. Moseley in this action.  And Mr. Moseley's

15   not appearing, and so it is my determination that I'm going to  10:14:29

16   deny his petition -- or application for admission to practice

17   pro hac vice, because it seems to me that it would create a

18   conflict in this case.

19           MS. IAFRATE:  Well, Your Honor, it's unfortunate that

20   Mr. Moseley is not here because this is his motion, not mine.   10:14:48

21   However, all that I can tell you is that within his pleading

22   papers they're saying that there is no conflict.  I would like

23   to ask -- I was hopeful that Mr. Moseley would be on the phone

24   so that we could ask how could he say that.  Without him

25   appearing to answer those questions, I just have -- I have no   10:15:06

 1   understanding regarding whether there is a conflict or there is

 2   not a conflict.

 3          THE COURT:  Well, I understand the position you're in,

 4   but he's not here.  We did authorize him to be here.  You can

 5   understand why I think there is an apparent conflict, despite        10:15:23

 6   what he says.

 7          I will say I've read his motion to intervene and I

 8   don't think that's well taken.  But, of course, I'm not going

 9   to rule on it because I'm going to strike it because I'm not

10   going to allow his admission.  I'm certainly not going to          10:15:36

11   prevent Mr. Montgomery from seeking to intervene if he wishes

12   to do so.  But he has to do so through counsel that is not

13   going to create a conflict by his very appearance, and it

14   surely seems to me like Mr. Moseley does that.

15          So how about we do this?  I'm going to deny               10:15:54

16   Mr. Moseley's application for admission to practice pro hac

17   vice without prejudice if he wants to appear and take it up.

18   But even if I admit him pro hac vice, we still have to then

19   deal with his motion to intervene, which strikes me, as I said,

20   to be a little bit problematic, anyway.  But that's --           10:16:12

21          Did you want to be heard on that, Mr. Young?

22          MR. YOUNG:  I do want to be heard on the motion for

23   pro hac vice admission, Your Honor.

24          Our view is that the Court has the discretion and

25   should exercise that discretion to deny the motion for           10:16:31

1    additional reasons beyond what Your Honor has just stated, and

2    I'll state those on the record now since the motion may be

3    renewed.

4            Under Local Rule 83.1(b)(2), this is a discretionary

5    issue for the Court under United States versus Ries,                    10:16:47

6    100 F.3d 1469 (9th Cir. 1996):  "Where an out-of-state attorney

7    strongly suggests through his behavior that he will neither

8    abide by the court's rules and practices - thus impeding the

9    'orderly administration of Justice' - nor be readily answerable

10   to the court, the Judge may ... deny the pro hac vice                   10:17:09

11   application."  And here already, based on the filings that have

12   been made, it is our view that that likelihood exists.

13           I would refer first to Mr. Moseley's May 2nd letter,

14   which is attached to the Court's May 8 order.  There is a

15   notation there that counsel of record were copied.  As of May          10:17:28

16   8, I believe the Court asked counsel of record and none of them

17   had received it.  We still have not received the letter.  We

18   only have it because of the Court's order.

19           The letter also states that Montgomery was not engaged

20   in relation to this case; he was engaged to help research other        10:17:45

21   matters, not this case.  We believe that statement by

22   Mr. Moseley is false.  We won't get into the substance of that

23   for now but we believe it is not correct.

24           Mr. Moseley's May 2nd letter also says that his

25   appearance would be, quote, for the purpose of presenting              10:18:05

1    answers to the Court.  That's also not true, because he

2    subsequently filed a motion to intervene.  That's not just

3    providing information to the Court about the testimony of the

4    witnesses in the earlier hearing, but it's actually filing a

5    motion that's not anticipated or not mentioned in this letter.    10:18:23

6    So we believe that that letter by itself is indicative of

7    disruption and, frankly, the possibility of improper activity

8    if he were to be admitted.

9         Now, this has been -- some of this letter has been

10   later withdrawn, but I believe that you can't just make a    10:18:51

11   statement about something that's material to a matter before

12   the Court and just say, "Oh, sorry," later, and withdraw it

13   without even apologizing or offer much explanation.

14        THE COURT:  Well, for what it's worth, Mr. Young, I

15   noted that he wanted to withdraw it -- he might want to    10:19:08

16   withdraw it, but I've attached it to my order and I'm not

17   withdrawing it from my order.

18        MR. YOUNG:  And that's the reason why we're able to

19   see it ourselves, Your Honor.

20        There was also a sealed document which was    10:19:19

21   accompanied -- which accompanied the May 2nd letter, and as

22   Your Honor noted previously, that communication said that the

23   purpose of the filing by Mr. Moseley was to file an amicus

24   brief on behalf of Sheriff Arpaio.  That statement has also

25   been withdrawn through a clarification paper that was filed    10:19:37

1    late yesterday, with some explanation that relates to what

2    apparently was a word processing error on the part of

3    Mr. Moseley, but there wasn't even an apology for that error.

4    And again you have a material misstatement in a document filed

5    in this court.  And he hasn't even been admitted to appear in          10:19:57

6    this case yet, and I believe that just tells us that it would

7    not be a wise thing to have him admitted.

