1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Manuel de Melendres, et al.,                    No. CV-07-02513-PHX-GMS

10                 Plaintiffs,                       **ORDER**

11  v.

12  Maricopa, County of, et al.,

13                 Defendants.

14

15          On May 7, 2015, after conducting an in camera review, this Court ruled that

16  Timothy Casey's mental impressions and opinions regarding litigation strategy based on

17  the Grissom information and investigation findings, which are contained in a November

18  6, 2013 letter, are protected from disclosure as opinion work-product, and that immunity

19  has not been waived.  (Doc. 1053.)  Subsequently, as reported in the *Arizona Republic*,[1]

20  Chief Deputy Sheridan made the following comments to the press regarding the Grissom

21  information: (1) "The Sheriff and I felt that we should have our lawyer look into the

22  comment in the event that it was made, and it was credible, because it went to the judge's

23  state of mind"; (2) "it sat in my desk drawer for a year and a half, until it came out in

24  court when the sheriff was on the stand . . . . We had no intention to do anything with it

25  because we were told it would be unethical for us to make a complaint on third-party

26  

27  [1] *See* Yvonne Wingett Sanchez, *How Mexican Food Drew Couple Into Heart of Arpaio*
28  *Case*, Ariz. Republic, May 08, 2015, *available at*
    http://www.azcentral.com/story/news/local/phoenix/2015/05/07/mexican-fooddrew%20-
    grissom-couple-heart%20-sheriff%20joe-arpaio-civil-contempt%20-case/70990098/.

hearsay"; and (3) Timothy Casey told Sheridan and Sheriff Arpaio that "there wasn't enough evidence to take the tip any further."  On May 14, 2015, District Judge G. Murray Snow referred to this Court an evaluation of whether the work-product immunity continues to apply to the redacted materials appended to Doc. 1053 in light of Chief Deputy Sheridan's statements.  (Doc. 1093.)   On May 19, 2015, Defendants submitted to this Court an Objection to Re-evaluation of Disclosures Made on Behalf of Tim Casey. (Doc. 1107.)

The Court has reviewed Chief Deputy Sheridan's statements and Defendants' Objection.  For the reasons detailed below, the Court finds that Chief Deputy Sheridan's comments waived the work-product immunity only as to the portions of the redacted materials Chief Deputy Sheridan directly disclosed.  The Court finds that the waiver does not extend to the other redacted portions of the November 6, 2013 letter that were not directly disclosed by Chief Deputy Sheridan during the interview.   Chief Deputy Sheridan's limited disclosure to the media does not warrant the wholesale disclosure of pages of work-product opinion and litigation strategy outlined by Mr. Casey in the November 6, 2013 letter.

## I.    Waiver of Work-Product Immunity

Work-product protections may be waived by voluntary disclosures or using the at-issue materials as evidence at trial.  *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 239 (1975); *Hernandez*, 604 F.3d 1095, 1100 (9th Cir. 2010).  The disclosure of work-product materials to a third party can result in waiver if "the material is disclosed in a manner inconsistent with keeping it from an adversary." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (citation and quotations omitted); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).

Here, there is no dispute that Chief Deputy Sheridan made the comments detailed in the *Arizona Republic* article,[2] and that the comments are now in the public domain.

---

[2] During the May 14, 2015 status conference, Chief Deputy Sheridan, who was in attendance, confirmed that he made the statements attributed to him in the article.  (Doc. 1097 at 10:1-11:8.)

1   The Court finds that this disclosure is inconsistent with keeping the protected materials

2   on those same topics from an adversary.

3          In their Objection, Defendants argue that Chief Deputy Sheridan's comments "do

4   not present any new information or evidence that suddenly put[s] Mr. Casey's mental

5   impressions and opinions of the Grissom investigation at issue in the contempt

6   proceedings.  Therefore, the news article did not waive the work-product doctrine and the

7   mental impressions of Mr. Casey are protected."   (Doc. 1107 at 4-5.)   However, Chief

8   Deputy Sheridan's statements to the press directly, and voluntarily, disclosed Mr. Casey's

9   conclusions that there was not enough evidence to pursue the Grissom information and

10  use of the information would be unethical.  Accordingly, at a minimum, Chief Deputy

11  Sheridan's comments waived the work-product protection as to those conclusions as they

12  appear in the November 6, 2013 letter.

