Michele M. Iafrate, Bar #015115
Iafrate & Associates
649 North Second Avenue
Phoenix, Arizona 85003
Tel: 602-234-9775
miafrate@iafratelaw.com

A. Melvin McDonald, Bar #002298
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com

Attorneys for Defendant Joseph M. Arpaio


Barry Mitchell Bar #013975
Lee Stein Bar #12368
Mitchell, Stein, Carey, PC
One Renaissance Square
2 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
Telephone: (602) 358-0290
Fax: (602) 358-0291
barry@mitchellsteincarey.com
lee@mitchellsteincarey.com

Attorneys for Gerard Sheridan

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al.,<br><br>Plaintiff,<br><br>v.<br><br>Joseph M. Arpaio, et al.,<br><br>Defendant. | NO. CV 07-02513-PHX-GMS<br><br>**Motion for Recusal or Disqualification of District Court Judge G. Murray Snow** |

## I.     INTRODUCTION

No doubt, moving for the recusal or disqualification of any sitting judge is a serious matter.  Under statute, case law, and judicial canons, the perception of judicial bias

4272904.1
5/22/15

and the appearance of impropriety, punctuated by the material witness status of the presiding judge's spouse, mandate the recusal and disqualification of the Honorable G. Murray Snow. Accordingly, Defendant Arpaio and Chief Deputy Gerard Sheridan have no other choice but to file this Motion.

Pursuant to 28 U.S.C. § 144 and § 455, Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully move for recusal and/or disqualification of the Honorable G. Murray Snow. (Affidavit of Sheriff Joseph M. Arpaio, attached as Exhibit 1). Defendant Arpaio Chief Deputy Gerard Sheridan present this Memorandum and file the attached affidavit and corresponding Certificates of Filing in Good Faith by Counsel. Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully request the transfer of this case to a different judge, immediately, as provided by 28 U.S. Code § 144, and the disqualification or recusal of Judge Snow in further related proceedings concerning Defendant Arpaio and Chief Deputy Gerard Sheridan.[1]

By his own official inquiry, statements, and questions in open court on the record, one of the investigations into which Judge Snow unexpectedly inquired during recent contempt proceedings concerns his spouse, Sheri Snow. No reasonable person with knowledge of the facts can deny that Judge Snow is now investigating and presiding over issues involving his own family. This alone is sufficient to mandate recusal and disqualification. Furthermore, the fact that Judge Snow's wife is now a material witness, while dispositive, is not the only appearance of bias and impropriety requiring recusal.

Defendant Arpaio and Chief Deputy Gerard Sheridan therefore move: (1) for Judge Snow to recuse himself based upon the facts and law stated in the Motion for Change of Judge for Cause; or (2) if Judge Snow declines to recuse himself, Defendant Arpaio and Chief Deputy Gerard Sheridan move that this Motion for Change of Judge for

---

[1] The legal opinion of Professor Ronald Rotunda, a renowned expert on Professional Responsibility and Constitutional Law, is attached and incorporated in support of this Court's disqualification. (Exhibit 10). As Professor Rotunda explains in his declaration, Judge Snow now has- by his own admission- "an incurable personal interest in the case, at least in this new phase of this case as it has metastasized into something entirely new." *Id.*

1  Cause be assigned to another United States District Court judge.

2  **II.     STATEMENT OF FACTS RELEVANT TO MOTION**

3       **A.     *Melendres* Preliminary and Permanent Injunction**

4       In December 2007, Latino motorists brought a class action under 42 U.S.C. § 1983 against the Maricopa County Sheriff's Office ("MCSO") and Sheriff Joseph Arpaio, in his official capacity only, alleging that Defendants engaged in a custom, policy, and practice of racially profiling Latinos, and a policy of unconstitutionally stopping persons without reasonable suspicion that criminal activity was afoot, in violation of Plaintiffs' Fourth and Fourteenth Amendment rights.[2] [Doc. 1, amended by Doc. 26.] The Plaintiffs sought declaratory and injunctive relief to prevent Defendants from engaging in racial profiling and exceeding the limits of their authority to enforce federal immigration law. [Doc. 1 at 19–20.]

