# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*, | )     CV-07-2513-PHX-GMS |
| Plaintiffs, | ) **DECLARATION OF STEPHEN** |
| | ) **GILLERS IN SUPPORT OF** |
| v. | ) **PLAINTIFFS' RESPONSE IN** |
| | ) **OPPOSITION TO SHERIFF** |
| | ) **ARPAIO AND CHIEF DEPUTY** |
| Joseph M. Arpaio, *et al.*, | ) **SHERIDAN'S MOTION** |
| | ) **FOR RECUSAL OR** |
| Defendants. | ) **DISQUALIFICATION OF** |
| | ) **THE COURT** |

I, Stephen Gillers, declare under the pains and penalties of perjury:

## QUALIFICATIONS

1.      My name is Stephen Gillers. I am a law professor at New York University School of Law, where I have taught the rules and law governing lawyers and judges ("legal ethics") and Evidence regularly since 1978. I am author of a leading casebook in the field, Regulation of Lawyers: Problems of Law and Ethics (10th ed. Aspen 2015). I have spoken hundreds of times on the subject of legal ethics at state bar and American Bar Association ("ABA") meetings nationwide, state and federal judicial conferences, and law firms and corporate law offices in the United States and abroad. I continue to do so. For more than a decade, I was active in the legal ethics work of the ABA's Center for Professional Responsibility and spent hundreds of hours yearly on this work. I was a member of the ABA's Multijurisdictional Practice Commission and its Commission on Ethics 20/20. In 2011, I received the Michael Franck Award from the ABA's Center for Professional Responsibility. In 2015, I received the American Bar Foundation's Outstanding Scholar Award. I have written widely in the area, including for academic journals and the law and popular press. Legal ethics is the primary focus of my academic

research. My background, qualifications, and experience are described in greater detail in my resume, which is attached as Exhibit A.

### THE RECUSAL MOTION

2.     I have read the Motion for Recusal [Doc. 1117], the Affidavit of Sheriff Arpaio [Doc. 1117-1], and the Declaration of Ronald D. Rotunda [Doc. 1117-10]. I do not have personal knowledge of the facts. Rather, I have been asked to assume the truth of the facts in Exhibit B to this Declaration. Other facts I have been asked to assume or that are in the record and relate to my opinion are referenced below.

3.     The Motion relies on 28 U.S.C. §§ 144 and 455. Procedurally, so far as here relevant, they differ in this way. Section 144 requires a judge to refer a motion made under it to another judge. But that is so only if the motion is timely and sufficient. The judge who is the subject of the motion is authorized to make both determinations. *United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978) (sufficiency and timeliness); *Shinault v. Foster*, No. 12-cv-00639-RBJ-BNB, 2013 WL 4550671, *1 (D. Colo. 2013) (same) (citing *Azhocar*). Section 144's basis for recusal – personal bias or prejudice – is "identical" to the actual bias standard of § 455(b)(1). *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980).

4.     The recusal motion relies on the following:

### A.

4.1.   Karen Grissom sent Sheriff Arpaio a Facebook message in August 2013. It said: "Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

4.2.   Defense counsel hired a person to investigate this information. In October 2013, Mrs. Grissom was interviewed and the interview was transcribed. She said that Mrs. Snow had approached her, *not* after "recognizing [her] from childhood," but after mistaking her for her sister Irene, whom Mrs. Snow did know.

Mrs. Grissom dated the restaurant event as "the summer or beginning of the summer" of 2012.

4.3.     In her interview, Mrs. Grissom remembered Mrs. Snow's alleged comment differently than in the Facebook message. She recalled that Mrs. Snow had said, "my husband, yeah, doesn't like him [Arpaio]. He wants him out of the – out of his office. And he – anything he can do to get him out of the office." (This quote and the quote in paragraph 4.4 come from a transcript of the interviews with the Grissoms, in which each purported to recollect the substance of what Mrs. Snow allegedly said a year earlier.)

4.4.     Mrs. Grissom's husband Dale was also at the restaurant and was interviewed. The transcript shows that he had a somewhat different memory. He said that Mrs. Snow "says, yeah, my husband wants to get him or wants him to go down or something like that." Dale Grissom was asked whether he could remember "specifically what she … said" and he replied, "No. I don't." After some more questions that provided nothing further of substance, the interviewer asked a leading question. "But did she ever say, my husband told me he doesn't like Joe, and he wants Joe to go down, or don't you remember that." Mr. Grissom replied: "I don't remember. That may have come up, but I don't remember."

4.5.     Sheriff Arpaio has known about the Grissom allegation since August 2013, but did not seek to recuse Judge Snow based on it. The defendants now claim that the restaurant encounter requires recusal under § 455(b)(5) because Mrs. Snow is "likely to be a material witness" in connection with it and because Judge Snow's "reputation" can be "substantially affected by the outcome of this proceeding." Judge Snow questioned Sheriff Arpaio about this investigation at a civil contempt hearing in April 2015.

**B.**

4.6.    At the same hearing as the events in paragraph 4.5, Judge Snow questioned Sheriff Arpaio and Chief Deputy Sheridan regarding a second MCSO investigation, known as the "Montgomery Investigation."

**C.**

4.7.    Judge Snow's brother-in-law, Keith Teel, is a partner in Covington & Burling, an international law firm. Covington is counsel to the plaintiffs. It is working without fee although in the event of a court award of counsel fees, it may be compensated for its time. Keith Teel will not share in any court-awarded fees. He is not working on this case. He does not practice in the area of law encompassed by this matter. He is based in Washington, D.C. The defendants have known about Mr. Teel's partnership in Covington since at least 2012 and have waived on the record a claim for recusal based on it, if any was available. Further assumptions regarding Covington are in paragraph 9.

**D.**

4.8.    Judge Snow "took evidence" out of court because, after a lunch break, he reported that he had been told that the Cold Case Posse "has its own funds" and back in court, he asked Sheriff Arpaio whether that was possible.

**E.**

4.9.    The Motion to Recuse at page 15 gives this further basis (with citations to Professor Rotunda's Declaration):

> Judge Snow also asked leading questions on irrelevant matters during the contempt proceeding. [*Id*. at ¶¶ 19, 21]. In addition, he gave his own testimony during the proceeding. [*Id*. at ¶¶ 22-23]. Furthermore, Judge Snow was argumentative with witness Chief Deputy Sheridan when he was on the stand. He interrupted Chief Deputy Sheridan and challenged his decision to make an informant, Dennis Montgomery, a confidential informant in an investigation unrelated to the contempt proceeding. [*Id*. at ¶ 24]. Judge Snow has also ordered the production of documents that may be protected by the work product doctrine or attorney client privilege. Those documents pertain to an attorney, Larry Klayman, and his client, Dennis Montgomery. Mr. Klayman is not an

attorney who has appeared in this case and Mr. Montgomery is not a party to this action. [*Id*. at ¶ 25].

## MY OPINION

5.      Each of these grounds for recusal is baseless. Some are frivolous.

6.      I will start with the ground summarized in paragraph 4.9. In *Liteky v. United States*, 510 U.S. 540, 555 (1994), the Supreme Court wrote:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible…. *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short- tempered judge's ordinary efforts at courtroom administration—remain immune.

7.      Nothing in the transcripts defendants and their expert quote supports a claim of bias. Judges can ask leading questions. Judges can be argumentative. They can interrupt. A court proceeding is not a tea party. If defendants wish to challenge Judge Snow's rulings, or bring claims of a denial of due process (which also infuse their motion), their remedy is appeal. *Liteky* held:

> It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal.

*Id*. (citation omitted).

8.      With regard to the claim in paragraph 4.9 that Judge Snow "gave his own testimony," the only citation is to paragraphs 22 and 23 of the Rotunda Declaration. There the only "proof" is Judge Snow's statement that evidence did not show "collusion." This is not testimony. This is an inference the judge is entitled to make and may have to make in order to adjudicate the issues.

9.      I turn now to the allegation summarized in paragraph 4.7: These facts do not support recusal as Judge Snow has amply shown in his opinions of June 19 and July 3, 2012. I could not improve on this analysis. Furthermore, Keith Teel's position has been known for three years and any objection has been waived. But defendants claim that a motion under § 455(b) cannot be waived. First, Keith Teel's status does not offend any provision of § 455(b). No interest of his will be "substantially affected" by a victory for plaintiffs as required by § 455(b)(5)(iii). Further, I am told that Covington will apply half of any fee award to the firm's out-of-pocket costs in this and other pro bono cases and donate the other half to nonprofit legal services organizations. Mr. Teel cannot be enriched by any fee award.

10.      If there were a basis for recusal it would fall under §455(a), which can be waived. There is no basis for recusal under that provision either. Judge Snow's impartiality cannot reasonably be questioned based on any claim of enhancement of Keith Teel's personal reputation because of Plaintiffs' success in this litigation. Mr. Teel is a member of a large, international law firm. He works in a different practice area and in a different city. The connection between any victory for plaintiffs here and Mr. Teel's own reputation is not merely too remote to lead an objective member of the public to question Judge Snow's impartiality. It is non-existent. Any recognition or positive publicity that Covington has received or may hereafter receive for its pro bono work in this case is too remote to be of benefit to Mr. Teel personally. As Judge Snow's exhaustive research demonstrates, the situation here is insufficient to warrant recusal under § 455(a). A reasonable and objective observer

would not question Judge Snow's impartiality based on Mr. Teel's partnership in Covington.

11.     Last, while it is true that a § 455(b) conflict cannot be waived, what that means is that a judge may not "accept" a waiver of a ground for recusal under §455(b) even if there is one. 28 U.S.C. § 455(e). Claims for recusal under §455(b) can be lost by inaction after the facts supporting the claim are known or reasonably should be known and no motion is made. This rule prevents a party from sitting on disqualifying information while waiting to see if the case is proceeding favorably and then invoking recusal if it is not. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992).

