# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Action No. 07-2513-PHX-GMS
Judge G. Murray Snow

Manuel de Jesus Ortega Melendres, et al.,

    Plaintiffs,

v.

Joseph M. Arpaio, et al.,
Defendants.

CV 07-2513-PHX-GMS

The Hon. G. Murray Snow,
*Judge Presiding*.

**SUPPLEMENTAL DECLARATION OF RONALD D. ROTUNDA**

I, RONALD D. ROTUNDA, declare as follows:

## I.  INTRODUCTION

**1.** My name is Ronald D. Rotunda. I am currently the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law in Orange, California, where I teach courses in Legal Ethics and Constitutional Law.

**2.** This Declaration supplements my earlier Declaration of on 6 May 2015.

## II.  OPINION AND ANALYSIS

**3.** For all the papers filed in this case and the related cases, one thing is very clear. Several witnesses heard Judge Snow's wife say, in substance, that her husband (Judge Snow)

wanted to do whatever he could to make sure that Sheriff Arpaio is not reelected. The witnesses may not recall or agree on the exact language that Judge Snow's wife used, but they do agree on the substance and import of the statement.

4. Judge Snow has never denied making such a statement under oath. In fact, he has never denied it at all.

5. Judge Snow's wife has never denied making that statement or the substance of that statement under oath. In fact, she has never denied making it at all.

6. Professor Gillers, in his Declaration of June 12, 2015 ("Gillers Declaration"), responds that this evidence is "would not be admissible in evidence." Gillers Declaration, ¶ 14.[1] Assuming that this is true, it misses the point. At Judge Snow's future disqualification hearing, Judge Snow, unless he disqualifies himself, will, under oath, testify whether he said, in substance, that he would do whatever he could to assure that Sheriff Arpaio is not reelected. Similarly, Judge Snow's wife will testify as to whether

   a. she was lying when she told witnesses that her husband would do what he could to make sure that Sheriff Arpaio is not reelected, or

   b. whether the other witnesses were all lying when they state that they heard her reassure others that her husband would do what he could to make sure that Sheriff Arpaio is not reelected.

7. Judge Snow should not be presiding at that disqualification hearing because (1) his wife will be a witness, and (2) he will be a witness. That is why he must recuse himself from

---

[1] Let us leave aside the fact that Professor Gillers is now apparently testifying as an expert on an issue of law, the admissibility of a statement on the law of evidence rather than on an issue dealing with judicial disqualification.

this case and why he certainly should recuse himself from the hearing on his disqualification.

8. Professor Gillers also states, "Nor would Mrs. Snow's impressions [*i.e.*, her statement of what she heard Mrs. Snow say] be admissible in evidence even if we assume that she said what Mrs.Grissom said she said." Gillers Dec. ¶14. This is mindboggling.

   a. Assume, as part of a thought experiment, that the Judge's wife told others that the Judge said, in substance, that her husband (Judge Snow) wanted to do whatever he could to make sure that Mr. Melendres, the plaintiff, would lose his job. Would anyone be surprised if plaintiff moved to disqualify Judge Snow?

   b. Assume another judge makes statements, off the bench, to a reporter indicating that he is prejudiced against a party or a race. Those statements (like the statement that Mrs. Snow made in the restaurant) are not made in a courtroom and not subject to cross examination (unless the court holds a hearing). Yet, Florida removed that judge as chief judge for such statements made out of court, even though they did not refer to any particular case but only about the "area covered by his court."[2]

9. Professor Gillers defends Judge Snow for conducting his own investigation of an incident. As Professor Gillers says, "What appears to have happened is that someone told Judge Snow that the Cold Case Posse had its own funding." Gillers Dec. ¶ 15. Professor Gillers' response is that Judge Snow complied with the Canon 3(A)(4) of the Code of Conduct for United States Judges.

---

[2] See, Gillers, Regulation of Lawyers: Problems of Law and Ethics ("Statements off the Bench") 625 (8th ed. 20009).

    **a.** Unfortunately, Professor Gillers, in quoting that Canon, does not quote the most important part. Here is the relevant part, with the sentence *in italics,* that Professor Gillers does not quote:

> "*Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.* If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested."[3]

    **b.** Professor Gillers argues the Judge Snow complied with Canon 3(A)(4). Judge Snow did not follow Canon 3(A)(4), which instructs federal judges not to "permit or consider ex parte communications," but Judge Snow did permit and consider ex parte communications.

    **c.** When Judge Snow disclosed to the parties that he was collecting information ex parte that did not cure his earlier violation of Canon 3(A)(4). As Professor

---

[3] http://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges#d (emphasis added). The complete Canon 3(A)(4) states:

> "(4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:
>
>     (a) initiate, permit, or consider ex parte communications as authorized by law;
>
>     (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;
>
>     (c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or
>
>     (d) with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters."

Gillers acknowledges, "What appears to have happened is that someone told Judge Snow that the Cold Case Posse had its own funding." Gillers Dec. ¶ 15.

