1  Jonathon A. Moseley
   Freedom Watch, Inc.
2  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
3  (310) 595-0800
   leklayman@gmail.com
4  Attorney for Intervenor

5  *(Pro hac vice pending)*

6  Larry Klayman
   Freedom Watch, Inc.
7  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
8  (310) 595-0800
   leklayman@gmail.com
9  Attorney for Intervenor

10 *Of Counsel*

11          **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF ARIZONA**
12

13 MANUEL de JESUS ORTEGA
   MELENDRES,
14 on behalf of himself and all others similarly
   situated; *et al.*

15               Plaintiff,
16          v.                              Civil Action No.
                                            CV-07-2513-PHX-GMS
17 JOSEPH M. ARPAIO, in his individual
   And official capacity as Sheriff of Maricopa
18 County, Arizona; *et al.*

19               Defendants

20 DENNIS L. MONTGOMERY

21               Intervenor

22 **PUTATIVE INTEVERVNOR DENNIS MONTGOMERY'S FOURTH SUPPLEMENT**
   **TO MOTION FOR RECONSIDERATION OF DENNIS MONTGOMERY'S**
23 **MOTION FOR INTERVENTION AND MOTION FOR ADMITTANCE**
   **PRO HAC VICE OF JONATHON A. MOSELEY**
24
        Putative Intervenor Dennis L. Montgomery hereby respectfully submits the attached exhibit
25
26 and newly-available information in support of his motion to intervene and motion for his attorney

27 Jonathon Moseley to be admitted *Pro Hac Vice* on my behalf.

28

                                    - 1 -

By not granting the motions, but instead continuing to sit on them for the Court's apparent strategic reasons, Mr. Montgomery's rights are being severely harmed, on an ongoing basis. Mr. Montgomery must respectfully be allowed to intervene in this lawsuit in order to protect his property and other interests, which was previously ordered by this Court to be handed over to third parties.

The delay in this lawsuit is creating much more than the appearance that this Court is working in concert with the American Civil Liberties Union ("ACLU") in order to harm Defendant Sheriff Joseph Arpaio and Intervenor Dennis Montgomery, as well as make good on its commitment, expressed by the Court's wife as confirmed by neutral persons, to "destroy" Sheriff Joseph Arpaio so the Sheriff cannot be reelected in 2016.

In fact, given the previous attorney-client relationship of the ACLU with putative Intervenor Montgomery, Mr. Montgomery was recently forced to file a lawsuit against the ACLU before the U.S. District Court for the Southern District of Florida. *See* Exhibit 1. In short, this case represents a multi-faceted and growing conflict of interest not only by the ACLU and its attorneys but as important the equally unethical conduct by the Court which must cease immediately.

Even more troubling, this Court's record reflects that the Court has previously authorized significant payment of legal fees and costs to the law firm which represented Plaintiffs, Covington & Burling LLP, where this Court's brother-in-law, Keith Teel, is a partner, insurance, patent and product-liability litigator. This has further created more than an appearance of bias or prejudice, as well as exacerbated the Court's egregious clear-cut conflict of interest, which this Court continues to ignore and instead through its actions and intentional inactions thereby continues to harm Mr. Montgomery and his perceived benefactor Defendant Sheriff Joseph Arpaio.

In short, by harming putative Intervenor Montgomery, the Court is furthering its apparent "vendetta," as disclosed and admitted to by the Court's wife, against Sheriff Arpaio. Putative

1  Intervenor Mr. Montgomery is thus caught between the proverbial rock and a hard place. The time

2  has more than come for the Court to grant intervention and *pro hac vice* status and to recuse itself

3  from this case.  Each day that recusal does not happen compounds the damage and rampant ethical

4  violations on multiple fronts.

5

6

7  Dated: July 8, 2015                              Respectfully submitted,

8                                                   Larry Klayman
                                                    Freedom Watch, Inc.
9                                                   2020 Pennsylvania Avenue N.W., Suite 345
                                                    Washington, D.C. 20006
10                                                  (310) 595-0800
                                                    leklayman@gmail.com
11                                                  Attorney for Intervenor

12                                                  *Of Counsel*

13

14                                                  _____
                                                    Jonathon Moseley, Esq.

15                                                  Jonathon A. Moseley
                                                    Freedom Watch, Inc.
16                                                  2020 Pennsylvania Avenue N.W., Suite 345
                                                    Washington, D.C. 20006
17                                                  (310) 595-0800
                                                    leklayman@gmail.com
18                                                  Attorney for Intervenor

19                                                  *(Pro hac vice pending)*

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

1

I hereby certify that on July 8, 2015, I served the foregoing documents via U.S. Mail on:

2

3  Stanley Young, Esq.
   Andrew Carl Byrnes, Esq.
4  333 Twin Dolphin Road
   Redwood Shores, California 94065
5  syoung@cov.com
6  650-632-4700
   Attorneys for Plaintiffs
7  (Service via Email)

8  Daniel Pochoda, Esq.
9  ACLU FOUNDATION OF ARIZONA
   3707 N. 7th Street, Suite 235
10 Phoenix, Arizona 85014
   dpochoda@acluaz.org
11 602-650-1854
   Attorney for Plaintiffs
12 (Service via Email)

13 Cecilia D. Wang, Esq.
14 ACLU FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
15 39 Drumm Street
   San Francisco, California 94111
16 cwang@aclu.org
17 415-343-0775
   Attorney for Plaintiff Melendres
18 (Service via Email)

19 Thomas P. Liddy, Esq.
   CIVIL SERVICES DIVISION
20 MARICOPA COUNTY ATTORNEY'S OFFICE
21 222 North Central Avenue, Suite 1100
   Phoenix, Arizona 85005
22 liddyt@mcao.maricopa.gov
   602-506-8541
23 Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
24 (Service via Email)

25 Michele M. Iafrate, Esq.
   IAFRATE & ASSOCIATES
26 649 North Second Avenue
   Phoenix, Arizona 85003
27 miafrate@iafratelaw.com

28

602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Melvin McDonald, Esq.
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio
(Service via Email)

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, New York 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs
(Service via Email)

Anne Lai, Esq.
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, California 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, California 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

(Service via Email)

Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, Arizona 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County
(Service via Email)

Jonathon Moseley, Esq.

Virginia State Bar No. 41058

Attorney for Plaintiff
*(Pro Hac Vice Application Filed)*

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY
Miami, Florida[1]

                         Plaintiff,

      v.

AMERICAN CIVIL LIBERTIES FOUNDATION
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

              and

SUSAN N. HERMAN, ESQ.
President
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

              and

CECILLIA D. WANG, ESQ.
ACLU
Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111

              and

DANIEL J. POCHADA, ESQ.
ACLU of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

              and

MICHAEL "MIKE" GERMAN, ESQ.
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

Civil Action No. _____

---

[1]     Street address not listed for security reasons.

and

ANDRE IVAN SEGURA, ESQ.
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

and

JOSHUA BENDOR
ACLU
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

Defendants.

