**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MANUEL DE JESUS ORTEGA
MELENDRES; JESSICA QUITUGUA
RODRIGUEZ; DAVID RODRIGUEZ;
VELIA MERAZ; MANUEL NIETO, JR.;
SOMOS AMERICA,
            *Plaintiffs-Appellees*,

v.

JOSEPH M. ARPAIO; MARICOPA
COUNTY SHERIFF'S OFFICE,
            *Defendants-Appellants*.

No. 13-16285

D.C. No.
2:07-cv-02513-
GMS

---

MANUEL DE JESUS ORTEGA
MELENDRES; JESSICA QUITUGUA
RODRIGUEZ; DAVID RODRIGUEZ;
VELIA MERAZ; MANUEL NIETO, JR.;
SOMOS AMERICA,
            *Plaintiffs-Appellees*,

v.

JOSEPH M. ARPAIO; MARICOPA
COUNTY SHERIFF'S OFFICE,
            *Defendants-Appellants*.

No. 13-17238

D.C. No.
2:07-cv-02513-
GMS

OPINION

Appeals from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted
December 3, 2014—San Francisco, California

Filed April 15, 2015

Before: J. Clifford Wallace, Susan P. Graber,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Wallace

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and vacated in part the district court's permanent injunction and remanded in an action against Sheriff Joseph M. Arpaio and the Maricopa County Sheriff's Office alleging that defendants have a custom, policy and practice of racially profiling Latino drivers and passengers, and of stopping them pretextually under the auspices of enforcing federal and state immigration-related laws.

The panel first held that the Maricopa County Sheriff's Office, a non-jural entity under Arizona state law, improperly

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was named as a party in the action.  The panel ordered that Maricopa County be substituted as a party in lieu of the Sheriff's Office and also that on remand, the district court may consider dismissal of Sheriff Arpaio in his official capacity because an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

Addressing the defendants' sufficiency of the evidence argument, the panel held the district court did not clearly err in finding that defendants' unconstitutional policies extended beyond the saturation patrol context.  Moreover, the panel held that the district court did not err in holding that the named plaintiffs had standing to assert the claims of absent class members who were stopped during non-saturation patrols.  For the same reasons, the panel held that there was no error in the district court's class certification order.

The panel held that the injunction was not overbroad simply because it included non-saturation patrols.  The panel further upheld specific provisions of the injunction pertaining to corrective training and supervision procedures and provisions requiring specific data collection and video-recording of traffic stops.  The panel additionally held that most of the provisions dealing with the scope of the appointed Monitor's assessment authority were narrowly tailored to remedying the specific constitutional violations.

The panel held that the provisions of the injunction which broadly require the appointed Monitor to consider the internal investigations and reports of officer misconduct created a problem to the extent that such internal investigations and reports were unrelated to the constitutional violations found by the district court.  The panel held that these provisions were not narrowly tailored to addressing the relevant

violations of federal law. The panel therefore vacated those particular provisions and ordered the district court to tailor them so as to address only the constitutional violations at issue in this case.

## COUNSEL

Eileen Dennis GilBride (argued), Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona; Timothy Casey and James Williams, Schmitt, Schneck, Smyth, Casey & Even, P.C., Phoenix, Arizona; Thomas Purcell Liddy, Deputy County Attorney, Maricopa County Attorney's Office, Phoenix, Arizona, for Defendants-Appellants.

Stanley Young (argued), Hyun S. Byun, and Priscilla G. Taylor, Covington & Burling LLP, Redwood Shores, California; Tammy Albarran, Covington & Burling LLP, San Francisco, California; Dan Pochoda and James Lyall, ACLU Foundation of Arizona, Phoenix, Arizona; Andre Segura, ACLU Foundation Immigrants' Rights Project, New York, New York; Jorge Martin Castillo, Mexican American Legal and Educational Fund, Los Angeles, California; Cecillia D. Wang, ACLU Foundation Immigrants' Rights Project, San Francisco, California; Anne Lai, Irvine, California, for Plaintiffs-Appellees.

