IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER DENYING MOTION FOR RECUSAL OR DISQUALIFICATION** |

Pending before the Court is the Motion for Recusal/Motion for Disqualification filed on May 22, 2015 by Defendant Joseph M. Arpaio and non-party contemnor Gerard Sheridan pursuant to 28 U.S.C. §§ 144 and 455. (Doc. 1117.) Along with their Motion, Movants[1] have submitted an affidavit by Sheriff Arpaio as required by § 144, as well as supporting exhibits and certifications from counsel.

In April, the Court began the first phase of civil contempt proceedings against Movants and other members of MCSO's command staff for violating a number of the

---

[1] For clarity, the Court will refer to Sheriff Arpaio and Chief Deputy Sheridan as "Movants" in relation to their pending Motion, and use "Defendants" when referencing the parties named in the underlying action, Sheriff Arpaio and Maricopa County/the Maricopa County Sheriff's Office. Neither Maricopa County, MCSO, nor the other named civil contemnors in this action—Executive Chief (retired) Brian Sands, Deputy Chief John MacIntyre, and Lieutenant Joseph Sousa—have joined the Motion for Recusal, or otherwise taken a position on its merits. (*See* Docs. 1129, 1135, 1137.)

Court's orders, entered both before and after trial. Sheriff Arpaio and Chief Deputy Sheridan have admitted the facts charged in the Order to Show Cause and have consented to the Court's entering a finding of civil contempt against them, although issues remain about the appropriate scope of remedies for their violations. The evidentiary hearings on contempt were slated to resume in June but have been postponed pending the resolution of the instant Motion.

The proposed bases on which the Motion is predicated are legally insufficient and untimely. Further, to the extent that Movants, by their own actions, created the circumstances on which they now seek the Court's recusal, they have improperly attempted to invoke the recusal provisions for strategic purposes. For these reasons, more fully explained below, Sheriff Arpaio and Chief Deputy Sheridan's Motion is denied.

## BACKGROUND

This case has a lengthy procedural history; the following limited facts provide context for the grounds on which Sheriff Arpaio and Chief Deputy Sheridan have moved for recusal.

Over two years ago, the Court ruled that Sheriff Arpaio and MCSO had violated the Fourth and Fourteenth Amendment rights of the Plaintiff class and entered associated injunctive relief. (Doc. 579.) For the past year and a half, a Monitor has been involved in supervising and assessing Defendants' implementation of the injunction and reporting to the Court on MCSO's ongoing compliance.[2] (*See* Doc. 649.) Since his appointment, the

---

[2] The Monitor's position is outlined in the Supplemental Permanent Injunction. Defendants appealed the injunction to the Ninth Circuit, which affirmed all provisions except those that permitted the Monitor to consider MCSO's discipline for "*any* violations of departmental policy" as well as whether any deputies are repeatedly the subject of "Complaints, civil suits, or criminal charges, including for off-duty conduct." *Melendres v. Arpaio*, 784 F.3d 1254, 1267 (9th Cir. 2015) (quoting Doc. 606 at 53). The Ninth Circuit reasoned that not every instance of officer misconduct "bear[s] on the constitutional rights at stake here," and directed that the injunction be clarified to relate to the constitutional violations found by the Court. *Id.* The mandate from the Ninth Circuit issued the day before this Order was filed. (Doc. 1163.) Thus, the Court shall more narrowly define the aspects of MCSO's internal affairs processes that the Monitor may consider so that they are clearly tailored to addressing the violations of federal law at issue in this case and matters related thereto.

Court has adjusted the Monitor's responsibilities in response to various issues presented by Defendants' actions.

On motion by Plaintiffs, in February the Court ordered the Sheriff's Office, Sheriff Arpaio, Chief Deputy Sheridan, and others in MCSO's chain of command to show cause why they should not be held in contempt for violating (1) the December 23, 2011 preliminary injunction; (2) their pre-trial discovery obligations under the Federal Rules of Civil Procedure; and (3) the Court's orders at a sealed hearing directing Defendants to cooperate with the Monitor in developing a protocol to recover audio/video recordings of traffic stops that were not disclosed during discovery. (Doc. 880.) The Order to Show Cause charged the named contemnors with civil contempt only.[3] (Doc. 880 at 7–9.) Sheriff Arpaio was noticed on all three matters; Chief Deputy Sheridan was implicated in the first and the third.

The charges in the Order to Show Cause resulted from materials MCSO had posthumously found in the home of Deputy Charley Armendariz as well as from MCSO's ensuing administrative investigations into Armendariz, his supervisors, and his former patrol division.[4] The Monitor was responsible for evaluating the sufficiency of these investigations, which revealed that Defendants had failed to disclose a considerable quantity of relevant evidence during pre-trial discovery. Because of Defendants' omission, Plaintiffs were precluded from admitting the evidence in support of their case-

---

[3] *See United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983) (explaining that it "would usually be wiser to try the civil and criminal charges separately" in light of the additional safeguards applicable only to criminal proceedings). The Court has noted that if a criminal contempt prosecution proves necessary to vindicate its authority after the civil contempt hearing, it will refer such proceedings to another judge. (*See* Tr. of Mar. 20, 2015 Status Conf. 61:23–62:2, Doc. 965.)

[4] Some of the evidence, such as the traffic stop recordings, was plainly requested by Plaintiffs during discovery but was never identified nor produced by Defendants. Other evidence suggested that members of the Plaintiff class may have been subjected to additional routine constitutional infringements other than those that were addressed in the underlying trial. The evidence also revealed that Defendants, as a matter of regular practice and operation, had actively enforced federal immigration law and detained persons after officers concluded that there was no legal justification for such detention for at least seventeen months after the Court prohibited these practices in the preliminary injunction. (Tr. Nov. 20, 2014 Status Conf. 67:10–22, Doc. 804.)

in-chief and uncovering the additional constitutional violations likely suffered by the Plaintiff class before trial. Further, the Court did not have the evidence to consider when making findings of fact and conclusions of law concerning what defects in MCSO's operations and procedures had led to the deprivation of Plaintiffs' rights, nor when fashioning supplemental injunctive relief to remedy those defects. (*See, e.g.*, Tr. of Sept. 10, 2013 Status Conf. 89:21–91:23 (declining to incorporate Plaintiffs' suggestions regarding the inadequacy of MCSO's existing internal investigative practices into the Supplemental Permanent Injunction due to the lack of evidence presented at trial on that issue).) As a result of these revelations and procedural inadequacies in MCSO's self-investigative processes that had been noted by the Monitor,[5] the Court authorized members of the monitoring team to conduct independent inquiries into the Armendariz materials in addition to supervising those undertaken by MCSO and its Professional Standards Bureau (PSB).  This authorization was to allow the Monitor to assess whether Defendants' implementation of the Court's orders and responsiveness to the Armendariz evidence promoted the constitutional and professional treatment of the Plaintiff class by MCSO. (Doc. 795 at 16–21, *amended by* Doc. 825 (following input by the parties).)

In the Order to Show Cause, the Court remarked that "crafting suitable civil relief for each of the grounds on which contempt is charged [would] be of chief interest to the Court if Defendants, or their subordinates, [we]re ultimately adjudged to be in contempt of court." (Doc. 880 at 25.) Prior to and throughout the contempt proceedings, the Court reiterated its expectation that the parties would develop an evidentiary record sufficient for the Court to fashion an appropriate remedy for members of the Plaintiff class whose rights were impaired by the contemnors' violations of the Court's orders and rules. (*See, e.g.*, Tr. of Mar. 20, 2015 Status Conf. 2:2–6, 11:6–12, 12:21–25, 13:1–21, Doc. 965; Tr. of Apr. 21–24, 2015 Evid. Hr'gs ("Tr.") 44:14–25, Docs. 1017, 1021, 1027, 1030, 1041,

---

[5] *See* Memorandum from Chief Robert S. Warshaw to the Honorable G. Murray Snow, Update and Assessment of MCSO's Armendariz and Related Investigations (Sept. 28, 2014) (Doc. 795, Attach. 1); (*see generally* Tr. Oct. 28, 2014 Status Conf., Docs. 776 780.)

1043; Doc. 1007 at 1–2.) Such a remedy would both compensate those individuals specifically harmed by Defendants' noncompliance and also provide relief for possible system wide deficiencies, relief to which Plaintiffs may have been entitled after trial but for Defendants' discovery violations.

Approximately one month before the scheduled hearing, Sheriff Arpaio and Chief Deputy Sheridan filed an Expedited Motion to Vacate the hearing. (Doc. 948.) Movants admitted to being in civil contempt on the charges in the Order to Show Cause and suggested possible remedial measures. (*Id.*) Plaintiffs opposed the Motion because it did not specify how the admitted violations of the Court's orders had occurred, nor did it resolve all outstanding questions involving the appropriateness and feasibility of the proposed remedies. (*See* Doc. 952.) At the next status conference, the Court encouraged the parties to pursue settlement while advising that any remedies would need to adequately compel Movants' compliance with the Court's orders going forward—in addition to any compensatory element—before the Court would approve the terms. (Tr. of Mar. 20, 2015 Status Conf. 38:12–42:18, Doc. 965.) In the end, negotiations with Plaintiffs were unsuccessful. (*See* Doc. 1005 at 1.) A representative of the United States Attorney's Office for the District of Arizona also declined, citing departmental policy, to participate in any pre-referral settlement of criminal contempt with the contemnors.[6] (Doc. 924; Tr. of Feb. 26, 2015 Status Conf. 35:7–16, Doc. 926.) The Court thus denied the motion without prejudice, as well as Movants' renewed Motion to Vacate that was substantively identical to the first. (Docs. 1003, 1007.)

