IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**NOTICE RE: MONITOR'S BILLING PROCEDURES** |

Pending before the Court is the County's Status Report Re: Retention of Accountant for Bill Review (Doc. 1148, Ex. 2) and the Wilson Status Report (Doc. 1157). The reports pertain to the procedure discussed in open court with all parties on May 8, 2015 to permit an appropriate degree of independent oversight over the Monitor's billing despite Maricopa County's re-entry as a party to this case. (*See* Doc. 1163.)

The Monitor's activities in large measure must be confidential to allow for the oversight required by the Court's previous orders. To accommodate the necessary confidentiality with the desired accountability, the Court had previously, during the interim in which Maricopa County was not a named party, arrived at a procedure in which the Monitor would submit publicly available billing for his expenses to Maricopa County. That billing would be sufficiently generic so that it did not compromise his need for confidentiality in conducting his monitoring operations. The Monitor further submitted more detailed billing to the Court. Sandi Wilson, the Deputy County Manager

for Maricopa County and her chosen counsel, Kate Baker, came to the Court and reviewed the billing for the purpose of verifying or challenging to the Court the legitimacy of the Monitor's billings. Ms. Wilson and Ms. Baker were under an obligation to raise their concerns with the Monitor and attempt to resolve them prior to raising the matter with the Court. If the parties were unable to resolve the matter, Ms. Wilson was authorized to submit the dispute to the Court in camera and under seal, for the Court's resolution. (*See, e.g.*, Doc. 696.)

The parties did have some billing disputes which frequently involved interaction between counsel for the Monitor and counsel for Ms. Wilson. That procedure resulted in the parties' adoption of the following generally acceptable procedures:

1. The Monitor submits his billing using activity codes coupled with short descriptions of the work he or his team performed. The combination of activity codes and descriptions do not need to reveal specifics about the detailed work being conducted, but must be capable of being understood, and sufficient to provide the County with an ability to evaluate whether the work was reasonably related to the Monitor's areas of authority. Further the internal time increments per entry must add up to the total billed per task.

2. The Monitor bills in increments of one-tenth of one hour.

3. During monitoring visits, the Monitoring team does not have to account for every single activity, no matter how small, that they undertake. The Monitor must, however, indicate all of its team's activities and time spent by activity code, and must list the specific activities that are the most time-consuming during such site visits.

4. When multiple members of the monitoring team are involved in the same activity, the time spent must be consistent between such members, absent an explanation as to why different individuals billed different amounts to perform the same activity .

5. The Monitor has designated a member of the Monitor Team (currently Commander John Girvin) to discuss any questions regarding invoices, and provide appropriate further follow-up or explanations to the County prior to raising billing disputes with the Court.

6. The Court may assess attorneys' fees and costs against either the Monitor or the County to the extent that either was not reasonable in conducting the billing review.

In the May 8 status conference, the Court expressed concern that it could no longer follow this procedure given the County's re-entry into this case as a party. Nevertheless, the Court suggested a procedure whereby the County could suggest three or four people acceptable to it that had a sufficient accounting ability to review billing detail. (Tr. May 8, 2015 Status Conf. 56:2–25, Doc. 1086.) The Court would choose one of those persons to conduct the review that to date has been conducted by Ms. Wilson. The County would pay for the services of that designee. That designee would be instructed on the level of billing detail that has generally been required of the Monitor by the Court, and has, proved, in large part, acceptable to the parties. The designee would have to keep the billing detail confidential from the parties. In other words, the designee would generally be subject to the same confidentiality requirements to which Ms. Wilson and Ms. Baker remain subject for their previous billing reviews. This independent designee would also attempt to informally resolve questions and concerns regarding the billing with the Monitor (or the appropriate member of the monitoring team) prior to raising such matters to the Court, and would file any objections to the Monitor's billing with the Court in camera and under seal. The Court would rule on such objections and maintain them in its file.

