# FOURTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



## Review Period – First Quarter 2015
## Robert S. Warshaw
## Independent Monitor
## July 14, 2015

## Table of Contents

Section 1:  Introduction…………………………………………………...………3

Section 2:  Executive Summary……………………………………………..5

Section 3:  Implementation Unit Creation and Documentation Request…………8

Section 4:  Policies and Procedures…………………….…..………………….12

Section 5:  Pre-Planned Operations……………………………...…………30

Section 6:  Training……………………………………………………………...35

Section 7:  Traffic Stop Documentation and Data Collection………………...53

Section 8:  Early Identification System (EIS)……………………………..…77

Section 9:  Supervision and Evaluation of Officer Performance………………87

Section 10:  Misconduct and Complaints……………………………………...110

Section 11:  Community Engagement…………………………………………115

Section 12:  Concluding Remarks……………………………………………...121

Appendix:  Acronyms……………………………………………………………122

## Section 1:  Introduction

This is my fourth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Joseph M. Arpaio, et al.* (No. CV-07-02513-PHX-GMS), and documents activities occurring during the first quarter of 2015.

Subsequent to my appointment, and as a result of further Court proceedings, my duties have been expanded in the areas of community engagement, oversight of internal investigations, and independent investigative authority.  The Order was amended on April 4, 2014 with respect to community engagement, and therefore my community engagement activities and those of my Team are detailed in this report.

The Maricopa Sheriff's Office (MCSO) made no appreciable gains during this reporting period in its compliance with the provisions of the Supplemental Permanent Injunction/Judgment Order ("Order") issued by the Honorable G. Murray Snow in the above-referenced litigation.  Our last report chronicled the advances made in achieving compliance with the Order's requirements, primarily as the result of the successful delivery of Fourth and Fourteenth Amendment training, accompanied by the issuance of several policies during that training process.  There were no such initiatives during this reporting period to significantly bolster the agency's momentum.  To the contrary, the development of the next major block of training required by the Order – Supervisor and Command Level Training – has stalled, despite accommodations made by the Plaintiffs and my Team to deliver the training in two phases in order to speed up the process.  This is particularly troubling in light of our observations chronicled in our last report regarding a lack of leadership at all levels of the Maricopa County Sheriff's Office, and in particular, in the upper command ranks of the Office.  The agency is devoid of meaningful management and leadership training, and the successful delivery of the supervisory training required by the Order would only begin to address this systemic issue.  Nonetheless, it must be made a priority.

We are encouraged by the progress made in the implementation of an Early Identification System (EIS).  While work remains to be done in finalizing policies and protocols, MCSO's Bureau of Internal Oversight (BIO) and its Early Intervention Unit (EIU) continue to do an adequate job of providing data, conducting audits, and developing an EIS system that incorporates pieces of information from across the organization.  While fine-tuning of their processes is in order, we note that they have conducted several audits of Office activity and have identified some of the issues that we are seeing in our own reviews.   Having a robust system of internal audits is necessary to assure sustainability once MCSO puts the Order-required reforms in place, and we are optimistic about the manner in which these newly created organizational components have embraced their mission.

Another accountability mechanism for the Office – the administrative investigation process – does not engender similar optimism.  We are required to review completed investigations as a result of our obligations to monitor Section XI of the Order (Misconduct and Complaints) and our expanded authority regarding investigations pursuant to the Court's Order of November 20, 2014.  In our review, we found that many of the cases were not thoroughly investigated, findings were not appropriate, discipline was not justified; and in the majority of cases, MCSO's own policies were not followed.  There is a notable and unacceptable disparity in the quality of investigations conducted at the district level, as well as a lack of consistency from district to

district.   Professional Standards Bureau personnel have been open to the concerns we have brought forward, and are taking steps to address them, but progress is slow.

MCSO is on the verge of deploying body-mounted cameras to its Patrol personnel.   This technology has tremendous potential to increase accountability in the organization, and we look forward to monitoring the agency's use of this equipment.   The existence of video footage should go a long way towards bolstering the quality of MCSO's administrative investigations.   Deputies need not fear the use of this technology, particularly if they are conscientiously trying to perform their duties in a professional manner.   Our experience in other jurisdictions has been that the video tends to exonerate employees far more often than it incriminates them.

## Section 2: Executive Summary

The Order is divided into several main parts, as outlined below, along with a brief description of some of the developments in each area over the review period.

- COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT:  MCSO's Court Implementation Division (CID) produced an Operations Manual during the review period.  We found this to be a well-written document, and suggested some minor changes.  Once adopted, we anticipate that MCSO will achieve Phase 1 compliance with several more Paragraphs.  The division published its quarterly report as required by Paragraph 11.

- COURT ORDER V. POLICIES AND PROCEDURES:  MCSO has promulgated and trained to the policies identified in this section of the Order.  The policies were distributed in conjunction with the agency-wide Fourth and Fourteenth Amendment training, which was completed during this reporting period.  We reviewed GA-1 (Development of Written Orders), and suggested changes to bring MCSO into Phase 1 compliance with applicable Order Paragraphs.  During the review period, MCSO's electronic policy dissemination system, E-Policy, became operational; but MCSO has not as of yet used the system to publish any Order-related policies.

- COURT ORDER VI. PRE-PLANNED OPERATIONS:  MCSO has achieved Phase 1 compliance with this Section of the Order.  MCSO did not conduct any applicable pre-planned operations during this reporting period.

- COURT ORDER VII. TRAINING:  As indicated in our last report, MCSO has successfully completed delivery of the Fourth and Fourteenth Amendment training.  However, progress remains stalled on development of the Order-required supervisory training.  Additionally, MCSO's policy GG-2 (Training Administration) remains in draft form.

- COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW:  MCSO continues to provide traffic stop data to us on a monthly basis.  Most of the systems used to collect the data have been automated, and deputies – for the most part – are complying with the information capture and documentation requirements associated with traffic stops. We also continue to note some of the inadequacies of MCSO practices surrounding the setting of alert thresholds used for ongoing monthly and quarterly data analyses related to these.  However, MCSO is in the process of contracting with an outside consultant to improve the statistical legitimacy of their monthly, quarterly and annual analyses of data.  On October 10, 2014, the Order was amended to allow MCSO to substitute "on-person" recording devices for "fixed mounted" recording devices.  MCSO has received approval for the purchase of this equipment; and has drafted a policy to cover all aspects of the distribution, operation, and maintenance of the recording devices.  We and the Plaintiffs have commented on the policy, and it currently remains in draft form.

- COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS"):  The policies that describe the EIS and the Bureau of Internal Oversight in which it is housed remain under development.  MCSO has acquired the EI Pro software mentioned in our previous

reports, and this has provided greater access to data by first-line supervisors concerning their subordinates. However, they still lack access to their subordinates' complaint histories and dispositions, which must be rectified. MCSO also deployed EI Pro without properly documenting any orientation training to the program. MCSO has engaged an outside contractor to assist in developing the protocols for alerts generated by the EIS system, as well as for the resulting investigations.

- COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE: Policy GB-2 (Command Responsibility) remains in development. We continue to note that many supervisors are not adequately documenting their interactions with their deputies or properly memorializing their oversight of deputy activity. MCSO has yet to create a daily activity log or identify alternatives to document deputy activity and supervisory response to scenes. In general, the documentation of interactions between supervisors and subordinates lacks the specificity needed to prove compliance with the Order's requirements. Similarly, required information is not being captured in deputy and supervisor performance evaluations.

- COURT ORDER XI. MISCONDUCT AND COMPLAINTS: While the quality of MCSO's investigations at both the Professional Standards Bureau (PSB) and at the district levels remains inconsistent and in many areas lacking, MCSO has taken steps to address these issues. An administrative sergeant has been assigned to each district to assist in completing complaint investigations. Lieutenants in PSB have been designated as liaisons to the Patrol Districts and Detention to serve as resources for investigations conducted by those entities. While there were some exceptions, in general the cases we reviewed were not thoroughly investigated, and the findings and disciplinary decisions were not supported by the documentation provided. MCSO has begun working on the policies governing integrity testing as required by Paragraph 103.

- COURT ORDER XII. COMMUNITY ENGAGEMENT: Two community outreach events were held during this reporting period. The purpose of these events is to inform community members of the many changes taking place within MCSO, as well as to provide community members the opportunity to voice support or criticism in a safe forum. The responsibility for Community Engagement has been transferred to the Monitor. However, key members of the MCSO's leadership, representatives from the Court Implementation Division, and district personnel have participated at each of these events; and CID personnel have been responsive and helpful in satisfying all requirements to reserve venues we have selected for community meetings. The newly constituted Community Advisory Board (CAB) has been very proactive in initiating actions to raise community awareness of the existence and function of the CAB. CAB members have also attended some of our site visit meetings with the MCSO to offer their feedback and input.

**Compliance Summary:**

This report documents compliance with applicable order requirements, or Paragraphs, in two phases. For Phase 1, compliance is assessed according to whether requisite policies and procedures have been developed and approved and agency personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that the applicable Order requirements are being complied with more than 94% of the time, or in more than 94% of the instances being reviewed.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In" compliance and "Not" in compliance are self-explanatory. Deferred is used in circumstances in which we are unable to fully determine the compliance status due to a lack of data or information, incomplete data, or other reasons which are explained in the narrative of the report. We will also use Deferred in those situations in which the Office, in practice, is fulfilling the requirements of a Paragraph but has not yet memorialized the requirements in a formal policy. "Not applicable" is only used when describing Phase 1 compliance, and is reserved for those Paragraphs where a policy is not required.

The table below and subsequent chart summarize the compliance status of Paragraphs tracked in this report. The percent in compliance estimate of 40.3 percent for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. The percent in compliance estimate of 24.7 percent for Phase 2 is calculated in the same manner. Therefore, the number of paragraphs included in the denominator totals 77 for Phase 1. This represents an increase from our last report, primarily because the Court Implementation Division has drafted an Operations Manual that, once approved and distributed to the personnel assigned there, will allow for Phase 1 compliance with six additional Paragraphs. The number of Paragraphs included in the denominator for Phase 2 remained at 89.

| Fourth Quarterly Report Summary | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| | | |
| Not Applicable | 12 | |
| Deferred | 3 | 12 |
| Not in Compliance | 43 | 55 |
| In Compliance | 31 | 22 |
| | | |
| **Percent in Compliance** | 40.3% | 24.7% |

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** (*Court Order wording in italics*)

*Paragraph 9. Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

Shortly after the issuance of the Order, MCSO created an Implementation Unit, now identified as the Court Implementation Division (CID). The Court Implementation Division has drafted an Operations Manual to identify its responsibilities and internal procedures for carrying them out. We reviewed the document and found it to be well written. We provided some suggestions for minor changes, and, once finalized and adopted, MCSO will be in Phase 1 compliance with this Paragraph.

At the beginning of our tenure, the division was staffed with a captain, two lieutenants, and two sergeants. The staff has grown significantly, and as of this writing, CID consists of a captain, one lieutenant, five sergeants, two deputies, one management analyst, and one administrative assistant. The captain and his staff continue to be responsive to all of our requests. The division is well supported by MCAO attorneys, who frequently participate in our meetings and phone calls with division personnel.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Deferred

*Paragraph 10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

The Court Implementation Division has drafted an Operations Manual to identify the division's responsibilities and internal procedures for carrying them out. We reviewed the document and found it to be well written. We provided some suggestions for minor changes, and, once finalized and adopted, MCSO will be in Phase 1 compliance with this Paragraph.

As mentioned above, CID has always been responsive to our requests.  In many instances, we have asked for material that has not been routinely collected – or even generated – by MCSO.  In this respect, our first year served as a learning curve for CID and our Team regarding what information may be available and the best ways to produce it.  Our first inquiries focused on policies more than data.  As progress on policies moved forward, our requests have become more data-driven.  We will continue to work with MCSO on what constitutes appropriate compliance assessment data.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Deferred

*Paragraph 11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

The Court Implementation Division has drafted an Operations Manual to identify its responsibilities and internal procedures for carrying them out.  We reviewed the document and found it to be well written.  We provided some suggestions for minor changes, and, once finalized and adopted, MCSO will be in Phase 1 compliance with this Paragraph.

MCSO filed its First Quarter Report for 2015, as required by this Paragraph, on June 15, 2015.  MCSO's report covers the period from January 1, through March 31, 2015.

The report was divided into three major parts.  Part I: Background and Overview of MCSO's Major Efforts Towards Compliance provides some background on the *Melendres* case, some general highlights of major compliance activities since the issuance of the Order, and a brief description of our methodology for determining compliance (describing Phase 1 and Phase 2).  The report also includes a table that was developed from information provided in our third quarterly report (covering the reporting period of October 1, through December 31, 2014) and then updated by MCSO to reflect what MCSO believes to be its compliance progress.

Part II: Steps Taken By MCSO and Plans to Achieve Full and Effective Compliance is the most substantive section of the report, and provides greater detail on MCSO's activities working towards compliance.  This part is organized by the major sections of the Order.  We found it to be well written and informative; and in some instances, it documents compliance activity of which we were unaware.  We will draw from this section of the report to inform our future document requests and our discussions during the next Team site visit.

Part III: Response to Concerns Raised in Monitor's Previous Quarterly Report simply indicates, "The Monitor provided a copy of their Third Quarterly Report, published April 16, 2015 to the CID. MCSO has no additional comments."  The Order requires that MCSO "include responses to any concerns raised in the Monitor's previous quarterly report."  It appears that MCSO is confusing this requirement with the agency's opportunity to provide written comments on a *draft*

*version* of our quarterly reports before they are finalized, pursuant to Paragraph 132 of the Order. The intent of the requirement in this Paragraph is for MCSO to respond to concerns we have raised in our last report with their compliance efforts and other issues.

MCSO submitted its status report in a timely manner, and is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  In compliance

*Paragraph 12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

See Paragraph 13.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Deferred

*Paragraph 13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

The Court Implementation Division has drafted an Operations Manual to identify its responsibilities and internal procedures for carrying them out. We reviewed the document and found it to be well written. We provided some suggestions for minor changes, and, once finalized and adopted, MCSO will be in Phase 1 compliance with this Paragraph.

MCSO submitted its first internal assessment on April 7, 2014. The 11-page document outlined MCSO's efforts to comply with the Order's requirements, and discussed Patrol Operations, Written Policies and Procedures, Training, Supervisor Review, Intake and Investigation of Civilian Complaints, Discipline of Officers, Community Relations, and Miscellaneous Procedures. We found the document to be informative, and a very good summary of the state of play as we were beginning our tenure. All of these areas have been topics of our meetings, discussions, and correspondence with CID personnel and other MCSO staff. MCSO's and the Monitor's responsibilities in some of these areas have been modified by Court Order. MCSO did not assert Full and Effective Compliance with the Order during this review period.

During our December 2014 site visit, we and CID established the schedule for future comprehensive annual assessments as required by these Paragraphs. They will cover MCSO's fiscal year, which runs from July 1 to June 30. Reports are to be submitted on or before September 15.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Deferred

## Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

MCSO policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."  We reviewed GA-1 and provided our comments to MCSO.  The policy has not yet been finalized. CID's proposed Operations Manual, also in draft form, affixes responsibility for coordinating and submitting this review with the CID Lieutenant.  MCSO is not in Phase 1 compliance with this Paragraph.

MCSO has taken steps towards a comprehensive review of its Patrol Operations Policies and Procedures in three phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, MCSO, in response to our requests, provided all of the policies and procedures it believes are applicable to the Order for our review and that of the Plaintiffs.  MCSO received our feedback on these policies, which also included the Plaintiffs comments, on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on those policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.  Many policies unrelated to the training, however, remain in development, and we continue to review them on a case-by-case basis as they are submitted.  Additionally, MCSO has not completed a review of *all* Patrol policies and procedures for potential conflicts with the Order's requirements.

During our December 2014 site visit, we and CID established the schedule for the reviews and assessments as required by the Order.  MCSO will review the policies and procedures applicable to the Order on an annual basis, reflecting their fiscal year, which runs from July 1 to June 30. Reports are to be submitted on or before September 15.  (See Paragraph 34.)

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*Paragraph 20. The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

### *a. Policies and Procedures to Ensure Bias-Free Policing*

*Paragraph 21. The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.　　*define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.　　*prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.　　*prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.　　*specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.　　*include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

MCSO has developed policies and addressed the policy deficiencies previously noted by the Monitoring Team.  MCSO has finalized and published policies, including:  CP-2 Code of Conduct (September 5, 2014); CP-8 Preventing Racial and Other Bias-Based Profiling (September 5, 2014); EA-5 Communications (September 5, 2014); EA-11 Arrest Procedures (September 5, 2014); EB-1 Traffic Enforcement, Violators Contacts and Citation Issuance (September 22, 2014); EB-2 Traffic Stop Data (September 22, 2014); and GJ-33 Significant Operations (September 5, 2014).  Each of these contains the appropriate policy direction related to this Paragraph.  These policies have been distributed to Department personnel and specifically trained to during the required Fourth and Fourteenth Amendment training conducted by MCSO in 2014.  Specific references to areas of required compliance in this section have been personally observed by a Monitoring Team member during the training.

The Department has achieved Phase 1 compliance with this Paragraph.  Implementation of these policies is covered in the other Paragraphs of the Order.  Therefore, Phase 2 compliance with this Paragraph is deferred.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Deferred

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

MCSO policy CP-8 Preventing Racial and Other Bias-Based Profiling and EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance have been finalized, approved, distributed and trained to in the MCSO Fourth and Fourteenth Amendment Training for sworn personnel and Posse members.  This training was completed in 2014.  The Department has achieved Phase 1 compliance with this Paragraph.

During our December 2014 site visit, we met with members of the CID to discuss methods and procedures MCSO could put in place to "consistently reinforce to subordinates that Discriminatory Policing is unacceptable."  This discussion included the review of monthly supervisor notes, facility and vehicle inspections, as well as conducting both email and CAD (Computer Aided Dispatch) audits.  During this same site visit, members of our Team visited Districts 1, 4, and 6 to conduct facility inspections.

In November 2014, the Bureau of Internal Oversight conducted its first audit of supervisory notes, and found numerous violations that were addressed with deficiency memorandums or memorandums of concern authored by the BIO and forwarded to the appropriate chain of command.  Only 2% of the 47 supervisors who were randomly inspected were found to be in compliance.  As a result of this inspection, the BIO recommended a review of MCSO policy GB-2 (Command Responsibility), and additional training in the proper use of Blue Team Supervisory Notes with a signature log to verify completion of this training.  The BIO also began publishing reports of its inspections on the BIO website at mcsobio.org.

During our December 2014 site visit, we requested that we continue to receive copies of any monthly or quarterly audit reports for supervisory notes, as well as other audits conducted.  There were no audits provided for this report indicating that any supervisory notes inspection occurred.

MCSO has made efforts in this area, developed policies, and implemented Blue Team for the reporting of supervisory notes.  Individual supervisory personnel have informed Monitoring Team members that they are consistently reinforcing this information; however, the documentation does not support these statements.  The first supervisory notes inspection conducted by the BIO in November 2014 demonstrated that there is still much to be done for MCSO supervisory personnel to be in compliance with this Paragraph.  In addition, this Paragraph applies to those personnel supervising both deputies and detention officers.  However, it does not appear that the "detention" population was included in the first supervisory notes inspection completed by the BIO.

During the current reporting period, the Bureau of Internal Oversight conducted inspections of both email and CAD messages.  The detailed outcomes of these inspections/audits are covered in Paragraph 23.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

**Paragraph 23.** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

On September 5, 2014, MCSO policy CP-2 (Code of Conduct) was published and has since been distributed.  It has been specifically trained to as part of the Fourth and Fourteenth Amendment training that was completed by MCSO in 2014.  The Department has achieved Phase 1 compliance with this Paragraph.

During prior reporting periods, we discussed with MCSO CID and BIO personnel the importance of conducting random email audits or other inspections to demonstrate compliance with this Paragraph.  Since that time, the BIO has conducted audits of emails and CAD/MDC communications for this purpose.  During the first audits in November and December 2014, the BIO found multiple violations, which it addressed by forwarding deficiency memorandums or memorandums of concern to the appropriate chain of command.  MCSO also began publishing BIO's audits on the BIO website at mcsobio.org.

Between January and March, the BIO conducted two CAD audits.  Using a Generally Accepted Government Auditing Standard (GAGAS), the BIO randomly selected 10 days in January and 10 days in February.  The BIO reviewed CAD messages in an effort to identify compliance with MCSO policies CP-2 (Code of Conduct), CP-3 (Workplace Professionalism), and GM-1 (Electronic Communications and Voicemail).  In its audit report, the BIO also included the specific nature of the discovered violation, which had not consistently been done in the first CAD audit.

In the January 2015 CAD audit, there were, collectively, 3,931 CAD and Alpha Paging Messaging entries.  The BIO identified only one concern, and it was forwarded to the employee's chain of command to be addressed in accordance with policy and procedure.  This number equates to a 100% overall compliance rate for January.  The BIO included the specific inappropriate message in the audit, and it related to unprofessional comments.  We reviewed these comments, and though unprofessional, they were not discriminatory or denigrating based on race, color, or national origin.

In the February 2015 CAD audit, there were, collectively, 4,224 CAD and Alpha Paging Messaging.  The BIO did not identify any concerns in this inspection, reflecting a 100% compliance rate for February.  Both the January and February audits show a decrease in violations from the five identified in the first CAD audit conducted in December 2014.

During this reporting period, the BIO conducted email audits in January, February, and March 2015.  For each month, the BIO reviewed a random sample of 35 employees' email accounts for compliance with MCSO policy CP-2 (Code of Conduct) and MCSO policy GM-1 (Electronic Communications and Voice Mail).

For January 2015, the total number of emails available for inspection was 8,913.  MCSO business emails were eliminated from this population, leaving the actual number of emails available for inspection at 1,280.  Employees in the sample included seven from Enforcement, 23 from Detention, four from Administration, and one from Operations Command.  Thirty-four (97%) of the 35 had no deficiencies noted.  The one deficiency was for failure to properly manage a Microsoft Outlook account, and was not related to any discriminatory or denigrating

practices.  The BIO authored and forwarded a deficiency memorandum to the appropriate Division Commander for review.

For February 2015, the total number of emails available for inspection was 12,714.  MCSO business emails were eliminated from this population, leaving the actual number of emails available for inspection at 1,794.  Employees in the sample included four from Enforcement, 24 from Detention, six from Administration, and one from Operations Command.  All thirty-five (100%) of the randomly selected employee accounts had no deficiencies noted.

For March 2015, the total population of emails available for inspection was 7,616.  MCSO business emails were eliminated from the population, leaving the actual number of emails available for inspection at 1,603.  Employees in the sample included six from Enforcement, 25 from Detention, and four from Administration.  Thirty-four (97%) of the 35 randomly selected employee accounts had no deficiencies noted.  The one deficiency was for failure to properly manage a Microsoft Outlook account, and was not related to any discriminatory or denigrating practices.  The BIO authored and forwarded a deficiency memorandum to the appropriate Division Commander for review.

These three most recent email inspections, along with the December 2014 inspection, compare favorably to the first email audit conducted in November 2014, where of the 35 randomly selected employees, there were 57 issues noted from 12 different employees.  At that time, we found that only 77% were in compliance.

As a result of their inspections, MCSO's Bureau of Internal Oversight authored and forwarded deficiency memorandums to Division Commanders and memorandums of concern to Professional Standards Bureau for review.  In addition, the BIO has continued to recommend additional training to employees and the reinforcement for MCSO employees to immediately report any violations of MCSO policy GM-1 (Electronic Communications and Voice Mail) or CP-2 (Code of Conduct) to a supervisor.  The BIO also added a recommendation during this reporting period to provide Microsoft Outlook program training so that employees could better manage their Outlook accounts.  A BIO Follow-up Action Form is required to be completed and returned within 30 days for any instance where discrepancies were noted.  The documentation provided continues to state that the BIO would conduct a follow-up inspection within the following 30 days.

MCSO has made appreciable efforts to inspect and identify any deficiencies to meet the requirements of this Paragraph.  The reduction in violations from the first audit makes evident the value of conducting these audits on an ongoing basis.  The BIO will continue to provide specific information on any potential violations found in either the CAD or email audits, and will now provide us with the completed action form that is returned to the BIO by the employee's chain of command.  We reviewed some of these returned forms, and found that the outcomes for potential violations to date have included: formal investigations; counseling; coaching; and training.  Several formal investigations were noted as having been completed, with the outcomes being verbal counseling or a written reprimand.  We will continue to review the actions MCSO takes when violations are found.  In addition, we have requested to review the working papers for both the email and CAD audits to conduct a review of what MCSO is actually reviewing to determine audit outcomes.  It is likely that due to the volume of information, especially in the case of the emails, that we will not conduct a regular review of the working papers, but may do

so on an infrequent basis.  Based on a question brought forward by the Plaintiffs, we have confirmed that the concerns found in the audits are being captured in EIS.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance


***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

MCSO policy EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) was finalized and published on September 22, 2014, and trained to during the Fourth and Fourteenth Amendment training completed by MCSO in 2014.  While this policy addressees "traffic" contacts, it does not address any information that MCSO receives from the public through other means upon which it may base its law enforcement actions.

We have met with the MCSO Court Implementation Division and the Special Investigations Division to determine what current methods they use to receive information from the public regarding criminal activity.  The Special Investigations Division has three hotlines.  Two are for narcotics information and the third is for animal crimes.  When the hotlines receive tips, the Special Investigations Division conducts an initial review on any information received before moving forward with an investigation.  If, based on the initial review, it decides to proceed with an investigation, the Special Investigations Division generates a Department report and completes what is referred to as a "run sheet."  (In the future, MCSO will provide the run sheets to the Monitoring Team for our review.)

CID personnel informed us that MCSO has other hotlines as well, including hotlines for child support, dog fighting, technocops, financial crimes, and ATF (Alcohol Tobacco and Firearms).  CID personnel were uncertain if all of these hotlines are still active.  There is also a MCSO email address for receiving complaints from citizens.  An employee conducts intake on any emails received and forwards the complaints to the appropriate Division Commander for follow-up.  CID personnel will explore the possibility of developing a form to capture incoming complaints for all of the different intake methods so that the information can be provided to us easily.  Also, prior to the next reporting period, CID personnel will research which hotlines are still active and provide us with that list.  We will review the active hotlines and "run sheets" for future reporting periods.

