**Plaintiffs' Comments on Monitor's Draft Fourth Quarterly Report**
**July 8, 2015**

**Sections 1-3, 12:  Introduction, Executive Summary, Implementation, and Conclusion**

Plaintiffs are deeply concerned by MCSO's wholesale failure to make any meaningful advancement towards compliance with the Court's Supplemental Injunction/Order during the first quarter of 2015.  More than a year after MCSO officially began its efforts to comply with the Order, it still has not achieved even a 50% compliance with putting in place required policy changes and procedures and has only obtained a marginal 25% operational compliance.  MCSO appears uninterested in achieving compliance in a timely fashion.  *Plaintiffs strongly suggest that the Monitor raise the possibility of further Court intervention to ensure MCSO takes its compliance responsibilities seriously.  Plaintiffs' concerns and suggestions with respect to particular sections of the Court's Supplemental Injunction/Order are addressed below.*

With respect to Section 3 on implementation, the Monitor's report does not address MCSO's compliance with Paragraphs 14-17.  In short, these paragraphs require that Plaintiffs have an opportunity to provide comments and recommendations on any policies, procedures, and protocols required to be submitted by MCSO by the Court's Order, and to have a chance to bring any disagreements with the Monitor's final decision to approve a particular policy, procedure or protocol to the Court.  As discussed below, Plaintiffs have not been included in the review process for EIS training and were not notified regarding recent developments during the time period covered by this report regarding the EIS policy and the final version of the body camera policy.  *Plaintiffs request that the Monitor address these issues in its report and instruct MCSO to provide Plaintiffs with appropriate notice so that Plaintiffs can take steps available to them under the Court's Order..*

**Section 4: Policies and Procedures**

On page 18, when discussing Paragraph 25.b of the Court's Supplemental Injunction/Order about the requirement that MCSO give deputies guidance on the appropriate prioritization of traffic enforcement resources, the Monitor's draft report notes that the Monitor team conducted a review of traffic stop data and that the review indicates MCSO is complying with this Paragraph. *The report does not mention what type of review the Monitor team did in order to determine that MCSO is appropriately prioritizing traffic enforcement resources, or the specific results of its review. Plaintiffs ask that this type of information be made available to Plaintiffs and the public by including it in the report, given its significance to the issues in this case.*

On page 18, when discussing Paragraph 25.d of the Court's Supplemental Injunction/Order about the requirement that MCSO not select motor vehicle occupants to question or investigate based to any degree on race/ethnicity, the Monitor's draft report notes that the Monitor team conducted a review of traffic stop data and that the review indicates MCSO did not base their stops to any degree on race or ethnicity. *This is a sweeping statement and Plaintiffs have two comments. First, in Plaintiffs' view, it is not possible through a review of traffic stop data alone to determine with the level of confidence expressed in the Monitor team's statement that MCSO did not base stops to any degree on race or ethnicity during the reporting period. Second, the report*

1

*does not mention what type of review the Monitor team did in order to determine that MCSO is not basing stops to any degree on race or ethnicity. Plaintiffs ask that this type of information be made available to Plaintiffs and the public by including it in the report, given its significance to the issues in this case.*

On page 18, when discussing Paragraph 25.e of the Court's Supplemental Injunction/Order about the requirement that MCSO not use tactics or procedures during a traffic stop based on race/ethnicity, the Monitor's draft report notes that the Monitor team conducted a review of traffic stop data and that the review indicates that traffic stops were not based on race/ethnicity and reflected the general makeup of the population. *This is likewise a sweeping statement. First, in Plaintiffs' view and as Plaintiffs' statistical expert testified at trial, the general makeup of the population is not a sufficient benchmark for determining whether there is a racial disparity in traffic stops that should be studied further. Second, the report does not mention what type of review the Monitor team did in order to determine that MCSO is not conducting stops based on race or ethnicity. Plaintiffs ask that this type of information be made available to the public, given its significance to the issues in this case. Third, this Subparagraph refers not to the initial selection of who to stop, but the use of tactics or procedures during a stop. Plaintiffs suggest that the Monitor specifically address tactics and procedures (including what type of review it specifically did of those things) if it is going to assert that MCSO is in compliance with this Paragraph.*

On page 19, when discussing Paragraph 25.g of the Court's Supplemental Injunction/Order about the prohibition on extending the duration of traffic stops without basis, the Monitor's draft report notes that there were two stops that may have lasted for a longer duration than necessary but then concludes that "therefore, MCSO is compliant with this Subparagraph." *Plaintiffs suggest that the Monitor team explain this apparent contradiction, either by stating MCSO is not in compliance with the paragraph or explaining how it reached this conclusion (e.g., whether the Monitor team is adopting a "substantial compliance" standard rather than a full compliance standard for these types of policy requirements).*

On page 19, when discussing Paragraph 25.i of the Court's Supplemental Injunction/Order, about acceptable IDs on traffic stops, the Monitor's draft report states only that the parties agreed on a list of acceptable IDs and deputies were trained on it. *Plaintiffs suggest that the Monitor team explain whether it made any attempt to determine whether the MCSO is in fact abiding by this list, and if so, what specific review/analysis it did.*

On page 19, when discussing Paragraph 25.j of the Court's Supplemental Injunction/Order, about not asking for the Social Security number or card of any motorists who have provided valid identification, the Monitor's draft report states that it did not review any documentation from the MCSO indicating that deputies were requiring vehicle occupants to provide a Social Security number. *Plaintiffs have two comments. First, the Order requires MCSO to instruct deputies that they are not to ask for such information, not that they are not to require such information. Second, as Plaintiffs noted in their comments to the Monitor's last quarterly report, they suggest the Monitor team discuss whether it conducted any independent affirmative assessment whether the MCSO is complying with this Paragraph. Plaintiffs note the Monitor report does state that it intends to review a sample of the traffic stop videos to determine whether*

*this practice is continuing. Plaintiffs agree that a review of traffic stop videos should be done, but submit that this affirmative assessment can also be done using immediately available means, such as by reviewing traffic stop documentation.*

On page 20, when discussing Paragraph 26 of the Court's Supplemental Injunction/Order, in the portion about arrests for lack of an identity document, the Monitor's draft indicates that it reviewed 12 arrests of vehicle drivers for lack of an identity document. It describes one such detention that it reviewed and seems to suggest the detention was justified. *Plaintiffs suggest the Monitor's report briefly address the other 11 arrests.*

**Section 5: Pre-planned Operations**

No comments.

**Section 6: Training**

Paragraph 43 requires that "Training shall include testing and/or writing that indicate that MCSO Personnel taking the Training comprehend the material taught . . . ." Plaintiffs are concerned that the testing procedures MCSO currently administers are so cursory that they do not show, as required, whether trainees "comprehend the material taught." And, as a practical matter, it appears that MCSO's tests do not provide enough incentive for trainees to pay attention and do not give the Parties or the Monitor enough information about the efficacy of the training.

For example, in the first round of the Bias-Free Policing and Fourth Amendment training, officers received five opportunities to obtain a passing score of 100%. According to page 36 of the draft report, MCSO now proposes to give officers three chances to attain a passing score of 75%. Plaintiffs generally support move towards a testing regime that will better assess how effectively officers are in fact learning the material, and the move towards a more realistic score and fewer opportunities to take the test is encouraging. However, Plaintiffs would urge that as time goes on, and after reviewing the test results, that the MCSO move towards increasing the passing score and further reducing the number of chances officers have to achieve that score. Further, MCSO should provide information to Plaintiffs and the Monitor team about how the tests are administered, such as the number of questions, whether test-takers are told the right answers to questions they got wrong, and whether they are asked the same questions on second and subsequent administrations of the test. In addition, the draft report reveals that comprehension of the Blue Team training was measured using a three-question test with multiple opportunities for success, *see* draft report at page 35, and MCSO has elsewhere revealed that students received 10 opportunities to successfully complete the TraCS training modules, *see* MELC134456. Such tests do not meaningfully measure comprehension. *Plaintiffs ask the Monitor to include in the final report more information about how MCSO proposes to administer the tests associated with the Bias-Free Policing and Fourth Amendment trainings, and to more closely scrutinize MCSO's compliance with the testing requirements of Paragraph 43.*

Paragraph 44 requires MCSO to provide the Plaintiffs and the Monitor with the dates of all trainings required by the Order so that Plaintiffs or the Monitor may observe the trainings. However, MCSO did not notify either Plaintiffs or the Monitor about the dates of the Blue Team

Entry System for IAPro training or the TrACS training, and so we were not able to observe those trainings to ensure their compliance with the Order.  In addition, Paragraph 126 states that one of the Monitor's responsibilities shall be "reviewing the curriculum, materials and proposed instructors for Training required by this Order," and Paragraph 14 states that whenever the Order requires MCSO to provide materials to the Monitor for review, MCSO shall also provide those materials to Plaintiffs for review.  However, MCSO did not provide Plaintiffs with the opportunity to review the training materials for the Blue Team or TrACS trainings.  *Plaintiffs ask the Monitor to deem MCSO non-compliant with any Training-related requirements unless the Monitor and Plaintiffs have had the opportunity to comment on the training materials ahead of time and the opportunity to observe the trainings themselves.*

Paragraph 52 requires MCSO to provide comprehensive supervisory training—which the evidence at trial showed was sorely lacking—within 180 days of the Effective Date of the Order, *i.e.*, by March 31, 2014.  That date came and went over a year ago.  The Monitor is right to strongly criticize MCSO for failing to timely develop the supervisor training.  Plaintiffs agree with the Monitor that Court intervention may be required if this serious problem is not promptly remedied.

**Section 7: Traffic Stop Documentation and Data Collection**

Paragraph 59 directs that "[e]very 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form."  Apparently, MCSO has provided that data to the Monitor, but it has not provided that data to Plaintiffs.  MCSO is therefore not yet in compliance with Paragraph 59, and it should provide that traffic stop data to Plaintiffs.  *Plaintiffs ask the Monitor to report that MCSO is not in compliance for this reason.*

Paragraph 63 directs the MCSO to develop a formal policy governing the use of body cameras, to be reviewed by the Monitor and Plaintiff and subject to the Court.  In May, Plaintiffs sent MCSO comments on the second draft of the body camera policy.  Plaintiffs were not provided with a copy of the final version of that policy until we requested one, after receiving a draft training lesson plan on the use of the body cameras.  The Order provides that Plaintiffs must have an opportunity to bring any disputes about policies to the Court, if necessary.  By finalizing and issuing the body camera policy without providing Plaintiffs with that opportunity to object, MCSO failed to comply with the Court's Order.  *See* Paragraphs 14-17, 63.  *Plaintiffs ask the Monitor to note this non-compliance in the report.*

Paragraphs 64-69 direct MCSO to analyze traffic stop data for warning signs of racial profiling or other improper conduct.  According to the draft report and MCSO's own report, MCSO has contracted with a professor at Arizona State University to develop a methodology for such analyses.  It is important that Plaintiffs and the Monitor be involved in methodology discussions with MCSO and the ASU team early on, so that the Parties can work cooperatively towards an appropriate methodology and work out any disagreements before significant resources are invested.  In addition, Paragraph 66 provides that the Monitor, and therefore Plaintiffs, shall have the opportunity to review the analytical benchmarks before they are used in the annual agency-wide data analysis.  *Plaintiffs ask the Monitor to so state in the report and, pursuant to*

*Paragraph 71, to provide Plaintiffs with the EIU memorandum and spreadsheet pertaining to alerts referenced on page 73 of the draft report.*

**Section 8: Early Identification System (EIS)**

Plaintiffs agree with the Monitor team's overall concern that EIS policies and training still remain incomplete. The EIS was introduced nearly two years ago by MCSO and there is no justification for continued delay in developing complete policies and training protocols.

Paragraph 72. Plaintiffs are very concerned to learn that they have not been included in discussions about recent drafts of the EIS policy and training protocol. Plaintiffs provided comments to an EIS policy and Blue Team entry system in September 2014, but received no further drafts of the policy that Defendants have sent to the Monitor team for comment. Further, Plaintiffs requested in writing several months ago that defense counsel provide them with certain EIS training materials that had apparently been provided to the Monitor and have received no response. *Plaintiffs object to the finalization of any EIS policy or training without the opportunity for input by Plaintiffs' counsel pursuant to Paragraph 72.*

*Further, the new EI Pro and Makenotes programs should also be included in a formal policy and within required training. Plaintiffs are also concerned that MCSO is making decisions to purchase new software programs to implement the EIS without any input from at least the Monitor team.*

Paragraph 74. Plaintiffs are unable to comment on specific protocols, since we have not seen those documents. Regarding the way data are analyzed, Plaintiffs are concerned by the seemingly high discretion placed with EIU personnel as to whether to raise alerts or call for investigations. *The standards used for raising alerts must be clear, consistent, and err on the side of overinclusion. There should also be an opportunity for supervisory review in determining whether certain behavior rises to the level of an alert.*

Paragraph 75. Plaintiffs are unable to comment on whether all of the categories required for inclusion into the EIS are captured by the EIS policy, since it has not been reviewed. Our September 2014 letter regarding the EIS policy noted the absence of many categories of data.

Plaintiffs are also concerned that there is actual "resistance" to supervisor access to complaints against deputies. A key element of the supplemental injunction is increased supervisory responsibilities and oversight of all employees. *Supervisors must not be restricted from or delayed in receiving this type of information.*

Paragraph 80. Regarding training, as previously noted, Plaintiffs are very concerned with the lack of formal pre-approved training. Plaintiffs are particularly concerned by MCSO's statement that training was not required for the EI Pro program. *This pre-approval must be incorporated into any training protocol on EIS.*

Paragraph 81.  Plaintiffs are unable to comment on whether these elements have been included in the EIS policy since we have not received a copy.  MCSO must provide that to Plaintiffs and allow for input.

*Further, pursuant to 81(e), MCSO is required to notify the Monitor and Plaintiffs whenever "the early warning protocol is triggered."  Plaintiffs have not received notice of any early warning alerts since the EIS has been put in place.  Plaintiffs request this information from the date of EIS implementation be provided to them as soon as possible.*

**Section 9:  Supervision and Evaluations of Officer Performance**

As noted by the Monitor team, MCSO has failed to comply with the new supervisory measures, including widespread delays in review and documentation of stops, use of canned or boilerplate language in review language, and inadequate daily oversight.  *Plaintiffs request that the Monitor address more specifically MCSO's nearly wholesale failure to comply with the provisions in this section.  In addition, Plaintiffs raised many of these same concerns in their April 12, 2015 comments to the Monitor's Third Quarterly Report, yet they remain unresolved.*

Paragraph 83.  MCSO must delineate the types of arrests for which supervisors are to respond to the scene.  Adequate and consistent supervisory review is critical in preventing future misconduct.  *MCSO must ensure that supervisors are abiding by their recordkeeping duties.  To date, supervisors are not complying with even the simple task of consistently completing daily activity reports.*

Paragraph 85.  *Regarding the practice by many supervisors of simply using boilerplate language in their review of stops and detentions or performing substandard reviews, this practice should be called to the attention of senior officials for review.*

Paragraph 87.  It has become clear that reforms regarding review of supervisor accountability have been entirely ignored.  *MCSO must make this a primary focus of this next review period.*

Paragraph 89.  Regarding the Monitor team's request for all reports relating to immigration status investigations, any immigration-related crime, or incidents involving lack of identity, *Plaintiffs respectfully request that the Monitor team provide Plaintiffs with a description of the immigration-related incidents.*

Paragraph 91.  The Monitor team reports that in several stops, the post-stop perceived race/ethnicity listed on the contact form did not match that on the citation or warning.  Given the nature of this case *Plaintiffs request that the MCSO and/or Monitor team take steps to determine why the documentation was inconsistent.*

**Section 10: Misconduct and Complaints**

On pages 107-08, the report discusses Paragraph 102 of the Court's Supplemental Order and lists numerous ways in which MCSO has made progress but still falls well short of the Court's Order.  The report mentions several areas of concern that both the Monitor and MCSO recognize need

6

remedying, including more consistency between PSB investigations and district investigations, thoroughness in all investigations, and justifications for actions taken.  As the report recognizes, progress has been unreasonably slow.  *Plaintiffs find these outstanding items to be very concerning.  Particularly egregious is the failure to finalize and implement the required supervisor and command level training, which is long overdue, and which would likely lead to tangible improvements on MCSO's ongoing deficiencies.*

On pages 108-09, the report discusses Paragraph 103 of the Court's Supplemental Order, revealing only the first steps towards compliance with his paragraph.  For example, MCSO has only just begun to review other agencies' polices related to audits, a step that the Monitor first suggested in their September 2014 site visit.  *Plaintiffs appreciate the Monitor's offering additional guidance to MCSO, but recommend that such guidance be included in the report itself to make MCSO more accountable to the Court, CAB, and members of the public in general.  Plaintiffs also recommend listing the agencies that MCSO has contacted to assist them in creating policies and troubleshooting implementation.*

On pages 109-10, the report discusses Paragraphs 104 and 105 of the Court's Supplemental Order, noting that MCSO has finally created a checklist that will help evaluate compliance with these paragraphs, but the Monitor has not yet reviewed the adequacy of the checklist, nor has MCSO apparently implemented it.  The report also notes that currently there is no real way to fully monitor deputy cooperation, and investigations themselves suffer from the same problems identified in earlier paragraphs.  *Plaintiffs note that compliance with these paragraphs is likely hampered by MCSO's failure to finalize training for supervisors and command level officers.*

On pages 110-11, the report discusses Paragraph 106 of the Court's Supplemental Order, indicating that MCSO has been cooperative with the Monitoring Team when they make requests for records and other inquiries.  *Plaintiffs are still having great difficulty in getting complete records from MCSO.  Progress is very slow, and the production of requested records suffers fits and starts.*

**Section 11: Community Engagement**

In the discussion of Paragraph 107, the draft report states that community engagement "is no longer an MCSO responsibility."  *Plaintiffs suggest editing this sentence to specify that MCSO chose to remove itself from having responsibility over the community engagement program as set out in the order.*  As currently written, the discussion reads as though MCSO does not have any responsibility for community engagement.

Plaintiffs have the following proposed changes to the draft report's discussion of Paragraph 115:

- The draft report refers to Victoria Lopez as Policy and Advocacy Director of the ACLU of Arizona.  Ms. Lopez is now the Legal Director of the ACLU of Arizona.  *Plaintiffs ask that the draft report be corrected.*

- The draft report mentions the resignation of two previous CAB members and the appointment of their replacements. *Plaintiffs propose adding that "Plaintiffs' counsel submitted a notice to the court about this change on March 4, 2015."*
- The draft report states that the Monitor "hosted a meeting on January 12, 2015 with the CAB and ACLU *to discuss the way forward for the CAB*." (emphasis added). Plaintiffs recommend replacing the italicized text with the more specific, "to discuss the transitions in the CAB."
- The report states that, "On January 13, 2015, Dr. Maldonado and Ms. Lopez attended an MCSO meeting on policy EA-4 . . . .". Ms. Lopez did not attend the meeting; instead, *the text should state that "Mr. Pochoda, Mr. Bendor, and other Plaintiffs' counsel attended . . . ."*

Plaintiffs have the following proposed changes to the draft report's discussion of Paragraph 117:

- *Plaintiffs recommend adding, after the first sentence of this paragraph: "The first meeting between the Monitoring Team, Plaintiffs' representatives and newly constituted CAB took place on March 10, 2015."*
- The words "Dr. Maldonado attended a Somos America meeting and delivered a presentation . . . " *should be replaced with "Dr. Maldonado attended meetings with the community groups, Somos America and Tonatierra, and delivered presentations on . . .".*
- In the sentence, "While CAB members have attended the community meetings we have held and communicated with members of the community to increase community trust, the CAB has not *initiated and* held any community meetings during the reporting period as required by the Order," Plaintiffs recommend removing the italicized words, "initiated and," because the CAB has initiated their own meetings by laying the groundwork with local community-based organizations and planning for their recent June meeting during the first quarter.

8