Mark Kappelhoff
  Deputy Assistant Attorney General
Judy Preston (MD Bar, no numbers assigned)
Timothy D. Mygatt (DC Bar. No. 1021564)
Edward G. Caspar (MA Bar No. 650566)
Jennifer L. Mondino (NY Bar No. 4141636)
Paul Killebrew (LA Bar No. 32176)
Puneet Cheema (CA Bar No. 268677)
U.S. Department of Justice, Civil Rights Division
Special Litigation Section
601 D St. NW, Suite 5200
Washington, D.C. 20004

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>             Plaintiffs,<br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; and Maricopa County, AZ<br>             Defendants. | No. 2:07-cv-02513-GMS<br><br>**COMPLAINT IN INTERVENTION** |

## INTRODUCTION

1.      Since at least 2007, Defendants Sheriff Joseph M. Arpaio (Arpaio) and Maricopa County, through the Maricopa County Sheriff's Office (MCSO) have engaged, and continue to engage, in a pattern or practice of unlawful discriminatory police conduct directed at Hispanic persons in Maricopa County, in violation of the United States Constitution and Federal law.  For example, as this Court found in May 2013, following a full evidentiary trial, Defendant Arpaio and MCSO have had a practice of unlawfully

stopping, detaining, and investigating persons of Hispanic ancestry based on their race, and of doing so in the furtherance of its aim to enforce federal and state immigration laws against Hispanic persons, even without a lawful basis for the enforcement of such laws. See *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013).

2. This pattern or practice of unlawful discrimination has resulted, and continues to result, in the systematic denial of the constitutional rights of Hispanic individuals in Maricopa County. Further, this pattern or practice of unlawful discrimination erodes the relationship between MCSO and key segments of the community, thereby threatening public safety by hampering MCSO's ability to fight crime.

3. The United States brings this action, as a Plaintiff-Intervenor, in order to ensure the Defendants' compliance with appropriate remedial orders in this case and to secure relief from the Defendants' equal protection violations against Hispanic persons in Maricopa County.

4. The United States alleges the following, based on information and belief.

**JURISDICTION AND VENUE**

5. The district court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

6. The United States is authorized to initiate this action under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, and its implementing regulations, 28 C.F.R. §§ 42.01 to 42.112.

7. Injunctive relief is sought as authorized by 42 U.S.C. §14141(b) and 28 U.S.C. § 2202.

8. The Attorney General has certified that the instant case is a case of general public importance, pursuant to Section 902 of the Civil Rights Act of 1964. 42 U.S.C § 2000h-2. The Certificate of the Attorney General is attached hereto as Exhibit A and is incorporated herein.

9. Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b). Defendants are located in Arizona, and all events, actions, or omissions giving rise to these claims occurred in Arizona.

**PARTIES**

10. Plaintiff-Intervenor is the United States of America.

11. Defendant Joseph M. Arpaio (Arpaio) is the Sheriff of Maricopa County and is responsible for the operation of the Maricopa County Sheriff's Office (MCSO). Defendant Arpaio serves as the head of MCSO, and as such, has final authority over the agency's decisions and sets the overall direction and policy for the agency.

12. Defendant Maricopa County was recently ordered to be substituted as a party defendant for MCSO, which is a law enforcement agency in Maricopa County, Arizona. MCSO is a Maricopa County agency and provides law enforcement throughout the County and operates the county jail system.

**BACKGROUND**

13. MCSO employs approximately 900 sworn deputies and 1,800 sworn detention officers. It is a program that receives federal financial assistance, both directly and as a subrecipient through Maricopa County, from the United States Department of Justice (DOJ). In connection with the grant of such federal financial assistance, Arpaio has signed contractual assurances that MCSO will comply with federal law, including all requirements imposed by Title VI and its implementing regulations.

14. Maricopa County, Arizona has close to four million residents, and is the fourth largest county in the United States by population. Approximately 30 percent of the population of Maricopa County is Hispanic. Maricopa County is also a recipient of federal financial assistance from the United States Department of Justice.

15. On May 10, 2012, following a three-year investigation into allegations of discrimination against Hispanic persons by MCSO, the release of a letter documenting the findings of that investigation, and good faith attempts to reach a cooperative resolution of the concerns described in its findings letter, the United States filed a lawsuit

3

against Sheriff Arpaio, MCSO, and Maricopa County, alleging, *inter alia*, a pattern or practice of discriminatory and otherwise unconstitutional law enforcement actions against Hispanic persons in Maricopa County, in violation of the Fourth Amendment and Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7, and the Title VI implementing regulations issued by the DOJ, 28 C.F.R. §§ 42.101 to 42.112.

16.    The United States' discriminatory policing claims in its ongoing litigation against Sheriff Arpaio and Maricopa County arise from much of the same unlawful discriminatory conduct found by this Court, although the United States alleges that the pattern or practice of unlawful discriminatory conduct is broader than that found by the Court here.  The United States' suit further concerns three broad categories of unlawful conduct beyond those at issue in this case: discriminatory jail practices against Hispanic inmates with limited English proficiency, retaliatory actions against perceived critics of MCSO policies or activities in violation of the First Amendment, and unlawful detentions during law enforcement actions targeting Hispanic immigrants working in area businesses in violation of the Fourth and Fourteenth Amendments.

17.    In June 2013, the United States submitted a statement of interest in this case, articulating its broad interest in ensuring that the unconstitutional conduct identified by the Court was adequately remedied, and providing recommendations as to appropriate and effective injunctive relief to be ordered by the Court.  *See* Statement of Interest by the United States, *Melendres v. Arpaio*, No. 07-cv-2513 (D. Ariz. June 13, 2013), ECF No. 580.

18.    Recent proceedings in *Melendres* have revealed and confirmed the Defendants' intransigence in this case and various and significant acts in contempt of the court's orders.

19.    The Court's November 20, 2014 Order unsealed a report of the Monitor in this case concerning the Defendants' non-compliance with the Court's orders.  *See* Order, *Melendres v. Arpaio*, No. 07-cv-2513 (D. Ariz. Nov. 20, 2014), ECF No. 795.

4

20. On February 12, 2015, the Court entered an Order to Show Cause setting a hearing on the Defendants' contempt of court for April 21 to 24, 2015. *See* Order to Show Cause, *Melendres v. Arpaio*, No. 07-cv-2513 (D. Ariz. Feb. 12, 2015), ECF No. 880.

21. Defendant Arpaio admitted his contempt of court on March 17, 2015, and acknowledged the need for further remedial orders. *See* Expedited Motion to Vacate Hearing and Request for Entry of Judgment, *Melendres v. Arpaio*, No. 07-cv-2513 (D. Ariz. March 17, 2015), ECF No. 948.

22. On June 15, 2015, the Court granted the United States' motion for summary judgment in the United States' related lawsuit against Sheriff Arpaio and Maricopa County, finding that the United States had proven its discriminatory policing claims to the extent those claims dealt with "the pattern of discriminatory conduct found in *Melendres*," namely, MCSO's "discriminatory enforcement of immigration laws through vehicle stops." Order at 39, 41, *United States v. Maricopa County*, No. 2:12-cv-981 (D. Ariz. June 15, 2015), ECF No. 379.

23. On July 17, 2015, the United States, Sheriff Arpaio, and Maricopa County entered into a settlement agreement to resolve all of the claims in the United States' related lawsuit relating to worksite identity theft operations and alleged retaliation. The parties reached a separate agreement to resolve all the United States' claims alleging discrimination in MCSO jails. That same day, July 17, 2015, the parties jointly moved the Court to approve and enter the settlement agreement relating to worksite identity theft operations and alleged retaliation.

24. On July 20, 2015, the United States further moved the Court for a stay of proceedings relating to the remaining claims in the case, pending this Court's resolution of the United States' motion to intervene in this case.

# FACTS

## **Defendants' Discriminatory Conduct**

25. This Court concluded, in its May 2013 Findings of Fact and Conclusions of Law, that, "MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Equal Protection Clause of the Fourteenth Amendment." *Melendres*, 989 F. Supp. 2d at 899.

26. In support of that conclusion, the Court found that Sheriff Arpaio, and other MCSO employees under his control, engaged in intentional discrimination against Hispanic persons during traffic stops conducted in connection with immigration-related law enforcement actions. *Melendres*, 989 F. Supp. 2d at 899.

27. The Court also found that "the most relevant facts" indicated "an institutionalized consideration of race in MCSO operations," particularly in its law enforcement operations aimed at enforcing state laws relating to immigration. *Id*.

28. For example, MCSO law enforcement practices included traffic stops conducted in connection with purported immigration and human smuggling law enforcement activities, including "saturation patrols," during which MCSO officers unlawfully relied on race, color, or national origin.

29. In conducting its "saturation patrols," MCSO officers "would conduct traffic enforcement operations with the purpose of detecting unauthorized aliens during the course of normal traffic stops." *Melendres*, 989 F. Supp. 2d at 831.

30. In furtherance of that purpose, MCSO officers emphasized the enforcement of traffic and vehicle infractions against vehicles occupied by Hispanic persons.

31. In so doing, MCSO considered Hispanic ancestry as one factor among others in choosing the location for its saturation patrols.

32. Similarly, MCSO considered race or Mexican ancestry as one factor among others in deciding whether or not to stop vehicles during large-scale saturation patrols.

33. Defendant Arpaio, as well as many MCSO officers, believe that most unauthorized immigrants in Maricopa County are originally from Mexico or from Central or South America.

34. Indeed, as this Court found, MCSO officers specifically equated being a Hispanic or Mexican day laborer with being an unauthorized alien.

35. In 2006, Defendant Arpaio decided to make immigration enforcement a priority for MCSO.

36. That same year, Defendant Arpaio created a specialized unit, known as the Human Smuggling Unit (HSU), to enforce a 2005 Arizona state human smuggling law.

37. In early 2007, the MCSO entered into a Memorandum of Understanding (MOU) with the United States Immigration and Customs Enforcement (ICE) under §287(g) of the Immigration and Nationality Act (INA), pursuant to which MCSO could enforce immigration law in certain circumstances.

38. After MCSO signed this MOU with ICE, it expanded the HSU. Within a year, the HSU had grown from two deputies to a unit of two sergeants, 12 deputies, and four detention officers, all under the leadership of a lieutenant.

39. Both the MOU between MCSO and ICE, and the protocols for the HSU, required that officers have a legitimate basis, under state law, to stop an individual or vehicle before investigating the individual's immigration status.

40. However, in MCSO news releases and public statements, Defendant Arpaio described MCSO's immigration enforcement authority as unconstrained by a requirement that MCSO officers first have a basis to pursue state law violations against stopped individuals.

41. Under Defendant Arpaio's leadership, MCSO command staff also believed that MCSO had inherent authority to enforce federal immigration laws, including the ability to make immigration arrests absent specific authorization from ICE.

42. MCSO news releases about the agency's large-scale saturation patrols emphasized that the purpose of such operations was immigration enforcement, or highlighted the number of unauthorized aliens arrested during such operations.

43. MCSO policy, training, and instruction for MCSO officers conducting saturation patrols stated that officers could consider race as one of multiple factors in making determinations as to whether there was reasonable suspicion that an individual was in the country unlawfully.

44. MCSO deputies also considered an individual's immigration status relevant to their determination as to whether an individual had violated state criminal laws.

45. Defendant Arpaio, MCSO command staff, and MCSO supervisors incorrectly believed, and MCSO command staff instructed MCSO deputies, that unlawful presence in the United States was a federal crime, and thus was an independent, legitimate basis for an arrest.

46. ICE revoked MCSO's 287(g) authority in October 2009. At the time of the revocation, MCSO had approximately 100 field deputies certified under 287(g).

47. After the revocation of MCSO's 287(g) authority, Arpaio had all MCSO sworn deputies, approximately 900 individuals, trained to enforce federal immigration law. According to MCSO, that training enabled all MCSO deputies to make immigration arrests; and routine patrol deputies did, in practice, make arrests resulting from that training.

48. According to MCSO policy and training, even after MCSO lost its 287(g) authority, and until at least December 2011, all MCSO deputies had the authority to enforce immigration laws and to detain individuals suspected of being in the United States unlawfully.

49. MCSO continued to engage in immigration enforcement, and to use race as an indicator of unauthorized presence in the United States, even after losing its 287(g) authority in October 2009.

50. Defendant Arpaio, and the command staff under his leadership, believed that MCSO's authority to engage in saturation patrols or other HSU operations was unaffected by the revocation of MCSO's 287(g) authority.

51. Defendant Arpaio, and the command staff under his leadership, have not made reasonable efforts to guard against violations of Hispanic persons' rights. Defendant Arpaio, and the command staff under his leadership, failed to make such efforts despite their awareness of public criticism and complaints that MCSO deputies were engaged in racial profiling, and even after this Court found that MCSO engaged in discrimination against Hispanic persons and ordered specific injunctive relief to remedy such discriminatory conduct.

52. For example, Defendant Arpaio, and other MCSO command staff, never made an evaluation to determine whether MCSO's saturation patrols were being implemented with racial bias. Neither Defendant Arpaio, nor the MCSO command staff under his leadership, collected data on the people stopped or detained to determine whether officers were engaging in racial profiling, or reviewed citations, statistics, or other documents to determine whether HSU officers were engaging in racial profiling.

53. Neither Defendant Arpaio, nor the command staff under his leadership, disciplined MCSO deputies for racial profiling.

54. Sheriff Arpaio has acknowledged that he did not believe that MCSO needed a training program to prevent racial profiling, because he did not believe that MCSO engaged in racial profiling.

55. Until June 2013, MCSO had no general written policy banning racial profiling.

56. In the immigration enforcement context, Defendant Arpaio, and the MCSO command staff under his leadership, did not believe that it constituted racial profiling to consider race as a factor in making law enforcement decisions. MCSO's written operations plans, policy descriptions, news releases, and training for its officers all inaccurately reflected that same belief.

57. Neither Defendant Arpaio, nor the command staff under his leadership, made any competent efforts to ensure that their interpretation of the extent of MCSO's authority to enforce federal immigration law was correct, and thus made no meaningful effort to ensure that MCSO deputies were following the law pertaining to the rights of Hispanic persons during its law enforcement operations.

58. The United States incorporates by reference the Court's findings of fact and conclusions of law as set forth in its May 2013 Order.

59. Defendant's violations of the Constitution and federal law are ongoing, as evidenced by defendants' acts in contempt of this Court's orders.

**VIOLATIONS**

60. The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and injunctive relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

61. The United States is authorized under Title VI to seek declaratory and equitable relief and/or the termination of federal funds to ensure that no person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal funding on the basis of race, color, or national origin.

**FIRST CLAIM FOR RELIEF:**

**DEFENDANTS' LAW ENFORCEMENT POLICIES AND PRACTICES VIOLATE 42 U.S.C. § 14141 AND THE FOURTEENTH AMENDMENT**

62. The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1-61, above.

63. Defendants, their agents, and persons acting on their behalf, including MCSO officers, have engaged in law enforcement practices, including traffic stops and the enforcement of federal and state immigration laws, with the intent to discriminate against Hispanic persons in Maricopa County on the basis of their race, color, or national

origin, and these enforcement actions have had a discriminatory effect on Hispanic persons.

64. Defendants' discriminatory law enforcement policies and practices constitute a pattern or practice of conduct by law enforcement officers that deprives persons of rights protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, in violation of 42 U.S.C. § 14141(a).

## SECOND CLAIM FOR RELIEF:
## DEFENDANTS' TREATMENT OF HISPANIC INDIVIDUALS VIOLATES TITLE VI

65. The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1-61, above.

66. Defendants, their agents, and persons acting on their behalf, including MCSO officers, have engaged in law enforcement practices with the intent to discriminate against Hispanic persons on the basis of their race, color, or national origin.

67. Defendants' law enforcement practices are unjustified and have had an adverse disparate impact on Hispanic persons.

68. Defendants' discriminatory law enforcement practices, and intentional discrimination, independently violate Title VI and the Title VI implementing regulations.

## PRAYER FOR RELIEF

69. WHEREFORE, the United States prays that the Court:

70. Order such equitable and injunctive relief as is appropriate to remedy the Defendants' constitutional violations found by the Court in this case;

71. Order such equitable and injunctive relief as is appropriate to remedy the Defendants' contempt of the Court's orders in this case; and

72. Order such other relief as the interests of justice may require.

11

Respectfully submitted,

Mark Kappelhoff
Deputy Assistant Attorney General
Civil Rights Division

Judy Preston
Acting Chief, Special Litigation Section

Timothy D. Mygatt
Special Counsel

/s/ Edward G. Caspar
Edward G. Caspar (MA Bar No. 650566)
Special Counsel
Jennifer L. Mondino (NY Bar No. 4141636)
Paul Killebrew (LA Bar No. 32176)
Puneet Cheema (CA Bar No. 268677)
Trial Attorneys
U.S. Department of Justice
Civil Rights Division- PHB
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Tel. (202) 514-2000/Fax (202) 514-6273
edward.g.caspar@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

CERTIFICATE OF SERVICE

I certify that on or about August 31, 2015, I used the Court's CM/ECF system to serve a true and correct copy of the foregoing filing on counsel of record.

 /s/  Edward G. Caspar
EDWARD G. CASPAR