# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | CV-07-2513-PHX-GMS |
| Plaintiff(s), | ) ) ) | **SUPPLEMENTAL DECLARATION OF ANNE LAI IN SUPPORT OF x PLAINTIFFS' MOTION TO COMPEL TESTIMONY RE:** |
| v. | ) ) ) | **JULY 17, 2015 MEETING AND MCSO'S NONDISCLOSURE OF THE "1500 IDS"** |
| Joseph M. Arpaio, et al., | ) ) | |
| Defendants(s). | ) ) ) | |

I, Anne Lai, declare as follows:

1.      I make the following statements based on my personal knowledge and I am prepared to testify to the matters set forth.

2.      I make this declaration in support of Plaintiffs' Motion to Compel Testimony Re: July 17, 2015 Meeting and MCSO's Disclosure of the "1500 IDs" in the above-referenced matter.

3.      I am a cooperating attorney with the ACLU Foundation of Arizona and admitted to practice *pro hac vice* in this Court.

4.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the transcript of the deposition of Steve Bailey taken in this matter on September 8, 2015.

5.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the transcript of the deposition of Gerald Sheridan taken in this matter on September 15, 2015.

I hereby declare that the foregoing is true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed on this 17th day of September, 2015, in Phoenix, Arizona.



Anne Lai

Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Manuel de Jesus Ortega Melendres,   )
et al.,                             )
                                    )
                 Plaintiffs,        )
                                    )
          vs.                       )  No. CV 07-02513-PHX-GMS
                                    )
Joseph M. Arpaio, et al.,           )
                                    )
                 Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF STEVE BAILEY

Phoenix, Arizona
September 8, 2015
9:40 a.m.

REPORTED BY:
CATHY J. TAYLOR, RPR
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

Steve Bailey - September 8, 2015

2

1                              I N D E X

2   WITNESS:                                        PAGE:

3   STEVE BAILEY

4           Examination by Ms. Wang                    9

5           Examination by Mr. Dodd                  378

6           Examination by Mr. Killebrew             386

7

8

9

10                        E X H I B I T S

11  NUMBER          DESCRIPTION                      PAGE:

12  2050       Compilation of correspondence           53
               (MELC098062 – MELC098071;
13             MELC098075 – MELC098082;
               MELC098086; MELC098090 –
14             MELC098103; MELC098106;
               MELC098110) (13 pages)
15             (double-sided)

16  2051       Memorandum to P. Lopez from             56
               K. Seagraves dated May 21, 2014
17             (MELC004088) (1 page)

18  2052       E-mail string (MELC829381 –            58
               MELC829383) (2 pages)
19             (double-sided)

20  2053       E-mail string (MELC004999 –            61
               MELC05000) (1 page)
21             (double-sided) (Confidential –
               AEO)
22
           2054       Memorandum to Steve Bailey from      88
23             Todd Hoggatt re Weekly Status
               Report dated June 27, 2014
24             (MELC005304 – MELC005313)
               (5 pages) (double-sided)
25             (Confidential – AEO)

3

1                    E X H I B I T S (Cont'd)

2   NUMBER              DESCRIPTION                        PAGE:

3   2055        Memorandum to Steve Bailey from        90
               Todd Hoggatt re Weekly Status
4              Report dated July 25, 2014
               (MELC005918 – MELC005921)
5              (2 pages) (double-sided)
               (Confidential – AEO)
6
    2056        Memorandum to Steve Bailey from        90
7              Todd Hoggatt re Weekly Status
               Report dated July 18, 2014
8              (MELC005596 – MELC005598)
               (2 pages) (double-sided)
9              (Confidential – AEO)

10  2057        Memorandum to Steve Bailey from        91
               Todd Hoggatt re Weekly Status
11             Report dated July 11, 2014
               (MELC005335 – MELC005340)
12             (3 pages) (double-sided)
               (Confidential – AEO)
13
    2058        Memorandum to Steve Bailey from        91
14             Todd Hoggatt re Weekly Status
               Report dated July 3, 2014
15             (MELC005297 – MELC005300)
               (2 pages) (double-sided)
16             (Confidential – AEO)

17  2059        Excerpt of MCSO Professional           95
               Standards Bureau HSU Criminal
18             Inquiry IA 2014-0541
               (MELC224936 – MELC224940)
19             (3 pages) (double-sided)
               (Confidential – AEO)
20
    2060        E-mail string (MELC005924 –            104
21             MELC005926) (2 pages)
               (double-sided) (Confidential –
22             AEO)

23  2061        Transcript of Captain Bailey           112
               interview by Don Vogel dated
24             2/6/15 (MELC-IA012751 –
               MELC-IA012810) (30 pages)
25             (double-sided)

4

1                    E X H I B I T S (Cont'd)

2    NUMBER              DESCRIPTION                    PAGE:

3    2062        Employee Grievance Christopher        136
                 Hechavarria dated 7/22/2015
4                (MELC680471 – MELC680481)
                 (6 pages) (double-sided)
5                (Confidential – AEO)

6    2063        Excerpt of PSB IA# 2014-0544          149

7    2064        Excerpt of MCSO Professional          156
                 Standards Bureau Administrative
8                Investigation IA 2014-0570 re
                 Christopher Hechavarria and
9                Michael Trowbridge dated
                 September 29, 2011 (MELC161088 –
10               MELC1610103; MELC161114)
                 (9 pages) (double-sided)
11
     2065        The Briefing Board Number 15-04       176
12               dated April 7, 2015 (MELC225056 –
                 MELC225058) (2 pages)
13               (double-sided) (Confidential –
                 AEO)
14
     2066        Transcript of Steve Bailey by Don     191
15               Anders dated July 23, 2015 (WAI
                 16914 – WAI 17130) (218 pages)
16
     2067        Order dated November 20, 2014 (11     252
17               pages) (double-sided)

18   2068        Excerpted IA# 14-0564                 258
                 (MELC160986 – MELC161056)
19               (36 pages) (double-sided)

20   2069        Memorandum to Steve Bailey from       286
                 Dave Munley re Weekly Status
21               Report dated September 5, 2014
                 (MELC0011654 – MELC0011656)
22               (2 pages) (double-sided)
                 (Confidential – AEO)
23
     2070        E-mail string (MELC1032200 –          301
24               MELC1032203) (3 pages)
                 (double-sided)

25

```
 1                    E X H I B I T S  (Cont'd)

 2    NUMBER              DESCRIPTION                      PAGE:

 3    2071           E-mail string (CaseySub 000050 –      310
                     CaseySub 000053) (2 pages)
 4                   (double-sided)

 5    2072           Exhibit F (No Bates; MELC199917 –     329
                     MELC199935) (10 pages)
 6                   (double-sided)

 7    2073           Compilation of documents re           345
                     Seattle investigation (21 pages)
 8                   (double-sided)

 9    2074           DOJ/Arpaio 2007–2013                  347
                     (MELC199549 – MELC199550)
10                   (2 pages)

11    2075           E-mail to Travis Anglin from           --
                     Gerard Sheridan dated 4/28/2014
12                   (MELC198504) (1 page)

13    2076           Excerpted portions of CIA             369
                     2015–0055 (MELC258950 –
14                   MELC258954; MELC258960) (3 pages)
                     (double-sided) (Confidential –
15                   AEO)

16

17

18

19

20

21

22

23

24

25
```

6

1                THE VIDEOTAPED DEPOSITION OF STEVE BAILEY was taken

2    at 9:40 a.m., on September 8, 2015, at the Offices of

3    LEGAL VIDEO SPECIALISTS, 3033 North Central Avenue,

4    Suite 100, Phoenix, Arizona, 85012, before CATHY J. TAYLOR, a

5    Certified Reporter in and for the State of Arizona, County of

6    Maricopa, pursuant to the Rules of Civil Procedure.

7

8    COUNSEL APPEARING:

9    For Plaintiff(s):

10               ACLU FOUNDATION OF ARIZONA
                 IMMIGRANTS' RIGHTS PROJECT
11               By:  Ms. Cecillia D. Wang
                 39 Drumm Street
12               San Francisco, California  94111

13

     For Defendants Maricopa County Attorney's Office:
14
                 WALKER & PESKIND
15               By:  Mr. Charles W. Jirauch
                 16100 North 71st Street
16               Scottsdale, Arizona  85254

17

     For Defendant Joseph M. Arpaio:
18
                 JONES, SKELTON & HOCHULI
19               By:  Mr. John T. Masterson
                 2901 North Central Avenue
20               Suite 800
                 Phoenix, Arizona  85012
21

22

23

24

25

7

```
 1   COUNSEL APPEARING (Cont'd):

 2   For Tom Liddy and Christine Stutz:

 3             BROENING, OBERG, WOODS & WILSON
              By:  Mr. Terrence P. Woods
 4            and  Mr. Jathan P. McLaughlin
              1122 East Jefferson Street
 5            Phoenix, Arizona  85034

 6

 7   For Brian Sands:

 8             LEWIS, BRISBOIS, BISGAARD & SMITH
              By:  Mr. Gregory S. Como
 9            and  Mr. Dane Adam Dodd
              2929 North Central Avenue
10            Suite 1700
              Phoenix, Arizona  85012
11

12   For the United States of America:

13             UNITED STATES DEPARTMENT OF JUSTICE
              By:  Mr. Paul Killebrew
14            (Via Telephonic Appearance)
              950 Pennsylvania Avenue
15            5th Floor
              Washington, DC  20530-0001
16

17   For the Witness:

18             MITCHELL STEIN CAREY
              By:  Mr. Barry Mitchell
19            Two North Central Avenue
              Suite 1900
20            Phoenix, Arizona  85004

21

22             Also present:  Craig Onuschak, videographer

23

24

25
```

171

1    did you know that he had the IDs before he turned them in --

2        A.    Oh --

3        Q.    -- to PSB?

4        A.    -- no.  No, not until the case came up.

5        Q.    So let's talk about the 1459 IDs that

6    Sergeant Knapp came forward with.  Okay?

7                    You're familiar with those?

8        A.    Yes.

9        Q.    You told Don Anders from the monitor team that you

10   were formally told of the 1459 IDs, or rather the fact

11   that -- let me start over.

12                    You told the monitor team that you were

13   formally told of the IDs that Sergeant Knapp had on about

14   July 8th of 2015; is that correct?

15       A.    That sounds right.

16       Q.    How did you find out about them?

17       A.    Sergeant Darriell Bone and Lieutenant Kratzer

18   walked into my office and -- and told me at -- it's probably

19   that day, the morning of that day.

20       Q.    And can you tell me the gist of that conversation.

21       A.    You're not going to believe this.

22                    What's that?

23                    Knapp just showed up at Property with a

24   thousand IDs, is what it originally came out to.

25       Q.    Have you seen the IDs personally?

174

```
 1                   THE WITNESS:  -- remember reading that
 2    necessarily.  At that time, the lawyers interpreted -- or our
 3    attorney would interperate -- interpret that stuff for us.
 4                   So I may have been made aware of it, but I
 5    didn't -- I don't remember specifically reading it.
 6    BY MS. WANG:
 7        Q.   Okay.  Sitting here now, you're aware that the
 8    Court did issue an order in February 2015 requiring IDs to be
 9    turned over?
10                   MR. MASTERSON:  Form.
11                   THE WITNESS:  I -- yes.
12    BY MS. WANG:
13        Q.   Well, on July 8th of 2015, you were certainly
14    aware that the monitor wanted to know about any IDs that came
15    to light; is that correct?
16                   MR. MASTERSON:  Form.  Foundation.
17                   THE WITNESS:  I would expect that they would.
18    BY MS. WANG:
19        Q.   Well, you knew that they had been very interested
20    in finding up -- out about all the prior times that IDs came
21    to light somewhere at MCSO; correct?
22        A.   Yes.
23                   MR. MASTERSON:  Foundation.
24                   MR. JIRAUCH:  Object to form and foundation.
25                   (Next page, please.)
```

1    with the chief?

2         A.    Probably later that day.  Later that afternoon.

3         Q.    So you had two conversations with Chief Sheridan

4    the day that the IDs came to your attention?

5         A.    I don't remember how many I had with him that day,

6    but I had at least two of them, yeah.

7         Q.    Did you tell Chief Sheridan that you had pulled an

8    IA number and were initiating an IA case?

9         A.    I believe so, yes.  I -- I believe I -- I told him

10   I had already pulled a number -- or I made sure a number was

11   pulled.

12        Q.    And did he give you any instructions about an IA

13   investigation of the Knapp IDs?

14        A.    I don't believe so.

15        Q.    Well, you told the monitor team that Chief Sheridan

16   instructed you not to initiate a case until he could confer

17   with others; is that right?

18        A.    No.  I didn't have that conversation with him that

19   day.  I believe it was the next day.  I suggested -- I -- I

20   don't remember the exact chronology, but I said, we should at

21   least interview Knapp so we have some idea of what this is

22   aside from his memo.

23              After that was done, he gave me those

24   instructions to stop the investigation until he could confer

25   with others.

183

1     Q.    Okay.  And did you question him about why he wanted
2  you to stop the investigation?
3     A.    I don't think I questioned him.  I think he just
4  told me.
5     Q.    All right.  But he agreed that you should go
6  forward with an interview of Knapp; is that right?
7     A.    Yes.
8     Q.    And did you subsequently interview Sergeant Knapp,
9  or did someone at PSB?
10     A.    Yes.
11     Q.    All right.  When did that interview happen?
12     A.    I want to say the very next day, but I'm -- which
13  is within a day or two, I believe.
14     Q.    Okay.  So let me just make sure I have the
15  chronology correct.  You discovered the Knapp IDs from
16  Sergeant Bone and Lieutenant Kratzer on July 8th of 2015?
17     A.    Is that a Tuesday?  Can somebody confirm that?
18     Q.    Oh.
19     A.    I can look at my phone.
20     Q.    Yeah.  Why don't you go ahead and look on your
21  phone.
22     A.    Oops.
23           MR. KILLEBREW:  July 8th was a Wednesday.
24           MS. WANG:  Thank you.
25           THE WITNESS:  Thanks.

191

1               THE COURT REPORTER:  2066.

2                    (Exhibit 2066 marked for identification.)

3  BY MS. WANG:

4      Q.    2066.  This is the transcript of the interview of

5  Captain Bailey by the Don Anders of the monitor team.

6                    And if you just look at the cover, it

7  indicates the date.

8                    Was that on July 23rd, 2015?

9      A.    I believe so.

10      Q.    As of the time of that interview, you had not yet

11  received any direction from Chief Sheridan to continue with

12  the IA investigation of the Knapp IDs; correct?

13      A.    Right.  I don't -- I don't think I had at all.

14      Q.    They asked you whether you had gotten any further

15  instruction?

16      A.    Yeah.

17      Q.    And you said no; correct?

18      A.    Yeah.  I think it happens later.

19      Q.    Okay.  You said in August?

20      A.    Yeah.

21      Q.    Were you present at a meeting on July 17th, 2015,

22  where the Knapp IDs were discussed?

23      A.    Yes.

24      Q.    I believe you characterized that to Don Anders as

25  it was a -- a -- what you called a rehearsal meeting for the

192

1  monitor's site visit, which was going to take place the

2  following week; correct?

3      A.    Yes.

4      Q.    Who was present at that meeting?

5      A.    Lieutenant Seagraves.  Kratzer.

6              MR. JIRAUCH:  Captain, I can't hear you.

7              THE WITNESS:  Kratzer.  Bone.  At some point,

8  our administrative assistant, Lauren Sanchez.

9  BY MS. WANG:

10     Q.    She's the PSB admin?

11     A.    Yes.

12              Chief deputy.  Michele Iafrate.

13              I'm going through the seating arrangement in

14  the building.

15              Not -- I don't believe any of the criminal

16  folks were there.  It would have been Sergeant Sparman would

17  have been there as well.

18     Q.    Anyone else there?

19     A.    Bone.  Kratzer.  Sparman.  I think that's about it.

20     Q.    Okay.  And during --

21     A.    Mike -- Mike Bocchino maybe.

22     Q.    All right.

23     A.    Sergeant Bocchino.

24              MR. MASTERSON:  How do you spell that one?

25              (Next page, please.)

1   BY MS. WANG:

2       Q.    Anyone else?

3               THE WITNESS:  Bocchino is B-O-C-C-H-I-N-O.

4               MR. MASTERSON:  Thanks.

5   BY MS. WANG:

6       Q.    Did -- did anyone take notes during that meeting?

7       A.    Lauren Sanchez would normally take notes.

8       Q.    Do you remember whether she was taking notes at

9   that meeting?

10      A.    I -- I believe she did, yes.

11      Q.    Was her function at that meeting to take notes?  As

12  a general matter, did she take notes at those --

13      A.    She --

14      Q.    -- rehearsal meetings?

15      A.    It wasn't her only function, but one of hers is to

16  help scribe for me or the other people in PSB so we remember

17  to do certain things.

18      Q.    And during the meeting -- well, what was the

19  purpose of that meeting?

20      A.    It's more of a -- it's a -- it's a time for us to

21  prepare for our -- our interaction with the monitors the next

22  week.  The monitors send out a -- an agenda -- a meeting

23  agenda and a schedule.  And what I would typically do is take

24  each topic that they were expecting to hear from us about and

25  make sure that we had the requested information, that whoever

194

1  was going to present it was ready to present it, and that we

2  didn't miss anything for information so we could provide, you

3  know, the best information to the monitor team we could.

4      Q.    And was Michele Iafrate typically at those meetings

5  where you prepared for the monitor's site visit?

6                    MR. MASTERSON:  Form.

7                    THE WITNESS:  Not typically, but not

8  completely uncommon either.  And there's -- not -- not

9  typ- -- completely uncommon.

10  BY MS. WANG:

11      Q.    In this instance, do you -- how did Michele Iafrate

12  come to be present at that meeting?  How did that happen?

13                    MR. MASTERSON:  Form.  Foundation.

14                    THE WITNESS:  I already had the meeting

15  scheduled in a -- in -- with my staff.  I -- I believe

16  Michele was out the week prior.  I hadn't talked to her in

17  some time, and a lot had happened because we had that

18  seven-week stay.

19                    MR. MASTERSON:  Well, you're getting close.  I

20  don't want you to testify --

21                    THE WITNESS:  No.

22                    MR. MASTERSON:  -- as to any communications

23  you had with Michele or she had with you.

24                    THE WITNESS:  Understood.

25                    MR. MASTERSON:  Okay.

1  BY MS. WANG:

2     Q.    How long was the meeting on July 17th, if you

3  recall, roughly?

4     A.    Hour, hour and 15 minutes maybe.

5     Q.    And you mentioned that -- already that the

6  identification documents that Knapp had were discussed at

7  that meeting; correct?

8     A.    I don't know if I said that today or not, but --

9            MR. MASTERSON:  If you -- wait.  If -- if

10  that's -- again, you're -- you're -- I don't think he said

11  that today.

12            THE WITNESS:  I didn't.

13            MR. MASTERSON:  So I'm instructing him not to

14  answer, because that's a communication that was made at the

15  meeting with Ms. Iafrate present.

16            MS. WANG:  Well, Captain Bailey testified --

17  discussed that meeting and the communications during that

18  meeting at length during the monitor's interview.

19            MR. MASTERSON:  Okay.  And I was -- I'm

20  good -- I'm glad you brought that up, because I have -- I

21  have some concerns with the interview as well.  And I'm

22  objecting to any use of any of these interviews that were

23  conducted by the monitor -- monitor in this case.

24            I think there was a denial of my clients' due

25  process rights during all of those interviews.  They were --

1    direction, guidance, order, or anything in that vein did the

2    chief deputy provide to you and/or any other MCSO member at

3    that meeting regarding the upcoming meeting with the

4    Monitor?"

5              So first I want to ask you, was chief deputy

6    Sheridan at that July 17th, 2015, meeting?

7        A.    I believe, yes.

8        Q.    Okay.  You did not --

9        A.    I believe so.

10       Q.    You did not mention him before, so --

11             MR. WOODS:  Sure, he did.

12             MR. JIRAUCH:  Yes, he did.

13             MR. WOODS:  It's right here in my notes.

14             MR. JIRAUCH:  He did.

15   BY MS. WANG:

16       Q.    Oh, you're right.  I apologize.  You did mention

17   him.

18             And you responded to Chief Anders that

19   Chief Sheridan did not give any direction regarding the

20   meeting with the monitor.

21             Do you see that?

22       A.    Yes.

23       Q.    Was that correct?

24             MR. MASTERSON:  Okay.  Hold on.

25             I -- like I said, I'm going to instruct him

209

1    not to answer any questions about communications made at that

2    meeting.  But you can ask him, did you say that in your

3    interview, and that's fine with me.

4    BY MS. WANG:

5         Q.    Well, let me ask you this:  Why don't you read

6    pages WAI 17023 through -- well, just -- let me go through it

7    specifically.

8                   Captain, did you tell the monitor team that

9    Chief Sheridan did not give you any direction at the July 17,

10   2015, meeting?

11        A.    Yes.

12        Q.    Did you tell them you did not receive guidance on

13   which topics to discuss with the monitor team from the chief

14   deputy?

15        A.    I -- I'm sorry?  Ask that again, please.

16        Q.    Did you tell Chief Anders during your -- during his

17   interview of you that the chief deputy did not give you

18   directions on which topics to discuss with the monitor?

19        A.    Yeah.  He did not.

20        Q.    And you also stated to Chief Anders that you

21   yourself did not provide any guidance on which topics people

22   should address or not address during the meeting with the

23   monitor.

24                   Did you -- was that your statement to the

25   monitor?

1      A.    Yes.

2      Q.    And did you tell the monitor that no lieutenant

3  present at the meeting gave any direction on topics to avoid

4  discussing with the monitor?

5      A.    That's correct.

6      Q.    Did you tell the monitor that a direction was given

7  to avoid a certain topic during the meeting on July 17th,

8  2015?

9      A.    This is -- this is accurate.

10     Q.    And was that direction specific -- did you tell the

11  monitor specifically that a direction was given during the

12  July 17, 2015, meeting not to discuss the Knapp IDs?

13     A.    That's -- yes.

14     Q.    And were all of your statements to the monitor

15  accurate?

16     A.    Yes.

17     Q.    Captain, there -- what you just -- what we just

18  covered among your statements to the monitor team did not run

19  through everybody that was present at the July 17th

20  meeting; correct?

21     A.    Say that again.

22     Q.    There -- you -- you made statements to the monitor

23  about whether any of the lieutenants at the meeting gave any

24  directions; is that right?

25     A.    Yes.

211

1    Q.    You covered whether you had given any instructions

2  on whether to discuss the 15 -- the 1459 IDs; correct?

3    A.    Yes.

4    Q.    You mentioned Chief Sheridan not giving any

5  direction about avoiding that topic; correct?

6    A.    Yes.

7    Q.    Okay.  There were also three sergeants present at

8  the meeting; correct?

9    A.    I believe so, yes.

10            MR. MITCHELL:  So are you asking about what's

11  in the transcripts, Cecillia, or are you asking the --

12            MS. WANG:  Now I'm just asking who was at the

13  meeting.

14            MR. MITCHELL:  Okay.  But, so you're doing the

15  same thing that Andrew [sic] did that -- that apparently I

16  wasn't quick enough on the uptake to understand.  It was by

17  process of elimination, which -- so you're narrowing it down

18  to what's going to be attorney-client privilege advice.

19            And you shouldn't answer the question.

20            MS. WANG:  Okay.  Well, I think that the cat

21  was out of the bag during Lieutenant Seagraves' deposition.

22            MR. MASTERSON:  Well, I think you can ask him

23  who was present at the meeting.  And I think you've done

24  that.

25            MS. WANG:  Right.  But Barry just instructed

212

1    him not to answer.

2                    MR. MASTERSON:  Well, but I think your

3    question was, were there sergeants at the meeting?

4    BY MS. WANG:

5         Q.    Were there sergeants at the meeting?

6         A.    Yeah.  I think I stated their names earlier when

7    you asked.

8         Q.    Okay.  As a general matter, would sergeants at a

9    monitor prep meeting, like the July 17th one, give

10   directions about topics to avoid discussing with the monitor?

11                   MR. MASTERSON:  Form.  Foundation.

12                   THE WITNESS:  No.

13   BY MS. WANG:

14        Q.    Did they do so during this July 17, 2015, meeting?

15                   MR. MASTERSON:  Now you've crossed into the

16   protected area, I think.  And I understand your position.

17                   MS. WANG:  Is there an instruction not to

18   answer?

19                   MR. MASTERSON:  There is.

20                   MS. WANG:  Okay.

21   BY MS. WANG:

22        Q.    And I'll just ask.  Lauren Sanchez was also present

23   at that meeting?

24        A.    Yes.

25        Q.    And she's the administrative assistant for PSB?

213

1      A.    Yes.

2      Q.    She would not have given a direction at that

3   meeting, or others like it, not to discuss certain topics

4   with the monitor; right?

5                  MR. MASTERSON:  Form.  Foundation.

6                  THE WITNESS:  No.  Our administrative

7   assistant wouldn't give direction.

8   BY MS. WANG:

9      Q.    So we've eliminated -- of the people at the

10  July 17, 2015, meeting, we have already gone through that

11  lieutenants Seagraves and Kratzer did not give a direction to

12  avoid the topic of the 1500 IDs with the monitor; right?

13                 MR. MASTERSON:  Wait.  Are we back to the

14  interview now, what you read?

15  BY MS. WANG:

16     Q.    You said that during the interview; correct?

17     A.    Yes.

18     Q.    And that was accurate; correct?

19     A.    Yes.

20     Q.    And you stated that you did not give any direction

21  to avoid discussing the 1500 IDs in your interview with the

22  monitor; correct?

23     A.    That's correct.

24     Q.    And that was accurate; correct?

25     A.    Yes.

214

1      Q.    And you also stated that Chief Sheridan did not

2   give any direction regarding avoiding discussing the 1500 IDs

3   with the monitor team; correct?

4      A.    Yes.

5      Q.    And that was accurate; correct?

6      A.    Yes.

7      Q.    And you've already been instructed by your lawyers

8   now not to answer whether Sergeants Bone, Sparman, or

9   Bocchino gave a direction not to discuss the 1500 IDs; is

10  that right?

11              MR. MASTERSON:  That's correct.

12  BY MS. WANG:

13     Q.    Okay.  But, as a general matter, you wouldn't

14  expect a sergeant in that meeting to give such an

15  instruction --

16              MR. MITCHELL:  Asked and answered.

17  BY MS. WANG:

18     Q.    -- is that right?

19              MR. MITCHELL:  Form.

20              MR. MASTERSON:  Form.  Foundation.

21              THE WITNESS:  Am I still answering this?

22              MR. MASTERSON:  You can go ahead and answer

23  that.

24              THE WITNESS:  Yes, that's true.

25              (Next page, please.)

215

1  BY MS. WANG:

2      Q.    Did anything happen at the July 17, 2015, meeting

3  that was unusual in terms of a sergeant speaking out of turn?

4                MR. MASTERSON:  No.  No.  That causes --

5  that -- that's asking for communication that occurred.

6                You're instructed not to answer.

7  BY MS. WANG:

8      Q.    Did Michele Iafrate -- well, let me say this:  You

9  told the monitor that somebody gave a direction during the

10  July 17, 2015, meeting not to discuss the Knapp IDs with the

11  monitor; is that right?

12                MR. MASTERSON:  Form.

13                THE WITNESS:  I think it's mentioned in here,

14  yes.

15  BY MS. WANG:

16      Q.    Was that accurate?

17      A.    Yes.

18      Q.    Did Michele Iafrate give that direction during the

19  meeting on July 17, 2015?

20                MR. MASTERSON:  Objection.  Privileged.

21                You're instructed not to answer.

22                MS. WANG:  Okay.  Let me e-mail the Court and

23  see if the judge is available, and then I'll keep going with

24  other questions.

25                MR. JIRAUCH:  Could we take a break so that

216

1  defense counsel, if we're going to talk to the judge, may

2  just call in, have an opportunity --

3               MS. WANG:  Yeah, sure.

4               MR. JIRAUCH:  -- to talk --

5               MS. WANG:  Well --

6               MR. JIRAUCH:  -- among themselves --

7               MS. WANG:  -- do you want to just email -- why

8  don't we go off the record for a second, but let's everybody

9  stay in the room.

10               THE VIDEOGRAPHER:  The time is 2:56 p.m.

11  We're now going off the record ending media 3.

12               (Recess from 2:56 p.m. to 3:18 p.m.)

13               (Conference call with Judge Snow 3:18 p.m. to

14  3:31 p.m.)

15               (Recess from 3:31 p.m. to 3:48 p.m.)

16               (Mr. Dodd joins proceedings replacing

17  Mr. Como.)

18               THE VIDEOGRAPHER:  The time is 4:00 --

19  3:48 p.m.  We're now back on record beginning media 5.

20               MS. WANG:  Gentlemen?  I think you said you

21  have a revised instruction for the witness?

22               MR. MASTERSON:  I am going to limit my

23  instruction to the witness, the instruction not to answer to

24  communications at the July 17 meeting made or between the

25  witness and Ms. Iafrate and other persons present at that

217

```
 1   meeting and Ms. Iafrate to the extent that communications
 2   were -- or involved legal advice by Ms. Iafrate.
 3                 Does that make sense?
 4                 MS. WANG:  I think so.  We might have to deal
 5   with that question by question.
 6                 MR. KILLEBREW:  Excuse me.  I apologize.  This
 7   line is cutting in and out.  Could I just call in --
 8                 MS. WANG:  Yes.
 9                 MR. KILLEBREW:  -- again?
10                 I'm --
11                 MS. WANG:  Yeah.  We'll wait for you, Paul.
12                 MR. KILLEBREW:  I'm very sorry.
13                 THE VIDEOGRAPHER:  Should we go off or leave
14   it on for a second?
15                 MS. WANG:  Why don't we go off.
16                 THE VIDEOGRAPHER:  The time is 3:49 p.m.
17   We're now going off the record ending media 5.
18                 (Recess from 3:49 p.m. to 3:50 p.m.)
19                 THE VIDEOGRAPHER:  The time is 3:50 p.m.
20   We're now back on record beginning media 6.
21   BY MS. WANG:
22       Q.    Okay.  Captain, going back to the July 17, 2015,
23   meeting, did you express any views about -- to your team or
24   to Chief Sheridan about whether the Knapp identification
25   documents should be disclosed to the monitor during the
```

218

1    upcoming site visit?

2        A.    Did I express my views?

3        Q.    Correct.

4        A.    No, I don't -- I don't think I had a particular

5    opinion about it, about disclosure.

6        Q.    Did you list as one of the items on your agenda for

7    that meeting the Knapp IDs?

8        A.    I didn't write it down, but it was going to come

9    up.

10       Q.    At the monitor meeting?

11       A.    Or during that meeting.

12       Q.    During the July 17 meeting?

13       A.    Yes.

14       Q.    And why was it obvious to you that it was going to

15   come up during the July 17, 2015, meeting?

16       A.    Because we had just recently received them, and it

17   was the first time we had Michele there collectively all

18   together with us.

19       Q.    Okay.  Did you also discuss at your July 17 meeting

20   the Leroy and -- who was the other deputy?

21       A.    Dickner.

22       Q.    Dickner IDs.

23       A.    The -- I don't believe we did.  There's no reason

24   to.  I mean, they -- they were already previously disclosed.

25   We'd already worked on them, so they weren't -- they weren't

1   a topic.

2       Q.    All right.  But they were still pending IA cases as

3   of July 17th, 2015?

4       A.    I believe so, yes.

5       Q.    All right.  Did Chief Sheridan express any views

6   during the July 17th meeting to MCSO staff about whether to

7   disclose the Knapp IDs to the monitor team during their

8   upcoming meeting --

9       A.    No.

10      Q.    -- site visit?

11      A.    No.

12      Q.    Did any of your PSB subordinates discuss the issue

13  of whether to raise the issue of the Knapp IDs with the

14  monitor team?

15      A.    No.  It wouldn't have been their place to, if that

16  makes sense.

17      Q.    Okay.  Did -- did somebody at the July 17th,

18  2015, meeting raise the topic of whether to disclose the

19  identification documents to the monitor team?

20              MR. MASTERSON:  Hold it.  I'm going to

21  instruct you not to answer that question based on privilege.

22              THE WITNESS:  Okay.

23  BY MS. WANG:

24      Q.    Before the July 17 meeting -- let me withdraw it.

25              Between the time you discovered the Knapp IDs,

220

1    July 7th or 8th, and July 17th when you had this

2    rehearsal meeting for the monitor site visit, did you have

3    any meetings with Michele Iafrate about the subject of the

4    Knapp IDs?

5                        Just yes or no.  Did you meet with her?

6                        MR. MASTERSON:  Wait.  Wait, wait, wait, wait.

7    I -- I think he can -- I'm going to instruct him not to

8    answer that specific question based upon the attorney-client

9    privilege because the question, did you meet with

10   Ms. Iafrate, and then you gave him a subject, I -- I think

11   that's improper, because that gets into the privilege.  And

12   the -- the -- the topic of the meeting, I suppose, gets into

13   the privilege, as far as I'm concerned.

14                       If you want to ask him if he met with

15   Ms. Iafrate during any particular week and how many times and

16   for how long, I don't have any problem with that.

17                       MS. WANG:  I think the subject -- the general

18   subject would be log information.  I mean, on a privilege

19   log, you would say whether -- what the subject line of an

20   e-mail was, for example.

21                       MR. MASTERSON:  Ask your question -- let me

22   listen to your question again.

23                       MS. WANG:  Okay.  Can you read it back, Cathy.

24                       THE COURT REPORTER:  Sure.

25                       (The requested record was read.)

221

1              THE WITNESS:  No.

2  BY MS. WANG:

3      Q.    Do you know whether Chief Sheridan had any such

4  meetings with Michele Iafrate before the July 17 meeting?

5      A.    I don't know.  I don't think he did, but I don't

6  know.

7      Q.    Why do you -- why do you have the impression that

8  he did not meet with her before July 17?

9      A.    She was out of town the previous week.

10     Q.    Okay.  Did you say anything to the PST -- PSB team

11  assembled at the July 17th meeting about the Knapp IDs?

12     A.    Did I say anything?

13     Q.    Yeah.

14     A.    Yes.

15     Q.    What did you say?

16              THE WITNESS:  This is going to get into

17  potentially a privileged area.

18              MR. MASTERSON:  Well, you -- I think you can

19  tell her about conversations you had with others on your team

20  but not -- not --

21              THE WITNESS:  Okay.

22              MR. MASTERSON:  -- statements you made to

23  Ms. Iafrate for the purpose of seeking legal advice --

24              THE WITNESS:  Okay.

25              MR. MASTERSON:  -- or statements that

222

1    Ms. Iafrate gave you for the purpose of providing legal

2    advice.

3                    THE WITNESS:  Okay.

4                    We were all waiting for direction on what we

5    were going to do next.  And the questions to me would have

6    been, do you know what we're doing yet?

7                    And I said, no.  I'm waiting to be advised on

8    what -- how we're going to handle this.

9    BY MS. WANG:

10       Q.    When you say what we're going to do next, what did

11   you mean?

12       A.    If we were going to take any additional

13   investigative steps on the case.

14       Q.    As an IA case?

15       A.    Right.

16       Q.    Did you include in your question -- so you were

17   saying you posed those questions during the meeting?

18       A.    I -- not with the staff.  They were more posing

19   that to me.  Like, do you have any direction yet, Captain?

20                    And I said, no, I don't.

21       Q.    Did you pose the question to Chief Sheridan?  He

22   was there; right?

23       A.    Yes.

24       Q.    And did you -- what did he say in response to you?

25       A.    We're waiting for a response.

1      Q.   And that was -- response was from counsel?

2      A.   Yes.

3      Q.   Okay.  Was that response given during the

4  July 17th meeting, without telling me what it was?

5             MR. MASTERSON:  Hold it.

6             THE WITNESS:  I can answer it yes or no.

7             MR. MASTERSON:  Well, but the question asks --

8  asks, was a response given on a particular -- particular

9  topic, so I -- I think that violates the privilege.  I'm

10  going to instruct you not to answer.

11             I'm trying to limit it as much as I can here,

12  but I think that crosses into their --

13             MS. WANG:  Understood.

14             MR. MASTERSON:  It's kind of gray, but --

15             MS. WANG:  I understood -- understood.  We'll

16  make our record and deal with what we've got at the end of

17  today.

18  BY MS. WANG:

19      Q.   So there were two -- two separate issues that I've

20  heard you discuss.  Tell me if this is right.

21             There was an issue about whether to go forward

22  with the IA case, and there was an issue about whether to

23  disclose those identifications to the monitor; correct?

24      A.   Yes.

25      Q.   Okay.  Did -- did anyone -- did any MCSO personnel

**235**

1      A.    Okay.

2      Q.    Who was present at that meeting?

3      A.    Myself.  Larry Kratzer.  Kim Seagraves.  I -- I

4  believe Lauren Sanchez.  Sherry Kiyler.  Chief Warshaw.  Al

5  Peters.  I believe Raul Martinez was there.  And I don't know

6  which of the sergeants were there off the -- right now, I

7  can't remember which of the sergeants were there, but

8  probably a couple of them were there.

9      Q.    A couple of your PSB sergeants?

10     A.    Yes.

11     Q.    Okay.  During that meeting, did Chief Kiyler ask

12 you about the pending IA cases involving the Dickner and

13 Leroy IDs?

14     A.    Yes.

15     Q.    Did she subsequently ask you a question about

16 whether there were any other IDs that had come to light?

17     A.    She asked me if there was any other pending cases

18 regarding IDs.

19     Q.    And what was your response?

20     A.    No.

21            MR. WOODS:  Who made that -- who asked that

22 question?

23            THE WITNESS:  Chief Kiyler.

24            MR. WOODS:  Thanks.

25            (Next page, please.)

1   BY MS. WANG:

2       Q.    Was that response accurate?

3       A.    In terms of a pending case?

4               MR. MITCHELL:  That's -- that's what the

5   question is.

6               THE WITNESS:  Yes, that was accurate.

7   BY MS. WANG:

8       Q.    You believe that was an accurate answer?

9       A.    Yes.

10      Q.    You had pulled an IA number for the Knapp ID case;

11  correct?

12      A.    I had.

13      Q.    And you'd already interviewed Knapp; correct?

14      A.    That's correct.

15      Q.    But it's still your position that your answer to

16  Chief Kiyler was truthful?

17      A.    Yes.

18      Q.    You obviously knew about the Knapp IDs at the time

19  you answered that question; correct?

20      A.    I did.

21      Q.    Did you understand that Chief Kiyler and other

22  members of the monitor team would have wanted to know about

23  the Knapp IDs on July 20th?

24              MR. MASTERSON:  Form.  Foundation.

25              THE WITNESS:  I believe they would have wanted

1    to know.

2    BY MS. WANG:

3        Q.    But you still did not feel that your answer to

4    Chief Kiyler's question was inaccurate?

5        A.    No.

6        Q.    You stand by it today?

7        A.    I do.

8        Q.    Did you give that answer based on direction you got

9    during the July 17th meeting?

10                  MR. MASTERSON:  Hold it.  I instruct you not

11   to answer the question.  And objection.  Attorney-client

12   privilege.

13                  THE WITNESS:  Okay.

14   BY MS. WANG:

15       Q.    Did you meet with Michele Iafrate between the

16   July 17th meeting and the July 20th meeting with the

17   monitor team?

18       A.    No.

19       Q.    Do you know whether Chief Sheridan met with Michele

20   Iafrate between the July 17th MCSO meeting and the

21   July 20th monitor meeting?

22       A.    I don't know.

23                  MR. WOODS:  Excuse me.  I don't know if you

24   left it out on purpose, but in -- in learning -- in getting a

25   record as to who was at the meeting, Michele's name wasn't

247

1  belonging to the plaintiff class or apparent members of the

2  plaintiff class were to be disclosed?

3                    MR. MASTERSON:  Form.

4                    THE WITNESS:  I don't remember that being

5  discussed.

6  BY MS. WANG:

7      Q.   Were you aware of that court order on July 17th,

8  2015?

9                    MR. MASTERSON:  Form.

10                   THE WITNESS:  I was aware of all the orders

11 generally.  I -- I don't know them probably like the

12 attorneys do.  I know them generally.

13 BY MS. WANG:

14     Q.   Well, you knew that the monitor team was very

15 interested in knowing about any identification documents that

16 cropped up --

17                   MR. MASTERSON:  Form.  Foundation.

18 BY MS. WANG:

19     Q.   -- correct?

20     A.   I did.

21     Q.   And there were many pending IA cases over the year

22 and more that you were the commander of PSB; correct?

23     A.   Yes.

24                   MR. MASTERSON:  Form.

25                   (Next page, please.)

248

1    BY MS. WANG:

2        Q.    And were you generally aware that the Court was

3    requiring those IDs to be turned over in the Melendres case?

4                    MR. MASTERSON:  Form.  Foundation.

5                    THE WITNESS:  I would have expected, yes.

6    BY MS. WANG:

7        Q.    And was that discussed during the July 17th

8    meeting?

9                    MR. MASTERSON:  Form.

10                    THE WITNESS:  No.

11    BY MS. WANG:

12        Q.    So court orders were not discussed during the

13    July 17th meeting?

14        A.    Orders in a general form, but not specific detail

15    or verbiage from an order.

16        Q.    You mentioned earlier today that Chief Sheridan,

17    when he discussed the Knapp IDs with you one on one,

18    expressed a view that he was going to confer with others

19    before deciding how to proceed with the Knapp case because he

20    wanted to check into timeline issues?

21                    Was that how you put it?

22        A.    Yes.

23        Q.    Can you explain what that meant to you when you

24    heard that from Chief Sheridan.

25                    MR. MASTERSON:  Foundation.

Steve Bailey - September 8, 2015

394

1   STATE OF ARIZONA        )
                            )            ss.
2   COUNTY OF MARICOPA      )

3           BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was duly
4   sworn by me to testify to the whole truth; that the foregoing
    pages are a full, true, and accurate record of the
5   proceedings, all done to the best of my skill and ability;
    that the proceedings were taken down by me in shorthand and
6   thereafter reduced to print under my direction.
            I CERTIFY that I am in no way related to any of the
7   parties hereto, nor am I in any way interested in the outcome
    hereof.

8

9           [X] Review and signature was requested.

10          [ ] Review and signature was waived.

11          [ ] Review and signature not required.

12

13          I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14  J(1)(g)(1) and (2).
            Dated at Phoenix, Arizona, this 10th day of
15  September, 2015.

16          _____

17                      CATHY J. TAYLOR, RPR
                          Certified Reporter
18                     Certificate No. 50111

19              *       *       *       *       *

20          I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has

21  complied with the ethical obligations set forth in ACJA

22  7-206(J)(1)(g)(1) through (6).

23          _____

24                      GRIFFIN & ASSOCIATES, LLC
                         Registered Reporting Firm
25                       Arizona RRF No. R1005

Exhibit B

IN AND FOR THE DISTRICT OF ARIZONA

MANUEL DE JESUS ORTEGA          )

MELENDRES, et al.,              )

                                )

        Plaintiffs,   )

                                )

    vs.            )No. CV-07-2513-PHX-GMS

                                )

JOSEPH M. ARPAIO, et al.,      )

                                )

        Defendants.   )

                                )

VIDEOTAPED DEPOSITION OF GERARD SHERIDAN

VOLUME IV

(Pages 355 to 685, inclusive)

Phoenix, Arizona

September 15, 2015

9:16 a.m.

REPORTED BY:

PAMELA A. GRIFFIN, RPR, CRR

Certified Reporter

Certificate No. 50010

PREPARED FOR:

CONDENSED/ASCII

(Certified Copy)

1                    I N D E X
2      WITNESS                              Page
3      GERARD SHERIDAN
4           Examination By Ms. Wang         363
5           Examination By Mr. Killebrew    628
6           Examination By Mr. Como         648
7
8
9
10
11

                E X H I B I T S
12

       Deposition
13     Exhibits:    Description           Page
14     No. 2510    Outlook Calendar Note dated    369
                   4/3/12, Bates No. MELC833475
15            (1 page)
16     No. 2511    E-mail dated 9/25/12 to John   373
                   MacIntyre and Others from Tim
17            Casey, Bates Nos. MCAO00025 to
              MCAO00027 (3 pages)
18
              No. 2512    E-mail dated 10/12/12 to Lisa    375
19            Allen from Tim Casey, Bates
              Nos. MCAO00028 to MCAO00038
20            (11 pages)
21     No. 2513    E-mail dated 10/11/12 to Brian   385
              Jakowinicz from Tim Casey, Bates
22            Nos. CaseySub 000174 to CaseySub
              000176 (3 pages)
23
              No. 2514    E-mail dated 10/18/12 to Brian   389
24            Sands and Others from Tim Casey,
              Bates Nos. MCAOO00043 to
25            MCAO00048 (6 pages)

1                 E X H I B I T S (Continued)
2     Deposition
      Exhibits:     Description                    Page
3
      No. 2515     E-mail dated 10/22/14 to David    431
4                  Garland from Kelly Grennan,
                   Bates No. MELC1016121 (1 page)
5
      No. 2516     E-mail dated 10/30/14 to Jerry    433
6                  Sheridan from Don Vogel, Bates
                   Nos. DV000256 (1 page)
7
      No. 2517     Maricopa County Sheriff's Office  437
8                  Internal Affairs Investigation
                   14-0543, Bates Nos. MELC209720
9                  to MELC209970 (251 pages)
10    No. 2518     Transcript of Recorded Interview  437
                   of Chief Deputy Jerry Sheridan,
11                 2/23/15, Bates Nos. MELC210080
                   to MELC210162 (83 pages)
12
      No. 2519     Maricopa County Sheriff's Office  466
13                 Administrative Investigation (IA
                   No. 2014-0580), Bates
14                 Nos. MELC676786 to MELC676814
                   (29 pages) CONFIDENTIAL - AEO
15
      No. 2520     Memorandum dated 6/1/15 to Jesus  485
16                 Cosme from Steve Bailey, Bates
                   Nos. MELC229076 to MELC229093
17                 (18 pages)
18    No. 2521     Maricopa County Sheriff's Office  540
                   Internal Affairs Division IA
19                 No. 12-0011, Bates
                   Nos. MELC820994 to MELC821177
20                 (184 pages) CONFIDENTIAL - AEO
21    No. 2522     E-mail dated 10/2/12 to Jerry     567
                   Sheridan and Others from Tiffani
22                 Shaw, Bates No. MELC1002784
                   (1 page)
23
24
25

1              E X H I B I T S (Continued)
2    Deposition
     Exhibits:      Description              Page
3
     No. 2523     Maricopa County Sheriff's Office  569
4                 Professional Standards Bureau IA
                  No. 2014-0546, Bates
5                 Nos. MELC158578 to MELC158624
                  (47 pages)
6
     No. 2524     Declaration of Cecillia Wang in  587
7                 Support of Plaintiffs' Response
                  in Opposition to Sheriff Arpaio
8                 and Chief Deputy Sheridan's
                  Motion for Recusal or
9                 Disqualification of The Court
                  (61 pages)
10
     No. 2525     E-mail dated 3/10/14 to Travis   600
11                Anglin and Others from Beverly
                  Owens-Prindle, Bates
12                Nos. MELC198446 and MELC198447
                  (2 pages) CONFIDENTIAL - AEO
13
     No. 2526     E-mail dated 10/29/13 to Cindy   604
14                Allen from Brian Mackiewicz,
                  Bates No. MELC198291 (1 page)
15                CONFIDENTIAL - AEO
16   No. 2527     E-mail dated 2/3/14 to Travis    605
                  Anglin from Carmen Hernandez,
17                Bates No. MELC198515 (1 page)
                  CONFIDENTIAL - AEO
18
     No. 2528     Memorandum dated 2/2/14 to Kim   606
19                Seagraves from Travis Anglin,
                  Bates No. MELC187093 (1 page)
20
     No. 2529     E-mail dated 7/22/14 to Sara     608
21                Bagley from Brian Mackiewicz,
                  Bates Nos. MELC198277 to
22                MELC198279 (3 pages)
                  CONFIDENTIAL - AEO
23
     No. 2530     Memorandum dated 1/21/14 to      610
24                Brian Stutsman from Travis
                  Anglin, Bates No. MELC187111
25                (1 page) CONFIDENTIAL - AEO

Sheridan, Gerard - Vol. 4  9/15/2015  9:16:00 AM

1           E X H I B I T S (Continued)

2    Deposition

     Exhibits:    Description              Page

3

     No. 2531    E-mail dated 11/14/14 to Jerry   611

4           Sheridan from Brian Mackiewicz,

            Bates Nos. MELC198093 to

5           MELC198095 (3 pages)

            CONFIDENTIAL - AEO

6

     No. 2532    Interview of Chief Deputy Jerry   625

7           Sheridan, Bates Nos. WAI 18461

            to WAI 18719 (259 pages)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              VIDEOTAPED DEPOSITION OF GERARD SHERIDAN was
2     taken on September 15, 2015, commencing at 9:16 a.m. at
3     the offices of Legal Video Specialists, 3033 North Central
4     Avenue, Suite 100, Phoenix, Arizona, before PAMELA A.
5     GRIFFIN, a Certified Reporter in the State of Arizona.
6
7     COUNSEL APPEARING:
8
      For the Plaintiffs:
9
              ACLU FOUNDATION
10            IMMIGRANTS' RIGHTS PROJECT
              By:  Ms. Cecillia D. Wang
11            39 Drumm Street
              San Francisco, California  94111-4805
12
      For the Defendant Joseph M. Arpaio:
13
              JONES, SKELTON & HOCHULI, PLC
14            By:  Mr. John T. Masterson
              2901 North Central Avenue
15            Suite 800
              Phoenix, Arizona  85012-2703
16
      For the Defendant Maricopa County:
17
              WALKER & PESKIND, PLLC
18            By:  Mr. Richard K. Walker
                   Mr. Charles W. Jirauch
19            16100 North 71st Street
              Suite 140
20            Scottsdale, Arizona  85254-2236
21    For the Intervenor Plaintiff United States of America:
22            UNITED STATES DEPARTMENT OF JUSTICE
              By:  Mr. Paul Killebrew
23            Civil Rights Division
              950 Pennsylvania Avenue, NW
24            Washington, DC  20530-0009
25
```

Sheridan, Gerard - Vol. 4  9/15/2015  9:16:00 AM

1    COUNSEL APPEARING:  (Continued)
2    For the Witness:
3         MITCHELL STEIN CAREY, PC
          By:  Mr. Lee David Stein
4         Two North Central Avenue
          Suite 1900
5         Phoenix, Arizona  85004-4466
6    For the Interested Party Tom Liddy and Movant Christine
     Stutz:
7
          BROENING, OBERG, WOODS & WILSON, PC
8         By:  Mr. Terrence P. Woods
          1122 East Jefferson Street
9         P.O. Box 20527
          Phoenix, Arizona  85036-0527
10
     For the Interested Party Brian Sands:
11
          LEWIS BRISBOIS BISGAARD & SMITH, LLP
12        By:  Mr. Dane A. Dodd
          2929 North Central Avenue
13        Suite 1700
          Phoenix, Arizona  85012-2761
14
     ALSO PRESENT:
15
          Mr. Craig Onuschak
16        Legal Video Specialists
          Videographer
17
18
19
20
21
22
23
24
25

Manuel de Jesus Ortega Melendres          Unsigned                    Page  361

1    A.  It's a small conference room.

2    Q.  Sorry -- conference table?

3    A.  Yes.

4    Q.  Do you recall how many chairs are around that

5  conference table?  Is it as big as this table?

6    A.  No.  No.  No.  There's probably 15, 16 chairs

7  around the table.

8    Q.  Was your --

9    A.  I'm guessing.

10    Q.  Was it your impression all the chairs were taken?

11    A.  Many of them.

12    Q.  Okay.  Do you recall whether anyone who was not a

13  member of PSB other than Michele Iafrate was present?

14    A.  No.

15        MS. WANG:  Okay.  We can take a break now.

16        THE VIDEO TECHNICIAN:  The time is 12 --

17  2:24 p.m.  We are now going off record, ending Media 3.

18        (Recess taken, 2:24 - 2:42.)

19        THE VIDEO TECHNICIAN:  The time is 2:42 p.m.

20  We're now back on record, beginning Media 4.

21  BY MS. WANG:

22    Q.  All right.  Chief, are you aware that on

23  July 20th of 2015, Captain Bailey and other PSB members

24  did meet with members of the monitor team?

25    A.  Yes, ma'am.

Sheridan, Gerard - Vol. 4  9/15/2015  9:16:00 AM

1     Q.   And were you present at that meeting?

2     A.   No.

3     Q.   You've discussed it with Captain Bailey since

4     then, the meeting, the July 20th meeting?

5     A.   That the meeting took place, yes.

6     Q.   Okay.  Are you aware that Chief Sherry Kiyler of

7     the monitor team asked Captain Bailey and other PSB

8     personnel about various IA cases about ID documents?

9     A.   Yes.

10    Q.   And are you aware that after asking about some

11    specific pending cases, she asked whether there were other

12    cases?

13         MR. MASTERSON:  Form.

14    BY MS. WANG:

15    Q.   Involving IDs?

16    A.   Yes.

17         MR. MASTERSON:  Form.

18    BY MS. WANG:

19    Q.   And that Captain Bailey said no in response to

20    that question.

21         Are you aware of that?

22         MR. MASTERSON:  Form.  Foundation.

23         THE WITNESS:  Yes.

24    BY MS. WANG:

25    Q.   Do you have an opinion about whether that

1    statement by Captain Bailey was true or false?

2          MR. MASTERSON:  Form.  Foundation.

3          MR. WALKER:  Join.

4          THE WITNESS:  Yes.

5    BY MS. WANG:

6     Q.  What's your opinion?

7          MR. MASTERSON:  Form.  Foundation.

8          MR. WALKER:  Join.

9          THE WITNESS:  I don't think I can answer

10   that question.

11   BY MS. WANG:

12    Q.  Why not?

13    A.  Goes back to the attorney-client privilege issue

14   from earlier.

15    Q.  So are you saying you do have an opinion about

16   whether Captain Bailey's answer was truthful, but your

17   opinion is based on advice of counsel?

18          MR. MASTERSON:  Form.  Foundation.

19          MR. WALKER:  Join.

20          THE WITNESS:  Yes.

21   BY MS. WANG:

22    Q.  So you were aware in July of 2015 of court orders

23   regarding production of documents generally; correct?

24    A.  Yes, ma'am.

25          MR. MASTERSON:  Form.

Sheridan, Gerard - Vol. 4  9/15/2015  9:16:00 AM

1    STATE OF ARIZONA         )
                              ) ss.
2    COUNTY OF MARICOPA      )

3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
4    duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
5    the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
6    shorthand and thereafter reduced to print under my
     direction.
7
         I CERTIFY that I am in no way related to any of
8    the parties hereto, nor am I in any way interested in the
     outcome hereof.
9
10       [X]  Review and signature was requested.
         [ ]  Review and signature was waived.
11       [ ]  Review and signature not required.
12
         I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     J(1)(g)(1) and (2).
14       Dated at Phoenix, Arizona, this [!DATE] day of
     [!MONTH], 2015.
15

16

17          PAMELA A. GRIFFIN, RPR, CRR
              Certified Reporter
18            Arizona CR No. 50010
19
            *     *     *     *     *
20
21       I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206 (J)(1)(g)(1) through (6).
23

24          GRIFFIN & ASSOCIATES, LLC
              Registered Reporting Firm
25            Arizona RRF No. R1005

Manuel de Jesus Ortega Melendres                    Unsigned                    Page  685