# EXHIBIT A

# In The Matter Of:

*Melendres v*
*Arpaio*

---

*Sergeant Travis Anglin*
*September 9, 2015*

---

*Griffin & Associates Court Reporters*

*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*

*www.arizonacourtreporters.com*

*602.264.2230*

Original File ta090915.txt

**Min-U-Script®**

1      A.   Yes, ma'am.

2      Q.   And if we could go to the flowchart-looking

3   pages starting at MELC199933, there are three of those.

4   They also have revision footers at the bottom.  Did you

5   receive these three revisions as well in your e-mail

6   exchanges with Mike Zullo --

7      A.   I did.

8      Q.   -- in December 2013?

9      A.   Yes, ma'am.

10      Q.   So you referred to a meeting and that's the

11   January 2nd, 2014, meeting?

12      A.   Yes, ma'am.

13      Q.   Who was at that meeting?

14      A.   Sheriff Arpaio, Mike Zullo, myself,

15   Captain Bailey, Mr. Masterson, Mr. Popolizio, Mr. Liddy,

16   and Mr. Casey, and Dennis Montgomery was on

17   speakerphone.

18           MR. WOODS:  When was this meeting?

19           THE WITNESS:  January 2nd, 2014.

20      Q.   BY MS. MORIN:  So did you bring these documents

21   with you to the meeting?

22      A.   I brought one of these flowcharts, probably the

23   most recent revision, and I also brought information

24   that I had received or discovered through Open Source

25   about Dennis Montgomery.

35

1       Q.   Did you circulate these documents prior to the

2   meeting to anyone?

3       A.   The sheriff had it.

4       Q.   And by "these documents," I mean all of these

5   timeline revisions and the matrix revisions.

6       A.   No, ma'am.  I believe I just brought one

7   version of this -- the flowchart.

8       Q.   Mm-hm.

9       A.   And I know the sheriff had that.  I don't

10  believe that I brought the spreadsheets to that meeting.

11      Q.   And when we say "spreadsheets," we are looking

12  at the documents with the Bates number MELC199917?

13      A.   I am.

14      Q.   Okay, just to be clear.

15           So did the sheriff already have the timeline

16  spreadsheets prior to the meeting?

17           MR. MASTERSON:  Foundation.

18           THE WITNESS:  I don't know.

19           MR. WALKER:  Join.

20      Q.   BY MS. MORIN:  Okay.  Did you ever circulate

21  those to him after?

22      A.   I don't believe that I did.

23      Q.   Okay.  Do you believe that someone did?

24      A.   I don't know the answer.

25      Q.   So if we look at the last page of the

1    flowchart, I'll call it, it says Revision 2.0 at the

2    bottom, Bates number 935.  Do you see that?

3         A.   Yes, ma'am.

4         Q.   Is that the document that you brought to the

5    meeting?

6         A.   I believe so.

7         Q.   Okay.  And that's the document that you asked

8    Dennis Montgomery about on the phone?

9         A.   Correct.

10        Q.   And I see the top box in the middle says,

11   "G. Murray Snow, Federal Judge, Arpaio Case 07/22/2009."

12             Do you see that?

13        A.   I do.

14        Q.   Did you ask him about that box?

15        A.   No.

16        Q.   And below that there is the Covington Burling

17   Law Firm 05/06/2010 box.  It also says "Melendres versus

18   Sheriff Arpaio," and it has a case number in it.

19             Do you see that?

20        A.   I do.

21        Q.   Did you ask him about that box?

22        A.   No, ma'am.

23        Q.   So did you wonder why and how these boxes are

24   on this document?

25        A.   I did.

1      Q.   And how did that come up in the meeting?

2      A.   I asked in a general sense what information he

3  used to complete this form.

4      Q.   Okay.  And what did he say?

5      A.   He didn't give me an answer.  He would talk

6  around the answer.  To my knowledge, he's never produced

7  an explanation as to how he could come up with this

8  information.

9      Q.   Did anyone else at that meeting ask questions

10  about this document?

11      A.   Not that I recall.

12      Q.   Nobody wondered at that meeting how he got a

13  document with -- or how he created a document with these

14  names and these other references on it?

15           MR. WALKER:  Object to the form.

16           MR. WOODS:  Foundation.

17           MR. MASTERSON:  Join.

18           THE WITNESS:  I don't know.

19      Q.   BY MS. MORIN:  Let me rephrase that.  You're

20  right.  That was a bad question.

21           Nobody expressed during the meeting any

22  questions to Mr. Montgomery, "How did you get this

23  information," except you?

24      A.   Well, I know I asked the question, so I don't

25  know whether it was repeated by anybody else or not.

38

1      Q.   Do you recall it being repeated by anyone?

2      A.   I don't.

3      Q.   Or did you -- do you recall other similar

4  inquiries, even if it wasn't a repetition of this

5  specific question, but inquiries about how did this

6  information come to be in Dennis Montgomery's

7  possession?

8      A.   What I can tell you that I remember Dennis

9  Montgomery saying in that meeting was repeating the --

10  basically the entire story about how he had been a

11  subcontractor for the CIA and going into details about

12  this computer that they would use to harvest

13  information.  That was the general answer is that the

14  CIA harvested information.

15          And we would say, well, how -- you know, how

16  did you get this?

17          Well, it was part of the information that was

18  harvested.  So he would always throw out that broad net

19  and that -- that's the only answer we ever got about it.

20      Q.   So is this -- just to make sure I'm clear, is

21  this flowchart thing the document that you have referred

22  to as the "matrix"?

23      A.   Probably, yes.

24      Q.   Okay.  Did Mike Zullo tell you anything about

25  these documents when he conveyed them to you or at any

56

1    "Joe Arpaio Brief"?

2         A.    It likely is.

3         Q.    So do you see where it says, "Covington now

4    included" in the e-mail from David Webb to

5    Detective Mackiewicz and Mike Zullo?

6         A.    I do.

7         Q.    And it also says, "Seems ... the only people

8    not talking to the Judge G. Murray Snow was Sheriff

9    Arpaio and his attorney's"?

10        A.    I do.

11        Q.    Did you have an understanding of what that

12   meant?

13             MR. MASTERSON:  Form; foundation.

14             THE WITNESS:  No.

15             MR. WALKER:  Join.

16        Q.    BY MS. MORIN:  And Mike Zullo forwarded that to

17   you with the e-mail of -- with the text in his e-mail

18   saying "Update," right?

19        A.    Yes, ma'am.

20        Q.    What was your understanding of why he was --

21   what he was updating you about?

22             MR. MASTERSON:  Foundation.

23             MR. WALKER:  Join.

24             THE WITNESS:  I received several of these

25   e-mails, it appears, on New Year's Day.  Don't tell the

57

1    sheriff, but I wasn't spending a lot of my New Year's

2    holiday reviewing these documents.  So I don't think

3    that I had any question or, you know, curiosity about

4    these at the time I received them.

5             I'm -- I'm going to go off just a little bit,

6    if you don't mind, and tell you that on January 2nd,

7    after the meeting that we discussed earlier, was the

8    first opportunity I had to have a meeting with

9    Chief Sheridan, and it was then that I had the

10   opportunity to ask some questions about why I was being

11   given this information.

12       Q.   BY MS. MORIN:  Okay.  Maybe we should turn back

13   to the text messages, if you could, that's Exhibit 2079,

14   and I want to look at the fourth page, which is Bates

15   number 199516.

16       A.   Yes, ma'am.

17       Q.   And do you see where Mike Zullo writes, "Hell,

18   I would wear a dress and ruby red slippers all year if

19   we can prove this"?

20       A.   I do.

21       Q.   Do you have an understanding of what he was

22   talking about proving in that text?

23             MR. MASTERSON:  Foundation.

24             MR. WALKER:  Join.

25             THE WITNESS:  It is my belief that Mike Zullo

74

1    that.

2        Q.    BY MS. MORIN:   When is the last time you were

3    aware of a payment going to Dennis Montgomery?

4        A.    Probably the week that I was there, so May 10th

5    to the 14th, thereabouts.

6        Q.    So at least through that time he was on the

7    payroll?

8        A.    Yes, ma'am.

9        Q.    Okay.   So getting back to the meetings with

10   Sheriff Arpaio, in May 2014, you told the sheriff to

11   distance himself from Mike Zullo and Dennis Montgomery?

12       A.    I did.

13       Q.    And subsequently you were taken off the case?

14       A.    Yes.

15       Q.    I want to go back to the January 2nd, 2014,

16   meeting.  Are you with me?

17       A.    Yes, ma'am.

18       Q.    So if you could, walk me through the start of

19   that meeting.  Like, you walk in the door.  The people

20   that you mentioned are at the meeting.  Just starting

21   there, if you could tell me what happened.

22            MR. WALKER:   Form.

23            THE WITNESS:   I'm afraid I can't really.  I

24   don't mind just telling you what I do remember.

25       Q.    BY MS. MORIN:   Sure.

75

1      A.    I do remember introductions being made to some

2   parties because there were some people there that I had

3   not met.  I didn't know who they were.  I remember Mike

4   Zullo giving some type of overview to the room about

5   Dennis Montgomery, that is, who he was and the general

6   briefing about the case and then he was called and put

7   on speakerphone.

8      Q.    And he told his story, as you've described it,

9   to the monitor, and, to some extent today, on the

10  speakerphone, correct?

11     A.    Yes, ma'am.

12     Q.    And what was -- so if we're walking through the

13  meeting, what was the response to him telling his story?

14  Was it interjected throughout or did people sort of

15  listen to him finish and then start in with their

16  questions?

17           MR. MASTERSON:  Form --

18           MR. WALKER:  Join.

19           MR. MASTERSON:  -- foundation.

20           THE WITNESS:  Mike Zullo spoke to Dennis

21  Montgomery on speakerphone.  I know I asked at least a

22  question or two and the sheriff spoke to him.  I don't

23  recall any of the other members -- of counsel or any of

24  the other members of the office having direct contact

25  with Montgomery over the phone.

1        Q.    BY MS. MORIN:  What did the sheriff say?

2        A.    The only thing I specifically remember him

3    asking Montgomery was if all of this information is true

4    and that he had in fact taken items from the CIA that

5    proved that they were harvesting information illegally

6    from the U.S. public, why he hadn't been assassinated.

7        Q.    That's the only thing the sheriff said to him

8    during the whole --

9        A.    That's the only thing I remember him saying.

10       Q.    That you remember?

11       A.    Yes.

12       Q.    And this was with the matrix flowchart --

13       A.    Correct.

14       Q.    -- present in the room at the meeting?

15       A.    Yes, ma'am.

16       Q.    Okay.  You said you don't recall if the

17   timeline spreadsheet was in the room as well?

18       A.    I don't believe it was.

19       Q.    Okay.  So what happened -- what else was said

20   to Dennis Montgomery?  You've mentioned your questions.

21   You mentioned the sheriff's questions.  What else was

22   said to him?

23       A.    I don't specifically recall anything else said

24   to him.  He just told us the story, and it's the same

25   story that if he were here today, he could tell in the

77

1   same cadence, in the same tone, in the exact almost

2   word-for-word because he's told it so many times.  And

3   by that time, it's probably the third time I had heard

4   it, so I just remember going through that and having to

5   endure that story again.

6       Q.   So I want to ask you to look at your interview

7   transcript, and specifically I think you describe some

8   of what you said on pages 85, 86, 87, around that point

9   in the transcript?

10      A.   That's 3835, is that what that's going to be?

11      Q.   No, just page 85 of the transcript.

12      A.   Okay, I see it.

13      Q.   It has a monitor's Bates number at the bottom.

14      A.   Okay.  Starting on page 85, ma'am?

15      Q.   Yeah, just to give you some context, if you

16  want to look at page 85.

17      A.   Okay.

18      Q.   But I think your response about Mr. Montgomery

19  on the speakerphone is on page 86 --

20      A.   Okay.

21      Q.   -- which is WAI 18309.

22           MR. MASTERSON:  Are you going to ask questions

23  about what's contained in the interview transcript?

24           MS. MORIN:  Yes.

25           MR. MASTERSON:  Okay.  I had an objection

1    yesterday concerning use of the interview transcripts,

2    and I'll incorporate that objection here.  I'm not going

3    to state it all, but in essence, these interviews were

4    taken without regard for my client's due process rights.

5    The interviews, to an extent, were compelled, although

6    the Court said they had to show up but they didn't have

7    to answer questions.  But in reality, they were coerced

8    by the monitors in that the monitors made threats to the

9    interviewees about if they did not answer questions,

10   that would be reported to the judge in fact --

11         MS. MORIN:  With all due respect,

12   Mr. Masterson, if you made an objection --

13         MR. MASTERSON:  I'm going to let him answer the

14   question.

15         MS. MORIN:  I haven't asked a question.  If you

16   made an objection on the record, I'm happy for you to

17   incorporate your objection on the record.

18         MR. MASTERSON:  I just want to --

19         MS. MORIN:  You're testifying here and arguing,

20   and this isn't really the place for that.

21         MR. MASTERSON:  I'm not arguing.  I'm just

22   putting an objection on the record.  And then you're

23   free to ask all the questions you want about the

24   interview.

25         The interviews were coerced to the extent the

1    monitors threatened the interviewees.  They threatened

2    to go to the Court and discuss questions that were not

3    asked.  In fact, we did go to court one time for a

4    status conference and the judge raised issues concerning

5    questions that at least for a short time were not asked

6    by an interviewee.

7            So the interviews were compelled.  They were

8    coerced.  The due process rights of my clients were

9    ignored, and I do not think they should be utilized in

10   this proceeding or at the evidentiary hearing.  Thanks.

11       Q.   BY MS. MORIN:  Were you coerced?  Or sorry.

12   Were you threatened by the monitor at your interview?

13           MR. WOODS:  Object to the form.

14           MR. WALKER:  Join.

15           MR. MASTERSON:  Foundation.

16           THE WITNESS:  I felt that I was compelled to be

17   there, and if I did not participate that that could be

18   problematic for me.

19       Q.   BY MS. MORIN:  Compelled by whom?

20       A.   Well, both by the sheriff's office, as well as

21   the monitors.

22       Q.   As a condition of your employment?

23       A.   That's the way I felt, ma'am.

24       Q.   So at the interview you described what

25   Mr. Montgomery said on speakerphone, I think starting on

80

1    page 86.

2        A.    Yes, ma'am.

3        Q.    And you said that it was the first time you

4    heard his voice at that point?

5        A.    I had heard his voice on video, I believe, but

6    actually speaking to him, that would be the first time I

7    heard his voice.

8        Q.    Okay.  And then Chief Anders asked you about

9    two documents at the top of page 87.  Do you see that?

10   And if you want to look at the page first, then I'll ask

11   you about this.

12       A.    Yes, ma'am.

13       Q.    And I believe you told the monitor that the

14   sheriff had copies of both of those documents on

15   page 88.  So if you want to read through to the top of

16   page 88, and then my question is, is that what you told

17   the monitor and do you have different -- a different

18   recollection now?

19       A.    And you're referring to what we're calling the

20   matrix as well as the spreadsheet?

21       Q.    Correct.

22       A.    I see what I told the monitors, and I can tell

23   you that I know that the sheriff had the matrix.  If

24   there was a subsequent sheet stapled to it or -- it

25   appears that I told the monitors that I thought he had

81

1    that, so I --

2        Q.   You're not changing that --

3        A.   I'm not changing that.

4        Q.   -- testimony today?

5        A.   No.  I -- I have the picture in my mind's eye

6    of the matrix, so I know -- or excuse -- yes, of the

7    matrix, so I know he had that.  He very well may have

8    had that other spreadsheet.  I honestly don't remember,

9    ma'am.  It seems that I told the monitors that he did,

10   and I'm not recanting that statement.

11       Q.   Okay.  All right.  And then you asked your

12   questions.  The attorneys didn't ask questions.  You've

13   mentioned the question that Sheriff Arpaio asked.

14            Did anyone else at that meeting ask -- ask

15   questions of Dennis Montgomery?

16       A.   If the attorneys asked any questions

17   specifically, I don't remember it.  And the only people

18   that were in the room that weren't attorneys were the

19   sheriff, Mike Zullo, Captain Bailey, and myself.  I

20   don't think Captain Bailey said anything.  Mike Zullo

21   had some conversations because he was the conduit

22   between Montgomery and everybody else, and, you know, I

23   think I tried to -- to get this information about these

24   documents that we've been discussing to no avail.

25       Q.   So this was on the morning of January 2nd?

82

1      A.    I believe so.

2      Q.    Do you remember about how long the meeting

3  lasted?

4      A.    I don't.  I don't recall it being a very long

5  meeting.  Maybe a half an hour, less than an hour, I

6  would say.

7      Q.    Did the meeting continue after you left the

8  meeting or did it end and everybody left?

9      A.    No, everybody left.

10      Q.    What happened in relation to this Seattle

11  investigation immediately after that meeting?

12      A.    Because the chief deputy wasn't in this

13  meeting, Captain Bailey and I waited for the chief

14  deputy at his office.  And when he arrived, I asked him

15  very specifically -- because I had gotten text messages

16  that had the name Judge Snow in it, and now there was

17  this matrix and these spreadsheets that say things like

18  Judge Snow.  And obviously I knew who Holder was.  Any

19  of the other law firms or the people mentioned, I didn't

20  know who they were.

21           So I asked the chief deputy specifically, are

22  you asking me to investigate a federal judge?

23           And he said in no uncertain terms am I to

24  investigate a federal judge or anything to do with the

25  birth certificate.  I was just investigating the

83

1    allegations of the illegal harvesting.

2        Q.   So did he tell you to stop Dennis Montgomery

3    from investigating the federal judge?

4        A.   No.

5        Q.   But he knew that that information was on the

6    matrix when you spoke with him?

7            MR. MASTERSON:  Foundation.

8            MR. WALKER:  Form; foundation.

9            THE WITNESS:  I provided the chief

10   deputy with -- I don't know what I gave him, but I at

11   least showed him the matrix, and I also provided him the

12   "Playboy" article and the "New York Times" article and

13   the Wikipedia page of Dennis Montgomery.  And that was

14   my concern is if the idea of investigating a federal

15   judge wasn't concerning enough to me, doing it based on

16   somebody who the media titles the man who duped the

17   government for millions of dollars just made it even

18   more ludicrous.  So I know I provided all that

19   information to him.

20       Q.   BY MS. MORIN:  So you provided that to the

21   chief deputy during this meeting that you had with him

22   on January 2nd?

23       A.   Yes, ma'am.

24       Q.   And he told you, you, Travis Anglin, are not to

25   investigate a federal judge or the DOJ -- did you say

127

1    returned back to Arizona a few times during the -- his

2    entire stay on that case.

3        Q.   BY MS. MORIN:  So starting when?

4        A.   He got there either in late October or

5    beginning of November of '13, and I don't believe he

6    returned until the beginning of January.  Because when I

7    went on January 10th, I flew up there with Mackiewicz

8    and Zullo.  They stayed when I returned, and I don't

9    think that Brian returned more than twice from then

10   until May when I came home with him.

11       Q.   And that was authorized by whom?

12       A.   That was ordered by Sheriff Arpaio.

13       Q.   Ordered by Sheriff Arpaio?

14       A.   Yes.

15       Q.   And so he went up in, you said, October or

16   November 2013?

17       A.   Yes, ma'am.

18       Q.   And then do you know when he came back before

19   again departing in January 2014?

20       A.   He wasn't back at our January 2nd meeting, but

21   he departed with me on January 10th, so within that time

22   frame.

23       Q.   So sometime between January 2nd and

24   January 10th he returns to Arizona?

25       A.   Yes.

154

1    incorrectly.  I don't want to --

2         A.   No, you're correct.

3         Q.   -- misrepresent.

4         A.   It was also in addition to the text messages

5    that I had received from Mike Zullo where he had

6    mentioned the judge.

7         Q.   Right.  So you showed those to Chief Sheridan

8    also?

9         A.   Yes.

10        Q.   But not in the call with -- the conference call

11   with Montgomery?

12        A.   Correct.

13        Q.   So my question, after recapping all that, is

14   why did you not bring up the Judge Snow allegation in

15   the matrix specifically during the January 2nd

16   conference call meeting?  Why did you wait until talking

17   to Chief Deputy Sheridan afterwards to raise that?

18             MR. MASTERSON:  Form.

19             THE WITNESS:  There were four attorneys in the

20   room and an elected official, and I didn't want to bring

21   up the conversation of investigating a federal judge in

22   that context, because if it progressed somewhere else, I

23   didn't want to hear the answer.

24             So I waited until I had a -- a private audience

25   with the chief deputy where I asked him in that tone,

155

1   you're not asking me to investigate a federal judge, are

2   you?  Because that gave me an opportunity if the answer

3   would have been "yes" to ask to recuse myself from that

4   investigation.  So I waited until I had just a more, I

5   guess, like I said, private audience than to bring it up

6   in front of everybody else.

7       Q.   BY MS. MORIN:  Do you think that sharing

8   information about Sheriff Arpaio's investigation of --

9   hypothetically, of a federal judge, if that existed,

10  would affect your career at the sheriff's office?

11           MR. MASTERSON:  Form; foundation.

12           MR. WALKER:  Join.

13           THE WITNESS:  You threw me off with the

14  hypothetical question there.

15      Q.   BY MS. MORIN:  Well, I don't want to force you

16  to assume based on my question that -- that I'm telling

17  you what you testified to says anything.  But let's say

18  that there is information in your possession,

19  hypothetically, that Sheriff Arpaio is investigating

20  Judge Snow or any other federal judge.  Do you think

21  that sharing that information outside of the sheriff's

22  office would affect your career at the sheriff's office?

23           MR. MASTERSON:  Form; foundation.

24           MR. WALKER:  Join.

25           THE WITNESS:  If I were, hypothetically or not,

Sergeant Travis Anglin - September 9, 2015

164

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3          BE IT KNOWN that the foregoing proceedings
     were taken before me; that the witness before testifying
 4   was duly sworn by me to testify to the whole truth; that
     the foregoing pages are a full, true, and accurate
 5   record of the proceedings, all done to the best of my
     skill and ability; that the proceedings were taken down
 6   by me in shorthand and thereafter reduced to print under
     my direction.

 7
            I CERTIFY that I am in no way related to any
 8   of the parties hereto, nor am I in any way interested in
     the outcome hereof.

 9

10          [X]  Review and signature was requested.
            [ ]  Review and signature was waived.
11          [ ]  Review and signature not required.

12
            I CERTIFY that I have complied with the
13   ethical obligations set forth in ACJA 7-206(F)(3) and
     ACJA 7-206 J(1)(g)(1) and (2).
14          Dated at Phoenix, Arizona, this 13th day of
     September, 2015.

15

16
                    _____
17                       KELLIE L. KONICKE, RPR
                            Certified Reporter
18                       Arizona CR No. 50223

19              *      *      *      *      *

20

21          I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206 (J)(1)(g)(1) through (6).

23
                    _____
24                     GRIFFIN & ASSOCIATES, LLC
                       Registered Reporting Firm
25                       Arizona RRF No. R1005
```