# EXHIBIT C

# In The Matter Of:

*Melendres v*
*Arpaio*

---

*Timothy J. Casey*
*September 16, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File TC091615.txt

**Min-U-Script®**

1          THE COURT:  I'm going to overrule the

2     objection and direct the witness to answer.

3          THE WITNESS:  I could have, but that's not a

4     solid -- that's not -- in my judgment, that's not a practice

5     to make, rewriting an opposing party's discovery request,

6     because that's the -- that's the problem with that.

7     BY MS. WANG:

8          Q.   So, in your view, it's -- setting aside not getting

9     into any communications with the client in this case, your

10    general practice as an attorney is to convey the other

11    party's document requests without elaboration?

12         A.   Generally that -- that is true.  I will -- I will

13    provide -- as a practical matter, I will provide follow-up

14    clarification if needed, but it's -- how I learned, it's very

15    dangerous for one advocate to summarize another advocate's

16    discovery.  If it's not clear, it ought to be objected to on

17    the appropriate grounds.  Otherwise, that's a problem.

18         Q.   And you don't know whether you followed your

19    general practice of not providing further instruction during

20    a pretrial discovery period in this case?

21         A.   I don't -- I don't remember that.

22         Q.   All right.  I'm going to change gears entirely.

23    This will be very brief.

24               Were you present at a meeting on

25    January 2nd, 2014, with John Masterson, Joe Popolizio,

246

```
 1   Sergeant Travis Anglin, Sheriff Arpaio, a posse member named

 2   Mike Zullo, and Tom Liddy concerning a -- an MCSO

 3   investigation involving a confidential informant in Seattle?

 4        A.    I know I was -- I don't know the date, but I know I

 5   attended one.

 6        Q.    And do you recall whether the confidential

 7   informant was on the telephone during that meeting?

 8                   MS. CLARK:  Objection.  Calls for

 9   attorney-client privileged, confidential, and work product.

10                   MS. WANG:  Well, if the confidential informant

11   were on the phone, it would affect the analysis of whether,

12   in fact, that conversation was privileged.  So I think I'm

13   entitled to an answer on that.

14                   (An off-the-record conversation was held

15   between the witness and his counsel.)

16                   THE WITNESS:  My memory of the meeting I

17   attended was there was no CI on the phone.  It was a briefing

18   by whoever it was in the MCSO that was telling -- that was

19   telling everyone in the room what their process was, or

20   analysis or whatever.

21   BY MS. WANG:

22        Q.    Were you there for the purpose of giving legal

23   advice?

24        A.    I -- don't know.  My -- my impression is what I can

25   just tell you.
```

Timothy J. Casey - September 16, 2015

247

1      Q.    What was your impression as to whether you were

2  there to give legal advice?

3      A.    My impression was is that the sheriff wanted to

4  know from the lawyers in the room what we thought about the

5  information that was being provided by MCSO personnel about

6  this confidential informant.

7      Q.    Was he seeking legal advice as to the

8  investigation, or was he trying to get a sense of whether you

9  believed the informant was reliable?

10     A.    I don't know, because it was never really

11  explained.

12                  MR. MASTERSON:   Foundation.

13  BY MS. WANG:

14     Q.    All right.  During that meeting -- well, let me ask

15  you this:  Do you know whether Mike Zullo is an employee of

16  the MCSO?

17     A.    I -- I mean, I heard the name.  I've read about

18  him, but I'm not sure I could spot him in a lineup.  So I

19  don't know what his role is.

20     Q.    All right.  Do you recall seeing any documents

21  during that meeting that mentioned Judge Snow's name?

22     A.    I do.

23     Q.    What do you recall about that?

24     A.    I remember seeing some sort of graphic.

25     Q.    Okay.  I'm going to hand you an exhibit that was

248

1   already marked 2524.

2                   MS. WANG:  I hope you still have this from

3   yesterday, because --

4                   MR. MASTERSON:  I don't, but that's okay.

5   BY MS. WANG:

6       Q.    Mr. Casey, can you -- this is a declaration that I

7   filed with the Court in response to the opposition to

8   Sheriff Arpaio and Chief Deputy Sheridan's motion to

9   disqualify the Court.  The document indicates on its face

10  that it is under seal.  I will tell you that it is no longer

11  under seal.  The motion to seal was -- well, there was a

12  court order either unsealing or denying the motion to seal.

13                  Take a look at Exhibit F.  There are two

14  documents there.  One is in landscape --

15      A.    This thing.

16      Q.    -- orientation.

17                  Correct.

18                  So there's a document that contains a -- a

19  sort of a graphical --

20                  MS. CLARK:  Mine looks like it's different.

21  My F starts with --

22                  MS. WANG:  Keep -- keep turning.

23                  MS. CLARK:  Keep going?

24                  MS. WANG:  Keep going.

25                  MS. CLARK:  Okay.

249

1                    THE WITNESS:  This is all part of F; right?

2                    MS. WANG:  Yes.

3                    MS. CLARK:  Okay.

4    BY MS. WANG:

5        Q.    So keep flipping.

6        A.    Yeah.  Excuse me.  I'm sorry.  Okay.

7        Q.    I think you're flipping the wrong direction.

8        A.    No, but I'm -- I'm looking at this.

9        Q.    Okay.

10                   (An off-the-record conversation was held

11   between the witness and his counsel.)

12                   THE WITNESS:  Okay.

13   BY MS. WANG:

14       Q.    Does -- do the materials that -- Exhibit F on my

15   declaration look like the documents you saw during that

16   January 2nd, 2014, meeting?

17       A.    This thing identified as timeline looks familiar.

18   And I remember a color-coded chart of some sort that looked

19   like what you see here, that I'm pointing to at Bates label

20   MELC199934.

21       Q.    Was there a discussion of these documents during

22   that meeting?

23                   MS. CLARK:  Objection.  Attorney-client

24   privilege.  Work product.  Confidentiality.

25                   MS. WANG:  Your Honor, we discussed this

1   Exhibit F to my declaration during the deposition of

2   Captain Bailey last week.  Mr. Masterson was present.  My

3   recollection is that there was not an objection to my

4   questions concerning what was said during that meeting on

5   January 2nd, 2014.

6               THE COURT:  I'll say, Ms. Clark, that I

7   haven't heard an objection from Mr. Masterson.  But whoever

8   is proponing -- whoever is the proponent of the privilege

9   has to establish that the privilege exists.  I have not yet

10   heard anything from Mr. Casey which would implicate the

11   attorney-client privilege.  To the extent that he said -- and

12   I'm saying what I understood his testimony to be -- that

13   Sheriff Arpaio had the attorneys there to ask them about what

14   they thought about the reliability of the informant.  That

15   does not strike me as solicitation of or the receipt of legal

16   advice.

17               So you're the proponent of the privilege.

18   Unless you can tell me that it -- convince me that it does,

19   I'm going to overrule your objection and instruct the witness

20   to answer.

21               MS. CLARK:  Judge, the holder of the privilege

22   is the client represented by Mr. Masterson here today.  And

23   as I told you in the prefatory statement, if he doesn't

24   object, I'm assuming there's a waiver.  However, I do believe

25   this is covered by client confidentiality under 1.6.  It's in

251

1    the course of representing the client that he's attending

2    these meetings.  It's confidential under ER 1.6.  And without

3    an order, I'm instructing the witness not to answer.

4                    THE COURT:  I'm directing the witness to

5    answer.  I'm overruling the client confidentiality objection.

6                    THE WITNESS:  Again, I -- can you read --

7    reread that question for me?

8    BY MS. WANG:

9       Q.    I think it was just was there discussion of these

10   documents at Exhibit F of my declaration during that

11   January 2nd, 2014, meeting?

12      A.    I believe so.

13      Q.    Can you describe what you recall of that

14   discussion.

15                   MS. CLARK:  Continuing objection.

16                   MR. MASTERSON:  Well, you -- has the witness

17   been asked the question to whether he was providing his legal

18   advice, mental impressions, or legal analysis to his client?

19                   In other words, if -- if the response to this

20   question is the witness says legal advice, mental

21   impressions, or legal analysis to his clients, if that is the

22   answer to this particular question, I'm going to object based

23   on privilege.  I'm not sure that question's been asked of

24   this witness yet.

25                   MS. WANG:  Well, I did ask Mr. Casey whether

252

1   he was there at the meeting to provide legal advice.  He said

2   it was not clear.

3              Let me ask -- let me withdraw the pending

4   question and ask another question first.

5   BY MS. WANG:

6       Q.    During the conversation about these documents at

7   Exhibit F of my declaration dated July 10th, 2015, did you

8   provide any legal advice?

9       A.    I, like the other lawyers in the room, including

10  some that are here today, offered our assessments of what we

11  heard.  Whether it's legal advice, I don't know to this day.

12  I'm a lawyer.  I don't remember being asked for any issue

13  about admissibility or anything.  I just remember that we all

14  talked about what we thought about what we heard.

15      Q.    Was there any discussion about whether any

16  particular action taken in the course of the investigation

17  was legal or not?

18      A.    What -- what was legal?

19      Q.    Whether any -- well, you understood that the

20  dis- -- there was discussion during the January 2nd, 2015,

21  meeting about -- sorry -- January 2nd, 2014, meeting, there

22  was discussion about an investigation by MCSO involving a

23  confidential informant; correct?

24      A.    Yes.  Generally, yeah.

25      Q.    During the discussion of that investigation, was

253

1    your advice sought on whether any actions taken during that

2    investigation were lawful --

3         A.    I don't --

4         Q.    -- or not lawful?

5         A.    I don't believe that was ever asked.

6         Q.    Were you asked for your assessments about whether

7    the -- the informant was reliable?

8         A.    I believe we were asked that.

9         Q.    Did it involve any legal analysis or application of

10   your knowledge of the law?

11        A.    My experience as an attorney that tries cases and

12   deals with people, like -- kind of like what you are, but I'm

13   not sure about legal analysis applying law to facts.  I'm not

14   sure about that.  I don't think so.

15        Q.    You were being asked to assess his believability,

16   in other words?

17        A.    I will state for clarification, I don't believe the

18   time I was present that there was the CI on the telephone.  I

19   believe it was just a report by whoever it was, detectives or

20   whoever.  But we were -- I think we were being offered to

21   share our thoughts about the information being relayed.

22        Q.    And were you -- was your legal advice being sought?

23              I guess I'm just trying to get at whether --

24        A.    I --

25        Q.    -- you were bringing to bear any legal analysis to

Timothy J. Casey - September 16, 2015

254

1    that situation or whether your opinion was being sought as an

2    observer of --

3                    (An off-the-record conversation was held

4    between the witness and his counsel.)

5    BY MS. WANG:

6        Q.    -- human behavior, whatever.

7                    You mentioned yourself assessing witnesses on

8    the stand.

9        A.    I -- I cannot tell you.  You would have to ask the

10   client what their expectation were for having the lawyers

11   present.  I don't -- I -- it's -- to this day, I don't know

12   exactly why.

13       Q.    Captain Bailey testified in his deposition that he

14   believed that at least Mr. Popolizio was present, because

15   there was a claim made by the confidential informant that

16   Mr. Popolizio's law firm's e-mails had been hacked.

17                   Do you recall that?

18       A.    I do.

19       Q.    All right.  That did not involve -- Mr. Popolizio

20   was not being asked for his legal opinion about anything, was

21   he?

22       A.    I -- I don't know what Joe was asked.  I know that

23   Joe was present.  I believe John was present.  And myself.

24   Mr. Liddy.  I don't know if James in my office was present.

25       Q.    All right.  So, Mr. Casey, I'll ask you again at

255

1    this point.  What was the discussion about the documents at

2    Exhibit F of my declaration?

3                    MS. CLARK:  I'm going to object based on

4    confidentiality and attorney-client privilege and work

5    product.  It's, I -- I think, fair to presume that if a

6    client asks you to attend a meeting as a lawyer, it is to

7    provide your legal analysis.

8                    And I understand Mr. Masterson is not

9    objecting, but Mr. Liddy -- excuse me -- Mr. Casey has

10   obligations to his former clients, and I'm going to make that

11   objection and instruct him not to answer absent a Court

12   order.

13                   MR. MASTERSON:  Well, actually, I am -- I am

14   objecting, because I think the testimony I just heard from

15   the witness is he's giving his impressions.  And I -- and I

16   understand you tried to finagle it a little bit and ask him,

17   well, are you giving legal advice?  And his answer was, well,

18   I'm giving an analysis possibly of a witness, although he's

19   telling us he doesn't recall the witness being on the phone.

20                   But, in any event, he's there in connection

21   with litigation.  He's looking at documents.  And if he's

22   being asked for comments on documents, that's part of his

23   position as a representative, a legal representative of the

24   client.  And his statements, I think, are then privileged as

25   being work product, at least, and probably attorney-client

256

1   privilege.  They're his impressions of what he has seen.

2   Possibly his legal analysis of what he has seen.

3                   MS. WANG:  Mr. Casey testified that it was not

4   clear to him that he was being -- he was there for the

5   purpose of providing legal advice or analysis, and I don't

6   believe that on the testimony that we've heard the

7   conversation is privileged.

8                   MS. CLARK:  I believe that's a legal

9   conclusion and for the judge to make.

10                   MS. WANG:  I'm making my argument and --

11                   MS. CLARK:  I'm making --

12                   MS. WANG:  -- now seeking a ruling.

13                   MS. CLARK:  I'm making mine.

14                   THE COURT:  All right.  Here's how we're going

15   to proceed:  We're going to proceed on a

16   statement-by-statement basis, a question-by-question basis,

17   that -- to the extent that the witness is capable of

18   reconstructing the conversation.  I believe it is true

19   that -- that the witness is entitled to a general presumption

20   that if he's asked to be there as an attorney, there is a --

21   there is some presumption that there is -- at least you have

22   to be careful about an attorney-client relationship.  But the

23   law, as I understand it, and I believe it exists and the

24   Ninth Circuit is quite clear, that does not necessarily mean

25   that the attorney-client privilege exists.

257

1              With respect to a conversation, the

2    attorney-client only exists -- the attorney-client privilege

3    only exists where legal advice of any kind is sought from a

4    professional legal advisor in his capacity as such.  And

5    communications relating to that purpose made in confidence by

6    a client are at the client's instance permanently protected

7    from disclosure.

8              So we are going to go forward to the extent

9    it's possible on a very specific basis.  I have not heard --

10   I will say, Mr. Masterson, Ms. Clark, I haven't heard

11   anything yet that necessarily implicates the attorney-client

12   privilege to cover the whole conversation.  I have heard

13   reason to proceed with caution.

14             And for that reason, I am going to require

15   you, Ms. Wang, to ask more specific questions about that

16   January 2nd meeting.

17             MS. WANG:  Yes, Your Honor.

18             THE COURT:  See if we can get to it any

19   better.

20             MS. WANG:  Yes, Your Honor.

21             MS. CLARK:  Judge, I'm continuing the

22   objection on confidentiality under ER 1.6.  Mr. Casey

23   can't --

24             THE COURT:  I'm overruling the objection on

25   confidentiality pursuant to ER 1.6.

258

1              MS. CLARK:  Thank you, Judge.

2     BY MS. WANG:

3         Q.    Mr. Casey, at any point during the January 2nd,

4     2014, meeting, did you learn that the confidential informant

5     was offering information or making a claim or allegation that

6     there was a conspiracy between Judge Snow, the Attorney

7     General of the United States, or the Department of Justice

8     generally and the law firm of Covington & Burling that would

9     affect the sheriff?

10             MR. MASTERSON:  Form.

11             THE WITNESS:  Am I instructed to answer, Your

12    Honor?

13             THE COURT:  You are.

14             THE WITNESS:  Yes.

15    BY MS. WANG:

16        Q.    Who provided that information during the

17    January 2nd, 2014, meeting?

18        A.    Well, first of all, I have to -- I don't know the

19    date.  For some reason, I thought it was earlier than that,

20    like November of '13.

21             Whoever was doing the speaking on the

22    telephone were relaying information -- was relaying

23    information about what the CI, the confidential informant,

24    claimed to have put together.

25        Q.    So your impression was that somebody was on the

259

```
 1   telephone conveying information on behalf of the confidential

 2   informant but that it was not the confidential informant --

 3                   MR. MASTERSON:  Form.

 4   BY MS. WANG:

 5       Q.   -- himself?

 6                   MR. MASTERSON:  Form.

 7                   THE WITNESS:  That's -- that's what I

 8   remember.  I thought there were two MCSO employees up in

 9   Seattle calling in.

10   BY MS. WANG:

11       Q.   All right.  Do you know who the person on the phone

12   was?

13       A.   The names that you mentioned.  One of them, the --

14   with the Z.

15       Q.   Mike Zullo?

16       A.   Yeah.  That sounds familiar --

17       Q.   All right.

18       A.   -- but --

19       Q.   What about Brian Mackiewicz?  Is that possibly --

20       A.   There were --

21       Q.   -- someone who was participating by telephone?

22       A.   I couldn't tell you, but I know there were two.

23       Q.   All right.

24       A.   Two employees.

25       Q.   What did the person on the telephone convey as far
```

1   as you remember about an alleged conspiracy between

2   Judge Snow, the Attorney General of the United States, the

3   Department of Justice, and the law firm of Covington &

4   Burling?

5        A.    Would you -- are you asking me for my impression --

6        Q.    No.

7        A.    -- or are you asking me --

8        Q.    I'm asking you --

9        A.    -- specifically --

10       Q.    -- for fuller information about what was conveyed

11  about that.

12             MR. MASTERSON:  Form.

13             THE WITNESS:  I will tell you in all sincerity

14  that the details are not clear.  The conclusion is abundantly

15  clear.

16  BY MS. WANG:

17       Q.    What was the conclusion?

18             MS. CLARK:  Again, just the continuing

19  objection, Judge, and the work product as well.

20             THE COURT:  Overruled.

21             THE WITNESS:  Hogwash.

22  BY MS. WANG:

23       Q.    Who said it was hogwash?

24       A.    That was my conclusion.  And if I'm not mistaken,

25  every lawyer in the room reached that conclusion.

Timothy J. Casey - September 16, 2015

261

1      Q.     Did anyone in the room not reach that conclusion?

2                    MR. WALKER:   Foundation.

3                    MR. MASTERSON:  Join.

4                    THE WITNESS:  I don't know.  I don't know.

5   BY MS. WANG:

6      Q.     Who in the room ventured an opinion as to whether

7   or not the information about that conspiracy was reliable?

8                    (An off-the-record conversation was held

9   between the witness and his counsel.)

10  BY MS. WANG:

11     Q.     You've mentioned already every lawyer in the room.

12  Every lawyer in the room said that it was hogwash.

13                   (An off-the-record conversation was held

14  between the witness and his counsel.)

15                   MS. CLARK:  Judge, we're renewing the

16  objection on all three bases.

17                   THE COURT:  I'm not sure I understand the

18  question, and I want to be able to be very clear that I

19  understand the question and give everybody a chance to

20  object.  I don't understand the question.

21                   MS. WANG:  Sure.  I'm not sure there was a

22  pending question.  I apologize.

23  BY MS. WANG:

24     Q.     My question was, you mentioned that the -- every

25  lawyer in the room expressed the view that the allegation of

262

1    the conspiracy was hogwash; is that right?

2        A.    That -- that was my description for my conclusion,

3    and I believe that was shared by the other lawyers in the

4    room.

5        Q.    All right.  So my question is, did any nonlawyer in

6    the room express a view as to whether the alleged

7    information -- the information about the alleged conspiracy

8    was accurate?

9        A.    Yes or no?

10       Q.    Yes, yes or no.

11       A.    Yes.

12       Q.    Who was that?

13       A.    My client.  Joe Arpaio.

14       Q.    And what was the view that he expressed?

15                 MS. CLARK:  Objection, Judge.  Attorney-client

16   privilege.  Confidentiality as well.

17                 THE COURT:  Well, I'm going to overrule the

18   confidentiality objection.  The privilege belongs to

19   Mr. Masterson.  I don't hear an objection, so I'll direct him

20   to answer.

21                 MR. MASTERSON:  Can we just wait a second

22   here.  Can --

23                 (Stenographic record reviewed by

24   Mr. Masterson.)

25                 MR. MASTERSON:  I'm going -- I'm going to

263

1   raise the objection.  I think the question calls for a

2   statement made by my clients, two lawyers, and I think the

3   assumption is that he is making this statement in order to

4   seek his attorney's counsel or advice regarding how to

5   proceed in a legal matter.

6                THE COURT:  Do you know, I think that this

7   is -- I think this requires some careful consideration on my

8   part and a little bit more research than I've done.  So this

9   is what I would propose.  And it's going to dislocate,

10  perhaps, Mr. Casey and everybody else, but I think it's an

11  important enough question that I may not want to just fire

12  from the hip here.

13               It seems to me that there are several

14  different reasons why this conversation may not be privileged

15  at all.  It depends on who was on the phone.  And the second

16  thing is, I'm not sure that a statement made by

17  Sheriff Arpaio is privileged, but I think that Mr. Masterson

18  raises a good point.  There are attorneys in a meeting.  He

19  expresses an opinion.

20               I would like to look into that and in terms of

21  whether or not it's covered by the attorney-client privilege.

22  So what I intend to do, and what I'll invite the parties to

23  do, we're meeting Friday morning.  If you have any

24  submissions or legal authority you want to put forward on

25  that question, I'll take a look at it and make the ruling.

1   But for now, I think in order to protect the privilege, I'm

2   going to tentatively sustain the objection, direct the

3   witness -- or sustain the objection.  And so the witness

4   won't answer it, but that he is going to be determinative on

5   who else -- I mean, if we can make a determination as to who

6   else was on the call.  And I'm not sure who else was actually

7   present physically, if there's anybody there that might

8   destroy the privilege and/or I want to look into just

9   statements made by counsel -- or I'm sorry -- statements made

10  by a client and whether or not it's up to the Court to

11  determine whether or not in the context that is seeking legal

12  advice.

13          MS. WANG:  All right, Your Honor.

14          May I ask the witness just -- I now realize I

15  told the witness who I understood to be at the meeting based

16  on prior deposition testimony by other witnesses.  I'd like

17  to ask him what his recollection is as to who was present.

18          THE COURT:  You may do so.

19  BY MS. WANG:

20      Q.   Who else was present, Mr. Casey, that you recall?

21      A.   I'm going to start off with the lawyers.  Joe

22  Popolizio and John Masterson from Jones Skelton.  Myself.

23  Tom Liddy.  I don't remember if James Williams in my office

24  was present or not.  As to the lawyers, I don't know if

25  Chris -- I -- Christine Stutz was there.  I don't remember

1    that.

2              Jerry Sheridan was there.  Sheriff Arpaio was

3    there.  I believe Jack Mac- -- Jack MacIntyre was there.

4    There were other people that were there.  Perhaps -- but I

5    can't say with certainty, like Mr. Bailey, Steve Bailey.  I

6    don't know if the PIO person, Lisa Allen, was there.

7              But, I mean, it seemed to me that it was a

8    very full conference room.  And I -- the meeting I'm thinking

9    about occurred in a conference room in his old building.

10       Q.   At the Wells Fargo building?

11       A.   Yes.  It was a long conference room at one end of a

12   hallway.

13       Q.   Did you know everyone present?  Were there people

14   unfamiliar to you there?

15              THE COURT:  Well --

16              THE WITNESS:  There may -- there may have

17   been.

18   BY MS. WANG:

19       Q.   Can you give me an estimate of the number of people

20   that you believe were present?

21       A.   As many as that are in this room.

22       Q.   And can you tell me how many people do you think

23   are in the room currently?

24       A.   Oh, 16.

25              MS. WANG:  All right.  Yes, Mr. Masterson's

1    requesting we take a break as Mr. Popolizio's come to fill

2    in.

3                  THE COURT:  We can, and we're off the record

4    for the deposition.

5                  (Discussion off the record.)

6                  THE COURT:  I would appreciate counsel doing

7    an evaluation of their own ethical obligations under the

8    Title 3s to make sure that they are not going to end up

9    either as witnesses or that they don't have duties relating

10   to candor to the tribunal on my previous testimony or other

11   matters that they need to investigate and consider, because

12   I -- I do not want to go down the road and be in the middle

13   of this hearing and have you tell me for some reason -- and

14   I'm not trying to suggest that I think there's any

15   determination here.  I'm just raising this issue.  I don't

16   want you to have to tell me for some reason that you believe

17   that your ethical obligations require you to withdraw.

18                  And is that clear?

19                  MR. STEIN:  Your Honor, I'm sorry.  It's not

20   clear to me.  And I don't mean to be difficult, but -- I

21   understand what you're saying, but I'm not sure what you mean

22   by it.  And so if -- if you could be more specific, I would

23   greatly appreciate it.

24                  THE COURT:  I'm not going to be more specific.

25                  MR. STEIN:  Okay.

267

1              THE COURT:  I think that -- well, I guess I

2    don't mind being more specific.  The reason I say I'm not

3    going to be more specific is because I don't want to suggest

4    that I made any determination, but as I'm sitting here -- let

5    me see if I've got -- I don't have the rules.

6              MS. CLARK:  Oh, I have them, Judge.  Oh, you

7    have -- okay.

8              Got 'em.

9              THE COURT:  Nah.  I have the federal rules.  I

10   don't have the state rules.

11             MS. CLARK:  Oh, I got them right here, Judge.

12   They're open to the 3s.

13             THE COURT:  We have candor toward the

14   tribunal.  "A lawyer shall not knowingly offer evidence that

15   the lawyer knows to be false.  If a lawyer" -- "the lawyer's

16   client or a witness called by the lawyer has offered material

17   evidence and the lawyer comes to know of its falsity, the

18   lawyer shall take reasonable remedial" -- "remedial measures

19   including, if necessary, disclosure to the tribunal."

20             There's a number of state ethical opinions

21   that'll give guidance on that.

22             "A lawyer may refuse to offer evidence, other

23   than the testimony of a defendant in a criminal matter, that

24   the lawyer reasonably believes is false."

25             That's one that seems to me -- I don't

268

1  remember exactly what previous testimony was, but I do

2  remember previous testimony regarding aspects of whether or

3  not this Court was ever the subject of an investigation by

4  the MCSO or if the MCSO ever knew of an investigation of

5  which this Court was the subject.  And I received answers, I

6  think, from Sheriff Arpaio, from Chief Deputy Sheridan, and

7  then there was a statement made under penalty of perjury by

8  Chief Arpaio.

9              It seems to me that counsel need to evaluate

10  that testimony in light of their own participation or what

11  they may have subsequently come to know to determine whether

12  or not they have a duty of candor toward the tribunal that

13  they have to fulfill.  I'm not saying you do.  It's up to you

14  to make that determination.  But I'm just raising it now,

15  because I don't want you to be wrong.

16              MR. STEIN:  May I respond to that, or would

17  you rather me not?

18              THE COURT:  I'm just -- you can respond to it

19  if you wish.  I'm just asking you to take it into account.

20              MR. STEIN:  Right.  I guess what my concern

21  is, we're sitting in a deposition, and that -- and, you know,

22  deputy -- and information gets presented through the course

23  of a deposition, but the Court hasn't sat through all the

24  depositions and --

25              THE COURT:  No, that's true.

269

1            MR. STEIN:  -- this is the first witness, for

2    example, who has said that Chief Deputy Sheridan was at that

3    January 2nd meeting.  No other witness has said so.

4            THE COURT:  That's true.

5            MR. STEIN:  And so --

6            THE COURT:  That's why I raise that now,

7    because the hearing is going to start next week.

8            MR. STEIN:  Right.  So the basis for the

9    Court's concern about revising previous testimony is based in

10   part on the testimony that he was at that -- that -- I'm

11   concerned that the Court is forming impressions --

12           THE COURT:  Well --

13           MR. STEIN:  -- based upon hearing deposition.

14           THE COURT:  I'm not forming impressions, and

15   I'm perfectly capable of listening and will listen to all the

16   witnesses.  I'm raising things that I want you to consider

17   if, in fact, you feel like you have an obligation to

18   withdraw, because I want to know that now.

19           So I didn't know -- for example, I have no

20   basis to know or any basis to believe, Mr. Stein, that you

21   knew about this prior to my finding out about it.  That's why

22   I've raised it.

23           There's also -- and it has to do with -- with

24   lawyers as witnesses.  There's several others that are in the

25   3 point area.  Maybe that's not applicable either, and I'm

1   not saying it is.  I'm not saying I made a determination that

2   it is.  But I think that you need to make such -- well, I

3   don't have any basis to believe that.  That was my reply to

4   you.  But we've just had the witness say that Mr. Popolizio

5   was in the meeting, that Mr. Masterson was in the meeting,

6   that Mr. -- did you say Casey?  I think he said Mr. Casey --

7   or Mr. Liddy was in the meeting.

8            So we've got some -- I guess Liddy was wrong.

9   We've got some lawyers here in the present action, and

10  there's now been a suggestion that they may be a witness to

11  something.  And they may not be a witness.  No party may want

12  to call them.  I'm not saying that's true.  But because we've

13  got this hearing scheduled to start next week, I'm just

14  asking you, as lawyers, to consider that and to consider if

15  you feel like you have any obligation.

16           If you do, I want to know about it so that we

17  can take appropriate steps and see if we have to postpone

18  this thing.  I don't want to postpone it, but I also don't

19  want to oblige any of you to violate what you think may be

20  your ethical obligations.

21           Since this is the first time I've heard this,

22  I thought I would raise it.  That's all, Mr. Stein.

23           MR. STEIN:  Fair enough.  I appreciate the

24  clarification.

25           THE COURT:  Mr. Woods?

271

1          MR. WOODS:  Thank you, Your Honor.  On a

2    different topic, it's occurred to me today that Friday's

3    deposition of Christine Stutz and Monday's deposition of Tom

4    Liddy are going to be missing you.  And because they're going

5    to be missing you, when they believe that they have an

6    obligation to keep information confidential under 1.6, there

7    won't be a judge there to tell them that they have to abandon

8    that obligation.  And until there's a judge here to tell them

9    that, I think they're under the obligation to keep

10   information confidential under 1.6.

11          And I hate to think that we have to have

12   supervised depositions, but I note in the Liddy deposition it

13   will come up often, and the Stutz probably less often.  But

14   in the Liddy deposition, it's going to come up as many times

15   as it did today with Mr. Casey.  And I -- I just needed to

16   put it out there so we can decide how we're going to deal

17   with it.

18          THE COURT:  Well, when is -- Friday we have a

19   status conference.  I'm available for part of Friday, but I

20   would appreciate it if I wouldn't have to -- have to have it

21   here or if you could call me on the phone.  I'm aware of the

22   issues.

23          Monday I'm completely unavailable.  Depending

24   upon how I rule on the pending motion that relates to whether

25   or not privileges have been waived regarding advice or

272

1  directions given concerning not disclosing the 1459 IDs,

2  there may be more depositions we have to notice up for

3  Tuesday.  So maybe we can take it up in that light.  But I am

4  going to be ruling on this.

5              And I -- and I haven't changed my direction,

6  Mr. Stein, to you or to anybody else that if you want to

7  provide me authority that would be of assistance to me in

8  deciding this question, then tell me.  But I will make a

9  ruling Friday morning.  And we may have to have Mr. Casey

10  back to answer these questions related to this meeting.  As

11  it is now, I've directed him not to answer, although I'm

12  still going to allow you to follow up when you come.

13              I may determine that based on who was at the

14  meeting there is no attorney-client privilege anyway.

15  Mr. Masterson may withdraw his -- his feeling about that.  I

16  don't know.  But we're just going to go step by step,

17  assuming I'm still going to hold that the meeting -- that I

18  still want to consider the question.  I'm inviting you or

19  anybody else to put forward whatever information you can for

20  me by Friday morning, and I'll take a look at it.

21              I'm really not available much of tomorrow.  If

22  you can get it to me by tomorrow night, I will read it

23  overnight and try and have some -- some ruling on it by the

24  morning.

25              Any other question, Mr. Stein?

273

1          MR. STEIN:  No, thank you.

2          MS. WANG:  Your Honor, we -- we all have a lot

3    on our plates between now and Friday morning.  May we submit

4    a list of authorities?

5          THE COURT:  Yes, you may.  Just -- and I would

6    prefer that.

7          MS. WANG:  Thank you.

8          THE COURT:  I will read the list of

9    authorities.  And, you know, develop whatever you want now

10   that you think might throw light on the privilege without me

11   requiring Mr. Casey to ask -- answer that last question.

12         MS. WANG:  All right.  Thank you, Your Honor.

13   BY MS. WANG:

14      Q.   Mr. Casey --

15         MR. MASTERSON:  Wait.  We were going to take a

16   little short break.

17         MS. WANG:  Oh, I'm sorry.  Okay.

18         (Recess from 4:31 p.m. to 4:47 p.m.)

19   BY MS. WANG:

20      Q.   All right.  Mr. Casey, let me continue asking you

21   some questions.  We'll see if we can get anywhere further on

22   this and tee it up for the judge's ruling.

23         The documents that we just looked at,

24   Exhibit F of my declaration, were those -- were copies of

25   those handed around at this meeting?

Timothy J. Casey - September 16, 2015

274

```
 1      A.    I don't remember that, if there was one copy
 2   circulated or if there were multiple copies.  I don't
 3   remember.
 4      Q.    Did you leave that meeting with a copy?
 5      A.    I did not.
 6      Q.    You've already testified that Sheriff Arpaio did
 7   speak during that meeting; is that correct?
 8      A.    Yes.
 9      Q.    Without telling me what he said, was it your
10   understanding that he was seeking the legal advice of any of
11   the attorneys in the room when he spoke on the subject of the
12   confidential informant's allegation about a conspiracy?
13              MR. POPOLIZIO:  Foundation.
14              THE WITNESS:  I don't know.  And I believe he
15   spoke towards the end, but I don't know.
16   BY MS. WANG:
17      Q.    Did he speak after the attorneys in the room had
18   spoken?
19      A.    I don't remember that.
20      Q.    Did anyone other than Sheriff Arpaio and the
21   attorneys in the room speak on the subject of the allegation
22   concerning this conspiracy?
23              MR. POPOLIZIO:  Form.
24              MS. CLARK:  Continuing objection on
25   confidentiality under ER 1.6.
```

275

1          THE COURT:  Confidentiality obligation is

2   overridden.

3          THE WITNESS:  I don't -- I'm sorry.  I don't

4   remember.

5   BY MS. WANG:

6      Q.    You mentioned that there was one person on the

7   telephone; is that right?

8      A.    No.  I had the -- my memory of the meeting -- and I

9   thought it was earlier than January 14th, but my memory is

10  there were two people.  And my impression was they were

11  calling from out of state, and they were --

12     Q.    Okay.

13     A.    -- employees of MCSO.

14     Q.    Were they on a speakerphone in the room?

15     A.    They were.

16     Q.    And your impression was they were both employees of

17  MCSO?

18     A.    Yes.

19     Q.    Was your impression that those two people were

20  together in the same place or calling in from different

21  locations?

22     A.    My impression was they were in the same place.

23     Q.    Was that in Seattle?

24     A.    That's my impression, yeah.

25     Q.    All right.

1      A.    I believe that's where they were calling from.

2      Q.    Okay.  Do you recall whether Sergeant Travis Anglin

3  was present?

4      A.    You know, the name -- I -- I'm familiar with the

5  name, but I don't -- I'm -- I'm sure I've met that person,

6  but I'm embarrassed to say if that person walked in, I

7  probably -- I might recognize the person but not match the

8  name.

9      Q.    All right.  You mentioned that you believe

10 Captain Bailey was present; is that right?

11     A.    I'm going off of my best memory, even though it was

12 what, a little over a year ago?  He -- I believe he was.

13     Q.    Do you recall whether Captain Bailey spoke on the

14 subject of an alleged conspiracy involving the Court and the

15 Department of Justice?

16     A.    I don't remember that.

17     Q.    Okay.  You mentioned that your recollection is that

18 Lisa Allen may have been there; is that right?

19     A.    She may have been there.  Yes.

20     Q.    You testified earlier today that Lisa Allen is the

21 head of MCSO's Public Information Office; is that right?

22     A.    That's my understanding, yes.

23     Q.    Is her job essentially to -- to do publicity for

24 the sheriff's office?

25     A.    Yes.

277

1     Q.   Do you recall whether she spoke on the subject of

2  an alleged conspiracy involving the Court, the Department of

3  Justice, and the Covington & Burling law firm?

4     A.   I do not remember that.  I -- I have a general

5  memory that most of the MCSO people were quiet except for the

6  people talking on the phone.

7     Q.   Did you do anything in relation to the Seattle

8  investigation?

9          Do you understand what I mean when I say --

10    A.   No.

11    Q.   Okay.  Let me -- let me withdraw that.

12         Did you do anything relating to the alleged

13  conspiracy involving the Court, the Department of Justice,

14  and Covington & Burling after this meeting?

15         MS. CLARK:  Objection.  Attorney-client

16  privilege.  Confidential.  Work product.

17  BY MS. WANG:

18    Q.   Tell me to the extent you can answer that without

19  revealing any attorney-client communications.

20         MS. CLARK:  I still have the objection based

21  on confidentiality and work product.

22         THE COURT:  Those are overruled.

23         THE WITNESS:  Yes.

24  BY MS. WANG:

25    Q.   To the extent you can tell me without revealing

278

1    attorney-client communications, what did you do to follow up?

2                    MS. CLARK:  Just a continuing objection,

3    Judge.

4                    THE COURT:  On what basis?

5                    MS. CLARK:  All three bases.

6                    THE COURT:  They're all overruled.

7                    THE WITNESS:  I remember lawyers talking

8    amongst ourselves.  I can remember talking to, you know -- I

9    thought Jack MacIntyre was there.  I thought Jerry Sheridan

10   was there, but my memory is not perfect.  This thing was --

11   this thing was so ridiculous on its face in everything that I

12   heard, and I remember sharing with whoever I talked to that

13   the timeline, I could hire my son, that that information was

14   publicly available -- I believe was publicly available

15   information, and it had some sex appeal because supposedly

16   someone was monitoring Jones, Skelton & Hochuli's -- I think

17   Joe's telephone line.

18                    But it -- it had nothing to it.  It was -- it

19   was out -- it was whacked is the best way I could describe it

20   to you to use kids' terms.  It was -- but that's what I

21   remember sharing.

22   BY MS. WANG:

23       Q.    At the time of this meeting, were you -- you were

24   co-counsel with Tom Liddy; correct?

25       A.    I was.

279

1      Q.    Were you co-counsel with Mr. Masterson and

2  Mr. Popolizio?

3      A.    No, but they had the DOJ case that had very

4  overlapping.

5      Q.    Did you have a joint defense agreement?

6      A.    In principle, we certainly did.

7      Q.    It was the same client?

8      A.    Same client; same interests.

9      Q.    Well, did they -- in that case, at that time, the

10  defendants in this case were the sheriff -- well, withdrawn.

11            Did you receive any information during the

12  meeting -- let's call it the January 2nd meeting, even if

13  it -- you -- you don't recall the exact date.  But just for

14  convenience, will you agree that we're talking about this

15  meeting?

16      A.    I know I went to some meeting in which this

17  material was discussed.

18      Q.    Okay.  I just -- want -- I just want to shorthand

19  it as the January 2nd meeting.

20            During the January 2nd meeting, did you see

21  any information suggesting that the confidential informant

22  had accessed telephone records of -- telephone records or any

23  electronic communications of the Jones Hochuli -- Jones

24  Skelton Hochuli firm?

25            MR. POPOLIZIO:  Form.

280

1          THE WITNESS:  I didn't see anything.  I heard

2    that there was representations that there was a duplication

3    of some sort of NSA/CIA data dump that this person had access

4    to, and that's where supposedly he got this information.

5    That's my memory.

6    BY MS. WANG:

7        Q.    Did you see any information or hear any information

8    during this meeting suggesting that telephone records or

9    other electronic communications of anyone at the law firm of

10   Covington & Burling had been accessed?

11          And feel free to refer to the document if that

12   helps you.

13       A.    I do remember there was something about the effect

14   of phone calls between -- you know, it wasn't Stan Young.  It

15   wasn't any of the lawyers that I had met, but, like, people

16   out of your DC office supposedly talking with Eric Holder or

17   Lanny Breuer.  There was something about a clerk that either

18   worked for or used to work for Judge Snow supposedly

19   communicating with somebody.  And I don't remember the

20   details, but that's -- that's what I remember.

21       Q.    Did you see any information that electronic

22   communications of any of those people you just described had

23   been somehow accessed, although they were private?

24       A.    I didn't see anything.

25       Q.    Did you hear that?

Timothy J. Casey - September 16, 2015

281

1    A.    It -- I was left with the impression that somehow,

2    somewhere there was some data that connected phone calls

3    between people that supposedly did this.  I'm looking at your

4    Exhibit 2524 at Exhibit F, this -- this chart, this flowchart

5    that emanates from the DOJ.  That somehow there was -- there

6    was some telephonic connection, but we didn't see that.  But

7    we -- that's what was represented as supposedly -- supposedly

8    potentially available.

9    Q.    Did you hear any represent -- representation that

10   the confidential informant had access to the content of

11   electronic communications between any of the people you just

12   mentioned:  Judge Snow's law clerk; somebody at Covington &

13   Burling's DC office?

14   A.    I don't --

15            MR. POPOLIZIO:  Form.

16            THE WITNESS:  I don't remember that, and I

17   don't believe that got down to that nitty-gritty.  It was

18   mostly that -- just to confirm that a call was placed from

19   this number and went to this number and lasted whatever

20   period of time.

21   BY MS. WANG:

22   Q.    And just to be clear, your understanding, based on

23   what you heard at that meeting, was that the information had

24   been obtained somehow from the CIA or the NSA?

25   A.    That was my -- that's my memory, which raised

282

1    questions about how did this CI obtain this information from

2    what I understood was a former employer?

3        Q.    Did you raise any concerns about that during this

4    meeting?

5        A.    I don't know if I did at the meeting.

6        Q.    Did there come a time when you did?

7              MS. CLARK:  Continuing objection, Judge.

8    Attorney-client privilege.  Confidentiality.  Work product.

9              THE COURT:  Sustained.  At least for now.

10   BY MS. WANG:

11       Q.    I just want to circle back and make sure that I got

12   a full answer to my question whether -- to the extent you can

13   answer this question without revealing attorney-client

14   communications, what did you do after this meeting that

15   related to the alleged conspiracy?

16             MS. CLARK:  Objection on work product.

17   Confidentiality.  And I believe it would be for Mr. Popolizio

18   to raise privilege.

19             MR. POPOLIZIO:  Can I hear the question again,

20   Ms. Court Reporter.

21             (The requested record was read.)

22             MR. POPOLIZIO:  Well, the question

23   specifically is whether he can answer, so it would be yes or

24   no that -- without revealing any privileged communications.

25             So I'm going to wait, Your Honor.

283

1              MS. CLARK:  I'm objecting --

2              THE COURT:  Okay.

3              MS. CLARK:  -- on work product.

4              THE COURT:  I'm going to overrule the

5    objection.  It doesn't deal with his impressions.  It deals

6    with what he did.  So I'm going to overrule the objection and

7    allow him to answer the specific question asked.

8              THE WITNESS:  What was the question again?

9              (The requested record was read.)

10             THE WITNESS:  That's more than a yes or no.

11             MR. POPOLIZIO:  Yeah.

12             MS. WANG:  It is.

13             THE COURT:  It is.

14             THE WITNESS:  And am I --

15             MR. POPOLIZIO:  Therefore, on that basis, Your

16   Honor, I'll assert the -- I will assert -- I will object and

17   assert the attorney-client privilege work product and to the

18   extent that it asks for any mental impressions or legal

19   analysis.

20             THE COURT:  I will overrule the objection to

21   the extent it is based on the work product privilege, 1.6,

22   and anything Mr. Casey did that did not involve

23   communications with his client.  To the extent it would

24   involve client communications, you should not answer the

25   question, Mr. Casey.

284

1          THE WITNESS:  I'm unable then to answer the

2    question, because my communications were to my client.

3    BY MS. WANG:

4        Q.   Did you do anything other than communicate with

5    your client after the meeting in relation to this alleged

6    conspiracy?

7          MR. POPOLIZIO:  Form.

8          THE WITNESS:  Yeah.  I remember the lawyers

9    talking, and I remember talking to my co-counsel.  And it was

10   a dead issue in my book.  It was worthless.  It was

11   vindictive, and we would have no part of it.

12   BY MS. WANG:

13       Q.   When you say "we," who do you mean?

14       A.   I said for the defense team, but I was talking

15   about myself and my law firm.  And my memory is, is that I

16   was joined in that by my co-counsel.  There were going to be

17   no use of this in any circumstances under any way.  Whatever

18   it is, we want nothing to do with it.

19       Q.   How did you find out about the meeting?

20       A.   I -- I don't remember.  We probably -- I don't

21   remember.  It was called.  It was summoned.  We showed up and

22   all gathered into a big room.

23       Q.   Did you -- were there -- did you attend any other

24   meetings at which this alleged conspiracy was discussed?

25       A.   I only remember one.  And nothing -- that one

285

1    meeting was the first, and that was the last.

2                    MS. WANG:  All right.  I think that is all I

3    have for you.  Thank you.

4                    THE WITNESS:  Thank you.

5                    THE COURT:  Who wants to question the witness?

6    Mr. Walker?

7                    MR. WALKER:  I have -- I have a few questions.

8    Thank you, Your Honor.

9                    MS. WANG:  Let me move.

10                   THE COURT:  You know, before you start,

11   Mr. Walker, I just guess -- I think I need to give a little

12   more guidance on the Friday morning thing.

13                   Although I will be interested if you have

14   authority that suggests that statements made by clients

15   during a meeting are possibly not subject to the privilege, I

16   think I'm inclined to give Sheriff Arpaio the benefit of the

17   doubt since he has so many attorneys here.  The real issue

18   then is going to be given -- is going to be whether given the

19   identity and the number of persons that were present at the

20   meeting, whether the attorney-client privilege applies.

21                   Everybody understand that?  Okay.

22                   MR. YOUNG:  Your Honor, if I can interpose a

23   question or an issue.  There may be differences in the

24   memories of various witnesses about who was at the meeting --

25                   THE COURT:  Uh-huh.

286

1              MR. YOUNG:  -- and those differences may,

2     depending on how we -- those differences may point to

3     different results on the issue --

4              THE COURT:  I see what you're saying.

5              MR. YOUNG:  -- whether the meeting is

6     privileged.

7              THE COURT:  I see what you're saying.  Maybe

8     we'll have to -- maybe I can't make the decision Friday

9     morning.  Maybe we'll just have to apply all of the testimony

10    that we have, and I'll consider it in its totality prior to

11    the beginning of the hearing.  And if we need to do that,

12    we're obviously going to have to do some scheduling on

13    Friday.  I will try to make it -- if you will let me know

14    which witnesses that you may be calling that were in that

15    meeting.  And I don't know whether waiver's an issue.  I

16    mean --

17             MR. YOUNG:  Well, it's not just witnesses, but

18    actually counsel for the sheriff have taken different

19    positions in different depositions with respect to that

20    meeting, or at least parts of that meeting, which is why we

21    have testimony about the content of the meeting from some

22    witnesses but not from Mr. Casey so far.

23             THE COURT:  We already have testimony about

24    this meeting from other witnesses?

25             MS. WANG:  Yes, Your Honor.

287

```
 1              THE COURT:  Who has testified?
 2              MS. WANG:  As far as I recall, Chief Deputy
 3  Sheridan had some testimony on it.  He did not recall the
 4  meeting.  Did not recall being at any such meeting.
 5              And Sergeant Anglin also testified.
 6              And Mr. Young is right.  I think -- I was not
 7  present at the Anglin deposition, but I do believe there have
 8  been different positions taken by defense counsel as to the
 9  privilege issues.
10              MR. YOUNG:  Well, and then specifically
11  whether Mr. Montgomery was part of the conversation or not.
12  And I think for those witnesses who have -- or recall that
13  Mr. Montgomery was part of the conversation, there's been no
14  assertion of privilege to bar testimony about what was said
15  while he was in the conversation.
16              THE COURT:  Well, then does that amount to
17  waiver?  I guess I'd invite that question.
18              MS. WANG:  I think there may be waiver issues
19  as well, yes, but we would need to take a look at the
20  deposition transcripts.
21              THE COURT:  Well, it sounds to me like maybe I
22  better look at the totality of the circumstances before I
23  make any rulings.
24              MR. YOUNG:  Yeah.  The issue with Mr. Casey
25  may be because Mr. Montgomery was on the phone and -- and
```

288

1   Mr. Casey had never met or --

2                   THE COURT:  Well, I mean, I don't -- you

3   know --

4                   MR. YOUNG:  Yeah.

5                   THE COURT:  -- I understand, but we're not

6   going to characterize that now.

7                   Let me see what the sworn testimony is, and

8   then you can try and characterize the sworn testimony.  But

9   we'll realize really what the whole totality of the issue is,

10  or if I can get actual descriptions of what the various

11  witnesses have said about it.

12                  MR. POPOLIZIO:  Your Honor, in terms of -- of

13  defining who the various witnesses who have testified on this

14  issue in deposition, I heard Chief Sheridan and Travis

15  Anglin.  Were there any others?

16                  THE COURT:  Those are the two I heard.

17                  MS. WANG:  I think Captain Bailey also may

18  have testified on this.  I took that deposition and confess

19  that I do not have a clear memory, but I -- I do believe I

20  asked him about the meeting.

21                  THE COURT:  All right.

22                  MR. POPOLIZIO:  Thank you.

23                  THE COURT:  Any -- any further issues on that?

24                  All right.  Mr. Walker.

25                  MR. WALKER:  Thank you, Your Honor.

Timothy J. Casey - September 16, 2015

289

1              E X A M I N A T I O N

2  BY MR. WALKER:

3      Q.     Mr. Casey, you were lead counsel for the defense in

4  this case in the fall of 2009; correct?

5              MS. CLARK:  Again, I'm going to just go back

6  and refer to my prefatory statement, and the final portion of

7  which stated that if counsel for any of the defendants

8  questioned Mr. Casey, that I'm -- he -- I've instructed him

9  to presume that that counsel has conferred with their

10  respective client and that they are waiving the

11  attorney-client privilege that might be invoked otherwise for

12  the information that responds to that question which

13  Mr. Casey's being asked.

14              I hope that was clear as mud.  I'm sorry.

15  It's getting late, and I'm getting tired.  But my prefatory

16  statement was he's going to presume there's been a waiver of

17  the privilege if he's questioned by defense counsel.

18              THE WITNESS:  Yes.

19              MR. WALKER:  In response to Ms. Clark's

20  comments, that -- I will represent to you that in this

21  proceeding, I represent Maricopa County.  I do not represent

22  the sheriff.

23  BY MR. WALKER:

24      Q.     Do you understand that?

25      A.     I hear what you're saying.