# EXHIBIT A

# In The Matter Of:

*Melendres v*
*Arpaio*

---

*Mike Olson*
*September 17, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File mo091715.txt

Min-U-Script®

Mike Olson - September 17, 2015

63

1   meeting?

2       A.    I'm not sure if we had two meetings or one

3   meeting, so you may know that, I don't know, but at some

4   point we worked on guiding Mr. Vogel on how MCSO

5   internal affairs are written up as far as to make the

6   allegations that fit his investigation, and that's why

7   Tiffani Shaw helped because that's what her section does

8   for MCSO.  So we sat in my office and worked on that

9   that morning.

10      Q.    Did you discuss the -- the findings of fact

11  that Mr. Vogel had made?

12      A.    He didn't make findings of facts.  He had

13  written the investigation and then we helped him make

14  allegations.  It was up to me to determine the findings.

15      Q.    Okay.  Did you talk about any of the -- any

16  part of his report during that?

17      A.    I'm sure that we did, yeah.  I mean, to get to

18  the allegations, we had to have.

19      Q.    Okay.  So in this email the first line says, "I

20  met with Chief Olson this morning to assist him as he

21  worked to identify potential policy violations on

22  14-542."  Do you see that?

23      A.    Yes, sir.

24      Q.    It says, "Chief Olson was under the impression

25  it is my responsibility to identify policy violations

70

1     A.     It would have been much the same as the earlier

2  meeting except it would have, for the most part, focused

3  on the 543 investigation and his making allegations

4  again in that report.

5     Q.     And did you discuss his report on 543 during

6  that meeting?

7     A.     I believe we did.  I believe that was the focus

8  of that meeting was to get the allegations hammered down

9  on that one.

10    Q.     And what did you discuss about those

11 allegations?

12    A.     Which policy violations fit his report.

13    Q.     Did you discuss -- did you discuss any findings

14 that he had made as to who was responsible for any

15 policy violations?

16    A.     Again, he didn't make findings, I made the

17 findings.  He did the allegations and the investigative

18 work.

19    Q.     Did you -- did you discuss anything that he had

20 written in his report about any of the principals in the

21 543 investigation?

22    A.     Not that I'm aware of or I remember.

23    Q.     But you were assigning the policy violations?

24    A.     We were assigning the policy violations.

25    Q.     Those were according to each principal?

71

1      A.      Correct.

2      Q.      So did you discuss whether he had sufficient to

3   find certain policy violations against certain

4   individuals?

5      A.      We discussed which -- which policies fit the

6   specific area that he was targeting in his

7   investigation.

8      Q.      Based on?

9      A.      Based on what he had written.

10      Q.      Based on his investigation in his report?

11      A.      Correct.

12      Q.      And so those were, again, sort of initial

13   findings of --

14      A.      Preliminary findings or preliminary allegations

15   and then I issued findings on those over the next few

16   days.

17      Q.      And those were findings as to potential policy

18   violations?

19      A.      Yes.

20      Q.      So would you take information contained in his

21   report and determine whether that information could

22   consist of a policy violation?

23      A.      Correct.

24      Q.      And so at the time did you agree that there

25   were initial findings of policy violations?

Mike Olson - September 17, 2015

95

1          MR. SEGURA:  Sure.  It's 1170.

2          MR. POPOLIZIO:  Okay.  Thank you.

3     Q.    BY MR. SEGURA:  There's sort of an initial

4  finding, correct, of whether it's sustained or not

5  sustained and then a subsequent finding?

6     A.    Correct.  We call it a preliminary finding and

7  a final finding.

8     Q.    Can you explain how -- how the preliminary

9  finding and the final findings are made?

10    A.    Certainly.  The preliminary finding was based

11 solely upon Mr. Vogel's investigation.  The final

12 finding was based upon the investigation and then the

13 information provided at the predetermination or the

14 name-clearing hearing.

15    Q.    So in order for a finding to change from the

16 initial to the final, there would have to be some

17 additional information provided?

18    A.    Correct.

19    Q.    Who were the -- who decided the principals for

20 this investigation?

21    A.    Mr. Vogel, I assume, through his investigation.

22    Q.    Did you have any input in who the principals

23 would be?

24    A.    No, sir.

25    Q.    Did you ever suggest people added -- that other

1    that he had made here in Task E.  Do you agree that

2    there was evidence to support each of these --

3            MR. POPOLIZIO:  Form, foundation.

4    Q.    BY MR. SEGURA:  -- findings or determinations?

5    A.    I believe that -- that he felt that way.  I

6    think that there's more information provided at the

7    predetermination hearing and the name-clearing hearings

8    that Mr. Vogel wasn't involved in, so I think that that

9    changes some things.

10   Q.    But upon reading his report, you agreed that

11   there was evidence to support these determinations?

12   A.    To support the allegations, yes.

13   Q.    Okay.  And so turning back to Tab 1, which is

14   page 166, third or fourth page, when you made your I

15   think we called them initial findings, for example, the

16   one on 170 as to Trombi, did you make those initial

17   findings based on Mr. Vogel's determinations?

18   A.    Yes, sir.

19   Q.    And could that initial determination stand on

20   its own if, for example, the person against whom it's

21   issued doesn't seek a predetermination hearing?

22   A.    Yes, sir.

23   Q.    Are there times when you make an initial

24   finding and that's that?

25   A.    If the person doesn't show for his

Mike Olson - September 17, 2015

239

```
1   STATE OF ARIZONA      )
                          )  ss.
2   COUNTY OF MARICOPA    )

3           BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that
    the foregoing pages are a full, true and accurate
5   record of the proceedings, all done to the best of my
    skill and ability; that the proceedings were taken down
6   by me in shorthand and thereafter reduced to print
    under my direction.

7

8           I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in
9   the outcome hereof.

10          [X]    [ ] Review and signature was requested.
            []     [ ] Review and signature was waived.
11          []     [] Review and signature not required.

12

13          I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA
    7-206 J(1)(g)(1) and (2). Dated at Phoenix, Arizona,
14  this 20th of September, 2015.

15                      _____
                        Jennifer Hanssen, RPR
16                      Certified Reporter
                        Arizona CR No. 50165

17                  *         *         *         *

18          I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
19  complied with the ethical obligations set forth in ACJA
    7-206 (J)(1)(g)(1) through (6).

20

21

                        _____
22                      GRIFFIN & ASSOCIATES, LLC
                        Registered Reporting Firm
23                      Arizona RRF No. R1005

24

25
```

# EXHIBIT B

# In The Matter Of:

*Melendres v*
*Arpaio*

---

*Don Vogel*
*September 14, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File DV091415.txt

28

1    any post-investigation that may or may not have happened.   I

2    don't know if one did or one didn't.   But my opinion is the

3    same for every one of these charging sheets.

4    BY MR. YOUNG:

5        Q.    So you thought that there was information that

6    would be sufficient to sustain each of the charges on the

7    charging sheets?

8        A.    Yes, sir.

9        Q.    And then it was up to Chief Olson thereafter to

10   make decisions as to what would happen with each of those

11   charges?

12       A.    Yes.

13       Q.    Did you confer with Chief Olson with respect to his

14   preliminary findings as shown on these forms where -- for

15   example, as to allegation 2 as to Lieutenant Sousa, he's

16   filled in sustained.

17             Did you talk with him about those findings?

18       A.    I haven't spoken to Chief -- how this process

19   works, I met with Chief Olson and -- and Ms. Shaw, and I hope

20   I'm remembering her name correctly, and we completed these

21   documents.   Chief Olson --

22       Q.    That is the forms without the handwriting?   Is that

23   what you're referring to?

24       A.    That's correct.

25       Q.    Okay.

39

1    Go ahead and call.

2                And I don't remember if I got her on the first

3    call or if she called me back, whatever, but she told me that

4    the 543 resulted in -- in no sustained complaints.

5                So that's how -- how I found out.  I didn't

6    find out individually that Sousa was or wasn't responsible

7    and Trombi and -- you know, I -- it's my understanding that

8    virtually all of this was not sustained.

9        Q.    What was your reaction when you found out that none

10   of the findings had been sustained in the 543 investigation?

11       A.    I was --

12                MR. MASTERSON:  Form.

13                THE WITNESS:  I was, again, shocked.

14   BY MR. YOUNG:

15       Q.    Why were you shocked?

16       A.    Because I -- I thought there was evidence to

17   support -- support these -- these -- these charges.  I don't

18   know what happened to them after April 16th.  I don't know

19   what happened in the hearings.  I don't know what happened,

20   if they did any additional investigation.  But with the

21   information I gave them -- gave them when I was done with

22   this, I -- I felt that there was certainly information to

23   support these charges.

24       Q.    Did you ever ask anyone in the MCSO about what

25   happened on the 543 findings?

40

1      A.    You mean after I found out they were cleared?

2      Q.    Correct.

3      A.    I don't -- I don't think -- I never -- I never

4  asked.  And I'm just trying to remember if I ever made --

5  maybe made a comment to somebody, but I never asked, you

6  know, what happened here?  You know, how did -- how did this

7  happen?  I didn't ask for an explanation.  I was hired to do

8  the investigation, and that's what I did.

9      Q.    Do you feel in any way that any of your work went

10  to waste as a result of the across-the-board findings of not

11  sustained in the 543 investigation?

12              MR. MASTERSON:  Form.  Foundation.

13              MR. WALKER:  Join.

14              THE WITNESS:  Well, at first I wondered why I

15  did all this work and nothing came of it.  But -- but then

16  after, you know, kind of thinking about it and considering

17  and -- the work wasn't wasted.  Information was gathered, and

18  information was documented.  I think -- I think that some

19  things were -- they were memorialized.  And if people choose

20  to -- what they choose to do with it, that's their -- that's

21  their choice.

22              But at first, I -- I wondered, but then, I

23  guess, as a -- as a small period of time passed, I did what I

24  was hired to do.  What people do with the product is -- it's

25  up to them.

72

1  BY MR. YOUNG:

2     Q.   Okay.  Did you have any sense from your

3  investigation that the same people within the department were

4  concerned about the well-being of the civilians whom

5  Deputy Armendariz's actions affected?

6              MR. MASTERSON:  Form.  Foundation.

7              MR. WALKER:  Join.

8              THE WITNESS:  I -- I don't have any

9  information to support an opinion that -- that that was

10  considered or not considered by MCSO as far as their actions

11  that they chose or chose not to do with Armendariz.

12  BY MR. YOUNG:

13     Q.   Well, would you agree with me that it should have

14  been a consideration?

15     A.   I agree with you.

16              MR. MASTERSON:  Form.  Foundation.

17  BY MR. YOUNG:

18     Q.   Do you think that the issues that you discussed in

19  your 542 report show problems in the IA process at MCSO?

20              MR. MASTERSON:  Form.

21              MR. WALKER:  Join.

22              THE WITNESS:  I never had an opportunity to

23  review the IA process.  I know that there were breakdowns in

24  some of the cases that I was specifically -- that were --

25  that were specifically part of this case.  But as a general

1    whole, I -- I couldn't comment on -- on the Internal Affairs

2    area at MCSO.

3    BY MR. YOUNG:

4        Q.    What are the IA breakdowns that you specifically

5    have in mind when you answered my last question?

6        A.    Getting a case from the Patrol Division to Internal

7    Affairs for investigation, getting it logged in, getting it

8    to case management and assigned to an investigator.  I think

9    that that's very evident in the Amber Murphy case.  I think

10   that there was some -- a -- again, tracking, I guess you

11   could say.  There was a problem with the -- taking the patrol

12   car to the bar.  That seemed to disappear.  Trombi's failure

13   to complete the administrative end of the Amber Murphy

14   investigation by issuing the -- the discipline.

15       Q.    Anything else?

16       A.    That's all that -- that's all that's coming to mind

17   right now.  If something comes, you know...

18       Q.    Do you have any views as to how those deficiencies,

19   at least as displayed in the examples that you know of, can

20   be solved?

21              MR. MASTERSON:  Form.  Foundation.

22              MR. WALKER:  Join.

23              THE WITNESS:  I don't have any experience

24   administratively in administer -- being an administrator over

25   an IA Unit.  The common trend is there always is a case

1   to -- that a chief deputy at the top, a sworn official -- I

2   don't know if Arpaio's sworn or not, but I know that

3   Chief Sheridan is.  I think it's a tough situation for the

4   person the next level down in his -- his command is -- has to

5   make a decision on a violation of policy against him.

6   BY MR. YOUNG:

7       Q.    Do you know why Chief Sheridan was a principal in

8   the 543?

9               MR. MASTERSON:  Foundation.

10              MR. WALKER:  Join.

11  BY MR. YOUNG:

12      Q.    Well, did you ever have any discussion with anyone

13  about whether or not Chief Sheridan should be a principal in

14  the 543?

15      A.    I think it was obvious that he should be.

16      Q.    Did you have any discussion or input into the issue

17  of whether Chief Olson should be the person making the final

18  findings?

19      A.    After April 16th, I don't -- had no idea where

20  this was going.

21      Q.    Okay.

22      A.    I -- I knew that Olson was going to have to do it.

23  That wasn't my decision.  I didn't have any standing.  I

24  didn't have a say.  That was not part of my retention.

25      Q.    When did you find out that Chief Olson would be the

1                    THE WITNESS:  That's what I thought you were

2    asking.

3                    I don't know what their motivation was, but I

4    know that I did an independent investigation.

5    BY MR. YOUNG:

6        Q.    Knowing what you know now about the outcome of the

7    investigation, do you have any reason to think that in any

8    way you were being used so that the MCSO could portray itself

9    as capable of investigating itself?

10                   MR. MASTERSON:  Form.  Foundation.

11                   THE WITNESS:  That I don't know.

12   BY MR. YOUNG:

13       Q.    You don't know one way or the other?

14                   MR. MASTERSON:  Form.  Foundation.

15                   THE WITNESS:  I don't.  I don't know what

16   happened to this once it left my -- my pen, so I don't

17   have -- I don't have the information to make that

18   determination.

19   BY MR. YOUNG:

20       Q.    Did you ever feel that anyone at MCSO really did

21   not want to find out or did not want you to find out the

22   reason for the violation of the preliminary injunction?

23                   MR. MASTERSON:  Form.  Foundation.

24                   THE WITNESS:  I'm sorry.  Are you asking if I

25   ever met any resistance in the investigation or --

92

1   BY MR. YOUNG:

2       Q.    Well, let's start with that.  Did you ever meet any

3   resistance?

4               MR. MASTERSON:  Form.

5               THE WITNESS:  I didn't.  I'm not -- I'm not --

6   I don't have the knowledge and the IT background that

7   certainly you have or that Mr. McAndrews had, who did some

8   work here, but it seemed that that moved pretty slow.

9   BY MR. YOUNG:

10      Q.    This is the attempt to find the metadata on the

11  December 23, 2011, e-mail?

12      A.    Yes.

13      Q.    Okay.  Can you elaborate on why you thought it went

14  slowly.

15              MR. MASTERSON:  Foundation.

16              THE WITNESS:  I think Mr. -- Mr. McAndrews'

17  report speaks for -- my opinion is based on -- on his

18  documentation that's included in here.

19  BY MR. YOUNG:

20      Q.    Did you just run out of time to pursue that issue?

21  Is that what happened?

22      A.    The next step in that investigation -- in the

23  retrieval of the metadata would have been to contact a

24  third-party outside vendor at the proposed cost of $30,000 to

25  take the next step to whatever it is that had to happen,

1              THE WITNESS:  In my mind, I can't marry the

2    results of these two investigations with the entire operation

3    of that division.  I've never visited, you know, went through

4    the process there, looked at cases to see how they're being

5    handled.  I've never done any of that.

6              So I -- I can't say that my opinion on these

7    two, 42 and 43, are a good representation of -- give me

8    enough information to form an opinion on a whole unit and

9    their daily operations.  I don't know.

10   BY MR. YOUNG:

11       Q.    The whole unit you're referring to is what?

12       A.    IA.

13       Q.    Okay.  Well, you'd be concerned if every IA

14   investigation ended up the way the 542 and 543 did; right?

15              MR. MASTERSON:  Form.  Foundation.

16              MR. WALKER:  Join.

17              THE WITNESS:  I can't -- that -- that's not --

18   that's not a great question, to be honest with you.  If every

19   investigation -- I think that every investigation would need

20   to be looked at on its face and reviewed, because just

21   because somebody's investigated and nothing happens to them,

22   like happened in 543, that's not a process.

23              So I -- I think that just because there's an

24   investigation doesn't mean somebody's got to be charged with

25   something and found guilty.  It means that there's an

Case 2:07-cv-02513-GMS   Document 1386-1   Filed 09/23/15   Page 20 of 21

97

```
 1    investigation.  So I -- I don't know.  I can only make a
 2    determination of 42 and 43.  The other ones I haven't looked
 3    at.  I don't know.
 4    BY MR. YOUNG:
 5        Q.    Okay.  You think something should have happened to
 6    somebody as a result of the 543 investigation; correct?
 7                    MR. MASTERSON:  Form.
 8                    THE WITNESS:  Based on the -- based on the
 9    information that's contained in my report, yes, I do.
10    BY MR. YOUNG:
11        Q.    And what you said earlier about the findings that
12    are in the charging sheets, those are things that as a result
13    of what you did and heard, those are allegations that
14    you've -- you thought ought to be sustained on the basis of
15    some result; is that right?
16                    MR. MASTERSON:  Form.
17                    THE WITNESS:  Yes.
18    BY MR. YOUNG:
19        Q.    When you suggested that the MCSO assemble a band of
20    people outside itself --
21        A.    A board.
22        Q.    -- to handle --
23        A.    A board of people.
24        Q.    A board of people.  I'm sorry.  A board.  Yes.  I'm
25    having trouble reading my handwriting.  Let me start over
```

211

```
 1   STATE OF ARIZONA       )
                            )        ss.
 2   COUNTY OF MARICOPA     )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was duly
 4   sworn by me to testify to the whole truth; that the foregoing
     pages are a full, true, and accurate record of the
 5   proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
 6   thereafter reduced to print under my direction.
          I CERTIFY that I am in no way related to any of the
 7   parties hereto, nor am I in any way interested in the outcome
     hereof.
 8

 9             [X] Review and signature was requested.

10             [ ] Review and signature was waived.

11             [ ] Review and signature not required.

12

13        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14   J(1)(g)(1) and (2).
          Dated at Phoenix, Arizona, this 15th day of
15   September, 2015.

16                       _____

17                           CATHY J. TAYLOR, RPR
                               Certified Reporter
18                           Certificate No. 50111

19          *       *       *       *       *

20        I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has

21   complied with the ethical obligations set forth in ACJA

22   7-206(J)(1)(g)(1) through (6).

23                       _____

24                           GRIFFIN & ASSOCIATES, LLC
                             Registered Reporting Firm
25                             Arizona RRF No. R1005
```