WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment of Retired Executive Chief Brian Sands. (Doc. 1214.) Defendant Joseph Arpaio, in his official capacity as Sheriff of Maricopa County, and the named putative civil contemnors, Chief Deputy Gerard Sheridan, Lieutenant Joseph Sousa, and Deputy Chief John MacIntyre, join in Sands' Motion. (Doc. 1569.) For the following reasons, the Court denies the Motion.

**DISCUSSION**

**I.     Legal Standard**

The Court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence "in a light most favorable to the non-moving party." *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

**II.  Analysis**

    **A.  Laches**

Sands argues that "Plaintiffs' contempt claim against [him] is barred because it was not timely raised" and therefore seeks summary judgment under the doctrine of laches. (Doc. 1214 at 2.)

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002) (internal citations omitted). "Traditionally, laches is invoked when witnesses have died or evidence has gone stale." *Trustees For Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 518 (9th Cir. 1987). The application of laches "depends

upon the facts of the particular case." *Brown v. Cont'l Can Co.*, 765 F.2d 810, 814 (9th Cir. 1985).

"Because laches is an equitable remedy, laches will not apply if the public has a strong interest in having the suit proceed." *Jarrow*, 304 F.3d at 840; *cf. Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 779 (9th Cir. 1980) (laches is disfavored in environmental cases); *Cady v. Morton*, 527 F.2d 786, 793 (9th Cir. 1975) (same). "Citizens have a right to assume" that law enforcement officials "will comply with the applicable law." *Bowers*, 632 F.2d at 779. "The public has an interest in compliance . . . that should not be impaired lightly." *Cady*, 527 F.2d at 793.

"The decision to apply laches is primarily left to the discretion of the trial court." *Bowers*, 632 F.2d at 779. "Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). "To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Id.*

### 1. Reasonableness of Plaintiffs' Delay

On December 23, 2011, the Court entered an order enjoining the MCSO "from detaining any person based solely on knowledge, without more, that the person is in the country without lawful authority." *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 992 (D. Ariz. 2011) *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012). The Court held that the MCSO may enforce state law or any federal *crime*, but not federal *civil* violations. *Id.* at 993. Federal crimes include entering the United States other than at a legal border crossing, remaining and willfully failing to register or be fingerprinted after thirty days, and filing a fraudulent application. *Id.* at 970. Federal law does not criminalize unauthorized presence in the country. *Id.* at 971. Thus, belief or knowledge that a person is an "illegal" alien (present in the country without authorization) does not provide MCSO deputies with a reasonable suspicion that the person has committed any state or federal crime. Detaining persons believed or known to

be present without authorization—without a reasonable suspicion of criminality—violates the Fourth Amendment of the United States Constitution. *Id.*; *see also Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) ("[B]ecause mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is 'afoot.'").

In July 2012, Sheriff Arpaio testified that the MCSO's "LEAR" policy, which required deputies to detain individuals believed to be in the country without lawful authority, remained in effect: "[W]e still had the authority, pursuant to a legitimate arrest, to determine that person was here illegally. And then if there was no state charge to book that person into jail, we would turn that person over to ICE." (Trial Tr. at 502:14-17, Doc. 572 at 225.)

In autumn 2012, the MCSO issued a series of three press releases, each of which suggested that the LEAR policy was still in effect. (Doc. 843-2 at Exh. A.) The first press release, dated September 27, 2012, stated that deputies found "five suspected illegal aliens" while conducting a drug interdiction operation. (*Id.* at A3.) Three members of the group admitted to being illegally smuggled into the country. Although the MCSO lacked evidence to charge the other two with a state crime, it "attempted to turn the suspects over to ICE as has been the practice during the last six years." (*Id.* at A4.) When ICE refused to accept them, Sheriff Arpaio directed deputies to take the "suspects" to the Border Patrol, which he referred to as his "back up plan." (*Id.*) Arpaio expressed displeasure with federal Homeland Security and stated that he planned "to continue to enforce all of the illegal immigration laws." (*Id.* at A5.)

The second press release, dated September 27, 2012, stated that MCSO deputies followed up on a tip that several employees at a warehouse "were suspected of being illegal aliens and using false identifications." (*Id.* at A6.) The press release further reported that ICE "refused to arrest two illegal aliens that were looking for work while deputies were investigating the establishment," and that "Arpaio refused to allow the suspected illegal aliens to be released . . . and ordered the deputies to transport these two

suspects to the United States Border Patrol." (*Id.*)

The third press release, dated October 9, 2012, stated that during a traffic stop, two men "admitted to being in the country illegally." (*Id.* at A8.) The driver was arrested on state charges, while the passenger was transported to the Border Patrol to be processed for deportation. (*Id.*)

On October 11, 2012, Plaintiffs' counsel Andre Segura contacted Defendants' counsel Timothy Casey regarding the press releases, noting that the MCSO "appears to be detaining and transporting individuals in violation of the Court's injunction prohibiting sheriff's deputies from detaining anyone solely on the basis of suspected unlawful presence." (*Id.* at A1.) Plaintiffs' counsel summarized the press releases and concluded that "it appears that MCSO had no state law basis to hold the individuals in question, let alone transport them to some other location. (*Id.* at A2.) Plaintiffs' counsel requested information about the detentions and "written assurance from the Sheriff's Office that this practice will no longer continue." (*Id.*)

Defendants' counsel responded with a letter stating that his "review of the three events indicates no violation of the Court's December 23, 2011 injunction." (*Id.* at Exh. B.) According to the letter, the circumstances surrounding the detentions detailed in the first press release gave rise to a reasonable belief that the individuals had *entered* the country illegally, thereby committing a federal crime. (*Id.*) Defendants' counsel's descriptions of the events in the second and third press releases included detentions of individuals who had admitted to unauthorized presence in the United States, but the descriptions provided no further information suggesting that the deputies reasonably suspected they had entered illegally or committed any other crime. (*Id.*) Nonetheless, Defendants' counsel concluded that no violation of the Court's injunction had occurred:

> In none of the foregoing three events/cases did the MCSO detain any individual based on knowledge or reasonable suspicion that he was unlawfully present in the United States, without more. Rather, MCSO moved swiftly in each case to determine whether state charges could be brought and, if not, to obtain and comply with the direction of federal

- 5 -

agents regarding the individuals.

(*Id.*)

On May 24, 2013, the Court issued its post-trial findings of fact and conclusions of law. The Court made it clear that "the MCSO's LEAR policy that requires a deputy (1) to detain persons she or he believes only to be in the country without authorization, (2) to contact MCSO supervisors, and then (3) to await contact with ICE pending a determination how to proceed, results in an unreasonable seizure under the Fourth Amendment to the Constitution." *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826-27 (D. Ariz. 2013) *adhered to,* No. CV-07-02513-PHX-GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013) *aff'd in part, vacated in part,* 784 F.3d 1254 (9th Cir. 2015) and *aff'd,* 784 F.3d 1254 (9th Cir. 2015). The Court specifically concluded:

> Even if this Court accepted the MCSO's argument that the application of the LEAR policy involves only a detention of the subject pending contact with ICE, it would not make the detention constitutional. In the absence of a reasonable suspicion that a crime has been committed, the MCSO lacks authority to engage in a detention of someone pending such contact. . . . The Court therefore concludes as a matter of law that when MCSO detains a vehicle's occupant(s) because a deputy believes that the occupants are not legally present in the country, but has no probable cause to detain them for any other reason, the deputy violates the Fourth Amendment rights of the occupants. The Court further concludes, as a matter of law, that the MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction. The MCSO is thus permanently enjoined from enforcing its LEAR policy with respect to Latino occupants of motor vehicles in Maricopa County.

*Id.* at 894-94.

On November 20, 2014, at a status conference, Sheriff Arpaio's counsel Thomas Liddy revealed that he had reviewed a video from November 1, 2012, which showed a traffic stop known as "the Korean stop," which was an interdiction patrol, conducted after the Court had enjoined the MCSO from conducting interdiction patrols. (Doc. 804 at 67:11-17.) Moreover, Mr. Liddy revealed that "the MCSO [had] concluded that this Court's order was not communicated to the line troops in the HSU [Human Smuggling

- 6 -

Unit]." (*Id.* at 67:20-22.)

On January 8, 2015, Plaintiffs filed a motion seeking an Order to Show Cause. (Doc. 843.) The Court granted the motion on February 12, 2015. (Doc. 880.)

According to Sands, "Plaintiffs have known that the MCSO continued to follow the LEAR policy since at least July 24, 2012," but Plaintiffs unreasonably waited until January 8, 2015 to request an order to show cause why Sands and others should not be held in contempt. (Doc. 1214 at 3-4.)

Plaintiffs did not unreasonably delay in seeking an Order to Show Cause. After Sheriff Arpaio's testimony in July 2012 and the series of press releases in September and October 2012, Plaintiffs timely notified Defendants that they believed the MCSO was violating the preliminary injunction, and Defendants responded that no violations were occurring—the parties here do not dispute that "[a]fter the Preliminary Injunction was issued, the legality of the LEAR policy was actually litigated." (Doc. 1215 at 9; Doc. 1333 at 9.) After the Court's Findings of Fact and Conclusions of Law stated that the MCSO's continued implementation of the LEAR protocol violated the preliminary injunction, Plaintiffs could have sought an Order to Show Cause. Nonetheless, it was not unreasonable for Plaintiffs to choose not to do so until after learning in November 2014 that the MCSO had failed to communicate the terms of the preliminary injunction to the line troops in the HSU, which demonstrated that the MCSO had made *no effort at all* to comply with the Court's preliminary injunction. Until that point, Plaintiffs could have reasonably believed that Defendants' violations of the preliminary injunction arose solely out of a disputed legal issue, which had since been resolved. After November 2014, however, it was apparent that the MCSO had not merely misinterpreted the terms of the preliminary injunction but had completely ignored it. Plaintiffs reasonably sought contempt less than two months after discovering the scope of the MCSO's noncompliance. Plaintiffs "did not dally or unconscionably sit on [their] claim." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1246-47 (9th Cir. 2013) *cert. denied,* 135 S. Ct. 57 (2014); *see also Huseman v. Icicle Seafoods, Inc.*, 471

F.3d 1116, 1126 (9th Cir. 2006) ("There must be particularized evidence to support the assertion that the time lag between knowledge of the potential action and the filing of the action was unreasonable in length. Mere delay alone will not establish laches."); *Jarrow*, 304 F.3d at 838 ("[L]aches penalizes inexcusable dilatory behavior; if the plaintiff legitimately was unaware of the defendant's conduct, laches is no bar to suit."); *cf. Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 955 (9th Cir. 2001) (Delay is unreasonable where plaintiff "has offered no viable justification for the delay," but it is reasonable, "among other reasons, . . . when it is used to evaluate and prepare a complicated claim, . . . and when its purpose is to determine whether the scope of [the alleged misconduct] will justify the cost of litigation.").

### 2. Prejudice to Chief Sands

"Prejudice to the other party is the essential element of laches." *Sandvik v. Alaska Packers Ass'n*, 609 F.2d 969, 972 (9th Cir. 1979). Assertions of prejudice cannot be "conclusory" and must be supported by evidence establishing specific prejudicial losses that occurred during the period of delay. *Id.* at 972-73. In asserting the defense of laches, a defendant cannot rely on general statements that witnesses' memories have lapsed or that documents might be lost; rather, the defendant must demonstrate how he or she was prejudiced by pointing to specific exonerating information that has been lost due to the delay. *See, e.g.*, *Montgomery v. Kitsap Cnty.*, No. C05-5225KLS, 2006 WL 1785846, at *4 (W.D. Wash. June 23, 2006) *aff'd,* 297 F. App'x 613 (9th Cir. 2008) ("Although defendant makes a general statement that necessary witnesses have retired or left its employ and that memories have faded, no specific evidence has been provided to show that this is the case or exactly how such would result in prejudice."). "[G]eneric claims of prejudice do not suffice for a laches defense in any case." *In re Beaty*, 306 F.3d 914, 928 (9th Cir. 2002).

Here, even if Plaintiffs' delay in seeking contempt charges had been unreasonable, genuine issues of material fact exist regarding whether Chief Sands was prejudiced by any such delay. Sands argues that due to the delay, "witnesses' memories faded and the

likelihood of evidence spoliation increased dramatically, thereby depriving Chief Sands of the evidence he now needs to defend himself." (Doc. 1214 at 4.) Sands refers to witnesses' memory loss regarding conversations or meetings, but he does not explain what happened at those meetings that would exonerate him if remembered. Sands asserts that he and Sergeant Trowbridge both testified that they met with Sheriff Arpaio and Chief Deputy Sheridan about the preliminary injunction, but Arpaio and Sheridan testified that they did not recall such a meeting. (*Id.* at 5.) Sands fails to demonstrate how he was prejudiced by Arpaio and Sheridan's memory loss, especially in light of the independent testimony from Sands and Trowbridge that the meeting took place. Moreover, Sands does not specify what occurred at the meeting that would exonerate him, were it remembered by Arpaio and Sheridan.

Sands further asserts that his testimony that he ordered the development of training to implement the Court's Order "was corroborated when emails surfaced," but neither Sands nor any of the other "crucial witnesses" remembered "why the training was not finished or implemented." (*Id.*) The fact that no one, including Sands, remembers (or admits to remembering) why the training was abandoned does not establish that Sands has been prejudiced—that is, that the reason it was abandoned, if remembered, would have been exonerating.

In fact, evidence *does* exist to support Sands' recollections. Sands testified that he ordered training developed, and "emails surfaced about the development of training scenarios." (*Id.*) Sands "testified that he assigned Lieutenant Sousa to spearhead the development of training," and emails "show Lieutenant Sousa's efforts." (*Id.*) Sands points to no relevant, exonerating information that has been lost due to delay.

Rather, Sands speculates that perhaps documents once existed that are now lost, but he does not identify what documents are missing or how their loss has prejudiced him. Sands noted that the MCSO initially identified eight documents in response to his document request, then at the Court's direction produced "additional relevant emails," and then still more relevant emails were discovered after the Court ordered computers

searched. (*Id.* at 6.) All of this relevant evidence is available to Sands, and he fails to refer to any specific document he has been unable to discover and to explain how it would have helped him. That exonerating documents are lost is entirely conjectural; Sands claims that "[t]here is simply no way of knowing what critical evidence is missing." (*Id.*) Mere speculation is not enough to establish prejudice. Delay is not prejudicial "where alleged harm was 'entirely hypothetical.'" *Beaty*, 306 F.3d at 928 (quoting *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992)).

Moreover, Sands cannot establish that exonerating documents and witness recollections were lost during the period in which Plaintiffs could have sought contempt and delayed in doing so. Seven months expired between the Court's issuance of the preliminary injunction and Plaintiffs' first notice that the MCSO continued to adhere to the LEAR protocol, and another ten months expired before Plaintiffs received confirmation from the Court that the LEAR protocol violates the preliminary injunction. Another six months passed before Plaintiffs learned that the MCSO had ignored the preliminary injunction altogether. Even if Sands had identified specific memories that had faded or specific documents that had been lost, and that the loss prejudiced him, Sands would still have the burden of proving that the prejudice was due to the delay, *i.e.*, that the memories or documents were lost *after* Plaintiffs could have filed suit but *before* they did file suit. *Sandvik*, 609 F.2d at 972-73; *Huseman*, 471 F.3d at 1127; *Couveau*, 218 F.3d at 1084.

Chief Sands further argues that he was prejudiced "because he had been retired for over a year and a half by the time he was served the order to show cause," which therefore "deprived him of any ability he might have had to take corrective action to try to bring MCSO into compliance with the Court's orders." (Doc. 1214 at 7.)

"Civil contempt is characterized by the court's desire to compel obedience to a court order, or to compensate the contemnor's adversary for the injuries which result from the noncompliance." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983) (internal citations omitted). "A contempt fine . . . is considered civil

- 10 -

and remedial if it *either* coerces the defendant into compliance with the court's order, *or* compensates the complainant for losses sustained. *Where a fine is not compensatory*, it is civil only if the contemnor is afforded an opportunity to purge." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (emphasis added) (citations omitted).

Here, Plaintiffs seek compensatory relief for violations of the preliminary injunction that occurred when MCSO officers detained members of the Plaintiff class based on knowledge that such persons were in the country illegally, without more. Although Chief Sands lacked the ability to take corrective action after his retirement, Plaintiffs can seek compensatory relief from him for violations that occurred while Sands remained in charge of implementing the preliminary injunction. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 956 (9th Cir. 2014) ("[R]esignation . . . does not immunize [one] from liability for contempt.").

### B. Res Judicata

Chief Sands also argues that Plaintiffs' allegations of contempt are "now precluded by the Court's valid and final order issued on October 2, 2013" due to the "[m]erger doctrine, a subset of res judicata." (Doc. 1214 at 8.)

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *Western Radio Servs. Co. v. Glickman,* 123 F.3d 1189, 1192 (9th Cir. 1997)). Res judicata "provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *C.I.R. v. Sunnen*, 333 U.S. 591, 597 (1948) (quoting *Cromwell v. Sac Cnty.*, 94 U.S. 351, 352 (1876)).

///

"But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly." *Id.* at 597-98. Where the second cause of action differs from the first, collateral estoppel, also known as issue preclusion, applies, "not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.'" *Id.* at 598. "Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time." *Id.*; *see also Cromwell*, 94 U.S. at 356 ("On principle, a point not in litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it might have been determined in the first action.").

The doctrine of res judicata "is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens*, 244 F.3d at 713.

"[T]he crucial question is whether appellant has stated in the instant suit a cause of action different from those raised in his first suit." *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982). "Res judicata preclusion extends only to claims that arise out of the same 'cause of action' asserted in the prior action." *Harris v. Jacobs*, 621 F.2d 341, 343 (9th Cir. 1980). Although "[w]hat constitutes a cause of action for purposes of res judicata cannot be defined with precision, or determined precisely by mechanistic application of a simple test," the Ninth Circuit generally relies on four factors in "determining whether the same cause of action is involved in the two suits":

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Id.* "The fourth criterion—the same transactional nucleus of facts—is the most important." *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139,

1150-51 (9th Cir. 2011).

Here, the suits do not arise out of the same transactional nucleus of facts. Although there is some overlap in the facts, in that the LEAR protocol was found in the previous litigation to violate the preliminary injunction, and the current cause of action involves MCAO's willful disregard of the preliminary injunction, in order to establish that Sands and others committed civil contempt, crucial facts must be found which were not at issue in determining whether the LEAR protocol violated Plaintiffs' constitutional rights. For example, Sands' personal responsibility for implementing the preliminary injunction was not at issue in the previous litigation but is at the crux of the current cause of action, to the extent that it pertains to Sands.

Likewise, different evidence is needed to prove that Sands and others committed civil contempt. Evidence regarding the chain of command at the MCSO and the efforts or lack thereof on the part of individuals in their various capacities to implement changes and communicate the terms of the preliminary injunction to the HSU deputies is essential to the contempt cause of action, but not to the previous causes of action. Additionally, some of the evidence relevant to the contempt cause of action was withheld from Plaintiffs until recently and thus could not have been presented in the previous action.

Moreover, the two suits involve infringement of fundamentally different rights. The Court's order issued on October 2, 2013 addressed Plaintiffs' rights under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The present litigation addresses Plaintiffs' right to seek enforcement on the judgment, in other words, their right to see that the Court's orders are obeyed. *See* Restatement (Second) of Judgments § 18 (1982) ("[W]hen a plaintiff has obtained a judgment other than one for the payment of money—such as a judgment ordering the defendant to engage or refrain from engaging in certain conduct—the plaintiff may seek enforcement of the judgment . . . by application for contempt or other sanctions, and with the passage of time, revivor or suit upon the judgment may become necessary to effectuate or preserve the plaintiff's rights."); *cf. Harris*, 621 F.2d at 344 (holding that res

judicata does not apply where the prior claim was founded on the Eighth Amendment and the current claim was premised on the Due Process Clause of the Fourteenth Amendment).

Finally, no rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action. Whether or not Sands is found to have committed civil contempt while he was in a position of power at the MCSO, the October 2, 2013 order will remain intact and unimpaired—the MCSO will continue to be permanently enjoined from committing the acts prohibited by the order.

Therefore, the Court holds that there is no identity of claims between the contempt cause of action and the previously litigated causes of action, and therefore res judicata does not apply.[1]

**CONCLUSION**

Plaintiffs' contempt claim against Chief Brian Sands is not barred by the doctrine of laches, as Plaintiffs did not unreasonably delay in seeking contempt charges against him. Furthermore, factual issues remain regarding whether Sands was prejudiced by any such delay. Plaintiffs' contempt claim against Sands is not precluded by the merger doctrine of res judicata, as there is no identity of claims between previously litigated causes of action and the current contempt cause of action.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of Retired Executive Chief Brian Sands (Doc. 1214) is **DENIED**.

Dated this 5th day of January, 2016.

_____
Honorable G. Murray Snow
United States District Judge

---

[1] The parties dispute whether the October 2, 2013 order was a final judgment on the merits and whether the parties are in privity. Because there is no identity of claims, res judicata is not applicable, *Harris*, 621 F.2d at 343, and therefore the Court need not reach these issues.