1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega Melendres,    )
     et al.,                              )
5                                         )
                    Plaintiffs,           )  No. CV 07-2513-PHX-GMS
6                                         )
                    vs.                   )  Phoenix, Arizona
7                                         )  March 1, 2016
     Joseph M. Arpaio, et al.,            )  10:08 a.m.
8                                         )
                    Defendants.           )
9    _____ )

10

11

12

13

14
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                    BEFORE THE HONORABLE G. MURRAY SNOW
16
                          (In-Court Hearing)
17

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                         A P P E A R A N C E S

2

3   For the Plaintiffs:
             American Civil Liberties Union Foundation
4            Immigrants' Rights Project
             By:  Cecillia D. Wang, Esq.
5            39 Drumm Street
             San Francisco, California  94111
6
             American Civil Liberties Union Foundation
7            Immigrants' Rights Project
             By:  Andre Segura, Esq. - Telephonically
8            125 Broad Street, 18th Floor
             New York, New York  10004
9
             Covington & Burling, LLP
10           By:  Stanley Young, Esq.
             By:  Michelle L. Morin, Esq. - Telephonically
11           333 Twin Dolphin Drive, Suite 700
             Redwood Shores, California  94065
12
    For the Defendant Maricopa County:
13           Walker & Peskind, PLLC
             By:  Richard K. Walker, Esq. - Telephonically
14           SGA Corporate Center
             16100 N. 7th Street, Suite 140
15           Phoenix, Arizona  85254

16  For the Defendant Joseph M. Arpaio and Maricopa County
    Sheriff's Office:
17           Iafrate & Associates
             By:  Michele M. Iafrate, Esq.
18           649 N. 2nd Avenue
             Phoenix, Arizona  85003
19
             Jones, Skelton & Hochuli, PLC
20           By:  A. Melvin McDonald, Jr., Esq. - Telephonically
             By:  John T. Masterson, Esq.
21           By:  Joseph T. Popolizio, Esq.
             By:  Justin M. Ackerman, Esq.
22           2901 N. Central Avenue, Suite 800
             Phoenix, Arizona  85012

23

24

25

1                        A P P E A R A N C E S

2


3     For the Movants Maricopa County Attorney's Office and Maricopa
      County Attorney William Montgomery:
4              Ridenour Hienton, PLLC
               By:  Ernest Calderon, Esq.
5              Chase Tower
               201 N. Central Avenue, Suite 3300
6              Phoenix, Arizona  85004

7     For the Intervenor United States of America:
               U.S. Department of Justice - Civil Rights Division
8              By:  Paul Killebrew, Esq.
               950 Pennsylvania Avenue NW, 5th Floor
9              Washington, D.C.  20530

10             U.S. Department of Justice - Civil Rights Division
               By:  Jennifer L. Mondino, Esq. - Telephonically
11             By:  Maureen Johnston, Esq. - Telephonically
               601 D. Street NW, #5011
12             Washington, D.C.  20004

13    For Deputy Chief Jack MacIntyre:
               Dickinson Wright, PLLC
14             By:  David J. Ouimette, Esq. - Telephonically
               1850 North Central Avenue, Suite 1400
15             Phoenix, Arizona  85004

16    For Executive Chief Brian Sands:
               Lewis, Brisbois, Bisgaard & Smith, LLP
17             By:  M. Craig Murdy, Esq.
               2929 N. Central Avenue, Suite 1700
18             Phoenix, Arizona  85012

19    For the State of Arizona:
               Office of the Arizona Attorney General
20             By:  Paul W. Ahler
               Fraud and Special Prosecutions Division Chief
21             1275 W. Washington Street
               Phoenix, Arizona  85007-2926
22
      Also present:
23             Chief Deputy Gerard Sheridan

24

25

1                    P R O C E E D I N G S

2

3           THE COURT:  Please be seated.

4           THE CLERK:  This is civil case number 07-2513,

5    Melendres, et al., v. Arpaio, et al., on for in-court hearing.    10:07:57

6           MS. WANG:  Good morning, Your Honor.  Cecillia Wang

7    for the plaintiffs.

8           THE COURT:  Good morning.

9           MR. YOUNG:  Good morning, Your Honor.  Stanley Young

10   for plaintiffs.                                                   10:08:05

11          THE COURT:  Good morning.

12          MR. KILLEBREW:  Good morning, Your Honor.  Paul

13   Killebrew for the United States.

14          THE COURT:  Good morning.

15          MR. MASTERSON:  Good morning, Judge Snow.  John         10:08:10

16   Masterson and Justin Ackerman for Sheriff Arpaio and the

17   individual alleged contemnors.

18          THE COURT:  Good morning.

19          MS. IAFRATE:  Good morning, Your Honor.  Michele

20   Iafrate on behalf of Joseph Arpaio and the individual alleged    10:08:22

21   contemnors.

22          MR. MURDY:  Good morning, Your Honor.  Craig Murdy on

23   behalf of retired Chief Brian Sands.

24          THE COURT:  Good morning.

25          Do we have anybody on the phone?                         10:08:34

 1          MR. SEGURA:  Good morning.  Andre Segura for

 2   plaintiff.

 3          MS. MONDINO:  This is Jennifer Mondino for plaintiff

 4   intervenor.

 5          MS. MORIN:  And this is Michelle Morin with Covington          10:08:53

 6   for plaintiff.

 7          MS. JOHNSTON:  This is Maureen Johnston, also for

 8   plaintiff intervenor.

 9          MR. WALKER:  Your Honor, this is Richard Walker

10   appearing on behalf of Maricopa County.          10:09:05

11          MR. McDONALD:  Good morning, Your Honor.  This is Mel

12   McDonald making a special appearance for Sheriff Joe Arpaio.

13          MR. OUIMETTE:  Good morning, Your Honor.  David

14   Ouimette specially appearing for Deputy Chief MacIntyre.

15          THE COURT:  Have we heard from everyone?          10:09:26

16          All right.  Thank you.

17          We had set this morning for several purposes, which

18   may take some time or may take no time at all, but they were

19   principally related, Mr. Masterson, to specific instances that

20   you felt still needed to be kept under seal.  Obviously, I          10:09:43

21   understand that we may need to proceed under seal, but I told

22   you when we set this conference that there would be other

23   matters that I might inform you of, and just as when I allowed

24   you to file written closings to my questions before closing

25   arguments, I'd just give you the chance to comment.          10:10:01

1          I'm not compelling you to comment if you don't want;

2    I'm just highlighting for you exhibits and giving you the

3    opportunity.  I think I've made other rulings.  I've set forth

4    other matters.  If you're unclear any of those, I'm happy to

5    answer the questions to the extent that I can, or hear you if          10:10:20

6    any party wants to be heard on any of the other matters I've

7    noticed.

8          Mr. Masterson, do you want to be heard on any of those

9    matters?

10         MR. MASTERSON:  Just briefly, Judge.  And if this is          10:10:30

11   okay with you, how we were going to do this is I was going to

12   handle 1 through 3 of the February 19 order, and then 9 through

13   11.  Ms. Iafrate is going to deal with 4 through 8, whether you

14   have questions or she has some comments she wants to make with

15   respect to those.          10:10:51

16         THE COURT:  Okay.

17         MR. MASTERSON:  And then you also issued an order on

18   Friday, last Friday.

19         THE COURT:  Yes, I just sort of supplemented it.

20         MR. MASTERSON:  I think, again, 1 may be something you          10:10:59

21   want to discuss with Ms. Iafrate or she may wish to discuss

22   with you, and number 2 is probably me.

23         THE COURT:  All right.  Well, I'm not sure that I've

24   divided them out that same way, I've kind of lumped them

25   together, so you can be specific.          10:11:13

1          How do plaintiffs intend to handle them?

2          MS. WANG:  Your Honor, I will handle questions 1, 7,

3  and 8, to the extent that plaintiffs have anything to offer on

4  that, and I'll also handle any issues relating to the sealing

5  of documents and exhibits relating to the Mackiewicz          10:11:29

6  investigation, and Mr. Young will handle the balance.

7          THE COURT:  All right.  So who wants to go first?

8          I don't mean to suggest that I have forgotten

9  plaintiff-intervenors, or, Mr. Murdy, that I've forgotten you.

10  I did receive and review your written filing yesterday, and so  10:11:46

11  that doesn't mean you can't speak today, but I have reviewed

12  that.

13          MR. MURDY:  All right.  Thank you, Your Honor.

14          THE COURT:  Ms. Wang.

15          MS. WANG:  Thank you, Your Honor.                    10:11:58

16          Your Honor, I believe there are some issues relating

17  to sealing that we need to address.  The Court had indicated

18  that Exhibits 1335, 1520- -- sorry, documents 1335, 1529, and

19  1456 are at issue.  These all relate to the Mackiewicz

20  investigation.  Plaintiffs' view is that there is no basis to  10:12:32

21  seal any of those documents.

22          To the extent that the investigation is closed,

23  obviously, there would be no need to seal them, and we would

24  leave it to defendants to give a report on that status.  But

25  even if there were still an open investigation, our position as  10:12:49

 1    to those particular documents is that they were discussed in

 2    great detail, the subject matter was discussed in great detail

 3    during the contempt hearing in open court --

 4            THE COURT:  Let me just offer, I think, a few words of

 5    clarification.  I believe that defendants were only moving to      10:13:05

 6    seal Exhibit 14 to document 1335, is that right, Mr. Masterson?

 7            MR. MASTERSON:  That's correct, Judge.

 8            THE COURT:  So there is no issue about Exhibits 8, 9,

 9    10, 11, 13, 15, or 16 in document 1335, correct?

10            MR. MASTERSON:  Correct.                                    10:13:22

11            THE COURT:  All right.

12            MS. WANG:  Thank you.

13            THE COURT:  So I have not read in great detail the

14    contents of Exhibit 14.  I do believe I skimmed it before last

15    time, and I do have a recollection of some of its contents.        10:13:33

16    They're fairly broad ranging, and some of them have nothing at

17    all to do with Mr. Mackiewicz's investigation, so I invited

18    Mr. Masterson to come back with specifics and I would hear him,

19    if he needed to, under seal.

20            So before we go any further as it pertains to              10:13:51

21    Exhibit 14, I want to give him the opportunity to make that

22    record if he feels like he needs to make it under seal with

23    specifics.

24            Document 1456 is 54 pages of the transcript of

25    Lieutenant Seagraves' testimony on October 1st.  And then          10:14:09

1   document 1529 is the statement lodged under seal by the Arizona

2   attorney general pertaining to my inquiries about the status of

3   the investigation.

4        Is it still your view as to all of those things that

5   they should -- all or part of them should remain under seal,          10:14:34

6   Mr. Masterson?

7        MR. MASTERSON:  Yes, Your Honor, and I forgot to

8   mention to the Court we have Mr. Ahler here from the Attorney

9   General's Office.  He can address these issues if you wish.

10       THE COURT:  All right.  Well, why don't we do --               10:14:46

11       Mr. Ahler, I don't know how busy you are.  I'm not

12  sure how long this other stuff will take, but I would rather

13  resolve it first.

14       The other thought I had, in light of your concern,

15  Mr. Masterson, that you didn't want to be messing with                10:15:01

16  Mr. Ahler, even though I realize -- in light of the ongoing

17  potential investigation, I thought of perhaps a unique

18  procedure, and that is maybe I could speak directly with

19  Mr. Ahler ex parte.  So both of you can think about that as to

20  whether or not you're comfortable or uncomfortable with it if         10:15:23

21  you have objections when we go under seal.

22       But that being said, Ms. Wang, unless you feel like

23  you can address the remainder of what you have to say without

24  trampling on what I'm going to at least give Mr. Masterson the

25  opportunity set forth under seal, then I think we need to move        10:15:38

1    on.

2              MS. WANG:  Sure.  Why don't I just say this, Your

3    Honor, before moving on, that plaintiffs also would move to

4    unseal Exhibits 2015 and 2016.

5              THE COURT:  Which are part of the Tennyson testimony?    10:15:53

6              MS. WANG:  That's right.  2015 is the memo from Chief

7    Lopez to Chief Sheridan about Mary Ann McKessy's allegations,

8    and 2016 is Jennifer Johnson, the civilian analyst's memorandum

9    on the Mackiewicz investigation.

10             THE COURT:  Were there any other exhibits admitted    10:16:10

11   during that testimony?

12             MS. WANG:  I believe so, yes.  And at least as to

13   Exhibit 2016, Mr. Segura questioned Sergeant Tennyson about the

14   subject matter of the document at length in open court.

15             THE COURT:  I guess my question, to be more specific,    10:16:24

16   is this.  I do not know whether 2015 and 2016 were the only

17   exhibits admitted in that under-seal portion.  I'm not sure

18   whether the exhibits have been released from seal or were ever

19   put under seal, but is your motion to release all exhibits that

20   were made during the Seagraves testimony?    10:16:44

21             MS. WANG:  Your Honor, I beli- -- for the moment, just

22   2015.

23             THE COURT:  What I mean is admitted under -- admitted

24   during the Seagraves testimony.

25             MS. WANG:  Your Honor, I believe those are the two    10:16:54

```
 1   that remain unsealed and not at issue today, so those -- those

 2   are the ones that we would move to unseal.

 3              THE COURT:  Do you agree with that, Mr. Masterson?

 4              MR. MASTERSON:  I'm not sure if there were other

 5   exhibits that were admitted during the Seagraves testimony.       10:17:07

 6              THE COURT:  Well, I do not know, but I do seem to

 7   recall that there was a recording that was at issue, and I'm

 8   not sure whether that was admitted during the under-seal part

 9   or not, so I just raise that for your consideration.

10              MR. MASTERSON:  What I'd like to do, Judge, is        10:17:28

11   possibly take a look at that testimony, and then if there are

12   additional matters or exhibits, then we can file a quick brief

13   with you and let you know what our position is.

14              THE COURT:  All right.

15              MS. WANG:  All right, Your Honor.  I'll move on to     10:17:40

16   question 1, then.  We'll be brief on this.  For plaintiffs, the

17   Court's question is whether the findings in the Court's trial

18   ruling regarding the incorrect training on authority to enforce

19   immigration law, whether that finding is still relevant in the

20   contempt hearing.                                                10:17:59

21              Plaintiffs' position is that it is relevant, for the

22   simple reason that the contempt -- the evidence in the contempt

23   hearing shows that the status quo that the Court enjoined

24   through the preliminary injunction order remained in place, and

25   so the Court's earlier ruling shows what that status quo was,    10:18:18
```

1    and therefore is obviously relevant.

2         Moving on to question 7 regarding the accuracy of

3    statements made by defendants in the documents referenced in

4    paragraphs 5 to 6 of the Court's February 19th, 2016 order,

5    Your Honor, plaintiffs do take issue with the accuracy of some          10:18:51

6    aspects of those reports.  We do not have adequate information

7    to assess comprehensively the accuracy of those reports on the

8    status of Internal Affairs investigations by MCSO, but we do

9    know enough, just from the face of the reports themselves and

10   the evidence at the contempt hearing, that there were certain          10:19:14

11   discrepancies in the descriptions of the Internal Affairs

12   investigations, and that in general, or in some aspects, at

13   least, the reports overstated or -- the adequacy of those

14   investigations, or didn't fully set out the problems that were

15   being investigated.                                                     10:19:39

16         I'll give a few examples if you like, Your Honor.

17         THE COURT:  Well, I guess that what I would ask you to

18   do at this point is restrict your examples to items that are in

19   the record, either in exhibits or through testimony, and if you

20   can do that, then please proceed.                                       10:20:00

21         MS. WANG:  Yes.

22         THE COURT:  If you have become aware of things that

23   are not in the record, then while I may consider opening it up

24   for final questions that I might pose, I don't want to hear

25   them today.  I'm not sure yet that they'll be necessary.               10:20:13

1          MS. WANG:  Your Honor, most of our examples are

2     restricted to the documents that are in the record on contempt.

3          THE COURT:  All right.

4          MS. WANG:  First, Your Honor, I would just note that

5     plaintiffs do not appear to have many of the IA files that are          10:20:27

6     listed in some of those status reports that were filed by the

7     defendants, and in others cases we have an incomplete file,

8     it's very clear that we have an incomplete file, and so we

9     would just note that that's the reason that we are unable to

10    assess the accuracy of the reports comprehensively.                      10:20:51

11          Second, Your Honor, in comparing earlier update

12    documents, including document 786 with Exhibit 2943A, we

13    noticed some discrepancies that came out.  There were three IA

14    cases in which there were principals listed in either document

15    786 or document 848 that did not later appear in Exhibit 2943A.          10:21:16

16    Those were 14-542, 14-801, and 15-18.  So, in other words, an

17    earlier update document referred to certain principals in the

18    investigations that somehow had disappeared by the time of the

19    later summary report.

20          And then third, Your Honor, in document 786 in                     10:21:47

21    particular, which was in response to the Court's order of

22    October 22nd, 2014, I think it's fair to say that the

23    defendants generally were painting a picture of Internal

24    Affairs investigations as trying to get to the bottom of

25    possible wrongdoing.  But we know from the subsequent evidence           10:22:08

 1  in the contempt hearing that in fact, certain of those

 2  statements were very much overstated as to the robustness of

 3  the IA investigations, and I'll give a few examples that are in

 4  the record.

 5          For example, document 786 at page 2 states:  The          10:22:25

 6  investigation -- referring to the 14-221 and 14-295 cases --

 7  cannot be clearly designated as criminal or administrative

 8  because when this investigation began, it was not clear why

 9  these items of evidence and various MCSO reports were at

10  Armendariz's home, end quote.  But as we later saw from          10:22:51

11  testimony at the contempt hearing, including Chief Sheridan's,

12  there was a conscious decision made to designate the

13  investigation as criminal, and there was testimony from Chief

14  Sheridan that he did so in order to try to address what he

15  anticipated would be complaints from the plaintiff class.          10:23:10

16          At page 2 of 786 regarding, again, 14-221, the report

17  stated because Armendariz is now deceased, the intent of MCS

18  has always been, A, to identify where these items of property

19  came from; B, whether they were properly seized, and, if not,

20  to identify the possible victims; C, to identify which, if any,          10:23:35

21  other MCSO personnel were aware of Armendariz's possession of

22  these items; and D, what, if any, knowledge or involvement they

23  had with respect to this property.

24          But again, the evidence at the contempt hearing showed

25  that in fact, 14-221 became a dumping ground, in essence, for          10:23:51

1   any items of property that could not be attributed to other

2   deputies, and those were all attributed to Armendariz, who, of

3   course, was deceased by that time.

4        The 221 and 295 investigations actually were conducted

5   in a way where investigators did little to nothing to either          10:24:14

6   trace items back to their owners, or to trace the items to

7   deputies other than Armendariz who were responsible for their

8   mishandling or improper seizure, and the failure to follow up

9   with Detention Officer Montoya is a key and glaring example of

10  that.  So, again, this was an instance where the later evidence       10:24:36

11  at the contempt hearing showed that the statements made about

12  the robustness of the 221 investigation in document 786 were

13  overstated, to put it mildly.

14       Again, page 8 of document 786, referring to the 14-541

15  IA case, stated the majority of the PSB administrative                10:25:01

16  investigation would rely on information from the criminal

17  inquiry.  But the testimony at the contempt hearing, again,

18  demonstrated the ways in which the initiation of the criminal

19  IA case, 14-295, interfered in various ways with the general

20  conduct of that investigation as it turned into an                    10:25:21

21  administrative one.

22       Because principals initially were questioned in a

23  criminal context, they were not given the usual admonition to

24  keep the information confidential, and we heard testimony that

25  word quickly spread to all of the suspects who became                 10:25:40

 1   principals in the administrative case, and they had advance

 2   warning prior to being investigated; and therefore uniformly

 3   made categorical denials in response to rote and superficial

 4   questions that were posed by investigator Sergeant Tennyson.

 5        Another one, Your Honor, which I think is very                 10:25:58

 6   critical, is that at page 12 of document 786 regarding the

 7   14-547 case regarding the stop of Ms. Ontiveris in which

 8   deputies and Sergeant Palmer were caught on the recording

 9   referring to six f'ing Guatemalans, the derogatory remark that

10   was at issue in the investigation was not even mentioned in       10:26:24

11   document 786, even though it's clear from the description given

12   by defendants in document 786 that that portion of the

13   recording had been reviewed.  In other words, the report given

14   in document 786 did not reflect the nature of the statement

15   that was made, the nature of the investigation, and how it was    10:26:46

16   directly linked to the civil rights issues in this litigation.

17        Your Honor, there are a number of other examples I

18   could give where document 786 or other reports turned out not

19   to be complete or accurate, based on -- as compared to the

20   evidence at the contempt hearing.                                 10:27:10

21        They're numerous, so I don't want to take up too much

22   time.  Would you like me to proceed?

23        THE COURT:  No.  Well, you don't need to give me more

24   examples.

25        MS. WANG:  Okay.  Thank you, Your Honor.                     10:27:24

1          THE COURT:  Thank you.

2          MR. YOUNG:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. YOUNG:  So going down the remaining items in the

5    Court's February 19 order, with respect to item number 2, it is          10:27:41

6    our view that credibility is certainly relevant in this action.

7    The sheriff's false testimony regarding Queen Creek, which was

8    contrary to the plain meaning of the documents, was an attempt

9    to deceive the Court with respect to the underlying issues of

10   racial profiling.  That effort is highly relevant to what the          10:28:08

11   Court may decide with respect to the sheriff's contempt.

12          Basically, one issue in this case, and it goes from

13   the beginning to the end, whether it was about the purpose of

14   the sheriff's efforts in chasing after people who were

15   brown skinned, or whether it was all the way to the          10:28:32

16   investigation of the Court, which both Sheriff Arpaio and Chief

17   Sheridan lied about under oath to this Court, it was an effort

18   to obstruct justice and obstruct the rights of the plaintiff

19   class in this case, and for that reason, we believe that the

20   issue that the Court has identified with respect to the          10:28:56

21   specific testimony about Queen Creek is highly relevant.

22          With respect to question number 3, that's the issue of

23   the testimony that the Court earlier cited with respect to the

24   continuation of the practice of detaining people based solely

25   on unlawful presence, that testimony, when you combine it with          10:29:20

 1   the other information that we have since learned, powerfully

 2   demonstrates the intentionality of the acts, the violation of

 3   the injunction, and supports the strongest possible remedy.

 4         We now know that not only were they continuing that

 5   policy, but MacIntyre, Sands, Palmer, and Casey all told          10:29:43

 6   Sheriff Arpaio, and all knew themselves, that what the MCSO was

 7   doing was wrong.  And that, I think, is also highly relevant to

 8   the contempt issue.

 9         Skipping now to --

10         THE COURT:  Have you read Mr. Murdy's brief?              10:30:04

11         MR. YOUNG:  I have, briefly, Your Honor, and I think

12   I -- I disagree with it.  I think the efforts that

13   Sergeant Palmer made, for example, in generating the training

14   scenarios shows that they were aware that something needed to

15   change.  They all knew that in the end, nothing actually         10:30:26

16   changed.

17         Now, perhaps there's been some loss of information --

18         THE COURT:  When I talk about his brief, I'm talking

19   about what he filed yesterday.

20         MR. YOUNG:  Yes, that's -- I did read that briefly         10:30:40

21   yesterday.

22         THE COURT:  Okay.

23         MR. YOUNG:  We'd like a chance to respond to that if

24   Your Honor would allow, but I do -- I don't think that -- if

25   Your Honor has a particular question about a particular fact --  10:30:51

1          THE COURT:  Well, I'm asking about his assertion that

2     it would be hearsay for me to consider the previous testimony

3     in this matter.

4          MR. YOUNG:  Well, Chief Sands testified in the earlier

5     trial.  I think Your Honor would be perfectly justified to          10:31:07

6     consider that testimony as a prior statement by Chief Sands

7     himself.  Chief Sands may have, speaking for himself, a point

8     with respect to those other issues, but -- as to the other

9     testimony, but I do think that it is, nonetheless, permissible

10    for the Court to consider matters that are the subject of the      10:31:35

11    Court's own prior rulings, and Mr. Sands' counsel will have the

12    opportunity to address those issues today.

13         THE COURT:  All right.  Thank you.

14         MR. YOUNG:  With respect to question number 9 --

15         THE COURT:  Also, I guess, before we leave               10:31:55

16    Chief Sands' arguments, he argues that this is actually a

17    different matter.

18         Is this a different matter or is it the same matter?

19         MR. YOUNG:  It's the same lawsuit.  Obviously, we're

20    in a contempt proceeding.  There's been evidence presented in      10:32:09

21    the contempt proceeding.  I take it that Mr. Sands' objection

22    is that those other matters were not introduced as evidence in

23    the current proceeding, and therefore he did not have a chance

24    to confront them.  As to his own prior testimony, I don't think

25    that's right; and as to the remaining testimony, I mean, I         10:32:28

1    don't think he's going to contest that what the Court earlier

2    cited was actually what happened.  He himself has admitted that

3    despite his own misgivings about the policy, the policy didn't

4    change; they kept doing exactly what they were doing.  So I

5    think the Court can consider that fact, which is in evidence in    10:32:50

6    the contempt hearing.

7           THE COURT:  All right.  Thank you.

8           MR. YOUNG:  With respect to paragraph 9, this was the

9    Court's earlier order requesting briefing on the issue of the

10   effect of certain prior Ninth Circuit and Supreme Court cases    10:33:04

11   on the ability of the Sheriff's Office to detain people based

12   solely on unlawful presence.

13          And what was said then, on behalf of Sheriff Arpaio

14   and the MCSO by Mr. Casey, was that they were not doing that.

15   And in fact they kept not doing that.  And I think what that    10:33:22

16   reflects, again, is the sheriff's misstatements to his own

17   lawyers.

18          The sheriff has lied to this Court.  I don't put it

19   beyond him, therefore, to lie to his own lawyer, which is what

20   Mr. Casey, in effect, said about what the Sheriff's Office was    10:33:41

21   doing and was the reason why he made the statements he made,

22   the incorrect statements he made, both to this Court and to the

23   Ninth Circuit.  Mr. Casey, of course, later became frustrated

24   with the sheriff's attitude toward this Court and toward

25   compliance with the orders of this Court and resigned.    10:34:02

1          So I think that the matters on the docket that the

2     Court identified certainly as to the sheriff, who's been a

3     party all along, and who had a chance to address Mr. Casey's

4     testimony, can certainly be held accountable for these

5     misstatements that he made not only to this Court, but to his          10:34:27

6     own lawyer.

7          With respect to question number 10, the additional

8     detail in docket number 1588, we do object to the Court's

9     consideration of that additional information that is simply

10    stated in the pleading with no testimony to support it.  We          10:34:46

11    didn't have a chance to ask questions about it.  We don't think

12    it should be addressed by the Court or considered by the Court.

13         With respect to topic number 11, the Court has made

14    its rulings.  I would add, of course, that under Federal Rule

15    of Evidence 803(b), records of a regularly conducted activity,          10:35:07

16    much of this -- or all of this information would additionally

17    be admissible.

18         There's also a line of cases which I'll briefly

19    mention which basically specifically provide that it is not

20    information offered for the truth of the matter asserted if          10:35:29

21    it's offered for the purpose of explaining why a government

22    investigation was undertaken.  So hearsay testimony, or what

23    would otherwise be hearsay testimony, is not barred by the

24    hearsay rule if it is offered for the limited purpose of

25    explaining why a government investigation was undertaken.          10:35:50

1           Cases there include United States versus Obi,

2   239 F.3d 662, 668.  That's a Fourth Circuit case.  And United

3   States versus Freeman, 816 F.2d 558, 563.  That's a Tenth

4   Circuit case from 1987.  And also a Ninth Circuit case, United

5   States versus Standley -- that's 121 F. App'x 728, 729, that's          10:36:21

6   Ninth Circuit (2005) -- where the information -- and this would

7   be relevant to what Montgomery said -- is simply offered to

8   explain why the MCSO did what it did, that's not offered for

9   the truth of the matter asserted; it's not excludable based on

10  the hearsay rule.          10:36:46

11          With respect to the particular documents that are

12  listed, I think it's worthwhile noting that many of those

13  documents were not the subject of an objection.  They were

14  admitted --

15          THE COURT:  Yeah, if they weren't the subject of          10:37:02

16  objection, I'm not going to allow them to raise it now, but

17  they did make some 805 objections --

18          MR. YOUNG:  There were --

19          THE COURT:  -- not as to all of those documents.

20          MR. YOUNG:  There were very few, Your Honor, and I          10:37:15

21  would reserve the right, if Mr. Masterson raises them with

22  respect to particular exhibits, to rebut as to those.  I

23  can't -- it doesn't make sense for me to go through each and

24  every one.  But I would note that even as to exhibits where

25  there were objections, often the objections were only as to          10:37:31

```
 1   relevance and under 403 and hearsay objections were not

 2   preserved as to many of the exhibits as to which objections

 3   were made.

 4          I do have a factual issue.  As I was looking at some

 5   of these exhibits that the Court mentioned, in particular 2092,   10:37:48

 6   2271, and 2273, there was some --

 7          THE COURT:  I don't know when you stopped among the

 8   documents.  2090 was one document?

 9          MR. YOUNG:  Yes.

10          THE COURT:  And then next?                                 10:38:02

11          MR. YOUNG:  2271.

12          THE COURT:  Okay.

13          MR. YOUNG:  And 2273.  Those are all exhibits from

14   February 2015, after the Court had indicated that it would

15   consider a contempt finding as to the sheriff and             10:38:13

16   Mr. Montgomery and Mr. Zullo were talking about what they might

17   be able to do in light of the Court's intention to consider

18   contempt with respect to the violation of the order.  And

19   they're talking about data that's relevant to that.

20          Now, there's some information that would lead one to  10:38:34

21   believe that the data that they were talking about could be

22   personal banking or IRS data of this Court.  There was a lot of

23   testimony about that.  I asked Mr. Zullo about that and he

24   said:  Well, no.  The data's actually relating to the

25   information about Sheriff Arpaio's voice, and whether there had  10:38:58
```

1    been wiretaps that captured the sheriff's voice.

2           I think that the information could lead to both sets

3    of data being what they were talking about.  Mr. Zullo and the

4    sheriff both testified that as of February 2015, part of what

5    they were looking into was the so-called identity theft that          10:39:20

6    they attempted to say was being inflicted upon the Court.  Our

7    view was that they were seeking financial data of the Court to

8    use in some way that was relevant to the contempt proceeding.

9           THE COURT:  Didn't Mr. Zullo testify that the only

10   time that the Court's banking information -- and I'm not sure          10:39:42

11   that I accept this but I'm going to evaluate it -- didn't he

12   say, at least at one point in his testimony, that the only time

13   that the Court's banking information came up from

14   Mr. Montgomery was at the very initial part of his contact with

15   Mr. Montgomery back in November of 2014?                               10:39:59

16          MR. YOUNG:  Well, he did say that, Your Honor, but I

17   would add the following.  And I would refer the Court to page

18   2403, lines 12 through 18, of Sheriff Arpaio's testimony, and

19   at that time the sheriff testified as follows:

20          "Question:  In that early February 2015 time frame, in         10:40:27

21   fact you may have talked to Mr. Zullo about Judge Snow in

22   connection with the banking investigation, because Mr. Zullo

23   was trying to track down information about that matter, is that

24   correct?

25          "Answer:  You talking about the bank investigation?            10:40:46

1          "Question:  Correct.

2          "Answer:  Could be."

3          And then several pages later at page 2406, line 24, to

4   page 2407, line 19, the question is -- and this is part of the

5   deposition:  "Starting at line 16 at page 608:                    10:41:08

6          'Question:  Well, you knew -- he did tell you that he

7   was working on Judge Snow information insofar as he was --

8          'Answer:  Yes.

9          'Question:  -- the victim --

10          'Answer:  Right.                                            10:41:25

11          'Question:  -- potentially of that banking, is that

12   right?

13          'Answer:  Yeah.'"

14          And then going back to what was said here in court:

15          "Question:  Sheriff, you gave that testimony            10:41:36

16   accurately on September 18?

17          "Answer:  About him working on the bank investigation?

18          "Question:  As I just read, yes.

19          "Answer:  I may have, yes."

20          So in February 2015, at the same time as these         10:41:50

21   documents, the sheriff admitted that he was talking to

22   Mr. Zullo about Mr. Zullo working with Mr. Montgomery to get

23   banking information relating to the Court.

24          Now, my larger point is whether it's the banking

25   information, as that testimony indicates, or whether it's      10:42:09

1   getting information on the sheriff's voice in connection with

2   that alleged wiretap, both of those relate to investigations of

3   the Court.  Since they were looking for the sheriff's voice in

4   order to verify the information, alleged information, that

5   Mr. Montgomery had provided that this Court had had the          10:42:30

6   sheriff's phone lines wiretapped.

7          So regardless of whether it was one or the other, it's

8   uncontested that the data that they were seeking in February

9   2015, according to those exhibits, in order to deal in some way

10  with this Court's contempt proceeding, was for the purpose of    10:42:47

11  finding information about the Court that they could use in

12  some -- in some way that I would suggest would have been

13  nefarious.

14         So I think that that, again -- and I'm not repeating

15  myself and I don't want to go on too long -- is highly relevant  10:43:04

16  to the issue of the sheriff's and Chief Sheridan's contempt of

17  this Court's prior orders.

18             THE COURT:  Thank you.

19             MR. YOUNG:  Thank you.

20             THE COURT:  Yes.                                      10:43:22

21             MR. KILLEBREW:  Your Honor, would you like us to be

22  heard now or after the defendants?

23             THE COURT:  Why don't we hear from you now.

24             MR. KILLEBREW:  Okay.

25             THE COURT:  We'll divide up the sides.                10:43:30

1        MR. KILLEBREW:  For the folks on the phone, this is

2   Paul Killebrew for the United States.  I'm just going to

3   address a few of the issues raised by the Court in the February

4   19th order.

5        The first one is the issue about whether Sheriff          10:43:52

6   Arpaio -- the testimony at trial that Sheriff Arpaio trained

7   all 900 deputies on the LEAR protocol.  We think this is

8   relevant not only for the reasons that Ms. Wang pointed out,

9   but also that it -- it helps the Court understand what

10  reasonable efforts would have needed to be made to comply with  10:44:10

11  the Court's 2011 preliminary injunction.  Having trained all

12  900 deputies, the countermanding instruction needed to be given

13  to all 900 deputies not to follow the LEAR protocol, which

14  wasn't done.

15       And in this regard, I would point the Court to In re       10:44:27

16  Transamerica Corporation.  It's 184 F.2d 319 at page 322, a

17  1950 case from the Ninth Circuit.  In that case, a bank had

18  instructed a number of its personnel about a particular

19  transaction.  That transaction was then enjoined and the bank

20  did not stop the personnel from carrying out the transaction.   10:44:53

21  That would have been the appropriate countermanding step, and

22  the Ninth Circuit found that was relevant to the question of

23  whether or not all reasonable efforts had been made.

24       There's a more recent case, Institute of Cetacean

25  Research versus Sea Shepherd Conservation Society,              10:45:08

1   774 F.3d 935.  The pin cite is 947.  It's a 2014 case from the

2   Ninth Circuit that addresses a similar point about the steps

3   that need to be taken once a party has set a course of conduct

4   in motion and that course of conduct becomes enjoined.

5        Incidentally, that case also has language about the      10:45:31

6   limits of the advice-of-counsel defense in contempt

7   proceedings.

8        We also think that that -- the training that was given

9   to all 900 deputies and the testimony about that at trial is

10  relevant to the question of willfulness and intent because     10:45:52

11  there is testimony by Chief Sands that he was specifically

12  instructed not to send the injunction -- specifically

13  instructed by Sheriff Arpaio not to send the injunction to all

14  deputies in the department.

15       With regard to the second question from the Court, as     10:46:08

16  Mr. Young stated, the false testimony given at trial about the

17  Queen Creek operation is certainly relevant to credibility.

18  The Ninth Circuit and this Court's jury instructions, pattern

19  jury instructions, both incorporate the falsus in uno, falsus

20  in omnibus instruction, which, you know, may be used to apply   10:46:35

21  here.  It may also be consistent with a pattern of false -- of

22  spreading false information to the Court.  We think that would

23  be relevant not only to credibility determinations, but also

24  just to contempt in general.

25       And this goes to Mr. Murdy's point as well.  There's a    10:46:52

1    Supreme Court case from 1978, Hutto versus Finney, 437 U.S.

2    678, the pin cite is 687, and in contempt proceedings the court

3    is permitted to take, and quote, the long and unhappy history

4    of the litigation into account.

5           We also note that if the -- if the Court finds that       10:47:17

6    sheriff has not been truthful to the Court, that can also be a

7    separate grounds for contempt.  The inquiry would be whether

8    the untruthfulness was intended to obstruct the judicial

9    process.

10          THE COURT:  That would require a different proceeding,     10:47:31

11   wouldn't it?

12          MR. KILLEBREW:  There's some controversy about whether

13   or not a court can make a summary finding of contempt for

14   providing false evidence, so that there may need to be a

15   different proceeding.  In this instance, there has been        10:47:47

16   extensive testimony given to the Court, and the issues have

17   certainly been visited exhaustively by the parties, so I'm not

18   sure which side of the line that falls on, but the relevant

19   case here is Clark versus United States, 289 U.S. 1, pin cite

20   of 10, 1933 Supreme Court case.                                 10:48:13

21          With regard to the third issue in the Court's order,

22   we again -- this is about the extensive testimony at trial

23   about how MCSO dealt with individuals who were undocumented but

24   they had no evidence of state charges.  Again, we think that

25   this shows the lack of efforts to comply with the Court's       10:48:40

1   orders.  We also think that, as Mr. Young referred to, that

2   testimony, which was all from people who either served in or

3   supervised the HSU, shed some light on the outcome of the

4   internal deliberations we heard about during the contempt

5   proceeding once the injunction came out.  They tell a very          10:49:02

6   consistent story at trial about what their authority is.  Given

7   what we know now about all of the internal debate going on

8   about how to respond to the 2011 injunction, it does suggest

9   that there was an intentional decision not to comply with it

10  that was communicated to the individuals who testified when         10:49:20

11  they -- by the time that they testified at trial.

12          And lastly, the Court has an issue number 8 in the

13  Court's order about the status updates to ongoing Internal

14  Affairs investigations.  We think that this issue -- the Court

15  didn't ask about this, but we think this issue is relevant to       10:49:41

16  remedy.  We view the Court's order about providing status

17  updates on Internal Affairs investigations as a

18  straightforward, fairly administrative order.  The fact that it

19  wasn't complied with speaks to what kinds of orders are going

20  to be necessary down the road.  And that's all we have.             10:49:58

21          THE COURT:  Thank you.

22          MR. KILLEBREW:  Thank you, Your Honor.

23          THE COURT:  Are you leading off, Mr. Masterson?

24          MR. MASTERSON:  Yes, Judge.

25          THE COURT:  Okay.                                           10:50:10

1           MR. MASTERSON:  Judge, Mr. Young told you that --

2    well, he used the phrase "status quo," and this is with respect

3    to question 1 by the Court, and that's not what happened.

4           Did MCSO continue to enforce the law after 287(g) was

5    revoked?  Yes.  But what the evidence shows you and what the          10:50:49

6    Court pointed out in question 1 here is that there was training

7    provided to MCSO deputies which informed them that they could

8    violate -- or, excuse me, they could arrest or detain based

9    upon a violation of federal law, which they believed to be

10   criminal law.  And, again, the testimony the Court referenced        10:51:19

11   was the evidence about Sergeant Palmer doing the research, and

12   then apparently citing a statute that did not exist, and then

13   off we went from there.

14          And what this shows is a reasonable effort or attempt

15   by MCSO to comply with the law, not -- they did not ignore the       10:51:34

16   law; they did not ignore the ramifications of the federal

17   government taking away 287(g) authority.

18          THE COURT:  And I don't want to oblige you to address

19   something you may not have otherwise wished to address, but I

20   did also invite you previously and I'll reinvite you if you          10:51:52

21   wish to, to address Mr. Casey's comments to this Court in

22   response to my questions that the MCSO had trained its deputies

23   that they didn't have the authority to enforce federal civil

24   immigration law, and that they had done so for some time prior

25   to the argument on the preliminary injunction, and cited to          10:52:13

 1   Ninth Circuit law which had been decided the previous spring, I

 2   believe.

 3        MR. MASTERSON:  Judge, I think you did invite us to

 4   comment on that in question 9.

 5        THE COURT:  Right.  But it sort of juxtaposes with          10:52:24

 6   this because it seems to be quite inconsistent during that time

 7   period with what is -- with the versions of what's happening.

 8   It's also inconsistent, I think, with the 900 -- the training

 9   of the 900 MCSO deputies that they continued to have inherent

10   authority to enforce federal civil immigration law, and so I     10:52:48

11   just invite you to address it.

12        MR. MASTERSON:  It does tie together.  It ties

13   together with your question 3 and 9, in that there was a point

14   when 287(g) authority was revoked, the question was asked of --

15   well, someone asked the question, and I can't tell from the      10:53:06

16   record who originally asked the question:  Can we still -- what

17   can we still do? was probably the question asked.  And that's

18   when Sergeant Palmer does his research, and apparently relied

19   on Kris Kobach as well, or at least that's indicated in a

20   footnote, that being present in this country in itself was a      10:53:27

21   criminal violation of federal law, and that MCSO could enforce

22   that.  Now, we know that's incorrect, but that's what was

23   presented to MCSO by Sergeant Palmer.  That is what was

24   trained.

25        Now, we know that was incorrect, but that was not           10:53:48

 1   intentional.  It was not an intentional violation of

 2   constitutional law; rather, it was a mistake, a

 3   misunderstanding, and certainly a misinterpretation of what the

 4   law required at that time.

 5           THE COURT:  How does that change once the Ninth                10:54:05

 6   Circuit had decided their case the previous spring?

 7           MR. MASTERSON:  In the March 2011 case?

 8           THE COURT:  Yeah.

 9           MR. MASTERSON:  Well, now we're launching -- now we're

10   launching into question 9, I believe, and Mr. Casey's --           10:54:21

11           THE COURT:  Yeah, and if you weren't going to answer

12   that, that's fine.  I'll wait until --

13           MR. MASTERSON:  Well, the short answer is then we're

14   dealing with the Arizona human smuggling statute and we're

15   dealing with the Arizona conspiracy statute.                       10:54:35

16           THE COURT:  But not with respect to persons for whom

17   they had no state charges.

18           MR. MASTERSON:  Well, those would be state charges.

19           THE COURT:  But I'm talking about detaining people for

20   whom they had no state charges and turning them over to ICE,       10:54:47

21   which they continued to do.

22           MR. MASTERSON:  I understand that, Judge.  I'm not

23   trying to say that they did not do that.  We all know they did

24   that.  What I'm presenting to the Court is that was not an

25   intentional violation of the law.  And that they -- and steps      10:55:04

1    were taken --

2              THE COURT:  Pursuant to what authority after the March

3    2011 case?  Which Mr. Casey did represent they had trained all

4    of their officers on.

5              MR. MASTERSON:  Understood, but at that point, and I          10:55:20

6    think Mr. Casey also points out in his briefing to the Court,

7    is that you could still stop.  You could use a pretextual stop

8    to enforce Arizona human smuggling and/or the conspiracy

9    statute.

10             THE COURT:  At least that was the belief until the            10:55:39

11   preliminary injunction made it clear that that was not the

12   case.

13             MR. MASTERSON:  That is correct.

14             THE COURT:  Except for that does not apply when there

15   was no applicable state charge, and that did exist well prior          10:55:48

16   to that time.

17             MR. MASTERSON:  Well, but there may well be a state

18   charge.  If you assume -- and I know that Judge Bolton

19   overturned the statute, what, 13-2319, I think, in 2014, but

20   prior to that time --                                                   10:56:07

21             THE COURT:  You're missing my point or I'm

22   misunderstanding something.  After March 2011, can you detain

23   somebody for whom you have no probable cause to believe there

24   is a state charge?

25             MR. MASTERSON:  No.                                          10:56:20

1          THE COURT:  But MCSO did that.

2          MR. MASTERSON:  Well, but they could detain based upon

3    a state charge of human smuggling.

4          THE COURT:  That isn't my question.  There is no basis

5    to detain somebody for whom you have no state charge after          10:56:38

6    March 2011.  And if you don't have probable cause for a state

7    charge, or if you determine that you're not going to charge

8    them, you can't hold them and turn them over to ICE.  There's

9    no way to do that after March 2011.

10          MR. MASTERSON:  Agreed.  So -- well, we're back to          10:56:56

11    the -- I think we're back to the point that was made, well,

12    throughout this case, it certainly was made in closing and it

13    is being made again today, is that what you have is not

14    intentional violations but misunderstandings and

15    misapplications of the law by MCSO deputies at that particular          10:57:14

16    time.

17          And I think the Court even recognized that in document

18    579, which is a court order of May 24, 2013, at page 101.  What

19    the Court finds is that the MCSO operated under that

20    misunderstanding during most of the period relevant to this          10:57:40

21    lawsuit.  That being that they could enforce federal

22    immigration law, in that it was a crime to be in the country

23    unlawfully.

24          THE COURT:  I made it clear in the December 2011 order

25    that it wasn't a crime to be in the country unlawfully, didn't          10:58:01

1    I?

2              MR. MASTERSON:  You did.

3              Now I'm going to move to question 2 of the February 19

4    order.  The statement's made in there that Sheriff Arpaio

5    provided incorrect information under oath as it pertained to          10:58:21

6    MCSO specific small-scale operation at Queen Creek.

7              Here, obviously we're not dealing with any violation

8    of the injunction since this event occurred in 2007.  What we

9    have is testimony by Sheriff Arpaio as to how this operation

10   came to be.  And what we had was a complaint provided by the        10:58:41

11   town manager.

12             THE COURT:  I'm well aware of the facts.

13             MR. MASTERSON:  Okay.

14             THE COURT:  And the documentation at the time, and I

15   did review that in the order.                                        10:58:53

16             MR. MASTERSON:  Well, is the Court's question, then,

17   Sheriff Arpaio seemed to feel that the operation would not have

18   occurred as quickly as it did; rather, the complaint would have

19   been evaluated by detectives, investigated, and an operation

20   may have occurred several weeks down the road?                       10:59:08

21             THE COURT:  No, my point is that Sheriff Arpaio

22   testified at the time that that operation was one to enforce

23   state charges and did not arise out of any complaint relating

24   to background of race or anything like that, and all the

25   documents that pertain to that investigation demonstrate quite      10:59:27

 1   clearly that that's exactly how it arose, there was not a

 2   single state charge brought against any of the persons who were

 3   arrested, they were all arrested, and they were all turned over

 4   to ICE.  So it really relates to the credibility of Sheriff

 5   Arpaio in making that testimony.                          10:59:44

 6          MR. MASTERSON:  Well, Judge, what we have here, we

 7   have the situation where the town manager of Queen Creek -- and

 8   MCSO has a contractual obligation to enforce the law in Queen

 9   Creek pursuant to their agreement.  You get an e-mail from the

10   town manager of Queen Creek that citizens of Queen Creek are    11:00:03

11   being harassed.  Specifically, a woman in her car is approached

12   on the driver's side window and harassed by a male.  Now, is it

13   a Hispanic male?  Yeah.

14          Further -- and this is -- Judge, I know you know these

15   facts, but counsel here's throwing around we're chasing brown   11:00:21

16   people around.  That's offensive, it's disgusting, and it's not

17   true.  What we have is information from Queen Creek town

18   manager that children are being harassed by these people, that

19   their pictures are being taken, and MCSO is out there a couple

20   days later in an operation, and I believe they should have been  11:00:38

21   there.  If I'm a citizen in Queen Creek and my kid's being

22   harassed --

23          THE COURT:  Once there's state charges, if there are

24   state charges.  But there were no state charges.

25          MR. MASTERSON:  Well, not yet there weren't.  If I'm a   11:00:50

 1    citizen of Queen Creek and my child's being harassed, if people

 2    are taking pictures of my kid --

 3              THE COURT:  That's for child harassment.

 4              MR. MASTERSON:  I want the police out --

 5              THE COURT:  Was anybody arrested --                    11:01:02

 6              MR. MASTERSON:  -- there, and I want them out there

 7    now.

 8              THE COURT:  -- for child harassment?

 9              MR. MASTERSON:  Excuse me?

10              THE COURT:  Was anybody arrested on any state charge   11:01:05

11    in that operation?

12              MR. MASTERSON:  The testimony I saw was that they were

13    arrested for state charges.  That's the testimony I read.  I

14    have not seen the documents pertaining to the arrests.

15              THE COURT:  The documents are quite clear that all of  11:01:15

16    the persons detained were sent to ICE on federal charges.

17              MR. MASTERSON:  Then --

18              THE COURT:  And you have those exhibits; they're still

19    with you.

20              MR. MASTERSON:  They are.  Then what I have to say,    11:01:27

21    Judge, is the sheriff is being asked questions on something

22    that occurred five years prior to his testimony.

23              THE COURT:  Okay.

24              MR. MASTERSON:  MCSO does a lot of operations.  This

25    one, in my mind, was justified.  And it's not chasing people    11:01:41

1   with brown skin; it's chasing people who are chasing children,

2   who are taking pictures of children, and that's justified.  I

3   want --

4           THE COURT:  Well --

5           MR. MASTERSON:  -- them out there.                        11:01:55

6           THE COURT:  -- I'm really not concerned about the

7   justification or non-justification of it; I'm asking it for

8   credibility purposes.

9           MR. MASTERSON:  Well, I don't think it goes to

10  credibility, Judge, because again, you're asking the sheriff     11:02:04

11  questions on a pretty insignificant incident that took place on

12  one day five years prior to his testimony.

13          Number 3, we've kind of talked about it.  And again,

14  it kind of works into 1, 3, and 9, all blend together, and I

15  think the Court's recognized that.  Again, the MCSO thought      11:02:30

16  they had authority to do what they were doing.  I don't think

17  this shows that they intended to violate your injunction.

18          One thing that's interesting here to me is that the

19  Court and plaintiffs knew about this since the trial of 2012.

20  There's been a ruling on the issue and the Court issued and      11:02:50

21  entered a civil remedy.  So the Court found a valid,

22  appropriate civil remedy for the violations that are being

23  discussed or referenced here in question 3 already.

24          THE COURT:  Well, you've already made that argument.

25  You've already lost it.  I would point out as well that the      11:03:07

1    Court was not aware until November of 2014 that no instruction

2    whatsoever was ever given to anyone at the MCSO about this

3    Court's preliminary injunction until Mr. Liddy told me so in

4    November of 2014.

5          MR. MASTERSON:  And again, Judge, it does work into          11:03:27

6    that valid arrests on Arizona state criminal law can be made

7    during this period of time under the human smuggling and the

8    conspiracy statutes.

9          THE COURT:  How many were?

10         MR. MASTERSON:  Excuse me?                                    11:03:41

11         THE COURT:  How many were?

12         MR. MASTERSON:  I do not know.

13         A couple of things.  In number 9 you reference

14    document 1583 and I think you ask:  Can I consider deposition

15    testimony?  I think the answer to that is no unless it's in the  11:04:07

16    record already.

17         And then I really don't have much to add with respect

18    to -- again, we're back to enforcing civil violations of

19    federal criminal law, and that discussion we've had --

20         THE COURT:  I also in 1575 asked about Ms. Iafrate's        11:04:24

21    statement to me that the only reason that Chief MacIntyre got

22    Casey's e-mail was to be sure that Chief Sands and Deputy Chief

23    Sheridan got it.

24         Can I use the affirmations of counsel?

25         MR. MASTERSON:  Is that your -- where you reference         11:04:39

```
 1   the -- he acted in a clerical --
 2            THE COURT:  Yeah.
 3            MR. MASTERSON:  -- capability, I guess.
 4            THE COURT:  I'm not sure if I used that word but I did
 5   at other times, but I -- I think I quoted what Ms. Iafrate told   11:04:50
 6   me.
 7            MR. MASTERSON:  Well, I guess my answer to that is if
 8   a statement is made to you by counsel in the capacity of
 9   representing a party that the Court can consider the statement.
10            THE COURT:  And I can do the same with respect to your   11:05:06
11   statement to me that the 50 hard drives that the marshal has in
12   custody are the 50 hard drives that Mr. Montgomery gave to the
13   Maricopa County Sheriff's Office?
14            MR. MASTERSON:  Yes, sir.
15            I don't have anything further to add on number 9 that    11:05:25
16   we haven't addressed with respect to questions 1 and 3, and
17   that's that they had reasonable suspicion to arrest pursuant to
18   13-2319 or 13-1003.
19            THE COURT:  Hold up.  Hold up.  Give that to me again,
20   please.                                                          11:05:43
21            MR. MASTERSON:  I'll slow it down.  It's the human
22   smuggling and conspiracy statutes I referenced before.
23            THE COURT:  Thank you.
24            MR. MASTERSON:  It's 13-2319 and 13-1003.  And Judge
25   Bolton found field preemption of 13-2319 on November 7, 2014.    11:05:53
```

1              With respect to 10, Mr. Young correctly addressed it.

2     There's a typo in the Court's order, just -- it says

3     "plaintiffs" and it's us --

4              THE COURT:  Sorry.

5              MR. MASTERSON:  -- so -- well, I don't care.                    11:06:18

6              THE COURT:  I appreciate the correction.

7              MR. MASTERSON:  Our position is we're not seeking to

8     admit new evidence; it's just in the form of further argument

9     on the evidence that is before the Court.

10             THE COURT:  Yeah, I didn't really view it to -- I         11:06:33

11    mean, it does extend what Captain Skinner says.  I did not view

12    it to be an egregious extension, but I do think that plaintiffs

13    have the right to object, so I gave them that right and they've

14    objected, and as you have the right to object to things that

15    are not in evidence unless I'm going to open it back up, I          11:06:51

16    won't consider it.

17             MR. MASTERSON:  Correct, and I understand the

18    objection.  My position is that it's not really additional

19    evidence we're offering, but just further argument on that

20    admitted testimony.                                                 11:07:01

21             I don't really have anything to say on 11.  We made

22    our objections.  And as the Court recognized, we made certain

23    objections during trial; certain objections we didn't make

24    during trial.  We'll stand on those.  We'll stand on the motion

25    for reconsideration which the Court has also ruled upon.  So I       11:07:23

1  don't have anything further to address which --

2       THE COURT:  Yeah, it does seem to me that there may

3  be -- it seemed to me that there may be very few, but there may

4  be a few when Mr. Montgomery says something that I want to use

5  for the truth of the matter asserted.  And then the question --    11:07:39

6  I don't think, and I think we've gone over this about 10 times

7  now, I don't think that you are asserting the truth of anything

8  Mr. Montgomery said, and I'm not taking it as the truth, for

9  the most part.

10      However, I do think that Mr. Young has a point, and    11:07:59

11 I've already ruled with respect to agency, the scope of his

12 agency and I've already ruled on that.  I do think that

13 sometimes the scope of his agency is the appropriate matter of

14 hearsay tes- -- what otherwise would be hearsay testimony out

15 of the agency relationship.    11:08:09

16      It strikes me that there may be one or two other

17 instances when he says something that may not reveal the scope

18 of his agency, and I'm going to review those, and I'm going to

19 review to see if you've made the 805 objection in those cases.

20 And if you have, then I'm simply not going to -- I'm not going    11:08:29

21 to use anything from such documents or recordings.

22      MR. MASTERSON:  Understood.  I will mention, though,

23 Mr. Young brought up the hearsay exception to a regularly

24 conducted activity.  And that's nice, maybe, for the document

25 itself, but doesn't help you with the statement made within the    11:08:48

1    document.

2         THE COURT:  Yeah, as long as you preserve the

3    objection, I think you're right about that.

4         MR. MASTERSON:  I'm not sure how we really got into

5    the discussion of Mr. Montgomery supposedly investigating you,    11:08:58

6    or MCSO supposedly investigating you when Mr. Young was up

7    here.

8         THE COURT:  Oh, on the February -- I think think they

9    were all from February, weren't they, Mr. Young?

10        MR. YOUNG:  Yes, Your Honor.    11:09:16

11        THE COURT:  Yeah, February 2015.

12        MR. MASTERSON:  I mean, our position is, and always

13   has been, that you were never investigated by MCSO.  What

14   Mr. Montgomery did, who knows?  I don't know today.  But you

15   were never investigated.    11:09:26

16        THE COURT:  Mr. Zullo was part of those conversations,

17   was he not?

18        MR. MASTERSON:  He was part of those conversations

19   with Mr. Montgomery.

20        THE COURT:  And Mr. Zullo had a continuing    11:09:33

21   relationship with Sheriff Arpaio which Mr. -- Sheriff Arpaio

22   testified that he continued to consult with Mr. Zullo on the

23   Montgomery investigation up through and including his testimony

24   in the contempt hearing, did he not?

25        MR. MASTERSON:  He did, but the testimony is also very    11:09:48

1    clear that Mr. Zullo was instructed, as were Detective

2    Mackiewicz and Detective Anglin, that you are not to look into

3    matters concerning Judge Snow.

4         That's all I have.  Ms. Iafrate has 4 through 8.

5    There was your order of February 26 last Friday.  Number 2,                11:10:07

6    again, relates to -- oh, you know what?  I do have a question

7    on that, Judge.

8         You referenced whether you could consider affidavits

9    or statements made under penalty of perjury.

10        THE COURT:  Yeah.                                                      11:10:23

11        MR. MASTERSON:  I don't know what specific

12   affidavit --

13        THE COURT:  Do I have it here?  It's Sheriff Arpaio's

14   statement made in support of a motion filed by Ms. Iafrate in

15   May of 2015, and I thought I'd given you the number.                       11:10:40

16        MR. MASTERSON:  All I would ask, Judge, if you could

17   give us that and then give me a chance to look at it and then

18   get back to you.

19        THE COURT:  All right.  It's not in affidavit form,

20   but he does make the statements, as I recall, under penalty of            11:10:53

21   perjury --

22        MR. MASTERSON:  Okay.

23        THE COURT:  -- which is sufficient under the federal

24   statute to be taken, because it's made under penalty of

25   perjury.                                                                    11:11:03

1          In fact, after we're through here, I don't seem to

2   have left it on my notes but I'm sure I can find it very

3   quickly, and if you just want to wait and let me go back, I'll

4   give you the document.

5          MR. MASTERSON:  That would be great.  And that's all I       11:11:18

6   have, Judge.

7          THE COURT:  All right.  Ms. Iafrate.

8          MS. IAFRATE:  Your Honor, based on your order of

9   November -- excuse me, February 19th, we submitted three

10  documents, two of them under seal, on February 25th in response   11:11:41

11  to your order.

12         I can tell you, Your Honor, that those documents had

13  previously been provided to not only your monitors, but to the

14  plaintiffs on a regular basis.  The failure was submitting it

15  to the Court.                                                      11:11:59

16         THE COURT:  That's not in evidence, though, right?

17         MS. IAFRATE:  Beg your pardon?

18         THE COURT:  Here's my problem.  You have objected and

19  I've granted your objection to me consulting either with my

20  monitor or with the plaintiffs to see what you turned over to     11:12:05

21  them.  But I entered that order so I would be aware of when

22  investigations began, against what people, what specific

23  targets, and when they were added to, when they were finished,

24  when they were appealed.

25         Now, I have no desire to continue this hearing.  I          11:12:20

1   have a desire, like all of you, to make a decision and get on

2   with this case.  But now I am hampered because you not only did

3   not comply with that order, but your current submission does

4   not comply with that order, and that causes me some problems.

5          There are I already noticed -- I have noticed, I          11:12:47

6   think, some discrepancies in addition to those already cited by

7   Ms. Iafrate.

8          MS. IAFRATE:  By Ms. Wang, Your Honor.

9          THE COURT:  I am so sorry.  I hate getting old.

10         MS. IAFRATE:  Not a problem.                              11:13:01

11         THE COURT:  The other thing is I have asked you to

12   tell me directly when the investigations began, who was the

13   subject of the investigations, and when additional parties were

14   added to.  And I checked again this morning.  In addition, you

15   have not answered that question.                                11:13:16

16         Are you not capable now of answering that question?

17         MS. IAFRATE:  I believe that I did answer that

18   question, Your Honor.  When it says "received," that's when it

19   began.

20         THE COURT:  And is that when it began as to all          11:13:26

21   principals that were ever identified in the investigation?

22         MS. IAFRATE:  Yes.

23         THE COURT:  Okay.  Even if the documents that you did

24   provide me suggest that that is not the case?

25         MS. IAFRATE:  That is my understanding, Your Honor.      11:13:46

1        THE COURT:  All right.  And the MCSO is bound by that.

2   As with respect to all principals that the investigation ever

3   undertook related to those principals, the principals -- the

4   investigation of the principals began on the date you have

5   provided me as the date the investigation began.                    11:14:05

6        MS. IAFRATE:  That is my understanding.

7        THE COURT:  All right.  I'll take that for what it --

8   for what it's worth and we'll move on for there the best I can.

9        MS. IAFRATE:  Very well.

10        THE COURT:  Thank you.  Is that all you had?               11:14:18

11        MS. IAFRATE:  Unless you have further questions or

12   comments, Your Honor.  I can tell you that the process -- this

13   doesn't aid you, Your Honor, but it does aid your monitor and

14   the parties -- the process has changed since approximately

15   October to provide all parties all information regarding these    11:14:37

16   internal investigations.

17        That's a change from how we were handling it before.

18   We were keeping it away from the parties until it was

19   completely done, and now the parties are being at least weekly,

20   if not biweekly, updated regarding some of this information.       11:14:58

21        THE COURT:  Well, I had one other concern with respect

22   to your chart, and that is as I compared it against other

23   exhibits, it looked to me like Chief Deputy Sheridan, in

24   granting one of the grievances, backdated the date of --

25   backdated and recharacterized the date of the initial decision.   11:15:26

1           Is that normal procedure?

2           MS. IAFRATE:  Do you have --

3           THE COURT:  Do you know what I'm talking about?

4           MS. IAFRATE:  I do not.  Do you have the IA number?

5           THE COURT:  I don't, but I'll get it for you.          11:15:40

6           MS. IAFRATE:  Okay.

7           THE COURT:  Just like I'm going to get the other

8    document if you want to address it.

9           MS. IAFRATE:  If I had the IA number, I could go back

10   to the source documents to answer your question.           11:15:49

11          THE COURT:  All right.  Thank you.

12          All right.  Mr. Murdy, do you want to be heard?

13          MR. MURDY:  I don't have anything to add, other than

14   one quick comment.

15          THE COURT:  You need to speak in the microphone,     11:15:59

16   please.

17          MR. MURDY:  I don't have anything to add to our

18   pleading that we filed yesterday afternoon, Your Honor.  I

19   would like to add one quick comment.

20          The Cetacean case cited by Mr. Killebrew, the Ninth  11:16:07

21   Circuit -- and I'm paraphrasing -- essentially held that a

22   subordinate does not have to resign their employment in order

23   to reasonably comply with an order.  And I would just like to

24   make that specific notation.

25          THE COURT:  You know, you said that before, Mr. Murdy, 11:16:24

 1   and I was interested in that statement, so I combed

 2   Chief Sands' testimony to ever hear him say that he felt like

 3   he had to resign in order not to comply with an order.  I never

 4   heard that once.  So on what factual statement are you basing

 5   that legal argument?                                    11:16:48

 6        MR. MURDY:  It's just the argument that you don't have

 7   to resign your employment in order to comply with an order.

 8        Now, Chief Sands did not testify that he felt that he

 9   needed to resign in order to comply with the order.

10        THE COURT:  Right.                                 11:17:02

11        MR. MURDY:  But the fact remains that there's no legal

12   obligation for him to resign his employment.

13        THE COURT:  Well, I guess I want to be a little bit

14   more pointed, then, and maybe I'm not understanding your

15   question -- or your argument, so I want to clarify that now.  11:17:14

16        MR. MURDY:  Fair enough.

17        THE COURT:  Was there ever any testimony from

18   Chief Sands, with one small exception, because I forget things,

19   but the only testimony that I recall from Chief Sands with

20   respect to an order that he got from Sheriff Arpaio was --   11:17:31

21   other than his general endorsement of the testimony of Tim

22   Casey, which was general -- was that Sheriff Arpaio told him

23   that he did not have to communicate the preliminary injunction

24   order to the MCSO, but he only had to communicate it to the

25   HSU.  That's the only order that I remember Chief Sands   11:17:55

1  testifying to.  Do I misremember his testimony?

2        MR. MURDY:  No, I believe that is accurate, Your

3  Honor, but I think there's also other testimony from other

4  individuals that testified during the course of the contempt

5  hearing that Sheriff Arpaio made similar or gave similar orders    11:18:10

6  to those individuals with regard to compliance with the order

7  as to --

8        THE COURT:  So there's Sergeant Palmer.  There's

9  Lieutenant Jakowinicz.  Who else is there?

10        MR. MURDY:  That's the ones I'm aware of, Your Honor.    11:18:24

11        THE COURT:  All right.  Thank you.

12        MR. MURDY:  Thank you.

13        THE COURT:  Well, before I let you go, Mr. Murdy --

14  well, you've already made the point, I think -- Chief Sands

15  never expressed that there was any -- that he received any    11:18:36

16  similar order to what Lieutenant Jakowinicz or Sergeant Palmer

17  said they received, did he?

18        MR. MURDY:  I'm not aware of any testimony in that

19  regard, Your Honor.

20        THE COURT:  So on what basis would I consider your    11:18:46

21  legal argument?

22        MR. MURDY:  Well, I think when you take the testimony

23  in context as a whole that there were decisions being made, and

24  that Chief Sands, you know, attempted to -- you know, he was --

25  I forget what Mr. Casey's exact testimony was, but when the    11:19:12

1   order came out, Chief Sands was happy that the order came out,

2   was motivated to comply with it, attempted to comply with it,

3   coordinated with Casey, coordinated with -- I forgot the

4   lieutenant's name now.

5          THE COURT:  Sousa?                                          11:19:30

6          MR. MURDY:  Sousa with regard to preparing the

7   scenarios --

8          THE COURT:  Yeah, but what do I do about Sousa's

9   testimony that says that he told Sands, after he read the

10  order, that he didn't think anything needed to change and Sands  11:19:41

11  did not disagree with him?

12         MR. MURDY:  I think Lieutenant Sousa's scenario

13  suggests that he was aware that something needed to change.

14         THE COURT:  I agree with that.  I agree with that.

15         MR. MURDY:  So --                                          11:19:56

16         THE COURT:  But that is what his testimony was.

17         MR. MURDY:  Well, then, you know, you've also got the

18  situation, what is it, in October of 2012 when Mr. Segura sends

19  the letter to Mr. Casey, Mr. Casey apparently addresses the

20  issue with Sheriff Arpaio, and in the presence of Chief Sands    11:20:13

21  for at least part of the time.  And I understand that the Court

22  has concerns with regard to Chief Sands' failure to recall that

23  conversation, but the fact of the matter is Mr. Casey testified

24  to it, so I think what you've got is a pattern showing that

25  Chief Sands is motivated to comply with the order and take       11:20:34

1    steps to ensure that it's complied with.  But there are

2    decisions being made that --

3            THE COURT:  So you'd ask me to draw that inference and

4    then apply that argument.

5            MR. MURDY:  Absolutely.                              11:20:55

6            THE COURT:  All right.  Thank you.

7            Does anybody else have anything to say before we take

8    up the matters that we're going to clear the courtroom for

9    pertaining to the sealed matters?

10           MS. WANG:  Your Honor, just a question as to the      11:21:03

11   Internal Affairs issues.  You indicated that you wanted me to

12   restrict my comments today to matters that are in the record on

13   the contempt hearing.

14           THE COURT:  Um-hum.

15           MS. WANG:  We have identified at least one IA case,   11:21:20

16   the file for which was produced to us after the close of

17   contempt hearing, that we believe should be on the list of

18   cases.  It doesn't appear either on Exhibit 2943A or on the

19   updated chart that defendants filed on the 25th, last week, so

20   I just wonder when the Court would like to hear about such     11:21:45

21   issues.

22           THE COURT:  Well, Ms. Iafrate, why don't I bring you

23   back up, because I had some questions that I forgot to ask you

24   that I meant to and this triggers that in my mind.

25           On what basis should I leave -- on what basis should I 11:22:02

1    accept your filing under seal as to the update on 2943A?  There

2    doesn't seem to me to be any reason to do that under seal.

3           MS. IAFRATE:  The reason that we filed those two

4    exhibits under seal and not the third one is that those two

5    exhibits discuss cases that are still open.                    11:22:24

6           THE COURT:  Well, they've been open, though, now, for

7    seven or eight months, right?

8           MS. IAFRATE:  Not all of them.

9           THE COURT:  But some of them.  Most of them have been

10   open well over the statutory period.                          11:22:39

11          MS. IAFRATE:  A lot of them are pending with another

12   agency, Your Honor, and that's what we're waiting on.  If you

13   look at the updates under seal regarding the specific IAs,

14   you'll see what the holdup is regarding some of those.

15          THE COURT:  Well, here's my concern with that.         11:22:55

16          It is relevant to me, or at least in my present

17   thinking, one of the things that I'm thinking about is the

18   number of times that different identifications were found at

19   the MCSO.  I fully intend to refer to those in my order.

20          Do you have any objection if I do so?                  11:23:15

21          MS. IAFRATE:  Based on the number of events, or based

22   on the specifics?  I'm --

23          THE COURT:  Based on the -- for the most part, I think

24   I can do it without huge specifics, but dates and numbers I can

25   do.  Do you have an objection if I cite them that way?        11:23:33

1           MS. IAFRATE:  I do not believe that I would object to

2    that.  I guess that I'm concerned regarding if the IA remains

3    open, if you identify the target.

4           THE COURT:  All right.  I guess that in light of the

5    fact that especially on some of those, the six-month period has          11:23:47

6    been perforated and there seems to be little major -- there

7    seems to be, according to MCSO policy, restrictions on imposing

8    any kind of major discipline, I'm wondering if any of those are

9    going to remain under seal.  We can discuss that with more

10   specificity maybe when we're taking up the other matter that          11:24:10

11   Mr. Masterson's going to take up.

12          With respect to your response to my order, the only

13   thing -- it contains a few of those investigations at the end,

14   and that's why you're claiming that also is filed under seal?

15          MS. IAFRATE:  There were three more at the end?  Is          11:24:31

16   that what you're referring to?

17          THE COURT:  Yes.

18          MS. IAFRATE:  Yes.  So if you -- if you look at the

19   ones that's under seal, those are the ones that are still open.

20   Then we filed the other document of all of the spin-offs          11:24:44

21   that -- that are completed.

22          THE COURT:  All right.  Well, here's my concern, and

23   we can raise this also in the next session that's under seal,

24   but you have provided updated information for 1453A, which is

25   not under seal.          11:25:00

 1            MS. IAFRATE:  Correct.

 2            THE COURT:  And I think that the public, to the extent

 3    there is updated information and they're interested, are

 4    entitled to receive all of it, because except with the

 5    exception of the three new investigations, none of that        11:25:09

 6    information is subject to seal, correct?

 7            MS. IAFRATE:  I would agree with that.

 8            THE COURT:  All right.  Anything else that anybody

 9    wants -- oh, yes.  Now, Ms. Iafrate, have you consulted with

10    Mr. Masterson and/or Ms. Wang about the IA that Ms. Wang       11:25:23

11    believes should be on 1453 but is not?

12            MS. IAFRATE:  I am not aware.  This is the first that

13    I've heard of this issue.

14            THE COURT:  All right.  I see Ms. Wang is nodding her

15    head in agreement.  Maybe we can take that up in the next -- is  11:25:43

16    there any -- well, I guess we don't know whether there's any

17    argument that would be under seal, since you don't know what it

18    is.  We'll take it up in the next section.

19            MS. IAFRATE:  Very well.

20            THE COURT:  All right.  I'm going to thank the public   11:25:52

21    and ask that the courtroom be sealed and so you can leave.

22            Mr. Ahler, of course I'm interested in having you

23    stay, however.  And so I'll ask the courtroom to be cleared at

24    this time.

25            Of course, Mr. Popolizio, you can stay, too.           11:26:04

1    MR. POPOLIZIO:  Thank you, Your Honor.

2    (The courtroom is cleared.)

3    MR. YOUNG:  Your Honor, I do have a little bit of

4 rebuttal to what Mr. Masterson said that does not need to be

5 under seal.  I'm sorry for raising it late.                    11:26:17

6    THE COURT:  Well, all right.  Go ahead.

7    MR. YOUNG:  On the Queen Creek issue, which is the

8 Court's number 2, Exhibit 219 says that the reason that the

9 MCSO took action was that people were feeling uncomfortable.

10 And that's part of what -- that's part of the tragedy of what  11:26:41

11 the sheriff did in this case.  There was no crime that the

12 sheriff could detect in the e-mails that were received but

13 there were people who felt uncomfortable.

14    Now, we can read the exhibit, but the problem is that

15 they were uncomfortable with people who were doing things who  11:26:57

16 were Hispanic.  And, you know, the ideal would be for people

17 not to be uncomfortable simply because there are people who are

18 of a different race, maybe speaking a different language, who

19 are in the neighborhood.  And what the sheriff did in this case

20 was basically tell an untruth.                                 11:27:16

21    Now, do we get him up on the stand again and try to

22 inquire into his intentions at the time that he made those

23 misstatements?  Perhaps.  But I think the fair inference from

24 his testimony, from the plainness of the documents that were in

25 front of him, from the fact that he had recently been deposed   11:27:33

1    on those issues, so it wasn't as if it was something five years

2    earlier that he was asked without warning on the stand in the

3    trial of this case, he had been deposed and asked about this

4    same issue.  So he had a chance to think about it, the

5    documents were before him, but he, nonetheless, made            11:27:53

6    misstatements, and I think that that is something that should

7    be taken into account.  There was no appeal on this issue, I

8    should add, as well.  So the factual dispute that Mr. Masterson

9    tries to raise about the fact -- his claim that that action was

10   warranted really has been waived.  I think the Court's findings  11:28:12

11   were clear, they've been affirmed on appeal, there was no

12   appeal on that issue, and the documents speak for themselves.

13         With respect to the sworn statements of Sheriff

14   Arpaio, the Court did mention in a May 2015 motion, and if the

15   Court would like us to address that I'd be happy to, I don't     11:28:33

16   have it in front of me now, but as a general matter -- and this

17   is clear from what I've said earlier -- I think the Court can

18   take into account any statement that's been made by the

19   sheriff.  Certainly, sworn testimony and sworn statements are

20   perfect, are relevant.                                          11:28:49

21         Finally, with respect to Mr. Sands and in rebuttal to

22   what Mr. Murdy said, I don't think there was ever a point where

23   we claimed that Mr. Sands needed to resign.  What he did was he

24   knew that the preliminary injunction prohibited what the MCSO

25   was doing; he testified that he told Sheriff Arpaio that; he    11:29:06

1    testified, Well, Sheriff Arpaio just has a different view; and

2    that was the only thing he did, he didn't do anything else.

3              And that is not sufficient action, in light of the

4    Court's order of which he was aware, and that's the reason he

5    should be held in contempt.                                    11:29:24

6              THE COURT:  Thank you.

7              MR. YOUNG:  Thank you.

8              THE COURT:  All right.  We are now going under seal.

9              (Sealed proceedings omitted.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 2nd day of March, 2016.

s/Gary Moll