WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>                           Plaintiffs,<br><br>and<br><br>United States of America,<br><br>                           Plaintiff-Intervenor,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>                           Defendants. | No. CV-07-2513-PHX-GMS<br><br>**FINDINGS OF FACTS**<br>**- AND-**<br>**ORDER SETTING A HEARING FOR**<br>**MAY 31, 2016** |

This Court held 21 days of evidentiary hearings in April, September, October, and November of 2015.  At issue were three different charges of civil contempt raised against Sheriff Joseph Arpaio and various other alleged non-party contemnors.  Also at issue was the relief necessary to compensate the Plaintiff class for the Defendants' acts of misconduct.

The Court ordered the Parties to introduce all fact evidence that would bear on the remedies to which the Plaintiffs might be entitled.

From the substantial evidence presented during the hearing and the facts set forth in detail below, the Court finds  that the Defendants intentionally failed to implement the Court's preliminary injunction in this case, failed to disclose thousands of relevant items

of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders and thereby prevented a full recovery of relevant evidence in this case.

Defendants also initiated internal investigations designed only to placate Plaintiffs' counsel.  Defendants did not make a good faith effort to fairly and impartially investigate and discipline misconduct or to discover other materials responsive to Plaintiffs' pretrial requests.  To escape accountability for their own misconduct, and the misconduct of those who had implemented their decisions, Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor.  The Defendants' unfair, partial, and inequitable application of discipline disproportionally damaged members of the Plaintiff class.

Ultimately, few persons were investigated; even fewer were disciplined.  The discipline imposed was inadequate.  The only person who received a suspension—for one week—was also granted a raise and a promotion.

When the Court issued an Order to Show Cause and scheduled the evidentiary hearing, Defendants again failed to timely produce the evidence they were legally obligated to produce.  Further, despite at least three applicable disclosure orders and despite assurances to the Court that they were disclosing and would continue to completely comply with court-ordered disclosure requirements, Defendants intentionally withheld documents involving the Plaintiff class.  In doing so, they again violated court orders, made intentional misstatements of fact to the Monitor about the existence of such documents, and made additional intentional misstatements to the Monitor in an attempt to justify their concealment.

In their testimony during the evidentiary hearing, Sheriff Arpaio and Chief Deputy Sheridan made multiple intentional misstatements of fact while under oath.

In short, the Court finds that the Defendants have engaged in multiple acts of misconduct, dishonesty, and bad faith with respect to the Plaintiff class and the protection of its rights.  They have demonstrated a persistent disregard for the orders of this Court, as well as an intention to violate and manipulate the laws and policies regulating their conduct as they pertain to their obligations to be fair, "equitable[,] and impartial" with respect to the interests of the Plaintiff class.

Sheriff Arpaio is in civil contempt on Counts One, Two, and Three of the Order to Show Cause.  Chief Deputy Sheridan is in civil contempt on Counts One and Three. Retired Chief Sands and Lieutenant Sousa are in civil contempt on Count One.

The Court has set a hearing for May 31, 2016, in which the Parties will be able to discuss with the Court the appropriate relief in light of the factual findings below.

## I.
## THE MCSO FAILED TO IMPLEMENT THE COURT'S PRELIMINARY INJUNCTION (COUNT ONE OF THE ORDER TO SHOW CAUSE).

1.      On December 1, 2011, with motions for class certification, summary judgment, and partial preliminary injunction pending, this Court ordered the Parties to provide supplemental briefing on several issues prior to oral argument.  (Doc. 477.)[1]

2.      Those issues principally involved whether the Maricopa County Sheriff's Office (MCSO) had the authority to enforce federal civil immigration law.  (Doc. 477.)

3.      In its supplemental brief, the MCSO acknowledged that it had no authority to enforce federal civil immigration law.  The MCSO also stated that it had been training its officers, especially its Human Smuggling Unit (HSU) officers, to comply with Ninth Circuit precedent to that effect.  (Doc. 488 at 1–2.)

4.      Sheriff Arpaio nevertheless claimed that the MCSO held authority *under Arizona law* to detain persons based only on the reasonable suspicion that the detainees

---

[1] The citations to the record supporting the Court's factual findings are not intended to be exhaustive.  "Doc." refers to the numbered docket entry in the Court's file. "Ex." refers to an exhibit admitted at trial.

1    were in the United States without authorization.

2        5.      However, after the loss of the MCSO's 287(g) authority, (*see* Doc. 579), it

3    remained the MCSO's office-wide policy and practice to detain and arrest persons

4    believed to be within the United States without authorization, even when no state

5    charges could be brought against such persons.  (*See, e.g.*, Doc. 1017 at Tr. 160:15–

6    162:7; Doc. 1027 at Tr. 711:10–21.)

7        6.      The preliminary injunction, entered shortly thereafter, made it clear that the

8    MCSO had no authority under state law to detain persons based solely on their illegal

9    presence within the United States.  "[T]he fact that a person is unlawfully present,

10   without more, does not provide officers with reasonable suspicion that the person is

11   currently being smuggled for profit, nor does it provide probable cause that the person

12   was at some point in the past smuggled for profit. . . .  To the extent that Defendants

13   claim that the [Arizona] human smuggling statute, or any Arizona or federal criminal

14   law, authorized them to detain people solely on the knowledge, let alone the reasonable

15   suspicion, that those people are not authorized to be in the country, they are incorrect as

16   a matter of law."  (Ex. 67 at 17.)

17       7.      The preliminary injunction further reaffirmed what the MCSO had already

18   admitted:  that under the United States Constitution, the MCSO could not "detain[]

19   individuals in order to investigate civil violations of federal immigration law."  (Ex. 67

20   at 39.)  The preliminary injunction further enjoined the MCSO from "detaining any

21   person based on actual knowledge, without more, that the person is not a legal resident

22   of the United States."[2]  (*Id.*)

23       8.      The prohibitions of the preliminary injunction were not restricted to the

24   HSU's operations, but rather applied to the entire MCSO.  (Ex. 67 at 40 ("MCSO and *all*

25   of its officers are hereby enjoined . . . .") (emphasis added).)

26       9.      After the preliminary injunction was entered, no changes were made to the

27   _____

28       [2] In affirming the preliminary injunction in September 2012, the Ninth Circuit
     characterized the preliminary injunction as "narrow" and "limited" in scope.  *Melendres
     v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

- 4 -

MCSO's active enforcement of immigration laws, nor to its policies, practices, or operations related to immigration enforcement.  The MCSO continued its past practice of detaining persons for whom it had no state charges and turning them over to ICE or Border Patrol.  (Doc. 1021 at Tr. 369:21–371:7, 383:7–10; Doc. 1027 at Tr. 611:7-14, 761:2-4; *see also* Ex. 2219 at MELC209788 ("[Sergeant Trowbridge] said nothing at all changed about the way they conducted business after the Court order."), MELC209805 ("Lt. Sousa said nothing changed about the way his unit approached its work as a result of that court order.").)  The MCSO also continued to detain all persons suspected of violating human smuggling laws and continued to take them to HSU offices for further interrogation to determine whether they could be charged with any state crime.  If the MCSO could not substantiate state charges, then attempts were made to transfer custody of such persons to federal agencies involved with immigration enforcement.

10.     The MCSO continued these unconstitutional practices until this Court entered its Findings of Fact and Conclusions of Law in May 2013.

**A.     Individual Liability for Failure to Implement the Court's Preliminary Injunction.**

**1.     Sheriff Arpaio Knowingly and Intentionally Failed to Implement the Preliminary Injunction.**

11.     Sheriff Arpaio has conceded that he is liable for civil contempt for violating the terms of the preliminary injunction.  Nevertheless, whether his contempt of the injunction was knowing and intentional is relevant to the appropriate remedy.  The Court thus finds that Arpaio is in civil contempt and additionally finds that Arpaio's contempt was both knowing and intentional.

**a.     Sheriff Arpaio Knew That the Preliminary Injunction Existed and Was in Force.**

12.     On December 23, 2011, the date that the preliminary injunction issued, Mr. Casey, the MCSO's outside legal counsel, informed Sheriff Arpaio of its issuance and terms.  (Doc. 1417 at Tr. 1639–43.)

13.     Sheriff Arpaio further acknowledged that he may have read about the

preliminary injunction in *The Arizona Republic*.  (Doc. 1051 at Tr. 478.)

14.    In fact, immediately upon its issuance, the preliminary injunction was featured in a front-page story in *The Arizona Republic*.  The article specifically noted that "[t]he judge's ruling also bars all sheriff's officers from arresting any person 'only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States.'"[3]  JJ Hensley, "Judge Curbs MCSO Tactics," *The Arizona Republic*, Dec. 24, 2011, at A1.  Moreover, the article quotes Mr. Casey as stating that he had been instructed by Sheriff Arpaio to appeal the preliminary injunction but nevertheless to have MCSO officers obey it in the meantime.  *Id.*

15.    At the hearing on this matter, Sheriff Arpaio reaffirmed his previous testimony that he was aware of the preliminary injunction when it came out.  (Doc. 1051 at Tr. 477–78.)[4]  Arpaio further testified that at all times from the date of its entry until his testimony in the evidentiary hearing, he knew that the preliminary injunction was in force and never forgot about it.  (*Id.* at Tr. 480–81.)

16.    Sheriff Arpaio was the only person who had the authority to decide whether to appeal the preliminary injunction, (Doc. 1051 at Tr. 479–80), and he publicly indicated that he would do so.  (Doc. 1027 at Tr. 740–41.)  On January 4, 2012, Mr. Casey emailed attorney Mr. Liddy, Chief Sands, and Chief MacIntyre, noting Arpaio's assertion that the preliminary injunction had no effect on ongoing MCSO operations and also noting that he was nevertheless instructed to appeal it.  (Doc. 1417 at Tr. 1656:12–1658:7; Ex. 2535 ("The Sheriff called last night . . . .  During the call, [the Sheriff] indicated that he wanted the Notice of Appeal on file even though the injunctive relief is,

---

[3] The Court takes judicial notice that *The Arizona Republic* published articles about this litigation and the issuance of the preliminary injunction.  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'").

[4] Sheriff Arpaio's testimony is inconsistent with the statements that he made to MCSO Special Investigator Vogel, to whom he indicated that he was not aware of the preliminary injunction for months after it issued.  (Ex. 2219 at MELC209841, MELC209843–45.)

in actual practice, relatively harmless to MCSO field operations."); *see also* Ex. 2533 at MELC210542.)

> **b.    Sheriff Arpaio Understood the Meaning of the Preliminary Injunction.**
>
> > **1)    Counsel Explained the Preliminary Injunction to Sheriff Arpaio.**

17.    On December 23, 2011, the date the preliminary injunction issued, Mr. Casey immediately told MSCO command staff that they could not turn anyone over to the federal authorities.  (Doc. 1417 at Tr. 1639–43.)  Sheriff Arpaio responded to Casey that the MCSO was not detaining anyone.  (*Id.* at Tr. 1642–43.)

18.    Sheriff Arpaio does not deny telling Mr. Casey that he would release people if they had no state charges to bring against them.  He also testified that he told Casey that he saw no reason to detain these individuals since President Obama was going to let them go anyway.  (Doc. 1458 at Tr. 2542–43.)  Arpaio also does not deny telling Casey that he would follow Casey's advice regarding the preliminary injunction.  (*Id.* at Tr. 2555-56.)

19.    Although at the hearing Sheriff Arpaio testified that he does not remember whether he communicated with Mr. Casey about the preliminary injunction on December 23, 2011, he acknowledged that he may have had such a conversation.  (Doc. 1027 at Tr. 628.)

20.    That communication is verified by contemporaneous correspondence.  Late on the night of December 23, 2011, Mr. Casey emailed his associate James Williams and reported that he had communicated the Court's ruling to Chief Sands, Chief MacIntyre, and Sheriff Arpaio.  (Doc. 1417 at Tr. 1642–43; Ex. 2534 ("Frankly I am relatively pleased.  So are Chiefs Sands and MacIntyre.  Arpaio is conflicted on how he feels.").)

21.    Mr. Casey's time sheet indicates several personal meetings or communications with Sheriff Arpaio in late December 2011 and in January 2012.  (Doc. 1417 at Tr. 1654-55; Ex. 2533 at MELC210539–40.)

22.     Sheriff Arpaio acknowledges that he may have met with attorneys regarding the preliminary injunction during this time period, but he testified that he was not "constantly" meeting with them.  (Doc. 1027 at Tr. 595.)

23.     Sometime shortly after the issuance of the injunction, Mr. Casey testified that he developed the "arrest or release" terminology to simplify the meaning of the injunction and to assist in explaining it to MCSO personnel.  The gist of his instruction was that if the deputies detained someone they suspected of being in the United States without authorization, they either had to arrest them on a state charge, or they had to release them.  (Doc. 1417 at Tr. 1647–48.)

24.     Sheriff Arpaio acknowledges that Mr. Casey may have told him that the MCSO either needed to arrest those they suspected of being unauthorized immigrants on applicable state charges or release them.  (Doc. 1458 at Tr. 2539–40.)  Arpaio admits that Casey never told him that it was acceptable to deliver persons to Border Patrol for whom he had no state charges.  (*Id.* at Tr. 2528, 2498:17–2499:11, 2500:14–2501:7.)

### 2)     Chief MacIntyre Presented the Preliminary Injunction to Sheriff Arpaio.

25.     Chief MacIntyre testified that he read the preliminary injunction and fully understood it.  (Doc. 1422 at Tr. 1877–78; *see* Ex. 2219 at MELC209815.)  He understood, for example, that if the MCSO had no probable cause to believe that a state crime existed, it could not hold an unauthorized alien for transfer to a federal agency.  (Doc. 1422 at Tr. 1877–78; Ex. 2219 at MELC209814–16.)

26.     Chief MacIntyre felt that he had an ethical responsibility to help Sheriff Arpaio understand the necessary changes he needed to make in the department to be in compliance with the preliminary injunction.  As a result, he attended a scheduled meeting on the first or second Monday of January 2012 at which the MCSO chiefs regularly meet with Arpaio and Chief Deputy Sheridan.  (Doc. 1422 at Tr. 1878:23–25; Ex. 2219 at MELC209814.)  He attended that meeting to make sure that Arpaio and others heard the words of the preliminary injunction and understood what it said.  (Doc.

1422 at Tr. 1879.)   MacIntyre "told [Sheriff Arpaio] point blank exactly what the [preliminary injunction] order says and what the requirements are."   (Ex. 2219 at MELC20981; *see also* Doc. 1422 at Tr. 1880–81.)  He explained it twice.  (Doc. 1422 at Tr. 1880; Ex. 2219 at MELC209815.)  He spoke slowly and enunciated.  (Doc. 1422 at Tr. 1879–81.)  Arpaio acknowledged that he heard MacIntyre.  (*Id.* at Tr. 1880:11–12.)

### 3) Nevertheless, Sheriff Arpaio Continued to Publicly Assert That the MCSO Had the Authority to Do What the Preliminary Injunction Proscribed.

27.     In June of 2012, Sheriff Arpaio gave a series of interviews in which he acknowledged that the MCSO had been arresting people for whom it had no state charge and turning them over to ICE.  (Ex. 198A ("When we stop people on violations of the law, and then we have suspicion that that person could be here illegally, then we call ICE.").)

28.     Sheriff Arpaio also indicated an unwillingness to release such persons if ICE refused to accept them and stated that he would "work around" any such refusal. (Ex. 200A (June 25, 2012 interview with Fox News, in which Arpaio indicated that he would implement a plan to keep arresting unauthorized aliens locally even if ICE refused to accept such persons from the MCSO); Doc. 1027 at Tr. 535–38; *see also* Ex. 197A; Ex. 198A; Ex. 198B.)

29.     On July 24, 2012, Sheriff Arpaio testified at the underlying trial in this matter.  During his testimony, Arpaio stated that the MCSO still had the authority to and did unauthorized persons for whom the MCSO had no state charges.  He testified that the MCSO turned such persons over to ICE.  (Doc. 572 at Tr. 502–04.)

30.     Other MCSO officers, including Chief Sands, corroborated such activity. (Doc. 579 at 105.)

31.     Sheriff Arpaio's insistence that the MCSO retained the authority to detain unauthorized persons without any state grounds for detention, does not indicate a failure to understand the preliminary injunction, but rather  a refusal to abide by it.

c.      **Sheriff Arpaio Intentionally Chose Not to Implement the Preliminary Injunction.**

32.      Sheriff Arpaio testified that he did not intentionally violate this Court's orders because he delegated the responsibility of the MCSO's compliance with the preliminary injunction to his subordinates and to his legal counsel.  (Doc. 1051 at Tr. 479, 482, 484–85; *see also* Ex. 2219 at MELC209836 ("I don't give the guidance.  I have my lawyers and subordinates that give guidance.").)

33.      In light of the evidence and testimony at the evidentiary hearing, that explanation is neither credible nor acceptable as a matter of fact or law.

1)      **Sheriff Arpaio Did Not Change the MCSO's Operations Against the Advice of Chief Sands, Chief MacIntyre, and Mr. Casey.**

34.      Chief Sands testified that he met with Sheriff Arpaio shortly after this Court issued the preliminary injunction.   During that meeting, Sands told Arpaio that the MCSO would have to curtail immigration enforcement operations including saturation patrols.  (Doc. 1017 at Tr. 259.)  Sands also told Arpaio that all MCSO deputies should learn about the preliminary injunction, but Arpaio instructed Sands to only disseminate information regarding the preliminary injunction to the HSU.  (*Id.* at Tr. 261, 328.)

35.      Sheriff Arpaio acknowledges the meeting and acknowledges that he instructed Chief Sands to only instruct the members of the HSU about the preliminary injunction, but he asserts that Mr. Casey was responsible for that instruction.  (Doc. 1051 at Tr. 487:13–18.)  Arpaio admits, however, that he had advised Casey, incorrectly, that the MCSO did not violate the preliminary injunction.  Thus, even if Casey did give such advice to Arpaio, it must be understood in that context.

36.      At yet another meeting, Chief Sands told Sheriff Arpaio that the preliminary injunction required that the MCSO release unauthorized immigrants for whom the MCSO had no state charge instead of taking them to ICE or the Border Patrol.  (Doc. 1017 at Tr. 269–72; Doc. 1021 at Tr. 350–52.)   This included unauthorized

immigrants encountered in drop house raids.  (Doc. 1017 at Tr. 269–72; Doc. 1021, Tr. at 350–52; *see also* Ex. 2219 at MELC209797.)

37.     Sheriff Arpaio acknowledges that he had this second conversation with Chief Sands, although he testified that during the conversation he disagreed with Sands as to whether unauthorized immigrants encountered in drop houses might be detained as material witnesses to human smuggling.  (Doc. 1051 at Tr. 487:23–489:18.)

38.     After Sheriff Arpaio's 2012 trial testimony, Mr. Casey addressed Arpaio and Chief Sands and directly explained that the MCSO had no authority to detain unauthorized persons and to turn them over to federal authorities.  Arpaio stated that he understood.  (Doc. 1422 at Tr. 1851–54.)

39.     Nevertheless, the MCSO continued to do so.

> **2)     Instead of Instructing the MCSO to Stop Violating the Preliminary Injunction, Sheriff Arpaio Promoted Continued Detentions and Even Developed and Publicized a "Back-Up Plan" to Work Around ICE's Refusal to Accept Detained Person.**

40.     On September 21, 2012, Sheriff Arpaio issued a press release announcing a "back-up plan" that would allow the MCSO to continue to detain persons for whom it had no state charges in light of ICE's refusal to accept them.

41.     Generally, Sheriff Arpaio reviews all of the MCSO's press releases before they go out, especially if they quote him.  (Doc. 1051 at Tr. at 493–94.)  The September 21, 2012 press release quotes Arpaio as saying:  "I expected that [ICE's refusal to accept persons from the MCSO for whom it did not have state charges] would happen eventually, so I had a back-up plan in place which was to take these illegal immigrants not accepted by ICE to the Border Patrol."  (Ex. 51; *see also* Ex. 199B.)  The press release continues:  "So as directed by the Sheriff, last night deputies took the two suspects to Border Patrol."  (Ex. 51; *see also* Ex. 199B.)

42.     Four days after the MCSO issued the press release, the Ninth Circuit rejected Sheriff Arpaio's appeal of the preliminary injunction.  *See Melendres*, 695 F.3d

at 1000–02.

43. On the day the Ninth Circuit affirmed the preliminary injunction, Mr. Casey sent notification of the decision to MCSO personnel and to Sheriff Arpaio's personal secretary.[5] (Ex. 2533 at MELC210588 (TJC entry on 09/25/2012).)

44. Two days later on October 9, 2012, apparently in light of the Ninth Circuit's affirmance of this Court's preliminary injunction, Sheriff Arpaio issued a press release stating: "My back-up plan is still in place and we will continue to take these illegal aliens not accepted by ICE to the Border Patrol." (Ex. 82; Doc. 1027 at Tr. 563:21–564:2.)

45. Sheriff Arpaio's publication of his back-up plan, and the incidents that led to it, came to the attention of Plaintiffs' counsel. Plaintiffs' counsel wrote a letter to Mr. Casey accusing the MCSO of violating the preliminary injunction.

46. When Mr. Casey discussed the Plaintiffs' allegations with Chief Sands, Sands told Casey that the press releases describing the back-up plan were issued to assist Sheriff Arpaio in his upcoming re-election campaign. (Doc. 1417 at Tr. 1690:12–1691:5, 1695:2–7; Doc. 1422 at Tr. 1959:24–1961:2.)

47. Mr. Casey met with Sheriff Arpaio.[6] During the meeting, Casey told Arpaio that he had never been informed of a back-up plan or a press release discussing one, and that he believed the back-up plan as described in the MCSO press releases violated the preliminary injunction. (Doc. 1417 at Tr. 1691–93.) Casey explained that in his judgment the preliminary injunction did not allow the MCSO to detain persons against whom it could not bring state charges to turn them over to ICE, the Border Patrol, or any other federal authority. (*Id.* at Tr. 1691–92; Doc. 1422 at Tr. 1801–02.)

---

[5] Arpaio requires those who wish to communicate with him by email to send the communication to his secretary. (Doc. 1417 at Tr. 1636:13–15, 1681:24–1682:3; *see also* Ex. 2511.)

[6] Chief Sands was present for part of the meeting. Although Chief Sands may not have been present for the entire conversation between Sheriff Arpaio and Mr. Casey, he generally concurs with the version of events testified to by Casey. (Doc. 1422 at Tr. 1956–59.)

48.     Mr. Casey also raised with Sheriff Arpaio his concern about the fact that the press release said that this had been the MCSO's consistent practice for over six years, because this was contrary to Arpaio's previous assurances to him that the MCSO was not detaining persons to turn them over to ICE.  (Doc. 1417 at Tr. 1692–94.)

49.     Sheriff Arpaio's response to Mr. Casey was that "he was the Sheriff, and he made the decisions."  (Doc. 1417 at 1692:13–15.)

50.     In the conversation, Sheriff Arpaio indicated to Mr. Casey that ICE and the Border Patrol had directed the MCSO to detain and turn over to them persons whom the MSCO believed to be unauthorized and for whom it had no state charges.  (Doc. 1422 at Tr. 1802:7–14.)

51.     In fact, the Court finds that neither ICE nor the Border Patrol ever instructed the MCSO to turn over to them any persons whom the MCSO believed to be in the United States without authorization.  Casey never saw any documentation suggesting that ICE or the Border Patrol had actually issued such instructions.  (Doc. 1422 at Tr. 1802:7–14; *see also* Ex. 2514.)  Defendants introduced no credible testimony or evidence at the hearing that federal agencies ever gave the MCSO any such instructions.

52.     Moreover, to accept Sheriff Arpaio's statement that ICE and/or the Border Patrol directed him to turn over unauthorized persons for whom he had no state charges contradicts Arpaio's own press releases which indicate that it was *his* "back-up plan" to turn unauthorized persons over to the Border Patrol once ICE began refusing to accept them.  (Ex. 51; *see also* Ex. 199B.)  Additionally, even if ICE or the Border Patrol had issued such a direction to the MCSO, any such direction would not have changed the explicit orders of this Court to the MCSO prohibiting it from doing so.

53.     Mr. Casey, taking his client at his word that federal authorities had given Sheriff Arpaio such direction, determined that it was possible to construct a good faith argument that the MCSO was not violating the preliminary injunction.  But Casey told Arpaio that even though he could make such an argument, he did not believe that it would prevail.  (Doc. 1417 at Tr. 1691–95; Doc. 1422 at Tr. 1802, 1847–49.)

54.     Mr. Casey advised Sheriff Arpaio that the MCSO should cease activities pursuant to Arpaio's back-up plan because it was in violation of the preliminary injunction. (Doc. 1417 at Tr. 1693 ("It was not a pleasant conversation . . . but [I] relayed to him that this is a problem.  This cannot go on.").)

55.     Sheriff Arpaio assured Mr. Casey that operations pursuant to his back-up plan would cease.  (Doc. 1417 at Tr. 1693, 1700:23–25.)

56.     Despite his communications with Mr. Casey, Sheriff Arpaio continued to directly instruct the head of the HSU to continue to detain such persons and turn them over to ICE.

57.     Lieutenant Jakowinicz, who was then in charge of the HSU, recalls a meeting with Sheriff Arpaio during the latter part of 2012, (Doc. 1051 at Tr. 404:13–16), in which Arpaio directed Jakowinicz to call the Border Patrol if ICE refused to take custody of an individual for whom the MCSO did not have state charges justifying detention.  (*Id.* at Tr. 371:9–372:9.)  Arpaio acknowledges that he had this conversation with Jakowinicz.  (Doc. 1027 at Tr. 553–54.)

> **3)**     **Sheriff Arpaio's Persistent and Publicized Violations of the Preliminary Injunction Were Motivated by His Belief that Such Activities Would Benefit His Upcoming Re-election Campaign.**

58.     Sheriff Arpaio knowingly ignored the Court's order because he believed that his popularity resulted, at least in part, from his enforcement of immigration laws. (Doc. 1017 at Tr. 277:5–13; Ex. 196C (August 31, 2012 interview with Fox News in which Arpaio states:  "[T]hey like me because I'm enforcing the illegal immigration laws.  So I think that should send a message that I am doing what the people elected me to do.").)  He also believed that it resulted in generous donations to his campaign.  (Ex. 196D (August 31, 2012 Fox News interview in which Arpaio states:  "I've raised 7.5 million [dollars] just to run for Sheriff . . . ."); Ex. 201B (April 13, 2012 interview in which Arpaio refers to the "big bucks" he is raising).)

59.     Sheriff Arpaio spoke frequently with the media and the public about the

MCSO's immigration work.  (Doc. 1017 at Tr.186:8–11.)  The operations of the HSU remained very important to Arpaio.  (Doc. 1027 at Tr. 640:22–24, 737:2–4.)  They resulted in media attention, (Doc. 1051 at Tr. 390:7–21), and were designed to do so.  (*Id.* at Tr.  440:10–441:3.)  As Lieutenant Sousa put it, "Sheriff [Arpaio] and Chief Sands used the Human Smuggling Division as a political tool to gain attention.  They always knew the details of our activity and put out press release after press release about them."  (Ex. 2219 at MELC209893; Ex. 2898 MELC-IA013691; *see also* Ex. 2559B MELC-IA013646.)

60.    Because the HSU was important to his popularity, "[Sheriff Arpaio] kept very aware of its operations and the number of arrests of illegal aliens that HSU operations produced."  (Doc. 1017 at Tr. 187; *see* Ex. 2898 at MELCIA013691; *see also* Ex. 2559B at MELC-IA013646–47; Ex. 2561 at MELC1337434 (Lieutenant Sousa stated:  "I was frustrated with all the demands from Chief Sands and the Sheriff for constant operations and arrests so they could put out press releases to the media.  For Sheriff Arpaio, the Human Smuggling Unit was a gold mine of media coverage.").)

61.    HSU officers felt that it was the HSU's duty to make Sheriff Arpaio look good to the media and to the public.  (Doc. 1017 at Tr. 185.)

62.    Throughout the effective term of the preliminary injunction, even from its entry, Sheriff Arpaio's press releases indicate an awareness that the injunction was entered and that Arpaio nevertheless continued to enforce all federal immigration laws.  (Doc. 1027 at Tr. 527–534.)

63.    On December 30, 2011, immediately after the preliminary injunction was entered, Sheriff Arpaio issued a press release that quoted him as stating:  "I will continue to enforce illegal immigration laws."  (Ex. 75.)  On February 9, 2012, Arpaio issued a press release stating:  "Sheriff Arpaio continues to crackdown on immigration and will not be deterred by activist groups and politicians for [sic] enforcing all immigration laws."  (Ex. 76.)  On March 28, 2012, the MCSO issued a press release noting that "Arpaio remains adamant about the fact that his office will continue to enforce both state

and federal illegal immigration laws as long as the laws are on the books." (Ex. 77; *see also* Ex. 200B (March 2012 interview in which Sheriff Arpaio acknowledges that he continues to arrest undocumented persons); Ex. 2828A (Arpaio states that he will continue to enforce state laws and federal laws); Ex. 2829A (April 5, 2012 interview with CBS Evening News in which Arpaio notes that people do not like him because he is enforcing illegal immigration laws); Ex. 196A (August 31, 2012 Fox News Interview in which the Sheriff states with respect to immigration: "I'm enforcing state laws and federal laws. I enforce all the laws."); Ex. 84 (October 18, 2012 MCSO press release that states: "In addition six Illegal Aliens were turned over to ICE for deportation," and further states: "We will continue to be vigilant in the fight against identity theft and Illegal Immigration. . . ."); Ex. 2832C (January 27, 2013 interview in which Arpaio states: "There are a certain group [sic] here that don't want me to enforce the immigration laws.").)

64.     Chief Sands told Mr. Casey that the press releases describing the back-up plan were issued to assist Sheriff Arpaio in his upcoming re-election campaign. (Doc. 1417 at Tr. 1690:12–1691:5, 1695:2–7; Doc. 1422 at Tr. 1959:24–1961:2.)

65.     The Court finds that Sheriff Arpaio knowingly and intentionally ensured that the MCSO did not comply with the preliminary injunction.

## 2.     Chief Deputy Sheridan Knowingly and Intentionally Failed to Implement the Preliminary Injunction.

66.     Chief Deputy Sheridan admits that he is in civil contempt for violating the orders of the Court. (Doc. 1043 at Tr. 925:14–927:2, 970:9–13.)

67.     Chief Deputy Sheridan is the second in command at the MCSO and is responsible for all of its operations. (Doc. 1043 at Tr. 822:10–11, 23–25, 864:7–9.) Within the MCSO, only he and Public Information Officer Lisa Allen report directly to Sheriff Arpaio. (Doc. 1027 at Tr. 602:8–17; Doc. 1043 at Tr. 823:3–16.) The MCSO designated Sheridan the interim Chief Deputy for Maricopa County in September 2010, after David Henderschott retired. (Doc. 1051 at Tr. 344:14–20; Doc. 1043 at Tr. 948:19–

21; Doc. 1465 at Tr. 1478:9–20.)  Sheridan transitioned from "interim Chief Deputy" to "Chief Deputy" in May 2011.  (Doc. 1043 at Tr. 948:22–23.)

68.    Despite his position as second in command at the MCSO, Chief Deputy Sheridan testified that he remained ignorant of the preliminary injunction until March 27, 2014.  (Doc. 1043 at Tr. 887.)  This testimony is demonstrably false.

69.    In between November 30, 2011, the time that the Court requested supplemental briefing concerning the MCSO's authority to enforce federal civil immigration law, and December 16, 2011, the date on which the MCSO filed its supplemental brief acknowledging that it had no such authority, Chief Deputy Sheridan met with Mr. Casey, Chief Sands, Chief MacIntyre, and Sergeant Palmer from the HSU about this case.  (Doc. 1389 at Tr. 1087:24–1088:23; Doc. 1417 at Tr. 1628:3–7; Ex. 2533 at MELC210537.)

70.    As of December 23, 2011, Chief Deputy Sheridan was aware of the *Melendres* litigation, (Doc. 1043 at Tr. 887:22–888:2, 890:17–19,) and he believed that lawsuits were a serious matter.  (*Id.* at Tr. 889:9–11, 890:20–22.)

71.    On December 23, 2011, Mr. Casey sent an email designated as one of high importance to Chief Deputy Sheridan.  (Doc. 1043 at Tr. 887:22–888:5; Doc. 1422 at Tr. 1748:4–1749:3; Ex. 187.)  The email had a copy of the preliminary injunction attached, and the portion of the email regarding the preliminary injunction was written in bold. (Ex. 187.)

72.    The Defendants have represented to the Court that Chief MacIntyre's only duty in connection with the receipt of the December 23, 2011 email was to ensure that Chief Deputy Sheridan and Chief Sands both knew of the preliminary injunction.  (*See, e.g.*, Doc. 989 at Tr. 12:2–4.)

73.    Chief Deputy Sheridan subscribes to and reads *The Arizona Republic*. (Doc. 1043 at Tr. 901-05.)  The *Republic* featured a series of articles pertaining to the issuance of the preliminary injunction, and Sheridan acknowledges that he may have read the articles.  (*Id.* at Tr. 905.)

74.     Chief Deputy Sheridan participated with both Sheriff Arpaio and Chief MacIntyre in the January 2012 meeting, *see supra* ¶ 26, in which MacIntyre slowly and carefully explained the preliminary injunction and what it required to Arpaio, Sheridan, and the other chiefs.  (Doc. 1422 at Tr. 1878:19–1881:8; *cf.* Ex. 2219 at MELC209817.)

75.     Chief Deputy Sheridan was also part of the meeting between Sheriff Arpaio and Chief Sands, *see supra* ¶¶ 34–35, at which Sands indicated to Arpaio that the preliminary injunction needed to be disseminated throughout the MCSO, but Arpaio told Sands to only discuss it within the HSU.  (Doc. 1017 at Tr. 259:7–17, 260:9–16, 261:4–20.)

76.     On January 31, 2012, Chief Deputy Sheridan was present at a meeting of the Maricopa County Board of Supervisors at which the Board discussed with the County Attorney the preliminary injunction granted by this Court, and the County's appeal of that injunction.  (Doc. 1389 at Tr. 1107–1110, 1113:6–11; Ex. 2878.)

77.     Chief Deputy Sheridan was kept apprised of settlement discussions between Plaintiffs' and Defendants' counsel.  (Doc. 1043 at Tr. 891–94; Ex. 2541.)

78.     Chief Deputy Sheridan held a status conference with Chief MacIntyre and Mr. Casey about this case on February 6, 2012.  (Ex. 2533 at MELC210549.)  He had a similar conference on March 23, 2012.  (Doc. 1417 at Tr. 1674:5–17; Ex. 2533 at MELC210556.)

79.     Mr. Casey further met with Chief Deputy Sheridan to discuss the *Melendres* case on April 3, 2012.   (Ex. 2510; Ex. 2533 at MELC210559; Doc. 1417 at Tr. 1675:2–5.)  Sheridan received briefings on the progress of the trial as it occurred. (*See, e.g.*, Ex. 2533 at MELC210580.)  On September 25, 2012, Mr. Casey sent an email to Sheridan, among others, informing him that the Ninth Circuit had affirmed this Court's preliminary injunction.  (Doc. 1389 at Tr. 1075:17–21; Ex. 2511.)

80.     Chief Deputy Sheridan was aware of the existence of Sheriff Arpaio's back-up plan for delivering unauthorized persons to the Border Patrol.  (Doc. 1389 at Tr. 1082–83.)

81.     And as Chief Deputy reporting to Sheriff Arpaio, Sheridan was well aware of the political benefit that Arpaio received from the MCSO continuing to make immigration arrests, and the importance Arpaio placed on the public perception that the MCSO was continuing to do so.

82.     On October 11, 2012, Mr. Casey sent an email of high importance to Chief Deputy Sheridan and two others.  He attached a letter from Plaintiffs' counsel and various MCSO press releases explaining that Plaintiffs' counsel had alleged that recent actions and press releases by the MCSO demonstrated that the MCSO was violating this Court's preliminary injunction.  (Ex. 2512.)

83.     The email indicated the need for Chief Deputy Sheridan and the other recipients to immediately learn the facts surrounding the incidents and press releases that Plaintiffs' counsel alleged violated the preliminary injunction, especially in light of the pending election, so that Defendants' counsel could advise and respond to the situation.  (Doc. 1417 at Tr. 1683–89; Doc. 1389 at Tr. 1076:23–1078:6; Ex. 2512.)

84.     On the same day, Mr. Casey also copied Chief Deputy Sheridan on correspondence sent to the lieutenant then in charge of the HSU in aid of his factual investigation.  (Doc. 1389 at Tr. 1083:19–1084:7; Ex. 2513.)

85.     A week later, Mr. Casey copied Chief Deputy Sheridan on his correspondence back to Plaintiffs' attorney in which he responded to the Plaintiffs' allegations.  (Doc. 1389 at Tr. 1084:20–1085:6; Ex. 2514.)

86.     Chief Deputy Sheridan testified that he read the Court's findings of fact and conclusions of law when they came out in May 2013.  He had multiple extended conferences with Mr. Casey two days later.  (Ex. 2533 at MELC210605.)  Those findings discuss in several places the preliminary injunction and the MCSO's violation of it.

87.     Nonetheless, despite overwhelming evidence to the contrary, Chief Deputy Sheridan denies having any knowledge of the injunction until March 2014.  (Doc. 1043 at Tr. 887.)  Chief Deputy Sheridan further testified that he was not involved in trial preparation, and does not believe that he ever spoke to Mr. Casey until after the

*Melendres* trial.  (*Id.* at Tr. 950, 953.)   The Court finds these to be knowing misstatements.

88.   Upon resuming his testimony in September, Chief Deputy Sheridan stated that in December 2011, the *Melendres* case was not an important matter relative to the other matters he was dealing with, and that he did not pay any attention to it since it was principally in the hands of Chief Sands.  (*See* Doc. 1465 at Tr. 1383:12–1386:6.)

89.   This testimony is not credible.  Immigration enforcement was extremely important to Sheriff Arpaio in terms of the publicity that it generated for him and for the MCSO.  It is not credible that Chief Deputy Sheridan, as Arpaio's immediate subordinate in charge of all of the MCSO's operations, would have been wholly ignorant of a matter of such importance to Arpaio.

90.   Further, many of the issues Chief Deputy Sheridan cites as preoccupying had been ongoing for some time, *e.g.*, the matter relating to Sheriff Arpaio's failure to investigate a number of child abuse cases arising from El Mirage.  These matters were not new to Sheridan.  He had assumed the duties of acting Chief Deputy in September 2010 and had been given the position in May 2011—seven months before the preliminary injunction was issued.

91.   Chief Deputy Sheridan could not have remained in perpetual ignorance of the preliminary injunction during the seventeen months in which it was in force, especially in light of his involvement with the *Melendres* case, the issues it presented with respect to Sheriff Arpaio's political popularity, and the amount of correspondence he received about it.

92.   The Court thus finds that Chief Deputy Sheridan was fully apprised of the terms of the preliminary injunction and fully informed of Sheriff's Arpaio's decision to ignore it.  He was responsible for implementing its terms, and he did nothing to do so.

**3.    Former Executive Chief Brian Sands Is Liable for Civil Contempt for Knowingly and Intentionally Failing to Comply with the Preliminary Injunction**.

### a. Chief Sands Knew that the Preliminary Injunction Existed and Was in Force.

93. Between 2009 and the date of his retirement in 2013, Chief Sands was the principal contact between the MCSO and its outside attorneys in the *Melendres* case. (Doc. 1417 at Tr. 1613.)  This includes the time during which the preliminary injunction was issued.  He was also the Chief of Enforcement at the MCSO.

94. The MCSO's counsel had multiple extended meetings with Chief Sands about this case both before and after the MCSO avowed to this Court that it did not attempt to enforce federal immigration law, and between then and when the preliminary injunction issued.  Such conferences occurred on at least December 6, 15, 16, 21, and 22, 2011.  (Doc. 1417 at Tr. 1628, 1629; Ex. 2533 at MELC210537–39.)

### b. Chief Sands Understood the Meaning of the Preliminary Injunction

95. Chief Sands received a copy of the preliminary injunction from Mr. Casey, (Doc. 1051 at Tr. 338:9–14; Ex. 187), which he discussed with him.  (Doc. 1422 at Tr. 1956:5–7, *see* Ex. 2534.)  Sands understood its meaning, (Doc. 1017 at Tr. 269:13–25, 271:2–18; *see* Doc. 1417 at Tr. 1641:2–1642:2, 1647:23–1648:5; Doc. 1422 at Tr. 1956:19–1957:1), and  he was in charge of handling it.  (Doc. 1422 at Tr. 1965.)

96. As such, Chief Sands had actual notice of the preliminary injunction.

97. Chief Sands does not dispute that Mr. Casey instructed him that the MCSO must either have probable cause to arrest suspected illegal immigrants on a state criminal charge or release them entirely.  (Doc. 1422 at Tr.  1969–71, 1974–77.)

98. Chief Sands testified that Mr. Casey specifically told him that the preliminary injunction affected the operations of the HSU and all saturation patrols. (Doc. 1017 at Tr. 256–57.)

99. Further, Chief Sands does not contest Mr. Casey's testimony that in August of 2012, after Casey learned through trial testimony in this matter that the MCSO was continuing to violate the preliminary injunction, that Casey instructed Sheriff Arpaio and

Sands not to further detain unauthorized persons in the absence of state charges.  (Doc. 1422 at Tr. 1979:18–23.)

100.   Chief Sands does not contest Mr. Casey's testimony that they agreed that the MCSO would cease detaining such persons.   He also does not contest Casey's testimony that after Casey became aware of Arpaio's back-up plan in September 2012, that Casey met with both Sands and Arpaio and advised them that in his opinion this conduct violated the preliminary injunction.  (Doc. 1422 at Tr. 1979:18–23.)  Nor does Sands contest Casey's testimony that Sands told him that Arpaio had published his back-up plan to gain advantage in the upcoming election.  (*Id.* at Tr. 1979:18–23.)

### c.   Chief Sands Knowingly Permitted the HSU to Continue Its Practices in Violation of the Preliminary Injunction.

101.   There is no evidence that Chief Sands did anything to correct Mr. Casey's misimpression, initially received from Sheriff Arpaio, that the preliminary injunction did not significantly affect MCSO's operations.

102.   For example, when Mr. Casey communicated to Chief Sands on January 4, 2012 that Sheriff Arpaio indicated to him that the preliminary injunction had no significant effect on MCSO operations, there is no evidence that Sands attempted to correct Arpaio's misleading statements to Casey.  (Doc. 1417 at Tr. 1656:12–1648:7; Ex. 2535 ("During the call, [Sheriff Arpaio] indicated that . . . the injunctive relief is, in actual practice, relatively harmless to MCSO field operations.").)

103.   In fact, Chief Sands furthered that misunderstanding by himself assuring Mr. Casey that no violations of the preliminary injunction were occurring.   (Doc. 1417 at Tr. 1680:2–10.)

104.   Chief Sands knew that HSU deputies were transporting unauthorized immigrants for whom they had no state charge to ICE or the Border Patrol, yet he did nothing to stop them.  (Doc. 1021 at Tr. 356.)

105.   Chief Sands testified that he told Chief Trombi to read the preliminary injunction but did not know whether Trombi did so.

106.   Chief Sands and Chief Trombi continued to receive shift summaries and emails from HSU operations that indicated if the unit arrested anyone, for what charges they were arrested, and the number of people the HSU turned over to ICE because there were no state charges.  (Doc. 1051 at Tr. 378:2–13, 381:19–382:2; Ex. 212 (March 31, 2011 email from Lieutenant Sousa to Sands and others explaining that the HSU is turning over individuals it cannot charge to ICE); *see also* Ex. 2219 at MELC209890–93.)

107.   Chief Sands and Chief Trombi also received departmental reports after HSU interdiction events that described the time, location, people involved, and a narrative of the event. (Doc. 1051 at Tr. 377:13–24.)  Both chiefs were aware that the HSU continued to detain persons for whom there were no state charges.  Sands also knew that immigration interdiction operations continued to happen regularly in the HSU after the injunction.  (*Id.* at Tr. 356:3–7.)

108.   Instead of directing the HSU to cease such operations, or at least to conduct them within the bounds of the preliminary injunction, Chief Sands, together with Sheriff Arpaio, pressured the HSU to increase the number of unauthorized aliens they arrested in their operations.  (*See, e.g.*, Ex. 2559B at MELCIA0132648.)  They were doing this for the political benefit it provided Arpaio.  (*See* Doc. 1017 at Tr. 276:16–277:13; Doc. 1422 at Tr. 1806:7–10, 1846:12–17.)

### d.   Chief Sands Failed to Communicate the Requirements of the Preliminary Injunction to His Subordinates.

109.   Chief Sands spoke to Lieutenant Sousa once a day during this period. (Doc. 1027 at Tr. 763:25–764:3.)  Sands testified that he told Sousa not to violate the preliminary injunction.  He does not recall giving him any more specific instruction. (Doc. 1422 at Tr. 1965–67.)

110.   Yet, Chief Sands knew that Lieutenant Sousa had, or purported to have, an understanding that the HSU did not need to alter its practices to be in compliance with the preliminary injunction.   (Doc. 1027 at Tr. 707–11, 759–61.)

111.   In April, when Lieutenant Jakowinicz replaced Lieutenant Sousa as the

head of the HSU, Chief Sands discussed the preliminary injunction order with Jakowinicz for only a few minutes and only told him that he should read it and study it.  (Doc. 1017 at Tr. 264:5–21.)  Sands never mentioned completing the training scenarios nor that HSU operations were in violation of the injunction, nor did he mention that the MCSO could not detain persons for whom it had no state charge to turn them over to ICE or the Border Patrol.

**e.      Chief Sands Failed to Oversee the Implementation of Training Scenarios Drafted in Response to the Preliminary Injunction.**

112.    Chief Sands emphasizes that he should not be held in contempt because he arranged for Lieutenant Sousa and Sergeant Palmer to prepare training scenarios for HSU deputies concerning the scope of the preliminary injunction.  (Doc. 1422 at Tr. 1975–78.)

113.    Yet, Sheriff Arpaio, Chief Sands, and Lieutenant Sousa all represented to Mr. Casey that the preliminary injunction did not materially affect the MCSO's operations, and that such operations did not have to change to be in compliance.  (Doc. 1417 at Tr. 1680:2–10; Doc. 1027 at Tr. 759-61.)  In light of the direction that Casey was receiving, he did not view the training scenarios as more than a prophylactic measure.  (Doc. 1417 at Tr. 1652; *see* Ex. 2535.)  Neither did Sousa.  (Ex. 2219 at MELC209890.)

114.    Further, Lieutenant Sousa testified that it was he who directed Sergeant Palmer to create the training scenarios.  (Doc. 1027 at Tr. 773; Ex. 2219 at MELC209890 ("Based on my review of these strings of emails, I believe I initiated this training and was not directed or ordered to by Chief Trombi or Chief Sands.").  Although Sousa acknowledged that it was possible Chief Sands directed him to create the training scenarios, Sousa testified that as he remembered it, he had taken the initiative without direction from Sands.  (Doc. 1027 at Tr. 779:21–780:15.)

115.    In any event, Sergeant Palmer's training scenarios were never completed, and they never went out.  Chief Sands was copied on all communications regarding the training scenarios.  He was thus aware that the training scenarios were not being prepared in a timely fashion and that the scenarios were never completed or promulgated.

1
2

    **f.**  **Chief Sands Did Not Take Reasonable Steps to Implement the Preliminary Injunction.**

3
4
5
6

  116. In his briefs submitted in conjunction with the evidentiary hearing, but not in his testimony itself, Chief Sands argues that he should not be held in contempt because he would have been fired for doing anything other than what he did with regard to the preliminary injunction.

7
8
9
10
11
12

  117. It may be that Chief Sands felt pressure or was ordered to benefit Sheriff Arpaio and his 2012 electoral chances by not implementing the terms of the preliminary injunction.  In any case, however, he misled at least counsel for Arpaio, if not his own subordinates, about the actual nature and effect of the injunction on the MCSO's operations.  As such, he was aware of the Court's order and did not take reasonable steps to implement it.

13
14
15
16
17

  118. A party is liable for civil contempt if clear and convincing evidence demonstrates that the relevant actor(s) did not take all reasonable steps to comply with the Court's specific and definite orders.  *Balla v. Idaho State Bd. Of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989); *Stone v. City & Cnty. Of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)).

18
19
20

  119. For a non-party to be held in contempt, it "must either abet the defendant or must be legally identified with him." *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977).

21

  120. Chief Sands is in civil contempt for its violation.

22
23

  **4.**  **Lieutenant Sousa Is Liable for Civil Contempt for Failing to Take Reasonable Steps to Implement the Preliminary Injunction.**

24

    **a.**  **Lieutenant Sousa Knew the Preliminary Injunction Existed.**

25
26

  121. Lieutenant Sousa immediately read the preliminary injunction after it was sent to him on December 23, 2011.  (Doc. 1027 at Tr. 707–08.)

27
28

  122. Lieutenant Sousa came to the conclusion, which he subsequently shared with Mr. Casey and Chief Sands, that nothing about the HSU's operations needed to

change in light of the requirements of the preliminary injunction.[7]  (Doc. 1027 at Tr. 707–11, 760-61.)

123.  Lieutenant Sousa testified that part of the reason for his conclusion was that he believed (erroneously) that once the HSU called ICE during an immigration interdiction traffic stop and ICE said that it wanted the MCSO to hold the person, the detention then became ICE's detention rather than the MCSO's.  (Doc. 1027 at Tr. 775 ("A:  The way I believed it was back then, I believed that once I said they wanted him and detained him, it was their detention.  Q:  You know that not to be accurate now, though?  A:  I know exactly what the judge meant now, it's not accurate.  Q:  But back then that was your interpretation?  A:  Yes, ma'am.").)

124.  Nevertheless, such a belief was not reasonable because the authority described would merely constitute 287(g) authority in all HSU officers, an authority which was selective even when it existed within the MCSO, and which Sousa knew to have been cancelled two years earlier.

> 1)  **The Training Scenarios Prepared by Sergeant Palmer After Discussing the Meaning of the Preliminary Injunction with Lieutenant Sousa Demonstrate that Sousa Understood that the Injunction Required Changes to MCSO Policies.**

125.  Despite his view expressed to Mr. Casey and Chief Sands that the HSU's operations were not violating the injunction, Lieutenant Sousa testified that he recommended the preparation of training scenarios for the MCSO as a whole.  However, in light of the fact that he did not think that the HSU was violating the injunction, he did not see any urgency in doing so.  (Ex. 2219 at MELC209890 ("I didn't believe we were violating the Order, so there was no urgency in my mind at the time to get the Order out

---

[7] Lieutenant Sousa testified that he also spoke with Sheriff Arpaio about the preliminary injunction and told Arpaio that, in his opinion, nothing about the HSU's operations needed to change to be in compliance with the preliminary injunction.  (Doc. 1027 at Tr. 708:21–709:17.)  He testified that Arpaio did not disagree with him.  (*Id.* at Tr. 761:5–762:5.)

Office wide.").)

126.   He testified that he made the recommendation because of his understanding of the need to halt the larger MCSO practice, existing at the time, of phoning ICE during traffic stops in which the MCSO encountered unauthorized persons—thus violating the preliminary injunction.  (Doc. 1027 at Tr. 710:11–711:24.)

127.   It is not possible for the Court to discern how Lieutenant Sousa thought that the HSU practice in this regard was permissible under the injunction, while the larger MCSO practice was not.

128.   Nevertheless, on January 11, 2012, Lieutenant Sousa assigned Sergeant Palmer to begin drafting training scenarios for an e-learning program on the preliminary injunction.  (Doc. 1051 at Tr. 328:4–17, 329:3–12; Ex. 189; Ex. 2536.)  This training, if implemented, would have changed how the HSU operated.  (Doc. 1051 at Tr. 375:7–13.)

129.   Eight days later, on January 19, 2011, Sergeant Palmer returned a draft containing four training scenarios to Lieutenant Sousa.  According to Palmer, these training scenarios were "constructed . . . in accordance with the many conversations [Sousa and Palmer] have had, as well as taking into account the information conveyed to [them] both from Tim Casey concerning Judge Snow's order."  (Ex. 2538; Ex. 189; Doc. 1017 Tr. at 239–40.)

130.   The Court concludes therefore that the training scenarios prepared by Sergeant Palmer are persuasive evidence of what, at the time, they believed the preliminary injunction required.

131.   At least the first two scenarios drafted by Sergeant Palmer represent a clear understanding of the principles set forth in the preliminary injunction.  For example, the second scenario involves a fifteen minute traffic stop in which the passengers are apparently unauthorized aliens.  The scenario makes clear that the MCSO deputies "cannot detain based solely on the reasonable suspicion these passengers may be illegal aliens," but rather, the persons must be released.  (Ex. 2538 at CaseySub000047.)  Palmer testified that this was his understanding of the Court's order and that it would have

changed the way the MCSO had operated in the past.  (Doc. 1017 at Tr. 160, 162.)

132.   Lieutenant Sousa similarly testified that scenario #2 indicated a change from existing MCSO policy.  (Doc. 1027 at Tr. 793–94.)

133.   There is no indication in the training scenarios or otherwise that MCSO deputies could turn an MCSO stop into an ICE stop if they timely called ICE and received direction from ICE to take the person into custody.

134.   The only possible exceptions to scenario #2 are those set forth in scenario #3 and to some extent scenario #4.  (Ex. 2538.)

135.   Scenario #3 incorrectly posited that the HSU might maintain some authority to turn persons over to ICE if they cited, but did not arrest, unauthorized persons on state charges.  (Ex. 2538.)

136.   Scenario #4 incorrectly assumed that there was probable cause to believe that all persons involved in the stop of a suspected human smuggling load were involved in the crime of human smuggling without setting forth facts sufficient to draw that conclusion as to each individual person involved in the stop.  (Ex. 2538.)

### 2) Other Evidence Undermines Lieutenant Sousa's Purported Interpretation of the Preliminary Injunction's Demand.

137.   In October 2015, during his second round of testimony in the evidentiary hearing, Lieutenant Sousa testified that Mr. Casey misguided him concerning the scope of the injunction.  (Doc. 1458 at Tr. 2704–08; *see, e.g.*, Ex. 2219 at MELC209889 ("Based on sitting through the Civil Contempt of Court Hearing in April of this year and listening to all testimony, I got the sense Tim Casey was telling us what we wanted to hear; not what we needed to hear.").)

138.   Nevertheless, Lieutenant Sousa's testimony was that, after reading the preliminary injunction and discussing it with Mr. Casey, it was he who told Casey that the HSU was not violating the terms of the preliminary injunction, not vice-versa.

139.   Lieutenant Sousa further testified that Mr. Casey never used the terms "arrest or release" in discussing the court's preliminary injunction order with him.  (Doc.

1458 at Tr. 2705–08.)  But Sousa's testimony is not inconsistent with Casey's testimony. Casey testified that he did not immediately develop the "arrest or release" rubric, but rather developed it shortly after the issuance of the preliminary injunction to more simply explain the concept involved to MCSO leadership.  (Doc. 1417 at Tr. 1647.)  According to Casey's contemporaneous time records, the last conference he had with Sousa on the topic of the preliminary injunction was on December 30—only one week after the injunction was issued.  (Ex. 2533.)

140.    Nonetheless, even if Mr. Casey did not use the exact "arrest or release" rubric in describing the terms of the preliminary injunction to Lieutenant Sousa, Sergeant Palmer's training scenario #2 indicates that the basic meaning of the preliminary injunction was communicated to Sousa very early on.

141.    Moreover, Lieutenant Sousa testified that he called Mr. Casey within a week of receiving the Court's preliminary injunction and told him his theory about an MCSO stop becoming an ICE stop if ICE was timely contacted and direction was timely received.  He testified that Casey never told him this was an incorrect understanding. (Doc. 1458 at Tr. 2705; *see also* Ex. 2219 at MELC209889.)  As mentioned, however, in his April testimony, Sousa had testified that this was his understanding, not that he had confirmed it with Casey.  (Doc. 1027 at Tr. 775.)

142.    Further, even if Lieutenant Sousa's supposed understanding had been correct, it would not permit the HSU to hold persons after ICE had refused them so that it could locate another federal agency to take them from the MCSO.  Sousa, nonetheless, knew the HSU engaged in this practice.  (Doc. 1027 at Tr. 720–21.)

143.    Nor would it justify the HSU's practice of taking all persons detained in a suspected human smuggling load into custody for questioning.  Sousa also knew that the HSU engaged in this practice.

144.    Sergeants Palmer and Trowbridge independently related that, pursuant to the instruction that they received from Chief Sands and Lieutenant Sousa, the HSU detained everyone in human smuggling loads and took them to the HSU offices even

when they did not have probable cause to believe that some of them had committed a state crime. (Doc. 1017 at Tr. 172–77, 246–49; Doc. 1021 at Tr. 430–33, 451, 454–55; *see, e.g.*, Ex. 2219 at MELC209796 ("Sands said understanding of the court order was that it meant MCSO was not allowed to detain people for being undocumented but MCSO could still hold them for questioning if it was trying to build a case against human smugglers."); *see also* Ex. 2219 at MELC209791–92 ("I [Palmer] was told[] if we have indicators of human smuggling, um, we are allowed to continue asking questions and furthering investigation in the detainment so long as we are moving forward in that regard."); Ex. 2219 at MELC90789 (Sergeant Trowbridge discussing the continued questioning of detainees by the MCSO or by ICE).)

145. The interview process conducted at the HSU offices could take anywhere from a few to several hours. (Doc. 1017 at Tr. 175:17–176:1, 176:17–20.) If, during the interviews, a basis was discovered to bring state charges against such persons, state charges were brought. If no basis was discovered, then MCSO officers would call ICE or the Border Patrol to arrange to deliver such persons to them. (*Id.* at Tr. 176:2–16.) They would further make Lieutenant Sousa aware of such transfers of non-chargeable persons to ICE or the Border Patrol. (*Id.* at Tr. 178.)

146. Thus, there is simply no evidence that the HSU ever made any detentions of the type that Lieutenant Sousa claimed he ran by Mr. Casey. The evidence is to the contrary.

147. Nor does Lieutenant Sousa's supposed understanding appear within the scenarios prepared by Sergeant Palmer after "the many conversations" Palmer had with Sousa on the topic. (Doc. 1017 at Tr. 239–40; Ex. 2538; Ex. 189.) It is in fact inconsistent with Palmer's scenario #2.

148. Nor is Lieutenant Sousa's October testimony consistent with his own April testimony in which he indicated that while he did not believe the HSU was violating the injunction, he did believe that other MCSO deputies may have done so by phoning ICE during traffic stops in which they encountered unauthorized persons. (Doc. 1027 at Tr.

710:11–711:24.)  If, as he testified, this was the reason he believed all MCSO officers should receive training on the preliminary injunction, it is inconsistent with his later testimony that it was permissible for MCSO members to make calls to ICE during a traffic stop.

> **b.      Lieutenant Sousa, Regardless of His Implausible Interpretation of the Preliminary Injunction, Allowed the HSU to Contravene the Court's Order.**

149.   Although Lieutenant Sousa did take steps to prepare what he considered to be prophylactic training scenarios, he testified that he did not consider such training urgent, and his actions belie any urgency.

150.   Lieutenant Sousa never made a concerted effort to bring the training scenario project to a conclusion during the final three months he remained at the HSU, although he did remind Lieutenant Jakowinicz and Sergeant Palmer of its pendency before his departure.

151.   Lieutenant Sousa was aware of the preliminary injunction and its terms, and he was the commanding officer of the HSU, yet he did not take reasonable steps to implement the preliminary injunction within the HSU, he did not set forth the nature of the HSU's procedures to his attorney in order to determine whether they required adjustment, and he did not take action to understand the injunction's true scope.

> **5.      Chief MacIntyre Is Not Liable for Civil Contempt.**

152.   Chief MacIntyre was initially Mr. Casey's point of contact on the *Melendres* case.  (Doc. 1417 at Tr. 1618; 1422 at Tr. 1904:17–1905:3.)  Casey testified that MacIntyre was a trusted member of Sheriff Arpaio's executive staff, and Arpaio liked to solicit MacIntyre's opinion on legal matters.  (Doc. 1417 at Tr. 1635.)  After MacIntyre was replaced by Chief Sands as the principal client contact, Arpaio asked Casey to keep MacIntyre in the loop on the case; Casey did so as a courtesy.  (*Id.* at Tr. 1633–35.)

153.   Chief MacIntyre agrees with Mr. Casey and Sheriff Arpaio's description of his role and relationship with Arpaio in this respect.  (Doc. 1422 at Tr. 1868:10–1870:3;

*see also* Ex. 2219 at MELC209813; Ex. 32 at 13 of 53 ("In my capacity as the Deputy Chief, Custody Bureau One for the MCSO . . . I work as needed with attorneys for the Maricopa County Attorney's Office and/or Outside Counsel in their defense of civil litigation matters pending in state or federal courts against Sheriff Joseph M. Arpaio and/or the MCSO.").)

154.   With the possible exception of Sheriff Arpaio, Chief MacIntyre was as aware as anyone that Arpaio and the MCSO were in constant violation of the preliminary injunction during its pendency.

155.   But there seems to be no dispute that Chief MacIntyre had no command authority by which he could implement the orders in *Melendres* with the MCSO patrols. (Doc. 1495 at Tr. 3666.)

156.   Thus there is an insufficient basis on which to find that Chief MacIntyre had sufficient personal responsibility for implementing the preliminary injunction.  He is therefore not liable for civil contempt for failing to take reasonable steps to implement it.

**B.     The MCSO's Failure to Follow the Preliminary Injunction Harmed Members of the Plaintiff Class.**

157.   During the period that the preliminary injunction was in place, the MCSO continued its immigration interdiction operations.  As a result of its street interdiction operations, and in violation of the preliminary injunction, the HSU detained and turned over at least 157 persons whom it could not charge for violating any state or federal laws to ICE and/or the Border Patrol.  (Doc. 1051 at Tr. 384:4–14, 386:16–22; Ex. 208; Ex. 209.)

158.   The HSU also continued its workplace enforcement and other operations. After such operations, and in violation of the preliminary injunction, it arrested, detained, and transported additional members of the Plaintiff class to ICE and/or the Border Patrol when it could not charge these people for committing any state or federal crime.

159.   The MCSO did not keep records on persons whom its regular non-HSU

patrol officers detained and turned over to ICE.  (Doc. 1353 at Tr. 9–10.)

160.   Nevertheless, Lieutenant Sousa testified that it was a common occurrence to hear deputies from District II call federal authorities concerning the referral of an unauthorized immigrant to them.  (Doc. 1458 at Tr. 2610–12; *see also* Ex. 2219 at MELC209810.)

161.   During the period that the preliminary injunction was in place, the MCSO used pre-textual traffic stops to examine a person's citizenship and enforce federal civil immigration law.  The MCSO used race as one factor among others in determining whom it would stop, regardless of whom it ultimately arrested and/or detained.  As a result, the MCSO stopped members of the Plaintiff class who were authorized residents of the United States that it would not have otherwise had grounds to stop if it complied with the preliminary injunction.

162.   Further, the MCSO detained persons for unreasonable periods of time to investigate their immigration status.  (Doc. 579.)

163.   Defendants' violation of the preliminary injunction therefore resulted in harm to many class members who were detained when they otherwise would not have been regardless of whether they were ultimately transferred to ICE or the Border Patrol.

164.   Plaintiffs do not allege that Defendants continued to enforce federal civil immigration law after this Court issued its findings of fact and conclusions of law on May 24, 2013.  (Doc. 579.)

## II.
### THE MCSO FAILED TO COMPLY WITH COURT RULES, DISCOVERY OBLIGATIONS, AND COURT ORDERS REQUIRING PRODUCTION (COUNTS TWO AND THREE OF THE ORDER TO SHOW CAUSE).

165.   Sheriff Arpaio admits that he is in civil contempt for the MCSO's failure to provide recordings, documents, and other tangible items that were requested by Plaintiffs prior to the underlying trial in this matter.  (Doc. 1027 at Tr. 626:6–627:10, Tr. 627:16–19.)

166.    The Court so finds.

167.    Chief MacIntyre, who was also noticed as a possible non-party contemnor on this count of the Order to Show Cause, was outside counsel's chief client contact at the start of this litigation.   It was to MacIntyre that Mr. Casey sent Plaintiff's original demand to preserve documents and tangible items.   (Doc. 1417 at Tr. 1618:18–21; Ex. 32, Doc. 235-1 at 21.)   MacIntyre denies his personal liability for civil contempt.

168.    The original preservation letters were sent by Plaintiffs to the MCSO on or about July 21, 2008.   Those letters requested that the MCSO "preserve all documents, including but not limited to all electronically stored information ("ESI") that are relevant to" or resulting from specifically enumerated "crime suppression operations" and future such saturation patrols that were the focus of the underlying lawsuit in this case.   (Ex. 32, Doc. 235-1 at 23–24.)

169.    In Mr. Casey's email of the same date transmitting the preservation letter to Chief MacIntyre, Casey directed MacIntyre to "[p]lease make certain that the appropriate person at the MCSO knows to KEEP AND PRESERVE the attached listing of categories of information."  (Ex. 32, Doc. 235-1 at 21.)

170.    Chief MacIntyre testified that at the time he may not have known who that appropriate person was.  (Doc. 1422 at Tr. 1901–03.)  As a result, he apparently sent the preservation letter to no one.  MacIntyre's failure to send the preservation letter to anyone is sufficiently blameworthy to merit sanction against Defendants.   However, the preservation order was not a Court order, and therefore failure to appropriately communicate the litigation hold does not merit a finding of contempt against MacIntyre.

171.    In addition to the litigation hold demand, Plaintiffs' counsel sent, at the same time, a largely identical Arizona Public Records Access Act request to then Captain Paul Chagolla.   Captain Chagolla directly forwarded the Request to Lieutenant Doris Culhane—then the director of the MCSO Legal Liaison Office.  (Ex. 32, Doc. 235 at 31 ¶ 5.)

172.    Lieutenant Culhane averred that she treated the request as a "litigation

hold" and instructed the "appropriate units within the MCSO to keep and preserve all electronic and hard copy documents prepared in the future that were responsive to [the] request." (Ex. 32, Doc. 235-1 at 32–33 ¶ 7.)

173.   In February 2009, Plaintiffs followed up the preservation demands with broad interrogatories and document production requests seeking any documents or tangible things referencing MCSO traffic stops, created during MCSO traffic stops, resulting from MCSO traffic stops, or guiding an officer's discretion during MCSO traffic stops. (Doc. 65 at 5 ¶ 13; Doc. 843 at 9 n.3.) Examples of the relevant discovery requests are cited in the Order to Show Cause. (Doc. 880 at 18–20.)

174.   Mr. Casey relayed these interrogatories to the Legal Liaison Office. (Doc. 1417 at Tr. 1620.) According to MCSO procedure, litigation discovery requests were handled by that office.

175.   At some point, because of Mr. Casey's perception that the Legal Liaison Office did not timely respond to the discovery requests, Casey asked Chief Sands if he could directly contact Lieutenant Sousa regarding requests for materials and information that he thought would be at the HSU. Sands authorized such direct contact with Sousa. (Doc. 1417 at Tr. 1618–19; Doc. 1027 at Tr. 662, 664, 777.)

176.   It remained Mr. Casey's impression that the Legal Liaison Office handled the document requests with respect to the MCSO as a whole, but Casey was authorized to inquire directly with Lieutenant Sousa where document requests pertained to the HSU. (Doc. 1417 at Tr. 1619–20.)

177.   By the fall of 2009, Mr. Casey and/or the Legal Liaison Office had made a large number of requests from Lieutenant Sousa for documents and other materials responsive to discovery. (*See, e.g.*, Ex. 32, Doc. 235-2 at 3 ¶¶ 5–8.)

178.   At that time, however, Plaintiffs discovered that Defendants had destroyed their individual stat sheets pertaining to HSU operations despite the preservation order. Lieutenant Sousa testified that he did not know about the MCSO's preservation obligation and the necessity of preserving documents and items until after Plaintiffs

discovered that the HSU had destroyed the stat sheets.  (Doc. 1027 at Tr. 662, 765–67.)

179.   If Lieutenant Sousa had not been previously aware of any order or direction to preserve materials related to HSU operations, then presumably neither had any HSU staff member.

180.   On December 8, 2009, in response to his apparently new knowledge of the preservation order, Lieutenant Sousa sent out an inaccurately narrow description of it to HSU staff.  The email limited the scope of the types of materials HSU deputies should save to "all incoming and outgoing emails [that] reference any operations we are running for the purpose of future litigation."  (Ex. 216.)  The directive said nothing about retaining recordings, reports, documents, identifications, license plates, personal property, or other items seized from members of the Plaintiff class.  (*See id.*)

181.   Lieutenant Sousa acknowledged that the process for communicating and generating responses to discovery requests "could have been a lot better" at the HSU.  (Doc. 1027 at Tr. 778–79.)

182.   When Lieutenant Sousa received a discovery request, responses to such requests were not logged properly.  (Doc. 1027 at Tr. 664, 778.)

183.   Lieutenant Sousa did not personally request that individual HSU deputies search for responsive documents and items.  Nor did he search the files or computers of other HSU personnel for such responsive documents.  (Doc. 1027 at Tr. 673.)

184.   While Sousa testified that he believes he directed his sergeants to search for such responsive documents, (*id.*), Sergeant Palmer testified in the April 2015 evidentiary hearings that he was never requested to search for video or audio recordings prior to May 2014.[8]  (Doc. 1017 at Tr. 229–30.)

185.    Sergeant Trowbridge testified similarly to Sergeant Palmer.  (Doc. 1051 at Tr. 457–59.)

186.   Lieutenant Sousa testified that at the same time that he was fielding

---

[8] It is nevertheless clear that Sergeant Palmer was earlier asked to search at least his own files for materials relevant to HSU operations.  (Ex. 32, Doc. 235-2 at 14–15 ¶¶ 12–14.)

discovery requests from Mr. Casey, he was also fielding many requests from the Public Information Office within the MCSO for information regarding immigration operations and arrests.  (Doc. 1027 at Tr. 664–65; *see also* Ex. 2559B; Ex. 2561 at MELC1337434–36.)   He was also under pressure from Sheriff Arpaio to produce high numbers of immigration arrests.

187.   Lieutenant Sousa did not feel he was given adequate resources by the chain of command to deal with the various discovery and information requests and at the same time supervise HSU operations.   (Doc. 1027 at Tr. 665–66, 776; Ex. 2561 at MELC1337434–36.)

188.   Lieutenant Sousa left the HSU to go to SWAT in April of 2012.

189.   When Lieutenant Sousa left the HSU, he instructed Lieutenant Jakowinicz, his replacement, merely that HSU members had to save emails pertaining to operations. (Doc. 1051 at Tr. 367, 392–93.)   Sousa gave Jakowinicz no instructions regarding recordings, other documents, or items seized during HSU detentions.

190.   Sergeant Palmer similarly left the HSU in the late spring of 2012.  (Doc. 1017 at Tr. 166.)

**A.     The MCSO Failed to Produce Recordings of Traffic Stops.**

191.   Despite Defendants' failure to provide any recordings to Plaintiffs prior to trial, MCSO members had been videotaping traffic stops with their own equipment prior to 2009.  (Doc. 1027 at Tr. 675; Doc. 700 at Tr. 57; *see, e.g.*, Ex. 154 at MELC098129.)

192.   By late 2009, the MCSO was issuing body video cameras to HSU members to record their traffic stops.  (Doc. 1017 at Tr. 149, 229–30; Doc. 1027 at Tr. 675, 683; Ex. 43; Ex. 44; Ex. 154.)

193.   Upon the MCSO's issuance of cameras, Lieutenant Sousa orally issued a standard operating protocol that directed HSU members to record and maintain all videos of their stops whenever possible.  (Doc. 1027 at Tr. 684–85, 703; *see also* Doc. 1017 at Tr. 197.)

194.   HSU members were issued various devices for recording their contacts

including body cameras, eyeglass cameras, and cameras mounted on a dashboard.  (Doc. 1017 at Tr. 195, 230; Doc. 1043 at Tr. 882:21–25; Ex.  43; Ex. 44 at MELC004763–64.)

195.   HSU deputies' recordings were transferred to CDs and stored in individual binders—one for each deputy—in HSU offices or retained on an external hard drive at the HSU.   (Doc. 1017 at Tr. 194; Ex. 44 at MELC004764; *see also* Ex. 154 at MELC098109, MELC098111, MELC098106.)

196.   As of May 9, 2011, the HSU supplemented Lieutenant Sousa's earlier oral directive with a written policy that required HSU officers to turn in recordings of traffic stops that might be evidence in any proceedings.  (Doc. 1027 at Tr. 677–82; Ex. 169 at MELC114964–65.)

197.   The MCSO also issued video recording equipment to other deputies, units, and divisions.  (Doc. 700 at Tr. 57.)

198.   The MCSO generally had no regulations or policies governing the use of video cameras.  (Doc. 1017 at Tr. 52, 81, 102.)  The MCSO never issued instructions about how to handle recordings or other evidence, nor did it issue any instruction forbidding deputies to keep recordings or items of evidence in their homes.  (*Id.* at Tr. 80–81.)

199.   Nor were there systems in place within the HSU to track, collect, review, or store those videos.  (Doc. 1043 at Tr. 883:8–13.)

200.   In addition to video recording devices, the MCSO issued audio recording devices to almost every deputy.  (Doc. 700 at 63, 65; *see e.g.*, Ex. 154 at MELC098111, MELC098113,   MELC098085,   MELC098083,   MELC098126,   MELC098064, MELC098104.)

201.   Prior to May 2014, there was no department-wide policy that governed the collection and cataloguing of recordings made with such devices.  (*See* Doc. 700 at Tr. 63:18–25.)

202.   A number of HSU deputies used their digital audio recorders to record interviews from passengers in traffic stops, which were downloaded to CDs.  (Ex. 154 at

MELC098111, MELC098085, MELC098076–77.)

203. Sheriff Arpaio testified that he was never asked to look for recordings before trial. (Doc. 1027 at Tr. 607–08.)

204. Although Chief Trombi directly supervised all of the MCSO's patrol operations including those of the HSU, he testified that no one ever asked him to look for videos, documents, or anything else that might be responsive to Plaintiffs' discovery requests. (Doc. 1017 at Tr. 100–01, 148.)

205. Moreover, Chief Trombi testified he was not aware at the time that the HSU had binders containing video recordings of traffic stops. (Doc. 1017 at Tr. 101.)

206. Sergeant Palmer testified that prior to May 2014, although he knew that recordings existed, nobody had ever asked him to gather them. (Doc. 1017 at Tr. 229.)

207. Sergeant Trowbridge likewise testified that he received no request to gather videos at any time from 2009 through 2013. (Doc. 1051 at Tr. 458.) He was not asked to gather any videos until May 2014.

208. The MCSO produced no videos to Plaintiffs prior to trial in July and August 2012. (Doc. 1417 at Tr. 1620.)

209. After trial, "[i]n June of 2014, HSU and CEU personnel went back to [former HSU offices] to clear out any remaining equip[ment], case files, [etcetera]." (Ex. 43 at MELC104078.) In addition to finding "many boxes containing detective's copies of cases," they also found "loose CDs." (*Id.*) The 1451 CDs principally contained audio interviews of persons detained from human smuggling loads and a few videotapes of traffic stops conducted by Deputy Armendariz. (*Id.* at MELC104079.)

210. Several months later, the MCSO conducted an additional search of former HSU offices. In that search, investigators found, among other things, 578 compact discs. (Doc. 1633 at 3.)

211. An additional CD was found a few days later in the Roeser Building. (Doc. 1633 at 3.) These discoveries subsequently became the partial subject of IA #2015-018 discussed below.

212.   It is not clear to the Court whether such recordings have yet been provided to Plaintiffs.

213.   In the spring of 2014, the Phoenix Police Department responded to a call concerning Deputy Charley Armendariz, who was a significant MCSO witness in the underlying trial.

214.   On May 1, 2014, a search was conducted of Deputy Armendariz's home.

215.   In addition to confiscated property, *see infra* Part II.C, the MCSO also discovered in Deputy Armendariz's possession thousands of video clips of traffic stops that Armendariz had conducted during the period relating to the Plaintiffs' claims.  (Doc. 700 at 50.)

216.   By the May 14, 2014 court hearing on the matter, the MCSO had reviewed some of the Armendariz videos which revealed what the MCSO characterized as "problematic" activity by Deputy Armendariz during traffic stops.  (Doc. 700 at 91.)

217.   In that hearing, the MCSO also acknowledged that other officers made recordings which were not regulated, tracked, or kept by the MCSO.  The MCSO did not disclose the HSU's practice of recording stops until after the Armendariz videos came to light.  Thus, the MCSO had produced none of the video and audio recordings that were responsive to Plaintiffs' discovery requests.

**1.      The MSCO Violated the Court's May 14, 2014 Order to Quietly Gather Recordings Responsive to Plaintiff's Discovery Requests.**

218.   At the hearing, the Court discussed the possibility that recordings made by officers other than Deputy Armendariz might also reveal problematic activity, and that other officers would be unlikely to turn in such recordings if that were the case.  The Court discussed the need to maximize the MCSO's ability to retrieve such recordings and to develop a plan for how that might effectively be done.  (Doc. 700 at Tr. 59–63.)

219.   The Court issued instructions that the MCSO was to formulate, with the Monitor's approval, a plan to quietly gather responsive recordings made by the officers.  (Doc. 700 at Tr. 59–63.)

220.   The Court also discussed whether the MCSO should assign the investigation of the issues arising from these materials to a separate agency or a third party in light of the potential conflict of interests arising from the discovery of this material.  (Doc. 1027 at Tr. 636–37; Doc. 1043 at Tr. 971–72.)

221.   The MCSO declined to refer any follow-up investigations to a third party and chose instead to conduct its own investigations.  The MCSO acknowledged that its internal investigations arising from these matters would be closely reviewed by the Court and its court-appointed Monitor.  (Doc. 1017 at Tr. 14–15; Doc. 1027 at Tr. 636–37.)

222.   Sheriff Arpaio agreed that he would cooperate fully with the Monitor and not withhold any information from him.  (Doc. 1027 at Tr. 575.)  Chief Deputy Sheridan did the same.  (Doc. 1043 at Tr. 826–27.)

223.   The MCSO violated the Court's orders that same day.  That afternoon, the MCSO scheduled a meeting with the Monitor to arrive at an agreed upon plan to collect the outstanding video recordings.  Prior to that meeting but after the Court hearing, Sheriff Arpaio and Chief Deputy Sheridan held a meeting with their lawyers in Arpaio's office. (Doc. 1043 at Tr. 828–29.)  Without consultation with the Monitor, Sheridan directed Chief Trombi to send an email to 27 MCSO division and bureau commanders directing them to gather video recordings from their personnel.  (*Id.* at Tr. 830, 856–59; Doc. 1027 at Tr. 610; Doc. 803 at Tr. 59:20–22; Ex. 38.)

224.   In the following meeting with the Monitor Team that afternoon, the MCSO agreed on a plan in which the MCSO internal affairs officers would individually identify and question—without advance warning—those officers most likely to have videos relevant to this lawsuit and require them to turn in the recordings.  (Doc. 1043 at Tr. 840–41, 934–35.)  Chief Deputy Sheridan did not tell the Monitor Team that he had already directed Chief Trombi to send the mass email to MCSO commanders.  (*Id.* at Tr. 840:21–24.)  To the extent that Sheridan represented to the Monitor Team that the MCSO had not yet taken steps to collect the videos, Sheridan's statement to the Monitor Team was inaccurate.  (Doc. 1017 at Tr. 116:6–9.)

225.   As a result of Chief Trombi's email, any officers who might also have recorded themselves in problematic activities were informed in advance that the MCSO was collecting such recordings.  Thus, the approach agreed upon between the MCSO and the Monitor was not possible.  (Doc. 1043 at Tr. 840:18–20.)

226.   Immediately after this meeting, Chief Deputy Sheridan met again with Chief Trombi and attorney Ms. Christine Stutz. (Doc. 1043 at Tr. 844:13–16, 856:7–13.) During this meeting, Trombi told Sheridan that he had already sent the email, per Sheridan's instructions. (*Id.* at Tr. 847:12–17; Doc. 1017 at Tr. 115.)

227.   Chief Deputy Sheridan called the Monitor after this meeting, around 5:15 in the evening. (Doc. 1043 at Tr. 848:16–20.)   In that telephone call, Sheridan made the false statement to the Monitor that Chief Trombi sent the email without his knowledge. (*Id.* at Tr. 848:24–849:2.)

228.   Chief Deputy Sheridan testified at the evidentiary hearing that his statement to the Monitor was not a false statement, even though he knew when he called the Monitor that he had ordered Chief Trombi to send out the email and that Trombi had done so.  (Doc. 1043 at Tr. 849–51.)  Sheridan maintained, "[J]ust because I told him to send an e-mail doesn't mean that I knew he had already sent it."  (*Id.* at Tr. 850:4–5.) Sheridan denied that his statement could be fairly understood to mean that he was not the one who directed Trombi to send the email.  (*Id.* at Tr. 850:15–25.)

229.   This attempted explanation seeks to twist the meaning of words beyond their reasonable usage.   Chief Deputy Sheridan was intentionally untruthful to the Monitor.

230.   Chief Deputy Sheridan wrote a letter that same night, May 14, 2014, to the Monitor.  (Doc. 1043 at Tr. 853:20–23.)  In that letter, Sheridan again intentionally and untruthfully stated that neither he nor Chief Trombi remembered who directed Trombi to send the email, and that Trombi stated it was a collective decision of all parties.  (*See id.* at Tr. 853:20–855:9, 856:14–20.)

231.   In the hearing, Chief Deputy Sheridan similarly testified that "his best

recollection at the time" was that it was a collective decision of all parties.  (Doc. 1043 at Tr. 855:15.)  He gave this testimony even while acknowledging that at five o'clock that afternoon Chief Trombi and Ms. Stutz reminded him that he had issued the order.  Again, this explanation is neither credible nor persuasive.

232.    Chief Trombi himself testified that Chief Deputy Sheridan's statements to the Monitor regarding who issued the directive are not accurate.  (Doc. 1017 at Tr. 114–16.)

233.    Sheriff Arpaio did not discipline Chief Deputy Sheridan or Chief Trombi for violating the Court's May 14, 2014 orders.  (Doc. 1027 at Tr. 633:17–19, 635:19–22.).

234.    Nevertheless, at some point, the MCSO did conduct an internal affairs investigation into the matter.  Sheriff Arpaio delegated to Chief Olson, Chief Deputy Sheridan's subordinate, the responsibility of making the disciplinary decision.    (Doc. 1458 at Tr. 2559.)

235.    Chief Deputy Sheridan admits that his instruction to Chief Trombi violated the Court's orders.  (Doc. 1043 at Tr. 830, 841.)

236.    Sheriff Arpaio admits he was part of the decision to have Chief Trombi send out the email and he did not object to Chief Deputy Sheridan giving the instruction.  (Doc. 1027 at Tr. 575–76.)

237.    Both Sheriff Arpaio and Chief Deputy Sheridan have admitted that they are in civil contempt for the violation of that order.

238.    The Court so finds.

**2.    The MCSO Destroyed Many Responsive Recordings.**

239.    The day after the May 14 hearing, Sergeant Mike Reese of the Internal Affairs Division took possession of all of the remaining binders in HSU custody that contained DVDs of video recordings of traffic stops.  (Ex. 44 at MELC004764; *see, e.g.*, Ex. 154 at MELC098106, MELC098071, MELC098087.)

240.    Because the MCSO could not "take back" the memorandum sent out by

Chief Trombi, the MCSO proceeded to attempt to collect the videotapes in the survey method that Chief Deputy Sheridan had directed Trombi to initiate.

241.    The MCSO command staff sent several follow-up emails to patrol division and posse members that threatened disciplinary action for non-compliance with Chief Trombi's collection efforts.  (Doc. 1043 at Tr. 873–74.)

242.    As of March 20, 2015, ten months later, the MCSO still had not received responses from all personnel directed to respond regarding video recordings.  (Doc. 1043 at Tr. 874–75, 881; *see also* Doc. 755 at 6 n.2.)

243.    Those video clips that the MCSO turned over to the Plaintiffs during the discovery process leading up to the evidentiary hearing were compiled and set forth in Exhibit 214.

244.    The results of the Trombi survey demonstrate that many recordings were made and destroyed during the period of the preservation order.

245.    The Court further finds for the reasons below that many responsive recordings were destroyed both intentionally and otherwise by MCSO officers.

246.    When Lieutenant Sousa received the May 2014 direction from Chief Trombi requiring him to turn over all of his recordings involving interactions with the general public, he submitted approximately 20 HSU stops which were still on his laptop. He is certain that he participated in "far more" stops than that.  (Doc. 1027 at Tr. 697–98; *see also* Ex. 164.)

247.    Lieutenant Sousa is aware of persons within the MCSO who did not comply with Chief Trombi's directive at all.  (Doc. 1027 at Tr. 695–96.)

248.    Lieutenant Sousa concluded that it is unlikely that all outstanding videos were collected.  (Doc. 1027 at Tr. 697.)

249.    Sergeant Palmer stated that he frequently destroyed video recordings he made of his HSU interactions with the public.  (Doc. 1017 at Tr. 196; Ex. 176 ("I did not record traffic stops routinely from beginning to end, and I did not routinely impound or otherwise administratively retain recorded traffic stops that did not somehow present

themselves as being significant, either stemming from a legal matter or an anticipated complaint."); Ex. 154 at MELC098109 (noting his deletion of "multiple videos of traffic stops based on personal subjective reasoning").)

250.   Others did the same.   (*See, e.g.*, Ex. 154 at MELC098129 (Deputy Templeton:  "I would delete the unnecessary audio/video files directly from the Scorpion body camera."); Ex. 154 at MELC098126 (Deputy Silva: "These recordings did not contain any evidentiary value so I did not copy any of the footage to CD/DVD and place into the HSU files.").)

251.   Further, rather than making DVDs of all of their recordings, other HSU personnel downloaded the recordings to their own flash drives or external hard drives, or they left the recordings on the recording devices when they returned the devices to the HSU.  (Ex. 154 at MELC098076–77, MELC098128, MELC098120.)

252.   Further, not counting the over 4300 video clips retrieved from Deputy Armendariz's garage, (Doc. 1465 at Tr. 1425, 1429), and the over 2000 video clips still in the binders in the HSU, the Trombi survey method was relatively unproductive,  resulting in 2163 video clips for the entire remaining MCSO during the relevant period.  (Doc. 755 at 2–3, 6.)

253.   Chief Trombi's email survey method provided advanced warning that videos would be collected and thus resulted in the destruction of problematic videos.

254.   When the MCSO sought to retrieve recordings through the Trombi survey, many HSU officers claimed that despite the directive to record their traffic stops whenever possible, they did not record their stops.  (Doc. 1027 at Tr. 702–03; Ex. 154 at MELC098111 (Quintero, very few recordings), MELC098106 (Ochoa, very few recordings), MELC098095 (Martinez, two recordings, one in 2009 and one in 2013), MELC098085 (Komorowski, no recordings), MELC098092 (Madrid, no recordings), MELC098058 (Brockman, no recordings).)

255.   The Court does not find it credible that all of these HSU deputies made or kept very few recordings (or none) despite the directive that they must record their stops

1   whenever possible.

2       256.   Because its initial review of the Armendariz videotapes indicated

3   "problematic" activity, the MCSO reviewed the video clips to determine whether they

4   contained evidence of problematic activity by MCSO employees.  If they did, the initial

5   reviewers referred the video clips to a secondary review by MCSO lieutenants to

6   determine whether an internal affairs investigation should be initiated.

7       257.   As of October 2014, the review of the 2163 video clips provided by the

8   entire MCSO in response to the Trombi survey resulted in the referral of only 30 video

9   clips for secondary review and resulted in only six IA investigations.  (Doc. 755 at 6.)

10      258.   By way of comparison, the review of the approximately 6700 video clips

11  received from Deputy Armendariz or the HSU resulted in the referral of 370 video clips

12  for secondary review and ultimately resulted in 33 IA investigations.    Thus,

13  proportionally, the review of the video clips from the Trombi survey resulted in about

14  one-fourth as many referrals to secondary review, and about one-half as many IA

15  investigations, as did the review of the Armendariz/HSU video clips.  (*See* Doc. 755 at

16  3.)  This suggests to the Court that the officers might have been selective about the clips

17  they turned in or might have simply declined to turn in responsive clips.

18      259.   The Court finds that at least some officers declined to submit some or all of their

19          responsive video clips out of fear or belief that the clips would reveal problematic

20          conduct.

21  **B.    The MCSO Failed to Produce Documents**

22      260.   Although prior to trial, Defendants did turn over numerous documents to

23  Plaintiffs, Defendants did not request documents from some of the persons most likely to

24  have them.

25      261.   As has been noted above, Sheriff Arpaio, Chief Trombi, Lieutenant

26  Jakowinicz, and Sergeant Trowbridge all testified that they were not asked to search for

27  responsive documents prior to trial.  (Doc. 1017 at Tr. 100–01, 148; Doc. 1051 at Tr.

28  391:12–19, 446, 458, 461; Doc. 1027 at Tr. 607–08.)

1    262.   On their June 2014 return to the HSU's former offices at Enforcement

2   Support, the MCSO found, in addition to IDs and audio recordings, "many boxes

3   containing detective's copies of cases." (Ex. 43 at MELC104078.)

4    263.   In November 2014, Chief Deputy Sheridan again instructed HSU deputies

5   to search former HSU offices.  After that search, Mr. Casey informed the Court that new

6   evidentiary items that were likely responsive to Plaintiffs' pretrial discovery requests,

7   including an additional 22 boxes of reports, had been located in the old HSU offices.[9]

8   (Doc. 788 at 2.)

9    264.   The MCSO's discoveries in November resulted in IA #2015-018 through

10  IA #2015-021, *see infra* Part III.B.4.

11   265.   Mr. Casey provided Plaintiffs with the incident reports found in the 22

12  boxes.  There were 124 reports that Plaintiffs were not given prior to trial.  (Ex. 215.)

13   266.   On February 12, 2015, the Court issued an order requiring Defendants to

14  provide additional discovery in this matter.   All responsive documents were due by

15  February 27, 2015.  (Doc. 881.)

16   267.   Captain Skinner testified that he issued internal orders within the MCSO to

17  comply with the Court's February 2015 discovery orders.

18   268.   Lieutenant Sousa, however, testified that, apparently despite these orders,

19  he was not asked to search for any of the ordered discovery.

20   269.   Captain Skinner and attorney Ms. Michele Iafrate searched for Lieutenant

21  Sousa's documents the day before Sousa's re-opened deposition took place in mid-April

22  2015.  (Doc. 1027 at Tr. 704–05.)  Even then, Sousa does not believe that anyone

23  searched the desktop computer he used at the HSU, even though he believes that

24  documents would likely be there, as well as in the buffalo drive that Iafrate copied.  (*Id.*

25  at Tr. 705.)

26

27   [9] Mr. Casey was then withdrawing from further representation of the Sheriff.  The
    Court ordered Casey to determine if any of those recordings and other materials
28   identified by Casey had been previously identified or provided to Plaintiffs prior to the
    underlying lawsuit.  (Doc. 803 at Tr. 56.)  Instead, Sheriff Arpaio apparently provided the
    Plaintiffs with the documents and required them to make the assessment.

270.    Sergeant Palmer was not asked to search for documents responsive to the Court's February 2015 order until April 7, 2015.  (Doc. 1017 at Tr. 199.)  Palmer's documents were finally searched on April 13 by two members of the MCSO Court Compliance Unit.  (*Id.*)  They searched his current computer but not the computer he used while he worked at the HSU.  (*Id.* at 200–01.)

271.    Sergeant Palmer believes that while he was at the HSU he might have had other documents that would have been responsive to the Court's discovery order, but there is no indication that the computer that he used at the time was searched.  (Doc. 1017 at Tr. 200–01.)

272.    Sergeant Trowbridge was not instructed to search his own files prior to his first deposition in this case.  (Doc. 1021 at Tr. 446.)  After his first deposition, Captain Skinner and Ms. Iafrate searched his emails.  (*Id.*)

273.    Lieutenant Jakowinicz was not asked to search his emails or documents for materials related to these evidentiary hearings prior to his first deposition.  (Doc. 1051 at Tr. 391:12–19.)

274.    During his third deposition, Lieutenant Jakowinicz testified that there were additional emails that related to the evidentiary hearing that had not yet been turned over to defense counsel.  (Doc. 1051 at Tr. 392.)

275.    Further, as of the first day of the evidentiary hearing, Maricopa County had not yet produced additional responsive documents that were ordered by the Court in February.  (Doc. 1017 at Tr. 20–27.)

**C.    The MCSO Failed to Produce Personal Property Seized from Members of the Plaintiff Class.**

**1.    Personal Property of Plaintiff Class Members Found in the Possession of MCSO Officers Led to the Court's February 2015 Discovery Order.**

276.    During the relevant period, MCSO officers routinely took "trophies" of their arrests of unauthorized aliens, including IDs, license plates, and other kinds of personal property.  (Doc. 1417 at Tr. 1546–47.)

- 48 -

277.    Although these materials resulted from HSU operations, none of the materials were provided to Plaintiffs prior to trial.

278.    The Armendariz search uncovered more than 1600 items including approximately 500 drivers' licenses, "tons" of license plates, weapons, illegal drugs both in MCSO evidence bags and otherwise including methamphetamine, marijuana, LSD, heroin, and oxycodone, a black purse with items in it, vehicle registrations, cell phones, wallets, a scale, drug paraphernalia, thumb drives, memory cards, currency, and other items of personal property.  (Ex. 2874A; *see also* Doc. 1043 at Tr. 973–74; Doc. 1417 at 1549; Doc. 1556 at Tr. 3245.)  All of these items were apparently taken from people during HSU stops.  (Doc. 1556 at Tr. 3246.)  With the very few exceptions noted below, these items have never been the subject of any administrative investigations.

279.    On May 23, 2014, shortly after the administrative investigation into the Armendariz materials began, Detective Frei raised with Captain Bailey 111 IDs, which eventually became the partial subject of IA#2015-018, *see infra* Part III.B.4.a.  (Ex. 1000 at MELC028133–57; Doc. 1498 at Tr. 3853–57.)

280.    The MCSO found Mexican identification cards and a Mexican passport (in addition to the case files and 1451 CDs discussed *supra* ¶ 209).   (Ex. 43 at MELC104079.)

281.    Cisco Perez, an HSU deputy terminated for untruthfulness, made generalized allegations in his subsequent state unemployment hearing.  These allegations included that HSU officers commonly "pocketed" shirts, flags, statues, drug paraphernalia, and on at least one occasion a 62 inch flat screen television "for training purposes" during their operations with the approval of their supervisors.  (Ex. 2006 at MELC011163.)

282.    An August report, drafted by Sergeant Tennyson of the Profession Standards Bureau (PSB), determined that no criminal charges should result from the Cisco Perez's allegations, *see infra* Part III.B.1.  (Doc. 1043 at Tr. 988–93; Doc. 1466 at Tr. 2819–24; Doc. 1467 at Tr. 3123–24, 3199; Ex. 2841.)    The August report

1    nevertheless noted that many different forms of identification were found in the HSU's
2    offices, that "[s]everal deputies recalled seeing license plates at the Enforcement Support
3    Building (former home base of the MCSO Human Smuggling Unit,)" and that some
4    officers had also collected religious statuettes, clothing, and other articles from HSU
5    operations.  (Ex. 2006.)

6        283.   On September 12, 2014, the MCSO opened up an administrative
7    investigation on the property that was discovered in the HSU offices.  The investigation
8    extended to "supervisors who appeared to have knowledge of detectives keeping property
9    within their work space."  (Doc. 786 at 7–8.)  This property subsequently became the
10   subject of IA #2014-541, *see infra* Part III.B.2.

11       284.   On November 4, Sergeant Tennyson, who was at Enforcement Support at
12   the time, was provided with four identification cards and other items.  (Doc. 1466 at
13   2942–43; Ex. 2025; Ex. 2026.)  Those items subsequently became the subject of IA
14   #2015-022, *see infra* Part III.B.4.c.

15       285.   On November 5, another deputy found 53 IDs while cleaning the MCSO's
16   offices, (Doc. 803 at 47–50), as well as 35 license plates that subsequently became the
17   partial subject of IA #2015-018.  (Doc. 848 at 2–3.)

18       286.   The November 5 search also revealed a report indicating that $260 was
19   secured from an arrestee but the funds were not placed in the inmate account nor were
20   they placed in Property and Evidence.  (Doc. 848 at 4–5.)  This discovery subsequently
21   became the subject of IA #2015-021, *see infra* Part III.B.4.b.

22       287.   In November 2014, during their second trip to the HSU's old offices, the
23   investigators found two purses that contained several identification cards, a $5 bill and
24   several other items.  The owners had been arrested during an HSU raid and deported.
25   (Doc. 848 at 3–4.)  The purses subsequently became the subjects of IA #2015-019 and
26   IA#2015-020.

27       288.   On December 9, 2014, the MCSO notified the Court that it had located an
28   additional 44 drivers' licenses/identification cards.   (Doc. 827.)   This discovery

1   subsequently became the subject of IA #2014-874.  (Doc. 848 at 5.)

2      289.   In early February 2015, the Court issued an order requiring the MCSO to

3   produce additional discovery and documents, including any IDs that might have been

4   taken from members of the Plaintiff class, by February 27, 2015.  (*See* Doc. 881.)

5      290.   On April 17, 2015, the MCSO put out a department-wide "Briefing Board"

6   newsletter (No. 15-04) which implemented protocols for the seizure of revoked driver's

7   licenses, suspended license plates, and license plates displayed in violation of state

8   criminal law.  (*See* Ex. 2065.)  It eliminated the existence of district or division collection

9   boxes for such materials.  (*Id.* at MELC225058.)  The Briefing Board further instructed

10  anyone encountering driver's licenses, identifications, or license plates in their duties to

11  immediately impound such items, document the circumstances in which they were

12  encountered in a memorandum, and forward the memorandum to the Court

13  Implementation Division, which would forward it to the PSB.  (*Id.*)

14     291.   The MCSO began receiving more collections of IDs and license plates.

15     292.   They include:  IA #2015-0393 (involving 44 IDs and 2 license plates begun

16  in May, 2015); IA #2015-0475 (involving 42 IDs and begun in June, 2105); IA #2015-

17  483 (involving 5 IDs and begun in June, 2015); IA #2015-0511 (involving 1459 IDs and

18  begun on July 28, 2015); IA #2015-0644 (involving 65 IDs and begun in August 2015);

19  IA #2015-0682 (involving 46 IDs and begun in September 2015); IA #2015-683

20  (involving 3 IDs and begun in September 2015); IA #2015-0882 (involving 1 ID and

21  begun in November 2015); IA#2016-0003 (license plate begun in January 2016).  (Doc.

22  1625.)

23     293.   Collections of IDs and license plates, apparently from the relevant period,

24  that are found in MCSO facilities but that were not placed in Property and Evidence

25  continue to come to light.

26     294.    The MCSO identified none of these items for Plaintiffs prior to the

27  underlying trial.  (*See, e.g.*, Doc. 1027 at Tr. 691.)

28

**2.      The MCSO Attempted to Conceal the 1459 Knapp IDs from the Court.**

295.   In early July, Sergeant Knapp attempted to place 1459 IDs in the MCSO Property and Evidence department for destruction.  (Doc. 1498 at Tr. 3857–58.)

296.   A supervisor in the Property and Evidence department refused to take the IDs and reported them to Lieutenant Seagraves.  (Doc. 1455 at Tr. 2166; *see also* Doc. 1498 at Tr. 3858–59.)  That same day, Seagraves emailed Captain Bailey to inform him about the Knapp IDs and cc'd Ms. Iafrate.  (Doc. 1455 at Tr. 2167.)

297.   Captain Bailey testified that he learned about the Knapp IDs on July 7, when Sergeant Bone and Lieutenant Kratzer came to his office to inform him.  (Doc. 1498 at Tr. 3858–59.)  Bailey ensured that the IDs were secured in the PSB's offices. (*Id.* at Tr. 3860.)  The PSB assigned IA #2015-511 to the case.  (Doc. 1455 at Tr. 2167; Doc. 1498 at Tr. 3861, 3931; Doc. 1465 at Tr. 1375:18–25; *see also* Doc. 1498 at Tr. 3869–70.)

298.   On the same day, Captain Bailey discussed the matter several times with Chief Deputy Sheridan.  (Doc. 1498 at Tr. 3861–62.)  Captain Bailey proposed that Sergeant Knapp should be interviewed, and Chief Deputy Sheridan agreed.  (*Id.* at Tr. 3862.)

299.   The PSB interviewed Sergeant Knapp that week.  (Doc. 1498 at Tr. 3864, 3920–21.)  Knapp indicated that he had been collecting these IDs since about 2006 from the destruction bin in the Property and Evidence room.  (*Id.* at Tr. 3864–65.)

300.   The MCSO approximates that 30% of the 1459 Knapp IDs are of Hispanic persons.  (Doc. 1465 at Tr. 1353, 1357–58.)  Captain Bailey believes the identifications were brought into the agency as a result of traffic stops or some other law enforcement action.  (Doc. 1498 at Tr. 3864.)  The MCSO asserts that the IDs appear to contain a mixture of valid and invalid IDs.  (*Id.* at Tr. 3863.)

301.   After receiving Sergeant Knapp's report of how he obtained the IDs, Chief Deputy Sheridan instructed Captain Bailey to suspend the IA investigation.  (Doc. 1498 at Tr. 3865, 3935.)

302.   Chief Deputy Sheridan testified that he suspended the IA investigation to try to find out more information about the IDs and to determine whether he had to disclose the identifications without raising unnecessary alarm.  (Doc. 1465 at Tr. 1363–64.)

303.   He testified that he thought that either the dates of collection or the fact that they had been pulled from the destruction bin in Property and Evidence might take the documents out of the Court's orders, so he consulted with Ms. Iafrate about the matter. (Doc. 1465 at Tr. 1349–50; *see also* Doc. 1498 at Tr. 3865.)

304.   Chief Deputy Sheridan testified that Ms. Iafrate was also very upset about the discovery of the identifications and their potential ramifications.  (Doc. 1465 at Tr. 1351, 1363–64).  He asked Iafrate to determine whether the facts pertaining to the IDs provided a basis to not disclose them.  (*Id.* at 1350.)

### a.      July 17, 2015 "Rehearsal Meeting"

305.   Approximately a week later, on Friday, July 17, the PSB staff held a "rehearsal meeting" to prepare for a July 20 meeting with the Monitor Team.  (Doc. 1498 at Tr. 3866–67.)

306.   Ms. Iafrate holds rehearsal meetings to help the PSB prepare for meetings with the Monitor Team by telling PSB members how they can respond to various possible questions from the Monitor Team.  (Doc. 1465 at Tr. 1360.)

307.   Chief Deputy Sheridan, Captain Bailey, Lieutenant Seagraves, Lieutenant Kratzer, Sergeant Sparman, Sergeant Bone, Sergeant Bocchino, Ms. Loren Sanchez, and Ms. Iafrate attended the meeting.  (Doc. 1498 at Tr. 3867.)

308.   Captain Bailey testified that he and the others present at the meeting, including Ms. Iafrate, discussed the Knapp IDs.  (Doc. 1498 at Tr. 3933.)  Because the MCSO had previously disclosed to the Monitor other collections of recently discovered IDs, the MCSO anticipated that the Monitor Team might ask if any additional IDs had been discovered.

309.   Lieutenant Seagraves testified that during the rehearsal meeting, Seagraves

inquired, "If we're asked about any [IDs or licenses not yet disclosed to the Monitor Team], what would be the response?"  (Doc. 1455 at Tr. 2169.)

310.   Ms. Iafrate indicated that she planned to research whether the Knapp IDs fell within the parameters of the Court order.  She advised the PSB not to disclose the existence of the IDs to the Monitor Team in the meantime.  (Doc. 1498 at Tr. 3868; Doc. 1455 at Tr. 2169; Doc. 1465 at Tr. 1355.)  Iafrate told Captain Bailey not to disclose the IDs to the Monitor until he heard back from her, (Doc. 1498 at Tr. 3868), and told Chief Deputy Sheridan it would be premature to disclose the identifications to the Monitor.  (Doc. 1465 at Tr. 1355–56.)

311.   After the rehearsal meeting, Chief Deputy Sheridan had a second meeting with Captain Bailey and Ms. Iafrate in the same conference room.  (Doc. 1498 at Tr. 3867–68.)  At this meeting, Bailey told Iafrate that an IA number had been assigned to the Knapp ID case.  (*Id.* at Tr. 3868.)

312.   Captain Bailey testified that he did not specifically speak to Ms. Iafrate about what he should do if the Monitor asked a question that would require the disclosure of the Knapp IDs.  (Doc. 1498 at Tr. 3868, 3871.)

313.   Chief Deputy Sheridan, on the other hand, testified that Captain Bailey asked Ms. Iafrate what he should do if the Monitor inquired about whether new IDs were found.  Sheridan testified that Iafrate told Bailey "something to the effect of, if [the Monitor] asks specifically about the 1500 IDs, go ahead, tell him."  (Doc. 1465 at Tr. 1357.)

**b.    July 20, 2015 Meeting**

314.   On July 20, the PSB met with the court-appointed Monitor Team.  (Doc. 1498 at Tr. 3868–69.)

315.   Lieutenant Seagraves testified that at that meeting, the Monitor Team asked about whether any new identifications had been found.  Captain Bailey responded that there were none found.  (Doc. 1455 at Tr. 2171.)

316.   According to Captain Bailey, the Monitor Team asked a more specific

question—whether there were "any other pending investigations regarding identifications." (Doc. 1498 at Tr. 3936.) It was to this question that Bailey testified he answered no. (*Id.* at Tr. 3869, 3935–37.)

317. Captain Bailey testified that Ms. Iafrate in fact instructed him to answer no. (*Id.* at Tr. 3936 ("I was asked the question, and I just glanced at [Iafrate], and she looked at me and said no.").)

318. Lieutenant Seagraves also testified that "at that moment in time, based on legal advice, [the Knapp IDs] were not disclosed." (Doc. 1455 at Tr. 2174.)

### c.   The Aftermath

319. Chief Deputy Sheridan and Captain Bailey's testimony differed as to what happened thereafter.

320. Chief Deputy Sheridan testified that approximately two days after the discussion, Captain Bailey came to see him. Bailey was upset because the Monitors asked Lieutenant Swingle the same question they had asked Bailey, and Swingle reported the discovery of the 1459 IDs to the Monitors. (Doc. 1465 at Tr. 1359.) Bailey was concerned with how the discrepancy would look—that Bailey's negative answer would make it look like he was trying to conceal the existence of the 1459 IDs. (*Id.*)

321. Chief Deputy Sheridan saw no problem with Captain Bailey's answer. (Doc. 1465 at Tr. 1359–61.) Sheridan told Bailey that it was okay so long as he had done what Ms. Iafrate had told him to do. (*Id.* at Tr. 1359:23–24.)

322. Captain Bailey has no recollection of discussing the matter with Chief Deputy Sheridan during that week. (Doc. 1498 at Tr. 3875:11–24.)

323. The investigation into the IDs was not reactivated until after Captain Molina assumed control of the PSB in late August because Chief Deputy Sheridan continued to await the advice of Ms. Iafrate. (Doc. 1465 at Tr. 1368.)

324. When the Court subsequently became aware of the IDs and the MCSO's responses to the Monitor Team concerning them, the Court ordered the U.S. Marshall to take custody of the IDs. (Doc. 1465 at Tr. 1377.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   **d.**  **The Court Finds that Chief Deputy Sheridan "Suspended" the Knapp IDs Investigation in a Bad Faith Attempt to Avoid His Obligation Under the Court's Orders to Disclose the Existence of the 1459 IDs.**

325. On the night the Court ordered the U.S. Marshalls to take custody of the IDs, Chief Deputy Sheridan told the press that the IDs had never been disclosed by the MCSO because nobody had ever asked for those IDs.  (Doc. 1465 at Tr. 1378.)  In his testimony during the evidentiary hearing, he was confronted with this statement and he indicated that he stands by it.  (*Id.*)

326. Chief Deputy Sheridan's statement to the press was a knowing misstatement of fact.  His reassertion of that statement during the evidentiary hearing was also a knowing misstatement of fact.

327. Since the inception of this case, the Court has ordered the MCSO to provide the Monitor access to all information and documents that the Monitor sought relating to MCSO operations.  (Doc. 606 at ¶ 145 ("Defendants shall ensure that the Monitor has timely, full and direct access to all personnel, documents, [and] facilities . . . that the Monitor reasonably deems necessary to carry out its duties."), ¶ 148 ("Upon [request from the Monitor or Plaintiffs], the Defendants shall provide in a timely manner copies (electronic, where readily available) of the requested documents.").)

328. The Court has specified that if the MCSO claimed a privilege justifying its refusal to turn over any document, it needed to notify the Monitor, so that the Monitor and/or Plaintiffs could challenge the invocation of the privilege.  (Doc. 606 at ¶ 146.)  The Court would then decide whether the documents needed to be disclosed.

329. This was not the course the MCSO pursued.  The MCSO claims no privilege regarding the IDs.  Nor did the MCSO identify the existence of the 1459 Knapp IDs to the Court to determine whether the MCSO had the right to withhold them from the Monitor and Plaintiffs.

330. To the extent there is a discrepancy in the testimony, the Court finds that in the July 20 meeting between the PSB staff and the Monitor Team, the Monitor Team

asked if any further IDs had been found.  The MCSO thus violated the Court's orders when Captain Bailey responded that no further IDs had been found, and no member of the MCSO disclosed the existence of the Knapp IDs during the meeting.  The MCSO did so with the intention of concealing the existence of the IDs from the Monitor, the Parties, and the Court.

331.   Even if, however, the Monitor Team had not asked whether any additional IDs had been found, but rather had asked only the unusually specific question that Captain Bailey testified that they asked (whether any further investigations regarding IDs were pending), it would not have changed the duplicity of Bailey's answer for a number of reasons.

332.   The Court's November 20, 2014 order states:  "When MCSO undertakes a new investigation that relates to (a) the MCSO's compliance with its discovery and/or disclosure obligations in this case, [or] (b) the MCSO's compliance with the resulting orders of the Court in this case . . . it is ordered to lodge under seal with the Court and to provide the Monitor written notice specifically identifying the subjects and targets under inquiry and specifically referencing the administrative number assigned to the investigation."[10]  (Doc. 795 at 18:16–22.)

333.   First, Defendants were under the obligation to disclose any investigation once it was "undertaken."  Defendants do not, and cannot dispute that an investigation was undertaken.  As such, the obligation to disclose the Knapp IDs investigation arose at the time that the investigation was first initiated.  Chief Deputy Sheridan was wrong when he testified that there is "no time period" or mandate that the MCSO must respond to the Court's order "immediately upon discovering" responsive documents or items. (Doc. 1465 at Tr. 1363.)  The Court's November 20, 2014 order explicitly states that the time period is "when MCSO undertakes a new investigation."  (Doc. 795 at 18:16.)  The

---

[10] In December 2014, the Court extended the order to require the MCSO "to also provide written notice to the Plaintiffs and the United States Attorney when it undertakes an investigation relating to these three enumerated categories of matters."  (Doc. 825 at 2; *see also* Doc. 817 at 7–9.)

Knapp IDs investigation was undertaken on or before July 7.  (Doc. 1498 at Tr. 3858–59.)  By the July 20 meeting with the Monitor Team, the MCSO had already been in violation of the Court's order for nearly two weeks.

334.   Second, the Court's order requires the Defendants to disclose *any* investigation that relates to the MCSO's compliance with discovery/disclosure obligations or this Court's orders.  (Doc. 795 at 18:16–22.)  Whether an investigation is "official," *i.e.*, has an IA number, or unofficial, *i.e.*, conducted by Chief Deputy Sheridan while the "official" investigation is "suspended," it is still an investigation.   Thus, Sheridan's suspension of the IA investigation to pursue *his own investigation* in no way altered his obligation to disclose that the Knapp IDs were being investigated.

335.   Third, a "suspended" investigation is still "pending," in that (at least in theory) it eventually will be resumed and resolved.  Captain Bailey testified that they fully intended to resume the investigation "when the time was appropriate."  (Doc. 1498 at Tr. 3923; *see also id.* at Tr. 3938 ("I expected that we would investigate these when I was told to proceed with the investigation as we had a number of other times.").)  If this testimony could be credited, then the answer to whether there were any "pending investigations" should have been yes.

336.   Fourth, even if the "suspension" was intended to end the investigation indefinitely, Defendants were obligated to report *both* the initiation and the closure of the investigation.  (Doc. 795 at 18–19 ("The MCSO will similarly inform the Court when it closes such an investigation without action, when it closes an investigation with adverse action to the employee, if the adverse action is appealed, and if so, when the appeal is abandoned, terminated or dismissed, or the matter is otherwise terminated.").)  To the extent the Defendants are attempting to assert that "suspending" the investigation renders it no longer "pending," this too amounts to closing the investigation.

337.   Furthermore, Chief Deputy Sheridan also testified (inconsistently) that he did not suspend the IA investigation into the Knapp IDs, but rather suspended only a part of it.  (Doc. 1465 at 1364–67.)  He testified that his intention to suspend only part of the

- 58 -

investigation explained his statement to Chief Anders during his interview with the Monitor Team after the concealment of the 1459 IDs was discovered.  (*Id.* at 1374–75.) In that interview, Sheridan stated that the IA investigation into the Knapp IDs had never been suspended but had always been open.  (*Id.* at 1373–74.)

338.    Chief Deputy Sheridan explained at the evidentiary hearing that in suspending the investigation into the Knapp IDs, he was attempting to avoid "another Charley Armendariz situation" involving thousands of personnel hours.  (Doc. 1465 at 1367:8–11.)    He did not want Captain Bailey looking into individual IDs and backtracking to try to identify where they came from.  (*Id.* at 1366.)  He testified that he only intended to suspend that part of the investigation, but he must have miscommunicated that to Bailey.  (*Id.* at Tr. 1375–77.)  He further testified that he "didn't think [he] needed to qualify [his] answer [that he ordered Bailey to suspend the investigation] until today."  (*Id.* at Tr. 1377:11–12.).

339.    This explanation is not credible.    The Court finds that Chief Deputy Sheridan generated this testimony in an attempt to explain his intentional misstatement of fact to Chief Anders.  Sheridan had in fact "suspended" the Knapp IA investigation in whole, in an attempt to avoid the Defendants' obligation to disclose the existence of the 1459 IDs to the Monitor and the Plaintiffs.  Sheridan did not have to "suspend" the entire investigation in order to limit the personnel hours spent identifying the source of the IDs; he could have simply ordered that such work not be included in the investigation.

340.    Moreover, in addition to the November 20, 2014 order, the Court had ordered the MCSO in February 2015 to disclose "[c]opies of any identification documents seized by MCSO personnel from apparent members of the Plaintiff class." (Doc. 881 at 2.)   Chief Deputy Sheridan knew that the Court had entered this order. (Doc. 1465 at Tr. 1380; Doc. 1417 at Tr. 1512.)  As of the "rehearsal meeting" on July 17, 2015, Sheridan was "well aware that 30 percent of the 1459 IDs apparently belonged to people who were Hispanic."  (Doc. 1417 at 1511.)  Sheridan also knew by then that Sergeant Knapp "had gotten all of the 1459 IDs from the destruction bin in the Property

1    and Evidence room," and in order to get into the destruction bin, the IDs must "have been

2    seized by a deputy." (*Id.* at 1511–12.)

3        341.   The Court therefore finds that when Chief Deputy Sheridan "suspended"

4    the IA investigation, he did so in a knowing and bad faith attempt to avoid the Court's

5    order requiring the MCSO to disclose the newly found IDs to the Monitor.

6            **e.    The MCSO Knowingly Attempted to Deceive the Monitor Team**
             **at the July 20 Meeting.**

7

8        342.   Captain Bailey was aware that the Court had ordered the disclosure of all

9    IDs seized by the MCSO from apparent members of the Plaintiff class. (Doc. 1498 at Tr.

10   3866, 3872.) He also knew that the Monitor Team would want to know about the IDs.

11   (*Id.* at 3866) Bailey understood that the Court had ordered him to provide complete

12   access to all matters regarding internal affairs investigations and that the MCSO could

13   not unilaterally withhold information from the Monitor. (*Id.* at 3873–75.) The Court

14   finds that Captain Bailey knew that his answer to the Monitor Team's question on July 20

15   was untruthful for the reasons explained above.[11]

16       343.   Captain Bailey nevertheless testified that when he denied to the Monitor the

17   existence of additional IDs (or the existence of additional "pending investigations

18   regarding IDs"), he did so at the instruction of the MCSO's counsel, Ms. Iafrate. (Doc.

19   1498 at Tr. 3937.)

20       344.   Captain Bailey testified that when Chief Kiyler of the Monitor Team asked

21   the question, Ms. Iafrate, who was sitting to his right, looked at him and, in front of all

22   present, said the word "no." (Doc. 1498 at Tr. 3870–71, 3936–37.) He thus claims that

23   his response to the Monitor Team was following her advice. (*Id.* at 3937.)

24       345.   Nothing about when or whether Ms. Iafrate instructed Captain Bailey to

25   violate the Court's order changes the ultimate fact that those MCSO officers and

26

27       _____

28       [11] In testifying about the obligation of a division to report to the PSB the status of
         a division-assigned IA investigation—even if the division had suspended the
         investigation—Captain Bailey testified that "[a]fter the [IA] number is pulled you can't
         say there's no IA investigation." (Doc. 1505 at Tr. 4000:2–3.)

1    representatives present at the July 20 meeting knowingly concealed the Knapp IDs in

2    violation of this Court's orders.

3         346.   Neither the dates during which Sergeant Knapp collected the IDs nor his

4    assertion that they all came from the Property and Evidence room removes the

5    identifications from the scope of any of the Court's three orders which required their

6    immediate disclosure.  The orders were written in plain terms that lawyers or non-lawyers

7    could understand.  Therefore, especially with the imminence of the resumption of the

8    hearings, the MCSO was not justified in indefinitely delaying disclosure pending an

9    interpretation of the Court's plain language in any of the three orders that all required

10   disclosure.  Thus, Captain Bailey, as a representative of the MCSO, was not justified in

11   answering "no" to the Monitor Team's question at the July 20 meeting, regardless of

12   whether his answer was at Ms. Iafrate's suggestion.

13        347.   Ms. Iafrate represents the MCSO in this case.  She was aware of the Court's

14   orders requiring the MCSO to disclose to the Monitor all materials sought, and

15   specifically the orders requiring the MCSO to disclose when it undertook investigations

16   relating to the existence of IDs.  Iafrate had demonstrated her knowledge of the order

17   requiring disclosure of IDs, and her ability to comply with it, by previously disclosing to

18   the Court additional IDs found in the custody of the MCSO.[12]   (*See, e.g.*, Doc. 827.)

19   Iafrate was also aware of the Court's February 2015 discovery order and the Court's

20   supplemental injunctive order.  Iafrate also knew that a large percentage of the 1459

21   Knapp IDs were of Hispanic persons and that the IDs had been obtained from the

22   destruction bin in Property and Evidence during periods that were subject to Plaintiffs'

---

[12] Further, the order in question was the subject of some discussion between the Court and Ms. Iafrate, as it related to the scope of the Monitor's access to internal affairs investigations.  While that discussion resulted in the amendment of the order in some other respects, (*see, e.g.*, Doc. 817 at 7–9; Doc. 825 at 2–3), the Court continued to order the MCSO to provide the Monitor full access to all aspects of its internal investigations. (Doc. 795 at 17 ("[T]he Monitor must necessarily have complete access to Defendants' internal affairs investigations.  This includes familiarity with the manner in which MCSO pursues an investigation—be it criminal or administrative in nature—the investigation's initial and continuing scope in light of the information the investigation uncovers, the performance of the investigators, and the kind of discipline—if any—ultimately imposed at its conclusion.").)

preservation order and discovery requests.  (Doc. 1465 at Tr. 1350-51, 1357-58.)  She was also aware that the PSB had actually assigned an IA number to an investigation regarding the IDs.  (Doc. 1498 at Tr. 3868.)

348.   When Captain Bailey answered "no" to the Monitor's question pertaining to identifications, regardless of the phrasing of the question, he knowingly violated the orders of the Court.  Chief Deputy Sheridan, Captain Bailey, and Ms. Iafrate violated the specific and direct orders of this Court without a justifiable basis for doing so.

### 3.     Sheriff Arpaio Knowingly Attempted to Conceal 50 Hard Drives of Montgomery Information.

349.   In April 2015, the Court asked questions eliciting testimony that the MCSO had received communications and information from a confidential informant who then lived in the Seattle area named Dennis Montgomery.

350.   Mr. Montgomery had purported to conduct certain inquiries involving this Court for Sheriff Arpaio.  In doing so, Montgomery purported to use a vast number of files that had been illegally harvested by the CIA from American citizens.  (Ex. 2726 at MELC1292695.)

351.   On April 23, 2015, Sheriff Arpaio testified that the MCSO and Mr. Montgomery exchanged communications and materials.  The Court ordered that Arpaio personally order the MCSO to preserve and disclose such information:

> THE COURT:  . . . I want you to direct your people to put a hold on it immediately and preserve it.  And that includes any documentation or numbers that would relate to Mr. Montgomery's confidential status.  You understand that?
>
> [ARPAIO]: Your Honor, are you referring to this investigation with the monitors and ---
>
> THE COURT:  No, no.  I'm referring to the investigation that Mr. Montgomery was undertaking with Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your staff, anybody else from the MCSO, or anyone else from the posse.  I want all records that in any way relate to it, all electronic data or anything else, or the financing, funding of that

operation, all phone records, e-mails, reports, I want it all preserved.  And I think I will send the monitor to begin taking possession of those records and we'll do it confidentially, imminently.  But I don't want in the interim any of those records lost inadvertently or otherwise.  You understand what I'm saying?

[ARPAIO]: Yes.

THE COURT:  And you'll so direct your people?

[ARPAIO]: Yes.

THE COURT:  All right.  Thank you, sir.

(Doc. 1027 at Tr. 659–660; *see also id.* at 653, 656 (directing Arpaio to preserve all documents held by Mr. Zullo); *see generally* Doc. 1027 at Tr. 631–32 (Arpaio acknowledging that the Court had informed him that he could not escape liability for non-compliance by delegation); *see also* Doc. 700 at Tr. 71.)

352.   One of the reasons the Court entered such a direct order was the MCSO's poor record of "spoliation of evidence and non-compliance with orders relating to document discovery."  (Doc. 1046 at 2.)

353.   At the time that the Court issued Sheriff Arpaio the order, Arpaio knew that Mr. Montgomery had given the MCSO 50 hard drives that Montgomery claimed to be the master database of records he had supposedly purloined from the CIA. (Doc. 1458 at Tr. 2561–62.)

354.   Despite the Court's order that he personally direct compliance with the Court's preservation order, Sheriff Arpaio subsequently testified that he "wasn't personally involved."  (Doc. 1458 at Tr. 2561–63.)  He does not recall having any discussion with anyone about the order, but he hoped that it would be carried out.  (*Id.* at Tr. 2563–64.)

355.   Sheriff Arpaio personally did nothing to implement the Court's order, and the MCSO did not produce the 50 hard drives that Mr. Montgomery had given to the MCSO.

356.   The Court did not discover the existence of the hard drives from the Defendants.  Rather, during the same July 2015 site visit in which the Monitor discovered the existence of the 1459 Knapp IDs that the MCSO was attempting to conceal, the Monitor also discovered that Sheriff Arpaio was storing 50 hard drives that the MCSO had received from Mr. Montgomery in its Property and Evidence department.   The Monitor further discovered that the hard drives were associated with a DR number—DR14-00750.

357.   In addition to the 50 hard drives, the MCSO also failed to produce a report from two former NSA computer specialists, Thomas Drake and Kirk Wiebe, whom the MCSO had engaged to inspect the hard drives in November 2014.  In that report, Drake and Wiebe advised the MCSO that the contents of Mr. Montgomery's purported master database were fraudulent, and did not result from any CIA harvest of information.  (Ex. 2531 ("We have found that he is a complete and total FRAUD.").)   Detective Mackiewicz forwarded the email and accompanying memorandum to Chief Deputy Sheridan.  (*See id.*)   Sheridan received the memorandum and shared it with Sheriff Arpaio.

358.   The memorandum was not produced until the Court raised a question subsequent to the discovery of the 50 hard drives about whether all of the Montgomery documents had been provided.  (*See* Doc. 1310 at Tr. 16–17.)

359.   There were many reasons Sheriff Arpaio would not have wanted the hard drives and their fraudulent nature disclosed.

360.   First, Mr. Montgomery committed a fraud on the MCSO.  (Doc. 1417 at Tr. 1562-64; Doc. 1457 at Tr. 2455.)  Having paid large sums of money to Montgomery for his investigations, the MCSO was a victim of that fraud.  Disclosure could therefore bring embarrassment to Sheriff Arpaio and the MCSO.

361.   Second, Sheriff Arpaio and Mr. Montgomery shared the same attorney and had shared this attorney since at least November 2014.

362.   Third, Sheriff Arpaio testified that the MCSO continued to engage Mr.

Montgomery as a confidential source up through and including the time of the hearing, despite Arpaio's repudiation of the substance of Montgomery's reports, and despite the overwhelming evidence of Montgomery's fraud.

363.    These are all powerful motivations to avoid disclosure of the fraudulent hard drives.

364.    Sheriff Arpaio did not follow the order of the Court that he personally direct the preservation and disclosure of all the Montgomery documents.  By failing to do so, he violated the Court's direct order.  Moreover, to the extent that Arpaio's testimony attempts to suggest that his violation of the order arose from negligence rather than an intention to conceal, the Court does not find that suggestion credible.

**D.    The Defendants' Failures Were in Bad Faith.**

365.    On October 2, 2013, this Court entered its initial injunctive relief specifying the corrective action that the MCSO would have to undertake to remediate its violations of the rights of the Plaintiff class.  (Doc. 606.)

366.    In that same month, Sheriff Arpaio took several actions demonstrating his defiance of that order.

367.    On October 18, 2013, Sheriff Arpaio and Chief Deputy Sheridan began misstating the contents of this Court's order to their own officers in training sessions and maligning the order as unconstitutional, "ludicrous," and "crap."    (Doc. 656 at 5–16; Doc. 662 at Tr. 25–27).   These misstatements served as the genesis for additional misstatements regarding the Court's order made to the public at large, both in newspaper editorials and in community meetings.  (Doc. 662 at Tr. 30; Doc. 1017 at Tr. 91.)

368.    For example, part of the Court's order required the MCSO to engage in community outreach.  (Doc. 606.)  In October, Sheriff Arpaio and an accompanying sergeant pulled over two automobiles, each of which contained four Hispanic occupants. Arpaio stated that turning on the flashing lights of the patrol car and effecting traffic stops of cars containing Hispanic occupants constituted the "community outreach"

ordered by the Court.[13]   (Doc. 1027 at Tr. 579–83, 606–07, 619–20; Ex. 193A; Ex. 193B; Ex. 193C.)

369.    It was also in October 2013 that the MCSO launched the "Seattle" investigation involving Mr. Montgomery.   (Doc. 1455 at Tr. 2055–57; Ex. 2962 at Zullo_000803.)

**1.    The MCSO's "Seattle" Investigation Involving Mr. Montgomery Demonstrates Sheriff Arpaio's Many Intentional Misstatements Under Oath and His Attitude of Hostility Toward the Court's Orders.**

370.    The Seattle investigation was conducted under the direct supervision of Sheriff Arpaio.  Arpaio consulted daily with Posseman Zullo over the phone or in person regarding the investigation.  (Ex. 2079 at MELC199518 (Zullo telling Sergeant Anglin in December "in this thing he calls me almost every day wanting updates."); Doc. 1455 at Tr. 2061–63; *see also* Doc. 1389 at Tr. 1264–65; Doc. 1457 at Tr. 2359.)  The lead detective, Detective Mackiewicz, reported directly to Arpaio during this operation.  It is unusual for a detective to be supervised directly by Arpaio.  (Doc. 1498 at Tr. 3877.)

371.    In an initial session with Mr. Montgomery in Seattle, Posseman Zullo directed Montgomery to search his CIA database for "Murray Snow" (the name of this Court).   (Doc. 1495 at Tr. 3689–92, 3713–14.)   After researching such information, Montgomery prepared a timeline.   (Doc. 1498 at Tr. 3733–35.)  Sheriff Arpaio received the initial timeline on November 5, 2013, and showed it to and discussed it with Chief Deputy Sheridan.  (Doc. 1455 at Tr. 2067, 2273; *see* Ex. 2074A; Doc. 1457 at Tr. 2263.) Arpaio was given various updated versions of the timeline and an accompanying schematic graph.  (Doc. 1457 at Tr. 2326–27; *see, e.g.*, Ex. 2072.)

372.    The timeline reveals a conspiracy theory suggesting an elaborate scheme to undermine Sheriff Arpaio.  The scheme involves many parties, including this Court, Attorney General Eric Holder, Deputy Attorney General Lanny Breuer, United States,

---

[13] The following December, the Sheriff scheduled the first community outreach meeting required by the Court's injunction.  The meeting was scheduled at 8:30 AM on a Saturday morning in December, in a parking lot.  (Doc. 1544 at Tr. 4275–76.)  The scheduled time and location were not amenable to a public gathering.

former Arizona United States Attorney Dennis Burke, this Court's former law clerk John Gray, Covington & Burling (the law firm representing the Plaintiff class), Senator Jon Kyl, former MCSO Chief Brian Sands, and the United States Department of Justice. (Ex. 2072.)

373.   The conspiracy was largely concocted by Mr. Montgomery, but Sheriff Arpaio played a role in creating it.  For example, Arpaio maintained a page of notes with three typewritten entries, which he acknowledges he may have typed in November 2013, and additional notes in his handwriting.  (Doc. 1457 at Tr. 2303–04.)  The third entry refers to an article in *The Arizona Republic* that indicated that now retired Senator Kyl had begun working for the Covington & Burling law firm.  The note then asserts (incorrectly) in Arpaio's handwriting that "Snow's wife works there."  (Ex. 2074B.) Arpaio further goes on to note that Kyl nominated the undersigned for a federal judgeship, and that the undersigned was confirmed by the U.S. Senate with Kyl on the judiciary committee in June 2008.  Arpaio wrote at the top of the page the incorrect statement that this Court's sister-in-law works for Covington & Burling.[14]  Montgomery began to find purported evidence of Kyl's involvement in the conspiracy only after Arpaio made these connections in the notes he drafted.

374.   Sheriff Arpaio testified that he continued to receive updates of this timeline through the early part of 2014.  (Doc. 1457 at Tr. 2574–76.)  He reviewed the updated timelines and schematics with Chief Deputy Sheridan and discussed with him the fact that the documents implicated the Court into the overall scheme involving the Department of Justice, wiretaps, and communications.  (*Id.* at Tr. 2576–78.)  Arpaio understood that the document alleged that this Court authorized the placement of a

---

[14] When writing his notes, Sheriff Arpaio misremembered the facts.  A year and a half earlier, prior to trial and after Covington and Burling's entry into this lawsuit, the Court disclosed to the Parties that his brother-in-law was a partner at the D.C. offices of Covington & Burling and asked if the Parties wished him to recuse in light of Covington's representation of the Plaintiff class.  Both Parties indicated that there was no conflict because the Court's brother-in-law had no substantial interest in the litigation. Both Parties requested that the Court remain on the case, which it did.  (*See, e.g.*, Doc. 1149 at Tr. 20–29; Doc. 537; Doc. 538; Doc. 539; Doc. 542.)

1    wiretap on Arpaio's cell phone.  (*Id.* at Tr. 2577–78.)  These documents stayed in the

2    MCSO's files.  (*Id.* at Tr. 2581.)

3        375.   Others at the MCSO, including the attorneys, expressed their belief that the

4    information provided by Mr. Montgomery was not credible.  Sheriff Arpaio held at least

5    one meeting with his lawyers and various members of his staff at which these timelines

6    were discussed and one of the graphs depicted in Exhibit 2072 was shown.  Captain

7    Bailey told Arpaio that he did not think the graph "was anything."  Arpaio responded

8    "you don't know."  (Doc. 1498 at Tr. 3882.)  Bailey responded that he knew that there

9    was no evidence to validate what was in the graph.  Bailey had the impression that all

10   four attorneys in the room shared his view that the information was not credible.  (*Id.* at

11   3883–84.)  Mr. Casey similarly testified that all of the attorneys present believed that the

12   allegations were "hogwash" and that he stated this to Arpaio.  (Doc. 1417 at Tr. 1727.)

13       376.   Nevertheless, the investigation continued.

14       377.   In early January 2015, the MCSO was representing to third parties that

15   "[Dennis Montgomery] is continuing to work with the Sheriff's office at this time."  (*See*

16   Doc. 1558 at Tr. 4362.)  Further, despite the analysis revealing that the hard drive data

17   was invalid, Posseman Zullo stated that the MCSO was "unable to determine whether

18   any evidence has been in fact manipulated by [M]ontgomery."  (Ex. 2969A.)  Sheriff

19   Arpaio acknowledged that his people were still working with Mr. Montgomery in

20   January 2015.   (Doc. 1457 at 2387.)   In fact, the MCSO kept the Montgomery

21   investigation open throughout the hearing.  (Doc. 1465 at Tr. 1307–09, 1335; *see also*

22   Doc. 1457 at Tr. 2407, 2421–22; *see* Ex. 2858.)

23       378.   Nevertheless, on April 23, 2015, the third day of the hearing, Sheriff Arpaio

24   testified that not only had the MCSO never been involved in investigating this Court but

25   that he was not aware that the Court or any of the Court's activities had ever been

26   investigated by anyone.  (Doc. 1083, Ex. 1.)  He reaffirmed this statement three weeks

27   after his initial testimony in a statement made under penalty of perjury filed with the

28   Court.  (*Id.*, Ex. 1 ¶¶ 5, 7 (Sheriff Arpaio stating:  "Judge Snow asked if I was aware of

anyone investigating him.  I responded, 'No[,]' . . . [a]t no time was an investigation initiated against Judge Snow or any of his family members.").)  These statements, made while Arpaio was under oath, constitute deliberate misstatements of fact made in bad faith.

379.    In his October testimony, Sheriff Arpaio attempted to explain his earlier testimony by asserting that he simply did not think of Mr. Montgomery's timelines when he was asked the questions.  (Doc. 1457 at Tr. 2457.)  In light of the extent of Arpaio's personal participation in the Montgomery investigation, this testimony is not credible. Arpaio further testified that what Montgomery was doing for him could not be called an "investigation."  (Doc. 1458 at Tr. 2580.)  This testimony is also not credible.

380.    Sheriff Arpaio also asserted that any mention of the Court by him, Mr. Montgomery, Posseman Zullo, or other assigned MCSO personnel would have been because Montgomery identified the Court as a victim of the CIA's illegitimate harvest of financial information.  There is no credible evidence to confirm such a claim, and much, including the content of the timelines themselves, disproves it.  Only 40 people were ever specifically identified by Montgomery and investigated by the MCSO as potential victims of the CIA's harvest.  The Court was not among them.  Further, the investigation of those forty people produced nothing sufficient to suggest the truth of Montgomery's allegations.

381.    Sheriff Arpaio also testified that he understood Mr. Montgomery's allegations involving the Court, but that he never believed them and that he and Chief Deputy Sheridan advised the investigators to not investigate the Court.  (Doc. 1457 at Tr. 2577–79.)   The evidence demonstrates that at some point, Sheridan expressed reluctance to investigate this Court.  (Doc. 1389 at 1265–68; Ex. 2256.)  Nevertheless, although Sheridan instructed Sergeant Anglin not to investigate this Court, Sheridan later removed Anglin from the Montgomery operations, (Doc. 1465 at Tr. 1331), and returned Posseman Zullo to his role.  At that point, the investigation into this Court resumed.  (Ex. 2960.)   There is no credible indication that Arpaio was part of the

decision to temporarily suspend the investigation, and in light of ample evidence of Arpaio's enthusiasm for and participation in the investigation, the Court does not find the suggestion credible.

### 2. Chief Deputy Sheridan Also Knowingly Made Misstatements of Fact Under Oath About the Montgomery Investigation.

382.   In his April testimony, Chief Deputy Sheridan testified that the MCSO was not investigating this Court.  Further, he testified that the MCSO had received nothing from Mr. Montgomery that would suggest that there was any collusion between this Court and the Department of Justice.  (Doc. 1043 at Tr. 1003.)

383.   In his September testimony, Chief Deputy Sheridan testified that Mr. Montgomery suggested investigating the Court only after the MCSO threatened to stop paying him to investigate other matters, and that the MCSO rejected Montgomery's invitation to investigate the Court.  (Doc. 1465 at Tr. 1299–1300, 1464–65; *see also* Doc. 1417 at Tr. 1564.)

384.   In fact, although the MCSO did make confidential informant payments to Montgomery, they did not begin making such payments until after Montgomery had provided them with false material alleging the involvement of this Court in a conspiracy with the U.S. Department of Justice.  (Doc. 1498 at Tr. 3721–23; Ex. 2085 at page 2; Ex. 2906; Ex. 2907; Ex. 2908; Ex. 2909; Ex. 2910; Ex. 2911; Ex. 2912; Ex. 2913; Ex. 2914; Ex. 2915.)   Sheridan would have been aware of this, as he authorized such payments.  (Doc. 1465 at Tr. 1318–20.)  Further, Sheridan was fully aware that the MCSO accepted Montgomery's invitation to pursue such an investigation.[15]   (Doc. 1457 at Tr. 2263–64, 2576–78, 2582.)

385.   The Court finds that Chief Deputy Sheridan's testimony, made under oath, constitutes deliberate misstatements of fact made in bad faith.

386.   The MCSO's discovery abuses and deliberate misstatements of fact to the

---

[15] Further, Chief Deputy Sheridan's testimony that he had never seen any of Mr. Montgomery's timelines that included this Court in the conspiracy until April 24, 2015, was directly contradicted by the testimony of Sheriff Arpaio and Detective Mackiewicz.

Court harmed the Plaintiff class and require remedial action.[16]

## III.
## THE MCSO FAILED TO CONDUCT ADEQUATE INTERNAL INVESTIGATIONS.

387. "It is the policy of [the MCSO] to ensure that all complaints of employee misconduct or wrongdoing are investigated fairly and impartially, and in accordance with state and federal law, to determine the validity of the complaint."  (Ex. 2881 at MELC1306916.)

388. Further, when complaints are determined valid, "[i]t is the policy of [the MCSO] to impose fair and equitable discipline as necessary."  (Ex. 2001 at MELC416242.)

389. Sheriff Arpaio and MCSO policy delegates to Chief Deputy Sheridan all authority regarding internal affairs investigations within the MCSO.  The Captain of the PSB reports directly to Sheridan, and Sheridan is very involved in the operation of the PSB.  (Doc. 1043 at Tr. 976.)

390. Generally there are two types of PSB investigations—administrative investigations and criminal investigations.  (Doc. 1043 at Tr. 975.)

391. An administrative investigation is focused on whether the subject of the investigation violated state civil law, federal civil law, or departmental policy.  Some procedures regulating such investigations are set forth under state law.

392. The more serious administrative investigations are conducted by the PSB— the MCSO's Internal Affairs Division.  More minor complaints are investigated by lieutenants and sergeants assigned to the MCSO's divisions and districts.  In theory the policies and practices between the PSB and the divisions and districts are the same. (Doc. 1389 at Tr. 1155–57.)

---

[16] Sheriff Arpaio acknowledged in his April testimony that it is "a pretty serious problem" to destroy documents and recordings."  (Doc. 1027 at Tr. 629.)  In his April testimony he also stated that while he "may not have" any policies in his office that guide employees about how they should go about responding to requests for materials and documents in litigation . . . we're going to be doing it and do a lot of corrections."  (*Id.*) No evidence presented by Defendants suggests that they did so.

393.   The measure of administrative discipline is determined by the application of a discipline matrix that is set forth in MCSO policy.  (Ex. 2001 at MELC416252–59.) The application of the matrix is strictly defined.   (Doc. 1465 at Tr. 1419 ("[The disciplinary matrix] is very – when I say strict, what it does is people know there's not much leeway in the system."); *see also* Doc. 1389 at Tr. 1214.)   MCSO policy specifies that management level employees are subjected to a more exacting disciplinary matrix. (*See, e.g.*, Ex. 2001 at MELC416243 ("[R]egular status exempt employees typically hold a management position, and, therefore, are held to a higher standard.").)

394.   After the entry of a preliminary finding sustaining a violation, but prior to any final determination, an officer who is the principal of a PSB investigation has the right to a predetermination hearing if a form of major discipline—a suspension of any length, a demotion, or a termination—is noticed as the possible penalty.    A predetermination hearing basically allows the principle to present new evidence and argument.   (Doc. 1495 at Tr. 3495–96.)   The PSB investigator is not part of the predetermination hearing, nor does the presiding officer generally ask questions.[17]  (Doc. 1389 at Tr. 1147.)  The investigating PSB officer has no formal opportunity to attend the predetermination hearing or to rebut the information supplied by the investigative principal, nor does the policy require that the principal put forth such information earlier so that it might be addressed by the MCSO.   (Doc. 1467 at Tr. 3181.).

395.   If minor discipline is imposed, the principal then has the right to file a grievance.   Anything above a written reprimand is considered major discipline.   (Doc. 1495 at Tr. 3495.)

396.   At the conclusion of each administrative investigation, findings are made as

---

[17] Chief Deputy Sheridan is an unclassified exempt employee as defined by MCSO policy. (Doc. 1389 at Tr. 1146; Doc. 1495 at Tr. 3613–14; *see, e.g.*, Ex. 2001 at MELC416242.)   As an unclassified employee, Sheridan has the option of having a name clearing hearing, prior to the imposition of discipline, but he has no right of appeal.  (Ex. 2001 at MELC416249–50.)

to each alleged policy violation "based on the facts of the investigation."  (Doc. 2881 at MELC1306932.)

397.   As noted above, Sheriff Arpaio designates to Chief Deputy Sheridan the authority to make all findings in internal affairs investigations.  (Doc. 1467 at Tr. 3150.) Sheridan typically delegates that authority to others.  (*Id.* at Tr. 3150.)

398.   Findings concerning some violations, *i.e.*, truthfulness, are only made upon the authorization of the Chief Deputy or his designee.  (Ex. 2881 at MELC1306924.)

399.   The PSB also investigates all allegations against MCSO officers that allege a violation of state or federal criminal law.   (Doc. 1389 at Tr. 1132–35.)    All constitutional rights apply to the officer being investigated in a criminal investigation.

400.   By policy and practice, Chief Deputy Sheridan must authorize all criminal investigations.  (Doc. 1043 at Tr. 975–76; Doc. 1456 at Tr. 2215–16; *see also* Ex. 2881 at MELC1306924–25, MELC1306920.)

A.    **The MCSO's Investigations Arising from Video Review Were Fundamentally Flawed.**

401.   On September 12 and September 19, 2014, the MCSO opened up numerous investigations resulting from its initial review of problematic video clips.

402.   Two of the investigations, IA #2014-543 and IA #2014-542, were ultimately investigated by Special Investigator Vogel, an independent special investigator appointed by the MCSO.  The MCSO, however, designated Chief Olson of the MCSO to make the disciplinary determination.

403.   The PSB itself conducted five of the investigations that it also opened on this date, IA #2014-544 through IA #2014-548, that resulted from the video review.[18] (Doc. 786.)

404.   The week after, on September 19, 2014, the MCSO opened 31

---

[18] Thereafter, the PSB has opened a few additional investigations resulting from the video review, none of which were the subject of much evidence or testimony presented to the Court.

investigations, IA #2014-562 through IA #2014-592, that were conducted by the various divisions to which the subjects of the investigations were assigned.  (*See* Doc. 786.)

### 1.     The Vogel/Olson Investigations (IA #2014-543 and IA #2014-542)

405.     The PSB initiated IA #2014-543 to investigate the MCSO command staff's failure to implement the Court's preliminary injunction.

406.     The PSB initiated IA #2014-542 to investigate the MCSO's supervisory failures with respect to Deputy Armendariz.

407.     Nevertheless, Captain Bailey, the new head of the PSB, had supervised Deputy Armendariz for eight months while Bailey was the Captain of the Special Investigations Division ("SID")—the Division in which the HSU was located.

408.     Further, while Captain Bailey was head of the SID, members of the SID were taking the personal property of detainees—such as drivers licenses—which would subsequently be the subject of investigation.  Bailey thus was a possible subject of the investigation.

409.     The Court noted this conflict at the October 28, 2014 hearing.  (Doc. 776 at Tr. 47–48; Doc. 780 at Tr. 92–94, 96; *see also* Doc. 1043 at Tr. 979–81.)

410.     Accordingly, Chief Deputy Sheridan contacted Special Investigator Vogel in late October 2014 and hired him as the MCSO's special investigator to assume the investigation in IA #2014-542 that potentially involved Captain Bailey.  (Doc. 1417 at Tr. 981; Doc. 1556 at Tr. 3291–93; Doc. 1389 at Tr. 1227–28; Ex. 2226.)

411.     However, Special Investigator Vogel and Captain Bailey knew each other well.  On a full-time basis from 1998–2001, they had served together on a federal task force.  (Doc. 1467 at Tr. 3191; Ex. 2218 at MELC-IA011234.)  Further, in 2013, Vogel, as a private investigator, had been hired by the *Melendres* defense team to conduct other investigations pertaining to this Court.

412.     Shortly thereafter, it became apparent that Chief Deputy Sheridan and others would themselves be the subject of investigation in IA #2014-543 for their failure to implement this Court's preliminary injunction.  (Doc. 1389 at Tr. 1226–27; Doc. 786

1  at 11.)

2      413.   The MCSO thus reported to the Court on November 20 that it had also

3  asked Special Investigator Vogel to assume responsibility for IA #2014-543.  (Doc. 804

4  at Tr. 68–69; *see also* Ex. 2226; Ex. 2219 at MELC209728.)

5      414.   On December 18, 2014, Special Investigator Vogel requested and received

6  a retention letter from Lee Ann Bohn of the MCSO that specified that he was to "conduct

7  or complete" three specific administrative investigations on behalf of the MCSO "due to

8  potential conflicts of interest involving certain MCSO personnel."  (*See* Doc. 1556 at Tr.

9  3287–88, 3339–40; Ex. 2223.)  Those investigations were IA #2014-542, IA #2014-543,

10  and  IA  #2014-874—an  investigation  into  44  driver's  licenses  related  to  a  2013

11  undercover investigation that also involved Captain Bailey.  (*See* Ex. 2223.)

12      415.   In February 2014, Special Investigator Vogel further clarified his role with

13  Ms. Iafrate.  She informed him that he would do the initial investigation but would not

14  make any final determinations regarding discipline.  (Doc. 1556 at Tr. 3345–47; Ex. 2225

15  ("You  are  to  conduct  the  investigation  and  make  findings  of  the  evidence.   Neither

16  MCSO  nor  me  should  direct  you  or  guide  you  in  any  way.   Once  you  complete  your

17  investigation, the final conclusion regarding whether policy violations exist will be up to

18  someone other than you.").)

19      416.   Special Investigator Vogel thus conducted factual investigations, and to the

20  extent it was warranted by his investigations, made generalized allegations of violations

21  against appropriate principals.  (*See* Doc. 1495 at Tr. 3489, 3491–92, 3547–48.)

22      417.   Special Investigator Vogel delivered his report on IA #2014-542 to the

23  MCSO on March 28, 2015.  (Ex. 2218 at MELC-IA011214–303.)

24      418.   He delivered his report to the MCSO on IA #2014-543 on April 6, 2015.

25  (Ex. 2237.)

26      419.   He delivered his supplemental report on IA #2014-543 on April 8, 2015.

27  (Ex. 2239.)

28      420.   Around the time Special Investigator Vogel submitted his reports, Sheriff

1  Arpaio told Chief Deputy Sheridan that he should name Chief Olson as Arpaio's

2  designated officer to make findings as to the existence of violations and to determine

3  discipline, if any, in IA #2014-542 and IA #2014-543.  (Doc. 1495 at Tr. 3619–20, 3627.)

4  Sheridan did so.

5       421.  Special Investigator Vogel was thereafter introduced to Chief Olson.  (Doc.

6  1556 at Tr. 3342, 3369–71.) Olson and Tiffani Shaw identified MCSO policies which

7  may have been violated by the conduct identified in Vogel's allegations as supported by

8  his report.  Vogel assisted them in this process.  (Doc. 1495 at Tr. 3490, 3492, 3638; Doc.

9  1556 at Tr. 3296–98, 3349–51; Ex. 2240.)

10      422.  Chief Olson then made his own preliminary findings of violations based on

11  Special Investigator Vogel's report.  (Doc. 1495 at Tr. 3493–94.)

12      423.  After providing the predetermination or name clearing hearings specified

13  by MCSO policy, Chief Olson also made the final determinations as to whether there

14  were any violations and whether to impose any final discipline.  (Doc. 1495 at Tr. 3493;

15  Doc. 1556 at Tr. 3338–39.)

16

17         **a.     The MCSO Did Not Appropriately Assist Special Investigator
            Vogel's Investigation into IA #2014-543**

18      424.  In January 2015, during the course of his investigation of IA #2014-543,

19  Special Investigator Vogel requested the metadata pertaining to the December 23, 2011

20  email sent by Mr. Casey to Chief Deputy Sheridan and others to determine whether the

21  email had been received and opened by the recipients.  (Doc. 1556 at 3306–07.)  The

22  metadata was not provided and was ultimately determined to be too expensive to provide

23  in a cost-effective manner because the files were corrupted.  (*Id.* at Tr. 3307–09, 3368,

24  3390; Ex. 2221 at MELC210499–526.)

25      425.  That same month, Special Investigator Vogel also asked to review Mr.

26  Casey's billing records related to this matter to determine if those records demonstrated

27  dissemination to and knowledge of the Court's order to MCSO personnel.  (Doc. 1556 at

28  Tr. 3311–12, 3364–65.)

1    426.    Special Investigator Vogel made numerous in-person and telephonic
2  requests without getting the records.  (Doc. 1556 at Tr. 3364.)

3    427.    Special Investigator Vogel did not receive Mr. Casey's billing records until
4  mid-March 2015.  (Doc. 1556 at Tr. 3314.)  And due to the compressed timeline in which
5  he had to complete his investigation, this was after he had conducted his interviews of
6  Sheriff Arpaio and Chief Deputy Sheridan.  (*Id.* at Tr. 3315–16, 3330–31.)

7    428.    On February 23, 2015, Special Investigator Vogel interviewed Chief
8  Deputy Sheridan and discovered, among other things, the existence of Sergeant Palmer's
9  training scenarios.  (Doc. 1556 at Tr. 3308–09.)

10    429.    On March 2, Special Investigator Vogel formally requested Sergeant
11  Palmer's training scenarios from Chief Deputy Sheridan.  (Doc. 1556 at Tr. 3309; Ex.
12  2228.)  Vogel made several follow-up email requests for the scenarios.  (*See, e.g.*, Ex.
13  2232.)

14    430.    Special Investigator Vogel received Sergeant Palmer's training scenarios on
15  March 23, 2015—again, too late to be of use in his interviews.  (Doc. 1556 at Tr. 3310–
16  11, 3394–95.)

17    431.    The inability to timely recover the metadata, Mr. Casey's billing records,
18  and Sergeant Palmer's training scenarios caused Special Investigator Vogel difficulty in
19  timely completing his investigations.  (Doc. 1556 at Tr. 3309–11; *see also* Ex. 2237; Ex.
20  2239.)

21    432.    Special Investigator Vogel also requested that Sheriff Arpaio be considered
22  when determining the existence of possible policy violations, but was told by Chief Olson
23  that he could not do so.  (Doc. 1495 at Tr. 3579–80, 3640–41; Doc. 1556 at 3352–56; *see*
24  *also* Ex. 2242.)  Arpaio, however, could have agreed to allow himself to be the subject of
25  the investigation.

26    433.    Special Investigator Vogel's report in IA #2014-543 related to six persons:
27  Chief Deputy Sheridan, Chief Sousa, Chief MacIntyre, Lieutenant Jakowinicz,
28  Lieutenant Sousa, and Sergeant Trowbridge.  Chief Olson did not identify any initial

allegations of violation against Jakowinicz.  (Ex. 2219 at MELC209781.)  Olson also did not preliminarily sustain charges against Trowbridge, and found the charges against MacIntyre to be unfounded.

434.    Chief Olson preliminarily sustained allegations of misconduct against Chief Deputy Sheridan, Chief Trombi, and Lieutenant Sousa.

### 1)        Chief Deputy Sheridan

435.    On April 21, 2015, the day that the evidentiary hearings began, Chief Olson preliminarily sustained four allegations of misconduct against Chief Deputy Sheridan. They included: (1) that Sheridan failed to have the appropriate oversight and control of information affecting units under his command, (2) that Sheridan failed to ensure the proper dissemination and interpretation of the December 23, 2011 Court order, (3) that Sheridan failed to ensure the proper development of training regarding the December 23, 2011 Court order, and (4) that Sheridan failed to comply with the December 23, 2011 Court order, which is a lawful order.  (Ex. 2219 at MELC209729–31, MELC209735–43.)

436.    During his name clearing hearing, Chief Deputy Sheridan presented for an hour and fifteen minutes to Chief Olson without Olson ever asking any substantive questions.  (Doc. 1389 at Tr. 1233–34; Ex. 2857A.)

437.    After the name clearing hearing, on May 12, 2015, Chief Olson reversed his finding on all four charges that he had preliminary sustained against Chief Deputy Sheridan.  (Ex. 2219 MELC209729–43.)

438.    Chief Olson made no attempt to provide a written justification for changing his decision, (Doc. 1495 at Tr. 3532), and no such explanation is required by MCSO policy.

439.    There are a number of problems with Chief Olson's decision with respect to Chief Deputy Sheridan.

440.    First, Sheriff Arpaio and Chief Deputy Sheridan created a structural conflict of interest when they appointed Chief Olson, Chief Deputy Sheridan's direct subordinate, to make a disciplinary ruling concerning him.

441.   To avoid this structural impropriety, MCSO policy generally requires that when investigations are conducted outside of the PSB the "investigation shall be investigated by personnel of higher grade or rank than the involved employee . . . ."  (Ex. 2881 at MELC1306919.)

442.   Nevertheless, Chief Olson reports directly to Chief Deputy Sheridan and has done so for many years.  (Doc. 1495 at Tr. 3485–86, 3560–61.)  Sheridan remained Olson's commanding officer both during and after his participation in these internal affairs investigations.  (*Id.* at Tr. 3575, 3630.)

443.   Chief Olson acknowledged that not only is it important that a disciplinary proceeding be unbiased, (Doc. 1495 at Tr. 3667), but it is equally important that there be no appearance of bias in an internal affairs investigation.  (Doc 1495 at Tr. 3488.)

444.   Chief Olson testified that there is no impropriety or appearance of impropriety in this case because, in the past, he imposed discipline on Chief Henderschott, who was his superior, when Olson was assigned by Sheriff Arpaio to make a disciplinary determination as to Henderschott.

445.   An important distinction is that Chief Henderschott was on leave and/or had already resigned when Chief Olson disciplined him.

446.   At any event, simply because Sheriff Arpaio has before appointed a subordinate to rule on the discipline of a direct superior does not somehow eradicate the creation of a structural conflict when he does so again.

447.   Second, Chief Olson actually was demonstrably biased and partial.  Olson testified that he based his determination to reverse his preliminary findings on his personal opinion of Chief Deputy Sheridan, which he arrived at due to the years that they had worked together.  "I do know Jerry Sheridan very well.  I know his character.  I know he -- I've worked for him for many years.  I know he strives to do the right thing.  I had a decision to make, and I based it on everything that I knew.  And one of the things I knew is that Jerry Sheridan tries to do the right thing."  (Doc. 1495 at Tr. 3681; *see also* Doc. 1495 at Tr. 3663 (Olson believed Sheridan because he has worked with him on projects

1    for 20-plus years and Sheridan has never lied to him), 3557–58, 3635, 3662–64 (Olson

2    testified that:  "[Sheridan] didn't know about the [preliminary injunction].  I believe that.

3    I believe that in my heart.  He did not know about that court order.").)

4         448.   Moreover, Chief Olson's reliance on his personal relationship with Chief

5    Deputy Sheridan and/or his beliefs regarding Sheridan's character in reaching a

6    disciplinary conclusion demonstrates actual partiality and otherwise violates MCSO

7    policy on internal investigations.  (Ex. 2881 at MELC1306932 ("[F]indings for each

8    Policy Violation will be based on the facts of the investigation.").)

9         449.   Third, it is improper to assign an individual to make a disciplinary decision

10   as to his friend.  Chief Olson considers Chief Deputy Sheridan a friend.  (Doc. 1495 at

11   Tr. 3589, 3621.)  They have socialized together.  (*Id.* at Tr. 3630.)  They have a very

12   good working relationship.  (*See id.* at Tr. 3631.)[19]

13        450.   Fourth, Chief Olson brought false factual predeterminations to the decision-

14   making process.  Olson testified that "[a] lot of what [Sheridan] presented at that name

15   clearing hearing I knew to be fact because I was there."  (Doc. 1495 at Tr. 3670.)  For

16   example, he notes "I attended the same staff meetings that the other executive chiefs sat

17   in on.  For all those years, those court orders [preliminary injunction] weren't talked

18   about at the staff meetings.  I never heard of the 2011 order prior to getting involved in

19   this, and I sat in those executive staff meetings."  (*Id.* at Tr. 3663.)  Yet, despite Chief

20   Olson's testimony, Chief MacIntyre testified that it was at just such a meeting that he

21   explained the details of the preliminary injunction at length to make sure that Sheriff

22   Arpaio, Chief Deputy Sheridan, and the other chiefs understood them.  (Doc. 1422 at Tr.

23   1878:23–25, 1879; Ex. 2219 at MELC209814–16.)   He gave the explanation twice.

24   (Doc. 1422 at Tr. 1880; Ex. 2219 at MELC209815.)  He said it slowly and enunciated it.

---

25        [19]  Sheriff Arpaio testified that Chief Olson also completed a disciplinary
26   proceeding with respect to Chief Deputy Sheridan's misconduct in disobeying this
     Court's order of May 14, 2014, which is the third count of contempt in this matter.  (Doc.
27   1458 at Tr. 2559.)  No discipline was imposed on Sheridan for this misconduct.  (Doc
     1027 at 635–36.)  For the reasons set forth above, any such decision in this matter is void.
28   Further, to the extent that such a proceeding actually occurred, the MCSO has also
     violated this Court's order in not disclosing once it was undertaken.

(Doc. 1422 at Tr. 1879–81; Ex. 2219 at MELC209815.)

451.    Fifth, Chief Olson was not able to consider the facts that subsequently came out that discredit Chief Deputy Sheridan's assertions to him.  The MCSO failed to timely provide Special Investigator Vogel the information he requested during his investigation, causing that information to not be discussed in his report.  Certain information was discovered prior to the evidentiary hearing by Plaintiffs and not necessarily presented to Chief Olson.  Special Investigator Vogel never had a follow-up opportunity to respond to matters raised in Chief Deputy Sheridan's name clearing hearing, since such opportunities are not provided.

452.    Sixth, when Chief Olson did not sustain the charges against Chief Deputy Sheridan, because he believed that Sheridan never knew about the injunction, he did not take into account the nature of all the charges.  For example, Olson preliminarily sustained allegation number one, which averred that Sheridan failed to exercise the appropriate oversight and control over information affecting units under his command. The violation of this policy does not require that Sheridan knowingly violated the Court order.  A lack of appropriate knowledge pertaining to those under his command virtually constitutes the charge of failing to have "appropriate . . . control of information affecting units under his command."

453.    Chief Deputy Sheridan himself has consistently admitted that it was his responsibility to know about the preliminary injunction and to train the deputies about it. (*See* Ex. 2219 at MELC209815.)

454.    Moreover, in the excerpts submitted at the name clearing hearing, Chief Deputy Sheridan admitted under oath that it was his responsibility as the Chief Deputy to communicate the requirements of the preliminary injunction to the MCSO.  (Ex. 2219 at MELC209933 ("Q: Do you know why the instructions from the preliminary injunction were never communicated to the MCSO? . . .   A: No.   Q: Who should have communicated those instructions? . . .   A: It would have been my responsibility as Chief Deputy.").)

1    455.   Discipline should have been imposed.  That it was not demonstrates that

2    Chief Olson did not impartially approach his assignment with respect to Chief Deputy

3    Sheridan.

### 2)   Chief Trombi

5    456.   The same four violations that were asserted and preliminarily sustained

6    against Chief Deputy Sheridan were also asserted and preliminarily sustained against

7    Chief Trombi.  (Ex. 2219 MELC209763–71.)

8    457.   After the predetermination hearing, Chief Olson reversed his preliminary

9    findings and vacated all sustained findings against Chief Trombi.   (Ex. 2219 at

10   MELC209910–15.)

11   458.   He did so because he determined that Chief Trombi was not aware of the

12   order.  (Doc. 1495 at Tr. 3578–79.)

13   459.   In the record available to Chief Olson, however, Lieutenant Sousa

14   expressed that he had no doubt that Chief Trombi knew about the orders because Trombi

15   was copied on the training scenarios.   (Ex. 2219 at MELC209807–08.)   Sousa

16   subsequently testified that he is sure that he discussed the matter with Trombi.  (Doc.

17   1027 at Tr. 761–62.)

18   460.   Chief Sands similarly indicated to Special Investigator Vogel that he told

19   Chief Trombi to read the order.  (Ex. 2219 at MELC209800.)

20   461.   Chief Olson was aware that Chief Trombi acknowledged that he received at

21   least part of the training scenarios and that he had command responsibility for the HSU.

22   462.   Chief Olson himself, in exonerating Lieutenant Sousa, faults Chief Trombi

23   (and others) for not taking appropriate action to inform Sousa about the content of the

24   order in light of Sousa's inquiry to him.  (Doc. 1495 at Tr. 3654–55 ("[Lieutenant Sousa]

25   e-mailed Brian Sands; he e-mailed Dave Trombi; he e-mailed Tim Casey; he asked for

26   scenarios on training to be written.  He e-mailed those to his bosses.  Didn't get any

27   response from—from Dave Trombi, from Brian Sands, from Tim Casey.  He was just

28   kind of left hanging out there.").)

463.    Chief Olson nevertheless determined that despite all of the evidence above, Chief Trombi was not aware of the order.  (Doc. 1495 at Tr. 3578–79.)  The Court finds that Chief Olson did not come to this conclusion in good faith.

464.    Moreover, as with Chief Deputy Sheridan, even assuming Chief Olson came to his conclusion in good faith, Chief Trombi's lack of knowledge of information that pertained to those under his command virtually constitutes one of the charges against him.  The charge is failing to have "appropriate . . . control of information affecting units under his command."

465.    In Special Investigator Vogel's report, Chief Trombi himself admitted that it was his responsibility to know about the preliminary injunction and to train the deputies about it, but that he was "negligent" in not informing himself of the order.  (Ex. 2219 at MELC209801–03.)

466.    Therefore some measure of discipline should have been imposed.

### 3)    Lieutenant Sousa

467.    The same four violations were asserted against Lieutenant Sousa, but only one—that Sousa failed to ensure the proper dissemination and interpretation of the December 23, 2011 Court order—was preliminarily sustained by Chief Olson.

468.    It is not clear on what basis Chief Olson chose not to preliminarily sustain the other asserted violations.

469.    Chief Olson reversed that finding after the predetermination hearing.  (Ex. 2219 at MELC209885–88.)

470.    Chief Olson testified that he vacated the finding because Lieutenant Sousa emailed his supervisors to try to find out the meaning of the Court order, but he received no response.  Furthermore, Olson testified that generally a decision to disseminate an order would have come from someone much higher in the command structure.  (Doc. 1495 at Tr. 3654–55.)

471.    As the Court has set forth at some length above, however, Lieutenant Sousa did not do all he should reasonably have done to ascertain the meaning of the Court's

preliminary injunction.  He imposed interpretations on the order that were consistent with the MCSO's existing practices even though those practices violated the plain terms of the preliminary injunction.

472.    Further, as he himself testified, he thought training concerning the order needed to be disseminated.  Even given that he made some efforts to initiate training, he undertook no efforts to see it through during the three and a half months that he remained the lieutenant in charge of the HSU.  He had the order and he did not disseminate it.

473.    Chief Olson's reasons for exonerating Lieutenant Sousa are not sufficient.

#### 4)    Lieutenant Jakowinicz

474.    In making his determination to assert no violations against Lieutenant Jakowinicz, Chief Olson's understanding was that Jakowinicz was not contacted in any way about Sergeant Palmer's training scenarios.  (Doc. 1495 at Tr. 3554–55.)  This is simply inaccurate.  He did have such information.

475.    Lieutenant Jakowinicz received this email when he was still with the training division in preparation for his transfer to the HSU. (Doc. 1051 at Tr. 373:8–22; Ex. 189.)

476.    Lieutenant Jakowinicz replaced Lieutenant Sousa as head of the HSU in April 2012.  (Doc. 1051 at Tr. 362:24–25.)  He remained with the HSU until May 2013, when the unit was subsumed into the Special Investigations Division.  (*Id.* at Tr. 363:10–17.)

477.    Lieutenant Jakowinicz did not follow up with Sergeant Palmer, Mr. Casey, or Chief Sands about finishing the training scenarios after he took over the HSU.  (Doc. 1051 at Tr. 419:17–420:15.)

478.    Lieutenant Jakowinicz does not recall whether the training scenarios developed by Sergeant Palmer and Lieutenant Sousa were ever conducted while he was at the HSU.  (Doc. 1051 at Tr. 374:1–375:6, 375:14–16.)

479.    Chief Olson would have known this if Sergeant Palmer's scenarios would have been timely provided to Special Investigator Vogel.

### 5)    Sergeant Trowbridge

480.    Special Investigator Vogel alleged that "Sgt. Trowbridge admitted to reading and knowing about the December 23, 2011, Court order.  He failed to discuss the order with Lt. Jakowinicz when Lt. Jakowinicz was transferred into HSU."  (Ex. 2219 at MELC209773.)

481.    Although a policy was identified which this behavior violated, Chief Olson did not preliminarily sustain this allegation as to Sergeant Trowbridge.  (Ex. 2219 at MELC209774.)  It is not clear what basis Olson had for failing to do so.

### 6)    The Investigation Into IA #2014-543 Is Insufficient.

482.    Sheriff Arpaio acknowledged that "it's a pretty big deal" to not comply with this Court's preliminary injunction for 17 months.  (Doc. 1027 at Tr. 628.)  Arpaio's failure in this respect has resulted in extensive injury to members of the Plaintiff class by the entire MCSO.

483.    Yet, as a result of Chief Olson's decisions, no internal discipline has resulted.

484.    Sheriff Arpaio testified that when he designated Chief Olson to determine discipline in these two matters he knew that Chief Deputy Sheridan was Olson's superior, but he did not think that there was a conflict.  (Doc. 1455 at Tr. 2027–29.)

485.    This testimony is not credible.  Sheriff Arpaio was aware of the necessity of employing Special Investigator Vogel with respect to IA #2014-543 because at least two high ranking members of MCSO leadership, including Chief Deputy Sheridan, were principals in several investigations including this one.

486.    Sheriff Arpaio himself was interviewed by Special Investigator Vogel, and Vogel filed a supplemental report indicating that Arpaio should also be included in the disciplinary proceeding.

487.    To the extent that Sheriff Arpaio obtained any degree of impartiality in the investigation of his command staff by appointing Special Investigator Vogel to conduct the investigation in IA #2014-543, he scuttled that impartiality by appointing Chief Olson

to make the final disciplinary determination in this case.

488.   The Court finds that as a matter of fact, Sheriff Arpaio achieved what he desired in appointing Chief Olson to the position—a biased decision-maker who imposed no discipline on anyone for the MCSO's 17 month violation of this Court's orders.

489.   The assignment of Chief Olson to make the disciplinary decision in IA #2014-543 in light of his partiality, his failure to acceptably perform that function, and his dismissal of all of the charges without individually considering them, constitutes unacceptable internal affairs practices.   These practices both violate and threaten continued violations of the rights of the Plaintiff class that this Court's orders have sought to vindicate.

490.   IA #2014-543 is invalid.

### b.      The MCSO Improperly Investigated IA #2014-542.

491.   On May 5, 2015, Chief Olson made preliminary findings of violations against five officers for their failure to supervise Deputy Armendariz:  Chief Trombi, Lieutenant Sousa, Lieutenant Jakowinicz, Sergeant Trowbridge, and Sergeant Madrid.

### 1)      Chief Trombi

492.   Chief Olson ultimately sustained preliminary findings against Chief Trombi on three separate charges.  (*See* Ex. 2218 at MELC-IA011167.)

493.   First, he preliminarily found that Chief Trombi was aware of a domestic violence incident involving Deputy Armendariz which Trombi did not have investigated. (Ex. 2218 at MELC-IA011170–72.)

494.   Second, he preliminarily found that Chief Trombi was aware of:  (1) a pattern of citizen complaints against Deputy Armendariz, (2) that Armendariz became "borderline insubordinate" with his sergeant and lieutenant (3) that Armendariz's sergeant and lieutenant recommended his transfer from the unit, and yet Trombi exercised his discretion and did not transfer Armendariz, failed to recognize the need for intervention, and took no action in the form of reassigning Armendariz or mandating training.  (Ex. 2218 at MELC-IA011173–75.)

495.   Third, he preliminary sustained findings against Chief Trombi arising from Sergeant Trowbridge's investigation of Deputy Armendariz in connection with the ticketing of State Representative Mesnard in violation of MCSO policy.   Trowbridge investigated the matter and recommended that a written reprimand be issued to Armendariz.   The investigation and recommendation were forwarded on to Lieutenant Jakowinicz and subsequently to Trombi, but no action was taken by Trombi.

496.   Chief Olson's May 18, 2015 final determinations confirmed all of the preliminary findings of violation against Chief Trombi.  (Ex. 2218 at MELC-IA011170–77.)

497.   A week-long suspension was imposed on Chief Trombi that he apparently did not appeal.

498.   There are at least three problems with the disciplinary process as it relates to Chief Trombi.

499.   First, although Chief Trombi did accept the discipline of a week-long suspension, he was also, during the course of the investigation, promoted by Sheriff Arpaio and Chief Deputy Sheridan from Deputy Chief to Executive Chief.  (Doc. 1017 at 87–89; Doc. 1389 at Tr. 1139; Doc. 1494 at Tr. 3503–04.)  Chief Olson also determined that Trombi's discipline did not make him ineligible for a pay increase, (Ex. 2219 at MELC209915), and in fact, Trombi received a pay increase in conjunction with his promotion.  (Doc. 1495 at Tr. 3503–04.)

500.   There is no policy preventing a promotion for someone under investigation within the MCSO.

501.   Further the discipline imposed on Chief Trombi was significantly less than that mandated by the appropriate application of the disciplinary matrix.

502.   The discipline mandated by the disciplinary matrix results from a combination of the number of past offenses together with the level of seriousness of each offense.  (Ex. 2001 at MELC416243.)  The matrix is used precisely so that it can take into account repeated and separate instances of misconduct in assessing and arriving at a

uniform and appropriate level of progressive discipline.  (Ex. 2001 at MELC416243–44 ("The number of times an employee has received prior discipline, regardless of the Category, shall be considered when determining where an employee shall be placed within the Matrixes.").)

503.    Although each of the three sustained allegations involved Chief Trombi's supervisory failures as they related to Deputy Armendariz, they did not all occur simultaneously.

504.    Allegation #1 involved Chief Trombi's failure "to complete his supervisor [sic] duty and ensure an investigation into the [domestic violence] matter . . . ."  (Ex. 2218 at MELC-IA11170.)   This failure is appropriately categorized as a Category 2 offense under the matrix:  a "[f]ailure by a supervisor to identify or investigate . . . actual or alleged incidents of misconduct, or violations of written instructions or rules."  (Ex. 2001 at MELC416255.)

505.    Allegation #2 involved Chief Trombi's failure "to recognize the need for intervention" resulting in him taking no action "in the form or reassigning Deputy Armendariz or mandating training."   This failure is appropriately categorized as a Category 3 offense under the Matrix:  a "[f]ailure to take corrective action when warranted."[20]  (Ex. 2001 at MELC416256.)

506.    Similarly, allegation #3 involved Chief Trombi's failure "to take any action" or to "notify his chain of command" with respect to the State Representative Mesnard citation.  (Ex. 2218 at MELC-IA011176.)  This too is appropriately categorized as a Category 3 offense.  (Ex. 2001 at MELC416256.)

507.    For a third violation of either a category two or three offense committed by an exempt employee, the presumptive discipline specified by the disciplinary matrix is a range between an 80-hour suspension and dismissal.  (Ex. 2001 at MELC416253.)  Chief Trombi was only advised of a possible maximum punishment of one week without pay

---

[20] Allegation #2 in and of itself involves the consolidation of several independent acts of misconduct as it pertains to the supervision of Deputy Armendariz.

for several separate incidents that violated MCSO policies and/or civil law.

508.   It is an inappropriate manipulation of the MCSO's disciplinary policy to consolidate separate instances of misconduct and to treat them as a single instance for purposes of applying the disciplinary matrix.  (Ex. 2001 at MELC416243.)

509.   Pursuant to MCSO policy, any departure from the presumptive ranges of discipline set forth by the matrix "shall be justified in writing in the Pre-Determination Hearing Notice and the Notice of Disciplinary Action letter as applicable."  (Ex. 2001 at MELC416243.)  Further, "[d]iscipline which deviates from the Discipline Matrixes must be approved by the Sheriff, or his designee."  (*Id.* at MELC416244.)

510.   Yet, this practice appears to be consistent with a special MCSO policy promulgated by Sheriff Arpaio that applied only to investigations that arose out of the *Melendres* case.   According to this *Melendres*-only policy, investigators were not to apply the MCSO disciplinary matrix.   In all such investigations, multiple independent violations of MCSO policies counted as only one violation for purposes of applying the disciplinary matrix. (Doc. 1455 at Tr. 2135; Doc. 1556 at Tr. 3272–74; Ex. 2010 at MELC288485.)

511.   The standard disclaimer placed on disciplinary notice forms stated:

> Please be advised that MCSO has ongoing investigations relating to the *Melendres* litigation.  If you become a principal in one of those investigations, and you receive a sustained policy violation on any such related matter, this reprimand shall be considered with that misconduct as one offense for purposes of the disciplinary matrix (not as a separate offense) and your discipline may be adjusted accordingly.

(Ex. 2008 at MELC724587; Ex. 2010 at MELC288485.)

512.   Of course, the *Melendres*-only policy categorically departs from the MCSO policy of treating all types of misconduct uniformly.  As is not surprising, a great number of the investigations that arose out of the *Melendres* case involved misconduct that harmed members of the Plaintiff class.  As a result of this special policy, the MCSO generally treated misconduct that harmed members of the Plaintiff class less seriously

1  than the uniform level of discipline that MCSO policy otherwise requires.

2      513.   Pursuant to MCSO policy, such a deviation from the disciplinary matrix

3  required approval from Sheriff Arpaio or his designee.  (Ex. 2001 at MELC416244.)

4      514.   The MCSO offered no adequate rational reason at the hearing, and the

5  Court cannot devise any, to treat independent violations of the MCSO's policies as a

6  single act of misconduct.

7      515.   This discriminatory policy violates the MCSO policy that requires fairness,

8  equity and uniformity in discipline in all such investigations.

9      516.   Second, when Chief Olson made his disciplinary decisions, he believed that

10 Chief Sands, not Chief Trombi, was principally responsible for the supervisory

11 misconduct at the HSU, including the decision not to transfer Deputy Armendariz out of

12 the HSU.  Because Sands was not a principal in IA #2014-542, Olson could not directly

13 address his culpability, but he did not believe others should be held responsible for what

14 he viewed as Sands's decisions.  (Doc. 1495 at Tr. 3535–47.)

15     517.   This assumption—at least as it relates to refusing the transfer of Deputy

16 Armendariz—was false.  Chief Olson obtained that impression from what Chief Trombi

17 told Special Investigator Vogel during his interview.[21]  (*See* Doc. 1495 at Tr. 3537.)

18     518.   According to Special Investigator Vogel's report, Chief Trombi told Vogel

19 that when he received the request to transfer Deputy Armendariz out of the HSU, he

20 asked Chief Sands whether Sands would give permission for him to do so.  Trombi told

21 Vogel that Sands had supposedly stated "something to the effect of 'not now' or 'it's not

22 a good time,'" and that Trombi "felt that Chief Sands did not want to elaborate on why it

23 wasn't a good time to move [Armendariz]."  (Ex. 2218 at MELC-IA011258–59)  Trombi

24 told Vogel that Sands's input provided the basis for his decision not to transfer

---

25 [21] It is very important that employees subject to PSB investigations tell the truth.  (Doc.

26 1505, at Tr. 4006.)  The failure to do so in this case caused Chief Olson to make an

27 erroneous assumption in assessing discipline.  It is also, of course, a violation of MCSO policy to be untruthful.  Violation of Office Policy, CP-5, *Truthfulness,* is a separate

28 category seven offense under the matrix.  (Ex. 2881 at MELC1306932; Ex. 2001 at MELC416258.)

Armendariz out of the HSU.  (Ex. 2218 at MELC-IA011258–59; *see also* Doc. 1495 at Tr. 3537.)

519.   Despite these apparent statements to Special Investigator Vogel, Chief Trombi admitted in his testimony under oath at the hearing that he alone decided not to transfer Deputy Armendariz out of the HSU.  He testified that he did not seek the approval of Chief Sands to keep Armendariz at the HSU, (Doc. 1017 at Tr. 87), nor did he consult with either Sheriff Arpaio or Chief Deputy Sheridan.  (*Id.* at Tr. 154; *see also id.* at Tr. 85, 117-18; Doc. 1051 at Tr. 396-97; Ex. 119.)

520.   Even though Chief Olson later acknowledged that Chief Trombi had some responsibility for this decision, he wrongfully placed the principal blame on Chief Sands based on Special Investigator Vogel's interview with Trombi.  (Doc. 1495 at Tr. 3535–47.)

521.   Thus, Chief Trombi's misstatement taints the discipline he received.

### 2)     Lieutenant Sousa

522.   On May 5, Chief Olson ultimately sustained preliminary findings against Lieutenant Sousa on two separate charges.  (Ex. 2218 MELC-IA011180–81.)

523.   Allegation #1 was that Lieutenant Sousa, who was made aware of a citizen complaint involving the possible theft by Deputy Armendariz of $300, forwarded it on to Sergeant Madrid for action, but failed to ensure that proper action was taken on the complaint.[22]  (Ex. 2218 at MELC-IA01182.)

524.   Allegation #2 was that Lieutenant Sousa failed to meet his supervisory responsibilities in failing to offer or mandate training for Deputy Armendariz after a clear pattern of behavior was recognized.  (Ex. 2218 at MELC-IA011184.)

525.   Lieutenant Sousa provided a memorandum to Chief Olson which set forth

---

[22] This incident was never addressed by MCSO internal affairs, although documents concerning the allegations were prepared by Sergeant Madrid at the direction of Lieutenant Sousa and supposedly forwarded to internal affairs.  (Doc. 1556 at Tr. 3298–99; Ex. 2560.)  There is no indication that the documents were ever received by internal affairs or that Sousa or Madrid ever followed up to determine whether those documents were sent or received.  (Doc. 1556 at 3298–99.)

his position regarding that discipline.  (*See* Ex. 2898.)

526.   After the predetermination hearing, on May 17, 2015, Chief Olson sustained Allegation #1, and reversed his preliminary finding sustaining Allegation #2. Nevertheless, he reduced the noticed discipline to a written reprimand.  (Doc. 1495 at Tr. 3507–09; Ex. 2895.)

527.   Lieutenant Sousa filed an employee grievance as it pertained to the written reprimand.  (*See* Doc. 1495 at Tr. 3512–14.)

528.   Lieutenant Sousa provided a detailed grievance memorandum to Chief Rodriguez in which he laid out the problematic behaviors caused by his superiors—most especially Sheriff Arpaio, Chief Sands, and Chief Trombi.   (Ex. 2559B at MELCIA0132648 ("The root cause of all the issues in Human Smuggling was the Sheriff's drive to enforce the illegal immigration issues that was giving him so much media attention.  In addition, the lack of sergeants and the Chief's failures to assign more supervisors to adequately address all the demands on this unit by the Sheriff.").)

529.   Chief Rodriguez rescinded the written reprimand because the MCSO had no method of tracking the original complaint registered against Deputy Armendariz, and because Lieutenant Sousa did not remember ever dealing with the matter.  (Doc. 1495 at Tr. 3512, 3652.)

530.   As a result, Lieutenant Sousa was not disciplined for any violations in IA #2014-542.

531.   There are several problems with respect to this investigation and the resulting grievance decision with respect to Lieutenant Sousa.

532.   With respect to Allegation #1, in reducing Lieutenant Sousa's discipline from major to minor discipline, Chief Olson incorrectly categorized Sousa's offense.

533.   In initially noticing the proposed discipline, Chief Olson correctly placed Lieutenant Sousa's violation as a Category 2 violation of the disciplinary matrix:  2(C) ("[f]ailure by a supervisor to ensure employees perform required duties"), 2(D) ("[f]ailure by a supervisor to identify or investigate . . . actual or alleged incidents of misconduct or

1    violation of written instructions or rules"), or 2(F) ("[f]ailure to exercise proper
2    supervision over assigned employee.").  (Ex. 2001 at MELC416255.)

3        534.   Then, however, when he decided to impose a written reprimand rather than
4    suspension, he inappropriately changed the violation to a Category 1 violation.  (Doc.
5    1495 at Tr. 3508–09; *see* Ex. 2559F at MELC-IAO13680.)

6        535.   Chief Olson testified that it was appropriate for him to make the sustained
7    violation fit any category on the disciplinary matrix he wanted it to.  (Doc. 1495 at Tr.
8    3511 ("You can make this fit however -- however you want it.  It's my decision where
9    they fit.").)

10       536.   This is an improper application of the MCSO disciplinary matrix, and it
11   reflects a belief that the disciplinary decision-maker may manipulate the matrix so as to
12   render it meaningless.   Under the correct application of the policy, the level of
13   misconduct dictates the discipline rather than the discipline dictating the level of
14   misconduct.    Chief Deputy Sheridan's testimony confirms that the standards for
15   correctly applying the disciplinary matrix are not flexible.  (Doc. 1389 at Tr. 1214; Doc.
16   1465 at Tr. 1419.)

17       537.   Chief Olson's arbitrary manipulation of the disciplinary matrix categories
18   contradicts one of the supposed principle benefits of the disciplinary matrix, which is to
19   make discipline uniform and equitable.    (Doc. 1495 at Tr. 3603; Ex. 2001 at
20   MELC416243.)   It further lessened the potential discipline to be faced by Lieutenant
21   Sousa.[23]  (Doc. 1495 at Tr. 3511.)

22       538.   Second, although Chief Olson offered no justification for reversing his
23   preliminary finding against Lieutenant Sousa on allegation #2—that he failed to offer or
24   mandate training for Deputy Armendariz after a clear pattern of behavior was

_____

25
26       [23]   In not charging the most serious act of applicable discipline that arises from a
     single event, Chief Olson violated MCSO policy and misapplied the MCSO disciplinary
27   matrix.    (*See, e.g.*, Ex. 2219.)   "In cases involving more than one offense, the most
     serious offense shall establish the Category of offense."  (Ex. 2001 at MELC416244.)
28   "Discipline shall be administered consistent with the Discipline Matrixes.   Discipline
     which deviates from the Discipline Matrixes must be approved by the Sheriff, or his
     designee."  (*Id.*)

1   recognized—he did offer justifications for that decision at the evidentiary hearing that

2   were, for the most part, not credible.

3       539.   Chief Olson testified that he did not think it was Lieutenant Sousa's

4   responsibility to ensure that Deputy Armendariz's annual training was up to date.  (Doc.

5   1495 at Tr. 3506.)   Olson thought that this was more in line with the supervisory

6   responsibility of a sergeant, not a lieutenant.  (*Id.* at Tr. 3649.)

7       540.   Nevertheless, this is a mischaracterization of allegation #2.  The allegation

8   did not have to do with whether Lieutenant Sousa ensured that Deputy Armendariz had

9   completed his required annual training.  It had to do with failing to mandate special

10  training for Armendariz in light of his "clear pattern" of problematic behavior.  Chief

11  Olson testified that he did not think that such an issue was raised, when in fact, it was the

12  very basis of the allegation.  (Doc. 1495 at Tr. 3507.)

13      541.   Later in his testimony, Chief Olson incorrectly testified that the report

14  revealed that either Lieutenant Sousa or Sergeant Trowbridge had attempted to get

15  Deputy Armendariz additional training to handle some of his problems, but this effort

16  was frustrated by the direction to not transfer Armendariz out of the HSU.

17      542.   Such testimony does not make sense.  Even to the extent that Lieutenant

18  Sousa was not responsible for the failure to transfer Deputy Armendariz out of the HSU,

19  that did not obviate the need for additional training whether or not the transfer was

20  approved.

21      543.   More to the point and contrary to Chief Olson's testimony, the report

22  reveals that Lieutenant Sousa himself did not believe that he ever required Deputy

23  Armendariz to attend any training in reference to his citizen complaint issues.  (*See* Doc.

24  1495 at 3543; Ex. 2559F at MELC-IA013682.)

25      544.   Finally, on cross examination, Chief Olson testified that Lieutenant

26  Sousa's predetermination submission and presentation caused him to better appreciate

27  Sousa's position as a lieutenant in charge of the HSU.  This understanding affected his

28  final decision as to whether discipline should be meted out to Sousa on allegation #2.

(Doc. 1495 at Tr. 3649–51; *see also* Ex. 2898; Ex. 2559F.)  Olson testified that he did not think that Sousa's failures were intentional or negligent, and he confirmed that Sousa was not given the tools to succeed by the MCSO.  (Doc. 1495 at Tr. 3653.)

545.   Lieutenant Sousa did submit evidence from which Chief Olson could have concluded that Sousa had unworkable demands placed on him at the HSU by Sheriff Arpaio and his supervisors.  Sousa stated in his predetermination hearing statement, for example:

> I was ordered to deal with an impossible situation, under demanding circumstances from the two Chiefs I had to directly report too [sic].  Chief Trombi and Chief Sands did not exercise any discretion when it came to facilitating the Sheriff's demands for more activity nor did they consider the ramifications of transferring in personnel that did not belong in the Unit. . . .  This situation is an institutional failure that is identifying and punishing lower level supervisors for the failures of leadership at the uppermost levels of command in this Office to include Sheriff Arpaio and his need for media attention at all costs.

(Ex. 2898 at MELCIA013693.)

546.   Nevertheless, because of the MCSO's predetermination hearing structure, Special Investigator Vogel was never able to respond to Lieutenant Sousa's assertions.  For example, there is material in Special Investigator Vogel's report that seems to suggest that Sousa loosely supervised Deputy Armendariz because of the number of arrests of unauthorized aliens he was producing.  (*See, e.g.*, Ex. 2218 at MELC-IA011271 ("The only reason [Sands] knew that Deputy Armendariz was arresting a lot of people was because Lt. Sousa told him about his activity.  Lt. Sousa was impressed with Deputy Armendariz's performance.").)  Further, as Plaintiffs pointed out, although Sousa said he was constantly raising concerns about Armendariz with his supervisors, he gave him positive personnel evaluations during the relevant period.  (Doc. 1458 at Tr. 2640–42.)

547.   It may be appropriate to excuse Lieutenant Sousa from discipline to the extent he could not adequately supervise his deputies due to the unreasonable demands placed upon him by MCSO command staff.  Nevertheless, to the extent that Sousa did

not adequately discipline his deputies because they produced a large number of HSU arrests, that would demand a different result.

548.   The ability of Chief Olson to make such an unexplained decision without providing the PSB investigator with a chance to respond is a flaw in MCSO policy that allows for the manipulation of results.

549.   If Chief Olson in fact accepted the above explanation and determined that it justified relieving Lieutenant Sousa from what were otherwise acts of misconduct, it would still require the report of such supervisory lapses on the part of Sousa's leaders as separate acts of misconduct. (*See, e.g.*, Ex. 2001 at MELC416255.)  It is not apparent that Olson did so.

550.   Finally, Chief Rodriguez vacated the written reprimand that survived against Lieutenant Sousa because the MCSO had no method of tracking the complaint registered against Deputy Armendariz, and because Sousa did not remember ever dealing with the matter.  (Doc. 1495 at Tr. 3652.)

551.   Even accepting that the MCSO had no system by which to track complaints registered against MCSO officers, (*see* Doc. 1556 at Tr. 3301), there is no doubt here that a complaint was made.   Moreover, whether a tracking system exists is irrelevant to Lieutenant Sousa's failure to fulfill his supervisory responsibilities by ensuring that a complaint of theft made against one of his officers is investigated and concluded.

### 3)   Lieutenant Jakowinicz

552.   Chief Olson sustained preliminary findings against Lieutenant Jakowinicz for:  (1) failing to properly supervise Sergeant Trowbridge and ensure that a proper and timely investigation occurred into an incident involving marijuana found in Deputy Armendariz's police vehicle on or about May 29, 2012, (Ex. 2218 at MELC-IA011198–99), and (2) failing to meet his supervisory responsibilities by not offering or mandating training to Armendariz.  (Ex. 2218 at MELC-IA011202–03.)

553.   Chief Olson's final findings reversed each of the preliminary findings sustained against Lieutenant Jakowinicz without stating any reasons for the reversal.

554.   Lieutenant Jakowinicz did not participate in a predetermination hearing, (Doc. 1495 at Tr. 3529), and Chief Olson never spoke to him regarding the preliminarily sustained findings.

555.   At the hearing, Chief Olson testified that he did not recall why he reversed all of his preliminary findings against Lieutenant Jakowinicz, but he did so after "research and reading," although he does not recall what that research and reading was. (Doc. 1495 at Tr. 3529–30.)

556.   Chief Olson gave his testimony just months after making these decisions. In light of the facts of this case, such a lack of explanation is wholly insufficient to establish that Olson conducted an adequate disciplinary evaluation with respect to Lieutenant Jakowinicz.

### 4)      Sergeant Trowbridge

557.   Chief Olson sustained preliminary findings against Sergeant Trowbridge for:   (1) failing to insure an investigation into the marijuana found in Deputy Armendariz's police vehicle on or about May 29, 2012, (Ex. 2218 at MELC-IA011189–90), and (2) failing to meet his supervisory responsibilities by not offering or mandating training in the area of interpersonal communication and officer safety to Armendariz. (Ex. 2218 at MELC-IA011193–94.)

558.   Chief Olson's final findings reversed each of the preliminary findings sustained against Sergeant Trowbridge without stating any reasons for the reversal.

559.   At the evidentiary hearing, Chief Olson acknowledged that when Sergeant Trowbridge became aware of the marijuana, he never filled out any paperwork or initiated any inquiry concerning it.   (Doc. 1495 at Tr. 3528.)   Olson admitted that the matter was not handled properly.   (*Id.* at Tr. 3540 ("I don't -- don't know why it wasn't handled properly, but I don't feel that he had a suspicion that it wouldn't be, so I overturned it."); *see also id.* at Tr. 3547, 3527 ("I thought that [Trowbridge] thought that it was already being taken care of.").)

560.   This is a wholly insufficient basis on which to find no violation of

departmental policy.

561.  This is especially the case when quantities of marijuana had been found stored in Deputy Armendariz's garage, and there were similar investigations involving Sergeant Trowbridge's supervision of Armendariz's confiscation of marijuana.   (*See, e.g.*, Doc. 833 at 2–3 (IA #2014-817).)

562.  Under such circumstances, the reversal of sustained preliminary findings is inadequate where it is merely based on Chief Olson's belief that Sergeant Trowbridge thought that Deputy Armendariz was going to appropriately resolve the matter.

563.  Regarding allegations #2 and #3 against Sergeant Trowbridge, Chief Olson found that Trowbridge was making significant efforts to appropriately supervise Deputy Armendariz, but he was receiving little to no support from the command staff in this respect.

564.  Sergeant Trowbridge and Lieutenant Jakowinicz attempted to have Deputy Armendariz reassigned, but this was thwarted by Chief Trombi.

565.  While Sergeant Trowbridge did not mandate courses for Deputy Armendariz or look at any trainings offered by the Arizona Peace Officer Standards, (Doc. 1495 at Tr. 3544), there was evidence from which Chief Olson could have found that Trowbridge discussed additional training with Armendariz.

566.  As was the case with Lieutenant Sousa, considering the lack of support that Sergeant Trowbridge was getting from his command staff on this question, the Court can see a plausible basis as to why Chief Olson may have determined that the real fault for Trowbridge's supervisory lapses was Chief Trombi.

567.  If this was the determination, it should have been factored into the discipline provided to Chief Trombi.  As the Court has previously noted, Trombi was promoted during this investigation, and the discipline he received is less than that indicated by the disciplinary matrix.

### 5)      IA #2014-542 Is Insufficient.

568.  There is no dispute that the MCSO's supervisory failures were extremely

serious.

569.   As the MCSO admitted at the hearing, supervisory failures pertaining to Deputy Armendariz revealed systemic supervision problems within the MCSO.  (Doc. 1467 at Tr. 3192–93.)

570.   Chief Olson's decision, coupled with Chief Rodriguez's grievance decision, resulted, with a single exception, in the imposition of no discipline on anyone at the MCSO for their serious, repeated, and significant supervisory failures with respect to Deputy Armendariz.  The one exception was the week-long suspension for Chief Trombi coupled with a promotion and a raise.

571.   In both dismissing and minimizing discipline, Chief Olson miscategorized offenses and grouped separate acts of misconduct into a single act for purposes of determining discipline.  He also engaged in bias and favoritism.

572.   The assignment of Chief Olson to make the disciplinary decision in IA #2014-542, his performance of that function, and the MCSO's *Melendres*-only policy, all constitute unacceptable internal affairs practices.

573.   IA #2014-542 is invalid.

### c.   The MCSO Manipulated the Timing of the Four Major Investigations

574.   At the time Special Investigator Vogel and Chief Olson conducted IA #2014-543 and IA #2014-542, Arizona statute and MCSO policy required that an employer make a good faith effort to complete all internal investigations within 120 working days.  (This statute was amended during the investigations to provide for 180 calendar days to conduct an investigation.)  MCSO policy provides that an appeals board "may dismiss the discipline if it determines that the Office did not make a good faith effort to complete the investigation within 120 business [now 180 calendar] days." (*See* Ex. 2881 at MELC1306926–27; A.R.S. § 38-1110 (2015).)

575.   Chief Deputy Sheridan testified that as a result of this statute and MCSO policy, if an administrative investigation exceeds the time limit, the discipline imposed

1    will just be overturned on appeal.

2          576.    As a result, he testified that "if an administrative investigation goes too

3    long you just don't impose discipline.  Or you don't impose -- impose serious discipline"

4    because it will just be overturned on appeal.[24]  (Doc. 1043 at Tr. 977–78.)

5          577.    It is for this reason that Captain Bailey testified that the MCSO always kept

6    very aware in internal affairs investigations of the 180 day time limit.  (Doc. 1505 at Tr.

7    3978.)

8          578.    There was testimony during the hearing, however, that Chief Deputy

9    Sheridan has manipulated the timing on investigations so he has a self-created

10   justification for imposing no discipline, or only minor discipline.  (*See* Doc. 1017 at Tr.

11   214–16.)

12         579.    In that light, Chief Sheridan identified four major IA investigations in this

13   case:  IA #2014-221, IA #2014-541, IA #2014-542, IA #2014-543.  (Doc. 1389 at Tr.

14   1135–37.)  In none of them, including IA #2015-543, in which he was a principal, was

15   the disciplinary decision timely completed.

16         580.    IA #2014-542 was officially opened on September 12, 2014, as was IA

17   #2014-543.  It is not clear when each principal was added to the investigation pursuant to

18   the terms of the statute.

19         581.    Special Investigator Vogel delivered the report on IA #2014-542 on March

20   28, 2014.  Yet, Chief Olson did not make his preliminary findings on the case until either

21   May 4 or May 5, 2015.   He made his final findings with respect to all principals on either

22   May 17 or May 18.  (Ex. 2218 at MELC-IA11170–213.)  Nevertheless, the final findings

23   were not transmitted to each principal until a month later on June 17, 2015.  (Ex. 2943a.)

24         582.    Special Investigator Vogel delivered the report on IA #2014-543 on April

25   6, 2015.  Chief Olson made his preliminary findings as to the various principals on the

_____

27   [24] Even if the Appeals Board were to overturn the discipline, both statute and
policy mandate that overturned discipline can still be considered in imposing future
28   discipline.  Thus, despite the potential reversal of discipline, there is still some purpose in
imposing it.

case on either April 21 or April 22.  He made his final findings as to all principals on either May 12 or May 14.  Nevertheless, the final findings did not become "final" until June 6, 2015.  (Ex. 2943a.)

583.    These unexplained gaps in processing the cases, when the MCSO is always very cognizant of the timing, demonstrate the MCSO's manipulation of these investigations to provide the principals with multiple defenses.

**2.     Other PSB Investigations That Resulted from Video Review Were Problematic.**

584.    On September 12, 2014, the PSB opened IA #2014-544 through IA #2014-548.  The PSB conducted the investigations in these cases.

585.    With the exception of one case,[25] each of these investigations involved policy, conduct, or professionalism violations on the part of one or more MCSO officers who were present during stops made by Deputy Armendariz.  (*See, e.g.*, Doc. 1498 at Tr. 3824, 3828–30.)

586.    The vehicle occupants in most of these stops appeared to be members of the Plaintiff class.  (*See, e.g.*, Doc. 1498 at Tr. 3815, 3830, 3835–36)

587.    Plaintiffs assert that the investigations into the misconduct demonstrate a lack of training or focus in the PSB investigations.

588.    First, in several of the investigations, the PSB investigators used leading exculpatory questions when interviewing their subjects.  (Doc. 1556 at Tr. 3443–47; Ex. 2063 at MELC160145, MELC160147, MELC160149; Doc. 1498 at Tr. 3825–28; Ex. 2772 at MELC158616–23.)

589.    Second, in one of the investigations, the discipline administered by the PSB was insufficient in light of the subject's previous discipline meted out in other *Melendres* investigations.  In IA #2014-545, Deputy Gonzalez was issued a written reprimand on

---

[25] IA #2014-548 involved one case of excessive force by Deputy Armendariz and was not significantly raised at hearing.

February 14, 2015, for his failure to provide a basis for a traffic stop.  Nevertheless, the previous week, on February 4, Gonzalez had received two written reprimands—one documented in IA #2014-563 (failure to inform of reason for a stop) and another one in IA #2014-575 (using profanity towards driver on a stop).  Because of the previous discipline, appropriate application of the disciplinary matrix would have resulted in more serious discipline.

590.   Third, in one of the investigations, PSB investigators assumed exonerating facts in their conclusions that were unsupported by the video recordings.  (Doc. 1556 at Tr. 3439–40; Doc. 1498 at Tr. 3819; Ex. 2063 at MECL160124, MELC160135.)  In IA #2014-544, Deputy Armendariz reported that he stopped a vehicle and that both passengers stated that they were in the United States illegally.  Sergeant Fax assumed that the detainees' statement was made spontaneously rather than as a result of being questioned, but it is apparent from the report that Armendariz questioned them.  (Doc. 1498 at Tr. 3819.)

591.   Fourth, one of the investigations demonstrates an instance in which the PSB investigated a lesser charge (inappropriate language) than the charge originally referred to the PSB by the reviewing lieutenants (no basis for the stop).  (Doc. 1498 at Tr. 3828–32; *compare* Ex. 2104 at MELC160768 *with id.* at MELC160792 (Sergeant Bocchino's investigation in IA #2014-547).)

### 3.   Investigations Handled by Divisions Demonstrate a Lack of Training and Consistency

592.   Each division of the MCSO has officers—sometimes lieutenants—assigned to conduct internal affairs investigations of complaints involving matters of minor discipline.  (Doc. 1467 at Tr. 3162, 3184.)

593.   Those persons are selected at the discretion of the division commanders. The PSB has no say in such selection and there are no criteria promulgated for purposes of aiding in such selection.  (Doc. 1467 at Tr. 3182.)

594.   The PSB does not yet offer systematic training to division personnel

1   designated to conduct internal affairs investigations.  (Doc. 1467 at Tr. 3182–83; Doc.

2   1505 at Tr. 4026.)

3       595.   However, every month the PSB administrative staff generates a list of the

4   IA investigative numbers that are still active within each division or district.   The

5   commander of each division or district is sent this list.  (Doc. 1467 at Tr. 3988–89.)  The

6   commander of the PSB is sent a similar list for open investigations assigned to the PSB.

7   (*Id.* at 4000.)     Other than sending the list, however, the PSB does not oversee the

8   substance of investigations done on the division side.  (*Id.* at Tr. 4027.)

9       596.   Each division had different interpretations of policies and procedures

10   governing internal affairs investigations.  (Doc. 1467 at Tr. 3166.)

11       597.   On December 4, 2014, the MCSO notified the Court that it opened IA

12   #2014-451—a PSB investigation into the adequacy of a division investigation of a

13   different complaint (IA #2014-142, which involved Deputy Armendariz's misconduct

14   during a traffic stop).

15       598.   The incident at issue in IA #2014-142 occurred on March 12, 2014, but the

16   responsible division did not complete the investigation and submit it to the PSB until

17   August 1, 2014.  (Ex. 2767 at MELC158128.)

18       599.   Despite the fact that the investigating officer had spent some eight hours in

19   training to conduct such investigations, the investigation of Deputy Armendariz was

20   poorly conducted in that (1) it was untimely, (2) there was a failure to conduct necessary

21   interviews, (3) there was a failure to record interviews or otherwise document evidence,

22   and (4) there was a failure to give adequate notices or *Garrity* warnings.  (Ex. 2767 at

23   MELC158128, MELC158130; Doc. 1556 at Tr. 3425–29.)

24       600.   This division investigation initially resulted in a finding of "not sustained"

25   against Deputy Armendariz, whereas a finding of "sustained" should have been and

26   eventually was made.  (Ex. 2767 at MELC158130–32.)

27       601.   On January 26, 2015, the PSB issued a written reprimand to the two

28   officers responsible for the poorly conducted division investigation.   (Ex. 2943a at

MELC1404203a.)

**B.     MCSO Investigations Arising from Found Personal Property.**

602.   In addition to the PSB investigations that began as the result of the MCSO's videotape reviews, the PSB also began several investigations resulting from items of personal property that were not accounted for and that were found in the custody of the MCSO.

### 1.     The MCSO Carried Out a Bad Faith Criminal Investigation into the Allegations Raised by Cisco Perez (IA #2014-295).

603.   Cisco Perez made the allegations, *see supra* ¶ 281, above in a state unemployment hearing that the MCSO investigated as IA #2014-295.[26]  (*See* Ex. 2748.)

604.   Chief Deputy Sheridan and Captain Bailey agreed that there should be a criminal investigation opened with respect to the Cisco Perez allegations.  (*See* Doc. 1556 at Tr. 3236; Doc. 1505 at 4012-13; Doc. 1389 at Tr. 1128; Doc. 1456 at 2215.)

605.   They also decided to suspend the ongoing Deputy Armendariz administrative investigation pending the completion of the Cisco Perez criminal investigation.  (Doc. 1467 at Tr. 3119–20; Ex. 2004; Doc. 755 at 10; Doc. 795-1 at 30.)

### a.     The MCSO Improperly Bifurcated the Cisco Perez Allegations and the Armendariz Search.

606.   Cisco Perez alleged that HSU officers were taking property during HSU operations in a manner that violated policy or law; the many items of property in Deputy Armendariz's garage amply demonstrated as much.  The Armendariz matter, therefore, provided an abundance of evidence to support the Perez allegations, evidence that was otherwise relatively sparse.  Unlike the Armendariz search, which yielded existing and potentially traceable evidence of misappropriation of items of value, the Cisco Perez

---

[26]During approximately the first week of June 2014, shortly before Cisco Perez made these allegations of misconduct within the MCSO, Chief Deputy Sheridan transferred Captain Bailey from the SID to head up the PSB.  (Doc. 1467 at Tr. 3144; *see* Ex. 2748 (memorandum from Deputy Knight to Captain Bailey raising the Cisco Perez allegations dated June 12, 2014).)   The Armendariz administrative investigation, including an inquiry into all of the items found in Deputy Armendariz's garage, was already underway when Captain Bailey became the head of the PSB.

allegations referenced no specific property other than a large screen TV.

607.    The Armendariz matter should have been considered as part of the evidence—indeed, the *bulk* of the evidence—when assessing the validity of the Cisco Perez allegations.

608.    By largely disregarding the Armendariz evidence in the Cisco Perez criminal investigation, the PSB and the assigned criminal investigator, Sergeant Tennyson, could investigate the otherwise largely unsupported Cisco Perez allegations without taking into account the corroborating physical evidence of "pocketing" that the items in Deputy Armendariz's garage provided.[27]

### b.    Sergeant Tennyson's Investigative Practices and Techniques Undermine the Veracity of His Investigations and Reports.

609.    On August 28, 2014, Sergeant Tennyson wrote a report addressed to Captain Bailey in which he closed out any criminal investigation relating to the Cisco Perez allegations.  (Doc. 1556 at Tr. 3237–39; Ex. 2006 at MELC011165.)

610.    On November 20, 2014, three weeks after the Court held a hearing on the August report, Sergeant Tennyson wrote a follow-up memorandum addressed directly to Chief Deputy Sheridan that recommended closing any criminal investigation as it pertained to the items of personal property found in Deputy Armendariz's garage.  (Ex. 1001.)

611.    In addressing the November memorandum directly to Chief Deputy Sheridan, Sergeant Tennyson skipped several levels of the normal chain of command.  (Doc. 1556 at Tr. 3249.)

612.    Chief Deputy Sheridan does not think that this is odd because he had frequent conversations with Sergeant Tennyson about this investigation.  (Doc. 1389 at Tr. 1181.)  Further, he was in close contact with all PSB operations.  (*Id.* at Tr. 1128.)

613.    Sergeant Tennyson began his interviews in regard to the Cisco Perez

---

[27] This bifurcation was especially problematic after it became clear that other surviving HSU members contributed to the contraband stored in Armendariz's garage.

investigation on June 16, 2014.   (Ex. 2006 at MELC011163.)   He conducted 45 interviews in a three week period.  (*Id.*)  His plan was to "speak briefly with everybody at HSU and get this thing done[.]"  (Ex. 2031 at MELC227066.)

614.   Chief Deputy Sheridan stayed very close to the investigation and had frequent contact and communication with Sergeant Tennyson.  (Doc. 1389 at Tr. 1180–81.)

615.   Aside from prioritizing the investigation into the Cisco Perez allegations, which had no physical evidence, over the investigation into the Armendariz search, which yielded a great deal of actual (often traceable) property, there were other considerable deficiencies in Sergeant Tennyson's investigations.

> **1)   Sergeant Tennyson Adopted the HSU's False Assertion that Deputies Used Identifications for Fraud Training Purposes.**

616.   Sergeant Tennyson notes in his August report that the deputies had recovered "many different forms of identification[,]" (Ex. 2006 at MELC011163), religious statuettes, "homemade booties," and other items of little value for training purposes.   Further, he acknowledged that Sergeant Trowbridge indicated that he kept license plates from load vehicles as trophies on his HSU office wall, with each license plate representing a load vehicle arrest.  (*Id.* at MELC011164.)

617.   Nevertheless, Sergeant Tennyson concludes that "some identifications were fraudulent and many were recovered without being able to identify its true owner." (Ex. 2006 at MELC011163.)

618.   In doing so, he apparently credited the false statements originally asserted by HSU personnel right after the Deputy Armendariz administrative investigation began that the recovered IDs were used in formal training courses in which participants had to provide fraudulent IDs.

619.   For example, as early as May 23, 2014, Detective Frei[28] authored a memorandum sent to Captain Bailey when he was the Captain over the Special Investigations Division which included the HSU.  This was immediately prior to Bailey's transfer to the PSB.  (Ex. 1000 at MELC028132.)

620.   In the memo, Detective Frei requested that Captain Bailey direct him as to what he should do with the numerous personal IDs he had gathered over the last five years in the course of his law enforcement activities and the law enforcement activities of other deputies.

621.   The memorandum claimed that the IDs in his possession came from detectives who had reason to believe that the identifications were fraudulent.  He stated that "[t]he identifications were used for training purposes only, as most of the Criminal Employment Unit is certified in document examination or has had some training in forged/fraudulent/questioned documents."  (Ex. 1000 at MELC028132.)

622.   Despite Detective Frei's representation that the IDs were fraudulent, Captain Bailey could not recall that the MCSO had ever attempted to determine whether this was accurate.  (Doc. 1505 at Tr. 4048–49.)

623.   Moreover, there is no reason to assume the identifications are fraudulent.  (Doc. 1505 at Tr. 4048–49.)  Almost all of the identifications attached to Detective Frei's memorandum are issued to members of the Plaintiff class, (*see, e.g.*, Ex. 1000 at MELC028133-59), and many of them were issued by foreign governments— predominantly Mexico or its states.  (*See id.*)  Chief Deputy Sheridan, when asked about these IDs, acknowledged that it would not make sense for someone asserting a legal right to be in the United States to create a fraudulent Mexican identification.  (Doc. 1043 at Tr. 985.)

624.   Further, as the MCSO would later admit, contrary to the assertions of Detective Frei, no one in the Criminal Employment Unit had formal training in

---

[28] During the course of this litigation, the MCSO promoted Detective Frei to the position of Sergeant.

forged/fraudulent/questioned documents. In fact, no one in the MCSO in general had such training. (Doc. 1417 at Tr. 1546–47.)

625. Detective Frei submitted the memorandum and the attached IDs to Property and Evidence for destruction. (Ex. 1000 at MELC028131.) At that time, the memorandum came to the attention of the Monitor Team and was not destroyed. (Doc. 1043 at Tr. 985.)

626. The memorandum to Captain Bailey has apparently never been the subject of an MCSO internal affairs investigation. (Doc. 1417 at Tr. 1546; Doc. 1505 at Tr. 4047.)

627. Nevertheless, as of May 2014, the same false explanation set forth by Detective Frei seems to have been generally adopted by other HSU officers in an attempt to offer a legitimate explanation for the many IDs in the possession of HSU deputies that in fact had been taken as souvenirs of arrests. (Doc. 1417 at Tr. 1547.)

628. When in early June, the HSU returned to its former offices in the Enforcement Support building, some of the things they found there were Mexican IDs and a Mexican passport or passports.

629. These IDs belong to members of the Plaintiff class.

630. When Sergeant Powe questioned Deputy Cosme and Deputy Joya about the presence of the identifications, they offered the same false explanation "that they attended courses designed to help them identify fraudulent Mexican IDs and Fraudulent Foreign Identifications." (Ex. 43 at MELC104079.)) They "explained . . . that they were instructed to confiscate fraudulent IDs found during the course of their duties, but because they were not Arizona State Identification, they were not able to use them to charge the subject with a crime." (*Id.*) However, as the MCSO now admits, contrary to the statements of Detective Frei, Deputy Cosme, and Deputy Joya, HSU and CEU members did not receive training to help them identify fraudulent Mexican IDs and fraudulent foreign identifications. (Doc. 1417 at Tr. 1546–47.) Nor is there any evidence that HSU or CEU members were "instructed to confiscate fraudulent IDs found during

the course of their duties" without submitting them to Property and Evidence.

631.   Nor was any evidence offered at trial to establish that the IDs referred to by Deputy Cosme and Deputy Joya are fraudulent.

632.   Sergeant Powe, however, apparently accepted these statements at face value.  In a June 6 memorandum to Lieutenant Jakowinicz regarding the explanation of Deputy Cosme and Deputy Joya, Sergeant Powe noted that this information might be helpful to the HSU in responding to the ongoing internal affairs investigation into such matters.[29]  (Ex. 43 at MELC104079.)

633.   How these identifications came to be left in the former HSU offices has not been the subject of an internal affairs investigation identified to the Court, although the documents have apparently been preserved in a departmental report.

634.   In the Cisco Perez investigation, there is no reason why Sergeant Tennyson would not have had access to the IDs to determine whether they were fraudulent. Detective Frei presumably still had his 111 IDs that he subsequently turned in the following November.   Sergeant Powe had preserved in a Departmental report the Mexican IDs found in the HSU's initial return to its HSU offices in Enforcement Support.  (DR#14-013242; Ex. 43 at MELC104079.)  Sergeant Tennyson also knew of, and had access to, the approximately 500 identifications found in Deputy Armendariz's garage, although given their storage in the garage, Tennyson could not have reasonably believed that they were being used for training purposes.

635.   At any rate, the MCSO now acknowledges that many of those IDs are not fraudulent.  (Doc. 1505 at Tr. 4048.)

636.   Although Sergeant Tennyson noted in his report that some of the IDs were fraudulent, he never discussed those identifications that were *not* fraudulent, and what

---

[29] This also demonstrates that HSU leaders were quite aware of the ongoing Armendariz investigation and one of its topics before the Cisco Perez criminal investigation even began.

basis the HSU members would have had for seizing/keeping them.[30]

637.   Additionally, the leading questions Sergeant Tennyson posed in his interviews demonstrated that he had already concluded that the IDs were fraudulent and that he was attempting to lead those he interviewed to the same conclusion.  (*See, e.g.*, Ex. 2028 at MELC226810 ("I was told by some of the guys that there'd be times when fro-or fraudulent ID's were, um—were acquired and used for training.  Is—did you recall anything like that?"); Ex. 2029 at MELC227806 ("As far as the um identification, I spoke with a ton of guys and some mentioned that some of the IDs were taken and used as training aids.  Does that sound familiar to you?").)

638.   Third, he concluded that the MCSO deputies attended "training classes put on by outside agencies, namely DPS, where students were asked to provide discarded fraudulent identification for training aids."  (Ex. 2006 at MELC011164.)  As has been demonstrated above, although this was a popular explanation engineered by HSU staff, there is no truth to it.

639.   As to the seized license plates, even though there was no suggestion that they were fraudulent, or that they were used in training, this did not prevent Sergeant Tennyson from suggesting such a connection.  (*See, e.g.*, Ex. 2028 at MELC226806 ("[I]t seems to be a common theme that the license plates were taken and some of them were posted on walls inside the – the, um – the offices – and keep in mind Cisco – Cisco mentions that after he – he says – he – these items were pocketed, he does follow-up with yeah, we used them for training.  Now, uh, is that a pross – is that a, uh – a protocol or something you guys did on a regular basis?").)

---

[30] In the conclusion of his November memorandum, Sergeant Tennyson does at least implicitly acknowledge that HSU members are inappropriately taking some property when he notes "it is not clear why the items did not remain with the arrestee or why the items were not placed into Property and Evidence for either destruction or for evidentiary purposes."  (Ex. 2841 at MELC1397012; *see also* Ex. 1001 at 3.)  But he does nothing in either the August or the November report to pursue these questions before terminating the investigations.

640.   Fourth, citing Deputy Gandara, Sergeant Tennyson concluded that when IDs were kept for training aids, "first the cards were processed as found property."  (Ex. 2006 at MELC011164.)  That is also not true.  With the apparent exception of those IDs involved in IA #2014-874 and those IDs collected by Sergeant Knapp, the Court is not aware that any of the IDs subsequently located by the MCSO were checked into and processed as property.  It is notable that even Gandara was later disciplined for not processing confiscated items as property.  (*See, e.g.*, IA #2015-022.)  Yet, in Sergeant Tennyson's rush to arrive at an exonerating conclusion, he apparently made no effort to confirm the truth of Gandara's statement before determining that it was accurate.

> **2)   Sergeant Tennyson Failed to Investigate or Follow Up on Identifiable and Traceable Property Found in Deputy Armendariz's Garage.**

641.   In his August report, Sergeant Tennyson did not discuss or disclose any of the personal property found in Deputy Armendariz's garage that had obvious value and was traceable to victims, which casts a different light on the minimal items for which he did account.

642.   To the extent that he was, at the time, trying to assume that all of the property in Deputy Armendariz's garage came from Armendariz, he was disabused of that notion before writing his November memorandum to Chief Deputy Sheridan.

643.   In between receiving Mr. Manning's email in early October, *see infra* ¶¶ 679–83, and writing the November 20 memorandum to Chief Sheridan, Sergeant Tennyson received further verification that Deputy Armendariz was not the only MCSO source of seized property recovered from Armendariz's home.

644.   In October, Sergeant Tennyson received nine CDs containing information demonstrating that the IDs of persons found in Deputy Armendariz's garage were attributable to law enforcement activity of MCSO officers other than Armendariz.[31]  (Ex. 1001 at 1 ("The identification cards associated with the information on the CDs mentioned above were discovered to have been obtained during HSU operations by

---

[31] This corroborated Deputy Armendariz's May interview asserting that fact.

Detectives **other than Armendariz**.") (emphasis in original); *see also* IA #2014-774 through IA #2014-783; Doc. 814 at 4–13.)

645.   By that same time, Sergeant Tennyson was able to identify an additional seven IDs from Deputy Armendariz's garage belonging to persons who had encounters with HSU officers other than Armendariz. (Ex. 2025; Ex. 2026.)  Three of these persons were identified as having encounters with "C. Perez S 1346." (Ex. 2026.)  To the extent that "C. Perez" is Cisco Perez, this demonstrates that some of the property that Perez "pocketed" found its way to Armendariz's garage.   This property thus provides considerable support for the validity of Perez's original allegation that HSU members were in the habit of pocketing things.  Armendariz's garage served as a depository of the pocketed property.  This connection was never noted by Tennyson.

646.   Sergeant Tennyson dropped any further investigations into the IDs once he determined that they belonged to individuals who had been transferred to ICE.  (Ex. 2025.)  He did so because he concluded that it was impossible to locate persons who had been deported.  Tennyson admitted that no additional efforts were made to locate these individuals. (Doc. 1466 at Tr. 2942–44; *see also* Ex. 2025.)  He further testified that he is not aware of any such efforts made by the MCSO.  (*See* Doc. 1466 at Tr. 2893, 2904–05; Doc. 1467 at Tr. 3135–36; *see also* Ex. 1001.)  These IDs were not fraudulent. Tennyson relied on the identities provided by them in confirming, through MCSO records, that the persons identified by the cards were transferred to immigration authorities, and then through immigration records that the persons were ultimately deported.  (*See, e.g.*, Ex. 1001; *see also* Ex. 2025; Ex. 2026.)  Further, based on their names and their deportations, these persons are members of the Plaintiff class.

647.   The fact that the victims of the MCSO's misappropriations were deported (or otherwise could not be located) does not negate the importance of at least administrative investigations into the misappropriations.   Where property could be connected to deputies, the investigations should not have been dropped, regardless of whether the owners of the property could be located.

1

2

3

          **3)**      **The MCSO Imposed No Discipline on HSU Members Who Seized Personal Property from Plaintiff Class Members and Stored It in Deputy Armendariz's Garage.**

4

648.    In his November report, Sergeant Tennyson noted that Deputy Armendariz

5

alleged, just prior to his suicide in May, that a female detention officer coworker in the

6

HSU removed items from HSU offices and placed them in Armendariz's garage once she

7

"got word of an upcoming inspection by the Internal Affairs Division." (Ex. 1001 at 3.)

8

649.    Sergeant Tennyson's memorandum dismissed this allegation because

9

Tennyson had identified and interviewed the relevant detention officer, Raphaelita

10

Montoya, and she "denied delivering anything to the Armendariz residence." He further

11

noted that Deputy Armendariz is a "pack rat." (Ex. 1001 at 3.)

12

650.    However, Officer Montoya subsequently admitted that she did in fact clear

13

contraband from HSU offices and take it to Deputy Armendariz's garage. (Ex. 2841 at

14

MELC1396996 ("At a later date the same female Detention Officer admitted to

15

Detectives during an audio/video taped post polygraph interview she did drop some items

16

off at the Armendariz residence. She also helped Armendariz load several items which

17

may have included the identification cards into his work vehicle when HSU was

18

relocated to a new facility."); see also Doc. 1556 at Tr. 246–47.)

19

651.    Officer Montoya made this admission after declining to submit to a

20

polygraph examination.32 (Doc. 1466 at Tr. 2901–03.) This is an independent violation

21

of MCSO policy.

22

652.    The MCSO now admits that there were items found in Deputy

23

Armendariz's garage that came from MCSO operations in which Armendariz took no

24

part. (Doc. 1556 at Tr. 3246–47.)

25

653.    Even after Officer Montoya confessed as much, there was no further

26

27

28

---

32 Officer Montoya apparently agreed to take a polygraph exam, had "some sort of a panic attack" before the exam, and was therefore never actually polygraphed. (Doc. 1466 at Tr. 2902:1-9.)

1   investigation or reassessment of her involvement, or that of anyone else, in the possible

2   mishandling or theft of property in either an administrative or a criminal investigation.

3   (Doc. 1466 at Tr. 2901–03.)   By the time of her confession, Montoya had already

4   received findings of "not sustained" in two administrative cases:   IA #2014-541 and IA

5   #2015-021.   (Doc. 1389 at Tr. 1205; Doc. 1556 at Tr. 3270–71; see also Ex. 2010, Ex.

6   2887, Ex. 2943.)

7       654.   Despite this, and despite Sergeant Tennyson's acknowledgment in a

8   previous memorandum to Chief Deputy Sheridan that the loads Officer Montoya took

9   over to Deputy Armendariz's home may have included IDs, (see, e.g., Ex. 2841 at

10   MELC1396996), Tennyson testified to this Court that no one at the PSB was yet able to

11   answer how the additional IDs in Armendariz's garage deriving from stops that

12   Armendariz did not execute came to be there.  (Doc. 1466 at Tr. 2890–91; Doc. 1556 at

13   Tr. 3246–47.)  In light of the facts set forth above, Tennyson's expressed mystification

14   (and that of anybody else at the MCSO) is neither genuine nor credible.

16       **4)    The MCSO's Defense of Sergeant Tennyson's August
                Report Is Not Persuasive.**

18       655.   After Sergeant Tennyson presented his August report to the MCSO and the

19   Monitor, the Monitor filed with the Court its written evaluation of the MCSO's

20   investigative efforts.

21       656.   The Monitor was critical of a number of aspects of Sergeant Tennyson's

22   investigation:   the PSB's lack of an investigation plan, Tennyson's minimal interview

23   questions, his leading questions, his apologetic tone, and his failure to follow-up when

24   interview subjects mentioned topics pertinent to the investigation.[33]

25       657.   On October 21, 2014, Defendants filed their response to the Monitor's

---

[33] In Sergeant Tennyson's initial interviews he only covered four basic questions that mostly related to the meaning of the term "pocketing."  (Doc. 795, Ex. 1 at 31.) Further, the interviews were very short.  (*See, e.g.*, Ex. 2030.) And he was apologetic to those he interviewed.  (*See, e.g.*, *id.* at MELC227271 (To Gamboa:  "I feel as though I'm wasting your time 'cause I only had a few questions for you[.]").)

report.  (Doc. 755.)

658.   The Court held a hearing on the Monitor's report on October 28, 2014.  In that hearing, at which Chief Deputy Sheridan was present, (Doc. 776 at Tr. 3), the Court noted its concerns with Sergeant Tennyson's investigation.  (*Id.* at Tr. 49–52; *see* IA #2014-0295; *see also* Doc. 804 at Tr. 71–72; Doc. 795 at 6–7.)

659.   The Court also noted, despite not being made aware of Mr. Manning's email conclusions, *see infra* ¶¶ 679–83, that the materials found in Deputy Armendariz's garage had value and in many cases—*e.g.*, credit cards—could be tracked to identifiable victims.  (Doc. 776 at Tr. 45; Doc. 780 at Tr. 86–90.)  The Court reaffirmed that a criminal investigation ought not to be foreclosed as to the personal property and items of value found in there.  (Doc. 776 at Tr. 45; Doc. 780 at 86–90.)

### i.   At the Evidentiary Hearing, the MCSO Defended Its Flawed Investigative Techniques

660.   In their testimony, Chief Deputy Sheridan, Captain Bailey, and to some extent Sergeant Tennyson all sought to defend the probity, propriety, and competence of Tennyson's investigation and his two resulting memoranda.

661.   Chief Deputy Sheridan did not discuss the Monitor's criticisms of Sergeant Tennyson's investigation with Tennyson because Sheridan does not agree with them.  (Doc. 1389 at Tr. 1198–99.)

662.   Captain Bailey was aware of the Monitor's criticisms of Sergeant Tennyson's investigation and for the most part disagreed with them.  (Doc. 1556 at Tr. 3250; Doc. 1505 at Tr. 4013–14, 4038–39.)  He had no problem with Tennyson's leading questions, (Doc. 1556 at Tr. 3253), his lack of investigative plan, (*id.* at Tr. 3252), his failure to prepare in advance a comprehensive set of questions, (Doc. 1498 at Tr. 3812), or his failure to follow up on information pertinent to the investigation that emerged during Tennyson's interviews.  (Doc. 1556 at Tr. 3254–55.)

663.   Captain Bailey did not agree with the Monitor's criticism that Sergeant Tennyson was being controlled nor that he was investigating just enough to make the

investigation appear credible.  (Doc. 1556 at Tr. 3254.)

664.   Captain Bailey did agree with some of the Monitor's criticisms.   For example, he tacitly agreed with the Monitor's criticisms regarding Sergeant Tennyson's failure to Mirandize people, so he talked to him about that.  (Doc. 1556 at Tr. 3255–57.) He talked to Tennyson about the need to use rooms in which the interviews could be recorded.  (*Id.* at Tr. 3258.)  He also mentioned to Tennyson that he did not need to be apologetic.  (*Id.* at Tr. 3259.)  Bailey further believed that the language in the November memorandum's conclusion that lauds the HSU, the unit Tennyson was investigating, was unnecessary.[34]  (*Id.* at Tr. 3249–50.)

665.   Nevertheless, Captain Bailey stands by Sergeant Tennyson's investigation into the Cisco Perez allegations and does not believe that it raises any issues or concerns. (Doc. 1556 at Tr. 3240.)

666.   At the hearing, Sergeant Tennyson defended his leading questions by testifying that such questions are a matter of his own style and were an effort to get more information from the subjects of his interviews.  (*See* Doc. 1467 at Tr. 3011–12.)

---

[34] Chief Sheridan, on the other hand, does not think that the language is inappropriately laudatory or inappropriate in tone.  He does not believe that it denotes bias in any way. (Doc. 1389 at Tr. 1184–85.)  The relevant language states:

> It is with great respect for those Deputies associated with the MCSO Human Smuggling Unit the following be noted.  Based on this inquiry as well as the aforementioned criminal investigation HSU Detectives invested much effort carrying out duties as they related to Human Smuggling Operations.  With every effort not to overshadow the tremendous work of the Detectives and Supervisors in the Unit it at least appears based on information provided some in the Unit may have not adhered to a procedurally sound method of handling seized items.  Per MCSO Property and Evidence personnel written procedures are and have been in place providing instructions for the forfeiture of items seized as a result of an arrest or found property for the use of the training aids or other applicable work related needs within the Office.

(Ex. 1001 at 3.)

- 116 -

667.   However, his leading questions incorporated the assumption that the identifications were fraudulent and that they were used for training purposes.  Thus, the answers that Sergeant Tennyson's leading questions suggested were not only false, they were the very answers which fit with Tennyson's, Chief Deputy Sheridan's, and Bailey's acknowledged view of the appropriate result in this case.  They also covered up what are at least pervasive violations of MCSO policy if not criminal conduct.  To the extent then that at the evidentiary hearing he suggested that his leading questions were merely a matter of his own style and were not problematic, the Court finds that testimony not credible.

668.   To the extent that Captain Bailey and Chief Deputy Sheridan determined that such questions were not problematic, it reflects their own lack of good faith in directing the investigation and/or in testifying about it.

669.   The Court also finds not credible Sergeant Tennyson's assertion that when he failed to give proper *Miranda* warnings, he did so as a matter of strategy.  (Doc. 1466 at Tr. 2925–28.)  To the extent that Tennyson's purposeful failure would have produced any information in the criminal interviews, it would have been inadmissible as would any information to which it led.

ii.    **Sergeant Tennyson Controverts the Facts When He Attempts to Blame the Monitor Team and Raise Other Excuses for the Insufficiency of His Investigations.**

670.   To at least some extent, Sergeant Tennyson himself acknowledges that his investigation "lacked . . . vigor."  (Ex. 2849 at MELC1397098 ("It has been said in open court the MCSO Professional Standards Bureau lacked skill and vigor while investigating the alleged widespread criminal activity of the MCSO Human Smuggling Division.  This is partially true."); Ex. 2841 at MELC1396978 ("I must agree with those critical of my actions, including Judge Snow, who suggested this investigation was handled without vigor.  Unfortunately, the investigative parameters were strongly influenced and in my

opinion the results were reflective.").)

671.    According to Sergeant Tennyson, the reason for his "lack of vigor" is that the Monitor Team insisted that the investigation be a criminal as opposed to an administrative one, which allegedly crippled his investigation.  Further, he testified that the Monitor Team dictated every question that he asked which deprived him of the ability to develop his own strategy.  (Doc. 1466 at Tr. 2919.)

672.    Neither one of these assertions is accurate or credible.

673.    As stated above, Chief Deputy Sheridan and/or Captain Bailey decided that the Cisco Perez investigation should be a criminal one; thus, regardless of which of the two actually made the decision, it is clear that the Monitor did not make it.

674.    Sergeant Tennyson's testimony is also inaccurate when he asserts that the Monitors directed every question that he asked.  It is true that after observing his initial cursory interviews, the Monitors did tell him that his interviews were insufficient and suggested a list of baseline questions.  (Doc. 1466 at Tr. 2919; *see also* Doc. 1498 at Tr. 3811–12; Doc. 795, Ex. 1 at 31–32; Ex. 2841 at MELC1396974–76.)  Tennyson accepted some of their suggestions and rejected others.  In fact, Tennyson agreed that he received the questions on June 23 and that he responded on June 24 with his own list of questions which incorporated many but not all of the Monitor's suggested questions.  (Doc. 1467 at Tr. 3130–33; Ex. 2841 at MELC1396974–76.)

675.     The bottom line is, although the Monitor Team did make suggestions, it did not make the decisions pertaining to the investigation.  Those were left in the hands of the MCSO, and the MCSO exercised its independence in making those decisions.  It now seeks to throw up dust to mask its own inadequacies by blaming the Monitor.

676.    Sergeant Tennyson also defended MCSO practice by testifying that other local police agencies also have collection bins in which they deposit fraudulent or invalid identifications without the necessity of turning them in to their Property and Evidence departments.  (Doc. 1467 at Tr. 3070–72.)  Nevertheless, those police agencies only do so for expired or invalid IDs.  Sergeant Tennyson never asked those police agencies whether

they deposited valid IDs into their collection bins as was the habit of the MCSO.  (Doc. 1467 at Tr. 3105–06.)

677.    Finally, Sergeant Tennyson defends his memorandum because, he states, he could not establish that any HSU officer had the intent to steal.  (Doc. 1466 at Tr. 2932–33; Doc. 1467 at Tr. 3074–77.)

678.    Even assuming that he in fact arrived at such a conclusion, he does not mention it or explain it in the memorandum itself.  And, if this was his conclusion, it would require at least a minimal amount of explanation in light of Sergeant Trowbridge's honesty in avowing that he and others took license plates as "trophies" of their HSU arrests and hung them on HSU office walls.

### iii.    The MCSO Failed to Provide MCAO Attorney Keith Manning with Sufficient Information, and Therefore the MCSO Cannot Justifiably Rely on His Advice.

679.    Shortly before the October hearing, but after the closure of the Cisco Perez investigation, Sergeant Tennyson provided an attorney from the Maricopa County Attorney's Office (MCAO), Keith Manning, with his August 28 memorandum.  Mr. Manning opined, based on his reading of Tennyson's memorandum, that criminal prosecutions would not have been viable because the MCSO had not attributed any value to the items involved in the investigation, and further, the investigation did not identify any actual victims of such thefts.  (Ex. 1001 at 3.)

680.    In light of the minimal amount of property that Sergeant Tennyson discussed in his August memorandum, the Court can understand how Mr. Manning would have doubts about the practicability of bringing criminal charges.  This is especially true if he believed that the property was being innocently used by the MCSO for training purposes, that the property had no value, and that no victims could be identified.

681.    It seems inconceivable to the Court, however, that Mr. Manning would have engaged in the same analysis if he had been aware that the items included money,

drugs, credit cards, bank cards, cell phones, purses, wallets, weapons, memory cards, and other items.  Further, despite what was stated in Sergeant Tennyson's memo, the items were not being used for formalized training purposes, and no effort was made to identify victims who were no longer in the country.

682.  Chief Deputy Sheridan was present in Court during the October hearing when the Court, in expressing the view that the criminal investigations should remain open as a possibility, emphasized the valuable nature of some of the property found in Deputy Armendariz's garage as well as its traceability.  (Doc. 776 at Tr. 45; Doc. 780 at 86–90.)

683.  Thus, in applying Mr. Manning's analysis concerning the Cisco Perez investigation property to the Armendariz investigation property, Chief Deputy Sheridan was already aware of the relevant distinctions.  Yet he made no attempt to account for them, because Sergeant Tennyson's November memorandum provided the result Sheridan had sought from the beginning.

> **5)      From the Outset, Chief Deputy Sheridan, Captain Bailey, and Sergeant Tennyson Predetermined that Neither the Cisco Perez Allegations nor the Property Found in Deputy Armendariz's Garage Supported Pursuing a Criminal Investigation.**

684.  Even though Chief Deputy Sheridan ordered that the Cisco Perez allegations be criminally investigated, he testified that from the beginning he did not think that there was a basis to pursue a criminal investigation.  He did not believe that the word of a mentally-ill officer (Deputy Armendariz) or a discredited officer (Perez) provided any probable cause to investigate HSU members for pocketing items.  (Doc. 1389 at Tr. 1161–62, 1185–88; *see also* Ex. 1001 at 3.)

685.  He felt compassion and empathy for the members of the HSU being investigated for events that he did not believe had occurred.  (Doc. 1389 at Tr. 1185–88.)

686.  He initiated the investigation merely because he believed that if he did not, Plaintiffs would try to suggest that he was not adequately conducting his internal

investigations.  (Doc. 1389 at Tr. 1188.)

687.  Although Captain Bailey recommended and subsequently ordered the criminal investigation, and further ordered that every HSU and former HSU member be interviewed, he also thought that innocent officers were being treated unfairly to the extent that the allegations resulted in their treatment as suspects.  (Doc. 1556 at Tr. 3250–52.)

688.  Like Chief Deputy Sheridan and Captain Bailey, Sergeant Tennyson thought from the outset that there was no basis for a criminal investigation or for interviewing all of the HSU deputies.  (Doc. 1466 at Tr. 2815, 2907–08; Doc. 1467 at 3078–80.)

689.  Therefore, upon his receipt of Sergeant Tennyson's November memorandum, Chief Deputy Sheridan closed any further criminal investigation into the materials located in Deputy Armendariz's garage based on faulty and insufficient reasoning.

### 6)    IA #2014-295 Is Therefore Void

690.  In short, Sergeant Tennyson's investigation ended up being what he and Chief Deputy Sheridan intended it to be:  a perfunctory whitewash.  His leading questions further propagated a fiction invented by HSU officers in an attempt to explain the unauthorized personal property in their possession, and he failed to adequately investigate the allegation that HSU officers other than Deputy Armendariz contributed to the items of personal property found at his home. Tennyson's failure to fairly investigate the pervasive seizure of these items of personal property in the criminal investigation also resulted in the MCSO not fairly addressing them in the following administrative investigation.

691.  As a result, although the property in Deputy Armendariz's garage *was not taken into consideration* when determining the outcome of the criminal investigation into the Cisco Perez allegations, that outcome was used to determine that no 'further' criminal investigation into the property found in the Armendariz garage was necessary.  Due to

this sleight-of-hand circumvention, the PSB never conducted a criminal investigation to attempt to determine the source of the drugs, currency, weapons, credit cards, bank cards, or other property in Armendariz's home.  (Doc. 1389 at Tr. 1171–72.)

692.   The Court finds that Defendants engaged in a cursory and bad faith investigation, and therefore IA #2014-295 is void.

**2.     The MCSO's Administrative Investigation into the Cisco Perez Allegations (IA #2015-541) Ignores Admitted Wrongdoing and Is Void.**

693.   IA #2015-541 was the administrative investigation that followed up on the wrongfully held property revealed by the Cisco Perez criminal investigation.  (Doc. 1556 at Tr. 3240–41; Doc. 852 at 2 (entry on IA #2014-295).)

694.   There are several problems with this investigation.

695.   First, the MCSO informed the Court that it would rely on the Cisco Perez investigation in conducting IA #2014-541.  (*See, e.g.*, Doc. 786 at 8–9 ("Based on the fact that a criminal inquiry (IA2014-0295) has been conducted on this matter, the majority of the PSB administrative investigation will rely on <u>information from that criminal inquiry.</u>") (emphasis in the original).)  It appears to have done so.

696.   Thus, the investigators apparently had little concern about whether the IDs, license plates, and other "trophies" that were scattered around MCSO offices were appropriately seized in the first place.  They continued to accept and to represent to the Court that all of the IDs seized were fraudulent and used for training purposes, (*see, e.g.*, Doc. 803 at 49), or that they were all seized by Deputy Armendariz.

697.   It would not be until much later, as IDs, license plates, and other property kept proliferating, that the MCSO would finally admit that it had a pervasive problem (not limited to the HSU) with department deputies taking IDs, license plates, and other property when they had no good reason to do so.  (Doc. 1043 at Tr. 992–93; Doc. 1417 at Tr. 1546–47, 1554; Doc. 1505 at Tr. 4023–24.)

698.   Nevertheless, during the investigation of IA #2014-541, principals were only investigated for property management and/or evidence control issues and not

1    whether the deputies had a basis to seize property in the first place without returning it.

2    (Ex. 2520.)

3        699.    At least two of the persons investigated demonstrate as much.  One of the

4    nine principals against whom charges were brought, but no charges were ultimately

5    sustained, was Detective Frei.  After the investigation began, Frei attempted to destroy

6    his memorandum to Captain Bailey and the attached IDs.  The memorandum came to

7    light and was turned over to the Monitor.  In his memorandum, Frei admitted that he had

8    been collecting IDs for five years and that they were "stored in a secure location in [his]

9    MCSO work station." (Ex. 1000 at MELC028132.)  The memorandum thus admits to at

10   least a property management violation.

11       700.    Yet no misconduct was sustained against Detective Frei.[35]  (Ex. 2520 at

12   MELC229078.)

13       701.    Of greater concern to the Court is that Detective Frei made no attempt to

14   verify the statement in his memorandum that the IDs are all fraudulent.  (*See, e.g.,* Doc.

15   1505 at 4049 (Bailey does not remember if they ever tried to determine whether the Frei

16   IDs were fraudulent); Doc. 1417 at Tr. 1551–52 (Sheridan has no recollection as to

17   whether any investigation was done with respect to the Frei IDs).)  Frei further makes the

18   inaccurate statement that all of the IDs were used for training purposes, and the untruthful

19   statement that most of the Criminal Employment Unit is certified in document

20   examination "or has some training in forged/fraudulent/questioned documents." (Ex.

21   1000 at MELC028132.)  These statements strongly suggest that Frei is seeking to

22   manufacture a semi-legitimate reason that the IDs were taken in the first place when he

23   does not have one.

24       702.    In fact, however, to the extent that the MCSO investigated only whether the

25

26       [35] To the extent that the investigation only involved Detective Frei's failure to turn
in property to the Property and Evidence room, and to the extent that Frei was a principal
27   in IA #2015-018 for these same IDs, the Court would not expect the imposition of double
discipline resulting from the two investigations.  However, the Court would expect a
28   property violation in at least one of the investigations since Frei admitted to the conduct.
No discipline was imposed upon Frei in either investigation.

- 123 -

1     IDs had ever been turned into the Property and Evidence room, rather than the question

2     of whether a deputy had an appropriate reason to take the IDs, the PSB failed to

3     investigate whether harm was done to the interests of members of the Plaintiff class.

4         703.    It is, of course, appropriate for the MCSO to conduct investigations for a

5     failure to impound property.[36] "Failure to impound property and evidence to a property

6     custodian" is a violation of MCSO policy.  (Ex. 2001 at MELC416255.)

7         704.    The matter of greater concern to the Court, however—a matter about which

8     the Court has expressed concern since it first heard of the property found in Deputy

9     Armendariz's garage (*see, e.g.*, Doc. 1237 at Tr. 24–25)—is whether MCSO officers

10    routinely seize IDs and other property from members of the Plaintiff class without any

11    legitimate basis for the seizure.  An unauthorized keeping of property amounts to a

12    separate violation of MCSO policy.  (Ex. 2001 at MELC416255.)  Moreover, seizing

13    property or failing to return it without a legitimate basis for doing so unjustly deprives

14    class members of their property, in violation of this Court's orders and in violation of the

15    Constitution.

16        705.    This problem exists throughout the IA property investigations arising in this

17    case.

18        706.    Yet, no charges—even charges for failure to turn in property—were

19    sustained against Detective Frei.

20        707.    What is at least as distressing is that Captain Bailey, the SID Captain to

21    whom Detective Frei wrote the memorandum requesting direction about what to do with

22    the IDs, is the PSB Captain who signed off on the decision to sustain no allegations

23    against Frei for the violations.  (Ex. 2520 at MELC229078, *see also* Doc. 1505 at Tr.

24    4047.)  Bailey had an obvious conflict in supervising this investigation—a conflict which

25    the Court pointed out as early as October 2014, and which Chief Deputy Sheridan

---

27        [36] Defendants testified that an officer can seize property if it is needed in evidence

28    for a case, for safekeeping if it has been abandoned, or for other reasons specified by law. In any event, however, the officer must deposit such property in Property and Evidence. (Doc. 1465 at Tr. 1447; Doc. 1498 at Tr. 3925–29.)

acknowledged in his April 2015 hearing testimony.  (Doc. 1043 at Tr. 985.)

708.   Yet, as the evidence demonstrates, Captain Bailey continued to supervise such investigations.  (*See* Doc. 1417 at Tr. 1556.)

709.   Moreover, Captain Bailey was himself the principal in such an investigation in which the finding of misconduct was sustained.  Captain Bailey received a "coaching" for the violation.[37]  (*See* Ex. 2943a at MELC1404207a (IA #2015-0357).)

710.   Nonetheless, on June 1, 2015, Captain Bailey sent Detective Frei a memorandum informing him that no discipline against him was sustained in this matter.

711.   This same conflict pervades almost all of the property investigations on which Captain Bailey signed off.  The MCSO can make no claim that such investigations were 'impartially' conducted.  The Court advised the MCSO multiple times that such investigations were improper.  Yet the MCSO persisted in conflict-ridden investigative staffing.

712.   A further example of the investigation's obvious flaws is that no charges were sustained against Officer Montoya.  Officer Montoya has since admitted to transferring confiscated materials from HSU offices to Deputy Armendariz's garage and, on other occasions, helping him to do so.  Even after she confessed to doing so, her investigation was not re-opened.[38]  (Doc. 1466 at Tr. 2901–03.)

713.   Given her confession, it appears clear that the finding of "not sustained" against Officer Montoya is indefensible.

714.   Third, as was the case with IA #2014-542 and IA #2014-543, IA #2014-541 was not completed in a timely fashion.

---

[37] Pursuant to MCSO policy "coaching" can be used in appropriate circumstances as an alternative to discipline.  (*See* Ex. 2001 at MELC416245.)

[38] Again, Officer Montoya was also noticed as a principal in IA #2015-018, but no discipline was sustained against her in that investigation.  Further, in light of the testimony that she was responsible for cataloguing the property confiscated from persons detained in connection with immigration enforcement operations, and in light of her illicit transfer of such property to Deputy Armendariz's garage, it seems likely that she was responsible for failing to place into Property and Evidence much of the other material that was the subject of IA #2015-018.

715.   The investigation was opened on September 11, 2014.  (Doc. 786 at 8.)

716.   On June 1, 2015, nine principals of IA #2014-541 received notice from Captain Bailey that any allegations asserted against them were "not sustained."  (Ex. 2520.)  Final findings of violation were sustained against the remaining eleven principals and all received the minor discipline of written reprimands.  The reprimands were issued on various dates ranging from June 3, 2015 to June 17, 2015.  All were well past the time requirement imposed by statute and MCSO policy.

717.   As is discussed and amply demonstrated, Chief Deputy Sheridan manipulates the timing on investigations to provide an additional basis for imposing no discipline or only minor discipline.  He has done so here.  (*See* Doc. 1017 at Tr. 214–15.)

> **3.   Except for a Few Items, the MCSO Lumped All of the Property Found in Deputy Armendariz's Garage into a Single "Umbrella" Investigation that Designated (Deceased) Deputy Armendariz as the Principal and Delayed Completion of that Investigation to Avoid Accountability for Its Inadequate Execution.**

718.   The MCSO opened individual investigations for only a few items found in Deputy Armendariz's garage, and none of these resulted in discipline.

719.   In his September 25, 2015 testimony, Chief Deputy Sheridan testified that the MCSO could connect "all kinds of items" from Deputy Armendariz's garage to other deputies, and that they opened up a separate IA investigation as to each such item.  (Doc. 1465 at Tr. 1440 ("[I]f in Charley's garage we had a credit card or something—I know there was a purse, there was all kinds of items—that we were able to attribute to another deputy sheriff having possession of those, we would have a separate IA pulled for that."); *see also* Doc. 1465 at Tr. 1436.)

720.   In reality, the MCSO initiated investigations into only 28 of over a thousand items of personal property found at Deputy Armendariz's house—26 driver's licenses (IA #2014-775 through IA #2014-783),[39] one credit card (IA #2014-774), and

---

[39]  The surnames on 25 of the 26 drivers' licenses suggest membership in the Plaintiff class.

1    one license plate (IA #2014-801).[40]

2        721.   The Court would expect, as Chief Deputy Sheridan's own testimony

3    indicated,  that once a department's own incident reports verified the connection between

4    the property owner and the MCSO deputy, the preponderance of the evidence standard

5    would be met and discipline would be imposed.  (*See* Doc. 1465 at Tr. 1452:3–10; *see*

6    *also* Ex. 2881 at MELC1306925; Ex.  2001 at MELC416243.)  Yet no such discipline

7    was imposed in any such case arising from the property found in Deputy Armendariz's

8    home when a deputy was matched with an item of personal property found there.

9        722.   Chief Deputy Sheridan acknowledged that there were no separate IA

10   investigations launched as to the various drugs found in Deputy Armendariz's house.

11   Because the drugs were never connected to any particular deputy, the only investigation

12   into these matters occurred in the context of the "catch-all" or "umbrella" Armendariz IA

13   investigation designated as IA# 2014-221.  (Doc. 1465 at Tr. 1437:5–10.)  Armendariz

14   was the only principal of that investigation.

15       723.   Chief Sheridan further testified that the weapons, credit cards, bank cards,

16   and money were individually investigated—but he testified that those investigations too

17   may have been only in the context of the umbrella Armendariz investigation.  (Doc. 1465

18   at Tr. 1439–40.)

19       724.   In fact, the MCSO has never opened up any investigation with respect to

20   any of the weapons, credit cards, bank cards (with one exception), cell phones, or CDs

21   they found in Deputy Armendariz's home.

22       725.   The MCSO asserts that they have set forth in IA #2014-221 their attempts

23   to connect these items of property to an MCSO deputy other than Deputy Armendariz.

24   (Doc. 1556 at Tr. 3421-22; Doc 1505 at 4017-18.)

25   _____

26   [40]  The license plate belonged to Maneula Ruiz Hernandez.  Ms. Hernandez
     reported that the plate was taken by a female deputy who asked her "if she was a citizen,
     a Mexican, are you illegal, and are you a wetback?"  (Doc. 814 at 13–14.)  CAD reports
27   indicate that the stop in question was conducted by Deputy Amie Duong.  (Doc. 1632 at
     Tr. 13–14.)  Inexplicably, on May 20, 2015, the MCSO determined that the allegations
28   were sustained as to Deputy Armendariz, who had been dead for a year, but not as to
     Deputy Amie Duong.  (Ex. 2943a at MELC1404206a.)

726.   The Court finds that these efforts are inadequate because Defendants manipulated the closure of the investigation to cover its deficiencies and avoid accountability for it in the evidentiary hearing.  Throughout the course of this evidentiary proceeding, the Court repeatedly addressed Sheriff Arpaio's counsel regarding the MCSO's failures to timely complete the investigations related to the Armendariz search and the Cisco Perez allegations.  (*See, e.g.*, Doc. 1017 at Tr. 15–20; Doc. 1051 at Tr. 427–28.)

727.   During the April 23, 2015 hearing, the Court addressed Ms. Iafrate and noted:  "Initially we were going to have those MCSO internal investigations done in early March.  You indicated . . . in early March, . . .  that you needed an extension until April 13.   April 13 has come and gone.   We don't have those investigations completed.  Obviously, in setting the supplemental hearing we will want to have them completed well enough in time to do the [Monitor's evaluations].  I would request in the next day or so, if you can, you provide me with an indication of when those investigations will be completed.   And I don't just mean 542 and 543.  I mean the other investigations that arose from the Armendariz and/or Cisco Perez and related allegations that are related to the subject matter of this lawsuit."  (Doc. 1051 at 427–28.)

728.   On May 7, 2015, Sheriff Arpaio informed the Court that there were 62 investigations arising from the Armendariz search and the Cisco Perez allegations, that 41 of them were completed, and that 21 remained incomplete.  (Doc. 1052 at 2.)  Arpaio assured the Court that "[a]ll of the remaining investigations will be completed on or before June 15, 2015."  (Doc. 1052 at 2.)  On May 8, the Court entered an order requiring Arpaio to specify by investigation number which of those 62 investigations had already been actually closed.  (Doc. 1064 at ¶ 9.)

729.   On May 13, in compliance with the May 8 order, Sheriff Arpaio identified IA #2014-221 as one of those investigations that was still open.   (Doc. 1076-1 at 2.)  Thus, IA #2014-221 was one of those investigations that were to be completed on or before June 15, 2015.

730.   The following October, Captain Bailey testified that he had signed off on the completed report of IA #2014-221 in August 2015, which was two months after Sheriff Arpaio represented to the Court that it would be complete.  (Doc. 1505 at Tr. 4045.)

731.   In his September 25, 2015 testimony, Chief Deputy Sheridan testified that he had reviewed the completed report of IA #2014-221 within the previous week and "sent it back for some editing, not of content, but of grammar."  (Doc. 1465 at Tr. 1437:13–15.)   Nevertheless, Sheridan did not sign off on this investigation until November 5, after the hearings were virtually completed.  (Doc. 1627, Ex. A.)

732.   This delay deprived the Court and the Parties of the opportunity to evaluate the report during the hearings.  By November 2015, IA #2014-221 had been open for approximately a year and a half.   There is no reason why the MCSO could not have completed the investigation in sufficient time to have its adequacy evaluated by the Parties during the hearing.

733.   The Court therefore finds that the completion of the umbrella Armendariz investigation (IA #2014-221) was manipulated to avoid accountability in the evidentiary hearings.

734.   Of course, to the extent that the MCSO failed to adequately investigate personal property seized from members of the Plaintiff class, such failure harms the members of the Plaintiff class.

**4.     The MCSO's Other Administrative Investigations into Personal Property Found Elsewhere Resulted in Minor Discipline, If Any**

735.   The MCSO initiated a few more administrative investigations involving personal property found elsewhere.

736.   The MCSO opened four separate investigations—IA #2014-018, IA #2014-019, IA #2014-020, and IA #2014-021—related to the property it found upon its second inspection of the HSU's former offices in the Enforcement Support Building.

737.   The MCSO also opened up IA #2014-022, which resulted from property

handed to Sergeant Tennyson just prior to that second inspection.

> **a.** **Although IA #2015-018 Resulted in Minor Discipline, the MCSO's *Melendres*-Only Discipline Policy Clouded the Basis of that Discipline and Ensured that Only Minimal Discipline Would be Imposed; the Investigation Is Invalid.**

738.   IA #2015-018 involved the discovery of 578 CDs, 462 departmental reports, 35 license plates, 164 IDs, and a passport.  In this investigation, the MCSO sustained a finding of minor discipline resulting in a written reprimand to five officers. (Ex. 2943a at MELC1404206a.)

739.   With respect to at least some of that property, for example license plates that were not returned to the Motor Vehicle Division, the PSB was able to connect the property with MCSO deputies other than Deputy Armendariz.  Of the 35 vehicle plates found, an MCSO CAD database search revealed that 13 of the license plates had some relation to Armendariz.   The MCSO connected eight license plates to the law enforcement activities of five other MCSO deputies.  One deputy was associated with two of the plates, another deputy, who testified at trial, was associated with three of the plates, and three other HSU deputies were associated with one license plate each.  The MCSO was unable to connect any deputy to 14 of the license plates.  (Doc. 803 at Tr. 51–53.)   There is no indication that a log scan or any similarly available search was conducted to attribute these 14 plates to any particular MCSO deputy.

740.   Contrary to the testimony of Chief Deputy Sheridan, no separate investigation was launched as to the five deputies who were associated with the license plates that were identified.  Moreover, only five deputies in total received any discipline at all for the various property that was investigated as a part of IA #2015-018.

741.   Of the 164 IDs in IA #2015-018 that were not turned into Property and Evidence, the MCSO found 53 in the bottom of a box that also contained reports.  (Doc. 803 at Tr. 48–50.)  These 53 IDs were turned in by one deputy, but had been retained by another.  Deputy Gandara apparently had some association with those IDs although it is not apparent whether he found them, or whether he was the deputy who had kept them

without turning them in.  (Doc. 803 at Tr. 48–50.)  Another 111 IDs were apparently those Detective Frei turned in to the property room for destruction together with his memorandum to Captain Bailey seeking advice on what to do with them.

742.    On November 20, 2014, Sergeant Fax informed this Court that the MCSO intended to run these 164 IDs through their CAD and JWI databases and that MCSO would potentially run them through log scans in the future.  (Doc. 803 at Tr. 48.)  While Sergeant Fax continued to incorrectly assert that the 111 IDs were used for training purposes, he frankly acknowledged that as to the 53 IDs, he did not yet know "what reason they were kept, confiscated, and used for."  (Doc. 803 at Tr. 49.)

743.    With respect to the 111 IDs, he asserted to the Court that the PSB intended to determine in its investigation from "what investigations [Detective Frei] had those, why he had those for so long, and why there were not put into the property room."  (Doc. 803 at Tr. 50.)

744.    Nevertheless, as is discussed above, the IDs held by Detective Frei were not investigated to determine who confiscated them and whether they were appropriately seized.  No discipline was imposed on Frei for inappropriately keeping such IDs without turning them into property.  The failure to even impose discipline on Frei for keeping such IDs in his desk indicates that this investigation was not adequately pursued.

745.    While Deputy Gandara did receive discipline in this investigation, it is not apparent for which act or acts of violation he received the discipline.  He may have received the reprimand for the IDs, for his failure to turn the license plates over to Motor Vehicles, or for leaving behind the other CDs and departmental reports that were found in the offices and that were the subject of this investigation.

746.    The failure to specify which acts of misconduct constituted the basis for an officer's discipline remains a problem with respect to every officer that received discipline under IA #2015-018.  And for reasons previously explained, the investigations were inappropriate to the extent that the PSB lumped together multiple separate acts of misconduct by an officer into one single sustained finding of discipline.

747.   For example, as was the case in IA #2014-541 and IA #2014-542, some of the officers who received discipline here also received discipline for separate acts of misconduct in other investigations that arose out of the *Melendres* case.  These various separate acts of misconduct were lumped together and treated as a single violation.  There should be no discount in the amount of discipline imposed on officers who commit separate acts of misconduct against members of the Plaintiff class.

### b.   The MCSO Improperly Investigated IA #2014-021.

748.   In this administrative investigation, $260 went missing and the MCSO identified Deputy Cosme as the principal.

749.   The money belonged to an apparent member of the Plaintiff class.  (Ex. 2887.)

750.   Although a criminal investigation was also undertaken in this matter, no criminal charges were ever asserted.  (*See* Ex. 2010; Ex. 2887.)   The criminal investigation in this case was undertaken by Sergeant Tennyson, who testified at the hearing that he thought there was no crime he could identify prior to the start of the investigation.  Tennyson was sympathetic to Deputy Cosme and did not believe that Cosme stole the $260.   (Doc. 1466 at Tr. 2935–42.)   Tennyson testified that he understood that $260 went missing, yet he also testified that he could not identify a possible crime at the start of the investigation.  This inconsistency further undermines Tennyson's credibility.

751.   During Sergeant Tennyson's interview of Deputy Cosme, Tennyson asked Cosme leading questions and made favorable comments during the interview designed to exculpate Cosme and to provide Cosme with testimony with which he could seek to exculpate himself.[41]  (*See, e.g.*, Ex. 2010 at MELC288264–65 (suggesting to Cosme that the oversight with the money may have resulted from great demands on the HSU and inadequate staffing); Ex. 2890 at MELC288285 (suggesting that Tennyson has known

[41] Sergeant Tennyson did the same when conducting interviews in IA #2015-295, *supra* Part III.B.1.

Cosme for 15 years and that he could not imagine him giving money to somebody Cosme did not trust).)

### c.   The MCSO Misled the Court as to the Grievance Relief Granted in IA #2015-022.

752.   On November 3, 2014, an MCSO sergeant handed Sergeant Tennyson a steno pad, four identification cards issued by foreign governments, one empty CD case, and one CD case that did contain a music CD.  (Doc. 803 at Tr. 46.)

753.   As a result, the MCSO sustained a finding of minor discipline in the form of a written reprimand against both Deputy Gandara and Deputy Rangel on June 4, 2015. (Ex. 2943a at MELC1404207a.)  Neither deputy filed a grievance.

754.   Deputy Hechavarria also received a written reprimand, but he filed a grievance as to that reprimand.

755.    Upon a second grievance review, Chief Deputy Sheridan reversed Deputy Hechavarria's discipline.

756.   In granting the grievance, Chief Deputy Sheridan directed that the preliminary finding, which was originally sustained, be changed to reflect that it had never been sustained.  (Ex. 2062 at MELC680471.)  While under MCSO policy, Sheridan does have the relatively unfettered authority to rescind discipline, (*see, e.g*., Ex. 2001 at MELC416246), he does not have the authority to change history in doing so.  This is especially true when the Court had previously ordered that the Defendants contemporaneously advise it of disciplinary decisions and of the results of those appeals.

757.   As a result of Chief Deputy Sheridan's grievance resolution, the information initially and repeatedly provided to this Court was that the charges against Deputy Hechavarria were not even preliminarily sustained.  (*See* Doc. 1420; Doc. 1613; Ex. 2943; Ex. 2943a.)  It was not until the Court ordered that Defendants provide it with a detailed list of IA investigations and their outcomes that it became apparent that the violation against Hechavarria in this investigation was both preliminarily and finally sustained and subsequently reversed in a grievance proceeding by Chief Deputy

Sheridan.  (Doc. 1627.)

758.   The Court finds that in his order granting the grievance, Chief Deputy Sheridan sought to conceal his grant of the grievance.

759.   The Court further finds that to the extent that Chief Deputy Sheridan's directive orders the MCSO to change the already established facts of the disciplinary adjudication, it transcends the authority given to Sheriff Arpaio or his designee by MCSO policy and is an abuse of that authority.

760.   There is no requirement within MCSO policy for Sheriff Arpaio or his designee to explain their grievance decisions.  Here, in reversing the final discipline imposed by Deputy Hechavarria's superiors, and in reversing an initial grievance brought by Hechavarria, Chief Deputy Sheridan only observed:  "I concur with your assessment of the incident as outlined in your Grievance Response."  (Ex. 2062 at MELC680471.)

761.   The factual allegations, submitted by Deputy Hechavarria in his grievance, and upon which Chief Deputy Sheridan ultimately relied in granting the appeal, may nevertheless provide sufficient good faith basis for reversing the grievance.

762.   In his grievance, Deputy Hechavarria alleges that he left the crime scene and booked the defendant before the additional property was discovered and thus was never told of the property.  (Ex. 2062 at MELC680475.)

763.   The only property identified to this Court as being the subject of the grievance was "four ID cards that appeared to be foreign national cards, one CD case that was empty, [and] one CD case that did contain a music CD."  (Doc. 803 at Tr. 46.)  If Deputy Hechavarria's story is credited, such property could conceivably be property that was uncovered on the scene after Hechavarria left to book the subject and process what property he then had.

764.   In his testimony on this point, however, Chief Deputy Sheridan does not indicate that he undertook any factual inquiry to determine the accuracy of Deputy Hechavarria's story, nor that he gave anyone from the PSB the opportunity to present any evidence refuting Hechavarria's recitation of events before granting the grievance.

**5.** **Personal Property Attributable to the Plaintiff Class in the Possession of the MCSO Continues to Come to Light.**

765.   Many ID investigations remain open.  Identification cards and license plates located in MCSO facilities—but not placed in Property and Evidence—continue to come to light.

**C.** **The MCSO Executed a Fundamentally Flawed Investigation Into the Allegations Raised by Maryann McKessy Regarding Detective Mackiewicz.**

**1.** **Ms. McKessy Raised Multiple Allegations, Both Civil and Criminal in Nature, with the MCSO Regarding Detective Mackiewicz.**

766.   Disclosed materials related to the Seattle investigation, together with the subsequent testimony, demonstrated that in August 2014, Ms. McKessy registered a complaint with the MCSO about Detective Mackiewicz.  She had been, for a period of time, one of Mackiewicz's girlfriends—although, apparently unbeknownst to her, Mackiewicz had also been living with a separate girlfriend—a Ms. W.

767.   When Ms. McKessy found out about Ms. W., and Detective Mackiewicz's other relationships, she informed Ms. W. of them.  Ms. W. had access to Mackiewicz's payroll information and she apparently reviewed it with McKessy.  McKessy took screen shots of some of that information with her cell phone.

768.   Ms. McKessy charged that Detective Mackiewicz was wrongfully profiting from his work in Seattle including billing the County for overtime work not performed and having Mr. Montgomery, a confidential informant to the MCSO, build a computer for Mackiewicz's personal use.   McKessy also alleged that Mackiewicz had an inappropriate intimate relationship with a victim of a domestic violence incident that he had investigated.  She also alleged that he was a steroid user.  (Doc. 1456 at Tr. 2180–81.)

**2.** **In Addition to Ignoring His Own Conflicts of Interest, Chief Deputy Sheridan Designated the Investigation of Ms. McKessy's Allegations as Criminal and Assigned It to Sergeant Tennyson, Who Is Supervised by Captain Bailey—Both of Whom Are Friends of Detective Mackiewicz.**

769.   Ms. McKessy made these allegations to Chief Lopez.  She also told Lopez that Detective Mackiewicz was protected within the MCSO by his close relationship with Chief Deputy Sheridan and Captain Bailey.  (Ex. 2015 at MELC186197.)

770.   Chief Lopez sent a memorandum to Chief Deputy Sheridan in which he reported Ms. McKessy's charges along with her concern that Detective Mackiewicz was protected by Sheridan and Captain Bailey.  (Ex. 2015.)

771.   In fact, Chief Deputy Sheridan and his wife were friends with Detective Mackiewicz and his girlfriend Ms. W.  The Sheridans saw them socially.  (Doc 1417 at Tr. 1598.)

772.   Chief Deputy Sheridan's wife was also involved in business relations with Detective Mackiewicz and with Ms. W.  (Doc. 1417 at Tr. 1598, 1604.)  The Sheridans received commissions from the real estate purchases Ms. Sheridan coordinated with Mackiewicz and Ms. W.  (*Id.* at Tr. 1598; Doc. 1456 at Tr. 2195–96).  Ms. Sheridan stood to make $100,000 in commission from home sales she made to Ms. W earlier in 2015.  (Doc. 1417 at Tr. 1604.)

773.   Chief Deputy Sheridan nevertheless testified that he supervised both the criminal and the administrative investigations that resulted from Ms. McKessy's allegations.  (Doc. 1417 at Tr. 1597–98.)  In fact, Sheridan must approve all initiations of PSB criminal investigations.  (Doc. 1043 at Tr. 975–77; Doc. 1389 at Tr. 1128–29; Doc. 1456 at Tr. 2215–16; *see also* Ex. 2881 at MELC1306925, MELC1306920.)

774.   Within a day or so of Chief Lopez's memorandum to Chief Deputy Sheridan, the matter was designated as a criminal investigation and assigned to Sergeant Tennyson. (Doc. 1456 at Tr. 2183; Doc. 1466 at Tr. 2948.)  Captain Bailey, as head of the PSB, supervises Tennyson's criminal investigations.

775.   Detective Mackiewicz had a personal relationship with each person involved in 'investigating' him or supervising his investigators.  Mackiewicz "was very important" to Sheriff Arpaio and his wife for the work he had done in protecting them. (Doc. 1455 at Tr. 2059.)  Chief Deputy Bailey and Mackiewicz were friends.  Captain

Bailey and Detective Mackiewicz were friends.  (Doc. 1498 at Tr. 3877.)   Sergeant Tennyson and Detective Mackiewicz were also friends.  (Doc. 1467 at Tr. 2978–79; Ex. 2842 at MELC1397034 ("[Y]ou and I have been friends and I think you've seen you know you've seen me go through my hives and knows whatever else."); Ex. 2842 at MELC1397042; *see also* Ex. 2894 (Tennyson gives Mackiewicz advice as a friend concerning the McKessy allegations.).)

**3.    Sergeant Tennyson and Detective Zebro Subverted the Investigation.**

      **a.    Sergeant Tennyson Failed to Investigate or Follow Up on Any of Ms. McKessy's Allegations.**

776.   Sergeant Tennyson and Detective Zebro met with Ms. McKessy on August 22, 2014.  (Ex. 2016 at MELC186198.)

777.   Sergeant Tennyson and Detective Zebro approached the interview assuming that they were dealing with a woman "scorned."  (Doc. 1456 at Tr. 2184; Doc. 1467 at Tr. 3099–100.)

778.   Ms. McKessy made the same allegations to Sergeant Tennyson and Detective Zebro that she had made to Chief Lopez.  (*See* Ex. 2893; *see also* Doc. 1456 at Tr. 2180–85.)

779.   She brought her cell phone to her meeting with Sergeant Tennyson to show him Detective Mackiewicz's payroll records of which she had taken a screen shot, but her cell phone died.  She also told Tennyson that the information verifying the excessive overtime came from Ms. W.  (*See* Ex. 2893.)

780.   Sergeant Tennyson did not attempt to retrieve the documents on Ms. McKessy's cell phone because he found the documents to be of no evidentiary value, even though he had never seen them.  (Doc. 1466 at Tr. 2953–54; *see also* Doc. 1456 at Tr. 2184.)

781.   Ms. McKessy explained to Sergeant Tennyson that Detective Mackiewicz was protected by Chief Deputy Sheridan, (Ex. 2893 at MELC186212–15), and that he had a good relationship with Captain Bailey; however, Tennyson did not investigate

either statement.  (Doc. 1466 at Tr. 2954–55.)

782.   Sergeant Tennyson testified that he did not do so because the allegation did not amount to a criminal allegation worth evaluating.  (Doc. 1466 at Tr. 2955.)

783.   While a personal and/or professional relationship may not in and of itself be criminal, it does in this instance give rise to a conflict.  To the extent that Sergeant Tennyson professes that it bore no relationship to Tennyson's criminal investigation of Mackiewicz, which was being supervised by Chief Deputy Sheridan, the Court finds that his testimony lacks credibility.  His lack of concern demonstrates his own conflict of interest in the investigation of Detective Mackiewicz.

784.   Ms. McKessy told Sergeant Tennyson that Detective Mackiewicz had inappropriately accessed some of her text messages through Cathy Woods Enriquez; yet, Tennyson never looked into it.  (Doc. 1467 at Tr. 2972–75.)

785.   Sergeant Tennyson agreed with Ms. McKessy that what she brought forth did not constitute a sufficient basis on which to go forward with a criminal investigation. In fact, McKessy stated that she did not wish to see Detective Mackiewicz criminally charged.  (Ex. 2893 at MELC186259, MELC186261, MELC186264.)

> **b.    Captain Bailey, Sergeant Tennyson, and Detective Zebro Obstructed the Investigation by Divulging Ms. McKessy's Allegations to Detective Mackiewicz.**

786.   Ms. McKessy requested that Sergeant Tennyson and Detective Zebro not inform Detective Mackiewicz about her complaint.  Tennyson told her that "We . . . will not divulge anything that's been said today."  (Doc. 1456 at Tr. 2184–85; Ex. 2893 at MELC186211, MELC186262–63.) They did say however that they were required to document their investigation and interview with her, and even though it would not result in criminal charges, it would be looked at on the administrative side of the PSB.  She was told that if an administrative investigation were pursued, Mackiewicz might eventually be informed of her complaint.  (Ex. 2893 at MELC186261–64.)

787.   Despite this representation to Ms. McKessy, Sergeant Tennyson called Detective Mackiewicz that same day.  (Doc. 1456 at Tr. 2185–87.)  Mackiewicz was on a

plane returning from Seattle.  When he arrived in Phoenix, Mackiewicz had Posseman Zullo's wife take him directly to the MCSO's offices to meet with Tennyson, Captain Bailey, and Detective Zebro.  (Ex. 2842 at MELC1397036.)

788.   In that meeting, they discussed Ms. McKessy's allegations, (Doc. 1467 at Tr. 2975), and the possibility that she was the snitch Sheriff Arpaio wished to identify who had disclosed the substance of the Seattle investigation to *The New Times*.  (*Id.* at Tr. 2987–89; Ex. 2842 at MELC1397035.)

789.   They in fact apparently initiated some sort of surveillance on Ms. McKessy to determine if she was in contact with Steve Lemons, the columnist for *The New Times*, who wrote the story about the Seattle investigation.  In their phone conversation the next day, in which Sergeant Tennyson continued to discuss with Detective Mackiewicz the details of McKessy's allegations against him, Mackiewicz comments to Tennyson that "[i]f Maryann [McKessy] goes to Lemons we'll know it's her," to which Tennyson responds, "exactly."  (Ex. 2894.)

790.   Detective Mackiewicz did not know that Ms. McKessy had asserted a complaint against him with the PSB until he heard it in the meeting with Captain Bailey, Sergeant Tennyson, and Detective Zebro.  (Ex. 2842 at MELC1397037 ("I didn't know that Maryann pressed the issue with the Office until . . . you guys called me down and said hey, we just met with Maryann.  And I'm like what the fuck?  Why did you guys meet with Maryann?").)

791.   In that meeting, Captain Bailey advised Detective Mackiewicz not to attempt to contact Ms. W. to learn about her cooperation with Ms. McKessy. Mackiewicz ignored that advice.  He reminded Sergeant Tennyson of that in a recorded conversation that occurred a year later:  "So against your advice 'cause remember in that meeting I was like I'm gonna confront [Ms. W.] and I wanna find out what fucking [Ms. W.] told her. . . .  And Bailey was like Brian, don't do that.  It's not worth it.  Let's not stir it up.  Well, the first thing I did when I got in the car is I fucking got in [Ms. W.'s] ass and I said I'm about ready to fucking get in trouble here.  I wanna know what the fuck is

goin' on.  And she's like Brian, she called me like two weeks ago telling me that she wanted me to go to Internal affairs together so we could stick it up your ass and I said absolutely not.  I'm done.  I'm over this.  I don't wanna do anything with this.  Nothing's going on."  (Ex. 2842 at MELC1397037.)

792.    The day after Sergeant Tennyson's initial interview with Ms. McKessy, he recorded a telephone exchange with Detective Mackiewicz concerning the matter.

793.    In that interview, recorded on August 24, Detective Mackiewicz states to Sergeant Tennyson that Ms. W. had spoken with Chief Deputy Sheridan about the matter—apparently the day before Tennyson had his initial interview with Ms. McKessy. (Ex. 2894).[42]

794.     In the recorded conversation, Detective Mackiewicz further asserted that Ms. W. had confessed to him that Ms. McKessy had come to her about six-weeks earlier and told her of Mackiewicz's concurrent relationship with McKessy and possibly others. According to Mackiewicz, when McKessy told Ms. W. this, Ms. W. concluded that even though she and Mackiewicz had been living together, she had no right to believe that they had an exclusive relationship.  Thus she was not angry and did not throw Mackiewicz's stuff out on the lawn as McKessy had hoped or expected.

795.    Rather, according to Detective Mackiewicz, Ms. W. confessed to giving Ms. McKessy some of his financial information after she learned of Mackiewicz's multiple relationships.   Ms. W. further told Mackiewicz that she had cut off communication with McKessy because she felt that McKessy was trying to drive a wedge in their relationship.  (Ex. 2016 at MELC186199.)

796.    In that interview, Sergeant Tennyson told Detective Mackiewicz that the matter had only to do with Mackiewicz's personal life and that the MCSO did not want anything to do with it and he should just let the matter go.  (Ex. 2894.)

797.    Despite Sergeant Tennyson and Detective Zebro's representation to Ms.

---

[42] The Court does not consider this allegation for the truth of the matter asserted, but merely for the fact that it was made to Sergeant Tennyson by Detective Mackiewicz.

McKessy that they would document their investigation and it would be referred to the administrative side of the PSB, they shelved their investigation without writing a report.

### 4. Lieutenant Seagraves Was Removed from the Case After Finding the Investigation into Ms. McKessy's Allegations Deficient.

798.   Six months later, in February 2015, Lieutenant Seagraves became the supervisor for Sergeant Tennyson and Detective Zebro.

799.   Lieutenant Seagraves required that a report of the investigation into the allegations against Detective Mackiewicz be prepared.  (Doc. 1467 at Tr. 2981.)

800.   Instead of writing the report himself, Sergeant Tennyson assigned the task to Jennifer Johnson, a criminal analyst working within the PSB but not an investigator. (Doc. 1467 at Tr. 2979–80; Ex. 2016.)

801.   Ms. Johnson's report summarizes the August 22, 2014 interview of Ms. McKessy by Sergeant Tennyson and Detective Zebro, and Tennyson's recorded interview with Detective Mackiewicz the following day.  (Ex. 2016.)  The report states that Ms. W. refused to cooperate with the investigation and that any information provided by McKessy was not first-hand knowledge.

802.   Lieutenant Seagraves refused to sign-off on the investigation because she did not think that the allegations were appropriately investigated.  (Doc. 1456 at Tr. 2187–88, 2193.)

803.   Her criticisms included that:

a.   After the initial investigation, Sergeant Tennyson and Detective Zebro did not attempt to collect the documents brought in by Ms. McKessy on her dead cell phone to support her charges against Detective Mackiewicz.  (Doc. 1466 at Tr. 2953–54; Doc. 1456 at Tr. 2184.)

b.   Their disclosure of Ms. McKessy's complaint to Detective Mackiewicz was not appropriate even assuming, as Sergeant Tennyson had represented to her, that at some earlier point Ms. W. herself told Mackiewicz that McKessy had approached her.  (Doc. 1456 at Tr. 2184–85,

2187.)

    c.  The report's statement that Ms. W. would not cooperate was an inappropriate statement since Ms. W. herself had never been contacted to confirm as much.  (Doc. 1456 at Tr. 2190–91.)

    d.  The overtime allegation had not been investigated.  (Doc. 1456 at Tr. 2191–92.)  Captain Bailey told Lieutenant Seagraves that the overtime allegation had been looked into because Chief Deputy Sheridan had told him so.  Seagraves confirmed this with Sheridan in a meeting, but there was still no documentation in the file that the overtime allegation had in fact been investigated.  (*Id.* at Tr. 2191–93.)   In fact, it had not been investigated.

    e.  It was inappropriate for Sergeant Tennyson to request Jennifer Johnson to draft the report.  (Doc. 1456 at Tr. 2190, 2192–93.)

804.   Lieutenant Seagraves took over the direction of the investigation because it had not been adequately conducted.  (Doc. 1456 at Tr. 2193, 2218–19.)

805.   In that renewed investigation, Sergeant Tennyson tried to interview Sheriff Arpaio to understand Detective Mackiewicz's work parameters because Mackiewicz was working exclusively with Arpaio at that point.  All such requests were denied.  (Doc. 1466 at Tr. 2957–59, 2982–85; Ex. 2843.)

806.   Lieutenant Seagraves opened additional investigations regarding Detective Mackiewicz that had been disclosed by Ms. McKessy's initial allegations and that had apparently been previously reported to the PSB.

807.   Chief Deputy Sheridan signed off on initiating such investigations.  For example, on March 30, 2015, he approved a new criminal investigation into Detective Mackiewicz's alleged steroid use.  (Doc. 1498 at Tr. 3893–94; Ex. 2799.)

808.   Sometime thereafter, Captain Bailey removed the investigation from Lieutenant Seagraves because she was "hypersensitive."  (Doc. 1456 at Tr. 2195.)

1
2

### 5.    Chief Deputy Sheridan Ensured that Detective Mackiewicz Received No Discipline.

3

809.   Detective Mackiewicz was placed on administrative leave on August 4,

4

2015 without receiving notice as to why.  (Ex. 2842 at MELC1397033.)   He called

5

Sergeant Tennyson and left a message.   On August 5, 2015, Tennyson returned

6

Mackiewicz's phone call and at Lieutenant Seagraves direction he recorded part of that

7

telephone call.  According to Tennyson, he was unable to record the entire telephone call

8

because the batteries on his device ran out.

9

810.   In that call, in addition to making the statements described above, Detective

10

Mackiewicz referenced the meeting in Captain Bailey's office that took place on the

11

same night that Ms. McKessy had her interview with Sergeant Tennyson.   Mackiewicz

12

further referenced an additional communication he had allegedly received from "Jerry"

13

informing him that the investigation of him that had been closed needed be reopened, but

14

he should not worry about it.  Mackiewicz stated:

15
16
17
18
19
20
21

> I'm gonna speak frank with you 'cause I can trust you.  But you know when, when I got back and I sat in your when I sat in Bailey's office and you, you, Bailey and Zebro were there, I was under the impression because of not, not because of how it was handled but, um, it was what it was.  You, you were, obviously, the Sheriff wanted to find out who the snitch was.  We didn't know if it was McKessie [sic] or not blah, blah, blah.  Makes all those allegations.  And then you investigate it.  Basically, hey you know what, there's nothin' here.  You go ahead and close it out and the next thing you know, I'm getting a call from Jerry saying hey, you know what don't worry about it but we gotta open it back up again.  And we're giving it to Sparman because you know we just wanna make sure that everything looks transparent and obviously they don't like Dave.  And they're gonna say that you know Dave just (unintel 6:06) it up you know what I mean.  And they didn't want that to happen.

22

(Ex. 2842 at MELC1397035.)[43]

23

811.   During the October hearing, the Court asked Chief Deputy Sheridan

24

whether he ever considered that he should assign out the oversight of the investigations of

25

Detective Mackiewicz since Mackiewicz was a scheduled witness in the contempt

26
27
28

[43] The Court does not consider Mackiewicz's statements about his conversations with Jerry Sheridan for the truth of the matter asserted.  It considers them merely for the fact that the allegations were made to Sergeant Tennyson.

proceeding against Sheridan.  (Doc. 1417 at Tr. 1597–98.)

812.   Chief Deputy Sheridan answered that when he heard, a week prior to his testimony, that Detective Mackiewicz had made some comments that would result in an administrative investigation into Sheridan, he then assigned the responsibility to supervise the investigation into Mackiewicz over to Chief Trombi; yet, no written record exists of such an assignment.  (Doc. 1417 at Tr. 1597–98.)

813.   The investigation was subsequently turned over by the MCSO to the Arizona Attorney General and the State Department of Public Safety.

**6.     The Court Finds that Conflicts, Untruthfulness, Manipulation, and Malfeasance Pervade the MCSO's Investigation of Ms. McKessy's Allegations.**

814.   In his April 24, 2015 testimony, Chief Deputy Sheridan testified that he did not believe there were any matters referred to the PSB for investigation related to the Seattle investigation.   On the resumption of the hearing in the fall, after the MCSO disclosed the investigation into Detective Mackiewicz's overtime records, he acknowledged that his earlier testimony had been incorrect.   Nevertheless, based on the evidence, the Court finds that he had intentionally concealed in his April 24 testimony the existence of such investigation.

815.   To have not "believed' that there were such investigations on April 24, 2015 would have required Chief Deputy Sheridan to forget that: (1) he had authorized a criminal investigation arising from the Seattle investigation of (2) a social friend from whom (3) he and his wife had financially benefited.  Sheridan would also have to forget that (4) he knew that Ms. McKessy alleged that Sheridan's relationship with Detective Mackiewicz would result in Mackiewicz's protection, and (5) after the resumption of the investigation by Lieutenant Seagraves, Sheridan himself had authorized the investigation of additional criminal charges against Mackiewicz, and (6) Sheridan had authorized such an investigation just three-weeks before he offered his April testimony.

816.   The Court thus finds that Chief Deputy Sheridan's testimony in this respect is untruthful.

817.    Further when Chief Deputy Sheridan testified that he had, a week earlier, turned the management of the investigations into Detective Mackiewicz over to Chief Trombi, his testimony was not credible.

818.    Immediately prior to this testimony, Chief Deputy Sheridan testified that he continued to oversee all of the criminal and administrative investigations into Detective Mackiewicz.  Only when he was confronted with questions regarding his conflicts in maintaining oversight of the Mackiewicz investigation did he state that he had actually turned it over to Chief Trombi.  Furthermore, he acknowledged that there was no record that he had, in fact, reassigned oversight of the investigations to Trombi.

819.    Even if it were true that Chief Deputy Sheridan had turned over oversight of the investigation to Chief Trombi a week earlier, Sheridan should have removed himself from all oversight of any investigation into Detective Mackiewicz at its very initial stages.   Wholly aside from Ms. McKessy's allegations that Mackiewicz's relationships with Sheridan and Captain Bailey would protect him, Mackiewicz did indeed have such relationships.  Moreover, Sheridan knew that Mackiewicz was going to be testifying in his noticed evidentiary hearing.  Sheridan also presumably knew for at least a year that Mackiewicz had asserted to Tennyson that Sheridan had discussed the McKessy allegations, even before the McKessy interview itself, with Ms. W.

820.    Chief Deputy Sheridan maintained control of the investigations into Detective Mackiewicz precisely because he wanted to insure that nothing came of them, both because of his personal and professional relationship with Mackiewicz and because he wished to keep secret the Seattle operation in which Mackiewicz had been working.

821.    Thus, Chief Deputy Sheridan designated the investigation as a criminal one and assigned the investigation to Sergeant Tennyson—Detective Mackiewicz's friend. Tennyson was under the supervision of Captain Bailey—also Mackiewicz's friend.

822.    Sergeant Tennyson, Captain Bailey, and Detective Zebro subverted any criminal investigation, and demonstrated that they had no intent of performing any legitimate investigation by immediately informing Detective Mackiewicz of Ms.

McKessy's allegations.

823.   Chief Deputy Sheridan also made an intentional misstatement of fact to Lieutenant Seagraves when he told her that an investigation into the overtime allegations had already been completed when it had not been.

824.   Captain Bailey further took steps to subvert any legitimate criminal investigation by removing  Lieutenant Seagraves from the investigation

825.   At the least, in their management and conduct of the investigations into Detective Mackiewicz, Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, and Mackiewicz himself violated multiple MCSO policies.[44]  (Ex. 2001 at MELC416255–58.)

**D.     Structural Inadequacies Pervade the MCSO's Internal Investigations.**

**1.     The MCSO Did Not Provide Adequate Training On How to Conduct an Internal Investigation.**

826.   There is no requirement or practice that the MCSO train PSB officers on conducting internal affairs investigations. (Doc. 1467 at Tr. 3189–90.)

827.   Captain Bailey had no training in internal affairs at the time that he took charge of the PSB.  (Doc. 1467 at Tr. 3148.)  And he never did receive training on IA investigations even while he was in charge of the PSB.  (*Id.* at Tr. 3148–49.)  He acknowledges that it would have been helpful.

828.    Chief Deputy Sheridan has never been trained in IA investigations.  (Doc. 1417 at Tr. 1539.)

829.   Chief Olson does not appear to have an appropriate understanding of the application of the MCSO disciplinary matrix.  (Doc. 1495 at Tr. 3511.)

830.   Lieutenant Seagraves received some external training in how to conduct internal investigations in 2004.  Yet she received no such training on her return to the

---

[44] There are also allegations of additional acts that would constitute misconduct if they are correct.  They include Detective Mackiewicz's allegations that Chief Deputy Sheridan was in contact with both him and his girlfriend throughout the time when he maintained supervision over the investigation.

PSB.  (Doc. 1455 at Tr. 2083–84.)

831.   Captain Bailey never had time to discuss things like interview technique with his sergeants.  (Doc. 1467 at Tr. 3148.)

832.   The failure of such training can be discerned by the way that PSB officers conduct some of their investigations.

833.   The MCSO does not contest that PSB officers sometimes used leading questions in their interviews and further acknowledges that, generally speaking, the use of leading questions is not a good interview technique for obtaining unrehearsed responses from an interview subject.  (Doc. 1498 at Tr. 3822–23; Doc. 1556 at Tr. 3445–47; *see also* Doc. 1498 at Tr. 3822, 3825–27; Ex. 2063 at MELC160147; Ex. 2772 at 17 of 22.)  PSB officers also make assumptions that exonerate MCSO officers.  (Doc. 1556 at Tr. 3439–40; Ex. 2063 at MECL160124.)

834.   The training of division personnel in the conduct of PSB investigations was not in place at the time that Captain Bailey left the PSB.  (Doc. 1467 at Tr. 3182–83.)  As discussed above, many internal affairs cases are not investigated by the PSB.  They are, in fact, investigated in the districts or divisions of the MCSO.  (*See* Doc. 1505 at Tr. 4029–30; Doc. 1467 at Tr. 3148.)   Division sergeants, for example, conduct investigations of complaints within the division, but sergeants are not required to go through any training.  (Doc. 1417 at Tr. 1539.)  Further, as the MCSO admits, the idea of having division lieutenants accomplish IA investigations has not yet been fully or successfully implemented.  (*Id.* at Tr. 1538–39.)

835.   There is no guidance on interview techniques in the operations manual. Captain Bailey desired to implement core training classes so that all personnel had the opportunity to learn appropriate investigative skills and techniques; yet, this was never accomplished.  (Doc. 1467 at Tr. 3189–90.)

836.   Before he left, Captain Bailey was preparing a one-day instruction course for the PSB, district, and division investigators to try and establish some consistency throughout the office and to foster similar expectations between the districts, divisions,

and the PSB on how cases should be handled.  (Doc. 1505 at Tr. 3983.)

837.   His training was not implemented when he left, and he does not know if it has been implemented since.  (Doc. 1505 at Tr. 3983–84.)

### 2.   The MCSO Did Not Adequately Train Its Leaders on How to Supervise Subordinates.

838.   The MCSO has no policy in place that requires supervisory personnel such as sergeants, lieutenants, captains, and chiefs to be adequately trained to supervise their staff.

839.   There were systemic failures in the quality of supervision and discipline in the Deputy Armendariz chain of command.  (Doc. 1467 at Tr. 3192–93.)  These failures were not limited to the HSU, but extended to other divisions within the MCSO.  (*Id.* at 3193–94.)  While some of these failures result directly from the orders of Sheriff Arpaio, and the structures of his administration, others are attributable to a lack of training and a lack of adequate staffing.

840.   Lieutenant Sousa, who was the head of the HSU during much of the relevant period, reported to two chiefs—Chief Sands and Chief Trombi—but no captain.  This violates the goals of efficient and direct reporting and accountability, and by all accounts was an unusual administrative structure, which was inadequate while it existed.

841.   Further, Lieutenant Sousa repeatedly asserted in his predetermination submittals and his grievances that the political pressure brought upon him by Sheriff Arpaio, Chief Sands, and Chief Trombi caused his own supervisory failures.  (Ex. 2898 at MELC-IA013693 ("This situation is an institutional failure that is identifying and punishing lower level supervisors for the failures of leadership at the uppermost levels of command in this Office to include Sheriff Arpaio and his need for media attention at all costs."); *see also* Ex. 2898 at MELC-IA013693 ("The root cause of all the issues in Human Smuggling was the lack of sergeants and my Chiefs failures to assign me more supervisors to adequately address the demands that were directly placed on me from the Sheriff's drive to enforce the illegal immigration issue that was giving him so much

media attention."); Ex. 2559B at MELC-IA013646 ("The working environment in the Human Smuggling Division for me and my two sergeants was dysfunctional at times, and lacked proper supervision, but not because of the lack of good leaders or supervisors; it was because we had three squads that were extremely busy, but only two had sergeants and one lieutenant and command staff that was only concerned with press releases."); Ex. 2559B at MELC-IA013648 ("They had a duty to provide more supervisors to manage the Division and assist with all the legal issues and constant requests for information, but I was always told the same thing, the Human Smuggling grant would not cover additional sergeants."); Ex. 2559B at MELCIA0132648 ("The root cause of all the issues in Human Smuggling was the Sheriff's drive to enforce the illegal immigration issues that was giving him so much media attention. In addition, the lack of sergeants and the Chief's failures to assign more supervisors to adequately address all the demands on this unit by the Sheriff.").)

842.   Chief Olson acknowledged that it was "the responsibility of the office to make sure that we have some sort of training in place . . . ." (Doc. 1495 at Tr. 3500.)

843.   Yet, Chief Trombi, Chief Olson's equivalent on the enforcement side of the MCSO, and the commander in charge of the entire patrol division, has never received any training on how to supervise deputies. (Doc. 1017 at Tr. 142.) Nor has he ever received any training as to the instances in which it might be appropriate to refer someone in his command to internal affairs for an investigation. (Doc. 1017 at 142, 144; *see also* Ex. 2218 at MELC-IA011256.)

844.   Chief Deputy Sheridan acknowledged to Special Investigator Vogel a breakdown in the agency's training of supervisors. (See Ex. 2218 at MELC-IA011245.) Ultimately, many key supervisory personnel have no training in supervising, which, as is evidenced by the supervisory failures of Chief Trombi, resulted in damage to class members. (*See, e.g.*, Ex. 2218 at MELC-IA011228 ("He [Chief Lopez] said he didn't receive any training upon promotion to Sergeant. . . .   When he was promoted to lieutenant, he did not receive any additional training."); Ex. 2218 at MELC-IA011248

(Lieutenant Jakowinicz received no supervisory training when he became a sergeant or lieutenant except for a POST class in which he enrolled on his own initiative.); Ex. 2218 at MELC-IA011225–26 (No training given to Sergeant Scott); Doc. 1017 at Tr. 212 (Sergeant Palmer likewise received no such supervisory training).)

845.    The MCSO did introduce evidence as to the potential functionality of the Early Intervention System (EIS) and other ameliorative measures which the MCSO is starting to implement as a result of the initial injunctive order entered in this case.  (See, e.g., Doc. 1505 at Tr. 4007–08.)

846.    Certainly, while the EIS will hopefully be an aid to effective supervision, it is not designed to cure a lack of training in supervision.

847.    Nor is there the evidence to suggest that the supervisory training measures required by the Court's previous injunctive order have yet been implemented.

848.    Further, it is unclear whether the measures previously recommended by this Court, once implemented, will be adequate to address the supervisory deficiencies that have been identified as a result of the late-disclosed evidence and the resulting investigations.

849.    Finally, the apparently uncontested testimony at the hearing was that, in light of the increased workload on sergeants necessary to engage in appropriate supervision and the use of the EIS, the ratio of sergeants to deputies authorized in the Court's previous injunctive order was too permissive.  Although circumstances vary, Captain Skinner generally testified that the ratio incorporated in many consent decrees which he had researched suggest one to six or one to eight—upwards of one to ten.  This is well below the ratio of one to twelve that this Court had previously authorized.  (Doc. 1544 at Tr. 4274-75.)

**3.    The MCSO's Complaint-Intake Process Is Inadequate**

850.    Although the MCSO has made some positive policy changes since the *Melendres* order was entered, there remain significant deficiencies in the complaint intake processes.

851.   At trial, several witnesses testified that they had filed complaints against the MCSO or left such complaints on recordings, but never received any response. Nevertheless, the Court initially concluded that the evidence was not sufficient for the Court to find that there was a system-wide problem within the MCSO that pertained to complaint intake and processing.

852.   At this point, however, the MCSO has admitted that a significant number of its deputies seized IDs and other personal property as "trophies" and has further admitted that it destroyed much of that property.  The admission that the MCSO has destroyed personal property gives rise to the reasonable inference that at least some of the owners of such property would have registered complaints with the MCSO.  The absence of complaints relating to the loss of such property in MCSO records gives rise to the reasonable inference that such complaints were not properly transmitted, processed, or investigated.

853.   This finding is bolstered by the MCSO's admission that it had no system in place to track these kinds of complaints.  (Doc. 1495 at Tr. 3652.)  The lack of such a system was offered as a reason why a finding of supervisory failures on the part of Lieutenant Sousa was vacated when it was grieved.  (*See* IA #2014-542 (Chief Trombi's failure to take action with respect to the Mesnard complaint)).

854.   Further, in his timeline of incidents that related to Deputy Armendariz, Sergeant Fax noted a large number of citizen complaints filed against Armendariz from May 2011 to August 2013 for which no internal affairs number was issued.  (Ex. 2760 at MELC011633–46; *see also* Doc. 1467 at Tr. 3198.)

855.   MCSO policy, last revised on September 5, 2014, requires that an IA number be issued for any external or internal complaint that is received.  (Ex. 2881 at MELC1306918.)  It is not apparent whether previous MCSO policy required this, or whether the MCSO has only attempted to follow this policy since the last revision.

856.   While, if it is followed it will likely provide some improvements, as Captain Bailey and Chief Deputy Sheridan both acknowledge, the policy has no "fail-

safe" that ensures that the officer receiving a complaint will enter it.  (Doc. 1556 at Tr. 3268; Doc. 1389 at Tr. 1159–60.)

857.   Nor does the MCSO use "testers" to audit the complaint intake system by "putting in a call and posing . . . as a civilian [making a] complaint to see what happens" in order to determine whether officers routinely enter complaints into the system and assign them IA numbers.  (Doc. 1467 at Tr. 3156; Doc. 1505 at Tr. 4028–29.)

858.   Despite its policy, therefore, the MCSO has yet to implement a means of detecting officers who do not adequately report complaints of misconduct in which they are implicated.  (Doc. 1467 at Tr. 3161–62.)

859.   Nor does the PSB have any mechanism to ensure that a complaint is not miscategorized.  (Doc. 1467 at Tr. 3177.)  The policy itself does not define certain key terms—for example there is no definition of "racial or bias-based profiling."  According to the testimony of Captain Bailey, when a civilian calls in a complaint, the MCSO relies upon the officer receiving the complaint to categorize the complaint and determine whether the complaint could involve the imposition of major discipline against an MCSO employee.  (*Id.* at Tr. 3151–52.)

860.   If the complaint could involve major discipline, the matter is normally transferred to the PSB for investigation.  (Doc. 1467 at Tr. 3152.)

861.   On the other hand, if the complaint likely involves the imposition of only minor discipline, the matter remains within the district or division receiving the complaint for a division investigation of the misconduct.  (Doc. 1505 at Tr. 3986.)

862.   The division commander or lieutenant charged with investigating internal matters can confer with the PSB captain to determine whether a matter should be referred to the PSB.  (Doc. 1505 at Tr. 3987; *see also* Doc. 1467 at Tr. 3151–52.)

863.   In making this determination, presumably, the MCSO officers rely on the disciplinary matrix.  Such a prediction, of course, depends upon the appropriate application of that matrix.[45]

---

[45] Chief Deputy Sheridan testified that the disciplinary matrix is very strict,

864.   Chief Olson's testimony calls into question the ability of MCSO division personnel to appropriately apply the disciplinary matrix.  As the head of the custody side of the MCSO, Olson testified that he had been the disciplinary decision maker in "thousands or hundreds" of internal affairs investigations.  (Doc. 1495 at Tr. 3573.)  Yet he testified that alleged misconduct can be made to fit in whatever offense category he deems appropriate.   Olson stated that "[y]ou can make [an offense] fit however— however you want to.  It's my decision where they fit."  (*Id.* at Tr. 3511.)  Such arbitrary application of the disciplinary matrix would frustrate the ability of MCSO division personnel, and even the PSB, to accurately determine whether a matter likely involves minor or major discipline.

865.   Moreover, appropriate application of the disciplinary matrix is further compromised by the MCSO's *Melendres*-only policy.

866.   MCSO policy also does not indicate what should be done when a deputy who is the subject of a complaint is also the deputy who receives the complaint.  (Doc. 1467 at Tr. 3178.)

867.   The hearing testimony thus demonstrates flaws that remain in MCSO complaint intake and categorization policies and practices.   That evidence further demonstrates a lack of training, consistency, and accountability.

**4.      The MCSO's IA Policies Fail to Address Numerous Issues that Arose in this Case.**

868.   There is no MCSO policy regarding what to do in the event that Sheriff Arpaio or his designee have a conflict, an appearance of bias, or an interest in an ongoing IA investigation.  There is no policy regarding what to do in the event that a PSB staff member has a conflict of interest or the appearance of impropriety in an ongoing IA investigation.  (Doc. 1467 at Tr. 3159–61.)  There is finally no MCSO policy concerning conflicts in internal investigations conducted by the districts or divisions of the MCSO.  (Doc. 1505 at Tr. 4029.)  Sheriff Arpaio has taken advantage of this lack of policy in

---

meaning "there's not much leeway in the system."  (Doc. 1465 at Tr. 1419.)  There is to be no favoritism or deviation.

subverting the appropriate discipline that should be imposed in this case.

869.    Captain Bailey testified that despite the absence of any formal policy, when a conflict situation presents itself, Bailey discusses it with Chief Deputy Sheridan and they determine whether another division or another agency should do the investigation. (Doc. 1505 at Tr. 4000–01.)  The facts here demonstrate that if they ever did so, they did not do so when they should have.

870.    MCSO policies and practices do not provide the MCSO investigating officer with the chance to address matters raised for the first-time by the investigative principal in the predetermination or name-hearing clearing.  That is a flaw in the MCSO IA policy that has been exploited in this case and which needs correction.

871.    Pursuant to MCSO policy, no officer needs to provide an explanation in writing for any of his decisions relating to discipline or grievances.

872.    Sheriff Arpaio, or his designee, may rescind disciplinary action imposed at the district, division, or the PSB level at his or her own discretion.  He or she need not offer any reason for doing so.  (Doc. 1556 at Tr. 3233–34; Ex. 2001 at MELC416246.)

873.    There is no MCSO policy prohibiting the promotion of an officer who is under investigation for misconduct.

874.    Chief Deputy Sheridan, in granting a grievance, has directed that the historical adjudicatory facts of an underlying IA investigation be changed.  This led to misleading statements being filed with the Court.  To the extent that the MCSO claims such grievance authority pursuant to policy, that policy is flawed.

875.    All of these policies and practices were used by the Defendants to avoid appropriate accountability for their treatment of members of the Plaintiff class.

# IV.

## POTENTIAL REMEDIES

876.    The Court makes the following additional findings relating to appropriate remedies:

**A.    Count One**

877.   The purpose of civil contempt is to coerce compliance with a court order or to compensate another party for the harm caused by the contemnor.  *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986).

878.   Plaintiffs do not assert that Defendants remain in violation of the Court's preliminary injunction through the continued engagement in unlawful detention practices against members of the Plaintiff class.  There is, therefore, no need to use the Court's contempt power to coerce Defendants to comply with the preliminary injunction.

879.   As is noted above, however, there are at least hundreds of members of the Plaintiff class who have been injured by the Contemnors' past failures to take reasonable steps to implement this Court's preliminary injunction.

880.   Although the Parties had previously indicated that they would provide the Court with a proposed method for compensating members of the Plaintiff class who were willing to surrender their individual claims months ago, they have not done so.

881.   The Court welcomes the Parties' input on proposed remedies designed to compensate members of the Plaintiff class who have suffered harm as a result of the Defendants' violation of the Court's preliminary injunction.   While the Court will consider class-wide remedies as to which the Parties have substantial agreement, it reminds the Parties of the concerns it has previously expressed in this regard to the extent that such matters may better be raised in a separate procedure or procedures.

**B.    Count Two**

882.   When the Court ruled for the Plaintiffs after the trial in this case, the parties resolved between themselves many of the issues pertaining to the appropriate measure of injunctive relief to be entered by this Court.  (*See, e.g.*, Doc. 592.)  The Court held a hearing to make decisions about the issues that the Parties could not resolve.

883.   Among the matters in dispute were provisions, proposed by Plaintiffs, "revising the internal affairs division of the MCSO and the investigation and resolution of complaints."  (*See, e.g.*, Doc. 603 at Tr. 7.)  At the hearing, the Court questioned Plaintiffs on the sufficiency of the evidence presented at trial to support such relief.

(Doc. 603 at Tr. 89–91.)  After such questioning, the Court denied much of the relief sought by the Plaintiffs.  (*Compare* Doc. 592-1 *with* Doc. 606.)

884.   Unknown at the time to the Plaintiffs and to this Court, the MCSO had deprived the Plaintiffs of considerable evidence of misconduct towards members of the Plaintiff class.

885.   Had the Defendants disclosed such evidence in a timely manner, as was their duty, the Plaintiffs would have been able to evaluate that evidence and pursue additional discovery concerning it.  Plaintiffs would have been able to demonstrate that, among other things, the MCSO routinely confiscated the personal property of members of the Plaintiff class without justification.  They would have also been able to demonstrate the MCSO's inadequate, bad faith, and discriminatory internal investigation policies and practices as well as additional harms.  The Court would have been able to timely evaluate that evidence in fashioning the appropriate injunctive relief for the Plaintiffs.

886.   As it pertains to the adequacy of the MCSO's investigations into its own misconduct, the Court need not speculate about what that evidence might have been.  The MCSO convened IA investigations resulting from the late-revealed evidence after it was disclosed.  When the MCSO did so, the Defendants and several non-party contemnors were fully advised and aware that the adequacy and good faith of their investigations would be subject to evaluation by the Parties and the Court.  (Doc. 700 at Tr. 93–94; Doc. 1027 at Tr. 636–37; Doc. 1043 at Tr. 863, 972, 978–79.)  That evidence was the focus of a lion's share of the evidentiary hearings, and is explained in detail in these findings.

887.   These after-the-fact investigations serve to adequately demonstrate the flawed disciplinary course that the MCSO would have pursued had it timely investigated the acts of misconduct revealed by the late-disclosed evidence.  Yet, even more tellingly, they also demonstrate the Defendants' ongoing, unfair, and inequitable treatment of members of the Plaintiff class.

888.   Members of the Plaintiff class constitute the overwhelming majority of the victims of the multiple acts of misconduct that were the subjects of virtually all the flawed investigations.  For example, those who suffered due to Sheriff Arpaio's failure to implement the preliminary injunction were all members of the Plaintiff class.  The great majority of the identifiable confiscated personal property found in Deputy Armendariz's garage, attached to Detective Frei's memorandum, and elsewhere within the HSU and the MCSO, for which adequate discipline was never imposed, came from members of the Plaintiff class.  The supervisory failures within the HSU disproportionately affected members of the Plaintiff class.  The *Melendres*-only policy, by definition, applies only to investigations arising from this lawsuit which was brought to vindicate the rights of members of the Plaintiff class.  When new evidence came forth of 1459 seized IDs, Chief Deputy Sheridan and Captain Bailey attempted to conceal them because a large number of them belonged to members of the Plaintiff class.

889.   An effective and honest internal affairs policy is a necessary element of the MCSO's self-regulation.  Thus, MCSO disciplinary policy calls for the administration of "fair and impartial" investigations and the imposition of "fair and equitable" discipline.  The Plaintiffs brought this suit for the vindication of their constitutional rights.  Although the Defendants are no longer detaining members of the Plaintiff class without authorization, they are manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class.  As is demonstrated above, the internal affairs and PSB operations of the MCSO are under the control of Sheriff Arpaio and his designees including Chief Deputy Sheridan.  They have directed this manipulation to avoid accountability for themselves, their protégés, and those who have implemented their flawed policies at the cost of fairness to members of the Plaintiff class.  Further, they continue to attempt to conceal additional past mistreatment of the Plaintiff class as it comes to light in order to avoid responsibility for it.[46]

---

[46] To the extent that the Defendants committed additional acts of dishonesty and

890.   Had the Court withheld evidence and the information to which it led been presented at trial, the Court would have entered injunctive relief much broader in scope.

891.   When evidence is discovered after trial, Federal Rules of Civil Procedure 59 and/or 60 authorize various, *but not exclusive*, remedies.  The Court has recourse to inherent and other authority when it is necessary to provide an adequate remedy.  *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

892.   However, because Plaintiffs had already sought an Order to Show Cause on what became Counts One and Three, the Parties agreed, as a matter of expediency, to pursue any relief for the withholding of discovery in the same evidentiary hearings that would be necessitated by the Order to Show Cause.  (*See, e.g.*, Doc. 858 at 14–20.)

893.   The Court subsequently included the withholding of discovery as a separate count in the Order to Show Cause but indicated in that order that its ability to provide a remedy for Plaintiffs might also spring from its inherent powers.  (Doc. 880 at 18.)  It had so advised the Parties prior to the issuance of the Order to Show Cause and throughout this hearing.  (*See. e,g.*, Doc. 858 at Tr. 18–19; Doc. 1575 at Tr. 14.)  The Parties have previously acknowledged that the Court has the inherent authority both to make Plaintiffs whole for Defendants' failure to provide requested discovery and to enforce its own orders.  (Doc. 1027 at Tr. 626–27; Doc. 1097 at Tr. 55.)

894.   The Court wishes to explore with the Parties several elements that may make up any part of the appropriate relief to which the Plaintiff class may be entitled for the deficiencies identified above.

895.   First, the Court must determine whether Plaintiffs are entitled to the entry of relief designed to correct the Defendants' misconduct revealed by the disclosure of the additional discovery after trial.  Such relief would include the revision or creation of policies and practices that would prevent future misconduct or administrative deficits discussed in these findings.  These topics include but are not limited to the areas of personnel supervision, supervisory structure, staffing and training, IA investigations,

---

obstruction during the hearings, they were advised that such acts would be relevant to assessing relief in this case.

MCSO disciplinary policies, MCSO policies related to complaint intake, tracking, and accountability, and any necessary training and staffing measures designed to implement these corrective measures.

896.   Second, the Court must determine whether the Plaintiffs are entitled to revisions to or the creation of new IA policies and practices that would prevent IA abuses of the type discussed in this Order as well as any necessary training and staffing measures designed to implement such corrective measures.  Such needed policies or specifications include, but are not limited to, policies regarding:  conflicts, bias and appearance of impropriety, hearing procedures that are fair to the principal and the MCSO, the requirement of some explanation when overturning initial or final sustained discipline, and specification of the extent of grievance authority.

897.   With respect to necessary remedial changes in MCSO policy, the Court invites the Parties comments about proceeding in the following way:

898.   The Court has found various flaws in MCSO policies—*e.g.*, the failure of the disciplinary policy to contain any provisions concerning conflicts of interest or the inability of the PSB to address evidence first presented by the principal at a name-clearing hearing.  As a result, MCSO grievance policy will likely have to be revised.

899.   Yet, it has also found flaws the MCSO has exploited in this action that, while requiring correction, may not require the re-writing of MCSO policy.  The Court may find expert testimony to be helpful in these areas.

900.   To the extent that the Parties wish to provide expert testimony on such questions, the Court is not persuaded that such testimony should prevent it from issuing its order that certain policies in general be revised (with an effective date for their revision) so as to avoid further delay in the implementation of other necessary remedial relief.  The Court proposes that during the period prior to the deadline set by the Court for the promulgation of new policies, the Plaintiffs' expert could prepare and present to the Defendants what (s)he believes to be the indicated policy changes in light of the deficiencies discussed in this Order.  To the extent Defendants could not agree to such

proposed changes, they can provide contrary expert testimony.  As to the issues on which the Parties could not agree, the Court could then hold a hearing in which it could review the specific contested provisions and make its rulings regarding which policy changes must be implemented in light of the facts it has found above.  That would prevent the balance of the Court's remedial orders from being postponed pending the implementation of necessary policy changes.

901.   Although again the Court does not wish to foreclose the Parties from suggesting additional or different remedies based on the factual findings on or prior to the May 31, 2016 hearing, the Court would like to further explore possible remedies that would include the following elements:

902.   Relief that would ensure that the Plaintiff class has appropriate access to information that has been sought pursuant to applicable law.

903.   The invalidation of past investigations, disciplinary decisions, and/or grievance decisions found to be insufficient, invalid, or void in these findings, and the initiation of new investigations and/or disciplinary processes for some or all of those decisions.  The vesting in an independent authority to conduct such investigations and to impose such discipline where appropriate.

904.   The initiation of additional IA investigations into new or previously uninvestigated violations, or alleged violations that are identified in these findings of fact that relate to:  harm or potential harm to members of the Plaintiff class, the integrity of MCSO IA investigations, the untruthfulness of MCSO command staff, the witnesses in this lawsuit or evidentiary hearings, and the MCSO's compliance with its own policies.  The vesting in an independent authority to conduct such investigations and to impose such discipline where appropriate.

905.   With respect to IA investigations that arise hereafter which relate to the interests of the Plaintiff class, the vesting of final approval of MCSO internal investigations and disciplinary decisions with the Monitor or other appropriate authority, and ultimately, where appropriate, with the Court.

906.    The suspension of any authority of Sheriff Arpaio, or his designee(s), to invalidate in any way the discipline imposed by the independent authority designated by the Court to make disciplinary decisions with respect to any of the investigations and/or disciplinary decisions listed above.

907.    If such authority is imposed, the Court invites the Parties to suggest what investigations should be reopened, what new investigations should be initiated, and how those investigations should proceed.  It further invites the Parties to address the condition or conditions that would result in the return of all investigative and disciplinary authority to Sheriff Arpaio and/or his designee.

908.    The Court must determine whether an award of attorney's fees is merited.

## C.    Count Three

909.    In this count of contempt, Sheriff Arpaio and Chief Deputy Sheridan disobeyed an order of the Court. As it pertains to the relief to which the Parties are entitled, this conduct is only one of a number of acts described above in which Arpaio and Sheridan have demonstrated their disregard for the interests of the Plaintiff class, and their disrespect for the orders of this Court that are designed to protect those interests.

910.    Although the Court again invites the Parties to comment on what relief they deem appropriate for this act of contempt, the Court does not view this act as giving rise to any relief separate from that which would be appropriate for the other misconduct set forth herein.

911.    The Court has set a hearing for May 31, 2016, in which the Parties will be able to discuss with the Court the above matters pertaining to relief.

912.    Prior to the hearing, the Parties are invited, if they wish to do so, to file a brief addressing the matters set forth above, their views of the appropriate relief, or any other matters which they desire to bring to the attention of the Court.  The briefs shall be filed **no later than noon on May 27, 2016**.  The Court will then hold the hearing with the Parties having exchanged such memoranda if they wish to file any.

/ / /

**IT IS HEREBY ORDERED THAT:**

1.      Sheriff Arpaio, Chief Deputy Sheridan, Chief Sands, and Lieutenant Sousa are in civil contempt on Count One of the Order to Show Cause.

2.      Sheriff Arpaio is in civil contempt on Count Two of the Order to Show Cause.

3.      Sheriff Arpaio and Chief Deputy Sheridan are in civil contempt on Count Three of the Order to Show Cause.

4.      Counsel for Plaintiff class and counsel for Defendants may each file a 30-page memorandum, if they wish to do so, no later than **noon on May 27, 2016**.

5.      Counsel for Chief Sands and counsel for the County may each file a 10-page memorandum, if they wish to do so, no later than **noon on May 27, 2016**.

6.      The Department of Justice may file a 20-page memorandum, if they wish to do so, no later than **noon on May 27, 2016**.

7.      The Court will further discuss the appropriate relief to be entered in a hearing set for **May 31, 2016 at 9:00 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151.  It will shortly thereafter enter any applicable orders and determine if it will refer any matters for criminal contempt.

Dated this 13th day of May, 2016.

Honorable G. Murray Snow
United States District Judge