WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **SECOND SUPPLEMENTAL PERMANENT INJUNCTION/ JUDGEMENT ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

This Court held 21 days of evidentiary hearings in April, September, October, and November of 2015. At issue were three charges of civil contempt raised against Sheriff Joseph Arpaio and various other alleged non-party contemnors. Also at issue was the relief necessary to compensate the Plaintiff class for the Defendants' acts of misconduct in, among other things, failing to provide requested discovery materials prior to the underlying trial in this matter.

On May 13, 2016, the Court issued detailed Findings of Fact. (Findings of Fact, Doc. 1677.) The Court found that Sheriff Arpaio and his command staff knowingly failed to implement the Court's preliminary injunction, resulting in harm to many Plaintiff class members who were detained in violation of their constitutional rights.

(Doc. 1677 at ¶¶ 1–164.)   The Court also found that Defendants failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders, thereby impeding the litigation, harming the Plaintiff class, and resulting in a trial that did not completely address—and remedies that did not fully repair—the MCSO's violations of Plaintiffs' constitutional rights. (*Id.* at ¶¶ 165–217, 239–94.) The contempt hearing further established that after Defendants disclosed to the Court extensive MCSO misconduct, including its failure to provide additional evidence pursuant to Defendants' discovery obligations, the Court allowed Defendants at their insistence to seek to investigate and discipline that misconduct and to disclose newfound evidence. (*Id.* at ¶¶ 220–22.)   Nevertheless, instead of forthrightly meeting their responsibilities, Defendants continued to intentionally withhold relevant evidence during the course of their ensuing investigation and the eventual contempt hearing. (*Id.* at ¶¶ 218–386.)  Further, in investigating the misconduct with respect to members of the Plaintiff class, Sheriff Arpaio and the MCSO manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class. (*Id.* at ¶¶ 387–875.)

The facts of this case are particularly egregious and extraordinary.  The MCSO's constitutional violations are broad in scope, involve its highest ranking command staff, and flow into its management of internal affairs investigations.  Thus the necessary remedies—tailored to the violations at issue—must reach that far.

The parties have briefed and argued before the Court the sources and scope of the Court's authority to issue remedies in light of the Findings of Fact, including Defendants' concerns regarding federalism and due process.  *See, e.g.*, Plaintiff's Memorandum on Remedies for Civil Contempt (Doc. 1684); United States' Memorandum in Response to Findings of Fact (Doc. 1685); Defendants' Responsive Memorandum to Court's Findings of Fact (Doc. 1687); Parties' Joint Memorandum Re: Internal Investigations (Doc. 1715);

Plaintiffs' Response to Defendant Arpaio's Briefing Re: Internal Affairs (Doc. 1720); United States' Response to Defendant Arpaio's Positions Re: Internal Investigations (Doc. 1721); Defendant Arpaio's Reply in Support of Briefing Re: Internal Affairs Investigations and Discipline (Doc. 1729).  The Court therefore prefaces its remedial order with an analysis of these issues.

## I.   SOURCES OF THE COURT'S AUTHORITY TO FASHION REMEDIES

Had the Court had access to the evidence withheld by the MCSO and the evidence to which it led, the Court would have entered injunctive relief much broader in scope. (Doc. 1677 at ¶ 890).  Although this bad faith failure to produce evidence gave rise to various remedies, the Parties agreed to pursue any relief for the Defendants' withholding of discovery in the same evidentiary hearings that would be necessitated by the Court's Order to Show Cause for contempt.  (*See id.* at ¶¶ 891–93).

A principal purpose of the hearing was, therefore, to provide the Plaintiff class the relief it would have had, to the extent possible, had Defendants complied with their discovery obligations prior to trial.

The Court derives authority to fashion remedies in this instance from multiple sources, including the Court's broad and flexible equitable powers to remedy past wrongs, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12-16 (1971), the Court's equitable authority to modify its injunctions in light of changed circumstances, *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932),  and the Court's authority to impose remedial sanctions for civil contempt, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-29 (1994).

### A.   Broad Remedial Powers

In "cases involving the framing of equitable remedies to repair the denial of a constitutional right[,] [t]he task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann*, 402 U.S. at 15-16.  Federal courts focus on three factors when applying equitable principles. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977).  First, "with any equity case, the nature of the

violation determines the scope of the remedy." *Swann*, 402 U.S. at 16. "The remedy must therefore be related to the condition alleged to offend the Constitution." *Milliken*, 433 U.S. at 281 (internal quotation marks omitted). "Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.* "Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* However, if the authorities "fail in their affirmative obligations . . . judicial authority may be invoked." *Id.* (quoting S*wann*, 402 U.S. at 15). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." S*wann*, 402 U.S. at 15.

"[I]njunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quotation omitted), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016). "Nevertheless, the district court has broad discretion in fashioning a remedy [and] is permitted to order 'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation.'" *Id.* (quoting *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir. 1986)). "Therefore, an injunction exceeds the scope of a district court's power only if it is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'" *Id.* (quoting *Milliken,* 433 U.S. at 282).

Moreover, "the enjoined party's 'history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted.'" *Id.* (quoting *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000)). When faced with "repetitive failures to comply with orders[,]" a district court is "'justified in entering a comprehensive order to insure against the risk of inadequate compliance.'" *Sharp*, 233 F.3d at 1173 (quoting *Hutto v. Finney,* 437 U.S. 678, 687 (1978)).

Here, as in *Sharp*, the Court orders remedies which are necessary to cure the MCSO's constitutional violations, in light of the MCSO's history of noncompliance.  *See id.* at 1173.  To the extent that the Court orders reforms of the MCSO's policies and practices, these reforms are necessary "to insure against the risk of inadequate compliance," *id.* (quoting *Hutto,* 437 U.S. at 687), because absent such reforms, there is no way to determine whether policies or practices that insulated those who violated the constitutional rights of the Plaintiff class from investigation and discipline would continue to do so.  Further, the reforms are aimed at eliminating a condition that flows from the MCSO's violation of the constitutional rights at issue—namely, the tacit authorization and condonation that the MCSO conveys to its deputies when police misconduct related to members of the Plaintiff class is exempted from the normal internal affairs system and is treated with special leniency or is entirely swept under the rug.[1]

"Members of the Plaintiff class constituted the overwhelming majority of the victims of the multiple acts of misconduct that were the subject of virtually all of the flawed investigations" summarized in the Court's Findings of Fact.  (Findings of Fact, Doc. 1677 at ¶ 888.)  So long as individuals within the MCSO can disobey the Court's orders with impunity, the rights of the Plaintiff class are not secure.  "[T]he ability to effectively investigate and discipline officers . . . is essential to correcting the underlying constitutional violations found in this case, and thus to the final resolution of this long-standing litigation."  *Madrid v. Woodford*, No. C90-3094 TEH, 2004 WL 2623924, at *8–9 (N.D. Cal. Nov. 17, 2004).  The Court's orders in this case have required implementation of new policies.  A system that effectively ensures compliance with the

---

[1] *See* Doc. 1677 at 2 ("To escape accountability for their own misconduct, and the misconduct of those who had implemented their decisions, Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor.  The Defendants' unfair, partial, and inequitable application of discipline disproportionally damaged members of the Plaintiff class.").

Court's orders requires five "interrelated components," each of which "builds upon and reinforces the others": written policies, training, supervision, investigation, and officer discipline. *Madrid v. Gomez*, 889 F. Supp. 1146, 1181 (N.D. Cal. 1995). "[A] meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, [an organization's] . . . policies and procedures become a dead letter." *Id.*

Defendants continue to "manipulate[e] the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class." (Findings of Fact, Doc. 1677 at ¶ 889.) In light of Defendants' repeated violations of the Court's orders and their continued attempts "to conceal additional past mistreatment of the Plaintiff class as it comes to light in order to avoid responsibility for it," (*id.*,) the Court has the authority to mandate reforms of the MCSO's internal affairs system in order to ensure the MCSO's continued compliance with the Court's permanent injunction (Doc. 606) and to coerce the MCSO's compliance with the Court's previous orders, as well as with orders the Court may enter in the future as the need arises.

## B.     Equitable Authority to Modify Injunctions

"A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Swift*, 286 U.S. at 114. "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). A modification is appropriate when a court, faced with new facts, must make a change "to effectuate . . . the basic purpose of the original" injunction. *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942) (holding a modification making a consent decree more onerous for the enjoined entity to be reasonable where it effectuates the purpose of the original consent decree).

/ / /

- 6 -

Before the Court entered its injunction, Plaintiffs requested provisions "revising the internal affairs division of the MCSO and the investigation and resolution of complaints." (*See, e.g.*, Doc. 603 at Tr. 7.)  The Court denied much of the relief sought. (Findings of Fact, Doc. 1677 at ¶ 883.)  Neither Plaintiffs nor the Court knew that "the MCSO had deprived the Plaintiffs of considerable evidence of misconduct towards members of the Plaintiff class." (*Id.* at ¶ 884.)  Had Defendants disclosed such evidence, Plaintiffs could have demonstrated "the MCSO's inadequate, bad faith, and discriminatory internal investigation policies and practices as well as additional harms." (*Id.* at ¶ 885.)  Because Defendants failed to disclose that evidence, the Court was unable "to timely evaluate that evidence in fashioning the appropriate injunctive relief for the Plaintiffs." (*Id.*)

"Had the evidence that Defendants withheld from the Court and the information to which it led been presented at trial, the Court would have entered injunctive relief much broader in scope." (*Id.* at ¶ 890.)  It is incumbent upon the Court now, equipped as it is with additional facts, to amend the injunction and grant the relief that would have been appropriate at the time of the original injunction had the MCSO disclosed such evidence in a timely manner, as was their duty.

## C.   Civil Contempt Authority

"[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Bagwell*, 512 U.S. at 827.  A contempt sanction is "civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"[2] *Id.* at 829 (quoting *United States v. Mine Workers,* 330 U.S. 258, 303–304 (1947)).

Ensuring that the MCSO has a functional system of investigating officer misconduct and imposing discipline is a remedial measure designed to coerce the MCSO

---

[2] This remedial order only sets forth remedies addressing the MCSO's policies and procedures.  To the extent that the parties may stipulate to the principal provisions of an order designed to monetarily compensate the victims of Defendants' contemptuous acts, the Court may issue a subsequent order providing for such compensation.

into compliance with the Court's orders.  (Findings of Fact, Doc. 1677 at ¶¶ 888–89.)  The MCSO must have in place an effective means of imposing discipline upon its own officers in order to ensure that officers do not feel at liberty to disregard MCSO's policies.  To the extent that such policies are in place to protect the rights of the Plaintiff class, an effective disciplinary system is an essential component of Plaintiffs' protection.  The MCSO's flawed investigations "demonstrate the Defendants' ongoing, unfair, and inequitable treatment of members of the Plaintiff class."  (Findings of Fact, Doc. 1677 at ¶ 887.)

## II.   FEDERALISM

"[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief."  *Rizzo v. Goode,* 423 U.S. 362, 379 (1976).  Federalism concerns "are highly contextual and must be evaluated on a case-by-case basis."  *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 860 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

"Where federal constitutional rights have been traduced, . . . principles of restraint, including comity, separation of powers and pragmatic caution dissolve."  *Id.* (citation omitted).  "Nonetheless, federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies."  *Id.* at 861.  "In employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'"  *Id.* (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)).  However, "when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable."  *Id.*

"Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights."  *Id.*  "[O]therwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme."  *Id.* at 862.

Defendants cite *Rizzo*, a case in which the Supreme Court held that a district court departed from the principles that govern injunctive relief, including principles of

federalism, when it "injected itself by injunctive decree into the internal disciplinary affairs of [a] state agency." (Doc. 1715 at 12 (quoting *Rizzo*, 423 U.S. at 380).) The facts of *Rizzo*, however, are diametrically opposed to the facts of the case at hand. In *Rizzo*, the district court had found an unrelated assortment of constitutional violations committed by a few individual rank and file police officers, a problem which the court indicated was "fairly typical of those afflicting police departments in major urban areas." *Id.* at 375. The district court also found that "the responsible authorities [*i.e.*, command staff] had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights." *Id.* at 377. Thus, the Supreme Court held that when the district court attempted to fashion "prophylactic procedures . . . designed to minimize [isolated constitutional violations] on the part of a handful of its employees" without evidence of any unconstitutional plan or policy promulgated by the responsible authorities, the remedy ordered by the district court was "quite at odds with the settled rule that in federal equity cases the nature of the violation determines the scope of the remedy," and moreover, "important considerations of federalism" weighed against the unnecessary intrusion into state affairs. *Id.* at 378 (internal quotation omitted).

The *Rizzo* Court distinguished cases in which the district court found "the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by the defendants," or a "persistent pattern" that "flowed from an intentional, concerted, and indeed conspiratorial effort" to deprive a class of its constitutional rights. *Id.* at 373–75 (citing *Hague v. CIO*, 307 U.S. 496 (1939) and *Allee v. Medrano*, 416 U.S. 802 (1974)).

Here, the Court found the presence of those exact distinguishing characteristics. In the underlying case, the Court determined that the Defendants were systematically violating the Fourth and Fourteenth Amendment rights of the Plaintiff class in several different respects including the adoption of unconstitutional policies. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826–27 (D. Ariz. 2013), *adhered to,* No. CV-07-02513-PHX-GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part,* 784

F.3d 1254 (9th Cir. 2015), and *aff'd,* 784 F.3d 1254 (9th Cir. 2015) ("*Melendres* 2013 FOF").  The MCSO continued to adhere to these policies after the Court ruled in 2011 that they violated Plaintiffs' constitutional rights.  *See, e.g., id.* at 825 ("The LEAR policy, however, remains in force."); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Moreover, and more recently, the Court found in its May 2016 Findings of Fact that "Defendants intentionally failed to implement the Court's preliminary injunction . . . , failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders and thereby prevented a full recovery of relevant evidence."  (Findings of Fact, Doc. 1677 at 1-2.)  "To escape accountability . . . , Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor."  *Id.* at 2.  The Court found that Defendants were "manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class.  *Id.* at ¶ 889.

Under the facts of this case, the Court has fashioned remedies which account for and balance the need to respect the prerogatives of state officials with the need to prevent them from exercising their discretion in a way that violates Plaintiffs' constitutional rights and the need to provide a remedy for the past deprivation of those rights.  The Court previously fashioned less intrusive remedies, but those remedies were not effective due to Defendants' deliberate failures and manipulations.  (*See, e.g.*, *id.* at ¶¶ 365–69.)

1    The Court must do what is necessary to achieve the end goal of "restoring the victims of

2    discriminatory conduct to the position they would have occupied in the absence of that

3    conduct" and eventually restoring authority to MCSO command staff, once there is a

4    "system that is operating in compliance with the Constitution." *Missouri v. Jenkins*, 515

5    U.S. 70, 89 (1995).  Here, the scope of Defendants' constitutional violation is broad; the

6    violation permeates the internal affairs investigatory processes, which have been

7    manipulated to provide impunity to those who violate the rights of the Plaintiff class.[3]

8    (*See* Findings of Fact, Doc. 1677 ¶¶ 387–765.)   The remedy, as is determined by the

9    scope and nature of the violation, must reach as far as the violation flows.  *Jenkins*, 515

10   U.S. at 98; *Milliken,* 433 U.S. at 282.  "[W]here, as here, a constitutional violation has

11   been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure

12   the condition that offends the Constitution."  *Milliken,* 433 U.S. at 282 (internal quotation

13   marks omitted).

14          As such, "there is no merit to [Defendants'] claims that the relief ordered here

15   violates the Tenth Amendment and general principles of federalism." *Id.* at 291.  "The

16   Tenth Amendment's reservation of nondelegated powers to the States is not implicated

17   by a federal-court judgment enforcing the express prohibitions of unlawful state conduct

18   enacted by the Fourteenth Amendment." *Id.*

19          There is also no merit to Defendants' prospective argument that the *Rooker-*

20   *Feldman* doctrine prevents the Court from reviewing a decision of a merit commission or

21   _____

22          [3] As the Court has previously observed, the egregious and extraordinary nature of
     the constitutional violations in this case enhances the scope of the necessary intervention
23   to remedy such intentional conduct.  Regardless of whether the MCSO's manipulation of
     its internal investigations to provide impunity for those who violate Plaintiffs' rights,
24   thereby tacitly authorizing such violations, might itself be a (new) constitutional
     violation, the Court has found this conduct to be indicative of a scheme to avoid
25   accountability for violating the Court's injunction.  (Doc. 1677 ¶¶ 726, 733, 868–75,
     889.)  The MCSO has chosen to deliberately thwart the effectiveness of the remedies the
26   Court already set forth in this case.  As such, Defendants' argument that the MCSO "has
     not yet had an opportunity to implement remedies in response to the Court's Findings of
27   Fact" misses the point.  This case has a long history before May 13, 2016.  The remedies
     the Court sets forth now are responsive to that history of Defendants' evasion,
28   manipulation, and violation of their obligations under the Court's orders, not to any
     recently discovered constitutional violation.

state court regarding the discipline of an MCSO employee whose conduct has been investigated pursuant to this Court's remedial scheme.

*Rooker–Feldman . . .* is a narrow doctrine, confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (internal quotation omitted). "The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). Moreover, "the rule has long stood that a state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000).

The Court has had exclusive jurisdiction over this case for nine years. To the extent that the Court has ordered remedies that will result in internal affairs investigations of individuals at the MCSO, those investigations stem from this case. The Court has the jurisdiction to see that its orders are followed and that the Plaintiffs' rights are vindicated. *Rooker-Feldman* is inapplicable.

## III.   DUE PROCESS

### A.   The Arizona Police Officer's Bill of Rights

Arizona has codified a police officer's "bill of rights." A.R.S. §§ 38-1101–1115. Pursuant to this Arizona law, "[a]n employer shall make a good faith effort to complete any investigation of employee misconduct within one hundred eighty calendar days after the employer receives notice of the allegation by a person authorized by the employer to initiate an investigation of the misconduct." *Id.* § 38-1110(A). "If the employer exceeds the one hundred eighty calendar day limit, the employer shall provide the employee with a written explanation containing the reasons the investigation continued beyond one hundred eighty calendar days." *Id.* "On an appeal of discipline by the employee, a hearing officer, administrative law judge or appeals board may dismiss the discipline if it

is determined that the employer did not make a good faith effort to complete the investigation within one hundred eighty calendar days." *Id.* § 38-1110(C).

Defendants argue that this state law "creates federally protected constitutional rights because that statutory scheme contains 'particularized standards or criteria' to create a property interest." (Doc. 1729 at 7 (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 369-70 (9th Cir. 1990).) Defendants quoted *Allen* for the proposition that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 911 F.2d at 369-70.

However, Defendants failed to note that the next paragraph in the *Allen* opinion clarifies that "[w]hether an expectation of entitlement is sufficient to create a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker]." *Id.* at 370 (internal quotation omitted). The Arizona statute at issue here does not contain mandatory language, as it merely provides that the administrative law judge or appeals board "may" dismiss the discipline, as an exercise of its discretion. A.R.S. § 38-1110.

Moreover, in *Allen*, the plaintiff of a § 1983 action claimed that "his layoff constituted a deprivation of a constitutionally protected property interest without due process of law." *Allen*, 911 F.2d at 369. Even if the plaintiff in that case had successfully made a case that he had a constitutionally protected property right in continued employment (he did not), his constitutional rights could be violated only if he were deprived of such an interest *without due process of law*. Thus, *Allen* does not stand for the proposition that state law can affect what due process itself entails.

Here, the Parties do not dispute that MCSO employees have a property interest in their jobs. Rather, Defendants suggest that the Arizona statute changes what constitutes the due process to which the property interest holder is entitled. That proposition was squarely rejected in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). In

*Loudermill*, the Supreme Court stated in no uncertain terms that the answer to the question of "what process is due . . . is not to be found in [an] Ohio statute." *Id.* Nor is it to be found in an Arizona statute. Rather, due process is a matter of settled constitutional law. Due process requires "a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542. MCSO employees will not be denied that.

Thus, the requirement under Arizona law that employers must make a good faith effort to complete investigations within 180 days is not incorporated into the constitutional guarantee of due process. Moreover, where the MCSO deliberately ensured that 180 days passed in order to protect certain employees from *Melendres*-related discipline, dismissing that discipline would impede the vindication of Plaintiffs' constitutional rights. That cannot stand. *Swann*, 402 U.S. at 45 ("[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees.").

### B. Reliance on the Court's Findings of Fact

Any employee subject to an investigation will have a hearing, at which he or she can present evidence and raise a defense. On the other hand, a great deal of evidence was set forth during the 21 days of evidentiary hearings, some of which may be relevant to a given investigation, and this evidence need not be disregarded.

## IV.   GC-17, MCSO'S PRINCIPAL DISCIPLINARY POLICY, APPLIES TO ALL EMPLOYEES

Sheriff Arpaio is the appointing authority over certified employees in the MCSO, and he has unique disciplinary authority over all deputies within the MCSO, according to state law. *See Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (App. 2008). The MCSO's principal disciplinary policy, GC-17, applies to all employees and sets out disciplinary matrices that apply to virtually all employees. There is, generally speaking, a disciplinary matrix for regular employees (non-exempt regular status employees) and a slightly more demanding disciplinary matrix for management employees (exempt regular status employees). The disciplinary matrix is slightly more demanding for management

1   employees because, as MCSO policy makes clear, management employees should

2   typically be held to a higher standard of conduct.   (Ex. 2001 at MELC416243.)

3   Nevertheless, even for those employees subject to a disciplinary matrix, Sheriff Arpaio,

4   and his designee, Chief Deputy Sheridan, have the authority to ignore the matrix and

5   impose whatever discipline they deem appropriate.

6   Chief Deputy Sheridan is the highest level management employee within the

7   MCSO.  As an employee, he is clearly subject to departmental policy and discipline, and

8   he has previously been a principal or a person of interest in the disciplinary process.

9   Chief Deputy Sheridan is, however, an unclassified employee.  Thus, although he is

10  subject to GC-17, there is no specific disciplinary matrix that applies to him.  Defendants

11  argue that because there is no specific disciplinary matrix that applies to him, the Court

12  should take greater care, due to federalism concerns, in subjecting his misconduct to

13  evaluation (or re-evaluation) and to potential discipline than it takes with respect to other

14  MCSO employees.

15  Nevertheless, as the Findings of Fact make clear, Sheriff Arpaio and Chief Deputy

16  Sheridan are the authors of the manipulation and misconduct that has prevented the fair,

17  uniform, and appropriate application of discipline on MCSO employees as that

18  misconduct pertains to the members of the Plaintiff class.  Sheriff Arpaio, as an elected

19  official of Maricopa County, however, is not subject to any MCSO disciplinary policy.

20  He is also, of course, an official who is elected by the people of Arizona.  Neither of

21  these factors is true with respect to Chief Deputy Sheridan.  To the extent that Sheriff

22  Arpaio and Chief Deputy Sheridan have manipulated the Internal Affairs process at the

23  MCSO to ensure that many employees—including Chief Deputy Sheridan—were

24  disciplined in a relatively lenient manner or not at all for violating the rights of the

25  Plaintiff class, a remedy is necessary and within the scope of the Court's authority, as the

26  condition flows from the constitutional violation at issue in this case.  *See Milliken,* 433

27  U.S. at 282.

28  / / /

1    Pursuant to state law, Chief Deputy Sheridan can be disciplined.  His discipline is

2    at the discretion of Sheriff Arpaio.  In light of Sheriff Arpaio's manipulations in this case,

3    the discretion granted to the sheriff by state law does not prevent the Court from ordering

4    that appropriate discipline be imposed, as failure to do so would be an undue impediment

5    of the remedies to which the Plaintiff class is entitled as a result of the deprivation of

6    their constitutional rights.

7    Due to Sheriff Arpaio and Chief Deputy Sheridan's manipulation of the

8    disciplinary process, the Court has fashioned a remedy in which an independent internal

9    affairs investigator, and an independent disciplinary authority, both nominated by the

10   parties, shall make and review disciplinary decisions for all employees pertaining to the

11   misconduct discussed in the findings of fact.  Those independent authorities are

12   experienced in police discipline and shall have the authority, independent from the Court,

13   to decide discipline.  The Independent Authorities shall apply the disciplinary matrices,

14   but have the authority to disregard the disciplinary matrices in cases in which they

15   provide appropriate justification for doing so.  They shall have the authority to determine

16   the appropriate discipline for Chief Deputy Sheridan.  In doing so they shall approximate

17   MCSO policy as closely as possible.  Because Chief Deputy Sheridan is the highest level

18   management employee within the MCSO, they shall thus apply categories of misconduct

19   and presumptive levels of discipline to him that are no less exacting than those set forth

20   in the disciplinary matrix for exempt regular status employees of the MCSO, in order that

21   Sheridan be "held to a higher standard."  (*Id.*; Ex. 2001 at MELC416243.)

22   In light of the above, the following procedures and authorities are hereby ordered.

23   These procedures are numbered consecutively to those set forth in the Court's previous

24   Supplemental Permanent Injunctive orders, (Doc. 606, 670), which are incorporated

25   herewith.

26   **IT IS HEREBY ORDERED** entering this Second Supplemental Permanent

27   Injunction/Judgement Order as follows**:**

28   **/ / /**

- 16 -

# XIV.   ADDITIONAL DEFINITIONS

160.   This Second Supplemental Permanent Injunction incorporates all definitions in the Court's first Supplemental Permanent Injunction (Doc. 606 ¶ 1).

161.   The following terms and definitions shall also apply to this Order:

162.   "Misconduct" means a violation of MCSO policies or procedures; violation of federal, state, or local criminal or applicable civil laws; constitutional violations, whether criminal or civil; violation of administrative rules; and violation of regulations.

   a.   "Minor misconduct" means misconduct that, if sustained, would result in discipline and/or corrective action less severe than a suspension;

   b.   "Serious misconduct" means misconduct that, if sustained, would result in discipline of suspension, demotion, or termination;

   c.   "Misconduct indicating apparent criminal conduct by an employee" means misconduct that a reasonable and trained Supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

   d.   "Internal affairs investigator" means any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau or Supervisors in the employee's Division or Bureau who are assigned to investigate misconduct.

   e.   "Preponderance of the Evidence" means that the facts alleged are more likely true than not true.

   f.   "Clear and Convincing Evidence" means that the party must present evidence that leaves one with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true.  This standard of proof is higher than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

   g.   "Principal" means an employee against whom a complaint of misconduct or

wrongdoing has been made and who is a subject of a misconduct investigation.

h.  "Tester" means a person who poses as a civilian making a fictitious complaint for assessment purposes.

i.  "Class Remedial Matters" means possible misconduct involving members of the Plaintiff class and the MCSO or the remedies to which such class members are entitled as set forth in the Findings of Fact and various supplemental orders of this Court.

**XV.   MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

162.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.

163.  All policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶ 46 of the first Supplemental Permanent Injunction (Doc. 606).

**A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances**

164.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures.  The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent

that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.

165.  Such policies shall apply to all misconduct investigations of MCSO personnel.

166.  The policies shall include the following provisions:

a.  Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:

i.  No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

ii.  No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct.  No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.

iii. No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

b.  If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or,

if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

c.  Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy.  All decisions not to investigate alleged untruthfulness must be documented in writing.

d.  Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.

e.  Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.

f.  Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.

g.  No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.

167.  All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates

with an investigation of misconduct constitute retaliation and are strictly prohibited.  This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.

168.  Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.

169.  The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.

170.  The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline.  The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

171.  Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.  Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.

172.  Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.  The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

173.  Employees' and applicants' disciplinary history shall be considered in all hiring,

promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion.  MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

174.   As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.

175.   The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.

176.   There shall be no procedure referred to as a "name-clearing hearing."  All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.

**B.     Misconduct-Related Training**

177.   Within three months of the finalization of these policies consistent with ¶ 164 of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.  This training will include instruction in:

a.   investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

b.   the particular challenges of administrative law enforcement misconduct

investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;

c.  properly weighing the credibility of civilian witnesses against employees;

d.  using objective evidence to resolve inconsistent statements;

e.  the proper application of the appropriate standard of proof;

f.  report-writing skills;

g.  requirements related to the confidentiality of witnesses and/or complainants;

h.  considerations in handling anonymous complaints;

i.  relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.  relevant state and federal law, including *Garrity v. New Jersey*, and the requirements of this Court's orders.

178.  All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.   This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.

179.  Within three months of the finalization of these policies consistent with ¶ 164 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.

180.  Within three months of the finalization of these policies consistent with ¶ 164 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including

dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.

181. Within three months of the finalization of these policies consistent with ¶ 164 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.

**C.     Administrative Investigation Review**

182. The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.   The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.

183. All findings will be based on the appropriate standard of proof.   These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.

184. Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.

185. Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident.   If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made.   The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and

reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.

186. The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.

187. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.

188. The Professional Standards Bureau shall administratively investigate:

a. misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and

b. misconduct indicating apparent criminal conduct by an employee.

189. Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.

190. If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately

notify the Professional Standards Bureau, which shall take over the investigation.

191. The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 260 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.

192. When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.

193. The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.

194. Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.

195. Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.   Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.

196. The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a

qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.

197.    To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.

198.    The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct.  Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations.  Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.

199.    In each misconduct investigation, investigators shall:

a.  conduct investigations in a rigorous and impartial manner designed to determine the facts;

b.  approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;

c.  identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;

d.  make reasonable attempts to locate and interview all witnesses, including

civilian witnesses;

    e.  make reasonable attempts to interview any civilian complainant in person;

    f.  audio and video record all interviews;

    g.  when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

    h.  make credibility determinations, as appropriate; and

    i.  attempt to resolve material inconsistencies between employee, complainant, and witness statements.

200.    There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

201.    Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

202.    If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself  justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the

mission of an internal affairs investigator is to determine whether any misconduct occurred.

203.   Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.

204.   The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.

205.   At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:

a.   a narrative description of the incident;

b.   documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;

c.   documentation of whether employees were interviewed, and a transcript or recording of those interviews;

d.   the names of all other MCSO employees who witnessed the incident;

e.   the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations,

orders, or other standards of conduct required of MCSO employees;

f.  in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

g.  in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

h.  an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;

i.  if a weapon was used, documentation that the employee's certification and training for the weapon were current; and

j.  documentation of recommendations for initiation of the disciplinary process; and

k.  in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

206.  In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:

a.  the law enforcement action was in compliance with training and legal standards;

b.  the use of different tactics should or could have been employed;

c.  the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

d.  the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.

207.  For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of

misconduct in an administrative investigation:

a. "Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;

b. "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;

c. "Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or

d. "Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.

208. For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.

209. For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.

210. If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.  The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.

211.    Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action.  An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.

212.    Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies.  After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence.  The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence.  The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.

213.    At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.

214.    If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's

Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

215.  If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

216.  The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.

217.  The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.

**D.    Discipline**

218.  The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

219.  To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:

a.  establish a presumptive range of discipline for each type of violation;

b.  increase the presumptive discipline based on an employee's prior violations;

c.  set out defined mitigating and aggravating factors;

d.  prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;

e.  prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;

f.  prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;

g.  clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;

h.  provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;

i.  provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

j.  provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;

k.  require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and

l.  provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.

220.  The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.

221.  The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the

presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.

**E.     Pre-Determination Hearings**

222.    If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

223.    Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.

224.    If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.

225.    If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.

226.    The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination

hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.   The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

a.  his or her personal opinion about the employee's reputation;

b.  the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

c.  whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

227.   The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:

a.  that decision does not relate to the Sheriff or his designee;

b.  the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;

c.  the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and

d.  the written explanation is available to the public upon request.

**F.      Criminal Misconduct Investigations**

228.   Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.   If the

evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.

229.   If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.  No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.  The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

230.   The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to *Garrity*.

231.   The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to

different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.

232.   If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau.  The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.

233.   If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness.  The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation.  Such directions shall be documented in writing and included in the investigatory file.

234.   If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

235.   The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

### G.   Civilian Complaint Intake, Communication, and Tracking

236.   Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for

filing complaints about the conduct of MCSO employees.

237. The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.

238. In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.

239. The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.

240. The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.

241. The Sheriff will also make complaint forms widely available at locations around the County including:  the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices.  The Sheriff will ask locations, such as public library branches

and the offices and gathering places of community groups, to make these materials available.

242. The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.

243. The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.

244. Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

245. In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:

   a.  within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned.  The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;

   b.  when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and

   c.  in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.

256. Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.

257. The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.

258. The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.

259. The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.

**H.    Transparency Measures**

260. The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:

    a. summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;

    b. aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.);

complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;

c.  analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;

d.  aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

e.  aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

f.  aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa

County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and

g.  aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.

261.  The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.

262.  The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations.  This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:

a.  complaint notification procedures were not followed;

b.  a misconduct complaint was not assigned a unique identifier;

c.  investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;

d.  deadlines were not met;

e.  an investigation was conducted by an employee who had not received required misconduct investigation training;

f.  an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;

g.  an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;

h.  an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;

i.  any interviews were not recorded;

j.  the investigation report was not reviewed by the appropriate personnel;

k.  employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;

l.  a final finding was not reached on a misconduct allegation;

m.  an employee's disciplinary history was not documented in a disciplinary recommendation; or

n.  no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**I.    Testing Program for Civilian Complaint Intake**

263.  The Sheriff shall initiate a testing program designed to assess civilian complaint intake.  Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau

upon the receipt of a civilian complaint.

264. The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.

265. The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

266. The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

267. The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.

268. MCSO shall not permit current or former employees to serve as testers.

269. The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:

    a. a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (*i.e.*, in-person, telephonic, mail, and electronic);

    b. the number and proportion of tests in which employees responded inappropriately to a tester;

    c. the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;

    d. the number and proportion of tests in which employees failed to promptly

notify the Professional Standards Bureau of the civilian complaint;

e.  the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;

f.  an evaluation of the civilian complaint intake based upon the results of the testing program; and

g.  a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.

## XVI.   COMMUNITY OUTREACH AND COMMUNITY ADVISORY BOARD

270.  The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.

271.  In addition to the administrative support provided for in the Supplemental Permanent Injunction,  (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities.  The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose.  The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.

## XVII.  SUPERVISION AND STAFFING

272.  The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent

Injunction.

273. The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.

274. First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.

275. First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.

276. Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.

277. During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to

1   achieve compliance in a timely manner.

2   **XVIII.        DOCUMENT PRESERVATION AND PRODUCTION**

3   278.   The Sheriff shall ensure that when the MCSO receives a document preservation
4         notice from a litigant, the MCSO shall promptly communicate that document
5         preservation notice to all personnel who might possibly have responsive
6         documents.

7   279.   The Sheriff shall ensure that when the MCSO receives a request for documents in
8         the course of litigation, it shall:

9         a.   promptly communicate the document request to all personnel who might
10             possibly be in possession of responsive documents;

11        b.   ensure that all existing electronic files, including email files and data stored on
12             networked drives, are sequestered and preserved through a centralized process;
13             and

14        c.   ensure that a thorough and adequate search for documents is conducted, and
15             that each employee who might possibly be in possession of responsive
16             documents conducts a thorough and adequate search of all relevant physical
17             and electronic files.

18   280.   Within three months of the effective date of this Order, the Sheriff shall ensure
19         that the MCSO Compliance Division promulgates detailed protocols for the
20         preservation and production of documents requested in litigation.  Such protocols
21         shall be subject to the approval of the Monitor after a period of comment by the
22         Parties.

23   281.   The Sheriff shall ensure that MCSO policy provides that all employees must
24         comply with document preservation and production requirements and that
25         violators of this policy shall be subject to discipline and potentially other
26         sanctions.

27   **XIX.  ADDITIONAL TRAINING**

28   282.   Within two months of the entry of this Order, the Sheriff shall ensure that all

employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.

## XX.   COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS

283.   In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:

### A.     Investigations to be Overseen and/or Conducted by the Monitor

284.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.

285.   The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.

286.   This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 297 below.   With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary

Authorities separately appointed by the Court, as is further set forth in ¶¶ 305–28, 329–46 below.

287. The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters.  The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.

288. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.

289. The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter.  Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice.  During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.

290. Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with:  (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters.  The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.

291. The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial

Matters may be vacated or overridden in whole or in part by the Monitor.  Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.

292. The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.

293. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.

294. Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).

295. Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 228–35 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.  To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.  The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 228–35 above.

296. Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:

   a.  When minor discipline is imposed, a grievance may be filed with the Sheriff or

his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

    b. disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.

297.   The Monitor's authority over Class Remedial Matters will cease when both:

    a.  The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.

    b.  The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.

298.   To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.

299.   This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class.  The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until

it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.

300.   The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.  This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.  The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.

301.   To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO.   In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law.  While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.

302.   The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations.   The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous order.  (Doc. 606 ¶¶ 128, 132.)

/ / /

/ / /

/ / /

**XXI.  INVESTIGATIONS TO BE CONDUCTED BY THE INDEPENDENT INVESTIGATOR AND THE INDEPENDENT DISCIPLINARY AUTHORITY**

303.   In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (*see, e.g.*, Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (*Id.* at ¶ 904.)

304.   In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.

**A.      The Independent Investigator**

305.   The Independent Investigator shall be Daniel Giaquinto, Esq.  He shall have the authority to:

a. investigate and assess the adequacy of the investigations and the discipline imposed and/or the grievance decisions rendered in those investigations that have been completed by the MCSO and that the Court has deemed to be inadequate.  These investigations include, but are not limited to, the following:

      1.  IA #2014-542

      2.  IA #2014-543

      3.  IA #2014-295

      4.  IA #2105-541

      5.  IA #2015-018

      6.  IA #2014-021

      7.  IA#2014-022

      8.  IA #2014-544

      9.  IA #2014-545

10.  IA #2014-546

11.  IA #2014-547

12.  IA #2014-548

To the extent that he deems reinvestigation to be appropriate, he shall have the authority to reinvestigate such matters, to make preliminary findings, to prepare a report, and to recommend new discipline to the Independent Disciplinary Authority for final findings and, if appropriate, for the imposition of new or different discipline.

b.  investigate and assess whether the Findings of Fact demonstrate in his judgment other acts of misconduct which should be investigated and/or brought to the Independent Disciplinary Authority for a disciplinary decision.

306.  In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

307.  In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 300-02 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.

308.  The Court does not wish to constrain the judgment of the Independent Investigator in identifying any acts of potential misconduct revealed by the Findings of Fact. Nevertheless, without attempting to be exhaustive, the Court provides the following rulings to the Independent Investigator to the extent that the parties have identified uncharged misconduct arising from the Findings of Fact in their previous briefing.

309.  The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:

a.  Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).

b.  Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (*Id.* at ¶ 816).

c.  Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (*Id.* at ¶ 823).

d.  Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (*Id.* at ¶¶ 766–825).

310.  The following potential misconduct is sufficiently related to the rights of the members of the Plaintiff class to justify an independent investigation should the Independent Investigator deem that such an investigation is merited:

a.  The mishandling of internal investigations by Chief Deputy Sheridan, and/or Chief Olsen, Captain Bailey, Sergeant Tennyson, and any other employee who the Independent Investigator determines to have played a role in the deficient internal affairs investigations  that related to misconduct pertaining to members of the Plaintiff class.  Such potential violations include, but are not limited to, the manipulation of timing on investigations to influence discipline, biased decision-making, improper conduct of investigations, and the deliberate or negligent mishandling of investigations, whether criminal or administrative.

b.  The knowing misstatements made under oath to the Court by Chief Deputy Sheridan regarding his knowledge of the Court's preliminary injunction.  (*Id.*

at ¶ 87).

    c.  The knowing misstatements made under oath to the Court by Chief Deputy Sheridan about his instruction to send out a directive to MCSO commanders regarding the collection of video evidence. (*Id.* at ¶¶ 228–32).

    d.  The knowing misstatement to the press regarding the 1459 IDs made by Chief Deputy Sheridan on the night the Court ordered those IDs to be transferred to the Court's custody, and Chief Deputy Sheridan's subsequent reaffirmation of those misstatements under oath. (*Id.* at ¶¶ 325–36).

    e.  The knowing misstatement made under oath by Chief Deputy Sheridan to Chief Anders of the Monitor staff that he did not completely suspend the investigation into the 1459 IDs. (*Id.* at ¶¶ 337–41).

    f.  Chief Deputy Sheridan's "suspension" of the investigation into the existence of the 1459 IDs in an unsuccessful attempt to avoid the Court's multiple orders requiring their disclosure. (*Id.* at 294–348).

    g.  Captain Bailey's intentional misstatements of fact to the Monitor regarding the 1459 IDs in an attempt to conceal their existence. (*Id.*)

    h.  Chief Trombi's misstatement to Special Investigator Vogel under oath that Chief Sands had directed that Deputy Armendariz not be transferred out of the Human Smuggling Unit. (*Id.* at ¶¶ 517, 521).

    i.  Property that may have been improperly seized or inventoried and that has not been investigated to date. (*See, e.g.*, *id.* at ¶ 720.)

    j.  The violation of the Court's May 14, 2014 order by Chief Deputy Sheridan.

    k.  The untruthful statements made by MCSO personnel that they were collecting IDs for use in formalized training courses. (*Id.* at ¶¶ 630, 638.)

    l.  Detective Frei's mishandling of property and his attempt to destroy such property. (*Id.* at ¶¶ 699–700.)

311.  To the extent that the Independent Investigator identifies other matters that should be investigated or reinvestigated, he shall indicate to the parties and the Monitor,

in writing, the subject of such investigation and the likely principals.  These designations shall be filed under seal and shall be kept confidential by the parties. To the extent the Court has not already made the determination, the Independent Investigator shall also designate whether or not he believes that such matters are sufficiently related to the rights and remedies to which the members of the Plaintiff class are entitled so as to be within his jurisdiction.  Alternatively, he may request the Court to make that designation by written notice filed under seal with the Court and provided to the parties.  In the event that the Independent Investigator makes the designation, any party may appeal to the Court the Independent Investigator's designation within seven days of receiving notice of it.

312.   To the extent possible, the Independent Investigator shall conduct his investigations in compliance with the best investigative practices and in compliance with the processes and standards set forth in this Order governing the operations of MCSO's Professional Standards Bureau.

313.   In preliminarily determining charges and discipline, the Independent Investigator shall apply the two disciplinary matrices attached to GC-17 to the appropriate MCSO employees.  To the extent that an MCSO employee is a non-classified employee, and is thus subject to the MCSO disciplinary policy GC-17 but not subject to an applicable disciplinary matrix, the Independent Investigator shall apply a level of discipline that is no less than that specified for those classified employees within the MCSO that share similar job functions as the non-classified employee.  For example, Chief Deputy Sheridan, who has the highest command position of any employee within the MCSO, but who is an unclassified employee, shall be subject to a level of discipline no less than that indicated by the disciplinary matrix for exempt regular status employees.  (*See, e.g.*, Ex. 2001 at MELC416243 (MCSO disciplinary policy establishing that MCSO management employees are subjected to a higher standard of discipline than non-management employees:  "Regular status exempt employees typically hold a management

1    position, and therefore, are held to a higher [disciplinary] standard.").)

2    314.   When a single act of alleged misconduct would constitute multiple separate policy

3    violations, all applicable policy violations shall be charged, but the most serious

4    policy violation shall be used for determining the category of offense.

5    315.   In applying the disciplinary matrix to determine the possible range of discipline in

6    new investigations or reinvestigations, the Independent Investigator is obliged to

7    determine the number of prior offenses that have been sustained against the

8    principle.   In making this determination, he may rely on the past disciplinary

9    decisions made by the MCSO even if the investigation was deemed inadequate or

10   invalid by this Court.   Alternatively, if he deems it appropriate, the Independent

11   Investigator may re-investigate or recalculate whether past separate discipline

12   should or should not have been imposed in determining the possible range of

13   discipline for a new or reopened offense.   To the extent that the Independent

14   Investigator determines that the appropriate categorization of an offense within the

15   disciplinary matrix would require the reassessment of past misconduct which the

16   employee either did not receive but should have, or did receive but should not

17   have, he shall calculate whether the employee would or would not have received

18   past discipline had the MCSO applied the appropriate standard of care for internal

19   affairs operations prevailing in police agencies of MCSO's size.   Should that

20   require a determination of liability for alleged misconduct that is not related to the

21   rights of the members of the Plaintiff class, the Independent Investigator may seek

22   guidance from the Court if necessary.

23   316.   The Sheriff and the MCSO's cooperation with such assessments and

24   reinvestigations are required.   The Sheriff shall insure that the Independent

25   Investigator and each of the investigators or members of his staff are given timely

26   and complete access to MCSO documents, employees, information, and resources

27   in conducting his assessment and investigations, in making his reports, and in

28   pursuing his other activities under this Order.   The Sheriff shall also provide any

necessary facilities or resources to hold necessary interviews, provide appropriate notices, and/or conduct hearings.

317.   The Independent Investigator should operate as efficiently and expeditiously as possible.   He may therefore employ the four persons whose resumes he has submitted to the Court as investigators on his team.   He may, if he deems it necessary, engage additional qualified investigators to assist him in timely completing whichever investigations he deems fit.   The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses.   The Independent Investigator may enter into a contract with the County governing his services if he wishes to do so.   Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services.   The Court will resolve any disputes between the Independent Investigator and the County about what is reasonable.   Should the Independent Investigator or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

318.   The Independent Investigator is authorized to prioritize the investigations in light of what he believes to be their relative gravity and their relative merit.   In determining the extent to which additional investigation is necessary or advisable, the Independent Investigator is authorized to refer to any of the work that has preceded his appointment in this matter including but not limited to:   (1) the Court's Findings of Fact, (2) the evidence, testimony and statements offered at the evidentiary hearing or in other Court proceedings, (3) the investigative interviews conducted by the MCSO, as well as all materials generated in their underlying reports and hearings, including the reports, interviews and evidence identified by Special Investigator Don Vogel who was the MCSO's investigator in IA #2014-542 and IA #2014-543, the interviews undertaken by the Monitors, as well as the parties' responses to the Monitor's inquiries for documents and the underlying

1    discovery provided in this matter.

2  319.  The Monitor and the parties are directed to promptly comply with the Independent
3        Investigator's requests for information.   The Monitor and the Independent
4        Investigator may communicate to coordinate their investigations.   Nevertheless,
5        each is independently responsible for their respective jurisdiction set forth in this
6        Order, and each should make independent decisions within his own delegated
7        responsibility.

8  320.  To the extent that legal questions arise on which the Independent Investigator
9        needs a determination, he can apply to the Court for such a determination after
10       serving the Court and the parties with the request.

11 321.  If any other matters arise on which the Independent Investigator needs to request
12       that the Court enter an order, he may apply to the Court for such an order in
13       writing served to all the parties.   In the writing, he should specify the reason for
14       the request and the remedy sought.

15 322.  Except as otherwise indicated in this order, the Independent Investigator has the
16       sole authority to determine whether reinvestigations or new charges arising from
17       the Findings of Fact should or should not be pursued.   The Independent
18       Investigator has the right to consider the severity of the misconduct, its apparent
19       merit, the practicality of bringing charges, and the expense of pursuing such
20       charges in making this determination in accord with how such determinations
21       would be made by a responsible internal affairs unit within a police agency of the
22       similar size to the MCSO.   Similarly, with the exceptions specified, the
23       Independent Investigator has the authority to reopen investigations, pursue new
24       investigations, make preliminary findings of fact, bring charges against an
25       employee, and recommend to the Independent Disciplinary Authority that a
26       particular level of discipline be imposed.

27 323.  Any decision not to pursue charges shall be explained in writing to the parties.

28 324.  For those charges he brings to the Independent Disciplinary Authority, the

Independent Investigator shall prepare thorough reports setting forth the basis for his findings of fact and his recommended discipline.

325. To the extent the Independent Investigator's recommended findings or discipline depart from procedures set forth in this Order, or from the disciplinary matrices, the Independent Investigator shall explain the basis for his recommended departure(s) in writing.

326. Such decisions are not appealable by the parties, and they cannot be countermanded by the Sheriff or the MCSO, with the caveat that the Independent Disciplinary Authority shall make the final decision with respect to liability and discipline for all charges of misconduct brought by the Independent Investigator regardless of whether such preliminary charges are for minor or serious discipline. Nevertheless, the Independent Disciplinary Authority must provide an opportunity to be heard only to those employees who may be subject to a level of discipline that requires such a hearing.

327. To the extent the Independent Disciplinary Authority desires the Independent Investigator's presence at a pre-determination hearing, the Independent Investigator shall be present to participate to the extent directed.

328. To the extent the Independent Investigator encounters evidence of conduct that he believes should be the subject of a criminal investigation, he shall inform the Commander of the Professional Standards Bureau in compliance with ¶¶ 228–35 above. The Commander of the Professional Standards Bureau shall then report the matter directly and confidentially to the appropriate prosecuting agency. The Independent Investigator shall then coordinate the administrative investigation with the criminal investigation consistent with the manner set forth in ¶¶ 228–35 above. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Independent Investigator shall report the matter directly and confidentially to the appropriate prosecuting agency without discussing it with the Commander of Professional Standards Bureau.

## B.  The Independent Disciplinary Authority

329.  The Independent Disciplinary Authority shall be Daniel Alonso.  The Independent Disciplinary Authority shall hold hearings required by law and policy, and make liability and disciplinary determinations with respect to all charges that are brought to him by the Independent Investigator.  In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

330.  The Independent Disciplinary Authority should operate as efficiently and expeditiously as possible.  He may employ associates to the extent that they are necessary in documenting his decisions or holding pre-determination hearings.  The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses.  The Independent Disciplinary Authority may enter into a contract with the County governing his services if he wishes to do so.  Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services.  The Court will resolve any disputes between the Independent Disciplinary Authority and the County about what is reasonable.  Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

331.  The Independent Disciplinary Authority will be the final arbiter of the facts and will decide which acts of misconduct, if any, the sustained facts establish.  If the facts establish misconduct, it is the duty of the Independent Disciplinary Authority to determine the level of discipline to be imposed on the employee.

332.  Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

333.  Any legal questions that go beyond the above determinations should be forwarded in writing by the Independent Disciplinary Authority to the Court for

determination with copies to other parties.

334.   Should he deem minor discipline appropriate, he shall write the written reprimand and direct that it be placed in the employee's file.

335.   If the Independent Investigator makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, the Independent Disciplinary Authority will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

336.   Consistent with the applicable law, the Independent Disciplinary Authority shall provide notice through the Sheriff's office or otherwise to any employee who has a right to be heard.   The Sheriff shall promptly provide the Independent Disciplinary Authority with the resources, information, and access necessary to provide such notice to MCSO employees and to schedule such hearings in conjunction with the Independent Investigator.

337.   The Sheriff shall ensure that the Independent Disciplinary Authority and the members of his staff are given timely and complete access to MCSO resources, personnel, and facilities.   The Sheriff shall provide complete and full access to any other resources to hold necessary interviews, provide appropriate notices, and/or conduct hearings.

338.   Pre-determination hearings will be audio and video recorded in their entirety, and the recordings shall be maintained with the administrative investigation file.

339.   If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the Independent Investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing.   The Independent Investigator shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the

1    Independent Investigator's initial misconduct investigation.

340.   If the Independent Disciplinary Authority does not uphold the charges recommended by Independent Investigator in any respect, or does not impose the Independent Investigator's recommended discipline and/or non-disciplinary corrective action, the Independent Disciplinary Authority shall set forth in writing his justification for doing so.   This justification will be appended to the investigation file.

341.   The Independent Disciplinary Authority should apply the disciplinary matrix, and any decision not to do so shall be justified in writing.

342.   The Independent Disciplinary Authority may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

    a.  his or her personal opinion about the employee's reputation;

    b.  the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

    c.  whether others were jointly responsible for the misconduct, except that the Independent Disciplinary Authority  may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

343.   The Decisions reached by the Independent Disciplinary Authority shall be final.

344.   Except as otherwise specified in this order, no party has the right to appeal the decisions of either the Independent Investigator or the Independent Disciplinary Authority.  The Sheriff shall implement those decisions.

345.   Neither the Sheriff nor his designee has any authority to rescind, revoke, or alter any disciplinary decision made by either Independent Investigator or the Independent Disciplinary Authority by grievance decision, appeal, directive, or otherwise.

346.   Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the

imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:

a. When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance.   If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

b. A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.   As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.   As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.   In this rare

instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.

Dated this 20th day of July, 2016.

Honorable G. Murray Snow
United States District Judge