```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega Melendres,    )
     et al.,                              )
 5                                        )
                  Plaintiffs,             ) No. CV 07-2513-PHX-GMS
 6                                        )
                  vs.                     ) Phoenix, Arizona
 7                                        ) July 22, 2016
     Joseph M. Arpaio, et al.,            ) 1:04 p.m.
 8                                        )
                  Defendants.             )
 9   _____ )

10

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            BEFORE THE HONORABLE G. MURRAY SNOW

16                   (In-Court Hearing)

17

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

I N D E X

Witness:                                                    Page

                              (None)


                           E X H I B I T S

No.        Description                                  Admitted

                              (None)


                    M I S C E L L A N E O U S

Argument                                                   Page

By Mr. McDonald                                             14
By Mr. Stein                                                29
By Mr. Mitchell                                             53
By Mr. Danneman                                             59
By Ms. Wang                                                 69
By Mr. Masterson                                            70

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:
              American Civil Liberties Union Foundation
4             Immigrants' Rights Project
              By:  Cecillia D. Wang, Esq.
5             39 Drumm Street
              San Francisco, California  94111

6
              American Civil Liberties Union Foundation
7             Immigrants' Rights Project
              By:  Andre Segura, Esq. - Telephonically
8             125 Broad Street, 18th Floor
              New York, New York  10004

9
              American Civil Liberties Union of Arizona
10            By:  Daniel J. Pochoda, Esq.
              By:  Brenda Munoz Furnish, Esq.
11            P.O. Box 17148
              Phoenix, Arizona  85011

12
              Covington & Burling, LLP
13            By:  Lauren E. Pedley, Esq. - Telephonically
              1 Front Street, 35th Floor
14            San Francisco, California  94111

15            Covington & Burling, LLP
              By:  Stanley Young, Esq.
16            333 Twin Dolphin Drive, Suite 700
              Redwood Shores, California  94065

17
     For the Defendant Maricopa County:
18            Walker & Peskind, PLLC
              By:  Richard K. Walker, Esq. - Telephonically
19            SGA Corporate Center
              16100 N. 7th Street, Suite 140
20            Phoenix, Arizona  85254

21   For the Defendant Joseph M. Arpaio and Maricopa County
     Sheriff's Office:
22            Jones, Skelton & Hochuli, PLC
              By:  A. Melvin McDonald, Jr., Esq.
23            By:  John T. Masterson, Esq.
              By:  Joseph T. Popolizio, Esq.
24            By:  Justin M. Ackerman, Esq.
              2901 N. Central Avenue, Suite 800
25            Phoenix, Arizona  85012

1                        A P P E A R A N C E S

2


3    For the Intervenor United States of America:
             U.S. Department of Justice - Civil Rights Division
4            By:  Cynthia Coe, Esq. - Telephonically
             By:  Maureen Johnston, Esq. - Telephonically
5            601 D. Street NW, #5011
             Washington, D.C.  20004
6
     For Chief Deputy Gerard Sheridan and Captain Steve Bailey:
7            Mitchell Stein Carey, PC
             By:  Barry D. Mitchell, Esq.
8            By:  Lee D. Stein, Esq.
             1 Renaissance Square
9            2 North Central Avenue, Suite 1900
             Phoenix, Arizona  85004
10
     For Executive Chief Brian Sands:
11           Lewis, Brisbois, Bisgaard & Smith, LLP
             By:  M. Craig Murdy, Esq.
12           2929 N. Central Avenue, Suite 1700
             Phoenix, Arizona  85012
13
             Wilenchik & Bartness, PC
14           By:  John Wilenchik, Esq.
             2810 N. 3rd Street, Suite 103
15           Phoenix, Arizona  85004

16   For Michele Iafrate:
             Lewis Roca Rothgerber Christie, L.L.P.
17           By:  Dale A. Danneman, Esq.
             201 E. Washington Street
18           Suite 1200
             Phoenix, Arizona  85004-2595
19
     Also present:
20           Chief Robert Warshaw, Monitor
             Commander John Girvin, Deputy Monitor
21           Chief Raul Martinez, Deputy Monitor
             Sheriff Joseph M. Arpaio
22           Chief Deputy Gerard Sheridan
             Michele M. Iafrate, Esq.
23


24


25

1                    P R O C E E D I N G S

2

3              THE COURT:  Please be seated.

4              THE CLERK:  This is CV 07-2513, Melendres, et al., v.

5      Arpaio, et al., on for in-court hearing.                        13:04:38

6              Counsel, please announce your appearances.

7              MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

8      of the ACLU for plaintiffs.

9              THE COURT:  Ms. Wang, good afternoon.

10             MR. YOUNG:  Good afternoon, Your Honor.  Stanley        13:04:47

11     Young, Covington & Burling, for plaintiffs.

12             THE COURT:  Good afternoon.

13             MR. POCHODA:  Good afternoon, Your Honor.  Dan Pochoda

14     and Brenda Munoz Furnish of the ACLU of Arizona.

15             THE COURT:  Good afternoon.                             13:04:59

16             MR. MASTERSON:  Good afternoon, Your Honor.  Justin

17     Ackerman, Joe Popolizio, and John Masterson for Joe Arpaio and

18     the individual contemnors.

19             THE COURT:  Good afternoon.

20             MR. McDONALD:  Good afternoon, Your Honor.              13:05:07

21     Mel McDonald appearing specially for Sheriff Joe Arpaio.

22             MR. MURDY:  Good afternoon, Your Honor.  Craig Murdy

23     on behalf of retired Chief Sands.

24             MR. STEIN:  Good afternoon, Your Honor.  Lee Stein and

25     Barry Mitchell appearing for Chief Deputy Sheridan and Captain  13:05:21

1    Steve Bailey.

2         MR. DANNEMAN:  Dale Danneman on behalf of Ms. Iafrate,

3    Your Honor.

4         MR. WILENCHIK:  Good afternoon, Your Honor.  John

5    Wilenchik specially appearing on behalf of Brian Sands.          13:05:31

6         THE COURT:  Do we not have Mr. Walker here, or anybody

7    here from Mr. Walker's office?

8         MR. WALKER:  Your Honor, this is Richard Walker.  I'm

9    calling in telephonically.

10        THE COURT:  Thank you, Mr. Walker.                           13:05:45

11        Who else is on the phone?

12        MR. SEGURA:  Good afternoon, Your Honor.  Andre Segura

13   of the ACLU for the plaintiffs.

14        MS. PEDLEY:  Good afternoon, Your Honor.  This is

15   Lauren Pedley from Covington & Burling for the plaintiffs.        13:05:55

16        MS. COE:  Good afternoon, Your Honor.  This is Cynthia

17   Coe and Maureen Johnston for the United States.

18        THE COURT:  All right.  Thank you.

19        This is the time that we had set forth that I had

20   indicated I would hear from those nonparty contemnors about       13:06:11

21   whether or not I should file criminal contempt charges.

22        Yesterday, however, I did send out notice to the

23   parties that I was interested in discussing, at least briefly,

24   the stipulated judgments that I received on the compensation

25   matters, and that's what I would like to raise first.  I think    13:06:29

 1    that we can raise it and dispose of it fairly quickly, and then

 2    we can hear from those who want to be heard on the contempt

 3    charges.

 4            I want to be sure that I understand a couple of things

 5    that are a little bit related both to defendants' separate                13:06:47

 6    proposal and plaintiffs' separate proposal for the compensation

 7    process for those who were victims of the contempt, so I'll

 8    just ask the questions and I'll get the answers.

 9            Are you who I'm asking, Ms. Wang, or am I asking

10    Ms. Pedley?                                                                13:07:09

11            MS. WANG:  Ms. Pedley, Your Honor.

12            THE COURT:  All right.  Ms. Pedley, did you do most of

13    your work with Mr. Walker on this case?  Are you the two that I

14    should be talking to?

15            Mr. Walker, did you work with Ms. Pedley on this case?            13:07:22

16            MR. WALKER:  Yes, Your Honor.

17            THE COURT:  All right.  So under the defendants'

18    proposal, it looks to me like it only applies to those who were

19    either actually arrested or at least their detentions lasted

20    longer than 20 minutes, whether or not you want to characterize          13:07:41

21    that as an arrest, is that correct?

22            MR. WALKER:  That's correct, Your Honor.

23            THE COURT:  And it also looked to me like under your

24    proposal there would be the initial $500 for the first 20

25    minutes, and then it would be $35 for every 20 minutes                    13:07:57

1   thereafter for as long as they were in the MCSO custody, and

2   $35 for every 20 minutes thereafter if they were in Border

3   Patrol or ICE's custody, up to a period of 24 hours in Border

4   Patrol or ICE's custody, is that correct?

5           MR. WALKER:  Yes, Your Honor, that's correct.                13:08:17

6           THE COURT:  So if -- you know, if they stayed in

7   Maricopa County custody for three days, there wouldn't be the

8   limit, the time limit, but the time limit would start when they

9   were transferred to Border Patrol and ICE, and then there would

10  only be reimbursements for the maximum 24 hours?                    13:08:36

11          MR. WALKER:  Yes, Your Honor.  And the rationale is we

12  have potential intervening causes if there's a delay from ICE

13  or CBP's going through whatever hoops they decided to go

14  through before releasing the individual.

15          THE COURT:  All right.  Now, some of that, it seems to      13:08:57

16  me, transfers over to both proposals.  In other words, there's

17  no limit on the MCSO custody, but there is a time limit, at

18  least in the defense, on Border Patrol and ICE, but there's no

19  limit in either plaintiffs' or defendants', is that correct?

20          MS. PEDLEY:  That's correct, Your Honor.  Detentions        13:09:20

21  by federal agencies, we believe the cutoff point would be when

22  the proximate causation is ended, as that would be by

23  independent intervening act by one of the federal agencies.

24          THE COURT:  Well, I understand that, but I guess I'm

25  going to rule this way after asking this question.  And          13:09:37

1    Ms. Pedley, I'm going to ask it to you.  And if you're

2    uncomfortable answering it, you can transfer it to Mr. Young or

3    Ms. Wang or whoever else you think can answer it.

4          I've indicated from long before you were involved in

5    this matter that I -- while in a civil contempt proceeding I          13:09:53

6    could award compensation, I was concerned because I could

7    not -- there appears to be some delineation in the cases

8    between compensation and damages.  And so I would deal with the

9    parties to the extent they could arrive at an agreement on most

10   issues, and you have done that.                                       13:10:18

11         It seems to me that the only issue on which there

12   remains substantial disagreement -- well, let me back up.  You

13   asked my opinion on a number of matters a couple of months ago.

14   I gave you my opinion.  I clarified that that was only my

15   opinion.  You've accepted my opinion, or the parties seem to         13:10:33

16   have agreed and accepted my opinion on most things, but still

17   have not accepted my opinion about the base rate of damages.

18   There appears to be disagreement.

19         I guess I want to know:  What evidence is there in the

20   record on which I can enforce my view about what an appropriate     13:10:52

21   rate of reimbursement is?  I mean, the parties haven't

22   stipulated that I could decide that question.  There doesn't

23   seem to be any evidence that I could rule on that question.  It

24   just seems to me like you're asking me to kind of pull a

25   number out of my hat.                                                13:11:07

1      MS. PEDLEY:  Well, Your Honor, our view is that we did

2   take your suggestion from the May 31st hearing and reduce the

3   rate accordingly from our initial request.  The number that we

4   came up with was based off of the chart that we created and

5   submitted as tab 6 in our May 27th filing.  And so we perused          13:11:25

6   other and researched other settlements in others types of cases

7   that -- and awards based on awards on unlawful detentions

8   and --

9      THE COURT:  Well, I appreciate that you may have done

10   that, but where is there evidence in the hearing on which I can       13:11:48

11   base a determination about what a reasonable rate of

12   reimbursement is?

13      MS. PEDLEY:  Well, we know that these detentions

14   occurred, and so we would submit --

15      THE COURT:  Again, I don't question that at all, and I          13:12:05

16   guess my question is this:  To the extent that the parties have

17   worked an agreement out and they haven't agreed on the funds

18   and the agreement is that process is voluntary, do you want me

19   to enter what the defendant proposes, or do you want me to

20   enter nothing at all and let the parties pursue their rights        13:12:27

21   under whatever other rights they may have?

22      It seems to me this is an alternative they may have

23   which may be easy and cost effective, but it relies upon the

24   agreement of the parties, and we only have an agreement of the

25   parties as it relates to the County's rate, not yours.            13:12:46

1          Do you understand my question?

2          MS. PEDLEY:  I understand, Your Honor.

3          Just a moment, please.

4          (Pause in proceedings.)

5          MS. PEDLEY:  Your Honor, I think based off of the          13:13:07

6    number that you suggested was fair, given the egregiousness of

7    the violation --

8          THE COURT:  I understand that --

9          MS. PEDLEY:  -- that would be why we would ask for the

10   $1500 base rate and $200 for the 20 minutes thereafter.          13:13:20

11         THE COURT:  All right, but let me get -- let me get to

12   the real heart of my question, Ms. Pedley, and that is:  How do

13   I have the authority to decide what's fair?

14         MS. PEDLEY:  Well, this is based on the remedies for

15   civil contempt.  This would be a remedial fine, so -- as          13:13:36

16   opposed to any sort of coercive fine.  So the remedial fine is

17   within the power of the Court to order it.

18         THE COURT:  So could I have the ability to order

19   $100,000 for each detainee?

20         MS. PEDLEY:  Well, no.  It needs to be -- it needs to          13:13:59

21   be tied to what the person experienced, and so --

22         THE COURT:  And so you --

23         MS. PEDLEY:  -- time frame we believe that entering an

24   order is within the Court's remedial powers of the -- of the

25   rate, and we think that, based off of the research that we've          13:14:11

1    done and the case law that we've submitted as tab 6, that the

2    numbers we have submitted more adequately represent what is

3    tied to each individual case and individual detention based on

4    the time frame alone and not based on additional harms they may

5    have suffered.                                                              13:14:33

6            THE COURT:  Anybody else want to be heard on this?

7            MR. WALKER:  Your Honor, this is Richard Walker.  If I

8    could, I'd like to make a comment.

9            THE COURT:  You certainly may.

10           MR. WALKER:  The respective rates, I think just to put      13:14:45

11   them in perspective -- and I hope I did the math correctly; I

12   think I did -- on an annualized basis, the plaintiffs' proposal

13   would be providing compensation to an individual at a rate of

14   about $5,250,000 a year.  Even under the County's proposal, the

15   annualized rate is about 920,000.  And we think that's actually    13:15:15

16   a very ample form of compensation, and we think anything above

17   that gets excessive.

18           THE COURT:  Anybody else want to be heard?

19           MR. YOUNG:  Your Honor, I think we submitted our

20   proposal based on the earlier discussions that we had with Your    13:15:39

21   Honor, which I understand were simply thoughts and opinions and

22   not orders at that time.

23           I think we have a little more clarity now as to Your

24   Honor's thinking, and with the benefit of that it may be that

25   on the plaintiffs' side we will want to have some further          13:15:55

1  discussions and a chance to think about, if we're limited to

2  those choices, which of them we would prefer that Your Honor

3  adopt.  So with Your Honor's leave, we'd like to take a little

4  bit more time after today to discuss that issue among ourselves

5  and with our clients.                                    13:16:16

6           THE COURT:  I'll consider that, Mr. Young, and I'll

7  consider it during the course of the hearing.  But it really

8  doesn't -- I'll just offer what I think, as long as I've done

9  that freely.  I don't know what disadvantage there is to your

10 clients to me entering the proposal that -- that is the minimal  13:16:35

11 agreement.  It seems to me that nobody's bound to take it.

12 They can all file their own suits independently of that.

13           Yes, they can, Mr. Pochoda.  Have you read it?

14           MR. POCHODA:  It's my understanding that once they opt

15 into this process they can't opt out.                    13:16:57

16           THE COURT:  Right, but there's nothing that makes them

17 opt in.

18           MR. POCHODA:  No, but you're saying wait until you see

19 what moneys are --

20           THE COURT:  No, I was certainly not saying that.  13:17:06

21           MR. POCHODA:  Okay.  All right.  I misunderstood.

22           MR. YOUNG:  Well, that further clarification's also

23 helpful, Your Honor.  But I think we -- and perhaps we can do

24 it during the afternoon break, but I think it would be helpful

25 from our standpoint and much appreciated if we could at least  13:17:20

1   have a little bit more time for us to discuss that issue among

2   ourselves.

3          THE COURT:  All right.

4          MR. YOUNG:  Thank you.

5          THE COURT:  Mr. McDonald.                                    13:17:30

6          MR. McDONALD:  Your Honor, I thank you for this

7   opportunity.  I first took my chair 18 months ago, never

8   thought this day would come, and at the end of the discussion

9   today I hope the thoughts that I share with you and the

10  feelings that I express will be accepted by you.               13:18:04

11         As I have anguished over what to say to the Court, I

12  came to one clear conclusion, and that is to me it would be

13  non-meaningful to go through and to try to challenge your

14  findings of fact.

15         THE COURT:  I agree.                                        13:18:25

16         MR. McDONALD:  For purposes of this, they're given,

17  and I'm going to accept it, and if it was ever to be challenged

18  it would have to be in a criminal contempt hearing.

19         THE COURT:  That, I think, is a wise way to proceed.

20         MR. McDONALD:  Good.  The area that I'm coming to,         13:18:38

21  Judge, when I look at your findings, there is no doubt that

22  under the findings, if you made the decision to refer, that the

23  mens rea, the willfulness and knowingness, is there.  So my

24  purpose today is to try to convince you, even with the findings

25  you have, which I'm not disputing today, that that is not the    13:19:00

1   way to go, to make a criminal referral.

2           One thing I'm convinced on, Judge, as I've sat through

3   this process, is that I am convinced that you want to see the

4   process succeed.  You've been on this thing for way longer than

5   I've been on it, and --                                    13:19:22

6           THE COURT:  Yeah, and it looks like I'll be on it for

7   a lot longer, too.

8           MR. McDONALD:  I was going to say that, but I will be

9   talking about that, that I hope I'm alive by the time it ends.

10  It's been going on for years and years and years.  And a lot of   13:19:32

11  what I've seen has been progress.  There are six reasons that

12  I'd like to suggest to the Court why you defer making a

13  referral.

14          I've talked about the first in my pleadings.  The

15  sheriff's career of public service at his age and the positive   13:19:52

16  things that he's done with his life.  I think those things are

17  worthy of consideration.  I don't clearly think they're

18  dispositive, but I think they're important.  This is, in his

19  remarkable career, this admission of civil contempt is a

20  considerable blemish on an otherwise admirable career.  So that   13:20:14

21  is one factor.

22          Second -- and this, to me, is one of the most

23  compelling.  I read your order the other day, two days ago, and

24  I looked at the revised order today.  Judge, as I've studied

25  your orders, there has got to be hundreds, if not thousands, of   13:20:38

1    hours of work that have gone into that, and the thing that

2    caught my eye is the direction to the sheriff to remedy the

3    future:  You've got 30 days to submit this, you've got 90 days

4    to submit this, another 90 days to submit this.

5            What that tells me, Judge, is there is a continuing            13:21:00

6    obligation on the sheriff, and my great concern would be that

7    if you made a referral today, the resources that he would give

8    in working with Masterson and Popolizio and Justin Ackerman

9    would be such a strain and a burden.  I'll give you an example.

10           All week long I was trying to get ahold of the three          13:21:25

11   to work with me to talk to me about the argument I'd be giving

12   today.  All of them were tied up working with the monitors.

13   They had a very fruitful meeting with the monitors.

14           THE COURT:  That's where they should be tied up.

15           MR. McDONALD:  Yes, and they have been, and I think --         13:21:42

16   so the second point I want to address is that.

17           Third point is, in my view, referring the criminal

18   contempt would almost undermine the directives you've given

19   today and two days ago.  If you've got the sheriff fighting in

20   one field on the criminal contempt and you've got directives in      13:22:06

21   the other, I think it is self-defeating.

22           Four, Judge, I think the concessions that he made at

23   the very beginning of this case last April, the acknowledgment

24   and the apologies were significant.

25           THE COURT:  Let me tell you, do you want my concerns          13:22:27

1    as you go along, or do you -- or would you rather just give me

2    your presentation?

3            MR. McDONALD:  Obviously, you run the show here,

4    and --

5            THE COURT:  Let me tell you, and this pertains --          13:22:39

6            Mr. Stein, are you going to do the arguing as it

7    pertains to Chief Deputy Sheridan?

8            MR. STEIN:  Yes.

9            THE COURT:  This really pertains to both of them.  One

10   of the things that I have thought as this matter has gone along   13:22:49

11   is:  Have the civil contempt remedies that I have imposed, or

12   the knowledge that there was going to be a civil contempt

13   proceeding, changed the conduct of Chief Deputy Sheridan and

14   Sheriff Arpaio in a way that I think is productive?  And you

15   know the answer to that, Mr. McDonald, and it's my primary       13:23:09

16   concern.

17           Chief Deputy Sheridan and Sheriff Arpaio lied in the

18   contempt hearing.  They lied about things that I asked about

19   directly.  They lied to my face.  They lied not only to me, but

20   they lied to internal investigators that were investigating      13:23:25

21   this thing.

22           If I'm going to be sitting over this thing for years

23   and I've already invested a ton of time, why isn't it to my

24   benefit to let them know, assuming that they're going to be in

25   charge of Maricopa County Sheriff's Office for a while, that I    13:23:38

1   am through putting up with that kind of stuff and they are

2   going to be as responsible for what they do here as any other

3   citizen of Maricopa County or anybody else is for what they do?

4          MR. McDONALD:  Judge, I thought without question --

5   and I get the message, and this why I think the proof is in the          13:23:59

6   pudding -- I think if you were to talk to Chief Warshaw or to

7   talk to others connected with the Monitor Team, I think a new

8   attitude has been brought into this case.  Of the three initial

9   areas for the preliminary injunction, your findings already

10  indicated that that has been successful, or at least there's          13:24:22

11  always going to be an ongoing concern that at least the first

12  element was satisfied --

13          THE COURT:  Which is?

14          MR. McDONALD:  The preliminary injunction.  Your

15  finding in the order of May 13th you talked about, I think it          13:24:33

16  was like number 834 or something where you said the plaintiffs

17  did not allege nor did you find that the issue that

18  precipitated this hearing in 2011, issues relating to the

19  preliminary injunction had been cured.  I can find that

20  quote --          13:24:57

21          THE COURT:  No, no, I know what you're talking about,

22  and I will tell you I don't know if you've been listening in on

23  the past proceedings, but plaintiffs have now determined that

24  in fact there have been continuing violations -- or I shouldn't

25  say they've been determined; it is alleged, at least, that          13:25:09

 1   there are continuing violations of that injunction that they

 2   have wanted to bring before me.

 3           MR. McDONALD:  Judge, I will say this.  We've got a

 4   department of approximately 750 personnel.

 5           THE COURT:  You mean patrol personnel.                    13:25:25

 6           MR. McDONALD:  Yeah, MCSO, I'm talking about patrol --

 7   patrol-type people out there that are being involved.

 8           THE COURT:  Um-hum.

 9           MR. McDONALD:  You and I both know that it will be

10   impossible to guaranty to this Court or to anybody that out    13:25:37

11   there there may not be a deputy that violates an order.  And I

12   don't pretend to suggest that along the way there are not going

13   to be violations, and those violations must be dealt with

14   sternly.

15           I think the program that you've implemented, though --  13:25:55

16   the training and the protocols and the education and the

17   process that we're going through now -- is absolutely pivotal.

18   And our responsibilities -- I think one of the great shortfalls

19   in this case has been the commitment over the years to lawyers

20   to monitor and to make sure that the process is complete.       13:26:25

21           When you talk about number 2, the disclosure,

22   disclosures are integrally involved with the lawyers in the

23   case.  They've got to be involved in that.  When we've been

24   meeting with the monitor, Mr. Popolizio and Mr. Masterson, they

25   have got to respond to what the monitors are requesting, or to  13:26:46

1    the plaintiffs, and I think what they have --

2            THE COURT:  That has hardly been exemplary, even since

3    I noticed the contempt hearing, either.

4            MR. McDONALD:  I'm sorry?

5            THE COURT:  I've noticed a number of times in a                    13:27:00

6    number of orders, some of which you may hear again in questions

7    to you, that I entered that have been ignored even since the

8    contempt hearings were noticed.

9            MR. McDONALD:  Well, Judge, I can only suggest to you

10   from what I've seen personally with the commitment of the              13:27:18

11   people that are on the civil end of this litigation, they are

12   putting in hours and hours day after day after day to comply

13   with the requests of the plaintiffs and the requests of the

14   monitors.  I believe that there's a positive new attitude here

15   that I think has actually been invigorated, and I think if you       13:27:40

16   have any question, ask the monitors privately if they haven't

17   seen a difference in all that is happening now, and that it's

18   happening with the direction and approval and authority of the

19   sheriff and Chief Sheridan.

20           I would just like to, Judge, if I could, talk about          13:28:05

21   the institution -- the implementation of what happened after

22   your May 13th order, if I could.  In fact, I need to --

23           (Pause in proceedings.)

24           MR. McDONALD:  Since the May 13th order in the area of

25   operations and policy, there's nine categories of improvements       13:28:34

1    that have been made.  They've evaluated and realigned first

2    line supervisors in order to provide better leadership,

3    guidance, and oversight.  They've evaluated specialized units

4    and reorganized them to provide better services to the citizens

5    and oversight to the office.  They've evaluated team members of      13:28:55

6    special units and made personnel changes to reflect the goals

7    of the office.  They've reviewed and revised Sheriff's Office

8    policies and procedures.  On December 15, 2014, MCSO

9    voluntarily enjoined itself from investigating identity theft

10   for the purpose of gaining employment.                              13:29:20

11            Your Honor, these lists go on and on.  I've got seven

12   pages.  In preparing this argument I asked the Sheriff's

13   Office:  Show me what you've done since the 13th.

14            THE COURT:  13th of what?  This year?

15            MR. McDONALD:  Since the injunction of May 2013.           13:29:36

16            THE COURT:  May 2013.

17            MR. McDONALD:  Yes.

18            THE COURT:  Well, all of that was done in response to

19   my order, wasn't it?

20            MR. McDONALD:  No question.  No question.  Your Honor,      13:29:48

21   I think when you look at contempt, though, if the sheriff and

22   chief deputy are defying that order, the way they show defiance

23   is they ignore it; tell people, Don't do it.

24            THE COURT:  Maybe they appoint Chief Olson to rule on

25   Chief Sheridan's discipline.                                        13:30:04

1          MR. McDONALD:  I'm sorry?

2          THE COURT:  Maybe they appoint Chief Olson to rule on

3    Chief Sheridan's discipline.  Isn't that a pretty effective

4    way -- they stood here -- and I've got the transcript right in

5    front of me.  They stood here in May 2014 on the day they told          13:30:14

6    me about Armendariz's investigation and they told me that they

7    would fully investigate and discipline, and it didn't matter

8    who or how high up it went, they would see that there was full

9    investigation and discipline.  Well, I spent a long time

10   unraveling everything to find out they did precisely not do          13:30:36

11   that.

12         MR. McDONALD:  What I can tell Your Honor --

13         THE COURT:  I'm going to direct -- let's see.  "The

14   sheriff and the chief are absolutely committed to seeing the

15   truth out, whatever it may be, and holding any and all persons          13:30:56

16   responsible, whatever might be the outcome."

17         Did they do that?

18         MR. McDONALD:  Judge, as I told you at the beginning

19   of this hearing, I'm not here to try to dispute the facts with

20   you; I'm trying to look prospectively for the future.  You've          13:31:11

21   laid out criteria two days ago and again today that are

22   guidelines that must be followed.  I can tell you that myself

23   and the other attorneys are going to push and shove and make

24   sure that that's accomplished.

25         I don't for a moment, Judge, intend to or pretend to          13:31:31

```
 1   try to argue if things could have been different -- done

 2   differently.  Of course they could.  And were mistakes made?

 3   Yes, and apparently glaring mistakes.  And I know and I've seen

 4   and understood the frustrations of the Court.

 5         My belief has been at the very core of this is you've       13:31:49

 6   got to get a team, and I think the team has been assembled that

 7   is going to work with the Sheriff's Department to make sure

 8   that the monitor's requests and the discovery requests, and,

 9   most importantly, the court directives are met.

10         THE COURT:  Let me just say that I don't have, at           13:32:07

11   least to date, any basis to complain about you or Mr. Masterson

12   or Mr. Popolizio or Mr. Ackerman.  That doesn't mean I wouldn't

13   develop such a basis, but I don't have one now.  But it's

14   really not a question of whether or not I bring them up for

15   criminal contempt.                                                13:32:22

16         MR. McDONALD:  Judge, let me -- I apologize.  I didn't

17   mean to interrupt you.

18         THE COURT:  That's all right.

19         MR. McDONALD:  Let me give you an example of what I'm

20   talking about.  When you came down with your order on December   13:32:32

21   23rd, 2011, the preliminary injunction, I think probably any

22   attorney out there when they got that order would want to make

23   sure that that order is implemented, the training begins, that

24   the process goes.

25         What do we find in this case?  And the record shows it     13:32:51
```

1    unmistakably.  Sousa contacted Palmer and said:  Draw up the

2    questionnaires.  We've had e-mails going to the then-attorney

3    in January and they sat for five weeks --

4        THE COURT:  But Sousa also told Mr. Casey that they

5    weren't violating the injunction.                              13:33:10

6        MR. McDONALD:  I'm sorry?

7        THE COURT:  Sousa also told Casey that they weren't

8    violating the injunction.  Sheriff Arpaio also told Casey MCSO

9    wasn't violating the preliminary injunction, that they weren't

10   doing anything that violated the preliminary injunction.       13:33:22

11   That's what the record shows.  That was not refuted by

12   Chief Sands.  That's what the record shows.

13       MR. McDONALD:  Judge, I think a lot of it may deal

14   with the education that they were being given, and I referred

15   in my paperwork to the Casey letter that he wrote to Mr. Segura 13:33:39

16   at the ACLU.  I know that Your Honor voiced a great concern

17   with the sheriff's backup plan, and yet three weeks before, or

18   three weeks -- in the proximity of three weeks, the Casey

19   backup plan was being given to Mr. Segura.

20       If you look at your lawyers and you're being told and   13:33:58

21   assured that this is okay, that you can -- if ICE turns you

22   away that you can call the Border Patrol, and it's in the

23   correspondence --

24       THE COURT:  Mr. McDonald, that isn't -- I mean, I know

25   we promised we weren't going to argue the facts, but what      13:34:11

 1    you're telling me aren't the facts.  We had Mr. Casey here.

 2    Mr. Casey testified that he told Sheriff Arpaio that, in his

 3    opinion, was a violation of the preliminary injunction, that he

 4    would do his very best to craft an argument based on facts the

 5    sheriff told him -- which turned out to be not true -- that it          13:34:29

 6    wasn't a violation of the preliminary injunction.

 7         So, I mean, it is kind of an attorney's job to make a

 8    silk purse out of a sow's ear, isn't it?  And isn't that what

 9    Mr. Casey was trying to do?

10         MR. McDONALD:  Well, I guess that's something that          13:34:44

11    Mr. Casey talked about, addressed.  I just think, Your Honor,

12    when I've heard the claims when he said arrest or release,

13    there's so many witnesses on this witness stand that didn't

14    hear that.  And I think under the circumstances Mr. Casey had

15    some concerns about his own performance.  And a lot of times he          13:35:05

16    may say, Well, the sheriff told me this and the sheriff told me

17    he didn't.

18         THE COURT:  Well, I mean, the sheriff himself doesn't

19    contest that Mr. Casey told him these things in his testimony.

20    I've laid all that out in the findings of fact and I spent a          13:35:18

21    considerable amount of time making sure that I was right.  I

22    mean, I'm not saying that I'm flawless, but I looked at those

23    things pretty carefully, because they made a big difference to

24    me.

25         MR. McDONALD:  Judge, in looking at the order, I          13:35:33

 1   would -- I mean, I often wondered if anybody could equal Victor

 2   Hugo and Les Miserables for length and precision.  You've done

 3   it.  And I'm not here, as I told you -- the last thing would be

 4   to challenge you on the facts, because you've made the findings

 5   and that's going to another forum.                                13:35:51

 6        Judge, I come down to this point.  I look at it most

 7   sincerely.  Through this progress I know that there's a lot of

 8   anger that the Court feels at this time.

 9        THE COURT:  I don't think that's true.

10   Disappointment, for sure.                                         13:36:08

11        MR. McDONALD:  Okay.  And really, I hope that's more

12   what it is is disappointment and not anger.  My desire to try

13   to convince you is that -- and I told you this at the

14   beginning -- I believe you want to see the change.  I think you

15   would like to be here for the day that the monitors are able to  13:36:26

16   go home.

17        All I can tell you -- and I've sat in on the meetings

18   as we've discussed, before we come to court, the ways we're

19   going to proceed -- I know that the sheriff and Sheridan have

20   apologized.  They've acknowledged mistakes, things happened on   13:36:45

21   their watch, I know what you believe has been dishonesty on

22   both of their parts.  I think at the end of the day, the

23   discretion obviously lies with you.

24        When I look at the progress that has been made -- and

25   Judge, there are pages after pages in the Operations Bureau, in  13:37:05

1    the Implementation CID Unit.  I've got page after page: the

2    training, community outreach, patrol operations, data

3    collection --

4         THE COURT:  What do I do about the monitor's

5    assessment of where your clients stand in terms of compliance          13:37:23

6    three years after I entered the orders?

7         MR. McDONALD:  Judge, it's been an evolving process.

8    You look at Oakland, Chief Warshaw I think has been there for

9    10 years.  As I look at the different quarterly reports, I

10   think there's progress being made in the directives that you          13:37:41

11   gave even two days ago and today.

12        There's some daunting responsibilities that lie ahead.

13   There are some enormous challenges that the sheriff, chief

14   deputy, and the other operations team, I believe with all my

15   heart that they want to regain the trust of the Court.  I             13:37:59

16   really believe that.  I think that they have gotten people in

17   place that have been absolutely impressive.

18        I was talking to Lieutenant Armer for hours preparing

19   this argument.  He's the one that put together these facts.  He

20   has got some bright -- the sheriff has some bright, dedicated         13:38:19

21   people in task right now and Your Honor, he realizes the

22   gravity of the situation.  I don't think in the twilight of his

23   career, of his 84th year of life, he wants to be remembered,

24   even if he were to take it to trial and succeed, would not want

25   to be remembered for --                                              13:38:39

1    THE COURT:  Well, he's certainly entitled to do just

2  that, and he may well succeed, if in fact I order up contempt.

3  But he's entitled then to the same procedural rights everybody

4  else is, right?

5    MR. McDONALD:  Oh, of course.  Of course.  If you made    13:38:50

6  the referral, it would go to trial.  So much attention that

7  could otherwise be put in on this would be diverted there.

8    Judge, I think, quite candidly, you have the best of

9  both worlds by not making the referral.  In the order that I

10  was reading today, there are some obligations and guidelines on    13:39:09

11  the sheriff; deadlines, if you will.  And your continuing

12  oversight and the potential for contempt is there.  I think by

13  waiting and seeing and, in fact, the pledge that I'm making to

14  you that they are going to do their very best to follow and

15  honor this Court in its order, let them prove it to you.    13:39:36

16    I think the other direction, referring them for

17  criminal contempt today would defeat the very object that

18  you're trying to do by taking them away from the people that

19  are doing the civil end and shifting it over to myself and

20  Mr. Stein and Mr. Mitchell.  Give them the opportunity to prove    13:39:56

21  it to you.

22    I noticed when you were talking the other day you made

23  the comment in court about the desire to see this operation go.

24  You've set some daunting guidelines, and there's going to be an

25  enormous resource put into that, but I hope and trust that you    13:40:17

```
 1    will give them that opportunity.
 2             I think to carry out your vision of the changes you
 3    want to see can best happen by allowing them to prove to you
 4    that they're going to do what you've expected and ordered them
 5    to do, and I guess what they're saying is they've apologized to      13:40:38
 6    the Court, they're asking for your forgiveness, and to accept
 7    their promise that they're going to go forward.
 8             THE COURT:  Thank you, Mr. McDonald.
 9             MR. McDONALD:  Thank you.
10             THE COURT:  Mr. Stein.                                       13:40:56
11             MR. STEIN:  Your Honor, I'm going to start with the
12    question that you asked Mr. McDonald, and that was whether the
13    threat of these proceedings had the effect of modifying the
14    behavior in this case.  And I don't think that you and I are
15    going to ever agree whether Chief Sheridan lied to you or not,      13:41:35
16    and --
17             THE COURT:  I would hope that would be true, since
18    you're his counsel.
19             MR. STEIN:  Well, I'm going to try to -- try to
20    approach the facts rationally and --                                 13:41:46
21             THE COURT:  Don't bother arguing the facts; it won't
22    be helpful to your case.
23             MR. STEIN:  So we're not going to agree on whether he
24    lied to you.  We're also not going to agree, probably, on
25    whether his conduct was modified.  But I think the place that       13:41:59
```

1   we can agree is that the remedies that you are imposing in this

2   last week are going to have the effect of modifying behavior.

3   He is going to be subject to a number of investigations for

4   untruthfulness as a result of your order.

5          THE COURT:  Are you saying that he and the County and      13:42:19

6   the sheriff and Chief Sands are not going to appeal my order,

7   are not going to contest my order?

8          MR. STEIN:  I'm not saying that at all.

9          THE COURT:  Okay.

10          MR. STEIN:  That's not my -- that's not my decision;      13:42:29

11   that's not my --

12          THE COURT:  I get it.

13          MR. STEIN:  But what I do know is that the Court has,

14   as it stands now, has imposed civil remedies that are going to

15   result in investigation, a number of investigations of Chief      13:42:43

16   Sheridan for untruthfulness.  And those will be conducted not

17   by the Sheriff's Office, but by an independent authority that

18   the Court has appointed that was recommended by the parties,

19   and the consequence for those, if he's found responsible on

20   those investigations, will be his termination.  That is a -- I      13:43:03

21   can hardly think of a more effective remedy, and one that will

22   make -- that will have the effect of modifying behavior.

23          THE COURT:  I would agree that that has that

24   potential, but what does that do to address his intentional

25   misstatements under oath on the stand?      13:43:22

1    MR. STEIN:  That actually is addressing very directly

2    what you characterize as misstatements on the stand.  That is

3    the subject of some of these investigations.

4    THE COURT:  Is it?

5    MR. STEIN:  Is it not?                                      13:43:34

6    THE COURT:  Have you read my order?

7    MR. STEIN:  You know, I -- I have tried to, and I

8    believe I have.  And I believe that some of the investigations

9    that you have directed or identified relate to his testimony on

10   the stand.  If I'm mistaken on that, I apologize.           13:43:52

11   THE COURT:  Well, certainly they're not mandatory, and

12   they -- if I've read my order correctly, if I understand it

13   correctly, the sheriff will not have returned vested in him the

14   power to conduct investigations relating to the members of the

15   plaintiff class until he's running an Internal Affairs decision  13:44:17

16   that fully and fairly investigates all claims of misconduct

17   against everybody.

18   But I have not reserved the power to force his -- to

19   force him to be reinvestigated for matters that don't involve

20   the members of the plaintiff class.  In other words, they can   13:44:38

21   make the choice, so long as they want to have the monitor run

22   the Internal Affairs department as it pertains to members of

23   the plaintiffs' class, to continue to run the Internal Affairs

24   Division however they want and to not investigate those matters

25   of misconduct that I have set forth in my order that although   13:44:57

1    they related to the contempt of this Court did not relate --

2    did not directly relate, at least, to the rights of the members

3    of the plaintiff class.

4             Are we on the same page?

5             MR. STEIN:  I think so.                                    13:45:10

6             THE COURT:  Okay.  So you understand that I'm not --

7    there are some matters in which, according to my order, Chief

8    Sheridan's conduct will be reinvestigated; there are others

9    that that's up to him and to the sheriff.

10            MR. STEIN:  And a number of the matters that he will      13:45:27

11   be reinvestigated on relate to issues of untruthfulness.  And

12   the consequence, if he is found responsible in those

13   investigations, is his termination.

14            THE COURT:  All right.

15            MR. STEIN:  We agree with that?                           13:45:43

16            THE COURT:  I will accept your characterization.

17            MR. STEIN:  I didn't mean to be disrespectful, Your

18   Honor.

19            So let me address a couple of other points, and I will

20   try not to repeat what's in my brief.  I know it was long and     13:45:55

21   I'm sure the Court has read it.

22            A criminal contempt requires a clear and definite

23   order, willful disobeyance, and no adequate remedy civilly.

24   We've just spent a bit of time talking about the remedies.  For

25   each of the possible grounds for referral I think there's an      13:46:12

 1    element missing, and maybe more than one element missing.

 2    Let's start with the preliminary injunction.  So we're talking

 3    about holding Chief Sheridan --

 4          THE COURT:  You know what?  You don't need to make

 5    jury arguments to me; they won't work.                          13:46:24

 6          MR. STEIN:  Okay.  Let me cut to the chase.  With

 7    respect to the preliminary injunction and Chief Sheridan --

 8          THE COURT:  Right.

 9          MR. STEIN:  -- there is no evidence that he did

10    anything one way or the other.  Nobody testified about him      13:46:42

11    making a statement about the preliminary injunction,

12    acknowledging the preliminary injunction, reading an e-mail,

13    forwarding an e-mail, taking action on training, doing

14    anything, not a thing.

15          THE COURT:  Is that pretty damning?                       13:47:03

16          MR. STEIN:  For civil contempt, it is.  For civil

17    contempt, it is, but it's not evidence of willful disobeyance.

18          THE COURT:  You know, I've read all your summation of

19    facts that you put in your brief.  You've left out some pretty

20    important ones, but it's a good lawyer's job to emphasize that  13:47:26

21    that is in his client's favor, and I recognize that.  And

22    certainly Chief Deputy Sheridan is entitled to have a

23    fact-finder, and even though it doesn't have to be a

24    fact-finder other than myself, necessarily, I've indicated from

25    the start that if I notify -- if I decide to set this up for    13:47:42

1   criminal contempt it will be a fact-finder other than myself

2   determine whether or not that is the case.

3        But your arguments to me at this point, to the extent

4   you're trying to reargue my findings of fact, are not going to

5   be helpful to me.  So you can spend your time how you wish,        13:47:58

6   Mr. Stein --

7        MR. STEIN:  Right.  So I will keep that in mind.  And

8   just I will --

9        THE COURT:  -- if you have an argument that you care

10  to make, and I'll let you summarize it, but I'm not going to       13:48:14

11  give you a ton of time to do it, but there is no way that any

12  of the findings of fact I actually made as opposed to the ones

13  you recited in your brief don't give rise to probable cause,

14  then I'll hear it.

15       MR. STEIN:  What I'm ask- -- on the preliminary              13:48:30

16  injunction issue, what I'm asking the Court to consider is the

17  fact that Chief Sheridan did nothing to interfere with the

18  implementation of that order.  He didn't do anything to ensure

19  its implementation, either, and Chief Sands was responsible for

20  the implementation of that order and reported directly to          13:48:48

21  Sheriff Arpaio.

22       In the face of him actively doing something,

23  interfering in some way or taking some action, I don't think

24  this is an appropriate matter for the referral of a criminal

25  contempt.                                                          13:49:03

1           THE COURT:  All right.

2           MR. STEIN:  I do want to talk a little bit in depth

3     about the videotape collection.

4           THE COURT:  You know, let me tell you that when

5     Mr. Masterson made the argument some time ago, I thought it was          13:49:16

6     well made in terms of the clarity of the order that resulted.

7     You've repeated it, and I don't intend to notice up

8     Chief Deputy Sheridan for violating my May 14th order.  But

9     here is the problem that I see that you might want to address.

10          MR. STEIN:  Yes.          13:49:39

11          THE COURT:  You know that I've made in my findings of

12    fact that he intentionally misstated the truth to the monitor

13    when the monitor was researching what actually happened.

14          MR. STEIN:  Yes.

15          THE COURT:  There are at least three different orders          13:49:54

16    in which I've directed that the -- directed that he be

17    forthcoming with the monitor.  How are lies forthcoming to the

18    monitor?

19          MR. STEIN:  Well, when you put it like that --

20          THE COURT:  Yeah.  Pardon me.  How are intentional          13:50:10

21    misstatements of fact being forthcoming to the monitor?  That

22    is the area that I might notice up for contempt in that -- in

23    that factual scenario, but I agree, and your brief is well

24    taken, as was, I thought, Mr. Masterson's argument that while I

25    do believe that my orders were sufficiently clear, and I          13:50:28

1    believe that they were sufficiently clear for purposes of civil

2    contempt, I agree that for criminal contempt I think there's

3    enough of a lack of clarity that it's not appropriate for me to

4    notice up Chief Deputy Sheridan on that ground.  But that

5    doesn't explain his misstatements of fact to the monitor when        13:50:45

6    the monitor was trying to come to the bottom of it.

7          MR. STEIN:  And so are you referring to when the

8    monitor comes back for the meeting, or the letter, or both?

9          THE COURT:  Both.

10          MR. STEIN:  So let me just say, let me just start from    13:50:59

11    the point that I don't think it's entirely clear what direction

12    Chief Sheridan actually gave to Chief Trombi.  I think that's a

13    matter of some dispute.

14          THE COURT:  Well, again, to the extent that you want

15    to argue facts with me that I've already found, it's not going    13:51:16

16    to be persuasive.  If you have other matters, though, I mean,

17    if you want to make a jury argument, it's not going to be

18    helpful.  If you think that there's a legal standard that

19    hasn't been met that you'd like to argue, go ahead, in terms of

20    probable cause on a criminal contempt.                            13:51:33

21          MR. STEIN:  So I think the point that I want to make

22    with respect to his statements to the monitor is -- and I

23    know -- I know you've -- you found the facts you found what you

24    believe was told to Chief Trombi, I think it's less than

25    certain.  And just give me a minute to say it, and then I'll     13:51:58

1   move it on.

2           Chief Sheridan, at the May 14th hearing, says he gave

3   the order to Trombi to start collecting stuff the day before.

4   Casey testified that --

5           THE COURT:  Chief Sheridan didn't testify to that.      13:52:12

6           MR. STEIN:  He did.

7           THE COURT:  All right.  I'll look it up.

8           MR. STEIN:  Would you like me to --

9           THE COURT:  Sure, if you'd like to read it.

10          Maybe I'm thinking of --                               13:52:25

11          MR. STEIN:  It's page 58 of the May 14th transcript,

12   Chief Sheridan says:  "... yesterday I ordered the chief of

13   patrol, Chief Trombi, to begin to identify who has the devices

14   and to gather any information on where those videos were, and

15   if they were not in evidence, to obtain them."                13:52:39

16          THE COURT:  Oh.  You're talking about the devices that

17   were previously collected in February?  That was a February

18   order, right?  That was relating to the February inquest that

19   Chief Sheridan did that was actually relating to other matters?

20          Maybe I'm wrong.  I'll go back and look at it.         13:52:59

21          MR. STEIN:  Okay.  And so my point is that he had

22   already given some direction to Trombi to start collecting

23   devices, by the time he walked into this hearing, the day

24   before.  That's what Sheridan testified -- or said in the

25   hearing, and that's what Casey testified to as well.  Casey    13:53:16

1  says that he thought it was the day before.  He remembered it

2  an earlier time.  Tom Liddy was more definitive when they

3  testified.

4          THE COURT:  Are you talking to me about deposition

5  stuff?                                                          13:53:31

6          MR. STEIN:  I am.

7          THE COURT:  Okay.

8          MR. STEIN:  And which is copied in our brief and I

9  think you have access to.  He said that Sheridan did not give

10 Trombi a directive on May 14th, but instead at an earlier      13:53:39

11 meeting on May 12th.

12         THE COURT:  What does that have to do with telling the

13 monitor that he doesn't know who gave the directive to Chief

14 Trombi right after Chief Trombi told him:  You gave me the

15 directive?                                                      13:53:56

16         MR. STEIN:  Well, that's not actually his memory.  And

17 Stutz and Trombi --

18         THE COURT:  That was Trombi's testimony.

19         MR. STEIN:  I understand that was Trombi's testimony,

20 but both Stutz and Trombi say that it was -- that Sheridan was  13:54:07

21 unclear and confused.

22         THE COURT:  And then Chief Deputy Sheridan, on

23 November 20th, I think, acknowledged that it was him in here?

24         MR. STEIN:  Right.

25         THE COURT:  Okay.                                       13:54:25

1      MR. STEIN:  I mean, at this point we know that Trombi

2  was called to the meeting, that Trombi -- there was some

3  discussion about collecting the videos, and Trombi went back to

4  his office and sent the e-mail.  And I think what Sheridan

5  has -- Chief Sheridan has testified to is that he must have          13:54:40

6  done it because it would have been him.

7      THE COURT:  But -- okay.  I'm not going to argue it

8  with you.

9      MR. STEIN:  So my point is that the direction to

10  Trombi on the May 14th is less than clear.  And so when he          13:54:53

11  tells --

12      THE COURT:  As I've told you, I'm not interested in

13  that.  I'm interested in him intentionally making misstatements

14  of fact to the monitor.

15      MR. STEIN:  So when he tells the monitor that he's --          13:55:07

16  he's not sure and he doesn't know and he's not positive, it's

17  because he's not sure and he's not positive, and that may be

18  because that's not actually what happened.

19      And let me just make one more point about the letter.

20  Chief Sheridan's letter to the monitor could have been better          13:55:30

21  written and more fulsome, I agree with that.  It did contain

22  all the material facts.  It did confirm to the monitor that

23  MCSO had initiated a process to gather the videos that was

24  contrary to the plan developed during the meeting.  The

25  essential facts had been communicated to the monitor.          13:55:53

1         THE COURT:  What about Chief Deputy Sheridan's

2   statement to Chief Anders that he never suspended the IA

3   investigation into the 1459 videos?

4         MR. STEIN:  That's not my recollection of the

5   testimony.                                                    13:56:13

6         THE COURT:  Okay.

7         MR. STEIN:  My recollection of the testimony --

8         THE COURT:  I don't really care what your recollection

9   of the testimony is, Mr. Stein.

10        MR. STEIN:  Well, it's hard for me to respond to Your   13:56:19

11  Honor about what I think about the testimony when that's not my

12  memory of the testimony.

13        THE COURT:  All right.

14        MR. STEIN:  And so my memory of the testimony --

15        THE COURT:  My findings of fact say otherwise, right?   13:56:27

16        MR. STEIN:  I thought that your findings of fact, and

17  I could be mistaken, were that he suspended the -- that he

18  suspended the investigation.

19        THE COURT:  Yes.  That's correct.

20        MR. STEIN:  Right.  And I don't believe that Chief      13:56:43

21  Sheridan's denied suspending the investigation.

22        THE COURT:  I believe that he said -- well, I found

23  his explanation to be not credible.  And his explanation was

24  that he suspended the investigation only in part.

25        MR. STEIN:  Okay.  Okay.  But he did suspend the        13:57:07

 1    investigation, and he did -- and he did acknowledge suspending

 2    the investigation --

 3              THE COURT:  Is that your position at this point, that

 4    he did suspend the investigation?

 5              MR. STEIN:  He did.                                    13:57:20

 6              THE COURT:  All right.  And then why did he tell Chief

 7    Anders that he didn't?

 8              MR. STEIN:  Well, you're not going to like my answer.

 9              THE COURT:  Well, I'll let you give it.

10              MR. STEIN:  My answer is that he didn't tell Chief     13:57:30

11    Anders that he didn't; he said he didn't suspend it entirely.

12              THE COURT:  Okay.  If in fact you have an argument to

13    make, then maybe I'll let you make it.

14              MR. STEIN:  Okay.  So with respect to the -- with

15    respect to the IDs, and is -- may I ask Your Honor whether your  13:57:49

16    particular concern with respect to the IDs is his statement

17    about -- to Chief Anders, his statement about suspending the

18    investigation?  I want to be responsive to Your Honor's

19    concerns.

20              THE COURT:  Well, I have two concerns with when he did 13:58:06

21    what he did.  He suspended the investigation I believe because

22    he knew that there was an order that required MCSO to disclose

23    all investigations, and so he suspended the investigation on

24    the belief that that would prevent him from having to disclose.

25              And then, when there was a follow-up -- or at least it 13:58:25

1    could give rise to such a finding, and I have so found.  And

2    then, when he was confronted with that suspension by Chief

3    Anders, he didn't tell him the truth, or at least there is

4    evidence from which I could make that determination and I

5    believe I have so found there, too.                                13:58:42

6            MR. STEIN:  So --

7            THE COURT:  Those are my two concerns.

8            MR. STEIN:  Sure.

9            THE COURT:  And by the way, both of those are right in

10   the middle of the contempt hearing.  And so, I mean, when we're   13:58:53

11   talking about if a criminal referral is necessary, I'm

12   wondering, well, they were doing this right in the middle of a

13   civil contempt hearing.  How am I -- what am I left with?

14           MR. STEIN:  Well, so to take your first concern, I

15   don't think there's any doubt that Ms. Iafrate expressed          13:59:19

16   skepticism about whether the IDs were within the orders.

17           THE COURT:  Well, I'll deal with that with

18   Mr. Danneman when he comes up.

19           MR. STEIN:  Well, there are a number of people who

20   testified --                                                      13:59:35

21           THE COURT:  Well, let me ask you this:  Are you

22   claiming that Chief Sheridan did what he did based on the

23   advice of counsel?

24           MR. STEIN:  No.

25           THE COURT:  Okay.                                         13:59:46

1        MR. STEIN:  Well, I answered too quickly.  Well, Chief

2   Sheridan suspended the investigation --

3        THE COURT:  And he did that before he ever even

4   conferred with Ms. Iafrate, correct?  I believe that's what the

5   testimony is, and I've checked it, but, you know, I will let          14:00:00

6   you educate me if I'm wrong, Mr. Stein.

7        MR. STEIN:  So I do believe that Chief Sheridan

8   expressed doubts or questions about whether these IDs fell

9   within the scope of the order.  These IDs, I think we could all

10   agree, were somewhat different than other -- other evidence in      14:00:17

11   the case.  And while I concede that they are within the orders

12   of the Court, they were somewhat different.  They were

13   collected differently, and they came to the attention of the

14   MCSO differently.  And so Chief Sheridan believed --

15        THE COURT:  Let me just say that may be the case, I'm       14:00:35

16   not going to argue with you on that, but it doesn't seem to me

17   that we have the full -- we have yet to have the full

18   accounting for all of the IDs that have been found over at the

19   MCSO, right?

20        MR. STEIN:  Right.                                          14:00:46

21        THE COURT:  Okay.

22        MR. STEIN:  So he questioned whether they were -- they

23   were called for under the order.  Ms. Iafrate also questioned

24   whether they were called for under the order.

25        THE COURT:  When you say "the order," I can think of       14:00:59

 1    three orders that would have required their production.

 2            MR. STEIN:  You're right, the orders.

 3            THE COURT:  Okay.

 4            MR. STEIN:  And she expressed that view to numerous

 5    people at MCSO, that they wanted to go back and research that       14:01:11

 6    point before the IDs were disclosed.  The whole time they

 7    were -- they were secured.  An IA investigation had been

 8    commenced.

 9            THE COURT:  And suspended.

10            MR. STEIN:  And suspended, but there was a record of        14:01:22

11    that IA investigation, there was a number, and there was -- and

12    that number and that investigation would remain for all time.

13    And so somebody would be going -- would be going back and

14    seeing the list of IDs and say -- excuse me, IAs -- and say:

15    What happened to this IA?  So it's not like it's going to          14:01:40

16    disappear.

17            THE COURT:  No, but we were in the middle of the

18    contempt hearing, something that it was relevant to.  We were

19    right in the middle of that hearing.

20            MR. STEIN:  Right.  And so what we're talking about is      14:01:52

21    Chief Sheridan allowing his counsel the opportunity to review

22    whether the IDs fell within the order or not.  That's what

23    we're talking about.  And I know the Court believes that it was

24    some other scheme to --

25            THE COURT:  Well -- I'm sorry.                              14:02:13

1      MR. STEIN:  I said that I believe that the Court

2  concludes that is some kind of scheme to avoid disclosing the

3  IDs, some kind of plan to avoid disclosing the IDs, but I think

4  it's -- I think it can't be disputed that Chief Sheridan was

5  wondering about their responsiveness; Ms. Iafrate, their          14:02:30

6  counsel, was wondering about their responsiveness --

7      THE COURT:  Let me ask you:  On what possible good --

8      Have you read the orders?

9      MR. STEIN:  I have.

10      THE COURT:  What possible good faith basis could there   14:02:41

11  be, with the exception of the discovery order, to question

12  whether or not there was an obligation to turn them over?

13      MR. STEIN:  Well, I think they were clearly

14  responsive.  I don't think that was obvious to Chief Sheridan,

15  and I don't think it was obvious to Ms. Iafrate.  And there      14:02:58

16  were a lot of orders, and there was a lot happening, and she

17  wanted the opportunity to go back and read the orders and make

18  that determination.

19      THE COURT:  Okay.

20      MR. STEIN:  And that was the basis upon which the IA      14:03:11

21  was suspended.  And it was -- and as I say, it was suspended

22  after an investigation had commenced and there was -- and it

23  was forever --

24      THE COURT:  Can I ask you, then, Mr. Stein, why

25  suspend the IA at all?                                            14:03:25

1          MR. STEIN:  Well, I think what -- what --

2          THE COURT:  Why suspend the IA at all?

3          MR. STEIN:  I think what the MCSO should have done was

4    immediately call the monitor and say:  We have 1500 IDs.  We

5    think they may not be responsive.                                    14:03:42

6          THE COURT:  But my question is:  If Chief Deputy

7    Sheridan's motives were pure, why suspend the IA investigation

8    at all?

9          MR. STEIN:  Well, in order to determine what the legal

10   effect of these IDs --                                               14:03:57

11         THE COURT:  What difference does that make as to the

12   IA investigation?

13         MR. STEIN:  It might make a difference as to the scope

14   of the investigation.

15         THE COURT:  Well, he could have ordered the scope to     14:04:05

16   be limited to the ongoing investigation, but why suspend the

17   investigation itself?

18         MR. STEIN:  That's actually what he thought -- what he

19   testified he thought he was doing was limiting the scope of it.

20         THE COURT:  All right.  And you understand I found      14:04:21

21   that not persuasive.

22         MR. STEIN:  I do.

23         THE COURT:  And you understand I still find that not

24   persuasive.

25         MR. STEIN:  I do.  And I know we talked about a          14:04:29

1   probable cause standard, but the evidence is basically in

2   on most of these points.  And --

3            THE COURT:  I agree.  I agree.

4            MR. STEIN:  I would think the Court would want to look

5   ahead and make a -- some kind of a judgment about:  Can this be        14:04:40

6   proven beyond a reasonable doubt?

7            THE COURT:  I think that's a fair request.

8            MR. STEIN:  And I think that there's a serious

9   question with respect to that point, that this could be proven

10  beyond a reasonable doubt.                                             14:04:55

11           THE COURT:  All right.

12           MR. STEIN:  So does Your Honor want me to address the

13  Montgomery investigation?

14           THE COURT:  Well, only to this extent.  I guess I

15  would ask first:  Do you think perjury, in and of itself, can         14:05:07

16  be the basis for contempt?

17           MR. STEIN:  No, I think that's a Title 18 offense, and

18  I think that's the purview of the U.S. Attorney's Office to

19  decide whether to prosecute or not.

20           THE COURT:  Well, it does seem to me that it may not         14:05:20

21  be the appropriate subject of criminal contempt, but it does

22  seem to me that if I have somebody here on the stand who is in

23  charge of everything in terms of the agency that I am

24  investigating, I can consider whether or not he's lying on the

25  stand, can't I, in determining whether or not he should be held       14:05:40

1   responsible for his other contempts of -- or what I believe to

2   be his other contempts of my order, or believe could constitute

3   criminal contempt of my order?

4           MR. STEIN:  Well, I don't want to create more problems

5   for Chief Sheridan, but I think that actually would be the              14:05:56

6   subject of a direct contempt that the Court would have the

7   authority --

8           THE COURT:  No, I disagree.  I think the evidence is

9   pretty clear that's not so, or the case law is pretty clear

10  that's not so.  But, you know, you can always -- if you want to        14:06:10

11  supplement -- supplementally brief that, Mr. Stein, I have

12  looked at it and I may be wrong, I would invite your

13  supplementary brief on the point.

14          MR. STEIN:  Well, I'm not suggesting --

15          THE COURT:  You're not suggesting I hold the chief in         14:06:28

16  contempt right now.

17          MR. STEIN:  Right, I'm not suggesting that.  You asked

18  if I thought perjury -- how perjury could be addressed, and

19  that's how I think it could be addressed.

20          THE COURT:  Okay.  I don't -- thank you.                       14:06:37

21          MR. STEIN:  So I asked Your Honor whether you wanted

22  me to address the Montgomery allegations.

23          THE COURT:  Well, I will tell you that I do believe

24  that the monitor allegations were relevant to the contempt

25  hearing.  I do not believe that for the most part the                  14:06:53

1    Montgomery allegations or the McKessy allegations directly

2    relate to the rights of the members of the plaintiff class.  So

3    they fall into that category that we have previously discussed

4    where it's up to the sheriff or not whether he chooses to

5    reinvestigate them.                                          14:07:16

6          And while I do believe -- while I have made findings

7    of fact on all those investigations as they relate to the

8    contempt, the civil contempt, I'm not sure that there's any

9    criminal contempt matter that I'm contemplating from the

10   Montgomery or the McKessy investigations as it relates to     14:07:40

11   Chief Deputy Sheridan.

12         That is not true, necessarily -- well, let me come --

13   let me hold -- pull back.  It doesn't seem to me, based on my

14   recollection of the case, that I gave any direct order -- well,

15   maybe you better invest- -- maybe you better discuss in this   14:08:00

16   respect.  I directly ordered Sheriff Arpaio, when he was on the

17   stand, and I believe the next day I directly ordered

18   Chief Deputy Sheridan, to provide me with all of the documents

19   that pertained to the Montgomery investigation.  And I believe

20   that -- and had follow-up questions with the monitor, and I     14:08:25

21   believe that they withheld those 50 hard drives.  That, it

22   seems to me, to be contempt.  So you might want to address

23   that.

24         MR. STEIN:  Well, I don't -- I don't think that

25   there's any evidence that Chief Sheridan took any action        14:08:42

 1    whatsoever with respect to the 50 hard drives.

 2            THE COURT:  Well, you may remember that he was in the

 3    middle of his testimony when we had a problem.

 4            Were you here on that day?

 5            MR. STEIN:  I was.  I was.                                  14:09:02

 6            THE COURT:  And we had a problem with the production

 7    and he went over at noontime and consulted with those who were

 8    doing the production after I ordered that.  So I don't think

 9    your statement is entirely correct.

10            MR. STEIN:  Well, Your Honor, I apologize.  I am -- I     14:09:16

11    am not prepared to talk about the 50 hard drives.  I can

12    supplement my papers if you like.  I didn't realize that that

13    was in play.

14            THE COURT:  That's okay.  If you want to you can, but

15    you need to do it quickly.                                        14:09:33

16            MR. STEIN:  I understand.  So I do want to make a

17    couple very quick points on the Montgomery issues, and that's

18    that I think the evidence is uncontroverted that any time the

19    matter came up, Chief Sheridan said:  We're not investigating

20    the Court.  Don't investigate the Court.                          14:09:47

21            THE COURT:  Well, that's really -- I think the

22    evidence is clear that he at least said that at some times.  I

23    think the evidence is also clear he did some contrary things.

24    But where I believe he made intentional misstatements of the

25    facts to the Court was in his testimony that they received       14:10:04

```
 1    nothing from Mr. Montgomery that would implicate this Court at

 2    all, and that they were never investigating me.

 3            MR. STEIN:  I don't think -- I don't think that is his

 4    testimony.

 5            THE COURT:  I'll look at that.  What?                    14:10:17

 6            MR. STEIN:  I said I don't think that's his testimony.

 7            THE COURT:  Well, I'm really not interested in having

 8    you argue the testimony.  I just read it.  So don't bother.

 9    I'm not going to order it up as a matter of criminal contempt,

10    as I just said.                                                  14:10:32

11            MR. STEIN:  Okay.

12            THE COURT:  But I am going to consider it and consider

13    his overall truthfulness, and as well his -- the timing

14    explanation that he offered after Sheriff Arpaio said that he

15    consulted with him on that subsequent Montgomery document that  14:10:46

16    was like the fourth or fifth iteration that had -- had me in

17    it.  You know, he said that he'd never seen them before.  I

18    mean, I've concluded that he's -- that he didn't tell me the

19    truth, and I am going to take that into account as to whether

20    or not I believe a criminal contempt hearing on matters that    14:11:09

21    are appropriate for criminal contempt should be noticed.

22            MR. STEIN:  And Your Honor, if I can -- I'm not going

23    to read the transcript to you.  I know you don't want me to do

24    that.

25            THE COURT:  Well, read the transcript if you want, but   14:11:19
```

1    the portion you cited in your brief is not the portion I'm

2    concerned about.

3           MR. STEIN:  Okay.  It was the portion that was cited

4    in your findings of fact and which is why I responded to it.

5           THE COURT:  If I miscited in my findings of fact, I'll    14:11:32

6    give you the more correct citation.

7           MR. STEIN:  Okay.  You're going to go back and reread

8    the testimony --

9           THE COURT:  I will.

10          MR. STEIN:  -- so I won't belabor that point.    14:11:45

11          And let me just say in conclusion, Your Honor, that we

12   started this thing in the beginning, and I think one of the

13   things I think Your Honor should consider in deciding whether

14   or not to refer it for a criminal contempt is the adequacy of

15   the remedies that you're imposing, and that those will have    14:12:00

16   severe and profound consequences for Chief Sheridan and for his

17   future, and will make a very loud and clear message to MCSO and

18   to everybody else who is watching this case, and there's an

19   awful lot of people watching this case.

20          And so I don't think that the right inquiry is, Was    14:12:16

21   the threat of a contempt enough to modify their behavior?  It's

22   Are the remedies that you're imposing now adequate?  And I

23   believe those remedies are adequate, because they will have

24   very serious consequences for Chief Sheridan.

25          THE COURT:  Thank you.    14:12:33

1          MR. STEIN:  Thank you.

2          THE COURT:  Mr. Mitchell.

3          MR. MITCHELL:  Your Honor, we appreciate the

4   opportunity to have this dialog with the Court as it exercises

5   its discretion in considering a criminal contempt referral.          14:13:12

6   Rule 42 places the Court in an unusual role, and that's as

7   charging authority, prosecutorial charging authority.  So today

8   I'm going to speak to the Court and share information with it

9   in a manner differently than I would normally proceed.

10          For example, I'm going to start with telling the Court     14:13:32

11   about my experience with Captain Bailey over the past 15 years.

12   I've had many cases with Captain Bailey on the other side,

13   starting when he was Sergeant Bailey and I represented a young

14   man accused of participating in a heroin ring that involved

15   many valley high schools.  I respected the way then-Sergeant     14:13:48

16   Bailey handled the investigation, and the compassion he showed

17   for the many defendants and their families.  Thanks in large

18   part to Captain Bailey, the young man I represented

19   rehabilitated himself and he's now a successful business owner.

20          I'd like to provide additional context today for          14:14:09

21   Captain Bailey's error of judgment concerning the IDs.  In

22   every case I handled against Captain Bailey he demonstrated the

23   utmost professionalism and integrity.  I've also worked on

24   several cases with Captain Bailey where I represented the

25   victims of crime.  With every additional case on which I worked  14:14:28

1   with him I gained a new level of respect for his determination

2   to do the right thing.

3          Being late to this case and having the role of the, up

4   till now, being the proverbial potted plant, has involved a

5   series of frustrating experiences.  More than frustrating, it's   14:14:49

6   been agonizing to witness the avoidable and unnecessary

7   self-inflicted wound concerning the 1459 IDs.  I hope through

8   our filing and presentation to persuade the Court that

9   Captain Bailey acted without intent to deceive the Court or its

10  monitor or disregard this Court's orders.   14:15:10

11         Captain Bailey was given the task to head PSB and work

12  closely with the Court's monitor in May of 2014.  He started

13  that work with his reputation for getting a job done with

14  integrity preceding him.  He has had a stellar and unblemished

15  record of service.   14:15:31

16         When he first met with the monitor and his team, he

17  told them he was looking forward to being part of the process

18  to heal and rehabilitate MCSO.  He acknowledged his lack of

19  experience in the IA side of law enforcement and he pledged to

20  be forthright in his efforts and promised he would act with   14:15:46

21  integrity and not compromise his or MCSO's integrity.

22         Throughout his time at PSB, members of the monitor

23  team -- including Major Peters, Commander Girvin, and Chief

24  Warshaw -- praised him for his prompt and dedicated handling of

25  the issues or concerns they brought to his attention.  Because   14:16:04

1   of systemic issues and complicated logistics, the process of

2   running PSB was difficult, but he was excited and he was proud

3   to be part of helping the agency through the many issues it

4   faced, believing there would be positive changes that would

5   benefit the community and all of MCSO.                        14:16:23

6         His earnest approach to the Monitor Team all along

7   should be part of the backdrop against which his actions

8   concerning the IDs are viewed.  Judge, it is not in

9   Captain Bailey's DNA to lie, cheat, conspire, or conceal.

10        THE COURT:  What was he doing when the monitor asked    14:16:45

11  the question whether or not there was -- I mean, whether it was

12  the question he says it was or whether or not it was the

13  question that Seagraves and Kiyler says it was, it's a lie.

14  His response is a lie.

15        MR. MITCHELL:  He was following the instruction of his  14:17:00

16  counsel.

17        THE COURT:  Well, I'm not sure that you can invoke

18  advice of counsel as to factual defenses, can you?

19        MR. MITCHELL:  Judge, you absolutely can if what's in

20  your heart and what's in your mind is that if somebody who has 14:17:14

21  greater expertise is telling me that this is the way it is,

22  then I'm going to follow that instruction.  That's not a --

23  that's not a lie.  That's not a knowing falsehood, Your Honor.

24        THE COURT:  Well, if I tell you that you're wearing a

25  blue tie and you tell everybody that you wear a blue tie --    14:17:32

1     MR. MITCHELL:  It's not as clear as that, Judge.

2     THE COURT:  Isn't it?  There was an ongoing

3  investigation, so even if we take Captain Bailey's word, there

4  was an ongoing investigation, and that was what he was asked

5  and he said "no."                                            14:17:49

6     MR. MITCHELL:  Judge, as soon as he learned of the

7  IDs, believing there would be an investigation and knowing the

8  monitor would have concern about the IDs, he took action that

9  demonstrates absolute transparency.  He informed Chief Sheridan

10  and he informed other PSB personnel.  He secured the IDs in the  14:18:04

11  PSB room.  He opened an investigation and he assigned the

12  investigation an IA number.  He interviewed the MCSO sergeant

13  who had collected the IDs.

14     When he was told by MCSO counsel and by Chief Sheridan

15  that the investigation would be suspended while MCSO counsel   14:18:22

16  conducted research concerning how the Court's orders applied to

17  the IDs, there was no question in his mind that this was being

18  done for the right reason.  That's what was in his heart and

19  mind.  When Ms. Iafrate directed him to answer "no" to

20  Chief Kiyler's question about any other pending               14:18:41

21  investigation --

22     THE COURT:  What he said, and maybe I misunderstood

23  his testimony so you can clarify it for me, Mr. Mitchell, is

24  that when he was asked the question, I think he said -- I can't

25  remember.  Ms. Iafrate was somewhere at the table.  He looked   14:18:56

1    at her and she shook her head and mouthed the word "no."

2              MR. MITCHELL:  He said he looked at her and she said

3    "no."

4              THE COURT:  Okay.

5              MR. MITCHELL:  And this was -- this wasn't new --          14:19:07

6              THE COURT:  Is that advice of counsel?

7              MR. MITCHELL:  Absolutely, Your Honor.

8              THE COURT:  Well, let me ask you, what were all the

9    separate instances in which you would say that Captain Bailey

10   was instructed by Ms. Iafrate that if he received any inquiry   14:19:21

11   about IDs, he was to answer "no"?

12             MR. MITCHELL:  There were several -- there were at

13   least two other times where that discussion came up.

14             THE COURT:  Okay.  So why don't you tell me when they

15   were.                                                           14:19:43

16             MR. MITCHELL:  They were at the meetings that took

17   place prior -- on July 17, and then there was a subsequent

18   meeting after that.  There was a meeting that took place

19   with -- the so-called rehearsal meeting for PSB personnel, and

20   then there was a meeting with Ms. Iafrate, Chief Sheridan --    14:19:55

21             THE COURT:  -- slightly varying testimony, but I do

22   think there is some occasion that may have been said at least

23   by some people.

24             MR. MITCHELL:  It wasn't a new concept, Your Honor.

25             THE COURT:  Okay.                                     14:20:08

1    MR. MITCHELL:  And again, Judge, when she directed him

2    to answer "no" to Chief Kiyler's question about any other

3    pending investigations, he didn't believe then and he doesn't

4    believe now that she was directing him to lie.

5    THE COURT:  What did he think?                        14:20:20

6    MR. MITCHELL:  He relied on her instruction as MCSO

7    counsel, and only now, only with the benefit of hindsight, did

8    he ever question that reliance.  Typically, Judge --

9    THE COURT:  There are some requirements for reliance

10   on advice of counsel, are there not?  Some legal requirements. 14:20:38

11   MR. MITCHELL:  There are.

12   THE COURT:  Has Captain Bailey's conduct met those

13   requirements?

14   MR. MITCHELL:  Judge, I would -- I would contend that

15   his reliance in this situation was reasonable and it was in    14:20:51

16   good faith.  Typically, Judge, when I'm dealing with a

17   prosecuting agency concerning a charging determination, I ask

18   the prosecutor to keep an open mind about the information I'm

19   presenting and the disposition I'm suggesting.

20   I heard loud and clear what the Court said about not     14:21:12

21   changing its findings of fact.  Nevertheless, it's incumbent

22   upon me to ask the Court to keep an open mind and consider

23   accepting Captain Bailey's explanation for his actions in light

24   of the fact and character information that we provided in our

25   memorandum.                                              14:21:28

1          I hope I've been somewhat successful in persuading the

2    Court that Captain Bailey did not willfully mislead the monitor

3    or disobey court orders.  If I failed, if I failed at that,

4    Judge, then I must ask the Court when it makes its

5    determination to consider the civil consequences of his conduct      14:21:43

6    as the Court views it.  With a finding of untruthfulness,

7    Captain Bailey faces professional, personal, and financial

8    ruin.

9          THE COURT:  What are the areas in which he may still

10   be subject to investigation?  Mandatory investigation?            14:21:59

11         MR. MITCHELL:  I believe the Court's finding of fact

12   of untruthfulness requires there to be an investigation.

13         THE COURT:  Okay.

14         MR. MITCHELL:  Judge, under either scenario, referral

15   for criminal contempt against Captain Bailey isn't warranted.      14:22:16

16         THE COURT:  Thank you, Mr. Mitchell.

17         MR. MITCHELL:  Thanks for hearing us.

18         THE COURT:  Thank you.

19         Mr. Danneman.

20         MR. DANNEMAN:  Dale Danneman, Lewis Roca, for            14:22:29

21   Ms. Iafrate.

22         Your Honor, with full recognition that this Court

23   makes evidence-based findings, we have submitted to the Court a

24   memorandum in which we expand the record beyond the evidentiary

25   hearing.  We have presented to your monitor interview            14:22:44

1    transcripts of --

2            THE COURT:  I've read them, I think, unless you just

3    did it today.

4            MR. DANNEMAN:  No, I'm sorry.  This is several days

5    ago.  Monitor interview transcripts of Lieutenant Swingle and      14:22:58

6    Lieutenant Seagraves in which the first recording of any sort

7    of what happened with regard to the events of the Knapp IDs

8    appear.  As the Court is aware, there is no transcript of the

9    meeting at PSB on July 17th, the Friday.  There is no

10   transcript --                                                       14:23:24

11           THE COURT:  Are you contesting that your client

12   instructed MCSO personnel to tell the monitor that no documents

13   existed?

14           MR. DANNEMAN:  I am, indeed, Your Honor.

15           THE COURT:  Are you contesting that your client          14:23:35

16   instructed Captain Bailey to say "no" when he was asked the

17   question on July 20th of last year?

18           MR. DANNEMAN:  As Ms. Iafrate said to this Court on

19   July 24th, the afternoon, that Friday afternoon when you called

20   an emergency hearing and as is reflected in the transcript, she    14:23:53

21   understood the question to be by the monitors on the 20th

22   whether there was a current pending investigation --

23           THE COURT:  What difference does that make?

24           MR. DANNEMAN:  That reflects her understanding of the

25   facts.  That reflects her understanding --                         14:24:09

1        THE COURT:  Well, there were three orders that her

2   advice violated, right?  Potentially violated.

3        MR. DANNEMAN:  Your Honor, I understand the Court has

4   expressed its view with respect to the certainty of those

5   orders, and I -- I've pointed out in the memorandum that the        14:24:24

6   discovery order with respect to the IDs --

7        THE COURT:  I think that if the discovery dispute were

8   the only order that were at issue here, it would not be

9   unreasonable for Ms. Iafrate to take the time that she took to

10   determine whether or not there was a -- the IDs were                14:24:42

11   responsive.  I'm talking about the other two.

12        MR. DANNEMAN:  So with respect to document number 606,

13   the October 12, 2013 supplemental permanent injunction --

14        THE COURT:  Yes.

15        MR. DANNEMAN:  -- the defendant shall ensure that the        14:24:59

16   monitor has timely, full, and direct access.  I believe that's

17   one of the orders the Court is referring to.

18        THE COURT:  It is one.  There's some other paragraphs

19   in that language.

20        MR. DANNEMAN:  And "timely" is -- is a word, doesn't        14:25:09

21   say instantaneous --

22        THE COURT:  Are you saying that that order allows your

23   client to lie to the monitor about whether or not documents

24   exist?

25        MR. DANNEMAN:  There is no evidence that Ms. Iafrate        14:25:26

1    lied.  She stated her express understanding that there was no

2    investigation.

3            Here's part of the difficulty, Your Honor.  Between

4    the meeting on the 17th at PSB and the meeting on the 20th with

5    the monitors there are at least 16 human beings.  Only six of          14:25:42

6    them have given statements in the form of a monitor interview

7    or a deposition or evidentiary hearing transcript as to what

8    occurred in those meetings.

9            When you indicated -- when Mr. Mitchell indicated in

10   his argument that counsel told Bailey the investigation was          14:26:03

11   suspended, I don't think Ms. Iafrate -- that's not reflected

12   anywhere in the hearing transcripts, that --

13           THE COURT:  No, but I will tell you what is reflected.

14   It's reflected that Bailey said that he told Ms. Iafrate on the

15   17th that there was an IA number assigned.  That is in the          14:26:20

16   hearing transcript.

17           MR. DANNEMAN:  I say that is -- I agree that is

18   reflected in the Bailey transcript, and the Court will note in

19   our memorandum we do not seek to quote to you testimony from

20   the hearing transcript of either Captain Bailey or          14:26:32

21   Chief Deputy Sheridan.  You heard testimony from three

22   witnesses of our 16 about two meetings where there's nothing

23   recorded.  The first transcript that exists is two days after

24   the meeting on the 20th where Lieutenant Swingle is asked by

25   the monitor the question that I think everybody would -- on the          14:26:56

1    Monitor Team would like to think they asked:  Did you find any

2    more IDs?  He says:  Yeah, I did.  And he goes on to tell them

3    what he knew about it.  That's two days after the meeting.  So

4    the Monitor Team was misled.  It was misled for actually less

5    than 48 hours.                                              14:27:14

6          In Lieutenant Swingle's monitor interview he's asked:

7    Well, did somebody tell you, If you're asked about these Knapp

8    IDs or something, did anybody tell you not to answer that

9    question?  He says clearly and distinctly:  No, it wasn't --

10   Chief Deputy Sheridan didn't tell him to lie; Captain Bailey   14:27:35

11   didn't tell him to lie; nobody told him to lie.

12         The events that took place in a compressed period of

13   time with the Monitor Team in town interviewing people, there

14   are meetings after meetings; there are visits on various

15   subjects; there's all sorts of stuff going on.  And what is --  14:27:52

16         THE COURT:  Well, certainly Ms. Iafrate should have a

17   chance to present her side of the story, I agree.

18         MR. DANNEMAN:  I'm sorry?

19         THE COURT:  Certainly Ms. Iafrate should have a chance

20   to present her side of the story.                            14:28:03

21         MR. DANNEMAN:  The Court has always indicated that it

22   hasn't heard her side of the story.

23         THE COURT:  My problem is this:  Where should she have

24   a chance to present it?  Why should -- I mean, it's certainly

25   possible, given the allegations that I've heard, that that    14:28:15

1    could -- what she did could give rise to criminal contempt.

2    Isn't that possible?  Isn't there probable cause based on the

3    evidence that's been presented to me?

4            MR. DANNEMAN:  If I may respond to that, Your Honor,

5    you've had that discussion now with Mr. Stein and                14:28:30

6    Mr. Mitchell --

7            THE COURT:  I did.

8            MR. DANNEMAN:  -- about probable cause.

9            THE COURT:  And even to some extent with Mr. McDonald.

10           MR. DANNEMAN:  It's not a criminal contempt referral.    14:28:43

11   It's not viewed like some private citizens or an investigative

12   agency saying to a government lawyer:  I think there's a crime

13   here.  Please charge it.  Go investigate it.

14           And under Rule 42 of the Federal Rules of Criminal

15   Procedure, if you issue a criminal citation, it's not a          14:28:58

16   referral.  That prosecutor -- whether it's a government lawyer,

17   or the government lawyer declines, then Rule 42 requires that

18   another lawyer be appointed -- that prosecutor is limited to

19   the role of presenting evidence and advocating.  Unlike every

20   other criminal charge --                                         14:29:14

21           THE COURT:  Are you saying the prosecutor can't settle

22   or dismiss charges?

23           MR. DANNEMAN:  Cannot.

24           THE COURT:  Do you have authority for that

25   proposition?                                                     14:29:22

1           MR. DANNEMAN:  So -- so --

2           THE COURT:  Do you have authority for that

3    proposition?

4           MR. DANNEMAN:  Yes, Your Honor, Rule 42.

5           THE COURT:  Well, Rule 42 does not say that.                14:29:28

6           MR. DANNEMAN:  It says if the government declines, the

7    Court must appoint another lawyer.  And if that lawyer

8    declines, the Court must appoint another lawyer.  There's no

9    instance I've found where in the reported cases that -- that a

10   lawyer -- where this issue is actually specifically addressed.    14:29:47

11          THE COURT:  And so let's go back to my original

12   question.  Ms. Iafrate has the right to be heard.  My question

13   now is:  In what forum should she be heard?  And if in fact

14   what I've heard suggests that she engaged in possible

15   misconduct, and in a violation of my orders, why shouldn't it     14:30:08

16   be a criminal contempt hearing?

17          MR. DANNEMAN:  Because by the time -- the point I was

18   about to make is a law enforcement agency refers to a

19   prosecutor when it has probable cause.  The prosecutor then

20   makes the determination as to whether to proceed, whether it's    14:30:26

21   going to have proof of guilt beyond a reasonable doubt.  I

22   don't think that exists within the government lawyer --

23          THE COURT:  What if I authorize it in my referral?

24   What if I say:  The prosecutor is authorized by this Court to

25   make a determination whether or not it has a basis for           14:30:42

1  prosecution?

2       MR. DANNEMAN:  Well, again, it's a citation, and I

3  don't know the answer to that question, Your Honor.  I've never

4  seen any case which has addressed that hypothetical.  But a

5  reasonable prosecutor is always looking at:  Do I have evidence   14:30:57

6  to prove guilt beyond a reasonable doubt?  And the fact of the

7  matter is that given the 16 witnesses that would have to be

8  called at the criminal contempt trial just on the issue of what

9  took place at these two meetings, given the fact that you heard

10  a limited evidentiary hearing where not a single document was   14:31:21

11  introduced to you that showed the actual date that any of these

12  events occurred, where the testimony of Lieutenant Seagraves

13  was, I don't remember what was said exactly, but it was

14  generally this:  Well, I think Ms. Iafrate said "give a

15  negative answer."  But when she's interviewed by the monitor,   14:31:39

16  as reflected in her interview transcript the day before your

17  emergency hearing on the 24th, when she's interviewed by the

18  monitor she says, Yep.  Your Honor asked about, Well, were

19  there other IDs found?  She says yes, and she tells them what

20  she knows about the Knapp IDs.   14:31:55

21       But there is -- I'm trying to stick to the evidence

22  that's in the fuller record with regard to the Knapp IDs.

23  There is, I will assure you, other evidence of the dates that

24  some of these events that they're all recalling are conflated

25  and mixed up, and you had a very limited presentation on an   14:32:09

1    issue that the lawyers I don't think were really focusing on.

2            I'm suggesting to Your Honor that this is not a case

3    that is suitable for proof beyond a reasonable doubt, and

4    you'll be putting -- and like all prosecutors exercising

5    prosecutorial discretion, you should not exercise it towards          14:32:30

6    prosecution.

7            Given the Court's concern, the proper forum for

8    Ms. Iafrate's behavior, if it is to be examined, is in the

9    state bar disciplinary process, which I think the Court has

10   some full knowledge of, where they can be very effective in           14:32:44

11   looking at the totality of the circumstances:  Who said what

12   when?  What did she know?  What didn't she know?

13           THE COURT:  Thank you, Mr. Danneman.

14           MR. DANNEMAN:  Thank you, Your Honor.

15           THE COURT:  Do you wish to be heard, Ms. Wang?                 14:33:01

16           MR. McDONALD:  Your Honor, if I could, I would object

17   to Ms. Wang making a presentation.  In prior proceedings with

18   this Court, and I've got the transcripts --

19           THE COURT:  Yes, I did not allow her to be heard.

20           And I've thought about it, really.  And she does              14:33:22

21   represent a whole class of people who have been the victims of

22   misconduct here.

23           There really is, as other lawyers have pointed out, no

24   reason I should have given you the opportunity to be heard,

25   Mr. McDonald.  I have the authority to make this decision all         14:33:33

1    on my own.  But I have given, I think, every party here, every

2    potential contemnor, nothing but a full opportunity to be

3    heard, and it seemed to me that it would be unfair, as long as

4    I am exercising my discretion to hear arguments, not to hear

5    them.                                                              14:33:51

6              If you want to be heard, Mr. Masterson, you can be

7    heard, too.

8              MR. MASTERSON:  Thank you, Judge.  If Ms. Wang --

9    well, depending upon what Ms. Wang says, I may have a comment

10   or two.  But I just want to make the objection that the conduct  14:34:00

11   we're dealing with here, the contempt proceeding we're dealing

12   with here is contempt of the Court --

13             THE COURT:  I understand that.

14             MR. MASTERSON:  -- that does not involve the plaintiff

15   class, and so I feel it's inappropriate for Ms. Wang to address  14:34:15

16   these issues at this time.

17             THE COURT:  Okay.  You've made your objection.

18             MR. McDONALD:  Judge, one other point, and I notice

19   you made the invitation to Mr. Stein, there were some materials

20   that I developed last night.  I would like to do a post-hearing  14:34:27

21   supplement.

22             THE COURT:  Are you going to want to file something

23   post-hearing, Mr. Stein?

24             MR. STEIN:  I have not yet decided that, Your Honor.

25             Do you want me to tell you right now?                   14:34:37

1     THE COURT:  Well, I'm not going to give you very long.

2     MR. STEIN:  That's fine.

3     THE COURT:  And so how long do you need?

4     MR. McDONALD:  Three days.

5     THE COURT:  Counting the weekend?                         14:34:46

6     MR. McDONALD:  By Wednesday of next week.

7     THE COURT:  All right.  Can you have it in by

8  Wednesday, if you want it?

9     MR. STEIN:  I can, Your Honor.

10    THE COURT:  All right.  Ms. Wang.                         14:34:54

11    MS. WANG:  Thank you, Your Honor.  I will be very

12 brief, and I think that Mr. McDonald and Mr. Masterson may have

13 gone on longer than I intend to in my brief comments.

14    Your Honor, it's very clear in the case law that

15 whether to refer these matters for criminal contempt is         14:35:13

16 entirely in the Court's discretion, and the interests to be

17 vindicated in any referral are those of the Court in the

18 integrity of the judicial process and all parties obeying the

19 Court's orders.

20    I will say, Your Honor, that as we have previously          14:35:31

21 argued and briefed, the Court's orders that the contemnors

22 violated did run to the benefit of the plaintiff class.  Their

23 rights and their interests were violated in the commission of

24 that contempt.  And therefore, Your Honor, the referral of

25 these matters for criminal contempt are in the interests of the  14:35:51

 1    plaintiff class, and we believe there is more than an ample

 2    basis for the Court to refer those matters for criminal

 3    investigation by the appropriate authorities.

 4              THE COURT:  Thank you.

 5              Mr. Young, do you have any word yet?  Or do you want          14:36:06

 6    till Wednesday, too?

 7              MR. YOUNG:  We would very much appreciate that, Your

 8    Honor.  There are difficult issues on the compensation, and we

 9    would like a chance to consider what the Court has said today.

10              THE COURT:  Okay.                                            14:36:23

11              MR. YOUNG:  So if we could have till Wednesday, that

12    would be great.

13              THE COURT:  Anybody else have anything they want to

14    say?

15              Mr. Masterson.  What do you want to talk to me about?        14:36:31

16              MR. MASTERSON:  Well, I'll just briefly respond to

17    Ms. Wang.

18              THE COURT:  Okay.  You don't get any longer than she

19    had.

20              MR. MASTERSON:  Only got this much (indicating).             14:36:45

21              THE COURT:  Gotta be fast.

22              MR. MASTERSON:  Judge, Mr. McDonald got up here and he

23    used the word "daunting" a couple of times, and that's what

24    it's been complying with the Court's orders, attempting to

25    comply with the Court's orders in this case.  It's been a              14:36:58

1    daunting task for MCSO, it's been an overwhelming task for

2    MCSO, and it's required a total evolution, and should require a

3    total evolution of MCSO policies and procedures, and that's for

4    the good.  It's been both law enforcement and in internal

5    accountability of the Court's ordered changes, and MCSO is          14:37:19

6    undergoing those changes.  These changes, this continuing

7    evolution, is to the institution of MCSO, and the reason that's

8    important, Judge, is because the sheriff, Sheriff Arpaio, is

9    the institution of MCSO.

10            The Court made the comment a while back:  I cannot         14:37:41

11   touch the sheriff.  Judge, you've touched the sheriff because

12   you've touched the institution, and the institution is

13   reforming.  Is it reforming as quickly as we'd all like to see?

14   No.  But it is reforming, it's evolving, and it's moving

15   forward.                                                            14:38:02

16            Judge, that's a good thing.  You've touched the

17   sheriff.  You've touched the institution.  You've touched Chief

18   Sheridan.  You've touched everyone in that organization.  And

19   trust me, everyone over there is following what's happening

20   here, what you're doing in this courtroom.                         14:38:12

21            And the effect that this proceeding has had on MCSO

22   has been significant.  Judge, every effort is being made to

23   comply with your orders, to move forward.  This institution has

24   changed.  This institution has been touched.  And it's been for

25   the good of both the institution and the community.                14:38:34

1          Judge, with the help of the parties and the monitors

2    and this Court, MCSO -- and with our help -- MCSO will move

3    forward and will comply with every single one of this Court's

4    orders.  Judge, you've touched them.  You've achieved an

5    appropriate civil remedy.  You do not need to refer anyone at          14:38:54

6    MCSO for criminal contempt.

7          THE COURT:  Thank you.

8          Anybody else want to be heard?

9          All right.  If you're going to have any supplemental

10   briefing, Mr. McDonald, if you're going to have any, Mr. Stein,          14:39:12

11   if you're going to have any further input, Mr. Young, I want it

12   by close of business on Wednesday.

13         I do thank the parties, thank all others who are here,

14   and I will decide the matter as soon as possible.

15         THE CLERK:  All rise.          14:39:32

16         (Proceedings concluded at 2:39 p.m.)

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5

6

7           I, GARY MOLL, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 26th day of July,

18  2016.

19

20

21                                  s/Gary Moll
                              _____

22

23

24

25