Charles J. Cooper*
Michael W. Kirk*
Harold S. Reeves*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
mkirk@cooperkirk.com
hreeves@cooperkirk.com

* Admitted pro hac vice

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1700
Fax: (602) 200-7846
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com

Attorneys for Defendant Joseph M. Arpaio
and non-party Movants Gerard Sheridan and
Joseph Sousa

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | NO. CV 07-02513-PHX-GMS |
| Plaintiffs, | **SHERIFF ARPAIO, CHIEF DEPUTY SHERIDAN, AND LIEUTENANT SOUSA'S MOTION FOR RECUSAL OF THE COURT AND ITS MONITOR** |
| v. | |
| Joseph M. Arpaio, et al., | |
| Defendants. | **(Oral Argument Requested)** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

I.    INTRODUCTION ................................................................................... 1

II.   TIMELINESS CONCERNS CANNOT BAR THE COURT
      FROM REACHING THE MERITS OF MOVANTS'
      REQUEST FOR PROSPECTIVE RECUSAL ........................................... 3

III.  RECUSAL OF THE COURT AND ITS MONITOR IS REQUIRED .................. 7

      A.    *Ex Parte* Communications Between the Court and the Monitor Are
            Prohibited and Require Recusal of Both the Court and the Monitor ........... 7

            1.    The Judicial Recusal Statute Prohibits
                  *Ex Parte* Merits Communications ..................................................... 8

            2.    The Due Process Clause Prohibits
                  *Ex Parte* Merits Communications .................................................... 13

            3.    This Court's Monitor Authority Order Does Not Permit
                  *Ex Parte* Communications Between the Court and the Monitor ..... 14

            4.    The Code of Conduct for United States Judges
                  Prohibits *Ex Parte* Merits Communications ................................... 16

      B.    The Court and Monitor Have Discussed *Ex Parte* the
            Merits of Issues Before the Court on Numerous Occasions ....................... 17

            1.    The Production of Police Recordings ............................................. 20

            2.    The MCSO's Decision To Close Criminal Investigations .............. 21

            3.    The Adequacy of MCSO's Internal Investigations ......................... 22

            4.    The Montgomery Investigation ....................................................... 22

            5.    Defendants' and Movants' Credibility and Good Faith .................. 24

            6.    Defendants' and Movants' Compliance with Court Orders
                  Regarding Internal Investigations and Document Production ......... 26

i

7.   The Armendariz Investigation...........................................27

8.   The Court's *Ex Parte* Fact Finding .................................28

9.   The Need To Expand the Monitor's Authority ...............................28

10.  The Structure of Community Outreach Meetings............................29

IV.  CONCLUSION. ................................................................30

**Cases**                                                                                                      **Page**

*Alexander Shokai, Inc. v. CIR*, 34 F.3d 1480 (9th Cir. 1994) ............................................ 8

*American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ..... 1, 2

*Bin-Wahad v. Coughlin*, 853 F. Supp. 680 (S.D.N.Y. 1994) ........................................ 6, 7

*Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215 (9th Cir. 2014) .................. 8

*Bracy v. Gramley*, 520 U.S. 899 (1997) .............................................................. 9

*Bradley v. Milliken*, 426 F. Supp. 929 (E.D. Mich. 1977) .................................... 4

*California v. Montrose Chem. Corp. of California*, 104 F.3d 1507 (9th Cir. 1997)........... 6

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ......................................... 13, 14

*Church of Scientology of Cal. v. Cooper*, 495 F. Supp. 455 (C.D. Cal. 1980) .................. 6

*Cobell v. Norton*, 237 F. Supp. 2d 71 (D.D.C. 2003)................................................. 12, 13

*Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864 (9th Cir. 1991) .............................. 4

*Davis v. Jones*, 506 F.3d 1325 (11th Cir. 2007)......................................................... 9

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992)........................ 4

*Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) ........................ 2, 3, 6, 9, 10, 11, 15, 19, 22, 26

*First Interstate Bank of Arizona, NA v. Murphy, Weir & Butler*,
   210 F.3d 983 (9th Cir. 2000) ........................................................................ 19

*Guenther v. CIR*, 889 F.2d 882 (9th Cir. 1989)........................................... 1, 2, 8, 14

*Guenther v. CIR*, 939 F.2d 758 (9th Cir. 1991)...................................... 2, 8, 14, 21, 24, 26

*Howe v. City of Akron*, 17 F. Supp. 3d 690 (N.D. Ohio 2014) ........................................ 14

*In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004)................................................. 2, 12, 13, 19

*In re Cement & Concrete Antitrust Litig.*, 515 F. Supp. 1076 (D. Ariz. 1981)................... 2

*In re Kensington Int'l, Ltd.*, 353 F.3d 211 (3d Cir. 2003) ...................................... 2

*In re Kensington Int'l, Ltd.*,
   368 F.3d 289 (3d Cir. 2004)...................... 2, 4, 5, 6, 9, 11, 12, 13, 17, 19, 20, 22, 24, 28

*In re Manoa Fin. Co.*, 781 F.2d 1370 (9th Cir. 1986) ............................................... 4

*LaChance v. Erickson*, 522 U.S. 262 (1998) ............................................................ 13

*Lamborn v. Dittmer*, 726 F. Supp. 510 (S.D.N.Y. 1989) ....................................... 7

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)................................. 2

*National Org. for the Reform of Marijuana Laws v. Mullen*,
   828 F.2d 536 (9th Cir. 1987) ......................................................................... 14

*Nobles v. Comm'r*, 105 F.3d 436 (9th Cir. 1997) ................................................................ 9

*Noli v. Comm'r*, 860 F.2d 1521 (9th Cir. 1988) ................................................................. 4

*O'Rourke v. City of Norman*, 875 F.2d 1465 (10th Cir. 1989) ........................................... 6

*Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415 (Fed. Cir. 1989) ....................... 4, 5

*Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444 (1980) ................................. 19

*Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982) ............................................................... 14

*Salmeron v. United States*, 724 F.2d 1357 (9th Cir. 1983) ........................................... 4, 5

*Sataki v. Broadcasting Bd. of Governors*, 733 F. Supp. 2d 54 (D.D.C. 2010) .................. 6

*Tenants & Owners in Opposition to Redevelopment v. HUD*,
    338 F. Supp. 29 (N.D. Cal. 1972) ................................................................................ 7

*Thompson v. Enomoto*, 815 F.2d 1323 (9th Cir. 1987) ................................................... 14

*Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381 (9th Cir. 1988) .................................. 4

*United States v. Apple Inc.*, 787 F.3d 131 (2d Cir. 2015) .................................. 13, 14, 17

*United States v. Conforte*, 624 F.2d 869 (9th Cir. 1980) ................................................ 5

*United States v. Craven*, 239 F.3d 91 (1st Cir. 2001) .................................................. 8, 9

*United States v. Furst*, 886 F.2d 558 (3d Cir. 1989) ................................................ 3, 5, 6

*United States v. Hernandez*, 109 F.3d 1450 (9th Cir. 1997) ........................................... 4

*United States v. O'Brien*, 18 F. Supp. 3d 25 (D. Mass. 2014) ........................................ 6

*United States v. Sarno*, 73 F.3d 1470 (9th Cir. 1995) .................................................... 5

*United States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777 (9th Cir. 1986) ..................... 6

*United States v. Tucker*, 78 F.3d 1313 (8th Cir. 1996) ................................................... 6

*Waggoner v. Dallaire*, 649 F.2d 1362 (9th Cir. 1981) ................................................ 5, 6

*Willenbring v. United States*, 306 F.2d 944 (9th Cir. 1962) ........................................... 8

*Yates v. United States*, 135 S. Ct. 1074 (2015) ............................................................. 6

**Statutes & Rules**

28 U.S.C.

    § 144 ............................................................................................................................ 5

    § 455 ............................................................................................................................ 3

    § 455(a) ................................................................................. 1, 8, 22, 24, 28

    § 455(b)(1) ................................................................................................................... 1

    § 455(b)(1) .......................................................................................... 8, 22, 27, 28

iv

Code of Conduct for United States Judges

Canon 3(A) .................................................................................................... 17

Canon 3(A)(4) ........................................................................................... 16, 17

Canon 3(A)(4)(a) ............................................................................................ 17

Canon 3(A)(4)(b) ............................................................................................ 17

FED. R. CIV. P. 53 ............................................................................................. 16

FED. R. CIV. P. 53(a)(2) ............................................................................. 13, 17

FED. R. CIV. P. 53(b)(2)(B) .............................................................................. 14

Defendant Joseph Arpaio and non-party Movants Gerard Sheridan and Joseph Sousa (collectively "Movants") respectfully move for an order terminating the Monitor and recusing the Court from all future proceedings in this case. The Court and the Monitor have engaged in improper *ex parte* communications concerning the merits of issues before the Court, which is prohibited by: (1) 28 U.S.C. §§ 455(a) and 455(b); (2) the Due Process Clause of the Fifth Amendment; (3) the Court's Supplemental Permanent Injunction; and (4) the Code of Conduct for United States Judges. For these reasons, and those more fully stated in the following Memorandum of Points and Authorities, the Court must recuse itself and the Monitor must be removed from all future proceedings in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      **INTRODUCTION.**

Moving for the recusal of a sitting judge is a serious matter. The record makes clear, however, that the Court and the Monitor have engaged in *ex parte* communications concerning the merits of issues before the Court, including (but not limited to): whether Movants have violated the law or complied with the Court's orders, whether Movants should be held in contempt, whether the Monitor's powers should be enlarged, and whether Movants or other government officials are credible and trustworthy witnesses. Making matters worse, many of these *ex parte* communications were effectively between the Court and *parties to the case*, for they involved the Monitor privately reporting to the Court information that the Monitor learned as a result of its *ex parte* communications with, and investigations of, Movants and other officers and employees of the Maricopa County Sheriff's Office (MCSO).

*Ex parte* communications such as these are "anathema in our system of justice," *Guenther v. Comm'r*, 889 F.2d 882, 884 (9th Cir. 1989) (*Guenther I*) (quoting *United States v. Thompson*, 827 F.2d 1254, 1258–59 (9th Cir. 1987)), because " '[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights,' " *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) (quoting *Anti-*

*Fascist Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)). When a court has engaged in *ex parte* communications about the merits of a case, the court must recuse itself so that the matter will be heard before "a judge who has not been exposed to ex parte communications . . . ." *Guenther v. Comm'r*, 939 F.2d 758, 762 (9th Cir. 1991) (*Guenther II*). In particular, courts have uniformly held that when a judge has had *ex parte* communications concerning the merits of a case with a special master, monitor, or other judicial officer, neither the judge nor the judicial officer may continue to participate in the case. *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 318 (3d Cir. 2004) (*Kensington II*); *Edgar v. K.L.*, 93 F.3d 256, 262 (7th Cir. 1996); *see also In re Brooks*, 383 F.3d 1036, 1043–44 (D.C. Cir. 2004).

Movants emphasize at the outset that the instant motion seeks only *prospective* relief. That is, this motion does not request that the Court *vacate* any of its prior decisions. Movants have contemporaneously requested leave to file a separate motion seeking discovery into the full scope and content of the Court's *ex parte* communications, so that Movants may determine whether such vacatur is warranted. The law is clear that, in circumstances like this case, Movants are entitled to discovery into the full scope of *ex parte* communications between the Court and the Monitor. *See, e.g.*, *In re Brooks*, 383 F.3d at 1044; *In re Kensington Int'l, Ltd.*, 353 F.3d 211, 223 (3d Cir. 2003) (*Kensington I*); *Edgar*, 93 F.3d at 258; *Guenther I*, 889 F.2d at 884–85.

But regardless of whether *retrospective* relief is warranted, the law disqualifies the Court and the Monitor from participation in the case *prospectively*. *See In re Cement & Concrete Antitrust Litig.*, 515 F. Supp. 1076, 1081–82 (D. Ariz. 1981) (Court must be recused prospectively even if prior rulings are not vacated); *Kensington II*, 368 F.3d at 318 (same). To safeguard "the public's confidence in the judicial process," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988), the judicial recusal statute, bedrock principles of due process, the Court's Supplemental Permanent Injunction, the Code of Conduct for United States Judges, and the uniform case law addressing *ex parte* merits

communications between a court and a special master or monitor authorized to communicate with the parties *ex parte*, all prohibit the Court and Monitor from continuing to participate in this case.

Accordingly, as Movants demonstrate in greater detail below, the Court should: (1) order that the Monitor's operations be suspended immediately pending resolution of this motion, and (2) after briefing and argument, grant Movants' request that the Court be recused and the Monitor be removed from all future proceedings in this case.

## II. TIMELINESS CONCERNS CANNOT BAR THE COURT FROM REACHING THE MERITS OF MOVANTS' REQUEST FOR PROSPECTIVE RECUSAL.

The judicial recusal statute, 28 U.S.C. § 455, does not impose a timeliness requirement in the circumstances of this case, where the improper conduct is patent and Movants request only that the Court recuse itself on a going-forward basis. Simply put, "[p]assage of time is not conclusive if the justification for disqualification is compelling." *Edgar*, 93 F.3d at 257. The Third Circuit acknowledged this rule in *United States v. Furst*, 886 F.2d 558 (3d Cir. 1989), where it vacated a criminal sentence and then reassigned the case to a new judge because the original judge had engaged in *ex parte* conversations about the merits with defense counsel. The district court denied the recusal motion primarily on timeliness grounds, relying on cases applying Section 455's timeliness requirement to requests to *vacate* prior decisions. *Id.* at 579–81. The Third Circuit reversed, holding that the motion could not be dismissed as untimely because the movant "filed his motion for disqualification while there remained some proceeding over which the judge would preside and the motion was directed only to that proceeding." *Id.* at 581. The court held that "authorities dealing with situations in which recusals were sought to upset what had already been done" are simply inapposite when a party asks only for prospective recusal. *Id.* Accordingly, the Third Circuit addressed the merits of the motion and ultimately required the district court to recuse itself from all future proceedings. *Id.* at 583.

The Third Circuit reaffirmed this rule in a case involving *ex parte* communications

between the Court and its appointed advisors, requiring the district court to recuse itself prospectively even though a party moved for recusal 22 months after learning about the grounds for recusal. *See Kensington II*, 368 F.3d at 316–17. The *Kensington II* Court emphasized that the movants sought only forward-looking relief and that Section 455 requires a weighing of the "competing institutional interest in avoiding the appearance of impropriety, on the one hand, and avoiding the abuse of § 455(a) procedure, on the other." *Id.* Here, just as in *Kensington II*, because "the seriousness of the grounds for recusal that exist on this record far outweighs any significance" of the timeliness of the recusal motion, this Court cannot "have the issue of timeliness trump what [it] ha[s] concluded are the principles of § 455(a)." *Id.* at 317. *See also Bradley v. Milliken*, 426 F. Supp. 929, 931 (E.D. Mich. 1977) (holding that plaintiffs' motion "is untimely" but nonetheless addressing the merits because "[w]ere plaintiffs' assertions grounds for recusal, we could not sit on this case regardless of any implied waiver or the untimeliness of the motion").

The Ninth Circuit has likewise recognized that courts should reach the merits of substantial recusal motions, even if those motions could have been brought earlier in the proceeding. *See, e.g.*, *Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1388 & n.4 (9th Cir. 1988) (civil case addressing the merits of a recusal motion raised for the first time on appeal); *Noli v. Comm'r*, 860 F.2d 1521, 1527 (9th Cir. 1988) (same); *In re Manoa Fin. Co.*, 781 F.2d 1370, 1373 (9th Cir. 1986) (same). To be sure, the Ninth Circuit has stated in some cases that a litigant should not be allowed to use an untimely recusal motion to *vacate prior rulings* and thus give litigants a "second bite at the apple." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992). But in cases in which further proceedings before the trial court are contemplated, the Ninth Circuit routinely addresses the recusal motion on the merits, even if it alternatively denies the motion as untimely.[1] In other words, the "refusal of courts to 'start over' has rested not on the mere

---

[1] *See United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871 (9th Cir. 1991); *Salmeron v. United States*,

4

passage of time, but on the events that had occurred and the balancing of equity/fairness considerations in deciding whether to expunge those events from history's pages." *Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1419 (Fed. Cir. 1989) (citing, *inter alia*, *United States v. Conforte*, 624 F.2d 869 (9th Cir. 1980)).

Concerns about a "second bite at the apple" are not implicated where, as here, the recusal request seeks only prospective relief—that is, that the Court recuse itself going forward. And the overriding public interest in ensuring public confidence in the judiciary demands recusal going forward, lest the Court and Monitor preside over this case for years to come even though the improper *ex parte* communications establish perceived and possibly actual bias. *See Kensington II*, 368 F.3d at 316–17; *Furst*, 886 F.2d at 581–83. Were the rule otherwise, a district court could continue to preside over a case for years despite undisputed violations of the recusal statute, due process norms, and ethical duties, simply because a party could have brought the recusal motion earlier in the litigation.

The Ninth Circuit, like all of its sister circuits to have addressed the issue, has consistently distinguished between motions that request *retrospective* relief in the form of vacatur of prior decisions (which have occasionally been denied for timeliness reasons) and motions that request *prospective* relief in the form of recusal or reassignment for future proceedings (which are addressed on the merits even if they could have been raised earlier in the proceedings). For example, in *Waggoner v. Dallaire*, 649 F.2d 1362 (9th Cir. 1981), the Ninth Circuit dismissed as untimely a post-trial motion, brought under 28 U.S.C. § 144, to recuse the judge and vacate its judgment, but the court then remanded for further proceedings and held that its ruling about timeliness "does not preclude a renewal of the

---

724 F.2d 1357, 1365 n.5 (9th Cir. 1983). *Cf. United States v. Sarno*, 73 F.3d 1470, 1499 & n.19 (9th Cir. 1995) (pro se criminal defendant not permitted to seek recusal on appeal where he failed to file a properly noticed recusal motion in the district court despite the district court's invitation to do so); *United States v. Conforte*, 624 F.2d 869, 879–80 (9th Cir. 1980) (rejecting a motion to vacate a conviction and grant a new trial, based on the district court's alleged bias, because the ground for recusal was not timely raised, but leaving open the possibility that even in such a circumstance, timeliness concerns may be disregarded for "exceptional circumstances" when a court is confronted with "the delicate matter of disqualification under section 455").

motion for disqualification upon remand" because a motion brought in advance of future proceedings "would not be untimely and may be subject to consideration by the district court." *Id.* at 1370. *See also, e.g.*, *California v. Montrose Chem. Corp. of California*, 104 F.3d 1507, 1521 (9th Cir. 1997) (holding that even if the movant's Section 455 recusal motion, raised for the first time on appeal, was untimely, the Court undoubtedly has "jurisdiction to consider a request for reassignment under [28 U.S.C.] § 2106 as well as under our inherent authority to reassign a case" for purposes of future proceedings); *United States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 780 (9th Cir. 1986) (reassigning the case to a new judge on remand pursuant to Section 2106 and the Court's inherent authority, even though recusal had not been considered at all in the district court); *see also United States v. Tucker*, 78 F.3d 1313, 1323–24 (8th Cir. 1996); *O'Rourke v. City of Norman*, 875 F.2d 1465, 1475 (10th Cir. 1989). In sum, in cases in which a substantial recusal motion is brought when significant proceedings must still be had in the case, courts have recognized their obligation to reach the merits of the recusal question, either rejecting timeliness objections (as in *Kensington II*) or issuing alternative rulings about timeliness that are, at most, "extra icing on a cake already frosted." *Yates v. United States*, 135 S. Ct. 1074, 1093 (2015) (Kagan, J., dissenting).[2]

---

[2] *See, e.g.*, *Kensington II*, 368 F.3d at 316–17 (reaching the merits without regard to timeliness concerns, and then holding that the District Court must be recused); *Furst*, 886 F.2d at 581–83 (same); *Edgar*, 93 F.3d at 257–58 (brushing aside timeliness concern and reaching the merits, holding that the District Court must be recused); *United States v. O'Brien*, 18 F. Supp. 3d 25, 32 (D. Mass. 2014) (holding that a recusal motion was untimely because the parties waited 15 months to file it, nonetheless reaching the merits because "the relatively high stakes involved" made the court "reluctant to deny the motion solely on the grounds that it is untimely," and ultimately holding that the Court must recuse itself from the case); *Church of Scientology of Cal. v. Cooper*, 495 F. Supp. 455, 458–60 (C.D. Cal. 1980) (acknowledging "some doubt" about whether a recusal motion was timely, but nonetheless addressing the merits and determining that the Court must recuse itself under Section 455(a)); *see also Sataki v. Broadcasting Bd. of Governors*, 733 F. Supp. 2d 54, 64–66 (D.D.C. 2010) (holding that although a recusal motion was untimely, the Court, "cognizant that section 455 imposes a duty upon this Court to consider recusal *sua sponte*, . . . shall proceed to consider the merits of the present Motion to Disqualify"); *Bin-*

In any event, this motion is timely because Movants have repeatedly preserved the objection they now raise in this motion. When the Court appointed the Monitor in this case, Plaintiffs requested that the order establishing the Monitor's powers authorize *ex parte* communications not only between the Monitor and the parties but also between the Monitor and the Court. *See* Proposed Consent Order at 68 (Aug. 16, 2013), Doc. 592-1. The Court, however, sustained Defendant's objection and refused to authorize *ex parte* communications between the Court and the Monitor. *See* Transcript of Status Conference at 11–12 (Aug. 30, 2013), Doc. 603; Supplemental Permanent Injunction/Judgment Order ¶ 129 (Oct. 2, 2013), Doc. 606 ("Monitor Authority Order"). When Defendant's counsel subsequently objected once again, the Court refused to discontinue its *ex parte* communications with the Monitor, but stated that Defendants have "preserved the issue to the extent that you believe it is a problem. . . . [Y]ou have preserved it for the record." Transcript of Status Conference at 57 (Aug. 11, 2015), Doc. 1237 ("Aug. 11, 2015 Transcript").

## III. RECUSAL OF THE COURT AND ITS MONITOR IS REQUIRED.

### A. *Ex Parte* Communications Between the Court and the Monitor Are Prohibited and Require Recusal of Both the Court and the Monitor.

Four separate legal and ethical guarantees prohibit *ex parte* communications about the merits between the Court and the Monitor. In the pages that follow, Movants demonstrate that the judicial recusal statute, the Due Process Clause, this Court's Monitor Authority Order, and the Code of Conduct for United States Judges all prohibit the *ex parte*

---

*Wahad v. Coughlin*, 853 F. Supp. 680, 684 (S.D.N.Y. 1994) (addressing an untimely recusal motion on the merits, "given the seriousness of such a motion"); *Lamborn v. Dittmer*, 726 F. Supp. 510, 515 (S.D.N.Y. 1989) (holding that although a recusal motion is untimely, " 'since the impartiality of the court has been questioned, it is important to address [defendant's] contentions on the merits' " (alteration in original) (quoting *Paschall v. Mayone*, 454 F. Supp. 1289, 1300 (S.D.N.Y. 1978))); *Tenants & Owners in Opposition to Redevelopment v. HUD*, 338 F. Supp. 29, 32 (N.D. Cal. 1972) (concluding that a recusal motion was timely filed because, when courts are faced with weighty recusal motions "involving serious allegations against a District Court Judge[,] the courts should not be too technical" in dismissing a motion on timeliness grounds).

communications that have occurred here and require recusal of the Court and removal of the Monitor.

### 1. The Judicial Recusal Statute Prohibits *Ex Parte* Merits Communications.

The judicial recusal statute provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or when the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding," *id.* § 455(b)(1). Each subsection requires the disqualification of both the Court and the Monitor where, as here, they have had *ex parte* communications concerning the merits.

It is black-letter law, of course, that ordinarily "*ex parte* communications will not be tolerated." *Guenther v. Comm'r*, 889 F.2d 882, 884 (9th Cir. 1989) (*Guenther I*) (quoting *United States v. Thompson*, 827 F.2d 1254, 1258–59 (9th Cir. 1987)); *see also Alexander Shokai, Inc. v. Comm'r*, 34 F.3d 1480, 1484 (9th Cir. 1994) (same). To be sure, *ex parte* communications that concern only "routine administrative matters do not raise any inference of bias" or warrant recusal. *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1220 (9th Cir. 2014). But when the trial court has been exposed to an *ex parte* communication touching on the merits of the case or the character of those before the court, the matter should be reassigned to a different "judge who has not been exposed to ex parte communications . . . ." *Guenther v. Comm'r*, 939 F.2d 758, 762 (9th Cir. 1991) (*Guenther II*). *See also Willenbring v. United States*, 306 F.2d 944, 946 (9th Cir. 1962) (recusal not warranted where "[i]t is not suggested or implied that any improper conduct took place in this [*ex parte*] conference or that the merits of the case were discussed").

When *ex parte* conversations touch on the merits, prospective recusal is required, for once a judge has been improperly exposed to information *ex parte*, "it is difficult, if not impossible, for a judge, no matter how sincere, to purge that information from her mind— and, equally, to maintain the perception of impartiality." *United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001). Simply put, were the same judge to continue to preside, "it would

be surpassingly difficult for her to disregard the guidance that she previously received from" the advisor who communicated *ex parte*. *Id.*

Indeed, the Ninth Circuit has held that when a trial court engages in unauthorized *ex parte* communications about the merits, prospective recusal is mandatory. *See Guenther II*, 939 F.2d at 762. In *Guenther II*, the Tax Commissioner's counsel had sent an *ex parte* communication to the Tax Court discussing the merits of the case, accusing the taxpayers of discovery violations, impugning their credibility, and suggesting that they might present fabricated evidence at trial. *Id.* at 760. The Ninth Circuit vacated the judgment against the taxpayers and required the Tax Court to recuse itself from all future proceedings, emphasizing that the *ex parte* communications contained "serious" allegations "going both to the merits of the case and to the [taxpayers'] character generally." *Id.* at 761.[3]

The Seventh, Third, and D.C. Circuits have all recognized that recusal is warranted when a District Court engages in *ex parte* communications about the merits with its appointed judicial officers. The Seventh Circuit's decision in *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) is materially indistinguishable from this case. *Edgar* involved a class action challenge to the Illinois mental health care system, where the District Court had appointed a panel of three experts who were permitted to meet *ex parte* with members of the plaintiff class and defendants' employees. *Id.* at 257. As in this case, the governing order in *Edgar* did *not* permit *ex parte* communications about the merits between the Court and its experts, *id.* at 259, yet the experts did in fact meet *ex parte* with the judge, apparently to discuss the merits, *id.* at 257.

The Seventh Circuit began its analysis with the established principle that recusal is

---

[3] *Guenther II* was brought under the Due Process Clause rather than Section 455, likely because "the mandatory recusal provisions in section 455 do not apply to tax court judges." *Nobles v. Comm'r*, 105 F.3d 436, 438 (9th Cir. 1997). The Due Process Clause provides only a "constitutional floor," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), and the "circuits uniformly have concluded that the federal recusal statute establishes stricter grounds for disqualification than the Due Process Clause." *Davis v. Jones*, 506 F.3d 1325, 1336 (11th Cir. 2007). If recusal was warranted in *Guenther II* based on the Due Process Clause, it follows *a fortiori* that Section 455 requires recusal under similar facts.

required if "any meeting between judge and experts touch[ed] the merits, or procedures affecting the merits." *Edgar*, 93 F.3d at 258. The court stated that it could not know whether the admitted *ex parte* communications between the district court and its experts concerned the merits because the district court had denied discovery on the grounds of "judicial privilege." *Id.* The district court's claim of judicial privilege alone required recusal, the Seventh Circuit stated, because "[n]o privilege covers arrangement of administrative details," and so "[t]o invoke a privilege is therefore to confess that the discussions covered the substance of potential testimony and the conduct of the litigation . . . ." *Id.* The Seventh Circuit also "assume[d]" that the *ex parte* communications concerned the merits because "no evidence in the record undermines the inferences . . . to be drawn" from the notes of an *ex parte* meeting between the court and its advisors. *Id.*

The Seventh Circuit thus held that recusal was warranted based on Section 455(b)(1), because the district court had impermissibly obtained "personal knowledge of disputed evidentiary facts concerning the proceeding." The court emphasized that "[o]ff-the-record briefings in chambers . . . leave no trace in the record—and in this case the judge has forbidden any attempt at reconstruction." *Edgar*, 93 F.3d at 259. Because the experts had communicated *ex parte* with the parties, and then communicated what they had learned *ex parte* to the district court, the impropriety was "no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated." *Id.*

The *Edgar* Court also held that recusal was warranted under Section 455(a), which concerns the appearance of bias. The court explained that "[t]he discussions in chambers were calculated, material, and wholly unnecessary," and the experts who had met *ex parte* with the district court "were loudly denouncing Illinois' mental health system." *Edgar*, 93 F.3d at 259–60. Adding that the record "lend[s] credence to a concern that the judge and the experts became excessively cozy as a result of these meetings," the Seventh Circuit held that an objective observer "would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising

impartiality." *Id.* at 260. The Seventh Circuit thus required both the district court and the experts to recuse themselves from the case. *Id.* at 261.

The facts of this case are closely analogous to those in *Edgar*. In both cases, the monitors were authorized to communicate *ex parte* with the parties but *not* with the Court. And yet, in both cases, the monitors communicated what they learned *ex parte* to the Court, in private "[o]ff-the-record briefings in chambers." *Edgar*, 93 F.3d at 259. These communications are tantamount to, and therefore just as improper as, *ex parte* communications between the Court and one of the parties themselves. Likewise, in both *Edgar* and this case, the monitors have denounced the defendants in their public filings, and so in both cases it may be presumed that they have done the same in private with the judge. This case actually presents a stronger case for recusal, because in *Edgar* the record was equivocal about whether merits-related discussions had occurred, and the court focused on one particular secret conversation between the court and monitor. Here, the record leaves no doubt that the Court and the Monitor have engaged in numerous *ex parte* conversations concerning the merits. *See* Part B, *infra*.

The Third Circuit's seminal decision in *In re Kensington*, 368 F.3d 289 (3d Cir. 2004) (*Kensington II*) is to the same effect, holding that recusal is required when the Court has engaged in improper *ex parte* communications about the merits with the parties and with the Court's own appointed judicial officers. The Third Circuit held that the *ex parte* conversations between the Court and the parties were problematic because they were not "limited to procedural matters" but rather "went to the very heart of the proceedings," and because there was no record of the conversations, depriving the parties of any opportunity "to know precisely what was said, when it was said, by whom, and what effect could be drawn from their offerings." *Id.* at 311. And the *ex parte* conversations between the Court and its biased experts "presented an even more egregious problem." *Id.* Although the Third Circuit did not have complete "knowledge about [the] content" of the *ex parte* conversations, the record indicated that the Court and the advisors had discussed the merits.

*Id.* Portions of the record indicated, for example, that the advisors had disparaged a potential expert witness and criticized a defense that might be raised. *Id.* The Third Circuit thus held that the district court must be recused under Section 455(a) because, as relevant here, "without knowledge of what was discussed at these [*ex parte*] meetings," the movants "could not respond to these 'silent' facts" alleged against them. *Id.* at 309. The court emphasized that *ex parte* communications "run contrary to our adversarial trial system," which relies upon "a debate between adversaries" in open court as "the truth-seeking function of trials." *Id.* at 310.[4]

The D.C. Circuit has likewise made clear that a district court must be recused when it engages in *ex parte* conversations about the merits with a court-appointed monitor or expert. The district court in *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004), had appointed monitors to review the Federal Government's trusteeship of certain Native American funds. As in this case, the monitors had investigated numerous officials affiliated with the government defendant and had then "transmitted" that information *ex parte* to the District Court. *Id.* at 1041. The D.C. Circuit did not require recusal, but only because "the district judge has described 'the nature of the *ex parte* contacts,' and stated unequivocally that those contacts were of a procedural and not a substantive nature." *Id.* at 1044. Here, by contrast, the record shows (*see* Part B, *infra*) that the Court and the Monitor have indeed engaged in extensive *ex parte* discussions concerning the merits, and *In re Brooks* makes clear that under those circumstances, recusal is required. *See also Cobell v. Norton*, 237 F. Supp. 2d 71, 90 (D.D.C. 2003) (district court decision below in *In re Brooks*, acknowledging that

---

[4] *Kensington II* emphasized that the advisors in that case had a conflict of interest, and that a judge might be allowed to have *ex parte* communications with advisors who are unbiased, so long as the judge affords the parties notice of the substance of the advice and an opportunity to respond. *Kensington II*, 368 F.3d at 305. The court also stated that a judge may have *ex parte* communications with the parties, so long as the parties consent to those communications. *Id.* at 311. In this case, of course, the Monitors are not advisors but rather *investigators* who have communicated their investigatory findings *ex parte* to the Court. Movants have not been given notice of the substance of these communications to the Court or an opportunity to respond. Nor have they consented to these *ex parte* communications, which, as discussed, effectively amount to *ex parte* communications between the Court and the parties.

recusal would have been required "if the Master had conveyed information he had obtained in an investigatory capacity to the Court during these consultations").

As previously noted, these cases reflect a uniform body of law requiring disqualification of judicial officers in circumstances such as these here. Indeed, we have found no case, regardless of the timeliness of the recusal motion, in which a judge has been permitted to continue to preside over an ongoing case after the judge has engaged in unauthorized *ex parte* communications concerning the merits of the case. The same result is required here.[5]

## 2. The Due Process Clause Prohibits *Ex Parte* Merits Communications.

Bedrock due process principles also prohibit *ex parte* communications between the Court and the Monitor. "The core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). *Ex parte* communications deprive parties of both notice and an opportunity to respond to the claims levied against them. When a court has discussed the merits of a case *ex parte* with a court-appointed judicial officer, the court has been provided with "information that cannot be 'controverted or tested by the tools of the adversary process.'" *In re Brooks*, 383 F.3d at 1042 (alteration omitted) (quoting *Edgar*, 93 F.3d at 259). In other words, "[i]f judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result." *Kensington II*, 368 F.3d at 310. As the Supreme Court has emphasized in the course of requiring a judge to recuse himself based on the Due Process Clause, "[t]he citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order." *Caperton v. A.T. Massey Coal Co.*,

---

[5] The recusal statute's prohibitions against bias and the appearance thereof apply no less to the Monitor than to the Court. FED. R. CIV. P. 53(a)(2) ("A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification."); *United States v. Apple Inc.*, 787 F.3d 131, 138 (2d Cir. 2015).

556 U.S. 868, 889 (2009) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 793 (2002) (Kennedy, J., concurring)).

Whether a party "received due process depends on whether they had an opportunity to participate in determination of the relevant issues and on whether the *ex parte* [communications] unfairly prejudiced them." *Guenther I*, 889 F.2d at 884. As already discussed, the Ninth Circuit held in *Guenther II* that the Due Process Clause required recusal because the court had engaged in prejudicial *ex parte* communications about the merits with opposing counsel. *Guenther II*, 939 F.2d at 761. The Due Process Clause requires no less here, where the Court has engaged in such improper communications with its appointed Monitor, who has in turn had extensive *ex parte* merits communications with the parties and their counsel.

**3.    This Court's Monitor Authority Order Does Not Permit *Ex Parte* Communications Between the Court and the Monitor.**

The Monitor Authority Order does not permit *ex parte* communications between the Court and the Monitor. Federal Rule of Civil Procedure 53 requires the Court to identify "the circumstances, if any, in which the [monitor] may communicate ex parte with the court or a party." FED. R. CIV. P. 53(b)(2)(B).[6] The Monitor Authority Order provides only that "[i]n carrying out [its] duties, the Monitor shall be permitted to have ex parte communications with the Parties." Supplemental Permanent Injunction/Judgment Order ¶ 129 (Oct. 2, 2013), Doc. 606 ("Monitor Authority Order").

The Court adopted this prohibition against *ex parte* communications after Defendants specifically objected to *ex parte* communications between the Court and the Monitor. Plaintiffs had initially proposed that the Monitor should "be permitted to have ex parte communications with the Parties *and the District Court*." *See* Proposed Consent Order

---

[6] Although Rule 53 speaks of "Masters," the Rule applies equally to judicial officers identified as "Monitors." *See, e.g.*, *National Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 539 (9th Cir. 1987); *Thompson v. Enomoto*, 815 F.2d 1323, 1325 (9th Cir. 1987); *Apple*, 787 F.3d at 138; *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982); *Howe v. City of Akron*, 17 F. Supp. 3d 690, 690–91 (N.D. Ohio 2014).

at ¶ 162 (Aug. 16, 2013), Doc. 592-1 (emphasis added). Plaintiffs' request was tantamount to a request that the Court be allowed to have direct *ex parte* communications with the parties themselves. Accordingly, Defendants opposed this request, arguing that the Monitor should "be permitted to have ex parte communications with the Parties" *only*. *See* Exhibit 4 to Defendants' Brief Re Justifications for Competing Positions on the Terms of the Proposed Consent Decree at ¶ 11 (Aug. 23, 2013), Doc. 595-1. At a status conference convened to address the scope of the authority that would be granted to the Monitor, Defendants once again objected to *ex parte* communications between the Monitor and the Court. The Court sustained Defendants' objection and stated that it would permit Defendants to be present whenever it had communications with the Monitor:

> THE COURT: If I want to have ex-parte communications with the monitor, are the parties going to object?
>
> If you object, I'll let you stand – –
>
> MR. CASEY: Yes – –
>
> THE COURT: – – in on any of the – –
>
> MR. CASEY: – – defendants object.
>
> THE COURT: – – communications. All right.

Transcript of Status Conference at 11–12 (Aug. 30, 2013), Doc. 603.

As noted, the Monitor Authority Order that the Court entered shortly after the status conference conspicuously omitted the language proposed by Plaintiffs that would have authorized the Court to communicate *ex parte* with the Monitor. *See* Monitor Authority Order ¶ 129. Thus, *ex parte* communications between the Monitor and the Court are strictly prohibited. *See Edgar*, 93 F.3d at 258 (holding that an injunction forbade *ex parte* communications between the Court and a panel of experts, because the experts proposed that they could communicate *ex parte* with the Court but this "language was deleted before the order was entered").

Other provisions of the Monitor Authority Order confirm that the Monitor may not discuss the merits *ex parte* with the Court. For example, the Monitor's reports concerning

15

MCSO's compliance must be made "to the parties and the Court." *Id.* ¶ 126; *see also id.* ¶ 31 (Monitor must report "to the Court and the Parties"); *id.* ¶ 138 (Monitor's recommendations must be made "to the parties and the Court"). Although the Monitor must "file with the Court" his assessment of MCSO's compliance, those reports "shall be public except for information covered by privacy laws or that is otherwise confidential." *Id.* ¶¶ 130–31. Even then, any redacted information may not be provided solely to the Court, but rather must be "filed under seal with the Court and provided to the Parties." *Id.* ¶ 131.

On August 11, 2015, Defendants objected again to *ex parte* communications between the Court and the Monitor, emphasizing that "[e]x parte communications between the monitor with respect to interviews concerns me a great deal with respect to protecting my client's due process rights." Aug. 11, 2015 Transcript at 56. This time, the Court overruled the objection, stating that the *ex parte* conversations were necessary for the Court "to supervise the monitor in his work. . . . I don't know how to do that without having some communication with the monitor." *Id.* at 57. But the Court twice emphasized that Defendants had preserved their objection, stating: "And so you've preserved the issue to the extent that you believe it is a problem, but I think it's clear that I have the obligation to supervise the monitor in his work," *id.*, and then adding once again: "[Y]ou have preserved it for the record," *id.*

Accordingly, because FED. R. CIV. P. 53 requires that any *ex parte* communications be expressly authorized by the order appointing the Monitor, and because the Monitor Authority Order does not authorize such communications, the Court is precluded from having any *ex parte* communications with its Monitor.

**4.    The Code of Conduct for United States Judges Prohibits *Ex Parte* Merits Communications.**

The Code of Conduct for United States Judges provides a fourth prohibition against *ex parte* merits communications between the Court and the Monitor. Canon 3(A)(4) of the Code of Conduct provides that judges generally "should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or

16

impending matter that are made outside the presence of the parties or their lawyers." Canon 3(A) "is designed to prevent all of the evils of *ex parte* communications: 'bias, prejudice, coercion, and exploitation.' " *Kensington II*, 368 F.3d at 310 (quoting Jeffrey M. Shaman et al., *Judicial Conduct & Ethics* § 5.03 (3d ed. 2000)).

There are certain exceptions to the Canon's prohibition on *ex parte* communications, but none apply here. Although a Judge may "initiate, permit, or consider ex parte communications as authorized by law," Canon 3(A)(4)(a), neither a statute nor the Monitor Authority Order permits such *ex parte* communications between the Court and the Monitor. And although the Court may communicate *ex parte* "when circumstances require it, . . . for scheduling, administrative, or emergency purposes," such *ex parte* communications may "not address substantive matters." Canon 3(A)(4)(b). The Court's *ex parte* merits communications with the Monitor violated Canon 3(A)(4).[7]

## B. The Court and Monitor Have Discussed *Ex Parte* the Merits of Issues Before the Court on Numerous Occasions.

The Court vested the Monitor with sweeping authority to "collect and maintain all data and records necessary to (1) implement [the Court's] order and document implementation of and compliance with [the Monitor Authority Order] . . . and (2) perform ongoing quality assurance in each of the areas addressed by [the Monitory Authority Order]." Monitor Authority Order ¶ 10. The Monitor has near-plenary power not only to access MCSO documents and facilities, but also to interview MCSO personnel, and Defendants have a legal duty to "ensure that the Monitor has timely, full and direct access to all personnel, documents, facilities and Order-related Trainings and meetings that the Monitor reasonably deems necessary to carry out its duties." *Id.* ¶ 145.

On July 26, 2016, the Court further expanded the Monitor's powers. The Court entered a supplemental permanent injunction that, *inter alia*, vested the Monitor with

---

[7] The Code's prohibition against *ex parte* communication applies no less to the Monitor than to the Court. *See Apple*, 787 F.3d at 140–41 (holding that a court-appointed "monitor is therefore subject to prohibitions against improper *ex parte* communications" in Canon 3(A)(4)); *see also* FED. R. CIV. P. 53(a)(2).

"authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to" certain aspects of MCSO misconduct. Second Amended Second Supplemental Permanent Injunction/Judgement Order ¶ 275 (July 26, 2016), Doc. 1765. With respect to these matters, "the Monitor has plenary authority," except where the Court has specifically vested authority in a separate independent body. *Id.* ¶ 277. In order to assess the adequacy of Defendants' internal investigations, the Monitor is "given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO." *Id.* ¶ 292.

The Monitor acts as a judicial officer of the Court. The Monitor Authority Order provides that the Monitor's role is to "assist [the Court] with implementation of, and assess compliance with, this Order." Monitor Authority Order ¶ 119. The Monitor is "subject to the supervision and orders of the Court," *id.* ¶ 126, and the Court has plenary authority to "order the removal of the Monitor for any reason sua sponte," *id.* ¶ 122. The Court has repeatedly stated that the Monitor is an arm and agent of the Court, and that Defendants "should accept instruction from Chief Warshaw as instruction from [the Court]." Transcript of Telephonic Conference at 30 (May 16, 2014), Doc. 715 ("May 16, 2014 Transcript"); *see also, e.g.*, *id.* at 28 ("[W]hat [the Monitor] says has the complete imprimatur of this Court").

The Court has acknowledged that "the Monitor is in constant communication with the Court regarding the performance of his services." Order at 3 (Sept. 11, 2014), Doc. 741. The Court has also stated that it has "regular, almost daily meetings with the Monitor when he is in Maricopa County, and frequent contact regarding developments and inquiries when he is not." *Id. See also* Transcript of Status Conference at 4 (May 14, 2014), Doc. 694 ("May 14, 2014 Transcript") ("I do have fairly regular communications with the Monitor."); Transcript of Status Conference at 47 (May 7, 2014), Doc. 697 ("[T]he Monitor is very good at keeping me apprised of everything that's going on. It's one of his many strengths.").

The fact that the Court has treated the Monitor as an agent of the Court compounds

the impropriety here. The Monitor's role may be analogized to that of a law clerk who may discuss the merits privately with the Court but who decidedly may *not* also engage in *ex parte* communications with the parties. *See Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444, 447 (1980) (a "principle that reverberates throughout [precedent] is that a judge may not direct his law clerk to do that which is prohibited to the judge"); *see also First Interstate Bank of Arizona, NA v. Murphy, Weir & Butler*, 210 F.3d 983, 987 (9th Cir. 2000). Accordingly, the *Court itself* has effectively engaged in *ex parte* communications with the parties too, requiring recusal. *See Edgar*, 93 F.3d at 259 (recusal required where the judge, "[i]nstead of going himself" "to take an undercover tour of a mental institution to see how the patients were treated," simply "appointed agents, who made a private report of how they investigated and what they had learned"); *In re Brooks*, 383 F.3d at 1041 (recognizing, where court's advisors had *ex parte* communications with the parties and then "transmitted" that information to the court in the form of *ex parte* reports, that recusal would be required if the information concerned the merits of the case); *see also Kensington II*, 368 F.3d at 311 (court must be recused when it had *ex parte* conversations with the parties and its appointed advisors).

Many of the *ex parte* conversations appear to have influenced the Court's views on the merits of issues going to the heart of this case, including (but not limited to): whether Movants have violated the law or complied with the Court's orders, whether Movants should be held in contempt, whether the Monitor's powers should be enlarged, and whether Movants or other government officials are credible and trustworthy witnesses. For example, in one statement that mirrors other record excerpts discussed below, the Court stated that "the monitor's briefings—limited, though they are, to the Court of the interviews that he has conducted—suggest, at least, that the violations that may have happened in a year and a half are quite numerous." Transcript of Status Conference at 28 (Jan. 15, 2015), Doc. 858. Based on this statement, and those more fully set forth below, the Court's recusal and the Monitor's removal are required.

### 1. **The Production of Police Recordings.**

*Ex parte* communications between the Monitor and the Court appear to have influenced the Court to issue orders to Defendants to remedy alleged non-compliance with the Court's orders regarding the production of police recordings. For example, on May 16, 2014, the Court explained that two days earlier, it was planning to meet privately with the Monitor to discuss the Monitor's conversations with MCSO about preserving documents related to the Armendariz investigation. May 16, 2014 Transcript at 8. When the Monitor entered the Court's chambers, Chief Deputy Sheridan telephoned the Monitor to report that Chief Trombi had emailed MCSO personnel directing them to preserve certain evidence related to the Armendariz investigation. *Id.* The Monitor relayed this information *ex parte* to the Court, which apparently concluded, on the basis of the Monitor's *ex parte* report, that Chief Trombi's actions had the effect of "frustrating the plan that had been arrived at by Chief Deputy Sheridan and the monitor." *Id.* Based on this private conversation, the Court directed the Monitor to provide the Court with "a formal written report" concerning Chief Trombi's actions. *Id.* at 25. The Monitor, in turn, directed Chief Deputy Sheridan to file a report with the Monitor, so that the Monitor could relay that information to the Court. *Id.* at 25–26. It is difficult to imagine clearer confirmation that the Court's *ex parte* communications with the Monitor have actually constituted *ex parte* communications *with the parties*, with the Monitor serving as intermediary.

Defense counsel objected to the process whereby the Court ordered the Monitor to produce a report, and the Monitor in turn ordered Chief Deputy Sheridan to produce a report, without ever notifying defense counsel of these orders. *Id.* at 25–26. Responding to that objection, the Court confirmed that Chief Deputy Sheridan "should accept instruction from Chief Warshaw as instruction from me." *Id.* at 30.

These *ex parte* discussions concerned factual questions at the heart of the Court's contempt orders and expansion of the permanent injunction. Movants were not privy to these "off-the-record discussions on substantive issues in chambers" between the Court and the Monitor. *Kensington II*, 368 F.3d at 308 n.18. It appears, however, that as in *Guenther*

*II*, the Monitor provided the Court a critical *ex parte* report relating to Movants' discovery conduct and integrity. *See Guenther II*, 939 F.2d at 760.

## 2.    The MCSO's Decision To Close Criminal Investigations.

The Monitor and the Court have engaged in *ex parte* communications concerning MCSO's decision to close criminal investigations arising out of Deputy Armendariz's suicide. At a hearing on October 28, 2014, the Court explained that it had a private conversation with the monitors in which they "came to [the Court] and said that it was their understanding that the only criminal investigation that resulted from the Armendariz matter had just been closed." Transcript of Status Conference at 36 (Oct. 28, 2014), Doc. 776 ("Oct. 28, 2014 Hearing"). Although Movants have never had access to what the Monitor told the Court, "what Monitor Warshaw told [the Court] about the substance and quality of that investigation concerned [the Court] considerably." *Id.*

In light of this private conversation with the Monitor, the Court directed the Monitor to prepare a report concerning the adequacy of MCSO's investigation into the Armendariz issue. *Id.* The Court and the Monitor then appear to have discussed privately the content of the Monitor's report during the drafting process. The Court explained that, before the report was completed, "Chief Warshaw told me that you had subsequently informed him of additional things that he previously had not realized or been aware of or noticed of, and he asked me if I wanted him to revise the report." *Id.* at 36–37. The Court then instructed the Monitor to proceed with drafting the report, and to update it later as necessary. *Id.* at 37. Only after the Court and the Monitor conferred privately on the report, and the Monitor completed the report, was the report made available to Defendants. *Id.* Even after Defendants responded to the report, the Court stated that it adhered to its initial view gleaned during the *ex parte* conversations—that is, it continued to believe "that much of [the Monitor's concern] has purchase and gives me great concern . . . ." *Id.*

The record indicates that the Monitor discussed the fruits of his investigation *ex parte* with the Court, and even apparently collaborated with the Court on what the Monitor's

21

report would say, before that report was presented to Defendants and Movants. The impropriety of this process is plain on its face, "no less than if the judge had decided to take an undercover tour of [defendants'] institution to see how" the Court's orders were being implemented. *Edgar*, 93 F.3d at 259.

### 3.    The Adequacy of MCSO's Internal Investigations.

*Ex parte* communications between the Monitor and the Court led the Court to conclude that MCSO was not doing an adequate job of investigating improper conduct by MCSO officials. On March 20, 2015, the Court stated that, "based on my conversations with [the Monitor]," "it is my understanding that Mr. Vogel"—the MCSO's independent internal investigator—"has been directed by the MCSO that he is to provide facts only and is not to evaluate those facts." Transcript of Status Conference at 12 (Mar. 20, 2015), Doc. 965 ("Mar. 20, 2015 Transcript"). The Court concluded that these facts, apparently reported to the Court *ex parte* by the Monitor, are "pretty concerning," and that "there's an inherent conflict there, especially if Mr. Vogel can't come to his own conclusions or make any recommendations." *Id.*

Once again, Movants have not been privy to the substance of these *ex parte* communications, which apparently prejudiced the Court's views of Movants and their compliance with the Court's orders. The Court made credibility determinations and evaluated Movants' compliance with its orders based on "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). These conversations concerned "disputed issues that are at the core of" this case, *Kensington II*, 368 F.3d at 302, and so the Court's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a).

### 4.    The Montgomery Investigation.

The Monitor and the Court also have engaged in *ex parte* conversations regarding the Montgomery investigation. In April 2015, the Court ordered Defendants to preserve and disclose documents that they had received from Dennis Montgomery. After the Monitor reviewed those documents, the Monitor discussed the contents of those documents in

private with the Court. For example, on May 8, 2015, the Court stated that after "[t]he monitor started to review" those documents, "he gave me a couple of concerns that, frankly, I hadn't been aware of, and I want to raise them with you . . . ." Transcript of Status Conference at 29 (May 8, 2015), Doc. 1464. The Court added that "the materials that [Defendants] are providing involve records that I—and, Bob, if I misstate this, tell me—but I believe the monitor on first cut thinks, based partly on Chief Deputy Sheridan's testimony, there was something I hadn't anticipated." *Id.* The Court explained that it "had not anticipated that Mr. Montgomery would have done a file dump with the MCSO of those files" that he allegedly procured from the CIA. *Id.*

The Monitor also evaluated, *ex parte* with the Court, the relevance of the Montgomery documents. At that same May 8, 2015, hearing, the Court explained that the Monitor "indicated to me, at least based on a rough initial look, that there are clearly documents in that file that are very relevant to this litigation." *Id.* at 33. The Montgomery documents provided a basis for the Court's contempt findings and expansion of the permanent injunction, but Movants have not been apprised of the content of the Court's *ex parte* conversations with the Monitor about those documents.

The Court's *ex parte* conversations with the Monitor concerning the Montgomery investigation also appear to have influenced the Court to expand the Monitor's powers and conclude that Defendants have provided untruthful testimony to the Court. At a May 14, 2015 hearing, the Court explained that the Monitor "has shown me several, 50 or so documents, that cause me great concern." Transcript of Status Conference at 44 (May 14, 2015), Doc. 1097. The Court stated that those documents that it reviewed *in camera* with the Monitor suggested a conspiracy between the Department of Justice and the Court, and the Court continued that it had "looked at these documents closely and I think there are a great deal of problems with them." *Id.* at 46. The Court concluded that the documents had a "tendency to suggest that previous testimony offered in this matter may have been untruthful." *Id.* The Court stated that this matter was relevant to the contempt hearings, and

that it would require Defendants to address the materials at those hearings. *Id.* at 47. Finally, the Court stated that it planned to order, "based upon [the Monitor's] ongoing review of the documents provided, that [the Monitor] be allowed to investigate these matters that are pertinent to the current contempt findings." *Id.* at 50–51. Defense counsel then raised a due process objection to the Monitor's expanded authority, which grew out of the Monitor's *ex parte* review of documents with the Court. *Id.* at 55. Movants have not been apprised of the contents of the Court's *ex parte* communications with the Monitor about this subject of the contempt proceedings and the expanded injunction.

These *ex parte* matters concern issues that go to the very core of the proceedings: whether Defendants and Movants have complied with this Court's orders and provided truthful testimony. The Monitor "gave [the Court] a couple of [his] concerns," and provided *ex parte* commentary on which documents are relevant to the investigation and which should "cause [the Court] great concern." These conversations appear to have influenced the Court's decision to expand the Monitor's powers, thus giving rise, at a minimum, to the appearance of partiality. 28 U.S.C. § 455(a). As in *Guenther II*, the Court received *ex parte* communications about whether Defendants and Movants were offering truthful testimony in this case. *Guenther II*, 939 F.2d at 760–61. The Court then took adverse action against Movants notwithstanding that Movants lacked "knowledge of what was discussed" or an opportunity to "respond to these 'silent' facts" that provided the basis for the orders against them. *Kensington II*, 368 F.3d at 309.

**5.**    **Defendants' and Movants' Credibility and Good Faith.**

The Court and the Monitor have engaged in *ex parte* conversations regarding Defendants' and Movants' credibility, and whether Defendants and Movants have engaged in good faith efforts to comply with the Court's orders. For example, the Monitor appears to have discussed Sheriff Arpaio's credibility in *ex parte* conversations with the Court. In one such conversation, the Monitor discussed *ex parte* Sheriff Arpaio's alleged statement to the Monitor that the Sheriff "loves to have confrontations with the federal court because

every time he does his popularity goes up." Transcript of Evidentiary Hearing at 19 (Dec. 4, 2014), Doc. 817.

The Court also indicated that the Monitor has opined *ex parte* on whether defense counsel had engaged in good faith efforts to comply with the Court's orders. *See* Oct. 28, 2014 Hearing at 52–53 ("Despite my disapproval of Ms. Stutz' legal advice, the monitor tells me that she has been very cooperative and very facilitative, and I want you to know, Ms. Stutz, that he's told me that.").

On another occasion, the Court evaluated the credibility of Mr. Vogel, an independent contractor hired by MCSO, based on what appear to be *ex parte* conversations with the Monitor. *See* Mar. 20, 2015 Transcript at 12 (Court stated that it was told by the Monitor that the Monitor has been "satisfied, and even somewhat praiseworthy, of Mr. Vogel's investigation to date").

Similarly, at the evidentiary hearing, the Court assessed Captain Russ Skinner's credibility, and regulated the presentation of testimony by both Captain Skinner and Captain Farnsworth, based almost entirely on what appears to have been *ex parte* conversations with the Monitor. The Court explained that "my monitor has never said anything other than that Captain Skinner has been exemplary . . . in his efforts to comply and in his efforts to contact with the monitor." Transcript of Evidentiary Hearing Day 12 at 2724 (Oct. 9, 2015), Doc. 1466. "In light of the fact that Skinner has been exemplary, and my monitor's never said anything to the contrary," the Court decided that it was "inclined to give you a little bit more time with Skinner [than with Farnsworth], if you want to establish a case for compliance . . . . [F]or that reason I'll give him an hour and a half, but I'm not sure you need more." *Id. See also* Transcript of Evidentiary Hearing Day 13 at 3210 (Oct. 13, 2015), Doc. 1467.

In sum, the Monitor had *ex parte* conversations with the parties, and then commented *ex parte* on these conversations with the Court, discussing such substantive matters as witnesses' credibility and whether they were acting in good faith. The Ninth Circuit's

decision in *Guenther II*, 939 F.2d at 760–61, makes clear that such conversations about witness credibility violate due process and require recusal. The fact that some of the Monitor's comments appear to have been favorable, such as his comments concerning Captain Skinner's "efforts to comply" with the Court's orders, does not eliminate the prejudice to Movants. It is reasonable to assume that the Monitor *also* discussed the "efforts to comply" made by other officials. Indeed, speaking *favorably* of some MCSO officials could impliedly have been viewed as viewing *unfavorably* the credibility of other MCSO officials. If the Monitor did in fact make negative *ex parte* credibility evaluations of these other officials to the Court, these presentations could have biased the Court against Defendants and Movants, and at a minimum, created the appearance of bias. *See Edgar*, 93 F.3d at 260.

**6.    Defendants' and Movants' Compliance with Court Orders Regarding Internal Investigations and Document Production.**

The Court and the Monitor have also engaged in *ex parte* conversations regarding Defendants' and Movants' ongoing internal investigations. For example, at a hearing on February 26, 2015, the Court stated that the Monitor had reported to the Court that Defendants "may not be in technical compliance with [a] court order" regarding the status of ongoing internal affairs investigations. Transcript of Status Conference at 51 (Feb. 26, 2015), Doc. 926. On another occasion, the Court disclosed that the Monitor had told the Court *ex parte* that Defendants were not adequately apprising the Monitor about the status of ongoing obligations. *See* Transcript of Evidentiary Hearing at 17–18 (Apr. 21, 2015), Doc. 1017 ("I will tell you that I've been consulting with the monitor and with monitor Kiyler and they have not been informed as to the status of those investigations despite repeated requests.").

More generally, the Court and the Monitor have engaged in regular, continuous communication regarding the adequacy of Defendants' document production. *See, e.g.*, Transcript of Evidentiary Hearing Day 6 at 1484 (Sept. 25, 2015), Doc. 1465 ("I will say that the monitor did provide me a quick bit of information that they do not have Chief

Deputy Sheridan's grievance grant on the Hechavarria matter."); Transcript of Telephonic Conference at 7 (Nov. 19, 2015), Doc. 1575 ("I will tell you I just called yesterday to check with my monitor to see if they had 14-221 and they didn't have it yet.").

Once again, these conversations went to the very heart of the merits of this case. The Monitor conducted *ex parte* conversations with the Court evaluating whether Defendants have been in "compliance" with the Court's orders and the speed with which Defendants complied with those orders. The Court has thus obtained "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). And it is hard to see how these *ex parte* communications would not cause a reasonable observer to suspect that the Monitor has influenced the Court's views of the merits in this case.

### 7.      The Armendariz Investigation.

The Monitor and the Court have engaged in *ex parte* communication about the Armendariz investigation, which was one of the bases for the Court's contempt finding. For example, at a hearing on May 14, 2014, the Court discussed "information that I've received from my monitor about communications that [Defendant Arpaio] had with [the Monitor]" concerning Deputy Armendariz's use of a dash camera. May 14, 2014 Transcript at 52. *See also* May 16, 2014 Transcript at 5–6 (Court confirming that it learned detailed information about the Armendariz issue through *ex parte* conversations with the Monitor).

At the same May 14 hearing, the Court also indicated that it had *ex parte* conversations with the Monitor concerning the MCSO's internal policies on digital recordings, which were relevant to the Armendariz investigation. *See* May 14, 2014 Transcript at 55 ("It is my understanding from my monitor . . . that the MCSO had no policy relating to the self-recording of traffic stops by deputies, is that correct?"); *id.* at 63 ("The monitor, in his initial activities, has come across the fact that during the term of the traffic stops that are at issue in this lawsuit there have been digital audio devices that have been delivered to members of the MCSO to make recordings of all such stops. Are you aware of that?").

The Court thus has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Additionally, because the Court and the Monitor have engaged in *ex parte* proceedings regarding "disputed issues that are at the core" of this case, *Kensington II*, 368 F.3d at 302, the Court's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a).

### 8. The Court's *Ex Parte* Fact Finding.

During the Court's cross-examination of Movants during the contempt proceedings, it became clear that the Monitor and the Court also have privately discussed issues related to the Montgomery investigation. At the evidentiary hearing held on April 23, 2015, the Court revealed, during its questioning of Sheriff Arpaio, that the Court had investigated, outside the courtroom, the question whether funds are available to MCSO for the purpose of conducting investigations. Transcript of Evidentiary Hearing Day 3 at 657–58 (Apr. 23, 2015), Doc. 1027. The Court stated that it "was told over lunch that posse funds" are available to MCSO, and that Sheriff Arpaio "ha[s] various sources of funding within the MCSO, like the Cold Case posse has its own funds." *Id.* The Court later acknowledged the Monitor as the *ex parte* source of its information about the MCSO's funding sources. *See* Order Denying Motion for Recusal or Disqualification at 20 (July 10, 2015), Doc. 1164. These *ex parte* conversations formed part of the basis for Movants' May 2015 recusal motion. *See* Motion for Recusal or Disqualification of District Judge G. Murray Snow at 15 (May 22, 2015), Doc. 1117.

### 9. The Need To Expand the Monitor's Authority.

Before the Court expanded the Monitor's authority in the Second Supplemental Permanent Injunction, the Court and the Monitor discussed in private the Monitor's "concerns about MCSO operations" that "didn't fall within the scope of our order." May 14, 2014 Transcript at 29 ("The monitor's already come to me with a few concerns about MCSO operations, and he wanted to know what to do with them, because while they might have been recommendations he could have made, they really didn't fall within the scope of

our order."). It is unclear whether the Court's expansion of the Monitor's authority was based on these conversations, but they create at least an appearance of improper influence.

### 10.     The Structure of Community Outreach Meetings.

The Court and the Monitor have engaged in *ex parte* conversations that influenced the Permanent Injunction's provisions concerning community engagement. On April 4, 2014, the Court entered amendments to the Injunction providing for a public meeting for all of Maricopa County within 180 days of the Court's order, and one to three meetings annually thereafter. *See* Amendments to the Supplemental Permanent Injunction/Judgment Order at 3 (Apr. 4, 2014), Doc. 670. The previous day, the Court explained that this structure was established based on the Monitor's *ex parte* recommendations to the Court. Specifically, the Court explained that the Monitor told the Court that "to divide [the meetings] into one-half of the county and the other half of the county is such a large group that it makes it completely infeasible to have any sort of personal impact on the policing." Transcript of Status Conference at 43 (Apr. 3, 2014), Doc. 672. Accordingly, the Court decided to adopt the Monitor's recommendation "that we don't divide into two communities, that we have one community meeting for the whole county one month, and then that we have from between one to three meetings in each district annually . . . ." *Id.* Once again, these conversations strike at the heart of this case, i.e., how the Court should structure relief.

*      *      *      *      *

The *ex parte* communications discussed above are known to Movants only because they were disclosed by the Court on the record. It seems likely that they are the tip of an iceberg. Indeed, as previously noted, none of the *ex parte* communications disclosed on the record concern information gathered by the Monitor from its *ex parte* communications with Plaintiffs and/or their counsel. Movants would require discovery to determine the scope and content of any such improper communications. But for purposes of the instant motion, the known *ex parte* communications make clear that both the Court and the Monitor are

disqualified from further participation in this case.

**IV.    CONCLUSION.**

For the foregoing reasons, Movants respectfully request that the Court (1) order that the Monitor's operations be suspended immediately pending resolution of this motion, and (2) after briefing and argument, grant Movants' request that the Court be recused and the Monitor be removed from all future proceedings in this case.

DATED this 26th day of October, 2016.

COOPER & KIRK, PLLC

By *Charles J. Cooper*
　　Charles J. Cooper*
　　Michael W. Kirk*
　　Harold S. Reeves*
　　COOPER & KIRK, PLLC
　　1523 New Hampshire Ave., N.W.
　　Washington, D.C. 20036

*Admitted pro hac vice*

JONES, SKELTON & HOCHULI, P.L.C.

By *John T. Masterson*
　　John T. Masterson
　　Joseph J. Popolizio
　　Justin M. Ackerman
　　40 North Central Avenue, Suite 2700
　　Phoenix, Arizona 85004

Attorneys for Defendant Joseph M. Arpaio and non-party Movants Gerard Sheridan and Joseph Sousa

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2016, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

*/s/ Charles J. Cooper*

Charles J. Cooper