UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | 2:07-cv-02513-GMS |
| and | ) ) | |
| United States of America, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| vs. | ) ) | Phoenix, Arizona September 27, 2017 |
| Paul Penzone, et al., | ) ) | 1:05 p.m. |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                        A P P E A R A N C E S

 2      For the Plaintiffs:

 3                    ACLU - San Francisco, CA
                      By: CECILLIA D. WANG, ESQ.
 4                    39 Drumm Street
                      San Francisco, CA  94111
 5
                      ACLU - Phoenix, AZ
 6                    By: KATHLEEN E. BRODY, ESQ. and
                          BRENDA MUNOZ FURNISH, ESQ.
 7                    PO Box 17148
                      Phoenix, AZ  85011
 8
                      Law Offices of James B. Chanin
 9                    By: JAMES B. CHANIN, ESQ. (via telephone)
                      3050 Shattuck Avenue
10                    Berkeley, CA  94705

11                    MALDEF - Los Angeles, CA
                      By: JULIA GOMEZ HERNANDEZ, ESQ. (via telephone)
12                    634 S Spring Street, 11th Floor
                      Los Angeles, CA  90014
13

14      For the Plaintiff-Intervenor:

15                    US Dept of Justice - Office of Civil Rights
                      By: MAUREEN JOHNSTON, ESQ.
16                    600 D Street NW
                      Washington, DC  20004
17
                      US Dept of Justice - Civil Rights
18                    By: PAUL KILLEBREW, ESQ.
                      950 Pennsylvania Avenue, 5th Floor
19                    Washington, DC  20530

20                    US Dept of Justice - Civil Rights Division
                      By: CYNTHIA COE, ESQ.
21                    601 D St. NW, Suite 5011
                      Washington, DC  20004
22

23

24

25
```

```
 1              A P P E A R A N C E S  (continued)

 2      For the Defendants:

 3                  Maricopa County Attorney's Office - Civil Services
                    By: JOSEPH I. VIGIL, ESQ. and
 4                      JOSEPH BRANCO, ESQ.
                    222 N. Central Avenue, Suite 1100
 5                  Phoenix, AZ  85004

 6                  Walker & Peskind, PLLC
                    By: RICHARD WALKER, ESQ.
 7                  16100 N. 71st Street, Suite 140
                    Scottsdale, AZ  85254
 8
                    Goldman & Zwillinger, PLLC
 9                  By: MARCUS KELLEY, ESQ.
                    17851 N. 85th Street, Suite 175
10                  Scottsdale, AZ  85255

11

12      Also Present:

13          Raul Martinez, Monitor

14          John Girvin, Monitor

15          Robert Warshaw, Monitor

16          Al Peters, Monitor

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              (Proceedings resume at 1:05 p.m.)
 3         THE COURT:  Please be seated.
 4         COURTROOM DEPUTY:  This is CV07-2513, Melendres, et
 5   al. v. Penzone, et al., on for status conference.
 6         Counsel, please announce your appearances.
 7         MS. WANG:  Good afternoon, Your Honor.
 8         Cecillia Wang of the ACLU for plaintiffs.
 9         THE COURT:  Good afternoon.
10         MS. BRODY:  Good afternoon, Your Honor.
11         Kathleen Brody and Brenda Munoz Furnish from the ACLU
12   of Arizona for plaintiffs.
13         THE COURT:  Good afternoon.
14         MS. JOHNSTON:  Good afternoon, Your Honor.
15         Maureen Johnston for the United States.
16         MS. COE:  Good afternoon, Your Honor.
17         Cynthia Coe for the United States.
18         MR. KILLEBREW:  Good afternoon, Your Honor.
19         Paul Killebrew for the United States.
20         THE COURT:  Good afternoon.
21         MR. VIGIL:  Good afternoon, Your Honor.
22         Joseph Vigil and Joseph Branco on behalf of the
23   defendants; Paul Penzone, who is present and in court.
24         THE COURT:  Good afternoon.
25         MR. WALKER:  Good afternoon, Your Honor.
```

UNITED STATES DISTRICT COURT

1     Richard Walker on behalf of Maricopa County.

2          MR. KELLEY:  Good afternoon, Your Honor.

3          Marcus Kelley on behalf of Mark Goldman, at the last

4     minute, and I'll be filing a notice of appearance this

5     afternoon, and representing Jerry Sheridan and Sheriff Joe

6     Arpaio.

7          THE COURT:  Good afternoon.

8          Anyone else?

9          All right.  Well, I set the agenda for this conference

10    in my last order.

11         Mr. Vigil, I did appreciate the status matters that

12    you have filed, and have read them, updating me on what's going

13    on.

14         Do you want to take the matters and review them with

15    me, or how do you wish to proceed?

16         MR. VIGIL:  Your Honor, I'm not sure what order you

17    want us to go in.  I know we had the paragraph 70 plan which

18    you wanted to address today, and also the supervisory

19    discussions.

20         We can start with the paragraph 70 plan, if that's

21    where you would like to start, since we do have a stipulation

22    with the parties on that.

23         THE COURT:  That's fine.

24         MR. VIGIL:  And I don't know, Your Honor, how much in

25    depth you want us to go.  I know that the last time you were

1   here, you wanted us to work together with the parties to come

2   up with a plan; and if there were any differences, to submit a

3   single document pointing out those differences.

4           We were able to work in a very collaborative effort

5   with the plaintiffs and the plaintiffs-intervenors to come up

6   with a plan that we submitted to Your Honor in that

7   stipulation.  And as Your Honor may see, that is slightly

8   different from the previous version that we did submit to the

9   Court.  We feel that it's a more -- more focused version.  We

10  took into account a great number of the requests and -- and

11  suggestions that were given to us by the ACLU and by the DOJ,

12  incorporated those into it, and took out the stuff that was, we

13  felt, and I think what the parties felt -- and they can correct

14  me if I'm wrong here -- were more outward looking, which has

15  been expressed before.  And that's what we came up and

16  submitted to you with that stipulation, and that's the plan

17  that we are planning on moving forward with, and to continue to

18  move forward with.

19          We want to let the Court know, the parties know, that

20  in the plan we noted that we will be updating this plan every

21  six months.  A goal that we have is to update it, not only with

22  what we have done, but also revising it, check and see what

23  we've done, what's been done well, what hasn't worked, revising

24  that, putting that into a new version of the plan with goals

25  that do extend out further than the six months that we have in

1    there at this point in time.

2         I know at the last hearing there was some concern

3    about dates.  The one thing we did take into account were a

4    number of the dates that we did include in this version.  There

5    are longer-term goals that we have not put dates on.  We do

6    intend to address those with other versions, putting dates on

7    those.  They're not just something out there that won't be

8    addressed, but they will get dates as we move forward and as

9    this plan continues in different -- to progress and becomes

10   more refined, and addresses the issues that were raised in the

11   ASU second report.

12        THE COURT:  All right.  Thank you.

13        Ms. Wang?

14        MS. WANG:  Thank you, Your Honor.

15        I -- I have a couple of observations that pertain not

16   only to the paragraph 70 plan, but are big-picture comments

17   about two other matters that the Court might hear about today.

18   Those are the -- the sheriff's notice about the supervisor

19   intervention discussions that occurred, as well as an update on

20   the EIS provisions in the first supplemental injunction.

21        As Mr. Vigil said, the parties, all three parties,

22   have engaged in a very frank discussion about all of those

23   matters.  It has been a fairly transparent process, and one

24   that we very much appreciate because we do have the sense that

25   the Sheriff's Office has considered the views of the plaintiffs

1    and the Justice Department as plaintiff-intervenors.

2            We do want to point out a couple of things.  I think

3    that the provisions in the paragraph 70 plan were very much

4    geared -- need to be geared, from plaintiffs' perspective, on

5    shifting the culture within the Maricopa County Sheriff's

6    Office, and particularly the supervisor culture within the

7    Maricopa County Sheriff's Office, so that rank and file, from

8    top to bottom within the agency, and particularly deputies and

9    sergeants, view the provision of constitutional, fair, and

10   unbiased policing services as part of their law enforcement

11   mission.  And my colleagues will both reflect on some of the

12   things that we've seen that give rise to some concern on

13   plaintiffs' part.

14           And I think that what's become clear is that the

15   parties agree that that is the end goal, to have supervisors

16   and deputies who approach indications of biased traffic stops

17   with an open mind, with a willingness to learn, and a

18   willingness to change.

19           The paragraph 70 plan is meant to address how the

20   agency gets from here, which is not that scenario, to that

21   point in time.

22           On the supervisor intervention process, I think we've

23   seen some of the uphill battle that we're going to have with

24   that.  Our observation in that process, although it was a

25   collaborative one, it was a transparent one, and it was one

1    that all counsel for the parties approached with a willingness

2    and commitment to reform, showed that there are still

3    supervisors in the agency who are very resistant to change.

4    And that is why, Your Honor, the parties are collectively

5    proposing that the agency -- excuse me -- look at its personnel

6    practices as well as instituting training and the EIS system as

7    already ordered by the Court, years ago at this point.

8            The second observation that I would make, Your Honor,

9    is that on the matter of deadlines and dates, you see the

10   parties' stipulation about dates we're proposing for the

11   supervisor interventions, as well as a few dates that are set

12   forth in the paragraph 70 plan that was submitted to the Court.

13           Your Honor, we are -- we remain concerned that

14   deadlines the Court imposed in the first supplemental

15   injunction still haven't been met by the Maricopa County

16   Sheriff's Office.  But I think there's a balance to be struck

17   here because what we're -- what the parties are trying to do

18   with EIS and the intervention that are geared at addressing the

19   outlier deputies identified in Dr. Wallace's report, are all

20   meant to accomplish real reform.  And we have concerns, as

21   plaintiffs, about not having the agency rush through the

22   various processes in order to check off deadlines that -- that

23   have been imposed, but really get to where we want to be, which

24   is an agency that has stopped its biased policing practices

25   with traffic stops.

1        So those are the pieces, Your Honor.  I think the

2   paragraph 70 plan obviously is meant to address Dr. Wallace's

3   findings from the last annual report that there is

4   organization-wide bias in traffic stops.  In other words, even

5   if you addressed all of the outlier individual deputies, the

6   agency still has a problem with bias in traffic stops, and the

7   supervisor interventions are meant to address the individual

8   deputies, the findings of individual bias.

9        We hope that the process will result in true reform.

10  We've urged the Sheriff's Office to set realistic deadlines

11  that will allow time to really get to that point of true

12  reform, rather than checking off compliance boxes.  And so

13  we've been glad to engage in that process with them.

14       Ms. Brody is also prepared to address the issues with

15  the EIS update, but I think Mr. Vigil and Ms. Coe will present

16  first on that.

17       THE COURT:  All right.

18       MS. JOHNSTON:  Your Honor, regarding the paragraph 70

19  plan, we also participated in the process and worked with MCSO

20  and the plaintiffs to come up with -- with this comprehensive

21  plan, and we think it's a good plan.  We look forward to

22  continuing a transparent revision process of the plan over the

23  next few months as it becomes -- as we understand what MCSO

24  will be able to do in the next six months, in the next 12

25  months.  And we plan to leverage some of our own resources from

| | |
|---|---|
| 1 | the Department of Justice to assist MCSO in implementing the |
| 2 | plan effectively.  And we stand ready to provide technical |
| 3 | assistance and expert consultants to assist in the process of |
| 4 | implementing over the next year. |
| 5 | THE COURT:  Does the MCSO want that assistance? |
| 6 | MS. JOHNSTON:  That is my understanding, Your Honor. |
| 7 | Yes. |
| 8 | THE COURT:  Okay.  And so what are the -- what are the |
| 9 | particular areas in which you're going to provide that |
| 10 | assistance? |
| 11 | MS. JOHNSTON:  Well, Your Honor, one of our expert |
| 12 | consultants is with us today in the courtroom, Mr. Julio |
| 13 | Thompson.  He has over 30 years of experience working to |
| 14 | develop EIS systems across the country.  He has extensive |
| 15 | experience in Internal Affairs practices and in super -- |
| 16 | supervision and training.  And so he will be able to assist |
| 17 | MCSO, we believe, in -- in developing additional trainings. |
| 18 | As Ms. Wang explained, we will have some comments |
| 19 | about the EIS training, and we expect that Mr. Thompson will be |
| 20 | able to assist MCSO in further developing the EIS and turning |
| 21 | it into a -- a tool that supervisors find useful and practical, |
| 22 | and that they can -- they can look to to enhance their |
| 23 | supervision processes. |
| 24 | THE COURT:  I was under the impression that we'd |
| 25 | already begun -- we'd already accepted, approved, trained, and |

UNITED STATES DISTRICT COURT

1   begun the EIS system.  Has that not been the case?

2           MS. JOHNSTON:  Mr. Vigil, do you want to --

3           MR. VIGIL:  Your Honor, that is the case.  The -- the

4   training is currently taking place with the -- within the

5   agency for the EIS system.  There is -- and so the Court knows,

6   let me back up just a little bit on that particular issue.

7           Over the course of --

8           THE COURT:  Well --

9           MR. VIGIL:  -- getting to this point --

10          THE COURT:  Can I make a suggestion, Mr. Vigil?

11          MR. VIGIL:  Yes, Your Honor.

12          THE COURT:  If we've going to deal with the EIS

13  system, although I recognize that the EIS system is part of

14  your paragraph 70 plan, why don't we just deal with it

15  separately in a few minutes; will that be all right?

16          MR. VIGIL:  That would be perfectly fine, Your Honor.

17          THE COURT:  Let's resolve the paragraph 70 plan first.

18          Did you have anything else more you wanted to say

19  about paragraph 70, Ms. Johnston?

20          MS. JOHNSTON:  No, Your Honor.  Thank you.

21          THE COURT:  I did note in the stipulation that the

22  parties request the Court approve the plan as submitted and

23  acknowledge that I might want to obtain the input from the

24  Court's monitor.  I had reserved the monitor from providing

25  input into the plan in case I needed to have his recommendation

```
 1    if there were -- there was not agreement.  I'm glad that the

 2    parties have reached agreement.  I commend the parties for

 3    that.  I still think I'd like to hear what the monitor has to

 4    say.

 5              Does anybody object to that?

 6              MS. WANG:  No, Your Honor.  Plaintiffs would like to

 7    hear the feedback from the monitor since we haven't had a

 8    chance to get that.

 9              THE COURT:  Any objection by --

10              MR. VIGIL:  No, Your Honor.

11              MS. JOHNSTON:  No, Your Honor.

12              THE COURT:  All right.

13              Chief?

14              CHIEF WARSHAW:  Thank you, Your Honor.

15              In -- in sharing with the Court our impressions of the

16    plan, I preface it with our full understanding that this is --

17    this is the sheriff's plan, and I provide the Court with our

18    perspective, not just in our capacity as members of the

19    monitoring team, but as individuals who have run police

20    agencies.

21              The plan focuses very much on mandates that are

22    already in the Court's order.  And while I think that that's

23    important, and they are certainly relevant, I would encourage

24    the parties, to the extent that they are going to be

25    collaboratively discussing this, to look beyond what is already
```

```
 1    in the Court order and look at some other areas that I think
 2    are worthy of elaborating and embellishing.
 3             I'm caught by the fact, since goal number 1 refers to
 4    the EIS system, and while I know EIS will be discussed
 5    momentarily as a separate issue, but as it pertains to its
 6    reference in the plan, the plan states that the EIS system
 7    should be used to identify patterns and practices agency-wide,
 8    but then the rest of the plan is very much focused almost
 9    exclusively on patrol and traffic operations and traffic stops,
10    and perhaps that's something that the parties would want to
11    take a close look at.
12             Throughout the plan there are references to training
13    policies and statistical analysis.  We find these to be
14    extremely important, but they're also very important in
15    compliance.  And we think it -- the parties may want to
16    consider the place of differentiation between compliance and
17    bringing around organizational cultural change.  You know, the
18    two are different.
19             THE COURT:  Let me understand what you're saying here,
20    and I think Mr. Vigil referred to this in one of his filings
21    with the Court -- Ms. Wang has just referred to it -- in terms
22    of, for example, running into some supervisors who question the
23    data rather than question its results.  Is that the sort of
24    thing that you're concerned about?
25             CHIEF WARSHAW:  I -- I -- I am concerned about that,
```

UNITED STATES DISTRICT COURT

```
 1    yes, but I am also concerned that the plan's emphasis on
 2    training policies and statistics is part of the process, but
 3    they must further that process by looking at personnel issues,
 4    especially during the embryonic stages.
 5              THE COURT:  Okay.  So what you're talking about is
 6    recruitment then.
 7              CHIEF WARSHAW:  Correct.  That's correct.
 8              THE COURT:  I see.  Okay.
 9              CHIEF WARSHAW:  At the end of the day, police agencies
10    and the cultures that police agencies adopt, the cultures that
11    are allowed to flourish are very much contingent upon whom it
12    is that populates a police agency.  Greater emphasis -- and I
13    specifically look at MCSO goal 9, building a workforce that
14    provides constitutional and community-oriented policing, while
15    reflecting the composition of the community.  I would encourage
16    the parties, to the extent that they continue these
17    discussions, to talk more about who becomes a deputy, who
18    becomes a supervisor, what does the County personnel system say
19    or not say as to what some of the latitudes that are afforded
20    the agency in making employment decisions; can there be
21    inclusion of community members sitting on panels as individuals
22    who are applicants for deputies' positions are selected, can
23    they similarly sit on panels that consider people who are up
24    for promotion; community input and the measure to which the
25    agency reflects community input, not just in terms of its
```

UNITED STATES DISTRICT COURT

1    composition, but in terms of what the community's feeling and

2    what the values of the community are are very, very essential.

3          So we believe that the -- that this is certainly a

4    good start, but we believe that some additions can and should

5    be considered.  And to the extent that the parties so seek it,

6    we would be glad to get into further detail with them.

7          THE COURT:  Well, again, I -- the parties have agreed

8    to this, so I don't have any problem with it.  I do think that

9    the Chief -- Chief Warshaw raises some good points.  I don't

10   see those as being precluded by your willingness to adjust the

11   plan, Mr. Vigil, if you determine that there are -- there is a

12   basis to do so.

13         MR. VIGIL:  Your Honor, no.  Definitely not.  And we

14   would look to -- and Chief Warshaw specifically mentioned goal

15   9.  The Court may not know, we just recently within -- how

16   long -- not too long ago -- hired its first HR manager too, and

17   we expect that we could delve into those issues as we go along

18   with that and as we reach those new six-month deadlines to

19   incorporate more of that.  And it is the intent of MCSO to look

20   to see how much the community can be engaged into this.

21         So, short answer, no, Your Honor, it does not preclude

22   us from entertaining those suggestions.

23         THE COURT:  Any comment by either the plaintiffs or

24   the plaintiffs-intervenors?

25         MS. WANG:  Your Honor, plaintiffs certainly would like

1    to talk more with Chief Warshaw and his team and would be very

2    much interested in adding whatever provisions of a plan they

3    think would be helpful or necessary.

4          And just to react to something Chief Warshaw said, I

5    think this goes to not only goal 9, but goal 7.  You know, like

6    I said, it's -- it's a delicate process because we want the

7    rank and file throughout the agency to approach this process

8    with an open mind, and with a true willingness to achieve

9    reform so that the agency stops bias policing.  And part of the

10   problem, as I mentioned already, is that we have a number of

11   supervisors who may have been directly recruited by Sheriff

12   Penzone's predecessor in office, specifically to engage in the

13   kinds of policies that led us all into this litigation.  And so

14   that, in addition to the recruiting and hiring piece, is

15   something that I think we're -- plaintiffs are very interested

16   in fleshing out in goal 9.

17         The flip side of that, Your Honor, is goal 7, which --

18   which, frankly, we had urged all of us to come together on.

19   How do we hold up as exemplary those supervisors who are doing

20   it right when given the tools to encourage people to address

21   their implicit bias and to provide policing that is

22   community-oriented and that is -- that views complying with the

23   Constitution as part of the law enforcement mission.

24         So those are all things that are very important to us,

25   and I think the Court saw the agency's initial effort at the

UNITED STATES DISTRICT COURT

1   paragraph 70 plan which, when it spoke about personnel matters,

2   talked about recruiting a diverse workforce.  From plaintiffs'

3   perspective, that is a very laudable goal.  But we are more

4   centrally interested in recruiting a workforce that respects

5   Constitutional rights of people who live in this county.

6          THE COURT:  Did you have anything you wanted to add,

7   Ms. Johnston?

8          MS. JOHNSTON:  Nothing to add, Your Honor.

9          THE COURT:  Let me add one small concern I had -- it's

10  not a big concern -- but I do want to put it on the record so

11  that the parties are aware.

12          The County has not objected -- obviously the monitors'

13  staff, the monitor and his staff, are very experienced in lots

14  of areas of law enforcement administration, having had their

15  entire careers be involved in it at administrative levels.  So

16  I don't mind -- certainly don't mind, and I think the County

17  has authorized and we have allowed -- I have allowed the

18  monitor to provide technical assistance to the sheriff at the

19  sheriff's request, and I understand that that makes a lot of

20  sense.  And I don't mind that the monitor give his input on

21  plans like this.  But I guess I want to make sure that the

22  monitor -- the monitor's role not be confused, and the

23  sheriff's role not be confused, and the plaintiffs' roles not

24  be confused.  The sheriff is the sheriff.  If the sheriff wants

25  the input and the parties can collectively have a sense that

1    they can value from the contributions of the monitor, then I'm

2    not going to object if the monitor provides opinions like he

3    just did.

4             But if you're going to get in a fight -- I'm going to

5    hold the monitor to be my monitor.  That's who he is.  He's my

6    agent.  He's not yours.  And so I don't want to get in a

7    position where he driving any part of this, and I don't want to

8    make it appear that he is.

9             Does anybody have any questions or doubts about that?

10             MR. VIGIL:  No, Your Honor.

11             THE COURT:  All right.

12             Then let's move on to the supervision of the -- of the

13    statistical results, the outliers, what you plan to do about

14    it.  I have read the report.  I appreciate, again, Mr. Vigil,

15    your providing me with it prior to hearing.  I -- I think I

16    have some background on what you've done and what the problems

17    are.  But anything you want to say on that, let's discuss it.

18             MR. VIGIL:  Yes, Your Honor.  And I'm going to ask

19    Mr. Branco to address that as he was a part of the TA -- the

20    technical assistance -- discussions that were had in relation

21    to this.

22             And also I just want to make Your Honor aware that

23    today we asked Professor Wallace, who is also a part of those

24    discussions, to be here.  We did not anticipate the need for

25    her to speak to the Court, but in case the Court had some

1    questions, she is here.  And we also have Lieutenant Lugo, who

2    plays an integral part in all of this for the MCSO, that's also

3    here.

4            But with that said, I'm going to turn it over to

5    Mr. Branco, who will be able to speak to that, Your Honor.

6            THE COURT:  All right.  Thank you.

7            MR. BRANCO:  Good afternoon, Your Honor.

8            I don't want to cover too much of the same ground that

9    the notice goes over, unless you have any questions about it.

10           But to sum it up, the office was able to meet

11   collaboratively with a representative from the ACLU and a

12   representative from the DOJ, as well as representatives from

13   the monitor team and Professor Wallace, in order to evaluate

14   both the initial pilot program that involved five deputies who

15   engaged in this process, this supervisor discussion process,

16   and to also evaluate the remaining deputies.  It came up in

17   court in the last status conference, it turns out there were

18   211 deputies who received a flag.

19           And so with our filing and also through the course of

20   the technical assistance process, we really wanted to answer

21   two things:  One, how many of those 211 deputies need to be in

22   this process at this time; and the second thing is, based on

23   the results from the first five, what is that process going to

24   look like going forward?

25           And as our filing indicated, we went from 211 down to,

1    I believe, 35.  And it was a collaborative effort to look at

2    not only the flags the deputy had, but trying to get at what is

3    the deputy's internal decision-making like because that's one

4    of the values of having the supervisor discussion, is to have a

5    frontline supervisor who knows that deputy try to figure out

6    what it is that -- that's causing the statistical differences,

7    and also evaluating those -- those pilot -- those five pilot

8    supervisors.

9         The group was concerned that there was an attitude

10   among some of those supervisors that either, A, misunderstood

11   what it was they were supposed to be looking at through this

12   process, and by that I mean some of the responses indicated

13   that supervisors and deputies were focusing on pre-stop

14   identification of a driver or passenger's race or ethnicity,

15   and sort of trying to dismiss some of their -- the concerns in

16   the data by saying, well, we don't know who's -- who we're

17   pulling over.  That's not the purpose of this.  The purpose of

18   this process, of course, is to identify post-stop outcomes, and

19   to identify in those post-stop outcomes discrepancies between

20   races and ethnicities.  So that was one thing that needed to be

21   addressed.

22        The second thing that needed to be addressed from the

23   supervisor's standpoint as well was a sense of frustration.  I

24   think the opposing counsel said "resistance."  Really, the idea

25   that making sure that we're -- the office is giving supervisors

1    the tools to carry out this discussion in good faith and

2    reasonably, to makes sure that the deputies who need to change

3    their behavior change their behavior.

4         And so with those two things in mind, the TA group

5    decided to put on a second pilot program.  That second pilot

6    program is going to contain seven deputies -- that's seven new

7    supervisors -- and to quickly go over some of the most

8    important changes.  There was a revision in the amount of

9    direction that the office is giving the supervisors.  We're

10   letting them -- and keying them into some of the very specific

11   concerns that are identified about that deputy.

12        Another thing is ensuring that supervisors avoid some

13   of the pitfalls that the first pilot program had.  One of the

14   biggest ones was this idea of confirmation bias, where you have

15   a frontline supervisor who interacts regularly with the deputy

16   who goes into the evaluative process, thinking, I don't think

17   this guy has a problem.  That doesn't accomplish anything.  We

18   need supervisors to come in with an open mind and look at the

19   data, look at the patterns that have been identified, and from

20   there have a discussion with the deputy about the

21   decision-making.  If they come in and they've already got a

22   conclusion about what's -- what's occurring, that doesn't --

23   that doesn't get the job done.

24        And additionally, it -- it worked on some of the --

25   streamlining some of the paper -- the paperwork.

1          Another key difference -- and this is the last one

2     I'll describe right now, unless you have any more questions,

3     Your Honor -- another key difference is getting the

4     supervisor's command staff into the process earlier.  In the

5     first pilot program, command would review what the supervisor

6     did.  Now the command staff, and that includes if you've got a

7     sergeant who's having a conversation with a deputy, that

8     sergeant now needs to work with the lieutenant to talk about

9     what the sergeant is seeing in the information that's given --

10    that is available, talk about an action plan -- this is another

11    change -- an action plan that will be implemented as a result

12    of this process; and to then take that to the captain so the

13    captain of that district is aware of what's going on.

14          Not only do they meet before the discussion happens,

15    they're also required to meet afterwards to talk about what did

16    the deputy discuss, how was the deputy's demeanor during this

17    discussion, was the deputy able at the provide an explanation

18    about his or her decision-making that made sense under the

19    circumstances.  And from there, talking about what that action

20    plan is going to look like going forward.

21          There are a lot of options, of course, in an action

22    plan that you would expect from a supervisor, everything from

23    more closely observing the deputy, you know, that could take

24    the place of ride-alongs, greater and enhanced view of

25    body-worn camera footage, or greater statistical analysis, or

1  meeting more regularly with the deputy.  It's incumbent upon

2  the supervisor to assess the information and be sure that the

3  plan is tailored to meeting that deputy's needs to -- to

4  correct the issue.

5       THE COURT:  Mr. Bronco, you heard Ms. Wang earlier

6  raise the issue that you, yourself, have acknowledged -- and

7  it's not particularly surprising, I suppose -- of confirmation

8  bias.  And I believe that you've said in your filing -- I think

9  I got this from your filing -- that if you find that

10 confirmation bias remains a problem, that there may need to be

11 a whole new evaluation about how we deal with this issue.  If

12 that wasn't the Sheriff's Office that said it, is the Sheriff's

13 Office committed to that position?

14      MR. BRANCO:  Yes, Your Honor.  It was.  After

15 discussing the issue -- and these issues did come up in the --

16 in the technical assistance group -- but after discussing it

17 with the ACLU and the Department of Justice, and as well as

18 getting some of the feedback from their expert, their -- the

19 confirmation bias issue, if it persists, really does have the

20 power to undo the good work that this can do.  And while we

21 think it's premature to say right now that it is baked into the

22 cake of -- of what we've tried to do so far, that when we get

23 the results back from the second pilot -- again, at that point

24 we will have the previous five supervisors and the additional

25 seven supervisors.  So that will be a total of 12 out of --

and, of course, now I'm doing numbers -- but 35.  That will give us a better indication.

You know, one of the things that -- that we've all talked about is we don't want to do these things just to do them.  The Sheriff's Office does not have a checklist mentality, particularly on something as important as addressing the concerns noted by Professor Wallace's descriptive statistics.

It's very nice today that we have the opportunity to talk to you about both sides of this coin.  The paragraph 70 plan addresses the inferential statistics, and the TSAR program, the supervisor discussions, address the descriptive statistics.  And if the process we've laid out so far -- we've all worked together to try to develop this and refine it and -- and believe in it -- if it's not getting the job done, then we're going to have to find another way to get at this issue.

THE COURT:  All right.

Plaintiffs?

MS. WANG:  Your Honor, I think Mr. Branco has illustrated some of the reasons that I started out by talking about the supervisor intervention process alongside the paragraph 70 plan.  It's a delicate situation.  And to put the current process and what's set out in the sheriff's notice in context, you know, let's not forget that there was an initial process that happened with Dr. Wallace's initial report that

1   was very alarming to us, that was carried out without the kind

2   of transparent and collaborative process that we've now gone

3   through with the first pilot and now with the second pilot.

4          And our concern remains, Your Honor, that there may be

5   other additional steps that need to be taken, in addition to

6   these interventions.  There could be different things going on

7   that have led to the problematic, or I would say failed

8   interventions:  One could be outright resistance to the Court's

9   orders, which I mentioned before; one could be that people --

10  the supervisors simply don't have the tools they need; and a

11  third, Your Honor, I think, that was illustrated by the

12  interventions that have happened so far is that, again, there

13  is a supervisor culture that's marked by, in my view,

14  supervisors who believe that their job as a supervisor is to

15  protect their deputies and to protect their deputies from

16  allegations that they have engaged in bias policing, or any

17  other wrongdoing.  That goes into some of the issues we've seen

18  with the internal affairs process, as well.

19         And so, Your Honor, we've engaged in this process

20  where we're very glad that the Sheriff's Office has worked with

21  plaintiffs' counsel and with Justice private attorneys to come

22  up with the best shot we can take with the second pilot

23  project.  But it is something that I think is -- appears to be

24  a very deep-seated and endemic problem with the Sheriff's

25  Office.

1          THE COURT:  Ms. Johnston?

2          MS. JOHNSTON:  Your Honor, following up on what

3   Ms. Wang was saying, one of the things that we've done with the

4   second pilot process is that all of the parties, all of the

5   individuals who are involved in the technical assistance

6   process, will have access to the same materials that the

7   supervisors themselves are looking at in evaluating.  And so at

8   the next site visit in several weeks, we all plan to reconvene

9   and discuss whether or not we think that the supervisors'

10  response to those materials was reasonable.  And at that time,

11  we can assess whether or not we think that, you know, we're

12  seeing differences from the first pilot and from the first

13  traffic stop annual report from a year ago, or whether we need

14  to pause and reevaluate.

15          And just one additional point on something that

16  Mr. Bronco said regarding post-op outcomes.  The purpose of the

17  supervisory intervention is not to identify post-op outcomes.

18  The purpose is to identify selective enforcement of the law.

19  And one of the ways that that is -- is done is by looking at

20  the post-op outcomes.  But it's critical to prepare the

21  supervisors to be able to -- to look at the materials that they

22  need to look at and to know what to look for.  And many of the

23  supervisors are very familiar with looking at violations of the

24  Fourth Amendment, whether there's probable cause or reasonable

25  suspicion, but they may not have any experience looking for

1    violations of the 14th Amendment and what that looks like.

2          And I think that assuming that all of the supervisors

3    are -- are able to do that perhaps was an assumption we should

4    not have made.  And as -- I agree with Mr. Bronco that, going

5    forward, when the supervisors are not prepared to do that,

6    could be worse than doing nothing at all because it will

7    just -- it -- it could have the effect of creating additional

8    confirmation bias that the process is illegitimate.

9          And, you know, I think we appreciate MCSO allowing us

10   to be part of this process, we think that it has been a

11   transparent process and we hope to continue to work with them.

12   But we just wanted to alert Your Honor to our concerns that we

13   might be coming back to have additional discussions with you

14   about what we should do.

15          THE COURT:  Well, I appreciate that.  For what it's

16   worth, it sounds to me like the parties, at least, are doing

17   their best to deal with this issue cooperatively, and I don't

18   think -- I mean, when we talk about confirmation bias that

19   exists in supervisors, when you think about it, it's not a very

20   surprising thing that it's there, and I'm sure it's difficult

21   to deal with.  And I think that we need to -- I'm open.  I am

22   open, and I appreciate the parties working together to try to

23   resolve what is a difficult process.  But if we don't resolve

24   it there, we're not going to resolve it.  So I think that we

25   need to resolve it.  It is one area in which I will be patient,

1     if that's why you're raising that because you're concerned I

2     won't be.  I'll be patient, if -- if you can -- if you show

3     diligence in resolving the problem.

4           If the second -- if the second study shows better

5     results, I assume the plan is to proceed then under the current

6     plan.

7           MR. VIGIL:  Yes, Your Honor.  If it shows -- if

8     there's no problems with that, then it would be proceeding on

9     with --

10          THE COURT:  According to the schedule --

11          MR. VIGIL:  -- the stipulation -- according to

12     stipulation that we submitted to the Court.

13          THE COURT:  All right.  And then if you're going to --

14     if you have supervisorial issues that raise themselves in the

15     second study, are you going to come back and see me, or are you

16     going to go ahead and do the whole second shot?  Because here

17     is my concern.  My concern is not so much -- I agree and share

18     the -- share the concern of what I perceived to be all parties,

19     that we fix this problem.  But my concern is those 35 deputies

20     who have enough indicia of problematic behavior that they've

21     been identified as candidates.  If they're still on patrol and

22     they're unsupervised or uncounseled, and we have evidence of

23     their problematic behavior, that concerns me that we leave them

24     there.

25          Do you understand where I'm coming from?

1      MR. VIGIL:  I do, Your Honor.

2      THE COURT:  So I would ask that if in the second study

3 you haven't been able to resolve that issue, I would invite the

4 Sheriff's Office to give that some careful consideration before

5 they -- before we come back and talk about what we're going to

6 do about it.

7      All right.  Does that take care of that issue, or are

8 there some other matters?

9      MR. VIGIL:  I think so.  I just wanted to put on

10 record for the sheriff, and for everyone, that the sheriff has

11 taken these seriously, especially for the second round --

12 second pilot.  The sheriff took it upon himself, and so did

13 Chief Skinner, to attend that second round to make

14 presentations there and to show that they are fully behind

15 these discussions, these supervisory discussions.  So I just

16 wanted that on record.

17      THE COURT:  Well, I appreciate that.

18      Let me just make an observation, and plaintiffs can

19 tell me if they don't share it.

20      I expect that this is a problem, if the sheriff's

21 looking at it as he seems to be.  It's -- it's his problem.

22 We're all just going to try and help him resolve it.  And if he

23 wants to resolve it, we want to help him.  And it will be

24 resolved.  But I -- I don't expect that just because he comes

25 in and gets elected it's going to be easy for him to win the

1    confidence of supervisors who have been there for years and may

2    be engaging in these conduct -- in these kinds of conduct for

3    years.  And, you know, there may be some mixed messages in

4    society right now about whether or not you can engage in these

5    kinds of conduct.  And we want to help the sheriff in a gentle

6    way, but a firm way -- I guess that's an oxymoron -- we want to

7    help the sheriff do what is necessary to accomplish change that

8    the whole MCSO will buy into so that we all can have an

9    unbiased Police Department or unbiased Sheriff's Department

10   here.

11           I have been presuming, based mostly on your report,

12   not that -- and based on the -- on what both Ms. Johnston and

13   Ms. Wang did not say, that there was -- I have been presuming

14   that there have been no problems with the process by which you

15   winnowed down the 211 to 35.  I -- I just assume that because

16   you didn't say anything about that, that you agree that that

17   process was an appropriate and fair one.

18           MS. WANG:  (Nods head in the affirmative.)

19           THE COURT:  Ms. Wang, you're --

20           MS. WANG:  Yes, Your Honor.

21           THE COURT:  All right.

22           Next issue.

23           MR. VIGIL:  Your Honor, I think the next issue is

24   going back to the -- what you asked for me to hold off on, and

25   that's the issue of the training leading up to the November 1

1    deadline that we have for the full integration of the EIS

2    system.

3           The training is going on at this time.  It is taking

4    place.  I was going to -- before Your Honor asked me to hold

5    off, I wanted to just sort of set the stage that the training

6    has been in development for -- for a number of years, I think;

7    way before I came into this case is when the training and the

8    lessons plan started on the EIS system.

9           Since I have come into the case and since Sheriff

10   Penzone has taken office, we have been able to go through that

11   process in -- in working with the monitors, working with the

12   parties, to get the training, to get the lessons plans up and

13   going.

14          When recently before we -- just before we started to

15   do the training, there was a Train the Trainer that was done.

16   The parties, the DOJ, and the ACLU raised issues as to whether

17   are or not the training should continue.  We did meet on the

18   phone, and -- with the parties, and with the monitors to

19   discuss that.  During that discussion, we, as a -- as an

20   organization, and with input from the monitors, came to the

21   conclusion that we should go -- go forward with the EIS

22   training.

23          During those discussions, the DOJ and ACLU raised

24   certain issues.  Those issues were addressed by our agency, for

25   the most part.  There are some issues that were not.  However,

1    those issues that were not addressed at that time are issues

2    that we do plan on looking at.  And as we go forward after this

3    training is done, either doing refreshing training, doing sort

4    of what we would call level 202 type of training on EIS -- and

5    this will be a continual thing, to make everyone aware of the

6    EIS, to keep them aware of it, how they can use it, and the

7    different types of scenarios that may come up in how to address

8    things.  So these are all things that we are looking at.

9            But at this point in time, we are going forward with

10   the EIS training.  We anticipate -- and we don't expect that

11   November 1 deadline -- we anticipate that to be met.  That was

12   a deadline we committed to earlier, and Ms. Wang indicated that

13   she doesn't want us to just check boxes.  We're not just

14   checking boxes.  But we made a commitment to that deadline to

15   get training done in an appropriate manner.  We believe we're

16   there.  And we will have it done before that deadline.

17           THE COURT:  Thank you.

18           Ms. Wang, or is it Ms. Brody?

19           MS. BRODY:  Yeah.

20           Thanks, Your Honor.

21           I -- I did, as Mr. Vigil just said, have a chance to

22   observe the Train the Trainer session for EIS.  That was on

23   September 14th, and I also did have the opportunity to observe

24   a supervisory training on the next day, September 15.  And

25   after having viewed the EIS Train the Trainer session, I think

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | from a high-level we were left with concerns about the |
| 2 | readiness of that training, about the training's organization, |
| 3 | and also about its effectiveness and the potential that it's |
| 4 | effective.  And those concerns are really rooted in the |
| 5 | concerns that Ms. Wang has expressed before, that we really |
| 6 | want the agency to be focused on reforming its supervisory |
| 7 | culture, and we want to be sure that these trainings going |
| 8 | forward are not doing more harm than good. |
| 9 | We do very, very much appreciate the agency's pushing |
| 10 | forward on doing this and its focus on meeting deadlines, but |
| 11 | we don't want that to come at the expense of the effectiveness |
| 12 | of these trainings.  And -- you know, because we do view EIS as |
| 13 | -- as very, very important. |
| 14 | As Mr. Vigil just said, we did -- we -- when I say |
| 15 | "we," a representative, me, from the plaintiffs' team, as well |
| 16 | as some represents from DOJ, did have the opportunity to |
| 17 | provide our feedback immediately following that Train the |
| 18 | Trainer session on September 14th.  And, you know, I -- I know |
| 19 | that DOJ has also shared some written feedback with the agency |
| 20 | with which we concur.  So I don't think it's necessary, Your |
| 21 | Honor, to go into very much detail about what those concerns |
| 22 | are.  But just to give some -- some kind of high-level |
| 23 | examples, we -- the Train the Trainer session that I observed |
| 24 | seemed to be very kind of cursory and not ready to deliver.  So |
| 25 | there was a kind of quick movement through it in a way that did |

1    not, in -- in my view, allow the trainers who were being

2    trained to learn the material that they were going to be

3    delivering; and there did seem to be some lack of engagement in

4    the room, perhaps because of, you know, what -- our -- our

5    perceived lack of readiness of the material to go forward.  But

6    from a content perspective, you know, there were some problems.

7    And -- and, you know, this -- this concern is again rooted in

8    this idea that these supervisory discussions can be very, very

9    difficult for supervisors to have.  And we didn't come away

10   with a feeling that the training was modeling what those

11   discussions should look like to give the supervisors the tools

12   to have those difficult discussions in a way that would not

13   increase resistance among -- among the, you know, the rank and

14   file of the agency to EIS, which is so incredibly important.

15          So, really, we want to have the super -- we want to be

16   sure that the supervisors have the skills to have those

17   difficult discussions, and the information that they need to do

18   these interventions or discussions, because -- and we want them

19   to accept the great value that EIS can bring to preventing bias

20   policing without the negative feelings that we feel like are

21   already there.  Those negative feelings and resistance to EIS

22   into having these discussions are there.  So we do not want

23   that to become more deeply rooted in the agency than it -- than

24   it may be right now.

25          We are going to -- you know, we appreciate the steps

1  that MCSO has taken to modify the training that they were --

2  they were planning to deliver, and we're going to continue

3  to -- to partic -- try to have the opportunity to participate

4  and view those trainings and evaluate them.  But we did have

5  those concerns, and so we'll be watching them going forward.

6          THE COURT:  Ms. Coe?

7          MS. COE:  Thank you, Your Honor.

8          I think the starting point for us in talking about the

9  EIS training probably would be to echo what the agency and the

10 ACLU have already said, which is that this was a collaborative

11 process.  We want to express appreciation to the agency because

12 we provided quite a lot of feedback before the training and

13 shortly after the training, and a couple of days after that.

14 And a lot of that feedback was accepted.  It was clear the

15 agency tried to make an effort to take that on board.

16         And the agency did do quite a number of things well in

17 the training.  For example, Sheriff Penzone took the time to

18 record an introductory message to underscore the importance of

19 the training.  We think that's a really wonderful thing, and we

20 should try to do that as much as possible for trainings just so

21 deputies get the impression and the message from on high that

22 this stuff is important.

23         We also noticed that the agency did try to make some

24 changes in response to our feedback.

25         But our overarching concern is and remains that we

1    want to be sure that the training is consistent across the

2    agency.  We want to make sure that supervisors know what an

3    alert is, what they should do in response to it.

4            One of the concerns we had during the training was

5    that we weren't confident that supervisors had been given the

6    tools to know how to have the most difficult discussions with

7    deputies.  It's one thing to talk about the easy situations,

8    but we were worried that perhaps supervisors need to get more

9    guidance on dealing with hostile deputies, sceptical deputies,

10   deputies who perhaps fudge the facts when they're talking to

11   their supervisors.

12           So one way to think of it, I think, is to quote one of

13   the MCSO command staff who put it very well, was that this

14   training is a starting point.  This would be EIS 101.  So the

15   parties are going to have to continue to work together to

16   address some of the concerns that Kathy described and that I

17   just mentioned, because the EIS training is critical.  If

18   supervisors don't know how to use the EIS system effectively,

19   it can't achieve its purpose, and it can't address some of the

20   concerns that you raised in your orders.

21           So looking forward, what we're hoping to do is

22   continue to work with MCSO.  Ms. Johnston and I are going to

23   attend training later this week, and we want to make sure that

24   we give feedback to the agency to make sure that some of the

25   difficulties that can arise from poor training don't happen in

1    this case.  If you don't have good EIS training, the

2    credibility of the supervisor in the command structure can --

3    can suffer; we can have inconsistencies from one supervisor to

4    the next, and the purposes of EIS can't be achieved.

5            So what we're going to do at this point is, of course,

6    continue to communicate with MCSO about the training and ways

7    to improve the training.  And then when supervisors begin to do

8    their documentation of EIS interventions, we're going to be

9    looking at that, because if we can see that supervisors don't

10   understand what they're supposed to do or aren't taking the

11   process seriously, we'll have to talk to MCSO about ways to fix

12   that.

13           THE COURT:  Well, I think I've understood what you

14   said, but I want to make sure.  And then I'll let you say your

15   piece, Mr. Vigil.

16           MR. VIGIL:  Thank you, Your Honor.

17           THE COURT:  You're not asking the training stop.

18           MS. COE:  Your Honor, we did ask that MCSO consider

19   postponing the training.  We discussed that with them.  And

20   it's their decision, and they decided to move forward with the

21   training.  So we think at this point the best response from us

22   is to attend the training.  And if we see problems, we'll

23   continue to do what we have done in the past, which is let them

24   know how they can address it.

25           We have also brought our consultant, Mr. Thompson,

1    with us to the Train the Trainer, and he provided excellent

2    feedback to MCSO.  And he'll be attending tomorrow's training.

3            So what we're going to do is try to continue to be

4    collaborative because we think that's the best way forward, to

5    make sure this training can be the best it can be.

6            THE COURT:  All right.

7            Mr. Vigil?

8            MR. VIGIL:  Your Honor, I just wanted to point out

9    that not only -- the training that we're talking about is not

10   just EIS training.  There's two components in two days of this

11   training.  It's EIS training, and it's also the supervisory

12   training.  And there were discussions as we were -- as the

13   plans were going along, whether or not these would be done

14   hand-in-hand together.  And the conclusion was that a two-day

15   training on EIS and supervisory training would be the best.

16   And so those go hand in hand.

17           I'm not sure if Ms. Brody was present for the full

18   second day of the supervisory training, Train the Trainer, but

19   that's -- I just wanted to make the Court aware.  It's not just

20   EIS, but the supervisory training, that is giving them also the

21   tools that they need.

22           And also, in answer to -- in response to your question

23   about whether or not the parties wanted the training to be

24   either postponed or stopped.  And we did hear them out, and --

25   on the phone.  I checked with the monitors who were there at

the Train the Trainer to make sure that there were no glaring

errors, no glaring problems that we had to be concerned about

to say, yes, we need to stop and rethink this and -- and make

these changes.  And none were pointed out to us.  If there

were, we might be in a different situation today here before

Your Honor.  But there weren't.  We made the decision to make

some of the changes that were pointed out to us, but to

proceed -- proceed with the training for EIS and the

supervisory training.

THE COURT:  Chief, do you have anything you want to

say on this?

CHIEF WARSHAW:  I do, Your Honor.

I certainly recognize the good faith concerns

expressed by the plaintiffs and the plaintiffs-intervenors.

All the parties were involved in the development of this

training.  Training starts as an imperfect product.  It

improves with time.  Instructors become more comfortable in

their delivery.  There are constant evaluations of the training

handed in by the students, which allows for the agency to

remediate, and I'm sure they will discuss it with the parties.

And if adjustments have to be made, they will be made.  It's an

evolutionary process.

We had a representative from our team, Major Peters.

Major Peters has been involved with the training portfolio of

this project from the beginning.  He's the former commandant of

1    the State Police academy for the New Jersey State Police.  We

2    value his on-site judgment, and certainly his assessment.

3    Understanding full well that it was ultimately the agency's

4    decision, his assessment was that this point -- at that point

5    in time he saw no reason why the agency should not proceed.

6    Again, that does not mean that there are imperfections -- that

7    there are not imperfections, but we feel that the agency has

8    been amenable to suggestions by us and suggestions by the

9    parties.  And if adjustments have to be made, we're confident

10   that they will be.

11           THE COURT:  I'm not sure that I have to make a whole

12   lot of comment on this.  It seems to me that the parties have

13   worked towards what I think is the best possible solution.

14   Maybe I'm wrong about that.  So I will offer a few other

15   thoughts.

16           When the parties are working together collaboratively,

17   as you have done, it takes some time, and it has taken some

18   time to get the training ready in this case.  Frankly, it's

19   taken quite a bit of time.  I think, based on my understanding,

20   and my understanding may be limited -- I'm sure it is

21   limited -- everybody had input, and everybody agreed to a

22   finalized process.  And that doesn't mean that when you start

23   the process you like it.

24           And certainly, Ms. Wang, there is that nut to crack

25   that we have to get the buy-in and the training of the

1    supervisors themselves.  So I understand the plaintiffs'

2    concern about that.  And maybe, in fact, your concerns now are

3    also informed by the first pilot supervisory process, and I

4    understand that as well also.

5          So I think it makes sense for you to, as Ms. Coe has

6    suggested -- and I think you're authorized to -- monitor the

7    training, go there, express your concerns, share your expert.

8    I think that's terrific.

9          But I think since this has taken so long -- and pardon

10   me, but it was four years ago -- four years ago -- that I first

11   ordered that there be EIS.  Four years later we are now

12   implementing EIS.  I am a little tired of this process taking

13   that long.

14         Now, a lot of that dose not have to do with these

15   plaintiffs or these defendants, but it does have to do with

16   this lawsuit.  And it is time that we get change here.  And

17   change has to start somewhere.

18         So I have been over to some of the trainings -- well,

19   I should not use the plural term.  I have been to training, and

20   I will go again if the parties think it's helpful.  I will go

21   unannounced, and I will just slip in if you think there's an

22   issue that you think you need to have me see.  I'm happy to do

23   it.  But what I saw when I went was good-faith training.  And

24   that wasn't even under these defendants.  That was under the

25   former defendants.  And it seems to me that some of the

1    training that has been described to me has even been innovative

2    and fun in a way that might be easily received by police

3    officers.  I heard about a Jeopardy-style game that they were

4    doing that sounded like people had put some thought into how to

5    have this stuff be received in a friendly way.

6            In the end, though, I think, Ms. Wang, because we

7    don't encounter problems until we start, sometimes, I think we

8    have to start.  And so I -- I am not going to stop training.  I

9    think we need to do that training.  I'm going to be very open,

10   and I hope and I sense that the parties are being open with

11   each other.  And I hope you'll continue to be so in terms of

12   how we can improve this to make it work for the deputy and for

13   the deputy sergeant, for the lieutenant, and get -- get the

14   changes that need to happen in this agency accomplished.

15           Is there any specific -- after I've prattled on and

16   said that stuff, is there anything specific you need me to

17   decide?

18           MS. BRODY:  No, Your Honor.

19           MS. COE:  No, Your Honor.

20           MR. VIGIL:  No, Your Honor.

21           THE COURT:  All right.

22           Anything else, Mr. Vigil?

23           MR. VIGIL:  Your Honor, I just wanted to give you an

24   update on the community -- the community advisory board --

25           THE COURT:  Oh, thank you.

1          MR. VIGIL:  -- and to let Your Honor know that the

2    members of that board have been selected.  And that at this

3    time, it's my understanding they have met on at least one if

4    not two occasions, and have begun their work.  So I just

5    want -- and we will file a notice with the Court.  I intended

6    to have that filed before today, Your Honor.  I just didn't get

7    to it.  So I wanted to bring that to your attention.

8          THE COURT:  Thank you.

9          MS. BRODY:  Yes, Your Honor.

10          We are -- we're very happy that the five members have

11    been selected.  And actually, they -- the five members did meet

12    on September 13th.  There were representatives from plaintiff

13    counsel, from the DOJ and several representatives from MCSO

14    there.  I think it was a first -- a very productive first

15    meeting.  And we were also informed that the five CAB members

16    met themselves together without anyone else a couple of days

17    ago on -- on Monday.  So we're very happy that they are seeming

18    to be getting going on their work, working together well, and

19    focused on their -- the purpose that this Court had in mind

20    when you -- when you issued your order years ago.

21          THE COURT:  All right.  Thank you.

22          MS. JOHNSTON:  Yes, Your Honor.

23          I -- I was also present at the meeting and echo what

24    Ms. Brody said, and some of the members of the community

25    advisory board have already reached out to our team to try to

1   get information about how similar community boards in our other

2   cases operate and organize themselves, and we think that's very

3   positive and are planning to put them in touch with other

4   individuals in other jurisdictions who operate in similar --

5   similar capacities.

6           MR. VIGIL:  One other thing, Your Honor.  There have

7   been a number of personnel changes within MCSO due to

8   promotions and just shuffling around.  One of those changes has

9   to do with the single point of contact in paragraph 9.  That

10  was and has been Ben Armer for a number of years, and he's done

11  a tremendous job in that role.  But he's moving on to different

12  pastures; and we have a new lieutenant that's going to be in

13  charge of that, and that's Lieutenant Frank McWilliams.  And he

14  is here in court.  I just wanted to make you aware of that.

15          THE COURT:  Thank you.  I --

16          MR. VIGIL:  And also, Your Honor --

17          THE COURT:  -- I will say that the monitor, in his

18  limited reports to me, has said that Lieutenant Armer has done

19  excellent, excellent work.  He's sorry to see him go.  But I

20  think he made the observation that if he didn't let him go, he

21  was going to die.

22              (Laughter in the courtroom.)

23          THE COURT:  But he did say that he -- that he was very

24  commendatory of Lieutenant Armer.

25          And Lieutenant, I realize that, as I sit here, I see

UNITED STATES DISTRICT COURT

1    very little of what goes on to make things change.  But I want

2    to -- I want to express to you my gratitude that you have been

3    faithful and diligent, serving well in trying to implement in

4    good faith the orders of this Court for the benefit of the

5    department and this community.  And I thank you.

6          MR. VIGIL:  And, Your Honor, I also wanted to point

7    out that there is going -- there is a new captain over at the

8    court implementation division, that's Captain Tim Campbell.  So

9    I just wanted to make you aware of that.

10         Those are two of the more prevalent changes, so you

11   know.  And I will be filing a notice with the Court about the

12   contact, the single contact change.

13         THE COURT:  All right.  Thank you.

14         The parties have been very good to respond by letter

15   to my inquiry about the Alonso inquiry, and have -- several

16   have indicated that we could raise it at this status meeting.

17   I've done it by letter for concerns about possible

18   confidentiality obligations under state statute that I didn't

19   want to violate.  So I guess I'm going to ask you, Mr. Vigil,

20   do you see any problem if we discuss the Alonso letter in

21   public, or do you want to do that under closed circumstances?

22         MR. VIGIL:  I don't see any problems with that, Your

23   Honor.

24         THE COURT:  Does anybody else have any concern about

25   confidentiality?

UNITED STATES DISTRICT COURT

1              All right.

2              I've proposed a draft letter to Mr. Alonso -- and we

3      can put it in an order if we're going to do it in public.  It

4      seems to me that all parties are agreed, and certainly the

5      Court is, that to the extent that someone has retired from the

6      MCSO who might otherwise be subject to discipline, there is no

7      real practical discipline that can be imposed, and that the

8      process has been served as it -- to the extent it can be as it

9      pertains to such persons; and that therefore, we can instruct

10     the independent authority, Mr. Alonso, that as to persons who

11     have retired from the MCSO, there is no need to impose

12     discipline because it would be a useless and needless expense

13     to the taxpayers of Maricopa County.

14             Is there any dispute about that?

15             MR. VIGIL:  No, Your Honor.

16             MS. WANG:  No, Your Honor.

17             MS. JOHNSTON:  No, Your Honor.

18             THE COURT:  All right.

19             MR. WALKER:  No, Your Honor.

20             THE COURT:  The second -- the second matter raised by

21     the independent authority Alonso is he just wanted to make sure

22     that since he apparently has to appear in merit commission

23     proceedings in those cases in which he has imposed discipline,

24     that if he comes, he'll get paid for it, essentially; that it

25     will be considered part of his duties.  And it seemed to me

that the responses that I received from the parties are

acknowledgment that those who are involved, those who have

received discipline, are entitled to the due process that is

involved in the hearing, and that necessitates -- if that

necessitates sometimes the independent authority, that that

would be part of Mr. Alonso's duties and that he should receive

appropriate reimbursement for that.

       Is there any dispute about that?

       MR. WALKER:  No, Your Honor.

       MR. VIGIL:  No, Your Honor.

       MS. WANG:  None from plaintiffs.

       MS. JOHNSTON:  No, Your Honor.

       THE COURT:  All right.

       Anything else we need to raise?

       MR. VIGIL:  Nothing from us, Your Honor.

       MS. WANG:  Not from plaintiffs, Your Honor.

       MS. JOHNSTON:  Nothing from us, Your Honor.

       MR. WALKER:  Nothing from the County, Your Honor.

       THE COURT:  All right.

       I appreciate your being here.  I also want to express

my appreciation, because I know it is not easy, that you have

been trying to work together for the benefit of this community.

I'm not expecting that you'll agree on everything, but I hope

that we have the good sense to realize that even if we don't

agree on some things, that doesn't mean that we shouldn't

1    strive to agree on everything we can agree on, and I'll resolve

2    the rest.

3              Thank you.

4                   (Proceedings in recess at 2:17 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

         I, CHARLOTTE A. POWERS, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.
         I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.
         DATED at Phoenix, Arizona, this 30th day of September,
2017.


                              s/Charlotte A. Powers
                         Charlotte A. Powers, RMR, FCRR




**UNITED STATES DISTRICT COURT**