**PLAINTIFFS' COMMENTS ON MONITOR'S
DRAFT THIRTEENTH QUARTERLY REPORT
DATED OCTOBER 8, 2017**

**I.     Introduction**

Plaintiffs reviewed the Monitor's Draft Thirteenth Quarterly Report in its entirety, but will not be responding to or addressing every topic and point included in the report. Instead, Plaintiffs have chosen to highlight those issues that are most concerning from the perspective of the Plaintiff Class.  Training (Section 6), Traffic Stop Documentation and Data Collection (Section 7), Supervision (Section 9), and Misconduct Investigations, Discipline, and Grievances (Section 12) remain of particular concern to Plaintiffs, and comments to those sections are provided below.

**II.    Training (Section 6)**

The Monitor comments that the MCSO Training Division uses the Master Training Calendar to manage class scheduling.  *See* Draft Report ¶ 44.  Plaintiffs agree with the Monitor that use of this calendar is a good management mechanism, but recommend more periodic updates to the Calendar to more accurately reflect the class offerings.  Plaintiffs also again recommend that MCSO make the Calendar more accessible to MCSO personnel and the public, and provide more in-depth descriptions of upcoming trainings.

The Monitor also comments that MCSO produced materials for the Early Identification System ("EIS") and Supervisor Responsibilities: Effective Law Enforcement ("SRELE") trainings during the second quarter of 2017.  *See* Draft Report ¶ 45.  MCSO began delivery of these trainings in September 2017.  Plaintiffs observed the Train-the-Trainer sessions and the actual trainings, and were extremely troubled.  Plaintiffs were particularly concerned with the delivery of the EIS Train-the-Trainer session and the EIS training.  Some of the specific concerns included: the inclusion of a problematic video in the training, the instructors' clear lack of preparation, and their inadequate teaching skills.  Plaintiffs relayed their concerns to the Monitor and MCSO, and believe that MCSO should place an increased focus on improving these trainings for next year.

The Monitor mentions that MCSO continued to update the Annual Combined Training ("ACT") during the second quarter, although the Monitor did not review the training material during this time.  *See* Draft Report ¶ 49.  The ACT is an extremely important court-ordered training, as it covers the cornerstone issues of the *Ortega Melendres* case, and the curriculum should be carefully scrutinized and reviewed before it is delivered.  However, the ACT Train-the-Trainer session was held in September 2017, before the lesson plan was finalized.  Plaintiffs understand that this decision was made to accommodate schedules, but strongly recommend against delivering training before it is reviewed and approved by all parties.  To address this issue, Plaintiffs favor

creating a master compliance plan, as the Department of Justice has suggested, to allow all parties and the Monitor to plan upcoming work.

### III. Traffic Stop Documentation and Data Collection (Section 7)

#### A. Annual Traffic Stop Analysis (ASU Report)

Arizona State University issued its "Yearly Report for the Maricopa County Sheriff's Office, Years 2015-2016" on July 28, 2017, MCSO's second annual traffic stop analysis. Plaintiffs, like the Monitor, continue to be deeply concerned by the findings of that analysis, particularly the finding of agency-wide bias. *See* Draft Report ¶ 66. Once again, ASU found that "there are deputies potentially engaged in racially biased policing and that within the traffic enforcement portion of MCSO, minorities are subjected to additional legal contact and intervention for several stop outcomes. As such, the issue of racially biased policing within MCSO appears to be both a deputy and systemic problem." Danielle Wallace, Ph.D., et al., *Yearly Report for the Maricopa County Sheriff's Office, Years 2015-2016* at 12; Doc. 2116-1. ASU also found that "the likelihood of Hispanics being arrested or searched over time has not decreased or even changed." *Id*. Finally, "there are no changes in the likelihood of Hispanics receiving citations or warnings relative to other stops over the years." *Id*.

Plaintiffs agree with Professor Wallace's assessment that biased policing remains an agency-wide problem, and the performance of MCSO supervisors in the pilot interventions of identified outlier deputies seemed to validate this conclusion. Almost without exception, supervisors defended their subordinates' behavior, questioned the validity of the ASU findings, and failed to address the conduct of the deputies they were supposed to coach and otherwise assist in the proposed interventions. If the supervisor intervention process continues to fail, Plaintiffs believe that some existing supervisors and commanders may need to be investigated and disciplined where appropriate. Supervisors and commanders who continue to deny the significance of the data without adequately investigating and addressing outlier behavior happening under their command should be considered for immediate transfer.

In her report, Professor Wallace also identifies outlier deputies, but she concludes that a remediation plan that only focuses on those specific deputies may not be the best approach for MCSO to take:

> While there may be some deputies that are engaged in possibly problematic behavior at a higher rate than others, the inferential analyses conducted above suggest that when presented with the "average stop," all deputies are performing similarly. Thus, setting alerts on specific deputies may be less fruitful for ending or even tamping down racially biased policing within MCSO than a more holistic, system wide approach.

*Id.* at 12, 54.

2

Plaintiffs also agree with the Monitor that MCSO's attempt to obfuscate Professor Wallace's findings were counterproductive. *See* Draft Report ¶ 66. We therefore appreciate the Monitor endorsing our position in the Draft Thirteenth Report:

> During our July site visit, ASU stated that it might rephrase the conclusion about organization bias, at MCSO's direction, to reflect that its finding pertains only to deputies within the organization who are involved in traffic stops. There was much discussion about whether this rephrasing might obfuscate findings about bias within MCSO. ASU's conclusions regarding systemic, organizational bias in MCSO have not changed between the first annual traffic stop analysis and both versions of the second analysis. To now attempt to mitigate the conclusion and nuance the findings about organizational bias through word choice and semantics seems disingenuous and ill-advised.

Draft Report ¶ 66.

Concerns about potentially "flawed data" (i.e., the "low org" variable) have yielded a number of rewrites of the ASU report. Nevertheless, the conclusions have never changed despite MCSO challenging its own data for two years straight. Unfortunately, MCSO has not adequately addressed how agency bias can be changed, and discussions amongst the parties and the Monitor have not been fruitful. Instead, the site visits over the past year are often devoted far more to questioning the soundness of the data—MCSO's own data—than they are to coming up with practical solutions to a problem that persists with almost no change over the past two years. Plaintiffs will be carefully watching the implementation of the recent Paragraph 70 plan, created only after it was ordered by the Court.

The ASU study is not an academic exercise; it has been ordered by the Court as an important remedial measure to correct MCSO's past constitutional violations. Doc. 606 at 31. Unlike academia, the ASU study is a means to an end—successfully addressing racial bias at MCSO. The racially biased policing that was found by the Court after the 2012 trial in this case continued during the period covered by the ASU study, harming the Plaintiff Class. Real people are affected by the bias of MCSO deputies identified in the ASU report. Latinos are still stopped disproportionately. They are given citations when whites receive warnings for similar offenses. They are given warnings when they should not have been stopped at all. They are searched in far greater numbers than whites. Despite improvement, Latinos are still being detained for longer periods of time for similar offenses. And because MCSO has allowed ICE agents to work in MCSO jails, sending a disproportionate number of Latinos to jail has the potential that some members of the Plaintiff Class, who may not otherwise have been arrested, might face the dire consequence of ending up in ICE custody.

The ASU report and its conclusions go to the heart of the Plaintiffs' purpose for bringing this litigation. The Plaintiff Class continues to suffer biased policing by MCSO

with virtually no improvement. If the MCSO cannot adequately address this issue, more drastic remedies may be appropriate.

### B.  Deputy Post-Stop Perceptions of Ethnicity

Plaintiffs continue to be concerned about deputies' misidentification of drivers' and passengers' ethnicity. Patrol deputies are required to complete a Vehicle Stop Contact Form ("VSCF") and record the post-stop perceived ethnicity of drivers and passengers. Doc. 606 at 28. Plaintiffs initially raised this issue with MCSO and the Monitor team in April 2017, after reviewing traffic stop documents from the first quarter of 2017 and noticing that that a disproportionately high number of VSCFs that marked drivers and passengers with Latino-identified surnames as other than Latino.

The Monitor and MCSO independently reviewed the documentation for the stops Plaintiffs identified, and also concluded this was a pervasive problem. *See* Draft Report ¶ 54. To combat this issue, MCSO developed a "Surname Briefing" training that was included in the 2017 SRELE lesson plan. *Id*. Plaintiffs observed the Train-the-Trainer and the actual SRELE training in September 2017, and provided feedback to the Monitor and MCSO. Plaintiffs were primarily concerned with some students' overt hostility and obvious lack of "buy-in" towards the briefing. Plaintiffs remain apprehensive about this problem, and believe that MCSO should continue to monitor this issue and institute disciplinary proceedings against recalcitrant deputies.

### C.  Body-Worn Camera Issues

The Monitor has noted a continued concern with several issues related to deputy use of body-worn cameras ("BWC"), and Plaintiffs share this concern. *See* Draft Report ¶ 62. Plaintiffs viewed several files of footage during the second quarter and observed problems with deputies failing to promptly turn on the cameras, placing the cameras at awkward positions, and covering the cameras or completely deactivating them at seemingly critical times. These problems violate the requirements of the First Supplemental Injunction and MCSO policy, which both require the prompt and proper use of BWCs. Doc. 606 at 30, MCSO policy GJ-35: Body-Worn Cameras. The MCSO has utilized BWCs since May 2016, and deputies should be familiar with agency policy regarding the proper operation of cameras. Plaintiffs believe that an increased focus on coaching and discipline for repeated and deliberate failures of body camera activation is warranted.

### D.  Individual Traffic Stops

Plaintiffs reviewed traffic stop data from the second quarter and have concerns about several stops involving Latino drivers and passengers.

During a traffic stop on June 10, 2017, a deputy stopped a Latina woman for "failing to maintain the line" and arrested her for possession of methamphetamine. The woman and the passengers, her husband and children, did not speak English, and the

4

deputy did not speak Spanish. The deputy called for interpretation assistance, but did not wait for the assistance to arrive, and proceeded with an investigation. The deputy asked the adult passenger for his identification and did not provide a reason for this request. The deputy also covered the BWC when another deputy arrived on-scene to provide interpretation assistance.

In a stop that occurred on June 18, 2017, a deputy pulled over a 17-year-old Latino driver on a busy freeway. The BWC footage reveals that the deputy asked the driver for his telephone number, to pull down his prescription glasses, and to stick out his tongue. The deputy asked the driver questions related to possible drug use, and instructed the driver get out of the car, take off his glasses, and count to thirty. The driver told the deputy that he cannot see without his glasses. He was able to count to thirty. The deputy issued a citation for speeding, but the deputy's behavior was inappropriate.

Plaintiffs have yet to see any supervisory notes or intervention measures concerning these stops, and recommend further investigation into both incidents.

### IV.     Supervision (Section 9)

Plaintiffs reviewed the supervisory notes that were produced by MCSO during the second quarter and continue to be concerned with the substance of these entries. Plaintiffs did not come across any supervisory notes where a supervisor did more than read or provide rote recitations of bias-free policing policies to their deputies. Like in the first quarter, Plaintiffs did not find any instances where a supervisor addressed actual or even potentially biased behavior by his or her subordinates. This is concerning given the issues identified in the latest analysis and report of traffic stops by ASU. Although Plaintiffs have seen a handful of supervisory notes during the third quarter that deal with these issues more critically and in more depth, the supervisory notes from the second quarter along with the more recent TSAR reviews raise concerns that the problems with MCSO are not limited to the deputies identified in the annual analysis, but extend to the supervisory level.

### V.     Misconduct Investigations, Discipline, and Grievances (Section 12)

Plaintiffs continue to agree with the Monitor that concerns remain with internal affairs investigations, particularly with those conducted by the Patrol Division. *See* Draft Report ¶ 190. As the Monitor notes, MCSO worked to finalize training curricula regarding misconduct investigations during the second quarter of 2017. *Id.* Delivery of this training began during the third quarter of 2017, and Plaintiffs hope to see improvement in the coming months.

Plaintiffs also agree with the Monitor that there are problems with administrative investigations exceeding the required timeframes. *See* Draft Report ¶ 204. Investigators need to be mindful of deadlines set forth by the Second Supplemental Injunction and Arizona law. *See* Doc. 1765 at 35, A.R.S. § 38-1110. Exceeding these deadlines violate the Court's orders and infringe on deputies' statutory rights, and can affect the

permanency of agency-imposed discipline—indeed, deputies who should have serious discipline and even termination imposed for policy violations affecting the Plaintiff Class may remain on patrol if MCSO fails to meet statutory deadlines for discipline. While exceeding deadlines has been an issue for some time, Plaintiffs learned during the October 2017 site visit that this problem has escalated. Specifically, a deputy with a sustained policy violation disputed his imposed discipline—termination—and it was overturned by the Arizona Law Enforcement Officers' Merit Commission because the underlying investigation exceeded the required 180-day limit. The case is now pending before the Arizona Court of Appeals, and that deputy is back working at MCSO. Plaintiffs believe that MCSO should make this issue a high priority, and hope to hear the agency's solution soon.

Finally, the Monitor notes concerns with investigations that result in a Pre-Determination Hearing based on serious sustained allegations. *See* Draft Report ¶ 226. The Monitor is particularly concerned with investigations where the appointing authority deviates from PSB's recommended discipline, and provides a written justification. *Id*. Like the Monitor, Plaintiffs feel that the justifications are often insufficient to merit a disciplinary deviation. This is particularly worrisome because it appears to leave in place problems with MCSO's disciplinary system that were brought to light during the civil contempt trial in this case in 2015. Plaintiffs suggest that MCSO provide more detailed documentation for these deviations.