UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | 2:07-cv-02513-GMS |
| and | ) ) | |
| United States of America, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| vs. | ) ) | Phoenix, Arizona January 26, 2018 |
| Paul Penzone, et al., | ) ) | 1:33 p.m. |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2   For the Plaintiffs:

3
                ACLU – Phoenix, AZ
4               By: KATHLEEN E. BRODY, ESQ.
                PO Box 17148
5               Phoenix, AZ  85011

6               MALDEF – Los Angeles, CA
                By: JULIA GOMEZ HERNANDEZ, ESQ.
7               634 S Spring Street, 11th Floor
                Los Angeles, CA  90014
8

9   For the Plaintiff-Intervenor:

10              US Dept of Justice – Office of Civil Rights
                By: MAUREEN JOHNSTON, ESQ.
11              600 D Street NW
                Washington, DC  20004
12
                US Dept of Justice – Civil Rights Division
13              By: CYNTHIA COE, ESQ.
                601 D St. NW, Suite 5011
14              Washington, DC  20004

15

16  For the Defendants:

17              Maricopa County Attorneys Office – Civil Services
                By: JOSEPH I. VIGIL, ESQ.
18                  JOSEPH JAMES BRANCO, ESQ.
                222 N Central Avenue, Suite 1100
19              Phoenix, AZ  85004

20
                Walker & Peskind, PLLC
21              By: RICHARD WALKER, ESQ.
                16100 N 71st Street, Suite 140
22              Scottsdale, AZ  85254

23

24

25

UNITED STATES DISTRICT COURT

<u>A P P E A R A N C E S</u> (continued)


Also Present:

     Raul Martinez, Monitor

     John Girvin, Monitor

     Robert Warshaw, Monitor

```
 1                    P R O C E E D I N G S

 2              (Proceedings resume at 1:33 p.m.)

 3         THE COURT:  Please be seated.

 4         COURTROOM DEPUTY:  This is CV07-2513, Melendres, et

 5    al., v. Penzone, et al., on for status conference.

 6         Counsel, please announce your appearances.

 7         MS. BRODY:  Good afternoon, Your Honor.

 8         Kathy Brody, Brenda Munoz Furnish, and Julia Gomez on

 9    behalf of plaintiffs.

10         MS. JOHNSTON:  Good afternoon, Your Honor.

11         Maureen Johnson and Cynthia Coe for the United States.

12         MR. VIGIL:  Good afternoon, Your Honor.

13         Joseph Vigil and Joseph Branco on behalf of the

14    Maricopa County Sheriff's Office.

15         Also is Sheriff Penzone and Chief Stephanie Cherny.

16         MR. WALKER:  Good afternoon, Your Honor.

17         Richard Walker on behalf of Maricopa County.

18         THE COURT:  Good afternoon.

19         Ms. Johnston, I believe you asked for the status.

20         MS. JOHNSTON:  Yes, Your Honor.

21         Originally we wanted to apprise Your Honor on the --

22    the status of the Traffic Stop Annual Report, and the

23    intervention -- the supervisory interventions that the

24    technical assistance working group, comprised of MCSO early

25    intervention units, plaintiffs, United States, and members of
```

UNITED STATES DISTRICT COURT

1        the monitoring team have been working on for some time.

2                This week was the quarterly site visit for the

3        monitor -- the monitoring team.  And when we arrived for the

4        site visit, we learned that the plans to complete the

5        supervisory interventions pursuant to your -- this Court's

6        order in, I believe, November was behind schedule.

7                As you know, yesterday evening the defendants filed a

8        motion requesting an extension of time to complete the

9        supervisory intervention discussions.

10               I understand that Mr. Vigil and Mr. Branco have a

11       presentation to apprise Your Honor on the status of where the

12       TSARs are -- I say "TSAR," that is an acronym for the Traffic

13       Stop Annual Report.

14               United States does not have a position yet on the

15       motion, Your Honor.  We are currently reviewing it, as well as

16       information that we've received.  We do have some --

17               THE COURT:  I -- I certainly want to hear what the

18       United States has to say, but I have a most definite opinion on

19       the motion.

20               MS. JOHNSTON:  Yes, Your Honor.

21               We -- we also have some preliminary thoughts and

22       concerns that we would like to share with Your Honor.

23               I would like to give the defendant the opportunity to

24       present their presentation to you first, and then I would ask

25       Your Honor to listen to our preliminary thoughts and some

1    suggestions for ways to proceed.

2            THE COURT:  Yeah, I might throw out my own suggestions

3    for you to comment on.

4            MS. JOHNSTON:  Yes, Your Honor.

5            THE COURT:  Does the ACLU have a position?

6            MS. BRODY:  Yes, Your Honor.

7            We do plan to oppose the motion, and we also have some

8    thoughts to share, as well.  We would like to respond in

9    writing, but we have prepared some thoughts to share with the

10   Court.

11           THE COURT:  Today?

12           MS. BRODY:  Yes.

13           MS. JOHNSTON:  And, Your Honor, we -- we also plan to

14   respond in writing, we would ask the time that the local rules

15   allow for a written response.  But we can also share some

16   thoughts and concerns today.

17           THE COURT:  Well, I appreciate that.  I'm not sure

18   that you're going to need to respond in writing after I do what

19   I intend to do today.  We'll see.

20           And I certainly don't want to be unfair to you,

21   Mr. Vigil.  You want to do a presentation?

22           MR. VIGIL:  Your Honor, Mr. Branco is going to speak

23   to the motion that we did file, and any follow-up questions

24   will be handled by either one of us.

25           THE COURT:  All right.

UNITED STATES DISTRICT COURT

1          Mr. Branco, you need to come here to the podium.

2          MR. BRANCO:  Your Honor, we begin with an apology; and

3     calling it an apology undersells it.

4          The Sheriff's Office made a mistake in terms of

5     planning its ability to complete their responsibilities of the

6     office to respond to the Traffic Stop Annual Report.

7          THE COURT:  Can I stop you, Mr. Branco?

8          I don't mean to -- I do mean to let you say everything

9     of substance that you want to say.  But I've read your motion.

10    I appreciate the clarity with which it's drawn.  I recognize

11    the advocacy in it, but I also recognize that you're being

12    fairly straightforward about things, which allowed me to go

13    back and review some things and tell you what I'm really,

14    really disturbed about.

15         I'm not disturbed -- and I'm going to make some

16    comments about the community meeting.  You all know I attended

17    the community meeting, and they do flavor a little bit about

18    what I want to do about this.  And I'll explain those too.

19         You know that I do have communications with my

20    monitor.  One of the things that he told me, to my surprise --

21    and by the way, he was aware of this failure to -- of you to

22    meet the schedule before the community meeting Wednesday night.

23    He didn't tell me about that.  He invited me -- well, he didn't

24    really invite me, but I suggested that I would attend the

25    community meeting on Wednesday night.  Sometimes he really

1  suggests security-wise that I don't go.  But he certainly

2  didn't do that this time, and I thought it was very, very

3  helpful for me to go to the community meeting.

4          Sheriff, I'm going to speak to you directly.  I hope

5  you won't mind that.  I don't mean any disrespect by it.

6          He did share with me yesterday that you didn't think

7  the community meeting was much of a success.  Well, maybe

8  that's mischaracterizing what he said.  But I told him on

9  Wednesday night that I thought it was one of the best community

10  meetings I had ever seen, and I think that a large part of that

11  is due to the efforts of the CAB.

12          When we had the president of the CAB take the floor

13  during the questioning and present why they'd chosen the

14  location they'd chosen, obviously it was something that would

15  make me discomfortable -- or uncomfortable if I were you,

16  because it had to do with the misdeeds of the office of which

17  you are now sheriff, even though they didn't happen while you

18  were sheriff.

19          But it did seem to me that it was a thoughtful

20  selection of a location precisely for that reason.  And I could

21  not ignore, having attended other community meetings, that the

22  attendance was tremendous vis-à-vis those other meetings, and

23  it seemed to represent, the representation was, over 400

24  people, most of which seemed to me to be members of the

25  plaintiff class, or potential members of the plaintiff class.

1          I will tell you that I had to arrive a little late

2     because I came as soon as I could after my business was done

3     here, and that many, like I, were searching for parking spots.

4     I'm not sure everybody got in that wanted to attend.

5          But not only did I think that the CAB did a nice job

6     in selecting the location, and you did a wise job in accepting

7     the CAB's recommendation.  During the question period, four of

8     the five members of the CAB spoke, and I thought two of them

9     spoke directly to the purpose of such meetings, even though

10    parts of that may have made you uncomfortable.  But I will note

11    that you got very strong ovations from the crowd, recognizing

12    what you had done to make things better for them.  So I thought

13    there were some positives there.

14          The other two members of the CAB who spoke, one spoke

15    about cultural confidence, which is something that I know you

16    are aware, you have to, by my orders, incorporate, and that

17    you've submitted a plan to do so.  So certainly that's

18    legitimate for them to make that kind of comment.

19          The fourth member of the CAB spoke about your decision

20    to allow ICE to be in the Maricopa County jails, and there were

21    at least two other people spoke about that.  I would say the

22    CAB member was quite respectful, as were one of the other

23    persons.  And the third person, while I'm not going to say was

24    inappropriate, was certainly much more inciting and probably

25    derogatory to you personally, or at least you viewed it that

1   way.

2          I'm going to tell you now in court what I want -- what

3   I would like to communicate to you so that you understand about

4   that.

5          Law enforcement is a difficult thing.  One of the

6   things that I thought that you did that was very good about

7   that, about all of the questions you took, is you were

8   respectful, you took the heat, you were there as a member of

9   the -- as the head of the agency that wanted to repair

10  relations with the community, and you took questions, both hard

11  and easy, very courteously.  I think that even though some of

12  those questions may have been angry and not welcome, that you

13  couldn't have done more in the meeting to repair -- to start in

14  a positive way to repair relationships.

15         I really suspect -- you know, I prefer in some ways

16  the way my monitor ran the meetings in some aspects, but there

17  isn't anything my monitor can do to pretend that he's the

18  sheriff of Maricopa County.  And merely having you there and

19  doing that was a tremendous thing.

20         Now, I'm also not naive.  I realize that you have

21  had -- made efforts to make sure some of your supporters are

22  there, that other people who may have different agendas have

23  made efforts to make sure their supporters were there.

24         I realize that law enforcement decisions have to be

25  made.  And one of those decisions is whether or not you will

1       allow ICE into your jails.  I think that there is nothing that

2       I am currently aware of under this order and under the way you

3       operate that system which would permit this Court, even if it

4       was inclined to do so, to require you to remove ICE from your

5       jails.  And you did stress to the community that you are not

6       involved in immigration enforcement, and I thought that was

7       very helpful.

8              I don't think -- even though it doesn't directly

9       relate to this lawsuit, however -- it is inappropriate for

10      members of the community to express their views on that topic,

11      especially when, for the most part, they were graciously

12      extended and graciously received by you, as you explained that

13      you don't do the enforcement.  You do allow ICE in there.  ICE

14      makes their own decisions.  And law enforcement is a -- law

15      enforcement policies are judgment calls.  And as long as

16      they're legitimately made, whether I agree or disagree is

17      totally beside the point because it's not my position to do

18      that.  It's yours.

19             Why do I get into all of that?  I think it's very

20      appropriate -- I mean, I would have to say, as I've already

21      said, that I thought it was one of the most useful and helpful

22      and purposeful community meetings that I've ever seen, and that

23      is because people got to express their views directly to the

24      sheriff of Maricopa County.  And I'm sure it wasn't always easy

25      to you.

1          I have instructed my monitor about the need to make

2     sure that these meetings don't turn into something that is

3     simply campaign events or oppressive events.  And if they turn

4     that way, I will end them.  But I -- I do -- I did see their

5     usefulness.

6          Now, I do think it was very appropriate that you

7     called on the ACLU to explain something that was very helpful

8     to the community, which is how to register in the remuneration

9     program.  Ms. Munoz Furnish did a nice job.

10         I've also discussed with my monitor, even though you

11    did go through the statistics, which was probably, as you as a

12    PR person would have perceived, the most boring part of the

13    presentation, I suspect you did that because the order requires

14    you to report on progress.  I've suggested to my monitor, who

15    will continue to monitor these things, that we can give you a

16    little leeway on that.

17         But if -- but I would suggest that you consider, if

18    you've got a positive working relationship with the ACLU and

19    with the Department of Justice, let them summarize the progress

20    you've made.  Let my monitor summarize that progress.  I'm not

21    telling you you have to do it.  They're your meetings.  But I

22    did think it was pretty darn helpful when you turned that part

23    over to the ACLU, which the ACLU knows best.  And if the DOJ

24    and the monitor can speak positively about what you've done,

25    that will be better, and it doesn't have to be in the

UNITED STATES DISTRICT COURT

1    statistical form that may not mean a whole lot to people who

2    were in attendance.

3            I've given you a lot of my suggestions, but I was very

4    impressed by the work of the CAB, and I would suggest that

5    you -- I realize you have your own advisory boards, and

6    certainly you have to integrate whatever you do with respect to

7    the plaintiff class with respect to other communities within

8    the state.  But again, I think you have a real resource in the

9    CAB that I wouldn't underuse.  But that's just my opinion based

10   on what I saw.

11           Now, why do I say all this as it relates to your

12   motion to again extend deadlines?  I think you're really kind

13   of lucky that I attended, because I sensed your good faith in a

14   way that I would not have otherwise sensed when I got your

15   motion yesterday, which was very disturbing to me.

16           So let me return now to you with what my real problem

17   is.

18           I read your motion carefully.  It suggests to me --

19   and, in fact, it does more than suggest to me because I believe

20   it was, as I said, it was advocacy there, but I also thought

21   there was honesty there.  I was able to go back and reconstruct

22   the fact that you indicated to me that the EIS had to do a

23   number of things pertaining to the TSAR.  One is review the two

24   pilot programs; that that, by your own motion, was done and

25   completed by November 6th.  They had to revise the TSAR

1    paperwork and revise the review methodology.  But that, by your

2    own motion, was completed by November 20th.  You had to revise

3    and implement the TSAR orientation materials and presentation.

4    And that, by your own motion, was done by December 4th.

5            The EIS did a parallel review of the TSAR materials

6    which you indicate began in October, and they also were charged

7    with comparison -- comparing their own review with the

8    supervisor's review.  And that -- I don't know, but I

9    presume -- also began in October or shortly thereafter.  But,

10   of course, it would depend on having the two reviews completed

11   in order to do the comparison, and then hold a meeting and then

12   actually do the intervention.

13           So it seems to me that the very last thing, other than

14   actually completing the reviews, which was begun in October,

15   all those other chores that you indicated that the EIU -- EIU

16   had to do relating to the TSAR were done on December 4th.  And

17   so what you had left to do was the parallel review, the

18   comparison of the parallel review, and then the preparation for

19   the actual intervention.

20           Is that correct?

21           MR. BRANCO:  Yes, Your Honor.  Those are the tasks

22   left to complete.

23           THE COURT:  All right.  So let me tell you what

24   disturbs me.

25           Between December 4th and this last week of January,

1    nobody knew that there was a bottleneck except you.

2            I'm not accusing you of bad faith, Sheriff.  But I

3    am -- I am -- I mean, I'm not sure what difference it makes.

4    If I set out a schedule and it isn't complied with, whether or

5    not there is good faith or bad faith, because of poor

6    implementation -- and I'm not even saying the implementation

7    was poor.  I mean, I don't question the fact that maybe there

8    weren't enough resources in the EIS to do the job that had to

9    be done, even though I gave you the extension you asked for.

10   But why was somebody not advised and why was the plaintiff --

11   why were the plaintiffs and why was the plaintiff class not

12   advised until this week, when this was a problem that was

13   brewing for months?

14           Let me tell you what else disturbs me about that.

15           We are now supposed to be in TSAR year 3.  But it

16   seems to me like that will inevitably be postponed while you

17   can -- while you finish up what had happened in year 2.  So we

18   may have statistics in year 3 which indicate that we have other

19   patrol officers that are problematic, and they remain

20   problematic, and they remain unaddressed because they haven't

21   even yet been identified, when the data is in and just awaits

22   EIS to look at it.  I wish I could say -- and I know -- let me

23   just say, Sheriff -- I know that there are many officers in the

24   MCSO, and I'm sure the majority of officers, if not all of

25   them, desire to do their jobs well and faithfully.

1          But what we have demonstrated by TSAR year 2 is there

2     are some that need correction.  And I also, from my

3     understanding of the statistical problems in year 2 data,

4     realize that the year 2 data are not going to be the same as

5     the year 3 data, and there may be other officers who are

6     identified who need to have this intervention.

7          Now, I understand that one of the things you're

8     telling me in the motion is, we've got to do this stuff right.

9     Well, yes, we do.  But we have to do it.  And I want to know

10    why, when this problem had to be evident for two months -- let

11    me just ask you, Sheriff.

12         When was this brought to your attention?

13         SHERIFF PENZONE:  Monday.

14         THE COURT:  This was brought to your attention Monday?

15         SHERIFF PENZONE:  Yes, sir.

16         THE COURT:  Had you put anything in -- and you don't

17    have to answer this -- I mean, you've got lawyers there, and

18    they may advise you not to answer it because you're going to be

19    in contempt in a couple of days, or at least risking

20    contempt -- but had you put anything in place to have anybody

21    advise you about the progress that was going on here or not

22    going on to meet the deadline?

23         You don't have to answer it.  But I'm going to tell

24    you, that's my concern.  Where is the communication?  Where is

25    the accountability?  If you had to do -- I mean, I don't see

1    anything in here that you propose to do.  And I think it's all

2    good faith proposal.

3            I'm going to wait and hear what the DOJ and the

4    plaintiff class have to tell me.  But you've indicated you're

5    not going to meet the deadline.  I don't know what I can do,

6    other than hold you in contempt -- although I do have a few

7    ideas -- for not meeting that deadline.  But the deadline still

8    isn't met.  And it seems to me that as I looked at what needs

9    to happen here -- I don't want to hold you in contempt or place

10   remedies on you that are more draconian than need to be when,

11   as you've said in your motion, I put in place the requirement

12   that you do a review of these particular officers, and you've

13   been doing that.  I don't know that anybody -- and I am going

14   to listen to the ACLU and to the DOJ -- but I don't know that

15   anybody suggests that you haven't done that well enough to

16   suspect that none of those 23 officers have engaged in

17   misconduct without being disciplined or removed from the

18   patrol, which you've indicated you've done.

19           So I appreciate that.  And that may not be a problem.

20           But it still prevents the implementation -- timely

21   implementation of the TSAR year 3.  And as I've said, we may

22   have other officers that we need to be checking up on this.

23   And it just isn't happening.

24           So if the sheriff didn't know about this until Monday,

25   I suspect that -- here's what I suspect.  I'll just be frank.

```
1    I suspect that what happens in this courtroom is when I set a
2    deadline, you scurry to meet it, you implement a plan to meet
3    it, and then you forget it.  And nobody follows up and nobody
4    makes the adjustments that need to be made until you come in
5    again, find you can't meet it, and you ask for another
6    extension because you realize that there were changes that you
7    now propose that you could have made six weeks ago.  That's my
8    problem.  And I wouldn't feel so badly about it if this were
9    the first extension I'd given you on TASR year 2, but it isn't
10   the first and it isn't the second, and I don't even think it's
11   the third.
12        So, that's my issue.
13        I don't really think you need to do the presentation
14   for me, unless you'd like to.
15        MR. BRANCO:  The only thing I'm going to add, Your
16   Honor, and I will let the Department of Justice speak to this
17   further, is that in addition to the remedies that we've
18   proposed to carry out this process going forward, the office
19   will need to implement a postmortem to figure out exactly how
20   these mistakes were made and exactly to address the Traffic
21   Stop Annual Report, the third report, timely and efficiently so
22   that these mistakes are avoided in the future.
23        THE COURT:  Let me tell you what I propose.  And this
24   may be a little painful.  I want it to be a little painful, but
25   I don't want it to be inordinate because, as I've said, I
```

UNITED STATES DISTRICT COURT

1  don't -- I mean, again, this is largely due to the community

2  meeting -- I don't think that your office is operating in bad

3  faith, but I think that some improvements need to be made.  And

4  I think that one of the things I need to do is emphasize to the

5  sheriff and to the administrative staff, and hopefully doing it

6  without ego, not -- not simply because an order of mine was

7  violated, but because it's important to have dates on orders --

8  I'm going to -- here is my inclination.  I'm not going to do

9  anything without hearing from the DOJ and the ACLU first.  But

10  let me tell you what my reasoning is so you understand, DOJ and

11  ACLU.

12         I can hold the sheriff in contempt.  So what do I do?

13  It doesn't produce the report any earlier.  I can impose fines,

14  but that seems to me to be almost pointless and does nothing

15  but impose expense on the county, when I think I've come up

16  with a better way to ensure timely fulfillment of the rest of

17  the obligation here, and to underscore to the sheriff and his

18  staff -- and again, this is not personal, Sheriff.  I don't

19  want to make it personal.  I do respect you, and I respect what

20  you're trying to do.  But I do think that I'm at an end of

21  giving extensions where they're not merited and where

22  communication hasn't -- timely communication has not been made

23  to the plaintiffs or to the plaintiff-intervenors.

24         I propose to accept everything that you've said, with

25  this exception.  The report will be given weekly, and it will

1    be given to me in person in this courtroom by Sheriff Penzone,

2    Chief Deputy Skinner, Chief Morrison, Chief Melina, and Chief

3    Cherny will be here at 8:45 on February 2nd; at 9:00 a.m. on

4    February 8th; at 9:00 a.m. on February 16th; at 8:45 a.m. on

5    February 23rd; at 8:45 a.m. on March 2nd; at 8:45 a.m. on

6    March 8th; at 8:30 on March 22nd.  I'm giving you a week off

7    because I'm not available that week for a lot of other reasons.

8    And at 8:45 on March 30th.  I'll take their weekly status

9    report that they will deliver in person.  And if at the end of

10   that time I have reason to believe or the parties have reason

11   to believe that there has been any reason to further proceed

12   against the Sheriff's Office for an action, we'll do it.  But

13   that will guarantee to me, I think, that the message has been

14   sent to the sheriff -- again, I don't intend anything

15   personally by this, Sheriff, but I do intend to see that my

16   orders are not ignored.  And I get the impression that fixes

17   are made, and then they're not followed through on.  And I

18   don't know who it is, but I imagine that if I get Sheriff

19   Penzone and Chief Deputy Skinner and Chief Morrison, and Chief

20   Melina, and Chief Cherny over here every week, pending the

21   implementation of that order, I probably won't have to do it

22   again without making sure that the plaintiffs and the

23   plaintiff-intervenors are fully advised of any issues that may

24   exist.

25            So you can go back and communicate with your clients

1    about that.  And that is what I propose to do for the ACLU and

2    for the plaintiff-intervenors that I don't think would require

3    you to respond to the motion.  But, of course, I'm not

4    preventing you from doing so.

5         It would not be my intent to grant the motion.  I will

6    leave in place the deadlines, but I will require the timely

7    implementation even -- or the timely late implementation by the

8    system I have proposed.

9         Do you have any immediate reaction to that,

10   Ms. Johnston?

11        MS. JOHNSTON:  Yes, Your Honor.

12        First, in reviewing defendants' motion, I don't know

13   that we fully understand how they got to the sixth week

14   extension of the deadlines that they seek.  And I -- they have

15   provided additional information to us about the current status

16   of the Traffic Stop Annual Report process.  But to us, this

17   entire -- these entire circumstances suggest some broader

18   problems that may be at work here.  And if you'll allow me, I

19   will explain to you some of the thoughts that we've had about

20   some of those broader patterns and problems, and ways to

21   address them potentially.

22        First, to us, this process and the larger TSAR process

23   demonstrate some problems with transparency, which the remedies

24   that you have proposed, Your Honor, would seem to address.

25        But they also address problems with planning, with

1    resource allocation, and with self-monitoring.  And so in

2    thinking about ways to ensure that these things don't happen

3    again, it may be appropriate for MCSO to undertake additional

4    activity.

5         Mr. Branco spoke of a postmortem.  It's typical in law

6    enforcement agencies to conduct an after-action report after a

7    major operation or a major project.  That may be appropriate

8    here.

9         The TSAR now -- process has been going on for several

10   years.  It has stretched into a new administration at the

11   Sheriff's Office.  And as you articulated, Your Honor, it has

12   been subject to a number of delays and problems.

13        This self-evaluative action could be conducted by MCSO

14   by an uninterested command -- commander or unit that would take

15   a significant look at what went wrong and make actionable

16   recommendations for how to ensure that it never happens again.

17   And those recommendations could include adding additional

18   resources to the EIU, additional training.  It could look at

19   the infrastructure of the EIS itself and determine if the EIS

20   is efficient and usable for the employees that need to get

21   information from it.

22        I will say that given what we have looked at, the two

23   pilots that MCSO has reviewed from the EIU reviews, there's

24   reason to be optimistic that the reviews that are being

25   conducted by the staff at EIU are much stronger than the

1   reviews that were conducted by the supervisors in the field.

2   And when we're thinking about nurturing the reforms that your

3   orders intend, that's a very, very good sign to us.  We -- we

4   think that they have -- that there is a commitment by EIU to

5   getting it right, but there's been some mistakes in planning

6   and in the resource allocation that they have put forth -- put

7   toward this project.

8          The other issue is self-monitoring.  Our -- I think

9   our collective goal is at the end of this process when we are

10  all gone, MCSO will have put into place the systems that will

11  allow it to self-monitor and to correct and to adjust when

12  various problems occur.

13         What we would suggest potentially, what may be

14  appropriate, is after MCSO has conducted this after-action

15  report, the monitor will also conduct an independent review of

16  what has happened in the TSAR process from the beginning.  And

17  part of that review would potentially include an assessment of

18  how MCSO has self-monitored itself in the after-action report;

19  that it -- you know, the recommendations that it made, are --

20  are those recommendations capable of being implemented, are

21  they thoughtful, was this a significant attempt to get to the

22  bottom of these problems?

23         In addition -- and we are still reviewing the

24  motion -- but we want to ensure that there are enough resources

25  to get this project completed; and as Your Honor said, to

1    ensure that the next TSAR is timely acted upon.

2            And so at this point, those are some of our initial

3    thoughts and concerns about ways to address the transparency

4    issues and the resource issues, and the planning issues.

5            So if you have any questions, Your Honor, we would be

6    happy to answer them or provide additional information.

7            THE COURT:  I don't think so.  And I don't really

8    expect you to be in any better position to comment than you've

9    already commented, in light of the motion that's been recently

10   filed.  I am encouraged that you -- that at least from your

11   assessment, the effort made by the MCSO is real in terms of

12   trying to make the process a quality one.  And by my

13   displeasure, I do not mean to suggest that it shouldn't be and

14   that I'm not -- that I wouldn't be inclined to give them the

15   time -- reasonable time to finish that process and not hurry it

16   up.

17           However, I do think there are issues of resource

18   allocation, as you've suggested, although I want to hear from

19   everybody, including the Sheriff's Office, on that.  I think

20   the Sheriff's Office has acknowledged in its motion that there

21   were resource allocation problems, but I don't want to be

22   unfair to them.

23           So, I assume what you're saying, Ms. Johnston, is you

24   still want the opportunity to file your response, and I'll

25   allow you to do that.

1          I have indicated, though, that I'm not inclined to

2     grant the motion, at least until I see your response and reply

3     by the Department.  And in the interim, I plan to enforce the

4     schedule I've just indicated.

5          Do you have any objection if I do that?

6          MS. JOHNSTON:  No, Your Honor.

7          If I could just say one more thing about the Early

8     Intervention Unit.

9          The EIU has been responsible for some of the most

10    complex and critical of the reforms that you have ordered, Your

11    Honor.  There may be -- it may be appropriate for additional

12    planning, additional resources to be put forth to ensure that

13    the EIU can plan and conduct all of the necessary activities

14    that it needs to conduct.

15         One year ago we were before you, Your Honor, asking

16    for the EIU to implement a comprehensive compliance plan for

17    the implementation of the EIS.  And while the EIS is not

18    perfect, there exists an infrastructure that did not exist one

19    year ago.  And from our perspective, Your Honor, a lot of that

20    is due to a -- a robust, granular compliance plan that MCSO

21    created and followed.

22         And so we -- we appreciate the opportunity to share

23    our thoughts on the different ways that -- that this could be

24    better organized or that MCSO could respond better to issues as

25    they come.

1          And so those are just some thoughts that we have that

2    you may consider before we file our motion.

3          THE COURT:  All right.

4          MS. JOHNSTON:  Thank you.

5          THE COURT:  Ms. Brody?

6          MS. BRODY:  Thank you, Your Honor.

7          As I indicated earlier, we do plan to oppose the

8    motion.  That may not be necessary in light of what you've told

9    us already.  But we would ask, because in the past the -- the

10   Court's deadlines have not been sufficient to enforce

11   compliance.  But you issued an order to show cause today why

12   the Sheriff's Office should not be held in contempt for this

13   repeated failure to miss deadlines and for repeated late

14   revelations of its anticipating meeting deadlines.  And with

15   that, Your Honor, we can certainly -- on the plaintiffs' end --

16   have an expedited briefing schedule, and we can propose

17   remedies in -- in that context.

18         And one of the remedies, for instance, that we would

19   propose -- and there may be others that we can think of in the

20   next few days -- is that Your Honor impose a monetary fine

21   starting February 1st, which will give the -- the Sheriff's

22   Office more incentive to get this done.

23         And, Your Honor, I mean, this -- we have been in front

24   of you many times pushing this process along.  And the

25   Sheriff's Office has been attempting to get this right for

1      going on almost two years now.  Today's status conference is

2      less than one week away from the deadline, as you know.  And we

3      just learned about this two days ago, as did the monitor, one

4      week before the deadline.

5              But as you've indicated already, Your Honor, the

6      papers make clear, and also by what we've been told, that at

7      least someone within the agency must have known about this for

8      quite some time.

9              Given that the agency and those within it do not

10     appear to be taking seriously the Court-imposed deadline, which

11     is why we feel that we need another coercive remedy.

12             THE COURT:  You don't think it's coercive to have the

13     sheriff and his whole staff come here every week?

14             MS. BRODY:  We -- we think that there should be more,

15     Your Honor.  I mean, this has been going on for so long.  I

16     had, you know, spent some time over the last couple of days

17     looking over the history of this.  And if you will entertain

18     it, I would like to put -- put it out there because this is why

19     we're asking for these -- you know, more coercive remedies.

20             We're starting in May 2016 when the first traffic stop

21     report came out.  In that summer of 2016, MCSO first attempted

22     the intervention process without any oversight of the monitor.

23     And after the parties reviewed that documentation and the

24     monitors reviewed that documentation, there were very

25     significant problems with those interventions.  And then the

UNITED STATES DISTRICT COURT

1    technical assistance process started in December of 2016.

2            Then in April of 2017, MCSO informed us that the

3    intervention process that was to begin days later had to be

4    delayed because of a problem with the data.  This is the

5    so-called low org variable problem that we all discussed last

6    year.

7            Then by stipulation and order in May of 2017, the

8    Court set a deadline of July 14th, 2017, to rerun the annual

9    traffic report because of the low org problem and to begin the

10    interventions.  And MCSO missed that deadline which, again, we

11    learned on or just before the day of the deadline.

12            And then by stipulation and order in September and

13    October, Your Honor entered more deadlines for the so-called

14    Second Pilot Project.  And at that time, the interventions were

15    to be completed by December 4th.

16            When we were in court later in October of last year,

17    we expressed serious concerns at that time over further delays

18    of the process, but we really wanted to get it done right.  We

19    were just frustrated with kicking the can down the road some

20    more.

21            And in looking back at the transcript, Your Honor, you

22    expressed some serious concerns about having officers with

23    indicia of racial bias out on patrol with no intervention.

24            THE COURT:  Let me just ask --

25            MS. BRODY:  Yeah.

1          THE COURT:  -- on that point, Ms. Brody.

2          I've required that you have access to, I've required

3    that the monitor have access to, the monitoring of any one of

4    those officers who's still on duty that's implicated by this

5    TSAR report.

6          Apart from what has been represented to me by the

7    Sheriff and the motion, do you have any reason to believe that

8    that surveillance, at least as far as it's ongoing, hasn't been

9    adequate?

10         MS. BRODY:  Your Honor, we have been reviewing what

11   we've gotten, and MCSO has, as I understand, taken two deputies

12   off patrol over issues that we discovered, and they also

13   apparently discovered separately as part of that review

14   process.

15         THE COURT:  And so I take that -- and I don't mean to

16   put words in your mouth, I take that to mean that you

17   acknowledge that the MCSO is actually doing an enhanced, very

18   detailed -- close review of any of those officers

19   implemented -- implicated by the second TSAR that are still on

20   patrol.

21         MS. BRODY:  We have heard from MCSO that they have

22   taken these two off patrol.  And so, yes, they're taking action

23   in response to that.

24         THE COURT:  The other question I have -- and if you

25   weren't finished, I don't mean to prompt you -- but it's

1    actually a question I need to ask Mr. Walker.

2         Mr. Walker, you may not know the answer to this, and

3    it may not be fair to ask, but I'm going to anyway.

4         If I were to impose sanctions on the MCSO in terms of

5    monetary sanctions until they comply, is there any mechanism

6    within the county that could require those sanctions to be paid

7    from the MCSO budget, or would it merely come from the county

8    general fund, or do you know?

9         MR. WALKER:  I can tell you what I understand, Your

10   Honor.

11        My understanding is that in a financial sanction that

12   is imposed on MCSO is a sanction that has to come out of MCSO's

13   budget.  Now, obviously, ultimately that budget has to be

14   negotiated with and approved by the County Board of

15   Supervisors.  So the money ultimately comes from the General

16   Fund.  When -- when the Court orders, as it has in some other

17   aspects, the County itself to pay for something, then that

18   comes directly from the -- the General Fund, without being part

19   of the -- of the budgetary give-and-take process.

20        May I just add a couple things?

21        THE COURT:  You may.

22        MR. WALKER:  I -- I have -- have a great and growing

23   concern that there is a failure -- and I'd say probably not on

24   Your Honor's part because, quite frankly, to your credit, you

25   have on several occasions acknowledged that you recognize this

1    has been very costly and -- and that you share an interest in

2    avoiding unnecessary costs.

3            But I have a feeling that at least for some of the

4    participants in this process, there is a failure to recognize

5    that we are talking about finite resources, and we're talking

6    about burdens on the taxpayers of this county that by any

7    measure have, over the period of years, grown quite, quite

8    large.  And I -- I think it's not just a matter of money, but

9    it's also time.  While I don't know how the current problem

10   came about, I've not been party to any of those discussions,

11   basically what I know is what's in the motion.

12           But with all respect, Your Honor, to the extent that

13   the sheriff's entire staff has to come over here once a week --

14           THE COURT:  For 15 minutes?

15           MR. WALKER:  Well --

16           THE COURT:  They're just right there, Mr. Walker.

17           MR. WALKER:  Okay.  I -- I -- I had envisioned it as

18   being something like what we're doing this afternoon.

19           But my point is, there are 24 hours in the day,

20   there's so many people available to do the work.  And --

21           THE COURT:  Would you recommend a financial fine as

22   opposed to a time fine?

23           MR. WALKER:  No.  To the contrary, I think the

24   financial fine is actually, if anything, counterproductive

25   because it further reduces resources that are available to

UNITED STATES DISTRICT COURT

1    accomplish what, frankly, I think we all want to accomplish.

2    And I know my client has a great concern about whether all of

3    these expenditures are truly necessary, although we certainly

4    understand Your Honor's frustration and the frustration on the

5    part of the plaintiffs and the DOJ with the fact that we aren't

6    where I think any of us, including the sheriff, would like to

7    be at this point in the process.

8            But I -- as I -- if I could just offer one small

9    example.  As Your Honor knows --

10           THE COURT:  You know what?  I don't mind hearing from

11   you, Mr. Walker, but I don't want to open up the whole picture

12   that I have constantly opened up to the county and that they've

13   declined.  I do want to be as cost-effective as possible.  But

14   I'm not the one -- I mean, as you know, most of these -- most

15   of this consent decree, most of the first one, was stipulated

16   to, and I have -- and then presented to me by the parties.  I

17   did make some decisions.  And then the second one, I think, was

18   established because of some pretty, in this Court's view,

19   incontrovertible evidence about what appears to me to be

20   affirmative misdeeds in the MCSO under its previous leadership.

21           The problem that you have and that I have, that

22   Sheriff Penzone has, is how do we make sure -- or how do we

23   take appropriate steps -- not more than are appropriate, but

24   appropriate steps -- to bring the MCSO and to provide it the

25   resources it needs to implement the decree that has been

1    entered and upheld -- at least the first part -- I know you're

2    still appealing the second part, and I don't mean to prejudice

3    that appeal in any way -- that will provide the protections

4    that are needed by members of the plaintiff class to be sure

5    that their rights are not infringed.

6         So I don't want to re -- I'm glad to hear what you

7    have to say, but I don't want to go over what I've already gone

8    over, what I've already extended to the County the opportunity

9    to do, what the County has declined to do.

10        And furthermore, the monitor -- which, you know, the

11   monitor's expense is a big part of the expense we're dealing

12   with here -- the monitor has agreed to provide technical

13   services to the MCSO, which I think have been very valuable.

14   But you may have a different view about that.

15        I have asked you whether or not you understand and

16   disagree when those times have come up with the monitor

17   providing technical assistance to the MCSO, more than just

18   monitoring.  And the County has never entered an opposition.

19   And, yes, that, too, is expensive, but it strikes me that --

20   you know, I have sometimes expressed my view that I'd rather

21   just have my monitor be my monitor, reach out and slap people

22   when they need to be slapped and give me the advice that I need

23   to do it.  But I do think it makes sense because the monitor's

24   team has such expertise on it in terms of these very matters

25   with which Maricopa County has had little experience, in

1    conjunction with some of the resources of the Department of

2    Justice and some of the energy and thought of the ACLU to bring

3    about a better conclusion.

4         I am not and will not prohibit the County from raising

5    concerns and suggestions about how things can be accomplished

6    more economically.  I'm all for it.  But my first concern is

7    not an economic one.  It is the implementation of the decree.

8         So with that being said, I'm glad to hear what you

9    have to say.  But I'm not interested in the -- what I'm asking

10   you about is the context of fines with this problem.  I'm not

11   interested in reopening where we've already been, without

12   prejudice to you raising it at a different time as you may want

13   to share that.

14        MR. WALKER:  Nor do I intend to, Your Honor.

15        I just -- the one point I wanted to add is I do think

16   that, to some extent, there's a failure to recognize by some

17   who are involved in this process that the changes that this

18   Court has -- has mandated are massive changes, and the devil is

19   very often in the details.  And the one example I wanted to

20   give was, I think everybody concerned worked in good faith

21   and -- and wanted to get this victims' compensation program

22   rolled out as soon as possible.  And it didn't happen as

23   quickly as any of us wanted, not because anybody was dragging

24   their feet, not because anybody was being unreasonable.  It

25   just took more time than anybody anticipated to get the nuts

1    and bolts worked out.

2              So I just ask that all concerned recognize that

3    sometimes these things may look like they're capable of being

4    accomplished in a shorter period of time than the reality

5    actually permits.

6              THE COURT:  All right.  I thank you, and I think

7    that's a relevant point.

8              Let me ask Ms. Brody as a follow-up to you.

9              The Department of Justice has suggested that, at least

10   as they look at what EIS has done, that they recognize that it

11   is a much higher quality.  It would lead -- I don't mean to put

12   words in your mouth -- but a significantly higher quality in

13   terms of the actual intervention that will occur in this case.

14             Does the ACLU have a different view of that?

15             MS. BRODY:  I think we agree with that, Your Honor.

16             THE COURT:  All right.

17             Did you want to say anything else, Ms. Brody?

18             MS. BRODY:  No, I don't think so.

19             Thanks, Your Honor.

20             THE COURT:  All right.  Thank you.

21             What do you have to tell me?  You've had a chance to

22   consult with your clients.

23             MR. BRANCO:  Yes, Your Honor.

24             To take things briefly --

25             THE COURT:  If you want to approach the podium.

1          MR. BRANCO:  Yes, Your Honor.

2          To take the discussion in somewhat reverse order, the

3     sheriff and the MCSO would object to the imposition of a

4     monetary remedy and would object to the issuance today of an

5     order to show cause.

6          The office -- the hope is that this motion makes clear

7     that the office recognizes the mistake and is attempting to fix

8     these.

9          To the extent that the Department of Justice has

10    proposed both short-term review of this particular process and

11    what can be done to avoid it in the third, through postmortem,

12    through assessment by a disinterested unit of the office and

13    the monitors reporting on that, the office has no objection.

14         To the extent that the Court stated that the Court

15    would require personal appearances of those staff members, the

16    office does not object.

17         THE COURT:  All right.

18         Thank you.

19         That's -- you know, I am not going to prevent you,

20    Ms. Brody, nor will I prevent you, Ms. Johnston, from filing

21    whatever you want to file, including if you, want a motion for

22    order to show cause.  But for the reasons I've set forth today,

23    I do, as much as it pains me to admit it, I do share concerns

24    about what Mr. Walker has to say of terms of if we fine the

25    Sheriff's Office, aren't we just taking away money that's

1      needed to solve this problem and putting it somewhere else?

2              I'm not saying that you can't ask for a fine.  But if

3      you do ask for it -- and I'm not saying I'll grant it -- but

4      the most -- I'm most likely to grant it if you give some

5      thought about what I would do with that fine in a way that

6      would cure this problem instead of -- which may be funneling it

7      back into the Sheriff's Office, which I'm not sure really makes

8      a whole lot of sense.

9              But I do think -- and I appreciate the willingness of

10     the MCSO command staff -- I do think if they have to go through

11     the exercise -- and Mr. Walker, I got to tell you, I don't want

12     to be with them any more than they want to be with me, and I

13     don't want to spend any more time with them than they want to

14     spend any more time with me.  I intend these weekly sessions to

15     be short.  They will go through the information outlined in the

16     motion.  And I'll go through it with them every week.  And I

17     may have questions to make sure that the process is moving

18     along.  Of course, plaintiffs, plaintiff-intervenors are

19     welcome to be here, as is the general public.  But I don't

20     intend to take any longer than I have to to have a status

21     conference and realize that things will be moving along.

22              But because I don't have a basis for presuming that

23     the sheriff has been operating in bad faith, but I just want to

24     draw his attention to something, I am hopeful that this rather

25     annoying exercise for him and for me will be enough that we

1    won't face this problem in the future.

2          And again, I think, Mr. Walker, you also made the

3    valid point, as has -- as have all parties, really, here --

4    that sometimes legitimate things come up that you just hadn't

5    anticipated.  I don't think the problem here so much in my mind

6    is that one of those things came up, but the problem is that

7    nobody seems to have been paying enough attention to it to

8    raise it to the other parties so that they could come in and

9    verify that it was a problem, and work in a work way to

10   ameliorate it six to eight weeks ago.  That's what I view to be

11   the problem.

12         So I will enter a more complete written order, and I

13   probably won't get it out until Monday at this point.  But --

14         MR. BRANCO:  Your Honor, I apologize again.  This was

15   my oversight when I got back up.

16         Would you like me to address you at the podium on this

17   issue?

18         THE COURT:  Let's just get it out.

19         MR. BRANCO:  In the -- because the Court is not going

20   to replace the original order, there is some confusion in

21   the -- in the wording of MCSO's initial timeline and the

22   Court's discussion about the use only of employees with the

23   early intervention unit conducting these --

24         THE COURT:  Well, and I think the reason I entered

25   that language is because it's language that you requested.

1          MR. BRANCO:  Without a doubt, Your Honor.  You

2     referred directly to our proposed timeline.  It's entirely on

3     that.

4          Given the fact that that has proved inadequate to

5     date, we outlined in the motion the ability to bring in other

6     members currently in BIO and former members of BIO, and we

7     would also seek today to expand that to all qualified

8     supervisor-level personnel who have the skill set to perform

9     these types of reviews efficiently.

10          THE COURT:  Yeah.  Why don't you do this.  Why don't

11     you submit to me proposed language that you've run by both

12     sides and the monitor, and just submit to me that language.

13     And I'll -- I have no problem entering it, but I want to make

14     sure that the plaintiffs and plaintiff-intervenors, as well as

15     the monitor, are comfortable with the qualifications of the

16     people that you're going to try to transfer over.  But I don't

17     have any problem making that correction to the order.

18          MR. BRANCO:  Thank you, Your Honor.

19          THE COURT:  Then I will expect to have -- I want

20     something in writing and filed, but I also want on the dates

21     and times I've indicated, Sheriff Penzone, Deputy Sheriff

22     Skinner, Chief Cherny, Chief Morrison, and Chief Melina to be

23     here on the dates I've indicated.  And the first one is

24     February 2nd at 8:45.  And again, Chief, I'm not going to waste

25     your time; Sheriff, I'm not going to waste your time.  I'm not

1    going to let you waste my time.  But we're going to be pretty

2    direct about getting where we need to be.

3              Is there anything else that needs to be taken up?

4              MS. BRODY:  Other than that, no, Your Honor.

5              MS. JOHNSTON:  Three small things, Your Honor.

6              First, in addition to those -- in advance of those

7    meetings, we would request that MCSO share with us their

8    progress spreadsheet that was shared during the site visit last

9    week that would articulate the progress that was made during

10   the week since the last week so that we could review prior to

11   the status conference.

12             We would also request that we could appear

13   telephonically in the status conferences.

14             And finally, Your Honor, we had hoped to discuss with

15   you the progress that MCSO has made on the plan that was

16   entered under paragraph 70 of the first supplemental

17   injunction.  That plan was ordered near to six months ago, and

18   we thought that Your Honor should be apprised of the progress

19   that MCSO has been making on that plan.  And we would request

20   that Your Honor set an additional status conference at some

21   time in the future to address specifically that issue.

22             THE COURT:  Well, when does it make sense to do that?

23             MS. JOHNSTON:  I believe in March, Your Honor, is when

24   the agency plans to republish the paragraph 70 plan.  We think

25   that would be an appropriate milestone.

1          THE COURT:  All right.  Why don't you submit a

2    proposed date in writing, after consulting with the parties.

3          MS. JOHNSTON:  Yes, Your Honor.

4          Thank you.

5          THE COURT:  Do you have any problem providing the

6    spreadsheet?

7          MR. VIGIL:  No, Your Honor.

8          THE COURT:  All right.  Then we'll proceed in that

9    way.

10          I thank the parties, all of you, for being here.  And

11    have a nice weekend.  I'll see you on February 2nd.

12              (Proceedings in recess at 2:33 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3         I, CHARLOTTE A. POWERS, do hereby certify that I am

4     duly appointed and qualified to act as Official Court Reporter

5     for the United States District Court for the District of

6     Arizona.

7         I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion of

9     the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control.

12        DATED at Phoenix, Arizona, this 29th day of January,

13    2018.

14

15                              s/Charlotte A. Powers
                                Charlotte A. Powers, RMR, FCRR
16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT