**PLAINTIFFS' COMMENTS ON MONITOR'S
DRAFT FIFTEENTH QUARTERLY REPORT
DATED MARCH 30, 2018**

I. **Introduction**

Plaintiffs reviewed the Monitor's Draft Fifteenth Quarterly Report. Without responding comprehensively to the Monitor's report, this document highlights those issues that are most concerning from the perspective of the Plaintiff Class. Training (Section 6), Traffic Stop Documentation and Traffic Stops (Section 7), Early Identification System (EIS) (Section 8), Supervision (Section 9), Community Engagement (Section 11), Misconduct Investigations, Discipline, and Grievances (Section 12), and Community Outreach and Community Advisory Board (Section 13) remain of particular concern to Plaintiffs, and comments to those sections are provided below.

II. **Training (Section 6)**

The Monitor comments that he continues to observe inaccuracies in the Master Training Calendar. *See* Draft Report ¶ 44. Plaintiffs agree with this observation, and once again recommend that MCSO make the Calendar more accessible to MCSO personnel and the public, and provide more in-depth descriptions of upcoming trainings.

The Monitor reports that five Posse members failed to pass the Annual Combined Training (ACT). *See* Draft Report ¶ 48. Of those five individuals, four were able to pass after remediation. *Id.* Some of the more egregious complaints that Plaintiffs have reviewed in the past have involved Posse members, and we stress the importance of having all MCSO employees and representatives, even volunteers, properly trained to understand policing limitations as dictated by the Constitution and MCSO's own policies.

III. **Traffic Stop Documentation and Traffic Stops (Section 7)**

   a. **Annual Traffic Stop Analysis (ASU Report)**

Plaintiffs have repeatedly expressed their concern with the findings of Arizona State University Professor Danielle Wallace and MCSO's inadequate attempts to remedy the problems identified in her reports.

In her first report, Dr. Wallace concluded that there were problems "associated with racially biased policing among some deputies and within certain administrative boundaries (i.e., beats and districts) across the distribution of stops, type of stop, length of stop, arrests, searches, and seizures by the race/ethnicity of drivers." Danielle Wallace, Ph.D., et al., *Preliminary Yearly Report for the Maricopa County Sheriff's Office, Years 2014-2015* (First ASU Report) at 49; *see also* Draft Report ¶ 66. Additionally, Dr.

Wallace has made two significant findings in both of her reports. The first finding is an inferential analysis that concludes that there is a culture of racially biased policing in MCSO. First ASU Report at 10; Danielle Wallace, Ph.D., et al., *Yearly Report for the Maricopa County Sheriff's Office, Years 2015-2016* (Second ASU Report) at 12; Doc. 2116-1. The second finding is that individual deputies are engaging in suspected racially biased policing when compared to the average behavior of their peers. *Id.*

Dr. Wallace's Second Annual Report found no change in any area except for a slight improvement in disparities between Latino and Caucasian/Asian drivers in the length of stop. Second ASU Report at 12. In other words, despite the substantial efforts of MCSO and the Monitor team, there has been practically no change in MCSO's racially disparate treatment of Latinos and African Americans drivers and passengers over the past two years.

As with the first and second reports where MCSO belatedly identified issues that ultimately had no effect on the findings of those reports, MCSO again belatedly identified issues with the Third Report that, as far as the Plaintiffs are aware, had no effect on Dr. Wallace's ultimate findings. Dr. Wallace's summary of her findings during the April 2018 site visit indicate that she has again found little or no change in MCSO's record towards Latino and African American drivers and passengers.

In the Draft Fifteenth Quarterly Report, the Monitor reported MCSO's failure to meet the court deadline for completing interventions with deputies who may be engaged in biased policing and the agency's request for an extension. *See* Draft Report Section 1: Introduction. MCSO has subsequently produced a number of reports on the recent interventions, which Plaintiffs are still reviewing. Plaintiffs intend to discuss the delay in the intervention process in more detail in our comments to the Monitor's Draft Sixteenth Quarterly Report.

### b. Recording Traffic Stop Data

As the Monitor explains, the Supplemental Permanent Injunction requires MCSO to record several pieces of data pertaining to traffic stops, including the pre- and post-stop perceived race of drivers and passengers. *See* Draft Report ¶ 54. Plaintiffs' own review of provided traffic stop data and supervisor notes revealed at least three instances during this period, MC17283464, MC17277971, and MC17294662, in which deputies misidentified the race of drivers and passengers. Plaintiffs first brought this issue to the Monitor and MCSO's attention in December 2016, which prompted additional oversight and training. Plaintiffs are concerned that this problem continues a year-and-a-half later.

### c. Body-Worn Cameras

Like the Monitor, Plaintiffs continue to observe problems with MCSO's body worn cameras (BWC): improper positioning, late activation, premature inactivation, and complete inactivation. *See* Draft Report ¶¶ 61-62. Plaintiffs have also continued to

observe the failure of supervisors to identify or document these issues.  The Monitor explains that MCSO is in the process of replacing its BWCs with new models.  *See* Draft Report ¶61.  MCSO reports that the new models will resolve many of the issues observed over the past two years.  Plaintiffs look forward to MCSO implementing this new system, and reviewing its training for the proper utilization of the cameras.

### d. Plan to Promote Constitutional Policing

MCSO drafted a plan to address problems of biased policing identified in the annual traffic stop analysis.  *See* Draft Report ¶ 70.  This Plan to Promote Constitutional Policing outlined nine goals to be achieved in late 2017 and early 2018, and was accepted by the Court in October 2017.  *Id*.  Plaintiffs agree with the Monitor that MCSO has made little progress on this plan, and further comment that MCSO should provide regular, detailed updates on its progress.  The Monitor mentions that he received some information after requesting it from MCSO, but this information should be regularly provided to all parties without request.  MCSO recently produced a draft update of the plan to the parties, and Plaintiffs commented that MCSO should also include information about that progress in the plan itself.

### IV.   Early Identification System (Section 8)

The Fifteenth Report of the Independent Monitor states that MCSO has reached complete policy compliance with all Paragraphs in Section 8 (EIS).  *See* Draft Report, Section 8.  MCSO reached practice or Phase 2 compliance with five paragraphs and is still out of compliance with five paragraphs in Section 8.  This represents an improvement of compliance with one paragraph in Phase 2 compliance since the last quarter.  MCSO has made progress in some aspects in this section.  However, MCSO must still make significant improvements in deputy interventions and in complying with the spirit, as well as the letter, of the EIS requirements.

MCSO's most notable accomplishment in the quarter under review was to complete formal training on the entire EIS system.  The EIS system had been somewhat operational prior to this time and was used by supervisors who were not properly trained.  It is expected that both the knowledge and acceptance of the EIS program will increase now that formal training has concluded.

The Monitor made these points on the key paragraphs still not in compliance:

1. MCSO remained out of compliance with the all-important paragraph 72, which directs MCSO to "regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts." Deficiencies here include inadequate tracking of the amount of time it takes supervisors to clear alerts, a crucial check on ensuring that the EIS program is being used as intended.

3

2. Regarding paragraph 74, the Monitor team noted that EIU had not adequately tracked intervention effectiveness as required by paragraph 81. In the interventions just concluded, MCSO has developed action plans for the subject officers. Plaintiffs will monitor and evaluate if and how these action plans are tracked to ensure they are properly concluded.

3. MCSO has not met several expected target dates regarding the production of analyses for the Monthly Traffic Stop Report and is therefore not in compliance with Phase 2 of paragraph 79, which requires that the EIS computer program and computer hardware be operational, fully implemented, and used in accordance with policies and protocols within one year of the effective date of the Court's first permanent injunction.

4. MCSO is not in compliance with paragraph 81 in part because the Second ASU Report was postponed. MCSO published the report in July 2017, but it conducted two pilot tests of supervisory discussions related to outlier deputies, which were inadequate and ineffective. More recently, MCSO has conducted additional interventions which Plaintiffs are still reviewing.

The Monitor concludes his analysis of paragraph 81 by noting that "while supervisors have improved how they respond to alerts sent to them by EIU, we have not seen much evidence of supervisors initiating such actions on their own. Command staff should take an active role in ensuring the thoroughness of their line supervisors." *See* Draft Report ¶ 81.

This failure of MCSO supervisors to initiate actions on their own is reflected in Plaintiffs' findings through their own review that the questionable conduct of deputies identified by EIS have almost never been identified by their supervisors in supervisory notes. Plaintiffs have written to the Monitor about this issue and have discussed it at the recent site visit. There is some indication that MCSO was responsive to our concerns, but Plaintiffs will continue to focus on this issue in our review.

V. **Supervision Section 8**

In the Draft Report, the Monitor team notes that it has concerns with Districts 2 and 4 reverting to the 3/13 shift configuration because, among other concerns, the four days off may impact the timeline for supervisory reviews and span of control. *See* Draft Report ¶ 83. During the April 2018 site visit, District 1 reported that it was also considering going to a 3/13 shift configuration. We echo the Monitor team's concerns of potential issues with this shift configuration, and welcome the Monitor team's future assessment of whether this configuration affects supervision.

Plaintiffs continue to be concerned with the substance of supervisor notes, including quarterly supervisor notes, as well as other notes (e.g., notes on review of VCSFs and bi-monthly EIS reviews). Our review of supervisor notes during this quarter revealed instances where supervisors failed to identify, or failed to document their

4

identification of, body-worn camera issues and issues with the misidentification of pre- and post-stop race of the driver.  *See, e.g.*, MC17280800 (note that BWC turned off to "Speak to Sgt. About Case," but no note from supervisor as to whether supervisor assessed if turning off camera was consistent with GJ-35); MC17283464 (note that BWC turned off due to "No contact with public"; this is not reason to turn off BWC under GJ-35 and no note from supervisor as to whether issue was discussed with deputy); MC17283464 (potential misidentification of race, no note from supervisor that issue was discussed with deputy); MC17275128 (same); MC17277971 (same).  Our review of supervisor notes during this quarter also showed the continued problem of entries where supervisors did nothing more than read or provide rote recitations of bias-free policies to their deputies.  We have written to the parties about our concerns regarding rote recitations by supervisors of MCSO's policy of bias-free policing, and we discussed this issue of during the April 2018 site visit.

## VI.  Community Engagement (Section 11) / Community Outreach and Community Advisory Board (Section 13)

The Monitor explains that MCSO held its first community meeting since assuming responsibilities for the quarterly meetings at Taft Elementary School on October 19, 2017.  *See* Draft Report ¶ 109.  MCSO refused advance requests from the other parties and the Community Advisory Board (CAB) to make statements during this meeting, and the community meeting held in January 2018.  After receiving feedback from the CAB and other community members that they would like to hear from Plaintiffs at these meetings, MCSO invited Plaintiffs to speak at the April 2018 community meeting solely to discuss the Victim Compensation Program.

The Monitor also reports that MCSO is now required to provide administrative support to the CAB.  *See* Draft Report ¶¶ 114, 117.  Since the Court transferred this duty to MCSO at the agency's request, the CAB has submitted several requests to MCSO for information and's technical support.  MCSO's responsiveness to the CAB's requests and full and transparent provision of information need improvement.  MCSO's cooperation and transparency are both required by the Court's orders and necessary to build community trust and goodwill, and Plaintiffs will continue to closely monitor these matters.

The Monitor comments that the CAB held its first community meeting in its new configuration during this quarter.  *See* Draft Report ¶117.  The meeting, which took place at Grant Park, was well attended and included several personnel from MCSO and a representative of Plaintiffs.  Plaintiffs' evaluation was that the CAB facilitated meaningful discussion and that the meeting was successful.

## VII.  Misconduct Investigations, Discipline, and Grievances (Section 12)

The Second Supplemental Permanent Injunction prohibits MCSO from promoting employees with open internal affairs investigations without providing a

detailed justification, even if those investigations are unlikely to result in sustained findings of serious misconduct.  *See* Draft Report ¶ 173.  Like the Monitor, Plaintiffs are concerned that an employee was promoted without much inquiry by command staff into an active allegation.  *Id*.  Plaintiffs also remain concerned that the justification memos drafted by supervisors and command staff in this instance do not provide enough detail explaining why particular investigations are discounted when an employee is hired, promoted, or transferred.

Plaintiffs also agree with the Monitor's assessment of MCSO's noncompliance with paragraph 175, which requires command staff to review the disciplinary history of new transfers as soon as practicable.  *See* Draft Report ¶ 175.  In addition to supervisors simply not completing this task, Plaintiffs review of supervisors' notes show the persistent use of boilerplate language.  Plaintiffs recommend that MCSO reiterate to its command staff the need for meaningful reviews and thorough documentation of those reviews.

The Monitor describes MCSO's continued problem with staffing the Professional Standards Bureau, which contributes to delays in completing investigations.  *See* Draft Report ¶¶194-195.  Plaintiffs understand that PSB is in the process of obtaining approval for additional staff, but are concerned that this process will take too long, and that the uncompleted investigations will continue to accumulate.

Plaintiffs continue to agree with the Monitor that there are problems with administrative investigations exceeding the required timeframes for completion.  *See* Draft Report ¶ 204.  Exceeding these deadlines violates the Court's orders and infringes on deputies' statutory rights, and can affect the permanency of agency-imposed discipline.  Investigators must be mindful of deadlines and submit detailed requests for extensions if it becomes clear that investigators cannot meet those deadlines.  Plaintiffs have written to the parties about our concerns regarding this issue, and we will continue to monitor this matter.