# SIXTEENTH REPORT

Independent Monitor

for the

Maricopa County Sheriff's Office



Reporting Period – First Quarter 2018

Chief (Ret.) Robert S. Warshaw

Independent Monitor

August 6, 2018

WAI 34077

# Table of Contents

Section 1:  Introduction……………………………………………..………3

Section 2:  Methodology and Compliance Summary………………………..5

Section 3:  Implementation Unit Creation and Documentation Request………..8

Section 4:  Policies and Procedures…………………….…………………….12

Section 5:  Pre-Planned Operations…………………………….…..……….39

Section 6:  Training………………………………………………………….44

Section 7:  Traffic Stop Documentation and Data Collection……………..….55

Section 8:  Early Identification System (EIS)…………….…………….…..…96

Section 9:  Supervision and Evaluation of Officer Performance…………..…120

Section 10:  Misconduct and Complaints……………………………….…....141

Section 11:  Community Engagement…………………………………….…146

Section 12:  Misconduct Investigations, Discipline, and Grievances………..155

Section 13:  Community Outreach and Community Advisory Board………..234

Section 14:  Supervision and Staffing………………………………………235

Section 15:  Document Preservation and Production…………………………239

Section 16:  Additional Training………………………………………….....243

Section 17:  Complaints and Misconduct Investigations Relating to

                Members of the Plaintiff Class…………………………….244

Section 18:  Concluding Remarks…………………………………….......261

Appendix:  Acronyms………………………………………………….263

WAI 34078

## Section 1:  Introduction

This is the sixteenth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the first quarter of 2018.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We will provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority.  These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

This report covers the period from January 1-March 31, 2018.  We continue to enjoy a close working relationship with the Sheriff; his upper command staff; and the Maricopa County Attorney's Office (MCAO), which has taken over exclusive representation of MCSO as it pertains to compliance.  We interact with the Court Implementation Division (CID) almost daily; and CID personnel continue to be responsive to our requests and facilitate the production of all compliance-related documents.

As noted in our previous quarterly status reports, MCSO's Second Traffic Stop Annual Report (TSAR) was plagued by data quality issues, which required a pause to address the underlying issues and develop quality control protocols to ensure that they would not be repeated.  The rerun of the analysis was completed in July 2017, and the findings of systemic bias on an organizational level did not change from the First TSAR and the initial iteration of the Second TSAR.  The analysis also identified deputies who were considered outliers as it relates to traffic stop outcomes, when compared to other deputies conducting traffic enforcement in the same geographical areas.  Via technical assistance, we and the Parties worked with MCSO to develop processes to review the activities of these deputies and address the patterns of activity for which they were flagged.

WAI 34079

Following this effort, MCSO implemented two separate pilot programs to test the intervention and supervisory discussion processes involving these deputies.  After each one, significant adjustments were made, resulting in a consensus on the final methodologies.  During this reporting period, MCSO began holding the final round of supervisory discussions with the identified deputies.  The lessons learned from the two pilot programs resulted in much more focused and meaningful conversations, all of which culminated in action plans with identified milestones.  While the quality of the discussions varied based on the knowledge and comfort level of the participants, overall they were much better than the previous iterations.  We discuss this further in the body of this report.

During our April site visit, MCSO and its vendor provided the preliminary findings of the yet-to-be-published Third TSAR.  The report was delayed because of significant data problems that were eventually traced back to lapses in quality control and oversight on the part of MCSO's contracted vendor.  There were no significant changes in the organizational findings from the previous two versions, and MCSO will again have to address individual outlier deputies via the supervisory discussion process.

In our last quarterly status report, we noted that MCSO completed the delivery of two significant blocks of training – Use of the Early Identification System (EIS), and Conducting Misconduct Investigations.  MCSO's supervisors have been using portions of the EIS throughout its development, as well as conducting administrative investigations of employee misconduct, both without the benefit of formal training.  This report covers the first full reporting period after the delivery of the training, and we observed the positive effects of the training almost immediately.  We note an increase in the quality of the documentation entered into the EIS, and we hope to see similar improvements in administrative investigations conducted at the District level.  The latter take longer to complete and thus be included in our review samples.

WAI 34080

# Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1] This is our seventh quarterly status report in which we report on MCSO's compliance with both the First and Second Orders. During this reporting period, MCSO's overall Phase 1 compliance rate with the **First Order** remained the same, at 85%. MCSO's overall Phase 1 compliance rate with the **Second Order** also remained the same, at 77%, although there were some shifts in compliance among the requirements.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 190 for Phase 1. The number of Paragraphs included in the denominator totals 213 for Phase 2. These denominators increased during this reporting period due to the restoration of the community engagement responsibilities to MCSO.

WAI 34081

During this reporting period, MCSO's overall Phase 2 compliance rate with the **First Order** decreased by one percentage point, from 65% to 64%.  MCSO's overall Phase 2 compliance rate with the **Second Order** increased by three percentage points, from 72% to 75%.

| Sixteenth Quarterly Status Report | | |
|---|---|---|
| **First Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 14 | 1 |
| Deferred | 0 | 12 |
| Not in Compliance | 13 | 24 |
| In Compliance | 73 | 63 |
| **Percent in Compliance** | **85%** | **64%** |

| Sixteenth Quarterly Status Report | | |
|---|---|---|
| **Second Order Summary** | | |
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 9 |
| Deferred | 1 | 6 |
| Not in Compliance | 23 | 23 |
| In Compliance | 80 | 85 |
| **Percent in Compliance** | **77%** | **75%** |

WAI 34082

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 |
|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | | N/A | | | | | | | | 1% |
| **Phase 2** | | N/A | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 |
|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% |

WAI 34083

# First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

### COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (*Court Order wording in italics*)

*Paragraph 9. Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters for this reporting period.

As of this reporting period, CID has the following personnel: one captain; one lieutenant; six sergeants; two deputies; one management assistant; and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.  The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates the Monitor and Parties' access to MCSO's personnel.

WAI 34084

***Paragraph 10.*** *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** In compliance

As discussed above, during this reporting period, CID continued to be responsive to our requests. CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems. For example, we were facing problems downloading of voluminous documents, and raised this with CID. CID now sends us these documents on flash drives for review.

In addition, MCSO has established a robust Bureau of Internal Oversight (BIO), which routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders. In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.


***Paragraph 11.*** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**Phase 1:** In compliance

- Court Implementation Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** In compliance

On June 29, 2018, CID published its most recent quarterly report as required by this Paragraph. The report covered the first quarter of 2018, January 1-March 31, 2018. For each section, MCSO provided an overview of the agency's activities working toward compliance. For each Paragraph, MCSO offered comments on the compliance status; and in some instances, provided responses to concerns raised in our previous quarterly status report, published on May 7, 2018. MCSO's report, as is customary, included a table showing the compliance of the numbered Paragraphs, developed with the information provided in our previous quarterly status report. MCSO did not assert full and effective compliance for any of the Paragraphs.

WAI 34085

During this reporting period, MCSO transitioned from the E-Learning system to "TheHUB," which memorializes and tracks employee compliance with the reading of policies and procedures and the employees' expression of their agreement to abide by them. Per MCSO, theHUB was used during this reporting period to distribute and obtain attestation of 11 policies, including eight policies related to the Court Order in accordance with Paragraph 31. During the quarter, MCSO published the annual reviews of seven policies relevant to the Court Order.

In addition, MCSO reported between 96%-100% compliance ratings on the training components for 2017, including: ACT, Fourth and Fourteenth Amendment/Bias Free Training, Early Identification System, Employee Performance Appraisal, Blue Team, Supervisor Responsibilities: Effective Law Enforcement, Body-Worn Camera, TraCS, and Professional Standards Bureau, among others. MCSO is also updating training for the lesson plans for 2018.

As to the community engagement-related Paragraphs, MCSO has yet to incorporate the Order requirements into either a policy or operations manual. The report notes that MCSO has recorded 180 events where public attendance approached 40,000 and 1,382 occasions of community policing, totaling over 2,062 personnel hours. The quarterly community meeting required by the amended First Order was held on January 24, 2018 at Palomino Intermediate School in Phoenix, and over 400 community residents attended. MCSO also hosted one Community Academy class; and during the month of January 2018, MCSO participated in the Martin Luther King, Jr. Diversity Award Banquet. Sheriff Penzone attended both events.

MCSO's noted that its overall compliance dropped to 85% for Phase 1 and increased to 65% for Phase 2. MCSO attributed the drop to the recently acquired community engagement responsibilities, which have not yet been incorporated into appropriate policy documents. However, Phase 1 compliance rates with the Second Order have increased to 77%, a 2% increase; and Phase 2 compliance rose to 72%, an increase of 6%.

**Paragraph 12.** *The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

WAI 34086

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

See Paragraph 13.


***Paragraph 13.*** *The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

CID and the Monitoring Team established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 15, 2017, MCSO filed with the Court its 2017 Annual Compliance Report covering the period of July 1, 2016-June 30, 2017.

WAI 34087

## Section 4:  Policies and Procedures

**COURT ORDER V. POLICIES AND PROCEDURES**

*Paragraph 18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  MCSO received our feedback on these policies, which also included the Plaintiffs' comments, on August 12, 2014.   Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during our April and July 2016 site visits, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, on August 5, 2016, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review, and we informed MCSO that it could achieve compliance with Paragraph 19 when it provided sufficient documentation of its completed review of all Patrol-related policies.

WAI 34088

In its response, MCSO noted that several policies were currently in compliance with the First and Second Orders. However, MCSO also determined that several policies required changes to comport with the First Order, Second Order, or both. During this reporting period, MCSO published the last two outstanding policies: ED-3 (Review of Cases Declined for Prosecution), on March 14, 2018; and GJ-3 (Search and Seizure), on March 2, 2018. As a result, MCSO is now in compliance with this Paragraph.

**Paragraph 20.** *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

**Paragraph 21.** *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.   *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.   *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.   *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.   *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.   *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.

- EA-5 (Enforcement Communications), most recently amended on December 8, 2016.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

WAI 34089

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  Not applicable

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis since 2014.

MCSO's implementation of these policies is covered in the other Paragraphs of the Order.

***Paragraph 22.***  *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

To verify compliance with this Paragraph, we randomly select the personnel to be inspected during the first month of the reporting period.  We also inspect the Supervisory Notes on these same employees for the two remaining months of the reporting period.  This allows us to review all notes on individual employees for a full three-month period.  This methodology facilitates the review and evaluation of supervisors' interactions with employees, as to the reinforcement of policies prohibiting racial and bias-based profiling.  Compliance with this Paragraph is dependent on specific and articulated reinforcement from supervisors – not merely an entry that there is no indication of any discriminatory policing.

For the audit of Supervisory Notes of sworn personnel for this reporting period, we selected a random sample of 41 employees.  We reviewed Supervisory Notes for the selected employees to determine if they had received reinforcement of the policy reiterating that discriminatory policing is prohibited.  We found that all 41 employees' notes included the appropriate documentation.  For this reporting period, the compliance rate for sworn employees was 100%.

For the audit of Detention Supervisory Notes for this reporting period, we randomly selected 35 employees.  We reviewed the Supervisory Notes submitted for each month of the quarter, and found that 33 of 35 employees had an appropriate supervisory entry reiterating that discriminatory policing is unacceptable.  For this reporting period, the compliance rate for Detention employees was 94.3%.

WAI 34090

During our April site visit, we met with MCSO and the Parties to discuss alternative methods of compliance with Paragraph 22. MCSO has been in compliance with this Paragraph for some time, and we stressed that the Monitoring Team does not intend to jeopardize MCSO's compliance rating. Instead, to ensure that reinforcing the policy does not become perfunctory or lose its effectiveness, we discussed the need to develop a new way to convey to agency employees that discriminatory policing is unacceptable. We asked MCSO to consider alternatives and present proposals with the Monitoring Team and the Parties.

**Paragraph 23.** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

**Phase 2:** In compliance

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism), and GM-1 (Electronic Communications and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. In May 2016, a Monitoring Team member observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During this reporting period, MCSO submitted three CAD and Alpha Paging inspection reports, pursuant to our request for verification of compliance with this Paragraph. BIO inspected 23,900 CAD/Alpha Paging messages for January 2018, and reported a 99.99% compliance rate (BI2018-0009). The inspection found one CAD message that was not in compliance. One BIO Action Form was requested from the affected division. BIO inspected 23,713 CAD/Alpha Paging messages for February 2018, and reported a 99.99% compliance rate (BI2018-0017). One CAD message was found to be not in compliance. One BIO Action Form was requested from the affected division. BIO inspected 22,853 CAD/Alpha Paging messages for March 2018, and reported a compliance rate of 100% (BI2018-0031).

During this reporting period, MCSO submitted three email inspection reports, pursuant to our request for verification of compliance with this Paragraph. The number of emails reviewed is usually less than the total number of emails, due to the elimination of routine business-related and administrative emails such as training announcements and Administrative Broadcasts. For January 2018, the BIO inspection report (BI2018-0008) states that there were a total of 12,749 emails, of which BIO reviewed 10,757. The inspection found that 100% of the inspected emails were in compliance. BIO inspected 7,773 of 8,380 emails for February 2018 (Inspection Report BI2018-0025), and reported a 99.97% compliance rate. The inspection found two emails that included inappropriate language, and were therefore out of compliance. Two BIO Action

WAI 34091

Forms were requested from the affected Divisions.  For March 2018, BIO inspected 10,957 of 14,061 emails.  The BIO inspection report (BI2108-0037) reported a 99.99% compliance rate. One email was found to be out of compliance with MCSO policies.  One BIO Action Form was requested from the affected division.

During this reporting period, BIO conducted facility inspections of the Central Intake Division, Patrol District 7, and the Towers Jail.  On January 23, 2018, BIO conducted an inspection of the Central Intake Division.  The BIO inspection report (BI2018-005) noted inconsistencies in the documentation of supervisory activities.  Inspectors recommended that all duty posts enter supervisory activities, and that this requirement be added to the Operations Manual.  The compliance rate recorded on the January inspection of the Central Intake Division was 97.83%. One BIO Action Form was requested from the division.

On February 18, 2018, BIO conducted an inspection of Patrol District 7.  District 7 provides contractual law enforcement services to the Town of Fountain Hills, as well as other unincorporated areas.  The inspection resulted in a 100% compliance rating for the facility; all evidentiary and property items were found to be stored according to policy.

On March 14, 2018, BIO conducted an inspection of the Towers Jail.  The Towers Jail primarily houses medium security pretrial inmates, but also houses fully sentenced inmates that participate in work release programs.  The inspection found three areas where it noted deficiencies.  One area of deficiency pertained to tool control, and two related to safety inspections of emergency equipment.  In addition, BIO found one area – the location of property lockers – to be noncompliant.  MCSO subsequently moved the lockers from their location in the hallway to a secure room.  The inspection resulted in a 93.22% compliance rating.  One BIO Action Form addressing the identified deficiencies was requested.

The inspections of the listed facilities found that there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability.  We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph.  During our site visits to Districts 1 and 2, we observed no evidence to indicate a violation of this Paragraph.

During our two last two quarterly status reports, we expressed concerns over the timeliness of BIO inspection reports and their availability for examination.  There has been considerable improvement in this area, and MCSO is up to date with its inspections.

WAI 34092

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:** In compliance

- GI-7 (Processing of Bias-Free Tips), published August 23, 2017.

**Phase 2:** In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the appropriate unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During this reporting period, the SILO Unit received approximately 941 tips, which were classified and recorded according to the type of alleged violation or service requested. The SILO Unit closed one tip it received in March due to bias. We reviewed the information provided for this tip and concluded that MCSO handled the information appropriately

During our April site visit, we met the staff of the SILO Unit and conducted a random inspection of tips received during the first quarter of 2018, to ensure compliance with GI-7 (Processing of Bias-Free Tips). As a result, we determined that the SILO Unit is properly tracking all tips received, as well as their disposition. Our reviews of the documentation provided, pursuant to the requirements of this Paragraph, have not discovered any evidence of bias in the processing of tips. We have also determined that MCSO is independently corroborating information received through tips before it is acted upon, to ensure that there is an appropriate criminal predicate.

WAI 34093

**b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

**Paragraph 25.** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a.  *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b.  *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c.  *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d.  *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e.  *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f.  *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g.  *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;*

i.  *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.  *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- EA-5 (Enforcement Communications), most recently amended on December 8, 2016.

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.

WAI 34094

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the TraCS system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Sheet, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop. MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

In addition, during our site visits, we meet with Arizona State University personnel and review the analysis of the traffic stop data they present. Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

WAI 34095

Our review of a sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies.  During our April 2018 site visit, we met with the commanding officers from Districts 1, 3, and 4, and Lake Patrol, who advised us that they had not received any complaints during this reporting period from Latino drivers alleging racial profiling.   We interviewed the District Commanders and inquired if their respective Districts had received any complaints alleging selective enforcement targeting specific communities or enforcement based on race.   None of the District Commanders were aware of any complaints alleging racial or ethnic-based traffic enforcement.  Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph.   MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns.  The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement.  Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 51 stops for speed above the posted limit (49%); 14 stops for failing to obey official traffic control devices (13%); 16 stops for equipment violations (11%); 13 stops for other moving violations (15%); and 11 stops for failure to possess valid registrations or tags (10%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation.  In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph.  When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate.  We continue to identify instances where the location of the stop contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.   Reviewing supervisors are not identifying and addressing this issue.   We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.   We also note that BIO has recently been identifying the same discrepancies during its monthly traffic stop data inspections and, to address the issues, has been issuing Action Forms to the respective Districts.  MCSO remains in compliance with this Subparagraph.

WAI 34096

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.  During our inspection, we document the location of every stop and note the GPS coordinates if available.  Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.  During our April 2018 visits to Districts 1, 3, and 4 and Lake Patrol, we inquired if the District Commanders had received any complaints from the public regarding MCSO enforcement activities in their communities.  None of the Districts had received any complaints with regard to racial or ethnic-based targeted enforcement.

MCSO is in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity.  During this reporting period's review of the sample of 105 traffic stops, we noted one instance where the deputy contacted the passenger.  In this contact, the deputy stopped an American Indian/Alaskan Native male driver for speeding.  The driver's license was suspended.  The American Indian/Alaskan Native female passenger was contacted, as she was the registered owner of the vehicle and spouse of the driver.  The deputy verified whether she had a valid driver's license before releasing the vehicle to her.  The deputy did not provide the passenger with an Incidental Contact Receipt.

There was one case identified in the stops reviewed for Paragraph 54.k in which the passenger was contacted.  In this contact, the deputy stopped a Latino driver for speeding.  The deputy determined during the traffic stop that the trailer attached to the vehicle was reported stolen.  The deputy then made contact with the white male passenger as part of the investigation of the stolen trailer.  The passenger was arrested for an outstanding warrant.

There were 30 cases identified in the stops that we reviewed for Paragraph 54.g. in which the passengers were contacted.  In three cases, the contact with the passengers was due to the deputy approaching the passenger side of the vehicle, as a safety precaution, to request information from the driver.  In nine cases, the passengers engaged in general conversation with the deputies.  In three cases, the passengers made contact with the deputy to interpret for the driver.  In four cases, the passengers contacted the deputy to inform them that they were the registered owners of the vehicles.  In the remaining instances where MCSO made contact with passengers, the following occurred:

- In one case, the deputy stopped a white female driver for driving with a cancelled license plate.  The vehicle was occupied by a Latina passenger.  The deputy cited the passenger for possession of an alcoholic container in a motor vehicle.

- In one case, the deputy stopped a Latina driver for making a left turn in front of oncoming traffic.  The vehicle was occupied by a Latino passenger.  The driver was operating with a driver's permit, requiring her to be accompanied with a licensed driver.  The deputy verified that the passenger had a driver's license.  The deputy did not provide an Incidental Contact Receipt to the passenger.

WAI 34097

- In one case, the deputy stopped a 17-year-old Latino driver for a stop sign violation. The driver stated he had never obtained a driver's license. The vehicle was occupied by eight persons – four of whom occupied the front seat. During the stop, an assisting deputy detected the odor of marijuana. The passengers, three Latinos and four Latinas, were contacted in relation to a narcotics investigation. One of the Latino passengers was arrested for marijuana possession and the deputies arranged for the transportation of the driver and the remaining passengers. The deputies did not provide Incidental Contact Receipts to the passengers.

- In one case, the deputy stopped a white male driver for driving with one brake light. The passengers, three white males, were contacted after the deputy noted that the vehicle occupants matched the description of persons involved in an assault at a nearby location. The driver and the three passengers were arrested in relation to the assault investigation.

- In one case, the deputy stopped a white male driver for failing to maintain lane of traffic. The driver did not have a driver's license. The vehicle was occupied by a white male passenger. The deputy contacted the passenger for the purpose of possibly releasing the vehicle to him. However, the passenger had consumed alcohol and was not in a suitable condition to drive. The deputies arranged to transport the driver and passenger to their campsite. An Incidental Contact Receipt was not provided to the passenger.

- In one case, the deputy stopped a white female driver for speeding. Her driver's license was suspended. The deputy obtained the identity of the Asian/Pacific Islander male and ran his name for warrants. On the VSCF, the deputy provided the following explanation for his contact with the passenger: "determine if he had warrants." The deputy did not provide an Incidental Contact Receipt to the passenger.

- In one case, the deputy stopped a Latino driver for speeding. The deputy contacted the passenger after determining that the driver's license was suspended. The deputy verified whether the passenger's license was valid. An Incidental Contact Receipt was not provided to the passenger.

- In one case, the deputy stopped a Latina driver for fail to maintain lane of traffic. The Latino passenger was contacted in relation to a narcotics investigation being conducted by Homeland Security. MCSO was requested by Homeland Security to identify the vehicle occupants.

- In one case, the deputy stopped a white male for fail to maintain lane of traffic. The driver was found to have a suspended driver's license; and during the stop, the deputy obtained the passenger's name and ran it for warrants. The deputy did not document the reason for the contact with the Latino passenger. In addition, the deputy did not provide an Incidental Contact Receipt to the passenger. The deputy documented the passenger as a white female on the VSCF, although based on our review, she should have been classified as a Latina. During our April 2018 site visit, we discussed this case with MCSO.

WAI 34098

- In one case, the deputy stopped a white male driver for driving with no operable lights on a trailer. During the stop, the driver was arrested on an outstanding warrant. The deputy contacted the passengers, a white male and a white female. The passengers' names were run for a warrant check. The passengers were subsequently released. The deputy did not provide Incidental Contact Receipts to the passengers.

- In one case, the deputy stopped a white female driver for driving without a license plate. The driver was taking the vehicle for a test drive when she was stopped. The Latino passenger was the owner of the vehicle. The deputy made contact with the passenger to investigate the issue of the vehicle not being properly registered and not having a license plate. The deputy issued the driver a warning for driving with no license plate and a citation for no insurance to the passenger.

As noted in several instances above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action.

We reviewed the demographic data of Maricopa County (according to 2014 U.S. Census data, 30.3% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in past reporting periods in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.) Seventeen (53%) of the 32 stops where passenger contacts occurred involved Latino drivers. A review of citizen complaints for this reporting period did not reveal any allegations against MCSO personnel that would indicate that deputies were conducting pre-textual traffic stops to question drivers or passengers regarding their ethnicity, or to determine whether they are unlawfully present in the country. MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.

During this reporting period, we observed that 43 of the 105 stops occurred during nighttime hours. During our visits to Districts 1, 3, and 4, and Lake Patrol in April 2018, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos. None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera video revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

WAI 34099

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications.  When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded.  (See Subparagraph 54.e.)  We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop.  Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 29 of the 30 cases we reviewed.  In one case, the deputy did not notify Communications until after making contact with the driver and passenger.  For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator.  In all 75 stops, the deputy properly advised dispatch the reason for the stop.  MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed.  MCSO utilizes a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged.  In our review of 105 traffic stops, we determined that MCSO documented three stops that were prolonged.  In each of the stops, the responses provided in relation to the five questions provided an adequate explanation for the duration of the stop.  The particulars of these stops are as follows:

- A white male driver was stopped for speeding.  His driver's license was suspended.  The deputy had the vehicle towed and impounded.  The driver was issued a citation.

- A white male driver was stopped for driving with a suspended driver's license.  The deputy had the vehicle towed and impounded.  The vehicle was occupied by two white female passengers and one white male passenger.  The driver was issued a citation.

- A white male driver was stopped for fail to maintain lane of traffic.  His driver's license was suspended.  The deputy seized the driver's license and had the vehicle towed and impounded.  The vehicle was occupied by a Latina passenger.  The deputy seized from the vehicle the following items, none of which matched the names of the vehicle occupants: three Social Security cards; two debit cards; and two driver's licenses.  The deputy issued the driver a citation.

MCSO remains in compliance with this Subparagraph.

WAI 34100

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with 100% compliance.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on June 15, 2016, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. Only driver's licenses, with six exceptions (drivers did not have a valid license on his/her person), were presented to deputies in all of the cases provided in our sample. One of these exceptions involved a Latino driver. The six cases are described in detail below:

- An American Indian/Alaskan Native male driver was stopped for speeding. The driver produced an Arizona identification card. The vehicle was occupied by an American Indian/Alaskan Native female. The driver was issued a citation and released.

- A white female driver was stopped for driving with no taillights. The driver did not have any identification on her person, and her driver's license was suspended. The driver was arrested.

- A white female driver was stopped for operating a vehicle with an expired registration, and she did not have any identification on her person. The driver was issued a citation and released.

- A Latino male driver was stopped for disregarding a red light. He did not have any identification on his person. The vehicle was occupied by a Latina passenger. The driver was issued a citation and released.

- An Asian/Pacific Islander male driver was stopped for disregarding a stop sign. He did not have any identification on his person. The driver was issued a citation and released.

- A white female driver was stopped for making an improper turn at a red light. She did not have any identification on her person. The driver was issued a warning and released.

MCSO is in compliance with this Subparagraph.

WAI 34101

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver. In the sample of 30 stops reviewed for Paragraphs 25.d. and 54.g., there was one case in which the deputy requested the driver's Social Security Number. In that case, the deputy stopped a white female driver for operating a vehicle with no license plate. The passenger in the vehicle was a Latino. The driver did not have any identification on her person. After the deputy made numerous attempts to run a records check to locate her driver's license information, to no avail, he approached the driver and requested her Social Security Number. The driver stated that she did not have a Social Security Number. The driver's friend later arrived to the scene and produced the driver's license, which was valid (from the state of Montana). There were no other instances identified where deputies requested a driver's Social Security Number or Social Security card.

MCSO remains in compliance with this Subparagraph.

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

**Paragraph 26.**   *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.   *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.   *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.   *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.   *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.   *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.   *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**Phase 1:**  In compliance

WAI 34102

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

MCSO did not report any immigration-related arrests or investigations during this reporting period. There were two arrests made for lack of identity documents, as explained below. There were no arrests or investigations for misconduct with weapons. MCSO reported two arrests in January and two arrests in March that would fall under the reporting requirements of this Paragraph. The first case involved an individual who used his mother's credit card to make unauthorized purchases. This subject was charged with identity theft. The second case involved an individual who was stopped for a traffic violation and did not have a valid driver's license. In March, there was one arrest made in an accident case involving a stolen vehicle; the driver did not have a valid license and was arrested on both charges. The other arrest case in March involved an individual who was driving with a suspended license. This subject was cited and released.

For January, February, and March, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 59 incidents involving arrests and 63 incidents involving criminal citations. We also reviewed a random sample of 229 Incident Reports for this reporting period. We found no evidence indicating a violation of this Paragraph.

We carefully review field interviews and contacts with members of the community to assess compliance with Paragraph 26. These types of contacts, that do not involve traffic stops, are being documented in Non-Traffic Contact Forms. For this reporting period, we reviewed 74 NTCFs. Our reviews of the NTCFs for this reporting period did not reveal any issues of concern.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

***Paragraph 27.*** *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**Phase 1:** In compliance

MCSO asserts that it does not have an agency LEAR policy. We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

**Phase 2:** In compliance

WAI 34103

**Paragraph 28.** *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.  *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.  *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c.  *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d.  *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e.  *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f.  *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g.  *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h.  *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed.  Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was*

WAI 34104

*received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.
- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

During this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order. In addition to documentation provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph. In total, we reviewed 59 arrest documents, 63 criminal citations, 163 traffic stops, and 229 Incident Reports for this reporting period and found no issues of concern, as it relates to this Paragraph.

### e. Policies and Procedures Generally

***Paragraph 29.*** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

See Paragraph 30.

WAI 34105

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to the Monitoring Team for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via theHUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO recently implemented to replace its E-Policy system. GA-1 defines a Briefing Board as an "official publication produced by the Policy Section, which provides information regarding Office policy. Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized. The information in a Briefing Board has the force and effect of policy." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we advised MCSO that we will generally not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

WAI 34106

During this reporting period, MCSO issued (or issued revisions of) seven Order-related policies, including: EB-1 (Traffic Enforcement, Violation Contacts and Citation Issuance); ED-3 (Review of Cases Declined for Prosecution); GA-1 (Development of Written Orders); GC-11 (Employee Probationary Periods); GF-1 (Criminal Justice Data Systems); GJ-3 (Search and Seizure); and GJ-26 (Sheriff's Reserve Deputy Program).

Several additional General Orders are currently in development.  During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.

During this reporting period, we reviewed policy compliance reports for policies that were approved over 60 days prior to the start of this reporting period.  Each report lists the MCSO personnel who are required, according to the Training Division, to receive the particular policy and the date upon which the employee received and read the policy.  In cases where formal training is required by the Order, distribution of policies via theHUB cannot serve as a substitute for the training.  We verified via the policy compliance reports that at least 95% of relevant MCSO employees received the following policies within 60 days of their publication: CP-5 (Truthfulness); CP-8 (Preventing Racial and Other Bias-Based Profiling); CP-11 (Anti-Retaliation); GC-4 (Employee Performance Appraisals); and GE-3 (Property Management and Evidence Control).

During our April 2018 site visit, MCSO updated us on the status of its implementation of theHUB.  As noted above, theHUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017.  Initially, MCSO intended to continue using E-Policy to distribute policies mandated by the Orders, and to distribute non-Court-mandated training via theHUB.  However, during our January 2018 site visit, Training Division personnel reported that MCSO would soon begin using theHUB for distributing Court-mandated policies as well.  During this reporting period, in March, MCSO officially made this change.  However, a few technical problems remain; until MCSO is able to resolve these issues, the Training Division is offering post-course testing via paper forms, and some information that will eventually be automated must be entered manually.

We will inquire with MCSO as to the status of this implementation during our next site visit.  Beginning in the next reporting period, we will begin reviewing MCSO's records in theHUB for the training of relevant personnel on its published policies.

WAI 34107

***Paragraph 32.***  *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.   The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 650 administrative investigations involving Patrol personnel.  During our reviews, we have continued to observe deficiencies in both the investigations and the associated documentation, but have also noted overall improvement.

During each site visit, we meet with PSB and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements.  We also highlight those cases we find to be properly investigated and in full compliance with Order requirements.  In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations.  MCSO has trained all supervisors who conduct investigations in the use of these documents.  Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

The revised policies related to internal investigations and the discipline process were finalized and implemented on May 18, 2017.  PSB personnel are now revising the investigative checklist and format to more clearly reflect the requirements for those investigations conducted outside of PSB and provide a more streamlined format.  We and the Parties have reviewed the proposed revisions to the investigative format and checklist, and have provided some comments and recommendations.  In general, we are supportive of the revisions.  We will review them again once MCSO has made additional revisions.

WAI 34108

While we continue to observe improvement in those investigations we reviewed for this Paragraph, we are still reviewing cases that MCSO has not properly and thoroughly investigated.   We continue to note concerns in our reviews, including: failure to conduct a timely investigation; failure to interview all parties; failure to properly conduct investigative interviews; failure to conduct a thorough investigation; use of leading questions; and findings that are not supported by the facts of the investigation.  We were previously concerned with the failure to audio- and video-record interviews in investigations, but we did not note any such failures during this reporting period.  While 28 interviews that we reviewed for compliance with this Paragraph were not audio- or video-recorded, all included an appropriate explanation in the report.

During our site visits, we have met with PSB to discuss our concerns with the overall quality of administrative investigations, and have provided specific case examples from the Paragraph 32 submissions that illustrate these concerns.    PSB personnel have been responsive to our feedback.  Both their investigations – and the reviews they conduct of those cases investigated by District personnel – have continued to demonstrate overall improvement.

We have noted some improvement in those investigations conducted at the District level, but we continue to observe deficiencies in many of the investigations they conduct.  Investigations are still being returned by PSB after review for additional follow-up or corrections.  This review by PSB continues to allow some District cases to be at, or near, full compliance when they are finalized.  However, as we have noted in previous reports, it continues to delay the timely completion of many of these same investigations, resulting in non-compliance findings for timeliness.  PSB continues to assign liaison personnel to each District to provide assistance while the investigations are underway.  We have noted the positive effects of PSB's efforts to assist investigators in the Districts.  However, PSB continues to dedicate significant personnel hours to ensure that others in the organization are properly completing their job responsibilities.

During our District visits in January 2018, members of our Team spoke with sworn supervisors in Districts 1, 2, 3, and 6, and Lake Patrol about internal investigations.  In all cases, the supervisors we spoke with had attended the required 40-hour Misconduct Investigative Training.  We received generally positive feedback regarding the quality of the training and the instructors.  District supervisors also speak highly of their interactions with PSB and the assistance PSB has provided to District personnel.  We heard that the completion of internal investigations is time-consuming and prevents supervisors from spending time in the field overseeing their personnel.  District supervisors said they continued to be most challenged by the requirements to complete investigations within the 60-day timeframe, arrange in-person interviews, and audio- and video-record interviews.

WAI 34109

In two of the Districts we visited, supervisors suggested that auto-populating fields in the investigative format would help ensure consistency and eliminate some of the administrative errors. While auto-populating some fields in the format might eliminate some administrative errors, it would not address the substantive issues we have found in our reviews or the completion of investigations within the required timeframes. We also heard comments that personnel needed improved notifications regarding the due dates for administrative investigations. We verified with PSB personnel that they send reports to each District and Division on the 15th of each month identifying the due dates for internal investigations, and that this information is also available on the Blue Team Dashboard for each supervisor. PSB is providing the necessary information, and it should be the responsibility of the Districts and Divisions to properly track the completion of the internal investigations assigned to their personnel.

During our District visits in April, members of our Team spoke with sworn supervisors and command personnel in Districts 1, 2, 3, and 4, and Lake Patrol about internal investigations. All those we spoke with reported that their District supervisors had attended the 40-hour Misconduct Investigation Training. We continued to receive positive feedback on the training and the assistance PSB is providing to District personnel. As we have noted previously, the most significant challenges identified by District personnel in completing administrative misconduct investigations are the time it takes to conduct the investigation, and the difficulties associated with contacting and arranging for interviews with all involved parties.

During our District visits in April, we provided feedback to the supervisory personnel present at the meetings regarding our reviews of internal affairs investigations and the areas where we see the greatest need for improvement. We also asked District Captains and lieutenants how they would address any deficient investigations now that the training has been completed. Command personnel in the Districts identified a variety of methods they will be using to address deficient investigations, including: writing memorandums regarding deficient investigations conducted by their personnel and ensuring that follow-up is conducted; creating action plans to address ongoing deficiencies; meeting with employees one-on-one; seeking training for employees where appropriate; and if necessary, initiating misconduct investigations. We are hopeful that these interventions will result in improved investigations being conducted at the District level. We have also submitted a standing monthly document request asking that each Commander and Division Chief provide information on deficient investigations that occur under their command that require an intervention and identify the actions being taken to address these deficiencies.

During the last reporting period, we reviewed all 58 administrative misconduct investigations submitted for compliance with this Paragraph. Of the 14 conducted by PSB, 100% complied with all investigative requirements. However, three cases (21%) were not in compliance due to the failure to request appropriate extensions. Of the 43 conducted by Districts, 33% were in full compliance with all requirements of the Order.

WAI 34110

During this reporting period, we reviewed all 69 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted 15 of these investigations and District personnel conducted the 54 remaining. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 137 potential policy violations included in the 69 cases. Fifty-four of the investigations resulted from external complainants, 14 were internally generated and one was initiated as a result of both an external and an internal complaint. All but one of the investigations were both initiated and completed after July 20, 2016.

Of the 69 administrative cases we reviewed for this Paragraph, 19 resulted in sustained findings against one or more employee or volunteer. We concurred with all the sustained findings, and concurred with the final discipline imposed in 16 of the cases. The discipline included: one suspension; six written reprimands; and 11 coaching sessions. Two imposed sustained findings on a deputy who is deceased. In all of these cases, the PSB Commander properly identified the category and offense number, as well as the presumptive range of discipline. In all but two of the total 69 cases, we concurred with the findings of the PSB Commander. In one case, we believe a finding of sustained for conduct unbecoming was supported and should have been made. In the second case, we believe further investigation should have occurred prior to reaching a finding.

There were three cases we reviewed for compliance with this Paragraph where we do not concur with the final disciplinary decision. One of the cases was completed prior to the implementation of the revised discipline policies implemented in May 2017. The Appointing Authority assessed a coaching. While the coaching fell within the presumptive range of discipline, we believe that the sustained misconduct should have resulted in more serious discipline.

Two of the cases were initiated and completed after May 17, 2017. In the Discipline Matrices implemented in May 2017, there is both a presumptive discipline and a presumptive range of discipline identified. In both cases, the presumptive discipline was an eight-hour suspension. The Appointing Authority identified mitigating factors and reduced the discipline to a written reprimand in both. While still within the range of discipline, we disagree that there were mitigating factors sufficient to reduce the discipline in either of these cases. We will discuss these cases with PSB and the Appointing Authority during our next site visit.

All 69 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Fifty-four were conducted at the District level and 15 were conducted by PSB. Of the 15 investigations conducted by PSB, 11 were not completed within the 85-day timeframe. All of these investigations contained a request for, and an authorization of, an extension. Twenty-one of the investigations conducted at the District level were not completed within the required 60-day timeframe. Six (29%) of these 21 investigations did not contain a request for, or an authorization of, an extension. For both PSB and District investigations, this demonstrated a notable improvement in proper documentation of necessary extensions from prior reporting periods. We will continue to reinforce that if an investigation cannot be completed within the required time limits, an extension memorandum providing justification must be authored and approved when appropriate.

WAI 34111

All 15 administrative investigations submitted for compliance with this Paragraph and conducted by PSB were completed after July 20, 2016. We continue to find that PSB investigations are thorough and well-documented. Fourteen (93%) of the 15 cases PSB investigated for compliance with this Paragraph were in compliance with all investigative and administrative requirements.

District personnel outside of PSB conducted 54 of the investigations MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. We found 22 (41%) in compliance with all investigative and documentation requirements. This is an improvement from the 33% compliance we noted in the last reporting period. We have some concerns with the 32 remaining investigations. Ten of these cases were not compliant based solely on procedural or timeline issues. The remaining 22 had more substantive issues, including: use of leading questions; failure to conduct a rigorous investigation; inadequate substance in the narrative of the report; and failure to interview witnesses or investigative leads. Some of these deficiencies were corrected after review and return of the investigation for further follow-up by PSB, allowing the investigations to be at or near compliance. We also continued to identify numerous cases where the District Commanders failed to identify and correct investigative and procedural deficiencies prior to forwarding the cases to PSB. This failure to correct deficiencies at the District level prior to submittal to PSB continues to result in lengthy delays in the completion of investigations. Of the 54 investigations conducted at the District level, PSB returned 20 to the Districts for additional investigation or other corrections. Some were returned multiple times. In the majority of these cases, we believe that the deficiencies could, and should, have been identified prior to their submittal to PSB. While we noted that the percentage of cases being returned to the Districts for additional investigation or corrections was lower than previous reporting periods, MCSO still falls far short of compliance in those investigations conducted in the Districts.

Our review of cases submitted for compliance with this Paragraph indicate a continuing effort by PSB staff to complete proper investigations, and assist District personnel in completing their internal investigations. PSB investigators are generally completing proper investigations in accordance with this Paragraph, and we are confident that they will continue to do so. We have also noted improvement in those cases investigated by District personnel, but many of these investigations are still not in compliance with MCSO policies and the Order of the Court.

All supervisors who conduct administrative misconduct investigations at the District level have been trained in their proper completion. We expect that we will note continuing improvement in the completion and review of misconduct investigations by District personnel during the next reporting period, or find documentation that supervisory and command personnel are properly addressing any failures to improve.

WAI 34112

***Paragraph 33.*** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During this reporting period, we reviewed seven administrative misconduct investigations submitted in compliance with this Paragraph. All were investigated by PSB and were initiated and completed after July 20, 2016. Five investigations involved sworn personnel and two involved Detention personnel. Four of the investigations resulted in findings of unfounded and one was not sustained. Two investigations resulted in sustained findings, both for conduct unbecoming. We concur with the findings in all seven cases. However, in one of the sustained cases completed by sworn personnel, though we concur with the sustained findings for conduct unbecoming, all parties involved in the law enforcement contact were not interviewed. Doing so might have resulted in additional information or additional sustained findings. In a second sustained investigation, conducted by Detention personnel, a proper extension request was not sought or approved.

MCSO was in compliance with this Paragraph during the last reporting period. We will bring the deficiencies identified during this reporting period to the attention of PSB. Should we find additional deficiencies during the next reporting period, we will remove MCSO from Phase 2 compliance with the Paragraph.

We reviewed eight additional cases during this reporting period that involved biased policing allegations. These cases were closed after July 20, 2016, involved members of the Plaintiffs' class, and were determined to be CRMs (Class Remedial Matters). All were in full compliance with the Second Order. We discuss them further in the Paragraphs related to CRMs later in this report.

WAI 34113

***Paragraph 34.*** *MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

MCSO's annual policy reviews are in conformance with GA-1 (Development of Written Orders), which was amended and published during this reporting period. These reviews ensure consistency with Constitutional policing, current law, professional standards, and any Court Order or Judgment. Each is documented in writing by MCSO and approved by our Team.

During this reporting period, 11 (23%) of the 48 required policies received their annual review. These policies include: CP-2 (Code of Conduct); EA-11 (Arrest Procedures); ED-2 (Covert Operations); ED-3 (Review of Cases Declined for Prosecution); GB-2 (Command Responsibility); GC-12 (Hiring and Promotional Procedures); GC-17 (Employee Disciplinary Procedures); GF-3 (Criminal History Record Information and Public Records); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GI-1 (Radio Enforcement Communications).

At MCSO's request, we approved the rescission of GN-1 (Criminal Intelligence Operations), noting that the policy is not offered as proof of Phase I compliance for any of the Orders' compliance requirements.

Previously we had recommended adding four policies to the current list. These include: EA-9 (Management of Special Events); ED-3 (Review of Cases Declined for Prosecution); GJ-2 (Critical Incident Investigations); and GJ-5 (Crime Scene Management). MCSO agreed with the additions of ED-3 (Review of Cases Declined for Prosecution) and GJ-2 (Critical Incident Investigations); but did not agree with the additions of EA-9 (Management of Special Events) and GJ-5 (Crime Scene Management). After consideration, we advised MCSO to remove EA-9 (Management of Special Events) from the annual list; however, we advised MCSO that GJ-5 (Crime Scene Management) should remain. While we agreed with MCSO that this policy overlaps with GE-3 (Property Management and Evidence Control), we have long held that more than one policy can provide guidance regarding the same Order-related requirements.

WAI 34114

## Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**Phase 1:**  In compliance

- Special Investigations Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

- Special Investigations Division Organizational Chart, most recently amended on April 10, 2017.

- Memorandum from Executive Chief Trombi to Deputy Chief Lopez directing the elimination of the Criminal Employment Unit, dated January 6, 2015.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart.  The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations.  The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported that it disbanded the Anti-Trafficking Unit and formed a new unit, the Fugitive Apprehension Investigative Team (FAIT), in April 2017.  The primary mission of FAIT is to arrest subjects with outstanding felony warrants.  We reviewed FAIT's mission statement and objectives, as well as the organizational chart for the Special Investigations Division.  The ATU has been removed from the organizational chart, and the mission of FAIT does not include any reference to the enforcement of Immigration-Related Laws.  MCSO is revising the Special Investigations Division Manual to formally reflect this change, as well as others.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FAIT support that the ATU no longer exists, and that there are no specialized units in MCSO that enforce Immigration-Related Laws.

WAI 34115

**Paragraph 36.**  *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion.  For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members.   That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since the requirements for conducting significant operations were implemented, MCSO has reported conducting only one significant operation that invoked the requirements of this Paragraph.  "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County.  MCSO met all of the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO.  After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media.  According to media reports, this was a two-week operation conducted by a special operations unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County.   We requested all documentation regarding this operation for review.   The documentation indicated that this operation was conducted from October 17-23, 2016.  The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to significant operations.  The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph.  We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

For this reporting period, we reviewed all documentation submitted by MCSO in response to this Paragraph requirement.  Reports from each District, the Enforcement Support Division, and the Investigations Division, document that no significant operations were conducted by MCSO during this reporting period.  We did not become aware of any potential significant operation through media releases or other sources.  We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to significant operations.

WAI 34116

***Paragraph 37.*** *The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

In late 2014, we reviewed all of the documentation submitted by MCSO regarding the significant operation conducted from October 24-27, 2014. This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.


**(Note: Unchanged language is presented in *italicized font*. Additions are indicated by underlined font. Deletions are indicated by ~~crossed-out font~~.)**

***Paragraph 38.*** *If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.   *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.   *information that triggered the operation and/or selection of the particular site for the operation;*

c.   *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.   *documentation of command staff review and approval of the operation and operations plans;*

e.   *a listing of specific operational objectives for the patrol;*

f.   *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.   *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

WAI 34117

h.   a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

i.   arrest lists, officer participation logs and records for the patrol; and

j.   data about each contact made during the operation, including whether it resulted in a citation or arrest.

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one significant operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any significant operations invoking the requirements of this Paragraph.


***Paragraph 39.*** *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO again reported that it did not conduct any significant operations that invoked the requirements of this Paragraph.

WAI 34118

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:** In compliance

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or significant operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

WAI 34119

# Section 6: Training

**COURT ORDER VII.  TRAINING**

### a.  General Provisions

***Paragraph 41.***   *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.***   *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 18, 2017.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  Not in compliance

MCSO has delineated the requirements to become and to remain an instructor or an FTO.  Per GG-1 (Peace Officer Training Administration), all instructors and FTOs are required to receive an annual PSB review and a second PSB review 30 days before any Officer in Training (OIT) assignment or the delivery of an assigned class.

In January, MCSO advised us that 10 individuals had completed their monthly FTO file and PSB review.  However, the documentation MCSO provided was incomplete and did not meet the requirements of GG-1.  We requested additional documentation; and in February, we received reports that we had previously reviewed during the fourth quarter of 2016.  We deemed them insufficient to meet the requirements of GG-1.  We cited the lack of supervisory recommendations; the last two consecutive EPAs; a General Instructor Certificate; and PSB reviews disqualifying deputies with open investigations relating to a serious offense, and sustained allegations for the previous three years for Category 1-3 offenses, and five years for Category 4-6 offenses.

WAI 34120

We requested that MCSO provide information indicating that these 10 individuals had fulfilled the policy requirements.  The additional documentation that MCSO provided further confused the situation.  The new documents identified 22 individuals selected as FTOs, but the reports contained several inconsistencies.  Yet MCSO did not provide any documentation of PSB's satisfactory disciplinary reviews and category reviews.  Twenty-seven percent of the EPAs provided did not meet the requirements; and 40% of the individuals selected did not meet the requirement to complete a 40-hour Arizona Peace Officers Standards and Training (POST)-accredited General Instructor School.  The Training Division indicated that it had reviewed these documents for compliance.

MCSO is aware that we consider FTOs to be instructors – arguably the most influential instructors that new deputies are exposed to.  This is the second occasion in which MCSO has not met the policy requirements for the selection and retention of FTOs.  MCSO is not following the requirements of the issued policy, as required for Phase 2 compliance.

During our April site visit, Training Division personnel provided an update on the instructor database.  Training had obtained new curricula vitae for the hard files.  Currently, the database is not electronic in format.  MCSO submitted the names of 145 sworn and 186 Detention and civilian personnel for an annual General Instructor PSB check.  These individuals appear on MCSO's certified instructor list.  The PSB reviews remain incomplete during this reporting period.

This Paragraph requires that persons delivering training be competent instructors with significant experience and expertise in the subject area.  MCSO's selection process for instructors still requires improvement to provide Order-related instruction.  The availability of an instructor cannot be the sole criteria replacing expertise, experience, and classroom presence.  During our April site visit, we discussed the essential components of instructor selection and evaluation; and MCSO was receptive.  During our discussions, MCSO personnel expressed a desire to improve the train-the-trainer program; and to create and implement processes for the observation and documenting of instructor deliveries – to include content expertise, delivery confidence, and classroom management skills.  MCSO should ensure that it selects the best instructors for all Order-related training classes.

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

WAI 34121

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

We verify compliance with this Paragraph by reviewing all completed tests, documentation of all failures, and all failure remediation efforts for each Order-related class delivered during each reporting period.

During this reporting period, MCSO delivered the following training:  Blue Team; Body-Worn Camera; Detention, Arrests, and Immigration-Related Laws; Bias-Free Policing; 2017 Early Identification System (EIS); Employee Performance Appraisal (EPA); 2017 Supervisor Responsibilities: Effective Law Enforcement (SRELE); and TraCS training.

MCSO delivered Blue Team (BT) Training once to 11 sworn personnel.  One individual required test remediation.

MCSO delivered Body-Worn Camera (BWC) Training once to 11 sworn personnel.  None required test remediation.

MCSO delivered the Detention, Arrests, and Immigration-Related Laws; Bias-Free Policing Training once in February to 21 personnel (11 sworn, 10 Posse members).  No staff required test remediation.

MCSO delivered the 2017 Early Identification System (EIS) Training once during this reporting period to 11 personnel (nine sworn, two civilians).  No personnel required remedial testing.

MCSO delivered Employee Performance Appraisal (EPA) Training once during this reporting period to 10 personnel (nine sworn, one civilian).  No staff required test remediation.

MCSO delivered the 2017 Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training once during this reporting period to 11 personnel (10 sworn, one civilian).  No staff required test remediation.

MCSO delivered TraCS Training once to 11 sworn personnel.   No personnel required remediation.

During our April site visit, we further discussed with MCSO ways to improve test development consistent with GG-1.  We also discussed the responsibilities of the CORT (Court Order Required Training) Development Phase Coordinator, who is responsible for test development, as outlined in the Training Division Operations Manual.  Training Division personnel advised us that analysts had adopted procedures to compare individuals' test scores to the different instructors.  They believe that this process will assist in identifying instructors who may require further development and additional training.  We recommended that this process be included in the Training Division Operations Manual.  Training Division personnel also advised us that they have been reviewing other agencies' instructor critique forms for possible adaptation.

WAI 34122

Also, during our site visit, we discussed the policy requirements for Training Division personnel to participate in quarterly ride-alongs with deputies of different tenures. District Captains advised us that ride-alongs had not yet commenced. The program is still under development.

We also discussed the manner in which MCSO delivers train-the-trainer sessions. The Training Division indicated that train-the-trainer courses would now include less observation by instructors and more hands-on instruction. The Training Division recognizes that for these to be successful programs, they must adhere to the timelines that are listed in the Training Division Operations Manual for providing advance material to potential instructors.

**Paragraph 44.** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

During our April site visit, we discussed previously identified problems with the accuracy of the Master Training Calendar. The Training Division is aware of these inaccuracies, and has implemented measures designed to reduce errors. The Master Training Calendar, published on MCSO's website, is now designed to project scheduled classes for the next 30 days. The information contained on the calendar will be updated twice weekly to ensure accuracy. The Parties expressed an interest to include more detailed information regarding the scheduled classes. The Training Division was receptive to this request, and will attempt to include a brief synopsis for each Order-related training class.

Each reporting period, we review and monitor Master Personnel Rosters to determine the number of personnel requiring Order-related training. We currently conclude that 693 sworn members, 22 reserve members, 23 retired reserve members, and 568 Posse members require Order-related instruction. These categories vary by reporting period, as a result of the attrition in the organization.

WAI 34123

***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

All lesson plans under development or revision continue to receive an extensive review. The Training Division has improved lesson plan development and routinely incorporates the requirements of this Paragraph.

We recommend that MCSO conduct additional documented random observations during scheduled class deliveries. These observations would assist Training Division analysts who examine the relationships between instructors and missed test questions. These recommendations are best practice activities that are consistent with the requirements of GG-1 and further support adult-learning methods.

***Paragraph 46.*** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Training Division provides all new and revised lesson plans and supporting materials for review by our Team and the Parties. The review protocol ensures a timely analysis of these materials as an aid to continue compliance with this Paragraph.

MCSO must continue to improve its selection and preparation process for instructors who deliver Order-related training. Currently, the Training Division maintains a database of approximately 331 instructors who have either sworn, Detention, or civilian titles. This number reflects about 21% of MCSO's active personnel rosters. Many of these individuals are commanders and others from all categories that do not regularly instruct. Annual Combined Training (ACT) instructors are contractors or members of Maricopa County Attorney's Office. We note these numbers because we have only observed approximately 40 individuals participate in train-the-trainers for Order-related courses other than the ACT. MCSO has repeatedly expressed availability as a critical criterion for instructor selection. Identifying and selecting better-skilled instructors for Order-related classes is not difficult. Selecting the best instructors and then scheduling them repeatedly actually limits organizational impact. Doing so would improve the delivery of the curriculum and promote consistency in the information provided. MCSO should prioritize selecting the best instructors for all Order-related training classes.

WAI 34124

*Paragraph 47.   MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  In compliance

As noted in other Paragraphs, the Monitoring Team and Parties comment on lesson plans and training support material for all training required by both Orders.   Our recommendations address the initial offering of training and any annual retraining sessions.   Where applicable, we, MCSO, and the Parties ensure that the most recent developments in state and federal law are included in the training material.

During this reporting period, the Training Division continued to revise the TraCS and BWC lesson plans.   During our April site visit, the Training Division advised us that it would release the BWC lesson plan in conjunction with the policy review of GJ-35 (Body-Worn Cameras). We requested, but did not receive, the anticipated date of release.

MCSO can reasonably expect that members of the Monitoring Team and the Parties will observe training sessions and provide appropriate feedback.


**B.  Bias-Free Policing Training**

*Paragraph 48.   The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the Annual Combined Training during this reporting period.

MCAO and the Training Division jointly advised us during our April site visit that they have discussed potential revisions to the curriculum with members of the Community Advisory Board (CAB).

MCSO delivered Bias-Free Policing Training once in February to 21 personnel (11 sworn, 10 Posse members).

WAI 34125

**Paragraph 49.**  *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *definitions of racial profiling and Discriminatory Policing;*

b.  *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.  *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.  *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.  *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.  *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.  *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.  *police and community perspectives related to Discriminatory Policing;*

i.  *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.  *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.  *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.  *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m.  *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n.  *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o.  *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p.  *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q.  *background information on the Melendres v.  Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law*

WAI 34126

*in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r.    *Instruction on the data collection protocols and reporting requirements of this Order.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO did not conduct an annual review of the lesson plan for the Bias-Free Policing Training during this reporting period.

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

**Paragraph 50.**  *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service.  MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO did not deliver the Annual Combined Training during this reporting period.

MCSO delivered the Detention, Arrests, and Immigration-Related Laws Training once in February to 21 personnel (11 sworn, 10 Posse members).

**Paragraph 51.**  *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.    *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.    *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.    *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.    *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.    *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

WAI 34127

f.   the circumstances under which a passenger may be questioned or asked for identification;

g.   the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.   the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.   the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.   a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l.   an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.   the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.   Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.   Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**Phase 1:** Not applicable

**Phase 2:** In compliance

Training personnel advised us during our April site visit that the Annual Combined Training (ACT) is currently under development.

WAI 34128

### d. Supervisor and Command Level Training

*Paragraph 52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered 2017 Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training once during this reporting period to 11 personnel (10 sworn, one civilian). No personnel required test remediation.

*Paragraph 53. The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.   *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.   *how to respond to and investigate allegations of Deputy misconduct generally;*

WAI 34129

k.  *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.  *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, we reviewed the 2018 Supervisor Responsibilities: Effective Law Enforcement (SRELE) lesson plan and accompanying documents.  The current lesson plan seeks to assist in building supervisor skills related to regular reviews of subordinates using the EIS, the evaluation of written reports, and the assessment of deputy performance.  A proficiency test is designed to assess the supervisor's ability to detect in deputies' reports the presence or absence of reasonable suspicion/probable cause for seizures, searches, and interviews or interrogations of individuals.  These are areas that have been deemed problematic while reviewing cases declined for prosecution and Supervisory Notes.

WAI 34130

## Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.     TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO.   The following describes how we made that request and how we handled the data once we received it.  These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month (or 105 cases per quarter).  Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available.  The selection of 35 cases reflects a sample based on this average per month.  This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol.  By way of background, MCSO reported a total of 3,740 cases of traffic stop events for these areas between January 1-March 31, 2018 (averaging 1,247 per month).  This number of traffic stops represents a significant decline from previous reporting periods.  We discussed this issue with MCSO during our April 2018 site visit.  MCSO is aware of the issue, and is exploring ways to ensure that deputies are effectively performing their duties, which includes the enforcement of traffic laws.

Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings.   Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases.  Stratification of the data was necessary to ensure that each area was represented proportionally in our review.  Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas.  Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS.  We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.  In February 2016, we began pulling cases for our body-worn camera review from the audio subsample.  Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month).  The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

WAI 34131

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.   *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.   *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.   *the license plate state and number of the subject vehicle;*

d.   *the total number of occupants in the vehicle;*

e.   *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.   *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.   *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.   *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.   *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.   *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.   *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.   *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

WAI 34132

m.    *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and other Bias-Based Policing), most recently amended on October 24, 2017.

- EA-5 (Enforcement Communications), most recently amended on December 8, 2016.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-3 (Search and Seizure), most recently amended on March 2, 2018.

**Phase 2:** Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event.  We selected a sample of 105 traffic stops conducted by deputies from January 1-March 31, 2018, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.  Our review indicated that in the 105 vehicle traffic stops, there were 17 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In all 17 cases where there were multiple units or deputies on a stop, the deputy documented the name, badge, and serial number of the deputies and Posse members on the VSCF.  In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were eight cases where there were multiple units or deputies on a stop.  In all of these cases, the deputy properly documented the required information on the VSCF.  In the 30 cases we reviewed for searches of persons under Subparagraph 54.k., there were 27 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  There were three instances in which the deputy did not effectively document the presence of those deputies/Posse members on the VSCF.  Following are the circumstances of the three cases:

WAI 34133

- In one case, the name, serial number, and unit of an assisting deputy were not documented on the VSCF.

- In one case, the name, serial number, and unit of a Posse member were not documented on the VSCF.

- In one case, the names, serial numbers, and unit numbers of a deputy and a Posse member who were on the scene were not documented on the VSCF.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated. We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units are on the scene. If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information. A TraCS change was made to the VSCF during 2016 to secure this information. MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies. While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.

The identity of personnel on scenes is a core issue in this case, and we shall consistently evaluate MCSO's measure of compliance with this requirement. This Paragraph requires that all deputies on the scene be identified with their names, and serial and unit numbers, on the appropriate forms. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary. During our quarterly site visits, we review the GPS coordinates with CID personnel to ensure the accuracy of the data. The CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in about 56% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

WAI 34134

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we found no instances where the start or end time on the Vehicle Stop Contact Form differed by five minutes or more from the CAD printout.  In monthly audits of traffic stop data, the Bureau of Internal Oversight (BIO) reviews the beginning/ending times of the stops and sends Action Forms to the Districts when there are discrepancies.  The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error.  When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

During our April 2016 site visit, we discussed with ASU and MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times.  We determined that using the CAD system to determine stop end times created additional challenges.  However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis.  MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.  Several additional TraCS technical changes were made and implemented in 2016.  Some of the changes implemented include: a feature that automatically imports the CAD time onto the VSCF; mandatory fields requiring the selection of an ARS Offense Classification (Civil, Traffic, Criminal Traffic, Criminal, or Petty Offense) – including a series of five questions (and responses) to document circumstances that frequently require a stop to be prolonged; the addition of help features to assist deputies using the TraCS system; the addition of a search feature that allows for the search of citations and warnings by a driver's last name or license plate; and permitting a reviewing supervisor to reject a VSCF if a deficiency is identified and to request that a deputy make the appropriate changes to the document.

The first change listed above should ensure that the start and end time of the stop from the CAD system and VSCF should be consistent.  MCSO's compliance rate is 100% for this portion of the Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in 105 of 105 cases.

MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

WAI 34135

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.  In 33 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (50 total passengers).  In all 33 cases, the deputies properly documented the total number of occupants in the vehicles.  In our review of the VSCFs for Paragraph 25.d. and 54.g, we identified one stop in which a white female passenger was not listed on the VSCF.  She was listed on the Incident Report prepared in relation to the traffic stop.  This case involved a white male driver with a white male passenger. MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression.  (No inquiry into the occupant's ethnicity or gender is required or permitted.)  In 33 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (50 total passengers).  In one case, the deputy listed the passenger as a white female on the VSCF; however, based on our review of the BWC video-recording, the passenger should have been listed as a Latina.  We discussed this case with MCSO during our April 2018 site visit.

Our earlier reviews of passenger contacts, drawn from the sample of 105 traffic stops, did not provide a sufficient number of cases where deputies made contact with passengers.  As a result, we requested that MCSO provide us, from the TraCS data, all cases where deputies made contact with passengers.  We then pulled a sample of 10 cases per month (30 per quarter) of those stops where deputies made contact with a passenger.  (The cases of passenger contacts are detailed in Paragraph 25.d.)

In our sample of 30 that contained body-worn camera recordings, our review, as well as BIO's inspection of traffic stops, did not identify any instances of the vehicle occupants' race or ethnicity or gender being misclassified.  Of the 75 traffic stops reviewed where body-worn camera recordings were not requested, there was one case in which two passengers were listed as "unknown-vision obstructed."  Subsequently, we requested the BWC video-recording for that case.  The driver, a white male, was stopped for speeding.  Based on our review of the BWC video, we were unable to ascertain the race/ethnicity and gender of the two additional occupants of the vehicle.  In our review of the 30 cases for Paragraph 25.d and 54.g., we identified one case in which the gender of the passenger was misclassified.  The case involved a Black female driver who was stopped for speeding.  The vehicle was occupied by two white females and one white male.  The deputy mistakenly classified the white male passenger as a white female.  The deputy had contact with the male passenger, as he explained to the deputy that he had a valid registration document for the vehicle stored on his cellular phone.

WAI 34136

Seventy-four, or 70%, of the 105 traffic stops involved white drivers. Twenty, or 19%, of the 105 stops involved Latino drivers. Five, or 5%, of the 105 traffic stops involved Black drivers. Five, or 5%, of the 105 traffic stops involved Asian/Pacific Islander drivers. One, or 1%, of the 105 traffic stops involved an American Indian/Alaskan Native driver. Fifty-nine traffic stops, or 56%, resulted in citations. The breakdown of those motorists issued citations is as follows: 42 white drivers (71% of drivers who were issued citations); 11 Latino drivers (19% of drivers who were issued citations); four Asian/Pacific Islander drivers (7% of drivers who were issued citations); two Black drivers (3% of drivers who were issued citations); and one American Indian/Alaskan Native driver (2% of drivers who were issued citations). Forty-six, or 44%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 32 white drivers (70% of the total who were issued warnings); nine Latino drivers (20% of the drivers who were issued warnings); three Black drivers (7% of the drivers who were issued warnings); and two Asian or Pacific Islander drivers (4% of the drivers who were issued warnings).

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. By way of our previous reviews as well as BIO's inspections, MCSO has learned of deputies' failure to properly document the race or ethnicity of passengers. MCSO's policy does not require that the names of passengers be documented unless a passenger is contacted and the deputy requests and obtains the identity of the passenger. In such instances, the passenger's name and the reason for the contact is required to be documented on the VSCF and an Incidental Contact Receipt. In addition, in such situations, MCSO's policy requires that the deputy provide the passenger with a copy of the Incidental Contact Receipt.

During the last two reporting periods, supervisors attended MCSO's Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training, which included a video component, accompanied with a discussion, specific to traffic stops and properly classifying the ethnicity of drivers and persons with Latino surnames on the VSCFs. Upon completion of the SRELE Training, supervisors provided roll-call training on this topic for sworn personnel.

We have noted that MCSO has improved the accuracy of documenting the perceived race or ethnicity of drivers and passengers. As mentioned above, during this reporting period, there was one case in which deputies misidentified the race or ethnicity of the passenger with a Latino surname.

During this reporting period, MCSO provided us with a draft methodology for the conducting of monthly inspections to determine whether deputies are correctly identifying the ethnicity of drivers and passengers with Latino surnames. On March 31, 2018, we provided our comments to MCSO in relation to the draft methodology. During our April 2018 site visit, MCSO indicated that the comments were under review.

For this reporting period, MCSO remains in compliance with this requirement.

WAI 34137

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname).  For this reporting period, we found that all of the 105 traffic stops we reviewed included a check on the license plate.  There were 98 stops where the driver or passengers had a warrant check run.  In seven cases, there was no explanation provided as to why the deputies failed to perform a check on the drivers.  During its monthly inspections of the traffic stop data, BIO identified six out of the seven cases that we identified in which a warrant check was not run on the drivers.  BIO issued Action Forms in those six cases; however, in the remaining case, BIO did not identify the omission, and no Action Form was issued.  We will follow up with MCSO regarding the one case.

MCSO's compliance rate is 100%, and MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact.  Due to the low number of cases where contact is made with passengers in our sample of 105 traffic stop cases per quarter, we pulled an additional sample for those cases involving passenger contacts.  For this reporting period, we reviewed 30 traffic stops where the deputy had interaction with one or more passengers.  Each passenger contact is described in detail in Paragraph 25.d.  All passenger contacts in the traffic stops we reviewed for Paragraph 25.d. were noted in the VSCFs.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form.  We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers.  We reviewed MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

In our experience, the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care.  The other type of traffic stop where we noted that deputies routinely contact passengers is when upon approaching a vehicle, the deputy detects the smell of burnt marijuana.  In the stops we reviewed where this has occurred, deputies have inquired if the driver or any passengers possess a medical marijuana card.  In other instances, the deputy may, for safety purposes, approach the vehicle from the passenger side, which often results in contact with the passenger who may be seated in the front seat.

MCSO remains in compliance with this Subparagraph.

WAI 34138

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop.  For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases.  We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured.  These forms are included in our monthly sample requests.  The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number.  The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning.  Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.  In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact Forms created by MCSO, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, capture the information required.  As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion.  We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

We did not find any traffic-related events where the stop or end time of the stop differed by more than five minutes between the Vehicle Stop Contact Form and the CAD printout.  Some stops vary in time for any number of reasons that may, or may not, be justified.  There were three stops that were prolonged due to one of the five reasons listed on the VSCF.  All of the stops involved white drivers.  We reviewed the circumstances of each stop and found that reasonable justification existed for the additional time expended for all three of the stops.  In addition to reviewing stops prolonged due to any one of the five reasons listed on the VSCF, we review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length if the stop was justified.  During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

WAI 34139

Supervisors conducted timely reviews and discussions of 102 of the 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in all of the cases that we reviewed.  MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquires as to immigration status.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.  During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals.  MCSO's response was that the current method is appropriate, and that there may be more instances once deputies properly document the searches of persons consistent with this Paragraph.  In the previous reporting period, we identified two cases in which deputies documented on the VSCFs that a consent search of individuals had occurred.  However, in one case, a pat-and-frisk search was performed on the driver and passenger, without requesting or obtaining consent; and in the other case, no search appeared to have been conducted.

We recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.  The method MCSO currently employs is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF.  Once that population is identified, a random sample of 10 traffic stops from each month (30 total for the reporting period) is identified and reviewed.  In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g.  In total, we review 165 traffic stops each reporting period to identify stops where a deputy may have performed a search of an individual specific to the requirements of

WAI 34140

this Subparagraph.  There were no cases that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g.

In the sample of 30 traffic stops identified in relation to this Subparagraph, there was one case that met the criteria specific to searches of individuals.  In that case, a white female driver was stopped for inoperable equipment, as her vehicle's taillight not working.  The license plate on the vehicle was improper; the deputy seized the license plate and advised the driver that the vehicle was not to be driven.  The deputy then offered to provide a courtesy ride to the driver. Prior to transporting the driver, the deputy conducted a pat down of the driver's jacket.  In this one case, MCSO properly documented the requirements of this Subparagraph.  The remaining 29 cases were not specific to the requirements of this Subparagraph, as they involved searches of individuals incident to arrest.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches.  MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs.  In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form.  MCSO reports that deputies have electronic access to the Consent to Search Forms.  We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest.  During the last reporting period, we identified one case in which the deputy reported that he had obtained consent to search an individual; and, although he reported that he was aware that his BWC was not operational, he did not document the request on the Consent to Search Form.  Due to the small population of cases that MCSO and the Monitoring Team have identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to maintain compliance with the requirement.

In the last reporting period, MCSO's compliance rate with this Subparagraph was 67%.  For this reporting period, we noted only one case that was applicable to this Subparagraph.  In light of this, we are deferring our assessment of MCSO's compliance with this Subparagraph.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence.  Of a total sample of 165 stops reviewed for the reporting period, which includes 105 stops for Paragraph 25; 30 stops for Subparagraph 54.k.; and 30 stops for Subparagraphs 25.d and 54.g., there were 19 cases identified in which MCSO deputies documented the seizure of contraband or evidence on the VCSFs.  In one case, the deputy did not obtain the signature from the driver on the property receipt after seizing the license plate; however, the seizure of the license plate was documented properly on the VSCF.

WAI 34141

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified five cases in which license plates were seized by deputies and placed into evidence.  In one case, a driver's license was seized and placed into evidence.  In one case, the driver's license was seized and placed into evidence, as well as the following items, which were located in the stopped vehicle: three Social Security cards; two driver's licenses; two debit cards; and narcotic paraphernalia.

In the 30 cases we reviewed for searches of individuals under Subparagraph 54.k., there were 11 cases in which the driver's licenses were seized by deputies and placed into evidence.  There were two cases in which the license plates were seized by deputies and placed into evidence.  In one case, the deputy seized marijuana and narcotic paraphernalia and placed the items into evidence.  In one case, the deputy seized the driver's license and license plate and placed the items into evidence.  In one case, the deputy seized narcotic paraphernalia and placed the item into evidence.  In one case, the deputy seized the driver's license and license plate and placed the items into evidence; however, the deputy did not document the seizure of the items on the VSCF.  In one case, the deputy seized the driver's license and a firearm and placed the items into evidence.  In one case, the deputy seized the driver's license, license plate and marijuana and placed the items into evidence.  In one case, the deputy seized a stolen utility trailer and numerous tools that were located in the vehicle and placed the items into evidence.  In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there was one case in which the driver's license was seized by the deputy and placed into evidence.  In one case, marijuana and two firearms were seized and placed into evidence.  In one case, marijuana was seized and placed into evidence.  MCSO is in compliance with this Subparagraph.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation.  In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation.  MCSO is in compliance with this Subparagraph.

***Paragraph 55.***  *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**Phase 1:**  In compliance

- EA-5 (Enforcement Communications), most recently amended on December 8, 2016.
- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, the CAD printouts, the I/Viewer, the citation, warning form, and any Incident Report that may have been generated as a result of the traffic stop.

WAI 34142

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

We visited Districts 1, 3, and 4 and Lake Patrol during our April 2018 site visit; and found were no indications from any personnel that there were recurring issues with the unique identifier, including duplicates. Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop.

**Paragraph 56.** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the samples we selected. While audits require in-depth analysis, quality control checks serve as more of an inspection or spot-check of the data. We reviewed the BIO traffic stop audits for January-March 2018, and found that the audits were thorough and captured most deficiencies. During our review of the identical dataset, we identified additional deficiencies, and brought them to the attention of CID while onsite; we identify them in other areas of this report.

WAI 34143

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. We initially documented the deficiencies in the draft procedures in a May 30, 2017 memorandum to MCSO. During our April 2018 site visit, MCSO informed us that it had no issues with our comments on the manual, and that sections of it would soon be ready for our review and approval. During our January 2018 site visit, MCSO noted that some sections of the Operations Manual could not be finalized, as they required finalizing methodologies related to monthly analyses of traffic stop data in accordance with the requirements of Paragraph 67. (See below.) Also, during our January 2018 site visit, we agreed that MCSO could submit completed sections of the Operations Manual for review and approval to enable Phase 1 compliance with those Paragraphs covered by those sections of the Operations Manual.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (prior to April 1, 2014) be stored in a locked cabinet box at the District. The protocol also addresses any traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity. Any personnel who require access to those files must contact the Division Commander or his/her designee who will unlock the cabinet. Once the deputy accesses his file, a TraCS file log must be completed and signed by the deputy. During our April 2018 site visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

MCSO began auditing traffic stop data in January 2014; and beginning in April 2014, MCSO has conducted audits of the data monthly and provided those results to us. We reviewed BIO's monthly audits of the traffic samples from January 1-March 31, 2018, and found them to be satisfactory. MCSO conducts audits of the 105 traffic stop samples that we request each reporting period. BIO also conducts a more expansive review of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons' searches. The approved policy also requires regularly scheduled audits on a monthly, quarterly, and annual basis.

As we reiterated during our April 2018 site visit, MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates in its EIU Operations Manual procedures for ensuring the integrity and accuracy of traffic stop data. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

WAI 34144

*Paragraph 57.  MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection).  GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt.  To verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form.  We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver.  Placing "SERVED" in the signature box without any explanation does not comply with the requirement.  For this reporting period, deputies issued citations or written warnings in all 105 cases we reviewed.  There were three cases in which the signature of the driver was not obtained on the citation or warning, and there was no explanation for the omission.  In one of those cases, BIO identified the issue during its inspections of traffic stop data and issued an Action Form.  In one case, a white male driver with a white male passenger was stopped for driving with an expired registration.  The driver was issued a warning and released.  The signature field contained "SERVED" instead of the driver's signature.  In one case, an Asian/Pacific Islander driver was stopped for making an unsafe lane change.  The driver was issued a warning and released.  The signature field contained "SERVED" instead of the driver's signature.

WAI 34145

In our review of passenger contacts, Subparagraph 54.g., and searches of individuals, Subparagraph 54.k., and passenger contacts, all of the citations and warnings had a signature, with the exception of six cases in which the drivers were arrested and held in custody. Excluding the six cases in which there was an arrest of the driver and a signature was not obtained (of the 165 cases we reviewed), MCSO's compliance rate with this requirement is 98%. MCSO is in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. In one case, there was a BWC recording of the traffic stop from the deputy who initiated the stop; however, there was no BWC recording in relation to the deputy who assisted on the stop. In the remaining 29 cases, the BWC recordings were provided for all of the deputies involved in the traffic stops. The compliance rate for the sample of 30 cases selected from the 105 for using the BWC to determine if deputies are accurately reporting stop length is 100%.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on January 9, 2018.

- GF-3 (Criminal History Record Information and Public Records), most recently amended on May 24, 2018.

**Phase 2**: In compliance

WAI 34146

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access to the systems had occurred during this reporting period.  The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System; and that any violation is subject to fine.  No secondary dissemination is allowed.  Every new recruit class receives three hours of training on this topic during initial Academy training.

MCSO's Chief Information Officer advised us during our April 2018 site visit that MCSO had no breaches to their systems.  All databases containing specific data identified to an individual comply with federal and state privacy standards, and MCSO limits access to only those employees who are authorized to access the system.

We will continue to observe the security issues.

**Paragraph 59.**  *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential.  Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form.  If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same.  If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Electronic traffic stop data capture began on April 1, 2014.  The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54 of the Order. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry.  MCSO has provided full access to all available electronic and written collected data since April 1, 2014.  MCSO did not collect electronic data before this time.  MCSO has continued to provide full access to the traffic stop data.

WAI 34147

### b. Electronic Data Entry

**Paragraph 60.** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:** In compliance

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our April 2018 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

We inspected marked vehicles at Districts 1, 3, and 4 and Lake Patrol to verify that MCSO vehicles used to conduct traffic stops on a routine basis are equipped with the ability to input traffic stop data electronically. Due to the size of the fleet, the number of marked and unmarked patrol vehicles fluctuates from month to month. Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop continues to average 15 minutes or less.

WAI 34148

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.**   *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment.   Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors.   Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops.   MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies.   The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras.   This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations.   We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Body-worn cameras were fully implemented and operational in May 2016, and the equipment has worked well.   The BWC recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel.   The retention requirement for the recordings is three years.

We verified during our District visits that MCSO has issued body-worn cameras to all Patrol deputies.   Records indicate that MCSO began distribution of the body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016.   Every reporting period, we review a printout provided by CID that documents each deputy, by District, who has been issued a BWC.

During our April 2018 site visit, we met with Districts 1, 3, and 4 and Lake Patrol supervisors and commanders; and inquired if Patrol supervisors had experienced any difficulty with the BWC equipment and the BWC system.   We learned that MCSO continues to experience minor issues with cords breaking and batteries not lasting for deputies' entire shifts.   There were also reports of BWC recordings not properly uploading.   In some instances, BWC recordings had to be manually uploaded into the system.

WAI 34149

MCSO pilot-tested a newer BWC version from the same vendor during the summer of 2017 at Lake Patrol and District 1.   MCSO reported that the feedback on the newer system was generally positive.   The deputies wore the BWCs on their upper chest area, as opposed to the current wearing of the device on the head area with the use of eyewear or headgear.   MCSO also reported that there were some deputies who reported experiencing discomfort and headaches from wearing the BWC in the current manner.   In some instances, deputies had obtained notes from their personal physicians requesting that the deputies be exempted from wearing the BWC on their head areas.

MCSO is currently procuring a new body-worn camera system for all of its deputies.   During our October 2017 site visit, we reviewed videos from the pilot-test of the newer equipment, and found that the BWC captures a wider view, and that the image is sharper than what is being recorded by the current system.   The new BWC will resolve the current issues of cords breaking and becoming disconnected, as there is no cord.   MCSO also anticipates that the issues related to battery life will be remedied with the new equipment.   In the last reporting period, we identified several instances in which the audio-recordings from the BWCs experienced intermittent periods of distortion.   During this reporting period, we did not identify as many instances in which there was audio distortion.   This issue may be resolved with the implementation of the new system and equipment.   During our April 2018 site visit, MCSO communicated to the Monitoring Team that MCSO is currently procuring the new equipment. MCSO reported that a lesson plan and revised policy have been prepared in relation to the new BWC system and equipment.

***Paragraph 62.***  *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop.  MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning.  Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**:  Not in compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon).   Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples.

WAI 34150

For our selection of a sample to review body-worn camera videos, we used the same sample we select for the CAD audio request.  During this reporting period, we reviewed 30 cases where body-worn camera footage was available.  Of the 30 cases we reviewed, 29 were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case, which involved an assisting deputy, there was no video from the assisting deputy and no explanation was provided for the lack of the BWC recording.  In relation to the sample of 75 cases in which BWC recordings were not provided, there was one case in which the deputy noted on the VSCF that his BWC did not activate properly until halfway through the stop and that he notified his supervisor of the malfunction.  In one case, the deputy initially failed to properly position the BWC, which did not allow one to view the vehicle being stopped prior to the stop; however, the deputy properly adjusted the BWC prior to him exiting the patrol vehicle to approach the driver.

In our sample of 30 body-worn camera recordings reviewed for Subparagraph 54.k., 28 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case, the BWC recording began after the vehicle was stopped.  In one case, the BWC recording began as the vehicle was coming to a stop.  In our review of the sample of 30 body-worn camera recordings for Subparagraph 54.b., 25 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In one case there was no video-recording from the deputy that conducted the traffic stop.  The deputy did not indicate that any technological issues existed with his BWC equipment.  In two cases, the deputies did not activate the BWC upon the decision to stop.  In both cases, the BWC recordings reveal that the vehicles were already stopped at the time of the activation of the BWCs.  In one case, there was no video from a deputy assisting on a traffic stop.  In one case, the deputy's BWC did not record the entire traffic stop.  The deputy noted on the VSCF that his BWC device might not have recorded the entire stop.  The deputy noted that when he attempted to deactivate the device, it was already off.  It is also noted that during the stop, a request was made by the deputy to conduct a consent search of the vehicle; however, the request by the deputy and the response from the driver (refusal) was not captured on the BWC recording.  The compliance rate for the sample of 90 cases is 91%.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes.  MCSO policy directs its employees to forward any such body-worn camera recordings that may be useful for training purposes to the Training Division.

WAI 34151

During our April 2018 District visits, we asked the District Captains whether any body-worn camera recordings had been identified and forwarded to the Training Division for training purposes.  District 3 personnel reported that a BWC recording was forwarded to the Training Division for consideration for training purposes.  The incident involved a deputy's contact with an unresponsive individual.  The deputy believed that the individual was suffering from an opiate/opioid overdose, so the deputy administered Naloxone (Narcan), which resulted in the individual being revived.  We encourage MCSO to continue to identify body-worn camera recordings that would be useful for training purposes and incorporate those into MCSO's training programs.  MCSO has already discovered the value of body-worn cameras – including in instances where community members have lodged accusations against deputies and the recordings proved to be invaluable in resolving complaints.

***Paragraph 63.***  *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections.  The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation.  The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:**  In compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy.  When a deputy is transferred, his/her written traffic stop information will follow the deputy to his/her new assignment.  During our April 2018 site visit, we inspected the traffic stop written data files of Districts 1, 3, and 4 and Lake Patrol; to ensure that hardcopies of traffic stop cases are stored for a minimum of five years.  We found that the files were in order and properly secured, and did not note any issues of concern.

WAI 34152

### d. Review of Traffic Stop Data

*Paragraph 64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analysis of the traffic stop data into the EIU Operations Manual.  To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodology delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.

*Paragraph 65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

WAI 34153

MCSO designated the Early Intervention Unit (EIU) as the organizational component responsible for this Paragraph. EIU is to conduct analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64. EIU must report the findings of its analyses to the Monitor and the Parties. As discussed in previous quarterly status reports, MCSO discovered serious problems with its traffic stop data, which ultimately required a reanalysis of the second annual evaluation and also affected production of the quarterly reports. Arizona State University (ASU), MCSO's contractor responsible for the annual and other periodic evaluations, completed the reanalysis of the second annual evaluation, which was reissued in July 2017 and posted by MCSO on its public website in October 2017. As is discussed below in Paragraph 66, due to data coding errors by MCSO's contractor, the third annual evaluation is seriously delayed.

During our January 2018 site visit, we discussed potential topics that might be studied by MCSO under the quarterly analysis requirement. Also, during that site visit, we noted that successful candidate topics would inform the methodologies used for the monthly or annual analyses – or contributed to improvements in traffic stop data. A tentative list of potential topics was developed for discussion during our January 2018 site visit. However, during that site visit, MCSO informed us of its desire to revisit the list. Just prior to our April 2018 site visit, MCSO requested permission to place the effort to develop a list of potential topics on hold. It reported that staff were overcommitted to completing the Second Traffic Stop Annual Report (TSAR) reviews and had no time to turn to the matter of topics for the quarterly analyses. We agreed to this request during our April 2018 site visit.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but it does not specify exactly what such analyses might entail. During our January 2018 site visit (and reiterated during out April 2018 site visit), we informed MCSO that, once a list becomes finalized, we would be amenable to changes to the list – but with the understanding that MCSO will not make any changes to it without first seeking our approval.

MCSO resumed monthly analyses of traffic stop data in May 2017. Monthly analyses had been suspended since May 2016 because of our determination that the process used up to then required refinement to improve the identification of potential alerts in EIS. MCSO had implemented a new process that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO.

We note that MCSO's resumption in May 2017 of monthly analyses was a significant milestone. During our July 2017 site visit, we expressed concerns about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared. We suspended the process during our July 2017 site visit to allow us and EIU time to consider possible refinements to the existing methodology that would result in fewer but more significant alerts in EIS. The resumption of the process was further delayed because of the need for technical assistance related to selecting alerts identified in the second annual comprehensive evaluation of traffic stop data (the Second TSAR) and the subsequent implementation of the supervisory review process to address Second TSAR alerts entered into EIS.

WAI 34154

During our October 2017 site visit, we discussed options to refine the monthly analysis. MCSO committed to testing its options and providing its analysis to us prior to our January 2018 site visit. MCSO failed to complete its analysis in time for our January 2018 site visit, stating that staff were overcommitted because of workload requirements needed to complete the Second TSAR reviews. EIU provided a demonstration of a partial analysis involving one option during our site January 2017 visit, and committed to fully documenting its analysis of all options by April 1, 2018, prior to our April 2018 site visit. EIU met this deadline.

MCSO provided a memorandum on April 1, 2018 delineating its proposed refinements to the monthly analysis, along with an Excel spreadsheet delineating the analysis. The memorandum presented two options that were explored by EIU to refine the methodology to analyze monthly traffic stop data. One option involved setting an alert in EIS if a deputy had two or more allegations during a rolling three-month period. The second option involved setting an alert if a deputy had three allegations in a rolling five-month period. The two options were tested using Paragraph 67 Benchmarks 1, 2, 4, 5, 10, and 11. (See Paragraph 67 for a description of the Benchmarks.) We agreed during our January 2018 site visit to suspend Benchmark 9; and Benchmarks 6 and 7 are now essentially combined. In an April 9, 2018 memorandum to EIU, we sought clarification of the analysis to ensure our understanding of the proposed options was correct. We received a written response from EIU on April 16, 2018, just prior to our scheduled meeting on this topic. Having their response to our questions just prior to our meeting greatly facilitated our site visit. During our April 2018 site visit, we reviewed both options and discussed the merits of each. We agreed that each option was quite promising, in that either option's rolling time period test would identify a pattern of behavior for deputies whose behavior was most at odds with the average behavior (determined by statistical means and standard deviations) of their peers. MCSO stated that it needed time to finalize its analysis and explore how it might propose to proceed.

MCSO will achieve Phase 2 compliance with this Paragraph when the periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers, and data that accurately represents deputy traffic stop behavior over time.

**Paragraph 66.** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

WAI 34155

**Phase 2:**  Not in compliance

MCSO has completed two comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing.  MCSO released the first annual comprehensive evaluation in a report dated May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015."  The first annual comprehensive evaluation found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.  MCSO released the second annual evaluation in draft on October 24, 2016, which became final on March 1, 2017.  However, as discussed in Paragraph 65, the second annual comprehensive evaluation and the first quarterly report had to be withdrawn due to data problems.  The revised second annual evaluation is dated July 28, 2017 and was posted on MCSO's website in October 2017.  Our review of the revised second annual evaluation found that there were no significant differences in findings from those of the first annual evaluation.  The revised second annual evaluation confirmed the earlier report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem.

MCSO committed to provide its third annual comprehensive evaluation on February 1, 2018, but informed us during our January 2018 site visit that it needed to seek relief from that deadline.  On February 23, 2018, MCSO apprised us that its review of the third annual evaluation found problems with its contractor's analysis requiring the analysis be redone.  We participated in two conference calls with MCSO and its contractor on February 26, 2018 and March 1, 2018 to discuss the problems with the analysis. MCSO informed us that the problems with the analysis were attributed to data-cleaning procedures used by its contractor to prepare the traffic stop data for analysis.  MCSO's contractor reported that it had made a number of errors writing the computer code used to prepare the traffic stop data file for analysis.  The problem with not properly cleaning the data file resulted in problems such as the inclusion of traffic stops that represented events associated with training or the inclusion of traffic stops from prior years.  There was also a discussion about whether we required the use of certain statistical software packages used in the analysis.  We stated that we did not require that any specific statistical software package be used, but noted that our only requirement is that we be apprised by MCSO whenever it changes statistical software packages used in its analyses of traffic stop data.

The third annual comprehensive evaluation was not completed in time for our April site visit.  During our site visit, MCSO advised us to expect that the findings in the third annual evaluation will be the same as the findings in the first two annual evaluations.

MCSO will achieve Phase 2 compliance with this Paragraph when it demonstrates an ability to conduct the annual comprehensive evaluation of traffic stop data in a consistent fashion each year using a statistical methodology supported by the peer-review literature and data that accurately represents deputy traffic stop behavior.

WAI 34156

**Paragraph 67.** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.   *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.   *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.   *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.   *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Deferred

The EIU provides monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other misconduct involving traffic stops.  As reported in EIU's May 2016 report ("Monthly Document Report Regarding Paragraph # 65, 66, 67, 74"), EIU's process for analyzing traffic stop data for the purposes of setting alerts for deputies potentially engaging in bias-based policing had been suspended to enable EIU to implement new thresholds and the new methodology for using them as described in our May 2016 guidance.   In a May 16, 2017 memorandum, MCSO reported that all benchmarks were operational at all required levels of analysis and had employed each of them using April 2017 traffic stop data.  However, we suspended this process again during our July 2017 site visit to address problems with the methodology that are described in Paragraph 65.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  MCSO reported in its May 16, 2017 memorandum that the last areas awaiting completion (District-level analysis for benchmarks 67.a. and 67.b.) were completed.  Since these three benchmarks are operational, MCSO is in compliance with Paragraph 67.a.

WAI 34157

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). MCSO reported in its May 16, 2017 memorandum that Benchmark 4 became operational on March 1, 2017. Since this benchmark is now operational, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. The draft EIS Project Plan 4.0 reports that this benchmark became operational at the organization and beat levels as of March 10, 2017. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. According to the draft EIS Project Plan 4.0, Benchmark 6 became operational by manual entry as of December 1, 2016. This is also the case for Benchmark 7. Since the three benchmarks are now operational, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS in those cases involving duplicate traffic stop records to deliver timely data validation for our review. The draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. The May 16, 2017 memorandum from MCSO reports that Benchmarks 9-11 are operational at the required levels of analysis. Therefore, MCSO is in compliance with Paragraph 67.e.

MCSO has completed operationalizing the benchmarks required by this Paragraph. That said, the monthly analysis that relies on these benchmarks generated a substantial number of alerts in the first two months of its use. The issue is that, collectively, the 11 benchmarks used in the monthly analysis of traffic stop data for May 2017 generate too many alerts (well over 100 per month), most of which lack sufficient detail to establish a pattern of problematic behavior for the individual deputies identified by the methodology. Because of this problem, we suspended the monthly analysis process during our July 2017 site visit to allow us and EIU time to consider possible methodological refinements that would result in fewer but more significant alerts for supervisory review.

WAI 34158

As stated in Paragraph 65, the resumption of the process was further delayed because of the Second TSAR technical assistance process and the implementation of the formal supervisory review process to address the Second TSAR EIS alerts.  However, beginning with our October 2017 site visit, we made several decisions about reinstating the monthly traffic stop analysis process.  We determined that the use of four benchmarks (Benchmark 3, Benchmark 6, Benchmark 7, and Benchmark 8) to set alerts in EIS should resume.  We also approved the suspension of Benchmark 9 (search rate for traffic stops that is an outlier) added by MCSO under Paragraph 67.e.

Additionally, during our October 2017 site visit, we agreed to two options for refining the monthly analysis pertaining to Benchmarks 1, 2, 4, 5, 10, and 11.  The status of MCSO's effort to refine its monthly methodology involving the Benchmarks is discussed in Paragraph 65.

Until the methodology is refined in a manner that redresses the problem of too many alerts, we are deferring our Phase 2 compliance assessment of Paragraph 67.

**Paragraph 68.**   *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.   *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.   *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.   *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.   *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.   *the resource needs and allocation during the Significant Operation; and*

f.   *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

MCSO has not conducted a significant operation that met the requirements of the Order since Operation Borderline in December 2014.  After learning about a joint operation with Customs and Border Patrol (Operation Gila Monster in October 2016), our review of the documents indicated that this operation did not meet the provisions of this Paragraph.

WAI 34159

We continue to assess Phase 2 compliance based upon responses to our monthly document requests and interviews conducted with Command and District staff during our site visits. District command, Investigations, and Enforcement Support attest to whether their staff have participated in any Significant Operations or immigrations-related traffic enforcement meeting the specifications of the Order within their jurisdictions for the prior month.  CID provides these attestations on a monthly basis.  For January, February, and March 2018, there were no reported Significant Operations or immigrations-related traffic enforcement.   During our site visit meetings in January and April 2018, District Captains, lieutenants, and sergeants from each District also indicated that no such operations occurred during the period from January-March in their assigned areas.

***Paragraph 69.*** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), and Arizona Office of Courts (AOC) records. Additionally, MCSO's Technology Management Bureau has tested and placed into production the Cornerstone software program (referred to as theHUB), which is expected to improve the automation of training and policy records for MCSO.  Supervisors should now be able to more easily oversee the activity of their subordinates for these foundational areas.

MCSO is also working to improve the tracking and closures of alert investigations by supervisors for their subordinates, and to ensure that supervisors are conducting proper oversight through the automation of Action Forms generated from the BIO Audits and Inspections Unit.

WAI 34160

We are still awaiting analysis by MCSO with regard to several significant benchmarks from Paragraph 67, as well as the initiation of quarterly traffic stop reports that focus on specific issues of concern that may improve analytic methodologies. Each of these reports could greatly improve the quality and quantity of information that supervisors have at their disposal to oversee their subordinates. Throughout this reporting period, BIO has been working to correct website issues that have delayed the publication and release of several audits and inspections. These issues now appear to be under control and we will be checking with field supervisors to ensure that all necessary information is readily available to them. Once MCSO addresses each of these deficiencies, we will be able to evaluate whether MCSO is in Phase 2 compliance with this Paragraph.

The Traffic Stop Monthly Reports (TSMRs) have been undergoing revisions since April 2016. While there have been periods since that time in which MCSO has launched new methodologies, these have also been suspended due to the sheer number of alerts generated and the lack of sufficient data to support a meaningful investigation of potential biased behavior. MCSO is currently working on a methodology that would use rolling time periods and provide a richer source of information to investigate any indication that a deputy's behavior might deviate from normal operations and policies. Due to several data problems that have been encountered, and the demands placed upon the EIU stemming from the Second Traffic Stop Annual Report, the implementation of new TSMR methodologies has been delayed. These alerts represent important mechanisms for supervisors to use in evaluating whether the deputies under their command may be engaging in biased or inappropriate activity when interacting with civilians. We will report on the dissemination and investigation of these alerts in subsequent quarterly status reports.

We have also been working with MCSO to begin publication of a quarterly traffic stop report that is more than just a duplication of either the annual or monthly analyses. During the fall of 2017, we had agreed on a series of special analytic issues that MCSO could pursue in these quarterly reports that would clarify or inform methods used in the annual and monthly analyses. However, MCSO personnel notified us during our January 2018 site visit that they were reevaluating whether the agreed-upon studies were doable, given the responsibilities of EIU regarding the ongoing evaluation and oversight resulting from the last annual analyses. MCSO has not yet produced a memorandum detailing what studies it proposes for the quarterly requirements of the Order. We will evaluate these as they are produced.

Each month, EIU provides a list of all completed alert investigations. From the list, we select 15 cases to evaluate the effectiveness of the supervisory oversight. MCSO created and put into production Attachment B for GH-5 (Early Identification System), which provides the investigating supervisor with sufficient background material to conduct the alert investigation as well as a series of question prompts to ensure a thorough and effective investigation is conducted. The earlier submissions of Attachment B by supervisors did not meet expectations. However, following the completion of training for the Early Identification System (EIS) and Supervisor Responsibilities: Effective Law Enforcement (SRELE) in November 2017, we have noted dramatic improvement in the investigations closed by supervisors.

WAI 34161

In addition, we have noted that command staff at the Districts have taken a much more active role in reviewing and recommending modifications to initial reports when necessary. During January-March 2018, we found only one case where an Attachment B was incomplete. MCSO provided updated documents regarding this case during our April site visit. Two alert investigations that we reviewed in the January submission stemmed from TSMR analyses dating back to January and March 2017. Both reports provided insufficient material for a supervisor to conclude that bias may have led to the actions taken by the respective deputies. Nonetheless, each supervisor conducted a thorough investigation and met with the deputy identified to discuss the materials that were provided. When TSMR analyses are re-implemented, the insufficiency of materials for supervisory review should no longer be a problem. The only other issue of note was that in February and March, MCSO notified us that 13 investigations had been closed and were available for review due to the other demands on EIU as a result of the TSAR processes. All investigations closed during the first quarter of 2018 were completed according to policy.

BIO conducts monthly audits of supervisors' use of EIS tools to oversee the deputies under their command. When BIO finds deficiencies, BIO sends Action Forms to District command for review and action. In May 2017, MCSO automated the transmission and response of Action Forms within the Blue Team software. MCSO continues to develop a tracking system that organizes the Action Form process and can be summarized in a separate inspection report. Additionally, EIU has recently proposed to activate an alert for supervisors who have repeated deficiencies during inspection/audit processes. We will evaluate these processes as MCSO places them into production.

BIO conducts a traffic stop data inspection, which is a simultaneous review of randomly selected cases we choose as part of our own monthly review. While these inspections are meant to verify that the information on traffic forms match CAD and body-worn camera footage, among other indices, they also indicate that supervisors are not adequately overseeing the quality of their respective deputies' work. The compliance rate in January was 74%, rising to 85% in February and dropping back to 77% in March. During this reporting period, BIO issued 20 Action Forms to District command staff. Half of the deficiencies resulted from the failure to run warrant checks on persons stopped or finding that the stop location differed when comparing CAD and VSCF forms. The latter are often explained by the fact that it takes some amount of time and distance between the place the deputy observes the infraction and the actual location of the traffic stop. We will follow up on how these Action Forms are closed by District staff during our future site visits. The fluctuation in compliance indicates an ongoing problem, as noted in our past quarterly status reports.

Related to the Traffic Stop Data Inspection are the Inspections for Review of Traffic Stops by supervisors within 72 hours of the stop and Discussion of Traffic Stops with Deputies within 30 days of the stop. During this reporting period, these inspections show that supervisors are meeting the requirements of policy in over 98% of all cases inspected. The difference in compliance rates across these three inspections suggests that supervisors are overseeing the traffic activity of their subordinates in the manner expected; however, the Review and Discussion processes do not adequately uncover the deficiencies of traffic data found in the Traffic Stop Data Inspection report. This remains a concern since the monthly, quarterly, and

WAI 34162

annual reports are dependent upon identifying the correct location of stops; presence of additional deputies on the scene of traffic stops; and the correct identification of persons and vehicles stopped.  It is important to note that the Review and Discussion roles of supervisors do not require them to compare traffic data forms against CAD or inspect all BWC videos for their subordinates.  The comparisons of inspections indicate that deputies need to be trained, or re-trained, in how to appropriately record the traffic stops they conduct.

The Audit and Inspections Unit (AIU) of BIO also conducts monthly evaluations of Supervisory Notes regarding two randomly drawn BWC evaluations, supervisors' performance notations for their subordinates, and a review of the EIS data pertaining to the deputies they supervise.  The compliance trend since EIS and SRELE training was completed in November has been positive.  From January-March, the compliance rate rose from 92% to 95% in February, and to 99% in March.  Supervisors are using the EIS tools available to them and documenting this in Blue Team as prescribed by policy.  Likewise, the Patrol Shift Roster Inspection reports from January-March show consistency (nearly 100%) in the documentation of shift rosters on a daily basis and the fact that supervisors are overseeing the activity of the same deputies over time.

BIO also conducts an inspection of County and Justice Court cases that are turned down for prosecution.  While the major issue being inspected centers on whether probable cause existed to support the actions of the deputy during the original activity, AIU also identifies other issues that can result in memoranda to Districts that suggest additional training of deputies might be in order.  For both January and February, the inspections noted that all cases evaluated had the requisite probable cause descriptions in the documents provided.  In March, following the inspection, BIO sent one Action Form to District 6, due to incomplete documentation involving a DUI arrest.  During our future site visits, we will follow up with MCSO on how they are dealing with cases involving the lack of complete documentation.  We also randomly assess the inspections of the turndown cases and have not come to conclusions that differ from AIU.

Aside from the fluctuating trends found in the Traffic Stop Data Inspection Report, we have found that the compliance rates for supervisory oversight have been improving recently.  This coincides with our interviews with supervisors during both our January and April site visit meetings, in which we found that supervisors appear conversant and comfortable with the EIS and how the information contained therein can improve the oversight of their deputies.  In future quarterly status reports, we will evaluate how supervisors can use the monthly traffic stop reports once they go into production.

WAI 34163

***Paragraph 70.*** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.  If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.  All interventions shall be documented in writing.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

During the last reporting period, MCSO, working with the Parties, drafted a strategy to address some of the systemic issues identified in the first two Traffic Stop Annual Reports (TSARs). MCSO identified nine goals, which are detailed in the Maricopa County Sheriff's Office Plan to Promote Constitutional Policing.  The Plaintiffs and Plaintiff-Intervenors stipulated as to the contents of the Plan; and the Court issued an Order in October 2017, approving the Plan.  The Plan listed several action items with deadlines in the fourth quarter of 2017 and beyond.

The most important findings from the Second Annual Traffic Stop Report include the potential individual bias by specific deputies, and the continued systemic biases across all of MCSO's traffic enforcement activities.  MCSO created a supervisory intervention process to address the individual deputies found to have stopped, arrested, cited, or warned particular racial groups in a manner that significantly deviated from the norm for deputies patrolling in the same geographic area (outliers).  The two initial pilot-tests of supervisory intervention processes were deemed insufficient.  MCSO worked with us and the Parties to create a supervisory intervention process that involved the cross-checking of documents prior to the intervention by a deputy's supervisor and EIU personnel; a pre-intervention meeting between the immediate supervisor of a deputy, EIU and command staff; as well as several document templates to provide structure to the background investigation and supervisory discussion.  This labor-intensive process required MCSO to temporarily reassign personnel to review, compare, and evaluate all of the background material in preparation for the supervisory discussion.

WAI 34164

At the same time, MCSO agreed that the activity of deputies found to be outliers should undergo a daily assessment by supervisors and command staff (using a Command Daily Assessment, or CDA) while all of these background materials were being gathered and evaluated.  Command staff would briefly evaluate the documents, traffic stops, and other activity of these deputies.  In addition, they would review and evaluate any BWC recordings associated with traffic stops according to existing policy.  Both we and AIU reviewed these recordings to ensure that supervisors were addressing any deficiencies as they arose.

MCSO conducted the supervisory discussions with the identified deputies in February and March 2018.  The discussion participants included the identified deputy, their immediate supervisor, the captain from BIO, and a Chief-level representative from command staff.  Each discussion was videotaped for preservation, and lasted between 90 minutes and two hours.  Following each discussion, an Action Plan was formulated to address the findings of the Second TSAR and any issues that arose during document preparation or the supervisory discussion itself.  MCSO compiled all of this material for each identified deputy, including the taped supervisory discussion, and provided it to us for review in groupings of five or more cases as they were completed.

We provided some preliminary feedback during our April site visit and a conference call preparing for the Third TSAR.  We collectively concluded that the most effective discussions occurred when supervisors came prepared with documents and questions arising from the Second TSAR and the background material accumulated.  Passive or less prepared supervisors, who allowed EIU to run the discussions, were less effective.  MCSO is investigating using segments of the most effective supervisory discussions in future Supervisory Training.  Other issues related to the long delay between the identification deputies as outliers and the initiation of the discussions.  Several deputies commented during their discussion about the secrecy of the process and the fact that morale of the agency had been adversely affected.  MCSO is evaluating ways to make the process more transparent without compromising the process.  Other observations include the belief that too little time was spent discussing actual traffic stops; potentially using BWC recordings in future discussions; and providing more attention to implicit bias, among others.  MCSO is also proposing to create a unit within BIO that would be solely responsible for TSAR processes to ensure that expertise is developed and future processes are streamlined and effective.  We will continue to evaluate these materials and will provide additional assessment, as needed, in our future quarterly reports.  MCSO has been proactive in refining its TSAR response from the early pilot projects and continues to explore ways to improve the organization's preparation for future TSAR analyses.  While the final round of supervisory discussions was not without deficiencies, overall their quality was much better than any previous attempts.

WAI 34165

EIU personnel are continuing to develop the next draft of the EIU Operations Manual. The completion of this is partly inhibited by the ongoing evaluation of the methods for both the Traffic Stop Monthly (TSMR) and Quarterly (TSQR) reports. During our April site visit, we recommended that MCSO produce the next draft with placeholders for those issues that are still under investigation or consideration. Given the recent transitions of personnel and leadership within EIU and BIO, it is imperative that the roles and responsibilities of the unit be memorialized so that they do not have to be recreated each time transfers occur. More importantly, it is essential that MCSO standardize the handling of data that is the foundation of monthly, quarterly, and annual traffic stop analyses. We have noted repeated delays in the production of statistical reports due to the occurrence of data anomalies that should have been discovered earlier. MCSO has created a "data quality" workgroup that meets on a monthly basis to review any changes in the data structure or process that might impact the outcomes. The memorialization of all EIU activities is fundamental not only for the production of reports, but it remains the foundation of effective supervisory practices that can only be supported by clear information.

EIU produces monthly alert investigations for supervisors to complete when thresholds, to be memorialized in the EIU Operations Manual, are triggered. These investigations are guided by the development of Attachment B of GH-5 (Early Identification System) that outlines the responsibilities of supervisors. This attachment has made these investigations, and any outcomes, more transparent for supervisors and deputies alike. Attachment B, once completed, is transmitted through the chain of command for approval or return to the assigned supervisor. As noted in Paragraph 69, these investigations have improved dramatically following the EIS and SRELE training completed in November 2017. During our January and April site visits, several supervisors advised us that the training provided information about the process that they were not aware of beforehand. In addition, we have found that command staff have taken a more proactive role in evaluating the materials provided by supervisors in Attachment B. The monthly alert process, while evolving, continues to be limited because the alerts emanating from the Traffic Stop Monthly Reports will not be included in these reports until such time as the methodologies for the TSMR are finalized and approved. We will continue to work with MCSO to evaluate and finalize these processes.

During the third quarter of 2017, MCSO, working with the Parties, drafted a strategy to address some of the systemic issues identified in the first two Traffic Stop Annual Reports (TSARs). MCSO identified nine goals, which are detailed in the Maricopa County Sheriff's Office Plan to Promote Constitutional Policing. The Plaintiffs and Plaintiff-Intervenors stipulated as to the contents of the plan, and the Court issued an Order in September 2017, approving the plan. We requested documentation pertaining to several goals listed in MCSO's Plan to Promote Constitutional Policing. The Plan lists different target dates for completion of its goals and sub-goals, so our methodology for requesting verification of compliance takes these due dates into account.

WAI 34166

MCSO planned to update and republish the Plan every six months; and began work on an updated version, which it shared with us and the Parties.  (We refer to this version as the March 2018 revision in the comments below.)  However, MCSO never finalized this revision; and MCSO advised us that it is planning on issuing future iterations to conincide with the fiscal year (July 1-June 30).  Therefore, the next revision of the Plan will be published sometime after July 1, with the following update scheduled sometime after January 1.

As to Goal 1, MCSO has completed EIS training, which included sections on implicit bias and cultural awareness.  MCSO has also completed the action plans to address issues related to the deputies who were considered outliers in the Second Annual Traffic Stop Report (TSAR).  The liaison program/internal town halls noted in Goal 1 of the Plan are due for implementation by September 1, 2018.  MCSO reported that it will monitor the effectiveness of the action plans, pertaining to the deputies identified in the Second TSAR, in 30-, 60-, and 90-day increments; and will publish the outcomes in the annual report.

As described in Goal 2 of the Plan, supervisors are to be held accountable for deputy outcomes, through the EPA process; and commanders are to address deficiencies noted in Blue Team notes and Employee Performance Appraisals.  During this reporting period, MCSO made some progress toward the completion of this goal.  The Enforcement Commanders' monthly meetings served as the platform for the discussion of issues that have been identified in Employee Performance Appraisals.  MCSO held three Enforcement Commanders' meetings during this reporting period.  The meeting minutes were better documented in this reporting period, as compared to last reporting period; and from what we can discern, the discussions addressing the issues noted in EPAs were substantive.  MCSO advised us that Enforcement Commanders have been returning deficient EPAs for correction.  In our reviews relative to Paragraph 87, we noted some improvement in the quality of EPAs, but MCSO needs to make further progress.  We anticipate that it will take time for the measures implemented as a result of the discussions in the Enforcement Commanders' meetings to produce any permanent changes.  We expect that the added attention to the quality and consistency of EPAs will manifest results in subsequent quarters this year.

Goal 3 of the Plan relates to training and roll-call briefings on enhanced cultural competency and implicit bias.  We reviewed the minutes of the Enforcement Commanders' monthly meetings, and noted that there were presentations made by different captains at each meeting.  The topics included implicit bias and cultural competency.  We learned that the purpose of the discussion of the topics was to review suggested training materials, which were to be recommended to the Training Division. MCSO advised us that it is working to develop a library of videos to use in training and roll call briefings.  There is one video on sexual abuse that has been approved for training, which touches on implicit bias.  During our April 2018 site visit, we learned that none of the videos that were being considered for training directly addressed implicit bias or cultural awareness as to the Plaintiffs' class.  With regard to Enforcement Commanders recommending training materials, our concern is that Enforcement Commanders may not necessarily be subject matter experts in cultural competency and implicit bias. Suggestions for training materials should be carefully vetted by those with expertise in the field, and approved by the Training Division.  It is our understanding that there was some discussion of training materials on cultural competency and implicit bias, but no actual training occurred

WAI 34167

during this reporting period.  In our last quarterly status report, we noted that there did not appear to be much input from organizations representing the Plaintiffs' class.  We understand that there has been increased interaction in this area.  We recommend that MCSO continue to foster cooperation among the Office, community members, the Community Advisory Board (CAB), and other community organizations; and seek greater input on the listed topics from the Plaintiffs' class.

As to Goal 4 of the Plan, which calls for enhanced fair and impartial decision-making training, and the importance of the guardian mindset, we note that there was a presentation during one of the Enforcement Commanders' meetings in which participants discussed training materials on the importance of developing the "guardian mindset."  We are not aware of any training that MCSO delivered with regard to the topics of this goal during the first quarter.  MCSO distributed a Briefing Board in April, asking Patrol supervisors to send BWC videos to be evaluated for training and roll call briefings.  MCSO has admitted that it is behind schedule in training on consent searches.  MCSO has advised us that Maricopa County Attorney's Office (MCAO) will develop this training.

Goal 5 of the Plan states that MCSO will provide deputies and supervisors with enhanced cultural competency training and roll-call briefings based on community input.  In the March 2018 revision of the Plan, MCSO stated that it would create a Deputy Liaison position to develop a team of Posse/reserve officers who will attend deputy briefings and help develop Block Watch in various communities.  The liaison is also tasked with scheduling meetings with District Commanders to enhance training on cultural competency.  The revised Plan states that the Training Division has already met with members of the African American and Hispanic Advisory Boards to solicit input for the 2018 Annual Combined Training (ACT).  The revised Plan also states that by July 11, 2018, the Training Division will develop short training videos or briefing materials for supervisors to use to build cultural competencies.  The Training Division issued an Administrative Broadcast on March 15, 2018, requesting that all Divisions to send BWC recordings to Training.  The intent is for supervisors to identify BWC videos that may be used in training as examples of desired behaviors, or to identify incidents where alternative methods could have resulted in better outcomes.  During our April site visit, we recommended that if deputies are active in community policing, they would receive feedback and recommendations from members of the community.  We reiterated the importance of tracking and evaluating these suggestions.  MCSO advised us that the Community Outreach Division (COrD) personnel who attend community meetings document the topics discussed in memorandums, which are forwarded to their supervisors.  If COrD personnel receive suggestions from the attendees, they document them as well.  We advised MCSO that it should establish a process for suggestions and recommendations coming from the public to be documented, tracked, and reviewed by command-level personnel.  It is incumbent upon MCSO to ensure that input from the community does not go unattended or simply gets misplaced.

WAI 34168

As to Goal 6 of the Plan, improving traffic stop data collection and analysis, the March 15, 2018 revision of the Plan states that MCSO has enhanced the policy and procedures to collect, verify, and analyze traffic stop data. The revised Plan states that EIU has incorporated input from Patrol Commanders to better capture decision-making. It adds that in January 2018, EIU and the Technology Management Bureau developed and delivered plans and responses to address the most recent recommendations from ASU to improve data collection in traffic stops. In the "steps beyond the next two quarters," MCSO noted a proposed revision to the Vehicle Stop Contact Form (VSCF) to enable more efficient data collection. During our April site visit, MCSO advised us that it was considering a number of revisions, including changes to the VSCF. MCSO also told us that the TraCS software needed to be updated before it could make any revisions to traffic data collection. MCSO advised us that a TraCS update was scheduled for May 2018.

Goal 7 of the Plan states that the Community Outreach Division (COrD) personnel and Enforcement Commanders would establish guidelines for supervisors to track employees who have made exemplary contributions to constitutional and community-oriented policing. The March 15, 2018 revision of the Plan states that in January 2018, COrD met with Human Resources and Enforcement Support to discuss processes to identify and track employees who made exemplary contributions; and that the policy and protocol is in the development stages. We understand that COrD is developing a process to include input from community members, community groups, and the CAB, in the employee selection process. The revised Plan noted that an awards banquet was scheduled for May 2018. The revised Plan states that MCSO will expand the post-Academy training for new recruits, to include a presentation by COrD in community policing and service to the community. The new Plan also notes that, in the third quarter of 2018, MCSO will establish two pilot Districts to set guidelines for deputy-community interactions. During our April site visit, MCSO advised us that it had selected Districts 1 and 2 for the pilot program. MCSO will measure the effectiveness of the pilot programs at the end of the first quarter of 2019. The Plaintiffs have inquired if MCSO would share feedback from community members on the pilot outreach plans. MCSO stated that it would develop a regular process for feedback.

As to Goal 8 of the Plan, the Peer Intervention Program, during our April site visit MCSO reiterated that it had considered adopting the EPIC Program from the New Orleans Police Department. MCSO determined that the program was not feasible for the Office. MCSO previously advised us that it would consider establishing its own peer intervention program. During our April site visit, we inquired if there were any updates on the alternative program, but MCSO informed us that there were none; an alternative program does not appear imminent.

WAI 34169

Goal 9 of the Plan involves building a workforce that provides constitutional and community-oriented policing and reflects the community that MCSO serves.  During our April site visit, Human Resources (HR) provided us with a detailed account of the progress it has made.  An HR representative described the action steps that MCSO intended to take to attract more qualified and diverse applicants.  MCSO advised us that it has established a diverse three-person recruiting team, and is also contracting with a marketing firm to assist with recruitment.  Of all the goals in the Plan, MCSO appears to have made the most progress in Goal 9.  The March 15, 2018 revision of the Plan notes that HR conducted an assessment of the staffing process and made recommendations for improvement; these have been presented to the command staff for approval and funding.  Key elements of the Recruitment Plan are the establishment of a recruitment function, development of a diversity hiring strategy, streamlining the background process, reviewing the screening process to ensure bias-free processing, and renewing the focus on employee retention.  HR also developed a 15-question annual employee survey.  The revised Plan also states that by the third quarter community meeting, COrD will assist the CAB in developing a survey to measure the community's perspective of the *Melendres* reforms.  The revised Plan states that in the third quarter, MCSO will conduct the employee survey; and HR will identify an outside subject matter expert to assist in developing screening tools for hiring.

MCSO has made limited progress in the goals and sub-goals listed in the Plan.  MCSO appears to have made the most progress in developing the action plans for Goal 9.  The Recruitment Plan includes several objectives and strategies that will become due throughout the first three quarters of 2018.  The Recruitment Plan appears viable, and MCSO has incorporated good ideas into the plan.  We are aware that there is significant competition for qualified applicants from other local law enforcement agencies.  There was improvement in the substance of the discussions in the captains' monthly meetings, but the efforts have not yet translated to quantifiable results.

MCSO has made some progress in meeting the requirements of this Paragraph during the quarter by completing the supervisory discussions for deputies found to be outliers in the Second TSAR.  MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR and TSQR are not yet in production.  In addition, there is much work to be done to finalize and implement the Plan to Promote Constitutional Policing.  We will continue to evaluate and provide feedback to MCSO as these materials are produced.

**Paragraph 71.** *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO has provided us with access to existing data from monthly and annual reports.

WAI 34170

We have been working with MCSO on the refinement of Traffic Stop Monthly Reports (TSMRs) since they were initially discontinued in April 2016.  At the time, the TSMRs were based upon a methodology that was largely qualitative in nature.  In January 2017, MCSO re-introduced the TSMR analysis; however, it again discontinued the analyses in June-July 2017 when it became clear that alerts set on the TSMR did not provide supervisors with sufficient information to determine if a problematic pattern of bias led to the traffic stops.  MCSO continues to develop alternate methodologies to incorporate the benchmarks from Paragraph 67.  Based upon discussions during our January and April site visit meetings, these analyses will be based upon a rolling time period that will provide a sufficient number of traffic stops for supervisors to adequately judge whether problems exist.  We will evaluate these proposals and discuss their efficacy as they become available.  MCSO continues to set alerts for non-traffic stop activity of deputies and a subset of the Paragraph 67 benchmarks (data issues and immigration or identity stops).

In November 2017, we approved a sequence of special studies MCSO could conduct to meet the requirements of the Traffic Stop Quarterly Report (TSQR).  During our January 2018 site visit, MCSO advised us that it was reevaluating whether the studies agreed to in November provided the agency with the most useful information possible.  Following the completion of the Second TSAR process, MCSO has committed to proposing a set of studies for the quarterly analyses that may further the goals of the organization.  We will evaluate these as they are made available.

Several data-handling deficiencies have arisen in the production of monthly and annual traffic stop analyses causing the suspension or delayed production of three TSAR documents and the interruption of months of TSMR analyses.  MCSO has worked with us and the Parties to overcome each of these deficiencies.  MCSO has now instituted a data-handling work-group, comprised of personnel from each unit that pulls or handles the data to be analyzed, that meets on at least a monthly basis to discuss any changes that may be occurring with the data itself or how it is transferred from one unit within the organization to the next.  These processes will be memorialized in the EIU Operations Manual and the outcomes of the monthly meetings of the work-group have been shared with us and the Parties.  Once memorialized, we will comment further on these processes.

MCSO has improved the transparency of data-handling and analytic processes.  While MCSO has missed several target dates for the production of monthly, quarterly, and annual data analytic reports, this Paragraph requires that the Monitor and Plaintiffs' representatives shall have access to the results of all supervisor and agency level reviews of the traffic stop and patrol data.  We have consistently been granted such access, and MCSO is in Phase 2 compliance with the Paragraph.  The deficiencies noted may impact compliance with other Paragraphs.

WAI 34171

# Section 8: Early Identification System (EIS)

## COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")

### a. Development and Implementation of the EIS

*Paragraph 72. MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

During 2017, MCSO created interfaces for several significant data elements outlined in Paragraph 75.  These include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs) and records from the Administrative Office of the Courts (AOC).  In February 2018, MCSO placed into production the Cornerstone software (referred to as theHUB) to replace the E-Learning and E-Policy programs previously employed.  While theHUB does not communicate directly with EIS, MCSO has tested and implemented an interface that updates on a routine schedule and allows supervisors to monitor the training and policy documents that their subordinates have completed and read.  MCSO is currently redrafting the EIU Operations Manual that will memorialize the roles and responsibilities of EIU personnel as they pertain to the EIS data.  The Operations Manual will standardize the handling of data to minimize the types of deficiencies that have plagued previous annual and monthly traffic data analysis, as well the thresholds that trigger alerts and the processes that EIU personnel must fulfill in the completion and approval of alert investigations.  The Operations Manual will provide transparency and accountability to a system of information that lays the foundation for ethical policing processes.  During both our January and April site visits, supervisors who had completed the SRELE and EIS training in 2017 commented that they had not fully appreciated the accessibility of the information incorporated into EIS, and that they believe this will make their supervisory roles easier in the future.

As noted in Paragraph 70, MCSO has missed target dates for the completion of both Traffic Stop Monthly (TSMR) and Traffic Stop Quarterly (TSQR) analyses.  The monthly analyses have been suspended twice – the last time because there were insufficient data for a supervisor to judge whether patterns of bias existed; not because of a problem with the data.  As a result, MCSO has tested and proposed a three-month rolling average of traffic stops that should provide supervisors with ample information should their deputies appear as outliers in the analysis.  MCSO has not had a consistent traffic stop monthly analysis for nearly two years.

WAI 34172

MCSO has not yet produced an example of the TSQR. Over several meetings and conference calls we, MCSO and the Parties had developed several quarterly analytic proposals that were confirmed in November 2017. During our January 2018 meetings, MCSO informed us that it was reevaluating whether the studies previously discussed would provide the most useful information to the organization. MCSO will propose new studies for consideration. Both the monthly and quarterly analyses had to be placed on hold for periods of time as EIU personnel were overwhelmed with activity related to the Second TSAR. We will evaluate the monthly and quarterly proposals of MCSO in future quarterly reports.

Each month, EIU produces a monthly alert report for deputies whose behavior may indicate a concern for MCSO. These alerts cover a range of behavior from arrests without probable cause to immigration inquiries and unscheduled absences. EIU is currently working to modify this report to include the time it takes a supervisor to complete an alert investigation once it is assigned. Policy dictates a 30-day timeframe, but to date, the tracking of these alert investigations has been inconsistent. Additionally, BIO has automated Action Forms in Blue Team when deputies and supervisors fail to accurately employ EIS documentation or information. For example, an Action Form can be triggered for a deputy if AIU finds that upon review of traffic stop documents that the VSCF information does not match CAD or BWC recordings (Traffic Stop Data Inspection). Alternately, supervisors are supposed to employ Supervisory Notes to show that they have reviewed two BWC recordings for each deputy in a month, among other responsibilities. The failure to do so would result in BIO sending an Action Form to District command staff. Like alert investigations, there is no process in place to capture how quickly command personnel may address these Action Forms and little ability to track whether supervisors or deputies have recurring Action Forms.

AIU is currently developing a tracking process for Action Forms. It should be noted that Action Forms are now included as an alert category in the monthly alert report. We will evaluate the proposals of EIU and AIU in future quarterly reports. When implemented, these will provide transparency to the supervisory process that does not currently exist. We have found, following the SRELE and EIS training that was completed in November 2017, that alert investigation documentation has improved dramatically. In particular, Attachment B of GH-5 (Early Identification System) has standardized how supervisors conduct alert investigations. More importantly, command staff have adopted a more active role in reviewing and returning these investigations when they are found lacking. We are confident that with the conclusion of the Second TSAR process, MCSO will be able to devote resources to complete the analytic and tracking tasks outlined above.

WAI 34173

***Paragraph 73.*** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** In compliance

The EIU is a fully functioning unit. A lieutenant coordinates the unit, with three sergeants conducting investigations, one analyst, and one administrative staff member under the auspices of BIO. Due to promotions, the leadership of both EIU and BIO has recently changed. In addition, during our April site visit meeting, MCSO indicated that it was seeking funding to create a new unit within BIO that would be responsible for all aspects of the TSAR process. During the final stages of the Second TSAR, MCSO found that it was necessary to temporarily assign personnel from across the agency to EIU/AIU due to the enormity of material that had to be processed, reviewed, and coordinated in anticipation of the supervisory discussions. Since this requisition is in the early stages of development, it remains unclear how many individuals may be assigned to this new unit. It is significant to note that the burden of the Second TSAR was borne largely by the new leadership of BIO and EIU. While we have recommended a number of changes for future TSAR processes, we found that the captain and lieutenant fulfilled their roles with diligence and professionalism.

EIU is also redrafting the EIU Operations Manual to standardize the roles, duties, and responsibilities of all persons regarding the information and use of EIS information. Given that several issues involving the monthly and quarterly traffic stop analysis have yet to be finalized, we have recommended that MCSO complete the memorialization of those portions of the manual that would be unaffected by data methodologies. We will comment on the production of portions of the Operations Manual as they become available, and MCSO can achieve Phase 1 compliance with the impacted Paragraphs.

EIU has overseen the expansion of the EIS data with the development, in 2017, of interfaces for Incident Reports, Non-Traffic Contact Forms, and Justice Court information. In February, the Cornerstone software (HUB) replaced the older E-Policy and E-Learning programs. MCSO created an interface between theHUB and EIS that will routinely update this information and alleviate the need for EIU personnel to enter individual training information into EIS manually.

The EIU continues to work on modifications to monthly reports and provide transparent access to all the information contained within the EIS. With the anticipated publication of the EIU Operations Manual, future leadership transitions should be smoother than we have noted in the past.

WAI 34174

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- EIU Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

MCSO continues to work on the development of the EIU Operations Manual.  During our January and April site visit meetings, MCSO indicated that EIU personnel were so overwhelmed with compiling and evaluating documents and videos related to the Second TSAR that they had made little progress on the Operations Manual.  We recommended that since several data issues were still in development, that MCSO produce sections of the manual that were not affected by those that are still in development.  We will evaluate and report on these as they are made available.

When EIU was initially created, we commented that much of what EIU personnel had been doing was not grounded in theory or analytic rigor.  Following a change in leadership, EIU began producing the EIS Project Plan in October 2016.  The Project Plan laid out target dates and goals to accomplish, among them, the development of a comprehensive Operations Manual.  In April 2017, MCSO produced the first draft of the manual, which we and the Parties evaluated.  MCSO produced a second draft in September 2017.  While MCSO made significant progress between the first and second drafts, there were still substantial gaps dealing with the tracking of interventions (Paragraph 81), and alert investigation processes (Paragraphs 69 and 70), among others.

MCSO has made significant progress in the development of a data development protocol.  As a result of several unexpected errors in the annual and monthly data analysis that were traced back to miscommunication between units handling or creating the data, MCSO created a data work-group comprised of representatives of each unit that pulls or adds to or uses the data in any fashion.  This group meets on a monthly basis and will incorporate a protocol and dictionary that defines the data used for all analytic processes.  While this will evolve with each modification, the foundation will be provided in the manual being developed.

We will evaluate each process or document as they become available.

WAI 34175

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.  *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.  *all internal investigations of alleged or suspected misconduct;*

c.  *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.  *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.  *all arrests;*

f.  *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.  *all arrests in which the individual was released from custody without formal charges being sought;*

h.  *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.  *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.  *all disciplinary action taken against employees;*

k.  *all non-disciplinary corrective action required of employees;*

l.  *all awards and commendations received by employees;*

m.  *Training history for each employee; and*

n.  *bi-monthly Supervisory observations of each employee.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.
- EIU Operations Manual, currently under revision.
- PSB Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

WAI 34176

MCSO continues to make progress toward the automation of data in the EIS database. Throughout 2017, we noted that MCSO had placed into production data interfaces for several elements of this Paragraph – including Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), and Justice Court information (AOC). Additionally, MCSO has produced two drafts of the EIU Operations Manual and incorporated many of the comments that we and the Parties provided. During our January site visit, the Technology Management Bureau advised us that they had been testing an interface between EIS and the Cornerstone software program (HUB) that will be replacing MCSO's E-Policy and E-Learning programs. During our April 2018 site visit, MCSO was able to show that the program is online and updating deputy entries on a routine schedule. This program alleviates the need for EIU personnel to manually update training records for every deputy. As modifications continue to be made, we will evaluate and report on developments as they arise. Finally, MCSO completed the EIS and SRELE training in November 2017; and field supervisors have indicated that they now appreciate all of the things EIS can provide in the way of supervisory tools. In Paragraph 69, we have noted that we believe this training appears to have resulted in more complete documentation of alert investigations. We will continue to monitor these trends.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

EIU and PSB worked closely with their vendor, CI Technologies, during 2016-2017 to provide access to both open and closed complaint cases. Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases. This protocol has been approved, and will be incorporated into the PSB Operations Manual that is currently under revision. As a result of a regular monthly document request, we receive three randomly selected open external complaints/investigations. Our review of these cases confirms that the summaries meet expectations. Additionally, during our January and April site visits, we observed that field supervisors can easily access these summaries and understand the types of issues involved in the complaints.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

WAI 34177

Corresponding to the discussion above involving complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. This protocol has been approved by us and will be included in the PSB Operations Manual that is now being drafted. We receive three randomly selected samples of open and closed internal investigations each month as a result of a regular document request. Field supervisors have also been able to show that they have access to these summaries in EIS and find them to be clear and concise.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO created several electronic forms to capture information from traffic stops, incidental contacts, and warning or repair orders. As noted in Paragraphs 70 and 74, MCSO has suspended alerts emanating from the benchmarks included in Paragraph 67. This data continues to be compiled within EIS, and will be employed accordingly for the production of future monthly traffic reports once the methods of analyses are completed and approved.

In 2017, MCSO produced interfaces for Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs) that allowed supervisors to view these documents within the EIS database. During our January and April 2018 site visits, field supervisors were able to show us they had access to these documents. Additionally, BIO routinely inspects IRs to ensure that the documents are complete and supervisors have approved the activity of deputies under their command. BIO is currently creating a similar quarterly inspection for NTCFs. Until such time as that is completed, we have been receiving all NTCF documents and found no concerns. The quarterly report should provide an examination across race/ethnicity like that produced in the traffic stop analyses. We will evaluate this proposal when it is produced.

MCSO is not in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our January and April 2018 site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

WAI 34178

Arrests may not always occur as a result of a traffic stop. For this reason, MCSO created an interface between the Jail Management System (JMS) that allows supervisors to access the information regarding arrests in the JMS that may not otherwise be viewed through traffic data. Supervisors have demonstrated the full functionality of searches for IR reports that are filed related to these arrests.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

EIU captures this information through Incident Report Memorialization Forms. Moreover, supervisors may catch these instances where probable cause is lacking in one of two ways. First, supervisors must check and sign off on the review of IRs for each deputy at the end of the shift in which they occur. Second, if a court or prosecutor turns down a case for prosecution, both the deputy and their immediate supervisor are notified. BIO also conducts a quarterly inspection of Incident Reports. During the third quarter of 2017, BIO found the compliance rate for probable cause, within the Incident Reports selected, was 98.39%; and in the fourth quarter of 2017, it was 100%. In the first quarter of 2018, BIO found that 100% of IRs inspected had the requisite probable cause outlined in the document. However, as a result of the lack of supervisor memorialization or the lack of documented use of body-worn cameras (BWCs), the overall compliance rate for IRs was 94%. As a result, BIO transmitted six BIO Action Forms through Blue Team to District command.

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

WAI 34179

For those incidents that do not involve a traffic stop, deputies create Incident Reports (IRs), which are then scanned into FILEBOUND. MCSO created an interface between the FILEBOUND system and EIS that went into production on July 1, 2017. Likewise, MCSO created an interface between the system containing Non-Traffic Contact Forms and EIS. As previously noted, we and BIO conduct quarterly inspections of these forms. BIO personnel indicated that in the fourth quarter of 2017 and the first quarter of 2018, their inspections found that 100% of reports included the necessary reasonable suspicion and probable cause statements dictated by law and MCSO policy. As a result of other issues involved in the inspections, BIO concluded that the overall compliance rate for IRs was 94%, which led to the transmission of six BIO Action Forms to District staff for investigation. We will follow up on these Action Form processes during upcoming site visits.

MCSO reissued EA-3 (Non-Traffic Contact) on June 1, 2017. This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph. MCSO is currently developing a proposal to either include NTCF activities in the Incident Report audit noted above, or create a new audit covering only NTCF activities. We will evaluate this proposal as it becomes available. Until this becomes an approved process, we will continue to evaluate all NTCFs provided by MCSO on a monthly basis. For the months of January-March, MCSO provided documentation for approximately 25 NTCF events per month. Neither we, nor MCSO, found evidence of inappropriate searches or deficiencies in reasonable suspicion or probable cause in the course of these reviews. Supervisors have also demonstrated the ability to search all NTCFs using keywords or types during our January and April 2018 site visits. Since the IR and NTCF data is included in EIS and accessible for review by supervisors, MCSO is in compliance with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database had already included cases returned from the Maricopa County Superior Court under "County Attorney Actions." As of July 2017, the interface for the Maricopa County Justice Court and Arizona Office of the Courts was also placed in production. If a case is returned from any court without prosecution, the arresting deputy and his immediate supervisor are notified. Supervisors are required to review these cases and make a notation about their review in Blue Team. District command staff are also able to view these cases. In addition, any arrest that is not supported by probable cause results in an alert being forwarded to District supervisors for further investigation. For January-March, there were no instances in which an alert for the lack of probable cause was set. In our discussions with District supervisors during site visits, we have been informed that one of the first EIS items they check when reviewing a deputy's profile are arrests without probable cause.

MCSO is in compliance with this Subparagraph.

WAI 34180

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system.

MCSO has revised its policies to now include "coaching" in GH-5 (Early Identification System) as non-disciplinary action. (See Subparagraph 75.k. below.) The current version of EIPro also allows supervisors to search for the disciplinary history of their employees in EIS. Moreover, EIU produces a monthly alert report for Paragraphs 70, 71, 75, and 81. Table 7 of this report provides the number of alerts that were sent out to supervisors for investigation for behaviors ranging from missed log book entries to complaints to use of force, etc. Tables 8 and 9 provide the disposition of these alert reports, which can range from "no further action required" to "referral to PSB." Table 8 is for those dispositions that occur within the same month as the alert is posted, and Table 9 is lagged by one month. The problem, which we have brought to the attention of EIU, is that the majority of investigations are not cleared within these timeframes. We have recommended to EIU that it create an aging table that indicates the time to clearance for the various disposition types. MCSO is investigating this option and will provide a proposal for our review. In the January-March reports, only three cases resulted in a disposition: one "meeting with a supervisor"; one "no further action"; and one "referral to employee services." The remaining cases remain open. MCSO is also proposing to set alerts on supervisors for failure to complete alert investigations within 30 days of issuance.

For Paragraph 69, we also request 15 randomly selected cases from all alert cases closed each month. In 2016, we had been concerned that the explanation for alert investigation closure was often insufficient. MCSO developed Attachment B to GH-5 (Early Identification System) to standardize the information that supervisors should review when required to conduct an alert investigation. We found that this improved the information provided by field supervisors, but that approximately one fourth of all cases closed still lacked necessary information. EIU and the Training Division used our comments to create learning scenarios that were delivered during the EIS and SRELE training that concluded in November 2017. Since that time, we have noted that nearly all closed investigations provide sufficient information to understand why the supervisor closed the case in the manner they had. More importantly, we have noted several cases each month where District command staff have sent alert reports back to supervisors for additional detail or explanation. MCSO provided us with the deficient and final versions of Attachment B in these cases. Command staff are now catching issues that we used to raise based upon our review.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

WAI 34181

MCSO uses Supervisory Notes and bimonthly reviews of a deputy's performance to fulfill this Paragraph. The monthly alert report described in the prior Subparagraph delineates what actions supervisors may have taken following an alert investigation. Supervisory Notes are searchable in the current version of EIPro through the use of key words or phrases. These notes reflect the supervisors' evaluation of a deputy's activity or a communication between a supervisor and their subordinate. Supervisory Notes also elaborate on briefings or training that supervisors may engage in with their squad.

We found that only three alert investigation cases were closed during the first quarter of 2018. We have recommended to EIU that Table 9 of the monthly alert report be transformed from a static 30-day table to an aging table showing the length of time to closure for the alerts that are closed each month. MCSO also intends to propose that alerts be set for supervisors who take longer than 30 days to complete the alert investigations assigned to them. We will evaluate this proposal when it is provided.

BIO also conducts a monthly inspection of Supervisory Notes, making sure that supervisors are documenting performance notes for their subordinates, review the required number of BWC recordings and review the subordinates' EIS profiles on a monthly basis. The trend from January to March shows increasing compliance with these requirements, from 92% to 99%. As a result, BIO sent out five Action Forms to Districts for review and return. In both February and March, BIO found only one supervisor in each month to be deficient. We will follow up on Action Form processes with MCSO during our future site visits.

For Action Forms that went out in November and December, MCSO informed us that each led to instruction on supervisory responsibilities in the Districts. BIO is also developing a proposal to track Action Forms and the closures that occur. We will evaluate this proposal when it becomes available. We have recommended that these should track deficiencies by individual supervisors as well as Districts that may receive a disproportionate number of Action Forms. In our discussions with District Captains, we have noted that they take the receipt of Action Forms seriously and generally try to make sure that supervisors are meeting the policy requirements.

MCSO is not in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

The EIU has completed its work with the Compliance Division and revised the awards policy. MCSO published GC-13 (Awards) on November 30, 2017. With this publication, EIU created categories for awards or commendations within EIS. With the introduction of the newest version of EIPro, these fields are also searchable by supervisors. During our January and April 2018 site visits, supervisors demonstrated how they search and locate these in their subordinates' EIS data.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

WAI 34182

MCSO has transitioned from the Skills Manager System to theHUB software.  TheHUB will replace the E-Policy and E-Learning programs.  TheHUB routinely updates recent training and policy for deputies and is visible by immediate supervisors.  MCSO also created an interface between theHUB and EIS.

During our April site visit, all field supervisors were familiar with theHUB and were able to access the information contained therein.  Several supervisors mentioned that while they could view information for their subordinates, they could not schedule training or policy requirements for them.  In addition, several lieutenants were concerned that they could only see the training of their sergeants – but not of the deputies assigned to the sergeants.  Each supervisor stated that they had contacted EIU about these issues.  We brought this information back to EIU, the Technology Management Bureau, and the Training Division to ensure that they were addressing such deficiencies.  EIU personnel stated that they were aware of several problems with the rollout of theHUB and were actively working with command and District staff to resolve any issues with the system or training.  We will evaluate this again during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

BIO conducts a monthly inspection of Supervisory Notes.  One of the indicators BIO evaluates is whether supervisors are making two notes per deputy each month.  In January, the compliance rate for this item was 82%.  The compliance rate rose to 92% in February, and 98% in March.  The lack of compliance for January and February was attributed to two supervisors each month, from different Districts, who failed to make the necessary two entries for each deputy.  BIO sent Action Forms to the affected Districts.  We will follow up on Action Form closures during our future site visits.  As noted above, EIU and BIO are exploring the possibility of setting alerts for supervisors who have repeated deficiencies over several months.  We will evaluate the proposal when it is produced.

MCSO is not in compliance with this Subparagraph.

MCSO is making progress toward the development of a functioning relational database that is used consistently by MCSO personnel.  With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and theHUB, EIS now contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Court Orders.

WAI 34183

*Paragraph 76. The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:**   In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**   In compliance

For traffic stops, MCSO meets these requirements in several ways.   First, MCSO has incrementally created mandatory fields that deputies must complete before the form can be closed.   This has dramatically reduced the amount of missing or erroneous data that impacted the first annual traffic stop analysis.   Second, EIU has instituted a quality check process of VSCFs; that is, supervisors are required to review all traffic stops within three days before the form goes into the EIS database.   Third, BIO conducts traffic stop data inspections and evaluates whether the deputy and civilian information matches the BWC and license and warrant checks.   The BIO Traffic Stop Data Inspection reports for January-March 2018 show that the overall compliance rates for these months are 74%, 85% and 77% respectively. However, none of the deficiencies were for the identification of the race/ethnicity of the driver. There was one deficiency noted in January, where the deputy did not file an Incidental Contact (IC) with a passenger even though the BWC showed contact.   BIO sent out 20 Action Forms through Blue Team for deficiencies it found.   We will follow up on the IC for this Paragraph. Five other cases from January and March showed that deputies did not conduct wants and warrant checks on the drivers stopped.   While this did not occur in conjunction with an inappropriate racial/ethnic identification, we will follow up on these cases as well.

MCSO has incorporated patrol data into the EIS through the creation of interface options for IR and NTCF documents.   Each of these documents lists the required name of the deputy and civilian in accordance with the Paragraph.   During our January and April 2018 site visits, field supervisors and command staff in the Districts were able to demonstrate their ability to view the information resulting from the activity of deputies under their supervision.   Additionally, BIO conducts quarterly inspections of Incident Reports to check for probable cause in the narrative report, and that all relevant information for civilians and deputies coincides across documents if necessary due to the enforcement actions taken by the deputy.   The BIO inspections for Incident Reports from the first quarter show two instances where deputies did not adequately inform supervisors of identity investigations in District 2.   We will request more information regarding the Action Forms that BIO sent to the District.   BIO and EIU are currently developing a quarterly inspection for NTCFs.   Due to the low use of this form, they are considering including it as a subsection in the IR inspection.   Once produced, we will evaluate the proposal to ensure it meets the requirements of this Paragraph.   However, as noted above, the IR and NTCF data exists in EIS for supervisors to review.   Given the low number (three) of instances where supervisors were not notified of identity investigations or an incidental contact was not documented (less than 3% of IRs inspected), MCSO remains in compliance with this Paragraph.

WAI 34184

*Paragraph 77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO.  As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

MCSO's Technology Management Bureau has regularly maintained an adequate supply of back-up equipment for distribution to the Districts.  Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment.  MCSO has also ensured that if unmarked vehicles may be used for traffic enforcement that they must also be equipped properly.  MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift.  Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues.  However, these areas are well-known to patrol deputies; and they have demonstrated how they adapt to connectivity problems.  The VSCF also allows deputies to note issues with technology on a traffic stop.

During our January and April visits to Districts 3 and 4, and Lake, we spot-checked patrol cars.  We found that they had functioning TraCS equipment, and each District office had available computers for any occurrence of system failures with vehicle equipment.

At present, the technology and equipment available in the agency meet the requirements of the Order.

*Paragraph 78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS.  On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.  No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  In compliance

WAI 34185

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely for purposes of aggregate statistical analyses. These statements meet the requirements of the Order.

We learned during our April 2017 site visit by the Technology Management Bureau Deputy Chief that due to an upcoming quality audit by the Federal Bureau of Investigation (FBI), MCSO discovered that there were two data breach instances that had not been brought to the attention of the Technology Management Bureau (TMB). These instances occurred in 2011 and 2015, and resulted in either prosecution or termination. In response, MCSO published an operating procedure (System Log Audit) on November 6, 2017, requiring that PSB notify the TMB should any system breach investigations arise. We discussed this operating procedure BAS SOP 17-4 in detail during our January 2018 site visit. MCSO informed us during our April 2018 site visit that no new system breaches had occurred since January. We will continue to inquire about these issues during subsequent site visits.

In addition, our discussions of Subparagraphs 75.a. and 75.b. indicate that MCSO takes several steps to ensure that only persons with a need to oversee the activity of deputies are allowed purview of their EIS profile. PSB has set out a protocol for purview and the creation of external and internal complaint summaries to protect the integrity of the investigation while providing supervisors with information necessary to administer appropriate supervision of their employees.

Additionally, MCSO has created a data-handling workgroup to ensure the integrity of traffic stop data. As noted previously, this workgroup was not concerned with the security of data itself, but to ensure that traffic stop information was attributed to the proper deputies. Both the PSB and EIU protocols will be memorialized in their respective Operations Manuals that are currently under revision.


***Paragraph 79.*** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

WAI 34186

MCSO has completed the operationalization of four interfaces linking remote databases for Incident Reports, Non-Traffic Contact Forms, Arizona Office of Courts case outcomes and turndowns, and theHUB software that replaces the Skills Management System with the EIS. While these interfaces have greatly improved the automation and use of EIS data, the Traffic Stop Monthly and Quarterly Reports remain in development.  As a result, MCSO is not in Phase 2 compliance with this Paragraph.

EIU and BIO continue to pull together data to conduct audits and analyses of deputy and supervisor activity.  Both units have automated aspects of the alert and Action Form processes using Blue Team for transmission of information to and from the Districts.  EIU, for example, produces a monthly report on alerts created within EIS that are evaluated for transmission to supervisors for a more thorough investigation.  We have found that the disposition tables for alert investigations, Tables 8 and 9, do not adequately capture how alerts were closed within the timeframes outlined for each table.  Table 8 lists whether alert investigations are closed within the month that it was sent to the supervisor and Table 9 follows up a month later.  However, due to the fact that these alerts may be sent out at the end of the month the supervisor still may not be in violation of policy even if they have not completed the investigation during the following month.  We have recommended to EIU that Table 9 be changed to an aging schedule that captures the time to completion for alert investigations.  EIU is also planning to set alerts for supervisors who do not complete their investigations in the time period specified.  MCSO is investigating the creation of such a table.  We will evaluate this as it becomes available.

BIO has also automated the transmission of Action Forms going to, and coming from, District command staff.  However, BIO does not currently track deficiencies by individuals or Districts. BIO is investigating the creation of a tracking process to focus corrective measures on supervisors who repeatedly have Action Forms sent to their District command staff.  We will evaluate this proposal when it is produced.

We have noted that since the EIS and SRELE training was completed in November 2017, supervisors and command staff are doing a better job of justifying the closure of alert investigations.  During our interviews with District supervisors, nearly all stated that the training has made them recognize the robustness of EIS.

WAI 34187

### b. Training on the EIS

**Paragraph 80.** *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** In compliance

MCSO completed the EIS and SRELE Training for all supervisory personnel overseeing patrol or traffic operations in November 2017. During our visits to the Districts, several supervisors have noted that they had finally received training on systems they had been using for over one year; while others commented that they did not understand how many tasks had been automated to make their supervisory roles easier. Nearly all supervisors remarked that they believe that future training should include more "hands-on" activities that they encounter on a regular basis. We recommended that the supervisors contact EIU and the Training Division to develop these ideas. In addition, we have routinely brought back to EIU and Training personnel the comments we receive from field supervisors.

We will continue to evaluate how the delivery of this training impacts the use of EIS tools by supervisors.

### c. Protocol for Agency and Supervisory Use of the EIS

**Paragraph 81.** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.    *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.    *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

WAI 34188

       i.     *failure to follow any of the documentation requirements mandated pursuant to this Order;*

      ii.    *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

     iii.   *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

     iv.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

      v.    *complaints by members of the public or other officers; and*

     vi.   *other indications of racial or ethnic bias in the exercise of official duties;*

c.    *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

WAI 34189

i.      *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

EIU and BIO produce monthly and quarterly analyses, audits, and inspections pertinent to this Paragraph.  EIU has conducted some form of monthly traffic stop analysis (TSMR) for several years; however, due to issues with the analysis, MCSO has suspended the activation of alerts based upon these findings twice in the past two years.  Our review of the operationalization of the Paragraph 67 benchmarks making up the TSMR analysis found that the thresholds were not based upon any statistical method or theory.  MCSO suspended the activation of alerts in May 2016 and began working on a statistical methodology.  After several months, it reintroduced the alert processes in March 2017, based upon traffic data going back to January 2017.  Upon review of material being sent to supervisors for investigation, both we and MCSO became concerned that there was insufficient material available for supervisors to deduce a pattern of potential bias.  MCSO suspended alerts again in July 2017.  Following several site visit meetings and conference calls, MCSO began developing a method involving a rolling monthly average of traffic stops.  Due to the priority of the Second TSAR process from October 2017-April 2018, MCSO has not been able to complete a draft of the TSMR methodology.  We will evaluate this in future quarterly status reports.  MCSO has yet to produce a Traffic Stop Quarterly Report (TSQR).  Until MCSO is able to consistently produce these analyses for supervisors to employ in overseeing deputies under their command, MCSO will not be able to achieve Phase 2 compliance with this Paragraph.

BIO also produces inspections and reports of supervisor activity.  When it discovers deficiencies, BIO sends out Action Forms to appropriate command staff through Blue Team.  Once addressed, these command staff are required to reply via Blue Team.  BIO has agreed to establish a process for Action Forms, similar to the process EIU has established for alert investigations:  specifically, that these forms can be tracked by individual and District deficiencies so that corrective measures can be most holistically applied.  We will evaluate this proposal in future quarterly status reports as MCSO makes it available.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67.  As we have noted above, the TSMR analyses have been under revision since May 2016; and alerts based upon these analyses are currently suspended.  We will address proposals by MCSO in our next quarterly status report.

WAI 34190

Finally, the publication of the Second Traffic Stop Annual Report (TSAR) was postponed due to a data issue that impacted the designation of where a stop occurred.  MCSO corrected this problem, and published the report in July 2017.  MCSO also postponed the publication of the Third TSAR due to a data anomaly.  We will discuss the findings of the Third TSAR in our future quarterly status reports.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

The publication of GH-5 (Early Identification System) on March 24, 2017 provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic.  The intent of the annual and monthly traffic stop analyses is to identify deputies who stop, cite, warn, or search civilians in a manner that appears to be different from their peers as it pertains to the race/ethnicity of the driver/passengers.  MCSO is continuing to work on the methodology to operationalize the benchmarks from Paragraph 67 in the TSMR.  We are confident that MCSO is working diligently to meet the requirements of the Order.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop data.  During our April site visit, we recommended that MCSO produce those portions of the manual that are not affected by ongoing revisions to data methodologies.  We will evaluate these items as they are made available.

BIO also conducts monthly inspections of traffic stop data.  We have noted a lot of fluctuation in compliance rates in past reports.  The findings for January, February, and March 2018 continue this pattern: 74%; 85%; and 77% respectively.  Many of the noted deficiencies involve the failure to run warrant checks, missing/incorrect vehicle information, or stop locations that differ between CAD and VSCF.  Based upon these findings, BIO sends Action Forms to the Districts.  During our April site visit, we discussed Action Forms with several field supervisors.  The consensus was that these are mechanisms to provide correction to deputies.  BIO is working on a proposal to track Action Forms by individuals and Districts to determine if any informative patterns may arise to improve the activity of deputies.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

WAI 34191

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates. The overall compliance rates for the first quarter of 2018 range from 92% to 99%. We noted a slightly more dramatic difference in one measure of this report – the "two Supervisory Notes per deputy" requirement: January, 82%; February, 92%; and March, 98%. There is slightly more consistency in the requirement that supervisors enter "one performance note" per deputy: 93%; 100%; and 98% respectively. BIO sent out Action Forms resulting from these deficiencies. It does not appear from these three monthly reports that the same supervisors are deficient over time. BIO is developing a proposal to better track the individual and District deficiencies to investigate whether patterns might arise that would lead to more meaningful corrective actions. We will evaluate this proposal once it is produced.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

Aside from interventions stemming from the Second TSAR, which include Action Plans requiring 30-, 60-, and 90-day follow-up evaluations, EIU personnel were not able to recall other interventions that have been tracked. We have made several recommendations to BIO and EIU during site visits and conference calls discussing the requirements of this Paragraph. MCSO is working to develop a tracking protocol and include it in the ongoing revision of the EIU Operations Manual.

EIU has created Appendix B (Early Identification Alert Response Form) to GH-5 (Early Identification System). This form provides a template for supervisors to follow when they are required to conduct alert investigations. The initial publication of this form yielded some improvement in the processes supervisors went through to investigate and close alert cases assigned to them. Following the EIS and SRELE training completed in November 2017, we have noted significant progress in the explanations supervisor provide when addressing the issue of the alerts; but, more importantly, command staff at the Districts are now catching a majority of the deficiencies in these investigations and sending them back to supervisors for additional work or clarification. The majority of these alerts are closed with the notation of "meeting with a supervisor" or "no further action required." Therefore, there is no need to track such actions. EIU does incorporate references to past alerts of a similar nature when they send out alert investigations to supervisors. Supervisors are also able to use EIS to search for past alerts or similar activity that may assist them in conducting current investigations or just remain apprised of their deputy's activity.

While there have been no interventions to track up to this point, EIU stated that the current revision of the EIU Operations Manual will include a description of the protocol for tracking interventions. Once it is produced, we will evaluate the proposed process.

MCSO is not in compliance with the Subparagraph.

WAI 34192

Paragraph 81.e. requires MCSO's EIS protocols include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options.  As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form."  This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use. EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry.  We began seeing the use of these forms in April 2017.  By September 2017, we found that the closure of alert investigations by supervisors had improved.  In recent months, we have only checked on the ongoing status of the related PSB inquiries.  During both our January and April site visit meetings, MCSO informed us that supervisory personnel had not initiated any interventions as a result of alert investigations.

Two reports provided by MCSO in March 2018 triggered alerts because they involved identity investigations.  The first resulted from a traffic accident involving a stolen vehicle.  The driver initially refused to identify himself.  The civilian was arrested, and the deputy notified a supervisor.  The second involved a Latino who was unable to produce any identification during the traffic stop when he was driving a vehicle while his driver's license was suspended.  The original reason for the stop was a faulty license plate light.  The civilian was cited and released from the scene.  Supervisors signed off on each of these reports as required by policy.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

WAI 34193

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment.  In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel.  Detention personnel are much more likely to need to employ force than their Patrol counterparts.  In the current version of GH-5, MCSO makes reference to thresholds that will be included in the EIU Operations Manual.  Additionally, when EIU conducts patrol data analyses, it makes sure to compare "geographic peers."  Therefore, deputies are only compared to other deputies who make stops within the same District.  The TSMR methodology is currently under revision, and we will review it in future quarterly status reports as it becomes available.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).  EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017.  EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.  During our January and April site visits, both lieutenants and captains noted that they always try to complete these within the first week of a subordinate's arrival and they prompt their sergeants to do the same.  We have found no instances where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.  The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE in November 2017 has dramatically improved the information provided by supervisors when closing alerts.  Command staff have also taken an active role in ensuring that if investigations appear incomplete, that they will return them for revision to the supervisor.  EIU is working to improve the tracking of alert investigations to make sure that they are completed in a timely fashion.

BIO's audits and inspections cover a wide range of activities from the "Traffic Stop Data Inspection" that evaluates whether deputies are accurately completing documents and running warrant checks on civilians they stop, to the "Traffic Stop Review/Discussion Inspections" that hold supervisors to specific deadlines for reviewing the paperwork of their subordinates and discussing these with them.  Each time BIO finds a deficiency, BIO sends an Action Form to District command staff.  BIO is developing a process to track whether there are recurring individual or District problems.

WAI 34194

In both the fourth quarter of 2017 and the first quarter of 2018, BIO found that all supervisors included notes regarding how they had discussed bias-free policing with their subordinates. MCSO is further developing strategies through its Constitutional Policing Plan to promote ethical policing, as noted in Paragraph 70.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays.  We spot-check technology and security of old forms during each site visit.  Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017.  The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach.  We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised but no one notified the Technology Management Bureau.  We believe this new procedure will ensure that such an oversight does not occur again.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant.  These range from the finalization of the TSMR, TSQR, and TSAR methods to the completion of revisions to the EIU Operations Manual.  In addition, both EIU and AIU staff are working to track the effectiveness of alerts and BIO Action Forms.  We and the Parties remain concerned that we have not noted instances where supervisors proactively intervene with their subordinates; rather, they wait until prompted by EIS alerts.  Command staff have taken a more active role in evaluating the work of supervisors as evidenced by seeing a number of alert investigations returned to supervisors for revision or additional inquiry.  We have also noted some discussion occurring within the captains' meetings regarding aspects of the Plan to Promote Constitutional Policing.  We will evaluate how these meetings might work to promote more ethical policing in the future.

WAI 34195

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X.  SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82.  MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.  To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83.  MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our April site visit, we interviewed supervisors and commanders from two Districts to determine if there was compliance with MCSO policies and the requirements of this Paragraph. We met with the District Commander, a lieutenant, and a sergeant from District 1.  District deputies operate on a 24/7 schedule; the District 1 offices are open Monday-Friday from 0800 to 1600.  With regard to crime patterns and forecasting, District 1 does not have its own crime analyst like District 6, but receives a monthly statistical report covering the previous three months.  Crime patterns have been fairly constant.  Many residents who live in the District are considered "snow birds" who leave town during the hot summer months.  Reports of burglaries increase when these residents return to their other homes in the fall.

WAI 34196

District 1 is still using a 4/10 shift configuration (four 10-hour shifts), but may go on the 3/13 (three 13-hour shifts) schedule due to staffing shortages.  With regard to the Plan to Promote Constitutional Policing, District 1 members stated that the Plan is fairly new and in its infancy. Some training videos have been provided on implicit bias, and they are expecting more training videos to be played at roll calls.   The District Commander attended one of the three Enforcement Commanders' meetings, and believes that they are productive.  MCSO advised us that District 1 has many vacancies, but MCSO does not have the funding to fill them.  Some Patrol shifts are staffed using deputies on overtime.  The lack of staffing, coupled with the heavy workloads, does not leave a lot of time for deputies to engage in community policing activities.

During our visit to District 2, we interviewed the District Commander, a lieutenant, and a sergeant.  The District office hours of operation remain Monday-Friday, 0800 to 1600 hours. District 2 uses a 3/13 shift configuration (three 13-hour shifts).  Crime statistics have remained somewhat constant, and are discussed at the supervisors' meetings.  With regard to the Plan to Promote Constitutional Policing, the staff of District 2 believe that it is designed to inform employees what is expected from them.  In reference to improving the quality of EPAs, the lieutenant stated that supervisors need to know what the expectations are in Employee Performance Appraisals.  There seems to be a lack of consistency, and appraisals vary greatly from supervisor to supervisor.  We discussed our observations that traffic enforcement appears to have decreased.  With regard to the decreased number of traffic stops, MCSO advised us that deputies have been hesitant to conduct traffic stops because they are concerned that they may be flagged as outliers.

We reviewed a representative sample of 75 Incident Reports for January 2018**,** for the randomly selected date of January 15, 2018.  We found no significant issues, as all 75 Incident Reports were reviewed and memorialized within the required seven days, and all of the 17 Vehicle Crash Reports were reviewed within the required timeframes.  All 11 Arrest Reports were reviewed within the required 72 hours.  We conducted a quality check on a random sample of 10% of the reports we reviewed.  One report reviewed had spelling errors; we found no other significant deficiencies.  For January, MCSO reported 676 hours of community policing.

We reviewed a representative sample of 82 Incident Reports for February 2018**,** for the randomly selected date of February 14.    All 82 Incident Reports were reviewed and memorialized by a supervisor within the required seven days.  Six of the seven Arrest Reports were reviewed and approved by supervisors within the required 72 hours; one report was reviewed late.  All 25 Vehicle Crash Reports were reviewed within the required seven days. We conducted a quality review on a 10% random sample of the reports we reviewed, and found spelling errors in some reports, but noted no significant deficiencies.  For February, MCSO reported 733 hours of community policing

WAI 34197

We reviewed a representative sample of 72 Incident Reports for March 2018, for the randomly selected date of March 17. Seventy of the 72 Incident Reports had been turned in and reviewed by supervisors as required by this Paragraph. All eight Arrest Reports were reviewed and approved by supervisors within 72 hours. MCSO provided us with a printout of Vehicle Crash Reports that documented supervisory review and approval; all of the 22 Vehicle Crash Reports were reviewed and approved within the required timeframe. We conducted a quality review on a 10% random sample of the reports submitted; we found no significant deficiencies. For March, MCSO reported 653 hours of community policing.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs, for each deputy. We reviewed PALs for each month of the quarter to assess if they were turned in by the end of each shift, and if supervisors reviewed each PAL. For January, all of the 36 deputies' Patrol Activity Logs contained documentation of supervisory review. All seven supervisors' Patrol Activity Logs contained documentation of command-level review. For February, we reviewed Patrol Activity Logs for 29 deputies and seven supervisors. All 29 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For March, we reviewed Patrol Activity Logs for 30 deputies and six supervisors. All of the 30 deputies' PALs contained documentation of supervisory review; all of the six sergeants' PALs contained documentation of command-level review.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in January, there were a total of 19 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in February, there were a total of 15 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in March, there were a total of 48 supervisor-deputy field contacts reported by deputies and supervisors.

For January, February, and March, we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For January, the Monitoring Team selected a random sample of 25 NTCFs to review. Twenty-four of the 25 NTCFs were reviewed and approved by supervisors, and 24 of the 25 were reviewed within 72 hours as required by the First Order. For February we selected 25 NTCFs to review. All NTCFs were reviewed and approved by supervisors; 24 of the 25 were reviewed within the required timeframe. For March, we selected 24 NTCFs to review. All NTCFs were reviewed and approved by supervisors, and all had been reviewed and approved by supervisors within the required 72 hours. MCSO has met the requirement of Paragraph 83, that supervisors review all field interview cards – or in this case, NTCFs.

WAI 34198

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2018. During this reporting period, we revised our document requests to conduct more frequent inspections of the larger Districts. We will inspect rosters for Districts 1, 2, and 3 in January, March, April, June, July, August, September, October, and December. We will inspect rosters for Districts 4, 6, 7, and Lake Patrol in February, May, August, and November. During this reporting period, consistent with our methodology, for January we reviewed a sample of shift rosters from Districts 1 and 2; for February we reviewed a sample of shift rosters from Districts 3 and 4; and for March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor. With the exceptions noted below, supervisors were assigned no more than eight deputies. Of the 41 shifts we reviewed for the quarter, 34 were in compliance.

District 1 had one day in January where a shift had a supervisor-deputy ratio of 1:9. District 2 had one day in January where the supervisor-deputy ratio was 1:10. All other shifts examined for January were in compliance. In February, District 3 had two days where a shift had a supervisor-deputy ratio of 1:9. All other shifts inspected for February were in compliance. In March, District 1 had one day where a shift had a supervisor-deputy ratio of 1:9, and District 3 had two days where a shift had a supervisor-deputy ratio of 1:10. All other shifts inspected for March were in compliance.

This Paragraph has two requirements. The first is that deputies be assigned to a single consistent supervisor. The second requirement of Paragraph 84, as it pertains to span of control, was amended in the Second Order to a ratio of 1:8. For this reporting period, MCSO was not in compliance with this Paragraph. MCSO has been in compliance with this Paragraph for some time. Consistent with our methodology, MCSO will retain the compliance rating for this reporting period. However, if MCSO fails to meet the requirements of this Paragraph in the next reporting period, we will withdraw compliance.

WAI 34199

***Paragraph 85.*** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month. Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month. Our selections for these discussions changes every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete. Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For January, MCSO submitted the December traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 12; District 2, 50 District 3, 10; District 4, nine; Lake Patrol, none; District 6, 25; and District 7, 17. There were a total of 123 traffic-related events in December for all Districts, and sergeants discussed 120 with the deputies who conducted them, for a compliance rate of 96%.

For February, MCSO submitted the January traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, six; District 2, 17; District 3, 15; District 4, three; Lake Patrol, 23; District 6, 28; and District 7, 14. There were a total of 106 traffic-related events in February for all Districts, and sergeants discussed all traffic stops with the deputies that conducted them, for a compliance rate of 100%.

For March, MCSO submitted the February traffic stops for each deputy, by District. The total number of traffic stops for each District were: District 1, 17; District 2, 22; District 3, seven; District 4, 47; Lake Patrol, 10; District 6, 84; and District 7, 17. There were a total of 206 traffic-related events in March, and sergeants discussed 204 of those with the deputies who conducted them, for a compliance rate of 99%.

WAI 34200

The compliance rate for discussion of traffic stops was 98% for this reporting period.

***Paragraph 86.*** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. For January, we reviewed Districts 1 and 2; for February, we reviewed Districts 3 and 4; and for March, we reviewed Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For January, we requested PALs for seven sergeants and 36 deputies, which we reviewed. We noted a total of 19 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For February, we requested PALs for 29 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 15 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For March, we reviewed PALs for 31 deputies and six sergeants; and noted a total of 36 field supervisor-deputy contacts on the deputies' PALs, and 12 field contacts listed on the supervisors' PALs. Our inspection of the Patrol Activity Logs that MCSO provided indicate that supervisors have been available to provide on-scene supervision.

***Paragraph 87.*** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** Not in compliance

WAI 34201

Consistent with our methodology, we requested the names of all deputies and supervisors who were evaluated during this reporting period. From the lists of employees submitted, we requested a representative sample. We received and reviewed performance evaluations submitted for six deputies and 13 supervisors who received performance evaluations in January 2018. All six deputy EPAs were acceptable. However, two of the EPAs were extraordinarily drawn out with information from Blue Team entries that had no relevance to the ratings.

With regard to supervisors' EPAs, 10 of the 13 were acceptable. One of the EPAs did not address the complaint history and their dispositions, and two of the 13 EPAs did not comment on the supervisors' ability to identify and respond to misconduct. One of the supervisors' EPAs was for the year 2016 and was completed in the legacy format. This EPA missed three of the required areas of assessment.

We received and reviewed performance evaluations submitted for six deputies and 10 supervisors who received evaluations in February 2018. Five of the six of the deputies' EPAs we reviewed were of acceptable quality. One EPA was missing a required area of evaluation. Eight of the 10 supervisors' EPAs contained comments on all of the required rating dimensions; two were missing comments in required areas of assessment. One EPA had extensive Blue Team notes attached, but had no comments or explanation as to how the Blue Team entries tied into the rating dimension. Nine of the 10 supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision. Eight of the 10 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. All of the 10 EPAs rated the supervisors' on the quality of supervisory reviews.

We received and reviewed Employee Performance Appraisals submitted for five deputies and seven supervisors who received appraisals in March 2018. Two of the five deputies' EPAs missed areas of evaluation. All seven supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision. Five of the seven supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. All of the seven EPAs rated the supervisors' on the quality of supervisory reviews. One of the seven EPAs failed to assess the supervisor on their ability to conduct internal affairs investigations.

We understand that Enforcement Commanders have discussed Employee Performance Appraisals and Blue Team notes during their meetings. MCSO has advised us that commanders are scrutinizing and returning deficient EPAs. MCSO has also drafted an Administrative Broadcast to address some of the issues we have identified. We have noted greater details in most of the EPAs we have reviewed, which is a positive development. However, during this reporting period, we continued to review Blue Team notes pasted into EPAs without regard to their content. Ideally, each rating dimension in the EPA should have a statement summarizing the employee's performance during the rating period. Selected Blue Team examples should then be used to support the statement. We have reviewed some excellent EPAs, and some that are very deficient, so there is still a consistency issue. We recognize that this is a learning process for supervisors and commanders. We are hopeful that the corrective measures implemented by Enforcement Commanders will yield positive results in upcoming reporting periods.

WAI 34202

*Paragraph 88.* *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**Phase 1:** In compliance

- Memorandum from Executive Chief Trombi, dated January 6, 2015.

- Memorandum from Sheriff Arpaio, dated February 12, 2015.

- Special Investigations Division Operations Manual, published on May 15, 2015.

**Phase 2:** In compliance

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For January, February, and March, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 59 incidents involving arrests and 63 incidents involving criminal citations. We also reviewed a random sample of 229 Incident Reports for this reporting period. During our reviews of the documentation provided for this quarter, we have found no evidence to indicate any violations of this Paragraph.


*Paragraph 89.* *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:** In compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests

WAI 34203

involving lack of identity documents.   The Incident Reports MCSO submitted covered the period of January 1-March 31, 2018.   Any incident wherein a deputy requests supervisory permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. MCSO did not report any cases involving immigration status investigations or immigration-related crime.

For this reporting period, MCSO submitted four incidents as responsive to this Paragraph.  Two incidents occurred in February, and two occurred in March.  There were no incidents reported for January.   The first case involved a suspect who used his mother's credit card to make unauthorized purchases.   The second case involved a suspect who was stopped for traffic infraction but had no driver's license.   This individual was cited and released.   The third case was submitted as two separate entries, but in effect it was one incident.   This involved an individual who was in possession of a stolen vehicle, but had neither a driver's license nor other form of identification.   This subject was arrested and booked.   The last case involved an individual who was stopped for an equipment violation.  Further inquiry by the deputy revealed that the individual's driver's license was suspended.  He was cited and released.

We also received a booking list and a criminal citation list for each month of the reporting period.  From each list, we selected a 10% random sample of incidents.  In total, we reviewed 59 incidents resulting in arrest and 63 incidents involving criminal citations.  In addition, we reviewed 229 Incident Reports for the quarter.  All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.


***Paragraph 90.***  *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.  Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

WAI 34204

We reviewed 35 incidents involving traffic stops for January 2018.  There were 20 stops related to speeding, 14 of which resulted in citations.  Three stops related to equipment violations, and nine stops were for moving violations other than speeding.  Three stops related to registration or license plate violations.  Twenty-one of the stops resulted in citations, and 14 resulted in warnings.  All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review.  All of the 35 VSCFs were reviewed within the required 72 hours.  For January, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 134 VSCFs.  We reviewed the data for January, and the compliance rate for timely supervisory reviews of VSCFs was 100%.

We reviewed 35 incidents involving traffic stops for February 2018**.**  Twenty of the 35 traffic stops related to speeding.  Fifteen citations and five warnings were issued for speeding.  Eight stops related to equipment violations.  Five stops involved moving traffic infractions other than speeding.  Two stops related to registration or license plate violations.  Of the 35 stops, 19 resulted in citations, and 16 resulted in warnings.  Supervisors reviewed all 35 VSCFs within 72 hours.  For February, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 75 VSCFs.  Supervisors reviewed all VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for March 2018**.**  Twelve of the 35 traffic stops involved speeding violations.  Ten of the drivers who were stopped for speeding were issued citations; two drivers were issued warnings.  Three stops related to equipment violations.  Twelve stops involved traffic violations other than speeding.  Eight stops related to registration or license plate violations.  Of the 35 stops, 20 resulted in citations and 15 resulted in warnings.  All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, and date and time of supervisory review.  Two of the 35 VCSFs were not reviewed within 72 hours as required.  For March MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 163 VSCFs.  We reviewed the data and supervisors reviewed 162 of the 163 VSCFs within 72 hours, for a 99% compliance rate.

For January, we selected a random sample of 25 NTCFs to review.  Twenty-four of the 25 NTCFs were reviewed and approved by supervisors.  Twenty-three of the 25 were reviewed within 72 hours.  For February, we reviewed a random sample of 25 NTCFs.  Of the 25 NTCFs inspected, all were reviewed and approved by supervisors; 24 of the 25 were reviewed within 72 hours.  For March, we reviewed a random sample of 24 NTCFs.  Of the 24 samples reviewed, all were reviewed and approved by supervisors.  All of the 24 NTCFs were reviewed and approved within the required timeframes.  In total, we reviewed 74 NTCFs for the quarter.  Seventy-one of the 74 NTFCs were reviewed within the required 72 hours, for a compliance rate of 96%.  We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph.  The compliance rate for timely reviews of all combined stops and detentions for this quarter was 98.8%.  For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

WAI 34205

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  Not in compliance

We reviewed traffic stop data reported by MCSO for its January inspection (BI2018-0012). To determine compliance with this Paragraph, for January the Monitoring Team randomly selected 35 traffic-related events, which BIO then audited for compliance. Of the 35 traffic-related events, MCSO reported that 26, or 74%, had no deficiencies. This demonstrated a 6% decrease from the December compliance rate. As a result of the inspection, BIO issued seven BIO Action Forms. BIO identified four deficiencies that were related to deputies failing to run warrants checks on drivers. Two deficiencies were for BWC logs not being completed for the deputies who assisted on traffic stops. One deficiency was related to an incorrect vehicle number listed in the VSCF. One deficiency was related to the vehicle number listed on a VSCF not matching the information in CAD. One deficiency was for a failure to complete an incidental contact form on a passenger involved in a traffic stop. One deficiency was related to the driver's signature not being captured in a written warning. One deficiency was related to information on an Arrest Report being inconsistent with the information listed in the VSCF. We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54. Our examination revealed that 12 of the 35 stops had deficiencies that supervisors failed to identify during their reviews of documentation related to the traffic stops.

We reviewed a spreadsheet documenting each VSCF by District, for January, to determine if supervisors were reviewing VSCFs within the required 72 hours. We reviewed data for 134 traffic stops, and determined that supervisors had completed timely reviews in 100% of the cases.

WAI 34206

For January, MCSO reported 62 corrective actions.  Corrective actions are documented on Blue Team Supervisory Notes.  Of the 62 corrective actions, 20 related to body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Nine corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Twenty-five corrective actions related to procedural or policy violations related to traffic stops, and four corrective actions were policy or procedural violations not related to traffic stops.  One corrective action related to deputy performance, not related to traffic stops.  Three corrective actions related to technical malfunctions.

We reviewed traffic stop data reported by MCSO for its February inspection (BI2018-0024).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 30, or 85%, had no deficiencies.  The compliance rate for February increased by 11% compared to January.  Two deficiencies identified were the result of failure to complete the assisting deputy BWC log.  One deficiency was related to an incorrect vehicle number listed in the VSCF.  In one deficiency, the reason for the stop that was listed in the VSCF did not match the information in CAD.  One deficiency was related to the vehicle number listed in the VSCF not matching the information in INetViewer.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  Our examination revealed that the documentation provided for eight of the 35 stops had deficiencies that supervisors did not identify during their reviews.

We reviewed a spreadsheet documenting each VSCF by District, for February, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 75 VSCFs and determined that supervisors had completed timely reviews in 100% of the cases.

For February MCSO reported 44 corrective actions.  We reviewed all of them and determined that of the 44 corrective actions, 14 related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Eleven corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Fifteen corrective actions related to procedural or policy violations related to traffic stops.  Two corrective actions related to deputy safety.  One corrective action related to deficiencies noted on Patrol Activity Logs and/or CAD, and one corrective action was generated as a result of technical failure or malfunction.

We reviewed traffic stop data reported by MCSO for its March inspection (BI2018-0036).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 27, or 77%, had no deficiencies.  The compliance rate for March decreased by 8% compared to February.  We reviewed the 35 traffic-related events selected by the Monitoring Team for BIO's March inspection, as part of our compliance assessment for Paragraphs 25 and 54.  Our examination revealed that the documentation provided for nine of the 35 stops had deficiencies that supervisors did not identify during their reviews.

WAI 34207

For March, the Monitoring Team selected a sample of 23 corrective actions to review.  Of the 23 corrective actions, one related to the late activation of the BWC during a traffic stop.  Eight corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Eight corrective actions related to procedural or policy violations related to traffic stops.  Two corrective actions related to technical malfunctions or system errors.  One corrective action related to deputy safety.

We reviewed a spreadsheet documenting each VSCF by District, for March, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 163 VSCFs and determined that supervisors had completed timely reviews in 99% of the cases.

Our reviews for this reporting period indicate that deputies, in the majority of cases, are acting within legal guidelines in conducting stops and detentions.  We recognize that Patrol supervisors are extremely busy and tasked with the completion of several administrative and operational tasks during their tour of duty.  Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations and deficiencies, in documentation pertaining to stops and detentions, which are in need of corrective action.  For the most part, the deficiencies that are occurring in traffic stops appear to be errors in accurately capturing and documenting information.  Supervisors are conducting timely reviews, but we continue to find deficiencies in documentation related to traffic stops that should have been noted and addressed by supervisors.

**Paragraph 92.**  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph.

WAI 34208

***Paragraph 93.*** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

We reviewed a representative sample of 75 Incident Reports for January 2018**,** for the randomly selected date of January 15, 2018. All 75 Incident Reports we reviewed were turned in by the end of the shift; and all Incident Reports were reviewed by supervisors and approved, or reviewed and returned for corrections within the required seven days. All 11 Incident Reports involving arrests or criminal citations were reviewed by supervisors and approved, or reviewed and returned for corrections within the required 72 hours. All 17 Vehicle Crash Reports were reviewed within the required timeframes. We conducted a quality review on a 10% random sample of the reports we reviewed. One strong point noted in Incident Reports is that deputies include substantial details of the events in their report narratives. The great majority of Incident Reports were well-written and contained the necessary information.

We reviewed a representative sample of 82 Incident Reports for February 2018**,** for the randomly selected date of February 14, 2018. Eighty-one of the 82 Incident Reports were submitted by the end of the shift, and all 82 Incident Reports were reviewed by supervisors and approved, or reviewed and returned for corrections within the required seven days. Six of the seven incidents involving arrest were reviewed and approved within the required timeframes. All 25 Vehicle Crash Reports were reviewed and approved within seven days. We conducted a quality review on a 10% random sample of the reports we reviewed; and noted a few minor spelling errors, but most were detailed and well-written.

We reviewed a representative sample of 72 Incident Reports for March**,** for the randomly selected date of March 17, 2018. Seventy of the 72 Incident Reports were turned in by the end of the shift; and all Incident Reports were reviewed by supervisors and approved, or reviewed and returned for corrections, within the required seven days. All eight Arrest Reports were reviewed and approved by supervisors within 72 hours. MCSO provided us with a printout of Vehicle Crash Reports that documented supervisory review and approval; all 22 Vehicle Crash Reports were reviewed and approved within the required timeframe. We conducted a quality review on a 10% random sample of the reports. With the exception of spelling errors in a few reports, we noted no significant deficiencies.

WAI 34209

***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

For this reporting period, we received three Incident Memorialization Forms (IMFs) – two in January and one in March.  One IMF related to an individual who was arrested and charged with two counts of assault in a domestic violence case.  The supervisor determined that one of the assault charges was inappropriate.  The second IMF also involved a domestic violence incident.  One of the parties of the domestic violence was placed in the backseat of the Patrol vehicle and interviewed without being read appropriate *Miranda* warnings.  This case was forwarded to PSB for investigation as a possible CRM.  The third IMF involved an arrest for DUI in which narcotics and narcotics paraphernalia were found.  There were several issues noted with this case, including questionable probable cause to search, and continuing to question the arrestee after the subject had requested an attorney.  The deficiencies were compounded by the fact that a supervisor reviewed and approved the documentation and the arrest.  This case was identified and referred to PSB by the District Commander.

We reviewed the inspection report for County Attorney Dispositions for January (BI2018-0015).  BIO reviewed 20 of 104 dismissals of criminal cases from the Maricopa County Justice Court.  BIO notes that the focus of the inspection is the identification of irreversible errors.  For the January inspection, MCSO found no irreversible errors.  BIO reported that all 196 cases from the Maricopa County Superior Court were reviewed, and no errors were found.  The inspection resulted in a 100% compliance rating.  In addition, for January, we reviewed 22 Arrest Reports and 25 incidents involving criminal citations.  All arrests were reviewed by supervisors, but two DUI arrests and one arrest for consumption of alcoholic beverage by a minor were not reviewed within the required time period.  All others had appropriate and timely reviews.

WAI 34210

We reviewed the inspection report for County Attorney Dispositions for February (BI2018-0020).  BIO reviewed 20 of 85 dismissals, from the Justice Court, and 140 dismissals from the Superior Court; and found no deficiencies in the combined Superior Court and Justice Court cases it reviewed.  The inspection resulted in a 100% compliance rating.  There were three cases that were turned down for prosecution that involved co-defendants on a case that was previously forwarded to PSB for review.  In addition, we reviewed 17 Arrest Reports and 18 criminal citations for February; and found that all reports contained the necessary information.  All arrests were reviewed by supervisors.  A disorderly conduct arrest and a trespassing arrest were not reviewed and approved by supervisors within the required timeframes.  There were no deficiencies noted in the 18 criminal citations, and we verified timely supervisory review on all 18 cases.

We reviewed the inspection report for County Attorney Dispositions for March (BI2018-0032).  BIO reviewed a sample of 20 of the 132 dismissals from the Justice Court, and all 58 dismissals from the Superior Court.  BIO identified one reversible error, which resulted in a 98% compliance rating for March.  One BIO Action Form was requested from the affected division.  We reviewed all the documentation provided by MCSO for March, for this Paragraph.  In addition, we reviewed 20 incidents involving arrest and 20 incidents involving criminal citations for March.  There were no concerns noted with the Arrest Reports we reviewed, and all 20 Arrest Reports were reviewed and approved by supervisors within the required timeframes.  There were no deficiencies noted in the 20 criminal citations, and we verified timely supervisory review on 18 of the 20 cases.

**Paragraph 95.**  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document verification of compliance for this Paragraph.

WAI 34211

***Paragraph 96.***  *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

•   EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  Not in compliance

We received three Incident Memorialization Forms (IMFs) – two in January and one in March.  One IMF regarded an individual who was arrested and charged with two counts of assault in a domestic violence case.  The deputy's supervisor determined that one of the assault charges was not appropriate and the charge was dropped.  The second IMF also involved a domestic violence incident.  One of the parties of the domestic violence was placed in the backseat of the Patrol vehicle and interviewed without appropriate *Miranda* warnings.  This case was forwarded to PSB for investigation as a possible CRM.  We will follow up on this case in our reviews of internal affairs cases.  The third IMF involved an arrest for DUI in which narcotics and narcotics paraphernalia were found.  There were several issues noted with this case, including questionable probable cause to search, and continuing to question the arrestee after the subject had requested an attorney.  The deficiencies were compounded by the fact that a supervisor reviewed and approved the documentation and arrest.  The District Commander identified this case for corrective action.

We reviewed a sample of 50 cases, from the total number of 196 cases submitted for January, in which the County Attorney declined prosecution.  Of these 50 cases, 39 were determined to be arrests; and 11 were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 39 cases, and found documentation that commanders had reviewed the reports in 30 of the 39 cases.  We reviewed a sample of 50 cases, from the total number of 141 cases submitted for February, in which the County Attorney declined prosecution.  Of these 50 cases, 27 were determined to be arrests and 23 were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 27 arrest cases, and found documentation that commanders had reviewed the reports in 16 of the 27 cases.  We reviewed all 58 cases submitted for March, in which the County Attorney declined prosecution.  Of these 58 cases, 23 were determined to be arrests; and 35 were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 23 cases, and found documentation that commanders had reviewed the reports in 11 of the 23 cases.

WAI 34212

This Paragraph requires command-level review of all supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. Some infractions and deficiencies are being documented in Incident Memorialization Forms, but there also appears to be a number of other possible issues that may need to be identified and corrected. The number of IMFs completed during this reporting period (three) seems low in comparison to the number of County Attorney Turndowns (395). In the last quarter, MCSO received 32 County Attorney Turndowns and there were three IMFs submitted. Logic would indicate that the increased number of Turndown Notices should result in a greater number of IMFs being generated. We understand that County Attorney Turndowns include a number of referrals for prosecution that are actually not physical arrests. Although we do not have statistical proof to indicate a correlation between County Attorney Turndowns and violations of policy, or deficiencies in policy, tactics, or training, we can conclude that command review of Turndown Notice Reports may identify issues that presently are going undetected.

The number of Incident Memorialization Forms has decreased significantly from the second and third quarters of 2017 – 15 and nine, respectively – to three in each of the last two reporting periods. MCSO has argued in the past that the decrease in IMFs is indicative of supervisors' increased diligence in reviewing their subordinates' work products. Our reviews of other Paragraphs indicate that there is some improvement in supervisory reviews, but there are still deficiencies that are being overlooked. The low number of Incident Memorialization Forms is not conclusive evidence that there are no issues to be corrected. We believe that command review of Turndown Reports can be helpful in finding deficiencies, and reiterate that commanders must follow MCSO policy, which requires command review of all cases declined for prosecution. From our reviews of the documents provided, we found that the compliance rate for command review of Turndown Notice Reports was 52% during the first quarter of 2018. In our last report, we noted that MCSO was not in compliance, and to retain compliance with this Paragraph, commanders needed to increase the number of reviews of Turndown Notice Reports to an acceptable level.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

WAI 34213

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members.  Command review of EIS profiles of supervisory and command personnel began in February 2017.  Review of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, has not been sufficiently documented to meet compliance with this Paragraph.  MCSO previously submitted memoranda stating that they have no policy in place for the Blue Team notes pertaining to Commander's quarterly review of EIS and assessments of the quality and effectiveness of interventions.  The requirement described in Paragraph 81.c. is covered in GH-5, under "Command Staff Responsibilities."  However, it does not specify that the documentation should be noted in Blue Team.

Consistent with our methodology, for every month of the quarter, we selected a supervisor and a squad of deputies from each District.  We then reviewed the documentation provided as verification of compliance with this Paragraph.  We also requested that EIS reviews of the commanders responsible for the selected personnel be included.  For January, we reviewed the documentation provided for 57 employees; which included the ranks of deputy, sergeant, lieutenant, and captain.  Of the 57 employees, 52 had the required two EIS reviews in the month, for a 91% compliance rate.  For February, we reviewed Supervisory Notes requested as verification of compliance for 50 employees.  Of the 50 selected employees, 45 had appropriate documentation of the required EIS reviews, for a compliance rate of 90%.  For March, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 56 employees.  Of the 56 employees, 54 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 96%.  The total compliance rate for the quarter was 92%.  During this reporting period, MCSO did not yet have a methodology for capturing the requirements of Paragraphs 81(c)–(h).

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.**  *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

Employee Performance Appraisal Training was completed during the third quarter of 2017, and the new EPA format was initiated on September 1, 2017.  Employee Performance Appraisals are capturing more detailed information, and their quality is slowly improving.  We discuss the Employee Performance Appraisals completed for this reporting period in detail under Paragraph 87.  MCSO did not meet the requirements of this Paragraph during this reporting period.

**Paragraph 99.** *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

MCSO's documentation regarding citizen complaints, past complaint investigations, corrective actions, lawsuits, claims, and commendations, has improved considerably.  Forty-five of the 47 EPAs that we reviewed documented that supervisors considered these requirements.  However, MCSO has not developed the procedure for tracking violations, deficiencies, and corrective actions in EIS, as required by Paragraphs 92 and 95.  MCSO will need to include this information in Employee Performance Appraisals.

**Paragraph 100.**  *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

We reviewed Employee Performance Appraisals for 30 supervisors and commanders who received EPAs during this reporting period.  All 30 of the appraisals rated the quality and effectiveness of supervision.  Twenty-four of the 30 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct.  Twenty-eight of the 30 appraisals rated supervisors on the quality of their reviews.  As it pertains to the requirements of this Paragraph, we have noted consistent improvement.  During this reporting period, the compliance rate for commanders rating supervisors on the quality of their reviews was 93%.

**Paragraph 101.**  *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**Phase 1:**  In compliance

WAI 34215

- Memorandum from Executive Chief Trombi, dated January 6, 2015.

- Memorandum from Sheriff Arpaio, dated February 12, 2015.

- Special Investigations Division Operations Manual, published on May 15, 2015.

MCSO has no specialized units whose mission includes the enforcement of human smuggling laws as part of their duties.  MCSO is in Phase 1 compliance with this Paragraph.

**Phase 2:**  In compliance

MCSO does not have any specialized units that enforce immigration-related laws.  Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For January, February, and March, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 59 incidents involving arrests and 63 incidents involving criminal citations.  We also reviewed a random sample of 229 Incident Reports for this reporting period.  We found no evidence of enforcement of immigration-related laws.

WAI 34216

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 142 administrative misconduct investigations.  Forty-one were initiated internally.  Twenty-five of the internally generated investigations involved sworn personnel or Posse members, 15 involved Detention or civilian personnel, and one involved an unknown employee of MCSO.

MCSO has continued to identify and address misconduct that is raised by other employees or observed by supervisory personnel.  While some of these investigations did not meet all requirements for the proper completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 34217

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:** Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.
- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO established the Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), to take responsibility for these requirements. AIU continues to develop an Operations Manual that will outline how the AIU will fulfill the "targeted" Paragraph 103 requirements. We and the Parties provided some comments on two different versions of the manual, and currently await the next iteration of the manual from MCSO.

In the meantime, MCSO has developed a structure for AIU that includes one lieutenant, four sworn sergeants, and one Detention sergeant, three senior (civilian) auditors, and an administrative assistant. As of our April site visit, the AIU lieutenant and the four sworn sergeants assigned to the unit had completed a two-part training course on law enforcement audits and inspections offered by a private consultancy. According to AIU's lieutenant, as new personnel are assigned to the unit, they will attend the training, as well.

We continue to work with AIU to explore possible avenues for integrity testing, In late November, via a conference call, we discussed with AIU personnel some examples of integrity tests that the unit could conduct that would satisfy the requirements of this Paragraph without being too resource-intensive. During our call, and in follow-up discussions during our January and April 2018 site visits, we advised AIU to devise tests that rely on the many data sources that are already available at MCSO. For example, we recommended that AIU consider reviews of body-worn camera footage or deputies with patterns of not sustained complaints. AIU personnel have begun meeting with analysts from both PSB and the Training Division, and EIU personnel, to discuss information on complaint and other trends. During our January site visit, AIU personnel advised us that they intended to soon conduct AIU's first integrity test, which will examine the misidentification of the ethnicity of drivers who are stopped by deputies. While Paragraph 103 does not require that the integrity tests focus on Order-related topics, this first test is; and it is a topic that is of great interest to the Plaintiffs' class. As of our April site visit, AIU had not yet initiated this test. We will inquire with AIU as to the progress of this test during our upcoming site visit.

WAI 34218

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph. The inspections examined, for example, Supervisory Notes, County Attorney turndown dispositions, and employee email usage; we reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

**Paragraph 104.**   *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All of the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations are required to use these forms. MCSO is consistently meeting this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

During this reporting period, PSB drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. We concur with the intent of these revisions, and will conduct another review once MCSO makes additional revisions that address our feedback.

During this reporting period, we reviewed 142 administrative misconduct investigations. Eighty-one involved sworn MCSO personnel. All were completed after June 20, 2016 and included the use of the required investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances where a supervisor failed to facilitate a deputy's attendance at a required interview.

WAI 34219

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During our reviews for this reporting period, we reviewed 53 sustained misconduct investigations. Twenty-seven involved misconduct by sworn personnel, 19 involved Detention personnel, four involved civilian personnel, and three involved Posse members. Forty-three of the 53 involved personnel still employed by MCSO at the time final findings and discipline decisions were made. We found that in all 43 cases, the PSB Commander determined the findings and preliminary discipline range for the violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

WAI 34220

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

WAI 34221

# Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

*Paragraph 107.  To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place. To this end, the MCSO shall conduct the following district community outreach program.*

*Paragraph 109.  As part of its Community Outreach and Public Information program, the MCSO shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class. The MCSO shall consult with Plaintiffs' representatives and the Community Advisory Board on the locations of the meetings. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available. The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

**Phase 2:**  Deferred

This Paragraph, per the August 3, 2017 Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), directs MCSO to conduct a District community outreach program.  More specifically, it requires that MCSO hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.  This Paragraph requires MCSO to consult with Plaintiffs' representatives and the Community Advisory Board (CAB) on the location of the meetings, and to inform community members at the meetings of the policy changes or other significant actions that MCSO has taken to implement the provisions of the Order.  The Order also requires that MCSO provide summaries of audits and reports completed by MCSO pursuant to this Order and that MCSO clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

During this reporting period, MCSO held a public meeting coinciding with our January 2018 site visit on January 24, 2018, at Palomino Intermediate School, at 15815 North 29th Street, in Phoenix, in MCSO Patrol District 4.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required; CAB members recommended Palomino Intermediate School, which MCSO ultimately selected.  Approximately 400 community members attended this meeting.

WAI 34222

At the meeting, MCSO informed community members of the policy changes or other significant actions that the agency has taken to implement the provisions of this Order.  Sheriff Penzone welcomed the attendees, and stated that MCSO remains committed to continuing to improve its relationship with the entire community; and acknowledged the Department of Justice (DOJ), the American Civil Liberties Union (ACLU) of Arizona, the CAB, and the Monitoring Team as partners in the effort.  Sheriff Penzone concluded his welcoming remarks by stating that he looked forward to hearing the questions and concerns from the community members.  MCSO made summaries of audits and reports completed by MCSO pursuant to this Order available, and MCSO representatives clarified for the attendees that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

**Paragraph 110.**  *The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust. MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO's quarterly community meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing the Order; and that MCSO representatives make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2018 site visit, on January 24, 2018, at Palomino Intermediate School, at 15815 N. 29th Street, in Phoenix, in MCSO Patrol District 4.  The more than 400 meeting attendees were given ample opportunity to ask questions or offer comments.  Several attendees asked why U.S. Immigration and Customs Enforcement (ICE) had offices at the County's Fourth Avenue Jail.  Sheriff Penzone explained that ICE could determine if an individual should be considered for deportation upon release from custody, but emphasized that MCSO does not interfere or participate in ICE actions.  Another attendee asked what she could do to protect herself from being harassed and victimized by her boyfriend, who had been arrested but not charged for actions against her.  She was invited to meet privately with a deputy at the conclusion of the meeting so that the deputy could take her information and provide assistance.

WAI 34223

Members of the CAB addressed the attendees and explained that the CAB was comprised of members of the community dedicated to representing community members.  They stressed the importance of MCSO creating an atmosphere in which community members have confidence in MCSO.   They also provided the CAB's contact information; and noted that community members who do not feel comfortable contacting MCSO directly with complaints, concerns, or comments should contact the CAB.

In response to a question from an attendee regarding the victim compensation program, a representative of the ACLU of Arizona explained the eligibility requirements to receive compensation funds and provided contact information for those who wanted to learn more about the program.

A member of the MCSO Hispanic Advisory Board introduced himself and provided his contact information, pledging to convey community members' complaints, comments, and concerns to MCSO's leadership.  At the meeting, MCSO representatives announced that complaint forms were available in the back of the meeting room for any attendees who wanted to provide a written complaint.  After the meeting, representatives of MCSO – as well as representatives of the Monitoring Team, the ACLU of Arizona, CAB, and DOJ – remained behind to individually answer questions.


***Paragraph 111.***  *English and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public. At least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order, as well as an MCSO Community Liaison, shall participate in the meetings. The Monitor, Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and MCSO shall announce their presence and state their availability to answer questions.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

- GJ-24 (Community Relations and Youth Programs), currently under revision.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that both English- and Spanish-speaking MCSO personnel attend MCSO's quarterly community meetings; at least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order participate in these meetings; and that MCSO invite the Monitor, Plaintiffs' and Plaintiff-Intervenors' representatives to attend the meeting, and announce their presence and state their availability to answer questions.

WAI 34224

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2018 site visit, on January 24, 2018, at Palomino Intermediate School, at 15815 N. 29th Street, in Phoenix, in MCSO Patrol District 4.   MCSO provided a professional Spanish interpreter for the meeting at Palomino to ensure that Spanish-speaking attendees could understand all remarks, questions, and responses.   The professional interpreter interpreted MCSO's entire presentation but, during the question-and-answer portion of the meeting, he did not always interpret into English questions that were asked in Spanish.   Several MCSO personnel who participated in and attended the meeting play instrumental roles in the implementation of the Orders.

In addition, the Monitor and representatives of the ACLU of Arizona, DOJ, and the CAB were invited to attend, and MCSO announced their presence and stated their availability to answer questions.

***Paragraph 112.**   At least ten days before such meetings, the MCSO shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.
- GJ-24 (Community Relations and Youth Programs), currently under revision.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.   This Paragraph, among the provisions of Document 2100, requires that MCSO widely publicize, in English and Spanish, its quarterly community meetings at least 10 days before such meetings and after consulting with Plaintiffs' representatives and the CAB regarding advertising methods.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our January 2018 site visit, on January 24, 2018, at Palomino Intermediate School, at 15815 N. 29th Street, in Phoenix, in MCSO Patrol District 4.   MCSO consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics.   Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

WAI 34225

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site. MCSO publicized the meeting with advertisements in both English and Spanish print media. MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

### b. MCSO Community Liaison

*Paragraph 113. MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:** Not in compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish, and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD. The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

*Paragraph 114. The COD shall have the following duties in relation to community engagement:*

*a.     to coordinate the district community meetings described above in Paragraphs 109 to 112;*

*b.     to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

*c.     to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

*d.     to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:** Not in compliance

WAI 34226

- Court Implementation Division Operations Manual, currently under revision.
- GJ-24 (Community Relations and Youth Programs), currently under revision.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that the Community Outreach Division (COrD) be responsible for the following: coordinating MCSO's quarterly community meetings; providing administrative support for, coordinating, and attending meetings of the CAB; compiling complaints, concerns, and suggestions submitted to the COrD by members of the public about the implementation of the Orders, and to respond to the complainants' concerns; and to communicate such concerns from the community at regular meetings with the Monitor and MCSO leadership.

As noted above, shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; and COrD – in collaboration with CID – began coordinating the required community meetings. As noted above (in Paragraphs 109-112), during this reporting period, COrD worked with CID to coordinate a community meeting coinciding with our site visit, in Phoenix, in MCSO Patrol District 4.

Also during this reporting period, the COrD – also in collaboration with CID – continued working with and providing support to the CAB. During this reporting period, the CAB did not hold any public meetings. However, CAB members also exchanged numerous email messages with COrD and CID regarding the quarterly community meeting, and various inquiries and requests for information about MCSO policy and MCSO's implementation of the Orders.

Following discussions during our October 2017 site visit, COrD created a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. During this reporting period, COrD did not submit any such documentation for our review. In response to our quarterly document request for such information, MCSO wrote, "The Community Outreach Division is unaware of any complaints, concerns or suggestions received during the dates of January 1, 2018 – March 31, 2018."

Upon our request, during the last reporting period, MCSO provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course via E-Learning. This training should assist COrD personnel in receiving and appropriately directing any complaints or concerns from community members they receive.

WAI 34227

### c. Community Advisory Board

**Paragraph 115.** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between MCSO and the community, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

**Phase 1:** Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO have specific duties in relation to the Community Advisory Board (CAB). MCSO and Plaintiffs' representatives are required to work with community representatives to create a CAB to facilitate regular dialogue between MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase public trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

As noted above, shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; MCSO and the Plaintiffs' counsel selected the CAB members; and MCSO began providing support and guidance to the CAB.

During this reporting period, the CAB did not hold any public meetings. During the last reporting period, in December, the CAB held one public meeting, at a community center in Grant Park. The meeting's goal was to facilitate dialogue between MCSO and the community, and allow community members an opportunity to share their concerns with MCSO. Nine representatives of MCSO attended this meeting, provided information on MCSO's compliance with the Orders to date, participated in the discussion regarding increasing community trust, and answered questions from CAB members and community members in attendance – on topics including how to file complaints.

During this reporting period, CAB members and representatives of MCSO – specifically, COrD and CID – exchanged numerous email messages. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. For example, CAB members made recommendations regarding outreach and site selection for MCSO's community meeting; and on behalf of Maricopa County community members, inquired about various Office policies and processes.

WAI 34228

***Paragraph 116.*** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives. One member shall be jointly selected by MCSO and Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case. A member of the MCSO COD and at least one representative for Plaintiffs shall attend every meeting of the CAB, but the CAB can request that a portion of the meeting occur without COD or the Plaintiffs' representative. The CAB shall continue for at least the length of this Order.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.
- GJ-24 (Community Relations and Youth Programs), currently under revision.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, reconstitutes the CAB so that it is comprised of five members – two selected by MCSO, two selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members. One of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives. The MCSO and Plaintiffs' representatives appointed four new CAB members, resulting in a total of five members; two selected by MCSO, two selected by the Plaintiffs' representatives, and one jointly selected by MCSO and Plaintiffs' representatives. None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

As noted above, the CAB did not hold any public meetings during this reporting period. However, the CAB held two private meetings during this reporting period.


***Paragraph 117.*** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The MCSO shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

**Phase 2:**  Deferred

WAI 34229

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the CAB hold either public or private meetings at regular intervals; and that MCSO should provide a suitable place for such meetings, coordinate the meetings and communicate with CAB members, and provide administrative support to the CAB.

The CAB did not hold any public meetings during this reporting period.

During the last reporting period, MCSO communicated with CAB members and offered administrative support to the CAB, in such areas as scheduling the meeting and developing the agenda, as CAB members prepared for the CAB's public meeting in Grant Park in December 2017.

**Paragraph 118.**  *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the COD for investigation and/or action. Members may also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, currently under revision.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that at their meetings, CAB members relay or gather concerns from the community about MCSO practices that may violate the provisions of the Orders; this Paragraph also allows for the CAB to hear from MCSO personnel on matters of concern pertaining to MCSO's compliance with the Orders.

During this reporting period, the CAB did not hold any public meetings.

During the last reporting period, in December 2017, the CAB held a public meeting at a community center in Grant Park, to facilitate dialogue between MCSO and the community, and to allow community members an opportunity to share their concerns with MCSO.  Nine representatives of MCSO attended this meeting, provided information on MCSO's compliance with the Orders to date, participated in the discussion regarding increasing community trust, and answered questions from CAB members and community members in attendance – on topics including how to file complaints.

WAI 34230

# Second Supplemental Permanent Injunction/Judgment Order

## Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.      MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

*Paragraph 163.   The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.   Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- EA-2 (Patrol Vehicles), most recently amended on December 8, 2017.

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

WAI 34231

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-7 (Transfer of Personnel), most recently amended on May 17, 2017.

- GC-11 (Employee Probationary Periods), most recently amended on April 10, 2018.

- GC-12 (Hiring and Promotion Procedures), most recently amended on April 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on October 7, 2017.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- GI-5 (Voiance Language Services), most recently amended on December 8, 2017.

- GJ-24 (Community Relations and Youth Programs), most recently amended on January 7, 2017.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

- Training Division Operations Manual, currently under revision.

WAI 34232

We received a majority of the documents listed above within one month of the entry of the Order.  The Monitoring Team and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work.  MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training.  Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance.  The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable.  This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.**  *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.**  *The policies shall include the following provisions:*

a.  *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited.  This provision requires the following:*

   i.  *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

   ii.  *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct.  No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

   iii.  *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.  *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority*

WAI 34233

*retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.   *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.   *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.   *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.   *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.   *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative and criminal misconduct investigations.

WAI 34234

During this reporting period, we reviewed 142 closed administrative misconduct investigations. Eighty-one cases involved sworn personnel. Six cases involved Posse members. Forty-three involved Detention personnel, five involved civilian personnel, and seven involved unknown MCSO personnel. Sworn or Detention personnel assigned to PSB conducted 82 of the investigations. Sworn supervisors in Districts or other Divisions conducted 60 of the investigations.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were two instances where PSB identified a potential conflict of interest. In one case, the investigation was reassigned; and in the second, the oversight and review of the investigation was reassigned.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. Our review of the 142 completed administrative investigations for this reporting period revealed one instance where MCSO identified a conflict of interest by an MCSO member responsible for making disciplinary decisions. While this investigation did not have sustained findings, the responsibility for oversight and final findings was reassigned outside of PSB. There are pending investigations that have been previously outsourced by PSB based on the Court's May 2016 Findings of Fact. Those cases outsourced to another law enforcement agency have been completed. The cases assigned to the contract investigator are still in progress.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander. Of the 142 completed misconduct investigations, there were four completed misconduct investigations during this reporting period where the Chief Deputy or the PSB Commander authorized a truthfulness allegation. We noted one additional case where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 142 completed administrative cases we reviewed for this reporting period, there were 41 investigations where an employee reported potential misconduct by another employee.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. Of the 41 cases where employees brought forward potential misconduct, all were properly documented and forwarded by the supervisor in a timely manner.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. During this reporting period, there were no misconduct investigations initiated for this reason.

WAI 34235

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level.  All District-level cases that we reviewed for this reporting period complied with this requirement.

***Paragraph 168.***   *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited.  This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations that were completed during this reporting period.

There were two completed investigations this reporting period where there were allegations of reprisal, discouragement, intimidation, coercion, or adverse actions against any person because that person reported misconduct, attempted to report misconduct, or cooperated in any misconduct investigation.  One of these cases involved an allegation of retaliation made by an MCSO employee against another employee, and the second involved a complaint of retaliation by an inmate.  Both investigations were properly investigated and we concur with the unfounded and exonerated findings.  MCSO reported that there were no grievances or other documents filed with PSB or the Compliance Division that alleged any conduct related to the requirements of this Paragraph.

WAI 34236

***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations that were completed during this reporting period.  As previously noted in Paragraph 168, there were two investigations where retaliation was alleged.  Both were properly investigated, and we concur with MCSO's findings.  There were no grievances or other documents submitted to PSB or to the Compliance Division that alleged any retaliation related to the requirements of this Paragraph.

***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations.  Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 completed administrative misconduct investigations conducted during this reporting period.  We also reviewed six criminal misconduct investigations.  Of the 148 total investigations we reviewed, 103 were generated as a result of external complaints.  PSB initiated 44 due to employee reports of misconduct, or discovery of potential misconduct by MCSO supervisory personnel.  One of these investigations was initiated as a result of both an external and internal complaint regarding the same alleged misconduct.

WAI 34237

Of the 142 administrative misconduct investigations we reviewed this reporting period, four involved anonymous complaints. Two were generated by external parties, one was lodged by an internal party, and one resulted from both an external and internal anonymous complaint of the same misconduct. Three third-party complaints were also received. Two were generated externally, and one was generated internally. All were completed as required for compliance. None of the criminal misconduct investigations were generated due to anonymous or third-party complaints. We have not become aware of any evidence that indicates that MCSO has refused to accept and complete investigations in compliance with the requirements of this Paragraph. None of the 142 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaints were not appropriately accepted and investigated.

***Paragraph 171.*** *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that 15 of the 142 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate. MCSO completed all 15 investigations and reached a finding as required. We also found that in five of the 142 investigations, the principal resigned during the investigation. MCSO completed all five of these investigations and reached a finding. Of the 142 investigations we evaluated for compliance, none were prematurely terminated.

***Paragraph 172.*** *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:** In compliance

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

WAI 34238

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 142 completed administrative misconduct investigations conducted by MCSO personnel.   There were three investigations identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation.   In all three of these cases, new allegations for truthfulness were initiated.   We did not identify any cases during our reviews where we believe an employee intentionally failed to provide all required information or evidence during an investigation and MCSO failed to act.

***Paragraph 173.*** *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.   The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.   This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-11 (Employee Probationary Periods), most recently amended on April 10, 2018.

- GC-12 (Hiring and Promotion Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

MCSO has established a protocol to address the requirements of this Paragraph.   When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).   Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).   As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications.   During this meeting, the results of the IAPro checks are provided to the staff for review and consideration.   The PSB Commander generally attends the promotion meetings for both Detention and sworn, and clarifies any questions regarding the disciplinary history that the staff may have.   When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation.   The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.   For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.

WAI 34239

During our April 2018 site visit, we reviewed personnel files for employees who had been promoted during the previous quarter. In our reviews, we found three instances of employees with open internal affairs investigations who were promoted; a justification memo was provided for each. One employee who was promoted was initially a principal in an internal affairs investigation. As the investigation progressed, the employee was determined to be an investigative lead, not a principal. The second promoted employee had an entry in his file where the action complained of occurred 10 years prior to his consideration for promotion. The memorandum justifying his promotion noted that for the last 10 years, the employee had not displayed any concerning pattern of conduct. The third promoted employee had two open internal affairs investigations. One complaint was taken in error, and was handled as a grievance. The other case involved a complaint by another employee, and the alleged violation was not of a serious nature. Although the justification memorandum regarding this employee was technically compliant with the requirements of this Paragraph, it could have been better written.

With regard to the information provided for Paragraphs 173 and 174, we previously reported that there were some issues in the accuracy of the information provided, compared to the information we found upon inspection of personnel files. MCSO appears to have satisfactorily addressed these issues. During our personnel file reviews in April, we noted that three files were missing documents. This appeared to have been a clerical error, and the documents were quickly restored to the proper files. Human Resources has commendably addressed the issues we have identified during our earlier reviews.

**Paragraph 174.** *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:** In compliance

- GC-12 (Hiring and Promotion Procedures), most recently amended on April 10, 2018.

**Phase 2:** In compliance

During this reporting period, we requested and received the names of employees hired, promoted, and transferred for each month of the quarter. For transfers to or from PSB, CID, and BIO, we reviewed the resumes and disciplinary histories of the affected employees. MCSO submitted the resumes and disciplinary history of seven incoming transfer requests to PSB, CID, and BIO for approval. In addition, six employees were transferred out of these units. We also received information pertaining to the designation of the new PSB commander. We

WAI 34240

reviewed the documentation submitted for each transfer request to ensure that each employee transferred into these units met the requirements of this Paragraph. We also reviewed each outgoing transfer to ensure that they were based on need, and were not a result of punitive measures. We approved all of the submitted transfers based on the information provided. For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status. We reviewed the documentation provided for new employees, for the first quarter of 2018, and found no issues of concern. During our April site visit, we audited the files of the transferred employees to verify the accuracy of the information submitted. We did not note any issues of concern with any of the transferred employees.

In our last report, we noted that during our January inspection, we identified four employees who had either disciplinary actions or administrative investigations in their personnel files that MCSO had not noted in the document production memorandums. We believe that MCSO has now satisfactorily addressed this issue. During our April site visit, our inspection noted no issues of concern.

There were four promotions to executive command level positions. We reviewed each employee's personnel file and noted no issues or concerns. In fact, we have worked with these individuals in the past, and our experience has been very positive. We reviewed the personnel files of four captains who were promoted. Although all employees had entries in their internal affairs profiles, all the employees promoted met the requirements of this Paragraph. MCSO promoted five sworn lieutenants and five Detention lieutenants. The disciplinary histories of these employees were reviewed and their promotions were compliant with the requirements of this Paragraph. MCSO promoted four sworn sergeants and 18 Detention sergeants. Four of the Detention sergeants had disciplinary issues in the past; and although these individuals were not ideal candidates, their promotions are technically compliant with the requirements of this Paragraph. One individual promoted to sworn sergeant had serious discipline in the past, but it fell outside the 10-year review period. One individual promoted to sworn sergeant had an open PSB investigation and a reprimand. We discussed this promotion in our review of Paragraph 173; a justification memorandum was provided.

**Paragraph 175.** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

WAI 34241

Per MCSO policy, an EIS review is to be conducted within 14 days of an affected employee's transfer. We requested documentation of EIS reviews of those employees that were transferred during this reporting period. We received and reviewed the Blue Team Notes submitted as verification of compliance with this Paragraph. We then compared the Supervisory Notes with the list of transfers received for each respective month of the quarter.

For January, MCSO submitted a list of employees who were transferred during the previous month. From the list, we selected a random sample of 13 sworn employees and 12 Detention employees to assess MCSO's compliance with this Paragraph. Of the 13 transferred sworn employees selected, six had documentation of command review of their EIS profiles. Of the 12 transferred Detention employees selected, six had documentation of command review of their EIS profiles. The compliance rate for January was 48%.

For February, MCSO submitted a list of employees who were transferred during January. From the list, we selected a random sample of 25 employees to assess MCSO's compliance with this Paragraph. The transfers selected for review included one sworn employee and 24 Detention employees. The sworn employee had documentation of command review of his EIS profile. Of the 24 Detention employees selected, 18 had documentation of command review of their EIS profiles upon transfer. The compliance rate for February was 76%.

For March, MCSO submitted a list of employees who were transferred during February. From the list of 19 employees transferred, we selected all employees to assess MCSO's compliance with this Paragraph. The transfers included 11 Detention personnel, six sworn employees, and two civilians. Of the 19 employees selected, 15 contained documentation of command review of their disciplinary history after the transfer. The compliance rate for March was 79%. The total combined compliance rate for the first quarter of 2018 was 68%.

**Paragraph 176.** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Not in compliance

We reviewed Employee Performance Appraisals for 30 supervisors and commanders who received EPAs during this reporting period. All 30 of the appraisals rated the quality and effectiveness of supervision. Twenty-four of the 30 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct. Twenty-eight of the 30 appraisals rated supervisors on the quality of their reviews. Twenty-seven of the supervisors' 30 EPAs reviewed for this reporting period were in compliance with the requirements of this Paragraph. Commanders have been consistently increasing the quality of the information contained in supervisors' EPAs. The number of EPAs that met the requirements of this Paragraph improved since our last report, but MCSO still needs to improve in this area. The compliance rate for the first quarter of 2018 was 90%.

WAI 34242

***Paragraph 177.*** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."


***B.    Misconduct-Related Training***

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 165of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.    *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.    *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.    *properly weighing the credibility of civilian witnesses against employees;*

d.    *using objective evidence to resolve inconsistent statements;*

e.    *the proper application of the appropriate standard of proof;*

f.    *report-writing skills;*

g.    *requirements related to the confidentiality of witnesses and/or complainants;*

h.    *considerations in handling anonymous complaints;*

i.    *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.    *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

WAI 34243

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Nearly all essential personnel received the 2017 Misconduct Investigative Training during the last quarter of 2017.  During this reporting period, the class was offered once for individuals who had not received the training.  A total of 18 personnel received the training.  One individual required test remediation.

During our April site visit, MCSO personnel advised us that they anticipate quarterly deliveries of this training to individuals who may be under consideration for promotion.

*Paragraph 179.   All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.   This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:**  Not in compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Deferred

During the April site visit, we continued our discussions on the status of the in-service curriculum required by this Paragraph.  PSB personnel and District personnel have different in-service needs.  The first curriculum is directed to PSB personnel who conduct more complicated investigations.  The second curriculum would consist of a fundamental review of the 40-hour Investigative Misconduct Training.  District investigators require further development for the investigation of misconduct allegations.  MCSO wants to use a vendor to develop and deliver both curriculums, but has not yet identified a vendor to do so.  We reaffirmed to all Parties that both in-service programs are subject to the Section IV review processes.

*Paragraph 180.   Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances.  This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

MCSO completed the transition from E-Policy to theHUB during this reporting period. TheHUB is now intended to distribute and inform employees of new or revised policies. Employees will continue to attest to the reading and comprehension of required procedures. During our April site visit, we determined that the full migration did not occur.  Previously, we identified that the following policies were applicable to this Paragraph: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism Discrimination and Harassment; CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).   In response to our request for a CP-11 update, the Training Division advised us that compliance with the requirements of this policy is currently at 96%.  We will continue to monitor the annual review of these policies and the associated attestations for compliance.

*Paragraph 181.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

MCSO now delivers the Complaint Reception and Processing Training via theHUB.   No personnel of any category that received this training during this reporting period.

*Paragraph 182.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

WAI 34245

We continue to monitor compliance with this Paragraph by reviewing the curricula of all Order-related training programs.  Currently, each contains the direction to supervisors and deputies alike.  During each revision, we continue to reinforce supervisory obligations.

## C.     *Administrative Investigation Review*

**Paragraph 183.**  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

**Paragraph 184.**   *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:**  In compliance

* GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 completed administrative misconduct investigations conducted during this reporting period.

Of the 142 cases we reviewed, there were five (4%) where we do not believe that the final investigative finding reached was based on an appropriate standard of proof.  In three of these cases, all involving sworn personnel, interviews were not conducted of witnesses or investigative leads who may have been able to provide additional information.  We were unable to concur with the findings without knowing what information, if any, these parties would have been able to provide.  In two of the cases, both involving Detention personnel, PSB made findings of not sustained when we believe that the facts of the investigations supported findings of sustained.

During our next site visit, we will discuss these investigations with PSB personnel.

**Paragraph 185.**   *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:**  In compliance

* GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

WAI 34246

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In 141 of the cases we reviewed, PSB was properly and immediately notified of the complaint. In one case, the initial supervisor who was contacted by a complainant failed to notify PSB or take a complaint. While the supervisor personally contacted the complainant and addressed the concerns, he did not initiate an administrative investigation. CID discovered the complaint during a review of Supervisory Notes, and initiated an appropriate investigation.

**Paragraph 186.** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

During our October 2016, January 2017, and July 2017 site visits, we met with the PSB lieutenant who served as the primary administrator for the IAPro database system. The lieutenant's demonstration represented IAPro as a technology instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timelines and deadlines, chronological misconduct investigation status, notifications, and dispositions. The lieutenant conducted a weekly evaluation of closed cases to ensure that data was entered in to the system, and a monthly review to audit timelines associated with open investigations. The tracking system provides estimates of key timelines for all investigators to ensure that they learn of previous and upcoming investigative milestones.

WAI 34247

PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems. The system can be accessed remotely. Additionally, PSB hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB provided to us for review, and the direct user access that one Monitoring Team member has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During our January 2018 site visit, a Monitoring Team member met with the management analyst assigned to PSB who is now responsible for management of the IAPro database. The management analyst again demonstrated the functionality of the tracking system in use. The analyst also showed us the documents that are sent out regarding the status of investigations and demonstrated how the Blue Team Dashboard can be used to track investigation information.

During this reporting period, we found that all 142 of the administrative misconduct investigations were properly assigned a unique identifier. All but one of the cases were both initiated and completed after July 20, 2016. Of the 142 cases, 100 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In 95 cases, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review. In five of the 100 cases, no documentation regarding the written notification was provided, or the notice had not been provided within the required seven-day time period.

***Paragraph 187.*** *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we previously verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

WAI 34248

During our January 2018 site visit, a Monitoring Team member again inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance.  We again verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

During our April 2018 site visit, PSB personnel advised us that PSB would relocate to its new offsite location in May 2018.  We will verify that PSB is maintaining all files and documents at the new facility as required during our next site visit.

***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator.  After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 108 administrative misconduct investigations that were conducted and completed by MCSO personnel during this reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense is determined once the investigation is completed.

All 142 administrative misconduct investigations that we reviewed for this reporting period complied with the requirements of this Paragraph.

With the approved revisions to the PSB and discipline policies, PSB is now authorized to determine that some complaints can be classified as service complaints.  PSB has initiated both a process and a complaint-tracking system for these complaints.

During the last reporting period, MCSO completed 10 service complaints.  Two of the service complaints were properly reclassified to administrative misconduct investigations after review by PSB.  The remaining eight were appropriately handled as service complaints.

WAI 34249

During this reporting period, MCSO completed and closed 54 service complaints. Four of the service complaints were appropriately reclassified to administrative misconduct investigations after review by PSB. The remaining 50 were classified and handled as service complaints. Eleven of these complaints were determined not to involve MCSO personnel. Twenty-six involved complaints regarding laws, or MCSO policies and procedures; or were other contacts from the public that did not include allegations of misconduct. Thirteen lacked specificity and the complainant was either unwilling or unable to provide additional clarification of their concern. We concur with MCSO's handling of 49 of these 54 complaints. In one case, though the concerns of the complainant were addressed in the service complaint and there was no indication that the employee was in violation of MCSO policy, we believe that there was sufficient information available to determine that the complainant was alleging misconduct by the employee. Allegations of employee misconduct cannot be handled as a service complaint and an administrative misconduct investigation should have been initiated.

During our April 2018 site visit, PSB personnel informed us that the number of service complaints they have processed since the initiation of the process has exceeded their expectations. PSB has opened 71 since the initiation of this process. They also informed us that in approximately 20% to 25% of the service complaints, they are able to immediately determine that no MCSO personnel are involved. We found during our reviews for this reporting period that 22% of the closed service complaints did not involve MCSO personnel. We discussed with PSB the possibility of implementing an expedited process for handling these complaints. As agreed upon during our most recent site visit, PSB will develop an expedited process for those service complaints that do not involve MCSO personnel for our review and approval

We remain satisfied that MCSO is properly classifying and handling service complaints and completing the required documentation. We will discuss the one case where we disagree with the classification during our next site visit.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented. There were no internal complaints during this or the last three reporting periods where the PSB Commander determined that the internal complaint did not require an administration investigation.

**Paragraph 189.** *The Professional Standards Bureau shall administratively investigate:*

a.   *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.   *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

WAI 34250

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 142 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 60 of the 142 administrative misconduct investigations conducted during this reporting period.  PSB investigated 82 of the cases.  PSB also investigated six allegations of criminal misconduct.  We did not identify any cases during this reporting period where we believe PSB failed to investigate allegations of serious misconduct.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 148 misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of these, 142 were administrative investigations, and six involved alleged criminal misconduct. PSB personnel conducted all of the criminal investigations.

Of the 142 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 82 of the investigations.  Sixty were investigated at the District or Division level. We did not identify any case where Divisions outside of PSB investigated allegations of serious misconduct.

The 40-hour Misconduct Investigations Training was completed prior to this reporting period and all required supervisory personnel have attended.  Of the 60 administrative misconduct investigations conducted outside of PSB during this reporting period, 58 were forwarded to PSB for review prior to January 1, 2018.  Many of them were returned to the Districts or Divisions by PSB for corrections prior to their final approval in 2018.  Only two investigations were both initiated and finalized after January 1, 2018.

WAI 34251

We have indicated previously that supervisors in the Districts and Divisions outside of PSB had not yet met the requirements of this Paragraph related to qualifications and training; and as a result, we deferred our Phase 2 compliance assessment for this Paragraph. All supervisors have now attended the required Misconduct Training. While many investigations still do not comply with all the requirements for the investigation of misconduct, these deficiencies are covered in other Paragraphs of this report.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.

MCSO is now in Phase 2 compliance with this Paragraph.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There was one case reviewed for this reporting period where an investigating supervisor outside of PSB discovered potential serious or criminal misconduct during their investigation. The investigation was properly forwarded to PSB for completion of the investigation. Our Team did not identify any investigation where the complainant alleged serious misconduct had occurred, and the case was not forwarded to PSB for investigation.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Not in compliance

WAI 34252

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During this reporting period, MCSO provided copies of PSB's daily reviews of 42 completed Division level misconduct investigations that were assigned outside the Bureau.  The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders have been provided for each case reviewed.  MCSO has not yet published a semi-annual public report that meets the requirements of this Paragraph.  During our April 2018 site visit, PSB advised the Monitoring Team that it intends to incorporate the requirements for Paragraph 192 into the next semi-annual report being prepared in relation to Paragraph 251.  The scheduled completion date for the report is June 30, 2018.

See Paragraph 251 below, regarding the additional summary information, analysis, and aggregate data PSB is required to assess for the semi-annual public report.

**Paragraph 193.**  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In all 53 cases with sustained allegations, the most serious policy violation was used to determine the category of the offense if more than one policy violation had been alleged.  In cases where multiple violations of policy occurred, this information was also listed on the preliminary discipline document.  There were no cases where the exoneration of any offense precluded discipline for other sustained allegations.

WAI 34253

**Paragraph 194.**  *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:**  Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required misconduct training, and the disciplinary backgrounds of internal investigators.

During this reporting period, we reviewed a total of 142 administrative misconduct investigations and six criminal investigations.  Five of the six criminal investigations complied with MCSO policy and the requirements of the Second Order.  Of the 142 administrative investigations, 85 (60%) were in full compliance with MCSO policy and all requirements of the Second Order.

We found during this reporting period that all administrative misconduct cases reported in response to the requirements of Paragraphs 249 (investigatory stops), and 275 (CRMS) complied with all Second Order requirements.  PSB personnel completed all of these cases.

Of the 142 total administrative misconduct cases we reviewed, we noted that investigations conducted by PSB sworn personnel complied in 94% of the cases.  PSB investigations conducted by Detention personnel complied in 66% of the cases.  In 10 of the cases investigated by Detention personnel, non-compliance findings were based solely on timelines or other minor administrative concerns.  Were it not for the timeline and minor administrative issues, investigations conducted by Detention personnel would have been over 80% compliant.  Those cases investigated by Divisions and Districts outside of PSB were compliant in 42% of the cases.  We also noted that in these cases, non-compliance was often attributable to timeline issues or minor administrative errors.  Were it not for these concerns, investigations conducted by Districts and Division outside of PSB would have been over 70% compliant.

WAI 34254

There are many factors that impact the PSB Commander's ability to ensure compliance in all cases. The most consistent factors we have noted in our reviews include the necessary reliance on other members of PSB to conduct some case reviews and ensure proper documents are prepared and forwarded for review, deficiencies in investigations conducted outside of PSB that are not identified prior to being forwarded to PSB, errors that cannot be corrected after the fact, a lack of training for some who conduct internal investigations, and final findings and disciplinary decisions that are made by the Appointing Authority.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau continues to make efforts to improve compliance. Were it not for many of the corrective emails sent out by PSB to Districts and Divisions conducting cases, many cases that we ultimately found at or near compliance would not have been.

A Monitoring Team member meets personally with the PSB Commander weekly to discuss Class Remedial Matters. We also use this opportunity to discuss other ongoing related concerns that affect compliance with the Second Order. The PSB Commander, now a captain in PSB, is attentive to our concerns. We have raised several concerns in our weekly meetings during this reporting period. In all cases, he has been responsive to issues we have raised; and when necessary, he has provided us with timely feedback.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division Command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings. We have found them all to be attentive and responsive to our input during these meetings. While improvement has been slow in some cases, most notably in those cases investigated outside PSB, we note that the overall quality of investigations continues to improve.

Since we began conducting these site visit meetings, the PSB Commander has taken a number of actions to address issues we have raised. Based on concerns regarding those cases investigated by Detention supervisors, the PSB Commander assigned a sworn lieutenant in the Bureau to serve as a secondary reviewer of these cases, and provided additional training and oversight for those who conduct these investigations. As a result of these efforts, improvement in the cases completed by Detention personnel has occurred. To address some of the concerns with the cases conducted outside of PSB, the PSB Commander assigned PSB liaisons to every District; and in some cases, the liaisons provide oversight and assistance during the investigations. There are also PSB personnel assigned to review District cases; provide feedback; and when necessary, return the cases for additional investigation or analysis by the District personnel. The PSB Commander has also noted that PSB does not have adequate staffing and has submitted requests for additional personnel.

During our April 2018 site visit discussions with the PSB Commander and his staff, we discussed both the completion of witness interviews and the handling of instances where inappropriate comments are made while a BWC or other recording device is activated but no members of the public are present.

WAI 34255

In the case of witness interviews, we discussed that in some cases, witnesses have already been interviewed during the course of a criminal or traffic related incident; and in others, there is clear and convincing evidence that misconduct did or did not occur without the need to interview some potential witnesses.  In the cases we have reviewed that involve such witnesses, there have been some inconsistencies in whether these witnesses are being interviewed during the administrative investigation.  We agree that in some cases, the interview of witnesses may be unnecessary, but these types of instances must be clearly defined.  We also believe that any decision not to interview a witness must be documented and then approved by a Command member of the Division where the decision is made.

In the case of BWC or other recordings, we discussed that while inappropriate comments may have been made, they may not be related to the law enforcement contact and may not have been made in the presence of any community members.  In other cases, though the comments were not made in the presence of community members, the comments made have had a direct relationship to the law enforcement contact.  We believe that there is a clear distinction on how such comments should be addressed.   We agree that in some cases, an administrative misconduct investigation may not be appropriate, but there should be clear direction provided on how these instances are handled.

In both the interview of witnesses and the handling of comments captured on BWC or other recording devices, we believe that consistency is necessary; and that MCSO needs to develop protocols to address how these instances are handled.  The PSB Commander will draft protocols for our review and approval prior to making any changes to the current procedures.

We have noted over the past several reporting period that there is significant fluctuation in the number of completed cases submitted for our review each month.  We have discussed this issue with the PSB Commander to determine what factors contribute to this fluctuation.  The PSB Commander informed our Team that in 2013, PSB initiated 76 internal investigations.  In 2014, PSB initiated 717 cases.  In 2015, PSB initiated 986 cases; and in 2016, PSB initiated 847 cases.  The PSB Commander informed us that as of the end of the first nine months of 2017, PSB has initiated more than 800 internal investigations.  During our January 2018 site visit, the PSB Commander advised us that there were over 1,000 internal affairs investigations opened in 2017, more than in either 2015 or 2016.

The PSB Commander continues to dedicate many of the Bureau's existing resources to ensuring that District cases are properly investigated and receive a thorough review when they reach PSB.  This has reduced the number of investigators available to conduct investigations assigned to PSB.  The required misconduct training completed in late 2017 also contributed to a decrease in cases completed by PSB, as numerous PSB personnel were involved in the delivery of this training and unavailable to complete or review investigations.

In 2016, each investigator had an average of 12-16 active cases per month.  This number has increased dramatically since that time.  During our January site visit, PSB personnel reported that their investigators are averaging a caseload of between 20 and 24 cases per month.  During our April 2018 site visit, PSB advised us that the average number of active cases per investigator in PSB has continued to increase; and is now between 20-30 active cases each month.

WAI 34256

Since our April 2017 site visit, the PSB Commander has continued to inform us that the assignment of additional sworn and Detention supervisors is necessary for PSB to handle the number of cases PSB investigates and reviews. The PSB Commander reaffirmed the need for additional staffing during our January 2018 site visit, and again informed us that MCSO had submitted a July 2018 budget request for additional personnel. This budget request included two sworn lieutenants, six sworn sergeants, and four Detention sergeants. An executive member of MCSO informed us during the site visit that this budget request would need to be split over a two-year period, and that the request for 2018 had been reduced to a total of six personnel for PSB.

During our April 2018 site visit, the PSB Commander advised us that PSB had received approval for one additional sworn lieutenant, three additional sworn sergeants, and two additional Detention sergeants for the 2018 budget year. We remain concerned that while additional staff increases are pending, PSB will simply continue to fall further behind, especially with the noted increase in internal investigations. As stated in our last several quarterly status reports, the assignment of additional personnel to PSB is not only necessary, it is critical, if MCSO is to achieve compliance with all requirements of the Second Order related to the investigation of misconduct. The failure to provide adequate investigative personnel is a disservice to both the community and MCSO employees.

While we are encouraged by the responsiveness of PSB and the overall improvement in the investigation of misconduct investigations, MCSO still falls short of overall compliance. The PSB Commander is held responsible for compliance with the requirements for the completion of internal investigations. Both the Commander and the staff assigned to PSB must have the cooperation and commitment of District and Division personnel and executive staff for MCSO to achieve compliance with this Paragraph.

Over our past several site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB outsourced investigations to another local law enforcement agency.

PSB personnel updated us on these investigations during our April 2018 site visit. Both cases outsourced to another law enforcement agency have been previously completed, and no additional cases have been outsourced to another law enforcement agency. The contract investigator continues with his investigations. PSB outsourced six new cases to him during the last reporting period. No new cases were outsourced to him during this reporting period.

MCSO finalized and published the revised internal investigation and discipline policies on May 18, 2017. The required 40-hour Misconduct Investigative Training was completed during this reporting period.

WAI 34257

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. Two supervisors were determined to be ineligible to conduct internal investigations. Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations.

***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165 of the Order, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and was completed on November 10, 2017 for the required PSB and Division level personnel.

During our January 2018 site visit, we learned that PSB remained understaffed by two sworn lieutenants' positions and six sworn sergeants' positions. The PSB Commander also indicated that, on the Detention investigative side of the Bureau, PSB was understaffed by four sergeants or lieutenants. The PSB Commander indicated that the budget request for additional staffing had been split in half for 2018 (six total PSB positions) and 2019 (six total PSB positions). The PSB Commander previously explained that any additional staffing to PSB would be automatically logged into the IAPro database. In place of monthly document requests, we will continue to inquire about the adequacy of staffing during our site visits.

During our April 2018 site visit, the PSB Commander informed us that MCSO has approved six budget positions for PSB for the July 2018 budget year. These positions include one sworn lieutenant, three sworn sergeants, and two Detention sergeants. With the current number of vacancies throughout MCSO, and the time it takes for training new deputies, PSB does not expect that any of these positions will be filled before mid to late 2019. PSB personnel also informed us that the caseload for PSB investigators is now at 20-30 active cases per month per investigator.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required misconduct investigation training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission. As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

WAI 34258

*Paragraph 196.  Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained.  A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator.  The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency.  Two of these investigations were completed by the outside law enforcement agency and closed by MCSO.  One was closed as the Independent Investigator was investigating the same alleged misconduct.  PSB has not outsourced any additional investigations to any outside law enforcement agencies.

During the last reporting period, PSB outsourced an additional six investigations to the contract investigator because allegations of misconduct were made against members of the administration; there were multiple complaints involving the same personnel; or the outside investigator previously investigated misconduct related to the new allegations.

During this reporting period, PSB did not outsource any additional investigations to the contract investigator.  All investigations outsourced to the contract investigator remain in progress.

*Paragraph 197.  The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:**  Not in compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Compliance Division Operations Manual, currently under revision.

WAI 34259

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order was being transferred to a captain within PSB. The PSB Deputy Chief, who previously had this responsibility was promoted, but will maintain overall oversight of PSB as an Executive Chief. We have worked with the assigned captain during his tenure in PSB, reviewed his qualifications, and believe he possesses the requisite qualifications and capabilities to fulfill the requirements of this Paragraph.

During our April 2018 site visit and during our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters, we have had numerous opportunities to meet with and interact with the captain now assigned as the PSB Commander. He is responsive to our input and concerns regarding misconduct investigations, and has immediately addressed any issues that we have brought to his attention. We remain optimistic that PSB will continue to make necessary improvements under his leadership. As we have previously noted, MCSO must support the PSB Commander with resources and executive leadership.

*Paragraph 198.    To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:** Not applicable

**Phase 2:** Deferred

MCSO will use the former East Court Building Library as an off-site PSB facility. During our April 2018 site visit, PSB advised us that the building was scheduled for move-in in May 2018. PSB also advised us that placards in place at the Districts and the MCSO website will be updated to reflect PSB's new address. MCSO obtained 10 dedicated parking spaces for visitors, and intends to identify parking spaces for employees. PSB's criminal investigators will be housed on the first floor, and administrative investigators will be housed on the second floor. The MCSO PSB off-site facility will have two dedicated security personnel assigned during normal business hours, currently scheduled for 8:00 am to 4:00 pm, Monday through Friday.

WAI 34260

***Paragraph 199.***  *The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct.  Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations.  Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During our April 2018 site visit, we met with the PSB Commander and learned that MCSO has not identified any additional personnel that fail to meet the qualifications to conduct internal affairs investigations.  PSB staff have continued working on the development of the PSB Operations Manual, which will further outline the review process to ensure that, at the time a minor misconduct case is referred to a District for investigation, the District Captain is notified of any supervisors under his command who are ineligible to conduct misconduct investigations.  We developed a standing monthly document request to ensure our future notification of MCSO employees prohibited from conducting misconduct investigations in compliance with this Paragraph.  We understand that the written procedures that would ensure District Captains receive prompt notification of ineligible supervisors, elaborating on the content of GH-2, are part of the revised Operations Manual.  We are disappointed that this process has taken so long.  These procedures have been in development for some time.  We suggest that MCSO prioritize their completion.

***Paragraph 200.***  *In each misconduct investigation, investigators shall:*

a.  *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.  *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.  *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.  *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.  *make reasonable attempts to interview any civilian complainant in person;*

f.  *audio and video record all interviews;*

WAI 34261

g.    *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.    *make credibility determinations, as appropriate; and*

i.    *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations that were completed by MCSO personnel during this reporting period.  All 142 investigations we reviewed were completed after the issuance of the Second Order.  PSB investigated 82 of these cases.  District or Division supervisory personnel not assigned to PSB investigated 60 of the cases.  Of the cases we reviewed, 100 involved external complaints, 41 were internally generated and one was initiated based on both an internal and an external complaint.  All but one of the investigations we reviewed were both initiated and completed after the issuance of the Second Order.  Seventy-two of the investigations were initiated after May 18, 2017, and are subject to all requirements of the new internal affairs policies finalized and published on that date.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During the last reporting period, we identified three investigations (4%) that did not comply with the requirements of this Subparagraph.  During this reporting period, two investigations (1%) fell short of the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  During the last reporting period, one completed investigation (1%) did not comply with the requirements of this Subparagraph.  During this reporting period, one of the investigations (1%) fell short of the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence.  During the last reporting period, all investigations complied with the requirements of this Subparagraph.  During this reporting period, one investigation (1%) fell short of the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, two completed investigations (2%) were not in compliance with this Subparagraph.  During this reporting period, four investigations (3%) fell short of compliance with this Subparagraph.

WAI 34262

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During the last reporting period, six completed investigations (6%) did not comply with the requirements of this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.f. requires audio- and video-recording of all interviews.  During the last reporting period, there were 15 investigations where interviews were not both audio- and video-recorded.  In 12 of the cases, MCSO documented appropriate reasons the interviews were not video-recorded.  During this reporting period, there were 35 investigations that were not both audio- and video-recorded.  All 35 (100%) documented appropriate reasons why the interviews were not.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct.  During the last reporting period, five completed investigations (5%) did not comply with the requirements of this Subparagraph.   During this reporting period, two investigations (1%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made.  During the last reporting period, three completed investigations (3%) did not comply with the requirements of this Subparagraph.  During this reporting period, four completed investigations (3%) fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies.  During the last reporting period, investigators attempted to resolve all material inconsistencies.  During this reporting period, there were three investigations (2%) that fell short of compliance with this Subparagraph.

*Paragraph 201.  There will be no automatic preference for an employee's statement over a non-employee's statement.  Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement.  In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

WAI 34263

Of the 142 completed administrative misconduct investigations, 100 involved complainants that were not MCSO employees. Eighty-four of the 142 investigations also included interviews with witnesses or investigative leads who were not MCSO employees. We did not identify any cases where there was an automatic preference for the statement of an employee over a non-employee witness.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered. There were no instances where we identified that any witness, complainant, or deputy had a history of deception or untruthfulness in any legal proceeding, misconduct investigation, or other investigation.

**Paragraph 202.** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In six of the 142 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations. In four additional cases, MCSO identified potential truthfulness violations and initiated separate investigations. We did not identify any instances where additional potential misconduct that was not part of the original allegation was discovered but not investigated.

**Paragraph 203.** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

WAI 34264

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

**Paragraph 204.** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

During this reporting period, PSB conducted 82 of the 142 administrative misconduct investigations. Seven (10%) of the 69 investigations not completed within the required 85-day time period did not include a request for, or an approval of, an extension.

Districts or Divisions outside of PSB conducted 60 of the administrative misconduct investigations. Six (28%) of the 22 cases not completed within the required 60-day time period did not include a request for, or an approval of, an extension.

We continue to note during our reviews that in some cases where an extension was not requested, doing so would likely have been appropriate. During our site visits, we continue to remind PSB and District and Division command personnel of these requirements; and encourage them to ensure that their investigators request extensions when it is appropriate to do so. We have also reinforced these timeframe requirements during numerous District visits.

In addition to those investigations not completed within 60 or 85 days, there were 66 investigations that were not approved and finalized within 180 days. Of these, 24 (36%) did not include a timely extension request or approval. None of these 24 investigations resulted in findings of misconduct that did, or should have, resulted in serious discipline.

WAI 34265

***Paragraph 205.***  *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

We determine compliance with this Paragraph by assigning a Monitoring Team member to observe demonstrations of the IAPro database during our site visits.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our January 2018 site visit, we met with PSB personnel and observed IAPro to ensure that the system still generates alerts to responsible investigators and PSB supervisors/commanders if deadlines are not met.  We also reviewed copies of emails PSB disseminates to the District/Divisions on the 15th of every month to identify investigatory deadlines.  The Blue Team Dashboard was also viewed, which uses a color system (green, yellow, red) to identify investigations that are nearing deadlines or are past deadlines.  Case management information appears in each supervisor's Blue Team while they are monitoring ongoing/open cases.  Once again, this demonstration represented IAPro as a technological instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timelines and deadlines, chronological misconduct investigation status, notifications, and dispositions.

The civilian PSB management analyst has the primary responsibility to administer the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  In response to our previous concerns about ensuring system administration redundancy, PSB has trained two lieutenants to administer the system, in addition to the analyst.

During this reporting period, PSB has continued to track investigations and provide required notifications regarding deadlines.  We also continue to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

WAI 34266

***Paragraph 206.***   *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.      *a narrative description of the incident;*

b.      *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.      *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.      *the names of all other MCSO employees who witnessed the incident;*

e.      *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.      *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.      *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.      *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.      *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.      *documentation of recommendations for initiation of the disciplinary process; and*

k.      *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:**  In compliance

•      GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 34267

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses. All but one of the completed investigations complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided. One investigation we reviewed for this reporting period did not comply with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. Two investigations we reviewed for this reporting period did not comply with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. Four completed investigations did not comply with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. In the 142 investigations that we reviewed for this reporting period, we did not note any investigation where this Subparagraph was applicable.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Fifty-three of the 142 misconduct investigations we reviewed had sustained findings against one or more MCSO employees. All complied with the requirements of this Subparagraph.

WAI 34268

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. All of the investigations we reviewed for this Subparagraph complied with this requirement.

**Paragraph 207.**  *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a. *the law enforcement action was in compliance with training and legal standards;*

b. *the use of different tactics should or could have been employed;*

c. *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d. *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During this reporting period, we reviewed 142 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all but two of the completed cases. MCSO identified 10 cases where action related to this Paragraph was appropriate; and addressed the concerns identified with either memorandums of concern, requests for policy review, remedial training, or referral to another Division for review and potential action. There were two of the 142 investigations we reviewed during this reporting period where we believe that training, in addition to discipline, would have been appropriate; and the training did not occur. PSB has now developed a tracking form to ensure that those concerns forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. We also routinely follow up with PSB on the outcomes of the concerns identified and have found that, generally, PSB is taking appropriate actions.

**Paragraph 208.**  *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a. *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b. *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

WAI 34269

c.     *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.     *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period.  We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we did not concur with the findings of the PSB Commander in three (3%) of the 108 cases that were completed after the Second Order.  These three cases resulted in findings of unfounded or exonerated without adequate investigation or justification for the findings.  There was also one case where the Appointing Authority changed the findings made by the PSB Commander, and we disagreed with his decision to do so.

During this reporting period, we did not concur with the findings of the PSB Commander in five (4%) of the 142 administrative misconduct investigations we reviewed.  Two of these cases resulted in findings of not sustained where we believe that the preponderance of evidence supported a finding of sustained.  In the remaining three cases, additional investigation or interviews should have been conducted before determining the findings.  There were no investigations where the Appointing Authority changed the findings made by the PSB Commander.  As is our practice, we will discuss those cases where we disagree with findings with PSB during our next site visit.

**Paragraph 209.**  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

WAI 34270

To assess Phase 2 compliance with this Paragraph, we reviewed 60 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period. All 60 of the investigations completed outside of PSB were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and found again during *this* reporting period, many of the District-level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

**Paragraph 210.** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 82 administrative misconduct investigations conducted by PSB investigative personnel and completed during this reporting period. All 82 complied with the requirements of this Paragraph.

**Paragraph 211.** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We previously noted that neither the PSB Commander nor other District or Division Commanders appeared to use any formal mechanism to ensure that the investigator's supervisor has taken appropriate action to address any instances of unsupported findings. This issue was included in the training curricula required under Paragraph 178.

WAI 34271

During the last reporting period, we did not concur with the findings by the PSB Commander in three (3%) of the 108 investigations we reviewed.

During this reporting period, we disagreed with the findings by the PSB Commander in five (4%) of the 142 administrative misconduct investigations we reviewed.

In 63 (77%) of those cases investigated by PSB, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander.  In eight cases (10%), we had concerns with the failure to interview all witnesses, failure to identify training issues, and findings that were not supported by the investigation.  In an additional 11 cases (13%), we found them non-compliant due to the failure to complete the investigation within the required timeframes without the approval for an extension, or due to other administrative errors.  In general, we continue to find that the investigations completed by PSB display appropriate – and often excellent – investigative efforts.   PSB's continues to increase its compliance percentages.  Were it not for continuing issues with the timely completion of investigations and other administrative errors, PSB would be nearing compliance with the requirements for the completion of administrative misconduct investigations.

Of the 60 investigations investigated by Districts or Divisions outside of PSB, we identified 35 (58%) where we had some concerns.  This is an improvement from the 67% of cases we found with concerns during the last reporting period.  In three of these cases, these concerns were identified and addressed at the District level, prior to forwarding the case to PSB for review.  This represents an improvement by only one case from the last reporting period.  As has been the case in prior reporting periods, many of the District cases required corrections – and in some cases, additional investigation – after review by PSB.  Eleven (18%) were not compliant due to procedural or timeline issues.  In the remaining 24 cases, there were more substantive issues, including: leading questions; failure to conduct a rigorous investigation; inadequate substance in the narrative of the report; and failure to interview all witnesses or investigative leads.

In 22 (37%) of the 60 investigations conducted by Divisions or Districts outside of PSB, PSB returned the investigation for additional information or corrections.  In four of these cases, additional investigation was required.   The remaining 18 investigations were returned for corrections to the allegations or findings, or for failures to complete all the administrative requirements.  This is a significant improvement from the 67% of cases returned for corrections during the last reporting period.

The 40-hour Misconduct Investigative Training was completed during the last reporting period.  All supervisors and command personnel who conduct or review administrative misconduct investigations have attended this training.

In January 2018, we requested that MCSO begin providing us documents that reflect what actions are being taken to address deficient misconduct investigations.  We requested that every commander and Chief provide a response to this request on a monthly basis.  We received the first response from all command personnel in March 2018.  There were two instances where PSB documented deficiencies in the reviews conducted by District Commanders.   This information was forwarded to the appropriate Chiefs for review and any necessary action.  In one of these two cases, a memorandum of concern was authored (on March 24, 2018); and no information on any action taken was provided during this reporting period.  In the second, it was

WAI 34272

determined that appropriate action had already been taken and no further action was necessary. There were two memorandums of concern authored by a District Captain regarding investigations conducted by his personnel. In both cases, there was documentation of the actions taken to correct the identified deficiencies.

As we have noted during previous reporting periods, both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph.

**Paragraph 212.** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.
- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** Deferred

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

None of the investigations we reviewed for this reporting period included any allegations that an internal affairs investigator had conducted a deficient misconduct investigation that was the basis for an internal investigation.

Our review of misconduct investigations does not disclose documentation about what corrective action may have occurred as a result of conducting a deficient investigation or a failure to improve. During our January and April 2017 site visits, we discussed with District Captains and the PSB Commander the need to document any corrective action that is taken as a result of an investigator failing to conduct a proper investigation. The PSB Commander assured us that, along with Paragraph 211, internal methods to ensure compliance with this Paragraph would be included in the training curricula developed in compliance with Paragraph 178.

The 40-hour misconduct training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations. The effective date for this request was March 2018. We requested that every commander and Chief provide a response to this document request on a monthly basis. We received the first response from all Command personnel for March 2018. There were two instances where PSB documented deficiencies in the reviews conducted by District Commanders. This information was forwarded to the appropriate Chiefs for review and any necessary action. In one of these two cases, a memorandum of concern was authored on March 24, 2018; and no information on any action taken was provided during this reporting period. In the second case, it was determined that appropriate action had already been

WAI 34273

taken and no further action was necessary.  There were two memorandums of concern authored by a District Captain regarding investigations conducted by his personnel.  In both cases, there was documentation of the actions taken to correct the identified deficiencies.  We agree that these actions were appropriate.

We previously deferred our Phase 2 compliance assessment for this Paragraph, as MCSO had not yet completed the 40-hour training for supervisory personnel on conducting internal investigations.  That training was completed during the last reporting period; and effective in March, MCSO began providing documentation on the actions it is taking to address deficient investigations.

As MCSO has not yet provided the required documentation for the entirety of a reporting period, we will continue to defer our Phase 2 compliance assessment until the next reporting period.

**Paragraph 213.**  *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies.  After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence.  The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence.  The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of the 142 investigations, 82 were investigated by PSB personnel.  Sixty were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

WAI 34274

All 60 District or Division level approved cases were forwarded to, and reviewed by, PSB as required. Twenty-two (37%) of the 60 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes. This is a notable improvement from the 67% of cases that were returned to Districts or Divisions for corrections during the last reporting period.

PSB documented all the cases returned to District investigators for additional investigation or corrections, and this information was included in the documentation we reviewed.

***Paragraph 214.*** *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Our analysis for this reporting period revealed that of the 60 investigations conducted outside of PSB, 22 investigations were returned by PSB to the original investigating supervisor for further investigation, analysis, or corrections. Two additional investigations were reassigned. In one instance, the initial investigating supervisor identified that he had a conflict; and in the second, the initial investigating supervisor retired. In both cases, the reassignment of the case was properly documented.

***Paragraph 215.*** *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 60 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

WAI 34275

Nineteen of the 60 completed misconduct investigations conducted outside of PSB resulted in sustained findings.  In 16 of these cases, the reports included documentation that appropriate discipline or corrective action was taken.  In one case, the employee resigned prior to receiving discipline.  Two cases imposed sustained findings on a deputy who is deceased.  Two of the 16 cases involved recommendations for training in addition to discipline for the involved employees.

***Paragraph 216.***  *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Eighty-two of the completed investigations were conducted by PSB.  Thirty-four resulted in a sustained finding against one or more MCSO employees.

In 27 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended.  In the seven remaining cases, three employees left MCSO employment prior to the determination of discipline, and four imposed sustained violations on a deputy who is deceased.   The preliminary determination of the range of discipline was provided by the PSB Commander in all 27 of these cases.  The PSB Commander cannot ensure that appropriate discipline or corrective action are the final *outcome* of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline on both minor misconduct cases and in serious misconduct cases that result in PDHs.  The hearing officer has the authority to change the findings or reduce the discipline.

WAI 34276

Of the 82 completed misconduct investigations conducted by PSB, five indicated a need for training or policy review. PSB conducted proper follow-up in all five of these cases. In one case, we believe that PSB should have identified a training need – but it did not. We routinely follow up with PSB to ensure that the concerns identified have been, or are being, addressed; and PSB has developed a tracking document that we receive and review each month.

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

Our Team has previously verified during our site visits that the administrative files and reports are being maintained by PSB as required.

WAI 34277

During our January 2018 site visit, a Monitoring Team member again inspected the file rooms where hardcopies of administrative investigations are stored and randomly reviewed case files to verify compliance.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

PSB personnel informed us during our April 2018 site visit that PSB would relocate to its new off-site location in May 2018.  We will inspect the file rooms at the new facility during our next site visit to ensure that PSB is properly maintaining the required reports and files.

### D.      Discipline

**Paragraph 219.**  *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**  *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.      *establish a presumptive range of discipline for each type of violation;*

b.      *increase the presumptive discipline based on an employee's prior violations;*

c.      *set out defined mitigating and aggravating factors;*

d.      *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.      *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.      *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.      *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.      *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.      *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.      *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.      *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

WAI 34278

*l.    provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 53 of the 142 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  Compliance findings are based on the discipline findings for both minor and serious discipline.  In those cases where serious discipline is recommended, compliance findings specific to these cases only are addressed in Paragraph 226 of the Order.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  In 43 of the sustained investigations we reviewed for this reporting period, the PSB Commander determined and documented the preliminary proposed discipline range.  In the 10 remaining cases, four involved employees who had left MCSO employment prior to the discipline determination; and six imposed sustained findings on a deputy who is deceased.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In 24 of the 43 sustained investigations where discipline was assessed, the employee had prior sustained violations.  In five of these cases, the PSB Commander considered and increased the presumptive discipline range based on these prior violations in accordance with the discipline policy in effect prior to May 18, 2017.  In 19 cases, the alleged misconduct and the sustained finding occurred after May 18, 2017; and are subject to the discipline policies that became effective on that date.  The PSB Commander considered the discipline range consistent with these revised internal investigation and discipline policies in all 19 cases.

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, does define these factors.  We note that aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.  During this reporting period, the Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for cases initiated both before and after May 18, 2017.  We also found that he is now specifically identifying those instances where there are aggravating or mitigating factors in these justification documents when appropriate.

WAI 34279

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline.  None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.  None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.  None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.  None of the sustained investigations resulted in the use of coaching or training as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.  None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed.  We reviewed 53 sustained investigations for this reporting period.  Investigators identified seven cases where non-disciplinary corrective action was also appropriate.  All seven resulted in the recommendation for training for the involved employees, in addition to the discipline imposed.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

During the last reporting period, we reviewed 51 investigations with sustained findings against one or more employees.  Thirty-four of these cases resulted in the recommendation for minor discipline and 17 resulted in the recommendation for serious discipline.  Eight of these cases resulted in the recommendation for serious discipline against current employees.  The Appointing Authority did not change the findings in any of these eight cases, but deviated from the presumptive range of discipline in two of the cases.  In 49 (96%) of these cases, we agreed with the discipline findings made by MCSO; and MCSO was in compliance with this Paragraph.  As previously noted, compliance specific to those cases where only serious discipline was recommended is covered in Paragraph 226.

During this reporting period, we reviewed 53 investigations with sustained findings against one or more employee.  Twenty-five of the cases resulted in the recommendation for minor discipline, and 18 resulted in the recommendation for serious discipline.  In the 10 remaining cases, four involved employees who resigned prior to the recommendation for discipline; and

WAI 34280

six imposed sustained findings on a deputy who is deceased.  The Appointing Authority did not change any of the recommendations for findings in any of the 43 sustained investigations.

In 18 cases, a recommendation for serious discipline was made; and in 17, a Pre-Determination Hearing was conducted as required.  In one case, the employee did not attend the hearing, but submitted a written document.  In five cases, though the final discipline findings fell within the presumptive range of discipline, we believe that the Appointing Authority failed to properly consider the number and types of violations sustained when he made his final decision.  While he provided mitigating factors for his decisions, we disagree that these factors were sufficient to mitigate the discipline.  In one case, the Appointing Authority mitigated the discipline below the presumptive range.  We concur with his decision to do so in this case.  Of the 43 total cases where discipline was assessed, we disagreed with the decision by MCSO in five (9.6%).

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees.  We reviewed the recently approved policies that affect discipline for unclassified management employees, and they comply with this requirement.  During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

Of the total 43 sustained investigations where discipline was assessed, 11 were initiated prior to May 18, 2018.  In these cases, the Discipline Matrices in effect provided a presumptive discipline range.  In one case, although the Appointing Authority did not reduce the discipline below the presumptive range, we believe that the misconduct should have resulted in more serious discipline.

Thirty-two of the sustained investigations were both initiated and completed after May 18, 2017, and are subject to all the requirements relative to investigations and disciplinary procedures contained in these revised policies.  Those investigations initiated and completed after May 18, 2018 have both a discipline range and a presumptive discipline.  Aggravating or mitigating the presumptive discipline requires a justification.  In four investigations that were completed after May 18, 2018, the Appointing Authority mitigated the presumptive discipline; and although he provided the required justification, we do not agree that there was sufficient cause for the mitigation.  In one case, the discipline was mitigated below the presumptive range, and we concur with the decision to do so.

MCSO achieved Phase 2 compliance with this Paragraph during the last reporting period.  MCSO's compliance with this Paragraph falls below the required compliance rate for this reporting period.  Should MCSO fall below the required compliance rate in the next reporting period, we will withdraw Phase 2 compliance for this Paragraph.

WAI 34281

***Paragraph 221.***  *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 53 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements of this Paragraph.


***Paragraph 222.***  *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 53 sustained investigations that were completed after July 20, 2016 where discipline was assessed.  In 11 cases, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices that were in effect prior to May 18, 2017.  In 32 cases, the investigations were both initiated and closed after May 18, 2017.  The PSB Commander determined the presumptive discipline based on the policies and Discipline Matrices in effect after May 18, 2017.  In the 10 remaining cases, four involved employees who resigned prior to the determination of the presumptive discipline range; and six imposed sustained findings on a deputy who is deceased. The documentation submitted for compliance with this Paragraph included the category, offense number, and employee's discipline history.

WAI 34282

### E.      Pre-Determination Hearings

***Paragraph 223.***  *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 53 administrative misconduct investigations resulted in sustained findings against MCSO employees.  Forty-three investigations resulted in discipline for current employees.  Eighteen of the 43 cases resulted in the recommendation for serious discipline as defined in this Paragraph.  In 17, MCSO held a Pre-Determination Hearing, as required.  In one, the employee declined to attend the hearing but provided a written document.


***Paragraph 224.***  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 18 cases were referred for a PDH based on the serious nature of the sustained violations.  In 17 cases, the hearing occurred and was audio- and video-recorded as required, included in the administrative file, and reviewed by a Monitoring Team member.  In one case, the employee chose not to attend the hearing.

WAI 34283

***Paragraph 225.*** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary.  If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing.  The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 18 investigations resulted in the recommendation for serious discipline and a PDH was scheduled.  In 17 cases, MCSO held the PDH, as required.  We reviewed the recordings of all 17 hearings.  In one case, the employee chose not to attend the hearing.  In another case, during the PDH, the employee brought forth allegations against another MCSO employee.  This information did not impact the findings or discipline in the subject case, but was appropriately forwarded to PSB for information and review.  A separate administrative investigation was initiated as a result of the information provided by the employee during the PDH.

***Paragraph 226.***  *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so.  This justification will be appended to the investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 34284

During every site visit, we meet with the Appointing Authority and the Compliance Division to discuss our concerns with final outcomes and decisions that result from Pre-Determination Hearings. We have emphasized the need to comply with agency policies when determining disciplinary outcomes, and encouraged the Appointing Authority to provide more detailed written justification in those cases where he determines that a sustained finding should be changed or discipline should be reduced.

During this reporting period, 18 cases resulted in the scheduling of a PDH. Seventeen hearings occurred. In all cases, the Appointing Authority provided a justification for the final decisions, and this information was provided to our Team in the submissions regarding closed internal affairs investigations. The Appointing Authority did not overturn any of the sustained findings by the PSB Commander. In five cases, discipline that we believe was insufficient for the type and number of policy violations that were sustained in the investigations was assessed; however, in all five cases, the discipline assessed fell within the identified presumptive range of discipline. One of these cases was initiated prior to May 18, 2018 and subject to the Discipline Matrices in effect at that time. While within the presumptive range, we believe that the discipline was insufficient for the sustained policy violation. Four of these five cases were initiated after May 1, 2018. The matrices that became effective May 18, 2018 specifically identify both a presumptive discipline, and a discipline range. In all four of these cases, the Appointing Authority mitigated the discipline and we believe that there was insufficient justification to do so. In one additional case, the Appointing Authority mitigated the discipline to a sanction outside of the presumptive range. In this case, we concur with his decision to do so. As is our practice, we will discuss these cases with MCSO during our next site visit.

During our January 2018 site visit, we met with the Appointing Authority and personnel from the Compliance Division to discuss the PDH process and the final outcomes of cases completed during this reporting period. During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the MCAO that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances. The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe. We discussed the specific requirements of Arizona Revised Statutes 38-1110, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe.

During that site visit, we also discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. It is our understanding from our meeting with the Appointing Authority and other staff who were present that the MCSO consults with the MCAO in these cases and their input is related to the final outcomes. However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

WAI 34285

During our April 2018 site visit, we met with the Appointing Authority and Compliance Division personnel to discuss cases where we had concerns with the final outcomes. We also reiterated during this meeting that because the documentation we receive and review is authored and signed by the Appointing Authority, we would continue to consider all final decisions to be those of the Appointing Authority unless other documentation is provided.

As has been our experience during prior site visits, the Appointing Authority was attentive to our concerns and provided detailed information and explanations regarding the PDH process and the concerns we raised. We also noted that while we disagree with some of the final decisions that the Appointing Authority has made, we continue to note improvement in the documentation that MCSO provides for our review.

**Paragraph 227.** *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.    *his or her personal opinion about the employee's reputation;*

b.    *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.    *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 43 administrative misconduct investigations where discipline was imposed. The serious sustained allegations in 18 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

WAI 34286

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

***Paragraph 228.***  *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.      *that decision does not relate to the Sheriff or his designee;*

b.      *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.      *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.      *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of PSB or the appointed MCSO disciplinary authority.

WAI 34287

### F.      Criminal Misconduct Investigations

**Paragraph 229.**   *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.   If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.   If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed six internal criminal investigations.   Three were externally generated, and three were internally generated.   All were completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.   The potential misconduct was brought to the attention of the PSB Commander as required; and in all cases, an administrative misconduct investigation was also initiated.   None involved someone superior in rank to the PSB Commander.

**Paragraph 230.**   *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.   The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

WAI 34288

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation.  To ensure our ability to verify that MCSO maintains compliance with this Paragraph on an ongoing basis, we discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed six administrative misconduct investigations where there was a companion criminal investigation completed.  In one of these six cases, while there was documentation that a criminal investigation had occurred and the outcome of the investigation was also documented, MCSO did not provide a copy of the criminal investigation with the administrative investigation.  We will remind MCSO to include the copy of the criminal investigation in all cases where one occurred.


**Paragraph 231.**  *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

PSB is separated into criminal and administrative sections.  Criminal investigators and administrative investigators are housed on separate floors of the building.  Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports.  We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place, and did so again during our January 2018 site visit.

During our April 2018 site visit, PSB personnel informed us that PSB would relocate to its new offsite facility in May 2018.  We will verify during our next site visit that the required separation of criminal and administrative investigations and restricted access to IAPro is in place at the new facility.

WAI 34289

**Paragraph 232.** *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During the last reporting period, we reviewed 11 criminal misconduct investigations conducted by MCSO personnel. All had a companion administrative misconduct investigation as required by this Paragraph.

During this reporting period, we reviewed six criminal misconduct investigations conducted by MCSO personnel. All have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

**Paragraph 233.** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

WAI 34290

During this reporting period, four of the six criminal investigations we reviewed were closed without submittal to a prosecuting agency.  In three of these four cases, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up.  The investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.  In one case, we believe that MCSO should have conducted further investigation prior to inactivating the case; as MCSO could have obtained additional information and conducted interviews of other parties.

MCSO has consistently been in compliance with the requirements of this Paragraph, but falls short of compliance during this reporting period.  Consistent with our methodology, should we find additional compliance issues during the next reporting period, we will remove MCSO from Phase 2 compliance with this Paragraph.

**Paragraph 234.**  *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation.  Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed six criminal misconduct investigations conducted by PSB personnel.  Two of the six cases were forwarded to an appropriate prosecutorial agency.  In both cases, MCSO provided documentation that the PSB Commander reviewed and approved the submittal.  Neither of the cases noted that the PSB Commander had directed any further investigation prior to the submittal to the prosecuting agency.  Both investigations were turned down for prosecution, citing no reasonable likelihood of conviction.

WAI 34291

**Paragraph 235.**  *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed two criminal misconduct investigations that were submitted to a prosecuting agency, but turned down for prosecution.  In both cases, the prosecuting agency provided a reason for the turndown in writing.  Neither of the turndowns noted any failure by investigators to conduct thorough investigations.

**Paragraph 236.**  *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

During previous site visits, we have inspected the file rooms where hardcopies of investigations are stored.  Criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our random review of criminal investigation case files verified that PSB is maintaining files as required.  A Monitoring Team member also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a Monitoring Team member again inspected the file rooms where hardcopies of criminal investigation are stored and randomly reviewed case files to verify compliance.

During our April 2018 site visit, PSB personnel informed us that PSB would relocate to its new offsite facility in May 2018.  We will verify during our next site visit that PSB is properly maintaining criminal investigation reports and files at the new facility.

WAI 34292

### G.     Civilian Complaint Intake, Communication, and Tracking

*Paragraph 237.  Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2**:  Not applicable

The Monitoring Team developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at the Monitoring Team's community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

The Monitoring Team contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

*Paragraph 238.  The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**Phase 1**:  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2**:  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During the last reporting period, we reviewed 108 administrative misconduct investigations. Sixty-five of these investigations were initiated based on a civilian complaint, including some in which the complaints were made by third parties (seven instances) or were anonymous (two instances).  None of the investigations we reviewed involved an allegation that any MCSO employee failed to accept a civilian complaint.  We identified one traffic stop where it was apparent that an arrested subject was alleging misconduct.  The deputies on scene did not notify a supervisor, and no complaint was taken.  We discovered this during our review of traffic stops; and we notified PSB, which initiated an internal investigation.

WAI 34293

During this reporting period, we reviewed 142 administrative misconduct investigations. Of these, 100 were initiated based on a civilian complaint, including two that were anonymous and two that were made by third parties. In one completed investigation we reviewed, a sergeant had learned that a community member wanted to be contacted regarding her negative interaction with a deputy. The sergeant contacted this community member in person and discussed her concerns. The community member stated that she did not want to make a formal complaint, and the sergeant made an entry into his Supervisory Notes at the conclusion of their discussion. CID discovered this incident while reviewing Supervisory Notes; and notified PSB, who reviewed the BWC, determined that the community member was making a complaint about the conduct of a deputy, and initiated an investigation.

Our review of traffic stops and body-worn camera video conducted for other Paragraphs of the Orders during this reporting period did not identify any instance where MCSO failed to take a civilian complaint. There were also no instances identified during the Complaint Intake Testing Program that indicated that MCSO failed to accept a complaint. (See Paragraphs 254-260.)

**Paragraph 239.** *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were prominently displayed. The placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

WAI 34294

***Paragraph 240.*** *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:** In compliance

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular phones.


***Paragraph 241.*** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

MCSO Facility Management intends to establish the PSB off-site location at 100 West Jefferson Street, in downtown Phoenix. During our January 2018 site visit, PSB advised us that the building was undergoing renovations to accommodate the Order requirement to provide accessibility to members of the public. MCSO stated that it expects to move into the new facility in May 2018; and to be open to receive community members once the move-in is completed, on or about June 1, 2018.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the future PSB reception area and offices. The future PSB area is accessible from First Avenue, a major thoroughfare; and there will be no required security screening of individuals entering the building through the First Avenue entrance.

WAI 34295

*Paragraph 242. The Sheriff will also make complaint forms widely available at locations around the County including:  the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices.  The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites; and widely available at MCSO facilities, County offices, and public locations where community groups meet.  MCSO maintains a list of these facilities, and Community Outreach Division personnel restock the materials when necessary.

*Paragraph 243. The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:**  In compliance

The free 24-hour hotline for members of the public to make complaints was established in July 2016 and continued to be operational during this reporting period.  A Monitoring Team representative periodically called the hotline during this reporting period and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint.  The recording advises callers that if the call is an emergency, they are to call 911.  Callers are requested to provide their name, phone number, and a brief summary of their complaint.  If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible.  If callers do not wish to leave a recorded message, they are provided with a phone number to call to speak to a supervisor.  That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor.  Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  During this reporting period, PSB personnel reported that they received two complaints on the hotline.

WAI 34296

**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

**Paragraph 245.**  *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

**Phase 2:**  In compliance

Complaint forms in English and Spanish are accessible on MCSO's website.  The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The forms provide street addresses, contact numbers, and website information.

**Paragraph 246.**  *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.    *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned.  The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.    *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

WAI 34297

*c.    in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 142 administrative misconduct investigations conducted by MCSO personnel. One hundred of these complaints were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of their complaint. In 95 of the 100 external complaints, PSB either sent the required written notice within seven days, or provided an explanation as to why the written notice could not be sent. All of the letters that were sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all 100 externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. Twenty-one of the externally generated complaints had sustained findings. In twenty of these cases (95%), PSB properly notified the complainant of the sustained findings and the discipline imposed. In one case, though PSB notified the complainant of the sustained findings, the discipline information in the letter was incorrect.

MCSO is now in Phase 2 compliance with this Paragraph.

***Paragraph 247.*** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

WAI 34298

During this reporting period, we reviewed 142 administrative misconduct investigations conducted by MCSO. Externally generated complaints resulted in 100 of the investigations. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all but one of the externally generated complaints where the complainant was known. MCSO also documented in their reports that they had additional contact with complainants on 17 occasions during the course of their investigations.

**Paragraph 248.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, PSB completed seven investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. All seven investigations were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

WAI 34299

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During this reporting period, PSB completed two investigations that are applicable to the requirements of this Paragraph.  Both were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

**Paragraph 250.**  *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

PSB completed a quarterly assessment, for the period of January 1-March 31, 2018, to meet the requirements of this Paragraph.  Previously, PSB conducted monthly assessments to meet the requirements of this Paragraph.  PSB's assessment identified the following potential problematic patterns or trends: an employee was identified as a principal in four investigations involving rude behavior; and four investigations were initiated due to certain deputies failing to provide *Miranda* rights when required.  One District received numerous complaints resulting in misconduct investigations, which included: four allegations related to improper arrest procedures; three allegations related to non-conformance to established laws; and three investigations regarding deputies who were involved in traffic crashes in MCSO vehicles.  PSB notified the appropriate command personnel of these patterns for appropriate action.  The assessment of complaints received during this reporting period complies with the requirements of this Paragraph in scope and content.

### H.    Transparency Measures

**Paragraph 251.**  *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.    *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.    *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic*

WAI 34300

information; complaints received from anonymous complainants or third parties; and principals' demographic information;

c.  analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;

d.  aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

e.  aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

f.  aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and

g.  aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

WAI 34301

**Phase 2:** Deferred

The proposed PSB Operations Manual reviewed by the Monitoring Team identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations. The proposed manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Previously, we reviewed the semi-annual public report prepared for the period July 1-December 31, 2016, and provided feedback to PSB. The report did not capture all of the requirements of this Paragraph, including, but not limited to: sustained allegations that an employee violated conflict-of-interest rules; aggregate data on the nature of the contact; aggregate data on the complainant's demographic information; Maricopa County Law Enforcement Merit System Council findings/disposition broken down by discipline and Council ruling (overruled, sustained, or changed); and similar information concerning appeals beyond the Council.

In January 2018, PSB issued and posted on the MCSO website its most recent semi-annual public report for period of January 1-June 30, 2017. The report contains the relevant information that is required by this Paragraph, including whether any sustained allegations exist in which an employee violated conflict-of-interest rules when conducting or reviewing misconduct investigations; aggregated data on complaints received from the public; an analysis to determine whether there is an increase or decrease of complaints that may be attributable to the intake process; aggregated data on internally generated misconduct allegations; aggregated data on the processing of misconduct investigations; aggregated data on the outcome of misconduct investigations; and aggregated data on employees with persistent or serious misconduct problems.

PSB intends to incorporate the requirements for Paragraph 192 into the next semi-annual report, which will cover the period of July 1-December 31, 2017. MCSO anticipates that the next report will be completed by June 30, 2018.

We are deferring our Phase 2 compliance assessment of this Paragraph until MCSO achieves Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

***Paragraph 252.*** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

WAI 34302

PSB provided its template for the information that will be captured from completed misconduct investigations for posting as required on the MCSO website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made detailed summaries of completed internal investigations (January, February, and March 2018) readily available to the public in electronic form in a designated section on the homepage of the MCSO website. MCSO remains in compliance with this requirement.

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.     *complaint notification procedures were not followed;*

b.     *a misconduct complaint was not assigned a unique identifier;*

c.     *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.     *deadlines were not met;*

e.     *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.     *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.     *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.     *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.     *any interviews were not recorded;*

j.     *the investigation report was not reviewed by the appropriate personnel;*

k.     *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.     *a final finding was not reached on a misconduct allegation;*

m.   *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.   *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

**Phase 2:**  Not in compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations has not yet been prepared.  After a telephone conference between BIO and the Monitoring Team on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection.  During this reporting period, MCSO provided the methodology for conducting the inspection to meet the requirements of this Paragraph.  We provided comments on the methodology prior to our April 2018 site visit.  We also briefly discussed this methodology during our April 2018 site visit.  MCSO indicated that changes to the methodology will be made and a response to the comments will be provided.  Once the methodology is approved, AIU will commence the inspection and prepare the semi-annual public audit report.  Pending the conducting of the semi-annual public audit report, MCSO is not in compliance with this Paragraph.


### I.   *Testing Program for Civilian Complaint Intake*

***Paragraph 254.***  *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.  Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

To meet the requirements of this Paragraph, BIO contracted with two vendors:  Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

WAI 34304

To date, PMR has conducted 18 tests, as well as two practice tests; PMR conducted the majority via telephone.  We receive documentation of these tests as they are completed, as part of our monthly document requests.  PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.  During this reporting period, PMR conducted two tests, both via telephone.

In the first test, a tester called District 1, to file a complaint that he observed a deputy accepting free food at a taqueria while in uniform.  The MCSO operator asked the tester to describe the deputy's appearance, and when the tester described the color of the deputy's uniform as khaki, the operator informed the tester that the person he observed was not employed by MCSO, but by the Arizona Highway Patrol Division.  The tester called back and told the same MCSO operator that he was certain the deputy worked for MCSO, as he observed the deputy in an MCSO vehicle; the operator then transferred the call to a sergeant, and the tester left the sergeant a voicemail message.  Three days later, the sergeant returned the tester's call, leaving a voicemail message with information about the case number for the complaint and contact information for the assigned complaint investigator.  The tester described MCSO personnel with whom he interacted as "friendly" and "professional."

In the second test, a tester called District 6, to file a complaint asserting that an MCSO employee was biased against Latinos.  The tester alleged that when he gave his Latino name and inquired with MCSO about current job openings, the MCSO employee who was initially "pleasant and kind…became irritated, stating she wasn't Human Resources" and recommending that the tester check MCSO's website.  When the tester spoke with the District 6 employee to lodge his complaint, the District 6 employee was "very professional" and provided additional information about available positions at MCSO.  The tester had to inquire about the District 6 employee's name and "the next steps" MCSO would take; but later that same day, a sergeant left voicemail messages for the tester to follow up, and the sergeant also called the following day to provide the complaint case number and contact information for the assigned complaint investigator.

To date, AFHC has conducted one test, as well as two practice tests.  Because AFHC is responsible for conducting in-person tests, AFHC has agreed to advise AIU of each test in advance.  During this reporting period, AFHC conducted one test, at District 2.  As of the end of the reporting period, AIU had not yet received documentation of this test, which was conducted on March 30, 2018, at the end of the reporting period.  We will report on this test in our next quarterly status report.

During our April 2018 site visit, we inquired with BIO personnel whether PMR and AFHC have deployed test complainants with Hispanic surnames.  While the complaint intake testing Paragraphs do not specifically include this provision, the Plaintiffs' class in this case is the Latino population of Maricopa County.  Following our site visit, BIO personnel informed us that six of the 18 PMR test complainants and none of the AFHC test complainants to date were lodged by complainants with Hispanic surnames.  MCSO also advised us that it would "have internal discussion regarding the possibility of adding this aspect to the Operations Manual or the testing companies' manuals."  We will follow up with MCSO on this issue during our upcoming site visit.

WAI 34305

***Paragraph 255.*** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

As noted above, BIO contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

BIO has informed both vendors of this requirement.  BIO has created several procedures to ensure that the complaint intake testing program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make, and creating official identification cards for testers designating them as such. For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel will be available by telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website.  Testers shall not interfere with deputies taking law enforcement action.  Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

As noted above, BIO contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.  BIO advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

WAI 34306

For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel will be available by telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:** Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:** Not in compliance

As noted above, BIO contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

BIO has informed both vendors of the requirements of this Paragraph.  Per the agreed-upon methodology, PMR will audio-record all testing conducted via telephone.  To date, AFHC has only completed one test, near the close of the reporting period, and it has not yet provided documentation of the test for BIO's review.  However, according to BIO personnel, AFHC intends to both audio- and video-record all in-person testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

***Paragraph 258.*** *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:** Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:** Not in compliance

As noted above, BIO contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

BIO has informed both vendors of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

***Paragraph 259.***  *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.
- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

BIO has informed both vendors it has contracted with to conduct the tests of this requirement. BIO personnel have informed us that no current or former employees have served, or will be serving, as testers.


***Paragraph 260.***  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.  *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.  *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.  *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.  *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.  *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.  *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.  *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.
- Audits and Inspections Unit Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

To date, BIO has not developed a methodology for the process by which it will analyze the findings of the completed tests for the required annual report.  As it receives documentation about completed tests from its two vendors, BIO reviews the information, and will issue Action Forms, author memorandums of concern, or take other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

WAI 34308

We will discuss the requirements of this Paragraph further with BIO personnel during our upcoming site visit.

WAI 34309

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.     COMMUNITY     OUTREACH     AND     COMMUNITY
ADVISORY BOARD**

*Paragraph 261.  The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, the CAB did not explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.

*Paragraph 262.  In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities.  The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose.  The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, as noted above, the Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 altered the composition of the Community Advisory Board (CAB) and CAB's responsibilities and relationship to MCSO.  As of September 1, 2017, the CAB is now comprised of five members – two selected by the Plaintiffs, two selected by MCSO, and one jointly selected.

During this reporting period, CAB members provided us with a proposed budget, which we reviewed and discussed via a conference call with CAB members.  We look forward to reviewing the next iteration of the proposed budget, and continuing these discussions with the CAB before and during our upcoming site visit.

WAI 34310

# Section 14: Supervision and Staffing

**COURT ORDER XVII.      SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period.  For January, we reviewed Districts 1 and 2; for February, we reviewed Districts 3 and 4; and for March, we reviewed Districts 1, 2, and 3.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a clearly identified supervisor, and that they worked the same schedules as their supervisors.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs of this Order that directly impact this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that MCSO is in compliance with Paragraphs 83, 85, 89, 90, 93, and 94 as they relate to this Paragraph.  For MCSO to achieve compliance with this Paragraph, it must be in compliance with Paragraph 91, in addition to the previously noted Paragraphs.  MCSO still needs to address deficiencies in supervisory reviews of documentation related to traffic stops.

WAI 34311

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the first quarter of 2018. We have revised our document requests to conduct more frequent inspections of the larger Districts, which our reviews have indicated are more likely to have span of control issues. Rosters for Districts 1, 2, and 3 will be inspected in January, March, April, June, July, August, September, October, and December. Rosters for Districts 4, 6, and 7, and Lake Patrol will be inspected in February, May, August, and November. During this reporting period, for January, we reviewed a sample of shift rosters from Districts 1 and 2; for February, we reviewed a sample of shift rosters from Districts 3 and 4; and for March, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor, and that on most days, supervisors were assigned no more than eight deputies. However, our inspection of the shift rosters indicated that only 34 of the 41 shifts were in compliance with the span of control requirements that no more than eight deputies be assigned to each supervisor.

We select a random sample of different dates in each quarter to examine shift rosters. District 1 had one day in January where a shift had a supervisor-deputy ratio of 1:9. District 2 had one day in January where the supervisor-deputy ratio was 1:10. All other shifts examined were in compliance. In February, District 3 had two days where a shift had a supervisor-deputy ratio of 1:9. In March, District 1 had one day where a shift had a supervisor-deputy ratio of 1:9, and District 3 had two days where a shift had a supervisor-deputy ratio of 1:10. For this reporting period, MCSO was not in compliance with this Paragraph. MCSO has been in compliance with this Paragraph for some time. Consistent with our methodology, we will not change the compliance rating for the first quarter of 2018. However, if MCSO fails to meet the requirements of this Paragraph in the second quarter, we will withdraw compliance.

WAI 34312

***Paragraph 267.*** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly impact Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. During this reporting period, MCSO is in compliance with Paragraphs 83, 85, 89, 90, 93, and 94. During the last reporting period, we found MCSO not in compliance with Paragraph 96. During this reporting period, we again found that MCSO was not in compliance, and withdrew compliance with Paragraph 96.

MCSO has made progress in the supervisory reviews of subordinates' work performance, but needs additional effort to achieve compliance with Paragraph 91. For MCSO to achieve compliance with Paragraph 267, in addition to the Paragraphs previously referenced, MCSO must achieve compliance with Paragraph 91 and regain compliance with Paragraph 96.


***Paragraph 268.*** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** Deferred

- Court Implementation Division Operations Manual, currently under revision.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

WAI 34313

During this reporting period, MCSO submitted the resumes and disciplinary histories of five employees whose approval was requested to transfer to PSB, CID, and BIO. In addition, three employees were transferred out of PSB and BIO. We reviewed the documentation submitted for each transfer request to ensure that each employee transferred into these units met the requirements of Paragraph 268. We also reviewed each outgoing transfer to ensure that the transfers were based on MCSO needs, and were not punitive in nature. We approved all of the submitted transfers based on the information provided. MCSO also provided documentation related to the designation of the new PSB Commander. During our April site visit, we audited the files of the employees transferred during the first quarter and verified the accuracy of the information submitted for each employee. In our inspection of personnel files, we noted no irregularities or deficiencies.

WAI 34314

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.**   The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

**Phase 2:**  Not in compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees for the reporting period.  We also reviewed a sample of cases during our January 2017 site visit to verify if a search for the documents identified in the Document Preservation Notice was performed and if responsive documents were appropriately identified and preserved.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS conducts initial research to determine which agency Divisions can properly address the hold, and then drafts a Document Preservation Notice which is sent out to the Divisions within five business days.

During our April site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  MCSO continues to correctly convey the information contained in the third-party source document into the Document Preservation Notices that go out to the employees.  The Document Preservation Notices are distributed in a timely manner to employees who may have responsive documents.

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives a document preservation request complete two forms: Attachment A, Document Preservation Acknowledgment and Attachment B, Document Preservation Questionnaire. Attachment A, the attestation, is due within five days of receipt; while Attachment B – which requires more in-depth information such as steps taken to search documents, the outcome of the search, and the itemization of the documents identified as responsive – is due within 10 days of receipt.  Attachment A was returned in a timely manner 81% of the time, while Attachment B was returned within established timelines 86% of the time.

WAI 34315

During our April site visit, we reviewed completed copies of Attachment B, and found fewer errors than during the previous reporting periods. We noted that the LLS intercepted the improperly filled out forms and returned them for corrections. We found the following deficiencies on the forms: files that were missing Attachment A and/or Attachment B and improper completion of Attachment B. We discussed our observations with the LLS personnel during our April site visit and commended them for identifying many deficiencies and returning the forms to the employees in a timely manner.

During our April site visit, we visited Districts to assess their document preservation practices. The Districts are meeting the requirements of GD-9 when they receive a document preservation hold. For the most part, the Districts do not receive requests for production of documents, so there is little knowledge on the procedure to follow for those requests. We received comments from the Districts that GD-9 seemed geared more toward attorneys, and the language was not easy to follow. Some employees indicated that they were looking forward to the GD-9 User Guide.

During our April site visit, we discussed the GD-9 User Guide, which will more plainly set out deadlines, interchangeable terms, office requirements, helpful hints, the Division Commander and employees' responsibilities, and frequently asked questions and answers on the policy. We discussed both the purpose and the format of the guide. MCSO agreed with most of our recommendations, and will provide an updated version of the document. MCSO maintained that it would like to keep the GD-9 User Guide separate from the policy, rather than having it become an attachment. We explained that since the document provided guidance on Order-related requirements, MCSO would have to verify that the intended users receive and understand the contents of the guide.

MCSO aims to perform the searches and preservations in a centralized process through Open Axes, a discovery software program. The tool will help the LLS in performing case management; LLS will be able to create a case, assign a case number, make associations with other cases, and trigger time alerts to the employees. Open Axes will search on the H, W, and U drives of MCSO, which are shared among Headquarters and the Districts. During our January 2018 site visit, MCSO informed us that Open Axes would be in its pilot phase in the LLS by March 2018. Yet during our April site visit, we learned that the start date has been delayed due to indexing procedures. Originally, the software required 26 individual searches to review all drives. The Technology Management Bureau is creating a unique global index that will only require one search on all affected drives. In addition, we observed an Open Axes demonstration during our April site visit, and learned that the software will allow for document uploads within the system. We believe this to be a step in the right direction toward establishing a centralized process for both document preservation and collection.

WAI 34316

**Paragraph 270.**  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.    *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.    *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.    *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  Not in compliance

- GD-9 (Litigation Initiation, Document Preservation and Document Production Notices), published on October 13, 2017.
- Open Axes Operations Manual, not yet drafted.

**Phase 2:**  Not in compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the Legal Liaison Section (LLS) in search of documents from other Divisions of the agency. For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required division of MCSO for production.

Our review revealed that MCSO is forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees.  In 88% of the cases, the personnel who provided responsive documents properly completed Attachment C.  Twelve percent of the forms lacked the proper identification of the steps that personnel took to search for documents or the itemization of the documents that were provided.

At the close of this reporting period, in 86% of the instances, MCSO complied with the policy's timeframes between the receipt of the request and the transmittal of the Request for Production of Records.  We will follow up during our next site visit to learn the reasons for the delay in the remaining cases.

WAI 34317

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process. During this reporting period, MCSO had not yet implemented the Open Axes program. During our April site visit, we learned that the program had not even been implemented in its pilot phase at the LLS. MCSO anticipates that the system will become operational by the summer of 2018.

We will continue to hold MCSO not in compliance with this Subparagraph until it develops an Open Axes Operations Manual outlining the protocols and procedures for the centralized process of document preservation, and makes any necessary amendments to GD-9 following the deployment of the software.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a through and adequate search of all relevant physical and electronic files. We reviewed a sample of responsive documents for this reporting period, and note that MCSO has identified responsive documents to the document production notices in most of the cases we reviewed.

*Paragraph 271. Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:** Not in compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.
- Compliance Division Operations Manual, currently under revision.

**Phase 2:** Not in compliance

As of the close of the reporting period, MCSO has not published the Compliance Division Operations Manual.

*Paragraph 272. The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:** In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

**Phase 2:** In compliance

No internal investigations were completed against any MCSO employee during this reporting period for failure to preserve or produce documents.

WAI 34318

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform.   All personnel (100%) determined to be applicable by CID have received this training.

WAI 34319

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

**COURT ORDER XX.     COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS**

*Paragraph 274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

### A.     Investigations to be Overseen and/or Conducted by the Monitor

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276. The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:**  Not applicable

**Phase 2:** In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  PSB holds a weekly meeting to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

WAI 34320

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the weekly CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs.  In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases.  By the end of the reporting period, nine cases were determined to be CRMs; and one other was pending a CRM decision.  The remaining cases were determined not to be CRMs.

As of the end of the last reporting period, PSB had reviewed a total of 157 cases since August 2016.  Of these, 34 were classified as CRMs.

During this reporting period, an additional 23 cases were reviewed as possible CRMs.  Of these, eight were determined to be CRMs.  As of the end of this reporting period, there are a total of 42 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

MCSO has closed a total of 32 CRM cases since July 20, 2016, including eight during this reporting period.  Two of these 32 cases had sustained findings on deputies who have left MCSO employment.  Six had sustained findings on two separate deputies who are deceased.  Eight have resulted in sustained findings against current MCSO deputies.  Two of these sustained CRM cases resulted in the dismissal of the involved deputies for truthfulness issues that were discovered during the investigations.  One case resulted in a sustained allegation that the employee had made an inappropriate comment (used profanity) during a contact with a community member.  While this conduct was inappropriate and the case resulted in discipline, the sustained allegation was not related to any bias.  In two separate cases, deputies received discipline for failing to properly complete the report of an incident; and a sergeant received discipline for signing off on the incomplete reports.  One case resulted in a 40-hour suspension for an inappropriate and biased comment that was made by a Detention officer.  One case resulted in a sustained finding for failing to meet standards and resulted in a coaching.  One case resulted in a 24-hour suspension for a deputy and a 120-hour suspension for a Posse member for inappropriate actions taken on a traffic stop.  The remaining CRM cases were closed with findings of exonerated, unfounded, or not sustained.  Our Team has approved the investigation; findings; and where appropriate, the discipline in all these cases.

During the weekly meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs.  Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team.  In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings.

WAI 34321

**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

**Paragraph 278.** *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented each week. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

**Paragraph 279.** *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During the weekly CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case during the weekly meetings, and their briefings include all appropriate information. They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised. There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

WAI 34322

**Paragraph 280.** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

**Paragraph 281.** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Compliance Division Operations Manual, currently under revision.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each weekly meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

During this reporting period, PSB completed and closed eight CRM cases. One of these cases involved multiple sustained policy violations for misconduct that occurred during a traffic stop. In this case, both the deputy, and the Posse member who was present, received suspensions. In four cases, PSB found that a deceased deputy had failed to properly impound identifications taken from subjects involved in traffic stops. This conduct occurred between 2008-2010, but was not discovered until 2017. The investigations determined that the identifications had been properly seized, but the deputy had failed to impound the identifications as required. Two of

the closed cases during this reporting period were not sustained; and in one case, the deputy was exonerated.  In our review of the eight completed CRM cases during this reporting period, we found all complied with the requirements specific to the investigation of CRMs; and other requirements for administrative misconduct investigations.  The case reports we reviewed were consistent with the briefings that had been provided during the weekly CRM meetings.  PSB investigators continue to conduct appropriate follow-up on these cases, expend extensive efforts to locate and contact all involved parties and witnesses, and provide detailed information concerning the allegations and the justifications for findings in their investigative reports.  In the one sustained case involving active employees, MCSO arrived at an appropriate disciplinary decision.

***Paragraph 282.***  *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor.  Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Compliance Division Operations Manual, currently under revision.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

***Paragraph 283.***  *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

WAI 34324

MCSO has closed a total of 32 CRM cases since July 20, 2016.  Six had sustained findings on two separate deputies who are deceased, and two involved deputies who left MCSO employment prior to the determination of discipline.  Eight resulted in sustained findings against current deputies, including one that was closed this reporting period.  In two of these eight cases, a deputy was terminated as a result of conduct discovered by investigators during the investigation.  In both cases, the conduct for which the employee was terminated involved a sustained truthfulness allegation.  In one case, the sustained finding was for an inappropriate comment (profanity) made by the deputy during a contact with a community member.  In two sustained cases, the misconduct involved the failure of a deputy to properly complete a report and the failure of his supervisor to identify that the report was not properly completed.  In one sustained case, the misconduct involved a Detention officer who made an inappropriate and biased comment to an inmate.  In one sustained case, the misconduct involved the failure to properly screen visitors to a jail facility.  In the final sustained case, the misconduct involved multiple policy violations by a deputy and a Posse member during a traffic stop.  We reviewed and approved all of these disciplinary decisions

***Paragraph 284.*** *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During this, and previous reporting periods, a Monitoring Team member attended all weekly CRM meetings conducted in an appropriate location determined by MCSO.  PSB also provided a password and access to the IAPro system to a Monitoring Team member so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 34325

*Paragraph 285.  Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

As of the end of this reporting period, there have been a total of 16 CRM cases with sustained findings.   Six had sustained findings on two separate deputies who are deceased, and two involved deputies who left MCSO employment prior to the determination of discipline.   Two cases resulted in the termination of employees for sustained truthfulness allegations.   The six remaining sustained cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were completed.   No action by us has been necessary relative to this Paragraph.

*Paragraph 286.  Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.   To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.   The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  Not in compliance

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During this reporting period, none of the CRM cases that we reviewed included both a criminal and an administrative investigation; nor did we find that these, or any other CRM case, should have included a criminal investigation.   No action on our part relative to this Paragraph was necessary.

WAI 34326

**Paragraph 287.** *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

Of the 16 total sustained CRM cases since the issuance of the Second Order, six have resulted in minor discipline.  Two have resulted in serious discipline.  We concurred with MCSO's decision in all of these cases.

During this reporting period, there were no grievances or appeals filed on discipline received by employees on any sustained CRM case.

**Paragraph 288.** *The Monitor's authority over Class Remedial Matters will cease when both:*

a,   *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.   *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

WAI 34327

During this and prior reporting periods, we and PSB concurred on the investigative outcome of each CRM investigation completed.

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in their weekly briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.

*Paragraph 289.   To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:**  Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on May 18, 2017.

- Compliance Division Operations Manual, currently under revision.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

During this reporting period, we reviewed a total of 148 internal investigations. All but one was both initiated and completed after the issuance of the Second Order. There were 142 administrative misconduct investigations, eight of which were CRMs, and six criminal misconduct investigations. All but one of the criminal investigations were in compliance with all Second Order requirements. We found MCSO in compliance with all Second Order requirements in 85 (60%) of the 142 total administrative conduct investigations we reviewed.

WAI 34328

We found during this reporting period that all cases reported in Paragraphs 249 (investigatory stops) and 275 (CRMs) complied with all requirements during this reporting period.  We noted that investigations conducted by PSB sworn personnel were compliant in 94% of the cases.  PSB investigations conducted by Detention personnel were compliant in 66% of the cases.  Those conducted by Divisions and Districts outside of PSB were compliant in 42% of the cases, an increase from 31% during the last reporting period.  These finding are based on the investigative and administrative actions by the investigators and the decisions of the PSB Commander.  Factoring in the final decisions made by the Appointing Authority after the investigations were concluded resulted in an overall compliance rate of 60%.

While the overall percentage of administrative misconduct cases that were fully compliant did not increase for this reporting period; we noted a decrease in cases that had serious investigative deficiencies, and noted that the overall investigative quality has improved in both PSB and in the Districts and Divisions.  While MCSO still falls short of compliance, there continues to be evidence of improvement.

During our next site visit, we will discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and provide them with specific case examples.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists.  Service complaint documentation must then be completed and will be reviewed under this Paragraph.

MCSO handled 54 service complaints during this reporting period.  Four (7%) of the 54 service complaints were appropriately reclassified to administrative misconduct investigations after review by PSB.  Eleven (22%) of these complaints were determined not to involve MCSO personnel.  Twenty-six (48%) involved complaints regarding laws, or MCSO policies and procedures; or they involved other contacts from the public that did not include allegations of employee misconduct.  Thirteen (24%) lacked specificity, and the complainants were either unwilling or unable to provide additional clarification of their concerns.  We concur with MCSO's handling of 53 of the 54 complaints.  In one case, we believe that there was sufficient information available to determine that the complainant had alleged misconduct by the employee; and MCSO should have initiated an administrative investigation.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist.  The PSB Commander's use of this discretion will also be reported in this Paragraph.  No such incidents occurred during this or previous reporting periods.

WAI 34329

*Paragraph 290. This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class. The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.*

*Paragraph 291. The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided here.

During this reporting period, we reviewed 142 administrative misconduct investigations and six criminal misconduct investigations. All but one of the criminal investigations was in full compliance with the Second Order. Of the 142 administrative investigations we reviewed, 60% were in full compliance with Second Order.

During the period of July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii. and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class. In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator. He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

WAI 34330

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed. We received and reviewed both investigations. A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator. MCSO outsourced six additional investigations to the contract investigator.

During our April 2018 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor. There have been no cases completed and submitted for our review that have been investigated by the contract investigator. The Independent Investigator continues investigations identified by the Court, and notifies us of the status of these cases on a regular basis. We also receive closed investigations that he has completed. To date, he has completed seven investigations; and we have reviewed them, only to ensure that the misconduct identified by the Court is being addressed.

**Paragraph 292.**  *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A Monitoring Team member attends each weekly CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

WAI 34331

***Paragraph 293***. *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1**:  Not applicable

**Phase 2**:  Not applicable

Since we began reviewing internal investigations conducted by MCSO more than three years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. As noted in our previous quarterly status reports and elsewhere in this report, we continue to note numerous concerns with internal investigations, but have also noted many improvements.

Five of the six criminal misconduct investigations that we reviewed for this reporting period were investigated by PSB and complied with the Second Order requirements. Of the 142 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 60%.

Administrative misconduct investigations completed by sworn personnel assigned to PSB that were in full compliance with all requirements of the Second Order was 82% of the cases we reviewed for this reporting period. Investigations completed by Detention personnel assigned to PSB were compliant in 66% of the cases. Some of the concerns from the last reporting period – including the timely completion of investigations, the failure to thoroughly conduct investigations, the failure to interview all parties, and a lack of required documentation – remain, but the overall investigative quality of investigations by personnel assigned to PSB continues to improve

Of the cases investigated outside of PSB, 42% complied with all Second Order requirements. While this is a significant improvement from 31% of compliant cases from the last reporting period, we continue to be most concerned with these cases. Most of these investigations were conducted at the District level. In many of the cases, non-compliance is still a result of procedural errors, or the failure to meet established timelines, but we also continue to observe ongoing issues with the quality of some investigations.

The compliance findings in this Paragraph are determined based on all requirements of the Second Order. We have noted that were it not for the failure to complete timely investigations without an approved extension, many more investigations would be in compliance. In addition, these overall compliance findings take into account the final findings and final discipline assessed where appropriate. The Appointing Authority makes these decisions. Throughout this report, we have noted that investigators, reviewers, and final decision-makers impact the final compliance findings for each case.

During our previous site visits, District supervisors and command personnel had informed us they believed that many of the errors in the proper completion of internal investigations resulted from a lack of training, and a lack of understanding regarding the investigative and procedural requirements.  We acknowledged that the investigative training had not yet occurred at that time, but also noted that we have been meeting with District supervisors and command personnel for over one year and specifically addressing with them the areas where compliance issues continued to exist.  We also noted that PSB personnel have provided significant input, assistance, and oversight of the District investigations; and have also identified those areas with ongoing compliance issues.  Despite extensive feedback and recommendations, we had observed only limited improvement in District and Division cases outside of PSB.

During the last reporting period, MCSO completed delivery of the 40-hour Misconduct Investigative Training, and all sworn supervisors who investigate administrative misconduct attended the training.  During our site visit meetings and District visit meetings in January 2018, those we talked to offered positive feedback: they believed that it was beneficial and provided the training and information they needed to understand and complete the investigative and administrative requirements for completing misconduct investigations.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted.  We continue to note that PSB addresses issues we raise during our site visit meetings.  The quality of the investigations conducted and overall compliance, though slow in some cases, continues to improve.  We continue to stress that compliance is not the sole responsibility of any one individual or division – but dependent on all those who complete, review, or approve internal investigations.

As we have noted in previous reporting periods, MCSO's executive leadership must take the appropriate actions to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations.  They must also provide appropriate oversight and support for the personnel who conduct these investigations.  The 40-hour Misconduct Investigations Training has been completed, all personnel who conduct misconduct investigations have been trained, and MCSO must begin to hold those who conduct and review internal investigations accountable for the quality of these investigations if MCSO is going to achieve compliance with the requirements set forth by the Court.

### B.    Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

**Paragraph 294.**  *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

WAI 34333

*Paragraph 295.  In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

## 1.    The Independent Investigator

*Paragraph 298.  In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

*Paragraph 300.  The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.    *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.    *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted independent investigator for investigative purposes.

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.).  PSB has not found it necessary to contract with any additional licensed private investigators.

WAI 34334

During our April 2017 site visit, we met with PSB command staff and MCAO to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Previous to this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all of the acts of misconduct that we had discussed.  The MCAO and PSB command personnel explained that many of the acts of potential misconduct identified in the FOF were also identified by the Court in Paragraph 301 as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justied if the Independent Investigator deemed that an investigation was warranted.

During the last reporting period, the Independent Investigator completed six investigations identified by the Court in the FOF.  We did not review these investigations for compliance with the investigative requirements in the Second Order, but reviewed them only to ensure that the misconduct outlined in the FOF was being addressed.

During this reporting period, the Independent Investigator completed one additional investigation identified by the Court in the FOF.  Again, we reviewed the investigation only to ensure that the misconduct in the FOF is being addressed.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all of the investigations are identified and completed.  Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation.  Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

**Paragraph 310.**   *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

### 2.  The Independent Disciplinary Authority

**Paragraph 337.**   *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.     *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide*

WAI 34335

*the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.  *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

On January 9, 2018, an MCSO employee filed a grievance regarding a written reprimand he had received on December 17 2017. The Compliance Division forwarded the grievance and associated documents to the Monitoring Team. We reviewed the materials; and on January 31, 2018, submitted a report disagreeing with one of the findings of the Independent Disciplinary Authority. On February 2, 2018, the Monitor submitted an Amendment to the employee's written reprimand as a result of the findings.

WAI 34336

## Section 18:  Concluding Remarks

We assess compliance with 99 Paragraphs of the First Order, and 114 Paragraphs of the Second Order, for a total of 213 Paragraphs.  MCSO is in Phase 1 compliance with 73 of the First Order Paragraphs, or 85%; and 80 of the Second Order Paragraphs, or 77%.  MCSO is in Phase 2, or operational compliance, with 63 of the First Order Paragraphs, or 64%; and 85 of the Second Order Paragraphs, or 75%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 153 Paragraphs, or 81%; and in Phase 2 compliance with 148 Paragraphs, or 69%.

As mentioned earlier in this report, during our April site visit, MCSO and its vendor provided the preliminary findings of the then yet-to-be-published Third Traffic Stop Annual Report, which, like the first two reports, found the existence of bias on an organizational level in the conduct of traffic stops.  We are concerned that this finding of systemic bias continues unabated despite the efforts MCSO has expended in implementing the First and Second Orders' numerous requirements.  MCSO, with the assistance of the Parties, developed its Plan to Promote Constitutional Policing as one way to address this systemic issue.  The agency is working on a revision to this Plan, which it intends to publish after the beginning of its fiscal year in July.  The Plan remains of interest to the Parties and the Monitoring Team, and we will closely scrutinize the content of the submittal and MCSO's compliance in implementing its own Plan.

MCSO has made strides in its relationship with the Court-established Community Advisory Board (CAB) during this reporting period.   In addition to meeting the Court-ordered requirements that MCSO provide assistance and support to the CAB, MCSO has invited CAB members to observe training sessions, review policies, and meet with MCSO personnel to learn more about the operations of the agency.  During our April site visit, MCSO invited CAB members to address the audience at its quarterly community meeting.  The CAB member who spoke stressed the importance of MCSO creating an atmosphere in which community members have confidence in MCSO.  In May, the Sheriff met with the CAB to discuss matters of mutual concern, and we are hopefull that such communications will continue.  We are pleased that the Sheriff recently appointed a Deputy Chief as the CAB's organizational point of contact.

Also during this reporting period, MCSO made several transfers and promotions that directly impacted the organizational components that are primarily responsible for compliance with the Orders' requirements.  The captain overseeing the Bureau of Internal Oversight (BIO), which is comprised of the Early Intervention Unit (EIU) and the Audit and Inspections Unit (AIU), was transferred to a patrol assignment.  He was instrumental in the development of the Early Identification System, and clearly the person most knowledgeable about its various intricacies.  His replacement has done a fine job thus far, and he played an integral part in the supervisory discussions resulting from the Second Traffic Stop Annual Report.   In addition, the commanding officer of the Professional Standards Bureau (PSB) was promoted from Deputy Chief to Executive Chief and placed in charge of the Bureau of Compliance, where she oversees all of MCSO's compliance efforts.  Her replacement is a tenured captain in PSB who is familiar with the Bureau's operations.

WAI 34337

We also note that the new Executive Chief overseeing compliance, as well as the newly promoted Chief Deputy, both served in CID and have been involved in the Office's reform efforts for several years.  Their promotions and assignments demonstrate the importance the Sheriff places on achieving compliance with the Court's Orders.

WAI 34338

## Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| ACLU | American Civil Liberties Union |
|------|--------------------------------|
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FBI | Federal Bureau of Investigation |
| FTO | Field Training Officer |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |
| LOS | Length of stop |

WAI 34339

| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 34340