# SEVENTEENTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



## Reporting Period – Second Quarter 2018
## Chief (Ret.) Robert S. Warshaw
## Independent Monitor
## November 5, 2018

WAI 35397

# Table of Contents

Section 1:  Introduction……………………………………………...……3

Section 2:  Methodology and Compliance Summary…………………………..5

Section 3:  Implementation Unit Creation and Documentation Request………..8

Section 4:  Policies and Procedures……………………..………………….13

Section 5:  Pre-Planned Operations…………………………..…..………..40

Section 6:  Training…………………………………………………….....45

Section 7:  Traffic Stop Documentation and Data Collection………………...56

Section 8:  Early Identification System (EIS)………….………………..…...98

Section 9:  Supervision and Evaluation of Officer Performance…………….121

Section 10:  Misconduct and Complaints……………………………….....143

Section 11:  Community Engagement…………………………………….148

Section 12:  Misconduct Investigations, Discipline, and Grievances………..159

Section 13:  Community Outreach and Community Advisory Board………..241

Section 14:  Supervision and Staffing……………………………………..243

Section 15:  Document Preservation and Production………………………246

Section 16:  Additional Training…………………………………………..250

Section 17:  Complaints and Misconduct Investigations Relating to
            Members of the Plaintiff Class……………………………251

Section 18:  Concluding Remarks…………………………………….…268

Appendix:  Acronyms…………………………………………………269

WAI 35398

# Section 1:  Introduction

This is the seventeenth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Paul Penzone, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the second quarter of 2018.

On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  Our reports cover the additional requirements of the Second Order while continuing to document MCSO's compliance efforts with the First Supplemental Permanent Injunction/Judgment Order (First Order) issued in October 2013.  We will provide summaries of compliance with both Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  Not all are subject to our review.  For example, the Second Order outlines the duties of the Independent Investigator and the Independent Disciplinary Authority.  These are autonomous positions, not subject to oversight of the Court or its Monitor.

The Second Order also delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.

This report covers the period from April 1-June 30, 2018.  We continue to enjoy a close working relationship with the Sheriff; his upper command staff; and the Maricopa County Attorney's Office (MCAO), which has taken over exclusive representation of MCSO as it pertains to compliance.  We interact with the Court Implementation Division (CID) almost daily; and CID personnel continue to be responsive to our requests and facilitate the production of all compliance-related documents.

As documented in our recent quarterly status reports, MCSO completed the delivery of misconduct investigations training late last year.  We have noted a steady improvement in the quality of internal investigations conducted by both Professional Standards Bureau (PSB) personnel and those completed by Patrol supervisors, particularly since the completion of the training.  More importantly, we have noticed an increase in District Commanders addressing deficiencies in investigations before they are forwarded to PSB.  In the past, many deficient investigations were simply sent to PSB, only to be returned for corrections or additional investigative work.  Since all sworn personnel, including command officers, attended the training, they appear to have a better understanding of what is required in these investigations and are more thoroughly exercising their supervisory responsibilities.

WAI 35399

Throughout our tenure, we have stressed the importance of having sound written quality control procedures for the creation, handling, and transfer of traffic stop data.  After numerous data issues were encountered during the preparation of the Second Traffic Stop Annual Report (TSAR), MCSO finally developed these procedures, which, once adopted, greatly diminished the instances of flawed data.  However, in April, we received a routine traffic stop data sample in which nearly 75% of the data appeared to be inaccurate.  We discussed this issue extensively with MCSO, and eventually the problem was traced to a software change in the County Map Roll, one of the overlays for the traffic stop data.  The occurrence was not entirely negative; it exposed a flaw in the quality control procedures that MCSO committed to addressing in an updated version.

On May 24, MCSO published its Third TSAR, covering the period from July 1, 2016-June 30, 2017.  This report was issued much later than expected, again because of problems with the handling of the underlying data.  In this case, the issues were because of a lack of quality control procedures with MCSO's contracted vendor responsible for the various analyses.  The agency's contractual relationship with the vendor ended on June 30,,and so the vendor did not participate in our July site visit as is customary.   Several questions regarding the report's conclusions, particularly around issues associated with the length of traffic stops, remain unanswered because of the unavailability of the former vendor to fully participate in the discussions.  After the close of the reporting period, MCSO solicited bids and subsequently entered into a contractual relationship with a new vendor.   While MCSO is ultimately responsible for compliance with the Orders' requirements, we look forward to learning of any new insights a fresh set of eyes will bring to the process.

Despite some concerns with the data, the Third TSAR found similar results to the previous two analyses – that the issue of racial differences in post-stop outcomes is systemic and cannot be attributed only to a small number of deputies.  That said, the report identified several deputies which were outliers when compared to their geographic peers, and MCSO has begun the process of identifying and addressing those deputies who will be subject to discussions, building on the successes and lessons learned from the recently completed process associated with the Second TSAR.  We will comment in more detail on these issues in future reporting periods.

WAI 35400

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements of the requirements in the Order.  To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with the agency's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite.  We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases.  For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents.   For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable.  "In compliance" and "Not in compliance" are self-explanatory.  We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report.  We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

The tables below summarize the compliance status of Paragraphs tracked in this report.[1]  This is our eighth quarterly status report in which we report on MCSO's compliance with both the First and Second Orders.  During this reporting period, MCSO's overall Phase 1 compliance rate with the **First Order** remained the same, at 85%.  MCSO's overall Phase 1 compliance rate with the **Second Order** increased by one percentage point, to 78%.

---

[1] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure.  Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included.  Therefore, the number of Paragraphs included in the denominator totals 190 for Phase 1.  The number of Paragraphs included in the denominator totals 213 for Phase 2.

WAI 35401

During this reporting period, MCSO's overall Phase 2 compliance rate with the **First Order** increased by two percentage points, from 64% to 66%. MCSO's overall Phase 2 compliance rate with the **Second Order** increased by five percentage points, from 75% to 80%.

| Seventeenth Quarterly Status Report First Order Summary | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 14 | 1 |
| Deferred | 0 | 12 |
| Not in Compliance | 13 | 22 |
| In Compliance | 73 | 65 |
| **Percent in Compliance** | **85%** | **66%** |

| Seventeenth Quarterly Status Report Second Order Summary | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 9 |
| Deferred | 1 | 6 |
| Not in Compliance | 22 | 17 |
| In Compliance | 81 | 91 |
| **Percent in Compliance** | **78%** | **80%** |

WAI 35402

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 |
|---|---|---|---|---|---|---|---|
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% |

WAI 35403

# First Supplemental Permanent Injunction/Judgment Order

## Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III.  MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT (***Court Order wording in italics***)**

***Paragraph 9.  Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.***

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID).  As of this reporting period, CID has one captain, one lieutenant, six sergeants, two deputies, one management assistant, and one administrative assistant.  CID continues to be supported by MCAO attorneys, who frequently participate in our meetings and telephone calls with Division personnel.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application.   The Monitoring Team, the Plaintiffs, and the Plaintiff-Intervenors receive all files and documents simultaneously, with only a few exceptions centering on open internal investigations.  CID effectively facilitates the Monitoring Team and Parties' access to MCSO's personnel.

During this reporting period, we learned that CID created a page called the "*Melendres* Compliance Corner" on MCSO's website which provides information to the public about CID's role.  The webpage contains a historical overview of the case, the Monitor's compliance reports, and additional links to both the First and Second Orders.  The page also provides a link to information about the Immigration Stops and Detention Compensation Fund.  The webpage can be read in both in English and Spanish.

WAI 35404

***Paragraph 10.*** *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

As discussed above, during this reporting period, CID continued to be responsive to our requests.  CID also addresses with immediacy any issues we encounter in the samples we request – be they technical issues, missing documents, or other problems.  For example, several reporting periods ago, we faced problems downloading of voluminous documents, and raised this with CID.  CID now sends us these documents on flash drives for review.

In addition, MCSO has established a robust Bureau of Internal Oversight (BIO), which routinely audits the work products of the Office, particularly in the areas that directly affect compliance with the requirements of the Orders.  In many instances, BIO will review the same material we request in our samples, and BIO frequently notes – and addresses – the same deficiencies we identify in our reviews.

***Paragraph 11.*** *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

WAI 35405

On September 10, 2018, MCSO published its most recent quarterly report as required by this Paragraph.  The report covered the second quarter of 2018 – April 1-June 30, 2018.  For each section, MCSO provided an overview of the agency's activities working toward compliance.  For each Paragraph, MCSO offered comments on the compliance status; and in some instances, provided responses to concerns raised in our sixteenth quarterly status report, published on August 6, 2018.  MCSO's report, as is customary, included a table showing the compliance of the numbered Paragraphs, developed with the information provided in our previous quarterly status report.  MCSO did not assert Full and Effective Compliance, as defined in the First Order, for any of the Paragraphs.

The report noted that in June 2018, MCSO published its third agency-wide comprehensive Traffic Stop Annual Report (TSAR), covering the period from July 1, 2016-June 3, 2017.  MCSO stated that the TSAR showed improvements in a reduction in the likelihood of Hispanic drivers receiving a citation when compared to white drivers, and a decrease in the length of stop for Hispanic drivers.  It noted, however, that post-stop outcomes between races/ethnicities still show disparities; as well as some inconsistent patterns by some deputies.  MCSO indicated that its data collection process had significantly improved.

MCSO noted that during this reporting period, the MCSO Training Division continued to review and deliver Court Order-related training.  Training Division staff updated existing lesson plans for the 2018 training.  During this quarter, the MCSO Training Division finalized the 2018 Supervisor Responsibility: Effective Law Enforcement (SRELE), with the collaboration and input from the Parties and the Monitoring Team.  Moreover, during this quarter, the Training Division implemented the Field-Ride program, which will satisfy Step 6 of the Training Development Cycle.

The report also documented the Professional Standards Bureau's move into a new off-site facility, located at 101 West Jefferson Street in Phoenix.  This facility is separate from other MCSO facilities and allows improved access to the public to file complaints.  MCSO also contracted with a third-party vendor to develop the annual eight-hour in-service training to be delivered during this calendar year.  MCSO is working towards finalizing the PSB Operations Manual in order to achieve Phase 1 compliance with numerous Paragraphs.

Regarding community engagement, MCSO noted 153 events where public attendance totaled around 57,000.  The report also noted the Community Outreach Division's participation in the Pathways to Justice Career Summer Program, a three-week course that included the participation of MCSO, the Phoenix Police Department, and the Arizona Department of Public Safety.

WAI 35406

*Paragraph 12.   The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations.   The first assessment shall be conducted within 180 days of the Effective Date.   Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

See Paragraph 13.

*Paragraph 13.   The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination.   Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore.   The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore.   The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**Phase 1:**  In compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  In compliance

WAI 35407

CID and the Monitoring Team established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.

Consistent with this agreement, on September 15, 2017, MCSO filed with the Court its 2017 Annual Compliance Report covering the period of July 1, 2016-June 30, 2017.  We expect that MCSO will file its next report during the next reporting period.

WAI 35408

# Section 4:  Policies and Procedures

## COURT ORDER V. POLICIES AND PROCEDURES

*Paragraph 18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

*Paragraph 19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

**Phase 1:**  In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:**  In compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases.  First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order.  Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures.  Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs.  We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014.  Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September.  We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures.  In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19.  We included on this list policies that were not recently revised or currently under review, and we informed MCSO that it could achieve compliance with Paragraph 19 when it provided sufficient documentation of its completed review of all Patrol-related policies.

WAI 35409

In its response, MCSO noted that several policies were currently in compliance with the First and Second Orders.  However, MCSO also determined that several policies required changes to comport with the First Order, Second Order, or both.  During the last reporting period, MCSO published the last two outstanding policies (ED-3 [Review of Cases Declined for Prosecution], and GJ-3 [Search and Seizure]), placing it into compliance with this Paragraph.

**Paragraph 20.**  *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

**Paragraph 21.**  *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling.  The policy or policies shall, at a minimum:*

a.    *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.    *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.    *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.    *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.    *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

WAI 35410

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.
- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  Not applicable

MCSO has developed and published the policies required by Paragraph 21.  MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014.

MCSO's implementation of these policies is covered in other Paragraphs.


***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

To verify compliance with this Paragraph, we randomly select the personnel to be inspected during the first month of the reporting period.  We also inspect the Supervisory Notes on these same employees for the two remaining months of the reporting period.  This allows us to review all notes on individual employees for a full three-month period.  This methodology facilitates the review and evaluation of supervisors' interactions with employees, as to the reinforcement of policies prohibiting racial and bias-based profiling.  Compliance with this Paragraph is dependent on specific and articulated reinforcement from supervisors – not merely an entry that there is no indication of any discriminatory policing.

For the audit of Supervisory Notes of sworn personnel for this reporting period, we selected a random sample of 41 employees.  We reviewed Supervisory Notes for the selected employees to determine if they had received reinforcement of the policy reiterating that discriminatory policing is prohibited.  We found that all 41 of the selected employees had documentation of compliance with the requirements of this Paragraph.  For this reporting period, the compliance rate for sworn employees was 100%.  BIO Inspection Report BI2018-0081 noted the same compliance rate of 100%, but for 34 selected deputies.  Our reviews included seven supervisors, as well.

WAI 35411

For the audit of Detention Supervisory Notes for this reporting period, we randomly selected 35 employees. We reviewed the Supervisory Notes submitted for each month of the quarter, and found that two of the selected employees were on extended leave during this time period. Of the 33 remaining employees, 32 had an appropriate supervisory entry reiterating that discriminatory policing is unacceptable. For this reporting period, the compliance rate for Detention employees was 97%. BIO conducted an inspection of the Detention Supervisory Notes for the selected employees (BI2018-0042), and noted a compliance rating of 96.97%.

During our July site visit, MCSO proposed an alternative method of compliance with Paragraph 22. MCSO is revising CP-8 (Preventing Racial and Other Bias-Based Policing), and the 2018 Annual Combined Training (ACT) will contain a component on bias-free policing. In addition, MCSO is developing a video that will feature the Sheriff or his designee speaking on the subject of bias-free policing. Deputies will be required to view the video and document their participation via theHUB. We will continue to work with MCSO on this process to ensure that the requirements of this Paragraph are met as the Office transitions to more meaningful methods of compliance.

***Paragraph 23.*** *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

**Phase 2:** In compliance

BIO uses a randomizing program to select samples for each inspection. BIO reviews CAD messages in an effort to identify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits. In May 2016, a Monitoring Team member observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits. For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.

During this reporting period, MCSO submitted three CAD and Alpha Paging inspection reports, pursuant to our request for verification of compliance with this Paragraph. BIO inspected 23,375 CAD/Alpha Paging messages for April 2018, and reported a 100% compliance rate (BI2018-0052). BIO inspected 25,833 CAD/Alpha Paging messages for May 2018, and reported a 100% compliance rate (BI2018-0064). BIO inspected 21,998 CAD/Alpha Paging messages for June 2018, and reported a compliance rate of 100% (BI2018-0076).

WAI 35412

During this reporting period, MCSO submitted three email inspection reports, pursuant to our request for verification of compliance with this Paragraph. The number of emails reviewed is usually less than the total number of emails, due to the elimination of routine business-related and administrative emails such as training announcements and Administrative Broadcasts. For April 2018, the BIO inspection report (BI2018-0051) states that there were a total of 15,301 emails, of which BIO reviewed 8,842. The inspection found that 99.99% of the inspected emails were in compliance. One email was found to have contained inappropriate comments. One BIO Action Form was generated as a result of the violation. BIO inspected 8,048 of 9,567 emails for May 2018 (Inspection Report BI2018-0063), and reported a 100% compliance rate. For June 2018, BIO inspected 7,308 of 7,999 emails. The BIO inspection report (BI2108-0075) reported a 99.99% compliance rate. One employee was found to have sent an email that was not in compliance with MCSO policies, and as a result, one BIO Action Form was generated from the affected Division.

During this reporting period, BIO conducted facility inspections of the Lake Patrol District Office, the Court Operations Division, and the Special Investigations Division. On April 19, 2018, BIO conducted an inspection of the Lake Patrol District Office. The BIO inspection report (BI2018-0045) noted that three employee files contained personal information that should have been purged from the files. The inspection also found that periodic safety meetings and discussions with employees had not been properly documented. This portion of the inspection resulted in an 88% compliance rating. The property and evidence portion of the inspection found two items in the evidence refrigerator that had not been processed in a timely manner. The compliance rating for this portion was 95%. As a result of four deficiencies, the overall compliance rate was 91%.

On May 16, 2018, BIO conducted an inspection of the Court Operations Division. This Division provides custodial transport of inmates to all Superior and Justice Court appearances. On a weekly basis, Division employees escort approximately 2,000 inmates to 120 courtrooms throughout Maricopa County. With regard to administration and supervision, the inspection found that the quarterly vehicle inspections were not being properly documented. No deficiencies were found with the facility inspection. The property and evidence portion of the inspection determined that property and evidence was being properly impounded and stored. Inspection report BI2018-0057 yielded a compliance rate of 100%.

WAI 35413

On June 20, 2018, BIO conducted an inspection of the Special Investigations Division (SID). The SID conducts investigations into narcotics trafficking and money laundering, as well as other criminal activities. The inspection found that the facilities were secure, with access limited to assigned personnel. The quarterly vehicle inspection was listed as not applicable, since SID's vehicles are leased and the leasing company had recently inspected the vehicles. BIO recommended that SID conduct its own quarterly inspections and document its findings in Blue Team. The inspection found that two employee files had not been purged as required. The inspection also found that safety meetings and equipment inspections were not being properly documented. The inspectors noted that new employees assigned to the Division had not received additional training as required. The compliance rate for this portion of the inspection was 81%. The property and evidence inspection – which includes the Property Room, the interior and exterior of the facility, and vehicles – resulted in a 100% compliance rating. Inspection report BI2018-0069 noted an 88% overall compliance rating for SID.

The inspections of the listed facilities found that there was no evidence indicating that any of the facilities were used in a manner that would discriminate, or denigrate anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. We reviewed the Matrix Checklist used for these inspections, and it contains a specific question regarding the use of any Office or County equipment that would violate this Paragraph. During our July visits to Districts 1, 2, 3, 4, and 7, we observed no evidence to indicate a violation of this Paragraph.

In previous reports, we commented on the lack of timeliness of inspection reports, which was partly attributable to the learning curve of new personnel in BIO. We recognize the effort made by MCSO to achieve the timely completion and posting of BIO inspection reports. During this reporting period, we noted that the BIO website was well-organized; and all inspection reports required for our assessment of compliance were available for review.

**Paragraph 24.** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**Phase 1:**  In compliance

- GI-7 (Processing of Bias-Free Tips), published August 23, 2017.

**Phase 2:**  In compliance

MCSO created the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that any tips received by MCSO components be forwarded to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity,

WAI 35414

or service requested, and forwards it to the appropriate unit for action and response. In some cases, residents email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO forwards the information to the appropriate law enforcement agency and documents it in the SILO database. Generally, if there is any bias noted in the information received, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During this reporting period, the SILO Unit received 998 tips, which were classified and recorded according to the type of alleged violation or service requested. Our reviews indicate that a major percentage of tips are related to warrants, animal crimes, and drug- related offenses. The other two categories that result in large numbers of tips are "information only" and "other." The SILO Unit closed one tip, received in June, due to bias. The SILO Unit provided us with the information, pursuant to our standing document request. We reviewed the information and determined that MCSO followed proper procedures and closed the tip accordingly.

Our reviews of the documentation provided, pursuant to the requirements of this Paragraph, have not discovered any evidence of bias in the processing of tips. We have also determined that MCSO is independently corroborating information received through tips before it is acted upon, to ensure that there is an appropriate criminal predicate.


### b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement

**Paragraph 25.** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a. *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b. *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c. *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d. *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e. *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f. *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

WAI 35415

g.   *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed; h. require the duration of each traffic stop to be recorded;*

i.   *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j.   *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph.  The data required for verification to ensure compliance with these policies is captured by the TraCS system.  The system documents the requirements of the Order and MCSO policies.  MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information.  TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Form (VSCF), Vehicle Stop Contact Form Supplemental Sheet, Incidental Contact Sheet, Written Warning/Repair Form, Arizona Traffic Ticket and Complaint Form, Internet I/Viewer Event Form, Justice Web Interface Form, CAD printout, and any Incident Report generated by the traffic stop.  MCSO created many of these forms to capture the requirements of Paragraphs 25 and 54.

WAI 35416

During our previous site visits, we met with personnel from Arizona State University, MCSO's vendor, and reviewed the analysis of the traffic stop data that they presented. Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

Our review of a sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, 6, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. During our July 2018 site visit, we met with the commanding officers from Districts 1, 2, 3, and 7, who advised us that they had not received any complaints during this reporting period from Latino drivers alleging racial profiling. We interviewed the District Commanders and inquired if their respective Districts had received any complaints alleging selective enforcement targeting specific communities or enforcement based on race. None of the District Commanders were aware of any complaints alleging racial or ethnic-based traffic enforcement. Paragraphs 66 and 67 require an annual comprehensive analysis of all traffic stop data, which will more accurately determine if MCSO is meeting the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are the main causes of accidents, and should be the focus of traffic enforcement. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 54 stops for speed above the posted limit (51%); 14 stops for failure to obey official traffic control devices (13%); nine stops for failure to possess valid registrations or tags (9%); 11 stops for equipment violations (10%); nine stops for failure to possess valid registrations or tags (9%); and eight stops for other moving violations (8%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to make a determination if the stop is justified and fulfills the requirements of this Paragraph. When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify instances where the location of the stop

WAI 35417

contained on the VSCF and the location of the stop contained on the CAD printout are inconsistent.   Reviewing supervisors are not identifying and addressing this issue.   We recommend that reviewing supervisors closely review the VSCFs and CAD printouts and address such deficiencies.   MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community.   During our inspection, we document the location of every stop and note the GPS coordinates if available.   Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.   During our July 2018 visits to Districts 1, 2, 3, and 7, we inquired if the District Commanders had received any complaints from the public regarding MCSO enforcement activities in their communities.   None of the Districts had received any complaints with regard to racial or ethnic-based targeted enforcement.

MCSO is in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity.   During this reporting period's review of the sample of 105 traffic stops, we noted five instances where deputies contacted the passengers.

- In one case, the deputy stopped a Latina driver for operating a motor vehicle with one headlight.   The driver did not have a valid driver's license.   The Latina passenger was contacted, as she was the registered owner of the vehicle.   The vehicle was released to the passenger.

- In one case, the deputy stopped a white male driver for reckless driving.   The vehicle was occupied by six white male passengers, all of whom were under the age of 21.   The deputy contacted all six of the passengers as part of an investigation as to whether they had consumed alcohol.

- In one case, the deputy stopped a white male driver for failure to maintain lane of traffic.   The driver was arrested for driving under the influence.   The deputy contacted the white female passenger to provide her a courtesy ride home.

- In one case, the deputy stopped a white male driver for a stop sign violation.   Upon the stop, the white male passenger became highly agitated and fled the vehicle on foot.   The deputy learned from the driver, the passenger's father, that the passenger was autistic; the deputy requested additional deputies to the scene to assist.   The father of the passenger and the deputy were able to calm the passenger and get him to return to the vehicle.

- In one case, the deputy stopped a Latino driver for speeding.   The vehicle was occupied by one Latino passenger and two Latina passengers.   One of the Latina passengers assisted in interpreting Spanish to English, and vice versa, for the driver and the deputy.

WAI 35418

There was one case identified in the stops that we reviewed for Paragraph 54.k in which the passengers were contacted. In this case, the deputy stopped a Latino driver for speeding. The deputy smelled the odor of marijuana and investigated. The driver was subsequently arrested for driving under the influence. During the investigation, the deputy approached the front seat Latina passenger after he was informed by the driver that the passenger has a medical marijuana card and was in possession of marijuana. Once it was determined that the passenger did not possess a medical marijuana card, she was subsequently arrested for possession of marijuana. The deputy also contacted two Latina passengers who were in the rear seat of the vehicle to advise them that the driver was being arrested and to provide them a courtesy ride to a MCSO facility to await private transportation.

There were 30 cases identified in the stops that we reviewed for Paragraph 54.g. in which the passengers were contacted. In five cases, the passengers contacted the deputy to inform them that they were the registered owners of the vehicles. In one case, the passenger contacted the deputy to inform him that the registered owner was her relative. In two cases, the deputies contacted the passengers because they were not wearing seat belts, as required by state law. In one case, the contact with the passenger was due to the deputy approaching the passenger side of the vehicle, as a safety precaution, to request information from the driver. In one case, the deputy contacted the passenger to inform him that the driver was arrested and that the vehicle was being towed. In one case, the passenger offered assistance in producing vehicle paperwork that was requested from the driver by the deputy. In one case, the passenger engaged in general conversation with the deputy. In the remaining instances where MCSO made contact with passengers, the following occurred.

- In one case, the deputy stopped a Latino driver for transporting a child under the age of five in a motor vehicle without the use of a child restraint system. The Latina passenger had the Latino child seated on her lap. The deputy informed the Latina passenger that the child must be seated in a child restraint system.

- In one case, the deputy stopped a white male driver for speeding. Two white female passengers occupied the vehicle. One of the passengers informed the deputy of persons driving in excess of the speed limit in her neighborhood.

- In one case, the deputy stopped a Latina driver for driving with one headlight. The Latina passenger responded to some of the deputy's inquiries that were directed toward the driver and informed the deputy that she was the mother of the driver.

- In one case, the deputy stopped a white male driver for driving with only one taillight. The deputy asked the white female passenger why she had a backpack with her. In this case, the explanation for the contact provided by the deputy was very limited. Based on the explanation provided, the Monitoring Team is not able to determine if the contact with the passenger was necessary.

- In one case, the deputy stopped a white male driver for driving without a license plate light. A white female occupied the vehicle. The deputy made contact with the passenger as he showed the driver and passenger that the license plate light was not operational.

WAI 35419

- In one case, the deputy stopped a Latina driver for a stop sign violation.  The driver did not have a driver's license on her person.  Two Latino passengers occupied the vehicle.  One of the passengers, the son of the driver, made contact with the deputy.  The passenger advised the deputy that he could walk the short distance to the driver's residence to produce her international driver's license.  The passenger returned and provided the deputy with the international driver's license.

- In one case, the deputy stopped a Latino driver for failure to maintain lane of traffic.  A white female, two white males, and a Latina passenger occupied the vehicle.  The driver was arrested.   The deputy made contact with the Latina passenger, who was the registered owner of the vehicle, to determine if she could drive the vehicle.  It was determined that she had been consuming alcohol.  The deputy contacted a white male passenger to determine if he had a valid driver's license.  It was determined that the white male passenger was a runaway juvenile, and he was taken into custody.

- In one case, the deputy stopped a Latino driver for failure to maintain lane of traffic.  The driver was found to have an expired Mexican driver's license.  The deputy contacted the Latina passenger to verify whether she had a valid driver's license before allowing her to drive the vehicle.

- In one case, the deputy stopped a white male driver for failure to maintain lane of traffic.  The driver was arrested for driving under the influence.  The vehicle was occupied by two white males, one of whom was a juvenile.  The deputy noted on the VSCF that he made contact with the juvenile to notify the juvenile's parents.  The deputy noted on the VSCF that he made contact with the white adult male passenger because he was making "furtive movements."

- In one case, the deputy stopped a white female for speeding.  The vehicle was occupied by a Black female passenger and three white male passengers.  The deputy advised the driver that he smelled alcohol emanating from the passenger compartment.  The deputy investigated all of the occupants of the vehicle for underage consumption of alcohol.  It was determined all three white male passengers were the age of 21.  The Black female passenger, who was determined to be 20 years of age, was issued a citation for minor in possession of liquor.

- In one case, the deputy stopped a Latino driver for passing in a "no passing" zone.  The vehicle was occupied by two Latinos, one of whom was a juvenile.  The driver was arrested for driving with a suspended driver's license.  The deputy made contact with the juvenile to ensure he was turned over to his mother who was at the scene in a different vehicle.

- In one case, the deputy stopped a Latino driver for passing in a "no passing" zone.  The vehicle was occupied by a Latino passenger and a Latina passenger.  The deputy made contact with both of the passengers after he observed litter being tossed from the vehicle just prior to the stop.

- In one case, the deputy stopped a white male for speeding and driving without headlights.  The driver did not have a valid driver's license.  The vehicle was occupied

WAI 35420

by four white males, one white female and one Black female, all of whom were juveniles. The deputy requested the ages of the passengers and, due to it being late at night, ensured that all of them were released to their parents. The deputy did not provide the passengers with Incidental Contact Receipts as required by policy.

- In one case, the deputy stopped a Black female for white light to rear of vehicle. The deputy indicated that he detected the smell of alcohol emanating from the passenger compartment of the vehicle. After investigating the driver for signs of impairment, with negative results, the deputy contacted the 18-year-old Black female passenger to determine if she had consumed alcohol. The deputy had the passenger perform a preliminary breath test, which revealed no evidence of alcohol consumption. The deputy did not provide the passenger with an Incidental Contact Receipt as required by policy.

- In one case, the deputy stopped a white male for an expired registration. The vehicle was occupied by a white male passenger. The deputy recognized the passenger as being a suspect in a criminal case. The passenger was arrested.

- In one case, the deputy stopped a white male for speeding. The driver's license was suspended. The passenger, an Asian or Pacific Islander female, requested that the deputy not tow the vehicle.

- In one case, a Latina driver was stopped for passing in a "no passing" zone. The vehicle was occupied by a Latina passenger. The deputy noted on the VSCF that he made contact with the passenger to obtain "her name for the report." In this case, the deputy requested and obtained the passenger's identification and listed her name on the VSCF. During our review of the BWC video-recording, we also noted that the passenger provided assistance in interpreting from English to Spanish for the driver as the deputy communicated with the driver. The deputy did not provide the passenger with an Incidental Contact Receipt as required by policy.

- In one case, the deputy stopped a Latino driver for speeding. The vehicle was occupied by a Latino passenger, a Latina passenger, and an unidentified infant (unknown gender and race or ethnicity). The deputy arrested the driver for a warrant and conducted an investigation for driving under the influence. The deputy made contact with the Latina passenger to determine if she had a driver's license so that she could possibly drive the vehicle from the scene. The deputy made contact with the Latino passenger to inquire his age after he observed him with a tobacco product. The deputy indicated that the Latino passenger appeared as though he may have been underage.

As noted in some of the cases above, deputies have not been consistent in preparing and providing passengers with Incidental Contact Receipts during traffic stops in which the passenger is contacted and asked by the deputy to provide identification. Supervisors should identify such omissions during their reviews of the VSCFs and take corrective action.

We reviewed the demographic data of Maricopa County (according to 2014 U.S. Census data, 30.3% of the population is Latino), and found that the ratio of Latino drivers stopped during this reporting period was lower than in past reporting periods in comparison to the ethnicity of the

WAI 35421

population in the County.  (See Paragraph 54.e.)  Twelve (23%) of the 37 stops where passenger contacts occurred involved Latino drivers.  A review of citizen complaints for this reporting period did not reveal any allegations against MCSO personnel that would indicate that deputies were conducting pre-textual traffic stops to question drivers or passengers regarding their ethnicity, or to determine whether they are unlawfully present in the country.  MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country.

During this reporting period, we observed that 30 of the 105 stops occurred during nighttime hours.  During our visits to Districts 1, 2, 3, and 7, in July 2018, we inquired if any Latino drivers or passengers made any complaints regarding deputies using particular tactics or procedures to target Latinos.  None of the personnel we interviewed were aware of any complaints alleging discrimination or the targeting of Latinos in traffic enforcement.  Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County.  MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity.  We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field.  We also reviewed body-worn camera recordings of deputies making traffic stops.  The methodology that we employed to select our cases is described in detail in Section 7.  In the cases we reviewed, the CAD audio recordings and the body-worn camera video revealed that deputies were not making traffic stops using tactics based on race or ethnicity.  MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications.  When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio recorded.  (See Subparagraph 54.e.)  We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop.  Through our reviews of BWC recordings and CAD printouts, we verified that the reason for the stop was voiced prior to making contact with the drivers in 30 of the 30 cases we reviewed.  For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to making contact with the violator.  In all 75 stops, the deputy properly advised dispatch the reason for the stop.  MCSO is in compliance with this Subparagraph.

WAI 35422

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of five questions on the VSCF to document the circumstances that might require a stop to be prolonged. In our review of 105 traffic stops, we determined that MCSO documented four stops that were prolonged. In each of the stops, the responses to the five questions provided an adequate explanation for the duration of the stop. The particulars of these stops are as follows:

- A white female driver was stopped for driving with an expired license plate. The vehicle was occupied by a white female passenger. The driver's license was suspended and the license plate on the vehicle was altered. The deputy impounded the vehicle and seized the driver's license and placed two license plates on evidence. The driver was issued a citation.

- A white male driver was stopped for driving with an expired registration. During the stop, the deputy indicated on the VSCF that he experienced technological problems with the TraCS system, which rebooted before it was operational. The driver was issued a citation.

- A white female driver was stopped for driving with an expired registration. The driver's license was suspended. The deputy impounded the vehicle and seized the driver's license. The vehicle was occupied by a white male passenger and a Latina passenger. The deputy issued the driver a citation.

- A Latina driver was stopped for driving without taillights. The deputy indicated on the VSCF that he experienced technological issues with the scanner. The vehicle was occupied by a Latina passenger. The deputy issued the driver a warning.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in 104 of the 105 traffic stops. In one case, the time in the termination of the stop in the CAD system did not match the termination time on the VSCF; there was a 10-minute time difference. We will follow up with MCSO on this case. MCSO is in compliance with this Subparagraph, with 99% compliance.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO have agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures), most recently amended on June 14, 2018, provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this

WAI 35423

reporting period's review of the sample of 105 traffic stops, there were three drivers who did not present a valid driver's license to deputies.  Two of the cases involved a Latino driver.  The three cases are described in detail below:

- A Latina driver was stopped for driving with one headlight.  The driver did not have any identification on her person, and did not have a valid driver's license.  The vehicle was released to the Latina passenger, who was the registered owner of the vehicle.  The driver was issued a citation and released.

- A white female driver was stopped for driving without a light on her license plate.  The driver did not have any identification on her person.  The driver was issued a citation and released.

- A Latino driver was stopped for speeding.  He did not have any identification on his person.  The driver was issued a citation and released.

In our review of the sample of cases in relation to Paragraphs 25.d. and 54.g. passenger contacts, there was one case where the deputy made contact with a 17-year-old white male passenger for failure to wear a seat belt and requested his identification.  The passenger indicated that he did not have identification on his person.  During the deputy's interaction with the passenger, the deputy advised the passenger to carry identification on his person in the future.  The passenger was issued a citation for the seat belt violation.  In addition to the 17-year-old white male passenger, this case involved a white female driver and a Latino passenger.  The driver was issued a citation for speeding.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.  EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification.  During this reporting period's review of the sample of 105 traffic stops, we did not identify any cases where a deputy requested the Social Security Number or card of a driver.

MCSO remains in compliance with this Subparagraph.

**Paragraph 26.**   *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.   *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.   *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.   *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

WAI 35424

d.    require Deputies to notify Supervisors before effectuating an arrest following any
immigration-related investigation or for an Immigration-Related Crime, or for any
crime by a vehicle passenger related to lack of an identity document;

e.    prohibit the use of a person's race or ethnicity as a factor in establishing reasonable
suspicion or probable cause to believe a person has, is, or will commit a crime, except
as part of a reliable and specific suspect description; and

f.    prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or
arrests (though this requirement shall not be construed to prohibit the MCSO from
reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness
or whether the Deputy may be engaging in unconstitutional policing).

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently
amended on January 11, 2018.

**Phase 2:**  In compliance

MCSO did not report any immigration-related arrests or investigations during this reporting
period.  There was one arrest made in May for lack of identity documents, as explained below.
There were no arrests or investigations for misconduct with weapons.  MCSO reported no
arrests in April or June that would fall under the reporting requirements of this Paragraph.  The
incident reported in May involved an individual who was stopped for a traffic violation.  After
the traffic stop, the subject did not provide a driver's license; but verbally identified herself with
a fictitious name and date of birth.  While the deputy attempted to verify the subject's identity,
the subject fled on foot.  The individual was apprehended and subsequently charged with
several violations, including not having a valid driver's license and reporting false information
to a law enforcement officer.

We also received a booking list and a criminal citation list for each month of this reporting
period.  From each list, we selected a 10% random sample of incidents.  In total, we reviewed
64 incidents resulting in arrest and 77 incidents in which criminal citations were issued.  In
addition, we reviewed 275 Incident Reports for the quarter.  All of the documentation we
reviewed during this reporting period indicates that MCSO is in compliance with this
Paragraph.

We carefully review field interviews and contacts with members of the community to assess
compliance with Paragraph 26.  These types of contacts, that do not involve traffic stops, are
being documented in Non-Traffic Contact Forms.  For this reporting period, we reviewed 79
NTCFs.  Our reviews of the NTCFs for this reporting period did not reveal any issues of
concern.

WAI 35425

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

*Paragraph 27.  The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**Phase 1:**  In compliance

MCSO asserts that it does not have an agency LEAR policy.  We have verified, through our document reviews and site compliance visits, that MCSO does not have a LEAR policy.

**Phase 2:**  In compliance

*Paragraph 28.  The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.    *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.    *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;*

c.    *prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

d.    *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);*

e.    *prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

f.    *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable*

WAI 35426

*suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

g.   *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

h.   *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

During this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests for any immigration-related investigations, or for any immigration-related crimes.  The reviews of documentation submitted for this reporting period indicate that MCSO has complied with the reporting requirements related to Paragraph 28.  In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we monitor deputies' actions to verify compliance with this Order.  In addition to documentation provided in response to this Paragraph, our reviews of documentation provided for other Paragraphs of this Order have found no evidence to indicate a violation of this Paragraph.  In total, we reviewed 64 Arrest Reports, 77 criminal citations, 165 traffic stops, 79 NTCFs, and 275 Incident Reports for this reporting period and found no issues of concern, as it relates to this Paragraph.

WAI 35427

*e. Policies and Procedures Generally*

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

See Paragraph 30.

**Paragraph 30.** *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenors with drafts of its Order-related policies and procedures prior to publication, as required by the Order. We, the Plaintiffs' attorneys, and the Plaintiff-Intervenors review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and comport with current professional standards. Once drafts are finalized, incorporating the feedback of the Plaintiffs' attorneys, the Plaintiff-Intervenors, and the Monitoring Team, MCSO provides them to the Monitoring Team for final review and approval. As this process has been followed for the Order-related policies published thus far, MCSO is in compliance with this Paragraph.

**Paragraph 31.** *Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

WAI 35428

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via theHUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented over one year ago to replace its E-Policy system.  Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly, but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued (or issued revisions of) 18 Order-related policies, including: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); EA-3 (Non-Traffic Contact); EA-11 (Arrest Procedures); EB-2 (Traffic Stop Data Collection); EB-7 (Traffic Control Services); ED-2 (Covert Operations); GB-2 (Command Responsibility); GC-12 (Hiring and Promotional Procedures); GC-16 (Employee Grievance Procedures); GC-17 (Employee Disciplinary Procedures); GE-3 (Property Management and Evidence Control); GF-3 (Criminal History Record Information and Public Records); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GI-1 (Radio and Enforcement Communications Procedures); GJ-33 (Significant Operations); and GM-1 (Electronic Communications and Voice Mail).   MCSO also published the Compliance Division Operations Manual.

During this reporting period, MCSO also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders.

During our July 2018 site visit, MCSO updated us on the status of its implementation of theHUB.  As noted above, theHUB replaced E-Policy, after several delays related to licensing and other technical issues, in July 2017.  Initially, MCSO intended to continue using E-Policy to distribute policies mandated by the Orders, and to distribute non-Court-mandated training via theHUB.  However, during our January 2018 site visit, Training Division personnel reported that MCSO would soon begin using theHUB for distributing Court-mandated policies as well. During the last reporting period, in March, MCSO officially made this change.  During our July site visit, Training Division personnel advised us that following a few initial technical problems, this transition has mostly been smooth.

WAI 35429

***Paragraph 32.*** *The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed more than 675 administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to observe deficiencies in both the investigations and the associated documentation, but have also continued to note overall improvement.

During each site visit, we meet with PSB and District and Division Command personnel to provide them with information regarding the cases that we find to be deficient in structure, format, investigation, or reporting requirements. We also highlight those cases we find to be properly investigated and in full compliance with Order requirements. In 2016, PSB developed and implemented the use of an investigative checklist and specific format for the completion of internal investigations. MCSO has trained all supervisors who conduct investigations in the use of these documents. Since June 1, 2016, the use of these investigative protocol documents has been required for all administrative investigations.

Revised policies related to internal investigations and the discipline process were finalized and implemented on May 18, 2017. GC-17 (Employee Disciplinary Procedures) was again revised in April 2018. PSB personnel are currently revising GH-2 (Internal Investigations) and the investigative checklist and format. We and the Parties have reviewed the proposed revisions and provided comments and recommendations. Our Team supports the proposed revisions.

WAI 35430

While we continue to observe improvement in those investigations we review for this Paragraph, we are still reviewing cases that MCSO has not properly and thoroughly investigated. We continue to note concerns in our reviews, including: failure to interview all parties; failure to provide adequate detail in investigative reports; improper findings; and numerous administrative errors. The concerns we have previously had with failure to audio- or video-record interviews, and failure to attempt to conduct in-person interviews, did not occur during this reporting period. There has also been significant improvement in timely requests for extensions when appropriate.

During our site visits, we meet with PSB to discuss our concerns with the overall quality of administrative investigations, and provide specific case examples from the Paragraph 32 submissions that illustrate these concerns. PSB personnel have remained responsive to our feedback, and the investigations they submit for compliance with this Paragraph continue to remain at or near full compliance. Their reviews of investigations conducted by District personnel continue to be thorough and have identified appropriate concerns.

We have seen many improvements in those investigations conducted at the District level, but we continue to observe many deficiencies in the investigations they conduct. Investigations are still being returned by PSB after review for additional follow-up or corrections. This review by PSB continues to allow some District cases to be near full compliance when they are finalized. However, as we have noted in previous reports, it continues to delay the timely completion of many of these same investigations. PSB continues to assign liaison personnel to each District to provide assistance while the investigations are underway. While we have noted the positive effects of PSB's efforts to assist investigators in the Districts, the time commitment involved with conducting these reviews results in significant personnel hours being dedicated to this effort by PSB personnel.

During our District visits in July 2018, members of our Team spoke to sworn supervisors and command personnel in Districts 1, 2, 3, and 7 about internal investigations. As has been the case in prior District visits, those we spoke to provided positive feedback on the 40-hour Misconduct Investigative Training that was completed in late 2017, though some indicated they believe additional training is still necessary. They also continued to note their appreciation for the assistance of PSB. The time required to complete administrative investigations continues to be a concern for District personnel; but we noted that some personnel in the Districts believe that as they gain experience in conducting these investigations, it has becoming easier to complete them and they are better able to manage the time commitment.

As in prior District visits, during our District visits in July 2018, we provided feedback to the supervisory personnel present at the meetings regarding our reviews of internal affairs investigations and areas where we see the need for improvement. We also asked District Captains and lieutenants how they are addressing any deficient investigations now that training has been completed. Those who have identified concerns with investigations completed by their personnel informed us that they are using memorandums of concern, monitoring by the supervisor, coaching, training, and mentoring to assist their personnel in improving the quality of their administrative misconduct investigations. This is consistent with what we are seeing in the monthly document submissions from MCSO that we have been receiving since March 2018.

WAI 35431

We have found that these submissions document appropriate actions, and we agree with the current methods MCSO is using to assist personnel. If employees who have been identified as needing assistance do not improve after interventions occur, we expect that MCSO will take additional actions.

During the last reporting period, we reviewed all 69 administrative misconduct investigations submitted for compliance with this Paragraph. Of the 15 conducted by PSB, 93% complied with all investigative and administrative requirements over which the PSB Commander has authority. Of the 43 conducted by Districts, 41% were in compliance with requirements of the Order.

During this reporting period, we reviewed all 28 administrative misconduct investigations submitted for compliance with this Paragraph. PSB conducted 11 of these investigations, and District personnel conducted the remaining 17. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. There were 55 potential policy violations included in the 28 cases. Twelve of the investigations resulted from external complainants and 16 were internally generated. All 28 investigations were both initiated and completed after July 20, 2016. Twenty-one of the 28 were both initiated and completed after the new investigation and discipline policies became effective in May of 2017. Only two were both initiated and concluded after the completion of the 40-hour Misconduct Investigative Training that was completed in late 2017.

Of the 28 administrative cases we reviewed for this Paragraph, 23 resulted in sustained findings against one or more employee or volunteer. We concur with all of the sustained findings, and concur with the final discipline imposed in 21 of the 23 cases. The discipline included: four coachings; seven written reprimands; 12 suspensions of eight hours or more; and one dismissal. In all of these cases, the PSB Commander properly identified the category and offense number, as well as the presumptive range of discipline. We agree with his decisions in all 28 cases.

There were four cases we reviewed for compliance with this Paragraph where the Appointing Authority mitigated the presumptive discipline. In all four cases, the Appointing Authority assessed discipline that fell within the range, but was not the presumptive discipline established in the policies revised in May 2017. In two of the cases, we disagree with the decision to mitigate the discipline and do not believe adequate justification existed to do so. In the other two cases, we believe the facts of the investigation, the employees' work history, and the justification provided by the Appointing Authority support the decision to mitigate the discipline; and we agree with the decision to do so.

All 28 cases we reviewed for this Paragraph were completed on or after July 20, 2016. Of the 11 investigations conducted by PSB, eight were not completed within the 85-day timeframe. All of these investigations contained a request for, and an authorization of, an extension. Seven of the 17 investigations conducted at the District level were not initially completed and submitted to PSB for review within the required 60-day timeframe. All included an appropriate request for, and an authorization of, an extension. We will continue to reinforce that these extensions need to be authored and approved when appropriate.

WAI 35432

All 11 administrative investigations submitted for this Paragraph and conducted by PSB were completed after July 20, 2016. We continue to find that PSB investigations are thorough and well-documented. Ten (91%) of the 11 cases PSB investigated for compliance with this Paragraph were in compliance with all investigative and administrative requirements. One case was not compliant, only because the initial letter to the complainant was not sent in a timely manner. Investigations by PSB continue to be near full compliance.

District personnel outside of PSB conducted 17 of the investigations MCSO submitted for review for this Paragraph. All were completed after July 20, 2016. We found 10 (59%) in compliance with all investigative and documentation requirements. This is a notable improvement from the 41% compliance finding we noted in the last reporting period. We have some concerns with the seven remaining investigations. The concerns we identified included: improper findings; failure to interview all parties; lack of detail in the report; and numerous administrative errors. All were returned to the Districts by PSB for additional investigation or corrections. In all seven of these investigations, we believe that District Command personnel could, and should, have identified the investigative and procedural deficiencies prior to forwarding the cases to PSB. We noted that all but one of the seven investigations that were not compliant were both initiated and completed prior to the misconduct investigation training conducted in late 2017. Those cases completed after January 1, 2018 show significant improvement compared to those completed prior to the training. While MCSO still falls short of compliance in those investigations conducted in the Districts, the quality of the investigations is continuing to improve.

Our review of cases submitted for this Paragraph indicates a continuing effort by PSB staff to complete proper investigations, and assist District personnel in completing their internal investigations. PSB investigators are generally completing proper investigations in accordance with this Paragraph, and we are confident that they will continue to do so. We have also noted significant improvement in those cases investigated by District personnel.

All supervisors who conduct administrative misconduct investigations at the District level have been trained in their proper completion. We expect that we will continue to note improvement in the completion and review of misconduct investigations by District personnel during the next reporting period, and that supervisory and command personnel will properly address any deficiencies they identify.

**Paragraph 33.** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 35433

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements and are discussed in Paragraphs 275-283.

During the last reporting period, we reviewed seven investigations submitted in compliance with this Paragraph. We found five of these investigations to be compliant with the requirements of this Paragraph. In one of the seven total cases, MCSO failed to interview all parties involved; and in a second, MCSO failed to complete a proper extension request. We brought these deficiencies to the attention of PSB during our April 2018 site visit. As a result of the deficiencies identified in this reporting period, we advised MCSO that if deficiencies continued, we would withdraw Phase 2 compliance.

During this reporting period, we reviewed one administrative misconduct investigation submitted in compliance with this Paragraph. This complaint was investigated by PSB. It was initiated after July 20, 2016, but prior to May 18, 2017. The investigation involved a sworn employee who was sustained for misconduct, resulting in an eight-hour suspension. In addition to the suspension, the Training Division facilitated the deputy's attendance at training specific to biased policing and decision-making. We found the investigation to be compliant, and MCSO remains in Phase 2 compliance with this Paragraph.

While biased policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, we note here that MCSO did not complete any investigations that were determined to be Class Remedial Matters (CRMs) during this reporting period.

*Paragraph 34.  MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews.  MCSO shall revise any deficient policy as soon as practicable.*

**Phase 1:** In compliance

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

**Phase 2:** In compliance

MCSO now appropriately treats their policies and procedures as living documents. MCSO schedules and conducts annual written inspections, guided by GA-1 (Development of Written Orders). These reviews ensure effectiveness and consistency with Constitutional policing, current law, professional standards, and any Court Order or Judgment. MCSO documents each examination; and after we and the Parties evaluate them, our Team approves the policies.

WAI 35434

During this reporting period, 12 (25%) of the 48 required policies received their annual review. These policies include: CP-2 (Code of Conduct); DJ-3 (Inmate Grievance Procedures; EA-3 (Non-Traffic Contact); GC-7 (Transfer of Personnel); GF-5 (Incident Report Guidelines); GG-1 (Peace Officer Training Administration); GG-2 (Detention/Civilian Training Administration); GH-2 (Internal Investigations); GH-4 (Bureau of Internal Oversight); GH-5 (Early Information System); GJ-24 (Community Relations and Youth Programs); and GM-1 (Electronic Communications and Voice Mail).

WAI 35435

## Section 5: Pre-Planned Operations

*Paragraph 35.   The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**Phase 1:**  In compliance

- Special Investigations Division Operations Manual, currently under revision, though the proposed revisions do not affect the language pertaining to this Paragraph.

- Special Investigations Division Organizational Chart, most recently amended on April 10, 2017.

- Memorandum from Executive Chief Trombi to Deputy Chief Lopez directing the elimination of the Criminal Employment Unit, dated January 6, 2015.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart.  The Human Smuggling Unit (HSU) was also disbanded and personnel reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations.  The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported that it disbanded the Anti-Trafficking Unit and formed a new unit, the Fugitive Apprehension Investigative Team (FAIT), in April 2017.  The primary mission of FAIT is to arrest subjects with outstanding felony warrants.  We reviewed FAIT's mission statement and objectives, as well as the organizational chart for the Special Investigations Division.  MCSO has removed the ATU from the organizational chart, and the mission of FAIT does not include any reference to the enforcement of Immigration-Related Laws.  MCSO is revising the Special Investigations Division Manual to formally reflect this change, as well as others.

The revised organizational chart for SID and documentation provided by MCSO regarding the implementation of FAIT support that the ATU no longer exists, and that there are no specialized units in MCSO that enforce Immigration-Related Laws.

While MCSO remains in compliance with this Paragraph based on documents we have previously received and reviewed, we will confirm during the next reporting whether the revisions to the Special Investigations Division Operations Manual have been made.

WAI 35436

*Paragraph 36.  The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion.  For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members.  That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since the requirements for conducting significant operations were implemented, MCSO has reported conducting only one significant operation that invoked the requirements of this Paragraph.  "Operation Borderline" was conducted from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County.  MCSO met all of the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media, and requested details on this operation from MCSO.  After reviewing the documentation provided by MCSO, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media.  According to media reports, this was a two-week operation conducted by a special operations unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County.  We requested all documentation regarding this operation for review.  The documentation indicated that this operation was conducted from October 17-23, 2016.  The documentation provided by MCSO was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to significant operations.  The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph.  We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

We continue to review documentation submitted for this Paragraph by all Districts, the Enforcement Support Division, and the Investigations Division on a monthly basis.  During this reporting period, and since October 2014, MCSO continues to report that it has not conducted any additional significant operations.  In addition, we have not learned of any potential significant operation through media releases or other sources during this reporting period.  We will continue to monitor and review any operations we become aware of to ensure continued compliance with this and other Paragraphs related to significant operations.

WAI 35437

*Paragraph 37.  The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.  In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.  Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

In late 2014, we reviewed all the documentation submitted by MCSO regarding the significant operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.


**(Note: Unchanged language is presented in *italicized font*.  Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.  If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.   *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.   *information that triggered the operation and/or selection of the particular site for the operation;*

c.   *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.   *documentation of command staff review and approval of the operation and operations plans;*

e.   *a listing of specific operational objectives for the patrol;*

f.   *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.   *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

WAI 35438

h.   *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.   *arrest lists, officer participation logs and records for the patrol; and*

j.   *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one significant operation, "Operation Borderline," in October 2014.  At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports.  MCSO was in full compliance with this Paragraph for this operation.

During this reporting period, MCSO again reported that it did not conduct any significant operations invoking the requirements of this Paragraph.


**Paragraph 39.**  *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol.  The community outreach meeting shall be advertised and conducted in English and Spanish.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO again reported that it did not conduct any significant operations that invoked the requirements of this Paragraph.

WAI 35439

***Paragraph 40.*** *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**Phase 1:**  In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph. We verified that MCSO employed the appropriate protocols and made all required notifications. MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or significant operations involving "the arrest of 5 or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month. MCSO began including this information in its November 2015 submission and continues to do so.

MCSO continues to report that it has not conducted any operations that meet the reporting requirements for this Paragraph since October 2014.

WAI 35440

## Section 6: Training

**COURT ORDER VII.  TRAINING**

### a.  General Provisions

*Paragraph 41.  To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

*Paragraph 42.  The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2017.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:**  Not in compliance

MCSO continues to work to correct previously identified deficiencies with individuals selected as FTOs who do not meet the criteria of GG-1.  The Training Division is now maintaining an internal tracking document for FTOs.  This document captures the five criteria requirements of GG-1 for each individual FTO and their status.  Individuals lacking a General Instructor certificate have been identified.  Assignment of these individuals to the General Instructor training is predicated upon AZ POST providing available positions.  During this reporting period, six current FTOs completed their General Instructor School.  During and after our July site visit, we discussed with MCSO better ways to document the required PSB reviews, both for selection to be an FTO and for the review required prior to being assigned an Officer in Training (OIT).  In order to improve the selection system, the Training Division must conduct a thorough review of the documents submitted by supervisors.  Issues such as inadequate EPAs and supervisor recommendations are easily remedied.  As a result of these recent steps, the Training Division has identified 27 individuals who meet all criteria of an FTO and are capable of being assigned an Officer in Training (OIT).  We will continue to monitor FTO files for consistency with the requirements of GG-1; and once current and new FTOs conform to these requirements, our concerns will be addressed.

During our July site visit, the Training Division advised it had identified and documented 97 individuals meeting all instructor requirements of GG-1.  That number represents a significant reduction from the 145 sworn personnel previously designated on the certified instructor list.  We note that PSB completed required reviews for 97 sworn instructors during this quarter.  This

WAI 35441

indicates that an additional 49 instructors require annual PSB reviews. We identified five individuals who were proposed as Supervisor's Responsibilities Effective Law Enforcement (SRELE) instructors who were not included on either list, but yet were approved as instructors. During our July site visit, we requested and reviewed additional documentation, which indicated that the five individuals had inadvertently been left off of the annual review request but had received a review in June.

Previously we have discussed improvements to the train-the-trainer program with MCSO. During this reporting period, we did not see any documentation of changes to the manner in which these programs are delivered. We encourage MCSO to document improvements to the instructor selection process.

***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

We verify compliance with this Paragraph by reviewing all completed tests, documentation of all failures, and all failure remediation efforts for each Order-related class delivered during each reporting period.

During this reporting period, MCSO delivered the following training: 2017[2] Annual Combined Training (ACT); Blue Team (BT); Body-Worn Camera (BWC); Detention, Arrests, and Immigration-Related Laws; Bias-Free Policing; 2017 Early Identification System (EIS); Employee Performance Appraisal (EPA); and TraCS training.

Blue Team (BT) Training was delivered once to one sworn person. No test remediation was required.

MCSO delivered the Body-Worn Camera (BWC) Training twice to two sworn personnel. No test remediation was required.

---

[2] MCSO identifies individuals that did not attended the most recent training sessions due to off-duty leave status, or who attended but require remediation due to test failure. MCSO delivered the last approved lesson plan (the 2017 version) to these individuals.

WAI 35442

MCSO delivered the Detention, Arrests, and Immigration-Related Laws, and Bias-Free Policing Training once to 11 personnel (one sworn, one Detention, nine Posse members). No staff required test remediation.

MCSO delivered the 2017 ACT once during this reporting period to five personnel (three sworn and two Posse members). No staff required remedial testing.

MCSO delivered the 2017 Early Identification System (EIS) Training once during this reporting period to 22 personnel (20 Detention, two civilians). No staff required remedial testing.

MCSO delivered the Employee Performance Appraisal (EPA) Training once during this reporting period to 23 personnel (20 Detention, three civilian). No staff required test remediation.

MCSO delivered the TraCS Training twice to two sworn personnel. No staff required test remediation.

During this reporting period, we did not seen previously discussed and recommended modifications to the Training Division Operations Manual or GG-1 indicating MCSO has further pursued test development alternatives.

During our July site visit, we followed up with discussions on instructor observations. Training Division personnel indicated they had reviewed and modified one Instructor Evaluation Tool obtained from an external organization. We requested documentation, and received documents indicating that the tool had been modified and adapted for MCSO's use. However, there was nothing to indicate the areas that were modified. We encourage MCSO to consider additional documents for review.

During this reporting period, Training Division personnel participated in three ride-alongs, as required by GG-1. These were the first attempts by the Training Division to accomplish this task. The documentation from these ride-alongs appeared to be of limited value, basically because they were not structured to provide the types of assessments expected from the policy. Ride-alongs should be designed to assess whether training courses are effectively resulting in positive deputy behaviors in the field, or whether revisions to training are appropriate. Ride-alongs should focus on training that the Office deems critical – such as training pertaining to the implementation of Order-related requirements, positive deputy-community interaction, and deputy safety.

Ride-alongs, however, should not be the only method employed by the Training Division. A routine review of BWC recordings and IRs can achieve similar results. The specific activities to be reviewed by each of these methods should be developed concurrently with the lesson plan. We encourage Training to actively pursue as many avenues as possible to gauge whether training provided in the classroom is directly and positively impacting the delivery of service to the community.

During this reporting period, MCSO conducted a train-the-trainer for SRELE instructors. During our July site visit, we discussed this program with Training Division personnel, who advised us that instructors were offered teaching assignments before they completed the train-the-trainer program. We requested documents indicating specific teaching assignments,

WAI 35443

observations of instructors, and lesson plan modifications as a result of instructor feedback; but MCSO advised us that no documentation existed. Previously, the Plaintiffs' attorneys had recommended that MCSO video-record these sessions; but MCSO elected not to record these sessions. We encourage the Training Division to continue to improve the train-the-trainer format, and to include any changes adopted in either GG-1 or the Training Division Operations Manual.

***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

During this reporting period, we observed modifications to the online Master Training Calendar that were consistent with previous recommendations. The calendar now clearly indicates the date through which the schedule is current and accurate. A legend now clarifies class acronyms that are listed. We did not identify any inaccuracies.

Master Personnel Rosters are used to determine the number of personnel requiring Order-related training. Currently, we conclude that 682 sworn members, 22 reserve members, 22 retired reserve members, 507 Posse members, 1,879 Detention members, and 679 civilian employees require Order-related instruction. These categories vary by reporting period, as a result of the attrition in the organization.

***Paragraph 45.*** *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this reporting period, we continued to review new and revised lesson plans for inclusion of the requirements of this Paragraph. These requirements apply to both MCSO-developed lesson plans, as well as vendor-created lesson plans.

WAI 35444

During this reporting period, there were no documented random observations of instructors.

**Paragraph 46.** *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

The Training Division provides all new and revised lesson plans and supporting materials for review by our Team and the Parties.

During this reporting period, we saw no indications of modifications to the selection and preparation process for instructors who deliver Order-related training. During our July site visit, the Training Division indicated that a total of 97 sworn instructors currently meet the GG-1 requirements. We continue to reinforce with MCSO that availability of an instructor should not serve as the primary consideration for selection and use. The identification of significant experience and expertise is most important.

**Paragraph 47.** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**Phase 1:** In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.
- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.
- Training Division Operations Manual, most recently amended on September 21, 2017.

**Phase 2:** In compliance

The Monitoring Team and Parties comment on lesson plans and training support material for all training required by both Orders. This review includes vendors retained by MCSO to produce and deliver curriculum on their behalf. Where applicable, we, MCSO, and the Parties ensure inclusion in the training material of the most recent developments in state and federal law.

During this reporting period, the Training Division revised the 2018 ACT, 2018 SRELE, and BWC lesson plans. During our July site visit, the Training Division advised us that it had retained a vendor to create and deliver the eight-hour PSB Annual In-Service Training for District personnel. The Plaintiff-Intervenors recommended a vendor to deliver the eight-hour

WAI 35445

PSB Annual In-Service for PSB personnel.  We did not review roll-call briefings and videos to support the ACT, SRELE, and the Constitutional Policing Plan during this reporting period.

MCSO can reasonably expect that members of the Monitoring Team and the Parties will observe training sessions and provide appropriate feedback.

## B.  Bias-Free Policing Training

*Paragraph 48.  The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2017 ACT once during this reporting period to five personnel (three sworn and two Posse members).  No staff required remedial testing.

During this reporting period, the Training Division continued to develop the ACT for the current year.  During our July site visit, the Training Division – in collaboration with the Community Outreach Division – advised that it had engaged community members and academic subject matter experts to assist in developing components of this lesson plan and to address deputies during training sessions.  The curriculum for 2018 will include enhanced elements on implicit bias, fair and impartial decision, and cultural competency.  As an enhancement to the ACT and in support of the Constitutional Policing Plan, MCSO advised us of its intent to develop new roll-call briefings on these Order-required topics.  Patrol supervisors will deliver the roll-call briefings.  We remind MCSO that the development of new roll-call briefings supplementing Order-required components of the ACT requires Section IV reviews.

MCSO delivered Bias-Free Policing Training once in June to 11 personnel (one sworn, one Detention, nine Posse members).

*Paragraph 49.  The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.    *definitions of racial profiling and Discriminatory Policing;*

b.    *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.    *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.    *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

WAI 35446

e.  constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

f.  MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g.  MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h.  police and community perspectives related to Discriminatory Policing;

i.  the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j.  methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k.  methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l.  methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m.  cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n.  problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

o.  the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.  background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.  Instruction on the data collection protocols and reporting requirements of this Order.

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO did not conduct an annual review of the lesson plan for the Bias-Free Policing Training during this reporting period.

WAI 35447

### c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO delivered the 2017 ACT once during this reporting period to five personnel (three sworn, two Posse members). No staff required remedial testing.

During this reporting period, the Training Division continued to develop the ACT for the current year. Previously, MCSO had advised us that the Criminal Intelligence Division would be conducting a review and analysis of BWC recordings to establish and enhance the curriculum relative to discretionary searches. During our July site visit, MCAO advised that it had replaced the Criminal Intelligence Division for the development of this Order requirement. MCAO informed us that a stand-alone training curriculum addressing consent searches was in development, but was not ready for submission to the review process.

The curriculum for 2018 ACT is not currently intended to include enhanced components on discretionary searches. We recommended that MCSO reconsider its decision to create a stand-alone curriculum if an adequate opportunity exists to cover this much-needed component within the ACT. Additionally, in support of the Constitutional Policing Plan, MCSO personnel advised us of consideration to develop online consent search training. We would recommend that any online training for this subject be supportive of classroom training, where competent instructors can address immediate feedback to questions.

MCSO delivered the Detention, Arrests, and Immigration-Related Laws Training once in June to 11 personnel (one sworn, one Detention, nine Posse members).

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.   *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.   *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.   *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

WAI 35448

d. *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e. *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f. *the circumstances under which a passenger may be questioned or asked for identification;*

g. *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h. *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i. *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j. *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k. *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l. *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m. *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n. *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o. *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

WAI 35449

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The 2018 ACT remained under development during this reporting period.


### d. Supervisor and Command Level Training

**Paragraph 52.**   *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.  MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.  As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training during this reporting period.


**Paragraph 53.**   *The Supervisor-specific Training shall address or include, at a minimum:*

a.   *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.   *how to conduct regular reviews of subordinates;*

c.   *operation of Supervisory tools such as EIS;*

d.   *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.   *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.   *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.   *incorporating integrity-related data into COMSTAT reporting;*

h.   *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

WAI 35450

i.      *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.      *how to respond to and investigate allegations of Deputy misconduct generally;*

k.      *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.      *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this reporting period, we conducted a conference call with the Training Division to answer any questions regarding recommendations to the SRELE curriculum.  After this call, we approved the lesson plan and supporting documents.

The Training Division conducted a train-the-trainer for SRELE instructors during June for 17 instructors (16 sworn, one Detention).  During our July site visit, we discussed this program with Training Division personnel.  Per the Training Division Operations Manual, instructors received curriculum materials in advance of the train-the-trainer.  MCSO advised us that instructors were required to deliver components of the lesson plan and assignments were distributed.  We requested documents that would indicate distribution of materials, instructor assignments, and instructor observations and evaluations.  The Training Division advised that no documentation existed.  We continue to recommend further development of the train-the-trainer program to MCSO.  Both GG-1 and the Training Division Operations Manual should memorialize any adopted changes.  Although the identified activities are improvements to the manner in which the Training Division manages the train-the-trainer program, we urge the Training Division to document its activities.  When adequately conducted, these programs will assist the Training Division in selecting only the best instructors for Order-required training.

WAI 35451

# Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO.  The following describes how we made that request and how we handled the data once we received it.  These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we modified our statistical technique in that, rather than selecting a representative random sample of 100 cases per quarter, we instead pulled a sample of about 35 cases per month (or 105 cases per quarter).  Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 time period when TraCS data were first available.  The selection of 35 cases reflects a sample based on this average per month.  This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the six Districts (Districts 1, 2, 3, 4, 6, and 7) and Lake Patrol.  By way of background, MCSO reported a total of 3,740 cases of traffic stop events for these areas between January 1-March 31, 2018 (averaging 1,247 per month).  This number of traffic stops represents a significant decline from previous reporting periods.  We discussed this issue with MCSO during our April 2018 site visit.  MCSO personnel informed us that they were aware of the issue and were exploring ways to ensure that deputies effectively perform their duties, which includes the enforcement of traffic laws.

Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings.  Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases.  Stratification of the data was necessary to ensure that each area was represented proportionally in our review.  Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas.  Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS.  We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.  In February 2016, we began pulling cases for our body-worn camera review from the audio subsample.  Since that time, we began pulling additional samples for passenger contacts and persons' searches (10 each per month).  The unique identifiers for these two samples were relayed back to MCSO personnel, who produced documentation for the selected sample (including the CAD documentation for the subsample).

WAI 35452

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and Paragraph 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order, and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

**Paragraph 54.** *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:*

a.   *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.   *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.   *the license plate state and number of the subject vehicle;*

d.   *the total number of occupants in the vehicle;*

e.   *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.   *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.   *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.   *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.   *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.   *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.   *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

WAI 35453

l.      *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.     *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on September 26, 2018.

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- GJ-3 (Search and Seizure), most recently amended on March 2, 2018.

**Phase 2:**  Deferred

To verify the information required for this Paragraph, MCSO created, and we reviewed, the Vehicle Stop Contact Form (VSCF), the Vehicle Stop Contact Form Supplemental Sheet, the Incidental Contact Receipt, and the Written Warning/Repair Order, all in electronic form, for those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning.  We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with the event.  We selected a sample of 105 traffic stops conducted by deputies from April 1-June 30, 2018, for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.  All of the listed documentation was used for our review of the following subsections of this Paragraph.

The Paragraph requires that MCSO create a system for data collection.  The data collected pursuant to this Paragraph will be captured in the Early Identification System, which we discuss further in this report.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.  Our review indicated that in the 105 vehicle traffic stops, there were 33 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In 32 of the 33 cases where there were multiple units or deputies on a stop, the deputy properly documented the name, badge, and serial number of the deputies and Posse members on the VSCF.  In one case, a deputy or Posse member was observed at the scene of the stop during a review of the BWC video; however, the deputy did not effectively document the presence of the deputy or Posse member.  In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were 18 cases where

WAI 35454

there were multiple units or deputies on a stop.  In 17 of the 18 cases, the deputy properly documented the required information on the VSCF.  In one case, the deputy did not effectively document the presence of two Posse members who were at the scene of the traffic stop.  In the 30 cases we reviewed for searches of persons under Subparagraph 54.k., there were 17 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene.  In 16 of the 17 cases, the deputy properly documented the required information on the VSCF.  In one case, the deputy did not effectively document the presence three additional deputies who were at the scene of the traffic stop.  We will follow up with MCSO on these cases.

For this reporting period, all of the primary deputies indicated their own serial numbers for every stop they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which units are on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information.  A TraCS change was made to the VSCF during 2016 to secure this information.  MCSO added a drop-down box so the deputy could enter the number of units on the scene and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.

The identification of personnel on scenes is a core issue in this case, and we shall consistently evaluate MCSO's measure of compliance with this requirement.  This Paragraph requires that all deputies on the scene be identified with their names, and serial and unit numbers, on the appropriate forms.  MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding.  Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared.  In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer).  We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide.  MCSO uses GPS to determine location for the CAD system.  GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation.  The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.  During our quarterly site visits, we review the GPS coordinates with CID personnel to ensure the accuracy of the data.  The CAD system was upgraded in 2014 to include geocoding of traffic stops.  CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates.  For this reporting period, the CAD or I/Viewer system contained the coordinates in about 66% of the cases.  In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

WAI 35455

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we found one instance where the end time on the VSCF Contact differed by 10 minutes from the CAD printout.  We will follow up with MCSO regarding the specifics of this case during our next site visit.  In monthly audits of traffic stop data, the Bureau of Internal Oversight (BIO) reviews the beginning/ending times of the stops and sends Action Forms to the Districts when there are discrepancies.  The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error.  When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

During our April 2016 site visit, we discussed with ASU and MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times.[3]  We determined that using the CAD system to determine stop end times created additional challenges.  However, a decision was made to use the CAD printout to determine traffic stop beginning and ending times for data analysis.  MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.  Several additional TraCS technical changes were made and implemented in 2016.  Some of the changes implemented include: a feature that automatically imports the CAD time onto the VSCF; mandatory fields requiring the selection of an ARS Offense Classification (Civil, Traffic, Criminal Traffic, Criminal, or Petty Offense) – including a series of five questions (and responses) to document circumstances that frequently require a stop to be prolonged; the addition of help features to assist deputies using the TraCS system; the addition of a search feature that allows for the search of citations and warnings by a driver's last name or license plate; and permitting a reviewing supervisor to reject a VSCF if a deficiency is identified and to request that a deputy make the appropriate changes to the document.

The first change listed above should ensure that the start and end time of the stop from the CAD system and VSCF should be consistent.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, we found that deputies properly recorded the vehicle tag number and state of issuance in 105 of 105 cases.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 99%.

---

[3] As of June 30, 2018, ASU is no longer MCSO's contract vendor for the analyses of traffic stop data.

WAI 35456

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted.  The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.  In 33 of the 105 traffic stops we reviewed, the driver had one or more passengers in the vehicle (60 total passengers).  In all 33 cases, the deputies properly documented the total number of occupants in the vehicles.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression.  (No inquiry into the occupant's ethnicity or gender is required or permitted.)  In 33 of the 105 stops from the traffic stop data sample, there was more than one occupant in the vehicle (60 total passengers).   In our sample of 30 that contained body-worn camera recordings, our review, as well as BIO's inspection of traffic stops, did not identify any instances of the vehicle occupants' race or ethnicity or gender being misclassified.  In our review of VSCFs for Paragraphs 25.d and 54.g., there was one case where the deputy listed the driver as a white female on the VSCF.  The driver's surname was Hispanic.  Based on our review of the BWC video-recording, coupled with the driver having a Hispanic surname, we determined that the driver should have been listed as a Latina.  We will discuss this case with MCSO during our next site visit.  In one case, the deputy indicated on the VSCF that the driver was a white male.  However, a review of the BWC video and the citation revealed that the driver was a white female.  This case involved six white female passengers and two white male passengers.  We will discuss this case with MCSO during our next site visit.  In one case, the deputy indicated that he was unable to determine the gender and race or ethnicity of one passenger (an infant in a car seat).  This case involved a Latino driver, a Latino passenger and a Latina passenger.  Based on the Monitoring Team's review of the BWC video-recording, we were also unable to determine the gender and race or ethnicity of the infant.

Our earlier reviews of passenger contacts, drawn from the sample of 105 traffic stops, did not provide a sufficient number of cases where deputies made contact with passengers.  As a result, we requested that MCSO provide us, from the TraCS data, all cases where deputies made contact with passengers.  We then pulled a sample of 10 cases per month (30 per quarter) of those stops where deputies made contact with a passenger.  (The cases of passenger contacts are detailed in Paragraph 25.d.)

Sixty-nine, or 66%, of the 105 traffic stops involved white drivers.  Twenty-nine, or 28%, of the 105 stops involved Latino drivers.  Four, or 4%, of the 105 traffic stops involved Black drivers. Two, or 2%, of the 105 traffic stops involved an American Indian/Alaskan Native driver.  One, or less than 1%, of the 105 traffic stops involved Asian/Pacific Islander drivers.  Fifty-nine traffic stops, or 56%, resulted in citations.  The breakdown of those motorists issued citations is as follows: 41 white drivers (69% of drivers who were issued citations); 14 Latino drivers (24% of drivers who were issued citations); two Black drivers (3% of drivers who were issued citations); and two American Indian/Alaskan Native drivers (3% of drivers who were issued citations).  Forty-five, or 43%, of the 105 traffic stops we reviewed resulted in a written

WAI 35457

warning.   The breakdown of those motorists issued warnings is as follows: 27 white drivers (60% of the total who were issued warnings); 15 Latino drivers (33% of the drivers who were issued warnings); two Black drivers (4% of the drivers who were issued warnings); and one Asian or Pacific Islander drivers (2% of the drivers who were issued warnings).   There was one stop in which the deputy did not issue a warning or a citation.   The white male driver was arrested for possession of narcotics and driving under the influence, and was charged via an accusatory instrument other than a citation.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not.   By way of our previous reviews as well as BIO's inspections, MCSO has learned of deputies' failure to properly document the race or ethnicity of passengers.   MCSO's policy does not require that the names of passengers be documented unless a passenger is contacted and the deputy requests and obtains the identity of the passenger.   In such instances, the passenger's name and the reason for the contact is required to be documented on the VSCF and an Incidental Contact Receipt.   In addition, in such situations, MCSO's policy requires that the deputy provide the passenger with a copy of the Incidental Contact Receipt.

During the last two reporting periods of 2017, supervisors attended MCSO's Supervisor Responsibilities: Effective Law Enforcement (SRELE) Training, which included a video component, accompanied with a discussion, specific to traffic stops and properly classifying the ethnicity of drivers and persons with Latino surnames on the VSCFs.   Upon completion of the SRELE Training, supervisors provided roll-call training on this topic for sworn personnel.

We have noted that MCSO has improved the accuracy of documenting the perceived race or ethnicity of drivers and passengers.   As noted above, during this reporting period, there was one case in which deputies misidentified the race or ethnicity of the passenger with a Latino surname.

During this reporting period, we approved MCSO's methodology for the conducting of monthly inspections to determine whether deputies are correctly identifying the ethnicity of drivers and passengers with Latino surnames.

For this reporting period, MCSO remains in compliance with this requirement.

WAI 35458

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review found that deputies recorded the name of each driver and passenger on the VSCF in each instance that a driver's license or warrant check was run. In addition, MCSO's policy requires that deputies perform a license plate check on each vehicle stopped by its deputies, as well as warrant checks on every driver stopped by its deputies. For this reporting period, we found that of the 105 traffic stops we reviewed, 104 included a check on the license plate. In one case, the stopped vehicle did not have a license plate. There were 102 stops where the driver had a warrant check run. In three cases, there was no explanation provided as to why the deputies failed to perform a warrant check on the drivers. During its monthly inspections of the traffic stop data, BIO identified two out of the three cases that we identified in which a warrant check was not run on the drivers. BIO issued Action Forms in those two cases; however, in the remaining case, BIO did not identify the omission, and no Action Form was issued. We will follow up with MCSO regarding the one case.

MCSO's compliance rate is 100%, and MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. Due to the low number of cases where contact is made with passengers in our sample of 105 traffic stop cases per quarter, we pulled an additional sample for those cases involving passenger contacts. For this reporting period, we reviewed 30 traffic stops where the deputy had interaction with one or more passengers. Each passenger contact is described in detail in Paragraph 25.d. All passenger contacts in the traffic stops we reviewed for Paragraph 25.d. were noted in the VSCFs.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We reviewed MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a record check was requested for the driver or any passengers.

In our experience, the vast majority of traffic stops do not require contact with a passenger unless the driver is arrested, the vehicle will be towed, or there are minor children in the vehicle that will need care. The other type of traffic stop where we noted that deputies routinely contact passengers is when upon approaching a vehicle, the deputy detects the smell of burnt marijuana. In the stops we reviewed where this has occurred, deputies have inquired if the driver or any passengers possess a medical marijuana card. In other instances, the deputy may, for safety purposes, approach the vehicle from the passenger side, which often results in contact with the passenger who may be seated in the front seat.

MCSO remains in compliance with this Subparagraph.

WAI 35459

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we initially requested each month, and requested CAD audio and body-worn camera (BWC) footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout documents the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop, and likewise entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene. In our review of the documentation provided, the CAD printouts, the Vehicle Stop Contact Forms created by MCSO, along with the E-Ticketing system and the Arizona Ticket and Complaint Form, capture the information required. As we noted in Subparagraph 54.b., the stop times on the CAD printout and the Vehicle Stop Contact Form vary slightly on occasion. We understand that this may occur due to extenuating circumstances, and we will report on those instances where there is a difference of five minutes or more from either the initial stop time or the end time.

During this reporting period, we identified one traffic stop where the end time of the stop differed by 10 minutes between the Vehicle Stop Contact Form and the CAD printout. Some stops vary in time for any number of reasons that may, or may not, be justified. There were four stops that were prolonged due to one of the five reasons listed on the VSCF. Three of the stops involved white drivers, and one of the stops involved a Latino driver. We reviewed the circumstances of each stop and found that reasonable justification existed for the additional time expended for all four of the stops. In addition to reviewing stops prolonged due to any one of the five reasons listed on the VSCF, we review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length if the stop was justified. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.

WAI 35460

Supervisors conducted timely reviews and discussions of 98 of the 105 VSCFs reviewed. Deputies accurately entered beginning and ending times of traffic stops in 104 of the 105 cases that we reviewed.  MCSO accurately entered the time citations and warnings were issued in all 105 cases.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph, and found that none of the stops involved any contacts with ICE/CBP.  None of the stops we reviewed involved any inquires as to immigration status.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.  During our January 2018 site visit, we discussed with MCSO whether any other method may be feasible to identify a larger population of searches of individuals specific to the requirements of this Paragraph.  MCSO's response was that the current method is appropriate, and that there may be more cases identified once deputies properly document the searches of persons consistent with this Paragraph.  We encourage MCSO to continue to explore methods to identify the overall population of cases that fit the criteria of this Paragraph.  Due to the limited number of cases being identified that fit the criteria of this Paragraph, MCSO's rate of compliance continues to stagnate.  In the last reporting period of 2017, we identified two cases in which deputies documented on the VSCFs that a consent search of individuals had occurred.  However, in one case, a pat-and-frisk search was performed on the driver and passenger, without requesting or obtaining consent; and in the other case, no search appeared to have been conducted.  During the last reporting period (the first reporting period of 2018), we identified only one case that met the criteria of this Paragraph.  In that case, the deputy conducted a pat-down search of an individual's jacket prior to providing a courtesy ride.

WAI 35461

MCSO's Compliance Report for the 17th Quarter reporting period indicates that MCSO is considering training opportunities for deputies to assist them to better identify and document searches of persons.  We continue to recommend that MCSO implement training to ensure that deputies properly document consent searches of persons, probable-cause searches of persons, and pat-and-frisk searches of persons.  The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF.  Once that population is identified, a random sample of 10 traffic stops from each month (30 total for the reporting period) is identified and reviewed.  In addition, we also review any cases in which the deputies performed searches of individuals in the sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g.  In total, we review 165 traffic stops each reporting period to identify stops where a deputy may have performed a search of an individual specific to the requirements of this Subparagraph.  There were no cases that met these criteria in our sample of 105 traffic stops reviewed in relation to Paragraphs 25 and 54 and the sample of 30 traffic stops reviewed in relation to Subparagraphs 25.d. and 54.g.

In the sample of 30 traffic stops identified in relation to this Subparagraph, there were four cases that met the criteria specific to searches of individuals.  We discussed these cases with MCSO during our July 2018 site visit.

- In one case, a deputy stopped a Black male for speeding.  The driver did not have any identification on his person.  His driver's license was suspended.  During the stop, the deputy asked the driver if he had any weapons on his person.  The driver stated that he did not have any weapons.  The deputy then asked the driver if he could conduct a pat-down to verify that he had no weapons.  The driver replied "Yes, sir."  The deputy then conducted a pat-down of the driver.  The deputy listed the pat-down as a consent search on the VSCF.  MCSO's policy concerning consent searches, GJ-3 (Search and Seizure), requires that when a deputy seeks consent for a search, that the individual is to be informed of his right to refuse and revoke consent at any time.  In this instance, the deputy did not inform the driver of his right to refuse or revoke the consent to search.

- In one case, a deputy stopped a white male driver for disregarding a stop sign.  The deputy suspected that the strong odor of perfume/body spray emanating from the vehicle was to conceal the smell of alcohol or marijuana.  The deputy conducted field sobriety tests on the driver, and found no signs of impairment.  The deputy conducted a further investigation to determine if either of the passengers was in possession of any contraband.  The deputy noticed that the two passengers, a white female (17-year-old) and a white male, had bloodshot eyes.  The white female had a backpack, which the deputy stated smelled of marijuana when she opened it.  The deputy then had the two passengers exit the vehicle.  As the white male passenger exited the vehicle, the deputy instructed him to place his hands on the vehicle.  The deputy then conducted a pat-down of the passenger.  The deputy then approached the white female passenger and asked her if she was in possession of any contraband.  She replied that she did not have any contraband.  The deputy then searched her shirt pockets.  No contraband was located

WAI 35462

from either passenger's person.  Even though consent had not been sought nor obtained, the deputy listed on the VSCF that the search of the passengers was conducted after consent was requested and obtained.

- In one case, a deputy stopped a white male for failing to maintain lane of traffic.  During the stop, the deputy asked the driver to exit the vehicle.  After the driver exited, the deputy asked the driver if he had any weapons on him.  The driver stated he did not have any weapons and asked the deputy if he needs to pat him down.  The deputy said, "Yes," and asked the driver to turn around while he conducted a brief pat-down.  No weapon was found.  On the VSCF, the deputy classified the search as a *Terry* frisk.  There did not appear to be reasonable suspicion to justify a pat-down of the driver in this case.

- In one case, a deputy stopped a white male driver on a motorcycle for speeding.  As the deputy approached the driver, he instructed the driver to turn the motorcycle off.  The driver complied and informed the deputy that he was carrying a concealed firearm on his person.  The deputy asked the driver if it was okay for the deputy to take the firearm from the driver.  The driver stated, "Yes."  As the deputy secured the firearm, he asked the driver if he had any more weapons.  The driver stated that he had a knife in his pants pocket, which the deputy then secured.  On the VSCF, the deputy classified the search as a consent search.

The remaining 26 cases were not specific to the requirements of this Subparagraph, as they involved searches of individuals incident to arrest.

In our review of cases in relation to Paragraph 54.k., we identified one case that met the criteria of this requirement.  In this case, the deputy stopped a white male driver for failing to maintain lane of traffic.  The deputy directed the driver to exit the vehicle prior to conducting field sobriety tests.  The deputy asked the driver if he had any weapons on his person.  The driver produced a knife, which he handed to the deputy.  After conducting the field sobriety tests, the driver was arrested.  The deputy then conducted a search incident to arrest of the driver.  On the VSCF, the deputy used the following three classifications for the search: 1) consent search; 2) incident to arrest; and 3) *Terry* frisk.  Based on our review of the BWC video-recording, in regards to the driver, the deputy did not request consent to conduct a search of the driver.  There were two passengers in the vehicle that were also investigated.  The deputy directed both passengers to exit the vehicle.  Both passengers were white males, with one of them being a 15-year-old.  The deputy asked the 15-year-old passenger if he had any weapons on his person.  He replied that he had a pocket-knife.  The deputy then asked the passenger if he would allow the deputy to conduct a search of his person.  The passenger refused the deputy's request to conduct a search.  The deputy then directed the 15-year-old passenger to sit on the curb.  Shortly afterward, the deputy noticed that the 15-year-old passenger had removed from his pockets a folding knife and two nicotine vaping devices.  The deputy then approached the 15-year-old passenger and conducted a pat-down of the passenger to ensure he did not have any additional contraband on his person.  On the VSCF, the deputy used the following two classifications for the search of the 15-year-old passenger: 1) plain view; and 2) *Terry* frisk.  The deputy properly documented that he had requested consent to search the 15-year-old passenger, and that the passenger's consent was not obtained.  The deputy then asked the other passenger if he had any

WAI 35463

weapons, to which the passenger replied, "No." The deputy then asked the passenger if he would allow him to conduct a search. The passenger stated, "Yes," and the deputy then conducted a pat-down of the passenger. No contraband was found. On the VSCF, the deputy classified the search as a consent search. In this instance, the deputy did not inform the passenger of his right to refuse or revoke the consent to search.

MCSO has indicated that it does not require its deputies to use Consent to Search Forms as the primary means for documenting consent searches. MCSO requires that deputies document requests to conduct consent searches by way of video-recording the event via the BWCs. In the event the BWC is not operational, MCSO policy requires deputies to document requests to conduct consent searches on the Consent to Search Form. MCSO reports that deputies have electronic access to the Consent to Search Forms. We continue to recommend that MCSO revisit the requirements of this section of the policy and require deputies to read the Consent to Search Form to the subject and require a signature from the individual for every request for consent to search unless the search is an actual search incident to arrest. Due to the small population of cases that MCSO and the Monitoring Team have identified, it is important that deputies accurately document each search and/or request to a consent search, as required by this Subparagraph, to attain and maintain compliance with the requirement. Based on some of the cases we reviewed this reporting period, it appears that some deputies are not aware of the policy requirements as it relates to informing individuals that a consent search may be refused; or, if granted, that the consent search may be revoked by the individual at any time. We recommend that MCSO implement training on the specific policy requirements regarding consent searches.

In the last reporting period of 2017, MCSO's compliance rate with this Subparagraph was 67%, with only three cases identified. During the last reporting period (the first reporting period of 2018), we noted only one case that was applicable to this requirement and determined that the compliance status would be deferred. Due to the low number of cases identified this reporting period, coupled with the inaccuracies in the some of the cases that were reviewed, we are again deferring our assessment of MCSO's compliance with this Subparagraph.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Of a total sample of 165 stops reviewed for the reporting period, which includes 105 stops for Paragraph 25; 30 stops for Subparagraph 54.k.; and 30 stops for Subparagraphs 25.d and 54.g., there were 20 cases identified in which MCSO deputies documented the seizure of contraband or evidence on the VCSFs. A summary of the cases is listed below. There were three cases where the deputies did not properly document the seizure of contraband or evidence on the VSCFs. A summary of those cases is also listed below. We will follow up with MCSO regarding these cases.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, we identified one case in which two license plates and a driver's license were seized by a deputy and placed into evidence. In two cases, deputies seized the driver's licenses and placed them into evidence. In one case, a deputy seized narcotics and narcotic paraphernalia and placed the items into evidence. The deputy also seized United States currency, which was placed into safekeeping.

WAI 35464

In the 30 cases we reviewed for searches of individuals under Subparagraph 54.k., the following items were seized by deputies and placed into evidence or safekeeping. In one case, the deputy seized a driver's license and narcotic paraphernalia and placed the items into evidence. In one case, the deputy seized marijuana that was packaged as a medicinal product and placed the item into safekeeping. The deputy also seized narcotic paraphernalia and placed the item into evidence. In one case, a deputy seized narcotics and a driver's license and placed the items into evidence; however, the deputy did not list the seizure of the driver's license on the VSCF. In two cases, the deputies seized the drivers' licenses and placed the items into evidence; however, in one case, the deputy did not list the seizure on the VSCF. In one case, the deputy seized a driver's license, which was placed into evidence, and a Taser and pepper spray, both of which were placed into safekeeping. In two cases, the deputy seized narcotics and narcotics paraphernalia and placed the items into evidence. In one case, the deputy seized a driver's license and a chewable product that may contain narcotics into evidence. In one case, the deputy seized narcotic paraphernalia and placed the item into evidence. In one case, the deputy seized the driver's license, two firearms, ammunition and holsters into safekeeping. In the 30 cases we reviewed for passenger contacts under Subparagraph 54.g., there were three cases in which the driver's licenses were seized by the deputies and placed into evidence; however, in one case the deputy did not list the seizure on the VSCF. In two cases, narcotic paraphernalia was seized and placed into evidence. During this reporting period, there was an increase in the number of errors and omissions in relation to deputies documenting the seizure of contraband or evidence on the VSCF. Supervisors should identify such errors and omissions and ensure that the deputies submit accurate reports. MCSO's compliance rate is 85% for this reporting period. MCSO will remain in compliance with this Subparagraph for this reporting period; however, during the next reporting period, MCSO will be required to attain a rate of compliance of greater than 94% to maintain compliance.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO is in compliance with this Subparagraph.


***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**Phase 1:** In compliance

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on April 19, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:** In compliance

WAI 35465

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

We visited Districts 1, 2, 3, and 7 during our July 2018 site visit; and found no indications from any personnel that there were recurring issues with the unique identifier, including duplicates. Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier (CFS number) is automatically entered from the deputy's MDT. No user intervention is required.

To determine compliance with this requirement, we reviewed 105 traffic stop cases and reviewed the CAD printouts and the Vehicle Stop Contact Forms for all stops. We reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed on correctly on all CAD printouts for every stop.


***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** Not in compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

WAI 35466

To verify compliance for this Paragraph, we reviewed the monthly audits of the traffic stop data conducted by BIO on the samples we selected. While audits require in-depth analysis, quality control checks serve as more of an inspection or spot-check of the data. We reviewed the BIO traffic stop audits for April-June 2018 and found that the audits were thorough and captured most deficiencies. During our review of the identical dataset, we identified additional deficiencies, and brought them to the attention of CID while onsite; we identify them in other areas of this report.

We reviewed the draft EIU Operations Manual, which includes procedures for traffic stop data quality assurance. During our July 2018 site visit, EIU presented its latest revisions to the operations manual that included two new refinements to validate the traffic stop data. One refinement is being implemented in the Technology Management Bureau using a sample of traffic stops to ensure that software changes do not inadvertently change the location of variables in the file used to analyze traffic stop data. The other modification occurs when EIU obtains the data from the Technology Management Bureau. EIU intends to use simple statistical tools such as frequency distribution analysis to ensure that data variables have expected values.

During our January and April 2018 site visits, MCSO noted that some sections of the EIU Operations Manual could not be finalized, as they required finalizing methodologies related to monthly analyses of traffic stop data in accordance with the requirements of Paragraph 67. (See below.) As is discussed in Paragraph 66 below, MCSO is selecting a new vendor to analyze its traffic stop data. While we have encouraged MCSO to submit completed sections of the operations manual for review and approval to enable Phase 1 compliance with those Paragraphs covered by those sections of the operations manual, MCSO requested that we allow them more time to allow the new vendor to review the operations manual to determine if they might recommend further changes to it. We agreed to this request and encouraged MCSO to give priority to refining the data sections of the operations manual to help the new vendor get quickly up to speed on traffic stop data.

On September 8, 2015, MCSO issued Administrative Broadcast 15-96, which addressed the security of paper traffic stop forms. The procedure requires that paper forms (prior to April 1, 2014) be stored in a locked cabinet box at the District. The protocol also addresses any traffic stop data that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity. Any personnel who require access to those files must contact the Division Commander or his/her designee who will unlock the cabinet. Once the deputy accesses his file, a TraCS file log must be completed and signed by the deputy. During our July 2018 site visits to the Districts, we inspected the written (hardcopy) files and verified that all records were locked and secure, that logs were properly maintained, and that only authorized personnel had access to these files.

MCSO began auditing traffic stop data in January 2014; and since April 2014, MCSO has conducted audits of the data monthly and provided those results to us. We reviewed BIO's monthly audits of the traffic samples from April 1-June 30, 2018, and found them to be satisfactory. MCSO conducts audits of the 105 traffic stop samples that we request each reporting period. BIO also conducts a more expansive review of 30 of the 105 sample pulls we

WAI 35467

request each reporting period to include passenger contacts and persons' searches.   The approved policy also requires regularly scheduled audits on a monthly, quarterly, and annual basis.

As we reiterated during our recent site visits, MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates in its EIU Operations Manual procedures for ensuring the integrity and accuracy of traffic stop data.  To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the procedures to ensure traffic stop data quality assurance.

**Paragraph 57.**  *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length.  In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit.  The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:**  In compliance

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample.  In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length.  In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an MCSO Incidental Contact Receipt.  To verify compliance that the violator received the required "receipt" from the deputy, a signature is required, or, if the violator refuses to sign, the deputy may note the refusal on the form.  We are unable to verify that motorists have been issued a receipt without a signature on the form, or the deputy advising of the refusal of the receipt from the driver.  Placing "SERVED" in the signature box without any explanation does not comply with the requirement.  For this reporting period, deputies issued citations or written warnings in 104 of the 105 cases we reviewed.  In one case, no warning or citation was issued.  The case

WAI 35468

involved a white male driver was stopped for following too closely and was subsequently arrested for possession of narcotics and driving under the influence. In one case, a white male was stopped for speeding and issued a citation. The signature of the driver was not obtained on the citation, and there was no explanation for the omission. The signature field contained "SERVED" instead of the driver's signature. In one case, a Latino driver with a Latina passenger and a Latino child passenger were stopped for failing to have the child in a child restraint device. The driver was issued a citation and released. The signature field contained "SEE ORIGINAL" instead of the driver's signature. It was noted that the deputies were operating an All-Terrain Vehicle (ATV), which was not equipped with a computer and scanner.

In our review of passenger contacts, Subparagraph 54.g., we identified one case where the signature of a driver was not obtained on the citation. The case involved a white male driver who was stopped for driving without taillights. The vehicle was occupied by a white female passenger. Based on our review of the BWC recording, we did not observe the deputy obtain a signature from the driver. In one case, the deputy noted on the VSCF that he was unable to scan the signature due to a malfunction of the scanner. The case involved a white male driver who was stopped for failure to maintain lane of traffic. The vehicle was occupied by two white male passengers. There were two cases in which there an arrest of the driver and a signature was not obtained. In our review of searches of individuals, Subparagraph 54.k., all of the citations and warnings had a signature, with the exception of 10 cases in which the drivers were arrested and held in custody. MCSO's compliance rate with this requirement is 99%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the BWC recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stops initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the BWC recordings to determine if stop times indicated by CAD were accurate. MCSO's Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the BWC video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the BWC video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

WAI 35469

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. In one case, the deputy noted on the VSCF that the BWC failed to activate initially. In that case, the video was activated shortly after the decision was made to conduct the traffic stop; however, the traffic violation was not captured on the BWC recording. There were five cases where there were no BWC recordings in relation to the deputies who assisted on the stops. In the remaining 24 cases, the BWC recordings were provided for all of the deputies involved in the traffic stops. Despite the lack of the some of the BWC recordings, we were able to use the BWC recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 for using the BWC to determine if deputies are accurately reporting stop length is 100%.

**Paragraph 58.** *The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**Phase 1:** In compliance

- GF-1 (Criminal Justice Data Systems), most recently amended on January 9, 2018.
- GF-3 (Criminal History Record Information and Public Records), most recently amended on May 24, 2018.

**Phase 2:** In compliance

To verify compliance for this Paragraph, we reviewed the applicable policies and met with Technology Management Bureau personnel to determine if any unauthorized access and/or illegitimate access to any of MCSO's database systems had occurred during this reporting period. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (ASDPS), and the Arizona Criminal Justice Information System; and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training. In addition, MCSO's Chief Information Officer informed us during previous site visits that a Standard Operating Procedure (SOP) for the processing of any requests from PSB had been implemented in relation to any alleged misuse or unauthorized access to any of MCSO's database systems. The SOP requires that the Technology Management Bureau create and maintain a tracking log of PSB requests for any database system audit logs.

WAI 35470

MCSO's Chief Information Officer advised us during our July 2018 site visit that MCSO had no breaches to their systems. All databases containing specific data identified to an individual comply with federal and state privacy standards, and MCSO limits access to only those employees who are authorized to access the system.

We will continue to observe the security issues.

**Paragraph 59.** *Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Electronic traffic stop data capture began on April 1, 2014. The forms created by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data on a monthly basis, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written collected data since April 1, 2014. MCSO did not collect electronic data before this time. MCSO has continued to provide full access to the traffic stop data.

### b. Electronic Data Entry

**Paragraph 60.** *Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

WAI 35471

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

**Phase 2:** In compliance

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms created by MCSO, completed by the deputy in the field, and manually entered in the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data they have created by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift. During our July 2018 site visit, we met with MCSO and the Parties; and reviewed the deficiencies BIO and our reviews discovered for this reporting period, along with the results of the Action Forms generated by BIO.

We inspected marked vehicles at Districts 1, 2, 3, and 7 to verify that MCSO vehicles used to conduct traffic stops on a routine basis are equipped with the ability to input traffic stop data electronically. Due to the size of the fleet, the number of marked and unmarked patrol vehicles fluctuates from month to month. Deputies have demonstrated their ability to access and use TraCS, as evidenced by the fact that their total time on a traffic stop averages 16 minutes or less.

### c. Audio-Video Recording of Traffic Stops

***Paragraph 61.*** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**Phase 1:** In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

**Phase 2:** In compliance

WAI 35472

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Body-worn cameras were fully implemented and operational in May 2016, and the equipment has worked well. The BWC recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years.

We verified during our District visits that MCSO has issued body-worn cameras to all Patrol deputies. Records indicate that MCSO began distribution of the body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. Every reporting period, we review a printout provided by CID that documents each deputy, by District, who has been issued a BWC.

During our July 2018 site visit, we met with District 1, 2, 3, and 7 supervisors and commanders; and inquired if Patrol supervisors had experienced any difficulty with the BWC equipment and the BWC system. As has been reported in the previous quarter, MCSO informed us that it continues to experience minor issues with cords breaking and batteries not lasting for deputies' entire shifts. There were also reports of BWC recordings not properly uploading. In some instances, BWC recordings had to be manually uploaded into the system.

MCSO pilot-tested a newer BWC version from the same vendor during the summer of 2017 at Lake Patrol and District 1. MCSO reported that the feedback on the newer system was generally positive. The deputies wore the BWCs on their upper chest area, as opposed to the current wearing of the device on the head area with the use of eyewear or headgear. MCSO previously informed us that there were some deputies who reported experiencing discomfort and headaches from wearing the BWC in the current manner. In some instances, deputies had obtained notes from their personal physicians requesting that the deputies be exempted from wearing the BWC on their heads.

MCSO is currently procuring a new body-worn camera system for all of its deputies. During our October 2017 site visit, we reviewed videos from the pilot-test of the newer equipment, and found that the BWC captures a wider view, and that the image is sharper than what is being recorded by the current system. The new BWC will resolve the current issues of cords breaking and becoming disconnected, as there is no cord. MCSO also anticipates that the issues related to battery life will be remedied with the new equipment. During our July 2018 site visit, MCSO provided a proposed revised policy and lesson plan to the Parties and the Monitoring Team in relation to the new BWC system and equipment for review and comments.

WAI 35473

***Paragraph 62.*** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**Phase 1:**  In compliance

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.
- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2**:  Not in compliance

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples.

For our selection of a sample to review body-worn camera videos, we used the same sample we select for the CAD audio request. During this reporting period, we reviewed 30 cases where body-worn camera footage was available. Of the 30 cases we reviewed, 24 were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In one case, the deputy noted on the VSCF that the BWC initially failed to activate. In that case, the video activated shortly after the decision was made to conduct the traffic stop; however, the traffic violation was not captured on the BWC recording. In one case, a deputy responded to assist another deputy at a traffic stop, and noted that he did not activate his BWC due to having to make a sudden stop along the center median of a freeway. In four cases, there was no BWC video-recording from the deputies that assisted on traffic stops. In relation to the sample of 75 cases in which BWC recordings were not provided, there were four cases in which the deputies noted on the VSCF that their BWCs did not activate at the beginning of the stops, but that they were able to activate their BWCs to activate at some point during the stops. In three cases involving three different deputies, the deputies noted on the VSCF that the BWCs failed to activate during the traffic stops.

In our sample of 30 body-worn camera recordings reviewed for Subparagraph 54.k., 23 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop. In two cases, there were no BWC recordings of the initial stops of the vehicles. In three cases, the BWC recordings began as the vehicles were either stopped or coming to a stop. In one case, the deputy noted on the VSCF that his BWC went into stand-by mode at some point during the stop. Our review of the stop revealed that the BWC stopped recording prior to the conclusion of the stop. In one case, the deputy noted on the VSCF that the BWC deactivated prior to the end of the stop due to battery issues. In our review of the sample of 30 body-worn

WAI 35474

camera recordings for Subparagraph 54.g., 25 cases were in compliance with the deputy activating the video- and audio-recording equipment as soon as the deputy decided to initiate the stop, and continuing to record through the end of the stop.  In two cases there was no BWC recording of the initial stop from the deputy that conducted the traffic stop.  In two cases, the deputies did not activate the BWC upon the decision to stop.  In both cases, the BWC recordings reveal that the vehicles were already stopped or coming to a stop at the time of the activation of the BWCs.  In one case, there was no video from a deputy assisting on a traffic stop.  In one case, there was no BWC recording of the transport of a passenger who was arrested and conveyed to a MCSO facility.  The compliance rate for the sample of 90 cases is 80%.

We also identified cases in which the deputies did not use the BWC according to policy.  In one case, all of the BWC videos from the deputy that initiated the traffic stop were recorded while the camera was positioned upside down.  In one case, the deputy appeared to be wearing the BWC on his sunglasses.  The deputy had the BWC positioned properly during his contact with the driver and passenger; however, once he entered his patrol vehicle, he flipped the BWC up as he typed on the patrol unit's computer.  In that case, there was a significant amount of time that the BWC was improperly positioned.  We discussed this case with MCSO during our July 2018 site visit.  In one case, the deputy readjusted his BWC as he attempted to assist a motorist during a traffic stop.  After the readjustment, the BWC was pointed upward for most of the duration of the stop, which did not allow a proper video-recording of the stop.

In addition to the issues identified above, we are identifying several cases in which deputies that respond to assist at traffic stops do not complete the Assisting Deputy and Body-Worn Camera Log.  AIU has previously identified the same issue during its monthly inspections of traffic stops.  We recommend that supervisors enhance their reviews of traffic stops to ensure that the form is completed when required.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes.  MCSO policy directs its employees to forward any such body-worn camera recordings that may be useful for training purposes to the Training Division.

During our July 2018 District visits, the District 1 Captain advised us that in May, a body-worn camera recording of a use of force event was identified and forwarded to the Training Division for consideration for training purposes.  We encourage MCSO to continue to identify body-worn camera recordings that would be useful for training purposes and incorporate those into MCSO's training programs.  MCSO has already discovered the value of body-worn cameras – including in instances where community members have lodged accusations against deputies and the recordings proved to be invaluable in resolving complaints.

WAI 35475

*Paragraph 63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

**Phase 2:**  In compliance

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our July 2018 site visit, we inspected the traffic stop written data files of Districts 1, 2, 3, and 7; to ensure that hardcopies of traffic stop cases are stored for a minimum of five years. We found that the files were in order and properly secured, and did not note any issues of concern.

### d. Review of Traffic Stop Data

*Paragraph 64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:**  Not in compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

WAI 35476

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

  GJ-33 (Significant Operations), most recently amended on May 10, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- EIU Operations Manual, currently under revision.

**Phase 2:** Not in compliance

MCSO will achieve Phase 1 compliance with this Paragraph when it incorporates its protocols for periodic analysis of the traffic stop data into the EIU Operations Manual. To achieve Phase 2 compliance with this Paragraph, MCSO must demonstrate ongoing use of the methodology delineated in the protocol established for Phase 1 compliance in the monthly, quarterly, and annual analyses used to identify racial profiling or other bias-based problems.


***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

MCSO designated the Early Intervention Unit (EIU) as the organizational component responsible for this Paragraph. EIU is to conduct analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia or possible racial profiling or other improper conduct as prescribed by Paragraph 64. EIU must report the findings of its analyses to the Monitor and the Parties.

We note that Paragraph 65 contemplates quarterly analyses of traffic stop data, but it does not specify exactly what such analyses might entail. During our January 2018 site visit, we discussed potential topics that might be studied by MCSO under the quarterly traffic stop analysis requirement. While a tentative list of topics was proposed by MCSO, it requested time to reconsider the list of potential topics. During our April 2018 site visit, MCSO requested permission to place the effort to develop the topic list on hold due to competing workload demands related to the second Traffic Stop Annual Report (TSAR) process. During our July 2018 site visit, MCSO requested that the status of selecting potential topics needed to remain unchanged for multiple reasons. One is due to the heavy workload demand related to completing the Second TSAR process; another is due to new work related to starting the Third

WAI 35477

TSAR process; and another reason was due to MCSO's effort to contract with a new vendor to provide analytic support on all traffic stop analyses (more about the process of retaining a new vendor is discussed in Paragraph 66 below).  We agreed to MCSO's request to keep the development of the list of potential study topics on hold.

MCSO's original monthly process to analyze traffic stop data began in 2015, and was suspended in May 2016 because of our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS.  The problems with this original process are documented in our Quarterly Reports from that period.  MCSO resumed monthly analyses of traffic stop data in May 2017 using a new methodology that was statistically based and not subject to the arbitrary, unscientific method originally employed by MCSO.  MCSO's resumption of monthly analyses was a significant milestone because MCSO employed a more meaningful statistical approach and had automated most of it, thereby lessening the chance of human error in the analysis.  While vastly improved, the methodology generated a substantial number of alerts, many of which did not demonstrate a pattern of potential bias sufficient to warrant the setting of an alert in EIS, which could be acted on by a supervisor.  Because of our concern about the number of potential alerts the monthly analysis generated – a concern that MCSO also shared – we suspended the process during our July 2017 site visit to allow us and EIU time to consider possible refinements to the existing methodology.  The resumption of the process was subsequently delayed because of the need for technical assistance related to selecting alerts identified in the Second TSAR and the subsequent implementation of the new supervisory review process to address the Second TSAR alerts entered into EIS.

Beginning with our October 2017 site visit, we started exploring refinements to the monthly methodology.  MCSO provided a demonstration of a promising approach during our site January 2018 visit, which it subsequently documented in an April 1, 2018 memorandum.  The memorandum presented two options that were explored by EIU to refine the methodology to analyze monthly traffic stop data.  One option involved setting an alert in EIS if a deputy had two or more allegations (a traffic stop outlier that is entered into EIS that has the potential of becoming an alert) during a rolling three-month period.  The second option involved setting an alert if a deputy had three allegations or more in a rolling five-month period.  The two options were tested using Paragraph 67 Benchmarks 1, 2, 4, 5, 10, and 11.  (See Paragraph 67 for a description of the Benchmarks.)  We agreed during our January 2018 site visit to suspend Benchmark 9; Benchmarks 6 and 7 are now essentially combined.  In an April 9, 2018 memorandum to EIU, we sought clarification of the analysis to ensure our understanding of the proposed options was correct.  We received a written response from EIU on April 16, 2018, just prior to our scheduled meeting on this topic.  During our April 2018 site visit, we reviewed both options and discussed the merits of each.  We agreed that each option was quite promising, in that either option's rolling time period test would identify a pattern of behavior for deputies whose behavior was most at odds with the average behavior (determined by statistical means and standard deviations) of their peers.  During our July 2018 site visit, MCSO presented the methodology it believes is the most efficacious.  It involves a rolling three-month sample using Benchmarks 1, 2, 4, 5, 10, and 11; the addition of the four-step method to the existing two-step method (uses means and statistical deviations); and a vetting process that MCSO reports will be

WAI 35478

similar in concept to the Second and Third TSAR processes.  MCSO intends to consult with its new vendor (see Paragraph 66) about this process before finalizing its recommendation for the monthly methodology.

MCSO will achieve Phase 2 compliance with this Paragraph when its periodic analyses involve the consistent use of a statistical methodology designed to identify patterns of deputy behavior at odds with their peers, and data that accurately represents deputy traffic stop behavior over time.

**Paragraph 66.** *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

MCSO has completed three comprehensive annual evaluations of traffic stop data to look for evidence of racial profiling or other bias-based policing.  MCSO released the first annual comprehensive evaluation on May 24, 2016 titled, "Preliminary Yearly Report for the Maricopa County's Sheriff's Office, Years 2014-2015."  It found that there are deputies engaged in racially biased policing when compared to the average behavior of their peers.  MCSO released the second annual evaluation first in draft on October 24, 2016 and then in final form on March 1, 2017.  However, the March 1, 2017 final evaluation had to be withdrawn due to data problems.  It was revised and re-released on July 28, 2017, and posted on MCSO's website in October 2017.  There were no significant differences in findings from those of the first annual evaluation.  The revised second annual evaluation confirmed the earlier report's main finding that racially biased policing within MCSO appears to be both a deputy and organizational level problem.

The third annual comprehensive evaluation is dated May 17, 2018.  MCSO had committed to providing this evaluation on February 1, 2018, but needed to seek relief from that deadline due to problems with MCSO's vendor responsible for the analysis.  These problems pertained to data cleaning procedures that resulted in a re-analysis of the traffic stop data.  The findings of the third annual evaluation focus primarily on traffic stops that occurred between July 1, 2016-June 30, 2017.  The analysis also incorporates data from the two previous data years spanning from July 1, 2014-June 30, 2016 for purposes of analyzing changes in organization bias over the three data years starting on July 1, 2014.

WAI 35479

The third annual evaluation continues to employ two basic methodologies. One methodology is simple ratio analysis, which uses simple statistical techniques to compare a deputy's traffic stops to traffic stops made by other deputies in a common geographic area to look for potential racial bias. This is the methodology used to generate "flags" for post-stop outcomes (citations, warnings, incidental contacts, arrests, searches, seizures, and length of stop). Ratio analysis is the primary technique used to generate most of the list of deputies from which MCSO identifies deputies who might be subject to a supervisory discussion. The second method is referred to as inferential analysis. This method involves more complex statistical modeling to explore global results related to systemic bias (organizational bias), changes in bias over time, and the influence of other factors on organizational behavior such as special assignments (e.g., DUI Task Forces) or grants. This year's evaluation included for the first time a special analysis of outlier deputies based on the length of their stops.

Using these methodologies, the third annual comprehensive evaluation reports the same findings of its two predecessor reports: racially biased policing persists within MCSO at the organizational level. In other words, potential bias across race/ethnicities is not due to the behavior of a few deputies – but occurs over the entirety of the MCSO's patrol function.

The Ratio analysis reports that Hispanic drivers have statistically significantly higher rates of arrests, searches, and seizures of contraband, and longer length of stops when compared to non-Hispanic drivers. As a group, minorities have higher rates of arrests, searches, and seizures of contraband, and length of traffic stops.

The inferential analysis reported results similar to the previous two annual evaluations. Hispanics are much more likely to receive citations compared to Whites. Hispanics and Blacks are more likely to have longer traffic stops, even after controlling for factors known to make a stop long – e.g., a tow. All minorities are more likely to be arrested compared to whites. Native Americans have the highest likelihood, followed by Hispanics. This finding holds for all minorities except Asians when it comes to discretionary arrests – i.e., those that do not involve an arrest for a suspended license, a DUI, or a warrant. Hispanics are more likely to be searched compared to Whites. Blacks and Native Americans are more likely to have a seizure of contraband compared to Whites.

The evaluation of changes over time in post-stop outcomes since 2014 found no improvement (reduction) in organizational bias. Hispanics continue to have a much greater chance than whites of being arrested or searched.

One new area of the analysis is with the use of inferential analysis to explore whether it is possible to identify individual deputies who differ from the organization average in three post-stop outcome areas: arrests, searches, and length of stop. The methodology used what is labeled in the report as a random effects model to determine how each deputy contributes to one of these outcomes. In applying this model to arrests, the report does not identify any deputy who is above or below the organization average. The model does find one deputy in the area of search outcomes. In the area of length of stops, the analysis reports that there are 86 deputies who uniquely contribute to higher length of stops for Hispanics. However, during our July 2018 site visit, we were apprised by MCSO that the finding for deputies involved in long length of stops is quite questionable. First of all, the 86 deputies reported in the study reflect a

WAI 35480

typographical error in the report; the actual number should have been 43.  MCSO also reported that of the remaining 43 deputies, three deputies never pulled over a Hispanic; and that 16 other deputies had longer stops times for whites than Hispanics.  Because the contract with the vendor had ended, MCSO reported that it had no means to double check the vendor's analysis; and we were also unable to ask the vendor our own questions about the analysis.  MCSO reported to us that the vendor had yet to provide them with the data file and the computer software syntax it used to conduct its random effects analysis, so we are unable to repeat the analysis to test its veracity.

As we have noted above, the contract with the vendor responsible for supporting MCSO's analyses of traffic stop data ended on June 30, 2018.  On May 18, 2018, MCSO issued a Request for Proposal (RFP) open to the public to establish a contract to collect, maintain, clean, analyze and disseminate traffic stop data.  During our July 2018 site visit, MCSO informed us that it had received bids from potential vendors and was reviewing them.  MCSO could not provide us with a projected award date, as the RFP review process involved many steps before a final decision could occur.

MCSO will achieve Phase 2 compliance with this Paragraph when it demonstrates an ability to conduct the annual comprehensive evaluation of traffic stop data in a consistent fashion each year using a statistical methodology supported by the peer-review literature and data that accurately represents deputy traffic stop behavior.

**Paragraph 67.**  *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.  *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.  *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.   *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

WAI 35481

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Deferred

The EIU provides monthly analyses and documents describing the benchmarks used to set alerts for possible cases of racial profiling or other misconduct involving traffic stops. As reported in Paragraph 65, this process is suspended pending MCSO's effort to finalize a refinement to the methodology used to analyze traffic stop data for the purposes of setting alerts for deputies potentially engaging in bias-based policing. During our July 2018 site visit, MCSO requested additional time to enable its new vendor adequate time to review MCSO's proposed approach before formally presenting its final methodology to us for approval. We agreed to that request.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities. The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1). The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2). The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3). MCSO reported in its May 16, 2017 memorandum that the last areas awaiting completion (District-level analysis for benchmarks 67.a. and 67.b.) were completed. Since these three benchmarks are operational, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4). MCSO reported in its May 16, 2017 memorandum that Benchmark 4 became operational on March 1, 2017. Since this benchmark is now operational, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks. The first benchmark pertains to the rate of citations (Benchmark 5): MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers. MCSO's draft EIS Project Plan 4.0 reported that this benchmark became operational at the organization and beat levels as of March 10, 2017. The second benchmark (Benchmark 6) pertains to seizures of contraband: MCSO is required to identify low rates of seizures of contraband following a search or investigation. The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation. According to the draft EIS Project Plan 4.0, Benchmark 6 became operational by manual entry as of December 1, 2016. This is also the case for Benchmark 7. Since the three benchmarks are now operational, MCSO is in compliance with Paragraph 67.c.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy non-compliance with the data collection requirements under the First Order (Benchmark 8). This benchmark requires that any cases involving non-compliance with data collection requirements results in an alert in EIS. EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS in those cases involving duplicate traffic stop records to deliver timely data validation for our review. MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016. Therefore, MCSO is in compliance with Paragraph 67.d.

WAI 35482

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d. MCSO has three benchmarks under Paragraph 67.e. Benchmark 9 is defined as racial or ethnic disparities in search rates. Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates. Benchmark 11 is defined for non-minor traffic stops. The May 16, 2017 memorandum from MCSO reports that Benchmarks 9-11 are operational at the required levels of analysis. Therefore, MCSO is in compliance with Paragraph 67.e.

MCSO has completed operationalizing the benchmarks required by this Paragraph. That said, the monthly analysis that relies on these benchmarks generated a substantial number of alerts in the first two months of its use. As discussed in Paragraph 65, the benchmarks used in the monthly analysis of traffic stop data for May 2017 generate too many alerts (well over 100 per month), most of which lack sufficient detail to establish a pattern of problematic behavior for the individual deputies identified by the methodology. Because of this problem, we suspended the monthly analysis process to allow us and MCSO time to explore refinements to the methodology, which affects Benchmarks 1, 2, 4, 5, 10, and 11. During our October 2017 site visit, we determined that the use of four benchmarks (Benchmark 3, Benchmark 6, Benchmark 7, and Benchmark 8) to set alerts in EIS should resume. We also approved the suspension of Benchmark 9 (search rate for traffic stops that is an outlier) added by MCSO under Paragraph 67.e.

Until the methodology is refined in a manner that redresses the problem of too many alerts, we are deferring our Phase 2 compliance assessment of Paragraph 67.

***Paragraph 68.*** *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.   *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.   *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.   *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.   *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.   *the resource needs and allocation during the Significant Operation; and*

f.   *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**Phase 1:** In compliance

- GJ-33 (Significant Operations), most recently amended on May 10, 2018.

WAI 35483

**Phase 2:**  In compliance

MCSO has not conducted a significant operation that met the requirements of the Order since Operation Borderline in December 2014.  Subsequent activities (i.e., Operation Gila Monster in October 2016) have not met the criteria for review under this or other Paragraphs.

We assess Phase 2 compliance via a combination of responses to monthly document requests and interviews of command and District staff during our regular site visits.  CID provides monthly memoranda from each District, as well as Investigations and Enforcement Support, regarding involvement in special operations and immigration-related traffic enforcement.  For April-June 2018, the memoranda show no activity meeting the criteria of this Paragraph has occurred.  Additionally, during our April and July 2018 site visits, our interviews with District personnel and central command indicate that no reported significant operations or immigration-related traffic enforcement occurred during this time period.

***Paragraph 69.***  *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy.   Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Arizona Office of Courts (AOC) records, and the Cornerstone software program (referred to as theHUB), that includes training and policy records for MCSO.  Supervisors have demonstrated the ability to access these during our April and July site visits .

MCSO has automated the dissemination and responses to Action Forms generated from BIO's Audits and Inspections Unit.  MCSO has also initiated alert investigations for repetitive issues discovered during the audit and inspection process.  BIO continues to develop the audit for tracking alert investigation processes following the initial proposal review by us and the Parties.

Additionally, the Traffic Stop Monthly Report, incorporating significant benchmarks from Paragraph 67, is still in under development.  MCSO has proposed, and is evaluating, several analytical options.  While some of the benchmarks – immigration inquiries and data collection issues – continue to trigger alerts that are being investigated by supervisors, the remainder continue to be in a holding process while the methodological options are being evaluated.  Finally, due to the priority of the Traffic Stop Annual and Monthly Reports, MCSO has not yet proposed the initiation of quarterly traffic stop reports required by the Order.  Each of these

WAI 35484

reports could greatly improve the quality and quantity of information that supervisors have at their disposal to oversee their subordinates. The routine publication of each of these reports is necessary for the evaluation of Phase 2 compliance for this Paragraph.

Each month, MCSO provides a list of completed alert investigations. From this list, we randomly select 15 cases, to review the investigations conducted by supervisors and evaluate the effectiveness of supervisory oversight. In several cases, there are ongoing PSB investigations that limit the ability of supervisors to review materials beyond the brief descriptions provided to supervisors, as outlined in Paragraph 75.a and b below. During our July site visit, we requested clarification of what supervisors can view regarding materials relevant to an ongoing PSB investigation that also led to an alert investigation. MCSO advised us that the majority of materials underlying an ongoing PSB investigation would only be closed to supervisors in the most serious cases until such time as the PSB investigation is closed. We suggested to MCSO that supervisors be advised to review as much material as possible without impacting PSB processes and note these circumstances in the closure of the alert investigations.

MCSO has also created a committee of BIO and EIU personnel who review all alert closures. During April-June, four of the randomly selected cases we reviewed included a notation that the committee had sent these alerts back to the District for further processing. During our July site visit, MCSO agreed that if a case is sent back to the District for further processing, it should not be included in the completed case list we request each month. In the future, only completed cases will be included in the list transmitted to us; however, those cases that the committee sent back for additional review will contain a notation about the deficiency and how District personnel remedied it.

Of the remaining closed alert investigations, we inquired about two investigations by different supervisors that were closed as NFA (no further action) but in the summary the supervisor described a discussion they had with the deputy. MCSO stated that these should have been returned to the District and changed to "meeting with a supervisor" or "coaching," depending on the extent of the conversation. One closed investigation was sent back to the District following the EIU committee review with the recommendation that the deputy be put on an action plan. We have requested a copy of the Action Plan and monthly supervisor notes regarding the progress. We will evaluate these materials when they are supplied. Finally, we have found that District command staff have also become more closely involved in the review of alert closures. From April-June, there were five cases in which lieutenants or captains asked the supervising sergeant to change a closure designation, add material to the discussion, or review particular materials relevant to the investigation. These circumstances indicate an improvement in supervision compared to what existed previously.

AIU conducts monthly audits of supervisory oversight via the supervisor notes made for each deputy. Minimally, each month supervisors should be making a performance appraisal note, reviewing two body-worn camera recordings and reviewing the EIS profile of their subordinate. When deficiencies are found, AIU sends out Action Forms to District command for correction. In addition, multiple Action Forms for the same supervisor deficiencies over time would result in an alert being set on the supervisor. From April-June 2018, MCSO averaged over 98% compliance in the evaluation of supervisor notes; however, during this period, there were five

WAI 35485

BIO Action Forms sent to Districts 6, 2, and 7.  In four cases, the Action Forms were sent due to deficiencies of sergeants; and in the fifth, the Action Form went to the Deputy Chief as a result of a captain's oversight of a lieutenant.  MCSO continues to work on a proposed audit of Action Form tracking to ensure that they adequately capture trends over time for individual supervisors or units as a whole.  We will evaluate this proposal as it is further refined.

AIU also conducts three inspections of traffic stop information: two of these pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and the third is an inspection regarding the correct completion of traffic forms and the coordination of these forms with databases like CAD.  In the review inspection, AIU found that, overall, the majority of supervisors are reviewing the traffic stops of subordinates within three days.  The compliance rates for April-June were above 98%.  Action Forms were sent to District 4 in both May and June.  We inquired with MCSO if these deficiencies were for the same supervisor.  The discussion inspections are lagged by one month since supervisors have 30 days to discuss traffic stops with their subordinates.  The compliance rates for March-May were above 95%.  Action Forms were sent to Districts 2, 5, and 6.  We will follow up with MCSO to determine how these Action Forms were resolved.  The traffic stop data inspection is intended to maintain the integrity of the data compiled, and to evaluate that in their review of subordinate activity, supervisors are catching any traffic form deficiencies.  While this inspection typically uncovers a greater number of deficiencies, the trend since January of this year has improved from the mid-seventieth percentile to the eightieth and ninetieth percentiles.

AIU also conducts inspections of patrol activity logs, to ensure that deputies are accounting for their time and supervisors sign the logs.  The shift roster inspections are designed to determine that supervisors are working the same shifts as their subordinates and that their span of control meets policy guidelines.  Each inspection shows compliance rates in the high ninetieth percentile for April-June.  Each month, a few Action Forms were sent to Districts for review and correction.

AIU also conducts an inspection of County and Justice Court cases that are turned down for prosecution.  While the major issue being inspected centers on whether probable cause existed to support the actions of the deputy during the original activity, AIU also identifies other issues that can result in memoranda to Districts that suggest additional training of deputies might be in order.  For April-June, AIU found one case each month that had been turned down for prosecution due to errors of a deputy.  In May and June, the turndowns were due to the submission of extremely late supporting documents and the prosecutor noted the delay as the reason for non-prosecution.  Each resulted in an Action Form to the respective District.  In April, AIU found that a case was turned down after receiving notification that probable cause statements in an aggravated assault case were not sufficient to proceed with prosecution.  AIU sent a memo of concern for this case to PSB, and we will follow up on the outcome of this investigation as it becomes available.

The inspections of supervisory oversight conducted by MCSO indicate increasing compliance and stability.  Aside from the fluctuating trends of the traffic stop data inspections, most reports indicate compliance in excess of 95%.  In our discussion with lieutenants and captains during our April and July site visits, the consensus was that most of the current errors are due to recent

WAI 35486

promotions to sergeant – that is, these personnel do not yet have the experience to keep up with all of the responsibilities of supervision.  In each case, however, the command staff believe that these new supervisors are improving.  We will continue to evaluate the adequacy of supervisory oversight and the responses to Action Forms sent to Districts for correction and reform.

**Paragraph 70.**  *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.  If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.  All interventions shall be documented in writing.*

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

EIU personnel are continuing to develop the next draft of the EIU Operations Manual.  MCSO continues to evaluate and develop the methods and plans for the Traffic Stop Monthly Reports (TSMR) and Traffic Stop Quarterly Reports (TSQR).  The manual will provide a basis for the transparency of roles and duties of EIS personnel.  Given recent transfers into and out of the Unit, it is imperative that MCSO complete the manual to ease the process for personnel to understand their responsibilities.  In addition, the manual will provide the organization as a whole an explanation of the goals to be achieved by a fully functioning early intervention process.  Due to the recent discontinuation of a contract with the outside vendor that assists MCSO in the compilation and analysis of traffic data, the TSMR and TSQR have been slowed until a new contractor is secured.  The issues related to the statistical reports (including the Traffic Stop Annual Report) have been a central focus of discussions with MCSO both during and between our site visits.  At times, these discussions have also included the Parties and their experts.  To its credit, MCSO has created a "data quality" workgroup consisting of members of all units that participate in the compilation, creation and transmission of traffic data.  The regular meetings and reports of this committee are intended to ensure that future data anomalies are minimized and reports are produced in a timely manner.  Several times in the past, the reports were based on data or methods that were opaque and undocumented, resulting in the

WAI 35487

need for recompilation of data or new analyses.  Once the new contractor is secured, a priority should be the completion of all aspects of the EIU Operations Manual.  This will provide more confidence in the reports that are produced in the future.  We will continue to work with MCSO and the Parties toward this end.

A portion of the monthly alert report produced by EIU depends upon the TSMR required in Paragraph 67 of the First Order.  The methods for the elements of Paragraph 67 remain under evaluation.  The EIS also produces alerts for numerous activities, ranging from use of force to county attorney turndowns lacking probable cause.  The new leadership of BIO has begun the process of evaluating and updating the thresholds used to trigger these alerts to ensure that they are sufficient to detect behaviors that might indicate bias on the part of deputies, taking into consideration the current assignment of the deputies as noted in Paragraph 81.f.  The alerts triggered are first evaluated by EIS personnel and then transmitted, via Blue Team, to the appropriate supervisor and District command.  The supervisors conduct an investigation, including a potential discussion with the designated deputy, and memorialize their actions in Blue Team.  These investigations are reviewed by District command staff and a newly formed "alert committee" to ensure that proper investigation and possible interventions are clearly outlined.  Any deficiencies result in the return of the original investigation to the immediate supervisor for revision.  The introduction of Attachment B to GH-5 (Early Identification System), a checklist of responsibilities for supervisors conducting alert investigations, has greatly improved the efficiency of this process.  We have noted several instances each month where command staff have returned investigations to supervisors; and, with the introduction of the alert review committee we have also found that the ARC has requested additional information in four cases from April-June 2018.  This dual quality control process should result in fewer instances of incomplete investigations, as well as the assurance that appropriate actions are taken to address problematic behavior of deputies.  We will continue to review and evaluate the sufficiency of the closed alert investigations and have requested updates on those that are still outstanding.  AIU is also developing an alert audit/inspection to further track the timeliness and sufficiency of randomly selected alert investigations.  We have commented on the first draft of this inspection and continue to work with AIU personnel on the refinement of these processes.

During the third quarter of 2017, MCSO, working with the Parties, drafted a strategy to address some of the systemic issues identified in the first two Traffic Stop Annual Reports (TSARs).  MCSO identified nine goals, which are detailed in the Maricopa County Sheriff's Office Constitutional Policing Plan.  The Plaintiffs and Plaintiff-Intervenors stipulated as to the contents of the plan; and the Court issued an Order in September 2017, approving the Plan.  We requested documentation pertaining to several goals listed in MCSO's Constitutional Policing Plan.  The Plan lists different target dates for completion of its goals and sub-goals.  Our methodology for requesting verification of compliance takes these due dates into account.

MCSO planned to update and republish the Plan every six months; and began work on an updated version, which it shared with the Monitoring Team and the Parties.  We reviewed the revised Plan, which we have referred to in our previous report as the March 2018 revision.  At

WAI 35488

the time of our July site visit, MCSO had not finalized this revision.  MCSO advised us that the July revision would be completed and published by July 31, 2018.

During our July site visit, we met with MCSO to discuss the progress of the Constitutional Policing Plan.  As to the liaison program listed in Goal 1, MCSO stated that BIO has emailed Patrol Commanders asking to attend their District staff meetings, to answer questions about EIS and the BIO process that supervisors may have.  BIO personnel intend to meet with District supervisors at least twice per year, but would facilitate BIO's participation more frequently if needed.  The feedback received from Patrol personnel has been positive.  The BIO command staff stated that there are portions of EIS that supervisors have had questions about, and details about the Traffic Stop Annual Report (TSAR) that they do not understand.  The program's intent is to dispel rumors, clarify issues, and answer supervisors' questions about these processes.  The liaison program/internal town halls noted in Goal 1 are due for implementation by September 1, 2018.  With regard to the deputies that were identified in the Second TSAR, MCSO advised us that it has enacted action plans to address the concerns noted, and BIO will monitor the effectiveness of the action plans in 30-, 60-, and 90-day increments.  MCSO will publish the outcomes of the action plans in the annual report.

With regard to Goal 2, the observations and recommendations from Enforcement Commanders pertaining to Blue Team notes and Employee Performance Appraisals, MCSO advised us that this has been the topic of discussion at the District Captains' monthly meetings.  Despite this, it is not clear if this information has been operationalized.  MCSO has collected all the feedback and categorized the comments according to the related areas of the EPA.  It is the Monitoring Team's position that, in addition to fulfilling the requirements of the Order, the Employee Performance Appraisal process should be a useful tool for measuring performance.  The Monitoring Team provided feedback to MCSO as to the areas that have been deficient, and how these deficiencies could be addressed.  MCSO is considering making a substantial revision of the EPA format as a result of some of the concerns that have been expressed.  MCSO noted that their data systems, at times, lack interoperability; some of the issues identified have been technology-related.  MCSO's goal is to simplify the EPA process, while ensuring that Order requirements are met.  MCSO is considering adding due dates that are accessible to the chain of command, for better tracking.  We asked for a timeline regarding the EPA revision, but one could not be provided at the time of our July site visit.

Goal 3 of the Plan relates to training and roll-call briefings on enhanced cultural competency and implicit bias.  MCSO provided documentation regarding a presentation made by one of the District Captains during the monthly Enforcement Commanders' meetings.  The presentation included strategies on how to address implicit bias, and successful and unsuccessful strategies to promote fair and impartial policing.  We inquired in July if there had been any training or roll-call briefings related to implicit bias and cultural competency since our April site visit – and MCSO advised us that none had occurred.  During our April site visit, MCSO advised us that it was developing a repository of video recordings that would be useful as teaching tools in identifying deficiencies and violations of policy, as well as noting desired outcomes in positive interactions with the public.  In April, MCSO circulated a request for supervisors to send BWC videos to the Training Division for evaluation.  During our July site visit, we learned that this

WAI 35489

endeavor had not been very successful.  MCSO also reached out to other law enforcement agencies to ask for BWC videos that they would be willing to share.  This proved unsuccessful, as well.  It is understandable that other law enforcement agencies would be hesitant to share videos where their employees were found to have committed violations or acted inappropriately.  In the absence of actual recorded incidents, MCSO will develop training videos with role players.  MCSO had previously approved a training video on implicit bias titled, "Start by Believing."  This video was related to gender bias.  During our July site visit, MCSO advised us that this video was not shown and will not be used in the future, and that MCSO has refocused its efforts on race and ethnic bias.

As to Goal 4 of the Plan, which calls for enhanced fair and impartial decision-making training, and the importance of the guardian mindset, MCSO identified the presentation made at the April Captains' meeting as responsive to our request for proof of compliance.  This presentation covered successful and unsuccessful strategies to address implicit bias and fair and impartial policing.  However, MCSO has not demonstrated that it has provided this information in any way to the rank-and-file during this reporting period.

As previously noted, MCSO distributed a Briefing Board in April, asking Patrol supervisors to send BWC videos to be evaluated for training and roll-call briefings.  The results were dismal, which prompted MCSO to formulate an alternative solution.  MCSO previously acknowledged that they were behind schedule in training on consent searches.  During our April site visit MCSO advised us that the Maricopa County Attorney's Office (MCAO) would develop this training.  During our July site visit, MCAO stated that it was currently developing the training, and that it would be delivered separately from the 2018 ACT.  MCAO stated that the delivery method had not been decided.  Ideally, an MCAO instructor would deliver the training in a classroom setting; but MCAO did not have sufficient attorneys to complete the task.  In addition, all instructors need to be vetted, in accordance with the Order, before training can take place.  MCSO informed us that there have been no recommendations from the Criminal Intelligence Division related to discretionary searches, as a result of their analysis of traffic stop data and BWC recordings.

Goal 5 of the Plan states that MCSO will provide deputies and supervisors with enhanced cultural competency training and roll-call briefings based on community input.  MCSO advised us that it has received substantial feedback from the LGBTQI community.  We noted the same, from comments on the July revision of the Plan, which had been reviewed and returned to MCSO by members of the LGBTQI community.  We also advised MCSO that several community members complained that they were not provided a sufficient amount of time (a day and a half) to properly review and provide meaningful feedback to the July revision.  MCSO admitted this mistake and has resolved to provide sufficient time in the next iteration of the Plan.  We are disappointed that there was no input on the July revision of the Plan from organizations representing the Plaintiffs' class.  We urge MCSO to continue to work with all groups, and seek input from the different communities that make up Maricopa County.

As to Goal 6 of the Plan, improving traffic stop data collection and analysis, MCSO advised us that the software update that was needed to move forward with the revision to the VSCF was completed.  Most of the updates that are being considered relate to the elimination of

WAI 35490

redundancies in the VSCF. MCSO has continued to work on the update to the VSCF, but it was placed on hold pending an update to the Records Management System. The revisions to the VSCF have been pushed back because other priorities have required attention.

Goal 7 of the Plan states that the Community Outreach Division (COrD) personnel and Enforcement Commanders would establish guidelines for supervisors to track employees who have made exemplary contributions to constitutional and community-oriented policing. MCSO conducted its first community-related award ceremony in May. The recipient was a Patrol supervisor. To better track deputy participation, MCSO personnel advised us that they are developing a worksheet for Patrol deputies to document community engagement activities. We asked for additional details during our July site visit. MCSO informed us that the purpose of the worksheet is to obtain better and more accurate data with regard to deputies' community policing and community engagement activities. We inquired if this worksheet is intended to document participation in formal events, where there are large numbers in attendance, or if the worksheet will be used to track one-on-one deputy interactions with the public. MCSO personnel stated that they have not made that determination yet.

As to Goal 8 of the Plan, the Peer Intervention Program, during our July site visit, we inquired as to the status of the alternative program that MCSO was considering. (MCSO had initially considered the EPIC program from New Orleans.) MCSO advised us that the alternative program would be run out of EIU, but that additional personnel would be needed. MCSO stated that the most workable methodology would be for EIU to work with Division Commanders to identify issues with personnel in their chain of command, and for EIU to assist with interventions. Without the benefit of additional information regarding this alternative program, it is difficult to evaluate. There appears to be an *intervention* element, but we have not identified the *peer* component. It appears that this process may be more useful in addressing issues related to the TSAR, and deficiencies identified by the chain of command, than it is in encouraging Patrol deputies to intercede when they observe a colleague about to commit a violation, as was the intent of the EPIC program.

Goal 9 of the Plan involves building a workforce that provides constitutional and community-oriented policing and reflects the community that MCSO serves. During our July site visit, MCSO advised us that Human Resources instituted a pilot program wherein a third-party vendor will complete the background investigation of applicants for civilian positions. The intent is to streamline the background process to make the hiring of civilians more timely and efficient. The process using a third-party vendor will be useful for civilian employees, but sworn and Detention personnel have additional Arizona Peace Officer Standards and Training (AZPOST) compliance requirements that make their background investigations more complex. One advantage to contracting out civilian background investigations may be that more investigators would be made available to supplement the number of MCSO investigators assigned to sworn and Detention applicants. As of our July site visit, MCSO reported that it had 79 sworn vacancies and 261 Detention vacancies. MCSO is experiencing a 6% attrition rate; the current hiring process is unable to keep up with attrition. In fiscal year 2018, MCSO had 32 separations and 19 hires. MCSO advised us that another concern with the recruitment and retention of employees is the lack of established step raises. To implement such a program

WAI 35491

requires the approval from the County Board of Supervisors.  MCSO should work to alter these to improve its ability to hire and retain employees.  We recommend that MCSO explore options for increasing its recruiting outside the County and the state, and improving its marketing strategies to demonstrate the full benefits of working at MCSO to potential applicants.

We note that the purpose of the Plan to Promote Constitutional Policing was to address the issues and concerns noted in the first two TSARs.  Definitive proof of compliance will be established with the completion of these goals, and verification of results through future TSARs.

MCSO has made some progress in meeting the requirements of this Paragraph during the quarter by completing the supervisory discussions for deputies found to be outliers in the Second TSAR.  MCSO is not in Phase 2 compliance with this Paragraph, as the TSMR and TSQR are not yet in production.  In addition, there is much work to be done to finalize and implement the Constitutional Policing Plan.  We will continue to evaluate and provide feedback to MCSO as these materials are produced.

**Paragraph 71.**  *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO has provided us with access to existing data from monthly and annual reports.

We have been working with MCSO on the refinement of the Traffic Stop Monthly Reports (TSMR) since we recommended their discontinuation in April 2016.  During the first quarter of 2017, these analyses were reintroduced – but discontinued again in July 2017, due to the finding that the methods employed were not sufficiently refined to detect patterns of problematic deputy activity.  Since that time, we and the Parties have worked with MCSO to create a more thorough methodology.  The discontinuation of the contract with the outside vendor conducting traffic stop analyses has delayed the completion of this project.  MCSO has proposed a new method that involves using multiple months of data to provide sufficient material for supervisors to detect potential patterns of biased traffic stop activity.  Once the new contractor is appointed, we will work with them and MCSO to finalize and evaluate the TSMR methodology.  As noted in Paragraph 69, MCSO continues to set alerts for some elements of Paragraph 67 not affected by the TSMR, as well as non-traffic activity of deputies.  MCSO is also reviewing and refining the thresholds that trigger non-traffic alerts.  We will continue to work closely with MCSO on these issues.

MCSO has not yet published a Traffic Stop Quarterly Report (TSQR) as required by the Order.  In November 2017, we had approved several proposed special studies that MCSO might conduct to meet the requirements of the TSQR.  During our January 2018 site visit, MCSO personnel stated that they wanted to revisit the topics of the special studies; and in February and March 2018, MCSO reported the discovery of data-handling problems that impacted both the

WAI 35492

monthly and annual traffic stop analyses.  As a result, further work on the TSQR has been postponed in favor of resolving the more pressing data issues, as well as waiting for the input of a new outside vendor.

MCSO has worked with us and the Parties to resolve each of these deficiencies, and has been transparent in advising us of problems that have arisen.  We have consistently been provided access to the data and reports relevant to this Paragraph.  The deficiencies noted, however, do impact compliance with other Paragraphs.

WAI 35493

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

*Paragraph 72.   MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  Not in compliance

During 2017 and early 2018, MCSO introduced interfaces between EIS and several remote databases of importance.  EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), training completion and policy acknowledgement records from the Cornerstone software (theHUB).  MCSO continues to work on the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data; as well as the responsibilities and roles of departmental and EIS personnel.

MCSO has not produced a consistent Traffic Stop Monthly Report (TSMR) in nearly two years as a result of data and methodological problems discovered by MCSO and us.  Additionally, MCSO has yet to produce a Traffic Stop Quarterly Report (TSQR).  We have been working with MCSO and the Parties to overcome the problems inhibiting the production of these reports and incremental progress has been made.  However, due to the fact that MCSO is hiring a new outside contractor to conduct analyses of traffic stop data, the production of these reports will be further delayed.  MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating supervisor notes that indicate whether supervisors are reviewing the EIS data of deputies under their command.  During this quarter, supervisors examined and made a Blue Team entry about their subordinates' EIS data in 98% of cases examined.  For those that were deficient, an Action Form was sent to their immediate supervisor.  Similar results occurred for the supervisory review of body-worn camera (BWC) recordings and Employee Performance Appraisal (EPA) notes.  Additionally, supervisors exceeded 95% compliance for the review of traffic stops for their subordinates and the requirement that supervisors discuss these stops with the deputies within specified timeframes in two separate AIU inspections (Traffic Stop Review and Discussion Inspections).  The traffic stop data inspection report published by AIU indicates

WAI 35494

slightly lower rates of compliance for April and June (88%) for a randomly selected sample of deputies.  The deficiencies ranged from not noting an assisting deputy on the BWC log to incorrect arrest types and times on the VSCF forms.  These indicate not only deficiencies on the part of deputies, but also the failure of supervisors to capture the inaccuracies.  BIO sent Action Forms to the Districts addressing each of these problems.  It is important to note that the disparity between the Traffic Stop Review and Discussion inspections with the findings of the Traffic Stop Data Inspection is due to the fact that supervisors are only required to review two BWC events for each deputy per month.  Therefore, some deficiencies will only be uncovered through the data inspection process.  This is an excellent quality check for supervisors and District command to address when Action Reports are received.

EIU also produces a monthly report on alerts triggered within EIS.  The alerts are reviewed by EIU personnel and disseminated to supervisors and District command if potential deficiencies or problems may exist.  The supervisors employ a template (Attachment B of GH-5) to conduct the investigation and report their findings and results to the chain of command through Blue Team.  Command personnel have improved their effectiveness in reviewing these investigations and have indicated that a number of investigations are returned to supervisors for clarification or further processing.  BIO has also created an alert investigation review committee to check the quality of the original investigation and the review of District command staff.  During this reporting period, four cases were returned to District command for further clarification.

AIU is currently working to develop inspections for both the alert inspection process and the tracking of Action Forms disseminated to the Districts because of deficiencies discovered.  We have commented on early drafts of these inspections and will use them as they are published to access the compliance of MCSO.

As noted in Paragraph 70, MCSO has also completed most of the Action Plans emanating from the Second Traffic Stop Annual Report (TSAR).  We have evaluated both the supervisory discussions leading up to the Action Plans (APs) and the supervisor notes describing the activity during the AP process.  We have shared with MCSO our concern that some supervisors did not appear well-prepared or comfortable conducting the taped supervisor discussion.  Moreover, a few supervisors noted repeated deficiencies of their subordinates during the Action Plan process, but did not recommend additional training that may have ameliorated these problems.  There were also examples of supervisors invested in the process and providing significant mentorship to their deputies.

***Paragraph 73.***  *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS.  MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users.  This unit may be housed within Internal Affairs ("IA").*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

WAI 35495

**Phase 2:**  In compliance

The EIU is a fully functioning unit.  A lieutenant coordinates the unit, with three sergeants conducting investigations, one analyst, and one administrative staff member under the auspices of BIO.  Over the past six months, this unit has seen a number of transfers and changes to leadership in both EIU and BIO.  These transitions occurred during the evaluation and implementation of the Second TSAR.  At the direction of the new leadership, MCSO provided significant additional personnel and support staff to address the volume of activity surrounding the creation and evaluation of documents, as well as the execution of supervisory discussions and action plan processes in the Districts.  While these processes were not without delay, we acknowledge MCSO's commitment.  More importantly, the lessons learned during this process have prompted MCSO to suggest a special unit within BIO for the future responsibilities surrounding annual traffic stop reports and processes.  This should alleviate the need for the temporary transfer of personnel in the future, and the delays that existed during the Second TSAR.  As these changes are implemented, we will evaluate them in future quarterly reports.

EIU is also working on the methodologies for the traffic stop monthly and quarterly analyses. MCSO is awaiting the assignment of a new outside contractor before finalizing the proposals for these analyses.  Additionally, EIU is working on another draft of the EIU Operations Manual.  The completion of this task is also dependent upon the finalization of TSMR and TSQR processes.

EIU has also overseen the expansion of the EIS database over the last year to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Arizona Office of Courts (AOC) and training and policy receipt records from the Cornerstone software program (theHUB).  Supervisors now have much more information available to them about the deputies under their command than they ever had before.  Training on the EIS was completed for supervisors in the fall of 2017 and EIU is already working on additional training to improve the ability of supervisors to fully use the information housed within EIS.

The hiring of a new outside contractor to analyze traffic stop data will provide the foundation for the completion of the remaining aspects of the EIU Operations Manual that are incomplete or under revision.  The operations manual is fundamentally important to improve the transparency and effectiveness of MCSO data collection and use as a whole.


***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- EIU Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

WAI 35496

MCSO continues to work on the development of the EIU Operations Manual. As a result of the demands of the Second Traffic Stop Annual Report (TSAR), and the more recent need to replace the outside contractor responsible for traffic stop data analysis, MCSO has placed on hold the completion of the EIU Operations Manual. While sections of the manual continue to be developed, those sections relating to Traffic Stop Monthly Report (TSMR) and Traffic Stop Quarterly Report (TSQR) have been put on hold.

The new leadership of BIO and EIU has also undertaken a re-examination of the thresholds that potentially trigger alert investigations. This is responsive to our repeated comments that many of the thresholds had never been based upon statistical or theoretical foundations. MCSO is revisiting each threshold, particularly the complaints accumulated by subordinates of supervisors and the use of force, to ensure that they are set at a level commensurate with the type of assignment of deputies and their supervisors in accordance with Paragraph 81.f. While the old thresholds remain in place, BIO is conducting a thorough examination of what led to the original thresholds and how these might need to be modified, given contemporary experience. In addition, the leadership has suggested they will consult with adjoining jurisdictions to further solidify the threshold changes that may be proposed.

MCSO has shown progress in the development of a data-handling protocol. A committee of personnel from units responsible for assembling the data used for analysis has been established. The monthly reports of these committee meetings appear consistent with the general guidelines of this Paragraph. The previous outside contractor for data analyses used methods of analysis and software in the publication of the Second TSAR that differed from that which was expected. With the hiring of a new outside contractor, these methods and software programs may need to be altered. We will evaluate these proposals as they are produced.

We will evaluate each of these processes as they are produced and ensure that they meet the Order requirements. At present, MCSO is not in Phase 2 compliance with this Paragraph.


***Paragraph 75.*** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.    *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.    *all internal investigations of alleged or suspected misconduct;*

c.    *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.    *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.    *all arrests;*

WAI 35497

f.   all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;

g.   all arrests in which the individual was released from custody without formal charges being sought;

h.   all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;

i.   all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

j.   all disciplinary action taken against employees;

k.   all non-disciplinary corrective action required of employees;

l.   all awards and commendations received by employees;

m.   Training history for each employee; and

n.   bi-monthly Supervisory observations of each employee.

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- EIU Operations Manual, currently under revision.

- PSB Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

During 2017, and the first quarter of 2018, MCSO has made progress toward the automation of data in the EIS database relevant to this Paragraph.  MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCF's), Justice Court turndowns (AOC) and the Cornerstone software program (theHUB) that provides reports for training and policy acknowledgment.  MCSO continues to develop some inspections that ensure that personnel are accurately using the EIS data available to them.  We continue to evaluate and monitor the use of EIS in furtherance of the First Order.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies.

WAI 35498

EIU and PSB worked closely with their vendor, CI Technologies, during 2016-2017 to provide access to both open and closed complaint cases.  Since February 2017, both open and closed cases have been viewable by supervisors.  PSB controls the ability to view open cases based upon the parties who may be involved.  PSB personnel developed a protocol to write the summaries for both open and closed cases.  This protocol has been approved, and will be incorporated into the PSB Operations Manual that is currently under revision.  As a result of a regular monthly document request, we receive three randomly selected open external complaints/investigations.  Our review of these cases confirms that the summaries meet expectations.  Additionally, during our April and July site visits, we observed that field supervisors can easily access these summaries and understand the types of issues involved in the complaints.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving complaints, internal investigation summaries also appear in the IAPro system.  All complaint summaries, open and closed, have been viewable since February 2017.  PSB uses a standard protocol to develop the case summaries and access limits.  This protocol has been approved by us and will be included in the PSB Operations Manual that is now being drafted.  We receive three randomly selected samples of open and closed internal investigations each month as a result of a regular document request.  Field supervisors have also been able to show that they have access to these summaries in EIS and find them to be clear and concise.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

As documented in past quarterly reports, MCSO has created electronic forms to collect data from traffic stops, incidental contacts, and warnings.  As noted in Paragraphs 69 and 74, MCSO has suspended traffic stop alerts based upon the benchmarks of Paragraph 67.  MCSO continues to collect this information within EIS and once the methodology is approved this data will be used to trigger future alerts.

MCSO has also created interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs).  These reports are readily available to supervisors to review within EIS.  During both our April and July site visits, field supervisors have shown that they have the ability to view IRs and NTCFs.  AIU already conducts an inspection of IRs, and is currently developing a similar quarterly inspection of NTCFs.  When proposed, we will evaluate the sufficiency of this new inspection.   In lieu of the inspection, MCSO has made available a random sample of NTCFs that we have evaluated; we found no areas of concern regarding the handling of these incidents.

MCSO is not in compliance with this Subparagraph.

WAI 35499

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Legal Liaison Section receives and forwards this information to EIU for entry into the EIS database. Deputies self-report contacts they have with other agencies, and any two contacts within a rolling six-month period results in an alert requiring a supervisor to investigate. Supervisors have demonstrated the ability to access this information during our April and July 2018 site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrest that cannot be viewed through traffic data. During our site visits, supervisors have demonstrated the ability to access the IRs and related arrest information.

MCSO is in compliance with this Subparagraph.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the Filebound software system. MCSO has created an interface between Filebound and EIS to provide a summary of information to facilitate supervisory oversight. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU conducts a quarterly audit of IRs to ensure that all policy requirements are met. In the first quarter of 2018, 97% of supervisors memorialized their review of the IRs and 100% of IRs contained the necessary probable cause statements. The audit for the second quarter has not yet been produced.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. AIU also conducts an inspection of all cases turned down for prosecution. From April-June, there were three cases that were turned down due to errors in the reports: two resulted from deputies' failure to supply necessary documents within an appropriate timeframe and prosecutors decided not to pursue the cases (each case was approximately one year old when the decision by prosecutors was made); and one case was denied prosecution due to the belief that probable cause for the deputy's actions did not exist. The former cases resulted in Action Forms to the supervisors and command staff of the Districts, while the latter case was referred for review by PSB. We will review each of these as the results of the Action Form and PSB processes are made available.

WAI 35500

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction.  If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above.  Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS.  However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow.  The interfaces for IR and NTCF data became operational prior to July 1, 2017.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has created interfaces for both IRs and NTCFs.  As noted in 75.f., the first quarter audit of IRs found that 100% had the necessary probable cause or reasonable suspicion statements necessary.  While the audit for the second quarter has not yet been produced, the monthly report of County Attorney turndowns for April shows that one case was not prosecuted because there was a lack of probable cause described in the documents.  This case has been sent to PSB for review.

In July 2017, the interface between EIS and the database for NTCFs was placed into production.  MCSO also reissued EA-3 (Non-Traffic Contact) on June 1, 2017 – and further amended the policy on June 14, 2018.  This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences.  If the search is related to a traffic stop, it should be captured on the VSCF.  Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

From January-April 2018, the number of NTCF reports was insignificant; and we reviewed each report.  However, in May 2018, we selected a sample of cases due to an increased volume.  While our review of the April-June NTCF cases reveals no significant issues, the volume of cases is getting to the point where examination of each case becomes impractical.  MCSO has been working on the development of an audit, like that for IRs, to ensure that the actions of deputies and supervisors meet the necessary policy requirements.  MCSO must make the development of this audit a priority to ensure continued compliance with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

WAI 35501

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017.  AIU produces a monthly inspection of these cases, looking for the lack of probable cause as well as a host of other issues.  The majority of deficiencies found result in an Action Form to the relevant District command.  In April, a case was turned down for a lack of probable cause and referred to PSB for review.  In both May and June, there was one case each month that was turned down for prosecution because the case had turned "old" (one year had passed) and the arresting deputy had not submitted the necessary updated reports for prosecution.  These and other cases with minor deficiencies were returned to District command staff through Action Forms in Blue Team.  We will request updates regarding all of these cases.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system, which allows supervisors to search the history of their employees in EIS.

EIU produces a monthly alert report relevant to Paragraphs 70, 71, 75, and 81.  Table 8 of this report indicates the disposition of the alerts for the reporting period, ranging from "no further action" to "referral to PSB."  Out of the 92 cases referred to supervisors for investigation from April – June, six cases resulted in a meeting with a supervisor; and supervisors closed 11 cases, indicating that no further action was required.  Table 9 of this report includes dispositions from cases sent to supervisors in the previous month.  Out of 99 cases sent to supervisors for investigation from March-May 2018, 28 cases were closed without further action, and 21 cases were closed with a meeting with a supervisor.  Another case resulted in a meeting with a commander, and one case was referred to PSB for further review.  The problem, evident in these numbers, is that there remain a significant number of cases with no disposition within the first two months.  We have discussed this with EIU and AIU personnel.  In response, they are working on an alert tracking inspection to better capture the time to disposition and the approval of the closure and disposition imposed.  We have only seen the first proposal of this report, and will evaluate subsequent iterations as they are made available.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

WAI 35502

MCSO uses a combination of Supervisory Note inspections (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph.  As noted previously, the majority of alert investigations reported each month are closed by supervisors as requiring no further action.  The second most frequently used closure is meeting with a supervisor.  We also conduct evaluations of a randomly selected group of closed alert investigations each month.  Those closed with the notation of meeting with a supervisor have generally been found to be supported by the documents connected to the investigation.  In these reports, supervisors provide a synopsis of the instances leading up to the alert being triggered and provide a substantive description of the discussion they have had with the respective deputy.  It would appear from the sampling that deputies are receptive to these meetings, as they provide clarification for the proper processes to use should future similar instances arise.

Supervisors can also search the Supervisory Note field for each deputy using key words and phrases to determine if prior supervisors of a particular subordinate had employed briefings, trainings, or supervisory discussions to address similar issues.

AIU also evaluates a supervisor's use of EIS in the supervision of their deputies.  The Supervisory Note inspection for April through June shows an average 98% compliance rate for the criteria investigated.  Only in April, was there a notation about two supervisors, from Districts 2 and 6, who failed to make the required two entries per month.  Action Forms were sent out to address these issues and we will follow up with MCSO to find out how these issues were addressed by command staff.  MCSO is planning to initiate an inspection of Action Forms and alerts.  Neither of these is in place yet, but we have reviewed and commented on draft proposals.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO published GC-13 (Awards) on November 30, 2017.  With this publication, EIU created categories for awards or commendations within EIS.  With the introduction of the newest version of EIPro, these fields are also searchable by supervisors.  During our April and July 2018 site visits, supervisors demonstrated how they search and locate these in their subordinates' EIS data.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (theHUB) software program.  TheHUB has replaced the E-Policy and E-Learning programs.  TheHUB routinely updates recent training and policy for deputies and is visible by immediate supervisors.  MCSO also created an interface between theHUB and EIS.

During our April and July site visits, all field supervisors stated they were familiar with theHUB and were able to access the information contained therein.  Several supervisors continued to note that they were having difficulty scheduling training for their subordinates, but they could

WAI 35503

view whether subordinates had completed training or logged in to review policy documents. The supervisors also noted that when they ran into difficulties they could easily contact training or technology staff to assist them.  The Technology Management Bureau and Training Division noted that they were keeping a running list of problems with theHUB and were incrementally correcting them.  We will evaluate this again during our next site visit.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisory Notes. One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  In April, two supervisors from Districts 2 and 6 failed to make sufficient entries for multiple deputies, and lowered the compliance rate to 89%.  Action Forms were sent to these District command staff.  The compliance rates for May and June were 98% respectively.  EIU has already included multiple BIO Action Forms for repetitive deficiencies as a trigger for an alert investigation.  We are following up on several of these and will report the findings in subsequent quarterly status reports

MCSO is not in compliance with this Subparagraph.

MCSO is making progress toward the development of a functioning relational database that is used consistently by MCSO personnel.  With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Arizona Office of the Courts, and theHUB, EIS now contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Court Orders and continues to work on the development of added inspections for alert tracking, BIO Action Form deficiencies, and NTCF evaluations similar to those conducted for IRs.  We will evaluate these as they are made available.

***Paragraph 76.***  *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**Phase 1:**  In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 13, 2018.
- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  In compliance

MCSO has instituted a quality check process for VSCFs that requires supervisors to review all traffic stop documents within three days of the stop.  AIU conducts an inspection of the timeliness of these reviews.  For April-June, the compliance rate for supervisor review exceeded 98%.  A subsequent inspection by AIU of Traffic Stop Data is designed to ensure that all necessary information is included on traffic forms and these forms coincide with CAD and

WAI 35504

BWC images.  The compliance rate for the data inspection ranges from 88% in April and June to 97% in May.  However, none of the deficiencies that led to these lower percentages were the result of failing to identify themselves, the driver or passengers of the vehicles stopped, or failing to register the perceived race/ethnicity of persons contacted.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents.  Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with the Paragraph.  AIU conducts a quarterly inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident.  While the compliance rate for the IR inspection in the first quarter of 2018 was only 93%, none of the deficiencies related to the identification of persons contacted.  Most deficiencies were the result of failing to notify supervisors in a timely fashion or filing/signing documents within policy timeframes.  The IR inspection for the second quarter has not yet been published.  Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted.  MCSO does not yet have an inspection of NTCFs, but they do provide us with copies of the documents.  Up to this point we have not found an NTCF document that does not include the criteria required by this Paragraph.  However, as the volume of NTCF documents increases MCSO will have to finalize their plans to create an inspection like that used for IRs.

***Paragraph 77.  MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.***

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO.  As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment.  MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift.  Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues.  However, these areas are well-known to patrol deputies; and they have demonstrated how they adapt to connectivity problems.  The VSCF also allows deputies to note issues with technology on a traffic stop.

WAI 35505

During our April and July site visits to Districts 3 and 6, we spot-checked the facilities and patrol cars, and found that they had functioning TraCS equipment, and each District office had available computers for any occurrence of system failures with vehicle equipment.  In addition, each District had spare parts in the eventuality that body-worn camera issues arose.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

***Paragraph 78.**  MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS.  On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.  No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  In compliance

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy.  The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel of that deputy.  In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely

The most recent occurrences of a misuse of MCSO's computer system occurred in 2011 and 2015.  These instances were discovered as a result of a quality audit by the FBI in 2017.  As a result, MCSO published a System Log Audit operating procedure in November 2017 that required PSB to notify the Technology Management Bureau of any investigations involving a system breach.  This operating procedure (BAS SOP 17-4) was fully vetted during the January 2018 site visit.  MCSO reported no system breaches had occurred during both our April and July site visits.  We will continue to inquire about these issues during subsequent site visits.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has created to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations.  PSB not only controls who can view summaries of open investigations, but has created a protocol for creating the summary of open investigations to protect the integrity of the case while it is being processed.

WAI 35506

MCSO has also created a work group to ensure the integrity of traffic stop data used for analysis. These protocols will be incorporated into the next draft of the EIU Operations Manual. Moreover, although the annual report includes analyses that identifies deputies who are outliers compared to their peers with regard to traffic stops, citations, warnings and arrests that may indicate racial/ethnic bias, the identities of these deputies are removed from documents prior to being made public.

**Paragraph 79.** *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

During 2017 and early 2018, MCSO added four interfaces between remote databases and EIS. The EIS now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (theHUB) that replaced the Skills Management System (SMS). Supervisors now have the ability to search this additional information for their subordinates without having to access multiple systems. While a significant improvement, the employment of the EIS database remains limited as MCSO is still developing methodologies for the Traffic Stop Monthly and Quarterly Reports, among others. Until these are complete and operational, MCSO will not achieve Phase 2 compliance with this Paragraph.

In the meantime, EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for behaviors ranging from unscheduled absences to external complaints. The EIU uses this information to create monthly reports and to determine whether an investigation by a supervisor is required. EIU and AIU are continuing to work on the tracking of alert investigations to ensure that they do not languish without some form of closure.

AIU uses the EIS database to generate numerous inspections of Traffic Stop data, Supervisory Notes, County Attorney turndowns, among many others. When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what was done. AIU has already automated an alert threshold for repeated Action Forms for the same events. AIU personnel are developing a monthly inspection for Action Forms that allows command staff to pinpoint if there are patterns occurring that may not be evident by looking at individual cases. The goal is to track deficiencies by Districts, shifts, and squads to focus corrective measures in the most beneficial way.

WAI 35507

MCSO is hiring a new outside contractor for data analysis. Progress on the methodologies for the TSMR and TSQR have been limited to allow the contractor the opportunity to evaluate the proposals that have been developed so far. We will review these as they are made available.

### b. Training on the EIS

*Paragraph 80.    MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**Phase 1:**  In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:**  In compliance

MCSO completed the EIS and SRELE Training for all supervisory personnel overseeing patrol or traffic operations in November 2017. During our visits to the Districts, several supervisors have noted that they had finally received training on systems they had been using for over one year; while others commented that they did not understand how many tasks had been automated to make their supervisory roles easier. Nearly all supervisors remarked that they believe that future training should include more hands-on activities that they encounter on a regular basis. We recommended that the supervisors contact EIU and the Training Division to develop these ideas.

We will continue to evaluate how the delivery of this training impacts the use of EIS tools by supervisors.

### c. Protocol for Agency and Supervisory Use of the EIS

*Paragraph 81.    MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.    *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

WAI 35508

b.   *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

    i.   *failure to follow any of the documentation requirements mandated pursuant to this Order;*

    ii.   *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

    iii.   *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

    iv.   *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

    v.   *complaints by members of the public or other officers; and*

    vi.   *other indications of racial or ethnic bias in the exercise of official duties;*

c.   *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.   *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.   *identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;*

f.   *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

WAI 35509

g.   a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.   an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

i.   mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

MCSO produces a number of reports and inspections that are relevant for this Paragraph. However, due to issues with EIS data and methods of analysis, MCSO has not been able to reliably produce the Traffic Stop Monthly Report based upon the criteria outlined in Paragraph 67; nor has MCSO ever produced a Traffic Stop Quarterly Report.  Additionally, each of the Annual Reports have been delayed, or had to be rewritten, because of anomalies that arose in the data or the manner in which it was analyzed.  MCSO is contracting with a new outside vendor to conduct analyses of traffic stop data.  We will work in concert with MCSO and the new vendor to find solutions for the issues that currently limit the full use of the EIS database.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67.  The TSMR has been suspended and under revision since April 2016.  We anticipate that the new outside vendor for data analysis will have some suggestions regarding the methodology that MCSO has been developing for the past several months.  We will work with them to test and implement these processes as soon as possible.

MCSO has never produced a TSQR.  There have been several proposals regarding the substance and form these reports may take, but no data has been used to produce an analysis to date.  The Second Traffic Stop Annual Report, like the first, was delayed due to unforeseen data and analytical problems.  When these issues were discovered, they were addressed as quickly as possible.  MCSO initiated the supervisory oversight and action plans associated with the findings of the Second TSAR.  We and the Parties have commented on the supervisory discussions with deputies and action plan processes that commenced thereafter, and there have been several in-person and telephonic conversations on these topics, many of which have included the Parties.

WAI 35510

For both the TSMR and TSAR, the analysis has focused on geographic peers; that is, comparing deputy activity to deputies that patrol or conduct traffic stops in the same District. This remains a rather coarse comparison as Districts can have a variety of social, economic and ethnic differences within their boundaries. We will work with the new vendor to determine if there is a means to focus the analysis so that it might be more useful for shift and squad supervisors to identify patterns of concern.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

The publication of GH-5 (Early Identification System) on March 24, 2017 provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSAR and TSMR is to identify deputies who might be engaged in biased activity regarding who to stop, cite, warn, or search. MCSO has been developing new methods for the TSMR, and we have collectively engaged in numerous discussions about the TSAR. We believe many of these issues will be addressed once the new outside vendor for data analysis is able to evaluate what has been done already and what MCSO would like to do in the future. We are confident that the benchmarks from Paragraph 67 will be operational in future monthly analyses, given the progress that MCSO has made to date.

MCSO is also revising the EIU Operations Manual, which will include sections on data protocols and the several analyses based upon the traffic stop data. The manual also includes thresholds for behavior ranging from failure to arrive on time for work to external complaints. BIO is taking a new look at these thresholds to determine why they were set the way that they were. This investigation may result in the modification of thresholds that have proven unproductive over the last several years. We will review these changes as they are proposed. Regardless of the outcome, we believe it is a worthwhile endeavor to test processes that have been in place to ensure that they are as efficient as they are intended.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisory Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates. These actions range from making supervisory comments on deputies, reviewing their body-worn camera footage, making Employee Performance Appraisal (EPA) notations, and reviewing subordinates' EIS profiles. The overall average across these criteria has risen from 97% in April, to 99% in June 2018. This is an improvement in the trend over the past several months, where the average was in the lower ninetieth percentile. When deficiencies are discovered in this inspection, AIU sends out an Action Form to the immediate supervisor for response and remedy. For the most part, the deficiencies identify supervising sergeants; however, in April, a captain was identified

WAI 35511

for failing to make two EIS entries for a lieutenant.  Although the average across all four criteria is 97%, in April, the compliance rate for making two supervisor notes per deputy was only 89%. More importantly, it does not appear that any particular supervisor or commander is repeatedly deficient.  AIU is developing a proposal to better track Action Forms by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

Aside from interventions stemming from the Second TSAR, which include Action Plans requiring 30-, 60-, and 90-day follow-up evaluations, EIU personnel were not able to recall other interventions that have been tracked.  We have made several recommendations to BIO and EIU during our site visits and conference calls discussing the requirements of this Paragraph. MCSO is working to develop a tracking protocol and intends to include it in the next draft of the EIU Operations Manual.

The Action Plan interventions stemming from the Second TSAR were tracked through supervisor notes under a specific heading for the Second TSAR.  While helpful, we found that the supervisor notes were often too general and should specifically address issues that led to the Action Plan to begin with – for instance, the race/ethnicity of driver/passenger contacts during traffic stops.  Additionally, we noted that several Action Plans were modified before completion without significant compelling reason.  MCSO should address these and other issues that have arisen during the processes related to the Second TSAR in anticipation of future annual reports. We will work closely with the new vendor and MCSO on these projects.

While there have been no interventions to track up to this point, apart from those stemming from the Second TSAR, EIU stated that the current revision of the EIU Operations Manual will include a description of the protocol for tracking interventions.  Once it is produced, we will evaluate the proposed process.

MCSO is not in compliance with the Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system."

WAI 35512

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options.  As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form."  This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use.  EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry.  We began seeing the use of these forms in April 2017.  By September 2017, we found that the closure of alert investigations by supervisors had improved.  Most recently, we have only inquired about the ongoing status of PSB inquiries that took priority over alert investigations.  MCSO has also created an alert review committee to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization.  During this reporting period, the committee has returned four cases that needed additional information or investigation from the Districts.  We applaud this proactive move, and will continue to review all documents related to alert investigations and closures.

The monthly alert report produced by MCSO identifies not only the allegation or incident that led to the alert (Tables 1-6), but also dispositions available to supervisors investigating the alert (Tables 8 and 9).  In most cases we reviewed, the disposition is "no further action" or "meeting with a supervisor."  However, in April the report also notes a case of "meeting with a commander."  The current tables follow alert investigations for only a two-month period.  Oftentimes, this is insufficient for an investigation to be concluded.  EIU and AIU are working jointly on an inspection that would track these to their completion and evaluate the effect of any intervention planned.  We will review this proposal when it is produced.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment.  In prior versions of GH-5, MCSO created an appendix for thresholds that indicated, for example, that the "use of force" threshold was different for Detention and Patrol personnel.  Detention personnel are much more likely to need to employ force than their Patrol counterparts.  In the current version of GH-5, MCSO makes reference to thresholds that will be included in the EIU Operations Manual.

The EIU Operations Manual has already undergone several revisions and was placed on hold due to the priority of completing the Second TSAR processes.  With the addition of a new outside vendor for traffic data analysis, we anticipate the conclusion of several portions of the manual addressing the TSMR and TSQR processes.  For these reasons, MCSO is not in compliance with this Subparagraph.

WAI 35513

BIO is also reviewing the current thresholds included in the EIU Operations Manual to determine whether they should be modified based upon the past experience with them.  In this process, MCSO has reiterated the need to differentiate thresholds based upon the assignment of particular deputies.

Also, when MCSO conducts patrol data analyses, a portion of those analyses is founded on the notion of comparing "geographic peers."   Therefore, deputies are only compared to other deputies who make stops within the same District.  We, The Parties and MCSO have often discussed more fine-tuned analyses – but at present, no option exists.  The TSMR methodology is currently under revision, and we will review it in future quarterly status reports as it becomes available.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System).   EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017.  EIU advised supervisors to document when they conducted their review in Supervisory Notes, as well as how long the deputy had been working in their chain of command when the review was conducted.  During our April and July site visits, both lieutenants and captains noted that they always try to complete these within the first week of a subordinate's arrival and they prompt their sergeants to do the same.  We have found no instances where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations.  The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE in November 2017 has dramatically improved the information provided by supervisors when closing alerts.  Command staff have also taken an active role in ensuring that if investigations appear incomplete, that they will return them for revision to the supervisor.  EIU is working with AIU to develop an inspection that tracks alert investigations and the resultant outcomes.  In this way, we should better be able to judge whether these investigations are being conducted in a timely fashion.

WAI 35514

BIO's Audits and Inspections Unit conducts evaluations of a wide range of activities from the Traffic Stop Data Inspection that evaluates whether deputies are accurately completing documents and running warrant checks on civilians they stop, to the "Traffic Stop Review/Discussion Inspections" that hold supervisors to specific deadlines for reviewing the paperwork of their subordinates and discussing these with them.  Each time AIU a deficiency, AIU sends an Action Form to District command staff.  AIU is developing a process to track whether there are recurring individual or District problems.

Since the fourth quarter of 2017 to this current reporting period (the second quarter of 2018), AIU has found that all supervisors included notes regarding how they had discussed bias-free policing with their subordinates.    MCSO is further developing strategies through its Constitutional Policing Plan to promote ethical policing, as we have noted in Paragraph 70.  Until such time as these processes are finalized MCSO will not be in compliance with this Subparagraph.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituted facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays.  We spot-check technology and security of old forms during each site visit and have found no problems to date.  Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017.  The procedure outlines how PSB personnel will notify the Technology Management Bureau of any misuse of MCSO information systems allegations and request an audit of the suspected breach.   We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all of the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Management Bureau.  We believe this new procedure will ensure that such an oversight does not occur again.

MCSO is in compliance with this Subparagraph.

WAI 35515

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be compliant.  These range from the finalization of the TSMR, TSQR, and TSAR methods to the completion of revisions to the EIU Operations Manual.  In addition, both EIU and AIU staff are working to track the effectiveness of alerts and BIO Action Forms.  Finally, the lack of substantive progress to institute the Constitutional Policing Plan to target potential bias across the organization has kept MCSO from achieving compliance with this Paragraph.  We and the Parties remain concerned that we have not noted instances where supervisors proactively intervene with their subordinates; rather, they wait until prompted by EIS alerts.  Command staff have taken a more active role in evaluating the work of supervisors as evidenced by seeing a number of alert investigations returned to supervisors for revision or additional inquiry.  We will continue to evaluate the progress toward the goals outlined in this Paragraph.

WAI 35516

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82. MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:*

*Paragraph 83. MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** In compliance

During our July site visit, we interviewed supervisors and commanders from Districts 1, 2, and 3 to determine compliance with MCSO policies and the requirements of this Paragraph.

During our visit to District 1, we met with the District Commander, two lieutenants, and two sergeants. As a result of our site visit, we received feedback from District 1 regarding the EPA process. Supervisors find the EPA process exhausting and somewhat redundant. Supervisors informed us that there is no easy way to retrieve Blue Team notes for inclusion in EPAs. There have been some discussions related to these issues with command staff. Lieutenants have been included in the monthly District Captains' meeting, which has proven helpful in obtaining other viewpoints of the concerns that need to be resolved. The number of traffic stops had been decreasing, due to deputies' fear of being singled out in the TSAR. The number of traffic stops has started to increase recently. District 1 has had several organized community engagement activities, but generally deputies have not had much free time to conduct these types of activities. District 1 reported nine deputy vacancies.

During our visit to District 3, we interviewed the District Commander, two lieutenants, and two sergeants. With regard to the EPA process, supervisors believe the EPA form should have a mechanism to auto-populate some fields, to expedite the completion of the EPAs. The current process requires going back and forth from the EPA to EI Pro and Blue Team, and is more

WAI 35517

complex than it needs to be.  There is concern from the chain of command that they are unable to determine when EPAs are due.  With regard to the Plan to Promote Constitutional Policing, there has been some information shared on implicit bias, but there is no protocol or mandate for dissemination to deputies.  With regard to the COrD District Liaison program, the District receives publications from COrD.  District 3 has active Block Watch programs already.  There have been no new programs that have emanated as a result of the COrD District Liaison program.  The District has had several shifts where the span of control has exceeded the 1:8 ratio.  With regard to traffic stops, traffic enforcement has decreased due to increased calls for service and the effect of the TSAR.  The District Commanders advised that they are actively working to increase traffic enforcement.

We met with the District Commander and two lieutenants from District 2.  With regard to the issues identified in the TSAR, District 2 personnel informed us that the District has established additional guidance for deputies, related to enforcement actions and decision-making in traffic stops.  This process was specifically initiated with the intent of addressing the findings in the TSAR.  The additional guidelines are intended to ensure deputies are consistent in how they handle traffic enforcement.  District 2 changed to a 3/13 shift configuration as a result of staffing shortages.  District 2 reported 10 deputy vacancies.  The District also reported a shortage of working patrol vehicles.  District 2 staff stated that traffic stops have decreased due to deputies' fear of being identified in the TSAR.  District 2 staff noted no additional training or roll-call briefings on implicit bias.  With regard to the effectiveness of the Captains' monthly meetings, the District 2 commander recommended expanding the topics of discussion from the current five areas.  COrD personnel have been meeting with the District staff to assess how they can assist with block watch groups and other community activities.  The role of the COrD liaison is to coordinate the materials and information, which is to be presented at community meetings, to ensure uniformity.  The COrD Liaison program has only three employees so they are somewhat limited in the assistance they can provide.

We reviewed a representative sample of 90 Incident Reports for April 2018, for the randomly selected date of April 16, 2018.  Eighty-three of the 90 incident reports had proper documentation of supervisory review.  Of the 90 incident reports, 19 were vehicle crashes.  We found that seven of the 19 Vehicle Crash Reports had no documentation that a supervisor had reviewed and approved the reports.  The compliance rate for timely supervisory review of incident reports in April was 92%.  With the exceptions noted, all other incident reports were reviewed and approved by supervisors within the required timeframes, including nine Arrest Reports.  During our quality control review, we noted one incident report involving a death investigation where the name of the deceased was misspelled.  We did not note other significant deficiencies.  For April, MCSO reported 783 hours of community policing.

We reviewed a representative sample of 102 Incident Reports for May 2018, for the randomly selected date of May 18.  All except one of the 102 Incident Reports were reviewed and memorialized by a supervisor within the required seven days.  All 13 Arrest Reports were reviewed and approved by supervisors within the required 72 hours.  There were 23 Vehicle Crash Reports submitted in the sample for May.  The log with documentation of supervisory review of Vehicle Crash Reports listed only nine reports.  Of those nine Vehicle Crash Reports

WAI 35518

listed, only five occurred on the selected date of May 18. This left 18 reports without documentation of supervisory review. The compliance rate for timely supervisory review of incident reports for May was 81%. We conducted a quality review on a 10% random sample of the reports we reviewed, and found no significant deficiencies. For May, MCSO reported 667 hours of community policing

We reviewed a representative sample of 85 Incident Reports for June 2018, for the randomly selected date of June 12. Seventy-four of the 85 Incident Reports had documentation that they had been reviewed and approved by supervisors as required by this Paragraph. There were 11 vehicle crashes submitted in the sample. The log documenting supervisory review of Vehicle Crash Reports listed nine reports, but none of the reports were for the selected date of June 12. The compliance rate for timely supervisory review of incident reports for June was 87%. All 10 Arrest Reports were reviewed and approved by supervisors within 72 hours. We conducted a quality review on a 10% random sample of the reports submitted. We found one report involving an arrest where there was conflicting information between the face page and the narrative as to whether an arrest was made. For June, MCSO reported 245 hours of community policing.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District. We requested several documents, including Patrol Activity Logs, for each deputy. We reviewed PALs for each month of the quarter to assess if they were turned in by the end of each shift, and if supervisors reviewed each PAL. For April, we reviewed PALs for 33 deputies and seven supervisors. All of the 33 deputies' Patrol Activity Logs contained documentation of supervisory review. All seven supervisors' Patrol Activity Logs contained documentation of command-level review. For May, we reviewed Patrol Activity Logs for 30 deputies and seven supervisors. All 30 deputies' PALs contained documentation of supervisory review. All seven supervisors' PALs contained documentation of command-level review. For June, we reviewed Patrol Activity Logs for 26 deputies and seven supervisors. All of the 26 deputies' PALs contained documentation of supervisory review; all of the seven sergeants' PALs contained documentation of command-level review.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in April, there were a total of 21 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in May, there were a total of 38 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in June, there were a total of 25 supervisor-deputy field contacts reported by deputies and supervisors.

For April, May, and June we reviewed the submissions of non-traffic incidents involving stops and detentions, which were recorded in Non-Traffic Contact Forms (NTCFs). For April, the Monitoring Team selected all 23 NTCFs generated during the month, for review. All 23 NTCFs had been submitted prior to the end of the shift. Twenty-two of the 23 NTCFs were reviewed and approved by supervisors within 72 hours as required by the First Order. The compliance rate for timely supervisory review of NTCFs in April was 96%. For May we selected 25 NTCFs to review. All NTCFs were submitted prior to the end of the shift. Twenty

WAI 35519

of the 25 NTCFs were reviewed and approved by supervisors within the required timeframe.  Of the five NTCFs not in compliance, four had no documentation of supervisory review; the fifth was reviewed and approved late.  The compliance rate for timely supervisory review of NTCFs for May was 80%.  For June, we selected 29 NTCFs to review.  Twenty-five of the 29 NTCFs were reviewed and approved by supervisors, within the required 72 hours.  One subject in a VSCF was described and having blue hair and black eyes, an apparent mistake in the entry.  The reviewing supervisor did not note the mistake.  The compliance rate for timely supervisory review of NTCFs in June was 86%.

MCSO has been in compliance with Paragraph 83.  During this reporting period, timely supervisory reviews of incident reports and NTCFs did not meet the Paragraph requirements.  In addition, the hours documented in which deputies participated in community engagement were significantly reduced in June.  From the sample dates of Patrol Activity Logs selected, there were four instances of community engagement activities noted in April, none in May, and one in June.  MCSO must address these issues to remain in compliance with this Paragraph.


**Paragraph 84.**  *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the second quarter of 2018.  During this reporting period, consistent with our methodology, for April we reviewed a sample of shift rosters from Districts 1, 2 and 3; for May we reviewed a sample of shift rosters from Districts 4, 6, 7 and Lake Patrol; and for June, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor.  Of the 60 shifts we reviewed for the quarter, all were in compliance.  There were 11 span of control memos generated during this reporting period, indicating that those shifts or part of those shifts exceeded the supervisor-deputy ratio of 1:8.  Six of the span of control memos were generated by District 1, three were generated by District 2, and two were generated by District 3.  However, MCSO exceeded a supervisor-deputy ratio of 1:10 in only two instances.  MCSO remains in compliance with this Paragraph.


**Paragraph 85.**  *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

WAI 35520

**Phase 1:**  In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

Consistent with our methodology, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month.  We requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor.  Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option.  MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection.   The spreadsheet also documents timely supervisory review of VSCFs.  In addition to the spreadsheet, MCSO submits all VSCFs for the month in review.  We select a 10% random sample of VSCFs from each District to review for content.  We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of our assessment of Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies.   To efficiently manage this requirement along with other administrative and operational duties, supervisors generally conduct several traffic stop-related discussions with each deputy during the month.  Supervisor-deputy discussions of traffic stops that occurred toward the latter part of the month may not get reviewed until the following month.  Our selections for these discussions changes every month, so to obtain complete records for each deputy, MCSO holds the submission until all of the information requested for the month is complete.  Accordingly, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For April, MCSO submitted the March traffic stops for each deputy, by District.  The total number of traffic stops for each District were:  District 1, one; District 2, 16 District 3, 25; District 4, 16; Lake Patrol, five; District 6, 44; and District 7, two  There were a total of 109 traffic-related events in March for all Districts, and sergeants discussed 106 with the deputies who conducted them, for a compliance rate of 97%.

For May, MCSO submitted the April traffic stops for each deputy, by District.  The total number of traffic stops for each District were: District 1, four; District 2, eight; District 3, one; District 4, five; Lake Patrol, three; District 6, nine; and District 7, four.  There were a total of 34 traffic-related events in April for all Districts, and sergeants discussed 33 of 34 traffic stops with the deputies that conducted them, for a compliance rate of 97%.

For June, MCSO submitted the May traffic stops for each deputy, by District.  The total number of traffic stops for each District were:  District 1, 24; District 2, 12; District 3, one; District 4, 11; Lake Patrol, 23; District 6, 39; and District 7, 15.  There were a total of 125 traffic-related events in May, and sergeants discussed 124 of those with the deputies who conducted them, for a compliance rate of 99%.

WAI 35521

The compliance rate for discussion of traffic stops was 98% for this reporting period. Although supervisors are still not capturing all errors, as it relates to the accuracy of the information in VSCFs, there has been an increase in comments pertaining to deficiencies found and actions taken. Additional comments on this topic are provided under Paragraph 91.

**Paragraph 86.** *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period. For April, we reviewed Districts 1, 2 and 3; for May, we reviewed Districts 4, 6, 7, and Lake Patrol; and for June, we reviewed Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to and worked the same schedules as their supervisors.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs). We selected a random sample of one day per month, and one squad per District, for review. For April, we requested PALs for seven sergeants and 33 deputies, which we reviewed. We noted a total of 21 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For May, we requested PALs for 30 deputies and seven sergeants. We received and reviewed all requested PALs, and noted a total of 38 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. For June, we reviewed PALs for 26 deputies and seven sergeants. We noted a total of 25 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision.

**Paragraph 87.** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

WAI 35522

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:** Not in compliance

Consistent with our methodology, we requested the names of all deputies and supervisors who were evaluated during this reporting period. From the lists of employees submitted, we requested a representative sample. We received and reviewed performance evaluations submitted for eight deputies and eight supervisors whose performance evaluations were completed in April 2018. Six of the eight deputy EPAs were acceptable; two of the EPAs failed to document the information required by Paragraph 99.

With regard to supervisors' EPAs, five of the eight met all requirements. All EPAs addressed the complaint history and their dispositions and met the requirements of Paragraph 99. Two of the eight EPAs did not comment on the supervisors' ability to identify and respond to misconduct. One EPA did not assess the supervisor's quality of internal affairs investigations and/or the quality of the supervisor's reviews of internal investigations, as required by Paragraph 176.

We received and reviewed performance evaluations submitted for seven deputies and 10 supervisors whose EPAs were completed in May 2018. Six of the seven deputy EPAs addressed all required areas of assessment. One EPA failed to document the information required by Paragraph 99. Three of the deputy EPAs contained extremely long Blue Team notes that could have been summarized to exclude superfluous information. Seven of the nine supervisors' EPAs contained comments on all of the required rating dimensions. All nine of the supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision and quality of supervisory reviews. Seven of the nine supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. All EPAs addressed the requirements of Paragraph 99. Seven of the nine EPAs assessed the supervisors' quality of internal investigations and/or the quality of their reviews of internal affairs investigations.

We received and reviewed Employee Performance Appraisals submitted for eight deputies and 10 supervisors whose EPAs were completed in June 2018. Seven of the eight deputy EPAs addressed all requirements. One EPA failed to document information required by Paragraph 99. All 10 supervisors' EPAs rated the supervisors on the quality and effectiveness of their supervision and the quality of supervisory reviews. Eight of the 10 supervisors' appraisals included comments related to the supervisors' ability to identify and respond to misconduct. Only two of the 10 EPAs assessed supervisors on the quality of their internal affairs investigations and/or the quality of their reviews of internal affairs investigations, as required by Paragraph 176.

During our July site visit, we discussed the ongoing deficiencies with EPAs with MCSO, as well as observations made by MCSO supervisors and commanders. MCSO is considering revising the EPA process to make it more efficient and user-friendly. MCSO informed us that part of the problem is lack of interoperability between systems. MCSO advised us that it is extremely cumbersome for reviewers to move back and forth between the Employee

WAI 35523

Performance Appraisals and Blue Team notes.  We are encouraged that MCSO is working to address these issues.  We requested a timeline for getting these issues resolved, but at the time of our July site visit, MCSO could not provide one.  In the last draft of the July iteration of the Plan to Promote Constitutional Policing, MCSO noted that by the second quarter of 2019, the EPA revisions would be implemented.

***Paragraph 88.***  *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**Phase 1:**  In compliance

- Memorandum from Executive Chief Trombi, dated January 6, 2015.

- Memorandum from Sheriff Arpaio, dated February 12, 2015.

- Special Investigations Division Operations Manual, published on May 15, 2015.

**Phase 2:**  In compliance

MCSO does not have any specialized units that enforce immigration-related laws.  We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For April, May, and June, we received lists containing all incidents involving MCSO arrests and criminal citations.  For each month, we requested a random sample of arrests and criminal citations.  In total, we reviewed 64 incidents involving arrests and 77 incidents involving criminal citations.  We also reviewed a random sample of 275 Incident Reports for this reporting period.  During our reviews of the documentation provided for this quarter, we have found no evidence to indicate any violations of this Paragraph.

WAI 35524

***Paragraph 89.*** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  In compliance

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports MCSO submitted covered the period of April 1-June 30, 2018. Any incident wherein a deputy requests supervisory permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request. MCSO did not report any cases involving immigration status investigations or immigration-related crime.

For this reporting period, MCSO submitted one incident as responsive to this Paragraph. This incident occurred in May. There were no reported cases in April and June. The incident reported in May involved an individual who was stopped for a traffic violation. After the traffic stop, the subject did not provide a driver's license, but verbally identified herself with a fictitious name and date of birth. While the deputy was verifying the subject's identity, the subject fled on foot. The individual was apprehended and subsequently charged with several violations, including not having a valid driver's license and reporting false information to a law enforcement officer. The individual was not a member of the Plaintiffs' class.

We also received a booking list and a criminal citation list for each month of the reporting period. From each list, we selected a 10% random sample of incidents. In total, we reviewed 64 incidents resulting in arrest and 77 incidents involving criminal citations. In addition, we reviewed 275 Incident Reports for the quarter. All of the documentation we reviewed during this reporting period indicates that MCSO is in compliance with this Paragraph.

WAI 35525

*Paragraph 90.   MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.   Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.   Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

We reviewed 35 incidents involving traffic stops for April 2018.  There were 17 stops related to speeding, 13 of which resulted in citations and four resulted in warnings.  Three stops related to equipment violations, and 11 stops were for moving violations other than speeding.  Four stops related to registration or license plate violations.  Twenty-four of the stops resulted in citations, and 11 resulted in warnings.  All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review.  Thirty-three of the 35 VSCFs were reviewed within the required 72 hours.  The two stops where supervisors did not review the VSCFs within 72 hours occurred in March, but were submitted for April.  For April, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 95 VSCFs.  We reviewed the data for April, and the compliance rate for timely supervisory reviews of VSCFs was 100%.

We reviewed 35 incidents involving traffic stops for May 2018**.**  Twenty-five of the 35 traffic stops related to speeding.  Sixteen citations and nine warnings were issued for speeding.  Two stops related to equipment violations.  Eight stops involved moving traffic infractions other than speeding.  There were no stops related to registration or license plate violations.  Of the 35 stops, 22 resulted in citations, and 13 resulted in warnings.  Supervisors reviewed all 35 VSCFs within 72 hours.  For May, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 45 VSCFs.  Supervisors reviewed all VSCFs within 72 hours, for a compliance rate of 100%.

We reviewed 35 incidents involving traffic stops for June 2018**.**  Fourteen of the 35 traffic stops involved speeding violations.  Twelve of the drivers who were stopped for speeding were issued citations; two drivers were issued warnings.   Five stops related to equipment violations.  Thirteen stops involved moving traffic violations other than speeding.  Three stops related to registration or license plate violations.  Of the 35 stops, 16 resulted in citations and 19 resulted in warnings.  All 35 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, and date and time of supervisory review.  All of the 35 VCSFs were reviewed within 72 hours as required.  For June MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 113 VSCFs.  We reviewed the data and supervisors reviewed 109 of the 113 VSCFs within 72 hours, for a 96% compliance rate.

WAI 35526

For April, we selected all 23 NTCFs to review.  Twenty-two of the 23 NTCFs were reviewed and approved by supervisors.  Twenty of the 23 were reviewed within 72 hours for an 87% compliance rate.  For May, we reviewed a random sample of 25 NTCFs.  Of the 25 NTCFs inspected, 21 were reviewed and approved by supervisors, and of the 25 NTCFs, 20 were reviewed within 72 hours.  The compliance rate for timely supervisory review for May was 80%.  For June, we reviewed all 29 NTCFs generated.  All 29 NTCFs, were reviewed and approved by supervisors.  Twenty-five of the 29 NTCFs were reviewed and approved within the required timeframes, for a compliance rate of 86%.  In total, we reviewed 77 NTCFs for the quarter.  Sixty-five of the 77 NTCFs were reviewed within the required 72 hours, for a compliance rate of 84%.  We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph.  The compliance rate for timely reviews of all combined stops and detentions for this quarter was 92%.  For this reporting period, our inspection of the documentation provided has not revealed any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

MCSO has been in compliance with this Paragraph, but was not in compliance with timely supervisory reviews of NTCFs during this reporting period.  It is disappointing that the compliance rate has dropped for this quarter.  As per our methodology, a second consecutive period of performance below requirements will result in withdrawal of compliance.

***Paragraph 91.*** *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.
- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on January 11, 2018.

**Phase 2:**  Not in compliance

We reviewed traffic stop data reported by MCSO for its April inspection (BI2018-0050).  To determine compliance with this Paragraph, for April the Monitoring Team randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 31 or 88% had no deficiencies.  This demonstrated an 11% increase from the March compliance rate.  As a result of the inspection, BIO issued five BIO Action Forms.  BIO identified one deficiency that related to the deputy failing to run warrants checks on the driver.  Two deficiencies were for BWC logs not being completed for the deputies who assisted on traffic stops.  One deficiency was related to a vehicle number listed in the VSCF that did not

WAI 35527

match what was listed in CAD.  One deficiency was related to the driver's signature not being captured on the citation.  Two deficiencies related to assisting deputies' BWC logs not being completed.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  Our inspection revealed that 15 of the 35 stops had deficiencies that supervisors failed to identify during their reviews of documentation related to the traffic stops.

We reviewed a spreadsheet documenting each VSCF by District, for April, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 95 traffic stops, and determined that supervisors had completed timely reviews in 100% of the cases.

For April, we requested a representative sample of 25 corrective actions.  Corrective actions are documented on Blue Team Supervisory Notes.  Of the 25 corrective actions, seven related to body-worn camera and recording issues, including: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Four corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Nine corrective actions related to procedural or policy violations during traffic stops, and one corrective action pertained to a procedural violation not involving a traffic stop.  There were no corrective actions related to deputy performance, but two corrective actions were related to safety procedures during traffic stops.  Two corrective actions were associated with technical malfunctions.

We reviewed traffic stop data reported by MCSO for its May inspection (BI2018-0062).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  For this inspection MCSO reported two conflicting compliance numbers.  The Inspection Report first states that 31,or 88%, had no deficiencies.  The report then notes a 97% compliance rate on the graph and a 9% increase in compliance from April.  However, if 31 of 35 stops reviewed had no deficiencies, this indicates an 88% compliance rate, the same as April's compliance rate.  We are unsure which number is correct.  There was one BIO Action Form issued for failure to run a warrants check on the driver during a traffic stop.  We reviewed the same traffic-related events, independent of BIO's audits, as part of our compliance assessment for Paragraphs 25 and 54.  Our examination revealed that the documentation provided for 13 of the 35 stops had deficiencies that supervisors did not identify during their reviews.

We reviewed a spreadsheet documenting each VSCF by District, for May, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 45 VSCFs and determined that supervisors had completed timely reviews in 100% of the cases.

For May, we selected a random sample of 25 corrective actions.  Of the 25 corrective actions, eight related to body-worn camera and recording issues: failure to activate the BWC; late activation of the BWC; turning off the camera before the event was concluded; or poor positioning of the BWC.  Seven corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Seven corrective actions related to procedural or policy violations during traffic stops.  There was one corrective action generated for a deficiency noted in a Patrol Activity Log.  There were two corrective actions generated for concerns with deputy safety.

WAI 35528

We reviewed traffic stop data reported by MCSO for its June inspection (BI2018-0074).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported that 31, or 88%, had no deficiencies.  The compliance rate for June decreased by 9% compared to May, assuming the compliance rate of 97% reported for May was correct.  We reviewed the 35 traffic-related events selected by the Monitoring Team for BIO's June inspection, as part of our compliance assessment for Paragraphs 25 and 54.  Our examination revealed that the documentation associated with 14 of the 35 stops had deficiencies that supervisors did not identify during their reviews.

For June, the Monitoring Team selected a random sample of 25 corrective actions to review.  Of the 25 corrective actions, four related to the late activation of the BWCs during traffic stops.  Ten corrective actions related to inaccurate or missing information on VSCFs, citations, or written warnings.  Six corrective actions related to procedural or policy violations related to traffic stops.  There were two corrective actions for procedural violations not involving traffic stops.  One corrective action was generated as a result of a technical malfunction.  There was one corrective action generated in Blue Team where we could not ascertain the nature of the deficiency.  There were no corrective actions related to deputy safety.

We reviewed a spreadsheet documenting each VSCF by District, for June, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 113 VSCFs and determined that supervisors had completed timely reviews in 96% of the cases.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions.  Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions.  Supervisors are performing timely reviews of the documentation associated with stops and detentions.  We have noted some improvement in the thoroughness supervisory reviews of stops and detentions, but we continue to find errors in the documentation of traffic stops that supervisors are not properly identifying and correcting.

**Paragraph 92.**  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

WAI 35529

The Employee Performance Appraisals completed for this reporting period, discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph. MCSO has not yet developed a methodology that will document MCSO's verification of compliance for this Paragraph. The tracking of alerts is still insufficient. The tables in the production for Paragraphs 70, 71, 75.j., and 81 do not allow us to know how the alerts were resolved, and the audits for alerts have not yet been produced. We discussed these issues during our July site visit, but we have not received a report indicating that the tracking/audit of alerts is complete. District command staff are improving how they identify incomplete alert investigations, but there is no overarching report on alert investigations and the tracking of outcomes or interventions.

**Paragraph 93.** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**Phase 1:** In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:** In compliance

We reviewed a representative sample of 88 Incident Reports for April 2018, for the randomly selected date of April 16, 2018. The sample of 88 Incident Reports included 12 Vehicle Crash Reports. Of the 76 Incident Reports, not related to vehicle crashes, all were turned in by the end of the shift and reviewed by supervisors within the required timeframes. MCSO submits a separate spreadsheet documenting vehicle crash reviews. This list documented 19 vehicle crashes, which included the 12 Vehicle Crash Reports submitted for the selected date. We could only confirm supervisory review and approval of five of the 12 Vehicle Crash Reports. Eighty-one of the 88 reports inspected had documentation of supervisory review. The compliance rate for April was 92%. All 11 Incident Reports involving arrests and criminal citations were reviewed by supervisors and approved, or reviewed and returned for corrections within the required 72 hours. We conducted a quality review on a 10% random sample of the reports we reviewed and noted no significant errors or deficiencies.

We reviewed a representative sample of 102 Incident Reports for May 2018, for the randomly selected date of May 18, 2018. Of the 102 reports submitted, there were 23 Vehicle Crash Reports. Of these, we confirmed supervisory review on five reports. Of the remaining 79 Incident Reports, we confirmed timely supervisory review on 78 of the reports. In total, 83 of 102 Incident Reports for the selected date had documentation of timely supervisory review. The compliance rate for May, for timely supervisory reviews of Incident Reports, was 81%. We conducted a quality review on a 10% random sample of the reports we reviewed. Most reports we reviewed were complete, and we noted no significant errors.

WAI 35530

We reviewed a representative sample of 85 Incident Reports for June, for the randomly selected date of June 14, 2018. Of the 85 Incident Reports, 11 were Vehicle Crash Reports. MCSO submitted a spreadsheet with 11 crash reports, but with different incident numbers than the Vehicle Crash Reports submitted in the sample. We could not confirm supervisory review of any of the 11 Vehicle Crash Reports for the selected date. Of the remaining 74 Incident Reports, we confirmed timely supervisory reviews on all reports. The compliance rate for timely supervisory reviews of Incident Reports for June was 87%. All 11 Arrest Reports were reviewed and approved by supervisors within 72 hours. We conducted a quality review on a 10% random sample of the reports. We noted no significant errors or deficiencies.

MCSO has been in compliance with this Paragraph for some time. However, the compliance rate for timely supervisory reviews of Incident Reports for this quarter was 87%. This was mainly due to the lack of documentation of supervisory reviews of Vehicle Crash Reports. MCSO will need to address this issue to maintain compliance with this Paragraph.

**Paragraph 94.**  *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

For this reporting period, we received four Incident Memorialization Forms (IMFs) – one in April, one in May, and two in June. For April, MCSO submitted one IMF that was generated as a result of two arrests that occurred following a traffic stop. A commander reviewed the incident, and determined that the information contained in the Arrest Report was inconsistent with the BWC recording. The incident report also did not adequately or accurately articulate the deputy's actions. The deputy's supervisor had reviewed the report and approved it as written. The incident was forwarded to PSB for investigation. This case may involve improper detention, improper searches, and *Miranda* violations. We will review the case when the internal investigation is completed. This was an example of an inadequate review by the supervisor, but command review identified the deficiencies and took proper steps to address the concerns.

WAI 35531

For May, MCSO submitted an Incident Memorialization Form that involved the same deputy as the incident in April. The circumstances were similar, as this involved a traffic stop and a DUI investigation. In this incident, the reviewing supervisor identified several concerns, including information on the report that was inconsistent with the BWC video, lack of articulation for the basis of action, and possible Fourth Amendment and *Miranda* violations. This case was also referred to PSB for investigation. We will follow up, as there may be some concerns, or at least training issues, that need to be addressed with this deputy.

For June, MCSO submitted two Incident Memorialization Forms. The first case involved a domestic violence incident where the supervisor identified a report that lacked sufficient detail with regard to the victim's statement. The supervisor reviewed the BWC recording and noted several deficiencies in the deputy's actions. In this incident, the supervisor determined that the deputy failed to follow the domestic violence protocol, and that the aggressor should have been arrested. This incident involved a relatively inexperienced deputy. The supervisor discussed the issues with the deputy and documented the discussion in a coaching. The second case submitted for June occurred during a deputy's off-duty employment. The deputy cited and released an individual for Criminal Trespassing. The supervisor determined that the deputy questioned the subject without providing *Miranda* warnings. The supervisor issued a coaching for this deficiency.

We reviewed the inspection report for County Attorney Dispositions for April (BI2018-0046). BIO reviewed 20 of 96 dismissals of criminal cases from the Maricopa County Justice Court. BIO notes that the focus of the inspection is the identification of irreversible errors. For the April inspection, MCSO found one irreversible error, which resulted in a 98% compliance rating. The deficiency identified involved a felony arrest for domestic violence wherein the deputy properly failed to articulate probable cause for the charges. The deputy stated that he submitted a supplemental report, but MCAO could not confirm receipt. AIU forwarded a memorandum of concern to PSB. BIO reported that all 40 cases from the Maricopa County Superior Court were reviewed, and no errors were found. In addition, for April, we reviewed 21 Arrest Reports and 21 incidents involving criminal citations. All arrests and criminal citations were reviewed by supervisors within the required timeframes. We noted no significant deficiencies.

We reviewed the inspection report for County Attorney Dispositions for May (BI2018-0058). BIO reviewed 20 of 122 dismissals, from the Justice Court, and 33 dismissals from the Superior Court; and found one deficiency in the combined Superior Court and Justice Court cases it reviewed. The inspection resulted in a 98% compliance rating, with one irreversible error. The inspection found one case where the deputy failed to submit the charges in a timely manner. The deputy submitted a supplemental report almost one year after the incident. MCAO determined that the information was stale and declined prosecution. A BIO Action Form was requested from the affected Division. In addition, we reviewed 22 Arrest Reports and 27 criminal citations for May. We found one Arrest Report where the deputy articulated sufficient probable cause on the incident report, but the probable cause on the Form 4 (the form used to submit criminal charges to the County Attorney) was weak. Four of the 22 Arrest Reports

WAI 35532

failed to document timely reviews by supervisors.  There were no deficiencies noted in the 27 criminal citations, and we verified timely supervisory review on all 27 cases.

We reviewed the inspection report for County Attorney Dispositions for June (BI2018-0070). BIO reviewed a sample of 20 of the 116 dismissals from the Justice Court, and all 36 dismissals from the Superior Court.  BIO identified one irreversible error and seven deficiencies outside the scope of the inspection, which resulted in a 98%compliance rating for June.  BIO identified one compliance deficiency, where the deputy failed to properly follow up on the investigation, after being requested to do so by MCAO.  In this case, the deputy submitted the requested information over one year after the initial arrest.  MCAO determined that the information was stale and declined prosecution.  The inspection report also identified seven non-compliance deficiencies, which included failure to follow up on a domestic violence case, improper charges in a traffic citation, failure to seize a suspended driver's license, failure to provide an estimate of damages in a case involving criminal damage, and failure to submit supplemental reports in an assault case.  The last incident noted in the inspection report was a traffic stop where the driver had a suspended driver's license.  The report lacked articulation for the *Terry* frisk, and there were several errors in the citation and VSCF.  We commend BIO for identifying these deficiencies, but we also suggest that most of these deficiencies should have been identified and addressed by the deputies' supervisors.  Eight BIO Action Forms were generated and forwarded to the affected Divisions.  We reviewed all the documentation provided by MCSO for June, for this Paragraph.  In addition, we reviewed 21 incidents involving arrest and 29 incidents involving criminal citations for June.  There were no concerns noted with the 21 Arrest Reports we reviewed, and all Arrest Reports were reviewed and approved by supervisors within the required timeframes.  There were no deficiencies noted in the 29 criminal citations, and we verified timely supervisory review on all 29 cases.

***Paragraph 95.*** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

The Employee Performance Appraisals completed for this reporting period, which we discussed in detail under Paragraph 87, did not meet the requirements of this Paragraph.  MCSO has not yet developed a methodology that will document verification of compliance for this Paragraph.

WAI 35533

The tracking of alerts is still insufficient.  The tables in the production for Paragraphs 70, 71, 75j and 81 do not allow us to know how the alerts were resolved, and the audits for alerts have not yet been produced.  We discussed these issues during our July site visit, but we have not received a report indicating that the tracking/audit of alerts is complete.  District command staff are improving how they identify incomplete alert investigations, but there is no overarching report on alert investigations and the tracking of outcomes or interventions.

**Paragraph 96.**  *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on June 14, 2018.

**Phase 2:**  In compliance

We received four Incident Memorialization Forms (IMFs) for this reporting period.  There was one IMF submitted for April, one IMF submitted for May, on two IMFs submitted for June.  Three of the four Incident Memorialization forms were reviewed and approved by commanders within the required 14 days.  In one case involving an arrest, the incident occurred in March, and the date received was in April.  A commander entered the IMF in Blue Team in June.  Comments on the Incident Memorialization Forms are detailed in our reviews of Paragraph 94.

We reviewed 42 cases for April, in which the County Attorney declined prosecution.  Of these 42 cases, 22 were determined to be arrests; and 20 were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 22 cases, and found documentation that commanders had reviewed all of the 22 cases.  Compliance for timely command review of these reports for April was 100%.  We reviewed 36 cases for May, in which the County Attorney declined prosecution.  Of these 36 cases, 14 were determined to be arrests; and 22 were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 14 arrest cases, and found documentation that commanders had reviewed the reports in 13 of the 14 cases.  Compliance for timely command review of these reports for May was 93%.  We reviewed 36 cases submitted for June, in which the County Attorney declined prosecution.  Of these 36 cases, 14 were determined to be arrests.  The remaining 22 cases were referrals to the Maricopa County Attorney for prosecution.  We reviewed the MCAO Turndown Notice Report for each of the 14 cases, and found documentation that commanders had reviewed the reports in 12 of the 14 cases.  Compliance for timely command review of arrests that were declined for prosecution for June was 86%.  Calculating the total number of cases in compliance versus the total number of arrest cases for the quarter, the compliance rate for this reporting period was 94%.

WAI 35534

This Paragraph requires command-level review of all supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. Some infractions and deficiencies are being documented in Incident Memorialization Forms, but there also appears to be a number of other possible issues that may need to be identified and corrected.

The number of Incident Memorialization Forms has decreased significantly from the second and third quarters of 2017. There were three IMFs generated in the fourth quarter of 2017, three IMFs generated in the first quarter of 2018, and four IMFs generated in the second quarter of 2018 (this reporting period). IMFs are generated internally and are dependent upon the diligence of supervisors and commanders. Our reviews of proof of compliance for this Paragraph must include information pertinent to the prosecution of criminal cases from exterior sources as well. If there are violations of policy and/or deficiencies in training that are impacting the successful prosecution of criminal violations, these need to be identified. BIO reviews all County Attorney turndown disposition reports from the Maricopa County Superior Court, and a sample of criminal cases from the Justice Courts. We recognize the work BIO has done in identifying deficiencies in their inspection. However, there is a large percentage of cases from the Justice Courts that are not part of the BIO inspection process. The low number of deficiencies and violations of policy being documented in Incident Memorialization Forms does not necessarily indicate that deficiencies and violations have decreased. In addition, we would not consider the absence of IMFs as sole determinant that no deficiencies or violations are occurring. We suggest that supervisors and commanders should be identifying many of these issues during the initial review process, prior to submission for prosecution.

Compliance for the second quarter of 2018, for timely command review of cases that were declined for prosecution, was 94%. MCSO has made a significant effort and improved its compliance rate from the last reporting period.


**Paragraph 97.** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

WAI 35535

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. Review of broader pattern-based reports, as required by Paragraph 81.c., and assessments of interventions as required by this Paragraph, has not been sufficiently documented to meet compliance with this Paragraph. The requirement described in Paragraph 81.c. is covered in GH-5, under "Command Staff Responsibilities."

Consistent with our methodology, for every month of the quarter, we selected a supervisor and a squad of deputies from each District. We then reviewed the documentation provided as verification of compliance with this Paragraph. We also requested that EIS reviews of the commanders responsible for the selected personnel be included. For April, we reviewed the documentation provided for 56 employees – which included the ranks of deputy, sergeant, lieutenant, and captain. Of the 56 employees, 48 had the required two EIS reviews in the month, for an 86% compliance rate. For May, we reviewed Supervisory Notes requested as verification of compliance for 54 employees. Of the 54 selected employees, 46 had appropriate documentation of the required EIS reviews, for a compliance rate of 85%. For June, we received Supervisory Notes as verification of compliance of EIS reviews for the selected 54 employees. Of the 54 employees, 53 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 98%. The total compliance rate for the quarter was 90%. During this reporting period, MCSO did not yet have a methodology for capturing the requirements of Paragraphs 81(c)–(h). We discussed compliance with MCSO during our July site visit, as it pertains to Paragraph 81.c.-h. We are encouraged by the progress MCSO has made. We understand that MCSO is currently reviewing an internal procedure for the assessment of interventions and the formulation of broader pattern-based reports.

### d. Regular Employee Performance Review and Evaluations

**Paragraph 98.**   *MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

Employee Performance Appraisal Training was completed during the third quarter of 2017, and the new EPA format was initiated on September 1, 2017. Employee Performance Appraisals is slowly improving, as evidenced with the compliance rating MCSO achieved for Paragraph 100. However, there are still several areas where EPAs are deficient; we discuss these in detail under Paragraph 87. MCSO did not meet the requirements of this Paragraph during this reporting period.

WAI 35536

***Paragraph 99.***  *The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

MCSO's documentation regarding citizen complaints, past complaint investigations, corrective actions, lawsuits, claims, and commendations, has improved considerably.  Forty-seven of the 50 EPAs that we reviewed considered past investigations, complaints, claims, and lawsuits, as well as commendations and awards.  MCSO has not developed the procedure for tracking violations, deficiencies, and corrective actions in EIS, as required by Paragraphs 92 and 95. MCSO will need to include this information in Employee Performance Appraisals.


***Paragraph 100.***  *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  In compliance

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period.  Twenty-six of the 27 of the appraisals rated the quality and effectiveness of supervision.  One supervisor had no direct reports.  Twenty of the 27 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct.  Twenty-six of 27 appraisals rated supervisors on the quality of their reviews, for a 96% compliance rating for this Paragraph.  The majority of EPAs that failed to meet compliance requirements are those of supervisors and command personnel. During our July site visit, we discussed issues pertaining to compliance with Paragraphs related to Employee Performance Appraisals with MCSO.  MCSO staff is aware of the shortcomings of the current EPA process; and is endeavoring to revise the process to make it useful and functional, while working to achieve compliance with the requirements of the Paragraphs that relate to performance evaluations.

WAI 35537

***Paragraph 101.*** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.*

*Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**Phase 1:** In compliance

- Memorandum from Executive Chief Trombi, dated January 6, 2015.
- Memorandum from Sheriff Arpaio, dated February 12, 2015.
- Special Investigations Division Operations Manual, published on May 15, 2015.

MCSO has no specialized units whose mission includes the enforcement of human smuggling laws as part of their duties. MCSO is in Phase 1 compliance with this Paragraph.

**Phase 2:** In compliance

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For April, May, and June, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 64 incidents involving arrests and 77 incidents involving criminal citations. We also reviewed a random sample of 275 Incident Reports for this reporting period. We found no evidence of enforcement of immigration-related laws.

WAI 35538

## Section 10: Misconduct and Complaints

### COURT ORDER XI.  MISCONDUCT AND COMPLAINTS

#### a. Internally-Discovered Violations

***Paragraph 102.***  *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 48 administrative misconduct investigations. Twenty-eight were internally generated.  Fifteen of these 28 involved only sworn employees, seven involved only Detention personnel, two involved only civilian employees, and one involved a single Posse member.  Two investigations involved a combination of sworn and non-sworn personnel, and one involved an unknown employee.

MCSO has continued to identify and address misconduct that is raised by other employees or observed by supervisory personnel.  While some of these investigations did not meet all requirements for the proper completion of misconduct investigations, we address these failures in other Paragraphs in this report.

WAI 35539

**b. Audit Checks**

**Paragraph 103.**   *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 303, currently under revision.

**Phase 2:**  Not in compliance

MCSO established the Audits and Inspections Unit (AIU), a unit of the Bureau of Internal Oversight (BIO), to take responsibility for these requirements.  AIU continues to develop an Operations Manual that will outline how the AIU will fulfill the "targeted" Paragraph 103 requirements.  We and the Parties provided some comments on three different versions of the relevant section of the manual, and currently await the next iteration of the manual from MCSO.

In the meantime, for the last several reporting periods, MCSO has maintained a structure for AIU that includes one lieutenant, four sworn sergeants, and one Detention sergeant, three senior (civilian) auditors, and an administrative assistant.  The AIU lieutenant and the four sworn sergeants assigned to the unit have all completed a two-part training course on law enforcement audits and inspections offered by a private consultancy.  According to AIU's lieutenant, as new personnel are assigned to the unit, they will attend the training, as well.  During our July site visit, AIU reported that four AIU personnel would also attend additional training on this topic in September.

We continue to work with AIU to explore possible avenues for integrity testing.    In late November, via a conference call, we discussed with AIU personnel some examples of integrity tests that the unit could conduct that would satisfy the requirements of this Paragraph without placing too many demands on personnel and other resources.  During the November call, and in follow-up discussions during our subsequent site visits, we advised AIU to devise tests that rely on the many data sources that are already available at MCSO.  For example, we recommended that AIU consider reviews of body-worn camera footage or deputies with patterns of not sustained complaints.  AIU personnel have begun meeting with analysts from both PSB and the Training Division, and EIU personnel, to discuss information on complaint and other trends.  During our January site visit, AIU personnel advised us that they intended to conduct AIU's first integrity test, an examination of the misidentification of the ethnicity of drivers who are stopped by deputies.  As we have noted previously, while Paragraph 103 does not require that the integrity tests focus on Order-related topics, this first test does; and it is a topic that is of great interest to the Plaintiffs' class.  As of our July site visit, AIU had not yet initiated this test.  AIU personnel reported that the Unit's main priority is completing the AIU Operations Manual.  We will inquire with AIU as to the progress of this test during our upcoming site visit.

WAI 35540

While the review process of the operations manual is still underway, for this reporting period, BIO again submitted several completed inspections in support of the "regular" and "random" elements of this Paragraph. The inspections examined, for example, Supervisory Notes, Patrol Activity Logs, Traffic Stop Discussions, County Attorney turndown dispositions, Patrol Shift Rosters, and employee email usage. We reviewed these reports and believe that they comport with the Paragraph 103 requirement for "regular" and "random" integrity audit checks.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All of the requirements in this Paragraph are included in these protocols. The checklist and formats were approved for use in early 2016, and all personnel through the rank of captain were required to attend a training session regarding the use of these forms. Effective June 1, 2016, all administrative investigations are required to use these forms. MCSO is consistently meeting this requirement, and MCSO has included the checklists in administrative investigations forwarded for our review.

During the last reporting period, PSB drafted revisions to the investigation checklist and format to provide additional clarification on procedural requirements. We and the Parties reviewed the revisions and provided our feedback. While these protocols have not yet been finalized and published, we support the proposed revisions.

During this reporting period, we reviewed 48 administrative misconduct investigations. Thirty-one involved sworn MCSO personnel. All were completed after June 20, 2016 and included the use of the currently approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances where a supervisor failed to facilitate a deputy's attendance at a required interview.

WAI 35541

**Paragraph 105.** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Compliance Bureau Commanders created a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During our reviews for this reporting period, we reviewed 37 sustained administrative misconduct investigations. Twenty-five involved misconduct by sworn personnel; six involved Detention personnel; two involved civilian personnel; two involved Posse members; one involved both a sworn and civilian member of MCSO; and one involved an unknown employee. Thirty-two of the 37 involved personnel were still employed by MCSO at the time final findings and discipline decisions were made. In all of these 32 cases, the PSB Commander determined the findings and presumptive discipline range for the violations. We found these preliminary decisions to be consistent with the Discipline Matrices in effect at the time the decisions were made. We also found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for final discipline findings. We noted several investigations where the review of performance evaluations was not specifically listed in the documentation we were provided. While there was sufficient information provided regarding the employees' performance as a whole, we have reminded PSB that the review of performance evaluations must be specifically listed in the documentation.

**Paragraph 106.** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

WAI 35542

MCSO has two obligations under this Paragraph: to maintain and make records available.  The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenors as well.

MCSO has been responsive to our requests, and neither the Plaintiffs nor Plaintiff-Intervenors have raised any concerns related to the requirements of this Paragraph for this or the past several reporting periods.  MCSO, via its counsel, distributes responses to our document and site visit requests via a document-sharing website.  The Plaintiffs' attorneys and Plaintiff-Intervenors have access to this information, including documents applicable to this Paragraph, at the same time as we do.

WAI 35543

# Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

### a. Community Outreach Program

*Paragraph 107.  To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

*Paragraph 109.  As part of its Community Outreach and Public Information program, the MCSO shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The MCSO shall consult with Plaintiffs' representatives and the Community Advisory Board on the locations of the meetings.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  Deferred

This Paragraph, per the August 3, 2017 Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), directs MCSO to conduct a District community outreach program.  More specifically, it requires that MCSO hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.  This Paragraph requires MCSO to consult with Plaintiffs' representatives and the Community Advisory Board (CAB) on the location of the meetings, and to inform community members at the meetings of the policy changes or other significant actions that MCSO has taken to implement the provisions of the Order.  The Order also requires that MCSO provide summaries of audits and reports completed by MCSO pursuant to this Order and that MCSO clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

During this reporting period, MCSO held a public meeting coinciding with our April 2018 site visit on April 18, 2018, at Frank Elementary School, at 8409 Avenida Del Yaqui, in Guadalupe, in MCSO Patrol District 2.  MCSO consulted with Plaintiffs' representatives and the CAB on the meeting location, as required.  Approximately 40 community members attended this meeting.

WAI 35544

The meeting began with a video presentation by MCSO, which included a review of the history of the *Melendres* case and information on MCSO community relations and advisory boards. The presentation included a summary of changes in the community engagement-related Paragraphs contained in the August 2017 Court Order. The video was presented in Spanish with English subtitles. At the meeting, MCSO informed community members of the policy changes or other significant actions that the agency has taken to implement the provisions of this Order. Sheriff Penzone welcomed the attendees, and acknowledged the Department of Justice (DOJ), the American Civil Liberties Union (ACLU) of Arizona, the CAB, and the Monitoring Team as partners in the effort. Sheriff Penzone concluded his welcoming remarks by stating that he looked forward to hearing the questions and concerns from the community members.

MCSO made summaries of audits and reports completed by MCSO pursuant to this Order available, and MCSO representatives clarified for the attendees that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws. Sheriff Penzone provided a presentation of MCSO's progress in attaining compliance with the requirements of the Court Order.

**Paragraph 110.** *The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust. MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.*

**Phase 1:** Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO's quarterly community meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing the Order; and that MCSO representatives make reasonable efforts to address such concerns during the meetings and afterward as well as explain to attendees how to file a comment or complaint.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2018 site visit, on April 18, 2018, at Frank Elementary School, at 8409 Avenida Del Yaqui, in Guadalupe, in MCSO Patrol District 2. The approximately 40 community members in attendance were given ample opportunity to ask questions or offer comments. Sheriff Penzone requested attendees keep comments brief so everyone would have an opportunity to ask questions. He added that there were no restrictions on the questions, and that he would

WAI 35545

answer all questions honestly and transparently.  There were several questions related to why U.S. Immigration and Customs Enforcement (ICE) maintained offices at the County's Fourth Avenue Jail.  Sheriff Penzone explained that ICE has a lawful responsibility to address issues of illegal immigration and are permitted space within the jail so that ICE can interview every individual who is detained in Maricopa County jails.  He stated that the interviews enable ICE to determine if an individual should be considered for deportation upon release from custody, but emphasized that MCSO does not interfere or participate in ICE actions.  He added that MCSO would not be involved in any immigration enforcement and does not conduct raids or inquire about immigration status.

Another attendee stated that the only experience with law enforcement the youth in Guadalupe have had is with the previous Sheriff, and he asked Sheriff Penzone what his vision was to engage youth so they have a more positive relationship with law enforcement.  The Sheriff stated that to build relationships with community members, MCSO must interact with them.  He said that he has directed staff to spend more time with the youth in the community because they are the most impacted by crime.  Sheriff Penzone emphasized that most of the men and women wearing the MCSO uniform are parents who want to foster a healthy relationship with the Maricopa County youth.

A member of the CAB addressed the attendees and explained that the CAB was comprised of members of the community dedicated to representing community members.  He explained that the CAB has a two-part mission: to ensure compliance with the Court's Orders and to provide recommendations for rebuilding community trust in MCSO.  He stressed the importance of MCSO creating an atmosphere in which community members have trust and confidence in MCSO.  He concluded by stating that members of the CAB would be available after the meeting and are open to hearing thoughts and suggestions from the attendees.

A representative of the ACLU of Arizona explained the MCSO Immigration Stops and Detention Compensation Fund eligibility requirements to receive compensation funds and provided contact information for those who wanted to learn more about the program.

At the meeting, MCSO representatives announced that complaint and comment forms were available in the back of the meeting room for any attendees who wished to provide a written complaint or comment.   After the meeting, representatives of MCSO – as well as representatives of the Monitoring Team, the ACLU of Arizona, CAB, and DOJ – remained behind to individually answer questions.

***Paragraph 111.***  *English and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order, as well as an MCSO Community Liaison, shall participate in the meetings.  The Monitor, Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and MCSO shall announce their presence and state their availability to answer questions.*

**Phase 1:**  Not in compliance

WAI 35546

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that both English- and Spanish-speaking MCSO personnel attend MCSO's quarterly community meetings; at least one MCSO supervisor with extensive knowledge of the agency's implementation of the Order participate in these meetings; and that MCSO invite the Monitor, Plaintiffs' and Plaintiff-Intervenors' representatives to attend the meeting, and announce their presence and state their availability to answer questions.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2018 site visit, on April 18, 2018, at Frank Elementary School, at 8409 Avenida Del Yaqui, in Guadalupe, in MCSO Patrol District 2.  MCSO provided a professional Spanish interpreter for the meeting at Frank Elementary to ensure that Spanish-speaking attendees could understand all remarks, questions, and responses.  At the start of the meeting, the interpreter asked, in Spanish, if any attendees were monolingual Spanish speakers.  One man raised his hand, and an interpreter sat next to him and interpreted the meeting for him.  We do not consider this to be an appropriate or effective means of providing interpretation for a few reasons.  First, there may have been others at the meeting who were uncomfortable raising their hands to acknowledge in front of the audience that they did not understand English.  Second, attendees arriving late would not be able to avail themselves of the interpretation.  We recommend that MCSO provide live, consecutive Spanish interpretation throughout the meeting for the full audience.  This sends a message, whether a meeting is held in a community such as Guadalupe or one with a smaller Latino population, that MCSO wants to be inclusive and cares about and is responsive to the needs of Maricopa County's Latino and Spanish-speaking residents.

Several MCSO personnel who participated in and attended the meeting play instrumental roles in the implementation of the Orders.  In addition, the Monitor and representatives of the ACLU of Arizona, DOJ, and the CAB were invited to attend; and MCSO announced their presence and stated their availability to answer questions.

*Paragraph 112.  At least ten days before such meetings, the MCSO shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods.  Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available.  If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

WAI 35547

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO widely publicize, in English and Spanish, its quarterly community meetings at least 10 days before such meetings and after consulting with Plaintiffs' representatives and the CAB regarding advertising methods.

As noted above, during this reporting period, MCSO held a public meeting coinciding with our April 2018 site visit, on April 18, 2018, at Frank Elementary School, at 8409 Avenida Del Yaqui, in Guadalupe, in MCSO Patrol District 2.  As required, MCSO consulted with the CAB and the ACLU of Arizona regarding the advertisement in local radio and print media in English and Spanish – as well as on the site selection, agenda creation, and meeting logistics.  Members of the Monitoring Team also participated in discussions with MCSO regarding preparations for the public meeting.

MCSO's selection of the venue for the meeting was based on accessibility, adequate meeting space, adequate parking, and ease in locating the meeting site.  MCSO publicized the meeting with advertisements in both English and Spanish print media.  MCSO also ran radio spots in Spanish and English, and distributed flyers in the vicinity of the meeting venue.

### b. MCSO Community Liaison

*Paragraph 113.  MCSO shall select or hire a Community Liaison who is fluent in English and Spanish.  The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website.  The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**Phase 1:**  Not in compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish; and that MCSO post on its public website the hours and contact information of the Community

WAI 35548

Outreach Division (COrD), which is responsible for public communications and questions regarding MCSO.

MCSO has a Community Liaison who is fluent in English and Spanish, and lists on the MCSO website the hours and contact information for the Community Liaison Officer and other members of the COrD. The MCSO website includes information about the COrD – such as its mission and frequently asked questions regarding MCSO.

***Paragraph 114.*** *The COD shall have the following duties in relation to community engagement:*

a.   *to coordinate the district community meetings described above in Paragraphs 109 to 112;*

b.   *to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and*

c.   *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.   *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that the Community Outreach Division (COrD) be responsible for the following: coordinating MCSO's quarterly community meetings; providing administrative support for, coordinating, and attending meetings of the CAB; compiling complaints, concerns, and suggestions submitted to the COrD by members of the public about the implementation of the Orders, and to respond to the complainants' concerns; and to communicate such concerns from the community at regular meetings with the Monitor and MCSO leadership.

WAI 35549

As noted above, shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; and COrD – in collaboration with CID – began coordinating the required community meetings.  As noted above (in Paragraphs 109-112), during this reporting period, COrD worked with CID to coordinate a community meeting coinciding with our site visit, in Guadalupe, in MCSO Patrol District 2.

During this reporting period, Sheriff Penzone designated a Deputy Chief as the CAB's new point of contact.  The Deputy Chief worked with and provided support to the CAB throughout the reporting period.  She distributed policies and other materials for CAB members to review and provide feedback upon, and tracked and responded to CAB members' inquiries and requests for information about MCSO's implementation of the Orders.

During this reporting period, the CAB did not hold any public meetings.  However, the CAB met with Training Division personnel regarding a draft lesson plan MCSO is developing on the history of discrimination in Maricopa County, and visited the District 2 office to learn about the District's community outreach.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our July site visit.  CAB members also exchanged numerous email messages with COrD, CID, and the Deputy Chief who is the CAB's designated point of contact regarding the quarterly community meeting, planning meetings between CAB members and MCSO officials, and various inquiries and requests for information.

Following discussions during our October 2017 site visit, COrD created a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD.  Upon our request, following our January 2018 site visit, MCSO provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns from community members they receive.

During our July 2018 site visit, we inquired with COrD regarding any complaints or concerns from community members they received during this reporting period.  COrD personnel reported that they occasionally receive complaints from community members, and that they forward those that are complaints to PSB.  They also reported that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or the MCSO website.  During this reporting period, COrD submitted one MCSO Complaint and Comment Form for our review.  On the form, which is dated June 16, 2018, a Sun City resident comments that a deputy from MCSO "was very kind and reassuring" when the officer stopped to assist the resident and her nieces when they were stranded on the side of the road.

Per this Paragraph, the COrD is required to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.  As in the past, we will discuss this topic with COrD personnel during our upcoming site visit.  We will also inquire with them if – and if so, how – COrD communicates community concerns to the MCSO leadership, beyond at our quarterly site visit compliance meetings.

WAI 35550

### c. Community Advisory Board

***Paragraph 115.*** *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between MCSO and the community, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.*

**Phase 1:** Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:** Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that MCSO have specific duties in relation to the Community Advisory Board (CAB). MCSO and Plaintiffs' representatives are required to work with community representatives to create a CAB to facilitate regular dialogue between MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase public trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

Shortly after the issuance of Document 2100, MCSO began the transition to assume responsibility for its Community Outreach and Public Information Program; MCSO and the Plaintiffs' counsel selected the CAB members; and MCSO began providing support and guidance to the CAB.

During this reporting period, CAB members and representatives of MCSO – specifically, the Deputy Chief who is the CAB's designated point of contact, COrD, and CID – exchanged numerous email messages. In these messages, among other topics, CAB members provided specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met. For example, CAB members made recommendations regarding outreach and site selection for MCSO's community meeting; and on behalf of Maricopa County community members, inquired about various Office policies and processes.

It is an imperative that MCSO consider the legitimate input of the CAB and all other community-based organizations, as such may apply to practices, training, and other policy matters.

WAI 35551

***Paragraph 116.*** *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  A member of the MCSO COD and at least one representative for Plaintiffs shall attend every meeting of the CAB, but the CAB can request that a portion of the meeting occur without COD or the Plaintiffs' representative.  The CAB shall continue for at least the length of this Order.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, reconstitutes the CAB so that it is comprised of five members – two selected by MCSO, two selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.

In September 2017, MCSO and the Plaintiffs' counsel announced their selection of the CAB members.  One of the two CAB members who had served prior to the issuance of Document 2100 resigned, leaving one CAB member previously appointed by the Plaintiffs' representatives.  The MCSO and Plaintiffs' representatives appointed four new CAB members, resulting in a total of five members; two selected by MCSO, two selected by the Plaintiffs' representatives, and one jointly selected by MCSO and Plaintiffs' representatives.  None of the CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

As noted above, the CAB did not hold any public meetings during this reporting period.  However, during this reporting period, the CAB held three private meetings.  The CAB also met with Training Division personnel regarding a draft lesson plan MCSO is developing on the history of discrimination in Maricopa County, and visited the District 2 office to learn about the District's community outreach.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our July site visit.

WAI 35552

*Paragraph 117.  The CAB shall hold meetings at regular intervals.  The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB.  The Defendants shall provide a suitable place for such meetings.  The MCSO shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  Deferred

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program.  This Paragraph, among the provisions of Document 2100, requires that the CAB hold either public or private meetings at regular intervals; and that MCSO should provide a suitable place for such meetings, coordinate the meetings and communicate with CAB members, and provide administrative support to the CAB.

During this reporting period, the CAB did not hold any public meetings during this or the last reporting period; the CAB held three private meetings.  The CAB also met with Training Division personnel regarding a draft lesson plan MCSO is developing on the history of discrimination in Maricopa County, and visited the District 2 office to learn about the District's community outreach.  Some CAB members also attended a few of the Monitoring Team's compliance meetings during our July site visit.

For the CAB's last public meeting, in Grant Park in December 2017, MCSO communicated with CAB members and offered administrative support to the CAB, in such areas as scheduling the meeting and developing the agenda.  MCSO has also offered the CAB members' use of a conference room space at a non-MCSO, County-owned facility in central Phoenix, for its meetings.


*Paragraph 118.  During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the COD for investigation and/or action.  Members may also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.*

**Phase 1:**  Not in compliance

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.

**Phase 2:**  Deferred

WAI 35553

On August 3, 2017, Document 2100, Amendments to the Supplemental Permanent Injunction/Judgment Order, amended Document 670 to direct MCSO to conduct a District community outreach program. This Paragraph, among the provisions of Document 2100, requires that at their meetings, CAB members relay or gather concerns from the community about MCSO practices that may violate the provisions of the Orders; this Paragraph also allows for the CAB to hear from MCSO personnel on matters of concern pertaining to MCSO's compliance with the Orders.

The CAB did not hold any public meetings during this or the last reporting period. The CAB's last public meeting, at a community center in Grant Park in December 2017, was designed to facilitate dialogue between MCSO and the community, and to allow community members an opportunity to share their concerns with MCSO. Nine representatives of MCSO attended this meeting, provided information on MCSO's compliance with the Orders to date, participated in the discussion regarding increasing community trust, and answered questions from CAB members and community members in attendance – on topics including how to file complaints.

During this reporting period, CAB members inquired with MCSO officials regarding several concerns that they received from the community – on topics including MCSO's traffic stop analyses and the U-Visa program. In several emails, CAB members noted that they would share this information with the community. Also during this reporting period, the CAB met with Training Division personnel regarding a draft lesson plan MCSO is developing on the history of discrimination in Maricopa County, and visited the District 2 office to learn about the District's community outreach. Some CAB members also attended a few of the Monitoring Team's compliance meetings during our July site visit.

WAI 35554

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

**COURT ORDER XV.      MISCONDUCT   INVESTIGATIONS,   DISCIPLINE,   AND GRIEVANCES**

*Paragraph 163.  The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

### A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances

*Paragraph 165.  Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order.  Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

MCSO provided us with the following:

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on September 26, 2018.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- EA-2 (Patrol Vehicles), most recently amended on December 8, 2017.

- GA-1 (Development of Written Orders), most recently amended on January 9, 2018.

WAI 35555

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

- GC-7 (Transfer of Personnel), most recently amended on September 27, 2018.

- GC-11 (Employee Probationary Periods), most recently amended on May 30, 2018.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on October 7, 2017.

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

- GI-5 (Voiance Language Services), most recently amended on December 8, 2017.

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on March 30, 2018.

- GJ-27 (Sheriff's Posse Program), currently under revision.

- GJ-35 (Body-Worn Cameras), most recently amended on January 7, 2017.

- Audits and Inspections Unit Operations Manual, currently under revision.

- Body-Worn Camera Operations Manual, published on December 22, 2016.

- Compliance Division Operations Manual, published on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

- Training Division Operations Manual, currently under revision.

WAI 35556

We received a majority of the documents listed above within one month of the entry of the Order.  The Monitoring Team and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work.  MCSO continues to revise the remaining policies and operations manuals related to misconduct investigations, the Sheriff's Posse Program, Audits and Inspections, and Training.  Those remaining policies and operations manuals identified by MCSO were in some phase of review by us and the Parties at the end of this reporting period.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the Second Order's issuance.  The sheer volume of policies, as well as the extensive modifications they contain, rendered that target date unachievable.  This is due, in large measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

**Paragraph 166.**  *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Paragraph 167.**  *The policies shall include the following provisions:*

a.   *Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited.  This provision requires the following:*

 i.   *No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

 ii.   *No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct.  No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

 iii.   *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.   *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no*

WAI 35557

*non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c. *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.*

d. *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e. *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f. *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g. *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative and criminal misconduct investigations.

WAI 35558

During this reporting period, we reviewed 48 closed administrative misconduct investigations. Twenty-nine cases involved sworn personnel.  Two cases involved Posse members.  Eleven cases involved Detention personnel; two involved civilian personnel; two involved a combination of sworn and non-sworn personnel; and two involved unknown MCSO personnel. Sworn or Detention personnel assigned to PSB conducted 28 of the investigations.  Sworn supervisors in the Districts conducted 17 of these investigations and other Divisions outside of PSB conducted the remaining three.

Paragraph 167.a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation. During this reporting period, there were no instances where any potential conflict of interest was identified.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately.  Our review of the 48 completed administrative investigations for this reporting period revealed that there were no instances where MCSO identified a conflict of interest by an MCSO member responsible for making disciplinary decisions

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy or the PSB Commander.  Of the 48 completed misconduct investigations, there were six during this reporting period where the Chief Deputy or the PSB Commander authorized a truthfulness allegation.  We did not identify any investigations where we believe a truthfulness investigation should have been initiated and was not.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB.  Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor.  Of the 48 completed administrative cases we reviewed for this reporting period, there were 24 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct.  In two cases, employees aware of potential misconduct did not properly report it.   Both instances resulted in misconduct investigations for these employees.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB.  Of the 24 cases where employees brought forward potential misconduct, all were properly documented and forwarded by the supervisor in a timely manner.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct.  During this reporting period, there were two investigations where employees failed to bring forth information regarding potential misconduct of another employee that they were aware of.  In both cases, PSB properly initiated misconduct investigations.

WAI 35559

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level.  All District-level cases that we reviewed for this reporting period complied with this requirement.

***Paragraph 168.***   *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited.  This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations that were completed during this reporting period.

There were no completed investigations during this reporting period where there were allegations of reprisal, discouragement, intimidation, coercion, or adverse actions against any person because that person reported misconduct, attempted to report misconduct, or cooperated in any misconduct investigation.  MCSO reported that there were no grievances or other documents filed with PSB or the Compliance Division that alleged any conduct related to the requirements of this Paragraph.

WAI 35560

***Paragraph 169.*** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations that were completed during this reporting period. As previously noted in Paragraph 168, there were no investigations where retaliation was alleged. There were no grievances or other documents submitted to PSB or to the Compliance Division that alleged any retaliation related to the requirements of this Paragraph.

***Paragraph 170.*** *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 completed administrative misconduct investigations conducted during this reporting period. We also reviewed five criminal misconduct investigations. Of the 53 total investigations we reviewed, 23 were generated as a result of external complaints. PSB initiated 30 due to employee reports of misconduct, or discovery of potential misconduct by MCSO supervisory personnel.

WAI 35561

Of the 48 administrative misconduct investigations we reviewed this reporting period, four involved anonymous complaints.  All four were generated by external parties.  There were no third-party complaints reviewed this reporting period.  One of the five criminal misconduct investigations we reviewed during this reporting period was also generated due to an anonymous complaint.  We have not become aware of any evidence that indicates that MCSO refused to accept and complete investigations in compliance with the requirements of this Paragraph.  None of the 48 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaints were not appropriately accepted and investigated.

**Paragraph 171.**  *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline.  The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We determined that three of the 48 completed administrative investigations involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate.  MCSO completed all three investigations and reached a finding as required.  We also found that in six of the 48 investigations, the principal left MCSO employment prior to the finalization of the investigation or discipline process.  MCSO completed all six of these investigations and reached a finding.  Of the 48 investigations we evaluated for compliance, none were prematurely terminated.

**Paragraph 172.**  *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.  Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**Phase 1:**  In compliance

- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

WAI 35562

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 48 completed administrative misconduct investigations conducted by MCSO personnel.  There was one investigation identified by MCSO where an employee failed to accurately provide all information or evidence required during the investigation.   In this case, allegations for truthfulness were initiated.  We did not identify any other cases during our reviews where we believe an employee intentionally failed to provide all required information or evidence during an investigation and MCSO failed to act.

*Paragraph 173.   Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.   The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.
- GC-11 (Employee Probationary Periods), most recently amended on April 10, 2018.
- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

MCSO has established a protocol to address the requirements of this Paragraph.   When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB).   Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro).   As part of the promotional process, MCSO conducts a meeting with command staff to discuss each employee's qualifications.   During this meeting, the results of the IAPro checks are provided to the staff for review and consideration.   The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel, and clarifies any questions regarding the disciplinary history that the staff may have.   When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation.   The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services.   For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information.

During our July 2018 site visit, we reviewed personnel files for employees who had been promoted during the previous quarter.  In our reviews, we found two instances where employees with open internal affairs investigations were promoted.   A memorandum justifying the

WAI 35563

promotion of the first employee was included in the file.  This promotion involved a Detention sergeant who was the principal in a complaint filed by an inmate, alleging that the employee failed to take action during an altercation between inmates.  The allegation, if sustained, would not preclude the employee from being promoted.  We reviewed the justification memorandum, in addition to the employee's personnel history, and determined that the promotion was in compliance with the requirements of this Paragraph.

The second individual promoted is a civilian who works in an MCSO Detention facility.  The employee has had minor discipline in the past, and at the time of promotion, had two open internal affairs investigations.  The allegations are related to administrative errors that resulted in both late and early releases of inmates.  We are not certain of the seriousness of the allegations, or the discipline that would result if the allegations were to be sustained, since the prior coachings are for similar violations.  There was no memorandum provided to explain or justify the promotion.  This Paragraph does not preclude MCSO from promoting an employee under these circumstances.  However, we caution MCSO that this Paragraph requires a written justification for any employee promoted, who is a principal in an ongoing investigation of serious misconduct.  MCSO has been in compliance with this Paragraph.  If the requirements of this Paragraph are not met in the next quarter, compliance will be withdrawn.

**Paragraph 174.**  *Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 10, 2018.

**Phase 2:**  In compliance

During this reporting period, we requested and received the names of employees hired, promoted, and transferred for each month of the quarter.  There were no transfers to or from PSB, CID, and BIO during this reporting period.

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.  We reviewed the documentation provided for new employees, for the second quarter of 2018, and found no issues of concern.

WAI 35564

MCSO promoted nine Detention sergeants and one Detention lieutenant during this reporting period. We reviewed the disciplinary profiles for each employee promoted and determined that the promotions met the requirements of this Paragraph. MCSO also promoted seven civilian employees. We reviewed the profiles submitted for each civilian employee. With the exception of the employee who had two open internal affairs investigations, we noted no other issues of concern. We will review the personnel file of this individual during our October site visit to verify compliance with the requirements of this Paragraph.

***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on March 24, 2017.

**Phase 2:** Not in compliance

Per MCSO policy, an EIS review is to be conducted within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. We received and reviewed Blue Team Notes submitted for the selected employees as verification of compliance with this Paragraph.

For April, MCSO submitted a list of employees who were transferred during the previous month. From the list, we selected a random sample of 25 employees, of which six were sworn and 19 were Detention. Of the six transferred sworn employees selected, five had documentation of command review of their EIS profiles. Of the 19 transferred Detention employees selected, 15 had documentation of command review of their EIS profiles. The compliance rate for April was 80%.

For May, MCSO submitted a list of employees who were transferred during April. From the list, we selected all 20 employees transferred to assess MCSO's compliance with this Paragraph. The transfers selected for review included six sworn employees and 14 Detention employees. Five of the six sworn employees had documentation of command review of their EIS profiles. Of the 14 Detention employees selected, 13 had documentation of command review of their EIS profiles upon transfer. The compliance rate for May was 90%.

For June, MCSO submitted a list of employees who were transferred during May. From the list, we selected 25 employees to assess MCSO's compliance with this Paragraph. The transfers included 16 Detention employees and nine sworn employees. Of the 16 Detention employees selected, 13 had documentation of command review of their disciplinary history after the transfer. Of the nine sworn employees selected, five had documentation of command review of their disciplinary history upon transfer. The compliance rate for June was 72%. The total combined compliance rate for the second quarter of 2018 was 81%.

WAI 35565

***Paragraph 176.***  *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**Phase 1:**  In compliance

- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:**  Not in compliance

We reviewed Employee Performance Appraisals for 27 supervisors and commanders who received EPAs during this reporting period.  Twenty-six of the 27 of the appraisals rated the quality and effectiveness of supervision.  Twenty of the 27 appraisals contained comments and/or rated the supervisors' demonstrated ability to identify and effectively respond to misconduct.  Twenty-one of the 27 supervisors' EPAs assessed the employees' quality of internal investigations and/or the quality of their reviews of internal investigations.  Twenty-six of the 27 appraisals rated supervisors on the quality of their reviews.  Twenty-one of the supervisors' 27 EPAs that we reviewed for this reporting period were in compliance with the requirements of this Paragraph.  Commanders have been consistently increasing the quality of the information contained in supervisors' EPAs.  The number of EPAs that met the requirements of this Paragraph slightly decreased during this quarter.  The compliance rate for the second quarter of 2018 was 78%.

***Paragraph 177.***  *There shall be no procedure referred to as a "name-clearing hearing."  All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations that were completed during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

WAI 35566

## B.      Misconduct-Related Training

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.   This training will include instruction in:*

a.      *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.      *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.      *properly weighing the credibility of civilian witnesses against employees;*

d.      *using objective evidence to resolve inconsistent statements;*

e.      *the proper application of the appropriate standard of proof;*

f.      *report-writing skills;*

g.      *requirements related to the confidentiality of witnesses and/or complainants;*

h.      *considerations in handling anonymous complaints;*

i.      *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.      *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO did not deliver the 40-hour Misconduct Investigative Training during this reporting period.   During our July site visit, the PSB personnel advised us of PSB's intention to collaborate with the Training Division to update this lesson plan soon.


***Paragraph 179.***   *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.   This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**Phase 1:**  Not in compliance

- GG-1 (Peace Officer Training Administration), most recently amended on May 16, 2018.

WAI 35567

- GG-2 (Detention/Civilian Training Administration), most recently amended on May 16, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Deferred

During our July site visit, PSB personnel advised us that an outside vendor had been retained by MCSO to develop and deliver the required annual in-service training for District personnel. The vendor has already provided the proposed curriculum to MCSO for reformatting into the standard MCSO lesson plan format. PSB will review the curriculum to ensure inclusion of Order requirements and topics of interest specific to PSB. The Training Division is anticipating classroom delivery during the next reporting period.

We further discussed the in-service lesson plan development for PSB personnel. During our July site visit, the Plaintiff-Intervenors recommended a vendor to deliver sexual harassment and domestic violence investigative training. We participated in a conference call with MCSO and the Parties to facilitate discussions between the vendor and MCSO. During this call, MCSO apprised the vendor of any concerns and recommendations. We reminded all participants that the curriculum is subject to the review requirements of the First Order. The Training Division is anticipating delivery for this training during the next reporting period, as well.


***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

WAI 35568

The following policies apply to this Paragraph: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment; CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures). During our July site visit, MCSO reaffirmed that annual reviews for these policies would prompt new reviews by all employees. As previously reported, deputies review newly revised policies in theHUB. After review, they complete an attestation indicating they have read and understand the policy. We will continue to monitor attestations for policies receiving an annual review.

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

MCSO did not approve the Complaint Intake and Reception Training for delivery during this reporting period. Previously, MCSO terminated its E-Learning platform, and this training transitioned to theHUB. During our July site visit, we inquired as to the status of this training. The Training Division explained that within theHUB, new employee profiles had not been completed. A lack of employee profiles prevented new hires from accessing the training materials. The Training Division was unable to provide the number of new employees requiring training. During the next reporting period, the Technology Management Bureau plans to resolve all access issues. Human Resources developed an eight-hour new employee orientation, which includes this training. New employees are required to complete this training within their first 30 days. MCSO does not anticipate any further issues with the delivery of this training through theHUB.

***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

WAI 35569

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

During this reporting period, our review of the SRELE curriculum continued to affirm the inclusion of material compliant with this Paragraph. We continue to reinforce supervisory obligations during the review process.

### C.   *Administrative Investigation Review*

*Paragraph 183.   The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

*Paragraph 184.   All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 completed administrative misconduct investigations conducted during this reporting period.

Of the 48 cases we reviewed, 47 (98%) complied with the requirements of this Paragraph. In one case, involving a detention employee, we do not believe the findings were based on an appropriate standard of proof, as there did not appear to be sufficient justification to unfound this complaint. Based on our review of the investigation, we believe a finding of not sustained would have been the appropriate finding.

During our next site visit, we will discuss this investigation with PSB personnel.

*Paragraph 185.   Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all of these cases, PSB was properly notified of the complaint.

WAI 35570

***Paragraph 186.*** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During our October 2016, January 2017, and July 2017 site visits, we met with the PSB lieutenant who served as the primary administrator for the IAPro database system. The lieutenant's demonstration represented IAPro as a technology instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The lieutenant conducted a weekly evaluation of closed cases to ensure that data was entered in to the system, and a monthly review to audit timeframes associated with open investigations. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones.

PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and Blue Team technology systems. The system can be accessed remotely. Additionally, PSB hired a management analyst dedicated to the administration of the centralized tracking system. The documentation that PSB provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During our January 2018 site visit, a member of our Team met with the management analyst assigned to PSB who is now responsible for management of the IAPro database. The management analyst again demonstrated the functionality of the tracking system in use. The analyst also showed us the documents that are sent out regarding the status of investigations and demonstrated how the Blue Team Dashboard can be used to track investigation information.

WAI 35571

During this reporting period, we found that all 48 of the administrative misconduct investigations were properly assigned a unique identifier. All of these cases were both initiated and completed after July 20, 2016. Of the 48 cases, 20 involved an external complaint requiring that PSB provide the complainant with this unique identifier. In all but one case, MCSO sent the initial letter that includes this unique identifier to the complainant within seven days, or provided an appropriate explanation for not doing so. In one case, though the letter was sent, it was not sent within the seven-day time period and no explanation was provided. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information. PSB has developed a form that identifies the reason why a required notification letter is not sent, and includes this document in the cases they forward for our review.

**Paragraph 187.**   *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we previously verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During past site visits, a member of our Team inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

During May 2018, PSB relocated to its new offsite facility. During this reporting period, we confirmed that PSB continues to maintain both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility. A member of our Team verified this compliance at the new facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information is also being electronically maintained in IAPro.

WAI 35572

***Paragraph 188.*** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations and service complaints that were conducted and completed by MCSO personnel during the reporting period.

We previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense is determined once the investigation is completed.

All 48 administrative misconduct investigations that we reviewed for this reporting period complied with the requirements of this Paragraph.

With the approved revisions to the internal investigations and discipline policies, PSB is now authorized to determine that some complaints can be classified as service complaints. PSB has initiated both a process and a complaint-tracking system for these complaints.

During the last reporting period, MCSO completed and closed 54 service complaints. Fifty-three (98%) complied with the requirements for the handling of service complaints.

During this reporting period, MCSO completed and closed 64 service complaints. Six of the 64 service complaints were appropriately reclassified to administrative misconduct investigations after review by PSB. The remaining 58 were classified and handled as service complaints. Fourteen (24%) of these complaints were determined not to involve MCSO personnel. Thirty-six (62%) involved complaints regarding laws, or MCSO policies and procedures where there was no employee misconduct; or were other contacts from the public that did not include allegations of misconduct. Five lacked specificity and the complainant was either unwilling or unable to provide additional clarification of their concern. Three involved multiple reasons for closure. We concur with MCSO's handling of 60 of the 64 service complaints. In two of the cases, while there might not have been employee misconduct, the complainant was clearly alleging that there was conduct that, had it occurred, would have been misconduct. Administrative misconduct investigations should have been initiated. In two additional cases, a service complaint may have been the appropriate outcome but the preliminary inquiries lacked sufficient detail to support this decision.

WAI 35573

During our April 2018 site visit, PSB personnel informed us that the number of service complaints they have processed since the initiation of the process had exceeded their expectations. PSB opened 71 since the initiation of this process. They also informed us that in approximately 20% to 25% of the service complaints, they could immediately determine that no MCSO personnel were involved. We noted in our reviews for that reporting period that 22% of the service complaints submitted for review did not involve MCSO personnel. We agreed to review an expedited process for the handling of service complaints that do not involve MCSO personnel if PSB wanted to provide a recommended protocol.

During our July 2018 site visit, we again discussed service complaints with PSB personnel. They advised that there were 155 service complaints for the first six months of 2018; and as they reported in the last reporting period, the number of service complaints continues to exceed their expectations. They again noted that they believe that 20% to 25% of the service complaints do not involve MCSO employees. Our findings for this reporting period confirmed that 25% of the service complaints we reviewed did not involve MCSO personnel. PSB personnel informed us that they are continuing to work on an expedited process for the handling of service complaints, where it can be immediately determined that the complaint does not involve MCSO personnel. As we noted in the last reporting period, we support this effort and will review any expedited process developed by PSB to address this issue.

While we remain satisfied that overall MCSO is properly classifying and handling administrative misconduct investigations and service complaints and are completing the required documentation, we noted four cases that we do not believe were fully compliant with the requirements for the handling of service complaints. We will discuss these complaints with PSB during our next site visit.

Consistent with the provisions of the revised policies on internal investigations and discipline, the PSB Commander now has the discretion to determine that internal complaints alleging minor policy violations can be addressed without a formal investigation if certain criteria exist. If the PSB Commander makes this determination, it must be documented. There were no internal complaints during this or the last four reporting periods where the PSB Commander determined that the internal complaint did not require an administration investigation.

***Paragraph 189.*** *The Professional Standards Bureau shall administratively investigate:*

a.  *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.  *misconduct indicating apparent criminal conduct by an employee.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

WAI 35574

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 48 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 20 of the 48 administrative misconduct investigations conducted during this reporting period.  PSB investigated 28 of the cases.  PSB also investigated five allegations of criminal misconduct.  We did not identify any cases during this reporting period where we believe PSB failed to investigate allegations of serious misconduct.

***Paragraph 190.***  *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 53 misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of these, 48 were administrative investigations, and five involved alleged criminal misconduct. PSB personnel conducted all of the criminal investigations.

Of the 48 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 28 of the investigations.  Twenty were investigated at the District or Division level. We did not identify any case where Divisions outside of PSB investigated allegations of serious misconduct that we believe should have been investigated by PSB.

The 40-hour Misconduct Investigative Training was completed prior to January 1, 2018.  Of the 20 administrative misconduct investigations conducted outside of PSB during this reporting period, two were both initiated and finalized after the completion of this training.  Both were in compliance with the requirements for the completion of administrative misconduct investigations.  Eighteen of the investigations conducted by personnel outside of PSB were initiated before the Misconduct Investigative Training was completed.   Of the total investigations conducted outside of PSB, 13 (65%) were in compliance with all investigative and administrative requirements.   Seven were returned by PSB for further investigation, clarifications, or administrative corrections.

WAI 35575

All supervisors have attended the required Misconduct Investigative Training. While many investigations still do not comply with all the requirements for the investigation of misconduct, these deficiencies are covered in other Paragraphs of this report.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations; and they provide a monthly report regarding those supervisors who they have determined are not qualified to conduct these investigations.

**Paragraph 191.** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no cases for this reporting period where an investigating supervisor outside of PSB discovered potential serious or criminal misconduct during their investigation. Our Team did not identify any investigation where the complainant alleged serious misconduct had occurred, and the case was not forwarded to PSB for investigation.

**Paragraph 192.** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Deferred

WAI 35576

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau.  During the last reporting period, MCSO provided copies of PSB's daily reviews of 42 completed Division level misconduct investigations that were assigned outside the Bureau.  The report review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached.  Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.  During our April 2018 site visit, PSB advised the Monitoring Team that it intends to incorporate the requirements for Paragraph 192 into the next semi-annual report being prepared in relation to Paragraph 251.

PSB recently included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251.  The report was published on MCSO's website in July 2018.  The report covers the period of July 1-December 31, 2017; and contains an analysis as to whether cases assigned outside of PSB are properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  Some of the issues identified in the review of the investigations include: failure to conduct a timely investigation; failure to attempt to interview complainants in person; failure to interview all parties (e.g., investigative leads and witnesses); failure to audio- and video-record all interviews without any documented explanation; failure to properly conduct investigative interviews; and findings not supported by the facts of the investigation.

We are deferring our Phase 2 compliance assessment of this Paragraph until MCSO achieves Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

**Paragraph 193.**  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

WAI 35577

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. In all 37 cases with sustained allegations, the most serious policy violation was used to determine the category of the offense if more than one policy violation had been alleged. In cases where multiple violations of policy occurred, this information was also listed on the preliminary discipline document. There were no cases where the exoneration of any offense precluded discipline for sustained allegations.

**Paragraph 194.** *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:** Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.
- CP-5 (Truthfulness), most recently amended on October 24, 2017.
- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.
- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO personnel, the review of attendance by internal investigators at required Misconduct Investigative Training, and the disciplinary backgrounds of internal investigators.

During this reporting period, we reviewed a total of 48 administrative misconduct investigations and five criminal investigations. All five (100%) of the criminal investigations complied with MCSO policy and the requirements of the Second Order. Of the 48 administrative misconduct investigations, 37 (77%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority. There were two cases where we disagreed with the final discipline decision of the Appointing Authority, resulting in an overall finding of 73% for compliance with all MCSO policy and Second Order requirements. This is an improvement from the last reporting period where 60% of the investigations were in full compliance.

WAI 35578

There were no administrative misconduct cases reported in response to the requirements of Paragraphs 249 (investigatory stops), or 275 (CRMS) during this reporting period. One case, submitted in compliance with Paragraph 33, involving an allegation of bias policing not involving members of the Plaintiffs class, was reviewed and found in compliance with the requirements of the Order.

Of the 48 total administrative misconduct cases we reviewed, PSB personnel completed 28. Twenty-four (86%) were in compliance with all investigative and administrative requirements over which the PSB Commander has authority. This is an improvement from the 77% compliance rating in the last reporting period.

Sworn personnel in PSB conducted 17 of these investigations. Fifteen (88%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority. Of the two cases that were not compliant, one lacked a timely extension request; and a second lacked timely completion of the requirement to complete a letter to the complainant within seven-days of receipt of the complaint. We found all of these 17 investigations to be properly investigated. Were it not for the two administrative process errors, all 17 cases would have been in compliance.

Eleven of the investigations conducted by PSB were completed by Detention personnel assigned to PSB. Of the 11 they investigated, nine (82%) were in compliance with all of the investigative and administrative responsibilities over which the PSB Commander has authority. This is a substantial increase from the 66% compliance the last reporting period. In one of the cases, we believe that a finding of not sustained instead of unfounded should have been made; and in the second, we believe additional interviews of MCSO employees were necessary and yet were not conducted. We note that in previous reporting periods, investigations completed by Detention personnel in PSB had a number of administrative concerns or failures to meet established timeframes. We did not find that to be true in the investigations conducted by Detention personnel this reporting period.

Twenty investigations were conducted by Districts or Divisions outside of PSB. We found 13 (65%) to be in compliance with investigative and administrative requirements. This is an improvement from the 42% compliance during the last reporting period.

While there are many factors that impact the PSB Commander's ability to ensure compliance in all cases, we have seen consistent improvement in those areas over which the PSB Commander has authority. The PSB Commander must rely on other members of PSB staff to conduct case reviews and ensure proper documentation is completed. We are consistently finding that these PSB personnel are identifying and ensuring, where possible, that corrections are made and all documentation is completed. We also note that in those cases completed outside of PSB, while the PSB Commander can – and does – ensure that deficient investigations are returned for corrections, some deficiencies cannot be corrected after the fact. One of the most significant factors adversely impacting compliance for those cases completed outside of PSB is the failure of Command personnel to identify and correct deficiencies prior to forwarding the cases to PSB for review. Numerous cases are still being found non-compliant for this reason. The final factor affecting the PSB Commander's ability to ensure all investigations are properly completed is that final findings and discipline decisions are made by the Appointing Authority,

WAI 35579

not the PSB Commander.  While lack of training has been a factor in the past, it appears that the Misconduct Investigative Training completed in late 2017 has addressed many of these concerns.  We are also aware that additional training on misconduct investigations will continue to occur.

While PSB continues to experience challenges in ensuring that completed internal investigations are reaching full compliance with both MCSO policy and both Court Orders, the Bureau continues to make efforts to improve compliance.  A member of our Team meets personally with the PSB Commander weekly to discuss Class Remedial Matters.  We also use this opportunity to discuss other ongoing related concerns that affect compliance with the Second Order.  The PSB Commander is attentive to our concerns.  We have raised several concerns in our weekly meetings during this reporting period.  In all cases, he has been responsive to issues we have raised; and when necessary, has provided us with timely feedback.

Since October 2016, during each site visit, we have met with PSB personnel and District and Division command personnel to update them on our identification of training and performance issues that adversely affect compliance with the Second Order.  Since January 2017, Detention personnel assigned to PSB to oversee investigations have also participated in these meetings.  We have found them all to be attentive and responsive to our input during these meetings.

Since we began conducting these site visit meetings, the PSB Commander has taken a number of actions to address issues we have raised.  Based on concerns regarding those cases investigated by Detention supervisors, the PSB Commander assigned a sworn lieutenant in the Bureau to serve as a secondary reviewer of these cases, and provided additional training and oversight for those who conduct these investigations.  We believe that this review and oversight, the additional training, and increased experience in conducting these investigations, are all factors in the ongoing improvement we are seeing.  Many of the timeframe issues that previously existed with these investigations have been addressed; and during this reporting period none of the investigations completed by Detention personnel were non-compliant in this area.

To address some of the concerns with the cases conducted outside of PSB, the PSB Commander continues to assign PSB liaisons to every District.  We have noted that PSB liaison personnel have met personally with some District supervisors to assist them or provide additional information and recommendations for improvement.  There are also PSB personnel assigned to review District cases; provide feedback; and when necessary, return the cases for additional investigation or analysis by the District personnel.

During our April 2018 site visit discussions with the PSB Commander and his staff, we discussed both the completion of witness interviews and the handling of instances where inappropriate comments are made while a Body-Worn Camera (BWC) or other recording device is activated but no members of the public are present.

In the case of witness interviews, we discussed that in some cases, witnesses have already been interviewed during the course of a criminal or traffic related incident; and in others, there is clear and convincing evidence that misconduct did or did not occur without the need to interview some potential witnesses.  In the cases we have reviewed that involve such witnesses,

WAI 35580

there have been some inconsistencies in whether these witnesses are being interviewed during the administrative investigation.  We agree that in some cases, the interview of witnesses may be unnecessary, but these types of instances must be clearly defined.  We also believe that any decision not to interview a witness must be documented and then approved by a Command member of the Division where the decision is made.

In the case of BWC or other recordings, we discussed that while inappropriate comments may have been made, they may not be related to the law enforcement contact and may not have been made in the presence of any community members.  In other cases, though the comments were not made in the presence of community members, the comments made have had a direct relationship to the law enforcement contact.  We believe that there is a clear distinction on how such comments should be addressed.  We agree that in some cases, an administrative misconduct investigation may not be appropriate, but there should be clear direction provided on how these instances are handled.

In both the interview of witnesses and the handling of comments captured on BWC or other recording devices, we believe that consistency is necessary; and that MCSO needs to develop protocols to address how these instances are handled.  The PSB Commander committed to drafting protocols for our review and approval prior to making any changes to the current procedures.

During our July 2018 site visit, we again discussed witness interviews and inappropriate comments that may be made outside the presence of any community members.  PSB personnel advised us that they are continuing to work on draft protocols and will forward them for our review when they are completed.

We have noted over the past several reporting period that there continues to be significant fluctuation in the number of completed cases submitted for our review each month.  During the last reporting period, MCSO submitted 142 administrative misconduct investigations for our review.  This reporting period, MCSO forwarded only 48.  We discussed this with the PSB Commander during both our April and July 2018 site visits to determine what factors contribute to this fluctuation.  The PSB Commander informed our Team that in 2013, PSB initiated 76 internal investigations.  In 2014, PSB initiated 717 cases.  In 2015, PSB initiated 986 cases; and in 2016, PSB initiated 847 cases.  There were more than 1000 cases initiated in 2017.  During the first six months of 2018, 586 investigations have been initiated, in addition to 155 service complaints that have been opened.

The PSB Commander continues to dedicate many of the Bureau's existing resources to ensuring that District cases are properly investigated and receive a thorough review when they reach PSB.  This continues to reduce the number of investigators available to conduct investigations assigned to PSB.  The required Misconduct Investigative Training completed in late 2017 also contributed to a decrease in cases completed by PSB during that time period, as numerous PSB personnel were involved in the delivery of this training and unavailable to complete or review investigations.  In May 2018, PSB relocated to its offsite facility; the relocation also adversely affected the completion of investigations and reviews.

WAI 35581

In 2016, each investigator assigned to PSB had an average of 12-16 active cases per month. This number has increased dramatically since that time. During our January site visit, PSB personnel reported that their investigators were averaging a caseload between 20 and 24 cases per month. During our April 2018 site visit, PSB advised us that the average number of active cases per investigator in PSB had continued to increase; and was between 20-30 active cases each month.

During our July 2018 site visit, the PSB Commander informed us that the number of cases assigned to sworn PSB investigators has now grown to between 33 and 39 active investigations per month that are assigned to each investigator. Detention personnel assigned to PSB are averaging 28 active cases per month. PSB personnel informed us that they are unable to keep up with the number of cases assigned and without relief of some kind, this problem will only continue to grow. There are currently nine sworn investigators and 15 Detention supervisors assigned to PSB to conduct administrative misconduct investigations. The PSB Commander also informed us that although the Bureau was authorized 11 new positions in the July 2018 budget, due to the ongoing vacancies in MCSO as a whole, and the challenges with hiring qualified applicants, they did not expect they would receive any of these personnel any time in the near future.

At the time of our July 2018 site visit, there were 84 sworn vacancies at MCSO. During our discussion with MCSO personnel about staffing, MCSO informed us that the Sheriff is actively working to secure more funding for positions and the ability to implement a pay plan that would assist with the recruitment of qualified applicants. Apparently the Sheriff recently made a presentation to the Maricopa County Board of Supervisors where he discussed the challenges of hiring personnel, presented a comparison of the salaries at MCSO to the salaries at other law enforcement agencies, and presented a proposed pay plan for MCSO. We requested that MCSO provide us with the information contained in this presentation. PSB also informed us that in its limited research of what an adequate number of investigators would be for the number of investigations they conduct, they believe an additional 40 investigators would be required. We requested that they provide us with any information they could obtain from any studies where the appropriate ratio of investigators to investigations has been established. We suggested that the Police Executive Research Forum (PERF), the International Association of Police Chiefs (IACP), or the Major County Sheriffs of America Organization (MCSA) might have this type of information.

WAI 35582

For numerous reporting periods, we have identified and noted the lack of sufficient staff in PSB. We have also continued to note that failure to provide adequate staff to conduct misconduct investigations is a disservice to both community members and MCSO employees. We continue to believe this is true, but acknowledge that staffing alone may not be sufficient to address the serious backlog and the increase in the number of investigations that are occurring. It also does not appear there will necessarily be any reduction in the amount of investigations being initiated, as they have continued to increase since 2013. We have seen the increasing number of cases and believe that PSB is making sincere efforts to address the investigations and meet the requirements of their policies and the Orders of the Court. We have also noted that hundreds of extension memorandums are being authored and approved for these investigations. While we agree that the extensions are appropriate, given all of the factors involved, it is simply not appropriate to continue to delay completion of these investigations without taking some action to address the ongoing concern.

During our July 2018 site visit meetings with PSB, we discussed several pending investigations regarding identifications in the custody of MCSO. One of these cases involves the 1,459 IDs that had been impounded at the MCSO Property Room and then checked out by an MCSO sergeant. This investigation was initiated in 2015. Since late 2017, this investigation has stalled due to other, more immediate priorities for investigators. While PSB has provided updates on this investigation, and we acknowledge the many challenges PSB faces with its completion, it cannot continue to remain inactive. Two other investigations involving IDs – one from 2015, and one from 2016 – also remain outstanding and need to be resolved. We requested during our July site visit that PSB provide us with a written update on these investigations, and a plan for resolving them.

During our July 2018 site visit, we had lengthy discussions with PSB command staff regarding the challenges they are facing ensuring that misconduct investigations are properly completed within established timeframes, given the number of investigations they conduct, the requirements for completion, and the lack of adequate staffing. During these discussions, both we, and the Parties, expressed our willingness to discuss with them any changes in the investigation methodology they might want to propose to address what we agree is of significant concern. If PSB is prepared to do so, we will provide an opportunity for this discussion during our next site visit.

Over our past several site visits, PSB staff have continued to communicate that they are properly outsourcing those cases where conflicts of interest exist. PSB has contracted with a qualified private vendor to conduct these investigations. Additionally, PSB previously outsourced investigations to another local law enforcement agency.

PSB personnel updated us on these investigations during our July 2018 site visit. Both cases outsourced to another law enforcement agency have been previously completed, and no additional cases have been outsourced to any another law enforcement agency. The contract investigator continues with his investigations. He has completed two of the investigations assigned to him, and they have been forwarded to MCSO for review. PSB did not outsource any new cases to this investigator during this reporting period.

WAI 35583

MCSO finalized and published the revised internal investigation and discipline policies on May 18, 2017.  The required 40-hour Misconduct Investigative Training was completed during this reporting period.

After the Second Order was implemented, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations, and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds.  Two supervisors were determined to be ineligible to conduct internal investigations.  Since January 2017, PSB personnel have reported on a monthly basis that they have not identified any additional members of MCSO who are disqualified from conducting misconduct investigations.


***Paragraph 195.***  *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:**  Not in compliance

 • Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training.  Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and further requires sufficient trained personnel in PSB within six months of the entry of the Order.  The first week of the required Misconduct Investigative Training commenced on September 18, 2017 and the training was completed prior to the end of 2017.

During our April 2018 site visit, the PSB Commander informed us that MCSO had been approved for six budget positions for PSB for the July 2018 budget year.  These positions included one sworn lieutenant, three sworn sergeants, and two Detention sergeants.  There were an additional five positions that PSB requested, but were not approved for the 2018 budget year at the time of our site visit.  With the current number of vacancies throughout MCSO, and the time it takes for training new deputies, PSB did not expect that any of these positions would be filled before mid to late 2019.

During our July 2018 site visit, PSB informed us that a total of 11 additional personnel had been approved for PSB in MCSO's July 2018 budget.  As we noted in Paragraph 194, this staffing increase is not expected to occur anytime in the near future.  PSB personnel believe that even with the addition of these personnel, the Bureau will still be insufficiently staffed to fulfill the requirements of this Order.

WAI 35584

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order."   MCSO has delivered the required misconduct investigation training, and our focus has shifted to the sufficiency of PSB staff to carry out its mission.   As documented in this and previous reports, PSB, in its command's estimation, is understaffed. We will not find MCSO in compliance with this Paragraph until MCSO addresses PSB's staffing issues.

**Paragraph 196.**  *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.  Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During our April 2017 site visit, the PSB Commander indicated that MCSO had not envisioned any need to retain additional contract investigators beyond the one investigator that had been already retained.  A member of PSB's staff serves as MCSO's single point-of-contact to liaise and assist with scheduling for the contract investigator.  The contract investigator will advance the investigations to the level of recommending findings.

PSB previously outsourced three misconduct investigations to a separate regional law enforcement agency.  Two of these investigations were completed by the outside law enforcement agency and closed by MCSO.  One was closed as the Independent Investigator was investigating the same alleged misconduct.   PSB has not outsourced any additional investigations to any outside law enforcement agencies.

During this and the last reporting period, PSB did not outsource any additional investigations to the contract investigator.   This investigator has now completed two investigations and forwarded them to PSB for review.  We have not yet received or reviewed these investigations.

**Paragraph 197.**  *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**Phase 1:**  Not in compliance

WAI 35585

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

In January 2018, MCSO advised that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  The PSB Deputy Chief, who previously had this responsibility was promoted, but will maintain overall oversight of PSB as an Executive Chief. We have worked with the assigned captain during his tenure in PSB, reviewed his qualifications, and believe he possesses the requisite qualifications and capabilities to fulfill the requirements of this Paragraph.

During our April and July 2018 site visits, and during our regularly scheduled meetings with PSB to discuss CRMs and other internal affairs matters, we have had numerous opportunities to meet with and interact with the captain now assigned as the PSB Commander.  He continues to be responsive to our input and concerns regarding misconduct investigations, and has immediately addressed any issues that we have brought to his attention.  We remain optimistic that PSB will continue to make necessary improvements under his leadership.  As we have previously noted, MCSO must support the PSB Commander with resources and executive leadership.

*Paragraph 198.*   *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO reported that in May 2018, PSB moved into the first and second floors of 101 West Jefferson Street.  During our July 2018 site visit, members of the Monitoring Team toured the facility.  In addition, we inspected the placards and comment and complaint forms at Districts 1, 2, 3, and 7; and noted that they all had been updated to reflect PSB's new address.  The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.  PSB's criminal investigators are housed on the first floor, and administrative investigators are housed on the second floor of the building.  PSB's off-site facility has two dedicated security personnel assigned during normal business hours of 8:00 am-4:00 pm, Monday-Friday.

WAI 35586

*Paragraph 199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

During our July 2018 site visit, we met with the PSB Commander and learned that MCSO has not identified any additional personnel that fail to meet the qualifications to conduct internal affairs investigations. PSB staff have continued working on the development of the PSB Operations Manual, which will outline the review process to ensure that, at the time a minor misconduct case is referred to a District for investigation, the District Captain is notified of any supervisors under his command who are ineligible to conduct misconduct investigations. We reviewed the monthly submissions pertaining to this Paragraph and noted no additions to the list of employees prohibited from conducting misconduct investigations. GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria are assigned misconduct investigations. If any supervisor is deemed ineligible, the PSB commander ensures that the supervisor's commander is notified and no misconduct investigations are assigned to that employee. This review and notification process is already in place; however, it is not documented in writing. We expect that the next draft of the PSB Operations Manual will memorialize this process. PSB has been working on the manual for some time now to get this process documented. We reiterate that MCSO needs to prioritize the completion of the operations manual.

*Paragraph 200. In each misconduct investigation, investigators shall:*

a.    *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.    *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.    *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.    *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

WAI 35587

e.   make reasonable attempts to interview any civilian complainant in person;

f.   audio and video record all interviews;

g.   when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

h.   make credibility determinations, as appropriate; and

i.   attempt to resolve material inconsistencies between employee, complainant, and witness statements.

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations that were completed by MCSO personnel during this reporting period.  All 48 were completed after the issuance of the Second Order.  Thirty-seven of these investigations were initiated after May 18, 2017, and are subject to all requirements of the internal affairs policies finalized and published on that date.  PSB investigated 28 of these cases.  District or Division supervisory personnel not assigned to PSB investigated 20 of the cases.  Of the cases we reviewed, 20 involved external complaints and 28 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner.  During the last reporting period, we identified two investigations (1%) that did not comply with the requirements of this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions.  During the last reporting period, one completed investigation (1%) did not comply with the requirements of this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence.  During the last reporting period, one investigation (1%) fell short of the requirements of this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses.  During the last reporting period, four investigations (3%) fell short of compliance with this Subparagraph.  During this reporting period, one investigation (3%) fell short of compliance with this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person.  During the last reporting period, all investigations complied with the requirements of this Subparagraph.  During this reporting period, all investigations again complied with the requirements of this Subparagraph.

WAI 35588

Paragraph 200.f. requires audio- and video-recording of all interviews.  During the last reporting period, there were 35 investigations that were not both audio- and video-recorded.  All 35 documented appropriate reasons why the interviews were not.  During this reporting period, there were eight investigations that were not both audio- and video-recorded.  All of these investigations again documented appropriate reasons why they were not.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct.  During the last reporting period, two investigations (1%) fell short of compliance with this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made.  During the last reporting period, four completed investigations (3%) fell short of compliance with this Subparagraph.  During this reporting period, one investigation (3%) fell short of compliance with this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies.  During the last reporting period, there were three investigations (2%) that fell short of compliance with this Subparagraph.  During this reporting period, all investigations complied with the requirements of this Subparagraph.

***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement.  Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement.  In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel that were completed during this reporting period.

WAI 35589

Of the 48 completed administrative misconduct investigations, 20 involved complainants that were not MCSO employees.  Twenty-one of the 48 total investigations also included interviews with witnesses or investigative leads who were not MCSO employees.  We did not identify any cases where there was an automatic preference for the statement of an employee over a non-employee witness.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.  There was one instance during this reporting period where we identified that a principal in an investigation had a prior investigation involving untruthfulness.  This employee resigned prior to the completion of the investigation that was completed during this reporting period.

**Paragraph 202.**  *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  In 11 of the 48 investigations, MCSO identified additional potential misconduct during the course of the investigations and properly added additional allegations or initiated new investigations.  We did not identify any instances where additional potential misconduct that was not part of the original allegation was discovered but not addressed by MCSO.

**Paragraph 203.**  *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation.  MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

WAI 35590

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

***Paragraph 204.*** *Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel.

During this reporting period, PSB conducted 28 of the 48 administrative misconduct investigations we reviewed.  Twenty-three of these investigations were not completed within the required 85-day time period.  While all 23 investigations included a request for, and an approval of an extension, one (4%) of the extension requests was not completed or approved in a timely manner.

In this, and future reporting periods, the 60-day time period compliance findings for those investigations conducted by personnel outside of PSB will be based on the original date the investigation is approved by the District or Division Commander and forwarded to PSB.  We acknowledge that with the ever-increasing delays in the completion and reviews of internal investigations, District and Division personnel may not know that PSB has found internal investigations they have submitted to require further investigation or other action, until after the 60-day time period has expired.  In those cases where deficiencies are identified by PSB, the cases will continue to be found non-compliant in other relevant Paragraphs, and specifically in Paragraph 213, which requires the District or Division Commander ensure that investigations conducted by their personnel are complete and the findings are supported by the evidence prior to their submittal to PSB.

Districts or Divisions outside of PSB conducted 20 of the administrative misconduct investigations.  Seven of these 20 investigations were not submitted to PSB within the required 60-day timeframe.  All seven included a timely request and approval for an extension**.**

WAI 35591

In addition to those investigations not completed within 60 or 85 days as required by this Paragraph, two of the 48 cases that exceeded the 180-day timeframe did not contain a timely request for an extension.  Neither of these two investigations resulted in a sustained finding of any kind.

MCSO is now in Phase 2 compliance with this Paragraph.

**Paragraph 205.**  *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- GH-5 (Early Identification System), most recently amended on March 24, 2017.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our January 2018 site visit, we met with PSB personnel and observed IAPro to ensure that the system still generates alerts to responsible investigators and PSB supervisors/commanders if deadlines are not met.  We also reviewed copies of emails PSB disseminates to the District/Divisions on the 15th of every month to identify investigatory deadlines.  The Blue Team Dashboard was also viewed, which uses a color system (green, yellow, red) to identify investigations that are nearing deadlines or are past deadlines.  Case management information appears in each supervisor's Blue Team while they are monitoring ongoing/open cases.  Once again, this demonstration represented IAPro as a technological instrument that meets the compliance criteria of this Paragraph – to include logging of critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions.

WAI 35592

The civilian PSB management analyst has the primary responsibility to administer the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic Blue Team database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.  In response to our previous concerns about ensuring system administration redundancy, PSB has trained two lieutenants to administer the system, in addition to the analyst.

In May 2018, PSB relocated to an offsite location.  A member of our Team confirmed that the tracking mechanisms already in place continue to be used for the tracking of investigations at the new facility.  We also continue to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.  (See Paragraph 204.)

**Paragraph 206.**  *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.    *a narrative description of the incident;*

b.    *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.    *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.    *the names of all other MCSO employees who witnessed the incident;*

e.    *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.    *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.    *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.    *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

WAI 35593

i.     *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.     *documentation of recommendations for initiation of the disciplinary process; and*

k.     *in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.*

**Phase 1:**  In compliance

•       GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To determine Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

Paragraph 206.a. requires a written description on the incident be included in the investigative report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of all evidence gathered, including all known information about witnesses.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility must be provided.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report.  All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations.

WAI 35594

All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. During this reporting period, there were two incidents where an employee had an accidental discharge of a firearm that occurred on duty. Both incidents occurred in parking lots at MCSO facilities and there were no injuries to anyone. Both were properly investigated, but neither included documentation of the employee's certification and training in the files forwarded for our review. We have discussed these two cases with PSB, and determined that there was a misunderstanding regarding the applicability of this requirement for those cases involving accidental discharges of weapons. We have clarified with PSB that the certification and training information must be provided in all cases involving the discharge of a firearm.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Thirty-seven of the 48 administrative misconduct investigations we reviewed had sustained findings against one or more MCSO employees. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. All of the investigations we reviewed for this Subparagraph complied with this requirement.

**Paragraph 207.**  *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.    *the law enforcement action was in compliance with training and legal standards;*

b.    *the use of different tactics should or could have been employed;*

c.    *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.    *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

WAI 35595

During this reporting period, we reviewed 48 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all completed cases we reviewed for this reporting period. MCSO identified seven cases where action related to this Paragraph was appropriate; and addressed the concerns identified with either memorandums of concern, requests for policy review, remedial training, or referral to another Division for review and potential action. PSB uses an internal tracking form to ensure that those concerns forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. We have found that PSB is properly assessing and addressing the requirements relative to this Paragraph, and appropriate actions are occurring.

**Paragraph 208.**   *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.    *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.    *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.    *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.    *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during the reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we did not concur with the findings of the PSB Commander in five (4%) of the 142 cases that were completed after the Second Order. Two cases resulted in findings of not sustained where we believe that the preponderance of evidence supported a finding of sustained. In the remaining three cases, additional investigation or interviews should have been conducted before determining the findings. There were no investigations where the Appointing Authority changed the findings made by the PSB Commander.

WAI 35596

During this reporting period, we concur with the findings of the PSB Commander in 47 (97%) of the 48 administrative misconduct investigations we reviewed.  In the one case where we disagree with the findings of the PSB Commander, we believe there was inadequate justification to unfound the allegation, and the allegation should have been not sustained.  There were no investigations during this reporting period where the Appointing Authority changed the findings made by the PSB Commander.  As is our practice, we will discuss the case where we disagree with the finding with PSB during our next site visit.

***Paragraph 209.***  *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander.  The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 20 administrative misconduct investigations not conducted by PSB personnel and completed during this reporting period.  All 20 of the investigations completed outside of PSB were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander.  As noted in previous reporting periods, and again during *this* reporting period, some of the District-level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report.  However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

***Paragraph 210.***  *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 28 administrative misconduct investigations conducted by PSB investigative personnel and completed during this reporting period.  All 28 complied with the requirements of this Paragraph.

WAI 35597

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

We previously noted that neither the PSB Commander nor other District or Division Commanders appeared to use any formal mechanism to ensure that the investigator's supervisor has taken appropriate action to address any instances of unsupported findings. This issue was included in the training curricula required under Paragraph 178.

During the last reporting period, we did not concur with the findings by the PSB Commander in five (4%) of the 142 investigations we reviewed.

During this reporting period, we disagreed with the findings by the PSB Commander in one (3%) of the 48 administrative misconduct investigations we reviewed.

PSB investigated 28 of the 48 administrative misconduct investigations we reviewed during this reporting period. In 24 (86%) of those cases investigated by PSB, we found the investigations to be thorough and well-written; and we concurred with the findings by the PSB Commander. This is a compliance increase of 9% from the 77% compliance the last reporting period. We identified four cases conducted by PSB this reporting period that were not compliant. In one case, we believe additional interviews of potential MCSO witness employees should have occurred; and in a second, we believe the finding of unfounded was not supported by the facts of the investigation. One case lacked a timely 85-day extension memo, and in one case, the initial letter was not sent to the complainant in a timely manner. We continue to find that the investigations completed by PSB display appropriate – and often excellent – investigative efforts and PSB continues to increase its compliance percentages.

WAI 35598

Of the 20 investigations investigated by Districts or Divisions outside of PSB, we identified seven (35%) where we had some concerns regarding the investigation and documentation. In all seven of these cases, PSB also identified concerns and the cases were returned for additional investigation or corrections. We believe that many of the concerns found in these seven cases could, and should, have been identified at the District or Division level prior to forwarding the cases to PSB for review. Concerns with these investigations included: a lack of analysis in the investigation; failure to initially arrive at the proper finding; failure to interview all parties; failure to ensure that training was provided; and numerous issues with administrative requirements. Compliance for investigations conducted outside of PSB increased from 42% the last quarter, to 65% this quarter.

We have observed that while there is improvement in the overall quality of those investigations being conducted by MCSO personnel outside of PSB, there are still many that do not comply with all of the Order requirements and MCSO policy. We noted that all seven investigations conducted outside of PSB, where we found substantive investigative concerns or extensive administrative documentation concerns were initiated prior to the completion of the Misconduct Investigative Training.

In January 2018, we requested that MCSO begin providing us documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that command personnel provide a response to this request on a monthly basis. We have consistently received the requested documentation since March 2018. We have noted numerous instances where Command personnel are now addressing needed clarifications, corrections, or additional investigation in cases completed or reviewed by their personnel. We have also noted that memorandums of concern, supervisor notes entries, training, and other interventions are being used to address identified concerns where appropriate. We did not note any instances during this reporting period where we believe actions other than those being taken by MCSO would be necessary. We will continue to review these reports to ensure that appropriate actions are being taken to address investigations where corrections are needed or deficiencies are found.

We have noted in numerous previous reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. Our reviews of both investigations submitted since the completion of the Misconduct Investigative Training and the documentation being provided by command personnel indicate that MCSO is making efforts to identify and address areas of concern with the completion of misconduct investigations. We are optimistic that we will see continuing improvement in the quality of misconduct investigations being conducted by MCSO personnel.

WAI 35599

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.
- GC-4 (Employee Performance Appraisals), most recently amended on September 6, 2017.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

None of the investigations we reviewed for this reporting period included any allegations that an internal affairs investigator had conducted a deficient misconduct investigation that was the basis for an internal investigation.

During our January and April 2017 site visits, we discussed with District Captains and the PSB Commander the need to document any corrective action that is taken as a result of an investigator failing to conduct a proper investigation. The PSB Commander assured us that, along with Paragraph 211, internal methods to ensure compliance with this Paragraph would be included in the training curricula developed in compliance with Paragraph 178.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received the required documentation since March 2018. We note that MCSO command personnel are now identifying and addressing concerns they have found with incomplete or deficient investigations conducted and reviewed by their personnel. We believe the corrective actions that are currently being taken are appropriate. We will continue to review these monthly reports, along with reviewing completed misconduct investigations, to ensure that any additional deficiencies are identified and addressed. If there is no improvement in the investigations conducted or reviewed by personnel identified by MCSO as having noted deficiencies, we expect that MCSO will take additional appropriate action.

We previously deferred our Phase 2 compliance assessment for this Paragraph, as MCSO had not yet provided the required documentation for the entirety of a reporting period. MCSO has now done so and is in Phase 2 compliance with this Paragraph.

WAI 35600

**Paragraph 213.**  *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies.  After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence.  The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence.   The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.  Of the 48 investigations, 28 were investigated by PSB personnel.  Twenty were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for the investigation.

All 20 District or Division level approved cases were forwarded to, and reviewed by, PSB as required.  Seven  (35%) of the 20 cases investigated at the District or Division level were returned by PSB personnel for additional investigation, corrections, proper documentation, or other changes.

PSB documented all the cases returned to District investigators for additional investigation or corrections, and this information was included in the documentation we reviewed.


**Paragraph 214.**  *At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis.  This assignment or re-assignment shall be explained in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 35601

Our analysis for this reporting period revealed that of the 20 investigations conducted outside of PSB, seven investigations were returned by PSB to the original investigating supervisor for further investigation, analysis, or corrections.  There were no instances where an investigation was assigned or reassigned to a different supervisor.

***Paragraph 215.***  *If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 20 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Fourteen of the 20 completed misconduct investigations conducted outside of PSB resulted in sustained findings.   In all 14 cases, the reports included documentation that appropriate discipline or corrective action was taken.  In three of the investigations with sustained findings, in addition to discipline, the recommendations also included additional training; and in one, a review of policy.

***Paragraph 216.***  *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action.  Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period.

WAI 35602

Twenty-eight of the completed investigations were conducted by PSB.  Twenty-three resulted in a sustained finding against one or more MCSO employees.  In 18 of these sustained investigations, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended.  In the five remaining cases, three employees left MCSO employment prior to the determination of discipline, one employee was dismissed from employment prior to the current case, and one sustained finding involved an unknown MCSO employee.  The PSB Commander provided the preliminary determination of the range of discipline in all 18 of these cases.  The PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline on both minor misconduct cases and in serious misconduct cases that result in PDHs.  The hearing officer has the authority to change the findings or reduce the discipline.

Of the 28 completed misconduct investigations conducted by PSB, six indicated a need for training or policy review.  PSB conducted proper follow-up in all six of these cases.  There were no cases where we believe PSB should have identified a training need but did not.  We routinely follow up with PSB to ensure that the concerns identified have been, or are being, addressed; and PSB has developed a tracking document that we receive and review each month.  We find this document to be very well done, and it is regularly updated with the information on the status of each concern being addressed.

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Not applicable

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct.  In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings.  The Appointing Authority will then make the final determination of discipline.

***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

WAI 35603

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of administrative investigations are stored and randomly reviewed case files to verify compliance.  Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May; and during this reporting period, a member of our Team inspected the file rooms in the new facility and conducted a review of random internal investigations in IAPRO to ensure ongoing compliance.

### D.    Discipline

**Paragraph 219.**  *The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Paragraph 220.**  *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.    *establish a presumptive range of discipline for each type of violation;*

b.    *increase the presumptive discipline based on an employee's prior violations;*

c.    *set out defined mitigating and aggravating factors;*

d.    *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.    *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.    *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.    *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

WAI 35604

h.    *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.    *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.    *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.    *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.    *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 37 of the 48 administrative misconduct investigations resulted in sustained findings against one or more members of MCSO.  Compliance findings for this Paragraph are based on the discipline findings for both minor and serious discipline.  In those cases where serious discipline is recommended, compliance findings specific to these cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation.  In 35 of the 37 sustained investigations we reviewed for this reporting period, the PSB Commander determined and documented the presumptive discipline range.  In one sustained investigation, the employee had already been dismissed from MCSO for prior sustained misconduct.  In a second investigation, though misconduct was uncovered, the involved employee was unknown.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations.  In 18 of the 35 sustained investigations where discipline was assessed, the employee had prior sustained violations.  In three of these cases, the PSB Commander considered and increased the presumptive discipline range based on these prior violations in accordance with the discipline policy in effect prior to May 18, 2017.  In 15 cases, the alleged misconduct and the sustained finding occurred after May 18, 2017; and are subject to the discipline policies that became effective on that date.  The PSB Commander considered the discipline range consistent with these revised internal investigation and discipline policies in all 15 cases.

WAI 35605

Paragraph 220.c. requires that mitigating and aggravating factors be defined.  Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017.  The revised discipline policy, effective May 18, 2017, does define these factors.  We note that aggravating or mitigating factors are not identified by the PSB Commander, but are identified and considered by the Appointing Authority when making the final disciplinary decisions.  During this reporting period, the Appointing Authority provided justification and documentation for all factors he considered when making the final discipline decisions for cases initiated both before and after May 18, 2017.  We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline.  None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline.  None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline.  None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined.  Phase 2 compliance is not applicable to this Subparagraph.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline.  None of the sustained investigations resulted in the use of coaching or training as a substitute for discipline.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline.  None of the sustained cases we reviewed during this reporting period resulted in MCSO taking non-disciplinary action when the Discipline Matrices in effect required the imposition of discipline.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed.  We reviewed 37 sustained investigations for this reporting period.  Investigators identified seven cases where non-disciplinary corrective action was also appropriate.  All seven resulted in the recommendation for training for the involved employees, in addition to the discipline imposed.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file.

WAI 35606

During the last reporting period, we reviewed 53 investigations with sustained findings against one or more employees. Forty-three of the cases resulted in the recommendation for discipline. In the 10 remaining cases, four involved employees who resigned prior to the recommendation for discipline; and six imposed sustained findings on a deputy who is deceased. The Appointing Authority did not change any of the recommendations for findings in any of the 43 sustained investigations. We disagreed with the final discipline decision in five (9.6%) of the 43 total cases. We advised MCSO that we would withdraw Phase 2 compliance if MCSO fell below the required compliance rate for the next reporting period.

During this reporting period, we reviewed 37 investigations with sustained findings against one or more employee. Thirteen of the cases resulted in the recommendation for minor discipline, and 21 resulted in the recommendation for serious discipline. In three cases, employees who were principals in the investigation left MCSO employment prior to the completion of the discipline process. In the 34 cases where discipline was assessed, 39 employees received discipline. We agree with the final discipline in 32 of these investigations. In all of the cases, the final discipline fell within the discipline range. In eight of the cases, all of which occurred after the implementation of the revised MCSO policy on discipline in May 2017, the final discipline fell within the range of discipline, but was not the presumptive discipline. In six of these eight cases, we believe the Appointing Authority considered and justified all factors that resulted in a determination of discipline that was not the presumptive discipline. We agree with his decision in these instances. However, in two of the 34 sustained investigations, we believe the Appointing Authority failed to properly consider the types of violations and the employee work history when he made his final discipline decision. While he provided mitigating factors for the decisions, we disagree that these factors were sufficient to mitigate the discipline.

Both cases involve serious discipline findings. As we have previously noted, compliance for this Paragraph is based on the final discipline outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226 of this Order.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the recently approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

Of the 34 total sustained investigations where discipline was assessed, five were initiated prior to May 18, 2017. In these cases, the Discipline Matrices in effect provided a presumptive discipline range. In all of these cases, we found that the Appointing Authority did not reduce the discipline below the presumptive range.

Twenty-nine of the sustained investigations where discipline was assessed were both initiated and completed after May 18, 2017, and are subject to all the requirements relative to investigations and disciplinary procedures contained in these revised policies. Those investigations initiated and completed after May 18, 2018 have both a discipline range and a presumptive discipline. Aggravating or mitigating the presumptive discipline requires a justification. In eight investigations that were completed after May 18, 2018, though all had

WAI 35607

final discipline findings within the range of discipline, the Appointing Authority mitigated the presumptive discipline.  In six of these cases, we agree with his decision to do so; and in two cases, we believe he lacked adequate justification to mitigate the discipline.

**Paragraph 221.**  *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 34 misconduct investigations with sustained allegations that resulted in the recommendation for discipline for current MCSO employees. We found that MCSO again met the requirements of this Paragraph.

**Paragraph 222.**  *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were 34 sustained investigations that were completed after July 20, 2016 where discipline was assessed.  In five cases, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices that were in effect prior to May 18, 2017.  In 29 cases, the investigations were both initiated and closed after May 18, 2017.  The PSB Commander determined the presumptive discipline based on the policies and Discipline Matrices in effect after May 18, 2017.  The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

WAI 35608

### E.    Pre-Determination Hearings

***Paragraph 223.*** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 37 administrative misconduct investigations resulted in sustained findings against MCSO employees.  Twenty-one investigations resulted in the recommendation for serious discipline.  In 19, MCSO held a Pre-Determination Hearing, as required.  In one case, the employee declined to attend the hearing; and in a second case, the employee left MCSO employment prior to the PDH.


***Paragraph 224.***  *Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in all cases where a PDH was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

WAI 35609

***Paragraph 225.*** *If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 19 sustained investigations resulted in a PDH and we reviewed all of the recordings of these hearings. There were no instances where we, or the Appointing Authority, identified any concerns that required additional follow-up related to the requirements of this Paragraph.


***Paragraph 226.*** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During every site visit, we meet with the Appointing Authority and the Compliance Division to discuss our concerns with final outcomes and decisions that result from Pre-Determination Hearings. We have emphasized the need to comply with agency policies when determining disciplinary outcomes, and encouraged the Appointing Authority to provide more detailed written justification in those cases where he determines that a sustained finding should be changed or discipline should be reduced.

WAI 35610

During this reporting period, 19 cases resulted in a PDH.  In all cases, the Appointing Authority provided a justification for the final decisions, and this information was provided to our Team in the submissions regarding closed internal affairs investigations.  The Appointing Authority did not overturn any of the sustained findings by the PSB Commander.  In eight cases both initiated and completed after May 2017, the Appointing Authority made the decision to mitigate the discipline below the presumptive discipline.  In all of these final decisions, the discipline fell within the discipline range.  We agree with his decision in six of these cases, and believe he provided sufficient justification for his final discipline findings.  In two (11%) of the 19 cases, while the discipline fell within the range, it was below the presumptive discipline established for investigations initiated and completed after May 2017.  In these two cases, we believe the discipline was not appropriate for the policy violations sustained, and the justification provided was insufficient.

During our January 2018 site visit, we met with the Appointing Authority and personnel from the Compliance Division to discuss the PDH process and the final outcomes of cases completed during this reporting period.  During the meeting, MCSO advised us that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases.  It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward.  Both the Appointing Authority and the representative from the MCAO advised that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.  The Parties present at the meeting also commented on their concerns regarding cases involving the Plaintiffs' class that might result in reductions in discipline as a result of the failure to complete the case within the 180-day timeframe.  We discussed the specific requirements of Arizona Revised Statutes 38-1110, and that the statute only requires a "good faith" attempt to complete cases that result in suspensions, demotions, or dismissals within the 180-day timeframe.

During that site visit, we also discussed those cases where a decision may be made after a PDH that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed.  It is our understanding from our meeting with the Appointing Authority and other staff who were present that the MCSO consults with the MCAO in these cases and their input is related to the final outcomes.  However, all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During our July 2018 site visit, we met with the Appointing Authority and Compliance Division to discuss cases where we had concerns with final outcomes.  We informed them during this meeting that while we continue to have ongoing concerns with some of the final discipline findings, we have continued to note improvement in the documentation being provided to justify these decisions.  We also encouraged MCSO to provide more detail in their review of employee work history, including prior performance evaluations, to ensure that their final decisions include all relevant information.  As has been our experience during prior site visits, the Appointing Authority was attentive to our concerns and provided detailed information and explanations regarding the PDH process and the concerns we raised.

WAI 35611

*Paragraph 227.   The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

*a.      his or her personal opinion about the employee's reputation;*

*b.      the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

*c.      whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 34 administrative misconduct investigations where discipline was imposed.  The serious sustained allegations in 19 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline.  There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix.  There were no instances where we determined that the member of command staff responsible for conducting the PDH considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.  There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

WAI 35612

*Paragraph 228.* *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.  *that decision does not relate to the Sheriff or his designee;*

b.  *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.  *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.  *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, there were no instances where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of PSB or the appointed MCSO disciplinary authority.


*F.*     *Criminal Misconduct Investigations*

*Paragraph 229.* *Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.  If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation.  If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

WAI 35613

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed five internal criminal investigations.  Three were externally generated, and two were internally generated.  All were completed after July 20, 2016, and appropriately assigned to criminal investigators in PSB.  The potential misconduct was brought to the attention of the PSB Commander as required; and in all cases, an administrative misconduct investigation was also initiated.  None involved someone superior in rank to the PSB Commander.

***Paragraph 230.***  *If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.   No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation.   The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation.  To ensure our ability to verify that MCSO maintains compliance with this Paragraph on an ongoing basis, we discussed this issue with PSB during our January 2017 site visit.  To resolve the concern, PSB agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted.  MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed four administrative misconduct investigations where criminal misconduct may have also occurred.  All four investigations included the companion criminal investigation for our review.

WAI 35614

**Paragraph 231.**  *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

PSB is divided into criminal and administrative sections.  Criminal investigators and administrative investigators are housed on separate floors of the building.  Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports.  We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location.  We have since verified that criminal and administrative investigators continue to be housed on separate floors in the new facility.  Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

**Paragraph 232.**  *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges.  The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by MCSO personnel.  All have a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

WAI 35615

**Paragraph 233.** *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, three of the five criminal investigations we reviewed were closed without submittal to a prosecuting agency. In all these three cases, the decisions were supported by the facts of the investigation, interviews, or other investigative follow-up. The investigators documented their conclusions and decisions to close the cases without submittal and the PSB Commander approved these decisions in writing.

While MCSO had been in full compliance with this Paragraph for multiple reporting periods, during the last reporting period, MCSO fell short of compliance with this Paragraph and we advised that Phase 2 compliance would be withdrawn if we found additional compliance concerns this reporting period. MCSO is in full compliance with the requirements of this Paragraph for this reporting period, and remains in Phase 2 compliance.

**Paragraph 234.** *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, we reviewed five criminal misconduct investigations conducted by PSB personnel. Two of the five cases were forwarded to an appropriate prosecutorial agency.

In both cases, MCSO provided documentation that the PSB Commander reviewed and approved the submittal. Neither of the cases noted that the PSB Commander had directed any further investigation prior to the submittal to the prosecuting agency. In one case, an arrest was initially made; but the charges were later dismissed – as the victim did not want to prosecute. In the second case, the investigation was turned down by the MCAO, who cited "no reasonable likelihood of conviction " as the reason for the turndown.

***Paragraph 235.*** *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine MCSO's compliance with this Paragraph, we review on a monthly basis administrative and criminal misconduct investigations conducted by MCSO.

During this reporting period, two cases resulted in a determination by a prosecutorial agency that charges would not be pursued. In one, an arrest was made the night of the incident, but was later dismissed by MCAO when the victim declined to prosecute. In the second case, the investigation was submitted to MCAO, and turned down for prosecution based on "no reasonable likelihood of conviction." Both cases were properly investigated and there is no indication that the decision by MCAO not to prosecute was related in any way to an investigator's failure to conduct a thorough investigation.

***Paragraph 236.*** *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine compliance with this Paragraph, we observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

WAI 35617

During previous site visits, we have inspected the file rooms where hardcopies of investigations are stored.  Criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted.  Our random review of criminal investigation case files verified that PSB was maintaining files as required.  A member of our Team also has access to IAPro, and has verified that case files are maintained in an electronic format.

During our January 2018 site visit, a member of our Team inspected the file rooms where hardcopies of criminal investigation are stored and randomly reviewed case files to verify compliance.

In May 2018, PSB relocated to a new offsite location.  We have since verified that PSB is properly maintaining criminal investigation reports and files at its new facility.

### G.      Civilian Complaint Intake, Communication, and Tracking

**Paragraph 237.**  *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

The Monitoring Team developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at the Monitoring Team's community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

The Monitoring Team contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

WAI 35618

***Paragraph 238.*** *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:** In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel. In addition, we review many initial complaint documents and initial phone calls, BWC video footage, traffic stop videos, and consider findings in the complaint testing process.

During the last reporting period, we reviewed 142 administrative misconduct investigations. Of these, 100 were initiated based on a civilian complaint, including two that were made anonymously and two that were third-party complaints. In our reviews, we identified only one incident during this previous reporting period where a supervisor initially failed to accept a complaint from a civilian.

During this reporting period, MCSO initiated 131 externally generated administrative misconduct investigations and 111 service complaints, the majority of which were also externally generated. Twenty of the 48 administrative investigations and 63 of the service complaints we reviewed for this reporting period were externally generated. As is our practice, we review many of the initial complaint phone calls, emails, complaint forms, and initial in-person contacts with complainants. In those instances where we reviewed the initial contact with the complainant, we did not identify any instances where we believe that any complaint was initially refused, or any instances where the employee who received the complaint attempted to dissuade the complainant from filing a complaint. As has been true in prior reporting periods, we again found instances where a complainant did not want to file a complaint after initially speaking to an MCSO employee. In the cases we reviewed this reporting period, MCSO personnel properly initiated an administrative investigation or service complaint despite a complainant's reluctance to pursue the issue. There were no instances this reporting period where either Compliance or BIO identified during their reviews that a supervisor had failed to initiate a complaint when appropriate.

In our review of traffic stops and BWC videos for this reporting period, we did not identify any incidents where MCSO failed to accept a complaint.

We did identify two complaint intake tests where we had concerns. In one, it appeared that an MCSO employee attempted to dissuade the filing of a complaint – or at the very minimum, placed the burden on the complainant to understand MCSO's complaint process and procedures. Despite this initial response, the complainant described the sergeant who assisted her as professional and the complaint was taken. In a second case, the tester believed the MCSO employee attempted to justify the alleged misconduct, but did refer the complainant to a sergeant who did offer to take a service complaint. While the initial contacts on these

WAI 35619

complaints were problematic, they are addressed in detail in Paragraph 254 of the Order which specifically addresses the complaint intake process, and neither case resulted in a refusal by MCSO personnel to take a complaint.

Compliance with this Paragraph covers all complaint intake.  We have found that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.


**Paragraph 239.**  *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

During this reporting period, the permanent placards were prominently displayed at MCSO Headquarters, and Monitoring Team members visiting MCSO Districts found that the permanent placards were prominently displayed.  The placard states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.


**Paragraph 240.**  *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

WAI 35620

During this reporting period, Monitoring Team members visiting District offices verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. All deputies with whom Monitoring Team members made contact understood their obligations to provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information for their immediate supervising officer.

Also during this reporting period, Monitoring Team members verified that the supervisors with whom they made contact were in possession of MCSO-issued cellular telephones.

**Paragraph 241.** *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO reported that in May 2018, PSB moved into the first and second floors of 101 West Jefferson Street. During our July 2018 site visit, members of the Monitoring Team toured the facility. In addition, we inspected the placards and comment and complaint forms at Districts 1, 2, 3, and 7; and noted that they all had been updated to reflect PSB's new address. The address was also updated on the comment and complaint form that is accessible to the public on MCSO's website.

The facility, the former East Court Building Library, is easily accessible to members of the public. The County Court facilities in the building are separate from the future PSB reception area and offices. The PSB area is accessible from First Avenue, a major thoroughfare; and there is no required security screening of individuals entering the building through the First Avenue entrance.

**Paragraph 242.** *The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**Phase 1:** In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:** In compliance

WAI 35621

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites.  MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel try to make the forms available.

During our July site visit, we surveyed eight of the 72 locations in Maricopa County that were included on MCSO's list.  We visited these facilities – which included libraries and a courthouse, among other locations – and discovered that only four of the eight facilities had complaint forms displayed and available.  We requested MCSO provide us an updated list of those locations at which complaint forms are displayed and available to the public.  During our upcoming site visit, will again visit some of these locations to verify if they are stocked with complaint forms.

***Paragraph 243.***  *The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

The free 24-hour hotline for members of the public to make complaints was established in July 2016 and continued to be operational during this reporting period.  A Monitoring Team representative periodically called the hotline during this reporting period and verified that the hotline is operational in both English and Spanish, and provides instructions in both languages on how to register a complaint.  The recording advises callers that if the call is an emergency, they are to call 911.  Callers are requested to provide their name, telephone number, and a brief summary of their complaint.  If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible.  If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor.  That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor.  Callers are further advised of MCSO's operating hours if they wish to contact PSB directly.

The hotline is housed in PSB, and PSB personnel access any recorded messages at the beginning of each business day.  During this reporting period, PSB personnel reported that the hotline received three complaints.

WAI 35622

**Paragraph 244.**  *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.


**Paragraph 245.**  *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish.  The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

**Phase 1:**  In compliance

- GJ-24 (Community Relations and Youth Programs), most recently revised on September 7, 2018.

**Phase 2:**  In compliance

Complaint forms in English and Spanish are accessible on MCSO's website.  The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The forms provide street addresses, contact numbers, and website information.


**Paragraph 246.**  *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.   *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned.  The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.   *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.     *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 48 administrative misconduct investigations conducted by MCSO personnel.  Twenty of these complaints were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days.  This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of their complaint.  In 19 of the 20 external complaints, PSB either sent the required written notice within seven days, or provided an explanation as to why the written notice could not be sent.  In one case, while the letter was sent, it was not sent within the seven-day timeframe and no explanation was provided.  All of the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation.  In all 20 externally generated complaints, the complainant was provided a notice of the outcome when contact information was known.  In one case, the outcome letter sent to the complainant provided inaccurate information.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law.  Eleven of the externally generated complaints had sustained findings.  In all of these cases, PSB notified the complainant of the sustained findings and the discipline imposed when contact information for the complainant was known.

MCSO achieved Phase 2 compliance the last reporting period, and remains in compliance for this reporting period.

**Paragraph 247.**  *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint.  The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

**Phase 2**:  In compliance

WAI 35624

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, we reviewed 48 administrative misconduct investigations conducted by MCSO. Externally generated complaints resulted in 20 of the investigations. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all of these cases where the complainant was known. On four occasions, MCSO personnel reported that they had additional contact with complainants during the course of the investigation.

***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During the last reporting period, PSB completed seven investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. All seven investigations were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB completed one investigation where potential bias was alleged that did not affect members of the Plaintiffs' class. This investigation was initiated and completed after July 20, 2016, investigated by PSB, and tracked in a separate category as required by this Paragraph.

WAI 35625

***Paragraph 249.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph.

During the last reporting period, PSB completed two investigations that were applicable to the requirements of this Paragraph. Both were initiated and completed after July 20, 2016; investigated by PSB; and tracked in a separate category as required by this Paragraph.

During this reporting period, PSB did not complete, or submit for our review, any investigation where reporting under this Paragraph is applicable.


***Paragraph 250.*** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**Phase 1:** Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

PSB completed a quarterly assessment for the period of April 1-June 30, 2018 to meet the requirements of this Paragraph. PSB's assessment identified the following potential problematic patterns or trends;

- Office-wide, MCSO received 43 complaints where the allegations were categorized as inappropriate language and improper conduct by deputies. These included: the use profanity; yelling; the use of demeaning language; engaging in affairs on duty; and engaging in physical contact which did not rise to the level of a use of force.

- Office-wide, there were 17 complaint allegations that specifically claimed that deputies engaged in "rude" behavior.

- District 2 received 26 complaints that resulted in misconduct investigations. These included: Seven allegations involving allegations of deputies' conduct being threatening, harassing, unprofessional or rude toward members of the public; five allegations of deputies failing to take action regarding calls for service; five allegations of deputies

WAI 35626

being unprofessional toward co-workers; three allegations of deputies being involved in traffic crashes or driving erratically; and two complaints alleging the mishandling of domestic calls for service. There were four additional complaints that did not follow a trend or pattern.

PSB notified the appropriate command personnel of these patterns for appropriate action. The assessment of complaints received during this reporting period complies with the requirements of this Paragraph in scope and content. In addition, PSB has recently included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The most recent report for the period of July 1-December 31, 2017, contains the issues identified as potentially problematic patterns or trends for that six-month period.

### H.    Transparency Measures

*Paragraph 251.  The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.    *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.    *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.    *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.    *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.    *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

WAI 35627

    *f.*    *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

    *g.*    *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  Deferred

The proposed PSB Operations Manual reviewed by the Monitoring Team identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The proposed manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

WAI 35628

In January 2018, PSB issued and posted on the MCSO website its semi-annual public report for period of January 1-June 30, 2017.  The report contained the relevant information that is required by this Paragraph, including whether any sustained allegations exist in which an employee violated conflict-of-interest rules when conducting or reviewing misconduct investigations; aggregated data on complaints received from the public; an analysis to determine whether there is an increase or decrease of complaints that may be attributable to the intake process; aggregated data on internally generated misconduct allegations; aggregated data on the processing of misconduct investigations; aggregated data on the outcome of misconduct investigations; and aggregated data on employees with persistent or serious misconduct problems.

In July 2018, PSB issued and posted on the MCSO website its semi-annual public report for period of July 1-December 31, 2017.  PSB also incorporated information relevant to Paragraph 192 in this report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether or not the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporated information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review on complaints received, for the time period of July 1-December 31, 2017.

During our July 2018 site visit, PSB informed us that it was developing a voluntary survey for complainants to complete after the conclusion of the investigation, which would capture demographic information in relation to the complainants.  Once the survey is implemented and responses from the complainants are received by PSB, the information will be included in future reports.

As in the previous reporting period, we are deferring our Phase 2 compliance assessment of this Paragraph until MCSO achieves Phase 1 compliance via the publication of the Professional Standards Bureau Operations Manual.

***Paragraph 252.***  *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**Phase 1:**  Not in compliance

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

PSB provided its template for the information that will be captured from completed misconduct investigations for posting as required on the MCSO website.  The following data fields have been identified for public disclosure:  Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged/Outcome; Discipline; Investigative Summary;

WAI 35629

and Date Completed.  During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website.  Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph.  In addition, we verify that the detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made detailed summaries of completed internal investigations (from April, May, and June 2018) readily available to the public in electronic form in a designated section on the homepage of the MCSO website.  MCSO remains in compliance with this requirement.

**Paragraph 253.**  *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations.  This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.  *complaint notification procedures were not followed;*

b.  *a misconduct complaint was not assigned a unique identifier;*

c.  *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.  *deadlines were not met;*

e.  *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.  *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.  *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.  *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.  *any interviews were not recorded;*

j.  *the investigation report was not reviewed by the appropriate personnel;*

k.  *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.  *a final finding was not reached on a misconduct allegation;*

m.  *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

WAI 35630

n.   *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**Phase 1:**  In compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

**Phase 2:**  Not in compliance

During our January 2018 site visit, the Bureau of Internal Oversight (BIO) Commander reported that the semi-annual public audit report regarding misconduct investigations had not yet been prepared.  After a telephone conference between BIO and the Monitoring Team on January 10, 2018, it was determined that the semi-annual public audit report would be placed on hold while BIO's Audit and Inspections Unit (AIU) developed the appropriate methodology for conducting the inspection.  During the last reporting period, MCSO provided the draft methodology for the inspection; and we provided comments on it prior to our April 2018 site visit.  We also briefly discussed the methodology during our April 2018 site visit.  MCSO indicated that it intends to conduct a monthly audit of misconduct investigations in lieu of a semi-annual audit.  After our July 2018 site visit, AIU personnel informed us that AIU is conducting a monthly audit in its effort to attain compliance with this requirement.  Pending the publication of the monthly public audit reports, MCSO is not in compliance with this Paragraph.

### *I.   Testing Program for Civilian Complaint Intake*

***Paragraph 254.*** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake.  Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

To meet the requirements of this Paragraph, AIU contracted with two vendors:  Progressive Management Resources (PMR), which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

As of the end of this reporting period, PMR has conducted 28 tests, as well as two practice tests; PMR conducted the majority of the tests via telephone.  We receive and review documentation of these tests as they are completed, as part of our monthly document requests.  In addition, as of this reporting period, we also receive and review any available audio-recorded documentation of the tests.  PMR does not advise AIU of the tests in advance; instead, PMR emails AIU once a test has been completed with documentation of the test.  During this reporting period, PMR

WAI 35631

conducted 11 tests:  two in April (one via email and one via U.S. Mail); four in May (three via telephone and one via MCSO's website); and five in June (two via telephone, one via U.S. Mail, one via email, and one via MCSO's website).

The majority of the testers did not believe that the MCSO employees with whom they interacted attempted to discourage, interfere with, or delay them from registering a complaint.  Several testers described the MCSO personnel as "friendly" and/or "professional."

For the most part, with one exception in which a tester received an email response to her letter eight days after sending it, the waiting periods for testers between contacts from MCSO appeared to be reasonable.  In one test, presenting as a monolingual Spanish speaker, the tester called MCSO, and he was promptly transferred to a bilingual officer who took his initial information and told the tester he would be contacted by a sergeant.  Approximately 30 minutes later, a sergeant, assisted by an interpreter, returned the tester's call.

However, we were concerned with some of the tests.  One of the testers, who called a District office to complain that she observed an MCSO deputy driving recklessly, described the civilian employee who initially answered the telephone as "unprofessional."  She noted in her documentation, "Did not offer name/was not told what would happen next."  In the audio-recording, the civilian employee asked the tester several questions about the supposed incident, and for the tester's contact information; and then the employee asked, "Did you want contact by a deputy?"  The tester explains that she was not certain, but that she wanted to file a complaint. The employee responded, "Is there a reason why you didn't report this sooner?"  After the tester explained that she thought about the incident after it occurred and decided to report it later, the employee asked, "So do you want someone to contact you back, or are you just giving us the information?"  It sounded as though the employee was attempting to dissuade the tester from filing a complaint – or at a minimum, the employee was placing the burden on the complainant to understand MCSO's complaint process and procedures.  The tester described the sergeant who ultimately assisted her as professional.

In another test, a tester called a different District office to complain that a deputy drove by the scene of her vehicle accident without stopping.  The employee who answered the telephone took some initial information from the tester and then attempted to explain to the tester, "[T]he reason they didn't stop…it's not required for you to get a police report."  The employee continued with her explanation, justifying the alleged conduct with a defensive tone that sounded as though she expected the tester to understand that she should have handled the situation differently.  The employee should have instead taken the initial information from the tester and then referred her to a sergeant to take the full complaint.  When a sergeant returned the tester's call, he also explained that it was not the responsibility of the deputy to stop at the scene of an accident – but he did offer to take a service complaint from the tester.  The tester believed that both employees she interacted with attempted to discourage, interfere with, or delay her from registering a complaint.

As of the end of this reporting period, AFHC has conducted one test (during this reporting period, in April), as well as two practice tests.  Because AFHC is responsible for conducting in-person tests, AFHC has agreed to advise AIU of each test in advance.  During this reporting period, AFHC conducted its one test, at a District office.  In this test, the tester visited the

WAI 35632

District office to ask where she could file a complaint.  The employee who she contacted told the tester to call a "Crime Stop" telephone number, and said that a deputy would meet the tester where convenient.  Fifteen minutes later, the tester made a second attempt, again visiting the same District office.  In that attempt, the tester interacted with a different employee, and explained that she wished to complain about the conduct of a motorcycle officer who pulled between two cars exiting a freeway.  The employee explained that MCSO does not have motorcycle deputies, and informed the tester that the officer she saw must have been from Mesa Police Department; the employee gave the tester the contact information for the Mesa Police Department.  Despite receiving improper information from the initial employee, the tester described both employees with whom she interacted as courteous and professional.

We will discuss these issues of concern with MCSO during our next site visit, to learn more about AIU followed up on these tests.  We also encourage MCSO to provide refresher training on the complaint process to all employees who interact with the public.

During our April 2018 site visit, we inquired with AIU personnel whether PMR and AFHC have deployed test complainants with Hispanic surnames.  While the complaint intake testing Paragraphs do not specifically include this provision, the Plaintiffs' class in this case is the Latino population of Maricopa County.  Following our April site visit, AIU personnel informed us that approximately one-third of the test complainants to date were lodged by complainants with Hispanic surnames – one of whom, as noted above, presented as a monolingual Spanish speaker.  MCSO also advised us that it would "have internal discussion regarding the possibility of adding this aspect to the operations manual or the testing companies' manuals."  During our July site visit, we discussed this issue further with MCSO, and emphasized that the complaint intake testing process will have more credibility with the Plaintiffs' class in this case and the County at large if the testers represent the diverse communities of Maricopa County.

**_Paragraph 255._**  _The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers._

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

AIU has informed both vendors of this requirement.  AIU has created several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries

WAI 35633

that testers make, and creating official identification cards for testers designating them as such. For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel will be available by telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 256.*** *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.  AIU advised both vendors that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

For tests conducted by AFHC, the vendor responsible for in-person testing, AFHC has agreed to inform AIU in advance of all tests, and AIU personnel will be available by telephone if testers encounter any issue as they lodge their test complaints.

***Paragraph 257.*** *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

WAI 35634

AIU has informed both vendors of the requirements of this Paragraph.  We receive copies of the recordings following the completion of the tests.  Per the agreed-upon methodology, PMR audio-records all testing conducted via telephone; and AFHC video-records all in-person testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

***Paragraph 258.***  *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.
- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

As noted above, AIU contracted with two vendors to meet the complaint intake testing requirements:  Progressive Management Resources (PMR), which is responsible for conducting testing via telephone, email, U.S. Mail, and MCSO's website; and the Arizona Fair Housing Center (AFHC), which is responsible for conducting in-person tests.

AIU has informed both vendors of the requirements of this Paragraph so that the tests conducted by both vendors shall also assess whether employees promptly notify the PSB of civilian complaints and provide accurate and complete information to the Bureau.

***Paragraph 259.***  *MCSO shall not permit current or former employees to serve as testers.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.
- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

AIU has informed both vendors it has contracted with to conduct the tests of this requirement. AIU personnel have informed us that no current or former employees have served, or will be serving, as testers.

WAI 35635

**Paragraph 260.**  *The MCSO shall produce an annual report on the testing program.  This report shall include, at a minimum:*

a.   *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.   *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.   *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.   *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.   *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.   *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.   *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**Phase 1:**  Not in compliance

- GH-4 (Bureau of Internal Oversight), most recently amended on December 14, 2016.

- Audits and Inspections Unit Operations Manual, Section 304, currently under revision.

**Phase 2:**  Not in compliance

To date, AIU has not developed a methodology for the process by which it will analyze the findings of the completed tests for the required annual report.  As it receives documentation about completed tests from its two vendors, AIU reviews the information, and will issue Action Forms, author memorandums of concern, or take other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

During our July site visit, and in a subsequent conference call, we discussed the requirements of this Paragraph further with AIU personnel.  Although Paragraph 260 requires that MCSO produce an annual report summarizing its complaint intake testing, AIU personnel have also elected to complete monthly reports.  AIU personnel are currently drafting methodology for the monthly and annual reports, and we look forward to discussing this further with AIU during our upcoming site visit.

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.   COMMUNITY   OUTREACH   AND   COMMUNITY ADVISORY BOARD**

**Paragraph 261.** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, the CAB began preliminarily exploring the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel, by researching polling firms that are experienced in working with Latino populations.

**Paragraph 262.** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, as noted above, the Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100) issued on August 3, 2017 altered the composition of the Community Advisory Board (CAB) and CAB's responsibilities and relationship to MCSO. As of September 1, 2017, the CAB is now comprised of five members – two selected by the Plaintiffs, two selected by MCSO, and one jointly selected.

During the last reporting period, CAB members provided us with a proposed budget, which we reviewed and discussed via a conference call with CAB members. During this reporting period, on June 25, 2018, CAB members provided us with a revised version of the budget. The proposed budget includes the following categories: community meetings; video production (for a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses. The Monitor approved the budget in early July. We will discuss this further in our next report.

WAI 35637

During this reporting period, the CAB did not establish a bank account for receiving County funds.  We look forward to discussing this issue further with the CAB during our upcoming site visit.

WAI 35638

## Section 14: Supervision and Staffing

**COURT ORDER XVII.        SUPERVISION AND STAFFING**

*Paragraph 263.  The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

*Paragraph 264.  The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed a sample of daily shift rosters for the three months of the reporting period.  For April and June, we reviewed rosters from Districts 1, 2, and 3.  For May, we reviewed rosters from Districts 4, 6, and 7, and Lake Patrol. Our reviews of monthly and daily rosters indicated that deputies were assigned to a clearly identified supervisor, and that they worked the same schedules as their supervisors.

*Paragraph 265.  First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

Paragraph 265 is a general directive that covers several aspects of supervision.  There are several requirements covered in other Paragraphs of this Order that directly impact this Paragraph; these requirements must be met before MCSO can establish compliance with Paragraph 265.  We have determined that MCSO is in compliance with Paragraphs 83, 85, 89, 90, 93, and 94 as they relate to this Paragraph.  For MCSO to achieve compliance with this Paragraph, it must be in compliance with Paragraph 91, in addition to the previously noted Paragraphs.  During this reporting period, our reviews of documentation of traffic stops revealed that 42 of the 105 stops had deficiencies that supervisors overlooked.  Although some of these deficiencies may be minor, supervisors must still address them.

WAI 35639

**Paragraph 266.**  *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise.  The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons.  If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations.  The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  In compliance

To verify Phase 2 compliance with this Paragraph, we inspect monthly rosters and shift rosters for the quarter in review.  During this reporting period, for April, we reviewed a sample of shift rosters from Districts 1, 2 and 3; for May, we reviewed a sample of shift rosters from Districts 4, 6, 7, and Lake Patrol; and for June, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Monthly and daily rosters indicated that deputies were assigned to one single consistent supervisor, and that on most days, supervisors were assigned no more than eight deputies.  Our inspection of the shift rosters for April indicated that all shifts from the sample reviewed were in compliance.  There were five memos generated in District 1 advising the District Commander that the span of control exceeded the 1:8 ratio.  All shifts reviewed for May, for Districts 4, 6, and 7, and Lake Patrol were in compliance.  Our reviews, of shift rosters for Districts 1, 2, and 3, for June, found all shifts to be in compliance.  There were span of control memos generated for three separate dates by District 1, and there were two dates in which District 3 supervisors submitted span of control memos.  MCSO remains in compliance with this Paragraph.

**Paragraph 267.**  *Supervisors shall be responsible for close and effective supervision of deputies under their command.  Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:**  In compliance

- GB-2 (Command Responsibility), most recently amended on May 10, 2018.

**Phase 2:**  Not in compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order.  There are requirements covered in other Paragraphs that directly impact Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph.  During this reporting period, we found MCSO in compliance with Paragraphs 83, 85, 89, 90, 93, and 94.  In addition, MCSO must also achieve compliance with Paragraphs 91 and 96 to fulfill the requirements of this Paragraph.  Paragraphs

WAI 35640

91 and 96 emphasize the importance of the supervisory review process. MCSO lost compliance with Paragraph 96 in our last report. During this reporting period, we again found that MCSO was not in compliance. We have discussed with MCSO the issues preventing it from achieving compliance with the noted Paragraphs, and we believe that we will see improved compliance in the future.

**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** Deferred

- Court Implementation Division Operations Manual, most recently revised on August 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

During this reporting period, there were no transfers in or out of PSB, CID, or BIO.

WAI 35641

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

***Paragraph 269.*** *The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of document preservation notices to MCSO employees for the reporting period.  We also reviewed a sample of cases during our July 2018 site visit to assess if MCSO is properly preserving documents that are requested in the course of litigation.

Document preservation is set in motion when a party sends a litigation hold notice or written directive to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency. MCSO's Legal Liaison Section (LLS) manages litigation holds.  Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the LLS conducts an initial research to determine whether the request is something that LLS can provide or if LLS has to request it from an MCSO Division.  If the LLS requires documents from other MCSO Divisions, it must draft a Document Preservation Notice within five business days and address it to the required Division.  Upon receipt of the Document Preservation Notice, MCSO must identify responsive documents and also preserve them in the manner in which they are usually kept in the course of business.

During our July site visit, we reviewed a sample of the third-party source documents that generate the litigation holds that the LLS receives from MCAO.  For the most part, LLS must request the information from different MCSO Divisions through a Document Preservation Notice.  MCSO correctly conveys the information contained in the third-party source document into the Document Preservation Notices that go out to the employees in the different Divisions. The Document Preservation Notices have been distributed 100% in a timely manner to employees who may have responsive documents.

WAI 35642

GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices) requires that the employee who receives a document preservation request complete two forms: Attachment A, Document Preservation Acknowledgment and Attachment B, Document Preservation Questionnaire.  Attachment A, the attestation, is due within five days of receipt; while Attachment B – which requires more in-depth information such as steps taken to search documents, the outcome of the search, and the itemization of the documents identified as responsive – is due within 10 days of receipt.  Attachment A was returned in a timely manner 90% of the time, a 9% increase since the last reporting period.  Attachment B was returned within established timeframes 91% of the time, a 5% increase since the last reporting period.

During our July site visit, we reviewed completed copies of Attachment B, and found that 92% of them were properly completed.  We noted that the LLS intercepted the improperly completed forms and returned them for corrections.  We identified the following deficiencies on the forms: files that were missing Attachment A and/or Attachment B; and improper completion of Attachment B.  We discussed our observations with the LLS personnel during our July site visit, and commended them for identifying many deficiencies and returning the forms to the employees in a timely manner.

To prepare our assessment of this Paragraph, we also visited the Districts to assess their document preservation practices.  The Districts are meeting the requirements of GD-9 when they receive a document preservation hold.  For the most part, the Districts do not receive requests for production of documents, so there is little knowledge about the procedure to follow for those requests.

We offered some technical assistance during our July site visit regarding the GD-9 User Guide, which will more plainly set out deadlines, interchangeable terms, office requirements, helpful hints, the Division Commander and employees' responsibilities, and frequently asked questions and answers on the policy.  We are expecting a final version of the document.

***Paragraph 270.***  *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.   *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.   *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.   *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:**  Not in compliance

- GD-9 (Litigation Initiation, Document Preservation and Document Production Notices), published on October 13, 2017.

- Open Axes Operations Manual, not yet drafted.

WAI 35643

**Phase 2:** Deferred

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submittals of requests for documents to MCSO employees for the reporting period and documents drafted by the LLS in search of documents from other Divisions of the agency.  For this reporting period, we identified a sample of document requests and requested a copy of the responsive documents sequestered and/or produced.  We also assessed sequestration and preservation practices within the different MCSO Divisions.

Paragraph 270.a. requires prompt communication of document requests to all personnel who might possibly be in possession of responsive documents.  GD-9 requires the LLS to enter the data into a tracking system within five business days and to draft a Document Production Notice within five additional business days.  The LLS is required, within five business days, to respond to the request for production if sourced within LLS, or to forward to the required MCSO Division for production.

Our review revealed that MCSO is forwarding the Document Production Notices in a timely manner to all of its Divisions.  In addition, MCSO is sending Attachment C, the Document Production Acknowledgement Questionnaire, to all employees.  In 91% of the cases, the personnel who provided responsive documents properly completed Attachment C; this reflects a 3% increase from the last reporting period.

Paragraph 270.b. requires that all responsive ESI be stored, sequestered, and preserved by MCSO through a centralized process.  MCSO aims to perform the searches and preservations in a centralized process through Open Axes, a discovery software program.  The tool will help the LLS in performing case management.   LLS will be able to create a case, assign a case number, make associations with other cases, and trigger time alerts to the employees.  Open Axes will search on the H, W, and U computer hard drives of MCSO, which are shared among Headquarters and the Districts.  During our January 2018 site visit, MCSO informed us that Open Axes would be in its pilot phase in the LLS by March 2018.  During our July site visit, we learned that the start date has been delayed due to indexing procedures and that the program would be operational by the end of July 2018.  Originally, the software required 26 individual searches to review all computer hard drives.  The Technology Management Bureau created a unique global index that requires one search on all affected hard drives.  MCSO will develop an Open Axes Operations Manual outlining the protocols and procedures for the centralized process of document preservation, and make any necessary amendments to GD-9 following the deployment of the software.

During our July site visit, we were able to assess MCSO's practices on sequestration and preservation of documents by visiting 25 MCSO Divisions.  In all but one, we observed that the documents were sequestered and preserved in both paper format – and where applicable, as ESI.  Since MCSO is complying with the sequestration and preservation of the data, as required by this Paragraph section, we will defer compliance with this Paragraph.  Once MCSO successfully runs the Open Axes software and is able to develop the Open Axes Operations Manual and the amendments to GD-9, we will reassess compliance with this Paragraph.

WAI 35644

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.  We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all of the cases we reviewed.

***Paragraph 271.** Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.

**Phase 2:**  In compliance

On June 25, 2018, MCSO published the Compliance Division Operations Manual, which details the protocols for the preservation and production of documents requested in litigation.

***Paragraph 272.** The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), published on October 13, 2017.

 **Phase 2:**  In compliance

No internal investigations were completed against any MCSO employee during this reporting period for failure to preserve or produce documents.

WAI 35645

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO previously delivered this training on the E-Policy platform.  All personnel (100%) determined to be applicable by CID have received this training.

WAI 35646

# Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class

## COURT ORDER XX.    COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:*

### A.    *Investigations to be Overseen and/or Conducted by the Monitor*

*Paragraph 275.   The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  PSB holds a weekly meeting to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the weekly CRM meetings.  In addition, a Monitoring Team member randomly selected an additional 52 cases from the 400 remaining

WAI 35647

pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs.  In addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases.  At the end of the first reporting period after the Court's Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision.  The remaining cases reviewed were determined not to be CRMs.

At the end of the last reporting period, PSB had reviewed a total of 180 cases since August 2016.  Of these, 43 had been classified as CRMs.

During this reporting period, an additional 21 cases were reviewed as possible CRMs.  Of these, two were determined to be CRMs.  As of the end of this reporting period, there are a total of 201 cases that have been reviewed and 45 cases that have been determined to be CRMs since the July 20, 2016 Court Order.

Since July 20, 2016, MCSO has closed a total of 32 CRM cases, including eight during the last reporting period.  Two of these 32 cases had sustained findings on deputies who have left MCSO employment.  Six had sustained findings on two separate deputies who are deceased. Eight have resulted in sustained findings against current MCSO deputies.  Two of these sustained CRM cases resulted in the dismissal of the involved deputies for truthfulness issues that were discovered during the investigations.  One case resulted in a sustained allegation that the employee had made an inappropriate comment (used profanity) during a contact with a community member.  While this conduct was inappropriate and the case resulted in discipline, the sustained allegation was not related to any bias.  In two separate cases, deputies received discipline for failing to properly complete the report of an incident; and a sergeant received discipline for signing off on the incomplete reports.  One case resulted in a 40-hour suspension for an inappropriate and biased comment that was made by a Detention officer.  One case resulted in a sustained finding for failing to meet standards and resulted in a coaching.  One case resulted in a 24-hour suspension for a deputy and a 120-hour suspension for a Posse member for inappropriate actions taken on a traffic stop.  The remaining CRM cases were closed with findings of exonerated, unfounded, or not sustained.  Our Team has approved the investigation; findings; and, where appropriate, the discipline, in all these cases.  PSB did not complete and submit for our review any CRM investigations during this reporting period.

During the weekly meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs.  Their briefings are thorough, and they continue to be responsive to any questions or input from members of our Team.  In all cases where we have provided oversight since July 20, 2016, we have concurred with the decisions made by the PSB Commander regarding the case classifications and findings.

WAI 35648

*Paragraph 277.  This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

*Paragraph 278.  The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters.  The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs.  A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented each week.  There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

*Paragraph 279.  The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During the weekly CRM meetings attended by a Monitoring Team member, PSB has consistently properly identified cases that could be, or are, CRMs.  PSB personnel brief each case during the weekly meetings, and their briefings include all appropriate information.  They have been responsive to any questions from our Team members during the meetings, and have responded appropriately to any suggestions we have raised.  There has been no need for us to independently conduct any review, research, or investigation; as PSB is consistently properly identifying and investigating these cases.

WAI 35649

***Paragraph 280.*** *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as possible CRMs, when appropriate. There were no appeals by any Parties regarding any of the CRM classifications.

***Paragraph 281.*** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each weekly meeting conducted by PSB to discuss Class Remedial Matters. PSB has consistently provided thorough briefings, and the PSB Commander has made appropriate decisions regarding these matters.

WAI 35650

During the last reporting period, PSB completed and closed eight CRM cases. We concurred with, and approved, all allegations; policy violations; findings; and if sustained, the discipline; for all of these eight cases. The case reports we reviewed were consistent with the briefings that had been provided during the weekly CRM meetings. PSB investigators continued to conduct appropriate follow-up on these cases, expend extensive efforts to locate and contact all involved parties and witnesses, and provided detailed information concerning the allegations and the justifications for findings in their investigative reports. In the one sustained case involving active employees, MCSO arrived at an appropriate disciplinary decision.

During this reporting period, PSB did not finalize any CRM cases and submit them for review by our Team.

***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**Phase 1:** Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** In compliance

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

***Paragraph 283.*** *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

WAI 35651

At the end of the last reporting period, MCSO had closed a total of 32 CRM cases since July 20, 2016.  Six had sustained findings on two separate deputies who are deceased, and two involved deputies who left MCSO employment prior to the determination of discipline.  Eight had resulted in sustained findings against current deputies.  In two of these eight cases, a deputy was terminated as a result of conduct discovered by investigators during the investigation.  In both cases, the conduct for which the employee was terminated involved a sustained truthfulness allegation.  In one case, the sustained finding was for an inappropriate comment (profanity) made by the deputy during a contact with a community member.  In two sustained cases, the misconduct involved the failure of a deputy to properly complete a report and the failure of his supervisor to identify that the report was not properly completed.  In one sustained case, the misconduct involved a Detention officer who made an inappropriate and biased comment to an inmate.  In one sustained case, the misconduct involved the failure to properly screen visitors to a jail facility.  In the final sustained case, the misconduct involved multiple policy violations by a deputy and a Posse member during a traffic stop.  We reviewed and approved all of these disciplinary decisions.

There were no completed CRM cases submitted for our review during this reporting period.

***Paragraph 284.***  *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**Phase 1:**  Not in compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During this, and previous reporting periods, a Monitoring Team member attended all weekly CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

WAI 35652

*Paragraph 285.  Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At of the end of the last reporting period, there were a total of 16 CRM cases with sustained findings.   Six had sustained findings on two separate deputies who are deceased, and two involved deputies who left MCSO employment prior to the determination of discipline.   Two cases resulted in the termination of employees for sustained truthfulness allegations.   The six remaining sustained cases resulted in appropriate sanctions based on MCSO policy and the Discipline Matrices in effect at the time the investigations were completed.  No action by us has been necessary relative to this Paragraph.

There were no completed CRM cases submitted for our review during this reporting period.

*Paragraph 286.  Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above.  The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency.   To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency.   The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**Phase 1:**  Not in compliance

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

During this reporting period, there were no CRM cases that were finalized and reviewed by our Team.  During our weekly CRM meetings, there have been no new CRM cases discussed where we, or PSB, believe that a criminal investigation should be initiated.  No action on our part relative to this Paragraph has been necessary.

*Paragraph 287.  Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

*a.     When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his*

WAI 35653

*designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.
- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.
- GH-2 (Internal Investigations), most recently amended on July 17, 2018.
- Compliance Division Operations Manual, most recently amended on June 25, 2018.
- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:**  In compliance

Of the 16 total sustained CRM cases since the issuance of the Second Order, six have resulted in minor discipline. Two have resulted in serious discipline. We concurred with MCSO's decision in all of these cases.

During this reporting period, there were no grievances or appeals filed on discipline received by employees on any sustained CRM case.

**Paragraph 288.**  *The Monitor's authority over Class Remedial Matters will cease when both:*

a,   *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.   *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

During this and prior reporting periods, we and PSB have agreed on the investigative outcome of each CRM investigation completed.

WAI 35654

PSB is responsible for the investigation of all CRM cases, and has continued to appropriately identify cases that could be, or are, CRMs. PSB personnel are professional in our contacts with them and responsive to any concerns or questions we have raised; and they provide detailed information and updates in their weekly briefings. Their written reports are thoroughly prepared, and the reports have been consistent with the information provided during the weekly case briefings.

**Paragraph 289.** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not in compliance

- CP-2 (Code of Conduct), most recently amended on May 9, 2018.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on April 10, 2018.

- CP-5 (Truthfulness), most recently amended on October 24, 2017.

- CP-11 (Anti-Retaliation), most recently amended on October 24, 2017.

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

- GC-17 (Employee Disciplinary Procedures), most recently amended on April 6, 2018.

- GH-2 (Internal Investigations), most recently amended on July 17, 2018.

- Compliance Division Operations Manual, most recently amended on June 25, 2018.

- Professional Standards Bureau Operations Manual, currently under revision.

**Phase 2:** Not in compliance

During this reporting period, we reviewed a total of 53 internal investigations. All but one was both initiated and completed after the issuance of the Second Order. We reviewed 48 administrative misconduct investigations and five criminal misconduct investigations. All five (100%) of the criminal investigations were in compliance with the Second Order requirements, and 35 (73%) of the 48 administrative misconduct investigations were in compliance. We found MCSO in compliance with all Second Order requirements in 37 (75%) of the 53 investigations. This is an improvement from the 61% compliance we found the last reporting period.

During this reporting period, we reviewed 48 administrative misconduct investigations. There were no completed investigations submitted for Paragraphs 249 (investigatory stops) or 275 (CRMs). One investigation was submitted for Paragraph 33 (Bias Policing) and was found to be in compliance. We noted that investigations conducted by PSB sworn personnel were compliant in 88% of the cases. The two non-compliant cases were due to untimely paperwork. PSB investigations conducted by Detention personnel were compliant in 82% of the cases, a significant increase from the 66% compliance finding during the last reporting period. Those

WAI 35655

conducted by Divisions and Districts outside of PSB were compliant in 65% of the cases, an increase from 42% during the last reporting period. These finding are based on the investigative and administrative actions by the investigators and the decisions of the PSB Commander. Factoring in the final decisions made by the Appointing Authority after the investigations were concluded resulted in an overall compliance rate of 73%, an increase from 60% during the last reporting period.

The overall percentage of administrative misconduct cases that were fully compliant increased during this reporting period. We again noted a continuing decrease in cases with serious deficiencies, and noted that the overall investigative quality has improved in both PSB and in the Districts and Divisions. While MCSO still falls short of compliance, there continues to be evidence of improvement.

During our next site visit, we will discuss overall compliance and the concerns we identified with PSB and District and Division personnel, and provide them with specific case examples.

Effective with the revisions to internal affairs and discipline policies on May 18, 2017, the PSB Commander may now determine that a received complaint can be classified as a "service complaint" if certain specified criteria exists. Service complaint documentation must then be completed and will be reviewed under this Paragraph.

MCSO handled 54 service complaints during the last reporting period. We noted that MCSO properly reclassified four complaints to administrative misconduct investigations after their review. Of the remaining 50, we found that in 49, MCSO properly completed service complaints. In one case, we disagreed with the final classification of service complaint and believe that MCSO should have conducted an administrative investigation. MCSO was in 98% compliance with this requirement for this reporting period.

During this reporting period, we reviewed 64 service complaints completed by MCSO. Six were properly reclassified to administrative misconduct investigations after review by PSB. The remaining 58 were handled as service complaints. Fourteen (24%) of these complaints were determined not to involve MCSO personnel. Thirty-six (62%) involved complaints regarding laws, MCSO policies and procedures; or they involved other contacts from the public that did not include allegations of employee misconduct. Five (8%) lacked specificity, and the complainants were either unwilling or unable to provide additional clarification of their concerns. Three (5%) involved multiple reasons for the closure. We concur with MCSO's handling of 60 of the 64 complaints. In two cases, while employee misconduct may not have occurred, the complainant was alleging misconduct. In two additional cases, while the classification as a service complaint may have ultimately been appropriate, the preliminary inquiries lacked sufficient detail to support this decision. We continue to find that PSB is handling the majority of these service complaints in an appropriate manner.

Effective with the revisions to the internal affairs and discipline policies, the PSB Commander is now authorized to determine that an internal complaint of misconduct does not necessitate a formal investigation if certain criteria exist. The PSB Commander's use of this discretion will also be reported in this Paragraph. No such incidents occurred during this or previous reporting periods.

WAI 35656

*Paragraph 290.   This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class.   The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.*

*Paragraph 291.   The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter.   This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters.   The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters.   An overall summary of our compliance observations and findings is provided here.

During this reporting period, we reviewed 48 administrative misconduct investigations and five criminal misconduct investigations.   All five criminal investigations were in full compliance with the Second Order.   Of the 48 administrative investigations we reviewed, 73% were in full compliance with the Second Order.   This is an improvement from the 60% we found during the last reporting period.

During the period of July-December 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact.   MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator.   These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300.   MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii. and 196 to conduct the investigations identified.   One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

WAI 35657

PSB provided us with a document sent by the Independent Investigator assigned by the Court to investigate, or reinvestigate, some of the misconduct that is related to the Plaintiffs' class.  In this document, the Independent Investigator clarified his intent to investigate the matters assigned to him by the Court, as well as the matters that the Court determined were the discretion of the Independent Investigator.  He further clarified that his investigations would include the initial misconduct alleged, as well as any misconduct that might have occurred during the process of review or issuance of discipline by MCSO personnel.

During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated.  PSB has continued to keep us apprised of the status of all such investigations.

During our January 2018 site visit, PSB advised us that the two administrative misconduct investigations that had been outsourced to a separate law enforcement agency had been completed and closed.  We received and reviewed both investigations.  A third investigation that MCSO outsourced to this same law enforcement agency had been previously returned to MCSO without investigation, as the allegations duplicated those already under investigation by the Independent Investigator.  MCSO outsourced six additional investigations to the contract investigator.

During our April 2018 site visit, PSB advised us that no additional investigations had been outsourced to the contract vendor.  There have been no cases completed and submitted for our review that have been investigated by this investigator.  The Independent Investigator continues investigations identified by the Court, and notifies us of the status of these cases on a regular basis.  We also receive closed investigations that he has completed.  To date, he has completed seven investigations; and we have reviewed them, only to ensure that the misconduct identified by the Court is being addressed.

During our July 2018 site visit, PSB advised us that no additional investigations were outsourced to the contract vendor.  This investigator has completed two investigations and forwarded them to PSB.  We have not yet received them for review.

The Independent Investigator continues investigations identified by the Court.  To date, we have reviewed seven investigations he has conducted.  There were no cases completed by the Independent Investigator during this reporting period.

***Paragraph 292.***  *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO.  In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law.  While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

WAI 35658

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations.  A member of our Team attends each weekly CRM meeting, reviews the lists of new internal investigations, and has access to the PSB IAPro database.  The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs.  We review all other misconduct investigations once they are completed, reviewed, and approved by MCSO personnel.

*Paragraph 293.  The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations.  The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order.  (Doc. 606 ¶¶ 128, 132.)*

**Phase 1**:  Not applicable

**Phase 2**:  Not applicable

Since we began reviewing internal investigations conducted by MCSO more than three years ago, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel.  As noted in our previous quarterly status reports and elsewhere in this report, we continue to note concerns with internal investigations, but have also noted many improvements.

All five of the criminal misconduct investigations that we reviewed for this reporting period were investigated by PSB and complied with the Second Order requirements.

PSB conducted 28 of the 48 total administrative misconduct investigations.  PSB's overall compliance rate for the investigative and administrative requirements of the investigations was 86%.  Sworn investigators conducted 17 of these investigations.  Fifteen (88%) were in compliance with all investigative and administrative requirements for which the PSB Commander has authority.  Eleven investigations were completed by Detention personnel assigned to PSB.  Nine (82%) of the 11 were in compliance.  Two of the investigations conducted by PSB were not compliant due to untimely documentation.  In one other case, we believe that additional MCSO witnesses should have been interviewed; and in another, we believe that the allegation should have been not sustained instead of unfounded.  The overall quality of investigations by personnel assigned to PSB continues to improve.

Of the 20 cases investigated outside of PSB, 13 (65%) complied with Second Order requirements.  Compliance for these investigations improved a notable 23% this reporting period.  Those investigations conducted outside of PSB that were found not compliant still contain both qualitative and administrative documentation concerns as has been noted throughout this report.  We again note that, in most cases, the deficiencies and errors we have found should have been identified prior to them being forwarded to PSB for review.  We also note that the most significant concerns we found were in those cases that were initiated prior to the 40-hour Misconduct Investigative Training.

WAI 35659

For the 48 administrative misconduct investigations we reviewed for this reporting period, MCSO's overall compliance was 73%. This overall compliance finding takes into account multiple factors. As we have noted throughout this report, investigators, reviewers, Command personnel, and the final decision makers all impact the compliance for each case.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training. During our site visit meetings and District visit meetings in July 2018, we continued to receive positive feedback on the training. Our review of a limited number of investigations completed after January 1, 2018, appears to indicate that the training is having the desired outcome and that there is additional improvement in the quality of investigations.

PSB personnel continue to be receptive to our input, and we have had many productive meetings and discussions regarding the investigations being conducted. We continue to note that PSB addresses issues we raise during our site visit meetings. The quality of the investigations conducted and overall compliance, though slow in some cases, continues to improve. We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

We have noted in numerous previous reporting periods that MCSO's executive leadership must take the appropriate actions to ensure that adequate resources are dedicated to the completion of administrative and criminal misconduct investigations. MCSO informed us during our July 2018 site visit that efforts are being made to increase staffing, both in PSB and in MCSO as a whole. We have also noted in numerous reporting periods that the executive leadership must provide appropriate oversight and support for the personnel who conduct these investigations. The documents we are now receiving from MCSO on a monthly basis indicate that MCSO Command personnel are now noting, documenting, and taking corrective actions when incomplete or deficient investigations are completed or approved by their personnel. While MCSO is not in compliance with a number of the requirements for the completion of internal investigations, we note that efforts are being made to address the obstacles to reaching compliance.

**B.**     ***Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority***

***Paragraph 294.*** *In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (Id. at ¶ 904.)*

WAI 35660

*Paragraph 295.   In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1.   The Independent Investigator

*Paragraph 298.   In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

*Paragraph 300.   The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.      *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.      *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.      *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.      *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander assured us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted independent investigator for investigative purposes.

WAI 35661

Since that time, the PSB Commander has advised us that MCSO has contracted with a licensed private investigator. The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d.). PSB has not found it necessary to contract with any additional licensed private investigators.

During our April 2017 site visit, we met with PSB command staff and MCAO to verify that all of the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator. Previous to this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator. The roster of intended assignments did not include all of the acts of misconduct that we had discussed. The MCAO and PSB command personnel explained that many of the acts of potential misconduct identified in the FOF were also identified by the Court in Paragraph 301 as sufficiently related to the rights of members of the Plaintiffs' class. In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

To date, the Independent Investigator has completed seven investigations identified by the Court in the FOF. We did not review these investigations for compliance with the investigative requirements in the Second Order, but reviewed them only to ensure that the misconduct outlined in the FOF was being addressed. The Independent Investigator did not complete any investigations during this reporting period.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are identified and completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving (former) Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

**Paragraph 310.** *The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

WAI 35662

### 2. The Independent Disciplinary Authority

**Paragraph 337.** *Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a.   *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance.  If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.   *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.  The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.  Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.  In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort.  The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.  As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.  As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.  In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO.  If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**Phase 1:**  In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on April 6, 2018.

**Phase 2:**  In compliance

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

WAI 35663

## Section 18:  Concluding Remarks

We assess compliance with 99 Paragraphs of the First Order, and 114 Paragraphs of the Second Order, for a total of 213 Paragraphs.  MCSO is in Phase 1 compliance with 73 of the First Order Paragraphs, or 85%; and 81 of the Second Order Paragraphs, or 78%.  MCSO is in Phase 2, or operational compliance, with 65 of the First Order Paragraphs, or 66%; and 91 of the Second Order Paragraphs, or 80%.  Combining the requirements of both Orders, MCSO is in Phase 1 compliance with 154 Paragraphs, or 81%; and in Phase 2 compliance with 156 Paragraphs, or 73%.

As mentioned in other sections of this report, the Third Traffic Stop Annual Report resulted in similar conclusions to its predecessor reports: that the issue of racial differences in post-stop outcomes is systemic and cannot be attributed to a small number of deputies.  The First Order requires that if we or MCSO conclude that systemic problems of racial profiling exist, MCSO shall take appropriate steps at the agency level to address them (Paragraph 70).  In response to this obligation, MCSO developed a Constitutional Policing Plan that remains an issue of concern to the Parties.  The Plan includes several goals, and we have been reviewing and commenting on their implementation.  However, the ultimate measure of the Plan's success will be the degree to which it mitigates the repeated findings of the TSARs.  MCSO appropriately considers the Plan a living document, subject to change as circumstances dictate.  Whenever the Office considers modifications to the Plan, it must keep this ultimate objective in mind.

We spent a considerable amount of time during our July site visit discussing MCSO's personnel issues, particularly as they impact the ability to properly staff the Professional Standards Bureau.  By MCSO's own admission, this critical function is not staffed sufficiently to support its mission.  Even though the consensus is that they will not be sufficient, authorized staffing increases to the Bureau have gone unfilled.  MCSO attributes this to vacancies that exist at the entry-level deputy position.  MCSO has inferred that the Orders have adversely impacted MCSO's ability to attract qualified applicants and retain existing personnel.  Whether factual or not, MCSO must move past this issue and focus its attention on variables the agency can control.  We understand that there is strong competition from other law enforcement agencies.  MCSO must tip the scales in its favor by improving its marketing, and demonstrating to applicants the positive aspects of living and working in Maricopa County.  MCSO must do a better job of recruiting outside of Maricopa County and outside of Arizona.  In addition, MCSO must work to alter some of the external budget processes that are hampering the agency's ability to hire and retain employees.  The best recruitment plans will have no significant impact unless they are followed by meaningful action.

The Monitoring Team recognizes that the agency has made strides in its technical compliance with the Court's Orders.  The Sheriff and the agency have inherited significant problems and circumstances not of their making.  To his credit, the Sheriff has personally immersed into a myriad of issues; and through his personal interactions, has demonstrated a resolve to move the organization and the process forward.

WAI 35664

# Appendix:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Arizona Office of Courts |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BIO | Bureau of Internal Oversight |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| FBI | Federal Bureau of Investigation |
| FTO | Field Training Officer |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IMF | Incident Memorialization Form |
| IR | Incident Report |

WAI 35665

| LOS | Length of stop |
|-----|----------------|
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NOI | Notice of Investigation |
| NTCF | Non-Traffic Contact Form |
| PAL | Patrol Activity Log |
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic Stop Data Collection System |
| TSAR | Traffic Stop Annual Report |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

WAI 35666