| | |
|---|---|
| Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et. al, | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **INDEX** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona, et. al., | |
| Defendants. | |

Exhibit:

**A.  Community Policing Philosphy**

1

# EXHIBIT A

## MARICOPA COUNTY SHERIFF'S OFFICE

### Response under Paragraph 70

Paragraph 70 of the Supplemental Permanent Injunction provides in pertinent part:

"If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff."

In the January 18, 2019 status conference, the Court said that "the purpose of paragraph 70 is to have an effective community outreach constitutional policing plan, not just for the short term, but for the long term." (*See* Jan. 18, 2019 Status Conf. Tr. at 16:18–19). This is MCSO's attempt at building a long term, effective community outreach constitutional policing plan in line with Paragraph 70, the Court's remarks, and the Sheriff's attempt to rebuild trust and the relationship with the community we serve.

## I.    The MCSO is taking "appropriate steps" consistent with Paragraph 70.

### A.    To date, the MCSO has achieved many accomplishments consistent with Paragraph 70.

In 2017, Sheriff Paul Penzone and the MCSO engaged in an interactive process with representatives for the Plaintiff's class and the U.S. Department of Justice to develop the original version of the Constitutional Policing Plan (CPP), which was a response under Paragraph 70 of the Supplemental Injunction/Judgment Order ("the Order"). Under Paragraph 70, "If the MCSO . . . concludes that systemic problems of racial profiling [or] unlawful searches or seizures . . . exist, the MCSO shall take

appropriate steps at the agency level." The need for "appropriate steps at the agency level" stemmed from the findings in the 2015-2016 and 2016-2017 comprehensive annual reports on traffic stop data.

Appendix A outlines the appropriate steps that have been taken to date and the status of each from the prior version of the CPP.

**B.     The MCSO is revising the current Constitutional Policing Plan to better focus on areas of improvement that are not mandated by the Court's Orders.**

Sheriff Paul Penzone and the MCSO are making tactical revisions to the CPP to better meet the needs of the community, the agency, and the spirit of the Order. The Order does not define what the "appropriate steps" under Paragraph 70 should be and the Office has spent considerable effort in determining the best next steps to approach the issue. Through a series of listening sessions with the community, MCSO has decided to focus on agency-wide non-enforcement community interactions. The MCSO continues in its commitment to work with the community as partners to achieve public safety. Since the time the data underlying the 2015–2016 comprehensive annual report was collected, Sheriff Penzone has taken office and, among other considerable measures, created the Community Outreach Division ("COrD"). COrD works with numerous community partners to encourage the exchange of information between MCSO and the community it serves. Sheriff Penzone also created Sheriff Penzone's Executive Advisory Review (SPEAR), Hispanic, LGBTQ and the African American advisory boards. The Sheriff also requested that the Court reinstate the Community Advisory Board with appointments

made from the Sheriff's Office in addition to the appointments from Plaintiff's counsel as well as a joint appointment.

The revised response to the 2016–2017 comprehensive annual report will emphasize community outreach at the District level. Districts will be expected to engage in non-enforcement community interactions to listen to and learn from community perspectives. Front-line deputies and supervisors will work with the community in a non-enforcement capacity to address any problems identified and gain an overall better understanding of the community itself. Specifically, non-enforcement interactions refers to interactions that may be educational in nature, or address quality of life issues, such as: a school or community group desiring information reference social-media and bullying; an abandoned property with overgrown weeds, which may pose a safety issue; a school's playground which may need rehabilitation; a family or families in need of food and/or clothing, who have been identified by a deputy in the course of his/her duty, or as identified by a community partner such as a local business, local house of worship, District Advisory Board, Community Center, or school.

To be clear, the MCSO is not abandoning other aspects of the response previously included in the Plan under Paragraph 70. Previously, the Plan included nine goals on disparate aspects of operations at the MCSO:

(1) the Early Intervention System and data collection (Goals 1 and 6);

(2) evaluating supervisors (Goal 2);

(3) training (Goals 3, 4, and 5);

(4) non-enforcement community interactions (Goal 7);

(5) a potential Peer Intervention Program (Goal 8); and

(6) recruitment, hiring, and retention (Goal 9).

Most of these goals duplicated efforts already required under the Order. As a result, the MCSO will not be including these goals in this revised version of the Plan. Instead, the MCSO will continue to implement changes, as necessary, through other responsibilities in the Order. Appendix A details each of the previous goals from the Plan and their status.

In tactical methods, the revised response under Paragraph 70 represents a significant change from the previous Plan: it focuses solely on the Office's commitment to meeting the community in the community, and working with the community to promote public safety and quality of life issues. Yet strategically the Office's overall activities are unchanged: the MCSO continues to work toward an Early Intervention System that impacts individual deputies, an Employee Performance Appraisal system that evaluates deputies and supervisors, training that meets and exceeds industry standards on implicit bias, cultural competency, and the Fourth and Fourteenth Amendment, and recruitment, hiring, and retention of employees who are committed to the MCSO's mission and values.

The following section explains the Office's shift in philosophy toward a Community Policing Model and its connection with Paragraph 70.

**C.    The Community Policing Model achieves the purpose of Paragraph 70 in a way meaningful to the MCSO and the community.**

The MCSO revised the Constitutional Policing Plan based on feedback from MCSO personnel, prior input from the Plaintiff class representatives and U.S. Department of Justice, and technical assistance from the Monitoring Team. All of these sources of information had a common thread: MCSO's service to the community beyond calls for service and enforcement activity or actions.

More significantly, the MCSO also conducted community listening sessions to learn what the community expected of the Plan and of services provided by their law enforcement agency. For example, in the District 1 listening session, community members emphasized the need for MCSO patrol deputies to engage with the community to solve community-based problems, such as the effects of the opioid epidemic and mental illness encountered by public safety. Community members also suggested that MCSO patrol deputies partner with community groups to connect community members with resources to address quality of life issues.

The purpose of this Community Policing Model is to improve community trust, build positive community relationships, transform all deputies into community policing officers, and collaborate with community stakeholders to solve safety problems and improve quality of life. The goals are to provide community members with meaningful opportunities to engage with deputies to improve trust, work with the community to define and develop responses to public safety needs and quality of life issues and respond to the community's needs through proactive problem solving.

In this context, the Community Policing Model meets the needs of Paragraph 70. First, the most recent traffic stop data analysis indicated that drivers with certain ethnic backgrounds—among them Latinos—faced different outcomes than white drivers. To the extent these results and the history of this case have made community members fearful of partnering with the MCSO to solve the community's problems, the Community Policing Model provides community members with meaningful opportunities to engage with deputies to improve trust, and provides deputies with opportunities to dispel those fears. Indeed, the COrD has worked hard over the last two years to rebuild the community's trust in the Office, and the MCSO seeks to leverage the lessons COrD learned to impact the Districts.

Second, the Community Policing Model assigns patrol deputies and their supervisors the task of working with the community to define and develop responses to the community's public safety needs. With more frequent and meaningful contact with the community, MCSO deputies and their supervisors can ensure they are responding to the community's expressed needs—in particular the needs of the Latino community.

Third, the most recent traffic stop data analysis revealed declining numbers of traffic stops performed by MCSO deputies. Often, the work of patrol deputies is viewed as a choice between attending calls for service and conducting traffic stops. The Community Policing Model offers deputies a third choice: proactive service to the community by listening to and responding to the community's needs through problem-solving. Sometimes that problem-solving will require increased traffic enforcement or will result in increased calls for service. The Community Policing Model also offers

deputies the opportunity to work with the community on quality of life issues that are not impacted by these "traditional" methods of law enforcement at the patrol level.

At present, some aspects of MCSO operations reflect the Community Policing Model. But the implementation of the Community Policing Model in the Districts will seek to formalize those operations and structure the Districts' interactions with the community. As the MCSO shifts its focus to the Community Policing Model, it will begin with District 6 as a Pilot District.

As MCSO was deciding which District to pilot the new program in, MCSO took into consideration the size and infrastructure of each District (personnel, buildings, equipment and associations) as well as the Latino populations within the District's boundaries and the current relationship with the Latino communities in each District. In order to ensure manageability, MCSO took its cue from the Seattle Police Department's "Micro-Community Policing Plans Implementation Evaluation" final report, dated, January 31, 2017, in which it divides large geographical areas into smaller more manageable groups. As a result, District 6 was selected to be the Pilot District given the existing infrastructure, contract relationship with the town, geographical makeup of approximately 29.2 square miles, and relationships with the Latino residents and migrant workers in that District. According to the recent data from the U.S. Census Bureau, the Hispanic population represents 15.6% of Queen Creek's total population of 33,298.[1]

---

[1]    U.S. Census Bureau, *American Community Survey 5-year estimates, Census Reporter Profile page for Queen Creek*, Ariz. (2017), https://censusreporter.org/profiles/16000US0458150-queen-creek-az/ (last visited Feb. 14, 2019).

When the Model is successfully implemented in District 6, the MCSO will expand it to the other patrol districts with a higher Latino population, initially focusing on district communities with a higher density of Latino residents, utilizing a modified version of the "Micro-Community Policing" model. Success will be determined through assessments, as stated in the below section. The next two sections discuss those processes.

## II.     Process for Piloting the Community Policing Model

The following process discusses how the MCSO will pilot the Community Policing Model in the Pilot District. Emphasis must be placed on the term "pilot" at this stage. Some of the structures included in this process will be universal—items like District Advisory Boards and District Open Houses. But the purpose of the piloting process is to allow these items and milestones to be evaluated. For that reason, the MCSO will work with the Pilot District to conduct 30-day reviews of progress to adjust the process as needed. Because MCSO recognizes that strong leadership is key to implementing community policing, it is vital that senior managers understand, buy into, promote, and model community policing in order to influence the behavior and activities of the deputies in the districts. For that reason, assessments will be conducted by the Bureau of Internal Oversight and Court Implementation Deputy Chief, along with the Patrol Bureau East and Patrol Bureau West Deputy Chiefs (respectively) and the District's Captain. The assessment will look at: whether a District Advisory Board has been established; is the board diverse and closely representative of the community served; does the board have at least one Latino community member; established community partnerships; deputy-community non-enforcement engagement; were

community concerns addressed; how were they addressed; what were the outcomes; communication and timely response to the community.

**Step 1: Managing Change**

    A.    <u>Communicating Change to the District</u>

    Some districts and individual deputies have a history of working with the community to meet the community's needs. Further, over the last two years the MCSO has expanded its community outreach efforts, particularly to the Latino community. But implementing a community policing model in a Patrol District will require change from Headquarters, District Command, District supervisors, and rank-and-file deputies. It is important at the outset to manage that change with communication within the District. Deputy Chiefs will work with MCSO's internal communications division and CNA's community outreach expert to draft a clear message. Deputy Chiefs will deliver the message of change to the District Captains first. Deputy Chiefs will accompany District Captains as they relay the message to those under their command during squad or district briefings, to ensure that the message is delivered in accordance with how it is drafted.

    MCSO will ensure that rank-and-file deputies in the District understand the changes to how they effectively serve the community that will occur as a result of implementing this philosophy. In particular, Executive and District Command will emphasize that this philosophy will enhance the ability of deputies to help safeguard community members as well as detect and apprehend offenders.

Executive and District Command will also acknowledge past notable efforts by deputies in the District to engage with the community.

B.      <u>Identifying Community Leaders to form a District Advisory Board</u>

Based on input from the Sheriff's Advisory Boards (Community Advisory Board, Hispanic Advisory Board, African-American Advisory Board, LGBTQ Advisory Board) and current contact with the community, the District Captain will identify community leaders who live and work in the District to serve on the **District Advisory Board**. The District Advisory Board consists of the District Captain and (ideally) 4–7 community leaders who can regularly (e.g., monthly) meet to discuss the community's safety concerns, quality of life issues and law enforcement needs. District Advisory Board members should represent the patrol district's diversity, with at least one member from the Latino community.

The other steps in this process depend upon community leaders who represent Maricopa County's diverse communities and interests to share their feedback with the District. For example, District Advisory Board members play a vital role in defining the MCSO's service to the community through the development and implementation of district-specific community engagement strategies.

**Step 2: Conducting District-Specific Community Needs Assessment**

The District Captain, the District Advisory Board, and deputies assigned to the District representative of the various ranks and various squads or assignments within the District will participate in a Community Needs Assessment. This Needs Assessment

seeks a comprehensive picture of the community that MCSO serves in that District. The Needs Assessment will look at strengths, weaknesses, opportunities, and challenges to employing the community policing model in the particular District. The target should be to complete this within the first four meetings of the District Advisory Board, or within 120 days.

A.    Demographics

The Needs Assessment will look at the District's population. In particular, the Needs Assessment will identify opportunities and challenges to engaging with the Latino community in the District.

B.    Community Assets

The Needs Assessment will look at the current social capital in the District—the organizations and institutions like businesses, community groups, and places of worship in the community. It will also assess the community's power structure, including the role of local government (i.e., a city or town) and Homeowners' Associations. These organizations and institutions will form the basis of community partnerships. In particular, the Needs Assessment will identify organizations and institutions that serve the interests of the Latino community in the District.

C.    Collecting Community Feedback

MCSO will collect initial feedback from the community about how MCSO currently serves the community's needs. Collecting feedback will take the form of question and answer sessions with community leaders (including, but not

exclusively, District Advisory Board members) and focus groups with community members.

D.    Crime Statistics

The Needs Assessment will include an examination of crime statistics and crime trends in the community.

E.    Current efforts to engage the community

The Needs Assessment will analyze the District's current work and engagement with the community. Not all community engagement is created equal; the Needs Assessment will look at the types of programs typically operated in the District and whether they need to be adjusted to meet the goals of this program.

**Step 3: Developing and Implementing District-Specific Community Engagement Strategies**

The community policing model is dependent upon deputies in Patrol Districts receiving concerns, complaints, and suggestions from the community that deputies can respond to. The MCSO will establish formal and informal opportunities for MCSO deputies to directly engage with the community to hear the community's feedback. Proactive outreach is key.

Deputies will engage in at least one intentional positive contact per shift, should time permit.  The contact/s will occur during the deputy's discretionary or down time, as s/he leaves the confines of his/her vehicle to regularly engage community members face-to-face.  Intentional contact includes but is not limited to: participating in a sporting event with community members; eating and talking with school aged youth during lunchtime;

visiting a community center and speaking with its patrons; speaking with local business leaders and owners; or, personally inviting members of the community to listening sessions. Each contact will be documented in the TraCs system.

A.    <u>Opportunities to Listen</u>

The Opportunities to Listen will allow the community to identify what it sees as important for public safety, security, and/or quality of life issues. These opportunities also allow for shared discussion of problem-solving.

1.    *District Advisory Board*

The District Advisory Board will meet regularly (e.g., monthly) with the District Captain to share the community's concerns, complaints, and suggestions. The District Captain will also report to the Board community feedback received through other forums. Discussion may include crime trends or perceived crime trends, quality of life issues, and the development and implementation of solutions. The first meeting of the District Advisory Board will be scheduled by the target date for implementation within the District. For the Pilot District, the first meeting of the District Advisory Board is targeted for the week of April 29, 2019.

2.    *Regularly-scheduled district listening sessions*

District Command and rank-and-file District personnel will attend regularly-scheduled **district listening sessions**. These listening sessions are the community's opportunity to provide feedback directly to the deputies who serve their community—and the District's opportunity to solicit the

community's feedback about the community's perception and engagement of MCSO. Information garnered will be captured in TraCs and as MCSO did with the initial listening sessions with the community for this Plan, for community members who share their contact information, follow up will be done via the method selected.

In some Districts, those listening sessions may be District-initiated—meaning the District personnel organize the event. One example of a District-initiated listening session is a **District Open House**, where community members can tour the District substation and provide feedback to District personnel. Coffee with a Cop, a program historically operated in MCSO's Patrol Districts, is another example of District-initiated listening sessions. Patrol Districts will coordinate these listening sessions with the Community Outreach Division.

District personnel will also form partnerships with community organizations and institutions—like school-sponsored groups, places of worship, businesses, community organizations, non-profit—to attend the regularly-scheduled meetings held by those entities. And in Districts with contract cities, District personnel will participate in city/town council meetings. Community members will be encouraged to share their feedback with the District through these forums. These forums are particularly important for reaching portions of the community that may not be comfortable attending MCSO-initiated listening sessions. Toward that end,

the District will partner with community groups that already work with those portions of the community, including groups focused on reaching new immigrants or new community members.

The target date for the first district listening session will be within 6 months of the establishment of the District Advisory Board.

B.     Collaborative Problem-Solving

1.     *Community-based projects and programs*

Based on the expressed needs of the community, District personnel—particularly rank-and-file deputies—will develop and implement **community-based projects and programs** that bring together the community's social capital and MCSO personnel to address pressing concerns. Where possible, District personnel will include MCSO personnel from non-patrol units in the program's implementation to ensure different MCSO personnel are exposed to the community's feedback.

2.     *Educational programs*

MCSO personnel—in the District and across the County—have a wealth of experience that District personnel will leverage to educate the community on topics of interest to the community. For example, District personnel could partner with a school (principal/teachers/PTO) with personnel specializing in internet crimes to present to students.

3.     *Newsletters and social media*

4.     *Responding through Listening Sessions*

The district-level meetings with community members and listening sessions are important activities, as are the deputies' consistent positive contacts with community members. Community engagement is achieved through dedication to a long-term relationship-building process. Positive interactions lead to higher levels of trust and humanize both deputies and the community.

District personnel will attend regularly-scheduled **district listening sessions** to report back to the community about steps taken to address their concerns. However, if practical or possible, communication should occur as soon as possible. For instance, if the community being served has other means of communication, such as community newsletters, social media sites such as Nextdoor, or a community e-mail, progress and/or status should be reported as soon as possible. For community members who share their contact information, follow up will be done via the method selected.

District personnel will also connect information from non-patrol units to the community in the patrol districts. For example, District personnel can bring investigators to listening sessions if a particular topic is likely to be covered based on prior sessions. Or MCSO can bring individuals from other government and social services agencies to listening sessions to provide information to the community. By regularly engaging

the community in listening sessions and relaying MCSO's response to the community, the District seeks to build the community's trust.

5.    *Responding through scheduled follow-up meeting, call, or email*

In all cases, follow-up dialogue as to what the division or its individual personnel are doing to resolve the situation, or address an issue, should occur as soon as practical or possible, informing the community or a community member of the status.

## Step 4: District-Specific Training

The District will work with the Training Division to engage outside experts to provide District personnel with advanced officer training on community policing-related topics, such as interpersonal communications and problem-solving skills. This training will include personnel at all ranks, and it will initially focus on the community policing philosophy and the planning process for developing and implementing District-specific community engagement strategies. The goal is for deputies to have the tools necessary to listen and respond to the community's needs with a problem-solving skillset.

## Step 5: Evaluating Progress

The Office will pilot this community policing model in District 6 on April 29, 2019. As Milestones are reached, the Office will prepare additional Districts for expansion of the program. The Office will evaluate the progress of implementing this model based on the following measurables:

A.    Milestones

Each milestone will entail a qualitative and quantitative assessment of the Pilot District's progress. These Milestones focus on the District-Specific Community Engagement Strategies because the effectiveness of those opportunities to listen and respond forms the backbone of the community policing model.

1. The District will be able to hold consistent District Advisory Board meetings (i.e., consecutive meetings attended by Board members) during the year.

2. The District will hold at least one community-based program initiated by feedback from the District Advisory Board/community leaders per year.

3. The District will hold at least one District Open House annually.

4. The District will hold at least one community-based program initiated by feedback from the community to a rank-and-file deputy annually.

5. The District's deputies will receive training on community policing-related topics based on community feedback.

6. District Command, District Sergeants, and at least one member from each squad will attend at least one regularly scheduled community listening session every six months.

7. Other Milestones as identified by the District Advisory Board, such as:

- How much time did the district spend on community policing overall? (compare to previous time periods once first assessment is conducted)

- What is the average time per deputy spent on community policing? (compare to previous time periods once first assessment is conducted)

- How many community events did deputies attend? (compare to previous time periods once first assessment is conducted)

- How many actionable items were identified in board meetings and listening sessions? (compare to previous time periods once first assessment is conducted)

- How long did it take to act upon actionable items identified? (compare to previous time periods once first assessment is conducted)

- Initiating an award for deputies in each district that exceed expectations.

B.    Periodic Needs Assessments

Districts will periodically (e.g., annually) perform the Community Needs Assessment to determine whether the strengths, weaknesses, opportunities, and challenges have persisted or changed in order to alter the District's approach. As before, the assessment will involve the community and District personnel.

**III.    Process for expanding the Community Policing Model beyond the Pilot District—and the Pilot District's continuing role in innovation.**

### A.    Expanding the Community Policing Model

As District 6 achieves the Milestones, the MCSO will identify the next patrol district to adopt the Community Policing Model, and the process will repeat itself, considering the lessons learned from District 6. The MCSO will consider feedback from the community and MCSO personnel on the selection of the first expansion District. The Pilot District will deliver 30-day assessments that will be incorporated as the Model rolls out to the next District.

There is no one-size-fits-all community policing program, certainly not in a county as large and diverse as Maricopa County. Each district will have their own nuances, but the MCSO will apply these same concepts and ideas across the County to the communities it serves. In particular, MCSO will work to develop sustainable concepts and ideas that reach the County's most rural areas to ensure that community members in those locations have a voice in MCSO's provision of service.  Board members from different districts will meet on a set schedule to compare notes on what is working and what is not.  The Sheriff or his designee will attend these all-district board meetings along with other members of executive staff and district personnel.

### B.    The continuing relevance of the Pilot District

As the expansion District (and other Districts) adopts the Community Policing Model, MCSO personnel in the Pilot District will serve as peer leaders on the implementation of community policing—just as COrD currently serves as in-house

consultants on community engagement. Command in the first expansion District will identify personnel interested in or well-suited to community policing to meet with District 6 personnel about the strengths, weaknesses, opportunities, and challenges of the Model—and to learn firsthand about its benefits. Over time, District Command in all patrol districts will assign sworn personnel to work together to share information about the implementation of the Community Policing Model.

**Maricopa County Sheriff's Office**

Accomplishments under previous versions of the Constitutional Policing Plan

## Goal 1: Implementing an effective Early Identification System with supervisor discussions

Under this Goal, the Maricopa County Sheriff's Office ("MCSO") refined the process of delivering non-disciplinary conversations and interventions between patrol deputies and supervisors to promote fair and impartial policing. In Fall 2017, the MCSO piloted these discussions with two groups of deputies. The MCSO then made improvements to the process based on deputy and supervisor feedback. In Spring 2018, the MCSO completed the supervisory discussions and implemented action plans based on the second annual traffic stop analysis report. In 2018, the MCSO further refined the supervisory discussion process based on feedback from all stakeholders.

Also under this Goal, the MCSO delivered training on the Early Identification System to supervisors by the end of 2017. And beginning in 2017, with improvements during 2018, the MCSO implemented a Compliance Bureau liaison program to address supervisors' questions about the Early Intervention System, among other topics. Based on supervisor feedback, the MCSO has made some changes to the Early Intervention System, including additional review conducted by BIO Command and closure of alerts prior to division review when deemed appropriate, one on one action plan development with supervisors and commanders, traffic stop review sessions with supervisors and commanders who have deputies with alerts specific to traffic stop activity, mentoring sessions when supervisors demonstrate difficulty in documenting interventions utilized for alerts, and ongoing development of several workgroups in other areas of interest.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan. Moving forward, the MCSO will continue working to improve the Early Identification System and supervisor discussions consistent with Paragraphs 72 through 81.

**Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process.**

The work under this Goal followed the MCSO's publication of a new Employee Performance Appraisal ("EPA") policy in 2017. That year, the MCSO trained supervisors on the use of the new EPA format. Since Fall 2017, Enforcement Deputy Chiefs and Commanders have returned EPAs lacking specific information to supervisors for correction. Since 2017, Enforcement Commanders have also provided guidance and sample exemplary EPAs during monthly Captains' Meetings to ensure that Blue Team notes and EPAs contain adequate information tied to deputy outcomes.

As explained below, the MCSO is adding a metric to the EPA evaluating a subordinate's service to the community. At present, the MCSO is revising the EPA format to better meet supervisors' needs, consistent with the Order and the MCSO's values.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan. The MCSO will continue working on the Employee Performance Appraisal system consistent with Paragraphs 98 through 100, including the addition of a component on community engagement to ensure accountability with the MCSO's Community Policing Philosophy.

**Goal 3: Delivering enhanced implicit bias training**

Under this Goal, beginning in 2017, the MCSO's Training and Development Division sought contributions from the community to improve the annual implicit bias training as part of its Annual Combined Training. For example, the MCSO recorded interviews with a Kenyan refugee and a member of the Hispanic Advisory Board to discuss their experience with law enforcement; those interviews were shown during training and discussed by training participants as part of the lesson plan. In 2017, a member of the Community Advisory Board and a member of the LGBTQ Advisory Board attended the Annual Combined Training train-the-trainer event to provide feedback. The MCSO incorporated that feedback from those attendees into the 2018 Annual Combined Training. For example, the 2017 Annual Combined Training incorporated a participatory Implicit Association Test into the training material. In 2018, the MCSO developed the 2018 Annual Combined Training with feedback from the Sheriff's Advisory Boards, including the Community Advisory Board and the African-American Advisory Board, to enhance the implicit bias training.

In 2018, the MCSO also contracted with a third-party expert to deliver enhanced implicit bias training as part of the 2018 Annual Combined Training. The MCSO contracted with the vendor after piloting the training with members of the MCSO from all ranks in Fall 2018.

The MCSO continues to work on delivery of a History of Discrimination in Maricopa County video. The purpose of the video is to combine historical knowledge about racism and discrimination in the Valley with community perspectives on policing, so that deputies understand the impact past and current history of discrimination has on the community. Unfortunately, this project has taken longer than the MCSO anticipated. The Training and Development Division has worked diligently to produce the video, meeting with historians and community members to understand the role of discrimination in Maricopa County's history, but there is not a final product yet. The MCSO remains committed to this important project, and will continue to work on this project under Paragraph 49 for delivery as part of the 2019 Annual Combined Training, another appropriate training vehicle, or a stand-alone training.

Beginning in 2018, the MCSO sought to build a bank of videos housed in the Training and Development Division that discuss the impact of implicit bias on decision-making for use in supervisors' roll call briefings. To date, two of those roll call briefings have been delivered. However, finding appropriate source material for these roll call briefings has proven difficult, and the Training and Development Division's work continues.

Beginning in Fall 2017, the MCSO carved out time during the Captains' Meetings for Enforcement Commanders to discuss successful and unsuccessful strategies to address implicit bias topics. The monthly Captains' Meetings have included discussion of successful measures, including self-awareness of our own biases through taking implicit bias tests / training / continued education, involvement in the community, and encouraging open discussion about the topic. In one meeting, a guest speaker from the NAACP was brought in to lead the discussion. The discussions have also addressed defensiveness in admitting that we all have bias. These discussions about implicit bias and cultural competency at monthly Captains' Meetings are part of a larger discussion during those meetings about understanding implicit bias, cultural competency, and fair and impartial policing.

The MCSO completed the tasks under this Goal involving delivery of enhanced implicit bias training by an outside expert, Captains' Meetings, and the development of the Annual Combined Training from the prior version of the Constitutional Policing Plan. The MCSO continues to work on the aspects of this Goal involving the History of Discrimination in Maricopa County and the roll call briefing bank consistent with Paragraph 49(i).

**Goal 4: Enhanced fair and impartial decision-making training.**

The work under this Goal addresses lawful factors to rely on when taking discretionary law enforcement action and the importance of the guardian mindset. As discussed above, fair and impartial decision-making was part of the discussions at monthly Captains' Meetings, along with the topics of implicit bias and cultural competency. For example, the discussions addressed the need to be involved in the community to become familiar with different cultures to assist in impartial discretionary decision-making and understand that not everyone responds to law enforcement the same way.

The MCSO developed a roll call briefing to address the issue of certain deputies improperly marking a driver's post-stop race/ethnicity as "white" when the body worn camera recording and the context (i.e., driver's surname) indicates the driver is Latino, and delivered that roll call briefing in November 2017. Following up on the roll call briefing, the Bureau of Internal Oversight developed an inspection to address this issue.

In 2018, the MCSO began to develop a roll call briefing on consent searches. However, the roll call format was deemed unsuitable to address consent searches because the material is legal in nature and, under the Order, must be delivered by an attorney. Further, the results of Bureau of Internal Oversight inspections and supervisory feedback indicate that more holistic training is needed on the types of searches, circumstances under which they are lawful, and means of recording searches on the Vehicle Stop Contact Forms. The MCSO is committed to developing and delivering that specific training consistent with Paragraph 51.

In the meantime, the 2018 Annual Combined Training used feedback from all stakeholders to improve the training on searches, to include a video-based activity that asked participants to think critically about the type of searches. The 2018 Annual Combined Training's learning activities also emphasized fair and impartial decision-making in the context of real-life court cases. The MCSO's training continues to integrate Fourth Amendment case law with the principles of fair and impartial policing.

In 2018, the MCSO published its policies on the MCSO's website to increase transparency to signal to deputies the importance of viewing the community as a partner in the MCSO's operations.

The MCSO completed the tasks under this Goal involving Captains' Meetings, Annual Combined Training, and posting policies on the MCSO's website from the prior version of the Constitutional Policing Plan. The MCSO continues to work on the aspects of this Goal involving search training consistent with Paragraphs 49(j).

**Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing.**

Under this Goal, in 2017 the MCSO revised the Annual Combined Training to include recorded interviews with a Kenyan refugee and a member of the Hispanic Advisory Board about their experiences and perspectives encountering law enforcement. The MCSO also included a section of training specific to understanding the experience new immigrant communities have when contacted by or making contact with law enforcement. In 2018, the MCSO reached out to community members and the Sheriff's Advisory Boards, including the Community Advisory Board, to revise the 2018 Annual Combined Training to include a focus on cultural competency on the Latino community. The MCSO is currently delivering that training. Consulting the community and the Sheriff's Advisory Boards is a routine part of the process for developing the cultural competency component of the Annual Combined Training. The MCSO continues to seek outside community partners to develop a bank of videos on cultural competency for use in roll call briefings.

As stated above, cultural competency topics were addressed at monthly Captains' Meetings, in particular the need for deputies to understand community perspectives on policing and how those perspectives may differ between cultures. Further, the MCSO continues to work with the Sheriff's Advisory Boards to discuss community perspectives on policing.

In 2018, the Community Outreach Division helped develop the Neighborhood Watch in various communities. Also beginning in 2018, the MCSO's Training and Development Division developed a process for incorporating greater cultural competency training and understanding of community perspectives on policing through the Field Training program.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan, and MCSO will continue working on delivering enhanced training on cultural competency and community policing consistent with Paragraph 49(m).

**Goal 6: Improving traffic stop data collection and analysis.**

The MCSO has a robust system of traffic stop data collection. After each traffic stop annual report in 2017 and 2018, the MCSO has acted on recommendations for improving data collection, including the automated collection of data from TraCS, data verification within the Early Intervention System to track repeated data entry errors by staff, and the ability of supervisors to reject TraCS forms or initiate changes when errors are discovered during the routine review/approval of TraCS forms. Toward that end, the MCSO has a weekly traffic stop data analysis that seeks to improve data validation.

Additionally, the MCSO has incorporated feedback from Patrol Commanders into additional mechanisms available to capture deputy decision-making. And, based on the responses to the traffic stop annual reports in 2017 and 2018, the MCSO's Bureau of Internal Oversight and supervisors encourage and in some circumstances require deputies to use the open field on the Vehicle Stop Contact Form to better understand deputy decision-making.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan, and MCSO will continue working on revisions to the Vehicle Stop Contact Form consistent with Paragraph 54 through 57.

**Goal 7: Encouraging and commending employees' performance and service to the community.**

Under this Goal, the MCSO has emphasized the need for deputies to understand the community's perspective on public safety. In 2017, the MCSO established a Computer Aided Dispatch code to track deputy involvement in community engagement. The MCSO also established a High Level Commendation for service to the community, community outreach, and leadership to promote community safety.

To better track deputy involvement in the community, the Community Outreach Division developed a deputy worksheet to uniformly document community engagement. The MCSO also implemented a process for documenting service to the community in the supervisors' Blue Team application.

The MCSO also expanded the introduction to community engagement at the academy level through a presentation on service to the community through non-enforcement interactions.

Finally, the current version of the Constitutional Policing Plan emphasizes these principles by establishing a community-policing model in a pilot district to improve the MCSO's responsiveness to the needs of the community.

The MCSO completed the tasks under this Goal involving tracking deputy engagement with the community, establishing a High Level Commendation, and presenting community engagement to the Academy under the prior version of the Constitutional Policing Plan. These prior steps are critical to the success of the Community Policing Philosophy because they ensure accountability. The MCSO will continue working on the tenants of this Goal through the community policing model.

**Goal 8: Studying the Peer Intervention Program.**

In 2017, the MCSO formed a task force to study the application and implementation of the New Orleans Police Department's EPIC program—a peer intervention program that seeks to prevent problems before they occur. The task force communicated directly with the New Orleans Police Department to learn about the program. The task force developed and submitted for review a comprehensive analysis of the EPIC program, covering its background, challenges, and a recommendation not to implement the program at the MCSO.

Command accepted the task force's recommendation and continues to evaluate alternatives.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan, and the MCSO will continue to evaluate the appropriateness of a peer-to-peer model under Paragraphs 72 through 81.

**Goal 9: Building a workforce that provides constitutional and community-oriented policing and reflects the community we serve.**

Under this Goal, the MCSO examined its hiring and retention of personnel that reflect the MCSO's values and the diversity of Maricopa County. In 2017, the MCSO examined programs that support multilingual employees, finding that its incentives are generally competitive compared to other local municipalities.

In Fall 2018, the MCSO developed and implemented an internal survey. The intent of the survey was to measure opinions from employees on a variety of factors related to their employment with MCSO. While the majority of questions intended to solicit feedback on employees' engagement level, MCSO asked about the employee's understanding of the role they play in MCSO reform efforts. MCSO also asked open-ended questions to get additional input to supplement their survey responses. Nearly 1900 employees responded. The Sheriff and Executive Command are currently addressing the findings of that internal survey by working with HR to identify common themes from which to focus and develop specific recommendations.

Since 2017, the MCSO has also improved its recruitment strategy. The MCSO initiated a recruitment plan using an outside marketing firm that included a 3-month interim digital recruitment campaign specific to detention officers. Based on that experience, the MCSO is expanding its recruitment efforts to sworn law enforcement and civilian employment opportunities. The outside marketing firm has assisted with branding and developing the full advertising campaign, which is scheduled to be launched soon.

In addition to the recruitment campaign, MCSO has also implemented strategies to streamline hiring for detention officers and deputy trainees centered around candidate engagement. Interviews and pre-employment testing (deputy trainee) are occurring more frequently to ensure a viable pipeline of candidates is continuously moving through the selection process. Throughout this process, the core values of MCSO are reinforced with candidates to ensure they are aware and reflect the expectations of the Office.

The MCSO completed the tasks under this Goal from the prior version of the Constitutional Policing Plan. The Sheriff remains committed to hiring candidates who are committed to the values of the Office and reflect the diversity of the community the MCSO serves.