8           Even more seriously, although Mr. Moseley's letter

9    refers to a Virginia Supreme Court case relating to his earlier

10   suspension from practice for a period of six months in that           10:20:21

11   court, I believe looking at the Virginia Supreme Court decision

12   will disclose that there is a lot that has not been disclosed

13   to this Court, and the citation for it is 694 S.E.2d.

14          THE COURT:  Wait.  Give me that again.

15          MR. YOUNG:  694 S.E.2d 586.  And I have copies of the           10:20:43

16   decision if you would like to see them.

17          THE COURT:  Yes, please provide copies.

18          MR. YOUNG:  Now, what happened in the Virginia case

19   that caused Mr. Moseley's suspension was that there was a key

20   document with an arbitration clause which was not disclosed            10:21:15

21   prior to a hearing by Mr. Moseley.

22          At the hearing, and this is what Mr. Moseley does not

23   say, according to the Virginia Supreme Court, on

24   cross-examination Mr. Moseley's client admitted that he had

25   given a copy of that document to Mr. Moseley, and that that           10:21:34

1    contract did contain an arbitration clause, which would make

2    the action that Mr. Moseley had filed improper.  So the courts

3    in Virginia decided, well, that's not proper behavior, and they

4    suspended him for that.

5         In addition, the Virginia court noted -- and this is          10:21:54

6    also omitted from Mr. Moseley's letter to you -- the court

7    found that Mr. Moseley filed in excess of 80 pleadings and

8    motions in the case and used abusive discovery tactics and

9    filed frivolous pleadings.

10        The court also found that Mr. Moseley wrote letters to       10:22:14

11   the adverse party that were unprofessional and intended to

12   intimidate and harass.  And Mr. Moseley stated that the judge

13   in that case issued an absurd decision, was a wacko judge who

14   he believed was bribed, and he believed that opposing counsel

15   were demonically empowered.                                        10:22:36

16        The Virginia Supreme Court then said the following,

17   quote:  "Moseley clearly made derogatory statements about the

18   integrity of the judicial officer adjudicating his matters, and

19   those statements were made either with knowing falsity or with

20   reckless disregard for their truth or falsity."  Now, that's      10:22:56

21   information that we believe is highly relevant to any

22   application by Mr. Moseley to appear in this case.

23        Your Honor has already noted the conflict issue.

24   Mr. Moseley's clarification statement filed yesterday says,

25   quote:  "Neither Dennis L. Montgomery nor his counsel are         10:23:20

 1    adverse to Sheriff Arpaio, his deputies, the Cold Case Posse or

 2    the MCSO in any respect."  We believe that for the reasons that

 3    Your Honor has already noted, and for other reasons in some of

 4    the documents that have been produced, which I won't go into,

 5    that statement also is false.                              10:23:41

 6         So for making all these false statements to the Court,

 7    and for the behavior that led him to be suspended in the

 8    Virginia bar, we believe that any application for pro hac vice

 9    appearance in this case by Mr. Moseley should be denied.

10         THE COURT:  Thank you.  Ms. Iafrate.                 10:23:56

11         MS. IAFRATE:  Your Honor, I'll leave it to your

12    discretion.  I do not advocate or have any opinion regarding

13    what Your Honor should do regarding the admission pro hac vice.

14         THE COURT:  Mr. Como?

15         MR. COMO:  I have no position on this issue, Your      10:24:12

16    Honor.

17         THE COURT:  All right.  Then I'm going to deny the

18    application, and if he wants me to move to reconsider he can do

19    that, but the application is denied.

20         The last matter, and I have some fairly important     10:24:21

21    things to say here, and I think we've all recognized that this

22    is a very unusual case with permutations that are new, and I've

23    decided to handle this in this way.  I have ordered the

24    defendants to produce certain documents, and I believe that

25    they have been doing so.  Among those documents are the      10:24:53

1    documents that are apparently a data dump of some kind by

2    Mr. Montgomery to MCSO.  And then in addition to those

3    documents there are other documents about what I will call the

4    Seattle operations with Mr. Montgomery that are not data dumps.

5           Last week I ordered Ms. Iafrate to contact the CIA      10:25:20

6    since I think at least it was Chief Deputy Sheridan's

7    understanding, that I think has been confirmed by some of the

8    documents that I've seen, that at least Mr. Montgomery claims

9    that some of these documents were taken from the CS -- or the

10   CIA.  And again, I don't know whether that's true or not, but  10:25:38

11   we've given the CIA another week to come lay any claim to any

12   sort of protection it wants.

13          And so I'm going to order the parties, at least with

14   respect to those documents that are the Montgomery data dump,

15   do not disclose them in any way.  I'm not saying you can't look  10:25:55

16   at them.  If you choose to, look at them all you want, but

17   don't disclose them to anybody else.  And that will give the

18   United States another week in which to act if it wishes to do

19   so.  I've been credibly informed that they're aware of your

20   letter.                                                         10:26:16

21          MS. IAFRATE:  That's good to know, Your Honor.

22          I have a piece of information that I would like to

23   share with you also when it's my time.

24          THE COURT:  Go ahead.

25          MS. IAFRATE:  I have heard that the CIA is aware of     10:26:27

 1    the letter, and I filed a notice just so that you saw that the

 2    letter actually did get sent out.

 3          Yesterday I was contacted by phone several times, and

 4    then by e-mail, from two people that said that they were part

 5    of the Department of Justice and they wanted the letter.                    10:26:54

 6          THE COURT:  They wanted the letter you sent the CIA?

 7          MS. IAFRATE:  Correct.  So I said -- I asked them if

 8    they were representing the CIA and they said no.  I asked them

 9    if they had authority from the CIA for me to give them the

10    letter, if there was someone that I could talk to.  They said      10:27:13

11    no.  I said I feel uncomfortable providing you with this letter

12    if I don't have someone from the CIA saying that you have

13    authority.

14          Your Honor, this is all new territory to me.  They

15    didn't write me a letter requesting it.  And when I asked         10:27:29

16    specifically regarding whether they had authority on behalf of

17    the CIA, they said no.

18          THE COURT:  Well, let me just say isn't it a good

19    thing we live in a country where there's a separation of

20    powers?  And I've told everybody, every party here, you can      10:27:43

21    hang on to the documents, and nobody's going to be taking those

22    documents.  You're going to have them.  They may be under some

23    sort of protective order.  We will proceed in an orderly

24    fashion.  So --

25          MS. IAFRATE:  Well, Your Honor, the reason --          10:28:02

1      THE COURT:  -- why don't you just direct them, if they

2  wish, to come to a proceeding or contact the Court or the

3  Court's monitor.

4      MS. IAFRATE:  Very well.

5      THE COURT:  Okay.                                        10:28:10

6      We have had issues, apparently, lately with the

7  County, Mr. Walker, about the County not being sure -- the

8  monitor has made requests to try and follow the financial trail

9  about payments that may have been made to Mr. Montgomery,

10  payments that may have been made to MCSO folks, and travel     10:28:28

11  costs and hardware costs and software costs that may have been

12  expended on this operation.

13      The folks at the County are not really sure about

14  whether or not they have such documents, in response to the

15  monitor's request.  Let me just throw something out there and   10:28:46

16  see if the parties can live with it.

17      Because we've had some past dealings with Sandi Wilson

18  in this case, I know she knows where the budgets are and where

19  things are kept if the County has them.  Is there any problem

20  if the monitor contacts Ms. Wilson about where or not -- where   10:29:05

21  these documents may be found if they are in the possession of

22  the County?

23      MR. WALKER:  Your Honor, I have no problem with

24  Ms. Wilson speaking directly with the monitor as long as I or

25  someone from my office can also be present.                    10:29:23

1        If I could just elaborate a little bit, I think the

2    problem is the way expense documents are filed.  And what I

3    understand is they're filed by a vendor name.  So if the office

4    management -- office management and budget is looking -- is

5    looking for a document, say one of my bills, and they know the          10:29:50

6    name of my firm, that's fairly easy.  If they don't know the

7    name of the vendor it's like looking for a needle in a

8    haystack.

9        So the only problem I think we have is there's a

10   degree of coordination that needs to happen between                     10:30:10

11   Ms. Wilson's office and the Sheriff's Office so that we have

12   the information we need so that a meaningful search for the

13   documents can be conducted.

14       THE COURT:  I think that's understandable and the

15   monitor can coordinate that with Ms. Wilson, with you, with            10:30:25

16   Ms. Iafrate, and whoever's handling document production at the

17   sheriff's Office.  If we can set up those meetings and avoid

18   problems, it sounds like a great solution.

19       Any problem with that, Chief?

20       CHIEF WARSHAW:  No, sir.                                            10:30:45

21       THE COURT:  Okay.  Now, I'd like to talk about how

22   we're going to go forward in light of these new documents.

23   There are a great number of them, even excluding the data dump.

24   And my monitor has had a chance to look at several of them but

25   far from the totality.                                                  10:31:03

1    He has shown me several, 50 or so documents, that

2  cause me great concern.  And I acknowledge that we're all

3  plowing new ground here.  But I'm going to say what those

4  documents show, and I'm going to say that it is a concern that

5  I expect the MCSO to address in the resumption of our May          10:31:23

6  hearing, and I'm going to propose how we proceed.

7    The documents that I have seen pertain to what appears

8  to be some of the activities of the Seattle operation we

9  involve Dennis Montgomery as a confidential informant.  The

10  documents seem to reveal that as at least part of their          10:31:43

11  operations, the Seattle operatives attempted to construct an

12  alleged conspiracy that supposedly involved this Court; one of

13  this Court's former law clerks; Eric Holder, the attorney

14  general of the United States; Lanny Breuer, the Chief Deputy

15  Attorney General of the United States in charge of the criminal    10:32:02

16  division; Phil Gordon, the mayor of Phoenix; and Brian Sands,

17  the executive chief of the MCSO.  The purpose of the alleged

18  conspiracy was apparently to covertly investigate the MCSO and

19  deprive the sheriff and the MCSO of the due process of law in

20  this particular case and in a related case brought against the    10:32:22

21  sheriff by the DOJ.

22    This Seattle operation work product seems to purport

23  that by allegedly using a database of information harvested by

24  the CIA and confiscated by him, Mr. Montgomery was able to

25  reproduce fragments of e-mails that had been sent in 2009 and      10:32:40

1    2010 between persons within the Department of Justice, Mayor

2    Gordon, and Brian Sands.

3        As it pertains to this Court, the Seattle operation

4    work product, which was apparently prepared and revised over a

5    number of months, not a few, it began apparently -- the first    10:32:56

6    contact was in September of 2013.  There were meetings in

7    December.  These documents began being created in December and

8    January, and at least their properties indicate that they have

9    been revised many times over a period of substantial months.

10       Anyway, the documents purport to track telephone calls    10:33:15

11   between this Court, Eric Holder, Lanny Breuer, and Dennis Burke

12   to reproduce those phone calls which occurred years earlier.

13   And between the Court and one of its former law clerks, who

14   apparently allegedly was supposed to have served as this

15   Court's liaison with the Department of Justice regarding this    10:33:35

16   case.

17       The documents appear to allege or suggest that this

18   Court had contact with the Department of Justice about this

19   case before the Court was ever assigned to it.  It further

20   seems to suggest that when Judge Murguia recused from this    10:33:48

21   case, the random selection process of this Court was subverted

22   so that the case was deliberately assigned to this Court.  The

23   documents further suggest that thereafter this Court had

24   conversations with Eric Holder and Lanny Breuer about this

25   case, and it also alleges that this Court issued an order to    10:34:05

 1    tap the MCSO's phones after being assigned as the judge in this

 2    case.

 3           It also seems to allege that this Court had

 4    conversations, as I've indicated, with the Department of

 5    Justice, through one of its former law clerks as an                    10:34:19

 6    intermediary.

 7           Now, I will tell you I've looked at these documents

 8    closely and I think there are a great deal of problems with

 9    them.  But I don't intend to put them on the screen and go over

10    those problems because I believe that Sheriff Arpaio and          10:34:35

11    Chief Sheridan have both acknowledged that the materials

12    received from Montgomery are not credible and/or are junk.  So

13    I'm not presuming at this point that the MCSO is alleging that

14    anything the documents contain in this respect are true.

15           If, Ms. Iafrate, you're going to assert that, I will          10:34:53

16    tell you that I'm going to require good faith assertions that

17    any of that information is true, and I have a number of

18    questions that you will have to respond to.  Nevertheless,

19    assuming, as I do, that the sheriff and Chief Sheridan both

20    will say that those documents are not credible, the very          10:35:16

21    existence of these documents in the MCSO's files causes this

22    Court some concerns.

23           In addition to their tendency to suggest that previous

24    testimony offered in this matter may have been untruthful, the

25    Court wonders why, when the MCSO should have been spending          10:35:33

1    their time, money, and resources in implementing its order,

2    they were funding a confidential informant as well as three

3    MCSO deputies or posse members to be in Seattle, Washington,

4    and other places, accruing overtime, travel, and salary

5    expenses, as well as significant technology costs, attempting    10:35:51

6    to construct some bogus conspiracy theory to discredit this

7    Court.

8         The Court notes that as of the monitor's last report,

9    the MCSO was only 29 percent in compliance with the injunctive

10   order entered a year and a half ago, approximately the same     10:36:06

11   time as this Seattle operation began.  There may be some

12   explanation for all of this, I realize that these are only

13   documents in MCSO's file, but I'm going to require you to

14   address that in the hearing that's coming up in June.

15        I also want to say that when upon the death -- I think    10:36:25

16   before I began questioning Sheriff Arpaio, I explained to him

17   why I was questioning about these things and how I viewed this

18   as being relevant to the contempt hearing, and I think it's

19   relevant for reasons I've already stated.  But when upon the

20   death of Deputy Armendariz it became clear to the Court that    10:36:46

21   the members of the plaintiff class in this case may have been

22   commonly subjected to deprivations not previously disclosed at

23   or prior to trial, and that this information as well as a great

24   deal of additional information sought prior to trial had never

25   been provided, this Court suggested to the MCSO that it arrange    10:37:02

1    for an independent investigation of these matters.  Rather than

2    do so, the MCSO elected to conduct a self-investigation through

3    its own Professional Standards Bureau.

4         This Court's orders were violated at the very start of

5    that investigation, and that is part of the notice contempt.        10:37:19

6    And even though many of the allegations of misconduct arose --

7    that were at issue in the Armendariz investigation arose from

8    the conduct of the HSU, the MCSO transferred in as the new

9    captain of the Professional Standards Bureau the previous

10   captain of the special investigation divisions -- Special        10:37:37

11   Investigations Division, which was over the HSU.

12        There is evidence that before his transfer to the PSB,

13   Captain Bailey was sent an inquiry memoranda regarding seized

14   identifications from within the HSU, which memorandum and

15   documents were subsequently sent for destruction.  Further, the    10:37:56

16   Special Investigations Division had responsibilities for

17   operations like the Seattle operation and would likely have

18   played a role in the Grissom inquiries.

19        Of course, Captain Bailey was supervised at both the

20   SID and the PSB by Chief Deputy Sheridan and by Sheriff Arpaio.    10:38:14

21   The Court has held repeated hearings regarding its concerns

22   about the inadequate investigations conducted by the PSB of

23   these matters.  There is evidence that the PSB accepted

24   facially inadequate explanations for the confiscation of

25   identifications of the members of the plaintiff class.  There     10:38:31

1    is evidence that such seizure practices existed

2    department-wide.  There is further evidence that the MCSO

3    failed to adequately investigate and evaluate the seizure of

4    items of value from members of the plaintiff class, attempted

5    to destroy relevant evidence and manipulate internal and          10:38:46

6    independent investigations to exonerate those whom it may have

7    wished to clear, or to mitigate any possible discipline.

8         This evidence may thus tend to demonstrate that the

9    MCSO attempted to keep all matters pertaining to this case, its

10   speculative investigations into this Court, and to the            10:39:05

11   investigations triggered by the unfortunate death of Deputy

12   Armendariz, in the hands of a relative few people who may not

13   have been working to implement this Court's order in good

14   faith.

15        Further, it may tend to demonstrate that contemptuous        10:39:18

16   actions that have been noticed by this Court in its order to

17   show cause hearing were part of a pattern of knowing defiance

18   rather than inadvertence.  This may affect necessary remedies

19   for members of the plaintiff class in civil contempt.  It is

20   for these reasons that the Seattle operations materials may be    10:39:35

21   relevant to this action.

22        Nevertheless, the Montgomery materials are

23   considerable, and they have only been reviewed in small part.

24   When they are reviewed in more complete detail, it may suggest

25   other potential problems in the operations of the MCSO that are   10:39:54

 1   beyond the scope of this contempt hearing and that I have no

 2   intent to raise in this contempt hearing except to the extent

 3   that it bears some relation to it.  I do not want to lose the

 4   focus of obliging the MCSO to comply with its orders and to

 5   cure the existing and admitted contempts that have impaired for          10:40:14

 6   a very long time the rights of the plaintiffs' class.

 7           I'm going to set forth my proposed solution to this

 8   problem, and I will hear your comments on it if you have

 9   suggestions.  I remind the parties that because of the

10   cooperation you made in the first week of the hearing where we          10:40:35

11   both -- where we were questioning witnesses at the same time,

12   we made substantial headway towards ending the hearing, and it

13   seems to me we shouldn't lose the focus on what the hearing is

14   about, recognizing that there now are other matters that may be

15   relevant.                                                               10:40:56

16           But when the Armendariz investigation came forth I

17   made it clear, and it's on the record, and we have several

18   orders that supplement the monitor's original investigative

19   authority with his investigative authority to ensure the

20   integrity, the adequacy of MCSO's investigative operations.  He        10:41:12

21   has authority to investigate all matters pertaining to this

22   contempt hearing and to the MCSO self-investigations in the

23   previous orders.

24           I propose, and I am likely to order, that based upon

25   his ongoing review of the documents provided, that he be               10:41:36

1    allowed to investigate these matters that are pertinent to the

2    current contempt findings.  He will have to, of course, have

3    broad leeway in determining what those are.  He has authority

4    and I'm going to authorize him to conduct such investigations,

5    and the defendants will completely cooperate in those                10:41:57

6    investigations.

7            Of course, when the monitor is conducting an interview

8    of an MCSO employee, counsel will be informed and may be

9    present if they wish to be.  And by "counsel" I don't just mean

10   defense counsel.  I mean plaintiffs' counsel; I, of course,          10:42:13

11   mean special appearing counsel; and Mr. Como, of course, you're

12   welcome.

13           Even if the monitor is conducting interviews of

14   persons who are not MCSO employees, all parties may have

15   transcripts of all of his interviews if they wish to pay for         10:42:29

16   them.  That does not prohibit the parties from looking at the

17   documents and seeking to obtain additional depositions if they

18   wish to do so, or making additional document production

19   requests.

20           Certainly, you may proceed with the depositions of the       10:42:48

21   attorneys that I've already basically authorized.  But before

22   conducting such depositions, I'm going to require you to check

23   with the monitor and obtain his approval to make sure that it

24   does not foul up his investigative plan.

25           As we approach the hearing, if his investigations make       10:43:10

 1   me believe that I am going to have to have information on this

 2   record that isn't on the record in an admissible form, I will

 3   indicate to the parties what information I'm interested in and

 4   what individuals I think need to testify, and then you can

 5   determine whether you can stipulate to facts, whether you can          10:43:31

 6   call witnesses without, or just based on the monitor's

 7   investigation or whether you need additional depositions.

 8            Again, to the extent that during the course of the

 9   monitor's or the parties' investigations you become aware of

10   matters that may implicate other concerns about misconduct that        10:43:50

11   you believe needs to be addressed, you can raise the matter for

12   the Court.  And I've indicated, based on the monitor's

13   inquiries, I will provide the parties, if they wish, areas in

14   which I'm interested in inquiring at the hearing, and we will

15   work out a way that that will happen.  Either I'll call my             10:44:11

16   monitor to testify or I will directly make sure that witnesses

17   appear to be questioned by the parties and then by me.

18            That is my proposal as to how to proceed.

19            Ms. Wang, any comment on that?

20            MS. WANG:  Your Honor, plaintiffs would agree that            10:44:28

21   that would be a good way to proceed.  As the Court knows, we

22   began our questioning about internal investigation processes at

23   MCSO during the April hearing dates.  We intend to do so,

24   continue to do so during the June dates.

25            We already have a tentative list of depositions we           10:44:50

 1    would like to take before the June dates, but those have been

 2    subject to revision as we are still getting documents from the

 3    defendants.  So we would, I guess when we're ready to do that,

 4    submit the list of proposed depositions to the Court.

 5            THE COURT:  Ms. Iafrate.                                    10:45:09

 6            MS. IAFRATE:  Your Honor, I have a couple questions.

 7            The investigative areas that you're talking about

 8    currently involves PSB, correct?

 9            THE COURT:  I'm not going to limit it.

10            MS. IAFRATE:  Well, is there any way for us to             10:45:22

11    understand the list of areas of investigations?

12            THE COURT:  Well, the monitor will inform you who he

13    wants to investigate.  I don't know, do you want -- do you want

14    to know anything else?

15            MS. IAFRATE:  I want to know the issues that are being     10:45:35

16    investigated.

17            THE COURT:  Well, they're going to be relevant to

18    the -- I suppose if you're saying -- well, I'm not going to

19    limit the monitor's authority, and I'm not going to require him

20    to provide you with advance notice of what he wants to inquire    10:45:48

21    into.

22            MS. IAFRATE:  Well, so, Your Honor, essentially

23    anything that the monitor wants to investigate, he can

24    investigate.

25            THE COURT:  No.  You have the right to object if you      10:45:59

1   believe he's getting into areas that have no relation to his

2   authority to investigate as based in the orders I've already

3   entered, or as it relates to this contempt hearing, and if you

4   make that objection, I'll rule on it.

5          MS. IAFRATE:  Very well.  I understand that there will          10:46:12

6   be some depositions regarding certain issues prior to the June

7   hearing.  Last time there was a lot of confusion regarding the

8   monitor's interviews and whether they are compelled statements

9   or not compelled statements; whether Garrity applies, whether

10  it doesn't.                                                             10:46:34

11         THE COURT:  The monitor has no Garrity authority, and

12  he can't require compelled statements unless you're aware of

13  something I'm not.

14         CHIEF WARSHAW:  No.

15         MS. IAFRATE:  Your Honor, are you --                            10:46:44

16         THE COURT:  So there's not Garrity.  They're not

17  compelled.  You're witnesses can take the Fifth.  They have all

18  the rights that they otherwise have.  We will be recording all

19  of the interviews and making transcripts, as I've said,

20  available to all parties.                                              10:46:58

21         MS. IAFRATE:  Well, Your Honor, I feel that I am

22  compelled to object to this procedure because I believe that

23  this OSC has morphed into something quite different than the

24  original OSC that my clients were noticed about.  There were

25  three distinct --                                                      10:47:16

1          THE COURT:  Well, let me --

2          MS. IAFRATE:  -- issues that were noticed for these --

3          THE COURT:  When I get to talk, I get to interrupt

4    you.

5          MS. IAFRATE:  Sorry, Your Honor.                          10:47:21

6          THE COURT:  I know it's not polite; I'll let you

7    finish.

8          MS. IAFRATE:  My clients were noticed of three

9    distinct areas regarding the OSC.  They were given notice and

10   we put on the trial -- or the evidentiary hearing as best we    10:47:32

11   could.  I understand that there are more documents.  I

12   understand that you have inherent authority to explore certain

13   things.  I'm not indicating that you have overstepped your

14   bounds, but I'm saying that as a due-process situation, in an

15   OSC hearing there is a notice component and also the right to   10:47:50

16   defend.  So now if what you're telling me is that your monitor

17   may investigate as he sees fit and we don't have notice of

18   what's going to be investigated, and how, and with whom, then I

19   believe that my client's due process rights are being violated.

20         THE COURT:  All right.  I'm going to overrule your        10:48:11

21   objection, but I will tell you that we will -- and I've just

22   stated, I think, in my -- I've just stated what I view to be

23   the bounds of the relevance here, and I've given you the right

24   to object to relevance.  But if you're asking that my monitor

25   put forth in advance the topics he's going to ask your          10:48:25

 1   witnesses about, it ain't happening --

 2           MS. IAFRATE:  No, Your Honor, I --

 3           THE COURT:  -- but you can object to it.

 4           MS. IAFRATE:  Your Honor, I was asking you to provide

 5   us with a list of what areas, what issues, what are at issue as   10:48:34

 6   we approach this June OSC continuation.

 7           THE COURT:  Well --

 8           MS. IAFRATE:  What are the issues?  My clients have a

 9   right to know what they are.

10           THE COURT:  I think I indicated to you that as we   10:48:49

11   approach the June hearing, I'll tell you what issues I believe

12   are relevant and concern me.  But I don't know that now,

13   because I have not had the opportunity to know everything

14   that's in Mr. Montgomery's files.  And it is, I assure you, it

15   is not my intent to explore all the various things that may or   10:49:04

16   may not be in there except as they relate to the order to show

17   cause.

18           However, the monitor also has independent

19   investigative authority pertaining to previous orders, and I'm

20   not going to unduly shackle him as long as it falls within his   10:49:22

21   authority under those previous orders to prevent him from doing

22   his investigation.

23           MS. IAFRATE:  Well, Your Honor --

24           THE COURT:  Nevertheless, if you have objections, you

25   can make them.   10:49:35

1          MS. IAFRATE:  Very well.  Your Honor, is there a

2    time frame by which we'll know what the issues are?

3          THE COURT:  I wish there were.

4          Oh, you mean from me?

5          MS. IAFRATE:  Yes.                                    10:49:44

6          THE COURT:  Well, one of the advantages -- you know,

7    this is a morphing thing.  One of the advantages of the weekly

8    status conferences is as soon as I know I'm going to be

9    interested in something, I'll tell you.  I'm not going to

10   play -- I'm not going to hold out on you till a week before the   10:49:55

11   hearing.  If we come across materials in that file that I want

12   him to investigate into, I may allow him to notice his

13   investigations and go, but I'll let you know.

14         MS. IAFRATE:  Just one --

15         THE COURT:  And by the way, I don't think I'm playing   10:50:10

16   hide-and-seek, because I laid it out pretty clearly just now

17   what I saw that concerns me.  I'm not trying to prevent you

18   from knowing my very great concern about the documents that

19   I've seen, and I'm not going to operate otherwise.

20         MS. IAFRATE:  Very well, Your Honor.  Just one more   10:50:24

21   statement that I may make for the record.

22         Your Honor, my understanding when I came into this

23   case in December was that the monitors were selected to

24   encourage compliance pursuant to the Court's orders.

25         THE COURT:  Um-hum.                                   10:50:47

1      MS. IAFRATE:  Now what I'm hearing is that the

2  monitors are investigating in order to provide further topics

3  as it relates to the OSC.

4      THE COURT:  The monitors are relating -- are

5  investigating pursuant to their authority.                    10:51:02

6      MS. IAFRATE:  Provided by you, I understand that.

7      THE COURT:  That's right.  And before you entered this

8  case, we had all the Armendariz matters come up.  We had all

9  the matters relating to concerns about MCSO's internal

10  investigations, and at that time I think it's very clear I made  10:51:17

11  it clear that the monitor was overseeing all of those

12  investigations since MCSO wanted to do it itself.  And he has

13  that full authority and he maintains that full authority, and

14  if you make objections that fall within that scope of the

15  authority, I'm going to deny them.                           10:51:36

16      Nevertheless, I do recognize the potential that these

17  documents will have stuff that might be fun to investigate but

18  don't have anything to do with this case, and I'm going to

19  allow you, certainly, to make any objections.  And I'll -- you

20  know, I'll be very receptive to them, but I'm going to give him  10:51:51

21  his full scope of authority within the authority he has.

22      MS. IAFRATE:  So Your Honor, I'm sorry, but I'm trying

23  to understand this procedure.  Will I have the opportunity to

24  object prior to the investigation or subsequent to the

25  investigation?                                               10:52:10

1         THE COURT:  Well, you can have the opportunity to

2    object during the investigation.  If it's a witness that is

3    subject to your direction and you want to instruct them not to

4    answer, you can instruct them not to answer.  But one of the

5    things that you will know is I will be paying attention to this      10:52:24

6    case.  You instruct a witness not to answer, I will interrupt

7    as soon as I can whatever I'm doing and I'll make the

8    determination whether or not this is an area of investigation

9    that can be gone into.

10        So if you're going to do that, and if it's one of your      10:52:37

11   witnesses over which you have the authority to instruct not to

12   answer, set forth on the record the basis for your instruction

13   and then all of you just call me and see if you can trundle on

14   over here or get on the phone, and if I'm available I'll decide

15   it right then.  And if I'm not available, I'll get available as      10:52:52

16   soon as I can so that you can finish the investigation if I'm

17   going to allow it or you can move on to other investigations.

18        MS. IAFRATE:  Thank you.

19        THE COURT:  Okay.

20        MR. WALKER:  Your Honor, for the record, the County --      10:53:05

21   I have to consult with my client on this, and I am meeting with

22   the board on Monday, so I'm not really in a position to take a

23   firm position one way or the other on what the Court has

24   proposed.  But for the record, I would express on behalf of the

25   board of supervisors a concern about what you and Ms. Iafrate      10:53:26

 1    have both referred to as the morphing.  And I would also use

 2    the word "mushrooming" and attendant costs as well as the due

 3    process implications.

 4           MR. COMO:  Your Honor, I just have one related

 5    concern, which is Chief Sands was noticed on one discrete issue    10:53:53

 6    regarding the failure to ensure that all the MCSO employees

 7    were informed of the Court's preliminary injunction order.

 8           It seems like this new development potentially opens

 9    up other hearings, more --

10           THE COURT:  Well, it may, but it's not going to change    10:54:19

11    the scope of this hearing, and that's all Chief Sands has to

12    worry about.

13           MR. COMO:  Okay.  What I would hope, Your Honor, is

14    that at these hearings in June, that the evidence regarding the

15    issue that Mr. Sands is noticed on, that the parties would rest    10:54:33

16    at that time on that issue so that this -- he is retired,

17    obviously, he would like to move on with his life, and I think

18    that --

19           THE COURT:  I understand that.

20           And Mr. Birnbaum, you don't even have to say it.  You    10:54:48

21    have the same concern with respect to Chief MacIntyre.

22           And I assume, Mr. Eisenberg, you have the same concern

23    with respect to Lieutenant Sousa.

24           MR. EISENBERG:  Correct, Your Honor.

25           THE COURT:  I promise you that as part of this ongoing    10:55:01

 1   process where we meet every week -- and we just can't do it now

 2   because we don't yet know what everything is, but you're

 3   invited to look.  But as we can go, as we can narrow issues and

 4   identify issues, eliminate issues, and include issues, so that

 5   we can have a very effective process and get it over with, and          10:55:16

 6   it may be that other matters spring up out of this that don't

 7   have anything to do with this, that's fine.  They're not going

 8   to have anything to do with this now.  We'll take care of it.

 9        Yes, Ms. Wang.

10        MS. WANG:  Thank you, Your Honor.  I just want to make          10:55:33

11   one point in response to Ms. Iafrate's presentation on this

12   procedure.  I think the Court was very clear before we began

13   the April hearing that there were the issues charged as grounds

14   for civil contempt in the order to show cause, but there were

15   also other issues that came to light as a result of the          10:55:50

16   Armendariz matters that might give rise to the need for

17   plaintiffs to move for additional injunctive relief.  We had

18   made those representations very early on when we first learned

19   of the Armendariz search and those events, and I think the

20   Court was very clear that we would take the opportunity during          10:56:13

21   the evidentiary hearing dates set in April and now continuing

22   to June that those matters could all be addressed.

23        One suggestion that plaintiffs would make is to the

24   extent that the Court is going to address any requests for

25   additional injunctive relief that come out of the monitor's          10:56:32

1   investigations as just outlined, that the monitor issue a

2   report pursuant to Federal Rule of Civil Procedure 53 that both

3   parties, or all parties, can comment on and raise objections

4   to.  And, of course, any issues that relate to additional and

5   new injunctive relief would have to be properly teed up before          10:56:53

6   the Court before they could be ruled on.

7           So I guess plaintiffs' response to Ms. Iafrate's point

8   about due process is that as far as plaintiffs are concerned,

9   there's been no -- nothing suggested here that would violate

10  anyone's due process rights, and as we proceed, the defendants        10:57:11

11  and individual named contemnors, charged contemnors, will have

12  every opportunity to respond to any action that plaintiffs

13  would be proposing.

14          THE COURT:  Anybody have anything else to raise at

15  this time?                                                             10:57:29

16          Let me just say, I think this weekly status conference

17  idea is a good thing, because -- I know that because on

18  Thursday night I'm starting to realize I don't get any sleep,

19  because you all file everything Thursday night.  We have a

20  status hearing set next Friday.  Right now there is nothing on         10:57:47

21  the agenda except for what may develop with my monitor over the

22  following week.  If you have ideas or you have things you want

23  to address, raise them.  I would appreciate it if they were

24  raised sometime before Thursday at 5 o'clock.

25          MS. IAFRATE:  Your Honor, we have a pleading due                10:58:07

 1   tomorrow regarding an issue that we discussed last week.

 2           THE COURT:  What is it?  I've forgotten.  I'm sorry.

 3           MS. IAFRATE:  It's regarding the expansion of the

 4   class.  And so that will be -- that will be filed tomorrow.

 5           THE COURT:  Okay.  Well, that will be helpful.  And          10:58:20

 6   we'll try and get that resolved.

 7           MS. IAFRATE:  Can you tell me that one more time?  I

 8   didn't hear you.

 9           THE COURT:  I just said we'll try and get that

10   resolved next week.                                                  10:58:30

11           MS. IAFRATE:  Very well.

12           MR. YOUNG:  Your Honor, we will try to file our

13   opposition to that, as we indicated earlier, as soon as

14   possible, and before Thursday at 5:00.  We would not

15   characterize it as an expansion of the class, but, rather, a        10:58:41

16   disagreement over what the class definition --

17           THE COURT:  Yes.

18           MR. YOUNG:  -- means.

19           THE COURT:  Well, please be assured, Mr. Young, that I

20   recognize that your side as well as Ms. Iafrate's side, in          10:58:52

21   pleadings and characterization of issues, are very good

22   lawyers, and you're both going to phrase things the way that

23   are most advantageous to your client to do it well.  That

24   doesn't mean I believe either one of you.  I see it the way I

25   see it, with all due respect.                                       10:59:10

1              Yes.

2              MR. WALKER:  Your Honor, we haven't spoken about this

3    directly, but it was my intention to file a brief on this

4    subject as well, so I guess I'm requesting leave to do so.

5              THE COURT:  You can, but you're subject to the same          10:59:20

6    deadlines as I gave Ms. Iafrate.

7              MR. WALKER:  I understand.  Thank --

8              THE COURT:  All right.

9              MR. WALKER:  -- you, Your Honor.

10             MS. WANG:  Your Honor, we do have the motion to compel          10:59:27

11   teed up, hopefully --

12             THE COURT:  Oh, that's true.

13             MS. WANG:  -- before next Thursday.

14             THE COURT:  Motion to compel.  And if you can resolve

15   that we'll take it off, but if you can't, I'll rule on it.          10:59:32

16             MS. WANG:  Thank you, Your Honor.

17             THE COURT:  All right.  See you next Friday.

18             (Proceedings concluded at 10:59 a.m.)

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4

5

6

7            I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17           DATED at Phoenix, Arizona, this 14th day of May,

18   2015.

19

20

21                          _____s/Gary Moll_____

22

23

24

25