13  **II.    Scope of Waiver**

14         The Court must now determine whether this waiver extends to the other redacted

15  portions of the November 6, 2013 letter that were not directly disclosed by Chief Deputy

16  Sheridan. The Court finds that it does not.

17         Pursuant to Rule 502(a) of the Federal Rules of Evidence, waiver of work-product

18  may extend to undisclosed materials if: "the disclosed and undisclosed communications

19  or information concern the same subject matter; and [] they ought in fairness to be

20  considered together."  However, the work product doctrine "is distinct from and broader

21  than the attorney-client privilege." *Nobles*, 422 U.S. at 238 n.11. "Work product

22  immunity furthers the client's interest in obtaining complete legal advice and creates 'a

23  protected area in which the lawyer can prepare his case free from adversarial scrutiny.'"

24  *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024-25 (7th Cir. 2012) (citing *Hickman*,

25  329 U.S. 495, 511 (1947)). "Accordingly, 'disclosure of some documents does not

26  necessarily destroy work-product protection for other documents of the same character.'"

27  *Id.* (quoting 8 Wright & Miller, Federal Practice & Procedure, § 2024).

28         Further, opinion work-protect is entitled to greater protection.  *See* Fed. R. Civ. P.

26(b)(3)(B) ("If the court orders discovery of those materials [for which a party has a substantial need], it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.").  In light of this heighted protection, "[w]hile certainly actual disclosure of pure mental impressions may be deemed waiver . . . . the underlying rationale for the doctrine of subject matter waiver has little application in the context of a pure expression of legal theory or legal opinion."  *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988); *see also In re EchoStar Communs. Corp.*, 448 F.3d 1294, 1302 (Fed. Cir. 2006) ("[W]ork product waiver only extends to 'factual' or 'non-opinion' work product concerning the same subject matter as the disclosed work product."); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) ("[T]he subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege.").

Here, Chief Deputy Sheridan disclosed to the press Mr. Casey's conclusions that "there wasn't enough evidence to take the tip any further" and use of the Grissom information would be unethical.  Chief Deputy Sheridan's statements, however, do not specifically discuss Mr. Casey's substantive analysis contained in the November 6, 2013 letter regarding use of the Grissom information and investigation findings. The Court does not find that these limited statements warrant the disclosure of pages of Mr. Casey's opinion work-product. Further, as the Court has already found, that analysis is not at issue in the current proceedings.  For these reasons, the Court finds that Chief Deputy Sheridan's waiver of the work-product immunity is limited to the specific information he disclosed and does not extend to the other redacted portions of the November 6, 2013 letter.  The Court will remove the redactions of those portions of the letter no longer protected by the work-product immunity.[3]

---

[3] The newly-released text in the November 6, 2013 letter can be found at the end of Section A (page 2) and the beginning of Section E (pages 13 and 14).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.     Conclusion

For the reasons discussed above, the Court finds that Chief Deputy Sheridan's statements to the press waived the work-product protections as to the redacted portions of the November 6, 2013 letter that are specifically addressed in those statements.   The waiver, however, does not extend to the other redacted portions of the letter that were not discussed by Chief Deputy Sheridan in the interview.   A copy of the newly-redacted November 6, 2013 letter is attached to this Order.

Dated this 21st day of May, 2015.

Honorable John Z. Boyle
United States Magistrate Judge

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

#### ATTORNEYS AT LAW

Timothy J. Casey
e-mail:  timcasey@azbarristers.com

Client No.: 5754.030

November 6, 2013

### *ATTORNEY-CLIENT PRIVILEGED/ATTORNEY WORK PRODUCT PRIVILEGED/CONFIDENTIAL/NOT SUBJECT TO A PUBLIC RECORDS REQUEST*

### VIA HAND-DELIVERY

Hon. Joseph M. Arpaio
MARICOPA COUNTY SHERIFF'S OFFICE
100 W. Washington St., Suite 1900
Phoenix, Arizona 85003-1812

> Re:   *Melendres v. Arpaio, CV2007-02513-PHX-GMS (United States District Court for the District of Arizona)*

Dear Sheriff Arpaio:

This letter provides the following information for your consideration: (1) the transcripts of private investigator Don Vogel regarding Karen Morris Grissom, Dale Eugene Grissom, and Scott Grissom; (2) the potential legal options available to you and the MCSO based on the Grissom investigatory materials; and (3) my analysis and recommendation to you and defendant MCSO regarding the Grissom information.

Upon my receipt later this week of the balance of Mr. Vogel's investigation report, I will forward the same to you immediately.

## A.   EXECUTIVE SUMMARY

Karen and Dale Grissom, husband and wife, had a chance encounter at a Tempe restaurant with a woman who was, in fact, Judge Murray Snow's wife. Mrs. Snow mistook Karen for her sister Irene. This encounter probably occurred in May of 2012. The encounter led to a conversation between Ms. Grissom and Mrs. Snow in the presence of Dale Grissom and Scott Grissom (the adult son of Karen and Dale Grissom). The fact that the woman was married to Judge Snow came up in the conversation. Mrs. Snow made a comment that Karen and Dale interpreted as hostile, negative, or unfavorable toward you. Karen Grissom reported to you the contact with Mrs. Snow 14 months after it happened. According to investigator Mr. Vogel, Karen and Dale Grissom present as sincere and truthful in their statements about what they believe they heard from Mrs. Snow ("the Grissom information").



I, therefore, respectfully recommend and strongly advise against any use of the Grissom information. Additionally, the Grissom information is so fundamentally flawed in its substance that it likely cannot be used in a Rule 60 motion, appeal, or otherwise without the lawyer who does so violating the federal court's rules of civil procedure and the Arizona Rules of Professional Conduct.

**B.     BACKGROUND INFORMATION**

To place this letter and its advice in context, some background information and key dates in this case are important to know.

**1.   Key Litigation Dates**

The bench trial in this matter took place on July 19, July 24-26, July 31, August 1, and August 2, 2012 before the Honorable Murray Snow.  The trial received daily local and national print and television media attention.

On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law (Dkt#579).  The Court held that defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendment to the United States Constitution.  The Court, therefore, issued various permanent injunctions as set forth in that Order.  The Court's Order received considerable local and national media attention.

On June 14, 2013, the Court held a status hearing with the parties.  The parties advised the Court of their mutual desire to try to negotiate the terms of a consent decree to ensure defendants' compliance with the Court's injunction.  The Court also indicated its current intention to implement certain elements into any final order (i.e., a monitor).  This hearing was

2

covered extensively by the local and national media.

On August 16, 2013, the parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement and terms on which they could not agree. The parties' proposal also received significant coverage in the media.

On or about August 21-22, 2013, a person named Karen Morris Grissom sent you a private message on your *Facebook* page purporting to have had a conversation in 2012 with Judge Snow's wife wherein Mrs. Snow reported that her husband, Judge Snow, did not like you and wanted you out of office.

On August 30, 2012, the Court held a hearing to discuss the terms agreed-upon by the parties and to hear oral argument on the terms the parties could not agree to. Argument was extensive. This hearing was covered by the media.

On October 2, 2013, the Court issued its Supplemental Permanent Injunction/Judgment Order (Dkt#606). Again, this Order was extensively covered in the media.

### 2.  <u>Karen Morris Grissom Message to Sheriff Arpaio</u>

On or about August 21-22, 2013, Karen Morris Grissom sent the following private[1] message to you on your *Facebook* page:

> "Karen Morris Grissom
> Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

(Lack of punctuation and spelling not changed).

Upon being advised of the foregoing and directed by your office to do so, I began to try to locate Ms. Grissom and interview her. I eventually sent a message to Ms. Grissom on her *Facebook* page and she called me on my cell telephone on August 28, 2013.

I spoke with Ms. Grissom around 3:00 p.m. on August 28, 2013 and explained the reason for contacting her. She advised that she and her husband (Dale) were driving to a job interview for her in Avondale (a teaching assistant position), she was experiencing poor cell phone connection, and we talked for a period of time and each time I lost the cell phone connection with her I called her back and she answered my call.

In short summary, and as you may recall from my prior oral report, Ms. Grissom, age 63, reported that she grew up in Yuma, Arizona, she went to the same church as Judge Snow's wife when she was a single woman, the judge's wife (as a single woman) was her piano teacher at one

---

1  The message was private to you only. The message was not publicly posted. █████████████

█████████████████████████████████████████████████████████████

3

time, and something to the effect that the Judge's wife had a step-mother that was murdered in Yuma years ago.

Ms. Grissom advised that on an unknown date in 2012 she and her husband were eating at a *Some Burros* Mexican food restaurant at Baseline Road and Mill Road in Tempe, Arizona when a middle-aged woman came into the restaurant with a younger woman (they left a dog outside) and walked up to her and her husband. The woman asked Ms. Grissom if she was "Irene." Ms. Grissom believed that the date of this encounter was sometime before school started, so likely in July or August 2012. The woman was tall, thin, with short hair, and light brown-colored hair. Ms. Grissom said that she was not Irene, that Irene was her younger sister (age 55), and the woman began to tell Ms. Grissom that she was friends with Irene, that she (the woman) eventually went to BYU, was a teacher, she married a man that was now a federal judge, and her husband was ruling on a case involving Sheriff Arpaio. According to Ms. Grissom, the woman volunteered that her husband "wanted to burn the Sheriff because he did not like him."

Ms. Grissom advised that her husband, Dale, was present and heard the same exchange. *She did not remember the woman's first name, or her maiden name.* She was firm in what she claimed to have heard, and that she was speaking the truth. We discussed the reasons she waited over a year to disclose this information to you. Ms. Grissom advised that the woman's statement "bothered [her] at the time but eventually [she] needed to share this." Ms. Grissom stated that she viewed your public services very favorably but had never met or interacted with you.

I wanted to meet Ms. Grissom in person to evaluate her credibility, and obtain from her either a recorded statement or a statement under oath before a court reporter. Ms. Grissom advised that she was willing to meet with me in person, to provide a statement under oath, and that she would call me back after her job interview. She was adamant that she was telling the truth about what the judge's wife had said to her. She expressed no fear or reservation about telling the truth. Ms. Grissom again told me she would call me back after her job interview. The call ended.

As I reported initially to you and Chief Sheridan, Ms. Grissom came across telephonically as sincere and credible (despite not knowing the date of the encounter, the name of the woman, and the 12-13 month delay in reporting the incident) but I reserved final credibility judgment until I could meet her in person and speak with her in detail.

Ms. Grissom, however, did not call me back after the job interview. She also did not take my two separate telephone calls to her around 5:30 pm that same date (08/28/13).

Over the next four weeks, Ms. Grissom and I had no contact despite my occasional telephone call into her. It appeared to me that Ms. Grissom did not wish to talk further for whatever reason. I reported the same to you and your chiefs and further shared my prior historical experience with witnesses sometimes being willing to say certain things privately on a telephone call to an attorney and then decline further involvement or more formal documentation of the substance of the earlier communication. The absence of further contact from Ms. Grissom after August 28, 2013 led me to personally conclude the matter was over and the information from Ms. Grissom lacked substance or merit.

4

3. <u>Retention of Vogel Investigations</u>

Pursuant to the conversation we had at your office on October 17, 2013 with Chief Sheridan regarding Ms. Grissom, I formally retained on October 23, 2013 investigator Don Vogel. The scope of Mr. Vogel's services were the following: (1) to try to interview Ms. Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the communication from Ms. Grissom to your *Facebook* page that occurred on or about August 21-22, 2013, and to try to learn her motivations and timing for communicating with you; (2) to voluntarily obtain, if allowed, a recorded and/or sworn statement about the same from Ms. Grissom and/or her husband; (3) to provide me with Mr. Vogel's candid assessment of the credibility of Ms. Grissom (and possibly her husband); and (4) to provide me with Mr. Vogel's findings and any statement(s) from the Grissoms.

C.     **THE INFORMATION FROM INVESTIGATOR VOGEL**

Attached for your review and file are the transcripts of Mr. Vogel's recorded interviews with the Grissoms.

1. <u>Karen Grissom</u>

Mr. Vogel showed up unannounced to the Grissom residence on Saturday, October 26, 2013. Dale Grissom was not at home. Karen Grissom, however, agreed to talk to Mr. Vogel and provide a recorded statement. The recorded statement lasted 20 minutes and 29 seconds.

Ms. Grissom is supportive of you and your law enforcement policies. While the precise details and context of the statement are contained on the attached transcript and audio, Ms. Grissom, her husband Dale, and their adult son, Scott, visited a *Some Burros* restaurant in Tempe Arizona on an unknown date in 2012. A woman entered the restaurant and approached Ms. Grissom and asked if she was Irene, the sister of Ms. Grissom. Irene and Karen apparently look very similar even though they differ in age by about a decade. The woman introduced herself as Sherry Snow; that name meant nothing to Ms. Grissom and the woman then mentioned her maiden name was Smock (or Smoch). The woman then described her background and that she was married to a federal judge. She presented as proud of her husband serving as a judge. Somehow the subject of Sheriff Arpaio surfaced in the conversation. The operative part of Ms. Grissom's statement is where Mrs. Snow is reported to have said to Ms. Grissom in response to a question by Ms. Grissom that **"my husband does not like him [Arpaio] and wants him out of office."**

Mr. Vogel's separate report will assesses Ms. Grissom's credibility from his perspective.

2. <u>Dale Grissom</u>

Mr. Vogel arranged to meet with Dale Grissom the following Monday.

Mr. Vogel interviewed and took a recorded statement of Dale Grissom on Monday, October 28, 2013. Mr. Grissom is age 64, but will turn 65 in a few weeks. The recorded

statement lasted 20 minutes and 41 seconds.  Dale Grissom is supportive of you and your law enforcement policies.  The details and context of the statement are contained on the attached transcript and audio.  The operative part of Dale Grissom's statement is where Mrs. Snow is reported to have said in his presence to Karen Grissom sometime in late April or May of 2012 that **"my husband wants to get him [Arpaio] or wants him to go down"** or something negative to that effect.

Mr. Grissom does not remember the precise details about what was said.  He does not recall Mrs. Snow ever reporting that her husband had actually said that her statements or views were those held by her husband but Mr. Grissom assumed that Mrs. Snow got her information or positions from her husband.  While he does not remember the details of the conversation, and would be unable to personally identify Mrs. Snow in person or by photograph, he remembers that whatever precisely was said was negative toward you.  Mr. Grissom also reported that there may have been two people with Mrs. Snow, a younger female and a younger male.

Mr. Grissom followed the *Melendres* case in the media stories as they were published or aired.  Eventually, he learned that you and Judge Snow were "at odds."

Mr. Grissom was unaware of whether Karen Grissom had returned any of my telephone calls.  He thought she had on an occasion but was uncertain.

Mr. Vogel's separate report will assesses Mr. Grissom's credibility from his perspective.

3. **Scott Grissom**

Mr. Vogel interviewed and took a recorded statement of Scott Grissom on Monday, October 28, 2013.  Scott Grissom is the adult son (age 40) of Karen and Dale Grissom.  He was visiting his parents and recalls eating a meal at *Some Burros*.  The details and context of the statement are contained on the attached transcript and audio.  The operative part of Scott Grissom's statement is where he remembers hearing, despite the noise in the restaurant, someone saying something to the effect of **"I'm going to get him or somebody's going to get him."**  This occurred while his mother was speaking with an unknown woman.  Scott Grissom remembers very little else about that date or the characteristics of the woman.  He has no idea what or who the woman was talking about.

Mr. Vogel's separate report will assesses Scott Grissom's credibility from his perspective.

6















**E.**   **CONCLUSION**

     Based on the foregoing, I respectfully recommend and strongly advise you *against any* use of the Grissom information.

     Additionally, it is important to note that the Grissom information is, in my judgment, so fundamentally flawed in its substance that it likely cannot be used in a Rule 60 motion, appeal,

or otherwise without the lawyer doing so violating the Federal Rules of Civil Procedure and the Arizona Rules of Professional Conduct.  *See* Rule 42, Arizona Supreme Court Rules, at ER 3.1 (Arizona Rules of Professional Conduct); Rule 11, Federal Rules of Civil Procedure. ████████

████████████████████████████████████████

I am available at your convenience to discuss or answer any questions you might have regarding the foregoing analysis or recommendation.

Sincerely,



SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

Timothy J. Casey

TJC:eh

Encls.

cc:   Chief Jerry Sheridan, via hand-delivery w/encl.
       Chief Jack MacIntyre, via hand-delivery w/encl.
       Tom Liddy, via e-mail w/o encl.

14