     After pre-trial discovery was closed, the parties filed competing motions for summary judgment; Plaintiffs' motion included a request for the entry of a preliminary injunction. [Docs. 413, 421.] Judge Snow granted the Plaintiffs' motion in part, and entered a preliminary injunction on December 23, 2011. [Doc. 494.] The injunction prohibited MCSO from "detaining individuals in order to investigate civil violations of federal immigration law," and from "detaining any person based on actual knowledge, without more, that the person is not a legal resident of the United States." [*Id.* at 39.] The injunction further stated that, absent probable cause, officers may only detain individuals based on reasonable suspicion that "criminal activity may be afoot." [*Id.* at 5.]

     Seventeen months later, approximately nine months following a bench trial, and one week before the recall petition for Sheriff Arpaio was due, Judge Snow issued his Findings of Fact and Conclusions of Law in May 2013, in which he found MCSO liable for a number of constitutional violations in its operations and procedures. [Doc. 579 at 115–31.] The timing of the decision was curious and problematic, as it resulted in

---

[2] MCSO, a non-jural entity, is no longer a named defendant in this action. Maricopa County has recently become a defendant in this action.

immediate marches and protests against Defendant Arpaio at a crucial point in his political career.

After allowing the Parties, at their request, to attempt to negotiate the terms of a consent decree, in October 2013 Judge Snow ordered supplemental injunctive relief to remedy the violations outlined in his Findings and Conclusions and defined enforcement mechanisms for such remedies. [Doc. 606.]

**B.    Judge Snow's Determination that a Civil Contempt Hearing was Necessary.**

On May 14, 2014, Defendants, on their own initiative, informed Judge Snow and Plaintiffs' counsel that a former member of the Human Smuggling Unit, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appeared to have been appropriated from members of the Plaintiff class. [*See* Doc. 700 at 12–13.] Deputy Armendariz was a regular participant in the HSU's saturation patrols, both large and small scale. He also testified at trial and was personally implicated by the allegations of two representatives of the Plaintiff class regarding his involvement in a 2008 immigration sweep in which two Hispanic American citizens were allegedly profiled and illegally detained on the basis of their suspected undocumented status. [Doc. 576.] After his apparent suicide, in addition to the numerous personal items apparently seized from persons he had stopped, MCSO also discovered numerous video recordings of traffic stops that Armendariz had conducted, apparently going back several years. [Doc. 700 at 11.] Some of those videos revealed what MCSO characterized as "problematic activity" on the part of Deputy Armendariz during the stops. [*Id.* at 35, 57.] Other officers, and at least one supervisor of Armendariz who also testified at the trial in this action, were depicted on these recordings during one or more problematic stops. [*Id.* at 35.]

In light of the inappropriate activity observable on Deputy Armendariz's videotapes and the questions surrounding other officers' use of video and audio recording devices during the time period in which pre-trial discovery in this case was occurring,

Judge Snow ordered Defendants to immediately formulate and obtain the Monitor's approval of a plan designed to retrieve all recordings made by officers that might still be in existence. [*Id*. at 25–27.] The ensuing investigations unearthed documents apparently requiring officers to make such recordings during the period of time relevant to Plaintiffs' claims, and that those here-to-fore unknown documents and recordings were never disclosed.

Moreover, the Armendariz videotapes resulted in administrative interviews with MCSO personnel. Those interviews have apparently revealed that, for at least seventeen months after Judge Snow issued his preliminary injunction, Defendants, as a matter of regular practice and operation, continued to enforce federal immigration law by conducting immigration interdiction operations, and detaining persons after officers concluded that there was no criminal law basis for such detention,.

Accordingly, Judge Snow determined that civil contempt proceedings were necessary to determine if MCSO, Sheriff Joseph Arpaio, Chief Deputy Gerald Sheridan and other MCSO leadership acted in contempt of this Court's "lawful writs, processes, orders, rules, decrees, or commands" by "(1) failing to implement and comply with the preliminary injunction; (2) violating their discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders." [Doc. 880 at 26.] Moreover, Judge Snow noted that the development of the evidentiary record in the contempt proceedings would permit him to evaluate whether civil remedies can vindicate the rights of the Plaintiff class, or if criminal remedies are necessary.

## C. **Pre-Civil Contempt Hearing Events**

On March 17, 2015, Defendants Sheriff Arpaio and the MCSO filed an Expedited Motion to Vacate Hearing and Request for Entry of Judgment. [Doc. 948.] The purpose of that Motion was to "convey to the Court and to Plaintiffs that Defendants Joseph M. Arpaio and Maricopa County Sheriff's Office, and identified nonparty Chief Deputy Gerard Sheridan (collectively, "Defendants") consent[ed] to a finding of civil contempt against them and the imposition of remedies designed to address their conduct."

[*Id.* at 1.] Defendants expressed their most sincere remorse to the Court and to Plaintiffs and explicitly acknowledged that they had violated the Court's Preliminary Injunction. [*Id.* at 2.] Accordingly, Defendants adopted and stipulated to the facts as stated in the Court's Order to Show Cause, [Doc. 880] as well as to the entry of an order finding them in civil contempt of court. [Doc. 948 at 3.]

Judge Snow demanded, before accepting the proposal, that Arpaio have "skin in the game", specifically that Defendant Arpaio pay a sanction from his personal funds and not from any defense funds supporting Defendant Arpaio. It is noteworthy that Defendant Arpaio is only named as a defendant in his official capacity in this lawsuit. To this end, Defendants attached a proposed list of stipulated remedial measures that Defendants had agreed to implement, including the payment of $100,000 from Defendant Arpaio's *personal funds* to a civil rights organization and that a fund would be created to compensate victims of the Defendants' violation of the Court's December 2011 injunction.[3] In light of these remedial measures, Defendants requested that Judge Snow vacate the evidentiary hearing to determine the existence of the admitted contempt. [Doc. 948 at 4.]

Despite the *admitted* violation of this Court's preliminary injunction and the remedial measures Defendants sought to implement, including Defendants agreeing to Plaintiffs' settlement terms that also would have mooted the need for contempt proceedings, Judge Snow refused to vacate the contempt proceedings. [Doc. 1007.] In fact, he requested that the United States Attorney for the District of Arizona attend the proceedings to determine whether sufficient evidence would be presented to justify

---

[3] The remedies proposed by Arpaio included: (1) acknowledging in a public forum the violations of this Court's orders; (2) Sheriff Arpaio and MCSO will seek from Maricopa County the creation and initial funding of a reserve to compensate victims of MCSO's violation of the Court's December 2011 injunction; (3) develop and implement a plan to identify victims of the Court's December 2011 order; (4) permit the Monitor to investigate any matter that relates to Defendants' violation of the Court's preliminary injunction; (5) move to dismiss the then pending appeal in the Ninth Circuit Court of Appeals; and (6) pay for Plaintiffs' reasonable attorneys' fees that were necessary to ensure compliance with this Court's Orders. [Doc. 748, Ex. B].

4272904.1
5/22/15

6

criminal contempt proceedings. In essence, Judge Snow requested that the U.S. Attorney function as his investigator to determine whether criminal contempt of his Preliminary Injunction had occurred. The U.S. Attorney appropriately declined Judge Snow's invitation to participate in this capacity by letter and subsequently in open court.

### D. Judge Snow's Surprise Examination of Unexpected, Irrelevant Subjects During Contempt Proceedings.

On April 23, 2015, Judge Snow embarked on his own inquiries during the testimony of Sheriff Arpaio. Those inquiries were entirely unrelated to the three grounds that were the defined and noticed subjects of the contempt proceeding.[4] Judge Snow continued these inquiries when he examined Chief Deputy Sheridan following Sheriff Arpaio's testimony. These lines of questioning were based on Judge Snow's reading of, reference to, and reliance on hearsay statements contained in a Phoenix New Times blog post by Stephen Lemons. [Phoenix New Times Blog Post, attached as Exhibit 2; *see also* 4/23/15 Transcript at 648-649, attached as Exhibit 3]. Importantly, this article had never been disclosed and no advance notice was provided to any of the Defendants or their counsel in the contempt proceeding that the article would be discussed or relied upon by Judge Snow.

#### 1. The "Grissom Investigation"

Specifically, Judge Snow questioned Sheriff Arpaio regarding a blog posting by Stephen Lemons in the Phoenix New Times that detailed an alleged investigation by Sheriff Arpaio regarding comments made by Judge Snow's wife ("Grissom Investigation"). [4/23/15 Transcript at 643-644]. During this line of questioning, Judge Snow questioned Sheriff Arpaio regarding whether he was aware if Judge Snow or any of his family members had ever been investigated by anyone. [*Id.* at 647:8-17]. In response, Sheriff Arpaio testified that he had received a communication in

---

[4] Again, the issues of the contempt proceeding were clearly defined: "(1) failing to implement and comply with the preliminary injunction; (2) violating [ ] discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders." (Doc. 880 at 26.)

August 2013 from Karen Grissom regarding comments that Judge Snow's spouse had made to her in a restaurant about Judge Snow's hatred for Sheriff Arpaio and his desire to do anything to get Sheriff Arpaio out of office. [*Id.* at 654-55; 4/24/15 Transcript at 962:14-16]. It was ultimately revealed that a private investigator hired by the Sheriff's counsel had interviewed three individuals: Karen Grissom, her husband Dale Grissom, and their adult son Scott Grissom, regarding the reliability of Mrs. Grissom's report. [4/23/15 Transcript at 655].

The private investigator's interviews of these individuals determined that Mrs. Grissom was credible in the following statement:

> **Karen Morris Grissom**
> Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her.
>
> Sent from Phoenix

[Facebook Message, attached as Exhibit 5; 4/23/15 Transcript at 655]. The Grissoms have been unwavering in their recollection of the comments Judge Snow's wife made regarding Judge Snow's hatred toward Sheriff Arpaio and his desire to do anything to get him out of office. *See* 10/26/13 Transcript of Karen Grissom at 12:18-21, 14:18-20, 19, 28:10-18 attached as Exhibit 6; 10/28/13 Transcript of Dale Grissom at 13:21-25, 16:5-12, 22:19-23:9, attached as Exhibit 7; 5/20/15 Arizona Republic Article, attached as Exhibit 8].

Although the interviews of these individuals were deemed credible, in that they corroborated Judge Snow's spouse had made these statements, Sheriff Arpaio never "went any further than just verifying that [a] conversation [between Karen Grissom and Sheri Snow] . . . occurred." [4/24/15 Transcript at 966:11-16]. Moreover, to date, neither Judge Snow nor Mrs. Snow have denied that Mrs. Snow made the statements attributed to her.

### 2. The "Montgomery Investigation"

In addition, Judge Snow questioned Sheriff Arpaio and Chief Deputy Sheridan regarding a second investigation, also unrelated to the three clearly defined subjects of the contempt proceedings. Judge Snow inquired regarding athe unrelated investigation and MCSO's use of a confidential informant, Dennis Montgomery, involving e-mail breaches, including the e-mails of certain attorneys representing the Sheriff, wiretaps of the Sheriff and judges, and computer hacking of 50,000 bank accounts of Maricopa County citizens. [4/23/15 Transcript at 647:1-3, 649; 4/24/15 Transcript at 1003:9-11; 1006:6-10].

Neither the Grissom investigation nor the Montgomery investigation involved any investigation of Judge Snow or his family. [4/23/15 Transcript at 649].

### E. Post Contempt Proceeding Expansion of Monitor's Duties by Judge Snow

As the sole arbiter of the matters relevant to the contempt proceedings, Judge Snow has also utilized the *Melendres* Monitor to expand his investigation into these unrelated issues. In an attempt to justify this expansion of power, Judge Snow is trying to create a connection between the Grissom and Montgomery investigations and a speculative pattern of "knowing defiance" rather than "inadvertence" of Judge Snow's Orders and necessary remedies for members of the Plaintiff class. [5/14/15 Transcript at 49:15-21, attached as Ex. 9]. In doing so, he has granted the Monitor "broad leeway" in determining what matters are pertinent to the current contempt proceedings. [*Id.* at 51].

When Defendant Arpaio's counsel requested clarification regarding the Monitor's investigatory powers, Judge Snow refused. Instead, Judge Snow stated that he is "not going to limit the Monitor's authority and [he's] not going to require [the Monitor] to provide [Defendant Arpaio's counsel] with advance notice of what [the Monitor] wants to inquire into." [*Id.* at 53:15-21]. Defendant Arpaio's counsel objected to the Court's morphing of the OSC hearing into something quite different than the three subjects that were a part of the original OSC Order and the expansion of the Monitor's powers as a

violation of her client's Due Process rights. Judge Snow overruled her objection and refused to "unduly shackle [the Monitor]." [*Id.* at 56:20]. Thus, the Monitor now has court ordered unlimited investigatory power.

Accordingly, despite the Ninth Circuit's recent Order, Judge Snow has improperly expanded the authority and investigatory powers of the Monitor into matters completely immaterial and irrelevant to the contempt proceedings and issues, as framed by Judge Snow's Order to Show Cause (*e.g.*, the Grissom and Montgomery investigations, and most recently MCSO's long past investigation into the authenticity of President Obama's birth certificate).[5]

### III.   JUDGE SNOW MUST RECUSE HIMSELF FROM THIS ACTION.

The right to a neutral and detached judge in any proceeding is protected by the Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). Accordingly, in order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct. *York v. United States*, 785 A.2d 651, 655 (D.C. 2001).

Cannon 2 of the Code of Conduct for United States Judges provides that "[a] judge should avoid impropriety and the appearance of impropriety in all activities." Avoidance of the *appearance* of impropriety in all judicial activities is important because:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen.

---

[5] The Ninth Circuit has advised Judge Snow against extending the Monitor's powers into areas not narrowly tailored to address the violations of federal law at issue in this case. *Id.* (holding that the injunction improperly requires the Monitor to consider the "disciplinary outcomes for any violations of departmental policy" and to assess whether Deputies are subject to "civil suits or criminal charges ... for off-duty conduct."). Judge Snow now seeks to expand the authority of the Monitor without regard to the Ninth Circuit's Order.

Comment 2A to Cannon 2.

Cannon 3 requires that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonable be questioned, including but not limited to instances in which:

> (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> . . .
>
> (c) the judge knows that the judge … [has an] interest that could be affected substantially by the outcome of the proceeding;[6]
>
> (d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:
>
> …
>
>> (iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or
>>
>> (iv) to the judge's knowledge likely to be a material witness in the proceeding;

Cannon 3 is, in essence, codified by 28 U.S.C. § 455. "Section 455(a) covers circumstances that appear to create a conflict of interest, whether or not there is actual bias." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir.1991) (citation omitted) (emphasis in original). In contrast, "[s]ection 455(b) covers situations in which an actual conflict of interest exits, even if there is no appearance of one." *Id.* (citation omitted). Given the developments in this case, both provisions require recusal.

---

[6] "Proceeding" includes pretrial, trial, appellate review, or other stages of litigation." Cannon 3(C)(3)(d).

A.     **28 U.S.C. § 455(b) Requires *Mandatory* Disqualification of Judge Snow.**[7]

Section (b) of 28 U.S.C. § 455 provides for ***mandatory*** recusal without investigation into the appearance of partiality by a judge. *Preston*, 923 F.2d at 734 (9th Cir. 1991) ("We need not explore whether an appearance of partiality existed in this case. The drafters of section 455 have accomplished this task for us.").

Section 455(b) "requires disqualification under Section 455(a), even absent any evidence of actual bias." *Mangini v. United States*, 314 F.3d 1158, 1161 (9th Cir.) opinion amended on denial of reh'g, 319 F.3d 1079 (9th Cir. 2003); *see also Preston,* 923 F.2d at 734 (addressing Section 455(b)(2), which requires disqualification when the judge either served as a lawyer or a lawyer with whom he previously practiced law served as a lawyer during such association in the matter in controversy). "[I]t is sufficient to state that section 455(b) provides us with a concrete example where the appearance of partiality suffices to establish a ground for recusal under section 455(a) *even absent actual bias*." *Preston*, 923 F.2d at 734 (emphasis added).

1.     **28 U.S.C. § 455(b)(5) Requires Disqualification of Judge Snow Due to Spousal Relationship.**

Under 28 U.S.C. § 455(b)(5), a judge shall disqualify himself in the following circumstances:

> (5) He or **his spouse**, or a person within the **third degree of relationship** to either of them, or the spouse of such a person:
>
> …
>
> (ii) Is acting as a lawyer in the proceeding;
>
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or
>
> (iv) Is to the judge's knowledge likely to be a **material**

---

[7] As a matter of style, most courts look first to Section 455(b), "which provides that a judge is automatically recused upon the existence of certain familial and/or financial relationships, and then to the more general terms of § 455(a)."

*In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990). Accordingly, this Motion is organized in accordance with this principle.

**witness** in the proceeding.

(Emphasis added).

***This requirement is strictly imposed.*** *Preston*, 923 F.2d at 734 (9th Cir. 1991). For example, a judge was required to recuse himself when it was learned that his daughter had participated in certain early depositions in a case, even though the daughter's role in the depositions was minimal and the firm she was working for was no longer involved in the case. *See In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136 (6th Cir. 1990). Here, Judge Snow's recusal is required for three reasons:

First, a person within the third degree of relationship to Judge Snow is affiliated with Plaintiffs' Counsel. Judge Snow's brother-in-law is an attorney with Covington Burling. Early in this action, Defendant Arpaio's former counsel waived this conflict. However, in light of recent events, reconsideration of this previously waived conflict is necessary.

Second, the interests of Judge Snow and his spouse are substantially affected by the outcome of this proceeding. Judge Snow himself has recognized that the documents involved in the Montgomery investigation "appear to allege or suggest that this Court had contact with the Department of Justice about this case before the Court was ever assigned to it." [5/14/15 Transcript at 45:17-19]. Moreover, Judge Snow stated on the record that the Montgomery Investigation appears to allege that the random selection process of this Court was subverted so that the case was deliberately assigned to him and that he had conversations with Eric Holder and Lanny Breuer about this case. [*Id.* at 45:19-25]. Judge Snow, therefore, has an interest that could be substantially affected by the outcome of the proceeding because his reputation is squarely at stake. [*Id.* at 46:23-47:7 (recognizing the potential of a "bogus" conspiracy theory to discredit the court)]; *see also* 28 U.S.C. § 455(b)(4) (requiring disqualification when a Judge "knows that he … [has] any other interest that could be substantially affected by the outcome of the proceeding.").

Finally, and most importantly, the fact that the Judge himself believes that the Grissom investigation is relevant to the contempt proceeding establishes his spouse as a material witness. In fact, Mrs. Snow is undoubtedly a material witness in this proceeding (i.e., whether she made the statement at issue and/or what she meant by it and the context in how it was made). Moreover, regardless of the irrelevance of the Grissom and Montgomery investigations to the issue of whether the admitted contempt of the Preliminary Injunction occurred, Judge Snow infused himself and the materiality of his wife as a witness and her uncontradicted statement into the contempt proceeding. Whether a sitting judge is admittedly biased toward a defendant in his Court and will do anything to ensure he is not re-elected is – without question – a conflict that creates grounds for recusal.[8] Accordingly, even if at some point there is a denial that Mrs. Snow made the statements at issue, the conflict that is created is unwaivable under § 455(b). *See* 28 U.S.C. § 455(e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)."). Judge Snow is solely responsible for making his spouse a material witness to this proceeding.[9]

**2.  28 U.S.C. § 455(b)(1) Requires Disqualification of Judge Snow Due To His Personal Bias.**

Under 28 U.S.C. § 455(b)(1), a judge shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Under Section 455(b), Judge Snow has made comments that indicate he has a personal bias or prejudice concerning a party, namely Sheriff Arpaio.

As revealed during the contempt proceeding, Judge Snow has engaged in

---

[8] Implicitly, Judge Snow has complete and unfettered access to a material witness in this case, his wife.

[9] For the same reasons, Judge Snow's wife has an interest that could be substantially affected by the outcome of the proceeding because her reputation is also squarely at stake under 42 U.S.C. § 455(b)(5).

1   outside investigations with regard to matters that he thought to be relevant and that he
2   infused into the proceeding. [Rotunda Declaration ¶ 20, attached as Ex. 10]. What's
3   more, he apparently took evidence outside of court. [*Id.*]. Although Judge Snow did not
4   disclose the identity of the individual with whom he spoke regarding this matter, he
5   clearly stated that he engaged in an investigation outside the courtroom during a lunch
6   break. [*Id.*]. In addition, Judge Snow also asked leading questions on irrelevant matters
7   during the contempt proceeding. [*Id.* at ¶¶ 19, 21]. In addition, he gave his own
8   testimony during the proceeding. [*Id.* at ¶¶ 22-23]. Furthermore, Judge Snow was
9   argumentative with witness Chief Deputy Sheridan when he was on the stand. He
10  interrupted Chief Deputy Sheridan and challenged his decision to make an informant,
11  Dennis Montgomery, a confidential informant in an investigation unrelated to the
12  contempt proceeding. [*Id.* at ¶ 24]. Judge Snow has also ordered the production of
13  documents that may be protected by the work product doctrine or attorney client privilege.
14  Those documents pertain to an attorney, Larry Klayman, and his client, Dennis
15  Montgomery. Mr. Klayman is not an attorney who has appeared in this case and Mr.
16  Montgomery is not a party to this action. [*Id.* at ¶ 25].

17          Moreover, Judge Snow's inquiry into matters unrelated to the contempt
18  proceeding deprived Sheriff Arpaio of his due process constitutional rights. At a
19  minimum, a Court must provide an alleged contemnor with notice and an opportunity to
20  be heard. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827
21  (1994). The concept of notice includes prior disclosure and provision of documents used
22  at trial and prior identification of areas of examination. *See generally, Stuart v. United
23  States*, 813 F.2d 243, 251 (9th Cir.1987), rev'd on other grounds, 489 U.S. 353 (1989); *DP
24  Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 846-47 (9th Cir.
25  2001). Such advance notice is consistent with an alleged contemnor's right to present a
26  defense. *See United States v. Powers*, 629 F.2d 619, 625 (9th Cir. 1980). Further, the law
27  requires progressively greater procedural protections for indirect contempts of complex
28  injunctions that necessitate more elaborate and in-depth fact-finding, as in this case. *See*

*Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 at 833-34. Here, although Defendant Arpaio testified that he previously read the Phoenix New Times blog Judge Snow utilized to justify his unauthorized line of questioning (Transcript, 643:23-24), neither the Court nor any other party previously provided it to Defendants nor gave notice that Defendant Arpaio or Chief Deputy Sheridan would be questioned about it. It was not identified as an exhibit. Neither was Defendant Arpaio nor Chief Deputy Sheridan provided notice that this subject area would be addressed. In contempt proceedings, procedural protections such as prior notice are crucial "in view of the heightened potential for abuse posed by the contempt power." *Taylor v. Hayes*, 418 U.S. 488, 498 (1974). Judge Snow's failure to abide by these fundamental and basic constitutional requirements, demonstrates further evidence of the perception of an unwaivable bias towards Sheriff Arpaio.

Finally, Judge Snow has improperly expanded the authority and investigatory powers of the Monitor into matters completely immaterial and irrelevant to the contempt proceedings and issues, as framed by his own Order to Show Cause (*e.g.*, the Grissom and Montgomery investigations, and most recently MCSO's long past investigation into the authenticity of President Obama's birth certificate). Judge Snow's willingness to ignore Defendant Arpaio's and Chief Deputy Sheridan's constitutional rights in favor of granting the Monitor "unfettered access" to further his own investigational curiosities or agenda further demonstrates a perception of bias.[10]

**B.     28 U.S.C. § 455(a) Requires Disqualification of Judge Snow Because His Impartiality is Questionable.**

Under 28 U.S.C. § 455(a), a judge shall disqualify himself "in any

---

[10] Additionally, the procedure outlined by the Court in its Order (Doc. 1032) places Defendants in an untenable position in which they must immediately provide documents pursuant to the Court's Order in such a way that sacrifices the attorney-client and work product privileges. The two Deputy County Attorneys who quickly reviewed documents on April 23, 2015 made random selections throughout the documents to discern what the documents were and made a cursory check for any privileged documents. They did not view any privileged documents; however, time did not allow for a careful or thorough review. It is probable that privileged documents were given to the monitors.

proceeding in which his impartiality might reasonably be questioned." A violation of section 455(a) occurs even if the judge is unaware of the circumstances that created the appearance of impropriety. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 8847 (1988). In determining whether disqualification is proper, courts apply an objective test: "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Clemens v. U.S. Dist. Ct. for Central Dist. of California*, 428 F.3d 1175, 1178 (9th Cir. 2005) (citations omitted). "The 'reasonable person' in this context means a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'" *Id.* (citations omitted). Further, the grounds for disqualification must arise from "extrajudicial" factors, namely, factors not related to the judicial proceeding at hand. *Id.*

Under Arizona Judicial Canon Rule 2.11, the standard for disqualification is identical to the disqualification standard under 28 U.S.C. § 455(a). Rule 2.11 states that the "Judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. For instance, a Judge shall disqualify himself if his spouse or a person within the third degree of relationship to either of them is a person who has more than a de minimis interest that could be substantially affected by the proceeding or is likely to be a material witness in the proceeding." *See* Rule 2.11(A)(2)(c)(d). In addition, the comments under Rule 2.11 provide guidance. For instance, comment 2 specifically states that: "A Judge's obligation not to hear or decide matters in which disqualification is required, applies regardless of whether a Motion to Disqualify is filed." Additionally, Comment 5 to Rule 2.11 requires the Judge to disclose on the record information that he believes the parties or their lawyers might reasonably consider relevant to a possible Motion for Disqualification, even if the Judge believes there is no basis for disqualification.

Finally, even in cases of a close question of judicial impartiality, this Court should decide in favor of recusal. The U.S. Courts of Appeals for the First, Fifth, Tenth, and Eleventh Circuits have said that close questions of judicial impartiality should be

decided in favor of recusal. *See Republic of Pan v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

For all of the reasons stated above, Judge Snow's recusal is required because his impartiality might reasonably be questioned. Even presuming this Court does not find that the aforementioned actions by Judge Snow demonstrate evidence of *actual* bias, *see supra* § III(B), a reasonable person with knowledge of all the facts would certainly question Judge Snow's impartiality. Recusal is therefore required because of the bedrock notion and importance of public confidence in the judiciary and that confidence in the judiciary is severely eroded by even the appearance of irresponsible, improper or biased conduct by judges.

## IV.   CONCLUSION

For the aforementioned reasons Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully request that (1) Judge Snow recuse himself from these proceedings and (2) if Judge Snow declines to recuse himself, Defendant Arpaio and Chief Deputy Gerard Sheridan move that this Motion for Change of Judge for Cause be assigned to a another United States District Court judge for immediate consideration.

DATED this 22nd day of May, 2015.

IAFRATE & ASSOCIATES

By s/ Michele M. Iafrate
Michele M. Iafrate
649 North Second Avenue
Phoenix, Arizona 85003
Attorneys for Defendants Joseph M. Arpaio

DATED this 22nd day of May, 2015.

JONES SKELTON & HOCHULI, PLC

By s/ A. Melvin McDonald
A. Melvin McDonald
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Attorneys for Defendants Joseph M. Arpaio

DATED this 22nd day of May, 2015.

MITCHELL STEIN CAREY, PC

By s/ Barry Mitchell
Barry Mitchell
Lee Stein
One Renaissance Square
2 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
Attorneys for Gerard Sheridan

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of May, 2015, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

s/ Mance Caroll

4272904.1
5/22/15

19