12.     I turn now to the allegation summarized in paragraph 4.1. For the same reason – lack of timeliness – any basis to recuse Judge Snow because of his wife's alleged comment (paragraph 4.1) is lost. Knowledge of that basis was present in mid-2013. In any event, even if timely, that claim does not support recusal. A threshold problem is to identify what the alleged comment was. There are several iterations. The most damning rendition is that Mrs. Snow allegedly said that Judge Snow "hates" Sheriff Arpaio (as opposed to "doesn't like" him, the words Mrs. Grissom later used) and that "he [Judge Snow] will do anything to get him out of office."

13.     It is important to be clear about what the offer of proof is here. It is this: Karen Grissom has paraphrased a statement by Cheri Snow, which purports to summarize the beliefs and intention of Judge Snow. To put it schematically: X has said that Y said that in her view Z believes something and intends to do something. But this is not proof of Judge Snow's belief nor of his intention, which is all that matters. Even if Karen Grissom accurately paraphrased what Cheri Snow said, we are left only with Cheri Snow's characterization of what she believes are Judge Snow's beliefs and intention. *Cf. General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1043 (6th Cir. 1990) (fact that opposing counsel remarked "we've got the judge in our pocket" insufficient to require § 144 referral or § 455(a) recusal).

14.     What matters are Judge Snow's actual beliefs and intentions. Of course, Judge Snow knows better than anyone what these are. If indeed he does hate Sheriff Arpaio to such an extent that he cannot be impartial, which is the *Liteky* standard, he would have had a duty to recuse himself without a motion. *E. & J. Gallo Winery*, 967 F.2d at 1294. If in fact he intends to invoke his judicial powers for the ulterior purpose of causing Sheriff Arpaio to lose his office and not based on the law and the facts before him, then again he would have had a duty to recuse himself. *Id*. If a hearing were held, the defendants' offer of proof of what Karen Grissom said Cheri Snow said regarding her impressions of Judge Snow's belief and his intentions would not be admissible in evidence. They would not be relevant. Nor would Mrs. Snow's impressions be admissible in evidence even if we assume that she said what Mrs. Grissom said she said. What Cheri Snow believes is also irrelevant. Defendants have not offered admissible evidence that can support a recusal motion on this ground even if it were timely made. Moreover, Judge Snow can, in his opinion on the recusal motion, negate the inferences that defendants urge, based on the Grissoms' statements. Courts should also be cognizant of the risk of manufactured statements offered to delay a matter or recuse a judge and which are said, therefore, to require a hearing. I do not say that this has occurred here, but the danger is a reason to insist on direct (not remote) proof of the disqualifying state of mind before a court is asked to convene a separate hearing on what a judge does or does not believe.

15.     The next claim summarized in paragraph 4.8 is that recusal is required because Judge Snow "took evidence." What appears to have happened is that someone told Judge Snow that the Cold Case Posse had its own funding. Judge Snow reported this information in court, on the record, and asked the Sheriff about it. That is not an example of taking evidence if that claim is meant to imply some sort of secret proceeding to gather facts. Canon 3(A)(4) of the Code of Conduct for United States Judges says: "If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of

the subject matter of the communication and allow the parties an opportunity to respond, if requested." This is exactly what Judge Snow did. Further, if the information came to Judge Snow from the monitor or an intrajudicial source, it would not be "unauthorized."

16.     Last is what appears to be an allegation that by asking witnesses about two MCSO investigations – one connected to the Grissom allegation and the other about the so-called "Montgomery Investigation" – Judge Snow acted improperly. It is a bit of a challenge to understand defendants' argument here. Insofar as it is a due process claim based on an expansion without notice of the focus of the order to show cause, the remedy is appeal. *Liteky,* 510 U.S. at 555. Insofar as it is based on a claim that these matters are none of the judge's business and his inquiry is therefore legally irrelevant to the issues before the court, it is also a subject for appeal. Insofar as it is a claim that by making these inquiries, Judge Snow has evinced some personal interest in the case that reveals him unable to be impartial or appear so, it is wrong for two reasons.

17.     First, the court could perceive that the conduct of these investigations had potential probative value on the issue of contempt for violation of the injunctive orders. Money spent investigating the judge would not be available to comply with the injunction. The ability to comply with a court order or the lack of it might inform any decision on contempt. The defendants may disagree with a causal linkage or evidentiary value between expenditures to investigate the judge and compliance with the injunction, but the court is free to conclude otherwise.

18.     The inquiries were appropriate for a second reason. The court has inherent power to protect the independence of the court and its processes. For example, there are rules that forbid lawyers to "seek to influence a judge, juror, prospective juror, or other official of a tribunal by means prohibited by law." Ariz. Rule of Professional Conduct 3.5(a). *See also In re Enforcement of Subpoena*, 972 N.E.2d 1022, 1029 (Mass. 2012) (citations omitted) ("This court has also censured

1   attorneys who attempted to 'pierce the confidential communications of a former law

2   clerk and a judge in a pending matter to benefit one of the litigants.' We deemed such

3   attempts to be 'prejudicial to the administration of justice,' which requires 'respect

4   for the internal deliberations and processes that form the basis of judicial decisions, at

5   very least while the matter is still pending.'").

6   19.   A concern with conduct prejudicial to the administration of justice is

7   heightened here, where one party is a law-enforcement agency with investigative

8   powers far superior than those available to most litigants.

9   20.   I don't suggest that counsel for the defendants or the defendants did

10  anything untoward, only that the court was well within its inherent authority in

11  asking questions about the defendants' possible investigations of the court in order to

12  ascertain that there was no conduct prejudicial to the administration of justice.

<strong>CONCLUSION</strong>

14  21.   The various grounds to recuse Judge Snow lack merit for the reasons

15  stated above.

_Stephen Gillers_

Stephen Gillers

Dated:       New York, New York
             June 12, 2015

Exhibit A

[February 2015]

# STEPHEN GILLERS

Elihu Root Professor of Law
(vice dean 1999-2004)
New York University
School of Law
40 Washington Square South
New York, NY 10012

(212) 998-6264 (tel)
(212) 995-4658 (fax)
stephen.gillers@nyu.edu

**AREAS OF TEACHING**  Regulation of Lawyers and Professional Responsibility
Evidence; Law and Literature; Media Law

**PRIOR COURSES**  Civil Procedure, Agency, Advocacy of Civil Claims, Federal Courts

**PUBLICATIONS**  BOOKS AND ANTHOLOGIES:

Regulation of Lawyers:  Problems of Law and Ethics (Aspen Law &
Business, 10th ed., 2015).  The first edition of this popular casebook
was published in 1985.  Norman Dorsen was a co-author on the first
two editions.  Stephen Gillers is the sole author of the third through
ninth editions.  The first four editions were published by Little, Brown
& Co., which then sold its law book publishing operation to Aspen.

Regulation of Lawyers:  Statutes and Standards (with Roy Simon and
Andrew Perlman) (Aspen Law & Business) This is a compilation with
editorial comment.  The first volume was published in 1989.  Updated
versions have been published annually thereafter. As of the 2009
edition, Andrew Perlman has joined as a co-editor. As of 2015, John
Steele is a co-editor.

Regulation of the Legal Profession (Aspen 2009). This is 400+ page
book  in the Aspen "Essentials" series explains  ethics rules and laws
governing American lawyers and judges.

Getting Justice:  The Rights of People (Basic Books, 1971; revised
paperback, New American Library, May 1973).

Stephen Gillers

**PUBLICATIONS**
(continued)

Investigating the FBI (co-Editor with P. Watters)
(Doubleday, 1973; Ballantine, 1974)

None of Your Business:  Government Secrecy in America (co-Editor
with N. Dorsen) (Viking, 1974; Penguin, 1975).

I'd Rather Do It Myself:  How to Set Up Your Own Law Firm (Law
Journal Press, 1977).

Looking At Law School:  A Student Guide From the Society of
American Law Teachers (editor and contributor) (Taplinger, 1977;
NAL, 1977; revised ed., NAL, 1984; third ed., NAL, 1990).

The Rights of Lawyers and Clients (Avon, 1979).

"Four Policemen in London and Amsterdam," in R. Schrank (ed.)
American Workers Abroad (MIT Press, 1979).

"Dispute Resolution in Prison:  The California Experience," and
"New Faces in the Neighborhood Mediating the Forest Hills Housing
Dispute," both in R. Goldmann (ed.) Roundtable Justice:  Case Studies
in Conflict Resolution (Westview Press, 1980).

"The American Legal Profession," in A. Morrison (ed.), Fundamentals
of American Law (Oxford University Press 1996).

The Elsinore Appeal: People v. Hamlet (St. Martin's Press 1996).  This
book contains the text of Hamlet together with briefs and oral argument
for and against affirmance of Prince Hamlet's (imaginary) murder
convictions.  The book arose out of a symposium sponsored by the
Association of the Bar of the City of New York.

"In the Pink Room," in Legal Ethics: Law Stories (D. Rhode & D.
Luban, eds.) (Foundation Press, 2006) (also published as a
freestanding monograph).

ARTICLES:

Lowering the Bar: How Lawyer Discipline in New York Fails to Protect
the Public, 17 J. Legis. & Public Policy 485 (2014).

Uniform Legal Ethics Rules? No – An Elusive Dream Not Worth the
Chase, 22 The Professional Lawyer __ (2014)

Stephen Gillers

The Two-Year Law Degree: Undesireable but Perhaps Unavoidable, 2013 N.Y.U. J. Legis. & Pub. Pol'y Quorum 4 (2013)

PUBLICATIONS
ARTICES (continued)

How To Make Rules for Lawyers: The Professional Responsibility of the Legal Profession, 40 Pepperdine L. Rev. 365 (2013) (Symposium issue on *The Lawyer of the Future*).

A Profession, If You Can Keep It: How Information Technology and Fading Borders Are Reshaping the Law Marketplace and What We Should Do About It, 63 Hastings L.J. 953 (2012)

Guns, Fruit, Drugs, and Documents: A Criminal Defense Lawyer's Responsibility for Real Evidence, 63 Stan. L. Rev. 813 (2011)

Is Law (Still) An Honorable Profession?, 19 Professional Lawyer 23 (2009)(based on a talk at Central Synagogue in Manhattan).

Professional Identity: 2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

Choosing and Working with Estate and Foundation Counsel to Secure an Artistic and Philanthropic Legacy, in The Artist as Philanthropist, volume 2, page 293 (The Aspen Institute Program on Philanthropy and Social Innovation 2010)

Virtual Clients:  An Idea in Search of a Theory (with Limits),  42 Valparaiso L. Rev. 797 (2008)  (Tabor lecture).

The "Charles Stimson" Rule and Three Other Proposals to Protect Lawyers From Lawyers, 36 Hofstra L. Rev. 323 (2007)

A Tendency to Deprave and Corrupt:  The Transformation of American Obscenity Law from *Hicklin* to *Ulysses II*, 85 Washington U. L. Rev. 215 (2007)

Some Problem with Model Rule 5.6(a), Professional Lawyer (ABA 2007 Symposium Issue).

Monroe Freedman's Solution to the Criminal Defense Lawyer's Trilemma Is Wrong as a Matter of Policy and Constitutional Law, 34 Hofstra L. Rev. 821 (2006)

"In the Pink Room," TriQuarterly 124.

Free the Lawyers:  A Proposal to Permit No-Sue Promises in Settlement Agreements, 18 Georgetown J. Legal Ethics 291 (2005) (with Richard W. Painter).

3

Stephen Gillers

Lessons from the Multijurisdictional Practice Commission: The Art of Making Change, 44 Ariz. L. Rev. 685 (2002).

ARTICLES
(continued)

Speak No Evil: Settlement Agreements Conditioned On Noncooperation Are Illegal and Unethical, 31 Hofstra L. Rev.  1 (2002) (reprinted at 52 Defense L.J. 769 (2003)).

"If Elected, I Promise [_____]"–What Should Judicial Candidates Be Allowed to Say?  35 Ind. L. Rev. 735 (2002).

Legal Ethics: Art or Theory?, 58 Annual Survey Am. L. 49 (2001).

The Anxiety of Influence, 27 Fla. St. L. Rev. 123 (1999) (discussing rules that restrict multidisciplinary practice.

Can a Good Lawyer Be a Bad Person? 2 J. Inst. Study of Legal Ethics 131 (1999) (paper delivered at conference "Legal Ethics: Access to Justice" at Hofstra University School of Law, April 5-7, 1998).

More About Us: Another Take on the Abusive Use of Legal Ethics Rules, 11 Geo. J. Legal Ethics 843 (1998).

Caveat Client: How the Proposed Final Draft of the Restatement of the Law Governing Lawyers Fails to Protect Unsophisticated Consumers in Fee Agreements With Lawyers, 10 Geo. J. Legal Ethics 581 (1997).

Participant, Ethical Issues Arising From Congressional Limitations on Legal Services Lawyers, 25 Fordham Urban Law Journal 357 (1998) (panel discussion).

The Year: 2075, the Product: Law, 1 J. Inst. Study of Legal Ethics 285 (1996) (paper delivered on the future of the legal profession at Hofstra University Law School's conference "Legal Ethics: The Core Issues").

Getting Personal, 58 Law & Contemp. Probs. 61 (Summer/Autumn 1995) (contribution to symposium on teaching legal ethics).

Against the Wall, 43 J. Legal Ed. 405 (1993) (ethical considerations  for the scholar as advocate).

Participant, Disqualification of Judges (The Sarokin Matter): Is It a Threat to Judicial Independence?, 58 Brooklyn L. Rev. 1063 (1993) (panel discussion).

Stephen Gillers

The New Old Idea of Professionalism, 47 The Record of the Assoc
Bar of the City of N.Y. 147 (March 1992).

ARTICLES
(continued)

The Case of Jane Loring-Kraft: Parent, Lawyer, 4 Geo. J. Legal
Ethics 115 (1990).

Taking L.A. Law More Seriously, 98 Yale L.J. 1607 (1989)
(contribution to symposium on popular legal culture).

Protecting Lawyers Who Just Say No, 5 Ga. St. L. Rev. 1 (1988)
(article based on Henry J. Miller Distinguished Lecture delivered
at Georgia State University College of Law).

Model Rule 1.13(c) Gives the Wrong Answer to the Question of
Corporate Counsel Disclosure, 1 Geo. J. Legal Ethics 289 (1987).

The Compelling Case Against Robert H. Bork, 9 Cardozo L. Rev.
33 (1987).

Ethics That Bite:  Lawyers' Liability to Third Parties, 13 Litigation 8
(Winter 1987).

Can a Good Lawyer Be a Bad Person?, 84 Mich. L. Rev. 1011
(1986).

Proving the Prejudice of Death-Qualified Juries After Adams v.
Texas:  An Essay Review of Life in the Balance, 47 Pitt. L. Rev.
219 (1985), cited in Lockhart v. McCree, 476 U.S. 162, 197, 201
(1986) (Marshall, J., dissenting).

What We Talked About When We Talked About Ethics: A Critical
View of the Model Rules, 46 Ohio St. L.J. 243 (1985).

The Quality of Mercy:  Constitutional Accuracy at the Selection
Stage of Capital Sentencing, 18 U.C. Davis L. Rev. 1037 (1985).

Berger Redux, 92 Yale L.J. 731 (1983) (Review of Death Penalties
by Raoul Berger).

Selective Incapacitation:  Does It Offer More or Less?, 38 The
Record of the Assoc. Bar City of N.Y. 379 (1983).

Great Expectations:  Conceptions of Lawyers at the Angle of Entry,
33 J. Legal Ed. 662 (1983).

Perspectives on the Judicial Function in Criminal Justice

5

Stephen Gillers

(Monograph, Assoc. Bar City of N.Y., 1982).

Deciding Who Dies, 129 U. Pa. L. Rev. 1 (1980) (quoted and cited as "valuable" in Spaziano v. Florida, 468 U.S. 447, 487 n.33 (1984) (Stevens, J., dissenting); also cited in Zant v. Stephens, 462 U.S. 862, 878 n.17, 879 n.19 (1983); Lockhart v. McCree, 476 U.S. 162, 191 (1986) (Marshall, J., dissenting); Callins v. Collins, 114 S.Ct. 1127, 1134 n.4 (1994) (Blackmun, J., dissenting); and Harris v. Alabama, 115 S.Ct. 1031, 1038-39 (1995) (Stevens, J., dissenting).

Numerous articles in various publications, including The New York Times, The Nation, American Lawyer, The New York Law Journal, The National Law Journal, Newsday, and the ABA Journal.  See below for selected bibliography.

**AWARDS**

**2011 Recipient, Michael Franck Award.** Michael Franck Award from the ABA's Center for Professional Responsibility. The Award is given annually for "significant contributions to the work of the organized bar….noteworthy scholarly contributions made in academic settings, [and] creative judicial or legislative initiatives undertaken to advance the professionalism of lawyers…are also given consideration."

**2015 Recipient of Outstanding Scholar Award** from the American Bar Foundation.

**VIDEOTAPES**

"Adventures in Legal Ethics and Further Adventures in Legal Ethics": videotape of thirteen dramatic vignettes professionally produced and directed and raising issues of legal ethics.  Author, Producer.  (1994)

"Dinner at Sharswood's Café," a videotape raising legal ethics issues. Author,  Producer. (1996)

"Amanda Kumar's Case," a 38-minute story raising more than two dozen legal ethics issues.  Author. (1998)

**TRIBUTES**

To Honorable Gus J. Solomon, printed at 749 Federal Supplement LXXXI and XCII (1991).

Truth, Justice, and White Paper, 27 Harv. Civ. R. Civ. Lib. L. Rev. 315

Stephen Gillers

(1992) (to Norman Dorsen).

<u>Irving Younger: Scenes from the Public Life</u>, 73 Minn. L. Rev. 797 (1989).

**OTHER TEACHING**    Visiting Professor of Law, Harvard Law School, Winter 1988 Semester;

Adjunct Professor of Law, Yeshiva University, Cardozo Law School, Spring 1986, Spring 1987, and Fall 1988 Semesters.
Course:  The Legal Profession.

Adjunct Associate Professor of Law, Brooklyn Law School, 1976-78.

**PRIOR EMPLOYMENT**    <u>1973 - 1978</u>
Private practice of law
Warner and Gillers, P.C. (1975-78)

<u>1974 - 1978</u>
Executive Director
Society of American Law Teachers, Inc.

<u>1971 - 1973</u>
Executive Director, Committee for
Public Justice

<u>1969 - 1971</u>
Associate, Paul, Weiss, Rifkind,
Wharton & Garrison

<u>1968 - 1969</u>
Judicial Clerk to Chief Judge
Gus J. Solomon, Federal District Court
for the District of Oregon, Portland, Oregon

**SELECTED TESTIMONY**    Testimony on "Nomination of Sandra Day O'Connor to the Supreme Court of the United States", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., Sept. 11, 1981.

Testimony on S. 2216, "Habeas Corpus Reform Act of 1982", Hearings, before the Senate Committee on the Judiciary,  97th Congress, 2d Sess.,  April 1, 1982.

Testimony on H.R. 5679, "Criminal Code Revision Act of 1981",

Stephen Gillers

Hearings, before the House of Representatives, Committee on the Judiciary, 97th Congress, 2d Sess., April 22, 1982.

Testimony on S. 653, "Habeas Corpus Procedures Amendment Act of 1981", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., November 13, 1981.

**SELECTED TESTIMONY** (continued)

Testimony on S. 8875 and A. 11279, "A Proposed Code of Evidence for the State of New York", before Senate and Assembly Codes and Judiciary Committees, February 25, 1983.

Testimony before A.B.A. Commission on Women in the Profession, Philadelphia, February 6, 1988.

Testimony on the nomination of William Lucas to be Assistant Attorney General for Civil Rights, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., July 20, 1989.

Testimony on the nomination of Vaughn Walker to be United States District Judge for the Northern District of California, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., November 9, 1989.

**PUBLIC LECTURES** (partial list)

Tabor Lecture, Valparaiso University School of Law, April 12, 2007. This event consisted of two lectures. A public lecture was entitled "Here's the Gun: A Lawyer's Responsibility for Real Evidence." The Bench and Bar lecture, which will be published in the school's law review, is entitled "Virtual Clients: An Idea in Search of a Theory (With Limits)."

Paul M. Van Arsdell, Jr., Memorial Lecture, University of Illinois, College of Law, March 7, 2005: "Do Lawyers Share Moral Responsibility for Torture at Guantanamo and Abu Ghraib?"

Howard Lichtenstein Distinguished Professorship of Legal Ethics Lecture Series, "In Praise of Confidentiality (and Its Exceptions)," delivered at Hofstra University School of Law, November 12, 2003.

Henry J. Miller Distinguished Lecture, Georgia State University College of Law, May 11, 1988.  "Protecting Lawyers Who Just Say No."

First Annual South Carolina Bar Foundation Lecture, April 9, 1992, University of South Carolina Law School, Columbia, South Carolina.  "Is the Legal Profession Dead?  Yearning to Be Special in an Ordinary Age."

Philip B. Blank Memorial Forum on Attorney Ethics, Pace University

Stephen Gillers

School of Law, April 8, 1992.  "The Owl and the Fox: The Transformation of Legal Work in a Commodity Culture."

Speaker on Judicial Ethics, ABA Appellate Judges' Seminar and Flaschner Judicial Institute, September 29, 1993, Boston, Massachusetts.

**PUBLIC LECTURES** (continued)

Baker-McKenzie Ethics Lecture, Loyola University Chicago School of Law, October 13, 1993, Chicago, Illinois ("Bias Issues in Legal Ethics:  Two Unfinished Dramas").

The Sibley Lecture, University of Georgia School of Law, Athens, Georgia, November 10, 1993 ("Telling Stories in School: The Pedagogy of Legal Ethics").

Participant,  "Ethics in America" series (to be) broadcast on PBS 2007, produced by Columbia University Seminars on Media and Society.

Participant, "Ethics in America" series, broadcast on PBS February and March 1989, produced by Columbia University Seminars on Media and Society.

Participant, "The Constitution: That Delicate Balance, Part II" series, broadcast on PBS February and March 1992, produced by Columbia University Seminars on Media and Society.

Lecturer on legal ethics and allied subjects in the U.S., China, Vietnam, Hong Kong, Camboia, Singapore, Colombia, Guam, Ireland, France, and  at hundreds of seminars, CLE events, and conferences organized by private law firms, corporate law departments, the District of Columbia, Second, Fourth, Sixth, Ninth and Federal Circuit Judicial Conferences; American Bar Association; Federal Bar Council; New York State Judiciary; New York City Corporation Counsel; American Museum of Natural History; Practicing Law Institute; Law Journal Seminars; state, local and specialty bar associations (including in Oregon, Nebraska, Illinois, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, and Georgia); corporate law departments; law schools; and law firms.

**LEGAL AND PUBLIC SERVICE ACTIVITIES**

Member, ABA 20/20 Commission, 2009- 2013 (appointed by the ABA President to study the future of lawyer regulation).

Chair, American Bar Association Center for Professional Responsibility, Policy Implementation Committee, 2004-2008 (Member 2002-2010).

Stephen Gillers

Member, American Bar Association Commission on Multijurisdictional Practice, 2000-2002.

Consultant, Task Force on Lawyer Advertising of the New York State Bar Association (2005).

**LEGAL AND PUBLIC SERVICE ACTIVITIES** (cont.)

Retained by the New Jersey Supreme Court, in connection with the Court's review of the lawyer disciplinary system in New Jersey, to provide an "analysis of the strengths and weaknesses of California's 'centralized' disciplinary system" and to "report on the quality, efficiency, timeliness, and cost effectiveness of the California system...both on its own and compared with the system recommended for New Jersey by the Ethics Commission."  Report filed December 1993.  Oral presentation to the Court, March 1994.

Reporter, Appellate Judges Conference, Commission on Judicial participation in the American Bar Association, (October 1990-August 1991).

Member, David Dinkins Mayoral Transition Search Committee (Legal and Law Enforcement, 1989).

Member, Committee on the Profession, Association of the Bar of the City of New York (1989-1992)

Member, Executive Committee of Professional Responsibility Section, Association of American Law Schools (1985-1991).

Chair, 1989-90 (organized and moderated Section presentation at 1990 AALS Convention on proposals to change the ABA Code of Judicial Conduct).

Counsel, New York State Blue Ribbon Commission to Review Legislative Practices in Relation to Political Campaign Activities of Legislative Employees (1987-88).

Administrator, Independent Democratic Judicial Screening Panel, New York State Supreme Court (1981).

Member, Departmental Disciplinary Committee, First Judicial Department  (1980 - 1983).

Member, Committee on Professional and Judicial Ethics, Association of the Bar of the City of New York (1979 - 1982).

10

Stephen Gillers

**BAR MEMBERSHIPS**     STATE:

New York (1968)

FEDERAL:

United States Supreme Court (1972);
Second Circuit (1970);
Southern District of New York (1970);
Eastern District of New York (1970)

**LEGAL EDUCATION**     J.D. cum laude, NYU Law School, 1968
Order of the Coif (1968)
Dean's List (1966-68)
University Honors Scholar (1967-68)

**PRELEGAL
EDUCATION**     B.A. June 1964, City University of New York
(Brooklyn College)

**DATE OF BIRTH**     November 3, 1943

**OTHER ARTICLES**     (Selected Bibliography 1978-present)

1.     Carter and the Lawyers, The Nation, July 22-29, 1978.

2.     Standing Before the Bar, Bearing Gifts, New York Times, July 30, 1978.

3.     Judgeships on the Merits, The Nation, September 22, 1979.

4.     Entrapment, Where Is Thy Sting?, The Nation, February 23, 1980.

5.     Advice and Consent, New York Times, September 12, 1981.

6.     Lawyers' Silence: Wrong . . . , New York Times, February 14, 1983.

7.     The Warren Court - It Still Lives, The Nation, September 17, 1983.

8.     Burger's Warren Court, New York Times, September 25, 1983.

11

9. "I Will Never Forget His Face!", New York Times, April 21, 1984.

10. Warren Court's Landmarks Still Stand, Newsday, July 29, 1984.

11. Von Bulow, And Other Soap Operas, New York Times, May 5, 1985.

12. Statewide Study of Sanctions Needed for Lawyers' Misconduct, New York Law Journal, June 6, 1985.

13. Preventing Unethical Behavior - Something New in Model Rules, New York Law Journal, August 30, 1985.

14. Proposed Model Rules Superior to State's Code, New York Law Journal, October 21, 1985.

15. Five Ways Proposed to Improve Lawyer Discipline in New York, New York Law Journal, January 8, 1986.

16. Poor Man, Poor Lawyer, New York Times, February 28, 1986.

17. Proposals To Repair Cracks in Ethical Legal Behavior, New York Law Journal, April 17, 1986.

18. Unethical Conduct: How to Deter It Through Education, Bar Leader (May/June 1986).

19. The New Negotiation Ethics - Or Did Herb's Lawyer Do Wrong? New York Law Journal, June 2, 1986.

20. The Real Stakes in Tort Reform, The Nation, July 19-26, 1986.

21. Bernhardt Goetz: Vigilante Or Victim?, Toronto Star, September 10, 1986.

22. The Message That the Goetz Trial Will Send, Newsday, August 31, 1986.

23. Amending the Ethics Code - Solicitation, Pre-Paid Plans, Fees, New York Law Journal, November 10, 1986.

24. Amending the Ethics Code - Conflicts of Interest, Screening, New York Law Journal, November 12, 1986.

25. Amending the Ethics Code - Confidentiality and Other Matters, New York Law Journal, November 13, 1986.

26. No-Risk Arbs Meet Risk Justice, New York Times, November 23, 1986.

27. The Meese Lie, The Nation, February 21, 1987.

Stephen Gillers

28. Amending State Ethics Code - Conflicts of Interest Gone Awry, New York Law Journal, May 18, 1987.

29. "The Lawyers Said It Was Legal," New York Times, June 1, 1987.

30. Feminists vs. Civil Libertarians, New York Times, November 8, 1987.

31. Lessons for the Next Round in Picking a Justice, Newsday, November 11, 1987.

32. We've Winked For Too Long, National Law Journal, December 21, 1987 (judicial membership in exclusionary clubs).

33. No More Meeses, New York Times, May 1, 1988.

34. In Search of Roy Cohn, ABA Journal, June 1, 1988 (book review).

35. Do Brawley Lawyers Risk Serious Discipline?, New York Law Journal, June 22, 1988.

36. Have the Brawley Lawyers Broken the Law?, New York Times, July 2, 1988.

37. Report Demonstrates Why Meese is Unfit to Be Attorney General, Atlanta Journal and Constitution, July 24, 1988.

38. Ethical Questions for Prosecutors in Corporate-Crime Investigations, New York Law Journal, September 6, 1988.

39. Restoring Faith at Justice, National Law Journal, November 21, 1988.

40. Is Bush Repeating Rockefeller's Folly?, New York Times, September 11, 1989.

41. Standards Time, The Nation, January 29, 1990 (on the subject of legislative ethics).

42. Abused Children vs. The Bill of Rights, New York Times, August 3, 1990.

43. Words Into Deeds: Counselor, Can You Spare a Buck?, ABA Journal, November 1990.

44. Bad Apples, ABA Journal at 96 (March 1991) (book review).

45. The Gotti Lawyers and the Sixth Amendment, New York Law Journal, August 12, 1991.

46. Justice or Just Us?  The Door to Dan Quayle's Courthouse Only Swings One Way, ABA Journal (June 1992) at 109.

47. Fighting Words (What was once comical is now costly), ABA Journal (August 1992) at 102.

48. Sensitivity Training: A New Way to Sharpen Your Skills At Spotting Ethics Conflicts, ABA Journal (October 1992) at 107.

49.     Under Color of Law:  Second Circuit Expands Section 1983 Liability for Government Lawyers, ABA Journal (December 1992) at 121.

50.     Cleaning Up the S&L Mess: Courts Are Taking the Duty to Investigate Seriously, ABA Journal (February 1993) at 93.

51.     All Non-Refundable Fee Agreements Are Not Created Equal, New York Law Journal (February 3, 1993) at 1.  (Analyzing appellate decision prohibiting non-refundable fees.)

52.     The Packwood Case: The Senate Is Also on Trial, The Nation (March 29, 1993) at 404.

53.     Conflict of Laws: Real-World Rules for Interstate Regulation of Practice, ABA Journal (April 1993) at 111.

54.     Packwood II, The Nation (May 10, 1993) at 617.

55.     Generation Gap, ABA Journal (June 1993) at 101.  (On the use of a boycott in response to the Colorado anti-gay initiative.)

56.     Future Shocks, ABA Journal (August 1993) at 104.  (Looking back on the practice of law in the 21st century from the year 2103.)

57.     A Rule Without a Reason, ABA Journal (October 1993) at 118.  (Criticism of the prohibition in Rule 5.6(b) against a lawyer agreeing not to restrict future practice in connection with a settlement.)

58.     Too Old to Judge?, ABA Journal (December 1993) at 94.  (Supreme Court justices have life tenure.  Maybe they should not.)

59.     Truth or Consequences, ABA Journal (February 1994) at 103.  (Discovery obligations.)

60.     "Ethical Cannons," in Symposium - Twenty Years of Change, Litigation (Fall 1993).

61.     Stretched Beyond the Limit, Legal Times (March 21, 1994) at 37.  (Analysis of the office of Counsel to the President in light of Bernard Nussbaum's resignation.)  [Same article was reprinted in the Connecticut Law Tribune, the Fulton County (Atlanta) Daily Report, and the Recorder (San Francisco).]

62.     Putting Clients First, ABA Journal (April 1994) at 111. (Discussing cases on lawyers' fiduciary duty.)

63.     Grisham's Law, The Nation (April 18, 1994) at 509.  (The effect of popular culture on Whitewater reporting.)

64.     The Elsinore Appeal: "People v. Hamlet", New York Law Journal (October 11, 1994) at 3. (Brief for Appellee, State of Denmark).  (This was a mock appeal from Hamlet's conviction

for the murder of Claudius, Polonius, Ophelia, Laertes, Rosencrantz & Gildenstern, held at the Association of the Bar of the City of New York on October 11, 1994.)

65. Billing for Costs and Disbursements: What Law Firms Can Charge and Clients Can Expect, monograph published 1995 by Pitney Bowes Management Services.

66. Clinton Has A Right To Privacy, N.Y. Times, 12/21/95, at ____.

67. "'Filegate' Was Bad Enough.  Now This?," N.Y. Times, 7/5/96, at A23. (Article criticizing proposal to privatize certain security investigations of government personnel.)

68. "Whitewater: How to Build a Case Using a Tainted Witness,"  Los Angeles Times, 2/16/97, at M1.

69. "Hillary Clinton Loses Her Rights," New York Times, 5/4/97, at E15.

70. "Shakespeare on Trials," IV Federal Bar Council News 16 (June 1997).

71. "Florida Backs Out On a Deal," New York Times, 10/10/97, at A23.

72. "The Perjury Loophole," New York Times, 2/18/98, at A21 (discussion of perjury in connection with Kenneth Starr's investigation of President Clinton).

73. "Any Method to Ginsburg's Madness?" Los Angeles Times, 3/15/98, at M1 (discussion of William Ginsburg's public defense of Monica Lewinsky).

74. "Whitewater Made Easy," The Nation, 6/1/98, at 8.

75. "A Highly Strategic Legal Chess Game," Los Angeles Times, June 7, 1998,  at M1 (Starr-Clinton legal maneuvers).

76. "To Sleep . . . Perchance, to Dream," New York Law Journal, July 8, 1998, at 2.  (Humorous article about bored jurors.)

77. "Clinton Is No Ordinary Witness," New York Times, 7/28/98, at A15.

78. "The High Cost of an Ethical Bar," The American Lawyer, July/August 1998, at 87.

79. "Clinton's Choice: Tell Truth or Dare to Gamble," Los Angeles Times, August 2, 1998, at M1.

80.  "Accurate Lies: The Legal World of Oxymorons," Los Angeles Times, August 30, 1998, at M1.

81. "A Fool For a Client?" The American Lawyer, October 1998, at 74.  (President Clinton's legal representation in the Lewinsky representation.)

Stephen Gillers

82.    "The Presidency: Out to End Clinton's Mess and Be Happy," Los Angeles Times, October 4, 1998, at M1.

83.    "Protecting Their Own," The American Lawyer, November 1998, at 118.

84.    "Can't We All Just Practice Together: Taking Down 'Trade Barriers' on Lawyers Here and Abroad," Legal Times, November 9, 1998, at 32.

85.    "Beyond the Impeachment Spectacle," Los Angeles Times, November 22, 1998, at M1.

86.    "The Perjury Precedent," New York Times, December 28, 1998, at A27.

87.    "From the Same Set of Facts: A Tale of Two Stories," Los Angeles Times, January 17, 1999, at M1 (about the Clinton impeachment trial).

88.    "The Decline and Fall of Kenneth Starr," Los Angeles Times, February 7, 1999, at M1.

89.    "The Truth About Impeachment," The American Lawyer, March 1999, p. 131.

90.    "The Double Standard," New York Times Book Review, March 21, 1999, at 13 (review of *No Equal Justice* by David Cole).

91.    "Four Officers, One Likely Strategy," New York Times, Saturday, April 3, 1999, at A15.

92.    "The Man in the Middle: Did George Ventura Step Over the Ethical Line?" The American Lawyer, May 1999, p. 80 (discussion of lawyer whistleblowing in light of *State v. George Ventura*). (Reprinted as "Whistleblower, Esq." in New York Law Journal, May 26, 1999 at page 2.)

93.    "Your Client Is A Corporation – Are Its Affiliates Clients Too?"  The New York Professional Responsibility Report, May 1999 , at 1.

94.    "Job Talk (Scenes from the Academic Life)," The American Lawyer, July 1999, at 161. (Satire about law school hiring.)

95.    "The Other Y2K Crisis," The Nation, July 26/August 2, 1999, at 4 (editorial about the year 2000 electoral races).

96.    "Walking the Confidentiality Tightrope," ACCA Docket 20 (September/October 1999) (remarks at ACCA's national conference in 1998).

97.    "Things Old & New – The Code Amendments," New York Professional Responsibility Report (September 1999), at 1.

98.    "Clinton's Chance to Play the King," New York Times,  Sept. 20, 1999 at A17.

99.    "Overprivileged," American Lawyer, October 1999 at 37.  (Discussion of First Amendment

16

protection for journalists.)

100. "Controlling Conflicts Between Old and New Clients,"  New York Professional Responsibility Report, January 2000 at 3.

101. "How To Spank Bad Lawyers," American Lawyer, February 2000 at 41.

102. "A Weak Case, But a Brave Prosecution," New York Times, Wednesday, March 1, 2000 at A23 (the Diallo case).

103. "Conflicts of Interest in Malpractice Cases," New York Professional Responsibility Report, March 2000 at 1.

104. "The Court's Picayune Power," New York Times, Thursday, April 20, 2000 at A29.

105. "Some Misrepresentations Among Corporate Lawyers," New York Professional Responsibility Report, June 2000 at 1.

106. "Was Hubbell Case About Getting Justice or Getting Even?" Los Angeles Times, June 18, 2000 at M2 (comment on the U.S. Supreme Court's decision in *United States v. Hubbell*, decided June 5, 2000).

107. "Who Owns the Privilege After a Merger?" New York Professional Responsibility Report, July 2000 at 1.

108. "Fighting the Future," The American Lawyer, July 2000 at 55.

109. "Campus Visits Deconstructed," Newsweek: How To Get Into College, 2001 Edition at 46.

110. "The Court Should Boldly Take Charge," New York Times, Tuesday, November 21, 2000 at A25 (Florida's presidential election recount).

111. "Who Says the Election Has a Dec. 12 Deadline?"  New York Times, Saturday, December 2, 2000 at A19.

112. "Motive Is Everything in the Marc Rich Pardon," New York Times, Saturday, February 17, 2001.

113. "For Justice To Be Blind, Must Judges Be Mute?"  New York Times, Sunday, March 4, 2001 at Section 4, page 3.

114. "Should Supreme Court Justices Have Life Tenure?"  Reprinted in *The Supreme Court and Its Justices* (Choper J., ed.) (ABA 2001).

115. Professionalism Symposium, 52 South Carolina L. Rev. 55 (2001) (closing remarks).

116. "No Lawyers To Call," New York Times, Monday, December 3, 2001 at A19 (ethical and

Stephen Gillers

constitutional obligations that will prevent lawyers from participating in military tribunals).

117.  "Let Judicial Candidates Speak," New York Times, Thursday, March 28, 2002 at A31.

118.  "The Flaw in the Andersen Verdict," New York Times, Tuesday, June 18, 2002 at A23.

119.  "Why Judges Should Make Court Documents Public," New York Times, Saturday, November 30, 2002 at A17.

120.  "It's an MJP World," ABA Journal, December 2002 at 51.

121.  "Upholding the Law as Pretrial Publicity Goes Global," New York Times, Sunday, April 27, 2003,  Sec. 4 at 14.

122.  "Court-Sanctioned Secrets Can Kill," Los Angeles Times, Wednesday, May 14, 2003 (reprinted May 15, 2003 in Newsday).

123.  "Make a List," New York Times, June 11, 2003 at 31 (advocating changes in the methods of judicial selection).

124.  "Conflicted About Martha?" American Lawyer (September 2003) (analysis of Martha Stewart indictment).

125.  "The Prudent Jurist," Legal Affairs, January/February 2004.

126.  "On Knowing the Basic Rules of Advocacy," New York Times, February 8, 2004, Sec. 4 at 2 (cross-examination in the Martha Stewart trial).

127.  "The Prudent Jurist," Legal Affairs, March/April 2004.

128.  "Scalia's Flawed Judgment," The Nation, April 19, 2004 at 21.

129.  "Scholars, Hucksters, Copycats, Frauds," Washington Post, April 25, 2004 at B3  (Outlook) (discussion of ethics of academics who put their names on newspaper opinion pieces written by industry).

130.  "The Prudent Jurist," Legal Affairs, May/June 2004 at 17.

131.  "Multijurisdictional Practice of Law:  Merging Theory With Practice," 73 The Bar Examiner 28 (May 2004).

132.  "Tortured Reasoning," American Lawyer (July 2004) (analysis of government lawyer memos addressing the application of various treaties and laws to the treatment of Afghan prisoners).

133.  "Paying the Price of a Good Defense," New York Times, August 13, 2004.

Stephen Gillers

134.   "Improper Advances:  Talking Dream Jobs with the Judge Out of Court," Slate.com, August17, 2005 (with D. Luban and S. Lubet).

135.   "Roberts' Bad Decision," Los Angeles Times, September. 13, 2005 (with D. Luban and S. Lubet).

136.   "No Privilege for Miers," The Nation, November 7, 2005

137.   "Senators, Don't Rubber-Stamp," USA Today, January 5, 2006 at 13A (discussing the Senate's advise and consent responsibility in connection with Alito nomination).

138.   Ethics Column, American Lawyer, page 61 (January 2006) (with Deborah Rhode).

139.   Ethics Column, American Lawyer, page 63 (April 2006) (with Deborah Rhode).

140.   "Bush Postpones 2008 Election," The Nation, August 14/21, 2006 (satire).

141.   "Free the Ulysses Two: Joyce's First U.S. Publishers Were Convicted of Obscenity. It's Time to Clear Them." The Nation, February 19, 2007.

142.   "Twenty Years of Legal Ethics: Past, Present, and Future," 20 Georgetown J. Legal Ethics 321 (2007) (symposium celebrating the 20th anniversary of the journal).

143.   "The Torture Memos," The Nation, April 28, 2008.

144.   "Bar None," American Lawyer (October 2008) (globalization of law practice and how it will effect regulation of the bar).

145.   2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

146.   "Time to Adapt to a Different Marketplace," New York Law Journal, March 27, 2012.

147.   "The Supreme Court Needs a Code of Ethics," Politico (Aug. 8, 2013) (with Charles Geyh).

148.   "Albany is a Cesspool. Here's How to Clean It Up," The Nation (online), January 26, 2015, http://www.thenation.com/article/196025/albany-cesspool-heres-how-clean-it.

149.   "Cuomo Talks Tough on Ethics (Again) and Invites Us to Trust Him," The Nation (online), Feb. 3, 2015,  http://www.thenation.com/article/196881/cuomo-talks-tough-ethics-again-and-invites-us-trust-him

Exhibit B

**Ortega Melendres v. Arpaio**

**Statement of Facts Relevant to Motion for Recusal**

<u>**The History of this Litigation**</u>

1.      This class action litigation began with the filing of a First Amended Complaint in this action, on September 5, 2008.  The lawsuit alleged that Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO") were engaged in a pattern and practice of race discrimination in violation of the Fourteenth Amendment and illegal detentions in violation of the Fourth Amendment.  In summary, the Plaintiffs alleged that the MCSO unconstitutionally singled out Latinos for traffic stops and detained Latinos without a valid legal justification, because of Sheriff Arpaio's policies targeting suspected undocumented immigrants.

2.      This case was assigned to the current Court on July 22, 2009 [Doc. 144], after the previous district judge assigned to this case, the Honorable Mary H. Murguia, recused herself based on a potential appearance of bias, on Defendants' motion [Doc. 138].  Since then, in the six years that this Court has presided over this litigation, it reviewed both parties' motions for summary judgment and the voluminous supporting documentation, and on December 23, 2011 issued an order granting Plaintiffs' motion for class certification, partially granting both parties' motions and granting a preliminary injunction.  [Doc. 494].

3.      The Court presided over a seven-day bench trial that began on July 19, 2012 and ended on August 2, 2012.

4.      On May 24, 2013, the Court issued a 142-page order with Findings of Fact and Conclusions of Law and a permanent injunction based on findings that the Defendants had violated the Fourth and Fourteenth Amendment rights of the Plaintiff class.  [Doc. 579].  The Court also specifically found a violation of the December 23,

2011 preliminary injunction in that class members continued to be detained on the basis solely of knowledge or suspicion of unlawful presence in the United States.

5.      On October 2, 2013, the Court issued a detailed Supplemental Permanent Injunction.  [Doc. 606].  Prior to that ruling, the Defendants had consented to the great majority of the remedies in the Supplemental Permanent Injunction.  *See* Parties' Joint Report Regarding Status of Consent Decree Negotiations [Doc. 592, 592-1 (color-coded remedies proposal indicating areas of agreement and provisions separately proposed by only one party)].

6.      The Court of Appeals affirmed this Court's preliminary injunction order and the trial ruling.  *Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The Court of Appeals also affirmed the Supplemental Permanent Injunction with the sole exception that it found one provision which permitted the Court-appointed Monitor the authority to consider "disciplinary outcomes for *any* violations of departmental policy," not to be narrowly tailored to addressing the constitutional violations found after trial– and remanded to the district court for further tailoring.  *Ortega Melendres v. Arpaio*, Nos. 13-16285, 13-17238, 2015 WL 1654550, at *10 (9th Cir. Apr. 15, 2015).  All of the Court's substantive rulings were based upon voluminous evidence and careful application of the law, and Defendants do not now contend otherwise.

**Defendants' History of Post-Judgment Non-Compliance Leading to Contempt Proceedings**

7.      During the period between the Court's issuance of the Supplemental Permanent Injunction on October 2, 2013, and the beginning of the contempt hearing on April 21, 2015, the Court saw evidence that Defendants and top commanders of the MCSO, including Sheriff Arpaio and Chief Deputy Sheridan, had repeatedly violated numerous court orders and made repeated statements that mischaracterized and disparaged the Court's orders to MSCO personnel.  The history of those statements is set

forth in Plaintiffs' Memorandum of Law and Facts re Contempt Proceedings and Request for Order to Show Cause at 12-16 [Doc. 843].  *See also* Tr. of Status Conference (Oct. 28, 2014) at 68:25-72:20.  Among other things, on August 6, 2013, Sheriff Arpaio stated in a letter to supporters that he "won't stand for" a Court-appointed monitor.  [Doc. 843 at 15].  And during the contempt hearing, Plaintiffs introduced a video recording of a press interview in October 2013 in which the Sheriff proclaimed, "I'm an elected constitutional sheriff, and no one is going to take away my authority that I have under the Constitution."  Ex. 193C and Tr. of Apr. 23, 2015 Hr'g at 578:25-579:8 and 581:25-582:17.

8.      In late April and early May 2014, a former MCSO deputy, Charley Armendariz, who had been a key witness during the 2012 trial, was arrested and subsequently committed suicide.  MCSO searched Armendariz's home pursuant to a criminal warrant.  The results of that search ultimately revealed, among other things, that there was a widespread practice among MCSO personnel of recording traffic stops, that MCSO had no policy governing the recording of traffic stops, and that such recordings should have been disclosed to Plaintiffs before trial, but were not.  Tr. of Dec. 4, 2014 Hr'g at 22:15-22:25.

9.      Plaintiffs expressed the view that the recordings, and other evidence of Deputy Armendariz's misconduct found in the search of his home, were material to issues in the case, including the adequacy of MCSO's supervision, discipline, civilian complaint, and internal investigations procedures.  Tr. of Dec. 4, 2014 Hr'g at 23:1-24:21 [Doc. 812].  The failure to disclose the recordings before trial is one of three charged grounds for civil contempt.  Order to Show Cause at 18 [Doc. 880].

10.     The second ground for contempt arose on May 14, 2014.  During a status conference on that date, the Court ordered Sheriff Arpaio and Chief Deputy Sheridan to cooperate with the Monitor in formulating a plan to "quietly" collect the recordings of

3

traffic stops throughout MCSO.  Order to Show Cause at 22 [Doc. 880]; Tr. of May 14, 2014 Status Conference at 25-27 [Doc. 700].  The movants violated that court order that same day, by putting into action a plan without the Monitor's approval, and then agreeing to a different plan after consultation with the monitor, while failing to disclose that the initial, unapproved plan had already been implemented.  Order to Show Cause at 23 [Doc. 880].

11.     The evidence developed during the contempt hearing on April 21-24, 2015 demonstrated that Chief Deputy Sheridan was not truthful and entirely forthcoming with the Monitor about the events of May 14, 2014.  Tr. of Apr. 24, 2015 Hr'g at 840:10-841:15; 846:22-848:5; 850:6-11; 851:22-25; 853:20-859:19; 861:4-11; 868:19-869:6.

12.     On September 20, 2014, the Court-appointed Monitor wrote a memorandum to the Court containing an assessment of MCSO's investigations following Deputy Armendariz's arrest and death.  [Doc. 795-1 (redacted version filed Nov. 20, 2014)].  The Monitor reported numerous serious deficiencies with the MCSO's internal investigation of Armendariz and other MCSO personnel and that MCSO had not been responsive to various requests of the Monitor.

13.     On October 21, 2014, Plaintiffs filed a Response to the Monitor's Report [Doc. 753] seeking remedies for the Defendants' pretrial discovery violations and new injunctive relief based upon the information disclosed in the aftermath of Armendariz's arrest and death.  Among other issues, Plaintiffs noted the clear deficiencies in MSCO's discipline and internal investigations processes and provided notice that they would seek new injunctive relief to address those deficiencies.  [Doc. 753 at 7-10].

14.     During a status conference on October 28, 2014, the parties and the Court addressed the Monitor's report on MCSO's internal investigations that had been triggered by the Armendariz incident.  During that status conference, Plaintiffs first raised the subject of contempt.  Tr. of Oct. 28, 2014 Status Conf. at 72:15-20.  The October 28,

4

2014 status conference also addressed, among other things, another defiant statement by Sheriff Arpaio to a reporter to the effect that, notwithstanding the fact that he did not contest its unconstitutionality, he would conduct the Guadalupe operation "all over again." *Id.* at 61:9-77:5; Tr of Apr. 23, 2015 Hr'g at 583:20-584:6.

15.     The third ground for contempt came to light for Plaintiffs during the November 20, 2014 status conference when then-counsel for the Defendants, Thomas Liddy, disclosed to the Court and to Plaintiffs that one of the traffic stop recordings recovered by the MCSO during the Armendariz and related investigations demonstrated that deputies had violated the Court's preliminary injunction order.  Mr. Liddy also revealed that the Court's preliminary injunction order had never been communicated to MCSO deputies.  Tr. of Nov. 20, 2014 Status Conf. at 67:10-67:24 [Doc. 804].

16.     Plaintiffs filed a Request for Order To Show Cause on January 8, 2015, requesting that the Court initiate civil contempt proceedings.  [Doc. 843].

17.     Defendants and the movants individually filed briefs denying liability for contempt.  [Doc. 860].

18.     By order dated February 12, 2015, the Court granted Plaintiffs' request, issued the order to show cause and set an evidentiary hearing for April 21-24, 2015. [Doc. 880].

**Defendants' "Settlement" Offers and Motion to Vacate the Contempt Hearing**

19.     On March 17, 2015, Defendants and Chief Deputy Sheridan filed an Expedited Motion to Vacate Hearing and Request for Entry of Judgment, admitting liability for civil contempt on the three grounds charged in the Order to Show Cause and providing a list of proposed remedies for their contempt.  [Doc. 948].  Despite the admission of liability, the Motion to Vacate Hearing did not describe how the violations of the Court's orders had occurred, and the Defendants' statements, in the motion and in court, attempted to portray the violations as mere mistakes.

5

20.     On March 19, 2015, Plaintiffs filed a response to that motion, opposing the request to vacate the contempt hearing on the grounds that Defendants had not yet provided full discovery on why and how they violated the Court's orders, and that material issues of fact that were crucial for determining the proper remedies for the contempt remained unresolved.[1]  [Doc. 952 at 3].

21.     On March 20, 2015, the Court denied the Defendants' motion to vacate the contempt hearing on the grounds asserted by Plaintiffs.  Tr. of Mar. 20, 2015 Status Conf. at 8:14-17.

22.     On April 10, 2015, Defendants filed another motion to vacate the contempt hearing that was substantively identical to the first.  [Doc. 1003].

23.     The Court also denied that motion.  [Doc. 1007].

**The Role of the United States Attorney's Office**

24.     During the November 20, 2014 status conference, the Court stated that it was researching the distinction between civil and criminal contempt and indicated that if at the end of a civil contempt proceeding, the Court were to determine that it could not find appropriate civil remedies, it intended to make a referral to the United States Attorney's Office for criminal contempt proceedings.  Tr. of Nov. 20, 2014 Status Conf. at 39:19-23 [Doc. 804]

---

[1] Plaintiffs stated during the status conference on February 25, 2015 that they had engaged in an initial exchange of ideas about settlement (which the parties agreed would be confidential under Federal Rule of Evidence 408), but that more conferring would be required before Plaintiffs would proceed with mediated settlement discussions.  Tr. of Feb. 25, 2015 Status Conf. at 38:7-11, 41:20-42:24.  Plaintiffs later opposed Defendants' Motion to Vacate because Plaintiffs had not had an opportunity to take discovery relevant to the adequacy of remedies.

25.     At its next conference with the parties, on December 4, 2014, the Court
indicated that it had invited a representative from the United States Attorney's Office to
be present "because if we proceed with the civil contempt proceedings there are, at least
to some extent, possible criminal ramifications to those proceedings, and I want . . . to . . .
keep [the United States Attorney's Office] apprised."  Tr. of Dec. 4, 2014 at 29:5-9.  The
Court stated that if, in the future, it decided to refer Sheriff Arpaio or others for criminal
contempt proceedings, either the federal government or an appointed special prosecutor
would have to prosecute such a criminal contempt proceeding, pursuant to Federal Rule
of Criminal Procedure 42.  The Court stated that it had given notice to the United States
Attorney's Office and invited a representative to be present in order to ensure that the
office would have "an opportunity to evaluate whether this is something you feel
comfortable handling if it comes your way, and whether or not you wish to pursue it or
whether or not you wish to tell me that if I'm going to pursue it, I need to find somebody
else to pursue it."  *Id.* at 29:24-30:3.  The Court indicated it would provide information to
the United States Attorney's Office under seal and gave the parties an opportunity to
object to that procedure.  Defendants affirmatively stated that they had no objection.  *Id*.
at 30:4-14.

26.     The Court stated that it had not reached any conclusion as to whether it
would make a criminal referral but noted that the Sheriff had retained specially appearing
counsel to defend against any such criminal proceeding.  *Id*. at 24:22-25:2.

27.     On January 30, 2015, the Defendants filed a Request for Rule 16 Settlement
Conference and proposed "structured settlement discussions among the parties and with
the Court." [Doc. 867 at 2].

28.     During a status conference on February 26, 2015, the Defendants brought
up the subject of settlement discussions and indicated that the parties had met and
conferred.  Tr. of Feb. 25, 2015 Status Conf. at 32:23-34:1.  In response, the Court stated

7

that if the parties sought a global resolution of all contempt issues, it would be "wise" to confer with the United States Attorney's Office.  *Id*. at 34:2-6.  Defendants stated that they had already conferred with the United States Attorney's Office, and that they were attempting to work out the "mechanics" of that settlement process, and that Defendants were seeking a global settlement of civil and criminal contempt issues.  *Id*. at 34:8-17.

29.     Ms. Strange of the United States Attorney's Office was present and indicated that there might be policy impediments to the federal government's participation in any court-mediated settlement discussion as Defendants were seeking. *Id.* at 35:7-16.

30.     On March 10, 2015, the United States Attorney's Office filed a Notice Regarding Participation in Settlement Negotiations.  [Doc. 924].  The United States Attorney's Office indicated that because no criminal contempt referral had been made, it would decline to participate in any settlement discussions.

31.     During a status conference on March 20, 2015, Assistant United States Attorney Lynette Kimmins stated that the United States has an interest in ensuring enforcement of court orders, and that the United States Attorney's Office "has not declined a request or referral of an appointment as a prosecutor for the potential criminal contempt proceeding, should that referral be made."  Tr. of Mar. 20, 2015 Status Conf. at 28:2-6.

**The Scope of the Evidentiary Hearing**

32.     Prior to the April 21-24, 2015 evidentiary hearing, the Court indicated that it would not limit the scope of the evidence to the three grounds for civil contempt, but would take evidence on the remedies needed to ensure compliance with the Court's prior orders.  See Tr. of Mar. 20, 2015 Status Conf. at 11:6-12, 12:21-25, 13:1-21; [Doc. 880 at 25]; [Doc. 1007].  In particular, at the outset of the evidentiary hearing, the Court stated that "[t]he adequacy of the MCSO's self-investigation still remains very much an item of

possible relevance in this hearing as it pertains to relief that I might grant to plaintiffs." Tr. of Apr. 21, 2015 Hr'g at 15:19-22.

**Questioning About Defendants' Investigations Implicating the Court**

33.     Consistent with its practice throughout the contempt hearing and at the bench trial of this matter in July and August 2012, after the parties had completed their examinations, the Court questioned witnesses and gave the parties an opportunity to re-examine witnesses after its examination.

34.     On April 23, 2015, the Court conducted an examination of Sheriff Arpaio, beginning with the grounds for civil contempt.  The Court also questioned the Sheriff about the re-assignment of Captain Steven Bailey from the command of the Special Investigations Division, with oversight of its subunit the Human Smuggling Unit (which had been primarily responsible for the constitutional violations found after trial), to the command of the Internal Affairs unit.  Tr. of Apr. 23, 2015 Hr'g at 637:2-642:22.  This reassignment of Captain Bailey occurred during a time when the Human Smuggling Unit was under investigation by the Internal Affairs department because of misconduct uncovered after Deputy Armendariz's arrest and death, and the apparent conflict was an issue in the litigation leading up to the contempt hearing.

35.     The Court then questioned Sheriff Arpaio about an article that had appeared in the *Phoenix New Times* newspaper on June 4, 2014, reporting that two MCSO detectives, Brian Mackiewicz and Travis Anglin, a member of the MCSO's civilian "Cold Case Posse," Mike Zullo, and a paid confidential informant named Dennis Montgomery, were engaged in an investigation of a "bizarre conspiracy theory" that the Court and the U.S. Department of Justice were conspiring to "get" Sheriff Arpaio.  [Ex. 522].  Arpaio testified that the article's statement that the Court was under investigation was not true.  Tr. of Apr. 23, 2015 Hr'g at 647:4-7.  As set forth below, that testimony was later contradicted by other evidence.

36.     The Court questioned the Sheriff about the source of funding for the investigation.[2] *Id.* at 658:4-659:1.

37.     During the course of the Court's questioning of Sheriff Arpaio on the subject of the investigation reported in the *Phoenix New Times* article, the Sheriff brought up a second investigation involving the Court.  The Sheriff testified that an outside investigator hired by Defendants' then-counsel, Tim Casey, had investigated an allegation that the Court's wife had stated to a woman named Karen Grissom that "Judge Snow wanted to do everything to make sure I'm not elected."  Tr. of Apr. 23, 2015 Hr'g at 654:6-655:12.

38.     The next day, on April 24, 2015, Defendants' counsel, Ms. Iafrate, examined Chief Deputy Sheridan about the investigations implicating the Court and the Court's wife.  After asking Ms. Iafrate if she had any objection and emphasizing that she should interrupt with any objection, Tr. of Apr. 24, 2015 Hr'g at 966:4-11, the Court joined in questioning of Chief Deputy Sheridan on the subject of Karen Grissom's allegations about the Court's wife.

39.     In response to the Court's questions, Sheridan testified that Tim Casey had hired a private investigator who had interviewed Karen Grissom and her family, and that

---

[2] The record demonstrates that when Sheriff Arpaio resumed the witness stand after a lunch break, the Court stated that it "was told over lunch" that the Cold Case Posse (which had been involved in the Dennis Montgomery investigation) "has its own funds" and asked Sheriff Arpaio whether that was "possible."  There is no indication in the transcript about how the Court obtained the information or whether it had sought the information, and defense counsel did not inquire in its re-direct examination.  As the parties know, the Court does have communications with its Monitor and the Monitor's staff.  The Sheriff initially responded that he was not sure whether the source of funding was seized "RICO" funds or general funds.  *Id.* at 658:25-12.  Upon further questioning by the Court, the Sheriff then testified that the Cold Case Posse is an independent § 501(c)(3) organization and raises its own funds.  *Id.* at 658:13-18.

MCSO did not do anything to follow up on the investigation.  *Id.* at 968:5-9.  The Court then proceeded to question Chief Deputy Sheridan about the grounds for contempt, MCSO's internal affairs operations, and other matters, and finally asked Chief Deputy Sheridan about the MCSO-Montgomery investigation.

40.     The Court also questioned Chief Deputy Sheridan about documents produced by MCSO that indicated that Captain Bailey, contemporaneously with his reassignment from the Special Investigation Division to the Internal Affairs unit, had directed or approved the destruction of evidence that the Human Smuggling Unit appeared to have illegally seized from members of the Plaintiff class, and that Defendants had improperly withheld from Plaintiffs, before trial.  Tr. of Apr. 24, 2015 Hr'g at 981:13-985:24.

41.     Chief Deputy Sheridan testified and stated publicly that MCSO ultimately decided not to pursue the investigation of the Grissom allegations relating to the Court's spouse.  Tr. of Apr. 24, 2015 at 968:5-9; Tr. of May 14, 2015 at 10:1-24.

42.     Both Arpaio and Sheridan testified that they concluded that confidential informant Dennis Montgomery was not credible.  Tr. of Apr. 23, 2015 Hr'g at 650:18-25, Tr. of Apr. 24, 2015 Hr'g at 961:1-11, 1002:14-15.  Arpaio, however, testified that he did not know whether the Montgomery investigation was still ongoing.[3]  Tr. of Apr. 23, 2015 Hr'g at 652:5-6.

43.     During his questioning of Arpaio, the Court directed the Sheriff to preserve all documents relating to both of these investigations.  Tr. of Apr. 23, 2015 Hr'g at 653:9-

---

[3] Documents produced by the Defendants (and to be filed under seal with Plaintiffs' response) indicate that in fact the MCSO-Montgomery investigation continued at least up until the eve of the contempt hearing.

654:2, 655:13-17, 656:3-6, 656:25-2.  He directed that copies of the documents be produced and instructed defense counsel to review the material for attorney-client privilege, work product, and confidential information.  Tr. of May 8, 2015 Status Conf. at 30:1-4.  The Court also sua sponte raised a potential security issue about the existence of documents that Dennis Montgomery purportedly had obtained from the U.S. Central Intelligence Agency, and proposed that the Monitor and Defendants review such documents for security issues prior to disclosure to the Plaintiffs, and that defense counsel communicate the existence of such documents to the CIA.  Both Plaintiffs' and Defendants' counsel agreed to that proposal.  Tr. of May 8, 2015 Status Conf. at 30:25-31:15.

44.     At the close of the four days of evidence, the Plaintiffs had not completed their case-in-chief.  Prior to the evidentiary hearing, on April 7, 2015, the Court had anticipated that four days of testimony might be insufficient and tentatively set additional dates for a continuation of the evidentiary hearing in June 2015.  Tr. of April 7, 2015 Status Conf. at 32:13-23.

**Post-Hearing Proceedings**

45.     During a status conference on May 14, 2015, the Court addressed the subject of the MCSO-Montgomery investigation, noting that documents produced by MCSO indicated that the investigators attempted to construct an alleged conspiracy that supposedly involved the Court, a former law clerk to the Court, the Attorney General of the United States, the Assistant Attorney General in charge of the Criminal Division of the U.S. Department of Justice, the former mayor of Phoenix, and the former executive chief of the MCSO.  Tr. of May 14, 2015 Status Conf. at 44:7-21.  The Court further noted that the documents indicated that Dennis Montgomery purported to use a database of information "harvested by the U.S. Central Intelligence Agency and confiscated by him" in his investigation, and also purported to be tracking telephone calls between the

12

Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona. *Id.* at 44:22-45:2, 45:10-16.

46.     The Court also noted that the documents from the MCSO-Montgomery investigation appear to allege that the Court was in contact with the Department of Justice about this litigation, that the random selection process of the Court was subverted so that the case would be reassigned to this Court after the recusal of Judge Murguia, and that the Court ordered the tapping of MCSO's phones. *Id.* at 45:10-46:2.

47.     The Court noted that Sheriff Arpaio and Chief Deputy Sheridan had acknowledged that the Montgomery materials were not credible. Tr. of May 14, 2015 Status Conf. at 46:7-14. The Court also alluded to the fact that the documents contradicted witness testimony—an apparent reference to Sheriff Arpaio's testimony that the MCSO-Montgomery investigation did not implicate the Court's partiality. Tr. of May 14, 2015 Status Conf. at 46:23-24. The Court then pointed out that the Monitor's last report had found that MCSO was only 29 percent in compliance with the Supplemental Injunction despite the passage of one-and-a-half years (*id*. at 47:8-11), and that during the compliance period, the Defendants and that MCSO had apparently diverted resources away from compliance with the Court's orders and toward investigations designed to discredit the Court (*id*. at 46:23-7).

48.     The Court also explained why the MCSO-Montgomery investigation is relevant to the pending contempt proceeding. First, the Court noted that the MCSO-Montgomery investigation was also linked to contempt issues through the participation of Captain Steve Bailey, who was reassigned from the Special Investigations Division, where he was responsible both for the Human Smuggling Unit and for oversight of confidential informants, to the command of the internal affairs unit. *Id.* at 48:4-49:7. The Court then stated:

> This evidence may thus tend to demonstrate that the MCSO attempted to keep all matters pertaining to this case, its speculative investigations into this Court, and to the investigations triggered by the unfortunate death of Deputy Armendariz, in the hands of a relative few people who may not have been working to implement this Court's order in good faith.  Further, it may tend to demonstrate that contemptuous actions that have been noticed by this Court in its order to show cause … were part of a pattern of knowing defiance rather than mere inadvertence.  This may affect necessary remedies for members of the plaintiff class in civil contempt. It is for these reasons that the Seattle [*i.e.*, MCSO-Montgomery] operations materials may be relevant to this action.

*Id.* at 49:8-21.

49.     The Court then proposed that the Monitor be authorized to investigate MCSO's "investigative operations."  After Defendants objected on the ground that they wanted advance notice of the topics of any investigations by the Monitor, the Court stated that it would not require the Monitor to give advance notice of topics of interviews, but that Defendants could contemporaneously raise any objections during any interviews and that the Court would make itself available to hear such objections.  The Court further stated that the Monitor's investigations would be limited to the enforcement of the Court's prior orders.  Tr. of May 14, 2015 Status Conf. at 53:12-56:25.

**The MCSO-Montgomery Documents**

50.     The MCSO-Montgomery documents indicate that Dennis Montgomery believed that MCSO personnel were responsible for leaking information about the MCSO-Montgomery investigation to *Phoenix New Times* reporter Stephen Lemons.  The documents also reveal that, contrary to the testimony of Sheriff Arpaio and Chief Deputy Sheridan, MCSO personnel specifically directed Dennis Montgomery to produce information about the Court.  Further, the documents indicate that by November 2014, MCSO personnel had concluded that Dennis Montgomery's information was completely false.  The documents indicate that notwithstanding MCSO's conclusion that Montgomery was not credible, the MCSO-Montgomery investigation continued at least through the time of the contempt hearing on April 21-24, 2015 and that MCSO was still

14

attempting to obtain results from that investigation.  (These documents were produced to Plaintiffs on an attorneys'-eyes-only basis and will be submitted under seal.)

## The Court's Brother-in-Law

51.     In 2012, prior to the trial in this matter, the Court set a status conference so that the parties could be heard on the possible basis for recusal based on the fact that his brother-in-law, Keith Teel, was a partner in the Washington, D.C. office of Covington & Burling, and that firm's representation of the Plaintiffs in this case.  [Doc. 537]  At the June 29, 2012 status conference, the Court offered to recuse upon the request of any party and indeed offered to vacate all of its orders entered after the appearance of the Covington & Burling firm in this litigation, including the preliminary injunction order of December 23, 2011.  Tr. of June 29, 2012 Status Conf. at 5:19-7:2.

52.     Defendants affirmatively urged the Court not to recuse, stating that "the Court's impartiality in this case cannot be reasonably questioned by the defendants … [or] any reasonable and fair-minded person," that "recusal is neither warranted nor desirable" and indeed stating the Defendants' position that it would be "unfairly prejudicial" to them if the Court's prior orders were vacated.  *Id.* at 16:6-2.

53.     After the status conference, Defendants filed a written waiver of "all appeal issues regarding only the Court's potential bias, impartiality, and/or conflict of interest as set forth in the Court's Order dated June 19, 2012 (Dkt#537)."  [Doc. 541].

54.     After hearing from the parties, the Court did not merely rely upon the parties' joint request that the Court not recuse, but issued a detailed opinion applying the recusal standards in 28 U.S.C. § 455.  [Doc. 542].