    **d.** The fact that Judge Snow does not tell us who told him about any alleged funding, how he got the information is another reason why he should disqualify himself. Judge Snow is gathering evidence someplace and that place is not in open court, because no one knew (or, at least, the defendants did not know[4]) about this until Snow told us. What else did Judge Snow learn from this mysterious source, how did Snow and the source meet, why did Judge Snow permit this person to talk about this case at all?

**10.** Professor Gillers and the plaintiffs repeatedly claim that the defendants have "waived" any argument regarding the judge's disqualification. Professor Gillers uses the word "waived" or "waiver" a half-dozen time in his Declaration.

    **a.** Oddly enough, neither the plaintiffs nor Professor Gillers (who is certainly familiar with and cites the "Code of Conduct for United States Judges," Gillers Dec. ¶ 15) ever cite the portion of Code of Conduct for United States Judges dealing with waiver.

    **b.** Canon 3(D) of the Code of Conduct for United States Judges provides the procedure for waiver of *judicial disqualification:*

> (D) *Remittal of Disqualification*. Instead of withdrawing from the proceeding, a judge disqualified by Canon 3C(1) may, except in the circumstances specifically set out in subsections (a) through (e), disclose on the record the basis of disqualification. The judge may participate in the proceeding if, after that disclosure, the parties and their lawyers have an opportunity to confer outside the presence of the judge, all agree in writing or on the record that the

---

[4] Even if one of the plaintiffs or one of the plaintiffs' lawyers told Judge Snow, but that still is a violation of Canon 3A(4).

      judge should not be disqualified, and the judge is then willing to participate. The agreement should be incorporated in the record of the proceeding.

  **c.** Judge Snow did not follow the procedure for waiver. First, the judge must disclose on the record the basis for disqualification (what he is asking the parties to waive). Second, "the *parties* and their lawyers have an opportunity to confer outside the presence of the judge." The lawyer's statement that the client waives a conflict is not sufficient. The lawyers must secure their clients' consent by meeting with them outside the presence of the judge. If both parties agree, and that agreement is reduced to writing or the agreement is put on the record there is a valid waiver. If one party does not agree, there is no valid waiver. More significantly, the judge will not know which party refused to waive.

  **d.** The purpose of this meticulous procedure is (1) to prevent the lawyers from waiving without discussing the matters with their client, (2) to prevent the judge from subtly pressuring the lawyers and parties and, (3) to prevent the judge from ever learning which party did not waive.

> "The purpose of imposing the writing requirement on both the lawyers *and* the parties 'independently of the judge's participation' is to prevent the judge from cajoling the parties and their lawyers to waive important rights. It is also to make sure that lawyers consult their clients outside of the judge's presence. Some lawyers may be sycophants, falling over themselves in an effort to please the judge, and thus too willing to waive their clients' rights. ***Judges should not be able to pressure a waiver of disqualification by figuratively cloaking the judge's iron fist in a velvet glove.*** The writing procedure minimizes the chance that a party or lawyer will feel coerced into an agreement." Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility § 10.2-2.11 (ABA-Westlaw/Reuters 2013-2014 ed.) (Italics in original)(Bold added).

    **e.** The fact that Judge Snow did not follow the procedures in Canon 3(D) of the Code of Conduct for United States Judges is another reason why Judge Snow should disqualify himself. He should not benefit from securing a waiver that he obtained in violation of Canon 3(D) of the Code of Conduct for United States Judges.

11. The defendants make much of the statement in *Liteky v. United States*, 510 U.S. 540 (1994), that judicial rulings "almost never constitute a valid basis for a bias or partiality motion." Frankly, that misses the point. The offer of proof is that Judge Snow, out of court, said (to his wife) that he would do whatever he could to make sure that Sheriff Arpaio is not reelected. The references —

    i. to what Judge Snow has said in the course of these hearings,

    ii. to Judge Snow's rulings,

    iii. to Judge Snow's failure to follow Canon 3(D) of the Code of Conduct for United States Judges, and

    iv. to Judge Snow's refusal to recuse himself, order a hearing, or allow another judge to rule on the disqualification

These references are completely consistent with what a judge would do if, in fact, he wanted to do whatever he could to prevent Sheriff Arpaio from being reelected.

12. Professor Gillers points out that "Judge Snow's brother-in-law, Keith Teel, is a *partner* in Covington & Burling." (Emphasis added.) Gillers Dec. ¶ 4.7.

    **a.** Professor Gillers book, "Regulation of Lawyers," has a brief section titled, in bold, "Lawyer Relatives," in his chapter on Judges. There he states:

"Advisory Opinion No. 58 (1978), issued by a committee of the U.S. Judicial Conference, concerns judicial disqualification in a case in which a relative is employed by a participating law firm. It provides in part:

> "We believe the following conclusions find support in the Code [of Judicial Conduct]. A judge is disqualified and should recuse if a relative within the third degree of relationship to the judge or his spouse (a) is a partner in a law firm appearing in the case; or (b) will profit or lose from the judge's action in the case either financially or otherwise, for example, the reputation of the firm would be significantly affected by the litigation."

b.  The motion of defendant to disqualify Judge Snow does not focus on the fact the brother-in-law of Judge Snow is a partner in Covington & Burling, the law firm representing the plaintiffs. Professor Gillers, however, does appear to emphasize this fact. In fact, Professor Gillers mentions Covington seven (7) times in his affidavit.

c.  Consequently, it is surprising the Professor Gillers' Declaration does not cite Advisory Opinion No. 58 (1978), issued by a committee of the U.S. Judicial Conference, because that Opinion directly applies to this case. Professor Gillers argues that any objection was waived. Let us leave aside the question whether Judge Snow followed the strict waiver requirements of Canon 3(D). The fact remains that Advisory Opinion No. 58 provides that Judge Snow must disqualify himself and that there is no provision for waiver. Let us turn to Opinion No. 58, as it now exists. We can find it at, The Federal Guide to Judiciary Policy, Vol. 2: Ethics and Judicial Conduct Pt. B: Ethics Advisory Opinions, http://www.uscourts.gov/file/document/published-advisory-opinions

    **d.** The Committee advises that under Canon 3(C)(1)(d)(ii), the judge must disqualify if the brother-in-law is "acting as a lawyer in the proceeding," Or if, under Canon 3(C)(1)(d)(iii), the brother-in-law is "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."

    **e.** The Committee then states quite clearly:

> The Committee concludes that an equity partner in a law firm generally has 'an interest that could be substantially affected by the outcome of the proceeding' in all cases where the law firm represents a party before the court.

    **f.** Covington & Burling is the law firm, and this "law firm represents a party before the court."

    **g.** The Committee then concludes — and its language merits quotation at length —

> As a cautionary note, the Committee further observes that *the remittal procedures of Canon 3D are not available if the judge's relative* is acting as a lawyer in the case *or is a partner in the law firm representing a party before the court. Recusal is required*. As discussed, recusal is not mandated if the firm representing a party before the court employs a judge's relative as an associate or non-equity partner and the relative has no involvement in the case. If nonetheless a judge is concerned that his or her impartiality might reasonably be questioned, the judge may invoke the remittal procedures of Canon 3D.
>
> The Committee notes that recusal decisions are also governed by the recusal statutes, 28 U.S.C. §§ 455 and 144, and the case law interpreting them. Although the Committee is not authorized to render advisory opinions interpreting §§ 455 and 144, *Canon 3C of the Code closely tracks the language of § 455, and the Committee is authorized to provide advice regarding the application of the Code*." (Emphasis added.)

  **h.** I do not understand how anyone could read Advisory Opinion No. 58 and conclude that Judge Snow followed that Opinion.

**13.** Professor Gillers and the Plaintiffs argue that the Defendant "waives" its right to file a disqualification motion because the Defendant waited too long.

  **a.** First, a waiver is a voluntary relinquishment of a known right. The Defendant does not waive a right simply because his lawyer and the judge did not follow the recusal requirements of Canon 3(D), or because the Judge asked for a waiver when the law does not allow a waiver, see, e.g., Advisory Opinion No. 58, supra.

  **b.** Second, when the Defendant's lawyers learned of the startling statement of Judge Snow's wife, they investigated. That is what they are supposed to do.

  **c.** These investigations took place two to three years ago, and the Defendant's lawyers did not think them relevant to this proceeding. It was not until Judge Snow injected the Grissom/Montgomery investigations into the April 2015 Order to Show Cause Hearing that the grounds for disqualification became ripe. The Order to Show Cause Hearing had three clearly defined topics – none of which included these investigations. Judge Snow's actions at that point made the grounds for recusal ripe. One should not criticize lawyers for being careful and not jumping the gun.

  **d.** As the Ninth Circuit has explained, a recusal motion filed 18 months after case was filed was timely, because the lawyers could not know the grounds for recusal until ten days before motion was filed. *Preston v. United States*, 923 F.2d 731 (9th Cir. 1991)

14. In the judge's order of April 27, he states that he ordered the "MCSO defendants to *immediately disclose* certain materials discussed in the Court's colloquy Sheriff Arpaio." [Emphasis added.] The judge states, "Attorney review for privilege was conducted contemporaneously with this production . . . ." I have been advised that this is not true.

### III.   CONCLUSION

15. We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

16. Moreover, we also know that in the several days of hearing, the judge —
   a. asked leading questions,
   b. gave his own version of the facts,
   c. conducted his own investigation outside the courtroom,
   d. argued with witnesses, and
   e. was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected.

17. I declare under penalty of perjury that the foregoing is true and correct and that I signed this declaration on 19 June 2015, in Orange, California.

_____
RONALD D. ROTUNDA