## COMPLAINT

Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, jointly and severally, in this civil action for Breach of Fiduciary Duty, Professional Malpractice, Common Law Defamation *Per Se*, General Defamation, Defamation by Implication and Intentional Infliction of Emotional Distress.  As grounds therefore, Plaintiff alleges as follows:

## I.   JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.     Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

## II.   THE PARTIES

3.     Dennis L. Montgomery is a natural person, an individual, a citizen of the United States and is a citizen of Florida.

4.      Defendant American Civil Liberties Union Foundation ("ACLU") by its own description: "is a 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators."

5.      Defendant Cecillia D. Wang, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of California and also appears *Pro Hac Vice* in the State of Arizona in *Melendres v. Arpaio*, Civil Action No. CV-07-2513-PHX-GMS, in the U.S. District Court for the District of Arizona.

6.      Defendant Daniel Pochoda, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of Arizona and also appears as counsel in *Melendres v. Arpaio*.

7.      Defendant Michael ("Mike") German, Esq., is an individual who is an attorney employed by and working for the ACLU, and the other Defendants, acting in concert, on information and belief, admitted to the bars in the State of New York and the District of Columbia who on behalf of the ACLU consulted with Dennis Montgomery, provided legal advice to Montgomery, directed Montgomery to take action, and engaged in an attorney-client relationship on behalf of the ACLU, along with the other individual Defendants, with Plaintiff.

8.      Defendant Susan N. Herman, Esq., is the current President of the ACLU and upon information and belief, resides in New York and is a member of the bar in the State of New York. She acted in concert with the other Defendants herein and had full knowledge of the facts and circumstances set forth in this Complaint, particularly since Plaintiff's activities as a

whistleblower involve matters of great national security interests. The ACLU represents

whistleblowers like Plaintiff, such as Edward Snowden, and has brought lawsuits that attempt to

seek redress for the illegal and unconstitutional actions of the National Security Agency ("NSA")

and other U.S. Government intelligence agencies in spying indiscriminately on the American

people without regard to any probable cause that they are in contact with terrorists. *See American*

*Civil Liberties Union v. Clapper*, Case no. 14-42. U.S. Court of Appeals for the Second Circuit,

Decided May 7, 2015.

9.    Defendant Andre Ivan Segura is an individual who is an attorney employed by

and working for the ACLU, admitted to the bar in New York and also appears *Pro Hac Vice* as

counsel in *Melendres v. Arpaio*.

10.    Defendant Joshua Bendor is an individual who is an attorney employed by and

working for the ACLU, is a member of the bar of Arizona and is one of the counsel for Plaintiffs

in *Melendres v. Arpaio*.

11.    All of the allegations and counts of this Complaint refer or relate to the tortious,

illegal conduct of each and every named Defendant, who acted individually and in concert,

jointly and severally, to severely damage Plaintiff Montgomery.

**III.    FACTS COMMON TO ALL COUNTS**

12.    Plaintiff Montgomery sues for harm and damages in this district, Florida, and

nationwide to himself as an individual and person, including for financial harm to his individual

business reputations and his individual and business and professional opportunities, his

ownership of intellectual and other property rights, breach of fiduciary duty, the loss of legal

rights through Defendants actions and failure to act on his behalf as his counsel, and defamation.

13.    Plaintiff is in poor health and requests expeditious handling of the lawsuit.

4

14.     The Plaintiff sought legal assistance from the ACLU starting in early June 2013.

15.     Dennis Montgomery consulted with the ACLU and the other Defendants herein, including but not limited to the ACLU's lead litigation attorney, Mike German, at the ACLU's national headquarters, with regard to his efforts as a whistleblower having information about the unconstitutional and illegal acts by the National Security Agency ("NSA"),  the Central Intelligence Agency ("CIA") and other U.S. Government intelligence agencies.

16.     Trusting in an attorney-client relationship, Dennis Montgomery disclosed to the ACLU and the other Defendants confidential information, identified legal issues of concern, and asked for and received legal advice.

17.     The Plaintiff entrusted to the ACLU information about government abuses potentially more egregious than those that Edward Snowden revealed.

18.     But unlike Snowden, Montgomery sought and seeks to come forward legally and through proper channels.  Addressing those abuses through proper legal and governmental channels was the primary reason for Montgomery entering into an attorney client relationship with the ACLU and the other Defendants herein.

19.     Because the ACLU, Mike German and the other individual Defendants, acting in concert, consulted with and gave Dennis Montgomery legal advice and an evaluation of his legal risks and situation and asked for actions to further future legal and other actions by the ACLU on Montgomery's behalf, an attorney-client relationship was actually established with each and every one of the Defendants and a duty of care and fiduciary duty was owed to Plaintiff by each of the Defendants.

20.     The ACLU, Mike German and the other individual Defendants, acting in concert, specifically requested that Dennis Montgomery send the ACLU even more information and

documentation so that the ACLU could further their legal representation of Montgomery.  The ACLU, German and the other Defendants, acting in concert, gave Montgomery legal advice, including advice they told Plaintiff would further his interests and the public in blowing the whistle on illegal and unconstitutional acts by the NSA, CIA and other U.S. Government agencies, as they had given and continued to give to client whistleblowers like Edward Snowden.

21.     Believing in and trusting the ACLU's and the other Defendants legal representation of him, Montgomery followed German's and the other individual Defendants', acting in concert, legal advice by sending the additional information and documentation.

22.     However, the Defendants subsequently neglected to actually help Montgomery with the ordinary standard of care required of lawyers.

23.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards of care required of attorneys, the Plaintiff lost legal rights.

24.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards required of attorneys, the Plaintiff also continued to lose money in his career, professional, occupation, and employment, his intellectual and other property rights, and continued to suffer harm and damage to his reputation.

25.     But then the Defendants suddenly began attacking and defaming Dennis Montgomery, starting in April 2015,[2] as part of their attacks on Sheriff Joe Arpaio ("Sheriff Arpaio") of Maricopa County, Arizona, his deputies, his office, and the Cold Case Posse of Maricopa County, alleging that these persons and entities engaged in an illegal criminal conspiracy with Dennis Montgomery.

---

[2]     The ACLU likely published attacks on Montgomery to journalists and others earlier. In late 2014, news articles began attacking Montgomery by citing unnamed sources.

6

26.     Defendants' intent was to destroy Sheriff Arpaio and Plaintiff as they were seen as adverse to Defendants' immigration agenda, which is based on having as many illegal aliens remain in the United States such that they can ultimately get voter cards and vote for leftist and Democrat political candidates, supportive of the Defendants' leftist agendas.

27.     In addition, the Defendants' attacks on Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County, were calculated to raise huge donations for Defendants, as the leftwing and other supporters of the ACLU despise and oppose Sheriff Arpaio and all persons and entitles associated with him.

28.     The ACLU and the other Defendants, acting in concert, had and continue to have actual knowledge that their defamation and disparagement of Dennis Montgomery, later in 2015, is false, because Dennis Montgomery had also approached and consulted with the ACLU in 2013 to help protect him against those very same smears and defamation and help him repair the damage to his reputation as a whistleblower and to further his coming forward on behalf of the American people as a whistleblower.

29.     The Defendants ACLU, Cecillia Wang, Daniel Pochoda, Michael German, Andre Segura and Susan Herman, acting in concert, and their supporters, have become so motivated by their deep-seated hatred for and opposition to Sheriff Arpaio and his office, who they claim violated the civil rights of illegal immigrants, that they are willing to harm other clients, such as Plaintiff, and violate their lawyerly duties in their rush to damage Sheriff Arpaio, his office, his deputies and the Cold Case Posse of Maricopa County.

30.     Sheriff Arpaio actually enforces those laws that the ACLU is trying to overturn and therefore the ACLU is determined to make an example out of Sheriff Arpaio and those

persons and entities associated with him and to publicly destroy them, even if the ACLU and the other Defendants have to betray their own former clients to do so.

31.     Meanwhile, Plaintiff Montgomery had also been approached by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO") under MCSO's "Cold Case Posse" project concerning the same topics as his consultation with the ACLU, as it concerned Arizona citizens and illegal surveillance of them by the federal government.

32.     Introduced through Sheriff Arpaio and the MCSO "Cold Case Posse," the Plaintiff met with the Attorney General of Arizona seeking action on the same topics and concerns about which he had consulted with the ACLU and sought its legal assistance.

33.     However, now the Defendants have twisted, misrepresented and falsified facts concerning these events in public and in court pleadings in their hatred of and their determination to harm Sheriff Arpaio and those persons and entities associated with them.

34.     Importantly, and unlike the public at large, the ACLU and the other Defendants have actual knowledge of the truth about these matters, because the Plaintiff confidentially disclosed in a private attorney client communications the truth about highly sensitive information regarding the U.S. Government's actions, to the ACLU and the other Defendants.

35.     Daniel Pochoda, acting in concert with the other Defendants, while speaking for the ACLU specifically in relation to *Melendres v. Arpaio*, *supra*, and specifically in attacking Sheriff Arpaio, defamed Dennis Montgomery in a <u>New York Times</u> article June 15, 2015, written by Ms. Fernanda Santos, Phoenix, Arizona, Bureau Chief, titled "Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff."

> *"This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man,"* said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

8

(Emphasis added.)

36.     The Defendants' defamation, disparagement and smears of the Plaintiff are far more damaging than mere news reporting because of the public impression and public image of the legal expertise, fame, reputation, and perceived credibility of the ACLU proclaiming that the Plaintiff has been previously been found to be a con man and a criminal.

37.     The factual assertion that *Dennis Montgomery is "a con man,"* and that he has been previously found to be a con man, is defamation *per se.*

38.     The underlying bases of these allegations are services Plaintiff provided to the U.S. Government.

39.     Therefore, the Defendants' statement is not only a false representation of criminal conduct, but also constitutes the making of false statements to the U.S. Government which is a crime under 18 U.S.C. § 1001 and also constitutes the violation of the False Claims Act 31 U.S.C. §§ 3729 – 3733 by submitting an alleged claim for payment based upon fraud or misrepresentation, which is also a crime.

40.     The Defendants' statements are defamation *per se* on at least two grounds, claiming commission of a criminal act and dishonesty in one's trade or business.

41.     The original version of the article was mass-distributed in physical form in an estimated 1.3 to 1.8 million newspapers physically distributed in Florida, nationally and internationally on June 15, 2015, on the Internet, in Florida and elsewhere. *See* Exhibit A.

42.     The article was revised on June 16, 2015, but the Defendants' defamation is identical in both versions and was also published in print form and on the Internet in Florida, nationally, internationally, and elsewhere.  *See* Exhibit B.

43.     Daniel Pochoda and Cecillia Wang, and the other individual Defendants acting in concert with each other, thus attacked their own former client Dennis Montgomery in public and in court pleadings, and thereby violated their ethical and fiduciary responsibilities of loyalty and confidentiality.

44.     The Defendants, acting in concert, have actual knowledge that Dennis Montgomery cannot fully defend himself against this defamation and these public disparagement and smears because of legal restrictions on what he can disclose under the national security laws of the United States.  Therefore, the ACLU feels free to lie about Montgomery and his work with Sheriff Arpaio and the persons and entities associated with Sheriff Arpaio, taking advantage of Montgomery's precarious situation.

45.     Indeed, Dennis Montgomery sought to intervene in the *Melendres* litigation to stop the repetition of this same defamation, disparagement and smears and to protect his intellectual and other property interests, which Defendants, in concert, compromised and damaged in their advocacy against Plaintiff in this case in particular.

46.     Incredibly, and without legal bases, the Defendants unethically and illegally opposed Montgomery's efforts to intervene, including by smearing his chosen current attorneys as much as they smear Montgomery, in opposition to the goals of their former client on behalf of their current clients the *Melendres* Plaintiffs.

47.     On information and belief, Cecillia Wang, Daniel Pochoda, the ACLU and the other ACLU individual Defendants, acting in concert with each other, distributed the same or similar defamatory and derogatory statements to other journalists and news organizations, not only to The New York Times.

10

48.     Furthermore, apparently starting in April 2015, Defendants representing Plaintiff and acting under the authority of the ACLU, including but not limited to Cecillia Wang, Daniel Pochoda, Andre I. Segura, Michael German, Joshua Bendor and Susan Herman, acting in concert with each other, have repeatedly (as a course of conduct) threatened, incited, and sought to stir up criminal prosecution of Dennis Montgomery along with their main targets Sheriff Joe Arpaio, Chief Deputy Jerry Sheridan and other personnel of the Maricopa County Sheriff's Office ("MCSO") as well as the Maricopa County Cold Case Posse.

49.     Threatening criminal prosecution to gain advantage in civil litigation is prohibited by the ethical obligations of the legal profession.  Seeking to orchestrate and incite criminal prosecution of a former client is a violation of the fiduciary and other duties of loyalty and confidentiality owed to a client.

50.     In Footnote 2 on Page 9, of the Defendants' pleading **Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court** filed by the ACLU in *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona, Civil Action No. CV-07-2513-PHX-GMS, attached as Exhibit C, the ACLU, acting in concert with the individual Defendants, accused Dennis Montgomery of committing crimes.

> Even more troubling, as the Court noted in a post-hearing status conference, the evidence indicates that Dennis Montgomery informed MCSO personnel—with Chief Deputy Sheridan's knowledge—that he was using a database of information "harvested by the CIA and confiscated by him" in his investigation, and also purported to be tracking telephone calls between the Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona. Tr. of May 14, 2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F. ***This implicates possible violations of federal criminal laws by MCSO personnel in the course of the MCSO-Montgomery investigation.*** See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of documents relating to national defense); 798 (disclosure of classified information); 1503 (intimidation of federal court and

> obstruction of justice); 1509 (obstruction of court orders); 1924
> (unauthorized removal of classified information); 2511
> (intercepting electronic communications); 2701 (unlawful access to
> stored communications).

*(Emphasis added.)*

51.     As shown in the entire course of events and public statements involving the lawsuit, Ms. Wang and Mr. Pochoda and the other ACLU attorneys and other Defendants, acting in concert with each other, make these allegations with the intention to cause criminal prosecution to be initiated against the Plaintiff Dennis Montgomery (as part of their efforts to incite criminal prosecution of Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County).

52.     The Defendants also attacked Dennis Montgomery in other legal pleadings in the case of *Melendres v. Arpaio*, also in violation of the fiduciary and other duties of loyalty and confidentiality to a client.

53.     The ACLU and the other individual Defendants, acting in concert with each other, have turned on its own former client and intensified and spread the damage caused by the defamation, disparagement, false and misleading information and smears against this whistleblower.

54.     Prior to filing suit, the Plaintiff, by the undersigned counsel, sent letters to the ACLU and all of the Defendants at the ACLU demanding retraction of the defamation pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander, " as well as their withdrawal as counsel for the Plaintiffs in the *Melendres* litigation, given their professional misconduct and conflicts of interest.

55.     The Plaintiff incorporates by reference that demand letter sent to the ACLU and the other Defendants, which is attached as Exhibit D.

56.     In response to this demand letter under Florida Statutes § 770.02, the ACLU by Ms. Cecillia Wang, acting in concert with the other Defendants, responded with a dishonest rebuke, making it clear that she, the ACLU and the other Defendants, acting in concert, have no intention of stopping its attacks on and harm to Dennis Montgomery or withdrawing as counsel for the Plaintiffs in the *Melendres* case even in the face of their clear-cut professional misconduct and conflicts of interest.  *See* Exhibit E, attached.

57.     As a result, the harm is continuing and the Defendants, each and every one of them, acting in concert and jointly and severally, have refused to correct or stop their severe injury and damage to the Plaintiff, which damage is being compounded daily.

58.     Also, the Plaintiff alleges that the ACLU and the other individual Defendants acting in concert with each other, actually used some of the information the Plaintiff provided confidentially to them as a basis for the ACLU's lawsuit *Melendres v. Arpaio* and perhaps other cases. Defendants acting in concert therefore used confidential and other information he gathered and provided by the Plaintiff.

59.     Plaintiff Montgomery is not a public figure.

60.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business in these capacities.

61.     Nevertheless, Defendants' actions establish actual malice because the ACLU and the other individual Defendants, acting in concert with each other, have – intentionally and knowingly – harmed and are harming Dennis Montgomery for the purpose of advancing the ACLU's goals to further illegal immigration, and other related goals, as this suits its political interests by giving illegal immigrants voting and other rights to elect leftist candidates aligned with the Democratic Party and its other clients in the *Melendres* case and elsewhere.

62.     The Defendants' harm to Dennis Montgomery is not negligent or accidental but an intentional part of its campaign to harm its main target, Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa Country while illegally trampling upon and destroying Plaintiff Dennis Montgomery in the process.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### *Breach of Fiduciary Duty*

63.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

64.     Florida has identified the elements for a breach of fiduciary duty specifically when involving an attorney's breach against a client:

> "As for a claim of breach of fiduciary duty, a plaintiff must allege three elements: the existence of a fiduciary duty, a breach of that duty, and plaintiff's damages proximately caused by the breach. *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla.2002)." *Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d at 116 n. 2.

*Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)

65.     Dennis Montgomery sought the legal assistance of the ACLU and the other Defendants with the legal issues he faces, including stopping prior defamation of him to silence and discredit him as a whistleblower attempting to reveal illegal and unconstitutional conduct by the U.S. Government, disclosing the information about misconduct as a whistleblower in a way to bring about change pursuant to the law, and repairing the damage to his reputation from the defamation and smears brought to silence and discredit him, as well as protecting his intellectual and other property rights, as well as other rights.

66.     When the Plaintiff sought the legal assistance of the ACLU and the other individual Defendants as not only professional experts as attorneys and otherwise but as experts

recognized worldwide as specialists in these areas, a fiduciary duty of trust owed by the ACLU

and the other Defendants to the Plaintiff was created.

67.    Instead of assisting the Plaintiff with those legal concerns, the Defendants, acting

in concert with each other, have turned around and attacked him publicly, further harming

Plaintiff's reputation and trade and profession, as well as damaging his intellectual and other

property rights, and other rights, including by stating to <u>The New York Times</u> on or about June

15, 2015, via Fernando Santos, as well as in court in the *Melendres* case:

> "*This guy [Sheriff Arpaio] hired a person [Dennis Montgomery]
> previously found to be a con man,*" said Dan Pochoda, senior
> counsel for the American Civil Liberties Union of Arizona, which
> represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

68.    As a direct conflict of interest between the Plaintiff and the *Melendres* Plaintiffs,

Defendants, acting in concert with each other, have harmed the Plaintiff in order to advance the

interests of the *Melendres* Plaintiffs who favor illegal immigration and have set out to destroy

Sheriff Arpaio, his deputies, and others who seek to enforce the laws of Arizona against them.

The Plaintiff and *Melendres* Plaintiffs are adverse in an actual conflict of interest.

69.    The conflict of interest of the Defendants between the Plaintiff and the *Melendres*

Plaintiffs accelerated into an increased conflict when the Defendants, acting in concert, and the

presiding Judge Snow injected Dennis Montgomery into the *Melendres v. Arpaio* case apparently

only in April 2015 and started to defame and attack him in court and publicly, as well as damage

his intellectual and other property interests and other rights.

70.    The Defendants, acting in concert, have also sought to induce criminal

prosecution against him, thereby not only failing entirely to fulfill its fiduciary duty but directly

opposing the goals for which the Plaintiff sought the ACLU's and the other individual

Defendants' legal assistance in an established attorney-client and professional relationship. *See* Exhibit C, attached.

71.     Furthermore, the Defendants failed to act diligently, promptly, or effectively for the Plaintiff, contrary to the standard of care owed by Plaintiff as a client, and thereby allowed rights to be compromised, opportunities for solutions to pass, and continued defamation against the Plaintiff to proliferate, as well as harm his intellectual and other property rights and other rights.

72.     While the Plaintiff sought the ACLU's and the other individual Defendants assistance to further his interests and those of the nation, as early as 2013, as a result of the Defendants actions and inactions, instead the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of these smears has grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, and other actionable acts as plead herein against the Defendants.

73.     Plaintiff has also been caused severe emotional distress, and given his fragile health that the ACLU and the other Defendants knew about at the time Plaintiff Montgomery first contacted the ACLU, has been placed in a condition of immediate bodily injury, incapacitation and potential death.

## SECOND CAUSE OF ACTION
### *Professional Malpractice*

74.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

75.     For a legal malpractice claim, Florida recognizes that the cause of action:

> "has three elements: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) the attorney's negligence [as] the proximate cause of the client's loss." Cira v. Dillinger, 903 So.2d 367 (Fla. 2d DCA 2005).

*Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d 111, 116 (Fla. 2d DCA 2009) (cited and relied upon in *Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)).

76.     As pled in detail above and throughout this Complaint, the Plaintiff sought out the ACLU's and the other individual Defendants' assistance with several related legal matters and circumstances, and Mike German, acting in concert with the other Defendants, provided legal advice including demanding documents to be used in the ACLU's future legal activities defending and assisting Dennis Montgomery.

77.     As pled above, the ACLU and the other individual Defendants, acting in concert with each other, violated the standard of care required of licensed attorneys, and failed to follow through and assist the Plaintiff as required of attorneys and other related persons as the ACLU.

78.     Instead the Defendants then turned around and attacked the Plaintiff for the benefit of the ACLU's other political goals and the *Melendres* Plaintiffs as well as the ACLU's and other supporters.

79.     The Defendants have actively opposed the Plaintiff's interests and defamed and harmed him as a result of an actual conflict of interest between the Plaintiff and the *Melendres* Plaintiffs, as well as other professional misconduct as pled herein.

80.     That conflict of interest was heightened when the Defendants and Judge Snow injected Dennis Montgomery into that lawsuit, without cause or rationale other than to harm him and Sheriff Arpaio, his office, his deputies,  and the Cold Care Posse of Maricopa County apparently as late as April 2015.

81.     The Defendant ACLU and the other individual Defendants, acting in concert with each other, failed to act diligently, promptly, or effectively for the Plaintiff and thereby allowed Plaintiff's rights to be lost, opportunities for solutions to pass, and continued defamation and loss of intellectual and other property rights against the Plaintiff to proliferate and be compounded.

82.     In violation of the duty of loyalty and confidentiality, the Defendants have spread defamation, disparagement and smears about the Plaintiff and have also worked aggressively to block the Plaintiff's attempts to rebut the lies and smears being spread against him, as well as to protect his intellectual and other property, advancing the goals of the *Melendres* Plaintiffs and their own at the expense of the Plaintiff Dennis Montgomery, including publishing to <u>The New York Times</u> on or about June 15, 2015, via Fernanda Santos:

> ***"This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man,"*** said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

83.     While the Plaintiff sought the ACLU's and the other individual Defendants' legal assistance to further his and the nation's interests as early as 2013, instead, due to the Defendants' actions and inactions, the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of this defamation, disparagement and smears have grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, as well as Defendants" other professional misconduct.

### THIRD CAUSE OF ACTION
***Common Law Defamation "Per Se"***

84.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

85.     Defendants have also severely harmed Plaintiff's intellectual and rights property interests as well as other interests in the *Melendres* case, as set forth herein in this Complaint.

86.     As pled above in detail, the Defendants – acting on behalf of the ACLU and for the ACLU's clients, supporters and goals – publicly defamed the Plaintiff as having been previously found to be a "con man," including publishing to <u>The New York Times</u> on or about June 15, 2015, via <u>The New York Times</u> reporter Fernanda Santos, which was published in Florida, nationwide and internationally as a physical newspaper and also published on <u>The New York Times'</u> website on the internet:

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man,***" said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

87.     The underlying basis of this continuing course of misconduct and illegality makes it explicitly clear and overwhelmingly obvious that this false and misleading statement is about Dennis Montgomery.  Not only does the description of who is being referred to apply to Dennis Montgomery and only Dennis Montgomery, but also he surrounding passages explicitly name Dennis Montgomery explicitly in reference to his connection to Sheriff Arpaio.

88.     Defendants' defamation of Plaintiff Montgomery was made and undertaken negligently and/or with actual malice.

89.     Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard for the truth.

90.     Defendants falsely accused Plaintiff of fraud, crime, scams, and being previously found to be a con artist.

91.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

92.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

93.     For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

94.     Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

### FOURTH CAUSE OF ACTION
*Common Law General Defamation*

95.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

96.     To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

97.     Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-alleges the allegations under the Third Cause of Action but also alleges that each of those statements also qualify under the cumulative and alternative legal grounds of General Defamation under Florida law.

**FIFTH CAUSE OF ACTION**
*Common Law Defamation By Implication*

98.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

100.     Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-alleges the allegations under the Third Cause of Action but also alleges that each of those statements also qualify under the alternative and cumulative legal grounds of Defamation by Implication under Florida law.

## SIXTH CAUSE OF ACTION
### *Common Law Intentional Infliction of Emotional Distress*

101.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

102.   The Defendants have actual knowledge that the Plaintiff is legally handicapped and medically ill, and knew this as a result of their communications with the Plaintiff in 2014, and have also learned of this repeatedly in April, May, and June of 2015.

103.   The Plaintiff suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014.  He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow).  He was in the hospital for two months, through June 2014.  He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time.

104.   The Defendants knew about this – because the Plaintiff raised it repeatedly in his attempts to intervene in *Melendres v. Arpaio, supra* – before making and thus publishing the defamatory statements on or about June 15, 2015, to The New York Times and (on information and belief) to others.

105.   Defendants' knowing and intentional publication of the defamatory, disparaging and other harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress and thus personal injury.

106.   Under the law intention does not require the intention to cause a particular result but only that a defendant intended to take the action that causes the harm.

107.   Here, the Defendants acted intentionally to cause harm to Dennis Montgomery from which emotional distress was an overwhelmingly obvious and foreseeable result.

108.    Here, the Defendants acted with actual malice in wanting to harm Sheriff Arpaio by portraying Dennis Montgomery as previously found to be a con man engaged in a criminal conspiracy with Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa County as well as harming his property interests and other rights.

109.    Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff, including incapacitation and possible death.

110.    Defendants' actions, each and every one of them, jointly and severely, were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress, and thus personal injury, and with utter disregard for the consequences of such actions. They were intended to harm Sheriff Arpaio, his office and his deputies, and members of the Cold Case Posse in Maricopa County, by harming and destroying Plaintiff.

**PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess $20 million U.S. Dollars as a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants causing financial, reputational, emotional, physical and professional injury to Plaintiff, damage to his intellectual and other property rights, as well as for equitable relief as may be appropriate, reasonable attorneys fees, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in excess of $90 million U.S. Dollars to punish the Defendants for their outrageous and malicious conduct.

## JURY DEMAND

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: June 30, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

# Exhibit A

# The New York Times

 Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff

 CHICAGO JOURNAL
Blackhawks Fans Show That Chicago Can Love a Winner, Too

 Losing Custody of Son Appeared to Set Off Troubled Dallas Gunman Family Says

U.S.

# *Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff*

By FERNANDA SANTOS   JUNE 15, 2015



Sheriff Joe Arpaio after an event on Tuesday celebrating his tenure as the longest-serving sheriff in the history of Maricopa County in Arizona. Laura Segall for The New York Times

Email

Share

PHOENIX — Judge G. Murray Snow pressed Sheriff Joe Arpaio to answer a bit of an odd question: Was the sheriff investigating the judge and his wife?

Judge Snow had already ruled against Sheriff Arpaio in a civil rights

Tweet

Save

More



case brought by Latinos who said they had been singled out because of their ethnicity, and the sheriff was back in Federal District Court here after admitting that he had violated an order barring his deputies from singling out Latinos they suspected of being in the country illegally.

But the issue at hand in late April involved whether Sheriff Arpaio and the Maricopa County sheriff's office had hired a rogue informant in Seattle — a compulsive gambler known for scamming federal agencies — to investigate whether Judge Snow and the Department of Justice were working together to take the sheriff down.

Sheriff Arpaio testified that, yes, he had hired the informant. And that was only the half of it: Sheriff Arpaio also said he had employed a private agent to investigate Judge Snow's wife after the sheriff received an email from someone claiming to have overheard her mention her husband's negative views of the sheriff.

Both investigations led nowhere. But now, after Judge Snow asked pointed questions about the dual inquiries — describing them as an effort "to construct some bogus explanation to subvert this court" — Sheriff Arpaio's lawyers are using the judge's line of questioning to try to get the case reassigned. Arguing in court documents that Judge Snow raised the specter of judicial bias and impropriety when he asked questions pertaining to personal matters in court, they are demanding someone new.

**RELATED COVERAGE**



Sheriff Joe Arpaio Embraces His Hollywood Moment   APRIL 25, 2014

Federal Judge Finds Violations of Rights by Sheriff Joe Arpaio   MAY 24, 2013



Angry Judge Says Sheriff Defied Order on Latinos   MARCH 24, 2014

"This is not about vitriolic accusations against the judge — he's a decent guy, a good judge," A. Melvin McDonald, a criminal lawyer retained by Sheriff Arpaio, said in an interview. "It's about the personal animus he has displayed to the claim."

It is also a sign of how Sheriff Arpaio has operated through much of his 22 years as sheriff, using his office and power to sidestep pressure to change his approach to policing, an issue that is part of the Justice Department's lawsuit, filed in 2012. He had previously begun other investigations against critics and opponents, drumming up claims of corruption and other malfeasance against state judges, elected officials

and the publishers of an alternative weekly, Phoenix New Times.

All of the cases eventually <u>fell apart</u>: Many of the accused <u>successfully sued</u> the sheriff's office, earning millions of dollars in damages, paid with taxpayers' money.

Judge Snow now has to decide whether to remain on Sheriff Arpaio's case or to let another federal judge take his place.

Regardless, Sheriff Arpaio has more legal troubles on the way: On Thursday, Judge Roslyn O. Silver, who is overseeing a civil rights lawsuit by the Justice Department against the sheriff and his office, ordered a bench trial to start Aug. 10.

An appointee of President George W. Bush, Judge Snow has played referee and arbiter in the <u>seven-year-old civil rights case against Sheriff Arpaio</u> since <u>Judge Mary Murguía recused herself</u> in 2009. Judge Murguía's recusal followed complaints from the sheriff about an appearance of conflict, given that her twin sister, Janet, was president and chief executive of the <u>National Council of La Raza</u>, one of the country's largest Latino advocacy groups.

Judge Snow <u>ruled against</u> Sheriff Arpaio in May 2013, delivering what appeared to be a decisive blow against the six-term sheriff, then 80, a defining symbol of Arizona's strict approach to immigration enforcement.

But 10 months later, Sheriff Arpaio was back before him, <u>facing stern reproach</u> for defying his order to stop singling out Latinos during patrols and traffic stops.

He told Sheriff Arpaio in April that he was looking for "a pattern that reflects a hesitancy on the sheriff's office, on the sheriff's department and on your part, or even a desire to subvert the orders of this court."

One of the issues involved the failure by Sheriff Arpaio and his chief deputy, Jerry Sheridan, to properly disseminate the judge's instructions to officers. Before the hearing, they <u>admitted to this and other failings</u> and pledged again to stick to the judge's corrective measures.

But the hearing went on as planned.

In court in April, Judge Snow noted that the Maricopa County sheriff's office, also known as M.C.S.O., was only 29 percent in compliance with the changes he had ordered 18 months earlier, right around the time

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 36 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - NYTimes.com
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 29 of 76
the informant, Dennis Montgomery, started his investigation.

Judge Snow said he was troubled — by both the investigation and what it had produced.

"The court wonders why, when the M.C.S.O. should have been spending their time, money and resources in implementing its order, they were funding a confidential informant as well as three M.C.S.O. deputies or posse members to be in Seattle, Wash., accruing overtime, travel and salary expenses, as well as significant technology costs, attempting to construct some bogus conspiracy theory to discredit this court," Judge Snow said in court.

He took to referring to the investigation as the "Seattle Operation" and sounded skeptical when describing the reasoning and results of Mr. Montgomery's work. He said Mr. Montgomery had "allegedly" used information "harvested by the C.I.A. and confiscated by him" when he was a government software contractor.

The materials, the judge said, included fragments of email messages between the Justice Department and a former clerk of Judge Snow's, as well as snippets of phone calls Mr. Montgomery claimed to have tracked between Judge Snow and the former attorney general, Eric H. Holder Jr., as well as with other high-ranking Justice Department officials.

On the stand, Deputy Sheridan said Mr. Montgomery had "pulled data from American citizens for the C.I.A.," an assertion that the agency has denied.

When Judge Snow suggested that the materials provided by Mr. Montgomery were "junk," Deputy Sheridan and Sheriff Arpaio agreed.

But the tale of the conspiracy has nonetheless reverberated from the glass-and-steel Sandra Day O'Connor United States Courthouse here to the halls of the Justice Department and the Pentagon. Last month, Judge Snow asked Michele M. Iafrate, who is representing Mr. Arpaio in the civil contempt case, to write to the C.I.A., informing it that her client may be in possession of some of its materials.

The cache is also said to include bank account numbers and balances for about 50,000 residents of Maricopa County, Deputy Sheridan told Judge Snow.

Mr. Montgomery, however, could just be bluffing: His reputation,

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 37 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - NYTimes.com
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 30 of 76

easily uncovered with a cursory search, includes ample evidence of deception. He duped the federal government more than once, according to federal officials, selling it antiterrorism technology that proved to be a hoax.

In 2007, he falsely accused the governor of Nevada at the time, Jim Gibbons, of having received kickbacks from Mr. Montgomery's former employer to help it secure secret federal defense contracts. Two years later, Mr. Montgomery was arrested on charges that he had written $1 million in bad checks at a Las Vegas casino. He filed for personal bankruptcy that year, over mounting gambling debts.

"This guy hired a person previously found to be a con man," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

The sheriff's office certified Mr. Montgomery as a confidential informant. On the stand, Sheriff Arpaio said he did not recall how much money Mr. Montgomery had gotten for his work.

Stephen Lemons, the Phoenix New Times columnist who first reported the link between Mr. Montgomery and Sheriff Arpaio, said he had relied on information from "longtime sources," including a former detective in the sheriff's Special Investigations Division, the unit that had been handling Mr. Montgomery.

On Jan. 21, Mr. Lemons wrote about the investigation into Judge Snow's wife. It started, the article said, after a sympathizer wrote a private Facebook message to Sheriff Arpaio, telling him that the judge's wife, an old acquaintance, had mentioned during a casual encounter at a Mexican restaurant that the judge was out to get him.

Larry Klayman, Mr. Montgomery's lawyer, a well-known defender of conservative causes, has mostly taken aim at Mr. Lemons, calling him a "sleazy reporter" working for a "discredited, ultraleftist and pro-illegal immigrant" publication.

But when questioned by Judge Snow in court, Sheriff Arpaio and Deputy Sheridan confirmed what the judge had highlighted: The investigations described in Mr. Lemons's reporting were real.

**MOST EMAILED**

1. A Shifting Middle: America's Seniors Find Middle-Class 'Sweet Spot' 

2. Opinion: How to Make Online Dating Work 

3. The Upshot: To Lose Weight, Eating Less Is Far More Important Than... 

4. Opinion: Three Simple Rules for Eating Seafood 

5. Magna Carta, Still Posing a Challenge at 800 

6. In Tucson, an Unsung Architectural Oasis 

7. Op-Ed Contributor: Stop Revering Magna Carta 

8. Paul Krugman: Democrats Being Democrats 

9. Pope Francis to Explore Climate's Effect on World's Poor 

10. Nature Helps Squeeze Out a Little More Mileage 

View Complete List »

PERSONAL SAVINGS

The New York Times

**NEWS**

World

U.S.

Politics

New York

Business

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 39 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - NYTimes.com
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 32 of 76

Technology

Science

Health

Sports

Education

Obituaries

Today's Paper

Corrections

**OPINION**

Today's Opinion

Op-Ed Columnists

Editorials

Contributing Writers

Op-Ed Contributors

Opinionator

Letters

Sunday Review

Taking Note

Room for Debate

Public Editor

Video: Opinion

**ARTS**

Today's Arts

Art & Design

ArtsBeat

Books

Dance

Movies

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 40 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - NYTimes.com
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 33 of 76

Music

N.Y.C. Events Guide

Television

Theater

Video Games

Video: Arts

**LIVING**

Automobiles

Crossword

Food

Education

Fashion & Style

Health

Home & Garden

Jobs

Magazine

N.Y.C. Events Guide

Real Estate

T Magazine

Travel

Weddings & Celebrations

**LISTINGS & MORE**

Classifieds

Tools & Services

Times Topics

Public Editor

N.Y.C. Events Guide

TV Listings

Blogs

Cartoons

Multimedia

Photography

Video

NYT Store

Times Journeys

Subscribe

Manage My Account

**SUBSCRIBE**

Times Premier

Home Delivery

Digital Subscriptions

NYT Opinion

Crossword

Email Newsletters

Alerts

Gift Subscriptions

Corporate Subscriptions

Education Rate

Mobile Applications

Replica Edition

International New York Times

© 2015 The New York Times Company | Privacy | Terms of Service

Site Map | Help | Site Feedback

Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - NYTimes.com

# Exhibit B

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 44 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - The New York Times
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 37 of 76

# The New York Times

ssues


Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff


Men at Kansas City Release Center Worry as Prison Plans to Move In


Kayak Protesters Detained After Trying to Stop Shell Oil Rig

U.S.

# *Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff*

By **FERNANDA SANTOS**   JUNE 15, 2015



Sheriff Joe Arpaio after an event on Tuesday celebrating his tenure as the longest-serving sheriff in the history of Maricopa County in Arizona. Laura Segall for The New York Times

Email

Share

PHOENIX — Judge G. Murray Snow pressed Sheriff Joe Arpaio to answer a bit of an odd question: Was the sheriff investigating the judge and his wife?



Tweet

Save

More



Judge Snow <u>had already ruled against</u> Sheriff Arpaio in a civil rights case brought by Latinos who said they had been singled out because of their ethnicity, and the sheriff was back in Federal District Court here after admitting that he had violated an order barring his deputies from singling out Latinos they suspected of being in the country illegally.

But the issue at hand in late April involved whether Sheriff Arpaio and the Maricopa County sheriff's office had hired a rogue informant in Seattle — a compulsive gambler who federal officials came to believe <u>had sold them bogus antiterrorist technology</u> — to investigate whether Judge Snow and the Department of Justice were working together to take the sheriff down.

Sheriff Arpaio testified that, yes, he had hired the informant. And that was only the half of it: Sheriff Arpaio also said he had employed a private agent to investigate Judge Snow's wife after the sheriff received an email from someone claiming to have overheard her mention her husband's negative views of the sheriff.

Both investigations led nowhere. But now, after Judge Snow asked pointed questions about the dual inquiries — describing them as an effort "to construct some bogus explanation to subvert this court" — Sheriff Arpaio's lawyers are using the judge's line of questioning to try to get the case reassigned. Arguing in court documents that Judge Snow raised the specter of judicial bias and impropriety when he asked questions

**RELATED COVERAGE**


Sheriff Joe Arpaio Embraces His Hollywood Moment   APRIL 25, 2014

Federal Judge Finds Violations of Rights by Sheriff Joe Arpaio   MAY 24, 2013


Angry Judge Says Sheriff Defied Order on Latinos   MARCH 24, 2014

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 46 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - The New York Times
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 39 of 76

pertaining to personal matters in court, they are demanding someone new.

"This is not about vitriolic accusations against the judge — he's a decent guy, a good judge," A. Melvin McDonald, a criminal lawyer retained by Sheriff Arpaio, said in an interview. "It's about the personal animus he has displayed to the claim."

It is also a sign of how Sheriff Arpaio has operated through much of his 22 years as sheriff, using his office and power to sidestep pressure to change his approach to policing, an issue that is part of the Justice Department's lawsuit, filed in 2012. He had previously begun other investigations against critics and opponents, drumming up claims of corruption and other malfeasance against state judges, elected officials and the publishers of an alternative weekly, Phoenix New Times.

All of the cases eventually fell apart: Many of the accused successfully sued the sheriff's office, earning millions of dollars in damages, paid with taxpayers' money.

Judge Snow now has to decide whether to remain on Sheriff Arpaio's case or to let another federal judge take his place.

Regardless, Sheriff Arpaio has more legal troubles on the way: On Thursday, Judge Roslyn O. Silver, who is overseeing a civil rights lawsuit by the Justice Department against the sheriff and his office, ordered a bench trial to start Aug. 10.

An appointee of President George W. Bush, Judge Snow has played referee and arbiter in the seven-year-old civil rights case against Sheriff Arpaio since Judge Mary Murguía recused herself in 2009. Judge Murguía's recusal followed complaints from the sheriff about an appearance of conflict, given that her twin sister, Janet, was president and chief executive of the National Council of La Raza, one of the country's largest Latino advocacy groups.

Judge Snow ruled against Sheriff Arpaio in May 2013, delivering what appeared to be a decisive blow against the six-term sheriff, then 80, a defining symbol of Arizona's strict approach to immigration enforcement.

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 47 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - The New York Times
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 40 of 76



But 10 months later, Sheriff Arpaio was back before him, underline facing stern reproach for defying his order to stop singling out Latinos during patrols and traffic stops.

He told Sheriff Arpaio in April that he was looking for "a pattern that reflects a hesitancy on the sheriff's office, on the sheriff's department and on your part, or even a desire to subvert the orders of this court."

One of the issues involved the failure by Sheriff Arpaio and his chief deputy, Jerry Sheridan, to properly disseminate the judge's instructions to officers. Before the hearing, they admitted to this and other failings and pledged again to stick to the judge's corrective measures.

But the hearing went on as planned.

In court in April, Judge Snow said that the Maricopa County sheriff's office was only 29 percent in compliance with the changes he had ordered 18 months earlier, right around the time the informant, Dennis Montgomery, started his investigation.

Judge Snow said he was troubled — by both the investigation and what it had produced.

"The court wonders why, when the M.C.S.O. should have been spending their time, money and resources in implementing its order, they were funding a confidential informant as well as three M.C.S.O. deputies or posse members to be in Seattle, Wash., accruing overtime, travel and salary expenses, as well as significant technology costs, attempting to construct some bogus conspiracy theory to discredit this court," Judge Snow said in court, referring to the sheriff's office.

He took to referring to the investigation as the "Seattle operation" and sounded skeptical when describing the reasoning and results of Mr. Montgomery's work. He said Mr. Montgomery had "allegedly" used

Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 48 of 50
Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - The New York Times
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 41 of 76

information "harvested by the C.I.A. and confiscated by him" when he was a government software contractor.

The materials, the judge said, included fragments of email messages between the Justice Department and a former clerk of Judge Snow's, as well as snippets of phone calls Mr. Montgomery claimed to have tracked between Judge Snow and the former attorney general, Eric H. Holder Jr., as well as with other high-ranking Justice Department officials.

On the stand, Deputy Sheridan said Mr. Montgomery had "pulled data from American citizens for the C.I.A.," an assertion that the agency has denied.

When Judge Snow suggested that the materials provided by Mr. Montgomery were "junk," Deputy Sheridan and Sheriff Arpaio agreed.

But the tale of the conspiracy has nonetheless reverberated from the glass-and-steel Sandra Day O'Connor United States Courthouse here to the halls of the Justice Department and the Pentagon. Last month, Judge Snow asked Michele M. Iafrate, who is representing Sheriff Arpaio in the civil contempt case, to write to the C.I.A., informing it that her client may be in possession of some of its materials.

The cache is also said to include bank account numbers and balances for about 50,000 residents of Maricopa County, Deputy Sheridan told Judge Snow.

Mr. Montgomery, however, could just be bluffing: His reputation, easily uncovered with a cursory search, includes ample allegations of deception. Federal officials came to believe that he had sold antiterrorism technology that proved to be a hoax. He has denied wrongdoing in a lawsuit.

In 2007, he falsely accused the governor of Nevada at the time, Jim Gibbons, of having received kickbacks from Mr. Montgomery's former

ELSEWHERE ON NYTIMES.COM



**A Thirsty Colorado Is Battling Over Who Owns Raindrops**

- Ex-A.I.G. Chief Wins Bailout Suit, but Gets No Damages
- In A.I.G. Case, Surprise Ruling That Could End All Bailouts

Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff - The New York Times
Case 2:07-cv-02513-GMS   Document 1161   Filed 07/08/15   Page 49 of 50
Case 1:15-cv-22452-KMM   Document 5-1   Entered on FLSD Docket 07/01/2015   Page 42 of 76

employer to help it secure secret federal defense contracts. Two years later, Mr. Montgomery was arrested on charges that he had written $1 million in bad checks at a Las Vegas casino. A court hearing is scheduled for Aug. 12. He filed for personal bankruptcy that year, over mounting gambling debts.

"This guy hired a person previously found to be a con man," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

The sheriff's office certified Mr. Montgomery as a confidential informant. On the stand, Sheriff Arpaio said he did not recall how much money Mr. Montgomery had gotten for his work.

Stephen Lemons, the Phoenix New Times columnist who first reported the link between Mr. Montgomery and Sheriff Arpaio, said he had relied on information from "longtime sources," including a former detective in the sheriff's Special Investigations Division, the unit that had been handling Mr. Montgomery.

On Jan. 21, Mr. Lemons wrote about the investigation into Judge Snow's wife. It started, the article said, after a sympathizer wrote a private Facebook message to Sheriff Arpaio, telling him that the judge's wife, an old acquaintance, had mentioned during a casual encounter at a Mexican restaurant that the judge was out to get him.

Larry Klayman, Mr. Montgomery's lawyer, a well-known defender of conservative causes, has mostly taken aim at Mr. Lemons, calling him a "sleazy reporter" working for a "discredited, ultraleftist and pro-illegal immigrant" publication.

But when questioned by Judge Snow in court, Sheriff Arpaio and Deputy Sheridan confirmed what the judge had highlighted: The investigations described in Mr. Lemons's reporting were real.

---

A version of this article appears in print on June 16, 2015, on page A13 of the New York edition with the headline: A Sheriff, an Informant, and a Judge on the Spot.

Order Reprints | Today's Paper | Subscribe

Exhibit C