**OPINION**

WALLACE, Senior Circuit Judge:

In a previous opinion in this case, we affirmed the district court's post-trial preliminary injunction against Sheriff Joseph M. Arpaio and the Maricopa County Sheriff's Office (individually, Sheriff Arpaio and MCSO; collectively, Defendants), which prohibited Defendants from detaining any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." *See Melendres v. Arpaio*, 695 F.3d 990, 994 (9th Cir. 2012) (*Melendres I*). In this opinion, we address Defendants' appeal from the district court's more comprehensive permanent injunction. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, and we vacate and remand in part.

I.

The background facts of this case may be found in greater detail in *Melendres I*. The facts relevant to the arguments made in the present appeal are as follows. Manuel de Jesus Ortega Melendres; David and Jessica Rodriguez; Manuel Nieto, Jr.; Velia Meraz; the organization Somos America; and the class of individuals the named plaintiffs represent (collectively, Plaintiffs) brought a class action for declaratory and injunctive relief, alleging that Defendants have a "custom, policy and practice" of racially profiling Latino drivers and passengers, and of stopping them pretextually under the auspices of enforcing federal and state immigration-related laws. *Id.* at 994–95. Plaintiffs alleged that Defendants' discriminatory policy extended to the post-stop investigatory process, resulting in longer and more

burdensome detentions for Latinos than for non-Latinos. These policies, according to Plaintiffs, violated federal constitutional and statutory law. *Id.*

It was alleged that Defendants implemented this policy primarily during "saturation patrols," or "crime suppression sweeps," in which Defendant officers would "saturat[e]" a particular area and "sweep[]" it, looking for violations of federal civil immigration laws and state immigration-related laws. *Id.* at 994. Indeed, each of the named individual plaintiffs, except for David and Jessica Rodriguez, was stopped by defendant officers during a saturation patrol. The district court ultimately certified a plaintiff class encompassing "[a]ll Latino persons who, since January 2007, have been or will be . . . stopped, detained, questioned or searched by [Defendants'] agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona," regardless of whether such persons were stopped, detained, questioned, or searched as part of a saturation patrol. *Id.* at 995 (alteration in original). At trial, the vast majority of evidence focused on Defendants' use of race during saturation patrols, although some evidence indicated that Defendants' policies and practices extended to regular, non-saturation patrols.

After a bench trial, the district court concluded that Defendants employed an unconstitutional policy of considering race as a factor in determining where to conduct patrol operations, in deciding whom to stop and investigate for civil immigration violations, and in prolonging the detentions of Latinos while their immigration status was confirmed. The court found that these unconstitutional policies applied to both saturation and non-saturation patrol activities. As a result, the district court permanently enjoined

Defendants from (1) "detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization"; (2) "using race or Latino ancestry" as a factor in deciding whether to stop any vehicle with a Latino occupant, or in deciding whether a vehicle occupant was in the United States without authorization; (3) "detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing a violation of federal or state criminal law"; (4) "detaining, holding or arresting Latino occupants of a vehicle . . . for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present"; and (5) "detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act."

The injunction became effective immediately. However, the district court stated it would confer with the parties about the need for additional injunctive relief, given Defendants' history of being "aggressively responsive" to a majority of the Maricopa County electorate in pursuing law enforcement efforts against "unauthorized residents." Such efforts had resulted in violations of the district court's preliminary injunction. The court suggested that additional injunctive relief should address Defendants' failure to have a "clear policy" about conducting saturation patrols and "other enforcement efforts" in a race-neutral manner, as well as Defendants' failure to monitor and keep proper records regarding whether officers were "engaging in racially-biased

enforcement" during saturation patrols. The district court told the parties that it expected them to submit a "consent decree" if they could agree on all terms necessary to resolve the matter; however, if they could not reach an agreement on "all particulars," they were to submit a "proposed consent decree" that denoted each point of agreement and disagreement.

After two months of negotiation, the parties submitted a document titled "Parties' Joint Report Regarding Status of Consent Decree Negotiations" (Joint Report) which contained provisions upon which the parties agreed, designated by black font, and those upon which they disagreed, designated by red or blue font. The Joint Report's terms did not distinguish between saturation and non-saturation patrols. At the evidentiary hearing on the Joint Report, the district court recognized that the parties had not arrived at a true "consent decree" but rather had produced a "general framework through which [the court could enter] supplemental injunctive relief" by resolving the parties' remaining "significant disagreements." Following that hearing, and using the Joint Report as a framework, the district court entered a supplemental permanent injunction. This injunction required Defendants, among other things, to increase training, improve traffic-stop documentation, develop an early identification system for racial profiling problems, enhance supervision and evaluation of MCSO deputies, and improve reporting of misconduct complaints. The supplemental injunction also directed the appointment of an independent Monitor to assess and report on Defendants' implementation of the original and supplemental injunctions. As with the parties' Joint Report, the court's injunctive provisions were not limited to saturation patrols, but rather applied across the board to all law enforcement activity within the MCSO.

On appeal, Defendants raise two main challenges to the district court's permanent and supplemental injunction orders. First, they challenge the scope of the injunction insofar as it applies to Defendants' conduct outside saturation patrols. Defendants maintain that insufficient evidence supported the court's finding that Defendants' constitutional violations occurred during regular, non-saturation patrols. Also, because the district court rejected David and Jessica Rodriguez' constitutional claims, and because the Rodriguezes were the only named plaintiffs stopped outside a saturation patrol, Defendants argue that the Rodriguezes lack standing to bring the constitutional claims on behalf of unnamed class members similarly stopped outside of a saturation patrol. Accordingly, Defendants argue that the injunction should be vacated as it applies to regular patrol activities, and that the Plaintiff class should be partially decertified and limited to Latino vehicle occupants stopped, detained, searched, or questioned "during a saturation patrol." Second, Defendants challenge several terms of the injunction as being broader than necessary to cure the constitutional violations found by the district court.

## II.

The district court's findings are reviewed for clear error and its legal conclusions are reviewed de novo. *Saltarelli v. Bob Baker Grp. Med. Trust*, 35 F.3d 382, 384–85 (9th Cir. 1994). The scope and terms of the district court's injunction, however, are reviewed for an abuse of discretion. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms is correspondingly narrow" (internal quotation marks omitted)).

III.

Before we reach the merits of the injunctions, we first address Defendants' threshold argument that MCSO is not a proper party before the court. Early in this litigation, Defendants moved the district court to dismiss MCSO on the ground that it was a non-jural entity—that is, it lacked separate legal status from the County and therefore was incapable of suing or being sued in its own name. When the district court ruled on that motion, Arizona law was unsettled on this issue and, given the lack of consensus among the state and lower federal courts, the district court refused to dismiss MCSO as a non-jural entity. Later, the Arizona Court of Appeals clarified that MCSO is, in fact, a non-jural entity. *Braillard v. Maricopa Cnty.*, 232 P.3d 1263, 1269 (Ariz. Ct. App. 2010). After *Braillard*, it is now clear that MCSO has improperly been named as a party in this action.

We therefore order that Maricopa County be substituted as a party in lieu of MCSO. *See* Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action. On . . . its own, the court may at any time, on just terms, add or drop a party"). On remand, the district court may consider dismissal of Sheriff Arpaio in his official capacity because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (dismissing a duplicative official-capacity defendant).

IV.

We now turn to the merits of the injunctions. We first address Defendants' sufficiency of the evidence argument. Defendants contend that, although the evidence supports the district court's findings and conclusions with respect to constitutional violations during saturation patrols, the evidence is insufficient to sustain the court's findings and conclusions that Defendants' unconstitutional policies extended beyond the context of saturation patrols.

Although the evidence largely addressed Defendants' use of race during saturation patrols, the district court did not clearly err in finding that Defendants' policy applied across-the-board to all law enforcement decisions—not just those made during saturation patrols. For example, the district court cited Sheriff Arpaio's own testimony stating that MCSO "continue[d] to engage in immigration enforcement even though not using saturation patrols to do so." Sheriff Arpaio testified that, despite an eight-month suspension in "immigration sweeps," "[w]e're still doing crime suppression concentrating on the drug traffic" in which "we continue to enforce the illegal immigration laws." Moreover, the district court pointed to multiple instances of deputy sheriffs' testimony in which it was confirmed that at least some MCSO deputies "continue[] to investigate the identity and immigration status of persons it detains during [all] vehicle stops" irrespective of whether they occur during a saturation patrol. Although there is more evidence in the record regarding MCSO's practices during saturation patrols, we hold that the district court did not clearly err in finding that Defendants' unconstitutional policies extended beyond the saturation patrol context.

V.

We now turn to Defendants' argument that the named plaintiffs lacked standing to represent the claims of unnamed class members who were stopped, detained, or searched outside of a saturation patrol effort.

The parties agree the Rodriguezes were the "only named plaintiffs who were stopped outside of a saturation patrol." Defendants argue that none of the evidence presented on the Rodriguez stop establishes a Fourth or Fourteenth Amendment violation, much less a pattern or practice of MCSO's violating the Fourteenth Amendment. Therefore, Defendants argue, no named plaintiff has standing to assert the claims related to stops outside saturation patrols. They thus ask us to decertify partially the class and vacate the injunction "as to all activities outside of saturation patrols."

The difficulty with Defendants' argument is that it conflates standing and class certification. Although both concepts "aim to measure whether the proper party is before the court to tender the issues for litigation, . . . [t]hey spring from different sources and serve different functions." 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:6 (5th ed.). *Standing* is meant to ensure that the injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate. *Class certification*, on the other hand, is meant to ensure that named plaintiffs are adequate representatives of the unnamed class. Unfortunately, when courts have found a disjuncture between the claims of named plaintiffs and those of absent class members, they have not always classified the disjuncture consistently, some referring to it as an issue of standing, and others as an issue of class certification. *Id.* Nor is the distinction always easy to discern.

Even the Supreme Court has apparently applied both approaches inconsistently. *Id.*; *see also Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003) (observing the "tension" in the Court's prior cases as to whether the similarity of injuries suffered by the named plaintiff and the unnamed class members is "appropriately addressed under the rubric of standing or adequacy").

The "standing approach" treats dissimilarities between the claims of named and unnamed plaintiffs as affecting the "standing" of the named plaintiff to represent the class. In other words, if there is a disjuncture between the injuries suffered by named and unnamed plaintiffs, courts applying the standing approach would say the disjuncture deprived the named plaintiff of standing to obtain relief for the unnamed class members. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 999–1002 (1982). The "class certification approach," on the other hand, "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." NEWBERG ON CLASS ACTIONS § 2:6.

We adopt the class certification approach. This approach has been embraced several times (though not always) by the Supreme Court, and is the one adopted by "most" other federal courts to have addressed the issue. *Id.*; *see, e.g.*, *Sosna v. Iowa*, 419 U.S. 393, 397–403 (1975); *Novella v. Westchester Cnty.*, 661 F.3d 128, 149–50 & n.24 (2d Cir. 2011); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000) (a court must first determine whether "at least one named class representative has Article III standing," then "question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to

assert the rights of others" (internal quotation marks omitted)); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998); *Cooper v. Univ. of Tex. at Dallas*, 482 F. Supp. 187, 191 (N.D. Tex. 1979).

For example, in *Sosna*, the Supreme Court held that

> [a] named plaintiff in a class action must show that the threat of injury in a case . . . is "real and immediate," not "conjectural" or "hypothetical." . . . This conclusion [that plaintiff had standing] does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it *does shift the focus* of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class."

419 U.S. at 402–03 (emphasis added, citations and internal quotation marks omitted). Under the class certification approach, therefore, "any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing." NEWBERG ON CLASS ACTIONS § 2:6; *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155–61 (1982) (treating dissimilarities in injuries between named and unnamed plaintiffs as an issue of class certification under Rule 23(a) rather than one of standing). Stated differently, "[r]epresentative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have

similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed.).

In the present case, Defendants do not dispute that the individually named plaintiffs, including the Rodriguezes, had individual standing to bring their own claims under the Fourth and Fourteenth Amendments. Moreover, the Rodriguezes did not lose their individual standing simply because the district court resolved their constitutional claims in Defendants' favor. *See Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits"). Defendants argue only that no named plaintiff has "standing" to represent the claims of unnamed plaintiffs stopped during a non-saturation patrol. But this argument raises the question of class certification—i.e., whether the named plaintiffs are adequate representatives of the claims of the unnamed plaintiffs—not a question of standing. *See Falcon*, 457 U.S. at 156–58 & nn. 13, 15 (holding that named plaintiff must prove "much more than the validity of his own claim"; the individual plaintiff must show that "the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims," explicitly referencing the "commonality" and "typicality" requirements of Rule 23(a)).

Under the class certification approach, or the standing approach for that matter, the named plaintiffs in this case, with or without the Rodriguezes, are adequate representatives because the named plaintiffs' claims do not "implicate a significantly different set of concerns" than the unnamed

plaintiffs' claims. *Gratz*, 539 U.S. at 265; *see also id.* at 263, 265 (holding that "[r]egardless of whether the requirement is deemed one of adequacy or standing, it is clearly satisfied in this case" because "the University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions"); *Falcon*, 457 U.S. at 156 (named plaintiffs can adequately represent claims that are "fairly encompassed by the named plaintiff's claims" (internal quotation marks omitted)). In determining what constitutes the same type of relief or the same kind of injury, "we must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry." *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001).

In this case, MCSO's practices during saturation patrols, determined by the district court to be unconstitutional, do not raise "a significantly different set of concerns" from the same practices instituted during regular patrols. *Gratz*, 539 U.S. at 265. Although Defendants may be right that "the purpose and procedures for saturation patrols departed from MCSO's normal traffic enforcement policies," the operative "set of concerns" is the constitutional violations flowing from MCSO's policies that the district court found to apply across the board to all traffic stops, not just to those conducted during saturation patrols. That is, whether the stop takes place as part of a saturation patrol or a routine traffic patrol, the constitutional concerns are the same because MCSO's policies, the district court found, have been applied to both situations. *See Falcon*, 457 U.S. at 159 n.15 ("If [a defendant-employer] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class

action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the . . . requirements of [Federal] Rule [of Civil Procedure] 23(a)").

Our view is not changed by Defendants' reliance on *Lewis v. Casey*, 518 U.S. 343 (1996). In *Lewis*, a class of Arizona state prisoners alleged that the prison denied them their right of access to the courts. *Id.* at 346. Two of the class representatives alleged that they were denied access because they were illiterate, and the prisons violated their rights by failing to provide services to assist them. *See id.* at 356. After trial, the district court found actual injury only on the part of one illiterate plaintiff. *Id.* at 358. The Court held that this injury could not confer standing upon that plaintiff to request relief for others who were denied access for other reasons, e.g., because they did not speak English or were in lockdown. *See id.* The Court wrote: "If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law." *Id.* at 358 n.6.

However, in *Lewis* the concerns of the named plaintiffs differed so significantly from the concerns of the unnamed plaintiffs that a remedy redressing the named plaintiffs' injury could not redress that of the unnamed plaintiffs, even though, in general terms, the stated injury (denial of access to the courts) was the same. For example, if the district court were to order accommodations for illiteracy to resolve the injury of the named plaintiffs, it would do nothing to redress the concerns of those unnamed plaintiffs who were literate but could not speak English or were in lockdown. *Lewis* therefore stands for the proposition that even where named

and unnamed plaintiffs state the same general constitutional injury, if the remedy sought by the named plaintiffs would not redress the injury of the unnamed plaintiffs, the claims raise a "significantly different set of concerns" that consequently makes the named plaintiffs inadequate representatives of the unnamed plaintiffs' claims. *Gratz*, 539 U.S. at 265.

That is not the situation in this case. Here, the district court found the same challenged practice and constitutional injury in *and* outside of saturation patrols. *See supra*, Part IV. As *Lewis* recognized, a "systemwide violation" would justify "systemwide relief." 518 U.S. at 359. There, systemwide relief was inappropriate because only one small injury had been shown (inadequate library access for the illiterate) by contrast to the harm alleged (denial of all access to the courts). *Id.* But here, as stated above, the district court found systemwide violations, warranting systemwide relief. Moreover, contrary to Defendants' argument, *Lewis*'s "holding regarding the inappropriateness of systemwide relief . . . [did] not rest upon the application of standing rules." *Id.* at 360 n.7.

In sum, the district court did not err in holding that the named plaintiffs had standing to assert the claims of absent class members who were stopped during non-saturation patrols. For the same reasons, there is no error in the district court's class certification order.

## VI.

Finally, we address Defendants' argument that various terms of the supplemental injunction are overbroad. Plaintiffs first argue that Defendants waived their overbreadth issue

because, at the direction of the district court, the parties "attempted to develop a proposed consent decree and submitted a joint document that showed Defendants' agreement with the majority of the remedies they now challenge." Thus, Plaintiffs assert that "Defendants consented below to almost all the remedies ordered by the District Court and have therefore waived their argument on appeal." However, the parties' Joint Report was not a consent decree. Indeed, when asking the parties to submit a proposed order, the district court said several times that the proposed order was not a "consent decree" and stated that Defendants' participation would not affect their appeal. Defendants then orally reiterated their intent to appeal and preserved that right in the Joint Report itself. Therefore, Defendants did not waive their objections to the injunctive provisions challenged here.

We have long held that injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc.*, 941 F.2d at 974. An injunction against state actors "must directly address and relate to the constitutional violation itself," *Milliken v. Bradley*, 433 U.S. 267, 282 (1977), and must not "require more of state officials than is necessary to assure their compliance with the constitution," *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (internal quotation marks omitted).

Nevertheless, the district court has broad discretion in fashioning a remedy. *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000). Indeed, a district court is permitted to order "'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation.'" *Id.*, quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986). Therefore, an injunction exceeds the scope of a district court's power only if it is

"aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Milliken*, 433 U.S. at 282. For example, in *Sharp*, we affirmed detailed injunctive provisions such as private visiting rooms and educational opportunities for individuals subject to civil commitment. 233 F.3d at 1173. Although the lack of such amenities did not itself violate the Constitution, the district court could order them to cure the facility's "underlying constitutional violation" of inadequate mental health treatment. *Id.* Similarly, in *Gluth*, we upheld a comprehensive injunction requiring a prison to provide specific office supplies to incarcerated plaintiffs to remedy the prison's unconstitutional denial of access to the courts. 951 F.2d at 1510.

Moreover, we have held that the enjoined party's "history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted." *Sharp*, 233 F.3d at 1173. We afford "special deference" to the terms of a trial judge's injunction where, as here, that judge has had "years of experience with the [case] at hand." *Id.* (internal quotation marks omitted). "The district court, which has first-hand experience with the parties and is best qualified to deal with the flinty, intractable realities of day-to-day implementation of constitutional commands, must be given a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation." *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 43 (2d Cir. 1994) (internal quotation marks omitted).

Defendants first argue that the injunction is overbroad because it impermissibly extends to non-saturation patrol operations. This is simply another iteration of the arguments we rejected above. For the reasons already discussed, the

injunction is not overbroad simply because it applies to non-saturation patrols. The district court's finding that Defendants' unconstitutional policy extended office-wide throughout the MCSO was supported by evidence in the record. Furthermore, Defendants' proposed distinction between the two types of patrols is artificial and ultimately immaterial. From Plaintiffs' perspective, it makes no difference which internal label the MCSO assigns to any given traffic patrol operation; the constitutional injury suffered as a result of Defendants' policy is the same when applied, as the district court found, during both types of operations.

Defendants also challenge specific provisions of the injunction, arguing that they are overbroad because they are "not limited to curing the constitutional violations resulting from the [traffic] patrols." Defendants begin with the injunction's training directives. The injunction provides that Defendants must conduct twelve hours of training on racial profiling to all deputies and posse members within 240 days, and at least six hours annually thereafter. Defendants must also provide additional training on the Fourth Amendment. However, these challenged provisions "directly address and relate to the constitutional violation[s]" found by the district court. *Milliken*, 433 U.S. at 282. They address MCSO's racially discriminatory targeting of Latinos for traffic stops and MCSO's unjustified prolongation of traffic stops. The evidence demonstrated to Judge Snow's satisfaction that MCSO gave virtually no training on racial profiling and otherwise provided erroneous training that led to constitutional violations. There is evidence that some MCSO deputies and supervisors lacked basic knowledge of constitutional requirements, and that MCSO took no steps to evaluate personnel for racial profiling or to discipline

personnel who engaged in racial profiling. The district court did not abuse its discretion in ordering these corrective training and supervision procedures in order to redress the constitutional violations it found here.

Defendants next challenge the injunctive provisions requiring specific data collection concerning and video-recording of traffic stops. Again, these measures "directly address and relate to the constitutional violation[s]" found by the district court. *Id*. They allow the district court to monitor whether MCSO deputies are complying with the court's orders and constitutional requirements. Although requiring state actors to implement recordkeeping systems to aid in judicial monitoring is typically disfavored, it is necessary in this case because of Defendants' record of spoliating evidence. As stated above, the enjoined party's "history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted." *Sharp*, 233 F.3d at 1173. Moreover, we have upheld data collection and analysis requirements in prior cases raising similar issues. *See, e.g.*, *Nicacio v. INS*, 797 F.2d 700, 706 (9th Cir. 1985) (upholding injunction requiring INS to record particularized grounds for motorist stops in order to prevent future racial profiling), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc). Courts in our sister circuits have done likewise. *See, e.g.*, *Floyd v. City of N.Y.*, 959 F. Supp. 2d 668, 685 (S.D.N.Y. 2013) (ordering body-worn video cameras for police department patrol officers in spite of "financial, administrative, and other costs"). We hold that the district court did not abuse its discretion in requiring the data-collection and recording measures at issue here.

Defendants next argue that the district court abused its discretion in granting expansive assessment authority to a "Monitor," which is "a person or team of people selected to assess and report on Defendants' implementation of the [injunction]." Defendants concede that it is "not the Monitor's appointment that is overbroad," but rather the scope of the Monitor's authority to evaluate "everything" in the MCSO, including "disciplinary outcomes for *any* violations of departmental policy, and whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct." We will uphold these provisions unless they are "aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Milliken*, 433 U.S. at 282.

In context, most of the provisions dealing with the scope of the Monitor's assessment authority are aimed at eliminating the constitutional violations found by the district court and therefore do not constitute an abuse of discretion. The district court's injunction requires the Monitor to perform "outcome assessments" to gauge MCSO's compliance with the court's order and the "effectiveness of the reforms." In performing these assessments, the Monitor "shall" take into account eleven enumerated "performance-based metrics and trends." Defendants first attack the metric of "misconduct Complaints" as being unrelated to the constitutional violations at issue. However, the Monitor's authorization is limited to considering only the prevalence of "civilian Complaints regarding biased policing or unlawful detentions and arrests by MCSO Patrol Operation deputies." This provision is therefore narrowly tailored to remedying the specific constitutional violations at issue and is not an abuse of discretion.

However, the metrics dealing with internal investigations and reports of officer misconduct create a problem to the extent they are unrelated to the constitutional violations found by the district court. The injunction broadly requires the Monitor to consider the "disciplinary outcomes for *any* violations of departmental policy" and to assess whether Deputies are subject to "civil suits or criminal charges . . . for off-duty conduct." These provisions are not narrowly tailored to addressing only the relevant violations of federal law at issue here. For example, if an officer commits spousal abuse, or clocks in late to work, or faces a charge of driving under the influence of alcohol in another state while on vacation, such conduct may amount to violations of departmental policy; it may subject officers to civil or criminal charges; but it has no bearing on the constitutional rights at stake here. We therefore vacate these particular provisions and order the district court to tailor them so as to address only the constitutional violations at issue. *See Milliken*, 433 U.S. at 282. However, we affirm all of the other provisions of the injunction as within the discretion of the district court.

**AFFIRMED IN PART AND VACATED AND REMANDED IN PART**. Each party shall bear its own costs on appeal.