Although the Court had ordered expedited discovery in advance of the scheduled hearings on contempt, (Doc. 881), this discovery was inhibited by Defendants' delays in

---

[6] The Court is required to designate the United States Attorney for the district in which it sits to prosecute criminal contempt of court. Fed. R. Crim. P. 42. The Court invited a representative of the Arizona USAO to attend status conferences following the later Armendariz revelations, some of which had potential criminal implications for members of MCSO. (Doc. 797 at 2; Tr. of Dec. 4, 2014 Status Conf. 5:4–8, Doc. 817.)

completing the Armendariz investigations,[7] assertion of a purported privilege over information pertaining to ongoing internal investigations, and inadequate document search and retrieval protocols. Consequently, Defendants had not disclosed the complete catalog of documents responsive to Plaintiffs' discovery requests by the beginning of the April hearings.[8] (Docs. 995, 1002, 1013; Tr. 16:14–19:1.)

At the show-cause hearing, the Court noted that it would participate in questioning witnesses, as it had done at trial. Nevertheless, the Court invited counsel to freely object during its examination of the witnesses,[9] and counsel did, in turn, successfully raise objections. (*See, e.g.*, Tr. 626:18–24 ("Ms. Iafrate: 'Your Honor, may I object just as to the way that question is worded? Could we include civil contempt?' The Court: 'Surely.'"); *see also* Tr. 985:19–86:19 (objection sustained).) Movants both had civil and criminal representation during the hearing.

Sheriff Arpaio testified under oath on the second and third days of the contempt hearing. In framing its examination of Sheriff Arpaio, the Court explained that it was important, from a remedial perspective, whether Sheriff Arpaio's admitted contempt was an isolated incident or reflected a pattern of resistance on his part or by MCSO to the Court's directives. (Tr. 635:12–18.) Accordingly, the Court questioned Sheriff Arpaio on

---

[7] For example, Defendants initially indicated that all internal investigations arising out of the Armendariz matter would be completed by March 13, 2015. (Doc. 864.) Defendants subsequently postponed the deadline for completing these investigations until April 13 and, again, until May 18. (Docs. 923, 1052.) The investigations have still not been completed. As a consequence of these delays, the Monitor was unable to make outcome assessments and recommendations based on MCSO's handling of the Armendariz investigations before the April hearings.

[8] Defendants' insufficient efforts to locate and produce the documents responsive to Plaintiffs' discovery request also led to the scheduling of the additional proceedings that were supposed to begin in June.

[9] "I'm going to have some questions, some of them may be difficult to answer, and I'm going to certainly let your attorneys participate if they have concerns, but I'm going to try and ask you [Sheriff Arpaio] my questions with respect, and I hope you'll afford me the same in response." (Tr. 625:12–16; *see also* Tr. 42:20–44:12 (explaining that specially appearing counsel could object where necessary to protect contemnors' criminal interests, even in the civil proceeding); Tr. 965:4–11 ("In all seriousness, Ms. Iafrate, I think that if you have objections or if anybody else does, they ought to make them . . . .").)

aspects of MCSO's internal investigations that had previously raised concerns for the Court and the Monitor about the integrity of those investigations, such as MCSO's apparent reluctance to mete out punishment for violations of department policy and this Court's orders. Sheriff Arpaio acknowledged that, although MCSO's failure to comply with a court order is a "pretty big deal," he had taken no action to hold anyone responsible for the violations of the Preliminary Injunction or the Court's May 14 instructions. (Tr. 628:20–29:1, 633:12–19, 635:19–22.) The Court also inquired about the reassignment of Captain Steven Bailey from the command of the Special Investigations Division (SID)—which was responsible for the unit to which Deputy Armendariz was assigned and that had been responsible for many of the constitutional violations found at trial—to the PSB at the time when the Human Smuggling Unit was under investigation by the PSB because of the Armendariz materials. (Tr. 637:19–38:1, 638:25–40:12.) The Monitor had previously identified this as a potential conflict of interest, which led to MCSO's appointment of an "independent" contractor named Don Vogel to oversee the two principal Armendariz-related investigations being conducted by MCSO. (*See* Tr. 979:24–80:12.)

Sheriff Arpaio went on to confirm that, in addition to overseeing the Human Smuggling Unit, the SID was also responsible for investigations that involved confidential informants, and that someone in the SID chain of command would have been responsible for approving payments to confidential sources during Captain Bailey's tenure there. (Tr. 642:3–14.) The Court then produced an article published in the *Phoenix New Times* on June 4, 2014, the approximate time of Captain Bailey's transfer to PSB. (Tr. 642:17–43:3.) The Court invited Sheriff Arpaio and all counsel to take a minute to read the article, which alleged that MCSO was paying a confidential informant from Seattle, Washington named Dennis Montgomery to investigate possible collusion between this Court and the United States Department of Justice. (Tr. 643:14–17.) Sheriff Arpaio confirmed the existence of an investigation being conducted by MCSO, the Maricopa County Sheriff's Cold Case Posse, and Mr. Montgomery, but repudiated the

article's implication that "what Montgomery was actually doing was investigating [the Court]." (Tr. 647:4–12.) The Court directed Defendants to preserve and immediately produce all documents implicated by Sheriff Arpaio's testimony, subject to a contemporaneous review for privilege by counsel. (Tr. 653:18–25.)

Defense counsel initiated the questioning on this matter when Chief Deputy Sheridan took the stand the following day, which was supplemented with a handful of follow-up inquiries by the Court. (Tr. 958:9–67:10.) At the end of Chief Deputy Sheridan's testimony, three separate attorneys who presently or formerly represented Sheriff Arpaio noted an ethical obligation to correct aspects of his testimony from the previous day. They have since made a variety of disclosures in fulfillment of their duty to act with candor toward the tribunal, including the submission of a November 8, 2013 letter/investigative summary from Movants' then-attorney to Sheriff Arpaio, which was copied to Chief Deputy Sheridan and others at the MCSO. (Tr. 1019–34; *see also* Docs. 1040, 1044, 1053.) From Sheriff Arpaio and Chief Deputy Sheridan's testimony and the corrective disclosures provided by former defense counsel, it is now apparent that Sheriff Arpaio in fact testified as to two investigations with a possible connection to the Court.

The first, the "Montgomery matter," was the topic of the *New Times* article and the subject of the Court's examination. In approximately September 2013 MCSO apparently hired Dennis Montgomery, a computer consultant based out of Seattle, Washington. (Tr. 960:9–14, 1006:2–4, 1007:21–08:2.) Montgomery was given the status of an MCSO confidential informant. (Tr. 998:12–14, 1006:10–16.) According to Movants, Montgomery represented to MCSO that he was in possession of a large number of documents he had obtained while employed by the United States Central Intelligence Agency that the CIA had harvested from American citizens. (Tr. 1000:2–18.) Sheriff Arpaio characterized Mr. Montgomery's investigation as pertaining to whether "someone" had infiltrated Movants' phone lines and the phones and e-mail accounts of various local attorneys and judges connected to Defendants, including this Court. (Tr. 649:14–50:6, 652:11–53:8.) Chief Deputy Sheridan reiterated that Mr. Montgomery had

made allegations that the "CIA hacked into individual bank accounts" of county residents, (Tr. 960:11–13, 1004:9–11), and that he, Sheriff Arpaio, and the two law firms representing Defendants in a related lawsuit brought against the MCSO by the Department of Justice had been the subject of a secret wiretap by the government. (Tr. 999:16–1000:6.) At some point during Montgomery's investigation, Chief Deputy Sheridan was informed that Montgomery had evidence of a communication sent by the DOJ to the Court's computer. (Tr. 1000:12–14). Sheridan testified that he ordered the MCSO personnel working on the project "not to investigate any information involving Judge Snow," and that "[i]f any further information comes up, [he] want[ed] to know immediately." (Tr. 1003:12–19.) He further testified that, after he issued this instruction, nothing further "ever did materialize." (Tr. 1003:19–29.)

Sheriff Arpaio avowed that nothing gleaned from Montgomery gave him any concern that the Court's judgment or neutrality in this case might be affected, (Tr. 652:16–18), and Chief Deputy Sheridan similarly confirmed that "there was really nothing [in the information from Montgomery] to think that there was any collusion between this Court and the Department of Justice." (Tr. 1003:1–2.) Movants both declare that MCSO eventually concluded that Montgomery had made false representations regarding his work product, and that they have no confidence in Montgomery or his allegations; they were "junk." (Id. at 650:18–25, 961:1–11.)

Documents pertaining to the Montgomery investigation that were subsequently disclosed pursuant to this Court's orders, however, call into question the version of events testified to by Movants. Some of these documents have been filed by Plaintiffs in their Response to this Motion. (Doc. 1150, Aff. of Cecilia Wang, Exs. B–F (available at Doc. 1153).) Although the body of documents produced has not yet been reviewed in full, and the Monitor has made document requests of the County that remain pending, at least some of the materials do—falsely—assert the existence of telephone calls between this Court and agents of the DOJ, including Eric Holder, Lanny Breuer, and one of this

Court's former law clerks, dating back to before this case was assigned to the Court.[10] They also appear to imply that this Court authorized a wiretap on MCSO. (*See id.*, Ex. F (available at Doc. 1153).) These documents and Sheriff Arpaio's hearing testimony further suggest that the same persons in charge of implementing the Court's injunctive decree within MCSO and supervising MCSO's internal affairs processes were aware of Mr. Montgomery's attempt to construct a conspiracy between the Court and other agents of the federal executive branch. In addition, although Movants apparently knew by at least November 2014 that the CIA database of documents from which Montgomery was supposedly providing this information was fraudulent, (*id.*, Ex. C (available at Doc. 1153)), the investigation was still ongoing as of the contempt proceedings (Tr. 651:24–52:4) and MCSO continued to press Montgomery for work-product until the day before the hearings began. (Doc. 1150, Aff. of Cecilia Wang, Ex. E (available at Doc. 1153).) It was after the Court noted some of the apparent inconsistencies between the documents from the Montgomery investigation and Movants' previous testimony, authorized the Monitor to collect documents and conduct additional interviews on the matter, and invited Movants to address these inconsistencies in the resumed contempt hearings, that Movants filed the instant Motion.

The second investigation, the "Grissom matter," came to light during the Court's questioning of Sheriff Arpaio about the Montgomery investigation; the Court was unaware of the Grissom matter until Sheriff Arpaio testified to its existence. After Sheriff Arpaio denied being aware of any investigation involving the Court, he then testified as follows:

> Q.   Are you aware that I've ever been investigated by anyone?
>
> A.   You investigated?
>
> Q.   Yes.

---

[10] The phone number that is attributed to the Court in these documents is not, however, accurate.

| | | |
|---|---|---|
| A. | No. No. |
| Q. | Any of my activities? |
| A. | No. |
| Q. | Any of my family members? |
| A. | That have been investigated? |
| Q. | Yes. |
| A. | Not by our office. |
| Q. | Are you aware of anybody who's investigated any of my family members by any—any office. Or anybody. |
| A. | I believe there was an issue, but once again, it wasn't my office. |
| Q. | Well, whose office was it? |
| A. | It was an outside investigator not hired by us. |
| Q. | Who hired the outside investigator? |
| A. | Could have been Counsel. |
| Q. | "Counsel" meaning your counsel? |
| Q. | Yes. |

(Tr. 647:8–48:3.) The Court's inquiry of Sheriff Arpaio on the Grissom matter lasted only for a few minutes prior to the lunch recess. The next day, the Court asked a few clarifying questions on this topic during defense counsel's cross-examination of Chief Deputy Sheridan. The Court asked no additional questions about a possible investigation of its family members during its own colloquy with Sheridan.

MCSO apparently initiated the Grissom investigation after a woman named Karen Grissom sent a message through Facebook.com to Sheriff Arpaio in August of 2013. Mrs. Grissom's message to Sheriff Arpaio alleged that she heard this Court's wife make remarks to the effect that "[the Court] hates u [Arpaio] and will do anything to get u out of office." (Doc. 1115 at 8; Doc. 1117, Ex. 5.) Mrs. Grissom attributes the statement to a conversation she had with the Court's wife fourteen or fifteen months earlier at a local restaurant. (Doc. 1115 at 6; Tr. 964:1–9.) Upon receiving the message, Sheriff Arpaio

consulted with his counsel, Timothy Casey, who initially tried to locate Mrs. Grissom and evaluate the credibility of her story. (Doc. 1115 at 8–9.) Although Mrs. Grissom repeated the supposed memory of her encounter with the Court's wife, her demeanor and general non-responsiveness led Mr. Casey to conclude that "the matter was over" and that "the information from Ms. Grissom lacked substance or merit." (*Id.* at 9.) Mr. Casey shared this conclusion with Sheriff Arpaio and Chief Deputy Sheridan. (*Id.*)

Nevertheless, after a subsequent meeting with Sheriff Arpaio and Chief Deputy Sheridan, Mr. Casey retained Don Vogel—the "independent contractor" to whom the principal Armendariz investigations were later outsourced by MCSO—in October 2013 to further investigate Mrs. Grissom's allegations. (*Id.* at 10; Tr. 966:2–3, 21–23.) In the interviews Mr. Vogel subsequently conducted with Mrs. Grissom and her family, all corroborated that Mrs. Grissom had met with a woman at this particular restaurant who had implied harboring negative feelings toward Sheriff Arpaio. (Doc. 1115 at 10–11; Tr. 967:17–68:2.) However, they were generally unable to remember the details of the conversation. (Doc. 1115 at 10–11.) There were also inconsistencies in the Grissoms' recounting of the statement pertaining to Sheriff Arpaio supposedly made by the woman in the restaurant. (*Id.*) According to counsel, Mr. Vogel found the Grissoms "sincere and truthful in their statements about what they believe they heard from Mrs. Snow." (*Id.* at 6.) Nevertheless, at the conclusion of Mr. Vogel's investigation, Mr. Casey made the following determination: "[T]he Grissom information is, in my judgment, so fundamentally flawed in its substance that it likely cannot be used in a Rule 60 motion, appeal, or otherwise without the lawyer doing so violating the Federal Rules of Civil Procedure and the Arizona Rules of Professional Conduct." (*Id.* at 7, 18–19.) Mr. Casey "recommend[ed] and strongly advise[d]" Sheriff Arpaio "*against any* use of the Grissom information." (*Id.* (emphasis in original).)

Despite their hearing testimony that the investigator allegedly found the Grissoms' stories credible, Chief Deputy Sheridan stated that nothing came of the Grissom allegations. (Tr. 968:5–9) He has since acknowledged both in interviews with the press

and on the record that Movants took Mr. Casey's advice, given in November 2013, and chose not to pursue the matter further (Tr. of May 14, 2015 Status Conf. 9–11, Doc. 1097.) Consequently, the matter "sat in [Chief Deputy Sheridan's] desk drawer for a year and a half, until it came out in court when the Sheriff was on the stand" because Movants "had no intention to do anything" after they were "told it would be unethical for [them] to make a complaint on third-party hearsay." (*Id.* (quoting Yvonne Wingett Sanchez, *How Mexican Food Drew Couple Into Heart of Arpaio Case*, Ariz. Republic, May 08, 2015).) Movants' counsel also avowed to the Court that the Sheriff and the Chief Deputy "accepted the advice of counsel and let it go." (*Id.*) Movants continue to maintain, as with the Montgomery matter, that "at no time was Judge Snow or his wife the subject of an investigation." (Docs. 1083, Ex. 1; *see also* Doc. 1117 at 9; Tr. 961:8–9.)

## LEGAL STANDARDS

The two principal statutes that govern federal judicial recusal are 28 U.S.C. § 144, "Bias or Prejudice of Judge," and 28 U.S.C. § 455, "Disqualification of Justice, Judge, or Magistrate Judge." Section 144 provides a statutory method for seeking recusal only on the basis of a federal district judge's personal bias and is triggered by the filing of "a timely and sufficient affidavit" setting forth the facts that would convince a reasonable person that the judge has a bias or prejudice. 28 U.S.C. § 144. The affidavit must be "accompanied by a certificate of counsel of record stating that it is made in good faith." *Id*. The affidavit and accompanying certificate are strictly construed for form, timeliness, and sufficiency. *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993). The court has a duty to "proceed no further" and assign the motion to another judge for a determination of the merits only after it determines the affidavit is legally sufficient. *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980). A party may file only one affidavit pursuant to § 144 in any case. 28 U.S.C. § 144.

Section 455, in contrast, has two recusal provisions. Subsection (a) states that a "judge. . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). An objective standard

applies to disqualification under § 455(a), which contemplates whether "a reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned." *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993). Subsection (b) enumerates specific situations that require a judge to disqualify himself, regardless of whether the conflict of interest creates an appearance of impropriety:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> . . .
>
> (4) He knows that he, individually or as a fiduciary, or his spouse . . . has a financial interest in the subject matter in controversy . . . or any other interest that could be substantially affected by the outcome of the proceeding; [or]
>
> . . .
>
> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
>
> . . .
>
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; [or]
>
> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b)(1)–(5). The analysis under section 455(b) is subjective and also self-enforcing on the part of the presiding judge. *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008).

Recusal for actual bias pursuant to subsection (b)(1) is required only if the moving party can prove by "compelling evidence" that a reasonable person would be convinced the judge was biased in a way that may prevent a fair decision on the merits.[11] *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985); *see also Liteky v. United States*, 510 U.S. 540, 553–56 (1994) (defining bias as animus or malice of a kind that a fair-

---

[11] The standard is identical under § 445(b)(1) and § 144. *Sibla*, 624 F.2d at 867.

minded person could not entirely set aside when judging certain persons or causes). The party seeking recusal carries a "substantial burden" of overcoming the presumption that a district court is free from bias. *United States v. Denton*, 434 F.3d at 1104, 1111 (8th Cir. 2006). The other relevant provisions of § 455(b) mandate disqualification on the basis of a judge's personal interest in the case or his familial relationship with a material witness or other interested party to a proceeding. 28 U.S.C. § 455(b)(4)–(5). The statute specifies that the degree of relationship that necessitates recusal under § 455(b) is calculated according to the civil law system, which includes spouses and siblings. *Id.* § 455(d)(2).

Motions brought pursuant to either § 144 or § 455 are subject to the extrajudicial source rule, meaning that the disqualifying bias or prejudice must generally stem from something other than "information and beliefs" the judge "acquired while acting in his or her judicial capacity." *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012) (quoting *United States v. Frias-Ramirez*, 670 F.2d 849, 853 n.6 (9th Cir. 1982)); *accord United States v. Wilkerson*, 208 F.3d 794, 799 (9th Cir. 2000) ("To disqualify a judge, the alleged bias must constitute animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct." (internal quotation marks omitted)). A judge's courtroom conduct, expressions of opinion, or adverse rulings during the course of proceedings in which disqualification is sought, or in related proceedings, do not constitute a valid basis for the judge's disqualification under §§ 144 or 455. *See Liteky*, 510 U.S. at 555; *In re Marshall*, 721 F.3d 1032, 1043 (9th Cir. 2013).

Recusal motions must also be filed in a timely manner. *See* 28 U.S.C. § 144; *Preston v. United States*, 923 F.3d 731, 732–33 (9th Cir. 1991) (applying same timeliness standard to § 455 motion). This requirement avoids "wasted judicial time and resources and a heightened risk that litigants would use recusal motions for strategic purposes." *Id.* (internal citations omitted). Although "no per se rule exists regarding the time frame in which recusal motions should be filed," they must be filed with "reasonable promptness after the ground for such a motion is ascertained." *Id.*

When a case is close, the balance should tip in favor of recusal. *Holland*, 519 F.3d

at 912. Nevertheless, the recusal statute "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). In considering whether recusal is appropriate under § 455, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *Balistrieri*, 779 F.2d at 1202.

## DISCUSSION

For the reasons set forth below, Movants have not satisfied the requirements to bring a motion pursuant to § 144. Therefore, the Court need not accept the truth of the allegations in Sheriff Arpaio's affidavit nor refer the Motion to another judge for a determination of its merits. *See Sibla*, 624 F.2d at 868. The Court will instead consider whether the record as a whole demonstrates actual bias against Movants, triggers the automatic recusal provisions of 28 U.S.C. § 455(b), or raises a reasonable question about the Court's impartiality.[12] (*See* Doc. 1117 (quoting 28 U.S.C. § 455).)

**I.    The Court's Actions and Rulings Relating to the Contempt Proceedings Are Not Grounds for Recusal.**

The record of the contempt proceeding belies Movants' contention that the Court exhibits antipathy toward Movants; nor would an objective third party perceive a significant risk that the Court would resolve the case on a basis other than the merits. Movants' reliance on the Court's rulings and actions as the foundation for their Motion to Recuse also ignores the long-settled principle that, to trigger recusal, any alleged bias must spring from an extrajudicial source, not from information or beliefs the judge gained over the course of litigation, or else the bias must be particularly excessive in degree. *See*

---

[12] The Motion also refers to the recusal requirements under the Judicial Code of Conduct. The standard for disqualification under the judicial canons is substantially identical to that under the federal statutes. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 870 (1988) (Rehnquist, J., dissenting) (explaining that § 455 was substantially revised by Congress to bring it in conformity with Canon 3C of the Code of Conduct for United States Judges). The state canons cited in the Motion are inapplicable to federal courts.

*Litkey*, 510 U.S. at 550–51.

Sheriff Arpaio and Chief Deputy Sheridan argue that the Court's conduct during the civil contempt proceedings establish that it has a "personal bias or prejudice" against them, 28 U.S.C. § 455(b)(1), or might cause a reasonable person to question the Court's partiality. *Id.* § 455(a). In particular, Movants challenge the Court's denial of their Motions to Vacate and its invitation to the United States Attorney's Office to attend status conferences. (Doc. 1117 at 5–7.) Movants further assert that the Court "engaged in outside investigations . . . that [it] infused into the proceeding," "took evidence outside of court," "asked leading questions," "was argumentative with" and "interrupted" Chief Deputy Sheridan, and "gave [its] own testimony." (*Id.* at 15.) Movants attempt to prove these allegations solely by reference to the declaration[13] of Ronald D. Rotunda, who is a professor at Chapman University School of Law. (*See id.* at 14–15.)

However, the Rotunda declaration—as well as Plaintiffs' corresponding declaration by Stephen Gillers, a professor at New York University School of Law—is an expert opinion. The law of this and every Circuit is that while an expert may provide an opinion to help the jury or judge understand a particular fact, the expert is not permitted to give an opinion as to his legal conclusion. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *see also* Fed. R. Evid. 702(a) (requiring that expert opinion evidence "help the trier of fact to understand the evidence or to determine a fact in issue"). The question presented on the recusal motion is whether 28 U.S.C. § 455 requires this Court to disqualify itself. This decision is solely a question of law. *See Jefferson Cnty. v. Acker*, 92 F.3d 1561, 1581 (11th Cir. 1996), *vacated on other grounds*, 520 U.S. 1261 (1997) ("Whether a judge is disqualified, that is, must not take part in

---

[13] Movants' reply memorandum is accompanied by a second declaration from Professor Rotunda dated June 19, 2015. (Doc. 1158, Ex. I.) In addition to the reasons stated below, the Court will not consider this new declaration because parties may not present new evidence for the first time in their reply briefs. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply to a motion . . . the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990))).

deciding a case, is a question of law."); *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (same). Because both declarations only purport to offer interpretations and analyses of § 455 and express the professors' opinions on whether the Court must withdraw from this case, (*see* Doc. 1117, Decl. of Ronald Rotunda ¶¶ 29–30; Doc. 1150, Decl. of Stephen Gillers ¶ 21), they are not appropriate for the Court to consider in deciding whether its recusal is appropriate. *See in re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (excluding expert opinions of law professors that trial judge should recuse herself on the grounds that they impermissibly stated conclusions of law); *accord United States v. Eyerman*, 660 F. Supp. 775, 781 (S.D.N.Y. 1987).

Although the Court disregards both declarations, it is Movants who bear the burden of overcoming the presumption that the Court is impartial. *See Denton*, 434 F.3d at 1111. Movants' failure to cite to anything admissible that might suggest how the Court's course of examination or rulings demonstrate its actual bias against them falls short of the "compelling evidence" standard that governs motions to recuse under § 455(b)(1). *See Hook*, 89 F.3d at 355. Moreover, to the extent that the examples of the Court's bias cited to by Movants are based on the Court's rulings and conduct during the contempt proceedings, the Motion also fails under § 455(a) and (b)(1) because judicial rulings and conduct during litigation are not a valid basis for a bias or partiality motion "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. If the Court committed error in relation to the contempt proceedings, Movants' proper recourse is an appeal to the Ninth Circuit, not a motion for recusal. *Id.* Under the circumstances, a person apprised of all relevant facts would not reasonably doubt the Court's impartiality.

First, the proceedings in which the underlying events occurred were civil contempt hearings, the factual basis for which Movants do not contest. (*See* Docs. 880, 948, 1003.) Even if it were to accept Movants' unsupported contention that the Court "interrupted" Chief Deputy Sheridan or was "argumentative," (*see* Doc. 1117 at 15), these actions would have to be especially severe or pervasive to fairly suggest the kind of "deep-

seated" animus toward Movants that requires the Court's recusal. *See Liteky*, 510 U.S. at 555–56; *see also Marshall*, 721 F.3d at 1043 (holding that a series of hostile comments toward litigant did not require the judge's recusal because the comments "might also be reasonably seen as the product of [the judge's] frustration with [the litigant's] behavior throughout the litigation"). The record reflects that the Court's orders were violated from a very early stage in this litigation, and that Movants continued to resist the Court's directives after the Court entered its permanent injunction and throughout the compliance phase. The Court has expressed concern for what it perceives to be, at best, Movants' negligent approach to the timely implementation of its orders and, at worst, a pattern of knowing defiance and subversion of the Court's efforts to administer justice in this action. Movants' antagonism has necessitated substantial judicial corrective action; yet, as of the Monitor's last report, MCSO was not close to achieving full compliance with the injunctive order entered nearly two years ago. *See* Robert S. Warshaw, *Third Quarterly Report* 112 (2015) (Doc. 1010). The Court's comment about Movants' having "skin in the game" in any proposed settlement does not provide a basis for recusal for similar reasons. The Court has previously questioned whether, due to the organization of the Maricopa County government—which requires the County as a whole to bear the brunt of the financial costs incurred by Movants' recalcitrance—and Movants' ability to solicit contributions to fund their litigation, Movants might appreciate no adverse consequences, financial or otherwise, from their admitted contempt. (*See, e.g.*, Tr. of Mar. 20, 2015 Status Conf. 52:16–53:7, Doc. 965.) The Court need not ignore these facts in making its rulings. *See in re Yagman*, 796 F.2d 1165, 1181–82 (9th Cir. 1986) ("When [a judge imposes sanctions], the judge will obviously be dissatisfied with some aspect of the offending . . . conduct[;] . . ."[w]ithout more, this natural responsive attitude does not provide reasonable grounds to question the judge's impartiality . . . ."). "Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky*, 510 U.S. at 551 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)). In this case,

the record does not support the conclusion that the Court was critical of or hostile toward Movants, let alone that its behavior was "serious enough to overcome the high standard set forth in *Liteky.*" *Marshall*, 721 F.3d at 1043.

Second, the accusation that recusal is required because the Court "took evidence" outside of court is misplaced. (*See* Doc. 1117 at 15.) During the evidentiary hearing, Sheriff Arpaio testified on the source of funding for the Montgomery investigation, which involved MCSO deputies as well as a member of the Cold Case Posse. Sheriff Arpaio stated that Maricopa County had not paid for the Cold Case Posse member's trips to the Seattle area. (Tr. 645:15.) During the ensuing lunch break, the Monitor mentioned to the Court that the Cold Case Posse may have separate finances from MCSO. When the proceedings resumed, the Court confirmed as much with Sheriff Arpaio during questioning. (Tr. 657:18–59:1.)

As an initial matter, only in the "rarest of circumstances" need the Court recuse itself on the basis of knowledge gained in a judicial capacity. *Holland*, 519 F.3d at 913–14. The Monitor is an agent of the court and, in this role, has communicated with the Court as necessary to oversee and coordinate Defendants' compliance with existing judicial orders on the Court's behalf. *See United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 184 (2d Cir. 1991) (denying motion to recuse based on communications between judge and court-appointed outside housing advisor). In addition, the Monitor's unprompted comment during the recess did not provide the Court with the kind of substantive information about proceedings that "cannot be controverted or tested by the tools of the adversary process." *See Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996). Rather, the only evidence on this matter is in the record: Sheriff Arpaio's testimony, as developed through the Court's examination. Under the circumstances, then, the Court's clarifying questions did not constitute an independent investigation or otherwise demonstrate that the Court possessed impermissible knowledge of a disputed evidentiary fact. *See* 28 U.S.C. § 455(b)(1). This would also not cause a reasonable and informed observer to question the Court's impartiality. *See id.* § 455(a); *Yonkers*, 946 F.2d at 184.

Third, the Court's orders after the first phase of the contempt hearings that Defendants immediately produce all documents relating to the matters on which Sheriff Arpaio had testified or pertaining to the Monitor's discretion to inquire into "matters . . . pertinent to the current contempt findings" are not an adequate basis for the instant Motion.[14] (*See* Tr. of May 14, 2015 Status Conf. 50:24-51:6, Doc. 1097.) The orders relating to document production were justified by Defendants' past failures to adequately and timely conduct discovery and produce requested documents. These failures are one of the grounds for contempt noticed in the Order to Show Cause to which the Movants have admitted and are largely the reason the evidentiary hearings remain incomplete. Defendants' past destruction of responsive documents also has already resulted in the imposition of sanctions at an earlier stage of litigation. (Doc. 493.) Movants' non-compliance with Court orders in a way that risked additional evidence spoliation is yet another ground on which Movants are charged with, and have admitted to being in, contempt. Further, Defendants' ambivalence toward meeting self-imposed deadlines has repeatedly delayed the judicious progression of this litigation; in the context of internal affairs, for example, Defendants' delay in completing the Armendariz-related investigations has prevented the Monitor from being able to assess the adequacy of a number of MCSO's self-investigations. In light of this history, the Court's efforts to ensure the preservation of the Montgomery and Grissom documents and their timely production do not fairly suggest that the tribunal is biased against Movants. *See Marshall*, 721 F.3d at 1042–43 (considering judge's orders in light of litigant's history in the case); *McTiernan*, 695 F.3d at 892 (finding judge's negative comments about a defendant did not imply her partiality where they were based on the defendant's known past misconduct).

---

[14] Movants' arguments that the Court ordered the disclosure of materials without providing an opportunity for counsel to conduct privilege review, or that the Court provided the Monitor with unbounded investigative power bearing no relation to this case, mischaracterize the record. (*See, e.g.*, Doc. 1032; Tr. 653:18–25; Tr. of May 8, 2015 Status Conf. 30:1–4, 30:25–31:15, Doc. 1086; Tr. of May 14, 2015 Status Conf. 53:12–56:25, Doc. 1097.)

The Court's specification following the first phase of the contempt hearing that the Monitor's investigative and oversight authority extended to the Montgomery investigation is likewise responsive to Movants' testimony and does not otherwise imply an invidious motive on the part of the Court. Under the terms of the Supplemental Permanent Injunction, the Federal Rules of Civil Procedure, and its inherent power, the Court has continuing authority to modify the Monitor's role in adaption to changed circumstances. (*See* Doc. 606); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380–81 (1992). Since the permanent injunction was entered, Defendants' actions have resulted in a number of modifications to the scope of the Monitor's authority.

For instance, in April 2014 the Court, at the parties' request, amended the Supplemental Permanent Injunction to transfer responsibility for conducting community outreach programs designed to improve relations with the Plaintiff class from Defendants to the appointed Monitor after Defendants objected to their compelled participation in these programs. (Tr. of March 24, 2014 Hr'g, Doc. 662; *see* Doc. 670.) Around this time, the Court became aware that Movants and other members of MCSO's command staff had repeatedly mischaracterized the Court's orders since it issued its Findings of Fact, including during a training organized for MCSO patrol deputies and in other public forums. (*See* Docs. 656 at 4–14, 680 at 1–3, 684 at 4; Tr. of Mar. 24, 2014 Hr'g, Doc. 662; Tr. of Apr. 3, 2014 Hr'g, Doc. 672; Tr. of Oct. 28, 2014 Status Conf., Doc. 776.) After the Movants agreed to voluntarily address these misrepresentations, subsequent press coverage caused Sheriff Arpaio to change his mind. (Doc. 680 at 3.) The Court, in response, entered an enforcement order requiring that Defendants distribute a corrective statement within MCSO and that command staff and patrol personnel take steps to familiarize themselves with the content of the Court's Findings of Fact and Conclusions of Law; the Court assigned to the Monitor the responsibility for verifying Defendants' compliance with that order. (Doc. 680 at 4.) The following month, developments brought about by the death of Deputy Armendariz put MCSO in the conflicted position of investigating its own operations and supervisors in matters related to this litigation. When

MCSO insisted on undertaking such investigations despite the conflict of interest, Defendants agreed that the Monitor's involvement and oversight was appropriate. (*See* Tr. of May 14, 2014 Status Conf. 95:6–96:15, Doc. 700.) In November 2014, concerns about the adequacy of MCSO's investigations into the Armendariz issues, and the revelation that MCSO had never complied with this Court's preliminary injunction, resulted in the addition of an independent investigative component to the Monitor's authority. (Doc. 795.) At each stage, the supplements to the Monitor's responsibilities were discussed with the parties and the memorializing orders revised at their suggestion. Movants do not explain why a detached third party would now infer bias from the Court's specification that the Monitor's independent investigative authority allowed him to look into the Montgomery investigation. Certainly, the documents produced by Defendants after Movants' testimony do suggest, at a minimum, the inaccuracy of their previous testimony sufficient to justify the Monitor to consider such matters in conjunction with his investigative and oversight authority.

Lastly, Movants' assertion that the Court's questions denied them of due process is baseless. The Federal Rules of Evidence plainly extend to the Court the right to participate in questioning witnesses. Fed. R. Evid. 614 & advisory committee notes; *see also Barba-Reyes v. United States*, 387 F.2d 91, 93 (9th Cir. 1967) ("[T]he function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. . . . [I]t is his duty to see that a case on trial is presented in such way as to be understood . . . . He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other."). In addition, in a civil contempt proceeding, it is "the offended judge [who is] solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). The record further indicates that on the first day of the contempt proceedings the Court informed the parties of its intent to participate in questioning witnesses. (Tr. 140:6–12.) Movants were each represented by civil and criminal counsel at the show-cause hearings,

none of which objected to the Court's examination at the time or to the questions posed to either Movant, despite being invited to do so by the Court. (Tr. 625:12–16); *cf.* Fed. R. Evid. 614(b)–(c); *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) ("[T]he failure of . . . counsel to object to any of this questioning at trial precludes our review of this issue on appeal."). Due process guarantees the right to be fairly heard before the Court arrives at a decision. *See Little v. Kern Cnty. Sup. Ct.*, 294 F.3d 1075, 1080 (9th Cir. 2002). However, a fact witness in a legal proceeding  has no constitutional entitlement to advance notice of every question he might be asked. The now-challenged topics on which the Court questioned Movants are relevant to the Court's determination of the extent of Defendants' resistance to the Court's orders and what measures are necessary to compel Movants' ongoing compliance with its orders and provide comprehensive relief to the Plaintiff class for Movants' contempt. Moreover, the Court's intervention in witness examination was particularly appropriate in light of the fact that Defendants had restricted Plaintiffs' ability to develop the evidentiary record by withholding discoverable evidence.  *See United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (noting judge's questioning of witnesses is especially appropriate in such circumstances). No due process violation occurred merely because Movants' compelled testimony revealed evidence contrary to Movants' interests in the litigation, namely, that MCSO may have hired a confidential informant at least partly in an attempt to discredit this Court by linking it to a speculative conspiracy. *Barba-Reyes*, 387 F.2d at 93; *cf. Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991) (remarking on district courts' inherent power to police litigants whose actions show bad faith or the intent to hamper enforcement of court orders).

Under the principles discussed above, Movants' arguments for recusal that relate to the Court's conduct in and around the contempt hearing are foreclosed by the record and the extrajudicial source rule. The examples Movants provide of the Court's alleged bias consist of rulings and conduct all occurred in the course of judicial proceedings and neither reflect a negative opinion of Movants based on facts that the Court acquired

extrajudicially, nor display a level of antagonism that would impede fair judgment on the merits. *See Liteky*, 510 U.S. at 556. Sheriff Arpaio is a frequent litigant before this Court on a wide variety of civil matters, and is a named defendant in a half-dozen pending cases assigned to the Court in which he has not sought the Court's recusal. This further suggests that the impetus for Movants' efforts to disqualify the Court in this case is not concern that the Court harbors any extrajudicial bias against Sheriff Arpaio or Chief Deputy Sheridan, but, rather, stems from their dissatisfaction with the Court's rulings in this case, which is not an issue properly resolved through a disqualification motion. *See id.* at 555–56. Although a court must recuse when the provisions of § 455 are implicated, it also has an obligation to hear all cases assigned to it when there is no legitimate reason to recuse. *Holland*, 519 F.3d at 912. In this case, nothing about the Court's conduct pertaining to the contempt hearing warrants its recusal under § 455(a) or (b)(1).

## II.  The Montgomery and Grissom Investigations Do Not Give the Court or its Wife a Disqualifying Interest in the Outcome of the Proceedings, Demonstrate its Actual Bias, or Otherwise Warrant Recusal.

Neither the facts underlying the Grissom and Montgomery investigations nor the Court's inquiry into those investigations demonstrate actual bias or reasonably risk an appearance of partiality to an objective third party with knowledge of the matters. *See* 28 U.S.C. § 455(a)–(b)(1). Furthermore, neither investigation implicates an interest of the Court or its wife that stands to be substantially affected by the outcome of this proceeding. *See id.* § 455(b).

### A.  The Montgomery Matter

A charge of bias or prejudice under § 455(b)(1) or that a judge's impartiality might reasonably be questioned under § 455(a) must be sufficiently grounded in fact to generate doubt in the mind of a fully informed, objective observer; mere speculation or innuendo is not enough. *See in re United States*, 666 F.2d 690, 695 (1st Cir. 1981). In this case, nobody—not even Movants—asserts that the Court was actually involved in the alleged conspiracy that is reflected in the documents on the Montgomery matter produced by

Defendants subsequent to Movants' testimony. (*See* Tr. 1003:1–2) Sheriff Arpaio and Chief Deputy Sheridan testified that they no longer have confidence in any of the materials provided by Mr. Montgomery—they believed those materials to be "junk" (Tr. 650:20–25)—that they had always been "very skeptical" of Mr. Montgomery's claims, and that they "finally realized that he was stringing [them] along." (Tr. 1002:2–16.) Among other problems apparent from the face of the Montgomery materials, the telephone number attributed to the Court in documents that purported to prove phone calls with the Department of Justice, (Doc. 1150, Aff. of Cecilia Wang, Ex. B (available at Doc. 1153)),   is similar to, but has never been, the Court's telephone number. "[R]umor, speculation . . . and similar non-factual matters" that are advocated by no one do not suffice to establish actual bias. *Clemens v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005).

Nor do they raise a reasonable question about the Court's impartiality: Sheriff Arpaio testified that nothing about the Montgomery matter affected his perception of the Court's ability to remain neutral in this case. (Tr. 652:16–18.) Chief Deputy Sheridan also disclaimed that the Montgomery materials caused him to believe there was collusion between the Court and the Department of Justice. (Tr. 1002:1–2.) Movants continue to contend under penalty of perjury that the Montgomery investigation never "involved any investigation of [the Court]." (Doc. 1117 at 9; Doc. 1083, Ex. 1 ("At no time was an investigation initiated against Judge Snow . . . . At no time was Judge Snow or his wife the subject or target of investigation.").) Movants have neither sought to recant those declarations nor assert the truth of the conspiracy apparently outlined in the Montgomery documents. If Movants, knowing the facts of the Montgomery investigation as they did, did not doubt the Court's impartiality it follows that a reasonable person would not either. *See* 28 U.S.C. § 455(a).

To the extent that the Movants seek to now implicitly assert the truth of the Montgomery materials, they are precluded from doing so because a party must seek to disqualify a judge "in a timely fashion" after he becomes aware of the basis for

disqualification.  Yet, Movants knew about the content of the Montgomery documents for some time before they filed the instant Motion. *See Preston*, 923 F.3d at 732–33 (quoting *Molina v. Rison*, 886 F.2d 1124, 1131 (9th Cir. 1989)). At the contempt hearing, Chief Deputy Sheridan testified that, over the course of Mr. Montgomery's investigation, he was presented with materials suggesting that the Department of Justice had made contact with the Court; it was at this point that he apparently ordered his subordinates to undertake no investigation of the Court. He further testified that no additional materials regarding the Court "materialized" after this point in time. Therefore, assuming the accuracy of Chief Deputy Sheridan's testimony, he has long been aware of all of the Montgomery documents implicating the Court in an alleged conspiracy, but nevertheless elected not to seek the Court's disqualification until May 2015—after the Court invited the parties to address the seeming inconsistencies between the Montgomery documents and Movants' testimony and months after Movants apparently lost faith in Mr. Montgomery's credibility.[15] There is a presumption that a recusal petition submitted after the moving party suffers adverse rulings has been filed for suspect tactical and strategic reasons. *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir. 1992).

Furthermore, that the Court inquired into the Montgomery investigation is not a proper basis for the Court's disqualification under § 455(b)(1) because there is nothing to suggest the Court's examination was the product of extrajudicial bias. *See Liteky*, 510 U.S. at 555. Aspects of the Montgomery investigation are relevant to this litigation for reasons the Court has already explained on the record. Sheriff Arpaio began a time- and resource-intensive operation involving Mr. Montgomery at a time when MCSO was

---

[15] The *New Times* article that summarizes what the documents subsequently produced by Defendants tend to show was also published over a year ago, and documents that have since been produced by Defendants reinforce the timeline testified to by Movants, that they suspected Mr. Montgomery was stringing MCSO along for at least several months. (*See* Doc. 1150, Aff. of Cecilia Wang, Ex. C (compiling e-mails from at least November 2014 challenging Mr. Montgomery's work product) (available at Doc. 1153).)

under an obligation to implement the Supplemental Permanent Injunction. To the extent that MCSO may have been trying to use Montgomery to discredit the Court and undermine the legitimacy of its judgment in the underlying lawsuit, these facts are relevant to the attitude that Defendants have toward the Court and its orders, and to the corrective measures that may be necessary to remedy Movants' contempt and achieve the implementation of the permanent injunctive relief. This may be particularly germane in light of the evidence that MCSO apparently continued to press Mr. Montgomery for work product up until the eve of the show-cause hearings even after his credibility was found to be lacking. (Doc. 1150, Aff. of Cecilia Wang, Exs. C–E (available at Doc. 1153).)

The integrity and transparency of MCSO's PSB and SID processes are also implicated by the Montgomery investigation. There is no dispute that there was misconduct within the HSU and the MCSO generally that is relevant to this lawsuit,[16] including patrol deputies' unexplained confiscation of personal identifications and other items. These matters were, at least at the time, systemically under-investigated by supervisors within the SID. Further, the intentional destruction of the evidence of that misconduct may have been sanctioned by those in charge. The inquiry into these issues— when they finally came to light—was handled internally by PSB at the election of MCSO and ultimately compromised by conflicts of interest, delays, and procedural inadequacies. There now appears to have been substantial overlap in the personnel who failed to adequately supervise Deputy Armendariz and the HSU, and those who were responsible for the Montgomery investigation with its speculative ties to this Court. This raises obvious questions about whether those personnel are, in fact, working to implement all of this Court's orders in good faith, especially since the documents that have been produced from the Montgomery investigation tend to suggest that Movants' testimony on the matter may have been at least partially inaccurate. Therefore, the Court's questions about

---

[16] Defendants have never contested the relevance of the Armendariz materials to the Plaintiffs' underlying constitutional claims or that it falls within the scope of the Monitor's oversight. (*See, e.g.*, Tr. of May 14, 2014 Status Conf. 55:21–56:8, 73:20–24, Doc. 700.)

the Montgomery investigation are relevant to this proceeding, and there is nothing to suggest that the questions were motivated by deep-rooted antagonism against Movants. *See Liteky*, 510 U.S. at 555.

In addition, to the extent that Movants are responsible for creating the circumstances that they now offer as grounds for their Motion, the Montgomery materials provide no basis for judicial disqualification. The Ninth Circuit is clear that a party cannot effect recusal of a trial judge by its own actions. "[B]aseless personal attacks on or suits against the judge by a party," "quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading," or "attempts to intimidate the judge" will not suffice to trigger the Court's disqualification. *Clemens*, 428 F.3d at 1179 (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)). Movants instigated the Montgomery matter and have controlled the investigation and the limited disclosures to date concerning its subject, scope, outcome, and relevance to this Court and Movants' contempt. By bringing the Motion, Movants stalled additional discovery into the Montgomery materials from occurring. This kind of risk of strategic manipulation is what § 455 (and its timeliness requirement) explicitly does not allow.

Lastly, none of the specific disqualifying subsections of § 455(b) are applicable here. Under § 455(b)(4), a judge must recuse himself if he has a "financial interest in the subject matter in controversy" or "any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). A judge must also disqualify himself under § 455(b)(5)(iii) where he or his spouse is "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." *Id.* § 455(b)(5)(iii). A disqualifying "interest" is one that concerns the "subject matter of the litigation or a party to it." *See in re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1314 (2d Cir. 1988). Courts have generally limited the kinds of "interests" for which recusal is mandatory to those that are somehow pecuniary or proprietary in nature. *See Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008); *In re N.M. Nat. Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980); *In re Va. Elec. & Power*

*Co.*, 539 F.2d 357, 367 (4th Cir. 1976); (*see also* Doc. 138 at 15–16.) Even if a court's concern with its general reputation were sufficient to constitute an "interest" within the meaning of §§ 455(b)(4) and (b)(5)(iii), such an interest would not be affected in this case because no one claims that the conspiracy outlined in the Montgomery documents is true. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1042 (9th Cir. 2011) ("[W]here an interest is not direct, but is remote, contingent or speculative, it is not the kind of interest which reasonably brings into question a judge's partiality." (quoting in parenthetical *Sensley v. Albritton*, 385 F.3d 591, 600 (5th Cir. 2004))).

### B.   The Grissom Matter

As with the Montgomery matter, the Court's questions and orders relating to the Grissom matter do not warrant its recusal under §§ 455(b)(1) or (a). *See Liteky*, 510 U.S. at 555. The Court's knowledge of the Grissom investigation was acquired in the course of this judicial proceeding, and the Court's conduct since learning of its existence in no way suggests that the Court is now biased or prejudiced against Movants in a way that threatens its ability to evaluate the case on the merits, let alone evidences the degree of antagonism required to justify recusal where no extrajudicial source is involved. *See id.*

Although the Court had read the *New Times* article concerning an alleged investigation of the Court by MCSO, the Court had no awareness of the Grissom matter until Sheriff Arpaio testified, in response to the Court's questioning about the reported investigation, that he knew of an investigation involving a member of the Court's family. The Court asked a few follow-up questions of Sheriff Arpaio; then, the next day, defense counsel elicited testimony on the matter from Chief Deputy Sheridan, apparently in an attempt to clarify Sheriff Arpaio's earlier statements. However, aspects of Sheriff Arpaio's testimony were sufficiently inaccurate to prompt the disclosure of additional materials on the subject by Sheriff Arpaio and his former attorneys. (*See generally* Tr. 1019–1035; Doc. 1083, Ex. 1.) As a result, the Grissom matter garnered further attention as the Parties litigated the applicability of attorney-client privilege and/or work-product immunity to some of those disclosures. The Court's own examination of Movants on this

matter has been minimal, and Movants provide no evidence that is reasonably suggestive of any newly generated bias on the part of the Court since it learned of Mrs. Grissom's allegations and Movants' decision to investigate them.

Mrs. Grissom's paraphrasing of a statement allegedly made by the Court's wife, alone, does not suffice to warrant the Court's recusal. Sheriff Arpaio's counsel initially evaluated the statement and Mrs. Grissom and concluded that her allegations "lacked substance or merit." (Doc. 1115 at 9.) Nonetheless, apparently at the request of Sheriff Arpaio, Mr. Casey took the additional step of retaining Mr. Vogel to investigate the matter further. (*Id.* at 10; Tr. 966:2–3, 21–23.) After reviewing the results of that investigation, Mr. Casey concluded that the Grissom information was "fundamentally flawed" and provided no basis for a "Rule 60 motion [or] appeal . . . without the lawyer doing so violating the Federal Rules of Civil Procedure and the Arizona Rules of Professional Conduct." (Doc. 1115 at 7, 18–19.) Movants acknowledge that they accepted this advice against any use of the Grissom information and let the matter go.

Movants stood by this decision even after the first phase of the contempt proceedings. Sheriff Arpaio's specially appearing counsel (who filed the instant motion) stated publicly following Sheriff Arpaio's testimony that the Grissom matter was not a basis on which the Court should recuse. (*See* Doc. 1150, Aff. of Cecilia Wang, Ex. H.) In addition, Movants argued before Magistrate Judge Boyle that nothing about the Grissom investigation was relevant to issues at stake in this case in order to preserve attorney-client privilege and work-product immunity over the November 2013 letter disclosed by Mr. Casey in which he had summarized Mr. Vogel's findings for Sheriff Arpaio. (*See* Doc. 1073 at 4–5; Doc. 1107 at 5.) Movants were successful in preventing disclosure of portions of the letter because Judge Boyle was apparently convinced, as Movants claimed, that the facts underlying the Grissom investigation did not relate to the contempt proceedings. (Doc. 1053 at 6.) The recusal statutes do not allow for the use of disqualifying elements as a sword and a shield any more than the doctrines of attorney-client privilege and work-product immunity do. *See Bivens Gardens Office Bldg., Inc. v.*

1   *Barnett Bks. of Fla., Inc.*, 140 F.3d 898, 913 (11th Cir. 1998) (noting that the

2   disqualification statute was "intended as a shield, not a sword," and that disqualification

3   cannot be used as "an insurance policy to be cashed in if a party's assessment of his

4   litigation risks turns out to be off and a loss occurs"). Accordingly, the history amply

5   demonstrates that Movants themselves have concluded, repeatedly and after thorough

6   investigation of all of the facts, that the Grissom matter does not warrant the Court's

7   recusal. The Court agrees with these conclusions.

8           When a party becomes aware of a basis to seek to disqualify a judge, it must act

9   with "reasonable promptness" after the basis for disqualification is ascertained. *Preston*,

10  923 F.3d at 732–33. The Ninth Circuit has cautioned that a party that unduly delays the

11  filing of a recusal motion is presumed to be filing it for manipulative purposes. *See E. &*

12  *J. Gallo*, 967 F.2d at 1295–96. Sheriff Arpaio became aware of the Grissom allegations

13  in August 2013, and, after inquiries by his attorney and an independent investigator,

14  elected not to pursue the Grissom matter further. Now, nineteen months later, Movants

15  have filed the instant Motion for disqualification. In the interim time, the Armendariz

16  materials came to light, precipitating the revelation of additional evidence of MCSO's

17  repeated failures to comply with the orders of this Court and the institution of civil

18  contempt hearings. Movants' delay in raising the Grissom allegations until after the

19  contempt proceedings were underway not only raises the specter of attempted

20  manipulation of the judicial process, it runs counter to § 455's requirement of prompt

21  action.

22          In an apparent attempt to bolster their argument for recusal, Movants now assert

23  that because testimony about the Grissom investigation occurred during the contempt

24  hearing, then "Mrs. Snow is undoubtedly a material witness in this proceeding." (Doc.

25  1117 at 14; *but see also id.* at 14 (noting the "irrelevance of the Grissom and

26  Montgomery investigations to the issue of whether the admitted contempt of the

27  Preliminary Injunction occurred . . .").) However, § 455(b)(5)(iv) requires recusal only

28  when the judge or his spouse "is to the judge's knowledge likely to be a material witness

- 32 -

in the proceeding." 28 U.S.C. § 455(b)(5)(iv). A material witness is one "who can testify about matters having some logical connection with the consequential facts" of a case. *Williams v. Stewart*, 441 F.3d 1030, 1055 (9th Cir. 2006) (quoting Black's Law Dictionary (8th ed. 2004)); *United States v. Vazquez-Botet*, 453 F. Supp. 2d 362, 370 (D.P.R. 2006) (applying definition in context of motion under § 455(b)(5)(iv)). The Court has no reason to think that its spouse will be a material witness in any proceeding pertaining to either the instant Motion or to the civil contempt proceedings. First, Sheriff Arpaio's former attorney already concluded that Mrs. Grissom's claims were fundamentally flawed and legally insufficient. Movants accepted that conclusion. Second, all of the facts from the Grissom investigation were known by Movants by the fall of 2013, and seeking disqualification on their basis now is untimely, regardless of which provision of the statute Movants claim it triggers. *See E. & J. Gallo*, 967 F.2d at 1295 n.8; *Preston*, 923 F.2d at 733. Third, Movants do not suggest a single example of admissible testimony that the Court's wife could offer: the Grissom allegation is not of material importance to the show-cause hearing, nor did Movants request a hearing in conjunction with their Motion for disqualification at which such testimonial evidence might be taken. A judge will not be disqualified under § 455(b)(5)(iv) based on mere speculation that the judge or his family member will be called as a witness. *See United States v. Rivera*, 802 F.2d 593, 601 (2d Cir. 1986) (finding judge was not required to recuse himself on the basis of defendants' allegations that judge would be material witness at a requested hearing where defendants did not allege sufficient facts demonstrating their entitlement to the hearing). Fourth, there is no precedent for Movants' contention that an alleged statement by a judge's spouse that might be used to question the judge's impartiality is grounds for disqualification because the spouse is likely to be a "material witness." If this was the case, a party could deliberately manipulate the recusal process by raising statements whose substance is "fundamentally flawed" to demonstrate the supposed bias of the presiding judicial officer and attribute them to the judge or a family member and, by forcing their contravening testimony to

rebut the charge of bias, oblige the judge to recuse under § 455(b)(5)(iv). That is exactly what Movants attempt to do here by trying to re-raise a forfeited suggestion of alleged bias. To the extent that anything about the Grissom matter continues to have incidental relevance to this case—for example, it may illuminate that factual misrepresentations have been made on the record, and suggests the existence of yet another potential conflict in Defendants' selection of Don Vogel as the independent contractor to whom to outsource the Armendariz investigations—it is not because the Court's wife will be a material witness.

Section 455's commitment to fairness in the administration of justice does not require recusal "upon the merest unsubstantiated suggestion of personal bias or prejudice." *Holland*, 519 F.3d at 913. If a judge were to allow manipulation to deter the normal course of litigation, this would equally risk "subvert[ing] [judicial] processes, undermin[ing] our notions of fair play and justice, and damag[ing] the public's perception of the judiciary." *Id.* at 915. Accordingly, the "reasonable person" as to whom the Court must evaluate the appropriateness of its recusal in light of a case's particularities is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." *Id.* at 913 (quoting *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990)). After careful consideration of all of the relevant facts, there is no basis to believe the Court or its wife has a disqualifying bias or interest in the litigation based on the Grissom matter. Moreover, Mrs. Grissom's allegations do not raise a reasonable question about the Court's impartiality, because a neutral observer would not infer the existence of actual prejudice against Movants from a single instance of third-party hearsay that Movants' own counsel determined to be baseless. *See* 28 U.S.C. § 455(a).

## III.   The Court's Brother-in-Law's Partnership Interest Does Not Require the Court's Recusal

Movants also revive as an issue the Court's brother-in-law's affiliation with Covington & Burling LLP, the law firm that represents Plaintiffs in this case. That a

relative of a judge is a law partner of an attorney of record triggers a judge's recusal only if the nature of the familial relationship raises a reasonable question about the judge's impartiality, or if the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding." *See* 28 U.S.C. §§ 455(a), (b)(5)(iii); *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83–84 (2d Cir. 1996).

The Court raised the issue of whether its withdrawal was appropriate in light of its brother-in-law's partnership interest at Covington with the parties three years ago, prior to trial. The Court entered an order setting forth the nature of its relationship with Mr. Teel, the extent of its past consideration of the matter, and the reasons why its recusal was not compelled by law or the judicial canons.[17] (Doc. 537.) The Court also noticed a hearing, (Doc. 539), at which it offered to recuse on the request of any party and to vacate the orders it entered after Covington & Burling's appearance, including the Summary Judgment and Preliminary Injunction order of December 23, 2011. (Tr. of June 29, 2012 Status Conf. 5:19–9:17, Doc. 1149.) At the hearing, Defendants agreed recusal was not mandatory and affirmatively stated that they desired this case to remain on the Court's docket. (*Id.* 15:13–17:2.) Defendants also filed a notice indicating they expressly "waiv[ed] any and all appeal issues regarding . . . the Court's potential bias, impartiality, and/or conflict of interest" potentially implicated by its brother-in-law's partnership interest at Covington & Burling. (Doc. 541.)

The Court, in another order, concluded that the Court's brother-in-law had no interest, financial or otherwise, that required the Court's recusal under § 455(b)(5)(iii), and that no reasonable and objective observer would question the Court's impartiality

---

[17] In 2010 when Covington was substituted as counsel for Plaintiffs the Court reviewed the case law, the Code of Conduct for United States Judges, and the commentaries to the canons and determined its recusal was not necessary, although the Court later observed that it may have been preferable to have fully discussed the matter with the parties at this time. (*See* Doc. 537.)

based on Mr. Teel's partnership at Covington.[18] (Doc. 542.) As Plaintiffs explained, Covington had screened Mr. Teel from participating in the case or receiving any income that may accrue to the firm, so he had no existing economic stake in the case. Further, no party had articulated a non-pecuniary interest of Mr. Teel's that might be "substantially affected by the outcome of the proceeding," *see* 28 U.S.C. § 455(b)(5)(iii), and the Court reasoned that any speculative reputational benefits or Mr. Teel's general interest in his firm's goodwill and client relationships did not amount to a disqualifying interest under § 455(b)(5)(iii) under the facts of this case. In the intervening three years, nothing that has occurred alters the Court's initial analysis: Movants offer no evidence suggesting that Mr. Teel has acquired an interest in the interim time that could be substantially affected by the outcome of these proceedings nor do they explain why the Court's impartiality would now be questioned by any abstract personal interest of Mr. Teel's in this litigation. *See Perry v. Schwarzenegger*, 630 F.3d 909, 914 (9th Cir. 2011) (explaining that recusal is not required where the alleged interest is remote).

In any event, this ground for recusal has long been forfeited. Covington & Burling first entered an appearance in 2010. Sheriff Arpaio was aware of the issue prior to trial three years ago and expressly waived the conflict. (*See* Doc. 541; *see also* Doc. 1117 at 13 (acknowledging that Movants waived this basis for recusal "early in this action").) Although the parties could not remit the Court's disqualification if recusal was required under § 455(b)(5)(iii), a conflict that is disqualifying only because it risks a judge's appearing impartial can be waived. 28 U.S.C. § 455(e); *United States v. Conforte*, 624

---

[18] The primary conflict observed by the Court was between the commentary to the judicial canons, which notes that "[t]he fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge," Code of Conduct for U.S. Judges, cmt. Canon 3C(1)(d)(ii), and the advice of the United States Committee on Codes of Conduct, which suggests a categorical rule of recusal when a relative within the third degree of relationship of a judge has an equity interest in a law firm in a case before that judge. Code of Conduct for U.S. Judges Canon 3C, Advisory Opinion No. 58. The Court explained at length in its earlier opinions on the matter why the per se rule of disqualification set forth in Advisory Opinion No. 58 is an erroneous interpretation of Judicial Canon 3C and the corollary subsection of § 455(b). (*See* Docs. 537, 542.).

F.2d 869, 880–81 (9th Cir. 1980). Further, even claims for recusal under § 455(b) may be lost by inaction after the facts supporting the claim are known by the party and no motion is timely made. *See E. & J. Gallo*, 967 F.2d at 1295 n.8 ("The timeliness of a party's presentation to the court of information it has that comprises a potential ground for disqualification is a different issue than is addressed by subsection (e)."). Movants' failure to raise this ground for disqualification before now precludes them from attempting to do so at this juncture.

## IV.   This Motion Is Legally Insufficient Under 28 U.S.C. § 144.

Section 144 provides for the assignment of a new judge when a party to a proceeding files a timely and legally sufficient affidavit alleging personal bias or prejudice on the part of a judge before whom the matter is pending. 28 U.S.C. § 144. All § 144 motions must also be accompanied by a certificate of good faith from counsel for the party moving for recusal. *Id.* Because the judge must accept the truth of the facts alleged in the affidavit as demonstrating the purported bias, the affidavit and certificate of counsel are strictly construed for form, timeliness, and sufficiency. *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993); *see also Rademacher v. City of Phoenix*, 442 F. Supp. 27, 29 (D. Ariz. 1977) (explaining that affidavits filed in support of § 144 motions "must be given the utmost of strict construction to safeguard the judiciary from frivolous attacks upon its dignity and integrity and to prevent abuse and to insure orderly functioning of the judicial system." (internal citations omitted)). The judge against whom a § 144 affidavit of bias is filed may pass on its legal sufficiency. *Sibla*, 624 F.2d at 868.

For the reasons set forth above, Movants' affidavit is legally insufficient. Recusal motions brought pursuant to § 144 are subject to the same timeliness requirement and extrajudicial source rule as § 455 motions. *See* 28 U.S.C. § 144; *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986). The Court's relationship to its brother-in-law and the facts underlying the Grissom and Montgomery investigations were all known by Movants for years before they filed their Motion. Furthermore, to the extent that any of the bases in Sheriff Arpaio's affidavit stem from the Court's conduct, they fail to establish

recusable bias or prejudice. *See Sibla*, 624 F.2d at 868 ("[A]n affidavit . . . is not legally sufficient unless it specifically alleges facts that fairly support the contention that the judge exhibits bias or prejudice directed toward a party that stems from an extrajudicial source."); *United States v. Scholl*, 166 F.3d 964, 977 (9th Cir. 1999) (holding that actions taken by a judge during proceedings are not a legally sufficient ground to include in a § 144 affidavit). A litigant may also not compel a judge's recusal through his own actions under § 144 any more than he can under § 455. *See Studley*, 783 F.2d at 939–40 (rejecting affidavit where "intemperate and scurrilous attacks" on the judge were the only grounds for recusal asserted).

In addition, this is Defendants' second Motion for Recusal brought pursuant to § 144 and second accompanying affidavit of prejudice. Section 144 explicitly limits a party to filing only one affidavit in support of recusal per case. 28 U.S.C. § 144 ("A party may file only one such affidavit in any case."). In 2009, Defendants moved to recuse Judge Murguía, then presiding over this case, on the grounds that her relationship with her twin sister raised concerns about her impartiality or at least risked an appearance thereof. (Doc. 63.) Defendants' motion was accompanied by an affidavit pursuant to § 144 and the requisite certification of good faith by counsel. (*Id.* at 17, Ex. 1.) Judge Murguía granted Defendants' motion and withdrew from the case. (Doc. 138.) Having previously filed a Motion and affidavit under § 144, in accordance with the express provisions of the statute, Movants are not permitted to file another against this Court.[19] *See United States v. Merkt*, 794 F.2d 950, 961 (5th Cir. 1986) ("[Movant's] affidavit violates the one-affidavit rule of 28 U.S.C. § 144 and need not be considered."); *Balistrieri*, 779 F.2d at 1200 n.6 (same). The limit on successive affidavits is considered necessary to prevent litigants from disqualifying each judge designated to the case and thereby avoid any disposition of its merits. *S.E.C. v. Loving Spirit Found. Inc.*, 392 F.3d

---

[19] If a party discovers new grounds for recusal after submitting an affidavit under § 144, it may still obtain the judge's recusal through a § 455 motion, to which the one-affidavit rule does not apply. *Cf. Sibla*, 624 F.2d at 867–68 (suggesting that an affidavit is not required under § 455).

486, 496 (D.C. Cir. 2004). Movants do not address the one-affidavit rule in their Motion or Reply nor have they credibly argued for its inapplicability even though it was raised to them by the Court on the filing of their Motion. (*See* Tr. of May 22, 2015 Status Conf. 7:13–8:9, Doc. 1130; Doc. 1158 at 12.)

The certifications of counsel submitted in support of Sheriff Arpaio and Chief Deputy Sheridan's Motion also fail to meet the statutory requirements of § 144, which oblige counsel to personally certify that the affidavit of alleged bias as well as the motion to which it is appended are filed in good faith. *See Loving Spirit*, 392 F.3d at 496. Like the ban on successive affidavits, the certification is not simply a pro forma procedural requirement "but is key to the integrity of the recusal process." *Klayman v. Judicial Watch, Inc.*, 744 F. Supp. 2d 264, 270 (D.D.C. 2010); *see also Loving Spirit*, 392 F.3d at 496 ("[T]he attorney's certificate plays a critical role in the recusal process. . . [by] guard[ing] against the removal of an unbiased judge through the filing of a false affidavit. . . " (internal citations omitted)). Although attorneys may have an obligation to consider the record in the light most favorable to their clients when certifying a motion for recusal, there is a difference between presenting the facts in a way that highlights the client's interests and misstating or mischaracterizing the facts in order to effect reassignment of a case. The Court need not determine whether counsel have acted improperly here, however, because the certificates filed by Movants' counsel are legally insufficient on their face. The four attorneys bringing this motion on behalf of Movants have signed an identical certificate stating only that "the associated affidavit from Joseph M. Arpaio for the recusal of Judge G. Murray Snow is made in good faith." (Doc. 1117, Exs. 11–13.) Counsel has not, however, personally certified that there is a good faith basis for the substantive factual allegations contained therein, nor that the Motion itself has been filed in good faith. Each certificate is therefore in disregard of the statutory mandate. The Court, therefore, denies Sheriff Arpaio and Chief Deputy Sheridan's alternative Motion to Recuse pursuant to § 144 as legally insufficient.

///

## CONCLUSION

**IT IS THEREFORE ORDERED** that Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal/Disqualification (Doc. 1117) is **DENIED**.

**IT IS FURTHER ORDERED** that any stay on pre-hearing discovery and/or the activities of the Monitor related to the resumption of the show-cause hearings is lifted.

**IT IS FURTHER ORDERED** setting a status conference in these matters for **Monday, July 20, 2015,** at **11:00 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003. All parties and specially appearing non-parties are required to attend.[20] The parties shall be prepared to discuss: (1) Defendants' Motion relating to the definition of the Plaintiff Class (Doc. 1103); (2) Plaintiffs' Motion to Compel (Doc. 1085); (3) the status of MCSO's remaining internal investigations; (4) the Department of Justice's request to see the database of documents given by Montgomery to the MCSO, which he claims to have taken from the CIA; (5) the procedures pertaining to Maricopa County's independent review of the Monitor's billing; (6) whether Maricopa County is entitled to representation in this litigation separate from Sheriff Arpaio; and (7) the scheduling of the second phase of the civil contempt hearings.

Dated this 10th day of July, 2015.

_G. Murray Snow_
Honorable G. Murray Snow
United States District Judge

---

[20] Out-of-state counsel may appear telephonically for the status conference. Plaintiffs' counsel are directed to establish a call-in number and disseminate to the parties and non-parties.