The County, at the hearing, expressed its general agreement to such a procedure. In its Status Report Re: Retention of Accountant for Bill Review (Doc 1148, Exhibit 2), however, the County informs the Court that it would prefer not to follow the procedure set forth by the Court because of the expensive hourly rates apparently charged by certified public accountants. The Court desires to facilitate the County's reasonable and cost-effective review of the Monitor's billings in a manner that will be acceptable to all of the parties. Therefore, as an initial matter, the Court notes that it did not require that the persons nominated by the County be certified public accountants. It only specified

that persons be designated in whom the County had sufficient confidence to conduct the billing reviews. The Court will not require that the persons designated by the County be CPAs, so long as the County has sufficient confidence to designate them.

The County then notes that Ms. Baker's billing rate to the County is less than that of a CPA, and she would not have to be trained or informed regarding the history by which the parties have arrived at their present understandings regarding the acceptable level of billing detail. The County thus recommends that Ms. Baker be approved by the Court to continue conducting the independent review.  Although the Court understands the reasons why the County would prefer to have Ms. Baker fill the role currently served by Ms. Wilson, the Court has the following concerns:

First, Ms. Baker has previously been a vigorous advocate on the County's behalf not only in conducting billing review, but in seeking to negotiate a contract renewal with the Monitor. (*See, e.g.*, Doc. 1148, Ex. 1; Doc 1157.) The independent reviewer would, of course, be representing the County's interest to at least some extent in monitoring the billings. But, due to the requirements of this litigation, the independent reviewer would need to keep all of the detailed billing confidential from the County. In light of Ms. Baker's past and concurrent representation of the County, including her attempts to negotiate the terms of potential contract provisions with the Court's Monitor on behalf of the County, the Court wonders whether she and the County are satisfied that any necessary waivers between them can be worked out to effectuate this required confidentiality, (*see* Doc. 1148, Ex. 2 at 19), and, whether the other parties (including the Monitor) would find such an arrangement acceptable. The Ninth Circuit has denied the County's Motion to be removed as a party to this lawsuit. Therefore, to the extent that Ms. Baker retains her status as a representative of the County, the Court is not sure that other parties or the Monitor would consent to the procedure. Second,  even  assuming that any such waivers could be effectively implemented, Ms. Baker's past or concurrent representation of the County on the contract renewal negotiations with the Monitor might cause additional issues. While there is nothing inappropriate about Ms. Baker

- 4 -

aggressively advocating the views of her client, as a lawyer practicing in the United States District Court for the District of Arizona she is under an ethical obligation not to communicate directly with a client whom she knows to have legal representation with respect to a specific matter. E.R. 4.3 (explaining that a lawyer cannot "communicate about the subject of the representation with a party [she] knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so").

Throughout the course of the last year, both in her attempts to renegotiate the terms of a contract renewal between the Monitor and the County, and in negotiating the appropriate specificity and process for the submission of the Monitor's billings, Ms. Baker has, of necessity, conducted negotiations with Pat Malgieri—the Monitor's legal counsel. The Court is informed that Mr. Malgieri's representation of the Monitor in such matters has proved to be costly to the Monitor. The fact that, as a lawyer, Ms. Baker cannot have direct communication with the Monitor has the potential to considerably increase the cost for the Monitor of allowing independent billing review, if Ms. Baker were to be that agent. Because Ms. Baker is an attorney, her sole review of the file has the potential to constantly require the Monitor to involve his counsel in the fee resolution process and would negate the ability for the parties to resolve questions efficiently and inexpensively.

It is true that Mr. Malgieri could authorize Ms. Baker to speak directly to his client, but Ms. Baker's existing and appropriate loyalties seem to suggest that such a possibility is unlikely. For example, in the Wilson Status Report, (Doc. 1157), Ms. Baker observes that "if the contract negotiations do not resume within the next few months, the current contract amount may be exhausted, leaving no approved funds for payment of the Monitor." The Court does not presume that, by making this statement, Ms. Baker or Ms. Wilson purports that the Monitor would not be paid upon the order of this Court to the County to do so regardless of whether the County has otherwise appropriated the funds. If that is the County's position, the Court invites the County to set forth any legal

- 5 -

authority on which it bases that assertion based on the circumstances presented by this case.  While the Court wishes to promote the reasonable and independent review of the Monitor to ensure accountability, and has no objection to a contractual relationship if the Monitor and the County can arrive at mutually agreeable terms, it does not wish to allow such independent review to be used as leverage to force the Monitor to enter into a contract with the County on terms unfavorable to the Monitor. As the Court has previously stated on the record, the Monitor is not a typical contractor for the County. The Monitor has been appointed by the Court as a required remedial measure resulting from the Defendants' violation of the civil rights of the Plaintiff class and, thus, is not necessarily subject to the same rules and regulations as those with whom the County consensually contracts. The Court, of course, desires to provide an independent check that the Monitor's charges are responsible and cost-effective for the County and, to that extent, it was the Court that previously ordered the review process described above prior to the time that the County re-entered the case. Further, the Court did not object when the Monitor entered a term contract with the County pursuant to which the Monitor was paid for the services it rendered the Court during his first year of service. That contract has, however, now expired.

Moreover, due to the choices of the MCSO during the Monitor's first year contract year, the scope of the services that the Court required from the Monitor significantly expanded. This increase in the Monitor's authority is due to: (1) Defendants' declination to be involved in community meetings as the Supplemental Permanent Injunction originally ordered, and (2) Sheriff Arpaio's determination to maintain control of all aspects of the investigative issues posed by the materials found in the home of Deputy Armendariz as to which the MCSO had conflicts, and for which it needed independent oversight. Further, given that Sheriff Arpaio and Chief Deputy Sheridan have already acknowledged their civil contempt in the matters noticed during ongoing show-cause hearings, the remedial measures concerning that contempt may conceivably require further expansion of the scope of the Monitor's duties in this case.

It should go without saying that while the term of that first contract between the Monitor and the County has expired the need for the Monitor's services has not. If, for the ease of both parties, the Monitor desires to enter a contract with the County pursuant to which it is paid for such services, the Court has no objection. The Court is willing to work with the County to arrive at an effective and independent review of the Monitor's more detailed billings.

In its Wilson Status Update, (Doc. 1157), the County requests that both Ms. Wilson and Ms. Baker be allowed to continue the current billing review procedures. To the extent that the process would involve Ms. Wilson, and thus might present the prospect of the two principals being able to simply, efficiently and cost-effectively resolve questions, the Court is willing to entertain the suggestion. However, the County would have to obtain the consent of all parties to the procedure and further convince this Court that it would not breach any ethical prohibitions by allowing it to proceed as it has despite the presence of the County as a party.[1] The Court is also willing to entertain the appointment of a non-CPA to conduct the review if such a person can be designated by the County. The Court is also open to alternative suggestions by the County. In the absence of any such acceptable procedures, the Court will continue to review the Monitor's billings and enter orders for payment.

Dated this 10th day of July, 2015.

_____
Honorable G. Murray Snow
United States District Judge

---

[1] Further, it would have to be clear that the County itself consented to the procedure. To avoid any apparent inconsistency, this Court has previously directed that "absent good reason to the contrary, all future communications with the Court regarding the selection of an alternate billing review procedure will be through counsel for Maricopa County." Doc. 1147 at 2. Ms. Baker nevertheless filed the Wilson status update (Doc. 1157). While the Court does not assume anything other than a good faith mistake in this respect, it does not wish to entertain the possibility of inconsistent positions arising from various attorneys representing the County's interests in this litigation. Further, in light of the mandate being issued in this case, it is not clear the extent to which the County is a party separate from Sheriff Arpaio in his official capacity.