We also discussed with CID personnel the need to receive any Operations Plans they develop to review the information received and the action taken – not just those that meet the criteria of a 'Significant Operation' as defined by the Order.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.    *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.    *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.    *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.    *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.    *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.    *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.    *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;*

i.    *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.    *Instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

MCSO has developed several policies that, in concert, incorporate the requirements of this Paragraph.   These include: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), dated September 22, 2014; EB-2 (Traffic Stop Data Collection), dated September 22, 2014; EA-5 (Enforcement Communications), dated September 5, 2014; and CP-8 (Preventing

Racial and other Bias-Based Policing), dated September 5, 2014.   In our feedback to the Department, we required that the definition of racial profiling be consistent throughout all policies where it is included, and that it mirror the definition provided in the Order.   MCSO made the requested policy changes in each of the affected documents, which were then reviewed and approved.   The policies were disseminated and trained to during the Fourth and Fourteenth Amendment training, which was completed in December 2014.   MCSO is in Phase 1 compliance with this Paragraph.

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.   The data required for verification to ensure compliance with these policies is captured in Paragraph 54 by the TracS system.   The system documents the requirements of the Order and MCSO policies.   MCSO has been making changes to the TracS system to ensure that the mandatory fields on the forms utilized to collect the data must be completed by the deputies in order to capture the required information.   TracS is a robust system that allows the user agency to make technical changes to improve how required information is captured.   Since implementation, MCSO has made five changes; currently, MCSO is working on another change to allow deputies to input "Hispanic" on the Arizona Traffic Ticket and Complaint.   In its current form, the traffic citation does not recognize Hispanic as a race or ethnicity.

In order to capture the information for this Paragraph, we review MCSO's Vehicle Contact Face Sheet, Vehicle Contact Supplemental Sheet, Incidental Contact Sheet, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout and any Incident Report generated by the traffic stop.   MCSO created many of these forms to capture the requirements of the Order for Paragraphs 25 and 54.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed.   Our review of a sample of 105 traffic stops that occurred during this reporting period indicated that MCSO was following protocol, and we did not determine that they were in violation of the Order or internal policies.   MCSO is compliant with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.   MCSO policy EB-1.A-E addresses these concerns.   The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement.   We found that the majority of violations cited are for speeding.   When we review the 105 sample traffic stops from across all districts during the quarter, we make note of the locations of the stops contained on the Vehicle Contact Face Sheet, which we review for every stop.   Our review of the data indicates MCSO is compliant with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.   Our review, as in the previous reporting period, of the sample data for this reporting period did not indicate MCSO was in violation of this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity. We reviewed a sample of traffic stop data, and it does not appear that deputies based their traffic stops, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County, and found that the ratio of the ethnicity of the violators in the population was in range with the ethnicity of the individuals stopped. (See Paragraph 54.e.) MCSO is compliant with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. (See Paragraph 54.e.) We reviewed a sample of 31 CAD audio recordings of traffic stops. Prior to making the stop, the deputies advised dispatch of the stop with location, tag/state, and reason for the stop. None of the stops in the sample involved the use of traffic checkpoints. All stops appeared to comport with policy. Our review indicated that traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County; therefore, MCSO is compliant with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact dispatch. In each of the records, deputies advised of the reason for the stop prior to the motorist being stopped. Our review indicates that MCSO is compliant with this Subparagraph (See Paragraph 54e).

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. In our review of 105 traffic stops, we determined that two stops may have lasted for a longer duration than necessary. Since greater than 94% of the cases complied, MCSO is in compliance with this Subparagraph. (See Paragraph 54.i.)

Paragraph 25.h. requires the duration of each traffic stop to be recorded. In our review, we determined that the duration was recorded accurately in 103 of the 105 traffic stops. In the remaining two cases, there was a difference of five or more minutes in the start or end time of the stop, when comparing the Vehicle Contact Face Sheet (VCFS) and the dispatch CAD printout. (See Paragraphs 54.b. and 54.i.) MCSO is compliant with this Subparagraph.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver license or other state-issued identification. The Plaintiffs and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training conducted by outside consultants. Only driver licenses were presented to deputies in each of the cases provided in our sample. MCSO is compliant with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security number of any motorist who has provided a valid form of identification. We have not reviewed any documentation from MCSO that has indicated that deputies are requiring motorists or passengers to provide their

Social Security number during the stop. When MCSO begins employing on-body cameras, we will review a sample of traffic stops to review the video/audio of the citizen interactions and determine if deputies are abiding by the requirements of the Order. The forms completed by deputies on a traffic stop (VCFS and Warning/Repair Form) do not contain boxes to capture this information. MCSO is compliant with this Subparagraph.

**Compliance Status:**

Phase 1: In compliance

Phase 2: In compliance

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

***Paragraph 26.*** *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.      *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.      *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.      *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.      *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.      *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.      *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

The MCSO has finalized and published policies EB-1 (Traffic Enforcement, Violator Contacts and Citation Issuance), on September 22, 2014; and EA-11 (Arrest Procedures), on September 5, 2014. Both contain the appropriate policy direction and have been specifically trained to during the required Fourth and Fourteenth Amendment training completed by MCSO in 2014. The Monitoring Team observed specific references to areas of required compliance in this section during the training. The Department has achieved Phase 1 compliance with this Paragraph.

During this reporting period, MCSO reports that there were no arrests made for any immigration-related investigation or for any immigration-related crime. There were two criminal violation arrests made for identify theft. MCSO provided the investigative reports for both. In both cases, victims filed a complaint for fraud, theft, and identity theft. The suspects in both cases were the sons of the victims. The investigations conducted supported the allegations made by both victims. The suspects in both cases were located, arrested, and booked.

There were no arrests of vehicle passengers for lack of an identity document.  There were 12 arrests of vehicle drivers that included charges for lack of an identity document.  All stops were made with articulated Title 28 violations precipitating the stop.

In four cases, the vehicle driver was a Hispanic male.  One of these stops was for running a red light.  The driver was booked for extreme DUI, the red light violation, and failure to produce ID.  The second Hispanic male driver was stopped for speeding.  He was issued a citation for the speed violation and failure to have ID and released.  The third driver was stopped for excessive speed.  He did not have any valid identification, and was found to have an outstanding warrant.  He was booked on all charges.  The driver of the fourth vehicle was stopped for no taillights.  He told the deputy that he did not have a driver's license or any other form of identification.  The female passenger of the vehicle produced her driver's license and volunteered that her husband (the driver of the vehicle) did not have a driver's license because he had been born in Mexico but had lived here since he was a baby.  A supervisor was called to the scene.  After the deputy was able to verify the identity of the driver by other means (medical information in the vehicle), he was satisfied of the driver's identity and cited and released him. One vehicle driver was a Hispanic female.  She was stopped as a result of an ongoing assault investigation involving the vehicle she was driving.  She was found to have a suspended driver license and no identification.  She was booked on both charges.

In three cases, the vehicle drivers were white males.  Two were stopped for expired registration, and one was stopped for excessive speed.  All were cited for the traffic violations and failure to have identification.  Two vehicle drivers were white females.  One was stopped for a suspended vehicle registration.  She was booked for the original violation, failure to provide identification, and two outstanding warrants.  The second white female driver was also stopped for a suspended vehicle registration.  She failed to provide any identification and appeared to be impaired.  She was booked as a "Jane Doe" as the deputy was unable to verify her identity.

In two cases reviewed, the vehicle drivers were Black males.  One was stopped for excessive speed (83 mph in a 55 mph zone).  He was booked for the speed violation and failure to provide identification.  The second Black male driver was contacted when he was found sitting in his vehicle in the middle of an intersection.  He appeared impaired and was booked for traffic violations and failure to have a driver license.

In all but one of the stops, a supervisor reviewed the report within 24 hours.  In one case, we were unable to determine specific information, as there was inadequate documentation provided.  A review of the documentation provided by the arresting deputies showed articulated and appropriate reasons for each of the stops.  Based on the reports reviewed, the actions of the deputies at each scene appear appropriate and consistent with law enforcement practices.

During this review period, MCSO Special Investigations Division submitted a memorandum indicating that the Anti-Trafficking Unit (formerly the HSU) had arrested four suspects for transportation of marijuana during the months of January and February 2015.  All were arrested on January 5, 2015 under the same report number.  There was no memorandum located indicating that the unit had made any arrests in March 2015.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

***Paragraph 27.*** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

MCSO has provided the finalized policy for EA-11 (Arrest Procedures), the Investigations Division Operations Manual, and the former HSU (Human Smuggling Unit) Operations Manual. The only reference to a LEAR (Law Enforcement Agency Response) Policy is in the former HSU Operations Manual where references are made to a U.S. Immigration and Customs Enforcement (ICE) LEAR Policy.  We reviewed the relevant policies and find no reference to an MCSO LEAR Policy.  We have met with MCSO staff, and have been advised that MCSO has never had a LEAR Policy of its own, though ICE does have one that was referenced in former policies and draft memorandums.  These draft memorandums and policy references to the ICE LEAR policy may have contributed to the belief by many MCSO personnel that MCSO did, in fact, have a LEAR policy.  MCSO needs to ensure that any future references to policies or procedures of other agencies are clearly defined and explained to MCSO personnel.

MCSO is in Phase 1 and Phase 2 compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

***Paragraph 28.*** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.      *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.      *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c.      *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d.      *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e.    *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f.    *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g.    *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h.    *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

On September 5, 2014, MCSO finalized policies CP-8, Preventing Racial and Other Bias-Based Profiling; and EA-11 Arrest Procedures. EB-1 Traffic Enforcement, Violator Contacts and Citation Issuance, was finalized on September 22, 2014. These policies have been approved, distributed, and trained to during the mandatory Fourth and Fourteenth Amendment training completed during 2014. The Monitoring Team observed specific references to areas of required compliance in this section during the training. The Department has achieved Phase 1 compliance with this Paragraph.

During the last reporting period, at the request of the Monitoring Team, the document request related to contacts and transportation to "ICE" was modified to include contacts, transportation to "ICE/Border Patrol." MCSO has provided written documentation for this reporting period that there were no instances of any subject being transported to ICE/Border Patrol, no instances of deputies having contacts with ICE/Border Patrol for the purpose of making an immigration status inquiry, and that there were no arrests made following any immigration-related investigation or for any immigration-related crime during this time period.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

See Paragraph 30.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

MCSO has provided the Monitoring Team and the Plaintiffs with drafts of its Order-related policies and procedures prior to publication as required by the Order.  We and the Plaintiffs' attorneys review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards.  Once drafts are finalized, incorporating the feedback of the Plaintiffs and the Monitoring Team, they are again provided to the Monitoring Team for final review and approval.  As this process has been followed for those Order-related policies published thus far, MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

MCSO's draft policy GA-1 (Development of Written Orders) indicates that Office personnel will be notified of new policies and changes to existing policies via Briefing Boards and through a newly acquired software program, E-Policy.

The draft policy defines a Briefing Board as an "official publication produced by the Policy Section, which provides information regarding Office policy. Prior to some policies being revised, time-sensitive changes are often announced in a Briefing Board until the entire policy can be revised and finalized. The information in a Briefing Board has the force and effect of policy." We recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we will generally not grant Phase 1 compliance for an Order requirement until such time as the requirement is memorialized in a more formal policy.

Since GA-1 remains in draft form, MCSO is not in Phase 1 compliance with the Paragraph.

Thus far, the only Order-related policies that have been approved and disseminated to the rank and file have been in conjunction with the required Fourth and Fourteenth Amendment training. Therefore, there has been appropriate records kept of receipt of the policies, and their contents were covered in the course of the training.

During our most recent site visit, we received an overview of the E-Policy System, a companion program to the computer-based training program, E-Learning, which MCSO has been using for years. Office personnel were advised of the launch of the E-Policy program in Briefing Board 15-02, issued January 21, 2015. The Briefing Board states, "Effective immediately, E-Policy will be used by the Office to ensure employees, posse members, and reserve deputies have access to all Office policy [Critical (C), General (G), Detention (D), and Enforcement (E)], as well as updates to, and revisions of all Office policy. E-Policy will also be the mechanism in which the Office will be able to verify the receipt of policy by employees, posse members, and reserve deputies, as well as an acknowledgement that the policy was reviewed and understood." The Briefing Board further states, "In those cases involving Critical Policy and other select policies, the E-Policy requirement will also include the need to correctly answer questions regarding the revised policy."

The E-Policy system has yet to be used for distribution of an Order-related policy. We have advised MCSO that in those cases where formal training is required by the Order, the E-Policy questions – which test comprehension of a policy – cannot serve as a substitute for the training.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Deferred

**Paragraph 32.** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.*

The following MCSO policies were originally offered in response to this Paragraph: CP-2 (Code of Conduct); CP-8 (Preventing Racial and other Bias-Based Profiling); GC-17 (Employee

Disciplinary Procedure); and GH-2 (Internal Investigations). After some necessary revisions, these policies were approved effective September 5, 2014. The requirements of this Paragraph are incorporated in these policies, which were disseminated and trained to during the Fourth and Fourteenth Amendment Training that was completed during the previous reporting period.

During this reporting period, we received a list of eight new allegations of policy violations by Patrol Operations personnel for the months of January and February 2015, and a list of the 35 closed investigations involving Patrol Operations for this same period of time. We reviewed the completed investigations of 20 of these closed cases. Of the 20 cases reviewed, seven (35%) had significant issues of concern.

In two of the cases reviewed, the Professional Standards Bureau returned the investigations to the investigating first-line patrol supervisors to correct investigative deficiencies.

In two other cases, it was noted that supervisors reaching findings of Exonerated where we do not believe this finding was supported by the investigation. In both of these cases, the complainant and deputy gave different versions of the incident; there were no independent witnesses and no evidence to support either version. A finding of Exonerated with only the conflicting statements of the deputies and the complainants is not appropriate.

In another case, a citizen filed a complaint via email to MCSO in July 2014 regarding an incident that had occurred in May. There is no indication that MCSO responded to this complaint, and the citizen sent a certified letter to the Public Safety Manager of Youngtown in August 2014 with the same complaint. It is unknown if this letter was forwarded to MCSO. On October 11, 2014, the citizen sent a letter to MCSO that his complaint had not been addressed; and on October 18, 2014, he sent a letter to the Arizona Peace Officers Standards and Training (AZPOST) Compliance Manager with the same complaint. On October 21, 2014, AZPOST forwarded the citizen's complaint to MCSO. It was only then that MCSO opened an internal investigation on October 30, 2014, serving a Notice of Investigation to the involved deputy on November 20, 2014; and completing the investigation on November 24, 2014, finding the complaint Exonerated. We are not in disagreement with the finding in this investigation, but are concerned that MCSO did not initially address this complaint.

In another case, at the conclusion of the internal investigation, the deputy received a Notice of Finding that the complaint against him was Unfounded. The letter MCSO sent to the complainant said that the complaint was Not Sustained, which would certainly leave a different impression with the complainant than with the deputy.

In another investigation, the employee's supervisor initiated the investigation internally. The allegations included insubordination and truthfulness. The incident revolved around the deputy calling in sick for several days and failing to provide a doctor's note as required by his supervisor. When asked why he had not provided the doctor's note, the supervisor believed the deputy was untruthful in his response. The investigation determined that both allegations were Not Sustained. The deputy was able to explain to the satisfaction of the investigating supervisor that he had only miscommunicated information to his supervisor and it was determined that a doctor's note was not required since he was only off sick for two-and-one-half days rather than three days. This investigation on its own raises some concern, but of even greater concern is the history of misconduct by this deputy that was included in the review of his prior discipline. As far back as 2009, he received verbal counseling, a Letter of Instruction, and unsatisfactory

performance evaluations for a variety of infractions.  In 2010, he received a written reprimand for several separate unsatisfactory issues; and in 2012, he was placed on a special evaluation due to numerous areas of improvement needed in his annual performance appraisal.  In May 2013, this deputy received a 40-hour suspension for Failure to Meet Standards, Conformance to Office Directives and Established Laws, and Keeping Supervisors Informed.  In August 2013, he received a Letter of Instruction for Insubordination.  In June 2014, he received two separate coaching sessions: one for showing a pattern of being late to work; and one for not properly handling evidence.  MCSO has taken administrative action on numerous occasions with this employee, and there is some evidence that MCSO has provided input on how he can improve.  It does not appear that MCSO has provided any specific remedial training or other proactive assistance to the employee.  The history of conduct by this deputy emphasizes the need for the EIS being implemented and used by MCSO.

While many of the 20 investigations reviewed were adequate, addressed the allegations, had justified findings, and included all of the necessary documents and reviews, MCSO will not be in Phase 2 compliance with this Paragraph until it addresses the kinds of issues that resulted in our finding that 35% of these completed investigations did not meet the requirements of this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

**_Paragraph 33._** _MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing._

MCSO offered policies CP-8 (Preventing Racial and other Bias-Based Profiling) and GC-17 (Employee Disciplinary Procedure) as proofs of compliance with this Paragraph.  The requirements of this Paragraph are incorporated in the combination of these policies.  MCSO considers acts of discriminatory policing as Category 6 violations under its Disciplinary Matrix, and the penalties range from a 40-hour suspension to dismissal for a first offense.  Penalties for a second offense range from an 80-hour suspension to dismissal, and dismissal is the mandatory penalty for a third offense.

CP-8 and GC-17 were revised and re-issued effective September 5, 2014.  These policies were distributed to all attendees at the Bias-Free Policing and Fourth Amendment training described later in this report.

During this reporting period, MCSO provided a list of complaints alleging discriminatory policing, documentation of any discipline associated with these complaints, or any complaints where discipline was recommended and/or imposed during January and February 2015.  Two cases were provided, and both are still open.  We have since requested that in all future submissions, MCSO include not only the list of complaints and documentation of any discipline given or recommended in these kinds of cases, but that MCSO also submit the entire

investigative document of any investigations conducted.  This will allow us to fully review the investigative process and outcomes for these types of allegations.

Given the continued small sample size, we will defer a compliance determination until we have a larger universe of completed cases to assess.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Deferred

**Paragraph 34.** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

MCSO draft policy GA-1 (Development of Written Orders) states that "policies will be reviewed annually or as deemed appropriate, and revised, as necessary, by Policy Development."  As mentioned above, throughout the first several months of our tenure, MCSO has been reviewing its policies in response to Order requirements and our document requests.  Many of the policies have been adjusted based on our feedback and that of the Plaintiffs' attorneys.  Several have been issued to sworn personnel and posse members in conjunction with the ongoing Fourth and Fourteenth Amendment Training.

During our December 2014 site visit, we established a schedule for the annual reviews required by the Order.  We agreed that the cycle for this review requirement will be MCSO's fiscal year, which runs from July 1 to June 30.  Documentation of the first annual review will be submitted on or before September 15, 2015.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Deferred

## Section 5: Pre-Planned Operations

MCSO was advised to notify the Monitor, as well as the two Deputy Monitors, of any upcoming Significant Operation via email, and by a telephone call, to ensure a prompt response by Monitoring Team personnel.  MCSO was asked to provide the Monitor with a submitted plan, as well as the name and contact information of the on-scene commanding officer of any scheduled operation.

The following Paragraph responses provide more detail with regard to particular aspects of the Court Order for Pre-Planned or Significant Operations.

**COURT ORDER VI. PRE-PLANNED OPERATIONS**

*Paragraph 35. The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

MCSO has taken the position that the Department no longer has Specialized Units that enforce immigration laws.  The Special Investigations Division (SID) Operational Manual identifies 11 different units, none of which appear to be directly involved in enforcing immigration laws. During discussions with the Compliance and Implementation Division (CID) and attorneys from the Maricopa County Attorney's Office (MCAO), we suggested that applicable immigration laws and immigration-related crimes, as those terms are defined in the Order, be identified.  From there, a determination could be made as to which units, if any, enforce these laws as one of their core missions.

During our December 2014 site visit, we met with the MCSO Special Investigations Division. We were advised that the CEU (Criminal Employment Unit) would be disbanded in January or February 2015 and removed from the agency organizational chart.  Any information regarding the kinds of violations previously investigated by MCSO CEU that came to the unit's attention would be forwarded to a federal agency for review and any action.  We were also advised that MCSO would be returning any unused grant funds dedicated to these types of investigations. We were told that MCSO is not conducting any human smuggling investigations, and that the Human Smuggling Unit's name has been changed to the Anti-Trafficking Unit (ATU).  MCSO advised that there is no unit within MCSO whose core function is the investigation of immigration-related crimes.  Those crimes that may in some cases have immigration status as an element of the crime (misconduct with weapons, forgery) would be investigated by district detectives, as would be the case for those same crimes without the element of immigration status.

During our review of the arrests made by the Anti-Trafficking Unit for the reporting period from January 1, through February 28, 2015, we did not note any arrests for human smuggling violations.  Only one case was noted for the ATU during this period, and all suspects were arrested for narcotics violations.

During this reporting period, MCSO provided numerous documents to support its statements that the CEU had been disbanded.  Included in this submission were:  a letter to the Department of Administration for the State of Arizona indicating that MCSO would be returning grant funds as they were ceasing their enforcement of statutes as they relate to identify theft for the purposes of

obtaining or continuing employment; a memorandum dated December 15, 2014 indicating that the CEU would be disbanded in January or February after their last case was concluded; an SID organizational chart that does not list the CEU as a Unit; and a memorandum dated January 6, 2015 stating that SID had been directed to immediately cease any future and/or active/pending investigations related to the relevant codes that had been enforced by CEU.  This January 6 memorandum included direction to immediately disband and reassign deputies that were currently assigned to CEU, remove any such identifiers within their agency that indicated the existence of such a unit, and assign the detectives to various other assignments.   Other documents, including Briefing Boards and Administrative Broadcasts, were also included to support the disbanding of CEU.

A memo dated February 23, 2015 to CID from the Special Investigations Division reinforces previous statements that MCSO does not have any units with primary responsibility for the enforcement of crimes that are potentially immigration-related.  The memorandum further states that SID does have an Operations Manual; however, it is currently under review and SID is continuing to work on a new draft of the manual.

While MCSO has provided adequate documentation that the CEU has been disbanded, its Operations Manual is still being updated.  Until this draft is completed and addresses the mission statement, policies and operations of ATU and other units within SID to verify MCSO's assertion that this Paragraph is not applicable to any SID Unit, Phase 1 and Phase 2 compliance is deferred.  We continue to urge MCSO to address this matter expeditiously.

**Compliance Status:**

Phase 1:  Deferred

Phase 2:  Deferred


***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

As of September 5, 2014, MCSO had finalized and distributed the Significant Operations policy GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized and distributed.  The policy (GJ-33) has been specifically trained to during the Fourth and Fourteenth Amendment training for sworn personnel and Posse members.  We have found the policies and protocols to accurately reflect the requirements of the Order.  The Department has achieved Phase 1 compliance with this Paragraph.

During the first two reporting periods, MCSO did not conduct any significant operations that would invoke the requirements of this Paragraph.

During the last reporting period, MCSO conducted a significant operation meeting the requirements of this Paragraph.  "Operation Borderline" was conducted from October 20,

through October 27, 2014, to interdict the flow of illegal narcotics into Maricopa.  MCSO met all the requirements for this Paragraph during this operation.

During the current reporting period, MCSO reported that it did not conduct any significant operations that would invoke the requirements of this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

**Paragraph 37.** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

As of September 5, 2014 MCSO finalized and distributed the Significant Operations policy, GJ-33.  The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized.  The policy (GJ-33) was specifically trained to during the Fourth and Fourteenth Amendment training conducted by MCSO during 2014.  The Department has achieved Phase 1 compliance with this Paragraph.

MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor during the first two reporting periods.

MCSO conducted a significant operation during the last reporting period, and it complied with the requirements of this Paragraph.

During the current reporting period, MCSO has reported that it did not conduct any significant operations that would invoke the requirements of this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**

**Paragraph 38.** *If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within ~~30~~ <u>10</u> days after the operation:*

a.      *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.      *information that triggered the operation and/or selection of the particular site for the operation;*

c.      *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.      *documentation of command staff review and approval of the operation and operations plans;*

e.      *a listing of specific operational objectives for the patrol;*

f.      *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.      *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.      *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.      *arrest lists, officer participation logs and records for the patrol; and*

j.      *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

On September 5, 2014 MCSO finalized and distributed the Significant Operations policy, GJ-33. The Protocols, Planning Checklist, and Supervisor Daily Checklists have also been finalized. The policy (GJ-33) was specifically trained to during the Fourth and Fourteenth Amendment training completed by MCSO is 2014.  The Department has achieved Phase 1 compliance with this Paragraph.

During the first two reporting periods, MCSO did not conduct any Significant Operations or Patrols that required notification to the Monitor.

MCSO conducted a significant operation during the last reporting period, and it complied with the requirements of this Paragraph.

During the current reporting period, MCSO reported that it did not conduct any significant operations that would invoke the requirements of this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance


**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by <u>underlined font</u>. Deletions are indicated by ~~crossed-out font~~.)**

***Paragraph 39.*** *The* ~~*MCSO*~~ <u>*Monitor*</u> *shall hold a community outreach meeting no more than* ~~*30*~~ <u>*40*</u> *days after any Significant Operations or Patrols in the affected District(s).* ~~*MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol*~~ <u>*The Monitor shall communicate the operational details provided to it by the MCSO and shall hear*</u>

*any complaints or concerns raised by community members.  The Monitor may investigate and respond to those concerns.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

The Court has amended the original Order to move responsibility for Community Outreach to the Monitor.  This section no longer applies to the activities of MCSO.

During the current review period, MCSO did not conduct any significant operations, and it was not necessary for us to conduct any community outreach meetings related to this Paragraph.

**Paragraph 40.** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

MCSO developed The Significant Operations Protocol as required, and modified it to include Section 7 that requires notification to the Plaintiffs.  The Department has achieved Phase 1 compliance with this Paragraph.

MCSO did not conduct any significant operations during the first two reporting periods that required notification under this Paragraph.

MCSO conducted a Significant Operation during the last reporting period, and it complied with the requirements of this Paragraph.

During the current reporting period, MCSO has reported that it did not conduct any significant operations that would invoke the requirements of this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

## Section 6: Training

### COURT ORDER VII. TRAINING

#### a. General Provisions

**Paragraph 41.** *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

**Paragraph 42.** *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

MCSO has developed a single policy, GG-2, Training Administration, adopted January 24, 2014, that was intended to incorporate the requirements of this Paragraph. In its current form, GG-2 fails to set out any instructor criteria, such as legal requirements for the Order-mandated areas of Bias-Free Policing, Fourth Amendment, and Supervisor and Command Level Training. We previously recommended that instructor selection criteria in additional areas such as Academy training, Post-Academy, and Field Training Officers training also be included. The document in its present form does not include any provisions for the establishment of instructor selection criteria, proof of expertise and educational achievements, Professional Standards Bureau reviews, or the establishment of an instructor database.

The aforementioned criteria was previously utilized to generate the proposed list of instructors agreed upon by the attorneys for the Defendants and the attorneys for the Plaintiffs to determine that they possessed qualifications that were compliant with the requirements of Paragraph 42. The final joint selection of qualified instructors to deliver Bias-Free Policing and Detentions, Arrests, and Immigration-Related Laws training was completed in August 2014.

During the previous reporting period, Training Command advised us that policy GG-2, Training Administration, was in draft form and under review for modification. On December 16, 2014, Training Command personnel reaffirmed to our Team that this policy remained in draft form due to pending modifications. Further query during our exit interview on December 19, 2014 prompted MCSO Command Staff to inquire internally regarding the status of this policy. On December 22, 2014, the policy as approved on January 24, 2014 was resubmitted as the final official submission. This policy was not reviewed during the previous reporting period.

On April 21, 2015, during our most recent site visit, MCSO stated that it intends to incorporate instructor selection criteria within its training policy. MCAO believes that some of the Monitor's recommendations may exceed the scope of the Order, but nonetheless are best practice for the Training Division to adopt and implement. MCSO desires a revised training policy to accurately identify and incorporate current MCSO practice. We will review and comment on the proposed changes to policy GG-2, Training Administration, prior to MCSO acceptance and implementation. As newly developed training is delivered, it is critical for policy GG-2, Training Administration, to have institutionalized these processes.

Previously, the process to select instructors for the training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws was cooperative and successful.

During the previous reporting period, we noted that initial training for EIS had been delivered, and that three additional instructors were identified to deliver the "Blue Team Entry System for IAPro" training.  Additional "Blue Team Entry System for IAPro" classes were presented to sworn personnel between January 1, and March 31, 2015.  MCAO indicated that instructor selection for "Blue Team Entry System for IAPro" was based on the Arizona Administrative Code, R13-4-114, A.1.a, General Instructor criteria. Four individuals from the EIU were designated as instructors.  We reviewed their résumés, and note that each of these instructors appears to meet the proposed standards for a General Instructor.  One was previously approved by the Parties to deliver Order-mandated Training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws.  The selection and hiring of instructors to provide Supervisor Specific Training did not commence during this review period.  Instructors for any other Order-related training have not been identified during this period.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 43.** *The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

MCSO has developed a single policy, GG-2, Training Administration, adopted January 24, 2014, that was intended to incorporate the requirements of this Paragraph.  The existing policy fails to make the distinction between the requirements of a live training delivery and an online training delivery.  Additionally, it fails to establish mandated testing criteria and administration.

We continue to recommend that although it is not a requirement of the Order, live training mandates could be better addressed in this policy while it is undergoing revision, in conjunction with the establishment of a database designed for the documentation of all approved training lesson plans. GG-2 could include provisions for the development of such a database and a requirement that the Training Division would have sole responsibility for the update and maintenance of this database.  This database would contain all Academy training lesson plans, Field Officer Training lesson plans, in-service training lesson plans, and Advanced or Specialty training lesson plans; and would specifically include provisions to identify all lesson plans requiring an in class delivery as well as those delivered via the online platform.  This is a critical point since AZ POST requires specific testing requirements for training delivered via an online platform.   A review of this type of database would provide the required information to effectively review compliance in this regard, as well as improve MCSO's ability to update lesson plans in accordance with Paragraph 47, in order to gain institutionalized compliance.

MCAO has indicated that training policy modifications under consideration may include a formalized training cycle which would include: 1) documentation of the need for training lesson plan development; 2) standardized lesson plan development criteria and format; 3) standardized

instructor selection protocols; 4) inclusion on the Master Training Calendar; and 5) documentation of the delivery of the training. We believe that the inclusion of these concepts would improve not only the quality of the development and delivery of training, but ensure that the Training Division embraces its oversight responsibilities for all Departmental training.

Ongoing modifications and revisions to GG-2, Training Administration should specifically outline their required testing processes and the documentation of testing delivered to training recipients. In its current form, GG-2 is deficient in this regard.

We had reviewed and commented on the first segment of the EIS "Blue Team Entry System for IAPro" training initially delivered during the last compliance period. Due to its complexity and interrelatedness with several Paragraphs of the Order, our Team has not approved EIS training as a whole. We recognize that Paragraph 80 is specific to the training on the EIS; however, the development and delivery of these Order-mandated trainings are addressed within the Paragraphs of Section VII, Training – more specifically, Paragraphs 42 through 47. We believe that many of these issues will be addressed with a more robust Training Administration policy.

Between January 1, and March 31, 2015, EIU continued to deliver the Order-mandated "Blue Team Entry System for IAPro" training, utilizing 100% live training (i.e., with a live instructor). According to the Training Division Chief and the EIU Lieutenant, one of the training classes delivered appeared on the Master Training Calendar. After our April 2015 site visit, we were provided a document entitled "Court Ordered Master Training Calendar," which included the scheduling of this training. A Training Notification had been disseminated on December 24, 2014 advising all MCSO personnel that this training was mandatory; the document provided the scheduling of 22 classes of 30 personnel between January and March 2015 for a total complement of 660 personnel. We did not observe this training because we were not advised of it; and as a result, we were unable to advise the Plaintiffs of the scheduled training. Supervisors and subordinate personnel were self-assigned to the training, and were required to sign in to and out of the training sessions. Testing criteria consisted of a three-question test with multiple opportunities to achieve success. Post training documentation was provided for the "Blue Team Entry System for IAPro." The "Blue Team – Sworn Compliance" document indicates that 702 sworn personnel were required to test and 671 successfully completed the course and testing criteria.

A similar situation also currently exists with the Order-mandated training identified as TraCS. CAD personnel, along with a business analyst, developed a course "outline" and delivered this training without the knowledge or input by the Training Division, according to the Training Division Chief. As a result, the training did not appear on the Master Training Calendar, and there were no sign-in sheets documenting attendance, and no testing component. The Training Division Chief further indicated that he had "learned" of the training delivery after completion, and as a result, he is trying to "catch up." It was the opinion of the Training Division Chief that the previously delivered training did not meet the requirements of the Order. Currently, TraCS training is under re-development, although the TraCS system is operational in each patrol division. At present, the Training Division has accepted and finalized the previously utilized introductory PowerPoint presentation entitled TraCS E-Learning Intro REV. This presentation is to be delivered via the E-Learning System as a mandatory training for designated sworn personnel. Simultaneously, the Training Division is finalizing a course outline, lesson plan, and corresponding PowerPoint presentation to be delivered as a train-the-trainer course. Instructors

will be selected utilizing the AZ POST General Instructor certification in addition to Field Training Officers certification. The live training class is estimated to be approximately 6-8 hours in duration, and will be required to follow all current documentation practices of the MCSO for training attended. Training Division personnel had anticipated a draft lesson plan, PowerPoint presentations, scenarios, testing, and success criteria by the first week of May 2015. We were advised that these drafts would be circulated to the Parties for further review and comment. None have been provided.

As of March 31, 2015, the lesson plan and testing criteria for Supervisor Responsibilities-Effective Law Enforcement has not been developed. The Monitoring Team and the Plaintiffs have reviewed the submitted "outline." Comments have been provided to MCSO. MCAO has requested a conference call with the Parties to discuss lesson plan development verses the use of an "outline" for the delivery of Supervisory Training.

The Training Division Chief has advised us that MCSO is currently reviewing its post-training testing requirement that was utilized for the training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws. That requirement mandated that each deputy must attain a minimum passing score of 100% in order to receive credit for the Order-mandated training. However, each deputy was allowed up to five attempts to achieve this score. This training was delivered in a classroom setting with a live instructor. MCSO believed the 100% requirement to be a mandate of the Arizona Peace Officers Standards and Training Board. MCSO would be accurate in the application of this requirement if the training had been delivered through an online platform or an e-learning system, which would then be required to contain an assessment model wherein there would be a 100% score on each assessment. However, Arizona Peace Officers Standards and Training Board has informed us and MCSO that there is no learning assessment requirement for in-person continuing training sessions.

We revisited this discussion with MCSO during our April 2015 site visit, and MCSO indicated an attempt to move away from what is considered to be an unrealistic passing score requirement. MCSO proposed reducing the admissible passing score to 75% and allowing up to three testing opportunities. Representatives for the Plaintiffs who were in attendance telephonically were amenable to the new testing option with specific requests. We requested that the testing be accomplished immediately after training delivery, and that test evaluations be performed on the first test taken by deputies. MCAO did not voice an objection at that time. It is unreasonable to expect every deputy to achieve 100% in the testing process. Actual test score reviews bear this out. A recommendation to revise this mandate was presented by our Team during our December 2014 site visit, but until now it has met resistance by Training Division Command. Currently, in order to effectively evaluate the whole testing process and review the individual scores for each deputy, one is required to review several different reports and cross reference each. A summary from the E-Learning administrative reports; Skills Manager reports of "passed" students; and the Master Rosters individually for Sworn, Posse, and Reserves are required to accomplish this. The ability to conduct thorough training assessments and improve the organizational training program continues to remain deficient.

No post-training documentation was provided for the TraCS training delivered during this reporting period.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*Paragraph 44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

MCSO has developed a single policy, GG-2 Training Administration, adopted January 24, 2014, that was intended to incorporate the requirements of this Paragraph.  The policy, in its current form, fails to identify the establishment and adherence to the development and maintenance of the Order-mandated Master Training Calendar.  On April 21, 2015, during our site visit, MCAO advised us that MCSO is currently considering memorializing an all-inclusive Master Training Calendar within the training policy.

After our April 2015 site visit, we were provided with a "Court Ordered Master Training Calendar" covering the period of January 1, through July 7, 2015, that included only Order-mandated training.  This document was not provided, as requested by the Monitor, for review prior to the start of the reporting period or prior to the deliveries of Blue Team Entry System IAPro training in January, February, and March; and Detention Arrests and Immigration-Related Laws and Bias-Free Policing on April 22-23, 2015.  This document lists a proposed delivery of TraCS Train-the-Trainer delivery for April 14-16, 2015, and additional Detention Arrests and Immigration-Related Laws and Bias-Free Policing scheduled for July 7, 2015.  MCAO is considering our recommendation to MCSO to incorporate all training on a single Master Training Calendar.

The Sworn Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, a total of 677 sworn (compensated) personnel were required to receive the Order-mandated Training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws.  The report indicates that 675 had completed it. Two deputies have not completed the mandatory training due to leave issues.

We were initially advised that the "Blue Team Entry System for IAPro" was to be delivered only to sworn supervisors.  Consistent with our understanding, we were provided with a document "Supervisor List as of 4-21-15" that identified five chiefs, 16 captains, 37 lieutenants, and 125 sergeants requiring this training.  A second document, entitled "Blue Team-Sworn Compliance All" indicated that all supervisors had, in fact, received this initial training.  We then received a third document, "Blue Team – Sworn Compliance," indicating that a total of 702 personnel were required to receive the training, and 671 successfully completed the training program.  This last document indicates that all sworn personnel are receiving this training.

The Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, a total of 36 Reserve personnel were required to receive the Order-mandated

Training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws; and 35 had completed the mandatory training.

The Retired Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, a total of 67 retired Reserve personnel were required to receive the Order-mandated Training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws; and 36 had completed the mandatory training.

In November 2014, the Court Implementation Division (CID), in conjunction with the Posse Personnel Management Unit (PPMU), provided what was termed a baseline number of 1,033 Posse personnel requiring the mandated training. CID indicated that this number was created from the actual number of Posse personnel who had completed the mandatory training. For this reporting period, 26 Posse personnel completed the mandatory training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws according to the " 2014 Required Training ELS Passed Posse (March 2015)" report. CID has advised that failure to complete the training results in mandatory de-selection from the Posse Program. During this reporting period, the PPMU identified a total of 1,673 Posse members. This number includes all active, resigned, separated, or terminated members dating back to 2007. Currently, active Posse members total 1,084, according to the "Master Posse Roster" with 1,062 compliant by the report "Posse Training Compliance – March (Required Training). Under the supervision of the PPMU lieutenant, reporting for all Posse issues has dramatically improved.

The Training Division did not issue a Quarterly Training Report.

A report entitled "Civilian Training Compliance – March (Required Training)" indicated that 11 civilians had received the training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws, but only 10 had completed testing.

The inability of MCSO to link together the Skills Manager Database, the MCSO Sworn Training Compliance Report, the Posse Training Compliance Report, the Reserve Training Compliance Report, and the Retired Reserve Training Compliance Report with Master Rosters continues to hamper documentation of training, and will continue to do so as the volume of training increases with the development and delivery of other Order-mandated training in order to achieve compliance, such as EIS and the use of Body Cams.

Mandatory Supervisory training has yet to be scheduled.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 45.** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

We were involved in a collaborative review with attorneys for the Plaintiffs and attorneys for the Defendants of Detentions, Arrests and Immigration-Related Laws; Bias-Free Policing; and the initial Supervisor Responsibilities – Effective Law Enforcement curricula.   The Bias-Free

Policing and Detentions, Arrests and Immigration-Related Laws curricula are in compliance with the requirements in Paragraph 45. The final approved curriculum incorporated adult-learning methods and included PowerPoint presentations, interactive learning exercises, and lecture.

In September 2014, MCSO had requested that it be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that it has the capability to deliver in the near future. We, and the Plaintiffs, agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice. We anticipated that the Parties would engage in a similar curriculum review process for these various components of Supervisor Responsibilities – Effective Law Enforcement training. On December 17, 2014, the Monitor was presented with an initial "outline" document to be utilized to develop a segment of a supervisor course entitled Supervisor Responsibilities-Effective Law Enforcement Course. A second draft "outline" was submitted to our Team and the Plaintiffs on January 27, 2015. We provided comments to MCSO on February 27, 2015; and the Plaintiffs provided comments on March 5, 2015.

During our most recent site visit, on April 21, 2015, we were advised by MCAO that MCSO intends to develop Supervisory training in two parts. The first part will include Paragraph 53: §a, d, f, h, i, j, and l. The second part will include Paragraph 53: §b, c, e, g, and k; and an EIS segment. MCAO also unexpectedly announced it did not intend to develop a lesson plan, and instead indicated that it believed that an "outline" would suffice for these training deliveries. We advised MCSO that the development of a lesson plan is absolutely critical. Representatives for the Plaintiffs who attended the meeting telephonically also reaffirmed their desire and understanding that a lesson plan would be jointly developed between the Parties. MCSO is currently proposing four individuals who were previously approved by the Parties to deliver the Bias-Free Policing and training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws to deliver the Supervisory training. During the current reporting period, no lesson plan was developed that the Parties could review.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not applicable

Phase 2: Not in compliance


***Paragraph 46.*** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

MCSO has previously provided the curricula for Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws; and Supervisor Responsibilities-Effective Law Enforcement to the Monitor and the Plaintiffs. The Parties have jointly reviewed these, and the Defendants' attorneys have been very receptive to the input from the Plaintiffs' attorneys and the Monitoring Team. We reviewed the proposed list of instructors and identified those who are qualified. MCAO has stated their intention to utilize the previously identified process for the development

of the annual refresher training and for identification of the instructors. Lesson plans for the annual refresher for Order required training on Bias-Free Policing, and Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws are currently under development and will be reviewed by the attorneys for the Defendants, the attorneys for the Plaintiffs, and the Monitoring Team upon completion.

During the previous reporting period, we were advised that training entitled "Blue Team Entry System for IAPro" had been delivered on multiple dates (October 6-10, and 13-17, 2014; November 17, 2014; and December 15, and 18, 2014) during the reporting period. The delivery of this training did not appear on the Master Training Calendar in accordance with Paragraph 44; and as a result, we were not afforded the ability to observe this training segment. During this reporting period, additional Blue Team Entry System for IAPro was delivered, and once again did not appear on the Master Training Calendar. Again we were not afforded the opportunity to observe this training segment. We previously reviewed, commented on, and approved this segment of EIS curriculum that is primarily focused on the processes for completing an entry into the Blue Team database and for completing a Supervisor Note in the Blue Team system, in accordance with Paragraph 46. Due to the complexity of the EIS training, and a need for segmented training, which has not been currently developed, all EIS training has not been approved by the Monitor. The Training Division lesson outline indicated that this was a one-hour computer based presentation that included an online testing component. The EIU Lieutenant clarified that these were "live training' instructor delivered sessions. All "Blue Team Entry System for IAPro" training is delivered by four members of the EIU that appear to meet the General Instructor Criteria of the AZ POST statutes. The Blue Team Sworn Compliance report indicates that 702 personnel were required to receive the training, and 671 personnel successfully completed the training. This report demonstrates that all sworn personnel received this training – not just supervisors.

According to the EIU lieutenant, EIS training development and delivery to date has not been coordinated with the Training Division, but current coordination efforts have been improved. Minor training coordination issues – such as listing EIS "Blue Team Entry System for IAPro" training on the Master Training Calendar – have not been implemented. The EIU lieutenant stated that he believed that the Master Training Calendar is only published and updated once every six months. When questioned more thoroughly on the Master Training Calendar issue and whether or not EIU had attempted to coordinate the delivery of this training with the Training Division, the EIU lieutenant advised us that he had made "contact" with the Training Division to address this issue; but could not identify the policy or procedure guiding this action and could not produce any documentation indicating this action had, in fact, been undertaken.

A second issue we identified was the use of an "outline" and not an actual lesson plan. MCAO is currently working with the EIU to develop the new "lesson plans." The Training Division Chief expressed frustration that the EIS "Blue Team Entry System for IAPro" training "outline" development and training delivery had taken place outside of the requirements of the Order. The Training Division has correctly, in our opinion, identified a lack of expertise within the Training Division for the EIS lesson plan content development. However, the Training Division has an oversight responsibility to ensure that the standardization of training development and documentation of training processes such as a standardized format for lesson plans, sign-in requirements, and testing requirements. The confusion as exhibited by the Training Division Chief and the EIU lieutenant can only be attributed to a failure to communicate and collaborate

on critical training issues and the failure of the current policy to dictate procedures to be followed for providing training.

A similar situation also currently exists with the Order-mandated training identified as TraCS. According to the Training Division Chief, CAD personnel, along with a Business Analyst, developed a course "outline" and delivered this training without the knowledge or input by the Training Division. As a result, the training did not appear on the Master Training Calendar, and there were no sign-in sheets documenting attendance or a testing component. The Training Division Chief further indicated that they had "learned" of the training delivery after its completion and as a result they are trying to "catch up." It is the opinion of the Training Division Chief that the previously delivered training did not meet the requirements of the Order. Currently, TraCS training is under re-development, although the TraCS system is operational in each patrol division. At present, the Training Division has accepted and finalized the previously utilized introductory PowerPoint presentation entitled TraCS E-Learning Intro REV. This presentation is to be delivered via the E-Learning System as a mandatory training for designated sworn personnel. Simultaneously, the Training Division is finalizing a course outline, lesson plan and corresponding PowerPoint presentation to be delivered as a Train-the-Trainer course. Instructors will be selected utilizing the AZ POST General Instructor certification in addition to Field Training Officers certification. The live training class is estimated to be approximately 6-8 hours in duration and will be required to follow all current documentation practices of the MCSO for training attended. Training Division personnel had anticipated a draft lesson plan, PowerPoint's, scenarios, testing, and success criteria by the first week of May 2015. Although we were advised that these drafts would be circulated to the Parties for further review and comment, no drafts have been circulated.

During this reporting period, once again, there was essentially no progress in the development of Supervisory training, despite the Parties agreement on an approach that was predicated on speeding up the development and delivery of this training to the agency's supervisors. This situation must be addressed as soon as possible.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not applicable

Phase 2: Not in compliance


***Paragraph 47.*** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

MCSO has developed a single policy, GG-2 Training Administration, adopted January 24, 2014, that was intended to incorporate the requirements of this Task. The policy fails to identify any semblance of a "Training Cycle" that should include such issues as diagnosis and needs assessment, development of training, delivery of training, evaluation of training, revision of training, an observation and evaluation of how deputies perform the field activities associated with the training, and documentation of each step of the process. We also recommend that existing policy be modified to direct that an annual review of all training lesson plans be

conducted in order to comply with this Paragraph.  During this annual review, each lesson plan would be updated with new developments in law, participant feedback, and training evaluations.

Compliance will be determined based upon whether or not MCSO's policy GG-2, Training Administration complies with this Paragraph and is followed in practice.  The intended purpose of this policy should be to delineate the procedures and clearly establish the duties and responsibilities of all contributors to the MCSO training process.  Adequate development and adoption of a complete policy will enable the Training Division to oversee and ensure the quality of *all* training provided by, or under the direction of, the MCSO.

On April 21, 2015, during our most recent site visit, MCAO advised us that it is considering memorializing including a Training Cycle, with regular updates to training, within their training policy..

We were not provided course evaluations from the Blue Team Entry System for IAPro training or from the TraCS training.  MCSO can reasonably expect that members of the Monitoring Team shall attend training for the purposes of rendering assessments to the Parties and the Court.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance


### b. Bias-Free Policing Training

***Paragraph 48.** The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

Previously, we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in-person or by teleconference with document-viewing capabilities.  The process included a line-by-line scrutiny of the entire Bias-Free Policing; Detentions lesson plans until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate, and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the instructors are adhering to the approved lesson plans.

Training on Bias-Free Policing was not conducted between January 1, and March 31, 2015.

The Sworn Training Compliance Report provided no indication of any personnel receiving Training on Bias-Free Policing during this reporting period.

The Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, a total of 36 Reserve personnel were required to receive the Order-mandated training on Bias Free Policing; and 35 had completed the mandatory training.

The Retired Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, a total of 67 Reserve personnel were required to receive the Order-mandated training on Bias-Free Policing; and 36 had completed the mandatory training.

In November 2014, CID provided what was termed a baseline number of 1,033 Posse personnel requiring the mandated Training on Bias-Free Policing.  CID indicated that this number was pulled from the actual number of Posse personnel who had completed the mandatory training.  CID has advised that failure to complete the training results in mandatory de-selection from the Posse Program.  During the reporting period, PPMU identified a total of 1,673 Posse members.  This number includes all active, resigned, separated, or terminated members dating back to 2007.  Currently, there are 1,052 active Posse members.   Under the supervision of the PPMU supervisor, reporting for all Posse issues has dramatically improved.

The Training Division did not publish a Quarterly Training Report accounting for the sworn personnel, Reserve personnel, retired Reserve personnel, Posse personnel, and civilians who received any mandatory training during the reporting period.

As noted above, the Parties have previously worked collaboratively to finalize the curriculum for Bias-Free Policing, and MCSO has stated its intent to utilize this process for the Order-mandated newly developed annual refresher training.  The refresher training was not delivered between January 1, and March 31, 2015.  As a result of CID's accounting of Posse personnel, Reserve personnel, and retired Reserve personnel, MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance


***Paragraph 49.** The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.      *definitions of racial profiling and Discriminatory Policing;*

b.      *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.      *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.      *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.      *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.      *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.      *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion; h. police and community perspectives related to Discriminatory Policing;*

i.      *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.      *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.      *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.      *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination; m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n.      *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o.      *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p.      *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q.      *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r.      *Instruction on the data collection protocols and reporting requirements of this Order.*

Previously, we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in-person or by teleconference with document-viewing capabilities.  The process included line-by-line scrutiny until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate, and fully compliant with the requirements set forth in Paragraph 49 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the instructors are adhering to the approved lesson plans. No newly developed curriculums were provided to the Parties for review during this reporting period.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

**Paragraph 50.** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

Training on the Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws was not conducted between January 1, and March 31, 2015.

The Sworn Training Compliance Report provided no indication of any personnel receiving training on the Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws during this reporting period.

The Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, 36 Reserve personnel were required to receive the Order-mandated training on the Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws; and 35 had completed the mandatory training.

The Retired Reserve Training Compliance – March (Required Training) Report indicates that as of March 31, 2015, 67 Reserve personnel were required to receive the Order-mandated Training on the Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws; and 36 had completed the mandatory training.

In November 2014, CID provided what was termed a baseline number of 1,033 Posse personnel requiring the mandated training on Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws. CID indicated that this number was composed of the actual number of Posse personnel who had completed the mandatory training. CID has advised that failure to complete the training results in mandatory de-selection from the Posse Program. During this reporting period, PPMU identified a total of 1673 Posse members. This number includes all active, resigned, separated, or terminated members dating back to 2007. Currently, there are 1,052 active Posse members. Under the supervision of the PPMU supervisor, reporting for all Posse issues has dramatically improved.

Training Division did not publish a Quarterly Training Report accounting for the sworn personnel, Reserve personnel, retired Reserve personnel, Posse personnel, and civilians who received any mandatory training during the reporting period.

As noted above, the Parties have previously worked collaboratively to finalize the curriculum for training on the Fourth Amendment, Detentions, Arrests, and the Enforcement of Immigration-Related Laws; and MCSO has stated its intent to utilize this process for the Order-mandated newly developed annual refresher training. The refresher training was not delivered between January 1, and March 31, 2015. As a result of CID's accounting of Posse personnel, Reserve personnel, and retired Reserve personnel, MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance

**Paragraph 51.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.    *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.    *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.    *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.    *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.    *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.    *the circumstances under which a passenger may be questioned or asked for identification;*

g.    *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.    *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.    *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.    *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.    *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.    *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.      the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.      provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.      Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

Previously, we conducted a curriculum review over several weeks with all Parties participating together in every meeting either in-person or by teleconference with document-viewing capabilities.   The process included a line-by-line scrutiny of the entire Bias-Free Policing; Detentions, Arrests, and Immigration-Related Laws lesson plans until consensus was reached among the attorneys for the Plaintiffs and the attorneys for the Defendants, with the approval of the Monitoring Team, that the content and wording were factual, legally accurate, and fully compliant with the requirements set forth in Paragraph 51 of the Order.  We will continue to review any additional associated training materials as they are developed, and also observe training as it progresses to verify that the instructors are adhering to the approved lesson plans. No newly developed curriculums were provided to the Parties for review during this reporting period.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance

### e.      *Supervisor and Command Level Training*

***Paragraph 52.*** *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

MCSO has developed a single policy, GG-2 Training Administration, adopted January 24, 2014, that was intended to incorporate the requirements of this Task.   The policy references the requirements of Paragraph 52 in section 2 Mandatory Training, A.5. in minimal fashion.   The policy fails to identify a standardized process for the development of training in general, and the inclusion of adult-learning methodology.  The requirements of Paragraph 52 are very specific in regards to minimum topics that must be included in the curriculum for the Supervisory training. Although we are aware that specific lesson plans would not be included within an administrative policy, a standardized process for development and oversight should be included.  On April 21,

2015, during our most recent site visit, MCAO advised us that GG-2, Training Administration is currently undergoing annual legal review. MCSO stated that it intends to seize this opportunity to incorporate many of the Monitor's previous recommendations within its training policy. MCAO provided no specific recommendations or considerations to be memorialized during this review process relative to Supervisory training.

Previously, the Parties worked collaboratively on a preliminary curriculum for Supervisor Responsibilities - Effective Law Enforcement. The Parties and we jointly agreed that development of this training should be placed on hold and that precedence should be given to development of the Fourth and Fourteenth Amendment training, which was scheduled for initial delivery to be completed in December 2014.

During our September 2014 site visit, MCSO requested that it be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that MCSO has the capability to deliver in the near future. Both we and the Plaintiffs agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice. However, the development and submission of appropriate training materials for *any* phase of supervisory training has continued to lag. The alleged reason for the bifurcated approach – to allow some supervisor training to occur sooner rather than later – appears to be baseless. The continued failure to develop acceptable curriculum in content and format is unacceptable, particularly given that a lack of consistent, quality supervision is a key contributor to the environment that allowed the behaviors at the center of this case to flourish. MCSO must make delivery of supervisory training a priority.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

*Paragraph 53.* *The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP; i. how to respond to the scene of a traffic stop when a civilian would like to make a complaint against a Deputy;*

j.   *how to respond to and investigate allegations of Deputy misconduct generally;*

k.   *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.   *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

Previously, MCSO requested that it be able to provide the Supervisor Training in two phases, so as to not unnecessarily delay training that it has the capability to deliver in the near future. We, and the Plaintiffs, agreed with this approach in order to keep training ongoing and consistent with new systems as they come online and into practice. We anticipated that the Parties would engage in a similar curriculum review process for these various components of Supervisor Responsibilities – Effective Law Enforcement training.

On December 17, 2014, the Monitoring Team was presented with an initial "outline" document to be utilized to develop a segment of a supervisor course entitled Supervisor Responsibilities-Effective Law Enforcement Course. A second draft "outline" was submitted to our Team and the Plaintiffs on January 27, 2015. We provided comments to MCSO on February 27, 2015, and the Plaintiffs provided comments on March 5, 2015. During our most recent site visit, on April 21, 2015, we were advised by MCAO that it intends to develop supervisory training in two parts. The first part includes  ¶53: Subparagraphs a; d; f; h; i; j; and l. The second part includes ¶53: Subparagraphs b; c; e; g; and k; and an EIS segment. MCAO also unexpectedly announced it did not intend to develop a lesson plan, and instead indicated that it believed that an "outline" would suffice for these training deliveries. We advised MCSO that the development of a lesson plan is absolutely critical. Representatives for the Plaintiffs who attended the meeting telephonically also reaffirmed their desire and understanding that a lesson plan would be jointly developed between the Parties. MCSO is currently proposing that previously identified instructors be utilized for the newly developed supervisory training. These individuals were previously approved by the Parties to deliver the Bias-Free Policing and Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws. During this reporting period, no lesson plan was developed that the Parties could review.

As noted above, between January 1, and March 31, 2015, once again, there has been essentially no progress in the development of Supervisory training, despite the Parties agreeing to an approach that was predicated on speeding up the development and delivery of this training to the Agency's supervisors. The failure of the MCSO to make satisfactory progress on the bifurcated approach may no longer justify the request. Court intervention may be required to ensure that the MCSO fulfills its obligations under these Paragraphs with deliberate speed. This situation must be addressed immediately. In the investigations we are conducting and/or monitoring as part of our other Court-assigned responsibilities, a consistent theme appears to be a lack of supervisory training for anyone with supervisory authority, regardless of rank.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

## Section 7: Traffic Stop Documentation and Data Collection

For Paragraphs 54 and 55, in particular, it was necessary to request traffic stop data from MCSO. The following explanation describes how this was done and how the data were handled once received. These data may also be referred to in other areas of Section 8 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month. The sample of traffic stop cases continues to be pulled from the districts and the Lakes Patrol (the "areas"). By way of background, MCSO reported a total of 5,824 cases of traffic stop events for these areas between January 1, and March 31, 2015. Once we received files each month containing these traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD tapes. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our utilization of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD subsample from the selected cases. The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

On October 10, 2014 the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62 and Paragraph (1) (r) (xv); and has been incorporated in the body of this report. The stipulations referenced amends the Court's Order of October 2, 2013, and will be addressed in Chapter VIII.

**COURT ORDER VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

### *a. Collection of Traffic Stop Data*

***Paragraph 54.*** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.     *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.     *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.      the license plate state and number of the subject vehicle;

d.      the total number of occupants in the vehicle;

e.      the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

f.      the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

g.      an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

h.      the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

i.      time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

j.      whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

k.      whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

l.      whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.      The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

MCSO developed several policies that, in concert, incorporate the requirements of these Paragraphs. These include: EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) dated September 22, 2014; EB-2 (Traffic Stop Data Collection) dated September 22, 2014; EA-5 (Enforcement Communications), dated September 5, 2014 and CP-8 (Preventing Racial and Other Bias-Based Profiling), dated September 5, 2014. We note that these four policies underwent several revisions, and all were finally approved in September 2014 and disseminated during the Fourth and Fourteenth Amendment training conducted from September through December 2014. According to documents received, 99% of the sworn, compensated personnel were trained, and all existing Posse members attended the training as of the close of the reporting period.[1]

---

[1] Failure to attend the training resulted in deselection from the Posse Program.

In order to capture the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Face Sheet, the Vehicle Stop Contact Supplemental Sheet, the Incidental Contact Receipt and the Written Warning/Repair Order, all in electronic form, for those motorists who commit a traffic violation or are operating a vehicle with defective equipment and provided with a warning. We also reviewed the Arizona Traffic Ticket and Complaint forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout and any Incident Report associated with the event. We selected a sample of 105 traffic stops conducted by MCSO deputies from January 1, through March 31, 2015 for purposes of this review; and assessed the collected data from the above listed documents for compliance with Subparagraphs 54.a.-54.m. All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph will be captured in the Early Identification System, which will be discussed further in subsequent sections of this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved. Our review indicated that in the 105 vehicle traffic stops, there were 40 cases where the deputy's unit had another deputy assigned to the vehicle or another deputy unit or Posse member was on the scene. There were five instances where the primary deputy failed to list the additional deputies on the scene (three cases) or failed to list the unit or serial number of the deputy on the VCFS (one each). However, for this reporting period the primary deputies indicated their own unit and serial numbers for every stop they initiated. We have observed a marked improvement in deputies' ability to indicate additional resources responding to their particular traffic stop.

The Vehicle Contact Face Sheet is completed by the deputy on every traffic stop whether s/he writes a citation or issues a warning. During our September 2014 site visit, CID advised that a programming change had been made to the Vehicle Contact Form; and if the deputy fails to indicate his/her unit number in the appropriate box, the system will not allow the deputy to complete the form. Similarly, MCSO should consider making the serial and unit numbers of secondary units mandatory fields if a deputy's name is listed on the form as a back-up unit. During our April 2015 site visit, MCSO advised that it had been working on a technical fix with TracS that would allow deputies to input the ethnicity of the violator on the Arizona Traffic Complaint. In its current form, the Traffic Complaint form does not recognize Hispanic as an ethnicity.

The identity of personnel on such scenes is a core issue in this case, and we shall consistently evaluate the agency's measure of compliance with this requirement. We found that the deputies' names, and serial and unit numbers were listed with few exceptions, on all required forms and identified on the VCFS. Progress was made with 95% compliance; MCSO is in compliance with this Subparagraph.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in the sample indicate that this data is captured and geocoded with the time the stop is initiated and the time the stop is cleared. We note that occasionally the CAD time of stop and end of stop times may not be exactly the same time as those listed on the Vehicle Contact Face Sheet, due to extenuating circumstances the deputy may encounter. We found two instances

where the start or end time on the VCFS differed by five minutes or more from the CAD printout. There were two stops where the location of the stop indicated on the VCFS did not match the location on the CAD printout. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. Since the CAD data system has been upgraded to include the geocoding of traffic stops, MCSO is in compliance (96%) with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. In our last two quarterly reports, we noted improvement in deputies' ability to capture this information. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in 100% of the cases. We found that many of the stops made by deputies were for invalid license plates or expired vehicle registrations. MCSO is in compliance with this Subparagraph.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. There were a total of 105 traffic stops and in 38 of these stops, the vehicle was occupied by more than one occupant. The Vehicle Contact Face Sheet, completed by the deputy on every traffic stop, is utilized to capture the total number of occupants and contains a separate box on the form for that purpose. In one instance, the deputy did not document the number of occupants of the subject vehicle; and therefore, MCSO's compliance rate is 99% for this Subparagraph (see Para. 54f). MCSO is in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into the occupant's ethnicity or gender is required or permitted). In 38 of the 105 stops, there was more than one occupant in the vehicle. In our review of the traffic stops we did not identify any cases where the deputy failed to list the ethnicity of the driver on the VCFS. In the previous reporting period there were four cases where the post stop race/ethnicity and gender for the driver was listed on the Vehicle Contact Face Sheet as "unknown," in violation of MCSO policy. The compliance rate for identifying the race/ethnicity of the driver is 100%.

In the 38 traffic stops where passengers were in the vehicle, we found four cases where the deputy failed to identify the race/ethnicity or gender of one or more passengers in each vehicle. In one of these cases the deputy identified four occupants and failed to indicate the ethnicity and gender of the three passengers. When a deputy indicates two or more passengers in the vehicle on the VCFS, a drop-down box automatically displays additional boxes for the deputy to document the passengers' information. MCSO has advised us that it has instructed deputies not to indicate the word "unknown" when describing the race/ethnicity of drivers or passengers. The compliance rate for identifying the race/ethnicity of the passengers is 89%, a considerable improvement over our previous review.

The stops included 50 white male drivers, 23 white females, 14 Hispanic males, five Hispanic females, five black males, five black females, three Indian/Alaskan males, and no Indian/Alaskan females. We could not find any indications of bias in the sample of traffic stops we reviewed. In addition, when the Bureau of Internal Oversight (BIO) conducts audits of the traffic stop data, they issue memorandums to the individual districts so they can learn of any deficiencies and provide corrective action. Most of the deficiencies to date have been for failure to complete all

the requested information on Warning/Repair forms or not requiring traffic violators' signatures on required forms to validate that a receipt has been issued.  District Captains are required to respond to BIO with comments on violations or with corrective action if required.  We do review the internal audits and associated matrices conducted by MCSO and occasionally we will disagree with their findings.

There were 39 instances where deputies chose to issue warnings to drivers instead of issuing a citation.  The ethnic breakdown of those receiving warnings reflected the numbers indicated in the number of total stops.  The breakdown of those motorists issued warnings is as follows: 16 white males, 11 white females, five Hispanic males, one Hispanic female, two Black males, one Black female, and three Indian American/Alaskan males.  We note that while deputies do a good job of completing the Arizona Traffic Complaint, their completion of the Warning/Repair form is lacking in thoroughness and accuracy.  They frequently fail to list the registered owner or fail to indicate the full description of the driver.  MCSO is aware of these deficiencies and is working to correct them.

We reviewed documentation where BIO would send memorandums to the District Commanders when their audits found that deputies were not following protocol when completing required documentation for traffic stops.  Previously, deputies did not indicate the race, ethnicity, or gender of passengers when no contacts were made with them.  The Order requires MCSO deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not.  MCSO is aware of the deputies' failure to indicate the race/ethnicity of passengers when no contact is made with them, and is working on a solution to include this documentation.  We have observed that the efforts put forth by MCSO staff have improved the capture of the ethnicity and gender of passengers.  The Order does not require the names of passengers unless a passenger is contacted and the reason for the contact is documented.  In those instances where contact is made, the passenger's name should be listed on the Vehicle Stop Form.

MCSO is not in compliance with this Subparagraph until documenting the gender and ethnicity of passengers is achieved.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname).  When we reviewed traffic stop documentation for our First Report, there were only two individuals identified during the 94 traffic stops that had queries (record checks) indicated on the CAD printout.  When we visited one of the districts during our September 2014 site visit, we interviewed a deputy who indicated that license plate or driver record checks are made on almost every traffic stop.  We inquired further and the deputy produced a copy of a record check on the Intergraph "I/Viewer."  However, we did not receive the information from the Intergraph "I/Viewer system for our first report.  We did review 'I/Viewer' checks deputies had run for the September sample.  In addition, on the deputy's Mobile Data Computer (MDC), there is an icon that allows the deputy to run checks on the Justice Web Interface (JWI).  This system provides deputies additional tools that Intergraph CAD does not, such as photographs, criminal history and booking history.  MCSO provided a mechanism to verify the existence of all access to the JWI in the samples we request.  MCSO indicated in a memorandum dated October 8, 2014 that it will provide the documentation beginning with the October sample request.  MCSO provided the JWI

documentation for the October-December 2014 quarter for our review and has provided it in all our subsequent monthly requests.

For this review, we found that in the 105 traffic stops conducted all stops had license checks run, and there were 78 stops where the driver or one or more passengers had a warrant check run. One of these warrant checks was not listed on the Vehicle Contact Face Sheet, and thus is in violation of the policy.   MCSO's compliance rate is 99%, and it is compliant with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  There were two instances where deputies made contact with passengers.  In both cases, the deputy had a valid reason for the contact.  MCSO made several changes to the Vehicle Stop Contact Face Sheet during the previous quarter to better capture the reason for the stop and the reason the passenger was contacted by changing the check box on the form to a fill-in-the-blank section requiring the deputy to indicate the precise violation or reason for the passenger contact.

To ensure that deputies are accurately capturing passenger information and verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Contact Face Sheet.  We also review the I/Viewer System and the Justice Web Interface (JWI) to see if a record check was requested for anyone other than the driver.

Deputies must ensure that they explain why they made contact with any passengers.  Indicating moving, non-moving violation, or contact during a traffic stop as a reason for the stop describes why they stopped the driver, but not why they *made contact* with any passengers.  Of the two cases where passengers were contacted, the deputies listed the name of one of the contacted passengers for the stop; and in the remaining case, the deputy properly checked the box on the VCFS indicating that he did not obtain the passenger's name.

In our experience the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care.  If contact with a passenger is made, deputies should indicate the name of the person contacted.  Due to the infrequent contact of passengers during traffic stops, deputies must be diligent in documenting passenger contacts as one or two violations have a direct impact on compliance.  MCSO's compliance rate for this Subparagraph is 100%.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed and any indicators of criminal activity developed before or during the stop.  For this review, we took a random sample of 10 cases from the 35 cases we initially requested each month for a CAD audio review.  (Note: for the January sample, we requested 35 cases for review and 11 CAD audio recordings.)  We listened to 31 CAD dispatch audio recordings from the sample of 105 used for this review and found that the deputies advised Communications of the location and license plate and state for all 31 stops.  The audio recordings we reviewed were clear, and the deputy advised of the reason for the stop in all 31 of the cases.  There were 74 instances in the sample where we did not listen to the CAD audio tapes, but did review the CAD printout where the reason for the stop, if advised by the deputy, is documented by the dispatcher.  In one instance, the documentation for the reason for the stop is not listed on the CAD report; however, a review of the dispatch tape did

reveal the deputy did advise dispatch of the reason for the stop. Communications personnel failed to list the reason for the stop on the printout. The CAD printout does document the time the stop begins and when it is concluded either by arrest, citation or warning. We did find four instances where the deputy did advise dispatch of the reason for the traffic stop but indicated moving violation or "M" as the reason for the stop on the VCFS. These comments by the deputy do not meet the requirements of the Order. The issues were identified during MCSO's internal audit and, and our review of the previous two reporting periods discovered the same deficiencies. MCSO's compliance rating for this Subparagraph dropped from 99% in the previous quarter to 95% for this rating period. MCSO remains compliant with the requirement.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or the deputy's departure from the scene. In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact forms created by MCSO along with the E-Ticketing system and the Arizona Ticket and Complaint form capture the information required. As we noted in Subparagraph 54b, the stop times on the CAD printout and the Vehicle Contact Face Sheet varies slightly on occasion. We understand that this may occur due to extenuating circumstances and we reported on those that were five minutes or more in duration from either the initial stop time or end time.

We understand that some stops vary in time for any number of reasons that may, or may not, be justified. We looked at all stops in our sample, and determined that there were two traffic stops where the duration of the stop *was* excessive. In one of the stops, the deputy describes the circumstance for the extension as for training purposes. The deputy had an inexperienced deputy assigned to him. When we review the extended stops, we examine issues such as whether or not it was a criminal traffic stop, was the vehicle towed, or were there other extenuating circumstances that caused the delay.

MCSO is in compliance with this Subparagraph, with a compliance rating of 98%.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual. Our review of the collection of the traffic stop data for this reporting period did not reveal any immigration status investigations. MCSO has advised us that it is no longer conducting immigration investigations when deputies are initiating traffic stops. We will continue to verify this assertion in our reviews.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters in order to do so.

MCSO is in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and frisk search was performed on any individual.  In our review, we did not find any indications where an individual was asked for a consent search or of any individual who was frisked during the stop.  We did find cases where an arrest was made for a criminal traffic offense.  In all cases except one, the violator was cited and released.  In the one exception, the violator was arrested and transported to a detention facility on an outstanding warrant.  In this case, the deputy indicated he frisked the subject, but it appeared to be a search incident to an arrest.  Traffic cases rarely require a subject to be arrested and detained.  In the majority of instances where MCSO does charge violators criminally, the violator is cited and released.  MCSO's compliance rate for this Subparagraph is 99%.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence.  During our review of the collected traffic stop data during this reporting period, there were no stops where contraband or evidence was seized.  MCSO is in compliance with this Subparagraph.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In the 105 cases we reviewed, we found documentation indicating the final disposition of the stop, whether an arrest was made, and a citation was issued, a warning was given, or a release was made without a citation.  MCSO's submission of the samples for this reporting period included a duplicate case that it discovered prior to our review and advised us of.  We mutually agreed to replace the duplicate with another traffic case in an email exchange.  MCSO is in compliance with this Subparagraph with a compliance rating of 100%.

In order to be compliant with Paragraph 54 of the Order, all Subparagraphs must be in compliance.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

**Paragraph 55.** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

We reviewed policy EA-5 (Enforcement Communications; effective September 5, 2014), which complies with the Paragraph requirement.

During our June 2014 site visit, we met with the Deputy Chief of the Technology Bureau, who confirmed that the unique identifier went live when the CAD system was implemented in September 2013.  This number provides the mechanism to link all data related to a specific traffic stop.  The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time of the stop.  We have visited the Communications Center (Dispatch) in previous site visits and again during the April 2015 visit, where we spoke at length with the captain and discussed various codes associated with the CAD printout and the unique identifier.  Specifically, we asked how the CAD printout is coded if a deputy is dispatched as a back-up and is then cancelled prior to arrival.  These situations do occur occasionally, and for our assessment

of numbers of personnel on traffic stops, we requested clarification.  Communications provided us with a code sheet for all numerical codes listed on the CAD printout.

We visited two districts during our April 2015 site visit, and had no indications from the districts that there were recurring issues with the unique identifier (MCSO's Event Number that is dispatched out of Communications for every traffic stop).

Once the deputy scans the motorist's driver license, the system automatically populates most of the information into one or more forms required by the Order.  If the data cannot be entered into TracS from the vehicle (malfunctioning equipment), policy requires the deputy to enter the data electronically prior to the end of the shift.  We found that the start and end times of the traffic stop does not populate to the VCFS from the CAD system.

Since our first visit for monitoring purposes in June 2014, TracS has been implemented in all Districts and the unique identifier (CFS number) is automatically entered from the deputy's MDT; no user intervention was required.  TracS Administrators discovered that the Event Number (unique identifier) was being duplicated on the vehicle stop forms.  The Event Number was previously auto-populated by CAD, however, when connection to CAD was lost because of dead zones, CAD populated the last known number, which assigned an incorrect number to the stop.  To overcome this deficiency, deputies now manually enter the CAD-supplied unique Event Number on the vehicle stop forms and a warning alert is given prompting the deputy to confirm the number.

In order to determine compliance, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Contact Forms for all stops.  We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment.  The unique identification number assigned to each event was listed on all CAD printouts for every stop, and the number was also listed on the Vehicle Contact Forms.  Policy EA-5, Enforcement Communications, effective September 5, 2014, has been disseminated and trained to.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance


***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks.  MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

Policy EB-2 (Traffic Stop Data Collection), effective September 22, 2014, addresses the issue of regular audits and quality control checks.  We recommended in our First Quarterly Report that the policy distinguish between the two.  While audits require in-depth analysis, quality control checks serve as more of an inspection or spot-check of the data.  MCSO has made the required distinction between the two and changed the policy to comply.

We received the protocol developed by MCSO for maintaining the integrity and accuracy of the traffic stop data contained in the TracS system.  The TracS system allows deputies to open any

traffic stop form available to them and create a new instance of data for the type of form selected (Citation, Incidental Contact, Warning, or Vehicle Contact Face Sheet).  For example, if a deputy makes a traffic stop and intends to issue a citation he would open the citation form and a new instance of the citation data would be created during the data entry process.  In all cases, the deputy creating a new data form is the only user that can update the data via the TracS application.  All forms lock the data entry process when the form has been marked "Issued" or "Completed," prohibiting any other user access.

Outside the TracS application, Technology Bureau staff manages the servers and database that run the system and consequently, this staff has access to the information in the system.  Currently there are a small number of users who have access to this information.  They are: System Administrator, Application Development Supervisor, Reports Developer and TracS Administrator.  MCSO's protocol for maintaining the integrity and accuracy of the traffic stop data contained in electronic form is compliant.

When we conducted our two District site visits (Districts Two and Three) during April, 2015 we discovered the paper records of traffic stops generated prior to TracS implementation and located at the districts was not secure.  We spoke with CID personnel on how to remedy this situation while we were on site.  The paper records are maintained at the districts and follow assigned personnel when they are transferred.  MCSO does have a protocol that requires written traffic stop data to be located at the districts, but it does not include maintaining the integrity and accuracy of the paper records.  This must be addressed in writing – by either updating of the protocol or modification of the policy.  We conducted a random review of written traffic stop data at the above-mentioned Districts and staff was able to provide the documentation.

We were advised that MCSO conducted an audit of traffic stop data in January 2014 and then again beginning in April 2014.  After the January 2014 audit, new handwritten forms were created to collect the data required by policy until full electronic data entry began on April 1, 2014.  CID advises that they have conducted spot audits that were directed at portions of data or the actions of individual deputies.  CID provided us with an audit during our September 2014 site visit, and continues to provide us monthly audits of a sample of traffic stops that we select.  We reviewed the BIO's January through March 2015 monthly audits of the traffic samples and found them complete and thorough.  In order to be in compliance, MCSO must provide the protocol specifically addressing the requirements for maintaining the integrity and accuracy of the written traffic stop data.  The approved policy requires regularly scheduled audits on a monthly, quarterly, and annual basis.  At present, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 57.** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014. Every person contacted on a traffic stop will be provided with either an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt. During this reporting period, there were 39 incidents where the deputy gave a warning to the motorist for a traffic violation and in seven of these cases, the deputy failed to have the violator sign the warning/repair form and in three instances the deputy wrote "SERVED" in the box requiring a signature for the warning. In order to verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign the deputy may note the refusal on the form. We cannot verify that motorists have been given a receipt without a signature on the form or the deputy advising of the refusal of the receipt from the driver. Placing "SERVED" in the signature box without any explanation does not comply with the requirement. MCSO's compliance for this portion of the Subparagraph is 74%, although MCSO did improve from the results of the previous reporting period.

In the 66 cases where drivers were issued citations, we found eight instances where the driver did not sign the Arizona Traffic Citation or the deputy indicated "SERVED" in the signature box. In two cases, the deputies indicated a valid reason for not obtaining a signature (TracS technical issues) for a 91% compliance rate.

The approved policy dictates that the CAD system will be used for verification of the recording of the initiation of the stop. The stop's termination is noted by the deputy verbally announcing same on the radio. CAD then permanently records this information. Once MCSO acquires on-body recording equipment, policies must be developed which account for its use in verifying stop duration. We will review the video recordings once the on-body camera system is functional to verify whether deputies are accurately reporting stop length.

In order to address the use of in-car recording equipment to check on whether deputies are accurately recording stop length, MCSO developed a draft policy, EA-4, Use of Body Worn Cameras, and provided the Monitor and the Plaintiffs with copies for our input on December 4, 2014. We provided recommendations, and MCSO advises that a new draft is pending.

MCSO is not in compliance with this Subparagraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

Policies GF-1 (Criminal Justice Data Systems), effective November 7, 2006, and GF-2 (Criminal History Record Information and Public Records), effective January 7, 2000, state that all databases containing specific data identified to an individual comply with federal and state privacy standards and it limits access to only those employees who are authorized to access the system.

The policies go further to include that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona Statutes, the Department of Public Safety, and the Arizona Criminal Justice Information System; and that any violation is subject to fine.  No secondary dissemination is allowed.  We reviewed an internal MCSO memorandum of April 12, 2014 that required all TOC (Terminal Operator Certification) personnel in these positions to be re-certified on a new testing procedure developed by the Training Division and the Systems Security Officer.  We previously met with two Deputy Chiefs who advised that MCSO had been vigilant in security of the data systems and had previously prosecuted violators and currently have one outstanding case in the system.  We reviewed two separate and independent external audits, the most recent Arizona Department of Public Safety and the FBI's audit of the integrity and restrictions required for database security.  We met with the Database Administrator, who advised that every new recruit class receives three hours of training during Academy training.  We will continue to observe the security issues outlined in Paragraph 58 of this Order; but at present, MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

**Paragraph 59.** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

Electronic traffic stop data capture began on April 1, 2014.  The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54 of the Order.  BIO provided the traffic stop data, which included a spreadsheet of all traffic stops from January 1, through March 31, 2015, listing event numbers as described at the beginning of Section 8.  We then requested a stratified sample from all traffic stops.  With the exception of two vehicles, all patrol vehicles used for traffic stops are now equipped with the automated TracS system, but there may be some deputies who have not yet been trained in TracS data entry.  MCSO has

provided full access to all available electronic and written collected data since April 1, 2014. Electronic data were not collected before this time. MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not applicable

Phase 2: In compliance


### b. Electronic Data Entry

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

We reviewed the approved MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), and EB-2 (Traffic Stop Data Collection), both effective September 22, 2014; and found them to be compliant with the provisions of the Paragraph. However, the system must be able to generate summary reports and analyses, as well as be used to conduct searches of the data. The requirement also includes that the system enable the deputies to enter the traffic stop data electronically from the field. If TracS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

We reviewed documents indicating that the Bureau of Internal Oversight (BIO) is conducting spot checks of the data and forwarding those instances of non-compliance to the districts for action. CID provided a memorandum on April 28, 2014, that indicates MCSO was in the process of conducting its first audit to determine the validity of the data captured. MCSO continues to conduct monthly traffic stop audits of the traffic stops and forwards them for our review. We have found the audits to be complete and thorough. Initially the traffic stop data was captured on forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each district.

As of June 30, 2014, there were 257 total vehicles equipped with the TracS e-citation system. We were advised that at the end of the reporting period, 267 units were so equipped. We looked at all districts for those units that are used to conduct traffic enforcement to ensure that deputies were able to enter the data electronically from the field. Therefore, we removed from the vehicle population those vehicles that were obviously specialized or special purposed, and are not used to conduct traffic stops. We reviewed two documents from MCSO: one generated January 21, 2015, that indicated that 163 of 165 marked patrol cars had TracS installed; and one indicating that as of March 31, 2015, all 175 marked patrol vehicles used to conduct traffic stops were equipped with TracS. Due to the size of the patrol fleet, the number of marked patrol vehicles will fluctuate from month to month.

In addition, MCSO must provide documentation pertaining to the training of deputies who use electronic data entry systems for traffic stops. During our June 2014 site visit, we were informed that training was conducted via train-the-trainer processes, whereby EIS personnel train supervisors who then train deputies under their command. However, no documentation of said training had been created; therefore, MCSO is not able to document who has received this training and who has not. We spoke with a Deputy Chief during the December 2014 site visit who indicated that there is a new training and documentation process being developed by the Training Division to identify those deputies who have received TracS training. MCSO deputies have demonstrated their ability to access and utilize TracS as evidenced by their total time on a traffic stop averages 15 minutes or less. We reiterated that a process of memorialization for training was required by the Order. Therefore, while progress is being made, MCSO is not in Phase 2 compliance with Paragraph 60.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

### c. Audio-Video Recording of Traffic Stops

*Paragraph 61. The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such installation must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one. Effective Date. MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date. Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other staff to discuss the progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring on-body video and audio recording devices for their deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014 amending the Order to incorporate on-body cameras. We believe this is a prudent choice in that it allows for capturing additional data, where a fixed mounted camera has limitations. The change will capture more citizen interactions when contact is away from the vehicle.

During our April 2015 site visit, we met with the Deputy Chief of the Bureau of Internal Oversight and staff from CID, and were advised that MCSO personnel had selected a vendor (Taser) to provide the body-worn cameras. The Maricopa County Board of Supervisors approved the request for purchase on January 29, 2015. MCSO advised that its request included the purchase of 700 body cameras, 150 docking stations, and 50 individual docking stations for

those deputies who do not regularly report to district offices. We reviewed MCSO's contract with Taser International, and note that it is for five years, with service intervals included, and that Taser will provide data storage and security through Evidence.com Data Security. We reviewed an internal memorandum from the Deputy Chief of BIO from February 19, 2015 that described an implementation plan for issuance of the cameras beginning with Districts One, Two, and Three; to be followed by Districts Four, Six, Seven, and Lakes. We were advised the training staff has starting working out a training schedule to accommodate the roll out period.

MCSO must develop a policy/protocol to address the requirements for the use of the video/audio recording of every traffic stop, and the security and maintenance of associated equipment. The policy must address, in addition, what deputies are required to do if equipment is malfunctioning, as well as the documented process of how such malfunctions are reported and serviced. MCSO did provide a draft policy, EA-4, Use of Body Worn Cameras, which did not meet all of the requirements. The Monitoring Team and the Plaintiffs provided input on the draft, and a new policy will be forthcoming. MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

*Paragraph 62. Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

MCSO has evaluated on-person body cameras from other jurisdictions and has decided on a vendor (Taser International). We have suggested that MCSO deputies conduct a functionality test at the beginning and end of their tour of duty. When the policy is developed, it must state the requirement that deputies are subject to discipline if they fail to activate and use their recording equipment; and it must address how non-functioning equipment will be repaired or replaced. At present, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the*

*District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

Policy EB-2 (Traffic Stop Data Collection) includes the requirement that MCSO retain written traffic stop data completed on the Vehicle Stop Contact form for a minimum of five years after it is created, unless a case involving a traffic stop remains under investigation by the Office or is subject of a Notice of Claim, civil litigation or criminal investigation, in which case MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO has developed a protocol and a policy that requires the original hard copy form to be kept at the district level and filed separately for each deputy. When a deputy is transferred, his written traffic stop information will follow him to his new assignment. The Technology Bureau maintains electronic traffic stop data, and we reviewed the bureau's protocol for maintaining the integrity of the data. MCSO has yet to develop a protocol for reviewing the on-body camera recordings and for responding to public records requests in accordance with the Order. This policy must address the retention of recordings. MCSO is not in compliance with this Paragraph.

MCSO developed and submitted a draft policy, EA-4, that did not meet the requirements of the Paragraph. We, along with the Plaintiffs, provided MCSO with suggestions to correct the deficiencies in the proposed draft. MCSO advised that it incorporated our concerns into a new draft that would be submitted in the near future. In order to be compliant with this Paragraph, the new policy governing the use of on-person cameras must consider accountability measures to ensure compliance, activation of video cameras for traffic stops, review of camera recordings, and responses to public records request. Therefore, until the policy is approved, disseminated and trained to, MCSO remains not in compliance with the requirements of the Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

### d. Review of Traffic Stop Data

**Paragraph 64.** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014); EB-2 (Traffic Stop Data Collection, dated September 22,

2014); the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014); and the responses to the Monitor's production requests related to this Paragraph (dated January 27, 2015). We also reviewed a draft new policy establishing new procedures for the BIO delineating management oversight; audits and non-audit reviews; and technical services of, but not limited to, traffic stop data evaluation. However, none of the aforementioned policies sufficiently address the issue of protocols to look for warning signs or indicia of possible racial profiling or other improper conduct.

We also reviewed documents and datasets provided in response to our December 2014 site visit production request that described how EIU staff (Early Intervention Unit—now incorporated into BIO) conduct analyses of traffic stop data. By way of background, during our December 2014 site visit we requested data and reports on traffic stops that EIU generates in a typical month in its effort to look for warning signs of racial profiling or improper conduct. We also requested copies of all the analyses the EIU generates from its analysis of traffic stop data during a typical month. This meant that the EIU had to provide the raw data files and the numerous analyses and reports for our review. EIU conducts analyses of traffic stop data after a month is closed for TraCS reporting purposes The EIU selected December 2014 traffic stop data to compile and evaluate in response to our request, which meant that the EIU could not satisfy our request at least until February 2015. The December data analyses by the EIU generated 19 reports for our review as well as Excel files used to generate the reports, a data file containing six months of traffic stop data, and the traffic stop data for December 2014. We were then able to review the data and reports to learn more about benchmarks used by the EIU to generate analyses of potential racial profiling and other improper conduct. The results of our review were intended to be the subject of discussions for our April 2015 site visit.

The datasets provided to us by the EIU included numerous, detailed EIU analyses of December 2014 traffic stops. We used the Excel files to learn more about the analytic procedures and numeric thresholds used to set individual patrol deputy "alerts' requiring further supervisory review and analysis. The Excel files containing various analyses of traffic stop data showed how alerts were set based on numeric thresholds a patrol deputy to other patrol deputies in the districts, by Zip Code, and agency-wide. Examples of thresholds that were established to set an alert include a citation rate difference of 20 percent or more by race or ethnicity per deputy, a two-minute longer civil traffic stop time per deputy compared to the average time for other deputies in the district, and so forth. Numerous other criteria exist and were discussed during our April 2015 site visit. Our review and meetings during the site visit led us to conclude that EIU staff are working diligently to identify and refine the thresholds to use to identify possible cases of racial profiling or biased policing. However, we also discussed the need for a more formal, statistically based evaluation to support the establishment of numeric thresholds to set alerts.

EIU staff noted that they had just procured the services of an independent evaluation team based out of Arizona State University that would explore methods to analyze traffic stop data that could eventually lead to more formalized procedures to identify possible cases of racial profiling and other improper conduct. At a meeting with the BIO/EIU team and ASU staff during our April 2015 site visit, we were presented with a document from ASU describing preliminary suggestions of analyses under consideration to identify possible cases of racial profiling or other improper conduct. A draft document described numerous analyses being considered – including basic descriptive statistics, a possible survey of patrol deputies to determine characteristics that might lead to a patrol deputy to engage in racial profiling or other biased policing, and inferential

analyses involving statistical test and regression analyses – was presented to us during our April 2015 site visit. Our conclusion is that the analyses proposed are generally in accord with the research literature. However, until such time as the status of the proposed analyses change from being preliminary to formally proposed as a protocol or protocols, we are unable to assert compliance with the Order. Therefore, MCSO is not in Phase 1 compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

*Paragraph 65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

We reviewed all the documentation set forth in Paragraph 64 above. These include MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014); EB-2 (Traffic Stop Data Collection, dated September 22, 2014); and the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014); the draft BIO policy (GH-4); and the numerous data files and reports generated by the EIU using December 2014 traffic stop data that the EIU was able to provide for our review on February 12, 2015.

Additionally, we participated in meetings during our April 2015 site visit to discuss the new organization of BIO and EIU to learn more about roles and responsibilities. The EIU is the lead within BIO for conducting the monthly, quarterly, and the eventual annual analyses of traffic stop data. During our April 2015 site visit, we learned that EIU will also have the day-to-day lead in working with the ASU team to develop protocols for identifying warning signs or indicia or racial profiling and other improper conduct. However, at the end of the reporting period, formalization of EIU's role remains unclear. It is our expectation that draft policy GH-4 will include language explaining the role and responsibility of the EIU as the review group for meeting the requirements of this Paragraph. To be in compliance with the Order, MCSO must develop a policy that specifically identifies the review group that will conduct the monthly, quarterly, and annual analysis of traffic stop data. The policy must include the requirement that the review group members recuse themselves from analyzing data pertaining to their own activities. MCSO must also develop a protocol delineating the methodological (including statistical) tools and techniques that the review group will use to conduct the periodic analyses. At the end of the review period, a formal designation in of a review group and its role and responsibilities did not exist. Therefore, MCSO is not in Phase 1 compliance with Paragraph 65.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

***Paragraph 66.** MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

MCSO provided documentation on January 27, 2015 stating "[T]he analytic benchmarks for the annual agency-wide comprehensive review of data has not yet been established." MCSO policy EB-2 (Traffic Stop Data Collection, dated September 22, 2014) references periodic analyses of traffic stop data to occur on a monthly, quarterly, and annual basis in order to check for possible individual-level, unit-level, or systemic problems; but it makes no explicit mention of the requirement for the annual, agency-wide comprehensive analysis. MCSO draft policy GH-4 (Bureau of Internal Oversight) does not make mention of the Bureau of Internal Oversight's responsibility to address the requirements of Paragraph 66. Because there is not a policy delineating the requirements of Paragraph 66, MCSO is not in Phase 1 compliance.

We note that in response to a production request related to this Paragraph, MCSO provided Excel spreadsheets in February 2015 containing calendar year 2014 fourth quarter passenger and driver data. Because the EIU must wait for a quarter to end before it can begin compiling and analyzing data, the fourth quarter of calendar year 2014 was the most current data available for our review and analysis. The methodologies and benchmarks currently being tested are discussed on our response to Paragraph 64 above. During our April 2015 site visit, MCSO staff introduced us to the ASU team that will propose benchmarks to be used as warning signs of racial profiling and other misconduct and explore methodologies for analyzing traffic stop data at least annually, quarterly, and monthly for the agency, subareas, and various organizational dimensions (e.g., by unit, beat, district, etc.). The proposed methodology was designated by MCSO as preliminary. In our meeting with the ASU team during our April 2015 site visit, we discussed the Order requirements for the annual, agency-wide comprehensive review of traffic stop data. We noted that the requirements must include benchmarks previously reviewed by the Monitor, as well as a protocol about the methodological (including statistical) tools and techniques that will be used to conduct the annual, agency-wide comprehensive evaluation. To achieve Phase 2 compliance with this Paragraph, MCSO must develop a policy for the annual, comprehensive analysis and protocols or procedures for incorporating analytic benchmarks into the annual, comprehensive analysis.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

***Paragraph 67.** In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.      *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical*

*modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.     *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.     *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.     *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.      *other indications of racial or ethnic bias in the exercise of official duties.*

We reviewed MCSO policies EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance, dated September 22, 2014) and EB-2 (Traffic Stop Data Collection, dated September 22, 2014), the Significant Operations/Patrols guidelines (GJ-33, dated September 5, 2014), and responses to the Monitor production requests related to this Paragraph (dated January 27, 2015). EB-2 explicitly lists the language of Paragraph 67 as part of its policy for periodic analyses of traffic stop data collection and is in Phase 1 compliance.

As discussed in Paragraph 64, the EIU provided copies of analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other misconduct.  These analyses and documents were helpful in showing how benchmarks are being used to conduct weekly, monthly, and quarterly analyses looking for individual, unit, or systemic problems. Our review of documentation provided by the EIU showed how the EIU uses the benchmarks to set alerts for subsequent investigation by EIU or supervisory staff.  These benchmarks are based on EIU staff expert opinion about what constitutes outliers with regard to indications of racial bias or other misconduct.  We continue to believe that the establishment of the numeric thresholds for the benchmarks requires the use of more sophisticated statistical techniques rather than expert judgment about the optimal settings for the benchmarks.  It is our understanding, based on the meeting with EIU and ASU staff during our April 2015 site visit, that more sophisticated techniques and benchmarks proposed in the preliminary suggestions by ASU will eventually be formalized for implementation in MCSO periodic analyses.  Because there is no policy about benchmarks that MCSO will use to look for warning signs of racial profiling or other misconduct, MCSO is not in Phase 2 compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

**Paragraph 68.** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.     *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.    the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;

c.    the tactics employed during the Significant Operation and whether they yielded the desired results;

d.    the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;

e.    the resource needs and allocation during the Significant Operation; and

f.    any Complaints lodged against MCSO Personnel following a Significant Operation.

As referenced in Paragraph 36, MCSO has finalized, distributed, and trained personnel to Significant Operations policy GJ-33.   Therefore, the Department has achieved Phase 1 compliance with this Paragraph.

During the December 2014 site visit, we were informed that one Significant Operation, Operation Borderline, had occurred during the period from October through December 2014. Operation Borderline was a drug interdiction effort described completely in Section 6: Pre-Planned Operations.

For the current reporting period, both the Chief of Patrol and Enforcement Support Bureau and the Chief of Detectives and Investigations Bureau stated during our April 2015 site visit that no applicable Significant Operations had occurred during this reporting period.  Therefore, MCSO is in both Phase 1 and Phase 2 compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance


**Paragraph 69.** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

As noted elsewhere in this report, MCSO had provided a new draft of the EIS policy which incorporates the Blue Team reporting system that allows supervisors to make regular notations about the traffic stop activity of persons under their command.   This policy was returned to MCSO with comments the week prior to our April 2015 site visit.  The latest draft was discussed in several meetings during the site visit, and the issues raised remain under review by MCSO. While this policy has yet to be approved, MCSO is conducting ongoing training for Blue Team

as noted in a memorandum pertaining to this Paragraph dated January 27, 2015.  Therefore, MCSO is not in Phase 1 compliance at this time.

As noted in our third quarterly report, MCSO's memorandum in response to the request for information for this Paragraph described a new drop-down menu for supervisors making notations about their subordinates that allows the supervisor to choose from a list of MCSO policies regarding the notations they are making.  These include:  EA11 (Arrest Procedures); CP2 (Code of Conduct); CP3 (Workplace Professionalism); CP8 (Preventing Racial and Other Bias-Based Profiling); EB1 (Traffic Enforcement, Violator Contact, and Citation Issuance); and EB2 (Traffic Stop Data Collection); among other criteria.

The draft EIS policy includes an EI Pro screen allowing supervisors to review all information, except the details of internal and external complaints, regarding persons under their command.  In addition, supervisors are able to use a drop-down menu that would trigger concerns the supervisor has about deputies' "workplace professionalism," "preventing Racial and Other Bias-Based Profiling," and the like as enumerated in this memorandum and outlined in the above paragraph.  During the site visit, the EIS lieutenant, and a lieutenant from District 3, showed us the drop-down menus and how they can remain updated on the activity of their assigned personnel.  The District 3 supervisor also demonstrated how additional features incorporated into TraCS – one field signifying review of traffic stops of subordinates and a second in which the supervisor can make comments regarding the stop itself – improved the ability of first-line supervisors to assess the work of their subordinates and also allowed lieutenants and commanders of the districts to ensure that these reviews are taking place.  However, while the District 3 lieutenant was able to demonstrate these various aspects of the system, including TraCS, he has not yet been trained in TraCS as he recently transferred from the Aviation Unit, which does not conduct traffic stops.

In addition, MCSO informed us during our April 2015 site visit that the agency was procuring a new supervisory evaluating system called Makenotes from CI Technologies that will track how supervisors handle the alerts identified by EIU personnel.  This new software program is expected to become available in May 2015.  Manuals and explanations of EI Pro and Makenotes should be incorporated into the evolving EIS policy.  EIU personnel and command staff regularly review the supervisory notes for indications of problems with deputy behavior with the drop-down menu mentioned above.  A review of the Supervisory Notes during this reporting period shows that supervisors are reviewing the traffic stop activity of their subordinates.  Included in these notes are descriptions of the type of traffic stops deputies are involved in as well as the race and ethnicity of the persons they come into contact with.  The majority of these notes indicate deputies are meeting the requirements of their position.  However, there are also clear examples of deputy behavior that has caused the supervisor to include a negative appraisal and counseling to their subordinate, including notations about their failure to stay up-to-date on e-learning systems and a lack of evidence of patrol activity.  As noted previously, these positive or negative appraisals can be viewed by deputies and their supervisors, with the addition of EI Pro.  According to EIU personnel, the addition of Makenotes to the EIS system should make the review of supervisory actions more standard and clear once the software is in place and all personnel are trained accordingly.  This should allow MCSO to identify any aberrations in a swift and effective manner.  In coming site visits, the evolution of these new supervisory tools will be a major issue to address with EIU and supervisory personnel.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

As noted in response to Paragraphs 64 and 65, we reviewed EB-1 (Traffic Enforcement, Violator Contacts and Citation Issuance), as well as EB-2 (Traffic Stop Data Collection).  In addition, MCSO provided a draft EIS policy to the Monitor and Plaintiffs' Attorneys in September 2014. Suggestions for modification and change to this policy were provided to MCSO on October 16, 2014.  A subsequent revision of the EIS policy was received from MCSO in February 2015 and returned with comments and suggestions in March 2015.  During our April 2015 site visit, we also met with several CID and EIU staff regarding issues related to this Paragraph.  Several concerns were raised with MCSO about definitions and protocols in earlier drafts of the EIS policy.  Since the EIS policy remains under development and review MCSO is not in Phase 1 compliance with Paragraph 70.  In addition, we have noted in the past that the documentation describing the "alert" of problematic behavior is not sufficient to judge whether any particular alert may have been "cleared" prematurely.  As a result, in response to the latest documentation request MCSO has produced a synopsis of alerts on a monthly basis as well as a more complete description of how those alerts have been handled or assigned.

EIU staff has provided memoranda on their methodology used to analyze traffic stop data on a weekly and monthly basis.  These documents, and communication during the latest site visit with contracted ASU personnel, have clarified how EIU personnel try to identify "outliers," "racial profiling," and "improper conduct."  Members of the Monitoring Team will continue working with EIU staff and their contractor to fine-tune these analyses.  However, as we have noted in earlier reports, MCSO should develop a statistically defensible process that excludes as much as possible the arbitrary and artificial setting of "alert" thresholds.

The EIU produced a memorandum and spreadsheet pertaining to alerts during this reporting period.   The memorandum summarizes the alerts and how they were handled while the spreadsheet adds additional detail regarding the investigation of EIU staff or the assignment of these alerts to district supervisors for a more thorough review, including an interview with the deputy whose behavior triggered the alert.  The spreadsheet analysis provides context to the activity of EIU staff investigations.   For instance, in one case the alert was triggered by

"deviation from post stop ethnicity benchmarks" and when EIU personnel investigated they found that this particular deputy was working in a district that includes Guadalupe, AZ, which has a large Hispanic population. As a result this alert was labeled "false" because once the area of patrol was taken into account the proportion of Hispanic drivers stopped compared to the proportion of resident Hispanics did not exceed a 30% disparity. However, this outcome yields exactly the problem suggested in the prior Paragraph; that is, that the setting of threshold levels remains an area that MCSO and their contractor must continue to refine. In other cases, the spreadsheet illuminates the process of the alert being forwarded to supervisory personnel for additional review along with the timelines for a response by those supervisors. In other cases, the spreadsheet shows the counseling or discipline imposed by the supervisor. Thus, while the more transparent documentation has improved our ability to evaluate the activity of MCSO personnel, we will continue to raise our concerns with MCSO and their subcontractors, who are assisting with these data elements.

At present, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

We have been provided access to all existing data. As noted above, the additional spreadsheet analysis tracking the alert status of cases of concern has improved our view of the supervisory review process. Moreover, the addition of two specific TraCS fields that allow supervisors to acknowledge review of traffic stops and add comments pertinent to those traffic stops would appear to alleviate concerns that we have raised in the past. We will continue to observe and evaluate the introduction of new software systems that impact the ability of supervisors to effectively supervise their subordinates. To this point, we have had access to all data that we have requested. We will continue to expect unfettered access to these reviews as they are completed.

**Compliance Status:**

Phase 1: Not applicable

Phase 2: In compliance

## Section 8: Early Identification System (EIS)

**COURT ORDER IX. EARLY IDENTIFICATION SYSTEM ("EIS")**

*a. Development and Implementation of the EIS*

*Paragraph 72. MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

The Early Intervention Unit (EIU) staff continues to do a noteworthy job of providing data, conducting audits, and developing an EIS system that incorporates pieces of information from across the organization. This was accomplished without the benefit of an over-arching policy to guide them. This early experience culminated in a draft policy provided on September 4, 2014 to the Monitoring Team and the Plaintiffs' attorneys, who suggested several changes and modifications. The EIS policy was returned to MCSO on October 16, 2014. We received a subsequent revision of the EIS policy from MCSO in February 2015, and returned it with comments and suggestions in March 2015. In the coming weeks, we will evaluate the changes proposed as this policy evolves. In addition, we have noted several additions to the data incorporated into the EIS system. First, within the TraCS data system, MCSO has added one field that allows supervisors to note their review of subordinates' traffic stops, and a second field that allows supervisors to make specific comments on those stops when deemed necessary. Second, MCSO informed us of the implementation of EI Pro in February 2015. EI Pro is designed to facilitate a supervisor's review of their subordinates' agency history. While this still does not allow supervisors unfettered access to internal and external complaints, we continue to work on the draft EIS policy with MCSO to overcome these issues. EI Pro was also introduced through a Bulletin Board process that did not involve online or in-person training documentation. Therefore, MCSO should evaluate how effectively this process is being used agency-wide. Finally, MCSO has begun the procurement process for Makenotes, which is a software program designed for supervisory functions and oversight. We have not yet seen documentation of this procurement or manuals that describe its use. In addition, we will expect that the introduction of this software will more closely align with documentation of training requirements specified in other areas of the Court Order.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

***Paragraph 73.*** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

The EIU has come together well to this point.  It is coordinated by a lieutenant, with three sergeants working investigations, one analyst, and one administrative staff person.  MCSO has provided an up-to-date organizational chart for the Bureau of Internal Oversight that incorporates the EIU personnel.  The EIU staff continue to conduct Pre-EIS data analysis, since there is not yet an approved EIS policy, using data they have compiled from across the organization – including CAD, RMS, Blue Team, TraCS, EI Pro, etc.  MCSO is not in Phase 1 compliance with this Paragraph.

Several issues remain from past site visits or reports pertaining to the sufficiency of data entry and inclusion, even though EIU has been organized as outlined above.  Some of these issues are technological in nature, and others result from inadequate training or personnel unable to enter data into the electronic system.

For instance, in a memo from the Deputy Chief of the Technology Bureau in response to a request for information, we were advised that the current RMS system does not accommodate the incorporation of Incident/Field Based Reporting narratives into the data sharing system; therefore, MCSO is in the process of developing the necessary forms in TraCS.  MCSO has provided the basic outline of the current Field Forms, but it has not yet developed how they will be included into the EIS system.

During our December 2014 site visit, we were apprised of the fact that some districts continued to have several hundred "open" VCSFs in TraCS as the result of missing information that would not allow the form to be closed.  By our April 2015 site visit, all but a few dozen of these remained outstanding.  We will continue to work with the Operations Audit/Inspections Unit to follow up on these issues.

Furthermore, as noted above, MCSO is procuring another software system, Makenotes, to facilitate supervisor appraisal of their subordinates.  It became apparent that the current systems available within the MCSO technological enterprise did not afford the flexibility sought by the agency.  We will monitor the implementation and training of this software to assure that it meets requirements of the Order.  Finally, we had requested an equipment tracking system to ensure that all districts had vehicles and computers with TraCS installed and operational.  During our April 2015 site visit, we were able to review that over 98% of all vehicles had TraCS installed in them and each district office had additional computer terminals that could be used for TraCS data entry should the need arise.  Moreover, during inspections of district offices throughout our April 2015 site visit, we noted that there were sufficient additional patrol vehicles should any deputy experience a TraCS problem in their originally assigned vehicle.  More importantly, MCSO has implemented a system for deputies to identify problematic equipment operation so that it can be addressed as quickly as possible.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

As noted above, a draft EIS policy has gone through several revisions with the latest offering from MCSO in February 2015, which we returned with suggestions for modification in March 2015.  Additionally, MCSO is proposing to add a new piece of software for supervisory processes in May 2015.  The EIS policy remains under development and review.  Therefore, MCSO is not in Phase 1 compliance with this Paragraph.

We have asked for clarification of the definitions included in the draft EIS policy including, but not limited to, "bias–based policing," "critical incidents," "County Attorney Actions," and the like.  In a memorandum responding to a request for documentation, the EIU has further clarified these definitions.

In addition, at our September 2014, December 2014, and April 2015 site visits, EIU personnel provided insight into the ways that they used the data to conduct weekly and monthly analysis looking for "outliers," "potential questionable behavior," and "racial profiling."  As a result of these discussions, we requested more documentation to support the analysis conducted.  Similar to our observations in Paragraphs 64 and 65, the documentation provided in January 2015 provides insight into what EIU personnel are doing, but the process remains largely "qualitative" since it relies heavily on judgments of EIU personnel.  MCSO has contracted with an outside vendor to develop a quantitative protocol for these alerts and investigations.  While MCSO appears to be capturing most of the necessary information through the alert settings, the way in which the Department arrived at these alert thresholds remains unclear, and will have to be further developed in consultation with MCSO's contractor.  While the additional spreadsheet analysis of alerts described earlier provides some insight into the clearance process of alerts by EIU personnel, or the transmittal of complaints to district personnel, the contractor will need to work with MCSO to address the qualitative aspects of the alert process and attempt to develop a quantitative one.  We will continue to work with MCSO to clarify these issues.  We have recommended that MCSO develop an "alert" protocol or template that includes a description of what judgments may lead an EIU personnel to clear an alert, or, in the case of further processing by district personnel, what the outcome of that process is, and why.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

l.  *all awards and commendations received by employees;*

m.  *Training history for each employee; and*

n.  *bi-monthly Supervisory observations of each employee.*

The EIS policy outlining the data elements and processes remains under development and review. MCSO has added the EI Pro software to the EIS system and proposed the addition of a supervisory evaluation system, Makenotes. However, at this time, we have no documentation regarding the latter software and how it will be incorporated into the EIS process. Therefore, MCSO is not in compliance with this Paragraph.

Some of the issues raised in past evaluations of the draft policy are definitional and have been subsequently addressed through clarification documents; for instance, in 75.a., the IR Memorialization (IRM) includes the concept of biased-based policing; and in 75.c. (IRM) we

suggested that MCSO should provide definitions of Investigatory Stop Violations and Incidental Contacts which have also been added.  Issues such as these have been easily rectified.  We have continued to recommend additional modifications, as in 75.d., regarding "criminal charges," and 75.f., "County Attorney Actions," that could also be rectified with minor changes in language.

Other issues involved access to the data for supervisory personnel who, under previous versions of the draft policy, were not able to review information for deputies under their command without the assistance of EIU personnel or their designees.  The purported introduction of EI Pro in the most recent formulation of EIS software appears to afford such access for supervisors.  However, during our April 2015 site visit, there continued to be resistance to allowing supervisors access to internal and external complaints against subordinates in a timely fashion that does not require the involvement of EIU personnel.  We will have to continue to confirm the inclusion of these elements through document review and examination in the future.

Finally, as noted in Paragraph 73, the Technology Bureau Chief has advised that the bureau is working to ensure that field reports are included in the data that combines to make the entirety of the EIS data system more complete.  As noted above, MCSO has begun the procurement of additional supervisory software, Makenotes, which will have to be evaluated during future inspections.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 76.** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

EB-2 (Traffic Stop Data Collection) requires the capture of the information necessary for EIU personnel to link a deputy's traffic stops, along with the racial and ethnic make-up of those stopped, to the actions the deputies take in those stops.   In addition, the integrity analyses conducted by our personnel have shown that this information is rarely missing from the TraCS data supplied by MCSO.  MCSO is in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  In compliance

**Paragraph 77.** *MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

As noted above, during our September 2014 and December 2014 site visits, the issue of "necessary equipment, in sufficient amount and in good working order" was requested from MCSO.  As noted in Paragraph 73, MCSO provided documentation that over 98% of vehicles assigned to Districts for patrol activities are already equipped with TraCS.  Moreover, in the rare

event that a TraCS vehicle is not available, or the vehicle equipment is not working, each district has equipment within its offices that would allow a deputy to input his/her traffic stop information before the end of their shift (EB-2, Traffic Stop Data Collection, 4A1).  In addition, the Deputy Chief of the Technology Management Bureau has provided a memorandum in response to our document request that comprehensively shows the deployment of personal computers and printers across the districts and specialty units.  During inspections of districts during our April 2015 site visit, we were able to visually confirm the availability of replacement squads equipped with TraCS and computers at each of the district offices should vehicle systems fail.  The memorandum is also a testament to the security of the system.  At present, it would appear that the technology and equipment available meet the requirements of the Order.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  In compliance


***Paragraph 78.** MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

As noted previously, the EIS policy remains under development and review.  Therefore, MCSO is not in Phase 1 compliance with this Paragraph.

Prior to our September 2014 site visit, a draft EIS policy was received by the Monitoring Team and Plaintiffs' attorneys on September 4, 2014.  This document was returned to MCSO on October 16, 2014, with extensive comments from both Monitoring Team personnel and Plaintiffs' Attorneys.  In response to a document request for this report, MCSO provided a new draft EIS policy on February 23, 2015.  We returned this draft with comments and discussed several issues noted above during the April 2015 inspection.  Future reports will discuss the latest policy efforts and the inclusion of additional software features like Makenotes, which will afford supervisors the ability to include ongoing evaluation of their subordinates.  We will evaluate these systems as they become available, including the training protocols put in place.

The Deputy Chief of the Technology Management Bureau provided a memorandum in response to Paragraph 77 that is also pertinent to Paragraph 78.  On the second page of this memorandum, dated October 17, 2014, there is a description of the security of the database and server.  These appear to meet the requirements of the Order.  However, at present, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

In the absence of a finalized EIS policy, or a fully integrated database as noted previously, MCSO personnel in the EIU have done a notable job pulling together data to conduct analyses looking for behavior that may appear to be outside the norm. However, at present, MCSO is not in Phase 1 compliance with this Paragraph. A new draft of the EIS policy is under development. The Chief of the Technology Bureau has enumerated in a memorandum provided after our December 2014 site visit how MCSO is developing new forms in TraCS to address the inadequacies of the current RMS system to integrate Incident/Field Based Reporting narratives into the data-sharing system. MCSO has also added the EI Pro software to the EIS system, which affords supervisors some insight into the agency history of personnel under their command. However, as noted previously, the current system still does not allow supervisors access to internal and external complaints without the assistance of EIU personnel. Moreover, MCSO is in the process of acquiring the Makenotes software from CI Technologies to afford supervisors a more complete mechanism to evaluate the personnel under their command. We will be evaluating all aspects of these new software systems, the training for them, and their application in the field during future site visits.

We were apprised of the weekly and monthly audits being conducted by EIU personnel during our December 2014 site visit. MCSO has provided monthly memorandum since February 2015 that enumerates the alerts EIU personnel have discovered. As a result of further request and consultation, MCSO has now provided a spreadsheet that coincides with their numerical tally of alerts and the subsequent outcomes. This spreadsheet provides much more detail that allows us to understand why some alerts resulted in quick termination by EIU personnel and why others were forwarded to District personnel. This spreadsheet also describes the timeframe allowed for District investigations, as well as space indicating the outcome of the investigation. This new detail has allowed for more transparency of alert processes. However, as noted above, there remain several issues about the setting of thresholds that EIU and District personnel employ in their investigations. We anticipate that the recently contracted outside vendor for data analysis will add detail to these processes that is currently lacking

While EIU personnel are doing well during this pre-EIS stage, they need to be more comprehensive and detailed in the process and production of their reports.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

**b. Training on the EIS**

*Paragraph 80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

As noted above and in a memorandum for Paragraph 80 dated January 26, 2015, the EIU was developing a new version of the EIS policy that was delivered in February 2015.  We have made additional suggestions and comments to the latest policy draft in late March 2015.  In addition, MCSO has added the EI Pro software to the EIS system in January 2015, and proposes to add Makenotes in May 2015.  Therefore, at this point, since the policy has not yet been approved MCSO is not in Phase 1 compliance with this Paragraph.

MCSO added the EI Pro software to the EIS system in January 2015, and introduced this to the agency through a Briefing Board.  EI Pro allows supervisors to have access to the history of personnel under their command with the exception of internal and external complaints that can only be accessed through collaboration with EIU personnel.  We have suggested that this be modified to allow immediate access to these types of reports by supervisors. MCSO has been notified repeatedly that without such modifications we cannot approve the EIS system.  Additionally, during our April 2015 site visit EIU personnel claimed that EI Pro was self-descriptive and did not require online or in-person training.  We questioned whether that met the requirements of the Order; and suggested that a process similar to the overhauling of TraCS training be implemented for EI Pro, as well.  However, it should be noted that during district inspections supervisory personnel were able to easily access the EI Pro system and show how they are able to keep track of the alert status and employment history of their subordinates.  Nonetheless, training must be articulated clearly and administered in a way to capture who has successfully completed the process to meet the requirements of the Order.

MCSO also is in the process of procuring a new software component, Makenotes from CI Technologies in May 2015.  This new software will purportedly allow supervisors the ability to easily evaluate the employees under their command.  We have received no documentation about this new software program or had access to any training curricula developed by MCSO to put this new software into practice.  Future site visits will focus on these additions to the EIS system.

However, as a result of the limitations outlined above, MCSO is not in compliance with Paragraph 80.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

### c. Protocol for Agency and Supervisory Use of the EIS

**Paragraph 81.** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

    i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

    ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

    iii.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

    iv.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

    v.  *complaints by members of the public or other officers; and vi. other indications of racial or ethnic bias in the exercise of official duties;*

c.  *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.  *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.  *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify*

*activity.  All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

The EIS policy and the protocols to be used by supervisory personnel remain under development and revision.  As noted above, MCSO had submitted a new draft EIS policy in February 2015; and was provided with comments and suggestions in late March 2015.  In addition, MCSO is proposing to add a new element to the EIS data, Makenotes, to facilitate supervisor evaluations of their subordinates.  Therefore, MCSO is not in Phase 1 compliance with this Paragraph.

Both the Monitor and Plaintiffs' Attorneys have made suggestions and comments on the draft EIS policy and returned same to MCSO.  Highlights of those suggestions for this Paragraph include: 1) delineating a more thorough description of the threshold limits and empirically evaluating, with their outside contractor, the adequacy of these limits, for actions that could result in an alert and including it in the policy how the EIU may set different thresholds depending on the assignment of any given deputy (81f); 2) training on EIS should be included in the checklist of training and MCSO should attempt to capture which individuals received training in TraCS, EI Pro, and the proposed Makenotes software, since there is no memorialization of this at present; 3) as noted previously in the discussion of alerts related to racial profiling, MCSO should consider a more robust operationalization of this concept in a way that is understandable to all parties.  It is expected that with the addition of an outside contractor, who was present during our April 2015 site visit, that these issues will be quickly resolved; and 4) create a protocol or template for EIU and district personnel to further memorialize how alerts are cleared, forwarded for additional investigation, or result in counseling or retraining.  While the spreadsheet data provided by MCSO during the last data production request illuminates this process, we have suggested ways in which this might be more efficiently done.  Once again, the inclusion of the outside contractor may ameliorate these issues in the future.

At present, MCSO is not in compliance with Paragraph 81.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*a. General Duties of Supervisors*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

We reviewed all policy submissions, and the policy requirements for Paragraph 83 are covered under GC-17 (Employee Disciplinary Procedure), which was revised on September 5, 2014. MCSO's policy is in compliance with Paragraph 83.

We conducted interviews with supervisors and commanders from two districts during our April 2015 site visit to determine if there is compliance with the policy.  In our interview with a District 1 Commander, he advised us that Field Interview (FI) cards are being completed in the Justice Web Interface (JWI), but they are not done on a regular basis.  According to the Commander, supervisors are responding to the scene of arrests, but there is no directive as to which type of arrests they respond to.  It is up to supervisors to determine which calls require their presence.  The Commander further stated that supervisors are reviewing, signing and dating all incident reports. Neither deputies nor supervisors are completing daily activity reports.  In our interview with a District 1 supervisor, he advised us that he responds to arrests depending on the circumstances and the type of arrest.  The supervisor stated that he reviews and signs all incident reports generated by the deputies that work under his supervision, and submits these reports before the end of the shift.  The supervisor stated that the Field Interview (FI) card is seldom used.  With regard to complaints of misconduct, the District 1 Commander advised us that if a citizen wants to file a complaint on a deputy, a supervisor is assigned to take the formal written complaint and will respond to the location of the complainant, in the field or at the district station.

We conducted interviews with a District 6 supervisor and a District 6 Commander.  The Commander indicated that supervisors respond to most arrests.  He also stated that supervisors review, sign and date all incident reports.  The Commander indicated that District 6 deputies complete Field Interview (FI) cards on the Justice Web Interface (JWI) system, but they are

rarely done.  Supervisors are reviewing and signing all incident reports.  Neither deputies nor supervisors are completing daily activity reports. MCSO submitted copies of individual unit histories from the Computer Aided Dispatch (CAD) system as proof of compliance with the requirement for daily activity reports.  CAD histories only offer a limited perspective of the daily activities of deputies, as they do not detail the total time spent on each activity, and do not account for periods when deputies are not on a call.  In addition, there is no proof of compliance with the mandatory supervisory review.

In our site visits of the districts, we noticed that citizen complaint forms were not readily accessible to the public.  We recommend that district stations have citizen complaint forms, at minimum, in both English and Spanish, in a location that is accessible at any time by anyone wishing to file a complaint.

We reviewed a representative sample of 115 incident reports for January 2015, for the randomly selected dates of January 1, and January 10, 2015.  Eighty-one, or 70%, of the 115 incident reports were memorialized within 72 hours.  Five incident reports were not signed, and five incident reports were signed but not dated.  Four vehicle crash reports included the name of the reviewing supervisor, but there was no signature or date of review.  Twelve incident reports were signed and dated by a supervisor after 72 hours; eight of these were reviewed and signed after the required seven-day timeline.  The time lapse from the completion of the report to memorialization in these 12 reports ranged from five to 24 days.

We reviewed a representative sample of 118 incident reports for February 2015, for the randomly selected dates of February 4, and February 23, 2015.  Eighty-five of the 118 incident reports, or 72%, were memorialized within 72 hours.  Four incident reports were signed but not dated.  Five vehicle crash reports included the supervisor's name, but no signature or date, on the report.  Twenty-five incident reports, or 21%, were signed and dated by a supervisor after 72 hours; nine of these were reviewed after the required seven-day timeline; the time lapse from the completion of the report to memorialization of these 25 reports ranged from four to 19 days.  One arrest report was not memorialized within the 72-hour timeline requirement.

We reviewed a representative sample of 118 incident reports for March 2015, for the randomly selected dates of March 8, and March 18, 2015.  Seventy-nine of the 118 incident reports, or 67%, were reviewed and signed by a supervisor within 72 hours.  Thirteen of 18 arrests, or 72%, were memorialized by a supervisor within the required 72 hours.  Four incident reports were signed but not dated.  Twelve vehicle crash reports included the supervisor's name, but not the signature or date of review, on the report.  Fifteen incident reports, or 13%, were signed and dated by a supervisor after 72 hours.  Five arrest reports, or 4%, were not memorialized within the 72-hour time requirement.

We reviewed 19 Field Interview (FI) cards that were completed during the reporting period.  The FI cards were completed in the Justice Web Interface (JWI).  There is no evidence of supervisory review in any of the completed FI cards; the FI format on JWI does not have a field to capture or memorialize supervisory reviews.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

***Paragraph 84.*** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

We reviewed GB-2 (Command Responsibility), dated April 19, 1996 and Briefing Board 14-43, (Immediate Change to GB-2), dated May 1, 2014, as they pertain to Paragraph 84.  Paragraph 84 requires that, within 120 days of the effective date, all patrol deputies shall be assigned to a single, consistent, clearly identified supervisor and that first-line supervisors shall be assigned to supervise no more than 12 deputies.  GB-2, as written, is non-compliant in that it states that no individual shall report to more than one commander or supervisor at any given time but does not state that it would be a single, consistent and clearly identified supervisor.  GB-2 also does not require that first-line supervisors shall be assigned to supervise no more than 12 deputies.  The proposed changes to the policy outlined in the Briefing Board will not address all of these issues, particularly that all patrol deputies shall be assigned to a single, consistent, clearly identified supervisor. In order to be compliant, GB-2 must include these requirements.  On November 16, 2014, we received MCSO's Third Quarter Report.  In the report, MCSO states that it continues to work on GB-2, Command Responsibility.  MCSO is not in Phase 1 compliance with this Paragraph.

To verify Phase 2 compliance, we reviewed monthly rosters and shift rosters for the first quarter of 2015.  For January we reviewed Districts 1 and 2; for February we reviewed Districts 3 and 4; and for March we reviewed Districts 6, 7, and Lake Patrol.  Monthly and daily rosters show that deputies are assigned to one single consistent supervisor and supervisors are assigned no more than 12 deputies.  With the exception of Lake Patrol, all districts are completing monthly rosters.  We requested a copy of the monthly roster for March from Lake Patrol.  Lake Patrol submitted a copy of a monthly roster, which was identified, in a separate memorandum, as being the monthly roster for January and February 2015.  Although the supervisor-to-deputy ratio was within Paragraph 83 requirements, the roster was not marked as to which month it was for.

During our site visit in April 2015, we interviewed supervisors and commanders from District 1 and District 6.  In our discussions we were told that supervisors have no more than 12 deputies reporting to them, and that supervisors work the same days and hours as the deputies that report to them.  We also learned from one of the district commanders that his goal is to increase the number of supervisors assigned to the district so that supervisors have no more than six deputies under their supervision.   We agree that this would be a positive step toward ensuring accountability and performance, and would facilitate compliance with this section.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Deferred

***Paragraph 85.** First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

We reviewed MCSO's policy submissions, and the requirements for Paragraph 85 are covered under EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) as revised on September 22, 2014. EB-1 is in compliance with Paragraph 85. EB-1 states, "Supervisory Responsibilities: First line supervisors shall individually discuss the traffic stops made by each deputy under their supervision at least one time per month. The discussion shall include whether the deputy detained any individuals and the reason for such detention, and whether any stops involved immigration issues."

We reviewed MCSO's submission as proof of compliance with Paragraph 85. A document request was made for MCSO to provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We requested documentation for one randomly selected supervisor from each district, for each month of the review period, and the squad of deputies that reports to that supervisor. MCSO submitted 119 supervisory notes completed for 92 deputies. Some supervisory notes covered a two-week period.

Of the 119 supervisory notes reviewed, very few contained all the necessary information in order to meet the requirements of Paragraph 85. We found that some supervisors were excellent reviewers and were thorough in their documentation, but these were few and far between. In some cases, supervisors appeared to have cut and pasted comments, as the wording was almost identical in all their supervisory notes. In addition, from the comments we reviewed, it became apparent that some supervisors simply reviewed the information in the data tracking system and rendered a conclusion as to whether or not the deputy conducted the stops and detentions in accordance with this Paragraph, without conducting a conference or meeting with the deputy to review the stops.

MCSO also included in their submission a list of 23 deputies from the requested list who did not have supervisory notes completed. In order to be in Phase 2 compliance with this Paragraph, supervisors must ensure that they are reviewing all stops and detentions at least once per month, with each deputy under their supervision. This review must be conducted in-person, as opposed to merely analyzing the data associated with stops and detentions. MCSO is making slow progress in memorializing the monthly discussion between supervisors and deputies, and it is clear the agency still has some work to do to achieve full compliance.

**Compliance Status:**

Phase 1: In compliance

Phase 2: Not in compliance

***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

We reviewed policy GB-2 (Command Responsibility), with regard to the Paragraph 86 requirement that on-duty field supervisors shall be available throughout their shift to provide adequate on-scene field supervision to deputies under their direct command and, as needed, to provide supervisory assistance to other units. Paragraph 86 also requires that supervisors shall be assigned to work the same days and hours as the deputies they are assigned to supervise, absent exceptional circumstances. GB-2 is non-compliant in that it does not address the Paragraph 86 requirements. GB-2 is under review and revision by MCSO. Policy GB-2 must include the Paragraph 86 requirements cited above in order to be compliant. On November 16, 2014, we received MCSO's Third Quarter Report. In the report, MCSO states that it continues to work on GB-2, Command Responsibility.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2015. For January, we reviewed Districts 1 and 2; for February, we reviewed Districts 3 and 4; and for March, we reviewed Districts 6, 7, and Lake Patrol. Monthly and daily rosters indicate that deputies are assigned to one single consistent supervisor and supervisors are assigned no more than 12 deputies. With the exception of Lake Patrol, all districts are completing clearly marked monthly rosters. Lake Patrol submitted a copy of a monthly roster, which was identified, in a separate memorandum, as the monthly roster for January and February 2015. Although the supervisor-to-deputy ratio fell within Paragraph 83 requirements, the roster is not marked as to which month it is for.

We reviewed Computer Aided Dispatch (CAD) unit histories submitted by MCSO as proof of compliance with the requirement for daily activity reports. The CAD unit histories we reviewed display the time of dispatch for each assigned or self-initiated call. The CAD history did not indicate the time when the call was completed, nor did it indicate if there were any supervisory contacts throughout the shift. In addition, supervisors are not completing daily activity reports to document on-field supervision or daily contacts with the deputies assigned to them. There is no documentation that can be audited, of contacts that occur throughout the shift between supervisors and deputies, and no documentation that supervisors are responding to incidents in the field.

**Compliance Status:**

Phase 1: Not in compliance

Phase 2: Not in compliance

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

We reviewed the submissions and the policy requirements for Paragraph 87 covered under GC-17 (Employee Disciplinary Procedure), which was revised on September 5, 2014.  MCSO's policy is in compliance with Paragraph 87.

GC-17 (revised September 15, 2014) states, "Commanders and supervisors shall be accountable for the quality and effectiveness of their supervision, including whether commanders and supervisors identify and effectively respond to misconduct, as part of performance evaluations or through non-disciplinary corrective action, or through the initiation of a formal investigation and the disciplinary process, as appropriate."

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  GC-4 must include the requirement of Paragraph 87 since it directly relates to Performance Appraisals.  Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this Paragraph.

We requested the performance appraisals for all deputies and supervisors who were evaluated during the review period.  We received and reviewed 87 performance evaluations submitted for deputies who received evaluations between January 1, and March 31, 2015.  One of the performance evaluations submitted fell within the previous reporting period, so it was not included in this review.  We also reviewed performance appraisals for 25 sergeants who received performance appraisals during this reporting period.  Of the 25 supervisor performance evaluations, 18 did not contain an assessment of the quality and effectiveness of the sergeants' supervision.  None of the 25 supervisors' performance evaluations contained comments regarding the supervisors' demonstrated ability to identify and effectively respond to misconduct.  We reviewed performance appraisals for nine lieutenants who received performance appraisals during the reporting period.  Of the nine performance evaluations, only one contained an assessment of the commander's quality and effectiveness of the commander's supervision.  None of the nine commanders' performance evaluations contained an assessment of the commanders' ability to identify and effectively respond to misconduct.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*b. Additional Supervisory Measures*

***Paragraph 88.*** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

MCSO has taken the position that it no longer has specialized units that enforce immigration laws. During discussions with CID and MCAO attorneys, we have suggested that applicable immigration laws and immigration-related crimes, as those terms are defined in the Order, be identified. From there, a determination can be made as to which units, if any, enforce these laws as one of their core missions.

In previous discussions, MCSO and MCAO attorneys articulated that the three criminal violations that they believe qualify as potentially immigration-related include: human smuggling; forgery; and misconduct with weapons. During our December 2014 site visit, we were informed that MCSO was disbanding the Criminal Employment Unit, which was part of the Special Investigations Division.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act. On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above statute including arresting, detaining, or questioning persons for suspected (or even known) violations of the Act and from extending the duration of traffic stops or other deputy-civilian encounters in order to do so.

During our April 2015 site visit, we met with the MCSO Command Staff to review proof of compliance that the Criminal Employment Unit (CEU) had been disbanded, as MSO had asserted, and that there were no Specialized Units enforcing immigration-related laws. MCSO submitted a copy of a memorandum dated December 15, 2014, from Deputy Chief Lopez to Chief Deputy Sheridan which states, "After a thorough discussion with Command Staff, it has been determined that the CEU will be disbanded after the current identity theft investigation concludes in the end of January or early February of 2015. The Maricopa County Sheriff's Office will be voluntarily enjoining itself from investigating identity theft for the purposes of gaining employment. This determination was made after certain laws enacted by the State of Arizona have been enjoined by United States Federal Court Decisions. The grant funding provided by the State to MCSO to enforce these crimes will be returned to the State. Existing personnel assigned to CEU will be transferred to other units in the Office to fill manpower needs. CEU will be removed from the organizational chart and Operations Manual of the Special Investigations Division."

MCSO also submitted a memorandum dated January 6, 2015, from Executive Chief Trombi to Chief Deputy Sheridan which states, "As a direct result of US District Judge David G. Campbell's January 5, 2015 Order in *Puente Arizona v. Joseph Arpaio*, which was previously distributed via the Court Compliance Division, I have directed Deputy Chief Lopez to immediately cease any future and/or active/pending investigations related to ARS 13-2009(A)(3) and the portion of ARS 13-2008(A) that addresses actions committed 'with the intent to obtain or continue employment.' Additionally, I have directed Chief Lopez to immediately disband and

reassign deputies currently assigned to that investigative branch known as the Criminal Employment Unit and remove any such identifiers with our agency that indicate the existence of such a unit.  These deputies shall be assigned to various other divisions/districts as deemed appropriate by office needs for resources."

In addition, MCSO submitted a copy of a letter dated February 12, 2015, from Sheriff Joseph Arpaio to Ms. Kathy Peckardt, Interim Director of the Department of Administration of the State of Arizona.  The letter states that MCSO will be returning $32,292.72 in previously allocated State funds to enforce criminal employer sanctions.

MCSO has advised us that the Criminal Employment Unit has been renamed the Anti-Trafficking Unit, and that its mission has changed to drug interdiction.  MCSO submitted an organizational chart for the Special Investigations Division, which shows that the Criminal Employment Unit name has been deleted; the initials "ATU" are handwritten in.  Compliance is deferred until we review the mission statement, policies, and operations manual of the Anti-Trafficking Unit (ATU) to verify MCSO's assertion that this Paragraph is not applicable to that unit.

**Compliance Status:**

Phase 1:  Deferred

Phase 2:  Deferred

*Paragraph 89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

We reviewed the following documents submitted by MCSO as policy documentation relative to Paragraph 89 requirements: EA-11 (Arrest Procedures), which was revised on September 5, 2014; GC-17 (Employee Disciplinary Procedure), which was revised on September 5, 2014; and proposed EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), which was revised on September 22, 2014.  The requirements of the Paragraph are covered as a result of the combination of these policies.

We requested to inspect all reports related to immigration status investigations, any immigration-related crime, or incidents or arrests involving lack of identity.  The incident reports submitted were for the period from January 1, to March 31, 2015.  The MCSO submission consisted of 15 incidents that occurred during the time period requested.  In 12 of the incidents, there was a physical arrest; in three incidents, the drivers were cited and released.  Of the 15 incidents, 13 were reviewed by a supervisor within 72 hours; seven incident reports had no documentation that a supervisor was notified of the investigation or arrest.  Two incidents involved arrest, but the

associated Incident Reports were not included with the submission.  Twelve of the incidents were for traffic stops but there were no Vehicle Stop Contact Forms included with the submission.  We reviewed all 15 incidents submitted for this reporting period, and found no other issues of concern or compliance violations other than those mentioned.

In MCSO's response, MCSO stated that there were no immigration-related arrests or investigations; there were no incidents submitted.  There were no immigration-related arrests or investigations for misconduct with weapons or forgery, or for any immigration-related crime; there were no incidents submitted.

In our review of incident reports, we observed that some incident reports had an entry line for deputies to write the date when the report was submitted to the supervisor, as well as a signature line for the deputy.  The new format also includes a signature line and date line for the supervisor to memorialize the date of review.  Most incident reports reviewed for this period were in the earlier format; but we believe that if used consistently, the revised incident report form will better assist us in determining compliance with this Paragraph.

MCSO has yet to establish daily activity reports for deputies and supervisors.  Daily activity reports can be used document any arrests or investigations related to immigration, immigration-related crime, identity fraud, or lack of identity documents, and corresponding supervisory approvals or disapprovals.  A supervisor's daily activity report may also be used to document any deficiencies or corrective actions related to any arrest or investigation in violation of MCSO policy.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance


***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014.  EA-11 states that deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred.  Absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently review the reports.  If the incident did not include an arrest or detention, the supervisor shall review the IR within seven calendar days, absent exigent circumstances.  Supervisors shall review reports and forms for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary

corrective action for the deputy, or referring the incident for administrative review or criminal investigation. We reviewed EA-11, revised on September 5, 2014; and it is in compliance with this Paragraph.

We reviewed 35 incidents involving traffic stops for January 2015. Out of 35 traffic stops, three resulted in arrests. Only those stops that had an Incident Report associated with it had documentation of supervisory review. Two of the three incidents that involved arrest had an associated incident report. The two incident reports were memorialized by the supervisor within the required timeline of 72 hours. The remaining 32 stops had Vehicle Stop Contact Forms, and in most instances also had traffic citations, but none of the Vehicle Stop Contact Forms contained any notations or signatures from a supervisor indicating that a review had taken place, and the date of the review. There were no notations by Deputies, on the Vehicle Contact Stop Forms, indicating the time they were submitted, and there are no acknowledgements of receipt or review by the supervisor. We were unable to verify if any were turned in by the end of the deputy's shift, or if the supervisor reviewed the documentation within 72 hours as required by this Paragraph.

We reviewed 35 incidents involving traffic stops for February 2015. Out of 35 traffic stops, one resulted in arrest. Only the stop that had an Incident Report associated with it had documentation of supervisory review. The incident report associated with the only arrest was memorialized by the supervisor within the required 72 hours. The remaining 34 stops had Vehicle Stop Contact Forms, and in most instances also had traffic citations; but none of the Vehicle Stop Contact Forms contained any notations or signatures from a supervisor indicating that a review had taken place, and the date of the review. There were no notations by deputies, on the Vehicle Contact Stop Forms, indicating the time they were submitted, and there are no acknowledgements of receipt or review by the supervisor. We are unable to verify if any were turned in by the end of the deputy's shift, or if the supervisor reviewed the documentation within 72 hours as required by this Paragraph.

No traffic stop data was submitted for the month of March.

We recommend that MCSO devise a way to record the date and time when deputies submit Vehicle Stop Contact Forms to their supervisors, on the form, and also find a way to memorialize the date of review by the supervisor in order to meet the requirements of this Paragraph.

**Compliance Status:**

Phase 1: In compliance

Phase 2: Not in compliance

**Paragraph 91.** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

EB-1 (Traffic Enforcement, Violator Contacts and Citation Issuance) revised September 22, 2014, is compliant with the Paragraph 91 requirements.

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014.  EA-11 states that deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred.  Absent exceptional circumstances, within 72 hours of receiving such documentation, supervisors shall independently review the reports.  If the incident did not include an arrest or detention, the supervisor shall review the IR within seven calendar days, absent exigent circumstances.  Supervisors shall review reports and forms for boilerplate or conclusory language; inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, including non-disciplinary corrective action for the deputy; or referring the incident for administrative review or criminal investigation.  We reviewed EA-11, revised on September 5, 2014, and it complies with this Paragraph.

We reviewed traffic stop data for January 2015.  Thirty-five reports for traffic-related events were submitted.  MCSO reported that of the 35 reports, 19 traffic-related events, or 54%, had no deficiencies noted.  Twenty-two potential issues were discovered.  A breakdown of the deficiencies discovered per district is as follows: District 1 with 27%; District 2 with 14%; District 3 with 5%; District 4 with 14%; District 6 with 14%; District 7 with 9%; Lake Patrol with 9%; and Dispatch with 9%.

MCSO found that all of the 35 stops reviewed, or 100%, all had Vehicle Stop Forms completed. Of these, 29 of the stops, or 83%, had a Computer Aided Dispatch (CAD) documented reason for the traffic stop and they matched the documented reason for the stop on the Vehicle Stop Contact Forms.  Thirty-four of the stops, or 97%, had a receipt issued to the driver and all contacted passengers.  If not, the reason for no receipt was documented.  One of the stops had passengers that were contacted but had a documented valid reason for doing so.  Four of the stops had additional passengers in the vehicle and all, or 100%, had the post stop race/ethnicity perceived/recorded on all passengers on the Vehicle Stop Contact Forms.  Thirty-four of the stops, or 97%, had a receipt that contained a signature or acknowledgement that the individual was served, or the lack of service was documented.  Thirty-five of the stops, or 100%, had an Arizona Traffic Citation/Complaint or MCSO Written Warning, or MCSO Incidental Contact Form for each event.  Twenty-seven of the stops, or 77%, had the post stop race/ethnicity on the Vehicle Stop Contact Form match the Arizona Traffic Ticket and Complaint Form or the MCSO Written Warning.  Thirty-five of the stops, or 100%, had all subjects who were queried for an MVD/NCIC check on CAD and JWI documented on the Vehicle Stop Contact Form. Eleven of the stops, or 31%, were inspected to ensure that the deputy recorded the law enforcement reason for the stop on the dispatch audio recording, and there was 100% compliance in these 11 stops. All three stops that had Incident Reports (IRs) associated with them, or 100%, had the IR memorialized by a supervisor within the timeline set by MCSO policy.  Thirty-three of 35 stops, or 94%, listed CAD times match the times annotated on the Vehicle Stop Contact Forms, or had a valid reason for the discrepancy.  None of the Vehicle Stop Contact Forms associated with the 35 stops listed the post stop race/ethnicity as unknown.

During this inspection, MCSO also discovered the following issues:

- In five of the stops, the CAD times did not match the times annotated on the Vehicle Contact Stop Forms.

- In eight of the stops, the post-stop perceived race/ethnicity listed on the Vehicle Stop Contact Form did not match the information listed on the Citation or Written Warning.

- Three of the stops had missing, incomplete, or inaccurate information on the Vehicle Contact Stop Forms.   In one stop, there was missing, incomplete, or inaccurate information on the Citation, Written Warning, Incidental Contact Form or Incident Report.

- In one stop, there was a receipt that did not contain a signature or acknowledgment that the subject was served, and did not document the reason for the lack of signature or service.

- In one stop, the passenger did not appear to have been issued a receipt (Citation, Written Warning, or Incidental Contact Form).

- In four stops, the reason for the stop on CAD does not match what is listed on the Vehicle Stop Contact Form.

- In two stops, the voiced reason for the stop (over radio) is missing from CAD or did not match what is listed in CAD.

MCSO has recommended additional training for deputies, and that first-line supervisors be mandated to review the TraCS system every two weeks to ensure compliance.

We reviewed traffic stop data for February 2015.  Thirty-five reports for traffic-related events were submitted.  MCSO reported that of the 35 reports, 23 traffic-related events, or 66%, had no deficiencies noted. Eighteen potential issues were discovered.  A breakdown of the deficiencies discovered per district is as follows: District 1 with 22%; District 2 with 6%; District 3 with 6%; District 4 with 6%; District 6 with 3%; District 7 with 0%; Lake Patrol with 39%; and Dispatch with 0%.

MCSO found that all 35 stops reviewed, or 100%, had Vehicle Stop Forms completed.  Thirty-five of the stops, or 100%, had a Computer Aided Dispatch (CAD) documented reason for the traffic stop, and they matched the documented reason for the stop on the Vehicle Stop Contact Forms.  Thirty-four of the stops, or 97%, had a receipt issued to the driver and all contacted passengers; if not the reason for no receipt was documented.  One of the stops had passengers that were contacted, but had a documented valid reason for doing so.  In four of the stops reviewed, or 11%, there was missing, incomplete, or inaccurate information on the citation, written warning, or Incidental Contact Form.  Twelve of the stops had additional passengers in the vehicle and all, or 100%, had the post stop race/ethnicity perceived recorded on all passengers on the Vehicle Stop Contact Forms.  Thirty-four of the stops, or 97%, had a receipt that contained a signature or acknowledgement that the individual was served, or the lack of service was documented.    All 35 of the stops, or 100%, had an Arizona Traffic Citation/Complaint or MCSO Written Warning or MCSO Incidental Contact Form for each event.  Thirty-three of the stops, or 94%, had the post stop race/ethnicity on the Vehicle Stop Contact Form match the Arizona Traffic Ticket and Complaint Form or the MCSO Written

Warning.  Thirty-five of the stops, or 100%, had all subjects who were queried for an MVD/NCIC check on CAD and JWI documented on the Vehicle Stop Contact Form.  Ten of the stops, or 29%, were inspected to ensure that the deputy recorded the law enforcement reason for the stop on the dispatch audio recording, and there was 100% compliance.  One stop had an Incident Report (IR) associated with it, and the IR was memorialized by a supervisor within the timeline set by MCSO policy.  Thirty-two of 35 stops, or 91%, listed CAD times match the times annotated on the Vehicle Stop Contact Forms or had a valid reason for the discrepancy.  None of the Vehicle Stop Contact Forms associated with the 35 stops listed the post stop race/ethnicity as unknown.

During this inspection, MCSO also discovered the following issues:

- In four of the stops, the CAD times did not match the times annotated on the Vehicle Contact Stop Forms.

- In two of the stops the post stop perceived race/ethnicity listed on the Vehicle Stop Contact Form did not match the information listed on the Citation or Written Warning.

- Five of the stops had missing, incomplete, or inaccurate information on the Vehicle Contact Stop Forms.

- In two stops, the Vehicle Stop Contact Forms did not document additional units on the vehicle stop.

- In four stops, there was missing, incomplete, or inaccurate information on the Citation, Written Warning, Incidental Contact Form, or Incident Report.

- In one stop, there was a receipt that did not contain a signature or acknowledgment that the subject was served; and it did not document the reason for the lack of signature or service.

- In one stop, the passenger did not appear to have been issued a receipt (Citation, Written Warning, or Incidental Contact Form).

MCSO has recommended additional training for deputies and recommended that first-line supervisors be mandated to review the TraCS system every two weeks to ensure compliance.  MCSO has also recommended that commanders disseminate the inspection report to all first-line supervisors to ensure that the issues identified are being addressed.

The March 2015 data was not submitted.

Thirteen Incident Memorialization Forms were submitted for the period in review. Of the 13 submitted, only five occurred during the review period.  Eight of the 13 were from 2014, and one of the eight had previously been submitted.  Of the 13 Incident Memorialization forms submitted, only four were completed within 72 hours.  Two of the remaining nine, were from September, one from October, and four were from December.  The two remaining Incident Memorialization Forms were for incidents in January 2015 but were not completed within 72 hours.  Two of the 13 Memorialization Forms had no corrective action listed.  All deficiencies were addressed through counseling and training.  The number of Incident Memorialization Forms still appears to be low, and even with the small number submitted there have been several issues, such as the timeliness of reviews, forms being routed improperly, and no proof of documentation of corrective action taken.

MCSO is conducting periodic inspections of investigatory stops and detentions to ensure that the deficiencies are identified and addressed.   While we support BIO conducting reviews and identifying issues associated with specific stops and detentions, this Paragraph requires that the first-line supervisors identify these issues as part of their review of their subordinates' activities. We believe that first-line supervisors are critical in ensuring compliance, and recommend that they be encouraged to take a hands-on approach to supervision in addition to data review.   BIO should continue its efforts, but to the extent that it routinely identifies deficiencies that supervisors fail to identify, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance


***Paragraph 92.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

EA-11 (Arrest Procedures) was revised on September 5, 2014; and EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) was revised on September 22, 2104.   EB-1 is compliant, in that it states that supervisors shall track each deputy's deficiencies or violations and the corrective action taken, in order to identify deputies who need repeated corrective action. EB-1 also states that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops.   EB-1 states that supervisors shall track, through the Early Intervention System (EIS), each deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action.   EB-1 also states supervisors shall notify the Professional Standards Bureau to ensure that each violation is documented in the deputy's performance evaluations and that the supervisory review shall be taken into account in the supervisor's own performance evaluations.   EB-1 also states that MCSO shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete thorough and accurate reviews of deputies' investigatory detention and stops. EB-1 meets the requirements of Paragraph 92.

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.   GC-4 must include the requirement of Paragraph 92 since it directly relates to Performance Appraisals.   Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this Paragraph.

We requested the performance appraisals for all deputies and supervisors who were evaluated during the reporting period.   We reviewed 39 performance evaluations submitted for deputies who received evaluations between January 1, and March 31, 2015.   One of the performance

evaluations submitted was for the previous period so it was not included in this review.  We also reviewed performance appraisals for 16 sergeants who received performance appraisals in the time period being reviewed.  Of the 16 supervisor performance evaluations, 13 did not contain an assessment of the quality and effectiveness of their supervision.  None of the 16 supervisors' performance evaluations contained comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.  We reviewed performance appraisals for six lieutenants who received performance appraisals during the review period.  Of the six performance evaluations, one contained an assessment of the commander's quality and effectiveness of supervision.  None of the six commanders' performance evaluations contained comments regarding their demonstrated ability to identify and effectively respond to misconduct.

In response to our request for proof of compliance, MCSO submitted the following response:

> "Review of deputies EIS profile is currently accomplished through the Blue Team dashboard. This dashboard displays colored lights. Red shows an alert has been set, Yellow shows one incident away from an alert. Green shows more than one incident away from an alert.  The dashboard does not record when a supervisor looks at a deputy's EIS profile. We have received requests from supervisors concerning information in an employee's EIS profile and we have provided the information requested.  However, there is no tracking method in place to record or track these requests."

> "The Maricopa County Sheriff's Office has purchased from the IAPro vendor, CI Technologies, a new program called EI Pro. The Sheriff's Office is beta testing the original version of EI Pro. This program does record when a supervisor looks at a specific incident in a deputy's profile. In the actual user log for the specific IAPro incident, the following is recorded:

> "EIPRO: Employee user name [S…] accessed incident XXXX, where XXXX is the specific IA PRO internal number for the incident."

Until such time as EIS is established throughout MCSO and supervisors are able to track each subordinate's violations and deficiencies in investigatory stops and detentions, as well as the corrective actions taken, MCSO is not in compliance with Paragraph 92.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance


***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

EA-11 (Arrest Procedures) as revised on September 5, 2014 states that deputies shall submit documentation of all stops, investigatory detentions, and arrests to their supervisors by the end of the shift in which the action occurred.  This revised policy is compliant with Paragraph 93.

We reviewed a representative sample of 115 incident reports for January 2015, from the randomly selected dates of January 1, and January 10, 2015. Eighty-one, or 70%, of the 115 incident reports were memorialized within 72 hours. Five incident reports were not signed, and five reports were signed but not dated. Four vehicle crash reports included the name of the reviewing supervisor but there was no signature or date of review. Twelve incident reports were signed and dated by a supervisor after 72 hours; eight of these were reviewed and signed after the seven-day time requirement. The time lapse from the completion of the report to memorialization in these 12 reports ranged from five to 24 days.

We reviewed a representative sample of 118 incident reports for the month of February 2015, from the randomly selected dates of February 4, and February 23, 2015. Eighty-five of the 118 incident reports, or 72%, were memorialized within 72 hours. Four incident reports were signed but not dated. Five incident reports have the supervisor's name printed on the report but no signature or date. Twenty-five incident reports, or 21%, were signed and dated by a supervisor after 72 hours; nine of these were reviewed and signed after the seven-day time requirement. The time lapse from the completion of the report to memorialization in these 25 incident reports ranged from four to 19 days. One arrest report was not memorialized within the 72-hour time requirement.

We reviewed a representative sample of 118 incident reports for the March 2015, from the randomly selected dates of March 8, and March 18, 2015. Seventy-nine, or 67%, of the 118 incident reports were reviewed and signed by a supervisor within 72 hours. Thirteen, or 72%, of 18 arrests, were memorialized by a supervisor within the required 72 hours. Four incident reports were signed but not dated. Twelve vehicle crash reports included the supervisor's name printed on the report but no signature or date. Fifteen, or 13%, of the incident reports were signed and dated by a supervisor after 72 hours. Five arrest reports, or 4%, were not memorialized within the 72-hour time requirement.

MCSO has no standardized, auditable method to document that deputies are completing reports before the end of their shift. MCSO has revised the incident report format and added a signature line and a line for the date of submission to the supervisor. The new incident report format also includes a signature line for the supervisor to acknowledge review. However, this new format has not been standardized, and most reports we reviewed were not in the updated format. We are also still seeing vehicle crash reports with the supervisor's name printed, but no signature or date of review.

**Compliance Status:**

Phase 1: In compliance

Phase 2: Not in compliance

***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

Our process for verification consists of reviewing supervisors' documentation of any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. MCSO submitted policies EA-11 that was revised on September 5, 2014 (Arrest Procedures). EA-11 states that supervisors shall document any arrests that appear unsupported by probable cause or are otherwise in violation of MCSO policy; or indicate a need for corrective action or review of MCSO policy, strategy, tactics, or training. Supervisors shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved deputy, and/or referring the incident for administrative or criminal investigation. EA-11 is in compliance with the requirements of Paragraph 94.

MCSO's submission cover sheet indicated that 15 Incident Memorialization Forms were submitted as proof of compliance with Paragraph 94, for the period of review from January 1, to March 31, 2015. Nine of the incidents submitted occurred in 2014, so they did not fall within the reporting period. One of the forms was completed on March 11, 2015, but the original incident occurred on November 12, 2014. Only six of the nine reports submitted were for the period under review; four of these incidents occurred in January and two occurred in February. Several Incident Memorialization Forms were improperly routed to the Supervisory Note Review Group, adding to the delay of review by commanders. None of the nine Incident Memorialization Forms included the corresponding incident reports.

The issues identified in the supervisors' narratives were improper collection of evidence, conclusory language, lack of probable cause, failure to read Miranda warnings, boilerplate language, lack of articulation of legal basis for arrest, improper investigation, and omission of details. The Incident Memorialization Forms submitted have chain of command signatures lines, but none of them were signed. MCSO supervisors appear to be having difficulty with the timely processing of Incident Memorialization Forms.

**Compliance Status:**

Phase 1: In compliance

Phase 2: Not in compliance

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

We reviewed EA-11 (Arrest Procedures) as revised on September 5, 2014; and the policy meets most of the requirements of Paragraph 95.  Both EIS and a performance evaluation system are in development.  Paragraph 95 requires that supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify deputies needing repeated corrective action.  EA-11 (Arrest Procedures), revised on September 5, 2014, comports with these requirements.  EA-11 also requires that supervisors shall take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of deputies' investigatory detentions and stops.  EA-11 requires that supervisors shall track, through the Early Intervention System (EIS), each deputy's deficiencies or violations and the corrective action taken in order to identify deputies who need repeated corrective action.  EA-11 also requires supervisors to notify the Professional Standards Bureau to ensure that each violation is documented in the deputy's performance evaluations, and that the supervisory review shall be taken into account in the supervisor's own performance evaluations.

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  GC-4 must include the requirement of Paragraph 95 since it directly relates to Performance Appraisals.  Until such time as GC-4 is published, MCSO is not in Phase 1 compliance with this Paragraph.

We requested the performance appraisals for supervisors who were evaluated during the review period.  In all, we reviewed performance appraisals for 16 sergeants who received performance appraisals in the time period being reviewed.  Of the 16 supervisor performance evaluations, 13 did not contain an assessment of the quality and effectiveness of their supervision.  None of the 16 supervisors' performance evaluations contained comments regarding the supervisors' demonstrated ability to identify and effectively respond to misconduct.

We also reviewed performance appraisals for six lieutenants who received performance appraisals during the review period.  Of the six lieutenants' performance evaluations, only one contained an assessment of the commander's quality and effectiveness of supervision.  None of the six lieutenants' performance evaluations contained comments regarding their demonstrated ability to identify and effectively respond to misconduct.

Given the absence of an EIS or governing policy, MCSO is not in compliance with Paragraph 95.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

***Paragraph 96.*** *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

We reviewed EA-11 (Arrest Procedures), which was revised on September 5, 2014; and the policy meets the requirements of Paragraph 96.  EA-11 requires that command-level personnel review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy; or that indicate a need for corrective action or review of MCSO policy, strategy, tactics, or training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and make recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.

MCSO's submission cover sheet indicated that 15 Incident Memorialization Forms were submitted as proof of compliance with Paragraph 94, for the period of review from January 1, to March 31, 2015.  Nine of the incidents occurred in 2014, and did not fall within the reporting period.  One of the nine Incident Memorialization Forms was completed on March 11, 2015, but the original incident occurred on November 12, 2014.  Only six of the nine reports submitted fell within the reporting period; four incidents occurred in January and two in February.  Several Incident Memorialization Forms were improperly routed to the Supervisory Note Review Group, adding to the delay of review by commanders.  Four of the 15 Incident Memorialization Forms were not reviewed and approved by a commander within the required 14-day period, and two of the forms were not marked as having been reviewed by a commander.  The Incident Memorialization Forms submitted have chain of command signatures lines, but none of them were signed.

We have discussed with MCSO the process used for supervisory reviews related to arrests, and the submission of Incident Memorialization Forms.  Considering that nine of the 15 Incident Memorialization Forms submitted for this review period covered incidents that occurred in 2014, it is clear that for the agency to be in compliance with this Paragraph, MCSO supervisors have to identify and document arrests unsupported by probable cause or otherwise in violation of MCSO policy in a more timely basis.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance


***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision.  We have not seen evidence that MCSO is compliant with the requirements of Paragraph 97.  Until such

time as GC-4 is published, and we verify that the requirements of Paragraph 97 are covered by policy, MCSO is not in Phase 1 compliance with this Paragraph.

In response to our request for proof of compliance, MCSO submitted the following response:

> "Review of Deputies EIS profile is currently accomplished through the Blue Team dashboard.  This dashboard displays colored lights.  Red shows an alert has been set, Yellow shows one incident away from an alert and green shows more than one incident away from an alert.  The dashboard does not record when a supervisor looks at a Deputy's EIS profile.  We have received requests from supervisors concerning information in an employee's EIS profile and we have provided the information requested.  However, there is no tracking method in place to record or track these requests."

> "The Maricopa County Sheriff's Office has purchased from the IAPro vendor, CI Technologies, a new program called EI Pro.  The Sheriff's Office is beta testing the original version of EI Pro.  This program does record when a supervisor looks at a specific incident in a Deputy's profile.  In the actual user log for the specific IAPro incident, the following information is recorded:

> "EIPRO: Employee user name [S…] accessed incident XXXX, where XXXX is the specific IA PRO internal number for the incident."

Until such time as EIS is established throughout MCSO and an EIS governing policy is established, MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance


### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.** *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of this Paragraph.  We will verify this information once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO maintains that the IAPro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first-line supervisor access issues identified in Section IX (Early Intervention System).  MCSO is not in compliance with Paragraph 98.

MCSO has not submitted the updated policy GC-4, Performance Appraisals.  GC-4 is still under revision.  Until the policy is revised and meets the requirements of Paragraph 98, MCSO is not in compliance.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

Policy GC-4 (Performance Appraisals) is currently under revision and will purportedly contain the requirements of Paragraph 99.  We will verify this information once we receive a draft of the completed policy as well as a draft of an EIS policy.

MCSO maintains that the IAPro/Blue Team system should have the ability to track the data required by this Paragraph.  MCSO must, however, resolve the first-line supervisor access issues identified in Section IX (Early Intervention System).

MCSO has not submitted the updated policy GC-4, Performance Appraisals.  GC-4 is still under revision.  Until the policy is revised and meets the requirements of Paragraph 98, MCSO is not in compliance.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*Paragraph 100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

MCSO noted that policy GC-4 (Performance Appraisals) is currently under revision and will contain the requirements of Paragraph 100.  We will verify this once we receive a draft of the completed policy as well as the EIS policy.

We requested the performance appraisals for all supervisors who were evaluated during the review period.  We reviewed performance appraisals for 16 sergeants who received performance appraisals in the reporting period.  Of the 16 supervisor performance evaluations, 13 did not contain an assessment of the quality and effectiveness of the supervisory reviews as it relates to subordinates' performance.  None of the 16 supervisors' performance evaluations contained comments regarding the supervisor's demonstrated ability to identify and effectively respond to misconduct.  We reviewed performance appraisals for six lieutenants who received performance appraisals during the review period.  Of the six performance evaluations, only one contained an assessment of the commander's quality and effectiveness of supervision.  None of the six lieutenants' performance evaluations contained comments regarding their demonstrated ability to identify and effectively respond to misconduct.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

*Paragraph 101. Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

During our April 2015 site visit, we met with the MCSO command staff to review proof of compliance that the Criminal Employment Unit had been disbanded, as MCSO had asserted, and that there were no specialized units enforcing immigration-related laws.  MCSO submitted a copy of a memorandum dated December 15, 2014, from Deputy Chief Lopez to Chief Deputy Sheridan which states, "After a thorough discussion with Command Staff, it has been determined that the Criminal Employment Unit (CEU) will be disbanded after the current identity theft investigation concludes in the end of January or early February 2015.  The Maricopa County Sheriff's Office will be voluntarily enjoining themselves from investigating identity theft for the purposes of gaining employment.  This determination was made after certain laws enacted by the State of Arizona have been enjoined by United States Federal Court Decisions.  The grant funding provided by the State to MCSO to enforce these crimes will be returned to the State. Existing personnel assigned to CEU will be transferred to other units in the Office to fill manpower needs.  CEU will be removed from the organizational chart and Operations Manual of the Special Investigations Division."

MCSO also submitted a memorandum dated January 6, 2015, from Executive Chief Trombi to Chief Deputy Sheridan which states, "As a direct result of US District Judge David G. Campbell's January 5, 2015 Order in *Puente Arizona v. Joseph Arpaio*, which was previously distributed via the Court Compliance Division, I have directed Deputy Chief Lopez to immediately cease any future and/or active/pending investigations related to ARS 13-2009(A)(3) and the portion of ARS 13-2008(A) that addresses actions committed 'with the intent to obtain or continue employment.'  Additionally, I have directed Chief Lopez to immediately disband and reassign deputies currently assigned to that investigative branch known as the Criminal Employment Unit and remove any such identifiers with our agency that indicate the existence of such a unit.  These deputies shall be assigned to various other divisions/districts as deemed appropriate by office needs for resources."

MCSO submitted a copy of a letter dated February 12, 2015, from Sheriff Joseph Arpaio to Ms. Kathy Peckardt, Interim Director of the Department of Administration of the State of Arizona. The letter states that MCSO will be returning $32,292.72 in previously allocated State funds to enforce criminal employer sanctions.

MCSO has advised us that the Criminal Employment Unit has been renamed as the Anti-Trafficking Unit, and that its mission has changed to drug interdiction.  MCSO submitted an organizational chart for the Special Investigations Division, which shows that the Criminal Employment Unit name has been deleted; and the initials "ATU" are handwritten on it.  Therefore, our assessment of compliance with this Paragraph is deferred until we review the mission statement, policies, and operations documents of the Anti-Trafficking Unit (ATU) to verify MCSO's assertion that this Paragraph is not applicable to that unit.

**Compliance Status:**

Phase 1:  Deferred

Phase 2:  Deferred

## Section 10: Misconduct and Complaints

**COURT ORDER XI. MISCONDUCT AND COMPLAINTS**

*a. Internally-Discovered Violations*

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

The following MCSO policies were offered in response to this Paragraph: GH-2 (Internal Investigations); CP-8 (Preventing Racial and Other Bias-Based Profiling); CP-5 (Truthfulness); CP-2, (Code of Conduct); CP-3, (Workplace Professionalism); and GC-17 (Employee Disciplinary Procedure). These policies were disseminated and trained to during the Fourth and Fourteenth Amendment training that was completed during this reporting period.

During our previous site visits, we determined that there had been a number of changes in staff assignments in the districts, and personnel were only vaguely aware of responsibilities outlined in GH-2 (Internal Investigations). The districts have continued to experience additional staffing changes, and MCSO has assigned a sergeant to each district to enhance supervision and serve in an administrative capacity and specifically to conduct internal investigations.

We were also advised that little or no formal training for internal investigations had been conducted at the districts or jails during the previous year. The Plaintiffs have also shared their concerns about the lack of progress in ensuring consistent investigations, developing template documents and checklists, and having PSB monitor administrative investigations.

During this reporting period, MCSO PSB added additional staff. Two lieutenants have been assigned to liaison with district supervisors who conduct internal investigations and another lieutenant will liaison with the Detention side.

Some of the areas of concern we have seen in internal investigations include: lack of clarity of the violation; allegations that are overly broad; lack of justification for outcome/discipline; and lack of appropriate documentation. PSB personnel have agreed that modifications may be needed in their policies, and they have contacted several other agencies to receive copies of their policies. PSB personnel are also working on a supervisory training module to ensure field supervisors know how to properly conduct an administrative investigation, as well as an investigative checklist for supervisors to use.

As noted in other Paragraphs, we reviewed 51 administrative investigations during this reporting period. Some were investigated by PSB, and others by district supervisors. We have consistently seen that those investigated by PSB supervisors are more thorough and more likely to contain all of the required documentation. Some of the investigations reviewed were initiated internally after MCSO personnel brought forward concerns, indicating that there is recognition of the responsibility by at least some employees to bring forward potential misconduct. In one case, a supervisor initiated an investigation for insubordination and possible truthfulness issues

on a deputy.  While this investigation was ultimately not sustained, it demonstrates that some MCSO supervisors are taking responsibility to investigate the actions of their employees, without waiting for an external complaint to be brought forward.

There is also evidence that MCSO continues to monitor the actions by Posse personnel.  One investigation resulted in the termination of two Posse members for inappropriately attempting to act in a law enforcement capacity that was not authorized by a sworn deputy, after their actions were discovered by a supervisor.

The 51 investigations reviewed during this reporting period resulted in numerous types of corrective action including verbal counseling, written reprimands, and suspensions.  In the 31 cases for which we provided a formal review, we found that many of them were not thoroughly investigated, findings were not appropriate, discipline was not justified, and in the majority of cases policies were not followed.  In the 20 cases reviewed specifically from Patrol Operations, we found that a third of them had significant deficiencies.  MCSO PSB personnel have been open to the concerns we have brought forward and appear to now be taking steps to address the internal investigation process.  They are moving in the right direction with the assignment of liaisons to the districts and the steps they are taking to potentially revise their policies and the development of supervisory training, but their progress is still slow.  We will continue to work with PSB personnel as they have requested as they revise any policies, and develop appropriate supervisory training.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance


### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

MCSO did not submit any policies or audits in support of this Paragraph.  MCSO did submit a document showing a record of audits of Incident Reports.

During our first site visit, we were made aware of MCSO's acquisition of IAPro for case management and tracking.  At that time, the system had not been completely populated with the cases, nor had all IA employees been trained on the system.  During our September 2014 site visit, we were informed that several personnel changes had taken place in the Professional Standards Bureau.  PSB personnel were not familiar with all of the operations of the unit at that time.   None were familiar with conducting integrity checks and proactively investigating deputies who may be engaging in illegal or improper behavior.  We referred them to an agency that has developed multiple protocols for these types of investigations.

During our December 2014 site visit, we discussed the concept and purpose of "integrity tests" with a different IA command staff.  They stated that they had not been able to do the research on other agencies' use of integrity tests up to that point.  During the last reporting period, we urged MCSO to delegate someone in a management position to research other agencies that have these programs in place.

During this reporting period, MCSO has advised that the Department has been working on creating and developing integrity and audit checks for the office; but to date, no policy has been developed and no audits have been completed.  We are aware that MCSO has added additional personnel to the Professional Standards Bureau, and MCSO has begun to review other agencies' policies for these types of audits.  The Plaintiffs have also noted their concern about the lack of progress in this area, asking our Team to provide more guidance to the MCSO regarding the type of integrity audits that would fulfill the terms of this Paragraph.  MCSO has recently reached out to us to review and provide our input on some other agencies' policies it has received,.  We will meet with MCSO and provide the requested input and assistance during the next reporting period, as requested.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  Not in compliance

Phase 2:  Not in compliance

### c. Complaint Tracking and Investigations

**Paragraph 104.** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

MCSO policy GH-2 (Internal Investigations) Section G. 1, revised September 5, 2014, requires personnel to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Commanders shall facilitate the employee's appearance, absent extraordinary and documented circumstances.  GH-2 was disseminated and trained to during the ongoing Fourth and Fourteenth Amendment Training.  MCSO is therefore in Phase 1 compliance with this Paragraph.

During this reporting period, MCSO provided a list of 29 supervisors who were notified when personnel under their supervision were summoned for an investigation.  Up to this point, there has been no method to document all of the areas regarding employee cooperation with investigations that are necessary to comply with this Paragraph.  The Plaintiffs have also noted concerns with compliance with this Paragraph.  MCSO has now developed a checklist that will include all the information that needs to be documented regarding employees cooperating with investigations and notification of supervisors.  This checklist will also be used to ensure compliance with Paragraph 105.  We have requested and will review this checklist to determine compliance with this Paragraph in future reporting periods.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

The policy, GH-2, Internal Investigations, was revised September 5, 2014; and includes language that investigators shall have access to and take into account, as appropriate, the collected traffic stop and patrol data, training records, discipline history, and any past complaints and performance evaluations of involved deputies.  A revised Internal Affairs SOP (Standard Operating Procedure), which should include a checklist with these tasks, had not been submitted for review during the prior reporting period.  We noted that the SOP should not only encourage investigators to consider this critical data, but should also provide detailed guidance to investigators regarding how such data should and should not be used.  The Plaintiffs have also noted this concern.

During this reporting period, we reviewed 31 investigations that were completed as a result of potential violations by HSU personnel identified during the internal investigation review of numerous videos and other items.  We consistently found problems with the investigations, the findings in the investigations, and the discipline assessed; as well as issues with compliance with MCSO policies and procedures.  We documented and provided to MCSO all of these reviews.  As a result, we have held several meetings and discussions with PSB personnel, and they have acknowledged the lack of consistency in the Department's internal investigations and the need to provide training to all supervisors.  PSB personnel are currently working on possible revisions of Internal Affairs policies, and they have committed to providing training to all supervisors on how to conduct administrative investigations.  We will continue to monitor their progress in these areas and provide input to the process as they have requested.

MCSO has developed a checklist that will be used for administrative investigations.  This should assist to ensure that critical data required is reviewed during the investigative process.  We have requested and will review this checklist to assist us in determining compliance with this Paragraph in future reporting periods.

MCSO is not in compliance with this Paragraph.

**Compliance Status:**

Phase 1:  In compliance

Phase 2:  Not in compliance

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

MCSO's record maintenance and/or retention policy as it pertains to complaints is incorporated in GH-2 Internal Investigations (effective September 5, 2014): "Professional Standards Bureau investigative files will be maintained for five years after an employee's separation or retirement from Office employment."

MCSO has two obligations under this Paragraph – to maintain and make records available. At this time, we have no reason to believe that MCSO has withheld any data requested by the Monitoring Team. However, the Paragraph also covers the requirement that MCSO make un-redacted records of such investigations available to the Plaintiffs as well. The Plaintiffs have continued to advise us that MCSO has not produced certain information requested by Plaintiffs' representatives after multiple requests.

MCSO Professional Standards Bureau now has a tracking system that was purchased for its use. PSB is inputting both Criminal IA investigations and Administrative IA investigations into its tracking system, and were able to provide us with a complete list of all Criminal and Administrative IA's, along with their status upon our request. PSB is also able to use different search criteria to obtain information; and it was able to demonstrate this process to us.

Phase 1 is not applicable for this Paragraph.

**Compliance Status:**

Phase 1:  Not applicable

Phase 2:  Not in compliance

## Section 11: Community Engagement

**COURT ORDER XII. COMMUNITY ENGAGEMENT**

***a. Community Outreach Program***

*(Note: Unchanged language is presented in italicized font. Additions are indicated by <u>underlined font</u>. Deletions are indicated by crossed-out font. Where an entire Paragraph has been removed, that is indicated with brackets, but the numbering remains unchanged. For example: "108. [REMOVED]".)*

**Paragraph 107.** *To rebuild public confidence and trust* ~~in the MCSO and~~ *in the reform process, the* ~~MCSO~~ <u>Monitor</u> *shall* ~~work to improve community relationships and~~ *engage constructively with the community during the period that this Order is in place.* ~~To this end, the MCSO shall create the following district community outreach program.~~

On April 4, 2014, an amended Order (Document 670) made community outreach a Monitor's function. This is no longer an MCSO responsibility. MCSO chose to remove itself from having responsibility over the community engagement program as initially set out in the Order. We and the Plaintiffs' representatives have communicated repeatedly about innovative ways to engage community members and leaders; supporting and encouraging Community Advisory Board (CAB) members; advertising upcoming community events; providing for the development of a complaint system that goes through us to assure access to the appropriate process; and informing the public about the authority of MCSO regarding immigration enforcement. Each of these issues will be addressed in more detail in the following Paragraphs.

**Paragraph 108.** *[REMOVED]* ~~*Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.*~~

**Paragraph 109.** ~~*As part of its Community Outreach and Public Information program, the MCSO*~~ <u>*The Monitor*</u> *shall hold a public meeting* ~~in each of MCSO's patrol Districts within 90~~ <u>180</u> *days of the* ~~Effective Date~~ <u>issuance of this amendment to the Order</u>, *and* ~~at least~~ <u>between</u> *one* <u>and three</u> *meetings in each* <u>of MCSO's patrol</u> *Districts annually thereafter.* <u>The</u> <u>meetings shall be under the direction of the Monitor and/or his designee.</u> *These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The* ~~MCSO~~ <u>Monitor</u> *shall clarify for the public at these meetings that* ~~it~~ <u>the MCSO</u> ~~does not~~ <u>lacks the authority</u> *to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

On April 4, 2014 an amended Order (Document 670) gave the requirement to hold public meetings to the Monitor. We hosted two community meetings during this reporting period. The first community meeting was held on January 14, 2015 at Anthem School located at 41020 NE Freedom Way, Anthem AZ 85086. Anthem is located in MCSO Patrol District 4. The meeting was held from 6:00 p.m. until 9:00 p.m. Twenty-one community members attended this meeting. The attendees raised several complaints about MCSO and demonstrated a genuine interest in the ongoing efforts to bring about change in MCSO policies and procedures. There

were a number of questions and comments offered by the attendees.  Sheriff Arpaio, Chief Deputy Sheridan, Deputy Chief Trombi, and other members of MCSO attended the meeting.  Deputy Chief Trombi offered remarks for MCSO.  ACLU representatives Mr. Pochoda, Mr. Bendor, and Mr. Kilar were in attendance, with Mr. Pochoda offering comments.  Attendees included CAB member Dr. Angeles Maldonado and media representatives from the Arizona Republic and La Voz.

The second community meeting held during this reporting period was conducted on March 11, 2015 at the Arizona State University Preparatory Academy, 735 East Fillmore Street, Phoenix, AZ 85006.  The meeting venue is located in MCSO Patrol District 2.  The meeting began at 6:36 p.m. and ended at 8:30 p.m.  Approximately 50 community members attended.  The meeting was attended by Sheriff Arpaio, Chief Deputy Sheridan, Deputy Chief Trombi, and other members of the MCSO.  Deputy Chief Trombi offered remarks for MCSO.  ACLU representatives Mr. Pochoda, Mr. Bendor, and Mr. Kilar were also in attendance, with Mr. Pochoda offering comments.  Attendees included CAB member Ms. Francisca Porchas and several media representatives.  The attendees offered a number of comments and asked several questions.  Several of the comments were critical of Sheriff Arpaio's actions, requesting he apologize for perceived past transgressions.  There were several complaints regarding the MCSO correctional facilities.  One attendee indicated that he has seen positive changes and that sending officers to training was a good idea.

Both meetings were conducted in English and Spanish to ensure that the maximum amount of participation and understanding took place.

At both meetings, we explained to the meeting attendees the role of the Monitor, his responsibilities to the community, the progress being made, as well as challenges ahead in implementing the Order.  As part of the initial presentation, and during questions and answers, we made it clear that MCSO did not have the authority to enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.  It was also explained to those in attendance that the Monitoring Team would have a regular presence in Maricopa County and we provided our contact information to all parties.  We advised the attendees that the Monitor has the authority to take complaints or compliments about MCSO, and to ensure that complaints are investigated completely.  Further, we explained that new policies, procedures, training, and equipment are being developed for MCSO deputies and supervisors to ensure that they are working within the law and toward the best interests of the people of Maricopa County.

At both meetings, community members asked a number of questions.  We responded to these inquiries, as did Plaintiffs' representatives, or members of MCSO, as appropriate.  For those who declined to ask their questions publicly, separate cards were made available for them to write their questions.  Attendees were also provided with forms to document complaints or concerns.

***Paragraph 110.*** *The meetings present an opportunity for* ~~*MCSO representatives*~~ *the Monitor to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.* ~~*MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.*~~ *The Monitor may investigate and respond to those concerns. To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the*

*Defendants' compliance with this order, it may assist the complainant in filing an appropriate complaint with the MCSO.*

Approximately 21 community members were in attendance at the meeting in Anthem, and 50 community members attended the meeting in Phoenix. Both meetings allowed ample opportunity for attendees to ask questions or offer comments. Participants could either use the roving microphone we provided, or write their comments or questions on note cards that were provided for us to read aloud and provide answers. Questions were successfully fielded at both meetings. Attendees at both meetings politely waited their turn at the microphone, and Monitoring Team personnel moved throughout the meeting location, providing microphones where needed or note cards for those who wished to ask their questions in writing.

A key objective of both meetings was to let those in attendance know that the Monitor has the authority, provided by the Court, to receive complaints about any activity involving MCSO personnel and ensure that an investigation is adequately conducted. Forms were made available for this purpose. After both meetings, all Monitoring Team personnel remained behind to individually answer questions, and did so until the last attendee left the building.

**Paragraph 111.** *English- and Spanish-speaking ~~MCSO~~ Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly-available information. ~~At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the Community Liaison Officer (described below) shall participate in the meetings.~~ The Monitor may request Plaintiffs' and/or Defendants' representatives ~~shall be invited~~ to attend such meetings and assist in answering inquiries by the community. The Defendants are under no obligation to attend such meetings, but to the extent they do not attend such meetings after being requested by the Monitor to do so, the Monitor may report their absence to the public and shall report their absence to the Court.*

Selected members of the Monitoring Team in Maricopa County, some of whom are bilingual, attended the meetings. Spanish translation was provided to ensure that all remarks, questions, and answers were understood by the Spanish-speaking attendees.

In addition, ACLU attorney Mr. Pochoda and MCSO Deputy Chief Trombi offered remarks at the meetings in Anthem and Phoenix. MCSO was well represented at both meetings and were recognized for their attendance. Several of the MCSO personnel in attendance at both meetings play instrumental roles in the implementation of the Court's Order.

**Paragraph 112.** *The meetings shall be held in locations convenient and accessible to the public. At least ~~one week~~ ten days before such meetings, the ~~MCSO~~ Monitor shall widely publicize the meetings using English and Spanish-language television, print media and the internet. The Defendants shall either provide a place for such meetings that is acceptable to the Monitor, or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and other expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If*

*the Monitor determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, he can file a request with the Court that this requirement be revised or eliminated.*

Preparations for both meetings began well in advance of the meeting dates.  Issues such as site selection, advertisement in local radio and print media in English and Spanish, agenda creation, and meeting logistics are of utmost importance in the planning stages.  Before finalizing these items, we consider input from the Community Advisory Board (CAB) and the ACLU of Arizona.  MCSO's Compliance and Implementation Division (CID) staff, as well as the Chief Deputy, are kept abreast of the planning as well as consulted on meeting security issues.  Members of the Monitoring Team met with the ACLU of Arizona and Community Advisory Board (CAB) members to discuss preparations for the public meetings.

The selection of venues for both meetings was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site.  The meetings in Anthem and Phoenix were widely publicized.  Advertisements, in both English and Spanish, appeared in print media with the widest circulation in the areas in which the meetings were held.  These ads were also included in the media outlets' Facebook pages and websites.  Extensive radio spots in Spanish and English were used to announce both meetings.  The ACLU also submitted the meeting notice to numerous online calendars and their local radio media contacts.

**b. ~~Community Liaison Officer~~ Monitor**

**Paragraph 113.** *[REMOVED] Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.]*

**Paragraph 114.** *In addition to the duties set forth in Title XIII of this order,* ~~*The CLO*~~ *the Monitor shall have the following duties in relation to community engagement:*

a.      *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.      *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 111; and*

c.      *to compile any Complaints, concerns and suggestions submitted to* ~~*CLO*~~ *him by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;*

*[d.      [REMOVED] to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and]*

*[e.      [REMOVED] to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.]*

At both of the community meetings, we and Plaintiffs' representatives explained the breadth of the Order to the community members in attendance.  An MCSO representative provided a summary of actions taken by the MCSO to comply with the Order.  Community members were also allowed to ask any question of these representatives, and were given an opportunity to comment on the information provided by these representatives.  Community members were also provided forms to document any concerns or complaints.  After the meetings, members of the Monitoring Team remained and spoke to several attendees who voiced their compliments and/or concerns and opinions regarding MCSO's operations.

### c. Community Advisory Board

**Paragraph 115.** ~~MCSO~~ *The Monitor and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the* ~~MCSO~~ *Monitor and community leaders, and to provide specific recommendations to MCSO about policies and practices that will* ~~increase community trust and~~ *ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

The Community Advisory Board (CAB) was reconstituted during this reporting period, as two CAB members resigned in January and their replacements were identified.  Dr. Lisa Duran submitted her resignation based on a potential conflict of interest with her law firm's business activities, and Dr. Carlos Santos submitted his resignation based on his demanding academic schedule preventing him from dedicating the necessary time to CAB activities.  Ms. Victoria Lopez, Legal Director of the ACLU of Arizona, accepted both resignations.  Plaintiffs' counsel submitted a notice to the Court about this change on March 4, 2015.  The newly appointed CAB members are Ms. Francisca Porchas and Ms. Viridiana Hernandez.  Dr. Angeles Maldonado remains as the third CAB member.  We have worked with the Plaintiffs' counsel to support and provide guidance to the three-member CAB.  We hosted a meeting on January 12, 2015 with the CAB and ACLU to discuss the way forward for the CAB.  CAB member Dr. Maldonado and Arizona ACLU representative Ms. Lopez were in attendance, along with the Monitoring Team management.  On January 13, 2015, Dr. Maldonado, Mr. Pochoda, Mr. Bendor, and other Plaintiffs' counsel attended an MCSO meeting on policy EA-4, Body-Worn Camera Policy, with the Monitoring Team.  The three CAB members attended the Monitor's community meeting in MCSO Patrol District 2 on March 11, 2015 in Phoenix.

**Paragraph 116.** *The CAB shall have* ~~six~~ *three members,* ~~three to be selected by the MCSO and three to be~~ *selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case.* ~~However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB.~~ *The CAB shall continue for at least the length of this Order.*

The CAB is currently comprised of three community members. None of these members are, or have been, MCSO employees, named as class representatives in this matter, or attorneys involved in the *Melendres* litigation.

***Paragraph 117.*** *The CAB shall hold* ~~*public*~~ *meetings at regular intervals of no more than four months.* <u>*The meetings may be either public or private as the purpose of the meeting dictates, at the election of the Board. The Defendants shall either provide a suitable place for such*</u> *meetings* <u>*that is acceptable to the Monitor, or pay the Monitor the necessary expenses*</u> *incurred in arranging for such a meeting place. The Defendants shall also pay to the* <u>*Monitor the additional reasonable expenses that he will incur as a result of performing his*</u> *obligations with respect to the CAB including providing the CAB with reasonably* <u>*necessary administrative support.*</u> ~~*The meeting space shall be provided by the MCSO.*~~ *The* ~~*CLO*~~ <u>*Monitor*</u> *shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.*

During this reporting period, the CAB participated in meetings with various members of the Monitoring Team and Plaintiffs' representatives.  The first meeting between the Monitoring Team, Plaintiffs' representatives, and newly constituted CAB took place on March 10, 2015.  Dr. Maldonado attended meetings with the community groups, Somos America and Tonatierra, and delivered a presentation on the CAB, the monitoring process, and the status of the *Melendres* case.  While CAB members have attended the community meetings we have held and communicated with members of the community to increase community trust, the CAB has not held any community meetings during the reporting period as required by the Order.  However, CAB members have initiated numerous contacts with community organizations – including Arizona Dream Act Coalition; LUCHA; CASE; and the Democratic Legislative Committee of Surprise, AZ – to schedule meetings with the purpose of introducing the CAB members, explaining the role of the CAB, and providing CAB contact information.  The three CAB members met with Ms. Lopez of the ACLU of Arizona to discuss the CAB work plan and role. We will continue to work with the CAB and continue to emphasize the criticality of its holding community meetings in accordance with the requirements of Paragraph 117.  We will provide the CAB logistical support as required.


***Paragraph 118.*** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter* ~~*and make reasonable efforts to address such concerns.*~~ <u>*and transmit them to the Monitor for his investigation and/or action. Members*</u> ~~*will*~~ <u>*may*</u> *also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

We have met with CAB members to discuss the issue of transmitting to us any complaints that may require investigation that have been received by CAB members.  In addition, we have discussed the crucial role of the CAB's ability to reach into the community in a way that the Monitoring Team cannot.  The Board members have been advised to compile concerns regarding MCSO actions or compliance with the Order.  To facilitate this effort, the ACLU of Arizona has launched a bilingual website, ChangingMCSO.org/CambiandoMCSO.org.  According to the ACLU, the website allows the public to gather information about the monitoring process, including the times and locations for community meetings, Monitoring Team reports, MCSO reports, and other Court filings.  The website also includes a form for filling out complaints, which will then be directly conveyed to the CAB and Monitoring Team.

## Section 12:  Concluding Remarks

MCSO's progress towards compliance has stalled during this reporting period. This is unacceptable – and it speaks to the absence of organizational resolve.  We assess compliance with 89 Paragraphs of the Order.  MCSO is in Phase 1 compliance with 31 of those Paragraphs, or 40%.  In 12 Paragraphs, Phase 1 compliance is not applicable – that is, a policy is not required.  MCSO is in Phase 2 compliance with 22 Paragraphs, or 25%.  These numbers are very similar to last quarter's report.  No additional Order-related policies were disseminated to agency personnel during the review period.  Several drafts of policies have been reviewed by my Team and the Plaintiffs' attorneys over the past several months, and we anticipate their issuance in the near future.  However, some are tied to the mandated Supervisor and Command Level Training, which remains mired in the development stage.

As mentioned in our last report, we recognize that by necessity each patrol district must have some autonomy and the flexibility to address crime and quality of life issues which are unique to its service area.  However, we continue to note that in too many instances, there is a lack of standardization from district to district in practices impacted by the Order.  These include use of agency forms such as FI cards, documentation of work attendance, complaint intake, and supervisory expectations such as responding to calls with their subordinates or review of completed reports.  Additionally, while the personnel our Team members have encountered at the district level have been professional and accommodating, we note that in general the district offices, like MCSO's main headquarters, are only open to the public during traditional Monday through Friday business hours.  This does not foster public accessibility, particularly in those areas where MCSO is the sole provider of law enforcement services.

As documented above, the Community Advisory Board (CAB) replaced two of its members during the reporting period.  The newly constituted CAB has been very proactive in initiating actions to raise community awareness of the existence and function of the Board.   The CAB members have also attended some of our onsite and telephonic meetings with the MCSO.  MCSO personnel have been hospitable and welcoming of their involvement.   While the existence of the Community Advisory Board is mandated by the Order, we are hopeful that this is the beginning of collaboration between the Office and the Board, and that MCSO personnel will take advantage of their access to these well-placed community representatives for feedback and an honest assessment of the community's perceptions.

In sum and substance, we find ourselves disappointed in the measure of progress achieved, to date, by the Maricopa County Sheriff's Office.  The leadership of the organization bears full responsibility for the agency's failure to have advanced the implementation of the Court's Order.  While a myriad of legal issues has transpired during this reporting period, these matters have been addressed by attorneys who are well trained for such tasks.  On the other hand, the matter of the reforms to the policies, practices, and procedures of the Sheriff's Office is in the hands of law enforcement executives.  These leaders have not succeeded in moving this process along at a pace that the Order envisions and the community deserves.

## Appendix:  Acronyms

The following is a listing of acronyms frequently used in our reports:

| ACLU | American Civil Liberties Union |
|------|-------------------------------|
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CID | Court Implementation Division |
| CEU | Criminal Employment Unit |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |